UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | : | Civil Action No. 22-2632 (JMV) (CLW) |
| | : | Honorable Cathy L. Waldor |
| Plaintiff, | | United States Magistrate Judge |
| | : | |
| v. | | Oral Argument Requested |
| | : | |
| | | (Electronically Filed Document) |
| SAVE ON SP, LLC, | : | |
| Defendant. | : | |

**PLAINTIFF JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.'S BRIEF IN OPPOSITION TO SAVE ON SP, LLC'S MOTION TO PARTIALLY STAY DISCOVERY**

PATTERSON BELKNAP WEBB
    & TYLER LLP
Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
aamangi@pbwt.com
hsandick@pbwt.com
globiondo@pbwt.com

SILLS CUMMIS & GROSS P.C.
Jeffrey J. Greenbaum
Katherine M. Lieb
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
jgreenbaum@sillscummis.com
klieb@sillscummis.com

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................... 3

LEGAL STANDARD.................................................................................................... 5

ARGUMENT ................................................................................................................. 6

I.      SAVEONSP'S MOTION TO DISMISS DOES NOT WARRANT A STAY ................... 6

II.     EACH OF THE RELEVANT FACTORS WEIGHS IN FAVOR OF DENYING
        SAVEONSP'S REQUEST TO STAY DISCOVERY.......................................... 9

        A.      Allowing Discovery to Proceed Would Not Create a Clear Case of
                Hardship or Inequity for SaveOnSP ................................................ 9

        B.      Staying Discovery Would Unduly Prejudice JJHCS ............................. 12

        C.      Staying Discovery Would Undermine the Interests of Both the Court
                and the Public.......................................................................... 13

        D.      The Remaining Factors All Weigh Against Staying Discovery ............ 15

III.    THE COURT SHOULD REJECT SAVEONSP'S PROPOSED
        "COMPROMISE" AND SCHEDULE A RULE 16 CONFERENCE ............................ 16

CONCLUSION.......................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Actelion Pharms., Ltd. v. Apotext Inc.*,
  2013 WL 5524078 (D.N.J. Sept. 6, 2013) ...............................................................8

*Akishev v. Kapustin*,
  23 F. Supp. 3d 440 (D.N.J. 2014) ...........................................................................10

*Benak v. Alliance Capital Mgmt. L.P.*,
  345 F.3d 396 (3d Cir. 2006)....................................................................................15

*Castro v. Sanofi Pasteur, Inc.*,
  2012 WL 12918261 (D.N.J. July 18, 2012).................................................5, 8, 9, 13

*Cipollone v. Liggett Group, Inc.*,
  785 F.2d 1108 (3d Cir. 1986)..................................................................................10

*Coyle v. Hornell Brewing Co.*,
  2009 WL 1652399 (D.N.J. June 9, 2009) ..................................................................5

*Gerald Chamales Corp. v. Oki Data Ams., Inc.*,
  247 F.R.D. 453 (D.N.J. 2007).....................................................................6, 7, 11, 13

*In re Motions for Access of Garlock Sealing Techs. LLC*,
  488 B.R. 281 (D. Del. Mar. 1, 2013) ......................................................................15

*Kiley v. Tumino's Towing, Inc.*,
  2019 WL 2432121 (D.N.J. June 10, 2019) ...................................................... *passim*

*Kollar v. Allstate Insurance Company*,
  2017 WL 10992213 (D. Conn. Nov. 6, 2017) .........................................................11

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936).............................................................................................6, 9

*Maher Terminals, LLC v. Port Auth.*,
  2013 WL 2253532 (D.N.J. May 22, 2013) ..................................................... *passim*

*Morgan v. Quest Diagnostics Inc.*,
  2020 WL 7183503 (D.N.J. June 8, 2020)...........................................5, 12, 15, 16

*Pfizer Inc. v. Johnson & Johnson*,
  2018 WL 1071932 (E.D. Pa. Feb. 27, 2018) .............................................................9

*Pfizer, Inc. v. United States Dep't of Health & Human Servs.*,
    42 F.4th 67 (2d Cir. 2022) .......................................................................................3

*Shire US, Inc. v. Allergan, Inc.*,
    2018 WL 10152305 (D.N.J. June 8, 2018) ..................................................... *passim*

*Skoorka v. Kean Univ.*,
    2019 WL 4509294 (D.N.J. Sept. 19, 2019) ..........................................5, 9, 13, 14

*Thompson v. Warren*,
    2015 WL 3386487 (D.N.J. May 26, 2015) ...............................................................5

*Trusted Transp. Sols., LLC v. Guar. Ins. Co.*,
    2018 WL 2187379 (D.N.J. May 11, 2018) .........................................................13

*Udeen v. Subaru of Am., Inc.*,
    378 F. Supp. 3d 330 (D.N.J. 2019) ............................................................... *passim*

*Vanderwerff v. Quincy Bioscience Holding Co.*,
    2018 WL 6243040 (D.N.J. Nov. 28, 2018) ..............................................................6

*Williams v. Oriental Bank*,
    2022 WL 392544 (D.V.I. Feb. 9, 2022).................................................................11

**Other Authorities**

Local Rule 16.1 .....................................................................................................5

Fed. R. Civ. P. 16 ......................................................................................... *passim*

Fed. R. Civ. P. 26 ......................................................................................... *passim*

Annabelle Gurwitch, "Tackling cancer while battling the insurance system,"
    Washington Post (Sept. 9, 2022).........................................................................14

## PRELIMINARY STATEMENT

SaveOnSP asks this Court to delay the discovery that will expose the full extent of its scheme to seize patient assistance funds for its own benefit and the benefit of its insurance industry partners. That request should be summarily denied. Motions to stay discovery pending a motion to dismiss are widely disfavored in this District and routinely denied. To prevail, SaveOnSP would have to "demonstrate a clear case of hardship or inequity in being required to go forward." SaveOnSP has failed to satisfy this burden. To the contrary, granting a stay would prejudice JJHCS and extensively delay the resolution of this case of public importance.

