**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.,<br>*Plaintiff*,<br>v.<br>SAVE ON SP, LLC,<br>*Defendant*. | Civil Action No. 22-2632<br>**OPINION & ORDER** |

**John Michael Vazquez, U.S.D.J.**

In this matter, Plaintiff Johnson & Johnson Health Care Systems Inc. ("JJHCS") alleges that Defendant Save on SP, LLC ("SaveOnSP") created a plan to deplete Plaintiff's payment assistance program for patients using certain of its costly, specialty prescription medications. Plaintiff alleges that Defendant created its plan to financially benefit itself and its partners at Plaintiff and the patients' expense. Presently before the Court is Defendant's motion to dismiss the Complaint. D.E. 31. Plaintiff filed a brief in opposition, D.E. 34, to which Defendant replied, D.E. 43. In addition, non-parties the Aimed Alliance, Triage Cancer, the HIV + Hepatitis Policy Institute, the Coalition of State Rheumatology Organizations, the AIDS Institute, the National Oncology State Network, and the Connecticut Oncology Association (collectively, the "Patient Advocate Amici") and Pharmaceutical Research and Manufacturers of America ("PhRMA") filed motions seeking leave to file Amicus Curiae briefs in support of Plaintiff. D.E. 35, 38. Defendant filed a brief in opposition to both motions, D.E. 49, to which the Patient Advocate Amici replied,

D.E. 52. The Court reviewed the parties' submissions[1] and decided the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons set forth below, Defendant's motion to dismiss is **DENIED** and the amici's motions are **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, a subsidiary of Johnson & Johnson, administers the Janssen CarePath program ("CarePath"). Compl. ¶¶ 7, 27.[2] CarePath, among other things, provides financial assistance that helps patients afford out-of-pocket costs for forty-four medications that are manufactured by Johnson & Johnson pharmaceutical companies. *Id.* ¶¶ 7, 47. The medications include complex biologic treatments for various cancers, pulmonary arterial hypertension, and autoimmune disorders. For many of the medications, there is no other treatment or "generic" substitute available. *Id.* ¶¶ 8, 32-34.

Patients must meet certain criteria to be eligible for CarePath, including being enrolled in commercial or private health insurance. *Id.* ¶ 48. The CarePath terms and conditions provide that CarePath "may not be used with any other coupon, discount, prescription savings card, free trial, or other offer." *Id.* In addition, CarePath participating patients agree to "meet the program requirements every time [they] use the program." *Id.* After a patient enrolls in CarePath, he or

---

[1] The Court refers to Defendant's brief in support of its motion to dismiss (D.E. 31-1) as "Def. Br."; Plaintiff's opposition (D.E. 34) as "Plf. Opp."; and Defendant's reply (D.E. 43) as "Def. Reply". The Court refers to the Patient Advocate Amici's motion, D.E. 35, as "PA Mot."; PhRMA's brief in support of its motion (D.E. 38-1) as "PhRMA Br."; Defendant's opposition to amici's motions (D.E. 49) as "Amici Opp."; and the Patient Advocate Amici's reply brief (D.E. 52) as "PA Reply".

[2] The factual background is taken from Plaintiff's Complaint. D.E. 1. When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the Complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

she receives a card that can then be used at a point-of-sale to cover most of the out-of-pocket costs for the medication. *Id.* ¶ 49.

Defendant is a company that works "in partnership" with pharmacy benefits manager ("PBM") Express Scripts and specialty pharmacy Accredo Health Group, Inc. ("Accredo") to administer the SaveOnSP Program (the "Program"). *Id.* ¶ 28. Commercial health insurance companies contract with PBMs to manage prescription drug benefits for health insurance plans. Thus, health insurance companies and PBMs work together to determine what cost-sharing obligations to impose on plan participants. Plaintiff alleges that PBMs "serve as middlemen with an aim towards increasing insurers' and their own profits by determining which drugs a plan will cover and to what extent they will be covered." *Id.* ¶ 37. Defendant's Program is allegedly one way a PBM, here Express Scripts, maximizes its profits (and in turn commercial health insurance companies' profits) at Plaintiff and patients' expense. *See id.* ¶¶ 50-51.

