# EXHIBIT 1

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

December 9, 2022

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

<u>By Email</u>

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

      **Re:**    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC***
                    **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear Meredith:

        We write to memorialize the parties' discussions during the conferrals that took place on December 7 and 8 regarding Save On SP LLC's ("SaveOnSP") Responses and Objections to Johnson & Johnson Health Care Systems, Inc.'s ("JJHCS") First and Second Requests for Production. We have addressed general issues common to numerous Requests as well as issues specific to individual Requests.

        We are at impasse on several issues based on our discussions, and therefore we intend to proceed to the Court with dispatch so that any disputed issues can be promptly resolved. To the extent that we have misunderstood your position on any of these issues, please let us know by December 14, 2022.

## I.    GENERAL ISSUES

###     A.    Anonymization of Patient Identities

        In response to Request Nos. 3, 5, 7, 8, 14, 15, 24, 28, 30, 33, 34, 40, and 41, which call for documents that include patient identities and various documents and communications about SaveOnSP and its Program that would reveal patient identities, SaveOnSP objected on the ground that "producing the identities of plan participants . . . is not sufficiently relevant and necessary to JJHCS's case to outweigh the harm that disclosure of that information could cause to SaveOnSP, plan participants, and health plans." *See, e.g.*, Response to Request No. 14. Thus, SaveOnSP responded that in its production of documents it would "anonymize references to the identities of plan participants." *See, e.g.*, *id.*

        As we explained during our conferral, SaveOnSP's objections are unfounded. First, patient identities are relevant for several reasons. JJHCS is entitled to track individual patients' experiences with SaveOnSP through the relevant data as part of its analyses in this

14041709

Meredith Nelson, Esq.
December 9, 2022
Page 2

action.  JJHCS is also entitled to prove its damages by comparing the amount of CarePath funds used by patients in the SaveOnSP Program with the amount of CarePath funds used by patients not in the SaveOnSP Program.  JJHCS is further entitled to see how patient co-pays increased or changed after a patient joined the SaveOnSP Program and to present to the jury relevant data at whatever level of specificity it deems appropriate.  JJHCS cannot determine with certainty whether a patient is actually enrolled in the SaveOnSP Program unless SaveOnSP provides it with participant information.  Further, patient harm is relevant to both of JJHCS's claims, and JJHCS is entitled to know patient identities so that it can pursue further discovery regarding particular experiences with SaveOnSP.

Second, there is no risk of harm to SaveOnSP, patients, or health plans if the identities of patients are revealed.  JJHCS already knows the identities of the patients who participate in its CarePath program.  In addition, the parties' productions are subject to a court-ordered, HIPAA-compliant Protective Order (Dkt. 62), which puts various protections into place to ensure that sensitive documents exchanged among the parties are not disclosed outside of the litigation.

You responded that while you agree that patient identities are not wholly irrelevant, that relevance is outweighed by the potential harm to SaveOnSP.  Specifically, you stated that even though there is a HIPAA-compliant protective order in place, there is still a risk of inadvertent disclosure.  You also stated that you would consider revealing patient identities on a case-by-case basis if they seemed particularly relevant, but that you did not think JJHCS needed all patient identities to prove its case or to prove damages.

SaveOnSP's rationale is unpersuasive, and we continue to disagree with its appraisal of relevance and potential harm.  Thus, we have a reached an impasse on this issue.

**B.    Anonymization of Health Plan Identities**

Similarly, in response to Request Nos. 4, 5, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 28, 31, 32, 33, 34, 42, and 44, which call for health plan identities and various documents and communications about SaveOnSP and its Program that would reveal health plan identities, SaveOnSP objected on the ground that "producing the identities of . . . health plans . . . is not sufficiently relevant and necessary to JJHCS's case to outweigh the harm that disclosure of that information could cause to SaveOnSP, plan participants, and health plans."  *See, e.g.*, Response to Request No. 14.  Thus, SaveOnSP responded that in its production of documents it would "anonymize references to the identities of . . . health plans."  *See, e.g.*, *id.*

As we explained, SaveOnSP's objections are unwarranted.  First, health plan identities are relevant to this action.  As SaveOnSP itself has asserted in various filings to the Court, health plans are one of the key actors in the scheme to extract funds from CarePath. JJHCS is entitled to know the identities of those actors to test SaveOnSP's claims and present to

Meredith Nelson, Esq.
December 9, 2022
Page 3

the jury the full story regarding SaveOnSP's conduct and its partners. JJHCS may also potentially pursue further discovery from those plans.

Second, there is no risk of harm to SaveOnSP, patients, or health plans if the identities of health plans are revealed. Again, the parties' productions are subject to a court-ordered, HIPAA-compliant Protective Order (Dkt. 62), which eliminates any potential harm from disclosure outside of the litigation. Further, many health plans publicly advertise the fact that they participate in the SaveOnSP Program. Therefore, SaveOnSP has not identified any harm posed by disclosure.

You responded that you would not hold back information to the extent a health plan has made its participation in the SaveOnSP Program public, but you disagreed that all identities were relevant because JJHCS's Complaint is not centered on health plans. Further, you stated that a list of the health plan identities is tantamount to a client list for SaveOnSP, making it commercially sensitive information and heightening the potential risks that would flow from its disclosure.

SaveOnSP's rationale is unpersuasive. SaveOnSP contracts with health plans to extract funds from CarePath and thereby injure JJHCS. SaveOnSP has itself placed their roles at issue in its motion to dismiss and other statements. The health plans' identities are therefore central to this case. Further, the Protective Order eliminates the potential for harm here, especially because JJHCS is not a competitor of SaveOnSP. Thus, we continue to disagree with SaveOnSP's assessment and believe that the parties have a reached an impasse on this issue.

### C.    Limited Scope of Communications

In response to Request Nos. 5, 7, 8, 16, 17, 18, 19, 20, 21, 22, 31, 35, 44, and 45, SaveOnSP objected to providing all documents and communications responsive to the Requests, and agreed to provide only (1) final versions of externally-facing documents and (2) documents and communications with persons external to SaveOnSP. *See, e.g.*, Response to Request No. 7 ("SaveOn will produce documents sufficient to show SaveOnSP's standard, scripted communications regarding SaveOnSP's services . . . . SaveOnSP will also produce communications . . . that it has received from persons currently enrolled in CarePath."); Response to Request No. 16 ("SaveOnSP will produce final version of communications or marketing materials that SaveOnSP provided to health plan sponsors."). These objections were primarily based upon the burden and expense of producing all such documents being outweighed by the marginal relevance of the material requested.

We explained that we are interested in not only final marketing materials and external communications, but also the internal communications between SaveOnSP employees regarding the drafting of marketing materials, as well as internal communications concerning interactions with patients or health plans. These internal communications are relevant to JJHCS's tortious interference claim because they provide insight into SaveOnSP's intent and

14041709

Meredith Nelson, Esq.
December 9, 2022
Page 4

means it used to induce patients to breach the CarePath terms and conditions and they are relevant to JJHCS's claim under New York General Business Law § 349 (the "GBL claim") because they reflect both SaveOnSP's intent and the resulting patient harm.

This is particularly so, for example, with respect to Request No. 35, which asks for communications relating to the SaveOnSP IPBC Video presentation, a video that features prominently in JJHCS's Complaint because it describes the SaveOnSP Program in detail and sheds light on how it extracts funds from CarePath and harms both patients and JJHCS. Likewise, with respect to Request Nos. 18-22, all of which relate to various aspects of SaveOnSP's compliance with the Affordable Care Act and the relevant regulations promulgated thereunder, JJHCS is entitled to see the internal discussions within SaveOnSP, rather than only documents reflecting advice provided to health plans that work with SaveOnSP.

In connection with the Requests identified above, you acknowledged that you are willing to produce all external communications with health plans and patients, rather than just form responses and scripts. However, you indicated that internal drafts or communications were not relevant, so you will not produce them.

We disagree with SaveOnSP's position that internal communications are generally irrelevant to this action. To the contrary, internal communications about relevant issues are basic and fundamental discovery. Thus, the parties have reached an impasse on this issue given that SaveOnSP intends to withhold responsive internal communications and draft documents in connection with the aforementioned Requests.

### D.    Limited Scope of Drugs At Issue

In response to Request Nos. 8, 12, 17, 19, 20, 21, 22, 28, 29, 30, 32, 33, and 34, SaveOnSP stated that it would only produce responsive documents "regarding Janssen Drugs." *See, e.g.*, Response to Request No. 12. SaveOnSP argued that documents not related to Janssen Drugs are irrelevant to this action.

First, during our conferral we sought to clarify whether you intended to not produce documents that relate to drugs generally or to drugs encompassing Janssen Drugs, but do not reference Janssen Drugs specifically. You confirmed that you would produce responsive documents regarding or applying to drugs generally or encompassing Janssen Drugs, even if they did not make a specific reference to Janssen or a Janssen Drug. You also confirmed that you would produce all documents related to or referencing CarePath, whether or not there was a specific reference to a Janssen Drug.

Second, we sought to clarify whether you intended to not produce documents that only related to or referenced non-Janssen Drugs specifically. You clarified that you intend to withhold such documents because documents concerning only non-Janssen Drugs are not relevant to this action.

14041709

Meredith Nelson, Esq.
December 9, 2022
Page 5

We explained that our GBL claim concerns all of SaveOnSP's conduct, not just that conduct related to CarePath or Janssen Drugs. Accordingly, documents and communication concerning non-Janssen Drugs are relevant to the claims at issue in this action.

You disagreed with our rationale for these Requests and stated that only documents generally or specifically applicable to Janssen Drugs would be produced. Thus, the parties have reached an impasse on this issue given that SaveOnSP intends to withhold responsive documents and communications that concern non-Janssen Drugs.

**E.    Limiting Responses to SaveOnSP's "Services"**

In many Requests, including Request Nos. 5, 6, 7, 10, 11, 12, 14, 15, 25, 33, and 45, SaveOnSP responded by stating that it would limit its production to responsive documents and communications "regarding SaveOnSP's services at issue in this action." *See, e.g.*, Response to Request No. 10.

We sought to clarify what "services" this limiting language might exclude given that SaveOnSP's entire business is at issue in this action. You explained that there is nothing that SaveOnSP does as part of its core business that will be excluded by this limitation. We write to memorialize that statement and confirm that SaveOnSP will not withhold any documents based upon this purported limitation.

**F.    Limiting Responses to Documents "Sufficient To Show"**

In many Requests, including Request Nos. 3, 5, 7, 10, 11, 12, 17, 25, 31, 33, 41, 42, 48, 49, and 51, SaveOnSP responded by stating that it would limit its production to responsive documents and communications "sufficient to show" a particular fact or data point. *See, e.g.*, Response to Request Nos. 11, 31.

We sought to clarify why SaveOnSP was limiting its production to such documents, as opposed to producing all responsive documents, as requested by JJHCS. In substance, you indicated that there was no present intention to carve out any particular documents and that this objection was made in order to avoid the potential burden to SaveOnSP should the volume of such documents be greater than expected.

Mindful of the need for proportionality in document production, we do not believe that we are presently at impasse. However, to the extent that you determine that documents or categories of documents cannot be produced due to burden, we understand and expect that you advise us promptly of this to permit further meet-and-confer and, if necessary, motion practice over the scope of SaveOnSP's production. If you are unwilling to do so, please apprise us immediately so that we can then raise the issue for resolution now.

14041709

Meredith Nelson, Esq.
December 9, 2022
Page 6

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

      The following discussion concerns issues related to specific Requests that are not otherwise entirely addressed by the general concerns laid out above.

    **A.    Request No. 2: Documents sufficient to identify the names and citizenship of all SaveOnSP LLC members, including the membership of any limited liability companies, limited partnerships, or partnerships that are members of SaveOnSP, either directly or indirectly (e.g., through membership of an LLC that is itself a member of SaveOnSP).**

      In its Responses, SaveOnSP indicated that it would not produce documents in response to this Request. During our conferral, we explained that we believe it is relevant to understand who owns and controls SaveOnSP for purposes of liability and to understand decision-making processes at SaveOnSP. We also noted that the citizenship issue is necessary to establish diversity jurisdiction. You responded that you do not intend to contest subject-matter jurisdiction in this action. Despite this concession, we disagree with your assertion that the information sought by this Request is not relevant, and we believe that the parties are at an impasse to the extent that SaveOnSP will not produce the names and citizenship of all SaveOnSP LLC members. In light of our conferral, we understand that the parties are at impasse on this issue.

    **B.    Request No. 6: All communications between SaveOnSP and JJHCS, as well as all communications SaveOnSP has had relating to SaveOnSP's communications with JJHCS.**

      In response to this Request, SaveOnSP agreed to produce communications between SaveOnSP and JJHCS concerning CarePath, SaveOnSP's services, or Janssen Drugs. You indicated that there was no present intention to carve out any particular documents and that this objection was made in order to avoid the potential burden to SaveOnSP should the volume of such communications be greater than expected.

      While we are mindful of the need for proportionality in document production, as discussed above, given the nature of this specific Request, we do believe it is reasonable for SaveOnSP to produce all communications, regardless of subject matter, with JJHCS. We also believe, for the reasons discussed above, that it is reasonable for SaveOnSP to produce internal communications about its communications with JJHCS. In light of our call, we understand that the parties are at impasse on this issue.

    **C.    Request No. 12: All documents concerning fees paid to or collected by SaveOnSP, not otherwise captured by other Requests.**

      In response to this Request, SaveOnSP agreed to produce documents sufficient to show all fees paid to or collected by SaveOnSP related to services it provides to plans regarding

Meredith Nelson, Esq.
December 9, 2022
Page 7

Janssen Drugs.  We explained that we seek to understand, among other things, how SaveOnSP's fees are structured and calculated in order to determine JJHCS's damages in this action.  We understand that the parties are at an impasse because that SaveOnSP will not produce all documents concerning the fees paid to it.

    **D.**    **Request No. 15: All recordings or transcripts of presentations or interviews concerning the SaveOnSP Program.**

In response to this Request, SaveOnSP indicated that it would produce "recordings or transcripts of presentations regarding the services that it provides to health plans identified during a reasonable search."  We clarified whether you intended to withhold comparable, responsive information related to "interviews."  You responded that the omission of "interviews" in SaveOnSP's response was not intentional and SaveOnSP would produce such documents.  We write to memorialize that representation.

    **E.**    **Request No. 24: All documents concerning SaveOnSP's offer of $0 co-payments to patients, including any communications relating to whether to cease offering $0 co-payments for one or more pharmaceuticals.**

In response to this Request, SaveOnSP objected to the phrase "SaveOnSP's offer of $0 co-payments to patients" because it claims "SaveOnSP does not offer $0 co-payments to patients."  Thus, SaveOnSP indicated that it would produce only "documents concerning such plan benefits identified during a reasonable search."

In our call, we sought clarification about whether you intended to withhold documents responsive to this Request.  You indicated that while SaveOnSP disagrees with the characterization of it as offering a $0 co-payment, SaveOnSP would not on that basis withhold documents responsive to this Request.  We write to memorialize that representation.

    **F.**    **Request No. 29: All documents and communications indicating the total amount SaveOnSP has collected from patients who had already satisfied their out-of-pocket maximum, prior to enrolling in SaveOnSP.**

In response to this Request, SaveOnSP objected to it for, among other reasons, "not describing the documents sought with reasonable particularity."  We asked whether SaveOnSP would produce documents if we rephrased the Request as "All documents and communications indicating the total amount of CarePath funds collected from patients enrolled in the SaveOnSP Program who had already met their out-of-pocket maximum under the Affordable Care Act prior to enrolling in SaveOnSP."  Please advise whether SaveOnSP will agree to produce such documents with this clarification.  If we do not receive a response, we will assume that SaveOnSP continues to refuse to produce documents and that we are at an impasse on this Request.

14041709

Meredith Nelson, Esq.
December 9, 2022
Page 8

G. **Request No. 30: All documents reflecting communications with pharmacies regarding the "[p]oint of sale claim rejection" to "facilitate warm transfer of member to SaveonSP."**

In response to this Request, SaveOnSP objected to the phrase "[p]oint of sale claim rejection" because it claims "it does not accurately describe pharmacies' communications with patients." Thus, SaveOnSP indicated that it would produce only "documents . . . reflecting its communications with pharmacies regarding communications with members using Janssen Drugs regarding the warm transfer of members to SaveOnSP." Response to Request No. 30. We asked whether, based on the parties' disagreement that there is a "point of sale claim rejection," you intended to withhold documents responsive to this Request. You indicated that SaveOnSP disagrees that there is a "point of sale claim rejection," but that SaveOnSP would not on that basis withhold documents responsive to this Request and would produce all responsive documents. We write to memorialize that representation.

H. **Request No. 36: Annual Program Summary documents outlining the terms of the SaveOnSP program for each participating health plan, including: (i) patient copay/coinsurance requirements for each drug included in the program; (ii) the extent to which SaveOnSP would rely on manufacturer copay assistance to cover the patient costs; (iii) patient copay/coinsurance requirements after a manufacturer's copay assistance has reached its maximum contribution for the year; (iv) patient deductible requirements; (v) patient out-of-pocket maximum limits and what patient payments are accounted for in determining whether a patient has reached their out-of-pocket maximum; (vi) any other payment obligations for the patient.**

In response to this Request, SaveOnSP stated that it is "not aware of any Summary Plan Descriptions, Summary of Benefits and Coverage documents, or annual open enrollment materials reflecting the advice that SaveOnSP provides to health plans that are within its possession, custody, or control," but that if "SaveOnSP becomes aware of any such documents in its possession, custody, or control, SaveOnSP will produce those documents."

In our call, we pointed out that the agreement governing the SaveOnSP Program provides that SaveOnSP shall "assist [health plans] with potential modifications to summary plan descriptions or other benefits documents to outline the SaveOnSP Program within the [health plan's] plan benefit," which suggests SaveOnSP would have documents responsive to this Request regardless of who generates them. *See* Exhibit A of the 2018 Master Program Agreement, SOSP_0000074. You said were not familiar with our reference and that you did not think that SaveOnSP maintained such documents in the ordinary course, but nevertheless would not hold back documents responsive to this Request to the extent they are in SaveOnSP's possession, custody or control. We write to memorialize that representation.

Meredith Nelson, Esq.
December 9, 2022
Page 9

I.    **Request No. 41: Data covering the period January 1, 2016 through the present on all manufacturer copay assistance provided to either a pharmacy, PBM, or SaveOnSP for prescriptions filled by SaveOnSP member patients, including: (i) manufacturer; (ii) brand name; (iii) National Drug Code ("NDC"); (iv) recipient of manufacturer assistance; (v) patient identifier; (vi) pharmacy for relevant drug fill; (vii) pharmacy address; (viii) prescription number; (ix) prescription fill date; (x) number of units; (xi) days of supply; (xii) unit of measure; (xiii) copay or coinsurance amount; (xiv) coupon amount; and (xv) information on how these payments can be linked to the transaction/claims data.**

**Request No. 42: Electronic prescription-level transaction data for all drug purchases from January 1, 2016 through the present for all patients who at any point during that time frame participated or did not participate in the SaveOnSP program, including:**

- **Information on parties to the prescription transaction, including: (i) pharmacy name; (ii) pharmacy address; (iii) patient identification; (iv) patient state of residence; (v) identifier for whether patient is on a SaveOnSP program; (vi) insurance/health plan name; (vii) insurance/health plan ID; (viii) type of insurance (e.g., commercial, Medicare, Medicaid); (ix) insurance/health plan member ID; (x) insurance/health plan BIN number; (xi) insurance/health plan PCN number; (xii) insurance/health plan group name; and (xiii) insurance/health plan group number.**

- **Drug information for the prescription transaction, including: (i) product description (i.e., brand name); (ii) NDC; (iii) product form; (iv) product strength; (v) number of units; (vi) days of supply; (vii) units returned or otherwise affected by the transaction; (viii) unit of measure; (ix) date of prescription fill; (x) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.); and (xi) any discounts, rebates, or other price adjustments or offsets.**

- **Payment information for the prescription transaction, including: (i) total amount paid to the pharmacy for the prescription; (ii) patient copayment; (iii) patient coinsurance payment; (iv) patient deductible payment; (v) copay coupon/manufacturer assistance amount applied to the prescription cost; (vi) voucher amount; (vii) bridge benefit payment; (viii) net consumer payment after subtracting co-pay, coinsurance, deductible, coupon, voucher, bridge benefit, and other assistance; (ix) insurance/health plan**

Meredith Nelson, Esq.
December 9, 2022
Page 10

> **cost submitted; and (x) insurance/health plan amount paid to pharmacy.**

In response to these Requests, SaveOnSP indicated that it would produce "data sufficient to show, for each Janssen Drug, the total amount of payments made by CarePath for participants of plans advised by SaveOnSP." In our call, we explained that the granular data sought by this Request was relevant to JJHCS's analysis of data and calculation of damages in this action, and that the data is necessary to identify patients enrolled in the SaveOnSP Program. You responded that some of this data could be relevant to JJHCS's damages calculation, but that it was not obvious why each category of data identified would be relevant. This is not an appropriate objection. JJHCS will make determinations in due course about how it will use the relevant data, but all relevant data that SaveOnSP maintains must be produced for analysis. We nonetheless indicated that if there are certain categories of this data that SaveOnSP does not maintain, then we would be open to meeting and conferring about potential categories to omit from the Requests. We also stated that depending on your response to Request Nos. 41 and 42, we would be prepared to reframe or withdraw Request No. 40, which addresses related issues. You indicated that you would review what data could be produced. Please let us know by December 14, 2022 if SaveOnSP will revise its response to these Requests to produce the categories of data responsive to this Request that it maintains. Absent confirmation to the contrary, we will assume that SaveOnSP is only willing provide "the annual total amount of payments made by CarePath for participants of plans advised by SaveOnSP," which will place the parties at an impasse with respect to these Requests.

**J.      Request No. 43: All documents and communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs.**

In response to this Request, SaveOnSP indicated that it would not produce any documents. In our call, we stated that this Request is similar to Request Nos. 18-22 concerning the Affordable Care Act and that we sought documents relating to how SaveOnSP interpreted its compliance obligations. You did not indicate a willingness to produce documents in response to this Request. We understand the parties are at an impasse with respect to this Request.

**K.      Request No. 45: All documents and communications relating to studies, reports, publications, analyses, research, white papers, reviews, or other written work product that SaveOnSP has created, commissioned, paid for, sponsored, or otherwise procured or supported regarding (i) specialty medication costs, (ii) copayment and coinsurance rates, (iii) accumulator programs, (iv) maximizer programs, or (v) strategies to manage specialty medication costs.**

In response to this Request, SaveOnSP indicated that it would only produce "publicly disseminated studies, report, publications, analyses, research, white papers, or reviews

Meredith Nelson, Esq.
December 9, 2022
Page 11

relating to the services SaveOnSP provides to health plans." We explained that we believe all
studies, reports, publications, analyses, research, white papers, or reviews are relevant, regardless
of whether or not they were publicly disseminated. You stated, in substance, that documents that
are purely internal are not relevant to this litigation. We disagree. We believe the parties are at
an impasse with respect to this Request. Please let us know by December 15, 2022 if SaveOnSP
will revise its response to this Request.

    L.    **Request No. 52: Documents sufficient to show SaveOnSP's liquidity, debt,
profits, losses, revenues, costs, EBITDA, and assets throughout the Time
Period, including financial statements or financial analyses.**

      In response to this Request, SaveOnSP indicated that it would not produce any
documents. In our call, we explained that JJHCS is entitled to this information about
SaveOnSP's financial position because it is relevant to damages in this action. You disagreed
and maintained that the information requested is irrelevant. We understand the parties are at an
impasse with respect to this Request.

* * *

      Any issue not raised herein does not constitute a waiver on the part of JJHCS, and
JJHCS reserves all rights to raise additional concerns at a future date based upon SaveOnSP's
objections or the materials that SaveOnSP produces in this action. Finally, as soon as SaveOnSP
is prepared to discuss logistics for its anticipated collection, we ask that you disclose your
intended custodians, search terms, any targeted collection methodologies, and your plans with
regard to producing all documents you have agreed to produce.

      We look forward to your response.

      Very truly yours,

      Harry Sandick

14041709

# EXHIBIT 2

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 6, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

By Email

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:    *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*
> *(Case No. 2:22-cv-02632-JMV-CLW)*

Dear Meredith:

We write in regard to Save On SP LLC's ("SaveOnSP") Responses and Objections to Johnson & Johnson Health Care Systems, Inc.'s ("JJHCS") First Set of Interrogatories. JJHCS has identified several issues with SaveOnSP's responses and objections. Many of these issues mirror those that we have already discussed at length in connection with JJHCS's Requests for Production. Please let us know your availability to meet and confer.

## I.    GENERAL ISSUES

### A.    Anonymization of Health Plan and Patient Identities (Interrogatory Nos. 5, 6, 7, and 10).

Interrogatory Nos. 5, 6, and 7 ask for information that would include the identities of health plans. Interrogatory No. 7, in particular, requested that SaveOnSP "[i]dentify the name and address of each Payor SaveOnSP has advised regarding the Co-payment or Co-insurance f any Janssen medication." *See* Interrogatory No. 7. In response, SaveOnSP objected to "producing the identities of Payors that have contracted with SaveOnSP because such information is not sufficiently relevant and necessary to JJHCS's case to outweigh the harm that disclosure of that information could cause to SaveOnSP, plan participants, and health plans." *See, e.g.*, Response to Interrogatory No. 7. Further, with respect to Interrogatory No. 7 in particular, SaveOnSP objected that "the burden and expense of producing all such information outweighs the marginal relevance of the material requested." *Id.* Accordingly, SaveOnSP stated it will not produce those identities. *Id.*

Similarly, in response to Interrogatory No. 10, which calls for information about "each Plan Member who declined to participate in the SaveOnSP Program in connection with their purchase of Janssen medication," SaveOnSP objected to "producing the identities of plan participants because such information is not sufficiently relevant and necessary to JJHCS's case

Meredith Nelson, Esq.
January 6, 2023
Page 2

to outweigh the harm that disclosure of that information could cause to SaveOnSP, plan participants, and health plans." *See* Response to Interrogatory No. 10. Again, SaveOnSP refuses to provide those identities. As we discussed at length in connection with JJHCS's Requests for Production, SaveOnSP's objections are unfounded.

First, patient and health plan identities *are* relevant. With respect to health plan identities, SaveOnSP has itself placed health plans roles at issue in its motion to dismiss and other statements in this action, and JJHCS is entitled to know the identities of those actors to test SaveOnSP's claims and to present the full story regarding SaveOnSP's conduct in tandem with health plans. JJHCS is also entitled to pursue further discovery from those plans, to the extent appropriate, to establish their role in the SaveOnSP scheme and its impact on JJHCS and patients.

With respect to patient identities, whether the SaveOnSP Program harms patients is relevant to whether SaveOnSP's conduct is wrongful and unjustified under JJHCS's tortious interference claim or is directed to consumers and causes public harm under JJHCS's GBL claim. JJHCS is entitled to prove that harm in ways that require patient identities, such as matching up a patient's narrative written complaints to SaveOnSP with their corresponding claims data to show their experience. JJHCS is also entitled to patient identities to perform damages analyses because JJHCS must be able to match patient identities across data sets. For instance, JJHCS may prove its damages by comparing the amount of CarePath funds used by patients in the SaveOnSP Program with the amount of CarePath funds used by patients not in the SaveOnSP Program. JJHCS can also prove damages and liability by demonstrating that patients' copay obligations rise dramatically after they enter into the SaveOnSP program. To match up the patient data maintained by the CarePath program administrators with SaveOnSP's patient data, JJHCS needs to be able to track patient identities. Finally, JJHCS is entitled to pursue third-party discovery from patients, to the extent appropriate, to learn more about their experience as well.

Second, there is no risk of harm to SaveOnSP, patients, or health plans if the identities of health plans or patients are revealed. The parties' productions are subject to a court-ordered, HIPAA-compliant Protective Order (Dkt. 62), which puts various protections into place to ensure that sensitive information exchanged among the parties are not disclosed outside of the litigation. Further, JJHCS already knows the identities of the patients who participate in its CarePath program, as well as the identities of some health plans that have advertised their use of SaveOnSP publicly. Finally, despite SaveOnSP's concerns about third-party discovery, SaveOnSP has not explained how concerns about potential outreach or subpoenas in the future justify withholding discoverable information in the first instance. If SaveOnSP wishes to prevent or limit third-party discovery, the proper means to do so is by moving for a protective order, not by preventing JJHCS from obtaining discovery in the first place.

Meredith Nelson, Esq.
January 6, 2023
Page 3

Lastly, SaveOnSP's claims of "burden and expense" are specious. There is no plausible undue burden associated with producing a list of the names and addresses of the Payors that SaveOnSP has advised.

**B.    Limited Scope of Communications (Interrogatory Nos. 2, 3, and 4).**

Interrogatory Nos. 2, 3, and 4 call for descriptions of internal processes, such as the drafting of the SaveOnSP IPBC Video (Interrogatory No. 2), the choosing of Janssen medication for inclusion in the SaveOnSP Program (Interrogatory No. 3), and SaveOnSP's determination of the increase in patients' co-payment or co-insurance (Interrogatory No. 4). Though SaveOnSP provided responses to these interrogatories, it objected that internal processes and communications about these processes are not relevant. For example, in response to Interrogatory No. 4, SaveOnSP said "the internal process by which SaveOnSP formulates the advice that it provides to health plans regarding the plans' setting of copays and co-insurance amounts for Janssen Drugs, including internal communications concerning that advice, is not relevant to the claims or defenses in this action." *See* Response to Interrogatory No. 4.

Such objections are improper. Internal processes, particularly about issues as central to this litigation as SaveOnSP's "advice that it provides to health plans regarding the plans' setting of copays and co-insurance amounts for Janssen Drugs," are basic and fundamental discovery. Such information is relevant to JJHCS's tortious interference claim because it may provide insight into both SaveOnSP's intent and whether the means it uses to induce patients to breach the CarePath Terms & Conditions are unjustified and wrongful, as required by New Jersey law. It is also relevant to JJHCS's GBL claim because it may reflect the extent to which SaveOnSP's actions result in patient harm. SaveOnSP cannot unilaterally exempt itself from producing internal information about some of its most questionable conduct. We cannot agree that SaveOnSP may limit discovery to information that it has already shared with others. Please confirm that SaveOnSP will withdraw this objection and clarify whether SaveOnSP has withheld information from its interrogatory responses based on these objections.

**II.    SPECIFIC ISSUES**

**A.    Interrogatory No. 4: Describe, in as much detail as possible, the process by which SaveOnSP determines the size of the "inflated co-pay," or increase to Plan Members' Co- payment or Co-insurance, including any and all criteria used to inform how that Co-payment or Co-insurance is determined.**

Although SaveOnSP provided a response to this interrogatory, it objected "to the extent that it seeks information regarding copays for drugs other than Janssen Drugs, as such information is not relevant to the claim or defenses in this action." *See* Response to Interrogatory 4.

Meredith Nelson, Esq.
January 6, 2023
Page 4

When we discussed this objection in connection with JJHCS's Requests for Production, you (1) confirmed that SaveOnSP would produce responsive documents regarding or applying to drugs generally or encompassing Janssen Drugs, even if they did not make a specific reference to Janssen or a Janssen Drug, but (2) clarified that SaveOnSP intended to withhold documents related to or referencing only non-Janssen Drugs.

We write first to clarify whether the same holds true for this objection. If so, we reiterate that SaveOnSP's objection to producing information related to or referencing only non-Janssen Drugs is improper. The practices of SaveOnSP with respect to non-Janssen Drugs will shed light on SaveOnSP's practices with respect to Janssen Drugs. In addition, as we have explained, in support of the wrongfulness element of its tortious interference claim, JJHCS is entitled to the full picture of SaveOnSP's wrongful conduct, not only as it relates to Janssen patients. Similarly, JJHCS's GBL claim concerns all of SaveOnSP's conduct, not just that conduct related to CarePath or Janssen Drugs. Accordingly, information concerning non-Janssen Drugs is relevant to the claims at issue in this action. Please confirm that SaveOnSP has not withheld information from its interrogatory response based on this objection.

**B.      Interrogatory No. 9: Describe, in as much detail as possible, the processes and methods by which the SaveOnSP Program employs a "tertiary biller" to pay a Plan Member's $5 or $10 out-of-pocket responsibility, which is "really SaveOn behind the scenes."**

Although SaveOnSP's response explains that it will, as the tertiary biller, pay for any balance that remains after the primary and secondary claims are adjudicated, SaveOnSP does not indicate what processes and methods it uses to execute that tertiary biller role. For example, SaveOnSP does not describe how it inputs itself onto the pharmacy's system so that "any balance that remains after the primary and secondary claims are adjudicated is billed to SaveOnSP," including what representations it makes to the pharmacy and other billers to do so. For that reason, SaveOnSP's response to Interrogatory No. 9 is incomplete and we ask you to amend the response to provide the missing information.

**C.      Interrogatory No. 10: For each Plan Member who declined to participate in the SaveOnSP Program in connection with their purchase of Janssen medication, identify how much each one paid for each prescription of Janssen medication that he or she filled after he or she declined to participate in the SaveOnSP Program.**

Although SaveOnSP's response describes generally that a patient who declines participation in the SaveOnSP Program is "then responsible for the full amount of her copays or co-insurance amounts, absent an internal appeals process that is solely determined by the health plan," SaveOnSP does not identify what that "full amount of . . . copays or co-insurance" is for each prescription and each patient. Even putting aside the anonymization issue raised in Section I, *supra*, SaveOnSP can provide in its response the amounts paid for each prescription by each

Meredith Nelson, Esq.
January 6, 2023
Page 5

Plan Member who declined to enroll in the SaveOnSP Program. For that reason, we find that SaveOnSP's response to Interrogatory No. 10 is incomplete and ask you to amend the response to provide the missing information.

* * *

Any issue not raised herein does not constitute a waiver on the part of JJHCS, and JJHCS reserves all rights to raise additional concerns at a future date based upon SaveOnSP's objections or the materials that SaveOnSP produces in this action.

We look forward to your response.

Very truly yours,

Harry Sandick

# EXHIBIT 3

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 27, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

<u>**VIA EMAIL**</u>

Andrew Dunlap, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
adunlap@selendygay.com

Re:    **SaveOnSP's Health Plan and Patient Identity Proposal**
*Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
*No. 22 Civ. 2632 (JMV) (CLW)*

Dear Andrew:

We write in response to your letter dated January 20, 2023 (the "Jan. 20 Ltr.") in which Save On SP LLC ("SaveOnSP") proposes a solution to the parties' dispute regarding Johnson & Johnson Health Care Systems, Inc.'s ("JJHCS") request that SaveOnSP produce lists of, and documents containing, the names of its health plan clients and the names of patients enrolled in those plans who are also enrolled in JJHCS's CarePath Program. SaveOnSP's proposal consists of the following:

> SaveOnSP would be open to producing client and patient names (designated Attorneys' Eyes Only) if JJHCS would agree to the following: (1) JJHCS will not subpoena or otherwise contact any client or patient until the parties substantially complete document production; (2) after that, JJHCS will contact or subpoena no more than five patients and five clients; and (3) JJHCS may then contact or subpoena additional patients or clients only with SaveOnSP's prior consent or by order of the Court for good cause shown.

Jan. 20 Ltr. at 2.

While we appreciate your reaching out to us to seek to resolve our dispute, we cannot agree to this proposal for several reasons. At its core, the SaveOnSP proposal would flip the ordinary rules of discovery by requiring JJHCS to seek permission to do what it is entitled to do as a matter of right.

First, SaveOnSP's proposal would limit JJHCS's ability not only to subpoena health plans or patients, but even to *contact* them. Such limitations are inappropriate. As many courts have explained, "pre-trial interviews with witnesses [are] common, and 'the right to conduct

Andrew Dunlap, Esq.
January 27, 2023
Page 2

such interviews is taken for granted as a matter of federal procedure.'" *Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, No. 2:17-cv-00495-JDW, 2021 WL 4262317, at *4 (E.D. Pa. Sept. 20, 2021) (quoting *Patton v. Novartis Consumer Health, Inc.*, No. 02-cv-47, 2005 WL 1799509, at *3 (S.D. Ind. July 25, 2005)); *see also Doe v. Eli Lilly & Co.*, 99 F.R.D. 126, 128 (D.D.C. 1983) ("[W]hile the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the *ex parte* interview of a witness who is willing to speak."). JJHCS and its counsel are permitted to contact and interview any third parties who are willing to speak, without limitation.

