```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE         .
SYSTEMS INC.,                         .
                                      .
          Plaintiff,                  .  Case No. 22-cv-02632
                                      .
vs.                                   .  Newark, New Jersey
                                      .  February 28, 2023
SAVE ON SP, LLC,                      .
                                      .
          Defendant.                  .


                      TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE CATHY L. WALDOR
                 UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via Zoom videoconference):


 For the Plaintiff:      JEFFREY J. GREENBAUM, ESQ.
                         Sills Cummis & Gross P.C.
                         The Legal Center
                         One Riverfront Plaza
                         Newark, NJ 07102-5400
                         (973) 643-7000
                         jgreenbaum@sillscummis.com

                         HARRY SANDICK, ESQ.
                         Patterson Belknap Webb & Tyler LLP
                         1133 Avenue of the Americas
                         New York, NY 10036
                         (212) 336-2723
                         Hsandick@pbwt.com



Audio Operator:

Transcription Service:   KING TRANSCRIPTION SERVICES
                         3 South Corporate Drive, Suite 203
                         Riverdale, NJ  07457
                         (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1   (APPEARANCES continued)

 2
     For the Defendant:      ANDREW R. DUNLAP, ESQ.
 3                           Selendy Gay Elsberg PLLC
                             1290 Avenue of the Americas
 4                           New York, NY  10104
                             (212) 390-9005
 5                           Adunlap@selendygay.com

 6                           MEREDITH NELSON, ESQ.
                             Selendy Gay Elsberg PLLC
 7                           1290 Avenue of the Americas
                             New York, NY 10104
 8                           (212) 390-9069
                             mnelson@selendygay.com
 9
                             E. EVANS WOHLFORTH, ESQ.
10                           Gibbons P.C.
                             One Gateway Center
11                           Newark, NJ 07102-5310
                             (973) 596-4879
12                           ewohlforth@gibbonslaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                  (Proceedings already in progress)

 2

 3         THE COURT:  -- tell me about the meet-and-confers,

 4  because this letter is really you yelling at each other

 5  through me.

 6         MR. SANDICK:  So, Your Honor, do you want us to

 7  address this first?

 8         THE COURT:  Yes.

 9         MR. SANDICK:  Sure.  So this is an issue that

10  actually arises in our letter and to some -- and also in the

11  letter for SaveOn.  And what it comes down to is we are

12  seeking discovery about the health plans that are

13  participants in what we call the "SaveOn Program."  And we're

14  seeking information about the patients that are in this

15  SaveOn program.

16         Our primary objective in obtaining that

17  information, both categories, is not about third-party

18  discovery, at least not right now.

19         THE COURT:  Right.

20         MR. SANDICK:  What it's about is -- and I can

21  explain the reason for it.  So with respect to patients,

22  knowing who the patients are is important, even if we never

23  serve a single subpoena or interview a single witness,

24  because what we want to see is these are patients who

25  participate in our co-pay support program, which is called

1  "CarePath."  They also participate in the SaveOn program.

2          And what we want to see is how do their care -- how

3  do the CarePath co-pay support payments that we make change,

4  how do they increase when someone goes on the SaveOn program?

5          And we also want to be able to compare how our

6  CarePath patients, what their co-pays are compared to those

7  patients who are on SaveOn.  We think they're going to be a

8  lot higher based on what we know, what we've alleged, what

9  survived the motion to dismiss.

10         And if we don't have their names, the process of

11  matching up the people becomes incredibly convoluted and

12  probably impossible.  And we need to do that in order for our

13  damages analysis, for one thing, in order to see how the

14  amounts go up based on SaveOn's misappropriation of the

15  CarePath co-pay support.  So it's important for damages.

16         In addition, patient deception and part of our

17  GBL 349 claim.  And how do we prove patient deception without

18  knowing what the patient communications are, what SaveOn said

19  internally?  And this is where -- you know, we will at some

20  point need to talk to patients in order to prove our case

21  about the deception of patients.

22         And so we have no interest in inflicting commercial

23  harm on anyone.  We think the real issue here is are we going

24  to be allowed to prove up our case in terms of damages and in

25  terms of patient deception?  And we need this information.

 1            And, of course, we'll abide by the protective order

 2   in this case, and we'll abide by the federal rules of civil

 3   procedure, which already place significant limitations.  We

 4   can't just go out and force people to talk to us.  We can

 5   call someone and ask to interview them.  That's been approved

 6   by courts from time immemorial.  And if they say "No" and we

 7   want to subpoena them, there'll be an opportunity for the

 8   witness to object, for SaveOn to object, for the Court to

 9   rule, if it comes to you.  So we're not looking to end-run or

10   hurt anyone's business or go after -- I think is the term

11   that is used a lot.

12            And the names of the health plans, it's a similar

13   rationale.  In the motion to dismiss that was just decided --

14   and we expect to see echos of this in summary judgment -- the

15   argument that SaveOn makes is that health plans are really

16   making the decisions here, that what we allege to be

17   something that SaveOn is doing, they say in their motion,

18   really, it's the health plans.

19            Well, how do we know that?  Because we get

20   discovery about and potentially from the health plans.  And,

21   again, if we get documents that are so thoroughly redacted

22   that we can't figure out what's going on because names are

23   redacted, because locations are redacted, it will be

24   impossible for us to make use of that.

25            And, again, we're not seeking to go after health

 1   plans or hurt anyone's business.  There are ample protections

 2   in the federal rules.  If we transgress those, I'm sure

 3   SaveOn and the Court will step in.  But we don't have any

 4   intention of doing that.

 5           There is also, I think, for the health plans, these

 6   are sophisticate -- two other points to make, briefly.  The

 7   health plans are sophisticated entities.  We've subpoenaed

 8   one so far.  A lawyer called us a few days later.  We set a

 9   schedule for objections.  We're going to have a

10   meet-and-confer.  It's going to proceed just like normal

11   discovery.

12           The patients -- one salient fact which I left out,

13   the identity of the patients in CarePath is known to JJHCS.

14   And that's because we're paying their co-payments.  They have

15   to sign up with us.  They're our business partners too.

16           And so when SaveOn says, "Well, we don't want to

17   tell you the names of these people," they're not -- they're

18   just preventing us from matching up our records and their

19   records.  We know who's on CarePath.  We're giving them

20   money.  We've helped two million patients with co-pay support

21   in the CarePath program.  So the idea of, like, holding back

22   the names of the patients that are already known to us only

23   prevents us from making the match we need to make for damages

24   purposes and for proving patient deception.

25           And so that's why we're seeking that information in

1    our motion in unredacted form subject to a protective order

2    and why we oppose the idea of a -- of a new protective order

3    that would be entered specifically to bar us from talking to

4    witnesses, many of whom are our own business partners.

5            So, anyway, I may have gone on too long,

6    Your Honor.  But I wanted to make those points.

7            MR. DUNLAP:  May I respond, Your Honor?

8            THE COURT:  Yes, of course.

9            MR. DUNLAP:  Thank you.

10           I was a little puzzled to hear my friend on the

11   other side talking about redacting information or holding

12   back names.  That is all in the past.

13           What we're moving on here is simply whether there

14   will be a protective order -- or an order from the Court that

15   would limit the number of plans or patients that Johnson &

16   Johnson could subpoena or interview in the first instance.

17           THE COURT:  Why?

18           MR. DUNLAP:  Okay.  So I want to put this in

19   context, Your Honor.  This is not an ordinary business

20   dispute where there's some contract or even a business tort

21   disagreement that the parties can resolve and sort of walk

22   away.

23           Johnson & Johnson is targeting SaveOn's entire

24   business.  Right?  They are seeking an injunction that would

25   shut down how SaveOn operates.  They want to put us out of

1   business.  And there's case law, as the Court is aware, that

2   allows the Court to limit discovery where there could be harm

3   or burden to a party, and there's the -- the Court is

4   required to limit discovery where it could be duplicative of

5   discovery sought from another party or a third party.

6           And as you heard from Mr. Sandick, Johnson &

7   Johnson wants to subpoena or interview -- it has said in

8   writing also -- SaveOn's clients in addition to the patients

9   who belong to those clients' plans.  And they've already

10  subpoenaed one of those plans indicating they're not even

11  waiting for party discovery to be done before they go after

12  that.  And they have not disclaimed an intent to go after

13  significant numbers of the plans or even the patients.  So

14  our concern is that subpoenas or outreach for a large number

15  of plans or patients could harm SaveOn's business.

16          Now, Mr. Sandick gave the example of Premera, which

17  is a big sophisticated entity.  It has served millions of

18  people.  But many of my client's clients are small businesses

19  or unions or even government entities.  Many don't have

20  internal counsel at all.  Many don't have internal

21  litigators.  These are entities that would need to go out and

22  hire counsel, spend money -- in some cases taxpayer money --

23  to deal with Johnson & Johnson subpoenas or outreach.

24          And the concern is that this could pressure clients

25  when faced with a choice between dealing with Johnson &

