```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE      .
SYSTEMS INC.,                      .
                                   .
          Plaintiff,               .  Case No. 22-cv-02632
                                   .
vs.                                .  Newark, New Jersey
                                   .  March 17, 2023
SAVE ON SP, LLC,                   .
                                   .
          Defendant.               .


                     TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE CATHY L. WALDOR
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via Zoom videoconference):


 For the Plaintiff:      JEFFREY J. GREENBAUM, ESQ.
                         Sills Cummis & Gross P.C.
                         The Legal Center
                         One Riverfront Plaza
                         Newark, NJ 07102-5400
                         (973) 643-7000
                         jgreenbaum@sillscummis.com

                         HARRY SANDICK, ESQ.
                         Patterson Belknap Webb & Tyler LLP
                         1133 Avenue of the Americas
                         New York, NY 10036
                         (212) 336-2723
                         Hsandick@pbwt.com



Audio Operator:

Transcription Service:   KING TRANSCRIPTION SERVICES
                         3 South Corporate Drive, Suite 203
                         Riverdale, NJ  07457
                         (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1  (APPEARANCES continued)

 2
    For the Plaintiff:      KATHERINE MARGUERITE LIEB, ESQ.
 3                          Sills Cummis & Gross P.C.
                            101 Park Avenue, 28th Floor
 4                          New York, NY 10178
                            (212) 643-7000
 5                          Klieb@sillscummis.com

 6
    For the Defendant:      ERIC EVANS WOHLFORTH, JR., ESQ.
 7                          Gibbons, P.C.
                            One Gateway Center
 8                          Newark, NJ 07102-5310
                            (973) 596-4879
 9                          ewohlforth@gibbonslaw.com

10                          ANDREW R. DUNLAP, ESQ.
                            Selendy Gay Elsberg PLLC
11                          1290 Avenue of the Americas
                            New York, NY  10104
12                          (212) 390-9005
                            Adunlap@selendygay.com
13
                            DAVID ELSBERG, ESQ.
14                          Selendy Gay Elsberg PLLC
                            1290 Avenue of the Americas
15                          New York, NY  10104
                            (212) 390-9004
16                          Delsberg@selendygay.com

17                          MEREDITH NELSON, ESQ.
                            Selendy Gay Elsberg PLLC
18                          1290 Avenue of the Americas
                            New York, NY  10104
19                          (212) 390-9069
                            Mnelson@selendygay.com
20
                            Also present:  Anthony Callaghan
21                          (Gibbons PC)

22

23

24

25
```

```
 1                    (Commencement of proceedings)

 2

 3          THE COURT:  This is 22-2632, and it's 10:37 on

 4   St. Patrick's Day, March 17th.

 5          All right.  So, folks, where did we leave off?  I

 6   understand you've resolved a good number of the issues.  I'd

 7   love to hear that you resolved them all.

 8          It seems like from the bench memo that Tim Duva

 9   [phonetic] gave me that you're not entirely on separate

10   pages, but -- yes.  Mr. Nelson.  You better turn your sound

11   on, if you want to be heard.

12          Uh-oh.  IT.  IT emergency.

13          So.

14          MALE SPEAKER:  Your Honor?

15          MALE SPEAKER:  I think we were about to go through

16   the issues that we had remaining.  And Mr. Sandick was going

17   to take us through them.

18          THE COURT:  Right.

19          But Mr. Nelson was raising his hand.

20          So I'm having a real dog event here.

21      (Off-the-record discussion)

22          THE COURT:  Evans, Evans, why isn't Meredith

23   Nelson -- tell me, again.

24          He can't tell me.

25      (Interruption in proceedings)
```

1          MALE SPEAKER:  Can you hear me now, Your Honor?

2          THE COURT:  Yes.  Sort of.  But you have an echo.

3          MALE SPEAKER:  Yeah.  How about that?  Is it a

4    little bit better?

5          THE COURT:  No.

6       (Interruption in proceedings)

7          THE COURT:  No, Ms. Nelson, Wohlforth.

8          MR. DUNLAP:  I am going to surrender -- I wasn't

9    sure if we were going to take appearances, Your Honor.  If

10   not, then I'll surrender my computer back to its owner,

11   Ms. Nelson.

12         THE COURT:  Yeah, well, there's no echo.  But

13   there's no volume.

14      (Interruption in proceedings)

15         MR. DUNLAP:  Is that any better, Your Honor?

16         THE COURT:  Yeah, that's substantially better.

17   We'll take it.

18         MR. DUNLAP:  Okay.  Thanks.  I was unsure.  And I

19   raised my hand to ask whether you were going to take

20   appearances.  If not, then I'll --

21         THE COURT:  Oh, yeah.  I am.

22         MR. DUNLAP:  Okay.

23         THE COURT:  But -- no -- good idea.

24         Thank you, Evans.

25         Let's start with plaintiff.  Let's have

 1  appearances, please.

 2          MR. SANDICK:  Harry Sandick from Patterson Belknap

 3  Webb & Tyler.

 4          Good morning, Your Honor.

 5          THE COURT:  Good morning.

 6          Mr. Greenbaum?

 7          MR. GREENBAUM:  Yes, Jeffrey J. Greenbaum, Sills

 8  Cummis & Gross for the defendants.  And with me is Katherine

 9  Lieb from the same firm.

10          MS. LIEB:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          Defense.

13          MR. WOHLFORTH:  I think Mr. Greenbaum may have

14  misspoken unless he's --

15          MR. SANDICK:  Excuse me.  Plaintiff --

16      (Simultaneous conversation)

17          MR. WOHLFORTH:  Yeah, this is Evans Wohlforth from

18  the Gibbons firm.  With me is Mr. Andrew Dunlap and Meredith

19  Nelson from Selendy Gay Elsberg on behalf of defendant SaveOn

20  SP LLC.

21          THE COURT:  Where is Meredith Nelson?  I don't see

22  her.

23          MR. WOHLFORTH:  She's going to be jumping in here

24  as soon as I get off that what I had to say, which I just

25  have done.

 1          THE COURT:  Because I'm calling you Mr. Nelson

 2  until she gets there.

 3          So bear --

 4          MS. NELSON:  I am -- Your Honor.

 5          THE COURT:  Where is Evans Wohlforth?  Okay.

 6          All right.

 7          So, folks, did we get all the appearances?  I'm

 8  sorry.

 9          MR. CALLAGHAN:  Your Honor, my name is Anthony

10  Callaghan.  I'm also with the Gibbons firm.  I'm a colleague

11  of Evans's.  I've not entered an appearance, but I'm here to

12  observe.

13          THE COURT:  Okay.  So let's get personal now.  Is

14  that an Irish accent?

15          MR. CALLAGHAN:  Yes, Your Honor.  And I was

16  delighted that you began the conference with the proper

17  salutation.

18          THE COURT:  The proper salutation would be green

19  beer.

20          MR. CALLAGHAN:  The top of the morning to you,

21  Your Honor.

22          THE COURT:  Top of the morning to you, and you're

23  very welcome today.  Very welcome here.

24          MALE SPEAKER:  Mr. Callaghan, I apologize for my --

25  I didn't know what I was doing this morning.  So --

1          THE COURT:  Oh, my god.

2          MR. CALLAGHAN:  Yes, the tie is definitely --

3          THE COURT:  Okay.

4          Mr. Sandick, we were at you, I believe.

5          MR. SANDICK:  Yes.  I -- we were -- first, I want

6  to thank the Court for saving us again in making some more

7  time for the case.

8          As we said in the letter that we submitted

9  yesterday, we have in the past few days resolved the majority

10 of the points that JJHCS raised in our January 5th letters.

11 They've been resolved on terms that, you know, I think,

12 result in JJHCS getting substantially what we asked for, and

13 it's gratifying to have reached the resolution.

14         I will say it is somewhat frustrating to us that

15 it's taken us time to get here, and we do believe that the

16 Court's intervention, both the conferences and the knowledge

17 that Court would be taking it up has been helpful in bringing

18 about those resolutions.

19         Before I turn to the substantive issues that

20 remain -- there are a couple on our side of the ledger -- we

21 did want to not forget to ask if the Court can set another

22 conference in a few weeks so that any further disputes can be

23 brought to the Court.  We're hopeful it won't be necessary,

24 but there are already other issues pending between the

25 parties.  And I think just even the fact of the conference

1    has helped us bring about this result.

2           The other thing we wanted to bring to the Court's

3    attention is we're -- we have a number of third-party

4    subpoenas out, and we've heard from third-party counsel in

5    recent days that some of them want to wait until the end of

6    party discovery to produce documents.  And they've made

7    comments to the effect of that the discovery deadlines in the

8    case, you know, won't hold, and we shouldn't feel ourselves,

9    you know, overly restrained by them.  But we were concerned

10   to hear that.  We certainly haven't suggested that to people.

