```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE      .
SYSTEMS INC.,                      .
                                   .
          Plaintiff,               .  Case No. 22-cv-02632
                                   .
vs.                                .  Newark, New Jersey
                                   .  April 13, 2023
SAVE ON SP, LLC,                   .
                                   .
          Defendant.               .


                       TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE CATHY L. WALDOR
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared in person):


 For the Plaintiff:      JEFFREY J. GREENBAUM, ESQ.
                         Sills Cummis & Gross P.C.
                         The Legal Center
                         One Riverfront Plaza
                         Newark, NJ 07102-5400
                         (973) 643-7000
                         jgreenbaum@sillscummis.com

                         HARRY SANDICK, ESQ.
                         Patterson Belknap Webb & Tyler LLP
                         1133 Avenue of the Americas
                         New York, NY 10036
                         (212) 336-2723
                         Hsandick@pbwt.com



Audio Operator:

Transcription Service:   KING TRANSCRIPTION SERVICES
                         3 South Corporate Drive, Suite 203
                         Riverdale, NJ  07457
                         (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1  (APPEARANCES continued)

 2  For the Plaintiff:      KATHERINE MARGUERITE LIEB, ESQ.
                            Sills Cummis & Gross P.C.
 3                          101 Park Avenue, 28th Floor
                            New York, NY 10178
 4                          (212) 643-7000
                            Klieb@sillscummis.com
 5
                            ADEEL ABDULLAH MANGI, ESQ.
 6                          Patterson Belknap Webb & Tyler LLP
                            1133 Avenue of the Americas
 7                          New York, NY 10036
                            (212) 336-2563
 8                          aamangi@pbwt.com

 9                          GEORGE A. CAROTENUTO, ESQ.
                            Patterson Belknap Webb & Tyler LLP
10                          1133 Avenue of the Americas
                            New York, NY 10036
11                          (212) 336-2547
                            Carotenuto@pbwt.com
12
13  For the Defendant:      ANDREW R. DUNLAP, ESQ.
                            Selendy Gay Elsberg PLLC
14                          1290 Avenue of the Americas
                            New York, NY  10104
15                          (212) 390-9005
                            Adunlap@selendygay.com
16
                            MEREDITH NELSON, ESQ.
17                          Selendy Gay Elsberg PLLC
                            1290 Avenue of the Americas
18                          New York, NY 10104
                            (212) 390-9069
19                          mnelson@selendygay.com

20                          ELIZABETH SNOW, ESQ.
                            Selendy Gay Elsberg PLLC
21                          1290 Avenue of the Americas
                            New York, NY 10104
22                          (212) 390-9330

23

24

25
```

```
 1   (APPEARANCES continued)

 2   For the Defendant:      E. EVANS WOHLFORTH, ESQ.
                             Robinson & Cole LLP
 3                           Chrysler East Building
                             666 Third Avenue, 20th Floor
 4                           New York, NY 10017
                             (212) 451-2954
 5                           ewohlforth@rc.com

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                    (Commencement of proceedings)

 2

 3              THE COURT:  Let me do the caption, and then we'll

 4   do appearances.

 5              THE COURT OFFICER:  You're on.

 6              THE COURT:  Thank you.

 7              It's April 13th, 2:49, 22-2632, Johnson & Johnson

 8   Health Care versus SaveOn.  We're here on some discovery

 9   disputes.

10              Let's have the appearances for Johnson & Johnson,

11   first.

12              MS. LIEB:  Good afternoon, Your Honor.  This is

13   Katherine Lieb from Sills Cummis & Gross.

14              And with me from -- excuse me -- for the plaintiff

15   Johnson & Johnson Health Care Systems.

16              And with me from Patterson Belknap are Adeel Mangi,

17   Harry Sandick, and George Carotenuto.

18              MALE SPEAKER:  Good afternoon, Your Honor.

19              THE COURT:  Good afternoon and welcome.  Have a

20   seat.  Relax.

21              MR. WOHLFORTH:  Good afternoon, Your Honor.  I am

22   Evans Wohlforth from Robinson Cole for defendant SaveOn SP.

23              And with me is Andrew Dunlap, Meredith Nelson, and

24   Elizabeth Snow from the Selendy Gay Elsberg firm on behalf of

25   SaveOn, and -- on our side of the mic.  Andrew Dunlap and

1    Meredith --

2              THE COURT:  Okay.  Thank you very much.  And good

3    afternoon.

4              So how do you want to do this?  Do you want to

5    address your 15 first?

6              MR. MANGI:  Certainly, Your Honor.

7              THE COURT:  Okay.

8              MR. MANGI:  So let me start there, then.

9              So, Your Honor, I trust you have that in front of

10   you through our letter, but in essence what we are asking in

11   and throughout Number 15 is describe to what extent and under

12   what circumstances SaveOn is advising plans to remove

13   coverage for patients for drugs and then send those patients

14   off to charitable foundations, including those that are part

15   of Johnson & Johnson to get their drugs.

16             Now, they've refused to answer that altogether.

17   They say it's irrelevant.

18             Now, if I could just give Your Honor a moment of

19   background on where this issue comes from and what's

20   happening in the industry around this.  So we gave you a

21   couple of articles with our letter that provide some of that.

22   But in essence, what's happening here, Your Honor, is this.

23   We understand that there are some entities in the marketplace

24   and, perhaps, SaveOn among them, it now appears.  And they

25   are operating a scheme whereby they advise health plans,

1   said, "Okay, you have patients who are on these specialty

2   pharmaceuticals, biologics for the most part, drugs that are

3   expensive to manufacture because of their particular

4   technology involved."  They said," We see you have patients

5   that are on these.  You're paying some money for those.  So

6   tell you what we are going to do.  We're going to take those

7   drugs that are essential health benefits for patients under

8   the regulatory scheme.  We are going to declare them to be

9   nonessential.  And then we're going to surgically take away

10  coverage for that drug.  So the patient who you are insuring

11  who's been giving you premiums in exchange for which you

12  cover their health needs, we're going to take away their

13  coverage for that drug.  Then we're going to take that

14  patient, and" -- in the words of some of the commentators --

15  "We're going to disguise them as being uninsured and send

16  them off to charitable foundations that exist, often operated

17  by companies like Johnson & Johnson that exist to help

18  uninsured patients.  But we're going to disguise your

19  patients as uninsured by taking away their coverage for this

20  drug.  Send them there, and then you get the manufacturer's

21  charitable foundation to pay for it.  And you, Insurer, now

22  don't have to pay any money for it at all.  You're off the

23  hook.  In other words, they paid their premiums, but you

24  don't have to pay for their drugs.  We'll get it done this

25  way."

1          Now, this has been a subject, as you can imagine,

2     Your Honor, of some controversy in the industry, the idea

3     that anyone is doing this and thinking that's okay or they

4     can get away with it.  But that's been happening out there.

5          Now, we got SaveOn's very initial document

6     production.  And in that document production, the first one

7     they sent over was one document which is Exhibit 2 in our

8     submission.  It is an email between Jody Miller, who is the

9     president of SaveOn.  Right?  So this is not some low-level

10    person who may be misspeaking.  This is the guy who's

11    actually verifying all of their interrogatories.  ████████

12    ████████████████████████████████████████████████████████

13    ████████████

14       ████████████████████████████████

15    ██████████████████████████████████████████████████████████

16    ██████████████████████████████████████████████████████████

17    ████████████████████████████████████████████

18    ████████████████████████████████████████████████████████

19    ██████████████████████████████████████████████████████████

20    ████████████████████████████████████  And what

21    they're describing there and in that email, they are talking

22    about essentially a ████████████████████████████████████

23    ████████████████████████████████████████████████████

24    ████████████

25          But then they're saying, ██████████████████████████

1

2

3

4

5

6

7

8

9          THE COURT:  What do you mean "operating together"?

10    What do you mean "integrated"?  I'm ...

11          MR. MANGI:  Yeah, what I mean, Your Honor, is that

12    they're not -- you could imagine a scenario in which they

13    said, "Okay.  You know, here's Client X.  And for Client X,

14    for you, we're going to run this charitable foundation scheme

15    where we're going to try and get your patients covered

16    through the foundation.  And for you Customer Y, what we're

17    going to do is get the co-pay assistance and suck that down

18    and help you that way."

19          THE COURT:  But what evidence do you have that this

20    has anything to do with the defendant?

21          MR. MANGI:  With SaveOn?

22          THE COURT:  Yeah.

23          MR. MANGI:  Well, we know it does, Your Honor,

24    because Exhibit 2 is



11    Now, let me say, Your Honor, that we don't know the

12  details of what exactly they're doing or how exactly they are

13  doing it because so far we've got this one email that snuck

14  through in their first production.  But they are taking the

15  position that all of this is entirely irrelevant and they

16  don't have to tell us anything about it.

17    So what we have done here, Your Honor, having

18  looked at this document and seeing that this is something

19  SaveOn is clearly engaged in, we served this interrogatory.

20    And let me also pause for a moment, Your Honor, to

21  emphasize that here now, we are not saying, you know, "Okay.

22  You've got to give us every document about all of this or

23  every datapoint."

24    We're trying to be very sequenced and measured

25  about this.  We're just here on an interrogatory.  We're

1   saying, "Okay. Tell us what it is that you're doing because

2   this looks pretty questionable, but let's get our facts

3   straight."

4           And we've asked this question. And, Your Honor,

5   you've seen, there have been a number of hearings now.

6   You've heard a lot of argument, I know, and document

7   requests. And I think you've seen that SaveOn has a

8   consistent theme. Right? They come in and they say, "Look.

9   We're not some fly-by-night entity misappropriating patients'

10  funds. We're legitimate. We're above-board. We provide a

11  service in the industry. And, ultimately, we're good for

12  healthcare." That's their position.

13          And ultimately the jury will sort that out, whether

14  that's right or not.

15          But if that is their position and if they, indeed,

16  believe it, there's no reason why they should be wanting to

17  hide in the shadows and not reveal what they do. Right?

18          So we -- all we're asking is tell us what it is

19  you're doing. And then the implications of that, whether

20  this is 404(b) evidence, whether it grounds free-standing

21  claims that are part of this case or whether it requires

22  something else, we'll get to that.

23          But for now, we can't decide what it means until we

24  know what the facts are. And we know that with this CarePath

25  scheme, there is another leg of the stool, which is what

|Hearing
|22-cv-02632, April 13, 2023

 1  we're seeing in Exhibit 2, which is their very own document.

 2         The one other piece I'd like to point out there,

 3  Your Honor, is we've also said we want the answer to that

 4  question, and we want it through to the present.  But part of

 5  what we have pled, Your Honor, is an overarching scheme to

 6  misappropriate resources that we make available for patients.

 7  But they want to make -- seize them for their own financial

 8  benefit and those of their health insurance clients.

 9         But we've pled this scheme.  And we have pled

10  specifically in paragraph 1 and 50 of our complaint, we've

11  pled that is an ever-evolving scheme because they are

12  constantly trying to bring more things in and get around

13  restrictions that manufacturers imposed to prevent this type

14  of conduct.

15         So all we're looking for here now are the facts.

16  Just tell us what you're doing.  It's a simple answer to a

17  question.  It should be one paragraph for them to type up.

18         And once we know what they're doing, and who it

19  impacts and how it impacts them, then we can address, you

20  know, is it part of our GBL claim?  Is it part of something

21  else?  Let's get those facts.

22         But when we have pled an overarching scheme to

23  misappropriate patient resources as part of an ever-evolving

24  scheme, we submit, Your Honor, that this is part of an

25  integrated scheme working hand in hand as one step of a

|Hearing
|22-cv-02632, April 13, 2023

 1  two-step process, we should get both steps -- so we should

 2  know what they're doing.

 3          Unless Your Honor has questions.  That's our

 4  submission on 15.

 5          THE COURT:  Well, let's do one at a time.

 6          MR. MANGI:  Okay.

 7          THE COURT:  So let me hear from you.

 8          MS. NELSON:  Good afternoon, Your Honor.

 9          There's a number of things that my adversary on the

10  other side just said that I'd like to address.  But, first,

11  this idea that we're trying to hide the ball, we're trying to

12  hide some nefarious scheme and if we have nothing to hide, we

13  should just produce documents and we should answer the

14  interrogatories -- that is not the standard in discovery.

15  It's not "If you have nothing to hide, open your -- open your

16  drawers and show us every single document you have."  Right?

17  It's "Is it relevant to the claims that were actually brought

18  in this case?"

19          These aren't.  They really aren't.  The claims that

20  are in this case are about CarePath; right?  So they have

21  said SaveOn is inducing patients to breach their conduct --

22  or their contracts with CarePath and that SaveOn is

23  misleading patients and that all of that is causing JJHCS to

24  pay more from CarePath.

25          Here's the fundamental problem with what they're

1  asking for.  If it's true -- and, look, we're not trying to

2  deny -- there is a limited program that certain of our

3  clients asked us to implement where we advise them how their

4  members can qualify for free drugs.  We think that's pretty

5  reasonable.  I don't think it's going to surprise you that we

6  have a pretty different view of the facts from our opponents.

7  No surprise there.

8          But what happens then is those patients then get

9  their drug from a separate foundations.  They are not getting

10  them from CarePath.  They're not getting them from JJHCS.  If

11  it doesn't harm JJHCS, if it doesn't cause harm to CarePath,

12  then it isn't in the claims in this complaint.

13          And what we're concerned about here is that they

14  seem to be throwing this idea, oh, it must be an integrated

15  scheme, and so we get to go digging into everything so that

16  they can find more claims to bring.  It's not even clear that

17  these plaintiffs here could bring these claims.  In fact, the

18  one foundation that they reference, it may be affiliated with

19  J&J, but it's not JJHCS.  It's a completely different entity.

20          If that entity wants to bring claims, it can bring

21  claims.  If JJHCS thinks it has standing to bring claims, it

22  can bring claims.

23          But where we are in this case is that we have

24  agreed to review half a million emails.  We're agreeing to

25  review many, many more noncustodial documents on top of those

1    emails.  We're giving them everything about CarePath.  In

2    fact, I think they served an RFP asking for every single

3    document about CarePath.  They're getting it.  If this is an

4    integrated scheme and it affects CarePath, they're going to

5    get it.

6              But it's not.  It's a completely separate -- it's a

7    separate program.  It's separate advice.  And it impacts

8    other entities.  So we just don't think they should get to go

9    fishing through all our documents and keep making us produce

10   more and more so that they can maybe find some other claims

11   that it -- can bring against us.

12             And I just want to touch on one last point, which

13   is that, you know, they said, oh, this is just an

14   interrogatory.

15             It's just an interrogatory for now, but we've

16   actually already received an RFP on this exact same issue.

17             THE COURT:  I was going to ask.

18             MS. NELSON:  If you say today this is relevant, I

19   think you know where we're going to be in a week.

20             And so all we're saying is I think this idea that,

21   oh, it's limited information, we're not denying that --

22   because services are there.  We weren't hiding it.  We

23   flipped through our production -- where we accidentally let

24   them know.

25             We're just trying to say, at some point enough is

 1    enough.  Like, let us go focus on the discovery that is

 2    directly relevant to this case.  It's a huge undertaking, and

 3    we've already committed to do.  And let's focus on that.  And

 4    if they want to add new claims, they want to try to amend

 5    their complaint, have at it.  But we should focus on what's

 6    actually relevant to the claims here and now.

 7            If you have any questions, happy to answer them.

 8            THE COURT:  I don't.

 9            But I do have questions of you.

10            MR. MANGI:  Yes, Your Honor.  Please.

11            THE COURT:  That's why I asked you about this

12    integrated scheme --

13            MR. MANGI:  Yes.

14            THE COURT:  -- so, so to speak.  And I am having a

15    hard time finding relevance if it doesn't have to do with

16    CarePath.

17            What I've ascertained and he's -- feel free to

18    correct me, and don't say "with all due respect" when you

19    do -- so if your problem is with the defense and CarePath,

20    why do you think you're entitled to have all other

21    information that is not directly related to your claims.  Is

22    it because you think there's this big scheme, as you say?  Or

23    let me take it a step further, appending RICO claim or

24    something like that?  I mean, is this going to turn into a

25    worldwide attack?

1          MR. MANGI:  No.

2          THE COURT:  Okay.

3          MR. MANGI:  No.

4          This is not expanding into, you know, some large

5   RICO claim, Your Honor.  And the reason for that is very

6   simple.  The conduct that we are targeting and we are focused

7   on here and we're trying to understand here, it's all just

8   SaveOn.  It's all things that SaveOn is doing.

9          THE COURT:  But not to you.

10         MR. MANGI:  Well, we don't know.  We don't know

11  that.  It certainly appears -- for example, we know they're

12  doing the CarePath, the co-pay assistance part of it to us.

13         THE COURT:  Right.

14         MR. MANGI:  That, we know.

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ███████████████████████████████████████████  So let

19  me -- let me --

20         THE COURT:  What do you mean?  Take me there,

21  because I am not connecting.

22         MR. MANGI:  So why don't we have a look,

23  Your Honor, at Exhibit 2.  I have a copy, if that would be

24  helpful.

25         THE COURT:  It'll save me a minute or two.

