# EXHIBIT A

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

September 7, 2023

**VIA ECF**

Hon. Cathy Waldor, U.S.M.J.
U.S. District Court for the District of New Jersey
50 Walnut Street, Room 4040
Newark, NJ 07102

> Re: ***Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC***
> **No. 2:22-cv-02632 (ES) (CLW)**

Dear Judge Waldor:

Defendant Save On SP, LLC ("SaveOnSP") seeks the Court's intervention to compel Plaintiff Johnson & Johnson Health Care Systems, Inc. ("JJHCS") to produce documents regarding JJHCS's budget for the CarePath program, Johnson & Johnson's return on its investment on that program, Johnson & Johnson's pricing of the Janssen drugs at issue, and patients' adherence to those drugs. JJHCS asserts that the Court should once again deny SaveOnSP's demands for documents on drug pricing going back to 2009, and the other irrelevant and overbroad lines of inquiry SaveOnSP is now using to take the focus off its own misconduct.

The parties have met and conferred in good faith to resolve their disputes concerning these RFPs but were unable to do so. We therefore submit this letter in accordance with Local Rule 37.1 and the Court's Civil Case Management Order.

### SaveOnSP's Position

SaveOnSP asks the Court to compel JJHCS to produce documents regarding JJHCS's budget for the CarePath program, Johnson & Johnson's return on its investment on that program, Johnson & Johnson's pricing of the Janssen drugs at issue, and patients' adherence to those drugs. SaveOnSP initially moved to compel JJHCS to produce these and other financial documents in February 2023. The Court ordered SaveOnSP to defer its requests until JJHCS completed its production regarding harm to JJHCS in June 2023. That production omits crucial documents.

### Background

JJHCS sued SaveOnSP for tortious interference with contract and deceptive trade practices under NY GBL § 349. JJHCS alleges that, according to its own "net price" calculation, it has "consistently decreased the price" of the Janssen drugs at issue in this case, Compl. ¶ 80, but also alleges that without copay assistance, "many patients would be unable to afford their medications," *id.* ¶ 7. It alleges that it provides copay assistance via CarePath "in order to help [patients]... more easily afford their life-saving and life-improving therapies," *id.* ¶¶ 6-7, 50, 74, and that "CarePath offers patients up to $20,000 in assistance towards their out-of-pocket costs per calendar year," *id.* ¶ 47. JJHCS alleges that SaveOnSP's services—which it calls the "SaveOnSP Program"—change health plans' designations of Janssen drugs from "essential health benefits" to "non-

Hon. Cathy L. Waldor
September 7, 2023
Page 2

essential health benefits," *id.* ¶ 9, and increase patient copay amounts so that the plans can take additional advantage of CarePath's copay assistance, *id.* ¶¶ 10, 17.

In both claims, JJHCS alleges that SaveOnSP injured it "by making [JJHCS] pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend." Compl. ¶ 110 (tortious interference); *id.* ¶ 115 (GBL). In its GBL claim, JJHCS alleges that SaveOnSP injured the public by, among other things, "jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive" and "making other patient healthcare needs more expensive[.]" *Id.* ¶ 114. For damages, JJHCS alleges that "SaveOnSP caused JJHCS to pay at least $100 million more in copay assistance than it otherwise would have[.]" *Id.* ¶ 5. JJHCS also alleges that it cannot reduce payments to patients on SaveOnSP-advised plans because it cannot easily identify them. *Id.* ¶ 101.

SaveOnSP asserts affirmative defenses that include: (1) SaveOnSP did not injure JJHCS because any increase in JJHCS's copay assistance payments is traceable to JJHCS's CarePath budget and benefit terms set by health plans, Affirmative Defenses ¶¶ 20-23; (2) JJHCS has not suffered damages because SaveOnSP's services result in Johnson & Johnson making more money from additional sales of Janssen Drugs, Dkt. No. 85, *id* ¶¶ 13-17; (3) JJHCS failed to use reasonable means to prevent and/or mitigate any alleged damages, *id.* ¶¶ 24-29; and (4) JJHCS is not entitled to any equitable relief because it has not suffered irreparable injury and the balance of equities favors SaveOnSP, *id.* ¶¶ 39-43.

Documents and communications related to the CarePath budget, Johnson & Johnson's financial return on the CarePath program, Johnson & Johnson's pricing of Janssen drugs, and patients' adherence to Janssen drugs are relevant to JJHCS's allegations and claims. They likely will show that CarePath's true purpose is not to help patients but rather to sell more Janssen drugs. They likely also will show that Johnson & Johnson's return on its expenditure of CarePath funds in the form of Janssen drug sales is so large that CarePath is more than "financially viable" regardless of SaveOnSP's conduct. JJHCS pled that SaveOnSP "damages the public" by "jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive." Compl. ¶ 114. It now claims that CarePath's profitability is irrelevant to the element of public harm. But CarePath is not a charity, and SaveOnSP is entitled to show that any "harm" it causes CarePath is nothing more harm to another private business, not the public. JJHCS may choose to argue at the merits phase that harm to its marketing budget somehow hurts the public, but it cannot preclude SaveOnSP from gathering evidence of CarePath's true purpose and financial condition during discovery.

The documents are also relevant to SaveOnSP's defenses. They could show that JJHCS was perfectly capable of reducing its CarePath expenditures but chose not to, supporting SaveOnSP's affirmative defenses that JJHCS failed to mitigate its damages and acquiesced to SaveOnSP's conduct. The documents could also show that SaveOnSP's conduct does not injure JJHCS—in fact, SaveOnSP believes that its conduct results in increased sales of Janssen drugs that more than offset any increased expenditure of CarePath funds. The documents could similarly show that JJHCS's purported damages are nothing or at least much lower than the amounts alleged,

Hon. Cathy L. Waldor
September 7, 2023
Page 3

accounting for increased drug sales. (While JJHCS suggests that SaveOnSP's defenses are not "germane," it did not move to dismiss or strike any of those defenses.)

SaveOnSP sought documents on these topics in its RFP Nos. 11, 25, and 27-30, which it served on November 11, 2022.[1] JJHCS refused to produce any documents in response to RFP Nos. 11 and 30. Ex. 2 at 12, 27-28 (JJHCS's Responses and Objections to SaveOnSP's First Set of RFPs ("R&Os")). In response to RFP Nos. 25, 27, 28, and 29, JJHCS agreed to produce limited information that supported its own theory of injury and damages.[2] In response to RFP No. 28(a)-(h), JJHCS agreed to produce only its publicly-available Janssen Transparency Reports, but none of the data underlying them. Ex. 2 at 25 (JJHCS's R&Os). In response to RFP No. 28(i)-(m), JJHCS agreed to produce responsive data from January 1, 2016 to July 1, 2022. Ex. 5 at 3 (Feb. 17, 2023 Ltr.). In response to RFP Nos. 29, JJHCS agreed to produce documents "sufficient to show" the requested information in RFP No. 29(a)-(c). *Id.* at 27-28. It refused to produce any documents in response to RFP No. 30. *Id.* at 27-28.

In February 2023, SaveOnSP moved to compel JJHCS to produce documents in response to its RFP Nos. 11, 28(a)-(h), and 29-30. *See* Ex. 6 at 13-18 (Feb. 24, 2023 Joint Letter (Dkt. 79)).[3] At the March 17, 2023 conference, at JJHCS's request, the Court denied SaveOnSP's motion without prejudice; it ordered JJHCS to prioritize the production of documents concerning SaveOnSP's financial impact on JJHCS and CarePath. *See* Mar. 17, 2023 Tr. at 33:24-34:4, 36:5-16. Contrary

---

[1] RFP No. 11 seeks all Documents and Communications from January 1, 2009 "regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 6-7, 36-49." Ex. 1 (SaveOnSP's First Set of RFPs). RFP No. 25 seeks all Documents and Communications concerning "any alleged harm caused by SaveOnSP to JJHCS," including those regarding the allegations in Complaint ¶¶ 110, 115. *Id.* RFP No. 27 seeks "[a]ll Documents and Communications regarding the 'internal JJHCS data' discussed in Complaint ¶¶ 92-101, including the complete databases from which that data was drawn." *Id.* RFP No. 28 seeks several categories of Documents related to the Janssen Drugs, including claims data, documents sufficient to show the cost, price, budget, and revenue received for each drug, as well as information regarding patients' enrollment in the CarePath program, including the amounts of copay assistance provided to each patient. *Id.* RFP No. 29 seeks, *inter alia*, for each Janssen Drug, all Documents and Communications concerning the amount of CarePath funds paid to patients, JJHCS's budgets for and revenue resulting from CarePath, Johnson & Johnson's return on investment from CarePath, JJHCS's accounting for unused CarePath funds, and the impact of CarePath on the sale and pricing of the Janssen Drugs. *Id.* RFP No. 30 seeks all Documents and Communications from January 1, 2009 regarding the decision to raise or lower the price of each Janssen Drug. *Id.*

[2] JJHCS agreed to produce from April 1, 2016 to July 1, 2022: (1) "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period;" (2) "the data that formed the basis for the allegations in Complaint ¶¶ 92-100;" (3) "JJHCS's budget for copay assistance through CarePath;" and (4) "JJHCS's actual and projected annual costs for CarePath." Ex. 3 at 1-2 (Feb. 14, 2023 Ltr.), Ex. 4 (Apr. 10, 2023 Email).

[3] The parties met and conferred extensively on these RFPs before SaveOnSP moved to compel. *See* Ex. 7 (Dec. 21, 2022 Ltr. at 13, 15-16); Ex. 8 (Jan. 6, 2023 Ltr. at 5, 8-11); Ex. 9 (Jan. 13, 2023 meet and confer and Jan. 20, 2023 Ltr. at 1-2); Ex. 9 (Jan. 20, 2023 Ltr. at 1-2); Ex. 10 (Jan. 27, 2023 Ltr. at 1-3, 7-12); Ex. 11 (Jan. 30, 2023 meet and confer and Feb. 7, 2023 Ltr. at 1-2); Ex. 3 (Feb. 14, 2023 Ltr. at 1-2); Ex. 12 (Feb. 15, 2023 Ltr. at 1-2); Ex. 5 (Feb. 17, 2023 Ltr. at 3); Ex. 13 (Feb. 21, 2023 at 3); Ex. 14 (Feb. 23, 2023 at 2).

Hon. Cathy L. Waldor
September 7, 2023
Page 4

to JJHCS's suggestions below, the Court did not deny this request on the merits. The Court stated that SaveOnSP was "entitled to prove that there's no injury," *id.* at 35:13-15; *see also id.* at 31:24, 33:24-25, and that it was deferring resolution of the motion until JJHCS "produces what [it] said [it is] going to produce and we can get a little more specific," *id.* at 34:2-4. The Court said that it would permit SaveOnSP to "renew th[is] request" after JJHCS had made its priority production. *Id.* at 35:17-19. SaveOnSP agreed but stated that it did not believe the documents JJHCS planned to produce would satisfy its requests. *Id.* at 34:22-35:11. In fact, when JJHCS completed its Court-ordered priority production on June 9, 2023, *see* Ex. 15 (June 15, 2023 Email), it lacked key categories of financial information that SaveOnSP requested.

On July 12, 2023, SaveOnSP sent a letter significantly narrowing its requests for JJHCS's financial data. It no longer requested documents responsive to RFP Nos. 11 and several subparts of RFP No. 29. It reduced the timeframe for several of its Requests so that only one extends before 2016. It significantly narrowed the data sought by RFP No. 28. And it narrowed RFP No. 30 to seek only documents sufficient to show the basis for Janssen's decision to raise or lower the price of each Janssen drug, instead of all documents related to those decisions. In a July 24, 2023 letter, JJHCS flatly refused to produce any of the additional documents that SaveOnSP seeks, offering only documents it had already agreed to produce in December 2022. *See* Ex. 16 at 2, 4-5, 5-7 (July 24, 2023 Ltr.); R&Os at 27. The parties met and conferred on August 8, 2023, JJHCS's position remained largely unchanged.[4] SaveOnSP now moves to compel JJHCS to produce documents responsive to narrowed versions of RFP Nos. 28(a)-(h), 29(a), (b), (i), and (j), and 30.

*Johnson & Johnson's CarePath Budget*

SaveOnSP moves to compel production in response to these narrowed requests:

- From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to Patients enrolled in CarePath. *See* RFP No. 29(a).

- From April 1, 2016 through the present, all documents and communications regarding JJHCS's budget for CarePath. *See* RFP No. 29(b).

SaveOnSP has narrowed these requests, which initially requested documents back to January 1, 2009, by more than seven years. *Compare* Ex. 1 at 16-17 (Defendant's First Set of RFPs) *with* Ex. 17 at 4 (July 12, 2023 Ltr.).

Documents regarding JJHCS's determination of the CarePath budget, and its communications regarding that budget, are highly relevant to rebutting the factual allegations in JJHCS's Complaint: (1) JJHCS says that it offers copay assistance to help patients afford Janssen drugs, Compl. ¶¶ 23, 47, 50, 74, 100—the documents sought likely will show that JJHCS's offers these

---

[4] JJHCS says that is currently investigating whether it can produce two limited categories of patient-level data sought by SaveOnSP's RFP Nos. 28(b) and (c).

Hon. Cathy L. Waldor
September 7, 2023
Page 5

funds primarily as a marketing program to increase the sale of Janssen drugs; (2) JJHCS says that it offers up to $20,000 in CarePath funds to each patient annually, *id.* ¶ 47—the documents sought may show that this is not a real offer, if JJHCS does not intend to provide that level of support to most patients; and (3) JJHCS says that SaveOnSP's services threaten CarePath's viability by making CarePath prohibitively expensive, *id.* ¶ 114—the documents sought likely will show that this is not true, and that even with SaveOnSP, CarePath still makes money for J&J by increasing drug sales.

These documents are also relevant to SaveOnSP's affirmative defenses. SaveOnSP alleges that JJHCS was not injured, and failed to mitigate its damages, in part because JJHCS could have reduced the CarePath budget but chose not to do so. For example, starting in January 2022, JJHCS purportedly . *See* Ex. 18 (JJHCS_00130230). If JJHCS considered cutting the CarePath budget for other Janssen drugs at issue but opted not to, it could show that JJHCS failed to reasonably mitigate its damages or acquiesced in SaveOnSP's conduct as to those other drugs. In May 2023, . *See* Ex. 19 (JJHCS_00130092). If JJHCS cut its budget for these two drugs in this way, it would be highly relevant to the amount of JJHCS's alleged damages and could be further proof of JJHCS's failure to mitigate.[5]

JJHCS is withholding these documents. In the parties' negotiations, JJHCS agreed to produce (1) for RFP No. 29(a), only documents "sufficient to show" how it determines the amounts of copay assistance funds that JJHCS offers to patients enrolled in CarePath from April 1, 2016 through the present; and (2) for RFP 29(b), only documents "sufficient to show" JJHCS's budget for copay assistance through CarePath and JJHCS's actual and projected annual costs for CarePath. *See* Ex. 16 at 2 (July 24, 2023 Ltr.). These are the same documents that it agreed to produce in its December 1, 2022 R&Os. *See* R&Os at 27.[6] This is completely insufficient, as it would not include communications among Johnson & Johnson personnel regarding the CarePath budget—and it would omit internal discussions about changes that JJHCS contemplated making to that budget but ultimately did not implement.

---

[5] JJHCS says that it has produced "scores" of documents regarding its decision to change the amount of co-pay support provided for the Janssen drugs Stelara and Tremfya, so the requested documents are not necessary. JJHCS's factual assertion is not true: It has produced some documents stating what the changed benefits were, but no documents from the decision-making process that explain *why* or *how* it changed them—SaveOnSP is separately moving to compel JJHCS to expand its search for those documents. And even JJHCS had produced documents explaining why it changed the amount of co-pay support for Stelara and Tremfya, it would still need to produce documents showing whether it contemplated changing the co-pay support for *other* Janssen drugs.

[6] When asked to identify the documents JJHCS produced that it believes are "sufficient to show" information responsive to RFP Nos. 29(a) and (b), JJHCS did not identify any documents responsive to RFP No. 29(a) and identified only three spreadsheets as responsive to RFP No. 29(b). *See* Ex. 20 (Aug. 15, 2023 Email); *see also* Ex. 21 (JJHCS_00026191), Ex. 22 (JJHCS_00130090), and Ex. 23 (JJHCS_00130091).

Hon. Cathy L. Waldor
September 7, 2023
Page 6

*Johnson & Johnson's Return on Investment from CarePath*

SaveOnSP moves to compel production in response to this narrowed request: "From April 1, 2016 through the present, all documents and communications regarding JJHCS's or Janssen's actual and projected return on investment for CarePath." *See* RFP No. 29(i); Ex. 17 at 4 (July 12, 2023 Ltr.). SaveOnSP has narrowed this request, which initially requested documents back to January 1, 2009, by more than seven years. *See* Defendant's First Set of RFPs at 16-17. JJHCS flatly refuses to produce any documents on this topic. Ex. 16 at 2 (July 24, 2023 Ltr.).

These documents are highly relevant. While JJHCS apparently wishes that this subject was irrelevant, JJHCS put CarePath's profitably and return on investment at issue by claiming that injuries to CarePath hurt the public, alleging that SaveOnSP threatens CarePath's "financial viability," and alleging that it has been injured and damages by paying out additional CarePath funds. In reality, JJHCS does not offer CarePath as a charity; it does so to increase its sales of Janssen drugs. Johnson & Johnson must calculate its return on its investment in CarePath—the amount of additional revenue it makes from sales of Janssen drugs attributable to the copay assistance funds that it pays out. The documents sought likely will confirm that JJHCS does not offer CarePath funds primarily to help patients, but rather to make money, hence harm to that program is not a public harm cognizable under a GBL claim. They also likely will prove false JJHCS's assertion that SaveOnSP's conduct threatens CarePath's financial viability—in reality, JJHCS's return on investment likely makes CarePath into a huge money-maker, even after JJHCS pays out additional CarePath funds.

Critically, SaveOnSP believes that the documents sought will show that its conduct may not injure JJHCS at all or at least not damage it to the extent alleged. SaveOnSP believes that what JJHCS calls the "SaveOnSP Program" increases the total number of patients who take Janssen drugs and increases the frequency with which patients take those drugs. Johnson & Johnson's revenue from its increased sales of Janssen drugs to those patients may well exceed the increase in its total expenditures of CarePath funds that it tries to pin on SaveOnSP—in which case, SaveOnSP's conduct would not injure JJHCS at all. And even if the total revenue from new sales does not exceed the total increased CarePath patients, that revenue may well offset a large chunk of JJHCS's alleged damages.

*Johnson & Johnson's Pricing of Janssen Drugs*

SaveOnSP moves to compel production in response to these narrowed requests:

- From January 1, 2009 to the present, for each year for each Janssen Drug, documents sufficient to show the basis for Janssen's decision to raise or lower the price of the Janssen Drug." *See* RFP No. 30; Ex. 17 at 6 (July 12, 2023 Ltr.).

- From April 1, 2016 to the present, documents sufficient to show all internal data which supports the Net Price values provided throughout the "Transparency Reports," which JJHCS has agreed to produce, and documents sufficient to show the prices charged to

Hon. Cathy L. Waldor
September 7, 2023
Page 7

> SaveOnSP's clients for each Janssen Drug and Johnson & Johnson's marginal costs for
> each Janssen Drug. *See* RFP No. 28(a)-(h).

SaveOnSP has narrowed the first request by seven years. It has also narrowed both requests to documents "sufficient to show" the topics, which is significantly narrower than SaveOnSP's initial RFP Nos. 28(a)-(h) and 30, which sought "all documents" on those subjects. *See* Ex. 1 at 15-17 (Defendant's First Set of RFPs). SaveOnSP has also significantly limited the subjects on which it seeks data in RFP No. 28(a)-(h), now seeking only documents sufficient to show (1) all internal data that supports the Net Price values cited in JJHCS's the "Transparency Reports;" (2) the net prices charged to SaveOnSP's clients; and (3) Johnson & Johnson's marginal costs for each Janssen Drug. This is much narrower than SaveOnSP's initial request, which asked for a broader range of data.[7] JJHCS refuses to produce any documents responsive to these narrowed requests. *See* Ex. 16 at 4-5 (July 24, 2023 Ltr.).

These documents are highly relevant to JJHCS's allegations. While JJHCS asserts that Janssen drug prices are not at issue, JJHCS put them at issue by alleging that Johnson & Johnson has reduced the "net price" of Janssen drugs every year since 2016—the documents sought would test this allegation and could show that JJHCS increased the ***true*** prices of the drugs. While JJHCS has produced publicly available so-called "Transparency Reports" that include the "net price" referenced in JJHCS's complaint, *see* Compl. ¶ 8, it refuses to produce the data underlying those prices. SaveOnSP needs this data because the Transparency Reports' high-level statements about JJHCS's pricing are simply not granular enough to be used for SaveOnSP's damages analysis. The reports, for instance, show trends in pricing across many Janssen drugs, but do not show pricing information on a drug-by-drug basis. SaveOnSP told JJHCS over a month ago that it was asking for this data so that it could calculate the monetary benefit JJHCS receives from additional fills of specific drugs. Ex. 17 at 5 (July 12, 2023 Ltr.).

SaveOnSP also needs this underlying data to test JJHCS's assertion that it has decreased the "net price" of the Janssen drugs at issue. *Id.* ¶ 8. SaveOnSP also needs that data to determine if Janssen has been increasing the ***true*** price of the drugs while telling the public that it has been reducing the "net price." JJHCS asserts that SaveOnSP does not understand what its "net price" represents, but that merits argument cannot justify withholding discovery. While JJHCS claims that SaveOnSP wants to "distract the jury with allegations that drug prices are just too expensive," that is an argument about what evidence is admissible at trial, which JJHCS can raise in a motion in limine; it is not a basis for JJHCS to refuse to provide relevant discovery about allegations that JJHCS choose to make in its Complaint. Finally, JJHCS makes the astonishing argument that SaveOnSP is not entitled to discovery that would allow it to probe the Transparency Reports and must simply accept the public statements of large companies like J&J as true. That is not how discovery works. *See, e.g., Mailloux v. Arrow Fin. Servs., LLC.*, No. 01 CV 2000(DGT)(RML),

---

[7] Initially, SaveOnSP sought from RFP No. 28(a)-(h), information on (a) all Patients receiving the Janssen Drug; (b) the number of fills of the Janssen Drug received by each such Patient; (c) the dosage of the Janssen Drug received by each such Patient for each fill; (d) the projected number of Patients, average number of fills, and average dosage for the Janssen Drug; (e) the cost to manufacture the Janssen Drug; (f) the sales and marketing budget for the Janssen Drug; (g) the price of the Janssen Drug; and (h) the revenue received by JJHCS from the Janssen Drug.

Hon. Cathy L. Waldor
September 7, 2023
Page 8

2002 WL 246771, at *1 (E.D.N.Y. Feb. 21, 2002) ("[P]laintiff need not accept defendant's inter-
pretation of its financial data … but is entitled herself to examine the data underlying defendant's
statement of net worth.").

     JJHCS also alleges that it provides CarePath to help patients afford Janssen drugs—the
documents sought likely will show that Johnson & Johnson offers CarePath in part so that it can
increase the price of its Janssen drugs, further showing that any alleged harm to CarePath is not a
public harm cognizable in a GBL claim. JJHCS further alleges that SaveOnSP makes CarePath
"prohibitively expensive," and threatens its financial viability—the documents sought likely will
show that this is not true, as CarePath likely enables Johnson & Johnson to raise the prices of
Janssen drugs, making it highly profitable even in the presence of SaveOnSP's conduct. SaveOnSP
seeks these pricing documents back to January 1, 2009 (the only financial data it now seeks prior
to 2016) so that it can compare the true prices of Janssen drugs and the factors going to those prices
before and after SaveOnSP began operations.

     These documents are also crucial for SaveOnSP's defenses: SaveOnSP also believes that
its clients' plan benefits ***increase*** Johnson & Johnson's sales of Janssen Drugs, because the bene-
fits result in more patients taking and continuing to take Janssen drugs than would have done so
without those benefits. The additional revenue that Johnson & Johnson receives from these in-
creased sales could well outstrip the additional CarePath funds that it pays out—which would show
that SaveOnSP's conduct does not injure JJHCS at all. *See* Mar. 17, 2023 Tr. at 35:13-15 (Save-
OnSP is entitled to show "no injury"); *see also id.* at 31:24, 33:24-25. To test this theory, Save-
OnSP needs to know the monetary benefit that Johnson & Johnson received from those additional
sales.

     JJHCS has no serious burden argument. SaveOnSP has significantly scaled back the scope
of its requests to the most essential data on drug pricing. Johnson & Johnson presumably docu-
ments the change in its prices for those drugs each year, and maintains relevant presentations,
meeting minutes, and data reflecting the information sought. It also must have, in accessible form,
the data underlying its Transparency Reports. JJHCS has certainly not quantified what the burden
of searching for and producing this data would be.[8]

### Patients' Adherence to Janssen Drugs

     SaveOnSP moves to compel production in response to this narrowed request: From April 1,
2016 through the present, for each Janssen Drug for each year, all documents and communications
regarding any analysis of the adherence rates of Patients enrolled in CarePath to Janssen Drugs,
including such Patients enrolled in plans advised by SaveOnSP. *See* RFP No. 29(j). SaveOnSP has
narrowed this request by more than seven years. *See* Ex. 1 at 16-17 (Defendant's First Set of RFPs).

---

[8] JJHCS repeats its assertion that SaveOnSP is asking it to interview all of its employees in all of its divisions and dig
through reams of irrelevant information. This remains false. SaveOnSP is asking JJHCS to gather the limited
documents "sufficient to show" the requested information from the Johnson & Johnson divisions responsible for
setting the prices of the 14 drugs at issue. JJHCS presumably knows which divisions those are.

Hon. Cathy L. Waldor
September 7, 2023
Page 9

JJHCS refuses to produce documents responsive to these requests. *See* Ex. 16 at 5-7 (July 24, 2023 Ltr.).

These documents are highly relevant. Johnson & Johnson's analysis of patient adherence rates could show that SaveOnSP's services result in more patients taking and continuing to take Janssen drugs, which could help show that those services do not injure JJHCS or at least do not cause the level of damages that JJHCS alleges. Johnson & Johnson clearly tracks and calculates adherence rates and considers maintaining patients' adherence to its drugs, a top priority. *See, e.g.*, Ex. 24 (2020 Janssen Transparency Report, JJHCS_00000195, states that "[t]he doubling of co-pays has been found to reduce patients' adherence to prescribed medicines by 25%-45%."); Ex. 25 (█████████████████████████ JJHCS_00000558 █████████ ████████████████████████████████████████). Nor has JJHCS substantiated any claim of undue burden associated with this narrowed request.

\* \* \*

JJHCS has withheld the critical financial information requested in this letter for nearly nine months. It cannot simply produce the limited financial data that it believes supports its claims while keeping hidden critical data that could show that it was not injured, that its damages are not what it claims to be, and that key allegations supporting its claims are simply not true. The Court should compel JJHCS to produce this information promptly.

### JJHCS's Position

SaveOnSP comes to this Court with yet another prolix letter seeking to compel the production of patently irrelevant documents, a renewal of a motion that the Court previously rejected. In this current joint letter, SaveOnSP offers a host of speculative theories about the pricing of Janssen drugs and the "return on investment" from CarePath, and insists that JJHCS must produce vast quantities of documents and data going back as long as ***fourteen years*** in the hopes that such a fishing expedition might somehow support SaveOnSP's theories.

What SaveOnSP is seeking to do in this motion is to try to turn this case into something it is not. As SaveOnSP doubtless already recognizes, a trial about SaveOnSP's conduct will be very challenging for SaveOnSP. Through witness testimony and documentary evidence, the judge and jury will hear all about how SaveOnSP has actively worked to harm patient health, using lies and deception to extract profit from a CarePath program that is meant to help patients, not middlemen like SaveOnSP. Tens of millions of dollars are at stake for SaveOnSP; every day that this case remains pending, SaveOnSP continues to take more money from JJHCS to which it is not entitled.

Facing a trial that will demonstrate conclusively that SaveOnSP has engaged in tortious interference with contract and consumer deception, SaveOnSP naturally wants to make this case into something else, like an inquisition into the price of Janssen drugs, or a study into how specialty medications are priced generally, or perhaps the overall profitability of pharmaceutical companies. But this case will culminate in a trial about the specific claims raised by JJHCS in the Complaint. It is not a public policy debate about health care in America. Nor is it a food fight in which SaveOnSP is allowed to throw anything against the wall and see what sticks. This case is about

Hon. Cathy L. Waldor
September 7, 2023
Page 10

SaveOnSP's improper conduct that has deceived patients and caused them to breach their contracts with JJHCS.

To be sure, SaveOnSP may present a defense to the charges in the Complaint. But those defenses must be actually germane to the misconduct alleged. SaveOnSP will not be permitted to create a trial within a trial to distract the jury with allegations that drug prices are just too expensive and thereby hope to draw attention away from SaveOnSP's own wrongful conduct. And it should not be permitted to seek irrelevant discovery that would put an unprecedented burden on JJHCS.

With respect to the particular discovery requests at issue here, JJHCS has produced or will soon produce a wealth of non-privileged documents and communications relating to the following:

- The extent of the harm that SaveOnSP has caused JJHCS during the relevant Time Period.

- The data that formed the basis for the damages allegations in the Complaint ¶¶ 92-100.

- JJHCS's budget for copay assistance through CarePath, including JJHCS's actual and projected annual costs for CarePath.

- The manner in which JJHCS determines the amounts of copay assistance offered to patients. *See* RFP No. 29(a).

- Patient-level data from the time period January 1, 2016 to July 1, 2022, including documents sufficient to show:

    (1) all patients enrolled in CarePath for each Janssen Drug;

    (2) the dates on which each patient was enrolled in CarePath;

    (3) the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath;

    (4) the Janssen Drug for which each patient enrolled in CarePath received copay assistance; and

    (5) all CarePath copay assistance payments made to each payment. This data is more than sufficient for you to test the injury and damages alleged by JJHCS.

Despite having received all of these documents and data, SaveOnSP remains unsatisfied and insists that it needs all documents and communications not only about budgeting, but countless other documents about a host of other issues, over a period of time as long as fourteen years. For example, SaveOnSP's seeks the production of all documents, communications, and data related to CarePath's "return on investment," the pricing of Janssen drugs, and patient adherence to

Hon. Cathy L. Waldor
September 7, 2023
Page 11

medication. To say that these requests are overbroad and irrelevant is an understatement. SaveOnSP's repeated insistence that the documents are "highly relevant"—without offering any analysis or persuasive explanation—does not make the documents relevant. Nor has SaveOnSP justified its insistence that JJHCS review as many as fourteen years of documents, communications, and data.

As has often been the case, SaveOnSP also ignores the Court's guidance at the March 17 status conference. More than five months ago, the Court expressed skepticism regarding the temporal and substantive breadth of SaveOnSP's requests for financial, budget, and other related information. The Court explained:

> I think it's an awfully broad and not just temporally but otherwise broad request. I understand the background and the basis for the request, but as I said, not – it's premature. Let's see what [JJHCS] produces. And let's see if you can modify and streamline your arguments to me and your requests after that.

Dkt. No. 89 at 34:5-10.

Later, the Court stated that the requests were "temporally [] way out of line" and expressed "hop[e]" that SaveOnSP could make "a more targeted request." *Id.* at 35:15-21.

This direction from the Court went in one ear and out the other: SaveOnSP has presented the Court with requests for production seeking documents, communications, and data related to CarePath's return on investment, the pricing of Janssen drugs, and adherence data that have only been slightly narrowed in ways that do not address the Court's concerns regarding the requests' overbreadth. SaveOnSP tries to make it appear as though it has made large concessions from what it initially sought in March versus what it now seeks. Upon even minimal inspection, however, it is clear that SaveOnSP's requests have been narrowed only in superficial ways that fail to address the Court's instructions.

For the reasons discussed below, the Court should deny SaveOnSP's motion.

### JJHCS Has Agreed to Make a Significant Production of Budget Data

SaveOnSP moves to compel production of all documents and communications, from April 1, 2016 to through the present, regarding JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to patients enrolled in CarePath, *see* RFP No. 29(a), and JJHCS's budget for CarePath, *see* RFP No. 29(b). JJHCS already has agreed to produce "documents sufficient to show" how it set copay assistance and what copay assistance was actually provided to patients, through July 1, 2022. *See* JJHCS's Responses and Objections to SaveOnSP's First Set of RFPs. Indeed, JJHCS made a substantial production of responsive materials responsive to RFP No. 29(b) in April 2023 and made a second production in response to RFP No. 29(b) in early June, in advance of the original June 9, 2023 substantial completion deadline. That data includes actual and forecasted budgets, as well as line-by-line ledger budget data. JJHCS has identified this data, by bates number, to SaveOnSP. JJHCS anticipates producing some additional

Hon. Cathy L. Waldor
September 7, 2023
Page 12

documents from the parties' agreed-upon time period (April 1, 2016 to July 1, 2022) responsive to RFP No. 29(a) in advance of the September 24 substantial completion deadline.

In addition, JJHCS has long agreed to update its production of documents in response to RFP Nos. 29 (a) and (b) through the present. SaveOnSP accepted JJHCS's proposal on August 29—more than a month after JJHCS initially offered to do so—after apparently misunderstanding JJHCS's offer for more than a month. With that agreement now confirmed between the parties, SaveOnSP does not require any documents to present its defenses, including any rebuttal of JJHCS's damages analysis.

*SaveOnSP Is Not Entitled to "All Documents and Communications" Regarding Budget Data*

Based on JJHCS's agreed-upon productions, the only live issue before the Court with respect to RFP Nos. 29(a) and (b) is whether "all documents and communications" on these topics are relevant.

SaveOnSP has not put forth compelling reasons to justify the relief it seeks. First, "all documents and communications" are unlikely to be relevant to the claims in this action. For example, SaveOnSP claims that the documents are "highly relevant" because the documents "likely will show that JJHCS[] offers these funds primarily as a marketing program to increase the sale of Janssen drugs." To be clear, JJHCS rejects this characterization. JJHCS is providing needed co-pay support to help patients who otherwise would lack access to life-saving Janssen therapies. But even if it CarePath was a "marketing program," that would have nothing to do with the tortious interference and GBL § 349 claims JJHCS is asserting. There is no "marketing program" privilege available to SaveOnSP that can justify its interference with contract or permit consumer deception. To the extent that SaveOnSP justifies its need for this production by claiming that CarePath's "financial condition" is somehow relevant based on JJHCS's allegations, that argument is similarly unavailing with respect to these specific documents. JJHCS already has agreed to produce data concerning forecasted and actual expenditures through the present and that data is sufficient for SaveOnSP's damages analysis.

Second, "all documents and communications" about budgeting are unlikely to be relevant to the defenses in this action. What matters for purposes of liability and damages is not what JJHCS thought about doing with respect to the level of copay support it provided but what JJHCS actually did. SaveOnSP claims that "[i]f JJHCS considered cutting the CarePath budget for other Janssen drugs at issue [e.g., those drugs other than Stelara and Tremfya, for which JJHCS reduced its maximum level of co-pay support] but opted not to, it could show that JJHCS failed to reasonably mitigate its damages or acquiesced in SaveOnSP's conduct as to those other drugs." But JJHCS already has and will produce scores of documents related to its decision to implement changes to the co-pay support provided to Stelara and Tremfya, including the maximum benefit offered and the business justification for such a change.[9] Likewise, whether or not JJHCS

---

[9] SaveOnSP again claims that JJHCS has produced "no documents showing why or how" the Stelara and Tremfya terms and conditions have changed. This is incorrect. As in a recent joint letter submitted to the Court on August 24, JJHCS again points SaveOnSP to several examples of such documents. *E.g.*, JJHCS Ex. 1 (JJHCS_00033681)

Hon. Cathy L. Waldor
September 7, 2023
Page 13

"intended" to provide the maximum of $20,000 in annual co-pay support to certain patients is irrelevant—all that matters is what JJHCS actually provided to patients, and SaveOnSP has all of this data. These documents are not relevant to the case or to SaveOnSP's defenses, and whether or not JJHCS moved to dismiss or strike these defenses is irrelevant.

In any event, as the Court knows from prior motion practice, JJHCS cannot reliably determine which patients are in the SaveOnSP program, making it impossible for JJHCS to remove SaveOnSP program participants. Reducing budgets wholesale, as SaveOnSP proposes that JJHCS do, would not stop SaveOnSP's wrongdoing. It would only hurt innocent patients who need co-pay assistance to afford their life saving medications, and would not even limit this punishment to patients in the SaveOnSP program. In addition, the difficulty in identifying patients in the SaveOnSP program is not due to happenstance: SaveOnSP has engaged in persistent efforts at preventing manufacturers from figuring out who is in the SaveOnSP Program, as alleged in the Complaint and as laid bare in SaveOnSP's own documents.[10]

*SaveOnSP Is Not Entitled to Documents or Communications*
*Regarding JJHCS's Return on Investment from CarePath*

SaveOnSP's RFP No. 29(i) seeks documents and communications about JJHCS's and/or Janssen's "return on investment" on expenditure of funds for the CarePath program from April 1, 2016 through the present. In other words, SaveOnSP is not seeking to learn how much money JJHCS spends on CarePath co-pay support, or how that has changed during the time of SaveOnSP's operations. Rather, it is seeking to know how these amounts compare to the general profitability of Janssen.

---



( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); JJHCS Ex. 2 (JJHCS_00002574) ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); JJHCS Ex. 3 (JJHCS_ 00034931) ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).

[10] *See* Compl. ¶ 101 ("SaveOnSP has taken steps to obscure when funds are being extracted from CarePath through its Program, including recently by varying the patient's out-of-pocket obligation per prescription fill, such that the amounts extracted from the copay card by the pharmacy are not consistent and easily detectible. Further, JJHCS cannot reduce cost support preemptively to prevent SaveOnSP's activities without an unacceptable risk that individual patients may be misidentified and suffer from reduced cost support and consequently be unable to afford their therapy. The secretive nature of SaveOnSP's operations, therefore, renders any attempt to reduce copay assistance on a patient-by-patient basis unworkable as it risks harming the very patients CarePath was designed to support."); JJHCS Ex. 4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); JJHCS Ex. 5 (SOSP_0423114) ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).

Hon. Cathy L. Waldor
September 7, 2023
Page 14

At the March 17 conference, the Court expressed skepticism about this document request. Months later, SaveOnSP has made no substantive changes to its request, instead choosing only to narrow the applicable timeframe—to now seek irrelevant documents "only" for seven years rather than fourteen years. But the Court already denied SaveOnSP's motion to compel RFP 29(i) due to its temporal *and* substantive breadth—and SaveOnSP's temporal modification is therefore insufficient to remedy the substantive concerns the Court expressed in its denial of SaveOnSP's motion to compel RFP 29(i). Also inconsistent with the Court's March 17 rulings is SaveOnSP's failure to tie the reasons for which it has renewed its motions to compel RFP No. 29(i) to any deficiencies in JJHCS's production. *See* Dkt. No. 89 at 34:10-19 ("I'll hear further argument once [JJHCS] produces what [counsel] said he's going to produce and we can get a little more specific . . . . Let's see what [JJHCS] produces. And let's see if you can modify and streamline your arguments to me and your requests after that."); *id.* at 35:17-21 ("I will allow you to renew that request after JJHCS's counsel] produces everything that he says he's going to produce. And I'm just hoping . . . that maybe it can be a more targeted request.").

The documents and communications sought by RFP 29(i) are irrelevant to JJHCS's claims. SaveOnSP asserts otherwise, that "[t]hese documents are highly relevant," and connects its relevance argument to an inaccurate characterization of JJHCS's GBL § 349 claim. SaveOnSP argues, without citation, that "[t]he documents sought will likely confirm that JJHCS does not offer CarePath funds primarily to help patients, but rather to make money, hence harm to that program is not a public harm cognizable under a GBL claim."

SaveOnSP incorrectly describes the focus of a GBL § 349 claim, much like it did in the parties' February 24 Joint Letter addressing the same requests for production at issue here. *See* Dkt. No. 79 at 16. As the Court held in its decision denying SaveOnSP's motion to dismiss, the question relevant to JJHCS's GBL § 349 claim is whether SaveOnSP's conduct harms the public, not whether CarePath serves a business or charitable purpose. *See* Opinion & Order, Dkt. No. 68 at 13 (holding that a plaintiff must "allege some harm to the public at large" and that JJHCS has done so by alleging that SaveOnSP "enlist[s] pharmacies to reject patients' claims for their prescriptions at the point of sale" and "fail[s] to inform patients that by enrolling in SaveOnSP, they breach the CarePath terms and conditions"). Thus, SaveOnSP's claimed relevance has no basis in law or fact and therefore should be disregarded.

SaveOnSP also argues that "JJHCS's return on investment likely makes CarePath into a huge money-maker, even after JJHCS pays out additional CarePath funds." Such theorizing has nothing to do with this case. Whether or not the operation of CarePath is a prudent or profitable business decision is entirely irrelevant. JJHCS has not made any allegations about the return on investment generated by CarePath. SaveOnSP likewise claims that the documents sought by RFP 29(i) will show that JJHCS's damages calculations are either nonexistent or less than JJHCS has alleged. If SaveOnSP wants to test JJHCS's damages calculations, it may do so with the data JJHCS has already produced, which, of course, is the same data that JJHCS will use to calculate its damages. To be clear, JJHCS already has produced more than 5GB of data (or roughly six million lines of data) to support the harm that SaveOnSP has caused JJHCS during the relevant Time Period. *See* JJHCS_0026192 (data from 2016 to 2021); JJHCS_00100085 (data from January 1 to July 1, 2022). In addition to this massive production, JJHCS has produced the

Hon. Cathy L. Waldor
September 7, 2023
Page 15

CarePath budgets (including the full ledger from 2016 to 2022), *see* JJHCS_00026191, JJHCS_00130090, JJHCS_00130091, as well as CarePath enrollment data from 2016 to 2022. SaveOnSP is not entitled to irrelevant information about an issue that is outside of the case and that JJHCS will not use to form the basis of its claims or damages.

*SaveOnSP Is Not Entitled to Documents or Data
Regarding the Pricing of Janssen Drugs*

SaveOnSP moves to compel JJHCS to respond to RFP No. 28(a)-(h) and 30, which seek documents and data regarding the pricing of Janssen Drugs. Much like RFP 29(i), JJHCS is not entitled to the data sought by these requests. JJHCS respectfully requests the Court deny SaveOnSP's motion to compel RFP Nos. 28(a)-(h) and 30.

In contravention of this Court's statements at the March 17 status conference, SaveOnSP has not meaningfully narrowed its requests for production related to the pricing of Janssen Drugs. SaveOnSP claims that it has narrowed RFP No. 28(a)-(h) to seek only "documents sufficient to show" certain categories of documents instead of "all documents." This modification is cosmetic at best, as one of the three categories of data sought by RFP 28(a)-(h) is "***all internal data*** that supports the Net Price values cited in JJHCS's the 'Transparency Reports.'" This would require review and collection of irrelevant documents—the "Net Price" of Janssen drugs (that is, the revenues earned by the manufacturer not including rebates and discounts) is not relevant to any claim or defense in the action.

SaveOnSP also ignored the Court's instruction that it narrow the temporal scope of RFP No. 30 by continuing to seek data from January 1, 2009 to the present. The only substantive difference between SaveOnSP's original and renewed requests for the pricing information sought by RFP No. 30 is that the request now seeks "documents sufficient to show" instead of "all documents." This slight narrowing of RFP No. 30 inadequately addresses the Court's concern that that this request is "awfully broad," both temporally and substantively, and still seeks responsive documents from a ***fourteen year*** period. Dkt No. 89 at 5-6.

On the merits, SaveOnSP never addresses why the documents and data JJHCS has produced are insufficient for it to conduct the analyses contemplated above. As described above, JJHCS has produced massive amounts of data (roughly six million lines of data) supporting its damages analyses, *see, e.g.*, JJHCS_0026192, JJHCS_00100085, and Transparency Reports for every year between 2016 and 2022, which, *inter alia*, provide an in-depth breakdown of the factors that influence the net price of Janssen Drugs. *See, e.g.* JJHCS Ex. 6 JJHCS_00038671 (2016 Transparency Report); JJHCS Ex. 7 JJHCS_00040275 (2022 Transparency Report).[11] In addition,

---

[11] SaveOnSP claims that the Transparency Reports are "not granular enough" to be used in its damages analysis but does not go to the trouble of explaining what additional data is needed to "test" JJHCS's assertions or how it will be used. SaveOnSP argues fleetingly that the data it requests will be used to calculate the "monetary benefit JJHCS receives from additional fills of specific drugs," but this is an irrelevant metric. It is bold of SaveOnSP to take credit for patients taking medication when it is doctors and not SaveOnSP who prescribe the life-saving or life-extending medication sold by Janssen. At any rate, this statistic is not one that JJHCS will not use in support of its own claims

Hon. Cathy L. Waldor
September 7, 2023
Page 16

against the Court's advisement, SaveOnSP has not linked RFP Nos. 28(a)-(h) and 30 with any deficiencies in JJHCS's production.

Nor has SaveOnSP identified any basis for its implicit claim that the Transparency Reports are incorrect or false.[12]  Johnson & Johnson is a publicly traded company and these reports are presented to investors and the medical community every year.  No law supports the notion that a litigant may freely challenge the statements in any document, insisting that they are entitled to see all underlying data rather than relying on what is in the produced documents.[13]  In response, SaveOnSP offers more unsupported assertions, stating that requiring SaveOnSP to offer any reasonable justification for its document requests is "astonishing" and "not how discovery works."  There is no on-point citation offered for these claims, which is not surprising—no law supports SaveOnSP's apparent view that it should be permitted to obtain as many documents as it can whether or not the documents are relevant to the case.  When a district court manages the discovery process in order to avoid the unnecessary creation of burden, this is exactly how discovery is supposed to work.  *See New Skies Satellites, B.V. v. Home2Us Communications, Inc.*, No. 13-200 (PGS), 2017 WL 11492220, at *1 (D.N.J. Oct. 20, 2017) ("[T]he Court has broad discretion in deciding discovery issues such as this.  Indeed, it is well settled that the appropriate scope of discovery and the management of requests for discovery are left to the sound discretion of the Court."); *Olsen v. J.W. Didado Electric, LLC*, C.A. No. 18-292, 2019 WL 13096572, at *1 (W.D. Pa. March 8, 2009) ("It is beyond dispute that the district court has the authority and the discretion to impose limitations and restrictions on the nature, scope, extent and type of discovery which it will permit the parties to propound.  This wide-ranging authority and discretion extends to requests for production of documents, and permits the court to set reasonable limits on this particular form of discovery prescribing the number and type of requests that a party may propound." (internal citations and quotations omitted)); *Petrancosta v. Malik*, No. 3:12-CV-00677, 2014 WL 4100723, at *3 (M.D. Pa. Aug. 19, 2004) ("Rulings regarding the proper scope of discovery and the extent to which discovery may be compelled are matters consigned to the court's discretion and judgment.  Thus, it has long been held that decisions regarding the scope of

---

asserted against SaveOnSP or its damages calculations.  SaveOnSP will receive all of the data upon which JJHCS relies to calculate its damages; any assertion by SaveOnSP that it is entitled to an expanded universe of data beyond this is without merit.

[12] SaveOnSP cites only one case for the proposition that it is entitled to seek all data underlying the Transparency Reports, and then it mischaracterizes that single case by omitting a key phrase from its parenthetical quotation.  *See Mailloux v. Arrow Fin. Serv's, LLC*, No. 01 CV 2000 (DGT) (RML), 2002 WL 246771, at *1 (E.D.N.Y. Feb. 21, 2002) ("[P]laintiff need not accept defendant's interpretation of its financial data **through representations in an affidavit**, but is entitled herself to examine the data underlying defendant's statement of net worth." (emphasis added)).  Unlike the defendant's self-serving affidavit in *Mailloux*, JJHCS produced Transparency Reports that include a robust discussion of the factors that influence the net price of Janssen Drugs *and* contain citations to the references used when compiling the Reports.  Moreover, the Court's holding in *Mailloux* relied on specific provisions within the Fair Debt Collections Act, which are not at issue here.  *See id.*  SaveOnSP has not articulated any justification as to why the Transparency Reports, paired with the materials cited therein, are insufficient, and *Mailloux* certainly does not provide any legal justification.

[13] It is ironic or worse for SaveOnSP to cite *Mailloux* for the proposition that SaveOnSP is "entitled [] to examine the data underlying defendant's statement of net worth," *supra* at 7; SaveOnSP successfully opposed any such disclosure of its own financial statements, let alone the data underlying them.  *See* Dkt. No. 66 at 11.

Hon. Cathy L. Waldor
September 7, 2023
Page 17

permissible discovery is committed to the sound discretion of the district court." (internal citations omitted)).

All of SaveOnSP's specific arguments about why it is entitled to documents and data related to the pricing of Janssen drugs fail, as explained below.

*First*, SaveOnSP claims that "JJHCS has no serious burden argument" and that JJHCS has "not quantified what the burden of searching for and producing [pricing data] would be" could not be more divorced from reality. As JJHCS explained at the March 17 status conference, "Johnson & Johnson, throughout the company has 140,000 employees, 200 affiliates, many of which are involved in the manufacture of drugs, the creation of drugs, [and] the decisions about how to price drugs." Dkt. No. 89 at 33:3-6; *see also* JJHCS Ex. 8 (July 24, 2023 Ltr. from H. Sandick to A. Dunlap, at 6). Any inquiry into how a specialty medication is priced would require digging through the files of Johnson & Johnson affiliates that are not parties to this suit and involve the collection of information that has nothing to do with this case.

Contrary to SaveOnSP's suggestion that "Johnson & Johnson"—a non-party to this case— "presumably documents the change in its prices for those drugs each year, and maintains relevant presentations, meeting minutes, and data reflecting the information sought," identifying the documents and data underpinning pricing data is not that simple. Pricing decisions depend on countless factors that have nothing to do with SaveOnSP or CarePath, including manufacturing costs, market and general economic conditions, government regulations, and competition in the specialty drug marketplace.

Put differently, if SaveOnSP had served a request for production seeking "documents sufficient to show everything that Janssen does," it would scarcely be less burdensome than the request for production it seeks to enforce. There is no single team of employees that make the decision on how to price each a drug, nor is there is no single document that aggregates every factor that influences the eventual price of a Janssen Drug. Nor does there exist one central repository that stores all of the documents related to pricing decisions. On an issue like this, "sufficient to show" is a meaningless limitation, as SaveOnSP implicitly acknowledged when it buries this point in a footnote on the eighth page of its letter.

*Second*, SaveOnSP claims *ipse dixit* that pricing data and documents are "highly relevant." Nothing could be further from the truth. JJHCS has not alleged that the price of Janssen Drugs has changed due to an increased utilization of CarePath funds or, more specifically, due to SaveOnSP's conduct. This fact is unsurprising because this case is not about how Janssen Drugs are priced. SaveOnSP's inquiry into how JJHCS (or, more appropriately, Johnson & Johnson entities other than JJHCS) price Janssen Drugs is an irrelevant distraction from SaveOnSP's own conduct. This is not a case about lost profits on Janssen Drugs; it only concerns the question of whether CarePath funds have been wrongfully diverted to SaveOnSP and its business partners. In this letter, SaveOnSP is not even able to explain or justify the relevance of these documents, asking the Court for permission to run wild in discovery while leaving for another day in the future, perhaps at trial, the issue of whether this discovery has anything at all to do with the case.

Hon. Cathy L. Waldor
September 7, 2023
Page 18

*Third*, SaveOnSP alleges that it needs the data underlying the net price calculations of Janssen Drugs to test its unsupported belief that the "true" price of the drugs has increased over time. *See* SaveOnSP's RFP No. 28(a)-(h). SaveOnSP does not explain where its theory of a hidden "true price" originated or what this term even means. In fact, SaveOnSP does not even explain the purported difference between the net price—which is generally understood in the industry to be the relevant price when looking at the cost of medication—and what SaveOnSP calls the "true price" of Janssen Drugs. This argument is based on nothing more than speculation and an incorrect understanding of what the net price represents.

*Fourth*, SaveOnSP challenges JJHCS's assertion that SaveOnSP makes CarePath prohibitively expensive and asserts a "belie[f]" that the alleged benefit design of SaveOnSP-advised plans increases the sales of Janssen Drugs. Whether or not this is true is no defense to the allegations in the Complaint and is only intended to distract the fact-finder. In any event, SaveOnSP's claim that its program causes increased sales of Janssen Drugs is devoid of legal significance. The sales and profitability of Janssen Drugs is not a justification for SaveOnSP's tortious conduct. There is no defense to tortious interference with contract or GBL § 349 claims based on the wrongdoer's "belie[f]" that its conduct somehow benefits the plaintiff. JJHCS has already produced documents and data sufficient for SaveOnSP to test this groundless theory, and SaveOnSP has not demonstrated a relevant justification as to why it needs additional data to test its theory.

*Finally*, SaveOnSP claims that it needs pricing data responsive to RFP No. 30 from 2009 to the present so "it can compare the true prices of Janssen Drugs and the factors going to those prices before and after SaveOnSP began operations." This would place an unprecedented burden on JJHCS to search through fourteen years of records across the entire network of Johnson & Johnson entities that is disproportionate to the needs of the case. As always, SaveOnSP never offers any justification for its rigid insistence that document production must go to 2009.

Moreover, the data sought by SaveOnSP through RFP No. 30 is completely irrelevant to this case. As evidenced by SaveOnSP's lack of citation to the record, JJHCS has not alleged that the price of Janssen Drugs has changed in response to SaveOnSP's conduct. RFP No. 30 seeks documents sufficient to show pricing decisions of Janssen Drugs dating back to 2009, which is seven years before SaveOnSP began operations in 2016. The allegations in the Complaint concern events that took place in or after 2017, and CarePath itself did not begin in its current form until 2016. There is no legitimate purpose or need to seek any documents or data related to the pricing of Janssen Drugs from seven years before the existence of SaveOnSP. SaveOnSP itself provides no specific reason why it is entitled to this information, and instead only offers basic, conclusory assertions about why it wants the documents sought by RFP No. 30.

*SaveOnSP Is Not Entitled to Documents or Data Regarding Adherence Rates*

SaveOnSP asserts that it is entitled to documents and data concerning "any analysis of the adherence rates of Patients enrolled in CarePath to Janssen Drugs" because its program increases both the sales of Janssen Drugs and patient adherence rates. *See* RFP No. 29(j). Even if this dubious proposition were true and somehow relevant to the claims and defenses—and it is

Hon. Cathy L. Waldor
September 7, 2023
Page 19

neither—JJHCS's document productions thus far are sufficient for SaveOnSP to prepare a defense. Again, JJHCS has produced a wealth of non-privileged documents and communications in its possession. *See supra* at 10. Moreover, JJHCS recently unilaterally added a custodian, Silas Martin, to address SaveOnSP's request for "studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents." *See* RFP No. 20. These documents were recently produced and address the adherence issue.

JJHCS's productions, which includes documents from before and after SaveOnSP began operations in earnest, is sufficient for SaveOnSP to answers the questions that it poses, even though the subjects raised by SaveOnSP are mostly irrelevant to this action. For example, using JJHCS's productions to date and SaveOnSP's internal data, SaveOnSP can analyze:

- Whether patients on the SaveOnSP program more likely to continue to take Janssen medications than patients who are not on SaveOnSP

- Whether JJHCS provides more or less co-pay support to patients after the patients register for SaveOnSP

- How, if at all, CarePath's budgets changed as SaveOnSP has grown

Moreover, JJHCS also has offered to "refresh" several of these categories of data through the present if SaveOnSP agrees to a reciprocal production. That proposal has yet to be accepted. SaveOnSP's purported need for additional documents concerning JJHCS's analysis of patient adherence rates is undercut by the very document it cites. The 2020 Janssen Transparency Report cites to ***publicly available*** sources to support the conclusion that "[t]he doubling of co-pays has been found to reduce patients' adherence to prescribed medicines by 25%-45%." JJHCS Ex. 9 (JJHCS_00000195) (citing Goldman, D.P., Joyce, G.F., Zheng, Y., JAMA, *Prescription drug cost sharing: associations with medication and medical utilization and spending and health*," (July 4, 2007), https://doi.org/10.1001 /jama.298.1.61).

In addition, it is possible that answers to some of these questions surrounding patient adherence may also be found in the files of SaveOnSP's business partners, Express Scripts, Inc. ("ESI"), and Accredo Health Group, Inc. ("Accredo"). These third-party subpoenas continue to be the subject of motion practice in federal court in Missouri and Tennessee. Despite the obvious relevance of ESI and Accredo's documents to their own asserted defenses, SaveOnSP inexplicably filed papers in support of ESI and Accredo's motions to quash JJHCS's third-party subpoenas, leaving SaveOnSP in the unusual position of opposing the production of relevant documents that they wish to use in this case and at the same time seeking the production of irrelevant documents from JJHCS.

At any rate, SaveOnSP's claim that its program somehow "benefits" JJJHCS through increased sales and patient adherence is illogical. The argument is apparently premised on the idea that if Janssen pharmaceuticals have been profitable in recent years, then it must be that the SaveOnSP program somehow led to increased sales and patient adherence, leaving JJHCS

Hon. Cathy L. Waldor
September 7, 2023
Page 20

unharmed by SaveOnSP's conduct. But the profitability of Janssen therapies is not a justification for SaveOnSP's tortious conduct. Whether or not Janssen therapies are profitable is irrelevant to SaveOnSP's interference with CarePath's terms and conditions and its deception of CarePath patients. SaveOnSP is not entitled to the additional discovery it seeks given that JJHCS already has produced documents sufficient for SaveOnSP to test its own unlikely theories.

Finally, the Court should not be fooled by SaveOnSP's upside-down claim that its interference is actually *good* for patients and JJHCS. The record on this point is quite clear, and it is devastating for SaveOnSP. For example, SaveOnSP rejects medication claims until patients affirmatively contact SaveOnSP and causes delays in medication that result in patients experiencing disruptions in their treatment schedules. *See, e.g.*, JJHCS Ex. 10 (SOSP_0052961) (

); JJHCS Ex. 11 (SOSP_0076301)

). Nor is there any truth in the absurd notion that SaveOnSP is actually doing JJHCS and other drug manufacturers a favor by disrupting patients' lives and misappropriating copay assistance funds. If SaveOnSP's actions actually were so heroic as it claims, then SaveOnSP would have no reason to go to extraordinary lengths to hide its identify from manufacturers and lie to patients about its "services." *See, e.g.*, Compl. ¶¶ 76–78, 86; JJHCS Ex. 4 (SOSP_0307960) (

); JJHCS Ex. 5 (SOSP_0423114) (

).

\* \* \*

The parties appreciate the Court's attention to this matter.

Respectfully submitted,

/s/ *Evans Wohlforth*
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

Hon. Cathy L. Waldor
September 7, 2023
Page 21

David Elsberg (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

/s/ *Jeffrey J. Greenbaum/ with permission*

Jeffrey J. Greenbaum
Katherine M. Lieb
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff Johnson & Johnson Health Care
Systems Inc.*

# Exhibit 1

David Elsberg
Andrew R. Dunlap
Meredith Nelson
SELENDY GAY ELSBERG, PLLC
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com

E. Evans Wohlforth, Jr.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
973-596-4500
ewohlforth@gibbonslaw.com

*Attorneys for Defendant Save On SP, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | Civil Action No. 22-2632 (JMV) (CLW) |
| Plaintiff, | **DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF** |
| v. | |
| SAVE ON SP, LLC, | |
| Defendant. | |

To:     Jeffrey J. Greenbaum, Esq.
        SILLS CUMMIS & GROSS, P.C.
        One Riverfront Plaza
        Newark, New Jersey 07102
        973-643-7000

1

Adeel A. Mangi, Esq.
Harry Sandick, Esq.
George LoBiondo, Esq.
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, New

*Attorneys for Plaintiff Johnson & Johnson*
*Health Care Systems Inc.*

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Civil Procedure 26 and 34,

Defendant Save On SP, LLC ("SaveOnSP") requests Plaintiff Johnson & Johnson Health Care

Systems Inc. ("JJHCS"), to produce for inspection and copying the documents listed in these Re-

quests, to the office of the undersigned within 30 days of being served or at a time and place mu-

tually agreed by the parties or ordered by the Court.

**PLEASE TAKE FURTHER NOTICE** that this demand for production of documents

shall be deemed continuing in nature so as to require supplemental responses if Plaintiff or Plain-

tiff's counsel obtain or locate further or additional documents subsequent to the time Plaintiff's

responses are served.

Dated:  November 11, 2022                By:  /s/ Andrew R. Dunlap
                                             David Elsberg
                                             Andrew R. Dunlap
                                             Meredith Nelson
                                             SELENDY GAY ELSBERG, PLLC
                                             1290 Avenue of the Americas
                                             New York, NY 10104
                                             212-390-9000
                                             deslberg@selendygay.com
                                             adunlap@selendygay.com
                                             mnelson@selendygay.com

                                             E. Evans Wohlforth, Jr.
                                             GIBBONS P.C.
                                             One Gateway Center
                                             Newark, NJ 07102-5310

2

973-596-4500
ewohlforth@gibbonslaw.com

*Attorneys for Defendant Save On SP, LLC*

**DEFINITIONS**

1.      The singular form of a word includes the plural, and vice versa.

2.      Any tense of a verb includes all tenses.

3.      Any natural person includes that person's agents, assigns, attorneys, employees, representatives, and successors.

4.      Any entity other than a natural person includes (a) that entity's present and former agents, affiliates (foreign or domestic), assigns, attorneys, consultants, directors, divisions, employees, officers, parents, predecessors, representatives, servants, subsidiaries, and successors; (b) any person or entity, directly or indirectly, wholly or in part, associated with, controlled by, or owned by that entity; (c) and any other person or entity acting or purporting to act on behalf of (a) or (b).

5.      "Action" means this litigation styled as "*Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*" currently pending in the United States District Court for the District of New Jersey, No. 22-2632 (JMV) (CLW).

6.      "Affordable Care Act" means the Patient Protection and Affordable Care Act, Pub. L. 148, 124 Stat. 119.

7.      "All," "any," and "each" mean any and all.

8.      "And" and "or" are construed both conjunctively and disjunctively.

9.      "CarePath" means the Janssen copay assistance program marketed under the name CarePath that provides financial support services for patients using specialty drugs researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including Janssen (as defined herein).

10.    "CarePath Care Coordinator" means any person or entity encompassed by that term as used on CarePath's "Contact Us" webpage,[1] as well as any person responsible for communicating with patients who contact CarePath via an advertised help number (*e.g.*, 877-CarePath).

11.    "Communication" means the transmittal of information in the form of facts, ideas, inquiries, or otherwise.

12.    "Complaint" means JJHCS's May 4, 2022 Complaint [ECF No. 1] or any subsequently amended Complaint in this Action.

13.    "Copay Accumulator Service" means (a) any service provided by Pharmacy Benefit Managers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assistance from counting towards a patient's deductible and out-of-pocket maximum and under which members remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay accumulator."

14.    "Copay Assistance" means any type of patient support that allows a drug manufacturer to pay all or some of a patient's prescription drug cost for that manufacturer's drug.

15.    "Copay Maximizer Service" means (a) any service provided by Pharmacy Benefit Managers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assistance from counting towards a patient's deductible and out-of-pocket maximum and under which members do not remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay

---

[1] *See* Contact Us, https://www.janssencarepath.com/patient/contact-us (last visited October 25, 2022).

assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay maxi-mizer."

16.     "Document" means "document" and "electronically stored information" as defined in the Federal Rules of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

17.     "ESI" means "electronically stored information" as defined in the Federal Rules of Civil Procedure.

18.     "Essential Health Benefit" means, in the context of prescription drug benefits at issue in this case, (a) a prescription drug benefit that satisfies the requirement for a plan to provide essential prescription drug benefits under the Affordable Care Act or that is treated as such by a plan;[2] and (b) any definition JJHCS ascribes to the term "essential health benefit" as used in the Complaint.

19.     "Identify" means (a) with respect to persons, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment; (b) with respect to documents, either (i) to give, to the extent known, the (A) type of document; (B) general subject matter; (C) date of the document; and (D) author(s), addressee(s) and recipient(s); or (ii) to produce the documents, together with sufficient identifying information sufficient to satisfy Federal Rule of Civil Procedure 33(d).

20.     "Including" means including but not limited to.

21.     "Janssen" means Janssen Biotech, Inc., Janssen Pharmaceuticals, Inc., Janssen Products, LP, and Actelion Pharmaceuticals U.S., Inc., as well as any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents,

---

[2] 45 C.F.R. §§ 156.122, 156.115.

representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Janssen Biotech, Inc., Janssen Pharmaceuticals, Inc., Janssen Products, LP, or Actelion Pharmaceuticals U.S., Inc.

22.     "Janssen Drug" means any Specialty Drug manufactured or sold by Janssen from any time for which patients may receive copay assistance, including BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA, as well as any other specialty drugs that JJHCS asserts are at issue in this Action.

23.     "JJHCS's Employee Health Plans" means any health plan offered by JJHCS or Janssen to its employees.

24.     "JJHCS" means Johnson & Johnson Health Care Systems Inc. and any and all pre-decessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or depart-ments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Johnson & Johnson Health Care Systems Inc., including Centocor, Inc., Ortho Biotech Products LP, McNeil Pharmaceutical, Ortho-McNeil Pharmaceutical, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Scios Inc., Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development, LLC, Janssen Pharmaceuticals, Inc., Janssen Products, LP, Actelion Pharmaceuticals U.S., Inc., Janssen BioPharma LLC, and Janssen Research & Development LLC.

25.     "JJHCS Access Group" means the team operating within and for JJHCS under this or a substantially similar name (*i.e.*, Access Group, Access Team, or Access Division).

26.    "<u>JJHCS Health Economics Group</u>" means the team operating within and for JJHCS under this or a substantially similar name (*i.e.*, Health Economics Group, Health Economics Team, or Health Economics Division).

27.    "<u>JJHCS Hub Entity</u>" means any entity retained or utilized by JJHCS to administer, in whole or in part, CarePath (including Lash Group and TrialCard), and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf of such an entity.

28.    "<u>JJHCS Outcome Group</u>" means the team operating within and for JJHCS under this or a substantially similar name (*i.e.*, Outcome Group, Outcome Team, or Outcome Division).

29.    "<u>Lash Group</u>" means The Lash Group, Inc. and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of The Lash Group, Inc.

30.    "<u>Non-Essential Health Benefits</u>" means, in the context of prescription drug benefits at issue in this case, (a) any prescription drug benefit covered by a plan in excess of those necessary for a plan to satisfy the requirements for providing essential prescription drug health benefits under the Affordable Care Act[3] and designated by the plan as a non-essential health benefit; and (b) any definition JJHCS ascribes to the term "non-essential health benefits" as used in the Complaint.

31.    "<u>Parties</u>" means "SaveOnSP" and "JJHCS."

32.    "<u>Patient</u>" means a natural person prescribed or eligible to be prescribed any Janssen Drug, whether or not they use CarePath or are a participant in a health plan advised by SaveOnSP.

---

[3] *See* 45 C.F.R. §§ 156.122, 156.115.

33.    "Person" means a natural person or legal entity including any business or governmental entity or association.

34.    "Regarding" means (directly or indirectly, partially or wholly) about, alluding to, assessing, bearing upon, commenting upon, comprising, concerning, confirming, connected to, considering, containing, contradicting, dealing with, discussing, embodying, evaluating, evidencing, identifying, in connection with, indicating, in respect of, involving, memorializing, mentioning, noting, pertaining to, probative of, proving, recording, referring to, reflecting, relating to, reporting on, reviewing, setting forth, showing, stating, suggesting, summarizing, supporting, touching upon a subject, or having been created, generated, or maintained in connection with or as a result of that subject.

35.    "Request" means any of these Requests for Production.

36.    "SaveOnSP" means Save On SP, LLC, and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Save On SP, LLC.

37.    "SaveOnSP IPBC Video" means the IPBC and SaveOnSP training video created by Express Scripts as defined in Complaint ¶ 9.

38.    "Specialty Drug" means any specialty pharmaceutical, medication, biologic, or other therapy treated as a pharmaceutical for purposes of health plan benefit coverage.

39.    "Stelara" means the Janssen Drug sold under that name.

40.    "Tremfya" means the Janssen Drug sold under that name.

41.    "TrialCard" means TrialCard Inc. and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of TrialCard Inc.

42.    "You" and "Your" means JJHCS.

## INSTRUCTIONS

1.    These Requests seek production of material in Your possession, custody, or control. Fed. R. Civ. P. 34(a)(1).

2.    These Requests seek production of nonprivileged material. Fed. R. Civ. P. 26(b)(1).

3.    These Requests seek production of material that is proportional to the needs of this case. Fed. R. Civ. P. 26(b)(1).

4.    For each Request, either state that you will produce the requested material or state with specificity the grounds for objecting to the Request, including the reasons. Fed. R. Civ. P. 34(b)(2)(C).

5.    If you object to all or part of a Request, state whether you are withholding any responsive material based on that objection. Fed. R. Civ. P. 34(b)(2)(C).

6.    If you object to part of a Request, specify the part and state that you will produce documents responsive to the rest. Fed. R. Civ. P. 34(b)(2)(C).

7.    If you withhold responsive information by claiming that the information is privileged or subject to protection as trial-preparation material, expressly make the claim and describe the nature of the information privileged or protected in a manner that, without revealing information itself privileged or protected, will enable SaveOnSP to assess the claim, Fed. R. Civ. P. 26(b)(5)(A)(ii), including by indicating whether any document exists regarding the information

requested and stating, to the extent the privilege is being asserted in connection with a claim or defense governed by state law, the state privilege rule being invoked, Local Rule 34.1.

8.    If a document responsive to a Request was once in your possession, custody, or control and has since been lost or destroyed, provide (a) a detailed description of the document; (b) the name of the author; (c) the names of all persons to whom the document was sent; (d) the date on which the document was prepared or initially received; (e) the date on which the document was lost or destroyed; and (f) if the document was destroyed, the manner of its destruction, the reason for its destruction, the name of the person who requested or authorized its destruction, and the name of the person who destroyed it.

9.    Produce documents as they are kept in the usual course of business. Fed. R. Civ. P. 34(b)(E)(i). For each document, identify the file or location from which it was taken and the name, affiliation, and position of the producing custodian or non-custodial source.

10.    Produce electronically stored information in the form and manner required by any agreed-upon or court-ordered protocols. In the absence of any such protocol at the time of production, consult SaveOnSP for further instruction.

11.    Produce each document in its entirety, without abbreviation or redaction, including all attachments or materials attached thereto.

12.    Produce all versions of each document that are not identical to the original document (including all drafts) whether due to handwritten notations, revisions, enclosures, attachments, underlining, highlighting, or otherwise.

13.    These Requests are deemed continuing. If after responding to any Request you learn that your response is in some material respect incomplete or incorrect, supplement or correct your response in a timely manner. Fed. R. Civ. P. 26(e)(1)(A).

**TIME PERIOD**

Unless otherwise specified, these Requests cover from and including January 1, 2017, through the present.

**REQUESTS**

1.      From January 1, 2009 through the present, Documents sufficient to show JJHCS's organizational structure, including organizational charts.

2.      From January 1, 2009 through the present, Documents sufficient to show Janssen's organizational structure, including organizational charts.

3.      From January 1, 2009 through the present, Documents sufficient to show the organizational structure of each JJHCS Hub Entity.

4.      From January 1, 2009 through the present, Documents sufficient to show the organizational structure of any group or division within JJHCS, Janssen, or any JJHCS Hub Entity involved in developing, managing, marketing, or administering CarePath or any other copay assistance program offered for Janssen Drugs, and to identify their employees.

5.      From January 1, 2009 through the present, Documents sufficient to show the organizational structure of JJHCS's Health Economics, Access, and Outcome Groups and to identify employees working in those groups.

6.      From January 1, 2009 through the present, Documents sufficient to show the organizational structure of the drug product team for each Janssen Drug, and to identify employees working on those teams.

7.      From January 1, 2009 through the present, documents sufficient to identify all natural persons with decisionmaking authority over the sale or marketing of Janssen Drugs.

8.      All Documents and Communications with or regarding SaveOnSP.

12

9.     All Communications by JJHCS or Janssen with any Patient regarding SaveOnSP, including any Documents regarding those Communications.

10.     All Documents and Communications regarding any presentation, document, or information regarding SaveOnSP referenced in the Complaint, including the "SaveOnSP IPBC Video" and the materials referenced in Complaint ¶¶ 82-88.

11.     From January 1, 2009 through the present, all Documents and Communications regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 6-7, 36-49.

12.     From January 1, 2009 through the present, all Documents and Communications regarding CarePath's terms and conditions, including Documents and Communications regarding (a) JJHCS's allegations in Complaint ¶¶ 3, 8, 18-26, 102-103, 108; (b) all CarePath terms and conditions for each Janssen Drug; (c) JJHCS's decision to revise any of its CarePath terms and conditions for any Janssen Drug; and (d) JJHCS's understanding of the term "offer" or "health plan" as used in CarePath's terms and conditions.

13.     From January 1, 2009 through the present, all Documents and Communications regarding CarePath's requirement that Patients enrolled in CarePath make any payments towards Janssen Drugs, including Documents and Communications regarding JJHCS's basis for setting the amounts of those payments and JJHCS's allegations in Complaint ¶¶ 48-49, 70, 89.

14.     From January 1, 2015 through the present, all Documents and Communications regarding JJHCS's or any JJHCS Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under

the Affordable Care Act and its regulations, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 9-10, 43, 53-59, 71, 79.

15.    All Documents and Communications regarding SaveOnSP's communications with Patients regarding CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 60-67, 109.

16.    All Documents and Communications regarding SaveOnSP's provision of services to qualified high deductible or health savings account plans, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 72.

17.    All Documents and Communications regarding JJHCS's payment of copay assistance funds to or on behalf of Patients enrolled in qualified high deductible or health savings account plans.

18.    All Documents and Communications regarding any allegedly misleading or confusing communications between SaveOnSP and Patients, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 13, 75-77, 85-88.

19.    All Documents and Communications regarding any alleged stress or confusion caused by SaveOnSP to any member of the public, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

20.    All Documents and Communications regarding any publicly distributed material (including, for example, articles, op-eds, white papers, and online postings) regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer Services, including Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect involvement with such material and JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect funding of the authors, publishers, or distributors of such material.

14

21.     All Documents and Communications regarding any advocacy to or communication with any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer Services.

22.     All Documents and Communications regarding any alleged harm caused by Save-OnSP to any Patient by allegedly making their healthcare more expensive, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

23.     All Documents and Communications regarding how SaveOnSP directly or indirectly affects or threatens the financial viability of CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

24.     All Documents and Communications regarding how SaveOnSP directly or indirectly affects or threatens the financial viability of any Copay Assistance Program other than Care-Path, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

25.     All Documents and Communications regarding any alleged harm caused by Save-OnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 110, 115.

26.     All Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum.

27.     All Documents and Communications regarding the "internal JJHCS data" discussed in Complaint ¶¶ 92-101, including the complete databases from which that data was drawn.

28.     From January 1, 2009 through the present, for each Janssen Drug for each year, Documents sufficient to show:

15

    a.      all Patients receiving the Janssen Drug;

    b.      the number of fills of the Janssen Drug received by each such Patient;

    c.      the dosage of the Janssen Drug received by each such Patient for each fill;

    d.      the projected number of Patients, average number of fills, and average dosage for the Janssen Drug;

    e.      the cost to manufacture the Janssen Drug;

    f.      the sales and marketing budget for the Janssen Drug;

    g.      the price of the Janssen Drug;

    h.      the revenue received by JJHCS from the Janssen Drug;

    i.      all Patients enrolled in the CarePath program for the Janssen Drug;

    j.      the dates on which each Patient was enrolled in CarePath;

    k.      the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath;

    l.      the Janssen Drugs for which each Patient enrolled in CarePath received copay assistance;

    m.      all copay assistance payments that JJHCS made to or on behalf each Patient enrolled in CarePath; and

29.    From January 1, 2009 through the present, for each Janssen Drug for each year, all Documents and Communications regarding:

    a.      JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to Patients enrolled in CarePath, including the determination of the maximum program benefit per calendar year for the Janssen Drug;

16

b.      JJHCS's budget for CarePath, including the sales and marketing budget;

c.      JJHCS's actual and projected annual costs for CarePath;

d.      JJHCS's use of or accounting for unused CarePath funds;

e.      the impact of the Affordable Care Act on JJHCS's CarePath budget or funding, including the impact of laws and regulations regarding out-of-pocket maximums;

f.      JJHCS's and Janssen's revenue and revenue projections from fills by Patients enrolled in CarePath;

g.      the impact of CarePath on Janssen's sales of any Janssen Drug;

h.      the impact of CarePath on JJHCS's or Janssen's gross to net calculations;

i.      JJHCS's or Janssen's actual and projected return on investment for CarePath; and

j.      any analysis of the adherence rates of Patients enrolled in CarePath to Janssen Drugs, including such Patients enrolled in plans advised by SaveOnSP.

30.     From January 1, 2009 through the present, for each year for each Janssen Drug, all Documents and Communications regarding the basis for Janssen's decision to raise or lower the price of the Janssen Drug, including labor or manufacturing costs or the increase in efficacy of the Janssen Drug.

31.     All Documents and Communications regarding JJHCS's attempts to limit or eliminate the amount of CarePath copay assistance funds available to Patients using Stelara or Tremfya based on whether the Patients' plans allegedly reduce or eliminate Patients' out-of-pocket costs, including Documents and Communications regarding JJHCS's attempts to limit or eliminate the

17

availability of CarePath copay assistance funds available to Patients enrolled in health plans advised by SaveOnSP.

32.     All Documents and Communications regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient.

33.     All Documents and Communications regarding JJHCS's attempts to identify health plans advised by SaveOnSP or Patients enrolled in such plans.

34.     From any time, all Documents and Communications regarding JJHCS's or Janssen's negotiations or agreements regarding the potential use of SaveOnSP's services, or the services of any Copay Maximizer Service or Copay Accumulator Service, for JJHCS's Employee Health Plans, including JJHCS's abandonment of those negotiations or agreements.

35.     Documents sufficient to identify all JJHCS Hub Entities and CarePath Care Coordinators.

36.     From January 1, 2009 through the present, Documents sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or CarePath Care Coordinator regarding CarePath, including any assessment of the fair market value of those services.

37.     From January 1, 2009 through the present, documents sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs.

38.    From January 1, 2009 through the present, all Documents and Communications received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath.

39.    All Documents and Communications received by JJHCS from any CarePath Care Coordinator regarding SaveOnSP.

40.    All Communications by any JJHCS Hub Entity or CarePath Care Coordinator with any Patient regarding SaveOnSP, including any Documents regarding those Communications and talk tracks or scripts prepared for use during those Communications.

41.    From January 1, 2015 through the present, all Documents and Communications relating to Copay Accumulator Services and Copay Maximizer Services and their effect on JJHCS's return on investment for copay assistance dollars.

42.    From January 1, 2015 through the present, all Documents and Communications relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms "copay accumulator" and "copay maximizer."

43.    All Documents and Communications concerning non-medical switching by participants of plans that implement SaveOnSP's services, a Copay Accumulator Service, or a Copay Maximizer Service.

44.    To the extent not requested above, Documents and Communications of any JJHCS Hub Entity or CarePath Care Coordinator regarding the topics of all Requests listed above.

45.    JJHCS's, Janssen's, any JJHCS Hub Entity's, and any CarePath Care Coordinator's document retention policies.

46.    Complete data dictionaries for any data that You produce.

19

47.     From any time, all Documents and Communications regarding this Action provided to you by any person or entity other than SaveOnSP, including in response to subpoenas served in this Action.

48.     To the extent not requested above, from any time, all Documents and Communications upon which you may rely in this Action.

# Exhibit 2

Jeffrey J. Greenbaum, Esq.
Katherine M. Lieb, Esq.
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza Newark,
New Jersey 07102
973-643-7000

Adeel A. Mangi, Esq.
Harry Sandick, Esq. (admitted *pro hac vice*)
George LoBiondo, Esq.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10035

*Attorneys for Plaintiff Johnson & Johnson Health Care
Systems Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br> Plaintiff, <br><br> v. <br><br> SAVE ON SP, LLC, <br><br> Defendant. | Civil Action No. 22-2632 (JMV) (CLW) <br><br> **PLAINTFF JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS** |

## <u>GENERAL OBJECTIONS</u>

Johnson and Johnson Health Care Systems, Inc. ("JJHCS") incorporates each of the

General Objections below into its specific objections to each Request, whether or not each such

General Objection is expressly referred to in JJHCS's objections to a specific Request.

JJHCS's investigation of facts related to this Action is ongoing.  It reserves the right to

supplement, amend, modify, or correct its responses under Rule 26(e) should it discover

additional information or grounds for objections at any time prior to the conclusion of this

Action.  The following responses and objections are based upon information known at this time.

1.    JJHCS objects to the Requests to the extent that they seek documents or

information protected from disclosure by a privilege including, without limitation, the First

Amendment privilege, the attorney-client privilege, the work-product doctrine, the joint defense

privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules

of the Court, and relevant case law.  The inadvertent production by JJHCS of information,

documents, materials, or things covered by any privilege or doctrine shall not constitute a

waiver of any applicable privilege or doctrine, including but not limited to, objections on the

basis of competency, confidentiality, relevancy, materiality, work-product, privilege, and/or

admissibility as evidence, as such objections may apply at trial or otherwise in this Action.

2.    JJHCS objects to the Requests to the extent that they seek documents or

information that are not relevant to a claim or defense or to the subject matter of this litigation.

Any response JJHCS makes to any Request shall not be deemed an admission that the response,

information, document, or thing produced is relevant to a claim or defense or to the subject

matter of this litigation, is reasonably calculated to lead to the discovery of admissible evidence,

is material, or is admissible as evidence.

1

3.      JJHCS objects to the Requests to the extent that they impose obligations beyond or inconsistent with those imposed by the Federal Rules of Civil Procedure, the Local Rules of the Court, the Court's orders, the discovery schedule entered in this Action, or any other applicable rule, order, or source of law.

4.      JJHCS objects to the Requests to the extent that they seek the production of documents or things that are equally available to or already in SaveOnSP's possession, custody, or control.  To the extent that JJHCS agrees in these responses to produce certain documents, information, or things, these responses shall not be construed as conceding that the documents, information, or things exist and/or are in the possession, custody, or control of JJHCS.  Instead, it means that JJHCS will perform a reasonable search for documents in its possession and produce such documents, information, or things to the extent any responsive documents, information, or things exist and are not otherwise protected from disclosure.

5.      JJHCS objects to the Requests to the extent that they seek information that is obtainable from sources other than JJHCS in a manner that is more convenient, less burdensome, or less expensive.

6.      JJHCS objects to the Requests to the extent that they seek production of documents, records, tangible things, or other materials to the extent that such disclosure would violate a confidentiality agreement, court order, or applicable law.

7.      JJHCS objects to the Requests to the extent that they are vague and/or ambiguous.

8.      JJHCS objects to the Requests to the extent that they require interpretation by it in providing a response.  JJHCS responds to the Requests as it interprets and understands each Request as set forth.  If SaveOnSP subsequently asserts an interpretation of any Request that

2

differs from JJHCS's understanding of that Request, JJHCS reserves the right to modify or supplement its objections and responses.

9.    JJHCS objects to the Requests to the extent that they are duplicative of other document requests, interrogatories, and/or other discovery requests.

10.    JJHCS objects to the Requests to the extent that they are argumentative, lack foundation, or incorporate assertions that are disputed, erroneous, or irrelevant to the Action. JJHCS further objects to the Requests to the extent that they assume facts that do not exist or the occurrence of events that did not take place.

11.    JJHCS objects to the Requests to the extent that they seek documents and information relating to any business affairs other than those that are the subject of the Action.

12.    JJHCS objects to the Requests as overbroad and unduly burdensome to the extent they purport to require production of "all" or "any" documents where a subset of documents would be sufficient to provide the relevant information.

13.    JJHCS objects to the Requests to the extent that they seek the production of documents that are not in JJHCS's possession, custody, or control.

## OBJECTIONS TO DEFINITIONS

1.    JJHCS objects to the definition of the term "Janssen" to the extent the term is used to seek documents and communications in the possession of entities other than JJHCS. JJHCS further objects to the definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it purports to include "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants and all persons or entities acting or purporting to act on behalf" of those entities.

3

2.      JJHCS objects to the definition of the term "Janssen Drug" as irrelevant to the extent it purports to include drugs that are not covered by CarePath.  JJHCS further objects to the definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any Specialty Drug manufactured or sold by Janssen from any time."

3.      JJHCS objects to the definition of the term "JJHCS" to the extent it purports to include attorneys and accountants who may be outside of JJHCS's possession, custody, and control.  JJHCS further objects to the definition as overbroad, unduly burdensome, and not proportional to the needs of the case to extent it purports to include "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, . . . agents, [or] representatives" or purports to include entities and persons acting or purporting to act on behalf of or under the control of entities other than Johnson & Johnson Healthcare Systems, Inc., including Centocor, Inc., Ortho Biotech Products LP, McNeil Pharmaceutical, Ortho-McNeil Pharmaceutical, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Scios Inc., Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development, LLC, Janssen Pharmaceuticals, Inc., Janssen Products, LP, Actelion Pharmaceuticals U.S., Inc., Janssen BioPharma LLC, and Janssen Research & Development LLC.

4.      JJHCS objects to the definition of the term "JJHCS Hub Entity" as vague and as irrelevant to the extent it purports to include entities other than those responsible for administering CarePath during the relevant Time Period.  JJHCS further objects to the definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants and all persons or entities acting or purporting to

4

act on behalf" of those entities.  JJHCS further objects on the ground that the phrase

"administer, in whole or in part, CarePath" is vague and ambiguous.  JJHCS further objects to

the extent the term is used to seek documents and communications in the possession of entities

other than JJHCS.

5.    JJHCS objects to the definition of the term "Lash Group" as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it includes "any and all

predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or

departments, agents, representatives, directors, officers, employees, committees, attorneys,

accountants and all persons or entities acting or purporting to act on behalf or under the control

of The Lash Group, Inc."  JJHCS further objects to the extent the term is used to seek

documents and communications in the possession of entities other than JJHCS.

6.    JJHCS objects to the definition of the term "TrialCard" as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it includes "any and all

predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or

departments, agents, representatives, directors, officers, employees, committees, attorneys,

accountants and all persons or entities acting or purporting to act on behalf or under the control

of TrialCard Inc."  JJHCS further objects to the extent the term is used to seek documents and

communications in the possession of entities other than JJHCS.

**OBJECTIONS TO THE TIME PERIOD FOR SPECIFIC REQUESTS**

1.    JJHCS objects to SaveOnSP's Requests as overbroad, unduly burdensome,

and not relevant to the subject matter of this Action to the extent they call for documents from

before January 1, 2017.  Unless otherwise noted, JJHCS will only produce documents from

January 1, 2017 through the July 1, 2022 (the "Time Period").

5

## SPECIFIC RESPONSES AND OBJECTIONS

### Request No. 1

From January 1, 2009 through the present, Documents sufficient to show JJHCS's organizational structure, including organizational charts.

### Response to Request No. 1

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to the JJHCS groups responsible for the administration of CarePath. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents outside of the relevant Time Period.

Subject to the foregoing objections, JJHCS will produce non-privileged documents in its possession sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath for the relevant Time Period, to the extent such documents exist and can be located after a reasonable search. Otherwise, JJHCS will not search for or produce documents responsive to this Request.

### Request No. 2

From January 1, 2009 through the present, Documents sufficient to show Janssen's organizational structure, including organizational charts.

### Response to Request No. 2

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to the JJHCS groups responsible for the administration of CarePath. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents outside of the relevant Time Period. JJHCS further objects to this

Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

JJHCS will not search for or produce documents in response to this Request.

**Request No. 3**

From January 1, 2009 through the present, Documents sufficient to show the organizational structure of each JJHCS Hub Entity.

**Response to Request No. 3**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to the JJHCS groups responsible for the administration of CarePath. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents outside of the relevant Time Period. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions.

JJHCS will not search for or produce documents in response to this Request.

**Request No. 4**

From January 1, 2009 through the present, Documents sufficient to show the organizational structure of any group or division within JJHCS, Janssen, or any JJHCS Hub Entity involved in developing, managing, marketing, or administering CarePath or any other copay assistance program offered for Janssen Drugs, and to identify their employees.

**Response to Request No. 4**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to the JJHCS groups responsible for the administration of CarePath. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the

7

extent it seeks documents outside of the relevant Time Period.  JJHCS further objects to this

Request to the extent it seeks documents and communications in the possession of entities other

than JJHCS.  JJHCS further objects to this Request on the ground that the phrase "any other

copay assistance program offered for Janssen Drugs" is vague and ambiguous.  JJHCS further

objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in

JJHCS's Objections to Definitions.

Subject to the foregoing objections, JJHCS will produce non-privileged documents in its

possession sufficient to show the organizational structure of the JJHCS groups responsible for

the administration of CarePath for the relevant Time Period, to the extent such documents exist

and can be located after a reasonable search.  Otherwise, JJHCS will not search for or produce

documents responsive to this Request.

**Request No. 5**

From January 1, 2009 through the present, Documents sufficient to show the
organizational structure of JJHCS's Health Economics, Access, and Outcome Groups and to
identify employees working in those groups.

**Response to Request No. 5**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to the

JJHCS groups responsible for the administration of CarePath.  JJHCS further objects to this

Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the

extent it seeks documents outside of the relevant Time Period.

Subject to the foregoing objections, JJHCS will produce non-privileged documents in its

possession sufficient to show the organizational structure of the JJHCS groups responsible for

the administration of CarePath for the relevant Time Period, to the extent such documents exist

and can be located after a reasonable search.  Otherwise, JJHCS will not search for or produce documents responsive to this Request.

**Request No. 6**

From January 1, 2009 through the present, Documents sufficient to show the organizational structure of the drug product team for each Janssen Drug, and to identify employees working on those teams.

**Response to Request No. 6**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to the JJHCS groups responsible for the administration of CarePath.  JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents outside of the relevant Time Period.  JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.  JJHCS further objects to this Request on the ground that the phrase "drug product team" is vague and ambiguous.

JJHCS will not search for or produce documents in response to this Request.

**Request No. 7**

From January 1, 2009 through the present, documents sufficient to identify all natural persons with decisionmaking authority over the sale or marketing of Janssen Drugs.

**Response to Request No. 7**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to the JJHCS groups responsible for the administration of CarePath.  JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents outside of the relevant Time Period.  JJHCS further objects to this

9

Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

JJHCS will not search for or produce documents in response to this Request.

**Request No. 8**

All Documents and Communications with or regarding SaveOnSP.

**Response to Request No. 8**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents related to any advocacy to or communication with any governmental or regulatory body regarding SaveOnSP. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by any privilege including, without limitation, the First Amendment privilege, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS will produce all non-privileged documents and communications in its possession with or regarding SaveOnSP from the relevant Time Period, to the extent such documents and communications exist and can be located after a reasonable search. However, notwithstanding the foregoing, JJHCS will not produce any documents or communications responsive to Request for Production No. 21, which seeks

documents that are irrelevant to any claim or defense in this Action.  JJHCS will not otherwise

search for or produce documents and communications responsive to this Request.

**Request No. 9**

All Communications by JJHCS or Janssen with any Patient regarding SaveOnSP, including any Documents regarding those Communications.

**Response to Request No. 9**

In addition to the foregoing general objections, JJHCS objects to this Request as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks "all" documents and communications regarding a broad subject matter.  JJHCS further

objects to this Request to the extent it seeks documents and communications in the possession of

entities other than JJHCS.

Subject to the foregoing objections, JJHCS incorporates by reference its response to

Request for Production No. 8.  Otherwise, JJHCS will not search for or produce documents and

communications responsive to this Request.

**Request No. 10**

All Documents and Communications regarding any presentation, document, or in-formation regarding SaveOnSP referenced in the Complaint, including the "SaveOnSP IPBC Video" and the materials referenced in Complaint ¶¶ 82-88.

**Response to Request No. 10**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it seeks documents related to any

advocacy to or communication with any governmental or regulatory body regarding SaveOnSP.

JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to

the needs of the case to the extent it seeks "all" documents and communications regarding a

broad subject matter. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

## Request No. 11

From January 1, 2009 through the present, all Documents and Communications regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 6-7, 36-49.

## Response to Request No. 11

In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request on the ground that the phrase "any other copay assistance program offered for Janssen Drugs" is vague and ambiguous. JJHCS further objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks documents unrelated to CarePath.

JJHCS will not search for or produce documents or communications responsive to this Request. JJHCS is, however, willing to meet and confer to determine if this Request can be appropriately narrowed.

12

**Request No. 12**

From January 1, 2009 through the present, all Documents and Communications regarding CarePath's terms and conditions, including Documents and Communications regarding (a) JJHCS's allegations in Complaint ¶¶ 3, 8, 18-26, 102-103, 108; (b) all CarePath terms and conditions for each Janssen Drug; (c) JJHCS's decision to revise any of its CarePath terms and conditions for any Janssen Drug; and (d) JJHCS's understanding of the term "offer" or "health plan" as used in CarePath's terms and conditions.

**Response to Request No. 12**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information beyond the final CarePath terms and conditions at issue. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it calls for JJHCS's understanding of any particular term, as such a contention interrogatory would be premature at this point in the litigation pursuant to Local Rule 33.1(d).

Subject to the foregoing objections, JJHCS will produce non-privileged documents in its possession sufficient to show all final versions of CarePath's terms and conditions for each Janssen Drug during the relevant Time Period, to the extent such documents exist and can be located after a reasonable search. Otherwise, JJHCS will not search for or produce documents responsive to this Request.

**Request No. 13**

From January 1, 2009 through the present, all Documents and Communications regarding CarePath's requirement that Patients enrolled in CarePath make any payments towards Janssen

13

Drugs, including Documents and Communications regarding JJHCS's basis for setting the amounts of those payments and JJHCS's allegations in Complaint ¶¶ 48-49, 70, 89.

**Response to Request No. 13**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information beyond the final CarePath terms and conditions at issue. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS will produce non-privileged documents in its possession sufficient to show all final versions of CarePath's terms and conditions for each Janssen Drug during the relevant Time Period, to the extent such documents exist and can be located after a reasonable search. Otherwise, JJHCS will not search for or produce documents responsive to this Request.

**Request No. 14**

From January 1, 2015 through the present, all Documents and Communications regarding JJHCS's or any JJHCS Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 9-10, 43, 53-59, 71, 79.

**Response to Request No. 14**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for views on a legal

14

question.  JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period.  JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.  JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions.

Subject to the foregoing objections, JJHCS will produce all non-privileged documents and communications in its possession regarding SaveOnSP's designation of specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations during the relevant Time Period, to the extent such documents and communications exist and can be located after a reasonable search.  However, notwithstanding the foregoing, JJHCS will not produce any documents responsive to Request for Production No. 21, which is irrelevant to any claim or defense in this Action.  JJHCS will not otherwise search for or produce documents and communications responsive to this Request.

## Request No. 15

All Documents and Communications regarding SaveOnSP's communications with Patients regarding CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 60-67, 109.

## Response to Request No. 15

In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  JJHCS further

objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 16**

All Documents and Communications regarding SaveOnSP's provision of services to qualified high deductible or health savings account plans, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 72.

**Response to Request No. 16**

In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request on the ground that the phrase "SaveOnSP's provision of services to qualified high deductible or health savings account plans" is vague and ambiguous. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 17**.

All Documents and Communications regarding JJHCS's payment of copay assistance funds to or on behalf of Patients enrolled in qualified high deductible or health savings account plans.

**Response to Request No. 17**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it seeks information about JJHCS's

payment of funds to patients enrolled in qualified high deductible or health savings account plans

as opposed to SaveOnSP's exploitation of a purported legal gray area with respect to those plans.

JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the

needs of the case to the extent it seeks "all" documents and communications regarding a broad

subject matter.  JJHCS further objects to this Request to the extent it seeks documents and

communications in the possession of entities other than JJHCS.

JJHCS will not search for or produce documents and communications responsive to this

Request.

**Request No. 18**

All Documents and Communications regarding any allegedly misleading or confusing
communications between SaveOnSP and Patients, including Documents and Communications
regarding JJHCS's allegations in Complaint ¶¶ 13, 75-77, 85-88.

**Response to Request No. 18**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it seeks documents related to any

advocacy to or communication with any governmental or regulatory body regarding SaveOnSP.

JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to

the needs of the case to the extent it seeks "all" documents and communications regarding a

broad subject matter.  JJHCS further objects to this Request to the extent it seeks documents and

communications in the possession of entities other than JJHCS.  JJHCS further objects to this

Request to the extent it seeks "misleading or confusing communications," as those terms are

vague and ambiguous.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 19**

All Documents and Communications regarding any alleged stress or confusion caused by SaveOnSP to any member of the public, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

**Response to Request No. 19**

In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 20**

All Documents and Communications regarding any publicly distributed material (including, for example, articles, op-eds, white papers, and online postings) regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer Services, including Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect involvement with such material and JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect funding of the authors, publishers, or distributors of such material.

**Response to Request No. 20**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks information about JJHCS's or any other entity's relationship or connection, if any, to materials about SaveOnSP's conduct,

18

as opposed to information about SaveOnSP's conduct itself. JJHCS further objects to this

Request as irrelevant to any claim or defense in this Action to the extent it seeks information

relating to Copay Accumulator Services or Copay Maximizer Services other than SaveOnSP's.

JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to

the needs of the case to the extent it seeks "all" documents and communications regarding a

broad subject matter. JJHCS further objects on the ground that the phrases "direct or indirect

involvement" and "direct or indirect funding" are vague and ambiguous. JJHCS further objects

to this Request to the extent it seeks documents and communications in the possession of entities

other than JJHCS or that are publicly available and therefore equally available to SaveOnSP.

JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the

reasons stated in JJHCS's Objections to Definitions.

Subject to the foregoing objections, JJHCS incorporates by reference its response to

Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and

communications responsive to this Request.

**Request No. 21**

All Documents and Communications regarding any advocacy to or communication with
any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or
Copay Maximizer Services.

**Response to Request No. 21**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it seeks information about JJHCS's

advocacy to or communication with any governmental or regulatory body regarding SaveOnSP

as opposed to information about SaveOnSP's conduct itself. JJHCS further objects to this

Request as irrelevant to any claim or defense in this Action to the extent it seeks information

relating to Copay Accumulator Services or Copay Maximizer Services other than SaveOnSP's.

19

JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the First Amendment privilege, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

JJHCS will not search for or produce documents and communications responsive to this Request.

## Request No. 22

All Documents and Communications regarding any alleged harm caused by SaveOnSP to any Patient by allegedly making their healthcare more expensive, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

## Response to Request No. 22

In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

20

**Request No. 23**

      All Documents and Communications regarding how SaveOnSP directly or indirectly affects or threatens the financial viability of CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

**Response to Request No. 23**

      In addition to the foregoing general objections, JJHCS objects to this Request as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks "all" documents and communications regarding a broad subject matter.  JJHCS further

objects to this Request to the extent it seeks documents and communications in the possession of

entities other than JJHCS.

      Subject to the foregoing objections, JJHCS incorporates by reference its response to

Request for Production No. 8.  Otherwise, JJHCS will not search for or produce documents and

communications responsive to this Request.

**Request No. 24**

      All Documents and Communications regarding how SaveOnSP directly or indirectly affects or threatens the financial viability of any Copay Assistance Program other than CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

**Response to Request No. 24**

      In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it seeks information about the

financial viability of any Copay Assistance Program other than CarePath.  JJHCS further objects

to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to

the extent it seeks "all" documents and communications regarding a broad subject matter.

JJHCS further objects to this Request to the extent it seeks documents and communications in

the possession of entities other than JJHCS.

21

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8.  Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 25**

All Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 110, 115.

**Response to Request No. 25**

In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.  JJHCS further objects to this Request on the ground that the phrase "any alleged harm" is vague and ambiguous.  For the purposes of its response, JJHCS shall interpret the phrase "any alleged harm" to mean the damages identified by JJHCS relating to the increased average amount of CarePath expenditures incurred for patients enrolled in the SaveOnSP Program.

Subject to the foregoing objections, JJHCS will produce all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period, including the extent to which SaveOnSP has caused JJHCS to pay more in copay assistance than it otherwise would have, to the extent such documents exist and can be located after a reasonable search.  However, notwithstanding the foregoing, JJHCS will not produce any documents responsive to Request for Production No. 21, which is irrelevant to any claim or defense in this Action.  JJHCS will not otherwise search for or produce documents and communications responsive to this Request.

22

**Request No. 26**

     All Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum.

**Response to Request No. 26**

     In addition to the foregoing general objections, JJHCS objects to this Request on the ground that the phrase "payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum" is vague and ambiguous.  JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.  JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions.

     JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 27**

     All Documents and Communications regarding the "internal JJHCS data" discussed in Complaint ¶¶ 92-101, including the complete databases from which that data was drawn.

**Response to Request No. 27**

     In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter and seeks "complete databases from which [] data was drawn."  JJHCS further objects to this Request to

the extent it seeks documents and communications in the possession of entities other than

JJHCS.  JJHCS further objects to this Request as duplicative of Request No. 25.

Subject to the foregoing objections, JJHCS will produce the data that formed the basis for

the allegations in Complaint ¶¶ 92-100.  Otherwise, JJHCS will not search for or produce

documents and communications responsive to this Request.

## Request No. 28

From January 1, 2009 through the present, for each Janssen Drug for each year,
Documents sufficient to show:

a.    all Patients receiving the Janssen Drug;

b.    the number of fills of the Janssen Drug received by each such Patient;

c.    the dosage of the Janssen Drug received by each such Patient for each fill;

d.    the projected number of Patients, average number of fills, and average dosage for
the Janssen Drug;

e.    the cost to manufacture the Janssen Drug;

f.    the sales and marketing budget for the Janssen Drug;

g.    the price of the Janssen Drug;

h.    the revenue received by JJHCS from the Janssen Drug;

i.    all Patients enrolled in the CarePath program for the Janssen Drug;

j.    the dates on which each Patient was enrolled in CarePath;

k.    the amounts of copay assistance funds that JJHCS offered to each Patient enrolled
in CarePath;

l.    the Janssen Drugs for which each Patient enrolled in CarePath received copay
assistance;

m.    all copay assistance payments that JJHCS made to or on behalf each Patient
enrolled in CarePath; and

**Response to Request No. 28**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks information unrelated to SaveOnSP's misconduct, including information relating to Patient fills, the cost of manufacturing Janssen Drugs, the sales and marketing budgets for Janssen drugs, and pricing and revenue generated by Janssen Drugs. JJHCS further objects to this Request on the ground that the phrases "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," "the cost to manufacture the Janssen Drug," and "the price of the Janssen Drug" are vague and ambiguous. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a variety of extremely broad subject matters. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS will produce Janssen Transparency Reports for the relevant Time Period. Further, JJHCS is willing to meet and confer to discuss subparts (i) through (m). Otherwise, JJHCS will not search for or produce documents responsive to this Request.

**Request No. 29**

From January 1, 2009 through the present, for each Janssen Drug for each year, all Documents and Communications regarding:

a.    JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to Patients enrolled in CarePath, including the determination of the maximum program benefit per calendar year for the Janssen Drug;

b.      JJHCS's budget for CarePath, including the sales and marketing budget;

c.      JJHCS's actual and projected annual costs for CarePath;

d.      JJHCS's use of or accounting for unused CarePath funds;

e.      the impact of the Affordable Care Act on JJHCS's CarePath budget or funding, including the impact of laws and regulations regarding out-of-pocket maximums;

f.      JJHCS's and Janssen's revenue and revenue projections from fills by Patients enrolled in CarePath;

g.      the impact of CarePath on Janssen's sales of any Janssen Drug;

h.      the impact of CarePath on JJHCS's or Janssen's gross to net calculations;

i.      JJHCS's or Janssen's actual and projected return on investment for CarePath; and

j.      any analysis of the adherence rates of Patients enrolled in CarePath to Janssen Drugs, including such Patients enrolled in plans advised by SaveOnSP.

**Response to Request No. 29**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks information unrelated to SaveOnSP's misconduct, including information relating to the sales and marketing budget for CarePath, JJHCS's uses of or accounting for unused CarePath funds, the impact of the Affordable Care Act or other laws and regulations on CarePath's budget or funding, JJHCS's and Janssen's revenue and revenue projections from fills by Patients enrolled in CarePath, the impact of CarePath on Janssen's sales of any Janssen Drug, the impact of CarePath on JJHCS's or Janssen's gross to net calculations, JJHCS's or Janssen's actual and projected return on investment for CarePath, and the adherence rates of Patients enrolled in CarePath to Janssen Drugs.  JJHCS further objects to this Request on the ground that the phrases "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," "JJHCS's or Janssen's gross to net calculations," and "JJHCS's or Janssen's actual and projected return on investment for CarePath" are vague and ambiguous.  JJHCS further objects to this

26

Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the

extent it seeks "all" documents and communications regarding a variety of broad subject matters.

JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to

the needs of the case to the extent it seeks documents and communications outside of the relevant

Time Period.  JJHCS further objects to this Request to the extent it seeks documents and

communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS will produce non-privileged documents in its

possession for the relevant Time Period sufficient to show (1) how JJHCS determines the

amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath,

(2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected

annual costs for CarePath, to the extent such documents exist and can be located after a

reasonable search.  Otherwise, JJHCS will not search for or produce documents responsive to

this Request.

**Request No. 30**

From January 1, 2009 through the present, for each year for each Janssen Drug, all
Documents and Communications regarding the basis for Janssen's decision to raise or lower the
price of the Janssen Drug, including labor or manufacturing costs or the increase in efficacy of the
Janssen Drug.

**Response to Request No. 30**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it seeks information unrelated to

SaveOnSP's misconduct, including information related to the pricing of Janssen Drugs.  JJHCS

further objects to this Request on the ground that the phrases "the price of the Janssen Drug" and

"the increase in efficacy of the Janssen Drug" are vague and ambiguous.  JJHCS further objects

to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to

27

the extent it seeks "all" documents and communications regarding a broad subject matter.

JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to

the needs of the case to the extent it seeks documents and communications outside of the relevant

Time Period.  JJHCS further objects to this Request to the extent it seeks documents and

communications in the possession of entities other than JJHCS.

JJHCS will not search for or produce documents responsive to this Request.

**Request No. 31**

All Documents and Communications regarding JJHCS's attempts to limit or eliminate the
amount of CarePath copay assistance funds available to Patients using Stelara or Tremfya based
on whether the Patients' plans allegedly reduce or eliminate Patients' out-of-pocket costs,
including Documents and Communications regarding JJHCS's attempts to limit or eliminate the
availability of CarePath copay assistance funds available to Patients enrolled in health plans
advised by SaveOnSP.

**Response to Request No. 31**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information beyond the

final CarePath terms and conditions at issue.  JJHCS further objects to this Request as overbroad,

unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all"

documents and communications regarding a broad subject matter.  JJHCS further objects to this

Request to the extent it seeks documents and communications in the possession of entities other

than JJHCS.

Subject to the foregoing objections, JJHCS will produce non-privileged documents and

communications in its possession relating to JJHCS's decision to limit or eliminate the amount of

copay assistance funds available to Patients using Stelara or Tremfya who are also enrolled in the

SaveOnSP Program, to the extent such documents and communications exist and can be located

after a reasonable search.  JJHCS will not otherwise search for or produce documents and

communications responsive to this Request.

**Request No. 32**

All Documents and Communications regarding any offer by JJHCS to provide to any
Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath
Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance
funds available to a Patient.

**Response to Request No. 32**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information beyond the

extent to which SaveOnSP has caused JJHCS to pay more in copay assistance than it otherwise

would have.  JJHCS further objects to this Request on the ground that the phrases "CarePath

funds greater than the amounts that JJHCS generally offers to CarePath Patients" and "to waive

any limitation on or elimination of the amount of CarePath copay assistance funds available" are

vague and ambiguous.  JJHCS further objects to this Request as overbroad, unduly burdensome,

and not proportional to the needs of the case to the extent it seeks "all" documents and

communications regarding a broad subject matter.  JJHCS further objects to this Request to the

extent it seeks documents and communications in the possession of entities other than JJHCS.

JJHCS will not search for or produce documents and communications responsive to this

Request.

**Request No. 33**

All Documents and Communications regarding JJHCS's attempts to identify health plans
advised by SaveOnSP or Patients enrolled in such plans.

**Response to Request No. 33**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information unrelated to

SaveOnSP's misconduct. JJHCS further objects to this Request as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents

and communications regarding a broad subject matter. JJHCS further objects to this Request to

the extent it seeks documents and communications in the possession of entities other than JJHCS

Subject to the foregoing objections, JJHCS incorporates by reference its response to

Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and

communications responsive to this Request.

**Request No. 34**

From any time, all Documents and Communications regarding JJHCS's or Janssen's
negotiations or agreements regarding the potential use of SaveOnSP's services, or the services of
any Copay Maximizer Service or Copay Accumulator Service, for JJHCS's Employee Health
Plans, including JJHCS's abandonment of those negotiations or agreements.

**Response to Request No. 34**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information about other

"services of Copay Maximizer Service[s] or Copay Accumulator Service[s]" and unrelated to

SaveOnSP's misconduct. JJHCS further objects to this Request as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents

and communications regarding a broad subject matter. JJHCS further objects to this Request as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks documents and communications outside of the relevant Time Period. JJHCS further

objects to this Request to the extent it seeks documents and communications in the possession of

entities other than JJHCS. JJHCS further objects to this Request to the extent it seeks

information that is exempt from discovery and protected from disclosure by a privilege

including, without limitation, the attorney-client privilege, the work-product doctrine, the joint

30

defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local

Rules of the Court, and relevant case law.

JJHCS will not search for or produce documents and communications responsive to this

Request.

**Request No. 35**

Documents sufficient to identify all JJHCS Hub Entities and CarePath Care Coordinators.

**Response to Request No. 35**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information about

JJHCS "Hub Entities" or "CarePath Care Coordinators" that are not implicated in this litigation.

JJHCS further objects to this Request to the extent it seeks documents and communications in

the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it

uses the term "JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions.

Subject to the foregoing objections, JJHCS will produce non-privileged documents in its

possession sufficient to identify the entities responsible for administering CarePath during the

relevant Time Period, to the extent such documents exist and can be located after a reasonable

search. Otherwise, JJHCS will not search for or produce documents responsive to this Request.

**Request No. 36**

From January 1, 2009 through the present, Documents sufficient to show the economic
terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or CarePath Care
Coordinator regarding CarePath, including any assessment of the fair market value of those
services.

**Response to Request No. 36**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information about

JJHCS "Hub Entities" or "CarePath Care Coordinators" that are not implicated in this litigation. JJHCS further objects to this Request on the ground that "any assessment of the fair market value of those services" is irrelevant. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions. JJHCS further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS will produce agreements in its possession between JJHCS and the entities responsible for administering CarePath during the relevant Time Period, to the extent such documents exist and can be located after a reasonable search. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 37**

From January 1, 2009 through the present, documents sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs.

**Response to Request No. 37**

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information unrelated to SaveOnSP's misconduct, including information about JJHCS's advertising or marketing of

CarePath or Janssen Drugs. JJHCS further objects to this Request on the ground that the phrase

"Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub

Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs" is

vague and ambiguous. JJHCS further objects to this Request as overbroad, unduly burdensome,

and not proportional to the needs of the case to the extent it seeks documents and

communications outside of the relevant Time Period. JJHCS further objects to this Request to

the extent it seeks documents and communications in the possession of entities other than

JJHCS. JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity"

for the reasons stated in JJHCS's Objections to Definitions.

JJHCS will not search for or produce documents and communications responsive to this

Request.

## Request No. 38

From January 1, 2009 through the present, all Documents and Communications received
by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding
SaveOnSP or CarePath.

## Response to Request No. 38

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information about

CarePath without relation to SaveOnSP. JJHCS further objects to this Request as overbroad,

unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all"

documents and communications regarding a broad subject matter. JJHCS further objects to this

Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the

extent it seeks documents and communications outside of the relevant Time Period. JJHCS

further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons

stated in JJHCS's Objections to Definitions. JJHCS further objects to this Request to the extent

it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 39**

All Documents and Communications received by JJHCS from any CarePath Care Coordinator regarding SaveOnSP.

**Response to Request No. 39**

In addition to the foregoing general objections, JJHCS objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 40**

All Communications by any JJHCS Hub Entity or CarePath Care Coordinator with any Patient regarding SaveOnSP, including any Documents regarding those Communications and talk tracks or scripts prepared for use during those Communications.

34

**Response to Request No. 40**

In addition to the foregoing general objections, JJHCS objects to this Request as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks "all" documents and communications regarding a broad subject matter.  JJHCS further

objects to this Request to the extent it seeks documents and communications in the possession of

entities other than JJHCS.  JJHCS further objects to this Request to the extent it uses the term

"JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions.  JJHCS further

objects to this Request to the extent it seeks information that is exempt from discovery and

protected from disclosure by a privilege including, without limitation, the attorney-client

privilege, the work-product doctrine, the joint defense privilege, the common interest privilege,

the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS incorporates by reference its response to

Request for Production No. 8.  Otherwise, JJHCS will not search for or produce documents and

communications responsive to this Request.

**Request No. 41**

From January 1, 2015 through the present, all Documents and Communications relating
to Copay Accumulator Services and Copay Maximizer Services and their effect on JJHCS's
return on investment for copay assistance dollars.

**Response to Request No. 41**

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information about other

"Copay Accumulator Services and Copay Accumulator Services" and information unrelated to

SaveOnSP's misconduct.  JJHCS further objects to this Request on the ground that the phrase

"JJHCS's return on investment for copay assistance dollars" is vague and ambiguous.  JJHCS

further objects to this Request as overbroad, unduly burdensome, and not proportional to the

needs of the case to the extent it seeks "all" documents and communications regarding a broad

subject matter.  JJHCS further objects to this Request as overbroad, unduly burdensome, and not

proportional to the needs of the case to the extent it seeks documents and communications

outside of the relevant Time Period.  JJHCS further objects to this Request to the extent it seeks

documents and communications in the possession of entities other than JJHCS.

Subject to the foregoing objections, JJHCS incorporates by reference its response to

Request for Production No. 8.  Otherwise, JJHCS will not search for or produce documents and

communications responsive to this Request.

## Request No. 42

From January 1, 2015 through the present, all Documents and Communications relating
to JJHCS's or any JJHCS Hub Entity's understanding of the terms "copay accumulator" and
"copay maximizer."

## Response to Request No. 42

In addition to the foregoing general objections, JJHCS objects to this Request as

irrelevant to any claim or defense in this Action to the extent it calls for information unrelated to

SaveOnSP's misconduct.  JJHCS further objects to this Request as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents

and communications regarding a broad subject matter.  JJHCS further objects to this Request as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks documents and communications outside of the relevant Time Period.  JJHCS further

objects to this Request to the extent it seeks documents and communications in the possession of

entities other than JJHCS.  JJHCS further objects to this Request to the extent it uses the term

"JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions.  JJHCS further

objects to this Request to the extent it seeks information that is exempt from discovery and

protected from disclosure by a privilege including, without limitation, the attorney-client

36

privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS will produce all non-privileged documents and communications in JJHCS's possession during the relevant Time Period relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to SaveOnSP. However, notwithstanding the foregoing, JJHCS will not produce any documents or communications responsive to Request for Production No. 21, which is irrelevant to any claim or defense in this Action. JJHCS will not otherwise search for or produce documents and communications responsive to this Request.

## Request No. 43

All Documents and Communications concerning non-medical switching by participants of plans that implement SaveOnSP's services, a Copay Accumulator Service, or a Copay Maximizer Service.

## Response to Request No. 43

In addition to the foregoing general objections, JJHCS objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information about any other "Copay Accumulator Service" or "Copay Maximizer Service" and information unrelated to SaveOnSP's misconduct. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS

Subject to the foregoing objections, JJHCS incorporates by reference its response to Request for Production No. 8. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 44**

To the extent not requested above, Documents and Communications of any JJHCS Hub Entity or CarePath Care Coordinator regarding the topics of all Requests listed above.

**Response to Request No. 44**

In addition to the foregoing general objections, JJHCS objects to this Request on the ground that the phrase "regarding the topics of all Requests listed above" is vague and ambiguous. JJHCS further objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions.

JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 45**

JJHCS's, Janssen's, any JJHCS Hub Entity's, and any CarePath Care Coordinator's document retention policies.

**Response to Request No. 45**

In addition to the foregoing general objections, JJHCS objects to this Request to the extent it seeks documents and communications in the possession of entities other than JJHCS. JJHCS further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in JJHCS's Objections to Definitions. JJHCS further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

38

Subject to the foregoing objections, JJHCS will produce its document retention policies for the relevant Time Period. Otherwise, JJHCS will not search for or produce documents and communications responsive to this Request.

**Request No. 46**

Complete data dictionaries for any data that You produce.

**Response to Request No. 46**

In addition to the foregoing general objections, JJHCS objects to this Request on the ground that the phrase "data dictionaries for any data that You produce" is vague and ambiguous. JJHCS further objects to this Request to the extent that it purports to require the creation of any document or record in a format not kept by JJHCS or seeks to impose production obligations that exceed those required by the Rules of Federal Procedure, the Local Rules of the Court, this Court's Orders, or with any applicable agreement among the parties.

JJHCS will not search for or produce documents or communications responsive to this Request. JJHCS is, however, willing to meet and confer to determine if this Request can be appropriately narrowed.

**Request No. 47**

From any time, all Documents and Communications regarding this Action provided to you by any person or entity other than SaveOnSP, including in response to subpoenas served in this Action.

**Response to Request No. 47**

In addition to the foregoing general objections, JJHCS objects to this Request on the ground that the phrase "all Documents and Communications regarding this Action provided to you by any person or entity other than SaveOnSP" is vague and ambiguous. JJHCS further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject

39

matter.  JJHCS further objects to this Request as overbroad, unduly burdensome, and not

proportional to the needs of the case to the extent it seeks documents and communications

outside of the relevant Time Period.  JJHCS further objects to this Request to the extent it seeks

information that is exempt from discovery and protected from disclosure by a privilege

including, without limitation, the attorney-client privilege, the work-product doctrine, the joint

defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local

Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS will produce documents obtained via third-

party subpoenas it serves in this Action.  Otherwise, JJHCS will not search for or produce

documents responsive to this Request.

## Request No. 48

To the extent not requested above, from any time, all Documents and Communications
upon which you may rely in this Action.

## Response to Request No. 48

In addition to the foregoing general objections, JJHCS objects to this Request on the

ground that the phrase "all Documents and Communications upon which you may rely in this

Action" is vague and ambiguous.  JJHCS further objects to this Request as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents

and communications regarding a broad subject matter.  JJHCS further objects to this Request as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks documents and communications outside of the relevant Time Period.  JJHCS further

objects to this Request to the extent it seeks information that is exempt from discovery and

protected from disclosure by a privilege including, without limitation, the attorney-client

privilege, the work-product doctrine, the joint defense privilege, the common interest privilege,

the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

Subject to the foregoing objections, JJHCS will produce all non-privileged documents

and communications upon which it intends to rely at trial in compliance with the schedule set by

the Court.  Otherwise, JJHCS will not search for or produce documents responsive to this

Request.

Dated: December 12, 2022

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:    /s/Jeffrey J. Greenbaum
       JEFFREY J. GREENBAUM
       KATHERINE M. LIEB


PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

# Exhibit 3

**Patterson Belknap Webb & Tyler** LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

February 14, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:    **SaveOnSP's Requests For Production**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

We write in response to your letter dated February 7, 2023 regarding Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production and First Set of Interrogatories. Below, we identify potential areas of compromise, as well as areas where we agree that the parties are at an impasse.

I.    **GLOBAL ISSUES**

A.    **Documents Related to the Development and Marketing of CarePath and SaveOnSP's Financial Impact on JJHCS and CarePath (RFP Nos. 11, 26, 28-30, 36-37)**

As we explained in our January 6 and 27 letters and during our meet and confers, SaveOnSP's requests for documents related to the development and marketing of CarePath seek documents that are not relevant and the requests are not proportional to the needs of this litigation. Nevertheless, we have offered to produce certain responsive documents in our February 9, 2023 letter. We are willing to discuss this subject further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

Further, with respect to SaveOnSP's financial impact on JJHCS and CarePath, JJHCS has already agreed to produce, *inter alia*:

- "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period,"

Meredith Nelson, Esq.
February 14, 2023
Page 2

- "the data that formed the basis for the allegations in Complaint ¶¶ 92-100,"

- "JJHCS's budget for copay assistance through CarePath," and

- "JJHCS's actual and projected annual costs for CarePath."

*See* R&Os to SaveOnSP's RFP Nos. 25, 27, 29.

As we explained in our January 6 and 27 letters and during our meet and confers, we do not agree that these documents are insufficient for the needs of the case, but we are willing to discuss this further as well.

**B.     JJHCS Hub Entities, Janssen, and Other J&J Entities**

**1.     Documents of JJHCS Hub Entities**

In your letter, you raise several issues relating to "documents of JJHCS Hub Entities."  We address each in turn.

*First*, you asked us to clarify the role of Lash Group.  Our current understanding remains that Lash Group did not have a comparable role to Trial Card in the administration of CarePath's copay assistance program.  As we have said before, Trial Card is the entity that did the work of administering CarePath's copay assistance program and we have already agreed to facilitate a document production from Trial Card.  All that said, we are continuing to investigate and will follow up with more details about Lash Group's role in a separate letter as soon as possible.

*Second*, you asked us to state "whether any entity other than Trial Card was in any way involved in enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card."  You also asked us to provide "(1) the identities of Hub Entities involved in the development and marketing of CarePath from 2009 to present; and (2) the identities of Hub Entities involved in the administration of CarePath from 2009 to 2016."   Finally, you asked us to provide the identities of any entities that provide "limited, episodic services to JJHCS relating to CarePath," and further information on the services provided by these vendors.

For the reasons set forth in our previous letters and at our meet and confers, documents and information from before 2017 and documents and information relating to the development and marketing of CarePath are not relevant to this action.  Therefore, JJHCS will not identify all the entities—of which there are many—who have played any role in the operation of CarePath.   Nevertheless, in an effort accommodate SaveOnSP's request for additional information, JJHCS identifies the following examples of entities that have provided certain services related to CarePath:

Meredith Nelson, Esq.
February 14, 2023
Page 3

- ***EagleForce***.  A vendor that works with TrialCard to ensure that a patient who is enrolling in copay assistance is not insured by a government payor, such as Medicaid.  The EagleForce check is performed electronically and EagleForce rarely communicates with patients directly.

- ***IBM***.  A vendor that developed and maintains the IT infrastructure for the CarePath website and certain data sharing platforms between TrialCard and JJHCS.

- ***TJ Paul***.  A vendor that provides marketing and design support, such as input on fonts and logos for the CarePath website.

- Numerous other agencies have been engaged to design content for CarePath marketing, promotional, and educational materials (all of which then go through JJHCS's internal review before issuance).

JJHCS does not represent that the list above is exhaustive.  The JJHCS teams that support CarePath are able to engage vendors as needed, subject to certain internal review and procurement processes, and it is possible that other vendors have performed services related to the development and marketing of CarePath.  However, other than EagleForce, which has a limited, discrete role in CarePath, JJHCS is unaware of other entities involved in "enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card."

## 2.    Documents of J&J and Janssen Entities other than JJHCS

As we explained in our January 6 and 27 letters and during our meet and confers, while JJHCS is prepared to make arrangements with its corporate affiliates to produce documents from other Johnson & Johnson or Janssen entities if required, SaveOnSP has not yet provided a compelling reason to do so.  We have explained to you before that Johnson & Johnson is composed of more than 200 affiliates with over 100,000 employees.  SaveOnSP's insistence that JJHCS is required to conduct an investigation throughout the entire Johnson & Johnson organization for documents that are possibly responsive to SaveOnSP's requests when it has already determined that JJHCS is the entity that manages the CarePath program is evidently driven by a motivation to impose burden and cost on JJHCS without any legitimate rationale.

We are willing to discuss this issue further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

Meredith Nelson, Esq.
February 14, 2023
Page 4

### 3.  Interrogatories Concerning Hub Entities, J&J, and Janssen

JJHCS has complied with your Interrogatories and submitted verified responses that identify the relevant individuals at JJHCS and Trial Card.  We are happy to discuss this issue further, if it would be helpful.

### C.  Time Period

#### 1.  Documents and Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

SaveOnSP continues to seek documents from January 1, 2009 onward for various requests.  As we explained in our January 6 and 27 letters and during our meet and confers, a starting date of 2009 is vastly overbroad for the needs of this case and is unacceptable to JJHCS.  As we have told you repeatedly in our many meet and confer sessions, the January 1, 2009 date is disconnected from any facts or events that are pertinent to this lawsuit.  It is almost a decade before SaveOnSP was created.  It is eight years before the allegations in the Complaint.  Never once has SaveOnSP identified any possible rationale for its selection of this specific date.  Nor could it, as it was selected by SaveOnSP for a single self-evident purpose:  to impose unnecessary expense and burden on JJHCS.

JJHCS is prepared to produce documents from January 1, 2016, for certain categories of documents, in an effort to compromise.  We remain willing to discuss this issue further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

#### 2.  Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, 42)

For certain documents relating to health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as JJHCS's understanding of Copay Accumulator Services and Copay Maximizer Services, SaveOnSP continues to seek a date range starting January 1, 2015 on the theory that "January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect."  As we stated in our January 27 letter, a starting date of 2015 is also overbroad date range for the needs of this case.  We confirm that the basis for this objection is both relevance and burden, but we nevertheless remain willing to discuss this further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

### D.  Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20, 21, 41-43; Interrogatory No. 7)

As we explained in our Responses and Objections, JJHCS will produce documents and communications from January 1, 2017 through July 1, 2022 relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to

Meredith Nelson, Esq.
February 14, 2023
Page 5

SaveOnSP.  JJHCS R&O to RFP No. 42.  Additionally, in our February 9, 2023 letter, we noted that, with respect to SaveOnSP's RFP No. 20, JJHCS is willing to produce studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents, provided that SaveOnSP is willing to make a reciprocal production of documents in response to JJHCS's RFP No. 45.[1]

Please confirm that SaveOnSP accepts this compromise with respect to these requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    RFP No. 11

We write to confirm that JJHCS has not operated any copay assistance programs other than CarePath since CarePath was created in its current form in June 2016.  JJHCS will not produce documents concerning any copay assistance program that predated CarePath.  As discussed earlier, SaveOnSP has failed to identify any legitimate basis for this request.  We agree that the parties are at an impasse on this issue and may present this dispute to the Court.

### B.    RFP Nos. 12 and 13

As we explained in our January 27, 2023 letter, JJHCS would be willing to produce internal communications relating to the drafting of CarePath's terms and conditions if SaveOnSP would be willing to produce internal communications responsive to JJHCS's RFP No. 17.  In our February 9, 2023 letter, we offered to further narrow the categories of internal communications responsive to JJHCS's RFP No. 17 that JJHCS would accept.  If SaveOnSP agrees to produce documents responsive to JJHCS's RFP No. 17 as laid out in our February 9, 2023 letter, then JJHCS would be willing to produce internal communications relating to the drafting of CarePath's terms and conditions.

Please let us know if SaveOnSP accepts the compromise with respect to these requests.

### C.    RFP No. 14

We write to confirm that JJHCS is willing to produce documents responsive to this request regarding JJHCS's understanding of commercial health plans' ability to designate specialty drugs as essential health benefits ("EHB") or non-essential health benefits ("NEHB")

---

[1] As noted in our February 9, 2023 letter, however, JJHCS is not willing to withdraw its RFP No. 43, which seeks documents relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs.

Meredith Nelson, Esq.
February 14, 2023
Page 6

under the Affordable Care Act and its regulations for the time period of January 1, 2017 to July 1, 2022. JJHCS will not search for documents that predate this time period, as such a search would be unduly burdensome and irrelevant to the needs of this action, given that SaveOnSP did not begin operations until 2017. We believe that the parties are at an impasse on this issue with respect to documents before January 1, 2017 and may present this dispute to the Court.

> ### D.  RFP No. 21

We write to memorialize the fact that SaveOnSP is deferring its request for documents responsive to this RFP at this time.

> ### E.  RFP No. 25

JJHCS confirms that there are no further disputes on this RFP. JJHCS will produce all non-privileged documents responsive to this request.

> ### F.  RFP Nos. 26 and 32

In your letter, you raise two issues relating to SaveOnSP's RFP Nos. 26 and 32, seeking "documents and communications concerning the payment of Patient's costs, including payments in excess of the advertised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity." We address each in turn.

*First*, you asked that we confirm whether JJHCS intends to provide patient-level data regarding the actual amounts paid to patients in copay assistance. To clarify, in our January 27, 2023 letter, we proposed a compromise on SaveOnSP's RFP Nos. 26 and 32 in which JJHCS is willing to produce the data requested in items i. through m. for RFP No. 28, which includes data regarding the actual amounts paid to patients in copay assistance, if SaveOnSP would in turn agree to produce the information sought in JJHCS's RFP Nos. 41 and 42. We reiterated this proposal in our February 9, 2023 letter and reiterate it in Section II.G, *infra*. If SaveOnSP agrees, JJHCS will provide patient-level data regarding the actual amounts paid to patients in copay assistance from January 1, 2016 to July 1, 2022, to the extent such data exists and can be located after a reasonable search.

*Second*, you asked JJHCS to confirm—without offering any rationale—that it will provide patient-level data by Friday, March 3, 2023. JJHCS agrees to produce this data early in the discovery process but does not consent to SaveOnSP's attempt to impose an arbitrary and unilateral deadline on production.

Please confirm whether you agree to the compromise outlined above.

Meredith Nelson, Esq.
February 14, 2023
Page 7

### G.    RFP Nos. 28 and 29

In your letter, you asked whether JJHCS consents to the following proposal: if JJHCS will produce the data items sought by i. through m. of RFP No. 28 from January 1, 2009 to July 1, 2022, SaveOnSP will produce data sufficient to show, for each Janssen Drug, the total number of patients enrolled in SaveOnSP-advised plans who received CarePath funds for the given drug; the total CarePath funds received by those patients for the given drug; the pharmacies at which those patients filled the given drug; and the average copay or coinsurance amount for the given drug for patients enrolled in plans advised by SaveOnSP.

As explained more fully in Section I.C, *supra*, and in other sections of this letter, much of the information sought from these requests is irrelevant to the claims and defenses in this case.  Further, the additional categories of information offered by SaveOnSP are insufficient because they do not include non-Janssen drugs and they only include aggregate, rather than patient-specific data.  Accordingly, as outlined in our February 9, 2023 letter, JJHCS renews its compromise proposal: if SaveOnSP is willing to produce the information sought in RFP Nos. 41 and 42, JJHCS will produce any available data responsive to parts (i) through (m) of SaveOnSP's RFP No. 28 for the period of January 1, 2016 through July 1, 2022.

Please let us know if you accept JJHCS's proposed compromise above.

### H.    RFP No. 34

We write to confirm that J&J never signed a contract with SaveOnSP, nor was JJHCS involved in any such negotiations.  Therefore, JJHCS will not produce any documents responsive to RFP No. 34, as these documents are irrelevant to the claims and defenses in this action.

Accordingly, JJHCS agrees that the parties are at an impasse on this issue and may present this dispute to the Court.

### I.    RFP Nos. 36 and 37

We write to memorialize the fact that SaveOnSP is deferring its request for documents responsive to RFP No. 36 at this time.

With respect to RFP No. 37, in its letter dated January 27, 2023, JJHCS clarified that because, after further investigation, it determined that it does not keep statistics on whether patients sign up for CarePath after being contacted by JJHCS or its vendors, we have no documents to produce, rendering this request moot.  In your letter, you dispute that RFP No. 37 has been mooted, claiming that "RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates."

Meredith Nelson, Esq.
February 14, 2023
Page 8

These documents are irrelevant to the claims and defenses in this litigation. However, to the extent SaveOnSP seeks enrollment data for CarePath, as indicated above and in our January 27, 2023 letter, JJHCS is willing to produce such data in response to parts (i) through (m) of RFP No. 28, if SaveOnSP is willing to produce the categories of data requested in JJHCS's RFP Nos. 41 and 42.

Please let us know whether SaveOnSP accepts this proposal.

\* \* \*

We are available to meet and confer regarding the issues outlined above at your convenience. We look forward to your response.

Very truly yours,

*/s/Anthony C. LoMonaco*
Anthony C. LoMonaco

# Exhibit 4

| | |
|---|---|
| **From:** | LoBiondo, George (x2008) |
| **To:** | Meredith Nelson; Carotenuto, George (x2547) |
| **Cc:** | Andrew Dunlap; Elizabeth Snow; Dominic Budetti; Sandick, Harry (x2723); Mangi, Adeel A. (x2563); Haigney Long, Julia (x2878); Shane, Beth (x2659); Brisson, Katherine (x2552); Hashmi, Kabir (x2701); Jeffrey Greenbaum; Katherine Lieb |
| **Subject:** | RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories |
| **Date:** | Monday, April 10, 2023 10:34:52 PM |

Hi Meredith,

Thanks very much for this additional information.  We understand you to now be representing that SaveOnSP and its personnel are unlikely to have generated documents relevant to the issues in this lawsuit before April 2016.  Accordingly, we will accept SaveOnSP's latest offer to extend its start date to April 1, 2016.  Of course, if it turns out that earlier relevant documents do exist, we reserve the right to seek them.

Regarding JJHCS's own production, we do not agree with your characterization of JJHCS's position regarding the "appropriate period for discovery for both parties."  We also note that you have failed to identify any principled basis for your demand that JJHCS produce documents going back to 2016 (and we are not aware of any).  You have also declined to identify, as requested, any authority for the proposition that parties must produce documents from precisely the same date ranges (and we are, again, not aware of any).  Nevertheless, we would like to avoid burdening Judge Waldor with another discovery dispute. So we will agree to produce documents going back to April 1, 2016, solely in the interest of compromise, and without conceding the propriety of your tit-for-tat demand.

Thanks again,
George

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Monday, April 10, 2023 3:00 PM
**To:** LoBiondo, George (x2008) <globiondo@pbwt.com>; Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories


*Caution: External Email!*


George,

We have attempted to answer your question, multiple times. Your accusations of evasion and false statements to the court are untrue, and unhelpful to trying to resolve this issue.

JJHCS served discovery requests asking for documents beginning January 1, 2017. JJHCS's decision to

ask for documents starting in 2017 was not based on any representation by SaveOnSP. JJHCS did not
ask SaveOnSP any questions about its pre-2017 activities until two weeks ago, even though we
produced SaveOnSP's August 16, 2016 contract with ESI to you last November.

We understood that when the parties previously referred to SaveOnSP's "operations," they meant
when the copay assistance benefits which SaveOnSP administers went live on an ongoing basis. That
was in January 2017. As some of the documents you cited indicate, SaveOnSP began a pilot program
in 2016 in which the copay assistance benefit of a single client went live on a test basis in September
2016; as we told you, we believe the earliest that SaveOnSP would have spoken to any patients as a
part of that pilot program would have been July 2016.

You now say that JJHCS believes that "beginning operations" includes activities before it began
providing services on an ongoing basis, such as hiring employees, drafting materials, marketing
services, and setting up call centers. We understand based on additional investigation that the
earliest communications SaveOnSP had with its first client was in May 2016, that it would have
drafted any marketing materials shortly in advance of those communications, and that it hired its
first employees and set up its first call centers after that date.

SaveOnSP is willing to extend the general start date of its document production to April 2016, over a
month before SaveOnSP's first contact with its first client, if JJHCS will do the same. JJHCS
has consistently taken the position that the appropriate period for discovery for both parties is when
SaveOnSP was "operating," which you now have clarified includes activities like hiring employees
and marketing its services. Please let us know whether you will agree to begin your productions in
April 2016.

Regards,

Meredith


**Meredith Nelson**
Associate   [Email]
Selendy Gay Elsberg PLLC   [Web]
Pronouns: she, her, hers
---------------------------------------------
+1 212.390.9069  [O]
+1 918.200.3148  [M]

---

**From:** LoBiondo, George (x2008) <globiondo@pbwt.com>
**Sent:** Friday, April 7, 2023 10:22 AM
**To:** Meredith Nelson <mnelson@selendygay.com>; Carotenuto, George (x2547)
<gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>;
Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>;
Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878)
<jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552)

<kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum
<JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

Hi Meredith,

With respect, we do not believe that "When did SaveOnSP begin operations?" is a confusing or difficult
question. Indeed, SaveOnSP itself (falsely) told Judge Waldor that it "began operations in 2017," belying
your present claim of confusion around this concept. And the letter we provided to you yesterday should
have resolved any lingering doubt. As it stated, we want SaveOnSP to produce documents covering the
entire early period during which it "conceived of its scheme, hired employees, drafted materials, marketed
its scheme to health plans, invested in call centers and related technology, and otherwise [got] ready to
begin meddling with patient access to therapy." If your position is that SaveOnSP started operations right
after it formed the corporate entity in March 2015 then just say so. If your position is that SaveOnSP
formed a corporate shell in 2015 but did not actually begin operations until 2016, then just say that. But
please do not evade the question.

SaveOnSP should agree to produce documents going back to when its activities began, whether that was
at the same time as the entity was formed, or before that, or after that. We cannot know with specificity
when that was, which is why we have repeatedly asked you. For its part, JJHCS will not be producing
documents going back to 2015 because you have not provided any principled reason that it should do so,
and because we believe JJHCS was completely unaware of SaveOnSP's existence until years later. It is
self-evident that SaveOnSP will have relevant documents from a period prior to JJHCS because
SaveOnSP is the defendant that was engaged in the conduct at issue before JJHCS ever became aware
of it. As such, there is no reason for the periods on each side to be mirrored. With that said, if your
position is that SaveOnSP began operations at a later date, we will consider whether that changes our
position after we know what the date is.

We think further back-and-forth along these lines is unlikely to be productive. So we ask, one final time,
whether SaveOnSP will correct its previous misstatement on this issue and agree to produce the
requested documents without resort to judicial intervention. Otherwise you can tell Judge Waldor why
you are now unable to answer the simple question of when SaveOnSP began operations, despite
previously telling her it was in 2017.

Thanks again,
George

---

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Thursday, April 6, 2023 7:52 PM
**To:** LoBiondo, George (x2008) <globiondo@pbwt.com>; Carotenuto, George (x2547)
<gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>;
Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>;
Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878)
<jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552)
<kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum
<JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

*Caution: External Email!*

George,

The most productive way to bring this issue to resolution is to finish meeting and conferring before proposing joint letters on an issue that the parties are still discussing.

Your statement that we have refused to answer when SaveOnSP began operations remains false. As we told you, SaveOnSP began operating—that is, providing services to its first clients—in 2016. The earliest that SaveOnSP would have communicated with any plan members in providing those services was July 1, 2016. In your proposed joint letter, you indicated that you intended "began operations" to mean activities before providing services (apparently including hiring employees or speaking to potential clients), which we understood to mean asking when SaveOnSP was formed. We then told you that SaveOnSP was formed in March 2015. You now say that you did not intend "began operations" to mean formation. We cannot keep guessing at your intended meaning. Please tell us what you mean by "began operations" (if not providing services to clients or formation) and we will consider your request.

We repeat our request that you tell us if JJHCS will agree to move the start date of its document production to the same date that SaveOnSP agrees to move its own start date. There is no reason that you cannot answer that question now.

Regards,

Meredith

**Meredith Nelson**
Associate  [Email]
Selendy Gay Elsberg PLLC  [Web]
Pronouns: she, her, hers
-------------------------------------------------
+1 212.390.9069  [O]
+1 918.200.3148  [M]

---

**From:** LoBiondo, George (x2008) <globiondo@pbwt.com>
**Sent:** Thursday, April 6, 2023 6:20 PM
**To:** Meredith Nelson <mnelson@selendygay.com>; Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** Re: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

Hi Meredith,

Thanks very much for your prompt response.  We of course disagree with the accusations and characterizations in your email but would like to stay focused on bringing this issue to resolution.

As you note, we have now repeatedly asked when SaveOnSP began operations.  You have refused to squarely answer that question and have instead offered various dates that you say correspond to SaveOnSP doing various things.  But we did not ask when SaveOnSP formed its LLC, just as we did not ask for the date that SaveOnSP's clients went "live."  If you are representing that SaveOnSP actually began operations in 2015, then we request that SaveOnSP collect and produce documents going back to January 1 of that year.  If on the other hand SaveOnSP personnel did not actually begin conceiving of and developing the program (as that term is used in the Complaint as well as the SaveOnSP documents we referred you to in our May 27 letter) until some later date, please let us know what that date is.

Without this information we have repeatedly requested, we cannot say whether JJHCS would agree to an identical expansion of its own production parameters.  As a general matter, though, we do not understand the basis for your suggestion that the parties must produce documents from exactly the same time period, without regard to relevance and their knowledge of the issues in dispute, and we do not believe that to be correct under the law.  If you have authority that supports your position we would be pleased to consider it.  Either way, we do not think that SaveOnSP's tit-for-tat request should be used as a pretext to artificially delay impasse on the core issue.

Thanks again,
George

---

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Thursday, April 6, 2023 3:48 PM
**To:** LoBiondo, George (x2008); Carotenuto, George (x2547)
**Cc:** Andrew Dunlap; Elizabeth Snow; Dominic Budetti; Sandick, Harry (x2723); Mangi, Adeel A. (x2563); Haigney Long, Julia (x2878); Shane, Beth (x2659); Brisson, Katherine (x2552); Hashmi, Kabir (x2701); Jeffrey Greenbaum; Katherine Lieb
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

*Caution: External Email!*

George,

Thanks for your email.

JJHCS's ongoing practice of proposing joint letters before the parties have finished meeting and conferring is inappropriate. We are glad to engage in a joint letter process once the parties have met and conferred and agreed that they are at impasse on an issue.

Your proposed joint letter contains a series of false or misleading statements. We will not try to address all of them here, but rather focus on the main points.

You falsely accuse us of refusing to identify when SaveOnSP "began operations." In fact, we did just that in our March 31, 2023 letter, identifying the earliest point at which SaveOnSP would have begun contacting health plan members in advance of a few clients implementing copay assistance benefits. Your colleague, George Carotenuto, contacted me directly after our meet and confer on Monday to ask for additional information on the activities in which SaveOnSP was engaged prior to July 2017. I told him that we would revert with that information. Instead of simply waiting for SaveOnSP to answer your additional questions, you now propose a letter to the Court accusing us of refusing to provide the information you asked for. From your proposed joint letter, it seems that the question you intended to ask is when SaveOnSP began developing its services, hiring employees, etc. before it began operations—something you never raised in your correspondence or during our meet-and-confer session. The answer to your new question is that SaveOnSP was formed in March 2015. This information is publicly available on the New York Secretary of State's website and has been available to JJHCS throughout the entirety of this lawsuit.

You also falsely accuse us of refusing to move back the starting date of our document production. In fact, in our March 31 letter, we offered to extend our document production back to the earliest point at which SaveOnSP would have contacted plan members—July 1, 2016— if JJHCS would agree to do the same. You have repeatedly asserted that the relevant period for discovery in this case is the period in which SaveOnSP was operating. *See, e.g.*, Jan. 6, 2023 Letter from H. Sandick to M. Nelson at 2 (stating that this case "concerns only whether SaveOnSP wrongfully induced patients to breach CarePath's actual terms and conditions during the time period when SaveOnSP was in operation"). If you now claim that SaveOnSP should produce documents from before 2017 because you believe that SaveOnSP had relevant operations during that period, then that expanded period for discovery should apply across the board. You have never told us whether JJHCS will move back the date of its own production.

So that the parties can continue to meet and confer, please promptly tell us (1) the date on which you are asking SaveOnSP to begin its document production; (2) whether JJHCS will move the starting date of its own document production to that same date; and (3) if JJHCS will not do so, the reasons why.

Regards,

Meredith

**Meredith Nelson**

Associate  [Email]

Selendy Gay Elsberg PLLC  [Web]

Pronouns: she, her, hers
----------------------------------------------

+1 212.390.9069  [O]
+1 918.200.3148  [M]

---

**From:** LoBiondo, George (x2008) <globiondo@pbwt.com>
**Sent:** Wednesday, April 5, 2023 6:26 PM
**To:** Meredith Nelson <mnelson@selendygay.com>; Carotenuto, George (x2547)
<gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow
<esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry
(x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney
Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>;
Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701)
<khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine
Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories


Meredith,


Thanks for your email.  We have prepared the attached letter concerning the time period issue that you
discussed with George C. during the last meet and confer.  We hope that SaveOnSP will agree to extend
its document production back to when it actually began operations, in which case JJHCS will not need to
seek Judge Waldor's intervention.  But if SaveOnSP is declining to concede on this issue, then please
add SaveOnSP's section to the attached letter so that it can be considered and resolved by Judge Waldor
at the upcoming conference.  Also, please let us know whether SaveOnSP believes the letter and/or its
exhibits should be filed under seal.


We do think that, out of courtesy to Judge Waldor, the parties should endeavor to submit these disputes
to the Court on Monday.  This will give her sufficient time to review them before the conference.  So we
request that you provide SaveOnSP's responses by Friday afternoon.


Thanks again,

George

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Wednesday, April 5, 2023 5:52 PM
**To:** Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow
<esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry
(x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>;
LoBiondo, George (x2008) <globiondo@pbwt.com>; Haigney Long, Julia (x2878)
<jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine
(x2552) <kbrisson@pbwt.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

*Caution: External Email!*

George,

As you know, this week is Passover and Easter, and several members of our team are out of
the office. We will provide our response to your letter by Friday if feasible, or early next week
otherwise, but in time that you can file in advance of next week's conference.

Regards,

Meredith

**Meredith Nelson**
Associate  [Email]

Selendy Gay Elsberg PLLC  [Web]

Pronouns: she, her, hers
----------------------------------------

+1 212.390.9069  [O]
+1 918.200.3148  [M]

**From:** Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Sent:** Tuesday, April 4, 2023 12:28 PM

**To:** Meredith Nelson <mnelson@selendygay.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow
<esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry
(x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>;
LoBiondo, George (x2008) <globiondo@pbwt.com>; Haigney Long, Julia (x2878)
<jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine
(x2552) <kbrisson@pbwt.com>
**Subject:** JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories


Meredith,


Attached please find JJHCS's half of a joint letter to Judge Waldor regarding SaveOnSP's
responses to Interrogatory Nos. 14 and 15.  Assuming that the arguments we have set forth do
not change SaveOnSP's position on responding to these interrogatories, please provide
SaveOnSP's half of the letter by 5pm on Thursday, April 6.  We will provide you with any
further edits by noon on Friday, April 7 so that this letter can be filed with the Court by the
end of the day on Friday, in advance of the April 13 conference.  Please also let us know if
you believe that this letter or any exhibits thereto must be filed under seal.


Separately, we write to confirm that SaveOnSP will respond to Interrogatory No. 13 by
producing documents that show what advice SaveOnSP has provided to all payors, through to
the present, "regarding whether payors can continue to include Janssen Drugs in the
SaveOnSP Program after any changes to the CarePath terms and conditions."  Please confirm
that this understanding is correct and that SaveOnSP does not intend to withhold any
documents responsive to this request.  JJHCS reserves all rights to raise issues regarding
SaveOnSP's response to Interrogatory No. 13 following a review of documents that
SaveOnSP produces.


As we discussed on yesterday's call, JJHCS seeks a response to Interrogatory Nos. 13-15
through the present.  While a standard date range cutoff may be appropriate for many requests
in this matter, there are certain categories of information that JJHCS requires through the
present in order to prove liability and damages.  We are continuing to review SaveOnSP's
responses to JJHCS's first set of interrogatories and will advise you if we seek information
through the present for any other request.


Best,

George


**George Carotenuto**

He | Him | His

Associate

**Patterson Belknap Webb & Tyler LLP**

1133 Avenue of the Americas | New York, NY 10036

T: 212.336.2547

gcarotenuto@pbwt.com | www.pbwt.com

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

# Exhibit 5

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

February 17, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:    **SaveOnSP's Requests For Production and Interrogatories**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

We write in response to your letter dated February 15, 2023 regarding Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production and First Set of Interrogatories. We agree with you that the parties are at an impasse on the issues in Section I of your letter. Please promptly send us your joint letter sections on those issues.

With respect to the issues in Section II of your letter, we address those issues in turn below.

## I.    ISSUES WHERE THE PARTIES ARE NOT CURRENTLY AT IMPASSE

### A.    Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20 and 41-43; Interrogatory No. 7)

*First*, we write to confirm that in exchange for JJHCS's production of "studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents" in response to SaveOnSP's RFP No. 20, SaveOnSP will agree to produce all documents in response to JJHCS's RFP No. 45, which requests all documents and communications relating to studies, reports, publications, analyses, research, white papers, reviews, or other written work product that SaveOnSP has created, commissioned, paid for, sponsored, or otherwise procured or supported regarding (i) specialty medication costs, (ii) copayment and coinsurance rates, (iii) accumulator programs, (iv) maximizer programs, or (v) strategies to manage specialty medication costs.

*Second*, SaveOnSP proposes that the parties continue to meet and confer on (1) SaveOnSP's RFP Nos. 41 through 43 and its Interrogatory No. 7, which request documents and

Meredith Nelson, Esq.
February 17, 2023
Page 2

information about accumulator and maximizer programs generally, and (2) JJHCS's RFP No. 43, which requests documents relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs, and that SaveOnSP.

With respect to SaveOnSP's RFP Nos. 41 through 43, as well as SaveOnSP's Interrogatory No. 7, JJHCS supports SaveOnSP's call for further meet-and-confer discussions. Indeed, the parties have not yet met-and-conferred on Interrogatory No. 7 at all, to which JJHCS objected because it is unclear what SaveOnSP is requesting when it asks for the identities of "each person who participated in or had responsibility for" JJHCS's "understanding of the terms 'copay accumulator' and 'copay maximizer.'" *See* R&O to SaveOnSP's Interrogatory No. 7.

With respect to JJHCS's RFP No. 43, JJHCS does not intend to withdraw its pending motion. JJHCS has explained at length why it is entitled to documents responsive to that request and the issue is ripe for judicial intervention, and it will not repeat those points here.

**B.    RFP Nos. 12 and 13**

In exchange for JJHCS's agreement to produce documents and communications in response to SaveOnSP's RFP Nos. 12 and 13, SaveOnSP states that in response to JJHCS's RFP No. 17, it intends to produce internal communications regarding:

- the treatment of CarePath drugs under the terms of the SaveOnSP Program;

- the designation of Janssen Drugs as Essential or Non-Essential;

- the monetary split between SaveOnSP an Express Scripts on the one hand, and between SaveOnSP and the health insurance plan sponsors, on the other; and

- instances where the Plan Member uses the entire annual allotment of CarePath funds for a given Janssen medication after enrolling the SaveOnSP Program.

SaveOnSP does not, however, intend to produce internal communications regarding its operations in states where copay accumulator and maximizer programs have been banned.

We are willing to accept the following compromise: In exchange for SaveOnSP's agreement to produce documents, including internal communications, regarding the four bullets above, JJHCS agrees to produce internal documents and communications relating to the drafting of CarePath's terms and conditions during the relevant time period of January 1, 2017 to July 1, 2022, to the extent such non-privileged documents exist and can be identified after a reasonable search.

Meredith Nelson, Esq.
February 17, 2023
Page 3

However, JJHCS will not withdraw its motion to compel the production of internal documents and communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs. Further, as noted in our February 9, 2023 letter, JJHCS reserves the right to issue follow up requests for additional documents based on information learned in discovery or fact investigation.

C.    **RFP Nos. 26 and 32**

SaveOnSP states that it is willing to accept JJHCS's proposal that JJHCS produce the data requested in SaveOnSP's RFP No. 28(i)-(m) in response to RFP Nos. 26 and 32 provided that (1) the parties can agree on the scope of the data JJHCS will produce in response to SaveOnSP's RFP Nos. 28(i)-(m) and (2) JJHCS agree to produce that data by a mutually-agreed date certain early in the discovery period.

With respect to the scope, we provide further detail on the scope of JJHCS's production of the data requested in SaveOnSP's RFP No. 28(i)-(m), as well as the data JJHCS requests from SaveOnSP in exchange for that production, in Section I.D, *infra*.

With respect to the date for production of the data, JJHCS will take all steps to produce this data as soon as possible, and in any event before April 30, 2023.

D.    **RFP Nos. 28 and 29**

We write to confirm that we will accept the compromise proposed in your February 15, 2023 letter: If SaveOnSP will produce all data, including patient-level transactional data, responsive to JJHCS's RFP No. 41 for the time period of January 1, 2016 to July 1, 2022, JJHCS will produce all patient-level data for the time period of January 1, 2016 to July 1, 2022 responsive to parts (i) through (m) of SaveOnSP's RFP No. 28, which seeks documents sufficient to show the following: (i) all patients enrolled in CarePath for each Janssen Drug; (j) the dates on which each patient was enrolled in CarePath; (k) the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath; (l) the Janssen Drug for which each patient enrolled in CarePath received copay assistance; and (m) all CarePath copay assistance payments made to each patient.

SaveOnSP also notes that this compromise does not resolve the issues relating to SaveOnSP's RFP No. 28(a)-(h) and RFP No. 29 or JJHCS's RFP No. 42, but invites JJHCS to continue meeting and conferring on those issues. While we are willing to continue meeting and conferring on these issues in advance of the conference, we are not inclined to withdraw JJHCS's motion with respect to RFP No. 42 at this time. Production of the data requested in JJHCS's RFP No. 42 is not burdensome and the information sought relevant to the lawsuit for the reasons discussed in prior correspondence. The only objection lodged by SaveOnSP to this request in its section of the letter to Judge Waldor was based on JJHCS's objection to so-called "reciprocal discovery" in SaveOnSP's RFPs 28 and 29. *See* Specific Ltr., Dkt. No. 66, at 5-6. This

Meredith Nelson, Esq.
February 17, 2023
Page 4

objection was lodged before there was any meet-and-confer on SaveOnSP's RFPs.  With JJHCS
having agreed to produce certain information in response to these requests, SaveOnSP's
objection to JJHCS's RFP No. 42 has been addressed.

     **E.**     **RFP No. 37**

     SaveOnSP's RFP No. 37 seeks "documents sufficient to show the percentage of the
patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity,
or any other third party authorized to advertise or market CarePath or Janssen Drugs."  As we
have previously explained on numerous occasions, JJHCS does not track data responsive to this
request.  Nonetheless, SaveOnSP insists that JJHCS can "produce documents, such as enrollment
records, which would allow SaveOnSP to calculate the proportion of patients who enroll in
CarePath after being contacted by JJHCS or its affiliates."  As explained in Section I.D., *supra*,
and as noted in your February 15 letter, JJHCS is willing to provide CarePath patient enrollment
data in response to SaveOnSP's RFP No. 28 subject to SaveOnSP's agreement to produce data
responsive to JJHCS's RFP No. 42.  This should resolve the parties' dispute.

<div align="center">*  *  *</div>

     We look forward to your response.

                    Very truly yours,

                    */s/Anthony C. LoMonaco*
                    Anthony C. LoMonaco

# Exhibit 6

E. EVANS WOHLFORTH, JR.
Director

Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102-5310
Direct: (973) 596-4879 Fax: (973) 639-6486
ewohlforth@gibbonslaw.com

February 24, 2023

<u>Via ECF</u>

Hon. Cathy L. Waldor
U.S. District Court for the District of New Jersey
50 Walnut Street, Room 4040
Newark, NJ 07102

Re:     ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC***
        ***(Case No. 2:22-cv-02632-JMV-CLW)***

Dear Judge Waldor,

We submit this joint letter on behalf of the parties in the above-captioned matter pursuant to the Court's Civil Case Management Order ¶ 7 and Local Rule 37.1 governing discovery disputes and in advance of the parties' discovery conference scheduled for February 28, 2023.

Plaintiff Johnson & Johnson Health Care Systems Inc. ("<u>JJHCS</u>") and Defendant Save On SP, LLC ("<u>SaveOnSP</u>") have met and conferred in good faith to resolve their discovery disputes. Despite these efforts, the parties are at impasse on the issues discussed below, which all relate to applications to compel discovery or for a protective order sought by SaveOnSP. We respectfully request that the Court address these disputes during the February 28, 2023 conference.

## I.      RELEVANT BACKGROUND

### *SaveOnSP's Statement of the Relevant Background*

Specialty drug costs are skyrocketing because pharmaceutical companies like JJHCS and its affiliates raise prices year after year to boost their own profits. One recent report found that specialty drug prices increased at three-and-a-half times the rate of inflation from 2019 to 2020, resulting in an average cost of therapy of $84,442 per year.[1] Employers, who sponsor and fund the employee benefit plans that provide most Americans with their health insurance, bear the brunt of these price increases.

To encourage patients to use, and keep using, Janssen specialty drugs, JJHCS created Care-Path. Under most commercial health plans, the employer pays for the vast majority of the cost; the patient pays the rest in the form of copays. CarePath offers to cover most of the cost of the patient's copay, encouraging the patient to use Janssen drugs. JJHCS thus makes a healthy return on its

---

[1] Purvis, Leigh, and Stephen W. Schondelmeyer, *Rx PriceWatch Reports*, Washington, DC: AARP Public Policy Institute (Sept. 2021), https://doi.org/10.26419/ppi.00073.000.

Hon. Cathy L. Waldor
February 24, 2023
Page 2

investment in CarePath in additional revenue for Janssen drugs—paid for, primarily, by commercial health plans.[2]

      To help plans manage rising specialty drug costs, SaveOnSP helps health plans encourage patients to take advantage of the full amount of copay assistance funds that JJHCS and other manufacturers voluntarily make available. These benefits help plans manage their costs. They also ensure that patients pay $0 for their specialty drugs. While JJHCS asserts that it reduces patient costs to $5 or $10 without benefit terms administered by SaveOnSP, most of patients' costs are paid by their *health plans*. If those plans cannot manage the ever-growing costs of specialty drugs, then they cannot keep providing coverage for those drugs.

      JJHCS wants health plans to change their benefits back, so that it pays out less in copay assistance funds and makes even more massive profits by foisting more of the costs of its drugs onto plans. JJHCS cannot directly sue health plan sponsors to change their benefits, so it sued SaveOnSP. JJHCS brings claims for deceptive trade practices and tortious interference with contract.

      JJHCS's goal is to put SaveOnSP out of business. It seeks to enjoin SaveOnSP from serving its clients and seeks damages that would make it economically impossible for SaveOnSP to do so. If JJHCS can prevent SaveOnSP from operating, it will put tremendous pressure on health plans to revert back to earlier plan terms under which JJHCS pays less in copay assistance and reaps even larger profits on its specialty drugs, and under which patients pay more for their specialty drugs.

      In its zeal, JJHCS has pushed for early and expansive discovery from SaveOnSP, even before the parties finished meeting and conferring. Since the Court ordered the parties to finish discussing JJHCS's requests, SaveOnSP has agreed to produce wide swaths of documents, resisting only JJHCS's remaining requests for patently irrelevant information.

      Notably, JJHCS wants to be able to contact or subpoena any of SaveOnSP's thousands of clients and the tens of thousands of patients who are members of their health plans. This could severely harm SaveOnSP, pressuring its clients to change or end their relationships with SaveOnSP. SaveOnSP offered to give JJHCS the identities of the plans and clients if JJHCS would agree to contact a limited number of each without SaveOnSP's consent or a showing of good cause to the Court. Alternatively, SaveOnSP offered to produce documents with patient and plan names anonymized in the first instance, producing specific names later if JJHCS can show a genuine need for them. JJHCS refused. JJHCS's refusal to agree on any limit to its ability to go after plans and

---

[2] The Department of Health and Human services determined, and the Second Circuit affirmed, that copay assistances are illegal kickbacks when applied to federal healthcare programs. *See Pfizer, Inc. v. U.S. Dep't of Health & Hum. Servs.*, *Pfizer, Inc v. United States Dep't of Health & Hum. Servs.*, 42 F.4th 67, 69 (2d Cir. 2022), *cert. denied sub nom.*, 143 S. Ct. 626 (2023).

Hon. Cathy L. Waldor
February 24, 2023
Page 3

patients is slowing down SaveOnSP's ability to produce relevant documents containing that information (SaveOnSP is not, as JJHCS disingenuously suggests, simply holding back documents).

At the same time, JJHCS refuses to give SaveOnSP key documents it needs to defend against JJHCS's claims, including (1) documents showing JJHCS's financial returns from Care-Path—relevant to JJHCS's claim that SaveOnSP threatens CarePath's viability and to JJHCS's alleged damages; (2) documents showing why JJHCS created and operates CarePath—relevant to JJHCS's assertion that threats to CarePath are a public harm; and (3) documents regarding Care-Path and Janssen drugs held by Johnson & Johnson entities other than JJHCS—relevant to, among other things, JJHCS's operation of CarePath and the profits that CarePath generated for Janssen drugs and thus to JJHCS's alleged damages. JJHCS cannot withhold documents that SaveOnSP needs to defend itself by pretending that JJHCS's own conduct is irrelevant to its claims.

This Court should grant SaveOnSP a protective order that limits JJHCS's ability to contact SaveOnSP's clients and their patients for purposes of litigation and it should compel JJCHS to produce the relevant documents it withholds.

### *JJHCS's Statement of the Relevant Background*

SaveOnSP's entire business model is to siphon funds from JJHCS's patient assistance program, CarePath, and to keep these funds for SaveOnSP's own profit and the profit of its insurance industry partners. SaveOnSP now claims it is benefitting patients, but under CarePath, these patients already have co-payments of only $5 or $10 per prescription fill—they are not in need of any help from SaveOnSP. Far from helping patients by pilfering CarePath funds, SaveOnSP harms patients by artificially deeming their lifesaving drugs "non-essential" in order to evade the patient protections of the Affordable Care Act, grossly increasing co-payments, coercing patients into enrollment in the SaveOnSP program with the threat of those artificially inflated copays, and leaving the patient to foot the bill on other out-of-pocket expenses that would have been offset by CarePath but for SaveOnSP's interference. That is why a slew of patient advocacy groups filed amicus briefs in this case opposing SaveOnSP's motion to dismiss and demanding that it be held accountable. SaveOnSP's complaint that JJHCS is "foisting more of the costs of its drugs onto plans" is revealing—the very purpose of those insurance plans is to protect patients (who pay their insurers ever-increasing premiums and face ever-increasing co-pay and deductible obligations) by covering the cost of prescription therapies, including specialty medications for life-altering illnesses.[3] SaveOnSP's desire to profit by helping plans avoid that responsibility does not justify

---

[3] The statistics quoted by SaveOnSP at the top of this letter are taken from a Washington, DC lobbying organization and they do not actually reflect the pricing of Janssen pharmaceuticals or even the actual net price paid. In fact, the net prices of Janssen pharmaceuticals have declined for five years in a row. *See* 2021 Janssen Transparency Report, at 2 (2022), found at https://transparencyreport.janssen.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000.

Hon. Cathy L. Waldor
February 24, 2023
Page 4

SaveOnSP's tortious interference with the CarePath terms and conditions or its deceptive practices that are at issue in this litigation.

SaveOnSP's almost one-year-long campaign to avoid discovery has stalled out—its motion to dismiss has been denied and the Court will soon adjudicate JJHCS's motion to compel.  In this letter application, therefore, SaveOnSP lays bare its new defense strategy: distract from its own wrongful conduct by trying to make this case into one about drug manufacturer pricing and by framing the CarePath program as a marketing tool as opposed to what it is—a program created to help patients facing serious medical conditions afford the specialty Janssen medications prescribed by their doctors.  And then, leveraging this sleight-of-hand, SaveOnSP seeks to impose extraordinary and shocking burden and expense on JJHCS through the discovery process—perhaps to try and ensure no other manufacturers or patient groups file suit against it.

After months of letter writing and meet and confer sessions, JJHCS has made a host of concessions in order to avoid wasting the Court's time on these disputes.  Nonetheless, due to SaveOnSP's irrelevant and burdensome requests and its unwillingness to compromise, the parties remain at impasse on several global issues:

- SaveOnSP's sweeping requests for all documents concerning the development and pricing of more than a dozen Janssen pharmaceuticals—truly extraordinary requests that would encompass an extraordinary volume of entirely irrelevant documents.

- SaveOnSP's insistence that JJHCS produce documents that are in the possession of Johnson & Johnson entities other than JJHCS, the only plaintiff in this case and the entity that is responsible for the CarePath program.

- SaveOnSP's contention that JJHCS must produce information relating to every vendor who ever provided services to CarePath, regardless of whether those services are connected in any way to the issue in this lawsuit.

- SaveOnSP's demand for documents and communications extending back to 2009, nearly a decade before either CarePath or the SaveOnSP program existed, and more than eight years before any of the allegations in the complaint.

None of this discovery has anything to do with JJHCS's claim against SaveOnSP, which are the only claims at issue in this lawsuit.  All of this is simply an attempt by SaveOnSP to make the costs of any lawsuit against it prohibitive.  Consider, for example, the impact of just the first and last bullet points noted above in combination:  SaveOnSP demands the production of virtually every document from over 13 years relating to every major specialty drug that any Johnson & Johnson company has ever sold.  JJHCS should not be required to engage in such burdensome and irrelevant makework; SaveOnSP's motion should be denied.

In addition, as discussed below, SaveOnSP asks for a "protective order" that would prohibit JJHCS from speaking with patients or health plans that are enrolled in the SaveOn Program, or

Hon. Cathy L. Waldor
February 24, 2023
Page 5

taking any discovery from these entities. This unprecedented request is driven by SaveOnSP's fear that these witnesses will offer testimony that supports JJHCS's claims in this lawsuit and it inverts the normal rules of litigation under which a party may speak to witnesses as it sees fit. It is especially audacious here where the witnesses that SaveOnSP seeks to block from speaking to JJHCS are the very patients in CarePath with whom JJHCS already has a business relationship. JJHCS will not "go after" anyone. All that JJHCS intends to do is to pursue witness interviews and third-party discovery as necessary to prove its claims, the same as any other litigant would do.

This all needs to stop. As a result of SaveOnSP's intransigence and discovery games, JJHCS has received no substantive discovery—almost a month after SaveOnSP lost its motion to dismiss, four months after SaveOnSP lost its motion to stay, and nine months after JJHCS filed the Complaint.[4] The parties' joint discovery schedule calls for the substantial completion of document production by June 9, 2023. *See* Dkt. 64. SaveOnSP should produce relevant discovery itself; and limit its affirmative demands to the discovery it needs from JJHCS that is directly relevant to the claims that have been asserted against it—not try to conjure up unrealistic demands for documents that have nothing to do with those claims merely for strategic gain.

Again, the claims at issue here are simple and focused and they are all against SaveOnSP. JJHCS is not the Defendant; nor is J&J; nor is the entire pharmaceutical industry. Rather, JJHCS asserts two claims against SaveOnSP based on its wrongful pattern of conduct: (1) a tortious interference with contract claim under New Jersey common law, and (2) a deceptive trade practices claim under New York General Business Law ("GBL") § 349. Both of these claims were the subject of SaveOnSP's motion to dismiss, which Judge Vazquez denied on January 27, 2023.

As Judge Vazquez held, to prove that SaveOnSP has tortiously interfered with contractual relations, JJHCS must show that (1) an existing contractual relationship between JJHCS and its patients; (2) SaveOnSP's interference is intentional and malicious; (3) SaveOnSP's interference caused a loss or breach of that contract; and (4) SaveOnSP's interference has caused JJHCS damage. *See* Order, Dkt. 68, at 15; *see also, e.g., Dello Russo v. Nagel*, 358 N.J. Super. 254, 268 (App. Div. 2003). To determine whether interference is wrongful and unjustified, courts consider several factors, including whether the actor uses improper means to accomplish the interference. *See Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 40 (N.J. 1989) (per curiam) (considering whether the defendant's interference was "sanctioned by the 'rules of the game'").

To prove its GBL claim, JJHCS must show that (1) SaveOnSP's acts are "directed to consumers," (2) they are materially "deceptive or misleading," and (3) JJHCS has been injured as a result. *See* Order, Dkt. 68, at 12; *see also, e.g., Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 744 (N.Y. 1995). The statute is "intentionally broad,

---

[4] The glacial pace of SaveOnSP's document productions are particularly striking given that SaveOnSP represented through counsel on October 12, 2022, that if JJHCS would agree to limit the scope of discovery to "no more than 160,000 documents," SaveOnSP would commit to substantial completion of the document production over a five-month period. *See* Email from E. Wohlforth to J. Greenbaum dated Oct. 12, 2022.

Case 2:22-cv-02632-JKS-CLW Document 171-2 Filed 02/24/23 Page 6 of 36 PageID: 6215
Case 2:22-cv-02632-JKS-CLW Document 172 Filed 02/24/23 Page 6 of 36 PageID: 6691
PageID: 6215

Hon. Cathy L. Waldor
February 24, 2023
Page 6

applying to virtually all economic activity." *See* Order, Dkt. 68, at 12. Because JJHCS is not a consumer, to prevail under the GBL, JJHCS must also demonstrate "some harm to the public at large." *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003). For the reasons set forth above, the public harm at stake in this litigation includes harm to patients.

The focal discovery relevant to these two claims at issue is almost all in the possession of SaveOnSP. As the foregoing statements of the law make clear, none of the elements of the claims at issue look inward to JJHCS's conduct, disproving SaveOnSP's contention that this case is somehow about JJHCS's business practices. It is not. JJHCS has already agreed to produce discovery relevant to the claim it has asserted. None of these claims at issue justify the extraordinary discovery that SaveOnSP now seeks from JJHCS. SaveOnSP's application should be denied.

## II. PROTECTIVE ORDER CONCERNING JJHCS'S THIRD PARTY DISCOVERY FROM SAVEONSP'S CLIENTS AND THEIR PATIENTS

### *SaveOnSP's Position*

JJHCS asked SaveOnSP for the names of its health plan clients and the patients enrolled in those plans, and for documents referring to those clients and patients. JJHCS has repeatedly made clear that it intends to subpoena or interview plans and patients. *See, e.g.*, Ex. 1 (Dec. 9, 2022 Ltr from H. Sandick to M. Nelson) at 2-3 ("JJHCS may also potentially pursue further discovery from those plans."); Ex. 2 (Jan. 6, 2023 Ltr. from H. Sandick to M. Nelson) at 2 ("JJHCS is also entitled to pursue further discovery from those plans, to the extent appropriate, to establish their role in the SaveOnSP scheme and its impact on JJHCS and patients."); Ex. 3 (Jan. 27 Ltr. from H. Sandick to A. Dunlap) at 2-3 (insisting that JJHCS be permitted to contact health plans and patients to obtain discovery); Ex. 4 (Feb. 9, 2023 Ltr. From A. LoMonaco to M. Nelson) at 1-2 (explaining that JJHCS accepts no limits on its ability to take third-party discovery from health plans and patients).

As it told JJHCS, SaveOnSP is concerned that JJHCS could subpoena or contact hundreds or thousands of clients and patients, putting extreme commercial pressure on client plans to cut ties with SaveOnSP. While JJHCS now says that it does not intend to "subpoena thousands of patients," it does not disclaim its intent to go after SaveOnSP's clients or to reach out to large numbers of patients without subpoenas. To prevent this harm, SaveOnSP first proposed to anonymize client and patient names in the documents it produces in the first instance, with JJHCS free to seek specific names after it reviewed SaveOnSP's productions. *See, e.g.*, Joint Ltr. re Global Disputes (ECF No. 65) at 10-13. JJHCS refused. *Id.* at 8-10. SaveOnSP then proposed that it would produce client and patient names if JJHCS agreed not to subpoena or contact for litigation purposes more than five clients and five patients unless SaveOnSP consented or on showing of good cause to the Court. *See* Ex. 5 (Jan. 20, 2023 Ltr. from A. Dunlap to H. Sandick) at 1-2. JJHCS said no, Ex. 4 (Feb. 9, 2023 Ltr. from A. LoMonaco to M. Nelson) at 1-2, then served a subpoena on Premera Blue Cross ("Premera"), one of SaveOnSP's publicly disclosed health plan clients. Ex. 6.

Hon. Cathy L. Waldor
February 24, 2023
Page 7

     SaveOnSP now seeks a protective order to stop JJHCS from subpoenaing or contacting for litigation purposes more than a limited number of SaveOnSP's clients and their patients, except upon SaveOnSP's consent or a showing of good cause to the Court.

     *First*, broad third-party discovery of plans and clients by JJHCS could severely harm Save-OnSP. A party may not harass, annoy, or embarrass another party or third-party through the discovery process. *See Santiago v. Apothaker Scian P.C.*, 2017 WL 4543689, at *1 (D.N.J. Oct. 11, 2017); *see also* Fed. R. Civ. P. 26(g)(1)(B)(ii). Most of SaveOnSP's clients are private, employer-sponsored, self-funded plans who keep their relationship with SaveOnSP confidential from drug makers like JJHCS. Many are not regular litigants and could incur significant costs and burdens if forced to hire outside counsel and respond to subpoenas. If JJHCS contacts or subpoenas them, many health plans may consider ending their relationship with SaveOnSP. Similarly, patients subpoenaed or contacted about the litigation by JJHCS could become confused, thinking their access to specialty drugs is in peril, and complain to their health plans, creating further pressure for the plans to cut ties with SaveOnSP. JJHCS should not be allowed to use litigation to harm SaveOnSP in this way. Courts have recognized serious risks to a party posed by subpoenas directed to its non-party clients and ordered relief to guard against those risks. *See, e.g.*, *Winona PVD Coatings, LLC v. Excel Enters., LLC*, No. 3:16-CV-19-WCL-CAN, 2016 WL 9347091, at *3 (N.D. Ind. Apr. 18, 2016) (stating that defendants' subpoenas to non-party customers posed a risk to plaintiff's business relationships and ordering that defendants proceed with party discovery first to prevent defendants from prematurely burdening non-parties); *Accusoft Corp. v. Quest Diagnostics, Inc.*, No. CIV.A. 12-40007-FDS, 2012 WL 1358662, at *1, 10-11 (D. Mass. Apr. 18, 2012) (quashing third-party subpoenas directed at defendants' customers because the discovery at issue would likely harm defendants' customer relationships); *see also Thompson v. Trident Seafoods Corp.*, No. C11-0120RSL, 2012 WL 293865, at *1-2 (W.D. Wash. Jan. 31, 2012) (denying defendants' motion to compel production of plaintiff's employers' identities, and granting plaintiff's motion for protective order over those identities, because even if those identities were relevant to damages, defendants' desire to take third-party discovery from those employers posed "a risk of annoyance, embarrassment, and oppression" to plaintiff).

     *Second*, JJHCS's subpoenas to third-party clients and patients are highly likely to be duplicative of party discovery. "A court may limit or deny otherwise appropriate discovery when the information sought is not proportional to the needs of the case when certain factors are considered, including burden and expense." *In re EthiCare Advisors, Inc.*, Civ.A. No. 20-1886 (WJM), 2020 WL 4670914, at *3 (D.N.J. Aug. 12, 2020; *see also* Fed. R. Civ. P. 26(c). As JJHCS's subpoena to Premera shows, it would seek information from these subpoenas that it is already seeking from SaveOnSP. Of JJHCS's nine requests to Premera, seven duplicate requests that it already made to SaveOnSP (the other two seek information about an entry on Premera's website, outside the time period of discovery). Ex. 6. JJHCS has not explained why it needs discovery from third-party health plans and patients that it can get from SaveOnSP. *Korotki v. Cooper Levenson, April, Niedelman & Wagenheim, P.A.*, Civil No. 20-11050 (CPO/MJS), 2022 WL 2191519, at *2, 7 (D.N.J. June 17, 2022) (quashing third-party subpoenas because they contained nearly identical requests to prior requests for production directed to a party); *see generally* Fed. R. Civ. P. 26(b)(2)(C). And JJHCS certainly has not explained why it would need to subpoena more than a limited number of

Hon. Cathy L. Waldor
February 24, 2023
Page 8

plans or patients to obtain whatever information it does not think that SaveOnSP could provide. *Wells Fargo & Co. v. ABD Ins.*, No. C 12-03856 PJH DMR, 2012 WL 6115612, at *3 (N.D. Cal. Dec. 10, 2012) (limiting number of non-party subpoenas directed to defendants' clients to a small percentage of its clients); *Heckler & Koch, Inc. v. German Sport Guns GMBH*, No. 1:11-CV-1108-SEB-TAB, 2014 WL 1323226, at *1-2 (S.D. Ind. Mar. 28, 2014) (limiting subpoenas to three out of fourteen customers as a sample).

JJHCS's arguments to the contrary are unpersuasive.

*First*, JJHCS asserts that its inability to speak to patients about the litigation with Save-OnSP would place "extreme limitations on JJHCS's business operations." Ex. 4 (Feb. 9, 2023 Ltr. from A. LoMonaco to M. Nelson) at 1. Not so. SaveOnSP proposes to produce patient and client identities as Attorneys' Eyes Only. Because JJHCS's businesspeople would not receive this information, they would be no more limited in their operations than they are now. SaveOnSP's proposal would simply prevent JJHCS's attorneys from contacting significant numbers of plans and patients about this litigation.

*Second*, JJHCS contends that SaveOnSP seeks measures inconsistent with the Federal Rules of Civil Procedure. Not so. SaveOnSP seeks relief consistent with the Court's power to limit discovery to prevent harm and avoid cumulative and duplicative discovery.

*Third*, JJHCS argues that a protective order is improper because it is unilateral. JJHCS identifies no commercial harm that might result from SaveOnSP speaking to plans or patients. And JJHCS has never asked SaveOnSP to limit the number of plans or patients it could contact for litigation purposes. SaveOnSP would be glad to discuss a mutual limit.

*Fourth*, while a party may interview willing third-party witnesses, that general principle yields when the contact poses a high risk of harm to a party's business unrelated to the litigation. In two cases cited by JJHCS, the party sought to speak to a small group of treating physicians relevant to the litigation who would possess unique information otherwise potentially unavailable to the parties. *See Patton v. Novartis Consumer Health, Inc.*, No. 02-cv-47, 2005 WL 1799509, at *3 (S.D. Ind. July 25, 2005) (asking to interview a group of treating physicians in which the plaintiff put her medical condition at issue); *Doe v. Eli Lily & Co.*, 99 F.R.D. 126, 128 (D.D.C. 1983) (same). JJHCS also cites to a case in which certain non-parties agreed in a settlement agreement to sit for an interview, and the movant sought a protective order to prevent those interviews. *Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, No. 2:17-cv-00495-JDW, 2021 WL 4262317, at *1-3 (E.D. Pa. Sept. 20, 2021). Those cases simply do not speak to the concerns here. And Save-OnSP has never suggested that JJHCS not speak to any plans or patients, just that it limit the number to minimize the risks of commercial harm.[5]

---

[5] JJHCS tries to distinguish the cases cited by SaveOnSP on the basis that they did not impose the precise limits that SaveOnSP seeks here. This misses the point. Those cases recognize that the

Hon. Cathy L. Waldor
February 24, 2023
Page 9

*Fifth*, JJHCS says that a limit of five plans or patients is too little. SaveOnSP is glad to discuss a different limit, as long as it is reasonable, but JJHCS has refused to do so.

*Finally*, JJHCS assets that the Federal Rules give SaveOnSP adequate protections because it could move to quash any subpoenas that JJHCS might serve, and the plans or patients would have time to retain counsel. This is disingenuous. The Rules would not prevent JJHCS from inter-viewing or speaking with clients or patients without subpoenaing them, putting commercial pres-sure on them to question their business relationships with SaveOnSP. And receiving a subpoena, even one that SaveOnSP then moved to quash, and having to hire litigation counsel would also apply commercial pressure. At bottom, the Rules do not protect SaveOnSP from the commercial harm that could result from wide-spread third-party discovery of plans and patients by JJHCS.

SaveOnSP respectfully asks the Court to enter a protective order limiting JJHCS to issuing subpoenas to, or otherwise contacting about the litigation, more than five patients and five clients without SaveOnSP's prior consent of or an order of the Court for good cause shown.

### JJHCS's Position

SaveOnSP seeks extraordinary relief through this application for a protective order. First, SaveOnSP asks the Court to prohibit JJHCS from speaking with its own patients who are taking its drugs and who are participants in its CarePath patient assistance program. The obvious purpose of this application is to prevent JJHCS from learning more about the harms inflicted by SaveOnSP or developing its case for trial. Second, SaveOnSP seeks to also prohibit JJHCS from speaking with health insurance companies and health plans—sophisticated entities who are well represented and certainly capable of defending their own interest. As such, SaveOnSP asks the Court to bar JJHCS from engaging in the routine factfinding process that is an essential part of discovery, by placing unprecedented restrictions on JJHCS's ability to contact potential witnesses—even those patients with whom JJHCS already has a contractual relationship. No factual showing has been made to support the issuance of such a protective order. Like any other plaintiff, JJHCS should be permitted to speak with witnesses and issue subpoenas without restrictions dictated by SaveOnSP, which should not be allowed to abuse the discovery process by imposing a gag order designed to pull a veil over its conduct impacting and involving third parties.

As an initial matter, any motion for a protective order relating to subpoenas that JJHCS has not served is not tethered to any specific dispute and is, therefore, premature. As discussed above, JJHCS is not "go[ing] after" patients or health plans or anyone else, or subpoenaing thousands of its own patients, or harassing witnesses. Nor has SaveOnSP shown that JJHCS has caused or will cause any business harm by proceeding with the normal course of third-party discovery. Such fears are entirely speculative. Nor has SaveOnSP sought Court permission to file a motion for a

---

Court may limit discovery to avoid risks of commercial harm. The Court can use its discretion to determine the specific limits appropriate to the case before it.

Hon. Cathy L. Waldor
February 24, 2023
Page 10

protective order, which would be premature at this time, in any event. There is no subpoena pending that has given rise to any need to issue a protective order, and it is inappropriate to ask the Court to issue a protective order without the development of a full factual record.

In reality, the harm feared by SaveOnSP is not commercial harm but rather that SaveOnSP will be unable to defend against the evidence of patient harm and wrongful practices that will be developed in third-party discovery. Of course, a party's fear that the evidence developed in discovery will be used against them in the lawsuit is provides no basis for a protective order. If and when SaveOnSP takes issue with any given subpoena JJHCS serves, SaveOnSP may seek judicial intervention at the appropriate time in accordance with the Federal Rules. *See* Fed. R. Civ. P. 30(b)(1), 45(a)(4). We ask the Court to deny this application as unripe.

On the merits, SaveOnSP is also wrong. Again, the patients with whom SaveOnSP seeks to prevent JJHCS from communicating are patients who are participants in JJHCS's CarePath program. These patients are directly impacted and harmed by SaveOnSP's conduct. JJHCS is entitled to speak with them to learn more about those issues and the harms inflicted on them by SaveOnSP. SaveOnSP has no legal standing to prevent JJHCS even from speaking to its own patients who are already in regular communication with JJHCS. This is both unfair to JJHCS and also unworkable given the ongoing business relationship between JJHCS and its patients.

The Court has already recognized the importance of discovery from patients. For example, in denying SaveOnSP's motion to dismiss, Judge Vazquez determined that JJHCS "plausibly alleges at least two types of consumer deception: (1) enlisting pharmacies to reject patients' claims for their prescription at the point of sale, Compl. ¶¶ 13, 63, 113; and (2) failing to inform patients that be enrolling in SaveOnSP, they breach the CarePath terms and conditions, Compl. ¶¶ 113." Dkt. No. 68, at 13. JJHCS is entitled to pursue discovery from patients who have found themselves caught in SaveOnSP's scheme, to hear their firsthand accounts of the effect it has had on their medication and treatment plans. This is not a case in which every patient will have had the same experience with SaveOnSP. Patients are covered by different insurance plans, take different medications, have different medical histories, and live in different geographic areas. It cannot be said that once we have spoken to a limited number of patients (out of the tens of thousands of patients who are harmed by SaveOnSP) that no other patient will have had a unique experience with Save-OnSP.

As to health insurance plans, SaveOnSP itself has placed the role of its health plan clients at issue in its motion to dismiss and other statements in this action, including, for example, arguing that JJHCS's claim should be preempted because the critical decisions relating to the SaveOnSP Program are purportedly made by the health plans, and not by SaveOnSP itself. *See, e.g.*, Mem. Of Law in Support of Def.'s Mot. To Dismiss, Dkt. 31-1, at 8-13. JJHCS is entitled to pursue discovery from the very health plans whose practices SaveOnSP placed at issue in this action. The Premera subpoena to which SaveOnSP refers is a good example. It seeks only a limited set of documents focused on Premera's recognition that CarePath's terms and conditions bar use of Save-OnSP; Premera engaged counsel after receiving the subpoena, has received an extension of time to reply, and is engaged in discussions with JJHCS regarding the subpoena. The system is working just as the Federal Rules contemplate.

Hon. Cathy L. Waldor
February 24, 2023
Page 11

Furthermore, SaveOnSP's request for a protective order is unilateral: it would only prevent JJHCS from speaking with patients and SaveOnSP's health plan clients, and imposes no analogous restrictions on SaveOnSP. This one-way street would create an unbalanced system of discovery that authorizes SaveOnSP to obtain information from potential witnesses while inhibiting JJHCS's ability to do the same. JJHCS should not be subject to SaveOnSP's arbitrary rules restricting the number of patients and health plans it is allowed to contact or subpoena. JJHCS certainly should not be subjected to SaveOnSP's proposal that JJHCS must seek SaveOnSP's prior consent or Court order to contact or subpoena more than five health plans or five patients.

The cases cited by SaveOnSP in which the court granted protective orders or otherwise restricted third-party discovery present materially different facts than are present here. *See, e.g., Korotki*, 2022 WL 2191519, at \*4-8 (quashing third-party subpoenas in a legal malpractice suit because, *inter alia*, they sought materials already provided to the plaintiff, were unduly burdensome, and fell outside the permissible scope of discovery); *Santiago*, 2017 WL 4543689, at \*1 (granting a limited protective order over the defendant's personal net worth because personal finances were irrelevant to the suit); *Thompson*, 2012 WL 293865, at \*1 (denying motion to compel the disclosure of the plaintiff's employer's identities in an employment case because it risked "subjecting plaintiff's current and prospective employers to discovery and inviting an in-depth critique of plaintiff's job performance [which would] certainly pose a risk of annoyance, embarrassment, and oppression."). None of those cases have any bearing here.

*Accusoft* is instructive. 2012 WL 1358662, at \*1. In that copyright infringement case, the court addressed a discovery dispute concerning 19 third-party subpoenas issued by the plaintiff to the defendants' customers. *Id.* The court had granted limited injunctive relief to the plaintiff by compelling the "defendants to produce an accounting of their [relevant business] relationships." *Id.* at 10. Accordingly, the court quashed the plaintiff's third-party subpoenas, but held that the plaintiff may renew the subpoenas, as needed, after the defendants produced an accounting of their business relationships. *Id.* at \*10-11. Here, JJHCS has issued only one health plan subpoena; not 19. And it not received any discovery from SaveOnSP that would moot the need for third party discovery. The Court has no record on which to determine, as in *Accusoft*, what is being sought from third parties or whether it can fairly be deferred.

Moreover, the terms of SaveOnSP's requested protective order are far more draconian than the cases it cites in support of its proposal. *Wells Fargo*, 2012 WL 6115612, at \*3-4 (permitting the plaintiffs to proceed with 50 third-party subpoenas instead of 142, in addition to the 19 third-parties that had already responded to the subpoenas); *Heckler*, 2014 WL 1323226, at \*3 (permitting the plaintiffs to proceed with three of the requested fourteen third-party subpoenas and ordering the defendants to produce responsive documents concerning all fourteen customers the plaintiffs intended to subpoena). Prohibiting JJHCS from contacting or serving subpoenas on more than five patients and five health plans out of the tens of thousands of patients and hundreds of health plan clients that are involved with SaveOnSP is entirely arbitrary and would not even provide JJHCS with a representative sample of patients' and health plans' experiences with SaveOnSP.

Hon. Cathy L. Waldor
February 24, 2023
Page 12

Far from discouraging informal efforts at fact gathering by interviewing witnesses, courts have made clear that such contacts are beneficial for the system and are to be permitted. *See, e.g.*, mm *Rail Co., LLC v. Bridger Logistics, LLC*, No. 2:17-cv-00495-JDW, 2021 WL 4262317, at \*4 (E.D. Pa. Sept. 20, 2021) ("[P]re-trial interviews with witnesses [are] common, and 'the right to conduct such interviews is taken for granted as a matter of federal procedure." (quoting *Patton v. Novartis Consumer Health, Inc.*, No. 02-cv-47, 2005 WL 1799509, at \*3 (S.D. Ind. July 25, 2005)); *Doe v. Eli Lily & Co.*, 99 F.R.D. 126, 128 (D.D.C. 1983) ("[W]hile the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the *ex parte* interview of a witness who is willing to speak."). JJHCS and its counsel are permitted to contact and interview any third parties who are willing to speak, without limitation.

Not surprisingly, SaveOnSP cites no authority for its effort to restrict JJHCS from contacting witnesses. And the cases it cites provide no support for its demand. Even where courts quashed subpoenas in particular circumstances, they imposed no prohibitions on contact of the kind SaveOnSP seeks. *See Korotki*, 2022 WL 2191519, at \*8 (quashing third-party subpoenas, but placing no restrictions on the plaintiff's ability to contact witnesses); *In re EthiCare Advisors, Inc.*, 2020 WL 4670914, at \*5 (denying motion to compel compliance with a third-party subpoena, but placing no restrictions on any party's ability to contact potential witnesses); *Santiago*, 2017 WL 4543689, at \*1 (granting limited protective order over the defendant's personal net worth but placing no restrictions on the plaintiff's ability to contact potential witnesses); *Winona*, 2016 WL 9347091, at \*3 (granting motion to quash subpoenas, but placing no restrictions on any party's ability to contact potential witnesses); *Heckler*, 2014 WL 1323226, at \*1-2 (limiting the scope of third party discovery on the facts, but placed no restrictions on the plaintiff's ability to contact potential witnesses); *Accusoft Corp.*, 2012 WL 1358662, at \*10-11 (granting motion to quash third-party subpoenas, but placed no restrictions on any party's ability to contact potential witnesses); *Thompson*, 2012 WL 293865, at \*1 (denying motion to compel the disclosure of the plaintiff's employer's identities, but placed no restrictions on any party's ability to contact potential witnesses); *Wells Fargo*, 2012 WL 6115612, at \* 4 (limiting the number of the plaintiffs' third-party subpoenas, but placed no restrictions on the plaintiffs' ability to contact potential witnesses).

JJHCS has already committed to "ensure that the return date for any subpoena provides adequate time for the witness to engage counsel and/or consult with either of the parties, if they care to do so, or for [SaveOnSP] to take any actions appropriate under the Federal Rules." Ex. 4 (Feb. 9, 2023 Ltr. from A. LoMonaco to M. Nelson) at 2. JJHCS stands by this commitment, which should alleviate SaveOnSP's speculative concerns regarding any potential commercial impact that may result from JJHCS contacting or subpoenaing patients or health plans. The Federal Rules sufficiently address SaveOnSP's concerns, and SaveOnSP should not expect this Court to take steps nowhere permitted in the Federal Rules or elsewhere to protect it from the impact of routine aspects of civil litigation.

JJHCS has not proposed a mutual limitation on the number of patients and health plans each party may contact or subpoena because no limitation is justified by law or by the facts of this

Hon. Cathy L. Waldor
February 24, 2023
Page 13

case. JJHCS and SaveOnSP are already restricted by the actual constraints of the Federal Rules of Civil Procedure and the limited time remaining for discovery—the same constraints that protect the rights of litigants and third parties in every case. It is both unnecessary and unjustified for SaveOnSP to demand additional artificial limitations on JJHCS's ability to engage in third-party discovery.

JJHCS respectfully requests that this Court deny SaveOnSP's request for a protective order limiting JJHCS's ability to contact and subpoena patients and SaveOnSP's health plan clients. The motion is overreaching in the extreme, both because it is unripe and because it is wrong on the merits.

## III.    MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND RESPONSES TO INTERROGATORIES

### A.    Documents Related to the Development and Marketing of CarePath, JJHCS's Financial Returns from CarePath, and the Price of J&J's Specialty Drugs (RFP Nos. 11, 28.a-28.h, 29-30)[6]

#### *SaveOnSP's Position*

SaveOnSP seeks information about the development and marketing of CarePath (RFP No. 11), JJHCS's financial returns from CarePath (RFP No. 29), and the price of Johnson & Johnson's ("J&J") specialty drugs, including J&J's decisions to raise those prices (RFP Nos. 28.a-28.h and 30). JJHCS has flatly refused to produce this information, asserting that it is irrelevant. *See, e.g.*, Ex. 7 (Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson) at 1-3; Ex. 8 (Feb. 15, 2023 Letter from M. Nelson to A. LoMonaco).

This material is highly relevant to SaveOnSP's defenses.

*First*, JJHCS's Complaint alleges that CarePath is intended to help patients afford their medications, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114, and that this threat to CarePath's viability constitutes a public harm for purposes of JJHCS's GBL § 349 claim. SaveOnSP intends to show that CarePath is not a public good, but primarily a marketing tool that JJHCS and its affiliates use to sell more specialty drugs and to hike the drug prices. JJHCS asserts that CarePath is not a marketing program, but that is for the factfinder to decide. SaveOnSP also intends to show that J&J's return on investment from CarePath is substantial, and that even if JJHCS's costs for CarePath have gone up, CarePath is still profitable for J&J—not "prohibitively expensive," as JJHCS claims—and that SaveOnSP thus poses no risk to CarePath's viability. JJHCS opted to

---

[6] SaveOnSP's RFP Nos. 26 and 36-37 also raise similar issues. Because the parties are negotiating a potential compromise on those RFPs, SaveOnSP is not moving on them at this time.

Hon. Cathy L. Waldor
February 24, 2023
Page 14

plead that one of the ways SaveOnSP causes public harm is by threatening the viability of Care-Path, and SaveOnSP is entitled to defend against that claim.

*Second*, JJHCS has accused SaveOnSP of violating GBL § 349 by making health care more expensive for patients. Compl. ¶ 114. SaveOnSP intends to show that JJHCS and J&J use their copay assistance program to convince doctors to prescribe and patients to fill prescriptions for its specialty drugs, even as J&J increases the price of those drugs year after year. Those cost in-creases—imposed by J&J and other pharmaceutical companies—pressure health plans to increase the cost of healthcare for all members to offset increased spending for specialty drugs. JJHCS asserts that SaveOnSP can get the discovery it needs to support this theory from health plans. But SaveOnSP is entitled to prove that the reason health plans must raise costs is because J&J raises its prices year after year simply to increase profits. The factfinder can then evaluate whether health plans' decision to increase plan members' costs is a public harm.

*Third*, JJHCS's return on investment from CarePath and its profits from specialty drugs are relevant to JJHCS's alleged damages. SaveOnSP intends to show that its services to health plans have resulted in more patients enrolling in CarePath than would have otherwise and that patients' adherence to J&J's specialty drugs has increased because of the benefit terms implemented by SaveOnSP's clients (which ensure that plan members always receive their drugs for free). As a result of SaveOnSP's activities, J&J has sold more specialty drugs and reaped more profits than it otherwise would have—undercutting JJHCS's alleged damages. To quantify this benefit to J&J, SaveOnSP seeks discovery on JJHCS's return on investment for CarePath and on J&J's profits on its specialty drugs. JJHCS disagrees with SaveOnSP's theory that it increases patient adherence to Janssen Drugs, claiming that SaveOnSP "play[s] [no] part in encouraging patients to take Janssen pharmaceuticals," but that is an issue to be resolved on the merits, once the parties have received relevant discovery.

*Finally*, JJHCS seeks injunctive relief in addition to damages. To obtain a permanent in-junction, JJHCS must demonstrate "(1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest." *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). SaveOnSP is en-titled to discovery that will enable it to refute each of those elements, including to show that JJHCS is not suffering any real injury, let alone an irreparable one, from SaveOnSP's activities and that an injunction would not serve the public interest. JJHCS claims that SaveOnSP is not entitled to any additional documents because JJHCS has already agreed to provide documents that show JJHCS's theory of liability. But SaveOnSP is entitled to documents that show that neither JJHCS nor the public was harmed by SaveOnSP's conduct. By seeking an injunction shutting down Save-OnSP's business, JJHCS itself has put these questions at issue.

SaveOnSP seeks this information to defend itself against JJHCS's baseless claims, which are designed to put SaveOnSP out of business (not to "penalize" JJHCS). JJHCS has agreed to produce documents relevant to its own theories of liability, injury, and damages, but it is withhold-ing documents critical for SaveOnSP to defend against those theories. And while JJHCS claims that SaveOnSP's requests are burdensome, the primary issue before the Court in this motion is

Hon. Cathy L. Waldor
February 24, 2023
Page 15

relevance. Once the Court determines that the information is relevant, the parties can meet and confer about appropriate search parameters, and JJHCS can then quantify any burden argument it might want to make, as the Federal Rules require. Fed. R. Civ. P. 26(b)(2)(B).

The Court should compel JJHCS to produce documents in response to SaveOnSP's RFP Nos. 11, 28.a-28.h, and 29-30.

### *JJHCS's Position*

While SaveOnSP attempts to gloss over the scope of the demands it references in this section, they are extraordinary. SaveOnSP's requests include items such as (1) all documents regarding the development, management, and marketing of CarePath going back to 2009, (*see* SaveOnSP's RFP No. 11); (2) data regarding every single individual patients who has received Janssen drugs since 2009, including dosages and fill amounts, even if those patients have nothing to do with CarePath or SaveOnSP (*see* SaveOnSP's RFP No. 28); and (3) all documents regarding the manufacturing and pricing of Janssen pharmaceuticals since 2009 (*see* SaveOnSP's RFP Nos. 28, 29, and 30). Each of these categories alone is grossly burdensome and utterly irrelevant. Together, they constitute a shocking overreach that can only be construed as an attempt to penalize JJHCS—and Johnson & Johnson overall—for having brought this lawsuit. SaveOnSP's rationale for these far-reaching requests is flawed, and its motion to compel should be denied.

As an initial matter, in an effort to reach a compromise, and notwithstanding the very limited relevance of these documents, JJHCS has already agreed to produce several categories of documents in these areas that SaveOnSP seeks. Specifically, JJHCS has agreed to produce

- "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period,"

- "the data that formed the basis for the allegations in Complaint ¶¶ 92-100,"

- "JJHCS's budget for copay assistance through CarePath," and

- "JJHCS's actual and projected annual costs for CarePath."

*See* R&Os to Requests 25, 27, and 29.

Subject to SaveOnSP's agreement to make a reciprocal production of patient-level data, JJHCS has also agreed to produce for the time period of January 1, 2016 to July 1, 2022 documents sufficient to show: (1) all patients enrolled in CarePath for each Janssen Drug; (2) the dates on which each patient was enrolled in CarePath; (3) the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath; (4) the Janssen Drug for which each patient enrolled in CarePath received copay assistance; and (5) all CarePath copay assistance payments made to each patient." Ex. 9 (Feb. 17, 2023 Letter from A. LoMonaco to M. Nelson).

Nothing more is necessary or appropriate. SaveOnSP's insistence on documents from as long ago as 2009 would require JJHCS to produce documents from nearly a decade before the allegations in the Complaint, and long before the SaveOnSP's operations began in earnest in 2017. Nor did CarePath even exist in its current form until 2016. Documents from the time period prior to 2017 are irrelevant and certainly fail the test of proportionality. Nor is there any basis for data relating to every patient on a Johnson & Johnson drug other than the data specific to CarePath that JJHCS has already agreed to produce. And whatever SaveOnSP might seek to argue with respect to the manufacturing and pricing of drugs, for it seek to every document relating to all specialty drugs in the Johnson & Johnson family of companies over a 13-year period is an astonishing overreach. Such documents are utterly irrelevant, certainly disproportionate, and their production would be an unprecedented burden.

SaveOnSP somehow suggests that the "primary issue before the Court in this motion is relevance," and that once the Court determines that the information is relevant, "the parties can meet and confer about appropriate search parameters, and JJHCS can then quantify any burden argument it might want to make." This is only an effort to further drag out the discovery process and to minimize the burden objections presented here. JJHCS's opposition to SaveOnSP's motion is based on both relevance and burden, and the Court can and should consider relevance and burden together.

SaveOnSP's purported justifications for its conduct all fail.

*First*, SaveOnSP's claims that it needs the documents so it can prove that "CarePath is not a public good, but primarily a marketing tool that JJHCS and its affiliates use to sell more specialty drugs and to hike the drug prices." This argument does not withstand even minimal scrutiny.

CarePath is not a marketing program—it is a patient assistance program. But regardless, whether CarePath is a marketing program does not give SaveOnSP license to tortiously interfere with CarePath patients or deceive them into enrolling in the SaveOnSP Program. There is no rule of law that precludes a tortious interference claim simply because the contract at issue purportedly serves a business purpose. *See, e.g.*, *Score Bd., Inc. v. Upper Deck Co.*, 959 F. Supp. 234, 238 (D.N.J. 1997) (finding plaintiff was likely to succeed on claim for tortious interference with its contract regarding licensing rights for sports memorabilia).

Further, as illustrated by Judge Vazquez's opinion, the question relevant to JJHCS's GBL § 349 claim is not whether, in the abstract, CarePath is a "public good," but whether ***SaveOnSP's actions*** harm the public. *See* Opinion & Order, Dkt. 68, at 13 (holding that a plaintiff must "allege some harm to the public at large" and that JJHCS has done so by alleging that SaveOnSP "enlist[s] pharmacies to reject patients' claims for their prescriptions at the point of sale" and "fail[s] to inform patients that by enrolling in SaveOnSP, they breach the CarePath terms and conditions"). JJHCS does not hide that it is a for-profit corporation, as are many plaintiffs who bring GBL § 349 claims. SaveOnSP cannot use that fact, or unsupported speculation about the "intent" behind CarePath, to justify its lies to patients or its interference with JJHCS's contracts.

Hon. Cathy L. Waldor
February 24, 2023
Page 17

*Second*, SaveOnSP also claims that it "intends to show that J&J's return on investment from CarePath is substantial, and that even if JJHCS's costs for CarePath have gone up, CarePath is still profitable for J&J—not 'prohibitively expensive,' as JJHCS claims." Again, SaveOnSP's claimed defense does not justify its overly expansive discovery requests. SaveOnSP seems to suggest that if Janssen pharmaceuticals are profitable, that somehow erases JJHCS's damages or gives SaveOnSP permission to interfere with CarePath's Terms and Conditions or justifies its deception of patients. It does not.

*Third*, SaveOnSP overreads JJHCS's allegation that SaveOnSP's services "jeopardiz[e] the viability of patient assistance programs like CarePath by making them prohibitively expensive." Compl. ¶ 114. This allegation self-evidently turns on the added expenses caused by SaveOnSP. JJHCS's point is simply that, as a matter of business judgment, it cannot justify the skyrocketing costs of its copay assistance program if those added costs are incurred not for the benefit of patients but rather for SaveOnSP and its partners. JJHCS has already agreed to produce documents relating to CarePath's budget and costs, and SaveOnSP is free to explore these points further at depositions and trial. But it is not free to probe every aspect of J&J's financial information in order to argue that JJHCS has the means to continue allowing SaveOnSP to steal from it.

*Fourth*, SaveOnSP states that it wants to disprove JJHCS's allegation that SaveOnSP "make[s] health care more expensive for patients" by demonstrating that CarePath is used to increase sales and prices of Janssen's specialty drugs, and that those increases cause "health plans to increase the cost of healthcare for all members to offset" that cost. Again, SaveOnSP misrepresents the allegations in the Complaint. SaveOnSP omits that JJHCS's full allegation reads: SaveOnSP "mak[es] other patient healthcare needs more expensive ***by not counting any of the funds spent of patients' medication towards their ACA maximum or deductible***." Compl. ¶ 114 (emphasis added). SaveOnSP does not dispute that its program does this, and JJHCS (or Johnson & Johnson) documents relating to increases in drug sales or prices have no bearing on this allegation.

In any event, even if SaveOnSP's claims about CarePath were true, it would provide no justification for SaveOnSP's wrongful and deceptive actions. SaveOnSP is admitting in this letter that it wants to make this case into one about the fairness of drug prices, but that is not relevant to this case in any way. SaveOnSP nowhere explains how the price of drugs or the reasons for any purported increases would disprove any of the elements of JJHCS's tortious interference or GBL claims or justify their conduct. The elements of those claims look to ***SaveOnSP's*** actions. But even still, there is no reason to think that ***JJHCS*** has the documents necessary to establish this purported defense. If SaveOnSP seeks to show that ***health plans*** have experienced increased costs or have chosen to shift those increased costs onto patients, then SaveOnSP should request the documents showing that from the ***health plans*** who are themselves SaveOnSP's customers.[7]

---

[7] Despite JJHCS's objections, it has nevertheless has already produced to SaveOnSP several Janssen Transparency Reports which provide summary data about Janssen drug prices over the

Hon. Cathy L. Waldor
February 24, 2023
Page 18

*Fifth*, SaveOnSP claims it needs documents relating to "JJHCS's return on investment from CarePath and its profits from specialty drugs" is based on speculation that due to "SaveOnSP's activities, J&J has sold more specialty drugs and reaped more profits than it otherwise would have." SaveOnSP's theory makes little sense. CarePath already makes Janssen pharmaceuticals affordable by reducing patient expenses to $5 or $10 per prescription fill. Nor does SaveOnSP play any part in encouraging patients to take Janssen pharmaceuticals; doctors are the ones who prescribe Janssen products.[8] Despite this, JJHCS has already said it will produce CarePath enrollment data and documents from 2016 to 2022, such as "all copay assistance payments made to each patient." Such documents should be sufficient to show whether SaveOnSP has in fact caused more patients to take advantage of CarePath and fill more Janssen prescriptions. SaveOnSP, however, still seeks additional documents.

*Finally*, SaveOnSP contends its overbroad requests are necessary so it may refute the elements of injunctive relief, including "to show that JJHCS is not suffering any real injury, let alone an irreparable one, from SaveOnSP's activities and that an injunction would not serve the public interest." SaveOnSP's conclusory rationale should be rejected. JJHCS has already agreed to produce documents sufficient to show its injury and SaveOnSP is free to test that claim at deposition. It does not need every document relating to the pricing of any Johnson & Johnson drug to do so, let alone all documents going back to 2009 when the SaveOnSP program began in 2017. S*ee also Healthcare Servs. Grp., Inc. v. Fay*, 597 F. App'x 102, 104 (3d Cir. 2015) (noting that "future losses of clients and revenue" are quintessential irreparable injuries). While SaveOnSP is free to make arguments about why enjoining its behavior would be contrary to the public interest, it provides no authority for the proposition that this strategy entitles it to over a decade's worth of documents relating to every aspect of CarePath and all manner of Janssen drug development and pricing information.

## B.    Documents in the Possession of J&J Entities Other Than JJHCS

### *SaveOnSP's Position*

SaveOnSP's RFPs and Interrogatories seek information from JJHCS and JJHCS affiliates. This includes Janssen Pharmaceuticals, Inc. ("Janssen")—the wholly owned subsidiary of J&J that developed the specialty drugs at the center of this litigation—and other J&J entities involved in the development, marketing, or administration of CarePath or in the development or marketing of

---

past several years. Such documents, plus discovery from SaveOnSP's health plan partners, are sufficient for SaveOnSP to make the arguments it says that it seeks to make.

[8] SaveOnSP replies to this point that it wants discovery to show that it does, in fact, play a part in encouraging patients to take Janssen pharmaceuticals. SaveOnSP is free to rely upon its own documents to show how it has brought about such results; there is no reason to think that JJHCS would have documents relevant to this issue.

Hon. Cathy L. Waldor
February 24, 2023
Page 19

Janssen drugs. JJHCS has refused to produce any documents and communications from these entities or to even identify which other J&J entities were involved with CarePath or Janssen drugs. Ex. 7 (Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson) at 4.

JJHCS has no valid basis to object based on relevance. SaveOnSP seeks documents on topics that either the parties agree are relevant (*e.g.*, communications about SaveOnSP, communications with patients or plans, the meaning of the CarePath terms and conditions) or on topics that SaveOnSP has asked the Court to compel JJHCS to produce over a relevance objection (*e.g.*, documents concerning the development and marketing of CarePath; documents concerning the development and marketing of the Janssen Drugs). JJHCS cites no authority suggesting that relevant documents become irrelevant simply because they are held by a corporate affiliate or vendor.

JJHCS does not assert that these entities lack relevant documents. Nor could it, as it has refused to conduct a reasonable investigation to determine if other J&J entities have such information or what information they have. JJHCS also does not assert that documents held by other J&J entities are outside of its possession, custody, or control.

JJHCS objects based on burden but says only that J&J and Janssen are "big companies" with many subsidiaries and employees. Ex. 10 (Feb. 7, 2023 Letter from M. Nelson to A. LoMonaco) at 4-5. That comes nowhere close to quantifying burden. JJHCS asserts that SaveOnSP has "demand[ed] that it must peer into every J&J entity that has been involved, however incidentally or minimally, in the development or marketing of a Janssen Drug since 2009." In fact, SaveOnSP wants JJHCS to identify what those entities were, and the roles they played, so the parties can then negotiate reasonable parameters for JJHCS's search for relevant documents. JJHCS's assertion that SaveOnSP has not engaged with JJHCS's investigation is simply false—JJHCS has categorically refused to produce *any* documents from *any* J&J entities other than JJHCS.

This Court should compel JJHCS (1) in response to SaveOnSP's Interrogatories, to identify all J&J entities involved in the development, marketing, or administration of CarePath or the development and marketing of Janssen drugs as well as the names of relevant individuals at those entities and at Janssen; and (2) in response to SaveOnSP's RFPs, to produce relevant documents from all such J&J entities subject to parameters agreed to by the parties.

### *JJHCS's Position*

Johnson & Johnson has over 200 corporate subsidiaries, operating all over the world. It is one of the largest health care companies in the world, with more than 140,000 employees. SaveOnSP should not be allowed to conduct a fishing expedition into every J&J entity that has had any hand in the development or marketing of *any* J&J drug on the CarePath copay assistance program dating back to 2009. As explained above, documents related to the marketing, development, and pricing of every Janssen Drug are irrelevant to any claim or defense in this action. This case concerns only the CarePath copay assistance program. SaveOnSP's discovery should be limited to the only J&J entity charged with the administration of CarePath: JJHCS.

Hon. Cathy L. Waldor
February 24, 2023
Page 20

JJHCS is the sole relevant J&J entity involved in the development, marketing, or administration of CarePath. *See* Ex. 2 (Jan. 6, 2023 Letter from H. Sandick to M. Nelson) at 3; Ex. 7 (Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson) at 2-4; Ex. 11 (Feb. 14, 2023 Letter from A. LoMonaco to M. Nelson) at 3. In response to SaveOnSP's interrogatories, JJHCS identified dozens of individuals within JJHCS's Strategic Customer Group ("SCG") and Patient Engagement and Customer Solutions ("PECS") business units who have had responsibility for the marketing and administration of CarePath since 2017. JJHCS also produced over five years' worth of organizational charts for SCG and PECS which confirm that the individuals identified held roles relevant to CarePath's marketing and administration, across relevant business functions and therapeutic areas for the Janssen Drugs at issue, including Immunology, Infectious Diseases, Oncology, Pulmonary Hypertension, and Neuroscience. Many of the individuals identified have also been selected as custodians for purposes of document collection in this action. *See* Ex. 12 (Feb. 6, 2023 Letter from H. Sandick to A. Dunlap).

Rather than engage with JJHCS's good faith investigation and document collection methodology, SaveOnSP instead continues to demand that it must peer into every J&J entity that has been involved, however incidentally or minimally, in the development or marketing of a Janssen Drug since 2009. Not only would such discovery be irrelevant to this case, it would also be shockingly burdensome for JJHCS, given the number of entities and affiliates involved. For example, SaveOnSP blithely suggests that JJHCS need only add to its production documents from Janssen Pharmaceuticals, Inc. Yet Janssen Pharmaceuticals itself has thousands of employees, and numerous other Janssen entities (including Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development, LLC, Janssen Products, LP, and Actelion Pharmaceuticals U.S., Inc.) have had a role in developing or marketing the complex and life-altering drugs for which copay assistance is available through CarePath. SaveOnSP insists that some specific quantification of burden is necessary, yet the sheer breadth of its requests—every J&J entity and affiliate involved in the development of dozens of Janssen drugs—makes that burden to JJHCS self-evident.

Entities other than JJHCS have no direct bearing on this case, and JJHCS should not have to collect and produce discovery from them absent some specific showing of need. If, after SaveOnSP has reviewed JJHCS's document productions in this matter, it can point to documents supporting the notion that specific J&J entities beyond JJHCS have relevant information concerning the administration of CarePath copay assistance, then SaveOnSP can renew its requests. Until then, we ask the Court to reject SaveOnSP's motion to compel discovery from J&J entities outside of JJHCS wholesale.

### C.     Identities of JJHCS Hub Entities

#### *SaveOnSP's Position*

SaveOnSP's Interrogatories seek information from various JJHCS Hub Entities—vendors and other third parties—involved in the development, administration, or marketing of CarePath and the individuals at those entities involved in those subjects. As SaveOnSP has explained to JJHCS, that information is relevant because these entities are likely to possess documents related to, amongst other things, the pricing of Janssen drugs, the true purpose of CarePath, and J&J's

Hon. Cathy L. Waldor
February 24, 2023
Page 21

return on investment for CarePath. *See* Ex. 8 (Feb. 15, 2023 Letter from M. Nelson to A. LoMonaco) at 2; Ex. 10 (Feb. 7, 2023 Letter from M. Nelson to A. LoMonaco) at 5-7.

JJHCS has identified five such entities: TrialCard, Lash Group, EagleForce, IBM, and TJ Paul. Ex. 11 (Feb. 14, 2023 Letter from A. LoMonaco to M. Nelson) at 2-3. JJHCS has also indicated that JJHCS retained "[n]umerous other agencies … to design content for CarePath marketing, promotional, and educational materials," all of which was done with JJHCS's review, *id.* at 3, as well as "[o]ther vendors" to provide "limited, episodic services to JJHCS relating to CarePath," Ex. 7 (Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson) at 3. JJHCS has not, however, agreed to identify any of those entities or to provide an exhaustive list of potentially relevant Hub Entities.[9]

JJHCS does not assert that all Hub Entities other than those previously identified lack relevant documents, nor does it represent that JJHCS has conducted a reasonable investigation to determine the full scope of entities involved in the development, administration, or marketing of CarePath. While JJHCS states that TrialCard is the "*primary* third-party entity" that administered CarePath, it flatly refuses to identify any other entity involved in administering CarePath. And while it claims that a significant number of entities were engaged in the development and marketing of CarePath, JJHCS has thus far identified only one—TJ Paul. JJHCS has thus far refused to identify even the core vendors involved in the development or marketing of CarePath.

JJHCS asserts it would be burdensome to ask all employees who worked on any J&J copay assistance programs about vendors they employed. But SaveOnSP seeks the identities of Hub Entities that provided services only to CarePath, not other programs. And JJHCS does not explain how many employees it might have to speak with or how long doing so might take, nor does it explain what its investigation to date consisted of. JJHCS cannot deny SaveOnSP relevant information simply because JJHCS chose to hire multiple vendors to assist with CarePath.

This Court should compel JJHCS, in response to SaveOnSP's Interrogatories, to identify all Hub Entities involved in the development, marketing, or administration of CarePath as the names of relevant individuals at those entities.

### *JJHCS's Position*

SaveOnSP seeks broad-ranging discovery from any and all CarePath vendors and third-parties (which it refers to as the so-called "Hub Entities") that have had any role whatsoever in the development, administration, or marketing of CarePath for a time period of more than a decade. In response, JJHCS has explained that Trial Card is the primary third-party entity with a role in administering the CarePath program relevant to this litigation. JJHCS has employed Trial Card for this purpose since CarePath began in its current form in 2016, which is only one year before the SaveOnSP Program appears to have begun in earnest. JJHCS has already agreed to facilitate a document production from Trial Card. *See* Ex. 11 (Feb. 14, 2023 Letter from A. LoMonaco to

---

[9] JJHCS has agreed to facilitate the production of documents only from Trial Card.

Hon. Cathy L. Waldor
February 24, 2023
Page 22

M. Nelson) at 2-3. JJHCS has also identified a handful of other vendors that have performed other discrete tasks relating to CarePath.

SaveOnSP is unsatisfied with this and demands that JJHCS produce an exhaustive list of all entities—*and all individuals*—that have ever had a hand in any aspect of CarePath. SaveOnSP's motion to compel should be denied on both relevance and burden grounds. As discussed at length in Section III.A, *supra*, its request is not relevant. JJHCS has identified the entities that, based on its investigation to date, are involved in enrolling patients in the copay assistance program and assisting them with their cards. But SaveOnSP's attempt to shift attention beyond those entities to any vendor or even any individual who has provided any services of any kind to CarePath—whether printing a brochure or hiring actors for a commercial—should be rejected. Indeed, CarePath is about more than co-pay support. It offers many services that are not at issue in this litigation. *See, e.g.*, *Support to Help You While Taking STELARA®*, JANSSEN CAREPATH, https://www.janssencarepath.com/patient/stelara/treatment-support (last visited Feb. 24, 2023) (noting that CarePath offers, *inter alia*, nurse support to answer patient questions about Stelara). An itemized account of every vendor or individual who has ever done anything relating to CarePath has no conceivable relevance to the allegations in this case, which all relate to SaveOnSP's conduct.

As to burden, SaveOnSP asserts that JJHCS has not "articulated any burden in identifying such entities or facilitating the production of documents therefrom." This is disingenuous. The JJHCS teams that support CarePath are able to engage vendors as needed, and so to compile the "exhaustive list" SaveOnSP demands, JJHCS would have to engage in a time-consuming investigation, accounting for all employees who worked on any J&J copay support program, and questioning each of them about any entities they had engaged, and then identifying all the individuals from those entities who did any work. JJHCS has undertaken a reasonable investigation, and has identified several entities and their roles. *Id.* SaveOnSP's demand for more than this is unduly burdensome and its motion should be denied.

**D. Documents Relating to the Meaning of CarePath's Terms and Conditions (RFP Nos. 12 and 13)**

*SaveOnSP's Position*

SaveOnSP's RFP Nos. 12 and 13 seek documents and communications concerning the meaning of CarePath's terms and conditions. JJHCS agreed to produce final versions of CarePath's terms and conditions and documents concerning the "drafting" of CarePath's terms and conditions starting in 2017 but refuses to produce any other documents on this topic, claiming they are irrelevant. For the first time in this letter, JJHCS now says that it will produce documents related to the meaning of the term "other offer" from 2017 on, but no documents from before 2017 and no documents related to any other portions of the terms and conditions.

Documents related to the meaning of CarePath's terms and conditions are centrally relevant. In its tortious interference claim, JJHCS asserts CarePath's terms and conditions say that it is not compatible with any other "offer," that the so-called "SaveOnSP Program" is such an offer,

Hon. Cathy L. Waldor
February 24, 2023
Page 23

and that SaveOnSP induced patients to breach this provision by purportedly inducing them to sign up for the "SaveOnSP Program." Compl. ¶¶ 19-20, 106-11. Among other things, SaveOnSP intends to show that the patients did not breach those provisions because SaveOnSP's services are not an "offer" under the meaning of CarePath's terms and conditions. *See* SaveOnSP's Mem. of L. in Supp. of Mot. to Dismiss (ECF No. 31-1) at 27-28. In resolving the motion to dismiss, the Court did not hold that the contract was unambiguous in JJHCS's favor; it held that arguments about the meaning of the terms "are better suited for a motion for summary judgment." Op. Denying SaveOnSP's Mot. to Dismiss (ECF No. 68), at 16. SaveOnSP is entitled to extrinsic evidence of what the parties—here, JJHCS—believed the disputed provisions meant. *See, e.g., Am. Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir. 1995); *Armkel, LLC v. Pfizer Inc.*, No. Civ. A. 02-4206, 2005 WL 2416982, at *7 (D.N.J. Sept. 29, 2005) ("[U]nder New Jersey law, extrinsic evidence is admissible to aid in the interpretation of an integrated agreement even when the contract, on its face, is free from ambiguity." (citing *Atl. N. Airlines Inc. v. Schwimmer*, 12 N.J. 293, 301-02 (1953)). That evidence goes beyond the mere drafting history of the terms and conditions and includes any documents that shed light on JJHCS's understanding of the meaning of its own terms and conditions. JJHCS also cannot unilaterally limit its search to the history of specific terms—SaveOnSP is entitled to full discovery on all terms in the contracts that JJHCS claims it induced patients to breach.

JJHCS insists that SaveOnSP's Requests are overbroad because they go back to 2009. In fact, as explained below, Section III.F, SaveOnSP seeks documents going back to the earliest date on which JJHCS began drafting the terms and conditions. Ex. 10 (Feb. 7, 2023 Letter from M. Nelson to A. LoMonaco) at 6. JJHCS has refused to tell SaveOnSP when the relevant terms and conditions were first drafted.

The Court should compel JJHCS to produce documents and communications responsive to SaveOnSP's RFP Nos. 12 and 13.

### *JJHCS's Position*

SaveOnSP's RFP Nos. 12 and 13 seek from January 1, 2009, through the present, all documents and communications regarding CarePath's terms and conditions, including (1) "Documents and Communications regarding (a) JJHCS's allegations in Complaint ¶¶ 3, 8, 18-26, 102-103, 108; (b) all CarePath terms and conditions for each Janssen Drug; (c) JJHCS's decision to revise any of its CarePath terms and conditions for any Janssen Drug; and (d) JJHCS's understanding of the term "offer" or "health plan" as used in CarePath's terms and conditions, *see* SaveOnSP's RFP No. 12; and (2) "all Documents and Communications regarding CarePath's requirement that Patients enrolled in CarePath make any payments towards Janssen Drugs, including Documents and Communications regarding JJHCS's basis for setting the amounts of those payments and JJHCS's allegations in Complaint ¶¶ 48-49, 70, 89," *see* SaveOnSP's RFP No. 12.

While JJHCS agrees that SaveOnSP is entitled to relevant documents about the drafting of the CarePath terms and conditions, this request for documents going back to 2009—long before the establishment of CarePath in its current form and before SaveOnSP came into existence—

Hon. Cathy L. Waldor
February 24, 2023
Page 24

seeks irrelevant documents and is unduly burdensome. JJHCS has agreed to produce "internal documents and communications relating to the drafting of CarePath's terms and conditions during the relevant time period of January 1, 2017 to July 1, 2022, to the extent such non-privileged documents exist and can be identified after a reasonable search." JJHCS is also prepared to conduct a reasonable search for non-privileged documents and communications during the relevant time period of January 1, 2017 to July 1, 2022 bearing on the meaning of the "other offer" provision at issue in this case. *See* Compl. ¶¶ 18-19. However, JJHCS will not search for and produce documents and communications bearing on the meaning of **all** provisions of the CarePath terms and conditions, most of which are not in dispute. Indeed, in SaveOnSP's own motion to dismiss, the only term it took issue with was the "other offer" provision. *See* Mem. of Law, Dkt. No. 31-1, at 27. It has not explained now why other terms have a disputed meaning and are relevant to this lawsuit. As noted, the other documents sought are irrelevant and would impose significant burdens due to their timeframe. SaveOnSP should accept JJHCS's reasonable limitation on these requests.

We ask the Court to reject SaveOnSP's motion to compel discovery regarding the meaning of terms and conditions not otherwise at issue in this litigation, extending back over seven years before the inception of the CarePath program. *See infra* § III.F.

## E.  Documents Regarding J&J's Negotiations To Use SaveOnSP For Its Own Health Plan (RFP No. 34)

### *SaveOnSP's Position: JJHCS Cannot Withhold Documents Concerning J&J's Negotiations to Use SaveOnSP's Services*

SaveOnSP's RFP No. 34 seeks documents and communications regarding JJHCS's or Janssen's negotiations to potentially hire SaveOnSP for their own health plans. JJHCS refuses to produce any such documents, asserting they are irrelevant because "J&J never signed a contract with SaveOnSP" and "JJHCS itself was not involved in any such negotiations." Ex. 7 (Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson) at 12.

As it has explained to JJHCS, SaveOnSP understands that J&J or JJHCS conducted significant negotiations with ESI to use SaveOnSP's services for the health plan that JJHCS provides to its own employees. SaveOnSP understands that those negotiations ultimately ceased at the insistence of another division within J&J or JJHCS. JJHCS now concedes that J&J considered contracting with SaveOnSP. Documents and communications reflecting J&J's contemporaneous assessment of how SaveOnSP's services could benefit patients go to the credibility of JJHCS's current assertions that SaveOnSP harms patients—even if the parties never signed a contract. JJHCS could not credibly claim that SaveOnSP's services harm patients while holding back documents that show that its affiliates believed that SaveOnSP's services could benefit its employees.

The Court should compel JJHCS to produce documents and communications responsive to SaveOnSP's RFP No. 34.

### *JJHCS's Position*

Hon. Cathy L. Waldor
February 24, 2023
Page 25

J&J's brief consideration of whether to participate in the SaveOnSP Program is not relevant to any claims or defenses in this action. Representatives from Express Scripts, Inc. ("ESI"), which has long served as J&J's pharmacy benefits manager for its employee healthcare plans, presented the SaveOnSP Program to individuals on J&J's employee benefits team in mid-2017 and early 2018, as part of ESI's regularly scheduled conversations with J&J concerning the services it offers. SaveOnSP was not even present at those meetings. After reviewing the information ESI provided, J&J employee benefits staff rejected any notion of contracting with SaveOnSP. These facts are undisputed, as is the fact that JJHCS had no involvement in these negotiations.

As such, RFP No. 34 represents another attempt by SaveOnSP to fish for J&J documents from entities that have nothing to do with CarePath. These documents have no relevance to the claims that JJHCS has asserted against SaveOnSP relating to CarePath. We ask the Court therefore to deny SaveOnSP's motion to compel documents responsive to RFP No. 34 as irrelevant.

### F.      Time Period (RFP Nos. 1-7, 11-14, 28-30, 36-37, 41-42; Interrogatory Nos. 1-4)

#### *SaveOnSP's Position*

While most of SaveOnSP's RFPs seek documents beginning January 1, 2017, some go back earlier. JJHCS refuses to produce documents pre-dating January 1, 2016, asserting they are irrelevant.

*RFP Nos. 12-13.* SaveOnSP requested documents and communications concerning the drafting and revision of CarePath's terms and conditions back to January 1, 2009 (when SaveOnSP understands the earliest Janssen drug was launched) or the earliest date on which JJHCS began drafting those terms and conditions. JJHCS refused to produce such documents prior to January 1, 2016. The documents are relevant: JJHCS alleges that SaveOnSP induced patients to breach the terms and conditions, so SaveOnSP is entitled to discovery into the meaning of those terms and conditions, including their drafting history—however far back it might go. JJHCS does not explain how producing these documents would be unduly burdensome. The Court should compel JJHCS to produce them. JJHCS's proposed "compromise" is not sufficient, both because JJHCS will not commit to producing documents going back to the original drafting of the relevant contracts, and because the documents that JJHCS seeks in exchange (drafts of agreements of SaveOnSP's contracts with plans) are not relevant.

*RFP Nos. 14, 41, and 42.* SaveOnSP requested information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as their understanding of Copay Accumulator Services and Copay Maximizers Services, back to January 1, 2015. JJHCS refused to produce these documents between January 1, 2015 and January 1, 2017. The documents are relevant: The relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums, which allowed health benefit plans to adopt the benefits proposed by Copay Accumulator Services and Copay Maximizer Services, came into effect in 2015. *See, e.g.*, 45 C.F.R. §§ 156.122, 156.115. It is thus

Hon. Cathy L. Waldor
February 24, 2023
Page 26

highly likely that JJHCS had internal discussions regarding these topics between January 1, 2015 and January 1, 2017. JJHCS does not assert that producing these documents would be unduly burdensome. While JJHCS asserts that doing so would be "disproportionate," this ignores the reality that JJHCS has been in business longer than SaveOnSP and has documents going back to 2015. The Court should compel JJHCS to produce these documents.

*RFP Nos. 1-7, 11, 28-30, and 36-37.* SaveOnSP requested organizational charts for JJHCS, Janssen, and the JJHCS Hub Entities (RFP Nos. 1-7) and documents and communications relating to the development, marketing, administration, and financials of CarePath, and the development, marketing, sale, and financials of Janssen drugs (RFP Nos. 11, 28-30, 36-37) back to January 1, 2009 or the earliest dates on which JJHCS began developing CarePath or the specialty drugs at issue. Where it agrees to produce any of these documents, JJHCS refuses to do so prior to January 1, 2017, because (it declares) January 1, 2017 is the beginning of the relevant period. But the fact that SaveOnSP began operations in 2017 does not mean that all documents from before 2017 are automatically irrelevant. The documents sought here are relevant: They go to JJHCS's assertion that a threat to CarePath's viability constitutes a public harm and to JJHCS's alleged damages. JJHCS does not explain why producing these documents would be unduly burdensome. The Court should compel JJHCS to produce them.

*Interrogatory Nos. 1-4.* SaveOnSP requested the identities of individuals involved in aspects of CarePath's development and administration—including communicating with patients and health plans; marketing and communicating with the public about CarePath; drafting and revising CarePath's terms and conditions; or analyzing price, revenue, cost, or other financial data for Janssen drugs, as well as financial data for CarePath—back to January 1, 2009. JJHCS refused to produce this information prior to January 1, 2017. The information is relevant: SaveOnSP needs to know the individuals involved in the requested subject matters to fully explore JJHCS's allegations that CarePath is a public good and the extent of JJHCS's alleged damages. JJHCS objects on burden grounds, but it has not quantified the burden associated with responding to these Interrogatories. The Court should compel JJHCS to respond to them.

### *JJHCS's Position*

SaveOnSP requests several categories of documents from before January 1, 2017, including requests that reach as far back as ***eight years before the inception of the SaveOnSP program.*** *See* RFPs Nos. 1-7, 11-13, 28-30, 36-37 (seeking documents from January 1, 2009). JJHCS objects to this extended timeframe both because these documents are irrelevant to the claims and defenses at issue ***and*** because this extended timeframe serves no legitimate purpose and is aimed at imposing unjustified burden and expense on JJHCS. *See, e.g.* Ltr. from A. LoMonaco to M. Nelson dated Feb. 14, 2023, at 4. To restate the key facts: SaveOnSP did not even exist until 2017. Nor did CarePath exist in its current form until 2016. The allegations in the Complaint all concern events in or after 2017. This Court should block SaveOnSP's plan to increase the time frame of relevant discovery from 5 years to more than 13 years. The burden associated with this dramatically expanded timeframe is self-evident and does not require further particularization. Nor can it be justified on relevance grounds, as it only serves to develop evidence for a proposition that is

Hon. Cathy L. Waldor
February 24, 2023
Page 27

irrelevant to the elements of the claims as articulated by Judge Vazquez. However, where Save-OnSP has put forth a colorable rationale for requesting documents that pre-date the existence of the SaveOnSP program, JJHCS has endeavored in good faith to identify common ground by offering to produce documents dating back to 2016, which marks the beginning of the CarePath program in its current form.

*RFP Nos. 12 and 13.* These requests seek extrinsic evidence relating to the meaning of CarePath's terms and conditions. SaveOnSP claims that because JJHCS alleged that it induced patients to breach the terms and conditions of the CarePath agreement, SaveOnSP is "entitled to discovery into the meaning of those terms and conditions, including their drafting history." But any such discovery, even if permissible, must be proportionate.

By way of compromise, JJHCS has proposed that, if SaveOnSP will produce internal communications responsive to a corresponding demand relating to SaveOnSP's own agreements—JJHCS's RFP No. 17 ("Any agreements, including drafts, between Express Scripts on the one hand, and health insurance plan sponsors, on the other regarding the SaveOnSP Program, and any communications relating thereto") —then JJHCS will agree to produce internal communications relating to the drafting of CarePath's terms and conditions, or the meaning of the "other offer" term that is central to this lawsuit, dating back to January 1, 2016. This proposed compromise should provide SaveOnSP with a sufficient vantage to assess the drafting history and the meaning of key terms and conditions pre- and post- the existence of SaveOnSP. SaveOnSP fails to explain why this compromise offer is insufficient nor why it requires extrinsic evidence extending more than eight years before SaveOnSP came into existence to assess the meaning of the terms and conditions in place when it began to engage in the conduct at issue in this litigation.

*RFP Nos. 14, 41, and 42.* SaveOnSP seeks documents dating back to January 1, 2015 relating to JJHCS's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits (RFP No. 14), "Copay Accumulator Services and Copay Maximizer Services and their effect on JJHCS's return on investment for copay assistance dollars," (RFP No. 41), and JJHCS's understanding of the terms "copay accumulator" and "copay maximizer," (RFP No. 42). Again, what matters here is SaveOnSP's understanding of the requirements of the Affordable Care Act and its taking of steps designed to circumvent its requirements. JJHCS's impressions are beside the point. Regardless, JJHCS is prepared to produce these documents for the relevant time period in this lawsuit from January 1, 2017 to July 1, 2022—but it should not be required to go back further given the demands of proportionality.

*RFP Nos. 1-7, 11, 28-30, and 36-37.* All of these requests suffer from at least one common defect: they seek documents from 2009 to the present rather than from the time period that is relevant to this lawsuit. In response to these requests, JJHCS has agreed to produce some documents from the relevant time period of 2016 to the present. Yet SaveOnSP will not budge and continues to insist on the production of documents for seven years prior to this time period, and for no valid reason.

For example, Requests 1-7 seek organizational charts for a host of entities, many of which are not involved in the management or administration of CarePath. JJHCS agreed to produce non-

27

Hon. Cathy L. Waldor
February 24, 2023
Page 28

privileged documents dating back to January 1, 2016, "sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath." However, organizational charts for the past seven years are not enough for SaveOnSP—they want such documents for another seven years, which is for the seven years before the launch of the CarePath copay assistance program and for the eight years before SaveOnSP existed. SaveOnSP does not need these documents from so long ago to lay a defense on the issue of public harm. Those people only involved in CarePath before SaveOnSP existed will have nothing to say at all about SaveOnSP, or JJHCS's response to its efforts to sabotage CarePath.

For RFP Nos. 11, 28-30, 36, and 37, which relate to the development, marketing, administration, and financials of CarePath and Janssen drugs, SaveOnSP again claims that it is entitled to documents dating back to January 1, 2009, in order to evaluate JJHCS's allegation that a threat to CarePath's viability constitutes a public harm. This is again an extraordinarily wide range of documents and topics. Every document relating to the development, marketing or administrating of CarePath obviously has no bearing on the claims at issue in this case—let alone every document relating to Janssen drugs generally. While these documents are generally irrelevant to the claims and defenses in this case, by way of compromise, JJHCS agreed to produce the following categories of documents dating back to January 1, 2016:

- In response to RFP No. 28, JJHCS agreed to produce Janssen Transparency Reports and also agreed to consider producing documents responsive to items (i) through (m), which relate to CarePath enrollment data.

- In response to RFP No. 29, JJHCS agreed to produce documents sufficient to show (1) how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath.

SaveOnSP rejected this proposal, but fails to explain why it needs documents that date back seven years before the launch of CarePath and fourteen years before the present date in order to analyze SaveOnSP's impact on the CarePath program.

*Interrogatory Nos. 1-4.* These interrogatories seek the identities of individuals involved in aspects of CarePath's development and administration. Here too, SaveOnSP seeks information dating back to January 1, 2009. For the reasons noted earlier, this date range is vastly overbroad and has no meaningful relation to the facts or events at issue in this litigation. SaveOnSP nevertheless persists in making this unduly burdensome request without providing any legitimate rationale for its need to review documents extending back seven years before the CarePath program began in its current form, and eight years before SaveOnSP began to engage in the conduct at issue in this litigation.

* * *

The parties appreciate the Court's attention to this matter.

28

Hon. Cathy L. Waldor
February 24, 2023
Page 29

Respectfully submitted,

/s/ E. Evans Wohlforth, Jr.
E. Evans Wohlforth, Jr.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
ewohlforth@gibbonslaw.com

David Elsberg (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
Attorneys for Defendant Save On SP, LLC


/s/ Jeffrey J. Greenbaum
Jeffrey J. Greenbaum
Katherine M. Lieb
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000


*Attorneys for Plaintiff Johnson & Johnson Health Care
Systems Inc.*

# Exhibit 7

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000



Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

December 21, 2022

**Via E-mail**

Harry Sandick
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
hsandick@pbwt.com

Re:   ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
      LLC* (Case No. 2:22-cv-02632-JMV-CLW)**

Dear Harry,

We write in response to your December 9, 2022 letter ("December 9 Letter")
regarding our meet and confer on Save On SP LLC's ("SaveOnSP") Responses and
Objections to Johnson & Johnson Health Care Systems, Inc.'s ("JJHCS") First and
Second Requests for Production. We also write regarding JJHCS's Responses and
Objections to SaveOnSP's First Request for Production of Documents.

## I.   Issues Relating to JJHCS's Requests for Production

### A.   General Issues

#### 1.   Anonymization of Patient Identities

SaveOnSP generally proposes to anonymize references to patient identities
in documents it produces. JJHCS objects to this proposal.

JJHCS has not adequately explained why it needs the requested patient
identities to analyze data produced by SaveOnSP. You state that JJHCS is "entitled
to track individual patients' experiences with SaveOnSP through the relevant data
as part of its analyses in this action"—but you do not explain what it is that JJHCS
wishes to track or what analyses it intends to perform that require patient identi-
ties. You state that JJHCS is "entitled to prove its damages by comparing the
amount of CarePath funds used by patients in the SaveOnSP Program with the
amount of CarePath funds used by patients not in the SaveOnSP Program"—but

Harry Sandick
December 21, 2022

SaveOnSP has agreed to provide these amounts and you do not explain why patient
identities are relevant to that comparison. You state that JJHCS is "further entitled
to see how patient co-pays increased or changed after a patient joined the Save-
OnSP Program and to present to the jury relevant data at whatever level of speci-
ficity it deems appropriate"—but, again, SaveOnSP has agreed to provide the data
you seek and you do not explain why patient identities are required for those anal-
yses. We are glad to reconsider JJHCS's request if it can explain why patient iden-
tities are relevant to these analyses.

JJHCS has not explained why it needs patient identities at this point in the
litigation to explore potential "patient harm." As we stated during our meet and
confer, SaveOnSP is willing to consider requests to disclose the identities of spe-
cific patients based on particularized showings by JJHCS. If, for example, docu-
ments produced by SaveOnSP show interactions with a specific patient that JJHCS
believes are relevant to its allegations of harm, SaveOnSP would consider produc-
ing the identity of that patient. JJHCS has not explained why it would not agree to
such an approach.

JJHCS does not acknowledge the full potential harm posed by its request.
As we stated during our meet and confer, the identities of patients enrolled in Save-
OnSP are highly sensitive and confidential business information, as well as highly
confidential information under HIPAA. Protecting patient information is at the
core of SaveOnSP's business; any inadvertent disclosure poses a risk of severe rep-
utational and business harm to SaveOnSP. As you acknowledge, the protective or-
der in this case cannot protect against inadvertent disclosure.

Most importantly, the protective order would not prevent JJHCS from sub-
poenaing or contacting patients enrolled in SaveOnSP-advised plans for litigation
purposes. In fact, you state that JJHCS intends to "pursue further discovery re-
garding particular experiences with SaveOnSP" from patients. The prospect of
JJHCS subpoenaing or otherwise contacting these patients—and there are tens of
thousands of them—poses a real risk to SaveOnSP. Receiving subpoenas or other
litigation-related communications regarding their specialty medications and their
dealings with SaveOnSP could greatly upset these patients, potentially leading
them to opt out of benefits offered by their health plans or creating pressure for
their health plans to discontinue their business dealings with SaveOnSP. Such a
result poses a risk of serious injury to SaveOnSP. *See, e.g.*, *Winona PVD Coatings,
LLC v. Excel Enters., LLC*, No. 3:16-CV-19-WCL-CAN, 2016 WL 9347091, at *3
(N.D. Ind. Apr. 18, 2016) (deferring subpoenas until after party discovery because
such subpoenas posed a risk to plaintiff's business relationships with its customers
and suppliers); *Accusoft Corp. v. Quest Diagnostics, Inc.*, No. CIV.A. 12-40007-
FDS, 2012 WL 1358662, at *1, 10-11 (D. Mass. Apr. 18, 2012) (quashing third-party
subpoenas directed at defendants' customers because the subpoenas would cause
harm to defendants' customer relationships).

We invite you to fully discuss these issues. Among other things, we would
like to know if JJHCS really needs the identities of all patients, or whether (for

2

Harry Sandick
December 21, 2022

example) it might limit its Requests to a subset. We would also like to discuss if JJHCS would be willing to discuss safeguards on its intended outreach to patients, including (for example) a limit on the number of patients it might contact or a period of notice before contacting patients sufficient for SaveOnSP to lodge objections with the Court.

## 2.    Anonymization of Health Plan Identities

SaveOnSP generally proposes to anonymize references to health plan identities in documents it produces. JJHCS takes issue with this proposal.

JJHCS has not explained why it requires the identities of SaveOnSP's clients to pursue its claims. You state that SaveOnSP has asserted in Court filings that "health plans are one of the key actors in the scheme to extract funds from Care-Path"—but SaveOnSP will produce documents showing its contracts and communications with health plans. And, as we told you, SaveOnSP will consider producing the names of specific health plans if JJHCS can make a particularized showing based on documents that SaveOnSP produces.

JJHCS does not acknowledge the harm that its request poses to SaveOnSP. You assert that "many health plans publicly advertise the fact that they participate in the SaveOnSP Program." As we told you, SaveOnSP will produce and will not anonymize the names of any health plans that it can verify have publicly disclosed that they are SaveOnSP clients. That some plans have publicly disclosed that they are clients, however, does not mean that SaveOnSP would not be injured by the disclosures of the names of those who have not.

As we have explained to you, SaveOnSP's client lists are highly confidential business information. You assert that JJHCS is not SaveOnSP's "competitor." This is disingenuous: JJHCS is engaged in a concerted effort to put SaveOnSP out of business. You acknowledge that JJHCS may "potentially pursue further discovery from those plans" who are SaveOnSP's clients, which the protective order would not prevent. If JJHCS were to subpoena or otherwise contact SaveOnSP's clients—and there are thousands of them—it could pressure many of those clients to discontinue their business dealings with SaveOnSP, severely damaging SaveOnSP. You have also not explained why JJHCS could not begin its third-party discovery with plans that have opted to publicly disclose that they are SaveOnSP clients.

We again invite you to fully discuss these issues. Among other things, as we said during our meet and confer, we are willing to discuss if SaveOnSP could satisfy JJHCS's Requests by producing a limited number of client names, for example after JJHCS has reviewed SaveOnSP's anonymized productions and determined which client identities it believes are relevant. We are also interested in discussing appropriate limits on JJHCS's subpoenas to and communications with SaveOnSP's clients.

3

Harry Sandick
December 21, 2022

### 3.    Internal Communications and Documents

JJHCS takes issue with SaveOnSP's position that it will not produce internal communications in response to certain of JJHCS's RFPs. Although this issue affects 14 separate RFPs, and although we explained to you during our meet and confer that our relevance objections differ based on the specific nature of the information sought by each RFP, you address these RFPs together. You state that such internal communications may be relevant to JJHCS's tortious interference claim because they may give insight into "SaveOnSP's intent" and how it induced breach. Dec. 9 Letter at 3-4. You also state that such communications may be relevant to JJHCS's GBL claim because they may show "SaveOnSP's intent and the resulting patient harm." *Id.* at 4. We again address each category below.

#### a.    Internal communications regarding patient communications and marketing (RFP Nos. 5, 7, 8, 16, 35)

SaveOnSP agreed to produce external facing communications and marketing materials responsive to RFP Nos. 5, 7, 8, 16, and 35, which generally seek all documents, including internal drafts and communications, related to communications with patients who are enrolled in or eligible to be enrolled in CarePath and all SaveOnSP marketing materials. JJHCS now claims that this is insufficient and demands that SaveOnSP produce all documents responsive to these Requests.

As we explained, JJHCS's claims are based on specific allegedly deceptive statements and omissions that it claims SaveOnSP makes to all patients and Save-OnSP's alleged inducement of CarePath patients to breach their contracts. You have not explained how every communication with patients or marketing document—much less every internal communication or document about those communications or marketing documents—is relevant. For instance, you have not explained why JJHCS requires drafts of marketing materials that simply describe SaveOnSP's services and contain none of the allegedly misleading statements or omissions that JJHCS describes in its Complaint.

SaveOnSP is willing to consider producing some sets of internal documents responsive to these RFPs. For instance, you stated during our meet and confer that JJHCS wants to see internal discussions that SaveOnSP had about communications where a patient is told that her drug is not covered. We are willing to search for and produce such documents, should we identify any. We invite you to identify other specific categories of internal documents that JJHCS believes are relevant to its claims so that SaveOnSP can consider JJHCS's relevance arguments and respond accordingly.

#### b.    Drafts and negotiation documents for contracts with plans (RFP No. 17)

JJHCS has not explained why drafts and negotiation history communications for SaveOnSP's contracts with health plans are relevant. We discussed

4

Harry Sandick
December 21, 2022

JJHCS's RFP No. 17 during our meet and confer and you said nothing about this issue. JJHCS's December 9 Letter offers no further explanation. We invite you to explain your position as to these documents.

### c.    Internal formulation of the advice SaveOnSP provides to health plans (RFP Nos. 18, 19, 20, 21, 22, 31, 44)

In its responses to JJHCS's RFP Nos. 18, 19, 20, 21, 22, 31, and 44, Save-OnSP stated that it was willing to produce documents that reflect the advice Save-OnSP provides to health plans. SaveOnSP does not believe that the advice that it provides to health plans is relevant to either of JJHCS's claims, which center on SaveOnSP's communications with patients after health plans have already decided to adopt the advice that SaveOnSP provides. Despite this, we agreed to provide you with documents reflecting SaveOnSP's advice to health plans.

Your December 9 Letter states that documents responsive to RFP Nos. 18-22 are relevant because they relate to "various aspects of SaveOnSP's compliance with the Affordable Care Act." But you have not explained how SaveOnSP's compliance with the Affordable Care Act relates to your GBL or tortious interference claims. And you refuse to produce documents in response to SaveOnSP's Requests seeking information on JJHCS's understanding of whether SaveOnSP advice to plans complies with the Affordable Care Act. JJHCS's R&Os to SaveOnSP's RFP Nos. 14, 21; *see also infra* at 13-14. Please explain why the information JJHCS seeks from SaveOnSP on these topics is relevant to its claims, and why the parallel information SaveOnSP seeks from JJHCS is not.

### d.    RFP No. 45

JJHCS's RFP No. 45 seeks "[a]ll documents and communications relating to studies, reports, publications, analyses, research, white papers, reviews, or other written work product that SaveOnSP has created, commissioned, paid for, sponsored, or otherwise procured or supported regarding (i) specialty medication costs, (ii) copayment and coinsurance rates, (iii) accumulator programs, (iv) maximizer programs, or (v) strategies to manage specialty medication costs."

As we said during our meet and confer, this Request could capture nearly every written document concerning SaveOnSP. We invited you to provide us with more information on the specific documents JJHCS is seeking, but you have not. SaveOnSP will agree to produce all studies, reports, publications, formal research summaries, and white papers responsive to this Request, regardless of whether they were publicly disseminated. If you seek additional documents, we invite you to tell us what they are and why they are relevant.

### 4.    Limited Scope of Drugs at Issue

In response to JJHCS's RFP Nos. 8, 12, 17, 19, 20, 21, 22, 28, 30, 32, 33, and 34, SaveOnSP agreed to produce responsive documents "regarding Janssen

5

Harry Sandick
December 21, 2022

Drugs." During our meet and confer, we stated that we intended to produce documents that apply to multiple drugs, including Janssen Drugs, and that SaveOnSP did not intend to limit its production to documents which reference JJHCS or Janssen Drugs on their face.

During our meet and confer, you stated that, given JJHCS's GBL claim, you believed there may be a case for the relevance of all documents responsive to these Requests but did not offer any further explanation. In your December 9 Letter, you now declare that your "GBL claim concerns all of SaveOnSP's conduct," that all "documents and communication concerning non-Janssen Drugs are relevant to the claims at issue in this action," and, accordingly, that the parties are at impasse. Dec. 9 Letter at 5.

JJHCS has not explained why our agreement to produce documents that relate to Janssen Drugs or SaveOnSP's practices generally, while withholding documents that relate *exclusively* to other manufacturers' drugs, will not provide you with the information JJHCS needs, or why documents relating exclusively to other manufacturers' drugs are relevant. We invite you to provide us with this response, so that SaveOnSP can consider your arguments and the parties can avoid burdening the Court with unnecessary disputes.

## 5.    Limiting Responses to SaveOnSP's "Services"

In response to JJHCS's RFP Nos. 5, 6, 7, 10, 11, 12, 14, 15, 25, 33, and 45, SaveOnSP stated that it would limit its production to responsive documents and communications "regarding SaveOnSP's services at issue in this action." As we stated during our meet and confer, this qualification is necessary due to the breadth of JJHCS Requests. JJHCS's Requests, for instance, seek all documents and communications between categories of people and entities without any stated limitations that would restrict discovery to the subject matter of this action. *See, e.g.*, RFP No. 5 (seeking all communications between SaveOnSP and persons enrolled or eligible to enroll in CarePath). This could include, for example, communications between a SaveOnSP employee and an individual taking a Janssen therapy that are personal in nature and have no relevance to this action.

SaveOnSP uses the term "SaveOnSP's services" to encompass SaveOnSP's core business operations. This term would include any of SaveOnSP's activities that are patient-facing (including, for example, patient outreach and monitoring). As we stated during our meet and confer, we are not currently aware of documents responsive to these Requests which SaveOnSP intends to withhold based on this limitation. We reserve the right to revisit this approach as we determine the extent to which documents and communications exist which are captured by JJHCS's Requests but have no relevance to this action.

6

Harry Sandick
December 21, 2022

### 6.    Limiting Responses to Documents "Sufficient to Show"

In response to JJHCS's RFP Nos. 3, 5, 7, 10, 11, 12, 17, 25, 31, 33, 41, 42, 48, 49, and 51, SaveOnSP indicated that it would limit its production to "documents sufficient to show" the information sought by JJHCS. This qualification was again necessary considering the breadth of JJHCS's Requests, many of which seek "all" documents without limitation.

During our meet and confer, you asked why we included this limitation for certain Requests. For RFP No. 13, for instance, we explained that we do not intend to withhold responsive contracts, agreements, and memoranda concerning the relationship between Accredo and SaveOnSP or informal documents that provide unique information about the relationship between Accredo and SaveOnSP, but that your Request as written could encompass nearly every communication between Accredo and SaveOnSP. We remain willing to negotiate a search protocol to identify documents responsive to these Requests and to revisit any concerns you may have regarding specific Requests.

### B.    Issues Related to Specific Requests for Production

#### 1.    RFP No. 2

JJHCS's RFP No. 2 seeks "documents sufficient to identify the names and citizenship of all SaveOnSP LLC members." SaveOnSP has objected to this Request on the ground that such documents are irrelevant to the claims and defenses in this action. During our meet and confer and in your December 9 Letter, you raised three points as to why the documents sought by this Request are relevant: (1) that this information is necessary for JJHCS to understand who owns and controls SaveOnSP for purposes of liability; (2) that this information is necessary for JJHCS to understand decision-making processes at SaveOnSP; and (3) that this information is necessary to establish subject matter jurisdiction. We address each of these points in turn.

First, you have not explained how this information is necessary for "purposes of liability." SaveOnSP is the only defendant in this case and the only party that faces liability. There are no allegations in JJHCS's complaint that suggest liability on the part of SaveOnSP's members. If you intend to pursue this argument, we ask that you clarify for us what you mean by this statement.

Second, you have not explained why this information is relevant to understanding SaveOnSP's decision-making process. We are producing information showing who the decision-makers within SaveOnSP are. If you intend to pursue this argument, we again ask that you provide us with more detail on why you believe you are entitled to this information.

Finally, you have not explained why this information is necessary to establish diversity jurisdiction. SaveOnSP is not contesting diversity jurisdiction. We

7

Harry Sandick
December 21, 2022

would be glad to stipulate that none of the members of SaveOnSP reside in New Jersey. If you intend to pursue this argument, please provide us with authority for the position that a party is entitled to jurisdictional discovery when the opposing party does not contest jurisdiction. *Cf. Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 102 (3d Cir. 2015) (plaintiff is entitled to limited discovery to support assertion of diversity jurisdiction if defendant disputes the factual basis for that assertion).

### 2.    RFP No. 6

Your December 9 Letter misstates our position as to RFP No. 6. You characterize our position as follows: "You indicated that there was no present intention to carve out any particular documents and that this objection was made in order to avoid the potential burden to SaveOnSP should the volume of such communications be greater than expected." Dec. 9 Letter at 6. Not so. We explained that RFP No. 6 seeks "all communications" between JJHCS and SaveOnSP without limitation to the subject matter of this litigation and thus may capture communications irrelevant to this action. We stated that our proposed limitation to produce communications between JJHCS and SaveOnSP concerning CarePath, SaveOnSP's services, or Janssen Drugs would capture all relevant communications.

In your December 9 Letter, you assert without explanation that "SaveOnSP [should] produce all communications, regardless of subject matter, with JJHCS" and claim that the parties are at impasse on this issue. Dec. 9 Letter at 6. This is in stark contrast to your position during our meet and confer, where you suggested that the parties could likely resolve this issue using search terms. Please explain why you now believe that SaveOnSP's proposed limitation is inadequate.

### 3.    RFP No. 12

JJHCS's RFP No. 12 seeks "[a]ll documents concerning fees paid to or collected by SaveOnSP." In its Responses and Objections, SaveOnSP agreed to produce "documents sufficient to show all fees paid to or collected by SaveOnSP that relate to the services it provides to plans regarding Janssen Drugs."

JJHCS asserts that it requires all documents concerning fees paid to or collected by SaveOnSP. During our meet and confer, you indicated this Request includes documents relating to fee negotiations and SaveOnSP's fee structures. You stated that JJHCS believes SaveOnSP's fee structures are relevant to its allegation that SaveOnSP causes CarePath to pay more money in copay assistance. You have not explained why this is so. JJHCS's purported damages are based on the amounts it pays out in copay assistance; you do not explain how SaveOnSP's fees impact the amount that JJHCS pays. In any event, we propose to produce documents showing the actual fees that SaveOnSP receives, which will also contain information about SaveOnSP's fee structure. Further, even if it were accurate that JJHCS is entitled to documents regarding SaveOnSP's fee structure, JJHCS has not explained why it

8

Harry Sandick
December 21, 2022

needs *all* documents related to SaveOnSP's fees. We invite you to explain why you need additional information beyond what SaveOnSP has agreed to provide.

### 4.     RFP No. 15

In its RFP No. 15, JJHCS seeks "[a]ll recordings or transcripts of presentations or interviews concerning the SaveOnSP Program." SaveOnSP agreed to produce "recordings or transcripts of presentations regarding the services that it provides to health plans identified during a reasonable search," anonymizing references to the identities of plan participants or health plans. During our meet and confer, you asked if SaveOnSP intentionally excluded "interviews" from its response. We stated that we did not. We confirm that we do not intend to withhold responsive recordings or transcripts of interviews, though we maintain our other objections and our position on the necessity of anonymization.

### 5.     RFP No. 24

In its RFP No. 24, JJHCS seeks "[a]ll documents concerning SaveOnSP's offer of $0 co-payments to patients, including any communications relating to whether to cease offering $0 co-payments for one or more pharmaceuticals." SaveOnSP objected to RFP No. 24 because SaveOnSP does not offer $0 copays to patients and the Request thus misstates SaveOnSP's business. During our meet and confer, you asked us if we intended to withhold any categories of documents based on this objection. We stated that our objection relates to JJHCS's characterization of SaveOnSP's business, but that SaveOnSP intends to produce responsive documents and communications relating to SaveOnSP's actual business activities. We confirm that your December 9 Letter reflects our understanding.

### 6.     RFP No. 29

JJHCS's RFP No. 29 seeks "all documents and communications indicating the total amount SaveOnSP has collected from patients who had already satisfied their out-of-pocket maximum prior to enrolling in SaveOnSP." SaveOnSP objected to this Request on the ground that it does not describe the documents requested with reasonable particularity.

In your December 9 Letter, you now ask if SaveOnSP will produce "[a]ll documents and communications indicating the total amount of CarePath funds collected from patients enrolled in the SaveOnSP Program who had already met their out-of-pocket maximum under the Affordable Care Act prior to enrolling in Save-OnSP." There is no SaveOnSP Program as you use that term in your Requests, and SaveOnSP does not "collect" funds "from patients." We interpret your restated Request as seeking documents and communications indicating the total amount of CarePath funds expended on patients enrolled in plans advised by SaveOnSP who had already met their out-of-pocket maximum under the Affordable Care Act prior to their plans partnering with SaveOnSP. We are investigating whether SaveOnSP has any information responsive to this restated Request.

9

### 7.    RFP No. 30

In its RFP No. 30, JJHCS seeks "[a]ll documents reflecting communications with pharmacies regarding the "[p]oint of sale claim rejection" to "facilitate warm transfer of members to SaveOnSP." In its Responses and Objections, SaveOnSP objected to the phrase "[p]oint of sale claim rejection," as it does not accurately describe pharmacies' communications with patients. As SaveOnSP set out in its motion to dismiss briefing and as we stated at our meet and confer, SaveOnSP disputes that a "point-of-sale claim rejection" occurs. SaveOnSP nevertheless intends to produce documents in response to this Request, including those related to administrative alerts which occur as part of the warm transfer process.

### 8.    RFP No. 36

In SaveOnSP's Response to JJHCS's RFP No. 36, SaveOnSP stated that it is not aware of any Summary Plan Descriptions, Summary of Benefits and Coverage documents, or annual open enrollment materials reflecting the advice that SaveOnSP provides to health plans that are within its possession, custody, or control, but that should SaveOnSP become aware of any such documents in its possession, custody, or control, it will produce them subject to its other objections. During our meet and confer, we reiterated that, to the best of our knowledge, SaveOnSP does not create or retain Summary Plan Descriptions, Summary of Benefits and Coverage documents, or annual open enrollment materials in its ordinary course of business, but that SaveOnSP does not intend to withhold any such documents it identifies during its search.

### 9.    RFP Nos. 41 and 42

JJHCS's RFP Nos. 41 and 42 seek extensive data regarding manufacturer copay assistance provided to participants of plans advised by SaveOnSP and transaction data for specialty drug fills by those participants. During our meet and confer, you stated that the data sought by RFP Nos. 41 and 42 was necessary for JJHCS's damages calculation. When we asked you why the specific data sought—including information such as the pharmacy name and address—was relevant to damages, you told us that this information was necessary for you to "match" the data with patients in CarePath's system. That is, JJHCS intends to use this data to identify specific patients. As discussed above, JJHCS has not adequately explained why it needs those identities to prove its claims, and SaveOnSP intends to anonymize those identities in the documents that it produces.

Your December 9 Letter now claims that SaveOnSP's objection that many of the categories of data sought are not relevant to this action is somehow "inappropriate." Dec. 9 Letter at 10. In fact, JJHCS may request only documents that are relevant to its claims or to SaveOnSP's defenses. We invite you to explain why the data that JJHCS seeks is relevant.

Harry Sandick
December 21, 2022

### 10.    RFP No. 43

JJHCS's RFP No. 43 seeks "All documents and communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs." As we explained during our meet and confer, none of JJHCS's claims are based on allegations that SaveOnSP violates such statutes or regulations. As with RFP Nos. 18-22, you have not explained how SaveOnSP's compliance with such statutes or regulations relates to your GBL or tortious interference claims.

### 11.    RFP No. 52

JJHCS's RFP No. 52 seeks documents "sufficient to show SaveOnSP's liquidity, debt, profits, losses, revenues, costs, EBITDA, and assets throughout the Time Period, including financial statements or financial analyses."

During our meet and confer and in your December 9 Letter, you stated that SaveOnSP's financial position is relevant to damages. We explained that the financial position of SaveOnSP goes solely to JJHCS's potential ability to collect a judgment and is irrelevant at this stage of the litigation. *See Parallel Iron LLC v. NetApp, Inc.*, 84 F. Supp. 3d 352, 362 (D. Del. 2015) (finding that discovery into plaintiff's assets before judgment has been entered is premature). We invited you to explain to us why this information is relevant to JJHCS's damages. You have not done so. We again invite you to explain why the information JJHCS seeks is relevant to its damages calculations so that we can consider JJHCS's position.

### C.    Search Parameters

In your December 9 Letter, you ask that SaveOnSP disclose its intended custodians, search terms, and any targeted collection methodologies. We invite you to meet and confer regarding what collection and production parameters the parties might agree to exchange and when.

## II.    Issues Relating to SaveOnSP's Requests for Production

SaveOnSP has identified several issues with JJHCS's responses and objections to SaveOnSP's First Request for Production of Documents.

### A.    General Issues

### 1.    Definition of Janssen Drugs

In its Requests for Production, SaveOnSP defines the term "Janssen Drugs" as "any Specialty Drug manufactured or sold by Janssen from any time for which patients may receive copay assistance, including BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA, as well as any other specialty drugs that JJHCS asserts are at issue in this Action."

11

Harry Sandick
December 21, 2022

JJHCS objects to SaveOnSP's definition "to the extent it purports to include drugs that are not covered by CarePath." Please tell us if JJHCS believes that any of the drugs included in this definition are not covered by CarePath.

### 2.     Time Period

In response to SaveOnSP's Requests, JJHCS has refused to search for or produce any documents from before January 1, 2017. JJHCS's blanket limitation on the period for its responses to SaveOnSP's Requests is inappropriate. SaveOnSP is entitled to information about the budgeting and development of CarePath from its inception, as well as the budgeting and development of any predecessor copay assistance program, so that it can investigate JJHCS's assertions that SaveOnSP's services make CarePath financially unviable and that CarePath was designed solely to help patients, not to financially benefit JJHCS. SaveOnSP cannot test those assertions without information about CarePath's budget and cost over time from both before and after SaveOnSP's services began. SaveOnSP is also entitled to documents predating 2017 concerning the CarePath terms and conditions and any changes thereto to fully assess the meaning and materiality of the terms and conditions at issue in this case, as decisions about many of these terms likely predate 2017. Please confirm that JJHCS will produce documents predating 2017.

### 3.     Limitation to Documents in Possession of JJHCS

JJHCS has limited the documents it will produce in response to SaveOnSP's Requests to documents within the possession, custody, and control of JJHCS. Please confirm that documents created or held by employees of other entities within the J&J corporate family or involved in the administration of CarePath, including Janssen, CarePath Care Coordinators, JJHCS Hub Entities, Lash Group, and TrialCard, are within JJHCS's possession, custody, and control.

### B.     Issues Related to Specific Requests for Production

### 1.     RFP Nos. 1-7, 35

SaveOnSP's RFP Nos. 1-7 and 35 seek organizational charts for JJHCS, Janssen, and each JJHCS Hub Entity, sub-groups within those entities, and certain J&J groups responsible for aspects of the sale and marketing of Janssen Drugs, as well as the identities of all JJHCS Hub Entities and CarePath Coordinators. JJHCS refuses to produce any documents except for those relating to "JJHCS groups responsible for the administration of CarePath," asserting those additional documents are irrelevant.

JJHCS's response is inadequate. SaveOnSP is entitled to documents beyond those relating to CarePath's administration. Among other things: SaveOnSP needs documents relating to CarePath's development, so that it can test JJHCS's assertion that CarePath was developed solely to benefit patients and not to benefit JJHCS financially. SaveOnSP needs documents relating to CarePath's finances, so that it can test JJHCS's assertion that SaveOnSP's conduct financially harms

Harry Sandick
December 21, 2022

CarePath and threatens its financial viability. SaveOnSP needs documents relating to the marketing of CarePath, so it can explore whether JJHCS's marketing caused any of the purported patient confusion that JJHCS attributes to SaveOnSP. SaveOnSP needs documents relating to the sale, pricing, and marketing of Janssen Drugs so that it can evaluate the relationship between CarePath and JJHCS's financial performance, including how JJHCS sets prices for Janssen Drugs (thus increasing costs for health plans and patients). SaveOnSP also needs documents relating to the drafting of JJHCS's terms and conditions, which JJHCS alleges that SaveOnSP induced patients into breaching. Please confirm that JJHCS will produce documents in Response to RFP Nos. 1-7 and 35.

### 2.    RFP No. 11

SaveOnSP's RFP No. 11 seeks Documents and Communications regarding "the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." Among other objections, JJHCS asserts that the phrase "any other copay assistance program offered for Janssen Drugs" is vague and ambiguous and that the documents requested are irrelevant.

The phrase "any other copay assistance program offered for Janssen Drugs" means any program that provides or provided patients with copay assistance for a Janssen Drug that does not operate under the name "CarePath." SaveOnSP maintains that documents and communications pertaining to the development, marketing, and management of those programs, as well as of CarePath itself, are relevant to refuting: JJHCS's assertion that SaveOnSP's services increase the cost and threaten the continued viability of "patient assistance programs like CarePath by making them prohibitively expensive," Compl. ¶ 114; JJHCS's assertion that any increase in the cost of copay assistance programs amounts to a public harm; and JJHCS's assertion that SaveOnSP induces patients to breach CarePath's terms and conditions and deceives patients by failing to inform them of that alleged breach.

SaveOnSP invites JJHCS to discuss what documents JJHCS will produce in response to this Request.

### 3.    RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek documents and communications regarding, respectively, CarePath's term and conditions and the CarePath requirement that patients enrolled in CarePath make payments toward Janssen Drugs. JJHCS has agreed to produce only final versions of CarePath's terms and conditions, asserting that all other requested documents are irrelevant. In fact, JJHCS's understanding of the terms and conditions in its CarePath contracts and the drafting of those terms and conditions is relevant to whether SaveOnSP induced patients to breach them, a central point for JJHCS's tortious interference claims. Compl. ¶ 109. Please confirm that JJHCS will produce documents responsive to RFP Nos. 12 and 13.

13

Harry Sandick
December 21, 2022

### 4. RFP No. 14

SaveOnSP's RFP No. 14 seeks information regarding JJHCS's and its related entities' understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act. JJHCS refuses to produce any documents in response, asserting that the requested materials are irrelevant. In fact, the requested information is relevant to JJHCS's allegation that SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits. *See, e.g.*, Compl. ¶ 54. Please confirm that JJHCS will produce documents responsive to RFP No. 14.

### 5. RFP Nos. 20, 41, and 43

SaveOnSP's RFP Nos. 20, 41, and 43 seek documents relating to Copay Accumulator Services and Copay Maximizer Services. JJHCS has refused to produce such documents, asserting that they are irrelevant. The requested information is relevant because JJHCS has in its complaint blurred the lines between SaveOnSP, accumulators, and maximizers. *See, e.g.*, Compl. ¶ 74. Thus documents related to JJHCS's understanding of accumulators and maximizers are also relevant to its understanding of SaveOnSP's business and the impact of that business on JJHCS. Please confirm that JJHCS will produce documents responsive to RFP Nos. 20, 41, and 43 that relate to Copay Accumulator Services or Copay Maximizer Services.

### 6. RFP No. 21

SaveOnSP's RFP No. 21 seeks information regarding JJHCS's advocacy to or communications with any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer Services. JJHCS refuses to produce any documents in response to these Requests, asserting that the requested materials are irrelevant. JJHCS's lobbying campaign is, at a minimum, relevant to showing that public confusion about SaveOnSP's services is the result of actions by JJHCS and its allies, not SaveOnSP. Such communications may also show JJHCS's understanding of whether SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits. Please confirm that JJHCS will produce documents responsive to RFP No. 21.

### 7. RFP No. 25

SaveOnSP's RFP No. 25 seeks all Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including JJHCS's allegations in Complaint ¶¶ 110, 115. JJHCS agrees to produce documents and communications relating to "the extent of the harm SaveOnSP has caused JJHCS." We understand based on its response that JJHCS is producing fully in response to this Request. Please let us know if that is not the case.

Harry Sandick
December 21, 2022

### 8.    RFP No. 26

SaveOnSP's RFP No. 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum." JJHCS objected to this Request on the ground that it is vague and ambiguous and refused to produce any documents in response to this Request. To clarify, RFP No. 26 seeks documents and communications that reflect any payments for Janssen Drugs made by JJHCS, Janssen, or any Hub Entity on behalf of patients, both in the ordinary course of providing copay assistance and in any instance where such entity covered a patient's copay for a Janssen Drug in excess of what it otherwise would have under CarePath's terms and conditions. Please confirm that JJHCS will produce documents responsive to RFP No. 26. SaveOnSP is willing to meet and confer with JJHCS to further clarify the Request as necessary.

### 9.    RFP No. 27

SaveOnSP's RFP No. 27 seeks documents and communications regarding the "internal JJHCS data" discussed in Complaint ¶¶ 92-101, including the complete databases from which that data was drawn. JJHCS agrees to provide only the data that formed the basis for the allegations in Complaint ¶¶ 92-101, stating that other documents are irrelevant. SaveOnSP is willing to examine the data that JJHCS has agreed to produce to see if sufficiently addresses SaveOnSP's Request. SaveOnSP reserves all rights to request additional data.

### 10.    RFP No. 28

SaveOnSP's RFP No. 28 seeks data regarding patient fills and dosages for Janssen Drugs, the manufacturing and marketing of Janssen Drugs, and copay assistance funds. In response, JJHCS has agreed to produce "Janssen Transparency Reports," though it does not define that term or clarify what responsive data is contained in those reports. JJHCS also states that it is willing to meet and confer regarding SaveOnSP's Requests for data regarding copay assistance funds. It otherwise refuses to produce documents in response to this Request on the grounds that such documents are irrelevant. The data SaveOnSP seeks is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm. At a minimum, there are clear parallels between the data SaveOnSP seeks in RFP No. 28 and the data JJHCS seeks in its RFP Nos. 41 and 42. SaveOnSP invites JJHCS to meet and confer on these Requests.

### 11.    RFP No. 29

SaveOnSP's RFP No. 29 seeks data regarding JJHCS's CarePath budget and JJHCS's return on investment for CarePath. JJHCS agreed to produce only certain data related to CarePath's budget and costs. As we have explained, the information SaveOnSP seeks, including information on JJHCS's return on investment for CarePath, is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm, as well as disputing JJHCS's claim that

Harry Sandick
December 21, 2022

CarePath is designed to help patients and not simply J&J's bottom line. Please confirm that JJHCS will produce documents responsive to RFP No. 29.

## 12. RFP No. 30

SaveOnSP's RFP No. 30 seeks documents and communications regarding the basis for Janssen's decision to raise or lower the prices of Janssen Drugs. JJHCS refuses to produce any documents in response to this Request on the grounds that such documents are irrelevant. The requested material is relevant to JJHCS's allegations that SaveOnSP's conduct threatens the viability of copay assistance, that JJHCS has suffered monetary losses as the result of SaveOnSP's conduct, that copay assistance programs like CarePath are a public good, and that the threatened viability of copay assistance programs is a public harm. Compl. ¶¶ 114, 115. Please confirm that JJHCS will produce documents responsive to RFP No. 30.

## 13. RFP No. 32

SaveOnSP's RFP No. 32 seeks all documents and communications regarding any offer by JJHCS to provide any patient with CarePath funds greater than the amounts that JJHCS generally offers to CarePath patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a patient. JJHCS refuses to produce any documents in response to this Request on the grounds that the Request is vague and ambiguous and that documents responsive to this Request are irrelevant.

RFP 32 seeks information concerning instances when JJHCS provided or offered to provide CarePath funds to individuals whom JJHCS believes do not qualify for CarePath. The requested material is relevant to JJHCS's allegations that providing CarePath funds to individuals who do not qualify for CarePath threatens the viability of copay assistance, as well as the significance of the CarePath terms and conditions at issue to JJHCS. If, for example, JJHCS offered CarePath funds to an individual whom it believed was on a plan that does not comply with the revised Stelara or Tremfya terms, *see* Compl. ¶¶ 102-03, such an offer would be relevant to JJHCS's allegation that providing copay assistance to patients enrolled in such plans threatens the viability of JJHCS's copay assistance. Please confirm that JJHCS will produce documents responsive to RFP No. 32.

## 14. RFP No. 34

SaveOnSP's RFP No. 34 seeks all documents and communications regarding JJHCS's or Janssen's negotiations or agreements regarding the potential use of SaveOnSP's services, or the services of any Copay Maximizer Service or Copay Accumulator Service, for JJHCS's Employee Health Plans, including JJHCS's abandonment of those negotiations or agreements. JJHCS refuses to produce any documents in response, asserting that such documents are irrelevant. In fact, whether JJHCS considered using such services for its own employees is relevant to JJHCS's claims that SaveOnSP harms patients by causing stress and confusion, increasing costs of other healthcare, and threatening the viability of copay

16

Harry Sandick
December 21, 2022

assistance. Compl. ¶ 119. Please confirm that JJHCS will produce documents responsive to RFP No. 34.

### 15.    RFP No. 36

SaveOnSP's RFP No. 36 seeks documents sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entities or CarePath Care Coordinator regarding CarePath. JJHCS agrees to produce only agreements between JJHCS and the entities responsible for administering CarePath. Please clarify whether this agreement encompasses agreements with entities which have in the past administered CarePath, not simply those which currently administer CarePath.

JJHCS refuses to produce any other documents, asserting they are irrelevant. In fact, documents that relate to the fair market value of JJHCS Hub Entities' or CarePath Care Coordinators' services may shed light on JJHCS's return on investment for CarePath, which is relevant to JJHCS's allegation that SaveOnSP's conduct threatens CarePath's viability and caused JJHCS monetary damages. These documents are also relevant to JJHCS's allegation that copay assistance programs like CarePath are a public good to the extent that they show that CarePath financially benefits JJHCS. Please confirm that JJHCS will produce documents responsive to RFP No. 36 that relate to the fair market value of JJHCS Hub Entities' or CarePath Care Coordinators' services.

### 16.    RFP No. 37

SaveOnSP's RFP No. 37 seeks documents sufficient to show the percentage of patients who enroll in CarePath after being contacted by JJHCS, Janssen, any Hub Entity, or any other third-party authorized to advertise or market CarePath or Janssen Drugs, from January 1, 2009 through the present. JJHCS refuses to produce any documents, asserting they are irrelevant. In fact, the requested information is relevant to JJHCS's allegations that that SaveOnSP's conduct damages JJHCS, in part because it will assist in demonstrating that SaveOnSP in fact causes more patients to use Janssen Drugs than would otherwise do so. Please confirm that JJHCS will produce documents responsive to this Request.

### 17.    RFP No. 38

SaveOnSP's RFP No. 38 seeks documents and communications received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath. JJHCS agrees to produce documents relating to SaveOnSP but not to CarePath, asserting that the latter documents are irrelevant. Documents and communications between JJHCS and JJHCS Hub Entities regarding CarePath are relevant to the operation of CarePath, to JJHCS's allegation that copay assistance programs like CarePath are a public good, and to JJHCS's allegations that SaveOnSP harms patients. Please confirm that JJHCS will produce documents responsive to RFP No. 38 relating to CarePath.

Harry Sandick
December 21, 2022

### 18.    RFP No. 42

SaveOnSP's RFP No. 42 seeks documents and communications relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms "copay accumulator" and "copay maximizer," from January 1, 2015 through the present. JJHCS refuses to produce any such documents, asserting that the requested material is irrelevant. In fact, the requested information is relevant to whether JJHCS knowingly contributes to the alleged patient stress and confusion that it attempts to attribute to SaveOnSP by conflating SaveOnSP's conduct with that of "maximizers" and "accumulators," including potentially harmful conduct commonly associated with "copay accumulators" such as non-medical switching. Documents not directly related to SaveOnSP itself are relevant to whether JJHCS is aware of the distinctions between SaveOnSP's services and those of "copay maximizers" or "copay accumulators." Please confirm that JJHCS will produce documents responsive to this Request.

* * *

We remain hopeful that the parties can work through these issues to reach a mutually agreeable resolution. We invite you to meet and confer at your earliest convenience.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

18

# Exhibit 8

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 6, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

<u>By Email</u>

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

Re:    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC***
***(Case No. 2:22-cv-02632-JMV-CLW)***

Dear Meredith:

We write in response to your December 21, 2022 letter concerning Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Responses and Objections to Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production.

As an initial matter, we note that the responses set out below are subject to ongoing factual investigation and document collection efforts. We reserve all rights to revise or amend these responses as necessary. Further, none of the responses set out below are intended to waive any of the general or specific objections or limitations provided in JJHCS's Responses and Objections to SaveOnSP's First Set of Requests for Production, or to suggest that responsive documents exist with respect to particular requests.

## I.    GENERAL ISSUES

### A.    Definition of "Janssen Drugs"

We objected to the term Janssen Drugs "to the extent it purports to include drugs that are not covered by CarePath." You ask us to clarify whether the drugs BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA are covered by CarePath. We write to confirm our understanding that patient assistance for these drugs is covered by CarePath.

### B.    Time Period

We objected to SaveOnSP's requests to the extent that they sought documents from before January 1, 2017. SaveOnSP seeks documents for many requests dating as far back

Meredith Nelson, Esq.
January 6, 2023
Page 2

as 2009.  We do not see the basis for extending the relevant time period beyond 2017, but would like to further understand your position as part of the meet-and-confer process.

For example, you assert that you are entitled to documents about the budgeting and development of CarePath from its inception, as well as the budgeting and development of any predecessor of the CarePath program, in order to "investigate JJHCS's assertions that SaveOnSP's services make CarePath financially unviable."    JJHCS's assessment that SaveOnSP's services "jeopardiz[e] the viability of patient assistance programs like CarePath by making them prohibitively expensive," Compl. ¶ 114, is one that you are free to probe in depositions and at trial, but it self-evidently turns on the added expenses caused by SaveOnSP, and all documents about the developing and budgeting of the program have no proportionate relationship to that general proposition.  Moreover, JJHCS has already agreed to search for and produce documents that will show that SaveOnSP is making CarePath prohibitively expensive, including, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath."  *See* R&Os to Requests 25, 27, 29.  Please explain why those documents, which include budget and harm-related materials, do not suffice.

Further, you claim that you need documents about CarePath's budget and cost for nearly a decade before SaveOnSP began operations, which we understand occurred in or about November 2017, when SaveOnSP executed its Master Program Agreement with Express Scripts Inc.  Please explain how CarePath's budget and development prior to 2017—a time when SaveOnSP did not exist—is relevant to investigating SaveOnSP's effect on CarePath's financial viability in the future.  Please also explain how the budgeting and development of any predecessors of the CarePath program, which only came into existence in 2015, has any bearing on the present dispute.

You also claim that you need documents from prior to 2017 in order to investigate whether "CarePath was designed solely to help patients, not to financially benefit JJHCS." Please direct us to where JJHCS has claimed that CarePath was designed "solely to help patients" and "not to financially benefit JJHCS."  Please also explain why documents prior to 2017 are needed to make such an assessment.

Finally, you claim that you are entitled to documents relating to CarePath's terms and conditions from before 2017 to "fully assess the meaning and materiality of the terms and conditions at issue in this case, as decisions about many of these terms likely predate 2017." Please explain what "decisions" prior to 2017 are relevant to this case, which concerns only whether SaveOnSP wrongfully induced patients to breach CarePath's actual terms and conditions during the time period when SaveOnSP was in operation.  Please also explain why SaveOnSP believes it needs additional documents apart from the final terms and conditions.  In any event, on this point, to the extent that SaveOnSP is willing to produce internal documents

Meredith Nelson, Esq.
January 6, 2023
Page 3

that it has thus far declined to produce, we are willing to discuss an appropriate compromise involving production from each side.

### C.    Documents in the Possession of JJHCS

You asked whether documents created or held by employees of entities other than JJHCS "within the J&J corporate family or involved in the administration of CarePath, including Janssen, CarePath Care Coordinators, JJHCS Hub Entities, Lash Group, and Trial Card" are in JJHCS's possession, custody, and control, and would accordingly be produced by JJHCS.

With respect to entities in the J&J corporate family, we plan to generally limit our production to documents in JJHCS's possession alone. The J&J corporate family consists of more than 140,000 employees who work at over 200 subsidiaries and affiliates across the world. Collecting and producing documents from all of these individuals and entities would be burdensome and disproportionate to the needs of this case. JJHCS is the sole corporate entity charged with administration of CarePath, and so it is incumbent on SaveOnSP to explain why the collection and production of documents outside of JJHCS is necessary and proportionate to the needs of this case. Please provide such an explanation to us, including an explanation of which of the J&J affiliates and subsidiaries you believe are likely to have relevant documents.

In addition, with respect to entities outside of the J&J corporate family, JJHCS objects to SaveOnSP's definition of "JJHCS Hub Entities" for a number of reasons, including to the extent it purports to include entities other than those responsible for administering CarePath during the relevant Time Period. Nevertheless, notwithstanding such objections, JJHCS will work with Trial Card, a third-party vendor with responsibility for the administration of CarePath during the relevant Time Period, to facilitate production of documents responsive to SaveOnSP's requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    Request Nos. 1-7, 35

SaveOnSP's Request Nos. 1-7 seek organizational charts, including charts for entities other than the JJHCS groups responsible for administration of CarePath. Request No. 35 seeks "documents sufficient to identify all JJHCS Hub Entities and CarePath Coordinators."

In response to Requests Nos. 1-7, JJHCS agreed to produce documents "sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath for the relevant Time Period." In response to Request No. 35, JJHCS agreed to produce "non-privileged documents in its possession sufficient to identify the entities responsible for administering CarePath during the relevant Time Period." We also note that while JJHCS will not produce organizational charts for Trial Card, we will work with Trial Card to facilitate production of such documents, to the extent they exist and can be located by a reasonable search.

Meredith Nelson, Esq.
January 6, 2023
Page 4

Please explain the basis for SaveOnSP's request that we collect and produce documents beyond this so that we can better understand your position.

We would also like to more fully understand the reasons you provided for why you need organizational charts beyond what JJHCS has agreed to produce. You claim that "SaveOnSP needs documents relating to CarePath's development, so that it can test JJHCS's assertion that CarePath was developed solely to benefit patients and not to benefit JJHCS financially." As requested in Section I.C, *supra*, please direct us to where JJHCS has claimed that CarePath was designed "solely to benefit patients" and "not to benefit JJHCS financially." Regardless, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to CarePath's finances, so it can test JJHCS's assertion that SaveOnSP's conduct financially harms CarePath and threatens its financial viability." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether SaveOnSP's wrongful conduct financially harms CarePath and threatens its financial viability. Again, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the marketing of CarePath, so it can explore whether JJHCS's marketing caused any of the purported patient confusion that JJHCS attributes to SaveOnSP." The patient confusion alleged in the Complaint is that created by SaveOnSP when pharmacies refuse to fill prescriptions at the point of sale unless those patients enroll with SaveOnSP. Compl. ¶ 88. Please explain your factual basis for claiming that such patient confusion could reasonably be attributed to JJHCS's marketing efforts. In particular, please direct us to specific instances of confusion identified in the complaint that could reasonably be attributed to specific CarePath's marketing efforts. Otherwise, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the sale, pricing, and marketing of Janssen Drugs so that it can evaluate the relationship between CarePath and JJHCS's financial performance, including how JJHCS sets prices for Janssen Drugs (thus increasing costs for health plans and patients)." Please explain how Janssen's drug sales, pricing, or marketing are related to the claims or defenses in this action, which concern SaveOnSP's misconduct in extracting funds from CarePath. Please also explain how Janssen's conduct is relevant in any way to this action. Again, this provides no basis for additional organizational charts. Further, even assuming that these points were relevant, SaveOnSP and its health plan partners already have access to extensive information concerning the pricing of Janssen Drugs, based on their own reimbursement records for those Drugs.

Meredith Nelson, Esq.
January 6, 2023
Page 5

You claim that "SaveOnSP also needs documents relating to the drafting of JJHCS's terms and conditions, which JJHCS alleges that SaveOnSP induced patients into breaching." Please explain why the drafting of the terms and conditions with which patients must comply is relevant to this action which is based on whether SaveOnSP has engaged in wrongdoing when it strong-arms patients into breaching those terms and conditions. On this point again, however, to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce, we are willing to discuss a compromise.

### B.    Request No. 11

SaveOnSP's Request No. 11 seeks documents "regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." JJHCS offered to "meet and confer to determine if this Request can be appropriately narrowed." We do not currently see the basis for producing the materials you request, but are willing to continue to discuss the merits of this Request.

You claim that documents pertaining to the "development, marketing, and management of [other copay assistance programs offered for Janssen Drugs,] as well as of CarePath itself, are relevant to refuting: JJHCS's assertions that SaveOnSP's services increase the cost and threaten the continued viability of 'patient assistance programs like CarePath by making them prohibitively expensive.'" Compl. ¶ 114.

With respect to CarePath, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether its services increase the cost of CarePath and threatens its financial viability.

With respect to the reference to "patient assistance programs like CarePath" in Compl. ¶ 114, that is a general reference to patient assistance programs across the industry, not other patient assistance programs for Janssen Drugs. As you know, SaveOnSP targets the patient assistance programs of other drug manufacturers as well. JJHCS reasonably infers that SaveOnSP's services harm those programs in ways similar to how they have harmed CarePath. We do not see how the "development, marketing and management" of those programs is relevant to that inference of harm, but invite you to explain.

You also claim that such documents are relevant to "JJHCS's assertion that any increase in the cost of copay assistance programs amounts to a public harm." JJHCS claims that SaveOnSP causes public harm by "causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare

Meredith Nelson, Esq.
January 6, 2023
Page 6

needs more expensive by not counting any of the funds spent on patients' medication towards their ACA maximum or deductible."  Compl. ¶ 114.  Please direct us to where JJHCS alleges that "**any** increase in the cost of copay assistance amounts to a public harm." (emphasis added).  Please also explain how the "development, marketing and management" of such programs is relevant to whether an increase in their costs amounts to a public harm.

You also claim that such documents are relevant to "JJHCS's assertion that SaveOnSP induces patients to breach CarePath's terms and conditions and deceives patients by failing to inform them of that alleged breach."  Please explain how documents relating to the "development, marketing and management" of CarePath, let alone other programs, is relevant to whether SaveOnSP induces patients to breach CarePath's terms and conditions.  Please also identify the elements in the relevant claims or defenses to which such documents are material.

## C.    Request Nos. 12 and 13

SaveOnSP's Request Nos. 12 and 13 seek documents regarding CarePath's terms and conditions and the CarePath requirement that patients enrolled in CarePath make payments toward Janssen Drugs.  JJHCS agreed to produce documents "sufficient to show all final versions of CarePath's terms and conditions for each Janssen Drug during the relevant Time Period."

Seeking additional documents beyond what JJHCS has promised to produce, you claim "JJHCS's understanding of the terms and conditions in its CarePath contracts and the drafting of those terms and conditions is relevant to whether SaveOnSP induced patients to breach them, a central point for JJHCS's tortious interference claims. Compl. ¶ 109."  As noted in Sections I.B and II.A, *supra*, whether there has been a breach is dependent on SaveOnSP's conduct and the final terms themselves, not the back-story of the drafting of the terms and conditions.  Nonetheless, so that we can consider your demand more precisely, please identify which terms you believe are relevant but also unclear or ambiguous on their face such that consideration of extrinsic evidence, such as the drafting history of the terms and conditions, is relevant to this action.  Again, we are willing to discuss a compromise on this point to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce.

## D.    Request No. 14

SaveOnSP's Request No. 14 seeks documents relating to JJHCS's and other entities' "understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations."  You claim JJHCS refused to produce any documents in response.

You have misstated JJHCS's response.  JJHCS did not refuse to produce any documents in response to RFP No. 14.  We agreed to search for and produce "all non-privileged documents and communications in its possession regarding SaveOnSP's designation of specialty

Meredith Nelson, Esq.
January 6, 2023
Page 7

drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care
Act and its regulations during the relevant Time Period." *See* R&O to Request No. 14.  Subject
to the objections laid out in JJHCS's Responses and Objections, JJHCS will produce such
documents.  We hope this clarification resolves your concerns, but if there are additional
documents SaveOnSP believes it requires, please let us know.

       **E.**       **Request Nos. 20, 41, 43**

       SaveOnSP's Request Nos. 20, 41, and 43 seek documents concerning "Copay
Accumulator Services and Copay Maximizer Services."  JJHCS in response agreed to produce
documents relating to SaveOnSP.

       You claim that documents relating to "Copay Accumulator Services" and "Copay
Maximizer Services" are relevant "because JJHCS has in its complaint blurred the lines between
SaveOnSP, accumulators, and maximizers. *See, e.g.*, Compl. ¶ 74.  Thus, documents related to
JJHCS's understanding of accumulators and maximizers are also relevant to its understanding of
SaveOnSP's business and the impact of that business on JJHCS."

       First, please explain how JJHCS's understanding of accumulators and maximizers
in general is relevant to the claims or defense in this action.  Please identify the elements of any
claims and defenses and explain the relevance of these requested documents to those elements.
Second, please explain why you need documents from JJHCS to refute an allegation that
SaveOnSP falls into the category of programs described in the article cited in Compl. ¶ 74.
Please explain why SaveOnSP needs documents from JJHCS in order to compare the contours of
its own program, as borne out by its own documents and other information within SaveOnSP's
control, against the descriptions in that article.

       **F.**       **Request No. 21**

       SaveOnSP's Request No. 21 concerns "any advocacy to or communications with
any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or
Copay Maximizer."  Based on, *inter alia*, relevance and privilege, JJHCS declines to produce
documents in response to this Request.

       You claim that "JJHCS's lobbying campaign is, at a minimum, relevant to
showing that public confusion about SaveOnSP's services is the result of actions by JJHCS and
its allies, not SaveOnSP."  As noted in Section II.A, *supra*, the Complaint alleges that SaveOnSP
confuses patients in part by creating rejections and delays at the point of sale.  Compl. ¶ 88.
Please explain how such confusion could reasonably be attributed to any lobbying efforts by
JJHCS.  In addition, please direct us to instances of confusion identified in the Complaint that
could reasonably be attributed to any lobbying efforts as opposed to the conduct of SaveOnSP
and its partners.

Meredith Nelson, Esq.
January 6, 2023
Page 8

You also claim that "such communications may also show JJHCS's understanding of whether SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits." Please explain how lobbying efforts are relevant to this question, as whether SaveOnSP violates the Affordable Care Act is a question of law.

Finally, please explain how requests for documents concerning JJHCS's lobbying of government officials are permissible given that JJHCS has a privilege against the production of documents that would unjustifiably burden its First Amendment right to political association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958).

**G.      Request No. 25**

SaveOnSP's Request No. 25 seeks "all Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 110, 115." JJHCS agreed to produce "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period, including the extent to which SaveOnSP has caused JJHCS to pay more in copay assistance that it otherwise would have."

You ask us to confirm whether "based on its response JJHCS is producing fully in response to this Request." Without waiving the objections and limitations in its response, JJHCS intends to search for and produce the documents and communications it identified in its response. We are happy to meet and confer should you have specific questions.

**H.      Request No. 26**

SaveOnSP's Request No 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum." In its Responses, JJHCS objected to this Request on the grounds that it was vague and ambiguous and declined to produce any documents in response to this Request.

You now clarify that this Request "seeks documents and communications that reflect any payments for Janssen Drugs made by JJHCS, Janssen, or any Hub Entity on behalf of patients, both in the ordinary course of providing copay assistance and in any instance where such entity covered a patient's copay for a Janssen Drug in excess of what it otherwise would have under CarePath's terms and conditions."

JJHCS has agreed to produce documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath. *See* R&O to RFP No. 29. Please let us know if that is sufficient or otherwise identify the claims or defenses for which SaveOnSP believes it needs documents beyond that. Please also let us know the rationale for seeking a broader production than what JJHCS has proposed.

Meredith Nelson, Esq.
January 6, 2023
Page 9

## I.    Request No. 28

SaveOnSP's Request No. 28 seek a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. through m.). JJHCS does not believe that documents unrelated to SaveOnSP's misconduct, such as documents relating to the sales and marketing budgets for Janssen drugs, are relevant to this action, but nevertheless agreed to produce "Janssen Transparency Reports." JJHCS also said it is willing to meet and confer regarding items i. through m.

You wrote that JJHCS's does not define the term "Janssen Transparency Reports" or clarify what responsive data is contained in those reports. To clarify, those Reports summarize, *inter alia*, changes in Janssen drug prices, the amount of rebates paid for Janssen Drugs and total spend on CarePath patient assistance. An example of such a report can be found here: *The 2021 Janssen U.S. Transparency Report*, JANSSEN PHARM., INC. (2022), https://transparencyreport.janssen.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000.

You claim further that the data "SaveOnSP seeks is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. We invite you to explain why it is necessary for SaveOnSP to also receive additional data, including, for the last thirteen years, (i) a listing of "all patients receiving a Janssen Drug," (ii) "the number of fills of the Janssen Drug each received by each such Patient," (iii) "the dosage of the Janssen Drug received by each such Patient for each fill," (iv) "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," as well as the other revenue and cost data. In particular, please explain how a request for the names of each and every of the tens of millions of patients who have received Janssen therapies over the past thirteen years is a proportional request for information given the claims and defenses at issue in this action, to the extent that JJHCS even has the data that SaveOnSP seeks. We are interested to understand your rationale for this Request and to hear your explanation for why it is proportionate to this action, particularly in light of the fact that, as explained above, SaveOnSP and its health partners already have substantial information about the pricing of Janssen Drugs based on their own claims and reimbursement data.

You claim further that "there are clear parallels between the data SaveOnSP seeks in RFP No. 28 and the data JJHCS seeks in its RFP Nos. 41 and 42" and "invite[] JJHCS to meet and confer." We do not understand this comparison but are willing to meet and confer to discuss this Request further.

Meredith Nelson, Esq.
January 6, 2023
Page 10

J.       **Request No. 29**

        SaveOnSP's Request No. 29 seeks documents relating to CarePath's finances.
JJHCS in response agreed to produce documents sufficient to show "(1) how JJHCS determines
the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2)
JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected
annual costs for CarePath."

        You claim that these documents are insufficient because the additional documents
SaveOnSP seeks, "including information on JJHCS's return on investment for CarePath, is
relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes
it financial harm."  The documents JJHCS has agreed to produce, including the CarePath budget
and actual costs, are sufficient to show the threat SaveOnSP poses to CarePath.  We invite you to
explain how further documents, including JJHCS's supposed "return on investment," are
relevant or necessary, or how it is proportionate.

        You also claim that additional data is necessary to dispute "JJHCS's claim that
CarePath is designed to help patients and not simply J&J's bottom line."  As noted in Section I.C
and Section II.A, *supra*, please direct us to where JJHCS has claimed that CarePath was not
"designed to help . . . J&J's bottom line."

K.       **Request No. 30**

        SaveOnSP's Request No. 30 seeks "for each year for each Janssen Drug, all
Documents and Communications regarding the basis for Janssen's decision to raise or lower the
price of the Janssen Drug, including labor or manufacturing costs or the increase in efficacy of the
Janssen Drug."  JJHCS declined to produce any documents in response to this Request.

        You claim that the documents requested are "relevant to JJHCS's allegations that
SaveOnSP's conduct threatens the viability of copay assistance" and that it has "suffered
monetary losses as a result of SaveOnSP's conduct."  As noted above, JJHCS has agreed to
search for and produce, *inter alia*, "all non-privileged documents and communications in its
possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant
Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100,"
"JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected
annual costs for CarePath."  *See* R&Os to Requests 25, 27, 29.  Please explain why it is
necessary for SaveOnSP to obtain documents relating to "Janssen's decision to raise or lower the
price of" to further probe those allegations.

        You also claim that such documents are relevant to JJHCS's allegations that
"copay assistance programs like CarePath are a public good" and "that the threatened viability of
copay assistance programs is a public harm."  Please explain how "Janssen's decision to raise or
lower the price of" its drugs is at all relevant to whether copay assistance programs like CarePath

Meredith Nelson, Esq.
January 6, 2023
Page 11

are a public good.  Please also explain why it is relevant to the claims and defenses in this action whether CarePath and similar programs are a public good.

**L.    Request No. 32**

SaveOnSP's Request No. 32 seeks all documents and communications "regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient."  JJHCS declined to produce any documents in response to this Request.

You assert that the requested documents are "relevant to JJHCS's allegations that providing CarePath funds to individuals who do not qualify for CarePath threatens the viability of copay assistance, as well as the significance of the CarePath terms and conditions at issue to JJHCS.  If, for example, JJHCS offered CarePath funds to an individual whom it believed was on a plan that does not comply with the revised Stelara or Tremfya terms, *see* Compl. ¶¶ 102-03, such an offer would be relevant to JJHCS's allegation that providing copay assistance to patients enrolled in such plans threatens the viability of JJHCS's copay assistance."

Even if JJHCS continues to offer copay assistance to a patient who JJHCS believes is enrolled in a health plan that does not comply with the revised Stelara or Tremfya terms, please explain why this would be relevant to the claims at issue in this action.  For example, please explain how JJHCS's willingness to continue to provide copay assistance to a patient who does not comply with the Terms & Conditions would change the fact that SaveOnSP causes JJHCS to spend more in CarePath patient assistance than it otherwise would absent the SaveOnSP program.  That a plaintiff does not enforce a term in its contract is no defense to a claim of tortious interference.  Indeed, New Jersey law is clear that a claim of tortious interference may exist even where the underlying contract is *unenforceable*.  *See, e.g.*, *Halebian N.J. v. Roppe Rubber Corp.*, 718 F. Supp. 348, 360 (D.N.J. 1989) ("That the underlying contract may be unenforceable is no defense to a claim of tortious interference."); *see also Mina L. Smith, Inc. v. Cyprus Indus. Minerals Co.*, 427 A.2d 1114 (N.J. App. Div. 1981) ("Unquestionably, one who unjustifiably interferes with the contract of another is guilty of a wrong.  That the contract may be unenforceable is no defense.").  We invite you to explain further why you believe such information is relevant to the claims or defenses at issue in this action.

**M.    Request No. 34**

SaveOnSP's Request No. 34 seeks documents and communications concerning JJHCS's consideration of SaveOnSP's services for its own employer-sponsored health plan.  JJHCS declined to produce any such documents.

You claim that "whether JJHCS considered using such services for its own employees is relevant to JJHCS' claims that SaveOnSP harms patients by causing stress and

Meredith Nelson, Esq.
January 6, 2023
Page 12

confusion, increasing costs of other healthcare, and threatening the viability of copay assistance."
As you are no doubt aware, Johnson & Johnson did not contract with SaveOnSP.  Given this
fact, please explain how Johnson & Johnson's employer-sponsored health plan bears on any of
these issues, or more generally to the claims and defenses at issue in this action.

N.    **Request No. 36**

SaveOnSP's Request No. 36 seeks documents "sufficient to show the economic
terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path
Coordinator regarding Care Path, including any assessment of the fair market value of those
services."  JJHCS agreed to produce agreements in its possession between it and the entities
responsible for administering CarePath for the period of January 1, 2017 to the present.

You wrote to confirm (1) whether this production would encompass "agreements
which have in the past administered CarePath, not simply those which currently administer
CarePath" and (2) whether JJHCS will produce documents responsive to Request No. 36 that
relate to the fair market value of JJHCS's Hub Entities' or CarePath Care Coordinators'
services."

We write to confirm that JJHCS intends to produce agreements for entities that
have administered CarePath for the period of January 1, 2017 to the present, even if those entities
no longer administer CarePath today.  Our current understanding is that those agreements will
include work orders that document the cost of the services provided.  We do not understand any
other relevant documents to be responsive to this Request.  If you seek any other documents,
please let us know and we will consider your request.

O.    **Request No. 37**

SaveOnSP's Request No. 37 seeks documents "sufficient to show the percentage
of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub
Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs."
JJHCS declined to produce documents in response to this Request because this Request is
irrelevant to the subject matter at issue in this litigation.

You assert that these documents are relevant to JJHCS allegations that
SaveOnSP's conduct damages JJHCS, in part because they will "assist in demonstrating that
SaveOnSP in fact causes more patients to use Janssen Drugs than would otherwise do so."  We
do not understand this purported rationale or its connection to this document request.  Please
explain how this might be the case.  We do not understand SaveOnSP to make the decision to
prescribe Janssen Drugs, and the "warm transfer" that is a necessary part of SaveOnSP's
program will naturally deter some patients from using Janssen Drugs, as the patients are told that
such medications are not covered by their health insurance unless additional steps are also taken.
We invite you to describe any efforts that SaveOnSP has undertaken to alter individual

Meredith Nelson, Esq.
January 6, 2023
Page 13

prescribing decisions, including whether SaveOnSP collaborates with its health plan partners to require non-medical switching to drugs that SaveOnSP can designate as non-essential health benefits and for which manufacturer patient copay assistance exists.

**P.    Request No. 38**

SaveOnSP's Request No. 38 seeks all documents and communications "received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath." As noted in our initial Responses, JJHCS agreed to produce all documents responsive to this Request regarding SaveOnSP. *See* Response to Request Nos. 8, 38.

You wrote to confirm that JJHCS will produce documents responsive to this Request regarding CarePath generally. Please explain why a Request that seeks all documents "regarding CarePath" and would necessarily encompass all documents exchanged between JJHCS and any entity with whom JJHCS contracts or partners with to administer CarePath is not overbroad or why complying with it would not be unduly burdensome. Given the Federal Rules' emphasis on proportionality, please also explain how such burdensome discovery would be proportional to SaveOnSP's needs in this action. *See* Fed. R. Civ. P. 26(b)(1).

**Q.    Request No. 42**

SaveOnSP's Request No. 42 seeks all documents and communications "relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms 'copay accumulator' and 'copay maximizer.'" JJHCS responded that it would produce all non-privileged documents and communications in its possession for the period of January 1, 2017 to the present relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to SaveOnSP.

You wrote to inquire whether we would produce all documents and communications concerning those terms more generally. You assert that such documents are "relevant to whether JJHCS knowingly contributes to the alleged patient stress and confusion that it attempts to attribute to SaveOnSP by conflating SaveOnSP's conduct with that of 'maximizers' and 'accumulators,' including potentially harmful conduct commonly associated with 'copay accumulators' such as non-medical switching."

We do not understand your assertions. This action concerns SaveOnSP's scheme to extract patient copay assistance funds in violation of the CarePath terms and conditions. The patient harms, including patient "stress and confusion," flow from how SaveOnSP operates its profit-seeking scheme, not from any entity's abstract understanding of the meaning of the terms "copay accumulator" or "copay maximizer." In light of this, please explain how JJHCS's, a third-party vendor's, or partner's understanding of these terms generally would be relevant to the claims at issue in this action.

* * *

Meredith Nelson, Esq.
January 6, 2023
Page 14

      We are available to meet and confer regarding the issues outlined above at your convenience.  We look forward to your response.

Very truly yours,

Harry Sandick

# Exhibit 9

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000



Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

January 20, 2023

**<u>Via E-mail</u>**

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

**Re:** ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC* (Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

We write to memorialize and follow up on our January 13, 2023 meet and
confer regarding Save On SP LLC's ("SaveOnSP") Requests for Production to John-
son & Johnson Health Care Systems, Inc. ("JJHCS").

## I.     Global Issues

### A.     Documents Related to the Development and Marketing of CarePath and SaveOnSP's Financial Impact on JJHCS and CarePath (RFPs 11, 26, 28-30, 36, and 37)

Several of SaveOnSP's requests, including RFPs 11, 26, 28-30, 36, and 37,
seek information on the development and marketing of CarePath, as well as the
finances of any entity with a stake in CarePath, including documents reflecting the
financial impact of SaveOnSP's services and the plan terms set by its clients on
JJHCS. You have objected to producing such information, telling us that you do
not view it as relevant.

This material is highly relevant. As we explained to you in our meet and
confer, JJHCS's Complaint alleges that CarePath is intended to help patients afford
their medications, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threat-
ens the continued viability of CarePath by making it "prohibitively expensive," *id.*
¶ 114, and that the threat to CarePath's viability constitutes a public harm for pur-
poses of JJHCS's GBL § 349 claim, *id.* In response, SaveOnSP intends to show that

Anthony LoMonaco
January 20, 2023

CarePath is not a public good, but primarily a marketing tool that JJHCS and its affiliates use to sell more Janssen Drugs and to hike the price of those drugs year after year. SaveOnSP also intends to show that Johnson & Johnson's ("J&J's") return on investment from CarePath is substantial, and that even if JJHCS's costs for CarePath have gone up, CarePath is still profitable for J&J—not "prohibitively expensive," as JJHCS claims. SaveOnSP further intends to show that it has helped more patients enroll in CarePath than would otherwise have enrolled; that patients' adherence to Janssen Drugs has increased because of the benefit terms implemented by SaveOnSP's plan partners (which ensure that plan members always receive their drugs for free); and that, as a result of SaveOnSP's activities, J&J has sold more drugs and reaped more profits than it otherwise would have.

SaveOnSP's RFP Nos. 11, 26, 28-30, 32, 36, and 37 seek information relevant to these topics. RFP No. 11 seeks documents and communications regarding "the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." These documents relate to SaveOnSP's defense that CarePath is a marketing tool, developed to increase J&J's bottom line. RFP Nos. 26 and 32 seeks documents concerning the actual amount of CarePath funds paid to patients, including instances where patients received more than the budgeted amount of CarePath funds. These documents are relevant to disputing JJHCS's claims that its increased CarePath expenditures threaten the viability of CarePath by making it prohibitively expensive, as well as to the extent of JJHCS's alleged damages. RFP Nos. 28 and 29 seek data that is relevant to understanding JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, the financial impact of SaveOnSP on J&J more broadly, and JJHCS's damages. RFP No. 30 seeks documents and communications "regarding the basis for Janssen's decision to raise or lower the prices of Janssen Drugs," which relate to SaveOnSP's defenses that CarePath is primarily a marketing tool that enables J&J to continue to raise drug prices year after year and that J&J profits from SaveOnSP increasing enrollment in CarePath, because it is able to sell more of its incredibly expensive drugs. And RFP Nos. 36 and 37 seek documents relevant to SaveOnSP's defense that, because SaveOnSP is more successful than JJHCS at getting patients to sign up for CarePath, SaveOnSP helps J&J by generating additional revenue, which is also relevant to the extent of JJHCS's damages. *See infra* Section II.I.

During our meet and confer, you stated that SaveOnSP is not entitled to the information it seeks because this case is only about the allegation that JJHCS is paying more in copay assistance than it would if SaveOnSP did not exist. But that is not what JJHCS pled, and, regardless, JJHCS cannot provide only discovery that it believes supports its theory of the case. SaveOnSP is entitled to information that will allow it to disprove JJHCS's allegations and to prove its defenses.

Please confirm promptly that JJHCS will produce documents in response to these requests.

2

Anthony LoMonaco
January 20, 2023

### B. Documents in the Possession of JJHCS Hub Entities, Janssen, and other J&J entities

Several of SaveOnSP's requests seek documents and communications likely possessed by Janssen, JJHCS Hub Entities, or entities within the broader J&J corporate family. In its January 6 letter, JJHCS stated that it would produce only those documents directly within JJHCS's "possession." During our meet and confer, we discussed your positions with respect to the JJHCS Hub Entities and all other J&J and Janssen entities, as detailed below.

#### 1. JJHCS Hub Entities

With respect to the JJHCS Hub Entities, we reiterated that SaveOnSP seeks documents and communications from any J&J entity, including any JJHCS Hub Entity, that was or is involved in the development, administration, or marketing of CarePath. As we explained, any JJHCS Hub Entity's documents or communications concerning SaveOnSP or the development, administration, or marketing of CarePath are relevant to this action. SaveOnSP maintains that JJHCS must produce all such responsive documents and communications to the extent they are within JJHCS's possession, custody, or control.

We understand that JJHCS is working with Trial Card to facilitate its production of documents, as you confirmed for us in your January 6 letter and during our meet and confer. You also stated during our meet and confer that JJHCS is similarly working with Lash Group to facilitate its production of documents. You confirmed that you were working with TrialCard and Lash Group to produce organizational charts responsive to our requests, and that JJHCS will produce organizational charts for other JJHCS entities administering CarePath, to the extent that any such entities exist. Although you took the position that Trial Card and Lash Group are the two primary JJHCS Hub Entities involved with CarePath, you were unable to confirm whether any other JJHCS Hub Entities are or have been involved with CarePath. We asked that you investigate whether there were any other relevant JJHCS Hub Entities that may have documents or communications responsive to SaveOnSP's requests. We also asked you to take a formal position as to whether documents possessed by any JJHCS Hub Entity are within JJHCS's possession, custody, or control.

Please confirm promptly (1) whether there previously were or currently are other JJHCS Hub Entities involved in the development, administration, and marketing of CarePath and (2) if so, that JJHCS will produce documents from those entities responsive to SaveOnSP's requests. Please also tell us whether the JJHCS Hub Entities' documents and communications are within JJHCS's possession, custody, and control.

#### 2. J&J and Janssen

During our meet and confer, we also reiterated that SaveOnSP seeks documents and communications likely in the possession of J&J and Janssen, including

3

Anthony LoMonaco
January 20, 2023

organizational charts and other information which SaveOnSP may use to determine which entities and individuals possess responsive documents. You explained that your objection to producing documents from these entities was based on relevance and that you were not asserting that documents held by these entities were outside of JJHCS's possession, custody, and control.

As we explained, Janssen and J&J likely possess documents that are highly relevant to JJHCS's claims and SaveOnSP's defenses, including documents related to the pricing of Janssen Drugs, the purpose of CarePath, and J&J's return on investment for CarePath.

You stated that you would take our position back to your client. Please confirm promptly that JJHCS will produce documents and communications held by Janssen or other relevant J&J entities. We also request that you provide us with a list of all J&J entities involved in the development, marketing, or administration of CarePath.

## C.    Time Period

SaveOnSP's RFP Nos. 1-7, 11-13, 28-30, and 36-37 seek documents and communications dating back to January 1, 2009. RFP Nos. 14, 41, and 42 seek documents and communications dating back to January 1, 2015. JJHCS has thus far refused to produce documents and communications from before January 1, 2017, the date that JJHCS selected for its own requests, on relevance, burden, and proportionality grounds.

As we explained during our meet and confer, SaveOnSP selected January 1, 2009 as the starting date for RFP Nos. 1-7, 11-13, 28-30, and 36-37 based on its understanding of when most of the Janssen Drugs first went to market. SaveOnSP attempted to apply this date range only to those requests where historical documents and communications are necessary to provide SaveOnSP with the full set of relevant materials. For instance, SaveOnSP requires extrinsic evidence concerning the drafting of CarePath's terms and conditions so that it can make arguments about the meaning of the contracts that SaveOnSP allegedly induced patients to breach. RFP Nos. 12 and 13. SaveOnSP also requires documents pre-dating 2017 so that it can probe why CarePath was created, J&J's historical return on investment for CarePath, and how SaveOnSP has impacted JJHCS and CarePath. *See supra* Section I.A (discussing RFP Nos. 11, 28-30, 36, and 37). As we pointed out during our meet and confer, JJHCS has said that it intends to rely on historical information to assess its damages and the impact that SaveOnSP has on JJHCS and CarePath. *See, e.g.*, Dkt. No. 65 at 13 ("JJHCS may also study how patient copays increased or changed after a patient joined the SaveOnSP Program."). SaveOnSP is entitled to that same type of information. Finally, in order to understand how the above information implicates the various entities whose conduct is relevant in this action and to identify potential sources of additional information, SaveOnSP requires documents dating back to January 1, 2009 for its requests seeking

4

documents sufficient to show the organizational structure of JJHCS, Janssen and other entities described in RFP Nos. 1-7.

SaveOnSP selected January 1, 2015 as the starting date for RFP Nos. 14, 41, and 42, because SaveOnSP understands that the relevant provisions of the Affordable Care Act ("ACA") and related regulations concerning EHB requirements and out of pocket maximums, *see, e.g.*, 45 C.F.R. §§ 156.122, 156.115, came into effect around January 1, 2015. SaveOnSP seeks information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits, under the ACA, since 2015 to track whether JJHCS has always considered SaveOnSP's designation activities legally suspect, as alleged in the complaint. RFP No. 14. Similarly, relevant documents and communications regarding Copay Accumulator Services and Copay Maximizer Services, JJHCS and Hub Entities' understanding of the meaning of those terms, and such services' effect on JJHCS's return on investment for copay assistance will likely have been created soon after January 1, 2015, when JJHCS became aware of the relevant provisions.

During our meet and confer, you stated that you do not believe it is appropriate for JJHCS to produce documents pre-dating 2017 because SaveOnSP did not exist until 2017 and that the burden of producing such documents would therefore be disproportional. But the mere fact that SaveOnSP did not exist until 2017 does not relieve JJHCS of its obligation to produce relevant documents, including those that pre-date SaveOnSP's existence. If JJHCS wishes to make proposals to narrow the time frame for specific requests based on its investigation, SaveOnSP is happy to meet and confer regarding those proposals.

Please confirm promptly whether JJHCS is standing on its refusal to produce any documents pre-dating January 1, 2017. If not, please tell us which documents pre-dating January 1, 2017 JJHCS will produce.

### D. Requests Related to Accumulators and Maximizers (RFP Nos. 20, 21, and 41-43)

During our meet and confer, the parties discussed several of SaveOnSP's requests that seek documents related to copay maximizers and accumulators (*e.g.*, RFP Nos. 20, 21, and 41-43). We explained that this information appeared to be relevant to JJHCS allegations regarding accumulators in its complaint, Compl. ¶¶ 22 n.4, 50 n.7, 74, and JJHCS's insistence that it has alleged SaveOnSP "operates like an 'accumulator,'" Jan. 5 Joint Letter (Dkt. 66), at 7.

You replied that, in the letter, JJHCS claimed that SaveOnSP has a characteristic of accumulators because it does not count copays towards patients' deductibles or out-of-pocket maximums. You conceded, however, that JJHCS has not alleged that SaveOnSP is itself a copay accumulator or maximizer. In response, we suggested that both parties might drop their requests concerning accumulators

Anthony LoMonaco
January 20, 2023

and maximizers. You stated that you would take this proposed compromise back to your client.

Please let us know promptly whether JJHCS will agree to dropping all discovery requests to the extent they concern copay accumulators and maximizers.

## II.    Issues Related to Specific Requests

### A.    RFP No. 11

SaveOnSP's RFP No. 11 seeks documents and communications regarding "the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." In addition to explaining the relevance arguments detailed above, *supra* Section I.A, during our meet and confer, we asked for clarification as to whether J&J or JJHCS operates or previously operated any other copay assistance programs besides CarePath. You explained that paragraph 146 of the Complaint, which refers to SaveOnSP's harm to "copay assistance programs like CarePath," does not imply that JJHCS has other copay assistance programs, but simply asserts that SaveOnSP is likely affecting other manufacturers' copay assistance programs similarly to how it affects CarePath. We explained that if J&J or JJHCS does have other copay assistance programs, then documents relating to those programs are relevant to the extent they shed light on the purpose of copay assistance. You could not confirm whether J&J or JJHCS has any copay assistance programs other than CarePath and stated that you would get back to us on this point.

Please confirm promptly whether J&J or JJHCS operates or previously operated any copay assistance programs other than CarePath.

### B.    RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek, respectively, documents and communications regarding CarePath's terms and conditions and the CarePath requirement that patients enrolled in CarePath make payments toward Janssen Drugs. JJHCS has agreed to produce only final versions of CarePath's terms and conditions, asserting that all other requested documents are irrelevant.

During our meet and confer, we explained that we are entitled to gather parole evidence on the meaning of CarePath's terms and conditions because both of JJHCS's claims are based, at least in part, on allegations that SaveOn induced patients to breach those terms. SaveOnSP seeks this information so that it can prove that JJHCS's interpretation of its contract is incorrect and that patients have not breached the relevant terms and conditions. You stated that SaveOnSP is not entitled to this information because the contract is unambiguous. But, as we explained, whether the contract is ambiguous or not is a merits argument, not a basis to refusing producing documents. SaveOnSP is entitled to extrinsic evidence on the meaning of the relevant terms and conditions unless and until the Court determines that those terms and conditions are unambiguous. *See Nestle Foods Corp.*

Anthony LoMonaco
January 20, 2023

*v. Aetna Cas. & Sur. Co.*, No. CIV. 89-1701 (CSF), 1990 WL 191922, at *5 (D.N.J. Nov. 13, 1990) ("[W]hen the question of ambiguity in the contract has not yet been resolved, the drafting history is relevant and discoverable under the federal rules."). We specifically identified the terms "offer" and "health plan" as examples of terms for which we dispute JJHCS's alleged interpretation.

You asked us to consider whether if JJHCS would agree to produce documents responsive to these requests, SaveOnSP would agree in exchange to produce internal documents responsive to JJHCS's RFP No. 17 ("Any agreements, including drafts, between SaveOnSP or Express Scripts on the one hand, and health insurance plan sponsors, on the other, regarding the SaveOnSP Program, and any communications relating thereto."). As we explained, we do not view that offer as reciprocal, because—unlike the CarePath terms and conditions—the terms of SaveOnSP's contracts with health plans are not at issue in this case. Moreover, SaveOnSP has already agreed to produce internal communications regarding SaveOnSP's understanding of the meaning of CarePath's terms and conditions—we simply ask that JJHCS agree to produce the same.

You stated that you would take this request and our explanation of relevance back to your client. Please confirm promptly that JJHCS will produce documents responsive to RFP Nos. 12 and 13.

## C.    RFP No. 14

SaveOnSP's RFP No. 14 seeks information regarding JJHCS's and its related entities' understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") and Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act. JJHCS has thus far agreed to produce only non-privileged documents and communications regarding SaveOnSP's designation of specialty drugs as Essential Health Benefits or Non-Essential Health Benefits.

During our meet and confer, we requested that JJHCS agree to produce a broader range of documents concerning any aspect of JJHCS's understanding of the designation of EHBs and NEHBs. You suggested that JJHCS may be willing to produce such documents if SaveOnSP would agree to produce internal communications regarding this topic. Though SaveOnSP maintains that such communications are not relevant, we agreed to discuss the exchange further with our clients and you agreed to do the same.

While reserving all rights, SaveOnSP would be open to producing internal documents that reflect its understanding of whether SaveOnSP's advice to health plans complies with the ACA if JJHCS would agree to produce (as discussed) documents concerning any aspect of JJHCS's understanding of the designation of EHBs and NEHBs, and not merely SaveOn's own advice regarding or understanding of the designation of EHBs and NEHBs.

Anthony LoMonaco
January 20, 2023

Please confirm promptly whether JJHCS will produce the broader set of documents SaveOnSP seeks in response to RFP No. 14, and, if so, on what conditions.

### D.    RFP No. 21

SaveOnSP's RFP No. 21 seeks information regarding JJHCS's advocacy to or communications with any governmental or regulatory body regarding Save-OnSP, Copay Accumulator Services, or Copay Maximizer Services. JJHCS has thus far refused to produce any responsive documents on the grounds that it has a First Amendment right to withhold them and that such communications are irrelevant.

During our meet and confer, the parties agreed to forego discussing this request insofar as it relates to copay accumulators and maximizers in light of the parties' potential agreement noted above. *See supra* Section I.D. As it relates to communications and advocacy regarding SaveOnSP, we explained that such documents are relevant to JJHCS's GBL claim, as JJHCS's public advocacy efforts may include misinformation that causes the alleged patient stress and confusion that JJHCS attributes to SaveOnSP. We maintained that we are entitled to discover such documents notwithstanding your assertion that this case concerns only the specific types of stress and confusion that JJHCS alleged in its complaint.

We note that JJHCS has requested similar information from SaveOnSP. In its RFP No. 33, JJHCS requests documents and communications SaveOnSP has received reflecting complaints, concerns, or inquiries about its services, including from governmental agencies. Both parties are currently seeking communications between parties and government entities. We are open to discussing a reciprocal agreement on this material.

You agreed to take our position back to your clients. Please confirm promptly whether JJHCS will produce any documents in response to RFP No. 21.

### E.    RFP No. 25

SaveOnSP's RFP No. 25 seeks all documents and communications regarding any alleged harm caused by SaveOnSP to JJHCS, including JJHCS's allegations in Complaint ¶¶ 110, 115. JJHCS has thus far agreed to produce documents and communications relating to "the extent of the harm SaveOn has caused."

During the meet and confer, we sought further clarification on whether JJHCS's use of the phrase "extent of the harm" in its response, as compared to the phrase "any alleged harm," as used in the request, is intended to exclude any documents responsive to SaveOnSP's request. You noted that you had not previously picked up on that distinction, but that you recognized the difference and would confirm what JJHCS intends to produce.

Anthony LoMonaco
January 20, 2023

Please confirm promptly that JJHCS will produce all documents regarding any alleged harm caused by SaveOnSP to JJHCS, without withholding any documents based on JJHCS's use of the phrase "extent of the harm."

## F.    RFP Nos. 26 & 32

SaveOnSP's RFP No. 26 seeks documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum. SaveOnSP's RFP No. 32 seeks documents and Communications regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient.

With respect to RFP No. 26, JJHCS has taken the position that its agreement to produce documents sufficient to show how JJHCS determines the amount of copay assistance funds it offers to CarePath enrollees is sufficient to satisfy this request. JJHCS has refused to produce any documents responsive to RFP No. 32.

As we explained during our meet and confer, these requests seek documents reflecting payments made to CarePath enrollees via JJHCS, Janssen, JJHCS Hub Entities, or any other entity that pays CarePath funds to patients, as well as communications concerning those payments. In short, SaveOnSP seeks documents concerning the actual amount of CarePath funds paid to patients, including instances where patients received more than the budgeted amount of CarePath funds. We explained that in this latter situation, such documents are particularly relevant to both refuting JJHCS's allegations regarding viability as well as for contesting any damages amount put forward by JJHCS, as such overpayments would not be caused by SaveOnSP.

You agreed to take these requests and our explanation of relevance back to your client. Please confirm promptly whether JJHCS will produce documents in response to RFP Nos. 26 and 32.

## G.    RFP Nos. 28 & 29

SaveOnSP's RFP Nos. 28 and 29 seek data regarding several topics, including patient fills and dosages for Janssen Drugs, the manufacturing and marketing of Janssen Drugs, copay assistance funds, the CarePath budget, and JJHCS's return on investment for CarePath. JJHCS has thus far agreed to produce Janssen transparency reports (RFP No. 28) and documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath" (RFP No. 29).

9

Anthony LoMonaco
January 20, 2023

As discussed above, *see supra* Section I.A., we explained that the data Save-OnSP seeks in RFP Nos. 28 and 29 is relevant to understanding JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, and the financial impact of SaveOnSP on J&J more broadly. With respect to RFP No. 28, we clarified that the transparency reports JJHCS has agreed to produce are insufficient, as they are public documents with very little responsive information. We also pointed out the significant similarities between certain categories of data covered by SaveOnSP's RFP No. 28 and JJHCS's request for similar data regarding drug fills in its RFP No. 41. We asked that JJHCS consider whether, in light of those similarities, there is potential for reciprocity.

We are open to discussing more robust data production from both Save-OnSP and JJHCS, subject to an agreement that satisfactorily limits the commercial harm to SaveOnSP by limiting JJHCS's ability to contact SaveOnSP-enrolled patients and SaveOnSP clients. *See* January 20, 2021 Letter from A. Dunlap to H. Sandick.

You agreed to take both requests back to your client for further discussion. Please confirm promptly whether JJHCS will produce additional documents, beyond what it has already agreed to produce, in response to RFP Nos. 28 and 29.

## H.    Request No. 34

SaveOnSP's RFP No. 34 seeks all documents and communications regarding JJHCS's or Janssen's negotiations or agreements regarding the potential use of SaveOnSP's services, or the services of any Copay Maximizer Service or Copay Accumulator Service, for JJHCS's Employee Health Plans, including JJHCS's abandonment of those negotiations or agreements. JJHCS has thus far refused to produce any documents in response, asserting that such documents are irrelevant.

During our meet and confer, we explained that these documents and communications are relevant to the credibility of JJHCS's allegations. We explained that SaveOnSP understands that J&J or JJHCS conducted significant negotiations with SaveOnSP to use SaveOnSP's services for the health plan it provides for its own employees. Before the parties could sign a contract, however, another division within J&J or JJHCS insisted that the negotiations cease. We explained that if J&J or JJHCS was in fact considering using SaveOnSP's services for its employee health plan, that would call into question JJHCS's assertions that SaveOnSP harms patients. You responded that these documents and communications are nonetheless irrelevant because no contract was ever signed between J&J and SaveOnSP. But, as we explained, J&J or JJHCS likely would have analyzed the benefits of employing SaveOnSP's services during these negotiations. Documents and communications reflecting that analysis are relevant to assessing the credibility of JJHCS's allegations.

10

Anthony LoMonaco
January 20, 2023

You stated that you would take this request and our explanation back to
your client. Please confirm promptly that JJHCS will produce documents respon-
sive to RFP No. 34.

## I.    Request Nos. 36 & 37

SaveOnSP's RFP No. 36 seeks documents sufficient to show the economic
terms of JJHCS's retention of, or agreements with, any JJHCS Hub Entities or
CarePath Care Coordinator regarding CarePath, including any assessment of the
fair market value of those services. SaveOnSP's RFP No. 37 seeks documents suf-
ficient to show the percentage of patients who enroll in CarePath after being con-
tacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third-party author-
ized to advertise or market CarePath or Janssen Drugs. In response to RFP No. 36,
JJHCS has agreed to produce agreements between JJHCS and the entities respon-
sible for administering CarePath, for the period of January 1, 2017 to the present,
even if those entities no longer administer CarePath today. JJHCS has represented
that those agreements will include work orders that document the cost of the ser-
vices provided. JJHCS has thus far refused to produce documents responsive to
RFP No. 37, asserting that they are irrelevant.

During our meet and confer, we explained that SaveOnSP believes it is more
successful at getting patients to sign up for CarePath than JJHCS is through its
own outreach, and that SaveOnSP thus generates additional revenue for JJHCS
both in the form of profits from additional drug fills and by saving JJHCS from the
expense of conducting outreach to these patients. We explained that demonstrat-
ing SaveOnSP's net benefit to JJHCS is relevant to refuting JJHCS's alleged injury
and the alleged threatened viability of CarePath. RFPs Nos. 36 and 37 seek infor-
mation relevant to that defense, including information regarding the value of the
CarePath outreach services for which JJHCS contracts and information about the
number of patients that JJHCS is able to enroll in CarePath through it and its part-
ners' outreach. Regarding RFP No. 36, we acknowledged that the contracts be-
tween JJHCS and the entities responsible for administering CarePath which
JJHCS has already agreed to produce may provide information regarding the value
of those entities' outreach services to JJHCS, but that SaveOnSP also seeks any
other documents reflecting the value of those services, including internal docu-
ments that may have been generated by JJHCS in the process of negotiating its
contracts.

You stated that you would take these requests and our explanations back to
your client. Please confirm promptly whether JJHCS will produce a broader range
of documents responsive to RFP No. 36, and whether it will produce any docu-
ments responsive to RFP No. 37.

## J.    Request No. 38

SaveOnSP's RFP No. 38 seeks documents and communications received by
JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity

11

Anthony LoMonaco
January 20, 2023

regarding SaveOnSP or CarePath. JJHCS has agreed to produce all documents re-
sponsive to this Request regarding SaveOnSP. SaveOnSP accepts JJHCS's offer
and will not seek further documents responsive to this request relating solely to
CarePath at this time, although SaveOnSP reserves all rights.

* * *

We remain hopeful that the parties can work through these issues to reach
a mutually agreeable resolution. We look forward to your response and are availa-
ble to meet and confer.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

12

# Exhibit 10

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

January 27, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:    **SaveOnSP's Requests For Production**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

We write in response to your January 20, 2023 letter concerning our January 13, 2023 meet and conferring regarding Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Responses and Objections to Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production.

## I.    GLOBAL ISSUES

### A.    Documents Related to the Development and Marketing of CarePath and SaveOnSP's Financial Impact on JJHCS and CarePath (RFPs 11, 26, 28-30, 36, and 37)

SaveOnSP claims that it needs documents relating to the development and marketing of CarePath as well as documents relating to the "finances of any entity with a stake in CarePath, including documents reflecting the financial impact of SaveOnSP's services and the plan terms set by its clients on JJHCS." In general, SaveOnSP advises it needs such documents because it "intends to show that CarePath is primarily a marketing tool that JJHCS and its affiliates use to sell more Janssen Drugs and to hike the price of those drugs year after year." SaveOnSP also claims that it needs such documents because JJHCS alleges that "SaveOnSP harms patients and threatens the continued viability of CarePath by making it 'prohibitively expensive,'" and that "the threat of CarePath's viability constitutes a public harm for purposes of JJHCS's GBL [section] 349 claim," and SaveOnSP "intends to show that Johnson & Johnson's ("J&J's") return on investment from CarePath is substantial, and that even if JJHCS' costs for CarePath have gone up, CarePath is still profitable for J&J." You elaborate on the rationale behind each specific RFP further. We address each RFP below in turn.

Meredith Nelson, Esq.
January 27, 2023
Page 2

RFP No. 11 seeks documents regarding "the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." You state that such documents "relate to SaveOnSP's defense that CarePath is a marketing tool, developed to increase J&J's bottom line."

SaveOnSP has not explained how its assertion that CarePath is a marketing tool is relevant to any claim or defense, or how this fact, even if proved, would justify SaveOnSP inducing patients to breach their contracts with JJHCS. Nor has SaveOnSP explained how JJHCS's intention in operating CarePath is relevant to JJHCS's claims.

RFP Nos. 26 and 32 seek documents concerning the amounts of CarePath funds paid out to patients. You claim such documents "are relevant to disputing JJHCS's claims that its increased CarePath expenditures threaten the viability of CarePath by making it prohibitively expensive, as well as to the extent of JJHCS's alleged damages." We address RFP Nos. 26 and 32 in Section II.F, *infra*.

RFP No. 28 seeks a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. thorough m.), and RFP No. 29 seeks additional documents relating to CarePath's finances. You claim such requests are relevant to "understanding JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, the financial impact of SaveOnSP on J&J more broadly, and JJHCS's damages." We address RFPs No. 28 & 29 in Section II.G, *infra*.

RFP No. 30 seeks documents "regarding the basis for Janssen's decision to raise or lower the prices of Janssen Drugs." You claim this relates to "SaveOnSP's defenses that CarePath is primarily a marketing tool that enables J&J to continue to raise drug prices year after year and that J&J profits from SaveOnSP increasing enrollment in CarePath, because it is able to sell more of its incredibly expensive drugs."

As noted above, SaveOnSP has not explained how Janssen's pricing decisions would justify or excuse SaveOnSP in causing patients to breach their contracts with JJHCS. Further, please explain how documents "regarding the basis for Janssen's decision to raise or lower the prices of Janssen Drugs" relates to SaveOnSP's claimed defense that it is somehow increasing JJHCS's profits by increasing enrollment in CarePath. Even if SaveOnSP did increase enrollment in CarePath, it is unclear how documents relating to decisions to raise or lower drug prices would prove the fact of that increased enrollment.

In short, proclaiming *ipse dixit* on a call that certain categories of documents relate to the litigation does not make it so, and the burden of explaining the relevance of the documents rests with SaveOnSP, especially where the documents requested are voluminous. Thus far, SaveOn has not carried its burden.

Meredith Nelson, Esq.
January 27, 2023
Page 3

RFP Nos. 36 and 37 seek documents relating to the economic terms of its agreements with vendors that support CarePath and documents relating to enrollment in CarePath, respectively. We address RFP Nos. 36 and 37 in Sections II.I, *infra*.

**B.      Documents in the Possession of JJHCS Hub Entities, Janssen, and Other**

**1.      JJHCS Hub Entities**

You ask us to confirm (1) whether there previously were or currently are other JJHCS Hub Entities involved in the development, administration, and marketing of CarePath aside from Trial Card and Lash Group, and (2) if so, whether JJHCS will produce documents from those entities responsive to SaveOnSP's requests.

As discussed in Section I.A., *supra*, SaveOnSP has not explained how documents relating to the development and marketing of CarePath are relevant to this litigation. Further, as explained in Section I.C., *infra*, it is unclear to us how documents dated from before 2017 are relevant to this litigation. Therefore, we focus our response on entities responsible for the administration of CarePath during the relevant Time Period and with regard to the scope that we have agreed is appropriate.

Trial Card is the entity responsible for administering CarePath's co-pay assistance program during the relevant Time Period and is most likely to have documents responsive to SaveOnSP's requests. We had previously identified Lash Group as a predecessor to Trial Card in administering CarePath during a small portion of the relevant Time Period. Based on additional fact investigation, however, we no longer believe that Lash Group had a comparable role in the administration of CarePath's co-pay assistance program. We are continuing to investigate and will let you know if that understanding changes. We are otherwise unaware of any of vendors that have had a comparable role in administering CarePath. Other vendors that provide or have provided limited, episodic services to JJHCS relating to CarePath are not relevant to the litigation.

As noted at our meet and confer, JJHCS is working with Trial Card to facilitate the production of documents responsive to SaveOnSP's requests. Such documents will be produced to SaveOnSP through JJHCS's counsel.

**2.      J&J and Janssen**

You ask us to confirm whether JJHCS will produce documents held by Janssen or other J&J entities because you believe those entities will have "highly relevant" documents, including "documents related to the pricing of Janssen Drugs, the purpose of CarePath, and J&J's return on investment for CarePath." You also request that we provide a list of all J&J entities involved in the development, marketing, or administration of CarePath.

Meredith Nelson, Esq.
January 27, 2023
Page 4

As discussed, JJHCS is the entity that manages CarePath and it is the only J&J entity that is a party to this action. There is no need for JJHCS to provide any list of entities or for documents from other JJHCS affiliates to be produced. JJHCS is prepared to produce documents held by other J&J entities to the extent that such production is agreed upon or ordered by the Court, but we do not think any such production is necessary or appropriate.

### C.     Time Period

SaveOnSP requests several categories of documents from before January 1, 2017. You ask us whether JJHCS intends to produce any documents pre-dating January 1, 2017.

### 1.     Your Demand for Documents Dating Back to January 1, 2009

For certain categories of RFPs (Nos. 1-7, 11-13, 28-30, 36-37), you state that you chose January 1, 2009 as the starting date based on your understanding of when most of the Janssen Drugs first went to market. As we have explained, this start date is unjustified and inappropriate, reaching back almost a decade before SaveOnSP existed, and seven years before CarePath was launched. Nevertheless, we address each request in turn.

For RFP Nos. 12 and 13, which relate to extrinsic evidence concerning the drafting of CarePath's terms and conditions, you claim you need documents going back to January 1, 2009 so you can "make arguments about the meaning of the contracts that SaveOnSP allegedly induced patients to breach." As discussed in Section II.B, *infra*, the drafting history of CarePath's terms and conditions is not relevant to the claims or defenses in this case, but to the extent the parties can reach an agreement on JJHCS's proposal with respect to the scope of JJHCS's response to RFP Nos. 12 and 13, JJHCS is willing to consider producing documents dating back to January 1, 2016.

For RFP Nos. 11, 28-30, 36, and 37, which relate to the development, marketing, administration, and financials of CarePath and Janssen drugs, you claim that you need documents going back to January 1, 2009 so you can "probe why CarePath was created, J&J's historical return on investment for CarePath, and how SaveOnSP has impacted JJHCS and CarePath." Further, you claim that you are entitled to rely on "historical information to assess [JJHCS's] damages and the impact that SaveOnSP has on JJHCS and CarePath," particularly by comparing information pre-dating SaveOnSP's existence to information post-dating SaveOnSP's existence.

As explained more fully in Section I.A, *supra*, and in other sections of this letter, much of the information sought from these requests is irrelevant to the claims and defenses in this case. Nevertheless, JJHCS has agreed to produce certain documents in response to them, subject to general and specific objections, including:

Meredith Nelson, Esq.
January 27, 2023
Page 5

- In response to RFP No. 28, JJHCS agreed to produce Janssen Transparency Reports and also agreed to consider producing documents responsive to items (i) through (m), which relate to CarePath enrollment data.

- In response to RFP No. 29, JJHCS agreed to produce documents sufficient to show (1) how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath.

In order to allow SaveOnSP to perform an analysis comparing information from before and after SaveOnSP's existence, JJHCS would be willing to provide documents in these categories dating back to January 1, 2016, to the extent such documents exist and can be located by a reasonable search. Any date range beyond that would be unduly burdensome and unnecessary to the analysis that SaveOnSP wishes to perform.

Finally, for RFP Nos. 1-7, which ask for various categories of organizational charts, you state you need documents dating back to January 1, 2009 "in order to understand how the above information implicates the various entities whose conduct is relevant in this action and to identify potential sources of additional information." Subject to general and specific objections, JJHCS agreed in response to RFP Nos. 1, 4, and 5 to "produce non-privileged documents in its possession sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath." As above, JJHCS would be willing to provide documents in these categories dating back to January 1, 2016, to the extent such documents exist and can be located by a reasonable search.

### 2.    Your Demand for Documents Dating Back to January 1, 2015

For another category of RFPs (Nos. 14, 41, and 42), you seek documents from as early as January 1, 2015. These requests seek documents relating to JJHCS's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits (RFP No. 14), "Copay Accumulator Services and Copay Maximizer Services and their effect on JJHCS's return on investment for copay assistance dollars," (RFP No. 41), and JJHCS's understanding of the terms "copay accumulator" and "copay maximizer." (RFP No. 42).

As we have explained, these requests are irrelevant to the claims and defenses at issue in this case because JJHCS's understanding of the regulatory backdrop or the meaning of the terms "copay accumulator" and "copay maximizer" have no bearing on whether SaveOnSP tortiously interfered with CarePath or violated the New York's GBL. Further, JJHCS has agreed to produce several categories of documents related to the harm SaveOnSP has caused it, so the effects of other programs are also not relevant to this case.

Meredith Nelson, Esq.
January 27, 2023
Page 6

Nevertheless, in response to RFP No. 14, subject to general and specific objections, JJHCS agreed to produce documents "regarding SaveOnSP's designation of specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations." JJHCS discusses further compromise on this RFP in Section II.C, *infra*. Further, while JJHCS has not agreed to produce documents in response to RFP Nos. 41 and 42, JJHCS also discusses a potential compromise in Section I.D, *infra*. While JJHCS is prepared to compromise on the requests and go beyond what it is obligated to produce, extending the time period beyond January 1, 2017 is not appropriate for these requests.

**D.    Requests Related to Accumulators and Maximizers (RFP Nos. 20, 21, and 41-43).**

SaveOnSP's RFP Nos. 20, 21, and 41-43 seek documents related to accumulators and maximizers. For example, RFP No. 42 seeks documents relating to JJHCS's "understanding of the terms 'copay accumulator' and 'copay maximizer.'" JJHCS responded to most of these requests that it would produce documents relating to SaveOnSP specifically, except for RFP No. 21, which JJHCS objected to in full because, *inter alia*, it targets irrelevant lobbying efforts.

As we explained during the meet and confer, JJHCS's understanding or views about accumulators or maximizers in general are irrelevant. The key point in JJHCS's Complaint is that SaveOnSP has characteristics of such programs (*see* Compl. ¶¶ 50, 74), which is a fact that will be proved only by reference to documents in SaveOnSP's possession. In response, you ask whether JJHCS would agree to a proposal that both parties drop their requests concerning accumulators and maximizers.

We do not accept this proposal. The documents relating to maximizers and accumulators that JJHCS seeks are relevant for reasons that are not reciprocal. For instance, JJHCS's RFP No. 43 seeks "documents and communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs and JJHCS's RFP No. 45 seeks "documents and communications relating to studies, reports, publications, analyses, research, white papers reviews, or other written work product" relating to, *inter alia*, "accumulator programs" and "maximizer programs." The wrongfulness of SaveOnSP's Program is at issue, so whether it can legally operate in states with accumulator bans is relevant. Further, SaveOnSP's intent is at issue, so given that it has characteristics of accumulators and maximizers, any analyses of whether such programs are wrongful or harmful is relevant. Because JJHCS's intent is not at issue, neither of those categories of documents are relevant with respect to JJHCS, nor is the broad category of "JJHCS's understanding of the terms 'copay accumulator' and 'copay maximizer'" an appropriate topic of discovery from JJHCS.

**II.    ISSUES RELATED TO SPECIFIC REQUESTS**

Meredith Nelson, Esq.
January 27, 2023
Page 7

### A.    RFP No. 11

You ask us to confirm whether J&J or JJHCS operates or previously operated any copay assistance programs other than CarePath.  We are unaware of any other copay assistance programs operated by J&J or JJHCS during the relevant Time Period of January 1, 2017 to July 1, 2022.  Any programs that predate CarePath's launch are irrelevant to this litigation.

### B.    RFP Nos. 12 and 13

SaveOnSP's Request Nos. 12 and 13 seek documents regarding CarePath's terms and conditions, including CarePath's requirement that patients enrolled in CarePath make payments toward Janssen Drugs.  In response, JJHCS has agreed to produce final versions of CarePath's terms and conditions because JJHCS's allegation that SaveOnSP causes a breach of those terms and conditions is evident by their plain meaning.  SaveOnSP nevertheless insists that it is entitled to gather extrinsic evidence on the meaning of CarePath's terms and conditions in support of its assertion that SaveOnSP does not cause of breach of cause a CarePath's terms and conditions.  You ask us to confirm whether JJHCS will produce internal communications regarding the meaning of SaveOnSP's terms and conditions.

During our meet and confer, we asked SaveOnSP to consider producing internal communications responsive to JJHCS's RFP No. 17 ("Any agreements, including drafts, between Express Scripts on the one hand, and health insurance plan sponsors, on the other, regarding the SaveOnSP Program, and any communications relating thereto") in exchange for JJHCS's agreement to produce internal communications relating to the drafting of CarePath's terms and conditions.  You rejected this proposal at the meet and confer and again in your letter because you claim that "the terms of SaveOnSP's contracts with health plans are not at issue in this case."

We ask you to reconsider our proposal.  The terms of SaveOnSP's contracts with health plans and Express Scripts are very much at issue in this case.  JJHCS alleges that SaveOnSP intentionally tortiously interferes with its CarePath program by contracting with Express Scripts and health plans to perpetuate the SaveOnSP Program.  *See, e.g.*, Compl. ¶¶ 28, 52, 68, 75, 113.  Because SaveOnSP's intent is at issue with respect to JJHCS's tortious interference claim, communications relating to SaveOnSP's understanding of those terms and whether they are wrongful is particularly relevant.  Further, because harm to both JJHCS and patients is at issue with respect both to JJHCS's tortious interference claim and its GBL claim, communications relating to whether the terms of SaveOnSP's agreements harm JJHCS or harm patients are also relevant.  If SaveOnSP intends to seek JJHCS's internal documents, fairness requires that SaveOnSP produces its internal documents, as we have proposed and propose again.

Meredith Nelson, Esq.
January 27, 2023
Page 8

C.      **RFP No. 14**

SaveOnSP's RFP No. 14 seeks documents relating to JJHCS's and other entities'
"understanding of commercial health plans' ability to designate specialty drugs as Essential
Health Benefits ('EHB') or Non-Essential Health Benefits ('NEHB') under the Affordable Care
Act ('ACA') and its regulations."  In response to this request, JJHCS agreed to produce non-
privileged documents and communications regarding SaveOnSP's designation of specialty drugs
as EHB or NEHB.  You ask us to confirm whether in addition to these documents, JJHCS would
be willing to produce internal communications relating to its understanding of a commercial
health plans' ability to designate specialty drugs as EHB or NEHB under the ACA.  In exchange,
you indicate that "SaveOnSP would be open to producing internal documents that reflect its
understanding of whether SaveOnSP's advice to health plans complies with the ACA."

We are willing to accept the following proposal:  We would agree to produce all
non-privileged documents and communications regarding JJHCS's understanding of commercial
health plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its
regulations for the time period of January 1, 2017 to June 1, 2022 to the extent such documents
exist and can be located after a reasonable search.  In exchange, SaveOnSP would need to agree
to produce all non-privileged documents and communications, including internal
communications, regarding SaveOnSP's understanding of commercial health plans' ability to
designate specialty drugs as EHB or NEHB under the ACA and its regulations for the time
period from January 1, 2017 to July 1, 2022.  Please let us know SaveOnSP is interested in such
a proposal.

D.      **RFP No. 21**

SaveOnSP's RFP No. 21 concerns "any advocacy to or communications with any
governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or Copay
Maximizer."   JJHCS has objected to this request, *inter alia*, as seeking documents and
communications that are irrelevant to any claim or defense in this action and also subject to a
First Amendment privilege.

In your letter, you claim "that such documents are relevant to JJHCS's GBL
claim, as JJHCS's public advocacy efforts may include misinformation that causes the alleged
patient stress and confusion that JJHCS attributes to SaveOnSP."  As we discussed during our
meet and confer, the Complaint alleges that SaveOnSP confuses patients by, for example,
creating rejections and delays at the point of sale.  *See* Compl. ¶ 88.  You respond by maintaining
that "you are entitled to discovery of such documents notwithstanding [JJHCS's] assertion that
this case concerns only the specific types of stress and confusion that JJHCS alleged in its
complaint."

SaveOnSP's request does not relate to the claims or defenses in this action and
you have offered no logical explanation to the contrary.  In response to our request that you

Meredith Nelson, Esq.
January 27, 2023
Page 9

identify stress or confusion alleged in the complaint that could reasonably be attributed to JJHCS, you instead suggest in conclusory fashion that this case does not concern "only the specific types of stress and confusion that JJHCS alleged in its complaint." Please explain how, if JJHCS's public advocacy efforts to protect patients theoretically somehow caused stress or confusion other than that alleged in the Complaint, that would justify SaveOnSP causing the stress or confusion alleged in the Complaint.

Moreover, as we explained in our letter dated January 6, 2023, JJHCS has a privilege against the production of documents that would unjustifiably burden its First Amendment right to political association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958). In light of this First Amendment privilege, we asked SaveOnSP to explain why its request for documents concerning JJHCS's lobbying of government officials is permissible. To date, you have provided no response to this request. Please explain why SaveOnSP is entitled to documents and communications concerning JJHCS's lobbying efforts, notwithstanding the burden this request imposes on JJHCS's First Amendment protections.

### E.     RFP No. 25

SaveOnSP's RFP No. 25 seeks all documents and communications regarding any alleged harm caused by SaveOnSP to JJHCS, including JJHCS's allegations in Complaint ¶¶ 110, 115. In response, JJHCS agreed to produce documents and communications relating to "the extent of the harm SaveOn has caused." R&O to SaveOnSP's RFP No. 25.

During the meet and confer, you asked to confirm whether use of the phrase "extent of the harm," as compared to the phrase "any alleged harm," as used in the request, was intended to exclude any documents responsive to SaveOnSP's request. There is no practical difference in the search terms or production that would follow from what was requested and what we have agreed to produce. Thus, subject to its general and specific objections, JJHCS confirms that it will produce all documents responsive to SaveOnSP's request.

### F.     RFP Nos. 26 & 32

SaveOnSP's RFP No. 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum." SaveOnSP's RFP No. 32 seeks all documents and communications "regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient."

With respect to Request No. 26, JJHCS agreed to produce documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to

Meredith Nelson, Esq.
January 27, 2023
Page 10

Patients enrolled in CarePath." *See* R&O to RFP No. 29.  However, JJHCS declined to produce
any documents in response to Request No. 32 as, *inter alia*, irrelevant to the litigation.

During our meet and confer, you clarified that SaveOnSP is seeking not just
documents showing how JJHCS determines the amount of copay funds it offers to patients, but
also documents and communications concerning what amounts are actually paid to patients,
including internal documents and communications regarding these amounts.  In your letter, you
contend that these amounts are "particularly relevant to both refuting JJHCS's allegations
regarding viability as well as for contesting any damages amount put forward by JJHCS, as such
overpayments would not be caused by SaveOnSP."

Internal communications regarding the amount of copay assistance funds paid to
patients are not necessary for SaveOnSP to assess whether JJHCS pays out more in copay
assistance than it has budgeted.  Nor has SaveOnSP explained how such documents are
otherwise relevant to any claims or defenses in this litigation.  However, subject to the conditions
laid out in Section II.F *infra* regarding RFP No. 28, JJHCS is willing to provide data regarding
the actual amounts paid to patients in copay assistance, to the extent such data exists and can be
located after a reasonable search.  To the extent that data reflects that JJHCS is in fact paying
more than the budgeted amount of CarePath funds to certain patients, JJHCS is willing to meet
and confer further to determine if additional discovery is appropriate on those specific cases.
Please confirm whether this compromise is acceptable to SaveOnSP.

G.      **RFP No. 28 & 29**

SaveOnSP's RFP No. 28 seeks a variety of categories of data relating to both
Janssen Drugs (items a. through g.) and CarePath (items i. through m.).  SaveOnSP's Request
No. 29 seeks documents relating to CarePath's finances and the relationship between those
finances and Janssen finances.  In response, subject to general and specific objections, JJHCS
agreed to produce Janssen Transparency Reports and invited SaveOnSP to confer on items i.
through m. for RFP No. 28, and also agreed to produce documents sufficient to show "(1) how
JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in
CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and
projected annual costs for CarePath" for RFP No. 29.  *See* R&Os to SaveOnSP's RFP Nos. 28 &
29.

You claim that the data SaveOnSP seeks in RFP Nos. 28 and 29 is relevant to its
understanding of "JJHCS's return on investment for CarePath, how CarePath enables JJHCS to
increase the costs of Janssen Drugs, and the financial impact of SaveOnSP on J&J more
broadly."  Further, during the meet and confer, you stated that SaveOnSP is entitled to discovery
on the marketing and development of CarePath and other copay assistance programs for the ***last
thirteen years***, because Janssen increases drug prices for profit and uses CarePath to induce
patients to take Janssen drugs, so any impact SaveOnSP has on CarePath does not constitute

Meredith Nelson, Esq.
January 27, 2023
Page 11

public harm.  Finally, you ask us to consider whether SaveOnSP's RFP Nos. 28 is similar to
JJHCS's RFP No. 41, and whether there is potential for reciprocity.

After conferring internally, with to items a. through g. for RFP No. 28, we still do not see
how those categories of documents relate to the claims and defenses in this case.

First, the items you request do not relate to the facts you seek to establish as outlined in
your letter, namely: "JJHCS's return on investment for CarePath, how CarePath enables JJHCS
to increase the costs of Janssen Drugs, and the financial impact of SaveOnSP on J&J more
broadly."  Please explain how items like "actual and projected number of patients receiving
Janssen drugs, the number of fills and dosages, the costs to manufacture Janssen Drugs, the sales
and marketing budget for Janssen drugs, the price of Janssen Drugs, and the revenue received for
Janssen Drugs" going back nearly thirteen years are relevant or necessary to determining the
"return on investment for CarePath," "how CarePath enables JJHCS to increase the cost of
Janssen Drugs," or "the financial impact of SaveOnSP on J&J more broadly."

Second,  the facts you seek to establish do not relate to the claims or defenses in this
action.  Specifically, please explain how, even assuming there is a "return on investment on
CarePath" or "CarePath enables JJHCS to increase the costs of Janssen Drugs," those facts
would permit SaveOnSP to cause patients to breach their contracts with JJHCS and repurpose
CarePath's funds for SaveOnSP's profit or would excuse the damages that JJHCS alleges
SaveOnSP has caused.  Likewise, please explain how SaveOnSP's theoretical impact on "J&J
more broadly" excuses those same damages.  There is no basis to convert this case from a claim
brought against SaveOnSP for two specific causes of action into a free-wheeling exploration of
all aspects of J&J's process of drug development and price.  Indeed, neither of the causes of
action brought by JJHCS permit the type of discovery from JJHCS that SaveOnSP seeks.

With respect to items i. through m. for RFP No. 28, which relate to enrollment data for
CarePath, JJHCS is willing to consider producing such data, to the extent it exists and can be
located after a reasonable search, if SaveOnSP is willing to produce the categories of data
requested in JJHCS's RFP No. 41 and 42, rather than just "data sufficient to show, for each
Janssen Drug, the annual total amount of payments made by CarePath for participants advised by
SaveOnSP."  *See* R&Os for JJHCS's RFP Nos. 41 and 42.  Please indicate whether SaveOnSP is
willing to consider this compromise.

Finally, with respect to RFP No. 29, in addition to agreeing to produce documents
showing the harm that results from SaveOnSP's conduct (*see, e.g.*, R&O to SaveOnSP's RFP
No. 25), JJHCS has also agreed, subject to general and specific objections, to produce documents
sufficient show (1) how JJHCS determines the amounts of copay assistance funds that JJHCS
offers to Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through
CarePath, and (3) JJHCS's actual and projected annual costs for CarePath."  R&O to
SaveOnSP's RFP No. 29.  As noted above, we still do not see how the facts you seek to establish
as outlined in your letter relate to the claims or defenses at issue, but we ask you to consider

Meredith Nelson, Esq.
January 27, 2023
Page 12

whether such data, in addition to the data JJHCS would be willing per the above compromise regarding RFP No. 28, is sufficient.

**H.      RFP No. 34**

SaveOnSP's Request No. 34 seeks documents and communications concerning JJHCS's consideration of SaveOnSP's services for its own employer-sponsored health plan. JJHCS declined to produce any such documents. As outlined in your letter, you indicated that "SaveOnSP understands that J&J or JJHCS conducted significant negotiations with SaveOnSP to use SaveOnSP's services for the health plan it provides for its own employees" but "[b]efore the parties could sign a contract, however, another division within J&J or JJHCS insisted that the negotiations cease."

As you are aware, J&J never signed a contract with SaveOnSP. Further, JJHCS itself was not involved in any such negotiations. Thus, RFP No. 34 is irrelevant to the claims and defenses in this action. JJHCS will not produce documents in response to this request.

**I.      RFP Nos. 36 & 37**

SaveOnSP's Request No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS has agreed to produce agreements for entities responsible for administering CarePath for the period of January 1, 2017 to the present, even if those entities are no longer involved in the administration of CarePath. *See* R&O to SaveOnSP's RFP No. 36. JJHCS is also endeavoring to produce work orders that document the cost of the services provided.

During the meet and confer, you clarified that in addition to these agreements, SaveOnSP is seeking internal communications regarding the value ascribed to the services provided by certain Hub Entities. In your letter, you again assert that in addition to the agreements themselves, SaveOnSP is seeking internal communications that "reflect[] the value of [those] services, including internal documents that may have been generated by JJHCS in the process of negotiating its contracts." Please explain how the value ascribed by JJHCS to the services provided its vendors or otherwise relevant to claims or defenses in this matter.

Relatedly, SaveOnSP's Request No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." JJHCS declined to produce documents in response to this Request on the grounds that, *inter alia*, this Request is irrelevant to the subject matter at issue in this litigation. *See* R&O to RFP No. 37.

During the meet and confer, you explained that SaveOnSP believes it is actually more successful in getting patients to sign up for CarePath than Janssen is by itself. Therefore,

Meredith Nelson, Esq.
January 27, 2023
Page 13

you contend that SaveOnSP "provides a net benefit to J&J, because more patients are taking Janssen drugs even if JJHCS is paying more in copay assistance."

We have investigated this issue further. JJHCS does not keep statistics on whether patients sign up for CarePath after being contacted by JJHCS or its vendors, which moots this request regardless of its irrelevance.

**J.     Request No. 38**

SaveOnSP's Request No. 38 seeks documents and communications received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath. As SaveOnSP indicates that it accepts JJHCS's offer to produce all documents responsive to this Request regarding SaveOnSP, there appears to be no further dispute on this issue.

* * *

We are available to meet and confer regarding the issues outlined above at your convenience. We look forward to your response.

Very truly yours,

*/s/Anthony C. LoMonaco*
Anthony C. LoMonaco

# Exhibit 11

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

selendy
gay
elsberg

Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com


February 7, 2023


**Via E-mail**

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

Re:   ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC*** **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

We write to memorialize and follow up on our January 30, 2023 meet and
confer regarding Save On SP LLC's ("SaveOnSP") Requests for Production to John-
son & Johnson Health Care Systems, Inc. ("JJHCS"), as well as JJHCS's January
27, 2023 letters and JJHCS's Responses and Objections to SaveOnSP's First Set of
Interrogatories.

I.    **Global Issues**

    A.    **Documents Related to the Development and Marketing of
CarePath and SaveOnSP's Financial Impact on JJHCS and
CarePath (RFP Nos. 11, 26, 28-30, and 36-37)**

We explained, as we have before, that SaveOnSP's RFP Nos. 11, 26, 28-39,
and 36-37 seek information relevant to SaveOnSP's defenses, including rebutting
JJHCS's allegations that CarePath is intended to help patients afford their medi-
cations, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the
continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114,
and that the threat to CarePath's viability constitutes a public harm for purposes
of JJHCS's GBL § 349 claim, *id.* SaveOnSP also seeks this information to discover
whether, because of SaveOnSP, Johnson & Johnson ("J&J") sold more drugs and
reaped more profits than it otherwise would have, which would be relevant to
JJHCS's claim of damages.

Anthony LoMonaco
February 7, 2023

These documents and communications are also relevant on three additional grounds.

*First*, JJHCS has asserted that it needs a wide range of documents and communications from SaveOnSP to assess the "wrongfulness" of SaveOnSP's conduct. In the context of a tortious interference claim, wrongfulness or malice "means that the harm was inflicted without justification or excuse." *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 564-65 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). The standard is commercial in nature—asking whether the "loss of business is merely the incident of healthy competition." *Id.* at 565 (quoting *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001)). If JJHCS is permitted to seek broad discovery into the supposed wrongfulness of SaveOnSP's conduct, then SaveOnSP should also be permitted to seek discovery that will allow it to explain the broader context in which it operates, including the untenable position in which J&J and other pharmaceutical companies have placed health plans by raising specialty drug prices to extraordinary heights. *See id.*; *Hotaling & Co., LLC v. Berry Sols. Inc.*, 2022 WL 4550145, at *4 (D.N.J. Sept. 29, 2022) (noting that defendants may contest a tortious interference with contract claim by justifying their "motive[s] and purpose," in addition to "the means used" (quoting *Lamorte Burns & Co.*, 770 A.2d at 1171)).

*Second*, JJHCS has argued that SaveOnSP causes patient harm by making health care more expensive for patients. Compl. ¶ 114. SaveOnSP is entitled to discovery showing that JJHCS and J&J are the true drivers of increasing health care costs by driving up drug prices and, as a result, forcing health plans to offset those increased costs by raising patient deductibles and copays.

*Third*, JJHCS seeks injunctive relief in addition to damages. To obtain a permanent injunction, JJHCS must demonstrate "(1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest." *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). SaveOnSP is entitled to discovery that will enable it to refute each of those elements, including to support its theory that JJHCS uses CarePath as a marketing tool that distorts patient incentives and allows Janssen to raise the cost of its drugs year after year. This defense is relevant to both the balance of the equities and whether the public interest supports the permanent injunction JJHCS seeks.

JJHCS stated that it will not produce documents responsive to these Requests because it does not believe the information sought is relevant. We understand that the parties are at impasse on this issue and may present this dispute to the Court for resolution.

2

Anthony LoMonaco
February 7, 2023

### B.    JJHCS Hub Entities, Janssen, and Other J&J Entities

During our meet and confer, we further discussed your positions with respect to SaveOnSP's requests for documents and communications possessed by the JJHCS Hub Entities and all other J&J and Janssen entities. These issues also bear on JJHCS's responses to SaveOnSP's Interrogatories.

### 1.    Documents Of JJHCS Hub Entities

SaveOnSP seeks documents and communications from any JJHCS Hub Entity that was or is involved in the development, administration, or marketing of CarePath.

*First*, during our meet and confer, you told us for the first time that documents and communications held by Trial Card and Lash Group are not in JJHCS's possession, custody, or control. SaveOnSP reserves its rights to contest that position or to subpoena information directly from Trial Card and Lash Group.

*Second*, although JJHCS previously agreed to "facilitate" the production of documents from Trial Card and Lash Group, in your January 27, 2023 letter and during our meet and confer you stated that you now would not facilitate the production of documents from Lash Group. You asserted that you "no longer believe that Lash Group had a comparable role [to Trial Card] in the administration of CarePath's co-pay assistance program." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 3. We asked for further information regarding Lash Group's role in CarePath. You said that while Lash Group may have been involved with CarePath generally, it was not tasked with enrolling patients in CarePath or assisting patients with their copay assistance cards, conduct for which you claimed Trial Card was "the main entity that was responsible." Instead, you maintained, Lash Group provided other services in connection with CarePath, such as "determining coverage."

SaveOnSP lacks the information necessary to assess whether Lash Group was in fact involved in the administration of CarePath. If, for example, confirming that an individual's insurance covered the Janssen Drug they sought to fill was a prerequisite to providing them with copay assistance, Lash Group's conduct as you have described it would be part of the "administration" of CarePath. As we stated during our meet and confer, we request that you provide further information on Lash Group's involvement with CarePath, including details on the services you claim Lash Group provided, the relationship between those services and the CarePath copay assistance program, and the time period during which Lash Group provided those services. Please also confirm promptly (1) whether you have completed your investigation into Lash Group's involvement in CarePath; and (2) whether, as a result of that investigation, you have changed your position on whether you will facilitate the production of documents from Lash Group.

3

Anthony LoMonaco
February 7, 2023

*Third*, your letter also states that you are unaware of other entities that "have had a comparable role [to Trial Card] in administering CarePath." *Id.* As we explained during the meet and confer, this statement is not clear. Please tell us whether any entity other than Trial Card was *in any way* involved in enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card.

*Fourth*, JJHCS has also refused to produce documents and communications from any other JJHCS Hub Entity, to identify any Hub Entities involved in the development or marketing of CarePath (including stating whether Lash Group was involved in that development or marketing), or to identify any Hub Entities involved in the administration of CarePath prior to 2016.

You assert in your January 27, 2023 letter that "SaveOnSP has not explained how documents related to the development and marketing of CarePath are relevant to this litigation." *Id.* This is untrue. As we explained, such documents are directly relevant to several of SaveOnSP's defenses—including rebutting JJHCS's allegations that CarePath is intended to help patients afford their medications, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114, and that the threat to CarePath's viability constitutes a public harm for purposes of JJHCS's GBL § 349 claim, *id*—and to contesting JJHCS's asserted damages. *See* Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2; *see also supra* Section I.A.

We therefore reiterate our request that you provide (1) the identities of Hub Entities involved in the development and marketing of CarePath from 2009 to present; and (2) the identities of Hub Entities involved in the administration of CarePath from 2009 to 2016.

*Finally*, you assert, without explanation, that entities that provided "limited, episodic services to JJHCS relating to CarePath are not relevant to the litigation." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 3. Please provide a basis for this representation, including the identity of these vendors and further information on the services provided by these vendors.

## 2.    Documents Of J&J and Janssen Entities Other Than JJHCS

SaveOnSP also seeks documents and communications in the possession of Janssen and other J&J entities. As we have explained several times, these entities likely possess relevant documents and communications concerning the development, marketing, and administration of CarePath, as well as the development and marketing of Janssen Drugs. *See, e.g.*, Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2; *see also supra* Section I.A.

4

Anthony LoMonaco
February 7, 2023

JJHCS refuses to produce documents from any such entities or to provide a list of J&J and Janssen entities that may possess documents responsive to Save-OnSP's Requests for Production. JJHCS has not asserted that it lacks possession, custody, or control over these documents.

In our January 20, 2023 letter and during prior meet and confers, we explained why these entities likely possess relevant documents, including the likelihood that these entities possess documents related to the pricing of Janssen Drugs, the purpose of CarePath, and J&J's return on investment for CarePath. You did not substantively respond to this explanation in your January 27, 2023 letter or in our meet and confer session. Instead, your letter simply maintained that "[t]here is no need for JJHCS to provide any list of entities or for documents from other JJHCS affiliates to be produced" because "JJHCS is the entity that manages CarePath and … is the only J&J entity that is a party to this action." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 4.

In our meet and confer, you said that JJHCS also objected to our request on both relevance and burden grounds. When we asked you to explain your burden objection, you provided no explanation other than asserting J&J and Janssen are "big companies" with many subsidiaries and employees. As we explained, Save-OnSP is not asking JJHCS to produce documents and communications from every J&J or Janssen entity, nor is it asking JJHCS to identify every J&J or Janssen entity, or every employee of those entities. Rather SaveOnSP seeks the identities of the specific J&J and Janssen entities that were involved in the development, marketing, or administration of CarePath or the development and marketing of Janssen Drugs and for JJHCS to produce relevant documents from those entities. Once you provide a list of those entities and identify relevant custodians and non-custodial sources, the parties can negotiate appropriate search parameters. You asserted (without explaining why) that it would be unduly burdensome for JJHCS to provide a list of such entities. You further asserted that J&J is a public company and that SaveOnSP should identify which entities it believes are relevant, despite our explanation that JJHCS is far better positioned to identify these entities.

Because JJHCS refuses to produce documents from entities other than JJHCS—including other J&J or Janssen entities—or to identify such entities involved with CarePath or Janssen Drugs, we understand the parties to be at impasse at this issue and may present this dispute to the Court.

### 3.    Interrogatories Concerning Hub Entities, J&J, and Janssen

SaveOnSP's First Set of Interrogatories seek information on individuals employed by the Hub Entities, J&J, and Janssen. In response to Interrogatories 1, 5, and 6, JJHCS provided information on individuals from JJHCS and Trial Card. In

Anthony LoMonaco
February 7, 2023

response to Interrogatories 2-4 and 7, JJHCS provided information on only individuals from JJHCS.

Based on your similar objection to our RFPs, we understand that JJHCS is refusing to provide the names of responsive individuals who were not employed by JJHCS or Trial Card in response to these Interrogatories on the basis that it views other entities as irrelevant. Please tell us promptly if that understanding is incorrect. Otherwise, we understand the parties to be at impasse at this issue and may present this dispute to the Court.

### C.    Time Period

#### 1.    Documents and Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

Several of SaveOnSP's document requests and interrogatories seek information dating back to January 1, 2009. As we explained in our prior letter, SaveOnSP selected January 1, 2009 as the starting date for RFP Nos. 1-7, 11-13, 28-30, and 36-37 and Interrogatories 1-4 based on its understanding of when most of the Janssen Drugs first went to market.

JJHCS previously refused to produce documents and communications from before January 1, 2017, the date that JJHCS selected for its own requests, on relevance, burden, and proportionality grounds. In your latest letter, you offered to produce documents and communications dating back to January 1, 2016 for several of SaveOnSP's Requests. We address those Requests in turn.

*RFP Nos. 12-13.* These requests seek documents and communications concerning the drafting and revision of CarePath's terms and conditions. SaveOnSP has requested such documents and communications dating back to January 1, 2009 to ensure that it receives complete information on the drafting, revision, and interpretation of the terms and conditions that JJHCS alleges SaveOnSP induces patients to breach. JJHCS's offer to provide responsive documents and communications dating back to January 1, 2016 is helpful, but is insufficient if JJHCS began to develop CarePath before that date. We ask that JJHCS produce documents regarding CarePath's terms and conditions back to January 1, 2009 or the earliest date on which it began to draft those terms and conditions.

*RFP Nos. 1-7, 11, 28-30, and 36-37.* RFP Nos. 1-7 seek organizational charts for JJHCS, Janssen, and the JJHCS Hub Entities, as well as specific groups within those entities. SaveOnSP has requested such documents and communications dating back to January 1, 2009 so that it can determine the full range of entities and persons whose conduct is relevant in this action. RFP Nos. 11, 28-30, and 36-37 seek documents and communications relating to the development, marketing,

6

Anthony LoMonaco
February 7, 2023

administration, and financials of CarePath, as well as the development, marketing, sale, and financials of Janssen Drugs. SaveOnSP has requested such documents and communications dating back to January 1, 2009 to ensure it receives sufficient information on the purpose and financial motivations behind CarePath, as well as the impact of SaveOnSP's services on JJHCS and CarePath. JJHCS's offer to provide responsive documents and communications dating back to January 1, 2016 is helpful, but is insufficient if JJHCS began to develop and sell Janssen Drugs and to develop and administer CarePath before that. We ask that that JJHCS produce organizational charts for JJHCS, Janssen, and the JJHCS Hub Entities, as well as specific groups within those entities starting on January 1, 2009 or the earliest dates on which it began developing CarePath and Janssen Drugs. We likewise ask that JJHCS produce the requested documents and communications relating to the development, marketing, administration, and financials of CarePath, as well as the development, marketing, sale, and financials of Janssen Drugs, starting on January 1, 2009 or the earliest dates on which it began developing CarePath and Janssen Drugs, respectively.

*Interrogatory Nos. 1-4.* SaveOnSP seeks information dating back to January 1, 2009 with respect to its Interrogatory Nos. 1-4. Those interrogatories concern the identities of individuals who were involved in several aspects of CarePath's development and administration, including communicating with patients and health plans; were responsible for marketing and communicating with the public about CarePath; or were involved in analyzing price, revenue, cost, or other financial data for Janssen Drugs, as well as financial data for CarePath. JJHCS limited its responses to Interrogatory Nos. 1-4 to January 1, 2017 through July 1, 2022. For the reasons explained above, SaveOnSP requires information on individuals involved in these subject matters dating back to January 1, 2009. Please amend your interrogatory responses to provide the requested information.

## 2.    Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, and 42)

SaveOnSP's RFP Nos. 14, 41, and 42 seek documents and communications dating back to January 1, 2015. Those requests seek information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as their understanding of Copay Accumulator Services and Copay Maximizers Services. As we have explained, January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect.

In your latest letter, you reiterated your position that "extending the time period beyond January 1, 2017 is not appropriate for these requests." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 6. Based on your prior correspondence,

7

we understand that JJHCS objects to producing documents dating back to 2015 in response to these Requests on both relevance and burden grounds. JJHCS has not, however, quantified this burden. We therefore understand that the parties are at impasse on this issue and may present this dispute to the Court.

### D.  Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20, 21, and 41-43; Interrogatory No. 7)

Both SaveOnSP and JJHCS seek documents and communications that relate to accumulators and maximizers. Several of these requests seek substantially similar information. As we explained during our meet and confer, for example, SaveOnSP's RFP No. 20 and JJHCS's RFP No. 45 both seek documents and communications related to studies, reports, publications, and analyses on accumulators and maximizers. Because of these similarities, SaveOnSP has offered to produce documents and communications relating to its understanding of maximizers and accumulators if JJHCS is willing to do the same.

In your January 27, 2023 letter and during our meet and confer, however, you refused to treat these requests reciprocally. You argued that while SaveOnSP's intent and the wrongfulness of its conduct are at issue, JJHCS's intent—and, therefore, its understanding of whether accumulators and maximizers cause patient harm—are not.

JJHCS's relevance arguments are misguided. As we explained, and as demonstrated by the cases cited by the District Court in its recent opinion on SaveOnSP's motion to dismiss, the only facet of SaveOnSP's "intent" that is relevant to JJHCS's tortious interference claim is SaveOnSP's intent to induce breach of the CarePath contracts. *See, e.g.*, *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002) (describing intent as "an intent to interfere with plaintiff's contract right or ... knowledge that his actions would interfere with the contract right."). You have not explained how the documents sought by JJHCS's Requests relate to SaveOnSP's intent to induce patients to (purportedly) breach their contracts. For instance, whether SaveOnSP complies with state statutes concerning accumulators and maximizers, JJHCS RFP No. 43, has no bearing on whether SaveOnSP intends to induce a breach of CarePath's terms and conditions.

At best for JJHCS, documents regarding accumulators and maximizers would relate to the wrongfulness of SaveOnSP's conduct in inducing purported breaches, not to its intent. But, as noted above, that wrongfulness, or "malice," simply concerns whether the purported breach was induced "without justification or excuse." *DiGiorgio*, 230 F. Supp. 2d at 564-65. Courts assess that inquiry with reference to several factors, including: "(i) the nature of the actor's conduct; (ii) the actor's motive; (iii) the interests of the party with which the actor's conduct interferes; (iv) the interests sought to be advanced by the actor; (v) the social interests

8

Anthony LoMonaco
February 7, 2023

in protecting the freedom of action of the actor and the commercial interests of the other party; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties." *Id.* at 565 (citing *Restatement (Second) of Torts*, § 767 (1979)). In other words, the wrongfulness inquiry considers facts well beyond SaveOnSP's subjective understanding of whether its conduct was wrongful. If documents regarding accumulators and maximizers relate to whether SaveOnSP's conduct was objectively wrongful, those documents would be relevant whether held by SaveOnSP or JJHCS. SaveOnSP disputes that such documents are relevant to wrongfulness. But it is willing to produce such documents if JJHCS will do the same; alternatively, if JJHCS does not want to produce such documents, SaveOnSP would agree not to produce them either.

SaveOnSP remains open to reciprocal productions. You stated that you would consider our renewed request. Please confirm promptly whether JJHCS agrees to making reciprocal productions on this subject matter.

## II.    Issues Related to Specific Requests

### A.    RFP No. 11

SaveOnSP's RFP No. 11 seeks documents and communications regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs. In our January 20, 2023 letter, we asked you to confirm whether J&J or JJHCS operates or previously operated any copay assistance programs other than CarePath. We explained that documents related to those programs are relevant to understanding the purpose of CarePath. In your January 27, 2023 letter, you stated that you are not aware of any other copay assistance programs which J&J or JJHCS has operated since January 1, 2017. You also stated that any copay existence programs which pre-date January 1, 2017 are irrelevant to this litigation.

During our meet and confer, you confirmed that JJHCS is refusing to provide any information on any copay assistance programs J&J or JJHCS may have operated prior to 2017, including answering our question about whether any such programs existed. We understand that the parties are at impasse on this issue and may present this dispute to the Court.

### B.    RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek documents and communications concerning various aspects of the CarePath terms and conditions. As we explained in our January 20, 2023 letter and during our meet and confer, SaveOnSP is entitled to gather parole evidence on the meaning of CarePath's terms and conditions because both of JJHCS's claims are based, at least in part, on allegations that SaveOn induced patients to breach those terms. *See* Opinion Denying SaveOnSP's Motion

to Dismiss (ECF No. 68), at 16 (holding that SaveOnSP's argument concerning the meaning of the terms and conditions "are better suited for a motion for summary judgment"). The meaning of specific terms in CarePath's terms and conditions—including the terms "offer" and "health plan"—are thus of central importance in this case, and information on what JJHCS meant by those terms when it chose to include them in the CarePath terms and conditions is exclusively in the possession of JJHCS. SaveOnSP has agreed to produce documents reflecting its internal understanding of the CarePath terms and conditions. JJHCS has refused to do the same on the grounds that such documents are irrelevant.

JJHCS's attempt to condition its production of documents responsive to SaveOnSP's RFP Nos. 12 and 13 on SaveOnSP agreeing to produce all documents responsive to JJHCS's RFP No. 17 is inappropriate. JJHCS has not identified any term in SaveOnSP's contracts with health plan sponsors that is at issue in this case, and has identified no reason why it needs every draft as well as the full negotiation history of those contracts. During our meet and confer, you suggested that if a health plan raised concerns about SaveOnSP harming patients or J&J during the negotiation of its contract with SaveOnSP, those communications would be relevant to JJHCS's claims. But SaveOnSP has already agreed to produce documents concerning its marketing or promoting its services to health plans, JJHCS's RFP No. 16, all documents related to CarePath, JJHCS's RFP No. 23, and all documents and communications that SaveOnSP has received reflecting complaints, concerns, or inquiries about its services related to Janssen Drugs, JJHCS's RFP No. 33.

We understand that the parties are at impasse on this issue and may present this dispute to the Court.

## C.    RFP No. 14

SaveOnSP's RFP No. 14 seeks document and communications concerning JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential or Non-Essential Health Benefits under the Affordable Care Act and related regulations. In your January 27, 2023 letter, you proposed a compromise with respect to SaveOnSP's RFP No. 14 where both JJHCS and SaveOnSP would agree to produce non-privileged documents and communications regarding JJHCS's understanding of commercial health plans' ability to designate specialty drugs as EHBs or NEHBs under the ACA and its regulations for the time period of January 1, 2017 to June 1, 2022 to the extent such documents exist and can be located after a reasonable search. During our meet and confer, we stated that we were considering your proposal and would revert with our position.

Although we believe the parties can reach a reciprocal agreement on this RFP, JJHCS's insistence on limiting its production to the period beginning January 1, 2017 is inappropriate. As we explained above, *supra* Section I.C.2, January 1, 2015 is the date that the relevant provisions of the ACA and related regulations

Anthony LoMonaco
February 7, 2023

concerning EHB requirements and out of pocket maximums came into effect. Rel-
evant documents concerning the parties' understanding of commercial health
plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its
regulations thus likely date back to 2015.

Please let us know if JJHCS will agree that both parties will produce docu-
ments on this subject, with JJHCS's search going back to January 1, 2015. Please
also confirm that SaveOnSP's agreement to this compromise would resolve any
outstanding disputes with respect to JJHCS's RFP Nos. 18, 19, and 22.

### D.    RFP No. 21

SaveOnSP's RFP No. 21 seeks documents and communications concerning
JJHCS's advocacy to or communications with governmental or regulatory bodies
regarding SaveOnSP, accumulators, and maximizers. SaveOnSP is considering the
points from your January 27, 2023 letter with respect to RFP No. 21 and will defer
seeking documents responsive to this Request. SaveOnSP reserves the right to seek
documents responsive to this Request at a future date.

### E.    RFP No. 25

SaveOnSP's RFP No. 25 seeks documents and communications regarding
any alleged harm caused by SaveOnSP to JJHCS. In your January 27, 2023 letter,
you confirmed that JJHCS will produce all documents responsive to SaveOnSP's
RFP No. 25. We thus understand that there are no further disputes on this RFP.

### F.    RFP Nos. 26 and 32

SaveOnSP's RFP Nos. 26 and 32 seek documents and communications con-
cerning the payment of Patient's costs, including payments in excess of the adver-
tised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity. In your Jan-
uary 27, 2023 letter, you proposed a compromise on SaveOnSP's RFP Nos. 26 and
32 in which JJHCS would provide data regarding the actual amounts paid to pa-
tients in copay assistance, to the extent such data exists and can be located after a
reasonable search. If that data reflects that JJHCS is in fact paying more than the
budgeted amount of CarePath funds to certain patients, you stated that JJHCS will
meet and confer further to determine if additional discovery is appropriate on
those specific cases.

During our meet and confer, we asked you to confirm whether JJHCS in-
tends to provide patient-level data as part of this proposal. We noted that without
patient-level data, SaveOnSP would have no one of determining if any patients had
received more funds than CarePath's terms and conditions would otherwise allow.
You indicated that you were still confirming what data exists that JJHCS could
produce. We also asked you to confirm whether JJHCS would commit to producing

11

Anthony LoMonaco
February 7, 2023

this data early in the discovery process so that SaveOnSP can analyze the data and determine whether it needs additional discovery before the end of the fact discovery period. Please provide us with your responses on both issues.

If JJHCS will provide patient-level data by Friday, March 3, 2023, Save-OnSP would defer its request that JJHCS search for additional documents related to the amount of CarePath funds paid to patients until after that production.

### G.    RFP Nos. 28 and 29

SaveOnSP's RFP Nos. 28 and 29 seek data regarding CarePath and Janssen Drugs, including patient fills and dosages for Janssen Drugs, the manufacturing and marketing of Janssen Drugs, copay assistance funds, the CarePath budget, and JJHCS's return on investment for CarePath. JJHCS previously agreed to produce Janssen transparency reports (RFP No. 28) and documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through Care-Path, and (3) JJHCS's actual and projected annual costs for Care-Path" (RFP No. 29). In our January 20, 2023 letter, we noted the significant similarities between certain categories of data covered by SaveOnSP's RFP No. 28 and JJHCS's request for similar data regarding drug fills in its RFP No. 41, and requested that JJHCS consider making reciprocal productions on this ground.

In your January 27, 2023 letter, you indicated that JJHCS is willing to engage in reciprocal productions for certain portions of the data requested in Save-OnSP's RFP No. 28. Specifically, you state that JJHCS "is willing to consider producing" the data sought by items i. through m. of RFP No. 28, which seek CarePath enrollment data, if SaveOnSP agrees to produce all categories of data requested by JJHCS's RFP No. 41 and 42.

If JJHCS will produce the data items sought by i. through m. of RFP No. 28 from January 1, 2009 to July 1, 2022,[1] then SaveOnSP will expand its production in response to RFP 41 to include, for each Janssen Drug for each year, data sufficient to show: the total number of patients enrolled in SaveOnSP-advised plans who received CarePath funds for the given drug; the total CarePath funds received by those patients for the given drug; the pharmacies at which those patients filled the given drug; and the average copay or coinsurance amount for the given drug for patients enrolled in plans advised by SaveOnSP. Please let us know if JJHCS agrees to this proposal.

---

[1] SaveOnSP remains open to alternative start dates as described above, *supra* Section I.C.

12

Anthony LoMonaco
February 7, 2023

JJHCS maintains that it will not produce any documents or information in response to items a. through g. of SaveOnSP's RFP No. 28 on relevance grounds. In your letter, you ask us to explain how JJHCS's return on investment for Care-Path and the relationship between CarePath and JJHCS's ability to increase drug prices "would permit SaveOnSP to cause patients to breach their contracts with JJHCS and repurpose CarePath's funds for SaveOnSP's profit or would excuse the damages that JJHCS alleges SaveOnSP has caused." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 11. You also ask us to "explain how SaveOnSP's theoretical impact on 'J&J more broadly' excuses those same damages." *Id.* As we have explained, several times, SaveOnSP seeks this information not to justify its alleged conduct but to show, among other things:

- That even after SaveOnSP began offering its services, JJHCS and J&J have continued to reap enormous profits because of their investment in copay assistance programs like CarePath, directly rebutting JJHCS's allegation that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," Compl. ¶ 114;

- That CarePath is not a public good but instead a means to sell more Janssen Drugs while raising the prices for those drugs year-after-year, such that any threat to its viability caused by SaveOnSP does not, as JJHCS's has alleged, *id.*, constitute a public harm for purposes of JJHCS's GBL § 349 claim; and

- That SaveOnSP's services have helped more patients enroll in CarePath than would otherwise have enrolled, helped to increase patients' adherence to Janssen Drugs, and therefore caused J&J to sell more drugs and generate more profits than it otherwise would have, all of which are relevant to JJHCS's asserted damages stemming from those same services.

*See, e.g.*, Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2, 9-10; *supra* Section I.A. We understand that the parties are at impasse on items a. through g. of SaveOnSP's RFP No. 28 and may present this dispute to the Court. Although your letter did not mention RFP No. 28.h, SaveOnSP understands that JJHCS is refusing to produce documents or information in response to that Request on the same grounds as RFP No. 28.a – g, and that the parties are therefore also at impasse on RFP No. 28.h.

Finally, in our last letter, we asked whether JJHCS is willing to produce additional data in response to RFP No. 29. In your letter, you do not agree to provide any information beyond what you have already agreed to provide and  ask that we consider whether your offer in response to RFP No. 28 is sufficient. It is not. RFP Nos. 28 and 29 concern different categories of data. We have offered to produce additional data in response to your RFP No. 41 in exchange for your agreement to produce additional data in response to our RFP No. 28. Nothing about that offer

13

Anthony LoMonaco
February 7, 2023

obviates our request that you produce additional data in response to RFP No. 29. We remain willing, however, to explore producing additional categories of data or documents in response to your other requests to the extent that you are willing to do the same in response to RFP No. 29. Please let us know if JJHCS is willing to discuss a compromise along these lines.

### H.    RFP No. 34

SaveOnSP's RFP No. 34 seeks all documents and communications regarding JJHCS's or Janssen's negotiations or agreements regarding the potential use of SaveOnSP's services, or the services of any Copay Maximizer Service or Copay Accumulator Service, for JJHCS's Employee Health Plans, including JJHCS's abandonment of those negotiations or agreements. JJHCS has thus far refused to produce any documents in response, asserting that such documents are irrelevant.

These documents are relevant. As we explained, we understand that J&J or JJHCS conducted significant negotiations with SaveOnSP to use SaveOnSP's services for the health plan it provides for its own employees, and that those negotiations ultimately ceased at the insistence of another division within J&J or JJHCS. As with several of SaveOnSP's other requests, documents and communications reflecting J&J's or JJHCS's assessment of the benefits of employing SaveOnSP's services during these negotiations—irrespective of whether the parties ever executed a contracted—go to the credibility of JJHCS's assertions.

In your January 27, 2023 letter, you maintain that JJHCS will not produce documents in response to this request because "J&J never signed a contract with SaveOnSP" and "JJHCS itself was not involved in any such negotiations." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 12. But you do not address whether any other J&J entity was involved in such negotiations. To the extent that documents exist that show that any J&J entity was involved in negotiations to use SaveOnSP's services, those documents are relevant to JJHCS's claims in this litigation. JJHCS cannot claim that SaveOnSP's services harm patients while also holding back documents that show that its affiliates believed that SaveOnSP's services could help both its own employees and its own employer-sponsored plans.

We understand that the parties are at impasse on this issue and may present this dispute to the Court.

### I.    RFP Nos. 36 and 37

SaveOnSP's RFP No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS has agreed to produce agreements between JJHCS and the entities responsible for administering CarePath and work orders

14

Anthony LoMonaco
February 7, 2023

documenting the cost of those services. Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 12. We will defer our request for additional documents at this time but reserve all rights.

With respect to RFP No. 37, as noted above, JJHCS has taken the position that documents responsive to this Request are irrelevant. As detailed above, *supra* Section I.A, the parties are at impasse on this Request. We also disagree with JJHCS's suggestion that any dispute regarding this Request is mooted because you assert that "JJHCS does not keep statistics on whether patients sign up for Care-Path after being contacted by JJHCS or its vendors." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 13. SaveOnSP's RFP No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates. Please confirm whether any such documents exist.

### III.    Drafting and Submission of Joint Letters

As we noted during the parties' meet and confer, we believe JJHCS and SaveOnSP should agree to a schedule for submitting any outstanding discovery disputes to the Court in advance of the February 28, 2023 conference. We propose this to avoid any miscommunications between the parties over what items are in dispute and to provide the parties' full positions to the Court a reasonable time in advance of the scheduled court conference. We propose the following schedule:

- Moving party provides its portion of any joint letter to the responding party by February 14, 2023.

- Responding party provides its portion of any joint letter to the moving party by February 21, 2023.

- Moving party provides any additional edits to the joint letter to the responding party by February 23, 2023.

- Parties finalize joint letter so that moving party may file joint letter by February 24, 2023.

So that the parties can plan accordingly, we ask that you tell us by no later than this **Thursday, February 9** whether this schedule is acceptable to you.

* * *

15

Anthony LoMonaco
February 7, 2023

     We remain hopeful that the parties can work through these issues to reach mutually agreeable resolutions. We look forward to your response and are available to meet and confer at your convenience.


Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

# Exhibit 12

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

**selendy
gay
elsberg**

Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

February 15, 2023

<u>Via E-mail</u>

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

Re:    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
       LLC*** **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

We write in response to your February 14, 2023 letter regarding Johnson &
Johnson Health Care Systems, Inc.'s ("JJHCS") responses to Save On SP LLC's
("SaveOnSP") First Set of Requests for Production and First Set of Interrogatories.

## I.    Issues Where the Parties Are at Impasse

JJHCS states that the parties are at impasse regarding JJHCS's responses
to RFP Nos. 11, 14, and 34. We agree. The parties are also at impasse on the other
RFPs discussed in this Section I. You do not offer to produce any additional docu-
ments in response to any of them. While you invite us to discuss these RFPs in
stated hopes of persuading us to reconsider our positions, you offer no reasons for
doing so beyond those that you have already presented, which we have already re-
jected as inadequate. If JJHCS wishes to change its positions, we are of course glad
to meet and confer, but the parties are currently at impasse.

### A.    Documents Related to the Development and Marketing of
         CarePath and SaveOnSP's Financial Impact on JJHCS and
         CarePath (RFP Nos. 11, 26, 28-30, and 36-37)

SaveOnSP's RFP Nos. 11, 26, 28-39, and 36-37 seek information regarding
the development and marketing of CarePath and SaveOnSP's financial impact on
JJHCS and CarePath. As we have explained, these documents are relevant to
JJHCS's tortious interference claim, its GBL claim, its alleged damages, and its

Anthony LoMonaco
February 15, 2023

request for injunctive relief. Jan 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 1-2; Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco 1-2. You do not offer to produce any documents beyond those that you previously agreed to produce. As we previously discussed, this is not sufficient. While we are glad to discuss if you would like, the parties are currently at impasse on these RFPs.

## B.   JJHCS Hub Entities

In Interrogatories 1-6, SaveOnSP seeks information regarding the JJHCS Hub Entities involved in the development, marketing, and administration of Care-Path and the individuals at those entities involved in those subjects. As we have explained, that information is relevant because these entities are likely to possess documents related to the pricing of Janssen Drugs, the true purpose of CarePath, and J&J's return on investment for CarePath. Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 5-7.[1] You state that the development and marketing of CarePath is irrelevant. You also refuse to identify all entities that played a role in CarePath's operations, identifying only three in addition to Trial Card. You concede this list is not exhaustive, stating that "numerous other agencies" were involved in CarePath's marketing. Feb. 14, 2023 Ltr. from M. Nelson to A. LoMonaco at 3. This is insufficient. While we are glad to discuss, the parties are currently at impasse on Interrogatories 1-6. We reserve our rights to seek documents from Relevant Hub Entities.

## C.   Janssen and Other J&J Entities

In its RFPs, SaveOnSP seeks relevant documents and communications in the possession of J&J entities other than JJHCS, including without limitation Janssen. In Interrogatories 2-4 and 7, SaveOnSP also seeks information about the relevant individuals employed at these entities. As we have explained, SaveOnSP is entitled to relevant discovery from entities that likely possess relevant documents and communications concerning the development, marketing, and administration of CarePath and the development and marketing of Janssen Drugs. *See, e.g.*, Jan. 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 1-2; Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 2-6. You refuse to produce documents from any J&J entity other than JJHCS, or to identify which such entities were involved in the development, marketing, or administration of CarePath or the development and marketing of Janssen Drugs. Feb. 14, 2023 Ltr. from M. Nelson to A.

---

[1] You accuse us of asking J&J to identify other J&J entities involved with CarePath solely "to impose burden and cost on JJHCS without any legitimate rationale." Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 3. This is false. We seek this information to obtain discovery relevant to the claims that JJHCS decided to bring against SaveOnSP.

LoMonaco at 3-4. As we have previously told you, this is insufficient. While we are glad to discuss, the parties are currently at impasse on this issue.

### D. Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

Several of SaveOnSP's document requests and interrogatories seek information dating back to January 1, 2009. You assert that SaveOnSP has "never once" identified any possible rationale" for this date, accusing us of selecting it solely to impose expense and burden on JJHCS. This is false. As we explained, several times, SaveOnSP selected January 1, 2009 as the starting date for RFP Nos. 1-7, 11-13, 28-30, and 36-37 and Interrogatories 1-4 based on its understanding of when most Janssen Drugs first went to market; JJHCS has not disagreed with that understanding. *See, e.g.*, Feb. 14, 2023 Ltr. from M. Nelson to A. LoMonaco at 4. And, as we explained in our February 7, 2023 letter, if JJHCS began marketing CarePath or drafting CarePath's terms and conditions (which it alleges SaveOnSP induces patients to breach) after January 1, 2009, we are glad to limit our request to that later date; JJHCS has not identified any later dates. As it did earlier, JJHCS offers to produce documents starting on January 1, 2016 for some categories of documents. As we explained earlier, however, that offer is insufficient. Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 6-7. While we are glad to discuss, the parties are currently at impasse on this issue.

### E. Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, and 42)

SaveOnSP's RFP Nos. 14, 41, and 42 seek documents and communications dating back to January 1, 2015. Those requests seek information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as their understanding of Copay Accumulator Services and Copay Maximizers Services. As we have explained, January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect. You again refuse to produce documents on these topics prior to January 1, 2017. Feb. 14, 2023 Ltr. from M. Nelson to A. LoMonaco at 4. As we previously explained, this is insufficient. Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 7-8. While we are glad to discuss, the parties are currently at impasse on this issue.

## II. Issues Where the Parties Are Not Currently at Impasse

We hope that the parties can resolve the following issues without Court intervention.

Anthony LoMonaco
February 15, 2023

### A.    Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20 and 41-43; Interrogatory No. 7)

You propose that, in response to SaveOnSP's RFP No. 20, JJHCS produce "studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents" if SaveOnSP produces similar documents in response to JJHCS's RFP No. 45. We agree.

This compromise does not resolve JJHCS's response to SaveOnSP's RFP Nos. 41-43 or SaveOnSP's Interrogatory No. 7. As we explained, documents and information regarding JJHCS's, Hub Entities', and other relevant J&J entities' understanding of the effect of accumulators and maximizers are relevant for, amongst other things, refuting JJHCS's argument that SaveOnSP's conduct is wrongful. *See* Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 8-9. This compromise also does not resolve SaveOnSP's response to JJHCS's RFP No. 43. We propose that the parties continue to meet and confer about these issues, and defer presenting them to the Court until after the February 28 conference. Please let us know if you agree.

### B.    RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek documents and communications concerning CarePath's terms and conditions. These documents are relevant to JJHCS's tortious interference claim. *See* Op. Denying SaveOnSP's Mot. to Dismiss (ECF No. 68); *see also, e.g.*, *Am. Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir. 1995); *Armkel, LLC v. Pfizer Inc.*, No. Civ.A. 02-4206, 2005 WL 2416982, at *7 (D.N.J. Sept. 29, 2005). JJHCS proposes producing documents in response to SaveOnSP's RFP Nos. 12 and 13 if SaveOnSP will produce certain categories of internal communications in response to JJHCS's RFP No. 17, which seeks SaveOnSP's internal communications relating to agreements between SaveOnSP or Express Scripts and health insurance plan sponsors.

In response to JJHCS's RFP No. 17, SaveOnSP intends to produce internal communications regarding: (1) the treatment of CarePath drugs under the terms of the SaveOnSP Program; (2) the designation of Janssen Drugs as Essential or Non-Essential; (3) the monetary split between SaveOnSP and Express Scripts on the one hand, and between SaveOnSP and the health insurance plan sponsors, on the other; and (4) instances where the Plan Member uses the entire annual allotment of CarePath funds for a given Janssen medication after enrolling in the SaveOnSP Program. Feb. 9, 2023 Ltr. from A. LoMonaco to M. Nelson at 6. SaveOnSP does not intend to produce internal communications regarding its operations in states where copay accumulator and maximizer programs have been banned.

4

Anthony LoMonaco
February 15, 2023

Please let us know promptly if JJHCS will agree to produce all documents responsive to SaveOnSP's RFP Nos. 12 and 13.

### C.    RFP Nos. 26 and 32

SaveOnSP's RFP Nos. 26 and 32 seek documents and communications concerning the payment of patients' costs, including payments in excess over the advertised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity.

In your January 27, 2023 letter, you proposed that (1) JJHCS would produce Documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath" and the data requested in SaveOnSP's RFP No. 28(i)-(m) regarding the actual amounts paid to patients in copay assistance (to the extent such data exists and can be located after a reasonable search); and (2) SaveOnSP would produce the information sought in JJHCS's RFP Nos. 41 and 42.

We are willing to accept this proposal if (1) if the parties can agree on the scope of data that JJCHS will produce in response to SaveOnSP's RFP No. 28(i)-(m), *see infra* at Section II.D; and (2) JJHCS will agree to produce that data by a mutually-agreed date certain early in the discovery period.[2] Please let us know if you accept this proposal.

### D.    RFP Nos. 28 and 29

SaveOnSP's RFP Nos. 28 and 29 seek data regarding CarePath and Janssen Drugs, including patient fills and dosages for Janssen Drugs, the manufacturing and marketing of Janssen Drugs, copay assistance funds, the CarePath budget, and JJHCS's return on investment for CarePath.

In its initial responses and objections, JJHCS agreed to produce Janssen transparency reports (RFP No. 28) and documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through Care-Path, and (3) JJHCS's actual and projected annual costs for CarePath" (RFP

---

[2] You assert that our request that you produce this data by March 3, 2023 was "without … any rationale" and that the date proposed was "arbitrary." This is false. As we explained in our meet and confer, we are open to JJHCS's proposal only if we can get the data sufficiently early in the discovery period to analyze it and determine if we need to request additional information on this point. Your offer to produce the data "early in the discovery process" is insufficient, Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 6, as the parties could have very different ideas of what that means. We invite you to meet and confer on a reasonable date.

No. 29). JJHCS's Responses and Objections to SaveOnSP's First Set of RFPs at 25-27. In our January 20, 2023 letter, noting the similarities between some data requested by SaveOnSP's RFP No. 28 and JJHCS's RFP No. 41, we asked that JJHCS consider making reciprocal productions. *See* Jan. 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 9-10. In your January 27, 2023 letter, you proposed that SaveOnSP produce the information sought in RFP Nos. 41 and 42, if JJHCS produces the data sought in SaveOnSP's RFP no. 28(i)-(m). *See* Jan. 27 Ltr. from A. LoMonaco to M. Nelson at 10-12. In our February 7, 2023 letter, we proposed that SaveOnSP expand its production in response to JJHCS's RFP No. 41—to include, for each Janssen Drug for each year, data sufficient to show the total number of patients enrolled in SaveOnSP-advised plans who received CarePath funds for the given drug; the total CarePath funds received by those patients for the given drug; the pharmacies at which those patients filled the given drug; and the average copay or coinsurance amount for the given drug for patients enrolled in plans advised by SaveOnSP—if JJHCS produces all data sought in SaveOnSP's RFP No. 28(i)-(m). *See* Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 12-14. In your February 14, 2023 letter, you rejected that proposal and repeated your prior proposal. *See* Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 7.

In hope of resolving at least a portion of this issue without Court intervention, SaveOnSP proposes the following regarding its RPF No. 28: (1) SaveOnSP produces any patient-level data responsive to JJHCS's RFP No. 41 that it can locate after a reasonable search; and (2) JJHCS produces patient-level data responsive to SaveOnSP's RFP No. 28(i)-(m) from January 1, 2016 (or an earlier date ordered by the Court) to July 1, 2022. Please let us know promptly if you agree.

This proposal would not resolve JJHCS's responses to SaveOnSP's RFP No. 28(a)-(h) and RFP No. 29 (SaveOnSP reserves its rights as to both) or to JJHCS's RFP No. 42. We invite JJHCS to continue meeting and conferring on those issues.

### E.    RFP No. 37

SaveOnSP's RFP No. 37 seeks documents sufficient to show CarePath's enrollment statistics. As we explained, this information is relevant to JJHCS's GBL claim and to JJHCS's alleged damages. *See* Jan. 20, 2023 Ltr. from M. Nelson to A. LoMonaco at 11. You stated that JJHCS does not keep statistics on whether patients sign up for CarePath. Jan. 27, 2023 Ltr. from A. LoMonaco to M. Nelson at 13; *see also* Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson at 7. We explained that this is not a sufficient response. SaveOnSP's RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates. *See* Feb. 7, 2023 Ltr. from M. Nelson to A. LoMonaco at 15. You then repeated your offer to produce data in response to SaveOnSP's RFP No. 28(i)-(m) if SaveOnSP will

Anthony LoMonaco
February 15, 2023

produce all data in response to JJHCS's RFP Nos. 41 and 42. We believe that there is more for the parties to discuss and invite you to meet and confer.

                      \*       \*       \*

As you know, the Court has set a conference for February 28, 2023. We had proposed that the parties finish meeting and conferring in time to provide each other with their portions of proposed joint letters by February 14, 2023. You rejected that offer, purporting to accept that schedule only for a letter on SaveOnSP's issues (an offer we did not make) while reserving JJHCS's rights to prepare joint letters on its issues at a later date. Then, on the same date that you asked SaveOnSP to provide its portion of a joint letter on its issues, you sent us a letter asking SaveOnSP to keep meeting and conferring on several of those same issues.

We intend to go to the Court before February 28, 2023 on the issues listed in Section I, on which the parties are at impasse. To fend off further delays, SaveOnSP may defer going to the Court before February 28, 2023 on some of the issues listed in Section II. Please provide us with your responses to those latter issues as promptly as possible so that we can determine if the parties have resolved them, are at impasse, or should continue to meet and confer. We will then provide you with our portion of a joint letter.

For any issues that SaveOnSP opts not to present to the Court in advance of the February 28 conference, SaveOnSP reserves all rights to present them to the Court at a later time.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

# Exhibit 13

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

selendy
gay
elsberg

Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

February 21, 2023

**Via E-mail**

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

Re:    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
       LLC*** **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

We write in response to your February 9 and February 17, 2023 letters in the hope of resolving additional disputes prior to the parties' February 28, 2023 conference with the Court.

## I.    Proposals on Current Disputes

### A.    SaveOnSP's RFP No 20 and JJHCS's RFP No. 45

In our February 15 letter, we agreed to your proposal that (1) JJHCS will produce "studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents" in response to SaveOnSP's RFP No. 20; and (2) SaveOnSP will produce similar documents in response to JJHCS's RFP No. 45. To be clear, SaveOnSP will not produce all documents responsive to JJHCS's RFP No. 45, because—as we have explained—the inclusion of words such as "analyses," "research," and "other written work product" in JJHCS's RFP No. 45 could be read to include all written documents concerning SaveOnSP's business. We understand that this resolves the parties' disputes on these Requests.

Anthony LoMonaco
February 21, 2023

### B.    SaveOnSP's RFP Nos. 12 and 13; JJHCS's RFP Nos. 17 and 43

In your February 17, 2023 letter, JJHCS proposed producing "internal documents and communications relating to the drafting of CarePath's terms and conditions during the relevant time period of January 1, 2017 to July 1, 2022" in response to SaveOnSP's RFP Nos. 12 and 13 if SaveOnSP would produce, in response to JJHCS's RFP No. 17, internal communications regarding:

- The treatment of CarePath drugs under the terms of the SaveOnSP Program;

- The designation of Janssen Drugs as Essential or Non-Essential;

- The monetary split between SaveOnSP and Express Scripts on the one hand, and between SaveOnSP and the health insurance plan sponsors, on the other; and

- Instances where the Plan Member uses the entire annual allotment of CarePath funds for a given Janssen medication after enrolling the Save-OnSP Program.

JJHCS also said that it would not withdraw its motion to compel SaveOnSP to produce internal document or communications relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs.

SaveOnSP understands the parties' dispute regarding JJHCS's RFP No. 17 to be resolved, as SaveOnSP has agreed to produce the only specific categories of documents responsive to RFP No. 17 that JJHCS has requested.

SaveOnSP understands the parties to be at impasse on JJHCS's RFP No. 43 to the extent that JJHCS asks SaveOnSP to produce internal communications regarding its operations in jurisdictions with statutes banning or limiting accumulator adjustment programs.

SaveOnSP understands the parties to be at impasse on SaveOnSP's RFP Nos. 12 and 13. Your offer to produce documents concerning the "drafting" of CarePath's terms and conditions is inadequate, because it does not cover the full universe of relevant extrinsic evidence that could shed light on JJHCS's understanding of the meaning of its own terms and conditions. We thus attach an updated version of our proposed joint letter that presents this issue to the Court for resolution.

2

Anthony LoMonaco
February 21, 2023

### C.    SaveOnSP's RFP Nos. 28 and 29 and JJHCS's RFPs 41 and 42

SaveOnSP understands that the parties have resolved their disputes regarding SaveOnSP's RFP No. 28(i)-(m) and JJHCS's RFP No. 41 and are at impasse on SaveOnSP's RFP Nos. 28(a)-(h) and 29. SaveOnSP intends to present the parties' dispute regarding RFP Nos. 28(a)-(h) and 29 to the Court for resolution.

With respect to JJHCS's RFP No. 42, SaveOnSP is willing to produce additional data, but believes the parties should meet and confer so that SaveOnSP can understand what additional information JJHCS believes is responsive that is not covered by SaveOnSP's production responsive to RFP No. 41. We have been working to determine what additional data SaveOnSP could produce in response to RFP No. 42, but SaveOnSP is not a pharmacy and does not maintain much of the requested data in the ordinary course. Understanding what additional information JJHCS seeks would help expedite this process. We do not believe that this issue is ripe for Court resolution at this time. Should JJHCS proceed with its motion on this Request, we intend to ask the Court to deny the motion without prejudice and direct the parties to continue to meet and confer.

### D.    JJHCS's RFP Nos. 5, 7, and 8

JJHCS's RFP No. 5 requests "[a]ll documents, including drafts, concerning communications with persons currently enrolled or eligible to enroll in CarePath." JJHCS's RFP No. 7 requests "[a]ll communications SaveOnSP has received from persons currently enrolled in CarePath, including patient complaints or inquiries regarding the SaveOnSP Program, and all documents regarding such patient complaints or inquiries." JJHCS's RFP No. 8 requests "[a]ll communications SaveOnSP has received from persons who (i) refused to enroll in the SaveOnSP Program; (ii) tried to opt out of enrollment in the SaveOnSP Program; or (iii) initially enrolled in the SaveOnSP Program, but later canceled their enrollment, as well as documents regarding such patient communications."

As we have explained, JJHCS's RFP Nos. 5, 7, and 8 are overbroad because they seek "all" communications with groups of individuals without limiting the subject matter of those communications. JJHCS has made no attempt to narrow these requests. SaveOnSP is willing to produce the following documents to resolve the parties' disputes over these RFPs:

- RFP Nos. 5 and 7:  Documents identified during a reasonable search concerning communications with persons currently enrolled or eligible to enroll in CarePath concerning CarePath or SaveOnSP's services.

- RFP No. 8: Communications and related internal documents identified during a reasonable search received from members of plans advised by

3

Anthony LoMonaco
February 21, 2023

SaveOnSP who use any Janssen Drug who (i) refused to either enroll in CarePath or allow SaveOnSP to monitor their pharmacy accounts on behalf of the plan; (ii) tried to opt out of either CarePath or monitoring of their pharmacy accounts; or (iii) initially enrolled in CarePath and consented to monitoring of their pharmacy accounts but later either cancelled their enrollment in CarePath or withdrew their consent to monitoring of their accounts.

Please let us know promptly if you accept these compromises.

### E.    JJHCS's RFP No. 16

JJHCS's RFP No. 16 seeks "all documents and communications, including drafts, concerning SaveOnSP's marketing or promoting its services to health insurance plan sponsors, including without limitation to pharmaceutical health plan sponsors."

In your February 9 letter, JJHCS proposed limiting its RFP No. 16 to "final versions of communications or marketing materials that SaveOnSP provided to health plan sponsors" if SaveOnSP accepts JJHCS's production of final CarePath marketing materials in response to SaveOnSP's RFP No. 11.

SaveOnSP declines this offer. SaveOnSP's RFP No. 11 seeks documents regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs. As we have explained, these documents are highly relevant to SaveOnSP's defenses.

SaveOnSP is willing to produce all documents responsive to JJHCS's RFP No. 16 if JJHCS will produce all documents responsive to SaveOnSP's RFP No. 11. Please let us know promptly if you agree.

### F.    JJHCS's RFP No. 35

SaveOnSP agrees to produce documents responsive to JJHCS's RFP No. 35 identified after a reasonable search. We understand that this resolves the parties' dispute regarding this Request.

### G.    JJHCS's RFP Nos. 18-22 and 44 and SaveOnSP's RFP No. 14

In its February 9, 2023 letter, JJHCS proposed the following compromise on its RFP Nos. 18-22 and 44 and SaveOnSP's RFP No. 14: (1) JJHCS will produce all non-privileged documents and communications regarding its understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the ACA and its regulations for the time period of January 1, 2017 to June 1, 2022, to the extent

4

Anthony LoMonaco
February 21, 2023

such documents exist and can be located after a reasonable search; and (2) Save-OnSP will produce all non-privileged documents and communications responsive to the aforementioned requests, including internal communications regarding SaveOnSP's understanding of commercial health plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its regulations for the time period from January 1, 2017 to July 1, 2022.

We agree, to the extent that this addresses documents created on or after January 1, 2017. SaveOnSP thus understands that this resolves the parties' disputes as to JJHCS's RFP Nos. 18-22 and 44. It also resolves the parties' dispute as to SaveOnSP's RFP 14 to the extent that it seeks documents beginning on January 1, 2017. It does not resolve the parties' dispute as to SaveOnSP's RFP 14 to the extent that it seeks documents prior to January 1, 2017.

### H.    JJHCS's RFP No. 31

JJHCS's RFP No. 31 seeks "[a]ll documents concerning or discussing the amount of 'savings' generated and commissions earned by SaveOnSP relating to Janssen therapies." Subject to its other objections, SaveOnSP will agree to produce internal communications responsive to this Request. We understand that this resolves the parties' dispute on this Request.

### I.    JJHCS's RFP No. 12

JJHCS's RFP No. 12 seeks "[a]ll documents concerning fees paid to or collected by SaveOnSP." SaveOnSP agreed to produce documents sufficient to show the fees it received for services related to Janssen Drugs, as well as its fee structures and fee arrangements with clients. In your February 9 letter, you asked whether SaveOnSP's proposal related to "all fees paid and collected, as well as fee arrangements for all drugs and health plan clients." SaveOnSP is willing to produce documents sufficient to show the fees it received for services related to Janssen Drugs and its fee structures and arrangements with health plan clients for all drugs included in the copay assistance benefit administered by SaveOnSP.

## II.    Remaining Issues

We are considering your positions as to SaveOnSP's RFP Nos. 26, 32, 37, and 41-43 and Interrogatory No. 7.

SaveOnSP intends to update the Court on the status of the parties' disputes as briefed in the January 5, 2023 joint letters. Our proposed joint letter to the Court

Anthony LoMonaco
February 21, 2023

on these issues is attached. We have left space in the letter for JJHCS to provide its
responses; please provide them by February 23, 2023.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

# Exhibit 14

**Patterson Belknap Webb & Tyler** LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

February 23, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

<u>**VIA EMAIL**</u>

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

     **Re:** **Discovery Disputes**
       *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
       No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

    We write in response to your letter dated February 21 regarding the parties' discovery disputes that remain in advance of the February 28, 2023 conference with the Court. We address each of the issues laid out in your letter in turn.

**I.**  **PROPOSALS ON CURRENT DISPUTES**

  **A.**  **SaveOnSP's RFP No. 20 and JJHCS's RFP No. 45.**

    In response to JJHCS's RFP No. 45, you note that SaveOnSP will produce some documents, but not all, because "the inclusion of words such as 'analyses,' 'research,' and 'other written work product' in JJHCS's RFP No. 45 could be read to include all written documents concerning SaveOnSP's business." Feb. 21 Ltr. at 1.

    While JJHCS is not requesting "all written documents concerning SaveOnSP's business," it does not agree that carving out internal communications regarding "analyses," "research," or "other written work product" is appropriate. Accordingly, JJHCS will not withdraw its motion with respect to RFP No. 45.

  **B.**  **SaveOnSP's RFP Nos. 12 and 13; JJHCS's RFP No. 17 and 43.**

    In response to JJHCS's RFP No. 17, you note that SaveOnSP has agreed to produce internal communications regarding the four bullets that JJHCS requested on page 2 of its February 17 letter, but that SaveOnSP will not produce internal communications regarding SaveOnSP's operations in jurisdictions where copay accumulator and maximizer programs have been banned. Feb. 21 Ltr. at 2. With respect to the category of internal communications SaveOnSP refuses to produce, JJHCS will press forward with its motion with respect to RFP No.

Meredith Nelson, Esq.
February 23, 2023
Page 2

43, which more broadly requests *all* documents and communications "relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs." JJHCS's RFP No. 43. But notwithstanding SaveOnSP's agreement to produce internal communications regarding the other four requested categories, SaveOnSP still has not agreed to produce the final agreements between SaveOnSP or Express Scripts on the one hand, and health insurance plan sponsors, on the other, regarding the SaveOnSP program. *See* Feb. 9 Ltr. at 5-6 (requesting both internal communications and final agreements in response to RFP No. 17). Please confirm that SaveOnSP will produce, in addition to internal communications regarding the four bullets that JJHCS requested on page 2 of its February 17 letter, all final agreements between SaveOnSP or Express Scripts on the one hand, and health insurance plan sponsors, on the other, regarding the SaveOnSP Program. Only if SaveOnSP can confirm this by Friday, February 24 will JJHCS withdraw its motion for RFP No 17.

With respect to SaveOnSP's RFP Nos. 12 and 13, you state that the parties are at an impasse, despite JJHCS's agreement to produce "internal documents and communications relating to the drafting of CarePath's terms and conditions during the relevant time period of January 1, 2017 to July 1, 2022, to the extent such non-privileged documents exist and can be identified after a reasonable search." Feb. 17 Ltr. at 2. You claim "documents concerning the 'drafting' of CarePath's terms and conditions is inadequate, because it does not cover the full universe of relevant extrinsic evidence that could shed light on JJHCS's understanding of the meaning of its own terms and conditions." Feb. 21 Ltr. at 2. To resolve this dispute, JJHCS is willing to conduct a reasonable search for non-privileged documents and communications during the relevant time period of January 1, 2017 to July 1, 2022 bearing on the meaning of the "other offer" provision at issue in this case. This is the only provision of the CarePath terms and conditions that is reasonably in dispute and relevant to the claims and defenses in the case. *See* Compl. ¶¶ 18-19. But JJHCS will not search for and produce documents and communications bearing on the meaning of *all* provisions of the CarePath terms and conditions, most of which are not in dispute. Please let us know if that will resolve this dispute.

**C.    SaveOnSP's RFP Nos. 28 and 29 and JJHCS's RFP Nos. 41 and 42**

With respect to SaveOnSP's RFP No. 28(i)-(m) and JJHCS's RFP No. 41, you state that the parties have resolved their dispute. JJHCS agrees. Accordingly, JJHCS will withdraw without prejudice its motion with respect to RFP No. 41. You also note that SaveOnSP intends to present the parties' dispute regarding SaveOnSP's RFP Nos.(a)-(h) and 29 to the Court for resolution.

With respect to JJHCS's RFP No. 42, you state that SaveOnSP is willing to produce additional data, but desires to meet and confer to "understand what additional information JJHCS believes is responsive that is not covered by SaveOnSP's production responsive to RFP No. 41." Feb. 21 Ltr. at 3. No further meeting and conferring is necessary. SaveOnSP should simply produce all of the data it has, if it has such data, that is responsive to RFP No. 42. Accordingly, JJHCS will not withdraw its motion with respect to RFP No. 42.

Meredith Nelson, Esq.
February 23, 2023
Page 3

### D.    JJHCS's RFP Nos. 5, 7, and 8

With respect to JJHCS's RFP Nos. 5 and 7, SaveOnSP has agreed to produce "documents identified during a reasonable search concerning communications with persons currently enrolled or eligible to enroll in CarePath concerning CarePath or SaveOnSP's services."  Feb. 21 Ltr. at 3.  With respect to JJHCS's RFP No. 8, SaveOnSP has agreed to produce "communications and related internal documents identified during a reasonable search received from members of plans advised by SaveOnSP who use any Janssen Drug who (i) refused to either enroll in CarePath or allow SaveOnSP to monitor their pharmacy accounts on behalf of the plan; (ii) tried to opt out of either CarePath or monitoring of their pharmacy accounts on behalf of the plan;  or (iii) initially enrolled in CarePath and consented to monitoring of their pharmacy accounts but later either cancelled their enrollment in CarePath or withdrew their consent to monitoring of their accounts."  Feb. 21 Ltr. at 3-4.

SaveOnSP's proposal for RFP Nos. 5 and 7 includes documents "concerning communications" with persons currently enrolled or eligible to enroll in CarePath, but does not appear to include the communications themselves.  Accordingly, JJHCS will not withdraw its motion with respect to internal communications for RFP No. 5 and 7 at this time.

SaveOnSP's proposal for RFP No. 8 includes internal documents as well as the communications themselves, but limits the subject-matter to enrollment in *CarePath* and monitoring by SaveOnSP, rather than enrollment in the SaveOnSP Program.  SaveOnSP also limits to subject-matter to CarePath and Janssen Drugs.  Accordingly, JJHCS will not withdraw its motions for RFP No. 8 at this time.

### E.    JJHCS's RFP No. 16

As you note, JJHCS proposed limiting its RFP No. 16 to "final versions of communications or marketing materials that SaveOnSP provided to health plan sponsors" if SaveOnSP accepts the production of final CarePath marketing materials in response to SaveOnSP's RFP No. 11.  SaveOnSP declined.  Feb. 21 Ltr. at 4.

Instead, SaveOnSP proposes that JJHCS produce all documents responsive to SaveOnSP's RFP No. 11 in exchange for SaveOnSP's production of all documents responsive to JJHCS's RFP No. 16.

JJHCS declines this proposal.  Accordingly, JJHCS will not withdraw its motion for RFP No. 16 at this time.

### F.    JJHCS's RFP No. 35

JJHCS agrees that the parties' dispute with respect to RFP No. 35 is resolved.  Accordingly, JJHCS will withdraw without prejudice its motion for RFP No. 35.

Meredith Nelson, Esq.
February 23, 2023
Page 4

>    **G.    JJHCS's RFP Nos. 18-22 and 44 and SaveOnSP's RFP No. 14**

With respect to JJHCS's RFP Nos. 18-22 and 44, SaveOnSP agrees to produce "all non-privileged documents and communications responsive to [JJHCS's RFP Nos. 18-22 and 44], including internal communications regarding SaveOnSP's understanding of commercial health plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its regulations for the time period from January 1, 2017 to July 1, 2022." Feb. 21 Ltr. at 5.

Please confirm that SaveOnSP: (1) does not intend to carve out other internal communications responsive to these requests and (2) does not intend to carve out documents relating to non-Janssen Drugs that are otherwise responsive to these requests. Only if SaveOnSP can confirm this by Friday, February 24 will JJHCS withdraw its motion for RFP Nos. 18-22 and 44.

>    **H.    JJHCS's RFP No. 31**

JJHCS agrees that the parties' dispute with respect to RFP No. 31 is resolved. Accordingly, JJHCS will withdraw without prejudice its motion for RFP No. 31.

>    **I.    JJHCS's RFP No. 12.**

In its February 9 letter, JJHCS asked SaveOnSP to clarify whether the documents it proposes to produce that are "sufficient to show its fees, fee structures, and fee arrangements with clients" will relate to "*all* fees paid and collected, as well as fee arrangements for *all* drugs and health plan clients." Feb. 9 Ltr. at 10 (emphasis in original). In your February 21 letter, you stated that "SaveOnSP is willing to produce documents sufficient to show the fees it received for services related to Janssen Drugs and its fee structures and arrangements with health plan clients for all drugs included in the copay assistance benefit administered by SaveOnSP."

SaveOnSP has carved out documents sufficient to show *all* of the fees it has received. It is also unclear whether SaveOnSP's addition of the qualifier "included in the copay assistance benefit administered by SaveOnSP" is intended to carve out certain fees. Accordingly, JJHCS will not withdraw its motion with respect to RFP No. 12.

## II.    SAVEONSP'S PROPOSAL FOR SUPPLEMENTAL JOINT LETTER BRIEFING ON JJHCS' FULLY BRIEFED AND PENDING MOTIONS

SaveOnSP's new proposed draft letter to purportedly update the Court on the status of JJHCS's motions violates the Court's Rules and is improper. As we stated in our February 9 letter, to "the extent any issues included in JJHCS's motions have been resolved or narrowed, JJHCS will notify the Court." Feb. 9 Ltr. at 1. We have now done so, limiting the content of the letter to a simple identification of the issues that have been resolved. A substantive letter of the kind that SaveOnSP proposes constitutes supplemental briefing and is

Meredith Nelson, Esq.
February 23, 2023
Page 5

inappropriate.  *See* Waldor Civ. Case Mgmt. Order ¶ 7 ("No further letter submissions regarding the dispute may be submitted without leave of Court.").  If SaveOnSP decides nevertheless to go forward unilaterally and submit such a letter, JJHCS will move to strike.

\* \* \*

Very truly yours,

*/s/Anthony C. LoMonaco*
Anthony C. LoMonaco

# Exhibit 15

| From: | Haigney Long, Julia (x2878) |
|---|---|
| To: | Elizabeth Snow; Mangi, Adeel A. (x2563); Sandick, Harry (x2723); LoBiondo, George (x2008); Arrow, Sara (x2031); Shane, Beth (x2659); Brisson, Katherine (x2552); Hashmi, Kabir (x2701); ~jgreenbaum@sillscummis.com; ~klieb@sillscummis.com |
| Cc: | David Elsberg; Andrew Dunlap; Wohlforth, E. Evans; Meredith Nelson |
| Subject: | RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-ES-CLW) |
| Date: | Thursday, June 15, 2023 7:21:19 PM |

Elizabeth,

Consistent with Judge Waldor's rulings at the March 17, 2023 conference, JJHCS prioritized its agreed upon production of documents responsive to the priority topics referenced in your email and production of those categories of documents is now substantially complete for the expanded time period subsequently agreed to by the parties.

To the extent that we identify any additional, non-privileged documents that are responsive to these requests, we will continue to produce these documents as soon as possible, on a rolling basis.

Best,
Julia

**Julia Haigney Long**
She | Her | Hers
Associate

Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

T 212.336.2878

jhaigneylong@pbwt.com

---

**From:** Elizabeth Snow <esnow@selendygay.com>
**Sent:** Monday, June 12, 2023 5:07 PM
**To:** Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Carotenuto, George (Departed User) <gcarotenuto@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Cc:** ~delsberg@selendygay.com <delsberg@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>; Wohlforth, E. Evans <EWohlforth@rc.com>; Meredith Nelson <mnelson@selendygay.com>
**Subject:** JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-ES-CLW)

*Caution: External Email!*

Julia,

Thank you for your production of documents on June 9, 2023. We understand based upon your prior representations that JJHCS's June 9, 2023 production completes JJHCS's production on the priority topics (financial documents and Janssen CarePath's terms and conditions) ordered by the Court on March 17, 2023. Please let us know if this is incorrect.

Thanks,

Elizabeth

**Elizabeth Snow**
Associate  [Email]
Selendy Gay Elsberg PLLC  [Web]
Pronouns: she, her, hers
---------------------------------------------
+1 212.390.9330  [O]
+1 540.409.7257  [M]

---

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

---

# Exhibit 16



www.pbwt.com

July 24, 2023

Harry Sandick
(212) 336-2723

Andrew Dunlap, Esq.
Selendy Gay Elsberg, PLLC
1290 Avenue of the Americas
New York, NY 10104

<p style="text-align:center">Re:    <strong><em>Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC</em></strong><br><strong>No. 2:22-cv-02632 (ES) (CLW)</strong></p>

Dear Andrew:

We write in response to your July 12, 2023 letter regarding SaveOnSP's renewed requests for documents related to CarePath budgeting and financial information.

## I.    Harm Caused To JJHCS

In the July 12 letter, SaveOnSP asks whether JJHCS believes its harm is "limited to additional CarePath funds that JJHCS believes it has expended because of SaveOnSP." July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 3. Consistent with the allegations in the Complaint, JJHCS confirms that SaveOnSP's tortious conduct "has caused JJHCS to pay at least $100 million more in copay assistance than it otherwise would have." *See* Compl. ¶¶ 5, 89-105. JJHCS reserves the right to pursue relief relating to any harm caused by SaveOnSP encompassed by its pleading.

We also note that SaveOnSP has engaged in acts of concealment in order to prevent JJHCS and other market participants from learning about the true nature and extent of SaveOnSP's wrongdoing. Accordingly, JJHCS reserves all rights to assert additional types or amounts of damages based on evidence learned in discovery or through ongoing fact investigation into SaveOnSP's ongoing tortious conduct.

## II.    JJHCS's Production of Financial Information

In the July 12 letter, SaveOnSP requests that JJHCS "refresh" its production of documents related to the extent of harm caused by SaveOnSP, as well as data responsive to SaveOnSP's RFP No. 28(i)-(m) through the present. *See* July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 3-4. As to an update of data, we agree this should occur but on a reciprocal basis, including data produced in response to JJHCS's RFP Nos. 41, 42, and 56. For the avoidance of doubt, JJHCS will "refresh" its production of (i) patients enrolled in CarePath; (j) the dates on which each patient was enrolled; (k) the amount(s) of copay assistance funds that JJHCS offered to each patient; (l) the Janssen drug which each patient received; and (m) all copay assistance

Andrew Dunlap, Esq.
July 24, 2023
Page 2

payments that JJHCS made to or on behalf of each patient enrolled in CarePath.  *See* SaveOnSP's
RFP No. 28(i)-(m).  We propose that the parties confer on dates for two updates of their respective
data productions.  We suggest that there be one update through to the present to occur at the close
of substantial completion of production, and another to occur two months before trial with an
understanding that expert using the data for damages calculations will be permitted to update their
calculations only within one month thereafter.  We are willing to confer as to any appropriate
reciprocal update as to documents relating to harm caused by SaveOnSP beyond these data
updates.

SaveOnSP's July 12 letter (at pages 4-5) also renews a series of requests for production:

- **RFP No. 29(a)**:  From April 1, 2016 through the present, all Documents and
  Communications regarding JJHCS's determination of the amounts of copay
  assistance funds that JJHCS offered to Patients enrolled in CarePath.  *See* RFP
  No. 29(a).

- **RFP No. 29(b)**:  From April 1, 2016 through the present, all Documents and
  Communications regarding JJHCS's budget for CarePath.  *See* RFP No. 29(b).

- **RFP No. 29(i)**:  From April 1, 2016 through the present, all Documents and
  Communications regarding JJHCS's or Janssen's actual and projected return on
  investment for CarePath.  *See* RFP No. 29(i).

With respect to RFP No. 29(a), JJHCS agrees to produce documents sufficient to
show how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients
enrolled in CarePath from April 1, 2016 through the present, subject to SaveOnSP's agreement to
make a reciprocal production of documents sufficient to show how determines the copayments for
Janssen drugs subject to the SaveOnSP program through to the present.

With respect to RFP No. 29(b), JJHCS agrees to produce documents sufficient to
show JJHCS's budget for copay assistance through CarePath and JJHCS's actual and projected
annual costs for CarePath.  JJHCS represents that, as part of its next production, JJHCS will
produce additional budget data, including all available forecasted and actual spend, related to the
CarePath co-pay assistance program from January 1, 2017 to July 1, 2022.  Based on a reasonable
investigation, we understand that this budget data is not available prior to January 1, 2017.  JJHCS
agrees to produce additional data to update this production through the present.

With respect to RFP No. 29(i), JJHCS does not agree to produce documents
"regarding JJHCS's or Janssen's actual and projected return on investment for CarePath."  The
documents JJHCS has agreed to produce, including the CarePath budget and actual costs, are
sufficient to show the harm caused by SaveOnSP to CarePath.  As explained more fully in Section
III, *supra*, SaveOnSP continues to seek information that is irrelevant to the claims and defenses in
this case.

Andrew Dunlap, Esq.
July 24, 2023
Page 3

**III.    Further Discovery of Janssen, JJHCS, and CarePath Budget and Financial Information Is Not Warranted**

At the March 17, 2023 Status Conference, Judge Waldor expressed skepticism regarding the breadth of SaveOnSP's requests for financial, budget, and other similar information. Judge Waldor cautioned SaveOnSP multiple times to limit the scope of its requests on these issues.

For example, Judge Waldor told the defense that "I think it's an awfully broad and not just temporally but otherwise broad request. I understand the background and the basis for the request, but as I said, not – it's premature. Let's see what [JJHCS] produces. And let's see if you can modify and streamline your arguments to me and your requests after that." Dkt. No 89 at 34:5-10. Later, Judge Waldor stated again that the requests were "temporally [] way out of line" and she expressed her "hop[e]" that the defense could make "a more targeted request." *Id.* at 35:15-21

Despite Judge Waldor's comments, SaveOnSP has presented renewed requests in Sections III.B and III.C of the July 12 letter that are nearly identical to those that the Court denied at the March 17 conference. Rather than make "a more targeted request," SaveOnSP is pressing the same requests that the Court rejected as overbroad four months ago. Given that SaveOnSP has not changed its position, JJHCS's position likewise remains the same: SaveOnSP's demands are overly broad, irrelevant, and unnecessary for preparation of its defense.

In SaveOnSP's renewed requests for documents responsive to RFP Nos. 28(a)-(h) and RFP 29(j), as identified in Section III.B of your July 12 letter, SaveOnSP has made no substantive changes to the requests themselves, even though Judge Waldor explicitly stated her concerns involved the temporal *and* substantive scope of the requests. *See* Mar. 17 Tr. at 34:5-6 ("I will tell you that I think it's an awfully broad and not just temporally but otherwise broad request."). Limiting the timeframe within which you seek documents is insufficient to address Judge Waldor's substantive concerns. In addition, SaveOnSP has failed to narrow either the temporal or the substantive scope of its renewed request for RFP No. 30, which seeks extensive pricing information for every Janssen Drug from 2009 through the present—a request that is both wildly overbroad and lacking in relevance to the claims and defenses in this case.

In addition to Judge Waldor's skepticism about the breadth of the requests, which seek, among other things, prescription-level data for all CarePath patients, all documents and communications regarding adherence rate analysis for CarePath patients, and internal data and pricing information related to the net price of each Janssen Drug, Judge Waldor explained that any renewed requests should be targeted to address any perceived deficiencies in JJHCS's priority production of documents. Mar. 17, 2023 Tr. at 34:2-10 ("I'll hear further argument once [JJHCS] produces what [counsel] said he's going to produce and we can get a little more specific … Let's see what [JJHCS] produces. And let's see if you can modify and streamline your arguments to me and your requests after that."); *id.* at 35:17-21 ("I will allow you to renew that request after [JJHCS counsel] produces everything he says he's going to produce. And I'm just hoping . . . that maybe it can be a more targeted request.").

Andrew Dunlap, Esq.
July 24, 2023
Page 4

        Despite this, SaveOnSP's July 12 letter never describes why the productions made by JJHCS are insufficient for analyzing the sale of Janssen Drugs or the adherence rates of patients in the SaveOnSP program compared to that of patients that are not.  Instead, the renewed requests amount to nothing more than a reiteration of the same points, without the additional justification contemplated by Judge Waldor as to why SaveOnSP needs more than the financial and patient-level data JJHCS has already produced.

### A.      SaveOnSP Is Not Entitled to Information Sought by Section III.B

        SaveOnSP claims that its program increases both the sales of Janssen Drugs and patient adherence rates.  Even if this dubious proposition were true and somehow relevant to the claims and defenses—and it is neither—JJHCS's document productions are sufficient for SaveOnSP to prepare a defense.  JJHCS has produced a wealth of non-privileged documents and communications in its possession relating to the following:

- The extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period.

- The data that formed the basis for the allegations in the Complaint ¶¶ 92-100.

- JJHCS's budget for copay assistance through CarePath; JJHCS's actual and projected annual costs for CarePath.

- Patient-level data from the time period January 1, 2016 to July 1, 2022, including documents sufficient to show:

    (1) all patients enrolled in CarePath for each Janssen Drug;

    (2) the dates on which each patient was enrolled in CarePath;

    (3) the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath;

    (4) the Janssen Drug for which each patient enrolled in CarePath received copay assistance; and

    (5) all CarePath copay assistance payments made to each payment.  This data is more than sufficient for you to test the injury and damages alleged by JJHCS.

        This document production—which includes documents from before and after SaveOnSP began operations in earnest—is sufficient for SaveOnSP to answers the questions that it poses.  Are patients on the SaveOnSP program more likely to continue to take Janssen medications than patients who are not on SaveOnSP?  Does JJHCS provide more or less co-pay support to patients after the patients register for SaveOn?  How if at all have CarePath's budgets

Andrew Dunlap, Esq.
July 24, 2023
Page 5

changed as SaveOnSP has grown?  These questions and much more can be answered by making reference to the documents produced by JJHCS and the documents in SaveOnSP's own files.[1]

At any rate, SaveOnSP's claim that its program somehow "benefits" JJJHCS through increased sales and patient adherence is illogical.  The argument is apparently premised on the idea that if Janssen pharmaceuticals have been profitable in recent years, then it must be that the SaveOnSP program somehow led to increased sales and patient adherence, leaving JJHCS unharmed by SaveOnSP's conduct.  But the profitability of Janssen therapies is not a justification for SaveOnSP's tortious conduct.  Whether or not Janssen therapies are profitable is irrelevant to SaveOnSP's interference with CarePath's terms and conditions and its deception of CarePath patients.  SaveOnSP is not entitled to the additional discovery it seeks (let alone for a time period that predates SaveOnSP's existence by almost a decade) given that JJHCS already has produced documents sufficient for SaveOnSP to test its own unlikely theories.

Accordingly, JJHCS declines to produce all documents responsive to SaveOnSP's RFP Nos. 29(a)-(h), (j) and 29.  If SaveOnSP were inclined to follow Judge Waldor's admonition and narrow the scope of the documents it seeks produced to only those that are relevant to the case, JJHCS remains open to further meet and confer discussions.

## B.    SaveOnSP Is Not Entitled to the Information Sought by Section III.C

SaveOnSP also now renews its vastly overbroad, irrelevant request for "[d]ocuments sufficient to show the basis for Janssen's decision to raise or lower the price of the Janssen Drug" for every Janssen Drug, and seeks these documents from January 1, 2009 to the present.  The temporal and substantive breadth of this request is extraordinary, and there it seeks documents with no connection to the Complaint whatsoever.

This is not a case about Janssen therapies and how they are priced or marketed. This case is about SaveOnSP's conduct in relation to CarePath.  Nowhere in the Complaint does JJHCS allege that the price of Janssen therapies has changed in response to an increased utilization of CarePath funds or, more specifically, due to SaveOnSP's conduct.  Only the conduct of SaveOnSP and the impact that SaveOnSP has on CarePath's co-pay support program are at issue. SaveOnSP continues its attempt to turn the case into a referendum on the expensive nature of pharmaceuticals and the fairness of drug prices—issues that are wholly irrelevant to the case and meant to be a distraction from SaveOnSP's tortious conduct.  The price of a Janssen Drug— whatever that price may be—does not give SaveOnSP the right to interfere with CarePath's terms

---

[1] In addition, it is possible that answers to some of these questions may also be found in the files of SaveOnSP's business partners, Express Scripts, Inc. ("ESI"), and Accredo, Inc.  Despite the obvious relevance of ESI and Accredo's documents, SaveOnSP has inexplicably filed papers in support of ESI and Accredo's motions to quash JJHCS's third-party subpoenas, leaving SaveOnSP in the unusual position of opposing the production of relevant documents and seeking the production of irrelevant documents.

Andrew Dunlap, Esq.
July 24, 2023
Page 6

and conditions or mislead consumers. Focusing on how Janssen prices its pharmaceuticals is an improper attempt to lay blame on JJHCS and to impose unwarranted burden on JJHCS in retaliation for the filing of this lawsuit. JJHCS's conduct is not at issue, and this attempt to shift the focus away from SaveOnSP is inappropriate.

SaveOnSP's letter claims that documents regarding the pricing decisions of Janssen Drugs are "relevant to JJHCS's allegations that SaveOnSP makes CarePath 'prohibitively expensive,'" but provides nothing more than this conclusory statement in support of this claim. As we have previously stated, "as a matter of business judgment, [JJHCS] cannot justify the skyrocketing costs of its copay assistance program if those added costs are incurred not for the benefit of patients but rather for SaveOnSP and its partners." Dkt. No. 79 at 17. CarePath does not exist to subsidize SaveOnSP's business; it exists to provide patients with access to medications that they otherwise might not be able to afford. SaveOnSP's opinion about to the business decisions of JJHCS and the considerations involved in running the CarePath program are irrelevant. Nevertheless, JJHCS has already produced budget and financial data that is relevant to our allegation that the SaveOnSP program makes CarePath prohibitively expensive. Additional data regarding the pricing of Janssen drugs over a fifteen-year period is irrelevant to this determination and simply unnecessary.

Furthermore, you again omit JJHCS's rationale behind its allegation that SaveOnSP makes healthcare more expensive for patients, as you did in your motion to compel regarding the same request at issue here. *See* Dkt. No. 79 at 14 ("JJHCS has accused SaveOnSP of violating GBL § 349 by making health care more expensive for patients."); July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 6 ("Documents regarding Johnson & Johnson's pricing decisions for the Janssen Drugs at issue in this case are relevant to JJHCS's allegations … that SaveOnSP makes health care more expensive for patients[.]"). In response, we again highlight the fact that JJHCS has been clear that the SaveOnSP program "mak[es] patient healthcare needs more expensive" not in the abstract but specifically "***by not counting any of the funds spent of patients' medication towards their ACA maximum or deductible***." Compl. ¶ 114 (emphasis added); *see also* Dkt. No. 79 at 17. The pricing of Janssen drugs has nothing to do with the design of the SaveOnSP program and its manipulation of essential versus non-essential health benefits, which causes patients' healthcare needs to be more expensive. CarePath already makes participating Janssen pharmaceuticals affordable by reducing patient expenses to $5 or $10 per prescription fill, thus annual price fluctuations have no impact on patients enrolled in CarePath and is irrelevant to CarePath patients' copay responsibility.

In addition to the clear irrelevance of this data, the breadth of this request is immense. As discussed at the March 17 conference, Johnson & Johnson has over 140,000 employees and 200 affiliates around the world, many of which are involved in the manufacture, creation, and pricing decisions of Janssen pharmaceuticals. *See* Mar. 17, 2023 Tr. at 33:3-8. Pricing decisions are made based on a wide array of factors that have nothing to do with CarePath or JJHCS—let alone SaveOnSP—such as manufacturing costs, inflation, and competition in the specialty drug marketplace.

Andrew Dunlap, Esq.
July 24, 2023
Page 7

       Finally, SaveOnSP's renewed request seeks documents sufficient to show pricing decisions of Janssen Drugs going all the way back to 2009, seven years before both CarePath began in its current form and SaveOnSP began operations in 2016.  The allegations in the Complaint all concern events that took place in or after 2017.  There is no legitimate purpose to seek the pricing of Janssen Drugs from eight years before SaveOnSP existed.  Indeed, SaveOnSP does not even provide a rationale for why it is entitled to this information going back to 2009, offering only conclusory assertions.  *See* July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 6.  SaveOnSP's request for documents sufficient to show pricing decisions for every Janssen Drug during a nearly fifteen-year period would require JJHCS to search through the entire network of Johnson & Johnson entities, creating a burden that is undue and disproportionate to the needs of the case and irrelevant to the claims at issue.

       In addition, as stated in our July 17, 2023 letter, based on our reasonable investigation, we understand that, due to applicable preservation and/or retention capabilities, we are not in a position to produce documents or communications created before 2013.

       Accordingly, JJHCS refuses to produce all documents responsive to SaveOnSP's RFP No. 30.  As with the other requests discussed above, JJHCS remains open to considering narrowed requested as suggested by Judge Waldor.

                              Very truly yours,

                              */s/ Harry Sandick*
                              Harry Sandick

# Exhibit 17

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

selendy
gay
elsberg

Andrew Dunlap
Partner
212 390 9069
adunlap@selendygay.com

July 12, 2023

**Via E-mail**

Harry Sandick
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
hsandick@pbwt.com

**Re:    *Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC* (Case No. 2:22-cv-02632-JMV-CLW)**

Dear Harry,

We write regarding Johnson & Johnson Health Care Systems Inc.'s
("JJHCS") production of documents in the above captioned matter in response to
Save On SP, LLC's ("SaveOnSP") requests for documents related to the develop-
ment and marketing of CarePath, JJHCS's financial returns from CarePath, and
the price of Johnson & Johnson's specialty drugs.

## I.    Background

JJHCS sued SaveOnSP for tortious interference with contract and deceptive
trade practices under NY GBL § 349. JJHCS alleges that it provides copay assis-
tance "in order to help [patients]... more easily afford their life-saving and life-im-
proving therapies." *Id*. at ¶¶ 6-7, 50, 74. JJHCS asserts that, according to its own
"net price" calculation, it has "consistently decreased the price of the drugs tar-
geted by the SaveOnSP Program," *id*. at ¶ 80, but also alleges that without copay
assistance, "many patients would be unable to afford their medications," *id*. at ¶ 7.
Conversely, JJHCS asserts that SaveOnSP changes the designation of Janssen
drugs from "essential health benefits" to "non-essential health benefits," *id*. at ¶ 9,
so it can increase patient copays and take advantage of CarePath's copay assis-
tance, *id*. at ¶¶ 10, 17.

JJHCS claims that "SaveOnSP has caused JJHCS to pay at least $100 mil-
lion more in copay assistance than it otherwise would have[.]" Compl. ¶ 5; *see also
id*. ¶¶ 110, 115. JJHCS alleges that it continues to suffer this injury because it is

Harry Sandick
July 12, 2023

unable to identify patients utilizing SaveOnSP's services and reduce or eliminate the amount of copay assistance available to them. *Id.* ¶ 101. JJHCS also alleges that SaveOnSP's conduct makes patients' other healthcare needs more expensive because plans advised by SaveOnSP do not count copay assistance toward patients' ACA maximum or deductible and SaveOnSP's services "jeopardiz[e] the viability of patient assistance programs like CarePath by making them prohibitively expensive," which, in turn, "causes damage to the public." *Id.* ¶ 114.

SaveOnSP asserts affirmative defenses that include: (1) JJHCS has not suffered damages because SaveOnSP's services result in an increase in the number of fills in Janssen Drugs, Dkt. No. 85, Affirmative Defenses ¶¶ 13-17; (2) JJHCS failed to use reasonable means to prevent and/or mitigate its alleged damages, *id.* ¶¶ 24-29; and (3) JJHCS is not entitled to any equitable relief because it has not suffered irreparable injury and the balance of equities favors SaveOnSP, *id.* ¶¶ 39-43.

Documents and communications related to the development and marketing of CarePath, JJHCS's financial returns from CarePath, and the price of Johnson & Johnson's specialty drugs are thus highly relevant. SaveOnSP sought discovery on these topics in its RFP Nos. 11, 25, and 27-30. RFP No. 11 seeks all Documents and Communications from January 1, 2009 "regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 6-7, 36-49." RFP No. 25 seeks all Documents and Communications concerning "any alleged harm caused by SaveOnSP to JJHCS," including those regarding the allegations in Complaint ¶¶ 110, 115. RFP No. 27 seeks "[a]ll Documents and Communications regarding the 'internal JJHCS data' discussed in Complaint ¶¶ 92-101, including the complete databases from which that data was drawn." RFP No. 28 seeks several categories of Documents related to the Janssen Drugs, including claims data, documents sufficient to show the cost, price, budget, and revenue received for each drug, as well as information regarding patients' enrollment in the CarePath program, including the amounts of copay assistance provided to each patient. RFP No. 29 seeks, *inter alia*, for each Janssen Drug, documents and communications concerning the amount of CarePath funds paid to patients, JJHCS's budgets for and revenue resulting from CarePath, JJHCS's return on investment from CarePath, JJHCS's accounting for unused CarePath funds, and the impact of CarePath on the sale and pricing of the Janssen Drugs. RFP No. 30 seeks Documents and Communications from January 1, 2009 regarding the decision to raise or lower the price of each Janssen Drug.

JJHCS refused to produce any documents in response to RFP Nos. 11 and 30 based on relevance and burden objections. In response to RFP Nos. 25, 27, and 29, JJHCS agreed to produce, from April 1, 2016 to July 1, 2022: (1) "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period;" (2) "the data that formed the basis for the allegations in Complaint ¶¶ 92-100;" (3) "JJHCS's budget for copay assistance through CarePath;" and (4) "JJHCS's actual and projected annual costs for CarePath." Feb. 14, 2023 Letter from A.

Harry Sandick
July 12, 2023

LoMonaco to M. Nelson, at 1-2; Apr. 10, 2023 Email from G. LoBiondo to M. Nelson. In response to RFP No. 28(a)-(h), JJHCS agreed to produce publicly available Janssen Transparency Reports. JJHCS's Responses and Objections to SaveOnSP's First Set of RFPs ("R&Os") at 25. In response to RFP No. 28(i)-(m), JJHCS agreed to produce responsive data from January 1, 2016 to July 1, 2022. Feb. 17, 2023 Letter from A. LoMonaco to M. Nelson at 3.

SaveOnSP moved to compel JJHCS to produce documents in response to its RFP Nos. 11, 28(a)-(h), and 29-30. *See* Feb. 24, 2023 Joint Letter (Dkt. 79) at 13-18. At the March 17, 2023 conference, the Court denied SaveOnSP's motion to compel without prejudice. The Court ordered JJHCS to prioritize the production of documents concerning SaveOnSP's financial impact on JJHCS and CarePath. Mar. 17, 2023 Tr. at 33:24-34:4, 36:5-16. The Court stated that SaveOnSP was "entitled to prove that there's no injury," *id.* at 35:13-15; *see also id.* at 31:24, 33:24-25, and that it was deferring resolution of the motion until JJHCS "produces what [it] said [it is] going to produce and we can get a little more specific," *id.* at 34:2-4. The Court said that it would permit SaveOnSP to "renew th[is] request" after JJHCS had made its priority production. *Id.* at 35:17-19. SaveOnSP told the Court that it would do as instructed and review JJHCS's priority production before renewing its motion to compel but that it did not believe the documents JJHCS planned to produce would satisfy its requests, and that waiting to renew its motion risked delaying discovery. *Id.* at 34:22-35:11.

While JJHCS made a portion of its court-ordered priority production of document concerning SaveOnSP's financial impact on CarePath and JJHCS on April 28, 2023, it did not substantially complete that production until June 9, 2023. *See* June 15, 2023 Email from J. Haigney Long to E. Snow. SaveOnSP's review of that production shows that JJHCS is still withholding key financial information.

## II.    JJHCS's Existing Production Of Financial Information

SaveOnSP seeks to clarify two issues regarding JJHCS's existing production of financial information.

*First*, JJHCS agreed to produce "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period." *See, e.g.*, Feb. 14, 2023 Letter from A. LoMonaco to M. Nelson, at 1. We understand that JJHCS believes this is limited to additional CarePath funds that JJHCS believes it has expended because of SaveOnSP. (If JJHCS intended this "harm" to include other things, please let us know promptly what they are.)

*Second*, JJHCS agreed to produce documents relating to its damages. Feb. 14, 2023 Letter from A. LoMonaco to M. Nelson, at 1. JJHCS alleges that its damages from SaveOnSP's conduct continue through the present. Compl. at ¶¶ 104-05. SaveOnSP requests that JJHCS refresh its production of documents relating to

3

Harry Sandick
July 12, 2023

the extent of the harm SaveOnSP has caused JJHCS as well as data responsive to SaveOnSP's RFP Nos. 28(i)-(m) through the present. Please promptly confirm that you will produce this information.

## III.  Omissions From JJHCS's Production of Financial Information

JJHCS continues to withhold key categories of financial information that SaveOnSP needs to defend against JJHCS's claims. During the March 17, 2023 conference, the Court denied SaveOnSP's motion to compel JJHCS to produce documents responsive to its RFP Nos. 11, 28.a-28.h, and 29-30 without prejudice, stating SaveOnSP could renew its motion "after [JJHCS] produces everything [it] says [it's] going to produce," Mar. 17, 2023 Tr. at 35:18-19, and encouraging SaveOnSP to present "more targeted request[s]" in its renewed motion, *id.* at 35:21. JJHCS says that it substantially completed its "agreed upon production of documents responsive to the priority topics" on June 9, 2023, *see* June 15, 2023 Email from J. Haigney Long to E. Snow, but that production lacks key categories of financial information that SaveOnSP requested.

SaveOnSP asks that JJHCS produce the following narrowed categories of documents responsive to its RFP Nos. 11, 28.a-28.h, and 29-30. Please confirm that JJHCS will promptly produce these documents.

### A.  Documents Related to CarePath Budget and Johnson & Johnson's Return on Investment from CarePath

SaveOnSP renews its request that JJHCS produce the following documents responsive to SaveOnSP's Requests for Production:

- From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to Patients enrolled in CarePath. *See* RFP No. 29(a).

- From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's budget for CarePath. *See* RFP No. 29(b).

- From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's or Janssen's actual and projected return on investment for CarePath *See* RFP No. 29(i).

Documents that show how and why Johnson & Johnson sets the amount of CarePath funds that it makes available, and its return on investment for CarePath, are relevant to JJHCS's claims that SaveOnSP threatens the viability of CarePath, that harm to CarePath is a public harm for its GBL § 249 claim, that JJHCS has been injured, the amount of JJHCS's damages, and whether JJHCS mitigated its damages. While JJHCS has produced documents showing the amount of CarePath's budgets, it has not produced documents regarding how or why those budgets were set or Johnson & Johnson's analysis or calculation of its current or

4

Harry Sandick
July 12, 2023

prospective return on investment elicited from CarePath. JJHCS withholds these documents, even though it agreed to produce documents regarding "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath," in response to RFP No. 29(a). *See* R&Os at 27.

## B. Documents Necessary to Show Benefits to Johnson & Johnson from Increased Sales

SaveOnSP renews its request that JJHCS produce the following documents responsive to SaveOnSP's Requests for Production:

- From April 1, 2016 through the present, for each Janssen Drug for each year, documents sufficient to show the number of fills of the Janssen Drug received by each Patient enrolled in CarePath and the dosage of the Janssen Drug received by each Patient enrolled in CarePath for each fill. *See* RFP No. 28(b), (c).

- From April 1, 2016 to the present, all Documents and Communications regarding any analysis of the adherence rates of Patients enrolled in CarePath to Janssen Drugs. *See* RFP No. 29(j).

- From April 1, 2016 to the present, all internal data which support the Net Price values provided throughout the "Transparency Reports," which JJHCS has agreed to produce, and documents sufficient to show the net prices charged to SaveOnSP's clients for each Janssen Drug and Johnson & Johnson's marginal costs for each Janssen Drug. *See* RFP Nos. 28(a)-(h).

As we have previously explained, SaveOnSP's believes that the plan terms that its clients adopt may increase Johnson & Johnson's sales of Janssen Drugs, patients on plans advised by SaveOnSP may be more likely to take and keep taking Janssen Drugs than those on other plans.[1] SaveOnSP is entitled to show the benefit that its services provide to Johnson & Johnson in assessing JJHCS's claims of injury and damages. SaveOnSP needs fill data for patients on CarePath so that it can compare the fill rates of patients on SaveOnSP-advised plans to those of patients on other plans. And SaveOnSP needs data sufficient to show the monetary benefit that Johnson & Johnson receives from each additional fill.

SaveOnSP also needs documents showing Johnson & Johnson's own analysis of patient adherence rates. Johnson & Johnson clearly tracks and calculates adherence rates and considers maintaining patients' adherence to its drugs a top priority. *See, e.g.*, JJHCS_00000195 (2020 Janssen Transparency Report states

---

[1] While SaveOnSP understands that JJHCS disputes this claim as a matter of fact, SaveOnSP has produced documents showing its internal analyses on adherence, *see, e.g.*, SOSP_0162993, SOSP_0162885, and it is entitled to take discovery that will allow it to prove these defenses.

Harry Sandick
July 12, 2023

that "[t]he doubling of co-pays has been found to reduce patients' adherence to prescribed medicines by 25%-45%."); JJHCS_00000558 ███████████████ ████████████████████████████████████████████████ JJHCS therefore should produce all documents regarding any analysis of the adherence rates of patients enrolled in CarePath to Janssen Drugs.

### C.  Docs Sufficient to Show How Johnson & Johnson Set Prices for Each Janssen Drug during the Relevant Time Period

SaveOnSP renews its request that JJHCS produce the following documents responsive to SaveOnSP's Requests for Production:

- From January 1, 2009 to the present, for each year for each Janssen Drug, Documents sufficient to show the basis for Janssen's decision to raise or lower the price of the Janssen Drug. *See* RFP No. 30.

Documents regarding Johnson & Johnson's pricing decisions for the Janssen Drugs at issue in this case are relevant to JJHCS's allegations that Save-OnSP makes CarePath "prohibitively expensive," and threatens its financial viability, Compl. ¶ 114, and to its claim that SaveOnSP makes health care more expensive for patients, *id*. It is also relevant to JJHCS's allegations that CarePath is necessary to offset the costs of Janssen Drugs, that patients could not afford those drugs without CarePath, and that JJHCS has decreased the net price of Janssen Drugs at issue in this case. *Id*. at ¶¶ 2, 7, 80.

JJHCS has not produced these documents. Its production does not include any documents revealing how Johnson & Johnson set the prices for each of the relevant drugs, beyond a general representation that it considers ███████████ ██████████████████████████████ *See* JJHCS_00128222.

*********************

For all the categories of documents requested above, JJHCS's production should include without limitation: (1) documents describing and analyzing the topics (including, without limitation, business plans, strategic plans, strategy presentations); (2) documents sufficient to show the individuals with input into and approval over each topic (including without limitation working group lists and organizational charts); and (3) documents and communications on each topic from those most knowledgeable about it and those with approval or decision-making authority over it (including, without limitation, emails, memos, and records of meetings of relevant groups or committees).

Please let us know by July 19, 2023 whether JJHCS will agree to produce the documents SaveOnSP requests, and, if so, the custodians and/or document sources that JJHCS believes are most likely to possess or contain documents responsive to these renewed requests, and the search terms that JJHCS intends to

Harry Sandick
July 12, 2023

use to identify those documents. Consistent with the Court's June 27, 2023 order and SaveOnSP's July 5, 2023 letter, SaveOnSP expects that JJHCS will identify appropriate custodians and documents sources from Janssen and any other Johnson & Johnson entities likely to possess information responsive to these requests.

We reserve all rights and are available to meet and confer.

Best,

/s/ Andrew R. Dunlap

Andrew R. Dunlap
Partner

# Exhibits 18-19
## CONFIDENTIAL - FILED UNDER SEAL

# Exhibit 20

| | |
|---|---|
| **From:** | Haigney Long, Julia (x2878) |
| **To:** | Emma Holland; Mangi, Adeel A. (x2563); Sandick, Harry (x2723); LoBiondo, George (x2008); Arrow, Sara (x2031); Shane, Beth (x2659); Deskus, Cassie (x2003); Hashmi, Kabir (x2701); ~jgreenbaum@sillscummis.com; ~klieb@sillscummis.com; Brisson, Katherine (x2552) |
| **Cc:** | Andrew Dunlap; Meredith Nelson; Elizabeth Snow |
| **Subject:** | RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-ES-CLW) |
| **Date:** | Tuesday, August 15, 2023 5:18:37 PM |

Counsel:

We write in response to your request that JJHCS identify the documents that JJHCS believes are sufficient to show the information it has agreed to produce in response to RFP Nos. 29(a) and (b). JJHCS identifies JJHCS_00026191, JJHCS_00130090, and JJHCS_00130091 as produced in response to RFP No. 29(b).

JJHCS will produce non-privileged, responsive documents sufficient to show how JJHCS determines the amounts of copay assistance funds that JJHCS offers to patients enrolled in CarePath in response to RFP No. 29(a), in advance of the September 24 substantial completion deadline.  Subject to reaching final agreement on a reciprocal refresh,  JJHCS also will produce additional data in response to RFP No. 29(b) through the present.

Best,
Julia

**Julia Haigney Long**
She | Her | Hers
Associate

Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

T 212.336.2878

**jhaigneylong@pbwt.com**

**From:** Emma Holland <eholland@selendygay.com>
**Sent:** Monday, August 14, 2023 5:06 PM
**To:** Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Arrow, Sara (x2031) <sarrow@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Deskus, Cassie (x2003) <cdeskus@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; ~jgreenbaum@sillscummis.com <jgreenbaum@sillscummis.com>; ~klieb@sillscummis.com <klieb@sillscummis.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-ES-CLW)

⬛*Caution: External Email!*

Counsel,

In our below correspondence we requested that you identify the documents that JJHCS believes are sufficient to show the information it has agreed to produce in response to RFP Nos. 29(a) and (b) by Friday, August 11. Please identify these documents promptly.

Best,
Emma


**Emma Holland**
Associate  [[Email](Email)]
Selendy Gay Elsberg PLLC  [[Web](Web)]
Pronouns: She/Her
------------------------------------------------
+1 212.390.9364  [O]
+1 631.742.1694  [M]

---

**From:** Emma Holland
**Sent:** Wednesday, August 9, 2023 8:22 AM
**To:** Mangi, Adeel A. (x2563) <[aamangi@pbwt.com](mailto:aamangi@pbwt.com)>; Sandick, Harry (x2723) <[hsandick@pbwt.com](mailto:hsandick@pbwt.com)>; LoBiondo, George (x2008) <[globiondo@pbwt.com](mailto:globiondo@pbwt.com)>; Haigney Long, Julia (x2878 <[jhaigneylong@pbwt.com](mailto:jhaigneylong@pbwt.com)>; Arrow, Sara (x2031) <[sarrow@pbwt.com](mailto:sarrow@pbwt.com)>; Shane, Beth (x2659) <[eshane@pbwt.com](mailto:eshane@pbwt.com)>; Deskus, Cassie (x2003) <[cdeskus@pbwt.com](mailto:cdeskus@pbwt.com)>; Hashmi, Kabir (x2701) <[khashmi@pbwt.com](mailto:khashmi@pbwt.com)>; ~[jgreenbaum@sillscummis.com](mailto:jgreenbaum@sillscummis.com) <[jgreenbaum@sillscummis.com](mailto:jgreenbaum@sillscummis.com)>; ~[klieb@sillscummis.com](mailto:klieb@sillscummis.com) <[klieb@sillscummis.com](mailto:klieb@sillscummis.com)>; Brisson, Katherine (x2552) <[kbrisson@pbwt.com](mailto:kbrisson@pbwt.com)>
**Cc:** Andrew Dunlap <[adunlap@selendygay.com](mailto:adunlap@selendygay.com)>; Meredith Nelson <[mnelson@selendygay.com](mailto:mnelson@selendygay.com)>; Elizabeth Snow <[esnow@selendygay.com](mailto:esnow@selendygay.com)>
**Subject:** JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-ES-CLW)

Counsel,

We write to follow up on yesterday's meet and confer. During our call, we discussed SaveOnSP's RFP Nos. 29(a) and (b), in response to which JJHCS has agreed to produce that documents it believes are sufficient to show how JJHCS determines the amounts of copay assistance funds that it offered to CarePath patients and JJHCS's budget for CarePath. JJHCS agreed to produce these documents in its Responses and Objections served in December 2022.

As we requested during our meet and confer, please identify the documents that JJHCS believes are sufficient to show the information it has agreed to produce in response to RFP Nos. 29(a) and (b). We ask that you provide this information by the end of the week.

Best,
Emma

**Emma Holland**
Associate  [Email]
Selendy Gay Elsberg PLLC  [Web]
Pronouns: She/Her
---------------------------------------------
+1 212.390.9364  [O]
+1 631.742.1694  [M]

---

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

---

# Exhibits 21-23
## CONFIDENTIAL - FILED UNDER SEAL

# Exhibit 24

JJHCS_00000195



PHARMACEUTICAL COMPANIES OF

Johnson & Johnson

Janssen

BUILDING A HEALTHIER
FUTURE FOR ALL:

THE 2020 JANSSEN
U.S. TRANSPARENCY
REPORT

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

# LETTER FROM OUR LEADERS

We launched our first annual Janssen U.S. Transparency Report four years ago because we wanted to provide policymakers and patients with useful information about what drives the cost of healthcare, including the cost of prescription medicines. We wanted to shed light on the aspects of our health system that stood in the way of patients getting needed care and ultimately, advance the dialogue about how to deliver greater access to medicines at a more manageable cost.

We currently face many challenges in our health system. Long-standing affordability challenges have only been exacerbated by the economic fallout of COVID-19, while the pandemic revealed that susceptibility to illness is unevenly distributed, with communities of color especially vulnerable. But we also have significant opportunities. The speed with which scientists developed COVID-19 vaccines reflects the vigor of our country's R&D ecosystem. In January 2020, Janssen scientists immediately mobilized to begin researching and developing a COVID-19 vaccine for use globally that earned Emergency Use Authorization from the U.S. Food and Drug Administration (FDA) and several other health authorities in the early spring of 2021. Today, millions of doses have been administered and we are on track to deliver one billion doses in 2021 at a not-for-profit price for emergency pandemic use as an example of our commitment to help bring this pandemic to an end.

That's why with our 2020 Janssen U.S. Transparency Report, we outline our vision of better health for all and continue the journey we began with the first report:

- Since the beginning of 2016 (the first year covered by a Janssen U.S. Transparency Report), the **compound net price decline of Janssen medicines was -14.4%.**[1]

- For 2020, the **average net price decline** of our medicines was -5.7%.[2]

- In 2020, we provided **$29.4 billion in rebates, discounts and fees** to government and private payers,[3] as well as hospitals and others in the supply chain—more than half the list price (53%) of our medicines.[4]

- Globally, we **invested $9.6 billion** in 2020 in discovering and developing new medicines and vaccines[5]—106% more than we spent on marketing and sales.[6]

- Since 2016, we've spent **$42.2 billion on R&D**[7]—resulting in a total of four new medicines approved by the FDA[8] and an additional 42 approvals for expanded indications or new product formulations over the same five-year period.[9]

- We provide specific actions we are taking to **address systemic racism and create a more equitable healthcare system.**

- We offer policy solutions to help make healthcare **more accessible and affordable** for patients.

This year, we offer a more detailed look at the price reductions we offer payers and others in the healthcare system to support access to our medicines. We want disclosures like these to shape the conversation about how to sustain the innovation that's the hallmark of the U.S. health system. That's the legacy we've established with the Janssen U.S. Transparency Report and the legacy we are humbled to carry forward.



**SCOTT WHITE**
Company Group Chairman
North America Pharmaceuticals
Johnson & Johnson



**ANASTASIA G. DAIFOTIS, M.D.**
Chief Scientific Officer
Janssen North America
Pharmaceuticals

JJHCS_00000196

# $29.4 BILLION: BREAKING IT DOWN[10]

In 2020, **we provided $29.4 billion in rebates, discounts and fees**[11] to private payers and government programs as well as providers, distributors and others. Here is the breakdown[*]:



COMMERCIAL PAYERS & PHARMACY BENEFIT MANAGERS (PBMs) 24%

340B PROGRAM 18%

MEDICARE 15%

COMMUNITY CLINICS 12%

DISTRIBUTORS 5%

MEDICAID 11%

VA/DoD 4%

OTHER** 9%

NON-340B HOSPITALS 3%

Government programs benefit from vigorous commercial competition as well as legally required price concessions. Medicaid discounts also reflect the extra, "supplemental," rebates states negotiate with manufacturers.

*Note: Due to rounding numbers add up to over 100.
**Other: Programs such as long-term care, ADAP (a program specific to HIV and AIDS) and other disease-specific sites of care/insurers.

LETTER FROM OUR LEADERS

**$29.4 BILLION: BREAKING IT DOWN**

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

JHCS_00000198

4

# 2020 AT A GLANCE

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

**2020 AT A GLANCE**

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT

## NET PRICES FOR OUR MEDICINES HAVE DECLINED…



**-5.7%**
Average net price decline of Janssen medicines in 2020[12]



**$29.4B**
Total amount Janssen paid in **rebates, discounts and fees** to payers and others in the health system in 2020[13]



**-14.4%**
**Compound net price decline** of Janssen medicines since the beginning of 2016[14]

## BECAUSE OUR DISCOUNTS HAVE GROWN FROM 2016-2020*



**3.3X** Medicare[15]



**4.2X** Commercial health plans and PBMs[16]



**2.2X** Medicaid[17]



**2.6X** 340B providers[18]

**53%** — More than half the list price of our medicines went to payers and others in the health system[19]

## DESPITE PRICE REDUCTIONS, BENEFIT DESIGNS PUT MORE FINANCIAL BURDEN ON PATIENTS



**-5.7%**
**Average net price decline** of Janssen medicines in 2020[20]



**111%**
**Average deductible amount increase** for employer-sponsored insurance from 2010 ($646) to 2020 ($1,364)[21]



**17%**
According to a study, **increase in annual ER visits** when co-pays are doubled for patients taking certain medications[22]

## WE'RE SUPPORTING PATIENTS TODAY AND TOMORROW

Nearly **1.2 million** patients helped with **access, affordability and treatment support** through the Janssen CarePath Savings Program[23]

**646,000** commercially insured patients reduced their out-of-pocket costs through the Janssen CarePath Savings Program[24]

**8.1%** increase in average R&D investment from 2016–2020[25]

**$9.6B dedicated in 2020 to the discovery and development of new medicines and vaccines**[26]

*By channel, growth rate in dollars of discounts provided, 2016-2020. For more detail, including discount rates, see pages 7-8.

JJHCS_00000199

# OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

People should have affordable access to the medicines they need, yet many in the U.S. do not.

Well before the COVID-19 pandemic, one in four adults in the U.S. reported difficulty affording their medication.[27] Even for families with insurance, many could not afford needed medical care or medicines.[28] This is happening despite declining net prices to payers, pharmacy benefit managers (PBMs) and government programs.

## SECTION HIGHLIGHTS:

 Our **net prices decreased for the fourth year in a row** because of the significant rebates and discounts we provide.[29]

 **Payers typically do not share rebates and discounts directly with patients** and are shifting more costs to them.

 Janssen CarePath provided access and affordability **support to nearly 1.2 million people,**[30] including **financial assistance to help 646,000 patients** access their Janssen medications.[31]

## OUR RESPONSIBLE APPROACH TO PRICING

We recognize our responsibility to patients today and to patients tomorrow. Today's patients need affordable access to medicines. Tomorrow's patients count on us to deliver preventions, treatments, and cures for challenging illnesses and emerging diseases, like COVID-19.

In setting a list price for a medicine, we balance:

 **Its value to patients, the healthcare system and society.** We assess how our medicines and vaccines improve individual health and allow a person to live their life to the fullest as well as the potential to lower healthcare costs and advance existing standards of care.

**The importance of supporting affordable access to our medicines and vaccines.** We negotiate with insurers, PBMs and governments, as well as hospitals, physicians, and other providers of care, so patients who are prescribed our medicines or need our vaccines can get access to them.

 **The importance of preserving our ability to develop future groundbreaking vaccines, treatments and cures.** Sales from our existing innovations provide us the necessary resources to meet the growing costs of R&D to address unmet medical needs, better help underserved populations and remain prepared for emerging health threats.

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL



LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

## HOW A LIST PRICE BECOMES A NET PRICE

In 2020, we provided $29.4 billion in rebates, discounts and fees to payers and others in the health system[32]—more than half the list price of our medicines (53%).[33]

**We provide rebates and discounts* in exchange for payer coverage of our medicines.**

The **list price** of a medicine is a starting point that is ultimately reduced to a **"net price,"** the amount a manufacturer receives after providing rebates, discounts and/or fees to different parts of the healthcare system. These include private insurance companies, PBMs and/or employers, as well as government programs (e.g., Medicare, Medicaid, the Department of Veterans Affairs, etc.), the 340B Drug Discount Program, and entities where patients receive care (e.g., hospitals, clinics and private physician practices).

Some price reductions are the result of commercial negotiations with private payers. Other reductions are required by law. The U.S. government requires that pharmaceutical companies provide discounts to ensure that seniors, as well as the nation's most vulnerable populations and low-income individuals and families, can access medicines at a very low cost. As we explain in more detail below, government programs receive prices reduced by both private negotiations and statutory discounts.

### JANSSEN U.S. PRICING OVERVIEW[34]

| YEAR | LIST PRICE CHANGE | NET PRICE CHANGE |
|------|-------------------|------------------|
| 2020 | 3.8% | -5.7% |
| 2019 | 5.1% | -1.2% |
| 2018 | 6.3% | -6.8% |
| 2017 | 8.1% | -4.6% |
| 2016 | 8.5% | 3.5% |

### A PRIMER ON PAYERS:

**Commercial Payers:** Private health insurers, self-insured employers and the PBMs who manage pharmacy benefits on their behalf.

**Government:** Federal and state governments provide different insurance coverage for seniors, veterans and vulnerable populations through Medicare, Medicaid, the Department of Veterans Affairs, Department of Defense and Indian Health Service, among others.

*Note: Throughout the report, we use rebates and discounts interchangeably.



JJHCS_00000200

## A CLOSER LOOK: ACCESS AND AFFORDABILITY

### How Payers Determine What Patients Will Pay

Each year, health insurers create tiered lists of covered medicines called formularies. These tiers reflect how much a patient is expected to pay out-of-pocket for a medicine he or she is prescribed. Pharmaceutical manufacturers offer payers discounts and rebates to have their medicines placed on "preferred" formulary tiers with lower patient out-of-pocket costs and fewer access hurdles. Access hurdles often include "utilization management" tools including:

- Requiring a patient to fail treatment on the payer's preferred medicine before trying another; also known as "step therapy;"

- Limiting access for some medicines to patients whose diseases have progressed to a certain stage;

- Imposing administrative requirements such as a healthcare professional needing to submit documentation before a prescribed medicine can be covered; and

- Changing the medicines covered on a formulary in the middle of a plan year, forcing patients to switch medicines for economic rather than medical reasons, also known as "non-medical switching."

Since 2016, the first year covered by a Janssen U.S. Transparency Report, the rebates and discounts we provide have nearly tripled, reflecting payers' growing negotiating power. Three PBMs currently cover 256 million Americans — more than 2/3 of the U.S. population — and handle 74% of all prescriptions processed in the U.S.[35] Further, the number of unique medicines not covered (that is, placed on "exclusion lists") nearly quadrupled, growing from 209 in 2016 to 846 in 2020.[36]

## POLICIES SHOULD ENSURE REBATE SAVINGS ARE SHARED DIRECTLY WITH PATIENTS[37]



**Commercial Payers**

**2016**
$1.7B
$ Total rebates, discounts and fees

Average of 20% off list price

**2020**
$6.9B
$ Total rebates, discounts and fees

Average of 35% off list price

↑ 4.2X increase

## A LOOK AT INVOKANA®
### FROM 2016–2020

**Payers are paying less as net prices decrease[38]**



| | List Price | Discount to Payers | Payers' Net Price |
|---|---|---|---|
| | $519 | $313 | $206 |

137%

32%

–21%

Payers often base patients' cost-sharing on list price. Therefore, when net prices decline patients may not directly share in the savings that payers receive.

## WHAT PATIENTS MAY PAY FOR INVOKANA® DEPENDS ON TYPE AND PHASE OF BENEFIT DESIGN

**Hypothetical Example:**



| Patient with HDHP still in 100% deductible phase | Patient with Co-insurance of 25% | Patient with a flat copay amount |
|---|---|---|
| $519 | $129.75 | $40 |

Higher out-of-pocket costs result in abandonment[39] and could potentially lead to worse outcomes.

7

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS**

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT

JJHCS_00000201

JHCS_00000202

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS**

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

We provide U.S. government programs with substantial discounts. Growth in these discounts reflects vigorous commercial competition as well as increases in the amounts of legally required, or statutory, price concessions. For an explanation of why this is, see Our Promise. At the state level, discounts to Medicaid reflect not only competition and statutory discounts, but also the extra, "supplemental," discounts we and other manufacturers negotiate with individual states. Because of these factors, price concessions to government programs have grown substantially in recent years.

Notably, between 2015–2019, patients' exposure to costs continued to rise, largely due to insurer practices, such as:[40]

**Not passing rebates** directly to patients.

**Basing cost-sharing on list prices,** not net prices.

In the third chapter, Our Promise, we share our ideas for policies that put patients first and create a more accessible and affordable healthcare system.

**Read more about our policy issues >**

## OUR GROWING DISCOUNTS TO GOVERNMENT PROGRAMS"

| | 2016 $ Total rebates, discounts and fees | 2020 $ Total rebates, discounts and fees | |
|---|---|---|---|
| Medicare | $1.3B (Average of 30% off list price) | $4.3B (Average of 49% off list price) | ↑ 3.3X increase |
| Medicaid | $1.4B (Average of 55% off list price) | $3.2B (Average of 58% off list price) | ↑ 2.2X increase |
| Veterans Affairs & Department of Defense | $.7B (Average of 51% off list price) | $1.3B (Average of 56% off list price) | ↑ 1.8X increase |
| 340B | $2.0B (Average of 59% off list price) | $5.2B (Average of 66% off list price) | ↑ 2.6X increase |

8

## INCREASES IN OUT-OF-POCKET COSTS CAN HARM PATIENT CARE

The amount insured patients pay out-of-pocket for their medicines is determined by how their health insurance is set up—the co-pays, deductibles, co-insurance amounts and out-of-pocket maximums for which a patient is responsible.

Patients are increasingly vulnerable to high out-of-pocket costs for medicines.

- In 2020, the share of U.S. workers' health plans with deductibles between $2,349 (single) and $4,601 (family)—known as high-deductible health plans (HDHPs)—**increased to 31%, up from 4% in 2006.**[44]

- For all people with employer-provided insurance, **the average deductible in 2020 was $1,364**, which was 27% higher than 2015 ($1,077) and 111% higher than 2010 ($646).[45]

- Deductibles and co-insurance, which are based on a percentage of a drug's list price rather than a pre-set dollar amount, **have risen faster than wages and inflation** at the same time.[46]

- The doubling of co-pays has been found to **reduce patients' adherence to prescribed medicines by 25%–45%.**[47]



Patients' share of total spending:

**15%** of total outpatient prescription drug spending ($53.7 billion)[42]

**3%** of total hospital care spending ($35.9 billion)[43]

## 2008–2018: CUMULATIVE GROWTH IN PREMIUMS AND OUT-OF-POCKET (OOP) SPENDING FOR FAMILIES WITH LARGE EMPLOYER COVERAGE[48]



— Worker share (OOP and premium)

— Employer share (premium)

— Workers' wages

Note: OOP costs are inflated from 2017 to 2018 because data are not yet available. Large employers are those with one thousand or more employees.

Kaiser Family Foundation Brief

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS**

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

JHCS_00000203

9

## Fast Facts: Cost-Sharing Increases Affect Adherence

Doubling co-pays has been found to **reduce patients' adherence to prescribed medicines by 25%–45%**.[50]



**PRESCRIPTION ABANDONMENT RATES FOR NEW PATIENTS**[49]

When cost-sharing increases, patients are less likely to fill a prescription (abandonment)

**8%** when the cost is under $10

**52%** cost is between $125 – $250

**69%** when cost exceeds $250

## ACCESS HURDLES CAN LIMIT LONG-TERM BENEFITS OF MEDICINES

Patients' health can suffer when they face high costs. They are more likely to stop taking their medicine or to leave a new prescription unfilled. In 2017, prescription "abandonment" rates for new patients were 8% when the out-of-pocket cost was $10 or less, but rose to 52% when the cost was between $125 – $250 and jumped to 69% when costs exceeded $250.[51] A recent study of Medicare beneficiaries taking life-saving statins and anti-hypertensives showed that a $10 increase in out-of-pocket costs led to 23% fewer patients filling their prescriptions and 33% more deaths.[52]

Three examples demonstrate why affordable access to treatments helps individuals, the healthcare system and society. Crohn's disease, a chronic inflammatory gastrointestinal disorder, often requires stays in the hospital and frequent visits to the emergency room (ER). A real-world study of one of our immunology therapies

found it was associated with reductions in ER visits, inpatient hospital stays and the use of corticosteroids that can be part of treatment regimens for Crohn's disease. Annual all-cause ER visits decreased by more than 20%, while inpatient stays decreased by more than 30%.[53]

In another study, we found that patients enrolled in Medicaid who started Janssen anti-retroviral therapy (ART) soon after an HIV diagnosis had better health outcomes and lower healthcare costs.[54] We also found that patients taking one of our long-acting injectable medicines used to treat schizophrenia were significantly less likely to have an encounter with the criminal justice system in the 12-month period[55] after starting the medicine than in the 15-month period prior, potentially reducing costs associated with the criminal justice system, including incarceration.[56]

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS**

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL




JHCS_00000204

## OUR PROGRAMS TO SUPPORT PATIENTS

We continue to support patients through Janssen CarePath.
Janssen CarePath is a service that provides information about
support resources for patients taking Janssen medications. Once
a healthcare professional has decided a Janssen medication is right
for their patient, the program can help that patient find the tools
they may need to get started and stay on track, including sharing
options to help manage out-of-pocket costs.

In 2020, Janssen CarePath helped almost 1.2 million patients
through the Janssen CarePath program.[57]

**For more information, please visit JanssenCarePath.com >**

## INDEPENDENT PROGRAM AND FOUNDATION SUPPORT

We also support independent programs and foundations that
help patients. In the U.S., Janssen and other Johnson & Johnson
operating companies donate medicines and funding to the
Johnson & Johnson Patient Assistance Foundation, Inc. (JJPAF)—
an independent, nonprofit organization committed to helping
eligible, low-income patients without insurance coverage. In 2020,
Janssen donated approximately $1.9 billion in products and financial
support to JJPAF,[58] enabling it to provide medicines at no cost to
about 95,000 patients.[59]

In response to COVID-19, JJPAF took action to ensure that
qualifying patients in need of donated medicines could access
those medicines and was able to support approximately 15% more
patients in 2020 than in 2019.[60] JJPAF will continue to monitor the
COVID-19 pandemic to address any changes that are required,
consistent with their charitable mission.

**For more information, please visit jjpaf.org >**



11

JHCS_00000205

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

JHCS_00000206

# OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

Society counts on us to deliver vaccines, treatments and cures to fight challenging diseases.

## SECTION HIGHLIGHTS:

 In 2020, we **invested $9.6 billion in R&D**[61]—more than twice (106%) what we spent on marketing and sales.[62]

 Our R&D investment has **increased an average of 8.1%** for the past five years. [63]

 **Since 2016, we've invested $42.2 billion in R&D**[64]—86% more than we've spent on marketing and sales.[65]

 When the pandemic struck, past R&D investment meant Janssen had a **ready technology platform to develop our COVID-19 vaccine.**

## OUR APPROACH TO RESEARCH AND DEVELOPMENT

We focus on the areas of medicine where we can make the greatest difference: cardiovascular and metabolism, immunology, infectious diseases and vaccines, neuroscience, oncology and pulmonary hypertension. Across these therapeutic areas, we use our expertise in small molecules, monoclonal antibodies, cell and gene therapies, RNA therapeutics and vaccines to develop transformational medical innovations.

In 2020, we increased our global investment in R&D to $9.6 billion,[66] up from $8.8 billion in 2019,[67] a substantial portion of Johnson & Johnson's $12.2 billion global R&D budget across all sectors[68]— enabling us to discover, test and develop new medicines as well as demonstrate the efficacy, safety and quality compliance of our medicines before approval.

Over the last five years we've invested $42.2 billion in R&D,[69] 86% more than we spent on marketing and sales.[70] This investment produced a total of four new Janssen medicines approved by the FDA[71] and an additional 42 approvals for expanded indications or new product formulations over the same five-year period.[72]





## Fast Facts: Driving Treatment Advances for Patients

Our $42.2 billion investment in R&D between 2016–2020[73] produced:

- Four new FDA-approved prescription medicines.[74]
- Forty-two additional approvals for expanded indications or new product formulations.[75]

12

 

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

**OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST**

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT

13

JHCS_00000207

## PAST INVESTMENT HELPED US BE PREPARED FOR COVID-19

Janssen began to research potential vaccine candidates against COVID-19 in January 2020, as soon as the gene sequence for the novel coronavirus became available. Our ability to move quickly reflected our long-term commitment to innovation and the infrastructure we have invested in over many years, including our AdVac®-based vaccine technology. The same technology was used to develop Janssen's European Commission-approved Ebola vaccine regimen and construct our HIV, RSV and Zika vaccine candidates.[74]

In addition to leveraging our existing technologies and platforms, we also:

- Expanded our manufacturing and distribution capabilities to provide access to our COVID-19 vaccine;

- Committed to bringing an affordable vaccine to the public on a not-for-profit basis for emergency pandemic use;

- Explored potential therapies by screening a library of compounds (ours as well as those of other companies) and where promising, initiated clinical trials; and

- Prepared for future pandemics by continuing to learn about immune response to respiratory pathogens and assessing combinations of different mechanisms of action.

The size, scale and global footprint of our organization enabled us to urgently address the crisis as it unfolded, committing $50 million to support and supply frontline health workers with meals, protective equipment, extra training and mental health support.[77] This commitment expanded upon a $250 million multi-year commitment made earlier in 2020.[78]

## FROM THE LAB TO THE REAL WORLD: OUR RESEARCH NEVER STOPS

**We want healthcare decision makers to have a more complete picture of the value our medicines and vaccines deliver.**

An essential element of delivering transformational medical advances is studying how our innovations work in real-world settings after they are approved by the FDA, generating "real-world evidence." We examine how our medicines can improve healthcare delivery, enhance population health, reduce costs to the healthcare system and society, and make day-to-day living easier for patients and their caregivers. In a large private health group, inpatient admissions, re-admissions after 30 days and ER visits decreased after adult patients started a long-acting injectable (administered once a month rather than taken daily, like a pill) used to treat schizophrenia.[79] This helps patients stay on the medicine they started and as a result, led to less use of healthcare resources.

Fast Facts: Our R&D
Investment Exceeds Our
Spending on Marketing and Sales

 Over the last five years we've invested **86% more in R&D ($42.2B)**[80] **than marketing and sales.**[81]

 Our R&D investment has **increased an average of 8.1%** for the past five years.[82]

 Our global 2020 R&D investment **($9.6B)**[83] was **106% more** than we spent on marketing and sales.[84]

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

**OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST**

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL



LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL

# OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

A fair and equitable healthcare system is one in which all patients have affordable access to the medicines they need. Policies and laws need to be patient-centric to improve access and patients' health.

**SECTION HIGHLIGHTS:**

 We highlight our efforts to understand how race and socioeconomics impact access and health outcomes and to make our clinical trials more racially inclusive.

 We explain how we engage with diverse patient populations to design studies for approval of our medicines and afterward through our Patient Engagement Research Councils.

 We present policy principles to build a more accessible, affordable and equitable healthcare system.

## Johnson & Johnson Investment to Eliminate Health Inequities for People of Color

Racism is a public health threat. Johnson & Johnson announced $100 million in commitments and collaborations over the next five years to promote health equity solutions for Black people and other communities of color in the U.S.[85]

Aiming to combat the disparities that threaten health in communities of color, our commitment prioritizes:

- **Healthier Communities:** Providing equitable healthcare for underserved communities.

- **Enduring Alliances:** Forging partnerships to reduce differences in socially determined health outcomes.

- **Diverse & Inclusive Corporate Culture:** Ensuring a diverse and inclusive workforce.

## Better Research Through More Inclusive Clinical Trials

To make R&D more equitable, we are improving how we collect real-world evidence and are working to better understand clinical effectiveness in diverse patient populations. We've modified our approach to trials to make them more broadly representative of the people we help. We have increased the number of investigators who work with diverse patient populations and provided tailored training to enable more physicians from underrepresented populations to lead clinical trial research. And we've addressed barriers to enrollment by patients in underrepresented communities, such as lack of transportation to a trial site.

## Examining Insurance Design and Health Disparities

At Janssen and across Johnson & Johnson, we seek to understand how race and socioeconomics determine access, so we are better equipped to combat systemic racism in healthcare.

We are researching how the design of insurance benefits exacerbates health disparities; for example, whether outcomes for patients enrolled in high-deductible health plans (HDHPs) vary based on race and ethnicity. A recent study published in the Journal of the American Medical Association found that among cancer survivors, 23% of Black survivors with an HDHP skipped medication to save money compared to 8% of White cancer survivors on the same plan.[86] Other research shows that the most frequent high-cost prescription claims (claims greater than $125) were for diseases that disproportionally affect African Americans, including diabetes, HIV, obesity, respiratory disease and stroke.[87]

14

JHCS_00000208

## WHAT WE STAND FOR: POLICIES PUTTING PATIENTS FIRST

The U.S. health system has many strengths—especially when it comes to medical breakthroughs. Yet, too many barriers stand between patients and affordable access to advances.

**At Janssen, we are committed to advancing solutions that strengthen the U.S. healthcare system and enable the development and rapid approval of new medicines.**

*When we offer policy solutions and/or assess policy proposals, the following principles guide our thinking:*



Patients should have **affordable access to appropriate treatment options** and sites of care



Treatment decisions **belong in the hands of patients** and their healthcare providers



Clinically stable **patients should not be switched from their treatments for non-medical reasons** (unless deemed substitutable by the FDA)



Appropriate **clinical rigor and manufacturing quality standards** should be applied in all instances to ensure patient safety

*We believe the healthcare system should support these principles by:*



Maintaining a **fair and competitive** marketplace

Fostering an environment that **supports future investment in innovation**

Ensuring **responsible pricing and appropriate transparency** system-wide



Determining value based on evidence that **incorporates the benefits and risks** for patients, the healthcare system and society

15

JHCS_00000209

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

**OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER FUTURE FOR ALL

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT



LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL

## BENEFIT DESIGN SHOULD ENABLE ACCESS TO MEDICINES AND TREATMENT CHOICE

When patients need medicines, their insurance should allow them to get the care they need. It should provide financial protection with predictable out-of-pocket costs. However, insurer programs and practices intended to reduce overall costs can add to patients' financial burden.

### Accumulators

Accumulator adjustment programs prevent co-pay assistance provided to patients by manufacturers from applying toward patients' out-of-pocket maximums or deductibles. They can lead to additional and unexpected costs for patients and consequently, can potentially lead to reduced medication adherence. We have serious concerns about their impact on patient health.

### Non-Medical Switching

We believe treatment decisions for all products belong in the hands of patients and their healthcare providers. We are concerned about clinically stable patients on any product being switched to other therapies for non-medical reasons. Non-medical switching also has impacts on patients. In a survey carried out by the Alliance for Patient Access (sponsored by Janssen Scientific Affairs, LLC), patients responded they experienced negative impacts on health outcomes and well-being because of non-medical switching.[32] Consistent with our position that no clinically stable patient should be switched from any medicine (not including medicines deemed substitutable by the FDA), regardless of whether it's a Janssen medicine or not, we do not proactively seek arrangements with payers that require patients who are clinically stable on a medicine to switch to a different medicine.

## ENSURING A LEVEL PLAYING FIELD WILL CONTINUE TO DRIVE BIOSIMILAR UPTAKE

Despite misconceptions, the uptake of biosimilars has been comparable to that of recently launched, competing innovator biologics and price reductions of both have resulted in significant savings to the healthcare system. Competition has reduced the price of REMICADE® (infliximab), a Janssen medicine used to treat immunological conditions like Crohn's disease and ulcerative colitis. Biosimilars and biologics should compete on a level playing field.

We have long supported a robust regulatory framework for biosimilars that promotes safety and confidence and does not have the unintended consequence of letting stable patients be switched from a medicine that is already working for them. Formulary policies that require failing on biosimilars before trying a branded biologic should not apply to patients whose treatment is working for them and who are stable on their current therapy.





LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

**OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER FUTURE FOR ALL

## REFORMS TO MEDICARE SHOULD FOCUS ON PATIENT OUT-OF-POCKET COSTS

Medicare Part B and Part D are effective programs for ensuring seniors have access to the medicines they need and benefit from private market competition. While most seniors pay nothing directly out-of-pocket for Part B medicines—most have supplemental insurance—we support a cap on out-of-pocket costs in Medicare Part D.

### Medicare Part B

Medicare Part B covers physician-administered medications—typically infused medicines and biologics for treating chronic conditions. On average, the patient is responsible for 20% of all medication costs[xiv] incurred after an annual deductible has been met ($198 in 2020).[xv] Most Medicare beneficiaries have some type of supplemental insurance coverage that covers much of the patient's Part B cost-sharing requirements.[xvi]

The Medicare Part B program benefits from private-market negotiations between manufacturers and payers and covers patients' medicines without barriers to access like utilization management. For a medicine it covers, Medicare Part B pays based on the "average sales price" (ASP), which is an average of the net prices negotiated between manufacturers, commercial health insurers and others (and excludes 340B and Medicaid discounts). These negotiations are reflected in the declining ASP of REMICADE®, one of our medicines covered under Medicare Part B (see below):

## MEDICARE PART B IS WORKING AS DESIGNED[xiii]

It benefits from competition and **nearly 9 out of 10 beneficiaries pay $0 for their medicines.**

**$500** REMICADE® ASP

**$522** Provider Reimbursement (ASP + 4.3%)

**$418** Medicare Covers 80% of Reimbursement Amount

**20% Cost to Part B Beneficiaries**

**89%** with supplemental insurance pay

**$0**

**11%** without supplemental insurance pay

**$104**

For 340B providers, reimbursement is ASP -22.5%.



**THANKS TO COMPETITION, PRICES ARE FALLING FOR REMICADE® (INFLIXIMAB) AND INFLIXIMAB BIOSIMILARS[xii]**

$1,000
$900
$800
$700
$600
$500
$400
$300
$200
$100
$0

2016   2017   2018   2019   2020

$946 (WAC)
$822
$782
$744
$738
$599
$597
$569
$490
$457
$500*
$449
$418
$410

| REMICADE® (ASP) (infliximab) | Inflectra® (ASP) (infliximab-dyyb) |
| Renflexis® (ASP) (infliximab-abda) | Avsola® (WAC) (infliximab-axxq) |

*Avsola® launched in July 2020 at a wholesale acquisition cost (list price) of $500, lower than previous infliximab biosimilar launches.

Renflexis® is a registered trademark of Merck Sharp & Dohme Corp.

Avsola® is a registered trademark of Amgen Inc.

Inflectra® is a registered trademark of Pfizer Inc.

17

JHCS_00000211

JJHCS_00000212

18



## Fast Facts: Reducing Patient Out-of-Pocket Costs in Part D

Tying cost-sharing to net price would result in:



**47%** of Medicare beneficiaries seeing **reductions in out-of-pocket spending** (for those who do not receive low-income subsidies)[vi]

**Medicare Part D**

Medicare Part D covers self-administered medications (typically orally administered and some injectable therapies) and is offered through private insurers.

Despite misconceptions, the Medicare Part D program benefits from competitive negotiations, as the private insurers that manage Part D bargain directly with pharmaceutical manufacturers for larger discounts.

The table below shows how much Janssen pays in rebates to support access to INVOKANA® (canagliflozin).

## Fast Facts: Discounts to Government Programs Support Patient Access℠

We give government programs deep discounts to support access to our medicines.

In 2020, for example, discounts on INVOKANA® (canagliflozin), were:

**72%** for Medicare Part D

**100%** for Medicaid

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

**OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER FUTURE FOR ALL






## DISCOUNTS IN GOVERNMENT PROGRAMS CAN GROW UP TO 100%[xxi]

### Medicaid

| | | |
|---|---|---|
| | **$519** | INVOKANA® list price |
| − | **$519** | Janssen discount on INVOKANA list price (100%) |
| | **$0** | Net cost to Medicaid |

### 340B

| | | |
|---|---|---|
| | **$519** | INVOKANA list price for 30 pill bottle |
| − | **$518.70** | Janssen discount on INVOKANA list price (~99%) |
| | **$.30** | Cost to 340B provider site (e.g., For 30 pill bottle cost would be $0.30) |

## THE 340B DRUG DISCOUNT PROGRAM SHOULD BENEFIT NEEDY PATIENTS

The 340B Drug Discount Program is intended to increase access to medicines for needy patients. The program requires drug manufacturers to provide steep discounts on outpatient drugs to certain healthcare providers. To be eligible for program participation, providers must be one of six designated hospital types or be a designated federal grantee.

In recent years, the 340B Program has expanded at double-digit rates.[xci] More than half of all hospital drug purchases are made at the discounted 340B Program prices,[xcv] and prescription drugs purchased at 340B Program discounts are estimated to account for about 14% of all branded outpatient drug purchases in the U.S.[xcvi]

Unfortunately, the program is no longer working as intended. Hospitals and other covered entities under the 340B Program do not always pass along the discounted drug prices to uninsured and indigent patients.[xcvii] Discounts can also be diverted from patients to for-profit intermediaries in the system, such as contract pharmacies owned by large pharmacy chains or PBMs.[c] The number of external pharmacies in the 340B Program has skyrocketed. Nearly half of the country's retail, mail and specialty pharmacies now profit from the 340B Program.[ci] These contract pharmacy arrangements have increased 4,228% since 2010;[cii] they are lucrative for both the contract pharmacies and for the covered entities, which can charge the patient list price of a medicine and split the 340B Program discount with the contract pharmacy that dispenses the prescription.

We support the 340B Program but want it to work as intended—to serve needy patients.

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL

19

JJHCS_00000213

JHCS_00000214

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT




## Fast Facts: Growth Rate of the 340B Program



- The 340B Drug Discount Program, the second largest federal prescription drug program[104], tripled in size between 2014 and 2019 to nearly $30 billion.[105]

- Since 2010, the number of contract pharmacy arrangements with 340B covered entities has increased to: **28,000**[106]

- Average annual growth rate of purchases in the 340B Program from 2014–2019: **27%**[107]

- Percentage of total U.S. drug market accounted for by the 340B Program: **over 8%**[108]

- Average portion of total manufacturer discounts for brand name medicines that go to the 340B Program: **16%**[109]

- Portion of all branded outpatient drug purchases in the U.S. made at 340B Program discounts: **14%**[110]

- Majority of hospital drugs purchased at the discounted 340B Program prices: **57%**[111]



### POLICIES SHOULD TARGET THE TRUE SOURCES OF PATIENT BURDEN

U.S. policymakers have considered proposals that would peg prices for medicines in the U.S. to those of other economically similar countries, an approach known as "international reference pricing."

These proposals also ignore important differences between the healthcare system in the U.S. and the rest of the world. In the U.S., patients expect timely access to new medicines, while patients outside our borders can face significant delays before treatments become available in their countries.[112] The U.S. system has many different payers, both public and private and most people are insured through their employer. Outside the U.S., healthcare is often funded by a single government payer. These differences reflect each countries' specific histories, cultures and values.

International reference pricing would, in essence, give control of part of the U.S. healthcare system to other countries and subject U.S. citizens to the consequences of political decisions made in another country. It would hinder the development of new treatments, creating a potential vulnerability for response to future pandemics and could reduce the nation's overall global competitiveness in an essential industry. No other healthcare service is benchmarked to payment rates in other parts of the world.[113]



National Commission
on Disability

"QALYs place a lower value on treatments which extend the lives of people with chronic illnesses and disabilities."

Quality-Adjusted Life Years and the Devaluation of Life with Disability 〉

## VALUE ASSESSMENT SHOULD BE PATIENT-CENTRIC AND HOLISTIC

As healthcare decision makers' interest in value assessment has grown, so has our concern about the shortcomings of frameworks currently used to analyze the value of medicines. Typically, these frameworks fail to appropriately account for all the factors that make a medicine valuable, most notably to patients through improved quality of life, the ability to work and care for family, reduced burden on caregivers and the chance to remain independent for a longer period of time.[114, 115, 116, 117]

Particularly concerning are value frameworks that use cost-effectiveness analyses and thresholds to determine whether patients should have access to medicines. Cost-effectiveness analyses attempt to quantify the level of health gained for each dollar spent on treatment.[118] They are estimates that rest on numerous assumptions and rely on inputs from a wide variety of sources, some more credible than others.

These estimates deem a medicine "valuable" if the ratio of dollars spent to health gained crosses a limit, or threshold. In practical terms, that threshold is arbitrary and puts a monetary ceiling on the value of human health and life.[119]

Cost-effectiveness analyses generally use an input called the Quality Adjusted Life Year, or QALY. The QALYs rate the value of human life relative to a subjective[120, 121] standard of perfect health and their use may discriminate against populations such as the elderly, chronically ill and disabled.[122] QALY-based frameworks place a lower value on treatments that extend and improve the lives of people who may never have perfect health.[123]

Some countries use government-funded organizations to carry out assessments of health technologies (sometimes known as HTAs) before patients can access new treatments. This can result in a delay for patients accessing new medicines compared with the U.S.[124, 125] They may also recommend limits on the prices of medicines, as well as certain coverage restrictions. In the U.S., we have a highly segmented system with multiple payers[126, 127] who serve groups of patients with diverse needs. As a result, the value of new medicines (and other technologies) is evaluated locally, with those needs in view. Therefore, health technology assessments should be carried out independently by payers, academic institutions and clinical groups.

At Janssen we follow four key principles when we assess the value of our medicines:

- What matters most in determining a medicine's value is its impact on patients.[128]

- The value of a medicine should include its impact on the health system and society.[129]

- Treatment outcomes should be assessed over an appropriate timeframe to capture all the benefits and risks for patients, the healthcare system and society.[130]

- Evidence considered in assessing the value of a medicine should be high-quality, current and relevant.[131]

LETTER FROM
OUR LEADERS

$294 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL

JJHCS_00000216

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

**BUILDING A HEALTHIER
FUTURE FOR ALL**

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

22

# BUILDING A HEALTHIER FUTURE FOR ALL

We work with policymakers to address this country's healthcare challenges and build on its significant strengths, offering solutions that:

- Eliminate the barriers to access created by antiquated insurance design that include unaffordable cost-sharing.

- Ensure rebates negotiated by pharmaceutical manufacturers for payer coverage of medicines go directly to the patients who need them.

- Reduce racial and socioeconomic disparities standing in the way of better health outcomes that Americans have come to expect and on which, amid COVID-19, so many hopes depend.

- Preserve an environment that fosters medical advances and encourages investment in research and development necessary to discover and make these medical advances available to patients in need.

We believe affordable access to healthcare is critical to ensuring individuals can live their fullest lives and society continues to advance. While redesigning healthcare delivery and redirecting resources away from ineffective, wasteful care is challenging, we can and must, continue to seek solutions that benefit all of our communities. Because doing so means improving patients' health, saving lives and creating a stronger, healthier society.

## Advancing Patient-Centric Solutions for a Healthier Future for All



**Eliminate** Barriers
to Access



**Reduce** Racial
and Socioeconomic
Disparities



**Ensure** Rebates
are Shared Directly
with Patients



**Preserve** Environment
for Innovation

JHCS_00000217

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

# REFERENCES

1. Figure According to Janssen Internal Financial Accounting.

2. Ibid.

3. Ibid.

4. Ibid.

5. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

6. Figure According to Janssen Internal Financial Accounting.

7. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

8. U.S. Food and Drug Administration. "New Drug Therapy Approvals 2020." https://www.fda.gov/drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products/novel-drug-approvals-2020.

9. U.S. Food and Drug Administration. "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf/.

10. Figure According to Janssen Internal Financial Accounting.

11. Ibid.

12. Figure According to Janssen Internal Financial Accounting.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ibid.

17. Ibid.

18. Ibid.

19. Ibid.

20. Ibid.

21. The Henry J. Kaiser Family Foundation. "2020 Employer Health Benefits Survey," p. 139. October 8, 2020. http://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf.

22. Jarvis, D. "How Are We Going to Get Paid Tomorrow? Emerging Models for Health and Behavioral Healthcare Working Draft." The College for Behavioral Health Leadership. March 18, 2020. https://www.leaders4health.org/wp-content/uploads/2020/02/Jarvis_Getting_Paid.pdf.

23. Data are an approximate number of patients supported by Janssen CarePath provided by the program administrator.

24. Ibid.

25. Figure According to Janssen Internal Financial Accounting.

26. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

27. Kirzinger, A., Lopes, L., Wu, B., Brodie, M. "KFF Health Tracking Poll – February 2019: Prescription Drugs." Henry J. Kaiser Foundation. March 1, 2019. https://www.kff.org/health-costs/poll-finding/kff-health-tracking-poll-february-2019-prescription-drugs/.

28. Hamel, L., Munana, C., Brodie, M. "Kaiser Family Foundation/LA Times Survey Of Adults With Employer-Sponsored Insurance." Henry J. Kaiser Family Foundation. May 2, 2019. https://www.kff.org/private-insurance/report/kaiser-family-foundation-la-times-survey-of-adults-with-employer-sponsored-insurance/.

29. Figure According to Janssen Internal Financial Accounting.

30. Data are an approximate number of patients supported by Janssen CarePath provided by the program administrator.

31. Ibid.

32. Figure According to Janssen Internal Financial Accounting.

33. Ibid.

34. Ibid.

35. Xcenda AmerisourceBergen. "Skyrocketing Growth in PBM Formulary Exclusions Raises Concerns About Patient Access." September 2020. https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_whitepaper_9-20.pdf.

36. Figure According to Janssen Internal Financial Accounting.

37. Figure According to Janssen Internal Financial Accounting.

38. Ibid.

39. IQVIA Institute for Human Data Science. "Patient Affordability Part Two: Implications for Patient Behavior and Therapy Consumption." Report. May 18, 2018. Available at: https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two.

40. PhRMA. "Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance." https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/D-F/Faced-with-High-Cost-Sharing-for-Brand-Medicines.pdf.

41. Figure According to Janssen Internal Financial Accounting.

42. Fein, A. "The 2021 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers." Drug Channels Institute. March 2021. Available At: https://www.drugchannels.net/p/our-industry-reports.html.

43. Ibid.

44. The Henry J. Kaiser Family Foundation. "2020 Employer Health Benefits Survey." October 8, 2020. http://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf.

45. Ibid.

46. Hernandez, I., San-Juan-Rodriguez, A., Good, C.B., Gellad, W.F. "Changes in list prices, net prices, and discounts for branded drugs in the US, 2007-2018." JAMA. 2020; 323(9):854–862. doi:10.1001/jama.2020.1012. https://pubmed.ncbi.nlm.nih.gov/32125403/.

47. Goldman, D. P., Joyce, G. F., Zheng, Y. "Prescription drug cost sharing: associations with medication and medical utilization and spending and health." July 4, 2007. JAMA. 298(1), 61–69. https://doi.org/10.1001/jama.298.1.61.

48. Rae, M., Copeland, R., Cox, C. "Tracking the rise in premium contributions and cost-sharing for families with large employer coverage." The Henry J. Kaiser Family Foundation. August 14, 2019. https://www.healthsystemtracker.org/brief/tracking-the-rise-in-premium-contributions-and-cost-sharing-for-families-with-large-employer-cov.

49. IQVIA Institute for Human Data Science. "Patient Affordability Part Two: Implications for Patient Behavior and Therapy Consumption." May 18, 2018. Available at: https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two.

50. Goldman, D. P., Joyce, G. F., Zheng, Y. "Prescription drug cost sharing: associations with medication and medical utilization and spending and health." July 4, 2007. JAMA. 298(1), 61–69. https://doi.org/10.1001/jama.298.1.61.

JHCS_00000218

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

# REFERENCES

51. IQVIA Institute for Human Data Science. "Patient Affordability Part Two: Implications for Patient Behavior and Therapy Consumption." May 18, 2018. Available at: https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two.

52. Chandra, A., Flack, E., Obermeyer, Z. "The Health Costs of Cost-Sharing." National Bureau of Economic Research. February 2021. https://www.nber.org/papers/w28439.

53. Obando, C., Ding, Z., Muser, E. et al. "Persistence, Dose Titration, and Health Care Resource Utilization Among Crohn's Disease Patients Treated With Ustekinumab: A Real-World Analysis in the United States." Advances in Therapy, 37: 2127–2143 (2020). https://doi.org/10.1007/s12325-020-01276-3.

54. Benson C., Bruno, E., Lefebvre, P. et al. "Rapid Initiation of Antiretroviral Treatment Following Diagnosis of Human Immunodeficiency Virus Among Medicaid-covered Patients: A Real-world Evaluation." Journal of Managed Care and Specialty Pharmacy. February 2020. 26(2):129-141. doi: 10.18553/jmcp.2019.19175. Epub 2019 Nov 20. https://pubmed.ncbi.nlm.nih.gov/31747358/.

55. Bhatta, M., Bista, S., El Khoury, A.C., et al. "Encounters with the Criminal Justice System in Patients with Schizophrenia or Schizoaffective Disorders Treated with Long-Acting Therapy at a Community Mental Health Service Facility." Psychiatry & Behavioral Health Learning Network. 2018 Psych Congress Poster #220. October 25-28, 2018. Orlando, Florida. https://www.psychcongress.com/posters/encounters-criminal-justice-system-patients-schizophrenia-or-schizoaffective-disorders.

56. Muser, E., Kozma, C.M., Benson C.J., et al. "Cost Effectiveness of Paliperidone Palmitate Versus Oral Antipsychotics in Patients with Schizophrenia and a History of Criminal Justice Involvement." Journal of Medical Economics. May 6, 2015. DOI: 10.3111/13696998.2015.1037307. https://pubmed.ncbi.nlm.nih.gov/25851616/.

57. Data are an approximate number of patients supported by Janssen CarePath provided by the program administrator.

58. Figure According to Janssen Internal Financial Accounting.

59. Data are an approximate number as reported by the Johnson & Johnson Patient Assistance Foundation, Inc.

60. Ibid.

61. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

62. Figure According to Janssen Internal Financial Accounting.

63. Ibid.

64. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

65. Figure According to Janssen Internal Financial Accounting.

66. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

67. Johnson & Johnson, FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020).

68. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

69. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

70. Figure According to Janssen Internal Financial Accounting.

71. U.S. Food and Drug Administration. "New Drug Therapy Approvals 2020." https://www.fda.gov/drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products/novel-drug-approvals-2020.

72. U.S. Food and Drug Administration. "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf/.

73. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 18, 2020), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

74. U.S. Food and Drug Administration. "New Drug Therapy Approvals 2020." https://www.fda.gov/drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products/novel-drug-approvals-2020.

75. U.S. Food and Drug Administration. "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf/.

76. Johnson & Johnson. "Johnson & Johnson COVID-19 Vaccine Authorized by U.S. FDA For Emergency Use - First Single-Shot Vaccine in Fight Against Global Pandemic." News release. February 27, 2021. https://www.jnj.com/johnson-johnson-covid-19-vaccine-authorized-by-u-s-fda-for-emergency-use-first-single-shot-vaccine-in-fight-against-global-pandemic.

77. Johnson & Johnson. "Johnson & Johnson Announces a $50 Million Commitment to Support Frontline Health Workers Battling COVID-19." News Release. March 27, 2020. https://www.jnj.com/latest-news/johnson-johnson-announces-a-50-million-commitment-to-support-frontline-health-workers-battling-covid-19.

78. Johnson & Johnson. "Johnson & Johnson Announces $250 Million Commitment to Support Frontline Health Workers, Reaching 100 Million People By 2030." News Release. January 23, 2020. https://www.jnj.com/johnson-johnson-announces-250-million-commitment-to-support-frontline-health-workers-reaching-100-million-people-by-2030.

79. Mahabaleshwarkar, R., et al. "The Impact of Once-Monthly Paliperidone Palmitate on Healthcare Utilization Among Patients With Schizophrenia Treated in an Integrated Healthcare System: A Retrospective Mirror-Image Study." Advances in Therapy, 38, pages 1958–1974(2021). January 15, 2021. https://doi.org/10.1007/s12325-021-01626-9.

80. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

81. Figure According to Janssen Internal Financial Accounting.

82. Ibid.

JHCS_00000219

# REFERENCES

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

83. Johnson & Johnson. FY20–Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2020).

84. Figure According to Janssen Internal Financial Accounting.

85. Johnson & Johnson. "Johnson & Johnson to Address Racial and Social Injustice Through Platform that Aims to Eliminate Health Inequities for People of Color." News Release. November 17, 2020. https://www.jnj.com/johnson-johnson-to-address-racial-and-social-injustice-through-platform-that-aims-to-eliminate-health-inequities-for-people-of-color.

86. Cole, M.B., Ellison, J. E., Trivedi, A. N. "Association Between High-Deductible Health Plans and Disparities in Access to Care Among Cancer Survivors." JAMA Network Open. June 24, 2020. 2020;3(6):e208965. doi:10.1001/jamanetworkopen.2020.8965. https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2767589.

87. Kogut, S.J. "Racial disparities in medication use: imperatives for managed care pharmacy." Journal of Managed Care and Specialty Pharmacy, 26(11):1468-1474, November, 2020 Available at: https://www.jmcp.org/doi/citedby/10.18553/jmcp.2020.26.11.1468.

88. Alliance for Patient Access. "A study of the qualitative impact of non-medical switching." February 2019. https://admin.allianceforpatientaccess.org/wp-content/uploads/2020/02/AfPA_Qualitative-Impact-of-Non-Medical-Switching_Report_Feb-2019.pdf.

89. The Official U.S. Government Site for Medicare. "Part B Costs." https://www.medicare.gov/your-medicare-costs/part-b-costs.

90. Centers for Medicare & Medicaid Services (CMS). HHS. "Medicare Program; Medicare Part B Monthly Actuarial Rates, Premium Rates, and Annual Deductible Beginning January 1, 2020." Federal Register. The Daily Journal of the United States Government. November 13, 2019. https://www.federalregister.gov/documents/2019/11/13/2019-24440/medicare-program-medicare-part-b-monthly-actuarial-rates-premium-rates-and-annual-deductible.

91. Janssen CarePath. "Medicare for Branded Drugs." 2020. https://www.janssencarepath.com/sites/www.janssencarepath.com/files/part-b-versus-d-brochure.pdf.

92. Figure According to Janssen Internal Financial Accounting.

93. Ibid.

94. Figure According to Janssen Internal Financial Accounting.

95. Trish, E., Kaiser, K., Joyce, G. "How Would Sharing Rebates at the Point-Of-Sale Affect Beneficiary Cost-Sharing in Medicare Part D?" University of Southern California, Schaeffer. March 17, 2020. https://healthpolicy.usc.edu/research/how-would-sharing-rebates-at-the-point-of-sale-affect-beneficiary-cost-sharing-in-medicare-part-d/.

96. Fein, A. "340B Program Purchases Reach $24.3 Billion—7%+ of the Pharma Market— As Hospitals' Charity Care Flatlines." Drug Channels. May 14, 2019. https://www.drugchannels.net/2019/05/exclusive-340b-program-purchases-reach.html.

97. Fein, A. "The 2021 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers." Drug Channels. March 2021. Available At: https://www.drugchannels.net/p/our-industry-reports.html.

98. Vandervelde, A. "Measuring the Relative Size of the 340B Program; 2018 Update." Berkeley Research Group (BRG). June 2020. https://www.thinkbrg.com/insights/publications/measuring-the-relative-size-of-the-340b-program-2018-update/.

99. United States Government Accountability Office. "Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement." June 2018. https://www.gao.gov/assets/gao-18-480.pdf.

100. Fein, A. "Letter to Chairman Alexander, of U.S. Senate Committee on Health, Education, Labor & Pension, and Ranking Member Walden, of U.S. House of Representatives Committee on Energy and Commerce." October 30, 2020. Drug Channels. http://drugchannelsinstitute.com/files/AdamFein-DrugChannels-340B-30Oct2020.pdf.

101. Ibid.

102. Vandervelde, A., Erb, K., Hurley, L. "For Profit Pharmacy Participation in the 340B Program." Berkeley Research Group (BRG). October 7, 2020. https://www.thinkbrg.com/insights/publications/for-profit-pharmacy-participation-340b/.

103. Figure According to Janssen Internal Financial Accounting.

104. Vandervelde, A. "Measuring the Relative Size of the 340B Program; 2018 Update." Berkeley Research Group (BRG). June 2020. https://www.thinkbrg.com/insights/publications/measuring-the-relative-size-of-the-340b-program-2018-update/.

105. Fein, A. "The 2020-21 Economic Report on Pharmaceutical Wholesalers and Specialty Distributors." Drug Channels. October 2020. Available At: https://www.drugchannels.net/p/our-industry-reports.html.

106. Fein, A. "Walgreens and CVS Top the 28,000 Pharmacies Profiting from 340B Program. So Will the Unregulated Party End?" vX.4. 2020. Drug Channels. https://www.drugchannels.net/2020/07/walgreens-and-cvs-top-28000-pharmacies.html.

107. Fein, A. "New HRSA Data: 340B Program Reached $29.9 Billion in 2019; Now Over 8% of Drug Sales." Drug Channels. June 2020. https://www.drugchannels.net/2020/06/new-hrsa-data-340b-program-reached-299.html.

108. Ibid.

109. Ibid.

110. Vandervelde, A. "Measuring the Relative Size of the 340B Program; 2018 Update." Berkeley Research Group (BRG). June 2020. https://www.thinkbrg.com/insights/publications/measuring-the-relative-size-of-the-340b-program-2018-update/.

111. Fein, A. "The 2021 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers." Drug Channels. March 2021. Available At: https://www.drugchannels.net/p/our-industry-reports.html.

112. U.S. Food and Drug Administration. "Advancing Health Innovation: New Drug Therapy Approvals 2019." FDA Center for Drug Evaluation and Research. https://www.fda.gov/media/134493/download.

113. Kurani, N., Cox, C. "What drives health spending in the U.S. compared to other countries." Peterson-KFF Health Systems Tracker. September 25, 2020. https://www.healthsystemtracker.org/brief/what-drives-health-spending-in-the-u-s-compared-to-other-countries/.

114. PhRMA. "Principles for Value Assessment Frameworks." March 30, 2016. https://www.phrma.org/Codes-and-guidelines/Principles-for-Value-Assessment-Frameworks.

115. Neumann, P.J., Willke, R.J., Garrison, L.P. "A Health Economics Approach to US Value Assessment Frameworks—Introduction: An ISPOR Special Task Force Report [I]." Value in Health. 2018. https://www.ispor.org/docs/default-source/sig-documents/pise1098301573389974.pdf?sfvrsn=1a05f09d_0.

116. Willke, R.J., Neumann, P.J., Garrison, L.P., Ramsey, S.D. "Review of Recent US Value Frameworks—A Health Economics Approach: An ISPOR Special Task Force Report [6]." Value in Health, 21(2):p.155-160, February 1, 2018. https://doi.org/10.1016/j.jval.2017.12.011 https://www.valueinhealthjournal.com/article/S1098-3015(17)33869-2/fulltext?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS1098301573389%2%3Fshowall%3Dtrue.

JHCS_00000220

26

# REFERENCES

117. Lakdawalla, D.N., et al. "Defining Elements of *Value in Health Care—A Health Economics Approach: An ISPOR Special Task Force Report [3]." Value in Health,* 21(2):131-139. February 1, 2018. doi: 10.1016/j.jval.2017.12.007. PMID: 29477390. https://www.valueinhealthjournal.com/article/S1098-3015(17)33892-5/fulltext?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS1098301517338925%3Fshowall%3Dtrue.

118. Xcenda AmeriSource Bergen. "Applying Cost-Effectiveness Thresholds to the Real World: Implications on Access for Medicare Beneficiaries." May 2018. https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda-phrma_icer_issue_brief_may2018.pdf?la=en&hash=2F6CBF5A4AC757AC997C20E52A107D4E20560678.

119. Whalen, J. "What is a QALY?" *The Wall Street Journal.* December 1, 2015. https://www.wsj.com/articles/what-is-a-qaly-1449007700.

120. Nord, E., Daniels, N., Kamlet, M. "QALYs: some challenges." *Value in Health;* Vol 12 (suppl1): S10-S15. doi: 10.1111/j.1524-4733.2009.00516.x. PMID: 19250125. https://www.valueinhealthjournal.com/article/S1098-3015(10)60047-2/pdf?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS1098301510600472%3Fshowall%3Dtrue.

121. Pettitt, D.A., et al. "The Limitations of QALY: A Literature Review." *Journal of Stem Cell Research & Therapy,* Vol 6(4): 1-7. 2016. https://www.longdom.org/open-access/the-limitations-of-qaly-a-literature-review-2157-7633-1000334.pdf.

122. Brock, D.W. "Cost-effectiveness and Disability Discrimination." *Economics and Philosophy,* 25(1), 27-47. doi:10.1017/S0266267108000266. Available at: https://www.cambridge.org/core/journals/economics-and-philosophy/article/abs/costeffectiveness-and-disability-discrimination/79E6A141C39C05660SEDD16A0A729E66F7.

123. Ibid.

124. Costa-Font, J., Varol, N., McGuire, A. "Does price regulation affect the adoption of new pharmaceuticals?" *Vox EU CEPR.* July 8, 2011. https://voxeu.org/article/does-price-regulation-affect-adoption-new-pharmaceuticals#:~:text=This%20column%20explains%20how%20price%20regulation%20affects%20the%20diffusion%20of%20pharmaceutical%20treatments.&text=But%20regulations%20can%20affect%20the,protected%20by%20intellectual%20property%20rights.

125. Costa-Font, J., McGuire, A., Varol, N. "Explaining Early Adoption on New Medicines: Regulation, Innovation and Scale." *CESifo.* May 2011. https://www.ifo.de/DocDL/cesifo1_wp3459.pdf.

126. Tikkanen, R., Osborn, R., Mossialos, E., Djordjevic, A., Wharton, G.A., "International Health Care Systems Profiles: United States." *The Commonwealth Fund.* June 5, 2020. https://www.commonwealthfund.org/international-health-policy-center/countries/united-states.

127. Rice, T., Rosenau, P., Unruh, L.Y., Barnes, A.J. "United States of America: Health system review." *Health Systems in Transition,* 12(3), 2013. https://www.euro.who.int/__data/assets/pdf_file/0019/215155/HiT-United-States-of-America.pdf.

128. Neumann, P.J. et al. "Cost-Effectiveness in Health and Medicine." *Oxford University Press.* November 1, 2016. Available at: https://global.oup.com/academic/product/cost-effectiveness-in-health-and-medicine-9780190492397?cc=us&lang=en&.

129. Alphs, L. et al. "Real-World Outcomes of Paliperidone Palmitate Compared to Daily Oral Antipsychotic Therapy in Schizophrenia: A Randomized, Open-Label, Review Board-Blinded 15-Month Study." *The Journal of Clinical Psychiatry* 76(5): p.554-561. May, 2015. doi: 10.4088/JCP.14m09584. https://www.psychiatrist.com/jcp/schizophrenia/psychotic-disorders/real-world-outcomes-paliperidone-palmitate-compared/.

130. Kim, D.D. et al. "The Influence of Time Horizon on Results of Cost-Effectiveness Analyses." *Expert Review of Pharmacoeconomics & Outcomes Research,* 17(6): p. 615-23. Epub. May 23, 2017. doi: 10.1080/14737167.2017.1331432. https://www.tandfonline.com/doi/abs/10.1080/14737167.2017.1331432?journalCode=ierp20.

131. Frieden, T.R. "Evidence for Health Decision Making – Beyond Randomized, Controlled Trials." *The New England Journal of Medicine,* 377(5): p. 465-75. August 3, 2017. doi:10.1056/nejmra1614394. https://www.nejm.org/doi/full/10.1056/nejmra1614394.

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL



# Exhibit 25
## CONFIDENTIAL - FILED UNDER SEAL

# Exhibits JJHCS 1-5
## CONFIDENTIAL - FILED UNDER SEAL

# JJHCS Ex. 6

JJHCS_00038671

# 2016

## JANSSEN U.S. TRANSPARENCY REPORT

- A Letter from Our Leaders
- Clinical Data Transparency
- Value & Pricing
- Access
- Our Investments

janssen | PHARMACEUTICAL COMPANIES OF Johnson-Johnson

# A LETTER FROM OUR LEADERS



**Jennifer Taubert**
*Company Group Chairman,
The Americas, Pharmaceuticals*

**Anastasia Daifotis, M.D.**
*Chief Scientific Officer, Janssen
North America Pharmaceuticals*

> We understand the concerns of patients, families and other stakeholders who are worried about health care costs, including the costs of prescription medications. They are calling on us to provide greater transparency about how we operate …

At Janssen, the Pharmaceutical Companies of Johnson & Johnson, our mission is to transform lives by treating and curing some of the world's most challenging diseases. Every day, we bring together cutting-edge science and the most creative minds in medical research to think differently about fighting disease.

We are passionate about this work because we know the dramatic impact medicines have on human life. All of us have benefitted from extraordinary medical advances over the past few decades — whether personally or through the experiences of loved ones who are now living longer or better thanks to innovative medicines. In fact, medicines are responsible for 70 percent of recent gains in life expectancy.[1]

That is why it is so important that patients who need a medicine can get that medicine. We understand the concerns of patients, families and other stakeholders who are worried about health care costs, including the costs of prescription medications. They are calling on us to provide greater transparency about how we operate — including disclosing more information on our pricing and marketing practices, our patient access programs, and our clinical trials.

At Janssen, we are proud of our legacy of leadership on transparency and responsible business operations. That is why we are pleased to release the first annual Janssen U.S. Transparency Report, providing information about our medicines — from discovery and development to commercialization:

- **Clinical Data Transparency:** Information about our recent efforts to make our clinical trial data more accessible and transparent.

- **Value & Pricing:** Our approach to pricing our medicines, disclosure of our list price increases over the past five years, the net impact of those increases on our business, and the amount of rebates and discounts we paid.

- **Access:** How we help patients who need our products, including details about our U.S. patient access programs and contributions to help improve patient access to medicines.

- **Our Investments:** How and why we provide information about our medicines to physicians and consumers, and disclosure of our sales and marketing expenses.

Our response to public questions does not end with increased transparency. As part of the world's most broadly-based health care company, we are in a unique position to see the challenges in our current system — and to advocate for improvements, working in partnership with stakeholders throughout the health care system.





> We hope that by providing even greater transparency into how we operate within the current health care system, we can advance the dialogue and sharpen the focus on the promise of a more value-based health care system.

The fact is, the U.S. health care system is extraordinarily fragmented and complex. In 2013 alone, wasted health care expenditures, such as excess administration and low-value care, cost the U.S. an estimated $765 billion.[2] Meanwhile, many still cannot afford the care they need, which is why we advocate for policies that support expanded coverage and assistance for patients.

Ultimately, however, ensuring that every American has access to affordable health care, including medicines, will require changes to how our country covers and pays for medical care. Instead of paying for volume in health care — the number of procedures performed or prescriptions filled — we should be paying for the value such care delivers. Every part of the health care system, including pharmaceutical companies like Janssen, should be held accountable for the value it delivers.

We believe this approach has tremendous potential to improve patient health, increase access to medicine, and limit costs. That is why we have entered into and continue to explore value-based arrangements with payers, aimed at containing costs and supporting patient population health goals. Such arrangements include, for example, contracts based on improving patient population outcome measures, lowering overall health care expenditures (such as inpatient hospitalization costs), or achieving treatment objectives. It is also why we recently became the first

pharmaceutical company to join the Department of Health and Human Services' Health Care Payment Learning and Action Network (LAN), which is focused on accelerating our health care system's transition to value-based care.

We recognize that we are just one company, and that our actions and disclosures alone cannot resolve all the challenges patients face in our health care system. We hope that by providing even greater transparency into how we operate within the current health care system, we can advance the dialogue and sharpen the focus on the promise of a more value-based health care system.

Sincerely,



Company Group Chairman,
*The Americas, Pharmaceuticals*



Anastasia Daniois, M.D.
Chief Scientific Officer,
*Janssen North America Pharmaceuticals*

**Section References:**

1. Frank R. Lichtenberg. "Pharmaceutical Innovation and Longevity Growth in 30 Developing and High-Income Countries, 2000-2009." National Bureau of Economic Research, (2012), doi:10.3386/w18235.  2. Mark Smith, et al, eds., "Best Care at Lower Cost: The Path to Continuously Learning Health Care in America," Institute of Medicine Report Brief, (National Academies Press, 2013).

A LETTER FROM OUR LEADERS

JHCS_00038673





A Letter from Our Leaders ›    Clinical Data Transparency ›    Value & Pricing ›    Access ›    Our Investments ›




# CLINICAL DATA TRANSPARENCY

The patients and health care professionals who rely on our medicines place their trust in our clinical research and development. At Janssen, we believe making clinical trial data available furthers understanding of diseases, expands the base of knowledge needed to develop new treatments, and provides relevant information to help health care providers and patients make better health care decisions. Sharing information about clinical trials also helps patients identify clinical studies that may be appropriate for them.

We are proud of our history of transparency when it comes to clinical trial data. Here is a summary of how Janssen discloses information about our clinical trials:

- **Registration and Disclosure of Clinical Trial Results:** Janssen provides information about our clinical trials in the largest U.S. public registry, ClinicalTrials.gov. Our disclosures, which comply with U.S., European Union and other global laws, include listing our controlled interventional studies conducted in patients — which are used to test the efficacy and safety of medicines — and, after the studies are completed and the medicine is approved for sale, revealing the results of the studies.

- **Publication of Clinical Trial Results in Peer-Reviewed Journals:** We seek to publish the results of all company-sponsored interventional pharmaceutical clinical trials in humans in peer-reviewed journals. This includes those studies that are positive as well as those that are negative, those that end early, and those from discontinued research programs. We also seek to publish health

economic studies and other forms of our research that may be useful in advancing public health. The quality and rigor of our R&D efforts is reflected in the publication of many of our studies in top-tier peer-reviewed medical journals.

- **Sharing of Participant-Level Data and Clinical Study Reports:** In January 2014, Janssen R&D entered into a first-of-its-kind agreement with Yale University School of Medicine to establish a pioneering clinical data-sharing initiative. Under the agreement, the Yale Open Data Access (YODA) Project serves as an independent review panel to evaluate and make decisions regarding requests from researchers to access summary and participant-level data from Janssen's clinical trials. These data, which are not available through registries and scientific literature, include clinical study reports (CSRs) and participant-level data. Participant-level data provides de-identified data at the individual or study participant level, while CSRs are extensive reports summarizing the aggregate results of a trial. YODA enables researchers to

CLINICAL DATA TRANSPARENCY ● ⊕

JJHCS_00038674

JJHCS_00038675





## YODA Project 2016




36 researcher requests for data received

36 requests approved

**OUR LEADERS DISCUSS**

Joanne Waldstreicher
*Chief Medical Officer, Johnson & Johnson*

Joanne Waldstreicher, M.D., **Chief Medical Officer, Johnson & Johnson,** discusses the importance of clinical data sharing and our company's novel collaboration with Yale School of Medicine to make data available to academic investigators.



CLINICAL DATA TRANSPARENCY ● ●

access and review such additional data from clinical trials for approved Janssen medicines for purposes of conducting their own scientific or medical research — with the goal of increasing medical knowledge and improving public health.

We believe granting an independent, academic group ultimate authority to determine how we respond to requests for access to participant-level data or CSRs from Janssen's clinical trials is a fair and unbiased approach.

YODA enables researchers to access and review such additional data from clinical trials for approved Janssen medicines for purposes of conducting their own scientific or medical research — with the goal of increasing medical knowledge and improving public health.

## YODA Update

In 2015, we expanded our agreement with YODA to include not only pharmaceutical but also medical device clinical trial data. Just recently, in February 2017, we expanded our agreement again to include clinical trial data for consumer products.

To date, the YODA Project has approved more than 60 research proposals for Janssen data as well as one request for medical device data. In 2016, the YODA program received 36 requests for data from researchers and physicians at institutions and academic centers in the U.S. and worldwide, including the Mayo Clinic, Mount Sinai Medical Center, the Harvard School of Public Health, Johns Hopkins University, McGill University, University College London and the Princess Margaret Cancer Centre, among others. All of these requests were approved. In addition, two papers were published this past year as a result of data we have shared via the YODA Project.

Researchers interested in requesting access to data from Janssen's clinical trials can do so via the YODA Project portal. ■

# VALUE & PRICING

At Janssen, we have maintained a responsible approach to pricing our medicines. At the same time, we recognize that patients and other stakeholders are seeking more transparency around how our medicines are priced.

That is why this section of our U.S. Transparency Report provides context about pharmaceutical pricing and our business as well as additional information about our price increases.

In this section, we detail the complex pharmaceutical purchasing and payment system in the U.S. We talk about the difference between a "list price" and a "net price" — and how much Janssen's total portfolio of medicines changed in price over the last five years.

The data presented in this section demonstrate that the net price of Janssen's medicines increased 3.5 percent over the past year. To put this in context, the medical care inflation rate — or the average price increase of medical care services and goods to consumers — was 4.1 percent in 2016.[1]



## The Value of Medicines

While drug price increases are a topic of much discussion, medicines in fact account for just 14 percent of total health care spending in the United States.[2] This percentage has been relatively stable over the last several decades, and is expected to remain so[3] — even as the value of medicines to patients and society has increased:



Just 18 months after the introduction of highly active antiretroviral therapies to treat HIV, hospital spending on HIV patients decreased by 43 percent, and total health spending on HIV patients decreased by nearly $300 per patient per month.[4]



New therapies have contributed to a 23 percent decline in the cancer death rate since its peak in 1991.[5]



Over time, as lower-cost generics become more widely available, prices are reduced by an average of 90 percent for oral medicines.[6]



9 out of 10 prescriptions in the U.S. are for lower-cost, generic medicines.[7]



## Our Pricing Principles

When we price a new medicine, we take into account:

1. **Its value to patients and society.** We consider not just health and productivity benefits to patients, but also the medicine's potential to reduce other costs — like surgeries, hospital stays, or long-term care — and the improvement it represents to the existing standard of care.

2. **The importance of maintaining affordable access to medicines for people who need them.** We consider not just the list price, but also the negotiated discounts and rebates we will provide to insurers and governments to support broad access to our products.

3. **The importance of preserving our ability to develop future groundbreaking cures and treatments.** We have an obligation to ensure that the sale of our medicines provides us with the resources to continue to invest in tomorrow's cures through research and development.

## Drug Pricing in the U.S.

The list price for medicines is a starting point and is ultimately reduced by discounts and rebates. We provide these discounts and rebates to insurance companies, pharmacy benefit managers, hospitals, clinics and others. We also pay fees to pharmaceutical wholesalers to distribute our medicines. However, these discounts, rebates and fees are often not visible to patients.

In fact, while the list price set by pharmaceutical manufacturers plays a role, patients' out-of-pocket costs for medicines are ultimately determined by payers, including insurers, pharmacy benefit managers and the government. Here is more information about how these discounts, rebates and fees work:

- **Private Insurance:** Commercial health insurance companies and pharmacy benefit managers (PBMs) manage the purchase of medicines for those with private insurance coverage. They determine what medicines will be included on their formulary (the list of products they cover) and the out-of-pocket amounts patients will pay for those medicines. Formulary determinations are based in part on payers' negotiations with pharmaceutical companies. These negotiations result in rebates from the pharmaceutical company to the payer.

- **Public Programs:** We are also required to give substantial discounts to government insurers such as state Medicaid departments and the U.S. Department of Veterans Affairs. The government requires that pharmaceutical companies provide specific minimum mandatory discounts on medicines in order to participate in these programs. For example, companies are required to provide a discount of at least 23.1 percent[8] off list price for medicines provided to people in traditional Medicaid programs. On top of that, many state Medicaid programs receive additional discounts for specific medicines either directly or by contracting with private insurers. Discounts and rebates are also paid in the drug coverage programs for seniors under Medicare Part D or Managed Medicare (Part C and Part D).

### NEGOTIATIONS IN MEDICARE PART D

Pharmaceutical companies negotiate rebates on medicines purchased by Medicare through the Part D benefit and through Medicare Advantage plans. These negotiations occur with the private health insurance companies and pharmacy benefit managers who administer benefits through these public programs.

The payers that administer Part D benefits represent as many as 40 million covered lives,[9] meaning they are powerful negotiators with leverage to secure large discounts and rebates on behalf of Part D plans.

## What Is the Difference Between a Discount and a Rebate?

**Discount:** A reduction in the amount that an insurer or other entity is charged for a medicine at the time of sale.

**Rebate:** A reduction from the price of a medicine, paid to an insurer or other entity retroactively, after the medicine is dispensed. This rebate is typically paid at the end of some defined period of time.

JHCS_00038677



JHCS_00038678

## AN EXAMPLE OF THE PHARMACEUTICAL SUPPLY CHAIN*



Drug Manufacturer

Wholesaler

Providers/Dispensers

Hospital · Physician Office · Specialty/Retail Pharmacy · Other Sites

Gov't/Employers/Insurers (Payers)

Pharmacy Benefit Manager

Patient

Dispense Rx/Provide Treatment

Co-Pay Assistance

— Rebates
--- Reimbursement
···· Product Distribution

*Actual distribution dynamics can vary at every level.

- **Hospitals and Clinics:** We provide discounts on our products to hospitals and clinics for inclusion in their formularies and utilization of our medicines. In addition, under a federal program known as the 340B Drug Discount Program, we provide significant discounts for medicines purchased by certain kinds of hospitals, particularly those that provide care for low-income patients.

- **Wholesalers and Distributors:** We pay fees to pharmaceutical wholesalers and distributors, which are companies that buy medicines in bulk and distribute them to pharmacies and other health care providers.

Why do all these negotiations, rebates and discounts exist? There are often many medicine options available for a particular condition, so insurers and pharmacy benefit managers create competition among pharmaceutical

### LEARN MORE

For more detailed information about the pharmaceutical supply chain, click here to watch the Biotechnology Innovation Organization video, "Understanding Your Drug Costs: Follow the Pill."

## What Is a Drug Formulary?

A **drug formulary** is a list of prescription medicines that are approved to be prescribed by a particular health insurance plan. The insurer or the pharmacy benefit manager develops and manages their formulary. In the U.S., **tiered formularies** are a common practice, where out-of-pocket costs vary depending on the tier in which the medicine is placed. An example of a four-tier formulary follows:

**TIER 1:**
Generic
Lowest cost tier of prescription drugs; most are generic

**TIER 2:**
Preferred Brand Name
Second-lowest cost tier; some medicines are generic and some are brand name

**TIER 3:**
Non-Preferred Brand Name
Second-highest cost tier; most are brand name medicines, some are specialty

**TIER 4:**
Specialty
Highest cost tier; most are specialty medicines

VALUE & PRICING

companies for more favorable placement on their formulary. They do this by placing one or two medicines for a particular condition on lower formulary tiers that require a lower patient out-of-pocket payment, while placing other treatment options on higher tiers or excluding them altogether. Companies offer discounts and rebates on their products in order to gain favorable formulary placement and ensure more patients are able to access their medicines.

## Patient Out-of-Pocket Costs

For someone with health insurance, the cost of a medicine is set by his or her payer (commercial insurance company, pharmacy benefit manager or the government), who determines the out-of-pocket payment for the medicine. After the patient meets his or her deductible, the patient pays either a co-pay or co-insurance for medicines.

Patients pay on average about 20 percent out-of-pocket for medicines, compared to just five percent for doctor

visits or hospital stays.[20] One reason patients may feel that prices for their medicines are increasing is due to changes in how their insurance is designed and, specifically, how their pharmaceutical benefits are managed.

For example, according to a recent study by IMS Health, the average patient's out-of-pocket cost rose more than 25 percent, to $44 per prescription, between 2010 and 2015.[21] In addition, the use of co-insurance rather than a flat co-pay amount is increasing. Among Medicare Part D plans, the percentage of medicines requiring co-insurance as opposed to co-pays increased from 35 percent in 2014 to 45 percent in 2015.[22]

Like many, we recognize that increasing out-of-pocket costs can be a burden to patients. To help make sure high out-of-pocket costs do not prevent patients from getting the medicines they need, Janssen offers a variety of cost support options through our Janssen CarePath program. In addition, uninsured patients are often eligible for patient assistance to help with out-of-pocket costs. (For more information, see the "Access" section.)

## Rebates and Discounts Provided by Pharmaceutical Manufacturers

**Mandatory:**
- Medicaid
- U.S. Department of Veterans Affairs
- Federal 340B Drug Discount Program

**Negotiated:**
- Insurers & Pharmacy Benefit Managers (including Commercial and Medicare Part D)
- Health Care Providers
- Pharmacies

## What Is the Difference Between a Co-Pay and Co-Insurance?

**Co-Pay:** A flat amount paid by patients at the time they receive their medicine or other health care service.

**Co-Insurance:** A percentage of the cost of a medicine or other health care service paid by the patient.




JJHCS_00038679

## The Net Price

When the rebates, discounts and fees provided to insurers, pharmacy benefit managers and others described previously are taken into account, we arrive at what is known as the net price. This is the best measure to assess the rate at which pharmaceutical prices are increasing.

**After accounting for discounts and rebates, we generally realize low- to mid-single digit percentages from our list price increases.**

## Janssen's Price Increases

At Janssen, we generally limit our annual aggregate list price increase to single digit percentages, below those of our competitive set.[13] After accounting for discounts and rebates, we generally realize low- to mid-single digit percentages from our list price increases. The past five years reflected these trends.

As the chart at the right shows, in 2016, after taking into account discounts and rebates to insurers, pharmacy benefit managers and others — a total of approximately $11 billion in the U.S., or a discount rate of 35.2 percent — the aggregate net impact of price on our U.S. business was 3.5 percent. This is lower than the total rate of medical inflation in the U.S. in 2016, which was 4.1 percent.[18]



### U.S. Product Portfolio,[14] % Change v. Prior Year[15]

| | List Price Change-Average[A] | Net Price Change-Average[B] |
|---|---|---|
| 2012 | 7.6% | 4.3% |
| 2013 | 9.0% | 4.8% |
| 2014 | 8.3% | 2.5% |
| 2015 | 9.7% | 5.2% |
| 2016 | 8.5% | 3.5% |

### OUR LEADERS DISCUSS

**Blasine Penkowski**
Chief Strategic Customer Officer

Blasine Penkowski, Chief Strategic Customer Officer for Janssen North America, discusses our company's approach to pricing medicines and how patient cost is determined.

VALUE & PRICING   ●●●●●



JHCS_00038680

**Section References:**

1. "Consumer Price Index - December 2016," news rel., U.S. Bureau of Labor Statistics, January 18, 2017, https://www.bls.gov/news.release/archives/cpi_01182017.htm. 2. "A 10-Year Projection of the Prescription Drug Share of National Health Expenditures, Including Nonretail," Altarum Institute, published October 2014 and addendum added August 2015, http://altarum.org/sites/default/files/uploaded-publication-files/Non-Retail%20Rx%20Forecast%20Data%20Brief%2010-14.pdf. 3. Ibid.   4. Samuel A. Bozzette, M.D., Ph.D., et al., (2001), "Expenditures for the Care of HIV-infected Patients in the Era of Highly Active Antiretroviral Therapy," New England Journal of Medicine, 344(11), (2001): 817-823, doi:10.1056/nejm200103153441107.   5. Rebecca Siegel et al. "Cancer Statistics, 2016." CA: A Cancer Journal for Clinicians 66(2016): 27-30.   6. "Price Declines after Branded Medicines Lose Exclusivity in the U.S.," IMS Institute for Healthcare Informatics, January 2016, https://www.imshealth.com/files/web/IMSH%20Institute/Healthcare%20Briefs/Price_Declines_after_Branded_Medicines_Lose_Exclusivity.pdf.   7. "Generic Drug Savings in the U.S. Seventh Annual Edition: 2015," Generic Pharmaceutical Association, (2016), http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.   8. Manufacturers must provide a discount of either 23.1 percent or the lowest price they offer the drug to others in the marketplace (known as best price).   9. "The Medicare Part D Prescription Drug Benefit," The Henry J. Kaiser Family Foundation, September 26, 2016, http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.   10. "Prescription Medicines: Costs in Context," chart, PhRMA analysis based on Medical Expenditure Panel Survey (MEPS), http://www.phrma.org/sites/default/files/pdf/prescription-medicines-costs-in-context.pdf.   11. "Medicines Use and Spending in the U.S. — A Review of 2015 and Outlook to 2020," IMS Health, April 2016, http://www.imshealth.com/en/thought-leadership/quintilesims-institute/reports/medicines-use-and-spending-in-the-us-a-review-of-2015-and-outlook-to-2020.   12. "Majority of Drugs Now Subject to Coinsurance in Medicare Part D Plans," Avalere, March 10, 2016, http://avalere.com/expertise/managed-care/insights/majority-of-drugs-now-subject-to-coinsurance-in-medicare-part-d-plans.   13. Based on internal calculations using Janssen financial data and data from Analysource, IMS. We compare our aggregate list price increase against aggregate key competitor price increase for branded products in those therapeutic areas in which we market our products.   14. U.S. Product Portfolio includes pharmaceutical products marketed by the company. Products are primarily in the areas of Immunology, Oncology, Cardiovascular Metabolics, Infectious Diseases and Central Nervous System.   15. Annual percent change vs. prior year calculated at product level and weighted across company's U.S. Product Portfolio.   16. Represents the year-over-year change in the average net price, which is WAC less rebates, discounts and returns. The data presented are based upon our internal analysis of product rebates and discounts. The analysis may be different from the methodologies used by other companies. The data have not been audited and should not be read in conjunction with our filings with the Securities and Exchange Commission.   18. "Consumer Price Index - December 2016," news rel., U.S. Bureau of Labor Statistics, https://www.bls.gov/news.release/archives/cpi_01182017.htm.

# ACCESS

Medicines contribute tremendously to individual health and to the health of our society, which is why we believe it is so important for patients to have access to the medicines their health care professionals prescribe. As discussed earlier in the Value & Pricing section, patients today are paying more out-of-pocket for medicines, creating access challenges for many Americans. For example, you may recall that, according to a recent study, the average patient's out-of-pocket cost increased more than 25 percent, to $44 per prescription, between 2010 and 2015.[1]

This section of the Transparency Report describes our efforts to address barriers to access to our medicines. We negotiate and partner with private and public payers and health care systems to support availability of our products. In addition, since patient coverage and financial circumstances vary, we support a variety of programs and services to assist with access to medicines. While we recognize that these programs are not a long-term solution for all patients, they are one way we aim to meet the needs of the patients we serve.

Here, we highlight Janssen programs and donations that support U.S. patient access to approved medicines — and disclose the impact of these programs and donations.

To help ensure high out-of-pocket costs do not prevent patients from getting the medicines they need, Janssen offers a variety of support options …

## 2016 Disclosures: Access to Medicines

To help ensure high out-of-pocket costs do not prevent patients from getting the medicines they need, Janssen offers a variety of support options, including:

- **Janssen CarePath helps patients understand their health insurance coverage for Janssen therapies and identify options that may help make Janssen products more affordable.** For commercially insured patients who meet our criteria, we offer our Janssen CarePath Savings Programs to reduce co-pays. For a list of all of Janssen CarePath's services, see the box on the right, or visit www.janssencarepath.com for more information.

*In 2016, we helped approximately one million patients through the Janssen CarePath program.[2] Of that number, we helped approximately 870,000 commercially insured patients reduce their out-of-pocket spend through the Janssen CarePath Savings Program.[3]*



## About Janssen CarePath

Once your health care professional has prescribed a Janssen medicine for you, Janssen CarePath can provide resources that may help you get started and stay on your medicine.

**Our Janssen CarePath coordinators can assist patients with:**

- Reviewing health plan benefits to help answer questions about insurance coverage for our medicines
- Identifying options that may help make Janssen products more affordable, if needed
- Reviewing available services and providing support for patients to choose the services that best meet their needs
- For some medications, locating centers near the patient to receive treatment
- Providing treatment education and support

**We also support health care providers through our Janssen CarePath program, offering services to help their patients, including:**

- Conducting reviews of patient health benefits and providing insurance coverage information
- Offering access to our online provider portal, where providers can request and review benefits investigations
- Providing online resources to help keep track of Patient Savings Program enrollments, benefits and payments (medication dependent)

JHCS_0008681

ACCESS

JHCS_00038682

A Letter from Our Leaders ▸    Clinical Data Transparency ▸    Value & Pricing ▸    Access ▸    Our Investments ▸





- **JANSSEN CONNECT® and JANSSEN CONNECT® ACCESS & CARE TRANSITIONS** are two programs offering comprehensive information and assistance to help patients with schizophrenia initiate and maintain their health care professional-prescribed Janssen long-acting injectable atypical antipsychotic therapy.

*In 2016, approximately 12,000 patients enrolled in these programs, gaining access to information, education and adherence support throughout their journey of managing their schizophrenia.[4]*

Janssen also supports independent programs and foundations that aim to assist patients in the U.S. For example:

- **We donate medicines and funding to the Johnson & Johnson Patient Assistance Foundation, Inc.**, an independent, nonprofit organization that provides Janssen medicines to U.S. patients who do not have insurance coverage for these products and do not have adequate financial resources. More information about the Johnson & Johnson Patient Assistance Foundation is available at www.jjpaf.org.

*We donated medicines valued at approximately $620 million[5] to support 2016 operations of the Johnson & Johnson Patient Assistance Foundation, enabling the Foundation to provide medicines at no cost to approximately 75,000 patients.[6]*

- **We make financial donations to independent charitable foundations that assist patients who are underinsured and in financial need with treatment-related expenses.** In 2016, our donations to these independent co-pay foundations helped patients with cancer and autoimmune diseases get financial support for medication-related expenses.

*In 2016, we donated over $47 million to independent charitable foundations,[7] enabling them to provide assistance with medication-related co-pays to approximately 5,550 patients for any medicine prescribed by their physician.[8]* ■

## More Information on Our Giving

In 2008, Janssen began voluntarily disclosing our charitable giving on our website. Each year, this information is updated to reflect the previous year's giving.

**OUR LEADERS DISCUSS**

**Carol Scholz**
Head, Patient Access Solutions team

Carol Scholz, Senior Director of Patient Access Solutions, discusses our company's efforts to help patients start and stay on Janssen medicines they've been prescribed.



**Section References:**
1. "Medicines Use and Spending in the U.S. — A Review of 2015 and Outlook to 2020," IMS Health, April 2016, http://www.imshealth.com/en/thought-leadership/quintilesims-institute/reports/medicines-use-and-spending-in-the-us-a-review-of-2015-and-outlook-to-2020.   2. Data is an approximate number provided by the external program administrator.   3. Ibid.   4. Ibid.   5. According to internal financial accounting.   6. Data is an approximate number as reported by the Johnson & Johnson Patient Assistance Foundation, Inc.   7. According to internal financial accounting.   8. This estimate is based on assessment of donation amounts and publicly available data on approximate levels of patient assistance.

ACCESS




JHCS_00038683

# Access to Investigational Medicines

Our mission is to develop, gain regulatory approval for, and bring to market important medicines that make a difference for patients around the world. While there have been improvements in shortening the time it takes to make new investigational medicines available, some seriously ill patients who have exhausted all available treatment options request, through their physicians, access to investigational medicines that are not yet approved by health authorities, including the U.S. Food and Drug Administration (FDA). There are three pathways to requesting what is known as "pre-approval access" to investigational medicines:

- **Clinical Trials:** The primary method for gaining access to Johnson & Johnson's investigational medicines is to enroll in a clinical trial. Clinical trials are scientific studies that evaluate the effectiveness and safety of medicines and, ultimately, are submitted to a health authority as part of the request for approval of a medicine. They are one of the most important steps in bringing new medicines to patients.

- **Expanded Access Programs:** Patients may sometimes obtain access to an investigational medicine through "expanded access programs" (EAPs), which provide a pathway for patients to get investigational medicines for serious diseases or conditions. At Johnson & Johnson, generally we consider opening an EAP in the U.S. when our clinical studies are completed and we are awaiting approval of our investigational medicine from government health authorities. However, an EAP is not opened for every investigational medicine, and we do not offer EAPs when clinical medicines are in early testing. The list of Janssen EAPs can be found at www.clinicaltrials.gov.

- **Individual Patient Requests or Compassionate Use:** For some patients who are not eligible for clinical trials or EAPs, and for whom no other alternative therapy exists, physicians — in discussion with patients — may make a "compassionate use" request to our company.

## About Compassionate Use

There are important factors we consider when determining whether or not we can fulfill compassionate use requests. Johnson & Johnson follows three important principles when deciding whether or not we can provide compassionate access to investigational medicines:

- We must not put patients at risk of unnecessary harm.
- We must ensure all patients are treated fairly and equally.
- Compassionate use should not impede efforts to conduct thorough scientific studies to understand the potential risks and benefits of any investigational medication.

To enhance our long-standing commitment to ethical and patient-centered decision-making, Janssen Research & Development, LLC, in partnership with the New York University (NYU) School of Medicine's Division of Medical Ethics, in 2015 launched a first-of-its-kind pilot program, The Compassionate Use Advisory Committee, to obtain independent input to assist in evaluating these requests.

## The Compassionate Use Advisory Committee (CompAC)

The Compassionate Use Advisory Committee, or CompAC, was established for the purpose of independently reviewing compassionate use requests and providing external, objective recommendations to Janssen R&D. For each compassionate use request evaluated by CompAC, NYU assembles a committee of internationally recognized medical experts, bioethicists and patient representatives with knowledge of the relevant disease area. CompAC makes recommendations regarding individual requests for compassionate use in accordance with the considerations and principles outlined previously. The committee's recommendations inform Janssen R&D physicians, who make the final decision on each request.

CompAC began in 2015 as a pilot for one medicine under development at that time, daratumumab. In September 2016, Janssen and NYU agreed to expand CompAC to include additional investigational medicines in late-stage development by Janssen R&D. Since the start of the program in July 2015, CompAC has reviewed 182 requests from around the world for compassionate use, seventeen (17) of which originated in the U.S. The results of these 17 requests are outlined below.*

- 12 requests were recommended by CompAC for approval
- Four were deemed to have an unfavorable risk-benefit profile
- One was eligible for an expanded access program, clinical trials or other approved therapies

**Janssen followed 100% of the CompAC U.S. recommendations.**

## How to Get More Information

The best and fastest way to get more information on accessing Janssen investigational medicines, or to make a request, is to have your doctor call Janssen Medical Information at 1-800-Janssen or email us at janssenmedinfo@its.jnj.com.

LEARN MORE

Click here to watch Dr. Amrit Ray, Chief Medical Officer, Janssen, discuss our company's approach to access to investigational medicines.

* Data based on Janssen's Pre-Approval Access global tracking system.

# OUR INVESTMENTS

At Janssen, we focus our investment on research and development (R&D) to discover and develop differentiated medicines that address many of the most serious unmet medical needs of our time. After we have U.S. Food and Drug Administration approval to bring an innovative medicine to market, we invest in providing accurate, up-to-date information about the medicine to health care professionals and patients through marketing and sales activities. We are sometimes asked if these activities are necessary and how our investment in R&D compares to the amount we spend on marketing our medicines. This section of the Transparency Report directly answers these questions.

## Sales and Marketing to Health Care Professionals

One way we market to physicians and other health care professionals is through visits by our sales representatives. Our sales representatives provide information about our medicines' effectiveness, approved uses, side effects, benefits and risks. They may also raise awareness of current clinical practice standards and guidelines. In addition, we consult with health care professionals to gather information about how they are using our medicines and engage physicians to educate their colleagues about the approved uses of our medicines.

In fact, research has shown that health care professionals value information provided by pharmaceutical representatives; please refer to the box on the right.

## Marketing to Patients and Caregivers

For consumers in the United States, marketing and promotional activities consist of educational materials we provide to help patients better understand their conditions and treatment options, as well as direct-to-consumer (DTC) advertising that provides information about our medicines.

## The Social Benefit of Direct-to-Consumer Advertisements

Pharmaceutical DTC advertisements raise awareness about diseases and available treatments, may encourage people to get treatment, and may prompt more informed conversations between patients and their doctors or nurses. The time physicians have to

## Physicians Value the Resources Provided by Pharmaceutical Company Representatives[1]

In one study, physicians characterized the usefulness of resources provided by pharmaceutical company representatives as follows:



■ ALWAYS USEFUL    ▦ OFTEN USEFUL    ▦ SOMETIMES USEFUL

Provide information about drug interactions, side effects, and contraindications
52% | 22%

Provide information about the latest drugs and treatments, including information about clinical trials and new research studies
36% | 28%

Provide information about assistance programs for patients without prescription coverage
41% | 27%

Provide information to give to patients
35% | 29%

Answer or find out the answers to specific questions you have
38% | 25%

Provide free drug samples
43% | 21%

Provide informational presentations for physicians and staff
25% | 29%

Relay your reports of any side effects you have seen in your patients back to the pharmaceutical company
34% | 22%

OUR INVESTMENTS ● ● ○ ○

JHCS_00038684



spend with patients is limited by desk work and record-keeping,[2] so it is especially important that patients have the information they need to have productive conversations with their doctors. Research shows that DTC advertising can enable these more informed conversations. In a 2010 survey among consumers:[3]

- 75-76 percent found the information they learned in DTC television ads — including benefit and risk information — "very or somewhat useful."
- 33 percent of Americans reported speaking with their physicians about a condition after seeing a DTC advertisement.

## Advertising and Marketing Standards that Protect Consumers

We believe acting ethically and responsibly is not only the right thing to do but also the right way to do business. We follow all relevant laws and regulations regarding the promotion of prescription drug products and submit promotional materials to the U.S. Food and Drug Administration at the time of initial publication or dissemination.

Our marketing and sales activities adhere to industry ethics standards and codes of conduct, including the PhRMA Code on Interactions with Health Care Professionals and the Guiding Principles on Direct to Consumer Advertising about Prescription Medicines. In accordance with these guidelines, we may provide health care professionals with textbooks, medical journal articles and other educational resources, consulting-related travel, as well as modest meals if we are meeting with them during a mealtime. We do not provide physicians and health care professionals with promotional or recreational items or entertainment.

## Ongoing Open Payments Disclosures

In 2010, Johnson & Johnson began voluntarily disclosing payments made to physicians by our U.S. pharmaceutical companies and posting this information to our websites. Beginning in 2013, as required by the Physician Payment Sunshine Act — passed in 2010 as a part of the Affordable Care Act — we began annually disclosing payments and items of value we provide to health care professionals to the Centers for Medicare and Medicaid Services (CMS), part of the U.S. Department of Health and Human Services. CMS posts these disclosures on an online, publicly available database, referred to as "Open Payments."[4] This data includes payments related to marketing activities. For example, all payments and items of value we provide to physicians when they are meeting with or consulting for us — such as modest meals or travel expenses — are disclosed in the Open Payments database.

The database also contains details about payments we make to physicians and teaching hospitals for their work in conducting clinical research. This work may include helping us design and conduct clinical trials. While these are not marketing activities, payments related to these activities are disclosed through the Open Payments database.

We anticipate that 2016 Open Payments data will be available through CMS on June 30, 2017. In this report we have included information on Janssen's 2015 payments and transfers of value to physicians and other health care professionals. Importantly, research activities account for more than 60 percent of these payments.

**"We believe acting ethically and responsibly is not only the right thing to do but also the right way to do business."**

JHCS_00038686

## OUR LEADERS DISCUSS



Dr. William N. Hait

Dr. William N. Hait, Global Head, Janssen Research & Development, discusses our investment in R&D to bring transformational innovation to people in need of medical solutions.

### In 2016, we invested 55% more in R&D than we spent on marketing and sales.

At Janssen, we are united by one mission — to discover and develop innovative medicines that transform individuals' lives. We leverage our world-class expertise to transform how diseases are prevented, treated and cured. We believe there are no limits to what science can do. And we never lose sight of those who rely most on our discoveries.

## 2015 OPEN PAYMENTS SUMMARY



PHARMACEUTICAL 2015
TOTAL $185,677,962

RESEARCH $114,592,742

TRAVEL & LODGING $9,079,259
GRANT $982,379
GIFT $350,628
ROYALTY OR LICENSING
FOOD & BEVERAGE $15,159,509
COMPENSATION FOR SERVICES OTHER THAN CONSULTING $4,632,340

Click here to view the full J&J Open Payments summary.

- Clinical studies and research that provide valuable scientific and clinical information about the medicines and medical devices that improve patients' lives.
- Compensation for services other than consulting, including serving as faculty or a speaker at a venue other than a continuing education program; fees for speaking at a program on our company behalf.
- Meals, whether paid directly or reimbursed, may be provided in conjunction with consulting services; training; educational and other business discussions with physicians.
- Product development; training; development of educational materials and disease management programs, unfinished market research.
- Travel, whether paid directly or reimbursed, in conjunction with consulting services; product training.
- Medical textbooks; scientific journal articles.
- Sponsorships of an educational event, patient advocacy event, or publication; sponsorship of fellowships for fellow and resident training; certified independent educational activities (i.e. activities certified by a continuing medical education provider); non-certified medical education activities.
- Space rental or facility fees (teaching hospital only); booth or exhibit space rental; facility rental for product training or clinical studies.
- Payment of royalty or license fees for inventions or significant contributions towards the development of a new innovation, often based on product sales over a pre-determined period of time.
- Open Payments categories are specified by regulation and do not provide for an "other" category (the gifts category may be used when there is no more appropriate category available).

## EXPENDITURES AND INVESTMENT

We spent 55% more on developing medicines than we did on marketing and selling them.

Janssen global pharmaceutical marketing and sales expenditures (U.S.: $2.6 billion)[7]
$4.5 billion

Janssen global pharmaceutical R&D investment[8]
$7 billion

$2B   $4B   $6B   $8B

## 2016 Marketing and Sales Spending

In addition to the disclosures outlined above, here we provide data about our pharmaceutical sector marketing and sales expenses as compared to our R&D expenses.

In 2016, our global pharmaceutical marketing and sales expenditures were $4.5 billion, and our global pharmaceutical R&D investment was $7 billion.[5] In other words, in 2016 we spent 55 percent more on developing medicines than we did on marketing and selling them. Of the $4.5 billion, $2.6 billion were U.S. pharmaceutical marketing and sales expenditures.[6] (For information on what these expenditures and investments include, please refer to the box entitled "Definitions of Marketing and Sales and R&D Expenditures" on the following page.) ■

OUR INVESTMENTS

OUR INVESTMENTS ▶

JHCS_00038687

**OUR LEADERS DISCUSS**

Michelle Goodridge
President, U.S. Neuroscience

Michelle Goodridge, **President of Central Nervous System at Janssen**, discusses the value of our promotional efforts in informing health care providers and patients about our medicines.

## Definitions of Marketing and Sales and R&D Expenditures

**Marketing and sales expenditures** include our sales force activities, market research, promotion and advertising, and marketing management.

**Research and development expenditures** relate to the processes of discovering, testing and developing new medicines; improving existing products; demonstrating product efficacy and regulatory compliance prior to the launch of a new drug; as well as safety monitoring and ongoing research post-launch.

**Financial Report**

## Understanding Our Financial Statements: Selling, Marketing and Administration vs. Marketing and Sales Expenses

**Public companies like Johnson & Johnson disclose detailed financial information so that the investing public can make informed judgments about a company's performance.** In our financial reporting, the marketing and sales expenses we describe above are combined with other items in a budget line item described as "Selling, Marketing and Administration" (SM&A). The SM&A figure reported in Johnson & Johnson financial documents accounts for much more than just marketing and sales expenses:

- It includes administrative and overhead activities that are not related to marketing or sales — such as expenses for insurance, legal, finance, distribution and accounting functions.

- It pertains to all of Johnson & Johnson, which includes medical devices, consumer products, and over-the-counter medicines, as well as pharmaceuticals.

- It is global, not solely for the United States.

**Section References:**

1. "Survey of Physicians About Pharmaceutical and Biotech Research Company Activities and Information," KRC Research, commissioned by PhRMA, March 2011.  2. Christine Sinsky, et al., "Allocation of Physician Time in Ambulatory Practice: A Time and Motion Study in 4 Specialties," *Ann Intern Med*. 166(11) (2016):753-760, doi: 10.7326/m16-0961.  3. "13th Annual National Survey: Consumer Reaction to DTC Advertising of Prescription Drugs," *Prevention Magazine*, (2010).  4. Johnson & Johnson has voluntarily posted the aggregated data for our companies covered by Open Payments, as submitted to CMS on March 31, 2016. Due to the CMS data review process, there may be differences between the aggregated totals for data posted here and aggregated totals derived from currently available data on the CMS website.  5. According to Janssen internal financial accounting. While we wish to provide as much detail to our stakeholders and consumers about our investments in R&D as possible, global R&D investment cannot be segmented by region. The R&D activities we undertake around the world collectively contribute to product development for the benefit of all consumers, regardless of market.  6. The financial figures in this section have not been audited and should not be read in conjunction with our filings with the Securities and Exchange Commission.  7. Ibid.  8. According to Janssen internal financial accounting.

OUR INVESTMENTS



JJHCS_00038688



Janssen Global Services, LLC.
©2017, JGS, LLC.

# JJHCS Ex. 7

# The 2022 Janssen U.S. Pricing Transparency Brief

Image Info: Microscopic Biology.

Janssen Phamaceuticals, Inc.
© 2023 JP, Inc.



JJHCS_00040275

Case 2:22-cv-02632-CCC-CLW    Document 156-2    Filed 09/21/23    Page 317 of 369 PageID: 6413

# $39 Billion Paid in Rebates, Discounts & Fees: Breaking It Down

In 2022, **we provided $39 billion in rebates, discounts and fees** to private payers and government programs, as well as providers, distributors and others.[1] Here is the breakdown:



**29%**
$11.2B
Commercial Payers and Pharmacy Benefit Managers

**16%**
$6.2B
340B Program

**13%**
$5.1B
Medicare

**11%**
$4.5B
Community Clinics

**10%**
$4.2B
Other*

**10%**
$3.8B
Medicaid

**2%**
$687M
Non-340B Hospitals

**4%**
$1.6B
Veterans Affairs/ Department of Defense

**5%**
$1.8B
Distributors

* Other: Includes Coupons/Co-Pay, programs such as Long-Term Care, ADAP (a program specific to HIV and AIDS) and other disease-specific sites of care/insurers.

JJHCS_00040276

Case 2:22-cv-02632-CCC-CLW    Document 156-2    Filed 09/21/23    Page 318 of 369 PageID: 6414

# 2022 at a Glance

**Our net prices declined for the sixth year in a row in 2022.** Unfortunately, the reality for millions of patients is growing affordability and health equity gaps caused by underinsurance and inadequate insurance benefit design driven by middlemen, including pharmacy benefit managers.

## ① Net Prices for Our Medicines Have Declined for the Sixth Year in a Row

**-3.5%**  Average net price decline of Janssen medicines in 2022 (compared to the 9.1% rise in consumer prices over the year ended June 2022)[1,2]

## ② Rebates and Discounts to Commercial Insurers, PBMs and Government Programs Have Grown

**$39B**  Total amount Janssen paid in rebates, discounts and fees to commercial insurers, government programs and others in the healthcare system in 2022[1]

## ③ Insurance Benefit Design Shifts More Costs to Sicker Patients

**32%**  Of covered U.S. workers face an annual deductible above $2,000[3]

**23%**  Of Americans are considered underinsured[4]

## ④ Our Investments in R&D Continue to Grow

**$11.6B**  Dedicated in 2022 to the discovery and development of new treatments and cures[1]

**110%**  Janssen spent 110% more on R&D than on sales and marketing in 2022[1]

### 3 Facts to Know



**58%**

Of the **list prices of our medicines** went to commercial insurers and others in the healthcare system[1]

**$65.7B**

In total R&D spending since 2016[1]

More than

**1.16M**

patients were helped with support to afford their medicines through the **Janssen CarePath Program**[5]




JJHCS_00040277

Case 2:22-cv-02632-CCC-CLW    Document 156-2    Filed 09/21/23    Page 319 of 369 PageID: 6415

# Introduction

When a prescription medicine becomes reality, it's the result of years of investments, research and the dedication of thousands of individuals across the U.S. healthcare innovation ecosystem that is bolstered by laws and policies supporting this ecosystem. When our ecosystem works as intended, patients and the entire healthcare system benefit from the discovery of next generation medicines that change the way we fight diseases. These discoveries do not happen overnight. They take decades, and the hope patients have today is created by a carefully cultivated innovation ecosystem.

At Janssen, we are proud of the innovative contributions that our dedicated employees have made to enable these medical breakthroughs that create hope for patients.

Since 2016, the first year we published the Transparency Report, Janssen has invested

## $65.7B

in research and development to push the boundaries to develop innovative therapies and treatments.[1]



These investments have led to significant breakthroughs, including the launch of our first cell therapy to treat multiple myeloma, a blood cancer, in 2022.[6] We are relentlessly pushing the frontier of innovation to bring greater personalization, earlier intervention and smarter, data-driven healthcare.

In addition to developing these transformative medicines that help millions of patients, we also negotiate and provide rebates, discounts and fees to many stakeholders in the healthcare system. These negotiations resulted in **our overall net prices in the U.S. decreasing by 3.5%,** our sixth year in a row of negative net prices.[1] Net prices are the amount we receive after providing rebates, discounts and/or fees to different parts of the healthcare system. In 2022, **we provided $39 billion in rebates, discounts and fees** to commercial insurers, pharmacy benefit managers (PBMs), hospitals, government payers and others in the healthcare system.[1] This means that nearly **58 cents of every dollar** of our gross sales went back into the healthcare system.[1]

### How Much in Gross Sales Was Returned to the Healthcare System in 2022[1]



.58¢

$1.00



Pictured: Crypt Cells.

JJHCS_00040278

Case 2:22-cv-02632-CCC-CLW    Document 156-2    Filed 09/21/23    Page 320 of 369
PageID: 6416

Notwithstanding our continued R&D investments and negotiations with payers to support patient access, we are deeply concerned about continuing trends and new policies that undermine patient access; further exacerbate gaps in affordability and health equity; and threaten the nation's leadership role in the global pharmaceutical innovation ecosystem. Our specific concerns include:



### Patients Are Not Directly Benefiting From Continuously Lower Net Prices and Growing Discounts

While the net prices that payers pay manufacturers for prescription drugs have grown at or below the consumer price index, too many patients continue to pay higher out-of-pocket costs.[7] This difference between the list price and net price has grown significantly, with one analysis putting the total at more than $200 billion in 2021 for the entire healthcare system.[8]



> **$200B**   The difference between list price and net price is now more than $200 billion.[8]



While commercial insurers pay lower net prices, patients do not always directly benefit from these lower prices and continue to pay higher out-of-pocket costs at the pharmacy counter.[7] Patients pay higher out-of-pocket costs because their cost-sharing amount is often based on the initial list price, not the negotiated lower net price the commercial insurer pays.



Pictured: Microscopic Image.

Learn more at transparencyreport.janssen.com



### Underinsurance Is Widening Gaps in Affordability, Health Equity and Access

There are a growing number of Americans who have health insurance but are still at financial risk, or underinsured, due to high deductibles, high out-of-pocket costs and some treatments not even being covered by their insurance plan. These inadequate benefit designs put the greatest burden on the sick, thereby raising concerns about affordability across the entire population and hampering the value of medical innovations.[9] Data show that commercial insurers' cost-shifting is a financial burden for households nationwide, affecting tens of millions of Americans every year who are unable to afford growing out-of-pocket costs.[10, 11]



### Enactment of the Inflation Reduction Act

The Inflation Reduction Act (IRA) threatens to harm the future development of innovative medicines, improvements in existing treatments and patients' access to these treatments. At a time when the nation is on the cusp of transformative innovation to tackle so many unmet healthcare needs, the IRA's drug pricing policies are the exact opposite of what patients need and deserve.

As one of the nation's leading healthcare companies, we have a responsibility to engage with stakeholders in constructive dialogue to address these gaps in affordability, access and health equity as well as protect our nation's leading role in the innovation ecosystem. Through the 2022 Janssen U.S. Transparency Report, we continue our legacy of contributing insights, data and real-world evidence to help inform and advance policy solutions to create a more sustainable, equitable and innovative healthcare system.

At Janssen, we know that patients are counting on us to develop and bring to market medicines that are safe, effective and accessible. We live this mission every day and are humbled by the patients who trust us to help them fight their diseases and live healthier lives.

Janssen Pharmaceuticals, Inc., © 2023 JP, Inc.

# Prescription Drug Net Prices in the Healthcare System

Intense political focus on healthcare costs, particularly patients' prescription drug costs, continues. Yet, there is a need to better understand three key issues:

1. how private market negotiation is driving prescription drug net prices lower;

2. why patients' out-of-pocket costs continue to increase; and

3. how the Inflation Reduction Act (IRA) will alter the future of patient access to innovative medicines.

**Negotiations Lead to Lower Net Prices**

The list price of a medicine is a starting point that is ultimately reduced to a net price, the amount a manufacturer receives after negotiating and providing rebates, discounts and/or fees to different parts of the healthcare system. These include negotiations with private insurance companies, PBMs and entities where medications are dispensed or administered (e.g., hospitals, clinics and private physician practices). In addition, there are mandatory or statutory price reductions provided through government programs. Government programs (e.g., Medicare, Medicaid, etc.) receive prices reduced by both private negotiations and statutory discounts. Vigorous private market negotiations throughout the system result in lower net prices for commercial payers and government programs.



Pictured: Tibia Talus.

**Janssen's Net Prices — Lower for the 6th Year in a Row**

In the face of inflationary pressures, American families and businesses experienced the fastest growth in prices in nearly 40 years in 2022.[2] Yet, commercial insurers, pharmacy benefit managers (PBMs) and government payers paid lower net prices for Janssen's medicines for the sixth year in a row.[1] Net prices for our medicines declined by 3.5%, and nearly 20% when compounded over the past six years.[1]

**Change in List Price v. Net Price[1]**



● List Price Change (Average)    ● Net Price Change (Compounded)

Industrywide, net prices for prescription drugs have grown at or below the consumer price index for the last five years.[7] This difference between the list price and net price has grown significantly over the past five years, with one analysis putting the total at more than $200 billion for the entire healthcare system.[8] While commercial insurers pay lower net prices, many patients do not directly benefit from these lower prices and continue to pay higher out-of-pocket costs.[7] Patients pay higher out-of-pocket costs because their cost-sharing amount, set by their insurance plan, is often based on the initial list price, not the negotiated lower net price the commercial insurer pays.

JJHCS_00040280

Case 2:22-cv-02632-CCC-CLW   Document 156-2   Filed 09/21/23   Page 322 of 369 PageID: 6418

## Rebates and Discounts Continue to Grow[1]

Rebates and discounts are one way we help support patients' access to medicines. In 2022, $39 billion of Janssen's gross sales (nearly 58 cents of every dollar) went back into the healthcare system through rebates, discounts and fees negotiated with or provided to commercial health insurers, PBMs, government healthcare programs and other intermediaries.[1] Since 2016, these rebates, discounts and fees have increased 256 percent, with the 340B Federal Drug Discount Program (340B Program) driving a significant part of this increase in rebates and discounts.[1] The chart to the right outlines where a majority of these rebates, discounts and fees went.



| | 2016 | | 2022 |
|---|---|---|---|
| VA/DOD | $0.7B 51%* | 2.3x | $1.6B 57%* |
| Medicaid | $1.4B 55%* | 2.7x | $3.8B 53%* |
| Medicare (Part D & Donut Hole) | $1.3B 30%* | 3.9x | $5.1B 48%* |
| 340B Program | $2.0B 59%* | 3.1x | $6.2B 62%* |
| Commercial Market | $1.7B 20%* | 6.6x | $11.2B 44%* |

● 2016   ● 2022   *As a Percentage of List Price

---

### Percent of Gross Sales Returned to the Healthcare System in 2022[1]



**58%**

Nearly 58 cents of every dollar in gross sales went back into the healthcare system.[1]

### Rebates, Discounts and Fees
(as $ and as % of Gross Sales)[1]



2022
2021
2020
2019
2018
2017

75%    25%

$14.9B
$20.7B
$24.5B
$29.4B
$33.9B
$39.0B

50%

Our rebates, discounts and fees (in $billions) as a percentage of gross sales have risen consistently, year-over-year.[1]





## Growth in 340B Discounts Puts Pressure on the Program's Sustainability

The 340B Program's original, limited intent was to restore outpatient drug discounts to certain specified safety-net providers that directly purchased and dispensed drugs to their own patients, without having those discounts affect the Medicaid best price calculation.[12] However, the program has grown as large for-profit companies and healthcare systems leverage the program and discounts for maximum financial gain. Since 2016, Janssen's 340B Program discounts have grown from $2 billion to $6.2 billion in 2022.[1] The 340B Program now represents nearly one out of every five dollars of the total manufacturer rebates and discounts provided each year across the healthcare system.[13] However, independent research showed that hospitals' 340B participation did not result in an increase of total community benefit spending, and it was not associated with offering low-profit medical care services.[14]

Read more in our 340B Issue Brief.

### 340B Program Discounts[1]



Janssen's 340B Program discounts have grown from $2 billion to $6.2 billion from 2016 to 2022.[1]



## The Inflation Reduction Act Impact on Prices

On August 16, President Biden signed into law the Inflation Reduction Act of 2022 (IRA).[15] The bill includes Medicare drug pricing policies, among other healthcare related provisions. The major drug pricing provisions include inflation penalties for manufacturers in Medicare Part B & D if prices rise faster than inflation; government price setting in Medicare starting in 2026 for drugs that have been on the market for nine years and biologics that have been on the market for 13; and a Medicare Part D benefit redesign, effective in 2025, to cap patient out-of-pocket costs at $2,000.[16, 17]

Though the law is in its initial stages of implementation, it is clear that it could disincentivize R&D investments and undermine the generic and biosimilar prescription drug market. While much remains to be settled on the IRA's long-term impact on costs, the concerns are mounting that government-mandated prices could upend the entire healthcare innovation ecosystem. In undermining strong intellectual property incentives, the IRA can eventually result in the loss of choice for doctors and patients of new treatment options. Furthermore, while the law does include some patient out-of-pocket costs protections for seniors, there is growing concern that private health plans providing Medicare benefits (known as Medicare Advantage plans) could further erode the financial protections insurance is meant to provide by implementing greater utilization management programs and creating more hurdles to needed treatments for beneficiaries.



Pictured: Human umbilical cord cells.

# As Net Prices Decline, Who Benefits?

Even as net prices decreased, out-of-pocket costs for patients continued to increase due to:

1. underinsurance that puts more financial burden on patients;[4]

2. increased prevalence of high-deductible health plans;[18] and

3. the growth in patient assistance diversion programs.[19]

In short, while net prices for Janssen's medicines decreased, many patients continued to pay more out-of-pocket for those very same medicines.

### Underinsurance – A Growing Source of Financial Hardship for Millions of Americans

A near record number of Americans had some form of health insurance coverage in 2022.[4] Yet nearly 23% of Americans are considered underinsured.[4] This happens because commercial payers determine patient deductibles, co-insurance, co-pays and other cost sharing.[20] Even though patients have insurance coverage, the benefit design leaves them open to significant financial risk, effectively rendering healthcare unaffordable – the exact opposite of what insurance is supposed to do.[4] This issue is even worse for people with lower incomes and serious health problems, as they have even more financial exposure in times of need.[4]

Exposure to financial risk is even more problematic for people who take medication for one or more chronic illnesses. One out of four people with one or more chronic health problems identify high out-of-pocket costs for prescription drugs as a reason for skipping or not filling a prescription for their specific healthcare need.[4] Additionally, rising deductibles continue to be a major financial challenge for individuals and families – with nearly half of households with employer insurance unable to afford a typical deductible.[21] Similarly, commercially-insured patients with a deductible have seen their out-of-pocket costs for brand medicines increase 50% since 2014.[22] In fact, most patient spending on brand medicines is based on the undiscounted list price of a medicine rather than the net price negotiated by their health plans.[7]

One report projects that commercial insurers will escalate out-of-pocket expenses to a staggering $800 billion by 2026.[23] To put this in perspective, that burden would equate to an annual tax on every U.S. worker of $4,774.[24]

What do these higher costs mean for patients starting and staying on their medicines? In 2021, patients starting a new treatment abandoned 81 million prescriptions at pharmacies – and this trend of abandonment grows as out-of-pocket costs rise.[7] For patients with a chronic condition, these higher costs resulted in 5.3 billion lost patient days of therapy, particularly affecting the uninsured.[7]

### Beyond Cost-Sharing – Growing Use of Utilization Management Programs Means More Hurdles for Patients and Providers

In the 2021 U.S. Transparency Report, we highlighted how commercial insurers and PBMs implemented more restrictive utilization management programs.[25] Utilization management can be broadly defined as commercial insurers' use of administrative mechanisms (e.g., prior authorization) and financial mechanisms (e.g., patient cost sharing) to control or restrict patient access to healthcare.[25] One such example is the increasing use of exclusion lists, which are designed to block patients from accessing a medicine that their own doctor has prescribed. Since 2014, these exclusion lists have grown more than 961% to include more than 1,156 unique products.[26] Exclusion lists are also being leveraged with specialty drugs, which could disproportionately affect patients with very serious and specialized treatment needs.[26] Utilization programs also include expanded tiered lists with varying cost sharing, prior authorization, non-medical switching and step therapy.

Read more in our 2021 U.S. Transparency Report.

JJHCS_00040283

## Patient Assistance Should Be for Patients

Patient assistance programs have evolved to become an important source of access support for more patients who face greater financial burdens because of underinsurance.[30] As commercial insurers and PBMs shift more costs onto patients, these programs help patients meet their deductible and out-of-pocket maximums. Through our patient support program Janssen CarePath, Janssen provided more than 1.16 million patients with access support.[5]



# 1.16 Million

More than 1.16 million patients were provided with access support through Janssen CarePath.[4]

But patients face the growing threat of patient assistance diversion programs, which are implemented by commercial insurers and PBMs to divert patient assistance money away from patients to the financial benefit of non-patient third parties.[27] These programs have numerous, deceptive names (e.g., accumulators, maximizers, optimizers or Alternative Funding Programs), yet they all have the same purpose – to make it harder for patients to access and afford needed healthcare so program operators may financially benefit. The implementation of these programs in commercial insurance has grown significantly since 2018, with accumulators seeing a 39% growth and maximizers seeing a more than 580% growth.[28] As one industry expert and academic recently noted, these types of programs can "cause disruptions in people's access to their medications."[29]



## Growth of Patient Assistance Diversion Programs

**39%** Growth of accumulators since 2018[28]

**+580%** Growth of maximizers since 2018[28]

### Janssen Policy Position:
### Health Equity & Patient Assistance Diversion

New data shows that benefit plans imposing accumulators and maximizers place disproportionate burdens on historically marginalized populations and people of color. The research found non-white patients (African American, Asian, Hispanic and other) are



31% more likely to be affected by accumulators[30] and



27% more likely to be affected by maximizers.[30]



Pictured: HIV Particles.

JJHCS_00040284

**What Are Patient Assistance Diversion Programs?**

As manufacturer patient assistance programs have grown in conjunction with higher out-of-pocket costs, commercial insurers, PBMs and third-party intermediaries are deploying various programs to divert these funds away from patients.

These patient assistance diversion programs take various forms including:



**Accumulators**

Do not allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of any patient assistance is reached. Then the patient's out-of-pocket costs begin counting toward their annual deductible and out-of-pocket maximum.[31]



**Non-essential Health Benefit Maximizers**

While similar to regular maximizers, this program classifies certain specialty medications as "non-essential," which takes away ACA patient protections related to maximum out-of-pocket limits.[32]



**Maximizers**

Do not allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizer programs take the maximum value of patient assistance for a year and apply that maximum throughout the plan year, either by distributing the maximum amount evenly or by taking larger amounts early in the year and tapering accordingly, without allowing any of those amounts to count toward a patient's annual deductible or cost-sharing limits under the plan.[31]



**Alternative Funding Programs**

Programs run by third-party vendors that push for the exclusion of specialty drugs from coverage by certain insurance plans. Upon exclusion for a specific medication, the patient becomes "uninsured" or underinsured and is then forced to apply for patient assistance for uninsured individuals through foundation-based patient assistance programs. If the patient is approved, then the third-party vendor claims a fee from the plan sponsor. These programs can cause disruption in coverage for patients.[33]



Pictured: Human pancreas.

JJHCS_00040285

# Our Investments Are Helping Make Disease a Thing of the Past

Janssen is proud of our historical investments in helping develop the global healthcare innovation ecosystem aimed at making disease a thing of the past. A healthy innovation ecosystem depends upon many elements working together to support and sustain each other. In the healthcare innovation ecosystem, biopharmaceutical industry R&D spending accounts for 75.5% of all investments in U.S. medical and health research and development.[34] A recent report summarizing an expert symposium on the impact of our R&D ecosystem concludes that "Pharmaceutical innovations have resulted and will continue to result in immense benefits for society, which can be measured directly through increases in life expectancy itself (not to mention improvements in individuals' quality of life or ancillary societal benefits, such as fewer missed workdays, decreased use of disability insurance and increased economic productivity)."[35]

Such investments across the industry have contributed to our nation's significant progress in addressing previously untreatable diseases and creating dramatic improvements in patients' health. This robust approach is also a critical tool in our nation's efforts to end health inequities across the entire healthcare system. For example:

- Pharmaceuticals accounted for 76% of the mortality reduction achieved for HIV/AIDS from 1990 to 2015, 60% for cerebrovascular disease, 60% for malignant breast neoplasms, 52% for ischemic heart disease and 27% for colon/rectal/anal cancers.[35]
- Over the past 40 years, the FDA has approved 599 medicines to treat rare diseases, which has brought hope for millions of patients living with a rare disease.[36]
- The biopharmaceutical industry has a robust pipeline of more than 800 new medicines, treatments and cures for diseases that disproportionately impact racial and ethnic communities.[37]

## Janssen's Continued R&D Investments

In 2022, we spent 110% more on R&D than on sales and marketing.[1] Since 2016, our total investments in R&D have reached $65.7 billion, nearly double what we spent on marketing and sales in the same timeframe.[1] This growing investment enables our scientists and doctors to rigorously pursue new medicines from early discovery through clinical development with comprehensive efficacy and safety studies. We continue to push the frontier on the next generation of treatments and cures. Since 2016, we produced a total of eight new Janssen medicines approved by the FDA and an additional 52 approvals for expanded indications or new product formulations.[38, 39]

### The Next Generation of Cancer Care for Patients

Multiple myeloma is an incurable blood cancer that affects a type of white blood cell called plasma cells, which are found in the bone marrow.[40] Despite the development of additional treatment options in recent years, most people living with multiple myeloma face poor prognoses after experiencing disease progression following treatment with three major therapy classes, which include an immunomodulatory agent, a proteasome inhibitor and an anti-CD38 monoclonal antibody.[41] Building on Janssen's legacy and commitment to innovation in multiple myeloma, Janssen received FDA approval in February 2022 for its first CAR-T therapy: CARVYKTI®. This novel cell therapy works by harnessing the patient's own immune system, or T cells, to fight the disease. This type of personalized cancer therapy is just one example of how Janssen is working to get in front of cancer with a focus ultimately on eliminating the disease.

## Helping Build a More Equitable Healthcare System

We also know a critical part of strengthening this ecosystem is to address inequities in the healthcare system, which is why we are investing in programs, people and research related to achieving health equity. Through *Our Race to Health Equity*, Johnson & Johnson is committed to addressing the systemic health inequities contributing to lower standards of care and outcomes for people in historically marginalized communities.[42] As part of this commitment, Janssen continues to identify innovative programs, community leaders and partners to make health inequity a thing of the past.

In 2022, we continued our investments to build a more equitable healthcare system by:

### 1  Helping to Address Peripheral Artery Disease in Black Communities:

Save Legs. Change Lives.™ is a multi-year initiative that aims to create urgency and action to address the hidden threat of peripheral artery disease (PAD)-related amputation. The initial focus is on reaching Black Americans, who are more than twice as likely to be impacted by PAD. Janssen has joined forces with leading professional associations, including the American College of Cardiology, as well as healthcare systems and community advocacy organizations to advance equitable care for individuals and communities at an increased risk for cardiovascular disease. There are three pillars to the initiative: driving research, powerful partnerships and empowering individuals.[43]



Pictured: Gene Therapy DNA.

### 2  Empowering the Next Generation of a Diverse Healthcare Workforce:

Building on its partnership with the National Medical Fellowships (NMF), Johnson & Johnson welcomed the newest 20 exceptional and diverse medical students from across the country to participate in the second cohort of the Alliance for Inclusion in Medicine (AIM) scholarship program. The three-year program helps students pursuing medical careers where their work is centered around prioritizing diversity and providing high-quality care to historically marginalized patient populations.[44] In 2023, Johnson & Johnson will expand its partnership and reach with NMF by welcoming its first cohort of diverse pharmacy students from the five accredited Historically Black Colleges and Universities (HBCU) Pharmacy Schools, which will be aligned to the same three-year programming that the diverse medical students experience. This effort will boost Johnson and Johnson's focus and commitment to building a "Diverse Healthcare Workforce." For more information, please visit www.nmfonline.org.

### 3  Expanding Diversity in Clinical Trials:

Janssen is actively working on ways to improve diversity in clinical trials by changing clinical trial design, ensuring a more inclusive criteria approach for participants and training clinical trial site staff to engage and interact with different communities and people of color. Increasing diversity also involves addressing barriers to enrolling in clinical trials that groups that are historically excluded sometimes face. J&J is actively engaging in work with patient-focused organizations that focus on Black and Brown patients with digestive diseases. The goal of the partnership is to raise awareness about Inflammatory Bowel Diseases (IBD) clinical research, as well as increase education in underserved communities about IBD. Strategic partnership with organizations allows researchers to meet patients where they are in their communities to help them finally feel seen and heard.[45]

**Taken together, these actions are some of the many ways we continue our efforts to build an equitable healthcare system that works for every patient.**

Case 2:22-cv-02632-CCC-CLW    Document 156-2    Filed 09/21/23    Page 329 of 369 PageID: 6425

# Supporting Access for Patients

## Janssen CarePath Directly Supports Patients

We continue to support patients through Janssen CarePath, a service that provides information about support resources for patients taking Janssen medications. Once a healthcare professional has decided a Janssen medication is right for their patient, the program can help that patient find the tools they may need to get started on a medication and stay on track, including sharing options to help manage out-of-pocket costs. In 2022, more than 1.16 million patients in the U.S. were helped through the Janssen CarePath program.[5]

## Johnson & Johnson Patient Assistance Foundation, Inc. (JJPAF)

We also support independent programs and foundations that help patients. In the U.S., Janssen and other Johnson & Johnson companies donate medicines and funding to the JJPAF, an independent, nonprofit organization. JJPAF gives eligible patients prescription medicines donated by Johnson & Johnson companies. In 2022, Janssen donated approximately $3.8 billion in products and financial support to JJPAF.[1] For more information, please visit JJPAF.org.

## How Patient Assistance Diversion Programs Are Taking Aid Away from Needy Patients

There are a growing number of companies operating programs called "Alternative Funding Programs" that are diverting patient assistance away from those patients who need aid the most.[46] These programs target patients who have complex or high-risk health needs that require specialty medicines to treat chronic and often fatal diseases, which often incur high cost-sharing because of insurance benefit design.[46] The programs limit or restrict coverage of certain specialty medicines, leaving patients functionally uninsured for a specific healthcare need. Then these program operators direct these "uninsured for the product" patients to seek assistance from charitable foundations (like the Johnson & Johnson Patient Assistance Foundation (JJPAF)) for free product.[47] Once the patients can access this free product, the program operators are financially rewarded for diverting the cost of these specialty medicines away from employers' health insurance plans. However, the charitable foundations intending to serve patients become overburdened in their ability to help patients in need when commercial insurance does not provide coverage that patients think they have through their existing plans.[46]



Pictured: Exacerbation.

JJHCS_00040288

# How We Build a Sustainable, Equitable and Innovative Healthcare System

**We have a responsibility as a leading healthcare company to advance patient-centric policy solutions and ideas that will reduce inequity and foster innovation.** We believe it is important to focus on ways to bring transparency into programs such as the 340B Federal Drug Discount Program and build more awareness of the benefit design changes that affect patients' access to needed treatments and medicines.

### Inflation Reduction Act — What It Could Mean for Innovation and the Future of Treating Unmet Healthcare Needs

While the IRA's healthcare provisions include important affordability improvements for seniors by capping out-of-pocket costs, the negative consequences to future innovation could be severe. Some experts have argued that the government negotiating, or "unilaterally setting prices," would lead to likely cuts in "...funding for development of new drugs, with a slowing of innovation."[48] Indeed, several leading biopharmaceutical companies and small biotech companies have already started shifting their R&D investment priorities, portfolios and budgets.[49] Some reports estimate that government-dictated prices like those included in the IRA "...could reduce overall annual cancer R&D spending by about $18.1 billion, or 31.8%."[50] In fact, this new law may undermine the industry's ability to develop new uses for existing therapies, reach new patient populations with unmet medical needs, including rare diseases, and advance product improvements that significantly increase adherence, tolerability and safety or reduce healthcare costs. The law will severely restrict the time available to research and gain regulatory approval to expand an existing medicine to treat additional patient conditions.



Pictured: Hepatocellular Carcinoma Cells.

The policies included in the IRA will limit future discoveries of new treatments across the entire U.S. healthcare innovation ecosystem, which depends upon the efforts and ingenuity of small biotech companies, universities and academic institutions and large biopharmaceutical companies.

The United States, more than other nations, accounted for a significant share of FDA approvals since 2010, but the IRA could severely curtail the nation's leadership position in the global healthcare innovation ecosystem.[51] At a time when the nation is on the cusp of transformative innovation to tackle so many unmet healthcare needs, the drug pricing policies included in the IRA are the exact opposite of what patients need and deserve.

We are committed to working with policymakers, regulators and stakeholders across the healthcare system to identify and advance needed changes to the law that will prevent irreparable and lasting damage from this law to the innovation ecosystem. We have a responsibility to our patients, partners and the healthcare system to ensure we adapt to the mandates of the new law in the most effective manner possible while securing access to treatments for patients. We will highlight to regulators, government officials and policymakers the IRA's real impact — intended or otherwise — while there is still time to address these challenges before the law's full implementation.

**As we continue to provide our insights, analysis and positions on these key policy issues, we are guided by our core principles:**

1. Patients should have affordable and timely access to the most appropriate, effective treatment options and sites of care now and in the future.

2. Treatment decisions belong in the hands of patients and their healthcare providers, not commercial payers with no accountability for patient outcomes due to misaligned incentives.

3. Clinically stable patients should not be switched from their treatments for non-medical reasons (unless deemed interchangeable by the FDA).

4. Appropriate clinical rigor and manufacturing quality standards should be applied in all instances to ensure patient safety.

**We believe by keeping these principles at the forefront of policy development, it is possible to create a sustainable healthcare system that:**

1. Maintains a fair and competitive marketplace.

2. Fosters an environment that supports future investment in transformational innovation.

3. Ensures responsible pricing and appropriate transparency system wide.

4. Determines value based on evidence that incorporates the benefits and risks for patients, the healthcare system and society.



Pictured: Neuronal Cells.

JJHCS_00040290

# Notes & Citations

**Notes on This Report.** All information in this report refers to the U.S. operations of the Janssen Pharmaceutical Companies of Johnson & Johnson, unless noted otherwise. Financial and nonfinancial information covers the period between January 4, 2022 and January 3, 2023, except where noted. The methodologies used for analyses in this report may be different from those used by other organizations. This report is not audited and is not intended to address all our required disclosures.

**Additional Resources.** In this report, we refer to locations where you can find more information about specific Janssen U.S. and Johnson & Johnson programs, disclosures, and patient resources. Financial performance information for our parent company and its subsidiaries, as well as its "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors," can be found in Johnson & Johnson Annual Reports at jnj.com/about-jnj/annual-reports. Information on corporate sustainability measures can be found at the Johnson & Johnson Health for Humanity Report at healthforhumanityreport.jnj.com.

1. Figure according to Janssen internal financial accounting.

2. Bureau of Labor Statistics, "Consumer prices up 9.1 percent over the year ended June 2022, largest increase in 40 years." TED: The Economics Daily. July 18, 2022. https://www.bls.gov/opub/ted/2022/consumer-prices-up-9-1-percent-over-the-year-ended-june-2022-largest-increase-in-40-years.htm. Accessed February 2023.

3. Kaiser Family Foundation. "2022 Employer Health Benefits Survey." October 27, 2022. https://www.kff.org/report-section/ehbs-2022-summary-of-findings.

4. Sara R. Collins, Lauren A. Haynes, and Relebohile Masitha, "The State of U.S. Health Insurance in 2022." Commonwealth Fund Biennial Health Insurance Survey, The Commonwealth Fund, https://www.commonwealthfund.org/publications/issue-briefs/2022/sep/state-us-health-insurance-2022-biennial-survey. Accessed February 2022.

5. Data are an approximate number of patients supported by Janssen CarePath, provided by the program administrator.

6. U.S. Food and Drug Administration, "Approved Cellular and Gene Therapy Products." CARVYKTI, https://www.fda.gov/vaccines-blood-biologics/carvykti.

7. IQVIA Institute for Human Data Science, "The Use of Medicines in the U.S. 2022." April 2022. https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/the-use-of-medicines-in-the-us-2022/iqvia-institute-the-use-of-medicines-in-the-us-2022.pdf.

8. Adam Fein, "Warped Incentives Update: The Gross-to-Net Bubble Exceeded $200 Billion in 2021." Drug Channels. March 22, 2022. https://www.drugchannels.net/2022/03/warped-incentives-update-gross-to-net.html. Accessed March 1, 2023.

9. Darius Lakdawalla and Anup Malani, "The insurance value of medical innovation," Journal of Public Economics 145: 94-102. 2017. https://www.sciencedirect.com/science/article/pii/S0047272716301864.

10. West Health – Gallup, "Stress Prominent Among U.S. Adults Struggling to Pay for Care," December 5, 2022." https://news.gallup.com/opinion/gallup/390425/benchmarking-healthcare-affordability-perceived-value.aspx. Accessed February 2023.

11. The Commonwealth Fund Issue Briefs, "U.S. Health Insurance Coverage in 2020: A Looming Crisis in Affordability." August 19, 2020. https://www.commonwealthfund.org/publications/issue-briefs/2020/aug/looming-crisis-health-coverage-2020-biennial. Accessed February 2023.

12. Nicholas C. Fisher, "The 340B Program: A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of Uncertainty." Journal of Health Care Law and Policy 22 no. 1. 2019. https://digitalcommons.law.umaryland.edu/jhclp/vol22/iss1/4.

13. Adam Fein, "EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019." Drug Channels. June 16, 2021. https://www.drugchannels.net/2021/06/exclusive-340b-program-soared-to-38.html. Accessed March 1, 2023.

14. Sayeh Nikpay, Melinda Buntin and Rena Conti, "Relationship Between Initiation of 340B Participation and Hospital Safety-Net Engagement." Health Services Research 55(2): 157–169. April 2020. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7080377.

15. WhiteHouse.gov, "FACT SHEET: The Inflation Reduction Act Supports Workers and Families." The White House Briefing Room, August, 19, 2022. https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/19/fact-sheet-the-inflation-reduction-act-supports-workers-and-families.

16. Juliette Cubanski, Tricia Neumann and Meredith Freed, "Explaining the Prescription Drug Provisions in the Inflation Reduction Act." Kaiser Family Foundation. January 24, 2023. https://www.kff.org/medicare/issue-brief/explaining-the-prescription-drug-provisions-in-the-inflation-reduction-act.

17. Congressional Research Service, "Selected Health Provisions of the Inflation Reduction Act." September 1, 2022. https://crsreports.congress.gov/product/pdf/IF/IF12203. Accessed March 2023.

18. Gary Claxton, Anthony Damico, Emma Wager, Gregory Young and Heidi Whitmore, "Health Benefits In 2022: Premiums Remain Steady, Many Employers Report Limited Provider Networks For Behavioral Health." Health Affairs. October 27, 2022. https://www.healthaffairs.org/stoken/collfree/2022_11_CLAXTON/full.

19. Dr. William Smith, Dr. Robert Popovian and Dr. Wayne Winegarden, "Out-of-Pocket Pirates: Pharmacy Benefit Managers (PBMs) and the Confiscation of Out-of-Pocket Assistance Programs." The Pioneer Institute. April 2023. https://pioneerinstitute.org/wp-content/uploads/PNR-519-Maxminimizers-WP-v01.pdf.

20. Gary Novack, "What Determines How Much Your Patient Pays for Their Medication in the United States?" American Journal of Ophthalmology. 2016,167:48-51. doi:10.1016/j.ajo.2016.04.010. https://pubmed.ncbi.nlm.nih.gov/27131775.

21. Gregory Young, Matthew Rae, Gary Claxton, Emma Wager and Krutika Amin, "How many people have enough money to afford private insurance cost sharing?" Peterson-KFF Health System Tracker. March 10, 2022. https://www.healthsystemtracker.org/brief/many-households-do-not-have-enough-money-to-pay-cost-sharing-in-typical-private-health-plans.

22. PhRMA, "Insurers and Middlemen Force Many of the Sickest Patients to Face High Out-of-Pocket Costs." https://phrma.org/resource-center/Insurance-Coverage/Insurance-Coverage-and-PBMs.

23. Kalorama Information, "Out-of-Pocket Healthcare Expenditures in the United States, 5th Edition." August 2, 2021. https://kaloramainformation.com/blog/u-s-out-of-pocket-healthcare-spending-swells-to-491-billion-up-10. Accessed February 2023.

24. Estimated $800B divided by 167,582M US workers in 2026, from U.S. Bureau of Labor Statistics 2018. https://www.bls.gov/opub/mlr/2017/article/projections-overview-and-highlights-2016-26.htm#:~:text=BLS%20projects%20that%20total%20employment,experienced%20from%202006%20to%202016. Accessed February 2023.

25. Scott Howell, Perry T. Yin and James C. Robinson, "Quantifying The Economic Burden Of Drug Utilization Management On Payers, Manufacturers, Physicians, And Patients." Health Affairs. August 2021. https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2021.00036.

26. Xcenda, "Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access." May 2022. https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_may_2022.pdf. Accessed February 2023.

27. Thomas J. Philipson and Troy Durie, "The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket Costs." University of Chicago, December 2021. https://cpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2021/12/2021_12_15-Copay-Assistance-Final-Draft-Clean.pdf. Accessed February 2023.

JJHCS_00040291

28. Adam Fein, "Copay Accumulator and Maximizer Update: Adoption Plateaus as Insurers Battle Patients Over Copay Support." Drug Channels. February 22, 2023. https://www.drugchannels.net/2023/02/copay-accumulator-and-maximizer-update.html.

29. Celine Castronuovo, "Patients Caught in Drug Industry, PBM Battle on Copay Assistance." Bloomberg Law. March 6, 2023. https://news.bloomberglaw.com/health-law-and-business/patients-caught-in-drug-industry-pbm-battle-on-copay-assistance.

30. Janssen Health Equity Brief, "How Insurers Divert Co-Pay Support Meant for Patients." https://transparencyreport.janssen.com/_document/janssen-caps-infographic?id=00000184-cc93-d0e5-a59c-efd3c3980000.

31. American Society of Clinical Oncology, "Copay Accumulators and Copay Maximizers," Policy Brief. https://old-prod.asco.org/sites/new-www.asco.org/files/content-files/advocacy-and-policy/documents/2021-AccumulatorsPolicyBrief.pdf. Accessed March 2023.

32. Aimed Alliance, "Non-essential Health Benefits and Copay Maximizers," May 19, 2022. https://aimedalliance.org/non-essential-health-benefits-and-copay-maximizers.

33. Optum.com, "Alternative funding: Real savings or problems?" https://www.optum.com/business/insights/pharmacy-care-services/page.hub.alternative-funding-savings-problems.html. Accessed March 2023.

34. ResearchAmerica, "U.S. Investments in Medical and Health Research and Development 2016-2020." January 2022. https://www.researchamerica.org/wp-content/uploads/2022/09/ResearchAmerica-Investment-Report.Final_.January-2022-1.pdf. Accessed December 6, 2022.

35. Stephen Ezell and Kelli Zhao, "The Economics of Biopharmaceutical Innovation: Symposium Report." Information Technology & Innovation Foundation. March 20, 2023. https://itif.org/publications/2023/03/20/economics-of-biopharmaceutical-innovation-symposium-report.

36. NORD, "ORPHAN DRUGS IN THE UNITED STATES: An Examination of Patents and Orphan Drug Exclusivity," March 25, 2021. https://rarediseases.org/wp-content/uploads/2022/10/NORD-Avalere-Report-2021_FNL-1.pdf.

37. PhRMA, "More Than 800 Medicines in Development for Diseases That Disproportionately Affect Racial and Ethnic Communities." Medicines in Development 2021 Report. https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/MID-Reports/MID-Health-Equity-2021-Report.pdf.

38. U.S. Food and Drug Administration, "New Drugs at FDA: CDER's New Molecular Entities and New Therapeutic Biological Products." https://www.fda.gov/drugs/development-approval-process-drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products.

39. U.S. Food and Drug Administration, "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf.

40. American Cancer Society. "What Is Multiple Myeloma?" http://www.cancer.org/cancer/multiplemyeloma/detailedguide/multiple-myeloma-what-is-multiple-myeloma. Accessed February 2022.

41. Jjawal H Gandhi, Robert F. Cornell, Arjun Lakshman., et al. "Outcomes of patients with multiple myeloma refractory to CD38-targeted monoclonal antibody therapy." Leukemia 33(9). http://www.ncbi.nlm.nih.gov/pubmed/30858549.

42. JNJ.com, "Our Race to Health Equity." https://www.jnj.com/our-race-to-health-equity.

43. JNJ.com, "Screening Event Targets Hidden Threat of Amputation Related to Peripheral Artery Disease (PAD)." https://www.jnj.com/our-race-to-health-equity/screening-event-targets-hidden-threat-of-amputation-related-to-peripheral-artery-disease-pad.

44. JNJ.com, "Tackling Health Disparities Through Empowerment, Partnership and Scholarship." https://www.jnj.com/our-race-to-health-equity/tackling-health-disparities-through-empowerment-partnership-scholarship.

45. JNJ.com, "What it Takes to Truly Diversify Clinical Trials." https://www.jnj.com/innovation/inside-johnson-and-johnsons-mission-to-improve-clinical-trial-diversity.

46. Adam Fein, "The Shady Business of Specialty Carve-Outs, a.k.a., Alternative Funding Programs." Drug Channels. August 2, 2022. https://www.drugchannels.net/2022/08/the-shady-business-of-specialty-carve.html.

47. Dawn Holcombe, "Patients in Financial Tug of War Under PBM Alternate Funding Programs." Oncology Practice Management. December 2021. https://oncpracticemanagement.com/issues/2021/december-2021-vol-11-no-12/2497-patients-in-financial-tug-of-war-under-pbm-alternate-funding-programs.

48. Paul Ginsburg and Steven Lieberman, "Government regulated or negotiated drug prices: Key design considerations." Brookings. August 30, 2021. https://www.brookings.edu/essay/government-regulated-or-negotiated-drug-prices-key-design-considerations.

49. Jamie Smyth, Financial Times, "Bristol Myers Squibb warns US price reforms will dent drug development." November 20, 2022. https://www.ft.com/content/a763ba0d-e48e-47e4-aba0-a7lee7e18d1f. Accessed December 9, 2022.

50. Tomas Philipson, Yier Ling and Ruiquan Chang, "Policy Brief: The Impact of Recent White House Proposals on Cancer Research." University of Chicago. June 2022. https://bpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2022/06/Cancer-Policy-Brief-June-27-no-tracking.pdf.

51. Daniel Gassull, Harry Bowen and Duane Schulthess, "Build Back Better: Total market impact of price controls in Medicare parts D and B." Vital Transformation. July 28, 2022. https://vitaltransformation.com/wp-content/uploads/2022/07/BBBA_VT_FINAL-28JULY.pdf.

# JJHCS Ex. 8



July 24, 2023

Harry Sandick
(212) 336-2723

Andrew Dunlap, Esq.
Selendy Gay Elsberg, PLLC
1290 Avenue of the Americas
New York, NY 10104

> **Re:**   ***Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC***
> **No. 2:22-cv-02632 (ES) (CLW)**

Dear Andrew:

We write in response to your July 12, 2023 letter regarding SaveOnSP's renewed requests for documents related to CarePath budgeting and financial information.

## I.    Harm Caused To JJHCS

In the July 12 letter, SaveOnSP asks whether JJHCS believes its harm is "limited to additional CarePath funds that JJHCS believes it has expended because of SaveOnSP." July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 3. Consistent with the allegations in the Complaint, JJHCS confirms that SaveOnSP's tortious conduct "has caused JJHCS to pay at least $100 million more in copay assistance than it otherwise would have." *See* Compl. ¶¶ 5, 89-105. JJHCS reserves the right to pursue relief relating to any harm caused by SaveOnSP encompassed by its pleading.

We also note that SaveOnSP has engaged in acts of concealment in order to prevent JJHCS and other market participants from learning about the true nature and extent of SaveOnSP's wrongdoing. Accordingly, JJHCS reserves all rights to assert additional types or amounts of damages based on evidence learned in discovery or through ongoing fact investigation into SaveOnSP's ongoing tortious conduct.

## II.    JJHCS's Production of Financial Information

In the July 12 letter, SaveOnSP requests that JJHCS "refresh" its production of documents related to the extent of harm caused by SaveOnSP, as well as data responsive to SaveOnSP's RFP No. 28(i)-(m) through the present. *See* July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 3-4. As to an update of data, we agree this should occur but on a reciprocal basis, including data produced in response to JJHCS's RFP Nos. 41, 42, and 56. For the avoidance of doubt, JJHCS will "refresh" its production of (i) patients enrolled in CarePath; (j) the dates on which each patient was enrolled; (k) the amount(s) of copay assistance funds that JJHCS offered to each patient; (l) the Janssen drug which each patient received; and (m) all copay assistance

Andrew Dunlap, Esq.
July 24, 2023
Page 2

payments that JJHCS made to or on behalf of each patient enrolled in CarePath. *See* SaveOnSP's RFP No. 28(i)-(m). We propose that the parties confer on dates for two updates of their respective data productions. We suggest that there be one update through to the present to occur at the close of substantial completion of production, and another to occur two months before trial with an understanding that expert using the data for damages calculations will be permitted to update their calculations only within one month thereafter. We are willing to confer as to any appropriate reciprocal update as to documents relating to harm caused by SaveOnSP beyond these data updates.

SaveOnSP's July 12 letter (at pages 4-5) also renews a series of requests for production:

- **RFP No. 29(a)**: From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to Patients enrolled in CarePath. *See* RFP No. 29(a).

- **RFP No. 29(b)**: From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's budget for CarePath. *See* RFP No. 29(b).

- **RFP No. 29(i)**: From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's or Janssen's actual and projected return on investment for CarePath. *See* RFP No. 29(i).

With respect to RFP No. 29(a), JJHCS agrees to produce documents sufficient to show how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath from April 1, 2016 through the present, subject to SaveOnSP's agreement to make a reciprocal production of documents sufficient to show how determines the copayments for Janssen drugs subject to the SaveOnSP program through to the present.

With respect to RFP No. 29(b), JJHCS agrees to produce documents sufficient to show JJHCS's budget for copay assistance through CarePath and JJHCS's actual and projected annual costs for CarePath. JJHCS represents that, as part of its next production, JJHCS will produce additional budget data, including all available forecasted and actual spend, related to the CarePath co-pay assistance program from January 1, 2017 to July 1, 2022. Based on a reasonable investigation, we understand that this budget data is not available prior to January 1, 2017. JJHCS agrees to produce additional data to update this production through the present.

With respect to RFP No. 29(i), JJHCS does not agree to produce documents "regarding JJHCS's or Janssen's actual and projected return on investment for CarePath." The documents JJHCS has agreed to produce, including the CarePath budget and actual costs, are sufficient to show the harm caused by SaveOnSP to CarePath. As explained more fully in Section III, *supra*, SaveOnSP continues to seek information that is irrelevant to the claims and defenses in this case.

Andrew Dunlap, Esq.
July 24, 2023
Page 3


**III.    Further Discovery of Janssen, JJHCS, and CarePath Budget and Financial
Information Is Not Warranted**

At the March 17, 2023 Status Conference, Judge Waldor expressed skepticism
regarding the breadth of SaveOnSP's requests for financial, budget, and other similar information.
Judge Waldor cautioned SaveOnSP multiple times to limit the scope of its requests on these issues.

For example, Judge Waldor told the defense that "I think it's an awfully broad and
not just temporally but otherwise broad request.  I understand the background and the basis for the
request, but as I said, not – it's premature.  Let's see what [JJHCS] produces.  And let's see if you
can modify and streamline your arguments to me and your requests after that." Dkt. No 89 at 34:5-
10.  Later, Judge Waldor stated again that the requests were "temporally [] way out of line" and
she expressed her "hop[e]" that the defense could make "a more targeted request." *Id.* at 35:15-
21

Despite Judge Waldor's comments, SaveOnSP has presented renewed requests in
Sections III.B and III.C of the July 12 letter that are nearly identical to those that the Court denied
at the March 17 conference.  Rather than make "a more targeted request," SaveOnSP is pressing
the same requests that the Court rejected as overbroad four months ago.  Given that SaveOnSP has
not changed its position, JJHCS's position likewise remains the same:  SaveOnSP's demands are
overly broad, irrelevant, and unnecessary for preparation of its defense.

In SaveOnSP's renewed requests for documents responsive to RFP Nos. 28(a)-(h)
and RFP 29(j), as identified in Section III.B of your July 12 letter, SaveOnSP has made no
substantive changes to the requests themselves, even though Judge Waldor explicitly stated her
concerns involved the temporal *and* substantive scope of the requests.  *See* Mar. 17 Tr. at 34:5-6
("I will tell you that I think it's an awfully broad and not just temporally but otherwise broad
request.").  Limiting the timeframe within which you seek documents is insufficient to address
Judge Waldor's substantive concerns.  In addition, SaveOnSP has failed to narrow either the
temporal or the substantive scope of its renewed request for RFP No. 30, which seeks extensive
pricing information for every Janssen Drug from 2009 through the present—a request that is both
wildly overbroad and lacking in relevance to the claims and defenses in this case.

In addition to Judge Waldor's skepticism about the breadth of the requests, which
seek, among other things, prescription-level data for all CarePath patients, all documents and
communications regarding adherence rate analysis for CarePath patients, and internal data and
pricing information related to the net price of each Janssen Drug, Judge Waldor explained that any
renewed requests should be targeted to address any perceived deficiencies in JJHCS's priority
production of documents.  Mar. 17, 2023 Tr. at 34:2-10 ("I'll hear further argument once [JJHCS]
produces what [counsel] said he's going to produce and we can get a little more specific … Let's
see what [JJHCS] produces.  And let's see if you can modify and streamline your arguments to me
and your requests after that."); *id.* at 35:17-21 ("I will allow you to renew that request after [JJHCS
counsel] produces everything he says he's going to produce.  And I'm just hoping . . . that maybe
it can be a more targeted request.").

Andrew Dunlap, Esq.
July 24, 2023
Page 4

       Despite this, SaveOnSP's July 12 letter never describes why the productions made by JJHCS are insufficient for analyzing the sale of Janssen Drugs or the adherence rates of patients in the SaveOnSP program compared to that of patients that are not. Instead, the renewed requests amount to nothing more than a reiteration of the same points, without the additional justification contemplated by Judge Waldor as to why SaveOnSP needs more than the financial and patient-level data JJHCS has already produced.

### A.    SaveOnSP Is Not Entitled to Information Sought by Section III.B

       SaveOnSP claims that its program increases both the sales of Janssen Drugs and patient adherence rates. Even if this dubious proposition were true and somehow relevant to the claims and defenses—and it is neither—JJHCS's document productions are sufficient for SaveOnSP to prepare a defense. JJHCS has produced a wealth of non-privileged documents and communications in its possession relating to the following:

- The extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period.

- The data that formed the basis for the allegations in the Complaint ¶¶ 92-100.

- JJHCS's budget for copay assistance through CarePath; JJHCS's actual and projected annual costs for CarePath.

- Patient-level data from the time period January 1, 2016 to July 1, 2022, including documents sufficient to show:

    (1) all patients enrolled in CarePath for each Janssen Drug;

    (2) the dates on which each patient was enrolled in CarePath;

    (3) the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath;

    (4) the Janssen Drug for which each patient enrolled in CarePath received copay assistance; and

    (5) all CarePath copay assistance payments made to each payment. This data is more than sufficient for you to test the injury and damages alleged by JJHCS.

       This document production—which includes documents from before and after SaveOnSP began operations in earnest—is sufficient for SaveOnSP to answers the questions that it poses. Are patients on the SaveOnSP program more likely to continue to take Janssen medications than patients who are not on SaveOnSP? Does JJHCS provide more or less co-pay support to patients after the patients register for SaveOn? How if at all have CarePath's budgets

Andrew Dunlap, Esq.
July 24, 2023
Page 5

changed as SaveOnSP has grown?  These questions and much more can be answered by making reference to the documents produced by JJHCS and the documents in SaveOnSP's own files.[1]

        At any rate, SaveOnSP's claim that its program somehow "benefits" JJJHCS through increased sales and patient adherence is illogical.  The argument is apparently premised on the idea that if Janssen pharmaceuticals have been profitable in recent years, then it must be that the SaveOnSP program somehow led to increased sales and patient adherence, leaving JJHCS unharmed by SaveOnSP's conduct.  But the profitability of Janssen therapies is not a justification for SaveOnSP's tortious conduct.  Whether or not Janssen therapies are profitable is irrelevant to SaveOnSP's interference with CarePath's terms and conditions and its deception of CarePath patients.  SaveOnSP is not entitled to the additional discovery it seeks (let alone for a time period that predates SaveOnSP's existence by almost a decade) given that JJHCS already has produced documents sufficient for SaveOnSP to test its own unlikely theories.

        Accordingly, JJHCS declines to produce all documents responsive to SaveOnSP's RFP Nos. 29(a)-(h), (j) and 29.  If SaveOnSP were inclined to follow Judge Waldor's admonition and narrow the scope of the documents it seeks produced to only those that are relevant to the case, JJHCS remains open to further meet and confer discussions.

### B.    SaveOnSP Is Not Entitled to the Information Sought by Section III.C

        SaveOnSP also now renews its vastly overbroad, irrelevant request for "[d]ocuments sufficient to show the basis for Janssen's decision to raise or lower the price of the Janssen Drug" for every Janssen Drug, and seeks these documents from January 1, 2009 to the present.  The temporal and substantive breadth of this request is extraordinary, and there it seeks documents with no connection to the Complaint whatsoever.

        This is not a case about Janssen therapies and how they are priced or marketed. This case is about SaveOnSP's conduct in relation to CarePath.  Nowhere in the Complaint does JJHCS allege that the price of Janssen therapies has changed in response to an increased utilization of CarePath funds or, more specifically, due to SaveOnSP's conduct.  Only the conduct of SaveOnSP and the impact that SaveOnSP has on CarePath's co-pay support program are at issue. SaveOnSP continues its attempt to turn the case into a referendum on the expensive nature of pharmaceuticals and the fairness of drug prices—issues that are wholly irrelevant to the case and meant to be a distraction from SaveOnSP's tortious conduct.  The price of a Janssen Drug— whatever that price may be—does not give SaveOnSP the right to interfere with CarePath's terms

---

[1] In addition, it is possible that answers to some of these questions may also be found in the files of SaveOnSP's business partners, Express Scripts, Inc. ("ESI"), and Accredo, Inc.  Despite the obvious relevance of ESI and Accredo's documents, SaveOnSP has inexplicably filed papers in support of ESI and Accredo's motions to quash JJHCS's third-party subpoenas, leaving SaveOnSP in the unusual position of opposing the production of relevant documents and seeking the production of irrelevant documents.

Andrew Dunlap, Esq.
July 24, 2023
Page 6

and conditions or mislead consumers. Focusing on how Janssen prices its pharmaceuticals is an improper attempt to lay blame on JJHCS and to impose unwarranted burden on JJHCS in retaliation for the filing of this lawsuit. JJHCS's conduct is not at issue, and this attempt to shift the focus away from SaveOnSP is inappropriate.

SaveOnSP's letter claims that documents regarding the pricing decisions of Janssen Drugs are "relevant to JJHCS's allegations that SaveOnSP makes CarePath 'prohibitively expensive,'" but provides nothing more than this conclusory statement in support of this claim. As we have previously stated, "as a matter of business judgment, [JJHCS] cannot justify the skyrocketing costs of its copay assistance program if those added costs are incurred not for the benefit of patients but rather for SaveOnSP and its partners." Dkt. No. 79 at 17. CarePath does not exist to subsidize SaveOnSP's business; it exists to provide patients with access to medications that they otherwise might not be able to afford. SaveOnSP's opinion about to the business decisions of JJHCS and the considerations involved in running the CarePath program are irrelevant. Nevertheless, JJHCS has already produced budget and financial data that is relevant to our allegation that the SaveOnSP program makes CarePath prohibitively expensive. Additional data regarding the pricing of Janssen drugs over a fifteen-year period is irrelevant to this determination and simply unnecessary.

Furthermore, you again omit JJHCS's rationale behind its allegation that SaveOnSP makes healthcare more expensive for patients, as you did in your motion to compel regarding the same request at issue here. *See* Dkt. No. 79 at 14 ("JJHCS has accused SaveOnSP of violating GBL § 349 by making health care more expensive for patients."); July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 6 ("Documents regarding Johnson & Johnson's pricing decisions for the Janssen Drugs at issue in this case are relevant to JJHCS's allegations … that SaveOnSP makes health care more expensive for patients[.]"). In response, we again highlight the fact that JJHCS has been clear that the SaveOnSP program "mak[es] patient healthcare needs more expensive" not in the abstract but specifically "***by not counting any of the funds spent of patients' medication toward their ACA maximum or deductible***." Compl. ¶ 114 (emphasis added); *see also* Dkt. No. 79 at 17. The pricing of Janssen drugs has nothing to do with the design of the SaveOnSP program and its manipulation of essential versus non-essential health benefits, which causes patients' healthcare needs to be more expensive. CarePath already makes participating Janssen pharmaceuticals affordable by reducing patient expenses to $5 or $10 per prescription fill, thus annual price fluctuations have no impact on patients enrolled in CarePath and is irrelevant to CarePath patients' copay responsibility.

In addition to the clear irrelevance of this data, the breadth of this request is immense. As discussed at the March 17 conference, Johnson & Johnson has over 140,000 employees and 200 affiliates around the world, many of which are involved in the manufacture, creation, and pricing decisions of Janssen pharmaceuticals. *See* Mar. 17, 2023 Tr. at 33:3-8. Pricing decisions are made based on a wide array of factors that have nothing to do with CarePath or JJHCS—let alone SaveOnSP—such as manufacturing costs, inflation, and competition in the specialty drug marketplace.

Andrew Dunlap, Esq.
July 24, 2023
Page 7


       Finally, SaveOnSP's renewed request seeks documents sufficient to show pricing decisions of Janssen Drugs going all the way back to 2009, seven years before both CarePath began in its current form and SaveOnSP began operations in 2016. The allegations in the Complaint all concern events that took place in or after 2017. There is no legitimate purpose to seek the pricing of Janssen Drugs from eight years before SaveOnSP existed. Indeed, SaveOnSP does not even provide a rationale for why it is entitled to this information going back to 2009, offering only conclusory assertions. *See* July 12, 2023 Ltr. from A. Dunlap to H. Sandick at 6. SaveOnSP's request for documents sufficient to show pricing decisions for every Janssen Drug during a nearly fifteen-year period would require JJHCS to search through the entire network of Johnson & Johnson entities, creating a burden that is undue and disproportionate to the needs of the case and irrelevant to the claims at issue.

       In addition, as stated in our July 17, 2023 letter, based on our reasonable investigation, we understand that, due to applicable preservation and/or retention capabilities, we are not in a position to produce documents or communications created before 2013.

       Accordingly, JJHCS refuses to produce all documents responsive to SaveOnSP's RFP No. 30. As with the other requests discussed above, JJHCS remains open to considering narrowed requested as suggested by Judge Waldor.

                       Very truly yours,


                       */s/ Harry Sandick*
                       Harry Sandick

# JJHCS Ex. 9

JJHCS_00000195



PHARMACEUTICAL COMPANIES OF
Johnson & Johnson

Janssen

BUILDING A HEALTHIER
FUTURE FOR ALL:

THE 2020 JANSSEN
U.S. TRANSPARENCY
REPORT

JJHCS_00000196

**LETTER FROM OUR LEADERS**

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

# LETTER FROM OUR LEADERS

We launched our first annual Janssen U.S. Transparency Report four years ago because we wanted to provide policymakers and patients with useful information about what drives the cost of healthcare, including the cost of prescription medicines. We wanted to shed light on the aspects of our health system that stood in the way of patients getting needed care and ultimately, advance the dialogue about how to deliver greater access to medicines at a more manageable cost.

We currently face many challenges in our health system. Long-standing affordability challenges have only been exacerbated by the economic fallout of COVID-19, while the pandemic revealed that susceptibility to illness is unevenly distributed, with communities of color especially vulnerable. But we also have significant opportunities. The speed with which scientists developed COVID-19 vaccines reflects the vigor of our country's R&D ecosystem. In January 2020, Janssen scientists immediately mobilized to begin researching and developing a COVID-19 vaccine for use globally that earned Emergency Use Authorization from the U.S. Food and Drug Administration (FDA) and several other health authorities in the early spring of 2021. Today, millions of doses have been administered and we are on track to deliver one billion doses in 2021 at a not-for-profit price for emergency pandemic use as an example of our commitment to help bring this pandemic to an end.

That's why with our 2020 Janssen U.S. Transparency Report, we outline our vision of better health for all and continue the journey we began with the first report:

- Since the beginning of 2016 (the first year covered by a Janssen U.S. Transparency Report), the **compound net price decline of Janssen medicines was -14.4%**.[1]

- For 2020, the **average net price decline** of our medicines was -5.7%.[2]

- In 2020, we provided **$29.4 billion in rebates, discounts and fees** to government and private payers,[3] as well as hospitals and others in the supply chain— more than half the list price (53%) of our medicines.[4]

- Globally, we **invested $9.6 billion** in 2020 in discovering and developing new medicines and vaccines[5]—106% more than we spent on marketing and sales.[6]

- Since 2016, we've spent **$42.2 billion on R&D**[7]—resulting in a total of four new medicines approved by the FDA[8] and an additional 42 approvals for expanded indications or new product formulations over the same five-year period.[9]

- We provide specific actions we are taking to **address systemic racism and create a more equitable healthcare system.**

- We offer policy solutions to help make healthcare **more accessible and affordable** for patients.

This year, we offer a more detailed look at the price reductions we offer payers and others in the healthcare system to support access to our medicines. We want disclosures like these to shape the conversation about how to sustain the innovation that's the hallmark of the U.S. health system. That's the legacy we've established with the Janssen U.S. Transparency Report and the legacy we are humbled to carry forward.



**SCOTT WHITE**
Company Group Chairman
North America Pharmaceuticals
Johnson & Johnson





**ANASTASIA G. DAIFOTIS, M.D.**
Chief Scientific Officer
Janssen North America
Pharmaceuticals



2

# $29.4 BILLION: BREAKING IT DOWN[10]

In 2020, **we provided $29.4 billion in rebates, discounts and fees**[11] to private payers and government programs as well as providers, distributors and others. Here is the breakdown[1]:



COMMERCIAL PAYERS & PHARMACY BENEFIT MANAGERS (PBMs) **24%**

340B PROGRAM **18%**

MEDICARE **15%**

COMMUNITY CLINICS **12%**

DISTRIBUTORS **5%**

MEDICAID **11%**

VA/DoD **4%**

OTHER** **9%**

NON-340B HOSPITALS **3%**

Government programs benefit from vigorous commercial competition as well as legally required price concessions. Medicaid discounts also reflect the extra, "supplemental," rebates states negotiate with manufacturers.

*Note: Due to rounding numbers add up to over 100.
**Other: Programs such as long-term care, ADAP (a program specific to HIV and AIDS) and other disease-specific sites of care/insurers.

LETTER FROM OUR LEADERS

**$29.4 BILLION: BREAKING IT DOWN**

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT

JJHCS_00000197

JHCS_00000198

# 2020 AT A GLANCE

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

**2020 AT A GLANCE**

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

## NET PRICES FOR OUR MEDICINES HAVE DECLINED…

 **-5.7%**
Average net price decline of Janssen
medicines in 2020[12]

**$29.4B**
Total amount Janssen paid in **rebates, discounts
and fees** to payers and others in the health system
in 2020[13]

**-14.4%**
**Compound net price decline** of Janssen medicines
since the beginning of 2016[14]

## BECAUSE OUR DISCOUNTS HAVE GROWN FROM 2016-2020*

 **3.3X**
Medicare[15]

**4.2X**
Commercial health
plans and PBMs[16]

 **53%**

**2.2X**
Medicaid[17]

**2.6X**
340B providers[18]

More than half the list price of our
medicines went to **payers and
others in the health system**[19]

## DESPITE PRICE REDUCTIONS, BENEFIT DESIGNS PUT MORE FINANCIAL BURDEN ON PATIENTS

 **-5.7%**
**Average net price
decline** of Janssen
medicines in 2020[20]

**111%**
**Average deductible amount
increase** for employer-sponsored
insurance from 2010 ($646) to
2020 ($1,364)[21]

**17%**
According to a study, **increase in
annual ER visits** when co-pays
are doubled for patients taking
certain medications[22]

## WE'RE SUPPORTING PATIENTS TODAY AND TOMORROW

 Nearly **1.2 million** patients helped with **access, affordability
and treatment support** through the Janssen CarePath Savings Program[23]

**646,000** commercially insured patients reduced their
out-of-pocket costs through the Janssen CarePath Savings Program[24]

 **8.1%** increase in average **R&D investment**
from 2016–2020[25]

**$9.6B** dedicated in 2020 to the discovery and
development of new medicines and vaccines[26]



\*By channel, growth rate in dollars of discounts provided, 2016-2020. For more detail, including discount rates, see pages 7-8.

4

JJHCS_00000199

# OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

People should have affordable access to the medicines they need, yet many in the U.S. do not.

Well before the COVID-19 pandemic, one in four adults in the U.S. reported difficulty affording their medication.[27] Even for families with insurance, many could not afford needed medical care or medicines.[28] This is happening despite declining net prices to payers, pharmacy benefit managers (PBMs) and government programs.



## SECTION HIGHLIGHTS:

 Our **net prices decreased for the fourth year in a row** because of the significant rebates and discounts we provide.[29]

**Payers typically do not share rebates and discounts directly with patients** and are shifting more costs to them.

Janssen CarePath provided access and affordability **support to nearly 1.2 million people,**[30] including **financial assistance to help 646,000 patients** access their Janssen medications.[28]

## OUR RESPONSIBLE APPROACH TO PRICING

We recognize our responsibility to patients today and to patients tomorrow. Today's patients need affordable access to medicines. Tomorrow's patients count on us to deliver preventions, treatments, and cures for challenging illnesses and emerging diseases, like COVID-19.

In setting a list price for a medicine, we balance:

 **Its value to patients, the healthcare system and society.** We assess how our medicines and vaccines improve individual health and allow a person to live their life to the fullest as well as the potential to lower healthcare costs and advance existing standards of care.

 **The importance of supporting affordable access to our medicines and vaccines.** We negotiate with insurers, PBMs and governments, as well as hospitals, physicians, and other providers of care, so patients who are prescribed our medicines or need our vaccines can get access to them.

 **The importance of preserving our ability to develop future groundbreaking vaccines, treatments and cures.** Sales from our existing innovations provide us the necessary resources to meet the growing costs of R&D to address unmet medical needs, better help underserved populations and remain prepared for emerging health threats.



LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

## HOW A LIST PRICE BECOMES A NET PRICE

In 2020, we provided $29.4 billion in rebates, discounts and fees to payers and others in the health system[32]—more than half the list price of our medicines (53%).[33]

**We provide rebates and discounts\* in exchange for payer coverage of our medicines.**

The **list price** of a medicine is a starting point that is ultimately reduced to a **"net price,"** the amount a manufacturer receives after providing rebates, discounts and/or fees to different parts of the healthcare system. These include private insurance companies, PBMs and/or employers, as well as government programs (e.g., Medicare, Medicaid, the Department of Veterans Affairs, etc.), the 340B Drug Discount Program, and entities where patients receive care (e.g., hospitals, clinics and private physician practices).

Some price reductions are the result of commercial negotiations with private payers. Other reductions are required by law. The U.S. government requires that pharmaceutical companies provide discounts to ensure that seniors, as well as the nation's most vulnerable populations and low-income individuals and families, can access medicines at a very low cost. As we explain in more detail below, government programs receive prices reduced by both private negotiations and statutory discounts.

### JANSSEN U.S. PRICING OVERVIEW[34]

| YEAR | LIST PRICE CHANGE | NET PRICE CHANGE |
|------|-------------------|------------------|
| 2020 | 3.8% | -5.7% |
| 2019 | 5.1% | -1.2% |
| 2018 | 6.3% | -6.8% |
| 2017 | 8.1% | -4.6% |
| 2016 | 8.5% | 3.5% |

### A PRIMER ON PAYERS:

**Commercial Payers:** Private health insurers, self-insured employers and the PBMs who manage pharmacy benefits on their behalf.

**Government:** Federal and state governments provide different insurance coverage for seniors, veterans and vulnerable populations through Medicare, Medicaid, the Department of Veterans Affairs, Department of Defense and Indian Health Service, among others.

\*Note: Throughout the report, we use rebates and discounts interchangeably.

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

6

JHCS_00000201

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS**

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

## A CLOSER LOOK: ACCESS AND AFFORDABILITY

### How Payers Determine What Patients Will Pay

Each year, health insurers create tiered lists of covered medicines called formularies. These tiers reflect how much a patient is expected to pay out-of-pocket for a medicine he or she is prescribed. Pharmaceutical manufacturers offer payers discounts and rebates to have their medicines placed on "preferred" formulary tiers with lower patient out-of-pocket costs and fewer access hurdles. Access hurdles often include "utilization management" tools including:

- Requiring a patient to fail treatment on the payer's preferred medicine before trying another; also known as "step therapy;"
- Limiting access for some medicines to patients whose diseases have progressed to a certain stage;
- Imposing administrative requirements such as a healthcare professional needing to submit documentation before a prescribed medicine can be covered; and
- Changing the medicines covered on a formulary in the middle of a plan year, forcing patients to switch medicines for economic rather than medical reasons, also known as "non-medical switching."

Since 2016, the first year covered by a Janssen U.S. Transparency Report, the rebates and discounts we provide have nearly tripled, reflecting payers' growing negotiating power. Three PBMs currently cover 256 million Americans—more than 2/3 of the U.S. population—and handle 74% of all prescriptions processed in the U.S.[35] Further, the number of unique medicines not covered (that is, placed on "exclusion lists") nearly quadrupled, growing from 209 in 2016 to 846 in 2020.[36]

## POLICIES SHOULD ENSURE REBATE SAVINGS ARE SHARED DIRECTLY WITH PATIENTS[37]



Commercial Payers

**2016**
$ Total rebates, discounts and fees
$1.7B
Average of 20% off list price

**2020**
$ Total rebates, discounts and fees
$6.9B
Average of 35% off list price

↑ 4.2X increase

## A LOOK AT INVOKANA® FROM 2016–2020

**Payers are paying less as net prices decrease[38]**



| List Price | Discount to Payers | Payers' Net Price |
|---|---|---|
| $519 | $313 | $206 |

137%   32%   -21%

Payers often base patients' cost-sharing on list price. Therefore, when net prices decline patients may not directly share in the savings that payers receive.

## WHAT PATIENTS MAY PAY FOR INVOKANA DEPENDS ON TYPE AND PHASE OF BENEFIT DESIGN

### Hypothetical Example:



| Patient with HDHP still in 100% deductible phase | Patient with Co-insurance of 25% | Patient with a flat copay amount |
|---|---|---|
| $519 | $129.75 | $40 |

Higher out-of-pocket costs result in abandonment[39] and could potentially lead to worse outcomes.

7

JHHCS_00000202

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

We provide U.S. government programs
with substantial discounts. Growth in these
discounts reflects vigorous commercial
competition as well as increases in the
amounts of legally required, or statutory,
price concessions. For an explanation of
why this is, see Our Promise. At the state
level, discounts to Medicaid reflect not only
competition and statutory discounts, but
also the extra, "supplemental," discounts
we and other manufacturers negotiate with
individual states. Because of these factors,
price concessions to government programs
have grown substantially in recent years.

Notably, between 2015–2019, patients'
exposure to costs continued to rise, largely
due to insurer practices, such as:[40]



**Not passing rebates** directly to patients.



**Basing cost-sharing on list prices,**
not net prices.

In the third chapter, Our Promise, we share
our ideas for policies that put patients first
and create a more accessible and affordable
healthcare system.

**Read more about our policy issues ›**

## OUR GROWING DISCOUNTS TO GOVERNMENT PROGRAMS"



**2016**
$ Total rebates,
discounts
and fees

**2020**
$ Total rebates,
discounts
and fees

Medicare
$1.3B → $4.3B    ↑ **3.3**X increase
Average of 30% off list price → Average of 49% off list price



Medicaid
$1.4B → $3.2B    ↑ **2.2**X increase
Average of 55% off list price → Average of 58% off list price



Veterans Affairs
& Department
of Defense
$.7B → $1.3B    ↑ **1.8**X increase
Average of 51% off list price → Average of 56% off list price



340B
$2.0B → $5.2B    ↑ **2.6**X increase
Average of 59% off list price → Average of 66% off list price



8

JHHCS_00000203

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

## INCREASES IN OUT-OF-POCKET COSTS CAN HARM PATIENT CARE

The amount insured patients pay out-of-pocket for their medicines is determined by how their health insurance is set up—the co-pays, deductibles, co-insurance amounts and out-of-pocket maximums for which a patient is responsible.

**Patients' share of total spending:**

**15%** of total outpatient prescription drug spending ($53.7 billion)[42]

**3%** of total hospital care spending ($35.9 billion)[43]

Patients are increasingly vulnerable to high out-of-pocket costs for medicines.

- In 2020, the share of U.S. workers' health plans with deductibles between $2,349 (single) and $4,601 (family)—known as high-deductible health plans (HDHPs)—**increased to 31%, up from 4% in 2006.**[44]

- For all people with employer-provided insurance, **the average deductible in 2020 was $1,364,** which was 27% higher than 2015 ($1,077) and 111% higher than 2010 ($646).[45]

- Deductibles and co-insurance, which are based on a percentage of a drug's list price rather than a pre-set dollar amount, **have risen faster than wages and inflation** at the same time.[46]

- The doubling of co-pays has been found to **reduce patients' adherence to prescribed medicines by 25%–45%.**[47]

## 2008–2018: CUMULATIVE GROWTH IN PREMIUMS AND OUT-OF-POCKET (OOP) SPENDING FOR FAMILIES WITH LARGE EMPLOYER COVERAGE[48]



Worker share (OOP and premium)

Employer share (premium)

Workers' wages

*Note: OOP costs are inflated from 2017 to 2018 because data are not yet available. Large employers are those with one thousand or more employees.*

Kaiser Family Foundation Brief

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT



**PRESCRIPTION ABANDONMENT RATES
FOR NEW PATIENTS [11]**

When cost-sharing increases,
patients are less likely to fill
a prescription (abandonment)

8%
when the
cost is under $10

52%
cost is between
$125 - $250

69%
when cost
exceeds $250

## Fast Facts: Cost-Sharing Increases Affect Adherence

Doubling co-pays has been found to **reduce patients'
adherence to prescribed medicines by 25%-45%.**[10]

## ACCESS HURDLES CAN LIMIT LONG-TERM BENEFITS OF MEDICINES

Patients' health can suffer when they face high costs. They are more likely to stop taking their medicine or to leave a new prescription unfilled. In 2017, prescription "abandonment" rates for new patients were 8% when the out-of-pocket cost was $10 or less, but rose to 52% when the cost was between $125 - $250 and jumped to 69% when costs exceeded $250.[11] A recent study of Medicare beneficiaries taking life-saving statins and anti-hypertensives showed that a $10 increase in out-of-pocket costs led to 23% fewer patients filling their prescriptions and 33% more deaths.[12]

Three examples demonstrate why affordable access to treatments helps individuals, the healthcare system and society. Crohn's disease, a chronic inflammatory gastrointestinal disorder, often requires stays in the hospital and frequent visits to the emergency room (ER). A real-world study of one of our immunology therapies

found it was associated with reductions in ER visits, inpatient hospital stays and the use of corticosteroids that can be part of treatment regimens for Crohn's disease. Annual all-cause ER visits decreased by more than 20%, while inpatient stays decreased by more than 30%.[13]

In another study, we found that patients enrolled in Medicaid who started Janssen anti-retroviral therapy (ART) soon after an HIV diagnosis had better health outcomes and lower healthcare costs.[14] We also found that patients taking one of our long-acting injectable medicines used to treat schizophrenia were significantly less likely to have an encounter with the criminal justice system in the 12-month period[15] after starting the medicine than in the 15-month period prior, potentially reducing costs associated with the criminal justice system, including incarceration.[16]




JHCS_00000204

## OUR PROGRAMS TO SUPPORT PATIENTS

We continue to support patients through Janssen CarePath.

Janssen CarePath is a service that provides information about support resources for patients taking Janssen medications. Once a healthcare professional has decided a Janssen medication is right for their patient, the program can help that patient find the tools they may need to get started and stay on track, including sharing options to help manage out-of-pocket costs.

In 2020, Janssen CarePath helped almost 1.2 million patients through the Janssen CarePath program.[57]

**For more information, please visit JanssenCarePath.com ›**

## INDEPENDENT PROGRAM AND FOUNDATION SUPPORT

We also support independent programs and foundations that help patients. In the U.S., Janssen and other Johnson & Johnson operating companies donate medicines and funding to the Johnson & Johnson Patient Assistance Foundation, Inc. (JJPAF)—an independent, nonprofit organization committed to helping eligible, low-income patients without insurance coverage. In 2020, Janssen donated approximately $1.9 billion in products and financial support to JJPAF,[58] enabling it to provide medicines at no cost to about 95,000 patients.[59]

In response to COVID-19, JJPAF took action to ensure that qualifying patients in need of donated medicines could access those medicines and was able to support approximately 15% more patients in 2020 than in 2019.[60] JJPAF will continue to monitor the COVID-19 pandemic to address any changes that are required, consistent with their charitable mission.

**For more information, please visit jjpaf.org ›**



JHCS_00000205

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

**OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS**

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

# OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

Society counts on us to deliver vaccines, treatments and cures to fight challenging diseases.

## OUR APPROACH TO RESEARCH AND DEVELOPMENT

We focus on the areas of medicine where we can make the greatest difference: cardiovascular and metabolism, immunology, infectious diseases and vaccines, neuroscience, oncology and pulmonary hypertension. Across these therapeutic areas, we use our expertise in small molecules, monoclonal antibodies, cell and gene therapies, RNA therapeutics and vaccines to develop transformational medical innovations.

In 2020, we increased our global investment in R&D to $9.6 billion,[66] up from $8.8 billion in 2019,[67] a substantial portion of Johnson & Johnson's $12.2 billion global R&D budget across all sectors[68]— enabling us to discover, test and develop new medicines as well as demonstrate the efficacy, safety and quality compliance of our medicines before approval.

Over the last five years we've invested $42.2 billion in R&D.[69] 86% more than we spent on marketing and sales.[70] This investment produced a total of four new Janssen medicines approved by the FDA[71] and an additional 42 approvals for expanded indications or new product formulations over the same five-year period.[72]

### SECTION HIGHLIGHTS:

 **$9.6B** In 2020, we **invested $9.6 billion in R&D**[61]— more than twice (106%) what we spent on marketing and sales.[62]

 Our R&D investment has **increased an average of 8.1%** for the past five years.[63]

 **$42B** **Since 2016, we've invested $42.2 billion in R&D**[64]—86% more than we've spent on marketing and sales.[65]

 When the pandemic struck, past R&D investment meant Janssen had a **ready technology platform to develop our COVID-19 vaccine.**



Fast Facts: Driving Treatment Advances for Patients

Our $**42.2** billion investment in R&D between 2016–2020[73] produced:

- Four new FDA-approved prescription medicines.[74]

- Forty-two additional approvals for expanded indications or new product formulations.[75]



12

JJHCS_00000206

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

**OUR FOCUS: CREATING A
FUTURE WHERE DISEASE
IS A THING OF THE PAST**

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER
FUTURE FOR ALL






LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

**OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST**

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL






## PAST INVESTMENT HELPED US BE PREPARED FOR COVID-19

Janssen began to research potential vaccine candidates against COVID-19 in January 2020, as soon as the gene sequence for the novel coronavirus became available. Our ability to move quickly reflected our long-term commitment to innovation and the infrastructure we have invested in over many years, including our AdVac®-based vaccine technology. The same technology was used to develop Janssen's European Commission-approved Ebola vaccine regimen and construct our HIV, RSV and Zika vaccine candidates.[76]

In addition to leveraging our existing technologies and platforms, we also:

- Expanded our manufacturing and distribution capabilities to provide access to our COVID-19 vaccine;
- Committed to bringing an affordable vaccine to the public on a not-for-profit basis for emergency pandemic use;
- Explored potential therapies by screening a library of compounds (ours as well as those of other companies) and where promising, initiated clinical trials; and
- Prepared for future pandemics by continuing to learn about immune response to respiratory pathogens and assessing combinations of different mechanisms of action.

The size, scale and global footprint of our organization enabled us to urgently address the crisis as it unfolded, committing $50 million to support and supply frontline health workers with meals, protective equipment, extra training and mental health support.[77] This commitment expanded upon a $250 million multi-year commitment made earlier in 2020.[78]

## FROM THE LAB TO THE REAL WORLD: OUR RESEARCH NEVER STOPS

**We want healthcare decision makers to have a more complete picture of the value our medicines and vaccines deliver.**

An essential element of delivering transformational medical advances is studying how our innovations work in real-world settings after they are approved by the FDA, generating "real-world evidence." We examine how our medicines can improve healthcare delivery, enhance population health, reduce costs to the healthcare system and society, and make day-to-day living easier for patients and their caregivers. In a large private health group, inpatient admissions, re-admissions after 30 days and ER visits decreased after adult patients started a long-acting injectable (administered once a month rather than taken daily, like a pill) used to treat schizophrenia.[79] This helps patients stay on the medicine they started and as a result, led to less use of healthcare resources.



### Fast Facts: Our R&D Investment Exceeds Our Spending on Marketing and Sales



Over the last five years we've invested **86% more in R&D ($42.2B)[80] than marketing and sales.[81]**



Our R&D investment has **increased an average of 8.1%** for the past five years.[82]

Our global 2020 R&D investment **($9.6B)**[83] was **106% more** than we spent on marketing and sales.[84]



JJHCS_00000207

# OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

A fair and equitable healthcare system is one in which all patients have affordable access to the medicines they need. Policies and laws need to be patient-centric to improve access and patients' health.

**SECTION HIGHLIGHTS:**

 We highlight our efforts to understand how race and socioeconomics impact access and health outcomes and to make our clinical trials more racially inclusive.

 We explain how we engage with diverse patient populations to design studies for approval of our medicines and afterward through our Patient Engagement Research Councils.

 We present policy principles to build a more accessible, affordable and equitable healthcare system.

## Johnson & Johnson Investment to Eliminate Health Inequities for People of Color

Racism is a public health threat. Johnson & Johnson announced $100 million in commitments and collaborations over the next five years to promote health equity solutions for Black people and other communities of color in the U.S.[85]

Aiming to combat the disparities that threaten health in communities of color, our commitment prioritizes:

- **Healthier Communities:** Providing equitable healthcare for underserved communities.
- **Enduring Alliances:** Forging partnerships to reduce differences in socially determined health outcomes.
- **Diverse & Inclusive Corporate Culture:** Ensuring a diverse and inclusive workforce.

## Better Research Through More Inclusive Clinical Trials

To make R&D more equitable, we are improving how we collect real-world evidence and are working to better understand clinical effectiveness in diverse patient populations. We've modified our approach to trials to make them more broadly representative of the people we help. We have increased the number of investigators who work with diverse patient populations and provided tailored training to enable more physicians from underrepresented populations to lead clinical trial research. And we've addressed barriers to enrollment by patients in underrepresented communities, such as lack of transportation to a trial site.

## Examining Insurance Design and Health Disparities

At Janssen and across Johnson & Johnson, we seek to understand how race and socioeconomics determine access, so we are better equipped to combat systemic racism in healthcare.

We are researching how the design of insurance benefits exacerbates health disparities; for example, whether outcomes for patients enrolled in high-deductible health plans (HDHPs) vary based on race and ethnicity. A recent study published in the Journal of the American Medical Association found that among cancer survivors, 23% of Black survivors with an HDHP skipped medication to save money compared to 8% of White cancer survivors on the same plan.[86] Other research shows the most frequent high-cost prescription claims (claims greater than $125) were for diseases that disproportionally affect African Americans, including diabetes, HIV, obesity, respiratory disease and stroke.[87]

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL




LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL

## WHAT WE STAND FOR: POLICIES PUTTING PATIENTS FIRST

The U.S. health system has many strengths—especially when it comes to medical breakthroughs. Yet, too many barriers stand between patients and affordable access to advances.

**At Janssen, we are committed to advancing solutions that strengthen the U.S. healthcare system and enable the development and rapid approval of new medicines.**

*When we offer policy solutions and/or assess policy proposals, the following principles guide our thinking:*



Patients should have **affordable access to appropriate treatment options** and sites of care



Treatment decisions **belong in the hands of patients** and their healthcare providers



Clinically stable **patients should not be switched from their treatments for non-medical reasons** (unless deemed substitutable by the FDA)



Appropriate **clinical rigor and manufacturing quality standards** should be applied in all instances to ensure patient safety

*We believe the healthcare system should support these principles by:*



Maintaining a **fair and competitive** marketplace

Fostering an environment that **supports future investment in innovation**

Ensuring **responsible pricing and appropriate transparency** system-wide



Determining value based on evidence that **incorporates the benefits and risks** for patients, the healthcare system and society

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT

JHCS_00000209

["

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

**OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER FUTURE FOR ALL

## REFORMS TO MEDICARE SHOULD FOCUS ON PATIENT OUT-OF-POCKET COSTS

Medicare Part B and Part D are effective programs for ensuring seniors have access to the medicines they need and benefit from private market competition. While most seniors pay nothing directly out-of-pocket for Part B medicines—most have supplemental insurance—we support a cap on out-of-pocket costs in Medicare Part D.

### Medicare Part B

Medicare Part B covers physician-administered medications—typically infused medicines and biologics for treating chronic conditions. On average, the patient is responsible for 20% of all medication costs[89] incurred after an annual deductible has been met ($198 in 2020).[90] Most Medicare beneficiaries have some type of supplemental insurance coverage that covers much of the patient's Part B cost-sharing requirements.[91]

The Medicare Part B program benefits from private-market negotiations between manufacturers and payers and covers patients' medicines without barriers to access like utilization management. For a medicine it covers, Medicare Part B pays based on the "average sales price" (ASP), which is an average of the net prices negotiated between manufacturers, commercial health insurers and others (and excludes 340B and Medicaid discounts). These negotiations are reflected in the declining ASP of REMICADE®, one of our medicines covered under Medicare Part B (see below):

## MEDICARE PART B IS WORKING AS DESIGNED[92]

It benefits from competition and **nearly 9 out of 10 beneficiaries pay $0 for their medicines.**

**$500** REMICADE® ASP

**$522** Provider Reimbursement (ASP + 4.3%)

**$418** Medicare Covers 80% of Reimbursement Amount

**20% Cost to Part B Beneficiaries**

**89%** with supplemental insurance pay **$0**

**11%** without supplemental insurance pay **$104**

For 340B providers, reimbursement is ASP -22.5%.



**THANKS TO COMPETITION, PRICES ARE FALLING FOR REMICADE® (INFLIXIMAB) AND INFLIXIMAB BIOSIMILARS[93]**

Chart values: $1,000 / $900 / $800 / $700 / $600 / $500 / $400 / $300 / $200 / $100 / $0

$946 (WAC), $822, $782, $738, $744, $599, $597, $569, $490, $457, $500*, $449, $418, $410

Years: 2016, 2017, 2018, 2019, 2020

REMICADE® (ASP) (infliximab)
Renflexis® (ASP) (infliximab-abda)
Inflectra® (ASP) (infliximab-dyyb)
Avsola® (WAC) (infliximab-axxq)

*Avsola® launched in July 2020 at a wholesale acquisition cost (list price) of $500, lower than previous infliximab biosimilar launches.

Renflexis® is a registered trademark of Merck Sharp & Dohme Corp.
Avsola® is a registered trademark of Amgen Inc.
Inflectra® is a registered trademark of Pfizer Inc.

17

JHCS_00000211



## Fast Facts: Reducing Patient Out-of-Pocket Costs in Part D

Tying cost-sharing to net price would result in:

**47%** of Medicare beneficiaries seeing **reductions in out-of-pocket spending** (for those who do not receive low-income subsidies)[xi]

**Medicare Part D**

Medicare Part D covers self-administered medications (typically orally administered and some injectable therapies) and is offered through private insurers.

Despite misconceptions, the Medicare Part D program benefits from competitive negotiations, as the private insurers that manage Part D bargain directly with pharmaceutical manufacturers for larger discounts.

The table below shows how much Janssen pays in rebates to support access to INVOKANA® (canagliflozin).

## Fast Facts: Discounts to Government Programs Support Patient Access[xii]

We give government programs deep discounts to support access to our medicines.

In 2020, for example, discounts on INVOKANA® (canagliflozin), were:

**72%** for Medicare Part D

**100%** for Medicaid

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL




JJHCS_00000212

JJHCS_00000213

19

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL

THE 2020 JANSSEN U.S.
TRANSPARENCY REPORT

## THE 340B DRUG DISCOUNT PROGRAM SHOULD BENEFIT NEEDY PATIENTS

The 340B Drug Discount Program is intended to increase access to medicines for needy patients. The program requires drug manufacturers to provide steep discounts on outpatient drugs to certain healthcare providers. To be eligible for program participation, providers must be one of six designated hospital types or be a designated federal grantee.

In recent years, the 340B Program has expanded at double-digit rates.[xc] More than half of all hospital drug purchases are made at the discounted 340B Program prices,[xci] and prescription drugs purchased at 340B Program discounts are estimated to account for about 14% of all branded outpatient drug purchases in the U.S.[xcii]

Unfortunately, the program is no longer working as intended. Hospitals and other covered entities under the 340B Program do not always pass along the discounted drug prices to uninsured and indigent patients.[xciii] Discounts can also be diverted from patients to for-profit intermediaries in the system, such as contract pharmacies owned by large pharmacy chains or PBMs.[xciv] The number of external pharmacies in the 340B Program has skyrocketed. Nearly half of the country's retail, mail and specialty pharmacies now profit from the 340B Program.[xcv] These contract pharmacy arrangements have increased 4,228% since 2010;[xcvi] they are lucrative for both the contract pharmacies and for the covered entities, which can charge the patient list price of a medicine and split the 340B Program discount with the contract pharmacy that dispenses the prescription.

We support the 340B Program but want it to work as intended—to serve needy patients.

### DISCOUNTS IN GOVERNMENT PROGRAMS CAN GROW UP TO 100%[xcvii]

**Medicaid**

| | |
|---|---|
| $519 | INVOKANA® list price |
| $519 | Janssen discount on INVOKANA list price (100%) |
| $0 | Net cost to Medicaid |

**340B**

| | |
|---|---|
| $519 | INVOKANA list price for 30 pill bottle |
| − $518.70 | Janssen discount on INVOKANA list price (>99%) |
| $.30 | Cost to 340B provider site (e.g., For 30 pill bottle cost would be $0.30) |

JHCS_00000214

20

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

**OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER FUTURE FOR ALL

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT

## Fast Facts: Growth Rate of the 340B Program



- The 340B Drug Discount Program, the second largest federal prescription drug program[104], tripled in size between 2014 and 2019 to nearly $30 billion.[105]

- Since 2010, the number of contract pharmacy arrangements with 340B covered entities has increased to: **28,000**[106]

- Average annual growth rate of purchases in the 340B Program from 2014-2019: **27%**[107]

- Percentage of total U.S. drug market accounted for by the 340B Program: **over 8%**[108]

- Average portion of total manufacturer discounts for brand name medicines that go to the 340B Program: **16%**[109]

- Portion of all branded outpatient drug purchases in the U.S. made at 340B Program discounts: **14%**[110]

- Majority of hospital drugs purchased at the discounted 340B Program prices: **57%**[111]



## POLICIES SHOULD TARGET THE TRUE SOURCES OF PATIENT BURDEN

U.S. policymakers have considered proposals that would peg prices for medicines in the U.S. to those of other economically similar countries, an approach known as "international reference pricing."

These proposals also ignore important differences between the healthcare system in the U.S. and the rest of the world. In the U.S., patients expect timely access to new medicines, while patients outside our borders can face significant delays before treatments become available in their countries.[112] The U.S. system has many different payers, both public and private and most people are insured through their employer. Outside the U.S., healthcare is often funded by a single government payer. These differences reflect each countries' specific histories, cultures and values.

International reference pricing would, in essence, give control of part of the U.S. healthcare system to other countries and subject U.S. citizens to the consequences of political decisions made in another country. It would hinder the development of new treatments, creating a potential vulnerability for response to future pandemics and could reduce the nation's overall global competitiveness in an essential industry. No other healthcare service is benchmarked to payment rates in other parts of the world.[113]




21

JJHCS_00000215

National Commission
on Disability

"QALYs place a lower value on treatments which extend the lives of people with chronic illnesses and disabilities."

Quality-Adjusted Life Years and the Devaluation of Life with Disability >

## VALUE ASSESSMENT SHOULD BE PATIENT-CENTRIC AND HOLISTIC

As healthcare decision makers' interest in value assessment has grown, so has our concern about the shortcomings of frameworks currently used to analyze the value of medicines. Typically, these frameworks fail to appropriately account for all the factors that make a medicine valuable, most notably to patients through improved quality of life, the ability to work and care for family, reduced burden on caregivers and the chance to remain independent for a longer period of time.[114, 115, 116, 117]

Particularly concerning are value frameworks that use cost-effectiveness analyses and thresholds to determine whether patients should have access to medicines. Cost-effectiveness analyses attempt to quantify the level of health gained for each dollar spent on treatment.[118] They are estimates that rest on numerous assumptions and rely on inputs from a wide variety of sources, some more credible than others.

These estimates deem a medicine "valuable" if the ratio of dollars spent to health gained stays below a limit, or threshold. In practical terms, that threshold is arbitrary and puts a monetary ceiling on the value of human health and life.[119]

Cost-effectiveness analyses generally use an input called the Quality Adjusted Life Year, or QALY. The QALYs rate the value of human life relative to a subjective[120, 121] standard of perfect health and their use may discriminate against populations such as the elderly, chronically ill and disabled.[122] QALY-based frameworks place a lower value on treatments that extend and improve the lives of people who may never have perfect health.[123]

Some countries use government-funded organizations to carry out assessments of health technologies (sometimes known as HTAs) before patients can access new treatments. This can result in a delay for patients accessing new medicines compared with the U.S.[124, 125] They may also recommend limits on the prices of medicines, as well as certain coverage restrictions. In the U.S., we have a highly segmented system with multiple payers[126, 127] who serve groups of patients with diverse needs. As a result, the value of new medicines (and other technologies) is evaluated locally, with those needs in view. Therefore, health technology assessments should be carried out independently by payers, academic institutions and clinical groups.

At Janssen we follow four key principles when we assess the value of our medicines:

- What matters most in determining a medicine's value is its impact on patients.[128]
- The value of a medicine should include its impact on the health system and society.[129]
- Treatment outcomes should be assessed over an appropriate timeframe to capture all the benefits and risks for patients, the healthcare system and society.[130]
- Evidence considered in assessing the value of a medicine should be high-quality, current and relevant.[131]

---

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

**OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL**

BUILDING A HEALTHIER
FUTURE FOR ALL



JJHCS_00000216

LETTER FROM
OUR LEADERS

$29.4 BILLION:
BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE
ACCESS FOR PATIENTS

OUR FOCUS: CREATING
A FUTURE WHERE DISEASE
IS A THING OF THE PAST

OUR PROMISE: CREATING A
HEALTHIER FUTURE FOR ALL

**BUILDING A HEALTHIER
FUTURE FOR ALL**

# BUILDING A HEALTHIER FUTURE FOR ALL

We work with policymakers to address this country's healthcare challenges and build on its significant strengths, offering solutions that:

- Eliminate the barriers to access created by antiquated insurance design that include unaffordable cost-sharing.

- Ensure rebates negotiated by pharmaceutical manufacturers for payer coverage of medicines go directly to the patients who need them.

- Reduce racial and socioeconomic disparities standing in the way of better health outcomes that Americans have come to expect and on which, amid COVID-19, so many hopes depend.

- Preserve an environment that fosters medical advances and encourages investment in research and development necessary to discover and make these medical advances available to patients in need.

We believe affordable access to healthcare is critical to ensuring individuals can live their fullest lives and society continues to advance. While redesigning healthcare delivery and redirecting resources away from ineffective, wasteful care is challenging, we can and must, continue to seek solutions that benefit all of our communities. Because doing so means improving patients' health, saving lives and creating a stronger, healthier society.

## Advancing Patient-Centric Solutions for a Healthier Future for All





**Eliminate** Barriers
to Access

**Reduce** Racial
and Socioeconomic
Disparities





**Ensure** Rebates
are Shared Directly
with Patients

**Preserve** Environment
for Innovation

JHCS_00000217

# REFERENCES

1. Figure According to Janssen Internal Financial Accounting.
2. Ibid.
3. Ibid.
4. Ibid.
5. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).
6. Figure According to Janssen Internal Financial Accounting.
7. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).
8. U.S. Food and Drug Administration. "New Drug Therapy Approvals 2020." https://www.fda.gov/drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products/novel-drug-approvals-2020.
9. U.S. Food and Drug Administration. "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf/.
10. Figure According to Janssen Internal Financial Accounting.
11. Ibid.
12. Ibid.
13. Ibid.
14. Ibid.
15. Ibid.
16. Ibid.
17. Ibid.
18. Ibid.
19. Ibid.
20. Ibid.
21. The Henry J. Kaiser Family Foundation. "2020 Employer Health Benefits Survey," p. 139. October 8, 2020. http://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf.
22. Jarvis, D. "How Are We Going to Get Paid Tomorrow? Emerging Models for Health and Behavioral Healthcare Working Draft." The College for Behavioral Health Leadership. March 18, 2020. https://www.leaders4health.org/wp-content/uploads/2020/02/Jarvis_Getting_Paid.pdf.
23. Data are an approximate number of patients supported by Janssen CarePath provided by the program administrator.
24. Ibid.
25. Figure According to Janssen Internal Financial Accounting.
26. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).
27. Kirzinger, A., Lopes, L., Wu, B., Brodie, M. "KFF Health Tracking Poll – February 2019: Prescription Drugs." Henry J. Kaiser Foundation. March 1, 2019. https://www.kff.org/health-costs/poll-finding/kff-health-tracking-poll-february-2019-prescription-drugs/.
28. Hamel, L., Munana, C., Brodie, M. "Kaiser Family Foundation/LA Times Survey Of Adults With Employer-Sponsored Insurance." Henry J. Kaiser Family Foundation. May 2, 2019. https://www.kff.org/private-insurance/report/kaiser-family-foundation-la-times-survey-of-adults-with-employer-sponsored-insurance/.
29. Figure According to Janssen Internal Financial Accounting.
30. Data are an approximate number of patients supported by Janssen CarePath provided by the program administrator.
31. Ibid.
32. Figure According to Janssen Internal Financial Accounting.
33. Ibid.
34. Ibid.
35. Xcenda AmerisourceBergen. "Skyrocketing Growth in PBM Formulary Exclusions Raises Concerns About Patient Access." September 2020. https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_whitepaper_9-20.pdf.
36. Figure According to Janssen Internal Financial Accounting.
37. Figure According to Janssen Internal Financial Accounting.
38. Ibid.
39. IQVIA Institute for Human Data Science. "Patient Affordability Part Two: Implications for Patient Behavior and Therapy Consumption." Report. May 18, 2018. Available at: https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two.
40. PhRMA. "Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance." https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/D-F/Faced-with-High-Cost-Sharing-for-Brand-Medicines.pdf.
41. Figure According to Janssen Internal Financial Accounting.
42. Fein, A. "The 2021 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers." Drug Channels Institute. March 2021. Available At: https://www.drugchannels.net/p/our-industry-reports.html.
43. Ibid.
44. The Henry J. Kaiser Family Foundation. "2020 Employer Health Benefits Survey." October 8, 2020. http://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf.
45. Ibid.
46. Hernandez, I., San-Juan-Rodriguez, A., Good, C.B., Gellad, W.F. "Changes in list prices, net prices, and discounts for branded drugs in the US, 2007-2018." JAMA. 2020; 323(9):854–862. doi:10.1001/jama.2020.1012. https://pubmed.ncbi.nlm.nih.gov/32125403/.
47. Goldman, D. P., Joyce, G. F., Zheng, Y. "Prescription drug cost sharing: associations with medication and medical utilization and spending and health." July 4, 2007. JAMA. 298(1), 61–69. https://doi.org/10.1001/jama.298.1.61.
48. Rae, M., Copeland, R., Cox, C. "Tracking the rise in premium contributions and cost-sharing for families with large employer coverage." The Henry J. Kaiser Family Foundation. August 14, 2019. https://www.healthsystemtracker.org/brief/tracking-the-rise-in-premium-contributions-and-cost-sharing-for-families-with-large-employer-cov.
49. IQVIA Institute for Human Data Science. "Patient Affordability Part Two: Implications for Patient Behavior and Therapy Consumption." May 18, 2018. Available at: https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two.
50. Goldman, D. P., Joyce, G. F., Zheng, Y. "Prescription drug cost sharing: associations with medication and medical utilization and spending and health." July 4, 2007. JAMA. 298(1), 61–69. https://doi.org/10.1001/jama.298.1.61.

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

# REFERENCES

51. IQVIA Institute for Human Data Science. "Patient Affordability Part Two: Implications for Patient Behavior and Therapy Consumption." May 18, 2018. Available at: https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two.

52. Chandra, A., Flack, E., Obermeyer, Z. "The Health Costs of Cost-Sharing." National Bureau of Economic Research. February 2021. https://www.nber.org/papers/w28439.

53. Obando, C., Ding, Z., Muser, E. et al. "Persistence, Dose Titration, and Health Care Resource Utilization Among Crohn's Disease Patients Treated With Ustekinumab: A Real-World Analysis in the United States." Advances in Therapy, 37: 2127–2143 (2020). https://doi.org/10.1007/s12325-020-01276-3.

54. Benson C., Bruno, E., Lefebvre, P. et al. "Rapid Initiation of Antiretroviral Treatment Following Diagnosis of Human Immunodeficiency Virus Among Medicaid-covered Patients: A Real-world Evaluation." Journal of Managed Care and Specialty Pharmacy. February 2020, 26(2):129-141. doi: 10.18553/jmcp.2019.19175. Epub 2019 Nov 20. https://pubmed.ncbi.nlm.nih.gov/31747358/.

55. Bhatta, M., Bista, S., El Khoury, A.C., et al. "Encounters with the Criminal Justice System in Patients with Schizophrenia or Schizoaffective Disorders Treated with Long-Acting Therapy at a Community Mental Health Service Facility." Psychiatry & Behavioral Health Learning Network. 2018 Psych Congress Poster #220. October 25-28, 2018. Orlando, Florida. https://www.psychcongress.com/posters/encounters-criminal-justice-system-patients-schizophrenia-or-schizoaffective-disorders.

56. Muser, E., Kozma, C.M., Benson C.J., et al. "Cost Effectiveness of Paliperidone Palmitate Versus Oral Antipsychotics in Patients with Schizophrenia and a History of Criminal Justice Involvement." Journal of Medical Economics. May 6, 2015. DOI: 10.3111/13696998.2015.1037307. https://pubmed.ncbi.nlm.nih.gov/25651616/.

57. Data are an approximate number of patients supported by Janssen CarePath provided by the program administrator.

58. Figure According to Janssen Internal Financial Accounting.

59. Data are an approximate number as reported by the Johnson & Johnson Patient Assistance Foundation, Inc.

60. Ibid.

61. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

62. Figure According to Janssen Internal Financial Accounting.

63. Ibid.

64. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

65. Figure According to Janssen Internal Financial Accounting.

66. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

67. Johnson & Johnson, FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020).

68. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

69. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

70. Figure According to Janssen Internal Financial Accounting.

71. U.S. Food and Drug Administration. "New Drug Therapy Approvals 2020." https://www.fda.gov/drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products/novel-drug-approvals-2020.

72. U.S. Food and Drug Administration. "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf/.

73. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

74. U.S. Food and Drug Administration. "New Drug Therapy Approvals 2020." https://www.fda.gov/drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products/novel-drug-approvals-2020.

75. U.S. Food and Drug Administration. "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf/.

76. Johnson & Johnson. "Johnson & Johnson COVID-19 Vaccine Authorized by U.S. FDA For Emergency Use - First Single-Shot Vaccine in Fight Against Global Pandemic." News release. February 27, 2021. https://www.jnj.com/johnson-johnson-covid-19-vaccine-authorized-by-u-s-fda-for-emergency-use-first-single-shot-vaccine-in-fight-against-global-pandemic.

77. Johnson & Johnson. "Johnson & Johnson Announces a $50 Million Commitment to Support Frontline Health Workers Battling COVID-19." News Release. March 27, 2020. https://www.jnj.com/latest-news/johnson-johnson-announces-a-50-million-commitment-to-support-frontline-health-workers-battling-covid-19.

78. Johnson & Johnson. "Johnson & Johnson Announces $250 Million Commitment to Support Frontline Health Workers, Reaching 100 Million People By 2030." News Release. January 23, 2020. https://www.jnj.com/johnson-johnson-announces-250-million-commitment-to-support-frontline-health-workers-reaching-100-million-people-by-2030.

79. Mahabaleshwarkar, R., et al. "The Impact of Once-Monthly Paliperidone Palmitate on Healthcare Utilization Among Patients With Schizophrenia Treated in an Integrated Healthcare System: A Retrospective Mirror-Image Study." Advances in Therapy, 38, pages1958–1974(2021). January 15, 2021. https://doi.org/10.1007/s12325-021-01626-9.

80. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021), FY19-Q4 Form 10-K for the period ending December 29, 2019 (filed February 18, 2020), FY18-Q4 Form 10-K for period ending December 30, 2018 (filed February 20, 2019), FY17-Q4 Form 10-K for period ending December 31, 2017 (filed February 21, 2018), FY16-Q4 Form 10-K for period ending January 1, 2017 (filed January 24, 2017).

81. Figure According to Janssen Internal Financial Accounting.

82. Ibid.

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

JHCS_00000219

# REFERENCES

83. Johnson & Johnson, FY20-Q4 Form 10-K for the period ending January 3, 2021 (filed February 22, 2021).

84. Figure According to Janssen Internal Financial Accounting.

85. Johnson & Johnson, "Johnson & Johnson to Address Racial and Social Injustice Through Platform that Aims to Eliminate Health Inequities for People of Color," News Release. November 17, 2020. https://www.jnj.com/johnson-johnson-to-address-racial-and-social-injustice-through-platform-that-aims-to-eliminate-health-inequities-for-people-of-color.

86. Cole, M.B., Ellison, J. E., Trivedi, A. N. "Association Between High-Deductible Health Plans and Disparities in Access to Care Among Cancer Survivors." JAMA Network Open. June 24, 2020. 2020;3(6):e208965. doi:10.1001/jamanetworkopen.2020.8965. https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2767589.

87. Kogut, S. J. "Racial disparities in medication use: imperatives for managed care pharmacy," Journal of Managed Care and Specialty Pharmacy, 26(11):1468-1474, November, 2020 Available at: https://www.jmcp.org/doi/pdf/10.18553/jmcp.2020.26.11.1468.

88. Alliance for Patient Access. "A study of the qualitative impact of non-medical switching." February 2019. https://admin.allianceforpatientaccess.org/wp-content/uploads/2020/02/AfPA_Qualitative-Impact-of-Non-Medical-Switching_Report_Feb-2019.pdf.

89. The Official U.S. Government Site for Medicare. "Part B Costs." https://www.medicare.gov/your-medicare-costs/part-b-costs.

90. Centers for Medicare & Medicaid Services (CMS), HHS. "Medicare Program; Medicare Part B Monthly Actuarial Rates, Premium Rates, and Annual Deductible Beginning January 1, 2020." Federal Register: The Daily Journal of the United States Government. November 13, 2019. https://www.federalregister.gov/documents/2019/11/13/2019-24440/medicare-program-medicare-part-b-monthly-actuarial-rates-premium-rates-and-annual-deductible.

91. Janssen CarePath. "Medicare for Branded Drugs." 2020. https://www.janssencarepath.com/sites/www.janssencarepath.com/files/part-b-versus-d-brochure.pdf.

92. Figure According to Janssen Internal Financial Accounting.

93. Ibid.

94. Figure According to Janssen Internal Financial Accounting.

95. Trish, E., Kaiser, K., Joyce, G. "How Would Sharing Rebates at the Point-of-Sale Affect Beneficiary Cost-Sharing in Medicare Part D?" University of Southern California, Schaeffer. March 17, 2020. https://healthpolicy.usc.edu/research/how-would-sharing-rebates-at-the-point-of-sale-affect-beneficiary-cost-sharing-in-medicare-part-d/.

96. Fein, A. "340B Program Purchases Reach $24.3 Billion — 7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines." Drug Channels. May 14, 2019. https://www.drugchannels.net/2019/05/exclusive-340b-program-purchases-reach.html.

97. Fein, A. "The 2021 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers." Drug Channels. March 2021. Available At: https://www.drugchannels.net/p/our-industry-reports.html.

98. Vandervelde, A. "Measuring the Relative Size of the 340B Program; 2018 Update." Berkeley Research Group (BRG). June 2020. https://www.thinkbrg.com/insights/publications/measuring-the-relative-size-of-the-340b-program-2018-update/.

99. United States Government Accountability Office. "Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement". June 2018. https://www.gao.gov/assets/gao-18-480.pdf.

100. Fein, A. "Letter to Chairman Alexander, of U.S. Senate Committee on Health, Education, Labor & Pension, and Ranking Member Walden, of U.S. House of Representatives Committee on Energy and Commerce." October 30, 2020. Drug Channels. http://drugchannelsinstitute.com/files/AdamFein-DrugChannels-340B-30Oct2020.pdf.

101. Ibid.

102. Vandervelde, A., Erb, K., Hurley, L., "For Profit Pharmacy Participation in the 340B Program." Berkeley Research Group (BRG). October 7, 2020. https://www.thinkbrg.com/insights/publications/for-profit-pharmacy-participation-340b/.

103. Figure According to Janssen Internal Financial Accounting.

104. Vandervelde, A. "Measuring the Relative Size of the 340B Program; 2018 Update." Berkeley Research Group (BRG). June 2020. https://www.thinkbrg.com/insights/publications/measuring-the-relative-size-of-the-340b-program-2018-update/.

105. Fein, A. "The 2020-21 Economic Report on Pharmaceutical Wholesalers and Specialty Distributors." Drug Channels. October 2020. Available At: https://www.drugchannels.net/p/our-industry-reports.html.

106. Fein, A. "Walgreens and CVS Top the 28,000 Pharmacies Profiting from 340B Program. So Will the Unregulated Party End?" July 14, 2020. Drug Channels. https://www.drugchannels.net/2020/07/walgreens-and-cvs-top-28000-pharmacies.html.

107. Fein, A. "New HRSA Data: 340B Program Reached $29.9 Billion in 2019; Now Over 8% of Drug Sales". Drug Channels. June 2020. https://www.drugchannels.net/2020/06/new-hrsa-data-340b-program-reached-299.html.

108. Ibid.

109. Ibid.

110. Vandervelde, A. "Measuring the Relative Size of the 340B Program; 2018 Update." Berkeley Research Group (BRG). June 2020. https://www.thinkbrg.com/insights/publications/measuring-the-relative-size-of-the-340b-program-2018-update/.

111. Fein, A. "The 2021 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers." Drug Channels. March 2021. Available At: https://www.drugchannels.net/p/our-industry-reports.html.

112. U.S. Food and Drug Administration. "Advancing Health Innovation: New Drug Therapy Approvals 2019." FDA Center for Drug Evaluation and Research. https://www.fda.gov/media/134493/download.

113. Kurani, N., Cox, C. "What drives health spending in the U.S. compared to other countries." Peterson-KFF: Health Systems Tracker. September 25, 2020. https://www.healthsystemtracker.org/brief/what-drives-health-spending-in-the-u-s-compared-to-other-countries/.

114. PhRMA. "Principles for Value Assessment Frameworks." March 30, 2016. https://www.phrma.org/Codes-and-guidelines/Principles-for-Value-Assessment-Frameworks.

115. Neumann, P.J., Willke, R.J., Garrison, L.P. "A Health Economics Approach to US Value Assessment Frameworks—Introduction: An ISPOR Special Task Force Report [I]." Value in Health. 2018. https://www.ispor.org/docs/default-source/sig-documents/piisi1098301573389740.pdfsii?sfvrsn=1a05f0r0_0.

116. Willke, R.J., Neumann, P.J., Garrison, L.P., Ramsey, S.D. "Review of Recent US Value Frameworks—A Health Economics Approach: An ISPOR Special Task Force Report [6]." Value in Health, 21(2):p155-160, February 1, 2018. https://doi.org/10.1016/j.jval.2017.12.011 https://www.valueinhealthjournal.com/article/S1098-3015(17)33869-2/fulltext?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS1098301573389742%3Fshowall%3Dtrue.

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL

THE 2020 JANSSEN U.S. TRANSPARENCY REPORT



JHCS_00000220

26

# REFERENCES

117. Lakdawalla, D.N., et al. "Defining Elements of Value in Health Care—A Health Economics Approach: An ISPOR Special Task Force Report [3]." Value in Health, 21(2):131-139 February 1, 2018. doi:10.1016/j.jval.2017.12.007. PMID: 29477990. https://www.valueinhealthjournal.com/article/S1098-3015(17)33892-5/fulltext?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS1098301517338925%3Fshowall%3Dtrue.

118. Xcenda AmerisourceBergen. "Applying Cost-Effectiveness Thresholds to the Real World: Implications on Access for Medicare Beneficiaries." May 2018. https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda-phrma_icer_issue_brief_may2018.pdf?la=en&hash=2F6C8F5A6AC75F6C997C20E52A107D4E20560678.

119. Whalen, J. "What Is a QALY?" The Wall Street Journal. December 1, 2015. https://www.wsj.com/articles/what-is-a-qaly-1449007700.

120. Nord, E., Daniels, N., Kamlet, M. "QALYs: some challenges." Value in Health; Vol 12 (suppl 1): S10-S15. doi:10.1111/j.1524-4733.2009.00516.x. PMID: 19250125. https://www.valueinhealthjournal.com/article/S1098-3015(10)60047-2/pdf?_returnURL=https%3A%2F%2Flinkinghub.elsevier.com%2Fretrieve%2Fpii%2FS1098301510600472%3Fshowall%3Dtrue.

121. Pettit, D.A., et al. "The Limitations of QALY: A Literature Review." Journal of Stem Cell Research & Therapy, Vol 6(4): 1-7. 2016. https://www.longdom.org/open-access/the-limitations-of-qaly-a-literature-review-2157-7633-1000334.pdf.

122. Brock, D.W. "Cost-effectiveness and Disability Discrimination." Economics and Philosophy, 25(1), 27–47. doi:10.1017/S0266267108000266. Available at: https://www.cambridge.org/core/journals/economics-and-philosophy/article/abs/costeffectiveness-and-disability-discrimination/9bEAf41C39CCE56d5ED0160A729E6 6f7.

123. Ibid.

124. Costa-Font, J., Varol, N., McGuire, A. "Does price regulation affect the adoption of new pharmaceuticals?" Vox EU CEPR. July 8, 2011. https://voxeu.org/article/does-price-regulation-affect-adoption-new-pharmaceuticals#:~:text=This%20column%20explores%20how%20price%20regulation%20affects%20the%20diffusion%20of%20pharmaceutical%20treatments.&text=But%20regulations%20can%20affect%20the,protected%20by%20intellectual%20property%20rights.

125. Costa-Font, J., McGuire, A., Varol, N. "Explaining Early Adoption on New Medicines: Regulation, Innovation and Scale." CESifo. May 2011. https://www.ifo.de/DocDL/cesifo1_wp3459.pdf.

126. Tikkanen, R., Osborn, R., Mossialos, E., Djordjevic, A., Wharton, G.A., "International Health Care Systems Profiles: United States." The Commonwealth Fund. June 5, 2020. https://www.commonwealthfund.org/international-health-policy-center/countries/united-states.

127. Rice, T., Rosenau, P., Unruh, L.Y., Barnes, A.J. "United States of America: Health system review." Health Systems in Transition, 12(3), 2013. https://www.euro.who.int/__data/assets/pdf_file/0019/215155/HiT-United-States-of-America.pdf.

128. Neumann, P.J. et al. "Cost-Effectiveness in Health and Medicine." Oxford University Press. November 1, 2016. Available at: https://global.oup.com/academic/product/cost-effectiveness-in-health-and-medicine-9780190492939?cc=us&lang=en&.

129. Alphs, L. et al. "Real-World Outcomes of Paliperidone Palmitate Compared to Daily Oral Antipsychotic Therapy in Schizophrenia: A Randomized, Open-Label, Review Board-Blinded 15-Month Study." The Journal of Clinical Psychiatry 76(5): p.554-561. May, 2015. doi:10.4088/JCP.14m09584. https://www.psychiatrist.com/jcp/schizophrenia/psychotic-disorders/real-world-outcomes-paliperidone-palmitate-compared/.

130. Kim, D.D., et al. "The Influence of Time Horizon on Results of Cost-Effectiveness Analyses." Expert Review of Pharmacoeconomics & Outcomes Research, 17(6): p.615-23. Epub. May 23, 2017. doi:10.1080/14737167.2017.1333432. https://www.tandfonline.com/doi/abs/10.1080/14737167.2017.1333432?journalCode=ierp20.

131. Frieden, T.R. "Evidence for Health Decision Making — Beyond Randomized, Controlled Trials." The New England Journal of Medicine, 377(5): p. 465-75. August 3, 2017. doi:10.1056/nejmra1614394. https://www.nejm.org/doi/full/10.1056/nejmra1614394.

LETTER FROM OUR LEADERS

$29.4 BILLION: BREAKING IT DOWN

2020 AT A GLANCE

OUR PRIORITY: AFFORDABLE ACCESS FOR PATIENTS

OUR FOCUS: CREATING A FUTURE WHERE DISEASE IS A THING OF THE PAST

OUR PROMISE: CREATING A HEALTHIER FUTURE FOR ALL

BUILDING A HEALTHIER FUTURE FOR ALL




# Exhibits JJHCS 10-11
## CONFIDENTIAL - FILED UNDER SEAL