```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE       .
SYSTEMS INC.,                       .
                                    .
         Plaintiff,                 . Case No. 22-cv-02632
                                    .
vs.                                 . Newark, New Jersey
                                    . June 6, 2023
SAVE ON SP, LLC,                    .
                                    .
         Defendant.                 .


                       TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE CATHY L. WALDOR
                   UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via Zoom videoconference):

 For the Plaintiff:      JEFFREY J. GREENBAUM, ESQ.
                         Sills Cummis & Gross P.C.
                         The Legal Center
                         One Riverfront Plaza
                         Newark, NJ 07102-5400
                         (973) 643-7000
                         jgreenbaum@sillscummis.com

                         HARRY SANDICK, ESQ.
                         Patterson Belknap Webb & Tyler LLP
                         1133 Avenue of the Americas
                         New York, NY 10036
                         (212) 336-2723
                         Hsandick@pbwt.com




Audio Operator:

Transcription Service:   KING TRANSCRIPTION SERVICES
                         3 South Corporate Drive, Suite 203
                         Riverdale, NJ  07457
                         (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1   (APPEARANCES continued)

 2   For the Plaintiff:       KATHERINE MARGUERITE LIEB, ESQ.
                              Sills Cummis & Gross P.C.
 3                            101 Park Avenue, 28th Floor
                              New York, NY 10178
 4                            (212) 643-7000
                              Klieb@sillscummis.com
 5
                              ADEEL ABDULLAH MANGI, ESQ.
 6                            Patterson Belknap Webb & Tyler LLP
                              1133 Avenue of the Americas
 7                            New York, NY 10036
                              (212) 336-2563
 8                            aamangi@pbwt.com

 9                            GEORGE A. LOBIONDO, ESQ.
                              Patterson Belknap Webb & Tyler LLP
10                            1133 Avenue of the Americas
                              New York, NY 10036
11                            (212) 336-2008
                              Globiondo@pbwt.com
12
                              Also present:  Sharon George (Johnson
13                            & Johnson)

14
     For the Defendant:       ANDREW R. DUNLAP, ESQ.
15                            Selendy Gay Elsberg PLLC
                              1290 Avenue of the Americas
16                            New York, NY  10104
                              (212) 390-9005
17                            Adunlap@selendygay.com

18                            MEREDITH NELSON, ESQ.
                              Selendy Gay Elsberg PLLC
19                            1290 Avenue of the Americas
                              New York, NY 10104
20                            (212) 390-9069
                              mnelson@selendygay.com
21
                              ELIZABETH SNOW, ESQ.
22                            Selendy Gay Elsberg PLLC
                              1290 Avenue of the Americas
23                            New York, NY 10104
                              (212) 390-9330
24

25
```

```
 1  (APPEARANCES continued)

 2  For the Defendant:     E. EVANS WOHLFORTH, ESQ.
                           Robinson & Cole LLP
 3                         Chrysler East Building
                           666 Third Avenue, 20th Floor
 4                         New York, NY 10017
                           (212) 451-2954
 5                         ewohlforth@rc.com

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Commencement of proceedings)

2

3          THE COURT:  Okay.  So this is 22-2632.  It's 1:07

4  on June 6th.  This is a recording pursuant to Docket Entry

5  109, 110, 111, and 112.

6          And where's Jeff?

7          MR. GREENBAUM:  I am here.

8          THE COURT:  Where are you?

9          Oh, there.  Thanks for that letter.  That's -- Jeff

10  always sends me a letter saying this is what we're going to

11  talk about.  And it's always short and sweet.  And I thank

12  you, Jeff, for that because it makes my life somewhat easier.

13          MR. GREENBAUM:  We try to keep it simple, Judge.

14          THE COURT:  Yeah.  Yeah.  No, that's good.  And

15  it's not that complicated.  These issues don't seem that

16  complicated.

17          But I want everybody to be able to make a record.

18          The way I look at 111, that's an eight-page letter

19  on whose fault things are.  And I don't really care about

20  that.  All right?

21          We can talk about 109 and 110 and talk about

22  extensions.  And so everyone knows, with respect to

23  extensions, I don't know why we're even arguing about this

24  because I can always extend extensions.  So keeping that in

25  mind, we'll deal with that last, if we have time.  If not,

 1    I'll send you back to the drawing board on that.

 2          So the first issue is change of designation from

 3    attorney's eyes only to -- we should probably put our names

 4    on the record.  I'm sorry.

 5          Let's have appearances for plaintiff.

 6          MR. GREENBAUM:  Yes, good afternoon, Your Honor.

 7    Jeffrey J. Greenbaum, Sills Cummis & Gross.  I'm here with

 8    Katherine Lieb of the same firm for plaintiff.

 9          And along with me are attorneys from Patterson

10    Belknap:  Adeel Mangi, George LoBiondo, and Harry Sandick.

11    And they will each have roles in the different numbers we've

12    put on the scoreboard.

13          So I'll introduce them as the issues pop up.

14          THE COURT:  Okay.

15          And who do we have for defense?

16          MR. GREENBAUM:  Also, Your Honor, we have Sharon

17    George from the plaintiff as in-house counsel.  So I wanted

18    to recognize her.

19          THE COURT:  Okay.  I see her.  Okay.

20          Go ahead.

21          MR. WOHLFORTH:  Evans Wohlforth counsel for

22    SaveOn SP LLC, from the Robinson Cole firm.

23          With me from Selendy Gay are Andrew Dunlap,

24    Elizabeth Snow, and Meredith Nelson.

25          Mr. Dunlap will be speaking on behalf of defendant

1  today.

2          THE COURT:  Okay.  Did everybody enter their

3  appearance?  Okay.

4          So the first issue is this redesignation or

5  dedesignation from attorney's eyes only to confidential.  And

6  I don't really understand the reason for that.

7          So whoever wants to convince me of the reason for

8  that, Jeff.

9          MR. GREENBAUM:  Your Honor, Adeel Mangi will speak

10  on that.

11          THE COURT:  Thank you.

12          MR. MANGI:  Good afternoon, Your Honor.

13          So, Your Honor, let me explain the outlines of what

14  we're seeking.  I also have some quite significant new

15  information that's occurred since we submitted the letter,

16  and I'll address that too.

17          So just to set the stage here, to SaveOn has

18  produced in discovery a list of patient names.  Just names;

19  no other information on it.

20          And those names are of patients that are both in

21  the SaveOn program but also in CarePath.  Okay?  And that is

22  a list that we appended to our submission and --

23          That list has been designated by SaveOn in its

24  production as attorney's eyes only.

25          Now, what we are seeking here is to downgrade that

1    designation from attorney's eyes only to confidential, the

2    lower tier under the protective order.  In addition, we are

3    seeking permission from the Court to share that list with

4    individuals at our client and at our vendor, TrialCard that

5    works with us on the administration of the CarePath program,

6    all of whom will sign the undertaking under the protective

7    order to keep the information confidential.

8            And the reason for that is so that those

9    individuals can then assist us with the process of removing

10   those individuals from the CarePath program so that the

11   health insurers and SaveOn can resume paying for those

12   individuals' drugs, as they have committed to do, regardless

13   of CarePath coverage.

14           And I'm going to talk about that in some detail in

15   a moment, but what I want to flag for you very clearly up

16   front and emphasize is that any steps that JJHCS takes here,

17   we're going to do them very slowly, very carefully with an

18   absolute prioritization to ensure patient continuity of care.

