```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE        .
SYSTEMS INC.,                        .
                                     .
        Plaintiff,                   .  Case No. 22-cv-02632
                                     .
vs.                                  .  Newark, New Jersey
                                     .  June 27, 2023
SAVE ON SP, LLC,                     .
                                     .
        Defendant.                   .


                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE CATHY L. WALDOR
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared in person):

 For the Plaintiff:       JEFFREY J. GREENBAUM, ESQ.
                          Sills Cummis & Gross P.C.
                          The Legal Center
                          One Riverfront Plaza
                          Newark, NJ 07102-5400
                          (973) 643-7000
                          jgreenbaum@sillscummis.com

                          HARRY SANDICK, ESQ.
                          Patterson Belknap Webb & Tyler LLP
                          1133 Avenue of the Americas
                          New York, NY 10036
                          (212) 336-2723
                          Hsandick@pbwt.com




Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1   (APPEARANCES continued)

 2   For the Plaintiff:      KATHERINE MARGUERITE LIEB, ESQ.
                             Sills Cummis & Gross P.C.
 3                           101 Park Avenue, 28th Floor
                             New York, NY 10178
 4                           (212) 643-7000
                             Klieb@sillscummis.com
 5
                             ADEEL ABDULLAH MANGI, ESQ.
 6                           Patterson Belknap Webb & Tyler LLP
                             1133 Avenue of the Americas
 7                           New York, NY 10036
                             (212) 336-2563
 8                           aamangi@pbwt.com

 9                           GEORGE A. LOBIONDO, ESQ.
                             Patterson Belknap Webb & Tyler LLP
10                           1133 Avenue of the Americas
                             New York, NY 10036
11                           (212) 336-2008
                             Globiondo@pbwt.com
12

13   For the Defendant:      ANDREW R. DUNLAP, ESQ.
                             Selendy Gay Elsberg PLLC
14                           1290 Avenue of the Americas
                             New York, NY  10104
15                           (212) 390-9005
                             Adunlap@selendygay.com
16
                             MEREDITH NELSON, ESQ.
17                           Selendy Gay Elsberg PLLC
                             1290 Avenue of the Americas
18                           New York, NY 10104
                             (212) 390-9069
19                           mnelson@selendygay.com

20                           ELIZABETH SNOW, ESQ.
                             Selendy Gay Elsberg PLLC
21                           1290 Avenue of the Americas
                             New York, NY 10104
22                           (212) 390-9330

23

24

25
```

```
 1   (APPEARANCES continued)

 2   For the Defendant:      E. EVANS WOHLFORTH, ESQ.
                             Robinson & Cole LLP
 3                           Chrysler East Building
                             666 Third Avenue, 20th Floor
 4                           New York, NY 10017
                             (212) 451-2954
 5                           ewohlforth@rc.com

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|Hearing
|22-cv-02632, June 27, 2023                                                    4

1                   (Commencement of proceedings)

2

3              THE COURT:  All right.  We're on the record in

4    22-2632 on various discovery disputes.

5              Let's have entries of appearance for Johnson &

6    Johnson Health Care Systems first.

7              MR. GREENBAUM:  Good morning, Your Honor.  Jeffrey

8    J. Greenbaum, and I'm with Katherine Lieb, Sills Cummis &

9    Gross, for plaintiff.

10             And I'll let the gentlemen from Patterson Belknap

11   introduce themselves.

12             MR. LOBIONDO:  Good morning, Your Honor.  George

13   Lobiondo from Patterson Belknap.  With me is Harry Sandick

14   and Adeel Mangi.

15             MALE SPEAKER:  Good morning.

16             THE COURT:  You have to talk slowly, because I'm

17   old and my hearing is slow.

18             MALE SPEAKER:  Thank Your Honor.

19             THE COURT:  Go ahead.

20             MR. WOHLFORTH:  Good morning, Your Honor.  Evans

21   Wohlforth from the Robinson & Cole firm for SaveOn SP LLC.

22             With me from the Selendy Gay firm is Andrew Dunlap,

23   Elizabeth Snow.  They'll be presenting the argument today for

24   our side.

25             And also Meredith Nelson.

1          THE COURT:  Okay.

2          So where, I believe, we left -- by the way, I

3  received your various submissions and your objections to the

4  other side's various submissions and your failure to agree on

5  meeting and conferring and every other submission that you

6  have.  And I've reviewed them the best I can, knowing that

7  Friday they came in at, like, 8:00 and 11:00, and I'm sorry

8  that people were working late.

9          But I did not work this weekend -- thank you very

10  much.

11          I am on criminal duty; so I had limited time

12  yesterday.  And I reviewed things today.  And, of course, Tim

13  Duva reviewed everything and helped me out with a bench memo.

14          So I think we can proceed.

15          Where are we going to start, Mr. Greenbaum?

16          MR. GREENBAUM:  Yes, Your Honor.  I did submit a

17  letter -- I don't know if you saw it yesterday.

18          THE COURT:  I have your agenda.  Again, thank you.

19          MR. GREENBAUM:  You're welcome.

20          Can we start, then, with 61?

21          THE COURT:  Yes, let's start with 61.

22          MR. GREENBAUM:  Okay.  We are going to have a

23  little different batting order today.  I'm going to start

24  with 61.

25          THE COURT:  Okay.

1          MR. GREENBAUM:  Mr. Lobiondo will start with 62 and

2     also the motion to strike.  And then Mr. Sandick will deal

3     with the custodian issues.

4          THE COURT:  Okay.  I want to make a general

5     statement first.

6          These broad-brush requests for protective orders

7     and compel, I need to deal with things one at a time as they

8     come up.  So as long as I'm going to work on this case, I

9     don't want to make broad protective orders against all

10    financial records or against all of anything.  I need to take

11    things one kernel at a time.

12         So please keep that in mind.  And, obviously, you

13    have open access to my court on a regular basis and know

14    that.

15         All right.  Go ahead.  61.

16         MR. GREENBAUM:  Yes, Your Honor.  Thank you.

17         In considering discovery disputes, the Court, of

18    course, needs to look at relevance and burden and to make

19    sure the burden is proportional to the claims and defenses.

20         Your Honor at one the last conferences asked what

21    was the updated standard on -- for discovery?  If -- you're

22    correct that it was updated in 2015.  And I can just read

23    what is, and I think it shows and it will demonstrate why the

24    business plans are so vital to this case.

25         And the standard is the parties may obtain

1    discovery regarding any nonprivileged matter that is relevant

2    to any party's claim or defense and proportional to the needs

3    of the case, considering the importance of the issues at

4    stake in the action -- and we have said these are very

5    important; the amount in controversy -- we're talking here

6    hundred million or more; the parties' relevant access to the

7    relevant information; the parties' resources; and the

8    importance of the discovery in resolving the issues and

9    whether the burden or expense of the proposed discovery is --

10   outweighs the likely benefit.  Information within the scope

11   of discovery need not be admissible in evidence.

12          Here, Your Honor, there's absolutely no burden, and

13   they haven't claimed there is any burden.  We're talking just

14   a few documents.  There's maybe quarterly business plan for

15   the years in question here.  And we're not talking about a

16   broad request.  This is a laser-tailored request, just to a

17   few documents considering the business plans.

18          And, Your Honor, that go to at the heart of the

19   case.  Relevance is a broad standard.  And I can't think of

20   anything more relevant to our claims challenging SaveOn's

21   efforts to take patient support moneys intended for patients

22   than their plans to do exactly that, which is set forth in

23   the business plans.

24          Here, the division -- diversion of patient

25   assistance funds is the foundation of SaveOn's business

 1    model.  And they've said that.  And the business plan

 2    documents are not only directly relevant, but directly

 3    implicate the harm SaveOn has caused to JJHCS as well as to

 4    its patients and to the public at large; things that are

 5    critical for us to prove for our GBL and our tortious

 6    interference claims.

 7              In both of the -- they've actually in this case,

 8    Your Honor, even though now they argue relevance, they've

 9    essentially conceded the relevance in two respects:  Number

10    one, they've also produced a business plan.  We have attached

11    as Exhibit B to our papers, the January 15th, 2019, business

12    plan.  And I'm going to go through it in a few minutes to

13    show why it's so relevant to our case.

14              But in arguing in opposition, they've also

15    implicitly conceded the relevance by arguing, ah, the

16    business plans are merely cumulative.  They're cumulative

17    because they have other stuff on our business operations.  In

18    the joint letter they submitted, they talk about listing

19    guides to employees who make calls, 140,000 call records, and

20    they say the client savings from Janssen drugs, SaveOn SP

21    operations, call centers, the process of communications with

22    clients and organizational charts -- that would be cumulative

23    of other discovery that you already have.  So they're

24    conceding these are all relevant topics.  And they're saying,

25    oh, the one document that shows their intent, that goes to

|Hearing
|22-cv-02632, June 27, 2023

1    the heart of this, we shouldn't get because we have 140,000

2    records that we have to piece together to try to find their

3    intent, well, this is the heart of it, Judge.  The business

4    plans show what their intent is -- and.

5              THE COURT:  But you have one business plan?

6              MR. GREENBAUM:  Yes.

7              THE COURT:  And what's in that business plan?  You

8    said you were going to get to that.

9              What's in it that's so important to you?

10             MR. GREENBAUM:  I'll explain that, Your Honor.

11             THE COURT:  Okay.

12             MR. GREENBAUM:  But before I do that, I just would

13   like to go to why this is so critical to our claims here.

14             THE COURT:  Okay.

15             MR. GREENBAUM:  Because it shows intent.  And

16   intent is so relevant to what we are trying to prove here.

17             SaveOn admits that it exists only to take advantage

18   of patient assistance programs, like CarePath.  It says that

19   in their video.  We've cited that on many times in the

20   complaint.  And we have two claims here:  tortious

21   interference and deceptive trade practices.  And intent is

22   relevant to both of those.  For tortious interference, we

23   have to show the interference is intentional, that it's

24   willful and unjustified and that it causes us damage.  And on

25   the GBL claim, we have to show it's directed to consumers and

|Hearing
|22-cv-02632, June 27, 2023

1  that it's materially and deceptive, that we're harmed, and

2  that there's a harm to the public at large.

3          And if we can show it's willful, we can get treble

4  damages up to $1,000 for each violation.

5          How they intend to take advantage of patient

6  assistance programs, how they intend to avoid detection.  The

7  law is that they direct to consumers.  This all goes to the

8  heart of our case and shows how they plan to accomplish this

9  in their business plans.

10          So let's go through the business plan, and it's

11  attached to their complaint.  But if Your Honor -- I have a

12  clean copy I can hand up separately, if that's easier for

13  Your Honor.  Would you --

14          THE COURT:  Yeah, that would be great.  Hold on.

15          I mean, don't hold on.  Yeah, go ahead.

16          MR. GREENBAUM:  May I approach?

17          THE COURT:  Yeah, please.

18          Okay.  I don't want to be -- I did this the last

19  time.  Who's in the audience?

20          MALE SPEAKER:  Your Honor, those are all associates

21  with the Selendy firm.

22          THE COURT:  Because last time we had an issue --

23  maybe it was a different case.

24          MALE SPEAKER:  Well, we have had an issue.  I think

25  that actually goes to the sealing issues before you on this.

 1   At least as far as I know, everyone in the courtroom is

 2   cleared, Judge.

 3              THE COURT:  Okay.  Thank you.  Go ahead --

 4              MR. GREENBAUM:  Your Honor, one of the issues that

 5   we want to try to show on their responses to the changes in

 6   co-pay assistance programs and how has manufacturers,

 7   including JJHCS, has kind of caught on to them and tried to

 8   protect themselves, how they try to wiggle around.

 9              If we look at page 7, Your Honor, it talks about

10   ████████████████████████████████████████  -- this is an

11   page 7 -- on some of SP -- SOSP -- that's SaveOn SP -- member

12   claims.  ████████████████████████████████████

13   ██████████████████████████████████████████

14   ████████████

15              ██████████████████████████████████████████████

16   ██████████████████████████████████████████

17   ████████████████████████████████████████

18              Let's turn to page 15.  We have an organizational

19   chart.  Obviously, relevant.  They say, oh, well, you've got

20   other organizational charts.

21              But it's right here in this document.

22              Page 17, it shows ██████████████████████████

23   ████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ██████████████████████████████████████████████

|Hearing
|22-cv-02632, June 27, 2023

12

1           And then most relevant, on the next two pages I'm

2    going to show to point to, page 18, ███████████████████

3    ████████████████████████████████████████████████

4    ████████████████████████████████ --

5           THE COURT:  I don't even know what that means.

6           MR. GREENBAUM:  I'll explain it.

7           THE COURT:  Okay.

8           MR. GREENBAUM:  █████████████████████████████

9    ███████████████

10          THE COURT:  Okay.

11          MR. GREENBAUM:  Warm transfers, Your Honor, it goes

12   to the heart of our case.  We have alleged -- and I think

13   it's somewhat admitted -- that the way SaveOn makes it money

14   is when somebody tries to get its prescription filled, they

15   say, "No, we're not going to fill it."  And they call it a

16   "warm transfer."  They say, "No, we're going to hold it up,"

17   and then basically they're going to hold it up until they

18   sign up for the SaveOn SP program.

19          So they then transfer to Accredo, and then they try

20   to get them agree to say -- to join SaveOn.  And some

21   customers have resisted that.  And they say, "Well, what's

22   this all about?  Who are you?"  And they don't get disclosed

23   who they are.  And we've seen in other documents that they

24   mislead the consumers.  They say, "Well, who are you calling

25   from?  Or you calling from our employer?"

1        "Well, we're representing your insurer."  Or,

2   "We're calling on behalf of the ESI."  And they mislead the

