# EXHIBIT C

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE          .
SYSTEMS INC.,                          .
                                       .
          Plaintiff,                   .  Case No. 22-cv-02632
                                       .
vs.                                    .  Newark, New Jersey
                                       .  October 30, 2023
SAVE ON SP, LLC,                       .
                                       .
          Defendant.                   .


                       TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE CATHY L. WALDOR
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared in person):

 For the Plaintiff:      JEFFREY J. GREENBAUM, ESQ.
                         Sills Cummis & Gross P.C.
                         The Legal Center
                         One Riverfront Plaza
                         Newark, NJ 07102-5400
                         (973) 643-7000
                         jgreenbaum@sillscummis.com

                         HARRY SANDICK, ESQ.
                         Patterson Belknap Webb & Tyler LLP
                         1133 Avenue of the Americas
                         New York, NY 10036
                         (212) 336-2723
                         Hsandick@pbwt.com




 Audio Operator:

 Transcription Service:    KING TRANSCRIPTION SERVICES, LLC
                           3 South Corporate Drive, Suite 203
                           Riverdale, NJ  07457
                           (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

```
 1   (APPEARANCES continued)

 2   For the Plaintiff:      KATHERINE MARGUERITE LIEB, ESQ.
                             Sills Cummis & Gross P.C.
 3                           101 Park Avenue, 28th Floor
                             New York, NY 10178
 4                           (212) 643-7000
                             Klieb@sillscummis.com
 5
                             ADEEL ABDULLAH MANGI, ESQ.
 6                           Patterson Belknap Webb & Tyler LLP
                             1133 Avenue of the Americas
 7                           New York, NY 10036
                             (212) 336-2563
 8                           aamangi@pbwt.com

 9                           GEORGE A. LOBIONDO, ESQ.
                             Patterson Belknap Webb & Tyler LLP
10                           1133 Avenue of the Americas
                             New York, NY 10036
11                           (212) 336-2008
                             Globiondo@pbwt.com
12
                             SARA A. ARROW, ESQ.
13                           Patterson Belknap Webb & Tyler LLP
                             1133 Avenue of the Americas
14                           New York, NY 10036
                             (212) 336-2031
15                           sarrow@pbwt.com

16   For the Defendant:      ANDREW R. DUNLAP, ESQ.
                             Selendy Gay Elsberg PLLC
17                           1290 Avenue of the Americas
                             New York, NY  10104
18                           (212) 390-9005
                             Adunlap@selendygay.com
19
                             MEREDITH NELSON, ESQ.
20                           Selendy Gay Elsberg PLLC
                             1290 Avenue of the Americas
21                           New York, NY 10104
                             (212) 390-9069
22                           mnelson@selendygay.com

23                           DAVID ELSBERG, ESQ.
                             Selendy Gay Elsberg PLLC
24                           1290 Avenue of the Americas
                             New York, NY 10104
25                           (212) 390-9000
```

```
 1                    (Commencement of proceedings)

 2

 3            THE COURT:  All right.  It's October 30th at 1:25.

 4   Make sure the mics are close to you.  This is 22-22632

 5   Johnson & Johnson versus SaveOn.

 6            Let's have appearances, beginning with Johnson &

 7   Johnson.

 8            MR. GREENBAUM:  Good afternoon, Your Honor.

 9   Jeffrey J. Greenbaum, Sills Cummis & Gross.  I'm here with my

10   colleague Katherine Lieb on behalf of plaintiffs.

11            I'll let Mr. Mangi introduce his group.

12            MR. MANGI:  Good afternoon, Your Honor.  Adeel

13   Mangi from Patterson Belknap Webb & Tyler.

14            I'm here with my colleagues Harry Sandick.

15            MR. SANDICK:  Good afternoon.

16            MR. MANGI:  -- George LoBiondo, Sara Arrow, Julia

17   Haigney-Long, and -- from Johnson & Johnson Health Care

18   Systems, Sheryn George.

19            THE COURT:  Why are there only men at your table?

20            MR. MANGI:  We've gone strictly in order of who's

21   handling the motions up first, Your Honor.

22            THE COURT:  Okay.  That assumes I'm letting you

23   argue your motions.

24            MR. MANGI:  Yes, it does.

25            THE COURT:  Yes, which -- go ahead.  Let's go,
```

1   defense.

2          MR. WOHLFORTH:  Good afternoon, Your Honor.  I'm

3   Evans Wohlforth from the Robinson Cole firm.  With me are

4   Andrew Dunlap, David Elsberg and Meredith Nelson from Selendy

5   Gay & Elsberg for the defense.

6          THE COURT:  Thank you.

7          So let me start out by saying, Mr. Greenbaum and

8   Mr. Wohlforth have appeared before me on a number of

9   occasions, as some of you have.  And I think they will tell

10  you that I am relatively patient human being.  And, by the

11  way, they are quite skilled, and I always love when they come

12  into my courtroom.

13         So you owe me a compliment, both of you.

14         But outside of that, I spent the weekend reviewing

15  the papers.  Obviously, I am not happy about it.

16         And Mr. Duva over here, in preparation of this

17  memo, spent many, many hours.

18         And I came in today after last night, thinking to

19  myself, well, here's what I'm going to do.  I'm going to

20  leave the courtroom, and I'm going to let you have a real

21  face-to-face discussion about this -- because it's apparent

22  from these letters, folks, that you don't even talk.  I don't

23  know what meet-and-confers you do.

24         But plaintiff says, we're already doing this.

25  Defendant said, no, you are not doing this.  We did this

1  partially.  We did this -- and you're just crossing each

2  other, which is exactly what happened the last time I had you

3  here.

4          And I heard you out last time, but I am not doing

5  it this time.

6          So my plan is this.  Because Mr. Duva convinced me

7  to discuss a minimum amount of things with you, the easy

8  things.  Then what you're going to do is have a face-to-face

9  discussion and iron out some of these issues -- because you

10 need to talk to each other.  You're talking through me.  I

11 don't want to be the "mommy" of the case.  I want to be the

12 judge.

13         That being said -- sit down, Jeff.  Have a seat.

14 Have a seat.  Relax.

15         That being said, the first thing I want deal

16 with -- and it's not going to be in your -- you can't even

17 agree on an agenda, which is really funny, the order of the

18 agenda -- the first thing I want to deal with is -- Tim,

19 those twelve documents because that's freshest in my mind,

20 which is your Exhibit 1.  Yeah.  149-1.

21         So let's discuss the purpose of uncovering -- or

22 opening up these exhibits, I assume, to show express and the

23 other one, the documents --

24         MR. GREENBAUM:  May I make a preliminary comment on

25 what's before us?

1            THE COURT:  On what?

2            MR. GREENBAUM:  What's before us, because as a

3    member of the bar, I feel an obligation to apologize to the

4    Court for the hundreds of pages that have been reflected in

5    these papers.  We have each side submitting 10, 12, 14 pages

6    a side, thousands of pages of exhibits, currently small

7    microscopic font size.  And in all my years I've never seen

8    letters on joint letters of this length and -- overlength, in

9    my view.

10           And when we get, you know, 10, 12 pages, we have to

11   respond to them.

12           My solution and my suggestion is that in the

13   future, any joint letters be limited to five pages per side

14   with full-size fonts.  I think that's in keeping with what's

15   been done in the past in other cases.  And it would force the

16   parties to be clear and concise because I think it's an

17   impossible burden on the Court as well as the parties.  We've

18   gone back and forth on some of these letters over a three-

19   or four-week period just to get -- well, you said this, and

20   we said this, and then we have to respond to you.

21           So I think that would be a solution, at least to

22   avoid some of the problems in the future.

23           THE COURT:  That may be a partial solution.

24           So I want everybody to know that I had a very short

25   *ex parte* conversation with Mr. Greenbaum before the swearing

1    in on Friday where I indicated that I was not happy with him.

2    And I also had a short conversation with Evans,

3    Mr. Wohlforth, before you all came in the courtroom to tell

4    him my intentions and that I was as upset as I can be, which

5    is a very high bar because I don't get upset at much.

6           But it is kind of abusive when the Court has so

7    many cases, many more cases than all of you have, to have us

8    spend this much time reading these letters, as I said, that

9    you're clearly speaking through me, not to each other.

10          And if you had spoken to each other about a quarter

11   of a half of what's in these letters, we wouldn't be here

12   today.  But I accept that.

13          And I also discussed with you that I'm thinking

14   about a special master in the case, and I don't know how

15   people feel about it.  I don't know that I care.  I don't

16   want to discuss it now.  I'm in conference with the district

17   judge about that.  I like the case.  I love the lawyers.  I

18   hate to do a special master and then impose that expense on

19   the parties.  But it's getting to that point.

20          So that may be one solution.  To limit the

21   submissions.

22          I'd also like to limit -- I mean, I've been known

23   to put on the docket, "There will be no further submissions

24   to this Court.  Figure it out."

25          I'm way past that point here.  But let's move on

1    today.

2            Let's start with the 12 pages.

3            Tell me -- the 12 documents.  Tell me what the

4    problem with this is.  Can it be redacted?  Let's -- from a

5    practical standpoint.  Go ahead.

6            MR. ELSBERG:  Sorry, Your Honor.  It's our

7    motion --

8            THE COURT:  Yeah.

9            MR. ELSBERG:  -- so just very briefly, as we

10   submitted to you in the papers and in the other motions as

11   well, one of the issues in the case is whether Johnson &

12   Johnson can identify people who take Janssen drugs who are

13   members of SaveOn pharmacy.  It's a critical issue in the

14   case because if they can do that, yet they continue to pay

15   them, CarePath funds, that's a failure to mitigate.  And it

16   can completely end a huge number of claims.  Whether they can

17   identify those patients is absolutely critical.

18            And we have produced to Your Honor and the

19   documents at issue in this motion are benefit investigations

20   that Johnson & Johnson has conducted that show that yes,

21   indeed.

22            THE COURT:  What do you want to do?

23            MR. ELSBERG:  Well, we have served discovery

24   requests through a subpoena on ESI and Accredo.  ESI is the

25   pharmacy benefit manager that works with SaveOn.  Accredo is

 1   the pharmacy that ESI owns.  It dispenses a lot of these

 2   drugs.

 3           The benefits investigation we submitted to you show

 4   that say right on the face of them that Johnson & Johnson or

 5   its vendor called up ESI or called Accredo and ESI Accredo

 6   said, yes, indeed, this patient is a member of the SaveOn

 7   plan and yet Johnson & Johnson decided to continue paying

 8   that person CarePath funds.

 9           So we're trying to get both information from them

10   and information from ESI and Accredo.  And we go to ESI, ESI

11   says, "Well, we'd like a little bit more information about

12   this.  When do the requests come in?  How do we provide it?

13   In what context?"

14           So what we want to do is take these documents,

15   these 12 documents, which we're glad to do on an AEO basis,

16   and show them to ESI's counsel so it can help them figure out

17   where the relevant material in ESI is located.

18           And we're doing this simply to gain the discovery

19   from ESI's side.  But Johnson & Johnson has said, "No.  We're

20   not going to let you show these documents to ESI."

21           We think this is a very reasonable request, a

22   straightforward request.  It'll help us get the discovery we

23   need.

24           MR. GREENBAUM:  Your Honor, we produced these

25   documents on the highest level of confidentiality, eyes of

|Hearing
|22-cv-02632, October 30, 2023

1    counsel only.  And something that the -- and they want to now

2    share it with not only their client but to third parties,

3    their partners and we say their co-conspirators in this case,

4    who are not even parties to this case.  There's no reason to

5    do that.  They don't need our documents to come back and tell

6    us what their documents say about us.

7              Your Honor, when I joined my firm, I had a partner

8    who complained to me about some search assignments that some

9    associates did.  He was very smart, this partner.  And he

10   knew some cases.  And he would say, "Research this subject.

11   Here are two cases."

12             And what he got back was a memo discussing at great

13   length those two cases.

14             They don't need our documents to tell us what

15   communications they've had with us.  They don't even need a

16   subpoena.  They have -- this is their business partner.  They

17   should comply with the subpoena.

18             And this request is done in the height of hypocrisy

19   in two respects.  Number one, they claim that the issue they

20   need this for is mitigation.  If you recall, we had a list of

21   all these patients, and we wanted to show "eyes of counsel

22   only" documents to our client so we could mitigate.

23             They said, "Oh, no."  And Your Honor denied that

24   request.

25             Here, they want to not -- disclose it to their own

1    client; they want to disclose it to third parties without our

2    permission.

3            That's not permitted.  We produced these documents

4    under the subpoena, under the DCO that gave us that

5    protection.  And it shouldn't be going now outside of the

6    case, outside of the eyes of these counsels to third parties.

7            The second point of hypocrisy, which Your Honor may

8    not have the full background on, we served subpoenas on

9    Accredo and ESI more than six months ago.  It would be last

10   January.  And SaveOn fought, supported them tooth and nail in

11   fighting those subpoenas.  They didn't serve their own

12   subpoena only until the end of discovery here, the

13   substantial completion date at the end of September.  And we

14   think that was done for window-dressing.  They didn't need a

15   subpoena to get documents from their own partners.

16           What happened with Accredo and ESI is they hired

17   the lawyer from -- we had meet-and-confers that went on for,

18   like, two or three months.  And ultimately, they refused to

19   produce a single document.  And we had to go and make

20   applications, not before Your Honor, who knows about this

21   case; they made us go to two different districts, and we had

22   to file papers in Missouri and Tennessee.  And those

23   applications were fought by Accredo and ESI, and guess who

24   supported them?  Mr. Dunlap filed an affidavit supporting

25   their application that they should produce no documents.

 1              Well, they were ordered to produce documents, and

 2    some of them are first dribbling in now.

 3              This application, I think, is all to show they

 4    don't need our documents.  The DCO prohibits it, and it

 5    shouldn't be permitted.

 6              Thank you.

 7              THE COURT:  All right.  Let me ask you, get down to

 8    the more practical issue.  Why is this designated attorney's

 9    eyes only?  What's so -- it's about insurance benefits;

10    right?

11              MR. GREENBAUM:  Yes.

12              THE COURT:  So explain to me what the

13    confidentiality of this is or why the documents can't be

14    appropriately redacted as a middle ground.

15              MR. GREENBAUM:  Well, because it shows the format

16    and the inner workings of how these benefit investigations

17    are handled.  It goes through patients.  It goes to

18    discussions that were had.  There's no need for the third

19    parties -- they haven't articulated any need for third

20    parties to see our documents to decide if they have

21    communications with us.  And, in fact, these are not

22    communications between us and ESI.  These are internal

23    documents.  It's not like we're giving them an email to ESI

24    and then they have to look in their files to see if they have

25    an email back to us.  I mean, they don't need that to find

 1   their documents.  They should be able to comply and are

 2   required to comply with a subpoena.

 3          And the subpoena was served in September.  And to

 4   our knowledge -- and we've been told that not a single

 5   document has been produced pursuant to the subpoena.  So I

 6   think that just goes to add to the wholesale basis in this

 7   whole application and this whole claimed need for the

 8   subpoena.  They don't need a subpoena to get documents from

 9   the cooperating parties, and they certainly don't need our

10   confidential documents that do the same.

11          THE COURT:  I am not sure I understand -- okay.

12   What you're saying is that there are descriptions of internal

13   goings-on that may be subject to confidentiality.

14          But I really don't see that.

15          MR. GREENBAUM:  Your Honor, this is our methodology

16   of how we're trying to stop them from abusing our programs.

17   And they -- this is, like, cat and mouse.  If we show them

18   how we got about approaching this, they'll just come up with

19   more deception, as they've done all along.  The documents are

20   replete here, how they keep changing their tactics -- how

21   SaveOn does -- to try to avoid detection.

22          And if this shows -- Accredo and ESI, how we got

23   about trying to find out if they belong to the SaveOn

24   program, they'll just come up with new ways to try to defeat

25   it.  They can do their own searches without our documents.

 1    And they don't need our documents to answer this subpoena

 2    that's been issued.  These are highly confidential documents,

 3    eyes of counsel only, and they were produced on that basis.

 4              THE COURT:  So --

 5              MR. ELSBERG:  Your Honor, may I respond to a point

 6    that he was --

 7              THE COURT:  Yes.

 8              MR. ELSBERG:  He said a few times that we want to

 9    show these to our actual clients and we want to show these to

10    the business people at ESI and Accredo.  That's not true.  If

11    it's AEO, we're not fighting the AEO designation right now.

12    We're not going to show it to SaveOn's business people.

13              And all we want to do is show it to the counsel for

14    ESI and Accredo so they can use it as a guide for determining

15    where the relevant information is.

16              These documents are records of -- they're Johnson &

17    Johnson's records of discussions that they had with ESI and

18    Accredo where ESI and Accredo said, yes, this person is a

19    member of a plan advised by SaveOn.  They have asked us,

20    "Well, can you give us information about the context in which

21    the discussions occurred, when they occurred," et cetera.

22    That's what these records will help show them.  We're not

23    trying to use it for some business purpose here.  We just

24    want to give it to the ESI and Accredo lawyers as a guide for

25    finding the relevant discovery.

1          All of these accusations that we're trying to use

2    it for some business purpose to try to evade detection is

3    absolutely -- is absolutely not true.

