# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br>          Plaintiff, <br><br> v. <br><br> SAVE ON SP, LLC, <br><br>          Defendant. | Civil Action No.: 22-2632(JKS)(CLW) <br><br> **OPINON AND ORDER** |

**Wolfson, Special Master:**

Plaintiff Johnson & Johnson Health Care Systems Inc. ("JJHCS" or "Plaintiff") brought this action to recover damages and enjoin Defendant SaveOnSP, LLC's ("SaveOnSP" or "Defendant") alleged scheme to capitalize on JJHCS's copay assistance programs, which provide funds to assist patients afford their medications.  Prior to my appointment as the Special Master in this matter,[1] the parties filed various lengthy discovery motions before the Court, and the parties have identified two motions that remain pending: 1) Defendant's motion to compel documents related to CarePath's Terms and Conditions ("T&C") (Dkt. No.: 146); and 2) Defendant's motion to compel certain financial documents (Dkt. No.: 150).  Additionally, Defendant moved before me to add additional custodians.  Having reviewed the voluminous record in connection with these motions and heard arguments of counsel at an in-person hearing on January 24, 2024, for

---

[1]       I was appointed by the Court in an Order dated December 12, 2023. (Dkt. No. 184.)

the reasons set forth on the record and below, the motions are **GRANTED in part and DENIED in part**.

### I.     Background Facts

Plaintiff, a subsidiary of Johnson & Johnson ("J&J"), provides funds to help commercially insured patients afford the costs of certain medications necessary for chronic conditions or severe illnesses.[2] (Compl., ¶ 2.) Specifically, through its assistance program, CarePath, which was created in early 2016, Plaintiff provides copay support to patients taking medications manufactured by other Johnson & Johnson entities.[3] (*Id.* ¶¶ 44, 47.) To enroll in CarePath, patients must meet certain criteria, such as being covered by commercial or private health insurance. (*Id.* ¶ 48.) Notably, patients on the CarePath program consent to its terms and conditions, including that CarePath "may not be used with any other coupon, discount, prescription savings card, free trial, or other offer." (*Id.*) In addition, CarePath participants agree to meet the program requirements every time they use the program. (*Id.*) After a patient enrolls in CarePath, he or she receives a card that can then be used at a point-of-sale to cover most of the out-of-pocket costs for the medication. (*Id.* ¶ 49.)

---

[2]     These pharmaceuticals include treatments for various forms of cancer (for example, DARZALEX®, ERLEADA®), pulmonary arterial hypertension (for example, OPSUMIT®, TRACLEER®, UPTRAVI®), and various autoimmune disorders (for example, REMICADE®, STELARA®, TREMFYA®). (*See* Compl., ¶ 32.)

[3]     According to Plaintiffs, CarePath helps patients afford out of pocket costs for 44 Janssen drugs. (Compl., ¶ 47.)

According to Plaintiff, Defendant partners with pharmacy benefits managers ("PBMs"), such as Express Scripts, to administer its program. (*See id.* ¶¶ 50-52.) PBMs contract with commercial health insurance companies to manage prescription drug benefits for their plans. (*Id.* ¶ 37.) They, in turn, work together to determine what cost-sharing obligations to impose on plan participants. Plaintiff alleges that PBMs "serve as middlemen with an aim towards increasing insurers' and their own profits by determining which drugs a plan will cover and to what extent they will be covered." (*Id.*) According to Plaintiff, Defendant's program (the "SaveOnSp Program") is one that a PBM uses to maximize profits on its own behalf and the insurers' behalf, at the expense of Plaintiff and patients. (*Id.* ¶¶ 50-52.)

Defendant's alleged scheme has two elements. First, Plaintiff alleges that the drugs at issue are reclassified from essential to non-essential health benefits under the Affordable Care Act ("ACA"), which decisions are made without assessing a patient's medical needs; rather, the drugs are redesignated to avoid the ACA's co-pay limits and annual out of pocket limits, which caps the amount a patient with private insurance can be required to pay for medical care each year. (*Id.* ¶¶ 9-10, 53-55, 57-58.) With regards to non-essential drugs, the SaveOnSP Program "increases the patient's copay amount for the given drug to an artificially high amount--often thousands of dollars per dose." (*Id.* ¶ 10.) According to Plaintiff, the inflated co-pays are key to the alleged scheme because the higher amounts essentially force patients into the Program.

The second aspect of the scheme is to target patients by instituting an outreach campaign to enroll patients in the Program. (*Id.* ¶ 61.) Plaintiff alleges that Defendant's

representatives inform patients that they will be responsible for the entire copay amount unless they join the Program; if the patients join the Program, the copay will be paid. (*Id.* ¶¶ 60-61.) Essentially, patients are, according to Plaintiff, tricked into enrolling in the SaveOnSP Program because they are under the false impression that they will be responsible for the very high co-pay if they do not participate.

Once enrolled in the Program, Defendant's agents assist patients in joining a manufacturer's financial assistance program, such as CarePath. (*Id.* ¶ 64.) For those patients in the CarePath program, Defendant will bill the copay amount to CarePath. (*Id.* ¶ 66.) Plaintiff avers that because the SaveOnSP Program increases the copay amount, it not only depletes CarePath's available funds more quickly, but it also results in a higher percentage of patients reaching the annual limits of the CarePath program, sometimes by the middle of the year. (*Id.* ¶¶ 23, 51, 66, 98-99.) Plaintiff claims that "SaveOnSP's business model is to drain patient assistance from programs like CarePath by increasing patient out-of-pockets costs in a manner that serves no end other than to maximize profits for SaveOnSP and its partners." (*Id.* ¶ 51.)

