UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHNSON & JOHNSON HEALTH    )
CARE SYSTEMS, INC.,         )
                            )
    Plaintiff,              )
                            )
    v.                      )    No. 4:23-MC-00527-SEP
                            )
EXPRESS SCRIPTS, INC.,      )
                            )
    Defendant.              )

MOTION HEARING
BEFORE THE HONORABLE SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

AUGUST 10, 2023

APPEARANCES:
For Plaintiff:        Beth A. Bauer, Esq.
                      HEPLER BROOM, LLC
                      130 N. Main Street
                      Edwardsville, IL 62025

For Plaintiff:        George LoBiondo, Esq.
                      Katherine Brisson, Esq.
                      PATTERSON BELKNAP WEBB & TYLER LLP
                      1133 Avenue of the Americas
                      New York, NY  10036

For Defendant:        Kate Ledden, Esq.
                      Sarah C. Hellmann, Esq.
                      HUSCH BLACKWELL LLP
                      8001 Forsyth Boulevard, Suite 1500
                      St. Louis, MO 63105

Reported by:          Kristine A. Toennies, RMR, CRR, CRC, CCR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO 63102 | (314)244-6701

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

```
 1                        AUGUST 10, 2023

 2              (The proceedings commenced at 1:27 p.m.)

 3              THE COURT:  Good afternoon.  We are on the record in

 4     the United States -- I'm sorry, excuse me; force of habit --

 5     Johnson & Johnson Health Care Systems, Inc. vs. Express

 6     Scripts, Inc., Case No. 4:23-MC-527.

 7                    Counsel, would you announce your appearances,

 8     please.

 9              MR. LoBIONDO:  George LoBiondo from Patterson

10     Belknap for Johnson & Johnson Health Care Services.

11              THE COURT:  Say your last name again.

12              MR. LoBIONDO:  LoBiondo.

13              THE COURT:  LoBiondo, okay, thank you.

14              MS. BRISSON:  Katherine Brisson from Patterson

15     Belknap for Johnson & Johnson Health Care Services.

16              THE COURT:  Okay.

17              MS. BAUER:  Good afternoon.  Beth Bauer from Hepler

18     Broom, also for Johnson & Johnson Health Care Services.

19              THE COURT:  Okay, can I refer to your client as

20     Johnson & Johnson today, or should I refer to them as

21     something else?

22              MR. LoBIONDO:  Johnson & Johnson is fine, Your

23     Honor.

24              THE COURT:  All right.  Thank you.

25              MS. LEDDEN:  Kate Ledden from Husch Blackwell
```

1     representing Express Scripts.

2              **MS. HELLMANN:**  And Sarah Hellmann also from Husch

3     Blackwell on behalf of Express Scripts.

4              **THE COURT:**  Ms. Ledden and Ms. Hellmann.  All right.

5     I'll do my best.  If you want to remind me -- well, you don't

6     have to remind me of your names; I know your names.  But is

7     everyone speaking today, or are we having one or the other

8     person taking the lead?

9              **MR. LoBIONDO:**  I'm going to speak on behalf of

10    Johnson & Johnson, Your Honor.

11             **THE COURT:**  Okay, great.

12             **MS. LEDDEN:**  And I'm speaking on behalf of Express

13    Scripts, Your Honor.

14             **THE COURT:**  Okay.  Why don't we have everybody speak

15    from where they are unless I ask you to come to the podium

16    because there might be a fair amount of going back and forth,

17    and I don't really want there to be -- yeah; okay.

18              If it's okay -- and even if it's not -- I'm going to

19    run the show today, so I will let you know what I want to hear

20    from you about.  We are not going to rehash anything or

21    certainly not everything that you have provided in briefing

22    already because I'm very capable of reading and digesting all

23    that myself.  And so what I will be asking you today will be a

24    little bit in follow-up and an application of the standard

25    that I'm going to apply.

1          I want to start, though, with some housekeeping.

2     There are two motions for leave to file under seal on the

3     docket, and those are going to be denied, and I'll tell you

4     why.

5          We have a local rule, 13.05, that requires a

6     proponent of sealing to state the specific legal and factual

7     reasons justifying the sealing, among other requirements, and

8     the fact that certain information has been protected as

9     confidential by parties in a case pursuant to a protective

10    order is relevant but not dispositive of whether the

11    information or material will be sealed when filed with the

12    court.  That's a direct quote from the Local Rule 13.05.

13         So to the extent that what it is that you're citing

14    as a basis for sealing it here is inconsistent with that, in

15    other words, if -- just the fact that it is subject to a

16    confidentiality agreement is not sufficient to justify sealing

17    it on the public docket here.  You do also have to satisfy the

18    requirements of Local Rule 13.05 to state those specific legal

19    and factual reasons.

20         And to move to the next part of the analysis, when

21    you cite those specific legal and factual reasons, I will be

22    evaluating whether you have provided a compelling governmental

23    interest sufficient to override the First Amendment right of

24    public access.  You can find orders I have already published

25    under this local rule in the last year or two on Westlaw, and

1  I invite you to look at them before you submit your motion so

2  that you can increase your odds of getting it granted.

3          But you have 14 days from today to resubmit a motion

4  to keep those documents under seal or else they will be filed

5  on the public docket.  Is that clear?

6          **MS. LEDDEN:**  Yes, Your Honor.

7          **MR. LoBIONDO:**  Yes.

8          **THE COURT:**  If you have questions about how -- I

9  think you managed to do the technical process part, which is

10  more than I can say for a lot of people first encountering

11  Rule 13.05, so well done.  Maybe you did call my docketing

12  team, but to the extent you have questions about process, you

13  can always call my docketing team.

14          I have now given you what you need, I think, to do

15  the legal work.  But if you have any questions, feel free to

16  follow up with the Court.  Okay, that is it for those.

17          For the supplemental authority, I granted that

18  motion to, you know, provide me with supplemental authority.

19  It seems to me that the authority provided is plainly relevant

20  to today's conversation, and both parties are free to make

21  whatever arguments they want for or against that authority in

22  their answers to my questions today, but that has been handled

23  at least insofar as whether I'm going to allow it to be

24  considered.  Of course, I am.

25          And now then, we can get to the motion to compel.

1    There are many RFPs in dispute, I noted, from your briefing

2    today, everything after 3(i), right, subpart (i) of RFP 3

3    remain to be resolved, and so I am going to -- as I said, I

4    have analyzed your briefing, so I just want to lay out a few

5    ground rules for today's conversation.

6          Things I do not care to hear about today:

7          Who said what to whom before the filing of the

8    motion.  I find that Plaintiffs adequately documented

9    compliance with the meet-and-confer requirement, and I reject

10   Defendant's request for attorneys' fees in light of its

11   refusal to produce anything at all in response to the subpoena

12   without being ordered to do so by this Court.  I don't need or

13   want to hear anything else about either of those arguments

14   today.  We have a lot to do without getting into things that

15   are unnecessary.

16         I also don't want to hear any argument that ESI --

17   what am I supposed to call your client?  Express Scripts?

18         **MS. LEDDEN:**  We usually go by Express Scripts, Your

19   Honor.

20         **THE COURT:**  Okay, sorry, I've been reading the

21   briefing, and so ESI is in there, but it's very easily

22   confused with another term that I use all the time, and so I

23   would prefer to call it Express Scripts.  Thank you.

24         Any argument that Express Scripts should not have to

25   produce anything at all in response to the subpoena until

1    after party discovery has been completed, I don't want to hear

2    that either.  I reject that as a principle.  I don't think

3    there's any blanket rule that says that, and I'm unpersuaded

4    that I should impose one here.

5             Of course, if you want to talk to me about why

6    certain requests may be duplicative of things that are going

7    to be produced in party discovery, I'm open to hearing that

8    argument but not the argument that as a general rule Express

9    Scripts should not have to produce anything that is otherwise

10   discoverable and nonduplicative until after party discovery is

11   complete.

12            So I'll tell you that the standard I intend to apply

13   to the request, the motion to compel, is that I am going to

14   grant it as to everything that is likely to be relevant to the

15   underlying litigation and is discoverable under Rule 26

16   provided Plaintiff has taken reasonable steps to avoid

17   imposing undue burden or expense, as they are required to do.

18            And, for example, one thing that they would need to

19   do under that is avoid seeking discovery that is unreasonably

20   cumulative or duplicative of discovery already being produced

21   by a party to the underlying litigation.

22            So that is the standard that I'm applying.  I intend

23   to ask some questions about how to apply that standard to the

24   RFPs that remain in dispute, and that will be the bulk of our

25   conversation today.

1          Before we do that, I would like to hear about --

2    from the parties about the relevance of the District of New

3    Jersey's limitation of discovery in that matter, the

4    underlying matter, to Janssen therapies.  I understand from

5    the supplemental authority that was submitted that in the case

6    involving Accredo or the miscellaneous case involving Accredo,

7    if I'm saying that correctly, Johnson & Johnson limited its

8    subpoena or conceded to the limitation that only -- that

9    Accredo should only have to produce information related to

10   non-Janssen drugs and patients -- or sorry -- to not have to

11   produce things related to non-Janssen drugs and patients.  Has

12   that been discussed between the parties here?

13          **MR. LoBIONDO:**  I think we discussed it a little bit

14   this morning, Your Honor.  We are not seeking to -- you know,

15   we served these subpoenas in January before we had the benefit

16   of that ruling.  We are not seeking to enforce the subpoena as

17   to purely non-Janssen material, so if they have transaction

18   data about some other drug company's drugs, we're not seeking

19   that data.

20          I think there was maybe a little bit of confusion in

21   the briefing about whether or not that ruling meant that they

22   did not have to produce transaction data that did not involve

23   SaveOn.  Part of the reason that we want transactional data

24   and we've asked for a relatively -- you know, transactional

25   data that both involve SaveOn and not SaveOn is that we, for

1    our damages analysis, need to be able to have a baseline

2    between what was happening with these patients before the

3    SaveOn scheme affected them and after.

4          And so for us to do that, we don't need -- for these

5    purposes today, we don't need data about other manufacturers'

6    drugs, but we do need data that goes to transactions from

7    before the SaveOn scheme was implemented, which SaveOn

8    obviously -- SaveOn the party -- is not going to have.  ESI

9    has that because ESI had a relationship with these plans and

10   these patients before the SaveOn scheme came into existence.

11        **THE COURT:**  Okay.  So we're talking about -- and

12   forgive me if I get some of this wrong.  You're talking about

13   in that case, when you're saying before, you're talking about

14   people who eventually enrolled in SaveOn but who already were

15   on Johnson & Johnson therapies before that, and you want to

16   compare their pricing and transactional situation after they

17   enrolled in SaveOn to that before; correct?

18        **MR. LoBIONDO:**  That would be part of it certainly.

19   There's probably -- I'm not a damages expert, but I'm sure

20   there's going to be different but-for scenarios that the

21   damages experts on both sides are going to want to analyze.

22   And so it might not just be a patient that didn't have SaveOn

23   and then did have SaveOn.  You also need to look at patients

24   that were affected in 2022 versus patients that never

25   interacted with SaveOn because their plan, you know, ESI

1    pitched the SaveOn program, but the plan decided not to do it.

2    So we also need to have that baseline of comparators, so it's

3    not just a before and after.  It's also kind of in realtime,

4    patient A has been affected and harmed this way; patient B has

5    not.

6         **THE COURT:**  Okay.  But patients A and B both have to

7    be on Janssen therapies in order to be relevant; correct?

8         **MR. LoBIONDO:**  Yes, and I apologize.  Johnson &

9    Johnson, Janssen for these purposes are --

10        **THE COURT:**  Are going to be interchangeable?

11        **MR. LoBIONDO:**  -- are interchangeable, but I --

12        **THE COURT:**  That's excellent news.  Okay, thank you.

13   I think I understand your point.  But you are not seeking

14   things related to, information related to patients that have

15   not been on Janssen therapies?

16        **MR. LoBIONDO:**  That's true as to the data.  As to

17   the documents, if there are documents that are exclusively

18   pertaining to other manufacturers because they're e-mailing

19   back and forth about another drug, we're not seeking to

20   enforce that.  However, if they have internal communications

21   about manufacturers in general or about the SaveOn scheme in

22   general, we don't think it has to have the word Johnson &

23   Johnson in it for that to apply because a lot of the scheme is

24   indistinguishable regardless of whether it's an Abbott drug or

25   a Johnson & Johnson drug or a Novartis drug.

1           So in that respect for the custodial communications

2   and that kind of thing, even if it doesn't say J&J, a lot of

3   that might be responsive because they're just talking about

4   the scheme at a high level.

5           **THE COURT:**  SaveOn, the SaveOn scheme.

6           **MR. LoBIONDO:**  Exactly.

7           **THE COURT:**  Okay.  And then -- but when you're

8   talking about the data, you're talking about the data you've

9   requested for purposes of evaluating damages?

10          **MR. LoBIONDO:**  Correct.

11          **THE COURT:**  Okay, thank you.  How does Express

12  Scripts understand the application of that ruling were I to

13  take it over, you know, lock, stock and barrel and do exactly

14  here what the New Jersey Court has required?  How do you think

15  it would be operational?

16          **MS. LEDDEN:**  I think, Your Honor, I would make two

17  points.  First and foremost, the opposing party has

18  received -- or Johnson & Johnson has already received data

19  from SaveOn, so it has that bucket of data, right, regarding

20  Janssen products.

21          Now it's in the process of litigating issues in the

22  Tennessee court relevant to the data from Accredo.  And just

23  by way of background, Accredo is a specialty pharmacy, and

24  Express Scripts is a PBM, so we don't have direct contact with

25  patients.  So a significant amount of the data that we would

*Motion Hearing - 8/10/23*                                              *Pg 11*

1  be receiving would be from Accredo directly.

2          And so our position as it relates specifically to

3  that is I know they're still in that process right now.  The

4  judge in Tennessee has indicated the nature of the burden

5  there; it's noted that there's a burden there.

6          **THE COURT:**  Yes.

7          **MS. LEDDEN:**  Because I wish it was as easy as

8  Googling; right?

9          **THE COURT:**  Right.

10          **MS. LEDDEN:**  Or in this instance just pulling all of

11  the patients for a seven-year period who had any of these

12  Janssen products.

13          **THE COURT:**  Right.  Okay, let me stop you for a

14  second.  There is an ongoing briefing issue going on in

15  Tennessee about the burden related with collecting the data

16  specifically; correct?

17          **MS. LEDDEN:**  That is correct.

18          **THE COURT:**  Okay.  So I expect we'll get to that.

19          **MS. LEDDEN:**  Okay.

20          **THE COURT:**  For the moment what I would like to know

21  is just this distinction between Janssen patients or patients

22  on Janssen therapies and not on Janssen therapies.  Does

23  what -- I'm going to say this wrong -- Mr. LoBiondo, okay,

24  said, is that you how you understand the distinction that was

25  drawn by the Court as well, as to data -- damages-related data

1    we're talking about.  You don't have to -- no one has to

2    produce things related to non-Janssen therapies, but as to

3    possibly communications, they might not all say specifically

4    Johnson & Johnson or Janssen, but they might still be

5    discoverable; is that how you understand it?

6              **MS. LEDDEN:**  This is how I understand it, Your

7    Honor, yes.

8              **THE COURT:**  Okay, terrific.  Thank you.  I will

9    definitely let you speak to the burdensome.  I think that's

10   RFPs 28 through 30 here?

11             **MS. LEDDEN:**  Yes, it is, Your Honor.

12             **THE COURT:**  So we'll probably get to that in a

13   while, yeah.  Okay.  All right.  So I mean, to give you all a

14   preview of what I'm hoping to do, I'm hoping to give you as

15   many rulings as I can today right here, but I may not be able

16   to give you all of the rulings for the reasons that we've

17   already seen that some of these issues are still being

18   litigated.  And if another court needed supplemental briefing

19   to deal with it, I am not arrogant enough to suggest that I

20   will definitely be able to rule on it without such briefing,

21   but we'll just see how that goes.  All right.

22             So moving on then, so it sounds like the parties are

23   in agreement, anyway, about how that rule about the -- the

24   qualification of the data is to be implemented, so I hope you

25   can remain in agreement about that and we don't have to

1    discuss it again.

2           All right.  The issue then for us today, issues, are

3    RFPs 3 through 30; 3, subsections (ii) and (iii), and so I'm

4    just going to go through them, at the risk of being tedious.

5    I don't know of any better way to make sure that I am

6    addressing everything that you've asked.  Give me one moment,

7    please.

8           All right.  We're not going to have ten minutes of

9    argument on each one.  I'm going to maybe ask some questions,

10   and then I'm going to give you a ruling.  That's going to be

11   the way this goes.

12          Okay.  All communications between -- so number (i)

13   is gone.

14          All communications between Express Scripts and

15   another entity about SaveOnSP or communications internally at

16   Express Scripts about SaveOnSP, including any communications

17   concerning manufacturer copay assistance programs and

18   SaveOnSP's negotiations with Express Scripts related to the

19   SaveOnSP program.

20          That's the request that we're talking about.  What I

21   would like to know from Express Scripts, is it your position

22   that those two things could be obtained from SaveOn?

23          **MS. LEDDEN:**  That's part of it, Your Honor.  I mean,

24   there are kind of three points here that the judge in

25   Tennessee also made.  It's duplicative of other requests in

 1   the subpoena.

 2           **THE COURT:**  Yeah, I wondered about that.  Which ones

 3   is it duplicative of?

 4           **MS. LEDDEN:**  Request 6, and there is -- sorry, Your

 5   Honor.  I mean, Request 6 is the most notable, Your Honor.

 6           **THE COURT:**  Okay.  So that one is about between

 7   Accredo and Express Scripts?

 8           **MS. LEDDEN:**  Oh, and 13 as well, Your Honor.

