# Exhibit D

Case 8:22-cv-02632-CEW Document 300-905/Filed 05/20/241 of Page 1 of 18 PageID: 19253

# Exhibit D

This transcript was exported on Dec 06, 2021 - view latest version here.

Melissa:

Okay. Well, thanks to everybody for joining. This is the follow-up session to the board discussion on the SaveOn SP program that IPBC will be implementing on May 1st. This session came about as a result of some detailed conversations and some concerns about the program and the applicability, especially with respect to collective bargaining arrangements and needing to understand what this program does on a more detailed level. So that each of the IPBC members can make decisions about whether or not this program needs to be ruled out to your particular member plan or not.

Melissa:

There's some pretty significant savings here. So IPBC in general is pretty excited about the program. It's a win-win on behalf of the employee and the employer to take advantage of these manufacturing discount programs. But we do understand the caution that you have in considering these programs and the impact it may have downstream, particularly with respect to existing CBAs. So we invited Express Scripts to come in and facilitate the conversation today. They have about 10 slides to walk through, so you can understand what this program does in a little bit more detail.

Melissa:

If you are considering opting out of the program, you will be asked to complete an opt-out form by this Friday. The tight turnaround time on that one is being driven by the implementation calendar for Express Scripts. The overall program, we estimate, is worth about $320,000 in savings a month to IPBC. And those are some pretty big dollars that we wanted to implement as soon as possible. But what that means is a pretty quick turnaround time for us to be able to manage that implementation schedule. So we're going to go through the slides today, and then you'll have the opportunity to ask your questions throughout.

Melissa:

And then we will review, there is an opt-out form that is something that you'll need to complete if this is a program that you would like to not implement. Two quick words, also on the grandfathered plans within IPBC will be carved out of this program because it is a change in benefit design, it would compromise the grandfathered status. So those plans will be carved out. There's also a question on HSA plans, it is looking possible that we will need to carve those out as well because we would want to make sure that we are in full compliance.

Melissa:

So that is something we are working on determining over the next few days to see whether or not HSA plans would also need to be excluded from the plan. Non-HSA plans, non-grandfathered plans are really the ones that are up for discussion today. And with that, I will hand it over to Tammy to introduce Rachel.

Tammy:

Good afternoon everyone, hope you're staying warm and safe in this crazy weather. So thank you all for the opportunity to come in and speak with you this afternoon. Rachel Harmon is the Product Director over the SaveOn program here at Express Scripts and really our subject matter expert. So we've invited Rachel to come in and review the presentation with you and assist with questions and answering any

IPBC and SaveonSP Training-20210216_1901-1 (Completed 12/04/21)  Page 1 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

questions that you may have. So with that, Rachel, I'm going to hand it off to you and Melissa, I assume you will be facilitating, moving the slides along as we need to, correct?

Melissa:

That's right.

Tammy:

Right. Great. Thank you.

Rachel Harmon:

All right. Thanks, Tammy, and thanks Melissa for that overview. I thought it would be good if we just took a moment to go ahead and go through the first slide, which is a high-level overview of what SaveOn is. So SaveOn is a program that's known in the industry as a co-pay offset savings program, which means that we're using the member co-pay as the mechanism to create savings for the plan at the point of sale. So that concept in and of itself is not unique in the industry. However, the way that SaveOn administers their program is.

Rachel Harmon:

So it's important to recognize that the way we operationalize this SaveOn offering is by understanding some of the key concepts as it relates to the Affordable Care Act and the essential health benefit. So if you rewind back to 2012, when we were designating ourselves as an essential health benefit under the ACA's guidelines, there was a mandate that simply said, "You align yourself to a benchmark state and that benchmark state would then dictate how many benefits, drugs, and services you have to cover by therapeutic categories to be deemed essential by the ACA."

Rachel Harmon:

So understanding that requirement and by meeting that requirement, what SaveOn has done is an extensive amount of work to understand all the state benchmarks, the therapy classes that we're targeting, and the applicable drugs that we could effectively carve out and administer a different benefit design. So under your existing benefit today, we cover those essential health benefits as defined by your benchmark state by therapeutic category there's no change there. But for a number of drugs, we can carve them out and create a different benefit design, where we designate these drugs as non-essential. And this is a key differentiator for SaveOn.

Rachel Harmon:

When you designate the drugs is not essential you do a couple of things. You remove the ceiling for how high you can set the member contribution. So there's no maximum as to how high we can set the member responsibility, which means that you are able to fully leverage all the manufacturer assistance dollars to offset your plan cost. So you can see in this example for the category of hepatitis C, the average amount of assistance per fill is $6,600. We would literally set the patient co-pay to $6,600, and you would save that amount on every fill.

Rachel Harmon:

The second piece is by definition, non-essential health benefits are not applicable to your maximum out-of-pocket accumulators. Which means in today's world, your patients can use co-pay assistance. And

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21) Page 2 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

unless you have an accumulator adjustment program in place like Out-of-Pocket Protection, any co-pay assistance dollars look like patient-paid dollars. And therefore a lot of patients are able to meet their maximum out-of-pocket by using the co-pay assistance dollars rather than paying out of their own pocket.