SaveOnSP focuses on the fact that it has filed a motion to dismiss, but that is not enough to stay discovery. Courts in this District typically refuse to engage on the merits of a pending motion to dismiss when considering a stay application, and will consider the underlying merits only when it is "clear and unmistakable" that the motion to dismiss will be granted. That is certainly not the case here. SaveOnSP's motion is predicated entirely on disputed facts that cannot be considered on a motion to dismiss, along with a spurious preemption argument. In these circumstances, requiring a well-funded corporate entity like SaveOnSP to engage in discovery would not impose "a clear case of hardship." Otherwise discovery would be stayed in virtually every case in which a motion to dismiss is filed.

Staying discovery would, however, significantly prejudice JJHCS's right to timely prosecute its claims. And JJHCS is not the only party with an interest in getting these claims efficiently resolved. As reflected by recent amicus filings on the motion to dismiss—by a variety of patient advocacy groups and the trade group representing pharmaceutical manufacturers—this case implicates the interests of patients and the entire pharmaceutical industry. JJHCS's complaint sets forth in detail how SaveOnSP's scheme is actively harming patients by increasing

their overall healthcare costs, and jeopardizing continuation of the manufacturer-provided patient assistance funds that SaveOnSP is diverting. Indeed, SaveOnSP's scheme and the harm it does to patients was the focus of a scathing Op-Ed by a cancer patient published in the Washington Post just three days ago. As the Court itself recognized during the recent teleconference, "this is a case of public interest." For this reason too, this case should not sit still while a motion to dismiss is pending. Indeed, the prejudice to JJHCS and interested third parties from a stay would be especially acute here given the lingering effects of the judicial shortage in this District. The Court noted during the recent teleconference that the "extremely backed up" motion list means that the motion to dismiss might not be resolved for "potentially [] a year or eighteen months." Discovery must proceed now so that the case can proceed promptly towards trial once the motion to dismiss is resolved.

The Court should also reject SaveOnSP's proposed "compromise," as set forth in the proposed order attached to its motion. That proposal would have the parties work out a protective order, serve initial demands, and engage in preliminary negotiations regarding the scope of discovery, but would relieve SaveOnSP from producing *any documents* until after its motion to dismiss is resolved. This is not a "partial" stay of discovery in any material sense, because it would prevent any meaningful discovery from taking place. Notably, SaveOnSP rejected JJHCS's proposed compromise, which would have deferred depositions for at least five months to allow time for the resolution of the motion to dismiss while ensuring that document discovery gets underway immediately.

Finally, SaveOnSP's proposed order also includes a detailed set of deadlines and other discovery parameters unilaterally decreed by SaveOnSP. The federal rules and the local rules require the parties to negotiate these details under the supervision of the Court at the Rule 26(f)

and Rule 16 conferences—the very process SaveOnSP has refused to engage in and has steadfastly obstructed for months.  Rather than permit SaveOnSP to dictate its preferred case schedule, the Court should deny SaveOnSP's motion to stay discovery and set a date for a Rule 16 conference, so that the parties can begin the conferral process and propose a schedule.

## BACKGROUND

On May 4, 2022, JJHCS brought this case seeking damages and an injunction barring an unlawful scheme by SaveOnSP to exploit JJHCS's patient assistance program ("CarePath"), which provides funds to help patients afford their medication.[1]  The Complaint alleges that SaveOnSP captures this ***patient*** assistance and redirects those funds to enrich itself and its partners in the health insurance industry.  ECF 1.  SaveOnSP's scheme also prevents these copay assistance funds from contributing to patients' deductibles and maximum out-of-pocket costs, causing patients' overall healthcare costs to rise.  SaveOnSP's misconduct thus not only harms JJHCS (whose damages are in excess of $100 million)—it also harms the patients that JJHCS serves.  *Id.* ¶¶ 11-13, 60-63, 74-78, 88, 89-99, 114; *see also* ECF 34 at 8-10, 29-35.  Resolution of this case will affect far more than just JJHCS's and SaveOnSP's bottom lines.

Given the public interest at stake, JJHCS has diligently sought to advance this case from its inception, including by serving document requests on the same day it served its Complaint,

---

[1] SaveOnSP again attempts to impugn patient assistance programs such as CarePath by citing to a case holding that another manufacturer could not offer patient assistance to help defray Medicare beneficiaries' copays.  *See* Br. at 1 (citing *Pfizer, Inc. v. United States Dep't of Health & Human Servs.*, 42 F.4th 67 (2d Cir. 2022).  That holding is completely beside the point here because CarePath, by its very terms, cannot be applied to federal healthcare programs such as Medicare.  *See* Compl. ¶ 48 (patients using CarePath "must be enrolled in commercial or private health insurance (not, for example, Medicare).").  SaveOnSP's further suggestion that CarePath exists to discourage patients from using other drugs is equally misleading, since as SaveOnSP knows, doctors make prescription decisions, not patients; and in any event many of Janssen's drugs are biologics that do not have generic or "biosimilar" competitors.  Compl. ¶¶ 33, 34 & n.6.

and by promptly seeking a Rule 26(f) conference.[2]  After SaveOnSP refused to participate in a Rule 26(f) conference, JJHCS asked the Court to set a Rule 16 conference.  ECF 25.  The Court held a teleconference on August 16, 2022, at which it ordered SaveOnSP to file the instant motion to stay discovery, and encouraged the parties to consider potential compromise resolutions.  ECF 44.

Following that teleconference, the parties conferred regarding a possible compromise pending resolution of SaveOnSP's motion to dismiss.  *See* ECF 45-6 (August 19, 2022 emails between counsel).  JJHCS proposed that the parties begin document discovery with the goal of substantially completing document production within five months—a perfectly reasonable and attainable goal—while holding off on fact depositions during that period in view of the pending motion.  *Id.*  At no point did JJHCS propose to take "expedited" discovery, as SaveOnSP claims in its brief.  JJHCS's proposal aimed to get document discovery underway immediately while holding off on further steps for a number of months while the motion was pending.  *Id.*

SaveOnSP rejected this proposal outright, and made clear that it "would not agree to the production of documents or depositions until the court decides the motion to dismiss."  *Id.*  Instead, SaveOnSP signaled that it would agree only to negotiation of a protective order and ESI protocol, an exchange of initial disclosures and documents requests, and conferral regarding the scope of each side's collection and production (*i.e.*, search terms, custodians, etc.).  *Id.*  In other words, SaveOnSP's proposed "compromise" would allow it to defer production of any documents—by far the most time-intensive aspect of discovery—indefinitely.