Plaintiff alleges that the SaveOnSP Program has two components. First, the drugs at issue are reclassified from essential to non-essential health benefits under the Affordable Care Act ("ACA"). There is purportedly no medical reason for this change, and, in fact, it is made without regard to a patient's medical needs. *Id.* ¶ 9. Plaintiff alleges that the drugs are re-designated to avoid the ACA's co-pay limits and annual out-of-pocket limits, which caps the amount a patient with private insurance can be required to pay for medical care each year. *Id.* ¶¶ 9-10, 53-55, 57-58. After a drug is designated as non-essential, the SaveOnSP Program "increases the patient's copay amount for the given drug to an artificially high amount--often thousands of dollars per dose." *Id.* ¶ 10. Plaintiff indicates that Defendant "work[s] in tandem with its payer partners" to

implement these changes, *id.* ¶ 9, but recognizes that "private payers and their affiliated entities"[3] determine copays, *id.* ¶ 6; *see also id.* ¶ 37 (pleading that health insurance plans and PBMs determine cost-sharing obligations under health insurance plans). The inflated co-pays are key to the alleged scheme because the higher amounts essentially force patients into the Program. *Id.* ¶ 56.

The second part of the purported SaveOnSP Program is to target patients. Plaintiff alleges that Defendant uses the threat of the artificially inflated copay to coerce patients into enrolling in the SaveOnSP Program. Specifically, Defendant's representatives allegedly tell patients that they will be responsible for the entire copay amount unless they join the Program; if the patients join the Program, the copay will be paid. *Id.* ¶¶ 12, 60. Defendant, however, fails to tell patients that they can access patient assistance program like CarePath without enrolling in the SaveOnSP Program. *Id.* ¶ 76. Defendant institutes an "outreach campaign" to get patients to enroll in the Program. *Id.* ¶¶ 12, 61. This campaign results in enrollment of 55% to 65% of a payer's membership. *Id.* ¶ 62. For those members who do not enroll through Defendant's outreach, Accredo conducts a warm transfer[4] to SaveOnSP when a member submits a claim. *Id.* ¶ 62. Plaintiff also alleges that Defendant, through Accredo, manufacturers a false rejection to recruit patients. *Id.* ¶¶ 13, 63. Plaintiff alleges that an Accredo phone representative informs unenrolled patients that their claim for a covered medication was rejected and then transfers the patients to a SaveOnSP representative who attempts to enroll the patient in the Program. *Id*. The impetus for

---

[3] It would also appear that the payers, in conjunction with the PBMs, make the decision to reclassify the drugs to non-essential, although the Complaint is vague on this point. Plaintiff does allege, however, that reclassification is the brainchild of Defendant. *See, e.g.*, Compl. ¶ 53.

[4] A "warm transfer" involves a person answering the phone and then transferring the caller to a third party while the person stays involved to provide assistance. Compl. ¶ 62 n.4 (citation omitted).

patients to enroll in the SaveOnSP Program is that they are informed that they will be responsible for the very high co-pay if they do not enroll but will not have any co-pay if they do enroll.

Once enrolled in the Program, Defendant's representatives walk patients through the process of joining a manufacturer's assistance program. CarePath is one such program. *Id.* ¶¶ 16, 64. Plaintiff alleges that by participating in the SaveOnSP Program, patients who utilize CarePath breach the CarePath terms and conditions. Plaintiff further alleges that Defendant knows that enrolling in the Program violates the CarePath terms and conditions. *Id.* ¶¶ 48, 65. Defendant then electronically bills the inflated copay amount to CarePath. Because the SaveOnSP Program increases the copay amount, the SaveOnSP Program drains CarePath's available funds more quickly. *Id.* ¶¶ 23, 51, 66. CarePath provides several examples of the average amount it pays per fill for persons not enrolled in the Program compared to those who are: STELARA - $1,171 v. $4,301; TREMYA - $1,126 v. $3,717; and UPTRAVI - $418 v. $5,000. *Id.* ¶¶ 92-94. Plaintiff indicates that not only do these higher payments result in CarePath funds being depleted more quickly, it also results in a higher percentage of patients reaching the annual limits of the CarePath program, sometimes by the middle of the year. *Id.* ¶¶ 98-99.

Pharmacists are the paid the same amount for the prescription, so they do not benefit from the alleged scheme. *Id.* ¶ 17. Instead, Defendant and the others participating in the alleged scheme split the additional money recovered from CarePath, with Defendant receiving 25% of the "savings" received (*i.e.*, the difference between amount CarePath would have paid without the Program and the amount it paid through the Program). *Id.* ¶ 68. Plaintiff claims that "SaveOnSP's business model is to drain patient assistance from programs like CarePath by increasing patient out-of-pockets costs in a manner that serves no end other than to maximize profits for SaveOnSP and its partners." *Id.* ¶ 51.