By seeking to block contact with its health plan customers, SaveOnSP is trying to have it both ways. SaveOnSP placed the role of its health plan customers directly at issue in its Motion to Dismiss. It cannot now expect that JJHCS should agree to limit its right to contact or subpoena those health plans without SaveOnSP first identifying any real harm that could come from such contact.

The problematic nature of SaveOnSP's proposal is even more obvious when it comes to the restrictions on speaking with patients. Taken literally, SaveOnSP's proposal would prevent JJHCS from speaking or doing business with any patient who is in the CarePath program and who is known or believed to be enrolled in the SaveOnSP Program. There is no basis at all for JJHCS to relinquish its right to speak with its own patients enrolled in CarePath. This would prevent CarePath from functioning. As we have explained before, the patients we are discussing are just as much JJHCS patients as they are SaveOnSP plan participants. We presume that SaveOnSP would never agree to a condition that it not speak to its plan participants, and yet it makes this same request of JJHCS.

Second, SaveOnSP's authorities do not support its proposal, which is far more restrictive than the remedies ordered in prior cases. For instance, in *Wells Fargo & Co. v. ABD Ins.*, No. C 12-03856 PJH (DMR), 2012 WL 6115612 (N.D. Cal. Dec. 10, 2012), the court addressed a discovery dispute regarding the plaintiffs' issuance of 142 third party subpoenas. *Id* at *1. The court limited the number of subpoenas with which Plaintiffs could proceed to 50. *Id.* at *4. Here, SaveOnSP's proposal would only permit JJHCS to subpoena *and contact* "five patients or five clients" and after that, JJHCS would only be able to contact patients or clients with SaveOnSP's prior consent or by order of the Court. Nor does anything in the *Wells Fargo* court's order prevent the plaintiffs from contacting any potential witnesses, and the limitation of third-party subpoenas to 50 is also far less restrictive than what SaveOnSP proposes. Similarly, in *Heckler & Koch, Inc. v. German Sport Guns GMBH*, No. 1:11-cv-1108-SEB-TAB, 2014 WL 1323226 (S.D. Ind. Mar. 28, 2014), is in no way comparable. *Heckler* was a narrow dispute between competing gun manufacturers. The Court limited the scope of third party discovery on the facts, but even there left open the possibility that it would "broaden [third party] discovery to the extent it seems necessary[.]" *Id.* at *1-2. And that court certainly placed no restrictions on the plaintiff's ability to contact potential witnesses.

Andrew Dunlap, Esq.
January 27, 2023
Page 3

      Third, despite SaveOnSP's concerns about third-party discovery, SaveOnSP still has not explained how concerns about potential outreach or subpoenas in the future justify withholding discoverable information in the first instance. Indeed, *Wells Fargo*, *Heckler*, and the remainder of cases that SaveOnSP cites for the proposition that courts have ordered similar remedies to the one it proposes in its letter are all distinguishable on this basis: they were decided *after* subpoenas had actually been issued. If SaveOnSP wishes to prevent or limit third-party discovery, the proper means to do so is by moving for a protective order after a subpoena issues, not by preventing JJHCS from obtaining discoverable information in the first place. SaveOnSP's proposal would essentially shift the burden to JJHCS by requiring JJHCS to seek consent or permission from the Court to issue subpoenas rather than requiring SaveOnSP to seek protection. The SaveOnSP proposal is an inversion of the normal discovery process.

      While we reject your proposal, we are nevertheless willing to meet and confer in an attempt to resolve this dispute prior to the February 28, 2023 conference with the Court.[1] We do not agree that the hypothetical commercial harm SaveOnSP cites warrants the protections it proposes because JJHCS is entitled to contact witnesses, and indeed, JJHCS already knows the identities of the patients who participate in its CarePath program, as well as the identities of the many health plans that have publicly advertised their use of SaveOnSP. We are happy to meet and confer to discuss other proposals further at your convenience.

* * *

      Any issue not raised herein does not constitute a waiver on the part of JJHCS, and JJHCS reserves all rights to raise additional concerns at a future date based upon SaveOnSP's objections or the materials that SaveOnSP produces in this action.

      We look forward to your response.

                              Very truly yours,

                              Harry Sandick

---

[1] SaveOnSP is mistaken to say that the Court "denied" JJHCS's motion to compel. Jan. 20 Ltr. at 2. In fact, the Court ordered the parties to "continue to meet and confer in a good faith effort to resolve the issues discussed therein," and stated that it would "address any unresolved issues during a Court-guided meet and confer session" during the February 28, 2023 conference. Text Order, *Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*, Case No. 2:22-cv-02632-JMV-CLW (D.N.J. Jan. 6, 2023), ECF No. 67.

# EXHIBIT 4

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

February 9, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:  **JJHCS's Requests For Production**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

We write regarding Save On SP, LLC's ("SaveOnSP") Responses and Objections to Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") First and Second Set of Requests for Production.  On January 6, 2023 Order (ECF No. 67), Judge Waldor directed the parties to "continue to meet and confer in a good faith effort to resolve the issues discussed" in the parties' Global Joint Dispute Letter ("Global Letter," ECF No. 65) and Specific Joint Dispute Letter ("Specific Letter," ECF No. 66).  In this letter, we address several of those disputed issues and are available at a mutually agreeable date and time to meet and confer further.

## I.    GLOBAL ISSUES

### A.    Anonymization of Patient and Health Plan Identities

On January 20, 2023, you sent us a proposal regarding the parties' dispute on the anonymization of patient and health plan identities (the "Jan. 20 Letter").  We responded on January 27, 2023, identifying several issues with your proposal, and noting our willingness to consider additional proposals (the "Jan. 27 Letter").  During our January 30 meet and confer, you asked us to respond further with a proposal of our own.

First, as discussed in our January 27 letter, some of the measures proposed by SaveOnSP are inconsistent with the Federal Rules of Civil Procedure and would themselves place extreme limitations on JJHCS's business operations.  In our call on January 30, 2023, SaveOnSP seemed to withdraw its proposal that JJHCS no longer speak to patients in the CarePath program and substituted a new proposal that would generally require that JJHCS not speak to its patients about its lawsuit against SaveOnSP.  This ill-defined requirement would put all of JJHCS's communications with patients under the microscope and subject them to hair-splitting scrutiny by SaveOnSP.  It is no more workable than the proposal that JJHCS not speak

Meredith Nelson, Esq.
February 9, 2023
Page 2

to its patients at all.  SaveOnSP thus appears to be sticking with its novel proposal that JJHCS—unlike all parties in litigation—should be subject to restrictions on speaking with witnesses, and, as noted, JJHCS rejects this proposal.

The conferral process has demonstrated that SaveOnSP is not opposed to producing patient and health plan information based on burden or relevance objections, but is instead concerned with what JJHCS will do with the identities provided.  That is, the purported basis for SaveOnSP's objection is that by taking routine litigation steps, such as contacting witnesses or seeking third-party discovery, JJHCS could "commercially harm SaveOnSP."  Jan. 20 Ltr. at 1.[1]  These concerns are already addressed by the Federal Rules of Civil Procedure.

Specifically, JJHCS will provide notice to SaveOnSP of any subpoenas it serves, which will permit SaveOnSP to seek court intervention if it believes it has a basis and standing to do so.  *See* Fed. R. Civ. P. 30(b)(1), 45(a)(4).  JJHCS will also ensure that the return date for any subpoena provides adequate time for the witness to engage counsel and/or consult with either of the parties, if they care to do so, or for you to take any actions appropriate under the Federal Rules.  These safeguards will adequately protect SaveOnSP's commercial interests related to patient and health plan identities, which are the only remaining issues in view of your recent proposals.

**B.    Internal Communications**

As JJHCS's outlined in the Global Letter, SaveOnSP refused to produce internal communications responsive to a variety of requests.  Global Ltr. at 16.  In response, SaveOnSP asserted its desire to meet and confer further on many individual requests that we address below.

**1.    RFP Nos. 5, 7, and 8**

RFP Nos. 5, 7, and 8 request documents relating to SaveOnSP's communications with patients:

- RFP No. 5 requests: "All documents, including drafts, concerning communications with persons currently enrolled or eligible to enroll in CarePath."

- RFP No. 7 requests: "All communications SaveOnSP has received from persons currently enrolled in CarePath, including patient complaints or

---

[1] SaveOnSP also expresses a concern based on the possibility that JJHCS will "harass, annoy, or embarrass another party or third-party through discovery," (Jan. 20 Ltr. at 1).  This concern is misplaced and unfounded; JJHCS has no intention of harassing or annoying witnesses, many of whom are its own patients and customers.

Meredith Nelson, Esq.
February 9, 2023
Page 3

inquiries regarding the SaveOnSP Program, and all documents regarding
such patient complaints or inquiries."

- RFP No. 8 requests: "All communications SaveOnSP has received from
  persons who (i) refused to enroll in the SaveOnSP Program; (ii) tried to
  opt out of enrollment in the SaveOnSP Program; or (iii) initially enrolled
  in the SaveOnSP Program, but later canceled their enrollment, as well as
  documents regarding such patient communications."

In its Responses and Objections, SaveOnSP agreed to produce some documents
but excluded any internal communications responsive to these requests:

- In response to RFP No. 5, SaveOnSP agreed to produce only documents
  "sufficient to show the content of communications with persons enrolled
  in health plans advised by SaveOnSP who were enrolled or were eligible
  to enroll in CarePath concerning CarePath or SaveOnSP's services."

- In response to RFP No. 7, SaveOnSP agreed to produce only documents
  "sufficient to show SaveOnSP's standard, scripted communications
  regarding SaveOnSP's services or the terms of plans advised by
  SaveOnSP with persons enrolled in CarePath and in a health plan advised
  by SaveOnSP" as well as communications SaveOnSP "has received from
  persons currently enrolled in CarePath concerning complaints or inquiries
  about SaveOnSP's services or the terms of plans advised by SaveOnSP."

- In response to RFP No. 8, SaveOnSP agreed to produce only
  communications "it has received from members of plans advised by
  SaveOnSP who use any Janssen Drug who (i) refused to either enroll in
  CarePath or allow SaveOnSP to monitor their pharmacy accounts on
  behalf of the plan; (ii) tried to opt out of either CarePath or monitoring of
  their pharmacy accounts; or (iii) initially enrolled in CarePath and
  consented to monitoring of their pharmacy accounts but later either
  cancelled their enrollment in CarePath or withdrew their consent to
  monitoring of their accounts."

SaveOnSP thereafter agreed to produce "internal discussions that SaveOnSP has
had about communications where a patient is told that her drug is not covered," and stated its
willingness to produce additional documents if JJHCS identifies "other specific categories of
internal documents JJHCS believes are relevant."  Dec. 21 Ltr. at 4.

First, while we appreciate SaveOnSP's agreement to produce documents
reflecting "internal discussions that SaveOnSP has had about communications where a patient is
told that her drug is not covered," *id.*, all other responsive documents also should be produced,

Meredith Nelson, Esq.
February 9, 2023
Page 4

especially in light of the Court's recent order denying SaveOnSP's motion to dismiss. As the Court explained, evidence that SaveOnSP intentionally and maliciously interfered with JJHCS's contractual relationship with CarePath patients is relevant to JJHCS's tortious interference claim. *See* Order Denying Mot. to Dismiss (ECF No. 68 at 15). Likewise, evidence that SaveOnSP directed deceptive acts at consumers and caused harm to the public at large is relevant to JJHCS's GBL claim. *See id.* at 12-13. Internal communications about any patient complaints are therefore relevant to these claims.

For example, with respect to RFP No. 5, SaveOnSP agreed to produce only the "content of communications" with CarePath patients, but not the communications themselves or communications about those communications, excluding, for example, emails and other communications among SaveOnSP employees about how to respond to CarePath patients. Those communications bear on whether SaveOnSP's program intentionally interferes with CarePath's terms and conditions or is deceptive to consumers. With respect to RFP Nos. 7 and 8, SaveOnSP agreed to produce only "standard, scripted communications" and complaints, inquiries, and communications received from patients, but not communications *about* those communications, thus excluding discussions about how to respond to patients.

There is no possible objection based on relevance. Communications about interactions between SaveOnSP and CarePath patients are relevant for the reasons noted above. Nor is a burden objection appropriate here. Requiring SaveOnSP to produce all communications relating to patient complaints is actually less burdensome than requiring SaveOnSP to determine on a document-by-document basis whether a given patient communication falls within the narrow categories proposed by SaveOnSP.

Please let us know whether SaveOnSP will re-consider its refusal to produce internal communications responsive to RFP Nos. 5, 7, and 8.

## 2. RFP No. 16

RFP No. 16 seeks "all documents and communications, including drafts, concerning SaveOnSP's marketing or promoting its services to health insurance plan sponsors, including without limitation to pharmaceutical health plan sponsors." In response, SaveOnSP agreed to produce "final versions of communications or marketing materials that SaveOnSP provided to health plan sponsors." R&O to JJHCS's RFP No. 16. SaveOnSP has stated that it has "concerns about the overbreadth" of this request and asserts that JJHCS has not explained why RFP No. 16 "request[s] relevant material." Global Ltr. at 20-21.

As discussed above, internal communications are relevant because they bear on SaveOnSP's intent and its use of wrongful means. Indeed, in a parallel request, SaveOnSP has requested CarePath marketing materials from JJHCS. *See* SaveOnSP's RFP No. 11.

Meredith Nelson, Esq.
February 9, 2023
Page 5

In an effort to reach a compromise, JJHCS accepts SaveOnSP's proposal to produce only "final versions of communications or marketing materials that SaveOnSP provided to health plan sponsors" if SaveOnSP accepts JJHCS's production of final CarePath marketing materials in response to SaveOnSP's RFP No. 11. However, any additional, otherwise responsive communications that are also responsive to other more specific requests for production are not exempted by this agreement and must be produced. Furthermore, either party would be free to issue follow-up requests for additional documents based on the initial productions of final materials responsive to these requests or based on other information learned in discovery or fact investigation.

Please let us know whether SaveOnSP is willing to accept this compromise.

**3.     RFP No. 35**

RFP No. 35 seeks all documents, "including drafts, and communications concerning the preparation of, and posting of the SaveOnSP IPBC Video presentation as discussed in the Complaint, including who prepared the presentation, to whom the presentation was given, how many times the presentation was given, by whom, and over what period of time." After initially objecting to producing any documents in response to this Request, SaveOnSP has since agreed to produce documents "that reflect feedback SaveOnSP provided to Express Scripts regarding marketing materials" that "may have been incorporated in part in the IPBC Video presentation slide deck." R&O to JJHCS's Interrogatory No. 2.

Please confirm that SaveOnSP's response to Interrogatory No. 2 means that it intends to conduct a reasonable search and produce all documents responsive to RFP No. 35 as drafted. If our understanding is correct, we do not need to present this issue to Judge Waldor.

**4.     RFP No. 17**

RFP No. 17 seeks "[a]ny agreements, including drafts, between SaveOnSP or Express Scripts on the one hand, and health insurance plan sponsors, on the other, regarding the SaveOnSP Program, and any communications relating thereto." In its Responses and Objections, SaveOnSP stated it would withhold any drafts and internal communications responsive to these requests, arguing that "the burden and expense of producing all such documents outweighs the marginal relevance of the material requested." R&O to JJHCS's RFP No. 17. SaveOnSP agreed to produce only anonymized "documents sufficient to show the terms of its contracts with health insurance plans that cover Janssen Drugs." *Id.*

As we have discussed in several meet and confers since submitting the joint letters, internal communications regarding SaveOnSP's contracts with the health plans and Express Scripts ("ESI") are relevant to JJCHS's claims. Nevertheless, in an effort to compromise, JJHCS proposes to narrow RFP No. 17 to require, without anonymization, only (i) the final agreements between SaveOnSP or Express Scripts on the one hand, and health

Meredith Nelson, Esq.
February 9, 2023
Page 6

insurance plan sponsors, on the other, regarding the SaveOnSP Program, and (ii) any internal communications relating to:

- the treatment of CarePath drugs under the terms of the SaveOnSP Program;

- the designation of Janssen Drugs as Essential or Non-Essential;

- the monetary split between SaveOnSP and Express Scripts on the one hand, and between SaveOnSP and the health insurance plan sponsors, on the other;

- instances where the Plan Member uses the entire annual allotment of CarePath funds for a given Janssen medication after enrolling in the SaveOnSP Program; and

- SaveOnSP's operations in states where copay accumulator and maximizer programs have been banned.

Other communications would not have to be produced by SaveOnSP at the present time, with JJHCS reserving the right to issue follow-up requests for additional documents based on information learned in discovery or fact investigation. Please let us know whether SaveOnSP is willing to accept this compromise.

**5.    RFP Nos. 18, 19, 20, 21, 22, and 44**

RFP Nos. 18, 19, and 22 seek documents relating to SaveOnSP's advice to health plans, including the rationale for that advice:

- RFP No. 18 requests: "All documents and communications concerning SaveOnSP's evaluation of Janssen therapies, including but not limited to the de-designation of Janssen therapies as essential health benefits pursuant to the Affordable Care Act."

- RFP No. 19 requests: "All documents and communications concerning SaveOnSP's inclusion or exclusion of specific drugs as essential health benefits pursuant to the Affordable Care Act, including the criteria for inclusion and exclusion."

- RFP No. 22 requests: "All documents and communications concerning SaveOnSP's compliance with the Affordable Care Act, including but not

Meredith Nelson, Esq.
February 9, 2023
Page 7

limited to documents and communications concerning legal 'gray area'[2] surrounding the de-designation of Janssen therapies as essential health benefits pursuant to the Affordable Care Act."

Further, RFP Nos. 20 and 21 request documents relating to SaveOnSP's understanding of "Essential Health Benefits" as defined by the ACA and the designation of certain drugs as Essential Health Benefits:

- RFP No. 20 requests: "All documents and communications concerning the definition of 'Essential Health Benefits' as that term is used in the Affordable Care Act."

- RFP No. 21 requests: "All documents and communications concerning which state benchmark to use for the designation of specific drugs as essential health benefits."

Finally, RFP No. 44 requests "[a]ll documents and communications relating to Drug Lists featuring Janssen medications."

In its Responses and Objections, although SaveOnSP agreed to produce some documents, it again excluded any internal communications:

- In response to RFP Nos. 18-21, SaveOnSP agreed to "produce documents and communications identified during a reasonable search reflecting its advice to health plans regarding the plans' treatment of Janssen Drugs as Essential or Non-Essential Health Benefits."

- In response to RFP No. 22 SaveOnSP agreed to "produce documents identified during a reasonable search reflecting the advice that it provides to health plans concerning compliance with the Affordable Care Act as it relates to Janssen Drugs."

- In response to RFP No. 44, SaveOnSP agreed to "produce Drug Lists featuring Janssen medications and documents and communications reflecting advice from SaveOnSP to health plans concerning such Drug Lists identified during a reasonable search."

You have made parallel requests for internal communications regarding JJHCS's "understanding of the commercial health plans' ability to designate specialist drugs as Essential

---

[2] *See* David Cook, IPBC and SaveOnSP Training-20210216 1901-1, VIMEO, at 26:27 (Feb 17, 2021), https://vimeo.com/513414094.

Meredith Nelson, Esq.
February 9, 2023
Page 8

Health Benefits or Non-Essential Health Benefits under the Affordable Care Act."  December 21, 2022 Letter from M. Nelson, at 14.  Specifically, you argued that these communications are "relevant to JJHCS's allegation that SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits."  *Id.*

We renew here our compromise offer made in our January 27 letter: JJHCS will produce all non-privileged documents and communications regarding its understanding of commercial health plans' ability to designate specialty drugs as EHB or Non-Essential Health Benefits ("NEHB") under the ACA and its regulations for the time period of January 1, 2017 to June 1, 2022, to the extent such documents exist and can be located after a reasonable search.  In exchange, SaveOnSP will produce all non-privileged documents and communications responsive to the aforementioned requests, including internal communications regarding SaveOnSP's understanding of commercial health plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its regulations for the time period from January 1, 2017 to July 1, 2022.[3]

Please advise whether SaveOnSP accepts this compromise with respect to RFP Nos. 18 through 22, and 44.

### 6.     RFP No. 31

RFP No. 31 requests documents relating to the monies generated by SaveOnSP for health plans through incorporation of certain Janssen therapies into its program.  Specifically, "All documents concerning or discussing the amount of 'savings' generated and commissions earned by SaveOnSP relating to Janssen therapies."

In its Responses and Objections, SaveOnSP agreed to produce "documents sufficient to show the annual savings on Janssen Drugs generated by SaveOnSP for its clients and the annual fees earned by SaveOnSP relating to Janssen Drugs," but excluded any responsive internal communications.

Internal communications responsive to this request are of obvious relevance.  For example, internal communications regarding the profits SaveOnSP generates for its partners and the commission SaveOnSP itself earns as a result provides a motivation for SaveOnSP's tortious interference and is a measurement of the extent of the harm caused by SaveOnSP's conduct.  SaveOnSP cannot unilaterally exempt itself from producing internal communications concerning the basic terms of its business model.  In addition, internal communications concerning which

---

[3] Our proposal is similar to one offered in your letter of February 7, 2023, except that JJHCS continues to object to the production of documents from before 2017—a time period during which SaveOnSP did not exist and one that is therefore irrelevant to this action.  While the parties may dispute the date range for JJHCS's production, there is no reason to delay production of the otherwise agreed-upon documents responsive to these requests.

Meredith Nelson, Esq.
February 9, 2023
Page 9

drugs are included in SaveOnSP's program bears directly on how these decisions are made.  For example, whether, as JJHCS alleges, these decisions are the result of SaveOnSP's careful tracking of manufacturer copay assistance programs and designed to target therapies for which there is generous copay assistance available, *see* Compl. ¶ 19, is relevant both the SaveOnSP's intent in causing patients to breach the CarePath Terms & Conditions and the extent of public harm resulting from its conduct.

For the reasons stated above, please advise whether SaveOnSP intends to produce internal communications responsive to this request.

### 7.    RFP No. 45

RFP No. 45 requests "[a]ll documents and communications relating to studies, reports, publications, analyses, research, white papers, reviews, or other written work product that SaveOnSP has created, commissioned, paid for, sponsored, or otherwise procured or supported regarding (i) specialty medication costs, (ii) copayment and coinsurance rates, (iii) accumulator programs, (iv) maximizer programs, or (v) strategies to manage specialty medication costs."  In its Responses and Objections, SaveOnSP excluded any internal communications responsive to this request and agreed to produce only "publicly disseminated studies, reports, publications, analyses, research, white papers, or reviews" relating to the services it provides health plans.

In the Specific Letter, you indicated that SaveOnSP is willing to produce internal communications responsive to this Request "if JJHCS will agree to produce similar documents regarding the studies, reports, [and] publications . . . that JJHCS has funded or supported regarding copay assistance programs and maximizer and accumulator programs" in response to SaveOnSP's RFP No. 20.  Specific Ltr. 9.

In an effort to compromise, and subject to its general and specific objections, JJHCS is willing to produce "documents and communications regarding publicly distributed material . . . regarding . . . Copay Accumulator Services, or Copay Maximizer Services" that JJHCS funded or supported if SaveOnSP is willing to produce all documents, including internal communications, responsive to JJHCS's RFP No. 45.

Please let us know if you accept this compromise proposal, which involves the reciprocal production of documents as you have proposed in your February 7, 2023 letter.

## II.    OTHER ISSUES

### A.    Fee Information (RFP No. 12)

RFP No. 12 requests "All documents concerning fees paid to or collected by SaveOnSP, not otherwise captured by other Requests."  In its Responses and Objections,

Meredith Nelson, Esq.
February 9, 2023
Page 10

SaveOnSP agreed to produce documents "sufficient to show all fees paid to or collected by SaveOnSP that relate to the services it provides to plans regarding Janssen Drugs."

After meet and confer, in the Specific Letter, SaveOnSP then indicated that it "will produce documents sufficient to show its fees, fee structures, and fee arrangements with clients." Specific Ltr. at 3. Please advise whether these documents will relate to *all* fees paid and collected, as well as fee arrangements for *all* drugs and health plan clients. If that is the case, JJHCS is willing to withdraw without prejudice its application to the Court concerning this Request.

**B.    Data Requests (RFP Nos. 41 and 42)**

RFP No. 41 requests "[d]ata covering the period January 1, 2016 through the present on all manufacturer copay assistance provided to either a pharmacy, PBM, or SaveOnSP for prescriptions filled by SaveOnSP member patients, including: (i) manufacturer; (ii) brand name; (iii) National Drug Code ("NDC"); (iv) recipient of manufacturer assistance; (v) patient identifier; (vi) pharmacy for relevant drug fill; (vii) pharmacy address; (viii) prescription number; (ix) prescription fill date; (x) number of units; (xi) days of supply; (xii) unit of measure; (xiii) copay or coinsurance amount; (xiv) coupon amount; and (xv) information on how these payments can be linked to the transaction/claims data."

RFP No. 42 requests "[e]lectronic prescription-level transaction data for all drug purchases from January 1, 2016 through the present for all patients who at any point during that time frame participated or did not participate in the SaveOnSP program, including:

- Information on parties to the prescription transaction, including: (i) pharmacy name; (ii) pharmacy address; (iii) patient identification; (iv) patient state of residence; (v) identifier for whether patient is on a SaveOnSP program; (vi) insurance/health plan name; (vii) insurance/health plan ID; (viii) type of insurance (e.g., commercial, Medicare, Medicaid); (ix) insurance/health plan member ID; (x) insurance/health plan BIN number; (xi) insurance/health plan PCN number; (xii) insurance/health plan group name; and (xiii) insurance/health plan group number.

- Drug information for the prescription transaction, including: (i) product description (i.e., brand name); (ii) NDC; (iii) product form; (iv) product strength; (v) number of units; (vi) days of supply; (vii) units returned or otherwise affected by the transaction; (viii) unit of measure; (ix) date of prescription fill; (x) information sufficient to identify the type of transaction (e.g., a sale, a return, a discount, etc.); and (xi) any discounts, rebates, or other price adjustments or offsets.

- Payment information for the prescription transaction, including: (i) total amount paid to the pharmacy for the prescription; (ii) patient copayment; (iii) patient coinsurance payment; (iv) patient deductible payment; (v) copay coupon/manufacturer assistance

Meredith Nelson, Esq.
February 9, 2023
Page 11

amount applied to the prescription cost; (vi) voucher amount; (vii) bridge benefit payment; (viii) net consumer payment after subtracting co-pay, coinsurance, deductible, coupon, voucher, bridge benefit, and other assistance; (ix) insurance/health plan cost submitted; and (x) insurance/health plan amount paid to pharmacy.

In its Responses and Objections to RFP Nos. 41-42, SaveOnSP agreed to provide data sufficient to show, for each Janssen Drug, the annual total amount of payments made by CarePath for participants of plans advised by SaveOnSP. Subsequently, in your December 21 letter and the Specific Letter, you invited us to meet and confer regarding the parties' mutual requests for transactional and financial data, arguing that such requests are reciprocal in nature. Dec. 21 Ltr. at 10; Specific Ltr. at 6. (SaveOnSP's RFP Nos. 28 and 29 seek, *inter alia*, data concerning the number of patients enrolled in CarePath for each Janssen Drug, adherence rates for patients enrolled in CarePath, the amount of copay assistance funds provided to each patient through CarePath, the budget for CarePath, the impact of CarePath on JJHCS's finances, and other financial and manufacturing information for Janssen Drugs more generally, all dating back to 2009.)

While the nature of these data requests appears similar at first glance, the relevance of the underlying data to the parties' claims and defenses is quite different, and the cursory, aggregated information that SaveOnSP has offered to produce is insufficient for JJHCS's needs. JJHCS requires patient-by-patient data regarding SaveOnSP's program in connection with liability and damages. In contrast, SaveOnSP's sweeping requests for financial, manufacturing, and transactional data for every Janssen Drug, for many years before SaveOnSP was even founded, are plainly outside the subject matter of this litigation—SaveOnSP's effects on the CarePath program.

Additionally, JJHCS has already agreed to provide SaveOnSP with the financial data *concerning CarePath* that it needs to marshal its case here. Specifically, JJHCS has agreed to produce documents sufficient to show (i) how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath, (ii) JJHCS's budget for copay assistance through CarePath, and (iii) JJHCS's actual and projected annual costs for CarePath for the period of June 2016, when the CarePath program began in its current form, through July 1, 2022. This production will enable SaveOnSP to conduct its analysis on what financial effects its program has had on JJHCS and CarePath. Additionally, JJHCS has produced Janssen Transparency reports, which summarize both drug sales and patient assistance spending, for the period of 2017-2021.

As part of a compromise, if SaveOnSP is willing to produce the information sought in RFP Nos. 41 and 42, JJHCS will produce any available data responsive to parts (i) through (m) of SaveOnSP's RFP No. 28, which includes documents sufficient to show:

- all Patients enrolled in the CarePath program for each Janssen Drug;

Meredith Nelson, Esq.
February 9, 2023
Page 12

- the dates on which each Patient was enrolled in CarePath;

- the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath;

- the Janssen Drugs for which each Patient enrolled in CarePath received copay assistance;

- all copay assistance payments that JJHCS made to or on behalf each Patient enrolled in CarePath.

In its letter of February 7, 2023, SaveOnSP offered a similar proposal to the above, except it insists on the production of documents and data from prior to 2017. Such documents and data are irrelevant to this lawsuit, as they concern a time period before the allegations in the Complaint and during a time in which SaveOnSP did not exist. Please let us know if you will accept the proposal outlined above.

## C.    Compliance with State Law (RFP No. 43)

RFP No. 43 requests "All documents and communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs." In its Responses and Objections, SaveOnSP refused to produce documents in response to this Request.

As we explained in the Specific Letter, SaveOnSP operates like an accumulator program because it does not allow manufacturer copay assistance, such as that provided by CarePath, to count towards a plan member's deductible or out-of-pocket maximum. This is a core facet of accumulator programs.[4] In those states, the SaveOnSP program may violate state law. Whether a defendant's actions are illegal is plainly relevant to the wrongfulness prong of a tortious interference claim. *See E Z Sockets, Inc.*, *v. Brighton-Best Socket Mfg. Inc.*, 704 A.2d 1364, 1370 (N.J. Super. 1996). Thus, demanding documents on this subject is not a

---

[4] *See* Compl. ¶ 50 n.7. Now, numerous states have outlawed accumulator programs. *See* National Conference of State Legislatures, *Copay Adjustment Programs* (Nov. 1, 2022), https://www.ncsl.org/health/copayment-adjustment-programs (explaining that 15 states require copay assistance to "be applied to a consumer's annual out-of-pocket cost-sharing requirement"); *see, e.g.* N.Y. Ins. C. § 3216(i)(37) ("Any policy that provides coverage for prescription drugs shall apply any third-party payments, financial assistance, discount, voucher or other price reduction instrument for out-of-pocket expenses made on behalf of an insured individual for the cost of prescription drugs to the insured's deductible, copayment, coinsurance, out-of-pocket maximum, or any other cost-sharing requirement.").

Meredith Nelson, Esq.
February 9, 2023
Page 13

"fishing expedition," as you asserted in the Specific Letter (Specific Ltr. at 8), and is instead relevant to proving a central element of one of JJHCS's claims.

In our meet and confers, you proposed that the parties mutually drop all Requests concerning accumulator and maximizer programs. For the reasons stated above, the parties' needs related to their understanding of accumulator and maximizer programs are not parallel. While SaveOnSP's understanding of those terms, as well as whether SaveOnSP is itself an accumulator or maximizer, is relevant to, among other things, the wrongfulness prong of JJHCS's tortious interference claims. JJHCS's understanding of the terms, by contrast, is not relevant to any claim or defense in this action. Thus, we reject your proposal that the parties mutually drop requests concerning accumulator and maximizer programs. We believe the parties are at an impasse with respect to this request.

* * *

We are available to meet and confer regarding the issues outlined above at your convenience. We look forward to your response.

Very truly yours,

*/s/Anthony C. LoMonaco*
Anthony C. LoMonaco

# EXHIBIT 5

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

**selendy
gay
elsberg**

Andrew R. Dunlap
Partner
212.390.9005
adunlap@selendygay.com

January 20, 2023            CONFIDENTIAL

Via E-mail

Harry Sandick
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
hsandick@pbwt.com

**Re:    *Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC* (Case No. 2:22-cv-02632-JMV-CLW)**

Dear Harry,

On behalf of SaveOnSP LLC ("SaveOnSP"), we write regarding Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") request that SaveOnSP produce lists of, and documents containing, the names of its health plan clients and the names of patients enrolled in those plans who are also enrolled in JJCHS's CarePath program. The parties have discussed this issue in the context of SaveOnSP's responses to JJHCS's document requests and its interrogatories. We write in attempt to find a solution.

As we have explained, even if SaveOnSP produced this information subject to the "Attorneys' Eyes Only" designation available under the Discovery Confidentiality Order, ECF No. 62 ("Protective Order"), JJHCS could still subpoena or contact SaveOnSP's clients and their patients, which could commercially harm SaveOnSP. This concern is heightened by JJHCS's explicit statements that it intends to subpoena or "interview" SaveOnSP's clients and their patients. *See* Joint Letter at 10-12, 14-15, *Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*, Case No. 2:22-cv-02632-JMV-CLW (D.N.J. Jan. 5, 2023), ECF No. 65 (hereinafter "Joint Letter"); Joint Letter Exh. 2 at 1-3, *Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*, Case No. 2:22-cv-02632-JMV-CLW (D.N.J. Jan. 5, 2023), ECF No. 65-2 at 14-16.

As we have also explained, we do not believe that it would be appropriate for JJHCS to subpoena or contact large numbers of SaveOnSP's clients or their patients. A party may not harass, annoy, or embarrass another party or third-party through discovery. *See Santiago v. Apothaker Scian P.C.*, 2017 WL 4543689, at *1

Harry Sandick
January 20, 2023

(D.N.J. Oct. 11, 2017); *see also* Fed. R. Civ. P. 26(g)(1)(B)(ii). Courts must also limit the extent or frequency of discovery, particularly from third parties, if the discovery sought is cumulative or duplicative. *Korotki v. Cooper Levenson, April, Niedelman & Wagenheim, P.A.*, Civil No. 20-11050 (CPO/MJS), 2022 WL 2191519, at *2, 7 (D.N.J. June 17, 2022) (quashing third-party subpoenas, which contained nearly identical requests to prior requests for production directed to a party, in their entireties as duplicative); *see generally* Fed. R. Civ. P. 26(b)(2)(C). Courts have accordingly acknowledged the serious risks to a party posed by subpoenas directed to its non-party clients. *See, e.g.*, *Winona PVD Coatings, LLC v. Excel Enters., LLC*, No. 3:16-CV-19-WCL-CAN, 2016 WL 9347091, at *3 (N.D. Ind. Apr. 18, 2016) (stating that defendants' subpoenas to non-party customers posed a risk to plaintiff's business relationships and ordering that defendants proceed with party discovery first to prevent defendants from prematurely burdening non-parties); *Accusoft Corp. v. Quest Diagnostics, Inc.*, No. CIV.A. 12-40007-FDS, 2012 WL 1358662, at *1, 10-11 (D. Mass. Apr. 18, 2012) (quashing third-party subpoenas directed at defendants' customers because the discovery at issue would likely harm their customer relationships).

As you know, to avoid this risk, SaveOnSP has proposed producing documents and data with client and patient names anonymized in the first instance, subject to JJCHS's ability to request specific names later in the litigation. To date, JJHCS has not agreed, and stated that it wants all the names, without restriction. *See, e.g.*, Jan. 6, 2023 Letter from H. Sandick to M. Nelson at 2. It moved the Court to compel SaveOnSP to produce the names. Joint Letter at 8-10, 12-14. The Court denied that motion and directed the parties to meet and confer. Text Order, *Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*, Case No. 2:22-cv-02632-JMV-CLW (D.N.J. Jan. 6, 2023), ECF No. 67.

SaveOnSP would be open to producing client and patient names (designated Attorneys' Eyes Only) if JJHCS would agree to the following: (1) JJHCS will not subpoena or otherwise contact any client or patient until the parties substantially complete document production; (2) after that, JJHCS will contact or subpoena no more than five patients and five clients; and (3) JJHCS may then contact or subpoena additional patients or clients only with SaveOnSP's prior consent or by order of the Court for good cause shown. This proposal is consistent with orders by courts limiting the number of subpoenas that a party may serve on its adversary's non-party customers. *See, e.g.*, *Wells Fargo & Co. v. ABD Ins.*, No. C 12-03856 PJH DMR, 2012 WL 6115612, at *3 (N.D. Cal. Dec. 10, 2012) (limiting number of non-party subpoenas directed to defendants' clients to a small percentage of its clients); *Heckler & Koch, Inc. v. German Sport Guns GMBH*, No. 1:11-CV-1108-SEB-TAB, 2014 WL 1323226, at *1-2 (S.D. Ind. Mar. 28, 2014) (limiting subpoenas to three out of fourteen customers as a sample).