```
 1   Johnson subpoenas or outreach or dropping SaveOn's services,
 2   to drop those services now or decide to do so in the
 3   contracts -- their current contracts with SaveOn expire.  And
 4   that could be very commercially harmful to SaveOn.
 5            Now, we are not trying to prevent Johnson & Johnson
 6   from learning the names of the patients or from learning the
 7   names of the plans.  What we're trying to do is ensure that
 8   there's not some large-scale outreach to the plans,
 9   especially to the plans, that could harm our business here.
10            And we don't show -- Johnson & Johnson has given
11   reasons why it needs the names of patients to run damages.
12   They also say they want to talk to some of the patients about
13   client harm.  They don't really give, at least to our mind, a
14   good reason why they need to speak to the health plans.  The
15   argument we make in the motion to dismiss is that SaveOn
16   cannot set plan terms on its own.  That's a matter of federal
17   law.  It's also a part of contracts.  This should all be
18   clear from the productions they're going to get from SaveOn.
19   So we don't think they have a strong reason for wanting to
20   speak to the plans at all.
21            And from what we've seen, the one subpoena they've
22   served on Premera is highly duplicative of information that
23   they've already sought from us.  They seek from Premera, for
24   example, documents showing the relationship between Premera
25   and SaveOn, documents concerning the financial benefit that
```

1  SaveOn has provided Premera, documents concerning the terms

2  and conditions of CarePath itself.  All of this is stuff that

3  they can get from the discovery they've served on SaveOn or

4  that they have already.

5         We don't think that Johnson & Johnson needs

6  discovery on this scale.  Certainly not now.  We think it is

7  marginal at best, and we think it would be grossly

8  disproportionate to the sort of harm that could befall us.

9         And when they say, "Oh, don't worry about it.  The

10  federal rules already protect you if we serve -- go out and

11  serve a bunch of subpoenas.  That will give you a chance to

12  object and move to quash," and all the rest of it, the

13  service of the subpoena, the outreach itself, could

14  accomplish the very harm that we are concerned about.

15        So we had proposed a limit on the number that they

16  could go after in the first instance, subject to them coming

17  back and us agreeing, if they should -- if we produce

18  documents and it shows reason for them to talk to us, a plan,

19  or speak to a patient, we might well agree to that.  And they

20  could come back to Your Honor and make a showing of good

21  cause.

22        THE COURT:  Well, good cause is discovery.  I mean,

23  if this were the case in any business case, you'd be arguing

24  or defense would be arguing, you're going to hurt our

25  business.

1          They're entitled to discovery.  I don't know that

2    they're going to hurt your business.  We have no proof of

3    that.  We have no examples of.

4          I just -- your general objections are not making

5    sense to me.

6          MR. DUNLAP:  I'm making representations,

7    Your Honor, about the nature of many of our clients who are

8    not sophisticated entities of the sort that the other side

9    describes who don't always have internal counsel.

10          I mean, if the Court wants more of a showing, I

11    suppose we could go back and give more information to

12    Your Honor, exactly what the client list looks like.

13          But what we're very concerned about, given that

14    Johnson & Johnson is out to put my client out of business, is

15    that they could serve a mess of subpoenas, especially on

16    clients.  The mere fact of receiving those could pressure the

17    clients to drop SaveOn's services and thereby impose

18    commercial harm.  We're not trying to stop them from getting

19    the discovery they need.  We're just trying to make sure that

20    it's phased and there are limits so that they can't get more

21    than what they need or seek more than what they need in a way

22    that would harm us.

23          THE COURT:  So you want to limit their prosecution

24    of this case.

25          MR. DUNLAP:  Your Honor, what I'm asking you to do

1   is to set a reasonable limit -- we proposed five plans or

2   patients, but that's not a magic number -- whatever

3   Your Honor thinks is appropriate -- above what -- that they

4   could go out and subpoena today, if they wanted to.  But

5   above which they couldn't go --

6           THE COURT:  But you're not -- if it's five, you're

7   not worried about those five subpoenas injuring your

8   business.

9           MR. DUNLAP:  We are concerned about the aggregate

10  effect.  We have thousands of clients.  Those clients have

11  hundred of thousands of patients.  We are worried about some

12  broad-based service of subpoenas on clients, especially on

13  clients that could pressure them to drop or renegotiate their

14  terms with SaveOn.

15          If Johnson & Johnson wants to talk to some

16  reasonable number of plans or some reasonable number of

17  patients, we're fine with that.

18          What we're worried about is the scale of them going

19  after, you know, scores or hundreds of plans with subpoenas

20  or outreach, because at that point their argument that they

21  have unique information to seek from any of the plans gets a

22  lot weaker.

23          So, you know, we tried to engage them in terms of a

24  reasonable limit.  They didn't want to discuss any limit at

25  all.  You asked us to have a meet-and-confer.  That's sort of

|Hearing
|22-cv-02632, February 28, 2023

 1    how they went.