11          And so we just wanted to also ask if the Court can

12   sort of confirm the scheduling order that Your Honor ordered

13   back last year remains in place and we should all try our

14   very hardest to meet those dates and that witnesses and

15   parties shouldn't use, you know, the -- the fear that the

16   schedule will not hold as an opportunity to, you know, kind

17   of bring about that end.  So we just wanted to make that

18   point at the outset.

19          THE COURT:  The schedule is on the docket and the

20   parties and third parties and any party should abide by the

21   schedule.

22          MR. SANDICK:  Thank you very much, Your Honor.

23          So we only have three issues left.  One of them is

24   from what I would call our "general issue" letter.  The other

25   two are from our "specific issue" letters.  These are the

 1    January 5th letters.

 2         The one issue that remains in the general issue

 3    letter is that there's a difference of opinion between JJHCS

 4    and SaveOn about whether the SaveOn production will relate to

 5    documents that touch on drugs that are manufactured by other

 6    makers.

 7         We think that the evidence in this case at trial is

 8    going to go beyond Janssen drugs for two reasons.  First, our

 9    GBL 349 claim, the consumer protection claim brought under

10    New York law -- SaveOn is a New York entity -- requires that

11    we prove broad impact on consumers.  And so it is our

12    intention to prove that not only by the consumers who use the

13    drugs that are subject to the CarePath program that JJHCS

14    runs but a broader impact on consumers impacting -- that

15    impacted, including those that are taking drugs made by other

16    manufacturers.

17         Second, we think it's relevant for purposes of

18    understanding SaveOn's decisions with respect to our drugs.

19    If they make a certain decision about how to approach a

20    broader policy issue but they make it in the context of a

21    Merck drug or a Pfizer drug, more likely than not, they're

22    going to follow that same policy position when it comes to

23    Janssen drugs.  And this is a -- the reason we put it in the

24    general issue letter is it touches on many requests.  We are

25    seeking patient complaints from people who are concerned

|Hearing
|22-cv-02632, March 17, 2023

1   about the impact on their treatment and finances of SaveOn,

2   whether or not those complaints relate to Janssen drugs.

3           To the extent that decisions are made about how to

4   approach designation of drugs under the Affordable Care Act,

5   and SaveOn is advising health plans about those issues, even

6   if it comes up in the context of a non-Janssen drug, those

7   policy issues are going to be relevant to this case.

8           And then finally there are a number of requests

9   that grow out of a promotion video in which the SaveOn

10  program is explained in detail.  And we're seeking documents

11  about the terms that are used in those -- in that promotional

12  video, even if in the internal discussion at SaveOn, they are

13  not specifically talking about our drugs but may be

14  specifically talking about makers' drugs.

15          So in any event, those are the reasons why we think

16  we're entitled to evidence relating to non-Janssen drugs.

17          THE COURT:  Well -- I'm a little stuck on the broad

18  effect on consumers.  What's the law on that?

19          MR. SANDICK:  Sure.

20          THE COURT:  It's not a numerosity issue.  The broad

21  effect would be, in your particular circumstance, that

22  consumers were materially misled and, in fact, misled to

23  violate a contract with JJ CS, is it?  JJ CS?

24          MR. SANDICK:  That's right.

25          THE COURT:  So I don't -- why isn't that broad

1   enough?

2          MR. SANDICK:  Sure.  So we have our tortious

3   interference claim, which, as Your Honor has stated, really

4   relates to the relationship between JJHCS and its CarePath

5   patients.  The GBL claim, the New York general business law,

6   § 349 claim, is somewhat different.  And in the -- -- courts

7   have held that because JJHCS is not a consumer, to bring a

8   349 claim, we have to demonstrate harm to the public at

9   large.

10          THE COURT:  Hold on one second.  I have a minor

11   emergency.

12          MR. SANDICK:  Sure.

13      (Interruption in proceedings)

14      (Recess)

15          THE COURT:  I'm sorry, folks.

16          So continue, Mr. Sandick.  I'm sorry.

17          MR. SANDICK:  Sure.  So the GBL claim and some of

18   this is tracked from Judge Vazquez's decision earlier this

19   year on the motion to dismiss, certainly -- SaveOn's acts are

20   directed at consumers, that they are materially deceptive or

21   misleading, that JJHCS has been injured as a result.

22          But because JJHCS is bringing this claim not as a

23   consumer itself but essentially based on harm to consumers,

24   we also have to demonstrate some harm to the public at large.

25          And so our concern is that if we are not --

 1         THE COURT:  Is that what "broad" means -- public at

 2  large?  I mean, that's really what my question is because I'm

 3  unclear as to how consumers were broadly affected is defined.

 4  Is it, as I said, by numbers?  I don't -- I'm having a

 5  problem seeing the relevance.  So...

 6         MR. SANDICK:  The language I'm reading comes from a

 7  Second Circuit decision called <u>Boule v. Hutton</u>.

 8         THE COURT:  Okay.

 9         MR. SANDICK:  And I am not sure that it quantifies

10  the harm to the public at large -- you know, that you have to

11  sort of affect a certain percentage of people or a number of

12  people.

13         But the -- but in order to make clear that we are

14  not only here concerned about the harm to the consumers who

15  are on CarePath but also consumers who might be in other

16  co-pay support programs.  So, you know, we run a CarePath

17  program that helps people on certain drugs made by Janssen,

18  but there are other similar programs at virtually all the

19  manufacturers in the industry have.

20         And our point is that if there is evidence relating

21  to the decisions that are made by SaveOn relating to those

22  drugs or if there are consumer harm -- so if a patient says,

23  "I've been harmed by this.  I'd been misled.  But actually I

24  am not on CarePath.  I'm on a Pfizer program or an AbbVie

25  program" -- you know, different drug manufacturers -- our

1    understanding is that under 349 we're allowed to prove our

2    case using that evidence.  That we're not limited to evidence

3    relating to Janssen drugs -- on the 349 claim, on the --

4            THE COURT:  Okay.  I don't know that.  But what I

5    do know -- or what I think I've ascertained -- who's going to

6    speak for plaintiff? -- is that plaintiff might be willing to

7    consider turning over some defined documents.  Is that true?

8    Or more narrowly defined documents?

9            I can't hear you.

10           MR. DUNLAP:  Your Honor, can you hear me now?

11           THE COURT:  Yeah.  Yeah.  Good.  Thanks.  Go ahead.

12           MR. DUNLAP:  And I apologize for all the IT issues

13   on our end.  I hope it hasn't impacted the conference.

14           With the Court's permission, I -- we're going to be

15   splitting the argument between me and my associate,

16   Ms. Nelson.

17           THE COURT:  Yup.

18           MR. DUNLAP:  So I'm going to let her respond on

19   this issue.

20           THE COURT:  Okay.

21           Go ahead, Ms. Nelson.

22           MS. NELSON:  Yeah, thank you, Your Honor.

23           I think what you just said is correct.  So we said

24   in our response to Johnson & Johnson's January letter that we

25   would be willing to meet and confer further regarding

1  narrower scope of documents that they might need.

2         But our problem is that they've moved on this issue

3  across the board.  And it's one that permeates all of

4  discovery.  We've had this same dispute over and over and

5  over again.  So, for instance, recently we got a new set of

6  requests from them where they're asking for every single

7  communication that SaveOn had with any patient on any drug.

8         And that is going to vastly expand the scope of

9  discovery.  Just to put it in context, there are 14 Janssen

10  drugs that are on SaveOn drug lists.  There are 300 drugs in

11  total.  Janssen is one of over a hundred different

12  manufacturers that SaveOn covers.  So when we're talking

13  about these sort of issues that Mr. Sandick raised -- and I

14  think we disagree that they're relevant at all, and we can

15  talk about that, but our real concern here is that this is

16  increasing the scope of discovery by a huge factor for issues

17  that we think are frankly tangential at best.

18         So if Johnson & Johnson wants to approve a GBL

19  claim, it has to prove that something that harmed the public

20  at large also harmed it.  These other drugs, other

21  manufacturers, other patients -- they don't harm Johnson &

22  Johnson.  They're just not part of what Johnson & Johnson

23  actually has standing to bring.

24         And so, you know, it may be that there are narrower

25  categories of documents that we could agree to produce, but

 1  this across-the-board motion that we should have to produce

 2  for non-Janssen drugs in response to many, many requests,

 3  we're just concerned that this is -- this is wildly opening

 4  up discovery that is just not proportionate to the needs of

 5  the case.

 6          THE COURT:  Okay.

 7          Mr. Sandick.

 8          MR. SANDICK:  Well --

 9          THE COURT:  Mr. Dunlap, did you want to add

10  anything to that?  I don't think you need to.

11          MR. DUNLAP:  I think Ms. Nelson stated it very

12  well.