```
1                MR. MANGI:  Yeah.  May I approach?

2                THE COURT:  Please.

3                MR. MANGI:  That's the letter with the exhibits --

4   and Exhibit 2 is -- has a slip sheet.

5                Do you have a copy?

6                THE COURT:  Okay.

7                MR. MANGI:  Okay.

8                THE COURT:  Take me through.

9                MR. MANGI:  So, Your Honor, let's start on

10  page 19017, which is the last substantive page of the email

11  chain.

12               THE COURT:  Uh-huh.

13               MR. MANGI:  And I'll just walk you through it.

14               THE COURT:  Thank you.

15               MR. MANGI:  See here at the bottom there, there's

16  an email from this ████████████████████████  And she's

17  emailing with Jody Miller, who is the president of SaveOn.

18  And they're talking there at the end about ████████████

19  ████████████████████████████████

20               And the next email up, Jody is ████████████████

21  ████████████████████████████████████████████

22  ████████

23               But let me focus you on the email that starts

24  19016, the previous page.  And at the bottom of it, ████████

25  ████████████████████████████████████████████
```



1

2        And "ESI" is the PBM Express Scripts, who they

3   appear to be working with.  And then she follows up above and

4   says,

5

6        Okay.  So what is that talking about?  Well, let's

7   go to Jody Miller's response, which is above.

8

9

10       And then he's talking about some -- in the second

11  paragraph, some of

12

13       But let me focus you on the second line of the

14  second paragraph, where he's talking about

15

16

17

18

19

20

21

22

23

24

25       And then if you turn to page 915 --

|Hearing
|22-cv-02632, April 13, 2023

```
 1              THE COURT:  Wait, wait, wait.  Back up.

 2              MR. MANGI:  Yes.

 3              THE COURT:  I am not following you.  I'm on the

 4  same page.

 5              MR. MANGI:  Yup.

 6              THE COURT:  [As read] ███████████████████████

 7  ██████████████████████████████████████████████████████

 8  ██████████████████████████████████████████████████████████

 9  ███████████

10              MR. MANGI:  Right.

11              THE COURT:  So put that into my head the way you're

12  thinking of it --

13              MR. MANGI:  Yeah.

14              THE COURT:  -- because I am not seeing it that way.

15              MR. MANGI:  Yeah.  I think actually the next email

16  clarifies it when she responds.

17              THE COURT:  Okay.

18              MR. MANGI:  And if you look at the email on 9015,

19  which is the first page, the email at the bottom from ████████

20  ████████████████████████████████████████████████████████

21  ████████████████████  -- do you see that, Your Honor?  That's

22  the email that starts with ████████████████████

23              THE COURT:  Yeah.

24              MR. MANGI:  Okay.  ████████████████████████████████

25  █████████████████████████████████████████████████████
```

1  ████████████████████████████████████████

2          So when you put that together with the next

3  email -- I understand it's a bit jargon-heavy.  But what

4  they're talking about here, Your Honor, very simply put, is

5  here's what we're going to try to do.  ████████████████

6  ████████████████████████████████████████████████████

7  ██████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ███████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ███████████████████

12         ████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ██████████████████

15         THE COURT:  Right.

16         MR. MANGI:  All right?  And then the 30 percent,

17 they're referring to the profits that they make and what --

18 who keeps what share of the spoils from it.

19         But what you see here, Your Honor, here's the key

20 point.  ████████████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████

23 ████████████████████████████████████

24         ██████████████████████████████████████████

25 ████████████████████████████████████████████

|Hearing
|22-cv-02632, April 13, 2023

1      ███████████████████████████████

2              Now, again -- go ahead, please.

3              THE COURT:  No.  I'm -- so if one doesn't work,

4      then they go to SaveOn.

5              MR. MANGI:  Right.  So if -- it appears from what

6      they're saying here, that ████████████████████████████

7      ████████████████████████████████

8      ██████████████████████████████████████

9      ███████████████████████████████████

10     ██████████

11             THE COURT:  Right.

12             MR. MANGI:  ███████████████████████████████

13     ███████████████████

14             THE COURT:  Right.

15             MR. MANGI:  Okay?  So our position here,

16     Your Honor, is -- bear in mind, you know, we have not just a

17     tortious interference claim, we also have a GBL claim.

18             THE COURT:  Right.

19             MR. MANGI:  Which goes to where a patient harm is

20     an important -- at the center.

21             And consider what's happening.  Let's assume this

22     is the scheme that they're running writ large.  Consider the

23     situation of the patients here and the additional aspects of

24     patient harm that are brought into this.  The patient has

25     been paying premiums to get health insurance from this health

1   insurer, because he now needs an expensive drug, they're

2   taking away that coverage, making him go seek health from

3   charitable foundations for the uninsureds.  There are various

4   aspects of patient harm --

5               THE COURT:  What's wrong with that?  I don't why --

6               MR. MANGI:  What's wrong with that?

7               THE COURT:  Yeah.

8               MR. MANGI:  Well, Your Honor, let me -- let me put

9   it this way.  Let's say I've been paying my premium to X

10  insurance company; right?

11              THE COURT:  Right.

12              MR. MANGI:  And I've been doing it my whole life.

13  I've been paying that monthly premium.  The bargain is I pay

14  the health premium.  When I need healthcare, you're going to

15  provide it to me.  Right?

16              THE COURT:  Right.

17              MR. MANGI:  Now, I need a medicine.  I'm going to

18  assume my health insurer's going to pay for my medicine.

19              THE COURT:  Right.

20              MR. MANGI:  Right?

21              THE COURT:  Or at least a portion of it.

22              MR. MANGI:  Or at least a portion of it.  And maybe

23  there's a co-pay obligation on your -- co-insurance

24  obligation.

25              THE COURT:  Right.

 1              MR. MANGI:  Now, what my health insurer is doing

 2    now in this situation is they're saying to me, "Okay,

 3    Mr. Mangi.  I see you need this drug.  But we're not going to

 4    pay for it.  We're not going to pay any part of it.  In fact,

 5    we're going to change the terms of your coverage such that

 6    we're going to take away coverage for that drug altogether."

 7              Now, you're uninsured with regard to that drug.

 8    Okay?  You still have your health insurance, but your

 9    coverage no longer covers that drug.

10              And why are we doing that?  Because now we're going

11    to disguise you as someone who doesn't have any health

12    insurance coverage and send you off to a charitable

13    foundation that exists for people who have no insurance.  But

14    he does have insurance.  Or?  That scenario that I'm

15    postulating to Your Honor --

16              THE COURT:  So --

17              MR. MANGI:  Yeah.

18              THE COURT:  Let me understand.

19              MR. MANGI:  Yes.

20              THE COURT:  I don't know, other than this case, I

21    know much about this --

22              MR. MANGI:  Sure.

23              THE COURT:  How is SaveOn taking away insurance

24    coverage because they send people to a charitable ...

25              MR. MANGI:  That's a very important part of the

 1  scheme to grasp, Your Honor, because what happens in these

 2  situations, this is not -- I think what Your Honor may be

 3  think of is a situation where, you know, whatever the terms

 4  of your insurance are, you're having some trouble meeting

 5  your part of the obligation; so maybe there's a charity that

 6  can help you.  Right?  That would be fine.  You know, that --

 7  that -- nothing wrong with that.

 8              THE COURT:  Okay.

 9              MR. MANGI:  That happens all the time.

10              This is something entirely different.  This is not

11  a situation where there's a preexisting insurance scheme and,

12  you know, I need some help covering my piece of it as the

13  patient.  This is something entirely different.  This is

14  situation where, once the patient needs the medication --

15              THE COURT:  Right.

16              MR. MANGI:  -- these entities come in, and they

17  say, "Okay.  That medication is covered on your insurance

18  now."  Right?

19              THE COURT:  Right.

20              MR. MANGI:  You should be getting it through the

21  insurance.

22              But here's we're going to do.  We're now -- because

23  now you need the drug -- we're now changing the terms.  We're

24  now changing what we cover.  And we're going to surgically

25  excise that drug.  So it's no longer covered.

1          It's like, Your Honor, my saying, you know, "You're

2    covered.  Don't worry.  You've got health insurance."  But

3    then as soon as you break your leg, I say, "Okay.  You know

4    what?  I'm changing it.  We don't cover broken legs anymore.

5    Now, you know, we're going to disguise you as someone who has

6    no health insurance, and we're going to send you off to a

7    charity that serves the uninsured.  And you can get help from

8    them."

9          But I am insured.  I had insurance that covered

10   this very thing.  And as soon as I needed it, turned around

11   and said, oh, now we're going to take that out.  Disguise you

12   as an uninsured person and send you off to a charitable

13   foundation for uninsured people.

14         So that does harm -- consider the different aspects

15   of that, the implications of that, Your Honor.

16         THE COURT:  Why do you send people to charitable

17   places, and then if that doesn't work, they come back and go

18   to SaveOn?

19         MS. NELSON:  Yeah, I just want to be clear.  I am

20   not going to try to dispute -- put in front of you.  There's

21   a lot of there, and I think it actually proves our point.

22   This is really a very separate rabbit hole we're going down.

23         But these are charitable foundations and -- but

24   they are affiliated with manufacturers.  And manufacturers

25   decide for various commercial reasons that it's in their

  1   interests to give out drugs for free to certain patients.

  2          Now, our clients have come to us and -- SaveOn's

  3   clients, the underlying -- trying to figure out how to make

  4   them pay for this enormously expensive drug that they are

  5   paying for.  As they --

  6          THE COURT:  Paying for the co-pay, you mean?

  7          MS. NELSON:  No -- have a plan --

  8      (Simultaneous conversation)

  9          THE COURT:  Okay.  Okay.

 10          MS. NELSON:  -- themselves are paying for --

 11      (Simultaneous conversation)

 12          THE COURT:  All right --

 13      (Simultaneous conversation)

 14          MS. NELSON:  All right?  And that's what this whole

 15   case is about.  It's about plans where we're trying to figure

 16   out how to manage extraordinarily high healthcare.

 17          THE COURT:  Right.

 18          MS. NELSON:  So our plan clients are coming to us,

 19   and they are saying, look, if the manufacturers are giving

 20   drugs away for free and they'll give them for our patients,

 21   why not --

 22          THE COURT:  Why not take advantage of that?

 23          MS. NELSON:  There's a whole -- and we can have a

 24   whole fight about whether, you know -- or -- or coverage.

 25          But the whole point --

|Hearing
|22-cv-02632, April 13, 2023

1              THE COURT:  But you still insure them.  It's not as

2   if you're disguising -- I am not -- not -- I'm sort of

3   getting lost on this disguising them as uninsured.  If the

4   drug is available through the manufacturer for free.

5              MR. MANGI:  It's not, Your Honor.  That's what's

6   wrong about that.

7              THE COURT:  Oh.

8              MR. MANGI:  The insurer --

9              THE COURT:  I see on TV, they say, if you need

10  help, come to, you know, whatever the name of the pharma

11  company is.

12             MR. MANGI:  But all of those programs, Your Honor,

13  have particular terms and conditions.

14             So, for example, when you talk about these

15  charitable foundations --

16             THE COURT:  Uh-huh.

17             MR. MANGI:  -- right?  Typically what you're

18  talking about there is a foundation that exists to provide

19  free drug to patients who are not insured, who are uninsured

20  patients, and who have particular financial thresholds that

21  they meet -- your circumstances for poverty and all that type

22  of stuff.

23             THE COURT:  Right.

24             MR. MANGI:  That money is not meant for the benefit

25  of insurance companies.

 1          So what are they doing in this scheme?  They take

 2   away surgically -- after the patient needs it, they take away

 3   coverage.

 4          THE COURT:  I understand your point now.

 5          MR. MANGI:  Okay.

 6          And so the implication of that, Your Honor, is the

 7   manufacturers' charitable foundation -- and, by the way, you

 8   know, this is separate charitable foundation -- they are now

 9   being duped into paying money meant for uninsured --

10          THE COURT:  But don't they know, if SaveOn sends

11   them to the pharma company or the charitable foundation, that

12   SaveOn's sending them?

13          MR. MANGI:  We don't know what they're doing or how

14   they're doing it, but I am not quite confident SaveOn is not

15   showing up and saying, you know, "Oh, you know, do this for

16   us so we can siphon off the money."  That is not how they're

17   presenting it.  They -- you know, whether they are directing

18   people, "Call this number.  Sign up there" --

19          THE COURT:  I see.

20          MR. MANGI:  The logistics of how they're doing are

21   very murky.

22          THE COURT:  I see.

23          MR. MANGI:  And a lot of what the press,

24   Your Honor, the industry press has written about in the

25   articles we've attached is about how murky all of it is.