19   These are our patients.  Nothing is more important to us than

20   to ensure that their care is prioritized.

21           But SaveOn has committed already that these

22   patients will have a zero dollar co-payment, will continue to

23   get their drugs, regardless.

24           Let me also flag just up front in describing the

25   relief we're seeking, there's a second important reason in

1   play here.  This data has been produced to us, but we cannot

2   make any effective use of it in relation to dealing with

3   these very large and complex datasets that exist at our

4   client and at TrialCard without their involvement.  These are

5   very large datasets, and we need the client involvement to be

6   able to utilize this data in assessing how it plays through

7   the data, making our damages assessments and so on.  An AEO

8   designation blocks us from making any use of that other than

9   through the attorneys who are not the right people to be

10  working with these large datasets.

11          Now, that's just a description up front of what it

12  is we're seeking.

13          Let me then go, Your Honor, into one point of

14  overarching background that I think is very important before

15  I get to the specific arguments here.  It is very important

16  to stress up front, Your Honor, that JJHCS is not obligated

17  to help anyone with co-payments.  All right?  The CarePath

18  program is not something that we are required to engage in,

19  we have any legal obligation to engage in.  We have chosen to

20  make co-payment assistance funds available for our patients

21  through CarePath exclusively to help our patients.  And

22  that's a choice we made.  And that money is intended only for

23  the patients.  It is not intended for anyone else.

24          Now, our starting premise, Your Honor, is that when

25  that money is being misappropriated by other actors here --

1    in this case by SaveOn and its partners -- we have every

2    right to stop making that money available.  We are under no

3    obligation, legal or otherwise, to keep providing money under

4    CarePath to anyone, much less to entities that are actively

5    misappropriating it.

6          To the contrary, SaveOn's taken the position we

7    have a legal obligation to mitigate our damages.  And they

8    have expressly pled that as an affirmative defense.

9          But even going beyond that -- and I think the point

10   I would like to stress here up front, Your Honor, is that we

11   have an obligation, as a responsible corporation, to not

12   allow our money, millions and millions of dollars, to be

13   misappropriated on an ongoing basis.  It's money that's

14   intended only for patients.

15         And just by way of analogy up front, before you

16   turn to the substance, if I'm giving money, Your Honor, to a

17   charity, a charity that's very important to me, I really want

18   the beneficiaries of that charity to be helped.

19         And then I learn that that money is being diverted

20   by another actor for their own financial benefit, it's not

21   getting to the patients who I want to help, as a starting

22   premise, I should not be forced to keep on making millions of

23   dollars of contributions to that charity only for it to be

24   misappropriated.  And we --

25         THE COURT:  But let me interrupt you and get back

1    to the chase a little bit here.

2            MR. MANGI:  Yes.

3            THE COURT:  In other words, this is important to

4    pursue your mitigation of damages.  And I'm talking about the

5    patient list, because I don't know what the datasets have to

6    do with anything.

7            MR. MANGI:  Well, yes, this is important to our

8    mitigation of damages.

9            THE COURT:  Okay.  But isn't -- doesn't the

10   confidentiality expressly say that all designated materials,

11   defined to include confidential, confidential health

12   information, attorney's eyes only shall be used by any person

13   to whom discovery material is produced solely for purposes of

14   the prosecution or defense of this action, not be used by the

15   receiving party for any business, commercial, competitive,

16   personal, or other person -- or other purpose.

17           MR. GREENBAUM:  Yes, it does.

18           THE COURT:  That's your confidentiality agreement.

19           So if you want to blame me for disallowing your

20   attempt to mitigate damages, I'll give you that order,

21   because that's all this sounds like to me --

22           MR. MANGI:  -- well --

23           THE COURT:  -- is discovery.

24           MR. MANGI:  Yes, I understand your point,

25   Your Honor.  But let me respond to it.

1              In our view -- I'd like to make two points, then.

2              First, in our view, utilizing this information to

3    mitigate damages in this case is absolutely and expressly a

4    litigation purpose related to our prosecution of this case.

5    And that as a policy matter is something that, I would

6    submit, the Court should encourage rather than allow a

7    protective order to be allowed to preclude.  Mitigation of

8    damages is part of any plaintiff's case here.  And they have

9    an affirmative defense expressly on point there.

10             Second point I'd make in that regard, Your Honor,

11   is that both in the paragraph you were just reading from,

12   paragraph 4, but also more expressly in paragraph 17 of that

13   same protective order, it is made abundantly clear that every

14   party has the right to seek relief from any designation under

15   the protective orders without prejudice to the right of a

16   party to move for a modification.

17             And so it is absolutely consistent with the

18   protective order for us to seek relief from the Court

19   explaining why it's logical and necessary, and then it's for

20   Your Honor to assess whether or not it, in fact, makes sense.

21   But there's nothing inconsistent with the protective order in

22   the relief that we are seeking.

23             THE COURT:  Didn't SaveOn say they're not going to

24   make that argument?

25             MR. MANGI:  Well, they have -- they have said that

 1    they are going to argue based only on other things they say

 2    we should have done in mitigation.

 3             But on that point, Your Honor, we cite a Third

 4    Circuit case in our papers that makes very clear that it's

 5    not up to the defendant to pick and choose what mitigation

 6    steps should be taken.  All right?  That is exclusively the

 7    domain of the plaintiff in the case, and I would submit to

 8    Your Honor that there's a very good policy reason why the

 9    Third Circuit takes that view.  Because, otherwise, you would

10    have situations where damages can be allowed to continue to

11    accumulate and grow only because the defendant is making some

12    strategic choice -- which is exactly what appears to be

13    happening here -- as to what they think is best for them from

14    a substantive point.

15             But the priorities that the courts are pursuing

16    when it comes to mitigation is ensuring that plaintiffs are

17    not allowed to unnecessarily grow and propagate over time

18    when there is a solution to allow that group to be cut off or

19    stopped, correctly, starkly limited.  And that is something

20    that the courts can and should encourage regardless of

21    whether the defendant is saying they're going to make one

22    argument or another.  That is the position the Third Circuit

23    has taken.  And I would argue it makes absolute sense from a

24    policy perspective.

25             Okay.  So that's -- that's the beginning position

|Hearing
|22-cv-02632, June 6, 2023

1    there and why I think that's important.

2            Now let me go to some of the substantive issues

3    here, Your Honor.  As Your Honor knows, from the time that we

4    started this case, Your Honor has heard a lot of discovery

5    arguments, and one argument that SaveOn has made repeatedly

6    to Your Honor is to say that, far from hurting JJHCS, they've

7    said they're actually doing us some kind of a favor because

8    they say that, oh, our steps are causing patients to start on

9    your medications and ultimately that's going to be good for

10   you.

11           But then they say, as a second leg of that

12   argument, they say, well, if you are unhappy, JJHCS, with

13   what it is that we're doing, then there's a simple solution

14   available to you.  You should shop allocating money towards

15   patients in the SaveOn program.

16           And we have cited, Your Honor, a couple of

17   examples, but let me just take one from --