3   public.  The warm transfer goes to the heart of it.

4        And they're saying here, we're having a problem

5   because it's taking too much time on hold.

6        And if you look at the next line, ████████████████

7   ███████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████

9        And then further down the line, ████████████████

10  ███████████████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████

12        Well, we have seen from some other emails, they

13  have frequent asked questions.  Well, if someone said --

14  well, they're saying they're not going to pay for me if I'm

15  on the SaveOn program.

16        We are not a program.  Tell -- and they tell their

17  PSRs, tell them we're not a program.  We're calling on behalf

18  of -- we're just an advisor.  They tell them to say we're not

19  an accumulator.  We're not a maximizer.  They're misleading

20  the public.

21        And this is the heart of it.  It shows their

22  intent.  And if we can tie in these plans with the emails

23  that we've otherwise gotten, we can show that it comes from

24  the very top.  That's what these business plans are.

25        And, finally, look to page 18 -- 22.  22 goes

1 ██████████████████████████████████████████████

2 ███████████████████████████████████  This is the

3 heart of the case.  We're trying to show that they are trying

4 to circumvent the changes at manufacturers are making to

5 defeat their efforts to take our money.

6         So these -- this is only one.  I don't know why we

7 have it.  But we know there's no burden here.

8         So why are they fighting so hard if this is not

9 relevant?  It's relevant.  It goes to the heart.  And they

10 just don't want us to see it because they know it's going to

11 be very harmful to their case.  We want to see all the

12 business plans.

13         So what's their response?  Well, their joint

14 letter, they first make this silly argument, "Well, it's

15 cumulative, that you already have all these thousands of

16 documents."  What do they needed this for?

17         And we said, well, it's right there in one

18 document.  It shows their intent.

19         And they said, oh, they can figure it out from the

20 other document.

21         That's not a basis.  It's kind of a silly argument.

22 They concede the relevance, but they are saying, ah, it's

23 just one more document.

24         Well, it's not one more.  The document goes to the

25 heart of it.

1            And then they say, well, it relates to Your Honor's

2    prior ruling but it involves some non-Janssen drugs.  Well,

3    that completely misstates Your Honor's prior ruling.

4    Your Honor ruled that when we asked for thousands of pages of

5    documents on prescriptions for non-Janssen drugs, we weren't

6    going to get that.

7            But in that very application, we even admitted they

8    would give us documents that related to Janssen drugs and

9    other drugs, even if it doesn't mention Janssen, the drugs

10   generally, but they didn't want us to go down the path of

11   thousands of documents relating to non-Janssen drugs.

12           That's not this situation.  This is a carefully

13   honed request.  This may be five or ten documents involved.

14   There's no burden.  It goes to the heart of our case, and it

15   should be given.

16           Now, I just want to spend a moment on the --

17           THE COURT:  So you want the business plan which

18   looks like this, I assume, from how many years?

19           MR. GREENBAUM:  From that we've all agreed what the

20   discovery period is.  I think it's from 2016 to 2022.

21           THE COURT:  Okay.

22           MR. GREENBAUM:  We just want them for those years.

23           THE COURT:  And this is what you're calling a

24   "business plan" --

25           MR. GREENBAUM:  Yes.

1          THE COURT:  -- just so I understand.  Okay.

2          MR. GREENBAUM:  It says it:  "SaveOn SP Business

3   Plan."

4          THE COURT:  Yep.

5          MR. GREENBAUM:  There's no hard -- they understand

6   what we want.  They just don't want to give it to us because

7   they know how relevant it is and how revealing they'll be.

8          Now, one other minor point, there was a

9   meet-and-confer.  Your Honor gave a preliminary indication.

10  So what's the meet-and-confer?  As we said in the letter, it

11  was heads, I win; tails, you lose.

12         I said, "Well, the judge said she was likely to

13  give 62," which relates to the operation -- operational

14  agreement -- operating agreement, which is the heart of that

15  request.

16         "Well, we don't want to give you that.  We'll give

17  you, you know, the social guidelines."

18         And I said, "Well, what about on 61?"

19         "Oh, we're not offering anything on 61."

20         So that was kind of a waste of time.  We got

21  nowhere on that.

22         Your Honor, I have nothing more to say at the

23  moment other than this is -- goes to the heart of our case.

24  It's a limited number of documents.  And they've already

25  produced one, and they should produce the others and do it

 1  forthwith.

 2           Thank you.

 3           THE COURT:  Okay.  Thank you.

 4           So who -- why -- who's going to speak on this?

 5           MS. SNOW:  Your Honor, Elizabeth Snow from Selendy

 6  Gay.

 7           THE COURT:  So, Ms. Snow, first of all, why do they

 8  have the 2019 business plan?

 9           MS. SNOW:  Your Honor, honestly, it was produced

10  inadvertently.  We've been reviewing 600,000 documents, as

11  they know.  We've produced over -- approximately 120,000

12  documents.  And, as Your Honor knows, in productions that

13  large, mistakes can happen.

14           THE COURT:  When did you produce this?

15           MS. SNOW:  I believe in March.  And, you know, we

16  don't intend to claw it back.  But we do not believe that --

17           THE COURT:  Okay.

18           MS. SNOW:  -- contained in the business plans, writ

19  large, is relevant.  The only information, as Mr. Greenbaum

20  pointed to -- you know, he pointed to Biogen.  Biogen is not

21  Janssen.  Biogen -- there's no possible allegations that

22  Biogen was harmed in this lawsuit.  All the other

23  information, such as the org charts or the consumer emails,

24  they have thousands of emails about the warm transfer

25  process.  They have over 20 organizational charts.

|Hearing
|22-cv-02632, June 27, 2023                                                    18

1          To the extent there is information relevant in the

2    business plans, they have that elsewhere.  And --

3          THE COURT:  Where elsewhere?

4          And Mr. Greenbaum specifically addressed, which I

5    want you to talk about, because I don't really understand the

6    language and, say, page 17, is this what you're saying,

7    confidential information, ████████████████████████████████

8    ████████████████████████████████

9          MS. SNOW:  Yes, ████████████████████████████,

10   which by definition includes well beyond just these related

11   to Janssen.  Of course, they have all fee information.  They

12   have 114,000 lines of transaction-by-transaction-level data

13   about Janssen drugs.

14         That is all they need to prove their damages in

15   this case they have -- their damages claim only rests on what

16   was done to Johnson & Johnson.  As Your Honor pointed out at

17   the March 17 conference at page 16, you said, "I just think

18   that what doesn't affect Johnson & Johnson is not part of

19   this lawsuit."

20         And the information contained in the business plans

21   that they do not already have exclusively affects entities

22   other than Johnson & Johnson.

23         THE COURT:  Well, first, I think Mr. Greenbaum made

24   a point and that is that was applicable to that particular

25   request, which I don't recall off the top of my head from the

 1  transcript reading -- I believe that's the point that you

 2  were making.

 3          And I believe that's the point I'm making.  I don't

 4  want to make general rulings, nor do I want my language

 5  misconstrued to be applicable to every request or denial to

 6  supply information.

 7          So I do see it that way.

 8          But Mr. Greenbaum's point is this -- and it's a

 9  point I'm thinking about, that there's an intent element.  So

10  would other conduct, if you will -- I'm not judging it bad or

11  good -- be applicable to show intent with respect to

12  Johnson & Johnson Health Services?  If Biogen or whatever

13  other company there is is involved in something -- and I

14  don't know what that is, either -- would that go -- would

15  that not go towards intent with respect to J&J?

16          MS. SNOW:  Well, I think -- well, two things,

17  Your Honor.

18          The dispute in March was over a wide variety of

19  requests.  We objected to producing documents related to

20  manufacturers other than Janssen.  It was not a limited

21  objection.

22          But as to your question on intent, SaveOn is not

23  hiding that it runs a business and it's trying to make a

24  profit.  That is --

25          THE COURT:  Right.

|Hearing
|22-cv-02632, June 27, 2023

1          MS. SNOW:  -- very normal --

2          THE COURT:  And you want to make more money next

3    year.  And that's okay.

4          MS. SNOW:  And we want -- yeah.

5          THE COURT:  Yes.

6          MS. SNOW:  -- of course.  And what is relevant is

7    the intent relative to Johnson & Johnson.  It is not relevant

8    as to Biogen, as to --

9          THE COURT:  Maybe at trial, you're correct.  But

10   insofar as discovery, would that still apply?  I am not

11   saying any of this would be admissible, under any evidentiary

12   standard, which would be committed to the pleadings, most

13   likely.

14         But this is discovery.  So shouldn't there be a

15   broader or more circumspect view with respect to intent?

16         MS. SNOW:  Well, to the -- I hear what Your Honor

17   is saying.

18         To the extent they need documents regarding intent,

19   they have tens of thousands of emails discussing if the

20   responses to other co-pay -- to co-pay assistance programs

21   that aren't Janssen.  They have general -- we've produced

22   certainly general documents about business strategy.  We've

23   produced tens of -- or -- I should say thousands of mails

24   from even the founders of SaveOn to new clients or potential

25   clients discussing their business model.  We've produced

1    thousands of communications to patients.

2              To the -- we've produced -- as Mr. Greenbaum said,

3    we've produced 140,000 call records of the patient service

4    representatives speak to patients.

5              To the extent they need to know what SaveOn -- how

6    it views its business, how it markets its business and its

7    goals that are relevant, it has those documents.

8              What it lacks and what we believe should not be

9    produced is its broad financial information, which is

10   unrelated to Janssen drugs, to the contracts at issue --

11   again, they've alleged a tortious interference claim, but

12   it's about the contracts between patients and CarePath, not

13   patients and every co-pay assistance program on the market.

14             And the information is incredibly sensitive.  This

15   is the kind of information that courts grant protective

16   orders over for a reason.  This kind of information in the

17   hands of a commercial adversary who has made no bones about

18   the fact that they are hell-bent on destroying SaveOn, seeks

19   to use this information -- we don't know why they seek this

20   information.  They want information that is irrelevant to the

21   case, and we know that they're trying to shut down SaveOn.

22   That is in their complaint.  We know that they -- you know,

23   we don't know exactly how they intend to deploy this

24   information, but that is why they want this information.

25             THE COURT:  Well, what if it's produced for

 1    attorney's eyes only, though?  Doesn't that suffice in terms

 2    of protection?

 3                MS. SNOW:  So, first and importantly, we don't

 4    believe that attorney's eyes only can turn this irrelevant

 5    information into relevant information.

 6                THE COURT:  Okay.

 7                MS. SNOW:  We also understand that protective

 8    orders are imperfect.  They have shown Your Honor that AEO is

 9    not always the end of the line.  And they can use AEO and

10    show it to their in-house counsel.  It might be used to

11    affect litigation strategy.

12                Remember, this is a $400 billion company facing off

13    against a small private LLC.  We don't know exactly how

14    they're going to use it.

15                THE COURT:  So, Mr. Greenbaum, did you want to

16    respond --

17                Were you done, Ms. Snow?  I'm sorry.  I'll get back

18    to you too.

19                MS. SNOW:  Okay.

20                MR. GREENBAUM:  Yes, Your Honor, I did want to

21    respond --

22                THE COURT:  But, wait, wait, wait, wait.

23                So turn to page 7.  I'm just curious what that

24    means to you, page 7 █████████████████████████████████

25    ████████

1          So does this tell you that there's some kind of

2    intent that's illicit, if you will, or untoward?

3          MR. GREENBAUM:  Well, I should say untoward.  It

4    shows their plans here.  They're going to try to come up with

5    a way of going around the denials so that they don't disrupt

6    their business.

7          Their efforts and their nimbleness of trying to

8    react every time the manufacturers generally are trying

9    defeat what they're trying to do, which is take money that

10   doesn't belong to them.  Janssen is what JJHCS and the other

11   manufacturers are doing this to help the patients.  Not to

12   line the pockets of SaveOn and this Express Scripts.

13         And they understand that.  So they try to keep

14   their involvement secret.

15         And they're saying, well, if they catch on and they

16   deny it, we'll figure out a way of paying them anyway through

17   a different source.

18         That's what it means.  And the fact that it's

19   Biogen and not JJHCS is really irrelevant because it goes to

20   their strategy with all manufacturers.  We have to show the

21   harm to the public.  And this is showing their intent and

22   their -- the conduct with all manufacturers is relevant to

23   showing their intent and proving our case.

24         And I'll give you a further example of we were able

25   to find a document they produced that precedes this business

1   plan but directly addresses this issue. ████████████

2   ████████████████████████████    And it says, I'm

3   reading here from a document, SOSP 300160, and it says -- and

4   I'll share this with counsel --

5            THE COURT:  Go ahead.

6            MR. GREENBAUM:  [As read] ████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ███████

12           And then it goes on.

13           They talk about the manufacturer.  They don't say

14  everybody but Janssen or but JJHCS.  This is their general

15  plan.  This goes to proving our intent.  We're trying to show

16  how this program works, that their efforts are to circumvent

17  what we're trying to stop.  And these document go to the

18  heart of showing their intent.

19           Sure.  The -- Your Honor is absolutely right.  They

20  are worried about -- we're not a competitor.  Yes?  We don't

21  like what they're doing.  But we're not a competitor.  And

22  Your Honor properly has said that eyes of counsel only will

23  protect this information.  We previously wanted to share

24  other information with our clients for business purpose, and

25  Your Honor said, "No.  Don't do that."  Well, we're honoring

 1  that.  And that's how discovery works.  We have a protective

 2  order in for that purpose.

 3          They're not seeking to claw back this document

 4  which has the numbers in it.

 5          So I think the others are clearly relevant, and

 6  they should be produced.