4          MR. GREENBAUM:  And if we limit it to the lawyers

5    only --

6          THE COURT:  Right.

7          MR. GREENBAUM:  Your Honor can't even enforce that,

8    because they've avoided your jurisdiction.  They made us go

9    out to Missouri.  They made us go out to Tennessee just to

10   get responses to documents because under the federal rules,

11   you have to go to the home county of the place of

12   incorporation unless there's consent.

13         And we asked them for their consent to go before

14   Judge Waldor.

15         They said, "No, we're not doing that."

16         And they just made it more difficult and more

17   difficult.  So we now have three proceedings going on

18   simultaneously to get documents.

19         THE COURT:  So those subpoenas haven't been fully

20   litigated in those jurisdictions?  Or they have?

21         MR. GREENBAUM:  There have been orders requiring

22   compliance.  There's one or two loose ends that are still

23   outstanding, and we're still trying to get documents pursuant

24   to those subpoenas and continuing to meet-and-confers.  There

25   was a motion for reconsideration.  Oh, it's too much.  We

 1   don't want to produce all this.

 2          So that's still going on.  We're trying to get

 3   compliance with those subpoenas to enforce the orders of

 4   those courts.

 5          And this now is a new subpoena that was issued

 6   until late September when all of this came up.  And, in fact,

 7   they wrote this application in September before they even

 8   issued the subpoena.  So the whole thing is really a put-up

 9   job.  And it's not necessary.  And they shouldn't get our

10   internal processes in terms of trying to discover things that

11   SaveOn has been trying since day one to hide.

12          MR. ELSBERG:  Your Honor.  A few things on that.

13          First of all, in terms of when we brought this, we

14   brought it later in the period because they concealed from us

15   benefits investigations showing that they could identify

16   people in SaveOn plans until later in the period.  In fact,

17   one of the letters they filed with you last week, they had to

18   concede that their prior representation to you that these

19   investigations has nothing to do with enforcing the terms and

20   conditions was false and, in fact, that they could and did

21   task their vendor with identifying members of SaveOn plans.

22   So they're trying to tag us with bringing this to you late

23   when it's their own withholding of the information -- is

24   really a little much.

25          Second of all, this is not about the motion that

1  they have brought to enforce a separate subpoena against ESI

2  and Accredo in another court.  It's about what we're asking

3  you to do in this court.  We're not asking you to just turn

4  over the documents to ESI or Accredo willy-nilly.

5      No, we will have -- we wouldn't turn them over

6  unless ESI and Accredo's lawyers signed the undertaking,

7  signed the confidentiality order and say that they are not

8  going to use it for any purpose outside the litigation.

9      This constant accusation that we're going to try to

10  use it for some business purpose is not true.  We're asking

11  you for this because ESI and Accredo have said we need

12  guidance to help find the information that we need that will

13  show that we actually provided this information to Johnson &

14  Johnson on an ongoing basis.

15      They're fighting us pretty hard.  That, you know,

16  the suggestion here, we think, is they know there's going to

17  be lot of information showing that on a lot of occasions they

18  could call up and get information from ESI and Accredo and

19  actually identify these members.  And that shows lack of

20  mitigation.  It's going to gut their claims.  That's why they

21  don't want it to get turned over.

22      But we think we need this to get the discovery we

23  need.

24      THE COURT:  Well, I am not concerned with the

25  accused motive on either side.  So we don't need to talk

 1    about that because that's pure conjecture.

 2              What I want to know is if, in fact, their attorneys

 3    sign on to attorneys' eyes only, why doesn't that protect

 4    these documents?

 5              MR. GREENBAUM:  Well, sort of two reasons.  Number

 6    one, Your Honor, they are not members of this bar.  We have a

 7    lawyer in Boston who avoided consenting to Your Honor's

 8    jurisdiction.  That would have been the logical thing to do

 9    when we wanted to enforce the subpoena.

10              Number two, we have lawyers in Missouri and

11    Tennessee who are also not members of this bar.  And so

12    that's the shortest answer.

13              But, number two, we've [sic] not given any

14    compelling reason why they need our documents to see what

15    their investigations have had.  If they've had communications

16    with us, they should go in their documents and find them.

17    We're talking about 12 instances.  We've turned over -- and

18    in the last day, benefit investigation documents, and we've

19    agreed to do that.  And we've agreed to do that.  We're not

20    hiding anything.

21              We're going to give them to SaveOn.

22              But this is the question that SaveOn wants to get

23    information from its partners.  Let them get that

24    information.  They don't need our 12 instances.  And if these

25    are the only 12 instances in the world, then I think they're

1   going to have a very slim case in trying to prove anything

2   from 12 instances.

3            But they shouldn't be able to see our internal

4   operations that are revealed in these documents.  They don't

5   need it.  They can do their own due diligence and look in

6   their files and make their production, which they haven't

7   done.

8            So this is, to me, a spurious application.  There's

9   no merit to it.  And it should be rejected.

10           THE COURT:  Tell me again what you intend to do

11  with these documents, very specifically.

12           MR. ELSBERG:  We want to show them to counsel for

13  ESI and Accredo.  It's the same firm.  We want to -- so that

14  they can see the information that was provided to Johnson &

15  Johnson.  And this -- the benefits investigation, you've seen

16  them.  They'll say, yes, we called up Accredo with ESI to

17  confirm that this was a member of SaveOn plan.  They'll talk

18  about the date.  There's other information there.

19           Counsel can then use that information to go try to

20  find in ESI and Accredo's files who would have communicated

21  this, when it would have happened, where that information may

22  be located.

23           THE COURT:  Why does that matter?

24           MR. ELSBERG:  Because we want the information.  We

25  need to be able to find the information showing that they

1   communicated all this to Johnson & Johnson.

2          The more that we can show that they communicated to

3   Johnson & Johnson -- that ESI and Accredo communicated to

4   Johnson & Johnson, that members of CarePath were taking

5   Janssen were on SaveOn-advised plans, the worse it is for

6   them because it shows that they could have mitigated their

7   damages but they chose not to.

8          This is very important information, Your Honor.

9   This goes to a major issue in the case.  And they are trying

10  to ham-string us from conducting an investigation with ESI

11  and Accredo.  It's asking us for some help in finding the

12  relevant information.

13         There's no risk of disclosure here.  They'll sign

14  the confidentiality order.  They'll -- we will ask them to

15  submit for purposes of this order, to the jurisdiction of the

16  Court in case they stray outside.  They can keep it on an

17  attorneys'-eyes-only basis.  But they should -- Johnson &

18  Johnson should not be allowed to prevent us from conducting

19  reasonable investigation with ESI and Accredo on this basis.

20  There's nothing in here that's going to give away the game.

21  We just need to find out where the information is.

22         And the accusations they're making against us are

23  simply baseless.  We just want to do discovery and find out

24  where the information is.

25         MR. GREENBAUM:  Your Honor, this argument makes no

1   sense.  We've given them the information.  SaveOn is the one

2   that is going to produce -- make their arguments about

3   mitigation.  They have these 12 instances.  We've given them

4   that information on an "eyes of counsel only" basis.  They

5   don't need to give it to ESI and Accredo.  ESI and Accredo,

6   if they want to find other instances, let them find other

7   instances.  Our 12 instances, which we already told them

8   about, are not going to help them find other once.  It will

9   help them maybe find these.  And if they have a procedure to

10  find any of these contacts, they should do it.  They don't

11  need our documents to do it.

12          I mean, this is just -- there's just no logic in

13  what they're seeking here.  And these are our confidential

14  documents.  We produced them in good faith under the

15  protections of these orders.  Your Honor previously denied us

16  the right to mitigate wholesale by allowing us to share with

17  our clients information to allow us to mitigate damages, the

18  exact same issue.

19          So we were denied that because they didn't consent.

20  And we're not consenting.  These are our very sensitive

21  information.  They don't need our documents.  They know about

22  the 12 instances.  They want to find more, let them ask their

23  partners to find more.  They have a subpoena requiring them

24  to do so.

25          Since when does a subpoena require another party to

 1   share their confidential documents?  This is, like, my

 2   partner's two cases.  If we get back the 12 instances only

 3   what does that accomplish?

 4           MR. ELSBERG:  Your Honor, I've got to say this

 5   is -- we're really surprised at the level of the resistance

 6   here.  The whole argument about we don't want to -- we didn't

 7   want to declassify our patient list so they could go forward

 8   in the future and take people off of SaveOn.  It has nothing

 9   to do with what they've done in the past.

10           This is about historically, could they identify

11   people on SaveOn plans or not?  Or not.  And if they could

12   have but they kept people on, that's going to dispense a huge

13   number of their damages.

14           And what you heard Mr. Greenbaum said, I think, is

15   typical of a lot of things we hear from them -- and we do

16   meet and confer, which is trust us.  We've given you what

17   there is.  You don't need anything more, nothing more to --

18           But we don't think that's right.  And we don't

19   think we should have to take their word for it.

20           And when we get to the letter we put in about a CAP

21   program, we'll hear from our colleague that we are concerned

22   that they haven't given us everything on benefits and --

23           THE COURT:  That's not -- we'll get to that when we

24   get to it, but --

25           MR. ELSBERG:  No, but I want to shoot down this

1    idea, Your Honor, if I may, that they've given us everything

2    and don't worry about it.

3              We don't know that they've given us everything --

4              THE COURT:  Okay.  That's fair.

5              MR. DUNLAP:  And we need to find out what's going

6    on with ESI and Accredo.

7              THE COURT:  But I still don't know what these

8    documents -- what further information these documents would

9    disclose to you or disclose to these two other -- how is this

10   a guide for information?

11             MR. GREENBAUM:  Aren't we asking the wrong

12   question?  Isn't it why do they need these?  They've not

13   given any articulated reason that makes any sense as to why

14   they need our documents to respond to a subpoena which asks

15   them about their communications with us.

16             SaveOn already knows about these 12 instances.

17             How are these 12 instances going to help them with

18   any other documents?  ESI and Accredo, both owned by Cigna,

19   the same company, can do their own search and respond to

20   their parent's inquiry and respond to the subpoena.  They

21   don't need -- these 12 documents are not going to add

22   anything to it.  This is typical of --

23             THE COURT:  That's why I'm asking him.

24             What if you were to give certification as to the

25   people that were contacted with ESI -- from ESI and Accredo?

 1                    MR. GREENBAUM:  The names of the people?

 2                    THE COURT:  Yeah.

 3                    MR. GREENBAUM:  Why do -- why would we be obligated

 4    to do that?

 5                    THE COURT:  You're not.  I'm asking a question.

 6                    MR. GREENBAUM:  I don't understand how --

 7                    THE COURT:  Well, they say they want information

 8    from the people from Accredo and ESI.

 9                    MR. GREENBAUM:  Wouldn't the normal way to do that,

10    Judge, is that you would have a search done.  You would go to

11    Accredo and ESI and say, tell us about communications with

12    J&J.  All right?  And they would go to the right people, and

13    that's exactly --

14                    THE COURT:  How do they know -- how do they know

15    the right people, though?

16                    MR. GREENBAUM:  Well, that's their business.  They

17    have to do it for our subpoena.  We've gotten court orders

18    requiring them to answer a whole list of document requests --

19    right? -- that deal with communications with us.  And about

20    SaveOn.  And they're required to do that.  That's what's been

21    going on here.  That's what each side has done.  We've done

22    searches about SaveOn.  We've done searches to respond.  And

23    they've done the same.  They talked about all the great

24    numbers of documents they produced.  And that's how parties

25    operate.  They make their own searches independent.  We

1    didn't go to them and say, "Tell us what you said to so we

2    can then find our documents so we can respond to you."

3              Each party has an independent obligation.

4              And these now are third parties.  They don't need

5    our documents to fulfill their legal obligations.

6              And this is typical of what's happening here.  They

7    make these broad overreaching requests in the hope that

8    Your Honor will split the baby and give them something.

9              Well, they are not entitled to this.

10             MR. ELSBERG:  Your Honor.

11             THE COURT:  What if you had the contacts, the names

12   of people that were contacted with respect to these 12

13   investigations?

14             MR. ELSBERG:  If they could tell us who at

15   Johnson & Johnson spoke to whom at ESI and Accredo and the

16   dates on which they spoke and the names of the patients that

17   they spoke about, then we would definitely start with that.

18             But they have refused to give us anything on this.

19   Refused to give us anything on this anywhere close to that.

20   If they want to --

21             THE COURT:  What's forthcoming --

22             MR. ELSBERG:  If they're worried about the

23   individual documents but they'll give us the data that we

24   need, we'll start with that.

25             MR. MANGI:  Your Honor, this -- I'm sorry.  I

 1    didn't mean to interrupt.

 2              THE COURT:  No.  Go ahead.

 3              MR. MANGI:  Okay.  This goes to an issue about

 4    working with the client.  So I'm just going to pop in to

 5    supplement what's been said so far.

 6              Your Honor, when we are asked to go and figure out

 7    who in the Johnson & Johnson family of companies was talking

 8    to someone; right?  And remember that's 200-plus companies

 9    scattered around the world, of course, there's a way to do

10    it.  But it takes a lot of effort.  We would go to

11    Ms. George.  She would find the right business units.  We

12    would talk to the right business people.  They would help us

13    identify, okay, who has responsibility for a particular

14    subject matter.  That's the process we go through.  And we go

15    through it in regular course of discovery.

16              But ESI, which is one of the biggest companies in

17    America, is certainly capable of doing exactly the same

18    thing.  They would go to their in-house counterpart.  They

19    would talk to the relevant business units.  They would say,

20    okay, you know, who's dealing with J&J?  Who are your points

21    of contact?  They don't need us to go and do that work on our

22    end just to save them from having to do that work on their

23    end.  This is their business partner.  They're running this

24    whole scheme together.  So if they want to find who's talking

25    to J&J within their outfit, whether it's SaveOn or SaveOn

1    plus ESI, they're fully capable of doing that.  They just

2    need to talk to their business and say, "Who is talking to

3    J&J?"

4                The idea that for them to figure that out, they

5    have to start by us going and doing this deep investigation

6    about who's talking to them is completely backwards.  If they

7    want to do that, go ahead and do that.  That's part of

8    getting their case ready.

9                We're getting our case ready.  But we don't have to

10   get their case ready.

11               MR. ELSBERG:  Your Honor, since he stood up, I'd

12   like to respond, if I can.  So the issue here is whether or

13   not there is information that SaveOn does not already have

14   that will allow us to show additional instances, more

15   instances, where J&J knew, they knew that a patient was a

16   SaveOn patient and yet they made the decision, the volitional

17   decision, the conscious decision to keep paying, for every

18   single patient like that, they get no damages.

19               The reason they got no damages is because there's

20   no causation.  If they made the business decision to keep

21   paying, they caused the payment.

22               And even if Your Honor said, "Well, no, there is

23   causation," even though there's not, it's also a total

24   failure to mitigate.

25               So when we say this could put an end to or gut

1    their case, it will gut their case on a patient-by-patient

2    basis.  And also when we show that not only did they identify

3    SaveOn patients, but that they could, they knew where they

4    could go to get this information about who are SaveOn

5    patients and they decided we know how to do it but we're not

6    going to do it, that will also show it was their choice, they

7    caused any supposed damages, their damages, they say, are

8    what they paid to SaveOn patients.

9              And it will also show a total failure to mitigate.

10             So against the arguments that they're making, I

11   would suggest to the Court that the importance of these

12   documents should be considered.  They're saying that given 12

13   documents -- I am not sure what they're saying -- is it a

14   burden to give 12 documents?  No.

15             They say there's a confidentiality issue.  But

16   there's not.

17             This will be attorneys' eyes only.  So their

18   arguments -- there's no burden argument.  Their

19   confidentiality argument is extraordinarily weak.  You have

20   lawyers, whatever bar they are, when a layer signs a

21   protective order, the presumption is, unless there's a

22   reason -- they are not going to risk their law license.  So

23   their arguments about what these -- this is 12 documents

24   shouldn't be given are very, very weak arguments.

25             And on top of that, Your Honor, on top of that,

1   what we just heard is that here's another reason why these 12

2   documents that are easy to get shouldn't be given.

3           What we are hearing from counsel is they can do an

4   enormously burdensome search, talk to all sorts of people.

5   It's a very heavy lift.  Well, that's irrelevant.  That's not

6   the question for today:  How could they do it?

7           The point is when counsel says that ESI can do it,

8   they don't need their documents, that is an assertion that is

9   simply not true.

10          And how do we know it's not true?  We know it's not

11  true because ESI has specifically said, "We're having trouble

12  do this.  Please give us these documents."

13          It's not that we said, "We have good idea -- we

14  want to give this to you."

15          They have said, "It will help us.  It will help us

16  find this information."

17          And that information is very important because I

18  don't think the other side is going to stipulate, if we say,

19  look, we believe -- we believe that ESI -- there are 24

20  people at ESI who told you, J&J, that 5,000 patients are

21  SaveOn patients.  And each of these 24 people not only told

22  you, but they told you 30 times, each of them, over and over

23  and over and over again.  They're not going to stipulate to

24  that.

25          And we want to be able to show the jury -- we don't

1   want to say, "Listen.  We think maybe we have all the

2   documents.  We're not sure because ESI said, 'We need the

3   help.'"