The Complaint asserts two causes of action—tortious interference with contract (the "Interference Claim")(Count One) and violation of Section 349 of the N.Y. General Business Law (the "GBL Claim"), which prohibits consumer deception (Count Two). (*See id.* ¶¶ 106-118.) In its interference claim, Plaintiff alleges that Defendant knowingly and wrongfully induces patients to agree to CarePath's terms and conditions, thereby intentionally causing those patients to breach their contact with JJHCS every time they use CarePath funds while enrolled in the SaveOnSp Program. (*Id.* ¶ 109.) Plaintiff claims

that Defendant's conduct caused JJHCS damage "by making it pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend." (*Id.* ¶ 110.) With regards to the deceptive trade practices claim, Plaintiff avers that Defendant deceptively engineered "a false denial of coverage at the point of sale to coerce patients into enrolling in the SaveOnSP Program." (*Id.* ¶ 113.) In that respect, Plaintiff accuses Defendant of causing, and continuing to cause, damage to the public by inducing stress and confusion, and more generally, causing patient healthcare needs to be more expensive. Plaintiff also complains that Defendant causes damage to Plaintiff by making it pay more from CarePath. (*Id.* ¶¶ 114-115.)

## II.    Pending Discovery Disputes

Three categories of discovery disputes remain pending: 1) documents concerning the CarePath terms and conditions; 2) financial information from JJHCS and affiliates of J&J on the profitability of Janssen drugs and how these drugs prices are calculated; and 3) additional custodians. I will turn to each, below.

To begin, I start with the language of Fed. R. Civ. P. 26, which governs the scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

5

Fed. R. Civ. P. 26(b)(1).  It is beyond dispute that Rule 26 should be construed in favor of disclosure, "as relevance is a broader inquiry at the discovery stage than at the trial stage." *Mesadieu v. Martinez*, No. 18-842, 2023 U.S. Dist. LEXIS 70805, at *5 (D.N.J. Apr. 24, 2023)(citing *Tele-Radio Sys. Ltd. v. De Forest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981)); *see Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990)(citation omitted) ("[I]t is important to distinguish the right to obtain information by discovery from the right to use it at trial.").  While the party seeking discovery must show that "'the information sought is relevant to the subject matter of the action and may lead to admissible evidence,'" *Mesadieu*, 2023 U.S. Dist. LEXIS 70805, at *5 (quoting *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000)), the party resisting discovery bears the burden of supporting its objections with clear explanations. *Hite v. Peters*, No. 07-4492, 2009 U.S. Dist. LEXIS 51894, at *11 (D.N.J. June 19, 2009).

Pursuant to Rule 26(b)(2)(C), courts are required to limit discovery where:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

### A.     Terms and Conditions

#### 1. *The Parties' Disputes*

SaveOnSP asks the Court to compel JJHCS to search for and produce documents regarding its drafting, understanding, and enforcement of its CarePath T&Cs. SaveOnSP initially made this request in a joint letter filed in February 2023. The Court ordered SaveOnSP to defer its requests until JJHCS completed its production of documents regarding the T&Cs.  Defendant reasons that the drafting and enforcement of the T&Cs are important and relevant because in ruling on SaveOnSP's motion to dismiss, the Court held that arguments regarding the meaning of the terms and conditions should be decided at summary judgment with the benefit of extrinsic evidence.  As to extrinsic evidence, SaveOnSP believes that JJHCS's documents will show that, until shortly before it filed this lawsuit, JJHCS never understood or intended its T&Cs to apply to services, like those offered by SaveOnSP, that it never believed that its T&Cs barred patients on the SaveOnSP Program from receiving CarePath funds, and that it never tried to enforce its T&Cs to exclude patients in that Program.

In response, Plaintiff first explains that it has taken reasonable steps to identify and produce documents about CarePath's T&Cs given, admittedly, their relevance to Plaintiff's claims.  Plaintiff maintains that it has produced:

- thousands of pages of documents (approximately 1,200 documents) in response to the search terms used to find documents relating to terms and conditions from April 2016-July 1, 2022 (agreed upon discovery period; however, the Court has explicitly directed all parties to update their discovery to October 2023); and

- other documents that bear on JJHCS's enforcement and understanding of the relevant terms and conditions.

In addition,

- JJHCS has investigated further the availability of additional documents and based on that investigation, understands that the terms and conditions at issue in this litigation are standard, uncontroversial terms used in most, if not all, manufacturer copay support programs, and are terms that long pre-date the relevant time period of 2016 to 2023; and

- JJHCS has offered to review thousands of additional documents to see if other documents from the relevant time frame of 2016 to 2022 exist.

Plaintiff argues that Defendant's request for documents that go further back in time to 2009 is not appropriate, and that the Court has admonished Defendant that this timeframe may be too expansive.  Moreover, Plaintiff argues that some of Defendant's requests are irrelevant, such as 1) documents concerning the enforcement of terms and conditions; 2) documents relating to Plaintiff's benefits investigations; and 3) documents from a time period when maximizer programs did not exist.  Ultimately, Plaintiff insists that Defendant is simply not satisfied with what it has received thus far in discovery, and that Defendant is engaging in a fishing expedition.