 9           **THE COURT:**  Okay, give me one second before you move

10   on.  You're saying that the request for all communications

11   between Express Scripts and another entity is duplicative of

12   the communications between Accredo and Express Scripts; right?

13           **MS. LEDDEN:**  Yes, Your Honor, partially.

14           **THE COURT:**  Okay.  All right.  So I would say,

15   though, I mean, reading them just on their face it sounds like

16   Number 6 might be a subset of number 3, not vice versa; right?

17           **MS. LEDDEN:**  Yes.

18           **THE COURT:**  And then Number 13?

19           **MS. LEDDEN:**  Number 13 is the marketing or

20   promotional --

21           **THE COURT:**  Promotional materials.

22           **MS. LEDDEN:**  Yes, Your Honor.

23           **THE COURT:**  You think that Number 3 is a subset of

24   number 13?

25           **MS. LEDDEN:**  Yes.

1          **THE COURT:**  Marketing or promotional materials would

2    include, in your view, all communications between Express

3    Scripts and another entity about SaveOnSP?

4          **MS. LEDDEN:**  I'm sorry, Your Honor.  I would flip

5    that.  I'm sorry.  I would say that those marketing materials

6    would be a subset of those communications.

7          **THE COURT:**  I see.

8          **MS. LEDDEN:**  Yes.  Because our marketing materials

9    would not be to patients.  They would be to entities.

10         **THE COURT:**  Okay.  So they would necessarily be

11   included in communications?  Like you would never have just

12   marketing material.  I guess if you're talking about

13   internally about Express Scripts, about SaveOnSP, that --

14   those internal communications would be, would encompass

15   marketing materials that hadn't been distributed outside the

16   company?

17         **MS. LEDDEN:**  Yes.

18         **THE COURT:**  Okay.  Let me hear from Mr. LoBiondo.

19         **MR. LoBIONDO:**  Your Honor, I think there probably is

20   overlap here.  I think to your points, a request about all

21   marketing materials, you know, some of those might be in

22   communications but some of those might not; right?  So a draft

23   of a marketing material, a draft of a Power Point, you know, I

24   don't know that that's a communication.  If it then gets sent

25   to somebody, it becomes a communication, so I don't want to

1    belabor the point or be over-technical.  I think there is some

2    overlap, but also Request 13 is one of the ones I believe that

3    was granted by the Accredo Court.

4        **THE COURT:**  Right, but I think he denied something

5    analogous to Requests No. 3, subset (ii) and (iii), but again,

6    I'm happy to hear arguments for or against whatever it is the

7    other Court did.

8        So Ms. Ledden, then, I take your point that there's

9    some overlap.  What other -- you said there were three points.

10       **MS. LEDDEN:**  One, they're impermissibly general, so

11   we're seeking all documents -- well, in this case all

12   communications, and while they're narrowed to some extent by

13   topical matter, this isn't a situation where we're looking at

14   documents that are contained in a database and we can easily

15   search.

16       This is, additionally, the third point, a burden

17   issue.  So any interactions regarding the SaveOn program, so

18   again, Express Scripts primarily interacts with clients, which

19   are these plans, right, essentially insurance companies.  The

20   insurance companies then have an account representative at

21   Express Scripts, and there are account representative teams.

22   And there are hundreds, if not thousands, of those

23   individuals.  And this is a program that is offered, in my

24   understanding, as a regular course.

25       So if we're looking for any and all communications

1  regarding that, I mean, it's not -- it's not something that we

2  can feasibly do.

3          **THE COURT:**  Have you proposed sensible

4  qualifications or narrowing of that?

5          **MS. LEDDEN:**  Well, we did as it relates like to

6  Request 13.  Speaking of it as a subset, this morning we had a

7  good conversation with opposing counsel and suggested that we

8  would go back to our client and look into whether or not we

9  could produce some noncustodial sheets, so marketing materials

10  that may be branded generally regarding the SaveOn program

11  that then would have been used by account managers to

12  communicate the basis of that program to these clients.  So

13  that was one way.

14          And then, let me see if there was others.  Oh, so --

15  and then when we're talking about Request No. 6, any

16  communications we offered, again, we're talking about

17  thousands of -- tens of thousands of plans; right?  We have

18  tens of thousands of clients.  We said, hey, if you find a

19  communication or you have, suspect in your prior productions

20  from Accredo or to be produced from Accredo prior production

21  from SaveOn, something that keys, a, hey, we believe there

22  have been some important communications regarding, I don't

23  know, Blue Cross Blue Shield, would you look for

24  communications from Blue Cross Blue Shield from a specific

25  time period regarding SaveOn; we're more than happy to look

1  into that.

2          An additional problem in that is that our account

3  managers move around frequently, so we're not just looking at

4  like one custodian for Blue Cross Blue Shield.  Sometimes

5  during the period they can have several different account

6  managers who may have discussed a matter.  All that is to be

7  said, you know, we're willing to work with them in that

8  respect if they can identify some troubling communications or

9  communications, rather, that they think are relevant, we're

10  happy to look into them further.

11          **THE COURT:**  Okay.  Was there an analogous request

12  from Accredo to Number 6?  I mean, I notice Number 6 is about

13  Accredo.  Did they ask Accredo for those same communications

14  between Accredo and Express Scripts?

15          **MS. LEDDEN:**  Yes, Your Honor.  There is an analogous

16  request, and the judge found that it was targeted towards

17  Accredo and Express Scripts' direct involvement.  My

18  understanding from subpoena counsel, or Accredo's counsel, is

19  that they intend to produce responsive documents to those

20  requests, and they're in further negotiations.  Mr. LoBiondo

21  might have more to add to that specifically.

22          **THE COURT:**  Yes, Mr. LoBiondo, you can respond to

23  any aspect of this that you wish.

24          **MR. LoBIONDO:**  Thank you, Your Honor, and I'll take

25  it sort of last thing first.  So, yes, the analogous request

1    was granted by the Tennessee Court, but they're analogous but

2    they're not necessarily overlapping, right, because the second

3    part of RFP 6 is about internal ESI communications.  To be --

4    the Court considering the Accredo subpoena granted both

5    aspects of the analogous request.  So we're going to get,

6    hopefully, internal documents among Accredo discussing Express

7    Scripts, but we're not -- those are internal documents to

8    Accredo, right, so they're not going to be overlapping.

9         **THE COURT:**  I see that Number 2 would not have been

10   produced by Accredo.

11        **MR. LoBIONDO:**  Right.  And then just to kind of

12   address the broader points on Request 3, you know, I think

13   this is, as I understand their position today, it is mostly

14   about burden.  Before today there was no offer to do anything

15   on Request 3 or Request 13, and as I understood what counsel

16   was saying, she said we're going to look and see if there are

17   some templates or they're noncustodial.

18        So the proposal is still from ESI about the burden

19   of producing custodial documents is that they're not going to

20   produce custodial documents.  And we don't want them -- we're

21   not asking the Court to compel them to have 500 custodians,

22   which they say they have 500 employees working on this scheme.

23        On the other hand, the fact that they have 500

24   employees working on the scheme gives you a sense of, A, the

25   investment that they have in the SaveOn program and the

1    relevance to the underlying litigation.  The litigation is

2    alleging at bottom that the entire SaveOn program is a

3    violation of our terms and conditions and has cost us a

4    hundred million dollars.

5            So when Your Honor asks have you proposed something

6    to winnow that burden, I suppose saying we're not going to

7    produce any custodial documents at all is a proposal, but in

8    the ordinary course what would happen is they would say, we're

9    not going to add 500 custodians.  We're willing to search

10   these accounts.  We're willing to -- you know, something

11   that's not just a pretext where we shouldn't have to produce

12   anything at all.  And that has not been forthcoming.

13           **THE COURT:**  Okay.  Ms. Ledden.

14           **MS. LEDDEN:**  May I respond to that?  A couple notes.

15   One, Express Scripts is not involved in this scheme in any

16   way.  We work for our clients.

17           Two, as I understand it from our discussions this

18   morning and what Mr. LoBiondo just said now, is that there

19   is -- I think they have a misunderstanding about how this

20   works.  It's not a situation where there's a dedicated SaveOn

21   team, right, so there wouldn't be like a manager over like

22   SaveOn products that, that isn't at Accredo; there's somebody

23   at Accredo that does some of that.

24           But at Express Scripts that's not how it works.  Our

25   interactions, it's a portion of a plan design, and so then

1    we're looking at each individual account manager.  It's not

2    something that, you know, we could propose five, ten people

3    and then do a limited search of those five or ten people.

4          And then, additionally, I would like to note as it

5    relates to the video that's another one of their requests, we

6    did discuss this morning producing e-mails from Rachel Harmon,

7    so that would be a custodian at Express Scripts that we intend

8    to -- we're looking into her e-mails now.

9          **THE COURT:**  Okay.  So you have not -- to that extent

10   you've offered a custodian?  Yes.

11         **MS. LEDDEN:**  One, yes.  It becomes challenging, Your

12   Honor, because they all have that similar role where it's very

13   general.  It's not like we're able, again, to find one person

14   that has some sort of supervisory authority and maybe all

15   e-mails flow through that person.

16         But, again, if there is communication out there,

17   they find something, they've gotten maybe something escalated

18   to SaveOn or Accredo, we're happy then to look at that person

19   for that time period about those issues, absolutely.

20         **THE COURT:**  Mr. LoBiondo, do you have anything on

21   the basis of which you could identify communications between

22   Express Scripts and other entities about SaveOnSP that you're

23   particularly interested in?

24         **MR. LoBIONDO:**  Respectfully, Your Honor, we don't

25   have really the information about how ESI works.  We have

*Motion Hearing - 8/10/23*                                      *Pg 22*

1    their attorney representations, but we don't have

2    organizational charts.  They have not engaged with us in this

3    process at all.

4            So obviously, we don't want to ask for something

5    that's a legitimately undue burden, but it's also not our job

6    to say, okay, well, we're going to find this other thing from

7    the SaveOn production and then ask you about it because what

8    they're going to say next is, You have it from the SaveOn

9    production; you don't need it from us.

10           So Rachel Harmon, I'm glad to hear they're going to

11   add Rachel Harmon as a custodian, but that's one account rep

12   doing one presentation, and the reason we know about that

13   presentation is because they accidentally put it on the

14   Internet and exposed the whole scheme.

15           I also don't want to, you know, belabor the point or

16   go back and forth because I think Your Honor has very clearly

17   read the briefing.  So the idea that ESI is not a part of the

18   scheme, I don't want to spend five minutes arguing about it,

19   but I think it's very obvious they're making money from the

20   scheme and all that.

21           **THE COURT:**  Right; there's no need.  I understand

22   Express Scripts' role both in the litigation or lack thereof

23   and the allegations of its involvement in the scheme.  All

24   right.

25           So I do think communications between Express Scripts

1    and other entities and also internal communications about

2    SaveOnSP are relevant to the litigation, and it's very hard

3    for me, just like for the reasons that you're suggesting,

4    Ms. Ledden, to carve that up into a smaller request that

5    they're allowed to make.

6           Normally that would be taken care of between the

7    parties who know about what's going on in those entities and

8    can work together to find a mutually agreeable resolution to

9    the issue that you're raising.

10          But I am not going to deny them discovery of these

11   communications, and the -- sorry -- both between Express

12   Scripts and other entities and internally because I don't

13   know, I have not heard why SaveOn might have produced anything

14   that falls into either one of those categories, and I'm not

15   sure how they would get what you're suggesting, Ms. Ledden,

16   which is sort of leads from other -- that all seems very

17   abstract to me that they might be able to find something else

18   that they want to target a specific RFP to.  They may well be

19   able to do that, but I'm not clear how, and this is, I think,

20   a reasonably tailored request for communications, unless and

21   until I have a motion for a protective order based on the

22   specific burden involved in this particular request.

23          So that motion to compel as to Request No. 3,

24   Sections (ii) and (iii), is granted.

25          And maybe we should discuss 6 and 13 since we've

1    already broached them.  Although, I worry about my ability to

2    remember which things we've talked about if we don't go

3    systematically through them.  Maybe we'll come back to them.

4          We'll go to Number 4, Documents and communications,

5    the extent to which Express Scripts is involved with enrolling

6    patients.  This also is -- seems likely to provide the

7    underlying case with information regarding the operation or

8    nonoperation of the alleged scheme.  That's from the Western

9    District of Tennessee case, which I know is not authoritative

10   on me, but that is a reasonable summary of why it would be

11   discoverable.

12         And, you know, that's certainly alleged that ESI has

13   played a significant role in the SaveOnSP program, and so

14   documents and communications showing that they, how they have

15   been involved with enrolling patients into it are fair game,

16   it seems to me, so that motion to compel will also be granted,

17   again, subject -- if you can make arguments about specific

18   burdens that Plaintiff's counsel is inflexibly unwilling to

19   accommodate in the production of these materials, obviously I

20   would entertain those on a specific concrete basis.

21         **MS. LEDDEN:**  May I just indicate, we don't have

22   responsive documents.

23         **THE COURT:**  Oh, well, then I don't know why we're

24   talking about it.  There's nothing about -- no responsive

25   documents about the extent to which Express Scripts is

1    involved with enrolling patients; yes?  They've searched for

2    all such documents and found none?

3           **MS. LEDDEN:**  We are not involved in enrolling

4    patients.

5           **THE COURT:**  Oh, okay.

6           **MR. LoBIONDO:**  Your Honor?

7           **THE COURT:**  Yes.

8           **MS. LEDDEN:**  And we did tell them that today.

9           **MR. LoBIONDO:**  This is sort of the frustrating thing

10   with hearing about these things for the first time the morning

11   of argument.

12          **THE COURT:**  Okay.

13          **MR. LoBIONDO:**  I would say that the attorney

14   representation has been made.  We think the request should be

15   granted and they should do a -- they should do a search; they

16   should interview their client.  If it turns out there's

17   nothing, there's nothing obviously, but the reasons for

18   nonproduction have been shifting, and so it's a little bit

19   hard for us to know whether there's no documents or whether

20   they don't see their role the same way we see it.  So we think

21   the ruling that it's granted, obviously if there's nothing --

22          **THE COURT:**  To the extent it exists, it's granted.

23   If there's -- you can't get water out of a stone, so if

24   there's nothing there, there's nothing there.  You know, I'm

25   not going to go to their building and look for the things

1    myself.

2              **MR. LoBIONDO:**  Understood, Your Honor.

3              **THE COURT:**  Okay.  All right, so we'll move on to

4    Request No. 5, Documents sufficient to show the relationship

5    between Accredo and SaveOnSP.  It seems to me that this is

6    likely duplicative of information that you are now able to get

7    from Accredo; is that correct?

8              **MR. LoBIONDO:**  Your Honor, the analogous request to

9    Accredo was for documents about the ESI/SaveOn relationship.

10   So in other words, we were trying to figure out how all of

11   these entities worked together.

12             **THE COURT:**  Right.

13             **MR. LoBIONDO:**  So we asked ESI how does Accredo and

14   SaveOnSP work together.  And then --

15             **THE COURT:**  And vice versa.

16             **MR. LoBIONDO:**  And vice versa.

17             **THE COURT:**  Right.

18             **MR. LoBIONDO:**  So they are analogous, but I don't

19   believe -- actually, the Accredo Court denied the request.

20             **THE COURT:**  Because it was about ESI.

21             **MR. LoBIONDO:**  Because it was about ESI.

22             **THE COURT:**  Right.  And so what I'm asking is why

23   wouldn't I do the exact same thing because now you have

24   information from Accredo about its relationship with SaveOn,

25   and so, I mean, starting from just the wording of the request,

1   it's unclear to me how this would not be covered by

2   information you're going to get from Accredo and SaveOnSP.

3          **MR. LoBIONDO:**  So what I would say to that very

4   briefly, Your Honor, is we don't have anything from Accredo

5   yet.  Accredo has already moved for reconsideration of aspects

6   of those orders.  Accredo has the same, in some respects, the

7   same counsel that we were negotiating with with ESI, not

8   counsel that's here, but I guess it's subpoena counsel.

9          **THE COURT:**  Okay.

10         **MR. LoBIONDO:**  So they are playing a lot of the

11  same -- I shouldn't say playing the same game.  They're taking

12  the same positions.  We haven't seen anything from them yet,

13  and we don't know what they're going to get.  So I just am

14  worried about saying, yes, we're definitely going to get it

15  from Accredo and then we don't and we don't have it from

16  anybody.

17         **THE COURT:**  Can you explain to me your understanding

18  of the relationship between Accredo and ESI with respect to

19  the SaveOn -- please focus on, so why would I think or you

20  think that Express Scripts is in -- you know, has documents

21  that reflect the relationship between Accredo and SaveOn?

22         **MR. LoBIONDO:**  So ESI is Accredo's parent, and ESI

23  is the one that's signing up the plans for the SaveOn program.

24  For ESI to do that, my understanding is that ESI pitches the

25  SaveOn program to its client plans.  A big part of that pitch

1   is -- you know, part of it is here's how we redesignate the

2   drug so that we can inflate the copay, but there's also a

3   whole discussion of how Accredo forces a rejection of the

4   prescription at the pharmacy level so that the patient

5   effectively is forced into, into signing up for the SaveOn

6   program because otherwise they're not going to get their

7   cancer medication or whatever it is.

8           **THE COURT:**  There was a diagram in the brief about

9   this; correct?