Rachel Harmon:

So what we've done here is, it's a nice, I think as Melissa said, it's a win-win because if you put an accumulator adjustment program in place, patients get upset because if they've been receiving the benefit for a long time of hitting that max out-of-pocket, then they feel like they have something taken away. Well, in this scenario, what we're doing is we're creating savings for the plan and we're keeping the patient responsibility at zero, but we're just not going to allow that to hit their max out-of-pocket. So there's not really much to complain about when you get your specialty drug for free. In fact, it's a pretty good incentive to want to participate in the program.

Rachel Harmon:

And so therefore the member wins, they get a very high-cost specialty medication at no cost to them. The plan gets the maximum cost offset at the point of sale from that manufacturer assistance program and further, the plan benefits because what would've happened in today's world with your existing benefit design is this high-cost specialty drug, as soon as you increase the co-pay, it's going to push you into full placement mode, much more quickly than you otherwise would have. So we feel like SaveOn is a true market differentiator in the sense that we're maximizing plan cost savings. We're benefiting the member and we're not disrupting the rest of the benefit design.

Rachel Harmon:

So we've expanded this program pretty significantly over the last few years, we're now over 270 drugs in the program, and that's how we're getting such significant savings for you all. Before I jump to the next slide, I'm just going to pause and make sure there aren't any questions as it relates to how we administrate our program differently than others in the industry. All right. Great. So if we want to go ahead and jump to the next slide. I think it's probably worth talking about this essential health benefit a little bit more. I know [crosstalk 00:08:55] for a couple of reasons.

Melissa:

Hey Rachel, oh, this is Melissa. There was a question posted, "Are there any specialty drugs not covered in this savings program?"

Rachel Harmon:

Yes. Good question. So if you remember, I said previously, we have to keep a certain amount of drugs in your existing benefit design, which follow your standard plan in order to stay compliant under the ACA. So we keep those required drugs in your existing benefits. So they would still follow suit with your current plan design and patients can still use co-pay assistance in those scenarios. It's just that you are not leveraging those savings dollars to create savings for the plan. All right. So I see another question to answer. So now that I'm alerted to this chat feature, I will try to answer these questions as they come in.

Rachel Harmon:

This transcript was exported on Dec 06, 2021 - view latest version here.

Okay. So when somebody picks up their prescription, does this mean they still pay their regular co-pay? So whenever we administer this program, we will have a set drug list with a corresponding co-pay schedule. So the co-pays will vary by drug and that's because there's a different amount of assistance depending on the manufacturer's program. And so what we do is we take the total amount of assistance per year and we factor in some assumptions based on the general course of therapy for that medication and the typical fill schedule.

Rachel Harmon:

So we set a co-pay that corresponds to if it's a therapy that is typically taken once a month and we have 12 fills, then we annualize the total amount of savings, and then we divide it by 12 to get the monthly co-pay. And then in terms of, do they have to do anything special for the savings? Yes, they have to opt into the program in enrolling co-pay assistance, and so that is SaveOn's job, they own the member experience in educating them on the co-pay assistance program, how to enroll and when possible they walk them through those steps so that we can secure those assistance dollars. And then is there a list of specialty drugs that are included? Absolutely. And we have a targeted drug list that we can share with you again. And it will have the corresponding co-pays on it.

Rachel Harmon:

What SaveOn does is create a client-specific URL, which is then referenceable, so it can be placed in your summary plan description documents. So you don't have to keep revising them every time the co-pay changes or if it changes or if the drug list changes. And so when we send member communications, we send a letter that has the co-pay drug list as the second page, and as well as referenced on their URL as well. All right, let's see, I'm getting quite a few. Can we see the member impact for our community? Yes. So I can share with you Tammy and I can work on getting member disruption for your specific groups. The only thing I would just say is to consider that there will be disruption in the sense that we have targeted members that need to be enrolled.

Rachel Harmon:

We have a very good success rate in terms of getting patients to agree and to participate. Again, there's heavy incentives, they pay nothing for their specialty medication. And if anybody ever resists any time SaveOn does reach out to Tammy and I, which then would prompt us to reach out to you and we can manage that member as they go through that process. And if you guys feel like it's acceptable to make an exception, that is possible. All right, if there's no co-pay, will this go towards the member's deductible? No. There is nothing in terms of patient-paid money that gets to apply.

Rachel Harmon:

How is it determined which specialty drugs are to be part of SaveOn and those that are not? So, like I said, SaveOn has done an extensive amount of work to understand one, [inaudible 00:13:28] state benchmarks, two, which programs have the most lucrative co-pay assistance programs to be able to leverage that savings. Then three, along with our Express Scripts preferred formulary strategies, we obviously don't want to incentivize the use of a product that you guys are not preferring. And so we worked hard to ensure that we're honoring those preferences because that upholds your rebate value, which is a separate pool of money than this co-pay assistance money.

Rachel Harmon:

This transcript was exported on Dec 06, 2021 - view latest version here.