---

[2] SaveOnSP faults JJHSC for serving its document requests so promptly.  Br. at 3.  This is an odd complaint.  It is unclear how SaveOnSP could possibly be prejudiced by receiving early notice of JJHCS's requests, especially given that the clock still has not begun to run on them (because SaveOnSP still refuses to participate in a Rule 26(f) conference).

## LEGAL STANDARD

Courts "generally do not favor granting motions to stay discovery." *Kiley v. Tumino's Towing, Inc*., 2019 WL 2432121, at *2 (D.N.J. June 10, 2019) (quoting *Thompson v. Warren*, 2015 WL 3386487, at *2 (D.N.J. May 26, 2015)).  This is "because when discovery is delayed or prolonged it can create case management problems which impede the court's responsibility to expedite discovery and cause unnecessary litigation expenses and problems." *Id.*; *see also Coyle v. Hornell Brewing Co.*, 2009 WL 1652399, at *3 (D.N.J. June 9, 2009) (stays of discovery "are not preferred"); *Castro v. Sanofi Pasteur, Inc.*, 2012 WL 12918261, at *1 (D.N.J. July 18, 2012) ("[M]otions to stay discovery are not favored.").[3]

Rule 26(c) therefore imposes a high burden on SaveOnSP: a stay is warranted "***only*** when there is a showing of 'good cause.'" *Skoorka v. Kean Univ.*, 2019 WL 4509294, at *5 (D.N.J. Sept. 19, 2019) (emphasis added); *see also Maher Terminals, LLC v. Port Auth.*, 2013 WL 2253532, at *3 (D.N.J. May 22, 2013) (the "burden rests squarely" on the moving party to show good cause); *Kiley*, 2019 WL 2432121, at *2 (same).  Without citing any authority, SaveOnSP claims that the "good cause" standard "does not apply here" because "discovery has not commenced."  Br. at 8.  This is wrong.  Courts routinely apply Rule 26(c)'s "good cause" standard where, as here, discovery has not yet begun.  *See Maher Terminals*, 2013 WL 2253532, at *1-2 (denying motion to stay discovery for lack of "good cause" that was filed in response to the court's "direction to commence immediate disclosure and discovery"); *Morgan v. Quest Diagnostics Inc.*, 2020 WL 7183503, at *1 (D.N.J. June 8, 2020) (applying "good cause"

---

[3] SaveOnSP ignores this case law entirely, and instead points out that Local Rule 16.1(a)(1) affords the Court the option of deferring an initial conference "due to the pendency of a dispositive or other motion."  Br. at 7.  This provision is irrelevant to resolution of this motion. The question currently before the Court is whether to ***stay discovery***, not whether the Court has discretion over when to schedule a Rule 16 conference.

standard and denying request that "no discovery should occur before the Court issues a decision on the motion to dismiss"); *Shire US, Inc. v. Allergan, Inc.*, 2018 WL 10152305, at *1 (D.N.J. June 8, 2018) (same). To meet its burden to show good cause, SaveOnSP "must demonstrate 'a ***clear case of hardship or inequity*** in being required to go forward, if there is even a fair possibility that the stay will work damage to someone else.'" *Kiley*, 2019 WL 2432121, at *2 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)) (emphasis added); *see also Vanderwerff v. Quincy Bioscience Holding Co.*, 2018 WL 6243040, at *3 (D.N.J. Nov. 28, 2018) (same). As set forth below, SaveOnSP has failed to meet that high burden.

## ARGUMENT

## I.    SAVEONSP'S MOTION TO DISMISS DOES NOT WARRANT A STAY

Rather than demonstrate how it would suffer a "clear case of hardship or inequity" if discovery proceeds, SaveOnSP devotes most of its brief to arguing that it should be relieved of participating in discovery altogether because its motion to dismiss is "likely to dispose of JJHCS's claims." Br. at 8-10. According to SaveOnSP, because its pending motion "could eliminate the need for discovery," the Court should prohibit discovery from proceeding at all. *Id.*

This argument is dead on arrival: it "is well settled that the mere filing of a dispositive motion does not constitute 'good cause' for the issuance of a discovery stay." *Kiley*, 2019 WL 2432121, at *2 (D.N.J. June 10, 2019) (citation omitted); *see also Udeen v. Subaru of Am., Inc.*, 378 F. Supp. 3d 330, 332 (D.N.J. 2019) (the "mere filing of a motion to dismiss does not stay discovery"); *Gerald Chamales Corp. v. Oki Data Ams., Inc.*, 247 F.R.D. 453, 455 (D.N.J. 2007) (rejecting defendant's argument that discovery should "be stayed pending the decision on its dispositive motion" because that "is not the law"); *Vanderwerff*, 2018 WL 6243040, at *3 (same).

In fact, courts in this District generally ***refuse to consider the merits*** of a pending dispositive motion when assessing whether the movant has met its burden to show hardship and good cause. *Gerald Chamales Corp. v. Oki Data Ams., Inc.* is particularly illustrative. 247 F.R.D. 453 (D.N.J. 2007). There, the defendants argued—just as SaveOnSP argues here—that discovery should be stayed because they had "made a strong showing [that] plaintiff's claim is unmeritorious" in their pending motion. *Id.* at 454 (internal quotation marks omitted). The Magistrate Judge rejected this argument, and "decline[d] to weigh in on the merits of defendants' motion," which was to "be decided by the District Judge, not this Court." *Id.* The court then identified the exceedingly narrow circumstance in which the merits of a pending dispositive motion might warrant a stay: where the court "***conclude[s] that there is only one result that could be reached***." *Id.* (emphasis added). "In the absence of a ***clear and unmistakable result***" in the defendants' favor, however, "the issuance of a protective order should [not] depend upon" a magistrate judge's "prediction of how the District Judge will decide defendants' dispositive motion." *Id.* (emphasis added).