Plaintiff filed its two-count Complaint challenging the SaveOnSP Program on May 4, 2022. D.E. 1. Plaintiff asserts a claim for tortious interference with patient's CarePath contracts (Count I) and a claim asserting that the second component of the SaveOnSP program, the patient targeting aspect, amounts to a deceptive trade practice under New York General Business Law ("GBL") § 349 (Count II). Plaintiff seeks monetary damages and an injunction preventing Defendant from implementing the SaveOnSP Program as to certain of its drugs. Compl. at 41. Defendant subsequently filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). D.E. 31. Proposed amici then filed their motions seeking leave to appear in support of Plaintiff. D.E. 35, 38. Defendant opposes all three motions.

## II. STANDARD OF REVIEW

Defendant moves to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however,

"must accept all of the complaint's well-pleaded facts as true" and give a plaintiff the benefit of all reasonable inferences flowing therefrom. *Fowler*, 578 F.3d at 210.

## III. ANALYSIS

### A. ERISA Preemption

Defendant first argues that Plaintiff's Complaint must be dismissed because it is expressly preempted by Section 514(a) of ERISA. Def. Br. at 9-15. Plaintiff counters that its claims do not fall into any of the Section 514(a) preemption categories. Plf. Br. at 12-22.

"ERISA was enacted 'to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures.'" *Rutledge v. Pharm. Care Mgmt. Ass'n*, -- U.S. --, 141 S. Ct. 474, 480 (2020) (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320-21 (2016)). Section 514 preemption, or ordinary preemption, is an affirmative defense that a defendant can assert against a state-law based claim that relates to an ERISA employee benefit plan. *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226 (3d Cir. 2020). The primary concern for ERISA preemption is "pre-empting laws that require providers to structure benefits plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status." *Rutledge*, 141 S. Ct. at 480. State law claims that are preempted by Section 514 are typically dismissed for failure to state a claim. *See, e.g.*, *Sleep Tight Diagnostic Ctr., LLC v. Aetna Inc.*, 399 F. Supp. 3d 241, 250-51 (D.N.J. 2019) ("[C]ourts within this district have consistently dismissed claims for breach of contract, quantum meruit, promissory estoppel, and negligence when they arise from an ERISA-governed plan on the basis of [Section 514] preemption.").

Section 514(a) provides as follows: "the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]"

29 U.S.C. § 1144(a). "State law" is defined as "all laws, decisions, rules, regulations, or State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). State common law claims may fall within this definition. *Plastic Surgery Ctr.*, 967 F.3d at 226. The Supreme Court, however, limited the seemingly endless reach of Section 514(a), recognizing that "if 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course." *Gobeille*, 577 U.S. at 319 (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)); *see also Rutledge*, 141 S. Ct. at 480 ("Crucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan"). Thus, the Supreme Court "sought to craft a functional test for express preemption." *Plastic Surgery Ctr.*, 967 F.3d at 226.

As a result, a claim "relates to" a plan "if it has either (1) a 'reference to' or (2) a 'connection with' that plan." *Id.* A state-law claim references an ERISA plan if it "act[s] immediately and exclusively upon ERISA plans" or is "premised on" the plan. *Id.* at 230. Recently, the Third Circuit "distille[ed] two overlapping categories of claims 'premised on' ERISA plans." *Id.* The categories are (a) "claims predicated on the plan or plan administration, e.g., claims for benefits due under a plan or where the plan is a critical factor in establishing liability" and (b) "claims that involve construction of the plan or require interpreting the plan's terms." *Id.* at 230 (internal quotations and punctuation omitted). A state-law claim has a connection with an ERISA plan if it "require[s] providers to structure benefit plans in particular ways" and those that have "acute, albeit indirect, economic effects that force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Rutledge*, 141 S. Ct. at 480. "As a shorthand for these considerations," courts must ask "whether

a state law governs a central matter of plan administration or interferes with nationally uniform plan administration." *Id.* (quoting *Gobeille*, 577 U.S. at 320).