Harry Sandick
January 20, 2023

We are available to meet and confer.

Best,

/s/ Andrew R. Dunlap

Andrew R. Dunlap
Partner

# EXHIBIT 6

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

| | |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❏ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: | Date and Time: |
|---|---|
| | |

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

SILLS CUMMIS & GROSS P.C.
Jeffrey J. Greenbaum
Katherine M. Lieb
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHNSON & JOHNSON | : | |
| HEALTH CARE SYSTEMS INC., | | Civil Action No. 22-2632 (JMV) (CW) |
| | : | |
| Plaintiff, | | |
| vs. | : | |
| | | |
| SAVE ON SP, LLC, | : | |
| | | |
| Defendant. | : | |

**NOTICE OF SUBPOENA FOR THE PRODUCTION OF DOCUMENTS**

PLEASE TAKE NOTICE that, pursuant to Rules 26, 34, and 45 of the Federal Rules of

Civil Procedure, Plaintiff Johnson & Johnson Health Care Systems Inc. in the above-captioned

matter intends to serve a subpoena in the form attached hereto commanding the production of

certain Documents in the possession, custody, or control of Premera Blue Cross.

The subpoena directs that the date, time, and place for production is: March 1, 2023 at

Veritext, 1200 6th Avenue, Suite 610, Seattle, WA 98101.

1

Dated: February 8, 2023

Very truly yours,

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:    s/ Jeffrey J. Greenbaum
       JEFFREY J. GREENBAUM
       KATHERINE M. LIEB

PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

2

## SCHEDULE A

### DEFINITIONS

1.      The definitions and rules of construction set forth in Federal Rule of Civil Procedure 34 are hereby incorporated by reference and apply to these requests for production of Documents ("Requests").  These definitions apply throughout these requests without regard to capitalization.

2.      "Action" means the above-captioned matter, *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*, No. 22-CV-2632, currently pending in the United States District Court for the District of New Jersey.

3.      "CarePath" means the Janssen patient assistance program providing support services for patients using medications researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including Janssen Biotech Inc., Janssen Pharmaceuticals, Inc, Janssen Products, LP, and Actelion Pharmaceuticals U.S., Inc. (collectively, "Janssen").

4.      "Communication" means any written, oral, or electronic exchange or transmission of information by any means, including face-to-face conversation, in-person meeting, mail, telephone, electronic mail, facsimile, text message, instant message, social media, and the Internet.

5.      "Complaint" means Johnson & Johnson Health Care Systems, Inc.'s ("JJHCS") May 4, 2022 complaint [ECF No. 1] or any subsequently amended Complaint in this Action.

6.      "Contract" means a written agreement, or all Documents relating to any verbal agreement, between You and another party, including any appendices, attachments, schedules, and amendments thereto.

3

7.      "Defendant" means Save On SP, LLC ("SaveOnSP"), and any and all predecessors and successors in interest, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of SaveOnSP.

8.      The term "Document" is used in the broadest sense consistent with Rule 34(a) of the Federal Rules of Civil Procedure.  The term includes, without limitation, any written, recorded, transcribed, taped, photographic or graphic matter, any electronically, magnetically or digitally stored information, including, without limitation, Communications, call notes, voice mail, video or audio recordings, electronic mail, software, source code, object code or hard or floppy disc files, any other tangible things, and all drafts or copies of any of the foregoing that are different in any way from the original.

9.      "Janssen Drug" means any Specialty Drug manufactured or sold by Janssen from any time for which patients may receive copay assistance, including, but not limited to, BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA.

10.     "Person" means (a) natural persons; (b) legal entities, including but not limited to corporations, partnerships, firms, associations, professional corporations and proprietorships; and (c) government bodies or agencies.

11.     "Plan Member" shall mean any beneficiary of or person enrolled in a health insurance plan, pharmaceutical benefits plan, or prescription coverage provided by a Payor.

12.     "Premera," "You," and "Your" means Premera Blue Cross, Premera Blue Cross HMO, and any and all predecessors and successors in interest, agents, representatives, directors,

officers, employees, committees, and all persons or entities acting or purporting to act on behalf or under the control of Premera Blue Cross.

13.    "Premera health plan" means any health insurance plan or group operating under the Premera Blue Cross or Premera HMO name, including as this term is used in the January 12, 2023 article *SaveOnSP Program Impacted by Drug Manufacturer Changes* (attached herewith as Exhibit 4).

14.    "Relating to," "relate to," "relates to," "related to," "relating to," "referring to," and "concerning" mean relating to, referring to, describing, referencing, reflecting, concerning, considering, evidencing, constituting, discussing, supporting, identifying, pertaining to, containing, embodying, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewing in conjunction with, setting forth, contradicting, refuting, supporting, recommending, or in any way logically or factually connected with the matter discussed, in whole or in part.

15.    "SaveOnSP" means Save On SP, LLC, and any and all predecessors and successors in interest, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of SaveOnSP.

16.    "SaveOnSP Program" means the program as described in the Complaint at ¶¶ 9–17.

17.    "And" and "or" are to be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive; use of a singular noun is to be construed to include the plural noun and use of a plural noun is to be construed to include the singular noun; the use of a verb in any tense is to be construed as the use of that verb in all other tenses

whenever necessary to bring within the scope of the requested documents or things that which might otherwise be construed to be outside its scope.

## INSTRUCTIONS

1.      These Requests are continuing in nature, requiring supplemental production of Documents if You later identify additional responsive Documents pursuant to Federal Rule of Civil Procedure 34.

2.      If any portion of a Document is responsive to any Request, the entire Document shall be produced.

3.      Any alteration of a responsive Document, including notes, underlining, stamps, drafts, revisions, modifications, and other versions of a final Document, is a separate Document and is to be produced as a separate Document.

4.      Pursuant to Federal Rule of Civil Procedure 45(e)(1)(b), You shall produce responsive Documents as they have been kept in the usual course of business or shall organize and label them to correspond to the enumerated Requests of this demand.  If You have no documents responsive to a particular category, You shall so state in writing.

5.      All Documents produced electronically are to include all available metadata fields, including but not limited to the date created and any custodian information.

6.      If You object to any part of a Request, You shall set forth the basis for Your objection and respond to all parts of the Request to which You do not object.

7.      Pursuant to Federal Rule of Civil Procedure 45(e)(2), if You withhold any document responsive to these Requests under a claim of privilege, You shall, for each such withheld document, provide a description of the document and a statement of the basis upon which the privilege asserted is claimed.  Such description(s) shall be sufficiently detailed to

permit JJHCS and the Court to evaluate the claim(s) of privilege.  Provide responsive documents or things to all parts of the Request to which You do not object.

8.      If a responsive document or thing was, but no longer is, within Your possession, custody, or control, please state in detail:

a.      the type of document or thing and the author(s), sender(s), recipient(s) and copy(ies) of the document or thing;

b.      a summary of the contents of the document or thing;

c.      what disposition was made of such document or thing;

d.      the date of such disposition;

e.      whether the original or a copy thereof is within the possession, custody or control of any other person; and

f.      if the answer to (e) is affirmative, the identity of such person.

9.      All documents and data and all electronically stored information should be produced in the manner required by any agreed-upon or court-ordered protocols or instructions provided by JJHCS.

10.     If You cannot produce responsive documents or things to any of these Requests in full, produce documents or things to the extent possible, specifying the reasons for Your inability to produce documents or things in full and provide responsive documents or things to the remainder.

11.     These definitions and instructions, and the requests set forth below, apply equally to all forms of electronic communications, including e-mails, and to all other tangible things.

12.     To extent a term is not defined herein, apply the definition for such term used in the Complaint.

13.    Unless otherwise specified herein or agreed to by the parties, the time period for each request is January 1, 2017 through the present (the "Time Period").

14.    These document requests are intended to cover all documents and things in Your charge or possession as well as those subject to Your custody or control, whether in Your possession, at the office of Your attorneys, or at any other place or in the possession of any other person or Entity subject to Your control.

15.    For purposes of interpreting these Requests, all terms should be given their most expansive and inclusive interpretation.  This includes the following: (i) construing the terms "and" and "or" in the disjunctive or conjunctive, as necessary, to make the Request more inclusive; (ii) construing the singular form of any word to include the plural and the plural form to include the singular; (iii) construing the past tense of the verb to include the present tense and the present tense to include the past tense; (iv) construing the masculine form to include the feminine form; (v) construing negative terms to include the positive and vice versa; and (vi) construing "include" to mean include or including "without limitation."

## REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**Request No. 1.**    Documents sufficient to show the relationship between Premera and SaveOnSP, including any Contracts to which both Premera and SaveOnSP are parties.

**Request No. 2.**    Documents concerning any actual or potential financial benefit provided by SaveOnSP to Premera or Premera health plans.

**Request No. 3.**    Documents concerning any actual or potential financial benefit to SaveOnSP or any other entity from Premera's or Premera health plans' participation in the SaveOnSP Program.

8

**Request No. 4.**        Documents concerning the terms and conditions to which patients must agree as a condition of participation in CarePath.

**Request No. 5.**        Documents sufficient to show the financial impact on Premera or Premera health plans of participating in the SaveOnSP Program.

**Request No. 6.**        Documents concerning changes to the CarePath terms and conditions which "exclude members utilizing a copay maximizer program," including for the Janssen Drugs Erleada, Simponi, Stelara, Tracleer, Tremfya, and/or Zytiga, and how those changes have impacted Premera's treatment of any Janssen Drug.[1]

**Request No. 7.**        Documents concerning the drafting of the January 12, 2023 article *SaveOnSP Program Impacted by Drug Manufacturer Changes* (attached as Exhibit 4 to this subpoena), including, but not limited to, Communications with SaveOnSP and Premera health plans.

**Request No. 8.**        Documents concerning why Premera removed the January 12, 2023 article *SaveOnSP Program Impacted by Drug Manufacturer Changes* (attached as Exhibit 4 to this subpoena) from its website.

**Request No. 9.**        Documents sufficient to show any changes that Premera has made with respect to its inclusion of any Janssen Drug in the SaveOnSP Program after any changes to the CarePath terms and conditions, including with regard to the December 2021 changes to the CarePath terms and conditions.[2]

---

[1] *See* Premera Blue Cross, *SaveOnSP Program Impacted by Drug Manufacturer Changes* (Jan. 12, 2023) (Attached as Exhibit 4 to this subpoena).

[2] *See* Compl. ¶¶ 102-04 (describing December 2021 change to CarePath terms and conditions for Stelara and Tremfya).

Dated: February 8, 2023

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:     s/ Jeffrey J. Greenbaum
        JEFFREY J. GREENBAUM
        KATHERINE M. LIEB


PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

10

SILLS CUMMIS & GROSS P.C.
Jeffrey J. Greenbaum
Katherine M. Lieb
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick (*pro hac vice* forthcoming)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHNSON & JOHNSON<br>HEALTH CARE SYSTEMS INC., | : | Civil Action No. |
| | : | |
| Plaintiff, | : | <u>Jury Trial Demanded</u> |
| vs. | : | |
| | : | |
| SAVE ON SP, LLC, | : | **COMPLAINT** |
| | : | |
| Defendant. | : | |

Plaintiff Johnson & Johnson Health Care Systems Inc. ("JJHCS"), having an address at 425 Hoes Lane, Piscataway, New Jersey 08854, for its Complaint against Defendant Save On SP, LLC, 611 Jamison Road, Elma, New York 14059 ("SaveOnSP"), alleges as follows:

**PRELIMINARY STATEMENT**

1.     JJHCS brings this action to stop SaveOnSP's scheme to pilfer tens of millions of dollars from the financial support program that JJHCS provides for patients. The patient assistance that JJHCS provides is for *patients*—not for SaveOnSP or the health plans with

which it partners.  By targeting and exhausting those funds for the benefit of its (and its partners') bottom line, SaveOnSP is increasing the cost of, and will ultimately render it untenable to provide, the assistance that patients desperately require.  That will irreparably harm JJHCS and the patients it serves.

2.       As a subsidiary of Johnson & Johnson, JJHCS provides funds to help commercially insured patients afford the costs of valuable and life-saving therapies.  Those costs include the co-payments ("copays")[1] that insurance companies and private health plans ("payers") insist must be paid by patients to obtain their prescription drugs.  Study after study has shown that many patients cannot afford such copays, and will be forced to forgo vital treatments unless help is provided to meet those obligations.  JJHCS provides that support through its patient assistance program.  However, with the deliberate intent to manipulate and thwart the purpose of JJHCS's program, SaveOnSP devised and implemented a scheme (the "SaveOnSP Program") to inflate and misappropriate the funding JJHCS provides for patients by interfering with the contractual relationship between JJHCS and patients.

3.       SaveOnSP's scheme works by (i) circumventing statutory constraints on the level of copay costs that payers may require patients to pay for pharmaceuticals; (ii) inflating patients' copay costs in order to increase the funds extracted from JJHCS's patient assistance program and thereby reduce the portion of the drug cost that the payers otherwise would have to pay to the pharmacy; (iii) using this artificially inflated copay cost to coerce patients to enroll in a program run by SaveOnSP, in addition to, and in violation of the terms of, JJHCS's patient

---

[1]  In this Complaint, the term "copay" is generally meant to encompass both an out-of-pocket fixed amount paid by the patient at the point of sale, as well as "co-insurance," or an out-of-pocket percentage of the cost of the product or service paid by the patient at the point of sale.

assistance program; and (iv) leveraging its illicit SaveOnSP Program to surreptitiously extract inflated amounts of patient assistance.

4.       Through this artifice, SaveOnSP enriches the payers with which it partners by (a) reducing the amount they pay to pharmacists for each prescription in the SaveOnSP Program, and (b) increasing by a commensurate amount the costs to the JJHCS patient assistance program.  In return for this exploitation and interference with JJHCS's program, the payers reward SaveOnSP with a 25% commission on their "savings."

5.       As a result, the costs to JJHCS of providing patient support have exploded. SaveOnSP has caused JJHCS to pay at least $100 million more in copay assistance than it otherwise would have for a purpose JJHCS did not intend, depleting the support available for patients who cannot afford their rising copays.  SaveOnSP knows this, and nonetheless has maliciously pursued this scheme to cause harm to JJHCS and the patients it supports while lining its own pockets.

### Patient Out-of-Pocket Obligations & JJHCS's Patient Assistance

6.       JJHCS does not and cannot control the price that a patient is asked to pay at a pharmacy when the patient goes to retrieve her or his medication.  Rather, a patient's copay cost is determined and imposed by private payers and their affiliated entities.  In recognition of the increasing costs that patients have faced at the pharmacy, since 2016, JJHCS has provided assistance to more than 2 million patients in order to help them defray their copay costs and more easily afford their life-saving and life-improving therapies.

7.       The patient assistance program at issue here, the Janssen CarePath Program ("CarePath"), provides a portfolio of support services for patients using medications researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including Janssen Biotech Inc., Janssen Pharmaceuticals, Inc, Janssen Products, LP, and Actelion

Pharmaceuticals U.S., Inc. (collectively, "Janssen").  These medications include complex biologic treatments for various cancers and serious immunological conditions.  Without JJHCS's assistance, many patients would be unable to afford their medications, potentially leading them to discontinue treatment, reducing their quality of life, and sometimes shortening their lives.

### SaveOnSP's Actions Interfere with JJHCS's Patient Assistance

8.      SaveOnSP knows that JJHCS funds patient assistance programs like CarePath to ease the burden on patients.[2]  Nevertheless, SaveOnSP has planned and executed a scheme to exploit, interfere with, and ultimately render it untenable for JJHCS to continue the CarePath program by inflating patients' copay obligations to coerce patients to enroll in SaveOnSP's own program—in violation of CarePath's terms and conditions.

9.      The SaveOnSP Program at the heart of SaveOnSP's scheme works by first changing the designation of Janssen's drugs—including live-saving cancer drugs and other critical medications—from "essential health benefits" to non-essential health benefits under the Affordable Care Act ("ACA").  Working in tandem with its payer partners, the SaveOnSP Program reclassifies the medications as non-essential *without regard to patients' actual medical needs and solely for SaveOnSP's own profit motives*.  Indeed, in a recorded presentation available online, a SaveOnSP Program representative admits: "The moment we reclassify these as non-essential we get to operate outside of those rules, which removes the limitations for how high we set the copay, it removes the requirement to apply copay assistance dollars to the max out-of-pocket.  And that's what allows us to be the *most lucrative* in terms of driving savings for SaveOn."  *See* David Cook, *IPBC and SaveonSP Training-20210216 1901-1*, Vimeo, at 23:35 (Feb 17, 2021), https://vimeo.com/513414094 (hereinafter, *SaveOnSP IPBC Video*).

---

[2]  SaveOnSP is well-versed in JJHCS's program, as its founder is a former Johnson & Johnson employee, and its CEO is also a former Johnson & Johnson employee.

10.     Once the SaveOnSP Program re-categorizes a drug as a non-essential health benefit, it is no longer subject to the ACA's annual out-of-pocket maximum that limits how much patients with private insurance can be required to pay for their medical care each year. The out-of-pocket maximum rule is meant to prevent patients from being forced to choose between vital medication and other necessities of life, such as food, clothing and housing.  In direct contravention to this legislative intent, by reclassifying certain medications as non-essential health benefits, the SaveOnSP scheme allows the payer to continue to charge the patient inflated copay costs even where the patient has already satisfied their out-of-pocket maximum as indicated during the SaveOnSP Program presentation:



*Id.* at 24:00.  In addition, after removing a given drug from the purview of the ACA's out-of-pocket maximum, the SaveOnSP Program increases the patient's copay for the given drug to an artificially high amount—often thousands of dollars per dose.  As explained by the SaveOnSP Program representative, "[I]n order for us to capitalize on this copay assistance funding, **we have to have that inflated copay upfront to bill to copay assistance.**"  *Id.* at 49:26.

11.     Further, in deciding which drugs to include in its program, SaveOnSP targets drugs that "**have the most lucrative copay assistance programs**," programs like CarePath.  *Id.* at

5

13:31.[3]  Once it has included those drugs in the SaveOnSP Program and the drug's copay has

been inflated, SaveOnSP then targets patients who take the drug, using the threat of an inflated

copay to coerce them into enrolling in the SaveOnSP Program.  Specifically, SaveOnSP tells

each patient that unless she enrolls in the SaveOnSP Program, she will have to pay the inflated

copay herself—and, making matters worse, the SaveOnSP Program will not count the thousands

she pays toward her deductible or out-of-pocket maximum.  SaveOnSP's offer is illustrated in

marketing materials available online:



*Pay $0 for Select Specialty Medications*, CIGNA (Aug. 2021), https://hr.richmond.edu/benefits/

insurance/medical-plans/pdf/SaveonSP.pdf (last visited Apr. 27, 2022).

---

[3] Similarly, in the same recorded presentation, the SaveOnSP Program representative admits that the program works only if they are able to extract patient assistance: "In order for us to leverage the savings, the member has to actively enroll in copay assistance.  **That's where the savings comes from**." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 49:27.

6

12.      SaveOnSP engages in a concerted effort to communicate this coercive offer to patients, including through phone calls and letters. This outreach campaign is illustrated by a SaveOnSP Program slide deck available online:



*Copay Assistance Program & Solutions*, EXPRESS SCRIPTS, at 9 (2019), https://pebp.state.nv.us/wp-content/uploads/2020/03/7.-Combined-for-website.pdf.

13.      SaveOnSP even goes so far as to enlist the help of the pharmacy to reject a patient's claim for their prescription medication at the point of sale—to tell the patient that insurance will not cover their prescription even though that medication is in fact covered—in order to get the patient on the phone with SaveOnSP so that a representative can pressure the patient to enroll in the SaveOnSP Program. This is highlighted in another SaveOnSP Program slide deck, which admits engineering a ***"[p]oint of sale claim rejection"*** to "facilitate warm transfer of member to SaveonSP":



*Human Resources Committee Meeting*, Village of Lindenhurst Illinois, at 69 (Mar. 11, 2021), https://www.lindenhurstil.org/egov/documents/1615238827_33717.pdf.

14.     Of course, a choice between paying nothing for badly needed medication, or paying thousands of dollars for that medication out of pocket, is—for most patients—no choice at all.  Indeed, many patients choose health plans precisely based on which plan purports to cover their necessary medications.  Unsurprisingly, therefore, once SaveOnSP's offer is communicated to the patients, most are coerced into accepting:  "[T]hat's often compelling enough for members to say, 'oh wait, I want my drugs for free.'"  *SaveOnSP IPBC Video*, *supra* ¶ 9, at 46:25.

15.     But while SaveOnSP is telling patients that their therapy will be "free" if they enroll in the SaveOnSP Program, what SaveOnSP is really doing is also enrolling them in

CarePath so that the cost of the artificially inflated copay is born by JJHCS and the entirety of the funds JJHCS makes available via patient assistance are drained. This is revealed when the SaveOnSP Program representative admits that patients may see an inflated copay on their "invoice paperwork," but "they will not be charged" that amount. *Id.* at 43:38; *see also, e.g.*, *Albuquerque Public Schools Summary of Benefits*, EXPRESS SCRIPTS, at 2 (2021), https://www.aps.edu/human-resources/benefits/documents/2021-summary-of-benefits/express-scripts-summary-of-benefits (stating that the cost of drugs for patients enrolled in SaveOnSP "will be reimbursed by the manufacturer").

16.     Further, while SaveOnSP walks the patient through the process of enrolling in programs like CarePath, SaveOnSP does not tell patients that CarePath is already available to them without enrollment in the SaveOnSP Program, and already reduces patients' out-of-pocket costs to $10, $5, or even $0. In other words, the SaveOnSP Program exists not to benefit patients, but solely to wrongfully meet the payer's obligation to the patient using the cost support made available by JJHCS for SaveOnSP's own profit.

17.     The SaveOnSP Program does not change the amount the pharmacist receives for a prescription. It decreases the portion that the payer pays of that amount, and increases the portion that the patient pays with patient assistance dollars. The payers' "savings" is actually the increased amount that payers withhold from pharmacists because the payers foist the obligation onto patients, who will use CarePath dollars to pay it. SaveOnSP then calculates the payers' "savings"—actually, the value the payer has gained by virtue of displacing its payment obligation to JJHCS—and charges the payer a fee of 25%.

**SaveOnSP Disregards the Terms and Conditions of JJHCS's Program**

18.     SaveOnSP's scheme is expressly prohibited by the CarePath terms and conditions, which do not allow the program to be used in connection with any "other offer" like

Case 2:22-cv-02632-JKS-CLW Document 79-1 Filed 05/04/23 Page 85 of 187 PageID: 871
Case 2:22-cv-02632-JKS-CLW Document 28 Filed 05/04/23 Page 65 of 187
PageID: 1189

the SaveOnSP Program.  *See, e.g.*, DARZALEX® Savings Program (Sept. 2021), https://www.

janssencarepath.com/sites/www.janssencarepath-v1.com/files/darzalex-faspro-yondelis-savings-

program-overview.pdf.

19.     The SaveOnSP Program is such an "offer."  The SaveOnSP representative

expressly refers to the SaveOnSP Program in her presentation as the "SaveOn ***offering***,"

*SaveOnSP IPBC Video*, *supra* ¶ 9, at 4:25; 27:31, and marketing materials state "That's why

your plan ***offers*** a program called SaveOnSP, which can help lower your out-of-pocket costs to

$0."  *See Pay $0 for Select Specialty Medications*, *supra* ¶ 11 (emphasis added).

20.     SaveOnSP is well aware of this prohibition on other offers because it

monitors drug manufacturers' patient assistance terms and conditions.  *See SaveOnSP IPBC

Video*, *supra* ¶ 9, at 31:59.  Nevertheless, SaveOnSP continues to coerce patients into signing up

for and using the SaveOnSP Program—thereby inducing those patients to breach the terms and

conditions of their CarePath agreement with JJHCS.

21.     SaveOnSP's scheme harms patients in a number of ways, including by

selecting drugs for coverage based upon a profit motive and not medical need; wrongfully

engineering a denial of coverage at the point of sale to coerce patients to participate in the

program; and not counting any of the funds spent on patients' medication towards their ACA

maximum or deductible, thereby making their other healthcare needs more expensive.

22.     Further, by imposing on JJHCS inflated costs that are not tethered to actual

patient need, SaveOnSP's scheme ultimately will make it cost prohibitive for JJHCS to offer

patient assistance.  This result is aligned with the interest of payers, which have used a variety of

tactics—widely condemned by patient advocacy groups[4]—to deprive patients of the benefits of patient assistance. As payers well know, eliminating patient assistance will result in patients seeking less medicine than they otherwise need and would obtain, which would in turn increase payers' profits.[5]

23.     SaveOnSP's scheme also harms JJHCS. SaveOnSP depletes the CarePath funds intended to help patients afford their Janssen medication, and causes JJHCS to pay out thousands of dollars more per patient in CarePath funds than it otherwise would pay, solely for SaveOnSP's and its partners' profit.

24.     SaveOnSP concedes this misappropriation and diversion. Marketing materials for the SaveOnSP Program tout the "savings" that it generates for payers. For example, one health plan projected $600,000 in annual "savings" from implementing the SaveOnSP Program. *See SaveOnSP for Specialty Medications*, VALLEY CENTER PAUMA UNIFIED SCHOOL DISTRICT, https://vcpusd.learning.powerschool.com/c/1720900/file/show/159819292; *see also Copay Assistance Program & Solutions*, *supra* ¶ 12, at 8 (projecting $1.9

---

[4] For instance, the "All Copays Count Coalition," made up of more than 60 groups representing patients with serious and chronic health conditions, has engaged in a concerted effort to stop payer use of "accumulators," programs that identify patient assistance funds and refuse to count them toward the patient's deductible or out-of-pocket maximum. *See New Insurance Policies Are Targeting Vulnerable Patients with High Copays*, NAT'L HEMOPHILIA FOUND., https://www.hemophilia.org/advocacy/federal-priorities/make-all-copays-count#ACCC (last visited Apr. 27, 2022). Accumulators and the harms they cause to patients are discussed in greater detail in Section III, *infra*.

[5] Certain payers have argued that copay assistance programs artificially increase payers' costs by "incentivizing patients to take brand-name drugs instead of cheaper bioequivalent generics" or even by incentivizing patients to take medications they do not require. *See, e.g.,* Tomas J. Philipson et al., *The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, UNIV. CHI. (Dec. 2021), at 18, https://cpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2021/12/2021_12_15-Copay-Assistance-Final-Draft-Clean.pdf (last visited Apr. 27, 2022). Beyond the absurdity of suggesting that copay assistance causes a patient suffering from cancer to take a cancer therapy they do not require, this argument overlooks that copay assistance is often used for specialty drugs without a generic substitute. *Id.*; *see infra* ¶ 34.

million in "savings" in 2020 for one health plan from implementing SaveOnSP); *Copay Assistance Strategy Reduces Financial Burdens for Plans and Patients*, EVERNORTH (Oct. 7, 2021), https://www.evernorth.com/articles/reduce-costs-for-health-care-plans-with-copay-program-assistance (advertising that "[i]n 2020, plans that participated in these copay assistance solutions [like the SaveOnSP Program] experienced a specialty [drug cost] trend of -7.2%, while nonparticipating plans experienced an 8.7% specialty [drug cost] trend."). But in fact, these "savings" are simply diverted CarePath funds that were intended to benefit patients, not payers.

25.     Patient assistance does not exist so that SaveOnSP can enrich payers further while taking a cut itself. Indeed, payers already negotiate enormous price concessions from manufacturers, including rebates that manufacturers pay when a patient fills a prescription. In 2021 alone, Janssen paid more than $8 billion in rebates, discounts, and fees to commercial insurers and pharmacy benefit managers. *See The 2021 Janssen U.S. Transparency Report*, at 6, https://2021jtr.prod.cmc.jnj-secondary.psdops.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000 (last visited Apr. 27, 2022); *see also Form 10-K*, CIGNA CORP., at 37 (Feb. 24, 2022), https://investors.cigna.com/financials/sec-filings/default.aspx ("We maintain relationships with numerous pharmaceutical manufacturers, which provide us with, among other things: . . . discounts, in the form of rebates, for drug utilization."). SaveOnSP acknowledges that these payer rebates are a "completely different set of funds" from *patient* assistance—which, SaveOnSP further acknowledges, is made available pursuant to "an agreement between the member and the manufacturer." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 24:32-24:50. By tortiously interfering with that agreement between JJHCS and patients, SaveOnSP wrongfully enables payers to "double-dip" into both manufacturer rebates and copay assistance.

26.        SaveOnSP should not be permitted to profiteer on the backs of patients by exploiting JJHCS's patient assistance.  SaveOnSP should therefore be enjoined from including Janssen drugs in the SaveOnSP Program, and should be ordered to compensate JJHCS for the funds it caused to be wrongfully extracted from CarePath.

## THE PARTIES

27.        Plaintiff JJHCS is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 425 Hoes Lane, Piscataway, New Jersey 08854. JJHCS is a subsidiary of Johnson & Johnson, and administers CarePath for the benefit of patients who are prescribed medications marketed by other Johnson & Johnson entities that are not fully paid for by private insurance.

28.        Defendant SaveOnSP is a limited liability company organized under the laws of the State of New York, with its principal place of business at 611 Jamison Road, Elma, New York 14059.  SaveOnSP advertises and administers its program (the "SaveOnSP Program") in partnership with pharmacy benefits manager Express Scripts, Inc. ("Express Scripts") and specialty pharmacy Accredo Health Group, Inc. ("Accredo").  SaveOnSP has operations, including a call center, in Buffalo, New York.  It also makes its client payers sign a joinder agreement governed by the laws of New York, and, on information and belief, accepts payments for its services in New York.  Upon information and belief, none of the members of SaveOnSP are citizens of New Jersey.

## JURISDICTION AND VENUE

29.        This Court has personal jurisdiction over SaveOnSP because SaveOnSP has sufficient minimum contacts with New Jersey so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  SaveOnSP actively implements the SaveOnSP Program in New Jersey, including by offering the SaveOnSP

Program to New Jersey payers, and by inducing New Jersey patients to enroll in the SaveOnSP Program.

30.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim" occurred in this judicial district, including SaveOnSP's offering of the SaveOnSP Program to New Jersey payers, New Jersey patients' enrollment in the SaveOnSP Program, violation of CarePath's terms and conditions, and JJHCS's injury as a result of SaveOnSP's wrongful acts.

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy in the present action exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interests and costs, and complete diversity of citizenship between the parties exists because JJHCS is a citizen of New Jersey, while SaveOnSP's members are not.

## FACTUAL ALLEGATIONS

### I.     The Pharmaceuticals for which JJHCS Offers Support Have Improved and Saved the Lives of Countless Patients

32.     The pharmaceuticals for which JJHCS offers support are essential to patients' health and, in some cases, survival.  These pharmaceuticals include treatments for various forms of cancer (for example, DARZALEX®, ERLEADA®), pulmonary arterial hypertension (for example, OPSUMIT®, TRACLEER®, UPTRAVI®), and various autoimmune disorders (for example, REMICADE®, STELARA®, TREMFYA®).

33.     A significant percentage of CarePath funds are provided for treatments known as "biologics," which are medications developed from living materials, usually cells, and which have complex molecular structures that are not easily definable.  This complexity is in contrast to more conventional medications, which tend to be chemically synthesized and have

simpler molecular structures. Because of this complexity, biologic therapies cannot be precisely copied, meaning that there are no "generic" versions of these molecules that can be substituted for branded products without a physician's prescription, as there are for simpler chemical compounds.[6] *See also* Tomas J. Philipson et al., *The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, Univ. Chi. (Dec. 2021), at 18, https://cpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2021/12/2021_12_15-Copay-Assistance-Final-Draft-Clean.pdf (last visited Apr. 27, 2022) (noting that "copay cards are used primarily for brand drugs without a generic substitute").

34.     Biologics remain at the cutting edge of medical science, and they are often used to treat life-altering medical conditions for which no other treatments are available. Janssen's biologic treatments are essential to the health of patients in a variety of important therapeutic areas, including immunology, oncology, and pulmonary hypertension. For example, STELARA® is an immunology biologic used to treat hundreds of thousands of patients in the United States for Crohn's disease, ulcerative colitis, and other chronic health conditions. TREMFYA® is an immunology biologic used to treat joint pain, stiffness, and swelling caused by psoriatic arthritis, as well as painful patches on the skin caused by moderate-to-severe plaque psoriasis. DARZALEX® is an oncology biologic used to treat multiple myeloma, a form of cancer that targets plasma cells found in bone marrow. For these and most of Janssen's other

---

[6]  There are "biosimilar" versions of certain biologics on the market. *See* Biosimilar and Interchangeable Products, FDA, https://www.fda.gov/drugs/biosimilars/biosimilar-and-interchangeable-products (last visited Apr. 27, 2022) ("A biosimilar is a biological product that is highly similar to and has no clinically meaningful differences from an existing FDA-approved reference product."). A biosimilar may also qualify for a designation by the FDA that it is "interchangeable" with the original branded product. Currently, there are no FDA-approved interchangeable biosimilars for any Janssen product.

biologic therapies, there are currently no FDA-approved "biosimilar" versions of the same molecule on the market.

35.     Developing these biologics is an expensive and risky venture for Janssen and other pharmaceutical manufacturers.  In order to produce safe and effective biologic treatments, Janssen makes enormous investments in research and development.  Even so, only 1 in 5,000 drug candidates makes it from discovery to market, and even for successful drugs, the entire process takes approximately 10 to 12 years.  Further adding to the expense, biologics require rigorous quality control during the manufacturing process, as they are sensitive to even minute changes in raw materials and can be compromised by changes in temperature or microbial contamination.  Manufacturing biologics thus requires specialized manufacturing equipment and facilities.  Without manufacturers like Janssen who are willing to take on these risks and costs, innovative and life-saving biologic treatments would not be available to patients suffering from a range of diseases.

## II.     CarePath Offers Patients Thousands of Dollars in Financial Assistance to Help Defray Out-of-Pocket Costs that Limit Access to Medication

36.     Patients with private commercial health insurance, especially those with acute complex medical conditions, are increasingly subject to higher and higher cost-sharing obligations imposed by their insurers, making it harder for patients to access medications prescribed by their doctors.

37.     Health insurance plan sponsors do not typically determine these obligations alone.  Rather, they contract with entities known as "Pharmacy Benefits Managers" or "PBMs."  PBMs are companies that manage prescription drug benefits on behalf of health insurance plans.  They often serve as middlemen with an aim towards increasing insurers' and their own profits by

determining which drugs a plan will cover and to what extent they will be covered. Express Scripts, Inc. is a PBM.

38. PBMs are also often part of even larger, vertically integrated organizations that offer other services in the health insurance field. For example, such organizations may offer health insurance themselves or operate specialty pharmacies, i.e., pharmacies that dispense complex pharmaceuticals like biologics that require special handling and care. Express Scripts, for example, is itself a subsidiary of the major insurance company Cigna.

39. In their role as middlemen, PBMs have presided over the rise of high cost-sharing insurance plans, which feature higher than usual deductibles, copays, and co-insurance. In essence, these plans pressure patients to limit their medical expenses by covering the full cost only after significant contributions by the patients. For instance, when a patient's health plan has a deductible, he or she must pay the entire price for the drug until the deductible threshold is met. Only once the deductible is met will the payer help the patient pay for the drug, at which point the patient may still pay either a fixed amount known as a copay, or a percentage of the drug's price, known as co-insurance.

40. Health plans with deductibles for prescription medications are becoming more common. Between 2012 and 2017, the share of employer-sponsored health plans requiring patients to meet a deductible for prescription medications rose from 23% to 52%. *See Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, PHRMA, at 3 (Jan. 29, 2021), https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/D-F/Faced-with-High-Cost-Sharing-for-Brand-Medicines.pdf.