 2            But we would ask you to do is impose some sort of

 3    reasonable limit at the beginning.

 4            And, again, that's not -- for all time.  They can

 5    come back and make a showing or come to us and make a

 6    showing.  And if we think they have a good reason, we would

 7    consent that.  And, of course, if you did, you could order

 8    something more broad.

 9            We're just asking to strike a balance, Your Honor,

10    here, between the risks that we face if they go out to a

11    large number of people and allowing them to get the discovery

12    they need.  We're really not trying to slow anybody down here

13    or deny them anything.

14            We have a large number of documents that we've

15    reviewed that we'd be willing -- that we're able to turn over

16    in the next week or two except that they have plan names or

17    patient identities, and we really want to get this resolved

18    in a way that protects our client's business.

19            THE COURT:  Mr. Sandick, do you want to respond?

20            MR. SANDICK:  Yeah, briefly.  So, first, I'm glad

21    to hear Mr. Dunlap tell us that they're going to give us the

22    documents with the names and patients -- names of patients

23    and the names of health plans.  That was not my understanding

24    based on our meet-and-confer.  That's not meant to cast

25    aspersions on Mr. Dunlap, who -- we know each other for many

1    years.  But I was not aware of that prior to this call.  But

2    I think that's a positive step.

3            In terms of the limitations, in addition to the

4    federal rules, I mean, the Court has set a discovery schedule

5    in this case.  Substantial completion of document production

6    is in June.  Expert discovery's supposed to begin in the

7    fall.  We're not going to serve 100,000 subpoenas on

8    patients.  We're not going to serve 1,000 or 2,000 subpoenas

9    on health plans or anything like that.  We have no intention

10   to do that.  I don't think there's a litigation purpose.  I

11   don't think it's feasible in the context of this case.  But

12   even if it were feasible, I don't think we would do it

13   because there's no litigation purpose.

14           But the issue is this:  When you're talking, for

15   example, about patients -- and we know this from experience

16   with, let's say, borrower discovery in cases involving

17   mortgage fraud -- you reach out to 20 people.  You might

18   not -- you might find two of them or one of them, especially

19   in a case where people are suffering from serious illness.

20   We don't know if we served, let's say, 20 subpoenas, whether

21   even one of those people would be in a position to

22   participate in this case at all.

23           So then we would, in Mr. Dunlap's world, have to

24   come back to him every five patients.  And then if he says

25   "No," we'd have to come back to Your Honor every five

 1  patients.  There's just no basis for this.

 2          If we had -- as a hypothetical that I don't think

 3  will ever occur.  But if we had served, you know, 1,000

 4  subpoenas on patients and they came in to complain about

 5  this, it would at least be a logical thing presented for the

 6  Court, queued up for the Court.

 7          But on the current situation, there's no reason to

 8  think we're going to do anything bad.  We have no interest in

 9  destroying anyone's business.  That's not the objective of

10  the lawsuit.

11          The objective of the lawsuit are the two claims

12  that we've brought.  We think that money that should be going

13  to patients is being taken by SaveOn.  We want it to stop.

14          But unless -- what they're saying is their whole

15  business is taking money that we intend to go to one person

16  and giving it to someone else; that's their whole business,

17  I -- you know, that's -- we're not intending to shut down any

18  businesses.  We're just prosecuting the claims we have.

19          THE COURT:  Well, I --

20      (Simultaneous conversation)

21          THE COURT:  -- this discussion -- hold on.

22          I think this discussion needs to be tabled until

23  after you have the names and you can ascertain how many

24  subpoenas you're going to issue.

25          I do think there's an issue of proportionality,

1    Mr. Dunlap.  Just so you understand, I am not saying that

2    they should issue 10,000 subpoenas.  But don't you think that

3    it's more readily discussed once they have the names and they

4    can ascertain what their target is in terms of subpoenas?

5         MR. DUNLAP:  Your Honor, I think we'd be very open

6    to that if it was understood that they wouldn't be going out

7    and serving subpoenas until we could have some sort of

8    discussion about an upper limit.

9         And I just want to thank you.  I think the wisdom

10   of how you've set this up is becoming apparent, because it

11   Mr. Sandick is hearing some things from me that I thought I

12   had communicated.  I'm hearing some new stuff from him for

13   the first time here.

14        We're not wedded to a limit of five.  He says,

15   well, they may go out and subpoena 20 patients.  Okay.  Then

16   let's set the limit -- the initial limit at 20.  You know,

17   we're not round just saying they have to come back every one

18   or two or five people.  What we want to avoid is

19   additional -- disproportionate harm that comes from going

20   after a huge number of people.

21        And if Your Honor wants to stage it such that we

22   produce the documents, it's understood that they're not going

23   to serve any subpoenas, we meet and confer and try agree on

24   an initial limit, and then if we can't agree on a limit, we

25   come back and you resolve that before any subpoenas or