13          THE COURT:  So do I.

14          Mr. Sandick.

15          MR. SANDICK:  So two things that I wanted to point

16  out.  One is just to give an example of the specific category

17  of documents that we think would be important here would be

18  patient complaints.  If a patient says, "I felt I was

19  compelled to use SaveOn.  You know, I feel as if I was

20  frightened by being turned down for my drugs in the pharmacy

21  unless I signed up with this program, and I didn't want to do

22  it, but I felt I had no choice," even if that patient is

23  taking a non-Janssen drug, the way in which the -- the GBL

24  claim embraces those claims, the Court said in its January

25  ruling on the motion to dismiss, the statute is intentionally

|Hearing
|22-cv-02632, March 17, 2023

1    broad, applying to virtually all economic activity.  And, you

2    know, threats to health and safety are meant to be embraced

3    by the 349 claim.

4         So, you know, we're certainly open to, you know,

5    having, you know, some of our cake and not all of our cake.

6    But the idea that we would only be getting information

7    relating to patients complaining who are taking Janssen drugs

8    I think would be a significant limitation, given how the

9    court has framed the elements of the 349 claim.

10         THE COURT:  Okay.

11         MS. NELSON:  -- may I respond very briefly?

12         THE COURT:  You can, but you're ahead of the game.

13         MS. NELSON:  Okay.  You know what.  Then I will

14    stop now --

15         (Simultaneous conversation)

16         MS. NELSON:  -- agenda.

17         THE COURT:  I completely disagree with Mr. Sandick.

18    And Ms. Nelson stated very succinctly what was on my mind as

19    well.  I mean, we're opening the doors here -- there are 14

20    drugs.  And I just think that what doesn't affect Johnson &

21    Johnson is not part of this lawsuit.  So that's denied.

22         Now, if there are -- I always encourage parties to

23    meet and confer if there's something very specific and you

24    have smoke and you think you get fire from that, you can come

25    back on that, but right now, you are denied on that.

|Hearing
|22-cv-02632, March 17, 2023

1           MR. SANDICK:  Okay.  Thank you, Your Honor.

2           The -- there are only two other issues remaining, I

3    believe, on our side of the ledger.  One relates to Requests

4    For Production 43.  And this is a request for documents

5    relating to SaveOn's communications about accumulator

6    programs.  So an accumulator program is a term of art in this

7    industry.  It's a type of program that says that if you get

8    co-pay support from an entity like CarePath, those

9    co-payments don't count towards your patient deductibles.

10   And there are state laws that prohibit accumulator programs.

11          And for purposes of showing wrongful conduct under

12   our tortious interference claim where we have to show whether

13   the conduct is wrongful, for purposes under our 349 claim

14   where we have to show a public harm, to the extent that

15   there's been communication at SaveOn about whether its

16   program complies with these state laws, we do think that that

17   is relevant.

18          We also think that, you know, taking the Court's

19   prior comments to heart, this is a much more discrete

20   request.  This is not one that is likely to cause a burden,

21   in our view.  It's a very specific type of request.  If they

22   they've had internal discussions about whether their program

23   runs afoul of accumulator laws, we think it's relevant to

24   this case and should not prove a significant burden.

25          THE COURT:  That goes to -- that goes to

|Hearing
|22-cv-02632, March 17, 2023

 1  willfulness, statutory violation -- or potential alleged

 2  statutory violation?  I am not sure I'm following.

 3              MR. SANDICK:  Sure.  So I can -- just referring

 4  back to the decision on the motion to dismiss, we have to

 5  show that the action by SaveOn to interfere with the contract

 6  is intentional, malicious, wrongful, unjustified.  Those are

 7  the kinds of words that courts have used.

 8              THE COURT:  So how does a violation of alleged

 9  violation of a statute go to that?  That's -- my connection's

10  not working here.

11              MR. SANDICK:  Sure.  The violation of a state law

12  would be wrongful means, and, therefore, it would be relevant

13  to our tortious interference claim.  It would be relevant to

14  our 349 claim because, again, as we discussed a few moments

15  ago, it would be relevant to show -- and harm to the public

16  at large, if the program internally were one that SaveOn knew

17  ran up against the state prohibitions that exist in many

18  states on accumulator programs.

19              THE COURT:  Ms. Nelson, are you going to take this

20  one?

21              MS. NELSON:  I am.

22              THE COURT:  Go ahead.

23              MS. NELSON:  So I guess I want to say two things

24  and keep this brief.

25              First off, I think it's important for the Court to

1  understand what an accumulator program is, how it's different

2  from SaveOn, and why these state statutes exist.

3        So Mr. Sandick correctly said, under an accumulator

4  program, a plan will refuse to count co-assistance program --

5  payments that are made from a manufacturer towards a

6  patient's out-of-pocket maximum.

7        And so what will happen is that if a patient has a

8  somewhat high co-pay, they will go, they will fill their

9  drug, and at the beginning of the year, co-pay assistance

10  will cover it.  And so they won't pay anything, or they'll

11  pay a very small amount.

12        And then somewhere in the middle of the year, the

13  patient will go to try to fill their drug; they've -- co-pay

14  assistance will have run out; they'll have used all that

15  money; and they won't have hit their out-of-pocket maximum

16  because the co-pay assistance haven't been counting towards

17  it.  And so they're told, "Now you have to pay your co-pay."

18  And it may be very high.  And that causes a huge problem for

19  consumers.  That's why states have intervened to try to

20  protect against this issue.

21        And that's now what happens on SaveOn.  So the way

22  that plans that are advised by SaveOn set up their benefits,

23  for the first part of the year, co-pay assistance covers a

24  big part of the co-pay, and the minute co-pay assistance is

25  extinguished, the plan kicks in.  The plan covers everything.

|Hearing
|22-cv-02632, March 17, 2023

 1          So this harm that these statutes protect against

 2   just doesn't happen on SaveOn's plans.  So I just want to

 3   make that very clear.  It's not that there's nothing that

 4   accumulators and SaveOn have in common.  They do have some

 5   things in common.  But this big harm to the public just

 6   doesn't happen on SaveOn plans.

 7          So that's one piece of it.

 8          The other piece of it is that Johnson & Johnson's

 9   complaint talks about these statutes.  It doesn't say

10   anything about SaveOn violating the statutes, and it doesn't

11   say anything about how these statutes connect to the elements

12   of its claim.  So, for instance, on the GBL claim, they say

13   SaveOn harms the public by causing confusion.  We either harm

14   the public by causing confusion, or we don't.  But whether we

15   violate some other statute -- which we don't think we do --

16   but it's just completely tangential.

17          And I'd like to point out that Mr. Sandick

18   previewed at the beginning of this conference, we have come

19   back to Johnson & Johnson, and we've agreed to produce huge

20   numbers of documents.  I think he even said, it satisfied

21   many of the requests that were previously pending before the

22   Court.

23          But at some point enough is enough.  And this case

24   needs to be about the actual claims that Johnson & Johnson

25   brought.  If there are these other statutes, there are other

1   parties that have the right to enforce them, but they're not

2   what Johnson & Johnson claims.  And so we'd really just want

3   to say, at some point, the line needs to be drawn.  And we

4   don't see how these are potentially relevant at all to the

5   claims that Johnson & Johnson actually brought.

6           THE COURT:  Okay.

7           Mr. Sandick, anything else?

8           MR. SANDICK:  Yeah, just one point.  In

9   Ms. Nelson's explanation of the SaveOn program, one thing

10  that is significant that she omitted which does make SaveOn

11  in many respects similar or, in fact, an accumulator program

12  is that, while that an individual patient will not pay for

13  that particular drug, again, if the SaveOn program works as

14  it's been described, that patient will still have to meet

15  their annual deductible for their and their family's other

16  healthcare needs.  So if they're on a second medication and

17  they got co-pay assistance, in the absence of SaveOn, that

18  patient would not have to pay anything further for their

19  annual deductible.  It would have been satisfied because the

20  payor has already received payments in this case from

21  CarePath.

22          So in our view, SaveOn does share many of the

23  salient aspects of an accumulator program.  And if they have

24  internal discussions about whether they, in fact, are

25  complying with those laws, it seems to us it goes directly to

 1  wrongful means under our first claim and harm to the public

 2  under our second claim.

 3          But that's all I have to say.

 4          THE COURT:  Ms. Nelson, anything else?

 5          MS. NELSON:  Yes, I just want to say very

 6  briefly -- this is a little bit of a side -- I don't want to

 7  spend too much time on it.

 8          But it is true that -- it is true that SaveOn, the

 9  way that SaveOn plans operate, they don't let manufacturer

10  co-pay assistance program funds accumulate towards a

11  patient's out-of-pocket deductible.  But that's just the same

12  as every other patient on the plan who's not on specialty

13  drugs.  Right?  If you have two patients on a plan -- one's

14  on specialty drugs; one's not -- if either of them have to

15  take their kid to the doctor for an ear infection, they both

16  will pay their co-pay the; right?  That's just how this

17  works.