```
 1   This is all operating in the shadows because this money is

 2   not intended for health insurers or SaveOn -- because here's

 3   what happening here, Your Honor.  They then -- they don't

 4   have -- they're not paying for that patient anymore --

 5   right? -- because they've now surgically stripped away the

 6   coverage.  But then what they do is so the insurer's now

 7   saving that money.  And let's say that's $20,000; right?  So

 8   now they've saved $20,000.  And then the SPs like SaveOn are,

 9   like, "Okay.  So now we've saved you 20 grand; so, you know,

10   some percentage of that, you're going to give to us."

11              THE COURT:  What?

12              MR. MANGI:  Yeah.  So then they're making --

13   whether it's, you know, 5,000 or 10,000 --

14              THE COURT:  So what -- what you're alleging is that

15   they're sending surreptitiously --

16              MR. MANGI:  Yes.

17              THE COURT:  -- people to the pharma companies and

18   their charitable --

19              MR. MANGI:  To the charitable foundations for

20   uninsured patients --

21              THE COURT:  -- foundations and then the foundations

22   are kicking back to SaveOn.

23              MR. MANGI:  No, no, no.  The foundations are just

24   sending free product to the patient.  Okay?

25              THE COURT:  Right.  I get that.
```

1        MR. MANGI:  But what is then happening between

2    SaveOn and the insurance company --

3        THE COURT:  Yeah.

4        MR. MANGI:  -- on the back end --

5        THE COURT:  Yeah.

6        MR. MANGI:  -- is -- and this is our understanding.

7    Again, we don't know because we don't have the answer.  But

8    based on the industry press of how these things work, the

9    insurance company and SaveOn get together, and they say,

10   "Okay.  Now, for that patient, you didn't have to pay for the

11   drug."  Right?  "Health insurance plan" --

12       THE COURT:  So --

13       MR. MANGI:  -- to you saved $10,000 --

14       THE COURT:  I see.  Okay.

15       MR. MANGI:  -- "and we're going to split that

16   amongst ourselves.  I'm going to keep, you know, two; you're

17   going to take eight.

18       THE COURT:  Okay.  And who's the loser there?

19       MR. MANGI:  Well, here are the losers.  There's the

20   patient who has not got his bargain is being sent off and

21   told -- well, Your Honor, I would --

22       THE COURT:  Well, he's still getting the -- the

23   patient's getting the drugs free.  So ...

24       MR. MANGI:  Well, Your Honor, but let me suggest to

25   you there's a piece that's missing in your analysis there.

|Hearing
|22-cv-02632, April 13, 2023

```
 1                THE COURT:  Okay.

 2                MR. MANGI:  And I get this from having talked to a

 3   lot of patients -- right? -- which is what they are looking

 4   for -- you know, these are people with cancer, with very

 5   serious illness.  What they're looking for is they want

 6   things to work smoothly.  Right?  They want to go to the

 7   pharmacy, get their drug, or go to the doctor, get their

 8   drug.  The last thing in the world they want is to get these

 9   headaches where they're told, "Oh, sorry.  Now you're

10   uninsured.  Now we're not going to cover it.  Now you go make

11   an application to this charitable foundation."  Then they've

12   got to fill out all these forms.  Then they've got to deal

13   with the charitable foundation.  This is a --

14                THE COURT:  Okay.

15                MR. MANGI:  This is a stressful --

16                THE COURT:  Okay.

17                MR. MANGI:  I mean, imagine if your cancer

18   treatment's due on the 1st --

19                THE COURT:  It took me a while, but I'm catching

20   on.

21                MR. MANGI:  No, no.  It's complicated, Your Honor.

22   It's very complicated.

23                Part of the reason --

24                THE COURT:  Don't say "most respectfully."

25                MR. MANGI:  No, no, no.  I never use that phrase.
```

|Hearing
|22-cv-02632, April 13, 2023

 1          Part of the reason why these schemes are so
 2   pernicious and have persisted to now is because they're very
 3   murky.  They're hard to understand.  Patients are bewildered
 4   by this.
 5          THE COURT:  Yeah.
 6          MR. MANGI:  And they're like, "SaveOn?  What is
 7   SaveOn?  My insurance is BlueCross.  Why are these guys
 8   calling me now?"  Right?
 9          And so the patient is suffering on that end.  The
10   charitable foundations that they have money set aside for
11   uninsured people at a certain level of the poverty threshold,
12   that money is not meant to be siphoned off, you know, first,
13   to cover their bills and then for them to split the proceeds
14   based off it.  So the charities are being hurt by that as
15   well.
16          THE COURT:  Okay.
17          MR. MANGI:  And so, again, Your Honor, none of this
18   is happening in -- you know, this is not some corner of the
19   SaveOn world where they're doing something completely
20   unrelated that we've just stumbled upon.  And it's not like
21   they were running a scheme about perfume and now we found out
22   they're also hawking burgers on the side.  This is all the
23   same thing.  As you see it in this email, it's all about how
24   do we take the resources that manufacturers have set aside to
25   help patients, and how do we make money off of it ourselves?

```
 1  And it's a one-, two-step --

 2           THE COURT:  So what you really want to know -- and

 3  I don't want to put words in your mouth.

 4           MR. MANGI:  Yeah.

 5           THE COURT:  -- is what the process is for SaveOn to

 6  have people go to charitable foundations?

 7           MR. MANGI:  So -- yeah.  So with the benefit of

 8  what we've discussed, Your Honor, let me go back to the rog

 9  itself.

10           THE COURT:  Okay.

11           MR. MANGI:  And let me point out, Your Honor, that

12  SaveOn's counsel has now started to answer the rog in these

13  arguments for the first time --

14           THE COURT:  Well, let's go home, then.

15           MR. MANGI:  Well, they just need to go the rest of

16  the way and give a full answer; right?

17           But so here's what the --

18           THE COURT:  Go ahead.

19           MR. MANGI:  At this time, I'll actually go to the

20  words of the rog; right?

21           THE COURT:  Okay.

22           MR. MANGI:  So what we are saying is describe

23  whether and under what circumstances you have advised any

24  payors -- those are the health insurance plans.