18           THE COURT:  Well, wait.  Are you talking about the

19   patient lists?

20           MR. MANGI:  Yes, I'm talking about the arguments

21   that they have made generally in the case -- before we even

22   got to this patient list issue.  Right?  The argument that

23   they made, Your Honor, here is that -- and this is a quote

24   from their papers -- JJHCS fully controls how much co-pay

25   assistance it provides.  Right?  And then they said later, if

1    you want to reduce how much you're paying under CarePath, you

2    can do that tomorrow because it's up to you.  You control how

3    much you pay.

4          My point here, Your Honor, is very simply that

5    SaveOn has made the very same point to Your Honor that I am

6    making now, which is that JJHCS, which is under no obligation

7    to provide those funds to anyone, does and should have the

8    power to not make payments if it chooses not to.  They've

9    affirmatively argued, if you don't like what's happening with

10   SaveOn, just stop making payments in relation to those

11   patients, which is exactly what we're seeking to do now,

12   exactly what they have invited --

13         THE COURT:  What does that have to do with the

14   redesignation of the patient lists?

15         MR. MANGI:  Because --

16         THE COURT:  It's confusing me.  Yeah.

17         MR. MANGI:  Yeah, because, Your Honor, we cannot

18   cut off patients who are in the SaveOn program without use of

19   this patient list.

20         THE COURT:  I see.  Okay.

21         MR. MANGI:  And let me explain the reason for that

22   because the reason is actually very important here.

23         We have pled, Your Honor, expressly in our

24   complaint and we are developing a growing record on this,

25   that SaveOn takes deliberate and careful steps to ensure that

1    manufacturers are not able to detect and identify which

2    patients are in the SaveOn program in addition to in the

3    assistance programs like CarePath.  For example, we pled that

4    one of the things they do are vary the amounts of money they

5    draw down so that manufacturers cannot use programmatic

6    methods and algorithms to identify who is in the SaveOn

7    program.

8            The -- and, by the way, in -- in connection with

9    one of the other motions that are on today, we appended as an

10   exhibit one of their business plans, and in that document,

11   they talk expressly about ███████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████

14   ██████████████████████████

15           So because they are taking these steps to evade

16   detection, to prevent us from knowing who is SaveOn, the only

17   reliable way, Your Honor, for us to know who is in SaveOn but

18   also in CarePath is to use this patient list, which is --

19           THE COURT:  So, in other words, dedesignation makes

20   the patient list more reliable?

21           MR. MANGI:  No.  Not at all.  Dedesignation permits

22   us to use the patient list in order to make the change we are

23   proposing, which is to stop paying money in relation to these

24   individual patients which --

25           THE COURT:  But --

1          MR. MANGI:  -- we assume to be misappropriated.

2          THE COURT:  Okay.  Isn't that a commercial use of

3    discovery?

4          MR. MANGI:  No, Your Honor.  I would submit that

5    this is a mitigation of damages issue.

6          Now, certainly, there is an overlap -- I don't

7    doubt that -- in that if we're paying less money ultimately,

8    perhaps, there is a special aspect to that.  But nonetheless,

9    that doesn't change the fact that it also constitutes

10   mitigation of damages, and it doesn't change the fact that

11   Your Honor has the authority, regardless of that issue,

12   Your Honor has the authority if it is reasonable in the

13   circumstances to grant whatever leave from the protective

14   order you deem appropriate.

15         And part of what we're arguing, not only is it

16   mitigation of damages -- I don't think you need to reach this

17   issue, but even if you did, we submit, Your Honor, that a

18   protective order should not be used as a mechanism to force

19   J&J to pay tens of millions of dollars every month only for

20   it to be misappropriated and, therefore, allowable claims to

21   continue to grow over time.  No company should be forced to

22   do that.  No person should be forced to do that.  And --

23         THE COURT:  Okay.

24         MR. MANGI:  -- and a protective order should not --

25         THE COURT:  I get the point.  I get the point.

|Hearing
|22-cv-02632, June 6, 2023

1           MR. MANGI:  Okay.

2           THE COURT:  So the fact that SaveOn has agreed, as

3   I understand it, that this argument about failure to mitigate

4   is not going to be on the table has no effect on your

5   argument.

6           MR. MANGI:  Yeah, it has no effect on my argument

7   for two reasons:  One, mitigation is something required as a

8   policy matter, and the Third Circuit has made clear the

9   defendant gets no say in how you mitigate.  That is up to the

10  plaintiffs, because we don't want them to make strategic

11  choices around it.  And as a policy matter, the courts want

12  mitigate- --

13          THE COURT:  Okay.  I heard you.

14          Let's -- again, I'm -- I don't mean to be rude.

15          MR. MANGI:  No.

16          THE COURT:  I never -- hold on.  I have got --

17          Hello?

18      (Interruption in proceedings)

19          THE COURT:  On the issue of the patient

20  redesignation, patient list redesignation.

21          Who am I going to hear from?

22          MR. MANGI:  Your Honor, just before we move off, I

23  was -- I was still in the middle --

24          THE COURT:  Oh, I'm sorry.  Go ahead.

25          MR. MANGI:  May I ask does Your Honor have a hard

|Hearing
|22-cv-02632, June 6, 2023

 1   stop at a certain point?  I'd like to tailor to what time you

 2   have available.

 3            THE COURT:  I don't have a hard stop.  I'll let you

 4   go, but I have hard interruptions.

 5            MR. MANGI:  No.  That's fine.  Those -- is welcome.

 6            Okay.  So, Your Honor, let me just summarize where

 7   I was, and then I'd like to make a few new points.

 8            So as I was pointing out, Your Honor, you may

 9   recall, we had to move to compel to get this list in the

10   first place.

11            THE COURT:  Yes.  I gave you --

12        (Simultaneous conversation)

13            THE COURT:  I remember.

14            MR. MANGI:  Your Honor -- exactly.  Your Honor gave

15   it to us.

16            And so what we're proposing to make, Your Honor,

17   are two distinct uses of it, both of which require the relief

18   that we're seeking.  Right?  So one of them is the relief

19   that I've been talking most about, which is enable us to use

20   that list to stop having to make these payments that are

21   going to be misappropriated.

22            But then the second one that I also talked about

23   early on and I just want to return to it to make sure this

24   point is clear -- because it's also important -- is

25   separately and apart from that, from cutting off the bleeding

1    going forward, separate from that, in order to calculate our

2    damages going back, we also need to be able to utilize this

3    list in connection with data that we have, large datasets

4    reflecting these claims and payments that were made over

5    time, et cetera.

6            And in order to do that hard-core data analysis

7    here, to calculate or retrospective damages, we need the

8    people who operate those datasets, who operate those

9    machines, to have access to this list so they can input data,

10   run analyses, and so on -- because, Your Honor, these large

11   databases, when we're talking about individual patient claims

12   for drugs, individual prescriptions, how much we pay in

13   relation to each prescription, these are very large and very

14   complex databases that house all of this information.  And to

15   go and analyze and run data analyses on that is not something

16   that we as outside counsel can do.  We need the assistance of

17   our people at the client and at TrialCard, who work with and

18   operate these databases, in order to make use of that data.

19           So I just want to focus on the fact that these are

20   two separate uses we need to make here to make --

21           THE COURT:  Yes.

22           MR. MANGI:  -- use, and both of them require

23   dedesignation.  Okay.

24           So then --

25           THE COURT:  Yes, you made both points very clear to

|Hearing
|22-cv-02632, June 6, 2023