 7          Again, we're trying prove the harm to the public in

 8  general, and we have to show their intent.  And intent is

 9  relevant to both of our claims.  If we can't prove intent,

10  we're not going to prevail.

11          And that's what discovery is all about, Your Honor.

12  And these are critical documents to get us there.  Thank you.

13          THE COURT:  So what does this mean:  We reacted to

14  patient needs by funding these claims through the tertiary --

15  to keep member disruption to a minimum?

16          MS. SNOW:  Yes, Your Honor.

17          Without seeing the document, it's a bit hard to

18  describe.

19          MR. GREENBAUM:  This document is attached to the

20  joint letter.  So it's --

21          MALE SPEAKER:  We have --

22      (Simultaneous conversation)

23          MR. GREENBAUM:  And, Your Honor, I want to make one

24  other point --

25          THE COURT:  Go ahead.

1     MR. GREENBAUM:  -- before she answers.  A lot of

2  this is in code.  They're not going to come out in the

3  business plan and say, "We intend to screw all the

4  manufacturers."

5     THE COURT:  I know.

6     MR. GREENBAUM:  So we have to do this, we have to

7  piece this together with other documents we've seen.  And

8  this is what reveals the intent.  We take these general coded

9  sentences -- like it says, ███████████████████████████

10 ████████████████████████████████████████████████████████████

11 ██████████████     Then we see a frequently asked question that

12 says, basically, "Lie.  They will them lies."

13     Well, it doesn't say they will them lies in here.

14 But when we tie that in with the other documents, it shows

15 the intent.  That's why this is so relevant.

16     THE COURT:  No.  I understand.

17     MR. GREENBAUM:  Thank you.

18     THE COURT:  And today that's a very familiar

19 weapon.

20     So explain to me what that means.

21     MS. SNOW:  So what this document shows is SaveOn's

22 goal is to help health plans be able to provide drugs -- or

23 be able to keep drugs on their formulary.  If a co-pay is

24 denied, part of what SaveOn and the plans that it advises

25 have promised is that their patients will pay zero dollars

|Hearing                                                                    27
|22-cv-02632, June 27, 2023

 1   for the drug.

 2            Now, I just want to be clear that J&J -- the money

 3   for the drugs never goes to the patients.  It goes from the

 4   pharmacy to the plans.  It doesn't touch the patients at any

 5   point.

 6            So what this document is showing is that for Biogen

 7   drugs -- again, not Janssen drugs that are actually at

 8   issue -- that the -- that SaveOn is trying to make sure if

 9   the co-pay is denied at Accredo, that the patient pays zero

10   for the drug.  That's the intent contained in this document.

11            And the intent -- you know, on page 7, which you

12   pointed to in the business plans, it says, ██████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████  Again the intent

15   that all of this is showing is to help the patients.

16            And, again, this is showing financial information

17   related to Biogen which is wholly unrelated to J&J's claims

18   in this case.  It's claims are, again, it's tortious

19   interference with CarePath contracts regarding the sale of

20   Janssen drugs.  It's that SaveOn violated consumer protection

21   law by causing stress and confusion to patients taking

22   Janssen drugs.  The damages at issue in this case are that

23   J&J -- JJHCS paid more in CarePath funds than it intended to

24   for Janssen drugs.

25            And they have to show this is relevant.

|Hearing
|22-cv-02632, June 27, 2023

 1          And this is completely unrelated to Janssen drugs.

 2    And to the extent that, you know, they need to see broad

 3    strategy, as I said earlier, they have those documents

 4    already.  This is -- these are incredibly harmful financial

 5    information regarding other manufacturers that has nothing to

 6    do with CarePath.  And that type of harmful information is

 7    exactly the type in the hands of a commercial adversary --

 8    Mr. Greenbaum says that J&J is not a horizontal competitor,

 9    but the law recognizes that you don't need to be just a

10    horizontal competitor to be a commercial adversary.  And this

11    litigation is good evidence that we are commercial

12    adversaries.  They intend to destroy SaveOn.

13          MR. GREENBAUM:  Your Honor, two points.  They are

14    correct that the documents will be harmful.  It's harmful to

15    their litigation because it shows their intent.

16          And, Your Honor, they argue, well, this may relate

17    to Biogen.  It really doesn't apply to JJHCS.

18          That's an argument about admissibility.  We say

19    it's directly relevant to this case because it shows their

20    pattern and practice, how they're running their business to

21    deal with all manufacturers, including us.  They previously

22    said we won't object to discovery that deals with drugs

23    generally and all manufacturers, including you.  Let them

24    argue later on that it's not admissible.  But the whole point

25    of discovery is we get the documents so we can argue about

1    it.

2           This is not determining -- and as I read to you,

3    the fact that it may not be admissible is not a reason to

4    deny discovery.  We think this is very relevant.  It shows to

5    intent.  Intent is hard to prove.  They're fighting because

6    it is harmful.  It's harmful to their case.  And that's why

7    it should be produced -- because we're entitled to it.

8           Thank you.

9           THE COURT:  So, Mr. Greenbaum, your request is for

10   all business plans from 2016 to 2022?

11          MR. GREENBAUM:  Correct.  It's probably eight to 30

12   documents -- just guessing.  If they do them quarterly or

13   annually; I am not sure.  If it's annual, then there's going

14   to be six of them.  -- or four of them -- five of them.

15          THE COURT:  Yeah, I am not concerned with burden.

16          MR. GREENBAUM:  Nor were they.

17          And, Your Honor, just to reiterate on page 22, it

18   goes right to ████████████████████████████████████████

19   ██████████████████████████████████████████

20          That's what this case is about.

21          THE COURT:  Yeah.  I mean, honestly, I don't know a

22   lot about the technicalities of other than what you've

23   instructed me through your writings and argument.

24          But, I mean, it looks like these can go either way.

25          And I think I'm going to reconsider what I forecast

1   and ask that you turn them -- order that you turn the

2   business plans over for attorney's eyes only.

3            I think Mr. Greenbaum's correct that possibly some

4   interpretation might go to intent.  On the other hand,

5   cursory review tells me that this is not necessarily so

6   harmful.

7            I think it is discoverable.  I doubt -- and I can't

8   predict what the district judge is going to do -- that it's

9   going to be admitted into evidence unless there's some kind

10  of explosive uncovering of something.

11           But I find that they are relevant and you shall

12  turn them over, all business plans between 2016, 2022.

13           MR. GREENBAUM:  Should we go on to 62 now?

14           THE COURT:  You want to give me a breath?

15           MR. GREENBAUM:  Yeah, sorry.

16           THE COURT:  He's motoring today.  Huh?

17           Now --

18           MR. GREENBAUM:  I don't want to waste your time,

19  Your Honor.  So we --

20           THE COURT:  No.  I -- although I've suggested a

21  special master, I told you last time, I do enjoy these

22  conversations.  So.

23           MR. GREENBAUM:  Thank you.

24           THE COURT:  I just don't like Friday night

25  11 o'clock submissions too much.

1          And but Evan says that he did it himself, so I
2    can't -- you know, I can't get mad then.
3          MR. WOHLFORTH:  I said without an associate.  I
4    wasn't -- I was involved with it, and I had the able
5    assistance of a clerk at the firm.
6          THE COURT:  Okay.  I just don't want to see some
7    poor associate at 11 o'clock on a Friday night.
8          MR. WOHLFORTH:  Didn't happen, Your Honor.  Just --
9          MR. GREENBAUM:  That's the decision we made, we
10   intentionally did not file a response at 11:00.  We waited
11   until Monday morning for that reason.
12         THE COURT:  That's good.
13         I have concern for the future of this profession,
14   which is standing before me, in many respects.
15         So you want to get to 63?  That is the corporate
16   governance documents?
17         MR. GREENBAUM:  Yes, Your Honor.
18         THE COURT:  And I -- okay.  Go ahead.
19         MR. LOBIONDO:  Thank you, Your Honor.  George
20   Lobiondo from Patterson Belknap.
21         I'm going to keep my remarks short because there's
22   actually only one category of documents that's remaining in
23   dispute, and that's the operating agreements.  And we're
24   asking for these because there's a lot we still don't know
25   about SaveOn's operations.  My friend on the other side

1    described them as a small private LLC.

2          It's true that they're very private.  They're made

3    up of other LLCs and entities.  And now that we're in

4    discovery -- depositions, we don't think that they should be

5    able to hide behind the corporate form any longer.

6          Now, again, their response is they produced

7    organizational charts and they produced emails.  And that's

8    true.

9          But their organizational charts don't mention the

10   entities that are the actual members of the LLC.  And for

11   some of the supposed executives that are on the

12   organizational charts, it's actually not clear that those are

13   really the people who are calling the shots for SaveOn or

14   whether they're just figureheads based on what SaveOn has

15   produced so far.

16         So before we go into depositions, we want to

17   understand how SaveOn operates, who the decision-makers are,

18   and what rules they have set up to govern those processes.

19   All we're looking to do is establish from very basic facts

20   about how the defendant in this case functions.

21         Now, the operating agreement in particular is the

22   key governing document of an LLC.  It shows where the real

23   power is.  It will tell us who can bind the LLC.  You can ask

24   for it.  There is no justification for SaveOn to conceal that

25   information at this stage in the case.

 1            And, finally, I just want to note that SaveOn seems

 2    to concede again that there would be no real burden to

 3    produce these documents.  It's either one document or a

 4    handful of documents.  They're essentially stored.  They know

 5    exactly what they are.  We're just asking for them to produce

 6    it.

 7            Thank Your Honor.

 8            THE COURT:  But so these are documents -- I should

 9    probably ask you -- that would show which person acts in

10    which position with what -- what am I --

11            MS. SNOW:  Yes, Your Honor.  So at issue is the

12    operating agreements.

13            THE COURT:  Yeah.

14            MS. SNOW:  And as you heard from my colleague, they

15    want to know who the decision-makers are.

16            THE COURT:  Right.

17            MS. SNOW:  It shows the agreement between SaveOn

18    and its member LLCs.  And saliently, the point that they

19    omitted is it shows how distributions are made.

20            So my colleague says that they need to -- they need

21    to know who the true decision-makers are.  We're not trying

22    to hide anything.  They have 20 -- over 20 org charts.  They

23    have almost 30,000 documents from the founders' custodial

24    files.  The president of the company is, in fact, the

25    president of the company and serves in that regard.

1          What we are -- and why we don't believe we should

2    produce these documents is that they show the distribution

3    information to the members.  That information --

4          THE COURT:  You mean financial distribution.

5          MS. SNOW:  The financial distribution.

6          THE COURT:  So would that -- would that then --

7    imply or indicate who a decision-maker is by the basis of

8    distribution?  I mean, I think that's what you're saying,

9    Mr. Lobiondo.

10          MR. LOBIONDO:  Of course.

11          MS. SNOW:  And what we would say to that is they --

12    it cannot be lost on them who the decision-makers are.  They

13    have the documents.  They can see in the documents who is

14    making the decisions.  They know who the owners are.  In our

15    Rule 7.1, we explained the member LLCs and who owns those

16    member LLCs, which takes you back to three owners of the

17    company, one of who is the president, and one, I believe, is

18    the managing partner.  Those titles have the same meaning at

19    SaveOn as they do at any other company.

20          They know.  They have the custodial files.  They

21    know who is making the decisions.  They know how they are

22    making those decisions.

23          What they don't know is how much of the profits of

24    SaveOn they're getting.  And the only purpose for that

25    information and why I think they're seeking this document is

1   they want to know -- they want to be able to embarrass,

2   annoy, harass the founders of the -- of the company.  And

3   they want to know -- again, they want to know the war chest

4   that SaveOn has to fight this litigation.  That's what's

5   really at issue in these documents.

6              THE COURT:  How would they discover the war

7   chest -- the litigation war chest through distribution?  I am

8   not sure I understand.

9              MS. SNOW:  They know what the member LLCs -- how

10  much money they have in order to fight this litigation, how

11  much SaveOn has in order to fight the litigation.

12             THE COURT:  They don't have that already?

13             MS. SNOW:  Well, with the business plans, they may

14  be a little bit closer.

15             But, no, that is key information.  They should note

16  be able to take this document -- what they're really seeking

17  in this document is is the personal financial information of

18  the members.  That is what's at -- that's what's at issue

19  that this document -- that's why they want this document.

20  It's not --

21             THE COURT:  Well, but they would just be getting

22  the distribution.  That's what you mean by personal financial

23  information?

24             MS. SNOW:  Yeah, they know the profits -- they know

25  the profits that the members are getting out of the company.

1    They have everything they could possibly need --

2            THE COURT:  I want go back to personal financial

3    information -- because that's of interest to me.

4            So I think what you're saying, Mr. Lobiondo is that

5    influence is weighted by distribution, w-e-i-g-h-t-e-d.

6            MR. LOBIONDO:  Right.  So you and I are operating

7    at a disadvantage because we're never seen these documents,

8    but it would be very surprising --

9            THE COURT:  I never get to see any documents until

10   Mr. Greenbaum showed me one.

11           MR. LOBIONDO:  Fair enough, Your Honor.

12           It would be surprising to me if a governance

13   document, an operating agreement for an LLC described a war

14   chest.  What this apparently shows is percentages.  So, for

15   example, if the operating agreement says LLC Number 1 gets 99

16   percent of the profits and LLC Number 2 gets 1 percent of the

17   profits, that this information that should be turned over in

18   discovery.  Again, it may not be admissible at trial, but

19   it's going to be extremely probative of who the

20   decision-makers are, and it's going to potentially

21   corroborate other information in their productions and --

22           THE COURT:  You are going to ask this in

23   depositions anyhow; right?

24           MR. LOBIONDO:  Well, we're going to ask some

25   questions, certainly, about --