4           We want to be able to, with the records, with the

5   documents, put those documents to J&J witnesses.  We want to

6   be able to put that the witnesses from ESI and tell the jury

7   with specificity, here's what happened.

8           Now, J&J, trust us.

9           There is really no delta between what SaveOn

10  already knows and SaveOn can already get.

11          ESI has told us differently.  And even if ESI had

12  not told us differently, what I would suggest to Your Honor

13  is that it is reasonable.  It is a reasonable thing to

14  conclude that we will get additional information from ESI

15  that will help us find more patients that they knew about,

16  more people who told them about it.

17          And given the extraordinary importance of these

18  documents, even that should be enough because, again, the

19  three things they've said, if they look for it, it's a

20  burden.

21          Who cares?

22          That's not what we're talking about.

23          They said confidentiality.

24          Not a concern.  There's a protective order.

25          And the last thing they say is their assertion,

 1    their empty assertion is we already know it.

 2              But ESI has told us, we can give you more

 3    information if you help.

 4              So, Your Honor, I would ask you to weigh whatever

 5    merit there might be to their arguments against how important

 6    this information is to us.

 7              And I won't go into the CAP documents.  But it's

 8    the same issue.  Their arguments to try to keep this from us

 9    and the Court are arguments to keep what are probably, if not

10    the most important, among -- among the most important because

11    they have no answer -- if you look at their letters on this,

12    they have never said, "You know what, SaveOn?  You're wrong."

13    They've never say that if SaveOn can show, they identified --

14    that J&J identified SaveOn patients, they have never said,

15    "You're wrong.  That's not going to gut our damages."

16    They've never said that.  Look at their CAP letter.

17              They don't have an answer to that.  And that's why

18    these are crucial.  We can show thousands of patients were

19    ones they chose, they chose to pay, even though they could

20    have pressed the button and said you're off.  You don't get

21    CarePath anymore.

22              So it's hard -- it's just hard, Your Honor, to

23    think of a document that's more important and their arguments

24    to withhold these arguments should be very, very compelling.

25    And they're just not, Your Honor.  We need these documents to

1    have a fair opportunity to defend ourselves or they can say

2    they're not going to seek damages because they are not giving

3    us the evidence, and they are trying to stop us from getting

4    evidence that will help defend ourselves.  There's no burden

5    on them.  There's no confidentiality -- we're talking about

6    12 documents that go to counsel.  Weighed on the other side

7    is what if we found another 100 instances where they knew and

8    paid patients.  We shouldn't have to pay damages for those

9    patients.  What if we find 100?  What if we find just one?

10   They shouldn't get damages.

11          So we have the most important documents on one

12   side, and we have nonconcerns or slight concerns.  We should

13   get the documents because we should be able to get this

14   information, Your Honor.

15          MR. GREENBAUM:  Your Honor, excuse me for standing

16   up multiple times; I thought Mr. Elsberg was done.

17          THE COURT:  That's fine wrap it up, though.

18          MR. GREENBAUM:  The why these letters are so long

19   is because in any case, the application is whether it's going

20   to end the case.

21          We don't agree with their arguments that this is

22   going to establish the mitigation.  If it were so easy to

23   establish mitigation, if we weren't required to -- if we had

24   to cut off these patients, why are they making such efforts

25   to hide the fact that SaveOn is involved in these patients?

1    We have been trying to find out.  They fought us

2    tooth and nail in not allowing our clients to have the

3    information.  So this is the -- the merits are not ripe here

4    for discussion.

5    They still have not established why giving them

6    information on these 12 instances helps ESI otherwise find

7    the information.  If this is so important to SaveOn and to

8    their case, the business partner who's up to their eyes in

9    this conspiracy, which should put in the effort to find the

10   documents.  They don't need our 12 instances, which SaveOn

11   already knows about, to find other instances.  It's

12   illogical.  It doesn't help at all to know that 12 instances,

13   which they already know, how is that going to help them find

14   other instances?  We've given over documents on these benefit

15   investigations.  There are going to be discussions about that

16   later on today.  So that's not an issue.  We are not hiding

17   anything.

18   But protective orders should mean something.  When

19   we proceed in good faith to produce something on the eyes of

20   counsel only, we expect it to be honored and not shared with

21   third parties who are not even parties to this case and to

22   lawyers who are even in this jurisdiction and affirmative

23   fought to avoid Your Honor's jurisdiction.

24   So there's no logical connection as to why these

25   documents help them in any way.  ESI has an obligation,

1  independent, to comply with our subpoena and to comply with

2  theirs.  They're required to put in effort to do so.  And

3  they should be required to do that.  They don't need our help

4  in 12 instances, which SaveOn already knows about.

5          MR. ELSBERG:  Since it's our motion, might I have a

6  very short reply?

7          So, Your Honor, I hope that Your Honor noticed

8  counsel referred to what I said about how everybody knows

9  that these documents are important because it will negate

10 causation, and it will negate and it will show they failed to

11 mitigate.

12          Counsel heard me talk about that.  And what counsel

13 said was not an argument against that.  He didn't say

14 causation would not be negated by these documents.  We didn't

15 say this will not show a failure to mitigate.

16          He sort of changed the subject and said, "Well, if

17 it was easy to find these documents, then ESI would already

18 do it I am that the I am not exactly sure what he said, but I

19 know what he did not say.  They don't have an argument

20 against these documents being crucial and case-killers.

21          And then -- I am not done -- and then --

22          MR. GREENBAUM:  Excuse me.

23          MR. ELSBERG:  -- the other thing that we heard is

24 what we heard before, which is they say, well, SaveOn has --

25 why does SaveOn need these?  SaveOn knows the 12 instances.

1    SaveOn should go to their business partners and say, "Please

2    do this."

3              We did.

4              We did exactly what he said we should do.  We went

5    to them.  We said, "We want the information."

6              They said, "We need help."

7              So, again --

8              THE COURT:  What do you mean "the information"?  I

9    mean, aren't these communications between J&J and ESI and

10   Accredo?

11             MR. ELSBERG:  Yes, Your Honor.  There's the point.

12   There's the point.

13             There are records that they have, that they have,

14   Johnson & Johnson, that show what communications happened

15   that is right?  And those documents ESI has said, "Give us

16   those documents because we don't have complete information on

17   that or it would be difficult for us to find."

18             The information on those documents that show who

19   was in contact with who, what was said, which patients were

20   mentioned, ESI has said, we don't -- it'll make it easier for

21   us to then go talk to the right people and find the right

22   documents.  It will help, Your Honor.  It will help.  It will

23   help find documents that are absolutely critical.

24             THE COURT:  Well, my decision is not based on what

25   it will help or whether or not it will help.

1            I think that they're relevant insofar as Accredo

2    and ESI.  I also would say that they are protected if, in

3    fact -- I don't care what jurisdiction their attorneys are

4    in.  Just because you're out of state doesn't mean you are

5    not going to abide by a protective order.

6            So I'm going to have these made available with

7    signature by attorneys for ESI and Accredo.

8            MR. ELSBERG:  Thank Your Honor.

9            THE COURT:  So let me talk to you about 162.  I

10   refer you to my text order Number 127, which was pretty clear

11   in terms of the decision-makers I am not sure why we're still

12   arguing about this.

13           [As read] Plaintiff shall conduct a further

14   investigation regarding non-JJHCS personnel responsible for

15   making decisions regarding the CarePath program and shall

16   supplement interrogatory responses as appropriate.

17           MS. NELSON:  Your Honor, I can address this one.

18           THE COURT:  Okay.

19           MS. NELSON:  Oh, I'm sorry I don't -- if I'm not

20   projecting well enough without the mic.

21           THE COURT:  No.  We need the mic.

22           MS. NELSON:  Okay.

23           THE COURT:  There's a couple of mics over there

24   too.

25           MS. NELSON:  So I'll keep this very short.

1            THE COURT:  Okay.

2            MS. NELSON:  When we were here last time, you

3    recall, I'm sure in vivid detail, the fairly lengthy colloquy

4    we had about what we wanted.  I think the parties disagree

5    about what Your Honor's meant.

6            THE COURT:  Yes.

7            MS. NELSON:  Of course Your Honor can tell us what

8    your order meant, but this is what we want today.

9            What we want is for J&J to answer the rogs that we

10   served, the language of the rogs we served, based upon

11   information in their possession, custody, and control.  That

12   is a basic requirement of the federal rules.

13           And our problem with this decision-maker limitation

14   is that it leaves out relevant people; right?  So if the four

15   people at this table sat in a room and talked about an issue

16   and tried to come to decision, I can tell you, Your Honor, if

17   someone were trying to figure out who the decision-maker is,

18   I certainly would not be on that list.

19           But I have relevant information.  I sat in the

20   room.  I had the conversation.  I was part of the

21   decision-making process.  I have relevant information.

22           And the rogs we served are very --

23           THE COURT:  Or what you're saying is you don't

24   trust them to identify decision-makers?

25           MS. NELSON:  No, our problem is that we want

1    everyone with relevant information.  And we don't think that

2    just decision-makers necessarily captures all that.  I don't

3    know what they mean by decision-makers; right?  It could be,

4    you know, sitting in this room, maybe only you're the

5    decision-maker or maybe the lead counsel of each table and

6    you are a decision-maker.  I just don't know what that means.

7              I just want the people who have relevant

8    information.  If someone was sitting in a conversation or

9    someone at J&J was talking about, wait, should we change our

10   terms and conditions to say this, they have relevant

11   information that goes to the interpretation of those terms

12   and conditions.  We just want their names.  Like, this is --

13   this really is very basic stuff.  These are basic rogs that

14   you serve at the beginning of discovery, and the parties are

15   obligated to answer them fully to give people with relevant

16   information that they can identify, based on what's in their

17   possession, custody, and control.

18              So I'll leave it there.  I don't want to rehash the

19   whole conversation.  But we think that -- we still don't have

20   a complete list of relevant people.  And, frankly, we still

21   don't think they've searched in the right places.  But this

22   goes, I think, in the first instance to the interpretation of

23   your order and what we want.  We just want answers to our

24   rogs.

25              MS. HAIGNEY-LONG:  Good afternoon, Your Honor.

1    Julia long for plaintiff.

2           I want to be clear about what counsel is saying.

3    What I heard is that they did not like the limitation in the

4    order that Your Honor issued.  To be very clear and to return

5    to the order at question, your June 29th order directed JJHCS

6    to, quote, "conduct a further investigation regarding

7    non-JJHCS personnel responsible for making decisions

8    regarding the CarePath program and to supplement

9    interrogatory responses as appropriate."

10          That was a June 29th order.  It is now

11   October 30th.  The time for reconsideration of that order and

12   reconsideration of the scope of that order has long passed.

13          We complied with Your Honor's order immediately

14   after the conference.  We began our investigation.  At that

15   point, or shortly thereafter on July 5th, we received a

16   letter from opposing counsel with an extreme ask of who we

17   should do.  They said -- and I quote just for a few

18   examples -- that any reasonable investigation must include

19   speaking with all members of the Janssen Americas Leadership

20   Team and their support staffs, including communications

21   teams.

22          That's 20 of the top leaders across the J&J family

23   of companies.  The vast majority have nothing to do with the

24   CarePath program.  The person who is responsible for

25   decision-making in South America is not relevant to this

1    case, and there's reason for us to speak with them.

2           They also demanded that we speak with Janssen Drug

3    random employees with a laundry list -- vice presidents,

4    senior directors, directors, senior managers, managers for

5    products, market access, sales, and national accounts for

6    Janssen drugs at issue in this case for each of the Janssen

7    drugs.

8           That is about 130 additional people.  Again, not

9    relevant to this action and certainly not encompassed in what

10   Your Honor directed us to do.

11          At the June conference, we had different opinions.

12   We said, as has been our position, that JJHCS is the relevant

13   entity.  It is the entity that makes decisions about the

14   CarePath program.

15          Counsel for SaveOn had different view.

16          Your Honor directed us to go back and answer the

17   interrogatories as to the non-JJHCS personnel.

18          That's what we did.  And we supplemented our

19   interrogatory responses, to be clear, to add six additional

20   personnel, one of which was a JJHCS employee.  The other five

21   worked for other Janssen entities.  We've now disclosed that

22   to opposing counsel.  And, really, there's nothing else for

23   us to do here.

24          THE COURT:  That's correct.

25          So I believe my order's clear as to

1    decision-makers.

2              And what your interpretation of a decision-maker

3    and their interpretation of a decision-maker is, I am not

4    getting into the weeds with that.  They've given you the

5    information on who they propose as decision-makers on

6    CarePath.  And that will be that.

7              Go ahead.

8              MS. NELSON:  Your Honor, can I put one thing on the

9    record very quickly.  Right.

10             THE COURT:  Yeah, sure.

11             MS. NELSON:  So when we're talking about JALT and

12   the brands, the JALT, Janssen Americas Leadership Team --

13   right? -- we did not ask in our letter to go speak with 20

14   senior executives of the JALT.  We asked them to

15   investigate -- right? -- because they had said to us over and

16   over again, there's only one person on the JALT with relevant

17   information.  In fact, they won't actually say that.  They'll

18   say there's one person on the JALT who was a decision-maker.

19             But we know, based on documents, that there were

20   other people on the JALT with relevant information.  So the

21   reason --

22             THE COURT:  How do you know?  And what is that

23   information?  Have you discussed that with your adversary?

24             MS. NELSON:  Yes, and we've had these discussions.

25   It's in emails.  They received emails about --

```
 1                THE COURT:  Is that how you're meeting and

 2    conferring?  By emails?

 3                MS. NELSON:  No, we've had phone conversations as

 4    well, Your Honor.

 5                THE COURT:  That's going to stop.

 6                MS. NELSON:  Okay.

 7                THE COURT:  Your meet-and-confers are going to be

 8    in court.

 9                Go ahead.

10                MS. NELSON:  I just want to make this clear that

11    when we ask them to look at the JALT and we ask them to look

12    at the brands, it is because we know, based on seeing

13    discovery and, frankly, what we know from our client, from

14    other -- from conversations that those are the people who are

15    making decisions about CarePath.  They have budget

16    responsibility for CarePath.  They decide how much money J&J

17    is going to pay out.  That's where CarePath gets its money;

18    right?  So there is a reason that we have concerns about the

19    answers they gave and we don't think they're complete.

20                But I understand, of course, Your Honor's ruling.

21    And I just wanted to make this record very clear.

22                THE COURT:  Okay.

23                Did you want to respond quickly?  No.

24                MS. HAIGNEY-LONG:  No, Your Honor.

25                THE COURT:  I like that "quit while you're ahead"
```

1    head shake.

2            Yeah, this leads me really to -- last time we were

3    here, I asked you -- we're talking about T&Cs now -- to

4    modify your ask, to review and modify so that you weren't

5    asking for everything in the world.

6            You did not do that.  There was no modification.

7    There is no change in your asks.

8            I mean, it seems to me from this letter, you want

9    everything and anything that whispers.  And that's not

10   proportional to this case or any case, number one.

11           Number two, if, in fact, you were to modify and

12   limit the scope of your requests and we found as a result of

13   that information was disclosed that very specifically you

14   could come to me and show me and say, "Wait a minute.  Look

15   what we found.  We're going to X now or Y now," you have

16   asked for everything with respect to that.  There is

17   absolutely no limitation.

18           I don't know how to impress upon you that the case

19   has to be directed on both sides.  It's not.  It's swimming

20   in the ocean here.  There's got to be direction.  And there's

21   got to be a way to funnel, whether the funnel goes out and

22   large on the top, it starts small so that we're not asking

23   for everything in the world, thereby stalling this case for

24   years and years.

25           So -- yeah.  Yes.

 1          MR. DUNLAP:  So we did attempt to narrow and

 2    specify what we're doing.  And I think it goes to three

 3    specific areas, three specific areas.  And, again, just want

 4    to emphasize -- right? -- they chose to bring this tortious

 5    interference claim.  The meaning of the terms and conditions

 6    is a central issue in that claim.  It's a central issue.

 7    They've taken the position that New Jersey applies.  As I'm

 8    sure you know, New Jersey contract law focuses on the intent

 9    of the parties so parol evidence, extrinsic evidence is

10    highly, highly important.

11          So the three areas we are looking at, one is the

12    drafting history.  The drafting history.  We have zero

13    documents, zero documents, about the drafting of the "other

14    offer" provision, which is the central provision at issue in

15    the general terms and conditions.  Not --

16          THE COURT:  So do you think there will be emails

17    that redefine "other"?  Or -- it's such a general term.

18          MR. DUNLAP:  We have -- we believe that there was

19    never -- that Johnson & Johnson never actually believed that

20    the "other offer" provision applies to plan terms, which is

21    what is at issue here.  I mean, at the fundamental, that

22    drafting history is primary evidence of what the drafting

23    party intended.  And Johnson & Johnson is the sole drafter

24    here.  They have told us that they drafted the "other offer"

25    provision as part of the predecessor program -- the

 1   predecessor program or programs.  They know what those

 2   programs are.  They know who worked for them.  But they will

 3   not tell us what the programs were.  They will not tell us

 4   who the employees were.

 5              THE COURT:  Is that the response that they will not

 6   tell you?

 7              MR. DUNLAP:  That is the response.  What they've

 8   just said is, well, they have one custodian who worked on the

 9   transition --

10              THE COURT:  Right.

11              MR. DUNLAP:  -- and they'll add a few months from

12   their documents, going back into 2015.