2.   *Status of Document Productions*

According to Defendant, Plaintiff did not begin producing documents related to the T&Cs until April 2023.  After Defendant's review, it further sought that Plaintiff (1) conduct a thorough search for documents relating to the drafting of the general T&Cs; (2) add additional search terms designed to identify documents relating to JJHCS's drafting, understanding, and enforcement of T&Cs; (3) add two custodians that JJHCS identified

as responsible for drafting the New Stelara and Tremfya T&Cs; and (4) extend its search for documents relating to its enforcement of the new Stelara and Tremyfa T&Cs.

Defendant complains that Plaintiff has resisted production and has however resisted complying with these requests, and instead, has only agreed to search eight more months of one custodian's documents and add two limited search terms. Since February 2023, Defendant has sought documents regarding the drafting of the general T&Cs, and in that regard, it asked Plaintiff to gather and produce relevant documents from predecessor programs before CarePath was created, but Plaintiff has not agreed to do so. Additionally, Defendant points out that one of Plaintiff's custodians, Adrienne Minecci, was "involved in the process of transitioning at least one predecessor co-pay support program to the CarePath Program" and worked at JJCHS during an eight-month period "during which the predecessor programs were combined under the CarePath umbrella." Defendant indicates that Plaintiff has only offered to expand the time frame by an additional eight months (August 1, 2015 to April 1, 2016), which Defendant claims is inadequate as it does not capture the origin of the general T&Cs that Plaintiff has admitted go back at least as far as 2010. Based on perceived deficiencies, Defendant requests for the following:

General T&Cs Documents

1. Plaintiff to identify the predecessor programs from which CarePath's general T&Cs were drawn;

2. Identify the individuals within any entities of J&J who worked on those T&Cs; and

3.  Gather and produce relevant documents from those sources, using proposed search terms.

Plaintiff has resisted production of various documents related to general T&Cs. First, Plaintiff argues that Defendant failed to identify these documents in its production requests. I have reviewed Defendant's prior document requests, and I find that Defendant did in fact request "all Documents and Communications regarding CarePath's terms and conditions" from January 1, 2009 through the present.  Because Plaintiff admits that CarePath's T&Cs were derived from other predecessor programs, it is reasonable that Plaintiff search documents related to those programs in order to identify relevant ones that would touch upon the drafting of the T&Cs.  Plaintiff also argues that it is not able to make a production of documents from a time period earlier than 2013 due to applicable preservation and/or retention capabilities. Even if that were so, Plaintiff must first search and determine whether any relevant documents can be found and to produce them.  If some or all relevant documents were not preserved prior to 2013, Plaintiff must identify and produce its retention policy to Defendant.

Plaintiff further complains that searching for and reviewing the documents Defendant requests is too burdensome, and unlikely to yield relevant results. I am not persuaded. The burden rests on Plaintiff to explain why production would be burdensome. Without conducting a search, Plaintiff cannot credibly say whether production, and the subsequent review, would not be practicable.  And, as I stated on the record, Plaintiff has not demonstrated that production would be burdensome. Rather, since Plaintiff has admitted that CarePath's T&Cs were drafted based on predecessor

programs, its position is inconsistent with its concession.  Furthermore, while it may be appropriate to limit the time period, it is not reasonable to maintain a position that earlier documents would not be relevant.

Plaintiff, nevertheless, argues that it is unlikely to find drafting documents because the "other offer" provision is a standard term of old vintage, which has been used by other programs.  Regardless whether this is a standard term, Defendant is permitted to seek documents that Plaintiff has in its possession which could shed light on what Plaintiff and/or other J&J entities believed "other offer" meant, particularly since this term was included in the relevant agreements. Finally, Plaintiff argues that pre-2016 documents cannot bear on the meaning of the general T&Cs in connection with the SaveOnSP Program, because Defendant was not in existence before that time.  This argument is easily dispensed of by the simple fact that the focus of the production is Plaintiff's understanding of the term "other offer," and as such, whether Defendant existed at a time prior to 2016 has no bearing on Plaintiff's understanding of the term in its own agreement.

Accordingly, I reject Plaintiff's contentions that documents related to the T&Cs of the CarePath program and its predecessors prior to 2016 would be irrelevant.  However, as to burden and retention, Plaintiff shall, by no later than February 2, 2024,[4] notify Defendant of the volume of documents in question and/or retention policy; thereafter,

---

[4]      I note that with regard to the deadlines set forth in this Opinion, I have already provided them to the parties during the hearing.  As such, this Opinion memorializes those dates.  Indeed, Plaintiff has timely submitted its status letter on February 2, 2024.

the parties must meet and confer as to whether a limitation of those documents is appropriate.  If any issues need my intervention, the parties are directed to bring it to my attention immediately.

<u>Enforcement Documents</u>

Defendant submits that Plaintiff, citing lack of relevance, has produced no documents regarding its enforcement of the T&Cs, which Defendant contends can be used to demonstrate the meaning of an ambiguous contractual term, and in that respect, Plaintiff should produce documents including: 1) the "other offer" provision in any circumstances, not just limited to copay assistance; 2) all other provisions of the T&Cs; and 3) all benefits investigations for the Janssen drugs at issue.[5]

Plaintiff argues that only its enforcement of the "other offer" provision is relevant, and those documents, which reflect records of patients calls, have been produced by its vendor TrialCard.  Defendant responds that documents related to enforcement of other provisions are crucial to show that Plaintiff has selectively enforced the T&Cs by overlooking the "other offer" provision in certain instances and not others, which would likely demonstrate acquiescence. Defendant further argues that call records do not show Plaintiff's decisions about which of the T&Cs to enforce.