10          **MR. LoBIONDO:**  Exactly.  So ESI indisputably, not

11  just because Accredo is a subsidiary and its own specialty

12  pharmacy, but also because ESI is in the business of selling

13  this program, it definitely has information about the Accredo

14  role in the program.  We do have some information from SaveOn;

15  obviously we have custodial productions from SaveOn.  But

16  SaveOn is outside of the ESI/Accredo corporate structure, so I

17  don't think those productions are duplicative.

18          **THE COURT:**  Okay.  But whether or not it's

19  duplicative of anything you might get from Accredo, you don't

20  know yet?

21          **MR. LoBIONDO:**  It's impossible to say.

22          **THE COURT:**  Yeah, okay.  All right.  I am going to

23  deny the motion to compel that information unless and until

24  counsel can come with some basis on lack of production from

25  Accredo or some other reason why they would need to have this

1    third party produce information about another third party

2    because they couldn't get it from them themselves.

3              All right.  Communications between Accredo and

4    Express Scripts.  This is the one we've already discussed to a

5    certain extent.  The internal part of this, which I take it

6    couldn't be obtained from someone else, unless someone can

7    tell me something different about the word internal than I'm

8    reading it, then I think should be granted.  And then as it

9    is, again, tailored to the role with respect to the SaveOnSP

10   program.

11             So I am not suggesting that Express Scripts should

12   have to produce every document that says the word Accredo in

13   it to the plaintiffs, but as described, it seems designed to

14   produce relevant information to the underlying litigation.

15             And for the first one between Accredo and Express

16   Scripts and concerning each entity's role in administering the

17   SaveOnSP program, it's hard to know what to do with that

18   because that's the kind of thing that if you were getting it

19   from one, you wouldn't necessarily need it from the other.

20   You have been ordered by a Court to get it from Accredo;

21   correct?

22             **MR. LoBIONDO:**  Yes, the Court in Tennessee granted

23   that request.

24             **THE COURT:**  Granted that, yeah, as to Accredo.  So

25   in as much as they're part of the same, you know, corporate

 1   structure and they have the same counsel, I don't know that I

 2   need to order both of these entities to produce the same

 3   quantity of information, but if obviously you don't get it

 4   from Accredo, I will hear a motion to reconsider that ruling.

 5           So I'm going to deny the motion to compel as to the

 6   first part, but I know, Ms. Ledden, you don't represent

 7   Accredo or I'm hearing -- that's what I'm hearing, but if you

 8   know people who do, if you could let them know that if they

 9   don't produce things that are responsive to this, then you are

10   likely to have to.  I don't know how that will affect their

11   behavior or yours, but you can communicate that fact to them.

12           All right.  Then Request No. 7, documents sufficient

13   to show Evernorth's role in administering the SaveOnSP

14   program.  Express Scripts, what is your relationship to

15   Evernorth?

16           **MS. LEDDEN:**  Evernorth is a parent.  And so I just

17   want to clarify too, we are not a parent company for Accredo.

18           **THE COURT:**  Okay.  Are you part of the same --

19           **MS. LEDDEN:**  We're all part of CIGNA.  So CIGNA is

20   the big parent and we're down below, so yes, I mean, our role

21   is working with clients on plan design.  Evernorth is our

22   parent.

23           **THE COURT:**  Your parent, which is a part of CIGNA

24   still?

25           **MS. LEDDEN:**  Yes.

 1          **THE COURT:**  Okay.  So you're all -- okay.  And then
 2   let me ask Mr. LoBiondo, why do you need information about
 3   Evernorth?
 4          **MR. LoBIONDO:**  Yes, so this is a document sufficient
 5   to show, so this was part of us trying to figure out what
 6   is --
 7          **THE COURT:**  The structure.
 8          **MR. LoBIONDO:**  Yeah, what the role is and, you know,
 9   if it's one document, it's one document.  This is not like
10   we're asking for every e-mail.
11          **THE COURT:**  Okay.  So this is not a scorched earth,
12   give us everything about Evernorth that's in ESI's files.
13          **MR. LoBIONDO:**  Correct.  We were trying to draw a
14   distinction between some requests that say all documents and
15   ones that say sufficient to show.  In my view, that can be a
16   contract, if there's one contract or nothing.
17          **THE COURT:**  Okay.  And if there's nothing, then
18   there's nothing.
19          **MR. LoBIONDO:**  And if there's nothing, but that
20   bespeaks, you know, there has to be some investigation; there
21   has to be talking to the client.
22          **THE COURT:**  Right.
23          **MR. LoBIONDO:**  There has to be some due diligence.
24          **THE COURT:**  Okay.  And Ms. Ledden, what is the
25   objection to this particular request?

1          **MS. LEDDEN:**  I mean, Evernorth obviously is a

2    separate entity, one.  Two, are we talking about just

3    documents in Express Scripts' possession?  Because when

4    discussing this or reviewing this, it seems to be seeking more

5    than that, you know, because of the nature of our

6    relationship.

7          **THE COURT:**  More than what exactly?

8          **MS. LEDDEN:**  Like documents from Evernorth.

9          **THE COURT:**  Right.

10          **MS. LEDDEN:**  Right.

11          **THE COURT:**  Well, these -- I mean, they're asking

12    Express Scripts, so if they're asking you to go to Evernorth

13    and get documents, that's another -- as I understand the

14    relationship, my very limited understanding of it, that would

15    be asking for yet another third party's documents; correct?

16          **MS. LEDDEN:**  Exactly.

17          **THE COURT:**  Okay.  So you would object to producing

18    something from Evernorth?

19          **MS. LEDDEN:**  Yeah, and my understanding from my

20    co-counsel here is that we wouldn't have that?  I'm sorry.

21          **MS. HELLMANN:**  Certainly we will check to see if

22    Express Scripts has documents relating to Evernorth's

23    involvement on SaveOnSP.  We are not going to go to Evernorth

24    to see what they have.  I mean, these are very

25    separate corporations.

1          **THE COURT:**  Sure.

2          **MS. HELLMANN:**  There are firewalls in place.

3          **THE COURT:**  If they want to subpoena Evernorth, they

4    can subpoena Evernorth.

5          **MR. LoBIONDO:**  We've never asked them to ask.

6          **THE COURT:**  Good.  Everybody is in agreement, and

7    I'm granting the motion to compel on RFP Number 7, subject to

8    the qualifications we've all agreed to here today.

9          Let's move on.  Request No. 8, all documents

10   concerning the Master Program Agreement, and I understand, at

11   least I thought I understood from the Tennessee order, that

12   the agreement itself has been produced; correct?

13         **MR. LoBIONDO:**  That's correct; the final agreement

14   SaveOn produced.

15         **THE COURT:**  Okay.  So you don't need the agreement

16   itself, but you are still seeking all of the rest of the

17   things that are described there:  Drafts, amendments,

18   schedules, exhibits, appendices, documents concerning any

19   predecessor, successor, from Express Scripts?  Are you seeking

20   those things?

21         **MR. LoBIONDO:**  Internal documents that SaveOn can't

22   produce about this core contract that is -- sets out the

23   entire framework for the program.  And 9, just to maybe keep

24   things moving, Requests 8 and 9 are similar in this regard.

25   They're different contracts because they cover different time

1    periods.

2              **THE COURT:**  Okay.

3              **MR. LoBIONDO:**  But these are contracts about how the

4    SaveOn program is going to be administered and the division of

5    labor between ESI and SaveOn, and so SaveOn gave us the

6    contracts, but I assume that somebody at ESI talked about the

7    drafts of the contracts.

8              **THE COURT:**  Okay.

9              **MR. LoBIONDO:**  If those materials are not

10   privileged, we would like to see those drafts and those

11   communications.

12             **THE COURT:**  Okay.  So you acknowledge that they

13   might be privileged, something might be privileged?

14             **MR. LoBIONDO:**  I'm sure that a lawyer looked at

15   something at some point, and we would not be asking for a

16   lawyer's comments, but this is a business, so there's going to

17   be nonprivileged documents.

18             **THE COURT:**  Other kind of communications, okay.

19             Ms. Ledden?

20             **MS. LEDDEN:**  I mean, that was going to be my first

21   point, Your Honor.  Any drafts involved in this process are

22   likely privileged, one, and then two, we have trouble seeing

23   the relevance here because our internal communications

24   regarding the program don't address the underlying issues,

25   which are the potential inducement of the SaveOn program on

1    these patients.

2              **THE COURT:**  Okay, let me try to think about that.

3    The documents related to the contracts don't reflect on the

4    fundamental issue, which is, again, the inducement to

5    patients, you said?

6              **MS. LEDDEN:**  Yes, of patients to violate their

7    contracts with J&J.

8              **THE COURT:**  Right.  Okay.  Mr. LoBiondo?

9              **MR. LoBIONDO:**  Yeah, I think -- well, in this and

10   perhaps some other requests, we're just going to have a very

11   different view of relevance.

12             **THE COURT:**  Okay, yeah.

13             **MR. LoBIONDO:**  So the scheme, the scheme is the

14   scheme, and obviously the final contract is relevant to that.

15   But if there was back and forth between ESI and Accredo --

16   between ESI and SaveOn about what ESI's role was going to

17   be -- and maybe it changed throughout the drafts of the

18   agreement -- or ESI saying I'm not comfortable with that or

19   SaveOn saying I'm not comfortable with that, all of that goes

20   to the wrongfulness element under tortious interference, and

21   all of it goes to the potential patient harm.

22             And we haven't seen the documents, so I'm shooting

23   completely blind, but the core contracts that set out how this

24   scheme is going to work, to me, are, including the drafts,

25   including the conversation that led up to the final

1   memorialization of it, are clearly discoverable because

2   they're going to tell you something relevant about how the

3   scheme works in practice on patients at the patient level.

4          **THE COURT:**  Okay.  You're not accusing -- when you

5   say the wrongfulness of the scheme, here again, we do not have

6   a defendant, right, in the New Jersey litigation that we're

7   talking about?

8          **MR. LoBIONDO:**  Correct.  But even if -- so this is

9   just a hypothetical; I'm just making it up.  But if, for

10  example, there are communications between ESI and SaveOn where

11  ESI says, You shouldn't do X because that is bad for patients,

12  and then SaveOn does it anyway, we're not alleging that ESI

13  has done anything wrong, but it's evidence that SaveOn has

14  done something wrong; right?

15         And the reason I said wrongfulness is because for

16  tortious interference under the law, the claim in the

17  underlying litigation, it's not enough just for us to show

18  that SaveOn induced patients to breach their contract.  There

19  is an additional layer where we have to show either

20  wrongfulness or some, some -- something that's more than just

21  breaking sharp practice.

22         So that's why I said wrongfulness.  It's not to cast

23  any dispersions on ESI or anybody else, but there is a sort of

24  motive and an intent aspect to this that the New Jersey Court,

25  when it's been ruling on these discovery requests, has been

1    really struggling with, because, you know, we are not just

2    looking for final copies of things because we need to see that

3    back and forth to be able to have evidence on whether or not

4    we can prove the wrongfulness, and then on the GBL claim, the

5    effect on patients of the program.

6        **THE COURT:**  Okay.  And speak to me about these two

7    contracts in particular, the eight and nine.  Why do you think

8    that Express Scripts specifically might have communications

9    that would reflect on what SaveOn was trying to do in crafting

10   these agreements?  I mean, you wouldn't ask for some other

11   entity's, random entity on the street, you know, whether they

12   had anything, any communications related to these agreements

13   and expect them to have evidence of wrongfulness in them.  So

14   I'm just asking you to tell me why this is particularly

15   relevant to you.

16       **MR. LoBIONDO:**  Okay, I think I got it, and you'll

17   tell me if I'm not saying it correctly or if I'm not answering

18   your question.

19       So the way that patients get sucked into the SaveOn

20   program is that their employers sign up with ESI, ESI pitches

21   them the program, and then my understanding is there is a

22   joinder agreement that is signed as between the plan, ESI, and

23   SaveOn.

24       So ESI is a party to this contractual arrangement

25   that leads to the scheme we have complained of.  So we

1   wouldn't ask a random party on the street because the random

2   person on the street doesn't have anything to do --

3           **THE COURT:**  Right.

4           **MR. LoBIONDO:**  -- with the implementation.

5           **THE COURT:**  So they're involved in the overall

6   program, so random on the street wasn't a good example, but

7   this Master Program Agreement, that's between Express Scripts

8   and SaveOn; right?

9           **MR. LoBIONDO:**  It is.

10          **THE COURT:**  Okay.  So that's why you're asking about

11  whether Express Scripts has --

12          **MR. LoBIONDO:**  Yes.

13          **THE COURT:**  What is it about the Master Program

14  Agreement that makes it the case that you think that

15  communications about it would have, might have evidence of

16  wrongfulness?

17          **MR. LoBIONDO:**  Because the program sets out -- I'm

18  sorry.  The program agreement sets out each entity's role, and

19  it may be the case that there are some things SaveOn is doing

20  that ESI did not want to do itself; right?  ESI, if it wanted

21  to, could have set this program up with one of its

22  subsidiaries.  Instead, they're contracting out with SaveOnSP.

23          And you'll see in some of the later requests that in

24  some public-facing materials, ESI says, We're pitching this to

25  you, but we're not making any claims about whether it's legal

1    or not.

2            So if those conversations happened in the context of

3    negotiating the Master Services Agreement, for example, the

4    agreement talks a little bit about indemnity and when ESI is

5    going to indemnify SaveOn and when SaveOn is going to

6    indemnify ESI.

7            So those are conversations that are very relevant to

8    wrongfulness, right, because ESI is deciding under what

9    circumstances are we willing to support and to pay the

10    expenses of SaveOn.  So it's those kind of things.  Again, we

11    don't know for sure.

12            **THE COURT:**  And what about the other agreement, can

13    you tell me what it is?

14            **MR. LoBIONDO:**  Sure.  So the other agreement --

15            **THE COURT:**  2018 agreement.

16            **MR. LoBIONDO:**  Yeah.  There's a number of different

17    agreements between ESI and SaveOnSP, and we don't have perfect

18    visibility into which of them apply to which ESI clients.  I

19    think there's not a perfect overlap, and some apply to

20    different clients and some apply at different times.

21            But this is the agreement that expressly says -- or

22    one of the agreements that expressly says what it is that

23    Express Scripts is taking a cut for.  And they say it's for

24    operational setup and support, member and claims support,

25    program and benefit coordination.

1              So there was presumably some negotiation leading up

2    to this language in this agreement about what ESI was going to

3    do to further the SaveOn scheme, and those conversations are

4    relevant.

5              **THE COURT:**  Okay.  And the conversations you're

6    talking about, to the extent they're with SaveOn, wouldn't

7    SaveOn have had to produce them?

8              **MR. LoBIONDO:**  Yes.

9              **THE COURT:**  Okay.  So are you seeking here internal,

10   just so these now are limited to just internal documents --

11             **MR. LoBIONDO:**  Correct.

12             **THE COURT:**  -- and internal communications?

13             **MR. LoBIONDO:**  Correct.  We've tried to be very

14   clear that if SaveOn has already produced it, we don't need it

15   from ESI.

16             **THE COURT:**  Okay.  All right.  Ms. Ledden, do you

17   want to respond?

18             **MS. LEDDEN:**  I mean, my biggest point is the

19   relevance here is on those communications between Express

20   Scripts and SaveOn.  Those that presumably SaveOn has already

21   produced, our internal processes or communications regarding

22   that, you know, wouldn't be relevant and then also, you know,

23   would be, I mean, in large part, especially when we're talking

24   about draft contracts, we're looking at privilege issues.  And

25   then we encounter some of the same burden situation

1    potentially regarding following up on them.

2            **THE COURT:**  Okay.

3            **MS. HELLMANN:**  And could I add just one thing on

4    that, Your Honor?

5            **THE COURT:**  Yes, Ms. Hellmann.

6            **MS. HELLMANN:**  Let's just do a hypothetical.  There

7    is an internal business communication from someone at Express

8    Scripts to somebody at Express Scripts that says, huh, I don't

9    know that SaveOn should be doing this.  That is not relevant

10   to this, that litigation.

11           At most -- and what counsel talked about for most of

12   his argument was it was Express Scripts told SaveOn they

13   shouldn't be doing this and SaveOn knows; that's all back and

14   forth between Express Scripts, the nonparty, and the party.

15           So even if you get -- let's just assume there's this

16   internal communication of like this doesn't sound good, that's

17   not relevant to what SaveOn knew and what SaveOn did.  I mean,

18   that's the communications between the two contracting parties,

19   to which they need to get it from the party, and if that party

20   hasn't produced it, they can follow up, but it's not relevant

21   here.

22           **THE COURT:**  Okay.  What is your response to that,

23   Mr. LoBiondo?

24           **MR. LoBIONDO:**  I think if ESI people are e-mailing

25   ESI people and saying SaveOn shouldn't be doing this but all

1    the time ESI is signing up more of its clients for the

2    program, in our view injuring more patients and taking tens of

3    millions of dollars every year from JJHCS, I think their

4    internal view is -- to me it's manifestly relevant, so I don't

5    think we're going to agree about whether or not --

6            **THE COURT:**  Wouldn't that be relevant to whether

7    Express Scripts is liable to J&J for something?

8            **MR. LoBIONDO:**  Yes, but also it's relevant to when

9    we go to a jury and we have to convince them of the element of

10   tortious interference that this conduct was wrongful, we can

11   say -- I mean, again, we're just talking about

12   discoverability, not admissibility.

13           **THE COURT:**  Right.

14           **MR. LoBIONDO:**  But just for present purposes, even

15   ESI, who was reaping the rewards of this conduct, agreed

16   privately that it was harming patients.  That's extremely

17   probative.