So once we've determined by therapeutic category effectively how many drugs can be carved out and fall into the separate benefit design, we then look for what's the biggest utilization and what's the most money that's available in terms of creating savings to get to that SaveOn drug list. Does the specialty drug list change from year to year? Yes. In fact, we evaluate the drug list constantly. We make designated changes on 1/1 and 7/1 unless there's a need to make an interim change. So we haven't had to yet, but we've reserved the right to, if something comes to our attention where the funding goes away completely, or we have a significant change, we have the ability to remove drugs from the program.

Rachel Harmon:

It would require extensive communication to the member and we would honor the co-pay assistance or the $0 save on co-pay until they were able to effectively manage that patient out, manage that drug out. But we knowingly make updates on 1/1 and 7/1. And if necessary, we could change it throughout the year. How much time does it take to enroll in SaveOn? Is it a one-time enrollment? So initially it's a one-time enrollment, and it depends on the co-pay assistance program. So generally speaking, co-pay assistance programs are good a year from the day of enrollment. So once a member enrolls, we have the enrollment information, and the claims should adjudicate and process at Accredo for $0 as long as that co-pay assistance program is active.

Rachel Harmon:

And the timing it takes to enroll depends on the manufacturer and the requirements for participation. Many of these are online enrollment, which SaveOn can help facilitate with the member on the phone, and those generally take anywhere from five to 15 minutes to secure that assistance. Other manufacturers require a phone call from the member to complete that questionnaire live. So that may take a little bit longer, but SaveOn does manage that member experience and works with the member to help them both understand the goal of the program and what we're trying to accomplish here, as well as how to respond to the questions that they're being asked as part of enrollment.

Rachel Harmon:

How long do the discount apply? So co-pay assistance again, is good for as long as the program is active, and as long as they haven't exhausted the annual maximum. So as long as the enrollment is good the co-pay assistance will create savings for the plan for the duration. Can a member opt-out after opting in if their medication comes off the list? So if medication comes off the list, the member is opted out. There's no ability for us then manage that patient through the SaveOn program. So effectively once the drug is determined to come off of the list, then we would communicate that date and at that date, the member would transition from the SaveOn plan design back to your original plan design. And so whatever your co-pay for the specialty is on your existing benefit will apply.

Rachel Harmon:

Can an IPBC member opt out now [inaudible 00:17:54] opt-in for the [inaudible 00:17:56] The plan design [crosstalk 00:17:58]

Melissa:

That ones for me, let me jump in there?

Rachel Harmon:

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21) Page 5 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

Okay.

Melissa:

Yeah. And I think that question has more to do with the IPBC rules. You would be allowed to opt out of the program if you wanted to roll it out on January 1st, 2022, that is possible. But note that your 7/1 of '21 renewal rates would not be adjusted for the savings, that would have to be factored into your 7/1 '22 renewal. So you wouldn't be able to realize the savings yet. So that is something to note. But you could decide to tell IPBC that you wanted to participate in SaveOn on 1/1. Go ahead, Rachel. You can grab the next one.

Rachel Harmon:

Okay. Thank you. Okay. So somebody asked if the cost of the specialty drug is free for the member, where does the co-pay come into play? Excellent question. So the way that this program is set up is in order for us to capitalize on this co-pay assistance funding, we have to have that inflated co-pay upfront to bill to co-pay assistance. So we set the co-pay, and we'll use an easy example of $1,000 just for the purposes of walking through how the claims process. We'll say that we set the co-pay to $1,000 before we ever communicate that there's a responsibility for the patient to pay there's a prompt at Accredo that alerts the advocate that is a SaveOn opportunity.

Rachel Harmon:

At that point in time, we know that we need to connect the patient to SaveOn so that they can enroll. So we always want the primary payer for these claims to be the plan. So IPBC is the primary payer and that's because that drives formulary utilization management protocols, and ensures that we're adjudicating according to your rules first. Once that claim pays, that's when we return the inflated co-pay, which allows us to create savings for you. So the secondary billing process goes to pharma. And so that's where we bill pharma. So typically speaking, the secondary payer would pick up the remaining amount, less any required fees that they have for participation in that program.

Rachel Harmon:

So some co-pay assistance programs will say, "We'll allow the patient to have up to $1,000 in co-pay assistance as long as they contribute $5 out of their own pocket." So that secondary bill in that example, we would bill them a thousand and they would pick up 995 and expect there's a patient responsibility. And that's where we leverage something called a tertiary biller or the third biller who's technically SaveOn behind the scenes because we want to keep the patient responsibility at zero. We have this third payer in place, accept any balance that co-pay assistance doesn't pick up, which always ensures that the member receives a $0 co-pay at the point of sale.

Rachel Harmon:

We have an example later in the deck, too, which I think if you have further questions might clear that up. All right. What happens to a member's co-pay for a specialty drug not included in the program? Is it adjusted to compensate for the reduction in the included specialty drug? So if the drug is not included in SaveOn, it will follow your existing benefit design. So again, for example, if your specialty co-pay is $25 today, the specialty drug will still process and the patient will have the responsibility of $25. If they choose to use co-pay assistance, that's perfectly fine, they still can. They just won't get the drug for free as in the SaveOn example.