Here, SaveOnSP has not come anywhere close to demonstrating "clearly and unmistakably" that it will win its motion to dismiss.[4] Staying discovery in these circumstances merely because SaveOnSP believes its motion to dismiss is "well-founded" (Br. at 9) would run afoul of a long line of cases rejecting this exact argument. *See, e.g.*, *Shire US, Inc. v. Allergan, Inc.*, 2018 WL 10152305, at *1 (D.N.J. June 8, 2018) ("I decline to weigh-in on the merits of the motion to dismiss. Issuance of a protective order based on the merits of a dispositive motion is

---

[4] SaveOnSP's brief rehashes at length its various motion to dismiss arguments. JJHCS does not respond to those merits arguments here because, as noted above, they are irrelevant to resolution of SaveOnSP's motion to stay. JJHCS respectfully refers the Court to its opposition to SaveOnSP's motion to dismiss, where it has fully addressed these merits arguments, to the extent the Court wishes to assess them. *See* ECF 34.

only appropriate when the result of that motion is 'clear and unmistakable.'") (citation omitted); *Castro*, 2012 WL 12918261, at *2 (motion to dismiss irrelevant to resolution of stay motion because the "Court [is] unable to find on the record before it that there is a 'clear and unmistakable result' that the Court could reach on the cross-motions to dismiss."); *Maher Terminals*, 2013 WL 2253532, at *3 ("[I]t is clear to this Court upon its review of the motion to dismiss that the motion does not dictate a 'clear and unmistakable result' for either party; consequently, this Court cannot justify granting a stay of discovery.").

SaveOnSP disregards this law entirely, and instead points to a handful of decisions that looked to "whether the pending dispositive motion … appear[s] to be without foundation in law." Br. at 8 (quoting *Actelion Pharms., Ltd. v. Apotext Inc.*, 2013 WL 5524078, at *3 (D.N.J. Sept. 6, 2013)). Such decisions are clearly in the minority, and their logic is not persuasive. If all a movant needed to show to obtain a stay of discovery was that its motion to dismiss was not "without foundation in law," then orders staying discovery would be routine. In reality, they are rare in this District. Moreover, such an approach would nullify the movant's burden to show "good cause," not to mention the well-established rule that "filing of a motion to dismiss does not stay discovery." *Udeen*, 378 F. Supp. 3d at 332. For example, SaveOnSP asks the Court to follow *Burress v. Freedom Mortgage Corporation*, in which discovery was stayed merely because the plaintiff did not file a Rule 11 motion in response to the defendant's motion to dismiss. 2021 WL 2661254, at *4 (D.N.J. May 26, 2021). This bar is so low as to be meaningless, and does not reflect the standard that typically applies in this District. Regardless, nearly all of the cases cited by SaveOnSP are entirely consistent with the rule that a stay "based on the merits of a dispositive motion is only appropriate when the result of that motion is 'clear

and unmistakable'"—a showing SaveOnSP cannot make.  *Shire*, 2018 WL 10152305, at *1 (citation omitted).[5]

## II.    EACH OF THE RELEVANT FACTORS WEIGHS IN FAVOR OF DENYING SAVEONSP'S REQUEST TO STAY DISCOVERY

Courts have consistently rejected SaveOnSP's core argument that its motion to dismiss warrants a stay of discovery in and of itself.  Instead, courts in this District conduct a multi-factor analysis that includes consideration of: whether denial of the stay would create a clear case of hardship or inequity for the moving party; whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; how a stay would impact the interests of the court and the public in a just, speedy, and efficient adjudication of the claims; whether a stay would simplify the issues and the trial of the case; and whether discovery is complete and/or a trial date has been set.  *Udeen*, 378 F. Supp. 3d at 332; *Skoorka*, 2019 WL 4509294, at *5; *Castro*, 2012 WL 12918261, at *1.  As set forth below, each and every factor weighs against granting a stay of discovery.

### A.    Allowing Discovery to Proceed Would Not Create a Clear Case of Hardship or Inequity for SaveOnSP

The central question before the Court is whether SaveOnSP has met its burden to show that allowing discovery to proceed would create a "clear case of hardship or inequity."  *Kiley*, 2019 WL 2432121, at *2 (quoting *Landis*, 299 U.S. at 255).  SaveOnSP does not even try to

---

[5] In *Mann v. Brenner*, for example, the court concluded that the district court did not abuse its discretion in staying discovery pending a motion to dismiss because the plaintiff had already amended the complaint twice before the court dismissed it for facial deficiency under Rule 8. 375 F. App'x 232, 240 (3d Cir. 2010).  In *Eye Care Ctr. of New Jersey, P.A. v. Twin City Fire Ins. Co.*, an insurance dispute, the court stayed discovery because there was a "rapidly developing body of authority" of nearly a dozen cases rejecting identical claims.  2020 WL 7227186, at *2 (D.N.J. Nov. 20, 2020).  The other cases cited by SaveOnSP fare no better. *Pfizer Inc. v. Johnson & Johnson*, 2018 WL 1071932 (E.D. Pa. Feb. 27, 2018), for example, was an antitrust case from the Eastern District of Pennsylvania involving the application of entirely different legal tests.  Such cases have no bearing here.

meet this standard, and instead posits that denial of a stay would "unjustifiably burden" SaveOnSP because if discovery proceeds, it will incur litigation costs that it might theoretically be avoided if its motion to dismiss is granted. Br. at 11. This is not enough. SaveOnSP "must state a clear countervailing interest in order to abridge" JJHCS's "right to litigate," and "the incidental burden and cost of proceeding in [a] litigation falls far short of a clear case of hardship or inequity." *Akishev v. Kapustin*, 23 F. Supp. 3d 440, 447-48 (D.N.J. 2014) (internal quotation marks and citations omitted).