Plaintiff first argues that its claims are not preempted because this matter falls outside of ERISA's scope. Plaintiff explains that Section 514(a) does not apply because the parties are not traditional ERISA entities like a plan, plan administrator or beneficiary, such that the relationship between Plaintiff and Defendant is not governed by ERISA. Plf. Opp. at 12-14. Plaintiff identifies several cases where disputes involving drug manufacturers were not preempted by ERISA. *See, e.g.*, *Blue Cross of Cal. Inc. v. Insys Therapeutics Inc.*, 390 F. Supp. 3d 996 (D. Ariz. 2019); *In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 179-80 (D. Mass. 2003); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 190-91 (D. Mass. 2003). But in each case, the court considered whether the specific claims raised related to an ERISA plan. The courts did not decide the preemption issue simply based on who asserted the claims or who they were asserted against. *See, e.g.*, *Blue Cross of Cal. Inc.*, 390 F. Supp. 3d at 1004 (explaining why each of the plaintiff's claims did not relate to ERISA plans). Further, the Court is not aware of any cases limiting ERISA preemption to claims asserted by ERISA entities. *See Pharm. Care Mgmt. Ass'n v. District of Columbia*, 613 F.3d 179, 185 (D.C. Cir. 2010) ("The District points to no support for this limitation upon ERISA" that Section 514(a) preemption only applies to "relationships among ERISA entities . . . either in ERISA or in any Supreme Court case interpreting it.").

Whether the parties in the litigation are traditional ERISA entities may impact the preemption decision, but Plaintiff fails to demonstrate that it is determinative. In fact, the express language of Section 514(a) focuses on the substance of the state law. *See* 29 U.S.C. § 1144(a). Consequently, the Court turns to the Supreme Court's functional test to determine whether

Plaintiff's claims are preempted, noting that courts should consider an ERISA preemption argument "with the starting presumption that Congress does not intend to supplant state law." *Travelers*, 514 U.S. at 654.

*Rutledge v. Pharmaceutical Care Management Association*, 141 S. Ct. 474 (2020), is instructive. In *Rutledge*, the Supreme Court considered whether Section 514 preempted an Arkansas statute that regulated "the price at which pharmacy benefit managers reimburse pharmacies for the cost of drugs covered by prescription-drug plans." *Rutledge*, 141 S. Ct. at 478. A group of PBMs challenged the statute, arguing that it was preempted by ERISA. The Supreme Court disagreed, concluding that the statute was not connected to, nor did it reference, any ERISA plan. *Id.* at 479.

In discussing the impermissible connection prong, the Supreme Court cautioned that "not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan. That is especially so if a law merely affects costs." *Id.* at 480. What is critical, according to the *Rutledge* Court, is whether the state law "forc[es] plans to adopt any particular scheme of substantive coverage." *Id.* The Supreme Court explained that the Arkansas statute was a form of cost regulation that would not dictate plan choices. Consequently, the Court in *Rutledge* determined that the statute did not have an impermissible connection to an ERISA plan. *Id.* at 480. As to the "reference to" prong, the Supreme Court explained that the statute "does not act immediately and exclusively upon ERISA plans because it applies to PBMs whether or not they manage an ERISA plan" and "does not directly regulate health benefit plans at all." *Id.* Moreover, the *Rutledge* Court noted, ERISA plans are not essential to the Arkansas statute's operation. *Id.* at 481. The Court therefore concluded that the statute did not reference an ERISA plan. *Id.*

Defendant argues that *Rutledge* is inapposite because Plaintiff's claims would force plan administrators to change plan terms that maximize copay assistance. Def. Br. at 13 n.9. In other words, Defendant asserts that Plaintiff's claims have a connection to an ERISA plan. The Court disagrees. Granting relief to Plaintiff on either claim would not *require* plan administrators to make any plan changes. Although administrators may choose to do away with certain copay assistance terms if Plaintiff prevails, this would be a business decision that in no way would be mandated by the relief awarded. *See Travelers*, 514 U.S. at 659-60 (explaining that an indirect economic influence "does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan"). Plaintiff's claims do not mandate certain payments or impose any new rules on plan administrators. Plaintiff's claims, therefore, do not undermine ERISA's objectives to facilitate standard procedures and uniformity, and are not connected to an ERISA plan for preemption purposes.