41.     These high-cost sharing models have been found to discourage patients from filling their prescriptions and can lead to abandonment of treatment.  *See, e.g.*, Katie Devane et al., *Patient Affordability Part Two: Implications for Patient Behavior & Therapy Consumption*, IQVIA (2018), https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two (finding that 52% of new patients with an out-of-pocket cost of $125 to $250 abandoned treatment, and 69% of new patients with an out-of-pocket cost of $250.01 abandoned treatment); Jalpa A. Doshi et al., *Association of Patient Out-of-Pocket Costs With Prescription Abandonment and Delay in Fills of Novel Oral Anticancer Agents*, JOURNAL OF CLINICAL ONCOLOGY (Dec. 20 2017), https://ascopubs.org/doi/abs/10.1200/JCO.2017.74.5091 (finding that abandonment of oral cancer treatment increased from 10% for patients with a $10 out-of-pocket cost or less to 31.7% for patients with a $100.01 to $500 out-of-pocket cost, 41% for patients with a $500.01 to $2,000 out-of-pocket cost, and 49.4% for patients with an out-of-pocket cost exceeding $2,000); Michael T. Eaddy, *How Patient Cost-Sharing Trends Affect Adherence and Outcomes*, PHARMACY & THERAPEUTICS (Jan. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3278192/ (conducting literature review of 160 articles from January 1974 to May 2008 and finding that "85% showed that an increasing patient share of medication costs was significantly associated with a decrease in adherence").

42.     Patient abandonment of prescribed medication is a serious, potentially fatal problem.  It is associated with "poor therapeutic outcomes, progression of disease, and an estimated burden of billions per year in avoidable direct health care costs."  Aurel O. Iuga & Maura J. McGuire, *Adherence and Healthcare Costs*, 7 RISK MGMT. HEALTHCARE POLICY 35 (Feb. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3934668/.

18

43.     In order to limit the negative effects of inflated out-of-pocket costs, the ACA places annual limits on the amount of out-of-pocket costs a payer can force a patient to pay for so-called "essential health benefits," which includes many prescription drugs.  *See* 45 C.F.R. § 156.130(a).  For example, the annual ACA out-of-pocket maximum for the 2022 plan year is $8,700 for an individual and $17,400 for a family.  *See Out-of-Pocket Maximum/Limit*, HEALTHCARE.GOV,    https://www.healthcare.gov/glossary/out-of-pocket-maximum-limit/    (last visited Apr. 27, 2022).  Nevertheless, that threshold is high enough that many patients would still be unable to afford the costs of their medication without help.

44.     Thus, in the face of these ever-increasing cost-share obligations, financial assistance like that provided by JJHCS has become an important safety net helping patients pay for necessary medications.  *See The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, *supra* ¶ 33, at 2 (explaining that "[m]anufacturer copay assistance is a tool to ensure drug affordability in response to higher list prices and shifts in benefit design that put more out-of-pocket burden on commercial patients" and that "[w]ithout copay assistance, . . . OOP spending would have increased 3.4 percent from 2015 to 2019, growing from $46.6 billion to $48.2 billion.  However, due to the growing use of copay cards in response to growing OOP exposure, patients faced a lower OOP burden, so actual OOP spending paid by patients was lower and decreased 6.3 percent, from an estimated $38.6 billion to $36.2 billion").  Such financial assistance is offered in the form of programs providing patients with coupons or a card that they can then use when purchasing their prescription medications.

45.     Patients with chronic illnesses are increasingly reliant on patient assistance to afford their medications.  For example, in 2019, 32% of patients filling brand-name oncology medicines used patient assistance, as did 45% of patients filling brand-name depression

medicines, 55% of patients filling brand-name HIV medicines, and 70% of patients filling brand-name multiple sclerosis medicines. *Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, *supra* ¶ 40, at 6. Without patient assistance, average patient out-of-pocket costs for brand medicines would have been 225% to 1,096% higher in 2019, depending on the illness category. *Id.* at 7; *see also The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, *supra* ¶ 33, at 2 (noting that "[c]opay cards are even more important to offset high-cost exposures for patients taking specialty drugs as 50 percent of patients taking a specialty brand drug use copay cards versus 33 percent of patients on traditional brand drugs. The savings from copay cards lead patients to have similar final OOP costs between specialty drugs and traditional drugs due to an average savings of $1,548 for specialty drugs and only $414 for traditional drugs"). On average, patient assistance helped patients taking brand HIV and oncology medicines with more than $1,600 in costs, and patients taking brand MS medicines with more than $2,200 in costs. *See Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, *supra* ¶ 40, at 7.

46.     These savings are critical to improving and saving the lives of patients who have private insurance without causing them to choose between treatment and other necessary expenditures, such as food, clothing and housing. Multiple studies have found that when manufacturers help patients pay their out-of-pocket costs, patients are more likely to obtain their medication and adhere to their treatment regimens. *See, e.g.*, Anna Hung et al., *Impact of Financial Medication Assistance on Medication Adherence: A Systematic Review*, 27 J. MGMT. CARE SPECIALTY PHARM. 924 (July 2021); *The Patient Impact of Manufacturing Copay*

*Assistance in an Era of Rising Out-of-Pocket*, *supra* ¶ 33, at 4 ("[A]ffordability offered by copay assistance has resulted in increased utilization of needed drugs. . . . Copay cards lower the out-of-pocket costs for patients leading them to increase their utilization by 4.8 to 16.7 percent."); Matthew Daubresse et al., *Effect of Prescription Drug Coupons on Statin Utilization and Expenditures: A Retrospective Cohort Study*, 37 PHARMACOTHERAPY 12 (Jan. 2017), https://accpjournals.onlinelibrary.wiley.com/doi/10.1002/phar.1802.

47.      CarePath helps patients afford out-of-pocket costs for 44 Janssen drugs.  For most of these drugs, CarePath offers patients up to $20,000 in assistance towards their out-of-pocket costs per calendar year.  This assistance is meant not only to help patients afford their out-of-pocket costs for medications, but also to help patients meet their deductible and ACA out-of-pocket maximums, thereby allowing patients to more easily afford their healthcare overall.

48.      To be eligible for CarePath, patients must meet certain criteria set forth in CarePath's terms and conditions.  Relevant here, patients using CarePath must be enrolled in commercial or private health insurance (not, for example, Medicare).  For some drugs, patients agree to pay $5 or $10 themselves at the point of sale.  Also, the terms state that CarePath "may not be used with any other coupon, discount, prescription savings card, free trial, or *other offer*." (emphasis added).  And patients agree that they "meet the program requirements every time [they] use the program."  *See, e.g.*, DARZALEX® Savings Program, *supra* ¶ 18.

49.      Patients may enroll in CarePath online using the MyJanssenCarePath.com website, by phone, or via mail or fax by filling out and sending an enrollment form.  Once enrolled, patients receive a card they can then use at the point of sale to cover the out-of-pocket costs for their prescription medication minus the $5 or $10 they agreed to pay themselves.

### III.    SaveOnSP Employs a Scheme to Drain Patient Assistance Program Funds for Its Own Benefit and the Benefit of Its Partners

50.       Although programs like CarePath are meant to help patients, payers and PBMs have devised a set of evolving schemes designed to capture the benefit of patient assistance funds.[7]  The scheme at issue in this lawsuit represents the latest in this line, and is administrated by SaveOnSP.

51.       SaveOnSP's business model is to drain patient assistance from programs like CarePath by increasing patient out-of-pocket costs in a manner that serves no end other than to maximize profits for SaveOnSP and its partners.  SaveOnSP's compensation is based on a contingency fee; it is paid a percentage based on the amount of patient assistance it is able to extract from manufacturer programs like CarePath.  In partnership with PBM Express Scripts and specialty pharmacy Accredo, SaveOnSP markets and sells its program to payers, and then induces patients to enroll.

52.       The contours of the SaveOnSP Program, and the partnership between Express Scripts and SaveOnSP in particular, are governed by a non-public "Master Program

---

[7]  For instance, for years and continuing today, various payers and PBMs have employed programs known as "accumulators."  These programs work by identifying and accepting manufacturer copay assistance, but refusing to count it toward the patient's deductible or out-of-pocket maximum.  Adam J. Fein, *Copay Maximizers Are Displacing Accumulators—But CMS Ignores How Payers Leverage Patient Support*, DRUG CHANNELS (May 19, 2020), https://www.drugchannels.net/2020/05/copay-maximizers-are-displacing.html.  Because none of the patient assistance counts towards the patient's deductible or out-of-pocket maximum, the scheme delays or prevents the patient from meeting those thresholds, and patient assistance that would normally be sufficient to last all year gets completely used up much earlier.  *Id.*  This leads to serious patient harm, as the patient will eventually go to fill a prescription and be shocked to learn that the patient assistance has run out and that the deductible and out-of-pocket maximum still have not been met—meaning he or she will have to pay the full list price or leave empty handed.  *Id.*  Patients often simply cannot afford to pay such costs without assistance, leading many patients to discontinue their treatment.  The harm caused by such programs has led 11 states to ban them.  Joseph Cantrell, *State Legislative Issues to Watch in 2022*, THE RHEUMATOLOGIST (Jan. 7, 2022), https://www.the-rheumatologist.org/article/state-legislative-issues-to-watch-in-2022/.

Agreement, effective November 13, 2017." *See* Res. 20-660, CITY OF JERSEY CITY, Exhibit B (Sept. 10, 2020), https://cityofjerseycity.civicweb.net/document/33785/Express%20Scripts%20-%20SaveOn%20Program.pdf. Further, SaveOnSP's public-facing website provides limited information about how its program functions. *See Frequently Asked Questions*, SAVEONSP, https://www.saveonsp.com/employers/ (last visited Apr. 27, 2022).

53. Nevertheless, SaveOnSP's modus operandi is revealed in a video posted online showing a SaveOnSP Program presentation to an Illinois-based health insurance plan sponsor. *See SaveOnSP IPBC Video*, *supra* ¶ 9. In the presentation, the representative admits that the SaveOnSP Program works by designating drugs covered under the health plan as non-essential health benefits: "for a number of drugs, we can carve them out and create a different benefit design, where we designate these drugs as non-essential." *Id.* at 5:30.

54. This designation prevents any money paid towards the drug from applying to the ACA's annual limit. *Id.* at 7:23 ("[W]e're not gonna allow [patient assistance] to hit [the patient's] max out-of-pocket."). This is because the ACA's annual limit applies only to "essential health benefits." *See* 45 C.F.R. § 155.20 (defining "cost sharing" so that the annual out-of-pocket maximum applies only to "any expenditure required by or on behalf of an enrollee with respect to ***essential health benefits***" (emphasis added)).

55. As is clear from the presentation, there is no legitimate medical reason for applying the designation, as the drugs are plainly essential for the health and well-being of many patients. Rather, SaveOnSP uses the designation to extract as much money from patient assistance as possible: "***The moment we reclassify these as non-essential we get to operate outside of those rules, which removes the limitations for how high we set the copay***, it removes the requirement to apply copay assistance dollars to the max out-of-pocket. And that's what

allows us to be **the most lucrative** in terms of driving savings for SaveOn." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 23:35.

56.     This "inflated" copay cost is essential to the SaveOnSP Program's mission of siphoning off patient assistance funds from programs like CarePath: "in order for us to capitalize on this copay assistance funding, **we have to have that inflated copay upfront to bill to copay assistance**." *Id.* at 19:01.  For example, the representative explains, if the amount of assistance per fill is $6,600: "we would literally set the patient copay to $6,600, and you would save that amount on every fill." *Id.* at 6:11.  To be clear, the "you" in this presentation is the payer—not the patient.

57.     SaveOnSP's method exploits what it perceives as a loophole in the ACA.  To cover the required number of prescription drugs mandated by the ACA, a payer must identify as "essential" the greater of "(i) One drug in every United States Pharmacopeia (USP) category and class" or "(ii) The same number of prescription drugs in each category and class as the EHB-benchmark plan."[8]  45 C.F.R. § 156.122(a)(1); *see also* 42 U.S.C. § 18022(b)(1) (specifying that the Secretary of HHS shall "define the essential health benefits" including, *inter alia*, "prescription drugs").

---

[8] An "EHB-benchmark plan" is a "standardized set of essential health benefits that must be met by a" payer.  45 C.F.R. § 156.20.  Each state typically selects the parameters for their own EHB-benchmark plan.  45 C.F.R. § 156.100.

58.     Because the regulation requires that payers provide "the same number" of prescription drugs in each category or class as the specified benchmark plans, SaveOnSP takes the view that payers may de-designate drugs covered beyond that number.  This view is reflected in a slide accompanying the recorded presentation:



*SaveOnSP IPBC Video*, *supra* ¶ 9, at 9:30.

59.     The Centers for Medicare & Medicaid Services ("CMS") has stated that if a payer "is covering drugs beyond the number of drugs covered by the [EHB] benchmark, all of these drugs are EHB" and cost sharing paid for drugs properly classed as EHB "must count toward the annual limitation on cost sharing."  *See Patient Protection and Affordable Care Act*, 80 Fed. Reg. 10749, 10817 (Feb. 27, 2015) (codified at 45 C.F.R. pts. 144, 147, 153, 154, 155, 156 and 158).  SaveOnSP's Program defies this admonition.  Instead, SaveOnSP and its partners designate covered drugs—including life-saving oncology, pulmonary arterial hypertension, and

immunology drugs—as non-essential health benefits so that it can inflate patient copay obligations.

60.    Once the copay cost is inflated, SaveOnSP can coerce the patient into enrolling in its Program (and consequently in manufacturer programs) by telling them that they will either pay $0 per prescription if they enroll, or will have to pay the inflated copay cost— potentially in the thousands of dollars—themselves if they do not:   "Meaning if you don't participate in this program, your copay or your responsibility will be [for example] $1,000.  And because it's not part of your existing benefit design, that $1,000 is not applicable to your max out-of-pocket.  And that's often compelling enough for members to say, 'oh wait, I want my drugs for free.'"  *SaveOnSP IPBC Video*, *supra* ¶ 9, at 46:10.  Because most patients cannot afford such costs, they are essentially forced into acceding to SaveOnSP's offer.

61.    To communicate this coercive offer to patients, SaveOnSP first engages in outreach.  The representative explains that once the payer signs the contracts to use its program, "there is a standard member letter that we have that can be co-branded" that is sent to patients in the first 30 days, "and it's our goal to outreach to every one of these members before the program ever goes live."  *Id.* at 33:27; 34:04.  The representative explains further that "at 30 days out, if we're unsuccessful in reaching those members, we send a reminder letter and again, another phone call campaign with attempts to try and get contact with that member and get them enrolled."  *Id.* at 34:25.

62.    On average, however, only 55% to 65% of the payer's membership typically gets enrolled by the date that the program goes live.  *Id.* at 34:50.  At this point, SaveOnSP leverages its partnership with the specialty pharmacy Accredo to facilitate patient enrollment. As the specialty pharmacy designated by the payers to administer the drug benefit plan, Accredo

26

steers the patients to SaveOnSP. In the words of the SaveOnSP Program representative, "our Accredo advocates, once the claim is processed, will receive a prompt to alert them that this is a SaveOn drug, and they have some scripting that says, 'We have an opportunity for you to participate in a program which allows you to get your drug for free. I need to connect you to SaveOn now.' And at that point in time, they 'warm transfer'[9] the member to SaveOn." *Id.* at 34:14.

63.     As illustrated in paragraph 13 above, adding to the pressure placed on patients, Accredo actually ***rejects*** the patient's claim for their prescription medication at the point of sale in order to transfer them to SaveOnSP, even though that medication is covered by the patient's insurance. *Human Resources Committee Meeting*, *supra* ¶ 13, at 69.

64.     Once the patient agrees to enroll in its program, SaveOnSP helps the patient enroll in manufacturer patient assistance programs. The representative explains that SaveOnSP "can help facilitate with the member on the phone" to guide them through online enrollment, or if enrollment is by phone, can advise patients "as how to respond to the questions that they're being asked as part of enrollment." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 16:08; 16:38.

65.     SaveOnSP inserts itself in this process even though it knows that the enrollment in its program violates the express terms and conditions of the CarePath agreement that prohibit the patient from combining CarePath with the SaveOnSP Program. SaveOnSP recognizes that the CarePath relationship "is an agreement between the patient and copay assistance through the manufacturer," but nevertheless involves itself because "in order for us to leverage the savings, the member has to actively enroll in copay assistance. ***That's where the***

---

[9] A "warm transfer" is "a telecommunications mechanism in which the person answering the call facilitates transfer to a third party, announces the caller and issue and remains engaged as necessary to provide assistance." *Warm Transfer Definition*, Law Insider, https://www. lawinsider.com/dictionary/warm-transfer (last visited Apr. 27, 2022).

*savings comes from.*"  *Id.* at 49:20.  Once SaveOnSP assists the patient in enrolling in patient assistance, "it relays that to Accredo, so that it's housed in our system and then again, the claims from there on out just process at $0."  *Id.* at 35:54

66.    The SaveOnSP Program then causes CarePath to be electronically billed for an inflated copay cost that is not connected to the patient's true out-of-pocket responsibility.  The amount charged to the CarePath card at the point of sale is communicated using an "OCC-8" code, which tells JJHCS that the patient owes a copay for the drug.  That code is supposed to communicate the patient's true out-of-pocket responsibility as set by their health plan.  Instead, SaveOnSP causes an inflated charge to be communicated to JJHCS for the express purpose of draining more patient assistant funds from the patient's CarePath card.

67.    This misrepresentation of an inflated copay is made to JJHCS even as it admits elsewhere that patients in the SaveOnSP Program do not have any copay obligation whatsoever.  *See Pay $0 for Select Specialty Medications*, *supra* ¶ 11 ("If [a patient] participates in SaveOnSP, he won't pay anything ($0) out-of-pocket.").

68.    Finally, SaveOnSP charges the payer "25% of the savings that's achieved." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 37:38.  To facilitate this payment, payers sign "a 25% joinder agreement," which "allows Express Scripts to bill you for that fee on your administrative invoice.  So you'll see a simple line item for SaveOnSP."  *Id.* at 40:50.  In other words, SaveOnSP is paid a percentage of the "savings" it has achieved for payers by meeting the payer's obligations to the patient with patient assistance funds—assistance that SaveOnSP obtains by inducing patients to violate the terms and conditions of CarePath.

69.    SaveOnSP also admits to engaging in careful tactics designed not for the patient's benefit but to optimize earnings.  For example, in deciding which drugs make it onto

SaveOnSP's drug list, the representative explains that SaveOnSP looks to which drugs "have the most lucrative copay assistance programs" and that SaveOnSP may "remove drugs from the programs" if "something comes to our attention where the funding goes away completely." *Id.* at 14:47. This further demonstrates that SaveOnSP is making business-driven decisions without any regard for what is best for the patients. Indeed, while SaveOnSP promises patients that they will receive their medication for $0, if the patient assistance is removed, it will eventually move the drug out of the SaveOnSP Program: "we would honor the copay assistance or the $0 SaveOn copay until they were able to effectively manage that patient out, manage that drug out." *Id.* at 14:58.

70.     In order to ensure that only the most lucrative drugs are on its list, SaveOnSP monitors manufacturers' assistance terms and conditions: "in the event that pharma decides to pull back funding for their programs *or decides to change the terms of the program*, it's seamless to the member. *SaveOn is actively watching* these claims process and sees when any of these changes occur." *Id.* at 31:50. And in response to such a change, SaveOnSP might switch one drug off their list in exchange for another one: "it might be a prompt to determine, 'Do we need to make a change in the drug list for this program? Because we are not saving as much as we initially anticipated, and there's another drug where we could.'" *Id.* at 32:09.

71.     Likewise, to minimize the necessary coverage and maximize profits, payers using the SaveOnSP Program are encouraged to pick the state EHB-benchmark plan that has the lowest number of requirements: "So again, the ACA defines the essential by again, leveraging a state benchmark. You do not have to leverage your own current state or the state in which most of your members reside. It's simply a guideline for how to administer that essential health benefit. So for example, many commercial plans pick Utah because it had the fewest number of

required drugs to cover, and therefore it was the most cost-effective. So all we're saying is that Utah is setting the list of drugs or the number of drugs by therapeutic category to be deemed essential." *Id.* at 22:40. In other words, instead of picking a state benchmark that reflects where a payer's patients live or where the drug coverage is most comprehensive, SaveOnSP encourages payers to choose a state benchmark with as few requirements as possible to maximize profits.

72.     The SaveOnSP Program representative also admits that the SaveOnSP Program operates in a legal "gray area" as it relates to "qualified high deductible HSA [i.e., Health Savings Account] plan[s]." *Id.* at 25:55; 26:27. The representative acknowledges in her presentation that "copay assistance is not ACA compliant in an HSA plan." *Id.* at 26:43. But she explains that SaveOnSP gets away with knowingly breaking this rule because of a lack of oversight: "there's no requirement that patients provide documentation or confirm that they've met their deductibles before they get copay assistance," and "there's no governing body that's really monitoring the industry today," so "copay assistance happens in qualified HSA plans all the time." *Id.* at 26:50. It thus leaves it to plans to "determine whether or not it's appropriate to include their HSA plans in the SaveOn offering or not." *Id.* at 27:27.

73.     Further, SaveOnSP deceives manufacturers by actively concealing its role and interference with patient assistance programs. SaveOnSP knows that such programs often have a requirement that a patient pay $5 or $10 of the cost of the prescription. But SaveOnSP intentionally circumvents this requirement by shifting that $5 or $10 obligation onto the payer— and actively conceals from JJCHS that it has done so by using the artifice of a "tertiary biller," which is "really SaveOn behind the scenes." *Id.* at 30:24.

74.     While SaveOnSP engages in these wrongful courses of conduct to increase profits, it unfortunately comes at a great cost to patients. Patient assistance programs are meant

30

to help patients pay their actual and required out-of-pocket costs.  By changing the amounts owed by patients based on only the availability of patient assistance, the programs disconnect patient assistance from actual cost to patients, causing patient assistance programs to be more expensive than originally intended, and converting what is meant to be patient assistance into a manufacturer subsidy for SaveOnSP and its partners.  *See The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket, supra* ¶ 33, at 17 (explaining that "accumulator adjustment and maximizer programs . . . counteract the uptake of manufacturer copay assistance shifting the cost burden back onto patients" and that "limiting [patients' use of copay assistance programs] without giving patients a new way to address their affordability issues will negatively impact patients").  By these actions, SaveOnSP wrongly increases the costs of patient assistance programs and, unless enjoined, will make it untenable for such programs to continue to be provided.

75.     Moreover, SaveOnSP misleads patients about the nature of the SaveOnSP Program.  SaveOnSP does not tell patients that by enrolling in the SaveOnSP Program, they are breaching their agreement with JJHCS.  It does not tell patients that the SaveOnSP Program may cause as much as a year's worth of patient assistance to be drained in just a few prescription fills.  And it does not tell patients that it charges a fee of at least 25% of the patient assistance funds pulled.

76.     It also does not tell patients that patient assistance is available without the SaveOnSP Program.  Indeed, in marketing materials, SaveOnSP misrepresents to patients that "Without SaveonSP," "[t]here is no copay assistance":

*SaveonSP: Copy Offset Program for Specialty Medication*, BLUECROSS BLUESHIELD OF WESTERN NEW YORK, https://www.bcbswny.com/content/dam/BCBSWNY/broker-group/public /pdf/group/computer-task-group/Saveon-Member-Flyer.pdf (last visited Apr. 27, 2022). This is false: manufacturers provide copay assistance independently of SaveOnSP, and did so for many years before SaveOnSP ever began interfering in these programs.

77. Further, the SaveOnSP Program puts patients who decide not to enroll in an even more precarious scenario: They will still have an inflated copay obligation, but the payer does not cover the cost, and the patient is told that he or she will have to pay the cost alone. *Id.*

78. Finally, in either case, no payments count towards the patient's deductible or out-of-pocket maximum, so the patient will still face higher costs for other healthcare services (such as doctor's visits or diagnostic testing). *Pay $0 for Select Specialty Medications*, *supra* ¶ 11. The marketing materials for the SaveOnSP Program referenced in paragraph 11 above make this clear, noting that in either scenario, payments made for the drug "won't count towards [the patient's] deductible or out-of-pocket maximum." *Id.*

79. The federal government has recognized that assistance from manufacturers is for patients, not payers, and has explained patients are harmed when payers "shift costs back to the patient prematurely by not applying the full value of the manufacturer-sponsored assistance to a patient's health plan deductible." *See* Medicaid Program, 85 Fed. Reg. 87,000, 87,049 (Dec. 31, 2020) (codified at 42 C.F.R pts. 433, 438, 447, and 456). Indeed, CMS has even issued a

rule intended to ensure that patient assistance benefits patients, not payers, 85 Fed. Reg. at 87,048–58, and has explained that the rule exists because "[h]ealth plans, with the help of third-party pharmacy benefits administrators, often reap the benefits of [patient assistance] by declining to allow [it] to offset patients' out-of-pocket costs," and as a result "plans are enriched through the reduction in the amount they have to cover for these drugs." *See Pharm. Research & Mfs. of Am. v. Becerra*, No. 21-CV-01395, Dkt. 32-1, at 1 (D.D.C. Feb. 3, 2022).

80.     Payers already can and do negotiate pricing discounts with manufacturers, including by securing rebates that manufacturers pay after patients fill prescriptions. *See The 2021 Janssen U.S. Transparency Report*, *supra* ¶ 25, at 6 (indicating that since 2016, "the rebates, discounts and fees we have provided to commercial insurers and PBMs have increased almost fivefold" and that Janssen provided $8.3 billion in rebates, discounts, and fees to commercial insurers and PBMs in 2021); *see also Form 10-K*, *supra* ¶ 25, at 37 (Cigna stating, "[w]e maintain relationships with numerous pharmaceutical manufacturers, which provide us with, among other things: . . . discounts, in the form of rebates, for drug utilization"). In fact, SaveOnSP has inflated patients' drug copay obligations even as JJHCS has consistently decreased the price of the drugs targeted by the SaveOnSP Program. *See The 2021 Janssen U.S. Transparency Report*, *supra* ¶ 25, at 2 (indicating that "net prices for Janssen medicines have declined for the fifth year in a row," including a net decline of -2.8% in 2021 (compared to the 2021 consumer inflation rate of 7%)).

81.     Patient assistance does not exist as additional funding for payers to absorb on top of those enormous price concessions. But various publicly available materials describing the SaveOnSP Program explicitly acknowledge that the program is designed for just that: to enrich payers.

33

82.     For example, in a presentation given to the New Jersey Health Insurance Fund, a New Jersey-based insurance pool, the SaveOnSP Program is described as a "very aggressive program" that sets copays to "maximize manufacturer assistance dollars" so that "*plan sponsor spend* [is] reduced $2.50 - $4.50 [per member per month]."  Joseph M. DiBella, *New Jersey Health Insurance Fund*, PERMA (Nov. 2019) at 19–20, https://slideplayer.com/slide/17742625/ (emphasis added).

83.     Similarly, an agenda for the Burlington County Insurance Commission, another New Jersey-based insurance pool, notes that the SaveOnSP Program is being implemented "*so that the plan can maximize manufacturer assistance* dollars (coupons) while reducing the member's copay to $0."  *Meeting and Reports*, BURLINGTON CNTY. INS. COMM'N (Nov. 5, 2020), at 28, https://bcnj.co.burlington.nj.us/Upload/BCIC/Images/Agenda_11-5-20.pdf (emphasis added).

84.     And in another agenda for Southern Skyland Regional, a New Jersey-based insurance fund, there are notes that while "Members receive a $0 copay," the "*plan receives the remaining discount*."  *Agenda & Reports*, Southern Skyland Regional (Oct. 5, 2021), at 8, https://static1.squarespace.com/static/5b1c2db85ffd2031c58b5583/t/615db86e5abc5715e41a709 e/1633532015317/A_SSRHIF_October+5th+Agenda.pdf (emphasis added).

85.     SaveOnSP's own website emphasizes the same, explaining how "plan[s] see savings generated" from its program.  *See Frequently Asked Questions*, SAVEONSP, https://www.saveonsp.com/employers/ (last visited Apr. 27, 2022); *see also Copay Assistance Strategy Reduces Financial Burdens for Plans and Patients*, *supra* ¶ 23 (highlighting that "[i]n 2020, plans that participated in these copay assistance solutions [like the SaveOnSP Program] experienced a specialty trend of -7.2%, while nonparticipating plans experienced an 8.7%

34

specialty trend."); *Form 10-K*, *supra* ¶ 25, at 7 (Cigna stating that it has a "partnership with SaveOnSP," an "aggressive solution" that "adapts" to changes in manufacturer programs to "protect plan design preferences and achieve lower trend" for health plans).

86.     And while these materials also tout reduced costs to patients, they mislead patients by obscuring the fact that patients can get the benefit of reduced costs by directly signing up for manufacturer assistance, without any involvement from SaveOnSP whatsoever.

87.     Further underscoring that the SaveOnSP Program is for the benefit of payers and not patients, SaveOnSP Program materials show that even when patients do hit their deductible or out-of-pocket maximum through other means, SaveOnSP will continue to extract patient assistance. *See Copay Assistance Program & Solutions*, *supra* ¶ 12, at 5 ("[T]he member continues to max out the copay assistance throughout the plan year regardless of whether they hit their DED/MOOP through other means.").

88.     Finally, the SaveOnSP Program also burdens patients with a complicated enrollment process that can create unnecessary confusion for individuals already under pressure from difficult medical circumstances. *See* Anndi McAfee, *SaveonSP's Copay Maximizer Failed Me: A Patient's Perspective*, Drug Channels (Nov. 13, 2020), https://www.drugchannels.net /2020/11/saveonsps-copay-maximizer-failed-me.html ("If SaveonSP had not used all of my money, I probably would have continued on in sweet blissful ignorance. But here I am again, expending precious time and energy to ensure that my drug gets into my body."). As noted in paragraph 13 above, one step in the SaveOnSP Program is to falsely tell a patient who is entitled to insurance coverage for a life-saving medication that their request for coverage was denied, as a ruse to push the person to apply for copay support just to drive greater profitability for SaveOnSP. *Human Resources Committee Meeting*, *supra* ¶ 12, at 69.

## IV.     JJHCS Is Harmed by SaveOnSP's Abusive Practices

89.     CarePath's terms and conditions typically require patients to pay $5 or $10 when using the Assistance Program, and they preclude patients from using the Assistance Program with "any other coupon, discount, prescription savings card, free trial, or other offer." *See, e.g.*, DARZALEX® Savings Program, *supra* ¶ 18.

90.     The SaveOnSP Program is clearly such an "offer."  Indeed, the SaveOnSP representative refers to the SaveOnSP Program in her presentation as the "SaveOn ***offering***." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 4:25; 27:31.  And marketing materials similarly state, "That's why your plan ***offers*** a program called SaveOnSP, which can help lower your out-of-pocket costs to $0."  *See Pay $0 for Select Specialty Medications*, *supra* ¶ 11 (emphasis added). Nevertheless, despite its knowledge of these terms, SaveOnSP implements its program to extract CarePath's funds.

91.     SaveOnSP's conduct is clear from its publicly available drug lists.  For example, one such list includes 14 Janssen drugs: BALVERSA®, DARZALEX®, DARZALEX FASPRO®, ERLEADA®, IMBRUVICA®, OPSUMIT®, REMICADE®, RYBREVANT®, SIMPONI®, STELARA®, TRACLEER®, TREMFYA®, UPTRAVI®, and ZYTIGA®.  *See 2022 SaveOnSP Drug List*, CHRISTIAN BROTHERS EBT, (Dec. 20, 2021), https://www.saveonsp. com/wp-content/uploads/2021/12/cbservices.pdf.

92.     Internal JJHCS data concerning CarePath use confirms that SaveOnSP is abusing CarePath.  For instance, in 2021, the average amount of CarePath funds pulled per fill for STELARA® patients who were not enrolled in the SaveOnSP Program was $1,171, while the average amount of CarePath funds pulled per fill for STELARA® patients who were enrolled in the SaveOnSP Program was $4,301.

93.     The same pattern holds true for patients on TREMFYA®.  In 2021, the average amount of CarePath funds pulled per fill for TREMFYA® patients who were not enrolled in the SaveOnSP Program was $1,126, while the average amount of CarePath funds pulled per fill for TREMFYA® patients who were enrolled in the SaveOnSP Program was $3,717.

94.     The difference is even starker for other drugs.  For example, the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were not enrolled in the SaveOnSP Program was only $418, while the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were enrolled in the SaveOnSP Program was $5,000.

95.     These trends continue into this year.  For January through March of 2022, the average amount of CarePath funds pulled per fill for STELARA® patients who were not enrolled in the SaveOnSP Program was $2,057, while the average amount of CarePath funds pulled per fill for STELARA® patients who were enrolled in the SaveOnSP Program was $6,401.

96.     Likewise, for the same time period, the average amount of CarePath funds pulled per fill for TREMFYA® patients who were not enrolled in the SaveOnSP Program was $1,796, while the average amount of CarePath funds pulled per fill for TREMFYA® patients who were enrolled in the SaveOnSP Program was $3,745.

97.     And, for the same time period, the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were not enrolled in the SaveOnSP Program was only $1,242, while the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were enrolled in the SaveOnSP Program was $6,979.

98.     SaveOnSP harms JJHCS not only by causing inflated amounts of patient assistance to be charged per fill, but also by causing greater amounts of patient assistance to be charged earlier in the year.  Many patients do not stay on therapy for an entire year.  Thus, when SaveOnSP seizes a year's worth of copay assistance by repeatedly charging inflated copays, but the patient does not actually fill a year's worth of prescriptions, SaveOnSP reaps an additional windfall and charges JJHCS for more copay assistance than is actually warranted.  In some instances, SaveOnSP has extracted an entire year's worth of patient assistance by the middle of the year.

99.     Indeed, SaveOnSP causes JJHCS to pay out the maximum amount of funds available per patient far more often than it otherwise would.  For example, in 2021, only 3% of STELARA® patients who were not enrolled in the SaveOnSP Program exhausted the full CarePath benefit of $20,000, while *33%* of STELARA® patients who were enrolled in the SaveOnSP Program exhausted the full CarePath benefit of $20,000.

100.    Through the SaveOnSP Program, SaveOnSP knowingly and wrongfully harms JJHCS by causing it to pay CarePath funds solely for its own enrichment.  JJHCS provides CarePath funds to help patients bridge the gap between what they must pay out-of-pocket to obtain their Janssen drugs and what they can afford.  But the SaveOnSP Program interferes with this intended purpose by causing JJHCS to pay out exponentially more CarePath funds per patient only so that it may profit in violation of the CarePath terms and conditions.

101.    Further, there is no easy or foolproof way for JJHCS to simply reduce the amount of assistance it provides to all patients enrolled in SaveOnSP's Program.  This is because SaveOnSP has taken steps to obscure when funds are being extracted from CarePath through its Program, including recently by varying the patient's out-of-pocket obligation per prescription

fill, such that the amounts extracted from the copay card by the pharmacy are not consistent and easily detectible. Further, JJHCS cannot reduce cost support preemptively to prevent SaveOnSP's activities without an unacceptable risk that individual patients may be misidentified and suffer from reduced cost support and consequently be unable to afford their therapy. The secretive nature of SaveOnSP's operations, therefore, renders any attempt to reduce copay assistance on a patient-by-patient basis unworkable as it risks harming the very patients CarePath was designed to support.

102. For STELARA® and TREMFYA®, JJHCS released a new version of the terms and conditions that were publicly on the CarePath website in December 2021. *See* STELARA® Savings Program (Dec. 2021), https://www.janssencarepath.com/sites/www.janssencarepath-v1.com/files/stelara-savings-program-overview.pdf?v=39; TREMFYA® Savings Program (Dec. 2021), https://www.janssencarepath.com/sites/www.janssencarepath-v1.com/files/tremfya-savings-program-overview.pdf?v=88.

103. The new terms and conditions specify explicitly that to be eligible for CarePath, "you . . . must pay an out-of-pocket cost for your medication." *Id.* They also explicitly prohibit use of programs like SaveOnSP, stating "Patients who are members of health plans that claim to eliminate their out-of-pocket costs are not eligible for cost support." *Id.*

104. To this date, however, SaveOnSP has not taken Janssen's drugs off its list, and continues to induce patients in the SaveOnSP Program to sign up for CarePath in violation of CarePath's terms and conditions.

105. Thus, SaveOnSP continues to harm JJHCS, entitling it to relief. Moreover, damages for ongoing and future wrongdoing are inadequate because SaveOnSP takes concerted

measures to avoid detection.  Unless enjoined, it will continue to cause damages and irreparable harm to JJHCS.