```
 1   informal interviews go out, I think we'd be open to that.

 2            MR. SANDICK:  Your Honor, one thing that Mr. Dunlap

 3   mentioned at the end that I think is important is it's not

 4   just subpoenas that he's trying to prevent.  It's any contact

 5   with patients.  And these are patients who CarePath pays,

 6   co-pays support -- they're our business partners too.

 7            I object to any limit on informal communications --

 8            THE COURT:  Okay.

 9            MR. SANDICK:  -- with --

10        (Simultaneous conversation)

11            THE COURT:  That's different.  I think that's

12   different.

13            Mr. Dunlap, go ahead.

14            MR. DUNLAP:  Sorry.  I just want to be clear -- we

15   would be producing the patient lists and the client lists on

16   an attorneys' eyes only business --

17            THE COURT:  Yes.

18            MR. DUNLAP:  To the extent that they are saying,

19   well, what we're doing would interfere with their current

20   business operations, that it'll prevent anyone in the

21   Johnson & Johnson business side, including folks at CarePath,

22   from speaking to any CarePath patient, that's not true.

23   That's not what we're asking for.

24            What we're seeking is a limit on the litigation

25   counsel going out and trying to interview patients about the
```

|Hearing
|22-cv-02632, February 28, 2023

 1   litigation in addition to subpoenaing them.

 2          So I just want to make that --

 3      (Simultaneous conversation)

 4          THE COURT:  That's a different.

 5          MR. DUNLAP:  I am not trying to monkey with their

 6   current business operations or the current operation of

 7   CarePath, just to be clear.

 8          THE COURT:  Okay.  But why shouldn't they be able

 9   to contact patients?

10          MR. DUNLAP:  It is a matter -- well, again, we

11   think they should be able to contact a reasonable number of

12   patients.

13          Our concern is about the scale, because once they

14   start talking to a large number of patients -- and, again,

15   these are folks who don't have their own litigators on

16   speed-dial -- they get a call from Johnson & Johnson saying,

17   "Hey, we would like to speak to you.  Do you think you were

18   deceived?  Do you think you were misled?  You know, we have

19   this big lawsuit going on," et cetera, some number of them

20   are going to get antsy and upset and, perhaps, complain to

21   their plan sponsors, and those plan sponsors could then

22   complain to SaveOnSP --

23          THE COURT:  But then -- they're their patients.

24   I -- they're their patients.

25          MR. DUNLAP:  Well, let's be quite clear about this.

1   They're members of healthcare plans that are run by employers

2   who are our clients.

3           Johnson & Johnson sells them drugs that the plans

4   pay most of the costs for.  So they're Johnson & Johnson's

5   patients to the extent that they buy a drug from Johnson &

6   Johnson giving them some sort of co-pay assistance program.

7           But they're our patients.  They're the patients of

8   our clients' healthcare plans.  I shouldn't say "ours."

9   They're not SaveOn's patients directly.  They're the patients

10  of SaveOn's clients.  And so if Johnson & Johnson goes and

11  says, "Hey.  You know, there's this problem with the SaveOn

12  program, and we have this allegation and that allegation and

13  the other allegation" -- which we all strongly contest, by

14  the way -- the patients could get stressed.  The patients

15  could get confused.  And they could go complain to their plan

16  administrators, who our clients, and say, "Wait a minute.

17  There's something going on here.  Is my speciality drug at

18  risk," et cetera.  And if you get enough of those complaints

19  as a plan administrator, you could say, "You know what?  It

20  might not be worth it to go forward with SaveOn's services."

21  But that would be a form of commercial harm to us.

22          It would also, frankly, harms the plans because

23  they would lose the benefit of the program.  And it could

24  harm the patients as well because they wind up paying a bit

25  more for their speciality drugs.

1           So, again, we're not trying to shut them down and

2      say they can't --

3           THE COURT:  If you want me to restrain them from

4      contacting people that use their drugs, that's an odd

5      request.

6           MR. SANDICK:  And, Your Honor, they agree to our

7      terms and conditions as part of the CarePath program.  We

8      have a business relationship with them.  We have a healthcare

9      relationship with them.  They sometimes make, you know, phone

10      calls that have nothing to do with the issues of funding

11      because we also -- CarePath also has programs that involve,

12      you know, nursing assistance and other types of aid to people

13      who are on Johnson drugs.

14           You know, it's really unprecedented for a plaintiff

15      to say that they get to control (A) who you interview as part

16      of your fact investigation.  I've never heard of that.  I've

17      never seen that.  None of the cases they cite provide for

18      that.  Even, frankly, to discuss, you know, the contents of

19      our subpoenas before they go out, they have opportunity to

20      object to them, just like everybody else.  And there's

21      nothing about this case that is any different from all the

22      other cases that are in this district or any other district,

23      for that matter.  And I've just never seen a court say, "You

24      can't talk to people who are your patients in your program

25      who agree to your terms and conditions if you have a case,"

1    and if they say, "No, I don't want to talk to you," we want

2    to subpoena them, that subpoena goes through the normal

3    process.

4           But informal interviews of witnesses are essential

5    to the operation of our civil litigation system.  It would

6    not work without it.  If you could only talk to someone after

7    the other side gives you permission, that's just the inverted

8    world of how civil litigation operates.

9           MR. DUNLAP:  If I may respond, Your Honor.  Once

10   again -- what we're actually asking the Court is not to shut

11   J&J down from speaking to any patients or even a decent

12   number of patients.  Mr. Sandick said, well, he might go to

13   speak to 20 of them.  That would be fine with us as an

14   initial limit.

15          What we're trying to put a cap on is the number of

16   patients that they could go to where the value of any

17   additional discovery they may get pales against the threat of

18   commercial harm that could result to SaveOn if they speak to

19   a large number of patients who get antsy and then complain to

20   their plans and are then pressured to drop SaveOn's services.

21          So just as informal witness interviews are part of

22   discovery, so are limits on discovery where there is a threat

23   of duplication of cumulativeness --

24          THE COURT:  Or proportionality.  Or

25   proportionality.

1          And we're way too early.  And I am not going to

2    issue prior restraints on who they can interview and who they

3    can't interview.  For now -- we discussed the subpoenas with

4    respect to interviewing, especially people that use their

5    services.  I am not going to put a prior restraint on that.

6          If, in fact, there is a problem, maybe you can

7    discuss a number -- I am not ordering this, Mr. Sandick, and

8    Mr. Dunlap -- a number of patients that you want to

9    interview.  But how can I stop him from talking to his

10   patients?

11       (Simultaneous conversation)

12       THE COURT:  It's an extraordinary request.

13       MR. DUNLAP:  Your Honor, we don't -- if we were

14   asking to stop him from speaking to any of his patients, that

15   might be extraordinary.

16       We are simply asking him to limit it to a number

17   where he can't impose commercial harm on us by doing so --

18       (Simultaneous conversation)

19       THE COURT:  -- that number?  Is the number 10?  Is

20   it 20?  Is it 50?  Is it 75?  How do we know that number?

21   That's where the speculative nature of this comes in.

22   There's nothing to say that 10, 20, or 60 or 70 or 200 is

23   going to harm your business --

24       (Simultaneous conversation)

25       MR. DUNLAP:  And I think, Your Honor, that that's

 1  what your -- what I understood your proposal to be, I think

 2  makes sense, which is as long as we understand that there is

 3  currently a restriction on them subpoenaing or interviewing

 4  patients or plans, we then produce the lists of names.  We'll

 5  start producing documents that have this, and then they

 6  should come to us and say what they think -- how many they

 7  want to go after.  And it can be, you know, a rough number.

 8  That's fine.  And then we can talk about whether we think

 9  that that's at a scale that could really harm --

10          THE COURT:  No.  No.  I'm not going to do that.

11  I'm not going to do that.

12          With respect to the subpoenas, that's another

13  issue.  They're talking about interviewing people that use

14  their services.  I can't possibly put a prior restraint on --

15  it's a First Amendment issue.  They can talk to whoever they

16  want.  I mean, whether or not it hurts your business -- and

17  that is the basis of your request for a protective order --

18  you have given me no real cause other than speculation that

19  it's going to hurt your business.

20          So I don't think this issue is completely fleshed

21  out.  I think you give them the names.  We discuss the

22  subpoena issues.  The two of you can discuss that and see

23  what's proportionate.

24          But I cannot and will not stop them from

25  interviewing people that use their services.