18          We don't really think that's a public harm treating

19  patients on specialty drugs just like every other patient on

20  their plan.  And this similarity that has been pointed out is

21  just really beside the point.

22          The real issue with these statutes is that patients

23  suddenly are having to pay huge amounts for their specialty

24  drugs.  And that's what doesn't happen on SaveOn.

25          So I just wanted to be very clear about that.

1          THE COURT:  Okay.  I -- Mr. Sandick, again, I'm

2   going to rule against you.  I don't see the relevance at all.

3   And it's too much.

4          MR. SANDICK:  Okay.  Thank you, Your Honor.

5          THE COURT:  Mr. Dunlap, are you going to do the

6   order?

7          MR. DUNLAP:  We will.

8          I think Mr. Sandick might have one more issue, and

9   then we have a few --

10         THE COURT:  He does.  But I'm just preparing you to

11  that you make sure you take good notes.

12         MR. SANDICK:  The final issue relates to

13  Request 52.  This is in section E of our specific issues

14  letter.

15         SaveOn's a private company.  We have no visibility

16  into the finances of the company.  Has it profited from

17  CarePath and other co-pay support programs?  What has it done

18  within?  Is a damages award collectible?  These kinds of

19  things are all, you know -- not known to us because of that.

20         And so we're seeking some very basic financial

21  statement disclosure.

22         That's all I have to say.

23         THE COURT:  That's good.

24         Denied without prejudice.

25         MR. SANDICK:  Okay.

1              THE COURT:  Oh, Ms. Nelson.  I'm sorry.

2              Did you want to say anything?

3              MS. NELSON:  You know, it was actually Mr. Dunlap

4    who was going to handle that.

5              THE COURT:  No.  I don't want to hear from him.

6    He's doing the order.

7              MS. NELSON:  Yeah, we'll be fine.  Thank you.

8              THE COURT:  All right.  Now, we get to -- I guess

9    your requests are still open?

10             MR. DUNLAP:  Your Honor, we have three items we're

11   moving on.

12             THE COURT:  Go ahead.

13             MR. DUNLAP:  And given how the day is going, I'm

14   tempted to let Ms. Nelson handle this one too.  But I'm going

15   to -- I'm going to barrel ahead.

16             The first issue is actually sort of a group of

17   issues, and we began to talk about this at the end of the

18   last conference, which is we're seeking information regarding

19   the historical development, administration, to marketing and

20   financing of Johnson & Johnson's co-pay assistance programs,

21   including CarePath.  And also historical information,

22   financial information regarding the Janssen drugs that those

23   co-pay assistance programs are designed to cover.  So I'd

24   just like to talk about why this is relevant and then why the

25   arguments we've heard from Johnson & Johnson resisting

1    production, we don't think wash here.

2              So in terms of relevance, as you know, Johnson &

3    Johnson sells specialty drugs, and for members of private

4    health plans, most of those costs are paid by the plan, but

5    then the member's responsible for the co-pay or co-insurance.

6              Johnson & Johnson set up co-pay assistance to pay

7    some of those members' co-pays for them.  And the plans

8    advised by SaveOn reacted by raising co-pay amounts.  And

9    under the terms of the plan, that means Johnson & Johnson is

10   paying more in the co-pay assistance up to the budget it has

11   set on its own.  The plan is paying a little bit less, but

12   the patient, as Ms. Nelson said, is paying nothing.

13             So we want to understand the finances and the

14   origins of CarePath and/or related Janssen drugs.  So why is

15   that relevant?  First, Johnson & Johnson says the co-pay

16   assistance programs, including CarePath, are designed to

17   benefit patients.  That's right at the beginning of their

18   complaint.  But we don't believe that's true.  We believe

19   they are designed to benefit Johnson & Johnson.  Essentially,

20   Johnson & Johnson is paying patients to take its drugs.

21   That's what these programs are.

22             And you don't just have to take it from me.  The

23   Department of Health and Human Services in the federal payor

24   context, has called this a kickback under the antikickback

25   statute.  And the Second Circuit has agreed.

 1          And by making -- by paying this co-pay or large

 2   portion of it for the patient, you make the patient

 3   price-insensitive, which means Johnson & Johnson can then go

 4   increase the cost of the drugs that it is selling, not

 5   because it's suddenly more expensive to produce the drugs,

 6   not because they're more effective, but just so it can boost

 7   its own profits.  And, of course, those costs are borne by

 8   the plans.

 9          We don't think that this is for members' benefits,

10   as they said.

11          Second, Johnson & Johnson says, well, by advising

12   plans to change their benefits in this way, SaveOn is

13   threatening the financial viability of co-pay assistance

14   programs like CarePath.  And they say that's one of the key

15   public harms that they allege in their complaint, if you look

16   at paragraph 114 of their complaint.

17          But we just don't think that's true.  We think as a

18   result of what SaveOn and its clients do, more people sign up

19   for CarePath, more people buy Janssen drugs, more people fill

20   their Janssen drugs more often.

21          And you have to remember for each dollar that

22   Johnson & Johnson spends in co-pay assistance, it makes a

23   huge return on investment in terms of selling more drugs.

24   Some of these drugs can cost a quarter of a million dollars a

25   year to fill.  And so if Johnson & Johnson can spend a few

1  thousand dollars to induce a new patient to buy that drug, it

2  has done very, very well.

3         And we believe that they are making more money from

4  selling Janssen drugs as a result of what SaveOn is doing.

5  And so the SaveOn program, as they call it, can't be a threat

6  to CarePath's financial viability.  And, in fact, we have

7  alleged an affirmative defense where we don't think they're

8  injured at all by the conduct they've described.

9         Third, they say that what SaveOn is doing increases

10  healthcare costs, which, again, they say is a public harm.

11  We disagree.  We think it's actually what they're doing that

12  increases co-pay costs, making patients price-insensitive so

13  they can jack up the price of their drugs.  In fact, we think

14  it would be irresponsible for these health plans that SaveOn

15  advises, who, let us not forget, are fiduciaries and have a

16  duty under the law to maximize plan assets to try and take

17  advantage of these funds that Johnson & Johnson is making

18  voluntarily available.

19         Fourth -- and there are only five of these points.

20  Fourth, they're seeking a permanent injunction here.  They

21  want to shut down these operations which would basically shut

22  down SaveOn's business.  But we intend to show under the

23  permanent injunction standard that they have not suffered any

24  real injury and that this injunction would not serve the

25  public interests.  And we have an affirmative defense on that

1   point.

2           And then finally -- and this is absolutely

3   critical -- Johnson & Johnson alleges that its damages --

4   right? -- the way stated on his cause of damages by causing

5   it to pay out more in co-pay assistance under these new plan

6   terms than it did under the old plan terms.

7           But what they don't say is that by doing this, it

8   actually causes Janssen to sell more drugs and to get more

9   money in from the drug sales.  For every new patient that

10  SaveOn steers toward CarePath and taking Janssen drugs that

11  Johnson & Johnson would not have signed up on its own, they

12  pay a little bit more in co-pay assistance for that patient,

13  but they make a lot more in terms of selling the drugs.

14          And so we don't think that if you average all this

15  out, Johnson & Johnson has suffered any financial harm, or if

16  they have, it's certainly a lot less than what they are

17  alleging.  We need the data that we're talking about in order

18  to test this.  This is critical to defeating Johnson &

19  Johnson's damages allegations.  And we actually have an

20  affirmative defense on this as well.

21          Now, the objections we've heard from Johnson &

22  Johnson, you -- they take various flavors, but they all boil

23  down to asserting burden; at least we think the main ones do.

24  They say, oh, they've already agreed to produce a large

25  number of documents, including about their injuries.  But

 1    they've given us a hard "no" on the type of documents that

 2    we're talking about here.  They're glad to give us documents

 3    about how much CarePath has spent.  But they're not

 4    interested in giving us documents about how much more money

 5    Janssen has made as a result of what we're doing.  They don't

 6    want to give us documents about how they set the CarePath

 7    budgets going back historically, the return on investment or

 8    the link between the drug prices and the CarePath program.

 9             They say, "Well, you're asking for a huge number of

10    documents -- you know, every document across this huge

11    company."

12             We're not.  We're looking for relevant documents on

13    these topics.  And we think this is a bit of a red herring.

14    It's for any request in any case -- at least any case I've

15    ever done, if you order that these documents are relevant and

16    compel them to produce, the parties will meet and confer.

17    We'll talk about relevant custodians.  We'll talk about

18    relevant document sources.  We'll try to agree.  And if we

19    can't agree on the protocol, we'll come back, and you can

20    resolve that.

21             And then finally, they say, "Well, goodness,

22    SaveOn's only been in business since 2017, but we want

23    documents going back to 2009," and doesn't that increase

24    their burden as well?