25           THE COURT:  Yup.
```

1          MR. MANGI:  To eliminate or alter coverage for

2  certain pharmaceuticals.  That's the drug --

3          THE COURT:  Stop.  Eliminate or alter coverage.

4          MR. MANGI:  Right.

5          THE COURT:  What have you said to eliminate or

6  alter coverage.

7          MR. MANGI:  Yeah, because, remember --

8          THE COURT:  But that assumes that coverage is

9  altered.

10          MR. MANGI:  Yes, because in this scenario, we are

11  targeting this specific instance.  And when I read the rest

12  of it, the context will become clear.

13          THE COURT:  But --

14          MR. MANGI:  Yeah.

15          THE COURT:  -- I don't know that they're going to

16  concede that coverage was altered.  And maybe that's why they

17  can't answer that question.

18          MR. MANGI:  That is not their objection,

19  Your Honor.

20          And I think --

21          THE COURT:  Okay.  Keep going.

22          MR. MANGI:  -- they will have to concede that

23  coverage is altered because they're removing coverage for a

24  drug.

25          And that was their answer.  You know, they could

 1   have said that answer, but they're not.  That's not what

 2   they're saying.

 3            THE COURT:  Okay.  Keep going.

 4            MR. MANGI:  Describe whether and under what

 5   circumstances you have advised any payors to eliminate or

 6   alter coverage for certain pharmaceuticals and to arrange for

 7   plan members -- patients now -- to obtain those

 8   pharmaceuticals from any source other than a -- that's where

 9   they normally go when they're covered -- including without

10   limitation independent not-profit organizations such as

11   Johnson & Johnson Patient Assistance Foundation.  All right.

12            So that's all we're asking about.  --

13            THE COURT:  Okay.

14            MR. MANGI:  -- if you're doing this, tell us

15   whether you're doing it --

16            THE COURT:  Or how.

17            MR. MANGI:  -- yeah.  And under what circumstances

18   you're doing it or how you're doing it.

19            And so once we know that, then we can assess what

20   the next steps are, who it's impacting, how it's operating,

21   do we need an amendment, do we not need an amendment, is it

22   already fairly in the case?

23            But I would suggest this, Your Honor, it is --

24   there can be no question, based on Exhibit 2, that it is

25   sufficiently proximate to the allegations in the case to fit

1    the standards of discovery.  And, in fact, you'll see in our

2    letter at the page 2 at the bottom, we quoted one of

3    Your Honor's prior cases where -- and these are not your

4    words; you were citing -- you were citing lots of other cases

5    that have said this before -- right? -- [As read] But

6    relevance encompasses any matter that bears on or that

7    reasonably could lead to other matter that could bear on any

8    issue that is or may be in the case.

9         So all we're asking for now, Your Honor, is let's

10   just understand the facts.  Let's understand what's happening

11   here.  Then we'll figure out the next step.  If they've got

12   nothing to hide, just tell us the facts.  If it doesn't

13   ground the cause of action, there'll be nothing else.  If

14   it's not in the case, as they argue, they'll have their

15   opportunity to make that argument later on.

16        But what they should not get to do, I would submit,

17   Your Honor, is where we have sued them specifically for

18   misappropriating resources made available for patients in an

19   ever-evolving scheme -- that is what we have said in our

20   pleading -- then what they should not get to do is say,

21   "Well, you didn't specifically describe this part of it.  You

22   only described that part of it.  And even though they're

23   steps one and two of the same process, we are not going to

24   answer any questions about step one."

25        THE COURT:  Okay.  What's the standard for

1    relevance these days?

2           MS. NELSON:  -- Your Honor, a lot of mud is being

3    slung at us.  And I am not going to try to walk you through

4    it.  If there are specific things you have concerns about the

5    things you've just heard, I'm happy to answer them.

6           But this is what I want to focus on -- because you

7    just heard a long speech about all these terrible things we

8    do.  If you actually listen very closely, what he's saying is

9    SaveOn is encouraging or advising plans on how to change

10   their coverage so that the patients can go to these

11   foundations and lie and say they're not covered so they can

12   get drugs they're not entitled to, it breaches the terms and

13   conditions of those foundations.

14          It breaches the terms and conditions of those

15   foundations.  If those foundations have a claim against us,

16   if they think that we've breached their contracts, that's a

17   totally different claim.

18          THE COURT:  Yeah, I know that.  But --

19          MS. NELSON:  Yeah.

20          THE COURT:  -- here's -- I mean, it took me a

21   while --

22          MS. NELSON:  Yeah.

23          THE COURT:  -- to get inside of this.  But as I

24   understand it now -- and I don't draw that from -- the

25   somewhat disjointed emails.  I just am curious, under what

1  circumstance does a patient go to a foundation?  Do they

2  first consult with SaveOn?  I know you're going to be

3  answering the question, but I need to know, is there a

4  process or a procedure?  Do they come to you and you say,

5  "Well, let's go to a charitable foundation or one of the

6  pharma companies that says they're going to give the drug

7  free"?  How does that occur?

8          MS. NELSON:  Yeah, and -- Your Honor, I am not

9  going to make broad representations because this separate set

10  of services that we offer --

11          THE COURT:  Yeah.

12          MS. NELSON:  -- really hasn't -- I am not -- this

13  is a rhetorical -- it really hasn't been part of this case

14  thus far.  And I would certainly have to go back to the

15  client and we'd have to do more research to try to figure out

16  exactly how this works.

17          But my understanding is that there are certain --

18  the patient isn't coming to SaveOn and saying -- and SaveOn

19  saying, "Oh, go to the foundation."  Right?  It's plan terms.

20  And SaveOn advises the plan, if you change your coverage in

21  this way, then we think this patient will be eligible for

22  free drug under this program.  If that doesn't work, then we

23  can move them into sort of a separate set of services that we

24  offer.  Regardless of how we do it, the patient's -- their

25  drug for free.

1          But, you know, if it -- they can qualify for a free

2    drug, then let's see if they qualify for free drugs so that

3    the plan isn't paying money out unnecessarily.

4          And I do want to focus on this for just a minute,

5    because, certainly -- look, we can have arguments about the

6    administrative hurdles.  I think -- regardless of whether

7    you're a cancer patient or not, having health insurance in

8    America involves a lot of administrative hurdles and is

9    challenging.  But at the end of the day, what the plans are

10   trying to do is they're trying to make sure that if there are

11   resources out there, whether they're through JJHCS and

12   CarePath, which is what this case is about, or they're

13   through other charitable foundations that are connected to

14   manufacturers, if there are resources out there where

15   patients can get their drugs, they can keep taking their

16   drugs, they can get every -- the healthcare they need, but

17   the plans don't have to keep paying huge amounts, they'd like

18   to take advantage of those resources.  Right?  And we can

19   have a fight about whether that breaches terms and

20   conditions.  I think that's a fight with a different entity.

21         THE COURT:  But doesn't -- isn't that -- go to the

22   relevance of this interrogatory question?

23         MS. NELSON:  I'm sorry.  I am not sure I'm

24   understanding the question.

25         THE COURT:  So SaveOn doesn't take -- let me just

1   switch gears for a second.

2           MS. NELSON:  Sure.

3           THE COURT:  Then there's the second part of his

4   allegation for now, which is that you and the insurance

5   company get together and have a party and split some money.

6           MS. NELSON:  Yeah.

7           THE COURT:  I mean, is that what happens?

8           MS. NELSON:  I mean, so SaveOn is an administrative

9   provider for insurance plans.

10          THE COURT:  Right.

11          MS. NELSON:  And it gets paid somehow.  We're

12  not -- we're not denying that.  They've known this whole

13  case --

14          THE COURT:  But is there a bonus, you don't pay out

15  a million dollars for a diabetes drug.  You -- does it

16  operate on a bonus system?

17          MS. NELSON:  I don't know that it's a bonus system.

18  And, frankly, Your Honor, I don't know exactly how the

19  compensation works for this specific program.

20          THE COURT:  Okay.

21          MS. NELSON:  I will say generally I can answer your

22  question, which is that how SaveOn is compensated is that it

23  gets a percentage of the amount that it saves the health

24  plan.  Right?

25          THE COURT:  Okay.

1          MS. NELSON:  So if we can advise you to structure

2    benefits so you save a lot of money, we will get a percentage

3    of, which is how the compensation structure, that's how they

4    keep the contract with the health plans and SaveOn are -- I

5    think, it's just because SaveOn is an administrative services

6    provider.  So the health plan is offering the service --

7          THE COURT:  And that's the -- contractually the way

8    the relationship --

9          MS. NELSON:  Yes.  Exactly.  That's set up between

10   SaveOn and the health plans it advises.  It's just the terms

11   of that --

12         THE COURT:  Okay.

13         MS. NELSON:  -- so if the health plan is saying,

14   "All right.  Well, I saved this amount of money, that's great

15   for me.  I am going to pay you some percentage of it, because

16   that's your fee."  I don't think it's at nefarious.  It's not

17   some kickback scheme.  It --

18         THE COURT:  No, no, no.  I understand the whole --

19   the constant use of the word "scheme" and things like that.

20         But I am not looking at it that way.

21         MS. NELSON:  Okay.  I just -- I want to be clear.

22         THE COURT:  I really am not.  I know that he's very

23   passionate and so are you.  He wants to convince me that

24   you're nasty and dirty.  I am not buying that.  I'm just

25   looking at anything that may lead to admissible evidence,

```
 1   ultimately.

 2            MS. NELSON:  I both understand and greatly

 3   appreciate --

 4            THE COURT:  But I appreciate the theatrics.  I

 5   always do.

 6        (Laughter)

 7        (Simultaneous conversation)

 8            MS. NELSON:  I will try not to be theatrical, so

 9   I --

10            THE COURT:  No, you're --

11        (Simultaneous conversation)

12            MS. NELSON:  Look, here's our fundamental point.

13   If this impacts CarePath, they're going to get the documents.

14   We've agreed to produce everything about CarePath.  If this

15   goes to JJHCS -- money --

16        (Simultaneous conversation)

17            THE COURT:  I understand what you're saying --

18        (Simultaneous conversation)

19            MS. NELSON:  They're going to get it.

20            THE COURT:  But he's opened my eyes a little bit to

21   things I didn't understand.  And, frankly, I'm going to ask

22   you to answer that -- that interrogatory because I think it's

23   a legitimate source of inquiry that may, in fact, lead to

24   admissible evidence.

25            MS. NELSON:  Okay.
```

1          THE COURT:  So that's 15.

2          MS. NELSON:  And I -- can I just make one point for

3    the record, which is he referenced a number of documents and

4    quoted from them that we --

5          THE COURT:  I am not -- I am not -- it's -- I can't

6    take a sentence out of context and mix it one way or another

7    sentence.

8          MS. NELSON:  My point is actually much simpler --

9          THE COURT:  Yes.

10         MS. NELSON:  -- which is that I'm just trying to

11   put a note in the record that there are con- -- there's

12   confidential information that I think we'll probably need to

13   redact because it actually is documents we produced --

14         THE COURT:  So we can do that -- or seal any

15   portion or seal the whole thing.  It's unsealed only once you

16   order the transcript, and then we'll have to do formal

17   sealing motions.

18         MS. NELSON:  And I will just say I hope that we

19   don't get here.  We will try to resolve it.  But I, like,

20   flagged earlier, there are RFPs.  I think there are burden

21   arguments that are going to be raised related to those, and

22   so the tangential value of this evidence, we'll get there

23   when we get there, but I want to make that record now.

24         THE COURT:  But I --

25         MS. NELSON:  Our concern is that the --

 1          THE COURT:  -- curious myself about the answer to

 2    this interrogatory.

 3          MS. NELSON:  Okay.

 4          THE COURT:  So forgetting them for now, forgetting

 5    J&J, I'm really curious now that I've heard this.

 6          What do you want?  You just want something.  You

 7    want to do 14 now?

 8          MR. MANGI:  Yes, Your Honor.  I am not going to say

 9    another word about --

10          Okay.

11          THE COURT:  It took us a while, but I finally -- I

12    probably should have targeted my questions a little bit

13    better.  It's probably my fault that it took us a while, but

14    that --

15          MR. MANGI:  No, Your Honor.  It is a -- it is a

16    complicated area.  I should have explained it from basics

17    more.  It is a --

18          THE COURT:  Okay -- now?

19          MR. MANGI:  Okay.

20          THE COURT:  Let's talk about 14.

21          MR. MANGI:  Let's talk about 14.  All right.

22          So, Your Honor, in 14 -- again I'll paraphrase --

23    what we're seeking essentially is very straightforward.  If

24    there -- if there's someone who is paying their bills, either

25    in the litigation or indemnifying them for their damages, we

 1   want to know the details of that --

 2             THE COURT:  Yeah.  This is a real push for me.  So

 3   it's got to be good.

 4             MR. MANGI:  No, it's good, Your Honor.  It's good.

 5             Here's why.  We have looked at the law on this,

 6   quite extensively.  And you're right that, you know, in the

 7   abstract there -- courts will go in different directions on

 8   indemnities, et cetera.

 9             But there is one area where, as far as I can tell,

10   Your Honor -- and we've cited to you three cases on this

11   point, but if you look at those cases, all of them cite,

12   like, a litany of law in the same direction.  But all courts

13   seem to be in agreement on this point, that arrangements for

14   indemnities or agreements to pay your legal fees or for your

15   damages if you're found liable are relevant and are important

16   to issues of credibility and bias.

17             And on that, Your Honor, the cases we've cited,

18   they deal with document requests, they deal with

19   interrogatories, depositions, and they haven't cited anything

20   to the contrary.  So that part of the law is absolutely

21   crystal-clear.  These arrangements are relevant in those

22   respects:  credibility and bias.

23             So then the question becomes, well, how does that

24   really matter here; right?  How does it come into play --

25             THE COURT:  That is the question.

 1              MR. MANGI:  That is the question, how does it come

 2    into play in this particular situation?

 3              Now, it's a little hard to do it in the abstract

 4    because we doesn't know who the mystery benefactor is.  And

 5    we don't know what their interest is.  So I can't tell you

 6    how it would actually play out.  But I can give you examples.

 7    Okay?

 8              Let's take one example.  You heard me talk earlier

 9    about Express Scripts.  Okay?  Also known as ESI.  Express

10    Scripts is one of the biggest companies in the entire country

11    right now.  They're a PBM, a pharmacy benefits manager.

12    Your Honor may have seen the state of Ohio just sued ESI and

13    other PBMs and in their complaint being the gangsters of the

14    modern era.

15              But the idea here is these are --

16              THE COURT:  Why does every civil litigator want to

17    be a criminal lawyer?

18              MR. MANGI:  Well, there's the AG's office,

19    Your Honor.  You know, they play on both sides of the dial, I

20    guess.

21              But ESI is an entity that we know is working

22    closely with SaveOn in relation to what we're talking about

23    here.  They seem to have an exclusive arrangement and some

24    kind of, you know, money split going on there as well because

25    they have --

1              THE COURT:  So what?

2              MR. MANGI:  Okay.

3              THE COURT:  Get to the point.

4              MR. MANGI:  So ESI, let's assume for a minute, ESI

5    is the mystery benefactor.  Okay?

6              THE COURT:  Okay.

7              MR. MANGI:  I don't know that for a fact, but --

8    but I'm just using it for purposes of argument.

9              Now, if ESI is -- we served a subpoena on ESI.  So

10   they themselves, their credibility and bias is going to

11   ultimately be at issue as, of course, is SaveOn's.  And on

12   both sides of that, Your Honor, when we are examining the

13   witnesses from SaveOn or we're examining the witnesses from

14   ESI, if, in fact, ESI is the one that is financially holding

15   the bag here, paying for their legal defense, paying for

16   their indemnification, that's certainly something that's

17   going to be very relevant to the testimony that they're

18   providing about how all of this is operating in the

19   marketplace and what its impacts are.

20             For example, when we have subpoenaed ESI, they have

21   refused to produce a single document to us.  And they have

22   refused to comment, resolve that dispute before Your Honor.

23   They want to litigate out in St. Louis.  So, fine, we'll go

24   litigate it there.

25             But they're taking the position that -- you know,

1  we're a third party.  Why are you bothering us?  You know, go

2  deal with party discovery.

3          Well, if they're the one that are paying --

4          THE COURT:  What difference does it make who's

5  paying for the litigation and who's -- with indemnifying?

6  What difference does it make?

7          MR. MANGI:  Because --

8          THE COURT:  You say it goes to credibility.

9          MR. MANGI:  Yeah.

10          THE COURT:  How?

11          MR. MANGI:  Ultimately, Your Honor, the witnesses

12  from ESI, if, in fact, they are -- they are paying for all of

13  that.

14          THE COURT:  Right.

15          MR. MANGI:  Their company is going to have a

16  fundamental financial interest in the outcome of the

17  litigation.

18          THE COURT:  Right.

19          MR. MANGI:  And if those witnesses are -- testify

20  at trial by deposition or otherwise, they should not get to

21  pretend, like, they are -- you know, they're a disconnected

22  third party that's just being called in to talk about some

23  aspect of how this operates.  I can certainly be able to

24  cross-examine them on the fact that they're the ones that are

25  ultimately going to pay any damages.  Or for that matter,