```
 1   me.  I thank for that.
 2              MR. MANGI:  Okay.  Great.
 3              So, then, let me turn to sort of the -- the
 4   additional point.
 5              So, Your Honor, what we've heard from SaveOn is
 6   that they and their business partners, their health insurers
 7   are at risk of losing money if this goes ahead.  And I'd like
 8   to address that and also give you some new information.
 9              Now, first, I'd like to return to the point I made
10   when we first started which is neither SaveOn, nor its health
11   insurers, have any right to make money from JJHCS CarePath
12   program.  No one has any entitlement to this money.  It is
13   money that we choose to make available for our patients.
14              So our view on that, Your Honor, is -- this is
15   essentially the equivalent of someone who is skimming from a
16   charity, saying, well, don't let them stop making
17   contributions to because I want to keep doing what I'm doing.
18   But they have no entitlement to the money.  And without an
19   entitlement to the money, the fact that they want the money
20   to continue doesn't move the dial, in our view, one way or
21   the other.
22              And then we also point out that the health
23   insurers, they're not parties to this case.  They're not
24   parties to this issue -- because all we're talking about is a
25   designation applied by a party to data that is already
```

1    produced pursuant to your order.

2            But, then, Your Honor, I'd like to turn to one --

3    the new information --

4            So Your Honor will note from our joint letter one

5    of the things that SaveOn has said is that, oh, you know,

6    health insurers are very concerned about the idea of this

7    data being redesignated.  They're very worried about that, so

8    you shouldn't rule on this, and you should let them be heard,

9    and they have a stake in all of this, et cetera.

10           THE COURT:  Yeah.  And I'm going to let them be

11   heard.

12           MR. MANGI:  Yeah, and that's fine, if that's what

13   Your Honor --

14       (Simultaneous conversation)

15           MR. MANGI:  But I would like to flag for you just

16   the context here because I think that context is very

17   important.

18           Your Honor is aware and will recall from prior

19   arguments that Express Scripts a -- the PDM here, one of the

20   biggest companies in the United States, that works

21   exclusively and directly with SaveOn on this program.  They

22   exclusively market.  They share the proceeds, and we've

23   talked about that in a prior hearing.

24           We received, Your Honor, just recently from Express

25   Scripts, no less, the communication that SaveOn sent to the

 1   health plans about this issue.  And I'd like to show that to

 2   you to flag a few -- just a few -- very important points

 3   here.  I'm going share-screen.  I'm going to put that up.

 4              So here is the letter that SaveOn just recently

 5   sent to health plans.  And I have applied highlighting to

 6   this, but I'll draw your attention to particular pieces of

 7   it.

 8              You'll see this was sent on May 30th -- right? --

 9   2023, and they're informing the health plans that J&J -- this

10   is the first paragraph, I've highlighted -- intend to move

11   for an order -- they describe it as allowing members of your

12   plan to be disenrolled, and they're saying if JJHCS

13   disenrolls your plan members, your plan and your members will

14   lose all savings generated by your plan's co-pay assistance

15   benefits support.  And they're dating that May 30th.  And

16   you'll see further down on the page, they say we told them

17   about this issue coming more than two weeks prior to that on

18   May 16th.

19              But I'd like to draw your attention, then,

20   Your Honor, to what they say to these health plans at the end

21   of this letter.  They say -- and this is the second to last

22   paragraph first.  They say if JJHCS removes your plan

23   members, you'll not get the co-pay assistance savings from

24   Janssen drugs.  And that is certainly true, because the money

25   is intended to patients; not for them.

1          But then they say, your options will then be to,

2   one, pay 100 percent of the cost of Janssen drugs under your

3   current plan design, which means the health insurer, you

4   would do what you're supposed to do anyway, pay for drugs for

5   your insureds; or, two, change your plan design, including by

6   potentially reducing or removing coverage for Janssen drugs,

7   allowing patients to transition to drugs in the same class

8   and category.

9          Now, I'd like to take one minute on this,

10  Your Honor, because this is an issue that is absolutely

11  critical, critical, when it comes to patients.  Bear in mind,

12  Your Honor, we're talking about patients that are on cancer

13  drugs, that are effectively treating and controlling their

14  cancer.

15          We're also talked about a lot of patients that are

16  on drugs for immunological conditions; like psoriasis,

17  arthritis, and so on.  When we talk about -- and so on.  And

18  for those patients what is absolutely critical is when they

19  finally find a drug that works for them -- because these all

20  operate based on the immune system and some work for a

21  patient and some don't, they need to stay on those drugs

22  where they are stable and treated and their condition is

23  controlled.

24          What SaveOn is proposing to its health plans here

25  is to say, you know what?  You should then switch those

1   patients for only the reason that you'll make more money off

2   it, switch them to another drug for non-medical reasons,

3   which is an egregious and outrageous thing to do for

4   patients.

5          And then they solicit health plans to come in and

6   argue against this -- in the last paragraph:  [As read] Let

7   us know if you'd like to submit a statement to the Court or

8   if you would like to appear -- and, by the way, what they

9   don't tell health plans, Your Honor, in these two options is

10  that, oh, you know, there is another option here, which is

11  just cut out this middleman SaveOn and go back to where

12  things always were:  You pay for the drugs for your insureds,

13  and the manufacturer will help them with co-pay support.

14  They don't want to get into that option.

15         But here's the most interesting thing, Your Honor,

16  about this.  Given how egregious that point is, nonmedical

17  switching, saying just to make money, take patients off the

18  drugs that are working for them?  When we got this letter

19  from Express Scripts -- right? -- which, remember, is their

20  partner in all of this, Express Scripts works with them on

21  all of this -- all the health plans and companies they work

22  with are introduced them by Express Scripts.

23         Let me show Your Honor what Express Scripts said to

24  us.  This is an email from Express Scripts senior vice

25  president or pharma and trade relations, Harold Carter.  He

1   sent this on Friday to us to Janssen.  And look at what he

2   said, Your Honor.  This is a letter that SaveOn sent out and

3   not Express Scripts.  And he says Express Scripts did not

4   know about or approve the sending of this letter, nor are we

5   supportive of the contents of this letter, and we'll not be

6   making any of these recommendations to our clients.

7           So my point here, Your Honor is simply that they've

8   taken a big step here to try and gin up support for their

9   position by health insurers by providing partial information

10  and proposing steps that are so egregious that even their own

11  primary partner Express Scripts is disavowing the approach

12  that they have taken.

13          Now, let me deal briefly with their other

14  arguments, and then I'll be done.  They also say,

15  Your Honor --

16          THE COURT:  They haven't made their arguments yet.

17          MR. MANGI:  That's fair.  If you'd like me to come

18  back to them --

19          THE COURT:  Well, because -- the information you

20  just gave me -- and I understand that Friday you got the

21  Express Scripts, I don't know anything about.  I don't that

22  they know anything about or I certainly wasn't on notice.  If

23  this came about on May 16th, it would have been nice if I had

24  it.

25          What does this have to do -- tie this in to the

|Hearing
|22-cv-02632, June 6, 2023

 1   dedesignation of patient lists?

 2           MR. MANGI:  Yeah, let me tie it in expressly,

 3   Your Honor.

 4           Number one, what happened on May 16th is that we

 5   sent them notice.

 6           THE COURT:  Right.

 7           MR. MANGI:  That we were going to bring this

 8   application.

 9           THE COURT:  Okay.

10           MR. MANGI:  And if they wanted to present an issue

11   to Your Honor from health plans or otherwise, they should

12   have taken steps immediately.  Right?  May 17, May 18,

13   May 19.

14           They didn't do anything until two weeks later,

15   May 30th.  And that is why we got this information so late.

16   That's why all of this is happening now.

17           THE COURT:  Okay.

18           MR. MANGI:  Point number 1.

19           Point Number 2, how does that relate into the

20   arguments you're hearing on the patient lists?

21           THE COURT:  Yeah.

22           MR. MANGI:  It relates in this way, Your Honor.

23   They're suggesting that the reason you should not do this is

24   because there's some great, you know, organic concern among

25   health plans.  And they won't have any standing anyway, but

1    even if they do, what I wanted to point out, Your Honor, by

2    showing you this letter is that the steps Express Scripts --

3    that SaveOn has taken are to expressly try and gin up

4    arguments from health plans without giving them the full

5    information while suggesting steps that are so egregious that

6    even their own primary business partner is disavowing them.

7    And that is going to color any arguments you may choose to

8    hear from health plans or anyone else.

9              That is why I flagged that for you.

10             And then --

11             THE COURT:  But --

12             MR. MANGI:  And then I'd just like to point out one

13   another point here, Your Honor, which is they also argue that

14   we haven't proved our case yet.  And that's true.  We'll

15   prove our case at trial.

16             But what I'd like to point out, Your Honor, is a

17   very important distinction.  When we prove our case at trial,

18   what we will then be seeking are two things:  One, we will

19   seek damages for what has occurred going back over time; two,

20   we will seek an injunction to prohibit this conduct going

21   forward.

22             Right now, we're not seeking either of those --

23   that is for the merits.

24             All we're seeking now is to cut off the breeding

25   and to not have to be forced to keep making payments that we

 1    think are going to be misappropriated by people for whom that

 2    money is not intended.

 3             And so our view, Your Honor, in conclusion, is that

 4    it really would turn the law on its head to use a protective

 5    order to require us to keep paying money to people for whom

 6    it's not intended.  And our relief is designed to ensure in a

 7    narrow limited focused way that that does not happen and it's

 8    done carefully in a way that won't hurt patients and the

 9    material remains under the protection of the protective

10    order.

11             THE COURT:  All right.  Just so everybody knows,

12    before I hear from defense, whatever decision I make on this

13    issue or any other issue, if, in fact, you want a preliminary

14    injunction or immediate relief, as it is said, I will not at

15    all stay any part of discovery.  It won't happen.

16             And the filing of the PI does not itself stay, just

17    so we're all clear.

18             So let's hear from the other side.

19             MR. DUNLAP:  Thank you, Your Honor.  It's Andrew

20    Dunlap from Selendy Gay Elsberg on behalf of SaveOn.

21             Just at the threshold, there is some discussion

22    here of SaveOn's operations that we think touches on

23    information that we've designated as attorney's eyes only.  I

24    just wanted to be clear on the record, confirm with you, that

25    discussion of that here is not a waiver or otherwise affect