```
 1              THE COURT:  No.  Just say yes.  You're just going

 2   to -- so -- what are you going to do?  Object to it?

 3              MS. SNOW:  Yes, Your Honor.

 4              THE COURT:  And what's your basis for objection?

 5              MS. SNOW:  This is completely irrelevant.

 6              THE COURT:  Not an objection in depositions.

 7   Change gears.

 8              MS. SNOW:  It is harassing -- harassing the

 9   witness.

10              MR. LOBIONDO:  It's part of discovery.  They're

11   parties.

12              MS. SNOW:  The members are not parties to this

13   litigation.  SaveOn, that is who J&J has the claim against.

14              MR. LOBIONDO:  Well, this is a hypothetical

15   deposition.  Who are we talking about deposing?  I mean,

16   that's why we can't decide this now.  We don't have a

17   deponent.  We don't have questions.  We're flying blind.

18              MS. SNOW:  J&J has still not explained how the

19   percentage of distributions to the partners -- they know the

20   percentage of ownership.

21              What they don't know is the percentage of

22   distribution --

23              THE COURT:  Okay.  They know the percentage of

24   ownership.

25              MS. SNOW:  Yes, it's in the 7.1, I believe.
```

1          MR. LOBIONDO:  No.  No.  That's -- my understanding

2    is that that's not accurate.  The 7.1 says who the member

3    LLCs of the LLC are and then who owns those underlying

4    entities.  There's no discussion of distribution of all of

5    the money they're taking from JJHCS.  We don't know how

6    they're treating it on the back end.

7          THE COURT:  Well, the distributions would have to

8    be in line with the percentage of ownership, so if you had

9    the percentage of ownership rather than the percentage of

10   distribution, that would be somewhat less intrusive.

11         MR. LOBIONDO:  But, again, Your Honor --

12         THE COURT:  It would go -- and -- wouldn't that go

13   toward the question -- wouldn't that go towards influence, as

14   you say, in decision-making?

15         MR. LOBIONDO:  Well, we need the whole picture --

16   right? -- because if hypothetically -- I don't think it's

17   true, but if hypothetically we knew that these two LLCs were

18   supposedly equal members of SaveOn --

19         THE COURT:  Right.

20         MR. LOBIONDO:  But it turned out that in, in fact,

21   one of them was getting all of the money and the other one

22   wasn't, then it's actually not probative that they are

23   supposedly equal partners because the money is telling a

24   different story.

25         And so I don't want to buy into their

1   characterization that this is all about money, but it's a

2   pretty basic governance document that 90 of 100 cases would

3   have been the first thing produced.  But to the extent

4   they're saying any document that has a dollar sign on it or

5   talks about money is per se exempt from disclosure, that's --

6   we're just not -- we don't have to take their word for it.

7   We're entitled to see basic documents about how their

8   organization works before depositions.

9           MS. SNOW:  Your Honor, first of all, we've produced

10  loads of documents with dollar signs on it.  They're not at a

11  loss for knowing how much money SaveOn makes relative to

12  CarePath.  They do not need to know the personal profits

13  obtained by the members of this private LLC.

14          And what I have not heard them address is how the

15  distribution -- they say that it goes to the weight one of

16  decisions.  They have emails showing the decisions getting

17  made.  They don't need to know the percentage of

18  distributions to be able to read the emails that show how the

19  three founders are communicating with each other and how

20  they're making the important decisions at SaveOn.

21          THE COURT:  Well, but they're not talking about

22  just the three founders.

23          MS. SNOW:  That is exactly what they're talking

24  about.  There are two member LLCs, the parties to these

25  operating agreements.

 1           As is in the 7.1, it is explained that one of the
 2  two member LLCs is owned by one of the founders.  The other
 3  is -- the other's members are the other two founders.
 4           What they're really talking about is the three
 5  founders and how the three of them make decisions.  And we've
 6  produced --
 7           THE COURT:  Is that true?  This is just --
 8           MS. SNOW:  -- 30,000 emails.
 9           MR. LOBIONDO:  We don't know how their organization
10  operates.
11           What we said is we've looked at their org charts.
12  We've looked at the emails they produced, and in certain
13  respects, we don't think the titles of all of their supposed
14  executives line up with how the decisions are actually made.
15           THE COURT:  But there's only three people that
16  you're talking about insofar as who owns the smaller -- the
17  LLCs?
18           MR. LOBIONDO:  We have no idea.  We haven't seen
19  the operating agreements.
20           THE COURT:  If you have no idea, then you're not
21  communicating.
22           MS. SNOW:  Your Honor, it's in the 7.1.  It says
23  exactly the two member LLCs and who are the members of those.
24  It is two individuals -- I represent to you today that it is
25  three individuals --

1          THE COURT:  In all the LL -- how many LLCs are

2   there?

3          MS. SNOW:  There are two.  One of them is -- has

4   two members who are two of the founding partners.  One has

5   a -- the other LLC has a single member.

6          All of that information is in the 7.1.

7          THE COURT:  I was under a misimpression that we're

8   talking about more than three people and distributions

9   amongst more than three people.

10          MR. LOBIONDO:  The operating, agreements, we

11   presume, although we haven't seen them, will tell us how

12   these entities, however many they are, operate; who makes

13   decisions for SaveOn; when there's a dispute among the LLC

14   members, who wins; and potentially, according to them, what

15   the percentages are of who gets what money.  But not a war

16   chest, but --

17          THE COURT:  But they're willing to tell you, from

18   what I intuit from this conversation, the percentages.  They

19   don't necessarily want to tell you the precise numbers of

20   distribution.

21          Have I misinterpreted your argument?

22          MS. SNOW:  Your Honor, we're willing to comply with

23   Rule 7.1, which we complied with, which is why they know who

24   our member LLCs are and they know who the founders are.

25          That is what we --

1        THE COURT:  But do -- are the percentages written

2    out as to the LLCs?  That's -- just his point is that the

3    more money somebody gets, the more persuasive they may be.

4    And he's going to ask this in deposition anyhow.  And you are

5    going to call me, and I'm going to say "Answer the question,"

6    just so you know.

7        But outside of that, if you give them the operating

8    agreement so they know the percentage of influence, if you

9    will -- unless I'm misinterpreting this whole thing -- why --

10   he doesn't need to know the amount of money they get

11   necessarily.

12       MS. SNOW:  But, Your Honor, based on the business

13   plans, based on -- they will have the amount of money.  They

14   will be able to calculate it.  If they receive the percentage

15   and they receive the total amount of money, they will know

16   the personal profits obtained by these founders.

17       MR. LOBIONDO:  That's not an argument about the

18   operating agreements.  The fact that the operating agreements

19   says --

20       THE COURT:  Yeah, I mean, the operating agreements

21   are turned over in initial.  He is right about that.

22       MS. SNOW:  Not if they're irrelevant.  They have

23   not made any claim relative to the member LLCs, they have not

24   sued the member LLCs or the founders.  They're not -- nothing

25   in their claim relates to the corporate structure of SaveOn.

1      MR. LOBIONDO:  We're just trying to get to the key

2 decision-makers.  We want to have the information about how

3 the defendant in this case operates before we go into

4 depositions.

5      MS. SNOW:  And, Your Honor --

6      MR. LOBIONDO:  It's relevant.  I mean, it's

7 facially relevant.

8      MS. SNOW:  Your Honor, and they have it.  If you

9 turn to page 15 of the --

10      THE COURT:  I saw that.  Organizational chart.

11      MS. SNOW:  -- business plan, the three founders are

12 listed at the top in red.

13      THE COURT:  Right.

14      MS. SNOW:  They have all the information that they

15 are seeking except for the information about how much money

16 those individuals have made from SaveOn.  That's what we're

17 fighting for.

18      MR. LOBIONDO:  Your Honor, I don't want to belabor

19 the points, but I have their 7.1 here.  And it says --

20      THE COURT:  I thought you were going to offer me a

21 compromise here.

22      But, go ahead.

23      MR. LOBIONDO:  Sorry, Your Honor.

24      So it says that SaveOn is -- has these numbers,

25 Break Wall Holdings LLC [phonetic] and the members of Break

1    Wall Holdings LLC are two actual humans.

2            And then it also says Net Equity Holdings Inc.

3    [phonetic] is a Florida corporation and has its principal

4    place of business in Florida.

5            So, apparently, one of the two members of SaveOn is

6    a company.  All we know about it is that it's in Florida.  We

7    know all of this about there's three owners.  I don't know

8    anything about Net Equity.  And they resisted discovery about

9    it.

10           So in the first instance, we would like to see the

11   operating agreements, and then presumably that will give us

12   at least more information than we have today about the key

13   decision-makers and about who the managing member of the LLC

14   is.

15           But I don't think -- I mean, the notion that

16   everything is just black and white if we would only read the

17   7.1 is not true.

18           MS. SNOW:  And I'm not saying they need to stop at

19   the 7.1.  I'm saying look at over 30,000 emails we've turned

20   over.  Look at the organization charts we've turned over.

21           We've said -- I mean, we're not hiding the ball.

22   What he said when he said the two people on the 7.1 is Jody

23   Miller and Claudia Dunbar.  They're at the top of this

24   organizational chart.

25           THE COURT:  Can you turn over the operating

1    agreements with a redaction of money?

2            MS. SNOW:  Or percentages, Your Honor?

3            THE COURT:  No, money.  I didn't say percentages.

4    I said money.

5            MS. SNOW:  But the operating agreements are about

6    percentages, and that's what's going to give them --

7            THE COURT:  So there's money in the operating

8    agreements.  There's no distribution amount?

9            MS. SNOW:  There are certain financial figures --

10   of the initial advancement --

11           THE COURT:  This is always like shooting in the

12   dark because you don't know what it is.

13           MS. SNOW:  Pardon, Your Honor.  There is certain

14   financial information about the initial investments into

15   SaveOn from the members that have, again, no relevance.

16           THE COURT:  I think it does have relevance because

17   certainly that would be an indication of influence.  Somebody

18   put in a dollar and somebody else put in a hundred dollars, I

19   would think the person with the larger investment is the

20   bigger decision-maker.

21           I don't know that.  That's for deposition.  But I

22   don't see what the harm in investment is.  I'm saying

23   distribution can be redacted.

24           From what I'm hearing, they have no idea how

25   anything operates.  And that's not right.

 1          MS. SNOW:  Your Honor.  That's just not true.  If

 2     they look at our documents, they know -- we produced over

 3     120,000 documents.

 4          THE COURT:  Yeah, everybody always says how much

 5     they produce, but I don't -- that doesn't say anything to me.

 6          MS. SNOW:  Right.

 7          THE COURT:  I need to know what was produced, and

 8     what was produced that shows them what -- who is the decision

 9     make -- excuse me -- decision-maker and which LLC.

10          MR. LOBIONDO:  And based on what they produced, we

11     don't have the first idea of who Net Equity is.  Net Equity

12     is --

13          THE COURT:  He's saying they know it's in Florida,

14     and that's all they know.

15          I -- you know, maybe you're not talking to each

16     other again.  I'm hearing two different stories.

17          MS. SNOW:  Your Honor, to go to the documents, to

18     go to your prior question as to what we've produced, we've

19     produced documents of those founders that we're talking about

20     today, describing how they're going pitch themselves to

21     clients, how they are going to get new clients, how they're

22     going to respond to the market.

23          THE COURT:  How does that tell me who the

24     decision-maker is?

25          MS. SNOW:  They're showing the decisions.

1   They're -- the documents are showing the decisions of how

2   they're going to -- what's going to go into the contracts,

3   how they're going to talk to patients, how they're going to

4   set up the warm transfer process that Mr. Greenbaum referred

5   to earlier.

6           THE COURT:  How does that tell me who the

7   decision-makers are?

8           MS. SNOW:  It shows who you is actually -- it's a

9   difference.  Looking on an org chart may show you who the

10  decision-makers are in one way.  But emails which show the

11  decisions actually being made shows you who the

12  decision-makers are.  And they may not be looking at our

13  documents, but we have produced thousands of those documents.

14  And this document, the operating agreement has sensitive

15  financial information about the members --

16          THE COURT:  What else other than what they put up?

17  What other sensitive financial information other than their

18  investment?

19          MS. SNOW:  The distributions.

20          THE COURT:  Well, I already told you you can cut

21  out the distributions.

22          MS. SNOW:  But it's the percentages of the

23  distributions that is sensitive.

24          THE COURT:  Well, one or the other is sensitive --

25  why is the percentage of distribution sensitive?

 1          MS. SNOW:  It's sensitive because as Your Honor

 2  just ordered the production of the business plans --

 3          THE COURT:  Right.

 4          MS. SNOW:  -- they will see the overall profit of

 5  SaveOn.  If they take the overall profits of SaveOn, they

 6  will be able, with a percentage, to easily calculate how much

 7  the members are each receiving.  Therefore, they will have

 8  their personal financial business.  This isn't about SaveOn's

 9  financial information.  This is about Claudia Dunbar and Jody

10  Miller.  It's about their financial information.  And that's

11  what we're trying to protect.

12          MR. LOBIONDO:  I don't want to belabor the point.

13          We still don't know -- and after that, we still

14  don't know who Net Equity is.  So the notion that we're

15  supposed to figure out from their emails some entity that we

16  don't know the first thing about how they play in, doesn't

17  really make a lot of sense to me, but I can assure you, we

18  have looked at their emails.  And the reason we asked for

19  these documents is because the representations that are made

20  in the org charts about who the certain supposed CEOs are.

21          THE COURT:  You can delete the financial

22  distribution.  Turn over the operating agreements.  If they

23  figure out how much, then they're going to figure it out.

24  They're going to ask it in deposition anyhow.

25          And I'm telling you, I only accept privilege

1    objections.

2              MS. SNOW:  Yeah, so we will delete the financial

3    and the percentages.  Thank you.

4              THE COURT:  No, I didn't say percentages.

5              MS. SNOW:  You didn't say percentages?  You said

6    the distribution.  Pardon me.

7              THE COURT:  Yeah.  Okay.  I meant the money.  Leave

8    the percentages in.

9              MR. DUNLAP:  Thank you, Your Honor.

10             THE COURT:  This is discovery.  This is crazy.

11             MR. DUNLAP:  Your Honor, I think that brings us to

12   our motion --

13             THE COURT:  Your protective order?

14             MR. DUNLAP:  No, I think that was covered by what

15   you already --

16             THE COURT:  Okay.  Hold on one second, because I

17   need to check ...

18             Okay.  Brings us to.

19             MR. DUNLAP:  Our motion to compel answers to

20   interrogatories and production of documents, Your Honor, J&J

21   entities other than --

22             MR. MANGI:  I'm sorry to interrupt, Your Honor.

23   Before we go to that, there was the item on the topic about

24   the protective order application.  I think counsel is saying

25   that he sees that's denied.

 1          I just want to make sure we have a clear record.

 2          THE COURT:  Well, I don't know if I would call it

 3  necessarily denied.  I want to take each point piece by

 4  piece.

 5          You want any financial information protected, I am

 6  not going to do that.

 7          MR. DUNLAP:  Well, I think it may be moot at this

 8  point or -- whatever term you want to use.

 9          THE COURT:  Well, in terms of this particular -- in

10  terms of 61 and 62, yeah.

11          MR. DUNLAP:  The reason we had moved for a

12  protective order was just because we see consistent requests

13  by them for financial information that's unrelated to

14  CarePath --

15          THE COURT:  I'll take it one by one.

16          MR. DUNLAP:  We heard you.  That's why we're moving

17  on.

18          THE COURT:  Okay.  And that's not to say I'm never

19  releasing -- or I'm always releasing, but I've got to take

20  the piecemeal.  It's too big to make blanket rulings on.

21          MR. DUNLAP:  Yes, Your Honor.  And in the light of

22  what you just said, I'd like to turn to our motion, which

23  is --

24          THE COURT:  Okay.

25          MR. DUNLAP:  -- to compel Johnson & Johnson to

1   answer interrogatories and produce documents from custodians

2   or individuals who work at Johnson & Johnson but outside of

3   JJHCS, which is the entity that brought the suit.

4            And our motion is very straightforward.  It is a

5   bedrock fundamental discovery rule that a litigant has to

6   answer interrogatories based on information within its

7   possession, custody, or control.  And it has to identify

8   individuals who have documents -- within their possession,

9   custody, or control.

10           And it doesn't matter in this case if the documents

11  reside within JJHCS or outside of JJHCS as long as they are

12  within possession, custody, or control of JJHCS.

13           And JJHCS does not dispute, as far as I understand

14  it, that they have possession, custody, or control of

15  documents in other Johnson & Johnson affiliates.

16           But they have simply decided that they are not

17  going to answer interrogatories based on information outside

18  JJHCS.  They are not going to designate any document

19  custodians from any company outside of JJHCS.  And we take

20  their letter to say that they haven't done an investigation

21  or at least not until recently outside of JJHCS.  They say on

22  page 10 of their letter, where we identify certain

23  individuals outside of JJHCS what appear to have relevant

24  materials, that they have conducted what they call a

25  preliminary investigation.  That's at the bottom of page 10.

 1   If you're following along, Your Honor.  It's in the -- right

 2   under the old header.  The first sentence.

 3           THE COURT:  Okay.  Go ahead.

 4           MR. DUNLAP:  Right?  Preliminary investigation is

 5   their way of saying they haven't done any investigation

 6   outside of JJHCS up until this point.  They simply didn't

 7   want to do it.

 8           But we think that could be the end of this motion.

 9   They -- the rules required them to identify document

10   custodians or individual documents within their possession,

11   custody, or control to answer with information within their

12   possession, custody, or control.  And they simply didn't do

13   it.  We don't think there's any argument that excuses it.

14   It's a nonnegotiable baseline discovery obligation.

15           But we think that there is more here, and we put it

16   in the letter that we think makes their refusal, the

17   self-help they're engaged in, particularly egregious.  There

18   is substantial evidence that key decisions about CarePath and

19   issues related to this case were made outside of JJHCS,

20   specifically at the Janssen division of Johnson & Johnson.

21           And Janssen is the entity that actually makes the

22   drugs at issue.  They're the ones that set the prices for the

23   drugs.  They're the ones that sell the drugs.  They're the

24   ones that get the revenue for the drugs.  JJHCS is a service

25   provider that runs CarePath as part of the marketing arm to

1    promote the use of these Janssen drugs.  JJHCS is not some

2    independent division.  It does not, as far as we understand

3    it, make any products.  It simply serves other Johnson &

4    Johnson divisions and the clients of those other divisions.

5    JJHCS, as far as we know, doesn't even set its own budget.

6    Others J&J entities do.

7           And in their letter, in response to our portion,

8    they admit that there are contacts between JJHCS and Janssen.

9    They admit that there are employees who are, quote,

10   crossdesignated between Janssen and JJHCS.  They admit that

11   some of these folks have documents that are relevant -- they

12   use the phrase "minimal relevance" -- that's code for the

13   documents are relevant.

14          And if you look at the documents that we have

15   attached to our motion from their very paltry production,

16   even those show decisions being made at Janssen about key

17   issues.  I won't go through them all, but I'm glad to go into

18   details.  But just a few -- our Exhibit 2 shows a letter to

19   patients about the terms and conditions that are issued here.

20   A letter being sent out to all the patients who take these

21   drugs was, quote, ██████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ██████████████████████████████████████████

24          Exhibit 33 talks about an FAQ document, a

25   frequently asked questions document, being circulated about