13              But they won't go back to the people who actually

14   worked at those predecessor programs and search for documents

15   that could go to the drafting here.  That could go to the

16   drafting here.

17              THE COURT:  How many drafts were there?

18              ATTORNEY FOR PLAINTIFF:  Your Honor, I am not sure

19   how many drafts there were.  Our document retention

20   effectively allows us to go back to about 2013.  They've

21   asked us to go back to at a minimum 2009 --

22              THE COURT:  We talked about this.

23              Go ahead.

24              ATTORNEY FOR PLAINTIFF:  Yeah, and maybe beyond

25   that.

1          This term has been used in other pharma offers.

2   It's been used by Horizon, Uber --

3          THE COURT:  Everywhere.

4          ATTORNEY FOR PLAINTIFF:  -- everyone uses it.

5          We would love, Your Honor -- let me just cut to the

6   chase -- we would love to have a document that is like the

7   kind that Mr. Dunlap is describing, and we did go back and we

8   spoke to some people who are relative of the vintage of the

9   people who were there around 2013, '14, thereabouts.

10         We don't have nonprivileged documents to produce to

11  them.

12         And so what we offered to do was to do some

13  additional searching.  And we engaged in some

14  meet-and-confer.  They asked for what would have effectively

15  been 300,000 documents.  We came back with a much smaller

16  proposal.  And rather than continue to bargain over this,

17  they wrote to Your Honor and went to the Court.

18         So we have already produced documents about the

19  issues that they talked about.  We've produced documents

20  showing how the terms and conditions are to be applied.

21  We've produced documents showing the 2022 changes -- 2022,

22  there were some changes made to the program for two drugs.

23  We produced instructions to our vendor TrialCard.  We

24  produced call notes from thousands of calls at TrialCard, our

25  vendor, that actually talks to the patients.  We produced

1  thousands of call notes from TrialCard to show how these

2  things are being done.  We've done the best question.  We're

3  willing to do a little bit more.

4         But we weren't willing to agree to 300,000 more

5  documents to review when everything we know indicates that

6  these documents will never be found.  We're willing to do a

7  little bit more to try to bridge the gap.

8         But that wasn't enough, and they wrote to

9  Your Honor rather than take our interim offer or continue to

10 bargain.  They actually moved up in the number of documents

11 at one point.

12        I'll stop.

13        THE COURT:  I am not going to resolve the T&C --

14 the terms and conditions issues.  I am not going to do it.

15 You're going to have to work those out yourself.

16        That's what you're going to come here -- and if

17 it's weekly, in person -- and work out terms and conditions.

18        I'm just not going to do it.

19        MR. MANGI:  Your Honor, I have to --

20        THE COURT:  Does this mean a district court is

21 going to have to decide what "other offer" means?

22        MALE SPEAKER:  It's a key issue in the case,

23 Your Honor.

24        THE COURT:  I know it is.  But it's also -- you

25 know, ambiguous.  And I know you're looking for something to

```
 1   define it by my very words ambiguous.

 2           But going back to the year 2000-and-whatever, if

 3   there are 64 drafts, how is that going help you?

 4           MR. DUNLAP:  We don't know --

 5           THE COURT:  Towards intent.

 6           MR. DUNLAP:  We don't know what there is because

 7   they won't tell us.

 8           And they say, "Oh, you know, other drug companies

 9   use it now, or Amazon uses it now."

10           Maybe.  But that's the relevant.  They drafted it.

11   They got it from somewhere.

12           And this is the standard contract --

13           THE COURT:  But how does that go to how it was

14   utilized?

15           MR. DUNLAP:  Because if we can show that when they

16   sat down to draft the "other offer" provision, they had some

17   understanding of what it would apply to and plan terms are

18   not on that list, that would be core evidence that they

19   don't -- they never really believed at the time of drafting

20   that it applies to the plan terms.  It's the benefit terms at

21   issue.

22           THE COURT:  But let me go back to my question --

23   because say there are 65,000 emails that say this is what

24   "other offer" means but it's never implemented in that

25   manner.
```

1          MR. DUNLAP:  Yes.

2          THE COURT:  What does it matter what their thought

3    process was prior to the implementation of "other offer" if

4    in reality the implementation had nothing to do with the

5    first draft or the third draft or the fifth draft?

6          MR. DUNLAP:  Evidence of what they thought a

7    contract -- a final term meant at the time is absolutely

8    relevant.

9          THE COURT:  At the time.

10         MR. DUNLAP:  At the time that they drafted it.

11         Well, I was just starting the drafting history.

12         We also then need to talk about course of

13   performance, which I haven't even gotten to yet.

14         But the drafting history, we don't know what

15   drafting history there is.

16         Now, he said things -- the other side said things

17   about their retention policies going back to 2013, but their

18   letters are very carefully worded.  They don't say they don't

19   have documents before then.

20         If they have documents, they need to go look

21   through them.  If they're not reasonably accessible --

22         THE COURT:  I thought we established that in the

23   last session.

24         MR. DUNLAP:  No, I don't believe we did.

25         THE COURT:  Okay.

1          MR. DUNLAP:  I have not heard or seen anything.

2    They certainly haven't told us why their documents wouldn't

3    be reasonably accessible.  And they haven't said they lack

4    documents from that earlier period.

5          If they're standing up and saying that now, that's

6    news to us, because that's not what they've said before.

7          If they have documents from the time period and the

8    predecessor programs, when this term, which is at issue here,

9    was drafted, they have to at least tell us what the programs

10   are, tell us what the employees were, and tell us what

11   document sources we have.

12         And they start throwing around these large numbers

13   of documents for drafting history.  We have no idea what the

14   numbers are.  We haven't even gotten to will they do searches

15   and run search terms so we can start agreeing on the number

16   of documents.  We talk about we need to meet and confer.

17   They've shut us down.  They've said, except for -- one

18   custodian in 2015, we are not going back any further.  We're

19   not going to tell you what the programs are.  We're not going

20   to tell you who the custodians are.  We're not going to tell

21   you what the doc sources are.  We're not going to tell you if

22   these are reasonably accessible or not.  We are certainly not

23   going to give you any information on it.

24         And the idea that they can simply say --

25         THE COURT:  And you.

 1          MR. DUNLAP:  -- "We are not giving you anything on

 2  drafting because it was too long ago," I'm sorry, but we then

 3  get to sue you and tell you what this contract means, I just

 4  don't think is consistent with -- a contract.

 5          MR. MANGI:  So, Your Honor, I'll just answer that

 6  very briefly.  I'm actually not here to argue this motion.  I

 7  was here to say something else.

 8          THE COURT:  I really wasn't going to hear any

 9  argument on this --

10          MR. MANGI:  Okay.  Then I'll just --

11          THE COURT:  -- because, as I said, I want you all

12  to work this out.

13          MR. MANGI:  Yeah, so then -- so then I won't even

14  respond to it.

15          Let me go to what I came here to say, then,

16  Your Honor.

17          Your Honor, I recognize fully your frustration with

18  the situation.  I recognize it.  We've anticipated it, and we

19  tried to find ways to avoid it.  Clearly we didn't succeed

20  collectively.  And I understand you want us to talk more.

21  And that's entirely fair and reasonable.

22          I wanted to just raise thought as to a potential

23  path forward in terms of what we have here.

24          Your Honor, if you look at the stack of motions

25  that are pending, setting aside now the two that you have

1    already resolved, here's what they are:  Number 163 is the

2    one we've just been talking about, which is the terms and

3    conditions and other related issues tied to it.  Right?

4            You will -- and, by the way, if you have the letter

5    from Mr. Greenbaum handy, I can point you to where they are.

6            THE COURT:  I do.

7            MR. MANGI:  Okay.  So Number 1 in Mr. Greenbaum's

8    letter is 163.  That's the terms and conditions issue that

9    you just started to hear about.

10           Now, that one, Your Honor, was, as you just

11   recognized, subject of an earlier motion.  And we talked

12   about many of these issues then.  And they're back now again

13   wanting to reargue that.  And that's fine.  That's their

14   right to bring it back.  But it's been a subject of some

15   prior discussions.

16           Number 3 on Mr. Greenbaum's list, which is

17   Number 150, documents regarding finances, that's the same

18   thing in that we've been here on that before.  Your Honor

19   denied that motion.  They want to come back and raise the

20   same issues again, but we've been here on it once before.

21           Number 5 on Mr. Greenbaum's list, which is

22   Number 165, seeking additional custodians, that also, in

23   part, we've been here on before because, you remember, they

24   wanted other custodians, they wanted Janssen custodians, they

25   wanted some of same custodians who they're seeking now, but

1    they've also added other people to the list.

2              THE COURT:  But doesn't this relate to the CAP

3    program, which is a newly --

4              MR. MANGI:  That's the next one, Your Honor.

5              THE COURT:  Oh, okay.

6              MR. MANGI:  Which is Number 6 on this list.

7              Now, as regards -- and I'm going to get to that one

8    in just a minute.

9              As regards these three that I just went through,

10   all of which, either in whole or in part, we have been here

11   on before, we are happy to go back, confer more, and come

12   back if we need to, but I think what's critical on those is

13   the guidance that Your Honor just gave, which is you told

14   them last time, you're not granting this, you need to have

15   something that is a much more specific ask.

16             And if they can come back with a much more specific

17   ask, we've actually proposed some specific compromises that

18   have been rejected, maybe they'll revisit those, but with the

19   benefit of your guidance, it may be those because they've

20   already been here once, we can make some progress on if they

21   take guidance to heart.

22             The one that is new is Number 6, which is the CAP

23   program one, Number 166.  And my suggestion, Your Honor,

24   would be, if Your Honor is amenable, that we argue that one

25   because that does raise some new issues.

1          On the other ones, frankly, I think it's really

2   very simple.  We've been here before.  We got a good sense of

3   what you thought of them last time.  We got a better sense

4   today.  If they're willing to come back with something

5   specific, we'll do our best to work it out and avoid coming

6   back because we know you don't want to deal with those

7   details.

8          On the CAP one, I think we need your help because

9   we haven't talked about it before.

10         So that's my suggestion, Your Honor, as one path

11  forward.

12         THE COURT:  That's Number 1 on Mr. Wohlforth's --

13         MR. MANGI:  Yeah, they're eager to resolve that.

14  And that's fine.  I would actually like to argue that one.

15         But, you know, on the other ones -- that's my

16  thought, Your Honor.  But, of course, we're happy to do

17  whatever you want us to do.

18         And I suspect, while we're happy to go in the back

19  room and do it, they're going to need to think pretty hard

20  about how can narrow their asks.  I suspect they'll want to

21  talk to their --

22         THE COURT:  Good.  You have a week.  I'll bring you

23  back next week.

24         MR. MANGI:  Okay.  That's fine.

25         THE COURT:  But that's with respect to the T&Cs.  I

1   mean, you've got to narrow it.  You've got to do it.

2              MR. MANGI:  Yeah.

3              And our view, Your Honor, is that the exact same

4   principle is in play in the other two that we've been here

5   before on:  Finances and, you know, they want 12 new

6   custodians.

7              And similarly, if they have more specific asks, you

8   know, we can talk about those with them.  But CAP is somewhat

9   different issue.

10             THE COURT:  Well, I thought CAP, the 12 new

11  custodians included CAP custodians.

12             Am I wrong about that?

13             MS. NELSON:  No, you're correct, Your Honor.  So --

14             THE COURT:  Seven CAP custodians?

15             MS. NELSON:  On the custodians, I'll just say

16  briefly, I disagree with some of the statements that have

17  been made.

18             It is true that some of the custodians relate to

19  issues we've heard before, but not all of them.  And, in

20  fact, some of these custodians were just disclosed to us in

21  the amended interrogatory responses that we received in July.

22  So --

23             THE COURT:  And --

24             MS. NELSON:  So these are not all old issues.

25             THE COURT:  -- are seven of those CAP custodians,

 1  though?  Because I'm going to open the doors on CAP.

 2          MS. NELSON:  Some of them, yes.  A number of them,

 3  I would say -- I have to count, but -- around half of the

 4  ones we ask for related to CAP.

 5          THE COURT:  And what have you offered in terms of

 6  CAP?

 7          MR. MANGI:  Yeah, so we actually have some new

 8  stuff here as well, Your Honor, on the CAP program.

 9          THE COURT:  Did you want to say something before he

10  continued?

11          MR. ELSBERG:  Yes, Your Honor, David Elsberg.

12          THE COURT:  I'm always criticized for having a

13  free-for-all in my courtroom.

14          MR. ELSBERG:  Well, this one's my fault,

15  Your Honor.

16          THE COURT:  Go ahead.

17          MR. ELSBERG:  And David Elsberg.

18          THE COURT:  Yes.

19          MR. ELSBERG:  We actually strongly agree -- we

20  strongly agree the CAP motion being argued today --

21          THE COURT:  Okay.

22          MR. ELSBERG:  -- because they're extraordinarily

23  important documents, and I would suggest that --

24          THE COURT:  That was the plan.

25          MR. ELSBERG:  Okay.  Thank you, Your Honor.

1           And I would suggest that before opposing counsel

2    starts talking about CAP, it's our motion.  I would like to

3    argue it, and then counsel can respond.

4           MR. MANGI:  I would --

5           THE COURT:  You're up there.  Go ahead.

6           MR. MANGI:  Okay.  Thank Your Honor.

7           All right.  So let me start, Your Honor, with the

8    question that you asked, and then I'll make a couple of

9    additional points.

10          The question you asked is what are we giving them

11   on this CAP program?  Right?

12          And let me preface this, Your Honor, by saying, I

13   remember from last time, your approach on these issues is,

14   one, you don't want the world of discovery opened up because

15   cases have to be practical.  But you want them to have what

16   they need to be able to defend against the claims.

17          And that is the criticism through which we have

18   approached this issue.

19          Now, the parties here have in this case agreed on

20   one thing -- I know there are not many things we agree on,

21   but we agreed on thing, which is we agreed on a time frame

22   for discovery.  And we agreed that time frame was April 2014

23   through July 1st, 2022.

24          And of course that's just an entirely practical

25   accommodation because discovery has to end somewhere.  We

1   have to collect those documents, process them, produce them,

2   and then we move on to depositions and then to trial.  We're

3   at the deposition phase now.  The first deposition is

4   scheduled for next week.

5          So when they raise the issue of wanting these

6   custodial documents -- and, Your Honor, let me just describe,

7   this is an important distinction -- all right? -- between

8   custodial documents where we have to go, search through

9   individual peoples' emails and you get a lot of junk, a lot

10  of false hits, a lot of manual review, but those on one hand,

11  and on the other hand, noncustodial stuff where you know what

12  you're looking for, you get it from a central source, you can

13  produce it.  Much less burden on the noncustodial side;

14  right?

15         So we agreed that for the searches that they want

16  on the CAP program, we'll go back and we'll do custodial

17  searches but only through until the cutoff.  And that alone

18  added some 32,000 documents.  Many of them are going to be

19  false hits.

20         But they also, Your Honor, don't want to do any

21  meaningful custodial discovery beyond that 2022 cutoff,

22  because they know that's going to be very hard on their side

23  also.  In fact, all they've agreed to do past that cutoff and

24  noncustodial stuff.  The only custodial discovery they agreed

25  to is one very narrow piece from one custodian that will

1    probably have a handful of documents.

2            But everyone is agreed that we are going to apply

3    this cutoff as a practical limitation to the case, can go

4    forward.  And we'll have some exceptions beyond that where

5    they're necessary.  But those have tended to only on the

6    noncustodial side because the custodial side inevitably bogs

7    the case down, restarts --

8            Now, with that in mind, we still want to ensure

9    that we can give them what they need to defend the case

10   because I know that's something Your Honor is going to

11   demand.  So here's what we have thought we're going to do,

12   Your Honor.  Their whole point here is they say, as you heard

13   from this morning, this CAP data, what they're asking for

14   here through these searches going to show that J&J was

15   getting information that told us who is in SaveOn.  And so if

16   we wanted to cut them off, we could have cut them off.

17   That's the premise underlying all of this.

18           So what we have said is, look, you don't need to --

19   us to go look for every single email that talks about CAP or

20   anything to do with this.  Your real point is you want to

21   know what data we have, telling us who is in SaveOn.  And

22   then when you have that, you can argue whatever you want,

23   based on whether they have the data, they didn't take action,

24   fine.

25           So on a noncustody basis for the period of after

1    the cutoff, here's what we've agreed to do, Your Honor.

2    First, we have agreed to give them documents that will show

3    all of the final reports that we got from our vendors who

4    were tasked with analyzing this issue, we're trying to find

5    out who is a maximize, an accumulator-type program.  So all

6    of those reports that assess whether they can identify

7    individuals enrolled, we told them we're going to give you

8    those.  We are going to give you those through to the

9    present.  So we are going to give them all of that, that

10   underlying data that they're most interested in.

11          Then that's the stuff that we're getting from our

12   venders.  And this task largely outsourced to vendors who are

13   data experts to try and do this for us.

14          But then if we had internal, any of our own

15   internal analyses, trying to assess whether it's possible to

16   identify individuals enrolled in these accumulator or

17   maximizer programs internally, we said, we'll give you those

18   too, and we'll give them to you through to the present.