During the hearing, I explained that documents related to the enforcement of T&Cs of CarePath, including "other offer" are relevant.  However, I agree with Plaintiff's

---

[5] During the hearing, Plaintiff has agreed to produce documents concerning certain benefits investigations and those productions are ongoing.  Should Defendant take issue with the production, it may bring it to my attention.

argument that it would be burdensome to search and produce records of each individual patient's call history. Rather, to strike the proper balance and considering proportionality, it is appropriate for Plaintiff to search for, and produce, documents reflecting the company's enforcement instructions and policy, during the entirety of the agreed upon discovery time frame (April 2016-November 2023), concerning eligibility criteria set forth in the provision: "may not be used with any other coupon, discount, prescription savings card, free trial, or other offer." The parties are directed to meet and confer on search terms by February 2, 2024.

<u>New Stelara & Tremfya T&Cs</u>

In January 2022, Plaintiff implemented new terms and conditions for both its Stelara and Tremfya medications, which specifically excluded from CarePath, members of Defendant's advised plans. Defendant claims that Plaintiff did not implement new T&Cs for any other drugs. Defendant seeks documents related to the T&Cs for these drugs to show the selective enforcement of the T&Cs and business decision to implement these new terms.  In this respect, Defendant argues that Plaintiff is obligated to produce documents 1) reflecting the decision to revise the T&Cs; 2) showing the business decision to implement the new T&Cs; and 3) enforcement of the T&Cs.

First, Defendant argues that Plaintiff refused to add as custodians[6] Jennifer De Camara and Savaria Harris simply because they are corporate attorneys.   Plaintiff insists that both individuals acted as litigation attorneys when they were involved in drafting

---

[6]     Defendant has agreed to exclude Harman Grossman after confirming that he was a litigation counsel.

the new T&Cs.  However, Plaintiff has an obligation to search documents in the custody of Ms. Harris and Ms. De Camara, despite necessarily including privileged documents. Plaintiff cannot point to the individuals' attorney status to resist searching for relevant documents.  If the relevant documents are privileged, Plaintiff may, pursuant to Fed. R. Civ. P. 26(b)(5), withhold production and provide the basis for doing so on its privilege log.  This will provide Defendant the opportunity to dispute such a designation by making an application for an *in camera* review.  As such, I direct Plaintiff to add Ms. Harris and Ms. De Camara as custodians.  Moreover, as I instructed during the hearing, the parties shall meet and confer as to the search terms[7] to run on these two new custodians.[8]

Defendant also argues that Plaintiff's production lacks any documents on its business decision to implement the new T&Cs because it used restrictive search terms.  I agree that Defendant is entitled to explore why Plaintiff decided to amend the terms in 2022, when it knew of the SaveOnSp Program since 2017, which decision could potentially support Defendant's defenses of mitigation, laches and acquiescence.  The parties shall meet and confer on a new set of search terms to adequately vet documents in the possession of Plaintiff or any of the J&J entities responsible for drafting the Stelara & Tremfya T&Cs.

---

[7]    I rejected Defendant's position that the previously agreed-upon search terms should be used.

[8]    Plaintiff indicated that the searchable documents for these two custodians would be overwhelming. To strike a balance, Defendant suggested, and I agree, that the starting point is the documents and communications between the attorneys and any third-party entities.

**B.     Financial Documents of Janssen Drugs**

      *1.     The Parties' Dispute*

Next, Defendant seeks to compel documents relating to Plaintiff's budget for the CarePath program, J&J's return on its investment on that program, J&J's pricing of the Janssen drugs at issue, and patients' adherence to those drugs.  These requests were made in February 2023, however, the Court deferred the requests until June 2023 when Plaintiff completed its production regarding harm.

Defendant argues that it is entitled to these financial documents to support its defense: 1) SaveOnSP did not injure JJHCS because any increase in JJHCS's copay assistance payments is traceable to JJHCS's CarePath budget and benefit terms set by health plans; 2) JJHCS has not suffered damages because SaveOnSP's services result in Johnson & Johnson making more money from additional sales of Janssen Drugs; 3) JJHCS failed to use reasonable means to prevent and/or mitigate any alleged damages; and 4) JJHCS is not entitled to any equitable relief because it has not suffered irreparable injury and the balance of equities favors SaveOnSP.  According to Defendant, the documents could show that JJHCS was capable of reducing its CarePath expenditures but chose not to do so, supporting Defendant's affirmative defenses that JJHCS failed to mitigate its damages and acquiesced. Defendant further contends that these financial documents could also show that SaveOnSP's conduct does not injure JJHCS, as Defendant's program resulted in increased sales of Janssen drugs that more than offset any increased expenditures of CarePath funds, or at the least, they could show that JJHCS's purported damages are lower than the amounts alleged.

15

On the other hand, Plaintiff argues that none of these documents are relevant. Plaintiff accuses Defendant of turning this case into an inquisition of the profitability and historic pricing of Janssen drugs. Plaintiff maintains that Defendant cannot create a trial within a trial to distract the jury with allegations that drug prices are too expensive and draw attention away from Defendant's own alleged wrongful conduct. Instead, according to Plaintiff, it has produced the following documents and communications that bear on the financial aspect of CarePath and Janssen drugs:

- The extent of the harm that SaveOnSP has caused JJHCS during the relevant Time Period.