18           **THE COURT:**  Probative of what ESI thought about what

19   SaveOn was doing?

20           **MR. LoBIONDO:**  Probative of whether the conduct was

21   actually wrongful and actually harmed patients.  If ESI, who

22   is supposed to be, you know, whose clients are all the plans,

23   has a private view that something it is enabling is wrongful,

24   that is certainly, you know, it's something the jury is

25   entitled to consider or the Court on summary judgment is

1    entitled to consider.  It's not just then us saying it's

2    wrongful and SaveOn saying it's not wrongful.  SaveOn's own

3    business partner is saying it's wrongful.  I also just --

4            **THE COURT:**  I'm not sure that I would necessarily

5    care what SaveOn's business partner thought about SaveOn's

6    conduct if I'm evaluating the actual legality of SaveOn's

7    conduct.  That seems like it might be -- and especially if you

8    were going to introduce it to a jury, I mean, I would expect

9    to elicit an objection based on distracting the jury or

10   confusing them about what standard they're applying or, you

11   know, providing a legal opinion that they may be unduly

12   influenced by, even though it has actually no weight

13   whatsoever in the court.

14           But your point about admissibility versus

15   discoverability is what I think is salient, the most salient

16   thing in your -- in support of your position.  I just --

17           **MR. LoBIONDO:**  Can I make one more point on this,

18   Your Honor, very briefly?

19           **THE COURT:**  Yes.

20           **MR. LoBIONDO:**  So this is a request where there was

21   an analogous request before the Accredo Court, and the Court

22   said, any documents concerning that agreement, so the Court

23   denied the request and said any documents concerning that

24   agreement are likely to be held by the parties that were party

25   to that agreement, namely Express Scripts and SaveOn.

1          **THE COURT:**  Right.

2          **MR. LoBIONDO:**  So they have argued there we don't

3     have the stuff; Express Scripts has it.  And now we're here

4     and they're saying we have it, but we don't want to give it.

5     So --

6          **THE COURT:**  Understood.  Ms. Ledden, any response to

7     that?

8          **MS. LEDDEN:**  I would just go back to the relevance

9     argument, Your Honor.  Again, you know, the judge said that

10    these documents would be held by the parties to that

11    agreement, namely Express Scripts and SaveOn.  So again,

12    what's relevant in the underlying case here are those

13    communications between Express Scripts and SaveOn to the

14    extent they exist, and we would ask that it would be limited

15    to that in such -- or at least the relevance is limited in

16    that way.  As Ms. Hellmann so eloquently put earlier, if there

17    was an internal communication, it's not relevant to their

18    case.

19         **THE COURT:**  Yes.  If we were talking about

20    admissibility, I would be very much inclined to agree with

21    you, Express Scripts.  As we are talking about

22    discoverability, I don't know that I can find that as a, you

23    know, that it's not even discoverable under Rule 26, documents

24    and communications related to these contracts insofar as those

25    contracts are very, very closely related to the operation of

1    this program, and so I'm going to grant the motions to compel.

2          But again, that is subject to any more concrete

3    objections on the basis of burden that Express Scripts wants

4    to make having now the general ruling that this is

5    discoverable information and that they should be responsible

6    for producing it assuming it is not overly burdensome.  We

7    don't have those concrete arguments right now, which is one of

8    the reasons it's frustrating to have to rule on this in this

9    context.  And so if there is some argument to be made after

10   discussions between the parties in light of today's ruling,

11   then I will hear those later.

12         Yes, Mr. LoBiondo?

13   **MR. LoBIONDO:**  Can I just briefly say before we go

14   on to the next one, I think one of our concerns is that

15   substantial completion in the New Jersey litigation is ending

16   soon, and so --

17   **THE COURT:**  Yes.

18   **MR. LoBIONDO:**  -- depositions are starting soon.  So

19   I think it's, you know, I think Your Honor is totally right to

20   say like if there's something specific about burden, like

21   bring it up, but I would ask you to keep us, both parties, on

22   a tight leash in terms of timing because what we can't do is

23   wait eight more months and then we hear, oh, it's really

24   burdensome for us to produce this because at that point

25   depositions will be over.

1          **THE COURT:**  I would like nothing better than for all

2   of you to come to an agreement about how to make this happen

3   tomorrow.

4          **MR. LoBIONDO:**  And I think we will.

5          **THE COURT:**  So I will put deadlines on follow-up

6   briefing to make this happen expeditiously because, as I

7   understand it, you've already sought an extension of discovery

8   and it's been denied; is that correct?

9          **MR. LoBIONDO:**  An extension of discovery was

10  granted, so now substantial completion of document production

11  is next month.  It was supposed to be in June.

12         **THE COURT:**  Okay.

13         **MR. LoBIONDO:**  So --

14         **THE COURT:**  But from there, you haven't requested

15  from there?

16         **MR. LoBIONDO:**  The judge yesterday, I believe,

17  entered a concomitant extension of the other deadlines.

18         **THE COURT:**  Okay.

19         **MR. LoBIONDO:**  So now document discovery is supposed

20  to be mostly done by next month.

21         **THE COURT:**  Okay.

22         **MR. LoBIONDO:**  And then depositions are happening

23  October, November.

24         **THE COURT:**  Okay.

25         **MR. LoBIONDO:**  I think a little bit in December.

1            THE COURT:  Okay.  Yes, in light of how long you all

2    have had to discuss this already, I am not going to be very

3    sympathetic to a request for a lot of time to discuss it more.

4    You should have done it before you came today.  You didn't.

5    You're going to need to get it done soon.  So if you -- to the

6    extent I'm open to follow-up arguments to this, I would want

7    those to be submitted promptly, which means that you all

8    should engage in very specific and concrete conversations very

9    soon, and I would hope then when you say the document

10   discovery is due, when is that?  I know it was in the

11   briefing; forgive me.  September something; right?

12           MR. LoBIONDO:  September 24th.

13           THE COURT:  September 24th.  Today is

14   August 10th.  I mean, ideally I would hear objections by the

15   18th and any response thereto by the 23rd.  Because I just had

16   a trial collapse that was supposed to be my second half of

17   August, and so you're much more likely to get my attention if

18   you are finished with your briefing before the end of August.

19   So why don't we -- I mean, that means you all have to meet and

20   confer possibly tomorrow or early --

21           MR. LoBIONDO:  -- better from our perspective, Your

22   Honor.

23           THE COURT:  Okay.  So I'm going to give the parties

24   until the 18th to file any follow-up motions to this and to

25   the 23rd to respond to those so that I can try to get you a

1    response by the beginning of September.

2            **MR. LoBIONDO:**  Okay, that's great.  And so, just so

3    I understand the procedure --

4            **THE COURT:**  We're not done here, but to the extent

5    there's going to be any kind of -- I'm granting the ones we've

6    discussed so far, and so the burden will be on Express Scripts

7    to show burden if they want to have me reconsider.

8            **MR. LoBIONDO:**  That was my question.  I wanted to

9    make sure that --

10           **THE COURT:**  To the ones we discussed so far.  There

11   might be other kinds of follow-up briefing that's appropriate,

12   but -- and then the burden is on you, but so far I think we

13   have dispatched through 9.  I mean, if you object to any of my

14   rulings on the ones that I've denied, then you can also

15   object.  The more you guys object, the less likely it is

16   you'll get a prompt ruling, though, so just bear in mind that

17   the Court's resources are limited.

18           Okay.  We're on 10; right?

19           **MR. LoBIONDO:**  Yes.

20           **THE COURT:**  Okay.  All documents concerning the

21   preparation of and the posting of the video presentation.

22   That will be granted for all the reasons that I've already

23   given for the others.  I think it is -- first of all, it's

24   very targeted about a very specific thing, and I think it is

25   likely to lead to information regarding -- that's relevant to

1    the underlying case.  I believe that's analogous to the ruling

2    in the Western District of Tennessee as well for what it's

3    worth.

4              Request No. 11, all documents concerning drugs for

5    which this -- I'm not even going to read it.  You all know

6    what it says.  That strikes me as quite broad, and I'm not

7    sure how it's specific to ESI, so perhaps Mr. LoBiondo could

8    help me with that.

9              **MR. LoBIONDO:**  Sure, Your Honor, and maybe I'll

10   start with the end of it.  So changes to the SaveOnSP program

11   is based on the, quote, most lucrative copay assistance

12   programs, end quote.  So that is a quote, Your Honor, from

13   their video.

14             **THE COURT:**  Okay.

15             **MR. LoBIONDO:**  So they are out in the market making

16   representations about, you know, when they're selling, when

17   ESI is selling to ESI's clients, they're saying we're making

18   these changes based on the lucrativeness of the copay

19   assistance programs, a/k/a, our program.  So they're making

20   these statements out in the market, and we assume that they

21   have some communications, not just with SaveOn but also

22   internally because they're the ones giving the presentations

23   about what it is they're telling to their clients, so that's

24   what this --

25             **THE COURT:**  That's for Number 4?

1          **MR. LoBIONDO:**  I think all of these are in the same

2     family.  It's documents where they are talking about our

3     CarePath copay assistance program and how it can be, in our

4     view, exploited.  Obviously they wouldn't say it that way.

5          **THE COURT:**  Right.  How it interacts with the

6     services that they're providing.

7          **MR. LoBIONDO:**  Correct.  And how they're targeting

8     our drugs because we have a relatively -- we have a very

9     generous copay assistance program, and so that's what put the

10    target on our back.

11         **THE COURT:**  Okay.  So this is implicitly limited to

12    documents that are within ESI that are not duplicative of

13    communications from outside; correct?

14         **MR. LoBIONDO:**  Everything I say today we don't want

15    anything that's duplicative of what SaveOn has already

16    produced.

17         **THE COURT:**  Okay.  Okay, Ms. Ledden or Ms. Hellmann?

18         **MS. HELLMANN:**  Your Honor, yeah, sorry, I know we're

19    switching up on you.

20         **THE COURT:**  It's fine.  It's fine.

21         **MS. HELLMANN:**  Express Scripts doesn't put the drugs

22    on this list.  We don't create this list.  So I think it's

23    exactly why the Court denied it in Tennessee, that this is in

24    SaveOn's possession, the drugs on the list, why those drugs

25    may change.  I mean, you're taking a statement from video and

1  being like, well, Express Scripts must have internal

2  communications on this as to why they put drugs on.

3          I mean, this is a fishing expedition.  The person

4  who made the statement, Rachel Harmon, we are pulling her

5  e-mails.  I don't know where we would even start to look for

6  this information.  I mean, it's just like Express Scripts may

7  offer, you know, a program to its clients with like drug

8  interactions, if you go into a pharmacy and you're going to

9  get too many drugs that interact; this is that program.  It is

10  a program, and it's not -- I mean, rhetoric aside, but it's

11  not like somewhere where these people are like here's the

12  SaveOnSP program.  It's just across the book of business.

13          So, one, I don't even know where we would start, but

14  this is information that is in SaveOn's possession.  It

15  certainly should be with respect to the drugs, the changing of

16  the drugs.

17          So I think it's all the reasons that it was denied

18  before, and there's -- it is incredibly burdensome, and it's

19  not even to be able to articulate burden; it's more of like

20  I'm not sure where we would go to start.  I've worked for

21  Express Scripts for a lot of years, and I know how they're set

22  up, and I wouldn't know what to tell them to go look for these

23  documents.

24          **THE COURT:**  Okay.  Could they look for documents

25  relating to CarePath?  That's a distinctive signifier of the

 1  information that they're seeking; right?

 2          **MS. HELLMANN:**  Because the same thing, I mean, this

 3  is part of the program that is offered, and the communications

 4  fall within all of the account teams.  It is not a place -- I

 5  mean, to look for these terms you have to know who the

 6  custodians are to look for the terms, and it's not a few

 7  individuals.  And I mean, certainly -- and this has been

 8  referred to of hoping that we do our due diligence.  Of course

 9  we will do our due diligence, everything the Court tells us to

10  do.  We will confirm that does CarePath help this.

11          But I am representing to the Court today I don't --

12  I'm positive that I don't think -- I'm positive I don't

13  think -- I don't think they're housed in one place.  And I

14  think it literally would be almost impossible, and I am more

15  than happy to go back and confirm and see if there is a place

16  that we can search.

17          **THE COURT:**  Okay.  So let me ask, when you say

18  you're producing, you're searching Rachel Harmon, she's the

19  person who put together the video presentation?

20          **MS. HELLMANN:**  Correct, Your Honor.

21          **THE COURT:**  Okay.  And you're going to produce

22  communications related to the putting together of that video

23  presentation?

24          **MS. HELLMANN:**  Correct.

25          **THE COURT:**  And if there is something that goes, in

1    her communications that goes to where she's getting this idea

2    that it's going to be changed according to the most lucrative

3    copay assistance programs, etc., that would be produced;

4    right?

5              **MS. HELLMANN:**  Absolutely.

6              **THE COURT:**  Okay.  So all right, Mr. LoBiondo, do

7    you want to respond before I rule on this?

8              **MR. LoBIONDO:**  Just very briefly, Your Honor.  I

9    mean, I think, to the observation you have made several times,

10   when we served the subpoena, they didn't say, Oh, we would

11   love to comply, but it's really hard for us to figure out how

12   to do it.  So we first heard, you know, you shouldn't even be

13   talking to us for another six months, and then we heard

14   there's no relevance, the burden.

15             So, you know, the fact that they may have a lot of

16   documents and they may have a lot of people that work on these

17   programs, you know, we would have been happy in January, in

18   February, in March, to sit with them and say, this is how we

19   think we can work out custodians; send us some more charts;

20   we'll send you some names of people.

21             But the fact that that didn't happen, you know, it's

22   interesting to hear these objections now, but to me it feels a

23   little bit pre-textual because if that was really the issue

24   was just that they didn't know how to do it, we could have had

25   that discussion.  We wouldn't need to be wasting Your Honor's

1    time.  That's all I'll say on it.

2            **THE COURT:**  Okay.  Does the video presentation

3    mention CarePath in particular?

4            **MR. LoBIONDO:**  No.  It is a program about

5    manufacturer copay.  No.

6            **THE COURT:**  All right.  I'm going to deny Request

7    No. 11, and I'll say that that is subject to the

8    representations made by Express Scripts that there's going to

9    be information related to that presentation, including

10   Ms. Harmon's information, produced such that if then something

11   in that information gives rise to a further, more tailored

12   request, I might be open to entertaining a motion to compel

13   related to that request.

14            I do think there's something in this universe,

15   Request No. 11, that would definitely be discoverable, and,

16   you know, it's just Request No. 11, and I know I've granted

17   some that I don't know how general or how specific you can be,

18   but on Request No. 11 it does seem to me that it may be quite

19   duplicative of information that is already produced by SaveOn.

20   I don't know that for sure, but it strikes me as possible.

21   And that the -- and that it also may be something that's best

22   pursued going from the narrow information about the

23   presentation more broadly rather than asking Express Scripts

24   to start from these very general categories.

25            So I'm going to deny that as overbroad and

1    potentially duplicative at this time until further notice from

2    the plaintiff.  All right?

3            Request No. 12, point-of-sale claim rejection at

4    pharmacies.  This is the process that you're saying that leads

5    to them feeling that they must enroll in this program;

6    correct?

7            **MR. LoBIONDO:**  Yes; these are more quotes from the

8    ESI presentation.

9            **THE COURT:**  And is that the kind of thing that ESI

10   has, or is that the kind of thing that Accredo has?

11           **MR. LoBIONDO:**  Well, Accredo is certainly the party

12   that is on the ground doing the actual rejecting.  But I don't

13   think it follows that ESI, therefore, doesn't have documents

14   about it, again, especially because they're going out to the

15   market and saying this is what this program does that we're

16   selling to you.

17           **THE COURT:**  Okay.  Let me hear from Ms. Ledden about

18   that.

19           **MS. LEDDEN:**  We discussed this this morning, Your

20   Honor.  We do not have documents responsive to this request.

21   We're not involved in the point of sale, in point-of-sale

22   rejections.

23           **THE COURT:**  Okay.  Well, it seems that it would be

24   relevant if they did, and so I'll grant the motion to compel,

25   and defense can respond to it that they have no documents if

1    that is correct.

2        Okay.  Number 13, marketing and promotional

3    materials related to SaveOnSP; I think that is, it seems to

4    me, manifestly relevant.  I know there's an "all" at the

5    beginning of the request, and so if there's some argument to

6    be made in very concrete terms that that is overbroad, I will

7    hear that argument by next Friday.  But barring that, I don't

8    think -- it seems to me it's tailored to the SaveOnSP program,

9    which is the, obviously the program that's in dispute, and so

10   I'm going to grant the motion to compel.

11        And the same -- for the same basis I'm going to

12   grant Number 14.

13        Number 15, Documents sufficient to identify every

14   health plan and employer that has contracted with Express

15   Scripts to participate during the time period.

16        Mr. LoBiondo, you seem to anticipate that I need you

17   to say something about that.

18        **MR. LoBIONDO:**  I think we can hold this one in

19   abeyance, Your Honor, because SaveOn has produced some of this

20   information.

21        **THE COURT:**  All right.

22        **MR. LoBIONDO:**  So hopefully we won't need to bother

23   ESI with it.

24        **THE COURT:**  Okay, let's hold that in abeyance.

25   Terrific.  More comments like that from anyone who wants to

 1    make them.

 2              Okay, Request No. 16, All documents concerning its

 3    inclusion or exclusion of specific drugs as essential health

 4    benefits pursuant to the Affordable Care Act, including the

 5    criteria for inclusion and exclusion.

 6              Now, this -- sorry, go ahead, Mr. LoBiondo.  Do you

 7    have something to say immediately about that?

 8              **MR. LoBIONDO:**  No.

 9              **THE COURT:**  Okay.  I understand that the Tennessee

10    Court found that this was most likely to reside with SaveOn.

11              Ms. Ledden, do you have anything to say in -- other

12    than that finding?