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21) Page 6 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

Melissa:

So Rachel, let's keep going with the presentation. I love all these questions coming in through the chat. I don't think I've ever seen this kind of engagement, it's fantastic. Let's keep going and then we can pick up the questions. I think a lot of the questions may be answered a little bit further, so we will make sure to get to all the questions, but let's keep going with the deck because I think that may head off some of... Where folks are coming from with their questions.

Rachel Harmon:

Yeah. So I think that sounds great. So just a reminder, essential health benefits are non-essential. So again, the ACA defines the essential by again, leveraging a state benchmark. You do not have to leverage your own current state or the state in which most of your members reside. It's simply a guideline for how to administer that essential health benefit. So for example, many commercial plans pick Utah because it had the fewest number of required drugs to cover, and therefore it was the most cost-effective. So all we're saying is that Utah is setting the list of drugs or the number of drugs by therapeutic category to be deemed essential.

Rachel Harmon:

Again, the differentiator being that those in the essential health benefit, all those ACA rules, as it relates to max out-of-pocket deductible, the applicability to those accumulators, that's what houses all of those rules. The moment we reclassify these as non-essential we get to operate outside of those rules, which removes the limitations for how high we set the co-pay, it removes the requirement to apply co-pay assistance dollars to the max out-of-pocket. And that's what allows us to be the most lucrative in terms of driving savings for SaveOn. And the next slide... Yep.

Rachel Harmon:

So just a reminder. So we're still at the core of this. We're still, at the core of this, we're following all of your current formulary and utilization management protocols, again, by making sure that the plan is the primary payer. That's what drives those first two components formulary, UM first, because that's what protects and preserves your rebate value, again, a completely separate pool of money, also still protected. So I always like to let clients know that the rebate agreement is between the rebate aggregator, in this case, Express Scripts, and the manufacturer, these co-pay assistance dollars is an agreement between the member and the manufacturer. It's a completely different set of funds.

Rachel Harmon:

Again, that essential health benefit is subject to your existing plan design deductible and out-of-pocket maximums. And again, the non-essential health benefits is what allows us to not allow any of the spend to be attributed to either deductible or max out-of-pocket. And this co-pay is still applicable. So in the flip to this, let's say you have a member through their existing benefit design that reaches their maximum out-of-pocket. It does not make the rest of these drugs ineligible because they're in a separate benefit design. So that $1,000 co-pay is still collectible, which allows us to still bill the manufacturer assistance program. And then unique to the SaveOn program, that member always has a $0 co-pay.

Rachel Harmon:

This transcript was exported on Dec 06, 2021 - view latest version here.

Now right here is probably as good as place as any to just briefly cover the nuance of a qualified high deductible HSA plan under the ACA. So we get a lot of questions related to how this is compliant and where we're at with that is we recognize that there is a requirement under the ACA that patients pay first dollar. So in qualified HSA plans, before patients can receive any additional paid benefit from the plan, they must fully satisfy their deductible out of their own pocket. Now it's a bit of a gray area because we're administering a different benefit design. So do those rules still apply to the SaveOn drug list? And we're in a bit of a conundrum from an industry standpoint because today's co-pay assistance is not ACA compliant in an HSA plan.

Rachel Harmon:

In other words, there's no attestation, there's no requirement that patients provide documentation or confirm that they've met their deductibles before they get co-pay assistance. So co-pay assistance happens in qualified HSA plans all the time. We just have little to control that. There's no governing body that's really monitoring that in the industry today. And so what we're faced with is really a plan-by-plan decision. And so we encourage plans to work with their own legal teams to determine whether or not it's appropriate to include their HSA plans in the SaveOn offering or not.

Melissa:

Yeah. And Rachel, this is Melissa again, I had alluded to that at the beginning where we'll spend some time over the next few days working with our compliance resources to take a position on that for IPBC and be able to make that determination. There are like you said, this is in the gray area where it really is subject to the appetite for risk and the interpretation. And that's something we will facilitate for IPBC.

Rachel Harmon:

Great. Yeah. And fortunate for you guys is you have a smaller portion in that category. So the savings is significant, no matter which route you go. Okay. So this is the adjudication process that I was referring to earlier, again, for easy math we're using some big round numbers, just to walk through this example. So we're going to say that in this example, the total cost of specialty drugs is $10,000. Your current plan design has the specialty co-pay of $100 and the manufacturer will pay $1,000 per 30 days. So up to $12,000 annually, as long as the patient contributes $5 out of their own pocket. So you can see on the next line what happens without SaveOn.

Rachel Harmon:

So in today's world, and using these assumptions, that $10,000 claim when we hit the plan for adjudication and assuming they pass the formulary and UM rules, the plan responsibility is 9,900 and the member co-pay is 100. And if the member is enrolled in co-pay assistance, they can go after that a hundred dollars through the co-pay assistance program, but they're still going to have to pay $5 out of their own pocket. The key here is that we know that the co-pay assistance program will pay 1,000 per claim. So effectively, in this example, we're leaving $900 on the table with every fill.