Courts consistently hold that this kind of vague allusion to potentially avoidable discovery costs is insufficient to satisfy the "good cause" standard. In *Kiley v. Tumino's Towing, Inc.*, for example, the defendant argued that a stay would "prevent the parties from spending additional time and money on costly discovery and motion practice that may be wholly unnecessary." 2019 WL 2432121, at *3 (D.N.J. June 10, 2019). The court rejected this argument, reasoning that "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)). Similarly, in *Maher Terminals, LLC v. Port Authority*, the defendant argued—just as SaveOnSP argues here—that "discovery may never be needed at all or at least be substantially narrowed" if its motion were granted, whereas allowing discovery to proceed "would impose a substantial burden" on defendant. 2013 WL 2253532, at *2 (D.N.J. May 22, 2013). The court easily disposed of this argument: "In ***any case*** where a dispositive motion is filed in the early stages of the litigation, the parties might incur discovery costs that ultimately may be rendered unnecessary if the pending dispositive motion is granted." *Id.* at *3 (emphasis added). However, because the movant "d[id] not explain with any specificity why the instant matter is different than any other case in which a dispositive motion has been

filed early," the court declined to stay discovery. *Id.*; *see also Shire*, 2018 WL 10152305, at *2 ("[A]nticipation of expensive discovery is not sufficient to establish undue hardship."); *Gerald Chamales*, 247 F.R.D. at 455 (movant's "broad contentions that plaintiffs will conduct 'costly and time consuming depositions'" were insufficient to show good cause).

SaveOnSP has failed to show how discovery in this case would be different from "any other case" in which a motion to dismiss is filed at the outset of discovery—particularly in this District, where complex litigation involving pharmaceutical companies is commonplace. It argues only that this case would involve "extensive electronic discovery" and that JJHCS has sought a "a large swath of material" via allegedly "sweeping" document requests. Br. at 11. But *all* cases present the possibility of electronic discovery, and concerns about the scope of discovery are present in *every* case—that it what Rule 26(b)'s proportionality standard is for. If SaveOnSP believes that JJHCS's discovery requests are overbroad, it should raise those concerns during the discovery conferral process, rather than try to evade discovery entirely. *See Kollar v. Allstate Insurance Company*, 2017 WL 10992213, at *2 (D. Conn. Nov. 6, 2017) (denying request for stay and explaining that "[t]o the extent that Defendants have concerns about the scope and proportionality of [plaintiff]'s discovery requests, they may seek to address those concerns in the appropriate way: by seeking a discovery conference with the Court"); *Williams v. Oriental Bank*, 2022 WL 392544, at *2 (D.V.I. Feb. 9, 2022) (the "presupposition that Plaintiffs may request irrelevant discovery does not create a clear case of hardship or inequity but refers to a common occurrence in pretrial preparation").

SaveOnSP also attempts to justify a stay by noting that JJHCS seeks "sensitive information" (Br. at 12), but this argument fails for the same reason: any such concerns can be addressed by the negotiation and execution of a protective order. JJHCS has been trying to

confer with SaveOnSP to generate such a protective order for months—but SaveOnSP has refused. The fact that confidential or sensitive information might be produced in this case is irrelevant to whether the Court should take the drastic measure of staying discovery.

## B.    Staying Discovery Would Unduly Prejudice JJHCS

Because SaveOnSP has failed to meet its burden to show a "clear case of hardship or inequity" absent a stay, the Court can deny this motion without reaching whether a stay would unduly prejudice JJHCS. *See Maher Terminals*, 2013 WL 2253532, at *3 (citation omitted). But if the Court does consider prejudice to JJHCS, this factor strongly favors JJHCS. Once a complaint is filed, "plaintiffs have a right to move forward" with their claims. *Udeen*, 378 F. Supp. 3d at 333. Staying discovery prejudices that right, and such prejudice would be particularly acute here. As the Court observed during the August 16, 2022 teleconference, "motion lists are extremely backed up" in this District, such that SaveOnSP's motion to dismiss could take as long as "a year or eighteen months" to resolve. Aug. 16, 2022 Hr'g Tr. (ECF 44) at 24:11-18; *see also id.* at 27:5-10 (noting the possibility that this case could be "two years old" before discovery starts).

SaveOnSP's only response is to speculate that the District Court may decide its motion by the end of March 2023, nearly a year JJHCS after brought this case. Br. at 13. The Court's own assessment of the impact of its backlog is likely more reliable than SaveOnSP's. But regardless, even the "end of March 2023" is almost seven months away. Courts have repeatedly found that delay of even a few months prejudices a plaintiff's "right to promptly take discovery and expedite its case." *Shire*, 2018 WL 10152305, at *1; *see also Udeen*, 378 F. Supp. 3d at 333 (holding that plaintiffs would be prejudiced "while waiting for defendants' motion to be decided" because "given … the expected time it will take for the motion to be decided, the case will be in suspense for months if defendants' request is granted"); *Morgan v. Quest Diagnostics*

*Inc.*, 2020 WL 7183503, at *2 (D.N.J. June 8, 2020) ("[G]iven the judicial emergency in this District, the resolution of the Motion to Dismiss may be many months away," and accordingly, "the delay in proceeding with discovery would unduly prejudice plaintiff and present a clear tactical disadvantage to plaintiff"); *Trusted Transp. Sols., LLC v. Guar. Ins. Co.*, 2018 WL 2187379, at *4 (D.N.J. May 11, 2018) (stay would "unduly prejudice and disadvantage plaintiff" because its "efforts to promptly and efficiently prosecute its case would be hampered" and stay "would substantially delay plaintiff's efforts to diligently proceed to sustain its claim.") (citations and internal quotation marks omitted).

### C.    Staying Discovery Would Undermine the Interests of Both the Court and the Public

Staying discovery would also undermine the Court's interest in moving this case forward to ensure "efficient adjudication of the claims" before it. *Skoorka*, 2019 WL 4509294, at *5. "Magistrate Judges have broad discretion to manage their docket," *Gerald Chamales*, 247 F.R.D. at 454, and it is well within the Court's discretion to deny SaveOnSP's motion to "keep its docket moving," *Castro*, 2012 WL 12918261, at *2 (denying stay because the court "has a responsibility to keep its docket moving to provide litigants with a timely and effective resolution of their claims," whereas "granting a stay would hinder the Court's responsibility to control the disposition of the matter").