Plaintiff's claims also do not reference an ERISA plan because they do not act immediately and exclusively on an ERISA plan. The SaveOnSP Program applies to ERISA and non-ERISA plans. Plaintiff's claims are also not premised on an ERISA plan. The claims are not predicated on a plan or its administration, and the Court will not need to interpret or construe any plan terms to decide either claim. Defendant maintains that the Court would need to interpret plan terms because in determining damages, Plaintiff would need to compare copays under the current plan to copays under its preferred plan design. Def. Br. at 14. But such comparison does not require the Court to interpret the meaning of plan provisions. Defendant also argues that the Court would be required to look at the plans for Plaintiff's GBL § 349 claim, to determine whether the drugs were covered and the details of coverage and benefit design. *Id.* at 14-15. Defendant's argument about considering plan terms amounts to a "cursory examination of the plan," which is "not the

sort of exacting, tedious, or duplicative inquiry that the preemption doctrine is intended to bar." *Plastic Surgery Ctr.*, 967 F.3d at 233 (quoting *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 85 (3d Cir. 2012)).

**B. GBL § 349**

Next, Defendant argues that Plaintiff fails to state a claim under GBL § 349 for numerous reasons: Defendant did not deceive participants already enrolled in CarePath, Defendant did not cause Plaintiff a cognizable injury, Defendant did not deceive or mislead patients, and Defendant did not harm Plaintiff. Def. Br. at 15-25.

GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. § 349. To state a Section 349 claim, a plaintiff must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). In asserting a GBL § 349 claim, a plaintiff must "plead that [it has] suffered an actual injury caused by a materially misleading or deceptive act or practice." *City of New York v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834, 839 (N.Y. 2009). The statute is "intentionally broad, applying to virtually all economic activity." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 1143 (N.Y. 2004) (internal quotation and citation omitted). Moreover, the "statute permits recovery by any injured 'by reason of' a deceptive business practice." *Id.* at 1144 (quoting N.Y. Gen. Bus. § 349(h)); *see also N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 107 (N.Y. App. Div. 2012) ("Turning once more to the plain language of the statute, we note that the right to bring a private action was not limited to those acting in a consumer role, but rather,

it was provided to 'any person who has been injured by reason of any violation of this section[.]'" (quoting GBL § 349(h)).

Turning to Defendant's arguments, the Court first agrees with Plaintiff that it plausibly pleads that Defendant deceived participants already enrolled in CarePath. Similarly, the Court disagrees with Defendant's reading that the statute requires a threat to the health or safety of the public at large. While Plaintiff must plausibly allege some harm to the public at large, and while a threat to the health or safety of the public is certainly a way to meet this obligation, the statute is not limited to health and safety harms. *See, e.g.*, *N. State Autobahn*, 953 N.Y.S.2d at 105 (finding sufficient the alleged public harm that insurance customers were unfairly induced to bring their vehicles to other repair shops); *see also M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 221 (E.D.N.Y. 2010). Plaintiff also plausibly alleges at least two deceptions as to consumers: (1) enlisting pharmacies to reject patients' claims for their prescription at the point of sale, Compl. ¶¶ 13, 63, 113; and (2) failing to inform patients that by enrolling in SaveOnSP, they breach the CarePath terms and conditions, Compl. ¶¶ 113.

Plaintiff also alleges a sufficient, direct injury. Defendant, relying on *Philip Morris*, contends that Plaintiff's injury is derivative. Def. Br. at 16-17. In *Philip Morris*, the insurance company plaintiff alleged that the defendant tobacco companies misrepresented the dangers of smoking cigarettes and "engaged in a campaign to encourage consumers to smoke." *Philip Morris*, 818 N.E.2d at 1143. The plaintiff alleged that because of the defendants' conduct, the plaintiff insurers bore the increased medical costs incurred by consumers. *Id.* The *Philip Morris* court acknowledged that GBL § 349 is a broad, remedial statute such that it is not limited solely to recovery from direct consumers. *Id.* The court, however, concluded that the plaintiff insurers could not recover because their alleged injury was derivative. The court in *Philip Morris* explained

that under the common law, an insurer's sole remedy to recover medical expenditures incurred by a third-party was through an equitable subrogation claim. The court reasoned that allowing the plaintiff's GBL § 349 claim "would effectively eliminate subrogation actions under section 349—a result which nothing in the legislative history shows was ever intended." *Id.* at 1144.