## COUNT I:
## TORTIOUS INTERFERENCE WITH CONTRACT

106.     JJHCS re-alleges paragraphs 1–105 as if fully set forth herein.

107.     JJHCS has a valid and enforceable contract with the patients who use CarePath.

108.     The CarePath terms and conditions prohibit patients from being enrolled in SaveOnSP while using CarePath.

109.     SaveOnSP knowingly and wrongfully induces patients to agree to CarePath's terms and conditions, thereby intentionally causing those patients to breach their contract with JJHCS every time they use CarePath funds while enrolled in the SaveOnSP Program.

110.     Through its wrongful inducement, SaveOnSP knowingly and proximately causes JJHCS damage by making it pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend.

111.     SaveOnSP has therefore tortiously interfered with JJHCS's agreement with patients who use CarePath.

## COUNT II:
## DECEPTIVE TRADE PRACTICES
## IN VIOLATION OF N.Y. GEN. BUS. LAW § 349

112.     JJHCS re-alleges paragraphs 1–111 as if fully set forth herein.

113.     SaveOnSP has been and is engaging in willful deceptive acts and practices in New York against JJHCS and the public in the conduct of its business through the following consumer-oriented acts: engineering a false denial of coverage at the point of sale to coerce patients into enrolling in the SaveOnSP Program; telling patients that there is "no copay

assistance with SaveOnSP" when manufacturers do in fact provide assistance independently of the SaveOnSP Program; failing to tell patients that by enrolling in the SaveOnSP Program, they are breaching their agreement with JJHCS; and failing to tell patients that they charge a fee of at least 25% of the patient assistance funds extracted from JJHCS.

114.     Through its willful deceptive acts and practices, SaveOnSP causes damage to the public, including patients, by causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare needs more expensive by not counting any of the funds spent on patients' medication towards their ACA maximum or deductible.

115.     Through its willful deceptive acts and practices, SaveOnSP also causes damage to JJHCS by making it pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend.

116.     SaveOnSP has therefore violated N.Y. Gen. Bus. Law § 349.

117.     SaveOnSP's violation of § 349 also warrants the recovery of attorneys' fees.

## DEMAND FOR JURY TRIAL

118.     JJHCS hereby respectfully requests a trial by jury for all claims and issues in its Complaint which are or may be entitled to a jury trial.

## PRAYER FOR RELIEF

**NOW, THEREFORE**, Plaintiff JJHCS respectfully requests that the Court:

A.     Award JJHCS damages in an amount to be ascertained at trial.

B.     Award to JJHCS pre-judgment and post-judgment interest.

C.     Issue an injunction preventing SaveOnSP from implementing the SaveOnSP Program as to Janssen drugs.

41

D.      Award JJHCS its reasonable attorneys' fees.

E.      Grant such other and further relief as the Court may deem appropriate.

                              Respectfully submitted,

                              SILLS CUMMIS & GROSS P.C.
                              One Riverfront Plaza
                              Newark, New Jersey 07102
                              (973) 643-7000

                              By:     s/ Jeffrey J. Greenbaum
                                      JEFFREY J. GREENBAUM
                                      KATHERINE M. LIEB


                              PATTERSON BELKNAP WEBB & TYLER LLP
                              Adeel A. Mangi
                              Harry Sandick (*pro hac vice* forthcoming)
                              George LoBiondo
                              1133 Avenue of the Americas
                              New York, New York 10036
                              (212) 336-2000

                              *Attorneys for Plaintiff*
                              *Johnson & Johnson Health Care Systems Inc.*

Dated:  May 4, 2022

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civ. Rule 11.2, I hereby certify to the best of my knowledge, information and belief that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:  s/ Jeffrey J. Greenbaum
     JEFFREY J. GREENBAUM
     KATHERINE M. LIEB


PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick (*pro hac vice* forthcoming)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

 *Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

Dated:  May 4, 2022

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Johnson & Johnson Health Care Systems Inc.

## DEFENDANTS
Save On SP, LLC

**(b)** County of Residence of First Listed Plaintiff   Middlesex, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Erie County, NY
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jeffrey J. Greenbaum, Katherine M. Lieb, Sills Cummis & Gross P.C.,
One Riverfront Plaza, Newark, New Jersey 07305, 973-643-7000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**      **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product       Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &       Pharmaceutical | | **INTELLECTUAL** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander       Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'       Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability   ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine       Injury Product | | ☐ 835 Patent - Abbreviated | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product       Liability | | New Drug Application | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | Act of 2016 | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability   ☒ 380 Other Personal | Act | | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal       Property Damage | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -       Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | Exchange |
| | Medical Malpractice | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/       Sentence | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| | Employment   **Other:** | ☐ 462 Naturalization Application | 26 USC 7609 | Agency Decision |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other   ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause: Plaintiff seeks damages for tortious interference with contract and for deceptive trade practices in violation of N.Y. Gen. Bus. Law § 349

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ In excess of $100 million
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   5/4/2022
SIGNATURE OF ATTORNEY OF RECORD   s/ Jeffrey J. Greenbaum

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHNSON & JOHNSON | : | |
| HEALTH CARE SYSTEMS INC., | | Civil Action No.  22-2632 (JMV) (CW) |
| | : | |
| Plaintiff, | | |
| | : | |
| vs. | : | **DISCOVERY CONFIDENTIALITY ORDER** |
| | | |
| SAVE ON SP, LLC, | : | |
| | | |
| Defendant. | : | |

It appearing that discovery in the above-captioned action is likely to involve the disclosure of confidential information, it is ORDERED as follows:

1. Any party to this litigation and any third-party who produces to any other person any "Discovery Material" (*i.e.*, information, documents, or things of any kind, including without limitation interrogatory answers, admissions, pleadings, responses to a subpoena, or testimony) in the course of discovery in this action) (a "Producing Party") shall have the right to designate as "Confidential" and subject to this Order any Discovery Material or portion thereof: (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales or other confidential business information, or (b) that contains private or confidential personal information, or (c) that contains information received in confidence from third parties, or (d) which the producing party otherwise believes in good faith to be entitled to protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure and Local Civil Rule 5.3, or the production of which would cause the Producing Party to violate his, her, or its privacy or confidentiality obligations to others.

   a. Any Producing Party who produces or discloses any Confidential Discovery Material shall mark the same with the following or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Confidential").

   b. Any Producing Party who produces Confidential Discovery Material in native format, shall include, at the end of the file name and prior to the file extension, the following or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER". Any person making any copy of the native file, if authorized under this Order, shall not rename the file.

2. Any Producing Party shall have the right to designate as "Attorneys' Eyes Only" and subject to this Order any Discovery Material or any portion thereof that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the

Producing Party or the disclosure of which absent an Attorneys' Eyes Only designation could cause the Producing Party to violate its privacy or confidentiality obligations to others.

    a.    Any Producing Party who produces or discloses any Attorneys' Eyes Only Discovery Material shall mark the same with the following or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Attorneys' Eyes Only").

    b.    Any Producing Party who produces Attorneys' Eyes Only Discovery Material in native format, shall include, at the end of the file name and prior to the file extension, the following or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER". Any person making any copy of the native file, if authorized under this Order, shall not rename the file.

3.    With respect to the production of any Discovery Material that identifies an individual or subscriber and relates to the past, present, or future care, services, or supplies relating to the physical or mental health or condition of such individual or subscriber, the provision of health care to such individual or subscriber, or the past, present, or future payment for the provision of health care to such individual or subscriber ("Confidential Health Information"), the Producing Party or its counsel shall mark the same with the following or similar legend: "CONFIDENTIAL HEALTH INFORMATION." If such Discovery Material is produced in native format, the native version shall include, at the end of the file name and prior to the file extension, the following or similar legend: "CONFIDENTIAL HEALTH INFORMATION." Any person making any copy of the native file, if authorized under this Order, shall not rename the file.

    a.    Confidential Health Information specifically includes "protected health information" as such term is defined by the Standards for Privacy of Individually Identifiable Health Information, 45 CFR parts 160 and 164, promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). *See* 45 C.F.R. § 160.103 (defining "individually identifiable health information" and "protected health information"). Confidential Health Information also includes, but is not limited to, medical bills, claims forms, charge sheets, medical records, medical charts, test results, notes, dictation, invoices, itemized billing statements, remittance advice forms, explanations of benefits, checks, notices, and requests. Confidential Health Information also includes without limitation all notes, summaries, compilations, extracts, abstracts, or oral communications that contain, are based on, or are derived from, Confidential Health Information.

    b.    Confidential Health Information does not include any Discovery Material that has all of the following identifiers of the individual or subscriber or of the relatives, employers, or household members of the individual or subscriber removed or redacted:

2

i.     names;

ii.     all geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent area codes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census, (i) the geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people, and (ii) the initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000;

iii.     all elements of dates (except year) for dates directly related to an individual, including birth date, admission dates, discharge dates and date of death, and all ages over 89, and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

iv.     telephone numbers;

v.     fax numbers;

vi.     electronic mail addresses;

vii.     social security numbers;

viii.     medical record numbers;

ix.     health plan beneficiary numbers;

x.     account numbers;

xi.     certificate/license numbers;

xii.     vehicle identifiers and serial numbers, including license plate numbers;

xiii.     device identifiers and serial numbers;

xiv.     web universal resource locators ("URLs");

xv.     internet protocol ("IP") address numbers;

xvi.     biometric identifiers, including finger and voice prints;

xvii.     full face photographic images and any comparable images; and

xviii.     any other unique identifying number, characteristic, or code except as permitted for a code utilized to re-identify de-identified data that complies with 45 C.F.R. § 164.514(c).

    c.    Notwithstanding the foregoing, the parties shall produce Discovery Material containing Confidential Health Information in response to discovery requests of another party in this litigation without redaction, designating such documents as set forth herein.

    d.    This Order is intended to provide protection sufficient to constitute a Qualified Protective Order under HIPAA and the regulations promulgated under its aegis. *See* 45 C.F.R. § 164.512(e)(1)(ii).

4.    All Designated Material, defined to include Confidential, Confidential Health Information, and Attorneys' Eyes Only materials, shall be used by any person to whom the Discovery Material is produced or disclosed (a "Receiving Party") solely for purposes of the prosecution or defense of this action, shall not be used by the Receiving Party for any business, commercial, competitive, personal or other purpose, including for purposes of initiating, prosecuting, or defending any other action, and shall not be disclosed by the Receiving Party to anyone other than those set forth herein, unless and until the restrictions herein are removed either by written agreement of counsel for the parties, or by Order of the Court. It is, however, understood that counsel for a Receiving Party may give advice and opinions to his or her client solely relating to the above-captioned action based on his or her evaluation of Designated Material, provided that such advice and opinions shall not reveal the content of such Designated Material except by prior written agreement of counsel for the parties, by Order of the Court, or as otherwise permitted by this Discovery Confidentiality Order.

5.    Discovery Material produced and marked Confidential and Confidential Health Information and the contents of such material may be disclosed only to the following individuals under the following conditions:

    a.    Outside litigation counsel retained by the parties for this action (herein defined as any attorney at the parties' outside law firms) and relevant in-house counsel for the parties;

    b.    Outside experts or consultants retained by outside counsel for purposes of this action, including their staff, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A.

    c.    Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

    d.    The Court and court personnel;

    e.    Any deponent may be shown or examined on any information, document or thing designated under this Discovery Confidentiality Order if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein or is employed by the party who produced the information, document or thing, or if the producing party consents to such disclosure;

      f.      Vendors retained by or for the parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials provided that the vendor has first signed a copy of Exhibit A;

      g.     Any other person mutually agreed upon in writing among the Parties, but only if that person has signed a copy of Exhibit A; and

      h.     The parties. In the case of parties that are corporations or other business entities, "party" shall mean executives who are required to participate in decisions with reference to this lawsuit.

6.     With respect to Discovery Material produced and designated Confidential Health Information:

      a.     A Receiving Party or any other person who has access to Designated Material shall implement appropriate administrative, physical, and technical safeguards to prevent the use or disclosure of Confidential Health Information in any manner other than pursuant to the terms and conditions of this Order;

      b.     A Receiving Party or any other person who has access to Designated Material shall limit the use or disclosure of Confidential Health Information to the minimum necessary to accomplish the intended purpose of such use or disclosure—but nothing in this sub-paragraph 6(b) shall prevent any use of Designated Material for purposes of this litigation in a manner consistent with the terms of this Order; and

      c.     In the event that the Receiving Party or any person who has access to Designated Material becomes aware of or suspects that Discovery Material produced and marked Confidential Health Information or the contents of such material has been disclosed or used by the Receiving Party—or by any other party to which the Receiving Party disclosed said Discovery Material—in a manner other than those permitted under this Order, that person or the Receiving Party shall immediately notify the Producing Party. Such notification shall provide the Producing Party with information sufficient to identify the Confidential Health Information at issue and, to the extent possible, the nature of the unauthorized disclosure or use. For the purposes of this reporting requirement, no person is required to report inconsequential incidents that occur on a daily basis such as scans or 'pings' that are not allowed past that person's fire walls.

7.     Discovery Material produced and marked as Attorneys' Eyes Only may be disclosed only to the persons described in Paragraphs 5.a through 5.g above, except that with respect to in-house counsel, said Discovery Material may also be disclosed only up to four (4) in-house counsel with responsibilities for this matter, provided that before any such

Discovery Material is disclosed to in-house counsel, they have been disclosed to the opposing party and have signed a copy of Exhibit A. A party may substitute which in-house counsel may access Attorneys' Eyes Only materials pursuant to this Paragraph, provided that such substitution is disclosed to the opposing party prior to sharing any Attorneys' Eyes Only Discovery Material with the substituted counsel and the total number of in-house counsel does not exceed four. The parties may agree in writing that Discovery Material produced and marked as Attorneys' Eyes Only may be disclosed to additional in-house attorneys.

8. Designated Material shall be used only by individuals permitted access to it under Paragraphs 5 and 7. Designated Material, copies thereof, and the information contained therein, shall not be disclosed in any manner to any other individual, until and unless (a) outside counsel for the party asserting confidentiality waives the claim of confidentiality, and, in the case of Discovery Materials marked "Confidential Health Information," there exists a valid authorization by the individual to whom it relates that complies with the requirements of 45 C.F.R. § 164.508(6); or (b) the Court orders such disclosure.

9. With respect to any depositions that involve a disclosure of Designated Material, the designating party shall have until fourteen (14) days after receipt of the final deposition transcript to inform all other parties which portions of the transcript, by page and line number, are to be designated as Confidential, Confidential Health Information, or Attorneys' Eyes Only, which period may be extended by agreement of the parties. During these fourteen (14) days), all deposition transcripts shall be treated as if they had been designated as Attorneys' Eyes Only in their entirety.

10. If counsel for a Receiving Party objects to the designation of all or a portion of Discovery Material as Confidential, Confidential Health Information, or Attorneys' Eyes Only, the following procedure shall apply:

    a. Counsel for the Receiving Party shall serve on the Producing Party a written objection to such designation, which shall describe with particularity by Bates number or deposition page and line number the documents or information in question and shall state the grounds for objection. Counsel for the Producing Party shall respond in writing to such objection within 14 days, and shall state with particularity the grounds for asserting that the Discovery Material is Confidential, Confidential Health Information, or Attorneys' Eyes Only. If no timely written response is made to the objection, the challenged designation will be deemed to be void. If the Producing Party makes a timely response to such objection asserting the propriety of the designation, counsel shall then confer in good faith in an effort to resolve the dispute. The challenged material shall be treated as it has been designated until the Producing Party agrees otherwise in writing or this Court issues an order rejecting the designation.

    b. If a dispute as to a Confidential, Confidential Health Information, or Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the party challenging the designation shall present the dispute to the Court initially by telephone or letter, in accordance with Local Civil Rule

37.1(a)(1), before filing a formal motion for an order regarding the challenged designation. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

11.  Any document designated Confidential, Confidential Health Information, or Attorneys' Eyes Only by a party or non-party and which document is filed with the Court shall be filed under seal in accordance with Local Civil Rule 5.3. Court filings that refer to Designated Material, but do not disclose the substance of that Designated Material, need not be filed under seal.  However, any Court filing that would disclose the substance of any Designated Material must be filed under seal or with redactions to the extent necessary to preserve confidentiality of that material in accordance with Local Civil Rule 5.3.

12.  Each person who has access to Designated Material shall take reasonable precautions to prevent the unauthorized or inadvertent disclosure of such material.

13.  To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Discovery Material that should have been marked as Designated Materials, regardless of whether the information, document or thing was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information, document or thing disclosed or as to any other material or information concerning the same or related subject matter.  Such inadvertent or unintentional disclosure may be rectified by notifying in writing counsel for all parties to whom the material was disclosed that the material should have been designated under this Discovery Confidentiality Order within a reasonable time after the Producing Party discovers that the material was not properly marked.  Such notice shall constitute a designation of the Discovery Material as Confidential, Attorneys Eyes Only, or Confidential Health Information under this Discovery Confidentiality Order.

14.  When the inadvertent or mistaken disclosure of any Discovery Material protected by privilege or work-product immunity is discovered by the Producing Party and brought to the attention of the Receiving Party, the Receiving Party's treatment of such material shall be in accordance with Federal Rule of Civil Procedure 26(b)(5)(B). If a Producing Party asserts an inadvertently produced document is privileged in its entirety, the Producing Party shall produce a privilege log with respect to any such inadvertently disclosed information within five (5) business days of receiving confirmation from the Receiving Party that the inadvertently disclosed information has been returned or destroyed.  If a Producing Party asserts that only a portion of an inadvertently produced document is privileged, it must reproduce the document in redacted form within five (5) business days of receiving confirmation from the Receiving Party that the inadvertently disclosed information has been returned or destroyed.  The Receiving Party may request additional information regarding the redacted document to the extent necessary to evaluate whether to challenge the claim of privilege.  The Producing Party shall provide that information within five (5) business days of receiving such request.  Such inadvertent or mistaken disclosure of such information, document or thing shall not by itself constitute a waiver by the Producing Party of any claims of privilege or work-product immunity.  However, nothing herein restricts the right of the Receiving Party to challenge

the Producing Party's claim of privilege if appropriate within a reasonable time after receiving notice of the inadvertent or mistaken disclosure. If such challenge involves moving the Court for an order compelling production, said motion shall be filed under seal, and neither the fact of the inadvertent production nor the content of any privileged portion of the Discovery Material at issue shall be asserted as a grounds or basis for entering such an order.

15.  If a non-party serves a Party in this action with a request, subpoena, or order ("demand") for disclosure of Designated Material of a Designating Party, the Party receiving the demand, if not prohibited under applicable law, shall promptly deliver a copy of the demand to the Designating Party's counsel, and shall notify the party who served the request that some or all of the materials sought by the request are subject to this Confidentiality Order. The Party receiving the demand shall not disclose any Designated Material prior to the date specified for disclosure, or prior to resolution of any dispute regarding production of such material in response to the request.  In its sole discretion and at its own cost, the Designating Party may oppose or seek to limit the demand in any legal manner. The Party who received the demand shall not oppose or otherwise interfere with the Designating Party's actions.

16.  No information that is in the public domain or which is already known by the receiving party through proper means or which is or becomes available to a party from a source other than the party asserting confidentiality, rightfully in possession of such information on a non-confidential basis, shall be deemed or considered to be Confidential material under this Discovery Confidentiality Order.

17.  This Discovery Confidentiality Order shall not deprive any party of its right to object to discovery by any other party or on any otherwise permitted ground.  This Discovery Confidentiality Order is being entered without prejudice to the right of any party to move the Court for modification or for relief from any of its terms.

18.  This Discovery Confidentiality Order shall survive the termination of this action and shall remain in full force and effect unless modified by an Order of this Court or by the written stipulation of the parties filed with the Court.

19.  Upon final conclusion of this litigation, within 30 days of the final disposition of the litigation, each party or other individual subject to the terms hereof shall promptly return to the origination source, or, upon permission of the producing party, destroy all originals and unmarked copies of documents and things containing Designated Material and to destroy, should such source so request, all copies of Designated Material that contain and/or constitute attorney work product as well as excerpts, summaries and digests revealing Designated Material; provided, however, that counsel may retain complete copies of all motions, filings, transcripts and pleadings including any exhibits attached thereto, and copies of attorney work product, including counsel's emails, for archival purposes, subject to the provisions of this Discovery Confidentiality Order.  Any copies of transcripts and pleadings including exhibits attached thereto retained by counsel for archival purposes shall, to the extent that they that contain or reference Confidential Health Information, be maintained in accordance with the requirements of HIPAA and

8

45 C.F.R. § 164.504(e)(2)(ii)(J) imposed on Business Associates to preserve the privacy of those transcripts and pleadings. Counsel to all Receiving Parties must certify compliance with these requirements within 45 days of the final disposition of the litigation.

20. To the extent a party requests the return of Designated material from the Court after the final conclusion of the litigation, including the exhaustion of all appeals therefrom and all related proceedings, the party shall file a motion seeking such relief.

21. This Court shall retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

We consent to the form and entry of the within Order.

Dated: November 21, 2022

GIBBONS, PC.
One Gateway Center
Newark, New Jersey 07102-5310
973-596-4500

*/s/ E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr., Esq.

SELENDY GAY ELSBERG, PLLC
David Elsberg
Andrew R. Dunlap
Meredith Nelson
1290 Avenue of the Americas
New York, NY 10104
212-390-9000

*Attorneys for Defendant*
*Save On SP LLC*

Dated: November 21, 2022

SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
973-643-7000

*/s/ Jeffrey J. Greenbaum*
Jeffrey J. Greenbaum, Esq.

PATTERSON BELKNAP WEBB
& TYLER LLP
Adeel A. Mangi
George LoBiondo
Harry Sandick
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

**IT IS SO ORDERED**

Dated: <u>November 22, 2022</u>

s/ Cathy L. Waldor
Honorable Cathy L. Waldor, U.S.M.J.

9

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHNSON & JOHNSON | : | |
| HEALTH CARE SYSTEMS INC., | | Civil Action No. 22-2632 (JMV) (CLW) |
| | : | |
| Plaintiff, | | **ENDORSEMENT OF** |
| vs. | : | **PROTECTIVE ORDER** |
| | : | |
| SAVE ON SP, LLC, | : | |
| | | |
| Defendant. | : | |

## EXHIBIT A

       I hereby attest that I understand that information or documents marked as Designated Material are provided to me subject to the Order dated _____, 2022 (the "Order"), in the above-captioned litigation ("Litigation"); that I have been given a copy of and have read the Order; and that I agree to be bound by its terms. I also understand that my signature below indicates my agreement to be bound by the Order and is a prerequisite to my review of any information or documents designated as Designated Material pursuant to the Order.

       I further agree that I shall not use Designated Material for any purpose other than as authorized in the Order and that, except as explicitly authorized in the Order, I shall not disclose Designated Material, in any form whatsoever, to others.

       I further agree to return or destroy Designated Material in my possession, custody, or control in the manner and time specified by the Order.

       I further agree and attest to my understanding that my obligation to honor the confidentiality of such Designated Material will continue even after this Litigation concludes.

       I further agree and attest to my understanding that, if I fail to abide by the terms of the Order, I may be subject to sanctions, including contempt of court, for such failure. I agree to be subject to the jurisdiction of the above-identified Court for the purposes of any proceedings relating to enforcement of the Order. I further agree to be bound by and to comply with the terms of the Order as soon as I sign this Agreement, regardless of whether the Order has been entered by the Court.

Date: _____

By: _____

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE
SYSTEMS INC.,

                Plaintiff,

      v.

SAVE ON SP, LLC,

                Defendant.

Case No. 2:22-cv-02632-JMV-CLW

## STIPULATION AND ORDER
## GOVERNING THE EXCHANGE OF ELECTRONICALLY STORED INFORMATION

Upon agreement of the Parties for entry of an order establishing a protocol for the exchange and production of documents in hard-copy format ("Documents") and electronically stored information ("ESI"), as those terms are used in the Federal Rules of Civil Procedure, plaintiff Johnson & Johnson Health Care Systems Inc. ("Plaintiff") and Defendant Save On SP, LLC ("Defendant") (each a "Party" and, collectively, the "Parties") hereby stipulate ("ESI Stipulation") and the Court orders as follows:

## I.    GENERAL PROVISIONS

A.    The Parties and non-parties producing Documents and ESI (each a "Producing Party") shall prepare their Documents and ESI for production to the Parties receiving the production (each a "Receiving Party") in accordance with this ESI Stipulation.

B.    If a provision of this agreement conflicts with the terms of the stipulated Discovery Confidentiality Order (ECF No. 62) (the "Confidentiality Stipulation") entered in this action,[1] the Confidentiality Stipulation will control absent further order of the Court.

---

[1] Defined terms in the Confidentiality Stipulation not otherwise defined herein are incorporated.

C.   Proportionality

    1.   Reasonable Discovery Limits. The proportionality standard set forth in Rule 26(b)(1) shall apply to discovery in this action. Consistent with that proportionality standard, the Parties agree to cooperate in identifying appropriate limits on discovery, including phased discovery and reasonable limits on search terms and the number of custodians, on discoverable data sources, on the relevant period, and on the permissible scope of requests for production, specifically including the permissible scope of requests for emails. Requests for production of ESI, including requests for emails, shall be reasonably targeted, clear, and as specific as possible.

D.   No Designation of Discovery Requests. Productions of Documents and ESI in the reasonably usable form set out in this protocol need not be organized and labeled to correspond to the categories in the requests.

## II.   PRODUCTION OF HARD COPY DOCUMENTS

A.   TIFFs. Producing Parties shall produce Documents in the form of single-page, Group IV TIFFs at 300 dpi. They shall name each TIFF image as its corresponding Bates number. They shall maintain Original Document orientation (*i.e.,* portrait to portrait and landscape to landscape). They shall provide TIFF image files in a self-identified "Images" folder.

B.   OCR Text Files. Producing Parties shall provide Optical Character Recognition ("OCR") text files as a single text file for each Document, not one text file per page. They shall name each file with the beginning Bates number assigned to its corresponding Document, followed by .txt. They shall provide OCR text files in a self-identified "Text" directory. To the extent that a Document is redacted, they shall produce OCR text files for that Document that shall not contain text for redacted portions.

C. <u>Database Load Files/Cross-Reference Files</u>. Unless otherwise agreed by the Parties, Producing Parties shall provide Documents with Concordance-compatible image and data load files (*i.e.*, .OPT and DAT files) using standard Concordance delimiters. They shall provide Concordance-compatible image and data load files (*i.e.*, .OPT and DAT files) in a self-identified "Data" folder.

D. <u>Coding Fields</u>. Producing Parties shall produce Documents with at least the following searchable information in accompanying delimited data files: (1) BegBates, (2) EndBates, (3) BegAttach, (4) EndAttach, (5) Custodians, (6) OCRTextPath, (7) Confidentiality, and (8) Source. When a Producing Party determines in good faith judgment that it is practicable to accompany Documents with other metadata fields in Table I, the Producing Party shall produce those Documents with the practicable metadata fields. Producing Parties shall identify custodians using any of the following conventions, as appropriate: "Last Name, First Name"; "last name_first name"; "first name_last name"; or "FLast." Producing Parties shall use a uniform description of a particular custodian, and separate multiple custodians in the "Custodian" field by a semicolon. For Documents with no individual custodian (*e.g.*, centralized files, document management systems), Producing Parties shall (a) use the relevant entity name(s) in the "Custodian" field and (b) identify the source of the Documents in the "Source" field.

E. <u>Bates Numbering</u>. Producing Parties shall assign each TIFF image a Bates number that: (1) is unique across the entire production; (2) maintains a constant length across the entire production (*i.e.*, padded to the same number of characters); (3) contains no special characters or embedded spaces; and (4) is sequential within a given Document. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production.

F.  Parent-Child Relationships. Producing Parties shall preserve parent-child relationships (*i.e.*, the association between an attachment and its parent Document), to the extent they exist in the manner in which the Documents are maintained in the ordinary course of business. For example, if a Producing Party produces a printout of an email with its attachments, it shall produce such attachments behind the email in the order in which they were attached.

G.  Color. Producing Parties need not, in the first instance, produce Documents containing color in color format. The Receiving Party may request production of such Documents in color format by (1) providing a list of the Bates numbers of the Document(s); and (2) explaining the need for production of the Documents in color format. Consent to produce in color shall not be unreasonably withheld.

H.  Unitizing of Documents. A Producing Party shall not, when scanning Documents: (1) merge distinct Documents into a single record; or (2) split single Documents into multiple records (*i.e.*, Documents should be logically unitized).

## III.  PRODUCTION OF ESI

A.  Technology Assisted Review ("TAR").

1.  Any Producing Party that wishes to use TAR agrees to disclose that intent to the Receiving Party before the Producing Party employs any TAR and must meet-and-confer with the Receiving Party regarding an appropriate TAR protocol. The Producing Party will identify the universe of Documents or ESI to which it intends to apply TAR. The Producing Party may not use TAR to limit or cull Documents or ESI to be reviewed without the prior consent of the Receiving Party.  If the parties are unable to reach agreement on an appropriate protocol, or if the Receiving Party withholds consent, any such disputes shall be resolved by the Court.

2.      The absence of a search term hit or retrieval by TAR methodology for a given ESI or Document does not automatically render it irrelevant. If any Producing Party identifies relevant ESI or Documents not hit upon by the search term filters noted above, it shall produce such non-privileged Documents and/or ESI, subject to the Producing Party's objections to discovery requests and rights under this ESI Protocol, the Local Rules, and this Court's individual rules.

3.      The fact that any electronic file has been identified in agreed-upon searches shall not prevent any Producing Party from withholding such file from production on the grounds that the file is not responsive or relevant, or that it is responsive or relevant but protected from disclosure by applicable privilege or immunity (in which case the Producing Party shall include it on a privilege log), or that the Protective Order entered in this Action allows the file to be withheld.

B.      <u>Avoidance of Duplicate Production</u>

1.      "Duplicate ESI" means files that are exact duplicates based on the files' MD5 hash, SHA-1 hash, email duplicate spare messages (as defined by Relativity), or SHA-256 hash values. The Producing Party need produce only a single copy of responsive Duplicate ESI. A Producing Party shall take reasonable steps to de-duplicate ESI globally (i.e., both within a particular custodian's files and across all custodians). Entire document families may constitute Duplicate ESI. De-duplication shall not break apart families. When the same Duplicate ESI exists in the files of multiple custodians, the additional custodians shall be listed in the "All Custodians" field identified in Table I to the extent such information is available.

5

2.      The Parties may confer regarding other deduplication methods, such as the use of Textual Near Deduplication. Except for the removal of extracted logos, no custom deduplication method will be implemented without the consent of the Receiving Party, and such consent shall not be unreasonably withheld.

3.      If the Producing Party collects and processes additional ESI which contains duplicates of ESI previously produced, that Party also shall provide an overlay file to allow the Receiving Party to update the "All Custodians" field. The overlay file shall include both all custodians listed in the "All Custodians" field in prior productions and any custodians identified in the newly processed ESI.

C.      Email Threading

1.      Email threads are email communications that contain lesser-included email communications that also may exist separately in the Party's electronic document collection. A most-inclusive email is one that contains unique content and all the lesser-included emails, including attachments, for that branch of the email thread. The Parties agree that removal of available lesser-included emails from potential production will reduce all Parties' costs of document review, production, and litigation-support hosting, and, when producing the most-inclusive email in a thread, the parties need not also produce lesser-included emails in the thread.

2.      Participants in lesser-included emails that otherwise would have been subject to review shall be listed in the most-inclusive email's "All Participants" field included in the data load file. With respect to an e-mail chain, the parties may produce the longest unique or most inclusive chain and the parties do not need to separately produce the lesser-included e-mails unless those lesser-included e-mails include unique attachments

6

not included in the longest chain or contain a BCC recipient not shown in the longest unique

chain. If a lesser-included e-mail includes a unique attachment, or if the lesser-included

email was modified in any way in a subsequent email, then the lesser-included e-mail must

be separately produced with the attachment.

D.      TIFFs. Producing Parties shall produce ESI in the form of single-page, black and

white, Group IV TIFFs at 300 dpi. They shall name each TIFF image as its corresponding Bates

number. They shall maintain original document orientation (*i.e.*, portrait to portrait and landscape

to landscape). They shall provide TIFF image files in a self-identified "Images" folder.

E.      Parent-Child Relationships. Producing Parties shall preserve parent-child

relationships (*i.e.*, the association between an attachment and its parent file).

F.      Metadata Fields and Processing. Producing Parties shall produce each of the

metadata and coding fields set forth in Table I that can be extracted from ESI for that ESI. They

are not obligated to populate manually any of the fields in Table I if such fields cannot be extracted

from the ESI, except for the following: (1) BegBates, (2) EndBates, (3) BegAttach, (4) EndAttach,

(5) Custodians, (6) NativeLink, (7) Confidentiality, (8) Parent ID fields (which the Producing Party

or its vendor may populate), and (9) Source. They shall identify custodians using any of the

following conventions, as appropriate: "Last Name, First Name"; "last name_first name"; "first

name_last name"; or "FLast." A Producing Party shall use a uniform description of a particular

custodian and separate multiple custodians by a semicolon in the "Custodians" field. For

documents with no individual custodian (*e.g.*, centralized files, document management systems),

Producing Parties shall (a) use the relevant entity name(s) in the "Custodian" field and (b) identify

the source of the documents in the "Source" field.

     G.    <u>Extracted Text Files</u>. For all ESI (other than multimedia or graphic files), Producing Parties shall provide an extracted text file along with its corresponding TIFF image file(s) and metadata. They shall name each extracted text file such that it is identical to that of the first image page of its corresponding file, followed by .txt. They shall not use file names that contain special characters or embedded spaces and shall extract the text of native files directly from the native file. If a file contains redactions, however, the Producing Party may provide OCR of the redacted file in lieu of extracted text.

     H.    <u>Database Load Files/Cross-Reference Files</u>.  Unless otherwise agreed to by the parties, Producing Parties shall include in each production (1) a metadata file (DAT file) using standard Concordance delimiters or carat pipe delimiters and (2) an image load file in Opticon format (.OPT file). They shall provide in a self-identified "Data" folder Concordance-compatible image and data load files (*i.e.*, .OPT and DAT files).

     I.    <u>Native Files</u>. The following governs the production of native files.

     1.    Producing Parties shall produce PowerPoint presentations, source code, large diagrams, Excel files and/or .csv files, word processing files with tracked changes, comments, or hidden text (*e.g.*, Word), desktop databases (*e.g.*, Access), and audio/video multimedia files in native format ("<u>Native Files</u>"), unless they have redactions.

     2.    Producing Parties shall provide native files in a self-identified "Natives" directory. Producing Parties shall produce each native file with a corresponding single-page TIFF placeholder image, which shall state the ESI is being produced as a native file and provide the Confidentiality Designation, if any. Producing Parties shall name each native file with the beginning Bates number that is assigned to that specific record in the production.

3.      Producing Parties shall include a "NativeLink" entry for each native file in the .DAT load file indicating the relative file path to each native file on the production media. Producing Parties shall produce native files with extracted text and applicable metadata fields as set forth in Paragraphs III.E and III.F. Producing Parties may produce redacted files in either native format or as TIFF image files and OCR in lieu of a Native File, TIFF placeholder image and extracted text file. Producing Parties shall exclude any metadata fields for redacted files that would reveal privileged information.

4.      If produced as a TIFF, each Producing Party shall make reasonable efforts to ensure that its discovery vendor, prior to conversion to TIFF, reveals hidden data from redacted native files that are produced as TIFF image files and ensures that redacted native files will be formatted to be readable. (For example, column widths should be formatted so that numbers do not appear as "#########").

J.      Structured Data. To the extent that responding to a discovery request requires production of ESI contained in a database, a Producing Party may query the database for discoverable information and generate and produce a report in a reasonably usable and exportable Excel or .csv format. The first line of each such file will, to the extent not unduly burdensome, show the column headers for each field of data included. The Parties shall meet and confer to finalize the appropriate data extraction and production format for specific information contained in a database.

K.      Audio and Video Files. Producing Parties shall produce audio and video files in a reasonably usable format as may be agreed upon by the Parties.

L.      Requests for Other Native Files. Other than as specifically set forth above, a Producing Party need not produce ESI in native format. The Receiving Party may request

9

production in native format of other documents by (1) providing a list of the Bates numbers of ESI

it requests to be produced in native format; and (2) explaining the need for reviewing such ESI in

native format. The Responding Party may object and any disputes will be resolved by the Court.