```
 1            MR. DUNLAP:  May I ask for clarification,

 2   Your Honor?

 3            THE COURT:  Sure.

 4            MR. DUNLAP:  I heard what you said on the patients.

 5            Does that -- what about the plans?  We understand

 6   there's a moratorium on subpoenas until we produce the names.

 7   We've talked about a number --

 8            THE COURT:  I am not -- a moratorium.

 9            I'm suggesting that the two of you meet and confer

10   and discuss the issuance of subpoenas.  There's no

11   moratorium.

12            First, you'll produce the list of patients and

13   who -- and whatever plans that are on the list.

14            Then you will discuss -- because it's clear to me,

15   you haven't discussed a lot -- how many subpoenas Mr. Sandick

16   chooses to issue.  If he says 100 and you say 20, then you

17   come to me.

18            The burden for a protective order here is proof

19   positive that harm would be caused.  I don't have that from

20   you.  I really don't.

21            So, again, this is a little bit speculative -- a

22   lot speculative on your part.

23            He will discuss with you the number of subpoenas.

24   Insofar as -- and maybe I am not clarifying what you want --

25   contacting patients that do business with J&J in any way,
```

1   shape, or form, he can call whoever he wants.

2          MR. DUNLAP:  We understand on those two points.

3          I'm ask -- Your Honor, I'm asking an additional

4   point, which is -- so there's subpoenas that they could -- so

5   there are two groups at issue.  There's the plans --

6          THE COURT:  Yes.

7          MR. DUNLAP:  -- who are -- who are our clients.

8   Right?

9          And then there are the patients who are members of

10  those plans.

11         THE COURT:  Right.

12         MR. DUNLAP:  What I understand on subpoenas, we

13  give them -- we're going to give them the lists of patients

14  and list of plans.

15         Then they will come to us and say roughly how many

16  they want to issue.  If we can agree, great.  If we can't, we

17  come to you.

18         THE COURT:  Yes.

19         MR. DUNLAP:  Informal outreach to patients, what I

20  understand you're saying, there's no limits.  They can talk

21  to whomever they want.

22         My question was on informal outreach to plans who

23  are our clients who don't have a direct business relationship

24  with J&J or at least not one -- most of them don't have one

25  here.  They're simply the entity that pays for the drugs.

```
 1   Whether you were anticipating that that would fall on the
 2   "give them the list and let's discuss" side of the line along
 3   with the subpoenas or whether you treat that like the
 4   patient.
 5            THE COURT:  Okay.  I understand.
 6            So, Mr. Sandick, these plans, if you know, are they
 7   plans that you deal with?  I mean ...
 8            MR. SANDICK:  So we deal with the plans from time
 9   to time in certain contexts.  We do not have direct contracts
10   with the plans because that's just not the role of JJHCS or
11   even J&J more broadly in the system.
12            My view on this is, you know, I think, as a
13   practical matter, I don't know us getting a lot of informal
14   cooperation from health plans because these are often -- and
15   I hear what Mr. Dunlap's saying -- some of them may not be
16   large, but many of them -- these are, like, Blue Cross Blue
17   Shield-type entities -- these are huge entities, and if I
18   call them up and ask to just chat with them, they'll probably
19   tell me, like, "Come back with a subpoena."  So I don't know
20   that there's going to be, as a practical matter.
21            But as a principled matter, the idea -- and -- of
22   prior restraint on our talking to anyone just strikes me as
23   wrong, contrary to law, contrary to the ordinary civil
24   procedure --
25            THE COURT:  I agree.
```

1          MR. SANDICK:  So I don't want to be barred from it,

2  but I can assure the Court, I don't think that's going to be

3  a terribly fruitful path because these are large entities

4  with well -- you know, they have fine attorneys.  No doubt.

5  And they will not view the informal cooperation that a

6  patient, who might well have reached out to us with a

7  complaint in the past about SaveOn -- you know, that's a

8  different story.

9          THE COURT:  So I agree, you can contact whatever

10  plan and/or patient you want to.

11          I would just, you know -- I am not trying to mess

12  with your strategy, but I would keep Mr. Dunlap advised.  And

13  if he sees an emergent situation arise, I can deal with it in

14  that manner as it arises.

15          MR. SANDICK:  Sure.  Sure, Your Honor --

16      (Simultaneous conversation)

17          THE COURT:  I am not -- restraining from talking to

18  anybody.

19          MR. SANDICK:  Thank you.

20          MR. GREENBAUM:  Your Honor, could I just address

21  the subpoenas for a moment?

22          We don't have the names yet.

23          THE COURT:  Right.

24          MR. GREENBAUM:  We don't know how many subpoenas we

25  want to issue, and it may be an iterative process.  We may