25             But we're asking to go back to that time because

 1  that's when we understand the co-pay assistance programs

 2  started.  They may not have been called CarePath at that

 3  point, but that is when we understand the programs started.

 4          And you want to understand the purpose of a

 5  program, it helps to go back to when it began so you can see

 6  what was going on.  And then we want to see over those years

 7  what were the budgets set at; what was the actual return on

 8  investment; what were the corresponding drug prices that they

 9  set.

10          And then we want to compare that information from

11  when the program started until 2017 with what happened after

12  SaveOn came on the scene.  And then we will have a basis to

13  say, well, what have the actual impact of SaveOn and the

14  plans that it advises been on CarePath and on sales of

15  Janssen drugs.  We need to be able to do that comparison, and

16  for that, we need the historical data.

17          And, again, if they're worried about that going

18  back too far will cause a burden, that's why we can meet and

19  confer about custodians and document sources and all the rest

20  of that.

21          So, again, we view these documents as absolutely

22  critical to our defense.  And we're asking you to rule today

23  that they're relevant and that Johnson & Johnson should

24  produce them.

25          MR. SANDICK:  Your Honor, we have three principal

1  categories of objection to this request -- to these requests:

2  Relevance, burden, and the fact that we have already agreed

3  to provide what they, in fact, need to make out these

4  defenses.  They say documents -- as, Mr. Dunlap, I suppose,

5  has acknowledged -- going back to 2009, eight years before

6  the time frame of the allegations in the complaint.  SaveOn

7  did not exist until 2017.  CarePath in its current form did

8  not exist until 2016.  And all of this is in service of

9  things that are irrelevant and not tethered to the complaint

10 in any way.

11         What they want to do is make this into a case about

12 the nature of drug pricing, either at Janssen or more broadly

13 in the American economy, but it has nothing to do with this

14 case.

15         The question in this case is not is CarePath good?

16 The question is does SaveOn harm the public when it deceives

17 customers?  Does SaveOn tortiously interfere with a contract

18 between CarePath and its patients?  They say that if

19 Johnson & Johnson makes money on developing and selling

20 therapies, that essentially they are privileged to interfere

21 with our contract or to mislead consumers.  And it just

22 simply is not a defense -- not in this court or any other

23 court --

24         THE COURT:  How do they show no injury?

25         MR. SANDICK:  Well, they can show no injury is

1   that -- well, first of all, I am not sure that they can show

2   it.  But the documents that we have already agreed to provide

3   are all documents relating to at the harm caused by SaveOn.

4   All of the data that forms the basis for the allegations in

5   our complaint, co-pay assistance budget, actual and

6   projected, for all patients involved in CarePath.  They're

7   getting enrollment information, how much was offered and paid

8   to each patient, what drugs they took for 2016 to 2022.  Not

9   back to 2009.  They are also getting documents from Janssen

10  which specifically address the issue of cost.  They're

11  getting documents to show how JJHCS determines the level of

12  support.

13          The fact is that, as they'll see when they review

14  the documents, that the key -- the key metric in looking at

15  price and not the so-called list price, but the -- what is

16  the net price, what do health plans actually pay.  And

17  Johnson & Johnson pays, as we will disclose to them in

18  discovery, pays literally billions of dollars in discounts

19  and rebates to payors, to health plans so that the net prices

20  that patients actually pay or that health plans actually pay

21  are far, far less than the list prices that SaveOn quotes in

22  its papers and cites in its answer.

23          The breadth of their request, again, is striking:

24  From 2009 to the present, for each year, all documents and

25  communications regarding the basis for Janssen's decision to

1   set price of its drugs, including all documents relating to

2   labor costs, manufacturing costs.

3           Johnson & Johnson throughout the company has

4   140,000 employees, 200 affiliates, many of which are involved

5   in the manufacture of drugs, the creation of drugs, the

6   decisions about how to price drugs.  And, according to

7   SaveOn, all of that is necessary, and yet they haven't tied

8   it to anything in the complaint.  It does not create a basis

9   to breach a contract or to induce someone to breach a

10  contract.  They seek data, they've asked -- they have one

11  request, Request 28 where they want data by every single

12  patient who has taken any Janssen drug going back to 2009,

13  every single fill.  So they come to court and try to act as

14  if these requests are reasonable modest requests.  But, in

15  fact, these are requests that go in terms of time frame and

16  the scope of what they're seeking and the reach throughout

17  the company, the requests are punitive in and of themselves.

18  And they have not made a case for why these drugs are

19  necessary to have a defense against the specific claims here.

20  They are interested in talking about the price of drugs being

21  too high, but that is neither here nor there.  That does not

22  give them a basis to interfere with contracts or to violate

23  the New York general business law.

24          THE COURT:  My focus really is in defending injury.

25  That's my focus.

1          So what I think, Mr. Dunlap and Ms. Nelson, this is

2    a premature request.  I am not going to rule on it.  I'll

3    hear further argument once Mr. Sandick produces what he said

4    he's going to produce and we can get a little more specific.

5          I will tell you that I think it's an awfully broad

6    not just temporally but otherwise broad request.  I

7    understand the background and the basis for the request, but

8    as I said, not -- it's premature.  Let's see what Mr. Sandick

9    produces.  And let's see if you can modify and streamline

10   your arguments to me and your requests after that.

11         MR. DUNLAP:  Your Honor, may I make -- we

12   understand your ruling.  I would just like to --

13         THE COURT:  Go ahead.  Sure.

14         MR. DUNLAP:  -- point on the record, which is I

15   don't believe this is a situation where, well, if they

16   produce enough of something, maybe we don't need something

17   else.  They've drawn a categorical line here that they are

18   not going to give us historical information about the

19   budgets, the return on investment.  They're not going to give

20   us anything about why they set up the drug prices that these

21   programs cover, the way that they do.

22         So we're glad to look at whatever Johnson & Johnson

23   produces.  We just think we're going to be back here and

24   however long it takes --

25         (Simultaneous conversation)

1          MR. DUNLAP:  -- arguments to you.

2          And what he said he'll produce is stuff relating to

3    their allegations and their allegations of harm.  But we --

4    what we want are things relevant to the benefits and how it

5    shows that they weren't actually harmed and that they don't

6    have any actual damages.

7          We are glad to wait, if that's what you say.

8          But I just want to be very clear now.

9          THE COURT:  -- here.

10         MR. DUNLAP:  Because I know you're concerned about

11   moving the case.

12         THE COURT:  I am.  And I understand your arguments

13   as well.  And that's what I asked Mr. Sandick is aren't you

14   entitled to prove that there's no injury -- because that's

15   really what I think this boils down to.  But I, number one,

16   think temporally it's way out of line.  You can meet and

17   confer and see if there's anything else in the interim, but I

18   will allow you to renew that request after Mr. Sandick

19   produces everything he says he's going to produce.

20         And I'm just hoping, Mr. Dunlap, from that, that

21   maybe it can be a more targeted request.

22         MR. DUNLAP:  Understood, Your Honor.

23         May I make one request that may help with what you

24   just said, which is if you could ask Mr. Sandick to

25   prioritize production of documents relating to what they call

 1   their allegations of harm and all the rest of it so that we

 2   can make a determination earlier and come back to you with

 3   specifics based on the record earlier about this, that might

 4   help moved the issue along.

 5          THE COURT:  That would help me as well.  So -- to

 6   move the case, Mr. Sandick.

 7          So if you could prioritize that and hopefully we

 8   can refine those additional requests through your initial

 9   production or your completed production of that information.

10          And I understand that it may not be dispositive --

11   that may not be dispositive of the issue at hand.  And I

12   think I understand the issue at hand.  So I am not

13   foreclosing it, but I'd like to take this a little more

14   slowly than Mr. Dunlap would.

15          MR. SANDICK:  We will do as Your Honor has

16   requested, of course.

17          THE COURT:  Okay.  Thank you.

18          MR. DUNLAP:  Your Honor, we have two other issues.

19   And with the spirit of the day, I'm going to let Ms. Nelson

20   take it.

21          THE COURT:  Why is that the spirit of the day?

22          MR. DUNLAP:  I was just saying that she's -- so far

23   she's done very well and I've done okay.

24          So I'm hoping -- I'm hoping that, you know, that

25   streak continues.

1          THE COURT:  Okay.

2          Go ahead, Ms. Nelson.

3          MS. NELSON:  Sorry.  I wanted to make sure we were

4    muted so we didn't have any more audio issues.

5          So I think the next two issues can be very quick.

6          We asked Johnson & Johnson to produce all documents

7    concerning the drafting and the meaning of the CarePath terms

8    and conditions.  Those are obviously critical documents for

9    this case.  They've accused us of tortiously interfering, of

10   inducing patients to breach their contracts.  And so if there

11   is no breach, there is no tortious interference.  That is a

12   complete defense.