```
 1   with SaveOn witnesses -- let me give you an example there,
 2   Your Honor.  We have in our complaint, we detail a particular
 3   piece of marketing that leaked out in the marketplace that
 4   detailed a lot of what SaveOn is doing.  And --
 5              THE COURT:  What do you mean "leaked out"?
 6              MR. MANGI:  Well, it was put up on a website, not
 7   by them but by a third party to whom they had presented it.
 8   So we found it on a far corner of the Internet.
 9              UNIDENTIFIED SPEAKER:  Your Honor, I could --
10              THE COURT:  No, no.  Not at all.  He loves using
11   these dark words like "scheme" and "leak" and --
12              MR. MANGI:  Well, scheme -- the scheme is a
13   dictionary word, and it's what we pled -- in our complaint.
14   It's not -- you know, you -- I -- scheme to -- candy.
15              THE COURT:  What difference does it make --
16              MR. MANGI:  Yeah --
17              THE COURT:  -- again, I don't understand.
18              So ESI is on the witness stand or in a deposition,
19   if you ever get them there.
20              MR. MANGI:  Sure.
21              THE COURT:  And they say, "You're funding this.
22   We're going to indemnify everything."  So what?
23              MR. MANGI:  That's not my problem.
24              My problem is if I am not allowed to know that and
25   they don't disclose that, and they present themselves as a
```

 1   third party with no interest at stake.

 2         THE COURT:  So shouldn't this be out in -- where

 3   it's being litigated -- ESI's being litigated?

 4         MR. MANGI:  No, because that is a subpoena for

 5   documents from them.

 6         All I'm asking now -- and, Your Honor, if I can get

 7   information from the party, then I don't need to go to a

 8   third party or pursue a subpoena.  My question is simply,

 9   "You SaveOn, the defendant in this case is someone

10   indemnifying you.  Is someone else paying your legal fees or

11   paying ultimately for any damages that you may be held

12   accountable for?"

13         So -- so let me just go back, Your Honor, to the

14   example on -- that I --

15         THE COURT:  Why is ESI going to testify in this

16   case?

17         MR. MANGI:  Why are they going to testify?

18         THE COURT:  Yeah.

19         MR. MANGI:  Well, Your Honor, so -- we don't have

20   the full picture yet, again, but part of what we have seen,

21   for example, is that the origins of this entire -- don't want

22   to use the word "scheme" -- I'll say, you know, "enterprise."

23   The origins of this enterprise.

24         THE COURT:  We're right up RICO alley.

25         MR. MANGI:  Yeah.  Yeah, right.

1            But it is -- it appears that ESI and SaveOn are

2    there together at the beginning to put this into operation,

3    and then to crossmarket SaveOn services to ESI's clients --

4            THE COURT:  Okay.

5            MR. MANGI:  And then to split the money that

6    they're -- in the same way that I was describing to you

7    earlier.  Right?

8            THE COURT:  Okay.

9            MR. MANGI:  So -- all -- let's say -- now let's go

10   back to the example I was giving you with SaveOn.  So there's

11   this presentation that's all over our complaint.  And part of

12   what we're hearing from SaveOn is, "Oh, that's ESI.  That's

13   not our presentation.  That's ESI's presentation.  So, you

14   know, go talk to them.  It's nothing to do with us."

15           But, okay.  If ESI's paying all your legal fees and

16   they're indemnifying you, you know, that's certainly grounds,

17   a relevant area of cross that I should be allowed to talk

18   about, to probe the witness's credibility and bias on that

19   position.

20           So in all of these cases that we have cited to,

21   Your Honor -- right? -- what the courts are saying in all of

22   them is, look, if there is an angle pursuant to which this

23   can become relevant to the credibility or the bias of other

24   the indem- --

25           THE COURT:  I don't disagree with that.

 1          MR. MANGI:  Okay.  Of either side of it, the

 2   indemnifier or the indemnifiee [verbatim].

 3          THE COURT:  Right.  I don't disagree with that.  I

 4   just -- let me hear from the other side.

 5          MR. MANGI:  Sure.

 6          May I add one last point?

 7          THE COURT:  Yeah.

 8          MR. MANGI:  Yeah, I don't want to get too caught up

 9   on ESI only because I'm just giving you an example.  I don't

10   know who the benefactor is; right?

11          THE COURT:  Yes.  Got it.

12          MR. MANGI:  But let me point this out, Your Honor.

13   There are a number of enough -- there's this healthcare

14   industry and the chain of insurance statements has become

15   complicated, as we all know.  There are a lot of different

16   middlemen involved.  There are a lot of relationships.  There

17   are health plans involved.  SaveOn involved.  There are a lot

18   of entities that may ultimately end up being relevant to this

19   case or giving testimony or giving subpoenas.  Right?

20          So our point here ultimately, Your Honor, is we

21   shouldn't have to wander about in the dark, not knowing which

22   one of these entities is the mysterious benefactor.  Right?

23   There's no reason why it should be hidden away or locked in a

24   vault because, if it has a potential relevance to credibility

25   or bias on either side of the dial with the indemnification,

```
 1   then it's fair game for discovery.

 2            And, again, all we're asking is one interrogatory,

 3   one answer, just tell us who it is.  And --

 4       (Simultaneous conversation)

 5            THE COURT:  But what's pending in St. Louis?  You

 6   said St. Louis.

 7            MR. MANGI:  Nothing is pending yet.  But ESI has

 8   just told us in relation to the subpoena, that they refuse to

 9   consent to enforcement before Your Honor.

10            THE COURT:  Okay.

11            MR. MANGI:  And because they're based in St. Louis,

12   we therefore have to file a motion to compel out there.

13            THE COURT:  Okay.

14            MR. MANGI:  So that's -- that's coming down the

15   pike.

16            THE COURT:  Okay.

17            MR. MANGI:  But also to that, if it turns out

18   they're the mysterious benefactor, I suspect the judge in

19   St. Louis would want to know that as opposed to thinking

20   they're just some, you know, third party who's being put upon

21   for no reason.

22            THE COURT:  Okay.

23            MR. MANGI:  Thank you.

24            MS. NELSON:  So I'd like to just put into context

25   why we've -- don't think we should have to answer this
```

1    interrogatory.  And it really has very little to do with what

2    was just said.

3              SaveOn is not a large business.  It's a relatively

4    young, relatively small operation.  We're going up against a

5    multi-billion-dollar conglomerate.  We have complied with our

6    obligations.  If we had a funder, we would have disclosed it

7    under the local rules here.

8              But this Court and this district in particular,

9    sets a balance; right?  There is a local rule that says what

10   we need to disclose about our litigation funding and what we

11   don't.  We've complied with that.

12             But this is a delicate issue.  This is really

13   sensitive financial information.  And we don't want to give

14   up or give through the sneak peek into the coffers of our

15   litigation funding so that J&J can say, "Okay.  Well, we

16   think it's going to cost us this much to drive these people

17   out of business."  Right?

18             That's why this is sensitive.

19             And I just want to be really clear because -- about

20   ESI.  This presentation that he's talking about, we actually

21   cited it extensively in our motion to dismiss.  We

22   actually -- we haven't -- we're not distancing ourselves from

23   it.  We said, actually, it accurately represents what we do,

24   and that's a reason to dismiss the complaint.  Like, we

25   haven't said, "Oh, that wasn't us.  It was ESI."

1          And what we said is we don't have documents about

2   how this presentation was put together.  We actually didn't

3   put it together.

4          But we're not distancing ourselves from ESI.  We're

5   not saying, oh, they're some separate entity.  They're our

6   business partner.

7          And J&J knows they're our business partner because

8   they have a contract with ESI.  So the idea, you know, ESI is

9   making money off of SaveOn's services, that's no -- we're not

10  hiding that.  That's been one hundred percent clear from the

11  beginning.  So the idea that there's some marginal benefit

12  of, oh, ESI's going to be even less credible if they testify

13  and SaveOn because they're footing the bill for the

14  litigation -- it's such a side show.  Right?  They're right

15  in there with us.  They're our business partners.  They make

16  money off of what we do.

17         If they want to ask ESI at a deposition of a

18  witness, "Are you paying for this litigation?"  We have no

19  problem with that.  We told them they could do that.  We're

20  not going to try to block that information.

21              THE COURT:  Well, he wants you to say it.

22              MS. NELSON:  But he wants us to say it.  And he

23  wants us to say if it's ESI or if it's someone else or if

24  it's no one.

25         And that's the problem.  Right?

1          THE COURT:  Okay.

2          MS. NELSON:  We don't think that we should have to

3    give up all our financial information.

4          THE COURT:  So what if the question is is ESI

5    indemnifying the litigation or the result of the litigation?

6          MS. NELSON:  I don't know that I'm in a position

7    right now to say my client will be fine with that, but I

8    certainly think if they get to a point where they want to

9    depose an ESI witness and, you know, that witness agrees to

10   appear for a deposition or tries to, you know, move to quash

11   and the Court says, "No, you should be deposed" --

12      (Simultaneous conversation)

13         THE COURT:  I am not going to -- I am not going to

14   open the door to everybody.

15         Ask the question about ESI.

16         MR. MANGI:  Okay.  Your Honor, may we also then --

17         THE COURT:  And I am not foreclosing future

18   inquiries.  So I just want that clear.  But right now, today,

19   the presentation is ESI and just ask the question about ESI.

20         MR. MANGI:  Okay.  We'll do that, Your Honor.

21         May I ask her a follow-up question?

22         May we expand that question to ask about, you

23   know -- for example, if it's not ESI but it's a health

24   insurance plan -- right? -- one of the health insurance plans

25   that they're dealing with, which are all entities that are in

1    discovery, is that not -- the fact that Your Honor would

2    permit us to get into?  Because here's what I'm concerned

3    about is I don't want to be dealing with an entity in the

4    case pursuant to subpoena, a deposition, or whatever it may

5    be, without knowing, you know, who the mysterious benefactor

6    is.  That is my concern.

7          THE COURT:  Let me say this to you.

8          I understand the case law.  I'm well familiar with

9    the case law as to discovery that hits on credibility

10   ultimately at trial.

11         I think that, as I sit here today, the question

12   should be limited to ESI.  And as the case moves on, if you

13   can convince me that they should answer the question

14   completely about who's paying for the litigation or signed up

15   for indemnification, then I will consider it.  But I am not

16   going to have them answer a general question right now as to

17   who may indemnify or fund.  I don't think it's relevant

18   enough today.

19         MR. MANGI:  Understood, Your Honor.

20         Thank you.

21         MS. NELSON:  Thank Your Honor.

22         THE COURT:  You've got a note.  Take the note

23   before you sit down.

24         Now, this other stuff you want.

25         MS. NELSON:  Your Honor, can I actually ask for

1   clarification on --

2            THE COURT:  Okay.

3            MS. NELSON:  So I think we have -- our adversary

4   clarified this for us.  But you were very clear that we're

5   answering questions as to Janssen drugs.  There are a lot of

6   different manufacturers that have a lot different charitable

7   foundations.  I think we would ask that -- generally about

8   our general services.  And -- Janssen, we -- about -- but

9   we're not going to provide information on things that

10  affects -- that are --

11           THE COURT:  I think that's fair.  I think that's

12  fair.  Yes.

13           MS. NELSON:  Okay.  Thank you.  I wanted to --

14           THE COURT:  So we can clarify so you don't have to

15  come back to me on the order because I really don't like

16  that.  Make sure, who's ever going to write up this order --

17  because one of you are -- one of you is -- that it's limited

18  to Janssen.

19           MS. NELSON:  All right.

20           THE COURT:  And thank you for that.

21           That is --

22           MS. NELSON:  Thank Your Honor.

23           THE COURT:  So what was the -- oh, good.  Somebody

24  else?  What's the problem here?  I don't really even

25  understand what you're -- this is, Tim, ECF 96.  Right?

 1            THE LAW CLERK:  That's right, Your Honor.

 2            MR. SANDICK:  I'll try to be as efficient as I can.

 3   We appreciate all the time you've spent with us today.

 4            There are three things in the scheduling order

 5   issue that have become sources of controversy.  The first is

 6   what is paragraph 1 in JJHCS's proposed order, which is just

 7   that we had said at the last conference, we wanted the Court

 8   to essentially reaffirm the scheduling order.  The reason we

 9   ask for that was we were told by the lawyer -- a lawyer at

10   Holland & Knight, who represents a third party in the case,

11   that in substance -- and I am not -- this is not a quote --

12   but, you know, the schedule may well slip or something like

13   that.

14            And hearing that -- they didn't hear it from us, I

15   am not going to accuse counsel for SaveOn that they said it

16   because I don't know that they said.  I don't know where it

17   came from that this lawyer at Holland & Knight --

18            THE COURT:  What does that mean, it will slip?

19            MR. SANDICK:  That the dates would slip.  The dates

20   won't hold.  The deadlines are, of course, going to move, and

21   so don't pressure us to produce things now.

22            And we thought it was important in light of that,

23   for the Court to reaffirm that the order is the order.  We

24   didn't think it was a major issue.  And, in fact, although

25   she did not make a formal appearance, one of the lawyers from

1    Holland & Knight was actually on the Zoom call that we had

2    with Your Honor on St. Patrick's Day on March 17th where this

3    came up.

4            So that's why we put it in there.  We don't think

5    it's a major issue or controversy.

6            THE COURT:  Okay.

7            Do you want to say anything?

8            MR. DUNLAP:  Yes, Your Honor.  So we didn't

9    understand at that conference that J&J was actually moving

10   into to make any sort of order.  We thought they were asking

11   to reaffirm that the schedule was in place.

12           And here's how we're thinking about it.  So the

13   extent that they're concerned about parties being bound by

14   the schedule, we are bound by the schedule.  We are bound

15   right now, if you want to reaffirm that we're bound by it.

16   That's fine.  But we're already bound.

17           Our concern is more about third parties.  So there

18   was no motion filed.  There was no notice or opportunity to

19   be heard by any third party.  Yes, there was one lawyer who

20   was sent to observe.  She didn't enter an appearance.  She's

21   not, as I understand it, even admitted in this district.  We

22   just don't think there was anything put before you as to any

23   third-party's compliance with the schedule.

24           THE COURT:  I'm going to deal with the third

25   party --