```
 1    that designation, that that does not --

 2              THE COURT:  Okay.

 3              MR. DUNLAP:  -- Johnson couldn't use it unless you

 4    order it otherwise.

 5              Is that right?

 6              For the record, you're nodding yes.

 7              THE COURT:  Yes.  Yes.  That's correct.  I'm sorry.

 8    And if you want to seal this transcript, we can work to do

 9    that too.

10              MR. GREENBAUM:  Your Honor, there's a problem,

11    though, because there are other parties -- other lawyers on

12    this phone, on this call that are not parties in this case.

13    So that raises some issues.  I see counsel for Express

14    Scripts and from other parties here.

15              THE COURT:  I am not aware of that.

16              FEMALE SPEAKER:  Your Honor, this is Carol Lee

17    [phonetic].  I'm here with my colleague, Will Delaney.  We're

18    attending on behalf of Premera Blue Cross.

19              THE COURT:  Okay.  I really wish that I had known

20    that.  I suppose in the future every conference we have will

21    now be in person.  Just be prepared for that, because that's

22    the only way I can figure out who's on what side and who's

23    here for other purposes and when I should clear the

24    courtroom, if necessary.

25              So this will be the last Zoom that we have.
```

1          So anyhow, let's get to it.

2          MR. DUNLAP:  Yes, Your Honor.  So let's not make

3     any mistake about what Johnson & Johnson is really trying to

4     do here.  They've teed this up as a dedesignation issue.  But

5     this is not a discovery dispute.

6          What they want is a permanent irreversible

7     injunction that would shut down SaveOn's operations regarding

8     Janssen drugs without having proved their claims, without

9     even having moved for injunctive relief.  They're trying to

10    do it through the guise of the dedesignation motion.

11         And it's proposing to do this using the most

12    sensitive information that SaveOn has, which is the

13    identities of its customers that was produced in discovery,

14    given the highest confidentiality designation.

15         And when Johnson & Johnson originally asked for

16    this information, they never told us -- and they never told

17    you -- that they wanted to use it for this purpose.  They

18    said that they wanted to use it for damages and potentially

19    to identify patients that they could speak to.

20         Yet now they're proposing to use that information

21    to terminate co-pay assistance to the members of

22    SaveOn-advised plans which would harm those SaveOn and those

23    plans.  And I heard my friend on the other side say that the

24    plans have no say here.  But this is their information.  The

25    information about who of -- which of their patients are

1    taking Janssen drugs and which plans they belong to is very

2    much something they have involvement with.

3           Now, we think there are lots of reasons that you

4    can deny this application, including that the information is

5    protected by HIPAA and there are all kinds serious issues

6    that would be raised for SaveOn and its clients.  But we

7    think there's a straightforward way for you to just deny the

8    application.

9           Theirs is a motion to dedesignate, and their

10   argument is that the patient list doesn't qualify for

11   attorney's eyes only protection.  So if it does qualify, you

12   can deny the motion on that basis alone.

13          Under the protective order, discovery material

14   qualifies for AEO protection if it's highly sensitive

15   business information and its disclosure would be highly

16   likely to cause significant harm to the business or

17   competitive position of the producing party -- in this case,

18   that's SaveOn.

19          So the proposed disclosure here would be not just

20   highly likely but absolutely certain to significantly harm

21   SaveOn's business.  They have told you that they're going to

22   use this information to kick members of SaveOn-advised plans

23   off of CarePath, and as we put in our letter, that would

24   cause SaveOn millions of dollars in fees.  That's significant

25   business harm on it face.

 1          It would also harm the plans who are SaveOn's

 2    clients.  And we did start sending out those notices.

 3    Everything we said in the notices is accurate.  And since we

 4    started rolling them out, we've heard from well over a

 5    hundred plans so far.  They all oppose Johnson & Johnson's

 6    requests.  They've asked that if this is going to go forward,

 7    they have a chance to weigh in.  Many of them have.  But, of

 8    course, they have not even been able to see Johnson &

 9    Johnson's full application, which was filed under seal.

10          And in terms of the timing, they did not tell us

11    they would bring this issue to court on May 16th.  They first

12    raised the issue to us on that date, but they didn't say they

13    would bring to court until later the next week, at which

14    point we started putting the notices together.

15          And Johnson & Johnson has spent a lot of time in

16    this lawsuit vilifying these plans.  But let me just give you

17    a quick sense of who we're really talking about here.  These

18    include unions.  They're plumbers and pipefitters and first

19    responders.  They include government entities, towns and

20    county municipal governments, small businesses, educational

21    institutions -- sorry -- did we -- Your Honor, are you still

22    there?  I'm sorry.

23          THE COURT:  I'm here.  I'm here.

24          MR. DUNLAP:  You went dark on us.

25          Includes educational institutions.  They include

 1  retirement funds, health and welfare funds, and even

 2  religious institutions, including archdioceses.

 3         And while Johnson & Johnson include -- accuses

 4  these people -- and they use all sorts of unfortunate

 5  language about pilfering or misappropriating money, these are

 6  real just fiduciaries who are trying to afford healthcare for

 7  their employees as Johnson & Johnson keeps hiking up drug

 8  prices.  And Johnson & Johnson proposes to increase those

 9  plans' healthcare costs significantly, adding up to a total,

10  as we showed you in our letter, of over $100 million a years.

11  That's significant business harm by any measure.  But it

12  doesn't stop there.

13         It would also put SaveOn at a severe competitive

14  disadvantage.  There are other companies that do what SaveOn

15  does; that is they help plans, as fully allowed by federal

16  law, change their benefit designs to get the full benefit or

17  co-pay assistance programs.  If Johnson & Johnson gets its

18  way here, plans advised by those companies would still get

19  the benefit of CarePath funds, but plans advised by SaveOn

20  would not.  So SaveOn's clients would have an incentive to

21  fire SaveOn and go sign up with another company that can

22  still get them savings from CarePath.

23         Again, this is significant harm, and it's not a

24  close call.

25         And it's also clear that the information that

 1   they're trying to use here is highly sensitive business

 2   information.  They keep saying, that, well, they already know

 3   who the patients are.  But let's be clear about what's really

 4   at issue here.  This is not about the patient list.  It's

 5   really about who SaveOn's clients are.  Johnson & Johnson

 6   wants to identify which patients are enrolled in

 7   SaveOn-advised plans so it can kick them off.  But you can't

 8   do that until you identify which plans SaveOn advises.  That

 9   is who its customers are.

10          Johnson & Johnson may know who's enrolled in

11   CarePath and which plans those patients are members of, but

12   it doesn't know -- its business side does not which of those

13   plans are advised by SaveOn.

14          Now, courts routinely find that customer lists

15   qualify for attorney's eyes only protection.  And SaveOn's

16   client information does here.  It's highly confidential.

17   It's amazingly sensitive, as this motion shows why:  Because

18   if it was publicly known, drug manufacturers could terminate

19   co-pay assistance to those patients.  That's the whole reason

20   Johnson & Johnson brought this lawsuit.

21          Letting them have this information now would allow

22   them to effectively shut down SaveOn's services regarding