```
 1    CarePath.  It's ███████████████████████████
 2    ████████████████████

 3            Exhibit 34, which is about something called ████████
 4    ████████████████████████████████████████████████
 5    ████████████████████████████    It says,  ████████
 6    ████████████████████████████████████
 7    ██████████████████████████████████████
 8    ████████████████████████████████████
```

9          And there are additional documents that we've cited

10   to you as well.  And yet they're refusing to do any search in

11   the first instance of documents from folks outside of four

12   corners of JJHCS.  Their position is "Well, SaveOn has to

13   come forward and identify specific gaps in the production."

14          But that is flipping the burden.  It is a matter in

15   the first instance, they have the obligation to do the

16   reasonable search, then to produce documents, and we can go

17   back and forth on burden, and then we identify gaps.  They

18   want to skip the part where they have to do the reasonable

19   search in the first instance.  But we can't do that.  They're

20   only looking in the JJHCS filing cabinet.  They're not

21   looking in the Janssen filing cabinet sitting right next to

22   it, and then they're saying, "Well, tell us what's in the

23   Janssen cabinets, and we'll let you know if it's missing."

24          That's not how it works.  They have to -- if

25   cabinet's within their control, they have to determine if

1    there are relevant documents within it.

2            Now, we do know, from what they've produced, that

3    there are big gaps that are missing.  And all indications

4    point towards Janssen here.  So, for example, the terms and

5    conditions which they accuse us of inducing people to breach,

6    the basis of their tortious interference claim, we know that

7    those terms and conditions were modified between 2017 and

8    2022.  But we have no documents showing who made that

9    decision or why.

10           A new terms and conditions were introduced for two

11   drugs, beginning in 2022.  Again, we don't know who made that

12   decision or who approved it.  And when the district judge

13   decided the motion to dismiss, they held that any issues

14   about the meanings of the terms and conditions would be held

15   for summary judgment, meaning we should be going after parol

16   evidence now.  If Johnson & Johnson -- sorry -- Janssen's

17   leadership team is signing off on communications about the

18   terms and conditions, that strongly infers that they had a

19   hand in deciding about introducing these new terms and

20   conditions in the first place.

21           The budget, they changed the budget for CarePath

22   for these two drugs, also starting in 2022.  Highly relevant

23   to allegations of injury and damages into their allegations

24   about the financial viability of CarePath.  We have no

25   documents showing who made those decisions.  And, again, the

1    documents we've shown you indicate that this was decided at

2    the Janssen level.

3         Also, we have affirmative defenses, including

4    waiver and laches and mitigation.  We have evidence that

5    Johnson & Johnson knew about the SaveOn program, as they call

6    it, starting in 2017, but they did nothing for five years.

7    Nothing.

8         Well, why is that?  What did the decision-makers

9    know?  What did the people in the leadership know?  Why did

10   they decide to do nothing about it for five years?  Highly

11   relevant.

12        They have an obligation to search these files in

13   the first instance and identify the decision-makers for us.

14        Now, in their papers, as they did before, they make

15   a burden argument is, frankly, a little overstated.  They

16   say, oh, SaveOn wants us to search 200 different divisions,

17   and they want us to talk to 140,000 employees about anybody

18   whoever brushed up against a SaveOn -- against CarePath in

19   any form.

20        That's just nonsense.  That's not what we're asking

21   them to do.  They don't need to go search the shampoo

22   division.  Right?  They don't need to go search the baby

23   powder division.

24        We think that certainly the five Janssen entities,

25   based on what we've shown here, are relevant.  Maybe there

1    are some other group that is also relevant here.

2            But the point is that they should know this; not

3    us.  Surely JJHCS knows where its budget comes from.  Surely

4    they know whose approvals they need to seek.  Surely they

5    know whose input and feedback are provided into the

6    implementation of CarePath.  Surely they know how changes to

7    the terms and conditions come about and if they had to talk

8    to anybody outside of JJHCS about it.

9            And if, in fact, the responsibility for this is

10    distributed across different companies or multiple people,

11    that may be how J&J has decided to set up its business, but

12    they can't use that complexity to shield critical relevant

13    documents from us in the first instance.

14            So we hear you loud and clear that you want to deal

15    with things one by one as they come up.  And I think they're

16    going to try to use that to say, oh, have them identify a

17    specific gap.  Let's negotiate about specific custodians.

18            But we're at the threshold step.  They've had to

19    identify who has relevant material in the first instance.

20    They had to provide answers to interrogatories based on stuff

21    in their possession, custody, or control, and they have

22    failed to do that.  They should answer the interrogatories.

23    They should identify people that have relevant documents.

24    Then we can meet and confer about a reasonable search, about

25    search terms, and they say there's nothing unique; right?

1   Well, they'll run the search terms, and all the documents

2   will be duplicative, and they won't have much to search.

3            THE COURT:  And that's exactly what I meant by

4   taking it point by point.

5            MR. DUNLAP:  Exactly.

6            But we think they haven't gotten off point one --

7            THE COURT:  Okay.

8            MR. DUNLAP:  -- in this, which is why we're asking

9   for them [sic] to grant this motion to compel.

10            And when you do, we are glad to work with them as

11   promptly as we can.

12            Thank you.

13            MR. SANDICK:  Your Honor, I'd like to address a few

14   things that Mr. Dunlap said that are not well supported.

15            The first point here is that we have answered the

16   interrogatory, and we have done a good-faith search.  And we

17   have determined that the individuals who are responsible for

18   managing the CarePath program are within JJHCS, number one.

19            Number two, throughout their letter, they make

20   reference to people, and they say, "This person is in JJHCS.

21   This person is in" -- and more than half the time, they're

22   incorrect.  The documents that they've supported do not show

23   the decisions being made by people within Janssen.  What they

24   show is people in Janssen either providing information to

25   JJHCS about a particular drug or about a particular issue

 1  relating to a drug, or they show people being advised of what

 2  is happening within JJHCS.

 3          The idea that we have ignored the interrogatory, we

 4  haven't done an investigation is false.  It's a canard.  This

 5  is not accurate.

 6          What is underlying the problem here, Your Honor, is

 7  the total failure by counsel for SaveOn to engage in

 8  meet-and-confer on these issues.  On May 9th, they sent us a

 9  letter and asked about a number of custodians.  We wrote back

10  about a week letter and said, "We'll give you one of those

11  custodians.  The others, we don't think they're relevant.

12  This is why."

13          And what we expected -- that was May 19th -- was

14  that we would hear from them in a week or two saying, "Well,

15  maybe these people are relevant.  Here are some other ideas,"

16  and have a back-and-forth.

17          THE COURT:  And then you would bring it to me.

18          MR. SANDICK:  And then we would bring it to you if

19  there wasn't an agreement.

20          But instead on June 16th, on a Friday night, we got

21  a letter saying we accept your offer of one custodian.  And

22  then on Juneteenth at about 8 or 9 o'clock at night, we got a

23  letter proposing to come here on issues that we have never

24  discussed even once.  In fact, Mr. Dunlap even today

25  continues to violate the basic rule of meet-and-confer

1    conferral by a good-faith meet-and-confer conferral.  For

2    instance, he talked about waiver and laches issues.  That has

3    never once been raised in a phone call with me relating to

4    this joint letter.  It's not even in the joint letter.  It's

5    completely new for Your Honor today.

6            The terms and conditions issues that he mentioned,

7    I'm shocked to hear Mr. Dunlap talk about that when I spoke

8    to him for an hour on Friday and with an associate, we took

9    down all of the things he asked us to look at on

10   meet-and-confer for terms and conditions, and now he's here

11   saying we haven't complied with our discovery obligations on

12   meet-and-confer.  We're still in the middle of talking to him

13   about these things.

14           So the idea of coming here and saying, number one,

15   that we haven't conducted an investigation -- not true.  He

16   has misquoted what we said in this letter, and I want to read

17   in full what we said, to correct the record.

18           We said, [As read] As to the specific seven

19   individuals whom SaveOn SP identifies in this letter, JJHCS's

20   preliminary investigation has realized each is of minimal or

21   no relevance to the claims and defenses.

22           Why was there a preliminary investigation?  Because

23   a couple of these people we had literally never heard

24   mentioned until we got the joint letter on the night of

25   Juneteenth, on June 19th.  And so, yes, we didn't fully

 1    investigate specific names of people that we didn't know he

 2    wants us to look into.  If we engage in meet-and-confer, I

 3    think we can make progress.  We already offered them one

 4    custodian.  We'll possibly offer more if circumstances

 5    justify.  And if not, we'll come back to Your Honor, and

 6    you'll decide what do.

 7            But the idea that they can say, "Well, for these

 8    six or seven people, we think they're relevant," and based on

 9    that, you now have to go -- we talked about Janssen.  Janssen

10    isn't one entity.  Janssen is many different entities.  You

11    now have to go and consider all sorts of other possibilities.

12    There's no functional way to do that.  At the start of the

13    case when JJHCS became the plaintiff and filed the lawsuit,

14    that was based itself on an extensive investigation, that the

15    evidence of wrongdoing and the evidence of harm was at JJHCS

16    and not at some other entity within the vast business that

17    is, you know, Johnson & Johnson, writ large.

18            I can talk about other issues.  But I think really

19    what the Court should do is deny the very broad requests that

20    we go throughout the entire Janssen or Johnson & Johnson

21    Enterprise and, instead, tell them to give us time --

22            THE COURT:  He doesn't want you to go through the

23    entire enterprise.

24            You said there were several Janssen entities, and I

25    thought that you said, Mr. Dunlap, that you knew which

1   entities to go through, which I am not quite sure that you

2   do.

3            MR. SANDICK:  So, Your Honor, let me address that.

4   A couple of things, they mentioned something called "JALT,"

5   which is the Janssen Americas Leadership Team.  JALT is

6   composed of people who do lots of different things within the

7   Janssen or Johnson & Johnson companies.  One of the members

8   of JALT, one of the 20 members, is someone named Katie Mazuk.

9   Her role is, among other things, is to supervise CarePath.

10  So if there are distributions to the JALT team, which is a

11  20-person team, Katie Mazuk, a custodian in this case, we've

12  produced documents from her, she would get those documents,

13  if there are distributions to JALT or by JALT.  We have a

14  JALT custodian in this case.

15           There are other people in JALT who have absolutely

16  nothing to do with CarePath.  And other than speculation, we

17  haven't heard anything.  So they picked Scott White.  Why

18  have they named Scott White in their letter?

19           THE COURT:  So why didn't you talk to each other

20  about that and then present your various sides to me?

21           MR. SANDICK:  I raised this with Mr. Dunlap on

22  Friday.

23           THE COURT:  Okay.

24           MR. SANDICK:  And said, "I'm surprised that you're

25  going to court on this.  We haven't had a chance to meet and

1    confer."

2              And he said, "Are you willing to do what I said in

3    the letter?"

4              I said, "No.  I thought we'd have a discussion

5    where we talk about custodians and work this thing through."

6              THE COURT:  A discussion means a discussion,

7    though.

8              MR. SANDICK:  Right.

9              THE COURT:  Not no and yes.

10             MR. SANDICK:  That's right.  And we have not had

11   that discussion to go through -- again, some of the names in

12   this letter, we were -- you know, we were criticized, let's

13   say, for not having Donna -- and someone named Karen Laib

14   [phonetic].

15             The first time that I heard Karen Laib, who she

16   was, that there was an issue with her, was when I got their

17   letter on the night of Juneteenth.

18             THE COURT:  Okay.  Can I say this without making a

19   ruling?  I really don't think these issues are fully

20   explored.  I think you need to meet and confer.  And you can

21   bring to me each one -- wait, Ms. Snow has something to say.

22   Go ahead.  You can pass the note.  I want to know what it is.

23             I got the sense just from the submission that

24   exhaustion of conference hasn't been had.

25             Am I wrong?

1        MR. DUNLAP:  Well, I think you are.  I'm glad to

2   address the meet-and-confer --

3        THE COURT:  And there can't be any stonewalling.

4   Meet and confer means, you know, the "C" word, compromise of

5   some sort.

6        MR. DUNLAP:  Yeah, well, I think opposing counsel's

7   conflating two different things.

8        THE COURT:  Okay.

9        MR. DUNLAP:  So there are definitely topics where

10  the parties are still meeting and conferring about whether or

11  not Johnson & Johnson needs to produce additional documents;

12  things about time frames; things about additional search

13  terms; things about additional topics.

14        We did meet and confer, as Mr. Sandick said, about

15  terms and conditions last week.  There are a number of holes

16  in their production about financial information where we

17  think they're holding stuff back -- or those topics, we agree

18  we need to meet and confer on --

19        THE COURT:  Okay.

20        MR. DUNLAP:  -- specifically and come to you.

21        If that's all we were talking about, we would not

22  have brought this.

23        The parties' agreements about a threshold question

24  about whether they had to do a search of entities outside of

25  JJHCS in the first instance and answer our interrogatories

|Hearing
|22-cv-02632, June 27, 2023