19   We'll get those -- collect those specifically without having

20   to search through hundreds of thousands of emails.

21          Third, we have said, okay, you're saying, well, you

22   know, we talked about -- about we can enforce these now

23   because we know who these people are, we can cut them off.

24   We said, okay, if we have documents that will show sufficient

25   to show any attempts to enforce our terms and conditions

1    against these individuals, to the extent those exist, we'll

2    give you those through to the present, again, without a

3    cutoff.

4         And, the Court, the actual transactional data that

5    is associated with the program, all of the people enrolled,

6    the datas of enrolled, what we are paying, what we're not

7    paying, what they may need to assess any of these analyses,

8    we'll do all of that through to the present.

9         Let me add to that one new point that's not in the

10   letters.  As we have been working to prepare for this

11   hearing, looking at other things we can do to try to resolve

12   this, we noticed, Your Honor, that a lot of what they are

13   pointing to -- in fact, I would say almost all of what

14   they're pointing to in these exhibits to their motions are

15   benefits investigations; right?  And these are where they

16   say, okay, you looked into a particular patient and may be

17   you figured out whether they're in SaveOn.

18        And as we pointed out to you, Your Honor, for the

19   vast majority of this time period, benefits investigation had

20   nothing to do with any of these issues.  It was about is this

21   a government patient?  Is this a commercial patient?  Do they

22   have any coverage?  Not looking at this stuff at all.

23        Right towards the end of the time period for

24   discovery, that phrase, we've now identified, started to be

25   used also to refer to an additional set of documents where

1    they are trying to figure out is someone in an accumulator or

2    a maximizer or a program like this?

3            And so we wrote Your Honor and said, look, just for

4    a narrow time period, but we have now seen that phrase is

5    used in that way, so we'll produce those for that relevant

6    time period.

7            But now, Your Honor, we'll make an additional

8    concession.  In addition to all of the categories that I just

9    pointed out, we will also give them through a production from

10   TrialCard, which is our vendor, who we also represent and is

11   subject to a subpoena, we'll give them benefits

12   investigations that find any patient in a maximizer or a

13   accumulator through to the present.  Through to the present.

14           So between all of those sources, Your Honor, I have

15   just identified, they have more than enough to be able to

16   make whatever arguments they want about mitigation without

17   needing to say, okay, now, even though depositions are

18   starting next week, we want you to start going through

19   hundreds of thousands of emails to find any stray mention of

20   these issues.  We don't need that because we are going give

21   they will the actual data that is underlying all of this.

22           Let me point -- make one last point, Your Honor,

23   and then I'll sit down.

24           I just want to address -- I wanted to first assure

25   Your Honor that we've heard your concerns.  We've looked to

 1  give them what they need.  But I do also want to address this

 2  premise underpinning this motion.  And it's important because

 3  it goes to proportionality.  The premise they make -- and you

 4  heard it from counsel today -- is they say we, JJHCS, have

 5  made, quote, a strategic business decision or a volitional

 6  choice -- these are all phrases from their phrases -- not to

 7  mitigate.  All right?  So they are telling Your Honor, we

 8  know who's in SaveOn.  We're confident.  We are certain.  But

 9  we are choosing voluntarily to keep giving them money.

10  Therefore, we have failed to mitigate, and we shouldn't get

11  damages for them.  That's what underpins all of this.

12          Now, Your Honor, I saw you nodding when

13  Mr. Greenbaum was speaking earlier so I know that you

14  remember this issue about patient lists that came earlier.  I

15  want to return that for just one minute because it's very

16  important in this regard.

17          Remember, Your Honor, what happened on that patient

18  list issue.  We came in, and we said, "We don't have any

19  information that tells us with confidence who is in SaveOn."

20  This is a very tricky issue because we don't want to cut

21  patients off if we don't have reliable --

22          But now there's list, and that list will

23  definitively tell us who's in SaveOn because they generated

24  it, so allow us to use that to mitigate.  And part of that,

25  obviously, is them taking those people out of the program.

1        They came in and they said, Your Honor, J&J's

2   intent on mitigating and cutting these people off.  Don't let

3   them do that because that's going to cost us hundreds of

4   millions of dollars.  That was their argument.

5        Now, Your Honor, if you think about that for a

6   moment, both things cannot be true.  On the one hand, they

7   are saying J&J is so intent on mitigating that if you give

8   them the patient list, they'll cut people off.  That will be

9   terrible.  Please didn't let them do that.  That's what they

10  said a few weeks ago.

11       And now they're saying, J&J has no intention of

12  mitigating.  They don't want to be mitigate at all.  They're

13  intentionally making a conscious choice to pay people money.

14       These two things cannot be both be true.

15       Now, what's really happening here, I'll tell you in

16  very short.  What we said to you, before, Your Honor, is the

17  reason we need their list to be able to cut people off is

18  because they are at pains to try and obscure and hide what is

19  in SaveOn from us.  So the information that we have is

20  uncertain.  It's guesswork.  We can't take action based upon

21  it.  That could harm patients.

22       Now, we have some initial documents from their

23  files going to this issue.  And what do they say?  These are

24  all exhibits that we've submitted to Your Honor.  But they

25  say things like -- these are their internal documents --

1   they're going to change their payment structure and vary the

2   amounts that they pay per month to, quote, ████████████████

3   ████████████████████    They say they're changing

4   things so that they're taking a co-payment funds will be,

5   quote, ████████████████████████████    They say

6   they're making efforts to, quote, ██████████████████

7   ████████████████████████████████████████████

8   ████████████████    Closed quote.

9           So, Your Honor, what mitigation requires is for us

10  to make reasonable efforts to not run up a bill.  Right?

11          But here this is a world apart.  We have SaveOn,

12  whose whole business model is making intentional efforts, as

13  their own documents reflect, to prevent us knowing who is in

14  SaveOn.  And then they come in here and have the temerity to

15  say, well, J&J's intentionally, consciously, volitionally

16  making these payments.  Those two things can't be true at the

17  same time either.

18          So I just want to point out because they've gone

19  back a few times and say J&J doesn't challenge this, doesn't

20  challenge that.  We absolutely challenge the premise of this

21  motion and everything underpinning it.

22          But for present purposes, all I have to say --

23  because I know Your Honor is careful about not wading into

24  the merits.  You want to deal with the issue in front of you.

25  And on the issue in front of you, we have an agreement on a

 1  time frame for discovery.  We have abided by that.  More

 2  custodial searches are not rational or reasonable at this

 3  stage when the substantial completion was back in September

 4  and we are now pressing into depositions.  This case has to

 5  press forward.  Important things depend upon it.

 6         But to ensure that they have what they need, we're

 7  going to give them that long list of things that I pointed

 8  to, and then they can come and make whatever arguments they

 9  want when we're at trial, and we'll oppose them then.  But we

10  should not be reopening custodial email searches at this late

11  date when they're not going to add to the specific data-based

12  arguments and underlying discovery that we already said we

13  are willing to give them.

14         THE COURT:  Okay.

15         MR. MANGI:  Thank Your Honor.

16         THE COURT:  When was the CAP issue disclosed?

17         MR. ELSBERG:  Your Honor, it was disclosed to us

18  when they very belatedly produced documents in June.  In

19  June.  ████████████████████████████████████████████

20  ███████████████████████████████████████████████████

21  ███████████████████████████████████████████████████

22  ███████████████████████████████████

23         So it was their belated production.  We then

24  immediately -- but in July sent a letter saying, hey, we have

25  this issue.

|Hearing
|22-cv-02632, October 30, 2023

 1             And, Your Honor, if I may -- may I give you a

 2    hand-up that I think will help.

 3             THE COURT:  Does your adversary have a copy?

 4             MR. ELSBERG:  I'm handing them right now.  There's

 5    nothing on it -- there's no --

 6             THE COURT:  Okay.

 7             MR. ELSBERG:  So you have two hand-ups here.

 8             If I may --?

 9             THE COURT:  Certainly.

10             MR. ELSBERG:  So, Your Honor, again, David Elsberg

11    for the record.

12             Your Honor, I'll begin with what was a core premise

13    of the argument that we just heard.  We heard an argument

14    that they've given us lots of categories of documents and

15    that should be enough.  And more specifically, they said,

16    "We'll give summary reports -- enough, we'll give you the

17    summary reports."

18             The problem with those so-called summary reports is

19    that data told us that their information is unreliable.  And

20    we just heard counsel say it's guesswork.  So whatever effort

21    they've made to put together these summary reports out of

22    their own mouth, it is unreliable and guesswork.  So we

23    certainly should not have to accept that.

24             And even if they hadn't said it's guesswork, we

25    still -- a summary by definition omits information.  That's

1    what it is.  It's not the underlying data.  It's somebody

2    deciding I'll put some data in.  I'll leave some data out.

3              And, Your Honor, if you would look at the first

4    hand-up, it's labeled Hand-up Number 1.  There's some

5    important information on there because what's very different

6    from any summaries they would give us is this underlying

7    data.

8              So what these documents show, on Hand-up 1, if

9    Your Honor looks at Row A.  ████████████████████████████

10   ███████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████

13   ██████████████████████████████████████

14         ██████████████████████████████████████████████

15   ██████████████

16         ██████████████████████████████████████████████

17   ██████████████████████████████████████

18         █████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████

20   ████████████████████████

21             So it's not in the summaries that you're going to

22   get this information that shows J&J had the information from

23   the most reliable sources, from Accredo, from ESI or Express

24   Scripts.

25             And we heard counsel say that not only are these

1    entities business partners -- SaveOn and Express Scripts and

2    Accredo -- they said it's a conspiracy.  And the only reason

3    I bring that up is because they are correct that these

4    entities, their business partners.  They share information,

5    they are the Beth source.  The best source of which patients

6    are SaveOn patients.

7    ███████████████████████████████████████████████████

8    ███████████████████████████████ any summary is not going to

9    include the detailed data like this.  It will leave it out.

10   █████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ███████████████████████████████████████████████

13   ██████████████████████████████████████████████████████

14   █████████████████████████████████████████████

15   ███████████████████████████████████████████████

16   ██████████████████████████████████████████████████████

17   ████████████████████████████████████████████

18   █████████████████████████████████████████████████

19   And they could limit it completely.  They could lower the

20   payment.  Or they can pay them exactly the same amount that

21   other patients who are not on SaveOn.

22            And they chose the last option.  So, again, no

23   causation, utter failure to mitigate, incredibly important

24   documents.

25            So we heard one argument which, again, supposedly

1    they had given us everything that we need.

2            They have not given us everything we need, and we

3    know that because, again, these summaries, they do not

4    contain this information.  I'd ask Your Honor to put that

5    question to them:  Is it going to contain --

6            THE COURT:  I don't need to.  Tell me what else you

7    need.

8            MR. ELSBERG:  Yes.  So, Your Honor, this is what

9    we -- this is what we need.  Whatever else they say they did

10   during this time period at issue, which is a time period

11   where they are seeking damages, whatever else they did, I can

12   tell you what they did not do.

13           What they did not do is run the most obvious, the

14   most basic, the most important search terms that would run to

15   find these CAP documents.  So, for example, they did not run

16   the term "CAP A."  "CAP A" is a term that Johnson & Johnson

17   used to identify patients who are on accumulators.  That's

18   what the "A" stands for.

19           THE COURT:  Did you meet and confer on the search

20   terms?

21           MR. ELSBERG:  Yes, Your Honor.

22           THE COURT:  And did you agree to certain search

23   terms?

24           MR. ELSBERG:  They refused -- oh, yes, we did,

25   Your Honor.  And I'll get back to why these were not on the

1    original list.

2              THE COURT:  Okay.

3              MR. ELSBERG:  So they've made an argument about why

4    didn't we do this earlier, and I will get to that, and I'll

5    get to that next, if it's okay.

6              THE COURT:  Okay.

7              MR. ELSBERG:  So they didn't run these search

8    terms.  ████████████████████████████████████

9    ████████████████████████████████████████

10   ██████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████

13             And SaveOn, they've said, is similar to either/or

14   both of those categories.  ██████████████████████

15   ██████████████████████████████████████████████

16   ████████████████████

17             And they've also refused to run the term

18   "adjustment program," even though these are adjustment

19   programs, and the adjustment programs are dead center at --

20   in the middle of this case because the question is did they

21   or did they not adjustment the payments, lower the payments,

22   eliminate the payments when they knew somebody was a SaveOn

23   patient?  These documents will show they kept paying; so no

24   damages.

25             So whatever else it is they do, certainly they

1    should have to do this, these two search terms.

2              Now, Your Honor, what they say and I believe what

3    Your Honor just asked about is why -- why didn't we do this

4    earlier?  Back when the search terms were being negotiated,

5    why didn't we bring this up?

6              And I have to say -- I'll just say it's surprising

7    to me that they would make that argument.  And I'll tell

8    Your Honor why.  If Your Honor looks at Hand-up 2, which

9    we'll see is that -- well, before I even get to Hand-up 2,

10   way back when the beginning of the case, when the parties

11   were meeting and conferring about what should the search

12   terms be, Johnson & Johnson hid the existence of these

13   programs.  They didn't say, look, we're talking about where

14   relevant documents will be.  ███████████████████████████

15   ████████████████████████████    They didn't tell us that they

16   had these programs at the very beginning of the case, much

17   less did they say, we're going to propose search terms that

18   refer to CAP.  So we didn't know about it at the beginning of

19   the case.

20             THE COURT:  Okay.  So the only search term

21   negotiation was at the startup of the case?

22             MR. ELSBERG:  We've returned to it more recently.

23             THE COURT:  Right.

24             MR. ELSBERG:  Again, if you -- this will take two

25   minutes.  I want to explain why we didn't do it earlier.

1          It's not just that they failed to disclose to us

2    the existence of these programs, it gets worse -- because

3    they made affirmative representations to us, to SaveOn, and

4    to Your Honor which, whether intentional or not, certainly

5    misled us, meaning SaveOn -- of course I am not speaking for

6    Your Honor.  But it misled us about whether or not there were

7    even any documents that they could look for.

8          So this is where Hand-up 2 comes in.  If you look

9    at Hand-up 2, these are five examples of many, and these go

10   all the way back to May 2022 when they filed their complaint.

11   These are five examples of representations that were made to

12   us and also -- "us" meaning SaveOn -- and also to Your Honor.

13   So May has that 4, 2022, that's their complaint.  They say

14   it's unworkable for them to reliably identify SaveOn

15   patients.

16         June 2, 2023, Row 2, joint letter to Your Honor,

17   JJHCS personnel cannot determine who these patients are with

18   reasonable or necessary certainty.

19         Row 3, the only reliable way for them to identify

20   SaveOn patients is to get our patient list.

21         And then they say in Row 5, they've never been able

22   to, never been able to definitively identify patients on

23   SaveOn.

24         Well, we know, because we just looked at the

25   documents -- and if Your Honor looks back at Hand-up 1 -- you

1    mentioned this before -- in these rows you can see, they

2    didn't just have the information; they verified with the best

3    sources of, and Express Scripts, with Accredo, with SaveOn.

4            So it was not true when they kept telling us,

5    "Listen, we just don't have records.  We just don't have

6    them."  It was not true.  And what's worse, Your Honor, is

7    that the examples that are on Hand-up 1, ███████████████

8    ███████████████████████████████████████████████████

9    █████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████

11   ████████████████████████████    when they filed their complaint.

12   So they knew better when they made the representation in

13   their complaint and then over and over to Your Honor and to

14   SaveOn.

15           So for a very long time, they're telling us,

16   "Nothing to see here.  Nothing for us to get here.  We just

17   don't have it.  We could never do it with any reliability."

18           It turns they could and they did.

19           Now, on top of all that -- they didn't disclose it

20   at the beginning, we're negotiating search terms, and they

21   were leading us to believe there's nothing for you to look

22   for as we simply were never able to do it, they belatedly --

23   they did not produce the vast majority of their production

24   until June of 2023.  And it's when we started reviewing those

25   belatedly produced documents in June of '23 where we said

1    hold on a second.  These documents we're seeing are flat

2    inconsistent with what they've been telling us all along, and

3    they never said to us there's this program.  Here are

4    proposed search terms, like CAP A, CAP M, adjustment program

5    that will catch them.

6              So just one month later in July, after we had been

7    reviewing these documents, we sent them letter.  It's date

8    July 18th, and it's Exhibit 23 to the CAP letter.  And we

9    started chasing them.  We started chasing them.  So we moved

10   very promptly.

11             So that's why I say, to put it mildly, it's

12   surprising to me that they would say where were we?  Why

13   didn't we ask earlier?  We're now in depositions.

14             Yeah.  This all should have happened earlier, and

15   it would have if they had acted -- if they had acted

16   differently.

17             I also wanted to say, Your Honor --

18             THE COURT:  Let me ask you a question.

19             MR. ELSBERG:  Yes.

20             THE COURT:  You want underlying data.  You want

21   search terms to include CAP A, CAP M, and.