- The data that formed the basis for the damages allegations in the Complaint.

- JJHCS's budget for copay assistance through CarePath, including JJHCS's actual and projected annual costs for CarePath.

- The manner in which JJHCS determines the amounts of copay assistance offered to patients.

- Patient-level data from the time period January 1, 2016 to July 1, 2022, including documents sufficient to show:

    (1) all patients enrolled in CarePath for each Janssen Drug;

    (2) the dates on which each patient was enrolled in CarePath;

    (3) the amounts of copay assistance funds that JJHCS offered to each patient enrolled in CarePath;

    (4) the Janssen Drug for which each patient enrolled in CarePath received copay assistance; and

    (5) all CarePath copay assistance payments made to each drug.

2. *Status of Document Productions*

The financial documents referenced above are encompassed by Defendant's narrowed request for documents Nos. 28-30.[9]

1.      RFP No. 28 seeks several categories of Documents related to the Janssen Drugs, including claims data, documents sufficient to show the cost, price, budget, and revenue received for each drug, as well as information regarding patients' enrollment in the CarePath program, including the amounts of copay assistance provided to each patient.

2.      RFP No. 29 seeks, *inter alia*, for each Janssen Drug, all Documents and Communications concerning the amount of CarePath funds paid to patients, JJHCS's budgets for and revenue resulting from CarePath, Johnson & Johnson's return on investment from CarePath, JJHCS's accounting for unused CarePath funds, and the impact of CarePath on the sale and pricing of the Janssen Drugs.

3.      RFP No. 30 seeks all Documents sufficient to show the basis for Janssen's decision to raise or lower the price of each Janssen Drug.  Plaintiff has refused to produce this category of documents.

I will address each category below.

CarePath's Budget Related to RFP 29

•   From April 1, 2016 through the present, all Documents and Communications regarding JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to patients enrolled in CarePath.

•   From April 1, 2016 through the present, all documents and communications regarding JJHCS's budget for CarePath.

Plaintiff has agreed to produce documents "sufficient to show" JJHCS's budget for copay assistance through CarePath and JJHCS's actual and projected annual costs for CarePath. However, Defendant argues that these agreed-upon productions are not

_____

[9]      The parties met and conferred on various requests. Defendant subsequently narrowed its requests in theses RFPS.

sufficient as they lack *communications* among J&J personnel regarding the CarePath budget and thus would omit internal discussions about changes that Plaintiff "contemplated" making to that budget which were not implement.  Defendant maintains that the requested documents will likely show that 1) Plaintiff uses CarePath as a marketing program rather than to truly offer assistance to patients; 2) Plaintiff, while offering up to $20,000 of copay assistance to each patient annually, does not intend to provide that level of support to most patients; and 3) CarePath still makes money for Plaintiff by increasing drug sales.  In that regard, consistent with its defense, Defendant claims that Plaintiff was not injured and has failed to mitigate its damages by not reducing CarePath's budget when it had the choice to do so.  For example, Defendant points to the reduction in copay assistance funds from $20,000 to $6,000 for patients (enrolled in maximizer plans like SaveOnSp's advised plans) only on Stelara and Tremfya. Defendant questions the reason for Plaintiff not to reduce copay assistance to patients on other types of drugs.

In response, Plaintiff claims that it made substantial document productions in April 2023 and June 2023, which include actual and forecasted budgets, as well as line by line ledger budget data.  Plaintiff argues that Defendant is not entitled to "All Documents and Communications," because they are not relevant to Plaintiff's claims. Specifically, Plaintiff contends that even if CarePath was a "marketing program," that would have nothing to do with Plaintiff's claims of interference or harm to the CarePath program. Plaintiff maintains that it has already agreed to produce data concerning forecasted and

actual expenditures through the present and that such data is sufficient for Defendant's damages analysis.

Plaintiff has the better argument on this issue. What matters for purposes of liability and damages are not the changes that Plaintiff contemplated implementing, but actual changes that occurred, and in that regard, Plaintiff has produced documents that reflect the copay assistance reduction to patients on Stelara and Tremfya and other budgetary changes to CarePath. For the same reasons, I find that the communications of budgetary decisions are not relevant to Defendant's defenses or Plaintiff's claims; however, as I expressed during the hearing, I do find that communications involving the viability of CarePath is a relevant topic which Defendant may explore. As such, in addition to the documents that Plaintiff has already produced, the parties are directed to meet and confer and agree on a narrow set of search terms in order to identify those communications related to the viability of CarePath.

<u>J&J's Return on Investment from CarePath</u>

- From April 1, 2016 through the present, all documents and communications regarding JJHCS's or Janssen's actual and projected return on investment for CarePath.

Defendant argues that these documents are highly relevant because Plaintiff has put CarePath's profitably and return on investment at issue through its GBL claim, by asserting that injuries to CarePath hurt the public, Defendant's conduct threatens CarePath's financial viability, and Plaintiff has been injured by paying out additional CarePath funds. According to Defendant, the documents sought will likely confirm that JJHCS does not offer CarePath funds primarily to help patients, but rather to make

19

money, hence harm to that program is not a public harm cognizable under a GBL claim.

Defendant further argues that the documents will also likely prove false JJHCS's assertion

that SaveOnSP's conduct threatens CarePath's financial viability, and in reality, JJHCS's

return on investment makes CarePath into a huge money-maker, even after JJHCS pays

out additional CarePath funds.