13              **MS. LEDDEN:**  No, we would concur with the judge's

14    finding, of course, regarding Requests 16, 17 and 18.

15              **THE COURT:**  Yeah, they were all related; correct?

16              **MS. LEDDEN:**  Yes.

17              **THE COURT:**  The Affordable Care Act information.

18    Why, I guess, Mr. LoBiondo, why do you think -- I know Accredo

19    and ESI are not the same thing, and I also know that I'm not

20    bound by the District Court of Tennessee, but why do you think

21    Express Scripts would have distinct unique information about

22    these things?

23              **MR. LoBIONDO:**  Sure.  So we don't have perfect

24    information, obviously, about --

25              **THE COURT:**  Sure.

1      **MR. LoBIONDO:** -- what ESI has and what ESI doesn't

2   have.  These requests really go to the core of how the program

3   works, so the way they are able to inflate the copay and take

4   extra money is by de-designating the drugs, even if they're

5   cancer drugs, as essential health benefits.

6      **THE COURT:**  Right.

7      **MR. LoBIONDO:**  So they believe this is a loophole in

8   the ACA that allows them to jack up the copay.  And so, you

9   know, we do not have good information exactly about where the

10  metes and bounds of what ESI does, when it stops and when

11  SaveOn begins.  If we have an attorney representation as of

12  today that ESI isn't really directly involved in these things

13  even though they are out in the market telling and educating

14  their clients about it, again, I think this falls into the

15  category of, if there are no documents, there are no

16  documents.  That's the end of that.

17     **THE COURT:**  Okay.

18     **MR. LoBIONDO:**  But this is, you know, these requests

19  go to core aspects of the program, and so --

20     **THE COURT:**  If the documents exist, you believe they

21  would be discoverable?

22     **MR. LoBIONDO:**  They're certainly discoverable and

23  relevant, Your Honor.

24     **THE COURT:**  Okay.  Let me ask, Ms. Ledden, are you

25  representing today that Express Scripts is not involved with

 1   this decision whether to include or exclude something as an

 2   essential health benefit?

 3           **MS. LEDDEN:**  That is correct, Your Honor.  We are

 4   not involved.

 5           **THE COURT:**  So Express Scripts does not have

 6   anything to do with that decisionmaking process?

 7           **MS. LEDDEN:**  We do not.

 8           **THE COURT:**  Okay.  All right.  Well, it sounds to

 9   me, if that, assuming that is the case and Plaintiff doesn't

10   have any reason to think it's not, then this information would

11   not be discoverable.  So if I were to compel it, the response

12   would be that there are no such documents; is that correct?

13           **MS. HELLMANN:**  Well, that's the issue, Your Honor.

14   Are we involved in de-designating the drugs?  No.  So do I

15   think there would be any documents?  No.  But as I've

16   represented today and counsel has referred to, there's a due

17   diligence.  So we can talk to our client, but what we don't

18   want to do is like, okay, let's start doing custodial e-mail

19   searches to see if maybe something if -- I mean, I can tell

20   you what our role is and based on that role why we would have

21   communications on this.  I'm representing the best I can

22   without having searched for all --

23           **THE COURT:**  Searched for all of it; I understand.

24   Okay.  And so, Mr. LoBiondo, that decision about

25   reclassifying, that's made at SaveOn, to the best of your

1    knowledge?  Do you know how that decision is made?

2            **MR. LoBIONDO:**  I believe that the decision is made

3    that there is a dialogue between SaveOn and the ESI clients,

4    and I believe that ESI, the account reps, are involved in

5    those discussions.  I don't think that anybody at ESI is

6    flipping a switch and changing a cancer drug from essential to

7    nonessential.  But the request is not that narrow; right?

8    It's documents concerning the program's inclusion or exclusion

9    of drugs, and ESI is a part of this program.  It gets some of

10   the money from the program; it introduces the clients.  It's

11   one of three participants, basically, in this program.

12           And so they are going to have, in my view, based on

13   my understanding of how the conversations flow, which is that

14   even after SaveOn implements the program as to a plan, ESI

15   doesn't disappear; right?  ESI, as they've said this morning,

16   they have account reps.  They have hundreds of account reps.

17   So my expectation would be that those account reps are part of

18   those communications.  If there are communications that SaveOn

19   is also on, we should have them from SaveOn.  So, again, we're

20   not asking for duplication.

21           **THE COURT:**  Right.  I think until you have some

22   evidence that there would be something there at ESI about this

23   reclassification process, so for example, if you do get

24   communications from SaveOn that go to ESI and you're wondering

25   sort of where ESI's responses came from because that makes a

1    difference to your case against SaveOn, then you can make a

2    more tailored request.  But I think for this moment I am in

3    agreement with the Court in Tennessee that the information

4    that goes to these three things, to the extent it reflects on

5    SaveOn's liability, which is the only defendant, would be in

6    the possession of SaveOn.

7            And so 16, 17 and 18 will be denied in their current

8    forms.  Again, I make no assumptions that I won't be hearing

9    again from either party as the discovery continues.

10           We are on 20 or did I skip 19?

11           **MS. LEDDEN:**  We're on 19, Your Honor.

12           **THE COURT:**  We're on 19.  All documents concerning

13   the reasons and basis for Express Scripts' representation that

14   it does not endorse the services or provide any guidance or

15   endorsement on the legal structure.

16           Okay.  What is the objection?  It seems pretty

17   specific.  What is the objection from, Ms. Ledden, from

18   Express Scripts?

19           **MS. LEDDEN:**  There are kind of three here or there

20   are three specifically, Your Honor.  One, this is traditional

21   contract language, you know, pointing to a contract that

22   doesn't have something similar in, you know, a business

23   relationship, one.

24           **THE COURT:**  Okay.

25           **MS. LEDDEN:**  Two, any communications behind the

1    decision of Express Scripts to include this language, likely

2    attorney-client privileged, and also, as we've discussed

3    previously on multiple occasions, our internal discussions

4    regarding our impressions aren't relevant to the underlying

5    litigation.

6              **THE COURT:**  Okay.  Yes, Mr. LoBiondo?

7              **MR. LoBIONDO:**  Very briefly, Your Honor.  I don't

8    think -- I don't think this is boilerplate.  I think it's

9    pretty specific.  They are out pitching the program.  They're

10   making money from the program, but they're saying to their

11   clients, Don't come after us if it turns out this program is

12   illegal.  So I don't know there's any evidence that this is

13   just something they slap on the bottom of every contract.

14   It's not just in the contract; right?  It's in the marketing

15   materials.

16              The other point I would make, is, again, obviously

17   if there's privileged materials, under discovery rules they

18   should have to log those, but we don't want their lawyers'

19   documents.  However, if they are talking to or about

20   communications with SaveOn or Accredo, right, those

21   communications might not be privileged because they would have

22   parties who are outside the privilege on them.

23              So we're not seeking duplicative information; we're

24   not seeking privileged information.  But this is, you know,

25   this is a pretty red flag as far as we're concerned about the

1    legality of the program and about whether or not it's

2    probative to whether the program is violating the law, and so

3    we think it's pretty squarely relevant.

4         **THE COURT:**  Yeah, I'm going to grant this.  Of

5    course, if there's privilege justifications for not producing

6    something, then the parties can deal with that the way

7    privilege documents are dealt with.  I think it's likely to

8    produce responsive and relevant documents regarding the

9    functioning of the scheme, and to the extent those things are

10   not admissible because they don't ultimately reflect on the

11   actual defendant in the case's liability, that's an issue that

12   I'm going to let the parties dispute in New Jersey and let

13   that judge worry about it.

14        Okay.  But as far as discoverability, I think it's a

15   tailored enough response and it's relevant enough to the

16   issues in the case that it should be produced.

17        The documents concerning the inflated copay or

18   increase to SaveOnSP's patients' copay or out-of-pocket

19   obligations, the Tennessee judge thought that this was most

20   likely to be in SaveOn's possession.

21        Why should I come to a different conclusion,

22   Mr. LoBiondo?

23        **MR. LoBIONDO:**  So, Your Honor, I think these are

24   very similar to the requests we spoke about a moment ago.

25   These are quotes from the ESI presentation.  So, you know, we

 1    think they're talking about it; they probably have internal

 2    communications about it.  But I understand, you know, Your

 3    Honor made a ruling that you are not going to compel some of

 4    the other aspects of the presentation, so I don't think that

 5    these are -- I'm not going to say that these are different in

 6    kind from the other ones.  These are other quotes from them

 7    about how the scheme works.

 8             **THE COURT:**  Okay.  The inflated copay, can you tell

 9    me the context of that quote.

10             **MR. LoBIONDO:**  Sure.  So in the presentation from

11    Ms. Harmon -- and again, that's the only presentation we've

12    seen, but she is explaining to the clients that the way they

13    make more money is by inflating the copay.  So she's

14    explaining the whole operation of the program and why they do

15    it the way they do and how they pick drugs because they're

16    going after the drugs that have the most money behind them,

17    basically, so that they can take the most amount of money.  So

18    inflated copay, that is ESI describing how the program

19    operates.

20             And savings in 21, you know, from our perspective

21    that's a little bit Orwellian because the savings that they're

22    talking about is the money that they've taken from us.  But it

23    is on a basic level money that their plans are not having to

24    pay for our drugs because they are getting the money from us

25    through what we think is subterfuge.  So those are quotes from

1    them about how the program works.  I don't know if that

2    answers your question.

3              THE COURT:  No, it does.  And it's someone at

4    Express Scripts who said it, so it's a little bit more, I

5    assume, to that extent a little bit more salient to your

6    request here.

7              MR. LoBIONDO:  Yes.

8              THE COURT:  Your request here has some more legs

9    than the one to Accredo; right?

10             MR. LoBIONDO:  Yes, absolutely.

11             THE COURT:  I understand that.  Let me hear from

12    Ms. Ledden why I shouldn't grant it because insofar as it is

13    an Express Scripts statement or statement by someone at

14    Express Scripts.

15             MS. LEDDEN:  I mean, our position would be similar

16    here as it was to the prior three at issue.  Again, our

17    internal thoughts are not relevant to the underlying case

18    here.

19             THE COURT:  You're already producing Ms. Hellmann's

20    documents; correct?

21             MS. LEDDEN:  Ms. Harmon's, yes.

22             THE COURT:  Sorry, Ms. Harmon's.  I apologize.

23             MS. LEDDEN:  That's okay.  Lots of Hs.

24             THE COURT:  It would be a lot easier if they were

25    the same person and we had Ms. Harmon here.  You're going to

1    produce Ms. Harmon's documents related to that presentation,

2    so I think that insofar as you're already going to be

3    receiving documents related to the construction of that

4    presentation, I'm going to deny that one.

5           Moving to documents concerning the amount of

6    savings, that's the same basis and the same denial, and I

7    think that's the same for 22 as well.  These all kind of hang

8    or fall together; correct?

9           **MR. LoBIONDO:**  So 22 is a little bit different.

10   This is -- the joinder agreement referenced there is the

11   agreement I mentioned a minute ago about how once a plan has

12   agreed to sign up for the SaveOn program they sign this

13   joinder agreement.

14          **THE COURT:**  Okay.

15          **MR. LoBIONDO:**  And so this is, this is sort of more

16   in the contract's bucket.

17          **THE COURT:**  Okay.  But these are between health

18   plans and SaveOn; right?

19          **MR. LoBIONDO:**  Yes.

20          **THE COURT:**  But they allow Express Scripts to bill

21   for the fee in the administrative invoice; correct?

22          **MR. LoBIONDO:**  Yes.  So it's really kind of a

23   tripartite; ESI, SaveOn.  The joining that's happening is that

24   this health plan is joining the SaveOn --

25          **THE COURT:**  SaveOn.  But ESI, you're saying, is a

1    party to each of these agreements or it's implicated by the

2    agreements?

3            **MR. LoBIONDO:**  My understanding of how it works is

4    that the plans are joining the ESI, ESI/SaveOn agreement, so

5    they are a party.  ESI is a party.  Certainly implicated but a

6    party.

7            **THE COURT:**  Okay.  And so to the extent that I

8    allowed discovery related to the other agreements, you think

9    it's of a piece with that?

10           **MR. LoBIONDO:**  Yes.

11           **THE COURT:**  Okay.  Ms. Ledden, why is it not of a

12   piece with that?

13           **MS. HELLMANN:**  Your Honor, it's Ms. Hellmann again.

14   Sorry.

15           **THE COURT:**  Sorry, I didn't mean to make

16   assumptions.

17           **MS. HELLMANN:**  No, no, we represented that.  So the

18   agreement that he's talking about where the health plan then

19   kind of becomes a scion, that agreement, right, doesn't -- we

20   still have that master agreement which we're already giving.

21           **THE COURT:**  Right.

22           **MS. HELLMANN:**  So this request as it reads, again

23   with the all documents, you know, any communication, any,

24   between Express Scripts and all of its clients --

25           **THE COURT:**  Yeah, I was going to say, is that all

1  health plans?

2          **MS. HELLMANN:**  Yes.

3          **THE COURT:**  That's a number of plans; correct?

4          **MS. HELLMANN:**  It is.  It is hundreds, if not

5  thousands, right, to say, okay, now you're part of the SaveOn,

6  so now you're part of that agreement.  I mean, those back and

7  forths, that's encompassed in this.  I mean, it is -- and I

8  know we can make the burden argument, but kind of going back

9  to one of the very early requests, all the communications

10  with, you know, entities; that's every one of our health plan

11  clients on the SaveOn program which is a product we offer

12  everybody.

13          You know, so it's, it is -- I mean, again, to search

14  for it, but just the vast amount that we're talking about,

15  this is not a separate three-party agreement; right?  It's if

16  you're part of this program, then you realize some of these

17  savings.

18          **THE COURT:**  Right.  Let me ask --

19          **MS. HELLMANN:**  That's how it works.

20          **THE COURT:**  So it's the same agreement that all of

21  these clients are signing though; correct?

22          **MS. HELLMANN:**  Correct.  It's the program that's

23  offered to the client.

24          **THE COURT:**  It's the program that's offered to the

25  clients, but then they have to enter into this 25 percent

1   joinder agreement as part of it?

2         **MS. HELLMANN:** I actually don't know that they

3   actually enter into a separate agreement; more of like, yes,

4   Express Scripts, this service, this product that you offer

5   like we offer any product to clients, we will take that and

6   then we accept it. I honestly don't know because this is the

7   first time I kind of heard that this, like, they actually sign

8   on to that agreement, like a signatory to that master

9   agreement. That in, all honesty, I am just not sure about.

10        **THE COURT:** Okay. Mr. LoBiondo, what can you tell

11   me about, what is the actual thing here that you're looking

12   for? Are you looking for the negotiation of the terms of like

13   a template that was then used thousands of times and you just

14   want what's going to the template, or are you asking for

15   something you don't even know exactly what you're asking for?

16   What's the situation here?

17        **MR. LoBIONDO:** Well, yeah, so there probably is a

18   template, but the 25 percent refers to the fee, the cut that

19   SaveOn and ESI take of our money before passing the rest of it

20   on to the plans.

21        **THE COURT:** Right.

22        **MR. LoBIONDO:** So we don't know if, you know, in

23   most cases our understanding is that it's 25 percent, but we

24   don't know whether there's negotiations, and I believe for

25   some large clients they actually do have negotiations of

1    slightly different rates.  It's like a volume discount; right?

2    So a particularly big plan might say to ESI, you know, we're

3    interested in this, but we're not going to let you keep

4    25 percent of it.  We want you to keep 20 percent of it or

5    15 percent of it.  So those conversations are happening.

6           And just to be clear, it's not all of ESI's clients

7    that this implicates.  It's the clients that they have signed

8    up for, this plan that we allege is injuring us.  So it's, you

9    know, they cover a hundred million lines, is my understanding.

10   It's certainly -- that's not what we're talking about, the

11   universe.  It is apparently hundreds or thousands of plans,

12   which is, you know, goes to the gravamen of the harm, but it's

13   not every ESI plan because not every ESI plan or even a

14   majority or even, you know, anything like a substantial

15   minority of the plans, as far as I know, have signed up for

16   SaveOn.  So it's a subset.  And that is a burden argument,

17   which is, again, something we could have talked about in

18   January, February, March.

19           **THE COURT:**  Okay.  And so what you want to know is

20   about the negotiation of that cut, the cut that ESI and -- I'm

21   assuming here his version of the facts; I'm not finding any

22   facts, just so you know.  But the -- you're interested in

23   knowing about how that percentage is negotiated?

24           **MR. LoBIONDO:**  Yes.

25           **THE COURT:**  Is that it?

1          **MR. LoBIONDO:**  Yes.

2          **THE COURT:**  And have you gotten information from

3     SaveOn about that?  Have they had to produce documents related

4     to that?

5          **MR. LoBIONDO:**  We have, to the extent SaveOn is a

6     part of those discussions, we have documents from SaveOn.  To

7     the extent there is negotiations between ESI and its clients

8     that SaveOn is not a part of or is not yet a part of or

9     there's side negotiations, we don't have those.  Anything that

10    SaveOn doesn't have visibility into, we don't have.

11         **THE COURT:**  And is it your impression that that's a

12    significant universe of things?

13         **MR. LoBIONDO:**  My impression is that sometimes ESI

14    account reps forward things to SaveOn and say, What about

15    this, what about that, and sometimes they don't; right?

16    Because at the end of the day these are ESI's clients, so we

17    have kind of half of the picture.  We see things that in the

18    e-mails that ESI people choose to kind of escalate to SaveOn,

19    but SaveOn is not part of the ESI, CIGNA family of companies;

20    right?