Rachel Harmon:

So when we enroll in SaveOn, we set the co-pay to correspond to the max that the co-pay assistance will allow. So in that primary adjudication point, again, we bill the plan, assuming formulary and UM rules are met. The plan responsibility now becomes $9,000, and we pass a member co-pay of 1,000. Again, we're not going to communicate that to the member. We're going to manage that member experience but once they're enrolled in co-pay assistance, we can then bill our secondary payer. Secondary payer

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21) Page 8 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

again is pharma, and so pharma picks up 995 saying, "Okay, we picked up our part. Now patient, you must contribute $5." The third biller or the tertiary biller is really SaveOn behind the scenes. Administratively we have a way to bill whatever pharma doesn't pick up on that secondary adjudication point back to the plan. All of that gets reconciled on your invoice, right?

Rachel Harmon:

So that $5 is not counted as savings to you. It's getting passed back and it's being deducted from your overall savings amount, but this is how we keep our patients whole. So this allows for the fluctuation in assistance programs, the required amount to pay could be anywhere from five to $50. And so we have a mechanism to you pass that back to the plan, reconcile the dollars and ensure the patient always pays zero. The other thing that this process allows for is ensuring we protect the member experience. So if we assume that the patient gets 12 fills per year, but they really need 13. We never penalize the member; we don't tell them that they've run out of assistance. The plan has achieved the maximum savings they could by getting the entire years' worth, or the 12 times $1,000 in savings. And they still get their drug at $0.

Rachel Harmon:

This also allows us to maneuver in a somewhat of a dynamic space when we could anticipate changes from pharma at any time. Knock on wood, we haven't, but in the event that pharma decides to pull back funding for their programs or decides to change the terms of the program, it's seamless to the member. SaveOn is actively watching these claims process and sees when any of these changes occur. And we can either adjust our co-pay amount so that the invoicing is cleaner on the back end, or it might be a prompt to determine, "Do we need to make a change in the drug list for this program? Because we are not saving as much as we initially anticipated, and there's another drug where we could." So all of this can happen behind the scenes. But this three-step adjudication process is what really protects the member because once they're enrolled, they're enrolled.

Rachel Harmon:

They see that they pay $0 time after time. The co-pay amount could change, sure, but they're not going to see that because they're always going to see that they pay $0 for these claims. So we feel like that's another differentiator in the market. Not only are we letting the patient have a $0 co-pay, it's not disruptive at the point of sale, they're not feeling any changes to the program. We're managing it for them on the back end. All right. And then the next slide, I think we talk about the member experience. So you guys have agreed to implement the program, and we generally say it's a 90-day lead time for go-live. So that first 30 days filled with really working on the member communications we do. I know there was a question about this earlier. There is a standard member letter that we have that can be co-branded. It can be customized as you see fit.

Rachel Harmon:

And so in that first 30 days, we're going to nail down the member communication. There are some contractual obligations. So it's PHI release form, a business associate agreement, and then signing something called the joinder, which I believe you guys have already completed those steps. But in that first 30 days, we want to get all of those details buttoned up because starting two months prior to go-live, we want to send that first member communication to our targeted member list. And so it's our goal to outreach to every one of these members before the program ever goes live, which gives us plenty of time for SaveOn to reach out. So we mail the letter and then a few days following SaveOn starts an

Case 2:22-cv-00632-SEC-CLW Document 306-92 Filed 06/20/24 Page 11 of 681 PageID: 19263

This transcript was exported on Dec 06, 2021 - view latest version here.

outbound call campaign, where we make three attempts in that first month to enroll the member in the program.

Rachel Harmon:

At 30 days out, if we're unsuccessful in reaching those members, we send a reminder letter and again, another phone call campaign with attempts to try and get contact with that member and get them enrolled. So that at the time you flip the switch on the program's live, all these claims just process as $0. Now, you can see there at the effective date, we generally get, you can see 55 to 65% of your targeted membership enrolled before go-live, which is great. Now, what happens if they don't get in touch with us before going live, or do you have a new patient to specialty medication after the program goes live?

Rachel Harmon:

That's where the partnership with Accredo is so important. So I mentioned before that our Accredo advocates, once the claim is processed, will receive a prompt to alert them that this is a SaveOn drug, and they have some scripting that says, "We have an opportunity for you to participate in a program which allows you to get your drug for free. I need to connect you to SaveOn now." And at that point in time, they warm transfer the member to SaveOn. So they stay on the line, make sure they're connected. And then SaveOn does the work to help them understand the program, the terms of enrollment in co-pay assistance, and getting them to that program.

Rachel Harmon:

Once they're enrolled, they give that information to the SaveOn advocate, who then relays that to Accredo, so that it's housed in our system and then again, the claims from there on out just process at $0. So our goal is to get as many people contacted and enrolled before the program ever goes live, but we do have mechanisms to help assist the member if again, they didn't contact us beforehand or they're a new patient to specialty after the program's turned on. All right. And then the next slide we have two different modeling scenarios and I'll walk through this one. This is your total population. So you can see just over 43,000 total live from that population, we estimate that 612 patients will be targeted for the SaveOn program. And if we annualize those claims, it's just over 4,400 claims.