At the recent teleconference, the Court noted "how much time" it would "lose in discovery" if it were to issue a stay pending resolution of SaveOnSP's motion to dismiss. Aug. 16, 2022 Hr'g Tr. (ECF 44) at 24:11-18. The Court told the parties that this "practical" consideration would "weigh very heavily" when evaluating SaveOnSP's motion, because "I don't want to get into a case that's two years old and start discovery then." *Id.* at 27:5-10. This is precisely why courts "generally do not favor granting motions to stay discovery": they "create

case management problems which impede the court's responsibility to expedite discovery and cause unnecessary litigation expenses and problems." *Kiley*, 2019 WL 2432121, at *2 (citation omitted). The surest way to avoid these problems is to deny SaveOnSP's motion.

The Court also must consider "the public interest in a just, speedy, and efficient adjudication of the claims." *Skoorka*, 2019 WL 4509294, at *5. Here, denying SaveOnSP's attempt to stall this case would promote the interests of the patients who are being actively harmed by SaveOnSP's tortious and unfair scheme, which involves false denials of coverage causing patients emotional distress, artificially increases patients' overall healthcare costs, and imperils JJHCS's patient copay assistance program. *See* Compl. ¶¶ 11-13, 60-63, 74-78, 88, 114; *see also* ECF 34 at 8-9, 32-35. Numerous patient advocacy groups joined in an amicus brief that explains in detail how patients are harmed by SaveOnSP's conduct. *See* ECF 35-1; *see also* ECF 38-3 (amicus brief filed by association representing country's leading biopharmaceutical companies further detailing how SaveOnSP's scheme undermines the interests of patients). As the Court noted at the recent teleconference "this is a case of public interest." Aug. 16, 2022 Hr'g Tr. (ECF 44) at 24:19-20. Public focus on SaveOnSP's egregious schemes against patients continues to grow and was the focus of a Washington Post Op-Ed published just days ago, in which a cancer patient with Stage 4 lung cancer recounted her "battle" with SaveOnSP.[6] The longer SaveOnSP's scheme is allowed to persist, the longer this harm to patients will continue.

---

[6] Not only was the patient author of the Op-Ed hit with a *$4,445* copay for a single month of cancer medication as a result of SaveOnSP's tactics (which the patient spent "many hours of [her] cancer-shortenedd life span" attempting to recover), but it took her far longer to meet her deductible and out-of-pocket maximum too. *See* Exhibit A, Annabelle Gurwitch, "Tackling cancer while battling the insurance system," Washington Post (Sept. 9, 2022), *available at* https://www.washingtonpost.com/outlook/2022/09/09/insurance-copay-specialty-medications-cancer/. The Court may take judicial notice of this article because the fact that it was published

SaveOnSP's only response is to ignore amici entirely and to assert that JJHCS's well-pled allegations regarding patient harm "are false," but that is no response at all.  Br. at 14.  SaveOnSP is entitled to probe these allegations in discovery, but its mere disagreement with them does not entitle SaveOnSP to indefinitely delay discovery.

### D.    The Remaining Factors All Weigh Against Staying Discovery

In evaluating whether to grant a stay, courts also consider whether a "stay would simplify the issues and the trial of the case."  *Udeen*, 378 F. Supp. 3d at 332.  Courts generally give this factor very little weight because, as noted above, it is inappropriate to issue a stay based on the strength of the pending motion unless the outcome of the motion is "clear and unmistakable."  *See supra,* at 6-8; *see also Shire*, 2018 WL 10152305, at *2 (rejecting argument that "simplification of the issue[s] would arise if the pending motion to dismiss is granted" and refusing to "base this decision on the merits of [defendant's] motion to dismiss unless the result of that motion is 'clear and unmistakable"); *Morgan*, 2020 WL 7183503, at *2 (acknowledging that this factor "weighs slightly in favor of granting a stay," but still denying motion because "the likelihood of success of the Motion to Dismiss is unknown.").  In any event, even if the Court does consider SaveOnSP's motion to dismiss, that motion confirms that a stay would not simplify the issues because SaveOnSP's various fact-laden arguments cannot be resolved without discovery.  *See* ECF 34 at 23-27, 35-40.

Finally, courts consider "whether discovery is complete and/or a trial date has been set."  *Udeen*, 378 F. Supp. 3d at 332.  Where discovery is "in its infancy" and no trial date has been

---

"is not subject to reasonable dispute" and it is "relevant to issues" before the Court, including "whether there is public interest" in the outcome of this litigation.  *See In re Motions for Access of Garlock Sealing Techs. LLC*, 488 B.R. 281, 302 (D. Del. Mar. 1, 2013); *see also Benak v. Alliance Capital Mgmt. L.P.*, 345 F.3d 396, 401 (3d Cir. 2006) (courts may take judicial notice of newspapers articles to assess "what was in the public realm at the time").

set—as is the case here—this factor weighs in favor of denying a stay. *See Shire*, 2018 WL 10152305, at \*2 (concluding that this factor weighed in favor of non-movant because "[d]iscovery is truly in its infancy with no trial date set"); *Morgan*, 2020 WL 7183503, at \*2 (same).

## III.  THE COURT SHOULD REJECT SAVEONSP'S PROPOSED "COMPROMISE" AND SCHEDULE A RULE 16 CONFERENCE

In addition to denying SaveOnSP's motion, the Court should reject SaveOnSP's so-called "compromise" proposal.  That proposal is nothing more than a de facto stay:  it would permit SaveOnSP to refuse production of ***any*** documents indefinitely.  Likewise, SaveOnSP's proposed order sets forth detailed deadlines and other discovery parameters that are normally the subject of conferral and negotiation among the parties at a Rule 26(f) conference—the very thing SaveOnSP has obstinately refused to do.

JJHCS's own proposal, which would have the parties aim for completion of document production within five months, is reasonable and appropriate.  But the Court need not make that decision now.  Instead, the Court should simply deny SaveOnSP's motion and schedule a Rule 16 conference so that the parties may confer regarding the best path forward.