"An injury is indirect or derivative when the loss arises solely as a result of injuries sustained by another party." *Philip Morris*, 818 N.E.2d at 1145. Here, Plaintiff alleges a direct injury because the SaveOnSP Program causes Plaintiff to pay more money from CarePath than it otherwise would have to do. Compl. ¶ 115. Unlike in *Philip Morris*, Plaintiff's alleged injury is not a consumer's injury that is then passed on to Plaintiff. It is an independent harm separate from the injuries that Plaintiff alleges consumers will incur from the Program. *See id.* ¶ 114 (setting forth the alleged, separate injury to consumers). Moreover, Plaintiff pleads that the purpose of the SaveOnSP Program is to maximize manufacturer's co-pay assistance program funds like CarePath and targets drugs that "have the most lucrative copay assistance programs." *Id.* ¶¶ 10-11. The fact that Plaintiff's injuries came after the alleged deceptive conduct does not doom Plaintiff's claim. *See, e.g.*, *N. State Autobahn*, 953 N.Y.S.2d at 99, 105 (explaining that the plaintiff's lost business because of insurance company's misrepresentations about the shortcomings of the plaintiff's business to consumers was a sufficient injury).

Next, Defendant maintains that Plaintiff fails to sufficiently allege that Defendant's conduct caused Plaintiff's injury. Specifically, Defendant points out that Plaintiff has no control over the size of the CarePath budget or the plan terms that maximize copay assistance, and that these decisions ultimately caused Plaintiff's alleged harm. Def. Br. at 17-18. As discussed, although the Complaint is vague in terms of who made certain decisions, Plaintiff does allege that the SaveOnSP Program is Defendant's brainchild. *See, e.g.*, Compl. ¶¶ 8-13; 53. Plaintiff alleges

that Defendant "works in tandem with its payer partners" to implement its scheme, and that changes to the plan are a critical piece of Defendant's Program. *Id.* ¶ 9. These allegations are sufficient to allege that Defendant caused Plaintiff's alleged injury.

**C. Tortious Interference with a Contract**

Finally, Defendant argues that Plaintiff's tortious inference claim must be dismissed. To state a claim for tortious interference with contract, a plaintiff must allege "(1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (1989)).

Defendant's argument is premised on the timing of its alleged interference. Defendant argues that it could not have interfered with any contract because when the interference occurred, the customers had not yet signed up for CarePath. Because Plaintiff fails to plead the existence of a contract when the alleged interference occurred, Defendant maintains that Plaintiff's tortious interference claim must be dismissed. Def. Br. at 26. The Court disagrees. Plaintiff pleads that a patient agrees to meet the CarePath requirements each time he uses the program. Compl. ¶¶ 48-49. This means that once enrolled in CarePath, patients agree under CarePath's terms and conditions not to participate in another offer each time they utilize the co-pay assistance program. In fact, Plaintiff pleads that as part of Defendant's scheme, Defendant "intentionally caus[es] those patients to breach their contract with [Plaintiff] every time they use CarePath funds while enrolled in the SaveOnSP Program." *Id.* ¶ 109. Plaintiff, therefore, sufficiently pleads an existing contractual relationship and that Defendant interfered in this relationship.

Next, Defendant maintains that the SaveOnSP Program is not an offer. Defendant's arguments are based on the plain language of private health insurance benefit design plans and structure, Def. Br. at 27-28, and Plaintiff's CarePath contract, *id.* at 28-29. These are legal arguments that are better suited for a motion for summary judgment. At the motion to dismiss stage, a court must accept a plaintiff's allegations as true. *Fowler*, 578 F.3d at 210. Plaintiff plausibly pleads that the SaveOnSP Program is an offer, Compl. ¶ 19, and that the CarePath terms and conditions prohibit patients from participating in the SaveOnSP Program, *id.* ¶ 109. Viewing the Complaint in a light most favorable to Plaintiff, Plaintiff adequately pleads that the SaveOnSP Program is an offer. Consequently, Plaintiff states a tortious interference with contract claim.

## IV. CONCLUSION

For the foregoing reasons, and for good cause shown

IT IS on this 25th day of January, 2023,

**ORDERED** that Defendant's motion to dismiss (D.E. 31) is **DENIED**; and it is further

**ORDERED** that the motions for leave to file Amicus Curiae briefs (D.E. 35, 38) are **GRANTED**.[5]

John Michael Vazquez, U.S.D.J.

[5] "District Courts may permit third parties to appear in court as amicus curiae where they 'can contribute to the court's understanding of the' issues being presented to the court." *United States v. Bayer Corp.*, No. 07-0001, 2014 WL 12625934, at *1 (D.N.J. Oct. 23, 2014) (quoting *Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir. 1987)). Whether to grant leave to file an *amicus* brief "rests in the discretion of the court which may grant or refuse leave according as it deems the proffered information timely, useful or otherwise." *Id.* (quoting *Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999)). Here, the Court concludes that the proposed amici contributed to the Court's understanding of the public harm from Defendant's Program and considered their amicus briefs.