If the Producing Party agrees to produce such a native file, the Producing Party shall produce in

response to such request each native file with corresponding production number fields and a

"NativeLink" entry in the DAT load file indicating the relative file path to each native file on the

production media, all extracted text (other than for multimedia or graphic files), and applicable

metadata fields set forth in Table I.

### Table I-ESI Metadata Fields

| FIELD NAME | DESCRIPTION |
|---|---|
| Author | Author of document, if identified in metadata |
| Begin Bates | Unique document identifier and the starting page of a document (*e.g.*, ABC00000001) |
| Bates End | The end number of a document (*e.g.*, ABC0000099) |
| Bates Beg Attach | The starting number of a group or family of documents (*e.g.*, ABC0000001) |
| Bates End Attach | The end number of a group or family of the document (*e.g.*, ABC0000099) |
| Custodian | The owner of a document |
| All Custo-dians | List of all custodians who had custody of the document; when global de-dupli-cation is used, these are custodians whose file has been de-duplicated; multiple custodians separated by semicolons |
| All Partici-pants | For emails only, lists all participants included in lesser-included emails that, without email threading, would have been subject to review |
| Filename | The original name of the file |
| File Exten-sion | File extension of document (*e.g.*, .msg, .docx, .xlsx, etc.) |
| File Size | The size of the file |

| FIELD NAME | DESCRIPTION |
|---|---|
| **Document Type** | Type of document (*e.g.*, email, e-document, attachment, hardcopy) |
| **Date Created** | Date document was created (*e.g.*, 01/01/2001) |
| **Time Created** | Time document was created (*e.g.*, 17:00) |
| **Date Last Modified** | Date the document was last modified (*e.g.*, 01/01/2001) |
| **Time Last Modified** | Time the document was last modified (*e.g.*, 17:00) |
| **Date Last Accessed** | Last access date of the document as extracted during processing from the file metadata |
| **Time Last Accessed** | Last access time of the document as extracted during processing from the file metadata |
| **Date Sent** | Date email was sent (*e.g.*, 01/01/2001) |
| **Time Sent** | Time email was sent (*e.g.*, 17:00) |
| **Date Received** | Date email was received (*e.g.*, 01/01/2001) |
| **Time Received** | Time email was sent (*e.g.*, 17:00) |
| **Email From** | Sender of email |
| **Email Subject** | Subject line of email |
| **Email To** | Recipient(s) of email |
| **Email BCC** | Blind-copied recipients of email |
| **Email CC** | Copied recipients of email |
| **MD5 Hash** | MD5 Hash Value of file |
| **Native Link** | Relative file path of native file |
| **File Path** | Original file path where file was kept (by the custodian) |
| **Pages** | Number of pages per document |

| FIELD NAME | DESCRIPTION |
|---|---|
| Confidentiality | Confidential, Confidential Health Information, or Attorneys' Eyes Only |
| Redactions | Yes/No |
| Source | Person, shared drive, or other source from whom files were collected |
| Prod Volume | Volume in which the Document was produced (*e.g.*, VOL001) |

  M. <u>Confidentiality Designations</u>. If a Producing Party reduces native files or other ESI designated "Confidential," "Confidential Health Information," and/or "Attorneys' Eyes Only," as defined by the Confidentiality Stipulation, to Document form, it shall mark the Document with the appropriate designation. Producing Parties shall produce all ESI designated as "Confidential," "Confidential Health Information," and/or "Attorneys' Eyes Only" with the designation in the metadata field pursuant to Table I and in the ESI itself.

  N. <u>Encryption of Production Media</u>. To maximize the security of information in transit, any media on which documents or electronic files are produced may be encrypted by the Producing Party. In such cases, the Producing Party shall transmit the encryption key or password to the Receiving Party, under separate cover, contemporaneously with sending the encrypted media. The Receiving Parties in this matter are on notice that certain data produced may originate from custodians in the European Union and the Receiving Parties therefore agree to follow the strictest security standards in guarding access to such data.

  O. <u>Time Zone</u>. Producing Parties shall produce all ESI normalized to Eastern Standard Time (EST).

IV.     PROCESSING OF THIRD-PARTY DOCUMENTS

A.      A Party that issues a non-party subpoena ("Issuing Party") shall include a copy of this ESI Stipulation with the subpoena and request that the non-party produce Documents and ESI in accordance with the specifications set forth herein. If an Issuing Party issued a non-party subpoena prior to the execution of this ESI Stipulation, that Issuing Party shall promptly forward a copy of this ESI Stipulation to the non-party and request that the non-party produce Documents and ESI in accordance with the specifications set forth herein.

B.      The Issuing Party is responsible for producing to all other Parties any Documents and/or ESI obtained pursuant to a subpoena. If a non-party refuses to produce Documents and/or ESI in accordance with the specifications set forth here, the Issuing Party has no obligation to conform the non-party's production to such specifications.

C.      Nothing in this ESI Stipulation is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or non-parties to object to a subpoena.

V.      MISCELLANEOUS PROVISIONS

A.      This ESI Stipulation is intended solely to address the format of Document and ESI productions. Nothing in this ESI Stipulation is intended to affect the rights of any Party to object to any requests or demand for production. Nothing in this ESI Stipulation shall constitute, or operate as, a waiver of any rights of any Party to object to, or to avoid, discovery or disclosure, in whole or in part, under the laws of the United States, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of New Jersey, the Individual Practices of Magistrate Judge Cathy L. Waldor, the Individual Practices of Judge John Michael Vazquez, or any other applicable law, rule, or order.

B.      Nothing in this ESI Stipulation establishes any agreement as to either the temporal or subject matter scope of discovery or as to the relevance or admissibility of any Document or ESI. Nothing in this ESI Stipulation shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections as to the production, discoverability, admissibility, or confidentiality of Documents and ESI.

C.      The Parties shall make good faith efforts to comply with and resolve any differences concerning compliance with this ESI Stipulation. If a Producing Party, notwithstanding their good faith efforts, cannot comply with any material aspect of this ESI Stipulation or if compliance with such material aspect would be unreasonable, such Producing Party shall inform the Receiving Party in writing as to why compliance with the Stipulation is impossible or unreasonable as soon as reasonably practicable.

D.      Nothing herein is intended to, nor shall be construed to, diminish or otherwise affect any Party's discovery obligations.

E.      Any application to the Court under or regarding this ESI Stipulation shall be made pursuant to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of New Jersey, and the Individual Practices of Magistrate Judge Cathy L. Waldor.

Dated: Newark, New Jersey
      November 21, 2022

By:   */s/Jeffrey J. Greenbaum*
      Jeffrey J. Greenbaum
      Katherine M. Lieb
      SILLS CUMMIS & GROSS P.C.
      One Riverfront Plaza
      Newark, New Jersey 07102
      (973) 643-7000

      Adeel A. Mangi
      Harry Sandick
      George LoBiondo
      PATTERSON BELKNAP WEBB &
      TYLER LLP
      1133 Avenue of the Americas New
      York, New York 10036
      (212) 336-2000

      *Attorneys for Plaintiff Johnson &*
      *Johnson Health Care Systems Inc.*

By:   */s/ E. Evans Wohlforth, Jr.*
      E. Evans Wohlforth, Jr.
      GIBBONS P.C.
      One Gateway Center
      Newark, NJ 07102-5310
      ewohlforth@gibbonslaw.com

      David Elsberg
      Andrew R. Dunlap
      Meredith Nelson
      SELENDY GAY ELSBERG PLLC
      1290 Avenue of the Americas New
      York, NY 10104
      Tel: 212-390-9000

      *Attorneys for Defendant Save On SP,*
      *LLC*

SO ORDERED this 22nd day of November, 2022

      s/ Cathy L. Waldor
      HON. CATHY L. WALDOR
      United States Magistrate Judge



| Document title: | SaveOnSP Program Impacted by Drug Manufacturer Changes | Producer | Premera Blue Cross |
| --- | --- |
| Capture URL: | https://webcache.googleusercontent.com/search?q=cache:MT1PivXLIrEJ:https://www.premera.com/wa/producer/news/large-group/saveonsp-program-impacted/&cd=1&hl=en&ct=clnk&gl=us |
| Page loaded at (UTC): | Wed, 25 Jan 2023 20:49:22 GMT |
| Capture timestamp (UTC): | Wed, 25 Jan 2023 20:50:19 GMT |
| Capture tool: | 10.20.2 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/108.0.5359.179 Safari/537.36 |
| Operating system: | Windows_NT (Node 16.17.1) |
| Capture ID: | c2WLhou8VhfPbGGfzZr71E |

This is Google's cache of https://www.premera.com/wa/producer/news/large-group/saveonsp-program-impacted/. It is a snapshot of the page as it appeared on Jan 19, 2023 08:24:16 GMT. The current page could have changed in the meantime. Learn more.

**Full version**    Text-only version    View source

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.



Sign in

# SaveOnSP Program Impacted by Drug Manufacturer Changes

**January 12, 2023**

SaveOnSP is a contracted vendor that works in conjunction with Express Scripts, Inc. (ESI) to manage specialty drug pharmacy spend. SaveOnSP provides a specialty pharmacy copay offset program intended to maximize savings to the plan on select specialty drugs. SaveOnSP focuses on certain specialty drugs with available manufacturer assistance.

The changes noted in this article apply to self-funded groups already included in the SaveOnSP program. At this time SaveOnSP is still closed to new sales.

## Program Changes

Premera recently became aware of changes made to drug manufacturer coupon Terms and Conditions that impact copay maximizer programs, such as SaveOnSP.

- AbbVie Inc. recently changed their Terms and Conditions to exclude members with a "copay maximizer" benefit design. As a result, members identified as such will no longer be eligible for copay cards as of November 1, 2022.
- Janssen Global Services, LLC also changed their Terms and Conditions to exclude members utilizing a copay maximizer program. Members identified in copay maximizer programs will no longer be eligible for copay cards starting January 1, 2023.

As a result of these changes, we expect savings for the following drugs to be impacted:

- Erleada®
- Humira®
- Rinvoq®
- Simponi®
- Skyrizi®
- Stelara®
- Tracleer®
- Tremfya®
- Zytiga®

### Employer Impact

- Groups will likely see reduced realized savings compared to prior savings and previously estimated savings modeling. The impacted drugs make up approximately 40% of historical savings. Updated modeling is available and groups are encouraged to assess the revised savings specific to their membership.
- Below are a few reminders about copay maximizer programs:

If you have additional questions about the SaveOnSP program, including the changes noted above, email **PharmacyPrograms@Premera.com** for assistance.

☐ **Email this article**

Back to News

## Forms

For your convenience, we've categorized our most frequently used forms.

**Producer forms**

☐ ☐ ☐ ☐

SaveOnSP is still closed to new sales.

## Program Changes

Premera recently became aware of changes made to drug manufacturer coupon Terms and Conditions that impact copay maximizer programs, such as SaveOnSP.

- AbbVie Inc. recently changed their Terms and Conditions to exclude members with a "copay maximizer" benefit design. As a result, members identified as such will no longer be eligible for copay cards as of November 1, 2022.
- Janssen Global Services, LLC also changed their Terms and Conditions to exclude members utilizing a copay maximizer program. Members identified in copay maximizer programs will no longer be eligible for copay cards starting January 1, 2023.

As a result of these changes, we expect savings for the following drugs to be impacted:

- Erleada®
- Humira®
- Rinvoq®
- Simponi®
- Skyrizi®
- Stelara®
- Tracleer®
- Tremfya®
- Zytiga®

## Employer Impact

- Groups will likely see reduced realized savings compared to prior savings and previously estimated savings modeling. The impacted drugs make up approximately 40% of historical savings. Updated modeling is available and groups are encouraged to assess the revised savings specific to their membership.
- Below are a few reminders about copay maximizer programs:

If you have additional questions about the SaveOnSP program, including the changes noted above, email PharmacyPrograms@Premera.com for assistance.

☐ Email this article

Back to News

---

About Premera | Medical Policies | Contact Us | Notice of Privacy Practices | Terms & Conditions | Fraud & Abuse

## Language support

Español (.pdf) | 中文 (.pdf) | Tiếng Việt (.pdf) | 한국어 (.pdf) | Русский (.pdf) | Tagalog (.pdf) | Українська (.pdf) | ภาษาไทย (.pdf) | 日本語 (.pdf) | አማርኛ (.pdf) | Oromoo (.pdf) | فارسی (.pdf) | ਪੰਜਾਬੀ (.pdf) | Deutsch (.pdf) | ខ្មែរ (.pdf) | Kreyòl Ayisyen (.pdf) | Français (.pdf) | Polski (.pdf) | Português (.pdf) | Italiano (.pdf) | العربية (.pdf)

Premera Blue Cross complies with applicable federal and Washington state civil rights laws (.pdf) and does not discriminate on the basis of race, color, national origin, age, disability, sex, gender identity, or sexual orientation.

Premera Blue Cross HMO complies with applicable federal and Washington state civil rights laws (.pdf) and does not discriminate on the basis of race, color, national origin, age, disability, sex, gender identity, or sexual orientation.

Availity is an independent provider of health information network services that does not provide Blue Cross Blue Shield products or services. Availity is solely responsible for its products and services.

Premera Blue Cross is an independent licensee of the Blue Cross Blue Shield Association serving businesses and residents of Alaska and Washington state, excluding Clark County. Premera Blue Cross HMO is an independent licensee of the Blue Cross Blue Shield Association serving businesses and residents of Washington State, excluding Clark County.

# EXHIBIT 7

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 27, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> **Re:    SaveOnSP's Requests For Production**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

   We write in response to your January 20, 2023 letter concerning our January 13, 2023 meet and conferring regarding Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Responses and Objections to Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production.

## I.    GLOBAL ISSUES

### A.    Documents Related to the Development and Marketing of CarePath and SaveOnSP's Financial Impact on JJHCS and CarePath (RFPs 11, 26, 28-30, 36, and 37)

   SaveOnSP claims that it needs documents relating to the development and marketing of CarePath as well as documents relating to the "finances of any entity with a stake in CarePath, including documents reflecting the financial impact of SaveOnSP's services and the plan terms set by its clients on JJHCS." In general, SaveOnSP advises it needs such documents because it "intends to show that CarePath is primarily a marketing tool that JJHCS and its affiliates use to sell more Janssen Drugs and to hike the price of those drugs year after year." SaveOnSP also claims that it needs such documents because JJHCS alleges that "SaveOnSP harms patients and threatens the continued viability of CarePath by making it 'prohibitively expensive,'" and that "the threat of CarePath's viability constitutes a public harm for purposes of JJHCS's GBL [section] 349 claim," and SaveOnSP "intends to show that Johnson & Johnson's ("J&J's") return on investment from CarePath is substantial, and that even if JJHCS' costs for CarePath have gone up, CarePath is still profitable for J&J." You elaborate on the rationale behind each specific RFP further. We address each RFP below in turn.

Meredith Nelson, Esq.
January 27, 2023
Page 2

RFP No. 11 seeks documents regarding "the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." You state that such documents "relate to SaveOnSP's defense that CarePath is a marketing tool, developed to increase J&J's bottom line."

SaveOnSP has not explained how its assertion that CarePath is a marketing tool is relevant to any claim or defense, or how this fact, even if proved, would justify SaveOnSP inducing patients to breach their contracts with JJHCS. Nor has SaveOnSP explained how JJHCS's intention in operating CarePath is relevant to JJHCS's claims.

RFP Nos. 26 and 32 seek documents concerning the amounts of CarePath funds paid out to patients. You claim such documents "are relevant to disputing JJHCS's claims that its increased CarePath expenditures threaten the viability of CarePath by making it prohibitively expensive, as well as to the extent of JJHCS's alleged damages." We address RFP Nos. 26 and 32 in Section II.F, *infra*.

RFP No. 28 seeks a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. thorough m.), and RFP No. 29 seeks additional documents relating to CarePath's finances. You claim such requests are relevant to "understanding JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, the financial impact of SaveOnSP on J&J more broadly, and JJHCS's damages." We address RFPs No. 28 & 29 in Section II.G, *infra*.

RFP No. 30 seeks documents "regarding the basis for Janssen's decision to raise or lower the prices of Janssen Drugs." You claim this relates to "SaveOnSP's defenses that CarePath is primarily a marketing tool that enables J&J to continue to raise drug prices year after year and that J&J profits from SaveOnSP increasing enrollment in CarePath, because it is able to sell more of its incredibly expensive drugs."

As noted above, SaveOnSP has not explained how Janssen's pricing decisions would justify or excuse SaveOnSP in causing patients to breach their contracts with JJHCS. Further, please explain how documents "regarding the basis for Janssen's decision to raise or lower the prices of Janssen Drugs" relates to SaveOnSP's claimed defense that it is somehow increasing JJHCS's profits by increasing enrollment in CarePath. Even if SaveOnSP did increase enrollment in CarePath, it is unclear how documents relating to decisions to raise or lower drug prices would prove the fact of that increased enrollment.

In short, proclaiming *ipse dixit* on a call that certain categories of documents relate to the litigation does not make it so, and the burden of explaining the relevance of the documents rests with SaveOnSP, especially where the documents requested are voluminous. Thus far, SaveOn has not carried its burden.

Meredith Nelson, Esq.
January 27, 2023
Page 3

RFP Nos. 36 and 37 seek documents relating to the economic terms of its agreements with vendors that support CarePath and documents relating to enrollment in CarePath, respectively.  We address RFP Nos. 36 and 37 in Sections II.I, *infra*.

**B.      Documents in the Possession of JJHCS Hub Entities, Janssen, and Other**

**1.      JJHCS Hub Entities**

You ask us to confirm (1) whether there previously were or currently are other JJHCS Hub Entities involved in the development, administration, and marketing of CarePath aside from Trial Card and Lash Group, and (2) if so, whether JJHCS will produce documents from those entities responsive to SaveOnSP's requests.

As discussed in Section I.A., *supra*, SaveOnSP has not explained how documents relating to the development and marketing of CarePath are relevant to this litigation.  Further, as explained in Section I.C., *infra*, it is unclear to us how documents dated from before 2017 are relevant to this litigation.  Therefore, we focus our response on entities responsible for the administration of CarePath during the relevant Time Period and with regard to the scope that we have agreed is appropriate.

Trial Card is the entity responsible for administering CarePath's co-pay assistance program during the relevant Time Period and is most likely to have documents responsive to SaveOnSP's requests.  We had previously identified Lash Group as a predecessor to Trial Card in administering CarePath during a small portion of the relevant Time Period.  Based on additional fact investigation, however, we no longer believe that Lash Group had a comparable role in the administration of CarePath's co-pay assistance program.  We are continuing to investigate and will let you know if that understanding changes.  We are otherwise unaware of any of vendors that have had a comparable role in administering CarePath.  Other vendors that provide or have provided limited, episodic services to JJHCS relating to CarePath are not relevant to the litigation.

As noted at our meet and confer, JJHCS is working with Trial Card to facilitate the production of documents responsive to SaveOnSP's requests.  Such documents will be produced to SaveOnSP through JJHCS's counsel.

**2.      J&J and Janssen**

You ask us to confirm whether JJHCS will produce documents held by Janssen or other J&J entities because you believe those entities will have "highly relevant" documents, including "documents related to the pricing of Janssen Drugs, the purpose of CarePath, and J&J's return on investment for CarePath."  You also request that we provide a list of all J&J entities involved in the development, marketing, or administration of CarePath.

Meredith Nelson, Esq.
January 27, 2023
Page 4

As discussed, JJHCS is the entity that manages CarePath and it is the only J&J entity that is a party to this action.  There is no need for JJHCS to provide any list of entities or for documents from other JJHCS affiliates to be produced.  JJHCS is prepared to produce documents held by other J&J entities to the extent that such production is agreed upon or ordered by the Court, but we do not think any such production is necessary or appropriate.

C.    **Time Period**

SaveOnSP requests several categories of documents from before January 1, 2017. You ask us whether JJHCS intends to produce any documents pre-dating January 1, 2017.

1.    **Your Demand for Documents Dating Back to January 1, 2009**

For certain categories of RFPs (Nos. 1-7, 11-13, 28-30, 36-37), you state that you chose January 1, 2009 as the starting date based on your understanding of when most of the Janssen Drugs first went to market.  As we have explained, this start date is unjustified and inappropriate, reaching back almost a decade before SaveOnSP existed, and seven years before CarePath was launched.  Nevertheless, we address each request in turn.

For RFP Nos. 12 and 13, which relate to extrinsic evidence concerning the drafting of CarePath's terms and conditions, you claim you need documents going back to January 1, 2009 so you can "make arguments about the meaning of the contracts that SaveOnSP allegedly induced patients to breach."  As discussed in Section II.B, *infra*, the drafting history of CarePath's terms and conditions is not relevant to the claims or defenses in this case, but to the extent the parties can reach an agreement on JJHCS's proposal with respect to the scope of JJHCS's response to RFP Nos. 12 and 13, JJHCS is willing to consider producing documents dating back to January 1, 2016.

For RFP Nos. 11, 28-30, 36, and 37, which relate to the development, marketing, administration, and financials of CarePath and Janssen drugs, you claim that you need documents going back to January 1, 2009 so you can "probe why CarePath was created, J&J's historical return on investment for CarePath, and how SaveOnSP has impacted JJHCS and CarePath."  Further, you claim that you are entitled to rely on "historical information to assess [JJHCS's] damages and the impact that SaveOnSP has on JJHCS and CarePath," particularly by comparing information pre-dating SaveOnSP's existence to information post-dating SaveOnSP's existence.

As explained more fully in Section I.A, *supra*, and in other sections of this letter, much of the information sought from these requests is irrelevant to the claims and defenses in this case.  Nevertheless, JJHCS has agreed to produce certain documents in response to them, subject to general and specific objections, including:

Meredith Nelson, Esq.
January 27, 2023
Page 5

- In response to RFP No. 28, JJHCS agreed to produce Janssen Transparency Reports and also agreed to consider producing documents responsive to items (i) through (m), which relate to CarePath enrollment data.

- In response to RFP No. 29, JJHCS agreed to produce documents sufficient to show (1) how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath.

In order to allow SaveOnSP to perform an analysis comparing information from before and after SaveOnSP's existence, JJHCS would be willing to provide documents in these categories dating back to January 1, 2016, to the extent such documents exist and can be located by a reasonable search. Any date range beyond that would be unduly burdensome and unnecessary to the analysis that SaveOnSP wishes to perform.

Finally, for RFP Nos. 1-7, which ask for various categories of organizational charts, you state you need documents dating back to January 1, 2009 "in order to understand how the above information implicates the various entities whose conduct is relevant in this action and to identify potential sources of additional information." Subject to general and specific objections, JJHCS agreed in response to RFP Nos. 1, 4, and 5 to "produce non-privileged documents in its possession sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath." As above, JJHCS would be willing to provide documents in these categories dating back to January 1, 2016, to the extent such documents exist and can be located by a reasonable search.

## 2.     Your Demand for Documents Dating Back to January 1, 2015

For another category of RFPs (Nos. 14, 41, and 42), you seek documents from as early as January 1, 2015. These requests seek documents relating to JJHCS's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits (RFP No. 14), "Copay Accumulator Services and Copay Maximizer Services and their effect on JJHCS's return on investment for copay assistance dollars," (RFP No. 41), and JJHCS's understanding of the terms "copay accumulator" and "copay maximizer." (RFP No. 42).

As we have explained, these requests are irrelevant to the claims and defenses at issue in this case because JJHCS's understanding of the regulatory backdrop or the meaning of the terms "copay accumulator" and "copay maximizer" have no bearing on whether SaveOnSP tortiously interfered with CarePath or violated the New York's GBL. Further, JJHCS has agreed to produce several categories of documents related to the harm SaveOnSP has caused it, so the effects of other programs are also not relevant to this case.

Meredith Nelson, Esq.
January 27, 2023
Page 6

Nevertheless, in response to RFP No. 14, subject to general and specific objections, JJHCS agreed to produce documents "regarding SaveOnSP's designation of specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations." JJHCS discusses further compromise on this RFP in Section II.C, *infra*. Further, while JJHCS has not agreed to produce documents in response to RFP Nos. 41 and 42, JJHCS also discusses a potential compromise in Section I.D, *infra*. While JJHCS is prepared to compromise on the requests and go beyond what it is obligated to produce, extending the time period beyond January 1, 2017 is not appropriate for these requests.

### D.    Requests Related to Accumulators and Maximizers (RFP Nos. 20, 21, and 41-43).

SaveOnSP's RFP Nos. 20, 21, and 41-43 seek documents related to accumulators and maximizers. For example, RFP No. 42 seeks documents relating to JJHCS's "understanding of the terms 'copay accumulator' and 'copay maximizer.'" JJHCS responded to most of these requests that it would produce documents relating to SaveOnSP specifically, except for RFP No. 21, which JJHCS objected to in full because, *inter alia*, it targets irrelevant lobbying efforts.

As we explained during the meet and confer, JJHCS's understanding or views about accumulators or maximizers in general are irrelevant. The key point in JJHCS's Complaint is that SaveOnSP has characteristics of such programs (*see* Compl. ¶¶ 50, 74), which is a fact that will be proved only by reference to documents in SaveOnSP's possession. In response, you ask whether JJHCS would agree to a proposal that both parties drop their requests concerning accumulators and maximizers.

We do not accept this proposal. The documents relating to maximizers and accumulators that JJHCS seeks are relevant for reasons that are not reciprocal. For instance, JJHCS's RFP No. 43 seeks "documents and communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs and JJHCS's RFP No. 45 seeks "documents and communications relating to studies, reports, publications, analyses, research, white papers reviews, or other written work product" relating to, *inter alia*, "accumulator programs" and "maximizer programs." The wrongfulness of SaveOnSP's Program is at issue, so whether it can legally operate in states with accumulator bans is relevant. Further, SaveOnSP's intent is at issue, so given that it has characteristics of accumulators and maximizers, any analyses of whether such programs are wrongful or harmful is relevant. Because JJHCS's intent is not at issue, neither of those categories of documents are relevant with respect to JJHCS, nor is the broad category of "JJHCS's understanding of the terms 'copay accumulator' and 'copay maximizer'" an appropriate topic of discovery from JJHCS.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

Meredith Nelson, Esq.
January 27, 2023
Page 7

### A.      RFP No. 11

You ask us to confirm whether J&J or JJHCS operates or previously operated any copay assistance programs other than CarePath.  We are unaware of any other copay assistance programs operated by J&J or JJHCS during the relevant Time Period of January 1, 2017 to July 1, 2022.  Any programs that predate CarePath's launch are irrelevant to this litigation.

### B.      RFP Nos. 12 and 13

SaveOnSP's Request Nos. 12 and 13 seek documents regarding CarePath's terms and conditions, including CarePath's requirement that patients enrolled in CarePath make payments toward Janssen Drugs.  In response, JJHCS has agreed to produce final versions of CarePath's terms and conditions because JJHCS's allegation that SaveOnSP causes a breach of those terms and conditions is evident by their plain meaning.  SaveOnSP nevertheless insists that it is entitled to gather extrinsic evidence on the meaning of CarePath's terms and conditions in support of its assertion that SaveOnSP does not cause of breach of cause a CarePath's terms and conditions.  You ask us to confirm whether JJHCS will produce internal communications regarding the meaning of SaveOnSP's terms and conditions.

During our meet and confer, we asked SaveOnSP to consider producing internal communications responsive to JJHCS's RFP No. 17 ("Any agreements, including drafts, between Express Scripts on the one hand, and health insurance plan sponsors, on the other, regarding the SaveOnSP Program, and any communications relating thereto") in exchange for JJHCS's agreement to produce internal communications relating to the drafting of CarePath's terms and conditions.  You rejected this proposal at the meet and confer and again in your letter because you claim that "the terms of SaveOnSP's contracts with health plans are not at issue in this case."

We ask you to reconsider our proposal.  The terms of SaveOnSP's contracts with health plans and Express Scripts are very much at issue in this case.  JJHCS alleges that SaveOnSP intentionally tortiously interferes with its CarePath program by contracting with Express Scripts and health plans to perpetuate the SaveOnSP Program.  *See, e.g.*, Compl. ¶¶ 28, 52, 68, 75, 113.  Because SaveOnSP's intent is at issue with respect to JJHCS's tortious interference claim, communications relating to SaveOnSP's understanding of those terms and whether they are wrongful is particularly relevant.  Further, because harm to both JJHCS and patients is at issue with respect both to JJHCS's tortious interference claim and its GBL claim, communications relating to whether the terms of SaveOnSP's agreements harm JJHCS or harm patients are also relevant.  If SaveOnSP intends to seek JJHCS's internal documents, fairness requires that SaveOnSP produces its internal documents, as we have proposed and propose again.

Meredith Nelson, Esq.
January 27, 2023
Page 8

### C.     RFP No. 14

SaveOnSP's RFP No. 14 seeks documents relating to JJHCS's and other entities'
"understanding of commercial health plans' ability to designate specialty drugs as Essential
Health Benefits ('EHB') or Non-Essential Health Benefits ('NEHB') under the Affordable Care
Act ('ACA') and its regulations."  In response to this request, JJHCS agreed to produce non-
privileged documents and communications regarding SaveOnSP's designation of specialty drugs
as EHB or NEHB.  You ask us to confirm whether in addition to these documents, JJHCS would
be willing to produce internal communications relating to its understanding of a commercial
health plans' ability to designate specialty drugs as EHB or NEHB under the ACA.  In exchange,
you indicate that "SaveOnSP would be open to producing internal documents that reflect its
understanding of whether SaveOnSP's advice to health plans complies with the ACA."

We are willing to accept the following proposal:  We would agree to produce all
non-privileged documents and communications regarding JJHCS's understanding of commercial
health plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its
regulations for the time period of January 1, 2017 to June 1, 2022 to the extent such documents
exist and can be located after a reasonable search.  In exchange, SaveOnSP would need to agree
to produce all non-privileged documents and communications, including internal
communications, regarding SaveOnSP's understanding of commercial health plans' ability to
designate specialty drugs as EHB or NEHB under the ACA and its regulations for the time
period from January 1, 2017 to July 1, 2022.  Please let us know SaveOnSP is interested in such
a proposal.

### D.     RFP No. 21

SaveOnSP's RFP No. 21 concerns "any advocacy to or communications with any
governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or Copay
Maximizer."   JJHCS has objected to this request, *inter alia*, as seeking documents and
communications that are irrelevant to any claim or defense in this action and also subject to a
First Amendment privilege.

In your letter, you claim "that such documents are relevant to JJHCS's GBL
claim, as JJHCS's public advocacy efforts may include misinformation that causes the alleged
patient stress and confusion that JJHCS attributes to SaveOnSP."  As we discussed during our
meet and confer, the Complaint alleges that SaveOnSP confuses patients by, for example,
creating rejections and delays at the point of sale.  *See* Compl. ¶ 88.  You respond by maintaining
that "you are entitled to discovery of such documents notwithstanding [JJHCS's] assertion that
this case concerns only the specific types of stress and confusion that JJHCS alleged in its
complaint."

SaveOnSP's request does not relate to the claims or defenses in this action and
you have offered no logical explanation to the contrary.  In response to our request that you

Meredith Nelson, Esq.
January 27, 2023
Page 9

identify stress or confusion alleged in the complaint that could reasonably be attributed to JJHCS, you instead suggest in conclusory fashion that this case does not concern "only the specific types of stress and confusion that JJHCS alleged in its complaint."  Please explain how, if JJHCS's public advocacy efforts to protect patients theoretically somehow caused stress or confusion other than that alleged in the Complaint, that would justify SaveOnSP causing the stress or confusion alleged in the Complaint.

Moreover, as we explained in our letter dated January 6, 2023, JJHCS has a privilege against the production of documents that would unjustifiably burden its First Amendment right to political association.  *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958).  In light of this First Amendment privilege, we asked SaveOnSP to explain why its request for documents concerning JJHCS's lobbying of government officials is permissible.  To date, you have provided no response to this request.  Please explain why SaveOnSP is entitled to documents and communications concerning JJHCS's lobbying efforts, notwithstanding the burden this request imposes on JJHCS's First Amendment protections.

### E.    RFP No. 25

SaveOnSP's RFP No. 25 seeks all documents and communications regarding any alleged harm caused by SaveOnSP to JJHCS, including JJHCS's allegations in Complaint ¶¶ 110, 115.  In response, JJHCS agreed to produce documents and communications relating to "the extent of the harm SaveOn has caused."  R&O to SaveOnSP's RFP No. 25.

During the meet and confer, you asked to confirm whether use of the phrase "extent of the harm," as compared to the phrase "any alleged harm," as used in the request, was intended to exclude any documents responsive to SaveOnSP's request.  There is no practical difference in the search terms or production that would follow from what was requested and what we have agreed to produce.  Thus, subject to its general and specific objections, JJHCS confirms that it will produce all documents responsive to SaveOnSP's request.

### F.    RFP Nos. 26 & 32

SaveOnSP's RFP No. 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum."  SaveOnSP's RFP No. 32 seeks all documents and communications "regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient."

With respect to Request No. 26, JJHCS agreed to produce documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to

Meredith Nelson, Esq.
January 27, 2023
Page 10

Patients enrolled in CarePath."  *See* R&O to RFP No. 29.  However, JJHCS declined to produce any documents in response to Request No. 32 as, *inter alia*, irrelevant to the litigation.

During our meet and confer, you clarified that SaveOnSP is seeking not just documents showing how JJHCS determines the amount of copay funds it offers to patients, but also documents and communications concerning what amounts are actually paid to patients, including internal documents and communications regarding these amounts.  In your letter, you contend that these amounts are "particularly relevant to both refuting JJHCS's allegations regarding viability as well as for contesting any damages amount put forward by JJHCS, as such overpayments would not be caused by SaveOnSP."

Internal communications regarding the amount of copay assistance funds paid to patients are not necessary for SaveOnSP to assess whether JJHCS pays out more in copay assistance than it has budgeted.  Nor has SaveOnSP explained how such documents are otherwise relevant to any claims or defenses in this litigation.  However, subject to the conditions laid out in Section II.F *infra* regarding RFP No. 28, JJHCS is willing to provide data regarding the actual amounts paid to patients in copay assistance, to the extent such data exists and can be located after a reasonable search.  To the extent that data reflects that JJHCS is in fact paying more than the budgeted amount of CarePath funds to certain patients, JJHCS is willing to meet and confer further to determine if additional discovery is appropriate on those specific cases.  Please confirm whether this compromise is acceptable to SaveOnSP.

G.    **RFP No. 28 & 29**

SaveOnSP's RFP No. 28 seeks a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. through m.).  SaveOnSP's Request No. 29 seeks documents relating to CarePath's finances and the relationship between those finances and Janssen finances.  In response, subject to general and specific objections, JJHCS agreed to produce Janssen Transparency Reports and invited SaveOnSP to confer on items i. through m. for RFP No. 28, and also agreed to produce documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath" for RFP No. 29.  *See* R&Os to SaveOnSP's RFP Nos. 28 & 29.

You claim that the data SaveOnSP seeks in RFP Nos. 28 and 29 is relevant to its understanding of "JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, and the financial impact of SaveOnSP on J&J more broadly."  Further, during the meet and confer, you stated that SaveOnSP is entitled to discovery on the marketing and development of CarePath and other copay assistance programs for the ***last thirteen years***, because Janssen increases drug prices for profit and uses CarePath to induce patients to take Janssen drugs, so any impact SaveOnSP has on CarePath does not constitute

Meredith Nelson, Esq.
January 27, 2023
Page 11

public harm.  Finally, you ask us to consider whether SaveOnSP's RFP Nos. 28 is similar to JJHCS's RFP No. 41, and whether there is potential for reciprocity.

After conferring internally, with to items a. through g. for RFP No. 28, we still do not see how those categories of documents relate to the claims and defenses in this case.

First, the items you request do not relate to the facts you seek to establish as outlined in your letter, namely: "JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, and the financial impact of SaveOnSP on J&J more broadly."  Please explain how items like "actual and projected number of patients receiving Janssen drugs, the number of fills and dosages, the costs to manufacture Janssen Drugs, the sales and marketing budget for Janssen drugs, the price of Janssen Drugs, and the revenue received for Janssen Drugs" going back nearly thirteen years are relevant or necessary to determining the "return on investment for CarePath," "how CarePath enables JJHCS to increase the cost of Janssen Drugs," or "the financial impact of SaveOnSP on J&J more broadly."