```
 1   start off with three or five, and then depending on what we
 2   get, we'll do -- so --
 3        (Simultaneous conversation)
 4        THE COURT:  That's what I thought:  You would
 5   probably stage it in such a way that you -- you know, if you
 6   get a return on your subpoena or you get cooperation, you get
 7   information, then you can issue more.  I mean, that seems to
 8   be a pyramid way of building discovery without --
 9        (Simultaneous conversation)
10        THE COURT:  Go ahead.
11        Jeff, I'm sorry.
12        MR. GREENBAUM:  I mean, we can start off and say to
13   Mr. Dunlap, you know, we're going to do 25.  Is that too
14   much?
15        You know, we don't know how many we're going to
16   want.  We're going to use one iterative process possibly.  So
17   that's why Rule -- I'm forgetting which rule, but the
18   discovery rules will work the way they are.  If we're
19   abusive, they can come to court.
20        But this whole application is premature and
21   unfounded and speculative.  We shouldn't have to --
22        THE COURT:  Okay.  I don't disagree with you.
23        I'm just trying to make peace here.
24        So I think that, you know, Mr. Dunlap gets the
25   picture that five is never going to work and that I'm
```

 1  entitling you to prosecute your case to the best of your

 2  ability.  That's the message in this conversation.

 3         My interim discussion with respect to subpoenas was

 4  to hopefully have Mr. Sandick and Mr. Dunlap and whoever else

 5  have discussions and make some agreements so that we -- I

 6  don't have to sit here and have six months of appeal to a

 7  district judge and then back to me and then -- you know, I'm

 8  just trying to circumvent, Jeff, the ongoing dispute process

 9  which will waylay and delay this case continually, because I

10  can see that nothing's going to be easy in this case.  I

11  think we all agree.

12         So let's just go by discuss the subpoenas, and if

13  Mr. Dunlap says, "Hey, this is outrageous, you're killing

14  me," then you can come back to me.

15         MR. DUNLAP:  Understood, Your Honor.

16         MR. GREENBAUM:  Thank Your Honor.

17         THE COURT:  So what else can we discuss?  I

18  actually had a cancellation; so we have a few more minutes --

19      (Simultaneous conversation)

20         THE COURT:  Go ahead --

21      (Simultaneous conversation)

22         MR. DUNLAP:  I was just going to say, I know that

23  there are letter -- there are outstanding issues from J&J.

24  There are also some issues that we've put in.  There's one

25  bundle of issues that we think is critical to our side, which

 1   I would like to have the opportunity to --

 2            THE COURT:  Your financial returns.  Documents

 3   showing why J&J has CarePath.

 4            MR. DUNLAP:  Yes.  The -- right.  The --

 5            THE COURT:  The CarePath and Janssen drugs.

 6            MR. DUNLAP:  Right.  The development and marketing

 7   and administration of CarePath and financial information --

 8   historical financial information about Janssen drugs.

 9            THE COURT:  Yeah.  I don't know that I have enough

10   on that, but can we talk about a little bit?

11            MR. DUNLAP:  Yes.

12            THE COURT:  So what relevance -- and I know these

13   are relevant to your defense in your submission, you say.

14            What relevance would documents showing J&J

15   financial returns have to your defense?

16            MR. DUNLAP:  And, again, I just want to clarify

17   what we're asking for.

18            THE COURT:  Okay.

19            MR. DUNLAP:  It is not every financial document

20   within Johnson & Johnson.  It's a large company with many

21   lines of business.

22            What we're focused on is historical information

23   about why CarePath itself, that program was developed, how

24   it's administered, how it's marketed, including analysis of

25   the return on investment in that program.  And on the Janssen

 1    drug side, we certainly don't want all the -- you know, the

 2    medical information and the lab tests and all of that.

 3              What we want is financial information about how

 4    they set prices and why they have raised Janssen prices over

 5    the year.  And it is -- remember, CarePath -- to Janssen

 6    drugs.

 7              So why is this relevant?  Let me take a shot at

 8    trying to explain.

 9              THE COURT:  Okay.

10              MR. DUNLAP:  So Johnson & Johnson in this case is

11    telling a very simple but we think misleading story.  Their

12    story is that speciality drug prices are just high and that

13    they have come along and for the good of patients set up

14    CarePath to help them afford the co-pays so they can get

15    their speciality drugs and that my client, SaveOn, came along

16    and is somehow maliciously ciphering [sic] funds away from

17    these patients for its own benefit and the benefit of the

18    plans, and then they say this harms patients and this

19    harms -- and it harms JJHCS.

20              But we have a different story and, we think,

21    accurate story to tell, which is that Johnson & Johnson jacks

22    up the prices of these speciality drugs, not because it's

23    required by any development of the drug but just because it

24    can, to increase its profits.

25              And it developed CarePath as a marketing tool so

1   that more patients would take its drugs as opposed to a

2   competitor's drugs and would keep taking those drugs so that

3   it can continue to make money.  And these drugs can be a gold

4   mine.

5           And so CarePath -- Johnson & Johnson makes a very

6   high return on investment, we believe, on its CarePath

7   program.  So, for example, Stelara, that's one of the drugs

8   at issue in this case.  The total cost of that per year,

9   assuming a patient uses it the full year -- and most of these

10  are for chronic conditions -- is $165,000.  Balversa, which

11  is another speciality drug at issue, the average cost

12  annually is $240,000.  So if they can pay out $5,000, 8,000,

13  and even $10,000 in CarePath funds to make sure that a

14  patient takes a drug where they get $240,000, that's a very,

15  very good return on their investment.

16          And in the federal system, in the federal system,

17  the same program has been rejected by the Department of