13         And we need this sort of robust set of documents

14   about the meaning of the terms and conditions so that we can

15   make arguments about what those terms actually mean and why

16   patients didn't breach them when they signed up for CarePath.

17         So -- and this is actually something that Judge

18   Vazquez said in his motion to dismiss, said specifically,

19   that the interpretation of the contract would be resolved

20   after discovery.

21         So we just think these are core documents.  And in

22   a case involving a breach of contract, parties produce

23   documents that go to the meaning of the contract.  That's how

24   you get extrinsic evidence.  That's how you make, you know,

25   these types of arguments about ambiguous contract terms.

1          So Johnson & Johnson made an offer to produce some

2    documents.  But there are still a number of documents that

3    they're holding back.  So they're holding back documents from

4    before 2017.  And, again, we have the same issue where they

5    say our request goes back too far, and they shouldn't have to

6    produce documents from before the year when SaveOn came into

7    existence.

8          I think the problem with this argument is that

9    SaveOn may have come into existence in 2017, but these

10   CarePath terms and conditions certainly predated SaveOn.  And

11   we don't know exactly when they were drafted.  Right?

12   Mr. Sandick said CarePath in its current form came into

13   existence in 2016.  I don't know what "in its current form"

14   means.  They haven't provided us with any more information.

15   They haven't told us -- you know, these terms and conditions

16   were actually drafted in 2016.  We don't know.

17         But I think it's very reasonable for us to say we

18   need documents that go back to when you actually drafted the

19   terms and conditions themselves.  So this time limitation is

20   sort of an artificial one.  And it's severely prejudicing

21   SaveOn because we don't have the documents that go back.

22         And I think this leads to one other point which is

23   that this is a contract of adhesion; right?  Johnson &

24   Johnson drafted these terms.  They put them out in the world.

25   It's not a breach of contract case where both sides

|Hearing
|22-cv-02632, March 17, 2023

 1   negotiated and we have some access to documents and they have

 2   some.  They have all the documents.  So if we don't get this

 3   extrinsic evidence from them, we're just not getting it.  And

 4   we won't be able to make sort of a robust set of arguments

 5   about what these terms actually mean.

 6           Another set of category that they seem to be

 7   holding back would be -- of performance.  So they've offered

 8   to give us some documents about the drafting.  But what also

 9   matters is how Johnson & Johnson actually treated these terms

10   and conditions over years.  So SaveOn existed for many years,

11   and Johnson & Johnson never said anything to the effect of

12   "We think you're breaching our terms and conditions."

13           We think how they interpreted their own contract

14   over that period of time and even before SaveOn is completely

15   relevant to the interpretation of these terms and that we

16   need those documents.

17           And the last thing I would say is, you know, they

18   offered to produce documents about one of the terms in the

19   contract.  But when parties make arguments about the meaning

20   of contract terms, they usually refer to the contract as a

21   whole.  There are sort of important structural arguments that

22   you can make.  Sometimes if a term has been deleted or

23   changed, you can use that to draw inferences about the

24   meanings of other terms.

25           We can't figure out what those terms unless we have

1    the full history.

2            And so on this one, I certainly Your Honor's

3    concern about the time frame with respect to the other

4    requests, and we'll deal with this.  But this is a much

5    more -- request, and, frankly, it's at the heart of the case.

6            And so we would ask Your Honor to grant our motion

7    to compel, that they should produce documents at least back

8    to when these terms and conditions were first drafted.  And

9    they should give us information about when they were drafted

10   so that we can work together and actually form, you know, a

11   search protocol that will get us the documents we need.

12           MR. SANDICK:  Your Honor.

13           THE COURT:  Yes.

14           MR. SANDICK:  I want to make it very clear to the

15   Court that we have agreed already to make a substantial

16   production of documents on this issue.

17           First of all, with respect to drafting history, we

18   have agreed to go back to 2017.  The terms and conditions

19   change all the time, as the SaveOn answer points out, for two

20   of the drugs, Stelara and Tremfya, they changed just within

21   the past 18 months.  So they're going to get documents

22   relating to all drafting history going back to 2017 to when

23   SaveOn began its program.  And we're doing that voluntarily.

24   That's not -- that's something we agreed to prior to coming

25   here this morning, Your Honor.

1           Secondly --

2           THE COURT:  But let me just interrupt you because

3    you did make a point -- and I picked up on it as well, maybe

4    you could explain, you said in its iteration now.

5           MR. SANDICK:  Sure.

6           THE COURT:  What was the precedent?

7           MR. SANDICK:  Sure.  Johnson & Johnson, through

8    other means, has had some forms of co-pay support in the

9    past.  The CarePath program that we're talking about in this

10   case was established in 2016 --

11          THE COURT:  Right.

12          MR. SANDICK:  -- by patient assistance across a

13   broad number of specialty drugs and other drugs as well.

14   CarePath also is a -- it's essentially a brand name.

15   CarePath does lots of things beyond co-pay support.  So, for

16   instance, CarePath has a nurse navigator program so that

17   patients who are on Janssen drugs can call in and get advice

18   from medical personnel to answer their questions:  Can I take

19   this drug with that drug?  Or if I take this drug and miss a

20   dose, what do I do?  So CarePath does lots of other things.

21          And it's a -- it's kind of name within the

22   Johnson & Johnson company that does this -- that does this

23   work.

24          So in 2016, CarePath came together in its current

25   form to be the -- the mechanism or the name for the mechanism

1    of providing CarePath support for a set of specialty drugs.

2    That's what we meant --

3         (Simultaneous conversation)

4         MR. SANDICK:  -- CarePath may have been used prior

5    to 2016 at Johnson & Johnson to mean other things.

6         But what we are focused on here is the CarePath

7    program that's existed during the time when SaveOn has

8    existed.  And that's --

9         (Simultaneous conversation)

10        THE COURT:  So -- anything that preceded the

11   current use of the name CarePath, has nothing to do with

12   CarePath or with the formulation of any contracts or terms of

13   contracts?  I mean, I'm --

14        MR. SANDICK:  That's -- I mean, yes; that's our

15   view.

16        But, number two --

17        THE COURT:  I want to know if that's the fact.

18        MR. SANDICK:  That -- yes.  The CarePath terms and

19   conditions that we're talking about that are relevant in this

20   case for the time period we're talking about were ones that

21   came into being after that.

22        There may have been other terms and conditions with

23   other programs in the history of co-pay assistance at

24   Johnson & Johnson, but that is a sweeping expansion of the

25   case from beyond the program and the harms of the program

1  that is the issue of the complaint to essentially like a term

2  paper about the history of all co-pay support ever at

3  Johnson & Johnson.

4          And that would dramatically expand the scope of

5  discovery into time periods and places that are not

6  relevant --

7          THE COURT:  I don't know that that's what they're

8  looking for.  I think they're looking to interpret, maybe

9  from an historical standpoint, the terms.

10          MS. NELSON:  Your Honor --

11          THE COURT:  Do I have this wrong?  I mean...

12          MS. NELSON:  No.  You have it completely right.

13          So if CarePath --

14          THE COURT:  You think you tell me I'm right, you

15  think I'm going to rule in your favor.

16          MS. NELSON:  No.  No.  No.  This is true.

17          I mean, I think the point about a term paper is

18  really missing the point.

19          If CarePath came into existence in 2016 and when it

20  came into existence, someone at Johnson & Johnson said, "Hey,

21  we have these terms and conditions from our old program.

22  Let's use those again."

23          THE COURT:  Right.  That's what I'm trying to get

24  at.  That's what I'm trying to get at.

25          But Mr. Dunlap seemed to say -- or represent that

1    they're not related.

2              I'm really trying to get a fine point on that.

3              MR. SANDICK:  Yeah, I mean, what -- what I would

4    propose is that we make the production that we've already

5    committed to make.  If it doesn't answer all of their

6    questions, they can always come back and ask for additional

7    documents.

8              But to, as an initial matter, go so far in time

9    behind to look at programs that are not the Johnson & Johnson

10   program that's at issue in this case, seems like an

11   unwarranted expansion of discovery --

12        (Simultaneous conversation)

13             THE COURT:  But what if -- what if the requests

14   were narrowed -- hmmm, then you would have to determine

15   relevance.  I mean, anything related or relevant to the

16   formation of the current CarePath.  In order -- I do believe

17   in order to interpret terms, there has to be a background.

18   It can't -- there's got to be some historical, as I said -- I

19   don't know what you can provide or what -- I'm willing to

20   limit this, but I do think that in order to see the evolution

21   of terms and the reason therefor, it's necessary to give some

22   amount of background.  I am not going to back to, you know,

23   CarePath 1 in 1920, but...

24             MR. SANDICK:  Well, Your Honor, and that -- and we

25   agree that there is a reason to go back, and we are offering

1  and have already promised to go back to 2017 to the present

2  for these terms.  And if doesn't answer all of their

3  questions, they can always come back for more.