```
 1              MR. DUNLAP:  Correct --

 2              THE COURT:  Schedule or not schedule.  I will, if

 3    there's a problem.

 4              MR. DUNLAP:  Right.  And so --

 5              THE COURT:  Is there a problem?

 6              MR. DUNLAP:  Well, that's -- we don't know.  I

 7    mean, that's -- there was no motion put forward.  We think

 8    that if they have an issue with a third party in terms of the

 9    speed of their production or what have you, who is subject to

10    this Court's jurisdiction, they can bring a motion to you.

11    And if they have an issue with a third party, you know, like

12    this party in St. Louis, they should bring a motion to the

13    appropriate court.  We're not sure that you even have

14    jurisdiction to issue an order for someone who's out of

15    district.

16              Our concern is we're not exactly sure how they're

17    trying to use this as it regards for parties and if they are

18    going to try to use it to represent that third parties have

19    to produce on a certain schedule -- I mean, the current

20    scheduling order binds the parties.  It does not bind third

21    parties.  We're just asking to stick to the normal process

22    and -- with the due process for --

23              MR. SANDICK:  It's not that complicated, from our

24    vantage point, Your Honor.

25              The -- when we go to St. Louis, we wanted to be
```

1   clear for the judge in St. Louis that the judge in New

2   Jersey, who's actually managing this case, has set a schedule

3   and has recently reaffirmed that that schedule remains in

4   force.  And so that to the extent that the judge there has --

5   entertains argument about, well, what's really a discovery

6   schedule, they should know that the schedule is an order of

7   this Court --

8                THE COURT:  Yes.

9                MR. SANDICK:  -- that is still in force.  It was

10  ordered many months ago in the fall, in November.  It's still

11  in force and equally valid now in March or today in April or

12  at any point until Your Honor changes the order.

13               THE COURT:  But it has not necessarily anything to

14  do with ESI.

15               MR. SANDICK:  No, it doesn't.  That's correct.

16               THE COURT:  Okay.  Okay.

17               MR. SANDICK:  It merely is a statement that as the

18  party --

19               THE COURT:  Boy, we have really gotten into the

20  weeds in this case.

21               MR. SANDICK:  We, perhaps, have.

22               THE COURT:  Scheduling order, it is.

23               MR. SANDICK:  Thank you, Your Honor.

24               Second concern that we have relates to a portion of

25  the proposed order --

1           THE COURT:  Right.

2           MR. SANDICK:  -- that states that JJHCS --

3           THE COURT:  Oh, yeah, right.

4           MR. SANDICK:  Shall keep SaveOn -- advised of

5   any -- to SaveOn SP's healthcare plan clients or their

6   participants.

7           The "participants" means the patient.

8           And we went through this already.

9           THE COURT:  Yeah.

10          MR. SANDICK:  And in, in fact -- and I can go

11  through it, but I see in the transcript between pages 20 and

12  23, the transcript from our February 28th conference, on

13  eight occasions, the Court made clear that we were not being

14  restrained in any way.  The Court said, "That's an odd

15  request."  This is on page 20, line 3.

16          On page 22, line 1:  "I am not going to issue prior

17  restraints or who they can interview and who they can't

18  interview."

19          Line 5:  "I am not going to put a prior restraint

20  on that."

21          Line 9:  "How can I stop him from talking to his

22  patients?"

23          Line 12:  "It's an extraordinary request."

24          THE COURT:  But don't you think the patients are

25  going to tell you if they're being harassed?

 1          MR. DUNLAP:  Well, Your Honor, they might.  But

 2   it's part of -- to come if they go after a huge number of

 3   patients already.

 4          Do you have copies of the transcripts there?

 5          THE COURT:  I don't.

 6          MR. DUNLAP:  If not -- may I hand them up to you,

 7   to make it easier --

 8          THE COURT:  Well, I know what I meant, but, yeah,

 9   you can.

10          MR. DUNLAP:  Well, I just want to show you what

11   we --

12          THE COURT:  Okay.

13          MR. DUNLAP:  -- what we were referring to.

14          THE COURT:  Okay.

15          MR. DUNLAP:  I assume you all have --

16          THE COURT:  Page and line?

17          MR. SANDICK:  Sure.  Starting on page 20.

18          MR. DUNLAP:  I thought that was a question for me.

19          THE COURT:  Yeah.

20          MR. SANDICK:  Line 3.

21          THE COURT:  Yeah, it was a question for SaveOn.

22          MR. SANDICK:  Sorry.

23          THE COURT:  But --

24          MR. DUNLAP:  It's not -- to step on you.

25          THE COURT:  Yeah.  Let me -- tell me what your --

 1              MR. DUNLAP:  Sure.  If I could -- if you could turn

 2   to page 27 of the February --

 3       (Simultaneous conversation)

 4              THE COURT:  Oh, you are.  Okay.  27 on --

 5              MR. DUNLAP:  It's the February conference

 6   transcript.  So you have a mark into February there --

 7              THE COURT:  February, you want.

 8              MR. DUNLAP:  Yeah, that's where the --

 9       (Simultaneous conversation)

10              THE COURT:  What page?  27, you said?

11              MR. DUNLAP:  Page 27.

12              THE COURT:  Go ahead.

13              MR. DUNLAP:  And there was a discussion here about

14   patients.

15              And then starting at line 9, you say, "You" -- and

16   you were speaking to Mr. Sandick -- "you can contact whatever

17   plan and/or patient you want -- I am not trying to mess with

18   your strategy, but I would keep Mr. Dunlap advised.  And if

19   he sees an emergent situation arise, I can deal with it in

20   that manner as" --

21              THE COURT:  Well, that doesn't mean he has to

22   report -- I mean, I can't ask them to disclose strategy to

23   you.

24              MR. DUNLAP:  We're not asking them to disclose

25   strategy.  In fact, if you look at what we proposed, okay, we

1   were just trying to quote the language that you said in that

2   portion of the transcript.  This is in paragraph 4, our

3   proposed order.

4          THE COURT:  "If you see an emergent situation

5   arise, then I can deal with it."

6          That doesn't mean they have to report to you who

7   they're interviewing --

8          MR. DUNLAP:  We're not asking that.

9          THE COURT:  Okay.  What do you want?

10          MR. DUNLAP:  But what we put in is JJHCS will keep

11   SaveOn advised of any outreach to SaveOn's health plan

12   clients or their participants.

13          THE COURT:  That's as murky as my language in --

14      (Simultaneous conversation)

15          MR. DUNLAP:  What we under- -- what we understand

16   you -- what we understood you to mean -- and we did actually

17   try to take some time to talk about this -- was we're not

18   asking for them to tell us who they're talking to or what

19   they're talking about or anything like that.

20          It's just the volume of the outreach.  Because,

21   remember, the issue that we raised to you was a -- the whole

22   reason we moved for a protective order was we have thousands

23   of clients.  Those clients have tens of thousands of plan

24   members or patients.  And if J&J was to go out and blanket

25   them with subpoenas or informal outreach, that could have

 1   immediate and real commercial harm on us and potentially also

 2   on the patients as well.  And that's the sort of event that

 3   we're trying to guard against.

 4           So we took you to be saying -- and we're -- again,

 5   we're glad to clarify this was talk to whoever you want.

 6   You're not putting any sort of prior restraint on them.  But

 7   just keep us advised of the volume of your outreach so that

 8   if your plan -- in the name of 28,000 patients the other day.

 9   If they're planning and going out and sending a letter to all

10   of them, we think you were saying tell us about that so that

11   we can come to you before that goes out --

12           THE COURT:  Yeah, that makes sense --

13       (Simultaneous conversation)

14           MR. DUNLAP:  But that's all we're -- all we're --

15   if I just conclude --

16           THE COURT:  Then I can deal with a PI.

17           MR. DUNLAP:  Yes, exactly.  We're just asking

18   for -- all we're asking for on this and on the subpoena issue

19   is really notice.  Just tell us if you're planning to do some

20   large-scale --

21           THE COURT:  General notice.

22           MR. DUNLAP:  Yeah, that's --

23           MR. SANDICK:  Your Honor, on the page before,

24   page 25, when talking about the issue, not of health plans

25   but of patients, Mr. Dunlap said -- and I'm quoting him --

```
 1  informal outreach to patients.  What I understand you're

 2  saying -- and "you" in this is Your Honor --

 3              THE COURT:  Yes.

 4              MR. SANDICK:  -- I understand you to say there's no

 5  limits.  They can talk to whomever they want.

 6              THE COURT:  Right.

 7              MR. SANDICK:  And today they're telling us we have

 8  this, as Your Honor indicated, sort of an amorphous --

 9              THE COURT:  No, no, no.

10              MR. SANDICK:  -- consultation obligation.

11              THE COURT:  No.

12              MR. SANDICK:  Patients call us up.  We want to talk

13  to them, we don't have to tell them anything about it.

14              THE COURT:  No.  No.  You don't have to tell them

15  who.

16              But if you were to advise -- I have to -- and I am

17  not saying I would grant the PI under this situation.  But I

18  think they have the right to be able to make certain

19  objections.

20              If you're going to send out 40,000 or 20,000 or

21  you're going to do mass mailings and you let them know and

22  they want to try and convince me or, oh, gosh, me, me, or the

23  district judge who would do the PI and then -- okay.