23   Janssen drugs and permanently.  If they lose and they show

24   that no damages, they are not going to put these patients

25   back on CarePath.

1          And all on the basis of allegations that we

2    strongly contest and don't think they're ever going to be

3    able to prove.

4          Put another way, if Johnson & Johnson had this

5    information before it had filed the lawsuit, it would get

6    this relief without having to sue us, which confirms that the

7    patient list is highly sensitive information.

8          For those reasons, it qualifies for attorney's eyes

9    only protection, and you don't have to go any farther.

10         And as to the argument that this is mitigation of

11   damages, we don't think this is proper mitigation.

12   Mitigation generally means that you can take steps within

13   your own control to lower your damages.  They've provided no

14   authority showing that you can take discovery from another

15   party's highly confidential business information and use that

16   to mitigate your damages.  The only case we found where this

17   even came up was the Ring Energy case, that we cite to you in

18   our papers.  And there, the court said, well, they're not

19   going to order the production of that information because the

20   other party had assumed the risk that the damages might be

21   larger because the -- the other could not use the information

22   to mitigate damages.

23         And, here, we have said multiple times, we're not

24   going to argue that they should have mitigated damages based

25   on our confidential information.  They might have been

1  required to mitigate based on other information that's

2  already available to them, but we're not arguing that it

3  shouldn't mitigate it based on the client list.

4      And the last point that my friend on other side

5  said was, well, they have no obligation to provide CarePath

6  funds to anybody.  And they can stop payment to anybody that

7  they like.

8      Well, that's true.  But they can stop payments

9  based on information they currently have, that they have

10 obtained through lawful means.  That's true.  And that's why,

11 for example, they could just cap their CarePath budget across

12 the board.

13     But what they can't do is make the commercial

14 decision to reduce payments to certain patients on certain

15 plans using our confidential information that they wouldn't

16 be entitled to without this lawsuit.  That is a commercial

17 nonlitigation purposes -- purpose, and it's inappropriate.

18     If they want this relief, if they want to shut down

19 SaveOn going forward, they need to prove their claims, but

20 they haven't.

21     Your Honor, I believe you're on mute, if you're

22 trying to speak to us.

23     THE COURT:  Thank you.  And give me two seconds

24 here.  Okay?  I have another call.

25     (Recess)

1          MR. MANGI:  Three points.

2          THE COURT:  Go ahead.

3          MR. MANGI:  Thank you.

4          So first point, Your Honor, is this:  Mr. Dunlap

5   raised this question of, you know, who are we accusing of

6   what and where's the harm under the protective order?

7          Let me just be very clear on that.  We are accusing

8   SaveOn of being the bad actor here that is misappropriating

9   this money.  Now, whether some plumbers union or archdiocese

10  that they have gotten to sign up on the promise of saving

11  them money knows exactly what they're up to and how it

12  operates is a question for another day.

13         But when it comes to SaveOn, can they prove some

14  kind of cognizable significant harm to them from the use

15  we're proposing to make under the protective order for terms

16  of an AEO designation?  Absolutely not.  And the reason is

17  very straightforward.  They have no entitlement to this

18  money.  And they have no ability to force us to keep paying

19  it only for them to misappropriate it.

20         THE COURT:  Are there any HIPAA implications,

21  though?

22         MR. MANGI:  There are not, Your Honor, because we

23  already have a HIPAA-compliant protective order that has been

24  entered in this case that allows for the designation of this

25  information as health information and requires careful

1    treatment of it.  Accordingly, all of that will remain

2    absolutely in place here -- because we've already gotten this

3    information.  We're going to continue to treat it compliant

4    with HIPAA under the existing terms of the protective order.

5           And let's not forget, we already have these names.

6    Right?  So there's nothing new from a HIPAA perspective that

7    we're getting.  All that's new is the fact that they're in

8    SaveOn.  So that issue doesn't come at all.

9           And let me also just note there that I didn't hear

10   a single word in their letter or from Mr. Dunlap on the

11   second independent reason why we need this dedesignation --

12   because it's very hard for us to make any use of this for our

13   damages calculation, the retrospective piece unless people

14   who work with this data can use it.  So that's point

15   Number 1.

16          Point Number 2 of 3 is Mr. Dunlap pointed you to

17   some case law they cite.  That case law, Your Honor, has to

18   do with customer lists being disclosed for one competitor to

19   another.  That has zero application here because we're not a

20   competitor with SaveOn.  We're not talking about customer

21   lists.  We're talking about patient lists.

22          THE COURT:  No.  But you're talking about cutting

23   off their business.

24          MR. MANGI:  Well, what we're talking about,

25   Your Honor, they can -- they can continue in their business

|Hearing
|22-cv-02632, June 6, 2023

1  with every other manufacturer that they are dealing with.

2  We're just one of them.

3         But what we're saying is that they -- if they have

4  some legitimate business stream where people are making money

5  available and they want to utilize and no one has any

6  objection, go ahead.

7         But when -- in this situation when it comes to

8  JJHCS, this is money we're making available only for

9  patients.  They have no entitlement to it.  And if it impacts

10 their business, well, too bad.  But they don't get -- they

11 have no right to have this continue -- this money continue

12 rolling in from us.  That would be the start for this to be

13 any cognizable sort of harm.

14        They can't force us to keep paying money only for

15 it to be misappropriated.

16        THE COURT:  Okay.  But your assumptions are this,

17 that you've won your case.  You are the judge, jury, and

18 executioner here.

19        MR. MANGI:  -- absolutely --

20        THE COURT:  -- your case, and therefore SPS should

21 not be entitled to continue its commercial endeavors.

22        MR. MANGI:  No, Your Honor.

23        THE COURT:  You're taking --  far from it, as you

24 know.  You're trying to prove your case.  It's almost like

25 prior restraint of some sort to, in fact, cut off their means

1  to do business because your case says that they are doing the

2  wrong thing.  And we just don't have the proof of that.  And,

3  again, that would be up to a finder of fact.

4       MR. MANGI:  That -- it is the opposite, Your Honor.

5  And let me -- let me explain why that is.

6       Again, when we prove our case, what is the relief

7  that we will be seeking ultimately?  The relief we are

8  seeking ultimately are two things:  One, we want damages

9  going back over time.  That is not implicated here.  We're

10  not seeking any damages through this.  That is going to

11  remain for trial.

12       Number 2, we will be seeking an injunction

13  prohibiting them from engaging in conduct going forward based

14  on a judicial determination that the conduct is wrongful.

15  We're not seeking any kind an injunction here either.

16       What we are seeking simply is the right to use this

17  information to stop our own bleeding.  These are payments

18  that we are making voluntarily, and we don't want to make

19  these payments to them.  Right?  That is why this is

20  completely different because we're not seeking damages; we're

21  not seeking to have the Court decide what is legal or

22  illegal.

23       All we're seeking is a right to not have to make

24  payments when we know that those payments are going to be

25  misappropriated.  And that, I would submit to Your Honor, is