```
 1   and identify potential document custodians, and they simply
 2   haven't done that, and --
 3                THE COURT:  Stop.
 4                What's your answer to that?
 5                MR. SANDICK:  My answer is that at the start of the
 6   case and throughout discovery, we have done a good-faith,
 7   reasonable search to try to determine --
 8                THE COURT:  What does that mean, good faith,
 9   reasonable?  I don't know what that means.
10                MR. SANDICK:  Sure, it means a few things.  Number
11   one, it means I've talked to my client and not just me, but
12   others on the team.  We've spoken to people to try to figure
13   out who is involved in the operation of CarePath.
14                Secondly, we've reviewed many documents and looked
15   there to see if there were unique responsive documents
16   outside of the group of custodians that we have identified.
17   Again, beginning with Katie Mazuk, who is the person who is
18   really the head of JJHCS for CarePath purposes, her documents
19   have been produced.
20                Seventeen other custodians, close to 20,000
21   documents.
22                And we've gone through these things.  We don't
23   just, you know, stamp them with a number and send them out.
24   We reviewed them and studied them and give thought as to
25   whether we need to do more.
```

1          I'm always open to hearing that there is some gap.

2   But we've taken these steps already.

3          THE COURT:  Tell him what you want.

4          MR. DUNLAP:  Sorry?

5          THE COURT:  Tell him what you want.

6          MR. DUNLAP:  Well, what we want them to do is the

7   reasonable investigation they should have done at the

8   beginning, and we disagree that what they did was reasonable.

9          And I think you should listen very carefully to

10  what Mr. Sandick's saying and what they wrote in their letter

11  about this, because they say, "Oh, we conducted a reasonable

12  investigation."  They don't say that they conducted an

13  investigation outside of JJHCS, that they went and they

14  looked at other entities, including Janssen, to see if there

15  was relevant information.

16         THE COURT:  Did you look at Janssen?  Stop.  One

17  thing at a time.

18         MR. SANDICK:  We looked at JJHCS documents in order

19  to determine whether we needed to go and collect and review

20  documents from Janssen.  Based on our review, we did not

21  determine that going, let's say, to somebody who's the head

22  of Janssen North America's files was necessary simply because

23  he once got an email that had a presentation from SaveOn.  We

24  didn't think that was necessary.  We thought that was, you

25  know, gilding the lily, so to speak.

1          THE COURT:  How do I make this decision without you

2    two speaking to each other?

3          So you think that there are -- there's more

4    investigation into some of the Janssen entities that's

5    necessary.

6          MR. DUNLAP:  Well, I think you just heard

7    Mr. Sandick acknowledge that they did not conduct a search

8    out of --

9          THE COURT:  Right.

10          MR. DUNLAP:  -- outside JJHCS.  They looked at

11   those documents, and they stopped.

12          And he says, well, we -- but that is because a lot

13   of have the operations about CarePath are within JJHCS.

14          THE COURT:  Right.

15          MR. DUNLAP:  But we need documents about decisions

16   and approvals, and we've shown you materials indicating that

17   those approvals and those decisions are made at Janssen, not

18   at JJHCS, and they're big gaps in their production, because

19   we don't have those approval documents.

20          And it's very interesting to hear them, after

21   spending all this time saying they need our decision-makers'

22   documents, to basically say, well, hold on a second, we've

23   decided that just because we sent somebody an email, that's

24   not enough to go after them.

25          Well, if they made decisions, if there were

1    approvals, we need to know.  And they're telling you they

2    haven't done that.

3           Now, they also say that -- they say, well, even

4    operational decisions were made at CarePath, but they don't

5    say that other signoffs are required for that.  And we've

6    shown you documents indicating that approvals, feedback, all

7    the rest of that is at issue.

8           We are glad to meet and confer with them once they

9    take the first step.

10          THE COURT:  Okay.

11          MR. DUNLAP:  -- which is -- and to -- and just to

12   be clear, I don't see how any of this excuses them from

13   answering our interrogatories, which is to simply --

14       (Simultaneous conversation)

15          MR. DUNLAP:  -- if I could finish.

16          Which is simply to identify people with knowledge.

17   Their interrogatories they say won't give us information from

18   people outside of JJHCS.  They answer on behalf of JJHCS, and

19   they identify people of one vendor named TrialCard.  But they

20   don't identify anybody outside of JJHCS at Janssen.

21          I don't see how this is possible.

22          Reasonable investigation has to take place.  Now,

23   we can talk about this, but the decision -- we did, in fact,

24   meet and confer with them about this -- meet and confer with

25   them about this extensively at the beginning of the year.

1              THE COURT:  Okay.

2              MR. DUNLAP:  Which was you should go and look at

3    outside of JJHCS.

4              And they said, "No.  We're not going to do it."

5              We moved to compel on this back in February.

6              They said, "Well, why don't you wait until our

7    document production comes in," and then we can renew.

8              You said, "Fine."

9              Now, on specific topics, terms and conditions,

10   finances, we're meeting and conferring with them about the

11   specifics.

12             But this is a threshold issue.  They haven't

13   changed their position.  They've acknowledged to you that

14   they haven't gone and searched outside of JJHCS.  They have

15   to do that if there's a reason to believe that there are

16   relevant documents there.

17             And we've shown you a basis in their own documents

18   that there were approvals and decisions being made about

19   CarePath at Janssen.  We don't need them to go search in

20   every corner of this company.

21             THE COURT:  Okay.

22             MR. DUNLAP:  But they have to do that reasonable

23   search, and then we're glad to meet and confer about

24   custodians and search terms and burden and all the rest of

25   that.

 1          MR. GREENBAUM:  We've done that work, Your Honor.

 2          THE COURT:  You said you've done it with J&J and

 3  you found nothing relevant or one piece of paper that you

 4  made reference to, relevant to anybody in Janssen.

 5          MR. SANDICK:  Nothing, no -- no unique responsive

 6  documents that I know of that are outside of the JJHCS

 7  entity.  We have spoken to people at JJHCS.  We've spoken to

 8  people who also do work for Janssen as well -- in order to

 9  try to determine who the right custodians, who the

10  decision-makers for this case.

11          And what we've come up with is what's led to our

12  production of documents, the 17 different custodians.

13          When we were here in March --

14          THE COURT:  Mr. Dunlap wants to know why you didn't

15  go to Janssen directly, why did you just rely on Johnson &

16  Johnson and their reference or documents that reference

17  Janssen?

18          MR. GREENBAUM:  Well, here's what I would say.

19  There are thousands of employees, tens of thousands of

20  employees, even within the various Janssen entities that

21  exist, most of whom have absolutely nothing to do with any of

22  this.

23          What he has done is he has --

24          THE COURT:  Well, he says that you know there are

25  several Janssen entities that were involved in some amount of

1    decision-making with J&J.

2              MR. SANDICK:  I don't think that's right.  He's

3    identified JALT as the primary focus, the Janssen Americas

4    Leadership Team.

5              One of the people who is in JALT is Katie Mazuk --

6              THE COURT:  Right.  You said that.

7              MR. SANDICK:  -- also -- right.

8              And so that is our window into JALT.

9              THE COURT:  What do you want him to do?

10             MR. DUNLAP:  We want them to do a full

11   investigation of documents within the possession, custody, or

12   control, specifically at Janssen -- maybe there's some other

13   entity involved as well --

14       (Simultaneous conversation)

15             THE COURT:  And how do you want them --

16             MR. DUNLAP:  -- we don't know because they won't

17   tell us.

18             THE COURT:  How do you want them to do that?

19             MR. DUNLAP:  Well, they should start by talking

20   with the folks at -- excuse me -- JJHCS.

21             THE COURT:  Janssen?

22             MR. DUNLAP:  No, no.  First at JJHCS.

23             THE COURT:  They did that.

24             MR. DUNLAP:  Where does your budget come from?  Who

25   do you have to speak with outside of JJHCS to get approvals?

 1   Who convenes meetings about this?  What is decisions --

 2            THE COURT:  Are there interrogatories that are

 3   targeted towards that?

 4            MR. DUNLAP:  Yes, we've asked them who have

 5   knowledge of these things?

 6            And they've said, "We're only answering within

 7   JJHCS, not about Janssen."

 8            THE COURT:  Did you say that?

 9            MR. SANDICK:  Because the answers lie within JJHCS.

10   They framed the interrogatories as anyone within all of

11   Johnson & Johnson.

12            And we said we're not doing an investigation

13   through 140,000 individuals and employees and 200 different

14   entities.  We're going to give you answers from JJHCS.

15            And we told them to meet and confer, that if the

16   arrows pointed elsewhere, that if there was reason to think

17   that there is -- you know, unique responsive materials

18   elsewhere, we're open to that.  We're not refusing to do

19   that.

20            But we haven't seen the evidence of that.

21            And what they've offered in this motion is not the

22   evidence of it.  Even down to bare facts -- like they have --

23   they say, "Look at these seven people.  These are all

24   non-JJHCS employees."

25            And they're wrong.  Most of them do work for JJHCS.

1  One of them is such an incredibly senior person within the

2  company that all they can do is say, "Well, who knows?  Maybe

3  he has something.  He once got one email attaching the

4  presentation and video."

5         If he responded to that, he didn't respond to Katie

6  Mazuk, who is the person who would have been -- the logical

7  person for him to talk to about it because she's in charge of

8  making sure that JJHCS functions well.

9         So we are open to meeting and conferring.  But

10 putting it in a joint letter for the first time --

11    (Simultaneous conversation)

12        THE COURT:  I don't what to do here because --

13    (Simultaneous conversation)

14        THE COURT:  -- you're -- Tim, you've got any ideas?

15        MR. DUNLAP:  Can I respond quickly to two points?

16        THE COURT:  Yeah, but -- you're crosstalking.  I

17 don't --

18        MR. DUNLAP:  Because there's a fundamental

19 disagreement about whether they need to do a search outside

20 of JJHCS.

21        And everything you hear him is in this very --

22        THE COURT:  I know, but --

23    (Simultaneous conversation)

24        MR. DUNLAP:  -- way to say, no, we're not going to

25 do that --

1    (Simultaneous conversation)

2    THE COURT:  But what's being said is that, we have

3  to start with Johnson & Johnson, and if we find that there's

4  nothing with Johnson & Johnson that leads to Janssen, why

5  should we go to Janssen?

6    MR. DUNLAP:  Because there's --

7    THE COURT:  And the very -- that's not even a

8  syllogism, but in a very simple way, is that what I'm

9  understanding you to say?

10    MR. SANDICK:  Yeah, that's basically it.  If

11  JJHCS -- if we see in the documents of the people who

12  actually oversee and manage and run CarePath, if we see

13  arrows pointing out that make us think, there should be

14  unique documents -- in other words, not going to someone

15  within Janssen because they will have the same emails that

16  we've already collected from JJHCS but because they're likely

17  to have done something sort of, so to speak, behind JJHCS's

18  back.

19    And we actually did give them one of the custodians

20  they asked for on May 9th.  We thought we would have further

21  discussions along these lines.

22    THE COURT:  I'm willing to give you what you want,

23  but I'm not sure what it is.

24    You want them to search certain Janssen entities.

25  Which ones?

 1              MR. DUNLAP:  Well, this is the problem, Your Honor.

 2    We don't know all of the Janssen entities --

 3              THE COURT:  And I certainly don't know.

 4              MR. DUNLAP:  The JALT is certainly involved, that

 5    we've shown you those documents.

 6              THE COURT:  Well, he said one person in JALT has

 7    involvement.

 8              MR. DUNLAP:  He said that one person has

 9    involvement.  But the very person he was talking about, Scott

10    White --

11              THE COURT:  Right.

12              MR. DUNLAP:  -- he says, oh, all he did was get a

13    copy of something.

14              No, he convened a meeting in December of 2021 about

15    co-pay adjustment programs.  He convened that meeting weeks

16    before they changed their terms and conditions and their

17    budget for two of the drugs at issue.

18              They haven't done an investigation, by all

19    accounts, to show who the actual decision-makers and approval

20    folks were.  And we think this shouldn't be that complicated.

21    If you work at JJHCS, you have to know where your budget

22    comes from and who's setting the CarePath budget.  You have

23    to know whose approvals you need to seek, who -- which

24    higher-ups have called you and asked you to participate in

25    meetings.  We don't see why this is so hard --

 1        (Simultaneous conversation)

 2             THE COURT:  Can you answer these questions?

 3             MR. SANDICK:  We --

 4        (Simultaneous conversation)

 5             MR. DUNLAP:  -- and --

 6             MR. SANDICK:  Sorry.  Do you want it answered?  Or

 7    should I wait for --

 8             THE COURT:  Well, I know what you want.  I don't --

 9    you're not responding to what he wants other than to say we

10    have gone to -- hold on.  I might have some wisdom coming

11    back.

12        (Pause in proceedings)

13             MR. DUNLAP:  The one other point I was going to --

14             THE COURT:  It's okay.

15             MR. DUNLAP:  The one other point I was going to

16    make, just to get it on the table, their cries of burden,

17    we're not --

18             THE COURT:  I don't want to hear burden.  I am not

19    listening to burden today.  It's not -- it's -- you can't

20    talk to me, either side, about burden.

21             And I don't want to hear 20,000 or 30,000 pages.

22             I want a path so that they can be satisfied that

23    you've contacted Janssen entities -- I don't know the

24    logistics.  I don't even know, really, what it is that they

25    need, but -- who makes budgetary decisions, who has input in

|Hearing
|22-cv-02632, June 27, 2023

1    decision-making, basic information that you say you gave them

2    from J&J and that Janssen has no involvement in.

3              MR. SANDICK:  That -- I think that the documents

4    that we have collected are the -- are the responsive

5    documents in this case, that if we go to other entities, we

6    are not going to find unique documents.  We're going to find

7    things that have already been produced.

8              THE COURT:  But you want them to go to Janssen -- I

9    mean, to Janssen.

10             MR. DUNLAP:  He's saying they haven't done the

11   investigation.

12             MR. SANDICK:  No, that's not at all what I'm

13   saying --

14       (Simultaneous conversation)

15             MR. DUNLAP:  They have -- if I could --

16             MR. SANDICK:  But you keep misstating what I'm

17   saying, Mr. Dunlap.

18             I've said six times we did the investigation.  You

19   don't like the answer from the investigation, and so you

20   filed a joint letter without any meet-and-confer --

21             THE COURT:  Well, he doesn't think you went far

22   enough.

23             MR. DUNLAP:  Your Honor, I'm glad to address him

24   directly, but I think you'll probably want me to direct my

25   comments to you.

```
 1                  THE COURT:  Okay.

 2                  MR. DUNLAP:  Right.

 3                  THE COURT:  That's my bad.  Go ahead.

 4                  MR. DUNLAP:  He has acknowledged that they haven't

 5    done a search outside of JJHCS.

 6                  What he said -- and this is consistent with the

 7    letter, is they talked to people within JJHCS --

 8                  THE COURT:  Right.

 9                  MR. DUNLAP:  -- and based on that, they don't think

10    they have go outside of JJHCS, and that's reasonable.