22             MR. ELSBERG:  Adjustment programs.

23             THE COURT:  Adjustment programs.

24             And what else do you want?

25             MR. ELSBERG:  Those -- those -- that is what we're

```
 1   looking for.

 2             THE COURT:  In addition to what they're giving you.

 3             MR. ELSBERG:  The other stuff that they said they

 4   would give us does not give us what I'm asking for now.

 5             So the answer is yes.  We want these obvious search

 6   terms to be run and to run through 2023.  And the reason I

 7   say through 2023 is they have made that time period relevant.

 8   They have said they're going to seek damages --

 9             THE COURT:  What's the start date again?

10             MR. DUNLAP:  April 2016.

11             THE COURT:  2016.

12             MR. DUNLAP:  Your Honor.

13             THE COURT:  Right, Tim?

14             MR. ELSBERG:  What we are talking about is less

15   than -- I believe less than a year and a half of --

16             THE COURT:  You want it through today.

17             MR. ELSBERG:  Yes, Your Honor.  If they're going to

18   be seeking damages through today.  Through whatever date it

19   is they're seeking damages.

20             THE COURT:  That is my question for them, but,

21   yeah, okay.

22             MR. ELSBERG:  They can either stipulate they are

23   not going to seek damages for a certain period.  They can

24   either stipulate that they're not going to seek damages --

25             THE COURT:  Okay.
```

1            MR. ELSBERG:  -- or they should give the -- they

2   should give the documents.

3            THE COURT:  Okay.

4            MR. ELSBERG:  And my colleague is making a good

5   point to me that I should say, Your Honor, █████████████

6   ████████████████████████████████████████████  So we are not

7   talking about a very long time period here.

8            THE COURT:  So in terms of search terms for CAP A,

9   CAP M, and adjustment programs, it's 2022 through today.

10            MR. ELSBERG:  Yes.  It's 2022 through whatever date

11   it is that they're seeking damages.

12            THE COURT:  The damages.  Okay.

13            What else do you want?

14            MR. ELSBERG:  That's what we're seeking on this

15   one.

16            THE COURT:  What about these seven custodians that

17   we were talking about before?

18            MR. ELSBERG:  I'll let my colleague Meredith Nelson

19   address that, if that's okay with Your Honor.

20            MS. NELSON:  Yeah, thank you, Your Honor.

21            So in our custodians motion, you're right.  There

22   were seven custodians who we specifically identified as

23   related to the CAP program.

24            THE COURT:  Right.

25            MS. NELSON:  There are also a few others who the

|Hearing
|22-cv-02632, October 30, 2023

1    documents we cited show their involvement in the CAP program.

2    So, for instance, there are a couple of members of the JALT

3    who received a full presentation ████████████████████████

4    ████████████████.  There is also a woman -- her name is

5    Juliette Deches [phonetic] -- ████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████, which is

8    a huge issue; right? ████████████████████████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████████████████

11   ████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████

14          So what I would suggest -- I think that there is a

15   potential compromise that we could offer where we don't go

16   for all 12, but there are at least six -- and I'd want to

17   communicate with others, far senior to me at the table, but

18   there are at least six custodians where we have strong

19   evidence of their No. In CAP, and you would ask for those to

20   be added.

21          MR. MANGI:  May I respond?

22          THE COURT:  Okay.

23          MR. MANGI:  Thank you, Judge.

24          Your Honor, I'm going to get to these search terms

25   in just a minute because, actually, the nature of the search

 1   terms is quite important here.  Bet let me just touch on a

 2   few points before that, if I may.

 3            First, you just heard this big presentation

 4   suggesting that we've been hiding this from them for months.

 5            THE COURT:  What if I told you I don't care about

 6   that?

 7            MR. MANGI:  Then I'll put it aside.

 8            THE COURT:  Good.

 9            MR. MANGI:  Okay.

10            Let me turn to these specific issues.

11            Now, Your Honor, they said that the example they

12   picked for you -- right? -- of why they need all this, from

13   all the stuff, the one they chose is in this handout, the

14   first exhibit, this document is what he just took you

15   through, this is a benefits investigation.

16            THE COURT:  Yes.

17            MR. MANGI:  Right?  That is what I said to you when

18   I first got up, we're voluntarily going to give them all of

19   these, all the way through to the present already.

20            THE COURT:  Okay.

21            MR. MANGI:  We don't need to get into any emails or

22   any search terms for that.

23            THE COURT:  Who writes the summaries?

24            MR. MANGI:  Okay.  So then let's talk about what

25   they're calling "summaries."  And so they seem to be drawing

```
 1   a distinction between -- they're suggesting, well, this data,

 2   we're not giving them the data.  What we're giving them is

 3   just a summary --

 4           THE COURT:  Right.

 5           MR. MANGI:  -- and the summary is unreliable.

 6           Okay.  That's just not right.  And let me explain

 7   to you why, Your Honor.

 8           We have vendors.  ████████████████████████████████

 9   ██████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████

11   ███████████

12           ████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15           THE COURT:  Do you get the data with the summary?

16           MR. MANGI:  We have access to feeds of data.  But

17   we're not -- we're not downloading that and keeping it.

18           What we're studying are reports they put together

19   from the analysis -- from the data and sent to us.

20           THE COURT:  So they look at their data.

21           MR. MANGI:  Correct.

22           THE COURT:  Do you feed into that data?

23           MR. MANGI:  What do you mean?

24           THE COURT:  Do you participate in supplying the

25   data to the vendors?
```

 1          MR. MANGI:  It's their data.  ███████

 2    ████████████████████████████████████████

 3    ██████████████████████████████████████████

 4    ███████████████████████████████████████████

 5    ████████████████████

 6          If we are doing any internal analyses, looking at

 7    our own data, we have given them and will give them the

 8    underlying data -- because I told you, we're giving them all

 9    of the underlying transactionable claims data for our program

10    through to the present -- we'll give them that -- and any

11    analyses that we did of that data, we're going to give them

12    that too.

13          THE COURT:  Okay.

14          MR. MANGI:  So there is no notion that there's some

15    pool of data that we are sitting on that we're hiding from

16    them.

17          THE COURT:  No.  I am not saying that.

18          MR. MANGI:  Yeah.

19          THE COURT:  But I'm curious because when you get a

20    summary -- I don't care if it's from you or an outside

21    vendor.

22          MR. MANGI:  Yeah.

23          THE COURT:  -- I don't understand why the data

24    shouldn't accompany the summary because --

25          MR. MANGI:  Your Honor, because these are -- I'm

 1    sorry.  I didn't mean to interrupt.

 2              THE COURT:  Go ahead.  No.  That's fine.

 3              MR. MANGI:  The -- we're talking -- the underlying

 4    data from which we're -- some of these analyses are drawn.

 5              THE COURT:  Right.

 6              MR. MANGI:  We're talking massive, massive

 7    datasets.  This is not like an Excel spreadsheet.

 8              And a lot of this is highly proprietary data, that

 9    these vendors --

10              THE COURT:  Well, that's what I wanted to hear.

11              MR. MANGI:  Yeah.

12              THE COURT:  How is it highly proprietary?

13              MR. MANGI:  Because a lot of companies, Your Honor,

14    in this market exist to -- their aggregate data and then sell

15    analyses of that data to other market participants.

16              You may have heard, for example, in other cases or

17    IMS health, which is now called IQVIA.  That's probable the

18    most famous example of them.  But studying and selling data

19    is big part of the market for pharmaceuticals generally.  In

20    fact, some of their partners, ESI and Accredo sell data

21    themselves.

22              So my point here, Your Honor, is ultimately if they

23    want to know what data is available out there on the

24    marketplace, you know, go get an expert or go subpoena these

25    data vendors and you can do that.

 1            If you want to know what analyses we got from

 2    vendors -- right? -- what reports we purchased --

 3            THE COURT:  You are going to give it to them.

 4            MR. MANGI:  We're going to give that to them.

 5    Okay?

 6            THE COURT:  Okay.

 7            MR. MANGI:  So they don't need -- there's no --

 8    there's no pool of data that we are sitting on that we are --

 9    that we are somehow hiding from them.

10            Now, let me turn to the search terms, because this

11    is important, the search terms, Your Honor, are "CAP M," "CAP

12    A," and "Adjustment program."  You'll notice something about

13    those.  None of are limited to SaveOn.  Right?  And we are

14    clearly very focused on SaveOn in this litigation for obvious

15    reasons, but there is a.

16            MS. HAIGNEY-LONG:  List of companies out there in

17    the market that are in this category of maximizers or

18    accumulators.  Right?  Some of them have been involved in

19    other litigation with other pharmaceutical companies, but

20    there's a long list of them, maximizers, accumulators, they

21    are the subject of movements in various states to outlaw them

22    as a matter of state law.  Many states have outlawed them.

23            But this is not specific to SaveOn.  There are

24    dozens and dozens of companies that fall under this rubric of

25    maximizers or accumulators.

1        And while we're very focused on SaveOn and we've

2   sued them because they think they're one of the most

3   egregious actors in the industry, that doesn't change the

4   fact that there are lots of other entities that are out

5   there.

6        Now, when you go looking for anything to do with

7   CAP A or CAP M or adjustment program, none of have is limited

8   to SaveOn.  And that is part of why it would pull in reams

9   and reams of material and hits here.  They haven't chosen to

10  limit their search terms any way that -- and, by the way,

11  Your Honor, they deny that they are maximizer.  In their

12  internal documents, they say, we're not a maximizer.  If

13  anyone is asking with you, "Are you not a maximizer?"  No,

14  you're not in a maximizer.  We are not a maximizer.

15        So they're asking discovery that by their own term

16  may not even apply to them.

17        THE COURT:  So if you -- did -- when you ran the

18  search terms --

19        MR. MANGI:  Yeah.

20        THE COURT:  -- did you run CAP A with the qualifier

21  of SaveOn?

22        MR. MANGI:  No.  We ran -- for the time period in

23  which we ran them, which was the time period up to the cutoff

24  of July of 2022.

25        THE COURT:  Right.

1           MR. MANGI:  We ran the search terms that they asked

2  for.  And those turned up, you know, 32,000-something hits,

3  and, you know, we're making our way through those.

4           Now, let me turn to one other issue, Your Honor,

5  that this is tied to.  They're suggesting to you that, look,

6  it is some narrow search.  And while all of this other stuff

7  Mr. Mangi has agreed to give us is great, we really want the

8  custodial searches to be done.

9           And, Your Honor had the question tied to that of

10 when are we -- when are we seeking damages through --

11 right? -- tie that to that.  And you said you wanted to ask

12 me; so I'm going to fold that into this issue.

13          Here's the issue, Your Honor.  In this case, we're

14 bringing case against them that has a lot of similarities to

15 a fraud case in that we're saying you were up to something.

16 We think it was very bad.  We didn't know about it until a

17 certain point in time.  We found out.  We sued you.  Okay.

18          So what discovery are we, as the plaintiff, going

19 to have about that?  Well, we're going to have discovery

20 relating to how we found out and when we found out about what

21 they're doing, which we've, of course, agreed to give.

22          And then there's going to be discovery about our

23 efforts to deal with this going forward.  That is basically

24 what we have -- right? -- in terms of custodial documents and

25 emails.  We don't have documents about the operation of the

1  SaveOn scheme because we are not operating it; they are.

2          So when they say that they want to do an update,

3  setting aside for a minute, even what the specific search

4  terms are, but when they say they want to update through to

5  the present, getting at every internal email we have about

6  this, what that is tantamount to, Your Honor, is asking us to

7  do a wholesale update of our document production through to

8  the present.

9          But we only have discovery from them through to

10 2022.

11         THE COURT:  When are your damages cutoff?

12         MR. MANGI:  Our damages are continuing.  Our

13 damages are accruing even now that.

14         THE COURT:  Okay.

15         MR. MANGI:  And they will continue to accrue, which

16 is why the parties have agreed that when it comes to the

17 underlying data, we are going to do supplements and updates

18 of that:  One later this year and another one later, closer

19 to trial -- because of that those specific issue.

20         But want to -- let me just point out.  I really

21 want to focus on because this is important, on the unfairness

22 inherent in what they're proposing.

23         When it comes -- remember I read you those notes

24 about how they're trying to evade and camouflage what we do?

25 They've only given us that information through to July of

 1  2022.  They refuse to give it any further than that.

 2              THE COURT:  Well, I can fix that.  I can have them

 3  deliver that through today.

 4              MR. MANGI:  Right.  So --

 5              THE COURT:  And you can do the search terms CAP A,

 6  CAP M, adjustment program, SaveOn through --

 7              MR. MANGI:  Well, they're -- but they're --

 8              THE COURT:  Today.

 9              MR. MANGI:  Maybe we're going in a direction there,

10  Your Honor, but let me address both sides of that.

11              First, if we are going to do an update of our

12  production through to the present, basically what's

13  tantamount to a full update -- because that's what this gets

14  to -- they should do a full update of their production to the

15  present.

16              THE COURT:  I agree that both sides -- if your

17  damages are continuing through to trial or whatever the

18  cutoff date may be --

19              MR. MANGI:  Yeah.

20              THE COURT:  -- I think both sides have to update

21  everything through the date of damages.

22              MR. MANGI:  Okay.  But here's my only concern,

23  Your Honor, and let me point out why that presents an issue.

24              Your Honor will recall they have twice come to you

25  seeking extensions of the schedule here, and we've two

 1  extensions so far.  Right?

 2          It is very important to us to get to trial in this

 3  case because with every month that goes by, there are

 4  hundreds of millions of dollars being transferred.

 5          THE COURT:  So why don't you settle the case and we

 6  don't have to worry about this?

 7          MR. MANGI:  Well, they'd like offer to pay us our

 8  damages and stop doing what they are doing, we could.

 9          THE COURT:  We have to know what the mitigation

10  was, then.

11          MR. MANGI:  Well, as a practical matter,

12  Your Honor, before we even get into, you know, what the

13  discovery should be or what the mitigation should be, there

14  is a practical start, position here, which is if our goal is

15  to move this case forward, to get to trial, then document

16  discovery has to stop somewhere.  I mean, this is not the

17  first case with ongoing damages.  Right?  This happens all

18  the time.  But you pick a date, and you say, okay, you know,

19  this is a practical accommodation.  That's what we're going

20  to do.

21          Now, you know, we update everything through to the

22  present on both sides tomorrow -- right? -- but let's say our

23  trial is in August of 2023 -- I'm just guessing here; there's

24  no schedule.  But then they pop up again in June and say, oh,

25  you know, we need to update again.  And every month that goes

1  by and they push this off --

2        THE COURT:  Well, you all can meet and confer and

3  select a cutoff date for damages and failure to mitigate.

4        MR. MANGI:  Well -- but, Your Honor, our damages

5  are continuing through to the present.  That's going to

6  remain the case.

7        THE COURT:  Well, then their failure to mitigate

8  has to continue to the same date.

9        MR. MANGI:  But then if that is going one way and

10  they are going to get some discovery on CAP, et cetera, then

11  we want their discovery updated too.  And I've heard

12  Your Honor say you agree that's --

13        THE COURT:  Yeah.

14        MR. MANGI:  -- so my point is, Your Honor, there

15  has to be -- it cannot be the case that in every case where

16  there are ongoing damages, you continuously update your

17  document productions through to the date of trial.  It's

18  impossible because you need months to do that.  Then you've

19  got to take depositions.  Then you've got to refresh

20  depositions.

21        THE COURT:  So you can agree to a cutoff date.  A

22  mutual cutoff date.

23        MR. MANGI:  Well, that is what we did, Your Honor.

24  We agreed to a mutual cutoff date for production.

25        THE COURT:  But your damages are continuing, how

1    can they not get discovery on that?

2              MR. MANGI:  Because, Your Honor, the way that has

3    been dealt with in every case I've ever litigated with

4    continuing damages is that you agree on certain date for the

5    custodial stuff that's hard to do, and then at some point

6    close to trial, you update data.  And that underlying data

7    both goes to your damages claim; it goes to any mitigation

8    claim.  And all the damages, mitigation data that I've

9    described, they'll get.

10             So that's the practical accommodation.

11             THE COURT:  What about the fact that they didn't

12   know about CAP until this summer?

13             MR. MANGI:  So let's talk about that.  I thought

14   you didn't care about that one, Your Honor.  But that's what

15   I was going to address.

16             THE COURT:  No.  I care about it because Mr. Duva

17   told me to care about it.

18             MR. MANGI:  Yeah, so let's -- let me go back and --

19   let me go back and address that one.

20             So here's -- here's the -- here's a remarkable

21   irony about this, Your Honor.  The substantial cutoff date,

22   September 24th --

23             THE COURT:  Right.

24             MR. MANGI:  -- right?  We produced our documents,

25   vast majority of them in June, months before we actually were

1    obligated to do that.

2              They have not met any of those deadlines that were

3    there, even when it comes to the September date, they made a

4    production, but we got big productions from them on Friday

5    and again today.  So they're still turns out documents, and

6    we didn't get the bulk of their production until September.

7    So there are lots of things in their documents that we are

8    discovering for the first time now as we look at them.

9              THE COURT:  What's the point of this conversation?

10             MR. MANGI:  The point of this conversation,

11   Your Honor, is that the way you learn about the other side's

12   factual story is in two ways:  One, you look at the

13   documents.  When it comes to the documents, we produced them

14   months before they did.  So they've got nothing to complain

15   about there.

16             Two, you serve interrogatories.  And you ask for

17   information.  They never served any interrogatory going to

18   any issue that we did not provide a clear and candid answer

19   to.

20             So everything here has proceeded exactly like it

21   would in any other case.  Nothing has been hidden from them.