In its opinion on Defendant's motion to dismiss, the Court set out the relevant law

on Plaintiff's GBL claim:

> New York's GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. § 349. To state a Section 349 claim, a plaintiff must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). In asserting a GBL § 349 claim, a plaintiff must "plead that [it has] suffered an actual injury caused by a materially misleading or deceptive act or practice." *City of New York v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834, 839 (N.Y. 2009). The statute is "intentionally broad, applying to virtually all economic activity." B*lue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140, 114 (N.Y. 2004) (internal quotation and citation omitted). Moreover, the "statute permits recovery by any injured 'by reason of' a deceptive business practice." *Id.* at 1144 (quoting N.Y. Gen. Bus. § 349(h)); *see also N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 107 (App. Div. 2012) ("Turning once more to the plain language of the statute, we note that the right to bring a private action was not limited to those acting in a consumer role, but rather, it was provided to 'any person who has been injured by reason of any violation of this section[.]'" (quoting GBL § 349(h)).

*Johnson & Johnson Health Care Sys. v. Save on SP, LLC*, No. 22-2632, 2023 U.S. Dist. LEXIS

12619,  at *17-18 (D.N.J. Jan. 25, 2023).

By way of injury, the Court already found that Plaintiff sufficiently alleges a direct

injury because the SaveOnSP Program causes Plaintiff to pay more money from CarePath

than it otherwise would. The Court reasoned that Plaintiff's alleged injury is not a consumer injury that is then passed on to Plaintiff. It is an independent harm separate from the injuries that Plaintiff alleges consumers will incur from the Program. *Id.* at *19. Based on the Court's ruling, although public harm is one aspect of the GBL claim, the focus is also on Plaintiff's injury as a result of the alleged deceptive practices of Defendant's conduct, regardless of the purpose or motivation of Plaintiff's assistance programs. In other words, even if Plaintiff's program is created for the purposes of promoting J&J's drugs, Plaintiff may sustain its GBL Claim by proving that Defendant's alleged conduct injured Plaintiff in some way. Moreover, as Plaintiff correctly argues, even if Plaintiff did not lose profits during the relevant time period, based on its theory of liability, which the Court found sufficient to state a claim, Plaintiff may still show that the CarePath funds would not have been improperly depleted in light of Defendant's alleged conduct; indeed, contrary to Defendant's argument, whether Plaintiff's operation is ultimately profitable is not the relevant inquiry. There is no statutory requirement, nor did Defendant cite to any case law, that imposes a profitability litmus test in order for a plaintiff to prove damages under § 349.

As to its public harm argument, I also do not find Defendant's position convincing. Plaintiff alleges the following as its basis for public harm:

> Through its willful deceptive acts and practices, SaveOnSP causes damage to the public, including patients, by causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare needs more expensive by not counting any of the funds spent on patients' medications towards their ACA maximum or deductible.

21

Compl., ¶ 114.  Again, the public harm, which the Court found sufficiently plead, is tethered to the viability of the CarePath program vis-à-vis the availability of funds generally available to patients in need.  The alleged harm is not related to the profitability of any Janssen drugs.  Put differently, even if J&J and its entities ultimately derive profits—even very generous ones—from selling the drugs at issue, that fact does not disprove Plaintiff's alleged harm in this case, either to itself or to the public.  That being said, during the hearing, I opened a small window for Defendant to explore documents that may reflect whether more patients are taking Janssen drugs as a result of being on the SaveOnSp Program.  The parties shall meet and confer on narrowing the search terms sufficient to locate those documents.

<u>Pricing of Janssen Drugs</u>

- From January 1, 2009 to the present, for each year for each Janssen Drug, documents sufficient to show the basis for Janssen's decision to raise or lower the price of the Janssen Drug.

- From April 1, 2016 to the present, documents sufficient to show all internal data which supports the Net Price values provided throughout the "Transparency Reports," which JJHCS has agreed to produce, and documents sufficient to show the prices charged to SaveOnSP's clients for each Janssen Drug and Johnson & Johnson's marginal costs for each Janssen Drug.

Defendant argues that these documents are relevant because Plaintiff has alleged that in response to the SaveOnSp Program, Plaintiff has reduced the "net price" of Janssen drugs every year since 2016.  While Plaintiff has produced its publicly available "Transparency Reports" which include the "net price" referenced in the Complaint, Defendant claims that Plaintiff has not produced the data underlying those prices, which

is necessary to perform granular calculations to disprove Plaintiff's allegations on pricing. According to Defendant, the reports, for instance, show trends in pricing across many Janssen drugs, but do not show pricing information on a drug-by-drug basis.

Defendant's arguments on this issue are not persuasive. First, Defendant points to the Complaint's allegation that Plaintiff has reduced the "net price" of the relevant Janssen drugs every year since 2016. Relying on that allegation, Defendant argues that it is entitled to discovery of Plaintiff's data to show that Plaintiff actually increased the *true* prices of the drugs. But, as a threshold question, Defendant does not define true price or the difference between a drug's true price and its net price such that a relevance determination can be made. Moreover, as discussed *supra*, Plaintiff's allegation of harm does not depend on the price changes of the drugs; rather, Plaintiff alleges that CarePath funds have been wrongfully diverted to Defendant and Defendant's business partners.