21              And so there may well be proprietary conversations

22    that SaveOn is not a part of or there are only, you know,

23    SaveOn is only part of half of the conversation but not the

24    whole thing because they are on some level at arm's length

25    with ESI, even though there's unity of interest in some

1    respects.

2            So the short answer is we don't really know what ESI

3    is talking about back and forth with their clients.  To the

4    extent ESI is then bringing SaveOn into the discussion, we

5    have those from SaveOn, and we don't need them from ESI.  But

6    sitting here now, I don't know that that's happening -- I

7    certainly don't think it's happening all the time.  I don't

8    even know that it's happening most of the time.  And the party

9    that would be in the best position to answer those

10   questions --

11           **THE COURT:**  Is ESI.

12           **MR. LoBIONDO:**  -- would have been ESI doing an

13   inquiry sort of before this morning.

14           **THE COURT:**  Okay.  Let me ask, is this information,

15   how much the percentage that these, that SaveOn is keeping --

16   because SaveOn is the defendant again, let's not forget -- the

17   percentage that SaveOn is keeping as to each of these

18   individual clients or plans that are signing up, does that go

19   to just liability, or does that go to damages as well?

20           **MR. LoBIONDO:**  It certainly goes to liability.

21   Sitting here right this moment, the damage is the same.

22           **THE COURT:**  No matter what percentage of it that

23   SaveOn keeps; right?  I'm trying to wrap my head around how

24   this works.

25           **MR. LoBIONDO:**  Right, so if they -- and I haven't

1    given this more than the thought that I'm just saying it in

2    realtime, but if they take $1000 of our money from a fill or

3    more likely $10,000, whether or not, how they split that up is

4    a liability question.  I'm not sure that it is a damages

5    question.  I would have to go back to the damages experts and

6    ask that.  Because at the end of the day it's $1000 out of our

7    pockets that we shouldn't have paid.  So --

8                **THE COURT:**  So this -- okay.

9                **MS. HELLMANN:**  Your Honor, may I respond briefly?

10               **THE COURT:**  Yes, you may.

11               **MS. HELLMANN:**  The last question you asked is one of

12   the first questions -- one of the first points I was going to

13   bring up, is if this is about, SaveOn, should you have done

14   this program and how much Johnson & Johnson has been damaged,

15   let's just say there are different cuts between SaveOn, health

16   plan and Express Scripts.  I definitely don't think it goes to

17   damages.  I'm not even sure liability, whether SaveOn -- I

18   mean, they're saying SaveOn shouldn't be doing this at all, so

19   whether it's a 10 percent cut or a 15 percent cut.  So I don't

20   think it's relevant.

21               But second of all, what I've heard is we think maybe

22   there might be different cuts, but we're not sure, and maybe

23   Express Scripts doesn't forward things on.  I mean, we are not

24   a party to this.  This -- I mean, this is a fishing

25   expedition, you know, and we think this might happen, but we

1    don't know, so you, Express Scripts, go start pulling e-mails

2    from hundreds and thousands of account team people to see if

3    maybe there's something there.

4            I mean, if there was an e-mail between that they've

5    received of like, huh, that's odd because we would expect a

6    response to this, Express Scripts, then we have a client to go

7    look for, we have an account team to go look for; we actually

8    have a target that we can look for.  But this like, well, we

9    think that probably you didn't always forward it on, is based

10   on nothing but speculation.

11           **THE COURT:**  Well, it's not speculation that whenever

12   someone signed up for SaveOn, Express Scripts and that plan

13   had, if not a full-on negotiation, but they came to terms in

14   some way; right?

15           **MS. HELLMANN:**  I mean, yes, but what I haven't heard

16   is is there any -- that the term is different for big plans or

17   little plans or there's a negotiation.  Again, we offer

18   products, you know, and that tends to be what we do.  Now, I

19   mean, certainly big plans have more leverage, the Blues versus

20   these small employer group, right, has more leverage.

21           **THE COURT:**  Right.

22           **MS. HELLMANN:**  So everything about Express Scripts'

23   relationship with them is different; right?  We give bigger

24   discounts.  We give higher rebates.  I mean, you can talk

25   through all the nuances of that.  But I haven't heard that

1    like because it's a big plan that's going to be different, or

2    even if it is different, why that's relevant to that piece of

3    litigation.

4            **THE COURT:**  Okay.  Do you -- okay.  To the extent

5    there's communications between Express Scripts and SaveOn on

6    this, then SaveOn would have had to produce it; correct?

7            **MR. LoBIONDO:**  They should have, yes.

8            **THE COURT:**  So it's not a question of collusion

9    between those two parties; at least this discovery request is

10   not aimed at that.  What you are trying to find out is what

11   the terms of these various agreements were with the ultimate

12   client of the SaveOn program; correct?

13           **MR. LoBIONDO:**  ESI in this capacity is kind of the

14   matchmaker; right?  ESI is sitting in the middle.

15           **THE COURT:**  Okay.  And why does it matter what those

16   terms were?

17           **MR. LoBIONDO:**  Well --

18           **THE COURT:**  If you know that there was a term, there

19   was some kind of term where the pie was sliced up, why does it

20   matter what those terms were?

21           **MR. LoBIONDO:**  So this potentially goes to SaveOn's

22   defenses in the litigation, right, because SaveOn is -- one of

23   their defenses is, oh, this program is actually great for

24   patients.  It's actually great for plans.  We're saving plans

25   all of this money, and so, you know, the difference between 25

1    and 26 percent, maybe not all that relevant, but if there is

2    real variability in the terms of the different plans we're

3    getting, at a certain point it gives the lie to any defense by

4    SaveOnSP that like we're doing this to bail out the plans if

5    actually most of the money or a big chunk of the money is not

6    going to the plans at all; it's going to SaveOn and ESI.

7          **THE COURT:**  So you don't -- do you have any other

8    source of information about how this pie is sliced up?

9          **MR. LoBIONDO:**  Other than the contracts and the

10   e-mails that SaveOn has produced, we don't, and I would also

11   just say, you know, we have to this point not gone out and

12   subpoenaed ESI's health plan clients.  I assume that they

13   don't want us to do that, but ESI is, again, the person, the

14   entity that's sitting in the middle of all this, so we

15   wouldn't be burdening the small employer plans that are caught

16   up in all of this.

17          And I don't want to belabor this point because I

18   think Your Honor understands it, but the idea, you know, it's

19   true they are not a party to the New Jersey litigation, but

20   neither are they somebody that we just pulled in off the

21   street; right?  They are, they are profiting from the conduct.

22   They are getting our money, and I think, you know, this is not

23   just attorney argument; right?  We've put in the exhibits that

24   show to Your Honor that they work with SaveOn to inflate this

25   copay.  They take that money, and then the 25 percent they

1  split between ESI and SaveOn itself.  So, you know, I just --

2      **THE COURT:**  That's generally the sense of how it

3  works.

4      **MR. LoBIONDO:**  That's the general, yes.

5      **THE COURT:**  But you're saying you don't know how it

6  works as to each specific client; right?  Because it may be

7  that they negotiated a different percentage of that money?

8      **MR. LoBIONDO:**  We -- the final contracts we should

9  have from SaveOn.

10     **THE COURT:**  With each of the plans?

11     **MR. LoBIONDO:**  With each of the plans or they should

12  be producing them if they haven't yet.

13     **THE COURT:**  Okay.

14     **MR. LoBIONDO:**  So this is a request for

15  communications about the plans, drafts of the plans, because

16  it's very possible that those communications and those drafts

17  would be going back and forth between ESI and its client

18  without SaveOn.  We don't know.  But --

19     **THE COURT:**  Okay.  I'm going to -- I'm going to deny

20  it then because I was with you when I thought you needed the

21  percentages to determine -- to counter this argument that it

22  is somehow benefiting the plan, but if you have the

23  percentages from somewhere else, specifically those contracts

24  or information from SaveOn, then I'm not going to require

25  this, this defendant in this case to produce internal

1    communications about it.

2         If, of course, you find out you can't get that

3    information that I agree sounds like you would benefit from

4    and goes to specifically exactly how these things are working,

5    if you don't have transparency into how the plan is working

6    and this is the only way to get it, we can have a

7    conversation.  But it seems to me that you have transparency

8    into the numbers or you should from what SaveOn is producing,

9    and so in that event I'm going to agree with the burden

10   argument and the relevance argument until I find out that you

11   can't get what you need.  Is that clear enough?  Clear as mud?

12   Denying 22; right?

13         **MR. LoBIONDO:**  Yes, Your Honor.  Thank you.

14         **THE COURT:**  23, Documents concerning communications

15   Express Scripts has received, complaints, concerns or

16   inquiries.  Okay, I understand there's ongoing briefing in

17   Tennessee about this, something filed yesterday about the

18   practicalities of finding this information at Accredo,

19   Accredo; I don't know how to say it.  But I assume you're not

20   just using Accredo's databases, right, so I can't just import

21   those arguments here.  Why would this not be something that is

22   relevant to how this plan is functioning and exclusively in

23   the custody of Express Scripts?

24         **MS. LEDDEN:**  We wouldn't argue that, Your Honor.  We

25   would just argue that we're unable to produce it, that there's

```
 1    an extreme burden here.

 2           THE COURT:  Okay.

 3           MS. LEDDEN:  As you probably saw in the Accredo

 4    briefing, they're lucky enough to be able to use some search

 5    terms.  We don't have the benefit of that.  There isn't a

 6    centralized database for patient complaints, to the extent

 7    they exist.  Again, you know, the focus here is on client

 8    interaction, so client, client complaints, client inquiries,

 9    etc.  As we previously discussed, those would come in to the

10    account managers, would be spread across the board, etc.

11           Ultimately I think what's relevant to Your Honor is

12    that any complaints that would be relevant to this action

13    would be sent up to SaveOn and potentially Accredo.  They have

14    their separate burden argument, but those would be the two

15    entities that would receive any information if it had anything

16    to do with the plan design.

17           As you can imagine and as indicated in Accredo,

18    again, separate entity, pharmacy, so many of the kind of

19    inquiries we get, to the extent we get any, again, queries

20    from patients, are really more escalations.  Why didn't I get

21    my medicine?  And then we send it on to Accredo.  This isn't

22    working for me.  I, for some reason, can't sign up.  We send

23    them on to SaveOn, etc., that kind of thing.

24           Again, this is like looking for a needle in a

25    haystack.  We just don't get very -- again, we're a PBM.  Our
```

1  relationships are with clients.

2          **THE COURT:**  Okay.  Mr. LoBiondo?

3          **MR. LoBIONDO:**  So, Your Honor, to me this is a

4  little bit of ESI trying to have it both ways; right?  They

5  sell the program to their clients, and then what I'm hearing

6  is that if the clients -- you know, these clients are plan

7  sponsors; right?  So they're employers.  If a human resources

8  professional at the employer then connects with the account

9  rep at ESI and says, We're having all of these difficulties,

10  or We're having this problem, or It's not working like you

11  said it would work, their position is, We shouldn't have to

12  produce that because it would be like finding a needle in a

13  haystack.

14          They have the relationship with the plans.  That is

15  sort of -- that is one of the value-adds ESI is bringing to

16  this scheme; right?  They are introducing the plans to the

17  SaveOn program, and they still have a customer relationship

18  with the plans.  And so patients' complaints often are going

19  through the plans, and so they should be going to ESI that

20  way.

21          And, you know, if ESI is getting complaints,

22  concerns or inquiries from governmental agencies about SaveOn,

23  I find it a little bit hard to believe that they just wouldn't

24  even know where to look for those.  I mean, regulatory

25  inquiries about this program, congressional inquiries, state

1   AGs, there's been a lot of activity in that area.

2          So one of the requests we're asking for here is

3   complaints, concerns and inquiries from not just patients,

4   right, but also patient advocacy groups, their own

5   customers -- plan sponsors -- and governmental agencies.

6          So, again, what we're hearing is a burden argument

7   that is different than the arguments we briefed up, and that's

8   fine, but you know, if patients are complaining to ESI that

9   they're not getting their medicine or that the plan -- that

10  SaveOn is not working as they were promised by ESI, that's

11  relevant, and that's obviously relevant to patient harm.

12         **THE COURT:**  Okay.  I think it is relevant and -- to

13  the issues in the underlying lawsuit.  That's not to say there

14  isn't some kind of burden argument that can be made, but I

15  think it would need to be first discussed between the parties

16  about whether this can be reasonably narrowed to a point where

17  you can produce enough information to satisfy Plaintiffs

18  without unduly burdening your client.

19         But after that if you cannot agree on the scope of

20  the universe of information that is going to be produced, I

21  will take it up then.  I'm not going to right now

22  hypothetically try to carve up this, you know, request, but it

23  seems to me that the information expressed to Express Scripts

24  about the functioning of the SaveOn program described as

25  Request No. 23 generally does seem to be discoverable.

1          So I'm going to grant the motion to compel and

2     hopefully that there can be a discussion between the parties

3     now about exactly what form that production will take, and

4     hopefully Plaintiff will be reasonable in what they expect

5     Defendant to do in response to that request such that we never

6     have to discuss it again.  But if that doesn't happen, then

7     you can file something by next Friday.

8          Okay.  Documents sufficient to identify Express

9     Scripts' patients who are participating in SaveOn, when they

10    signed on to the program, if when they discontinued their

11    participation in the program, and information on how these

12    patients can be identified in the transaction claims data

13    produced hopefully aspirationally in response to Request

14    Nos. 26, 27.

15         Why would that not be relevant information?  I'm

16    going to start with Express Scripts.

17         **MS. LEDDEN:**  To be honest, Your Honor, we're not

18    entirely sure what they want.

19         **THE COURT:**  Okay.  So have you --

20         **MS. LEDDEN:**  So we're in that situation, and then,

21    additionally, any information regarding SaveOn patients

22    specifically they've already received and they're in the

23    middle of negotiating with Accredo, the pharmacy, a

24    significant portion of any data that we would have would come

25    directly from Accredo.

1           And so at this point I think it's best we keep this

2    in abeyance, honestly, until they sort things out with Accredo

3    and then can properly identify things that may be uniquely in

4    our possession that we could provide them.

5           **THE COURT:**  Is Accredo, do they manage all of your

6    clients who are involved in SaveOn?  Is that, they exclusively

7    process?

8           **MS. HELLMANN:**  Yes, it was raised today on the call

9    because it's always been our understanding they mentioned,

10   they said, no, there's other pharmacies that do the SaveOn

11   program.  That was -- I'm not sure where that came from.  That

12   was news to us.  We since have been actually trying to confirm

13   with the client that in fact our understanding is correct that

14   it's only Accredo that is the pharmacy for this program.

15          **THE COURT:**  Okay.

16          **MS. HELLMANN:**  And so I don't know if they have more

17   information as to what made them think it's Accredo plus other

18   pharmacies because when it was raised this morning, it was --

19   it's not been raised before.

20          **THE COURT:**  Okay.

21          **MS. HELLMANN:**  Again, so that's why this

22   information --

23          **THE COURT:**  Could all be coming from Accredo?

24          **MS. HELLMANN:**  Yes.

25          **THE COURT:**  If Accredo is the only pharmacy that's

1    processing.

2              Okay, Mr. LoBiondo?

3              **MR. LoBIONDO:**  Your Honor, it's always very

4    interesting to hear them say we don't know what they're asking

5    for here when this is a subpoena they've had since January.

6              But, you know, what I'll say is I do think in

7    fairness to them, it says, Transactional claims data produced

8    in response to these other requests.  I think that's

9    misnumbered because the data requests are later in our

10   requests.  I think it's 28, 29 and 30.

11             And what I'll say is this, and this is going to

12   collapse a little bit into the discussion of the data.  Again,

13   we don't have perfect visibility into how the data is split up

14   between ESI and Accredo.  We do think that -- I agree with

15   counsel that most of the data, most, if not all, of the data

16   relating to transactions with patients that were affected by

17   the SaveOnSP program should have gone through Accredo, which

18   is not to say that ESI does not have any relevant data.

19             A, we don't know what the Tennessee judge is going

20   to do, whether he's going to require Accredo to produce data.

21   We don't have good information about, you know, which data

22   lives at which entity.

23             But this request, you know, how patients can be

24   identified in the transaction and claims data, basically what

25   we're asking for here -- and this is another documents

 1  sufficient; it's not all documents -- we want to make sure

 2  that whichever one of their entities produces the data, we can

 3  figure out what it means, right, and figure out who the

 4  patients are and match it up with other data that we have on

 5  our CarePath program because it doesn't do us any good to have

 6  data that does not line up with what SaveOn produced.  We need

 7  to be able to make use of everything.

 8          So I agree with counsel that we don't need a list of

 9  patients who are participating in the program because we have

10  gotten that from SaveOnSP.

11          **THE COURT:**  Okay.

12          **MR. LoBIONDO:**  But to the extent the data, if they

13  are compelled to produce data --

14          **THE COURT:**  Right.

15          **MR. LoBIONDO:**  -- we need to have information from

16  them on how to link up that data with -- how to link up the

17  patients across the data sets.

18          **THE COURT:**  Okay.

19          **MR. LoBIONDO:**  And so that's what this request --

20  you know, there's other things here, and they will either tell

21  us or they should have told us already whether this stuff is

22  kept in the ordinary course of their business, but we think

23  they have a lot of data.

24          **THE COURT:**  Right.

25          **MR. LoBIONDO:**  So this is a request that's just

1  trying to make sure that data is usable.

2          **THE COURT:**  Okay.  Okay, I'm trying to understand

3  now because it's related to the other requests, and you said

4  you have some of it already.  So you have Express Scripts'

5  patients who are participating in the SaveOnSP program, you

6  have a list of those people; yes?