Rachel Harmon:

We do take into account your existing benefit design. So what we're showing across your membership, which tells me you probably have multiple plan designs, is that our average member contribution per prescription is $32. So when we estimate your $4.9 million in annual plan savings, we're taking that into account. In other words, SaveOn doesn't take credit for your current plan cost offset by the member contribution. So that 4.9 million is less the current member contribution, it's less the fee that SaveOn charges to administer your program, which is 25% of the savings that's achieved. And so it's a huge amount. And when you look at the mix, you have just the right mix of specialty utilizers because your per member per month estimated savings is over $9 at $9 and 38 cents PM. So again [crosstalk 00:38:00]

Melissa:

This is Melissa, let me jump in here. Those of you who participated in either the sub-pool, the committee, or the board meetings in the last couple of months may not recognize these numbers. These are higher. They've been updated for this particular presentation. What we'll do is we will drill into these numbers and come up with the final number once we know which plans it applies to after you've made

Case 2:22-mv-00632-CCC-CLW. #: Document 306-92/25 Filed 06/20/24 Page 12 of 682 PageID: 19264
Case 2:23-cv-00632-SRC-CLW Document 91-2 Filed 05/10/24 Page 12 of 18 PageID #: 1682

your decisions at the end of this week, and after we've made the call and HSA plan, then we will be able to factor it into the rate sheet after the final renewal is published.

Melissa:

I saw a question in the chat about how that's going to be handled. What we will do is the preliminary renewal did not include this saving. The final renewal will be expressed also not including this saving by the time we publish your rate sheet that shows your final rate. That's when we will apply these savings if you elect to participate in this program. So just from a timing perspective, that's where you're going to see it. And by the time we are able to publish your final rates, that's where we'll roll it in. So just wanted to clarify that from a process perspective, for those of you who have heard parts of this presentation before.

Rachel Harmon:

Great point, thanks, Melissa. And then the next slide highlights what the savings looks like when you exclude your HSA population. So, as I mentioned before, you have a great opportunity, even if you don't include the HSA live at $4.7 million annualized. Again, this is net of the fee to administer, net your current plan cost offset, or less your current plan cost offset. Again, the implementation timeline, we've already satisfied a significant portion of this, so we're pretty close to that 60-days out timeline. Just finalizing those member communications and getting the green light from you guys in terms of which specific populations to include in enrollment.

Rachel Harmon:

So again, we'll send those letters out, followed by phone calls, and then again at 30 days, and then when the program goes live. So you guys have done a lot of the heavy lifting in terms of what's required from the client's perspective for implementation of this program. We're just looking forward to SaveOn managing the population once we get the rest of it underway. So, because you guys signed the joinder agreement, the invoicing process. So I mentioned there's a 25% fee the joinder agreement allows Express Scripts to bill you for that fee on your administrative invoice.

Rachel Harmon:

So you'll see a simple line item for SaveOn SP, which is the total amount, but then after implementation, we will be providing you detailed implementation reports, which allows you to see the entire claim and complete flow of money. So when I broke down the example of the primary second, and tertiary bill, there will be a column for each of those amounts. You will see the total cost of a drug, less the co-pay that we charged, less the amount that co-pay assistance paid, and then a column for any amounts that we had to pass back to the plan and then your total savings, which is how we actually calculate the amount of savings to calculate the fee. And besides that we'll have detailed monthly invoicing reports and then quarterly, we can provide higher-level reporting package type results.

Rachel Harmon:

So I think that's the end of my presentation. I can bounce back to chat and cover the questions that we didn't cover in my presentation or Melissa, how would you prefer I wrap up here?

Melissa:

This transcript was exported on Dec 06, 2021 - view latest version here.

Let's open it up for questions. The next question that's in the chat that we didn't get to is, "What does the member pay once they hit the maximum allowed under the program?"

Rachel Harmon:

The member always pays zero. As long as they're enrolled, and as long as the drug is in the program, if they've maxed out the co-pay assistance, then the plan has done the best that they can. Meaning they've achieved their offset, using the entire amount of assistance that pharma will pay for that entire year.

Melissa:

Okay. Next question. When we talked about the primary, secondary, and tertiary claim payments, I think there's a question around, "Does the member have to initially pay the $1,000 to receive the medicine and then wait for reimbursement or is all of that behind the scenes and automated?"

Rachel Harmon:

Good question. Not at all. It should be all behind the scenes and automated. So the only visibility that the member will have is one, through the letter that includes the drug list and the corresponding co-pays. And it's made clear that as long as they participate in the program, they pay zero. And the other place would be on the invoice paperwork. They could see where the co-pay was listed as $1,000, but they will not be charged the $1,000. So we do a pretty good job in terms of explaining it, I think, in the member letter proactively, and then as part of the conversation that SaveOn has with the member, they do their due diligence to explain, "We're charging the co-pay to be able to create the savings, but you will always pay zero as long as you are enrolled in the program."