## CONCLUSION

For the foregoing reasons, the Court should deny SaveOnSP's motion to stay discovery, and set a date for a Rule 16 conference so that discovery may begin without further delay.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:    <u>s/ Jeffrey J. Greenbaum</u>
       JEFFREY J. GREENBAUM
       KATHERINE M. LIEB


PATTERSON BELKNAP WEBB &
TYLER LLP
Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff Johnson & Johnson
Health Care Systems Inc.*

Dated: September 12, 2022

# EXHIBIT A

# The Washington Post

*Democracy Dies in Darkness*

OUTLOOK

# Tackling cancer while battling the insurance system

Even plans that are supposed to save patients money can end up costing them dearly

Perspective by Annabelle Gurwitch

Annabelle Gurwitch is an actress and the author, most recently, of "You're Leaving When?: Adventures in Downward Mobility," now in paperback from Counterpoint.

September 9, 2022 at 5:40 p.m. EDT

When you take up residency in Cancerland, as I did when I was diagnosed with Stage 4 lung cancer in 2020, you regularly hear yourself described as "battling" cancer. With my one-pill-a-day biomarker-directed therapy, I prefer to say that I'm "tackling" cancer. But if I am at war, it's with an insurance system that works more like an extortion scheme.

In mid-January 2022, my phone rang early in the morning. This is my recollection of that call.

"Hi, this is Unintelligible Name from SaveOn."

"Who? I don't use Sav-On pharmacy."

"We're not Sav-On pharmacy, we're SaveOnSP, specialty pharmacy." SaveOn is pronounced exactly the same as Sav-On, just to be more confusing.

"I just changed insurers," I said, "and I've been in close contact with my new plan. They contract with Express Scripts, who've assigned Accredo as my specialty pharmacy."

"Yes, and we're your specialty pharmacy's specialty pharmacy. If you don't sign up through us you'll be charged the full amount of your co-pay of $4,500 every month for your specialty medication. We have all your information. You just have to verbally consent to let us manage your account."

I was stunned and so sure this was a scam call that I neglected to ask how they had arrived at this $4,500 co-pay, and how that could even be possible because that number was larger than my plan's deductible and out-of-pocket maximum.

"You'll receive a bill, but don't pay it," my caller continued. "Working with us ensures that you have a zero co-pay."

"Okay?" I replied. Was there a real choice? I've had lengthier consent discussions for a one-time hookup. I promptly forgot about the call and received no paperwork, but a few weeks later my monthly shipment of medication arrived along with an invoice from Express Scripts for $4,445. It noted that I might not owe this amount; nevertheless, it had a detachable payment slip, and a return envelope was provided. Remembering the caller's assurances, I tossed the bill into my ever-expanding, supersize file I've labeled "insurance gobbledygook." But when I visited an ATM the next day, my balance was significantly lower than I expected. $4,445 had been deducted by Express Scripts.

After I discovered that ginormous deduction from my account, I spent the majority of my waking hours that week ping-ponging between customer service representatives of my insurer, Express Scripts and Accredo. (The name SaveOnSP appeared neither on my invoice nor on my account portals at Express Scripts and Accredo.) I was transferred so many times in my crusade to satisfy the gods that govern the peculiar ecosystems of customer service call centers — which require you to offer up your member ID, Social Security number, date of birth, Zip code and sacrifice of the first born, and shriek "operator" over and over into the void — that I can't remember which representative informed me that they didn't show me as being enrolled with SaveOnSP.

Nor was I enrolled, they said, in the co-pay assistance program I had been participating in for more than a year — one sponsored by AstraZeneca, which manufactures my medication, osimertinib, which is sold under the brand name Tagrisso. Like many pharmaceutical companies, AstraZeneca offers several types of assistance designed to help patients pay for costly medications. The program I'm enrolled in provides up to $26,000 per patient per calendar year for Tagrisso, which retails at $14,000 per month.

(A representative of SaveOnSP later told The Post, "Plan participants sign up independently with copay assistance programs, not through SaveOnSP; SaveOnSP monitors consenting participants' pharmacy accounts on behalf of plans.")

My previous insurer had billed the AstraZeneca program and the funds they received were applied toward my deductible, and my insurance plan covered the remaining cost of the prescription. When I switched over to Express Scripts, they had initially done the same. If any of the math seems like it doesn't make a lick of sense, it's because insurers work out deals with pharma companies that are closely guarded secrets. What's certain is that they're not paying the sticker price for drugs like mine. My plan had a pricey monthly premium, but I'd never been charged an out-of-pocket co-pay, and the system operated so seamlessly that I felt fortunate.

Many hours of my cancer-shortened life span were expended before Express Scripts agreed to a refund and acknowledged the screw-up. I was issued a provisional credit, minus a bank-processing fee that came out of my pocket, natch, and it took several weeks before the refund was fully secured.

I was able to weather the $4,445 debit, but more than half of Americans can't afford a $1,000 emergency. This could have had catastrophic consequences for another family who might have missed a mortgage payment or been unable to put food on the table.

Then, in mid-March, a representative from the AstraZeneca co-pay assistance program called me in a state of agitated confusion.

Previously, the program had been billed $250 a month in co-pay assistance for an annual total of $3,000; now it was being billed $4,500 every month. Had I changed insurers? "A third party is now adjusting my benefits," I said, and she got very quiet and stopped asking questions. Now I wanted to know what had happened and what I could expect.

As I would learn from longtime industry observer Adam Fein, founder of Drug Channels Institute, I'd been entangled in an increasingly exploitative scheme. In what's become a standard industry practice, pharmacy benefit managers (PBMs) contract with secretive third-party adjusters commonly called co-pay accumulators and maximizer programs to process "specialty medication" prescriptions, including biomarker-targeted therapies for lung cancer and other chronic and deadly diseases. Once a plan engages a co-pay accumulator or maximizer, these entities reclassify these medications (some of the priciest on the market) as "nonessential." This allows plans to exploit a loophole in the Affordable Care Act: Coverage can be denied for therapies that a plan labels "nonessential," and a plan can reset the member's pharmaceutical benefit deductible and out-of-pocket maximum to any amount of their choosing.