Second, the facts you seek to establish do not relate to the claims or defenses in this action.  Specifically, please explain how, even assuming there is a "return on investment on CarePath" or "CarePath enables JJHCS to increase the costs of Janssen Drugs," those facts would permit SaveOnSP to cause patients to breach their contracts with JJHCS and repurpose CarePath's funds for SaveOnSP's profit or would excuse the damages that JJHCS alleges SaveOnSP has caused.  Likewise, please explain how SaveOnSP's theoretical impact on "J&J more broadly" excuses those same damages.  There is no basis to convert this case from a claim brought against SaveOnSP for two specific causes of action into a free-wheeling exploration of all aspects of J&J's process of drug development and price.  Indeed, neither of the causes of action brought by JJHCS permit the type of discovery from JJHCS that SaveOnSP seeks.

With respect to items i. through m. for RFP No. 28, which relate to enrollment data for CarePath, JJHCS is willing to consider producing such data, to the extent it exists and can be located after a reasonable search, if SaveOnSP is willing to produce the categories of data requested in JJHCS's RFP No. 41 and 42, rather than just "data sufficient to show, for each Janssen Drug, the annual total amount of payments made by CarePath for participants advised by SaveOnSP."  *See* R&Os for JJHCS's RFP Nos. 41 and 42.  Please indicate whether SaveOnSP is willing to consider this compromise.

Finally, with respect to RFP No. 29, in addition to agreeing to produce documents showing the harm that results from SaveOnSP's conduct (*see, e.g.*, R&O to SaveOnSP's RFP No. 25), JJHCS has also agreed, subject to general and specific objections, to produce documents sufficient show (1) how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath."  R&O to SaveOnSP's RFP No. 29.  As noted above, we still do not see how the facts you seek to establish as outlined in your letter relate to the claims or defenses at issue, but we ask you to consider

Meredith Nelson, Esq.
January 27, 2023
Page 12

whether such data, in addition to the data JJHCS would be willing per the above compromise regarding RFP No. 28, is sufficient.

### H.     RFP No. 34

SaveOnSP's Request No. 34 seeks documents and communications concerning JJHCS's consideration of SaveOnSP's services for its own employer-sponsored health plan. JJHCS declined to produce any such documents. As outlined in your letter, you indicated that "SaveOnSP understands that J&J or JJHCS conducted significant negotiations with SaveOnSP to use SaveOnSP's services for the health plan it provides for its own employees" but "[b]efore the parties could sign a contract, however, another division within J&J or JJHCS insisted that the negotiations cease."

As you are aware, J&J never signed a contract with SaveOnSP. Further, JJHCS itself was not involved in any such negotiations. Thus, RFP No. 34 is irrelevant to the claims and defenses in this action. JJHCS will not produce documents in response to this request.

### I.     RFP Nos. 36 & 37

SaveOnSP's Request No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS has agreed to produce agreements for entities responsible for administering CarePath for the period of January 1, 2017 to the present, even if those entities are no longer involved in the administration of CarePath. *See* R&O to SaveOnSP's RFP No. 36. JJHCS is also endeavoring to produce work orders that document the cost of the services provided.

During the meet and confer, you clarified that in addition to these agreements, SaveOnSP is seeking internal communications regarding the value ascribed to the services provided by certain Hub Entities. In your letter, you again assert that in addition to the agreements themselves, SaveOnSP is seeking internal communications that "reflect[] the value of [those] services, including internal documents that may have been generated by JJHCS in the process of negotiating its contracts." Please explain how the value ascribed by JJHCS to the services provided its vendors or otherwise relevant to claims or defenses in this matter.

Relatedly, SaveOnSP's Request No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." JJHCS declined to produce documents in response to this Request on the grounds that, *inter alia*, this Request is irrelevant to the subject matter at issue in this litigation. *See* R&O to RFP No. 37.

During the meet and confer, you explained that SaveOnSP believes it is actually more successful in getting patients to sign up for CarePath than Janssen is by itself. Therefore,

Meredith Nelson, Esq.
January 27, 2023
Page 13

you contend that SaveOnSP "provides a net benefit to J&J, because more patients are taking Janssen drugs even if JJHCS is paying more in copay assistance."

   We have investigated this issue further. JJHCS does not keep statistics on whether patients sign up for CarePath after being contacted by JJHCS or its vendors, which moots this request regardless of its irrelevance.

**J.  Request No. 38**

   SaveOnSP's Request No. 38 seeks documents and communications received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath. As SaveOnSP indicates that it accepts JJHCS's offer to produce all documents responsive to this Request regarding SaveOnSP, there appears to be no further dispute on this issue.

* * *

   We are available to meet and confer regarding the issues outlined above at your convenience. We look forward to your response.

        Very truly yours,

        */s/Anthony C. LoMonaco*
        Anthony C. LoMonaco

# EXHIBIT 8

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

selendy
gay
elsberg

Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

February 15, 2023

**Via E-mail**

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

Re:     ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,***
        ***LLC*** **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

        We write in response to your February 14, 2023 letter regarding Johnson &
Johnson Health Care Systems, Inc.'s ("JJHCS") responses to Save On SP LLC's
("SaveOnSP") First Set of Requests for Production and First Set of Interrogatories.

I.      **Issues Where the Parties Are at Impasse**

        JJHCS states that the parties are at impasse regarding JJHCS's responses
to RFP Nos. 11, 14, and 34. We agree. The parties are also at impasse on the other
RFPs discussed in this Section I. You do not offer to produce any additional docu-
ments in response to any of them. While you invite us to discuss these RFPs in
stated hopes of persuading us to reconsider our positions, you offer no reasons for
doing so beyond those that you have already presented, which we have already re-
jected as inadequate. If JJHCS wishes to change its positions, we are of course glad
to meet and confer, but the parties are currently at impasse.

        A.      **Documents Related to the Development and Marketing of**
                **CarePath and SaveOnSP's Financial Impact on JJHCS and**
                **CarePath (RFP Nos. 11, 26, 28-30, and 36-37)**

        SaveOnSP's RFP Nos. 11, 26, 28-39, and 36-37 seek information regarding
the development and marketing of CarePath and SaveOnSP's financial impact on
JJHCS and CarePath. As we have explained, these documents are relevant to
JJHCS's tortious interference claim, its GBL claim, its alleged damages, and its

Anthony LoMonaco
February 15, 2023

request for injunctive relief. Jan 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 1-2; Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco 1-2. You do not offer to produce any documents beyond those that you previously agreed to produce. As we previously discussed, this is not sufficient. While we are glad to discuss if you would like, the parties are currently at impasse on these RFPs.

### B.    JJHCS Hub Entities

In Interrogatories 1-6, SaveOnSP seeks information regarding the JJHCS Hub Entities involved in the development, marketing, and administration of Care-Path and the individuals at those entities involved in those subjects. As we have explained, that information is relevant because these entities are likely to possess documents related to the pricing of Janssen Drugs, the true purpose of CarePath, and J&J's return on investment for CarePath. Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 5-7.[1] You state that the development and marketing of CarePath is irrelevant. You also refuse to identify all entities that played a role in CarePath's operations, identifying only three in addition to Trial Card. You concede this list is not exhaustive, stating that "numerous other agencies" were involved in CarePath's marketing. Feb. 14, 2023 Ltr. from M. Nelson to A. LoMonaco at 3. This is insufficient. While we are glad to discuss, the parties are currently at impasse on Interrogatories 1-6. We reserve our rights to seek documents from Relevant Hub Entities.

### C.    Janssen and Other J&J Entities

In its RFPs, SaveOnSP seeks relevant documents and communications in the possession of J&J entities other than JJHCS, including without limitation Janssen. In Interrogatories 2-4 and 7, SaveOnSP also seeks information about the relevant individuals employed at these entities. As we have explained, SaveOnSP is entitled to relevant discovery from entities that likely possess relevant documents and communications concerning the development, marketing, and administration of CarePath and the development and marketing of Janssen Drugs. *See, e.g.*, Jan. 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 1-2; Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 2-6. You refuse to produce documents from any J&J entity other than JJHCS, or to identify which such entities were involved in the development, marketing, or administration of CarePath or the development and marketing of Janssen Drugs. Feb. 14, 2023 Ltr. from M. Nelson to A.

---

[1] You accuse us of asking J&J to identify other J&J entities involved with CarePath solely "to impose burden and cost on JJHCS without any legitimate rationale." Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 3. This is false. We seek this information to obtain discovery relevant to the claims that JJHCS decided to bring against SaveOnSP.

Anthony LoMonaco
February 15, 2023

LoMonaco at 3-4. As we have previously told you, this is insufficient. While we are glad to discuss, the parties are currently at impasse on this issue.

### D. Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

Several of SaveOnSP's document requests and interrogatories seek information dating back to January 1, 2009. You assert that SaveOnSP has "never once" identified any possible rationale" for this date, accusing us of selecting it solely to impose expense and burden on JJHCS. This is false. As we explained, several times, SaveOnSP selected January 1, 2009 as the starting date for RFP Nos. 1-7, 11-13, 28-30, and 36-37 and Interrogatories 1-4 based on its understanding of when most Janssen Drugs first went to market; JJHCS has not disagreed with that understanding. *See, e.g.*, Feb. 14, 2023 Ltr. from M. Nelson to A. LoMonaco at 4. And, as we explained in our February 7, 2023 letter, if JJHCS began marketing CarePath or drafting CarePath's terms and conditions (which it alleges SaveOnSP induces patients to breach) after January 1, 2009, we are glad to limit our request to that later date; JJHCS has not identified any later dates. As it did earlier, JJHCS offers to produce documents starting on January 1, 2016 for some categories of documents. As we explained earlier, however, that offer is insufficient. Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 6-7. While we are glad to discuss, the parties are currently at impasse on this issue.

### E. Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, and 42)

SaveOnSP's RFP Nos. 14, 41, and 42 seek documents and communications dating back to January 1, 2015. Those requests seek information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as their understanding of Copay Accumulator Services and Copay Maximizers Services. As we have explained, January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect. You again refuse to produce documents on these topics prior to January 1, 2017. Feb. 14, 2023 Ltr. from M. Nelson to A. LoMonaco at 4. As we previously explained, this is insufficient. Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 7-8. While we are glad to discuss, the parties are currently at impasse on this issue.

## II. Issues Where the Parties Are Not Currently at Impasse

We hope that the parties can resolve the following issues without Court intervention.

3

Anthony LoMonaco
February 15, 2023

### A.     Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20 and 41-43; Interrogatory No. 7)

You propose that, in response to SaveOnSP's RFP No. 20, JJHCS produce "studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents" if SaveOnSP produces similar documents in response to JJHCS's RFP No. 45. We agree.

This compromise does not resolve JJHCS's response to SaveOnSP's RFP Nos. 41-43 or SaveOnSP's Interrogatory No. 7. As we explained, documents and information regarding JJHCS's, Hub Entities', and other relevant J&J entities' understanding of the effect of accumulators and maximizers are relevant for, amongst other things, refuting JJHCS's argument that SaveOnSP's conduct is wrongful. *See* Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 8-9. This compromise also does not resolve SaveOnSP's response to JJHCS's RFP No. 43. We propose that the parties continue to meet and confer about these issues, and defer presenting them to the Court until after the February 28 conference. Please let us know if you agree.

### B.     RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek documents and communications concerning CarePath's terms and conditions. These documents are relevant to JJHCS's tortious interference claim. *See* Op. Denying SaveOnSP's Mot. to Dismiss (ECF No. 68); *see also, e.g.*, *Am. Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir. 1995); *Armkel, LLC v. Pfizer Inc.*, No. Civ.A. 02-4206, 2005 WL 2416982, at *7 (D.N.J. Sept. 29, 2005). JJHCS proposes producing documents in response to SaveOnSP's RFP Nos. 12 and 13 if SaveOnSP will produce certain categories of internal communications in response to JJHCS's RFP No. 17, which seeks SaveOnSP's internal communications relating to agreements between SaveOnSP or Express Scripts and health insurance plan sponsors.

In response to JJHCS's RFP No. 17, SaveOnSP intends to produce internal communications regarding: (1) the treatment of CarePath drugs under the terms of the SaveOnSP Program; (2) the designation of Janssen Drugs as Essential or Non-Essential; (3) the monetary split between SaveOnSP and Express Scripts on the one hand, and between SaveOnSP and the health insurance plan sponsors, on the other; and (4) instances where the Plan Member uses the entire annual allotment of CarePath funds for a given Janssen medication after enrolling in the SaveOnSP Program. Feb. 9, 2023 Ltr. from A. LoMonaco to M. Nelson at 6. SaveOnSP does not intend to produce internal communications regarding its operations in states where copay accumulator and maximizer programs have been banned.

4

Anthony LoMonaco
February 15, 2023

Please let us know promptly if JJHCS will agree to produce all documents responsive to SaveOnSP's RFP Nos. 12 and 13.

### C.    RFP Nos. 26 and 32

SaveOnSP's RFP Nos. 26 and 32 seek documents and communications concerning the payment of patients' costs, including payments in excess over the advertised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity.

In your January 27, 2023 letter, you proposed that (1) JJHCS would produce Documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath" and the data requested in SaveOnSP's RFP No. 28(i)-(m) regarding the actual amounts paid to patients in copay assistance (to the extent such data exists and can be located after a reasonable search); and (2) SaveOnSP would produce the information sought in JJHCS's RFP Nos. 41 and 42.

We are willing to accept this proposal if (1) if the parties can agree on the scope of data that JJCHS will produce in response to SaveOnSP's RFP No. 28(i)-(m), *see infra* at Section II.D; and (2) JJHCS will agree to produce that data by a mutually-agreed date certain early in the discovery period.[2] Please let us know if you accept this proposal.

### D.    RFP Nos. 28 and 29

SaveOnSP's RFP Nos. 28 and 29 seek data regarding CarePath and Janssen Drugs, including patient fills and dosages for Janssen Drugs, the manufacturing and marketing of Janssen Drugs, copay assistance funds, the CarePath budget, and JJHCS's return on investment for CarePath.

In its initial responses and objections, JJHCS agreed to produce Janssen transparency reports (RFP No. 28) and documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath" (RFP

---

[2] You assert that our request that you produce this data by March 3, 2023 was "without … any rationale" and that the date proposed was "arbitrary." This is false. As we explained in our meet and confer, we are open to JJHCS's proposal only if we can get the data sufficiently early in the discovery period to analyze it and determine if we need to request additional information on this point. Your offer to produce the data "early in the discovery process" is insufficient, Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 6, as the parties could have very different ideas of what that means. We invite you to meet and confer on a reasonable date.

No. 29). JJHCS's Responses and Objections to SaveOnSP's First Set of RFPs at 25-27. In our January 20, 2023 letter, noting the similarities between some data requested by SaveOnSP's RFP No. 28 and JJHCS's RFP No. 41, we asked that JJHCS consider making reciprocal productions. *See* Jan. 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 9-10. In your January 27, 2023 letter, you proposed that SaveOnSP produce the information sought in RFP Nos. 41 and 42, if JJHCS produces the data sought in SaveOnSP's RFP no. 28(i)-(m). *See* Jan. 27 Ltr. from A. LoMonaco to M. Nelson at 10-12. In our February 7, 2023 letter, we proposed that SaveOnSP expand its production in response to JJHCS's RFP No. 41—to include, for each Janssen Drug for each year, data sufficient to show the total number of patients enrolled in SaveOnSP-advised plans who received CarePath funds for the given drug; the total CarePath funds received by those patients for the given drug; the pharmacies at which those patients filled the given drug; and the average copay or coinsurance amount for the given drug for patients enrolled in plans advised by SaveOnSP—if JJHCS produces all data sought in SaveOnSP's RFP No. 28(i)-(m). *See* Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 12-14. In your February 14, 2023 letter, you rejected that proposal and repeated your prior proposal. *See* Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 7.

In hope of resolving at least a portion of this issue without Court intervention, SaveOnSP proposes the following regarding its RPF No. 28: (1) SaveOnSP produces any patient-level data responsive to JJHCS's RFP No. 41 that it can locate after a reasonable search; and (2) JJHCS produces patient-level data responsive to SaveOnSP's RFP No. 28(i)-(m) from January 1, 2016 (or an earlier date ordered by the Court) to July 1, 2022. Please let us know promptly if you agree.

This proposal would not resolve JJHCS's responses to SaveOnSP's RFP No. 28(a)-(h) and RFP No. 29 (SaveOnSP reserves its rights as to both) or to JJHCS's RFP No. 42. We invite JJHCS to continue meeting and conferring on those issues.

### E.     RFP No. 37

SaveOnSP's RFP No. 37 seeks documents sufficient to show CarePath's enrollment statistics. As we explained, this information is relevant to JJHCS's GBL claim and to JJHCS's alleged damages. *See* Jan. 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 11. You stated that JJHCS does not keep statistics on whether patients sign up for CarePath. Jan. 27, 2023 Ltr. from A. LoMonaco to M. Nelson at 13; *see also* Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 7. We explained that this is not a sufficient response. SaveOnSP's RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates. *See* Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 15. You then repeated your offer to produce data in response to SaveOnSP's RFP No. 28(i)-(m) if SaveOnSP will

6

Anthony LoMonaco
February 15, 2023

produce all data in response to JJHCS's RFP Nos. 41 and 42. We believe that there is more for the parties to discuss and invite you to meet and confer.

\*     \*     \*

As you know, the Court has set a conference for February 28, 2023. We had proposed that the parties finish meeting and conferring in time to provide each other with their portions of proposed joint letters by February 14, 2023. You rejected that offer, purporting to accept that schedule only for a letter on SaveOnSP's issues (an offer we did not make) while reserving JJHCS's rights to prepare joint letters on its issues at a later date. Then, on the same date that you asked SaveOnSP to provide its portion of a joint letter on its issues, you sent us a letter asking SaveOnSP to keep meeting and conferring on several of those same issues.

We intend to go to the Court before February 28, 2023 on the issues listed in Section I, on which the parties are at impasse. To fend off further delays, SaveOnSP may defer going to the Court before February 28, 2023 on some of the issues listed in Section II. Please provide us with your responses to those latter issues as promptly as possible so that we can determine if the parties have resolved them, are at impasse, or should continue to meet and confer. We will then provide you with our portion of a joint letter.

For any issues that SaveOnSP opts not to present to the Court in advance of the February 28 conference, SaveOnSP reserves all rights to present them to the Court at a later time.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

7

# EXHIBIT 9

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

February 17, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:    **SaveOnSP's Requests For Production and Interrogatories**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

We write in response to your letter dated February 15, 2023 regarding Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production and First Set of Interrogatories. We agree with you that the parties are at an impasse on the issues in Section I of your letter. Please promptly send us your joint letter sections on those issues.

With respect to the issues in Section II of your letter, we address those issues in turn below.

## I.    ISSUES WHERE THE PARTIES ARE NOT CURRENTLY AT IMPASSE

### A.    Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20 and 41-43; Interrogatory No. 7)

*First*, we write to confirm that in exchange for JJHCS's production of "studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents" in response to SaveOnSP's RFP No. 20, SaveOnSP will agree to produce all documents in response to JJHCS's RFP No. 45, which requests all documents and communications relating to studies, reports, publications, analyses, research, white papers, reviews, or other written work product that SaveOnSP has created, commissioned, paid for, sponsored, or otherwise procured or supported regarding (i) specialty medication costs, (ii) copayment and coinsurance rates, (iii) accumulator programs, (iv) maximizer programs, or (v) strategies to manage specialty medication costs.

*Second*, SaveOnSP proposes that the parties continue to meet and confer on (1) SaveOnSP's RFP Nos. 41 through 43 and its Interrogatory No. 7, which request documents and

Meredith Nelson, Esq.
February 17, 2023
Page 2

information about accumulator and maximizer programs generally, and (2) JJHCS's RFP No. 43, which requests documents relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs, and that SaveOnSP.

With respect toSaveOnSP's RFP Nos. 41 through 43, as well as SaveOnSP's Interrogatory No. 7, JJHCS supports SaveOnSP's call for further meet-and-confer discussions. Indeed, the parties have not yet met-and-conferred on Interrogatory No. 7 at all, to which JJHCS objected because it is unclear what SaveOnSP is requesting when it asks for the identities of "each person who participated in or had responsibility for" JJHCS's "understanding of the terms 'copay accumulator' and 'copay maximizer.'"  *See* R&O to SaveOnSP's Interrogatory No. 7.

With respect to JJHCS's RFP No. 43, JJHCS does not intend to withdraw its pending motion.  JJHCS has explained at length why it is entitled to documents responsive to that request and the issue is ripe for judicial intervention, and it will not repeat those points here.

**B.    RFP Nos. 12 and 13**

In exchange for JJHCS's agreement to produce documents and communications in response to SaveOnSP's RFP Nos. 12 and 13, SaveOnSP states that in response to JJHCS's RFP No. 17, it intends to produce internal communications regarding:

- the treatment of CarePath drugs under the terms of the SaveOnSP Program;

- the designation of Janssen Drugs as Essential or Non-Essential;

- the monetary split between SaveOnSP an Express Scripts on the one hand, and between SaveOnSP and the health insurance plan sponsors, on the other; and

- instances where the Plan Member uses the entire annual allotment of CarePath funds for a given Janssen medication after enrolling the SaveOnSP Program.

SaveOnSP does not, however, intend to produce internal communications regarding its operations in states where copay accumulator and maximizer programs have been banned.

We are willing to accept the following compromise: In exchange for SaveOnSP's agreement to produce documents, including internal communications, regarding the four bullets above, JJHCS agrees to produce internal documents and communications relating to the drafting of CarePath's terms and conditions during the relevant time period of January 1, 2017 to July 1, 2022, to the extent such non-privileged documents exist and can be identified after a reasonable search.

Meredith Nelson, Esq.
February 17, 2023
Page 3

However, JJHCS will not withdraw its motion to compel the production of internal documents and communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations which ban or limit accumulator adjustment programs. Further, as noted in our February 9, 2023 letter, JJHCS reserves the right to issue follow up requests for additional documents based on information learned in discovery or fact investigation.

### C.    RFP Nos. 26 and 32

SaveOnSP states that it is willing to accept JJHCS's proposal that JJHCS produce the data requested in SaveOnSP's RFP No. 28(i)-(m) in response to RFP Nos. 26 and 32 provided that (1) the parties can agree on the scope of the data JJHCS will produce in response to SaveOnSP's RFP Nos. 28(i)-(m) and (2) JJHCS agree to produce that data by a mutually-agreed date certain early in the discovery period.

With respect to the scope, we provide further detail on the scope of JJHCS's production of the data requested in SaveOnSP's RFP No. 28(i)-(m), as well as the data JJHCS requests from SaveOnSP in exchange for that production, in Section I.D, *infra*.

With respect to the date for production of the data, JJHCS will take all steps to produce this data as soon as possible, and in any event before April 30, 2023.

### D.    RFP Nos. 28 and 29

We write to confirm that we will accept the compromise proposed in your February 15, 2023 letter: If SaveOnSP will produce all data, including patient-level transactional data, responsive to JJHCS's RFP No. 41 for the time period of January 1, 2016 to July 1, 2022, JJHCS will produce all patient-level data for the time period of January 1, 2016 to July 1, 2022 responsive to parts (i) through (m) of SaveOnSP's RFP No. 28, which seeks documents sufficient to show the following: (i) all patients enrolled in CarePath for each Janssen Drug; (j) the dates on which each patient was enrolled in CarePath; (k) the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath; (l) the Janssen Drug for which each patient enrolled in CarePath received copay assistance; and (m) all CarePath copay assistance payments made to each patient.

SaveOnSP also notes that this compromise does not resolve the issues relating to SaveOnSP's RFP No. 28(a)-(h) and RFP No. 29 or JJHCS's RFP No. 42, but invites JJHCS to continue meeting and conferring on those issues. While we are willing to continue meeting and conferring on these issues in advance of the conference, we are not inclined to withdraw JJHCS's motion with respect to RFP No. 42 at this time. Production of the data requested in JJHCS's RFP No. 42 is not burdensome and the information sought relevant to the lawsuit for the reasons discussed in prior correspondence. The only objection lodged by SaveOnSP to this request in its section of the letter to Judge Waldor was based on JJHCS's objection to so-called "reciprocal discovery" in SaveOnSP's RFPs 28 and 29. *See* Specific Ltr., Dkt. No. 66, at 5-6. This

Meredith Nelson, Esq.
February 17, 2023
Page 4

objection was lodged before there was any meet-and-confer on SaveOnSP's RFPs.  With JJHCS having agreed to produce certain information in response to these requests, SaveOnSP's objection to JJHCS's RFP No. 42 has been addressed.

> **E.      RFP No. 37**

SaveOnSP's RFP No. 37 seeks "documents sufficient to show the percentage of patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs."  As we have previously explained on numerous occasions, JJHCS does not track data responsive to this request.  Nonetheless, SaveOnSP insists that JJHCS can "produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates."  As explained in Section I.D., *supra*, and as noted in your February 15 letter, JJHCS is willing to provide CarePath patient enrollment data in response to SaveOnSP's RFP No. 28 subject to SaveOnSP's agreement to produce data responsive to JJHCS's RFP No. 42.  This should resolve the parties' dispute.

* * *

We look forward to your response.

Very truly yours,

*/s/Anthony C. LoMonaco*
Anthony C. LoMonaco

# EXHIBIT 10

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

selendy
gay
elsberg

Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

February 7, 2023

**Via E-mail**

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

Re:   ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
      LLC* (Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

We write to memorialize and follow up on our January 30, 2023 meet and
confer regarding Save On SP LLC's ("SaveOnSP") Requests for Production to John-
son & Johnson Health Care Systems, Inc. ("JJHCS"), as well as JJHCS's January
27, 2023 letters and JJHCS's Responses and Objections to SaveOnSP's First Set of
Interrogatories.

**I.    Global Issues**

    **A.    Documents Related to the Development and Marketing of
        CarePath and SaveOnSP's Financial Impact on JJHCS and
        CarePath (RFP Nos. 11, 26, 28-30, and 36-37)**

We explained, as we have before, that SaveOnSP's RFP Nos. 11, 26, 28-39,
and 36-37 seek information relevant to SaveOnSP's defenses, including rebutting
JJHCS's allegations that CarePath is intended to help patients afford their medi-
cations, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the
continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114,
and that the threat to CarePath's viability constitutes a public harm for purposes
of JJHCS's GBL § 349 claim, *id.* SaveOnSP also seeks this information to discover
whether, because of SaveOnSP, Johnson & Johnson ("J&J") sold more drugs and
reaped more profits than it otherwise would have, which would be relevant to
JJHCS's claim of damages.

These documents and communications are also relevant on three additional grounds.

*First*, JJHCS has asserted that it needs a wide range of documents and communications from SaveOnSP to assess the "wrongfulness" of SaveOnSP's conduct. In the context of a tortious interference claim, wrongfulness or malice "means that the harm was inflicted without justification or excuse." *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 564-65 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). The standard is commercial in nature—asking whether the "loss of business is merely the incident of healthy competition." *Id.* at 565 (quoting *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001)). If JJHCS is permitted to seek broad discovery into the supposed wrongfulness of SaveOnSP's conduct, then SaveOnSP should also be permitted to seek discovery that will allow it to explain the broader context in which it operates, including the untenable position in which J&J and other pharmaceutical companies have placed health plans by raising specialty drug prices to extraordinary heights. *See id.*; *Hotaling & Co., LLC v. Berry Sols. Inc.*, 2022 WL 4550145, at *4 (D.N.J. Sept. 29, 2022) (noting that defendants may contest a tortious interference with contract claim by justifying their "motive[s] and purpose," in addition to "the means used" (quoting *Lamorte Burns & Co.*, 770 A.2d at 1171)).

*Second*, JJHCS has argued that SaveOnSP causes patient harm by making health care more expensive for patients. Compl. ¶ 114. SaveOnSP is entitled to discovery showing that JJHCS and J&J are the true drivers of increasing health care costs by driving up drug prices and, as a result, forcing health plans to offset those increased costs by raising patient deductibles and copays.

*Third*, JJHCS seeks injunctive relief in addition to damages. To obtain a permanent injunction, JJHCS must demonstrate "(1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest." *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). SaveOnSP is entitled to discovery that will enable it to refute each of those elements, including to support its theory that JJHCS uses CarePath as a marketing tool that distorts patient incentives and allows Janssen to raise the cost of its drugs year after year. This defense is relevant to both the balance of the equities and whether the public interest supports the permanent injunction JJHCS seeks.

JJHCS stated that it will not produce documents responsive to these Requests because it does not believe the information sought is relevant. We understand that the parties are at impasse on this issue and may present this dispute to the Court for resolution.

Anthony LoMonaco
February 7, 2023

### B.    JJHCS Hub Entities, Janssen, and Other J&J Entities

During our meet and confer, we further discussed your positions with respect to SaveOnSP's requests for documents and communications possessed by the JJHCS Hub Entities and all other J&J and Janssen entities. These issues also bear on JJHCS's responses to SaveOnSP's Interrogatories.

### 1.    Documents Of JJHCS Hub Entities

SaveOnSP seeks documents and communications from any JJHCS Hub Entity that was or is involved in the development, administration, or marketing of CarePath.

*First*, during our meet and confer, you told us for the first time that documents and communications held by Trial Card and Lash Group are not in JJHCS's possession, custody, or control. SaveOnSP reserves its rights to contest that position or to subpoena information directly from Trial Card and Lash Group.

*Second*, although JJHCS previously agreed to "facilitate" the production of documents from Trial Card and Lash Group, in your January 27, 2023 letter and during our meet and confer you stated that you now would not facilitate the production of documents from Lash Group. You asserted that you "no longer believe that Lash Group had a comparable role [to Trial Card] in the administration of CarePath's co-pay assistance program." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 3. We asked for further information regarding Lash Group's role in CarePath. You said that while Lash Group may have been involved with CarePath generally, it was not tasked with enrolling patients in CarePath or assisting patients with their copay assistance cards, conduct for which you claimed Trial Card was "the main entity that was responsible." Instead, you maintained, Lash Group provided other services in connection with CarePath, such as "determining coverage."

SaveOnSP lacks the information necessary to assess whether Lash Group was in fact involved in the administration of CarePath. If, for example, confirming that an individual's insurance covered the Janssen Drug they sought to fill was a prerequisite to providing them with copay assistance, Lash Group's conduct as you have described it would be part of the "administration" of CarePath. As we stated during our meet and confer, we request that you provide further information on Lash Group's involvement with CarePath, including details on the services you claim Lash Group provided, the relationship between those services and the CarePath copay assistance program, and the time period during which Lash Group provided those services. Please also confirm promptly (1) whether you have completed your investigation into Lash Group's involvement in CarePath; and (2) whether, as a result of that investigation, you have changed your position on whether you will facilitate the production of documents from Lash Group.

3

Anthony LoMonaco
February 7, 2023

*Third*, your letter also states that you are unaware of other entities that "have had a comparable role [to Trial Card] in administering CarePath." *Id.* As we explained during the meet and confer, this statement is not clear. Please tell us whether any entity other than Trial Card was *in any way* involved in enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card.

*Fourth*, JJHCS has also refused to produce documents and communications from any other JJHCS Hub Entity, to identify any Hub Entities involved in the development or marketing of CarePath (including stating whether Lash Group was involved in that development or marketing), or to identify any Hub Entities involved in the administration of CarePath prior to 2016.

You assert in your January 27, 2023 letter that "SaveOnSP has not explained how documents related to the development and marketing of CarePath are relevant to this litigation." *Id.* This is untrue. As we explained, such documents are directly relevant to several of SaveOnSP's defenses—including rebutting JJHCS's allegations that CarePath is intended to help patients afford their medications, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114, and that the threat to CarePath's viability constitutes a public harm for purposes of JJHCS's GBL § 349 claim, *id*—and to contesting JJHCS's asserted damages. *See* Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2; *see also supra* Section I.A.

We therefore reiterate our request that you provide (1) the identities of Hub Entities involved in the development and marketing of CarePath from 2009 to present; and (2) the identities of Hub Entities involved in the administration of CarePath from 2009 to 2016.

*Finally*, you assert, without explanation, that entities that provided "limited, episodic services to JJHCS relating to CarePath are not relevant to the litigation." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 3. Please provide a basis for this representation, including the identity of these vendors and further information on the services provided by these vendors.

### 2.   Documents Of J&J and Janssen Entities Other Than JJHCS

SaveOnSP also seeks documents and communications in the possession of Janssen and other J&J entities. As we have explained several times, these entities likely possess relevant documents and communications concerning the development, marketing, and administration of CarePath, as well as the development and marketing of Janssen Drugs. *See, e.g.*, Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2; *see also supra* Section I.A.

4

Anthony LoMonaco
February 7, 2023

JJHCS refuses to produce documents from any such entities or to provide a list of J&J and Janssen entities that may possess documents responsive to Save-OnSP's Requests for Production. JJHCS has not asserted that it lacks possession, custody, or control over these documents.

In our January 20, 2023 letter and during prior meet and confers, we explained why these entities likely possess relevant documents, including the likelihood that these entities possess documents related to the pricing of Janssen Drugs, the purpose of CarePath, and J&J's return on investment for CarePath. You did not substantively respond to this explanation in your January 27, 2023 letter or in our meet and confer session. Instead, your letter simply maintained that "[t]here is no need for JJHCS to provide any list of entities or for documents from other JJHCS affiliates to be produced" because "JJHCS is the entity that manages Care-Path and … is the only J&J entity that is a party to this action." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 4.

In our meet and confer, you said that JJHCS also objected to our request on both relevance and burden grounds. When we asked you to explain your burden objection, you provided no explanation other than asserting J&J and Janssen are "big companies" with many subsidiaries and employees. As we explained, Save-OnSP is not asking JJHCS to produce documents and communications from every J&J or Janssen entity, nor is it asking JJHCS to identify every J&J or Janssen entity, or every employee of those entities. Rather SaveOnSP seeks the identities of the specific J&J and Janssen entities that were involved in the development, marketing, or administration of CarePath or the development and marketing of Janssen Drugs and for JJHCS to produce relevant documents from those entities. Once you provide a list of those entities and identify relevant custodians and non-custodial sources, the parties can negotiate appropriate search parameters. You asserted (without explaining why) that it would be unduly burdensome for JJHCS to provide a list of such entities. You further asserted that J&J is a public company and that SaveOnSP should identify which entities it believes are relevant, despite our explanation that JJHCS is far better positioned to identify these entities.

Because JJHCS refuses to produce documents from entities other than JJHCS—including other J&J or Janssen entities—or to identify such entities involved with CarePath or Janssen Drugs, we understand the parties to be at impasse at this issue and may present this dispute to the Court.

### 3.    Interrogatories Concerning Hub Entities, J&J, and Janssen

SaveOnSP's First Set of Interrogatories seek information on individuals employed by the Hub Entities, J&J, and Janssen. In response to Interrogatories 1, 5, and 6, JJHCS provided information on individuals from JJHCS and Trial Card. In

Anthony LoMonaco
February 7, 2023

response to Interrogatories 2-4 and 7, JJHCS provided information on only individuals from JJHCS.

Based on your similar objection to our RFPs, we understand that JJHCS is refusing to provide the names of responsive individuals who were not employed by JJHCS or Trial Card in response to these Interrogatories on the basis that it views other entities as irrelevant. Please tell us promptly if that understanding is incorrect. Otherwise, we understand the parties to be at impasse at this issue and may present this dispute to the Court.

### C.    Time Period

#### 1.    Documents and Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

Several of SaveOnSP's document requests and interrogatories seek information dating back to January 1, 2009. As we explained in our prior letter, SaveOnSP selected January 1, 2009 as the starting date for RFP Nos. 1-7, 11-13, 28-30, and 36-37 and Interrogatories 1-4 based on its understanding of when most of the Janssen Drugs first went to market.

JJHCS previously refused to produce documents and communications from before January 1, 2017, the date that JJHCS selected for its own requests, on relevance, burden, and proportionality grounds. In your latest letter, you offered to produce documents and communications dating back to January 1, 2016 for several of SaveOnSP's Requests. We address those Requests in turn.

*RFP Nos. 12-13*. These requests seek documents and communications concerning the drafting and revision of CarePath's terms and conditions. SaveOnSP has requested such documents and communications dating back to January 1, 2009 to ensure that it receives complete information on the drafting, revision, and interpretation of the terms and conditions that JJHCS alleges SaveOnSP induces patients to breach. JJHCS's offer to provide responsive documents and communications dating back to January 1, 2016 is helpful, but is insufficient if JJHCS began to develop CarePath before that date. We ask that JJHCS produce documents regarding CarePath's terms and conditions back to January 1, 2009 or the earliest date on which it began to draft those terms and conditions.