18  Health and Human Services.  HHS called this and the Second

19  Circuit agreed that this type of program is a kickback, which

20  is not allowed under antikickback statute.

21          So the entities that wind up paying for these high

22  drug plans are the health plans:  SaveOn's clients.  And so

23  the clients have tried to figure out ways and SaveOn has

24  tried to help them to take full advantage of the co-pay

25  assistance funds that Johnson & Johnson has on offer.  And we

1    don't think there's anything nefarious about the plans doing

2    this.  Indeed, it would be surprising if they didn't do this

3    sort of thing.  They're fiduciaries.  They are required to

4    administer plan assets for the benefits of the patients and

5    implementing the sort of terms that SaveOn advises them to

6    save the plans money and ensures that patients pay nothing

7    for these drugs.

8            So that information, we think is critically

9    relevant to the following allegations at a minimum that

10   Johnson & Johnson has made.  It says in its GBL claim, that

11   what SaveOn does threatens the financial viability of

12   CarePath, which, it says, is a public harm.  Right?

13           But we don't think that CarePath is a public good.

14   And we think that it exists solely to increase Johnson &

15   Johnson's profits.  And we want to be able to show that any

16   impact we're having on its program, its ability to sell this

17   is not a public harm of any sort.

18           Second, J&J says that SaveOn harms patients by

19   increasing their healthcare costs because under the terms of

20   these plans, CarePath funds don't across -- against

21   out-of-pocket maximums.  But we intend to show, among other

22   things, that rising costs here are driven primarily by

23   increases in speciality drug prices, including by Johnson &

24   Johnson's decision to raise these prices simply because it

25   can, for no other reason.  That goes to whether this is

1    actually a public harm or not.

2              Third, Johnson & Johnson says it was damaged by

3    what SaveOn does, by advising plans to set these terms that

4    increase the CarePath payments that Johnson & Johnson makes.

5    And they say only look at how much our CarePath payments have

6    gone up.  That's our damages.

7              But we don't think that can put this man behind --

8    don't -- "pay no attention to this man behind the curtain"

9    approach.  Right?  We intend to show that the SaveOn approach

10   here actually leads to more patients signing up for Janssen

11   drugs, using Janssen drugs and signing up for CarePath and so

12   that Johnson & Johnson may actually make money in total, if

13   you look at the return on its Janssen drugs as a result of

14   what SaveOn is doing, and certainly if they lost money, it's

15   not just limited to -- it's not as big as they claim it is.

16   You have to look at the profits they're making off of their

17   drugs, not simply how much they're paying out in CarePath

18   funds.

19             And, finally, they're seeking a permanent

20   injunction to shut us down, to stop us from administering

21   this program.  You heard Mr. Sandick accuse us of theft,

22   basically.  And what we intend to show under that standard is

23   that J&J is not suffering any real injury that would require

24   an injunction and certainly that an injunction would not

25   serve the public it is.

|Hearing
|22-cv-02632, February 28, 2023

1          So, again, Johnson & Johnson's basic approach here
2  has been that they want to produce a narrow set of documents
3  that will support their own theory of liability and damages.
4  But we think it's critical to get these documents because
5  they're critical to our theories that there was -- there is
6  no liability and they have not actually been damaged.

7      (Simultaneous conversation)

8          THE COURT:  Mr. Sandick, do you want to respond?

9          MR. SANDICK:  Yes, I do.  Thank you.

10         The -- nothing that Mr. Dunlap said is tethered in
11 any way to elements of the torts that we have alleged in this
12 case, the elements that Judge Vazquez stated in his recent
13 motion to dismiss.

14         None of the -- even if it is true that the prices
15 of speciality drugs are high, that does not create a defense
16 or justification for committing torts or violating GBL 349.
17 The question is not -- and it's just not relevant to the
18 case -- is CarePath a good program?  CarePath is not a
19 defendant in this case.  The question is does SaveOn harm the
20 public by deceiving consumers?  They say that if Johnson &
21 Johnson, the company broadly speaking, is still making money
22 on developing and selling therapies, then it's okay for
23 SaveOn to induce patients to tortious -- it violate the terms
24 and conditions of their agreement with JJHCS.  And that just
25 can't be true.  There's no legal basis for it.  It doesn't

 1   touch to anything.  These are completely irrelevant

 2   documents.

 3          What they would like to do is make this into a case

 4   about the question whether drug prices in America are high,

 5   whether they are too high, and whether it's, therefore, okay

 6   for SaveOn and the health plans to try to grab some money

 7   back by increasing co-pays and inducing patients to breach

 8   the terms and conditions.  We never said in our complaint

 9   that there was, you know, harm to plans.  What we talked

10   about was the harm to the patients because of the deception,

11   because a patient shows up and says, "I'm here for my

12   medication" -- which, by the way, it's not a matter of, like,

13   mercy or kindness that the health plans are paying for these

14   speciality drugs.  They're paying for it because people have

15   purchased insurance and they are paying premiums for

16   insurance.  And some people who pay premiums, the way the

17   system works, don't get sick and don't draw down very much.

18   But some people do get sick, badly sick, with cancer,

19   immunological conditions.  And so when that patient goes to

20   the pharmacy and is told "You're not covered" and actually

21   they are covered but they're being told they're not covered

22   because they haven't signed up to SaveOn, that's patient

23   deception.  And whether the cost of the drug is a dollar or a

24   hundred thousand dollars, it makes no difference to this

25   case.

|Hearing
|22-cv-02632, February 28, 2023