4       We are also offering to give documents discussing

5  the meaning of the only term in this contract that is under

6  dispute at all, which is the "other offer" language, that at

7  the end, the final term states that this program offer may

8  not be used -- the program offer being CarePath -- may not be

9  used with any other coupon, discount, prescription savings

10  card, free trial or other offer.

11       And that's the -- that's the key --

12      (Simultaneous conversation)

13       THE COURT:  Right.  I get that.  I get that --

14      (Simultaneous conversation)

15       MR. SANDICK:  In the sense that there are other

16  documents on this issue, we are willing to produce documents

17  about how people within our client interpreted that language.

18       The other -- to give a meaning for, you know, sort

19  of -- I've forgotten the framing that Ms. Nelson used, but

20  sort of force of performance understanding for all of these

21  terms would result in nothing more than meaningless burden.

22  So, for instance, one term says the program is only for

23  people age 6 or older.  Why is that relevant here?  Another

24  one says the program is only for people using private health

25  insurance.  As Mr. Dunlap's already explained, people on

1  Medicare and Medicaid aren't permitted by the terms of their

2  program, their health program, Medicare and Medicaid, to

3  participate.

4         So to go back and produce all of the documents on

5  all of these issues, it's just -- it's just an unwarranted

6  burden for no relevant documents where we've already agreed

7  to make a substantial production.  This one I -- you know, on

8  the last issue, I think Mr. Dunlap is right that there are

9  some real differences of principle.

10        Here, we've actually agreed to make a significant

11  production on this issue, and yet we're still trying to

12  prevent it from being CarePath in 1920.

13        THE COURT:  Okay.  Okay.

14        So I'm going to hold off, as Mr. Sandick said,

15  Mr. Dunlap and Ms. Nelson, and let's see what he produces.

16  And, again, very often, after initial productions, there are

17  more tailored requests, and perhaps that will happen and ease

18  the burden of all of us as well.

19        But I think Mr. Sandick's correct that let him do

20  this production.  If, in fact, there's again, smoke leading

21  to fire or something that -- I am not even talking about

22  burden right now, honestly.  I'm really targeting on

23  relevance and trying to again streamline the issues in the

24  case.

25        So that will be denied without prejudice subject to

 1   renewal after production, the same as the last request.

 2           MS. NELSON:  I understand, Your Honor.  And I

 3   appreciate it.

 4           THE COURT:  I really need to know, you know, to

 5   understand more specifically -- let's see what he produces.

 6   And that will help me as well.

 7           MS. NELSON:  Two things I'd just like to state very

 8   briefly.

 9           THE COURT:  Sure.

10           MS. NELSON:  One, we would ask that Mr. Sandick

11   prioritize his production as well for the same reasons as

12   before.

13           And, second, part of the reason that we haven't

14   been able to tailor our request is because Johnson & Johnson

15   won't tell us any information about the terms and conditions

16   before 2017, sometimes 2016.  So --

17           THE COURT:  Yeah.

18           MS. NELSON:  -- I just want to be very clear, we

19   sort of hit a roadblock that's inhibited our ability to try

20   to narrow this and really get what we want.  But we are not

21   looking for every document about completely irrelevant terms

22   and conditions.  That's really not the goal here.

23           So we will look at what he produces, and we will

24   hopefully come back --

25       (Simultaneous conversation)

 1          THE COURT:  Well, I think that -- I think that you

 2   all need to talk to each other after the production because I

 3   am not sure you're speaking the same language.  I understand

 4   that you're entitled to -- and I agree -- to know the

 5   evolution of the terms not limited to what Mr. Sandick says,

 6   necessarily -- or that little portion -- because that doesn't

 7   always tell the whole story.

 8          So let's see what he produces, and let's -- and you

 9   all talk after that.  And if you specifically say, "Look, I

10   need this because I need to understand how this happened,"

11   maybe Mr. Sandick will agree?

12          MR. SANDICK:  We're happy to listen and maybe to

13   agree.  Who knows?  I don't want to foreclose that

14   possibility, and I think the Court's emphasis on meet and

15   confer is -- you know, is one we recognize and want to honor.

16          THE COURT:  Okay.  There's another, Ms. Nelson;

17   right?  Or.

18          MS. NELSON:  One last issue.

19          THE COURT:  Go ahead.

20          MS. NELSON:  And this is a fairly narrow one.

21          So the parties agree that in 2017 or in 2018,

22   Johnson & Johnson actually negotiated or considered using

23   SaveOn as fee services for its own health plan.  And

24   Mr. Sandick and Johnson & Johnson in their last letter, they

25   admitted that this happened.

 1        Now, Johnson & Johnson says we rejected it out of

 2   hand.  It was presented to us, and we said, "No way."

 3        We have a different understanding of what actually

 4   happened, that there were, in fact, some negotiations and

 5   back-and-forth and that it is actually a different part of

 6   Johnson & Johnson that came and sort of shut them down.

 7        But if Johnson & Johnson itself as an employer, a

 8   sponsor of an employer health plan, considered using SaveOn

 9   services and gave some thought to -- us -- would this benefit

10   our employees?  You know, is this bad for the public? --

11   that is both extremely important evidence going to their

12   claims of public harm.  It also goes directly to their

13   credibility.  And this isn't a fishing expedition.  This

14   isn't a -- we made this up and we think maybe this happened.

15        Everyone agreed that this happened.  And it's clear

16   from what Johnson & Johnson put in response to our letter

17   that they know this happened.  They know when it happened.

18   They know who was involved.  They have all the information

19   that one would need to duo search.

20        And we see this as a very narrow but extremely

21   pertinent category of documents.  And we're talking about

22   2017 to 2018.  This isn't even, you know, in the realm of

23   sort of --

24        THE COURT:  But they rejected you.

25        MS. NELSON:  Yes.  But why they rejected us.  If

1  they rejected us not because they thought we were -- you

2  know, what we do is bad for patients but because somebody

3  from marketing came in and said, "Oh, no, no, this is a bad

4  look" -- right?  The reasons and why, frankly, if they looked

5  at our documents and they said, "Wow, this is a terrible

6  program for patients, we can't possibly sign up for this," I

7  don't see why Mr. Sandick would be opposed to producing that

8  right?

9          But what we think may have happened is they looked

10  at our documents and said there are some benefits to this

11  program.

12          And if those exist, we would like to see them.

13          THE COURT:  So in other words, your argument to a

14  finder of fact would be even plaintiff saw that we had some

15  benefits.  So why are they suing us?  Hmmm.

16          MS. NELSON:  I mean, I think it would be even

17  plaintiffs saw that we had some benefits.  Maybe plaintiffs

18  saw that this is something that is helpful to patients.

19          And that undermines their allegations now that what

20  we do out in the world harms patient.  I think it also just

21  goes directly to the credibility of their witnesses.

22          THE COURT:  I think you're stretching it.  I really

23  think that's a stretch.  I don't even know what -- would

24  produce, but if they considered your program and rejected

25  you, I know you're saying, oh, well, it's incredible that

 1   they're suing us when they even considered us.

 2           That --

 3       (Simultaneous conversation)

 4           MS. NELSON:  I realize I'm in a hole, Your Honor.

 5   So I am not going to try to dig myself deeper --

 6           THE COURT:  Can -- I allow everybody to try.

 7           MS. NELSON:  I mean, one thing I would like to say.

 8   From our perspective, what we understand is that the reason

 9   that they've rejected us is not because they decided this was

10   a bad program but because they actually -- somebody else

11   actually came in and said, for optics reasons, you can't do

12   this.

13           So we don't know.  We don't know.  Maybe they don't

14   have any internal documents that say, actually, SaveOn really

15   does do a great thing for patients, making sure that they

16   always pay nothing for their drugs.  Right?

17           But if those documents exist, they do go to

18   credibility.  They absolutely do.  And they think this is a

19   very narrow band, which is why --

20           THE COURT:  I think it's a narrow band too, but

21   you're denied.

22           Mr. Sandick, did you want to make a record on that?

23           MR. SANDICK:  No, Your Honor.  Thank you.

24           THE COURT:  Yeah, I think that's a little far

25   afield for me.  I understand your points -- they rejected

1  you.  So who cares why?  It's not going to -- and I wholly

2  doubt from an evidentiary standpoint that that would ever get

3  in.

4          MS. NELSON:  Thank Your Honor.  We appreciate --

5      (Simultaneous conversation)

6          THE COURT:  Not that I'm making any evidentiary

7  rulings, but -- all right.

8          So, Mr. Dunlap, you're doing the order; right?

9          MR. DUNLAP:  We will prepare the order.  Yes.

10         THE COURT:  Thank you.

11         And run it by Mr. Sandick and team.

12         MR. DUNLAP:  Absolutely.

13         THE COURT:  And don't disagree on the letter

14  because I don't like doing that.