24              So I just want them to know sort of the general

25  parameters of what you intend to do without taking an oath as
```

```
 1  to specifics or limiting yourself -- if you say 20,000 and
 2  you do 30,000, you know, that doesn't matter.  But I just
 3  want them to have an idea so that they have the opportunity
 4  to make an application.
 5          MR. SANDICK:  Well -- and just to be clear,
 6  Your Honor, what we're talking about --
 7          THE COURT:  Make it a protective order.
 8          MR. SANDICK:  What we're talking about here would
 9  be prior restraint on JJHCS, as the Court indicated.  It is
10  not a --
11          THE COURT:  It is not a specific prior restraint.
12          MR. SANDICK:  It's not a subpoena.  It's saying to
13  us --
14          THE COURT:  Yeah.
15          MR. SANDICK:  That before we can talk to people,
16  JJHCS --
17          THE COURT:  No.  Not before.
18          MR. SANDICK:  Okay.
19          THE COURT:  Nobody's said anything about before.
20          MR. SANDICK:  Okay.  So what is the --
21          THE COURT:  We've reached out, and we're going to
22  make inquiry of 50,000 people.  We're going to send letters
23  to 70,000 people.  Again, I don't -- I don't think that it's
24  possible to restrain their investigation.
25          I understand the business considerations that you
```

1  have.  That is not before me now.  And I would have to be

2  convinced that that outweighs -- that that outweighs their

3  ability to strategize and/or speak to people or witnesses.  I

4  mean, that would have to really be convincing.

5          My -- Tim had an idea -- Tim Duva -- that's my

6  esteemed law clerk sitting before you -- had an idea that

7  after this is done -- that's too much, though, Tim.  Oh, no.

8  That after what you've done, you just give them a sense of

9  what you're doing to permit him to make an application to me,

10  which, as I say, you would really have to convince me that

11  their investigation should be limited.

12          MR. SANDICK:  And to be clear, Your Honor --

13      (Simultaneous conversation)

14          THE COURT:  -- and let me say this.

15          MR. SANDICK:  I'm sorry.

16          THE COURT:  -- there's going to come a time,

17  because this is getting a little out of hand, the whole case.

18  There's going to come a time when we have to sort of come

19  full circle and get the case ready.

20          MR. SANDICK:  And that's what we're trying to do,

21  Your Honor.

22          And to be clear on the patient issue, we have not,

23  nor do we intend, to send out 30,000 letters.  This is an

24  imagined harm created in order to try to handcuff us from

25  taking more reasonable actions.

1              THE COURT:  Nobody's handcuffing you.

2              MR. SANDICK:  Okay.  That --

3              THE COURT:  You're not handcuffed.

4              MR. SANDICK:  -- that's all I need to hear.

5    Primarily the patients who we talk to are patients who have

6    come forward and said, "I don't like the SaveOn program.  I

7    don't like the way this impacts my healthcare expenses."

8    They're people who are reaching out to us.  We are not -- we

9    have no need to send 30,000 letters to look for people who

10   don't like SaveOn.

11             THE COURT:  Okay.

12             MR. SANDICK:  They're out there.

13             THE COURT:  And it may be relevant that you keep

14   track of those who reached out to you as opposed to those

15   who -- I use the word "solicit" loosely, but you get in touch

16   with voluntarily.

17             MR. SANDICK:  And also these are patients --

18             THE COURT:  So could you keep a record of that?

19             MR. SANDICK:  To keep a record of who we've spoken

20   to and --

21             THE COURT:  No, not the -- I don't care about --

22             MR. SANDICK:  Okay.

23             THE COURT:  -- who -- yet, unless you're going to

24   call 30,000 witnesses.

25             MR. SANDICK:  I don't think so.

1        THE COURT:  So if people reach out to you and then

2   there's a different set of -- or a subset of people that

3   reach out to, I think that you might want to keep track of

4   that in the event a motion is filed.

5        MR. SANDICK:  Okay.

6        And, Your Honor, also to be clear, the patients who

7   we're talking about, these are people who are taking Janssen

8   drugs and who are part of the -- our client, JJHCS's CarePath

9   program.  So these are not strangers to us.  These are our

10  patients.  These are the people who are taking the drugs,

11  thanks to the co-pay assistance that CarePath provides.

12       So, you know, I don't know whether at the end of

13  this we're going to have to go back, the lawyers, and settle

14  up an order.  It would be helpful, I think, to make clear

15  that -- in that order that emerges, there is no limit on our

16  ability to contact people, that we are not -- to use the

17  language from the stipulation that we proposed, "JJHCS may

18  contact any health plan or patient.  It is not restrained by

19  the Court from contacting anyone."

20       I think it's important that that be in there.

21       THE COURT:  I agree with you.

22       MR. SANDICK:  Okay.

23       And on the final question relates to the issuance

24  of subpoenas.

25       THE COURT:  But are you going to put in there that

|Hearing
|22-cv-02632, April 13, 2023

```
 1  you're going to keep your adversary advised in a very general

 2  sense?

 3            MR. SANDICK:  I -- we'll do what -- if that's

 4  Your Honor's wish --

 5            THE COURT:  Yes.

 6            MR. SANDICK:  -- of course, we'll do that.  I want

 7  to be clear on the record, that that type of wording does not

 8  create any obligation to give them any particular --

 9            THE COURT:  No prior notice is necessary.

10            MR. SANDICK:  Okay.  Okay.

11            THE COURT:  And you're saying that you're limiting

12  it now to your patients?  Is that a statement of finality?

13            MR. SANDICK:  Yeah -- I believe that the patients

14  we're talking to are the patients on CarePath, particularly

15  since Your Honor --

16            THE COURT:  Well, only put that in -- and I request

17  that you do -- if it's true.  If it's not true, then don't

18  put that in.

19            MR. SANDICK:  I mean, I -- there are other people

20  besides me on the team.