```
 1   a very, very different thing -- because what they're saying
 2   is under the protective order, because of the protective
 3   order, we are obligated to make payments for a charitable
 4   sort of purpose going to help patients just so they can
 5   misappropriate it.  There is no obligation on us to do
 6   whatsoever.  And we shouldn't be required to do that if we
 7   know that money is going to be taken away.
 8            And I think a very good illustration of that,
 9   Your Honor, is that when they say, oh, you know what?
10   There's some other companies out there, like SaveOn.  And
11   what about them?
12            Well, when we sue them, you know, we'll deal with
13   them.
14            But we are here now dealing with SaveOn.  And we
15   have a clear pathway to stopping the bleeding.
16            And we can cut off payments to an entity that we
17   know is taking money that is not intended to.
18            If there is any case law here that's comparable,
19   it's case law that indicates when they're common customers or
20   there's information that both companies have, then that's not
21   appropriate under the protective order to try to block that.
22   And we cited cases to that effect in our brief.
23            But I will say, ultimately, Your Honor, all of
24   these cases in this area, they're all very fact-specific.
25   And what we're presenting to you is a very unique and
```

 1   distinct fact pattern here because the key issue is we are

 2   making these things to help patients.  And what they're

 3   saying is we are required to keep making those payments for

 4   them to misappropriate.  And if we do, all that is happening

 5   here, Your Honor, is we are multiplying and increasing

 6   damages claims over time, which is exact opposite of what

 7   policy and the law should require.

 8          If we don't want to -- money -- them to take money,

 9   we should be allowed to stop that.  And then at the merits,

10   we will deal with the issue of damages.  That's what the

11   merits trial will about as well as injunctive relief --

12          THE COURT:  The merits trial will be about the

13   merits and whether or not they're doing anything untoward,

14   which you have --

15          MR. MANGI:  Okay.

16          THE COURT:  -- seemingly put your judgment on

17   already.

18          MR. MANGI:  No -- well, Your Honor, only to this

19   extent -- only to this extent, that our judgment, JJHCS's

20   judgment, about that informs whether J&J wants to make this

21   money available for them to misappropriate, because we think

22   they're misappropriating it.  And the --

23          THE COURT:  I know what you think.  That's what I'm

24   saying is a prejudgment of merits, that that, I don't think,

25   is appropriate at this --

 1          MR. MANGI:  Well, Your Honor, here's why it's

 2   appropriate:  Because the only person whose judgment matters

 3   as to whether or not we keep providing this particular pool

 4   of money is ours.  Right?  If we think that the money is

 5   being skimmed inappropriately, then our judgment matters,

 6   because then we don't have to make --

 7          THE COURT:  It certainly matters.  But it's up to a

 8   finder of fact as to whether or not there's misappropriation.

 9          I am not sure why we're jumping the bridge on this.

10   It's crazy to say, well, because we think they've

11   misappropriated, now is the time to punishment -- punish them

12   and shut them down.

13          MR. MANGI:  There's no punishment involved here,

14   Your Honor.  And --

15          THE COURT:  Well, if they stop making money,

16   certainly, there is punishment.

17          MR. MANGI:  Your Honor, they're not making money.

18   They are taking money that we give to patients.  And if we

19   don't want them to do that, it's our money.  They have no

20   entitlement to it.  We're not asking you to make any judgment

21   now on whether that's right or wrong or misappropriation.

22          We're only asking you to recognize that this is our

23   money, we're voluntarily making it available, and if we don't

24   want them to have it, that's up to us.  And we -- he

25   shouldn't be allowed to use a protective order --

 1              THE COURT:  A little far afield from discovery.

 2              MR. MANGI:  Well, it's come up in the context of

 3  discovery, Your Honor, for one reason and one reason only --

 4  because they take deliberate steps to evade manufacturer

 5  detection.

 6              But now we're in litigation.  The information has

 7  been produced to us.  And it has a legitimate

 8  litigation-related purpose, which is mitigation of damages.

 9              THE COURT:  Okay.

10              Mr. Dunlap, do you want to respond?

11              I think you're on mute now.

12              MR. DUNLAP:  Can you hear me now?

13              THE COURT:  Yeah.  Thank you.

14              MR. DUNLAP:  All right.  Sorry.

15              So a few quick points, Your Honor.  You mentioned

16  the second basis for his request, which is needing to work

17  with J&J on damages.  This is a brand-new argument.  It was

18  never raised in meet-and-confers.  It was not raised in their

19  papers.

20              We, frankly, don't understand why they can't do it

21  the old-fashioned way and give their data to a litigation

22  vendor, an expert shop.  So glad to meet and confer with them

23  on that, but their -- that hasn't been raised and is not

24  before you now.

25              They say a few other things.  They don't think

1    there are HIPAA implications.

2              Well, the plans disagree -- that we've heard from.

3    There are statutes involved.  There are contracts involved

4    that do put HIPAA restrictions on this.  He says there are no

5    new names of patients involved.  But there are new

6    disclosures being proposed; that is, they want them to go to

7    new people within Johnson & Johnson.  They want it to go

8    outside of Johnson & Johnson to a third-party vendor.  They

9    want it to be used for all sorts of things.  Obviously, that

10   implicates HIPAA as well.

11             So I think we agree with where you are.  He keeps

12   saying, this is misappropriation.  He wants to stop the

13   bleeding.

14             But no one's determined that we've misappropriated

15   anything else or that the payments they make constitute

16   bleeding.  And we don't think they do.

17             He also says, well, they have the right to decide

18   who they want to make payments to.  But they don't have the

19   right to use our confidential information produced in a

20   federal litigation subject to a protective order to do that.

21   They can use information that's in the public record now or

22   anything that they've managed to find through lawful means to

23   take actions, if they want to.  But they -- this is whether

24   they can use our information.  He keeps saying, oh, you can't

25   use a protective order to require them to make payments.

1          That really doesn't make any sense.  What the

2   protective order does is prevents them from using our

3   confidential information and our plans' confidential

4   information for this commercial purpose.

5          And -- oh, he also says, well, look, this is not

6   really like the case law we've cited because Johnson &

7   Johnson and SaveOn are not competitors.

8          But we don't think that's right.  They are clearly

9   commercial adversaries, even if they don't compete for the

10  same lines of business.  They're commercial adversaries for

11  the very reasons that my friend on the other side makes

12  forward.  They want to stop us from making money off of

13  advising plans about how to get the full benefit of their

14  co-pay assistance.  They want to make -- they want to get

15  more money from themselves by taking money away from us.

16  That makes us commercial adversaries.  And we think the same

17  logic underlies the competition case -- the competitor cases

18  underlies the situation here.

19         And he also says, well, you know, you share

20  patients.  The patients who are taking care -- Janssen drugs

21  who are on CarePath are also SaveOn's patients because they

22  are members of plans that SaveOn advises.

23         But, again, it's about the client information.

24  They're trying to use the patient list to identify who our

25  clients are so they can take that information to kick just

 1   our folks off of CarePath.  That's a commercial use.  When he

 2   says, well, Johnson & Johnson doesn't want to spend its money

 3   that way, that's a commercial decision that they want to make

 4   about not spending their money on members of SaveOn-advised

 5   plans.  But they can't use information produced in a federal

 6   litigation for that purpose.  If they want to use the

 7   information in this litigation for that purpose, they have to

 8   prove their claims.

 9        And as you keep pointing out, rightfully, they

10   haven't.

11        You're still muted, Your Honor, I believe.

12      (Pause in proceedings)

13        ATTORNEY FOR PLAINTIFF:  -- schedule this later in

14   the week in person so we could finish the argument and

15   address the other issues.

16        THE COURT:  Yeah, but it may not be this week.  I

17   mean, that's -- I'm really very tightly wound in this next

18   few weeks, which is why I was trying to do this.

19        But let me just look at the calendar.

20        First of all, I disagree with the dedesignation or

21   redesignation for the reasons that were stated within the

22   questions I had from plaintiff.  I believe that the end here

23   is commercial and punitive measures.  In other words, you

24   want me to issue sort of a preliminary injunction tieing

25   hands.  I am not going to do that.  This is discovery.  Only

1  discovery.  We all agree to a confidentiality order.  And we

2  all agree to designations.  I am not sure of the potential

3  here of exposure of sensitive material.  I think there is

4  that exposure once we open this up to business people or

5  other people.  It's -- smells punitive to me without merits

6  decisions.  We need to go on to exploring discovery and not

7  concluding who or what did anything wrong.  As I said, acting

8  as the judge and jury is not appropriate in this case.

9        So for that reason -- for those reasons, I am not

10  going to make -- judgments on the merits of the case by

11  dedesignating what we've already agreed to, you-all have

12  agreed to, and that is that the patient list is for

13  attorney's eyes only.

14        With respect to the remaining issues, let me just

15  look at my calendar.

16        Let's just -- in terms of scheduling, why is that a

17  problem?  Why can't you agree on scheduling?

18        ATTORNEY FOR PLAINTIFF:  We set a schedule in this

19  case at the very outset.

20        THE COURT:  Right.

21        ATTORNEY FOR PLAINTIFF:  It was a schedule that

22  was, you know, reasonable but not super fast.  It provided

23  for seven months for substantial completion of document

24  production; 11 months for all of fact discovery so that

25  additional document production as well as depositions could

1   be conducted -- 11 months is a reasonable time frame.

2           And as my partner explained a moment ago, we're

3   suffering continuing harm, in our view.  I understand

4   Your Honor's point -- it hasn't been proved yet.  We want to

5   get to the point where it can be proved.  We want to move

6   this case along to a conclusion, to stop the bleeding that my

7   partner explained.

8           And so by putting in a four-month extension, really

9   without any basis in the record of this case, you know, would

10  just -- it's just four months of payments that are being

11  misappropriated from patients to SaveOn and its business

12  partners.

13          And so we just don't understand why four months are

14  necessary.  If they had come and said, oh, we need another

15  week or something, as I think we said in our letter, you

16  know, we're not -- we're not trying to be difficult about

17  this.  But four months is just -- it just blows a hole in the

18  schedule that everyone agreed to, that was not a super fast

19  schedule.  And the continuing harm to our client goes on

20  every day.

21          So that's why we're opposing.  I can go into more