11                  THE COURT:  Yes.

12                  MR. DUNLAP:  And our answer -- our response is

13    that's not reasonable.  If you know that Janssen and JJHCS

14    are wound up this way, you know that people are

15    crossdesignated.  You know that they work together.  You know

16    JJHCS runs CarePath for Janssen.  You have indications in

17    your very documents that Janssen people are approving things

18    relating to CarePath.  You have to then go to Janssen -- I

19    don't know how many people it is or how they instruct their

20    organization, but you have to do a reasonable investigation

21    and figure out who are the people who actually have

22    approvals, inputs, substantive knowledge of this.

23                  And how he can say there are no unique documents

24    when they haven't done the search is a little bit beyond me,

25    especially when a search only of JJHCS would not capture any
```

1    internal documents at Janssen by these decision-makers about

2    the decisions that they are making.

3            We think this is a square one fundamental issue.

4    Do the investigation that you should have done months ago.

5    Answer our interrogatories.  We don't see why that is a

6    burden.  Identify people who have relevant documents.

7            And then if you want to talk about duplication or

8    cumulativeness or the burdens or the rest of it, we can then

9    negotiate.  But until they move off of square one, they're

10   asking us to identify gaps in a production they haven't made

11   and a search they haven't done.

12           MR. SANDICK:  Your Honor --

13           THE COURT:  What if he issues a third -- this is

14   Duva wisdom.  What if he issues a third-party subpoena to

15   Janssen?

16           MR. SANDICK:  I would have to see it.  I understand

17   what Mr. Duva is suggesting.

18           THE COURT:  Well, wouldn't it be better that you do

19   this collaboratively rather than starting to get into that?

20   I didn't mean to suggest that that's what you should do to

21   get the information.  But --

22       (Simultaneous conversation)

23           MR. SANDICK:  The point that I'm making,

24   Your Honor, is that -- is that what Mr. Dunlap is using, you

25   know, fairly neutral terms.  Like, just go look at Janssen --

1          THE COURT:  Right.

2          MR. SANDICK:  -- there are so many people who work

3    at Janssen, thousands of people --

4          THE COURT:  But he wants crossovers.  So -- and

5    he's named this White person --

6          MR. DUNLAP:  Scott White is one of Janssen's --

7      (Simultaneous conversation)

8          THE COURT:  -- as a crossover --

9      (Simultaneous conversation)

10         MR. SANDICK:  He's an apex -- he's an apex witness,

11   Your Honor.  He is the only connection --

12         THE COURT:  Oh, was that the answer to the

13   interrogatory?  That is an apex?

14         MR. SANDICK:  No.  The answer -- that is the

15   answer --

16         THE COURT:  Because then I get to determine whether

17   he's an apex.

18         MR. SANDICK:  That's an answer to the question of

19   is this someone who's likely to have unique documents?

20         He is the head of this 20-person group that

21   oversees a million different things.  One of the very small

22   things that that group oversees happens to be CarePath.

23         The person on JALT who actually oversees CarePath

24   is, of course, a custodian.  I'm sure they'll depose her.

25   And they can ask her the questions that Mr. Dunlap is talking

1     about.

2          THE COURT:  Well, you see, here's the other side of

3     this, and this probably won't help you to do what you have to

4     do.  But, you know, I ordered them to give, with a wide

5     berth, relevant documents.  And I'd like you to do the same.

6          MR. SANDICK:  I think we have, Your Honor.

7          THE COURT:  I know that you think you have.

8          But Mr. Dunlap doesn't think that you have, and his

9     issue is not that large.  It's why can't you go to Janssen

10    and find out about these crossover people or related

11    J&J/Janssen decision-makers.

12         So you are telling me nobody in Janssen has

13    anything that that would be applicable to a CarePath

14    decision?

15         MR. SANDICK:  What I'm saying is that we have done

16    that work, and we have identified the people who make those

17    decisions are the custodians in this case; that it is not

18    someone --

19         THE COURT:  But there's only one you've agreed to.

20         MR. SANDICK:  Well, there's only one we've agreed

21    to.  The others were sort of thrown at us in the joint letter

22    process.

23         So I would also just say that to -- to come out of

24    this and order us to do something where there's been no

25    meet-and-confer, I think also incentivizes future disputes to

1    be resolved along these lines --

2            (Simultaneous conversation)

3            THE COURT:  I don't know if we're the tail or the

4    dog, because then we're back to the custodian issue.

5            But I think that his issue is preliminary.

6            MR. DUNLAP:  Yes, and if I could speak to that,

7    Your Honor, we're really not trying to sandbag them or slip

8    anything by.  We've spent a lot of time meeting and

9    conferring about lots of things.  And we are still meeting

10   and conferring about things like terms and conditions --

11           (Simultaneous conversation)

12           THE COURT:  Right.  But you want the --

13           (Simultaneous conversation)

14           MR. DUNLAP:  We understood there so be --

15           (Simultaneous conversation)

16           THE COURT:  -- further investigation into Janssen

17   to see whether or not --

18           MR. DUNLAP:  Yes, we want them to do a reasonable

19   investigation into Janssen.  If there's some other entities

20   involved --

21           THE COURT:  But that's a general --

22           (Simultaneous conversation)

23           MR. DUNLAP:  -- they can do that.  But Janssen is

24   key --

25           (Simultaneous conversation)

1           MR. DUNLAP:  Right.  It's a general they should

2   point -- right? -- which is this is what they're supposed to

3   do at the beginning.  We don't think they did what they were

4   supposed to do.

5           They need to answer --

6       (Simultaneous conversation)

7           THE COURT:  This is so circular --

8       (Simultaneous conversation)

9           MR. DUNLAP:  -- they need to answer their

10  interrogatories and identify people with knowledge at

11  Janssen, which is something they're refusing to do.  They

12  need to identify people at Janssen who may have relevant

13  documents, even if they think they're cumulative.  Identify

14  those people, which they've refused to do.  And then we can

15  meet and confer about specific individuals.

16          But we can't do the meeting and conferring before

17  we do the reasonable investigation.

18          And it's a little bit head-snapping, because on the

19  one hand, they're telling you nobody outside of JJHCS, we

20  think, has nothing to do with CarePath, and so many people

21  outside of JJHCS might have something to do with CarePath, it

22  would take us a huge amount of time to figure out who they

23  are.

24          Well, both of those things can't --

25          THE COURT:  How does he do an investigation?  He

1   goes to Janssen or sends out an email saying, "If you have

2   any relationship with CarePath, contact me"?

3          MR. DUNLAP:  I mean, I think it would be two

4   things.  You would interview folks within JJHCS about people

5   at Janssen, maybe other entities --

6          THE COURT:  He said he did that.

7          MR. DUNLAP:  Well -- but --

8      (Simultaneous conversation)

9          MR. SANDICK:  We did that --

10     (Simultaneous conversation)

11         MR. SANDICK:  We did that.

12         MR. DUNLAP:  Well, but they did -- but then it's

13  very hard for them to explain, I think, the documents we just

14  showed which show people -- which show that the Scott White,

15  the chairman or the -- one of the head folks on the JALT

16  convening a meeting about co-pay assistance.  And --

17         THE COURT:  What about that specifically?

18     (Simultaneous conversation)

19         MR. SANDICK:  Sure, a meeting on co-pay assistance

20  at which a custodian in this case was a -- would have been

21  the key person because she's the person in charge of

22  CarePath.

23         THE COURT:  Now, we're back to Scott White's being

24  an apex.

25         MR. SANDICK:  Scott -- this is -- you know, because

1    there's a meeting invitation that emanates from the email,

2    who knows it's even him or his secretary who sends it out --

3            THE COURT:  Well, they're asking you to find out.

4    That's the very point.

5            MR. SANDICK:  But the point is --

6        (Simultaneous conversation)

7            MR. DUNLAP:  It says other things -- I'm sorry --

8        (Simultaneous conversation)

9            MR. SANDICK:  -- the fact that there's a meeting

10   that Scott White calls, if there are documents relating to

11   that meeting that go through a JALT distribution list, they

12   would be in the documents that we've reviewed and produced

13   where responsive because someone on JALT is a custodian in

14   this case.

15           It can't be the case, Your Honor, that 20 members

16   of JALT all have to become custodians because there was once

17   a meeting held that touched on --

18       (Simultaneous conversation)

19           THE COURT:  But he's not saying that.

20           MR. DUNLAP:  Exactly.

21           MR. SANDICK:  I think he is saying that.

22           MR. DUNLAP:  What we're saying --

23       (Simultaneous conversation)

24           MR. SANDICK:  His letter says exactly that --

25       (Simultaneous conversation)

1          THE COURT:  He's saying he doesn't believe that you

2    did your due diligence with respect to any Janssen people --

3          MR. SANDICK:  He should come forward with specific

4    document issues, just as we have.

5          THE COURT:  He did.  He did.  He said,

6    decision-making, budget, who decides the budget.

7          MR. DUNLAP:  Where does the budget come from?  Who

8    signs off on changes to the program?  Who signs off on

9    changes to the terms and conditions.  Where's the feedback

10   come from?  And --

11         MR. SANDICK:  Those issues were first raised in the

12   joint letter with us a week ago.

13         MR. DUNLAP:  But --

14         MR. SANDICK:  -- you haven't come here today

15   prepared to answer those.

16         And some of these issues like laches and others

17   things, they were never mentioned even in the letter --

18      (Simultaneous conversation)

19         THE COURT:  I -- don't you just love to hear

20   laches, though?

21         MR. SANDICK:  It's a wonderful common law doctrine.

22   It has no application here.

23         But it was never mentioned in the letter --

24      (Simultaneous conversation)

25         THE COURT:  Well, he said you waited five years,

1   so --

2           MR. SANDICK:  It was never mentioned in their

3   letter.  It was never mentioned in meet-and-confers.

4           We can't have a system where we just come in and

5   spring things on the Court and opposing counsel for the first

6   time --

7           THE COURT:  No, better you should spring them on a

8   Friday night.

9           MR. DUNLAP:  Yeah, Your Honor, we were --

10      (Simultaneous conversation)

11          MR. DUNLAP:  We were not trying to spring anything

12  on them.  We understand -- again, on specific issues like

13  more on terms and conditions and more on finances.  We're

14  meeting and conferring.

15          It is on this threshold issue that we understood

16  that there was a dispute, and I haven't heard anything from

17  Mr. Sandick indicating that there's not --

18      (Simultaneous conversation)

19          THE COURT:  I want to know specifically what you

20  want him to do -- one, two, three.

21          MR. DUNLAP:  I want him to conduct a reasonable

22  investigation.

23          THE COURT:  What do you mean by that?

24          MR. DUNLAP:  I -- well, he has to talk to the folks

25  at JJHCS about who they seek approvals for, coordinate, work