22   They've had all of the documents.  They've had them before

23   they were due.  And, in fact, they've had every document that

24   they have --

25             THE COURT:  Except for the CAP information.

1            MR. MANGI:  No, Your Honor.  The CAP information is

2    part and parcel of everything we've produced to them.  These

3    are documents that we've produced to them.

4            The documents that they are talking about the CAP

5    program based on now, those are all documents that we

6    produced to them.

7            So they've had had the benefit op have discovery.

8    They got it -- not late; months before they were required to

9    get it because we timely produced our documents and produced

10   them long before they did.

11           So nothing's been hidden from them.

12           So the point here, Your Honor, ultimately is, as I

13   sort of hear you thinking through this, I see there are two

14   potential pathways here.  One is Your Honor takes the view

15   that, look, in anyway case, there's got to be someplace where

16   you stop with the email production; this goes on forever and

17   we never get to trial.  If that is the view, we already

18   agreed on a cutoff.  And we are giving them all this data

19   going forward.

20           On the other hand, if Your Honor feels like there

21   needs to be an update of underlying email issues -- right? --

22   then I would say, because what they're seeking from us is

23   tantamount to a wholesale update, they have to do a wholesale

24   update too.  Otherwise, it's one way.

25           THE COURT:  I agree with that.  And I can't agree

1    with the cutoff date being September when they just found out

2    about CAP and they need information about that.

3            MR. MANGI:  Okay.  So if Your Honor --

4            THE COURT:  So I'm suggesting is that, yes, both

5    sides have to do an update, that you sit down and decide what

6    the date for the cutoff exchange update damages accumulation,

7    because it's got to coincide with that.  If you're going to

8    condition to allege accumulation of damages, they're entitled

9    to continue to allege failure to mitigate.  No?

10            MR. MANGI:  But, Your Honor -- I'm sorry.

11            But in that scenario, the prism you are looking at

12    this through, there's no way a case with ongoing damages can

13    ever get to trial because you have to keep updating your

14    documents.  How do you get to deposition?

15            THE COURT:  That's why I'm suggesting that both

16    sides come to terms with the date, a realistic date that

17    total production, that depositions are completed, and that

18    cut off the damages and the failure to mitigate.  I am not --

19    I don't think that's unreasonable to expect the parties to

20    agree to a date like that.

21            If you continue to accumulate damages through the

22    day of trial, they're entitled to investigate mitigation

23    through the date of trial -- or failure to mitigate.

24            MR. MANGI:  But, Your Honor, in that scenario,

25    let's say -- let's say just for purposes of argument --

1          THE COURT:  This isn't a car accident.

2          MR. MANGI:  Well, that's the point, though, with

3    Your Honor.  That's why this is a problem -- because, you

4    know, let's say we incur -- I'm just making up a number here.

5    Let's say we incur $20 million a month in damages.  Okay?  So

6    Your Honor is proposing that if damages have to match up

7    exactly with the date of document production -- right? -- --

8    so let's say we pick December of 2023 -- again with that I'm

9    just making this up.  And we say, okay, we'll produce through

10   there, and we'll do -- and we'll do damages through there.

11         Okay.  Then we've got to do depositions.  We've got

12   to do expert work.  We've got to get to trial.  I know

13   there's still a significant backlog in this district from the

14   shortage.  So, you know, maybe we don't get to trial until

15   the end of next year.  So now we've had 12 months times $20

16   million a month of damages which, under this prism, there's

17   no remedy for.

18         Your Honor, I have never -- I have never come

19   across a rule that says you cannot seek ongoing damages and

20   you have to cut off at the same date as document production.

21   That is -- respectfully, that is not a rule that I've

22   every --

23         THE COURT:  It may not be a rule, but as I see it,

24   if you accumulate an alleged continuing damages --

25         MR. MANGI:  Yes.

1          THE COURT:  -- they have a right to continuing

2  investigation of failure to mitigate, and you're just going

3  to say at trial, okay, the last two months, we had $50

4  million in damages.  And they are going to say, okay.  No

5  problem.  We don't need to know about it.

6          MR. MANGI:  No.  That's not what we're --

7          THE COURT:  We'll accept your number.

8          MR. MANGI:  -- that's not what we are saying at

9  all, Your Honor.

10          What we are saying is, yeah, they can get update an

11  mitigation, but we can't be digging into emails continuously

12  for every stray mention.  There has to be some middle ground

13  there where, okay, you can get this data, you can get this --

14  these benefits investigations, you can get some corpus of

15  materials that are critical to your mitigation argument on an

16  ongoing basis.

17          But to say that you must have every email through

18  to the date of trial in order to have an ongoing damages

19  claim, Your Honor, I've never heard --

20          THE COURT:  I see.

21          MR. MANGI:  -- any court anywhere in the country

22  take that position.  And as a practical matter, it's

23  completely impossible.

24          What it does ultimately is it says to plaintiffs,

25  you know, for whatever that gap is between the end of

1   document production and trial, you know, I, the Court, am

2   going to require you to give up your damages.  That is giving

3   them like a hundred million dollar gift.  And it has -- it

4   has no basis, Your Honor, respectfully in any principle here.

5          The principle that I think is entirely fair is that

6   if we're seeking damages on an ongoing basis, yeah, if

7   there's data we have that goes to mitigation, they should be

8   able to get that too.  Right?  So they can have a reasonable

9   response to it.  That part is fair.  And I give you that.

10          But to say that we have to cut off our damages and

11   give up on the last year or so just so they can have every

12   email through that date, I don't think that the fair,

13   Your Honor.  And I'll --

14          THE COURT:  Okay.  I understand better what you're

15   talking about now.

16          MR. MANGI:  Okay.

17          THE COURT:  I don't want to deal with that, though,

18   today.

19          MR. MANGI:  Yeah.  Okay.

20          THE COURT:  But I do understand better what you're

21   talking about.  And I don't think we're there yet.

22          MR. MANGI:  Yeah, okay.

23          THE COURT:  So let me punt on that, if you will.

24          MR. MANGI:  Sure.  Sure.

25          MR. ELSBERG:  Your Honor, may I respond?

1            MR. MANGI:  So --

2            THE COURT:  What?  Yeah, you can respond.

3            Do you want to know what Mr. Duva says?  26(e)(1)

4    duty to supplement discovery responses.

5            MR. ELSBERG:  Your Honor.

6            MR. MANGI:  I'm sorry.  I didn't hear that.

7            MR. ELSBERG:  If I may, Your Honor --

8            THE COURT:  26(e)(1), the duty to supplement

9    discovery responses.

10           MR. ELSBERG:  Your Honor, if I may, I've heard a

11   lot.  And if I may respond to what I've been hearing.

12           THE COURT:  Okay.  You can respond.  But -- okay.

13   I have some questions, perhaps.  Go ahead.

14           MR. ELSBERG:  I'll be very quick.

15           So first of all, whatever counsel's -- whatever

16   counsel's experience has been, it's very, very different from

17   my experience.  When there are ongoing damages, you pick

18   date, and you say I'm seeking damages through this date, and

19   you give discovery through that date because while he says it

20   would be a hundred million dollar gift, if they could avoid

21   damages, if they could avoid proving damages, it would be a

22   hundred million dollar theft from us if we aren't able to

23   disprove it.

24           So what parties do is they pick a date, and both

25   parties produce.  And we're both capable law firms.  If we

1    need to be producing while the trial is even happening, can

2    you do it.

3              And, by the way, this is not a problem of do we

4    have to wait forever to have a trial?  No, of course, you

5    don't.

6              There'll be this trial, and there will be a

7    verdict.

8              And after that, if they think that they have a

9    claim for damages that were not the subject of this trial,

10   well, maybe they can try and sue again.  I think probably the

11   outcome of that this trial is going to make the rules of the

12   road very, very clear, and there's never going to meet --

13   there will never be a need for another trial.

14             But that's how it works.  You pick a point.  And,

15   of course, discovery -- so each side can test the other's

16   assertions.

17             The second thing is I just want to point out that

18   what we heard about what they're saying they have and they'll

19   give us, why that -- he just underscored why it is we need

20   the search terms that we proposed, why it is we need them to

21   be run -- because I didn't realize until just now listening

22   that the data, the summaries that they say they'll give us

23   are market-aggregated data.  There are these services out

24   there, and they do whatever they do this their proprietary

25   way.  We don't know how they do it.  And they aggregate some

1    data to give to the market.

2           Their mission, their mandate is not to find the

3    evidence we need about SaveOn patients and J&J's knowledge

4    that they were SaveOn patients.  And I will guarantee and

5    they will not tell you the contrary, these market

6    aggregators, they do not have the emails, they do not have

7    the types of documents that we've seen that demonstrate that

8    they knew that patients were on SaveOn.  So they're pointing

9    to something over there that does not include these emails,

10   these specific documents -- they're saying go to some vendor

11   who wasn't even -- it wasn't their job to do this, and

12   whatever their job was, they didn't find these documents.

13   CAP A, CAP M, and adjustment program will.

14          And, by the way, Your Honor, when you hear counsel

15   say we shouldn't have to search for every email, that is a

16   suggestion and a burden argument.  Their burden argument is

17   completely hollow, and I'll tell you why.

18          THE COURT:  You don't have to.  I am not

19   considering a burden.

20          MR. ELSBERG:  Okay.  All right, Your Honor.

21          THE COURT:  I didn't understand you to argue burden

22   insofar as -- I didn't understand that to be the focus of

23   your objection with respect to production.

24          MR. MANGI:  Yeah.

25          THE COURT:  What I understood -- and I just want to

1  be clear on this is --

2          MR. MANGI:  Yeah.

3          THE COURT:  -- these vendors have underlying data.

4  And you don't have access to that underlying data.

5          MR. MANGI:  There are -- there are two sets of data

6  that we're talking about, Your Honor.  I just wanted to make

7  sure this is entirely clear.

8          THE COURT:  Yeah.

9          MR. MANGI:  Right?  There is data that is our data

10  about the CarePath program.  Right?

11          THE COURT:  Yes, you're going to produce that.

12          MR. MANGI:  The vendors --

13          THE COURT:  Yes.

14          MR. MANGI:  -- they use some of that also, but that

15  data we're producing to them.  Okay?

16          THE COURT:  Okay.

17          MR. MANGI:  So that data they have.  Whether we're

18  using it, the vendor is using it, they've got that data.

19          And then whatever other --

20          THE COURT:  So, well, that's interesting.

21          MR. MANGI:  And then whatever other data is out

22  there in the market, you know, that's -- that is data

23  analyses that vendors have that they can do.

24          But they've got all of the data relating to

25  CarePath, which we maintain -- right? -- we're giving them

 1    that data, that claims data.  And we're proposing to update

 2    the in the future.

 3              MR. ELSBERG:  Your Honor, they're not.  They're

 4    not.  They say we're giving you the data.  They're saying

 5    that.  They're mouthing the words:  We are giving you the

 6    data.

 7              But they're not because the way to find the data

 8    that matters here is run the search terms that are most

 9    likely to get --

10              THE COURT:  I didn't get there yet.  You're talking

11    about CAP A, CAP M?

12              MR. ELSBERG:  Yes, Your Honor.

13              MR. MANGI:  Yes.

14              THE COURT:  I'm going to order that they search

15    CAP A and CAP M and adjustment programs but related to

16    SaveOn.

17              MR. ELSBERG:  May I speak about that for a moment,

18    Your Honor?

19              THE COURT:  Okay.

20              MR. ELSBERG:  So documents that mention maximizers

21    and accumulators do relate to SaveOn.  And the reason is they

22    say that SaveOn is a maximizer or an accumulator.

23              And one of the documents in the hand-up that I gave

24    you --

25              THE COURT:  So what about searching maximizer,

 1  SaveOn?

 2          MR. ELSBERG:  Yes, Your Honor.  If they are "or"

 3  connectors, yes.

 4          MR. MANGI:  Well --

 5          MR. ELSBERG:  Hold on.  Hold on.

 6          MR. MANGI:  Right.

 7          MR. ELSBERG:  Before you guffaw in response, the

 8  reason it should be "or" -- the reason it should be "or" --

 9          THE COURT:  You're going to say they deny being a

10  maximizer.

11          MR. MANGI:  No, no, no.  I'm going to say something

12  entirely different, which is he just slipped in make it an

13  "or" connector.  That means he wants all documents that are

14  maximizers generally, including maximizers, other ones --

15          THE COURT:  I wanted the qualifier SaveOn.

16          MR. MANGI:  Yeah, but he slipped in a connector

17  "or," which means either -- in it's about SaveOn, they get

18  it.  If it's not about SaveOn, they get it too.

19          THE COURT:  All right.  Now we're out of control.

20          Tell me what you want.

21          MR. ELSBERG:  Yeah.  So what we want is not every

22  document that says "maximizer" --

23          THE COURT:  Tell me precise what you want.

24          MR. ELSBERG:  We want -- we within the to search

25  for CAP A, CAP A, and adjustment program and I believe the

 1   suggestion was to add a limiter to those search terms, so it

 2   would say "and maximizer," and we think that makes sense.

 3                THE COURT:  Related to SaveOn.  Qualified by

 4   SaveOn.

 5                MR. ELSBERG:  No, no.  Here's why not, Your Honor.

 6   Here's why not.

 7                If Your Honor looks at Hand-up 1, Row E.  ██████

 8   ████████████████████████████████████████████████████████████

 9   ████████████████████████████████████████████████████

 10  ████████████████████████████████████████████████████████████

 11  ██████████████████████████████████████████████████████████

 12  █████████████████████████████████

 13          ████████████████████████████████████████████████

 14  ████████████████████████████████████████████████████████

 15  ████████████████████████

 16                And to not be able to use documents that show

 17  here's what they were doing with maximizers, that would be

 18  like saying they have a policy with respect to fruit, all

 19  fruits, but you can't look for what rules he had with respect

 20  to fruit.  You can only for what they did to apples.

 21                The problem is maximizer includes SaveOn.  So if

 22  you cut out maximizers, you're cutting out what they said

 23  about --

 24                THE COURT:  ██████████████████████████

 25                MR. ELSBERG:  ██████████████████████████████

1

2          THE COURT:  Right.

3          MR. ELSBERG:  As used respect to maximizers.

4          THE COURT:  What are we doing?

5          MR. MANGI:  So, I mean, the problem --

6          THE COURT:  Yeah, go ahead.

7          MR. MANGI:  Yeah, the problem -- here's what he's

8   saying, Your Honor.  He's saying when we talk about

9   maximizers, you know, that might include SaveOn in it.

10  Right?

11         And, yeah, that's true.  It might also include two

12  dozen other companies that have nothing to do with SaveOn.

13         THE COURT:  I agree with that point.

14         MR. MANGI:  Okay.

15         THE COURT:  I'm trying to get where we bring in

16  that which is --

17         MR. MANGI:  Yeah.

18         THE COURT:  -- identifiable with SaveOn.

19         MR. MANGI:  Right.

20         THE COURT:  And if it applies to express scripts or

21  Accredo, why does that certain you?

22         MR. DUNLAP:  Your Honor, may I make a suggestion?

23         THE COURT:  Yeah.

24         MR. DUNLAP:  I think one of the issues here is we

25  are fumbling a little bit in the dark because we don't have

 1    hit counts.

 2              So if what -- if they could just take the terms

 3    that we have proposed, the CAP M, the CAP A.

 4              MR. MANGI:  We're not talking about hit counts.

 5    We're not talking about burdens.

 6              We're talking about -- I'm sorry.  Go ahead.

 7              MR. DUNLAP:  I mean, if they -- if we could get an

 8    order that they at least have to run those hit counts, you

 9    asked us to meet and confer, then we would know of how many

10    documents we're talking about.  Run the terms that we've

11    asked over the limited time period we've asked, and then they

12    can talk about whether it's really too burdensome to do all

13    the collections.  But we're not actually --

14              THE COURT:  It's not burden that concerns me.  It's

15    unnecessary conducting of search terms that are not limited.

16              MR. DUNLAP:  And as Mr. Elsberg was saying, for

17    example, we've seen instances within Johnson & Johnson's

18    documents when they're talking about SaveOn, they don't

19    always use the word "SaveOn" or "SOSP."

20              They'll say, for example, "ESI's maximizer" or

21    "maximizer programs."  But if they could identify someone on

22    maximizer, then they could identify someone who's on the

23    SaveOn program as being on a maximizer.

24              MR. MANGI:  Your Honor, there's -- I'm sorry.  Go

25    ahead.

|Hearing
|22-cv-02632, October 30, 2023

```
 1        MR. DUNLAP:  So, I mean, to put to say we're going
 2   to limit it just to the word "SaveOn" or acronyms for SaveOn,
 3   would cut out a whole number of documents potentially where
 4   they're referring to SaveOn by another name or they're
 5   referring to other maximizer programs.  And that's our
 6   concern.
 7        MR. MANGI:  Your Honor, there is no search protocol
 8   in this universe that is perfect that's going to capture
 9   every document, that's going to look into people's minds.
10   Right?  We have to be practical and, under the federal rules,
11   proportional.
12        THE COURT:  ████████████████████████
13        MR. MANGI:  ██████████████████████████████
14   ████████████████████
15        THE COURT:  Okay.
16        MR. MANGI:  The way you modify that --
17        THE COURT:  Yeah.
18        MR. MANGI:  -- to capture the -- about SaveOn is
19   you add an additional requirement -- for example, you said,
20   instead of they're searching CAP M in the abstract, you say,
21   CAP M within the same sentence as SaveOn or variants on
22   SaveOn, like SOSP or whatever it may be.
23        And then you'll get the documents that are talking
24   about CAP M but also about SaveOn, and those hits appear in
25   the same sentence.
```

1              MR. ELSBERG:  Your Honor, if I --

2              MR. MANGI:  Or --

3              MR. ELSBERG:  We may be close to a --

4              MR. MANGI:  Sorry, can I just finish what I'm

5    saying.