Defendant further argues that it is entitled to documents that would show Plaintiff gained more sales through Defendant's programs. While Defendant is entitled to discovery to demonstrate Plaintiff's injuries, the year to year of pricing of Janssen drugs has little relevance to the injury calculation. Plaintiff correctly argues that the sales and profitability of Janssen drugs is not a justification for Defendant's alleged tortious conduct. Indeed, information on the pricing of the drugs does not shed light on Plaintiff's alleged harm to the CarePath program or somehow support Defendant's theory. In that regard, Defendant has not established any causal connection between Plaintiff's pricing of the drugs with Defendant's alleged conduct that led to diversion of funds from CarePath.

23

More significantly, at the hearing, Plaintiff's counsel made an express representation on the record that Plaintiff will not, at trial or on a summary judgment motion, rely on the pricing of Janssen drugs as a basis to prove its claims. Counsel stressed that Plaintiff's theory of harm does not relate in any way to lost profits or lowering drug prices. Based on my review and counsel's representation, I am satisfied that Defendant has not shown that documents on pricing of Janssen drugs are relevant to Plaintiff's claims or Defendant's defenses. As such, Defendant's motion to compel in this context is denied.

### C.   Custodians

#### 1.   *November Order*

There are two sets of disputes regarding custodians. In Defendant's latest letter, dated January 16, 2024, it argues that Plaintiff violated Judge Waldor's November Order by failing to run all the previous agreed-upon search terms on the six custodians who Judge Waldor had required Plaintiff to add.[10] Defendant reasons that it moved to compel Plaintiff to add "twelve custodians and run all agreed-upon or Court-ordered search terms … over their files." According to Defendant, in her November 7 Order, Judge Waldor granted that motion as to six custodians, with no limitations on the search terms to be run.

Plaintiff responds that because the six custodians were added on the basis that they were involved in Plaintiff's Cost Adjustment Program (the "CAP program"), the

---

[10]    The parties agreed to the following custodians: Quinton Kinne, Daphne Longbothum, William Shontz, Alison Barklage, John Hoffman, and L.D. Platt.

search terms should only be limited to the CAP program.  Moreover, Plaintiff argues that the search terms should also be limited to the period of January 1, 2022 through the present (*i.e.*, November 2023). The parties' dispute centers on the language of the November Order, as well as Judge Waldor's intent.  As such, my office reached out to Judge Waldor's Chambers to seek guidance.  I have now been informed by Judge Waldor's Chambers as follows:

> Among other things, the parties were fighting over discovery concerning [Plaintiff's] "CAP" (Cost Adjust Program"). In that program, J&J tried to identify patients who were enrolled in Maximizers/Aggregators such as SaveOn, and then take action accordingly to reduce its losses. Defendant SaveOn [did not] learn about the existence of the CAP program until June 2023 (it apparently existed since before J&J filed this case), so [Judge Waldor] permitted [Defendant] to take additional discovery on the topic. That came in two main flavors.
>
> First, [Judge Waldor] told [Plaintiff] to add several new custodians for doc searches, all of whom [Judge Waldor] understood were connected specifically to the CAP program.   [The Court] directed the parties to meet and confer regarding the logistics of that process.
>
> Second, [Judge Waldor] told [Plaintiff] to run several CAP-specific search terms, limited to a specific time period (January 1, 2022 through present). The January 1, 2022 date was meaningful because [Judge Waldor] understood that the CAP program came into existence at some point in 2022.
>
> . . . . The parties now disagree on whether those two paragraphs should be read in conjunction with each other, or applied separately.  Basically, Defendant wants to [Plaintiff] to search the new custodians' records for ALL of the parties' search terms for the beginning of the previously agreed search period (April 2016) through the present.   [Plaintiff] argues that the new custodian searches should be limited to the CAP-related search terms [the Court] identified, as well as the limited CAP-related time period.
>
> The short answer is that [Judge Waldor] did not order specifics regarding the new custodian searches because [the Court] asked the parties to work out the logistics . . . .

25

> In any case, Judge Waldor . . . agree[s] that [Plaintiff's] position is the only one that makes sense from a proportionality standpoint.   [The Court was] only adding the new custodians because of their association with the CAP program.  Since that program only came into being in 2022, it would not make any sense to search all of the records the custodians generated since April 2016.  Similarly, we would limit the searches of the new custodian's records to the CAP-related terms that Judge Waldor specified, since that's the only reason these people are involved in discovery in the first place.

Chambers' Email dated January 23, 2024.

That correspondence confirms that Judge Waldor's November Order did not order specific custodian search terms in the hope that the parties would come to a compromise. In the last part of Chambers' Email, Judge Waldor nonetheless cautioned that the search terms for the additional custodians must be limited.  Based upon the Court's advice, Plaintiff is directed to use CAP-related search terms, including terms that capture discussions by the custodians prior to the creation of the CAP program. The parties are instructed to meet and confer on the search terms. Similarly, because I am of the view that CAP discussions began before 2022, I am directing Plaintiff to run the search terms for the time period of April 2016 through November 2023.

### 2.    *New Custodians*

Defendant also asks that the following four new custodians be added:

1.  Scott White is the Company Group Chairman of North America Pharmaceuticals, who is among the highest-ranking executives in the Johnson & Johnson family of companies.