7          **MR. LoBIONDO:**  Correct.

8          **THE COURT:**  Do you have the information about when

9  they signed up, discontinuation information about how they can

10  be -- so the last part is about how to identify them and any

11 other data; correct?

12         **MR. LoBIONDO:**  That's right.  And with the data that

13 SaveOn has produced, we have not been able to identify

14 specific patients in that data.  So it's an incomplete data

15 set, and it's also -- it doesn't have the identifying

16 information we need.

17         **THE COURT:**  SaveOn's data?

18         **MR. LoBIONDO:**  The data that SaveOn has produced to

19 us, correct.

20         **THE COURT:**  Have you asked SaveOn to link up the

21 data with the list?

22         **MR. LoBIONDO:**  Yes.  We asked them for more

23 categories of data, and they said to us -- and this, now I'm

24 reading from a letter that they sent us -- SaveOn will produce

25 the requested data within its possession, custody and control.

1   The vast majority of this data comes to SaveOn from ESI.

2          **THE COURT:**  Okay.  And are you -- how sure are you

3   that they're going to produce anything else?  Have they made

4   it clear that they have other things they're going to give

5   you, or are they now telling you to go ask Express Scripts?

6          **MR. LoBIONDO:**  Our understanding is that they have

7   given us or are giving us what they have visibility into, and

8   it is not the full universe of what we need.  And, in fact, on

9   a meet-and-confer the other day, they were telling us that

10  they need more data because they can't -- you know, they were

11  saying for their damages defense they need information about

12  transactions that happened after the CarePath assistance has

13  been extended.

14         So this is all transaction-level claims data that

15  either ESI or Accredo has.  Some of it Accredo definitely does

16  not have, the transactions that don't go through Accredo, but

17  with respect to the SaveOn program-affected patients, it's

18  either Accredo or ESI, and we don't know.  I assume they know.

19  And if we get it all from Accredo, that would be great, but we

20  don't know if we're going to.  And even if we got everything

21  we asked for from Accredo, we would still need some stuff from

22  ESI.

23         **THE COURT:**  Okay.

24         **MR. LoBIONDO:**  I realize that is -- I have gone

25  beyond the bounds just of 24, but I think it is --

```
 1            THE COURT:  This is 24 and 28 through 30

 2  essentially; correct?

 3            MR. LoBIONDO:  It is all related, yes.

 4            THE COURT:  Okay.  Yes, Ms. Hellmann?

 5            MS. HELLMANN:  I mean, a couple of things.  One --

 6  and maybe I just misheard him.  The letter he read, I think he

 7  read -- I have too many plans in my head.  SaveOn said all the

 8  data we have we get from Express Scripts, so presumably they

 9  have that data, whatever data they were referring to.

10            THE COURT:  Yeah.  I think they said most of this

11  comes from Express Scripts.  Is that what you're saying?

12            MR. LoBIONDO:  Yeah, so ESI gives SaveOn some of the

13  data we need but not all of it.

14            MS. HELLMANN:  And so I guess -- and maybe we can

15  short-circuit this a little bit.  Accredo is the pharmacy that

16  adjudicates the scripts, so all this information comes into

17  Accredo.  As the PBM, that data then comes to Express Scripts;

18  okay?  But whether a patient is enrolled or not enrolled,

19  remember, we are not -- we, Express Scripts, are not enrolling

20  patients.  We have clients.

21            So maybe a member doesn't -- is not enrolled anymore

22  because he or she doesn't have that health insurance anymore;

23  right?  That is not information that's in Express Scripts'

24  data; right?  We -- any prescription that we adjudicate,

25  whether that be for Walgreen's or Accredo, we have that data,
```

1  but what I'm hearing here is, And even if we don't -- even if

2  we get everything from Accredo, we still need stuff from

3  Express Scripts.

4          And my question is, tell us what that is.  What

5  field of data does not reside in Accredo, right, when they're

6  kind of going through all this briefing with the Court, that

7  you need from Express Scripts.  We are talking about massive

8  amounts of data.  It is not a couple clicks and run a report.

9  It is -- I don't want to speculate -- hours, hours and hours

10  of people's time to pull this data.

11          **THE COURT:**  Okay, but Accredo is not producing it,

12  right, yet?

13          **MS. HELLMANN:**  Yeah, I think that's what the

14  briefing is --

15          **THE COURT:**  Is about, whether or not they're going

16  to produce it?

17          **MS. HELLMANN:**  Right, and what extent they're going

18  to produce.

19          **MS. LEDDEN:**  The judge there was concerned about the

20  extreme burden on the party and then wanted some more

21  information from J&J regarding the additional relevance of

22  material outside.

23          **THE COURT:**  Okay, yes, but it's currently being

24  briefed; right, Mr. LoBiondo?

25          **MR. LoBIONDO:**  It is.

1          **THE COURT:**  So I think maybe that it's correct that

2    this should be held in abeyance, especially as far as he's

3    moved the ball farther than I have, and many of the issues

4    about burden I would think would overlap to some extent, or

5    they would be mooted, if Accredo doesn't produce it or if

6    Accredo does produce it and you have no need for it from

7    Express Scripts, then we don't have to have this conversation.

8    And that's my favorite solution.  So maybe we should hold off

9    on 24 and 28 through 30 until we hear or until the Tennessee

10   Court has a chance to consider the arguments there.

11          Is that -- Mr. LoBiondo, how would that handicap

12   you?

13          **MR. LoBIONDO:**  I think in broad strokes that's fine

14   so long as, you know, to state the obvious, we don't agree

15   that it's burdensome to provide data; right?  This is what

16   they do.  This is what Accredo and ESI does.  ESI is a

17   $100 billion company.  So this is not like -- we're not asking

18   them to run searches through e-mails; right?  It's data.  It's

19   collected and stored in centrally stored places.  It's -- you

20   know, there's no privileged information in there.  It doesn't

21   have to be reviewed by attorneys.

22          So the burden argument, I think, is specious, but

23   if, if Accredo is directed to produce the data that Accredo

24   has, then we don't need that data from ESI.  We don't know

25   whether that's going to happen, and I am a little bit

 1   concerned about running out of time.

 2             **THE COURT:**  Time, yes.

 3             **MR. LoBIONDO:**  So my preference would be to handle

 4   this the way we've handled some of the other requests, which

 5   is granting it, and then if it turns out we're getting it from

 6   Accredo, we don't need it from ESI.  We will not seek to

 7   enforce that.

 8             But also, I don't want to lose sight of at least

 9   request 29 which I think does cover data that Accredo is

10   likely not to have for the reasons that I talked about a

11   little bit at the beginning, which is Accredo only has,

12   obviously -- I guess it's a truism -- they only have data for

13   transactions that have gone through Accredo.

14             But ESI has plenty of plans who -- where patients

15   are taking Janssen drugs, my understanding is, that are not

16   obligated to go through Accredo.  So these are patients that

17   are not affected by SaveOn.  And this goes to kind of the

18   baseline figuring out what our damages are.

19             **THE COURT:**  I see.

20             **MR. LoBIONDO:**  And so, you know, Accredo will have a

21   subset of 29, but it will not have all of 29.

22             **THE COURT:**  I see, because it will not have the

23   information on the non-SaveOn patients who are taking Janssen

24   therapies?

25             **MR. LoBIONDO:**  It will presumably have some

1     non-SaveOn patients but not -- I don't know how many.  Because

2     it could be that some of these clients already, even though

3     SaveOn never came into the picture, they were already using

4     Accredo, but other plans are not.  Other plans let patients

5     get their drugs from a normal pharmacy.

6              **THE COURT:**  Right, okay.  And what you're asking for

7     in 29 is information about everyone who has taken these

8     particular Janssen drugs; yes?  Whether or not --

9              **MR. LoBIONDO:**  It's the transactions, right, so it's

10    telling us these people over here who were on the SaveOn

11    program, they were charged this.  We were charged that.  And

12    then, on the other hand, patients who never got swept up in

13    the SaveOn scheme --

14             **THE COURT:**  Were charged this and they paid that.

15             **MR. LoBIONDO:**  -- something different and we were

16    charged something different, yes.

17             **THE COURT:**  And that is for the calculation of

18    damages?

19             **MR. LoBIONDO:**  Correct.

20             **THE COURT:**  Okay.

21             **MS. HELLMANN:**  Your Honor?

22             **THE COURT:**  Why should I not treat 29 differently,

23    Ms. Hellmann?

24             **MS. HELLMANN:**  I actually was reading 29 where it

25    says at least one of the Janssen drugs subject -- am I reading

1    that wrong?  I've recopied.

2              **THE COURT:**  I had to read it a couple times too, but

3    I think, Mr. LoBiondo, what you're saying there is that these

4    are the Janssen drugs that could have been subject to or are

5    subject to the SaveOnSP program, but you want information

6    about patients who took them, whether or not they were subject

7    to the SaveOnSP program; correct?

8              **MR. LoBIONDO:**  Exactly.  So Darzalex patients,

9    whether or not in the SaveOn scheme.

10             **THE COURT:**  Okay.  So the drug subject to the

11   SaveOn, that's the category of drugs.

12             **MR. LoBIONDO:**  Exactly.

13             **THE COURT:**  But the patients is everyone, whether or

14   not they were in the SaveOnSP?

15             **MR. LoBIONDO:**  Correct.

16             **THE COURT:**  Okay.  Does that help, Ms. Hellmann?

17             **MS. HELLMANN:**  It does.  I was reading it that were

18   part of that program.

19             And so let me just tell you what that would

20   encompass.  So there are -- I'm not sure how many Janssen

21   drugs there are; maybe nine.  I saw them listed somewhere.

22             **THE COURT:**  They're listed right here.  Including

23   but not limited to; at least 20 drugs.

24             **MR. LoBIONDO:**  Yeah, and SaveOn sometimes changes

25   the drugs that are in the program.

1          **MS. HELLMANN:**  So it's a Johnson & Johnson, also a

2     very large company, their drugs; correct?

3          **THE COURT:**  Yes.

4          **MS. HELLMANN:**  Express Scripts adjudicates the

5     billion prescriptions, it's all of this coming in, so there is

6     a data warehouse, and it is not simply click some buttons.  We

7     would have to, if every pharmacy in the country -- there are

8     70,000 pharmacies in our network.  We would have to find those

9     drugs and produce the data.  I mean, I would need some time,

10    and we could come back with what that would entail.

11         I mean, it is a massive undertaking, and certainly

12    if the nonparty is being asked to help this plaintiff with

13    their damages, to the extent the Court is even inclined to

14    grant this, there has to be cautionary involved.  We are

15    talking about a massive, massive undertaking.

16         I had a problem with it when it was just, I thought

17    it was people in this program.  Now we're talking about every

18    one of these drugs that presumably changed to look for the

19    NDC, which is that unique drug identifier for every drug, and

20    any one of those drugs are going to have numerous NDCs because

21    if you change the day supply, it changes the NDC number

22    associated with the drug.

23         **THE COURT:**  Okay, Ms. Hellmann, can I stop you for a

24    second?  What -- Was there ever any question whether the

25    information that was responsive to Request No. 29 would have

1    been had by SaveOn, SaveOn would have had that?

2             **MR. LoBIONDO:**  Yeah, so -- I'm sorry.

3             **THE COURT:**  Go ahead.

4             **MS. HELLMANN:**  I don't think so.  If the -- I'm just

5    thinking out loud.  If it wasn't part of the SaveOn program;

6    right?  They're simply saying, Express Scripts, give us your

7    data of patients that have received a Johnson & Johnson drug.

8             **THE COURT:**  Yes, that's my interpretation too.  So

9    what I'm wondering is what was your rationale for not having a

10   conversation with them about this problem before now?

11            **MS. HELLMANN:**  Because I didn't realize that they

12   were talking about everything until right now.  We've --

13            **THE COURT:**  Okay.

14            **MS. HELLMANN:**  -- kind of like get the stuff from

15   Accredo; right?  I was reading this of like subject to the

16   SaveOn program like they were part of the SaveOn program.

17   This is all data.  So I mean, we can certainly talk about it,

18   but it is --

19            **THE COURT:**  What you were supposed to talk about.

20   You guys are supposed to talk about this before you come to

21   me.

22            **MS. HELLMANN:**  And I would have said the same thing.

23   I was reading this request a little differently.

24            **THE COURT:**  Okay, but I mean, it doesn't seem like

25   you've had a lot of practical conversations about producing

1    anything.  I'm hearing a lot of burden arguments without a lot

2    of, you know, we asked the plaintiff if they would accept this

3    subset of the information, and they said no.  It doesn't sound

4    like those conversations have happened at all; is that

5    correct?

6            **MS. HELLMANN:**  Well, you're asking me to speculate

7    on some conversations we were not a part of.

8            **THE COURT:**  Okay, fair enough.  But I mean, we've

9    had months and months and months to talk about this stuff and

10   to say what you're saying now, and even if you weren't in the

11   conversations, those conversations didn't happen.  Did they

12   happen, Mr. LoBiondo?

13           **MR. LoBIONDO:**  There were numerous meet-and-confers

14   with ESI counsel, not counsel who's here right now.

15           **THE COURT:**  Okay.

16           **MR. LoBIONDO:**  And they were never, you know, Oh,

17   we're not clear on what tranche of data you're asking.  It

18   was, We're not producing -- from the very first

19   meet-and-confer ESI's subpoena counsel said, We are never

20   going to produce any transactional data unless and until a

21   Court orders us to do so.  So that was their position in

22   February.

23           **THE COURT:**  Right.  So my concern is if I don't

24   order the production of this information, then those

25   conversations still won't happen.

1          **MS. HELLMANN:**  Well, they will.  On this one, they

2    will.

3          **THE COURT:**  Okay.

4          **MS. HELLMANN:**  Because -- I mean, it is -- it could

5    be one of the largest data pulls Express Scripts has ever had

6    to do if, in fact, this is that data.

7          **THE COURT:**  I hear what you're saying.  That sounds

8    hard.  I can't evaluate how hard or what subset of that might

9    be doable or proportional to the needs of the case here right

10   now in realtime for the first time.  So -- and I don't want to

11   take a lot of time for briefing, and I know you guys don't

12   want to take a lot of time for briefing, but you obviously

13   don't want to produce what's actually being asked for here.

14         So I would just say, I mean, if you don't want me to

15   just blanket order this information, because it does seem to

16   be relevant to their calculations, that doesn't mean you

17   should have to produce it.  Maybe someone else is already

18   producing it; maybe the parties can meet and confer and come

19   to some kind of terms about a more reasonable data set.

20         But it does seem relevant, and if you don't want me

21   to order that you produce all of it, then I would suggest that

22   you begin by making a counterproposal to the plaintiffs with

23   specifics about exactly what it would require to obtain this

24   information.

25         **MS. HELLMANN:**  I will do so.

1          **THE COURT:**  Okay.  I'm going to hold the

2     data-related requests in abeyance because it sounds like

3     maybe, having had this conversation, you all can have further

4     conversations that would move the ball forward more quickly

5     and efficiently than me making an order in one direction or

6     another today.  Please have those conversations, and then if

7     you need an order from me, come back next Friday.

8          I will tell you that when the parties are as far

9     apart as these parties are in discovery, this is when I start

10    considering just send me your, you know, rival proposals and

11    I'll pick one kinds of solutions, because it's just not

12    possible for me to adjudicate every single detail.  I'm the

13    one in the room who knows the least about the issues that

14    you're asking me to resolve.

15         And so it may be the case that you're going to ask

16    me to do eenie, meenie, miney, moe and pick whoever's seems

17    more reasonable.  That never works out as well for the parties

18    as if they've actually managed to come to some agreement in

19    the middle.  So I would just strongly encourage you to have

20    the rest of this conversation that we're about to have with

21    each other, and then I will encounter the issue again next

22    Friday if it needs to be encountered.

23         I assume -- I'm not under any illusions that you all

24    go away and resolve everything, especially since a lot of what

25    you're arguing depends on whether Accredo is going to be

1   producing something and whether, you know, SaveOn already has

2   produced something.  You're going to need more information or

3   more discussion, and that's fine, but let's try to narrow the

4   issues.  Let's try to get a little closer, please, before I

5   have to make a black-or-white kind of decision like this,

6   because it sounds like that would be bad for everyone

7   involved.

8             Okay, so that is 24, 28 through 30, is that right,

9   the ones that are data-related?

10            **MR. LoBIONDO:**  Yes.

11            **THE COURT:**  Then we have 25, 26 and 27, guys.  All

12  right.  The plan formularies, plan summaries or other

13  documents sufficient to identify patient cost-sharing for

14  plans where the SaveOn program was ever offered, including

15  cost-sharing components such as annual deductible, etc.

16            Can this information be obtained from SaveOn?

17            **MR. LoBIONDO:**  No, SaveOn says they don't have it.

18            **THE COURT:**  Okay.

19            **MR. LoBIONDO:**  This is true for all three,

20  actually --

21            **THE COURT:**  All three, yes.

22            **MR. LoBIONDO:**  -- SaveOn.

23            **THE COURT:**  They seem to be kind of related to each

24  other.

25            **MR. LoBIONDO:**  Yes.

1              **THE COURT:**  Okay.  Why do you need it?

2              **MR. LoBIONDO:**  So these plan formulary documents

3    are, you know, these are kind of the default rules of the

4    plans that ESI has and that their clients have.  And so this

5    is where we get the information about how, you know, separate

6    and apart from whatever specific thing that SaveOnSP program

7    does, it's basically the default rules before there is the

8    edit of the SaveOn program; right?