Melissa:

Great. Okay. The next question is, "If an employee ignores the communications that they've received on the program, when and how [inaudible 00:44:19] first become aware or experience the plan changes while attempting to fill their prescription?" So [crosstalk 00:44:26] a description of right here.

Rachel Harmon:

Yeah. So whenever, and I think I used the words, a warm transfer, we get a prompt in our system, that prompt for the advocate is actually a rejection. So I don't like to use that word in this capacity because we're not telling them that the claim's not paid, but it's the prompt for our Accredo advocate to recognize that it is a SaveOn prescription and the claim cannot move further until we either have the override, which is the co-pay assistance information to put in the system to get it to zero. So we will not advance that any further. And if we have difficulty getting the member connected with SaveOn, or if it's an instance where we've tried to reach out to the member and the member does not get to us, we then engage you to let you know that we're having difficulty.

Rachel Harmon:

So we don't want to have disruption, we want members to be able to get their medication. We stay very engaged with these patients and we track their success in terms of enrollment. So you would find out if we had any difficulties, so we would not tell the member, they couldn't get their medicine or anything to that effect that we would be coordinating with them to the best of our ability and then to you if we had difficulty.

This transcript was exported on Dec 06, 2021 - view latest version here.

Melissa:

What would the member be asked to pay if they refused to enroll in the program at the point of sale or with any outreach?

Rachel Harmon:

That's an excellent question. So what we do at that point in time is if they refuse to enroll, that's when SaveOn reaches that to Tammy and I, and we engage you. Our recommendation is to always uphold the plan's design. Meaning if you don't participate in this program, your co-pay or your responsibility will be $1,000. And because it's not part of your existing benefit design, that $1,000 is not applicable to your max out-of-pocket. And that's often compelling enough for members to say, "Oh, wait, I want my drugs for free." Right? If that's not a successful message, or if you have concerns for that message, we will work with you in terms of how you want to manage those patients.

Rachel Harmon:

We have some clients with union populations like yourself that feel strongly, that they have to have the ability to override. And you should know that you absolutely have that ability. We ask that you do so cautiously because we don't want to undermine the plan design you're putting in place to create savings. So if members realize that they can simply say no and opt-out, we're defeating the purpose. The flip to that is if you have a really escalated member and you have a sensitive situation where you feel like it's appropriate to provide that override, we absolutely can do so.

Rachel Harmon:

Just know that we can't override the plan design. We can give the patient an override to mirror what your specialty co-pay is on your existing benefit design. So [inaudible 00:47:31] $25, we can say, "Okay, we'll put an override in your responsibility is $25, but it doesn't change the fact that it's carved out a non-essential." So when they pay that $25, it is not applicable to that max out-of-pocket. And that's just a really important distinction that we all understand. So you can override it, you can put it at zero and forgo any plan cost savings. We don't recommend it, but we recognize that there are situations where you might feel that that is necessary. And so we can support any of those scenarios. We just work with you if and when that happens

Melissa:

And for IPBC members, those decision points, go back through the cooperative. We have to be a little sensitive to the fact that this is a shared risk within the cooperative. And that that is a decision that generally is made at the cooperative level. So just works a little different with the fact that this is a combined multi-employer arrangement. Okay. Next question. "Why can't Express Scripts just include any members who are on the specialty drug in the program rather than making them individually register for the program?"

Rachel Harmon:

So, [inaudible 00:48:56].

Melissa:

Rachel?

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21)   Page 13 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

Rachel Harmon:

Again, this is an agreement [inaudible 00:48:58]

Melissa:

Oh, no. You're cutting out. Can you maybe start at the top again with the answer to that question?

Rachel Harmon:

Sure. You can hear me, correct?

Melissa:

Yes. Now we can.

Tammy:

Now we can.

Rachel Harmon:

Okay. Okay. Okay. Sorry. So again, this is an agreement between the patient and co-pay assistance through the manufacturer. So in order for us to leverage the savings, the member has to actively enroll in co-pay assistance. That's where the savings comes from. We can't do that for a member. They have to do it on their own.

Melissa:

Okay. The next question is on someone who uses an HSA outside of their current plan. [Joan 00:49:51] we'll respond to that individually. I want to be careful to make sure we give you an accurate answer. So I have to follow up with you on that one. The next question is, "If an employee currently pays the co-pay to obtain their prescription, are they even aware of manufacturer assistance? And will they even understand what this is?"

Rachel Harmon:

Yeah. So it's an interesting dynamic. Our specialty patients are very aware of co-pay assistance. And if you listen to drug ads on TV at the very end, there's always a tagline. "If you can't afford your medication, ask us how we can help." Right? And so our specialty patients are often part of different communities and different support groups where these things are actively talked about. And so what we often see, you guys have a very generous plan design, but in plan design have higher patient responsibility, we often see that most patients use co-pay assistance in those plans because of the cost. And honestly, we see it when the cost isn't an issue, whether they need it or not if they know co-pay assistance is out there if they're getting it. So they're probably aware if they're not, that's SaveOn's job to help them understand what we're going after here and how we're getting the savings for them and the plan.