Accumulators typically first bill the co-pay assistance program up to a patient's deductible, and then, because they aren't obligated to apply this to the deductible, double dip and bill the patient up to the amount of their deductible before providing coverage, often with a newly inflated co-payment rate. "Maximizers are even sneakier," Fein explained. "They extract the maximum amount allowable from the assistance program before the plan picks up the rest of the cost" ($4,445 turned out to be the maximum amount billable per month from my co-pay assistance program).

"Patients are generally unaware of the complex and confusing benefit design," according to Fein. Sure enough, I discovered that my co-pay assistance was no longer being applied to my deductible. Had I missed a mention of this program in my insurance plans' summary of benefits? Nope. The information packet I received included no mention of a third-party maximizer. So much for shopping as an informed consumer in the insurance market.

Making matters more opaque, companies don't refer to themselves as accumulators or maximizers. SaveOnSP describes itself as a "cost-saving healthcare solution" that focuses on "helping plan sponsors and their participants manage the skyrocketing costs of specialty pharmaceutical drugs." At the same time, PBMs are pushing back on growing concerns. In a web posting titled "Copay Accumulator Programs Level the Out-of-Pocket Playing Field," Express Scripts refers to its "Out of Pocket Protection Program" as a way "to ensure an equal benefit for all members." It reads, "Plan sponsors believe it is not fair to allow one member to utilize outside funding to satisfy their deductible while another has to meet it entirely with their own money." That's like complaining that one person has a wealthy aunt who contributes to their care and another doesn't, pitting plan members against one another like a hunger games. The purported benefit of signing up through SaveOnSP was that there would be zero co-pay for my specialty medication, but I'd already had a zero co-pay — and now it would take me longer to meet my deductible and out-of-pocket maximum, which meant an outlay of more cash for my other health-care costs.

(A representative of SaveOnSP told The Post, "Drug manufacturers keep increasing specialty drug prices. Employer-sponsored health plans bear most of those costs. Plans hire SaveOn to implement plan designs that take full advantage of drug makers' copay assistance programs and ensure plan participants get specialty drugs for no or little cost. SaveOnSP is glad that the participant received a refund for the pharmacy's erroneous charge and got her specialty drugs at no cost.")

I began hearing similar horror stories from patient advocates, such as Carl Schmid, the executive director of the HIV+Hepatitis Policy Institute. "To me, co-pay accumulators very much seem like extortion," Schmid told me. "And they lead to a decrease in adherence since people can no longer afford their drugs."

"What's more," he said — and this was something I hadn't realized — "the out-of-pocket obligations patients must pay to meet their deductible and any coinsurance are based on the drug's undiscounted, pre-rebate list price, not the pharmacy's actual negotiated price." Not that anyone knows the rates insurers negotiate; it's a more closely guarded secret than the identity of Satoshi Nakamoto, but we know it's substantially less than the sticker price.

Anna Hyde, vice president of advocacy and access at the Arthritis Foundation, wasn't surprised by my experience. Ever since co-pay accumulators entered the marketplace in 2017, she's been hearing from patients worried about "interruptions in care and whose co-pays were ballooning." Hyde alerted me to H.R. 5801, the Help Ensure Lower Patient Copays Act, introduced to Congress in November 2021 by Reps. A. Donald McEachin (D-Va.) and Rodney Davis (R-Ill.) along with more than 50 co-sponsors. The bill "requires health insurance plans to apply certain payments made by, or on behalf of, a plan enrollee toward a plan's cost-sharing requirements." In plain English, this means money that plans collect from a patient's co-pay assistance fund must count toward the patient's deductible and out-of-pocket maximum. Fourteen states already have banned co-pay accumulators.

Alas, California, where I live, is not one of those states, and H.R. 5801 is still pending in the House. In late August, the HIV+Hepatitis Policy Institute partnered with the Diabetes Leadership Council and the Diabetes Patient Advocacy Coalition to file a suit challenging the US Department of Health and Human Services May 2020 ruling that allows plans to avoid counting co-pay assistance toward deductibles and out-of-pocket maximums. But the difficulties remain in place for now.

"It's always a scramble," sighed Lia (who asked to be identified by only her first name out of fear of retribution from future insurers), who lives in Georgia and was diagnosed with lung cancer at age 49. She takes a specialty medication that's similar to mine, and when her current insurer engaged a maximizer she lost her deductible credit, which has had a dramatic impact on the family's finances. She has another preexisting condition that's most effectively treated with a compounded medication that isn't covered under her plan.

"Each time we change insurances, I hold my breath," she told me.

"And we know that's not easy!" I joked. This is what we call "living with lung cancer humor."

Not long after I spoke with Lia, I learned that I'd have to change my insurance once again. The kicker: SaveOnSP ran through my annual allotment of $26,000 in assistance in only six months, which means I could face a gap period of vastly inflated medication costs. How could I even prepare? When I phoned another insurer, I was informed that they couldn't determine the cost unless I was already enrolled in the plan. The representative's best guess was that I'd be responsible for 20 percent of the cost of the medication, up to $750 dollars per order.

"Okay, do you contract with a maximizer?"

"I don't know," the customer service representative admitted. Based on my experience, the information is so siloed it's possible that she really didn't know.

Before collapsing into an exhausted sleep, I picked up my dog-eared copy of Yuval Harari's "Sapiens." I'd been rereading about ancient forager societies over the summer as a tonic to the slings and arrows of Cancerland contingencies. When an old woman in the Aché tribe, hunter-gathers who foraged the jungles of Paraguay, became "a liability to the band," one of the younger men would sneak behind her and kill her with an ax-blow to the head. *How far we've come,* I'd marveled during my first reading in 2015, long before I learned that the cells in my body were conspiring against me. Now, as I weighed my options, it hit me: I'm the old woman in the modern retelling of this story, and to a PBM, I'm a liability, so until science finds a cure, I can expect many more soul-sucking hours of haggling over insurance benefits. Sometimes, an ax to the head seems preferable.

*This essay was underwritten with a grant from the Economic Hardship Reporting Project.*