*RFP Nos. 1-7, 11, 28-30, and 36-37*. RFP Nos. 1-7 seek organizational charts for JJHCS, Janssen, and the JJHCS Hub Entities, as well as specific groups within those entities. SaveOnSP has requested such documents and communications dating back to January 1, 2009 so that it can determine the full range of entities and persons whose conduct is relevant in this action. RFP Nos. 11, 28-30, and 36-37 seek documents and communications relating to the development, marketing,

6

administration, and financials of CarePath, as well as the development, marketing, sale, and financials of Janssen Drugs. SaveOnSP has requested such documents and communications dating back to January 1, 2009 to ensure it receives sufficient information on the purpose and financial motivations behind CarePath, as well as the impact of SaveOnSP's services on JJHCS and CarePath. JJHCS's offer to provide responsive documents and communications dating back to January 1, 2016 is helpful, but is insufficient if JJHCS began to develop and sell Janssen Drugs and to develop and administer CarePath before that. We ask that that JJHCS produce organizational charts for JJHCS, Janssen, and the JJHCS Hub Entities, as well as specific groups within those entities starting on January 1, 2009 or the earliest dates on which it began developing CarePath and Janssen Drugs. We likewise ask that JJHCS produce the requested documents and communications relating to the development, marketing, administration, and financials of CarePath, as well as the development, marketing, sale, and financials of Janssen Drugs, starting on January 1, 2009 or the earliest dates on which it began developing CarePath and Janssen Drugs, respectively.

*Interrogatory Nos. 1-4.* SaveOnSP seeks information dating back to January 1, 2009 with respect to its Interrogatory Nos. 1-4. Those interrogatories concern the identities of individuals who were involved in several aspects of CarePath's development and administration, including communicating with patients and health plans; were responsible for marketing and communicating with the public about CarePath; or were involved in analyzing price, revenue, cost, or other financial data for Janssen Drugs, as well as financial data for CarePath. JJHCS limited its responses to Interrogatory Nos. 1-4 to January 1, 2017 through July 1, 2022. For the reasons explained above, SaveOnSP requires information on individuals involved in these subject matters dating back to January 1, 2009. Please amend your interrogatory responses to provide the requested information.

## 2.    Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, and 42)

SaveOnSP's RFP Nos. 14, 41, and 42 seek documents and communications dating back to January 1, 2015. Those requests seek information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as their understanding of Copay Accumulator Services and Copay Maximizers Services. As we have explained, January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect.

In your latest letter, you reiterated your position that "extending the time period beyond January 1, 2017 is not appropriate for these requests." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 6. Based on your prior correspondence,

we understand that JJHCS objects to producing documents dating back to 2015 in response to these Requests on both relevance and burden grounds. JJHCS has not, however, quantified this burden. We therefore understand that the parties are at impasse on this issue and may present this dispute to the Court.

### D.    Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20, 21, and 41-43; Interrogatory No. 7)

Both SaveOnSP and JJHCS seek documents and communications that relate to accumulators and maximizers. Several of these requests seek substantially similar information. As we explained during our meet and confer, for example, SaveOnSP's RFP No. 20 and JJHCS's RFP No. 45 both seek documents and communications related to studies, reports, publications, and analyses on accumulators and maximizers. Because of these similarities, SaveOnSP has offered to produce documents and communications relating to its understanding of maximizers and accumulators if JJHCS is willing to do the same.

In your January 27, 2023 letter and during our meet and confer, however, you refused to treat these requests reciprocally. You argued that while SaveOnSP's intent and the wrongfulness of its conduct are at issue, JJHCS's intent—and, therefore, its understanding of whether accumulators and maximizers cause patient harm—are not.

JJHCS's relevance arguments are misguided. As we explained, and as demonstrated by the cases cited by the District Court in its recent opinion on Save-OnSP's motion to dismiss, the only facet of SaveOnSP's "intent" that is relevant to JJHCS's tortious interference claim is SaveOnSP's intent to induce breach of the CarePath contracts. *See, e.g.*, *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002) (describing intent as "an intent to interfere with plaintiff's contract right or … knowledge that his actions would interfere with the contract right."). You have not explained how the documents sought by JJHCS's Requests relate to SaveOnSP's intent to induce patients to (purportedly) breach their contracts. For instance, whether SaveOnSP complies with state statutes concerning accumulators and maximizers, JJHCS RFP No. 43, has no bearing on whether SaveOnSP intends to induce a breach of CarePath's terms and conditions.

At best for JJHCS, documents regarding accumulators and maximizers would relate to the wrongfulness of SaveOnSP's conduct in inducing purported breaches, not to its intent. But, as noted above, that wrongfulness, or "malice," simply concerns whether the purported breach was induced "without justification or excuse." *DiGiorgio*, 230 F. Supp. 2d at 564-65. Courts assess that inquiry with reference to several factors, including: "(i) the nature of the actor's conduct; (ii) the actor's motive; (iii) the interests of the party with which the actor's conduct interferes; (iv) the interests sought to be advanced by the actor; (v) the social interests

Anthony LoMonaco
February 7, 2023

in protecting the freedom of action of the actor and the commercial interests of the other party; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties." *Id.* at 565 (citing *Restatement (Second) of Torts,* § 767 (1979)). In other words, the wrongfulness inquiry considers facts well beyond SaveOnSP's subjective understanding of whether its conduct was wrongful. If documents regarding accumulators and maximizers relate to whether SaveOnSP's conduct was objectively wrongful, those documents would be relevant whether held by SaveOnSP or JJHCS. SaveOnSP disputes that such documents are relevant to wrongfulness. But it is willing to produce such documents if JJHCS will do the same; alternatively, if JJHCS does not want to produce such documents, SaveOnSP would agree not to produce them either.

SaveOnSP remains open to reciprocal productions. You stated that you would consider our renewed request. Please confirm promptly whether JJHCS agrees to making reciprocal productions on this subject matter.

## II.    Issues Related to Specific Requests

### A.    RFP No. 11

SaveOnSP's RFP No. 11 seeks documents and communications regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs. In our January 20, 2023 letter, we asked you to confirm whether J&J or JJHCS operates or previously operated any copay assistance programs other than CarePath. We explained that documents related to those programs are relevant to understanding the purpose of CarePath. In your January 27, 2023 letter, you stated that you are not aware of any other copay assistance programs which J&J or JJHCS has operated since January 1, 2017. You also stated that any copay existence programs which pre-date January 1, 2017 are irrelevant to this litigation.

During our meet and confer, you confirmed that JJHCS is refusing to provide any information on any copay assistance programs J&J or JJHCS may have operated prior to 2017, including answering our question about whether any such programs existed. We understand that the parties are at impasse on this issue and may present this dispute to the Court.

### B.    RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek documents and communications concerning various aspects of the CarePath terms and conditions. As we explained in our January 20, 2023 letter and during our meet and confer, SaveOnSP is entitled to gather parole evidence on the meaning of CarePath's terms and conditions because both of JJHCS's claims are based, at least in part, on allegations that SaveOn induced patients to breach those terms. *See* Opinion Denying SaveOnSP's Motion

9

Anthony LoMonaco
February 7, 2023

to Dismiss (ECF No. 68), at 16 (holding that SaveOnSP's argument concerning the meaning of the terms and conditions "are better suited for a motion for summary judgment"). The meaning of specific terms in CarePath's terms and conditions—including the terms "offer" and "health plan"—are thus of central importance in this case, and information on what JJHCS meant by those terms when it chose to include them in the CarePath terms and conditions is exclusively in the possession of JJHCS. SaveOnSP has agreed to produce documents reflecting its internal understanding of the CarePath terms and conditions. JJHCS has refused to do the same on the grounds that such documents are irrelevant.

JJHCS's attempt to condition its production of documents responsive to SaveOnSP's RFP Nos. 12 and 13 on SaveOnSP agreeing to produce all documents responsive to JJHCS's RFP No. 17 is inappropriate. JJHCS has not identified any term in SaveOnSP's contracts with health plan sponsors that is at issue in this case, and has identified no reason why it needs every draft as well as the full negotiation history of those contracts. During our meet and confer, you suggested that if a health plan raised concerns about SaveOnSP harming patients or J&J during the negotiation of its contract with SaveOnSP, those communications would be relevant to JJHCS's claims. But SaveOnSP has already agreed to produce documents concerning its marketing or promoting its services to health plans, JJHCS's RFP No. 16, all documents related to CarePath, JJHCS's RFP No. 23, and all documents and communications that SaveOnSP has received reflecting complaints, concerns, or inquiries about its services related to Janssen Drugs, JJHCS's RFP No. 33.

We understand that the parties are at impasse on this issue and may present this dispute to the Court.

## C.    RFP No. 14

SaveOnSP's RFP No. 14 seeks document and communications concerning JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential or Non-Essential Health Benefits under the Affordable Care Act and related regulations. In your January 27, 2023 letter, you proposed a compromise with respect to SaveOnSP's RFP No. 14 where both JJHCS and SaveOnSP would agree to produce non-privileged documents and communications regarding JJHCS's understanding of commercial health plans' ability to designate specialty drugs as EHBs or NEHBs under the ACA and its regulations for the time period of January 1, 2017 to June 1, 2022 to the extent such documents exist and can be located after a reasonable search. During our meet and confer, we stated that we were considering your proposal and would revert with our position.

Although we believe the parties can reach a reciprocal agreement on this RFP, JJHCS's insistence on limiting its production to the period beginning January 1, 2017 is inappropriate. As we explained above, *supra* Section I.C.2, January 1, 2015 is the date that the relevant provisions of the ACA and related regulations

10

concerning EHB requirements and out of pocket maximums came into effect. Relevant documents concerning the parties' understanding of commercial health plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its regulations thus likely date back to 2015.

Please let us know if JJHCS will agree that both parties will produce documents on this subject, with JJHCS's search going back to January 1, 2015. Please also confirm that SaveOnSP's agreement to this compromise would resolve any outstanding disputes with respect to JJHCS's RFP Nos. 18, 19, and 22.

### D.   RFP No. 21

SaveOnSP's RFP No. 21 seeks documents and communications concerning JJHCS's advocacy to or communications with governmental or regulatory bodies regarding SaveOnSP, accumulators, and maximizers. SaveOnSP is considering the points from your January 27, 2023 letter with respect to RFP No. 21 and will defer seeking documents responsive to this Request. SaveOnSP reserves the right to seek documents responsive to this Request at a future date.

### E.   RFP No. 25

SaveOnSP's RFP No. 25 seeks documents and communications regarding any alleged harm caused by SaveOnSP to JJHCS. In your January 27, 2023 letter, you confirmed that JJHCS will produce all documents responsive to SaveOnSP's RFP No. 25. We thus understand that there are no further disputes on this RFP.

### F.   RFP Nos. 26 and 32

SaveOnSP's RFP Nos. 26 and 32 seek documents and communications concerning the payment of Patient's costs, including payments in excess of the advertised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity. In your January 27, 2023 letter, you proposed a compromise on SaveOnSP's RFP Nos. 26 and 32 in which JJHCS would provide data regarding the actual amounts paid to patients in copay assistance, to the extent such data exists and can be located after a reasonable search. If that data reflects that JJHCS is in fact paying more than the budgeted amount of CarePath funds to certain patients, you stated that JJHCS will meet and confer further to determine if additional discovery is appropriate on those specific cases.

During our meet and confer, we asked you to confirm whether JJHCS intends to provide patient-level data as part of this proposal. We noted that without patient-level data, SaveOnSP would have no one of determining if any patients had received more funds than CarePath's terms and conditions would otherwise allow. You indicated that you were still confirming what data exists that JJHCS could produce. We also asked you to confirm whether JJHCS would commit to producing

Anthony LoMonaco
February 7, 2023

this data early in the discovery process so that SaveOnSP can analyze the data and determine whether it needs additional discovery before the end of the fact discovery period. Please provide us with your responses on both issues.

If JJHCS will provide patient-level data by Friday, March 3, 2023, SaveOnSP would defer its request that JJHCS search for additional documents related to the amount of CarePath funds paid to patients until after that production.

### G.    RFP Nos. 28 and 29

SaveOnSP's RFP Nos. 28 and 29 seek data regarding CarePath and Janssen Drugs, including patient fills and dosages for Janssen Drugs, the manufacturing and marketing of Janssen Drugs, copay assistance funds, the CarePath budget, and JJHCS's return on investment for CarePath. JJHCS previously agreed to produce Janssen transparency reports (RFP No. 28) and documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through Care-Path, and (3) JJHCS's actual and projected annual costs for Care-Path" (RFP No. 29). In our January 20, 2023 letter, we noted the significant similarities between certain categories of data covered by SaveOnSP's RFP No. 28 and JJHCS's request for similar data regarding drug fills in its RFP No. 41, and requested that JJHCS consider making reciprocal productions on this ground.

In your January 27, 2023 letter, you indicated that JJHCS is willing to engage in reciprocal productions for certain portions of the data requested in SaveOnSP's RFP No. 28. Specifically, you state that JJHCS "is willing to consider producing" the data sought by items i. through m. of RFP No. 28, which seek CarePath enrollment data, if SaveOnSP agrees to produce all categories of data requested by JJHCS's RFP No. 41 and 42.

If JJHCS will produce the data items sought by i. through m. of RFP No. 28 from January 1, 2009 to July 1, 2022,[1] then SaveOnSP will expand its production in response to RFP 41 to include, for each Janssen Drug for each year, data sufficient to show: the total number of patients enrolled in SaveOnSP-advised plans who received CarePath funds for the given drug; the total CarePath funds received by those patients for the given drug; the pharmacies at which those patients filled the given drug; and the average copay or coinsurance amount for the given drug for patients enrolled in plans advised by SaveOnSP. Please let us know if JJHCS agrees to this proposal.

---

[1] SaveOnSP remains open to alternative start dates as described above, *supra* Section I.C.

Anthony LoMonaco
February 7, 2023

JJHCS maintains that it will not produce any documents or information in response to items a. through g. of SaveOnSP's RFP No. 28 on relevance grounds. In your letter, you ask us to explain how JJHCS's return on investment for Care-Path and the relationship between CarePath and JJHCS's ability to increase drug prices "would permit SaveOnSP to cause patients to breach their contracts with JJHCS and repurpose CarePath's funds for SaveOnSP's profit or would excuse the damages that JJHCS alleges SaveOnSP has caused." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 11. You also ask us to "explain how SaveOnSP's theoretical impact on 'J&J more broadly' excuses those same damages." *Id.* As we have explained, several times, SaveOnSP seeks this information not to justify its alleged conduct but to show, among other things:

- That even after SaveOnSP began offering its services, JJHCS and J&J have continued to reap enormous profits because of their investment in copay assistance programs like CarePath, directly rebutting JJHCS's allegation that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," Compl. ¶ 114;

- That CarePath is not a public good but instead a means to sell more Janssen Drugs while raising the prices for those drugs year-after-year, such that any threat to its viability caused by SaveOnSP does not, as JJHCS's has alleged, *id.*, constitute a public harm for purposes of JJHCS's GBL § 349 claim; and

- That SaveOnSP's services have helped more patients enroll in CarePath than would otherwise have enrolled, helped to increase patients' adherence to Janssen Drugs, and therefore caused J&J to sell more drugs and generate more profits than it otherwise would have, all of which are relevant to JJHCS's asserted damages stemming from those same services.

*See, e.g.*, Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2, 9-10; *supra* Section I.A. We understand that the parties are at impasse on items a. through g. of SaveOnSP's RFP No. 28 and may present this dispute to the Court. Although your letter did not mention RFP No. 28.h, SaveOnSP understands that JJHCS is refusing to produce documents or information in response to that Request on the same grounds as RFP No. 28.a – g, and that the parties are therefore also at impasse on RFP No. 28.h.

Finally, in our last letter, we asked whether JJHCS is willing to produce additional data in response to RFP No. 29. In your letter, you do not agree to provide any information beyond what you have already agreed to provide and  ask that we consider whether your offer in response to RFP No. 28 is sufficient. It is not. RFP Nos. 28 and 29 concern different categories of data. We have offered to produce additional data in response to your RFP No. 41 in exchange for your agreement to produce additional data in response to our RFP No. 28. Nothing about that offer

13

Anthony LoMonaco
February 7, 2023

obviates our request that you produce additional data in response to RFP No. 29.
We remain willing, however, to explore producing additional categories of data or
documents in response to your other requests to the extent that you are willing to
do the same in response to RFP No. 29. Please let us know if JJHCS is willing to
discuss a compromise along these lines.

### H.    RFP No. 34

SaveOnSP's RFP No. 34 seeks all documents and communications regard-
ing JJHCS's or Janssen's negotiations or agreements regarding the potential use
of SaveOnSP's services, or the services of any Copay Maximizer Service or Copay
Accumulator Service, for JJHCS's Employee Health Plans, including JJHCS's
abandonment of those negotiations or agreements. JJHCS has thus far refused to
produce any documents in response, asserting that such documents are irrelevant.

These documents are relevant. As we explained, we understand that J&J or
JJHCS conducted significant negotiations with SaveOnSP to use SaveOnSP's ser-
vices for the health plan it provides for its own employees, and that those negotia-
tions ultimately ceased at the insistence of another division within J&J or JJHCS.
As with several of SaveOnSP's other requests, documents and communications re-
flecting J&J's or JJHCS's assessment of the benefits of employing SaveOnSP's ser-
vices during these negotiations—irrespective of whether the parties ever executed
a contracted—go to the credibility of JJHCS's assertions.

In your January 27, 2023 letter, you maintain that JJHCS will not produce
documents in response to this request because "J&J never signed a contract with
SaveOnSP" and "JJHCS itself was not involved in any such negotiations." Jan. 27,
2023 Letter from A. LoMonaco to M. Nelson at 12. But you do not address whether
any other J&J entity was involved in such negotiations. To the extent that docu-
ments exist that show that any J&J entity was involved in negotiations to use Save-
OnSP's services, those documents are relevant to JJHCS's claims in this litigation.
JJHCS cannot claim that SaveOnSP's services harm patients while also holding
back documents that show that its affiliates believed that SaveOnSP's services
could help both its own employees and its own employer-sponsored plans.

We understand that the parties are at impasse on this issue and may present
this dispute to the Court.

### I.    RFP Nos. 36 and 37

SaveOnSP's RFP No. 36 seeks documents "sufficient to show the economic
terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care
Path Coordinator regarding Care Path, including any assessment of the fair market
value of those services." JJHCS has agreed to produce agreements between JJHCS
and the entities responsible for administering CarePath and work orders

14

Anthony LoMonaco
February 7, 2023

documenting the cost of those services. Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 12. We will defer our request for additional documents at this time but reserve all rights.

With respect to RFP No. 37, as noted above, JJHCS has taken the position that documents responsive to this Request are irrelevant. As detailed above, *supra* Section I.A, the parties are at impasse on this Request. We also disagree with JJHCS's suggestion that any dispute regarding this Request is mooted because you assert that "JJHCS does not keep statistics on whether patients sign up for Care-Path after being contacted by JJHCS or its vendors." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 13. SaveOnSP's RFP No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates. Please confirm whether any such documents exist.

## III.    Drafting and Submission of Joint Letters

As we noted during the parties' meet and confer, we believe JJHCS and SaveOnSP should agree to a schedule for submitting any outstanding discovery disputes to the Court in advance of the February 28, 2023 conference. We propose this to avoid any miscommunications between the parties over what items are in dispute and to provide the parties' full positions to the Court a reasonable time in advance of the scheduled court conference. We propose the following schedule:

- Moving party provides its portion of any joint letter to the responding party by February 14, 2023.

- Responding party provides its portion of any joint letter to the moving party by February 21, 2023.

- Moving party provides any additional edits to the joint letter to the responding party by February 23, 2023.

- Parties finalize joint letter so that moving party may file joint letter by February 24, 2023.

So that the parties can plan accordingly, we ask that you tell us by no later than this **Thursday, February 9** whether this schedule is acceptable to you.

* * *

15

Anthony LoMonaco
February 7, 2023

      We remain hopeful that the parties can work through these issues to reach mutually agreeable resolutions. We look forward to your response and are available to meet and confer at your convenience.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

# EXHIBIT 11

**Patterson Belknap Webb & Tyler** LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

February 14, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> **Re:** **SaveOnSP's Requests For Production**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

We write in response to your letter dated February 7, 2023 regarding Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production and First Set of Interrogatories. Below, we identify potential areas of compromise, as well as areas where we agree that the parties are at an impasse.

## I.    GLOBAL ISSUES

### A.    Documents Related to the Development and Marketing of CarePath and SaveOnSP's Financial Impact on JJHCS and CarePath (RFP Nos. 11, 26, 28-30, 36-37)

As we explained in our January 6 and 27 letters and during our meet and confers, SaveOnSP's requests for documents related to the development and marketing of CarePath seek documents that are not relevant and the requests are not proportional to the needs of this litigation. Nevertheless, we have offered to produce certain responsive documents in our February 9, 2023 letter. We are willing to discuss this subject further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

Further, with respect to SaveOnSP's financial impact on JJHCS and CarePath, JJHCS has already agreed to produce, *inter alia*:

- "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period,"

Meredith Nelson, Esq.
February 14, 2023
Page 2

- "the data that formed the basis for the allegations in Complaint ¶¶ 92-100,"

- "JJHCS's budget for copay assistance through CarePath," and

- "JJHCS's actual and projected annual costs for CarePath."

*See* R&Os to SaveOnSP's RFP Nos. 25, 27, 29.

As we explained in our January 6 and 27 letters and during our meet and confers, we do not agree that these documents are insufficient for the needs of the case, but we are willing to discuss this further as well.

**B.    JJHCS Hub Entities, Janssen, and Other J&J Entities**

**1.    Documents of JJHCS Hub Entities**

In your letter, you raise several issues relating to "documents of JJHCS Hub Entities." We address each in turn.

*First*, you asked us to clarify the role of Lash Group. Our current understanding remains that Lash Group did not have a comparable role to Trial Card in the administration of CarePath's copay assistance program. As we have said before, Trial Card is the entity that did the work of administering CarePath's copay assistance program and we have already agreed to facilitate a document production from Trial Card. All that said, we are continuing to investigate and will follow up with more details about Lash Group's role in a separate letter as soon as possible.

*Second*, you asked us to state "whether any entity other than Trial Card was in any way involved in enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card." You also asked us to provide "(1) the identities of Hub Entities involved in the development and marketing of CarePath from 2009 to present; and (2) the identities of Hub Entities involved in the administration of CarePath from 2009 to 2016." Finally, you asked us to provide the identities of any entities that provide "limited, episodic services to JJHCS relating to CarePath," and further information on the services provided by these vendors.

For the reasons set forth in our previous letters and at our meet and confers, documents and information from before 2017 and documents and information relating to the development and marketing of CarePath are not relevant to this action. Therefore, JJHCS will not identify all the entities—of which there are many—who have played any role in the operation of CarePath. Nevertheless, in an effort accommodate SaveOnSP's request for additional information, JJHCS identifies the following examples of entities that have provided certain services related to CarePath:

Meredith Nelson, Esq.
February 14, 2023
Page 3

- ***EagleForce***.  A vendor that works with TrialCard to ensure that a patient who is enrolling in copay assistance is not insured by a government payor, such as Medicaid.  The EagleForce check is performed electronically and EagleForce rarely communicates with patients directly.

- ***IBM***.  A vendor that developed and maintains the IT infrastructure for the CarePath website and certain data sharing platforms between TrialCard and JJHCS.

- ***TJ Paul***.  A vendor that provides marketing and design support, such as input on fonts and logos for the CarePath website.

- Numerous other agencies have been engaged to design content for CarePath marketing, promotional, and educational materials (all of which then go through JJHCS's internal review before issuance).

JJHCS does not represent that the list above is exhaustive.  The JJHCS teams that support CarePath are able to engage vendors as needed, subject to certain internal review and procurement processes, and it is possible that other vendors have performed services related to the development and marketing of CarePath.  However, other than EagleForce, which has a limited, discrete role in CarePath, JJHCS is unaware of other entities involved in "enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card."

## 2.    Documents of J&J and Janssen Entities other than JJHCS

As we explained in our January 6 and 27 letters and during our meet and confers, while JJHCS is prepared to make arrangements with its corporate affiliates to produce documents from other Johnson & Johnson or Janssen entities if required, SaveOnSP has not yet provided a compelling reason to do so.  We have explained to you before that Johnson & Johnson is composed of more than 200 affiliates with over 100,000 employees.  SaveOnSP's insistence that JJHCS is required to conduct an investigation throughout the entire Johnson & Johnson organization for documents that are possibly responsive to SaveOnSP's requests when it has already determined that JJHCS is the entity that manages the CarePath program is evidently driven by a motivation to impose burden and cost on JJHCS without any legitimate rationale.

We are willing to discuss this issue further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

Meredith Nelson, Esq.
February 14, 2023
Page 4

### 3.    Interrogatories Concerning Hub Entities, J&J, and Janssen

JJHCS has complied with your Interrogatories and submitted verified responses that identify the relevant individuals at JJHCS and Trial Card.  We are happy to discuss this issue further, if it would be helpful.

### C.    Time Period

### 1.    Documents and Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

SaveOnSP continues to seek documents from January 1, 2009 onward for various requests.  As we explained in our January 6 and 27 letters and during our meet and confers, a starting date of 2009 is vastly overbroad for the needs of this case and is unacceptable to JJHCS.  As we have told you repeatedly in our many meet and confer sessions, the January 1, 2009 date is disconnected from any facts or events that are pertinent to this lawsuit.  It is almost a decade before SaveOnSP was created.  It is eight years before the allegations in the Complaint.  Never once has SaveOnSP identified any possible rationale for its selection of this specific date.  Nor could it, as it was selected by SaveOnSP for a single self-evident purpose:  to impose unnecessary expense and burden on JJHCS.

JJHCS is prepared to produce documents from January 1, 2016, for certain categories of documents, in an effort to compromise.  We remain willing to discuss this issue further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

### 2.    Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, 42)

For certain documents relating to health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as JJHCS's understanding of Copay Accumulator Services and Copay Maximizer Services, SaveOnSP continues to seek a date range starting January 1, 2015 on the theory that "January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect."  As we stated in our January 27 letter, a starting date of 2015 is also overbroad date range for the needs of this case.  We confirm that the basis for this objection is both relevance and burden, but we nevertheless remain willing to discuss this further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

### D.    Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20, 21, 41-43; Interrogatory No. 7)

As we explained in our Responses and Objections, JJHCS will produce documents and communications from January 1, 2017 through July 1, 2022 relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to

Meredith Nelson, Esq.
February 14, 2023
Page 5

SaveOnSP.  JJHCS R&O to RFP No. 42.  Additionally, in our February 9, 2023 letter, we noted that, with respect to SaveOnSP's RFP No. 20, JJHCS is willing to produce studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents, provided that SaveOnSP is willing to make a reciprocal production of documents in response to JJHCS's RFP No. 45.[1]

Please confirm that SaveOnSP accepts this compromise with respect to these requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    RFP No. 11

We write to confirm that JJHCS has not operated any copay assistance programs other than CarePath since CarePath was created in its current form in June 2016.  JJHCS will not produce documents concerning any copay assistance program that predated CarePath.  As discussed earlier, SaveOnSP has failed to identify any legitimate basis for this request.  We agree that the parties are at an impasse on this issue and may present this dispute to the Court.

### B.    RFP Nos. 12 and 13

As we explained in our January 27, 2023 letter, JJHCS would be willing to produce internal communications relating to the drafting of CarePath's terms and conditions if SaveOnSP would be willing to produce internal communications responsive to JJHCS's RFP No. 17.  In our February 9, 2023 letter, we offered to further narrow the categories of internal communications responsive to JJHCS's RFP No. 17 that JJHCS would accept.  If SaveOnSP agrees to produce documents responsive to JJHCS's RFP No. 17 as laid out in our February 9, 2023 letter, then JJHCS would be willing to produce internal communications relating to the drafting of CarePath's terms and conditions.

Please let us know if SaveOnSP accepts the compromise with respect to these requests.

### C.    RFP No. 14

We write to confirm that JJHCS is willing to produce documents responsive to this request regarding JJHCS's understanding of commercial health plans' ability to designate specialty drugs as essential health benefits ("EHB") or non-essential health benefits ("NEHB")

---

[1] As noted in our February 9, 2023 letter, however, JJHCS is not willing to withdraw its RFP No. 43, which seeks documents relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs.

Meredith Nelson, Esq.
February 14, 2023
Page 6

under the Affordable Care Act and its regulations for the time period of January 1, 2017 to July 1, 2022. JJHCS will not search for documents that predate this time period, as such a search would be unduly burdensome and irrelevant to the needs of this action, given that SaveOnSP did not begin operations until 2017. We believe that the parties are at an impasse on this issue with respect to documents before January 1, 2017 and may present this dispute to the Court.

### D.    RFP No. 21

We write to memorialize the fact that SaveOnSP is deferring its request for documents responsive to this RFP at this time.

### E.    RFP No. 25

JJHCS confirms that there are no further disputes on this RFP. JJHCS will produce all non-privileged documents responsive to this request.

### F.    RFP Nos. 26 and 32

In your letter, you raise two issues relating to SaveOnSP's RFP Nos. 26 and 32, seeking "documents and communications concerning the payment of Patient's costs, including payments in excess of the advertised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity." We address each in turn.

*First*, you asked that we confirm whether JJHCS intends to provide patient-level data regarding the actual amounts paid to patients in copay assistance. To clarify, in our January 27, 2023 letter, we proposed a compromise on SaveOnSP's RFP Nos. 26 and 32 in which JJHCS is willing to produce the data requested in items i. through m. for RFP No. 28, which includes data regarding the actual amounts paid to patients in copay assistance, if SaveOnSP would in turn agree to produce the information sought in JJHCS's RFP Nos. 41 and 42. We reiterated this proposal in our February 9, 2023 letter and reiterate it in Section II.G, *infra*. If SaveOnSP agrees, JJHCS will provide patient-level data regarding the actual amounts paid to patients in copay assistance from January 1, 2016 to July 1, 2022, to the extent such data exists and can be located after a reasonable search.

*Second*, you asked JJHCS to confirm—without offering any rationale—that it will provide patient-level data by Friday, March 3, 2023. JJHCS agrees to produce this data early in the discovery process but does not consent to SaveOnSP's attempt to impose an arbitrary and unilateral deadline on production.

Please confirm whether you agree to the compromise outlined above.

Meredith Nelson, Esq.
February 14, 2023
Page 7

> ### G.    RFP Nos. 28 and 29

In your letter, you asked whether JJHCS consents to the following proposal: if JJHCS will produce the data items sought by i. through m. of RFP No. 28 from January 1, 2009 to July 1, 2022, SaveOnSP will produce data sufficient to show, for each Janssen Drug, the total number of patients enrolled in SaveOnSP-advised plans who received CarePath funds for the given drug; the total CarePath funds received by those patients for the given drug; the pharmacies at which those patients filled the given drug; and the average copay or coinsurance amount for the given drug for patients enrolled in plans advised by SaveOnSP.

As explained more fully in Section I.C, *supra*, and in other sections of this letter, much of the information sought from these requests is irrelevant to the claims and defenses in this case.  Further, the additional categories of information offered by SaveOnSP are insufficient because they do not include non-Janssen drugs and they only include aggregate, rather than patient-specific data.  Accordingly, as outlined in our February 9, 2023 letter, JJHCS renews its compromise proposal: if SaveOnSP is willing to produce the information sought in RFP Nos. 41 and 42, JJHCS will produce any available data responsive to parts (i) through (m) of SaveOnSP's RFP No. 28 for the period of January 1, 2016 through July 1, 2022.

Please let us know if you accept JJHCS's proposed compromise above.

> ### H.    RFP No. 34

We write to confirm that J&J never signed a contract with SaveOnSP, nor was JJHCS involved in any such negotiations.  Therefore, JJHCS will not produce any documents responsive to RFP No. 34, as these documents are irrelevant to the claims and defenses in this action.

Accordingly, JJHCS agrees that the parties are at an impasse on this issue and may present this dispute to the Court.

> ### I.    RFP Nos. 36 and 37

We write to memorialize the fact that SaveOnSP is deferring its request for documents responsive to RFP No. 36 at this time.

With respect to RFP No. 37, in its letter dated January 27, 2023, JJHCS clarified that because, after further investigation, it determined that it does not keep statistics on whether patients sign up for CarePath after being contacted by JJHCS or its vendors, we have no documents to produce, rendering this request moot.  In your letter, you dispute that RFP No. 37 has been mooted, claiming that "RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates."

Meredith Nelson, Esq.
February 14, 2023
Page 8

These documents are irrelevant to the claims and defenses in this litigation. However, to the extent SaveOnSP seeks enrollment data for CarePath, as indicated above and in our January 27, 2023 letter, JJHCS is willing to produce such data in response to parts (i) through (m) of RFP No. 28, if SaveOnSP is willing to produce the categories of data requested in JJHCS's RFP Nos. 41 and 42.

Please let us know whether SaveOnSP accepts this proposal.

* * *

We are available to meet and confer regarding the issues outlined above at your convenience. We look forward to your response.

Very truly yours,

*/s/Anthony C. LoMonaco*
Anthony C. LoMonaco

# EXHIBIT 12




www.pbwt.com

February 6, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

**VIA EMAIL**

Andrew Dunlap, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
adunlap@selendygay.com

Re:     **JJHCS's Proposed Custodians and Search Methodology**
         *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*,
         No. 22 Civ. 2632 (JMV) (CLW)

Dear Andrew:

As agreed during our meet and confer on January 30, 2023, we write to provide JJHCS's proposed custodians and search methodology for its production of documents in response to SaveOnSP's Requests for Production, subject to the limitations and objections set forth in JJHCS's responses.

For each of SaveOnSP's requests where JJHCS has agreed to search for and produce documents, Appendix A identifies whether JJHCS plans to search custodial or non-custodial sources. As to the requests for which JJHCS plans to search custodial files, JJHCS's proposed custodians are Spilios Asimakopolous, John Paul Franz, Heith Jeffcoat, Jeremy Mann, Katie Mazuk, Silviya McCool, Hattie McKelvey, Lauren Pennington, Bill Robinson, Nidhi Saxena, and Jasmeet Singh. JJHCS reserves the right to revise and narrow these custodians if SaveOnSP fails to identify and produce from a corresponding number of document custodians.

Appendix B lists the search terms and date ranges JJHCS proposes to use to identify responsive documents from its custodians for purposes of document review. We reserve the right to modify these search terms, or our anticipated document custodians, with notice to you, if the search terms and custodians in combination return unacceptably high rates of false hits or generate a volume that would constitute undue burden to review and produce.

Very truly yours,

Harry Sandick

**Appendix A**

| Req # | Custodial or Non-Custodial |
|---|---|
| 1 | Non-custodial |
| 4 | Non-custodial |
| 5 | Non-custodial |
| 8 | Custodial & non-custodial |
| 12 | Non-custodial |
| 13 | Non-custodial |
| 14 | Custodial |
| 25 | Custodial & non-custodial |
| 27 | Non-custodial |
| 28 | Non-custodial |
| 29 | Non-custodial |
| 31 | Custodial |
| 35 | Non-custodial |
| 36 | Non-custodial |
| 42 | Custodial |
| 45 | Non-custodial |

**Appendix B**

| Search Terms | Date Range |
|---|---|
| (STELARA* OR TREMFYA* OR CarePath OR JCP OR "Savings Program") w/25 (6000 OR 6,000 OR limit OR eliminate) | January 1, 2020 to July 1, 2022 |
| SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" | January 1, 2017 to July 1, 2022 |
| "essential health benefit*" OR EHB* OR "non-essential health benefit" OR "nonessential health benefit*" OR NEHB* | January 1, 2017 to July 1, 2022 |
| ("Express Scripts" OR ESI) w/50 (accumulat* OR maximiz*) | January 1, 2017 to July 1, 2022 |
| (essential OR nonessential OR non-essential OR "non essential") w/50 ("Affordable Care Act" OR ACA OR Obamacare) | January 1, 2017 to July 1, 2022 |
| Accredo w/50 (accumulat* OR maximiz*) | January 1, 2017 to July 1, 2022 |
| "Save On"[1] | January 1, 2017 to July 1, 2022 |
| "save on" w/50 (accumulat* OR maximiz* OR "essential health benefit*" OR EHB* OR "non-essential health benefit*" OR "nonessential health benefit*" OR NEHB* OR accredo OR ESI OR "express scripts") | January 1, 2017 to July 1, 2022 |

---

[1] For this search term only, JJHCS will employ a case-sensitive search mechanism.