```
 1              What they are seeking to do is bog down the
 2   plaintiff in irrelevant discovery, by the way, on a vast
 3   scale.  Request 30, this is just literally what they are
 4   asking for, Judge -- from January 1st, 2009, to the
 5   present -- so eight years before the allegations in the
 6   complaint -- for each year, for each Janssen drug -- and
 7   there are 40 Janssen drugs, more than 40, that are part of
 8   CarePath, we want all documents and communications
 9   regarding -- for Janssen's decision to raise or lower the
10   price of the Janssen drug, including labor or manufacturing
11   costs or an increase the efficiency of the Janssen drug --
12   this would result in -- in order to reply to this, we would
13   have hundreds of custodians.  We would have to review
14   millions and millions of documents all in an issue that's
15   entirely irrelevant, that's being injected into the case of
16   hoping of changing the case about a tortious interference and
17   consumer harm into a case about drug prices are just too
18   high.
19              So whether they are too high or not too high
20   creates no justification for the offenses that we charged in
21   the complaint.  So completely irrelevant discovery that is
22   also incredibly burdensome should not be permitted.
23              We have actually, though, made an offer -- to be
24   fair, we have offered a compromise.  We have offered to
25   produce the following:  All documents relating to harm caused
```

1  by SaveOn; all of the data that's formed the basis for the

2  allegations in our complaint, of course, we're producing; the

3  co-pay assistance budget at JJHCS, actual and projected for

4  all the patients involved in CarePath to the extent we have

5  the data -- and we do have some of the data; the dates of

6  enrollment; how much was offered; how much was paid to each

7  patient; what drug they took; from 2016 to 2022 -- one year

8  earlier than SaveOn even existed.  SaveOn didn't exist until

9  2017.  But they want -- eight years before they were created

10 to write a term paper about drug prices, I suppose.

11         We've offered them what are called the "Janssen

12 transparency reports."  Every year Janssen issues reports

13 that address drug costs.  And we're producing documents that

14 reflect how JJHCS determines the level of support.

15         We're also producing documents about the drafting

16 history of the terms and conditions going back to 2017 and

17 about the understanding about the very specific term and

18 condition that's the issue that's under dispute in the case.

19 There's this language in our terms and conditions that says

20 offer may not be used with any other offer.  To the extent

21 that there are people within J&J talking about that going

22 back to 2017, we will produce that document.  So they will

23 get all of this.

24         And what I'm saying here is if they get all of this

25 and they still need more, it's obviously all about prejudice.

1    But to, on day one of discovery, say we need to go eight

2    years before the allegations of complaint and get every

3    document relating to the manufacturing and labor costs and

4    efficacy of the Janssen drugs?  I mean, that is the whole

5    business, just in part -- the plaintiff JJHCS, but of

6    multiple affiliates and thousands of employees at this

7    company.  This is being done to burden us and also, I would

8    say, to discourage other plaintiffs who might look at SaveOn

9    and say, "This is not a good thing.  This is not fair to

10   patients or to us."  They should know, if SaveOn is allowed

11   to get this discovery, that bringing a case will lead to an

12   immense burden on them.  Huge, huge disproportionate,

13   irrelevant discovery.

14           THE COURT:  Okay.  Let me just stop you.

15           I am running out of time clearly for my next

16   conference.

17           But, Mr. Sandick, when do you think substantial

18   completion of your production will occur?  Or do you have

19   date?  I don't have it at hand.

20           MR. SANDICK:  So we expect to make an initial

21   production, I would say -- well, we have initial production

22   of org charts and other materials.  We expect to make

23   productions on these and other issues in approximately two

24   weeks.  The substantial completion date for document

25   discovery, I believe, is in June.  For the CarePath

1    enrollment data, we are going to have that by the end of

2    April.  It's an immense of data.  But we're gathering it, and

3    that will be produced by the end of April.  So some of this

4    in March; more of it in April; all of it by the beginning of

5    June, which is the discovery schedule in the case.

6              THE COURT:  Okay.

7              Mr. Dunlap, I am not trying to cut you off, but I

8    have to move on.  So once they do their production, why don't

9    we renew your applications at that time and either have a

10   Zoom or an in-person with substantial amount of time that we

11   can discuss this and you can try and convince me of the

12   relevance of your requests.

13             MR. DUNLAP:  Your Honor, I'm glad to resume

14   discussing this whenever it's convenient for the Court.

15             I do want to signal, however --

16             THE COURT:  Okay.

17             MR. DUNLAP:  -- that getting -- we're not asking

18   for anything near the volume that Mr. Sandick said we were.

19             But we are asking for a good amount of information

20   here.  And if we have to wait several months for him to make

21   these productions before we renew the request and then

22   Your Honor requires them to produce that information later,

23   that is going to lead to a pretty significant -- we would

24   think, extension of discovery schedules so he can gather it,

25   he can produce it, and our experts can go through -- because

1    it will be a decent amount of material.

2            Now, I understand that you're out of -- you are

3    running low on time here.  You know, we have multiple

4    responses to what Mr. Sandick said.  He said it wasn't in the

5    complaint.

6            It's in black and white in their allegations.  It's

7    highly, highly relevant what they're offering it is the

8    sleeves off their vest.  It's stuff that they believe is

9    relevant to prove their theory but not to allow us to rebut.

10   And it is critical that we have this information in order to

11   rebut.

12           I'm glad to go through jot by jot.  It sounds like

13   you don't have the time for that right now.

14           THE COURT:  Not today.  But you want -- you want to

15   further this discussion prior to substantial completion?

16           MR. DUNLAP:  That would be our preference,

17   Your Honor, because, again, we understand you want to keep

18   things moving here and if we're waiting, you know, two, three

19   months more than that, to get the production --

20           THE COURT:  Okay.

21           MR. DUNLAP:  -- I mean, if we can tell you right

22   now that if Mr. Sandick produces limited amount of stuff that

23   he's talked about that only goes back to 2017 or 2016,

24   doesn't go back to when terms and conditions were drafted,

25   doesn't go back and tell us the full history of CarePath,

1   doesn't include the information we need about return on

2   investment, we're going to be asking that -- for that

3   information in three months, and we know that we need it now.

4           So it might be more effective --

5           THE COURT:  Okay.

6           MR. DUNLAP:  -- if we can talk about it in the near

7   future.

8           THE COURT:  Is there a preference for in-person or

9   Zoom?

10          MR. DUNLAP:  My own preference, Your Honor, is I

11  would always rather be in person, but we'll do whatever you

12  prefer.

13          MR. SANDICK:  We agree with Mr. Dunlap.

14          THE COURT:  Okay.  And --

15          MR. GREENBAUM:  Your Honor, we have requested and

16  pending since January 5th, that we would like to get

17  production on, so is Your Honor going to be addressing those

18  items too?  Because Mr. Sandick only had the opportunity to

19  address the --

20      (Simultaneous conversation)

21          THE COURT:  I have a 2 o'clock Zoom, Jeff.

22          MR. GREENBAUM:  I understand.

23          THE COURT:  Or I only -- I was lucky to get an hour

24  for this today just because of the cancellation.

25          So why don't I bring you in in person in the next

|Hearing
|22-cv-02632, February 28, 2023

1    couple of weeks and we can continue this.

2              MR. GREENBAUM:  Okay.  Thank you.

3              THE COURT:  So if the date's posted and somebody's

4    got a problem with it, get back to my chambers immediately.

5              MR. SANDICK:  Thank you, Your Honor.  We will.

6              THE COURT:  All right.  I'm sorry, folks.  I'll see

7    you soon.  Thank you.

8              UNIDENTIFIED SPEAKERS:  Thank you.

9                    (Conclusion of proceedings)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
|Hearing                                                                    44
|22-cv-02632, February 28, 2023
|Certification
```

1                            Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3     that the 44 pages contained herein constitute a full, true,

4     and accurate transcript from the official electronic

5     recording of the proceedings had in the above-entitled

6     matter; that research was performed on the spelling of proper

7     names and utilizing the information provided, but that in

8     many cases the spellings were educated guesses; that the

9     transcript was prepared by me or under my direction and was

10    done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12    the parties hereto nor am I in any way interested in the

13    outcome hereof.

14

15

16

17

18    S/ *Sara L. Kern*                    1st of March, 2023

19    _____    _____
      Signature of Approved Transcriber              Date

20

21
      Sara L. Kern, CET**D-338
22    King Transcription Services
      3 South Corporate Drive, Suite 203
23    Riverdale, NJ  07457
      (973) 237-6080
24

25