15         MR. SANDICK:  Judge, did you want to give us

16  another day as a holding pattern.

17         THE COURT:  Yeah, yeah.  So what do you want?  Two

18  or three weeks?  Let me see.  I'll look at my calendar while

19  you're here.

20         MR. SANDICK:  I know that first week of April is

21  the -- is the week that all the holidays fall on.  And so

22  maybe the second week is better for the lawyers and the

23  parties.

24         THE COURT:  Okay.

25         MR. SANDICK:  I think some schools may be out that

1   week, although my kids' school have a funny March break

2   inside.

3           THE COURT:  So week of the 10th, we're talking

4   about.  Oh, my god.

5           MR. SANDICK:  Yes, Your Honor.

6           MR. GREENBAUM:  I'm out of the country that week,

7   but Ms. Lieb can cover my absence.

8           THE COURT:  All right.  Let me -- I -- that may not

9   be -- you could -- I have April 13th but it would be in the

10  afternoon.  You can do in person or Zoom?  Up to you.

11          MR. SANDICK:  We're happy to come in person,

12  Your Honor, and I believe I will be here on the 13th,

13  although I didn't confer with Mr. Greenbaum, and I don't want

14  to deprive him of the chance to participate.

15          MR. GREENBAUM:  That's -- what? -- a Friday of a

16  Thursday?

17          THE COURT:  That's a Thursday.

18          MR. GREENBAUM:  I'm actually flying back that day.

19          THE COURT:  So let me --

20          MR. GREENBAUM:  So we -- like the following Monday?

21          THE COURT:  Hold on, Jeff.  Let me look.

22          Hold on.  But -- okay.  Hold on.

23          So I have the afternoon the 18th or 19th, meaning,

24  you know, like, 2 o'clock.

25          MR. GREENBAUM:  I could do the 18th, not the 19th.

1             THE COURT:  Okay.  Check, everybody.

2             MR. DUNLAP:  Your Honor, I'm actually going to be

3    in transit on the 18th, myself.  It appears I'm leaving just

4    as Mr. Greenbaum is coming.

5             THE COURT:  Oh, so you are going to be going or

6    coming back on the 18th.

7             MR. DUNLAP:  I will be leaving on the 18th.

8             THE COURT:  So you're out of pocket that week?

9             MR. GREENBAUM:  Is it the whole day?  Would you

10   have the morning or not?

11            THE COURT:  Oh, please don't even say that.

12            MR. DUNLAP:  The 17th, if that was still on the

13   table would work.  The 13th's not ideal, but I could make it

14   work.

15            THE COURT:  What's not ideal?

16            MR. DUNLAP:  The 13th isn't ideal.  Mr. Sandick

17   referred to school breaks.  Apparently his kids and my kids

18   are on duelling schedules, but I could make that week work,

19   if that's best for the Court.  But the --

20        (Simultaneous conversation)

21            THE COURT:  Jeff, will you -- Jeff, you are out of

22   town, then, though; right?

23            MR. GREENBAUM:  I am.  But if -- I mean, if that's

24   the only time that works, Mr. Sandick can do it in my

25   absence.  But if we could do the 17th, that would be great.

1  In the afternoon, if that's possible.

2            THE COURT:  Okay.  My next -- I hate to keep

3  pushing this out, but the 24th is pretty good for me.

4            MR. DUNLAP:  24th, I believe works here.  Just --

5            MR. SANDICK:  I am not available on the 24th.  I

6  mean, I can get another Patterson lawyer to cover, but

7  unfortunately I have another commitment that day that I

8  cannot move.

9            MR. DUNLAP:  Your Honor, we're also -- I know

10 Mr. Sandick talked about the first week of April being hard,

11 but we're glad to do it sooner.

12           THE COURT:  Yeah, I'm trying to do it sooner.

13           MR. SANDICK:  Sure.  We can take an earlier time.

14           MR. GREENBAUM:  The 13th, if the 13th works then

15 I'll, you know --

16           THE COURT:  They want to come in in person, Tim.

17 Hold on.

18

19           THE COURT:  What did you say works?

20           MR. SANDICK:  Like the 3rd or the 4th.  Is that

21 what you were saying, Andrew?

22           MR. DUNLAP:  Yeah, I could make the 3rd or the 4th.

23           THE COURT:  Okay.  Is everybody on --

24           MR. DUNLAP:  Let me just check with the team here.

25           MR. SANDICK:  I could do the 3rd or the morning of

1    the 4th.

2            MS. LIEB:  Jeff, I think you're gone that week as

3    well.

4            MR. GREENBAUM:  That's true.  But --

5            MS. LIEB:  I -- my kids are off that week, so I

6    can't do in person that week to cover Jeff.  But I could do

7    the 13th.  Or I could Zoom in as well.

8            THE COURT:  Well, it looks like we're going to be

9    Zooming.

10           So, I mean, I want you to come in because we have

11   such fun.

12           MR. GREENBAUM:  How about the end of March, the

13   last week of March?

14           THE COURT:  That's not even two weeks, is it?  It's

15   two weeks.  I mean, I'm -- I'm on criminal duty that week,

16   the 27th, so I could bring you in, and if you were

17   interrupted by crime, you'd have to be interrupted.

18           MR. DUNLAP:  Is this the last week of March you're

19   referring to, Your Honor?

20           THE COURT:  Yeah.  If that is going to be too soon,

21   though, let's not do something that's stupid.

22           MR. DUNLAP:  I just -- it seems to me that's little

23   soon.  I mean, we've got a lot to meet and confer about.

24   There's some outstanding stuff we can try and make letters

25   about, but --

1           THE COURT:  Okay.

2           MR. DUNLAP:  I mean, that strikes me a little soon.

3  Anytime in April, I think, if -- if we can get calendars to

4  line up, I think would be fine.

5           MR. GREENBAUM:  Judge, with all due respect, I have

6  to drop off now.  So I'll leave the dates to Mr. Sandick and

7  Ms. Lieb.

8           THE COURT:  Okay.  Have a good --

9           MR. GREENBAUM:  Thank you for your time.

10          THE COURT:  Thank you.  Hold on.  Yeah, my deputy's

11 texting me.  It sounds like the only way we're going to get

12 this done is Zoom-wise.

13          Mrs. Lieb, if you're -- if you can do that week in

14 April.

15          MS. LIEB:  Yeah, I should --

16          THE COURT:  We'll -- at some point.

17          MS. LIEB:  Or you can do in person on the 13th as

18 well, if that's on the table.  If we prefer in person, I can

19 do it the week of April 10th.

20          THE COURT:  Yeah, somebody -- somebody -- Jeff

21 can't be there on the 13th, he said.  But --

22          MS. LIEB:  Jeff is gone in Israel for two weeks.

23 So the first two weeks of April Jeff is going to be out of

24 pocket.

25          So I'm happy to -- I can -- I can be there the

1    first week of April, but I need to do virtually.  And the

2    second week of April, I can be there in person.

3            THE COURT:  All right, folks.  So choose your --

4    choose your person.

5            MR. SANDICK:  All fine for us.  As much as I

6    benefit from Jeff's counsel, I worry that if we push it too

7    far into the month, we'll lose some momentum and also to be

8    candid, my own schedule becomes complicated.  I have a

9    witness who's scheduled to testify in a federal trial in

10   Florida, and I need to be with him later in the month for a

11   couple of days on the road.

12           THE COURT:  Okay.

13           MR. DUNLAP:  You mean for the 13th, Your Honor?  It

14   sounds like.

15           THE COURT:  Yeah, we can aim for the 13th.

16           We can do the 13th in person --

17           MR. DUNLAP:  In Zoom or in person, as you prefer.

18           THE COURT:  Well, if it's in person, I mean, excuse

19   me -- are we off the record, Tim?  Please take us off the

20   record because I might curse a lot.

21                    (Conclusion of proceedings)

22

23

24

25

|Hearing
|22-cv-02632, March 17, 2023
|Certification

1                            Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3     that the 59 pages contained herein constitute a full, true,

4     and accurate transcript from the official electronic

5     recording of the proceedings had in the above-entitled

6     matter; that research was performed on the spelling of proper

7     names and utilizing the information provided, but that in

8     many cases the spellings were educated guesses; that the

9     transcript was prepared by me or under my direction and was

10    done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12    the parties hereto nor am I in any way interested in the

13    outcome hereof.

14

15

16

17

18    S/ *Sara L. Kern*                    20th of March, 2023

19    _____    _____
      Signature of Approved Transcriber              Date

20

21
      Sara L. Kern, CET**D-338
22    King Transcription Services
      3 South Corporate Drive, Suite 203
23    Riverdale, NJ  07457
      (973) 237-6080
24

25