21            THE COURT:  Okay.

22            MR. SANDICK:  I want to confirm that.

23            But my understanding is that these are CarePath

24  patients taking --

25            THE COURT:  Okay.
```

1            MR. SANDICK:  -- Janssen drugs.

2            THE COURT:  Okay.

3            MR. SANDICK:  And those are the people who we would

4   have --

5            THE COURT:  Just say it.  Don't --

6            MR. MANGI:  Your Honor --

7            THE COURT:  Okay.  I'll just say it.  Yeah.

8            MR. MANGI:  I just want to clarify.  As I

9   understand it, Your Honor's concern is with something of mass

10  outreach -- you know, like a letter to 30,000 people,

11  et cetera, or things like that.

12           I just want to make clear that, you know, we talk

13  to one individual, we don't have to go and give them a

14  report.

15           THE COURT:  No.  No --

16      (Simultaneous conversation)

17           THE COURT:  That's not what he's asking.

18           MR. MANGI:  Okay.

19           THE COURT:  You're asking to be kept in the loop in

20  a very general basis, not as -- before you do it, but

21  afterwards, what -- what are you doing?  So he can make a

22  decision as to whether or not he's going to ultimately

23  adversely affect any business.

24           MR. MANGI:  Yeah --

25           THE COURT:  And I am not even saying that that

 1  concerns me.  I'm saying he's entitled to make that motion.

 2  I mean, you have this a lot in class actions where you have

 3  to be careful of what goes on.  This is not comparable to

 4  that, but if, in fact, he anticipates -- or that team

 5  anticipates that business will be affected, he's entitled to

 6  file a motion.

 7          MR. MANGI:  Okay.  Understood.

 8          THE COURT:  And, again, I suggest, if the motion

 9  comes, that it be a protective order, and we can talk about

10  it later.

11          MR. DUNLAP:  Your Honor, if I could actually

12  speak --

13          THE COURT:  Go ahead.

14          MR. DUNLAP:  -- to this, which is the language we

15  proposed is -- the relative language is the following:  JJHCS

16  shall keep SaveOn SP advised of any outreach SaveOn SP's

17  health plan clients or their participants.

18          THE COURT:  Can you repeat that.

19          MR. DUNLAP:  JJHCS shall keep SaveOn advised of any

20  outreach to SaveOn SP's health plan clients or their

21  participants -- because the participants are the patients.

22          MR. SANDICK:  And, Your Honor --

23          MR. DUNLAP:  It's the last sentence of the

24  paragraph 4 of our proposed order.

25          THE COURT:  Well, that's -- no.

 1              MR. DUNLAP:  Which we understand what you were

 2   saying --

 3              THE COURT:  It's not what I'm saying.

 4              What I'm saying is --

 5              MR. DUNLAP:  -- page 27.  Yeah.

 6              THE COURT:  This is preemptive or suggests that its

 7   preemptive.

 8              MR. SANDICK:  That was our -- that was our concern,

 9   Your Honor.

10              THE COURT:  I am not -- I am not saying they have

11   to call you up and say, "We're calling Jane Doe.  We want to

12   tell you that."

13              What I want is language to the effect that they'll

14   keep you apprised as they reach out, not before necessarily.

15              I mean, aren't we making a big deal out of nothing

16   here?

17              MR. DUNLAP:  I hope that's the case.

18              But our view -- we are very concerned about mass

19   outreach to our clients and the patients that they --

20              THE COURT:  But they've already said they think so

21   far it's their clients or their patients --

22              MR. DUNLAP:  Well -- but let's be clear about that.

23   Their patients and our patients are the same patients.

24              THE COURT:  I understand that.

25              MR. DUNLAP:  -- categories.  So -- and, again, if

1  they want to talk to their patients about their own services,

2  they can go ahead.  We're not asking for any -- they'll need

3  to --

4           THE COURT:  No.  They want to talk to them about

5  your services --

6      (Simultaneous conversation)

7           MR. SANDICK:  -- he's relitigating the motion,

8  Your Honor.

9           MR. DUNLAP:  --

10          MR. SANDICK:  He's relitigating the motion --

11          THE COURT:  No.  He's not -- let him talk --

12  because I am not changing my mind.  Don't worry.

13          MR. DUNLAP:  Yeah.  No.  What we were concerned

14  about then, we're concerned about now is them reaching out to

15  patients about this litigation in a way that could then have

16  bad effect on SaveOn's business.  That was a concern we --

17          THE COURT:  Okay.

18          MR. DUNLAP:  -- we brought to you.

19          THE COURT:  They are -- this is -- this suggests

20  that it's preemptive.  It's not preemptive.

21          The language should say in a very general sense --

22  because I don't want to preclude or shadow any motions that

23  may be anticipated.  They can do what they want to do, and

24  they're to say to you at some point afterwards -- they don't

25  have to call you before -- say, listen, we're talking to 25

1    people.  We're talking to 30 people.

2              And if you start getting complaints -- specific

3    complaints from people, then that gives you grounds to file

4    for a protective order.

5              MR. DUNLAP:  Yes, Your Honor.  And that's where we

6    were going, which is what you just said, 25 or 30 people.

7              What we thought you meant and what we were going

8    for is just keep it advised of the -- with the outreach.  We

9    don't need to know who you're speaking to or what you're

10   asking them.

11             THE COURT:  Or you don't have to know

12   preemptively --

13             MR. DUNLAP:  Well, certainly, if it's 25 or 30.

14             Now --

15             THE COURT:  No.  I'm never going to say to you --

16   if it's 100,000 --

17        (Simultaneous conversation)

18             MR. DUNLAP:  We weren't asking then and we're not

19   asking now for any sort of restraint.

20             We would have asked if it was 20,000.  We think

21   prior notice might be helpful because if they go and they

22   blanket 20,000 people and that's a real harm and we don't

23   have a chance to address it before then, then the horse has

24   left the barn.

25             THE COURT:  I'm sure you'll hear about it.

1         MR. DUNLAP:  Well, afterwards, after the harm has

2   been inflicted.

3         So if we're not going to get you to the point where

4   you say they should give us notice of how many people they're

5   speaking to --

6         THE COURT:  No.

7         MR. DUNLAP:  -- ask that they at least say that

8   they should keep us -- whatever terms you want to use -- sort

9   of regularly advised of outreach that they have made or the

10  volume of the outreach that they have made so --

11        THE COURT:  Okay.

12        MR. DUNLAP:  -- which is what I thought is what

13  you're getting at.

14        THE COURT:  Okay.  Okay.  I think that's fair.

15        MR. DUNLAP:  -- so that we know what's going on.

16        MR. SANDICK:  As long as it places no restraint,

17  and that's why we --

18        THE COURT:  There's no restraint.

19        MR. SANDICK:  Right.  And that's why --

20        THE COURT:  There's no restraint.

21        MR. SANDICK:  -- we added in our order --

22        MR. DUNLAP:  -- asking for notice, Your Honor.  Not

23  restraint.

24        MR. SANDICK:  And that's why we added in our --

25        THE COURT:  Notice afterwards.  I know you're

1  saying that -- this is really crazy, people.  This is crazy.

2  I'm now in the world of advisory opinions.  I am not going to

3  do that.

4           Conduct your litigation.  Keep them informed as to

5  the volume before, during, after, whenever you want.

6           MR. SANDICK:  Okay.  Thank you, Your Honor.

7           The last issue relates to the issuance of

8  subpoenas.  Looking at their proposed order --

9           THE COURT:  This is also anticipatory.

10          MR. SANDICK:  It is, except that in their proposed

11  order, which is why we are here, they would have us

12  essentially have to go to SaveOn for permission to serve

13  individual subpoenas on health plans.  The language they

14  proposed is JJHCS -- this is in paragraph 4 of their proposed

15  order -- shall meet and confer with SaveOn regarding total

16  number of subpoenas it intends to issue to SaveOn SP's health

17  plan clients and their plan participants.

18          Up to that point, we are in agreement with that.

19          THE COURT:  Okay.

20          MR. SANDICK:  Our order has the same language.

21          THE COURT:  Okay.

22          MR. SANDICK:  The nub of the objection is the

23  language that follows:  [As read] Before issuing any such

24  subpoenas, by use of the word "any," it means that if I want

25  to serve a health plan with one subpoena, one health plan

 1   with one subpoena, I have to first clear it with them.

 2            That is not in the federal rules.  It's not in any

 3   rules.

 4            THE COURT:  No.  And you don't have to clear

 5   anything.  I take --

 6            MR. SANDICK:  Exactly.

 7            THE COURT:  -- I thought it was an intent to meet

 8   and confer and help litigation.  I didn't think it was to

 9   meet and confer and they said you can't serve a subpoena.

10   Then if you serve -- I mean, they have a right to serve --

11   and they -- and then there's a right to quash.

12            What -- how --

13        (Simultaneous conversation)

14            MR. DUNLAP:  Right, Your Honor.  We're just saying

15   it's not what we put an order --

16            THE COURT:  Okay.

17            MR. DUNLAP:  -- it's not what we're suggesting.

18            If I could refer you to page 25 of the

19   February transcript.

20            THE COURT:  Okay.

21            MR. DUNLAP:  Starting at line 12 --

22            THE COURT:  Right.

23            MR. DUNLAP:  -- this follows the discussion we've

24   had about subpoenas.

25            [As read] What I understand in subpoenas, we're

1   going to give them the list of patients and the list of

2   plans.  Then they -- Johnson & Johnson -- can come to us,

3   SaveOn, and say roughly how many they want to issue -- how

4   many subpoenas.  If we can, great.  If we can't, we come to

5   you.

6           Which you then said, "Yes."

7           So our understanding was that you will -- because,

8   again, we are concerned about this mass subpoena idea.  We

9   thought you were striking balance.  We're not asking to come

10  to us on individual subpoenas.  Nothing like that.

11          What we thought you were saying was, look, meet and

12  confer about the order of magnitude, the number of subpoenas

13  that they intend -- third-party subpoenas they intend to

14  serve the plans -- if we think that there's a problem, if

15  they come in with some number that we think is crazy, then we

16  have an opportunity to come to you and litigate that before

17  the subpoenas come out.

18          THE COURT:  Is that what you were saying?

19          MR. DUNLAP:  And so --

20          THE COURT:  I'm --

21     (Simultaneous conversation)

22          THE COURT:  I'm in two different conversations.

23          MR. SANDICK:  Your Honor, I'm just -- what I am

24  focused on is the language of the proposed order that they

25  want Your Honor to sign.  And it says that we have to meet

1   and confer with them regarding the number of subpoenas before

2   issuing any subpoenas.

3            That's our concern.  Strike those five words from

4   their order, I'm fine with it.

5            THE COURT:  Well, it doesn't mean that you can't

6   issue the subpoenas.  Meet and confer.  And that he's just

7   asking, again, for notice so that he can come to me -- or

8   they can come to me.  But whether or not the subpoena issues,

9   what's the difference is really what I have to say, because

10  you have to have notice of the subpoena.

11           MR. DUNLAP:  Right.

12           THE COURT:  They have to send you a copy of the

13  subpoena.  You come in the next day.

14           MR. DUNLAP:  Right.  What we understood you to be

15  saying, Your Honor -- the normal process --

16           THE COURT:  What difference does it make?

17           MR. DUNLAP:  Well, here's the difference.  The

18  normal process would be they give us notice of the

19  subpoena -- issue can report -- to quash it.

20           THE COURT:  After it's issued.

21           MR. DUNLAP:  After -- yes.

22           THE COURT:  You can't quash something that's not

23  issued.

24           MR. DUNLAP:  Right.  But, I mean, in the normal

25  course, they would have to -- well, we could file a -- we

 1    could file a motion.

 2              In the normal course, they have to give us notice;

 3    then it would go out.  What we thought you were saying was

 4    because of the concern that we had raised.  And this is what

 5    we understood you to be saying on 25, we were supposed to

 6    meet and confer now.  If they tell us --

 7              THE COURT:  Yes.

 8              MR. DUNLAP:  -- we're going to serve -- we are

 9    going to serve -- you know, at this point in the litigation,

10    we'll serve like up to 20 or 30 subpoenas --

11              THE COURT:  Well, that's what I thought I was

12    talking about --

13        (Simultaneous conversation)

14              THE COURT:  If they were going to serve 2,000

15    subpoenas --

16              MR. DUNLAP:  Yeah, that's all we're asking.

17              MR. SANDICK:  Which we're not --

18              THE COURT:  Which he's not saying that.

19              MR. SANDICK:  This is an imagined harm.

20              THE COURT:  You're talking about the number of

21    subpoenas.

22              MR. DUNLAP:  Correct.  And that's what we were

23    trying to say.

24              THE COURT:  He's talking about who they can

25    subpoena.

1          MR. DUNLAP:  We're not trying to get at who they

2  can subpoena at all.  That doesn't -- that is just a red

3  herring.

4          MR. SANDICK:  Your Honor --

5          MR. DUNLAP:  What we're -- Your Honor, if we could

6  speak now.

7          THE COURT:  I don't care who speaks.  I mean, --

8          MR. DUNLAP:  But, Your Honor what we thought you

9  were saying is meet and confer.  Tell us where plaintiffs --

10  serving 20, 30 subpoenas now --

11      (Simultaneous conversation)

12          THE COURT:  Okay --

13      (Simultaneous conversation)

14          MR. DUNLAP:  If they're doing that, that is not an

15  issue --

16      (Simultaneous conversation)

17          THE COURT:  Talk to each other.  Let me make this

18  clear so you can take another transcript and quote me,

19  because I'm never making a transcript again.

20          Meet and confer.  Let him know how many subpoenas

21  you're going to issue.  Issue your subpoenas, if you want.

22  But before -- if you tell him it's a thousand and he thinks

23  that's too many for the case, then he can come to me and say,

24  "It's too many subpoenas."

25          I can't stop you from issuing the subpoenas.  If

1  they're -- he -- you're talking about number of subpoenas,

2  the volume.

3          MR. DUNLAP:  Yes.

4          THE COURT:  He's talking about he can subpoena

5  anybody he wants.  It's two different conversations.  He can

6  subpoena anybody he wants.  They can quash it, or if you have

7  standing, you can move to quash.  But if the number of

8  subpoenas is outrageous and disproportionate to this case,

9  then he can let you know how many he's going to serve, and

10  you can come to me and say, "I want an early motion,

11  protective order; it's disproportionate to the case."

12          MR. DUNLAP:  That's what we understood you to say

13  last time.  That's what we were trying --

14      (Simultaneous conversation)

15          THE COURT:  It is, but you're having two different

16  conversations.

17          MR. DUNLAP:  Well, we tried to assure them that

18  their concern where they have to come to us before --

19          THE COURT:  You can't assure them.  And they can't

20  assure you of anything --

21          MR. DUNLAP:  Apparently not.  But I still have --

22  but hopefully I can assure you that we're not trying to do

23  that.  We just want what you just said:  Meet and confer with

24  us about the number so we have an opportunity before large

25  numbers of subpoenas get out --

1          THE COURT:  Okay.

2          MR. DUNLAP:  -- if there's an issue about the

3    volume.

4          THE COURT:  Okay.

5          MR. SANDICK:  Well, Your Honor, again, the only

6    concern we have with their -- is with their order that makes

7    it a condition:  "Before issuing any such subpoenas."  Strike

8    those five words from their order, we're in agreement -- the

9    five words.

10          THE COURT:  It's not a condition.  It's a

11    discussion that adult lawyers should have --

12          MR. SANDICK:  Yes.

13          THE COURT:  -- out of consideration so that if they

14    are motions to be had, they should be permitted to be filed.

15          MR. SANDICK:  And, Your Honor, just to put it into

16    context, this case has been pending for almost a year.  The

17    number of subpoenas --

18          THE COURT:  Oh, my god.  It's only a year?

19          MR. SANDICK:  The number of subpoenas that we've

20    served on health plans.

21          THE COURT:  Okay.

22          MR. SANDICK:  So the notion that we're sitting

23    here -- I could -- I will assure the Court --

24      (Simultaneous conversation)

25          THE COURT:  -- a discussion I had with Tim Duva,

 1  who did a very nice bench memo and is completely on top of

 2  this case, they're starting to ask me for anticipatory

 3  advisory rulings.

 4          And I don't really want to do that.

 5          So just litigate the case.  No.

 6          MR. SANDICK:  That's all?  That's all that we want

 7  to do, Your Honor.

 8          THE COURT:  Just litigate -- move the case on.

 9          MR. SANDICK:  Your Honor, can the -- can the next

10  order simply be an order that we proposed to you that the

11  rulings made in this conference are adopted as rulings in the

12  case in order to avoid --

13          THE COURT:  No.  Stop.

14          Stop.

15          What are you doing?

16          MR. SANDICK:  Okay.  Okay.

17          THE COURT:  No.

18          MR. SANDICK:  In terms of the scheduling --

19          THE COURT:  No.  No.  Because --

20          MR. SANDICK:  Okay.

21          THE COURT:  -- because if I wake up tomorrow and

22  overrule myself.

23          MR. SANDICK:  Well, that -- that could always

24  happen.

25          THE COURT:  It does happen.

1          MR. SANDICK:  A judge can always change their mind.

2          THE COURT:  Just -- yes.

3          But stop micromanaging this.  Could you please just

4   litigate the case?  We know it's going to trial -- how about

5   mediator?  These are your transcripts.  I know we're not near

6   that.

7          MR. SANDICK:  I don't have an -- I don't have an

8   official position on that.  If the Court's asking, we'll take

9   it back to our client.

10         THE COURT:  I think you should all take this back

11  to your clients.  I don't -- I am not very hopeful at all.

12  But I'd like to sit and discuss mediators, if we could get to

13  that point.

14         And I don't want to appoint a master.  I'd like to

15  manage the case myself.

16         But you're -- you're run awild here.

17         MR. MANGI:  -- mediation.

18         THE COURT:  Yeah.

19         MR. MANGI:  Is it Your Honor's practice to mediate

20  cases yourself?

21         THE COURT:  I do.

22         MR. MANGI:  Okay.

23         THE COURT:  I do.  I'm happy to do that.

24         MR. MANGI:  Okay.  Okay.

25         THE COURT:  But if and when that happens, I want

 1  people here in person -- I don't care where they're from.

 2            MR. MANGI:  Yup.

 3            THE COURT:  And I would reserve an entire day as

 4  our first settlement conference.

 5            MR. MANGI:  Understood.

 6            And, Your Honor, in -- to try to get us where we're

 7  litigating the case and not bothering you on a regular basis,

 8  I just want to figure out what is Your Honor's preference in

 9  terms of dealing with -- now we've heard Your Honor.

10  Your Honor has issued your rulings.  And there are nuances,

11  obviously, to a number of the points that you've made.  If

12  we're going to try to reduce those to a short order -- I just

13  feel we're back to bothering you again.

14            If Your Honor would like us to do that, we'll do

15  that.

16            THE COURT:  Yeah.

17            MR. MANGI:  If Your Honor's --

18            THE COURT:  Yeah.

19            MR. MANGI:  Okay.  You would like to have a written

20  order at the end?

21            THE COURT:  Yes.

22            MR. MANGI:  Okay.  Understood.

23            THE COURT:  I want a written order.  Confer with

24  each other.  If we have to tweak the language, we'll do this

25  again.

|Hearing
|22-cv-02632, April 13, 2023

1              MR. MANGI:  Okay.  Thank you.

2              THE COURT:  I'm in this deep.  Right?  Turn the

3    record off, please.

4                    (Conclusion of proceedings)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|Hearing
|22-cv-02632, April 13, 2023
|Certification

92

```
 1                            Certification

 2         I, SARA L. KERN, Transcriptionist, do hereby certify

 3   that the 92 pages contained herein constitute a full, true,

 4   and accurate transcript from the official electronic

 5   recording of the proceedings had in the above-entitled

 6   matter; that research was performed on the spelling of proper

 7   names and utilizing the information provided, but that in

 8   many cases the spellings were educated guesses; that the

 9   transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ *Sara L. Kern*                    17th of April, 2023
     _____    _____
19   Signature of Approved Transcriber            Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25
```