22  detail if the Court would like, but that's the -- those are

23  the core points here.

24          I guess the other thing I would say is, you know,

25  we really took exception to the accusation of being

1  foot-dragging.  The opposite is true here.  The record of

2  discovery in this case has involved foot-drags but by SaveOn

3  and not by JJHCS.  As the Court will recall, they made a stay

4  motion initially to try to put everything on hold.  The Court

5  denied that in October of last year.  But we did not get any

6  real production of documents for five months after the stay

7  was denied.  They produced a total -- a grand total of 50

8  documents during the five months.

9          THE COURT:  Is there some compromise that we can

10  make, rather than four months, with the knowledge if there's

11  good cause, obviously, I'm going to give extensions so that

12  every aspect of this case can be properly explored?

13          ATTORNEY FOR PLAINTIFF:  Well, what we said in our

14  papers was that if they needed a few more days to get to

15  substantial completion so that they could finish their work,

16  we have finished our work -- or I should say we will have

17  finished our work on the time table envisioned by the Court.

18  If they needed a few more days -- I think we said 10 days or

19  something like that -- again, we are not trying to be

20  difficult.  If they need a week or two more, that's one

21  thing.  But four months is just not acceptable.

22          THE COURT:  Okay.  Let me hear from the other side.

23          What's the compromise here?  Why am I having to

24  deal with this?

25          MR. DUNLAP:  I think just the parties are on

1   different planets when it comes to what has been done and

2   remains to be done.

3           So you may remember back in October when we had our

4   first hearing, we had said that once we gathered documents,

5   we thought we could go through about 160,000 of them in four

6   months if we hired a couple of dozen of reviewers.  And that

7   was the basis on which we, at least, were agreeing to the

8   schedule the parties negotiated.

9           And while our estimates about how fast we could

10  review were right, our estimate of how many documents would

11  be at issue was not.  So just looking at Johnson & Johnson's

12  request, we proposed search parameters on our own that

13  yielded about 250,000 documents, just from our custodians.

14          Johnson & Johnson then asked us to do even more.

15  We've met and conferred extensively.  At their request, their

16  request, we've added custodians, we've added search terms,

17  we've extended the time period.  And that has added 320,000

18  custodial documents to the pile.

19          So that's a total of 570,000 custodial documents we

20  need to review.  When you add noncustodial documents, that is

21  things shared sort of like share drives and that sort of

22  thing, the total is well over 600,000.

23          And, I mean, to state the obvious, 600,000 is more

24  than 160,000.  It's almost four times the original

25  projection.

1              And the idea that we've been foot-dragging I just

2   don't think passes the "laugh" test here.  We've employed

3   dozens of reviewers to go through these documents.  My client

4   is spending millions and millions of dollars on this effort.

5   And while it's hard -- because it's a multi-layered review,

6   it's hard to say exactly how many we've finished fully

7   reviewing, but we think more than halfway done.

8              As of yesterday, we've produced nearly 100,000

9   total documents.

10             We've also, on top of that, produced over 140,000

11  records of calls.  The other side said in this letter that

12  that didn't have to be reviewed.  That's not true.  They were

13  all reviewed, and it took a lot of time to do it.

14             We've also gathered and produced large amounts of

15  claims data, nearly 120,000 lines of it, about all the

16  transactions involving Janssen drugs for patients on

17  SaveOn-advised plans.

18             And we prioritized a lot of that data production,

19  again, at Johnson & Johnson's request.

20             So we've done an extraordinary amount of work.  Any

21  idea that we've been foot-dragging is simply not true -- I

22  don't think borne out by the numbers.

23             And we have more work to do.  We have to finish

24  reviewing hundreds of thousands of documents that still

25  remain, and Johnson & Johnson keeps sending us new discovery

 1   requests.  They keep asking us to add new custodians and new

 2   search terms.  And we need time to work through all this.

 3           And then in terms of Johnson & Johnson's

 4   production, while we they say they'll certify that they're

 5   done as of this Friday, I believe it is, that might be true

 6   for the documents they want to produce, but not for the ones

 7   we think they need to.

 8           Now, you may recall, Your Honor, we moved to

 9   compel -- SaveOn moved to compel, back in January,

10   information on Johnson & Johnson's terms and conditions and

11   then also a bunch of financial and other information going to

12   its injuries.  Johnson & Johnson said, well, they intend to

13   make a big production on those topics.  And what you ordered

14   was, well, wait until we get those productions, review them,

15   and then come back if there are gaps or things that we

16   needed.

17           And when we -- when you said that and it was first

18   argued in February and then later argued in March, but in

19   February, we said we would do that, but we anticipated that

20   if that's what happened and Johnson & Johnson continued to

21   refuse to produce categories of information that it was

22   refusing to produce at the time, that we thought that that

23   would require an extension of the schedule.

24           And that's exactly what's happened.  They've

25   produced some documents on these topics, but what they told

1  us was that they wouldn't -- those productions.  And, again,

2  these are productions you told them to prioritize,

3  Your Honor.  They won't complete those productions until the

4  substantial completion deadline.

5           And as of now, they've produced about 11,500

6  documents; most of those at 10 o'clock on Friday night.

7           But based on we've seen so far, there isn't all the

8  information we need on terms and conditions.  There isn't all

9  the information we need on finances.

10          And we need enough time to work through that,

11 identify gaps.  If we can resolve through negotiations,

12 splendid.  But if not, we'll need time to litigate it before

13 Your Honor as well.

14          And we think we'd be severely prejudiced if we

15 don't have that time.

16          So we're glad to talk about a compromise -- an

17 interim compromise, somewhere in the middle.

18          But as of last time we communicated with Johnson &

19 Johnson, they said they refused anything.  And another 10

20 days to complete all the work we have to do is just not

21 realistic.

22          ATTORNEY FOR PLAINTIFF:  So, Your Honor, on one

23 piece of what Mr. Dunlap said in terms of their complaints

24 about our production, we made a significant production at the

25 end of April.  Their major complaint is that it was too

1    small.  They've had plenty of time to review it, and as of

2    sitting here, they've made no application to Your Honor, and

3    although we have engaged with them on the subject of terms

4    and conditions, on all of the other issues that they've

5    mentioned, we have -- I don't think we've heard from them on

6    the issue of, you know, their requests in the past for every

7    record of every patient fill for Janssen drugs going back

8    2009, all of the manufacturing cost information and marketing

9    cost information.  They didn't go back -- either going back

10   to 2009 -- we haven't heard them in any letters revisiting

11   these things.  And we made our production six weeks ago.

12           So, really, they need to, you know -- they -- their

13   actions don't match what they are saying here in terms of the

14   urgency of pressing us for discovery.  The fact is we've

15   produced and will continue to produce what we have, what we

16   can.  On many of these issues, like terms and conditions, the

17   essence of their complaint isn't that, you know, we haven't

18   produced what we have.  The essence of their complaint is we

19   badly wish there were documents that don't actually exist.

20   And why not -- in a recent letter, they asked us to go back

21   essentially to the beginning of time, which sounds like an

22   exaggeration, but they said, go back as far as you need to go

23   back, as many years as that is, beyond 2009, to see when

24   certain terms and conditions were first used.

25           So we're not really engaging here in a serious

 1   process as to what JJHCS needs to do.

 2            You know, we're going to honor our obligations

 3   under the order.  And, you know, we did make a compromise

 4   proposal in our letter.  We talked about 10 days.  Mr. Dunlap

 5   says that's not enough.  It's a substantial completion

 6   deadline.  It doesn't require that literally every piece be

 7   produced.  It's just to substantially comply in the time

 8   period that we stipulated to, that we agreed to many, many

 9   months ago.

10            Sorry, Your Honor.  And you are on mute,

11   Your Honor.

12            THE COURT:  Don't -- I'm at home, and my dogs are

13   barking; so I keep muting.  I'm at home because my car broke

14   down on the way to Newark, and I don't want to be here

15   anymore.

16            ATTORNEY FOR PLAINTIFF:  So sorry to hear about

17   that, Judge.  I've had car problems too.  And it's -- there's

18   nothing worse.

19            THE COURT:  Yeah.  And they found out that there

20   was a stone -- a rock in my brake apparatus.  It took a long

21   time to do that, and the car's still not ready.

22            But I can't stay home anymore.  I can't do it.

23            Anyway I'm sorry about that.  And, obviously, I am

24   not even dressed because I'm back in COVID head.

25            But outside of that, look, I am not -- a schedule

1    does not necessarily encompass disputes.  If there are going

2    to be disputes that I have to litigate, I need time, and the

3    schedule would get pushed out.

4         Can we make the 10 days 45 days -- we shall make

5    the 10 days 45 days.  Not four months.  And let's keep

6    rolling.

7         And the disputes are sort of a time warp.  You

8    know, we'll have to decide them, and then if more time is

9    needed, I can give you more time.

10        So it's 45 days.

11        Now, let me just give you the benefit of my

12   thoughts on the other two issues that -- 61 and 62.  My

13   thoughts are, without argument -- and I'm going to try and

14   bring you in in person, but maybe if I give you a preview of

15   what I'm thinking, I think I would deny 61 and grant 62.

16        So you can speak with each other on that basis.  I

17   am always willing to be convinced of my stupidity on those

18   requests.  I'll try and schedule an in-person as soon as I

19   possibly can.  But, perhaps, we can avoid that, knowing what

20   my preliminary thoughts are.

21        MALE SPEAKER:  Thank you, Your Honor.

22        THE COURT:  All right.

23        All right.  Thanks for your time once again and the

24   education.  As I said, I'll -- let me search the calendar

25   right now and see if I can fit you in -- when I can fit you

|Hearing
|22-cv-02632, June 6, 2023

1    in for an in-person.

2              MALE SPEAKER:  Thank you.  That will be

3    appreciated.

4              THE COURT:  Thank you all.  Bye-bye.

5                   (Conclusion of proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
|Hearing
|22-cv-02632, June 6, 2023
|Certification
```

                                    Certification

1
2        I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 59 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11       I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ *Sara L. Kern*                    10th of June, 2023

19   _____    _____
     Signature of Approved Transcriber            Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080

24

25