```
 1   with, the key topics in the case.
 2           And I want him to talk to people at Janssen,
 3   however that's organized, about anything they do regarding
 4   CarePath or SaveOn.
 5           And from there, I want him to answer the
 6   interrogatories without the restriction of JJHCS.  And I want
 7   him to identify custodians who may have relevant materials
 8   outside of JJHCS.
 9           Then we can negotiate about with which of those
10   additional individuals become custodians --
11       (Simultaneous conversation)
12           THE COURT:  I'm going to order you to do exactly
13   what he's outlining.
14           I don't know how you do it.  I don't know the
15   mechanics.  I am not internally involved here.
16           But if it satisfies them for you to do further
17   investigation and find out --
18       (Simultaneous conversation)
19           MR. SANDICK:  In a sense, Your Honor, maybe this
20   is -- part of this won't be hard because we've already done
21   it.
22           He doesn't like the answer.  The traditional way
23   that these things are maintained is not by one lawyer coming
24   in and saying, you know, answer the interrogatory differently
25   from how you answered it.
```

1            THE COURT:  But he says you restricted your answers

2    to J&J.

3            MR. SANDICK:  Based on the fact that JJHCS is the

4    entity that has knowledge on this issue and that we were not

5    inclined to go all throughout the company looking for

6    individuals.

7            If we had thought at the outset of this case, based

8    on our extensive internal review prior to filing a complaint

9    and interviews of employees and collection and review of

10   documents that they -- the arrows pointed outside of JJHCS,

11   we would be, of course, open to doing that, and we're not

12   saying that they have to serve a subpoena --

13       (Simultaneous conversation)

14           THE COURT:  But clearly Janssen's involved.

15           MR. SANDICK:  Well, the name of the program at some

16   point has been Janssen CarePath.

17           THE COURT:  Yeah.

18           MR. SANDICK:  And Johnson & Johnson, the overall

19   entity, not just --

20           THE COURT:  They make all the decisions for Janssen

21   CarePath?

22           MR. SANDICK:  JJHCS runs Janssen CarePath.  I can't

23   say --

24       (Simultaneous conversation)

25           THE COURT:  But that's why they're the

 1   administrator; right?

 2           MR. SANDICK:  No, the administrator is TrialCard,

 3   this third party that is also -- that we have identified and

 4   we've made document production from -- and probably we'll be

 5   making more if meet-and-confer -- which is still ongoing as

 6   to TrialCard Points in that direction.

 7           The -- but the traditional way --

 8           THE COURT:  How do I get past this?

 9           MR. SANDICK:  Your Honor, this is a traditional --

10           THE COURT:  Volunteer something to get past this?

11           MR. SANDICK:  Yeah, my colleague Jeff says, let's

12   go back and meet and confer on these issues and go through

13   the documents and go through custodians.  The issues that

14   should have been done prior to the filing of this letter,

15   we're, of course, to doing, you know -- not -- not right here

16   in court --

17       (Simultaneous conversation)

18           THE COURT:  But, you know, again, we're circular on

19   this, because they're saying that you never did an initial

20   preliminary full reasonable investigation.

21           MR. SANDICK:  I don't agree with that, Your Honor.

22           THE COURT:  You say you didn't.

23           So what am I supposed to do?  Have an evidentiary

24   hearing?

25           MR. SANDICK:  Well, Your Honor, the way these

1   things are often addressed is that -- two ways:  meet and

2   confer by going specific documents, as Jeff just mentioned

3   and as I proposed today.

4            And, secondly, they're going to take depositions of

5   these people, and they're going to be sworn depositions.

6            THE COURT:  Yeah, but I don't want to do that

7   because I didn't -- I didn't do that the other way.  I could

8   have easily --

9            MR. SANDICK:  Well --

10           THE COURT:  -- do this at depositions with respect

11  to some of the things that I ordered them to turn over.

12           MR. SANDICK:  But, Your Honor, the other way --

13           THE COURT:  I am not going to stumble on that,

14  because you've got to be prepared for a deposition.

15           MR. SANDICK:  But, Your Honor, the other way is

16  very different.  My colleague here is asking for one

17  document, the operating agreement.  My other colleague here

18  was asking for 10 documents.  Specific documents.  Look, we

19  know they have business plans.  Give us the business plans.

20           THE COURT:  Okay.

21           MR. SANDICK:  If this were a specific request

22  saying give us the documents that relate to this category or

23  that category, again, we have a meet-and-confer.  Maybe they

24  get some of them.  And if they didn't, they come here and ask

25  for them.

 1          But it this amorphous obligation -- you know, a

 2   court's going to order me to do something I think I've

 3   already done?

 4          THE COURT:  Well, I don't even know what to order

 5   you --

 6      (Simultaneous conversation)

 7          MR. SANDICK:  -- and then I'll come back and he'll

 8   be unhappy --

 9      (Simultaneous conversation)

10          THE COURT:  So that's --

11          MR. SANDICK:  Okay --

12      (Simultaneous conversation)

13          THE COURT:  -- where I'm stuck.

14          MR. SANDICK:  Okay.

15          MR. DUNLAP:  Your Honor, if I could just -- I'm

16   sorry.  May I respond to that?

17          Again, we're asking for something that we think is

18   very basic.  He keeps trying to pull it back to let's meet

19   and confer about specific custodians.

20          THE COURT:  Yes.

21          MR. DUNLAP:  But that -- you can't do that until

22   you've done the reasonable investigation in the first place.

23          If you order us to go back and simply say, well,

24   identify custodians based on their production, then they've

25   gotten away with not answering our interrogatories or

1    identifying people with documents in the first instance

2    outside of JJHCS.

3              THE COURT:  He's saying there are no people if --

4              MR. DUNLAP:  Well -- but -- that -- we think that

5    the documents contradict that.  I mean, one other way we

6    could go here, Your Honor, is you could agree that we can

7    take a 30(b)(6) deposition, not to count against our normal

8    30(b)(6) --

9              THE COURT:  Okay.

10             MR. DUNLAP:  -- up front to identify individuals

11   and locations of documents relating to the topics in this

12   case.  And it would have to be, obviously, for people outside

13   of JJHCS.  And if they're going to say -- if they're going to

14   have someone come in there and swear, yeah, no one at Janssen

15   has anything to do with setting the CarePath budget, no one

16   at Janssen has ever had to give approval or sign off any --

17   occasion about CarePath, that would be one thing.

18             But if they say, oh, yeah, no, there actually are

19   some people at Janssen or the JALT or these other individuals

20   who were involved, that would be something else.

21             THE COURT:  So the 30(b)(6) be from J&J.

22             MR. DUNLAP:  From JJHCS.

23             But, again, they're not disputing their possession,

24   custody, and control goes outside of the four corners of

25   JJHCS.

1           THE COURT:  Right.

2           MR. DUNLAP:  I mean, that's not our preferred

3    route.  Our preferred route is they actually do the

4    investigation, answer the interrogatories, identify potential

5    custodians, and then we would --

6           THE COURT:  But their position is clear.  They

7    think they've done that.

8           MR. DUNLAP:  They have to acknowledge to you that

9    they have not gone outside of JJHCS.

10          THE COURT:  They did --

11          MR. DUNLAP:  They've acknowledged that to you.

12          MR. SANDICK:  Well, Your Honor, just to -- I don't

13   mean to double back to something we were discussing before,

14   but with regard to this December -- I think you said

15   December 2021 meeting of the Janssen Americas Leadership

16   Team, JALT, we are prepared, based on the colloquy today and

17   trying to think of some way to address Your Honor's concern,

18   to go back, including to people who, you know, if -- are

19   outside of JJHCS, if that's where we think the arrows lead,

20   and to try to figure out are there more documents about that

21   meeting.

22          THE COURT:  Just go to Janssen.  That's all I want

23   you to do.

24          MR. SANDICK:  Well, yes, and I don't mean to be

25   harass, but even within Janssen, there are many different

 1    entities.

 2             Janssen is a, among other things, it's a brand

 3    name; right?  There are Janssen therapies.  The drugs that

 4    are at issue in this case, if you want to go to your doctor

 5    and you say, I want the Janssen drug daratumumab because I

 6    have multiple myeloma or something like that -- or probably

 7    your director tells you you need it --

 8        (Simultaneous conversation)

 9             THE COURT:  Are there Janssen entities or areas

10    of -- or groups that you have specific knowledge of that you

11    want them to investigate?

12             MR. DUNLAP:  Well, we've identified from their

13    limited production with individuals who have crossover

14    responsibilities and specific groups within Janssen --

15             THE COURT:  We dealt with Mr. White already.

16             MR. DUNLAP:  We did -- but I --

17             THE COURT:  And we dealt with Ms. JALT already.

18             MR. DUNLAP:  This is part of -- the JALT is the

19    actual entity, the Janssen Americas Leadership Team.

20             THE COURT:  Right.

21             MR. DUNLAP:  But I think this is all proving our

22    point.  Johnson & Johnson lawyers aren't able to tell you in

23    this hearing how Janssen works.  How are we supposed to be

24    able to do that?  The burden's on them to do that

25    investigation.  Who at Janssen -- sorry.  Who at Janssen is

1  involved in this?  I mean, look, this is -- I understand it

2  may be a little work for them.  But this is what representing

3  a big company is about.

4          And, again, I know you don't want to hear burden,

5  but I just want to point out -- right? -- we've produced

6  120,000 documents, and we're still going, and we're going to

7  make another substantial production next month and probably

8  after that.

9          They've produced 16,000 documents, and they say

10  they're done.  We just don't think that that's an indication

11  that they have done a full production here on these topics.

12          And the fact that they're excludeing, categorically

13  people outside of Janssen, we think, speaks to that.

14          MR. SANDICK:  Your Honor, there's almost never a

15  parallel between the documents produced by the plaintiff and

16  produced by the defendant.

17          THE COURT:  I don't -- that doesn't matter.

18          MR. SANDICK:  Okay.

19          THE COURT:  That doesn't matter.  It doesn't.

20          What matters to me is this is what I would call a

21  simple request, and that is to go to Janssen to figure out

22  any way you can, any crossover decision-makers and disclose

23  them, whether they be custodians -- either that, or he gets a

24  30(b)(6) early on, which I don't how appropriate that is --

25  forget appropriate.  I don't know how advantageous that is

1    this early on in the case, honestly.

2                  But if you could go back to Janssen -- I don't know

3    how to structure this.  I'm making you do an investigation

4    and find out if there are crossover or integrated -- I don't

5    know if that's the right word -- people --

6                  MR. SANDICK:  We'll do that, Your Honor.  And I

7    think our specific focus, if it meets Your Honor's approval,

8    will be things that have been specifically identified.  This

9    meeting of the JALT group in December --

10                 THE COURT:  No, he wants you to do a full

11   investigation.

12                 MR. SANDICK:  I understand that.  But I think

13   you -- as you've heard, we think we already have done what we

14   were required to do here.  We're now going back to do more

15   because we want to be mindful of Your Honor's --

16                 THE COURT:  No, because I'm ordering you to do that

17   and I'm the judge.

18                 MR. SANDICK:  Yes, that's --

19                 THE COURT:  So I can do that.

20                 But I can't give you parameters because I don't

21   know what they are other than Mr. Dunlap is sure -- and I am

22   not unsure, sure, either way, that there are crossover -- or

23   there are people in Janssen that make decisions for CarePath

24   and/or Johnson & Johnson who help.  And other than Mr. White

25   and Ms. -- what's her name from JALT?

1          MR. SANDICK:  Karen Laib was the other person who

2    are -- we only heard about Ms. --

3          MR. DUNLAP:  And that's part of the point.

4    Mr. Sandick is a great advocate.  He's trying to pull you

5    back to these individual -- like, let's talk about --

6          THE COURT:  No, he's not pulling me back.

7          MR. DUNLAP:  I thought he was trying.

8          THE COURT:  I just want them to do whatever they're

9    supposed to do with respect to Janssen and its involvement in

10   CarePath and --

11         MR. DUNLAP:  Correct.  And it's do the

12   investigation --

13         THE COURT:  Yeah.

14         MR. DUNLAP:  -- of Janssen.  And, again, if there's

15   some non-Janssen entity that we're not aware of who's

16   involved in this too, they should look at that.

17         But we think, really, most roads here lead to

18   Janssen.  Do the investigation.  Answer the interrogatories,

19   which they explicitly say they're not answering to anyone

20   other than JJHCS.  And identify people outside of JJHCS at

21   Janssen who they think have relevant documents.

22         They can make their arguments later about

23   cumulativeness and duplicativeness and everything else.

24         THE COURT:  Answer the interrogatories.  I mean, I

25   know you've said to me you did the investigation, you

1  answered the interrogatories.  If you're going to say you are

2  not going out of Johnson Health Systems, you can't say that.

3  That's not a good answer.  That's -- the answer is we've

4  investigated, we've spoken to people in Janssen.  I'm really

5  at a loss at --

6            MR. SANDICK:  We will do that, Your Honor.

7            THE COURT:  -- how to do this.

8            MR. SANDICK:  We will do that, Your Honor.

9            MR. DUNLAP:  Well, I think what you've said is a

10 good step of the way.  Do the investigation.  Answer the

11 interrogatories.

12           We think, along with answering interrogatories,

13 they should say who they think document custodians would be.

14 At this point we're not asking them to commit to add anybody

15 as custodians.  Just tell who has relevant docs.

16           THE COURT:  Well, you're going to discuss

17 custodians.

18           MR. DUNLAP:  That's exactly right.  But they should

19 go first -- right?  Generally what happens is a party says --

20           THE COURT:  Right.

21           MR. DUNLAP:  -- you have doc requests.  I've

22 searched within my possession, custody, or control.  Here are

23 my proposed custodians.

24           And, of course, there's always discussion later on

25 about changing that list.

1    What we're saying is because they exclude Janssen,

2  answer the rogs, tell us who has knowledge, then identify

3  folks at Janssen who are potential custodians, and then let's

4  talk.  Let's talk about burden and search terms and time

5  frames and all the rest of it.  We're glad to do that.

6         MR. SANDICK:  Your Honor, we'll supplement the --

7         THE COURT:  Perception is everything.

8         MR. SANDICK:  Yes, I -- that's often true.

9    We'll supplement the interrogatory, as Your Honor

10  has instructed.  We will -- we will confirm our prior

11  understanding or change it if we are not to be -- not to have

12  the correct the first time.

13        But -- but I don't know what more we can say as the

14  specifics.  We have to be in specifics.  And that's, of

15  course, the concern that we've raised today and in our

16  letter, that, you know, when we have a document issue, it's

17  we need these 10 things.  We need this one thing.

18        When they have a document issue, it's here our

19  seven custodians, and we're not even asking for them.  We

20  don't know exactly how many we're asking for.  It could be a

21  lot.  It could be many.  Look through the whole company.

22  We'll call it Janssen, even though it's actually five or six

23  different entities --

24        THE COURT:  Well, then we get to proportionality

25  issues.  I mean, if we're going to getting --

1           (Simultaneous conversation)

2               MR. SANDICK:  Yes, and then we'll have to come

3    back.

4               THE COURT:  In the beginning of the case,

5    especially a case of this size, you know, it's sort of like a

6    funnel, you would hope.  And you start out wide, and then you

7    determine proportionality as you investigate and turn over

8    documents and read documents.  I would hope that that's the

9    way the case goes.

10              But we're at the stumbling block at the top of the

11   funnel.  So --

12              MR. DUNLAP:  Well, can I speak to proportionality

13   for just a second -- because --

14              THE COURT:  We're not really there yet.

15              MR. DUNLAP:  No.  But I think it bears noting at

16   this point, because he just said, oh, when they ask for

17   documents, like 10 documents here, two documents there, bunk.

18   We have had -- three hundred thousand documents based on

19   various based on various requests that we've searched.

20              THE COURT:  No, and they've only turned over 60.

21              MR. DUNLAP:  And we've --

22              MR. SANDICK:  Well --

23              MR. DUNLAP:  We've gone through all of those.  And

24   they're pushing us back on actually doing an investigation

25   and answering interrogatories.

1            THE COURT:  Okay.

2            MR. DUNLAP:  We've done what we're supposed to

3    do --

4        (Simultaneous conversation)

5            THE COURT:  I really think this is a matter of

6    perception.  I think that you all will do what I say.

7            MR. SANDICK:  I think -- I think we understand what

8    Your Honor wants to do, and, of course, we'll do it.  And

9    then we'll be in touch with Mr. Dunlap, and --

10           THE COURT:  And I'm sorry I'm stumbling, but I just

11   don't know -- it's so hard to do this job when you don't have

12   discovery and you don't have the inside information and I'm

13   trying to get in each of your heads as to what your

14   allegations are and your defenses, including laches.  I mean,

15   tell me that you didn't your whole life after you graduated

16   law school want to hear laches?

17           MR. DUNLAP:  I didn't think I'd see conduct this

18   extreme, that they've given us --

19           THE COURT:  This is the second laches defense that

20   I've had in about two weeks in my whole life.  So ...

21           MR. SANDICK:  Making a comeback.  It's hot.  Laches

22   is hot.  We had laches trial last year in the Southern

23   District in our case.  It wasn't us, but our firm did.

24           THE COURT:  How did it go?

25           MR. SANDICK:  And the laches defense was rejected

 1   there.  It was a case brought by Howard University about a

 2   painting that had been stolen many, many years ago, and the

 3   current possessor said, you didn't do enough to try to track

 4   down the possessors.

 5            And Judge Liman ruled in Howard's favor.

 6            So laches --

 7            THE COURT:  Oh, isn't that interesting?

 8            MR. SANDICK:  You can have a laches trial.

 9            THE COURT:  So sort of the -- Phil, you can turn

10   the record off.

11            MR. DUNLAP:  Well, Your Honor, recording -- we

12   do -- there are two other items.

13            THE COURT:  Oh.

14            MR. DUNLAP:  One is on, maybe --

15            THE COURT:  Preview, maybe because I do have

16   criminal duty.

17            MR. DUNLAP:  There's one about a motion to seal,

18   which is for some reason contested, which Evans is going to

19   address.

20            And then we should probably just talk about when

21   are you going to set the next conference and the relationship

22   to the substantial completion deadline?

23            THE COURT:  Well, that, we can do off the record.

24            But they're giving you -- before we go on [sic] the

25   record -- what's the problem with the motion to seal?

|Hearing
|22-cv-02632, June 27, 2023

1              MR. GREENBAUM:  It's not returnable yet.  They

2   wanted to seal argument in one of their letters.  And we

3   objected to that.  We believe it should be part of the

4   record.  They wanted to take certain words out.

5              In the last argument, if you remember, Your Honor,

6   they argued that -- oh, if we comply with this --

7        (Simultaneous conversation)

8                    (Conclusion of proceedings)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|Hearing
|22-cv-02632, June 27, 2023
|Certification

1                          Certification

2         I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 105 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11        I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ *Sara L. Kern*                      10th of July, 2023

19   _____        _____
     Signature of Approved Transcriber             Date

20

21

     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080

24

25