6              So you then have a modifier that limits it to the

7    SaveOn context; right?  And that is the way to accomplish

8    what Your Honor is seeking.

9              THE COURT:  Okay.

10             MR. MANGI:  However, in terms of your question as

11   to where are we and where do we take this -- right? -- my

12   suggestion -- I understand you want to -- you don't want to

13   deal with the issue of when do we update until right now; so

14   I'll set that aside.

15             But I will say, we're going to do an update of CAP

16   A, CAP M terms, modified to be limited to SaveOn, is

17   basically everything we have tantamount to a full update on

18   SaveOn to the present, I want the same from them.

19             THE COURT:  What was the agreement you suspect we

20   might have arrive at?

21             MR. ELSBERG:  Yeah, so this is what I'm thinking,

22   Your Honor.  We could -- we could agree to do what counsel

23   just said except instead of saying within the same sentence,

24   I think it's fair to say SaveOn and variations on it, if it's

25   in the same document, we should get the document, because

1    it's talking about SaveOn.  It doesn't need to be in the

2    sentence.  It could be three paragraphs later.  It could be

3    the next page.

4            THE COURT:  Okay.  That's an agreement.  You've

5    just agreed to that.

6            MR. ELSBERG:  And, Your Honor, I would then say I

7    hope that's going to be sufficient.  And --

8            THE COURT:  Well, I don't want to talk about

9    what-ifs or tomorrow.

10           MR. ELSBERG:  Fine.

11           THE COURT:  And let's not get hyperbolic about

12   anything in terms of what that's going to uncover and produce

13   because the points that's really being paid here is there's

14   going to be a stop at some point.  There is got to be.

15           So let's just minimize -- minimize -- let's do the

16   search that was suggested if CAP M and CAP A.

17           MR. ELSBERG:  And adjustment program.

18           THE COURT:  And adjustment programs.

19           MR. ELSBERG:  With variations of SaveOn in the

20   document.

21           THE COURT:  And that's an agreement.  Right?  Yes.

22   Okay.  Good.

23           MR. ELSBERG:  All right.  Thank you, Your Honor.

24           MR. MANGI:  Don't be thanking just yet.  Just to

25   get -- just to get the other side of it, though, Your Honor

1  they're going to update their searching through to the

2  present as well.

3          THE COURT:  Yes.

4          MR. MANGI:  Okay.

5          THE COURT:  You're going to update your searches to

6  the present as well.

7          MR. MANGI:  And then, Your Honor, the one issue

8  that that leaves is what I don't --

9          THE COURT:  There's another issue.

10          MR. MANGI:  Your Honor, it's tied to this.

11          The only thing I don't want to happen here,

12  Your Honor --

13          THE COURT:  Is --

14          MR. MANGI:  -- is for this case then -- for them to

15  come back then and say, well, sorry, we can't take any

16  depositions.  We've got to push the whole case off six

17  months.

18          THE COURT:  That may happen.  I can't do the

19  what-ifs.  How do I know what's going to be produced in these

20  emails?  How do you know?

21          MR. MANGI:  No that.  I'm with you.  But I'm

22  getting there.

23          So the one thing I would ask is that Your Honor

24  require both sides to do this work expeditiously, collect the

25  documents, run the searches, prepare a plan for completing

1    this in a time will expedited way, bearing in mind the

2    current case schedules, and then to report back to you on

3    where that stands -- because I am very concerned, Your Honor,

4    there are a lot of patients impacted.  There's lot of our

5    money going out the door every day.  And the schedule is a

6    big concern with our clients.

7              THE COURT:  They're J&J.

8              MR. MANGI:  Yeah, but, Your Honor, you know, it's

9    true.  J&J does have -- you know, is not in the poorhouse.

10   I'll give you that.

11             But -- but there is a very real impact on patients

12   of this program.  And that motivated us in large part in

13   bringing this case, and that's going on every day.

14             THE COURT:  All right.  So when you end up in

15   mediation and settle the case, you just have to get to point

16   where it's -- because I'm going to order you to mediation at

17   some point.  I have to feel as if everything's been done --

18        (Simultaneous conversation)

19        (Simultaneous conversation)

20        (Simultaneous conversation)

21             MR. MANGI:  I just had a thought, though --

22             MR. ELSBERG:  Your Honor, if I may -- if I may,

23   Your Honor --

24        (Simultaneous conversation)

25             MR. MANGI:  Sorry, can I just finish?

|Hearing
|22-cv-02632, October 30, 2023

1      (Simultaneous conversation)

2           MR. ELSBERG:  I just want to clarify something.

3           THE COURT:  What?

4           MR. ELSBERG:  So what we heard, I think, is counsel

5    saying we should have to update our documents also.

6           THE COURT:  Yes.

7           MR. ELSBERG:  I assume that what that means is we

8    need to update our documents that relate to this same issue.

9           MR. MANGI:  No.

10           MR. ELSBERG:  So -- all right.  I want to be clear.

11    So you're saying that both sides should update all documents

12    responsive to all requests.  Is that what you're saying?

13           THE COURT:  Always.  Why wouldn't that be the

14    nature course of things?

15           MR. ELSBERG:  This is --

16           THE COURT:  Discovery's not closed.

17           MR. ELSBERG:  This is what I'm --

18           THE COURT:  There's an obligation to continue to

19    supplement --

20      (Simultaneous conversation)

21           MR. ELSBERG:  This is what I propose, Your Honor.

22    I would propose that for today, it makes sense to say that

23    they will update their documents, as we've already described.

24           We will update our documents on what they say is us

25    engaging in, quote, deceitful conduct to make it hard for

 1    them to know who's on SaveOn.  And then -- and then --

 2    because those are two sides of the same coin.  And then I

 3    would suggest that the parties meet and confer about whether

 4    both sides --

 5              THE COURT:  In my classroom in person.

 6              MR. ELSBERG:  Yes, Your Honor.

 7              THE COURT:  I am not going to have emails.  I am

 8    not going to have telephone.  I am not going to have Zoom of

 9    Teams.

10              MR. ELSBERG:  Yes.

11              THE COURT:  No.

12              MR. ELSBERG:  So what I would suggest is for today,

13    that's the order.  We get the documents that Your Honor

14    described, which are targeted towards CAP.  We agree we'll

15    update our production of their, quote, deceitful-related

16    requests.  Those are requests that they --

17              THE COURT:  I don't even know what that is.

18              MR. ELSBERG:  I'll tell you.

19              MR. MANGI:  Your Honor --

20        (Simultaneous conversation)

21        (Simultaneous conversation)

22              MR. MANGI:  This had trying turn the whole ruling

23    on its head --

24        (Simultaneous conversation)

25              MR. ELSBERG:  Please let me -- please let me

|Hearing
|22-cv-02632, October 30, 2023

1   finish.

2           Those are documents that are the other side of the

3   same coin.

4   ████████████████████████████████████████████████

5   ████

6           They say they had trouble identifying patients

7   because SaveOn supposedly engaged in deceit.  So.

8           So these are two sides of the same coin.  Did they

9   and could they identify patients?

10          THE COURT:  What updates do you want?

11          MR. ELSBERG:  I suspect -- may I?  I suspect that

12  if the parties have a chance to meet and confer, if that's

13  what's ordered today, I suspect that Johnson & Johnson does

14  not really feel a need for us to update everything.  And I

15  suspect they don't want to update everything.

16          If we meet and confer and they say they do, but in

17  their letter, they didn't say that.

18          I think the parties may both be okay with updating

19  some but not others.

20          If counsel does not want to confer on that, that's

21  okay.  I just think it might save some time and money if we

22  do the narrow thing now, which goes to the CAP program and

23  what they say are efforts we made to cause difficulty for

24  them to use the CAP program.  Let's get that order today

25  because we don't want delay, as counsel said, and we can have

1    a week to discuss what else should be updated.

2              MR. MANGI:  Your Honor, here's -- here's what

3    counsel is proposing to you.  He's suggesting that J&J that

4    to look through potentially hundreds of thousands of emails,

5    and they have to look at something that they're going to

6    self-define -- mean very little at all --

7         (Simultaneous conversation)

8              THE COURT:  No.  What I'm saying is both sides have

9    a continuing obligation to supplement and update discovery.

10   That's what I'm saying.  And that's what you're saying.  And

11   that's what you're saying.

12              I am not limiting any supplementation.  There's no

13   limitation.  If there's new discovery or developing

14   discovery -- and I suspect during depositions there'll be a

15   load of additional discovery, you have an obligation -- why

16   are we having this conversation?

17              MALE SPEAKER:  Understood, Your Honor.  Thank you.

18   124 because, Your Honor, the reason -- the reason we're

19   having the conversation is because, yes, of course, you

20   supplement.  In the course of -- in depositions documents

21   come up, what about this?  What about that?

22              But in every case, there is a cutoff when you go

23   and collect the documents --

24              THE COURT:  We're not having a cutoff discussion.

25   We're not doing that.

 1              We are not even near that.  We just opened CAP can

 2    of worms.

 3              MR. MANGI:  Yeah.

 4              THE COURT:  How with we going to possibly put

 5    cutoff date when we don't even know what that production

 6    looks like.

 7              MR. MANGI:  Yeah, so then -- so then, my point,

 8    Your Honor, is if they want the update on all these --

 9    whatever mitigation steps, as they're describing it that we

10    have done to present -- right? -- we want to understand

11    everything about how the scheme has evolved and changed over

12    time, which is all their business model has been doing over

13    the last year.

14              So we don't want just what they're describing as

15    their "deceit production," whatever that means.  Right?  If

16    we're going to do this, I want them to just bing their

17    document production up to date with the search terms we

18    already have.

19              THE COURT:  I've already said that all productions

20    will be updated and supplemented.  That's all I'm going to

21    say.

22              If there are going to be complaints about it after

23    you have meet-and-confers in my courtroom, then I guess I'll

24    have to deal with it, if I can, or a special master will.

25              MR. ELSBERG:  And, Your Honor, I think -- I

 1    think --

 2              THE COURT:  I still have something else to discuss.

 3              MR. ELSBERG:  One sentence.  Really one sentence.

 4              I think what you're saying is a practical reality.

 5    What I predict is that the parties will end up speaking, and

 6    I predicted neither side is really going to want to update

 7    everything.  And there might be agreements that carve some

 8    things out.  And if not, then --

 9              THE COURT:  Well, then you'll be back here, and I

10    have more weekend work to do.  And I'll be very unhappy about

11    it.

12              MR. ELSBERG:  Oh, no.  I was saying I think the

13    parties might agree.

14              THE COURT:  You might try to agree on something.

15              MR. ELSBERG:  Yes.

16              THE COURT:  Because -- I had to knock off any

17    afternoon calendar for this.

18              MR. ELSBERG:  Yes, Your Honor.

19              Thank you.  We understand the ruling.

20              THE COURT:  Here's the other thing.  The

21    custodians, which we glossed over, are they apex?  Is -- do

22    you need to further discuss them?  I'm going to permit

23    additional custodians.  I know we're down to six.  But are

24    you alleging they're apex?

25              MR. MANGI:  So, Your Honor, my colleague

1    Mr. LoBiondo will address custodians.

2              THE COURT:  Oh, my god.

3              MR. MANGI:  But, okay.  I'll answer your question.

4              There are -- there are two of them in there who are

5    amongst the most senior executives.

6              THE COURT:  I saw that.

7              MR. MANGI:  Yeah.  And -- and let me point out

8    also, Your Honor, that every custodian who we add, you know,

9    potentially thousands and thousands of documents to go

10   through to get to whether anything is even responsive.

11             THE COURT:  Good.  It's good.  Then you have a job

12   then.

13             MR. MANGI:  Well, we've got job security in this

14   case already, Your Honor.  Because we --

15             THE COURT:  That's my fear.

16             MR. MANGI:  We still have to go through the --

17   thousand documents they produced on Friday.

18             THE COURT:  That's my biggest fear.

19             MR. MANGI:  But -- but the point is, Your Honor --

20   look, if you decide ultimately there's some custodial

21   discovery --

22             THE COURT:  Yes.

23             MR. MANGI:  -- that they should get, you know,

24   understood.

25             But --

1          THE COURT:  Start with the four that are nonapex

2    out of six.  And then we can discuss the apex -- alleged

3    apex's status.

4          MR. MANGI:  Okay.

5          MS. NELSON:  Can I address, briefly, Your Honor?

6          THE COURT:  Yeah, okay.

7          MS. NELSON:  And not to cut off Mr. Mangi off, but

8    I think we're moving on --

9          THE COURT:  No, he's going to -- he's going to live

10   right there.

11         MS. NELSON:  That's mine.  He can stay there.

12         MR. MANGI:  I like it here.

13         MS. NELSON:  I just want to be very clear,

14   Your Honor.  We cited cases in our letter.  The apex

15   doctrine, black-letter law, it does not apply to document

16   discovery.  Right?  The purpose of the apex doctrine is to

17   shield high-level executives from being forced to testify,

18   because that takes time out of their lives.  It takes time

19   out of their days.  That is the purpose.  It's about

20   testimony.

21         It does not apply, clear law, it does apply to

22   document discovery.

23         THE COURT:  So you're not alleging --

24       (Simultaneous conversation)

25         THE COURT:  -- if it doesn't apply.

1          MS. NELSON:  It does not put any burden opinion

2    executives to have their documents collected.  It just

3    doesn't.  So I don't think that's an issue that we should be

4    debating here.  I think the law's very clear.

5          MR. MANGI:  Identify in the same way, but

6    nonetheless, when you're talking about at that executives of

7    the company, whether you need to go and wade through all of

8    their documents -- them for the purposes of collection,

9    expose all of their very sensitive documents to these guys,

10   yeah, I would suggest that when you're dealing with a top

11   executive, there needs to be just a little bit more

12   circumspection and need shown, which they have not done for

13   any of those people.

14          So if Your Honor's point is, look, when it comes to

15   the number they wanted, you know, we think we should

16   compromise and do four, okay.

17          THE COURT:  I said start with four.

18          MR. MANGI:  We'll talk to them about it.  Fine.

19          THE COURT:  And then we can discuss the two that

20   you're going to try and protect with the apex doctrine, which

21   is, according to adversary inapplicable to documents.

22          MR. MANGI:  Yeah.

23          THE COURT:  I just assume ultimately you're going

24   to want to depose him anyway, but maybe not.

25          MR. MANGI:  Yeah, my one -- the only -- we'll do

1   that, Your Honor.  Understood.  Have the one point I just

2   want to flag, though, Your Honor, you know, is every time we

3   add a custodian -- right? -- that is adding significant more

4   time to the case, and we're doing this, you know, now a month

5   after the substantial close of production.

6           So I'm very concerned and my client is very

7   concerned about this case being pushed off into eternity

8   which makes them 10 times as much money every month as they

9   spend on litigation.

10          THE COURT:  It won't get pushed off until it --

11  until eternity.  I'm doing the best I can.

12          MR. MANGI:  No, no.  I hear you, Your Honor.  I

13  just want to --

14          THE COURT:  So you have to -- when you have to

15  spend the weekend and Mr. Duva has to spend a week or two

16  evaluating close to a hundred pages of letters --

17          MR. MANGI:  Yeah.

18          Your Honor --

19          THE COURT:  You tell me who's putting the case off.

20          MR. MANGI:  No, no, well, but, Your Honor, I would

21  like to point out one fact about that.  You will note that of

22  the six applications that are here before you today, there is

23  not one, not one made by us.  We made all our motions --

24          THE COURT:  That's true.

25          MR. MANGI:  -- months ago.  And you'll remember --

1      THE COURT:  But if you just say "yes" to

2  everything, then we wouldn't be here.

3      MR. MANGI:  Yes.  But you'll remember, Your Honor,

4  that every application we had was discrete, was focused, and

5  was made on time.

6      THE COURT:  I do remember that.

7      MR. MANGI:  Okay.  So I certainly -- you know, I

8  understand the frustration with the current load.  But I did

9  want to point that out.

10      THE COURT:  Okay.  I wouldn't call it frustration.

11  I'd call it anger.

12      MR. MANGI:  Yeah, and -- justified.

13      THE COURT:  You know how nice it was Saturday?

14      MR. MANGI:  Going through this stuff?

15      THE COURT:  The weather.

16      MR. MANGI:  Oh, the weather.

17      THE COURT:  Do you know?  Because I don't.

18      MR. MANGI:  Your Honor, actually, I don't either.

19  I'm sorry to say.

20      THE COURT:  Take us off the record.

21      Thanks.

22              (Conclusion of proceedings)

23

24

25

1                            Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 122 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   s/ *Sara L. Kern*                  2nd of November, 2023

19   _____    _____
     Signature of Approved Transcriber              Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services, LLC
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25