2.  Blasine Penkowski is JJHCS's Chief Strategic Customer Officer.

3.  Karen Lade is a Product Director of Rheumatology Marketing at Janssen Pharmaceuticals.

4. Juliette Deshaies works primarily on marketing with respect to a specific cancer drug.

As a preliminary issue, Plaintiff argues that Judge Waldor already rejected Defendant's proposal to add these custodians; that is, these same employees were part of Defendant's October 25, 2023 motion to compel twelve additional custodians. According to Plaintiff, that motion was the subject of extensive briefing by the parties. Ultimately, Judge Waldor granted the motion in part and denied it in part, ordering JJHCS to add half of the custodians SaveOnSP had sought—specifically, six of the seven employees SaveOnSP claimed were relevant to the CAP program.  Plaintiff goes on to argue that Defendant could have sought reconsideration of Judge Waldor's decision, but it did not, and that Defendant must abide by that decision.  In response, Defendant claims that newly obtained documents, which were not part of its motion before Judge Waldor, show that these proposed custodians have more involvement than previously known. Because Judge Waldor did not consider these documents that may or may not support Defendant's position, I will address them in the first instance.

According to Defendant, White and Penkowski discussed whether Defendant's services purportedly violate CarePath's terms and conditions—relevant to J&J's understanding of those provisions (which J&J unilaterally drafted), the disputed meaning of which is at the heart of Plaintiff's claim that Defendant induced plan members to violate them.  As evidence, Defendant submits a copy of a one-page notebook paper, which is from the notes of senior partner Douglas Bock of third-party Archbow Consulting, that shows a meeting including White, Penkowski, and Archbow discussing suing SaveOnSP,

27

providing the meeting date ("1/28/22"), attendees (including "Scott – Company Group Chairman" and "Blazeen"), and subject matter (including "considering suing Saveon for violations of T&Cs").

Defendant further argues that because White and Penkowski were also counterparties for Plaintiff on contracts with TrialCard, the third-party vendor which administered the CarePath Program, they had authority over CarePath's payments to patients via TrialCard. As support, Defendant submits a work order, which shows that White was responsible for the amount of funds that Plaintiff provided to Trial-Card to disburse through CarePath.  On the other hand, Defendant claims that previously produced work orders submitted to Judge Waldor did not make such a showing. Other documents reflect that White convened a meeting of J&J's patient engagement and customer solutions team to conduct a business review of the CAP program. Defendant explains that previously produced documents showed that White convened a different group—the Janssen Americans Leadership Team—to discuss implementing the CAP program, not its business purpose. In response, Plaintiff argues that White has no day-to-day responsibilities for the relevant patient assistance programs, and that Defendant's arguments were already considered by Judge Waldor.

Based on the documents submitted by Defendant on this application, however, it appears that White was involved in high level discussions about the CarePath program, SaveOnSp's role and how that was impacting Plaintiff's program, and litigation against SaveOnSp.  In that regard, it is likely that White would possess relevant documents.

In addition, newly produced documents confirm that Penkowski is an appropriate custodian: for example, documents show her role in responding to "accumulators," a term that Plaintiff used internally to refer to SaveOnSP's programs. In particular, Penkowski sent internal memos and emails that addressed accumulator programs. Contrary to Plaintiff's argument, Defendant's denial that it is an accumulator does not change the fact that Plaintiff refers to Defendant's program in that manner, and therefore, Defendant is entitled to discovery from representatives who were internally involved in responding to accumulator programs. Accordingly, it is likely that Penkowski would have relevant documents related to Plaintiff's claims and Defendant's defenses.

Similarly, Lade was involved with informing patients about accumulators, maximizers, and SaveOnSP in 2018, and she was also involved with J&J's earliest formulation of a response to SaveOnSp's services—which goes to Defendant's mitigation defense. Nonetheless, Plaintiff argues that Lade would not possess any relevant documents because the two emails and attachment cited by Defendant do not mention SaveOnSP at all. However, the documents speak for themselves—they show that Lade was involved early on in Plaintiff's formulation of a response to maximizer and accumulator programs. This puts Lade in the same position as Penkowski. As such, I find that it is appropriate to add Lade to the custodian list.

Deshaies stands on a different footing. Defendant's newly submitted document shows that Deshaies worked primarily on marketing with respect to a specific cancer drug (which is covered by Defendant's program)—not CarePath or any other issues in this litigation. Deshaies was asked, along with other recipients, to review a 2021 draft work

order to engage the consulting firm Archbow. Besides this one email, Deshaies does not appear to be on any other documents submitted by Defendant. More importantly, Deshaies apparently received this email along with multiple JJHCS employees who are already custodians.  One email involving Deshaies should not open the floodgate to search for all documents in Deshaies's possession, particularly since that email was sent to others who have been designated as custodians. Additionally, more likely than not, the documents that Deshaies has, if any, would be cumulative of those already produced to Defendant from other custodians.[11]

In sum, I find that based on newly submitted documents, White, Penkowski and Lade would have relevant documents, while Deshaies would not. The parties are directed to confer as to the search terms of these additional custodians, and the search shall cover the entire agreed-upon discovery period.

The parties are directed to submit a letter on February 15, 2024, apprising me of any agreements that they reached after their meet-and-confer sessions and the status of document productions. The parties may, of course, submit to me any disputes for resolution as soon as they arise.


Dated: February 6, 2024                              /s/ Freda L. Wolfson
                                                     Hon. Freda L. Wolfson (ret.)
                                                     Special Master

---

[11]    Since Defendant did not introduce any new evidence as to Ernie Knewitz, I deny its request to add him as a custodian.