9              So how, after the SaveOn program is implemented,

10   patients, CarePath support and any manufacturer copay support

11   is not counted toward those patients' out-of-pocket maximums,

12   not counted toward their deductibles, not counted toward their

13   cost-sharing at all.  But in most cases or at least some cases

14   before SaveOn came in the picture, the patients were getting

15   the benefit of those dollars.

16             And so we say one of the ways that the SaveOn

17   program harms patients is that it actually makes their other

18   healthcare needs more expensive because the money that they

19   were getting from CarePath to afford their cancer drugs is

20   also accumulating toward their other healthcare expenses.

21             And SaveOn has raised a number of defenses, but one

22   of the defenses is, well, you don't actually -- or one of

23   their arguments is you need to have perfect information about

24   exactly what the plan terms were before the implementation of

25   our plan because it's possible that there are some patients

 1   who already were subject to what's called in the industry an

 2   accumulator where they were not getting the benefit of that

 3   copay support in any way.

 4          So this is kind of a similar thing to the data,

 5   although it's not, it's not a spreadsheet, right, it's

 6   documents that ESI helps plans prepare to tell their employees

 7   what their benefits are, and we need visibility into what the

 8   benefits were before and after the implementation of the

 9   program.  And SaveOn doesn't have that, right, because SaveOn

10   comes on the scene at a certain point and doesn't, in a

11   comprehensive way, doesn't really know what the plan was

12   offering in the year before SaveOn came on.

13          **THE COURT:**  Okay, thank you.

14          **MS. HELLMANN:**  Again, we're talking about hundreds

15   of plans; right?  So you have the plan design documents, and

16   the requests aren't really worded quite as nice, like we need

17   one before and one after; right?  I think that's ultimately

18   what he means.

19          We actually when we talked this morning today and we

20   followed up with an e-mail saying we can give you like

21   exemplar plan documents.  My -- and what we proposed is give a

22   couple plans and let's look to see if there even is this

23   difference that I think you're alleging before we go start

24   trying to pull plan summary and plan documents for hundreds

25   and hundreds of plans.

1              Again, it's not one -- you know, it's not one place.
2     It would be, I keep saying, just incredibly difficult to pull
3     these for all these different plans.  We're not talking
4     about -- I mean, a lot of these, I think, if we could talk
5     about one or two or three plans, you know, and target, you
6     want to talk about those communications or the account teams,
7     but it's everything.
8              **THE COURT:**  Okay.  How many plans are -- so when you
9     say "plan," you're talking about the agreement that Express
10    Scripts has with a health insurer, so -- is that right?  The
11    health insurance plan.  Okay.  Those are your clients?
12             **MS. HELLMANN:**  Those are our clients.
13             **THE COURT:**  Okay.  There's got to be a number.  What
14    number of those individuals -- those plans interact with
15    SaveOn?
16             **MS. HELLMANN:**  I don't have a number.  I can tell
17    you it's the majority of our clients.  And let me just give
18    you an example.  Today I Googled SaveOn Express Scripts
19    formulary, because in kind of response to this.  I probably
20    had at least 50 hits of like Wash U.  Wash U is one, actually.
21    Wash U has their plan summary document online, and it says, We
22    participate in SaveOn with the University of Rochester.  I
23    mean, I was finding so many, because I was just -- I was kind
24    of curious about these.
25             Well, and these plan summary documents are public;

1    they're online.  But I can tell you the number of hits that I

2    got that hit on Express Scripts, SaveOn, and it was all of

3    these small employer groups of a trust, like trustees of a

4    union in Iowa.  They had their plan document on there.  And it

5    talked about, We participate in SaveOn.  You need to go to

6    Accredo.  So I don't have a number, but --

7            **THE COURT:**  Okay, let me ask you this.  If SaveOn is

8    arguing in that litigation, that I know you are not a

9    defendant in, that actually the individual patients were not

10   negatively affected because their terms of their plans, you

11   know, didn't actually -- weren't harmed in the way that J&J is

12   describing, that it wasn't a net negative for the patient or

13   for the plan, how would anyone document whether or not that

14   was true without having these formularies?

15           **MS. HELLMANN:**  Well, it's not -- I wouldn't say it's

16   a formulary.  I think we're kind of interchanging words.

17   Formulary is simply a list of drugs that are covered.

18           **THE COURT:**  Right.

19           **MS. HELLMANN:**  It would be -- I think it would

20   probably be what's your out-of-pocket max, you know, one year

21   versus your out-of-pocket max the next year.  I can't imagine

22   the number of factors that go into that.

23           **THE COURT:**  Well, that's for like an individual

24   patient; right?

25           **MS. HELLMANN:**  Right.

1              **THE COURT:**  But if --

2              **MS. HELLMANN:**  That's what --

3              **THE COURT:**  Maybe I'm misunderstanding Mr. LoBiondo,

4     but you're looking at it from a plan perspective, sort of the

5     terms that the plan compensated the particular J&J product for

6     before it got involved with SaveOn versus after?

7              **MR. LoBIONDO:**  Right, so if 30,000 people are

8     covered by a plan, we need one plan summary, one plan

9     formulary, not 30,000.

10             **THE COURT:**  Yes.  But you're still talking about

11    thousands of plan documents?

12             **MS. HELLMANN:**  Yeah, but what I'm saying --

13             **THE COURT:**  I just want to make sure I understand

14    your answer to this question.  How would anyone document that

15    differential, the delta between, you know, what patient was

16    paying for this drug before SaveOn versus after without having

17    the information about, you know, how much it was reimbursed

18    under each of these plans before and after participation in

19    SaveOn?

20             **MS. HELLMANN:**  I actually -- if you're asking my

21    opinion, I think it would be impossible to prove, because

22    even -- well, first of all, it sounds like this is probably

23    SaveOn's problem because they're the ones that raised the

24    defense.  But let's -- I mean, this is why I was trying to use

25    a concrete example.

1          If Blue Cross Blue Shield, their plan design is
2     you're going to have an out-of-pocket max of $10,000 per year,
3     right, we're going to kick in.  That was pre-SaveOn.
4     Post-SaveOn they say now you're going to have an out-of-pocket
5     max of $5000 a year; right?  I can't think of the logic being
6     able to connect the difference to that to a SaveOn program
7     versus all the other things that go into health insurance.
8          So, again, if you're asking Sarah Hellmann's
9     opinion, I don't think anybody could prove that piece of it,
10    but if you're looking at the plan documents and essentially
11    out-of-pocket max or copays, right, that is in a plan
12    document.  And we said we will give you exemplar plan
13    documents.  Again, you can find most of them.  But it's doing
14    that for every single plan?  I mean, take a couple and see.
15         And again, if there is a difference connecting,
16    making that connection because it's because of or not because
17    of the SaveOn program, which only covers certain specialty
18    drugs that are pharmacy and not all the other healthcare costs
19    that go into when plans set premiums and set out-of-pocket
20    maxes and set copays.
21         **THE COURT:**  Okay, understood.
22         Mr. LoBiondo.
23         **MR. LoBIONDO:**  I thought that I -- they gave an
24    example that was somewhat illustrative, which is that for some
25    of these plans but probably not all of them before SaveOn,

1    patients, when they used CarePath support for their drugs, it

2    accumulated toward their out-of-pocket maximum.  So we're

3    helping them afford their health care, and then at a certain

4    point they hit their deductible and their insurance takes

5    over; right?

6            **THE COURT:**  Right.

7            **MR. LoBIONDO:**  After SaveOn, that never happens.

8    SaveOn says you -- not a dime of the money you get from

9    CarePath, not only are we inflating it and then taking out the

10   maximum possible, the money that Janssen or J&J is making

11   available to you doesn't count towards your deductible.  So

12   you are paying much more patient out-of-pocket for your

13   overall healthcare.

14           And so formulary -- I shouldn't say formulary.

15   Summary documents is not just about what is the number.  It's

16   also about what kind of patient assistance is going to count.

17           **THE COURT:**  What things go toward that number.

18           **MR. LoBIONDO:**  And I couldn't disagree more with the

19   idea this is going to be SaveOn's problem; right?  We're the

20   plaintiffs in the underlying litigation.  We're going to say

21   this is why we think you're harming patients, and this is the

22   amount of damage.  And SaveOn is going to say, no, you're

23   wrong about that because you haven't shown, your damages

24   expert hasn't shown a one-to-one correlation between what

25   happened before and after.

1              And SaveOn, I'm sure, and its damages expert and its

2       liability experts are not going to accept the idea that we

3       just took one template or one example plan document from ESI

4       and extrapolated it to a lot of patients.  That's not

5       statistically valid.  So it's not SaveOn's problem.  It's

6       SaveOn's defense and we have to overcome it.  So we need this

7       information.

8              **THE COURT:**  I take your point there.

9              Yes, Ms. Hellmann.

10             **MS. HELLMANN:**  So it sounds like, actually, the

11      issue has been narrowed down a little bit is, so after SaveOn,

12      the amount of these dollars does not go to a patient's

13      out-of-pocket.

14             **THE COURT:**  Out-of-pocket, yes.

15             **MS. HELLMANN:**  And that is, I mean, you can, again,

16      all the Googling I did this morning, there's a fair amount of

17      plan documents out there that say this will not count towards

18      your out-of-pocket max.

19             So it sounds like what Plaintiff is really looking

20      for are pre-SaveOn plan documents that do or do not show

21      whether the J&J dollars go to the out-of-pocket max; right?

22      And I, again, what I would propose is I'm not saying one, but

23      I'm also not saying a thousand.  There's a number in between

24      there, and look to see what those plan documents say.

25             I mean, there is some middle ground here of instead

1  of looking at -- and I don't really know even post-SaveOn with

2  those plan documents because it sounds like in that litigation

3  it said these numbers will not count towards your

4  out-of-pocket maximum; right?  So if what they're trying to do

5  is compare it to what happened before SaveOn, right, that's

6  very different than formularies and a lot of the other groups

7  of documents.  It's, you know, what did the plan documents say

8  about copayment-assistive programs going to out-of-pocket max

9  or out-of-pocket maximums.

10          And again, give us -- they have all the plans at

11  issue, right, because they have all the contracts.  Let's pull

12  an exemplary.  You can pick which ones you want, and we can

13  pull some of those plan documents.

14          **THE COURT:**  Okay.  That sounds like a very sensible

15  way of moving forward after I grant the motion to compel as to

16  the Request No. 25 through 27 because it does seem to me that

17  this information will be necessary to Plaintiff's case or will

18  be, if it exists in the way that you think it does, but I also

19  think it would not make sense for you to go to every single

20  plan and produce all of these documents before you know if

21  it's what they actually need to make that argument.

22          And so I find that there is a sufficient basis to

23  find that this -- that these requests, such as they are,

24  describe universes of information that are relevant to the

25  case.  If there is a counterargument that some of it is beyond

1    what's necessary to do what they're trying to do, then I'll

2    hear that argument after you all talk about it and there's a

3    basis for making the argument because you've produced

4    something and you've seen it and you've found it sufficient or

5    not.  Fair enough?

6              **MR. LoBIONDO:**  Yes, Your Honor.

7              **THE COURT:**  I'm granting the motion to compel.  It

8    is subject to, like every discovery request, to reasonable

9    limitations based on facts on the ground as you proceed in

10   producing the information.  Those are 26 through 27, which I'm

11   treating all of a piece, and I think we are holding 28 through

12   30 in abeyance, and I think 30 is the end; is that correct?

13             **MR. LoBIONDO:**  Yes, Your Honor.

14             **THE COURT:**  Okay.  So that's something of an answer

15   on everything.  I know this probably isn't the final word;

16   although, I won't be sad if you all figure it all out on your

17   own from now on, but you know, you don't have to fill the end

18   of my August, but I will entertain any additional follow-up

19   motions to this.

20             Please don't come back to me without having spoken

21   to each other at length about the real practicalities of

22   producing the information, especially if your argument is

23   going to be based on burden.  Not only do I need to see that

24   there's a big significant burden to the entire universe, I

25   need to see that you've gone to Plaintiff and said, Here's the

1    burden, let's talk about how to minimize it, and then after

2    they have been unreasonable in entertaining that proposal, I

3    will hear from -- I will hear your argument that they're being

4    unreasonable.  Clear enough?

5              **MR. LoBIONDO:**  Just one clarifying question.

6              **THE COURT:**  Yes.

7              **MR. LoBIONDO:**  So I think for most of the requests,

8    other than the data requests, they were either granted or

9    denied.

10             **THE COURT:**  Right.

11             **MR. LoBIONDO:**  And to the extent the aggrieved party

12   wants to --

13             **THE COURT:**  Pursue it further.

14             **MR. LoBIONDO:**  -- make another argument --

15             **THE COURT:**  Yes.

16             **MR. LoBIONDO:**  -- set a date for that.  For the data

17   requests, we will obviously try to come to agreement on them.

18             **THE COURT:**  Yes.

19             **MR. LoBIONDO:**  Because they were held in abeyance

20   and not granted or denied --

21             **THE COURT:**  Yeah.

22             **MR. LoBIONDO:**  -- do you want us to submit competing

23   proposals or --

24             **THE COURT:**  That's a good question.  You all -- I

25   know not you individually but another member of your corporate

```
 1    family is litigating this exact issue, right, in Tennessee

 2    right now, and you definitely are litigating it?

 3               MR. LoBIONDO:  Yes.

 4               THE COURT:  I'm loath to complicate the situation

 5    there or vice versa by asking you all to brief the same exact

 6    thing that you're briefing there but as to a different entity

 7    in the family.  What do you think would be the most -- let me

 8    ask you guys as the ones most involved.  What would be the

 9    most productive way of proceeding?  I know you have time

10    concerns, and that's why I'm asking.

11               MR. LoBIONDO:  Yeah, and I'm also perhaps a little

12    bit cynical about whether we're going to get a counterproposal

13    from them, so I think this is probably going to end with

14    competing proposals that the Court has to pick.  I know that

15    you --

16               THE COURT:  Okay.

17               MR. LoBIONDO:  -- accurately pointed out that that's

18    not ideal for a number of reasons, but my experience with --

19    in this area is that their clients just historically are loath

20    to produce data, period, unless somebody makes them do it.  So

21    I think that's where we're headed, but you know, I defer to

22    Your Honor if there's a different way --

23               THE COURT:  You don't mind going ahead with that

24    proposal while you're also litigating it in Tennessee?  Do you

25    think it would be productive to do so because it's a different
```

1   entity?  Do you think it's different enough, the questions?

2          **MR. LoBIONDO:**  There are some data requests that we

3   talked about here that are not at issue in the Accredo

4   litigation.

5          **THE COURT:**  Okay.

6          **MR. LoBIONDO:**  So I think, you know, at least as to

7   those, it would be good not to delay.

8          **THE COURT:**  Okay.

9          **MR. LoBIONDO:**  Obviously I don't have any insight

10  into when the Accredo judge is going to --

11         **THE COURT:**  Right.

12         **MR. LoBIONDO:**  -- rule.

13         **THE COURT:**  He seems to be moving expeditiously, but

14  I don't want to assume that you'll have what you need by the

15  time you need it.  Go ahead.

16         **MS. HELLMANN:**  Yeah, I would say with what's at

17  issue in Accredo, we hold that in abeyance, and I think the

18  Court has ruled quickly.  I think the data request that we

19  know is not at issue there --

20         **THE COURT:**  Number 29.

21         **MS. HELLMANN:**  -- is the all data of Johnson &

22  Johnson drugs.

23         **THE COURT:**  Yes.

24         **MS. HELLMANN:**  So that is ripe for discussion and

25  perhaps for, you know, proposal next Friday.  Other than

1  that --

2            **THE COURT:**  Yes.

3            **MS. HELLMANN:**  -- I believe that is the only data

4  request that we've talked about today that is not covered by

5  Accredo.

6            **THE COURT:**  Right.

7            **MS. HELLMANN:**  Counsel mentioned that maybe there's

8  some more fields at Accredo that we would need.  I haven't

9  heard those.  I do know the one set is the all Johnson &

10  Johnson drugs by any pharmacy.

11           **THE COURT:**  Okay.  Well, then let's put it that way.

12  Number 29, and to the extent Plaintiff is aware of other data

13  that would still need to be -- even if Accredo was compelled

14  to produce absolutely everything that's being asked of it,

15  there are still things that would need to be obtained from

16  Express Scripts; you can take that up too in your discussions

17  this week, and if you all -- let me think.

18            I think competing proposals is as good a method as

19  any for my deciding quickly on how you guys are going to

20  proceed, and so why don't we do that with respect to the data,

21  especially insofar as we're talking about very concrete

22  things.  I think making you each have to sort of lay out

23  exactly how you would go about producing or not producing that

24  information would probably be the best strategy.

25            So for next Friday, you can also produce to me,

1  unless you've come to terms, some rival proposals on how to

2  get at what Plaintiff needs from RFP Number 29 without

3  incurring the burden that I take you, Ms. Hellmann, to be

4  realistically representing, which does sound significant.

5          All right.  So next Friday lots of things but

6  hopefully less than you might have had to do had we not

7  resolved the things we did today.

8          All right.  Anything else before we adjourn?

9          **MR. LoBIONDO:**  No, Your Honor.  Thank you very much

10  for all the time that you spent on this.  I appreciate it.

11          **THE COURT:**  Yes, well, that's my job.  But no

12  problem, again, if you want to take care of it for me from

13  here on out.

14          All right.  Thank you.  We're adjourned.

15          (Hearing concluded at 3:51 p.m.)

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

       I, Kristine A. Toennies, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

       I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

       I further certify that this transcript contains pages 1 through 115 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

       Dated at St. Louis, Missouri, this 14th day of August, 2023.

*/s/ Kristine A. Toennies*
Kristine A. Toennies, RMR, CRR, CRC, CCR
Official Court Reporter