Tammy:

And I would just interject there. Rachel and Melissa, that in fact, last year we saw that 317 IPBC patients did utilize co-pay assistance to help offset their specialty co-pays.

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21)  Page 14 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

Melissa:

And maybe that's a good time to ask the question. It seems like Express Scripts is trying to take advantage of a manufacturing co-pay assistance program that were intended to help low-income patients who cannot afford their co-pays. At what point do the drug manufacturers decide to eliminate these programs when they realize they're being used to basically reduce the cost of employers and those who may not need assistance?

Rachel Harmon:

Well, that's a good one. So I'll clarify by saying there are two different types of assistance out in the industry. Well, there's really three. One is a free drug, and then it's administered by the manufacturer directly in the industry. Second is foundational support, which is the charitable organizations that put forward funds to help patients in need. Now, those foundation support programs have lengthy requirements for getting those funds, think of this like scholarship money, right? They have to submit an application, their W-2s, their monthly income and expense statement. They have to prove that they are truly in need financially of those funds.

Rachel Harmon:

What we target in SaveOn is manufacturer assistance programs that are not part of foundational support. We purely view these funds as marketing dollars. So pharma's put, we estimate roughly $15 billion in the industry of co-pay assistance programs today. And they do it under the guise of making their drugs more affordable and accessible to the patients that need them, but they do get significant tax write-offs for those types of program offerings. And also we know that they put those programs out there to really preserve market share in their product.

Rachel Harmon:

So far, we have seen some reactions from manufacturers because of co-pay assistance programs, but most of the reactions have been related to the accumulator adjustment programs. And the reason for that is when you use an accumulator adjustment program and you're constantly resetting their max out-of-pocket, removing the co-pay assistance. When you have a patient in a high deductible plan where they can meet their max out-of-pocket in the first three fills, they also exhaust their funding for the year for these co-pay assistance programs. And what would happen is they would start on a drug, exhaust the funding and then flip to a competitor's drug.

Rachel Harmon:

And that's really what pharma has reacted negatively to, which tells us that the pure reason for them putting these dollars on the table is to ensure that they have patients using their drug, not any drug. So it's not to say that we couldn't see other reactions. Most of the changes to programs we've seen in the marketplace are really focused on the accumulator adjustment because it exhausts and then it makes them flip to another drug. For SaveOn we've been successful because we're keeping them on the same drug, we're just leveraging the assistance they've put on the table.

Melissa:

Thanks, Rachel. The next question I'll answer real quick. And then in the interest of time, we're going to have to switch over to just a quick walkthrough of the opt-out form. The question to everyone is why the 5/1 effective date for IPBC, why not wait until the renewal? That is a decision that was based on the

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21)  Page 15 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

dramatic savings involved. Here, these are real dollars in a year that we know that many local budgets are being subject to a serious amount of pressure to find dollars.

Melissa:

This is one of those things that's a win-win for employees, they get their co-pays subsidized and for IPBC to allow these dollars to flow through. And so there was some urgency in rolling this out as soon as possible to take advantage of the savings. So that's why the unusual timing in here, but knowing that it has the potential to be concerning to you. That's why we wanted to develop this process that you see on your screen right here. This is the opt-out form, if you look at this program and for whatever reason decide that it is not something you feel is appropriate for your employee base, you do have the ability to opt-out. Based on the board vote, everyone will have this rolled out with the exception of grandfathered plans and possibly HSA plans.

Melissa:

If you want your own plans excluded from this program, you need to fill in this opt-out form. This will be distributed, we posted it on the IPBC website. I'll work with [Sandy 00:56:23] to make sure it gets sent out as well if it hasn't been already. But this is the form that will notify myself and Dave Cook that you do not want this program rolled out. Because of the urgency in the implementation the deadline for this is this Friday. So you've got the chance now to review this material and consider what you've heard here today. And then you can take a look at this form and complete it if it's something that you would like to opt-out of.

Melissa:

I know that there were a handful of questions. We can keep going for a few minutes. And if you put a question in the chatbox that was not addressed, we can follow up with you via email after the meeting. But I wanted to make sure that we had a chance to discuss this form because this is the action needed on your part if you're concerned about the implementation of this program for your community. So with that Dave or Sandy, do you want to add any comments to wrap up or anything additional to add?

Dave:

Melisa, there was just a question regarding, can we send the answers to everyone? We can format the questions and send out the form and the responses all together later today, I hope.

Melissa:

Sounds good. Okay. Well, Rachel, you've been enormously helpful, really appreciate the time to do the presentation today. Thanks, Tammy for helping pull all this together. And I appreciate the engagement and all the questions we got. Thank you very much on the part of IPBC members as well. And for you really paying attention to this important issue that is being rolled out for IPBC. So this recording will be posted on the website, along with the slides and the opt-out form, and we'll send out the answers to questions that we didn't get to later on. So thanks, everybody.

Rachel Harmon:

Thank you.

Tammy:

IPBC and SaveonSP Training-20210216 1901-1 (Completed 12/04/21)  Page 16 of 17
Transcript by Rev.com
121651645v1

This transcript was exported on Dec 06, 2021 - view latest version here.

Thank you.