# EXHIBIT D

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

February 20, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Re:    ***Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC***
    ***No. 2:22-cv-02632 (JKS) (CLW)***

Dear Judge Wolfson:

Defendant Save On SP, LLC ("SaveOn") writes to request clarification of portions of Your

Honor's February 6, 2024 Order, Dkt. 192, (the "Order") and reconsideration of other portions.

SaveOn requests three clarifications of the Order. *First*, SaveOn requests clarification that

J&J's enforcement of all CarePath eligibility criteria is relevant, including age limits and re-

strictions against membership in government health pelans, which were discussed at the January

24, 2024 conference before Your Honor. Section I.A. *Second*, SaveOn asks for clarification that

documents relating to CarePath's financial viability are relevant, including those concerning how

J&J sets the annual maximum amount of copay assistance that it offers to patients and how much

money J&J makes from its investment in CarePath even after paying more to patients on SaveOn-

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

Hon. Freda L. Wolfson                                                                    Page 2

advised plans. SaveOn understood Your Honor to rule at the conference that such documents were relevant. Section I.B. *Third*, SaveOn seeks clarification that J&J must produce information sufficient to quantify the monetary benefit SaveOn's conduct generates for J&J. SaveOn understood such information to be part of Your Honor's ruling that J&J must produce documents showing the impact of SaveOn on J&J's sales of the drugs at issue. Section I.C.

SaveOn also requests reconsideration on three points of the Order. *First*, SaveOn asks Your Honor to rule that the reasons why J&J set the annual maximum amounts of copay assistance for the drugs at issue at the levels it did and why J&J chose to maintain those levels after learning of SaveOn's services are relevant to SaveOn's mitigation defense. J&J's failure to change those maximums, especially after considering implementing such changes, would show that it did not take reasonable efforts to avoid any purported damages caused by SaveOn's conduct. Section II.A. *Second*, SaveOn asks Your Honor to rule that discovery relating to CarePath's purpose is relevant to J&J's allegations of public harm as part of its GBL claim. Under New York law, J&J must show that the same conduct that purportedly injured it also injured the public, and showing that CarePath does not benefit the public (only J&J) would refute any allegation of public harm. Section II.B. *Third*, SaveOn asks Your Honor to rule that J&J cannot withhold information about its specialty drug pricing if it reserves the right to use such information to rebut arguments that it knows SaveOn will make at trial. Section II.C.

## I.      Requests for Clarification

A court may grant a motion for clarification "to explain or clarify something ambiguous or vague" about a prior order. *Alberts v. Bumgardner*, No. CV-13-5538(JXN)(JBC), 2022 WL 2833828, at *1 (D.N.J. July 19, 2022). SaveOn seeks clarification of three points.

Hon. Freda L. Wolfson                                                                                    Page 3

A.     **J&J Should Produce Documents Relating to <u>All</u> Eligibility Criteria for Care-Path's General T&Cs**

In the joint letter filed at Docket 146, SaveOn moved the Court to compel J&J to produce documents relating to its enforcement of its General T&Cs. Dkt. 146 at 8-9. The Court declined to construe those contractual provisions as a matter of law at the pleadings stage, Dkt. 68 at 16, and J&J's course of conduct in enforcing them is relevant extrinsic evidence of their meaning. Dkt. 146 at 8 (citing *Quick v. N.L.R.B.*, 245 F.3d 231, 247 (3d Cir. 2001); *Int'l Paper Co. v. Rexam, Inc.*, No. 3:11-CV-6494(JAP), 2013 WL 3043638, at *5 (D.N.J. June 17, 2013)). As SaveOn explained at the January 24, 2024 conference, if J&J did not enforce the "other offer" term against members of SaveOn-advised health plans until it contemplated this lawsuit, but during that same time enforced other CarePath eligibility criteria, that would be strong evidence that J&J did not genuinely believe that members of SaveOn-advised plans were ineligible for CarePath. *See* Tr. 20:7-21:7. Such evidence would undermine J&J's tortious interference with contract claim.

SaveOn understood Your Honor to rule at the conference that documents relating to J&J's enforcement of CarePath's eligibility criteria were relevant. Tr. 31:5-13 ("I believe [SaveOn is] entitled to documents that show what policies [J&J] had with regard to enforcement of eligibility criteria beyond 'other offer.'"); *see also id.* at 31:12-13 ("Those documents I believe would be relevant."). SaveOn understood this ruling to apply to J&J's enforcement of *all* CarePath eligibility criteria. The Order, however, could be read as including only ***some*** criteria:

> [I]t is appropriate for Plaintiff to search for, and produce, documents reflecting the company's enforcement instructions and policy, during the entirety of the agreed upon discovery time frame (April 2016-November 2023), concerning eligibility criteria set forth in the provision: "may not be used with any other coupon, discount, prescription savings card, free trial, or other offer."

Dkt. 192 at 13.

Hon. Freda L. Wolfson                                                                                    Page 4

     SaveOn asks Your Honor to clarify that J&J's enforcement of ***all*** CarePath eligibility criteria is relevant, not just its enforcement of those criteria contained in the "may not be used" provision. These other criteria include requirements that patients not be enrolled in Medicare or Medicaid and must meet age requirements.[1] At the conference, both J&J and SaveOn discussed these additional eligibility criteria, Tr. 18:8-16, 20:19-25; Your Honor indicated that they were at issue, *id.* at 23:15-25; and Your Honor indicated that no criteria were to be excluded, *id.* at 34:7-12 ("MR. DUNLAP: … I've heard my friend on the other side say he thinks enforcement is only relevant as to 'other offer.' JUDGE WOLFSON: I already said no. MR. DUNLAP: I just wanted to clarify it goes to the other eligibility criteria as well.").

     SaveOn does not ask for clarification or reconsideration of Your Honor's ruling that J&J need not "search and produce records of each individual patient's call history," Dkt. 192 at 12-13; *see also* Tr. 35:3-12, or that the parties must meet and confer on search parameters for documents relevant to J&J's enforcement of CarePath's eligibility criteria, Dkt. 192 at 13; *see also* Tr. 30:25-31:13. SaveOn simply asks Your Honor to clarify that J&J's enforcement of all eligibility criteria is relevant. SaveOn will work with J&J to craft appropriate search parameters.[2]

---

[1] *See* Ex. 1 (Tremfya Savings Program Overview) ("This program is only for people ***age 18 or older*** using commercial or private health insurance who must pay an out-of-pocket cost for their Janssen medication. This includes plans from the Health Insurance Marketplace. This program is ***not for people who use any state or federal government-funded healthcare program***. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.") (emphases added); *see also* Ex. 2 (Stelara Savings Program Overview) (same).

[2] If Your Honor intended to exclude eligibility criteria such as enrollment in federal healthcare programs and age requirements, SaveOn submits (in the alternative) that Your Honor should reconsider that ruling based on documents produced after the parties submitted their joint letter. ███████████████████████████████████████████████████████████. *See, e.g.*, Ex. 3 (TRIAL-CARD_00002400) ██████████████████████████████████).

Hon. Freda L. Wolfson                                                                                    Page 5

**B.      J&J Should Produce Documents Relating to CarePath's Viability, Even if Such Documents Also Relate to CarePath's Budget or Return on Investment**

In the joint letter filed at Docket 150, SaveOn moved the Court to compel J&J to produce documents relating to CarePath's financial viability. Dkt. 150 at 4-6. J&J put this issue front and center in its Complaint. In its GBL claim, J&J alleges that SaveOn's conduct "jeopardiz[es] the viability of patient assistance programs like CarePath by making them prohibitively expensive." Compl. ¶ 114. To rebut this claim, SaveOn sought information going to CarePath's financial viability, including "[d]ocuments regarding JJHCS's determination of the CarePath budget, and its communications regarding that budget," Dkt. 150 at 4-5, and documents regarding "CarePath's profitably [*sic*] and return on investment," *id.* at 6.

In the Order, Your Honor ruled that "communications involving the viability of CarePath is a relevant topic which [SaveOn] may explore." Dkt. 192 at 19. Your Honor also ruled, however, that "communications of budgetary decisions are not relevant," *id.*, and that "[J&J's] alleged harm is not related to the profitability of any Janssen drugs," *id.* at 22. Citing these latter rulings, J&J now says that it will not produce any new documents relating to CarePath's budget or any documents relating to its return on investment for CarePath. Ex. 5 (Feb. 8, 2024 Ltr. from J. Long to E. Snow) at 1-2; Ex. 6 (Feb. 14, 2024 Ltr. from E. Snow to J. Long) at 1-2.

-----------------------

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████. Ex. 4 (JJHCS_00132108) at 4.█████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████.

SaveOn is entitled to discover additional such evidence.

Hon. Freda L. Wolfson                                                                                      Page 6

SaveOn asks Your Honor to clarify that documents relating to CarePath's financial viabil-

ity are relevant, even if they also relate to CarePath's budget (that is, how J&J sets the annual

maximum amount of copay assistance that it offers to patients) and to J&J's return on investment

from CarePath (that is, how much money J&J makes from its investment in CarePath, even after

paying more to patients on SaveOn-advised plans).

At the conference, Your Honor said that SaveOn's effect on CarePath's viability included

relevant information about both CarePath's budget and SaveOn's impact on J&J's "bottom line":

> JUDGE WOLFSON: … I think to the extent that the harm being
> alleged is a financial harm to the CarePath program and, as you call
> it, the viability of the program, there could be communications that
> could be relevant. It's not just what the budget is, but if people are
> saying, you know, this is going to hurt our bottom line, we're going
> to be okay, but it's going to hurt our bottom line, that could go to
> your viability argument.

Tr. 64:3-11. Your Honor confirmed this understanding in discussion with SaveOn's counsel:

> JUDGE WOLFSON: … So, with regard to CarePath specifically,
> what do you think you're missing that you need to give you the dis-
> covery you require to show how this impacts the viability of Care-
> Path.
>
> MR. DUNLAP: We need to understand how Johnson & Johnson
> sets the CarePath levels, how it decides on the budget, where that is
> done, the factors that go into it, and relevant communications about
> that.
>
> JUDGE WOLFSON: Okay. Frankly, I find that okay. So that's
> where we are.

Tr. 69:20-70:6. SaveOn asks Your Honor to reaffirm this guidance.

As a practical matter, allowing J&J to withhold all documents about CarePath's budget and

return on investment would allow it to withhold the most relevant information about CarePath's

financial viability. If, for example, J&J once made $5 in drug sales for every $1 it invested in

CarePath, but SaveOn's conduct led it to now make $4 for every $1 it invests, then CarePath would

Hon. Freda L. Wolfson                                                            Page 7

not be "prohibitively expensive" as J&J alleges, Compl. ¶ 114. CarePath instead would be still

viable because it continues to earn J&J a healthy return on its investment. In these circumstances,

J&J may well have consciously chosen not to lower its CarePath annual maximums for patients

on SaveOn-advised plans because, even when paying out more in copay assistance than it other-

wise would have, CarePath was still a profit driver for J&J.[3]



─────────────────────

[3] Public documents indicate that most leading drug manufacturers keep track of the return on their investments in copay assistance by tracking increases in drug sales. A December 2021 Congressional Report noted that Teva's copay program for Copaxone had an average return on investment of 451 percent for commercial patients. Staff of House Committee on Oversight and Reform, 117th Cong., Drug Pricing Investigation, 154 (December 2021), https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf. Similarly, Novartis valued its patient assistance program as providing "a return on investment of $8.90 for everyone dollar spent on the program" starting six months before the loss of exclusivity for the drug. *Id.* at 157. Documents cited in this report suggest that J&J also considers how its investments in copay assistance can be used to "optim[ize] … sales growth." *Id.* at 159.

Hon. Freda L. Wolfson                                                              Page 8

█████████████████████████████████████████████████████████████

██████████████████████████); Ex. 11 (JJHCS_00141359)████████████████████

████████████████████████████████████████████). J&J should not be

allowed to withhold information showing that its allegations that SaveOn threatens CarePath's

viability are patently false.

        In moving for this clarification, SaveOn does not ask Your Honor to alter Your Honor's

rulings that CarePath's budget and the profitability of Janssen drugs are not relevant *other than* as

they relate to the financial viability of CarePath. SaveOn separately moves Your Honor to recon-

sider portions of those rulings for other reasons, *see* Section II, *below*, but its motion for clarifica-

tion of the scope of Your Honor's ruling on CarePath's financial viability is not based on (and

does not depend on) the outcome of those reconsideration motions.

        **C.    J&J Should Produce Data Sufficient for SaveOn to Quantify the Monetary
                Benefit that SaveOn's Conduct Creates for J&J**

        In the joint letter filed at Docket 150, SaveOn moved the Court to compel J&J to produce

documents regarding J&J's return on investment from the CarePath program. Dkt. 150 at 6. One

of the ways in which this information is relevant, SaveOn argued, is that:

> SaveOnSP believes that what JJHCS calls the "SaveOnSP Program"
> increases the total number of patients who take Janssen drugs and
> increases the frequency with which patients take those drugs. John-
> son & Johnson's revenue from its increased sales of Janssen drugs
> to those patients may well exceed the increase in its total expendi-
> tures of CarePath funds that it tries to pin on SaveOnSP—in which
> case, SaveOnSP's conduct would not injure JJHCS at all. And even
> if the total revenue from new sales does not exceed the total in-
> creased CarePath patients, that revenue may well offset a large
> chunk of JJHCS's alleged damages.

*Id.* To explore this theory, SaveOn sought information showing any additional sales of the J&J

drugs at issue that are attributable to SaveOn's conduct and the revenue that J&J receives from

those sales. *See, e.g.,* Tr. 80:2-6, 81:21-25, 82:11-15, 83:24-84:10.

Hon. Freda L. Wolfson                                                                                    Page 9

Ruling on this portion of SaveOn's motion, Your Honor opened a "small window for De-

fendant to explore documents that may reflect whether more patients are taking Janssen drugs as

a result of being on the SaveOnSp Program." Dkt. 192 at 22. This ruling was consistent with black

letter law that if a plaintiff alleges that a defendant's conduct caused it financial harm, the defend-

ant is entitled to prove that very same conduct caused the plaintiff a financial benefit that wholly

or partially offsets the alleged harm. *See, e.g.,* Restatement (Third) of Torts: Remedies § 9 Am. L.

Inst., Tentative Draft No. 2, 2023) ("If a defendant's tort harms the plaintiff and also causes or

enables the plaintiff to receive a benefit that the plaintiff could not have received but for the tort,

the plaintiff's damages generally should be reduced by the amount of the benefit."); Restatement

(Second) of Torts § 920 (Am. L. Inst. 1979).[4]

SaveOn asks Your Honor to clarify that the documents J&J must produce on this subject

include information sufficient to quantify the monetary benefit that SaveOn's conduct generates

for J&J. This specifically includes data showing the revenue that J&J received from sales of those

drugs to members of SaveOn-advised plans during the relevant period.

---

[4] *See also Ronson v. David S. Talesnick, CPA*, 33 F.Supp.2d 347, 355 (D.N.J. 1999) (holding that, for tort claim, "defendants should be permitted to come forward with evidence of benefit from the [tort] that could be applied to reduce a plaintiff's recovery. This conclusion properly balances the public policy of preventing injured plaintiffs from recovering a windfall and the public policy against permitting tortfeasors to escape liability deriving from their tortious actions[.]"); *In re: Fisher-Price Rock 'N Play Sleeper Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 1:19-md-2903, 2023 WL 1822239, at *3 (S.D.N.Y., Feb. 8, 2023) (holding that, for NY GBL § 349 claim based on sale of defective child's toy, "[t]he defendants are entitled to introduce evidence of [plaintiff's] positive experiences with the [defective toy] and whatever offset they can establish through the receipt of the plush toy [provided as a replacement]. These may reduce the damages to zero or a jury may give them less weight.").

Hon. Freda L. Wolfson                                                    Page 10

Discovery supports SaveOn's theory that its conduct increases drug sales for J&J. Before it was sued in May 2022, SaveOn analyzed this issue and concluded that " ███████████████ ███████████████████████████████████████████████████████ ███████████████ " Ex. 12 (SOSP_0167735) at 8. ████████████████████████████████████ ██████████████████████ Ex. 13 (JJHCS_00036487) at 5. ████████████████████████ ██████████████████ *Id.* at 8. ██████████████ ████████████████████████████████████████████ Ex. 9 (JJHCS_00140340) at 22.

It makes sense that patients on SaveOn-advised plans have better adherence rates, because SaveOn can directly contact members of the plans that it advises to help them enroll in CarePath, while J&J cannot. Once a member of a SaveOn-advised plan enrolls in CarePath and qualifies for the copay assistance benefit that SaveOn administers, that member pays nothing for their specialty drug, increasing the likelihood that they will continue to take it. If SaveOn's conduct results in a member taking a drug who otherwise would not have taken in, or filling a drug more often than they otherwise would have, then that conduct creates additional revenue for J&J. To quantify the effect of its conduct, SaveOn needs data showing the additional revenue that J&J makes from those additional sales.

In seeking this clarification, SaveOn does not seek to alter Your Honor's ruling that the profitability of J&J's drugs is generally not relevant. Dkt. 192 at 19-22. SaveOn does not argue that J&J's profits from selling the drugs at issue eliminate J&J's injury for purposes of its GBL claim, *contra id.* at 22, or excuse SaveOn's conduct for purposes of its tortious interference claim, *contra id.* at 23. SaveOn submits only that if the same conduct that J&J says caused it a financial

injury *also* caused J&J a financial benefit, SaveOn is entitled to quantify that benefit and present it as an offset to J&J's alleged damages. SaveOn asks Your Honor to clarify this point.

## II.     Requests for Reconsideration

Requests for reconsideration, governed by Local Civil Rule 7.1(i), may be granted when "(1) an intervening change in controlling law has occurred; (2) evidence not previously available has become available; [or] (3) it is necessary to correct a clear error of law or prevent manifest injustice." *Bricklayers and Allied Craftworkers Loc. 5 of N.J. Pension & Annuity Funds v. Chanree Constr. Co., Inc.*, No. 3:12-CV-03897-FLW-LHG, 2013 WL 6528776, at *2 (D.N.J. Dec. 12, 2013). Reconsideration "is within the Court's inherent powers" and "the [C]ourt retains a good deal of discretion." *U.S. ex rel. Silver v. Omincare, Inc.*, No. 1:11-cv-01326-NLH-JS, 2021 WL 9848445, at *1 (D.N.J. Apr. 13, 2021) (citing *In re Anthanassious*, 418 F. App'x. 91, 95 (3d Cir. 2011) *and* Fed. R. Civ. P. 54(b)). SaveOn seeks reconsideration of three portions of Your Honor's rulings on SaveOn's requests for J&J's financial information.

### A.     Evidence That J&J Failed to Adjust CarePath's Budget in Response to SaveOn's Conduct Is Relevant to SaveOn's Mitigation Defense

In the joint letter filed at Docket 150, SaveOn sought documents related to CarePath's budget that would show that "JJHCS could have reduced the CarePath budget but chose not to do so." Dkt. 150 at 5. In ruling on that motion, Your Honor ruled that, while "communications involving the viability of CarePath" were relevant, "communications of budgetary decisions" unrelated to viability were not. Dkt. 192 at 19. In this latter ruling, Your Honor stated: "What matters for purposes of liability and damages are not the changes that Plaintiff contemplated implementing, but actual changes that occurred." *Id.*

SaveOn asks Your Honor to reconsider a portion of this latter ruling: It asks Your Honor to rule that the reasons why J&J set the annual maximum amounts of copay assistance for the drugs

Hon. Freda L. Wolfson                                                                    Page 12

at issue at the levels that it did, and why J&J chose to maintain those levels after learning of SaveOn's services (and those of so-called accumulators and maximizers), are relevant to SaveOn's defense that J&J failed to mitigate its purported damages.

To determine an injured party's "reasonableness" in mitigating damages, courts look at all the facts and circumstances and judge the reasonableness of the party's actions "in the light of one viewing the situation at the time the problem was presented." *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 259 (3d Cir. 2008); *see also Williams v. Benshetrit*, No. 19-CV-00797, 2022 WL 138007, at *9 (E.D. Pa. Jan. 14, 2022), *reconsideration denied*, No. 19-CV-00797, 2022 WL 20742777 (E.D. Pa. Mar. 14, 2022) ("Evidence that Plaintiff failed to mitigate his damages by failing to [take actions his doctor recommended] for eighteen months is relevant"); Restatement (Second) of Torts § 918 cmt. e (Am. L. Inst. 1979) (Avoidable Consequences) (different factual circumstances are relevant to assessing whether a party reasonably mitigated its damages).

Documents produced since SaveOn filed its motion show that ██████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ . Ex. 11 (JJHCS_00141359) at -360. ████████████ ████████████████████████████████████████████████████████████████████████████ . *Id.* ████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████ SaveOn-advised plans did not count copay

assistance towards plan limits on patients' out-of-pocket responsibility, and thus knew that Care-Path would spend more in copay assistance to members of such plans as a result—the very harm that J&J alleges in its Complaint, Compl. ¶¶ 110, 115. ██████████████████████████

███████████████████████████████████████████████████. Ex. 11 (JJHCS_00141359) ████████████████████████████████████████).

There are other examples too. ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████.⁵ ████████████████████████████████

███████████████████████████████████████████████████

███████████████████. Ex. 18 (JJHCS_00164633) at -633 ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████).  ██████████████████. Even now, annual maximums for most drugs at

_____

⁵ ████████████████████████████████████████████████████
██████████ Ex. 14 (TRIALCARD_00001884) at -885. ████████████
██████████████ See Ex. 15 (TRIALCARD_00002732) at -733 (2█████
█████████████████████████████); Ex. 16 (TRIALCARD_00004935) at -934-35 (█
██████████████████████████████████████████). Ex. 17 (TRIAL-CARD_00003383) at -383-84.



issue remain unchanged. *See, e.g.*, Ex. 19 (Savings Program Overview for Opsumit, Uptravi, and Tracleer); Ex. 20 (Savings Program Overview for Darzalex and Darzalex Faspro).

J&J should not be allowed to withhold evidence that it could have reduced these annual maximums—especially that it considered doing so in response to maximizers and accumulators and SaveOn but affirmatively decided not to. Such evidence could significantly reduce or eliminate J&J's purported damages. *See Sean Wood, L.L.C. v. Hegarty Grp., Inc.*, 422 N.J. Super. 500, 519 (App. Div. 2011) ("Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts without undue risk, burden or humiliation.").

In this request for reconsideration, SaveOn does not seek all documents and communications regarding the CarePath budget. It seeks only documents going to why J&J set CarePath's annual maximums at the levels it did during the relevant time period and ███████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████.

## B.    Evidence Of CarePath's Purpose Is Relevant to SaveOn's Defenses Against J&J's GBL Claim

In the joint letter filed at Docket 150, SaveOn sought documents relating to J&J's CarePath budget that could show that "JJHCS[] offers these [copay assistance] funds primarily as a marketing program to increase the sales of Janssen drugs." Dkt. 150 at 4-5. In the Order, Your Honor held that CarePath budget documents other than those going to CarePath's viability were not relevant. Dkt. 192 at 19. In a separate portion of the Order, Your Honor ruled that "even if [J&J's] program is created for the purposes of promoting J&J's drugs, [J&J] may sustain its GBL Claim by proving that [SaveOn's] alleged conduct injured [J&J] in some way." *Id.* at 21.

SaveOn does ***not*** ask Your Honor to revisit the ruling that CarePath's purpose is irrelevant to J&J's alleged harm for its GBL claim. To prevail on a GBL claim, "a plaintiff must allege that

Hon. Freda L. Wolfson                                                                      Page 15

(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Dkt. 192 at 20 (citing and quoting Dkt. 68 at 12). In deciding SaveOn's motion to dismiss, the Court held that J&J had sufficiently alleged the third element—injury to J&J—by alleging that SaveOn caused J&J to pay out more in CarePath funds than it otherwise would. *See id.* at 20-21. In this context, Your Honor held that even if J&J created CarePath to sell more drugs, that fact would not affect J&J's allegations that SaveOn's conduct injured J&J or affect J&J's purported damages. *Id.* at 21. SaveOn agrees.

To the extent that Your Honor held that CarePath's purpose was fully irrelevant to J&J's GBL claim, however, SaveOn moves Your Honor to reconsider. J&J cannot prevail on its GBL claim simply by showing that SaveOn injured it. *Ideal You Weight Loss Ctr., LLC v. Zillioux*, 106 N.Y.S.3d 495, 497-98 (N.Y. App. Div. 2019) (dismissing GBL § 349 claim where "the gravamen of the complaint is not consumer injury or harm to the public interest but, rather, harm to plaintiff's business"). As an independent element of its claim, J&J must show that the same conduct that injured it *also* injured the consuming public. *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 839 (N.Y. 2009) ("Plaintiffs must demonstrate that the complained-of acts or practices have a broader impact on consumers at large").

Your Honor held that J&J's allegations of public harm were "tethered to the viability of the CarePath program vis-à-vis the availability of funds generally available to patients in need." Dkt. 192 at 21-22. This is consistent with J&J's Complaint, in which it alleges that CarePath exists "to help commercially insured patients afford the costs of valuable and life-saving therapies," Compl. ¶ 2; "CarePath funds [are] intended to help patients afford their Janssen medication," *id.* ¶ 23; and "CarePath helps patients afford out-of-pocket costs for 44 Janssen drugs," *id.* ¶ 47.

SaveOn is entitled to disprove J&J's allegations of public harm by showing that, even if it is true that SaveOn harms CarePath's viability (a point which SaveOn also disputes, *see above* Section I.B), harming CarePath's viability does **not** harm the public. SaveOn believes that discovery will show that: CarePath is not intended to benefit patients; it is intended to benefit J&J by helping J&J to sell more drugs to patients who would otherwise buy a competitor's drugs. CarePath does not target payments to patients "in need;" it gives money to patients of any income level who might otherwise purchase a competitor's drugs to encourage them to buy J&J's drugs. (J&J has a separate program designed to provide drugs to low-income patients.[6]) And, most critically, CarePath allows J&J to raise drug prices by insulating those plan members who take specialty drugs from the immediate effects of paying higher prices for those drugs—allowing J&J to charge higher prices for those drugs that ultimately drive up overall health care costs for all other plan members. Simply put, CarePath does not benefit the public; it benefits J&J at the public's expense.

This is not hypothetical: A recent Congressional Oversight Committee report found that though "[d]rug companies often highlight the generosity of their patient assistance programs . . . companies emphasized the significant returns on investment from these programs in the form of increased sales." *See* Staff of House Committee on Oversight and Reform, 117th Cong., Drug Pricing Investigation 149 (December 2021).[7] That report emphasizes how those returns on investment for pharmaceutical companies come at the expense of health plans and patients:

> These programs allow the [drug] companies to generate higher revenues by maintaining demand while raising prices. Although these programs defray some patients' out-of-pocket costs, ***the overall cost***

---

[6] JOHNSON & JOHNSON PATIENT ASSISTANCE FOUNDATION, INC., https://www.jjpaf.org/ (last visited Feb. 20, 2024).

[7] https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf.

*to the health care system increases due to price increases*. This cost is in turn passed on to all patients in the form of higher insurance premiums.

*Id.* at 159 (emphasis added). The Committee concluded that "the pharmaceutical industry has used patient assistance programs to distract from price increases, even when company representatives privately acknowledged that lowering prices would be more helpful to patients." *Id.* at 163.



SaveOn therefore asks Your Honor to rule that discovery relating to CarePath's purpose is relevant to J&J's allegations of public harm. Your Honor did not address this argument in the Order, and the recently produced documents cited above provide an ample basis for reconsideration. SaveOn should be allowed to pursue discovery on this topic, as New York courts routinely reject attempts to turn purely business harms into GBL claims. *See, e.g., Ideal You Weight Loss*

*Ctr*, 106 N.Y.S.3d 495, 497-98; *Emergency Enclosures, Inc. v. Nat'l Fire Adj. Co., Inc.*, 893 N.Y.S.2d 414, 417-18 (N.Y. App. Div. 2009); *H2O Swimwear v. Lomas*, 560 N.Y.S.2d 19, 21 (N.Y. App. Div. 1990). SaveOn will meet and confer with J&J on appropriate search parameters.

### C.  J&J Cannot Withhold Information About Its Specialty Drug Pricing Unless It Represents That It Will Not Use Such Information to Rebut SaveOn's Arguments at Trial

In the joint letter filed at Docket 150, SaveOn sought information relating to J&J's drug pricing because J&J alleged in its Complaint that it reduced the "net price" of its drugs and because J&J's use of CarePath to raise drug prices helps show that any alleged harm to CarePath does not harm the public. Dkt. 150 at 7-8. In the Order, Your Honor denied that request, Dkt. 192 at 24, based in large part on J&J's representation at the conference that it would not "rely on the pricing of Janssen drugs as a basis to prove its claims," *id.*

SaveOn asks Your Honor to reconsider a portion of this ruling. At trial, to counter J&J's GBL claim, SaveOn intends to present evidence that J&J uses CarePath in part to raise drug prices; if J&J reserves the right to rebut that presentation, it must produce information now showing the connection between CarePath and its pricing of the 14 drugs at issue.

As Your Honor noted, Dkt. 192 at 5, 21, J&J alleges that SaveOn harms the public, in part, by "making other patient healthcare needs more expensive by not counting any of the [CarePath] funds spent on patients' medication towards their ACA maximum or deductible." Compl. ¶ 114.

SaveOn intends to counter this allegation as follows: In recent years, drug makers like J&J increased specialty drug prices far beyond the cost of inflation.[8] Drug makers like J&J used their

---

[8] For instance, a Congressional report on drug pricing found that as of 2021, "AbbVie and Janssen charge over \$181,529 for a year's supply of Imbruvica—82% more than when the drug was launched in 2013." Staff of House Committee on Oversight and Reform, 117th Cong., Drug Pric-

copay assistance programs to support these price increases by covering large portions of patients'
copays, insulating them from higher prices and encouraging them to buy the manufacturers' drugs
instead of competitors' drugs.[9] Because commercial health plans pay the vast majority of the cost
when their members fill these drugs, increased drug prices caused the plans' spending on pharmacy
benefits—overwhelmingly driven by specialty drugs—to skyrocket.[10] This hurt plan members, as
the plans had less money available for healthcare benefits.

　　　　As fiduciaries managing plan assets for the benefit of all members, plan sponsors looked
for ways to manage rising specialty drug costs. One way is the copay assistance benefit that
SaveOn administers: It helps use all copay assistance funds that a drug maker voluntarily makes
available while ensuring that members get their specialty drugs for free. An aspect of this benefit
is that the plans choose not to count copay assistance funds towards members' maximums or de-
ductibles. J&J asserts that this plan benefit hurts the few plan members taking specialty drugs
because it requires them to pay for their other healthcare (just as other plan members do). But this
same plan benefit helps all other plan members—the vast majority—by leaving the plans more

---

ing Investigation, AbbVie—Humira and Imbruvica at i (May 2021), https://docs.house.gov/meet-ings/GO/GO00/20210518/112631/HHRG-117-GO00-20210518-SD007.pdf. Imbruvica is one of the drugs at issue in this litigation.

[9] *See, e.g.*, Staff of House Committee on Oversight and Reform, 117th Cong., Drug Pricing Inves-tigation 149 (December 2021), https://oversightdemocrats.house.gov/sites/democrats.over-sight.house.gov/files/DRUG%20PRICING%20REPORT%20WITH%20APPENDIX%20v3.pdf. As discussed above, documents recently produced by J&J show J&J internally describing copay assistance as a vehicle to "insulate" patients from high costs. Ex. 22 (JJHCS_00141442).

[10] *See, e.g.*, Department of Health and Human Services, Assistant Secretary for Planning and Eval-uation, Trends in Prescription Drug Spending, 2016-2021 (September 2022), https://aspe.hhs.gov/sites/default/files/documents/88c547c976e915fc31fe2c6903ac0bc9/sdp-trends-prescription-drug-spending.pdf.

Hon. Freda L. Wolfson                                                              Page 20

money to spend on healthcare benefits. Far from raising the public's healthcare costs, SaveOn's conduct helps **lower** those costs for the vast majority of commercial health plan members.

This presentation will necessarily involve showing that the plan benefit that SaveOn administers was a reaction to drug makers raising specialty drug prices. At the conference, while promising not to affirmatively rely on drug pricing evidence, J&J's counsel said: "I want to leave myself one out, your Honor. If they start making allegations about the greedy drug companies that have raised prices, I think we're allowed to reply to that." Tr. at 97:23-98:1. J&J **knows** that SaveOn intends to make such a presentation—SaveOn told J&J and the Court as much a year ago. *E.g.*, Dkt. 79 (February 24, 2023 Joint Letter) at 14.

Allowing J&J to rebut SaveOn's presentation about rising specialty drug prices while denying SaveOn discovery of information relevant to that rebuttal would be manifestly unjust, which is not what SaveOn believes Your Honor intended. If J&J will disclaim any rebuttal to SaveOn's anticipated showing that J&J and other drug makers have raised specialty drug prices—fully eliminating the "out" that its counsel reserved—then no discovery on this point is necessary. But if J&J continues to reserve itself the right to present rebuttal evidence that it has lowered (or not increased) those prices, then SaveOn submits that J&J must produce discovery on this topic now, including the data underlying any such assertions. SaveOn seeks reconsideration of Your Honor's ruling to the extent necessary to declare that such evidence is relevant. SaveOn will work with J&J to craft appropriate search parameters to gather and produce this information.

Respectfully submitted,

Hon. Freda L. Wolfson                                                        Page 21

/s/ E. Evans Wohlforth
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

# Exhibit 1

Tremfya with Me



# Savings Program
## for eligible commercially insured patients
# Pay $5 per injection

Maximum program benefit per calendar year shall apply.
Terms expire at the end of each calendar year and may change.
See program requirements on next page.

**Get instant savings on your out-of-pocket costs for your Janssen medication. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**



# Get started

## Mobile Enrollment Available

 **Text "SAVINGS" to 56011**
(message and data rates may apply*)

 **Express Enrollment**
MyJanssenCarePath.com/Express

Check eligibility, enroll, and receive an electronic Savings Program card that can be saved to your digital wallet on your iPhone or Android device.

You can use your Savings Program card when filling your prescription at a specialty or retail pharmacy.
If for any reason your pharmacy cannot process your card, please submit a **Rebate Form** to receive a check.

**Learn more about TREMFYA withMe – the support program built around you.**

Through the dedicated support of a TREMFYA withMe Guide, a qualified healthcare professional, you will get additional resources to help you with prescription cost and treatment support.

**You can also create a personalized Patient Account at MyJanssenCarePath.com where you can:**

- Enroll in the TREMFYA withMe Savings Program
- View and manage your Savings Program benefits
- Learn about your insurance coverage
- Sign up for treatment support

If you enroll in the Savings Program via Mobile or Express Enrollment, you will not be able to view and manage your Savings Program benefits until you create an account at **MyJanssenCarePath.com**.

Care Team members, such as Providers and Pharmacists, can enroll patients in the Savings Program at **JanssenCarePathPortal.com/Express**

*See **Terms** and **Privacy Policy**.

**Please read the full Prescribing Information and Medication Guide for TREMFYA®, and discuss any questions you have with your doctor.**

Tremfya with Me



# Savings Program

## Am I eligible?

You may be eligible for the TREMFYA withMe Savings Program if you are age 18 or older and use commercial or private health insurance for TREMFYA® and must pay an out-of-pocket cost for your medication.

There is no income requirement.

## Other requirements

- **This program is only for people age 18 or older using commercial or private health insurance who must pay an out-of-pocket cost for their Janssen medication. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.

- You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.

- You must meet the program requirements every time you use the card.

- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.

- Patients who are members of health plans (often termed "maximizer" plans) that claim to **reduce** their patients' out-of-pocket costs will have a reduced maximum program benefit of $6,000 per calendar year. Out-of-pocket costs may be co-pay, co-insurance, or deductible. If you have enrolled in one of these plans, please inform TREMFYA withMe at 833-withMe1 (833-948-4631).

- Patients who are members of health plans that claim to **eliminate** their out-of-pocket costs are not eligible for cost support. If you have enrolled in one of these plans, please inform TREMFYA withMe at 833-withMe1 (833-948-4631).

- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program. By using the Savings Program card, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.

- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of TREMFYA®, and our service providers to enroll you in the TREMFYA withMe Savings Program. We may also use the information you give us to learn more about the people who use TREMFYA®, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.

- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in TREMFYA withMe at any time by calling 833-withMe1 (833-948-4631).

**Get started at <u>MyJanssenCarePath.com/Express</u>**

 **Need help?**   Call **833-withMe1** (833-948-4631)
Monday–Friday, 8:00 AM–11:00 PM ET
Visit JanssenCarePath.com/Tremfya

**Please read the full <u>Prescribing Information</u> and <u>Medication Guide</u> for TREMFYA®, and discuss any questions you have with your doctor.**

© Janssen Biotech, Inc. 2022   03/22   cp-05009v10



# Exhibit 2





# Savings Program
for eligible commercially insured patients

## Pay $5 per dose

Maximum program benefit per calendar year shall apply.
Terms expire at the end of each calendar year and may change.
See program requirements below.

**Get savings on your out-of-pocket medication costs for STELARA®. Depending on your health insurance plan, savings may apply toward deductible, co-pay, and co-insurance.**

**Program does not cover costs to give you your treatment.**



## ① Enroll in the Savings Program

### 3 ways to enroll

 **By creating an online account** and enrolling at **MyJanssenCarePath.com**

 **By phone**
877-CarePath
(877-227-3728)

 **By fax or mail**
Complete **Patient Enrollment Form**†
†You will activate your card upon receipt of enrollment confirmation by mail.

## Am I eligible?

You may be eligible for the Janssen CarePath Savings Program if you are age 6 or older and currently use commercial or private health insurance for STELARA®, and must pay an out-of-pocket cost for STELARA®. There is no income requirement.

Janssen CarePath Savings Program for STELARA® is based on medication costs only and does not include costs to give you your treatment.

## Other requirements

· This program is only for people age 6 or older using commercial or private health insurance for their Janssen medication. This includes plans from **the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.

· You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.

· You must meet the program requirements every time you use the program.

· Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.

· Patients who are members of health plans (often termed "maximizer" plans) that claim to **reduce** patients' out-of-pocket costs will have a reduced maximum program benefit of $6,000 per calendar year. Out-of-pocket costs may be co-pay, co-insurance, or deductible. If you have enrolled in one of these plans, please inform Janssen CarePath at 877-CarePath (877-227-3728).

· Patients who are members of health plans that claim to **eliminate** their out-of-pocket costs are not eligible for cost support. If you have enrolled in one of these plans, please inform Janssen CarePath at 877-CarePath (877-227-3728).

· To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program. By getting a Savings Program benefit, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.

· Before you activate your card, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of STELARA®, and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use STELARA®, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.

· If you use medical/primary insurance to pay for your medication, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.

· This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 877-CarePath (877-227-3728).

Janssen Biotech, Inc., is not liable for unintended or unauthorized use of the STELARA® Mastercard®, if it is lost or stolen. The Janssen CarePath Savings Program for STELARA® Prepaid Mastercard is issued by MetaBank®, N.A., Member FDIC, pursuant to license by Mastercard International Incorporated. Mastercard is a registered trademark, and the circles design is a trademark of Mastercard International Incorporated. Janssen CarePath Savings Program is not a MetaBank or Mastercard product or service, nor is the optional offer endorsed by them.

**Please read the full Prescribing Information and Medication Guide for STELARA®, and discuss any questions you have with your doctor.**

# ② How to use your Savings Program benefits

## How your card can be used depends on the insurance you use to pay for your medication:

 If you use your **pharmacy/prescription insurance** to pay for your medication from a pharmacy:
- You may use your card (provide your Member ID #, Rx BIN #, and Group #) to receive instant savings off the cost of your medication
- The pharmacy will collect your co-pay

 If you use your **medical/primary insurance** to pay for your medication through your doctor, treatment provider, or pharmacy:
- You may use your card to receive a rebate, **OR**
- You may assign your benefits directly to your treatment provider. Please discuss this option with your provider

### How it works:
- Your provider or pharmacy may or may not collect your co-pay, based on your insurance coverage
- You receive your treatment with STELARA® (ustekinumab)
  - Your provider or pharmacy submits your claim to your healthcare insurance provider
- You and your provider receive an EOB statement from your insurance
  - You are responsible for submitting the EOB to Janssen CarePath Savings Program, or you can request your provider to submit the EOB on your behalf (see *How to submit a rebate request* below)
- Janssen CarePath Savings Program reviews your EOB, and issues rebate to your card, to you by check, or to your provider if you have assigned your benefits to your provider

**Remember to bring your card to your treatment appointment. Your card is not a credit card. There is no charge for your card.**

**If for any reason your provider or pharmacy cannot process your card, please call us at 877-CarePath (877-227-3728). You may be able to submit a Rebate Form to receive a check. Proof of medication payment required.**

**With a Janssen CarePath online account, you can manage your Savings Program benefits**


- Review your available benefits
- Submit Savings Program requests
- View benefit payment transactions
- Receive timely alerts and program updates

**Get started now...**

 **Need help?** Visit **JanssenCarePath.com/Stelara**
Call **877-CarePath** (877-227-3728)
Monday–Friday, 8:00 AM–8:00 PM ET

## How to submit a rebate request
If you have created an online Janssen CarePath Patient Account, you may submit online in your account. If you would like to receive a rebate check payable to you by mail, you must complete a **Rebate Request Form** and provide proof of medication payment.

**At your request, your provider may submit rebate requests to the Savings Program on your behalf via the Provider Portal or by fax or mail.**

 **Online:**
**MyJanssenCarePath.com**

 **Fax:**
844-250-7193

 **Mail:**
Janssen CarePath Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

**Please read the full Prescribing Information and Medication Guide for STELARA®, and discuss any questions you have with your doctor.**

© Janssen Biotech, Inc. 2021    12/21    cp-54244v7



# EXHIBITS 3-4

# CONFIDENTIAL – FILED UNDER SEAL

# Exhibit 5



www.pbwt.com

February 8, 2024

Julia Long
(212) 336-2878

**VIA EMAIL**

Elizabeth H. Snow, Esq.
Selendy Gay Elsberg, PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:     ***Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC***,
         **2:23-cv-02632 (JKS) (CLW)**

Dear Elizabeth:

We write in response to SaveOnSP's January 29, 2024 letter regarding Judge Wolfson's rulings on SaveOnSP's requests for ancillary financial documents at the January 24, 2024 conference and as memorialized in Judge Wolfson's February 6, 2024 Order.

**I.      CarePath's Budget**

SaveOnSP continues to demand JJHCS "produce documents showing how J&J sets the level of CarePath copay assistance funds that it offers patients, how it decides on the CarePath budget including the factors that go into this decision, where that decision is made, and the relevant communications about the budget." *See* Jan. 29, 2024 Ltr. from E. Snow to J. Long at 1.  Not only do we reject this request, but Judge Wolfson and Judge Waldor have also rejected it.  Judge Wolfson found that as to issues concerning CarePath's budget, "[JJHCS] has the better argument" and "communications of budgetary decisions are not relevant to Defendant's defenses or Plaintiff's claims."  Dkt. No. 192 at 19.

Despite SaveOnSP's protests otherwise, it is clear from the February 6, 2024 Order that Judge Wolfson only directed JJHCS to produce a narrow subset of communications relevant to the action—i.e., those "communications involving the viability of Carepath."  *Id.*  Judge Wolfson further directed the parties to "meet and confer and agree on a narrow set of search terms in order to identify those communications."  *Id.*

The remaining demands in SaveOnSP's letter—including production of broader categories of documents, identification of new custodians, and search terms wholly untethered from issues related to the viability of CarePath—are in direct conflict with Judge Wolfson's February 6 Order.  For example, SaveOnSP proposes two search strings (copied below), but neither is tailored to the "narrow" issue on which Judge Wolfson permitted discovery.  Rather, these terms

Elizabeth H. Snow, Esq.
February 8, 2024
Page 2

are explicitly designed to result in any document discussing the term "budget" within proximity to CarePath—not CarePath's viability—and there is no basis to include terms related to "chang[es]" (including "increase[s]," "decreas[es]," or "adjust[ments]") to the annual maximum benefit of any "immunology," "oncology," or "infectious disease" related drug—without even a basic limitation for those drugs that are at issue in the litigation.

- Budget* w/10 (CarePath OR (care w/2 path) OR Carpath OR Carepth OR CP OR "WithMe" OR (with w/2 me) OR PAS OR "Patient Access Solutions")

- ("20,000" OR "20k" OR "6,000" OR "6k" OR "9,100") w/10 (set* OR chang* OR determin* OR adjust* OR increas* OR decreas* OR maintain* OR update*) AND (CarePath OR (care w/2 path) OR Carpath OR Carepth OR CP OR "WithMe" OR (with w/2 me) OR PAS OR "Patient Access Solutions" OR immunology OR IMM OR oncology OR ONC OR (Pulmonary w/2 Hypertension) OR PH OR PAH OR "infectious disease" OR ID OR Balversa OR Darzelex OR Faspro OR Erleada OR Imbruvica OR Opsumit OR Prezcobix OR Remicade OR Rybrevant OR Simponi OR Stelara OR Symtuza OR Tracleer OR Tremfya OR Uptravi OR Ventavis OR Zytiga)

Finally, to the extent that SaveOnSP now asks JJHCS to refresh certain data productions previously provided, JJHCS notes that it has sent two letters—both unanswered—to SaveOnSP proposing a date for the exchange of this refreshed data. *See* Jan. 10, 2024 Ltr. from J. Long to E. Snow; Jan. 22, 2024 Ltr. from J. Long to E. Snow. Subject to SaveOnSP agreeing to prioritize its refresh, JJHCS will do the same.

## II.    Return on Investment

SaveOnSP's letter also demands that JJHCS "produce documents and communications regarding [JJHCS's] actual and projected return on investment," including "documents and communications regarding accumulators' and maximizer's effect on [JJHCS's] ROI." Jan. 29, 2024 Ltr. from E. Snow to J. Long at 3. Again, this demand finds no basis in Judge Wolfson's February 6 Order. Here, too, Judge Wolfson unambiguously rejected SaveOnSP's arguments, finding that JJHCS's "alleged harm is not related to the profitability of any Janssen drugs. Put differently, even if J&J and its [affiliates] ultimately derive profits . . . from selling the drugs at issue, that fact does not disprove Plaintiff's alleged harm in this case, either to itself or to the public." (Dkt. No. 192 at 22.)

Judge Wolfson only permitted discovery on a "small window" of "documents that may reflect whether more patients are taking Janssen drugs as a result of being on the SaveOnSp Program." *Id.* But SaveOnSP's proposed search terms—with direct references to "ROI"—demands for additional custodians related to ROI, are wholly untethered from Judge Wolfson's Order. If SaveOnSP is willing to meet and confer in good-faith and to propose search terms related to the "small window" that Judge Wolfson opened, JJHCS will run those search terms and provide hit counts, as appropriate. But JJHCS will not provide hit counts where SaveOnSP refuses to

14910279

Elizabeth H. Snow, Esq.
February 8, 2024
Page 3


recognize the clear limitations on an issue already twice litigated—and on which JJHCS has twice prevailed.

Very truly yours,



*/s/ Julia Long*
Julia Long

14910279

# Exhibit 6

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy | Gay

Elizabeth Snow
Associate
212.390.9330
esnow@selendygay.com

February 14, 2024

**Via E-mail**

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jlong@pbwt.com

Re:  ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC*** (Case No. 2:22-cv-02632-ES-CLW)

Dear Julia,

We write regarding our discussion of financial data during Monday's meet and confer.

*First*, we noted that your most recent February 8, 2024 letter takes issue with our proposed search terms, custodians, and noncustodial documents without proposing any alternatives.

*Second*, we discussed Judge Wolfson's order requiring J&J to produce communications about the viability of CarePath. *See* Feb. 6, 2024 Wolfson Order, Dkt. 192 at 19. Judge Wolfson directed the parties "to meet and confer and agree on a narrow set of search terms in order to identify those communications related to the viability of CarePath." *Id.* You stated that you believed any communications regarding CarePath's budget were outside the scope of "communications related to the viability of CarePath," citing to Judge Wolfson's holding that communications regarding budgetary decisions generally are not relevant. We stated that some documents regarding the budget are relevant to Judge Wolfson's ruling because Save-OnSP ("SaveOn") understands that some documents regarding CarePath's budget are likely to bear on the viability of CarePath. We asked you to explain what you meant by your allegation that SaveOn jeopardizes the viability of CarePath by making it prohibitively expensive, *see* Comp. ¶ 114, and what documents you believe

Julia Long
February 14, 2024

are relevant to Judge Wolfson's ruling that J&J must produce documents regarding CarePath's viability.[1] Please provide those explanations promptly.

*Third*, we discussed Judge Wolfson's order requiring J&J to produce documents that reflect whether more patients are taking Janssen drugs as a result of being on health plans advised by SaveOn. *See* Dkt. 192 at 22. We pointed out that though you rejected the search terms we initially proposed on this topic, you did not propose alternative search terms in your February 8, 2024 letter.

We explained that documents regarding whether more patients are taking Janssen drugs because they are on health plans advised by SaveOn are relevant whether or not J&J itself conclusively identified the patient as on a SaveOn-advised plan or simply included those patients in its analysis, having identified the patient as using an accumulator or a maximizer. Judge Wolfson agreed with us that J&J uses these terms to refer to SaveOn. *See* Jan. 24, 2024 Tr. at 131; Dkt. 192 at 29. You stated that Judge Wolfson's comment was irrelevant because it did not appear in her order on this topic. You also stated that you would not produce documents showing how all accumulators or maximizers affect J&J even if those analyses included patients on SaveOn-advised plans.

The words "maximizer" and "accumulator" should be included in any search term aimed at identifying documents regarding whether more patients are taking Janssen drugs as a result of SaveOn because J&J often uses those words to refer to SaveOn. *See* Dkt. 192 at 29. You agreed that you would consider proposed search terms. We propose the following search terms:

- (additional OR more OR number* OR quantit* OR greater OR increas* impact OR effect OR frequency) w/20 (patient* OR sales OR fill* OR lives OR spend*) AND ((accumulat*) OR (maximiz*))

We also asked you to confirm that you would search noncustodial documents and identify relevant custodians to the extent there are additional sources with responsive data. You stated that you did not believe this was required by Judge Wolfson's order. We explained that it was incumbent on you to identify relevant sources of information to locate "documents that may reflect whether more patients are taking Janssen drugs as a result of being on the SaveOnSp Program." *See* Dkt. 192 at 22. Please tell us whether you will identify relevant noncustodial sources and any additional custodians with responsive documents.

---

[1] As SaveOn explained during the meet and confer, without a clear understanding of and agreement on the substantive scope of documents encompassed by the viability of CarePath, it cannot propose search terms.

2

Julia Long
February 14, 2024

We reserve all rights. Please respond by Tuesday, February 20.

Best,

/s/ Elizabeth Snow

Elizabeth H. Snow
Associate

# EXHIBITS 7-18

# CONFIDENTIAL – FILED UNDER SEAL

# Exhibit 19

   

# Savings Program
## for eligible commercially insured patients
## Pay $5 per prescription fill

$20,000 maximum program benefit per calendar year across all oral PAH therapies in the program. Not valid for patients using Medicare, Medicaid, or other government-funded programs to pay for their medications. Terms expire at the end of each calendar year and may change. Offer not valid for TRACLEER® in CA or MA, or for MA residents (62.5 mg and 125 mg only). There is no income requirement. See program requirements on next page.



**Get savings on your out-of-pocket medication costs for OPSUMIT®, UPTRAVI®, or TRACLEER®. Depending on the health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

Call a Janssen CarePath Care Coordinator at
**866-228-3546** or visit **JanssenCarePath.com** for more information about affordability programs that may be available.

**Please read the full Prescribing Information for OPSUMIT® and Medication Guide for OPSUMIT®, including an Important Warning about Serious Birth Defects. Please read the full Prescribing Information, including Boxed Warning about liver injury and birth defects, for TRACLEER® and Medication Guide for TRACLEER®. Please read full Prescribing Information for UPTRAVI® and Patient Product Information for UPTRAVI®.**

  

# Savings Program

## Am I eligible?

**You may be eligible for the Janssen CarePath Oral PAH Savings Program if you:**

- Are age 18 or older (age 3 or older for TRACLEER® 32 mg) and currently use commercial or private health insurance for your medication costs

- (Female patients only) Are enrolled in the Macitentan REMS Program for OPSUMIT®. Learn more at **MacitentanREMS.com**

- Are enrolled in the Bosentan REMS Program for TRACLEER®. Learn more at **BosentanREMSProgram.com**

## Other requirements

- **This program is only available to individuals age 18 or older (age 3 or older for TRACLEER® 32 mg) using commercial or private health insurance for their Janssen medication, including plans available through state and federal healthcare exchanges.** This program is not available to individuals who use any state or federal government-funded healthcare program to cover a portion of medication costs, such as Medicare, Medicaid, TRICARE, Department of Defense, or Veterans Administration

- Eligibility to receive a Savings Program benefit is subject to meeting the program requirements at the time of each use

- Program terms will expire at the end of each calendar year. Program subject to change or discontinuation without notice, including in specific states. Offer not valid for TRACLEER® in CA or MA or for MA residents (for 62.5 mg and 125 mg only)

- As a condition of participating in this program, you must ensure that you comply with any co-payment disclosure requirements of your insurance carrier or third-party payer, including disclosing to your insurer the amount of co-payment support received from this program. By receiving a Savings Program benefit, you are giving permission for information related to your Savings Program enrollment to be shared with your healthcare provider(s)

- Before using the program, it is important that you understand that Actelion Pharmaceuticals US, Inc., will not share information with anyone else except as required by law. This program offer may not be combined with any other coupon, discount, prescription savings card, free trial, or other offer. The selling, purchasing, trading, or counterfeiting of this card is prohibited. Offer good only in the United States and the Commonwealth of Puerto Rico, excluding states noted above. Void where prohibited, taxed, or otherwise restricted by law

Janssen CarePath is in no way an extension of medical treatment provided by healthcare professionals to individual patients. You may discontinue your participation at any time by calling 866-228-3546, Monday–Friday, 8:00 ᴀᴍ–8:00 ᴘᴍ ET

**Need help?** | Call **866-228-3546**
Monday–Friday, 8:00 ᴀᴍ–8:00 ᴘᴍ ET
Multilingual phone support available

**Please read the full Prescribing Information for OPSUMIT® and Medication Guide for OPSUMIT®, including an Important Warning about Serious Birth Defects. Please read the full Prescribing Information, including Boxed Warning about liver injury and birth defects, for TRACLEER® and Medication Guide for TRACLEER®. Please read full Prescribing Information for UPTRAVI® and Patient Product Information for UPTRAVI®.**

© Actelion Pharmaceuticals US, Inc. 2023    07/23    cp-184256v3



# Exhibit 20

   

# Savings Program
## for eligible commercially insured patients
## Pay $5 per dose

$26,000 maximum program benefit per calendar year.
Terms expire at the end of each calendar year and may change.
See program requirements below.



**Get savings on your out-of-pocket medication costs for your Janssen medication. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

**Program does not cover costs to give you your treatment.**

## ① Enroll in the Savings Program



📱 **By phone**
877-CarePath (877-227-3728)

–OR–

☑ **Online at**
**MyJanssenCarePath.com**

## Am I eligible?
You may be eligible for the Janssen CarePath Savings Program if you meet the minimum age requirements in product labeling — age 18 or older for TALVEY™ and TECVAYLI® — and currently use commercial or private health insurance for DARZALEX®, DARZALEX FASPRO®, TALVEY™, or TECVAYLI®. There is no income requirement.

The Janssen CarePath Savings Program is based on medication costs only and does not include costs to give you your injections.

## Other requirements
- This program is only for people who meet the minimum age requirements (see above) and are using commercial or private health insurance for their Janssen medication. This includes plans from the Health Insurance Marketplace. This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program. By getting a Savings Program benefit, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information about your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of DARZALEX®, DARZALEX FASPRO®, TALVEY™, and TECVAYLI®, and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use DARZALEX®, DARZALEX FASPRO®, TALVEY™, and TECVAYLI®, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.
- If you use medical/primary insurance to pay for your medication, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 877-CarePath (877-227-3728).

**Please read the full Prescribing Information for DARZALEX® and DARZALEX FASPRO® and discuss any questions you have with your doctor.**

**Please read full Prescribing Information, including Boxed Warning, and Medication Guides for TALVEY™ and TECVAYLI® and discuss any questions you have with your doctor.**

# ② How to use your Savings Program benefits

## Use our streamlined process for requesting a rebate

### Here's how it works:

- Your provider or pharmacy may or may not collect your co-pay, based on your insurance coverage

- You receive your treatment with DARZALEX® (daratumumab), DARZALEX *FASPRO*® (daratumumab and hyaluronidase-fihj), TALVEY™ (talquetamab-tgvs), or TECVAYLI® (teclistamab-cqyv)
  - Your provider or pharmacy submits your claim to your healthcare insurance provider

- You and your provider receive an Explanation of Benefits (EOB) statement from your insurance
  - You are responsible for submitting the EOB to the Janssen CarePath Savings Program, or you can request your provider to submit the EOB on your behalf (see *How to submit a rebate request* below)

- The Janssen CarePath Savings Program reviews your EOB and issues rebate to your card, to you by check, or to your provider if you have assigned your benefits to your provider.

  NOTE: Your provider must provide a copy of the Health Insurance Claim Form—CMS-1500 (HICF) or Uniform Billing Form—CMS-1450 (UB-04) with EOB submissions.

Your Janssen CarePath Savings Program Virtual Payment Card can be used for DARZALEX®, DARZALEX *FASPRO*®, TALVEY™, and TECVAYLI®. **Your card is not a credit card. There is no charge for your card.** If your physician makes any changes to your medication, you must confirm your eligibility for the Savings Program, either online or by phone.

Your healthcare provider can visit **JanssenCarePathPortal.com** to create a Provider Portal Account to enroll you in the Janssen CarePath Savings Program, upload EOB forms from your insurance provider, and view your Savings Program requests and transactions.

**With a Janssen CarePath online account, you can manage your Savings Program benefits**



- Review your available benefits
- Submit Savings Program requests
- View benefit payment transactions
- Receive timely alerts and program updates

**Get started now...**
Visit **MyJanssenCarePath.com**



**Need help?** Call **877-CarePath** (877-227-3728) Monday–Friday, 8:00 AM–8:00 PM ET

If you only want to check your eligibility and enroll in the Janssen CarePath Savings Program, visit **MyJanssenCarePath.com/express** or call 877-CarePath (877-227-3728).

## How to submit a rebate request

If you have created an online account, you may submit rebate requests online in your account. You can also submit your EOB by fax or by mail. **At your request, your provider may submit rebate requests to the Savings Program on your behalf via the Provider Portal or by fax or mail.**


**Online:**
**MyJanssenCarePath.com**


**Fax:**
833-871-5345


**Mail:**
Janssen CarePath Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

**Please read the full Prescribing Information for DARZALEX® and DARZALEX *FASPRO*® and discuss any questions you have with your doctor.**

**Please read full Prescribing Information, including Boxed Warning, and Medication Guides for TALVEY™ and TECVAYLI® and discuss any questions you have with your doctor.**



© Janssen Biotech, Inc. 2023   11/23   cp-381095v2

# EXHIBITS 21-23

# CONFIDENTIAL – FILED UNDER SEAL



www.pbwt.com

March 1, 2024

Harry Sandick
Partner
(212) 336-2723
hsandick@pbwt.com

**By Email**

Hon. Freda L. Wolfson
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068

Re:    **JJHCS's Opposition to SaveOnSP's February 20, 2024
Motion for Clarification and Reconsideration**
*Johnson and Johnson Health Care Systems, Inc. v. Save On SP, LLC*
**No. 2:22-cv-02632 (JKS) (CLW)**

Dear Judge Wolfson:

On behalf of Johnson & Johnson Health Care Systems, Inc. ("JJHCS"), we write in opposition to the February 20, 2024 letter motion by Defendant Save On SP, LLC ("SaveOnSP") seeking clarification or reconsideration of portions of the Court's February 6, 2024 Order, Dkt. No. 192 (the "February 6 Order"). SaveOnSP's motion should be denied and the Court should leave its February 6 Order in place.

The February 6 Order was based on a careful review of the parties' contentions, which were presented through lengthy written submissions and oral argument. The Court's written decision contained some rulings in favor of each party and thereby brought to an end months of disputes over a host of issues. That Order also provided guidance and a path forward for the parties to address those and similar issues in the future.

Now, in the immediate aftermath of the decision, SaveOnSP asks the Court for a "do-over" on no fewer than six different aspects of the Court's February 6 Order. Simply put,

Hon. Freda L. Wolfson
March 1, 2024
Page 2

SaveOnSP is asking the Court to revisit virtually every issue on which it did not prevail. But the law does not allow litigants to make the same arguments, based on the same evidence, over and over again. Rather, the discovery process depends on parties accepting that they will win some and lose some, and that as to the latter, they must move on with the case as best they can. This is how JJHCS has responded to the portions of the February 6 Order in which SaveOnSP prevailed. Rather than submit a 21-page brief asking the Court to reverse itself on every issue it lost, JJHCS has taken extensive efforts to comply with the Court's order by collecting new documents, running search terms, and engaging in meet-and-confer discussions with SaveOnSP counsel. Whether or not we agreed with each specific aspect of the Court's ruling, we respect it and will abide by it. SaveOnSP should not be permitted to do otherwise.

SaveOnSP can have no legitimate complaints as to process or substance. As to process, the February 6 Order was only decided after both sides had ample opportunity to present their arguments. For example, on both the issues of (1) terms and conditions and (2) ancillary financial documents, there was full briefing by the parties on two occasions—first in February 2023, (Dkt. No. 79), and again in August and September 2023, (Dkt. Nos. 146 and 150). In both March 2023 and October 2023, when Judge Waldor heard arguments on the issues presented by these motions, she declined to grant the motions, telling SaveOnSP's counsel that it needed to narrow its requests. (Mar. 17, 2023 Tr. at 34:5–35:21, 46:14–47:1; Dkt. No. 173). For weeks, SaveOnSP ignored Judge Waldor's order, and then elected only to propose somewhat narrowed search terms, leaving its broad requests in place just as they were at the outset of discovery. Finally, in January 2024, Your Honor heard argument for more than two hours on the issues raised in the current motion and then issued a thorough 30-page opinion in which each argument made

Hon. Freda L. Wolfson
March 1, 2024
Page 3

by counsel was described, analyzed, and decided.  After all of this process and opportunity to be heard, there is no need for further briefing or argument on the merits of the issues raised in SaveOnSP's current motion.  Win or lose, it is time for the parties to move on.

As to substance, the law mandates denial of this motion.  Reconsideration only can be granted when there are new facts, new law, or a clear error of fact or law in the underlying opinion.  None of these are present here.  SaveOnSP does not even allege that there has been a change in the law or that the February 6 Order includes a clear error of fact or law.  SaveOnSP does make some intermittent efforts to identify new facts, but as demonstrated below, while there are occasionally new *documents* identified by SaveOnSP, there are no new *facts* presented.  A motion for clarification, to the extent that courts entertain them at all, must comply with the same requirements as a motion for reconsideration; at a minimum, there must be some actual ambiguity in the order being addressed, and no such ambiguity exists in the February 6 Order.

Finally, to grant SaveOnSP's motion, even in part, will only encourage this strategy of endless relitigation.  Once the parties learn that serial motion practice is rewarded even with partial victories, the incentives are created to do what SaveOnSP has done here:  to contest every defeat, imposing unnecessary cost and burden on the prevailing party and the Court, keeping on until some of the losses are flipped into victories.  Nor is this the first time that SaveOnSP has sought to relitigate issues already decided by the Court.[1]  For all of these reasons, we ask the Court to deny the motion.

---

[1] *See, e.g.*, Dec. 28, 2023 Ltr. from E. Wohlforth to Hon. Wolfson (relitigating custodian issue); Jan. 16, 2024 Ltr. from E. Wohlforth to Hon. Wolfson (search terms for CAP custodians); Feb. 7, 2024 Ltr. from E. Wohlforth to Hon. Wolfson (relitigating SaveOnSP modifier in CAP search string); Feb. 16, 2024 Ltr. from E. Wohlforth to Hon. Wolfson (same).

Hon. Freda L. Wolfson
March 1, 2024
Page 4

I.    **SaveOnSP Misstates The Applicable Legal Standard For Its "Motion For Clarification"**

SaveOnSP ignores the clear standard in this District, repeatedly affirmed by many courts, that motions for clarification are "evaluated under the standard for a motion for reconsideration in this jurisdiction." *Lynch v. Tropicana Prods., Inc.*, 2013 WL 4804528, at *1 (D.N.J. Sept. 9, 2013); *see, e.g.*, *Fastware, LLC v. Gold Type Bus. Machs., Inc.*, 2009 WL 2151753, at *2 (D.N.J. July 14, 2009); *Nye v. Ingersoll Rand Co.*, 2011 WL 253957, at *3 (D.N.J. Jan. 25, 2011). SaveOnSP cannot avoid complying with that demanding standard simply by slapping the label of "clarification" on what is in essence a motion for reconsideration.

"Reconsideration is 'an extraordinary remedy' that is to be granted 'very sparingly.'" *Asirifi v. Omni Asset Mgmt., LLC*, 2013 WL 4858711, at *1 (D.N.J. Sept. 11, 2013) (citations omitted). Local Rule 7.1(i), which governs motions for reconsideration, requires that the moving party must demonstrate either: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Andreyko v. Sunrise Senior Living, Inc.*, 993 F. Supp. 2d 475, 478 (D.N.J. 2014) (alteration in original) (citations omitted). In other words, motions for reconsideration are meant to "correct manifest errors of law or fact or to present newly discovered evidence." *Mid-Am. Salt, LLC v. Morris Cnty. Cooperative Pricing Council*, 964 F.3d 218, 230 (3d Cir. 2020).

Reconsideration "is not warranted where (1) the movant simply repeats the cases and arguments previously analyzed by the court, or (2) the movant has filed the motion merely to disagree with or relitigate the court's initial decision." *E.g.*, *Ebert v. Twp. of Hamilton*, 2019 WL

Hon. Freda L. Wolfson
March 1, 2024
Page 5

5782872, at *2 (D.N.J. Nov. 6, 2019); *see also Echols v. United States*, 2022 WL 16576489, at *1 (D.N.J. Nov. 1, 2022) ("Mere disagreement with a court's decision is not an appropriate basis upon which to bring a motion of reconsideration."); *Lynch*, 2013 WL 4804528, at *1 ("Local Rule 7.1(i) . . . does not contemplate a recapitulation of arguments considered by the Court before rendering its original decision."); *Tehan v. Disability Mgmt. Servs., Inc.*, 111 F. Supp. 2d 542, 549 (D.N.J. 2000) (noting that a motion for reconsideration "will not be granted where a party simply asks the court to analyze the same facts and cases it had already considered" to come to a different conclusion; *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990) ("A motion for reconsideration is improper when it is used to ask Court to rethink what it had already thought through—rightly or wrongly." (citations omitted)).  For the reasons discussed below, SaveOnSP does not even approach this legal standard.

## II.    The Court's Order Requires No Clarification

### A.    There Is No Ambiguity In The Court's Order That JJHCS Produce Documents Reflecting JJHCS Enforcement Instructions And Policy That Concern A Single Terms & Conditions Provision

The February 6 Order is pellucid with respect to JJHCS's discovery obligations.

There the Court concluded:

> *to strike the proper balance and considering proportionality*, it is appropriate for Plaintiff to search for, and produce, documents reflecting the company's enforcement instructions and policy, during the entirety of the agreed upon discovery time frame (April 2016-November 2023), *concerning eligibility criteria set forth in the provision: "may not be used with any other coupon, discount, prescription savings card, free trial, or other offer."*

Dkt. No. 192 at 12–13 (emphasis added).  JJHCS's obligations under the Order are plain:  they relate to the key provision in the CarePath terms and conditions and not to all eligibility provisions

Hon. Freda L. Wolfson
March 1, 2024
Page 6

that CarePath uses.  The Court did not require JJHCS to produce documents concerning other eligibility criteria, such as whether a patient was enrolled in Medicare or Medicaid, which are not relevant.

In the absence of any basis for reconsideration, SaveOnSP asks for "clarification" that Your Honor *sub silentio* intended to order JJHCS to produce documents regarding its enforcement of *all* CarePath eligibility criteria.  Mot. at 4.[2]  SaveOnSP's motion does not withstand even minimal scrutiny.  The Court's ruling could scarcely have been more clear:  JJHCS must produce documents "concerning eligibility criteria set forth ***in the provision***: 'may not be used with any other coupon, discount, prescription savings card, free trial, or other offer.'"  Dkt. No. 192 at 13 (emphasis added).  This is not something that requires clarification.  Nor has there been a change in the law, new evidence, or a "clear error of law or fact or to prevent manifest injustice" such that reconsideration is appropriate.  *See Ebert*, 2019 WL 5782872, at *2.  SaveOnSP raised nearly identical arguments in the parties' joint August 24, 2023 submission, Dkt. No. 146 at 8–9, and the Court addressed those arguments both at the January 24 conference and in the February 6 Order.  SaveOnSP brought this motion "merely" because it "disagree[s] with" the February 6 Order and wishes to "relitigate the [C]ourt's initial decisions."  *Ebert*, 2019 WL 5782872, at *2.  This is plainly improper.

---

[2] In a footnote, SaveOnSP argues in the alternative that, if the Court intended to limit its ruling to enforcement of the "coupon, discount, prescription savings card, free trial, or other offer" provision, then "Your Honor should reconsider that ruling based on documents produced after the parties submitted their joint letter."  Mot. at 4 n.2.  SaveOnSP raises this request only in a footnote, which is improper and provides another basis to reject SaveOnSP's extraordinary relief.  *See John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").  Regardless, the argument is meritless for the reasons discussed above.  *See* pp. 5–6.

Hon. Freda L. Wolfson
March 1, 2024
Page 7

Moreover, during the hearing, the Court repeatedly emphasized that although SaveOnSP may be entitled to "some understanding of, generally what are [JJHCS's] enforcement efforts that [it] take[s] with regard to eligibility criteria," discovery on this issue must "be cabined in some way." Jan. 24, 2024 Tr. at 28:9–19 ("I don't want it to be so broad because there are lots of things here and much of it may not be relevant. So I think . . . they have to understand, how do you go about enforcing, when do you do so, and there is more information that is needed."). The February 6 Order reflects this balancing, stating that "to strike the proper balance and considering proportionality," JJHCS need only produce documents concerning eligibility criteria set forth "in the provision . . . 'may not be used with any other coupon, discount, prescription savings card, free trial, or other offer.'" Dkt. No. 192 at 12–13.

Even if this Court were to grant SaveOnSP's wish and hear this motion anew, SaveOnSP's motion should still be denied on the merits for the same reasons that underlie the Court's February 6 Order: the additional documents SaveOnSP seeks about enforcement of eligibility criteria that are not at issue are irrelevant. SaveOnSP argues that if JJHCS did not enforce the "other offer" provision against individuals enrolled in SaveOnSP until shortly before it filed this lawsuit, but did enforce other CarePath eligibility criteria like age or enrollment in government-funded health plans, then this would be evidence that JJHCS did not actually believe that SaveOnSP members were ineligible for CarePath under the applicable terms and conditions. Mot. at 3. This is an obvious *non sequitur*. Whether JJHCS enforced the Medicare and Medicaid eligibility provisions (which implicate wholly distinct regulatory considerations) has no bearing, and gives no indication, regarding the meaning or enforcement of the "coupon, discount, prescription savings card, free trial, or other offer" provision at issue in this litigation.

Hon. Freda L. Wolfson
March 1, 2024
Page 8

Moreover, "[i]t is hornbook law that '[t]he waiver of one right under a contract does not necessarily waive other rights under the contract; rather, the parties to a contract may waive parts of its provisions.'" *Mister Softee, Inc. v. Amanollahi*, 2016 WL 5745105, at *18 (D.N.J. Sept. 30, 2016) (second alteration in original) (quoting Williston on Contracts § 39:18 (4th ed.)).  For example, "a waiver of the right to timely performance under one provision of a contract does not necessarily operate to waive of all of the contract's time specifications."  Williston on Contracts § 39:18 (4th ed.).  Ultimately, the tortious interference claim in this case does not turn on the consistency of JJHCS's enforcement across different portions of the terms and conditions; rather it turns on whether SaveOnSP tortiously interfered, and these documents are irrelevant to determining this issue.

> **B.**     **There Is No Ambiguity In The Court's Order Relating To Financial Viability Documents, Which Does Not Require JJHCS To Produce Budget-Related Communications Or "Return On Investment" Documents**

SaveOnSP next claims that it is seeking "clarification" that JJHCS documents that relate to CarePath's budget communications and return on investment must be produced, based on the Court's ruling that certain documents relating to financial viability must be produced.  Mot. at 5–8.  Again, SaveOnSP fails to demonstrate any ambiguity in the Court's rulings and rather seeks a do-over based on "a recapitulation of arguments considered by the Court before rendering its original decision."  *Lynch*, 2013 WL 4804528, at *1.

The Court's ruling on the subject of budget-related communications and financial viability documents is clear:

> What matters for purposes of liability and damages are not the changes that Plaintiff contemplated implementing, but actual changes that occurred, and in that regard, Plaintiff has produced documents . . . .  For the same reasons,

Hon. Freda L. Wolfson
March 1, 2024
Page 9

> I find that the **communications of budgetary decisions are not relevant** to Defendant's defenses or Plaintiff's claims; however, as I expressed during the hearing, I do find that communications involving the ***viability of CarePath is a relevant topic which Defendant may explore***.  As such, in addition to the documents that Plaintiff has already produced, the parties are directed . . . to identify those communications related to the viability of CarePath.

Dkt. 192 at 19 (emphasis added).  The same is true for the Court's ruling denying SaveOnSP's request for documents relating to the so-called CarePath "return on investment."  *Id.* at 22 (rejecting SaveOnSP's request that JJHCS produce return on investment documents because "even if J&J and its entities ultimately derive profits—even very generous ones—from selling the drugs at issue, that fact does not disprove Plaintiff's alleged harm in this case, either to itself or to the public").

The Court's written Order is no different from what the Court stated at the hearing, and is equally clear.  *See, e.g.*, Jan. 24, 2024 Tr. at 68:3–10 ("I am saying discovery about the viability of the program is fine.  That is the limitation.  And so that's what I'm focused on.  But that's why I'm saying, ***things that you're saying about, oh, but let's see how much money J&J makes on Stelara, let's see how much money J&J makes overall, is really not the issue.  I want to focus on the program itself***." (emphasis added)).

The Court need go no further than this in order to deny SaveOnSP's motion for clarification.  There is nothing to clarify.  If the Court does consider the merits, we note that SaveOnSP mischaracterizes the parties' meet-and-confer discussions, which it claims supports undoing the Court's February 6 Order.  What happened in the meet-and-confer discussions after the January 24 Conference is that SaveOnSP insisted that JJHCS (1) produce documents that the Court refused to compel and expressly did not order JJHCS to produce, and (2) use search terms

Hon. Freda L. Wolfson
March 1, 2024
Page 10

aimed at locating these irrelevant documents.[3]  SaveOnSP proposed search terms aimed not at

financial viability issues but at the budget-related communications that the Court just ruled

SaveOnSP was not entitled to receive.  For example, SaveOnSP asked to JJHCS to search any

document in which the term "budget" was used within close proximity to generic terms such as

"chang[es]," "increase[es]," "decreas[es]," or "adjust[ments]."  That SaveOnSP continued to insist

on receiving the very documents that that were the subject of its unsuccessful motion does not

reflect any lack of clarity in the Court's ruling.  Rather, it showcases SaveOnSP's intransigence

and its latest refusal to abide by a court order.

JJHCS has already told SaveOnSP that it will comply with the Court's Order and

produce documents related to CarePath's financial viability.  And to be clear, if JJHCS identifies

responsive, non-privileged documents discussing *both* relevant topics (e.g., CarePath's viability)

and irrelevant topics (e.g., return on investment or budget-related communications), JJHCS will

produce those documents.  What JJHCS is unwilling to do and is not required to do is to use

SaveOnSP's search terms, which are aimed at producing the very documents this Court held

SaveOnSP was not entitled to receive.

**C.    There Is No Ambiguity In The Court's Order Relating To Patient Adherence
Documents**

SaveOnSP also seeks "clarification" that JJHCS must produce documents

containing information sufficient to quantify the monetary benefit that SaveOnSP generated for

---

[3] In a January 29 letter, SaveOnSP demanded that JJHCS "produce documents showing how J&J sets the level of CarePath copay assistance funds that it offers patients, how it decides on the CarePath budget including the factors that go into this decision, where that decision is made, and the relevant communications about the budget."  Ex. 1, Jan. 29, 2024 Ltr. from E. Snow to J. Long at 1.

Hon. Freda L. Wolfson
March 1, 2024
Page 11

JJHCS, such as data showing the revenue that JJHCS received from drug sales that members of SaveOn-advised plans used.  Mot. at 9–11.  Just as with SaveOnSP's other points, this issue requires no clarification.  That much is clear even from SaveOnSP's motion, which explicitly quotes from Your Honor's ruling that "opened a '*small window* for Defendant to explore *documents that may reflect whether more patients are taking Janssen drugs as a result of being on the SaveOnSp Program*.'"  Mot. at 9 (emphasis added) (quoting Dkt. 192 at 22).

   Notwithstanding this unmistakable instruction, SaveOnSP cites to its August 2023 moving papers and argues that "if the same conduct that [JJHCS] says caused it a financial injury *also* caused J&J a financial benefit, SaveOn is entitled to quantify that benefit and present it as an offset to J&J's alleged damages."  Mot. at 9, 11 (emphasis in original).  In so doing, SaveOnSP again runs afoul of the applicable legal standard.  *See Ebert*, 2019 WL 5782872, at *2 (reconsideration "is not warranted where (1) the movant simply repeats the cases and arguments previously analyzed by the court, or (2) the movant has filed the motion merely to disagree with or relitigate the court's initial decision").  There is no new law cited, no asserted clear error of fact or law, no new evidence, nothing at all other than another request for a do-over.  *See Oritani*, 744 F. Supp. at 1314 ("A motion for reconsideration is improper when it is used to ask Court to rethink what it had already thought through—rightly or wrongly.").

   The Court already heard and rejected this same argument in January, explaining that "even if J&J and its entities ultimately derive profits – even very generous ones – from selling the drugs at issue, that fact does not disprove Plaintiff's alleged harm in this case, either to itself or to the public."  Dkt. No. 192 at 22.  SaveOnSP cannot argue that this direct ruling, which forecloses discovery on the issue, is somehow vague.

Hon. Freda L. Wolfson
March 1, 2024
Page 12

Again, the Court can and should stop here and deny SaveOnSP's motion for clarification without revisiting the underlying merits of the February 6 Order.  Even if the Court again considers the merits, however, the motion still fails.  As with its other requests, SaveOnSP fails to identify a shred of new evidence in support of its motion.  Rather, the two documents on which it relies—JJHCS_00036487 and JJHCS_00140340—were produced on April 28, 2023 (months before its August brief) and December 22, 2023 (more than a month prior to Your Honor's ruling).  Neither present a basis to reopen the issue.  In any event, SaveOnSP would not need JJHCS's documents if it sought to advance an adherence argument at trial (that is, to argue that its actions somehow result in increased adherence by patients and, therefore, more utilization of JJHCS drugs).  SaveOnSP—and its business partner—already have produced documents showing ██████████████████████████████████████████████████████████████████.  *E.g.*, Ex. 2 (SOSP_0695753) ("███████████████████████████████████████ ██████████).[4]  Therefore, the purported relevance of these documents is unfounded, and SaveOnSP's motion should be denied.

## III.    SaveOnSP's Motion For Reconsideration Should Be Denied

SaveOnSP similarly falls far short of the reconsideration standard in each of its three sub-motions where it expressly seeks reconsideration.

---

[4] ██████████████████████████████████████████████████████████ *E.g.*, Ex. 3 (ACCREDO00013591) ██████████████████████████████████████████████████████████ ██████ Ex. 4 (ACCREDO00013597) █████████████████████████████████████████████████████████████████).

Hon. Freda L. Wolfson
March 1, 2024
Page 13

### A.    There Is No Basis For Reconsideration With Respect To The Production Of Budget-Related Communications

In the February 6 Order, Your Honor concluded that as to issues concerning CarePath's budget communications, "[JJHCS] has the better argument" and "communications of budgetary decisions are not relevant to Defendant's defenses or Plaintiff's claims." Dkt. No. 192 at 19. As discussed above at *infra* § II.B, SaveOnSP tries to evade this ruling in the first part of its motion for clarification by contending that budget-related communications must be produced in order to ensure that JJHCS complies with the Court's order that it produce documents relating to the financial viability of CarePath. That portion of SaveOnSP's motion should be denied. There is nothing unclear or incorrect about the Court's order, which specifically rejected the relief that SaveOnSP seeks.

Now, through the first part of its motion for reconsideration, SaveOnSP proposes another way to evade the Court's order by asking that the Court direct JJHCS to produce one category of budget-related communications that the Court already deemed irrelevant: documents concerning the "reasons why J&J set the annual maximum amounts of copay assistance for the drugs at issue at the levels that it did, and why J&J chose to maintain those levels after learning of SaveOn's services (and those of so-called accumulators and maximizers)." Mot. at 11–12. SaveOnSP claims that these documents are necessary to support its so-called "mitigation defense." But SaveOnSP has not satisfied the high bar for a motion for reconsideration.

SaveOnSP does not—and cannot—claim an intervening change in the law or a clear error of law and fact. Therefore, reconsideration only can be entertained based on new evidence. None exists here. While SaveOnSP identifies six documents that it claims are newly discovered

14937676

Hon. Freda L. Wolfson
March 1, 2024
Page 14

evidence meriting reconsideration, Mot. at 12–14, reconsideration may only be granted because of newly discovered evidence when "new evidence was not available when the court [issued its order]," *Andreyko*, 993 F. Supp. 2d at 478 (alteration in original). Much of this purported newly discovered evidence was available well before the Court denied SaveOnSP's motion to compel.

For example, SaveOnSP claims that reconsideration is warranted because "[d]ocuments produced since SaveOn filed its motion show that ██████████████████████ ████████████████████████████████████████████████████████████ ████████████ Mot. at 12. This is not "new evidence"—SaveOnSP made an identical argument nearly ***six months ago*** based on documents making the same points that it had already received in discovery. *See* Dkt. 150 at 5 (claiming, based on two JJHCS-produced documents, that SaveOnSP was entitled to more documents on the CarePath budget because they could show "JJHCS was not injured, and failed to mitigate its damages, in part because JJHCS could have reduced the CarePath budget but chose not to do so").

In addition, four of the cited documents (TRIALCARD_00001884; TRIALCARD_00002732; TRIALCARD_00003383; TRIALCARD_00004935) were produced on October 26, 2023, and one (JJHCS_00141359) was produced on December 19, 2023.[5] If SaveOnSP wished to bring these documents to Your Honor's attention, SaveOnSP should have sought leave to file a supplemental brief before the January 24 conference, or at least addressed

---

[5] Only one (JJHCS_00164633) was produced after Your Honor's oral ruling on SaveOnSP's motion to compel. And, as SaveOnSP acknowledges, ███████████████████████████████ ████████████████████████████████████████████████████████ . *See* Mot. at 12 (describing the cited document as ████████████████████████████████████████████████████ ████████████████████████████████████████ ").

Hon. Freda L. Wolfson
March 1, 2024
Page 15

them at the January 24 conference. *See Polizzi Meats, Inc. v. Aetna Life & Cas. Co.*, 931 F. Supp.

328, 339 (D.N.J. 1996) (explaining that "[i]t is not the purpose of [a motion for reconsideration]

to allow the losing party on a motion an opportunity to supplement its brief on the issues presented

in the original motion" or bring to the Court's attention matters that "were overlooked by

counsel").

      To the extent that SaveOnSP's motion is based on a theory that that the Court never

really knew that SaveOnSP wanted budget-related communications for use in mitigation, this is

incorrect.  In fact, the February 6 Order acknowledges that SaveOnSP sought the documents at

issue to bolster an intended mitigation defense, and nonetheless denied SaveOnSP's motion to

compel production of those documents.  *See* Feb. 6, 2024 Order at 18 ("Defendant claims that

Plaintiff was not injured and has failed to mitigate its damages by not reducing CarePath's budget

when it had the choice to do so.").[6]  The record thus reflects that Your Honor did not overlook the

potential mitigation issue in denying SaveOnSP's motion to compel.  The Court already considered

and rejected the argument made by SaveOnSP in this motion.

      At any rate, if the Court nonetheless reaches the merits for a do-over, the motion

should be denied because the requested documents are irrelevant to SaveOnSP's proposed

mitigation defense.  SaveOnSP claims that it is entitled to documents regarding the overall

---

[6] It is no surprise that the Court acknowledged this claim, as SaveOnSP made in several places, including in a submission to the Court and at oral argument.  Dkt. 165 (October 25, 2023 Joint Letter) at 2 (claiming that JJHCS must produce documents from additional custodians because those documents "dispense of [JJHCS's] claims by showing that it failed to mitigate its supposed damages"); Oct. 30, 2023 Tr. at 8:11–15 ("[O]ne of the issues in the case is whether Johnson & Johnson can identify people who take Janssen drugs who are members of SaveOn pharmacy. It's a critical issue in the case because if they can do that, yet they continue to pay them, CarePath funds, that's a failure to mitigate.").

14937676

Hon. Freda L. Wolfson
March 1, 2024
Page 16

CarePath budget because it has identified documents indicating that JJHCS ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.” Mot. at 12. However, SaveOnSP does

not explain why the ostensible relevance of JJHCS's decision-making regarding annual maximum

benefits for *individual participants* in the CarePath program who are also enrolled in the

SaveOnSP program entitles it to irrelevant communications regarding the *overall budget* for the

CarePath program. Nor would there have been any reason for JJHCS to have responded to

SaveOnSP's wrongdoing by reducing the CarePath annual maximums for all patients, including

those who were not coerced to enroll in the SaveOnSP program. SaveOnSP has no argument for

the relevance of documents regarding the overall CarePath budget, which is why the Court denied

this motion in the first place.

**B.**    **There Is No Basis For Reconsideration With Respect To The Production Of Documents Relating To The Purpose of CarePath**

During oral argument on January 24, 2024, counsel for SaveOnSP made precisely

the same argument that it has been making for months: that SaveOnSP is entitled to discovery on

the purpose of CarePath because "CarePath is actually the marketing program," such that

threatening the viability of CarePath does not cause public harm as required to violate General

Business Law Section 349. *See* Jan. 24, 2024 Tr. at 60:9–18. After hearing from both parties, the

Court rejected this argument, finding that "even if J&J and its entities ultimately derive profits—

14937676

Hon. Freda L. Wolfson
March 1, 2024
Page 17

even very generous ones—from selling the drugs at issue, that fact does not disprove Plaintiff's alleged harm in this case, either to itself or to the public." Dkt. No. 192 at 22.[7]

        As with the other issues presented, the Court can and should deny the motion for reconsideration at this point; the legal standard for reconsideration has not been satisfied. If the Court is inclined to reach the merits, the question whether CarePath operates for a charitable or a business purpose is categorically irrelevant to JJHCS's claim under GBL, as Your Honor already has ruled. *See* Dkt. No. 192 at 21; *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (affirming injunctive relief granted to corporate competitor and clarifying that "[t]he critical question, then, is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor"). The relevant inquiry, as Judge Vazquez emphasized in denying SaveOnSP's motion to dismiss, is whether SaveOnSP engaged in deceptive trade practices and if so, whether that conduct (1) caused JJHCS to suffer damages, and (2) the public to suffer harm. *See* Dkt. No. 68 at 13 (concluding that JJHCS sustained its burden by alleging that it suffered a direct harm as a result of SaveOnSP's conduct and "some harm to the public at large"). The purpose of the CarePath program has no bearing on these issues.

---

[7] In support of its reconsideration bid, SaveOnSP cites a "recent" Congressional report on drug pricing. Mot. at 16–17. Far from being "recent," this Congressional report is dated December 2021, and it is improper for SaveOnSP to mischaracterize it as new evidence supporting reconsideration. *See Andreyko*, 993 F. Supp. 2d at 478; *Polizzi Meats*, 931 F. Supp. at 339. Even if the report were properly before the Court and relevant to this case (and it is neither of those things), SaveOnSP's warped view of the world would not carry the day. The very portion quoted by SaveOnSP recognizes that patient assistance programs "defray some patients' out of pocket costs"—and indeed, it goes on to characterize such programs as "***an important lifeline*** for some patients." *See* Staff of House Committee on Oversight and Reform, 117th Cong., Drug Pricing Investigation (Dec. 2021), at 159–60 (emphasis added).

Hon. Freda L. Wolfson
March 1, 2024
Page 18

The cases on which SaveOnSP relies stand for the unremarkable proposition that to succeed, the gravamen of JJHCS's claim under Section 349 must be harm to the public, rather than harm only to JJHCS's business. There is ample evidence of the type of public harm that flows from SaveOnSP's conduct, beginning with the undue stress and confusion that SaveOnSP causes patients to suffer by "engineering a false denial of coverage at the point of sale to coerce patients into enrolling in the SaveOnSP Program." Comp. ¶ 113. Discovery has not only confirmed this source of public harm, but also revealed that the public harm SaveOnSP causes includes its complicated enrollment process, delayed shipments of medication, and financial harm to patients. The purpose of CarePath is irrelevant to the Section 349 claim, and there is no basis to disturb the Court's February 6 Order.

**C.    There Is No Basis For Reconsideration With Respect To The Production Of Documents Relating To Drug Pricing**

SaveOnSP also moves for reconsideration with respect to the Court's denial of discovery relating to the specialty drug pricing of certain Janssen drugs. On this issue as with all of the issues in SaveOnSP's motion, the February 6 Order was clear. The Court concluded that SaveOnSP's "arguments on this issue are not persuasive." Dkt. No. 192 at 23. Instead, the Court credited JJHCS's argument that "***the sales and profitability of Janssen drugs is not a justification for Defendant's alleged tortious conduct***" and "[i]ndeed, information on the pricing of the drugs does not shed light on Plaintiff's alleged harm to the CarePath program or somehow support Defendant's theory." *Id.* at 23 (emphasis added).

Again, SaveOnSP has not identified any "intervening change in controlling law" or any "new evidence not previously available" that could support a successful motion for

Hon. Freda L. Wolfson
March 1, 2024
Page 19

reconsideration. *Ebert*, 2019 WL 5782872, at *2. As noted above, SaveOnSP only points instead to several government reports that are not new, having been released to the public in 2021 and 2022, well in advance of SaveOnSP's motion to compel. SaveOnSP cannot now use a motion for reconsideration as a means of saying what it wishes it could have said in its briefing on the motion to compel. *Groark v. Timek*, 2014 WL 12908801, at *2 (D.N.J. Oct. 2, 2014) (explaining that a party must "include[] all its reasons in support of" a motion to compel in its initial motion and "does not get a 'do over' after its motion was denied"). SaveOnSP also cites certain arguments made by JJHCS at the January 24 conference as new evidence supporting reconsideration. But, of course, the "statements at oral argument of . . . counsel are not evidence." *Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, 2020 WL 359398, at *9 n.10 (D.N.J. Jan. 22, 2020). Therefore, such statements cannot be new evidence supporting a motion for reconsideration. SaveOnSP should not be permitted to divert the Court's attention from the impact of its own conduct by creating a side show about drug pricing.

In any event, SaveOnSP has no credible argument that the demanded pricing data is relevant to this case. As JJHCS has previously explained, pricing data is irrelevant because "JJHCS has not alleged that the price of Janssen Drugs has changed due to an increased utilization of CarePath funds or, more specifically, due to SaveOnSP's conduct," and JJHCS has not sought from SaveOnSP damages on "lost profits on Janssen Drugs." Dkt. No. 150 at 17. SaveOnSP offered a variety of speculative and unsupported theories for the relevance of these documents, including that "the alleged benefit design of SaveOnSP-advised plans increases the sales of Janssen Drugs." *Id*. at 18. But the Court rejected all of these SaveOnSP theories in denying SaveOnSP's motion to compel, holding that "Defendant has not shown that documents on pricing of Janssen

Hon. Freda L. Wolfson
March 1, 2024
Page 20

drugs are relevant to Plaintiff's claims or Defendant's defenses" because JJHCS's "theory of harm does not relate in any way to lost profits or lowering drug prices."  Dkt. No. 192 at 24.

SaveOnSP now returns with yet another speculative theory on the relevance of these documents, contending without evidence or citation that "SaveOn's conduct helps lower [health care] costs for the vast majority of commercial health plan members."  Mot. at 20 (emphasis omitted).  This second bite at the apple fares no better than the first because it has the same fundamental defect: this contention is simply irrelevant to JJHCS's theory of harm.

SaveOnSP's remaining claim is that if evidence of drug pricing is admitted at trial, and if SaveOnSP makes false claims about JJHCS's drug pricing, JJHCS should not be permitted to rebut such arguments unless JJHCS also agrees today to produce entirely irrelevant documents to SaveOnSP.  This argument by SaveOnSP satisfies none of the three possible grounds for reconsideration:  no new evidence, no new law, no clear error by the trial court.  In addition, JJHCS repeatedly has made clear—including at the very conference cited by SaveOnSP—that it is "not planning to prove a case about our drug prices" and that evidence regarding drug pricing is "not something [it is] planning to present."  Jan. 24, 2024 Conf. Tr. 97:5–7, 98:1–2.  Indeed, we anticipate that at the appropriate time, JJHCS will make a motion *in limine* to exclude all evidence relating to the appropriateness of the pricing of Janssen drugs.

*        *        *

Hon. Freda L. Wolfson
March 1, 2024
Page 21

We appreciate Your Honor's attention to this matter, and we are available to answer

any questions.

Respectfully submitted,

*/s/ Harry Sandick*
Harry Sandick

cc:    Counsel for SaveOnSP

14937676

# Exhibit 1

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

**selendy
gay
elsberg**

Elizabeth Snow
Associate
212 390 9330
esnow@selendygay.com

January 29, 2024

**Via E-mail**

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jlong@pbwt.com

**Re:**  ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC* (Case No. 2:22-cv-02632-ES-CLW)**

Dear Julia,

      We write regarding Judge Wolfson's rulings regarding Johnson & Johnson's
("J&J") financial information at the January 24, 2024 conference.

**I.    CarePath Budget**

      Judge Wolfson ordered J&J to produce documents showing how J&J sets
the level of CarePath copay assistance funds that it offers patients, how it decides
on the CarePath budget including the factors that go into this decision, where that
decision is made, and the relevant communications about the budget. *See* Tr.
69:24-70:7.

      *First*, please produce noncustodial documents including:

- ███████████████████████████ JJHCS_00026191, for Imbru-
  vica, Opsumit, Prezcobix, Tracleer, Uptravi, and Ventavis, and for all
  drugs at issue in this case through November 7, 2023;

- ████████████████████████████████████████
  JJHCS_00130090, for Imbruvica and Rybrevant and for all drugs at is-
  sue in this case through November 7, 2023;

Julia Long
January 29, 2024

- ████████████████████████████████████████
  JJHCS_00130090, for Imbruvica, Tracleer, Uptravi, and Ventavis and for all drugs at issue in this case through November 7, 2023; and

- any presentations and meeting minutes regarding meetings in which J&J discussed the annual copay assistance maximum benefit for each drug at issue in this case.

*Second*, please identify custodians within J&J who are likely to have documents and communications relevant to these subjects (including custodians who might work for J&J entities other than JJHCS, such as Janssen). In doing so, please identify █████████████████████████████████████████████████, JJHCS_00080656, you will add as custodians. At a minimum, ██████████████████████████ ████████████: (1) in ███████████████████████████████████████████ ███████████, *see* JJHCS_00141359; and (2) ██████████████████████ ████████████████████████ JJHCS_00142489 at -491-92.

*Third*, please run the following search terms over the documents of the relevant custodians from April 1, 2016 to November 7, 2023:

- Budget* w/10 (CarePath OR (care w/2 path) OR Carpath OR Carepth OR CP OR "WithMe" OR (with w/2 me) OR PAS OR "Patient Access Solutions")

- ("20,000" OR "20k" OR "6,000" OR "6k" OR "9,100") w/10 (set* OR chang* OR determin* OR adjust* OR increas* OR decreas* OR maintain* OR update*) AND (CarePath OR (care w/2 path) OR Carpath OR Carepth OR CP OR "WithMe" OR (with w/2 me) OR PAS OR "Patient Access Solutions" OR immunology OR IMM OR oncology OR ONC OR (Pulmonary w/2 Hypertension) OR PH OR PAH OR "infectious disease" OR ID OR Balversa OR Darzelex OR Faspro OR Erleada OR Imbruvica OR Opsumit OR Prezcobix OR Remicade OR Rybrevant OR Simponi OR Stelara OR Symtuza OR Tracleer OR Tremfya OR Uptravi OR Ventavis OR Zytiga)

If you object to adding any of these search terms on the basis of burden, please provide hit counts of the unique documents identified by each term for each custodian and in the aggregate for each custodian and all custodians.

*Fourth*, to the extent that J&J previously reviewed any documents identified by these search terms and concluded that they were not responsive, please review those documents again in light of Judge Wolfson's order.

2

SaveOn asks that J&J prioritize production of these documents.

## II.    Return on Investment

Special Master Wolfson also ordered J&J to produce documents and communications regarding J&J's actual and projected return on investment ("ROI") for CarePath as they relate to SaveOnSP. *See* Tr. 86:9-12, 88:13-16; RFP No. 29(i). We understand that this includes documents and communications regarding accumulators' and maximizers' effect on J&J's ROI, as J&J often used those phrases to refer to SaveOn. *See* Tr. 131:11-21.

*First*, please produce from noncustodial sources any analyses of J&J's actual or projected ROI for CarePath for any of the drugs at issue that refer to SaveOn, accumulators, or maximizers from April 1, 2016 through November 7, 2023.

*Second*, please identify the custodians likely to have documents and communications relating to J&J's actual or projected ROI for CarePath for any of the drugs at issue that refer to SaveOn, accumulators, or maximizers (including custodians who might work for J&J entities other than JJHCS, such as Janssen). Please include Blasine Penkowski and ███████████████████████████████████████ *See* JJHCS_00132628.

*Third*, please run the following search terms over the documents of the relevant custodians from April 1, 2016 to November 7, 2023:

- ((lose* OR loss* OR (return w/4 investment) OR "ROI" OR returns OR (negative w/5 impact) OR (positive w/5 impact) OR (gross w/5 impact) OR (net w/5 impact) OR GTN OR "gross to net" OR (increase w/5 sales)) w/10 (CarePath OR (care w/2 path) OR Carpath OR Carepth OR CP OR "WithMe" OR PAS OR "Patient Access Solutions")) AND ("Save On" OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulat* OR maximiz*)

- (((rebate* w/3 program*) OR (market* w/3 program*)) w/10 (CarePath OR (care w/2 path) OR Carpath OR Carepth OR CP OR "WithMe" OR PAS OR "Patient Access Solutions")) AND ("Save On" OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulat* OR maximiz*)

*Fourth*, to the extent that J&J previously reviewed any documents identified by these search terms and concluded that they were not responsive, please review those documents again in light of Judge Wolfson's order.

Julia Long
January 29, 2024

      If you object to adding any of these search terms on the basis of burden, please provide hit counts of the unique documents identified by each term for each custodian and in the aggregate for each custodian and all custodians.

      We reserve all rights and ask for a response by February 5, 2024.

Best,

/s/ Elizabeth Snow

Elizabeth H. Snow
Associate

# EXHIBITS 2-4

# CONFIDENTIAL – FILED UNDER SEAL

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20ᵗʰ floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

March 11, 2024

**<u>VIA E-Mail</u>**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

      Re:    *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
               **No. 2:22-cv-02632 (JKS) (CLW)**

Dear Judge Wolfson:

Defendant Save On SP, LLC ("**<u>SaveOn</u>**") writes in reply to Johnson & Johnson Health Care Systems, Inc.'s (with its affiliates, "**<u>J&J</u>**") opposition SaveOn's February 20, 2024 motion.

## I.    SaveOn's Motion for Clarification

*First*, contrary to J&J's assertion (Opp. 4), SaveOn cited the correct standard in seeking reconsideration: A court may clarify "to explain or clarify something ambiguous or vague" about a prior order. *Alberts v. Bumgardner*, No. CV-13-5538(JXN)(JBC), 2022 WL 2833828, at *1 (D.N.J. July 19, 2022). J&J's cited cases say only that if a motion for clarification in essence seeks reconsideration, the reconsideration standard governs. They are irrelevant here.

*Second*, while J&J asserts that the February 6, 2024 Order (the "Order") unambiguously

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

excuses it from producing documents showing its enforcement of some CarePath eligibility criteria, like age limits and limits on government payors (Opp. 6-7), J&J does not dispute that Your Honor stated at the January 24, 2024 conference that those other criteria were at issue, Tr. 18:8-16, 20:19-25, 23:15-25, and that SaveOn was entitled to documents on all criteria, *id.* 30:25-31:13, 34:7-12. SaveOn asks Your Honor to resolve this ambiguity about the Order's scope by clarifying that J&J must produce its enforcement instructions and policies on enforcement of all criteria.[1]

*Third*, Your Honor ordered J&J to produce documents about SaveOn's impact on Care-Path's financial viability; despite J&J's assertions (Opp. 8-10), SaveOn seeks to clarify only what "financial viability" means. SaveOn understood Your Honor to agree that it includes "how [J&J] sets the CarePath levels, how it decides on the budget, where that is done, the factors that go into it, and relevant communications about that." Tr. 64:3-11, 69:20-70:6. J&J cannot produce these documents unless it runs search terms designed to locate them. To find documents on "how it decides on the [CarePath] budget," for example, J&J must run search strings including the word "budget" and identify custodians who worked on it—but J&J refuses to do so. At the same time, J&J will not explain how it defines viability or how it proposes to locate documents on that topic; its promises to produce viability-related documents thus mean little. J&J's position is not tenable. J&J must produce documents on CarePath's viability as discussed at the conference.

*Fourth*, SaveOn's request to clarify J&J's obligation to produce documents on "whether

---

[1] J&J also recycles its argument that its enforcement of eligibility criteria apart from "other offer" are irrelevant because failing to enforce some criteria does not waive its rights to enforce others. Opp. 7-8 (repeating argument from Dkt. 151 at 21). SaveOn does not argue waiver. Evidence that J&J monitored patients' eligibility based on some criteria but not enrollment in SaveOn-advised plans would show that (1) J&J did not believe that the "other offer" provision applied to patients on such plans; and (2) J&J failed to mitigate damages by continuing to pay funds to such patients.

Hon. Freda L. Wolfson                                                                    Page 3

more patients are taking Janssen drugs as a result of being on the SaveOnSp Program," Dkt. 192 at 22, is limited to information sufficient to quantify the monetary benefit that SaveOn generates for J&J, so it can offset that benefit against J&J's purported damages, as black letter law allows. Mot. 9. Without this information, SaveOn cannot properly quantify the offset. Contrary to J&J's assertion (Opp. 11), SaveOn is not after J&J's general profits from its drug sales. And while J&J argues that SaveOn can use its own documents to show how it affects patients' adherence to J&J's drugs[2] (Opp. 12), it does not dispute that J&J alone has the information necessary to translate that increased adherence into the dollar figure necessary to offset J&J's damages.

## II.    SaveOn's Motion for Reconsideration

*First*, again contrary to J&J's assertions (Opp. 16), SaveOn does not seek "documents regarding the overall CarePath budget." It seeks only information on why J&J did not lower its CarePath maximums once it became aware of SaveOn, accumulators, and maximizers, relevant to showing that J&J failed to mitigate its purported damages, Mot. 11–12. ██████████████

████████████████████████████████████████████████████████████ Mot. 12–13. J&J asks Your Honor to ignore them because SaveOn did not file a supplemental brief or raise the documents at the January 24 conference, Opp. 12-15; *see also id.* 19—but SaveOn said at the conference that J&J had produced supporting documents after September 7, it offered to make a supplemental submission, and Your Honor said that it could. Tr. at 100:7-101:1.

*Second*, J&J misses the point in arguing that discovery about CarePath's purpose is irrele-

---

[2] J&J asserts that ████████████████████████████████████ Opp. 12. Even were this merits argument appropriate, J&J misstates the record. It cites ████████████ ████████████████████████████████, ████████████████████. Mot. 10.

Hon. Freda L. Wolfson                                                                 Page 4

vant to its GBL claim. Opp. 16-18. J&J alleged that SaveOn's purported threat to CarePath's fi-

nancial viability is a ***public*** harm—not a harm to J&J. Compl. ¶ 114. While J&J may assert addi-

tional forms of public harm, Opp. 18, SaveOn must defend against each of J&J's public harm

allegations and is entitled to show that any threat to CarePath's viability did not harm the public,

in part by showing that CarePath benefits only J&J—and that J&J itself agrees. J&J does not refute

the documents indicating that such evidence exists.

*Third*, contrary to J&J's assertions (Opp. 18-20), SaveOn does not seek general evidence

about J&J's drug prices. SaveOn rather intends to refute J&J's allegation that SaveOn's conduct

increases healthcare costs, Compl. ¶¶ 21, 114, by showing that SaveOn's conduct helps combat

increased healthcare costs caused by J&J and other drug makers raising drug prices. Mot. 18–20.

J&J does not say if it will use evidence of its drug pricing in response. If J&J reserves the right to

do so, *see*, Tr. 97:23-98:1, it must produce that evidence now. It is no answer that J&J might move

to exclude SaveOn's argument, Opp. 20; it has not and would have no meritorious basis to do so.

*Finally*, while J&J tries to distract from the merits by accusing SaveOn of continuously

relitigating issues, *e.g.*, Opp. 3, 6, 11, the opposite is true—J&J has continuously withheld patently

relevant documents. For just the documents at issue, J&J argued that SaveOn moved too early, Dkt

No. 79 at 28, Dkt No. 84 at 38-39, then argued that SaveOn moved too late, Dkt No. 111 at 6, Dkt

No. 116 at 54-55, produced limited documents right before seeking to end discovery, *id.* at 2–3,

argued that aspects of its own damages were irrelevant, Dkt No. 150 at 12, 14, 18-20, and, when

ordered to produce, unilaterally interpreted the Order narrowly so as to keep withholding docu-

ments, Mot. 5, Opp. 10-11. J&J should stop this and just produce the documents that SaveOn needs

to defend itself. As Your Honor admonished J&J: "It will take you less time to produce and move

on than to fight." Tr. 132-3-4.

Hon. Freda L. Wolfson                                                                    Page 5

Respectfully submitted,


/s/ Evans Wohlforth
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com


Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

March 21, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

> Re:    *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
>        **No. 2:22-cv-02632 (JKS) (CLW)**

Dear Judge Wolfson:

As Your Honor knows, on March 14, 2024, Johnson & Johnson Health Care Systems, Inc.'s (with its affiliates, "**J&J**") filed a motion for leave to file an Amended Complaint. Dkt. 219. Defendant Save On SP LLC ("**SaveOn**") writes to update Your Honor regarding the effect of J&J's proposed Amended Complaint on SaveOn's fully briefed February 20, 2024 motion for clarification and reconsideration, its February 7, 2024 motion to compel J&J to run CAP Terms for its refresh production, and its February 16, 2024 motion to compel J&J to use CAP Terms for several February 7 Court-ordered custodians. This is not intended to be a sur-reply but rather to address the effect of J&J's motion to amend on SaveOn's pending motions.

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

Hon. Freda L. Wolfson                                                                    Page 2

## I.    SaveOn's Motion for Clarification

In its original Complaint, in pleading its claim under NY GBL § 349, J&J alleged that SaveOn's conduct harmed the public by "jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive." Dkt. 1 ¶ 114. In the February 6 Order, Your Honor recognized that J&J's allegation of public harm "is tethered to the viability of the CarePath program vis-à-vis the availability of funds generally available to patients in need," Dkt. 192 at 22, and that "communications involving the viability of CarePath is a relevant topic that [SaveOn] may explore," *id.* at 19. In Section I.B of its February 20 motion, SaveOn asked Your Honor to clarify that J&J must produce documents relating to its financial viability even if they also relate to CarePath's budget or J&J's return on investment on the CarePath program.



In its proposed Amended Complaint, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Dkt. 220 Ex. B ¶ 202▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Compl. ¶ 114; Dkt No. 25 at 1; Dkt No. 79 at 17; Ex. 1 (Jan. 6, 2023 Letter from H. Sandick to M. Nelson) at 2, 5, 10; Ex. 2 (Jan. 24, 2024 Hr'g Tr.) at 68:4-69:5. On that basis, SaveOn withdraws its request for clarification in Section I.B, of its February 20 motion for clarification and reconsideration. (SaveOn reserves its rights to seek such information should J&J attempt to preserve any such argument.)

## II.    SaveOn's Motion for Reconsideration

### A.    Copay Assistance Maximums (Section II.A)

In its original Complaint, J&J alleged: "For most of these drugs [for which J&J offers CarePath], CarePath offers patients up to $20,000 in assistance towards their out-of-pocket costs

Hon. Freda L. Wolfson                                                                    Page 3

per calendar year." Compl. ¶ 47. It further alleged that SaveOn's conduct caused J&J to pay out the maximum amount of CarePath funds "more often than it otherwise would," *id.* ¶ 99, which it claimed as the basis of its damages, *id.* ¶¶ 110, 115. In Section II.A of its motion for reconsideration, SaveOn asked Your Honor to compel J&J to produce documents regarding (1) the reasons that J&J set CarePath's annual maximums for the drugs at issue at the levels it did during the relevant time period; and (2) the reasons that J&J apparently did not change those maximums until 2022 despite knowing that it was paying more due to accumulators, maximizers, and SaveOn.

In its proposed Amended Complaint,



. Dkt. 220 Ex. B ¶ 57 (

). 

. *See* Mot. 14 (quoting Ex. 18 (JJHCS_00164633) at -633)

).

Without information from J&J, SaveOn does not know whether and how J&J has adjusted the copay assistance maximums for the drugs at issue, even though those copay assistance levels are a key component of J&J's alleged damages. Dkt. 220 Ex. B ¶¶ 186, 202. This is another reason why the Court should grant SaveOn's motion for reconsideration in Section II.A of its February 7 motion and compel J&J to produce "documents going to why J&J set CarePath's annual maximums at the levels it did during the relevant time period and

. Mot. 14.

## B.    CarePath's Purpose (Section II.B)

In Section II.B of its motion for reconsideration, SaveOn asked Your Honor to compel J&J

Hon. Freda L. Wolfson                                                    Page 4

to produce discovery relating to CarePath's purpose on two bases: (1) J&J alleged that SaveOn's conduct threatened CarePath's financial viability, hence SaveOn was entitled to show that any harm to CarePath's viability does not harm the public, Mot. 16; and (2) J&J alleged that CarePath's purpose was to help commercially insured patients afford their specialty drugs, *id.* at 15 (quoting Compl. ¶¶ 2, 23, 47). In its proposed Amended Complaint, ███████████████████████ ███████████████████, *see* Dkt. 220 Ex. B ¶ 202; ████████████████████████████████████ ██████████████.

Also in its proposed Amended Complaint, however, ████████████████████ ████████████████████████████, Dkt. 220 Ex. B ¶¶ 2, 30, 57 ██████████ ████████████████████)—and ██████████████ ██████████████, *id.* ¶ 2 (████████████████████████████); *id.* ¶ 128 (███████████████████████████████████ ████████████████).

This underscores that Your Honor should grant the relief sought in Section II.B of SaveOn's motion. SaveOn is entitled to the information necessary to effectively counter these allegations, which J&J has repeated throughout this litigation. *See, e.g.*, Dkt. 116 at 9:15-24, 20:14-21 (J&J's counsel analogizing CarePath to a charity); *cf.* Mot. 17 (citing Ex. 10) (describing CarePath as an "investment" that drives J&J's profits). As long as J&J continues to make these allegations or reserves the right to make them at trial, Your Honor should compel J&J to produce information regarding CarePath's purpose.

## C.    Pricing (Section II.C)

In its original Complaint, J&J alleged that (1) "JJHCS has consistently decreased the price of the drugs targeted by the SaveOnSP Program," Compl. ¶ 80; and (2) SaveOn's conduct "mak[es]

Hon. Freda L. Wolfson                                                                    Page 5

other patient healthcare needs more expensive by not counting any of the [CarePath] funds spent on patients' medication towards their ACA maximum or deductible," *id.* ¶ 114. In the February 6 Order, Your Honor held that information regarding J&J's drug pricing was generally not relevant, in large part because "at the [January 24, 2024] hearing, [J&J's] counsel made an express representation on the record that [J&J] will not, at trial or on a summary judgment motion, rely on the pricing of Janssen drugs as a basis to prove its claims."

In Section II.C of its February 20 motion, SaveOn explained that it intended to counter J&J's allegation that SaveOn's conduct increases other healthcare costs (in part) by showing that J&J has increased those costs by raising drug prices. Mot. 18. If J&J reserves the right to oppose that showing, SaveOn argued, then J&J should produce any evidence relating to its drug pricing now. *Id.* at 19-20. In opposition, while saying it might move to exclude SaveOn's argument, it did not disclaim its right to oppose it if any such motion is denied. Opp. 18-20.



. Dkt. 220 Ex. B ¶ 129 (                         ).

This "transparency report" is actually quite opaque; it simply asserts that J&J reduced its prices, citing "Janssen internal financial accounting" that J&J has not produced. Ex. 3 at 2 & n.1.

Dkt. 220 Ex. B ¶ 129 (

Hon. Freda L. Wolfson                                                    Page 6

██ Once again, its "transparency report" cites only "Janssen internal financial accounting" as support for these assertions, which it un-transparently does not provide. Ex. 3 at 6 & n.1.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████. This is an additional reason that Your Honor should compel J&J to produce discovery "showing the connection between CarePath and its pricing of the 14 drugs at issue." Mot. 18.

### III.    SaveOn's Motions Regarding CAP Terms[1]

The Court recognized that SaveOn is entitled to discovery on J&J's mitigation measures of its damages. *See* Dkt. 171 at 93:21-23. As Your Honor and Judge Waldor recognized, a purpose of the CAP Program was to "take action to reduce [J&J's] losses," Dkt. 192 at 25, including by "identify[ing] patients who were enrolled in" maximizers, accumulators, and plans advised by SaveOn, *id.* at 25-26. Judge Waldor and Your Honor thus both held that SaveOn was entitled to discovery about the CAP program. *See* Dkt. 171 at 55:25-56:1 (opening the doors on CAP discovery); Ex. 2 (Jan. 24, 2024 Hr'g) at 108:21-109:6 (Your Honor indicating that documents related to the CAP Program are relevant).

In a November 2, 2023 Order, Judge Waldor thus compelled J&J to add the so-called CAP Custodians—William Shontz, Quinton Kinne, Daphne Longbothum, John Hoffman, L.D. Platt,

─────────────────────

[1] The CAP Terms are: "CAPa" OR "CAPm" OR "adjustment program*".

Hon. Freda L. Wolfson                                                                 Page 7

and Alison Barklage, Dkt. 173 at 2—and in a February 6, 2024 Order, Your Honor compelled J&J

to add Karen Lade, Scott White, and Blasine Penkowski because they worked on the CAP Program

and related efforts to mitigate, Dkt. 192 at 26-29. On February 7, 2024, SaveOn filed a motion to

compel J&J to comply with the November 3 Order by running the CAP Terms for all its custodians

over the full refresh period of July 1, 2022 to November 7, 2023 (as J&J did for the period of April

1, 2016 to November 7, 2023). On February 16, 2024, SaveOn moved to compel J&J to comply

with the November 7 Order and the February 6 Order by running the CAP Terms over the custodial

files of the CAP Custodians and those of Lade, White, and Penkowski.



        In its proposed Amended Complaint, █████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████.” Dkt. 220 Ex. B ¶ 177. ████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████ *Id.* ¶ 193.

        This provides an additional reason that Your Honor should grant SaveOn's February 7 and

February 16 motions regarding the CAP Terms. ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████. Your Honor recognized that J&J used the CAP program in an effort to identify patients

enrolled in such plans, Dkt. 192 at 25, and █████████████████████████████, Dkt. 166

Ex. 1; Feb. 16, 2024 Mot. Ex. 9 (███████████████████████████████████████████████

████████████). This makes robust discovery regarding the CAP Program even more essential.

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Exhibit 4 (JJHCS_00198255),

Hon. Freda L. Wolfson                                                    Page 8

for example, ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████. Exhibit 5

(JJHCS_00195975) and Exhibit 6 (JJHCS_00196018) ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████. These documents

were identified by the CAP Terms but would not have been identified by the CAP Terms with a

SaveOn limiter. J&J should not be able to manipulate its terms to withhold such documents.

***

SaveOn appreciates Your Honor's attention to this matter.

Respectfully submitted,

*/s/ E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

Hon. Freda L. Wolfson                                                                 Page 9

Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

# Exhibit 1

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 6, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

<u>By Email</u>

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

Re:    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC***
***(Case No. 2:22-cv-02632-JMV-CLW)***

Dear Meredith:

We write in response to your December 21, 2022 letter concerning Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Responses and Objections to Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production.

As an initial matter, we note that the responses set out below are subject to ongoing factual investigation and document collection efforts. We reserve all rights to revise or amend these responses as necessary. Further, none of the responses set out below are intended to waive any of the general or specific objections or limitations provided in JJHCS's Responses and Objections to SaveOnSP's First Set of Requests for Production, or to suggest that responsive documents exist with respect to particular requests.

## I.  GENERAL ISSUES

### A.  Definition of "Janssen Drugs"

We objected to the term Janssen Drugs "to the extent it purports to include drugs that are not covered by CarePath." You ask us to clarify whether the drugs BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA are covered by CarePath. We write to confirm our understanding that patient assistance for these drugs is covered by CarePath.

### B.  Time Period

We objected to SaveOnSP's requests to the extent that they sought documents from before January 1, 2017. SaveOnSP seeks documents for many requests dating as far back

Meredith Nelson, Esq.
January 6, 2023
Page 2

as 2009.  We do not see the basis for extending the relevant time period beyond 2017, but would like to further understand your position as part of the meet-and-confer process.

For example, you assert that you are entitled to documents about the budgeting and development of CarePath from its inception, as well as the budgeting and development of any predecessor of the CarePath program, in order to "investigate JJHCS's assertions that SaveOnSP's services make CarePath financially unviable."  JJHCS's assessment that SaveOnSP's services "jeopardiz[e] the viability of patient assistance programs like CarePath by making them prohibitively expensive," Compl. ¶ 114, is one that you are free to probe in depositions and at trial, but it self-evidently turns on the added expenses caused by SaveOnSP, and all documents about the developing and budgeting of the program have no proportionate relationship to that general proposition.  Moreover, JJHCS has already agreed to search for and produce documents that will show that SaveOnSP is making CarePath prohibitively expensive, including, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath."  *See* R&Os to Requests 25, 27, 29.  Please explain why those documents, which include budget and harm-related materials, do not suffice.

Further, you claim that you need documents about CarePath's budget and cost for nearly a decade before SaveOnSP began operations, which we understand occurred in or about November 2017, when SaveOnSP executed its Master Program Agreement with Express Scripts Inc.  Please explain how CarePath's budget and development prior to 2017—a time when SaveOnSP did not exist—is relevant to investigating SaveOnSP's effect on CarePath's financial viability in the future.  Please also explain how the budgeting and development of any predecessors of the CarePath program, which only came into existence in 2015, has any bearing on the present dispute.

You also claim that you need documents from prior to 2017 in order to investigate whether "CarePath was designed solely to help patients, not to financially benefit JJHCS."  Please direct us to where JJHCS has claimed that CarePath was designed "solely to help patients" and "not to financially benefit JJHCS."  Please also explain why documents prior to 2017 are needed to make such an assessment.

Finally, you claim that you are entitled to documents relating to CarePath's terms and conditions from before 2017 to "fully assess the meaning and materiality of the terms and conditions at issue in this case, as decisions about many of these terms likely predate 2017."  Please explain what "decisions" prior to 2017 are relevant to this case, which concerns only whether SaveOnSP wrongfully induced patients to breach CarePath's actual terms and conditions during the time period when SaveOnSP was in operation.  Please also explain why SaveOnSP believes it needs additional documents apart from the final terms and conditions.  In any event, on this point, to the extent that SaveOnSP is willing to produce internal documents

Meredith Nelson, Esq.
January 6, 2023
Page 3

that it has thus far declined to produce, we are willing to discuss an appropriate compromise involving production from each side.

### C.    Documents in the Possession of JJHCS

You asked whether documents created or held by employees of entities other than JJHCS "within the J&J corporate family or involved in the administration of CarePath, including Janssen, CarePath Care Coordinators, JJHCS Hub Entities, Lash Group, and Trial Card" are in JJHCS's possession, custody, and control, and would accordingly be produced by JJHCS.

With respect to entities in the J&J corporate family, we plan to generally limit our production to documents in JJHCS's possession alone. The J&J corporate family consists of more than 140,000 employees who work at over 200 subsidiaries and affiliates across the world. Collecting and producing documents from all of these individuals and entities would be burdensome and disproportionate to the needs of this case. JJHCS is the sole corporate entity charged with administration of CarePath, and so it is incumbent on SaveOnSP to explain why the collection and production of documents outside of JJHCS is necessary and proportionate to the needs of this case. Please provide such an explanation to us, including an explanation of which of the J&J affiliates and subsidiaries you believe are likely to have relevant documents.

In addition, with respect to entities outside of the J&J corporate family, JJHCS objects to SaveOnSP's definition of "JJHCS Hub Entities" for a number of reasons, including to the extent it purports to include entities other than those responsible for administering CarePath during the relevant Time Period. Nevertheless, notwithstanding such objections, JJHCS will work with Trial Card, a third-party vendor with responsibility for the administration of CarePath during the relevant Time Period, to facilitate production of documents responsive to SaveOnSP's requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    Request Nos. 1-7, 35

SaveOnSP's Request Nos. 1-7 seek organizational charts, including charts for entities other than the JJHCS groups responsible for administration of CarePath. Request No. 35 seeks "documents sufficient to identify all JJHCS Hub Entities and CarePath Coordinators."

In response to Requests Nos. 1-7, JJHCS agreed to produce documents "sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath for the relevant Time Period." In response to Request No. 35, JJHCS agreed to produce "non-privileged documents in its possession sufficient to identify the entities responsible for administering CarePath during the relevant Time Period." We also note that while JJHCS will not produce organizational charts for Trial Card, we will work with Trial Card to facilitate production of such documents, to the extent they exist and can be located by a reasonable search.

Meredith Nelson, Esq.
January 6, 2023
Page 4

Please explain the basis for SaveOnSP's request that we collect and produce documents beyond this so that we can better understand your position.

We would also like to more fully understand the reasons you provided for why you need organizational charts beyond what JJHCS has agreed to produce. You claim that "SaveOnSP needs documents relating to CarePath's development, so that it can test JJHCS's assertion that CarePath was developed solely to benefit patients and not to benefit JJHCS financially." As requested in Section I.C, *supra*, please direct us to where JJHCS has claimed that CarePath was designed "solely to benefit patients" and "not to benefit JJHCS financially." Regardless, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to CarePath's finances, so it can test JJHCS's assertion that SaveOnSP's conduct financially harms CarePath and threatens its financial viability." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether SaveOnSP's wrongful conduct financially harms CarePath and threatens its financial viability. Again, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the marketing of CarePath, so it can explore whether JJHCS's marketing caused any of the purported patient confusion that JJHCS attributes to SaveOnSP." The patient confusion alleged in the Complaint is that created by SaveOnSP when pharmacies refuse to fill prescriptions at the point of sale unless those patients enroll with SaveOnSP. Compl. ¶ 88. Please explain your factual basis for claiming that such patient confusion could reasonably be attributed to JJHCS's marketing efforts. In particular, please direct us to specific instances of confusion identified in the complaint that could reasonably be attributed to specific CarePath's marketing efforts. Otherwise, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the sale, pricing, and marketing of Janssen Drugs so that it can evaluate the relationship between CarePath and JJHCS's financial performance, including how JJHCS sets prices for Janssen Drugs (thus increasing costs for health plans and patients)." Please explain how Janssen's drug sales, pricing, or marketing are related to the claims or defenses in this action, which concern SaveOnSP's misconduct in extracting funds from CarePath. Please also explain how Janssen's conduct is relevant in any way to this action. Again, this provides no basis for additional organizational charts. Further, even assuming that these points were relevant, SaveOnSP and its health plan partners already have access to extensive information concerning the pricing of Janssen Drugs, based on their own reimbursement records for those Drugs.

Meredith Nelson, Esq.
January 6, 2023
Page 5

You claim that "SaveOnSP also needs documents relating to the drafting of JJHCS's terms and conditions, which JJHCS alleges that SaveOnSP induced patients into breaching." Please explain why the drafting of the terms and conditions with which patients must comply is relevant to this action which is based on whether SaveOnSP has engaged in wrongdoing when it strong-arms patients into breaching those terms and conditions. On this point again, however, to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce, we are willing to discuss a compromise.

## B.    Request No. 11

SaveOnSP's Request No. 11 seeks documents "regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." JJHCS offered to "meet and confer to determine if this Request can be appropriately narrowed." We do not currently see the basis for producing the materials you request, but are willing to continue to discuss the merits of this Request.

You claim that documents pertaining to the "development, marketing, and management of [other copay assistance programs offered for Janssen Drugs,] as well as of CarePath itself, are relevant to refuting: JJHCS's assertions that SaveOnSP's services increase the cost and threaten the continued viability of 'patient assistance programs like CarePath by making them prohibitively expensive.'" Compl. ¶ 114.

With respect to CarePath, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether its services increase the cost of CarePath and threatens its financial viability.

With respect to the reference to "patient assistance programs like CarePath" in Compl. ¶ 114, that is a general reference to patient assistance programs across the industry, not other patient assistance programs for Janssen Drugs. As you know, SaveOnSP targets the patient assistance programs of other drug manufacturers as well. JJHCS reasonably infers that SaveOnSP's services harm those programs in ways similar to how they have harmed CarePath. We do not see how the "development, marketing and management" of those programs is relevant to that inference of harm, but invite you to explain.

You also claim that such documents are relevant to "JJHCS's assertion that any increase in the cost of copay assistance programs amounts to a public harm." JJHCS claims that SaveOnSP causes public harm by "causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare

Meredith Nelson, Esq.
January 6, 2023
Page 6

needs more expensive by not counting any of the funds spent on patients' medication towards their ACA maximum or deductible." Compl. ¶ 114. Please direct us to where JJHCS alleges that "*any* increase in the cost of copay assistance amounts to a public harm." (emphasis added). Please also explain how the "development, marketing and management" of such programs is relevant to whether an increase in their costs amounts to a public harm.

You also claim that such documents are relevant to "JJHCS's assertion that SaveOnSP induces patients to breach CarePath's terms and conditions and deceives patients by failing to inform them of that alleged breach." Please explain how documents relating to the "development, marketing and management" of CarePath, let alone other programs, is relevant to whether SaveOnSP induces patients to breach CarePath's terms and conditions. Please also identify the elements in the relevant claims or defenses to which such documents are material.

C.    **Request Nos. 12 and 13**

SaveOnSP's Request Nos. 12 and 13 seek documents regarding CarePath's terms and conditions and the CarePath requirement that patients enrolled in CarePath make payments toward Janssen Drugs. JJHCS agreed to produce documents "sufficient to show all final versions of CarePath's terms and conditions for each Janssen Drug during the relevant Time Period."

Seeking additional documents beyond what JJHCS has promised to produce, you claim "JJHCS's understanding of the terms and conditions in its CarePath contracts and the drafting of those terms and conditions is relevant to whether SaveOnSP induced patients to breach them, a central point for JJHCS's tortious interference claims. Compl. ¶ 109." As noted in Sections I.B and II.A, *supra*, whether there has been a breach is dependent on SaveOnSP's conduct and the final terms themselves, not the back-story of the drafting of the terms and conditions. Nonetheless, so that we can consider your demand more precisely, please identify which terms you believe are relevant but also unclear or ambiguous on their face such that consideration of extrinsic evidence, such as the drafting history of the terms and conditions, is relevant to this action. Again, we are willing to discuss a compromise on this point to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce.

D.    **Request No. 14**

SaveOnSP's Request No. 14 seeks documents relating to JJHCS's and other entities' "understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations." You claim JJHCS refused to produce any documents in response.

You have misstated JJHCS's response. JJHCS did not refuse to produce any documents in response to RFP No. 14. We agreed to search for and produce "all non-privileged documents and communications in its possession regarding SaveOnSP's designation of specialty

Meredith Nelson, Esq.
January 6, 2023
Page 7

drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations during the relevant Time Period." *See* R&O to Request No. 14. Subject to the objections laid out in JJHCS's Responses and Objections, JJHCS will produce such documents. We hope this clarification resolves your concerns, but if there are additional documents SaveOnSP believes it requires, please let us know.

E.    **Request Nos. 20, 41, 43**

SaveOnSP's Request Nos. 20, 41, and 43 seek documents concerning "Copay Accumulator Services and Copay Maximizer Services." JJHCS in response agreed to produce documents relating to SaveOnSP.

You claim that documents relating to "Copay Accumulator Services" and "Copay Maximizer Services" are relevant "because JJHCS has in its complaint blurred the lines between SaveOnSP, accumulators, and maximizers. *See, e.g.*, Compl. ¶ 74. Thus, documents related to JJHCS's understanding of accumulators and maximizers are also relevant to its understanding of SaveOnSP's business and the impact of that business on JJHCS."

First, please explain how JJHCS's understanding of accumulators and maximizers in general is relevant to the claims or defense in this action. Please identify the elements of any claims and defenses and explain the relevance of these requested documents to those elements. Second, please explain why you need documents from JJHCS to refute an allegation that SaveOnSP falls into the category of programs described in the article cited in Compl. ¶ 74. Please explain why SaveOnSP needs documents from JJHCS in order to compare the contours of its own program, as borne out by its own documents and other information within SaveOnSP's control, against the descriptions in that article.

F.    **Request No. 21**

SaveOnSP's Request No. 21 concerns "any advocacy to or communications with any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer." Based on, *inter alia*, relevance and privilege, JJHCS declines to produce documents in response to this Request.

You claim that "JJHCS's lobbying campaign is, at a minimum, relevant to showing that public confusion about SaveOnSP's services is the result of actions by JJHCS and its allies, not SaveOnSP." As noted in Section II.A, *supra*, the Complaint alleges that SaveOnSP confuses patients in part by creating rejections and delays at the point of sale. Compl. ¶ 88. Please explain how such confusion could reasonably be attributed to any lobbying efforts by JJHCS. In addition, please direct us to instances of confusion identified in the Complaint that could reasonably be attributed to any lobbying efforts as opposed to the conduct of SaveOnSP and its partners.

Meredith Nelson, Esq.
January 6, 2023
Page 8

You also claim that "such communications may also show JJHCS's understanding of whether SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits."  Please explain how lobbying efforts are relevant to this question, as whether SaveOnSP violates the Affordable Care Act is a question of law.

Finally, please explain how requests for documents concerning JJHCS's lobbying of government officials are permissible given that JJHCS has a privilege against the production of documents that would unjustifiably burden its First Amendment right to political association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958).

**G.      Request No. 25**

SaveOnSP's Request No. 25 seeks "all Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 110, 115."  JJHCS agreed to produce "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period, including the extent to which SaveOnSP has caused JJHCS to pay more in copay assistance that it otherwise would have."

You ask us to confirm whether "based on its response JJHCS is producing fully in response to this Request."  Without waiving the objections and limitations in its response, JJHCS intends to search for and produce the documents and communications it identified in its response.  We are happy to meet and confer should you have specific questions.

**H.      Request No. 26**

SaveOnSP's Request No 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum."  In its Responses, JJHCS objected to this Request on the grounds that it was vague and ambiguous and declined to produce any documents in response to this Request.

You now clarify that this Request "seeks documents and communications that reflect any payments for Janssen Drugs made by JJHCS, Janssen, or any Hub Entity on behalf of patients, both in the ordinary course of providing copay assistance and in any instance where such entity covered a patient's copay for a Janssen Drug in excess of what it otherwise would have under CarePath's terms and conditions."

JJHCS has agreed to produce documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath. *See* R&O to RFP No. 29.  Please let us know if that is sufficient or otherwise identify the claims or defenses for which SaveOnSP believes it needs documents beyond that.  Please also let us know the rationale for seeking a broader production than what JJHCS has proposed.

Meredith Nelson, Esq.
January 6, 2023
Page 9

## I.    Request No. 28

SaveOnSP's Request No. 28 seek a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. through m.). JJHCS does not believe that documents unrelated to SaveOnSP's misconduct, such as documents relating to the sales and marketing budgets for Janssen drugs, are relevant to this action, but nevertheless agreed to produce "Janssen Transparency Reports." JJHCS also said it is willing to meet and confer regarding items i. through m.

You wrote that JJHCS's does not define the term "Janssen Transparency Reports" or clarify what responsive data is contained in those reports. To clarify, those Reports summarize, *inter alia*, changes in Janssen drug prices, the amount of rebates paid for Janssen Drugs and total spend on CarePath patient assistance. An example of such a report can be found here: *The 2021 Janssen U.S. Transparency Report*, JANSSEN PHARM., INC. (2022), https://transparencyreport.janssen.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000.

You claim further that the data "SaveOnSP seeks is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. We invite you to explain why it is necessary for SaveOnSP to also receive additional data, including, for the last thirteen years, (i) a listing of "all patients receiving a Janssen Drug," (ii) "the number of fills of the Janssen Drug each received by each such Patient," (iii) "the dosage of the Janssen Drug received by each such Patient for each fill," (iv) "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," as well as the other revenue and cost data. In particular, please explain how a request for the names of each and every of the tens of millions of patients who have received Janssen therapies over the past thirteen years is a proportional request for information given the claims and defenses at issue in this action, to the extent that JJHCS even has the data that SaveOnSP seeks. We are interested to understand your rationale for this Request and to hear your explanation for why it is proportionate to this action, particularly in light of the fact that, as explained above, SaveOnSP and its health partners already have substantial information about the pricing of Janssen Drugs based on their own claims and reimbursement data.

You claim further that "there are clear parallels between the data SaveOnSP seeks in RFP No. 28 and the data JJHCS seeks in its RFP Nos. 41 and 42" and "invite[] JJHCS to meet and confer." We do not understand this comparison but are willing to meet and confer to discuss this Request further.

Meredith Nelson, Esq.
January 6, 2023
Page 10

**J.      Request No. 29**

SaveOnSP's Request No. 29 seeks documents relating to CarePath's finances. JJHCS in response agreed to produce documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath."

You claim that these documents are insufficient because the additional documents SaveOnSP seeks, "including information on JJHCS's return on investment for CarePath, is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." The documents JJHCS has agreed to produce, including the CarePath budget and actual costs, are sufficient to show the threat SaveOnSP poses to CarePath. We invite you to explain how further documents, including JJHCS's supposed "return on investment," are relevant or necessary, or how it is proportionate.

You also claim that additional data is necessary to dispute "JJHCS's claim that CarePath is designed to help patients and not simply J&J's bottom line." As noted in Section I.C and Section II.A, *supra*, please direct us to where JJHCS has claimed that CarePath was not "designed to help . . . J&J's bottom line."

**K.      Request No. 30**

SaveOnSP's Request No. 30 seeks "for each year for each Janssen Drug, all Documents and Communications regarding the basis for Janssen's decision to raise or lower the price of the Janssen Drug, including labor or manufacturing costs or the increase in efficacy of the Janssen Drug." JJHCS declined to produce any documents in response to this Request.

You claim that the documents requested are "relevant to JJHCS's allegations that SaveOnSP's conduct threatens the viability of copay assistance" and that it has "suffered monetary losses as a result of SaveOnSP's conduct." As noted above, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why it is necessary for SaveOnSP to obtain documents relating to "Janssen's decision to raise or lower the price of" to further probe those allegations.

You also claim that such documents are relevant to JJHCS's allegations that "copay assistance programs like CarePath are a public good" and "that the threatened viability of copay assistance programs is a public harm." Please explain how "Janssen's decision to raise or lower the price of" its drugs is at all relevant to whether copay assistance programs like CarePath

Meredith Nelson, Esq.
January 6, 2023
Page 11

are a public good.  Please also explain why it is relevant to the claims and defenses in this action whether CarePath and similar programs are a public good.

L.       **Request No. 32**

SaveOnSP's Request No. 32 seeks all documents and communications "regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient."  JJHCS declined to produce any documents in response to this Request.

You assert that the requested documents are "relevant to JJHCS's allegations that providing CarePath funds to individuals who do not qualify for CarePath threatens the viability of copay assistance, as well as the significance of the CarePath terms and conditions at issue to JJHCS.  If, for example, JJHCS offered CarePath funds to an individual whom it believed was on a plan that does not comply with the revised Stelara or Tremfya terms, *see* Compl. ¶¶ 102-03, such an offer would be relevant to JJHCS's allegation that providing copay assistance to patients enrolled in such plans threatens the viability of JJHCS's copay assistance."

Even if JJHCS continues to offer copay assistance to a patient who JJHCS believes is enrolled in a health plan that does not comply with the revised Stelara or Tremfya terms, please explain why this would be relevant to the claims at issue in this action.  For example, please explain how JJHCS's willingness to continue to provide copay assistance to a patient who does not comply with the Terms & Conditions would change the fact that SaveOnSP causes JJHCS to spend more in CarePath patient assistance than it otherwise would absent the SaveOnSP program.  That a plaintiff does not enforce a term in its contract is no defense to a claim of tortious interference.  Indeed, New Jersey law is clear that a claim of tortious interference may exist even where the underlying contract is *unenforceable*.  *See, e.g.*, *Halebian N.J. v. Roppe Rubber Corp.*, 718 F. Supp. 348, 360 (D.N.J. 1989) ("That the underlying contract may be unenforceable is no defense to a claim of tortious interference."); *see also Mina L. Smith, Inc. v. Cyprus Indus. Minerals Co.*, 427 A.2d 1114 (N.J. App. Div. 1981) ("Unquestionably, one who unjustifiably interferes with the contract of another is guilty of a wrong.  That the contract may be unenforceable is no defense.").  We invite you to explain further why you believe such information is relevant to the claims or defenses at issue in this action.

M.       **Request No. 34**

SaveOnSP's Request No. 34 seeks documents and communications concerning JJHCS's consideration of SaveOnSP's services for its own employer-sponsored health plan. JJHCS declined to produce any such documents.

You claim that "whether JJHCS considered using such services for its own employees is relevant to JJHCS' claims that SaveOnSP harms patients by causing stress and

Meredith Nelson, Esq.
January 6, 2023
Page 12

confusion, increasing costs of other healthcare, and threatening the viability of copay assistance." As you are no doubt aware, Johnson & Johnson did not contract with SaveOnSP. Given this fact, please explain how Johnson & Johnson's employer-sponsored health plan bears on any of these issues, or more generally to the claims and defenses at issue in this action.

N.    **Request No. 36**

SaveOnSP's Request No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS agreed to produce agreements in its possession between it and the entities responsible for administering CarePath for the period of January 1, 2017 to the present.

You wrote to confirm (1) whether this production would encompass "agreements which have in the past administered CarePath, not simply those which currently administer CarePath" and (2) whether JJHCS will produce documents responsive to Request No. 36 that relate to the fair market value of JJHCS's Hub Entities' or CarePath Care Coordinators' services."

We write to confirm that JJHCS intends to produce agreements for entities that have administered CarePath for the period of January 1, 2017 to the present, even if those entities no longer administer CarePath today. Our current understanding is that those agreements will include work orders that document the cost of the services provided. We do not understand any other relevant documents to be responsive to this Request. If you seek any other documents, please let us know and we will consider your request.

O.    **Request No. 37**

SaveOnSP's Request No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." JJHCS declined to produce documents in response to this Request because this Request is irrelevant to the subject matter at issue in this litigation.

You assert that these documents are relevant to JJHCS allegations that SaveOnSP's conduct damages JJHCS, in part because they will "assist in demonstrating that SaveOnSP in fact causes more patients to use Janssen Drugs than would otherwise do so." We do not understand this purported rationale or its connection to this document request. Please explain how this might be the case. We do not understand SaveOnSP to make the decision to prescribe Janssen Drugs, and the "warm transfer" that is a necessary part of SaveOnSP's program will naturally deter some patients from using Janssen Drugs, as the patients are told that such medications are not covered by their health insurance unless additional steps are also taken. We invite you to describe any efforts that SaveOnSP has undertaken to alter individual

Meredith Nelson, Esq.
January 6, 2023
Page 13

prescribing decisions, including whether SaveOnSP collaborates with its health plan partners to require non-medical switching to drugs that SaveOnSP can designate as non-essential health benefits and for which manufacturer patient copay assistance exists.

**P.    Request No. 38**

SaveOnSP's Request No. 38 seeks all documents and communications "received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath." As noted in our initial Responses, JJHCS agreed to produce all documents responsive to this Request regarding SaveOnSP. *See* Response to Request Nos. 8, 38.

You wrote to confirm that JJHCS will produce documents responsive to this Request regarding CarePath generally. Please explain why a Request that seeks all documents "regarding CarePath" and would necessarily encompass all documents exchanged between JJHCS and any entity with whom JJHCS contracts or partners with to administer CarePath is not overbroad or why complying with it would not be unduly burdensome. Given the Federal Rules' emphasis on proportionality, please also explain how such burdensome discovery would be proportional to SaveOnSP's needs in this action. *See* Fed. R. Civ. P. 26(b)(1).

**Q.    Request No. 42**

SaveOnSP's Request No. 42 seeks all documents and communications "relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms 'copay accumulator' and 'copay maximizer.'" JJHCS responded that it would produce all non-privileged documents and communications in its possession for the period of January 1, 2017 to the present relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to SaveOnSP.

You wrote to inquire whether we would produce all documents and communications concerning those terms more generally. You assert that such documents are "relevant to whether JJHCS knowingly contributes to the alleged patient stress and confusion that it attempts to attribute to SaveOnSP by conflating SaveOnSP's conduct with that of 'maximizers' and 'accumulators,' including potentially harmful conduct commonly associated with 'copay accumulators' such as non-medical switching."

We do not understand your assertions. This action concerns SaveOnSP's scheme to extract patient copay assistance funds in violation of the CarePath terms and conditions. The patient harms, including patient "stress and confusion," flow from how SaveOnSP operates its profit-seeking scheme, not from any entity's abstract understanding of the meaning of the terms "copay accumulator" or "copay maximizer." In light of this, please explain how JJHCS's, a third-party vendor's, or partner's understanding of these terms generally would be relevant to the claims at issue in this action.

\* \* \*

Meredith Nelson, Esq.
January 6, 2023
Page 14

      We are available to meet and confer regarding the issues outlined above at your convenience.  We look forward to your response.

Very truly yours,

Harry Sandick

# Exhibit 2

Page 1

1           UNITED STATES DISTRICT COURT

2           DISTRICT OF NEW JERSEY

3           CIVIL ACTION NO. 22-2632

4    JOHNSON & JOHNSON HEALTH CARE

5    SYSTEMS, INC.,

6         Plaintiff,                    TRANSCRIPT

7         vs.                               OF

8    SAVE ON SP, LLC,                  PROCEEDINGS

9         Defendant.

10   - - - - - - - - - - - - - - - -

11

12           TRANSCRIPT of the stenographic notes of

13   the proceedings in the above-entitled matter as

14   taken by and before RUTHANNE UNGERLEIDER, a

15   Certified Court Reporter and Notary Public of the

16   State of New Jersey, held at the office of

17   LOWENSTEIN SANDLER LLP, One Lowenstein Drive,

18   Roseland, New Jersey, on Wednesday, January 24,

19   2024, commencing at approximately 10:00 in the

20   forenoon.

21

22

23

24

25

Page 2

```
 1   B E F O R E:
 2   HONORABLE FREDA L. WOLFSON
 3   A P P E A R A N C E S:
 4   PATTERSON BELKNAP WEBB & TYLER LLP
     1133 Avenue of the Americas
 5   New York, New York  10036
          BY:  HARRY SANDICK, ESQ.
 6               JULIA LONG, ESQ.
                 GEORGE A. LoBIONDO, ESQ.
 7               SARA A. ARROW, ESQ.
     Attorneys for Plaintiff
 8
     SILLS CUMMIS & GROSS P.C.
 9   The Legal Center
     One Riverfront Plaza
10   Newark, New Jersey  07102
          BY:  JEFFREY J. GREENBAUM, ESQ. (VIA ZOOM)
11   Attorneys for Plaintiff
12   SILLS CUMMIS & GROSS P.C.
     101 Park Avenue, 28th Floor
13   New York, New York  10178
          BY:  KATHERINE M. LIEB, ESQ.
14   Attorneys for Plaintiff
15   SELENDY GAY ELSBERG PLLC
     1290 Avenue of the Americas
16   New York, New York  10104
          BY:  ANDREW R. DUNLAP, ESQ.
17               ELIZABETH SNOW, ESQ.
                 HANNAH MILES, ESQ.
18   Attorneys for Defendant
19   ROBINSON & COLE LLP
     666 Third Avenue 20th Floor
20   New York, New York  10017
          BY:  E. EVANS WOHLFORTH, JR., ESQ.
21   Attorneys for Defendant
22
23   ALSO PRESENT:
     SHERYN GEORGE, JJHCS In-House Counsel
24   WAYNE FANG, ESQ., Lowenstein Sandler
25
```

Page 3

1          JUDGE WOLFSON:  All right.

2          We're here today in connection with the

3   outstanding disputes, and when we had our Zoom

4   conference several weeks ago I indicated I wanted to

5   address whatever had been left open by Judge Waldor.

6   She's had many, many conferences in this case,

7   resolved many issues on the record, entered some

8   orders, and there were a couple of substantial issues

9   that have really been kicking around for a while

10  where she was looking for everyone to meet and confer

11  and see where you ended up.  And, primarily, they're

12  going to relate to discovery regarding the terms and

13  conditions, there was financial information, and now

14  there are other things to do with custodians, and I'm

15  going to try to get to everything.  But I want to

16  deal with this, in the first instance, with regard to

17  those pending discovery disputes, let me turn first

18  to the documents dealing with the CarePath terms and

19  conditions that have been talked about for quite a

20  while now and what should be discoverable with regard

21  to the drafting, understanding enforcement of the

22  terms and conditions.

23          We know that, in particular, what's

24  being looked at is that this program is supposed to

25  fall under the "Other Offer" category.  It's not the

Page 4

1    coupon.  No one is asserting that it falls within the

2    other language.  Right?  Everybody agrees?  Yes?  So

3    it's all about the other offer.

4              MR. GREENBAUM:  Your Honor, may I make

5    two short preliminary points for context to just kind

6    of set the table at least from our perspective?

7              JUDGE WOLFSON:  I don't think it's

8    necessary at this point.

9              Let me move forward.

10             And I will say this -- can I go off the

11   record one moment?

12             (Brief recess taken.)

13             JUDGE WOLFSON:  So let's break this down

14   into what's there.

15             There's no doubt -- or there's no

16   dispute that there certainly is relevance to evidence

17   regarding what this term means.  The question is, how

18   much discovery is to be given, and where does it go,

19   and what are our time tables for doing that, et

20   cetera?  And we're going to get to that.

21             The Plaintiff has said that it produced

22   thousands of pages of documents, approximately 1200,

23   in response to search terms that were used to find

24   documents relating to terms and conditions from

25   April 2016 to July 1, 2022 that had been an agreed

Page 5

1    upon discovery period, however, the Court at the last

2    hearing had directed the parties to continue to

3    update discovery through October 2023.

4                So now we're all dealing with updating,

5    updating.

6                Okay.

7                There were requests also for documents

8    that bear on -- if I can, for short, I know it's

9    JJHCS -- if I can say J&J for purposes of the

10    hearing.  We know it's a different entity, but just

11    for ease -- J&J's enforcement and understanding of

12    the relevant terms and conditions.  And Plaintiff

13    says also that J&J has investigated availability of

14    additional documents and based on that investigation

15    understands that the terms and conditions at issue

16    are standard, uncontroversial terms, used in most, if

17    not all, manufacturer co-pay support programs that

18    long predate the time period of 2016 to 2023.  And

19    J&J has offered to review additional documents to see

20    what else might fall within that relevant time frame.

21                J&J has indicated that documents that go

22    further back to 2009, which is what really I think

23    SaveOn has been talking about, argues that either

24    they're irrelevant and also enforcement of terms and

25    conditions relating to other terms besides "other

Page 6

1    offer."  I mean, I have all the arguments here.

2              So let's move into this.

3              Now, in this connection too we have

4    custodian issues, and you agreed to some

5    modifications.

6              I think what we have here is Defendant

7    asked Plaintiff to conduct a search for documents

8    relating to the drafting of the general T&C's to add

9    additional search terms used designed to identify

10   documents relating to drafting, understanding and

11   enforcement, and add two custodians that J&J

12   identified as responsible for drafting the new

13   Stelara and Tremfya T&C's and to extend a search for

14   documents relating to enforcement of the new Stelara

15   and Tremfya T&C's.

16             Plaintiff has indicated that it will

17   search eight more months of one custodian's documents

18   and add two limited search terms.

19             So let's talk about where we are.

20             With regard to the requests, it was

21   requested that Plaintiffs identify predecessor

22   programs from which CarePath's general T&C's were

23   drawn.  And I think there are also interrogatories on

24   that topic.  Right?

25             MR. DUNLAP:  Yes, are honor.

Page 7

1            MR. SANDICK:  I don't think that there

2    is an interrogatory that specifically tracks what

3    they asked for in our discovery letters.  And not to

4    get sidetracked, but one of the points of contention

5    is that if they want detailed historical information

6    about things within JJHCS, I think the discovery

7    device for that is an interrogatory.  If they

8    propound one, we'll answer it subject to objections.

9    But I don't think that they have propounded one that

10   would cover all of the issues that they have raised

11   and have tried to use discovery correspondence as a

12   mechanism essentially as a substitute for

13   interrogatories.  And they're not at their

14   interrogatory cap.  They could propound

15   interrogatories.

16            MR. DUNLAP:  Could I respond to that,

17   your Honor?

18            JUDGE WOLFSON:  Sure.

19            MR. DUNLAP:  Just briefly.

20            We served document requests asking for

21   documents relating to the drafting of the terms and

22   conditions.  We served interrogatories asking them to

23   identify individuals with responsibility for the

24   drafting of the terms and conditions.  It turns out

25   that this specific term and condition, which is the

1   heart of part of the case, ████████████████████

    ███████████████████████         We think our

3   existing interrogatory and document requests are

4   broad enough to cover whoever drafted it, whether

5   they were working at JJHCS or some other predecessor

6   program.  So we think it's covered.

7               JUDGE WOLFSON:  Okay.

8               We're going to talk about it today,

9   whether it was specifically asked in that way or not,

10  but I'm going to get to the bottom of this and be

11  done with it so that we have this resolved.

12              Now, in that regard, you've asked for I

13  think January 1, 2009 to the present, right?

14              MR. DUNLAP:  Yes.

15              JUDGE WOLFSON:  Because it would include

16  predecessor programs.

17              MR. DUNLAP:  Because that is our

18  understanding of when it began.  Obviously, if the

19  program began earlier, at some other time, then we

20  would want it to be tailored, our issue, but they

21  haven't given us information, so it's hard for us to

22  tailor our understanding of when the program started.

23              JUDGE WOLFSON:  Okay.

24              Why would you, Mr. Sandick, believe

25  that -- you know, we're looking for what the meaning

Page 9

1    of this is -- that if you had predecessor programs

2    that used the same term, why would that not be

3    relevant at a discovery stage?

4              MR. SANDICK:  So, a couple of things.

5              It's not so much that we're saying it

6    would be irrelevant.  What we're saying is, number

7    one, as we've explained to the Defendants before, we

8    do not have consistent record keeping within our

9    client's files.

10             JUDGE WOLFSON:  I'm going to get to

11   retention.

12             What I'm saying is, I want to take this

13   piece by piece.  Which is, if we start with

14   relevancy, now let's go to what the problems are with

15   producing it.

16             MR. SANDICK:  Sure.

17             I think the relevance issue is this:  As

18   to the meaning of "other offer" in the context of a

19   program like SaveOn, an accumulator or maximizer

20   program, those programs did not exist back in --

21   SaveOn was created in 2016.  So trying to figure out

22   prior to 2016 what the terms and conditions meant

23   with respect to a company like SaveOn I think is not

24   a productive project.

25             Also, for that matter, the current

Page 10

 1    CarePath system, which started in around 2016, also

 2    did not exist prior to that.

 3              To be short, J&J through JJHCS has tried

 4    to help patients pay for co-pay support, help them

 5    pay their deductibles on drugs for many years, but

 6    the program was different.

 7              So we're going to a time period when

 8    SaveOn did not exist, when the CarePath program we're

 9    talking about did not exist, and in a time period

10    where -- and I know your Honor said you'll get to

11    this -- but where the document record is not what it

12    is in more recent years because 2013 is a long time

13    ago.

14              JUDGE WOLFSON:  And I'll deal with that,

15    but I have to say I don't agree with your position

16    on -- that it would not be relevant simply because

17    programs like SaveOn didn't exist, whether

18    accumulator or maximizer programs, or CarePath didn't

19    come into being.

20              You know, you have indicated that these

21    are terms, that is the position you have taken, that,

22    you know, through maybe time, this is a term that is

23    used.  So in creating that, how broad a meaning you

24    thought that had, what it meant outside of the other

25    things you described, coupons, rebates, et cetera,

Page 11

1    that it could encompass, it may have nothing to do

2    with this, but that is okay.  So we need to answer

3    that question.

4                I do not agree with you.  I do agree

5    with SaveOn that I believe that going back in time is

6    relevant to the extent it was included in predecessor

7    programs.  It had to have a meaning.  If anyone even

8    discussed it.  Maybe they didn't.  And maybe that is

9    what will turn up.  But that is an answer in itself.

10               Now, talking about availability of

11   documents, because you have indicated that there are

12   preservation of retention issues, but I don't know

13   that you have provided anything that tells us what

14   those retention policies are or the issues as to why

15   they don't exist or how limited they are.

16               That has to be provided so that I could

17   determine, or your adversaries can determine, what

18   was done, and what the policy was, and whether it was

19   followed here.

20               That is always what we do when you have

21   a relevant document and a relevant time period and

22   there may be an issue.

23               So you're going to have to produce that

24   retention policy.

25               To the extent that you do find the

Page 12

1    documents regardless of that retention policy, I'm

2    ordering that they be produced.

3            Now, you've also indicated it's too

4    cumbersome, but you haven't done a search going back

5    because you haven't thought you had to produce them,

6    and the burden is on you to explain why it would be

7    burdensome.  And, frankly, if you're telling me you

8    may have nothing before 2013, it doesn't sound very

9    burdensome to me.  So I'm not buying that at the

10   moment without more.

11           For me, when I look at all of this,

12   rather this one seemed like an easy one, and I think

13   it's totally appropriate.

14           The crux of this case is going to be

15   what "other offer" means.  And in Judge Vazquez's

16   opinion in very short order in that last paragraph it

17   said this is going to need discovery and it could be

18   the subject of a summary judgment motion, but not a

19   dismissal motion, or maybe it goes to a trial, but he

20   noted that that was something that required

21   discovery.  And that term is going to be critical

22   here.

23           MR. SANDICK:  So, your Honor, we will

24   come back to you then with a submission on the

25   subject of burden and accessibility because I do

Page 13

1    believe those are substantial issues here.  That, you

2    know, very few companies would have sort of coherent

3    organized records going back 15 years or longer.  And

4    so I do think we have an issue that we need to bring

5    to your Honor's attention on this.

6                    JUDGE WOLFSON:  Okay.

7                    You're going to have to really convince

8    me because, first of all, I don't know what your

9    retention policy is, but on the burdenness, I know

10   that Judge Waldor kept putting burden to the side.

11   She said, a hundred million dollar case, it's a big

12   case, big companies, don't argue burden to me.

13                   I'm not quite sure I always agree with

14   that because burden is something you are allowed to

15   assert.  I'm not preventing you from doing so, but I

16   think you have a high hurdle there.

17                   So you want to move this along, I want

18   to also, so those answers you're going to have to get

19   to me pretty quickly.

20                   MR. SANDICK:  We'll do that, your Honor.

21                   JUDGE WOLFSON:  Okay, when?

22                   MR. SANDICK:  I would like to talk to

23   people internally to figure out, but today is

24   Wednesday.  Next week?

25                   JUDGE WOLFSON:  Sure.

Page 14

1              MR. SANDICK:  Okay.

2              JUDGE WOLFSON:  That would be fine.

3              You want a week from today?

4              The end of next week?

5              MR. SANDICK:  Let me just confer for a

6      moment.

7              Next Friday.

8              JUDGE WOLFSON:  Next Friday is fine.

9              MR. DUNLAP:  I assume you would want us

10     to meet and confer about this.

11             JUDGE WOLFSON:  Yes.

12             MR. DUNLAP:  Part of our concern is that

13     they haven't been really forthcoming in explaining to

14     us what their preservation or retention issues are.

15             JUDGE WOLFSON:  Now you're going to get

16     it.

17             MR. DUNLAP:  I assume you want the

18     parties to meet and confer before they file the

19     motion.

20             JUDGE WOLFSON:  Yeah.

21             MR. SANDICK:  I mean, I'm happy to talk

22     to Andrew any time.  We're going to file something on

23     this.  And I do not agree that we have been not

24     forthcoming.  We explained that 2013 is the crucial

25     time period for our client when there were changes in

Page 15

1    the record keeping system and that before that time,

2    all though I can't say that there aren't documents

3    here and there sort of lying around, so to speak, the

4    digital equivalent of that, there is no consistent

5    effort to retain documents from that time period.

6                JUDGE WOLFSON:  Look, they haven't

7    gotten that, and, you know, simply indicating that is

8    not enough.

9                They said they would have an answer by

10   next Friday.  So what I'll direct is that information

11   be given to you, as to burden and retention, you can

12   meet and confer, and then tee it up for me.

13               MR. SANDICK:  Would you like us to

14   submit it to your Honor in parallel next Friday?

15               JUDGE WOLFSON:  I would love to see it.

16               MR. SANDICK:  We will send it to you and

17   of course copy defense counsel by next Friday.

18               JUDGE WOLFSON:  Okay.

19               And then you can meet and confer and

20   we'll see if we have an issue.

21               As I said, but from my perspective on

22   the burden aspect, it's going to have to be a pretty

23   darn heavy burden because I think this is highly

24   relevant information, and so on a weighing here as to

25   the relevance versus the burden on you, I think you

Page 16

1    know where I'm going to come out.

2                  All right.  Let's move onto the next

3    topic.

4                  These are, quote, the enforcement

5    documents.

6                  So let's talk about this issue.

7                  This is I think where it -- the issue is

8    whether it's enforcing all of the terms of that or

9    only the other offer, correct?  That's where we are.

10                 MR. DUNLAP:  I think that is part of it.

11   Part of it is also what search terms they employ.

12   Since this submission went in we met and conferred

13   with the other side and narrowed the search terms.

14   It cuts out about 20 percent of the documents that

15   were identified in my previous submission.

16                 JUDGE WOLFSON:  Okay.

17                 So tell me what is left on this issue

18   that you want to argue today.

19                 MR. DUNLAP:  Well, we believe that they

20   should run a broader search for documents relating to

21   the meaning and understanding and enforcement of the

22   general terms and conditions, the "other offer"

23   provision.

24                 JUDGE WOLFSON:  The "other offer"

25   provision is good.

                                                    Page 17

 1                  MR. DUNLAP:  Yes.

 2                  Well, we think there are other portions

 3       of the general terms and conditions that are relevant

 4       as well.

 5                  So the way this works is that a lot of

 6       the -- they call this the SaveOn program, but a lot

 7       of the things they're complaining about, the setting

 8       of the co-pays, the not counting towards

 9       out-of-pocket max, are actually plan terms.  Those

10       are part of what the commercial plan sets as terms

11       for their members.  And there are references within

12       the terms and conditions health plans.  And we

13       think -- part of our argument is that that indicates

14       whatever "other offer" means, it can't mean plan

15       terms.  So we think it can't be limited just to the

16       "other offer" provision.  That is point one.

17                  Point two is, based on what we have seen

18       in the documents we don't --

19                  JUDGE WOLFSON:  So let me think of

20       though what you're looking for in that regard.

21                  You're not interested in coupons,

22       rebates, and the other things that are in there.

23                  I want to make sure how we're limiting

24       this.

25                  MR. DUNLAP:  Well, we are to the extent

Page 18

1    that we want to understand, there is an affirmative

2    case did they actually believe SaveOn was a coupon or

3    other offer or a program.

4                    JUDGE WOLFSON:  I think we are clear

5    that you said it's only other offer.

6                    MR. SANDICK:  The other offer is the

7    only term that we're doing.

8                    There is a long list of terms and

9    conditions that patients have to agree, most of them

10   have nothing to do in not even any conceivable way

11   with this case.

12                   For example, you cannot by federal law

13   be on Medicare or Medicaid and be part of SaveOn.

14   That is prohibition.  Children are not eligible to

15   receive drugs through this program.  And there are a

16   number of other things.  None of them are within the

17   scope of what we are alleging to be the contract that

18   was tortiously interfered with.  That's why the focus

19   has been -- in Judge Vasquez's decision and in our

20   complaint -- on the "other offer" language that your

21   Honor has spotlighted.

22                   JUDGE WOLFSON:  So we're limiting it to

23   the only contractual term that they think is "other

24   offer."

25                   MR. DUNLAP:  Right.

Page 19

```
 1              And I think we have a couple of issues
 2      with that.
 3              So, first, as you may have seen if
 4      you've looked at the Motion to Dismiss briefing,
 5      "other offer" appears in a string of other terms,
 6      coupon, et cetera.  And under ejusdem generis, if I'm
 7      pronouncing that doctrine correctly, you would
 8      understand what "other offer" means by looking at
 9      what the other terms in that clause mean.
10              So what they understand a coupon to
11      mean, what they understand another offer of financial
12      assistance to mean, is relevant to determining what
13      in context the "other offer" provision means.
14              So we do want to understand what they
15      think that means.
16              I would also make the point that --
17              JUDGE WOLFSON:  But we're on the
18      enforcement documents now, not on the actual
19      interpretation, terms, conditions.
20              MR. DUNLAP:  Well, but that period we're
21      talking about from 2016 through 2022 we're not just
22      looking for documents on enforcement, it also goes to
23      the meaning and their understanding of what the
24      "other offer" provision meant during that time
25      period.  And we submit to understand that you have to
```

Page 20

```
 1    look not just at "other offer," but also at the other
 2    terms that are in the clause where it appears other
 3    provisions in the terms and conditions that relate to
 4    health plans, there is a lot of contractual context
 5    that we need in order to argue about what "other
 6    offer" means.
 7              But I do want to turn to enforcement
 8    also.
 9              So as Mr. Sandick said, there are other
10    eligibility requirements that are not at issue.  For
11    example, if you're on Medicare or Medicaid, or you're
12    not of a certain age, et cetera.
13              Part of our argument is that until they
14    decided to bring this lawsuit we don't think J&J
15    actually ever contemplated that the "other offer"
16    provision covered members on SaveOn plans.  They
17    never actually thought that being on a SaveOn plan
18    ran afoul of the "other offer" provision.
19              And part of the evidence of that will be
20    that they did enforce eligibility criteria.  That
21    they were able to enforce other parts of the terms
22    and conditions, on Medicare, Medicaid, on age
23    requirements, et cetera, but they never sought to
24    enforce their new position on SaveOn until they
25    brought this lawsuit.
```

Page 21

1          We think that information is highly

2     relevant circumstantial evidence to show their course

3     of performance was they didn't actually believe that

4     "other offer" applied to the SaveOn program.

5          And so we need to see what they were

6     doing in terms of enforcing the terms and conditions

7     generally not just on "other offer."

8          MR. SANDICK:  Your Honor, two things:

9     First of all, on the subject of enforcement, since

10    these letters were submitted I think in August we

11    have already agreed to produce what are either

12    directly through us or by asking our vendor, a

13    company called Trial Card, to produce what are known

14    as benefits investigations.  And those are the

15    enforcement documents.  We're in the process of

16    making those productions for the relevant time period

17    right now.

18          So the enforcement issue I think by

19    virtue of concessions made by HCS, by J&J, is already

20    being addressed.

21          I want to also though pause for a moment

22    on the subject of whether the other terms next to

23    "other offer" in that particular term and condition

24    are relevant.

25          I think it's important to say two

Page 22

1    things.  First of all, this particular language,

2    coupon, discount, prescription savings card, free

3    trial, those are primarily what is driving the hit

4    count for the search terms they have proposed.

5    Something like maybe two-thirds or three-quarters of

6    the documents that they are asking to be reviewed

7    relate not to "other offer," which, by the way, have

8    already been the subject of search terms.  That's

9    why, as your Honor pointed out, we have already

10   produced thousands of pages of documents.  But the

11   search terms that they are proposing go way beyond

12   that, into any time that someone uses the word

13   "coupon" and the word "Janssen," we would have to

14   produce those documents.

15             That is why Judge Waldor told -- well,

16   one of the reasons why she told them back in October

17   and in the order that they needed to narrow their

18   requests, not just the search terms, but the requests

19   themselves, that this is too broad, it goes beyond

20   the scope of what is actually necessary to resolve

21   this case.

22             And if we were focusing on things like

23   "other offer" language, again, we've already made a

24   lot of production on that.  And we had offered

25   before, as your Honor pointed out, to do some

Page 23

1    additional production on that subject.

2              It's when you blow it open into

3    everything -- every word that is used on the sheet of

4    terms and conditions that the burden in terms of

5    document review goes through the roof.  And as we

6    pointed out, probably for very little benefit.

7    Because these are standard industry terms that are

8    used in the co-pay program area and also used in all

9    sorts of other consumer areas.  The ABA said this is

10   a standard term in all consumer discount programs.

11             JUDGE WOLFSON:  So what I'm hearing is,

12   but what I want to understand too, is you are going

13   to produce documents with regard to this, quote,

14   benefits investigation.

15             What I want to get back to you here, Mr.

16   Dunlap, what you said a couple of moments ago is what

17   is important to you is to give definition to what

18   they're enforcing and what they're not enforcing, you

19   want to know, well, were you enforcing all of these

20   other programs that you have listed, whether they

21   were Medicare, Medicaid, and all the various coupons

22   and other things, right?

23             MR. DUNLAP:  The eligibility questions.

24             JUDGE WOLFSON:  The eligibility

25   questions.

Page 24

1          You want to know, were you diligently

2     and regularly enforcing.  You knew SaveOn was there

3     and you didn't do it.  And you want to make an

4     argument, so guess what, we're going to tell you, you

5     never thought of any of these exclusions.

6          I hear what you're saying.  The question

7     is, how many documents do we need?  If they're going

8     to give you what we would call the benefits

9     investigations, would that not turn up every time

10    that they questioned eligibility?

11          MR. DUNLAP:  We don't think so, your

12    Honor.

13          Let me talk about the benefits

14    investigations.

15          So what they said at the last conference

16    was that ███████████████████████████████

██  ██████████████████████████████████

██  ██████████████████████████████████

██  ████████████████████████████████████

██  ██████████████     ████████████████████

██  ████████████████████████████████████

██  ██████████████████████████████

██  ██████████████████████████████████████

██  ██████████████████████████████████████

██  ██████████████████████

Page 25

1          They have so far declined to give us any

2   documents related to those investigations, just the

3   final reports themselves.

4          We got a production the other day.  We

5   had some issues with that.

6          What they're offering to give us is

7   very, very narrow.  They are not offering to give us

8   benefits investigations going to the full relevant

9   time period of this case from 2016 to present.  ██████

██  ████████████████████████████████████████████████

██  ██████████████████████████████████  And they're

12  not offering to give us any documents, there are no

13  enforcement search terms, for example, that go to the

14  enforcement of eligibility criteria or the meaning of

15  things like coupon or discount or benefit card.

16          And I hear what opposing counsel is

17  saying about the search terms.

18          We have proposed search terms to them.

19  We have narrowed those search terms since we put in

20  our letter by about 20 percent.  We have not received

21  I believe a counteroffer from the other side about

22  which of our search terms they would be willing to

23  run.  Their response has generally been no.

24  Certainly inviting us to negotiate against ourselves.

25          We're always glad to talk about

Page 26

1  appropriate search terms here, but we don't have

2  anything on enforcement.  We're not convinced that

3  just the benefits investigations process will give us

4  what we need here.

5          I'm glad to address the other points he

6  made, but I think those are the main ones.

7          MR. SANDICK:  Your Honor, I think there

8  are a few things I would like to address and correct.

9          So, first of all, it's not true that we

10  aren't giving other documents relating to the subject

11  of enforcement of the terms and conditions against

12  accumulator and maximizer programs.  We are running

13  to some extent voluntarily and to some extent in

14  response to Judge Waldor's order the so-called CAP

15  terms.

16

Page 27

1          As we said in some of our papers, SaveOn

2    goes to great effort to prevent anyone from finding

3    out which patients are in the program. ████████████

████ ████████████████████████████████████████████████

████ ████████████████████████████████████████████

████ ████████████████████████ they go to great length to

7    prevent us from figuring out who is in the program.

8                    ████████████████████████████████████

████ ████████████████████████████████████████████

████ ████████████████████████████████████████████████████

████ ████████████████████████████████████████████████

████ ████████    That's why we have been producing for that

13   category from 2022, the beginning of the year, now up

14   through the date of Judge Waldor's order.

15                    JUDGE WOLFSON:  Well, let me go back a

16   moment.

17          We got two things going on.  Now we're

18   talking about dates, how far back we go, but the

19   other is the various enforcement efforts with regard

20   to eligibility, which they have been talking about.

21   And the position there is, SaveOn was in existence

22   prior to 2022.  The fact that you started to take

23   some steps in response to what you believe was a

24   problematic program and would violate your terms in

25   that time frame doesn't address their concern, which

Page 28

1  is, okay, we were around before, and you also came to

2  this conclusion in 2022, whatever, but we'd like to

3  see what generally did you do as enforcement efforts

4  with regard to other eligibility criteria.  Do you

5  police generally?  Do you let things go?

6            I mean, these are some of the arguments.

7            I know you have some defenses you also

8  want to raise on, you know, latches, mitigations,

9  whatever, steps that were not taking, but I think

10 that there needs to be some understanding of,

11 generally, what are your enforcement efforts that you

12 take with regard to eligibility criteria.

13            Now, it has to be cabined in some way.

14 I don't want it to be so broad because there are lots

15 of things here and much of it may not be relevant.

16 So I think we have to understand, or they have to

17 understand, how do you go about enforcing, when do

18 you do so, and there is more information that is

19 needed.

20            MR. SANDICK:  So, your Honor, a couple

21 of things:  First of all, the subject of benefits

22 investigations.  Benefits investigations are,

23 generally speaking, not relevant to this case because

24 they don't touch on the application of the "other

25 offer" term, they don't touch on how that's applied

Page 29

1    in the context of a so-called maximizer or

2    accumulator program like SaveOn.

3              So what that would lead to, your Honor,

4    if there were to be some expansion of benefits

5    investigations, would be, essentially, meaningless

6    documents about, "Oh, this person is on Medicare.  We

7    can't cover that."  Things having nothing at all to

8    do with the scope of this case.

9              The other thing is, the questions that

10   Mr. Dunlap is raising, if he serves an interrogatory

11   on us that asks those questions, we'd be obliged to

12   answer those questions in a way that would be binding

13   as an admission on JJHCS.

14             To, you know, beat it back and forth in

15   discovery letters doesn't lead to that outcome.

16             JUDGE WOLFSON:  What would that

17   discovery interrogatory look like?

18             MR. SANDICK:  Sure.

19             It would be an interrogatory asking for

20   a statement of what the company's policy was on the

21   issue of enforcement of the terms and conditions.

22             It could ask for --

23             JUDGE WOLFSON:  And then they're going

24   to ask for all the documents that support what that

25   policy is and explain that policy and discuss the

Page 30

1    policy.

2              MR. SANDICK:  And we produced those.

3              JUDGE WOLFSON:  There will be a document

4    request.

5              MR. SANDICK:  As to "other offer," we

6    produced those documents already.

7              JUDGE WOLFSON:  I'm not so limiting it

8    at this point.

9              MR. SANDICK:  So, in any event, the

10   point I'm making is that, the subject of benefits

11   investigation is, unless it has something to do with

12   SaveOn, or maximizer, or accumulator programs, is

13   really just completely irrelevant to this case, and

14   it's going to lead to the production of documents

15   that talk about issues that have nothing to do with

16   the "other offer" term, nothing to do with SaveOn,

17   that just simply show that, you know, there are a

18   host of different eligibility requirements, and can

19   see this patient passing the test, this patient not

20   passing the test, but none of it relating to SaveOn,

21   none of it relating to maximizer or accumulator

22   programs, other than from the time period of 2022 to

23   the present, which we're already engaged in producing

24   documents for.

25             JUDGE WOLFSON:  I think that -- and I

Page 31

1    know that Judge Waldor would constantly say go meet

2    and confer, but I hate kicking the can down the road

3    and keep doing this, but I'm prepared to do it or

4    discuss it with you now, but I think you need to

5    narrow your request.  I believe we got to the crux of

6    it a moment ago, which is, I believe you're entitled

7    to documents that show what policies they had with

8    regard to enforcement of eligibility criteria beyond

9    "other offer."

10             They need a comparison here to what were

11   your policies.

12             Those documents I believe would be

13   relevant.

14             It doesn't mean, therefore, and now we

15   eliminate the burden of going through every time you

16   actually took an individual's eligibility criteria

17   and looked at it.

18             I think let's start with documents that

19   reflect what their policies were and anything that

20   reflects how they would go about enforcing it or

21   instructions given to enforce it, and it will also

22   identify, therefore, for you what areas that they

23   thought were important to enforce.

24             That is of a more general nature.

25             You said they could ask an interrogatory

Page 32

1    as to that.  The document request is going to follow,

2    so I'm saying go ahead with the document request

3    right now.  And it won't be involved with the

4    individual benefits investigations.

5                 MR. SANDICK:  So what your Honor is

6    proposing is something limited, essentially, to

7    policy or discussion of policy.

8                 My concern is that it really should be

9    tied to "other offer" because once it moves into

10   things like discount, or free trial, or coupon, the

11   burden escalates dramatically.

12                We're talking about the review of

13   perhaps a quarter of a million documents.  And we

14   told them this.

15                We haven't failed to engage them in meet

16   and confer.  I'm happy to relate the history of that,

17   your Honor, if you would like to hear it.  But we

18   have tried throughout to engage them in meet and

19   confer and for months the only position they took

20   was, these are our terms, you need to run them all.

21   Even for two months after Judge Waldor told them to

22   narrow their search terms, told them in court, told

23   them in a written order.  They did not even provide

24   us with narrow search terms, let alone narrowing the

25   request, which is what her order said, that they're

Page 33

1    going too far, they're taking extreme positions.

2                    JUDGE WOLFSON:  I read every single

3    transcript, not just the October one.

4                    MR. SANDICK:  Yes.

5                    It was in March too.

6                    JUDGE WOLFSON:  Okay.

7                    But you understand what I am saying is

8    relevant.  I appreciate we don't want every little

9    document every time they discuss a discount.

10                    When you're talking about policies and

11   discussions with regard to enforcing those policies,

12   no, I don't believe that we're talking about millions

13   of documents.

14                    So come up with better.  I'm not going

15   to create them for you, I mean, I have given general

16   categories about this.  You know, from my

17   perspective, the world has become search terms.  Not

18   how I grew up, or when I was a Magistrate judge, we

19   didn't have search terms.  Okay?  You made a document

20   request and everybody understood what it meant and go

21   find them, wherever they are.  Now everyone needs to

22   define custodians and search terms to make sure that

23   you have done it a certain way.

24                    I have given you what the subject matter

25   is.

Page 34

```
 1              So you think you need search terms to do
 2   it, talk about what they are.
 3              MR. DUNLAP:  Your Honor, can I ask a
 4   clarifying question?
 5              JUDGE WOLFSON:  Yes, go ahead.
 6              MR. DUNLAP:  So you said that policies
 7   regarding enforcement would be relevant.  I've heard
 8   my friend on the other side say he thinks enforcement
 9   is only relevant as to "other offer."
10              JUDGE WOLFSON:  I already said no.
11              MR. DUNLAP:  I just wanted to clarify it
12   goes to other eligibility criteria as well.
13              Now, we still had -- within the request
14   for this 2016 to 2022 time period, part of our
15   request was also about their understanding and
16   meaning of things like coupon or discount or other
17   terms as well, which I don't believe your Honor
18   addressed in talking about the enforcement side of
19   the request.
20              So we would ask that whatever they do in
21   terms of running additional search terms, and we're
22   glad to continue meeting and conferring with them
23   about that, that there be an understanding that --
24   their understanding, their enforcement -- the meaning
25   of the other terms in that clause, coupon, discount
```

Page 35

1    and the others, is also relevant and something they

2    look for.

3              MR. SANDICK:  Your Honor, that's really

4    where the heart of the burden comes in.  If they're

5    asking for every time that someone at JJHCS talks

6    about the word discount in the context of Janssen,

7    you can just imagine the burden that that will

8    create.

9              JUDGE WOLFSON:  I don't want it that

10   broad, I agree.  So we have to figure out a way to

11   narrow that because, yes, we don't want to bring in

12   things that are not going to be relevant.

13             So you're going to go back and work as

14   to how to narrow this with the understanding of, I

15   appreciate your argument is, we want to see how they

16   define these terms or interpret them and then use

17   them.

18             They've already conceded, however, that

19   SaveOn doesn't fall within any of those terms, they

20   only fall within the "other offer."

21             So I understand -- what I'm trying to

22   figure out is what more that's relevant about

23   understanding how they interpreted coupon, rebate,

24   discount is important to your case?

25             MR. DUNLAP:  Sure.

Page 36

```
 1            So, as you said, the "other offer"
 2   provision is a big piece of this case.  It's a big
 3   piece of the tortious interference claim.  What did
 4   "other offer" mean?
 5            They say it applies to SaveOn services.
 6   We say it does not apply to SaveOn services.
 7            So to the extent that the court finds
 8   that term ambiguous, one of the standard tools of
 9   construction that it may use is looking at the terms
10   that go along with it in that same clause.
11            And I'm sure you are familiar with that
12   doctrine.
13            JUDGE WOLFSON:  Absolutely.
14            MR. DUNLAP:  So in order to determine
15   whether or not other offer -- the scope of other
16   offer is like a coupon or discount savings card we
17   need to understand what they believe a coupon or
18   discount savings card meant.
19            So we don't want every time anyone at
20   Johnson & Johnson used the word "coupon."  What we
21   want to understand is, what did they believe, what
22   did they understand those terms within the context of
23   the general terms and conditions meant.
24            We believe that that is relevant.  And
25   if you can give us guidance that that is relevant,
```

Page 37

1    then we're glad to go back and continue meeting and

2    conferring with them on the search terms that are

3    designed to try and capture that.

4                    MR. SANDICK:  Your Honor, Mr. Dunlap

5    said a moment ago words to the effect of, we're not

6    looking for every time that somebody mentioned

7    discount or coupon, but the search terms that they

8    proposed even after Judge Waldor ordered them to

9    narrow their request are exactly what Mr. Dunlap just

10   said --

11                   JUDGE WOLFSON:  It's not going to

12   happen.

13                   MR. SANDICK:  Okay.

14                   Because I think what he is saying is,

15   I'd like guidance.  What I hear him saying is, he

16   would like you to say something that contradicts what

17   you said a moment ago.  And we'd ask you not to do

18   that.

19                   JUDGE WOLFSON:  I got it.

20                   MR. DUNLAP:  That is not what I said or

21   I asked for.

22                   JUDGE WOLFSON:  We have what the

23   position is.  I appreciate your argument.

24                   And this is also going again back to

25   interpreting what the terms and conditions mean.  And

Page 38

1    I do appreciate that one of the arguments is going to

2    be, if you look at this entire phrase, and the things

3    that they really wanted to exclude, it gives meaning

4    to "other offer."

5              I know that is your argument, and I

6    understand that, which is why I would permit the

7    discovery on what does that mean.

8              That is different than enforcement.

9              We have gone backwards now.  We are

10   going back to terms and conditions and what this

11   sentence means.  I was on enforcement for a moment.

12   We'll return to enforcement.  But, yes, I do.  But

13   we're not going to have search terms that you're

14   right that every time that phrase comes up it gets

15   produced.  It has to in some way be cabined to

16   capture what we are talking about, which is, what was

17   the understanding of those terms when they were

18   placed into these various agreements, plans,

19   whatever, and documents that reflect what that

20   understanding was and the intent of it.

21             MR. SANDICK:  And we've already produced

22   documents to the extent they exist, to the extent

23   that we have non-privileged documents, from the

24   period of 2016 to 2022.  We've already produced those

25   documents.

Page 39

 1              JUDGE WOLFSON:  And I guess you're going

 2    to have a privilege log.

 3              MR. SANDICK:  We do have a privilege

 4    log.  We're going to meet and confer on that subject.

 5    I'm sure that will go on too.

 6              JUDGE WOLFSON:  I would like to go back

 7    now to enforcement.

 8              It's of a similar nature, which is that

 9    the idea is, here, you want to know how vigilant were

10    they about enforcing these various terms that appear

11    here, or whatever the eligibility criteria are.

12              You don't need the underlying

13    investigations on all the other terms.  Right?  It's

14    really to figure out how they decided, one, if there

15    are documents that reflect, we are going to

16    aggressively pursue these terms.  You know, people

17    that get the coupons or whatever.  And do you

18    actually go about enforcing.  You know, because they

19    are going to make an argument you sat back on this

20    one.  Do you sit back on others too, is this kind of

21    what you do, or do you aggressively enforce that and

22    you didn't come about doing this for a few years.

23              These are, again, of a more general

24    nature than every individual one that they do.

25              So, go to work on figuring out -- I

Page 40

1    would do it in general categories like I did in the

2    old days, but you'll come up with search terms

3    instead that create all these issues for us -- work

4    on those search terms that capture what I just said.

5                Okay?

6                MR. DUNLAP:  Yes, your Honor.

7                MR. SANDICK:  Okay.

8                JUDGE WOLFSON:  Next.

9                So then, I guess, part of this problem

10   has been we're still talking about the understanding

11   of what "other offer" means, how that overlaps with

12   the specific categories.  We're back to all these

13   search terms.  And I think you found 188,000

14   documents on using certain of the search terms they

15   gave you, and you say, hey, that is too burdensome.

16               MR. SANDICK:  Yes.

17               And after Judge Waldor asked them to

18   narrow their requests, they never narrowed their

19   requests, but they gave us somewhat narrower terms.

20               From an apples to apples comparison, if

21   we look at the same time period and the same

22   custodians, they went from about 180,000 to about

23   150,000.

24               The terms themselves are only slightly

25   narrowed.  The nature of the requests are not

Page 41

1    narrowed at all.  In our view, they have not complied

2    with what Judge Waldor asked them to do.

3              JUDGE WOLFSON:  I could sit here and we

4    could go through search terms and say, how can we

5    better do this, but the goal here is to come up with

6    the documents you need, and not more than you need,

7    which is going to be of no help for you either to

8    review.

9              So -- I hate to send you back to meet

10   and confer.

11             I've given you guidance on what

12   categories or subjects I think are relevant.  Based

13   on that, maybe you can do search terms that are honed

14   better to that.

15             But I want this meet and confer to

16   happen within the next week.  We're back and forth

17   too much.  And to the extent you can't agree, I'll do

18   a Zoom with you.  But we need to move this ahead.

19   Keeping in mind that I've defined for you areas that

20   I think are relevant.

21             Okay?

22             MR. DUNLAP:  We understand, your Honor,

23   yes.

24             Thank you.

25             JUDGE WOLFSON:  Okay, good.

Page 42

1              Now, I guess in January of 2022 there
2      were new terms and conditions for Stelara and Tremfya
3      medications that specifically excluded members of the
4      Defendant plans from CarePath.
5              I know SaveOn has argued that Plaintiff
6      didn't implement new terms and conditions for other
7      drugs.  Kind of a selective enforcement argument
8      maybe being made here.  And I guess you've asked for
9      documents reflecting the decision to revise those
10     terms and conditions for those two drugs, how it's
11     being enforced and implemented.
12             Okay.
13             I think the argument here is that there
14     have been -- the production is deficient, restrictive
15     search terms were used, and custodians, such as
16     Jennifer De Camara and Harman Grossman and Savaria
17     Harris were not added because they are attorneys, but
18     I don't think there has been a privilege log.
19             MR. SANDICK:  So a privilege log has
20     been sent.  They sent us a letter critiquing some of
21     it and we are going to this week, by the end of
22     Friday, send them back a response.  They identified
23     several hundred documents, we've reviewed every one,
24     and we have a response planned for them by Friday
25     close of business, so Friday the end of the day.

Page 43

1          JUDGE WOLFSON:  And then if there are

2     still documents upon which there is disagreement, I'm

3     going to do an in camera review of them.

4          MR. DUNLAP:  Yes, your Honor.

5          MR. SANDICK:  That is something we're

6     working through, and, of course, we'll bring it to

7     your Honor.

8          On the subject, your Honor, of the

9     Stelara and Tremfya terms and conditions, this is

10    really related to the CAP issue that was the subject

11    of movement at the October conference.  So we have

12    already produced documents that relate to this issue,

13    documents that show the changes in the Tremfya terms

14    and conditions, documents that show how the CAP

15    program operated, and that is going to be updated

16    right through, as Judge Waldor said, through

17    November 7.

18          So I think this issue is one that I

19    think has been kind of overtaken by events, so to

20    speak, since the letters in August.

21          MR. DUNLAP:  I agree to some extent.

22          Part of the original dispute was were

23    they going to search past July of 2022.  Judge Waldor

24    sort of took that out of everyone's hands by saying

25    go through November, and we understand they're going

Page 44

1    to be running all their search terms, so that should

2    capture a lot of it.  I think there are a few pieces

3    that still remain.  One is the issue of these two

4    custodians who are attorneys but there is evidence

5    they worked in a business role at some point.  So we

6    ask that they be added.

7                    There are two additional points.

8                    We had asked that they run --

9                    JUDGE WOLFSON:  Well, I'm assuming, by

10   what I was just asking about, because we always know,

11   in-house attorneys in particular, we have to decide

12   are they acting in their role as an attorney or in a

13   business sense?

14                   I am assuming this is part of the

15   privilege log.  You did go through their documents.

16                   MR. DUNLAP:  No.

17                   MR. SANDICK:  So, your Honor, we have

18   not added these people as custodians.

19                   Mr. Dunlap is wrong.  They play no

20   business role.  They are lawyers.  They are not,

21   let's say, JD's doing business, or former lawyers

22   doing business.  They work in a legal capacity as

23   lawyers for JJHCS.  So their documents do come up

24   from time to time because they will be in

25   communication with the people who are custodians in

Page 45

1    this case, the business people, and when they are,

2    those documents will be withheld or redacted for

3    privilege as appropriate.

4              On very rare occasions they may be in

5    communications with both the business people and

6    people external to JJHCS, and in some of those cases

7    the documents are produced because, obviously, if a

8    lawyer is talking to a complete stranger, that might

9    not be privileged.

10             We have not added them as custodians.

11   In other words, we have not undertaken specifically

12   to review all of the lawyers' files.  And let me tell

13   you why.  It's because, given that they are attorneys

14   working as attorneys, if we are reviewing all of

15   their documents, all we are going to wind up doing is

16   creating a massive privilege log problem for us, and

17   in the end I suppose for them, because their files

18   are going to be, if not exclusively, overwhelmingly

19   privileged, because what they do when they talk to

20   people within the company is going to be conveying

21   legal advice or receiving requests for legal advice.

22             To the extent that they have

23   communications with business people and those are not

24   privileged, those would be produced.

25             JUDGE WOLFSON:  How do you search for

Page 46

1   those, though?  If you're saying you're not doing a

2   search for them as a custodian, how are you

3   determining which I falls in which category?

4               MR. SANDICK:  Sure.

5               Let's take an example.

6               You have a custodian at the company, an

7   employee named Heith Jeffcoat.  If he has e-mails

8   with Savaria Harris, who is the lawyer for JJHCS, we

9   may see those e-mails when we review Heith Jeffcoat's

10  files, and to the extent those documents are

11  privileged, they will be marked privilege, they will

12  be put on the log, they will either be withheld or

13  redacted, depending on the nature of the privilege

14  assertion.

15              What we're not doing is specifically

16  collecting all of Ms. Harris' e-mails and looking at

17  those separately.

18              JUDGE WOLFSON:  How about though -- we

19  use Ms. Harris as an example.  She's having

20  communications with Trial Card, she's having

21  communications with a third party outside that it

22  doesn't have a business person on it, so you're not

23  capturing it there, but if you're not doing a search

24  on her, you're not capturing Trial Card because

25  they're not part of the search.

Page 47

1          MR. SANDICK:  So Trial Card is producing

2    documents, actually, they're producing custodial

3    documents from the most important people at Trial

4    Card.  There has been a separate third-party subpoena

5    back and forth between Trial Card and SaveOn.  But

6    Trial Card is producing documents, number one.

7          JUDGE WOLFSON:  I only gave that as an

8    example.

9          Any third party on the outside that she

10   is having a communication with, if you're not doing a

11   search on her, you're not going to capture any of

12   those communications that would not be protected by

13   the privilege.

14          MR. SANDICK:  Well, what we have seen is

15   that her communications will inevitably have business

16   people on them.  She is not doing business work on

17   her own.  She is the legal advisor to JJHCS.  So to

18   the extent that JJHCS is doing business-related work,

19   that is going to be conducted by the business

20   personnel.  And if Ms. Harris is copied on an e-mail,

21   and the e-mail is not a request for legal advice, or

22   the rendering of legal advice, then there will be no

23   privilege assertion.  That is how they have gotten

24   some documents that Ms. Harris is on.  Because not

25   every communication that she is copied on is

Page 48

1    necessarily going to be privileged.

2              But the issue is this:  Should we have

3    to undertake separately the burden of reviewing

4    attorney e-mails, which is very unusual in this

5    context.  It's common when the attorney is not really

6    functioning as an attorney, when the attorney is

7    really -- they have a JD, but they're doing business

8    work.

9              That is not the case here.  These are

10   in-house lawyers for J&J.

11             So if we are required to review their

12   documents separate from reviewing the business

13   people's documents, what we're going to do, you know,

14   we'll have someone sitting at a computer, privilege,

15   privilege, privilege, and at the end they will get

16   thousands more entries.

17             The cost of that to us is significant.

18   The benefit to them will be negligible or

19   non-existent, because these are people engaged in

20   legal work.  They're not doing business work for the

21   company.  They're lawyers practicing as lawyers.

22             MR. DUNLAP:  Your Honor, may I respond

23   briefly to that?

24             JUDGE WOLFSON:  Yes.

25             MR. DUNLAP:  So since the letter went

Page 49

1    out we have seen documents indicating that a couple

2    of these folks did have communications with third

3    parties, not just Trial Card, but another J&J

4    consultant called Archbow.

5              Where I think your Honor is going, and

6    this might be something we can discuss, is something

7    where they don't have to review, in the first

8    instance at least, all the internal e-mails, which

9    really seems to be Mr. Sandick's concern, but start

10   with the production of their communications with

11   third parties outside of JJHCS limited by search

12   terms, specifically folks like Archbow or Trial Card

13   or the other consultants that we know were involved

14   in discussions like this.  That might be a place to

15   start.

16             I just want to note that we have dropped

17   our request for the one in-house lawyer who

18   apparently functioned in a litigation function.

19             JUDGE WOLFSON:  Mr. Grossman?

20             MR. DUNLAP:  Mr. Grossman, yes.

21             So we're only down to these other two.

22   So we would think that that might be a place to

23   start.

24             MR. SANDICK:  Your Honor, even on the

25   issue of external communications there is, of course,

Page 50

1    a privilege doctrine that when someone working

2    outside of the company is either serving,

3    essentially, as a functional employee of the company

4    because of the nature of the work that they're doing,

5    or is part of a discussion in anticipation of

6    litigation, those e-mails involving the lawyer will

7    also be protected.

8              So even the screen that Mr. Dunlap is

9    proposing is a very -- it's a very poor tool for

10   limiting the burden on us.

11             What they are getting is, to the extent

12   that Ms. Harris is on communications with external

13   parties, for instance, let's say -- going to

14   Mr. Jeffcoat again, to use him as an example, he

15   wants to enter into some kind of a contract to help

16   manage the CarePath program, he has back and forth

17   with his business counterpart at this other company,

18   at some point he will copy Ms. Harris on that e-mail,

19   and then there will be some external discussions.

20   But those aren't discussions that drop the business

21   people.  The business people are always involved.

22   Ms. Harris is just there maybe to look at a contract

23   or provide legal advice offline to Mr. Jeffcoat about

24   the nature of the business that is being proposed.

25             So we do object to the inclusion of

Page 51

1    lawyer custodians when we know that these are lawyers

2    doing legal work, not business work.

3            JUDGE WOLFSON:  I want to go back to the

4    limitation that Mr. Dunlap raised, which is as to

5    third parties.

6            Address that.

7            I know you said they subpoenaed Trial

8    Card.

9            That doesn't relieve you.

10           As you know, more than one party could

11   have a document, and sometimes one of the parties

12   doesn't maintain the documents properly.  It doesn't

13   relieve your obligation to produce them as well.

14           So I want to address communications with

15   third parties.

16           And I know you said, well, there could

17   be an occasion where she is having a communication

18   with a third party, but we still believe privilege

19   applies.  And that's when you put it on a privilege

20   log though.  It doesn't mean you produce it, it ends

21   up on a privilege log.

22           What is the problem with the third-party

23   communications?

24           MR. SANDICK:  So third-party

25   communication issue, number one, they are going to

Page 52

1   have -- just saying based on our investigation for a

2   long time in this matter -- Ms. Harris'

3   communications with third parties when she has been

4   copied on an e-mail, or is the recipient of an

5   e-mail, they are going to be business people who are

6   already custodians in this case.  So we are doing

7   this work for no additional advantage.  We're going

8   to be reviewing documents that are already in the

9   files of the business people at JJHCS.

10                  JUDGE WOLFSON:  I hope.

11                  MR. SANDICK:  Well, or at least

12  overwhelmingly so.

13                  I can't sit here and say that there

14  might not be one document that falls outside of what

15  I'm describing, but, again, the question is, what is

16  reasonable and proportional in this context?

17                  They have 16 business unit custodians.

18  They are getting some more as a result of the Court's

19  order.  So they will be getting more production over

20  the next month.

21                  But the question is whether we should be

22  required to review all of the in-house lawyer e-mails

23  for the narrow purpose of seeing if maybe once in a

24  while she has done this.

25                  JUDGE WOLFSON:  I hope not all e-mails.

Page 53

1           What are the search terms you're using?

2           MR. DUNLAP:  Your Honor, may I respond

3   to that?

4           JUDGE WOLFSON:  Yes.

5           MR. DUNLAP:  It's not all of their

6   in-house lawyers.  It's not all of their e-mails.

7   It's just the third-party communications at this

8   point.

9           JUDGE WOLFSON:  Third-party

10  communications on what subject?

11          MR. DUNLAP:  Well, we will limit it to

12  search terms.

13          The reason we're interested in these

14  folks specifically is because the other side has

15  indicated they were involved in revising the Stelara

16  and Tremfya search terms.  So communications they had

17  about the meaning of those terms outside of JJHCS

18  would be very relevant to us.

19          And Mr. Sandick said, well, you know, a

20  lot of times when they communicate outside, they have

21  copied existing custodians.

22          Well, if they have, then those documents

23  will be de-dupped, they will be taken out, they have

24  already been identified for review if they hit on our

25  search terms.

Page 54

1          So we think at least in the first

2   instance they should gather the documents, we can

3   talk about tailored search terms for those

4   custodians, and then give us the numbers, and then

5   they can make a burden argument that is based on

6   actual numbers.

7          JUDGE WOLFSON:  All right, this is where

8   we're going on this.

9          It's only as to two attorneys, it's

10  Jennifer De Camara and Savaria Harris, correct?

11         MR. DUNLAP:  Yes.

12         JUDGE WOLFSON:  Okay.

13         As to them we're only looking at

14  communications to third parties on narrowly-defined

15  search terms, which I don't know what they are yet.

16         MR. DUNLAP:  We're glad to meet and

17  confer.

18         JUDGE WOLFSON:  You will.

19         MR. SANDICK:  And one other thing that

20  is important here, this is only terms and conditions

21  related discovery, that's what their request was, not

22  the whole world of SaveOn.

23         JUDGE WOLFSON:  Yes.

24         MR. SANDICK:  So communications with

25  third parties relating to terms and conditions is

Page 55

1    what your Honor is asking for?

2              JUDGE WOLFSON:  And I think this was

3    really within the Stelara and Tremfya area.

4              MR. SANDICK:  Right.

5              MR. DUNLAP:  Yes, that's why we were

6    interested in them.

7              I will say, if they mention SaveOn to a

8    third party, we do want to know about that.

9              MR. SANDICK:  What is the entitlement to

10   that?

11             MR. DUNLAP:  Because it goes to J&J's

12   awareness of SaveOn and their responses to SaveOn.

13             MR. SANDICK:  This has never been

14   briefed, your Honor.

15             JUDGE WOLFSON:  Yeah, I'm not addressing

16   that today.  If you want to address that with them,

17   you can address that with them.

18             MR. DUNLAP:  I think there are two other

19   issues that I think linger from the later time

20   period.  The custodians was one of the three.

21             So in our original request we had ask

22   that they run I think five search terms during this

23   later time period.  Four of those they had already

24   agreed to run for the earlier time period, but there

25   is one search term that we had asked them to run for

Page 56

1    the 2022 time period forward that was not caught up

2    by Judge Waldor's order, and it's my understanding

3    that they're declining to run it, and it's one that

4    we think is very important, and it is a term that

5    asks for the term EI, which is benefits

6    investigations, which is what Mr. Sandick discussed

7    earlier, within the same document as Stelara and

8    Tremfya.

9              So you may have recalled him saying that

10   through Trial Card they are producing information or

11   copies of benefits investigations they conducted for

12   Stelara and Tremfya because at that point they

13   specifically started asking to look for whether

14   people were on SaveOn advised plans or not.

15             So we want documents relating to those

16   investigations, which is why we asked them to include

17   the search term.

18             I believe they're declining to run it

19   and we think that they should.

20             MR. SANDICK:  Your Honor, they are going

21   to be getting benefits investigations documents

22   relating to Stelara and Tremfya as a result of Judge

23   Waldor's order.  What they need beyond that I do not

24   perceive it or understand it, but maybe they should

25   wait to see what our production is.

Page 57

1           JUDGE WOLFSON:  See what their

2    production is, and if there is still an issue, I'll

3    resolve it.

4           MR. DUNLAP:  Glad to reserve that.

5           There is just one other issue that I

6    believe is still out there, which is within the

7    documents that they reviewed for this later period,

8    2022 through November of last year, we believe that

9    they should be looking for and producing documents

10   identified by the search terms that go to their

11   enforcement of the Stelara and Tremfya conditions.

12          I believe there was an indication in

13   some of their correspondence that they weren't going

14   to do that.  We don't think there is a basis for

15   that.  We think that if there is a document

16   identified by the search terms and it goes to

17   enforcement of these terms, we need to see it,

18   because we have seen some documents from that time

19   period indicating ████████████████████████████████

     ████████████████████████████████████████████████

     ████████████████████████████████████████████████

     ████████████████████████████████████████████████

     ████████████████████████████████

24          We just want to make sure that they're

25   producing documents relating to the enforcement of

Page 58

 1   those terms.

 2           MR. SANDICK:  The first time that I ever

 3   heard this issue raised was right now.

 4           I have in front of me the search

 5   terms that they proposed on terms and conditions.  I

 6   don't know what he's saying, how it connects to any

 7   of this.  I'm just totally surprised by what he's

 8   proposing.

 9           JUDGE WOLFSON:  Then talk after we're

10   done.

11           MR. DUNLAP:  Sure.

12           We have met and conferred about this,

13   but we'll do it again.

14           JUDGE WOLFSON:  Okay.

15           Let's turn to the financial documents.

16   I think that's the next thing.

17           Now, what I understand is Plaintiff has

18   produced documents that bear on the following:  The

19   extent of the harm that SaveOn has caused J&J during

20   the relevant time period; and then a number of other

21   things.

22           What are those documents?  That is a

23   general description.  What does that mean?  What are

24   you producing to them?

25           MR. SANDICK:  So what we've produced to

Page 59

1    them is ██████████████████████████████

     ████████    ██████████████████████

     ████████████████████    We have, of course,

4    agreed to update that through the present.

5    ████████████████████████████████████

     ██████████████████████████████████

     ████████████████████████████████

8    What they are asking for is -- going

9    back at one point at least to 2009 -- all documents

10   and communications about those budgets.  And they've

11   offered no rational for why they need all documents

12   and communications about the budget.

13           So this is one where we do object on the

14   basis of relevance.

15           What matters is what budget was set; how

16   much was paid.

17   ████████████████████████████████████

     ████████████████████████████████

     ████████████████████████.  So we've already

20   produced substantial budget data.

21           What we haven't produced is all

22   communications ever about how much money was going to

23   be spent.  We don't think that is necessary for the

24   case.  It creates burden for no benefit.

25           JUDGE WOLFSON:  Okay.

Page 60

 1                    MR. DUNLAP:  So, they bring a GBL claim

 2          against us alleging that we caused public harm.

 3                    One of the things that they allege that

 4          we do is that we threaten the financial viability of

 5          CarePath.

 6                    That is right in their complaint.

 7                    We don't think that SaveOn threatens the

 8          financial viability of CarePath, number one.

 9                    And number two, we don't think that this

10          is a public harm, because CarePath is actually the

11          marketing program.  It is designed to encourage

12          patients to buy Johnson & Johnson's drugs instead to

13          competitors' drugs.

14                    And there is case law saying that if

15          what you're really doing is impacting somebody's

16          business, that is not a harm recognizable under the

17          general business law, which is about protecting the

18          public.

19                    We need documents showing who sets the

20          budget, why is it set, where do the funds come from.

21                    JJHCS is a division of Johnson & Johnson

22          that as far as we know doesn't make any products or

23          offer any services outside of Johnson & Johnson.

24          It's an administrative entity that serves other J&J

25          entities.

Page 61

1          If, in fact, the budget for CarePath is

2     part of the marketing budget, if, in fact, it is not

3     part of some sort of public or charitable effort,

4     that goes a long way in showing that this was a

5     marketing program.

6          If, in fact, we can show that the

7     budget -- the factors that go into setting the budget

8     are not actually impacted by what SaveOn is doing and

9     they're going to keep funding this anyway, that could

10    go a long way in showing that we don't actually

11    threaten their financial viability.

12         What they have produced are a limited

13    number of documents showing amounts paid out under

14    the CarePath program and some budgeting documents,

15    but they're just numbers, they don't show us why the

16    budgets were set, we don't know who sets the budgets,

17    there is no documents indicating any of that.

18         We're not asking for every single

19    communication under the sun about this.  It's a

20    question of whether this is relevant.  And we think

21    it's squarely relevant.

22         And if we can establish that, then we're

23    glad to work on determining who the right custodians

24    are and the search terms and all of that.

25         JUDGE WOLFSON:  Let me first stop you.

Page 62

```
 1              Judge Vazquez talked about public harm
 2     in his opinion, and the way he analyzed it was -- he
 3     said that "Plaintiffs plausibly allege at least two
 4     deceptions as to consumers:  One, enlisting
 5     pharmacies to reject Plaintiffs' claims for their
 6     prescriptions at the point of sale; and two, failing
 7     to inform patients that by enrolling in SaveOn SP can
 8     breach the CarePath terms and conditions."
 9              The things you're looking to do don't
10     answer those public harm questions.
11              So I want to get away from that for a
12     moment.
13              I think really the focus here is on the
14     harm to the Plaintiff itself and how the discovery
15     relates to that.
16              So let's focus on that.
17              I know that one of the arguments is the
18     viability, economic viability of the program.
19              Okay.
20              Yeah.  Documents that go to that are
21     important.
22              Could be communications go to it.
23              I think at this point what you've
24     done -- I don't know if you have produced any
25     communications.  You have given budgets.  You have
```

Page 63

1    given I think you know -- let's see -- data.

2              What have you given?

3              MR. SANDICK:  We have given them

4    documents about how co-pay assistance is determined.

5    We answered interrogatory on this subject.

6              They said we don't know who makes the

7    decisions.

8              Literally that exact question of who

9    makes the decisions was the subject of our

10   interrogatory response that we provided this summer

11   after Judge Waldor told us that she wanted us to

12   broaden our response on that.

13             JUDGE WOLFSON:  Okay.

14             MR. SANDICK:  Patient level data to show

15   every patient enrolled, dates of enrollment, the

16   amounts of assistance, the drugs they took, all of

17   this for a six-and-a-half year period.

18             You know, why would they need

19   communications within various parts of the J&J

20   company, not just JJHCS, but other components of the

21   company, why would they need that to figure out what

22   damages are?  There is no need for that.

23             JUDGE WOLFSON:  I will tell you, I think

24   that your requests in the financial area are over

25   broad.

Page 64

1            There may be areas that are pertinent,

2     and I want to define what they are.

3            I think to the extent that the harm

4     being alleged is a financial harm to the CarePath

5     program and, as you call it, the viability of the

6     program, there could be communications that could be

7     relevant.  It's not just what the budget is, but if

8     people are saying, you know, this is going to hurt

9     our bottom line, we're going to be okay, but it's

10    going to hurt our bottom line, that could go to your

11    viability argument.

12            There certainly could be communications.

13            So what I would like is a better or more

14    narrow request for what those communications are as

15    opposed to the entire world.

16            Frankly, the success of these drugs is

17    really not the issue for me or for this case.  These

18    are about programs.

19            I know you say this is really a

20    marketing tool, it's not to help the patient.

21            Maybe.

22            Maybe they're not such good guys.  I

23    don't know, that is not my determination today.  That

24    is not what this is about.

25            They created a program.  They are, you

Page 65

1    know, entitled to enforce the program how they'd

2    like.

3              And this is not a determination of, as I

4    said, are they benevolent here in doing something

5    great or not.  That is not the inquiry.  It's an

6    economic harm that is being alleged.

7              Right?

8              MR. DUNLAP:  Your Honor, may I respond

9    to that?

10             JUDGE WOLFSON:  Yeah.

11             MR. DUNLAP:  So I believe you said

12   that -- and you cited the Court's opinion in talking

13   about the harm and pointing to things like failing to

14   say that signing up for whatever it is allegedly

15   breaches the contract.

16             I just want to clarify the elements of

17   the GBL claim.

18             I believe when Judge Vazquez was talking

19   about those things he was talking about the

20   underlying acts.

21             The elements are, you have to have an

22   act that is consumer facing, public facing, that is

23   deceptive or missing.

24             That is one.

25             Two, that act has to cause some sort of

Page 66

```
 1   harm to the public.

 2              And then third, that act also has to

 3   cause some sort of harm to the Plaintiff bringing the

 4   suit.

 5              So when he was talking about failing to

 6   tell patients that they breached their contract, he

 7   was talking about the deceptive act, one of the

 8   alleged deceptive acts.  He wasn't talking about the

 9   harm that they allege.

10              The harm that they allege, if you look

11   at the complaint --

12              JUDGE WOLFSON:  Yeah, but I'm looking at

13   his opinion right here.

14              You're right, he is talking about the

15   deception.

16              But turning to Defendant's argument.

17              "The Court first agrees with Plaintiff

18   that a plausible belief that Defendant deceived

19   participants already enrolled in CarePath.

20   Similarly, the Court disagrees with Defendant's

21   reading that the statute requires a threat to the

22   health or safety of the public at large.  While

23   Plaintiff must plausibly allege some harm to the

24   public at large, while a threat to the health or

25   safety of the public is certainly a way to meet this
```

Page 67

1   obligation, the statute is not related to health and

2   safety harms," and then it goes on to say what he

3   says.

4           Now, you may think that his opinion

5   didn't adequately address harm, but we have what he

6   did.  And, you know, it's not a lengthy opinion, and,

7   you know, but it is what is, and that is how he did

8   it.

9           But I want to get to, I think that -- I

10  believe that this financial information overall, your

11  request 28, 29, and I think 30, are over broad, and I

12  want to talk about what narrow requests could be

13  relevant to your claim.

14          MR. DUNLAP:  Your Honor, I don't want to

15  belabor this, but just in response to what you said,

16  which is, what the Court did was it disagreed with

17  our basis to dismiss the complaint in terms of

18  allegations of harm to the public.  So as I

19  understand it, he allowed J&J's allegations to go

20  through to discovery.

21          Those allegations of harm, paragraph 114

22  of their complaint, says SaveOn causes damage to the

23  public, including patients, through a series of

24  things, one of which is jeopardizing the viability of

25  patient assistance programs like CarePath by making

Page 68

 1     them prohibitively expensive.

 2                JUDGE WOLFSON:  But that is the point.

 3                I am saying discovery about the

 4     viability of the program is fine.  That is the

 5     limitation.  And so that's what I'm focused on.  But

 6     that's why I'm saying, things that you're saying

 7     about, oh, but let's see how much money J&J makes on

 8     Stelara, let's see how much money J&J makes overall,

 9     is really not the issue.  I want to focus on the

10     program itself.

11                MR. SANDICK:  And, your Honor, just to

12     clarify the subject of the public harm that we're

13     alleging.

14                The public harm in this case is not even

15     exclusively or primarily this viability issue, what

16     it is, and as we have seen in discovery, is across

17     the country patients who come into contact with the

18     SaveOn program find their lives made much worse by

19     it.  ████████████████████████████████████████████

20     ████████████████████████████████████████████████

21     ██████████████████████████████████████████████████

22     ██████████████████████████████████████████████████

23     ██████████████████████████████████████████████████

24     ███████████████████████████████████████████████████

25     ████████████████████████████████████████████

Page 69

1          So the idea that somehow this will be a

2     case primarily about the viability of SaveOn, 349, as

3     I'm sure the Court knows, is a statute about consumer

4     harm, and consumer fraud, and the consumers have been

5     very badly harmed.

6          That evidence will be what this trial is

7     about.

8          JUDGE WOLFSON:  That is fine, but I want

9     to now get to the other aspect, which was what his

10    requests were about, which is the viability of

11    CarePath and what documents are necessary to talk

12    about that economic harm that challenged the

13    viability of CarePath.  And let's come up with

14    requests that are more narrowly tailored to that.

15         I don't think getting discovery on, you

16    know, gee, you're making -- you know, this is really

17    a marketing program, or, more broadly, J&J makes a

18    lot of money on these drugs.

19         Let's break it down.

20         So, with regard to CarePath

21    specifically, what do you think you're missing that

22    you need to give you the discovery you require to

23    show how this impacts the viability of CarePath.

24         MR. DUNLAP:  We need to understand how

25    Johnson & Johnson sets the CarePath levels, how it

Page 70

1    decides on the budget, where that is done, the

2    factors that go into it, and relevant communications

3    about that.

4                    JUDGE WOLFSON:  Okay.

5                    Frankly, I find that okay.

6                    So that's where we are.

7                    Let's move onto the next.

8                    J&J's return on investment from

9    CarePath.

10                   MR. DUNLAP:  I'm glad to speak about it.

11                   Return on investment documents we think

12   goes to fundamental issues of injury and damages.

13                   Fundamental issues of injury and

14   damages.

15                   Their allegation is that somehow what we

16   do causes them to pay out more in CarePath, in these

17   co-pay assistance funds, and they say, we don't want

18   to be paying this much money, it costs us however

19   much it costs us, that is our injury, and those are

20   our damages.  We will figure that out.

21                   Part of what SaveOn does on behalf of

22   its plan clients is it helps more people enroll in

23   CarePath and take more Janssen drugs.

24                   So we believe that if you look at the

25   additional patients who have signed up for CarePath,

Page 71

1    the additional patients who have bought more Janssen

2    drugs as a result of what we are doing on behalf of

3    our clients, that Johnson & Johnson has made much

4    more money in terms of drug sales, new drug sales, it

5    otherwise would not have made than in the money that

6    it pays out.

7            Now, it has been well documented,

8    including congressional hearings, that a lot of drug

9    companies specifically monitor their return on

10   investment.

11           You can spend a little bit of money to

12   help patients take your drugs as opposed to a

13   competitors.  You can sell many more of these drugs

14   that the commercial health plans then basically pay

15   for.

16           That's why they do this, it's part of

17   the purpose of the program, not to benefit the

18   public, but to make this amazing investment, this

19   amazing return for themselves.

20           So that goes to whether it's a public

21   harm.

22           But it also goes to the question of

23   injury and damages.

24           If we are signing more people up and

25   they are paying more in CarePath assistance funds,

Page 72

1   but they're making much more in drug sales, we think

2   that offsets or eliminates their damages, and it

3   might offset or eliminate their entire injury.

4               These return on investment documents are

5   absolutely critical to us.  We can talk about the

6   scope of how we get them, the type of data they

7   produce, the type of communication they produce, but

8   the subject of return on investment is critical to

9   our defenses on injury and damages, and it's relevant

10  to questions of public harm and GBL.

11              MR. SANDICK:  Judge, I would like to

12  respond.

13              JUDGE WOLFSON:  Sure.

14              MR. SANDICK:  This argument is

15  essentially that if CarePath, you know, and Johnson &

16  Johnson are still able to make money despite the

17  looting of the program that his client has engaged

18  in, then, you know, it's okay.  It's okay to steal

19  from someone, and to loot a program, so long as at

20  the end of the day they're still making money.

21              If this program was helping the

22  pharmaceutical manufacturers, as Mr. Dunlap suggests,

23  why have they gone through such extensive efforts to

24  hide their existence, to prevent us from knowing who

25  was in the program?

Page 73

```
 1          If these were something that, you know,
 2   advanced the profitability of the CarePath program,
 3   or of pharmaceutical industry generally, why are they
 4   hiding this from everyone?
 5          This is a made for litigation argument
 6   to obtain documents that have nothing to do with the
 7   case in an effort to shift the case from a fairly
 8   specific question, do their efforts lead CarePath to
 9   pay more money than it would pay in the absence of
10   CarePath, into a huge question about how much money
11   is J&J making on its drugs, can it afford to absorb
12   some losses here because they're generally a
13   profitable company, things that are just totally
14   irrelevant.
15          Also, just for a moment on the burden
16   issue.
17          The question of how much money does a
18   drug company make on a particular drug is not a
19   simple question, you know, residing in a couple of
20   paper files in someone's office.  This is a massively
21   complicated question that goes to virtually every
22   corner of the entire J&J company to figure out, you
23   know, is a drug profitable relative to what?  To
24   other investments?  To other potential drugs?
25          It's an effort to place a huge burden on
```

Page 74

1   us for no benefit in the lawsuit.  It's totally

2   irrelevant to the lawsuit whether or not the whole

3   company of Johnson & Johnson makes more money or less

4   money.

5              The question is, are they inducing

6   people to breach the terms and conditions, the

7   patients, are they forcing them to do this in order

8   to get their medication, are they causing harm to

9   those patients, and does this lead to an increase in

10  the amount of co-pay support that we would pay absent

11  that?

12             They are reframing this to entities, by

13  the way, that are not part of this lawsuit.

14             JUDGE WOLFSON:  Well, that's why I want

15  to ask a question.

16             May I stop you there for a minute?

17             MR. SANDICK:  Sure.

18             JUDGE WOLFSON:  I find this curious, and

19  I have been wondering about this as I've looked at

20  this case since the beginning, the only Plaintiff in

21  this case is JJHCS, not J&J.  So the question is, you

22  have just defined, Mr. Sandick, that this is a very

23  narrow harm, narrow in the sense of to this one

24  subsidiary or affiliate that runs the CarePath

25  program.

Page 75

```
 1              You want to argument more broadly, it's
 2   much more than that.  J&J is making a lot of money.
 3              So, first of all, who funds the CarePath
 4   program?
 5              MR. SANDICK:  So -- I'm not actually
 6   sure what the -- it's something within the Johnson &
 7   Johnson family of companies, but I couldn't say
 8   specifically.  I think there are specific drugs that
 9   fund -- essentially that fund their own co-pay
10   support, it's not decided in one person's office
11   sitting alone.
12              JUDGE WOLFSON:  Okay.
13              So those decisions are made somewhere
14   else within corporate J&J perhaps, it's not limited
15   to this one entity who is the Plaintiff in the case,
16   but who may be the one administering it.
17              I understand your arguments, Mr. Dunlap.
18   I'm not buying it at the moment.
19              What I don't want to see happen too in
20   this case is that this becomes, essentially, J&J is a
21   big company that makes a lot of money.  Don't cry for
22   them.
23              And I don't think, by the way, any juror
24   is going to believe that anyway, that you're doing
25   something that's greatly going to harm the overall
```

Page 76

1    J&J company.

2             So that's why I'm trying to figure out,

3    if you're narrowing harm as to the CarePath program

4    itself that exists within this one entity.

5             MR. SANDICK:  That is the case.

6             We are not, for example, this is not a

7    case about lost profits.  This is not a case about

8    the harm, more broadly, to Johnson & Johnson.  This

9    is a program that says, well, the program gets this

10   amount of money.  As a result of SaveOn, they need to

11   spend this amount of money.  And that delta is the

12   financial damage.  And then the patient harm is what

13   we talked about before.

14            JUDGE WOLFSON:  Yeah, that's what I'm

15   dealing with now on financials.

16            MR. DUNLAP:  So I have to reiterate how

17   strongly we believe this is relevant and how

18   important we think these documents are.  And, again,

19   we're glad to talk about exactly which documents they

20   would produce, what sort of data, et cetera.

21            But the name of the program, or it used

22   to be, it was not just CarePath, but Janssen

23   CarePath.  Janssen being the entity that actually

24   sells the drug.

25            They decided to arrange their business

Page 77

1    so that this entity develops and sells the drug,

2    Janssen, and this entity administers the CarePath

3    program, but the two are related.  Of course they

4    analyze their return on investment.  There is, again,

5    congressional testimony showing that a number of

6    these drug companies do that.  And we haven't heard

7    them say that they don't have return on investment

8    related documents.  They figure out how much they're

9    going to give to CarePath to give to patients.  They

10   figure out how much that helps them drive additional

11   sales over in the Janssen entity.

12            We don't think that they should be able

13   to say, well, nothing that happens over in Janssen in

14   terms of additional sales is relevant because they

15   decided to put the CarePath program under JJHCS.

16            We're not trying to stand up and say,

17   oh, J&J makes a huge amount of money generally.

18   We're not interested in baby powder sales or shampoo

19   sales or anything.

20            JUDGE WOLFSON:  I know that.

21            MR. DUNLAP:  But we do think that this

22   fundamentally goes to what the purpose of this

23   program is and what the financial consequences of it

24   are.

25            They want to stand up and tell a story

Page 78

1   that says, J&J provides this money to help patients

2   for their drugs and SaveOn comes in and loots and

3   steals and all the other pejorative terms Mr. Sandick

4   used.

5           We think that that is not true.

6           What we want to be able to stand up and

7   say, they don't offer this program to help patients.

8   They offer this program to help persuade people to

9   buy their drugs instead of their competitors.

10          And what SaveOn does on behalf of its

11  plans actually winds up with them making more money.

12  It's not, oh, they make lot of money, they can afford

13  this.  It's that the direct consequences of the

14  actions that they have put at issue causes them to

15  make more money.  That there is an offset through the

16  additional drug sales that we are able to drive by

17  signing more people up for CarePath that more than

18  offsets the additional CarePath funds that they're

19  spending.

20          This isn't some general argument, they

21  make a lot of money, they can afford it.  That is not

22  what it is.  It is directly tied to the allegations

23  in the complaint.

24          And I have to underscore -- you know,

25  we're glad to narrow, as I said, the search terms,

Page 79

1    the types of requests that we go after here.

2                    JUDGE WOLFSON:  Tell me what that

3    narrowing would be.  Let me hear that.

4                    And I do appreciate, but I'm assuming

5    you are producing documents about CarePath being

6    created and what it's intended to do and how it's

7    being funded.

8                    MR. SANDICK:  Absolutely.

9                    And the reason, by the way, it's named

10   Janssen CarePath is not like some secret thing, it's

11   because patients know the company as Janssen.  So if

12   you take Darzalex, you know that is a Janssen drug.

13   Janssen CarePath helps you pay for it.

14                   That is the reason that at one time

15   Janssen was part of the name, it's not some broad

16   conspiracy theory.

17                   MR. DUNLAP:  We're not alleging a

18   conspiracy theory.

19                   JUDGE WOLFSON:  What is the narrow terms

20   you would say?

21                   MR. DUNLAP:  We need documents showing

22   Johnson & Johnson's analysis of its return on

23   investment for CarePath.  Not just the data about

24   what it's paid out.  We know thing going to produce

25   that because that's driving their damages.

Page 80

1              JUDGE WOLFSON:  Repeat that.

2              MR. DUNLAP:  We need Johnson & Johnson's

3    analysis of its return on investment for the CarePath

4    program, including how it helps patients adhere to

5    Janssen drugs once they enroll in CarePath, and we

6    want relevant communications on that topic as well.

7              MR. SANDICK:  Your Honor, what that

8    would require is, essentially, a company wide X-ray

9    of how much money the company makes on all of these

10   different drugs, how much it costs to make these

11   drugs, how much it costs to market these drugs.  All

12   of that information would be necessary.  A vast

13   project, totally irrelevant to the case.

14              And on the subject of adherence, by the

15   way, this is something that is very important for

16   your Honor to know, ███████████████████████████

17   ██████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████        We have documents.  We can

20   produce those to the Court if that is relevant, I

21   don't think it is necessary to reach this.  But the

22   notion that the adherence story somehow resides

23   within JJHCS, they've looked at it.  They know

24   already.  Their partner is Express Scripts.  They get

25   all sorts of tremendous industry wide data.  Express

Page 81

1    Scripts manages pharmaceutical benefits for more

2    Americans than any other company.  So if there is an

3    adherence story, they would know it.  And what

4    they've have figured out was it's nonsense.  There is

5    no adherence story.

6              And what he said is not a narrowing of

7    the request, when he said, "oh, this is my narrowed

8    request."  It is almost verbatim what they've asked

9    for in the requests, in the discovery correspondence,

10   before Judge Waldor.  It's not a narrowing at all in

11   any regard.

12             MR. DUNLAP:  Can I respond to those

13   points, your Honor?

14             JUDGE WOLFSON:  Go ahead.

15             MR. DUNLAP:  So, first, he's acting as

16   if we're asking him to create a return on investment

17   analysis from scratch and just go out into the

18   company and all the various corners of it and try to

19   figure this out.

20             No.

21             We want whatever analyses they have

22   already done on their return on investment for

23   CarePath.  There has to be existing work product on

24   this.  Whatever finance teams or product teams drive

25   it must have done something.

Page 82

1           JUDGE WOLFSON:  He's limiting it to

2      CarePath not on your drugs.

3           MR. SANDICK:  Well, in order to figure

4      out the question of whether CarePath is helpful you

5      have to look at all of these other issues relating to

6      the manufacturing, development, marketing, and sale

7      of the drugs, and I don't think -- I know Mr. Dunlap

8      keeps saying there is one piece of paper and it will

9      have all the answers -- I don't think that is true,

10     not based on anything I have seen.

11          MR. DUNLAP:  So the return on investment

12     documents would say, we put this much money into

13     CarePath, and then we make this much money in terms

14     of selling additional drugs to patients over in the

15     Janssen entity.

16          We're not asking him to, you know,

17     search every single corner for documents that are

18     irrelevant or -- we want whatever analysis they have

19     done.

20          They do CarePath for a reason.  There

21     must be some analysis of the benefit that CarePath

22     has on Janssen's product line.

23          MR. SANDICK:  The question of whether

24     CarePath operates for charitable purposes or for

25     business purposes is not really relevant to the case

Page 83

1   if they're taking money from it.

2              If you run a car dealership and someone

3   steals a car once a week from your lot, it doesn't

4   matter whether as an overall matter the dealership is

5   still making money, it's still wrong to take cars

6   from people's lots, and it's wrong to induce people

7   to breach their terms and conditions in order to make

8   more money.

9              So the idea that somehow it matters how

10  profitable CarePath is or whether it's prudent for

11  J&J to run it, it's just moving the case far, far

12  away afield from anything in the complaint, the

13  judge's order, into this other subject of, is this

14  segment of J&J's business, the drug segment, is it

15  profitable, and is this just some gold dust from the

16  machine that it's okay for SaveOn to take.

17             Whether CarePath has a huge return on

18  investment or has no return on investment, it still

19  has no bearing on whether they're allowed to do this.

20  It's irrelevant to the case.

21             MR. DUNLAP:  Your Honor, if I could just

22  respond quickly.

23             JUDGE WOLFSON:  Yes.

24             MR. DUNLAP:  It has a huge bearing on

25  whether we have actually damaged them because if the

Page 84

1  action we take by signing someone up for CarePath,

2  what they call the SaveOn program, resulted in a new

3  patient signing up for CarePath, they're saying, wait

4  a minute, we have paid more to that patient than we

5  otherwise would have.  But if by signing them up we

6  gave them more drug sales, we produced more drug

7  sales for Janssen, which is a J&J entity, then that

8  additional money eliminates whatever damage we say

9  was caused -- they say was caused by the additional

10  expenditure of CarePath funds.

11        Now, of course it's fine for him to

12  argument differently at trial if he wants to, but we

13  need these documents to show that we're not actually

14  injuring them.

15        And the car dealership scenario he

16  provides makes no sense, frankly.  If you steal a car

17  a week from a car dealership, that might be illegal,

18  but it's not a GBL claim.

19        JUDGE WOLFSON:  Let me ask you this

20  question:  Mr. Sandick, is there any analysis --

21  their position is, guess what, we make more sales for

22  you.  More people sign up because of the SaveOn

23  program.  And that may not be accurate.  You may

24  dispute it.

25        Is there a document or do you have

Page 85

1    documents that show whether, indeed, as a result of

2    --

3              MR. SANDICK:  If we do and it talks

4    about SaveOn, it would have already been produced.

5              MR. DUNLAP:  Aw, if it talks about

6    SaveOn.  That is the critical point.

7              MR. SANDICK:  Well, yeah, this is a case

8    about SaveOn.

9              There is literally no way to search as a

10   practical matter without going to every corner of the

11   business to generate the information that Mr. Dunlap

12   wants to be generated for this case.

13             JUDGE WOLFSON:  I didn't ask you to

14   generate it.  What I asked was, has anyone done an

15   analysis for documents that exist as to whether there

16   are more patients signing up for your drugs or

17   getting the drugs who are SaveOn customers?

18             MR. SANDICK:  I have seen that analysis

19   in their files stating that it's not true.

20             They have, along with their business

21   partner --

22             JUDGE WOLFSON:  I asked if you have it?

23             MR. SANDICK:  I haven't seen that

24   document.

25             JUDGE WOLFSON:  Answer that question.

Page 86

1              MR. SANDICK:  I have not seen that

2    document.

3              JUDGE WOLFSON:  I'm asking if there are.

4              Do a search for that.

5              I want to start in that instance.  I

6    think that is a starting point.

7              MR. SANDICK:  What is the search, your

8    Honor?

9              JUDGE WOLFSON:  Whether there are

10   documents that exist that have looked at whether

11   there are more patients taking your drugs as a result

12   of being in the SaveOn program.  That's the inquiry.

13             MR. DUNLAP:  Your Honor, may I?

14             JUDGE WOLFSON:  Yes.

15             MR. DUNLAP:  I think it is necessary for

16   them to do that search, but we don't think it should

17   be limited to that.  And let me tell you why.

18             JUDGE WOLFSON:  I'm going to start with

19   that.

20             MR. DUNLAP:  Limiting it to the SaveOn

21   program we think has too narrow a net because if they

22   have documents that say, you know, for every

23   additional hundred people we sign up for taking

24   Stelara, we make this much money, that may not

25   mention SaveOn, but if we could find those documents,

Page 87

1    if we could find that analysis, and then we compare

2    that with our own separate analysis of how many new

3    patients we got to sign up, we can show additional

4    profits to them as well.

5              So the relevant documents may not

6    mention SaveOn.  I understand you want to start

7    narrow, but I just want to put a stake in the ground

8    that we don't think limiting return on investment

9    information to SaveOn is sufficient.

10             MR. SANDICK:  Yeah, I mean, if it

11   doesn't mention SaveOn, then I don't see what it has

12   to do with this issue.

13             I should also point out that going back

14   right to the start of the case we made some requests

15   to SaveOn, saying, we want to know about how your

16   program operates with other pharmaceutical companies,

17   because the public harm in the GBL 349 claim is not

18   limited to harm to patients taking our drugs, it

19   could be patients taking Pfizer's drugs, or some

20   other company's drugs, those could also be harmed

21   under 349.

22             They objected and said, anything beyond

23   Janssen and SaveOn, CarePath and SaveOn, we object

24   to.  And Judge Waldor heard argument and ruled in

25   their favor and said, absent some very specific

Page 88

1    showing, and a couple of times that showing has been

2    made, they don't have to tell you about their program

3    as it ties to other drug companies.  But now they are

4    making the mirrored request saying we have to do

5    something that has nothing to do with SaveOn.

6               MR. DUNLAP:  The mirrored request is

7    about Janssen drugs.  We're not asking them for all

8    kinds -- the draft drugs at issue in this case.

9    We're not asking for return on investment on a whole

10   bunch of drugs that aren't at issue.  What is their

11   return on investment for the drugs at issue, those 14

12   drugs.

13              JUDGE WOLFSON:  I need it to be honed in

14   on SaveOn at the moment, and I'm limiting it to that.

15   You're certainly free to come back to me depending on

16   what we get.  I know we're not done.

17              MR. DUNLAP:  Thank you, your Honor.

18              JUDGE WOLFSON:  All right.

19              But answer that, please.

20              MR. SANDICK:  Okay.

21              JUDGE WOLFSON:  Are those all the old

22   requests?

23              MR. DUNLAP:  Well, I think there was

24   also a pricing issue, a pricing data issue.

25              JUDGE WOLFSON:  The pricing of Janssen

Page 89

1   drugs.

2           MR. DUNLAP:  I could address that

3   briefly.

4           JUDGE WOLFSON:  Go ahead.

5           MR. DUNLAP:  So they allege in their

6   complaint that they have actually lowered the cost of

7   Janssen drugs, and they cite for that something that

8   they call a transparency report, which is a

9   publicly-available document that they put up on a

10  website that says, we have lowered the cost of

11  Janssen drugs, but it provides no actual data.  And,

12  in fact, if you go and look at those reports, it

13  drops footnotes that says, we base this on internal

14  Janssen financials.  But they haven't produced the

15  backup for them.  And, in fact, we think that they

16  don't actually reduce drug prices, that they increase

17  drug prices.  Which is relevant to why these plans

18  are fighting back, because the prices that Johnson &

19  Johnson continues to raise, continues to put

20  financial pressure on the plans.

21          We also think that there is information

22  showing that one of the reasons they're able to keep

23  raising drug prices is because of the CarePath

24  program and the fact that they're able to get more

25  people through that program to stay on their drugs as

Page 90

1    opposed to taking competitors' drugs.

2              We think that that is highly relevant to

3    their allegations here.

4              MR. SANDICK:  Your Honor, I think your

5    Honor may have said a few minutes ago that you didn't

6    think that the price of drugs was relevant in this

7    case, and it's not.

8              We produced the transparency reports as

9    a way of trying to give them something on an issue

10   that is actually irrelevant.

11             What they have asked for is, they say,

12   all internal data that supports the net price values.

13             Net price is, essentially, the price

14   that matters when we're talking about drug pricing.

15             And all internal data that supports it.

16             Again, this would require us to go well

17   outside of JJHCS to go through the entire company and

18   to try to explain what the pricing is, how it changes

19   over time.

20             First of all, they have a lot of this

21   information already through their business partners,

22   Express Scripts, and Accredo.  Accredo is a pharmacy.

23   The pharmacy collects payment on these drugs.  They

24   know, and their business partners know, what the drug

25   prices are.

Page 91

1            But the case is not about what we charge

2    for the medication, is that a fair price, should be

3    charge something more or something less.

4            JUDGE WOLFSON:  You're not going to

5    argue that your drug pricing was affected by their

6    program?

7            MR. SANDICK:  No.  The drug pricing --

8    we're not seeking lost profits.  Drug pricing is set

9    by reference to a million factors.  SaveOn is not one

10   of them.

11           MR. DUNLAP:  If I could respond on that.

12           JUDGE WOLFSON:  Yeah.

13           MR. DUNLAP:  They say they produced

14   these transparency reports.  Of course they're on the

15   website.  This wasn't really much of a production.

16   It was something that was already available.  And

17   they say the net price is what matters.  And they

18   also say, oh, we have to go outside of JJHCS.  We

19   have to do this wide range search.

20           They put these numbers into the

21   transparency reports.

22           JUDGE WOLFSON:  But I want to know what

23   is the relevance of it.

24           MR. DUNLAP:  It's relevant -- first,

25   it's relevant because we believe it will show that

Page 92

1    their allegation that they actually lowered real

2    prices over the course of these years, something

3    they're intending to tell the jury --

4                    JUDGE WOLFSON:  Well, I hope not.  I

5    just asked that.  And I'm going to put that right out

6    there again to Mr. Sandick.

7                    Are you in any way going to put to a

8    jury that you lowered prices and put that up to

9    suggest implicitly or explicitly it's because of

10   SaveOn.

11                   MR. SANDICK:  This is not a lost profits

12   case.  This is about the CarePath program and whether

13   that funding has had to go up over time because of

14   their efforts.

15                   I think that answers your Honor's

16   question.

17                   JUDGE WOLFSON:  But you're not going to

18   argue, and by that funding, we've now lowered prices,

19   or we've raised prices, or anything else?

20                   MR. SANDICK:  No.  The drug pricing is

21   not set by reference to SaveOn, it's set by reference

22   to a million other things, but not SaveOn.

23                   JUDGE WOLFSON:  I'm going to put this

24   right out, Mr. Dunlap, we're on the record today:  If

25   there will be no argument in this case at a trial, or

Page 93

1   at a motion for summary judgment, or wherever it

2   might be, that CarePath in any way has impacted the

3   pricing of these drugs, it's a non-issue.

4              MR. DUNLAP:  Well, they're going to

5   stand up --

6              JUDGE WOLFSON:  I'm asking.

7              I want that representation.

8              MR. SANDICK:  Yes, that is not the

9   theory of our damages.

10             JUDGE WOLFSON:  I ask for a

11  representation that you will not make that argument.

12             MR. SANDICK:  Yes, we are not going to

13  argue that our drug prices were lowered due to what

14  SaveOn has done.

15             The only argument we will make about

16  damages is how the funding for the CarePath program

17  within JJHCS has changed as a result of their

18  conduct.

19             MR. DUNLAP:  Paragraph 80 of their

20  complaint they say, "SaveOn SP has inflated patients'

21  drug co-pay obligations even as JJHCS has

22  consistently decreased the price of the drugs

23  targeted by the SaveOn SP program," and it cites its

24  own transparency report, a quote that says, "Net

25  prices for Janssen medicines has declined for the

Page 94

1    fifth year in a row."

2            MR. SANDICK:  But that is not in any way

3    different from what I just said a moment ago, your

4    Honor.  What we say there is that they have taken a

5    bigger share of the CarePath program payments even

6    while we have reduced drug prices, but we are not

7    alleging that the drug price reduction was caused by,

8    was driven by, is related to SaveOn's program.  The

9    drug prices are set not by reference to what SaveOn

10   is doing, by reference to lots of other things, but

11   not that.

12           MR. DUNLAP:  The issue, your Honor, is

13   that we don't think that allegation is true.  We

14   think that, in fact, they have raised drug prices.

15           JUDGE WOLFSON:  Well, I want to know

16   what you're going to do with allegation number 80.

17           MR. SANDICK:  What am I going to do with

18   allegation number 80?

19           JUDGE WOLFSON:  Yeah.

20           MR. SANDICK:  What I'm going to do with

21   allegation number 80 is show that they are taking an

22   increased piece of the co-pay support program.

23           We are not intending --

24           JUDGE WOLFSON:  And that is not

25   impacting your pricing?

Page 95

 1                 MR. SANDICK:  No.

 2                 JUDGE WOLFSON:  Lowering your pricing or

 3    raising your pricing?

 4                 MR. SANDICK:  No.

 5                 That line in there, which is far from

 6    central to what our case is going to be about, what

 7    that line in there is meant to say is that it is

 8    commonly the case in sort of the market of public

 9    discourse for insurance companies to say, oh, yes, we

10    know that your drug prices have gone up, but that is

11    not our fault, that is the drug company's fault that

12    raise their prices every year.

13                 So we made this sort of rhetorical

14    aside.

15                 We are not intending to show, will not

16    show, or not alleging that the cause of drug prices

17    moving up or down is because of SaveOn.

18                 MR. DUNLAP:  Well, no, because they are

19    going to stand up and they're going to say, we have

20    been lowering our prices, and then they're going to

21    come in and say, while we have been lowering our

22    prices SaveOn has come in and taken a bunch of our

23    CarePath assistance programs --

24                 JUDGE WOLFSON:  I think I heard you're

25    not going to say that.

Page 96

1              MR. DUNLAP:  Well, I thought he said he

2    wasn't limiting it to the damages or the cause of the

3    increase.

4              MR. SANDICK:  No, we are not going to

5    argue that our damages are in the form of lost

6    profits by having reduced prices due to SaveOn.  That

7    is not our theory of the case, our damages, or

8    anything else like that.

9              If they make arguments in their case

10   using SaveOn data about drug pricing, say, no, no,

11   no, actually, these guys are -- you know, they're

12   ganas, they're taking from everyone, then we will be

13   able to come back and say something.  But our case is

14   not about the drug prices being set by reference to

15   anything that SaveOn does.  I want to make that very

16   clear.

17             MR. DUNLAP:  He keeps trying to link it

18   to SaveOn.

19             Put SaveOn aside for a second.

20             He is going to stand up at trial, if it

21   gets there, and say, Johnson & Johnson has been

22   lowering its drug prices.

23             JUDGE WOLFSON:  Why would you say that?

24             MR. SANDICK:  I don't think that we're

25   going to say that.

Page 97

1          MR. DUNLAP:  It's in his complaint.

2          JUDGE WOLFSON:  I hear it's in the

3    complaint.  Just because it's in the complaint --

4    that's why I'm looking for representations today.

5          MR. SANDICK:  We're not planning to

6    prove a case about our drug prices.  The case that

7    we're going to prove on damages, just to spell it out

8    --

9          JUDGE WOLFSON:  You're not going to open

10   and say, and you're not going to close and say, we're

11   such good guys, we keep reducing the price, but they

12   stealing from us?

13         MR. SANDICK:  No.

14         JUDGE WOLFSON:  Do you agree you're not

15   going to do that?

16         MR. SANDICK:  I agree that we're not

17   going to do that.  That's not the theory of our case.

18         MR. DUNLAP:  I just want to make clear,

19   he is not going to make any representation that they

20   have been lowering drug prices?

21         MR. SANDICK:  We are not going to make

22   that representation.

23         I want to leave myself one out, your

24   Honor.  If they start making allegations about the

25   greedy drug companies that have raised prices, I

Page 98

1    think we're allowed to reply to that.  But that is

2    not something we're planning to present.  And, in any

3    event, they and their business partners have tons of

4    data about this. ████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████    ████████████

7    ████████████████████████████████    ████████████████

8    ████████████████████████████████ Why all the

9    lies and the deception?

10                MR. DUNLAP:  Well, I'm not getting into

11   all those false accusations.

12                Look, we had raised the drug pricing for

13   two reasons.  One is that they allege that they were

14   increasing these prices.  And if they are going to

15   make that allegation, we want to see the data on

16   which they are basing that.

17                JUDGE WOLFSON:  Okay.  I have just

18   gotten a commitment that they weren't.

19                MR. DUNLAP:  We also want to make the

20   point that it's our understanding that one of the

21   reasons Johnson & Johnson can, in fact, continue to

22   increase its drug prices is because it is able to get

23   patients to commit to taking its drugs through the

24   CarePath program.  That the CarePath program, one of

25   the consequences of it is, that it allows Johnson &

Page 99

1    Johnson to increase drug prices.  That they don't

2    exist separately, that, in fact, it's part of Johnson

3    & Johnson's strategy, that they've increased prices

4    for reasons having nothing to do with material costs

5    or efficacy or anything like that, but just because

6    they can.  And one of the reasons they can do that is

7    because they made the patients pricing sensitive to

8    this program and they keep buying more drugs.  And

9    the cost of that is borne by the employers.  And we

10   think that evidence goes to whether or not this is

11   actually a public harm or not or whether it's a

12   program designed to benefit J&J through increased

13   drug prices.  And we also think it could go to

14   damages and injury if we can show that by adding new

15   patients to the CarePath rolls, where they are able

16   to raise their prices more, not just make more sales,

17   but make more sales at a higher price.  That could

18   offset damages.

19              JUDGE WOLFSON:  Did you want to take a

20   break?

21              COURT REPORTER:  Yes, I would love to.

22              JUDGE WOLFSON:  Okay.

23              (Brief recess taken.)

24              JUDGE WOLFSON:  Mr. Dunlap, you got one

25   minute to summarize.  Before we took the break we

Page 100

1    kind of interrupted you.

2            MR. DUNLAP:  I think I just finished

3    making another pitch about why we thought drug

4    pricing was relevant even if they are not going to

5    affirmatively say that they have been decreasing

6    prices.

7            One other point I just want to make on

8    the financial stuff generally to the extent that your

9    Honor is going back and forth about whether or not

10   it's relevant or wants to put it off.

11           We have seen a number of documents that

12   have been produced since we submitted the letter and

13   since the conference occurred that we think

14   underscores that they do look at return on

15   investments.  And we're glad to make a supplemental

16   submission to you summarizing those documents, and

17   we're happy to do that promptly if that will help

18   you.

19           JUDGE WOLFSON:  Okay.

20           For today I'm not directing that

21   anything further be provided on the financial.  I

22   don't foreclose you if you got something else that

23   you want to submit to me that you think would be

24   convincing, but, first, would you please speak to the

25   other side and confer as to, based on that, why you

Page 101

1   think.

2                   MR. DUNLAP:  This is on the drug

3   pricing?

4                   JUDGE WOLFSON:  Yes.

5                   MR. DUNLAP:  Okay.

6                   JUDGE WOLFSON:  Okay, I think the next

7   thing now is with regard to this issue that's been

8   briefed the last week or so on custodians.

9                   MR. DUNLAP:  And my associate Ms. Snow

10  is going to present argument on that.

11                  JUDGE WOLFSON:  Okay.

12                  All right.  So we got a couple of

13  disputes here.  This started with, I guess, 12

14  custodians, et cetera.  November 7 Judge Waldor

15  granted the motion as to six custodians.  And in that

16  regard the Plaintiff is now -- and I think you

17  reached some agreement on that, but the question is

18  the scope of the search terms.  Right now they have

19  been as to the CAP program, the Plaintiff has said,

20  right?

21                  MS. SNOW:  Yes, just two narrow terms as

22  to the CAP program.

23                  JUDGE WOLFSON:  And I think that you

24  have gone back and forth as to what did Judge Waldor

25  mean.

Page 102

1          Well, guess what?  As Judge Waldor had

2     put in her order, you know, I had the opportunity if

3     I would like to speak to her.  Actually, Wayne

4     communicated with her chambers and we got a response

5     that told us -- well, you know what, I'll let Wayne

6     put into the record because you communicated with

7     them about it.

8               MR. FANG:  The law clerk sent

9     correspondence back to my inquiry.

10              JUDGE WOLFSON:  Tim.

11              MR. FANG:  Tim.

12              And he summarized the dispute as he

13    understands it, and he spoke to Judge Waldor about

14    the differing interpretations, the parties'

15    interpretation of her order.  So, ultimately, what

16    she first said -- what he first said was, and

17    Defendant was right, that the judge did not

18    specifically order specifics regarding new custodian

19    searches, because the judge had asked the parties to

20    work up logistics, but upon reviewing and considering

21    the parties' dispute, Judge Waldor agrees -- and I'm

22    reading his e-mail -- that "Johnson & Johnson's

23    position is the only one that makes sense from a

24    proportionality standpoint.  We were only adding the

25    new custodians because of their association with the

```
                                              Page 103

 1   CAP program. ███████████████████████████████

 2   ██████████████████████████████████████████████

 3   ████████████████████████████████████████

 4   █████████████. Similarly, we will limit the searches

 5   of the new custodians' records to the CAP related

 6   term that Judge Waldor specified since that is the

 7   only reason these people are involved in the

 8   discovery in the first place."

 9           MS. SNOW:  Your Honor, you know, I hear

10   what she is saying.

11                  ████████████████████████████████

12   ███████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████

15           I would ask that we be allowed discovery

16   on that earlier time period.

17           Additionally, I think we did raise new

18   evidence that demonstrates why the two narrow

19   searches --

20           JUDGE WOLFSON:  I'm going to address

21   that in a moment.  Okay?

22                  ██████████████████████████

23           MR. SANDICK:  Let me pass it off to

24   Ms. Long.  I have had enough.  I don't want to say

25   anything else for the rest of the day.
```

Page 104

1          MS. LONG:  I just wanted to clarify, I

2    think as to the search terms at issue in the

3    November 7 order we did meet and confer where we were

4    considering the position that was offered by SaveOn

5    and a potential for compromise in the middle.

6    Ultimately we did not make that compromise.  But

7    prior to the October 30 conference we had agreed to

8    run a specific CAP search term which did not include

9    a SaveOn modifier for the 2016 to 2022 period.  We

10   did that to try to avoid the dispute that ultimately

11   went before Judge Waldor.  And what we took back from

12   the meet and confer was whether to consider running

13   that term over some period of these CAP custodians

14   earlier.

15          Ultimately we said back to Ms. Snow, and

16   we've had several meet and confers on this point,

17   that we did not consider that is what Judge Waldor

18   had ordered us to do so we declined to run the term.

19   ████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████

23          It is always possible that there is some

24   correspondence just outside of that window, but

25   consistent with our meet and confer our position has

Page 105

1    been, as Mr. Fang just said, the order prescribed

2    only these search terms and only for that time

3    period, and that is why we cabined our searches

4    accordingly.

5              JUDGE WOLFSON:  She didn't say that,

6    though.  What she said is -- she didn't give a

7    specific order on it, but she said what makes sense

8    to her based on the discussion.

9              So it was not ruled upon.  So to the

10   extent you went back and forth, you're right, I think

11   you're interpreting what her meaning might be, but it

12   does say, the short answer is, "we did not order

13   specifics regarding the new custodian searches.  We

14   wanted the parties to work it out."  And then the

15   rest of the response was her kind of weighing in on

16   proportionality though.

17             So it's not necessarily a done deal.

18             So, let's talk about, is there

19   compromise in here?  That is really where we are.

20   And, one, I want to talk about dates.  I don't

21   understand this whole thing about before 2022.  There

22   is some earlier date involved or not.

23             MS. LONG:  ███████████████████████

24   ███████████████

25             JUDGE WOLFSON:  ██████████████████████

Page 106

1   ████████████████████████████

2          MS. LONG:  ███████████████

3   █████████████████████████████████

4   █████████████████████████

5          MS. SNOW:  If I can speak on that.  Two

6   points on that.

7          ███████████████████████████

8   ████████████████████████████████████

9   ████████████████████.

10         JUDGE WOLFSON:  ███████████████

11  ███████████████████████████

12         MR. LoBIONDO:  We'll search for those.

13         JUDGE WOLFSON:  You're going to search

14  for those.

15         MR. LoBIONDO:  ████████████████

16  █████████████████████████

17         MS. SNOW:  So I think my second point is

18  that, really, it's about the essence of the CAP

19  program, and █████████████████████████

20  ████████████████████████████████

21  ███████████████████████████████

22  ████████████  ██████████████████

23  ███████████████████████████████████

24  ████████████  And that is what we are -- that is what

25  we believe we're entitled to discovery on.

Page 107

1          And I think that for those custodians we

2    do need to go back further.  It is clear that, like,

3    for example, John Hoffman was working on the response

4    to accumulators and maximizers in 2020.

5          And I think there is another additional

6    point I have here, which is that the search terms

7    that they have agreed to run just on the CAP program

8    do not actually capture all of the documents that

9    would be involved in that response, which ultimately

10   turned into that program.

11              JUDGE WOLFSON:  Okay.

12          So you're saying there could be other

13   documents because perhaps even there wasn't a name of

14   a CAP program but the idea of what this program could

15   be was out there and maybe it's not being captured by

16   the search terms?

17              MS. SNOW:  Yes.

18              JUDGE WOLFSON:  What are the search

19   terms?

20              MS. SNOW:  So I believe they're

21   referring to the two additional search terms that

22   were requested in SaveOn's other motion regarding the

23   CAP program, and there is this additional term which

24   they agreed to starting -- they agreed to it in

25   September, which was also covering the CAP program

Page 108

1    specifically, but there are a number of other terms

2    that I'm happy to get into the specifics on but that

3    encompass mentions of SaveOn, mentions of ESI and of

4    accumulator because, of course, many of the documents

5    reveal that ████████████████████████████████████████

6    ████████████████████████████████████ .

7            JUDGE WOLFSON:  And you haven't reached

8    agreement on these?

9            MS. LONG:  I want to be clear that we're

10   limited as to the new CAP custodians.  We have run

11   these search terms for the original time period and

12   through the refresh as to 17 other custodians.

13           JUDGE WOLFSON:  Why wouldn't you run

14   them for these?

15           MS. LONG:  Because, respectfully, their

16   request was cabined -- was about the CAP program.

17   Judge Waldor opened the door about CAP.

18           We're happy to take the terms back to

19   mid-2021 or to another date, and we can investigate

20   what that date was.

21           JUDGE WOLFSON:  Well, the reason I asked

22   that is, if these were the people that were somehow

23   involved with the CAP program, they may have been

24   involved in the discussions at an earlier date as

25   well and may be relevant custodians.

Page 109

1              So I'm going to direct that it happen,

2       that you run them for these additional custodians as

3       well.

4              I can't believe they just suddenly

5       appeared just for CAP and didn't have involvement

6       before.

7              MR. LoBIONDO:  They were certainly

8       relevant, your Honor.

9              The argument we made before Judge Waldor

10      and she agreed with was, as I understand it, was, we

11      have custodians that are covering these issues.

12      These people would be cumulative of what we already

13      produced.  And she decided they were not cumulative

14      as to CAP, which is why she thought that they should

15      be added not with respect to proportionality, only as

16      to CAP.

17             JUDGE WOLFSON:  It's four more.  I'm not

18      worried about it.  I'm doing it.

19             MR. LoBIONDO:  It's six more for five

20      years.

21             MS. LONG:  Are we talking about number

22      of custodians or the search terms as to the CAP

23      custodians?

24             JUDGE WOLFSON:  Those custodians that

25      we've agreed to, but running the additional search

Page 110

1    terms on them.

2                      MS. LONG:  Back to 2016?

3                      JUDGE WOLFSON:  Right, what the

4    attorneys agreed to, correct.

5                      MR. SANDICK:  So all of the search terms

6    that we've used in the case, that is your Honor's

7    ruling?

8                      JUDGE WOLFSON:  I don't know of all the

9    search terms, it's whatever is related --

10                     MR. SANDICK:  Because that is the core

11   issue.

12                     MR. LoBIONDO:  This is part of the

13   issue, frankly, that we've been having, which is

14   that, we brief up an issue, they get a ruling they

15   don't like.  They say, no, Judge Waldor actually

16   meant something else.  Judge Waldor said, no, this is

17   what I meant.  And now we're re-litigating it for a

18   third time until they've finally gotten a ruling that

19   is going to give them everything they asked for.

20                     JUDGE WOLFSON:  I don't know about

21   everything.  All I heard was the terms that would be

22   relevant to them would be referring to SaveOn,

23   referring to ESI.  It's not the world.

24                     What I'm trying to capture with them,

25   the only reason is, that I'm saying it, is these are

Page 111

1    CAP people.  The likelihood is that they were

2    involved somehow before this in looking at these

3    issues, and to the extent they were, they should

4    produce documents.  But I want to limit it then to

5    this world, not every search term.

6                    MR. LoBIONDO:  Okay.

7                    JUDGE WOLFSON:  So come up with the

8    search terms that relate to this and confer on it.

9                    MS. SNOW:  Your Honor, we're happy to

10   make a narrow proposal of search terms.

11                   JUDGE WOLFSON:  Okay, let's do it.

12                   New custodians that were brought up in a

13   letter.

14                   I guess you brought up Scott White,

15   Blasine Penkowski, Karen Lade, and Juliette Deshaies.

16                   I think Plaintiff is saying that Judge

17   Waldor rejected proposal of these additional

18   custodians, that they were part of that motion to

19   compel 12, and she ordered only half basically,

20   right?

21                   Okay.

22                   And now what you're claiming is that

23   there are new documents that were not part of the

24   motion before Judge Waldor that show that these

25   proposed custodians have more knowledge than you

Page 112

1    previously knew and presented to her and that you

2    want them to be added, right?

3              MS. SNOW:  Yes, your Honor.

4              There are actually five remaining

5    custodians that were left undecided, and we have

6    renewed our motion as to all five, however, in the

7    event you determine that Judge Waldor did resolve as

8    to -- you know, we don't think the order states

9    that -- it doesn't name those custodians at all.  At

10   the conference she didn't issue a ruling as to those

11   custodians, and so we don't think she's decided

12   those.  But we have also put forth significant new

13   evidence as to White, Penkowski, Lade and Deshaies,

14   as we've mentioned.

15             JUDGE WOLFSON:  Ms. Long.

16             MS. LONG:  Yeah.

17             I think your Honor said our position

18   fairly succinctly.  We believe Judge Waldor already

19   decided this.  I think that is fairly clear from the

20   text of her order.  This issue was part of 27 single

21   spaces of briefing and 146 exhibits that went before

22   Judge Waldor, and ultimately Judge Waldor split the

23   issue.  As your Honor said, there were 12 custodians

24   that were at issue in the motion.  She ordered us to

25   provide six of seven.  We later conferred on which

Page 113

 1   six those would be and agreed and resolved as to

 2   those.  And I just don't think there is anything

 3   ambiguous about the order and what was resolved.

 4                JUDGE WOLFSON:  Do you think that --

 5   their position is we've identified, now based on new

 6   documents I'm assuming that you could not have

 7   presented to her at the time because you didn't have

 8   them, that based on new documents this is a new and

 9   different argument to be made?

10                MS. LONG:  No.

11                If I could take the custodians in turn.

12                First, as to Ernie Knewitz, there are no

13   new documents.  There are no new documents in

14   SaveOn's opening brief.  There are no new documents

15   on the reply brief.

16                As to the remaining custodians that are

17   at issue --

18                JUDGE WOLFSON:  Yeah.

19                Let's start with White and Penkowski.

20                MS. LONG:  Sure.

21                They're the same types of documents that

22   were at issue, for example, calender invitations

23   concerning JALT, et cetera.  And as was before Judge

24   Waldor, the issue with Mr. Knewitz and Mr. White and

25   Ms. Penkowski are all that they serve on what's

Page 114

1    called the JALT.

2              We have a senior executive who was on

3    the JALT.  Her name is Katie Mazuk.  She has already

4    been designated as a custodian in this case on all

5    relevant issues on all agreed upon search terms.  And

6    so any discovery that would be relevant, anything

7    that the JALT considered, will be produced from Ms.

8    Mazuk's files.  That is something that was before

9    Judge Waldor.  That is consistent with the documents

10   that are still before your Honor.  Ms. Mazuk is the

11   senior most executive with responsibility for making

12   decisions about the CarePath program.

13             As to Mr. White.  Mr. White is one of

14   the highest ranking executives in the Johnson &

15   Johnson family of companies and he has no

16   responsibilities day to day for CarePath.

17             Mr. White came up first in a motion that

18   SaveOn brought in June about our interrogatory

19   responses, that was also at issue at the October

20   conference, where we have consistently provided

21   representation to the other side that Mr. White does

22   not have responsibility for -- does not have day to

23   day responsibility for the CarePath program.  He has

24   no unique documents because, again, he is on the

25   JALT, which is the main piece of evidence that SaveOn

Page 115

1   cites.  So is Ms. Mazuk.  And all of the documents

2   that SaveOn has cited Ms. Mazuk is either on or is a

3   custodian of.  The calendar invitations include

4   Ms. Mazuk.  And so the only --

5                JUDGE WOLFSON:  So let me ask you this

6   question:  The documents that they now provided say

7   that -- you know, forget the day to day

8   responsibility -- that White may have been involved

9   in the high level discussions about CarePath,

10  SaveOn's role and how it was impacting Plaintiff's

11  program, litigation.

12               Why do you think that White would not

13  have relevant documents?

14               MS. LONG:  ████████████████████████

15  ████████████████████████████████████████████████

16  ████████████   ████████████████████████   █████

17  ████████████████████████████████████████████████

18  █████████████████   █████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████.

21               And that is consistent with all of the

22  documents that we've cited, including decks and

23  other -- the evidence that is at issue before your

24  Honor today.

25               The other evidence comes down to being a

Page 116

1    counterparty on certain work orders with Trial Card,

2    and, again, I don't see how that is relevant here.

3                And I think the last category of new

4    documents, which, you know, SaveOn points to as kind

5    of a smoking gun by a third party is an ████████

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████████████

8    ██████████████████████████████████████████████████

9    █████████████████████████████████████████████████et

10   ████████████████████████████████████████████████

11   ████████████████████████████████. 

12               First, we've now found the calendar

13   invitation -- what we believe is the calendar

14   invitation for this meeting.  It does not include any

15   of those individuals.  ██████████████████████████

16   ██████████████████████████████.  And, also, as

17   your Honor just ordered, █████████████████████████

18   ██████████████████████████████████████████████████

19   ██████████████████████████████████████████

20   ██████████████████████████████.  John Hoffman is one of

21   the CAP custodians that you just ordered additional

22   search terms be run over.

23               So there is not a gap in our production

24   here.

25               I don't see in the document what SaveOn

Page 117

1    is claiming, but even if it was true, those files

2    would be produced already.

3            And I think when we're looking at

4    someone as senior was Mr. White and Ms. Penkowski,

5    and the same would apply for Mr. Knewitz, there is a

6    particular concern about Apex custodians.  And I

7    recognize that the Apex doctrine comes up more so in

8    the context of depositions, but if we're talking

9    about cumulative files from very senior people, I

10   don't think that SaveOn has met that showing.

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████  ██

13   ██████████████████████  █████████████████████████

14   ██████████████████████   There is no additional

15   benefit to these other custodians.

16            JUDGE WOLFSON:  Ms. Snow.

17            MS. SNOW:  Yes.

18            So, first of all, I just want to address

19   the point that ███████████████████████████████

20   ██████████████████████████████.  That's because

21   that's who they actually have produced documents

22   from.  That doesn't mean that that's the only place

23   there are relevant documents.

24   ████████████████████████████████████████████████

25   ██████████████████

Page 118

1 ███████████████████████████████████

2 ████████████████████████████████

3 ████████████  You would -- I have a copy if you'd

4 like.

5          JUDGE WOLFSON:  I have it here too.

6          MS. SNOW:  ███████████████████████,

7 ██████████████████████████████████████

8          And I also want to make a point about

9 this document.

10          This is the only -- ██████████████████

11 ██████████████████████████████████

12 ██████████████████████████████████

13          There is not a single document produced

14 before January 2022 that suggests this idea.

15          So what this document shows us is that

16 ████████████████████████████████████

17 ████████████████████████████████████

18 ████████████████████████████████████

19          For that reason alone I think he's

20 highly likely to have relevant documents.

21          And just addressing the Trial Card work

22 order.

23          I think we brought up Trial Card a few

24 times today.

25          █████████████████████████████████

Page 119

1    ████████████████████████████████████████

2    ████████████████████████████████████████

3    Those are very key aspects of how you actually run a

4    program like this. ██████████████████████████ a

5    ████████████████████████████████████

6    ██████████████    ██████████████████████

7    ████████████████████

8                 ████████████████████████████

9    ██████████████████████████████████████

10   ████████████████████████

11                 That goes to the viability we have been

12   discussing.  It goes to the harm, because they're

13   having to -- you know, J&J alleges that they're

14   having to up the amount that they're reimbursing

15   patients.

16                 JUDGE WOLFSON:  Yeah, so let me ask you

17   this question:  So Scott White is apparently the

18   company group chairman of North America

19   Pharmaceuticals, right?  So one of the highest

20   ranking executives.

21                 ██████████████████████████████████

22   ████████████████████████████████████

23   ████████████████████████████████████

24                 MS. SNOW:  ████████████████████████

25   ████████████████████████████████████

Page 120

1    ███████████████████████████████████████

2    ███████████████    So we see in numerous documents --

3              JUDGE WOLFSON:  At the what level?

4              MS. SNOW:  ████████    ████████   ██████

5    ███████████████████████████████████████

6    ████

7              You know, they make a point about us

8    going after so many executives.  █████████████████

9    ████████████████████████    ██████████████████████

10   ██████████████████████████████████████

11   ████████████████████████████████████

12   ████████████████████████████████████.

13   ████████████████████████████████████

14   ████████████████████████████████████████

15   ███████████████.

16             JUDGE WOLFSON:  What is it precisely

17   you're looking for Mr. White to produce?

18             MS. SNOW:  Well, I think we've been

19   missing many documents to show who actually -- like

20   the decisions being made.

21             You know, █████████████████████████████

22   ███████████████████  and we're not disputing that.

23   ████████████████████████████████████████

24   ██████████████████████████████████████

25   ███████████    █████████████████████████████

Page 121

1   ██████████████████████    ████████████████████████

2   ███████████████████████████████████████████████████

3   ██████████████████████████████████████████████████

4   █████████████████████████████████████████

5   ████████████

6          ████████████████████████████████████████

7   ████████████████████████████████████████

8   ██████████████████████

9          MS. LONG:  May I respond?

10         JUDGE WOLFSON:  Yes.

11         MS. LONG:   ████████████

12         Let's start with just a brief look at

13  Exhibit 2.

14         ████████████████████████████████

15  ███████████████████████████████████████

16  ████████████████████████

17         ████████████████████████████████

18  ██████████████████    ████████████████████

19  ████████████████████████████████████████

20  █████████████████████████████████████████

21  ██████████████████    ████████████████████.

22         What Ms. Snow was talking about, ████████

23  ████████████████████████████████████████

24  ████████████████████████████████████

25  ██████████████████████████.    ████████████████

Page 122

1    ████████████████████████████████████████

2    ███████████████████████  █████████████ ,

3    █████████████████████████  ███████████

4    ████████████████████████████████

5    ███████████████████████████████████████

6    ██████████████████ .

7                   JUDGE WOLFSON:  But how was that meeting

8    captured?

9                   MS. LONG:  Sure.

10                  So there are a couple of ways that the

11   meeting was captured.  There are, first, these

12   calendar invites.  Usually attaching a presentation.

13   The presentation has content, sometimes relevant to

14   the CAP program, for example.

15                  Ms. Mazuk was on the calendar

16   invitation, was on the e-mail where those decks were

17   communicated.

18                  JUDGE WOLFSON:  But what happens at the

19   meeting, and where is that document?

20                  MS. LONG:  So what happened at the

21   meeting I believe is that the presentation -- the

22   deck is presented and there is a discussion.  I am

23   not aware of any minutes, for example, that come out

24   of that meeting, but if there was subsequent e-mail

25   discussion, it would presumably be as we've seen in

Page 123

1   the documents amongst ████████████████████

2   ████████████

3   ████████████████████████

4   ████████████████████████,

5   ██████████████████████ for

6   ███████████ -- this was at issue with

7   respect to our interrogatories -- different areas of

8   the company that have absolutely nothing to do with

9   the CarePath program.

10          And just, again, to emphasis, as to

11  Mr. Knewitz, we have also stated, for example, that

12  he has nothing to do with CarePath.  He occasionally

13  made statements regarding the lawsuit, and that is

14  the limitation.  We have represented that in

15  interrogatory responses.

16          JUDGE WOLFSON:  Which one are you

17  referring to?

18          MS. LONG:  Mr. Knewitz.  It's

19  K-N-E-W-I-T-Z.

20          JUDGE WOLFSON:  Okay.

21          MS. LONG:  And then as to the remaining

22  folks, again, those decisions would be captured -- to

23  the extent that there are documents, which I think if

24  ████████████████████████

25  ███████████████████

```
                                              Page 124
```

1     ████████████████████, but certainly SaveOn is

2     welcomed, as I'm sure they will, to depose Ms. Mazuk

3     to learn about those discussions, but I don't have

4     any evidence, nor do they, that those discussions

5     were otherwise memorialized in e-mails that have

6     somehow been withheld from our productions.

7              If there are relevant communications, if

8     there are relevant documents, decks, minutes, those

9     would have already been produced to opposing counsel.

10             MS. SNOW:  I just have a few quick

11    responses.

12             First of all, to the last point, we need

13    documents before we're taking depositions.  And the

14    standard that is at issue is, have we shown that

15    these individuals are likely to have relevant

16    documents.

17             Going to the point that Ms. Long was

18    making, while it's not in the new evidence, there are

19    ████████████████████████████████████████████████

20    ████████████████████████████████████████████████

21    ██████████████████████████████████████

22             JUDGE WOLFSON:  Did you present that to

23    Judge Waldor?

24             I don't want to go over ground that she

25    already decided.  So I don't want to do that.

Page 125

1          I'm only looking at if they're new

2    documents and you have a new argument to make,

3    because she obviously considered this already.

4               MS. SNOW:  Your Honor, if we could just

5    look at the old documents in the context of the new

6    documents.  There is evidence that shows that these

7    ████████████████████████████████████████████████

8    █████

9              ██████████████████████████████████████

10   ████████████

11            I██████████████████████████████████████

12   ███████████████████████████████████████████

13   █████████████████████████████████.  ██████████

14   ███████████████████████████████████████  █

15   █████████████████████████████████████████████

16   █████████████  █████████████████████████████,

17   ████████████████████████████████████████now,

18   ████████████████████████████████████████

19   ██████████

20              JUDGE WOLFSON:  I don't know if you want

21   to take these one by one or as a group, I mean, you

22   dealt with them kind of as a group overall, but I

23   have a couple of concerns here.  I certainly don't

24   want to go over ground that Judge Waldor actually

25   dealt with unless, as I said, there was something new

Page 126

1    and there was a reason to do so and to revisit it.

2    Respectfully, I don't think it would be otherwise

3    appropriate.

4              Now, I don't know how well this was

5    addressed or simply if it was, like, get these, this

6    is all you're getting.  You know, you get six

7    custodians, I'm not giving you more, or whatever it

8    might be.

9              MS. SNOW:  So, actually, in the

10   transcript she said, I'm going to order some to

11   start, and then we'll deal with the Apex custodians

12   later, so I think today is that later.

13             JUDGE WOLFSON:  Did she leave that

14   opening?

15             They're seeming to shake their head no

16   on the other side of the table.

17             MS. LONG:  The transcript, your Honor,

18   is long.  In that context, we disagree with what was

19   set forth by Ms. Snow.

20             JUDGE WOLFSON:  Is it the October

21   transcript?

22             MS. LONG:  Yes, it is the October

23   transcript.  We agree on that.

24             But, your Honor, specifically Judge

25   Waldor said, "Well, I thought CAP -- the 12 new

Page 127

1    custodians included CAP custodians, I'm going to open

2    the doors on CAP," and then later, "I'm going to

3    permit additional custodians.  I know we're down to

4    six."  Referencing the six custodians that ultimately

5    Judge Waldor ordered.

6              I think that is also consistent with,

7    frankly, the natural reading of the order that

8    followed the conference.  Here the order read, "With

9    regard to SaveOn's requested relief as set forth in

10   docket entry number 165, custodians' motion, the

11   Court will require" --

12             JUDGE WOLFSON:  I'm looking at the

13   transcript, I'm reading, so if you could wait a

14   moment, please, I'm reading the portion of the

15   transcript.

16             Well, this is what she says, she said,

17   "I said start with four.  Mr. Mangi will talk to them

18   about it.  And then we can discuss the two that

19   you're trying to protect with the Apex doctrine,

20   which is, according to adversary, inapplicable to

21   documents."

22             Mr. Mangi, "Yeah."

23             The Court, "I assume ultimately you're

24   going to want to depose them."

25             MS. ARROW:  Your Honor, what page are

Page 128

1    you on?

2                    JUDGE WOLFSON:  119, 120.

3                    Well, it doesn't look like she

4    definitively closed the door, that is true.  So I

5    don't think I should look at it that way.  It clearly

6    was a start.  So I don't want to rely on that.

7                    So let's talk about the merits of the

8    issue.

9                    Now, what are the limited search terms

10   with regard to White and Penkowski that you want to

11   use?

12                   MS. SNOW:  We're happy to provide a

13   proposal on that.

14                   JUDGE WOLFSON:  Very limited.

15                   MS. SNOW:  Very limited, yes, your

16   Honor.

17                   JUDGE WOLFSON:  Very limited.

18                   Confer with your adversary.

19                   MS. SNOW:  And for the time period --

20   the full time period that they've used for every

21   other custodian?

22                   JUDGE WOLFSON:  That's fine, but, as I

23   said, these are going to be limited search terms.  I

24   do understand they are high level executives and may

25   be duplicative of what others have, but I also know

Page 129

 1   people sometimes write e-mails and do things that

 2   don't include everybody else when they want to talk

 3   to someone else in the company, and it happens, so

 4   there could be other documents, but, please, limit

 5   it.

 6              Now we've got -- in fact, I mean,

 7   ██████████████████████████████████████████████

 8   ██████.   Very relevant.   I've got quotes from her in

 9   e-mails.   I understand others may have gotten them,

10   but that is an important person.

11              Yeah, do your search terms and I'm going

12   to allow it.

13              MS. SNOW:   Thank you, your Honor.

14              JUDGE WOLFSON:   Then we've got Lade,

15   L-A-D-E.

16              MS. SNOW:   Yes.

17              So just to start about the so-called

18   brand employees.

19              There's new evidence -- if you look at

20   Exhibit 6, it includes the e-mail, actually, that

21   ████████████████████    ██████████████████████

22   ████████████████  -- I can give you a copy of the

23   exhibit.

24              JUDGE WOLFSON:   I have them here, it's

25   just finding where 6 starts.

Page 130

1          Thank you, Wayne.

2          Okay, I got it.

3          MS. SNOW:  If you look at the -- I

4    believe the very bottom of that first page, it says,

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████

7    ██████████████████████████████████████████████

8    ████████████████████████████████

9          So Ms. Lade is a brand employee, and I

10   think -- you know, turning to just looking at the new

11   evidence, in May of 2017 -- if you look at Exhibit

12   11.

13         I'm happy to also give you a copy.

14         JUDGE WOLFSON:  Now, these documents

15   were produced to you because they came through other

16   custodians?

17         MS. SNOW:  Yes.

18         But if you look at Exhibit 11, there's

19   an e-mail -- I'll give you a minute.

20         JUDGE WOLFSON:  Okay, I'm up to 11.

21         Go ahead.

22         MS. SNOW:  So if you look at the second

23   page of that exhibit, there's an e-mail that Ms. Lade

24   sent and there is not a single current custodian on

25   that e-mail, and it's all about --

Page 131

1            JUDGE WOLFSON:  So how did you get it?

2            MS. SNOW:  Because later in the thread

3    it was forwarded to a custodian.

4            JUDGE WOLFSON:  Okay.

5            I see you shaking your heads on this

6    side, but that's happenstance, that it ended up being

7    forwarded to someone.  She authored an e-mail, and if

8    it's relevant -- and she's authoring a lot of

9    documents.  I don't know why she would not be a

10   custodian to search if it's relevant material.

11           MS. LONG:  Your Honor, one, there is no

12   mention of SaveOn in this document; and two, I want

13   to be ███████████████████████████████████████

14   ████████████████████  ███████████████████████████

15   ██████████████████████████████████████████████

16   ███████████████████  ████████████████████████

17   █████████████████████████████████████

18           JUDGE WOLFSON:  Yes, but you take the

19   position that they are.  Yes, you do.  So the fact

20   that they don't isn't really the issue because you

21   are going to be arguing they are.

22           Look, you know what, I have enough on

23   this.  This is someone who you should be getting

24   documents from.  I'm adding it.

25           You know, everybody wants to slice this

Page 132

1   so finely.  It's a huge case.  There is a lot of

2   discovery on both sides.  Let's just do it instead of

3   fighting over it.  It will take you less time to

4   produce and move on than to fight.

5              MS. SNOW:  And, your Honor, to be clear

6   on those, for the regular set of search terms and the

7   full regular time period?

8              JUDGE WOLFSON:  Regular time period, but

9   I don't know about all the search terms.  You have to

10  hone something that is appropriate for her, it cannot

11  be a universe.  I have to have some limitations.

12             So work on those search terms with your

13  adversary please.

14             Okay?

15             MS. SNOW:  And turning to Ms. Deshaies.

16             JUDGE WOLFSON:  Yes.

17             MS. SNOW:  So her primary -- or her

18  relevance in the new additional document is she was

19  working with a really important third party.  The

20  third party is named Archbow.  It's all one word,

21  A-R-C-H-B-O-W.  That third party was working on the

22  ████████████████████████████████████████████

23  █████████████  ██████████████████████████████

24  █████████████████████████████████████████

25  ████████████████████████████████████████

Page 133



18          JUDGE WOLFSON:  Why is that critical?

19          MS. SNOW:  It's critical to our

20  mitigation defense.

21              They have these ways that they're trying

22  to use to limit their damages.

23          JUDGE WOLFSON:  Aren't there others

24  involved in this issue that are already custodians?

25          MS. SNOW:  There are others involved in

Page 134

1   the CAP program. ███████████████████████████

2   ███████████████████████    ██████████████

3   █████████████████████████████████████████████

4   ████████████████████████████████████

5           JUDGE WOLFSON:  I never understood

6   Erleada to be the driving drug in this whole case.

7           I'm not buying this one.  I have to have

8   some limits.  So I'm not ordering that to be done.

9           Does that take care of all our new

10  custodians?

11          Go ahead.

12          MS. LONG:  I think Mr. Knewitz is still

13  at issue, your Honor.  That was the custodian without

14  any new evidence that we had discussed earlier.  I

15  believe you███████████████████████████████████

16  █████████████████████████.

17          Mr. Knewitz is essentially a PR

18  professional. ████████████████████████

19  █████████████    ██████████████████████

20          JUDGE WOLFSON:  I'm not adding him.

21          You have the ones we've added, Lade,

22  Penkowski and White, but you're going to confer on

23  search terms, please.

24          MS. SNOW:  Yes.

25          Thank you.

Page 135

1                    JUDGE WOLFSON:  Anything else open?

2                    MR. SANDICK:  No.

3                    Thank you, your Honor.  We really

4      appreciate the evident time you spend reading all of

5      this paper and helping us resolve the issues.

6                    Thank you very much.

7                    JUDGE WOLFSON:  No problem.

8                    MR. DUNLAP:  We greatly appreciate your

9      attention to this.

10                    (Proceedings concluded at 1 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1                    C E R T I F I C A T E

2

3          I, RUTHANNE UNGERLEIDER, a Certified Court

4    Reporter and Notary Public of the State of New

5    Jersey, certify that the foregoing is a true and

6    accurate transcript of the stenographic notes of the

7    deposition of said witness who was first duly sworn

8    by me, on the date and place hereinbefore set forth.

9          I FURTHER CERTIFY that I am neither

10   attorney, nor counsel for, nor related to or

11   employed by, any of the parties to the action in

12   which this deposition was taken, and further that I

13   am not a relative or employee of any attorney or

14   counsel in this case, nor am I financially

15   interested in this case.

16

17

18

19

20

     RUTHANNE UNGERLEIDER, C.C.R., C.R.R.

21   LICENSE NO. XIO1634, XIO0115

22

23

24

25

| & | | |
|---|---|---|
| **&**   1:4 2:4,8,12 2:19 36:20 60:12,21,23 69:25 71:3 72:15 74:3 75:6 76:8 79:22 80:2 89:18 96:21 98:21,25 99:3 102:22 103:12 114:14 | | |

| 0 |
|---|
| **07102**   2:10 |

| 1 | | |
|---|---|---|
| **1**   4:25 8:13 135:10 | | |
| **10017**   2:20 | | |
| **10036**   2:5 | | |
| **101**   2:12 | | |
| **10104**   2:16 | | |
| **10178**   2:13 | | |
| **10:00**   1:19 | | |
| **11**   130:12,18,20 | | |
| **1133**   2:4 | | |
| **114**   67:21 | | |
| **11883**   136:20 | | |
| **119**   128:2 | | |
| **12**   101:13 111:19 112:23 126:25 | | |
| **120**   128:2 | | |
| **1200**   4:22 | | |

**1290**   2:15
**14**   88:11
**146**   112:21
**15**   13:3
**150,000**   40:23
**16**   52:17
**165**   127:10
**17**   108:12
**180,000**   40:22
**188,000**   40:13

| 2 |
|---|
| **2**   119:5 121:13 |
| **20**   16:14 25:20 120:9 |
| **20,000**   121:3 |
| **200**   119:7 125:12,18 |
| **2009**   5:22 8:13 59:9 |
| **2013**   10:12 12:8 14:24 |
| **2016**   4:25 5:18 9:21,22 10:1 19:21 25:9 34:14 38:24 103:4 104:9 106:4,16 110:2 |
| **2017**   130:11 |
| **2020**   107:4 |
| **2021**   106:3,9,20 108:19 |
| **2022**   4:25 19:21 24:16,23 26:18 27:8,13 27:22 28:2 |

30:22 34:14
38:24 42:1
43:23 56:1
57:8 103:2,14
103:22 104:9
104:22 105:21
105:24 106:1
106:11,16
118:14
**2023**   5:3,18
24:24
**2024**   1:19
**20th**   2:19
**22-2632**   1:3
**24**   1:18
**27**   112:20
**28**   67:11
**28th**   2:12
**29**   67:11

| 3 |
|---|
| **30**   67:11 104:7 |
| **349**   69:2 87:17 87:21 |

| 6 |
|---|
| **6**   129:20,25 |
| **6,000**   121:3 |
| **666**   2:19 |

| 7 |
|---|
| **7**   24:24 43:17 101:14 104:3 |

| 8 |
|---|
| **80**   93:19 94:16 94:18,21 |

| a |
|---|
| **aba**   23:9 |
| **able**   20:21 72:16 77:12 78:6,16 89:22 89:24 96:13 98:22 99:15 132:25 |
| **above**   1:13 |
| **absence**   73:9 |
| **absent**   74:10 87:25 |
| **absolutely** 36:13 72:5 79:8 123:8 |
| **absorb**   73:11 |
| **accessibility** 12:25 |
| **accredo**   90:22 90:22 |
| **accumulator** 9:19 10:18 26:12 29:2 30:12,21 108:4 108:5 129:7 130:7 131:13 131:15 |
| **accumulators** 57:23 106:21 107:4 132:22 |
| **accurate**   84:23 136:6 |
| **accusations** 98:11 |

act  65:22,25
  66:2,7
acting  44:12
  81:15
action  1:3 84:1
  136:11
actions  78:14
acts  65:20 66:8
actual  19:18
  54:6 59:3
  89:11 120:1
  121:20
actually  17:9
  18:2 20:15,17
  21:3 22:20
  31:16 39:18
  47:2 60:10
  61:8,10 75:5
  76:23 78:11
  83:25 84:13
  89:6,16 90:10
  92:1 96:11
  99:11 102:3
  103:13 107:8
  110:15 112:4
  117:21 118:25
  119:3,5 120:19
  125:24 126:9
  129:20
add  6:8,11,18
added  42:17
  44:6,18 45:10
  109:15 112:2
  134:21

adding  99:14
  102:24 131:24
  134:20
additional  5:14
  5:19 6:9 23:1
  34:21 44:7
  52:7 70:25
  71:1 77:10,14
  78:16,18 82:14
  84:8,9 86:23
  87:3 107:5,21
  107:23 109:2
  109:25 111:17
  116:21 117:14
  127:3 132:18
additionally
  103:17
address  3:5
  26:5,8 27:25
  51:6,14 55:16
  55:17 67:5
  89:2 103:20
  117:18
addressed
  21:20 34:18
  126:5
addressing
  55:15 118:21
adequately
  67:5
adhere  80:4
adherence
  80:14,18,22
  81:3,5 98:5,6

adjustment
  26:16 106:23
  130:7 131:14
  131:16
administering
  75:16
administers
  77:2 118:25
administrative
  60:24 68:24
admission
  29:13
advanced  73:2
advantage  52:7
adversaries
  11:17
adversary
  127:20 128:18
  132:13
advice  45:21,21
  47:21,22 50:23
advised  24:18
  56:14
advisor  47:17
affected  91:5
affiliate  74:24
affirmative
  18:1
affirmatively
  100:5
afford  73:11
  78:12,21
afield  83:12
afoul  20:18

age  20:12,22
aggressively
  39:16,21
ago  3:4 10:13
  23:16 31:6
  37:5,17 90:5
  94:3
agree  10:15
  11:4,4 13:13
  14:23 18:9
  35:10 41:17
  43:21 97:14,16
  126:23
agreed  4:25 6:4
  21:11 55:24
  59:4 104:7
  107:7,24,24
  109:10,25
  110:4 113:1
  114:5
agreement
  101:17 108:8
agreements
  38:18
agrees  4:2
  66:17 102:21
ahead  32:2
  34:5 41:18
  81:14 89:4
  130:21 134:11
allegation
  70:15 92:1
  94:13,16,18,21
  98:15

**allegations**
67:18,19,21
78:22 90:3
97:24
**allege** 60:3 62:3
66:9,10,23
89:5 98:13
**alleged** 64:4
65:6 66:8
**allegedly** 65:14
116:19
**alleges** 119:13
**alleging** 18:17
60:2 68:13
79:17 94:7
95:16
**allow** 129:12
133:1
**allowed** 13:14
67:19 83:19
98:1 103:15
**allows** 98:25
**amazing** 71:18
71:19
**ambiguous**
36:8 113:3
**america** 119:18
**american** 123:6
**americans** 81:2
**americas** 2:4
2:15 120:5
**amount** 74:10
76:10,11 77:17
119:14,22
121:2,4,23

125:18
**amounts** 61:13
63:16
**analyses** 81:21
**analysis** 79:22
80:3 81:17
82:18,21 84:20
85:15,18 87:1
87:2
**analyze** 77:4
**analyzed** 62:2
**andrew** 2:16
14:22
**answer** 7:8
11:2,9 15:9
29:12 62:10
85:25 88:19
105:12
**answered** 63:5
**answers** 13:18
82:9 92:15
**anticipation**
50:5
**anyone's**
123:25
**anyway** 57:22
61:9 75:24
**apex** 117:6,7
126:11 127:19
**apologies** 116:8
**apparently**
49:18 119:17
**appear** 39:10
**appeared** 109:5

**appears** 19:5
20:2 121:15,15
**apples** 40:20,20
**application**
28:24
**applied** 21:4
28:25
**applies** 36:5
51:19
**apply** 36:6
117:5
**appreciate** 33:8
35:15 37:23
38:1 79:4
135:4,8
**appropriate**
12:13 26:1
45:3 126:3
130:8 132:10
**approximately**
1:19 4:22
24:22
**april** 4:25
**archbow** 49:4
49:12 116:5,10
132:20
**area** 23:8 55:3
63:24 122:6
**areas** 23:9
31:22 41:19
64:1 123:7
**argue** 13:12
16:18 20:5
91:5 92:18
93:13 96:5

**argued** 42:5
**argues** 5:23
**arguing** 131:21
**argument**
17:13 20:13
24:4 35:15
37:23 38:5
39:19 42:7,13
54:5 64:11
66:16 72:14
73:5 75:1
78:20 84:12
87:24 92:25
93:11,15
101:10 109:9
113:9 125:2
131:16
**arguments** 6:1
28:6 38:1
62:17 75:17
96:9
**arrange** 76:25
**arrow** 2:7
127:25
**aside** 95:14
96:19
**asked** 6:7 7:3
8:9,12 37:21
40:17 41:2
42:8 44:8
55:25 56:16
81:8 85:14,22
90:11 92:5
102:19 108:21
110:19

**asking** 7:20,22
  21:12 22:6
  29:19 35:5
  44:10 55:1
  56:13 59:8
  61:18 81:16
  82:16 86:3
  88:7,9 93:6
**asks** 29:11 56:5
**aspect** 15:22
  69:9
**aspects** 119:3
  134:3
**assert** 13:15
**asserting** 4:1
**assertion** 46:14
  47:23
**assistance**
  19:12 59:1
  63:4,16 67:25
  70:17 71:25
  95:23 121:2,4
**assistant**
  121:16 125:14
**associate** 101:9
**association**
  102:25
**assume** 14:9,17
  125:11,15,16
  127:23
**assuming** 44:9
  44:14 79:4
  113:6
**attaching**
  122:12

**attention** 13:5
  135:9
**attorney** 44:12
  48:4,5,6,6
  136:10,13
**attorneys** 2:7
  2:11,14,18,21
  42:17 44:4,11
  45:13,14 54:9
  110:4
**august** 21:10
  43:20 103:4
**authored** 131:7
**authoring**
  131:8
**authority**
  121:18,20
  125:12
**availability**
  5:13 11:10
**available** 89:9
  91:16 121:2
**avenue** 2:4,12
  2:15,19
**avoid** 104:10
**aw** 85:5
**aware** 122:23
**awareness**
  55:12

**b**

**b** 2:1 132:21
**baby** 77:18
**back** 5:22 9:20
  11:5 12:4,24
  13:3 22:16

23:15 27:15,18
29:14 35:13
37:1,24 38:10
39:6,19,20
40:12 41:9,16
42:22 47:5
50:16 51:3
59:9 87:13
88:15 89:18
96:13 100:9
101:24 102:9
104:11,15
105:10 106:15
107:2 108:18
110:2 125:9
**backup** 89:15
**backwards**
  38:9
**badly** 69:5
**bag** 68:22
**base** 89:13
**based** 5:14
  17:17 41:12
  52:1 54:5
  82:10 100:25
  105:8 113:5,8
**basically** 71:14
  111:19
**basing** 98:16
**basis** 57:14
  59:14 67:17
**bear** 5:8 58:18
**bearing** 83:19
  83:24

**beat** 29:14
**began** 8:18,19
  24:16 27:12
**beginning**
  24:23 27:13
  74:20
**behalf** 70:21
  71:2 78:10
**belabor** 67:15
**belief** 66:18
**believe** 8:24
  11:5 13:1
  16:19 18:2
  21:3 25:21
  27:23 31:5,6
  31:12 33:12
  34:17 36:17,21
  36:24 51:18
  56:18 57:6,8
  57:12 65:11,18
  67:10 70:24
  75:24 76:17
  91:25 103:11
  106:25 107:20
  109:4 112:18
  116:13,18
  122:21 130:4
  134:15
**belknap** 2:4
**benefit** 23:6
  25:15 48:18
  59:24 71:17
  74:1 82:21
  99:12 117:15

**[benefits - cap]**                                                    Page 5

| | | | **c** |
|---|---|---|---|

**benefits**  21:14
23:14 24:8,13
24:17,21 25:8
26:3 28:21,22
29:4 30:10
32:4 56:5,11
56:21 81:1
98:6 104:20
**benevolent**
65:4
**best**  26:20
**better**  33:14
41:5,14 64:13
**beyond**  22:11
22:19 31:8
56:23 87:22
**big**  13:11,12
36:2,2 75:21
**bigger**  94:5
**binding**  29:12
119:6
**bit**  71:11
**blasine**  111:15
116:8
**blow**  23:2
**blowback**
133:12
**borne**  99:9
**bottom**  8:10
64:9,10 130:4
**bought**  71:1
**brand**  129:18
130:6,9
**breach**  62:8
74:6 83:7

**breached**  66:6
**breaches**  65:15
**break**  4:13
69:19 99:20,25
**brief**  4:12
99:23 110:14
113:14,15
121:12
**briefed**  55:14
101:8
**briefing**  19:4
112:21
**briefly**  7:19
48:23 89:3
**bring**  13:4
20:14 35:11
43:6 60:1
120:21
**bringing**  66:3
**broad**  8:4
10:23 22:19
28:14 35:10
63:25 67:11
79:15
**broaden**  63:12
**broader**  16:20
**broadly**  69:17
75:1 76:8
**brought**  20:25
111:12,14
114:18 118:23
**budget**  59:2,12
59:15,20 60:20
61:1,2,7,7 64:7
70:1

**budgeting**
61:14
**budgets**  59:3
59:10 61:16,16
62:25
**bunch**  88:10
95:22
**burden**  12:6,25
13:10,12,14
15:11,22,23,25
23:4 31:15
32:11 35:4,7
48:3 50:10
54:5 59:24
73:15,25
**burdenness**
13:9
**burdensome**
12:7,9 40:15
**business**  42:25
44:5,13,20,21
44:22 45:1,5
45:23 46:22
47:15,16,18,19
48:7,12,20
50:17,20,21,24
51:2 52:5,9,17
60:16,17 68:25
76:25 82:25
83:14 85:11,20
90:21,24 98:3
**buy**  60:12 78:9
**buying**  12:9
75:18 99:8
134:7

**c**  2:3 132:21
136:1,1
**c.c.r.**  136:20
**c.r.r.**  136:20
**cabined**  28:13
38:15 105:3
108:16
**calendar**  115:3
116:12,13
122:12,15
**calender**
113:22
**call**  17:6 24:8
64:5 84:2 89:8
**called**  21:13
26:14 29:1
49:4 114:1
129:17 133:7
**camara**  42:16
54:10
**camera**  43:3
**camouflage**
27:5
**cap**  7:14 26:14
26:16 43:10,14
101:19,22
103:1,5,13
104:8,13,19
106:9,18,19
107:7,14,23,25
108:10,16,17
108:23 109:5
109:14,16,22
111:1 116:21

**[cap - circumstantial]**

120:24 121:23
122:14 126:25
127:1,2 132:22
133:7,10,12,14
133:16 134:1,2
**capacity** 44:22
**capture** 37:3
38:16 40:4
44:2 47:11
107:8 110:24
124:1
**captured**
107:15 122:8
122:11 123:22
**capturing**
46:23,24
**car** 83:2,3
84:15,16,17
**card** 21:13 22:2
25:15 36:16,18
46:20,24 47:1
47:4,5,6 49:3
49:12 51:8
56:10 116:1
118:21,23,25
119:6 125:19
**care** 1:4 134:9
**careful** 131:13
**carepath** 3:18
10:1,8,18 42:4
50:16 60:5,8
60:10 61:1,14
62:8 64:4
66:19 67:25
69:11,13,20,23

69:25 70:9,16
70:23,25 71:25
72:15 73:2,8
73:10 74:24
75:3 76:3,22
76:23 77:2,9
77:15 78:17,18
79:5,10,13,23
80:3,5 81:23
82:2,4,13,20,21
82:24 83:10,17
84:1,3,10
87:23 89:23
92:12 93:2,16
94:5 95:23
98:24,24 99:15
114:12,16,23
115:9,18,19
119:1,10 121:7
121:21 123:9
123:12 132:25
133:13 134:4
**carepath's** 6:22
118:12,18
120:14
**cars** 83:5
**case** 3:6 8:1
12:14 13:11,12
18:2,11 22:21
25:9 28:23
29:8 30:13
35:24 36:2
45:1 48:9 52:6
59:24 60:14
64:17 68:14

69:2 73:7,7
74:20,21 75:15
75:20 76:5,7,7
80:13 82:25
83:11,20 85:7
85:12 87:14
88:8 90:7 91:1
92:12,25 95:6
95:8 96:7,9,13
97:6,6,17
110:6 114:4
116:16 132:1
134:6 136:14
136:15
**cases** 45:6
**categories**
33:16 40:1,12
41:12
**category** 3:25
27:13 46:3
116:3
**caught** 56:1
**cause** 65:25
66:3 95:16
96:2
**caused** 58:19
60:2 84:9,9
94:7
**causes** 67:22
70:16 78:14
**causing** 74:8
**center** 2:9
**central** 95:6
**certain** 20:12
33:23 40:14

59:18 116:1
117:13 118:2
119:22
**certainly** 4:16
25:24 64:12
66:25 88:15
106:4,7 109:7
118:1 124:1
125:23
**certified** 1:15
136:3
**certify** 136:5,9
**cetera** 4:20
10:25 19:6
20:12,23 76:20
101:14 113:23
**chairman**
119:18
**challenged**
69:12
**chambers**
102:4
**change** 104:20
120:25 121:1,4
**changed** 93:17
**changes** 14:25
43:13 90:18
121:22,23
133:13
**charge** 91:1,3
**charitable** 61:3
82:24
**children** 18:14
**circumstantial**
21:2

**cite** 89:7
**cited** 65:12
  115:2,22
**cites** 93:23
  115:1
**citing** 133:5
**civil** 1:3
**claim** 36:3 60:1
  65:17 67:13
  84:18 87:17
**claiming**
  111:22 117:1
**claims** 62:5
**clarify** 34:11
  65:16 68:12
  104:1 121:19
**clarifying** 34:4
**clause** 19:9
  20:2 34:25
  36:10
**clear** 18:7
  96:16 97:18
  107:2 108:9
  112:19 132:5
**clearly** 128:5
**clerk** 102:8
**client** 14:25
  72:17
**client's** 9:9
**clients** 70:22
  71:3
**close** 42:25
  97:10
**closed** 128:4

**closely** 130:7
**coherent** 13:2
**cole** 2:19
**collecting**
  46:16
**collects** 90:23
**colon** 68:22
**colostomy**
  68:22
**come** 10:19
  12:24 16:1
  33:14 39:22
  40:2 41:5
  44:23 60:20
  68:17 69:13
  88:15 95:21,22
  96:13 111:7
  117:20 122:5
  122:23
**comes** 35:4
  38:14 78:2
  115:25 117:7
  133:3
**commencing**
  1:19
**commercial**
  17:10 71:14
**commit** 98:23
**commitment**
  98:18
**common** 48:5
**commonly** 95:8
**communicate**
  53:20

**communicated**
  102:4,6 122:17
**communication**
  44:25 47:10,25
  51:17,25 61:19
  72:7
**communicati...**
  45:5,23 46:20
  46:21 47:12,15
  49:2,10,25
  50:12 51:14,23
  52:3 53:7,10
  53:16 54:14,24
  59:10,12,22
  62:22,25 63:19
  64:6,12,14
  70:2 80:6
  115:15 116:11
  124:7 134:19
**companies** 13:2
  13:12 71:9
  75:7 77:6
  87:16 88:3
  95:9 97:25
  98:7,8 114:15
**company** 9:23
  21:13 45:20
  46:6 48:21
  50:2,3,17
  63:20,21 73:13
  73:18,22 74:3
  75:21 76:1
  79:11 80:8,9
  81:2,18 90:17
  119:18 121:7

  123:8 129:3
**company's**
  29:20 87:20
  95:11
**compare** 87:1
**comparison**
  31:10 40:20
**compel** 111:19
**competitors**
  60:13 71:13
  78:9 90:1
**complaining**
  17:7
**complaint**
  18:20 60:6
  66:11 67:17,22
  78:23 83:12
  89:6 93:20
  97:1,3,3
**complete** 45:8
**completely**
  30:13
**complicated**
  73:21
**complied** 41:1
**components**
  63:20
**comprised**
  130:5
**compromise**
  104:5,6 105:19
**computer**
  48:14
**concede** 121:17

[conceded - corner]                                    Page 8

conceded 35:18
conceivable
   18:10
conceptualize
   123:3
concern 14:12
   27:25 32:8
   49:9 117:6
concerned
   133:11
concerning
   113:23
concerns
   125:23
concessions
   21:19
concluded 98:5
   135:10
conclusion 28:2
condition 7:25
   21:23
conditions 3:13
   3:19,22 4:24
   5:12,15,25
   7:22,24 9:22
   16:22 17:3,12
   18:9 19:19
   20:3,22 21:6
   23:4 26:11,25
   29:21 36:23
   37:25 38:10
   42:2,6,10 43:9
   43:14 54:20,25
   57:11 58:5
   62:8 74:6 83:7

118:12,18
   120:15 121:1
conduct 6:7
   93:18
conducted
   24:22 47:19
   56:11
conducting
   24:17
confer 3:10
   14:5,10,18
   15:12,19 31:2
   32:16,19 39:4
   41:10,15 54:17
   100:25 103:11
   104:3,12,25
   111:8 128:18
   134:22
conference 3:4
   24:15 43:11
   100:13 104:7
   112:10 114:20
   127:8
conferences 3:6
conferred
   16:12 58:12
   112:25
conferring
   34:22 37:2
confers 104:16
congressional
   71:8 77:5
connection 3:2
   6:3

connects 58:6
consequences
   77:23 78:13
   98:25
consider
   104:12,17
considered
   106:21 114:7
   125:3
considering
   102:20 104:4
   120:13
consistent 9:8
   15:4 104:25
   114:9 115:21
   127:6
consistently
   93:22 114:20
   117:11 131:14
conspiracy
   79:16,18
constantly 31:1
construction
   36:9
consultant 49:4
consultants
   49:13
consumer 23:9
   23:10 65:22
   69:3,4
consumers 62:4
   69:4
contact 68:17
contemplated
   20:15

content 122:13
contention 7:4
context 4:5
   9:18 19:13
   20:4 29:1 35:6
   36:22 48:5
   52:16 117:8
   125:5 126:18
continue 5:2
   34:22 37:1
   98:21
continues
   89:19,19
contract 18:17
   50:15,22 65:15
   66:6 125:13
contractual
   18:23 20:4
contradicts
   37:16
conveying
   45:20
convince 13:7
convinced 26:2
convincing
   100:24
copied 47:20,25
   52:4 53:21
copies 56:11
copy 15:17
   50:18 118:3
   129:22 130:13
core 110:10
corner 73:22
   82:17 85:10

corners 81:18
corporate
  75:14
correct 16:9
  26:8 54:10
  110:4
correctly 19:7
corresponden...
  7:11 57:13
  81:9 102:9
  104:24
cost 48:17 89:6
  89:10 99:9
  106:22 133:1
costs 70:18,19
  80:10,11 99:4
counsel 2:23
  15:17 25:16
  103:12 121:19
  124:9 125:14
  136:10,14
count 22:4
counter 119:5
counteroffer
  25:21
counterpart
  50:17
counterparty
  116:1
counting 17:8
country 68:17
couple 3:8 9:4
  19:1 23:16
  28:20 49:1
  73:19 88:1

101:12 122:10
125:23
coupon 4:1
  18:2 19:6,10
  22:2,13 25:15
  32:10 34:16,25
  35:23 36:16,17
  36:20 37:7
coupons 10:25
  17:21 23:21
  39:17
course 15:17
  21:2 43:6
  49:25 59:3
  77:3 84:11
  91:14 92:2
  108:4
court 1:1,15
  5:1 32:22 36:7
  66:17,20 67:16
  69:3 80:20
  99:21 127:11
  127:23 136:3
court's 52:18
  65:12
cover 7:10 8:4
  29:7
covered 8:6
  20:16
covering
  107:25 109:11
create 33:15
  35:8 40:3
  68:25 81:16

created 9:21
  64:25 79:6
creates 59:24
creating 10:23
  45:16
criteria 20:20
  25:14 28:4,12
  31:8,16 34:12
  39:11
critical 12:21
  72:5,8 85:6
  133:18,19
critiquing
  42:20
crucial 14:24
  133:15
crux 12:14 31:5
cry 75:21
cumbersome
  12:4
cummis 2:8,12
cumulative
  109:12,13
  117:9
curious 74:18
current 9:25
  130:24
custodial 47:2
custodian 6:4
  46:2,6 102:18
  105:13 114:4
  115:3 116:16
  128:21 130:24
  131:3,10
  134:13

custodian's
  6:17
custodians 3:14
  6:11 33:22
  40:22 42:15
  44:4,18,25
  45:10 51:1
  52:6,17 53:21
  54:4 55:20
  61:23 101:8,14
  101:15 102:25
  103:3,5 104:13
  107:1 108:10
  108:12,25
  109:2,11,22,23
  109:24 111:12
  111:18,25
  112:5,9,11,23
  113:11,16
  116:21 117:6
  117:15 126:7
  126:11 127:1,1
  127:3,4,10
  130:16 133:24
  134:10
customer 130:6
customers
  85:17
cutoff 24:24
cuts 16:14

**d**

d 129:15 133:8
damage 67:22
  76:12 84:8

**damaged** 83:25
**damages** 63:22
   70:12,14,20
   71:23 72:2,9
   79:25 93:9,16
   96:2,5,7 97:7
   99:14,18
   133:22
**darn** 15:23
**darzalex** 79:12
**data** 59:2,20
   63:1,14 72:6
   76:20 79:23
   80:25 88:24
   89:11 90:12,15
   96:10 98:4,15
**date** 24:24 27:9
   27:14 105:22
   108:19,20,24
   118:6 136:8
**dates** 27:18
   63:15 105:20
**day** 25:4 42:25
   72:20 103:25
   114:16,16,22
   114:23 115:7,7
   120:21,22
**days** 40:2
**de** 42:16 53:23
   54:10
**deal** 3:16 10:14
   105:17 126:11
**dealership** 83:2
   83:4 84:15,17

**dealing** 3:18
   5:4 76:15
**dealt** 125:22,25
**deceived** 66:18
**deception**
   66:15 98:9
**deceptions** 62:4
**deceptive** 65:23
   66:7,8
**decide** 44:11
   133:9
**decided** 20:14
   39:14 57:20,21
   75:10 76:25
   77:15 109:13
   112:11,19
   124:25
**decides** 70:1
**decision** 18:19
   42:9 119:21,25
   120:1 134:2
**decisions** 63:7
   63:9 75:13
   114:12 115:18
   120:12,20
   121:6,20,25
   123:22
**deck** 122:22
**decks** 115:22
   122:2,16 124:8
**declined** 25:1
   93:25 104:18
**declining** 56:3
   56:18

**decreased**
   93:22
**decreasing**
   100:5
**deductibles**
   10:5
**defendant** 1:9
   2:18,21 6:6
   42:4 66:18
   102:17
**defendant's**
   66:16,20
**defendants** 9:7
**defense** 15:17
   133:20
**defenses** 28:7
   72:9
**deficient** 42:14
**define** 33:22
   35:16 64:2
**defined** 41:19
   54:14 74:22
**definition**
   23:17
**definitively**
   128:4
**delta** 76:11
**demonstrates**
   103:18
**depending**
   46:13 88:15
**depose** 117:14
   124:2 127:24
**deposition**
   136:7,12

**depositions**
   117:8 124:13
**deprived** 68:19
   68:23
**described**
   10:25
**describing**
   52:15
**description**
   58:23
**deshaies**
   111:15 112:13
   132:15 133:3
**designated**
   114:4
**designed** 6:9
   37:3 60:11
   99:12
**despite** 72:16
**detailed** 7:5
**determination**
   64:23 65:3
   119:8
**determine**
   11:17,17 24:18
   36:14 112:7
**determined**
   63:4
**determining**
   19:12 46:3
   61:23 133:6
**development**
   82:6
**develops** 77:1

| | | | |
|---|---|---|---|
| **device**  7:7 | **discourse**  95:9 | **dismissal**  12:19 | 5:7,14,19,21 |
| **different**  5:10 | **discoverable** | **dispute**  4:16 | 6:7,10,14,17 |
| 10:6 30:18 | 3:20 | 43:22 84:24 | 7:21 11:11 |
| 38:8 80:10 | **discovery**  3:12 | 102:12,21 | 12:1 15:2,5 |
| 94:3 113:9 | 3:17 4:18 5:1,3 | 104:10 | 16:5,14,20 |
| 116:11 123:7 | 7:3,6,11 9:3 | **disputes**  3:3,17 | 17:18 19:18,22 |
| **differently** | 12:17,21 29:15 | 101:13 | 21:15 22:6,10 |
| 84:12 | 29:17 38:7 | **disputing** | 22:14 23:13 |
| **differing** | 54:21 62:14 | 120:22,23 | 24:7 25:2,12 |
| 102:14 | 67:20 68:3,16 | **district**  1:1,2 | 26:10 27:4 |
| **dig**  26:20 | 69:15,22 81:9 | **division**  60:21 | 29:6,24 30:6 |
| **digital**  15:4 | 103:8,15 | **docket**  127:10 | 30:14,24 31:7 |
| **diligently**  24:1 | 106:25 114:6 | **doctrine**  19:7 | 31:12,18 32:13 |
| **direct**  15:10 | 132:2 | 36:12 50:1 | 33:13 38:19,22 |
| 78:13 109:1 | **discuss**  29:25 | 117:7 127:19 | 38:23,25 39:15 |
| **directed**  5:2 | 31:4 33:9 49:6 | **document**  7:20 | 40:14 41:6 |
| **directing** | 127:18 | 8:3 10:11 | 42:9,23 43:2 |
| 100:20 | **discussed**  11:8 | 11:21 23:5 | 43:12,13,14 |
| **directly**  21:12 | 56:6 134:14 | 27:9 30:3 32:1 | 44:15,23 45:2 |
| 78:22 | **discussing** | 32:2 33:9,19 | 45:7,15 46:10 |
| **disagree** | 119:12 | 51:11 52:14 | 47:2,3,6,24 |
| 126:18 | **discussion**  32:7 | 56:7 57:15 | 48:12,13 49:1 |
| **disagreed** | 50:5 105:8 | 59:1,5 84:25 | 51:12 52:8 |
| 67:16 | 118:17 122:22 | 85:24 86:2 | 53:22 54:2 |
| **disagreement** | 122:25 123:24 | 89:9 116:6,20 | 56:15,21 57:7 |
| 43:2 | **discussions** | 116:25 118:9 | 57:9,18,25 |
| **disagrees**  66:20 | 33:11 49:14 | 118:13,15 | 58:15,18,22 |
| **disburses**  119:1 | 50:19,20 106:1 | 121:15,16 | 59:9,11,17 |
| **discount**  22:2 | 106:3,4,7 | 122:19 125:16 | 60:19 61:13,14 |
| 23:10 25:15 | 108:24 115:9 | 131:12,17 | 61:17 62:20 |
| 32:10 33:9 | 122:2 124:3,4 | 132:18 | 63:4 69:11 |
| 34:16,25 35:6 | 124:20,21 | **documented** | 70:11 72:4 |
| 35:24 36:16,18 | 125:7 | 71:7 | 73:6 76:18,19 |
| 37:7 | **dismiss**  19:4 | **documents** | 77:8 79:5,21 |
| | 67:17 | 3:18 4:22,24 | 80:16,19 82:12 |

[documents - e]                                                    Page 12

| | | | |
|---|---|---|---|
| 82:17 84:13 | **door**   108:17 | 98:7,8,12,22 | 37:20 40:6 |
| 85:1,15 86:10 | 128:4 | 99:1,13 100:3 | 41:22 43:4,21 |
| 86:22,25 87:5 | **doors**   127:2 | 101:2 133:7,17 | 44:16,19 48:22 |
| 100:11,16 | **doubt**   4:15 | 134:6 | 48:25 49:20 |
| 107:8,13 108:4 | **draft**   88:8 | **drugs**   10:5 | 50:8 51:4 53:2 |
| 111:4,23 113:6 | **drafted**   8:1,4 | 18:15 24:19,25 | 53:5,11 54:11 |
| 113:8,13,13,14 | **drafting**   3:21 | 25:11 42:7,10 | 54:16 55:5,11 |
| 113:21 114:9 | 6:8,10,12 7:21 | 60:12,13 63:16 | 55:18 57:4 |
| 114:24 115:1,6 | 7:24 | 64:16 68:24 | 58:11 60:1 |
| 115:13,22 | **dramatically** | 69:18 70:23 | 65:8,11 67:14 |
| 116:4 117:19 | 32:11 | 71:2,12,13 | 69:24 70:10 |
| 117:21,23 | **drawn**   6:23 | 73:11,24 75:8 | 72:22 75:17 |
| 118:20 120:2 | **drive**   1:17 | 78:2,9 80:5,10 | 76:16 77:21 |
| 120:11,19 | 77:10 78:16 | 80:11,11 82:2 | 79:17,21 80:2 |
| 123:1,23 124:8 | 81:24 | 82:7,14 85:16 | 81:12,15 82:7 |
| 124:13,16 | **driven**   94:8 | 85:17 86:11 | 82:11 83:21,24 |
| 125:2,5,6 | **driving**   22:3 | 87:18,19,20 | 85:5,11 86:13 |
| 127:21 129:4 | 79:25 134:6 | 88:7,8,10,11,12 | 86:15,20 88:6 |
| 130:14 131:9 | **drop**   50:20 | 89:1,7,11,25 | 88:17,23 89:2 |
| 131:24 133:11 | **dropped**   49:16 | 90:1,6,23 93:3 | 89:5 91:11,13 |
| **doing**   4:19 | **drops**   89:13 | 93:22 98:23 | 91:24 92:24 |
| 13:15 18:7 | **drug**   71:4,4,8 | 99:8 121:5 | 93:4,19 94:12 |
| 21:6 31:3 | 72:1 73:18,18 | 123:6 | 95:18 96:1,17 |
| 39:22 44:21,22 | 73:23 76:24 | **due**   93:13 96:6 | 97:1,18 98:10 |
| 45:15 46:1,15 | 77:1,6 78:16 | **duly**   136:7 | 98:19 99:24 |
| 46:23 47:10,16 | 79:12 83:14 | **dunlap**   2:16 | 100:2 101:2,5 |
| 47:18 48:7,20 | 84:6,6 88:3 | 6:25 7:16,19 | 101:9 135:8 |
| 50:4 51:2 52:6 | 89:16,17,23 | 8:14,17 14:9 | **duplicative** |
| 60:15 61:8 | 90:14,24 91:5 | 14:12,17 16:10 | 128:25 |
| 65:4 71:2 | 91:7,8 92:20 | 16:19 17:1,25 | **dupped**   53:23 |
| 75:24 94:10 | 93:13,21 94:6 | 18:25 19:20 | **dust**   83:15 |
| 109:18 | 94:7,9,14 | 23:16,23 24:11 | |
| **dollar**   13:11 | 95:10,11,16 | 29:10 34:3,6 | **e** |
| 125:12 | 96:10,14,22 | 34:11 35:25 | **e**   2:1,1,3,3,20 |
| | 97:6,20,25 | 36:14 37:4,9 | 46:7,9,16 |
| | | | 47:20,21 48:4 |

**[e - essence]**                                                    Page 13

49:8 50:6,18
52:4,5,22,25
53:6 102:22
122:16,24
123:19,25
124:5,19 129:1
129:7,9,15,20
130:19,23,25
131:7 132:23
133:8,8 136:1
136:1
**earlier**  8:19
55:24 56:7
103:14,16,22
104:14 105:22
108:24 134:14
**early**  26:18
**ease**  5:11
**easy**  12:12
**economic**  62:18
65:6 69:12
**effect**  37:5
104:22 105:23
106:11
**efficacy**  99:5
**effort**  15:5 27:2
61:3 73:7,25
**efforts**  27:19
28:3,11 72:23
73:8 92:14
**ei**  56:5
**eight**  6:17
**either**  5:23
21:11 26:22
41:7 46:12

50:2 115:2
**ejusdem**  19:6
**elements**  65:16
65:21
**eligibility**  20:10
20:20 23:23,24
24:10 25:14
27:20 28:4,12
30:18 31:8,16
34:12 39:11
**eligible**  18:14
**eliminate**  31:15
72:3
**eliminates**  72:2
84:8
**elizabeth**  2:17
**elsberg**  2:15
**emphasis**
123:10
**employ**  16:11
**employed**
136:11
**employee**  46:7
50:3 130:9
136:13
**employees**
129:18
**employers**  99:9
**encompass**
11:1 108:3
**encourage**
26:23 60:11
**ended**  3:11
131:6

**ends**  51:20
**enforce**  20:20
20:21,24 31:21
31:23 39:21
57:21 65:1
**enforced**  42:11
**enforcement**
3:21 5:11,24
6:11,14 16:4
16:21 19:18,22
20:7 21:9,15
21:18 25:13,14
26:2,11 27:19
28:3,11 29:21
31:8 34:7,8,18
34:24 38:8,11
38:12 39:7
42:7 57:11,17
57:19,25
**enforcing**  16:8
21:6 23:18,18
23:19 24:2
28:17 31:20
33:11 39:10,18
**engage**  32:15
32:18
**engaged**  30:23
48:19 72:17
**enlisting**  62:4
**enroll**  70:22
80:5
**enrolled**  63:15
66:19
**enrolling**  62:7

**enrollment**
63:15
**enter**  50:15
**entered**  3:7
**entire**  38:2
64:15 72:3
73:22 90:17
**entities**  60:25
74:12
**entitled**  1:13
31:6 65:1
106:25
**entitlement**
55:9
**entity**  5:10
60:24 75:15
76:4,23 77:1,2
77:11 82:15
84:7
**entries**  48:16
**entry**  127:10
**equivalent**  15:4
**erleada**  133:8
133:10 134:2,4
134:6
**ernie**  113:12
**escalates**  32:11
**esi**  108:3
110:23
**esi's**  108:5,6
**esq**  2:5,6,6,7,10
2:13,16,17,17
2:20,24
**essence**  106:18
106:22

[essentially - figure]                                                    Page 14

**essentially**  7:12
  29:5 32:6 50:3
  72:15 75:9,20
  80:8 90:13
  106:24 134:17
**establish**  61:22
**et**  4:19 10:25
  19:6 20:12,23
  76:20 101:14
  113:23
**evans**  2:20
**event**  30:9 98:3
  112:7
**events**  43:19
**everybody**  4:2
  33:20 129:2
  131:25
**everyone's**
  43:24
**evidence**  4:16
  20:19 21:2
  44:4 69:6
  99:10 103:18
  112:13 114:25
  115:23,25
  124:4,18 125:6
  129:19 130:11
  134:14
**evident**  135:4
**exact**  63:8
**exactly**  37:9
  76:19
**example**  18:12
  20:11 25:13
  46:5,19 47:8

50:14 76:6
  107:3 113:22
  122:14,23
  123:11
**exclude**  38:3
  121:1
**excluded**  42:3
**exclusions**  24:5
**exclusively**
  45:18 68:15
**executive**  114:2
  114:11 115:16
**executives**  27:4
  114:14 119:20
  120:8 122:4
  128:24
**exhibit**  119:5
  121:13 129:20
  129:23 130:11
  130:18,23
**exhibits**  112:21
**exist**  9:20 10:2
  10:8,9,17
  11:15 38:22
  85:15 86:10
  99:2
**existence**  27:21
  72:24
**existent**  48:19
**existing**  8:3
  53:21 81:23
**exists**  76:4
**expansion**  29:4
**expenditure**
  84:10

**expensive**  68:1
**explain**  12:6
  29:25 90:18
**explained**  9:7
  14:24
**explaining**
  14:13
**explicitly**  92:9
**express**  80:24
  80:25 90:22
**extend**  6:13
**extensive**  72:23
**extent**  11:6,25
  17:25 26:13,13
  36:7 38:22,22
  41:17 43:21
  45:22 46:10
  47:18 50:11
  58:19 64:3
  100:8 105:10
  111:3 121:25
  123:23
**external**  45:6
  49:25 50:12,19
**extreme**  33:1

**f**

**f**  2:1 136:1
**facing**  65:22,22
**fact**  27:22 61:1
  61:2,6 89:12
  89:15,24 94:14
  98:5,21 99:2
  124:19 129:6
  131:19 133:4

**factors**  61:7
  70:2 91:9
**failed**  32:15
**failing**  62:6
  65:13 66:5
**fair**  91:2
  125:11
**fairly**  73:7
  112:18,19
**fall**  3:25 5:20
  35:19,20 106:3
**falls**  4:1 46:3
  52:14
**false**  80:18
  98:11
**familiar**  36:11
**family**  75:7
  114:15
**fang**  2:24 102:8
  102:11 105:1
**far**  25:1 27:18
  33:1 60:22
  83:11,11 95:5
**fault**  95:11,11
**favor**  87:25
**federal**  18:12
**fifth**  94:1
**fight**  132:4
**fighting**  89:18
  132:3
**figure**  9:21
  13:23 26:20
  35:10,22 39:14
  63:21 70:20
  73:22 76:2

77:8,10 81:19
82:3
**figured** 81:4
**figuring** 27:7
39:25
**file** 14:18,22
**files** 9:9 45:12
45:17 46:10
52:9 73:20
85:19 114:8
115:20 117:1,9
117:13,20
122:3 123:25
**final** 24:21 25:3
**finally** 110:18
**finance** 81:24
130:6
**financial** 3:13
19:11 58:15
60:4,8 61:11
63:24 64:4
67:10 76:12
77:23 89:20
100:8,21
**financially**
136:14
**financials**
76:15 89:14
**find** 4:23 11:25
33:21 68:18
70:5 74:18
80:19 86:25
87:1
**finding** 27:2
129:25

**finds** 36:7
**fine** 14:2,8 68:4
69:8 84:11
128:22
**finely** 132:1
**finished** 100:2
**first** 3:16,17
13:8 19:3 21:9
22:1 26:9
28:21 49:7
54:1 58:2
61:25 66:17
75:3 81:15
90:20 91:24
100:24 102:16
102:16 103:8
113:12 114:17
116:12 117:18
118:11 122:11
124:12 130:4
136:7
**five** 55:22
109:19 112:4,6
**floor** 2:12,19
**focus** 18:18
62:13,16 68:9
**focused** 68:5
**focusing** 22:22
**folks** 49:2,12
53:14 116:9
123:5,22
**follow** 32:1
**followed** 11:19
127:8

**following** 58:18
**footnotes** 89:13
**forcing** 74:7
**forecasted** 59:3
**foreclose**
100:22
**foregoing**
136:5
**forenoon** 1:20
**forget** 115:7
**form** 96:5
**former** 44:21
**forth** 29:14
41:16 47:5
50:16 100:9
101:24 105:10
112:12 126:19
127:9 136:8
**forthcoming**
14:13,24
**forward** 4:9
56:1
**forwarded**
131:3,7
**found** 40:13
116:12
**four** 55:23
109:17 127:17
**frame** 5:20
27:25
**frankly** 12:7
64:16 70:5
84:16 110:13
127:7

**fraud** 69:4
**freda** 2:2
**free** 22:2 32:10
88:15
**friday** 14:7,8
15:10,14,17
42:22,24,25
**friend** 34:8
**front** 58:4
**full** 25:8 128:20
132:7
**function** 49:18
**functional** 50:3
**functioned**
49:18
**functioning**
48:6
**fund** 75:9,9
**fundamental**
70:12,13
**fundamentally**
77:22
**funded** 79:7
**funding** 61:9
92:13,18 93:16
**funds** 60:20
70:17 71:25
75:3 78:18
84:10 119:1
**further** 5:22
100:21 107:2
136:9,12

| g | | | |
|---|---|---|---|
| **ganas** 96:12 | 25:10,12 26:3 | 79:1 81:14,17 | 45:18,20 47:11 |
| **gap** 116:23 | 36:25 54:4 | 89:4,12 90:16 | 47:19 48:1,13 |
| **gather** 54:2 | 69:22 77:9,9 | 90:17 91:18 | 49:5 50:13 |
| **gay** 2:15 | 90:9 105:6 | 92:13 99:13 | 51:25 52:5,7 |
| **gbl** 60:1 65:17 | 110:19 129:22 | 107:2 124:24 | 54:8 56:20 |
| 72:10 84:18 | 130:13,19 | 125:24 130:21 | 57:13 59:8,22 |
| 87:17 | **given** 4:18 8:21 | 134:11 | 61:9 64:8,9,10 |
| **gee** 69:16 | 15:11 31:21 | **goal** 41:5 | 75:24,25 77:9 |
| **general** 6:8,22 | 33:15,24 41:11 | **goes** 12:19 | 79:24 85:10 |
| 16:22 17:3 | 45:13 62:25 | 19:22 22:19 | 86:18 87:13 |
| 31:24 33:15 | 63:1,2,3 | 23:5 27:2 | 91:4 92:5,7,17 |
| 36:23 39:23 | **gives** 38:3 | 34:12 55:11 | 92:23 93:4,12 |
| 40:1 58:23 | **giving** 26:10 | 57:16 61:4 | 94:16,17,20 |
| 60:17 78:20 | 125:15,17,18 | 67:2 70:12 | 95:6,19,19,20 |
| **generally** 21:7 | 126:7 | 71:20,22 73:21 | 95:25 96:4,20 |
| 25:23 28:3,5 | **glad** 25:25 26:5 | 77:22 99:10 | 96:25 97:7,9 |
| 28:11,23 73:3 | 34:22 37:1 | 119:11,12 | 97:10,15,17,19 |
| 73:12 77:17 | 54:16 57:4 | **going** 3:12,15 | 97:21 98:14 |
| 100:8 | 61:23 70:10 | 4:20 8:8,10 | 100:4,9 101:10 |
| **generate** 85:11 | 76:19 78:25 | 9:10 10:7 11:5 | 103:20 106:13 |
| 85:14 | 100:15 | 11:23 12:4,14 | 106:15 109:1 |
| **generated** | **go** 4:10,18 5:21 | 12:17,21 13:3 | 110:19 119:9 |
| 85:12 103:3 | 9:14 22:11 | 13:7,18 14:15 | 120:8,9,24,25 |
| **generating** | 25:13 27:6,15 | 14:22 15:22 | 121:1,3 124:17 |
| 118:17 | 27:18 28:5,17 | 16:1 23:12 | 126:10 127:1,2 |
| **generis** 19:6 | 31:1,20 32:2 | 24:4,7 25:8 | 127:24 128:23 |
| **george** 2:6,23 | 33:20 34:5 | 27:17 29:23 | 129:11 131:21 |
| **getting** 50:11 | 35:13 36:10 | 30:14 31:15 | 134:22 |
| 52:18,19 56:21 | 37:1 39:5,6,18 | 32:1 33:1,14 | **gold** 83:15 |
| 69:15 85:17 | 39:25 41:4 | 35:12,13 37:11 | **good** 16:25 |
| 98:10 126:6 | 43:25 44:15 | 37:24 38:1,10 | 41:25 64:22 |
| 131:23 | 51:3 57:10 | 38:13 39:1,4 | 97:11 98:7 |
| **give** 23:17 24:8 | 61:7,10 62:20 | 39:15,19 41:7 | **gotten** 15:7 |
| 24:21 25:1,6,7 | 62:22 64:10 | 42:21 43:3,15 | 47:23 98:18 |
| | 67:19 70:2 | 43:23,25 45:15 | 110:18 129:9 |

granted  101:15
granular
  119:21
great  27:2,6,6
  65:5
greatly  75:25
  135:8
greedy  97:25
greenbaum
  2:10 4:4
grew  33:18
gross  2:8,12
grossman
  42:16 49:19,20
ground  87:7
  124:24 125:24
group  119:18
  125:21,22
  129:22 130:5,6
guess  24:4 39:1
  40:9 42:1,8
  84:21 101:13
  102:1 111:14
guidance  36:25
  37:15 41:11
gun  116:5
guys  64:22
  96:11 97:11

**h**

h  132:21
half  63:17
  111:19
hands  43:24
hannah  2:17

happen  37:12
  41:16 75:19
  109:1
happened
  115:15 122:20
happens  77:13
  122:18 129:3
happenstance
  131:6
happy  14:21
  32:16 100:17
  108:2,18 111:9
  128:12 130:13
hard  8:21
harm  58:19
  60:2,10,16
  62:1,10,14
  64:3,4 65:6,13
  66:1,3,9,10,23
  67:5,18,21
  68:12,14 69:4
  69:12 71:21
  72:10 74:8,23
  75:25 76:3,8
  76:12 87:17,18
  99:11 119:12
harman  42:16
harmed  69:5
  87:20
harms  67:2
harris  42:17
  46:8,16,19
  47:20,24 50:12
  50:18,22 52:2
  54:10

harry  2:5
hate  31:2 41:9
hcs  21:19
head  126:15
heads  131:5
health  1:4
  17:12 20:4
  66:22,24 67:1
  71:14
hear  24:6 25:16
  32:17 37:15
  79:3 97:2
  103:9
heard  34:7 58:3
  77:6 87:24
  95:24 110:21
hearing  5:2,10
  23:11
hearings  71:8
heart  8:1 35:4
heavy  15:23
heith  46:7,9
held  1:16
help  10:4,4
  41:7 50:15
  64:20 71:12
  78:1,7,8
  100:17
helpful  82:4
helping  72:21
  135:5
helps  70:22
  77:10 79:13
  80:4

hereinbefore
  136:8
hey  40:15
hide  72:24 98:7
hiding  73:4
  98:8
high  13:16
  115:9 120:13
  128:24
higher  99:17
highest  114:14
  119:19
highly  15:23
  21:1 90:2
  118:20
historical  7:5
history  32:16
hit  22:3 53:24
hoffman  107:3
  116:8,17,20
hone  132:10
honed  41:13
  88:13
honor  4:4 6:25
  7:17 10:10
  12:23 13:20
  15:14 18:21
  21:8 22:9,25
  24:12 26:7
  28:20 29:3
  32:5,17 34:3
  34:17 35:3
  37:4 40:6
  41:22 43:4,7,8
  44:17 48:22

49:5,24 53:2
55:1,14 56:20
65:8 67:14
68:11 80:7,16
81:13 83:21
86:8,13 88:17
90:4,5 94:4,12
97:24 100:9
103:9 109:8
111:9 112:3,17
112:23 114:10
115:24 116:17
119:24 125:4
126:17,24
127:25 128:16
129:13 131:11
132:5 134:13
135:3
**honor's**  13:5
92:15 110:6
**honorable**  2:2
**hope**  52:10,25
92:4
**host**  30:18
**house**  2:23
44:11 48:10
49:17 52:22
53:6
**huge**  73:10,25
77:17 83:17,24
132:1
**hundred**  13:11
42:23 86:23
**hurdle**  13:16

**hurt**  64:8,10

**i**

**idea**  39:9 69:1
83:9 107:14
118:11,14,17
**identified**  6:12
16:15 42:22
53:24 57:10,16
113:5
**identify**  6:9,21
7:23 31:22
**illegal**  84:17
**imagine**  35:7
**impacted**  61:8
93:2
**impacting**
60:15 94:25
115:10
**impacts**  69:23
**implement**  42:6
120:24 133:7
133:10,16
**implemented**
42:11
**implicitly**  92:9
**important**
21:25 23:17
27:8 31:23
35:24 47:3
54:20 56:4
62:21 76:18
80:15 129:10
132:19
**inapplicable**
127:20

**include**  8:15
56:16 104:8
115:3 116:14
129:2
**included**  11:6
127:1
**includes**  59:2
116:15 129:20
**including**  67:23
71:8 80:4
115:22 123:2
134:4
**inclusion**  50:25
**inconsistent**
26:25
**increase**  74:9
89:16 96:3
98:22 99:1
**increased**
94:22 99:3,12
**increasing**
98:14 125:18
**indicate**  80:17
**indicated**  3:4
5:21 6:16
10:20 11:11
12:3 53:15
**indicates**  17:13
**indicating**  15:7
49:1 57:19
61:17
**indication**
57:12
**individual**  32:4
39:24

**individual's**
31:16
**individuals**
7:23 116:15
118:3 120:12
123:1 124:15
125:7
**induce**  83:6
**inducing**  74:5
**industry**  23:7
73:3 80:25
**inevitably**
47:15
**inflated**  93:20
**inform**  62:7
**information**
3:13 7:5 8:21
15:10,24 21:1
28:18 56:10
67:10 80:12
85:11 87:9
89:21 90:21
**inherently**
122:5
**injuring**  84:14
**injury**  70:12,13
70:19 71:23
72:3,9 99:14
**inquiry**  65:5
86:12 102:9
**instance**  3:16
49:8 50:13
54:2 86:5
**instructions**
31:21

| | | | |
|---|---|---|---|
| **insurance** 95:9 | **interrupted** | 53:15 103:7 | 113:22,24 |
| **intended** 79:6 | 100:1 | 105:22 107:9 | 114:19 115:23 |
| **intending** 92:3 | **investigate** | 108:23,24 | 123:6 124:14 |
| 94:23 95:15 | 108:19 | 111:2 115:8 | 128:8 131:20 |
| **intent** 38:20 | **investigated** | 118:16 120:12 | 133:24 134:13 |
| **interested** | 5:13 | 133:24,25 | **issues** 3:7,8 6:4 |
| 17:21 53:13 | **investigation** | 134:1,3,18 | 7:10 11:12,14 |
| 55:6 77:18 | 5:14 23:14 | **involvement** | 13:1 14:14 |
| 136:15 | 30:11 52:1 | 109:5 | 19:1 25:5 |
| **interfered** | **investigations** | **involving** 50:6 | 30:15 40:3 |
| 18:18 | 21:14 24:9,14 | **irrelevant** 5:24 | 55:19 70:12,13 |
| **interference** | 24:17,21 25:2 | 9:6 30:13 | 82:5 98:5 |
| 36:3 | 25:8,10 26:3 | 73:14 74:2 | 109:11 111:3 |
| **internal** 27:4 | 28:22,22 29:5 | 80:13 82:18 | 114:5 135:5 |
| 49:8 89:13 | 32:4 39:13 | 83:20 90:10 | |
| 90:12,15 | 56:6,11,16,21 | **issue** 5:15 8:20 | **j** |
| **internally** | 104:20 | 9:17 11:22 | **j** 2:10 |
| 13:23 | **investment** | 13:4 15:20 | **j&j** 5:9,13,19 |
| **interpret** 35:16 | 70:8,11 71:10 | 16:6,7,17 | 5:21 6:11 8:1 |
| **interpretation** | 71:18 72:4,8 | 20:10 21:18 | 10:3 20:14 |
| 19:19 102:15 | 77:4,7 79:23 | 24:19 27:5 | 21:19 26:19 |
| **interpretations** | 80:3 81:16,22 | 29:21 43:10,12 | 48:10 49:3 |
| 102:14 | 82:11 83:18,18 | 43:18 44:3 | 58:19 60:24 |
| **interpreted** | 87:8 88:9,11 | 48:2 49:25 | 63:19 68:7,8 |
| 35:23 | **investments** | 51:25 57:2,5 | 69:17 73:11,22 |
| **interpreting** | 73:24 100:15 | 58:3 64:17 | 74:21 75:2,14 |
| 37:25 105:11 | **invitation** | 68:9,15 73:16 | 75:20 76:1 |
| **interrogatories** | 116:13,14 | 78:14 87:12 | 77:17 78:1 |
| 6:23 7:13,15 | 122:16 | 88:8,10,11,24 | 83:11 84:7 |
| 7:22 123:7 | **invitations** | 88:24 90:9 | 99:12 108:5 |
| **interrogatory** | 113:22 115:3 | 93:3 94:12 | 119:6,13 133:1 |
| 7:2,7,14 8:3 | **invites** 122:12 | 101:7 104:2,19 | 133:9 |
| 29:10,17,19 | **inviting** 25:24 | 110:11,13,14 | **j&j's** 5:11 |
| 31:25 63:5,10 | **involved** 32:3 | 112:10,20,23 | 55:11 67:19 |
| 114:18 123:15 | 49:13 50:21 | 112:24 113:17 | 70:8 83:14 |
| | | | 106:8,20 |

[j&j's - judge]                                                    Page 20

125:13
jalt 113:23
  114:1,3,7,25
  117:19 120:2,4
  120:9 121:11
  122:1 123:2,4
  123:24 134:16
  134:19
janssen 22:13
  35:6 70:23
  71:1 76:22,23
  77:2,11,13
  79:10,11,12,13
  79:15 80:5
  82:15 84:7
  87:23 88:7,25
  89:7,11,14
  93:25 120:5
janssen's 82:22
january 1:18
  8:13 24:16
  42:1 104:22
  105:24 106:1
  106:11 118:14
jd 48:7
jd's 44:21
jeffcoat 46:7
  50:14,23
  116:15
jeffcoat's 46:9
jeffrey 2:10
jennifer 42:16
  54:10
jeopardizing
  67:24

jersey 1:2,16
  1:18 2:10
  136:5
jjhcs 2:23 5:9
  7:6 8:5 10:3
  27:10 29:13
  35:5 44:23
  45:6 46:8
  47:17,18 49:11
  52:9 53:17
  60:21 63:20
  74:21 77:15
  80:23 90:17
  91:18 93:17,21
john 107:3
  116:8,17,20
johnson 1:4,4
  36:20,20 60:12
  60:21,21,23,23
  69:25,25 71:3
  71:3 72:15,16
  74:3,3 75:6,7
  76:8,8 79:22
  80:2 89:18,19
  96:21,21 98:21
  98:21,25 99:1
  99:2 102:22
  103:12,12
  114:14,15
johnson's
  60:12 79:22
  80:2 99:3
  102:22
jr 2:20

judge 3:1,5 4:7
  4:13 7:18 8:7
  8:15,23 9:10
  10:14 12:15
  13:6,10,21,25
  14:2,8,11,15,20
  15:6,15,18
  16:16,24 17:19
  18:4,19,22
  19:17 22:15
  23:11,24 26:14
  27:14,15 29:16
  29:23 30:3,7
  30:25 31:1
  32:21 33:2,6
  33:18 34:5,10
  35:9 36:13
  37:8,11,19,22
  39:1,6 40:8,17
  41:2,3,25 43:1
  43:16,23 44:9
  45:25 46:18
  47:7 48:24
  49:19 51:3
  52:10,25 53:4
  53:9 54:7,12
  54:18,23 55:2
  55:15 56:2,22
  57:1 58:9,14
  59:25 61:25
  62:1 63:11,13
  63:23 65:10,18
  66:12 68:2
  69:8 70:4
  72:11,13 74:14

74:18 75:12
  76:14 77:20
  79:2,19 80:1
  81:10,14 82:1
  83:23 84:19
  85:13,22,25
  86:3,9,14,18
  87:24 88:13,18
  88:21,25 89:4
  91:4,12,22
  92:4,17,23
  93:6,10 94:15
  94:19,24 95:2
  95:24 96:23
  97:2,9,14
  98:17 99:19,22
  99:24 100:19
  101:4,6,11,14
  101:23,24
  102:1,10,13,17
  102:19,21
  103:6,20
  104:11,17
  105:5,25
  106:10,13
  107:11,18
  108:7,13,17,21
  109:9,17,24
  110:3,8,15,16
  110:20 111:7
  111:11,16,24
  112:7,15,18,22
  112:22 113:4
  113:18,23
  114:9 115:5

117:16 118:5
119:16 120:3
120:16 121:10
122:7,18
123:16,20
124:22,23
125:20,24
126:13,20,24
127:5,12 128:2
128:14,17,22
129:14,24
130:14,20
131:1,4,18
132:8,16
133:18,23
134:5,20 135:1
135:7
**judge's** 83:13
**judgment**
12:18 93:1
**julia** 2:6
**juliette** 111:15
**july** 4:25 43:23
**june** 114:18
**juror** 75:23
**jury** 92:3,8

**k**

**k** 123:19
**karen** 111:15
**katherine** 2:13
**katie** 114:3
116:7,19,20
**keep** 31:3 57:21
61:9 89:22
97:11 99:8

**keeping** 9:8
15:1 41:19
**keeps** 82:8
96:17
**kept** 13:10
**key** 119:3 130:5
**kicking** 3:9
31:2
**kind** 4:5 39:20
42:7 43:19
50:15 100:1
105:15 116:4
125:22
**kinds** 88:8
**knew** 24:2
112:1 125:17
**knewitz** 113:12
113:24 117:5
123:11,18
134:12,17
**know** 3:23 5:8
5:10 8:25
10:10,20,22
11:12 13:2,8,9
15:7 16:1
23:19 24:1
26:18 28:7,8
29:14 30:17
31:1 33:16
38:5 39:9,16
39:18 42:5
44:10 48:13
49:13 51:1,7
51:10,16 53:19
54:15 55:8

58:6 60:22
61:16 62:17,24
63:1,6,18 64:8
64:19,23 65:1
67:6,7 69:16
69:16 72:15,18
73:1,19,23
77:20 78:24
79:11,12,24
80:16,17,23
81:3 82:7,16
86:22 87:15
88:16 90:24,24
91:22 94:15
95:10 96:11
98:4 102:2,5
103:9 110:8,20
112:8 115:7
116:4 119:13
120:7,14,21
125:13,17,20
126:4,6 127:3
128:25 130:10
131:9,22,25
132:9
**knowing** 72:24
**knowledge**
111:25
**known** 21:13
**knows** 69:3

**l**

**l** 2:2 129:15
133:8
**lade** 111:15
112:13 129:14

130:9,23
134:21
**language** 4:2
18:20 22:1,23
**large** 66:22,24
**latches** 28:8
**law** 18:12
60:14,17 102:8
**lawsuit** 20:14
20:25 59:7
74:1,2,13
123:13
**lawyer** 45:8
46:8 49:17
50:6 51:1
52:22
**lawyers** 44:20
44:21,23 45:12
48:10,21,21
51:1 53:6
**lead** 29:3,15
30:14 73:8
74:9
**leadership**
120:5 123:4
**learn** 124:3
**leave** 26:24
97:23 126:13
**left** 3:5 16:17
68:22 112:5
**legal** 2:9 44:22
45:21,21 47:17
47:21,22 48:20
50:23 51:2

[length - lowering]                                                    Page 22

length  27:6
lengthy  67:6
letter  25:20
  42:20 48:25
  100:12 111:13
letters  7:3
  21:10 29:15
  43:20 119:2
level  63:14
  115:9 120:2,3
  120:13 123:3
  128:24
levels  69:25
license  136:21
lieb  2:13
lies  98:9
light  26:18
likelihood
  111:1
likely  118:20
  124:15
limit  53:11
  103:4 111:4
  129:4 133:22
limitation  51:4
  68:5 123:14
limitations
  132:11
limited  6:18
  11:15 17:15
  26:22 32:6
  49:11 61:12
  75:14 86:17
  87:18 108:10
  128:9,14,15,17

128:23
limiting  17:23
  18:22 30:7
  50:10 82:1
  86:20 87:8
  88:14 96:2
limits  134:8
line  59:2,2 64:9
  64:10 82:22
  95:5,7
linger  55:19
link  96:17
list  18:8
listed  23:20
literally  63:8
  85:9
litigating
  110:17
litigation  49:18
  50:6 73:5
  115:11
little  23:6 33:8
  71:11
lives  68:18
llc  1:8
llp  1:17 2:4,19
lobiondo  2:6
  106:12,15
  109:7,19
  110:12 111:6
log  39:2,4
  42:18,19 44:15
  45:16 46:12
  51:20,21

logistics  102:20
long  2:6 5:18
  10:12 18:8
  52:2 61:4,10
  72:19 103:24
  104:1 105:23
  106:2 108:9,15
  109:21 110:2
  112:15,16
  113:10,20
  115:14 121:9
  121:11 122:9
  122:20 123:18
  123:21 124:17
  126:17,18,22
  131:11 134:12
longer  13:3
look  12:11 15:6
  20:1 29:17
  35:2 38:2
  40:21 50:22
  56:13 66:10
  70:24 82:5
  89:12 98:12
  100:14 121:12
  125:5 128:3,5
  129:19 130:3
  130:11,18,22
  131:22
looked  3:24
  19:4 31:17
  74:19 80:18,23
  86:10 98:4
looking  3:10
  8:25 17:20

19:8,22 36:9
  37:6 46:16
  54:13 57:9
  62:9 66:12
  97:4 111:2
  117:3 120:17
  121:6 125:1
  127:12 130:10
looks  118:1
loot  72:19
looting  72:17
loots  78:2
losses  73:12
lost  76:7 91:8
  92:11 96:5
lot  17:5,6 20:4
  22:24 44:2
  53:20 69:18
  71:8 75:2,21
  78:12,21 83:3
  90:20 131:8
  132:1
lots  28:14 83:6
  94:10
love  15:15
  99:21
lowenstein  1:17
  1:17 2:24
lowered  89:6
  89:10 92:1,8
  92:18 93:13
lowering  95:2
  95:20,21 96:22
  97:20

**[lying - meant]**                                                    Page 23

| | | | |
|---|---|---|---|
| **lying** 15:3 | 54:5 57:24 | **manufacturer** | **mazuk** 114:3 |
| **m** | 60:22 71:18 | 5:17 | 114:10 115:1,2 |
| | 72:16 73:18 | **manufacturers** | 115:4,16 |
| **m** 2:13 | 78:12,15,21 | 72:22 | 116:20 117:12 |
| **machine** 83:16 | 80:10 82:13 | **manufacturing** | 117:14,20 |
| **made** 21:19 | 83:7 84:21 | 82:6 | 121:21,25 |
| 22:23 26:6 | 86:24 93:11,15 | **march** 33:5 | 122:1,5,15 |
| 33:19 42:8 | 96:9,15 97:18 | **mark** 116:8 | 123:2 124:2,20 |
| 68:18 71:3,5 | 97:19,21 98:15 | **marked** 46:11 | 125:7 |
| 73:5 75:13 | 98:19 99:16,17 | **market** 80:11 | **mazuk's** 114:8 |
| 87:14 88:2 | 100:7,15 103:2 | 95:8 | 115:20 |
| 95:13 99:7 | 104:6 111:10 | **marketing** | **mean** 6:1 14:21 |
| 109:9 113:9 | 118:8 120:7 | 60:11 61:2,5 | 17:14 19:9,11 |
| 115:19 120:20 | 125:2 133:13 | 64:20 69:17 | 19:12 28:6 |
| 121:7 123:13 | **makes** 63:6,9 | 82:6 134:4 | 31:14 33:15 |
| 134:15 | 68:7,8 69:17 | **massive** 45:16 | 36:4 37:25 |
| **magistrate** | 74:3 75:21 | **massively** | 38:7 51:20 |
| 33:18 | 77:17 80:9 | 73:20 | 58:23 87:10 |
| **mail** 47:20,21 | 84:16 102:23 | **material** 99:4 | 101:25 117:22 |
| 50:18 52:4,5 | 105:7 | 131:10 | 125:21 129:6 |
| 102:22 122:16 | **making** 21:16 | **matter** 1:13 | **meaning** 8:25 |
| 122:24 123:25 | 30:10 67:25 | 9:25 33:24 | 9:18 10:23 |
| 129:20 130:19 | 69:16 72:1,20 | 52:2 83:4,4 | 11:7 16:21 |
| 130:23,25 | 73:11 75:2 | 85:10 | 19:23 25:14 |
| 131:7 132:23 | 78:11 83:5 | **matters** 59:15 | 34:16,24 38:3 |
| **mails** 46:7,9,16 | 88:4 97:24 | 83:9 90:14 | 53:17 105:11 |
| 48:4 49:8 50:6 | 100:3 114:11 | 91:17 | **meaningless** |
| 52:22,25 53:6 | 119:22,25 | **max** 17:9 | 29:5 |
| 124:5,19 129:1 | 120:1,12 | **maximizer** 9:19 | **means** 4:17 |
| 129:7,9 | 124:18 | 10:18 26:12 | 12:15 17:14 |
| **main** 26:6 | **manage** 50:16 | 29:1 30:12,21 | 19:8,13,15 |
| 114:25 | **manages** 81:1 | 108:6 | 20:6 38:11 |
| **maintain** 51:12 | **mangi** 127:17 | **maximizers** | 40:11 |
| **make** 4:4 17:23 | 127:22 | 57:23 106:21 | **meant** 9:22 |
| 19:16 24:3 | | 107:4 132:23 | 10:24 19:24 |
| 33:22 39:19 | | | |

33:20 36:18,23
95:7 110:16,17
**mechanism**
7:12
**medicaid** 18:13
20:11,22 23:21
**medicare** 18:13
20:11,22 23:21
29:6
**medication**
68:21 74:8
91:2
**medications**
42:3
**medicines**
93:25
**meet** 3:10
14:10,18 15:12
15:19 31:1
32:15,18 39:4
41:9,15 54:16
66:25 103:11
104:3,12,16,25
**meeting** 34:22
37:1 116:14,18
116:18 117:24
118:2 122:7,11
122:19,21,24
123:24
**members** 17:11
20:16 42:3
**memorialized**
124:5
**mention** 55:7
86:25 87:6,11

118:11 131:12
**mentioned** 37:6
112:14
**mentions** 108:3
108:3
**merits** 128:7
**met** 16:12
58:12 116:9
117:10
**mid** 108:19
**middle** 104:5
**miles** 2:17
**million** 13:11
32:13 91:9
92:22 119:7
125:12,18
**millions** 33:12
**mind** 41:19
**minute** 74:16
84:4 99:25
130:19
**minutes** 90:5
122:23 124:8
**mirrored** 88:4
88:6
**missing** 65:23
69:21 120:19
**mitigation**
133:20
**mitigations**
28:8
**modifications**
6:5
**modifier** 104:9

**moment** 4:11
12:10 14:6
21:21 27:16
31:6 37:5,17
38:11 62:12
73:15 75:18
88:14 94:3
103:21 127:14
**moments** 23:16
**money** 59:6,22
68:7,8 69:18
70:18 71:4,5
71:11 72:16,20
73:9,10,17
74:3,4 75:2,21
76:10,11 77:17
78:1,11,12,15
78:21 80:9
82:12,13 83:1
83:5,8 84:8
86:24 119:9,23
**monitor** 71:9
**monitoring**
130:7
**month** 52:20
**months** 6:17
32:19,21
**motion** 12:18
12:19 14:19
19:4 93:1
101:15 107:22
111:18,24
112:6,24
114:17 127:10
133:5

**move** 4:9 6:2
13:17 16:2
41:18 70:7
132:4
**movement**
43:11
**moves** 32:9
**moving** 83:11
95:17

**n**

**n** 2:3 123:19
**name** 76:21
79:15 106:20
107:13 112:9
114:3
**named** 46:7
79:9 132:20
**narrow** 22:17
25:7 31:5
32:22,24 35:11
35:14 37:9
40:18 52:23
64:14 67:12
74:23,23 78:25
79:19 86:21
87:7 101:21
103:18 111:10
**narrowed**
16:13 25:19
40:18,25 41:1
81:7
**narrower**
40:19
**narrowing**
32:24 76:3

**[narrowing - offering]**                                            Page 25

79:3 81:6,10
**narrowly** 54:14
  69:14
**natural** 127:7
**nature** 31:24
  39:8,24 40:25
  46:13 50:4,24
**necessarily**
  48:1 105:17
  115:15 123:25
**necessary** 4:8
  22:20 59:23
  69:11 80:12,21
  86:15
**need** 11:2 12:17
  13:4 20:5 21:5
  24:7 26:4 27:5
  31:4,10 32:20
  34:1 36:17
  39:12 41:6,6
  41:18 56:23
  57:17 59:11
  60:19 63:18,21
  63:22 69:22,24
  76:10 79:21
  80:2 84:13
  88:13 107:2
  124:12
**needed** 22:17
  28:19 68:21
**needs** 28:10
  33:21
**negligible**
  48:18

**negotiate** 25:24
**neither** 136:9
**net** 86:21 90:12
  90:13 91:17
  93:24
**never** 20:17,23
  24:5 40:18
  55:13 134:5
**new** 1:2,16,18
  2:5,5,10,13,13
  2:16,16,20,20
  6:12,14 20:24
  42:2,6 71:4
  84:2 87:2
  99:14 102:18
  102:25 103:5
  103:17 105:13
  108:10 111:12
  111:23 112:12
  113:5,8,8,13,13
  113:14 116:3
  124:18 125:1,2
  125:5,25
  126:25 129:19
  130:10 132:18
  134:9,14 136:4
**newark** 2:10
**non** 38:23
  48:19 93:3
**nonsense** 81:4
**north** 119:18
**notary** 1:15
  136:4
**note** 49:16
  118:7

**notebook** 116:7
  117:25
**noted** 12:20
**notes** 1:12
  118:2,7 136:6
**notion** 80:22
**november**
  24:24 43:17,25
  57:8 101:14
  104:3
**number** 9:6
  18:16 47:6
  51:25 58:20
  60:8,9 61:13
  77:5 94:16,18
  94:21 100:11
  108:1 109:21
  120:10 127:10
**numbers** 54:4,6
  61:15 91:20
**numerous**
  120:2

**o**

**o** 2:1 132:21
**object** 50:25
  59:13 87:23
**objected** 87:22
**objections** 7:8
**obligation**
  51:13 67:1
**obligations**
  93:21
**obliged** 29:11
**obtain** 73:6

**obviously** 8:18
  45:7 125:3
**occasion** 51:17
**occasionally**
  123:12
**occasions** 45:4
**occurred**
  100:13 116:19
**occurring**
  120:1
**october** 5:3
  22:16 33:3
  43:11 104:7
  114:19 126:20
  126:22
**offer** 3:25 4:3
  6:1 9:18 12:15
  16:9,22,24
  17:14,16 18:3
  18:5,6,20,24
  19:5,8,11,13,24
  20:1,6,15,18
  21:4,7,23 22:7
  22:23 28:25
  30:5,16 31:9
  32:9 34:9
  35:20 36:1,4
  36:15,16 38:4
  40:11 60:23
  78:7,8
**offered** 5:19
  22:24 59:11
  104:4 121:24
**offering** 25:6,7
  25:10,12

**[office - part]** Page 26

**office** 1:16
73:20 75:10
**offline** 50:23
**offset** 72:3
78:15 99:18
**offsets** 72:2
78:18
**oh** 29:6 68:7
77:17 78:12
81:7 91:18
95:9
**okay** 5:6 8:7,23
11:2 13:6,21
14:1 15:18
16:16 28:1
33:6,19 37:13
40:5,7 41:21
41:25 42:12
54:12 58:14
59:25 62:19
63:13 64:9
70:4,5 72:18
72:18 75:12
83:16 88:20
98:17 99:22
100:19 101:5,6
101:11 103:21
107:11 111:6
111:11,21
123:20 130:2
130:20 131:4
132:14
**old** 40:2 88:21
124:19 125:5

**once** 32:9 52:23
80:5 83:3
**oncology** 68:23
**ones** 26:6
134:21
**open** 3:5 23:2
97:9 127:1
135:1
**opened** 108:17
**opening** 113:14
126:14
**operated** 43:15
**operates** 82:24
87:16
**operation**
68:22
**opinion** 12:16
62:2 65:12
66:13 67:4,6
**opportunity**
102:2
**opposed** 64:15
71:12 90:1
119:22
**opposing** 25:16
121:19 124:9
**order** 12:16
20:5 22:17
26:14 27:14
32:23,25 36:14
52:19 56:2,23
74:7 82:3 83:7
83:13 102:2,15
102:18 104:3
105:1,7,12

112:8,20 113:3
118:22 125:10
125:15 126:10
127:7,8
**ordered** 37:8
104:18 111:19
112:24 116:17
116:21 127:5
**ordering** 12:2
134:8
**orders** 3:8
116:1
**organized** 13:3
**original** 43:22
55:21 108:11
118:16
**outcome** 29:15
**outside** 10:24
46:21 47:9
49:11 50:2
52:14 53:17,20
60:23 90:17
91:18 104:24
**outstanding**
3:3
**overall** 67:10
68:8 75:25
83:4 125:22
**overlaps** 40:11
**overtaken**
43:19
**overwhelmin...**
45:18 52:12
**own** 47:17 75:9
87:2 93:24

131:16

**p**

**p** 2:3,3
**p.c.** 2:8,12
**p.m.** 135:10
**page** 117:25
127:25 130:4
130:23
**pages** 4:22
22:10
**paid** 59:2,16
61:13 79:24
84:4 119:9
**paper** 73:20
82:8 116:6
135:5
**papers** 27:1
**paragraph**
12:16 67:21
93:19
**parallel** 15:14
**park** 2:12
**part** 8:1 14:12
16:10,11 17:10
17:13 18:13
20:13,19 34:14
40:9 43:22
44:14 46:25
50:5 61:2,3
70:21 71:16
74:13 79:15
99:2 110:12
111:18,23
112:20 119:8
132:23,23

133:5,13

**partially**
119:25

**participants**
27:11 66:19
118:7

**participated**
122:2

**particular** 3:23
21:23 22:1
44:11 73:18
117:6

**parties** 5:2
14:18 49:3,11
50:13 51:5,11
51:15 52:3
54:14,25
102:14,19,21
105:14 136:11

**partner** 80:24
85:21

**partners** 68:25
90:21,24 98:3

**parts** 20:21
63:19

**party** 46:21
47:4,9 51:10
51:18,22,24
53:7,9 55:8
116:5,10 119:5
132:19,20,21

**pass** 103:23

**passing** 30:19
30:20

**past** 43:23

**patient** 30:19
30:19 63:14,15
64:20 67:25
76:12 84:3,4
133:1,12

**patients** 10:4
18:9 24:18
26:21,23 27:3
57:22 60:12
62:7 66:6
67:23 68:17,23
70:25 71:1,12
74:7,9 77:9
78:1,7 79:11
80:4 82:14
85:16 86:11
87:3,18,19
93:20 98:23
99:7,15 119:2
119:2,9,15
121:24

**patterson** 2:4

**pause** 21:21

**pay** 5:17 10:4,4
10:5 23:8
26:16,22 59:1
59:6,19 63:4
70:16,17 71:14
73:9,9 74:10
74:10 75:9
79:13 93:21
94:22 121:2,4

**paying** 57:21
70:18 71:25

**payment** 90:23

**payments** 94:5

**pays** 17:8 71:6

**pejorative** 78:3

**pending** 3:17

**penkowski**
111:15 112:13
113:19,25
117:4 118:16
121:17 124:20
128:10 129:7
129:21 134:16
134:22

**people** 13:23
39:16 44:18,25
45:1,5,6,20,23
47:3,16 48:19
50:21,21 52:5
52:9 56:14
64:8 68:19
70:22 71:24
74:6 78:8,17
83:6 84:22
86:23 89:25
103:7 108:22
109:12 111:1
117:9 120:9
129:1

**people's** 48:13
83:6

**perceive** 56:24

**percent** 16:14
25:20

**performance**
21:3

**period** 5:1,18
10:7,9 11:21
14:25 15:5
19:20,25 21:16
24:22 25:9
30:22 34:14
38:24 40:21
55:20,23,24
56:1 57:7,19
58:20 63:17
103:16 104:9
104:13 105:3
108:11 128:19
128:20 132:7,8

**permit** 38:6
127:3

**person** 29:6
46:22 117:12
129:10 133:6

**person's** 75:10

**personnel**
47:20

**perspective** 4:6
15:21 33:17

**persuade** 78:8

**pertinent** 64:1

**pfizer's** 87:19

**pharmaceutical**
72:22 73:3
81:1 87:16

**pharmaceutic...**
119:19

**pharmacies**
62:5

[pharmacy - price]                                    Page 28

pharmacy
  90:22,23
phrase  38:2,14
piece  9:13,13
  36:2,3 82:8
  94:22 114:25
  116:6
pieces  44:2
pitch  100:3
place  49:14,22
  73:25 103:8
  117:22 136:8
placed  38:18
plaintiff  1:6 2:7
  2:11,14 4:21
  5:12 6:7,16
  42:5 58:17
  62:14 66:3,17
  66:23 74:20
  75:15 101:16
  101:19 111:16
plaintiff's
  115:10
plaintiffs  6:21
  62:3,5
plan  17:9,10,14
  20:17 70:22
planned  42:24
planning  97:5
  98:2
plans  17:12
  20:4,16 24:18
  38:18 42:4
  56:14 71:14
  78:11 89:17,20

plausible  66:18
plausibly  62:3
  66:23
play  44:19
plaza  2:9
please  88:19
  100:24 127:14
  129:4 132:13
  134:23
pllc  2:15
pocket  17:9
point  4:8 17:16
  17:17 19:16
  30:8,10 44:5
  50:18 53:8
  56:12 59:9
  62:6,23 68:2
  85:6 86:6
  87:13 98:20
  100:7 104:16
  106:17 107:6
  117:19 118:8
  120:7 124:12
  124:17 125:9
pointed  22:9,25
  23:6
pointing  65:13
points  4:5 7:4
  26:5 44:7
  81:13 106:6
  116:4
police  28:5
policies  11:14
  31:7,11,19
  33:10,11 34:6

policy  11:18,24
  12:1 13:9
  29:20,25,25
  30:1 32:7,7
poor  50:9
portion  127:14
portions  17:2
position  10:15
  10:21 20:24
  27:21 32:19
  37:23 84:21
  102:23 104:4
  104:25 112:17
  113:5 131:15
  131:19
positions  33:1
possible  104:23
potential  73:24
  104:5
powder  77:18
pr  134:17
practical  85:10
practicing
  48:21
precisely
  120:16
predate  5:18
predecessor
  6:21 8:2,5,16
  9:1 11:6
preliminary
  4:5
prepared  31:3
prescribed
  105:1

prescription
  22:2
prescriptions
  62:6
present  2:23
  8:13 24:23
  25:9 30:23
  59:4 98:2
  101:10 124:22
presentation
  122:12,13,21
  132:24
presentations
  122:3
presented
  112:1 113:7
  122:1,22
preservation
  11:12 14:14
pressure  89:20
presumably
  122:25
pretty  13:19
  15:22
prevent  27:2,7
  72:24
preventing
  13:15
previous  16:15
previously
  112:1
price  90:6,12
  90:13,13 91:2
  91:17 93:22
  94:7 97:11

99:17
**prices** 89:16,17
89:18,23 90:25
92:2,8,18,19
93:13,25 94:6
94:9,14 95:10
95:12,16,20,22
96:6,14,22
97:6,20,25
98:14,22 99:1
99:3,13,16
100:6 133:1
**pricing** 88:24
88:24,25 90:14
90:18 91:5,7,8
92:20 93:3
94:25 95:2,3
96:10 98:12
99:7 100:4
101:3
**primarily** 3:11
22:3 68:15
69:2
**primary**
132:17
**prior** 9:22 10:2
27:22 104:7
133:5
**privilege** 39:2,3
42:18,19 44:15
45:3,16 46:11
46:13 47:13,23
48:14,15,15
50:1 51:18,19
51:21

**privileged**
38:23 45:9,19
45:24 46:11
48:1
**probably** 23:6
119:23
**problem** 40:9
45:16 51:22
135:7
**problematic**
27:24
**problems** 9:14
**proceedings**
1:8,13 135:10
**process** 21:15
26:3
**produce** 11:23
12:5 21:11,13
22:14 23:13
51:13,20 72:7
72:7 76:20
79:24 80:20
111:4 120:17
132:4
**produced** 4:21
12:2 22:10
30:2,6 38:15
38:21,24 43:12
45:7,24 58:18
58:25 59:5,17
59:20,21 61:12
62:24 80:16
84:6 85:4
89:14 90:8
91:13 100:12

109:13 114:7
117:2,21
118:13 124:9
130:15
**producing** 9:15
27:12 30:23
47:1,2,6 56:10
57:9,25 58:24
79:5
**product** 81:23
81:24 82:22
**production**
22:24 23:1
25:4 27:9
30:14 42:14
49:10 52:19
56:25 57:2
91:15 106:8
116:23
**productions**
21:16 124:6
**productive**
9:24
**products** 60:22
**professional**
134:18
**profitability**
73:2
**profitable**
73:13,23 83:10
83:15
**profits** 76:7
87:4 91:8
92:11 96:6

**program** 3:24
8:6,19,22 9:19
9:20 10:6,8
17:6 18:3,15
21:4 23:8
26:17,24 27:3
27:7,24 29:2
43:15 50:16
59:7 60:11
61:5,14 62:18
64:5,6,25 65:1
68:4,10,18
69:17 71:17
72:17,19,21,25
73:2 74:25
75:4 76:3,9,9
76:21 77:3,15
77:23 78:7,8
80:4 84:2,23
86:12,21 87:16
88:2 89:24,25
91:6 92:12
93:16,23 94:5
94:8,22 98:6
98:24,24 99:8
99:12 101:19
101:22 103:1,1
103:13 105:23
106:9,10,16,19
106:19,23
107:7,10,14,14
107:23,25
108:6,6,16,23
114:12,23
115:11,18,19

119:1,4,10
120:25 121:8
121:21,23
122:14 123:9
129:8 131:14
131:16 132:22
133:7,10,12,14
133:16 134:1
**programs** 5:17
6:22 8:2,16 9:1
9:20 10:17,18
11:7 23:10,20
26:12,19,21
27:10,11 30:12
30:22 64:18
67:25 95:23
130:7
**prohibition**
18:14
**prohibitively**
68:1
**project** 9:24
80:13
**promising**
119:6
**promptly**
100:17
**pronouncing**
19:7
**properly** 51:12
**proportional**
52:16
**proportionality**
102:24 105:16
109:15

**proposal**
111:10,17
128:13
**proposed** 22:4
25:18 37:8
50:24 58:5
111:25
**proposing**
22:11 32:6
50:9 58:8
**propound** 7:8
7:14
**propounded**
7:9
**protect** 127:19
**protected**
47:12 50:7
**protecting**
60:17
**prove** 97:6,7
**provide** 32:23
50:23 112:25
128:12 130:8
**provided** 11:13
11:16 63:10
100:21 114:20
115:6 117:13
**provides** 78:1
84:16 89:11
**provision** 16:23
16:25 17:16
19:13,24 20:16
20:18 36:2
**provisions** 20:3

**prudent** 83:10
**public** 1:15
60:2,10,18
61:3 62:1,10
65:22 66:1,22
66:24,25 67:18
67:23 68:12,14
71:18,20 72:10
87:17 95:8
99:11 136:4
**publicly** 89:9
**purpose** 52:23
71:17 77:22
132:25
**purposes** 5:9
82:24,25
**pursue** 39:16
**put** 25:19 46:12
51:19 77:15
78:14 82:12
87:7 89:9,19
91:20 92:5,7,8
92:23 96:19
100:10 102:2,6
112:12 118:6
**putting** 13:10

**q**

**quarter** 32:13
**quarters** 22:5
**question** 4:17
11:3 24:6 34:4
52:15,21 61:20
63:8 71:22
73:8,10,17,19
73:21 74:5,15

74:21 82:4,23
84:20 85:25
92:16 101:17
115:6 116:8
119:17
**questioned**
24:10
**questions** 23:23
23:25 29:9,11
29:12 62:10
72:10 122:4
**quick** 124:10
**quickly** 13:19
83:22
**quite** 3:19
13:13
**quote** 16:4
23:13 93:24
**quotes** 129:8

**r**

**r** 2:1,3,16
132:21 133:8
136:1
**raise** 28:8
89:19 95:12
99:16 103:12
103:17 133:1
**raised** 7:10
51:4 58:3
92:19 94:14
97:25 98:12
**raising** 29:10
89:23 95:3
**ran** 20:18

**range** 91:19
**ranking** 114:14
  119:20
**rare** 45:4
**rather** 12:12
**rational** 59:11
**ray** 80:8
**reach** 80:21
**reached** 101:17
  108:7
**read** 33:2 127:8
**reading** 66:21
  102:22 127:7
  127:13,14
  135:4
**real** 92:1
**really** 3:9 5:22
  13:7 14:13
  26:20 30:13
  32:8 35:3 38:3
  39:14 43:10
  48:5,7 49:9
  55:3 60:15
  62:13 64:17,19
  68:9 69:16
  82:25 91:15
  105:19 106:18
  131:20 132:19
  135:3
**reason** 27:8
  53:13 79:9,14
  82:20 103:7
  108:21 110:25
  118:19 126:1

**reasonable**
  52:16
**reasons** 22:16
  89:22 98:13,21
  99:4,6
**rebate** 35:23
**rebates** 10:25
  17:22
**recalled** 56:9
**receive** 18:15
**received** 25:20
**receiving** 45:21
**recent** 10:12
**recess** 4:12
  99:23
**recipient** 52:4
**recognizable**
  60:16
**recognize**
  117:7
**record** 3:7 4:11
  9:8 10:11 15:1
  92:24 102:6
**records** 13:3
  103:3,5
**redacted** 45:2
  46:13
**reduce** 89:16
**reduced** 94:6
  96:6
**reducing** 97:11
**reduction** 94:7
**refer** 124:19
**reference** 91:9
  92:21,21 94:9

  94:10 96:14
  116:19 131:13
**references**
  17:11
**referencing**
  127:4
**referring**
  107:21 110:22
  110:23 123:17
**refers** 108:5
**reflect** 31:19
  38:19 39:15
**reflecting** 42:9
**reflects** 31:20
**reframing**
  74:12
**refresh** 108:12
**regard** 3:16,20
  6:20 8:12
  17:20 23:13
  27:19 28:4,12
  31:8 33:11
  69:20 81:11
  101:7,16 127:9
  128:10
**regarding** 3:12
  4:17 34:7
  102:18 105:13
  107:22 123:13
**regardless** 12:1
**regular** 132:6,7
  132:8
**regularly** 24:2
**reimburse**
  119:6

**reimbursing**
  119:14
**reiterate** 76:16
**reject** 62:5
**rejected** 111:17
**relate** 3:12 20:3
  22:7 32:16
  43:12 111:8
**related** 25:2
  43:10 47:18
  54:21 67:1
  77:3,8 94:8
  103:5 110:9
  136:10
**relates** 62:15
  104:20
**relating** 4:24
  5:25 6:8,10,14
  7:21 16:20
  26:10 30:20,21
  54:25 56:15,22
  57:25 82:5
**relative** 73:23
  136:13
**relevance** 4:16
  9:17 15:25
  59:14 91:23
  132:18 133:3
**relevancy** 9:14
**relevant** 5:12
  5:20 9:3 10:16
  11:6,21,21
  15:24 17:3
  19:12 21:2,16
  21:24 25:8

28:15,23 31:13
33:8 34:7,9
35:1,12,22
36:24,25 41:12
41:20 53:18
58:20 61:20,21
64:7 67:13
70:2 72:9
76:17 77:14
80:6,20 82:25
87:5 89:17
90:2,6 91:24
91:25 100:4,10
108:25 109:8
110:22 114:5,6
115:13 116:2
117:23 118:20
122:13 124:7,8
124:15 129:8
131:8,10,17
134:3
**relief**  127:9
**relieve**  51:9,13
**rely**  128:6
**remain**  44:3
**remaining**
  112:4 113:16
  123:21
**rendering**
  47:22
**renewed**  112:6
**repeat**  80:1
**reply**  98:1
  113:15

**report**  89:8
  93:24
**reporter**  1:15
  99:21 136:4
**reports**  25:3
  89:12 90:8
  91:14,21
  115:17
**representation**
  93:7,11 97:19
  97:22 114:21
**representations**
  97:4
**represented**
  123:14
**request**  30:4
  31:5 32:1,2,25
  33:20 34:13,15
  34:19 37:9
  47:21 49:17
  54:21 55:21
  64:14 67:11
  81:7,8 88:4,6
  108:16
**requested**  6:21
  107:22 127:9
**requests**  5:7
  6:20 7:20 8:3
  22:18,18 40:18
  40:19,25 45:21
  63:24 67:12
  69:10,14 79:1
  81:9 87:14
  88:22

**require**  69:22
  80:8 90:16
  127:11
**required**  12:20
  48:11 52:22
**requirements**
  20:10,23 30:18
**requires**  66:21
**reserve**  57:4
**resided**  121:25
**resides**  80:22
**residing**  73:19
**resolve**  22:20
  57:3 112:7
  135:5
**resolved**  3:7
  8:11 113:1,3
**respect**  9:23
  109:15 121:20
  123:7
**respectfully**
  108:15 126:2
**respond**  7:16
  48:22 53:2
  65:8 72:12
  81:12 83:22
  91:11 121:9
**response**  4:23
  25:23 26:14
  27:23 42:22,24
  63:10,12 67:15
  102:4 105:15
  106:20,23
  107:3,9 132:22

**responses**
  55:12 114:19
  123:15 124:11
**responsibilities**
  114:16 120:22
**responsibility**
  7:23 114:11,22
  114:23 115:8
  115:17 122:6
  123:5
**responsible**
  6:12
**rest**  103:25
  105:15
**restrictive**
  42:14
**result**  52:18
  56:22 68:20
  71:2 76:10
  85:1 86:11
  93:17
**resulted**  84:2
**retain**  15:5
**retention**  9:11
  11:12,14,24
  12:1 13:9
  14:14 15:11
**return**  38:12
  70:8,11 71:9
  71:19 72:4,8
  77:4,7 79:22
  80:3 81:16,22
  82:11 83:17,18
  87:8 88:9,11
  100:14

| | | | |
|---|---|---|---|
| **reveal** 108:5 | **role** 44:5,12,20 | 77:18,19 78:16 | 103:23 110:5 |
| **review** 5:19 | 115:10 | 84:6,7,21 | 110:10 135:2 |
| 23:5 32:12 | **rolls** 99:15 | 99:16,17 | **sandick's** 49:9 |
| 41:8 43:3 | **roof** 23:5 | **sandick** 2:5 7:1 | **sandler** 1:17 |
| 45:12 46:9 | **root** 27:10 | 8:24 9:4,16 | 2:24 |
| 48:11 49:7 | **roseland** 1:18 | 12:23 13:20,22 | **sara** 2:7 |
| 52:22 53:24 | **row** 94:1 | 14:1,5,21 | **sat** 39:19 |
| **reviewed** 22:6 | **ruled** 87:24 | 15:13,16 18:6 | **savaria** 42:16 |
| 42:23 57:7 | 105:9 | 20:9 21:8 26:7 | 46:8 54:10 |
| **reviewing** | **rules** 59:18 | 28:20 29:18 | **save** 1:8 |
| 45:14 48:3,12 | **ruling** 110:7,14 | 30:2,5,9 32:5 | **saveon** 5:23 |
| 52:8 102:20 | 110:18 112:10 | 33:4 35:3 37:4 | 9:19,21,23 |
| **revise** 42:9 | 134:15 | 37:13 38:21 | 10:8,17 11:5 |
| **revising** 53:15 | **run** 16:20 | 39:3 40:7,16 | 17:6 18:2,13 |
| **revisit** 126:1 | 25:23 32:20 | 42:19 43:5 | 20:16,17,24 |
| **rhetorical** | 44:8 55:22,24 | 44:17 46:4 | 21:4 24:2,18 |
| 95:13 | 55:25 56:3,18 | 47:1,14 49:24 | 26:19,24 27:1 |
| **right** 3:1 4:2 | 83:2,11 104:8 | 51:24 52:11 | 27:4,11,21 |
| 6:24 8:13 16:2 | 104:18 107:7 | 53:19 54:19,24 | 29:2 30:12,16 |
| 18:25 21:17 | 108:10,13 | 55:4,9,13 56:6 | 30:20 35:19 |
| 23:22 32:3 | 109:2 116:22 | 56:20 58:2,25 | 36:5,6 42:5 |
| 38:14 39:13 | 119:3 | 63:3,14 68:11 | 47:5 54:22 |
| 43:16 54:7 | **running** 26:12 | 72:11,14 74:17 | 55:7,12,12 |
| 55:4 58:3 60:6 | 34:21 44:1 | 74:22 75:5 | 56:14 58:19 |
| 61:23 65:7 | 104:12 109:25 | 76:5 78:3 79:8 | 60:7 61:8 62:7 |
| 66:13,14 87:14 | **runs** 74:24 | 80:7 82:3,23 | 67:22 68:18,25 |
| 88:18 92:5,24 | **ruthanne** 1:14 | 84:20 85:3,7 | 69:2 70:21 |
| 101:12,18,20 | 136:3,20 | 85:18,23 86:1 | 76:10 78:2,10 |
| 102:17 105:10 | | 86:7 87:10 | 80:17 83:16 |
| 110:3 111:20 | **s** | 88:20 90:4 | 84:2,22 85:4,6 |
| 112:2 119:19 | **s** 2:3 | 91:7 92:6,11 | 85:8,17 86:12 |
| **riverfront** 2:9 | **safety** 66:22,25 | 92:20 93:8,12 | 86:20,25 87:6 |
| **road** 31:2 | 67:2 | 94:2,17,20 | 87:9,11,15,23 |
| **robinson** 2:19 | **sale** 62:6 82:6 | 95:1,4 96:4,24 | 87:23 88:5,14 |
| | **sales** 71:4,4 | 97:5,13,16,21 | 91:9 92:10,21 |
| | 72:1 77:11,14 | | |

92:22 93:14,20
93:23 94:9
95:17,22 96:6
96:10,15,18,19
104:4,9 106:21
106:23 108:3,5
110:22 114:18
114:25 115:2
116:4,25
117:10 121:1
124:1 131:12
131:14,17
**saveon's** 94:8
107:22 113:14
115:10 118:11
118:17 120:14
127:9
**savings** 22:2
36:16,18
**saying** 9:5,6,12
24:6 25:17
32:2 33:7
37:14,15 43:24
46:1 52:1 56:9
58:6 60:14
64:8 68:3,6,6
82:8 84:3
87:15 88:4
103:10 107:12
110:25 111:16
**says** 5:13 67:3
67:22 76:9
78:1 89:10,13
93:24 116:7
127:16 129:21

130:4
**scenario** 84:15
**scg** 130:5
**scope** 18:17
22:20 29:8
36:15 72:6
101:18
**scott** 111:14
116:7 119:4,17
121:8,14
**scratch** 81:17
**screen** 50:8
**scripts** 80:24
81:1 90:22
**search** 4:23 6:7
6:9,13,17,18
12:4 16:11,13
16:20 22:4,8
22:11,18 25:13
25:17,18,19,22
26:1 32:22,24
33:17,19,22
34:1,21 37:2,7
38:13 40:2,4
40:13,14 41:4
41:13 42:15
43:23 44:1
45:25 46:2,23
46:25 47:11
49:11 53:1,12
53:16,25 54:3
54:15 55:22,25
56:17 57:10,16
58:4 61:24
78:25 82:17

85:9 86:4,7,16
91:19 101:18
103:2 104:2,8
105:2 106:12
106:13 107:6
107:16,18,21
108:11 109:22
109:25 110:5,9
111:5,8,10
114:5 116:22
128:9,23
129:11 131:10
132:6,9,12
134:23
**searches**
102:19 103:4
103:19 105:3
105:13
**second** 96:19
106:17 130:22
**secret** 79:10
**see** 3:11 5:19
15:15,20 21:5
28:3 30:19
35:15 46:9
56:25 57:1,17
63:1 68:7,8
75:19 87:11
98:15 116:2,25
119:4 120:2
131:5
**seeing** 52:23
**seeking** 91:8
120:10

**seemed** 12:12
**seeming** 126:15
**seems** 49:9
**seen** 17:17 19:3
47:14 49:1
57:18 68:16
82:10 85:18,23
86:1 100:11
106:8 122:25
**segment** 83:14
83:14
**selective** 42:7
**selendy** 2:15
**sell** 71:13
**selling** 82:14
**sells** 76:24 77:1
**send** 15:16 41:9
42:22
**sends** 119:2
**senior** 27:4
114:2,11
115:16 117:4,9
122:4
**sense** 44:13
74:23 84:16
102:23 103:2
105:7
**sensitive** 99:7
**sensitivity**
133:2
**sent** 42:20,20
102:8 130:24
**sentence** 38:11
**separate** 47:4
48:12 87:2

124:21
**separately**
46:17 48:3
99:2
**september**
107:25
**series** 67:23
**serve** 113:25
**served** 7:20,22
**serves** 29:10
60:24
**services** 36:5,6
60:23 118:11
118:18 120:14
**serving** 50:2
**set** 4:6 59:15,18
60:20 61:16
91:8 92:21,21
94:9 96:14
126:19 127:9
132:6 136:8
**sets** 17:10
60:19 61:16
69:25
**setting** 17:7
61:7
**seven** 112:25
**several** 3:4
42:23 104:16
**shake** 126:15
**shaking** 131:5
**shampoo** 77:18
**share** 94:5
**sheet** 23:3

**sheryn** 2:23
**shift** 73:7
**short** 4:5 5:8
10:3 12:16
105:12
**show** 21:2
30:17 31:7
43:13,14 59:17
61:6,15 63:14
69:23 84:13
85:1 87:3
91:25 94:21
95:15,16 99:14
111:24 120:19
**showing** 59:1,5
60:19 61:4,10
61:13 77:5
79:21 88:1,1
89:22 117:10
**shown** 120:11
124:14
**shows** 118:15
125:6
**side** 13:10
16:13 25:21
34:8,18 53:14
100:25 114:21
126:16 131:6
**sides** 132:2
**sidetracked** 7:4
**sign** 84:22
86:23 87:3
119:23 120:24
**signatory**
121:18

**signature**
121:14 136:20
**signed** 70:25
121:16 125:16
**significant**
48:17 112:12
**signing** 65:14
71:24 78:17
84:1,3,5 85:16
125:12,13
**sills** 2:8,12
**similar** 39:8
**similarly** 66:20
103:4
**simple** 73:19
**simply** 10:16
15:7 30:17
126:5
**single** 33:2
61:18 82:17
112:20 116:6
118:10,13
130:24
**sit** 39:20 41:3
52:13
**sits** 120:5
**sitting** 48:14
75:11
**six** 63:17
101:15 109:19
112:25 113:1
126:6 127:4,4
**slice** 131:25
**slightly** 40:24

**small** 120:10,10
133:5
**smoking** 116:5
**snow** 2:17
101:9,21 103:9
104:15 106:5
106:17 107:17
107:20 111:9
112:3 117:16
117:17 118:6
119:24 120:4
120:18 121:22
124:10 125:4
126:9,19
128:12,15,19
129:13,16
130:3,17,22
131:2 132:5,15
132:17 133:19
133:25 134:24
**somebody** 37:6
**somebody's**
60:15
**someone's**
73:20
**somewhat**
40:19
**sorry** 120:4
**sort** 13:2 15:3
43:24 61:3
65:25 66:3
76:20 95:8,13
134:3
**sorts** 23:9
80:25

| | | | |
|---|---|---|---|
| **sought** 20:23 | **sporadic** 57:20 | **statements** | **subject** 7:8 |
| **sound** 12:8 | **spotlighted** | 123:13 | 12:18,25 21:9 |
| **south** 123:6 | 18:21 | **states** 1:1 112:8 | 21:22 22:8 |
| **sp** 1:8 62:7 | **squarely** 61:21 | **stating** 85:19 | 23:1 26:10 |
| 93:20,23 | **stage** 9:3 | **statute** 66:21 | 28:21 30:10 |
| **spaces** 112:21 | **stake** 87:7 | 67:1 69:3 | 33:24 39:4 |
| **speak** 15:3 | **stand** 77:16,25 | **stay** 89:25 | 43:8,10 53:10 |
| 43:20 70:10 | 78:6 93:5 | **steal** 72:18 | 59:7 63:5,9 |
| 100:24 102:3 | 95:19 96:20 | 84:16 | 68:12 72:8 |
| 106:5 117:12 | **standard** 5:16 | **stealing** 97:12 | 80:14 83:13 |
| **speaking** 28:23 | 23:7,10 36:8 | **steals** 78:3 83:3 | **subjects** 41:12 |
| **specific** 7:25 | 124:14 | **stelara** 6:13,14 | **submission** |
| 40:12 73:8 | **standpoint** | 24:19 25:11 | 12:24 16:12,15 |
| 75:8 87:25 | 102:24 | 42:2 43:9 | 100:16 |
| 104:8 105:7 | **stands** 26:16 | 53:15 55:3 | **submit** 15:14 |
| **specifically** 7:2 | **start** 9:13 | 56:7,12,22 | 19:25 100:23 |
| 8:9 24:17 42:3 | 31:18 49:9,15 | 57:11 68:8,20 | **submitted** |
| 45:11 46:15 | 49:23 86:5,18 | 86:24 104:21 | 21:10 100:12 |
| 49:12 53:14 | 87:6,14 97:24 | 121:2,24 | **subpoena** 47:4 |
| 56:13 69:21 | 113:19 121:12 | **stenographic** | **subpoenaed** |
| 71:9 75:8 | 126:11 127:17 | 1:12 136:6 | 51:7 |
| 102:18 108:1 | 128:6 129:17 | **steps** 27:6,23 | **subsequent** |
| 126:24 134:1 | **started** 8:22 | 28:9 | 122:24 |
| **specifics** | 10:1 26:19 | **stop** 61:25 | **subsidiary** |
| 102:18 105:13 | 27:22 56:13 | 74:16 | 74:24 |
| 108:2 | 101:13 103:13 | **story** 77:25 | **substantial** 3:8 |
| **specified** 103:6 | 106:16 | 80:18,22 81:3 | 13:1 59:20 |
| **spell** 97:7 | **starting** 24:16 | 81:5 | **substitute** 7:12 |
| **spend** 71:11 | 86:6 107:24 | **stranger** 45:8 | **success** 64:16 |
| 76:11 135:4 | **starts** 129:25 | **strategic** 130:6 | **succinctly** |
| **spending** 78:19 | **state** 1:16 | **strategy** 99:3 | 112:18 |
| **spent** 59:6,23 | 136:4 | **string** 19:5 | **suddenly** 109:4 |
| **split** 112:22 | **stated** 123:11 | **strongly** 76:17 | **sufficient** 87:9 |
| **spoke** 102:13 | **statement** | **stuff** 100:8 | **suggest** 92:9 |
| | 29:20 | | 133:11 |

**suggests** 72:22 118:14

**suit** 66:4

**summarize** 99:25

**summarized** 102:12

**summarizing** 100:16

**summary** 12:18 93:1

**summer** 63:10

**sun** 61:19

**supplemental** 100:15

**support** 5:17 10:4 26:22 29:24 59:6,19 74:10 75:10 94:22

**supports** 90:12 90:15 116:9

**suppose** 45:17

**supposed** 3:24

**sure** 7:18 9:16 13:13,25 17:23 29:18 33:22 35:25 36:11 39:5 46:4 57:24 58:11 69:3 72:13 74:17 75:6 113:20 122:9 124:2

**surprised** 58:7

**sworn** 136:7

**system** 10:1 15:1

**systems** 1:5

**t**

**t** 123:19 136:1 136:1

**t&c's** 6:8,13,15 6:22

**table** 4:6 126:16

**tables** 4:19

**tailor** 8:22

**tailored** 8:20 54:3 69:14

**take** 9:12 27:6 27:22 28:12 46:5 70:23 71:12 79:12 83:5,16 84:1 99:19 106:10 108:18 113:11 118:2,7 125:21 131:18 132:3 134:9

**taken** 1:14 4:12 10:21 53:23 94:4 95:22 99:23 131:15 136:12

**talk** 6:19 8:8 13:22 14:21 16:6 24:13 25:25 30:15

34:2 45:19 54:3 58:9 67:12 69:11 72:5 76:19 105:18,20 127:17 128:7 129:2

**talked** 3:19 62:1 76:13

**talking** 5:23 10:9 11:10 19:21 27:18,20 32:12 33:10,12 34:18 38:16 40:10 45:8 65:12,18,19 66:5,7,8,14 90:14 109:21 117:8 121:22 123:4,5

**talks** 35:5 85:3 85:5

**targeted** 93:23

**team** 120:5 133:6,6

**teams** 81:24,24

**tee** 15:12

**tell** 16:17 24:4 45:12 63:23 66:6 77:25 79:2 86:17 88:2 92:3

**telling** 12:7

**tells** 11:13

**term** 4:17 7:25 9:2 10:22 12:21 18:7,23 21:23 23:10 28:25 30:16 36:8 55:25 56:4,5,17 103:6 104:8,13 104:18,19 107:23 111:5

**terminated** 26:23

**terms** 3:12,18 3:22 4:23,24 5:12,15,16,24 5:25 6:9,18 7:21,24 9:22 10:21 16:8,11 16:13,22 17:3 17:9,10,12,15 18:8 19:5,9,19 20:2,3,21 21:6 21:6,22 22:4,8 22:11,18 23:4 23:4,7 25:13 25:17,18,19,22 26:1,11,15,25 27:9,24 29:21 32:20,22,24 33:17,19,22 34:1,17,21,21 34:25 35:16,19 36:9,22,23 37:2,7,25 38:10,13,17

| | | | |
|---|---|---|---|
| 39:10,13,16 | 135:3,6 | 28:9,16 30:25 | 119:21,24 |
| 40:2,4,13,14,19 | **theory** 79:16,18 | 31:4,18 34:1 | 120:9,18 |
| 40:24 41:4,13 | 93:9 96:7 | 37:14 40:13 | 123:23 125:11 |
| 42:2,6,10,15 | 97:17 116:9 | 41:12,20 42:13 | 126:2,12 127:6 |
| 43:9,13 44:1 | **thicket** 68:24 | 42:18 43:18,19 | 128:5 130:10 |
| 49:12 53:1,12 | **thing** 29:9 | 44:2 49:5,22 | 131:14 133:10 |
| 53:16,17,25 | 54:19 58:16 | 54:1 55:2,18 | 134:12 |
| 54:3,15,20,25 | 79:10,24 101:7 | 55:19,22 56:4 | **thinks** 34:8 |
| 55:22 57:10,16 | 105:21 | 56:19 57:14,15 | **third** 2:19 |
| 57:17,20 58:1 | **things** 3:14 7:6 | 58:16 59:23 | 46:21 47:4,9 |
| 58:5,5 59:18 | 9:4 10:25 17:7 | 60:7,9 61:20 | 49:2,11 51:5 |
| 61:24 62:8 | 17:22 18:16 | 62:13,23 63:1 | 51:15,18,22,24 |
| 67:17 71:4 | 21:8 22:1,22 | 63:23 64:3 | 52:3 53:7,9 |
| 74:6 77:14 | 23:22 25:15 | 67:4,9,11 | 54:14,25 55:8 |
| 78:3,25 79:19 | 26:8 27:17 | 69:15,21 70:11 | 66:2 110:18 |
| 82:13 83:7 | 28:5,15,21 | 72:1 75:8,23 | 116:5,10 |
| 101:18,21 | 29:7 32:10 | 76:18 77:12,21 | 132:19,20,21 |
| 104:2,21 105:2 | 34:16 35:12 | 78:5 80:21 | **thirds** 22:5 |
| 107:6,16,19,21 | 38:2 58:21 | 82:7,9 86:6,15 | **thought** 10:24 |
| 108:1,11,18 | 60:3 62:9 | 86:16,21 87:8 | 12:5 20:17 |
| 109:22 110:1,5 | 65:13,19 67:24 | 88:23 89:15,21 | 24:5 31:23 |
| 110:9,21 111:8 | 68:6 73:13 | 90:2,4,6 92:15 | 96:1 100:3 |
| 111:10 114:5 | 92:22 94:10 | 94:13,14 95:24 | 103:13 109:14 |
| 116:22 118:12 | 129:1 | 96:24 98:1 | 126:25 |
| 118:18 120:14 | **think** 4:7 5:22 | 99:10,13 100:2 | **thousands** 4:22 |
| 120:25 128:9 | 6:6,23 7:1,6,9 | 100:13,23 | 22:10 48:16 |
| 128:23 129:11 | 8:2,6,13 9:17 | 101:1,6,16,23 | **thread** 131:2 |
| 132:6,9,12 | 9:23 12:12 | 103:17 104:2 | **threat** 66:21,24 |
| 134:23 | 13:4,16 15:23 | 105:10 106:17 | **threaten** 60:4 |
| **test** 30:19,20 | 15:25 16:7,10 | 107:1,5 111:16 | 61:11 |
| **testimony** 77:5 | 17:2,13,15,19 | 112:8,11,17,19 | **threatens** 60:7 |
| **text** 112:20 | 18:4,23 19:1 | 113:2,4 115:12 | **three** 22:5 |
| **thank** 41:24 | 19:15 20:14 | 115:14 116:3 | 55:20 133:6 |
| 88:17 129:13 | 21:1,10,18,25 | 117:3,10 | **tied** 32:9 78:22 |
| 130:1 134:25 | 24:11 26:6,7 | 118:19,23 | |

**ties** 88:3

**tim** 102:10,11

**time** 4:19 5:18
5:20 8:19 10:7
10:9,12,22
11:5,21 14:22
14:25 15:1,5
19:24 21:16
22:12 24:9
25:9 27:25
30:22 31:15
33:9 34:14
35:5 36:19
37:6 38:14
40:21 44:24,24
52:2 55:19,23
55:24 56:1
57:18 58:2,20
79:14 90:19
92:13 103:16
105:2 108:11
110:18 113:7
128:19,20
132:3,7,8
135:4

**times** 53:20
88:1 118:24

**today** 3:2 8:8
13:23 14:3
16:18 55:16
64:23 92:24
97:4 100:20
115:24 118:24
126:12

**told** 22:15,16
32:14,21,22,22
63:11 102:5
117:11

**tons** 98:3

**took** 31:16
32:19 43:24
63:16 99:25
104:11 105:23
106:19

**tool** 50:9 64:20

**tools** 36:8

**top** 116:7 118:6

**topic** 6:24 16:3
80:6

**tortious** 36:3

**tortiously**
18:18

**totally** 12:13
58:7 73:13
74:1 80:13

**touch** 28:24,25

**towards** 17:8

**tracks** 7:2

**transcript** 1:6
1:12 33:3
126:10,17,21
126:23 127:13
127:15 136:6

**transparency**
89:8 90:8
91:14,21 93:24

**tremendous**
80:25

**tremfya** 6:13
6:15 24:19
25:11 42:2
43:9,13 53:16
55:3 56:8,12
56:22 57:11
68:20 104:21
121:3,24

**trial** 12:19
21:13 22:3
32:10 46:20,24
47:1,3,5,6 49:3
49:12 51:7
56:10 69:6
84:12 92:25
96:20 116:1
118:21,23,25
119:6 125:19

**tried** 7:11 10:3
32:18

**true** 26:9 78:5
82:9 85:19
94:13 117:1
128:4 132:25
136:5

**try** 3:15 26:20
27:10 37:3
81:18 90:18
104:10

**trying** 9:21
35:21 76:2
77:16 90:9
96:17 110:24
121:18 127:19
133:21

**turn** 3:17 11:9
20:7 24:9
58:15 113:11

**turned** 107:10

**turning** 66:16
117:24 130:10
132:15

**turns** 7:24

**two** 4:5 6:11,18
17:17 21:8,25
22:5 24:19,22
24:25 27:17
32:21 42:10
44:3,7 49:21
54:9 55:18
60:9 62:3,6
65:25 77:3
98:13 101:21
103:18 106:5
107:21 127:18
131:12

**tyler** 2:4

**type** 72:6,7

**types** 79:1
113:21

**u**

**ultimately**
102:15 104:6
104:10,15
106:19 107:9
112:22 127:4
127:23 133:9

**uncontrovers...**
5:16

| undecided | understands | **v** | **w** |
|---|---|---|---|
| 112:5 | 5:15 102:13 | values 90:12 | w 123:19 |
| **under** 3:25 | **understood** | various 23:21 | 132:21 |
| 19:6 60:16 | 33:20 57:22 | 27:19 38:18 | wait 56:25 84:3 |
| 61:13,19 77:15 | 134:5 | 39:10 63:19 | 127:13 |

**undecided**
112:5
**under** 3:25
19:6 60:16
61:13,19 77:15
87:21
**underlying**
39:12 65:20
**underscore**
78:24
**underscores**
100:14
**understand**
18:1 19:8,10
19:11,14,25
23:12 28:16,17
33:7 35:21
36:17,21,22
38:6 41:22
43:25 56:24
58:17 67:19
69:24 75:17
87:6 105:21
109:10 128:24
129:9
**understanding**
3:21 5:11 6:10
8:18,22 16:21
19:23 28:10
34:15,23,24
35:14,23 38:17
38:20 40:10
56:2 98:20
104:21 132:24
133:15

**understands**
5:15 102:13
**understood**
33:20 57:22
134:5
**undertake** 48:3
**undertaken**
45:11
**ungerleider**
1:14 136:3,20
**unique** 114:24
**unit** 52:17
**united** 1:1
**universe**
132:11
**unusual** 48:4
**update** 5:3 59:4
**updated** 43:15
**updates** 130:8
**updating** 5:4,5
**use** 7:11 35:16
36:9 46:19
50:14 128:11
133:22
**used** 4:23 5:16
6:9 9:2 10:23
23:3,8,8 36:20
42:15 76:21
78:4 110:6
128:20
**uses** 22:12
**using** 40:14
53:1 96:10
**usually** 122:12

**v**
**values** 90:12
**various** 23:21
27:19 38:18
39:10 63:19
81:18
**vasquez's**
18:19
**vast** 80:12
**vazquez** 62:1
65:18
**vazquez's**
12:15
**vendor** 21:12
**verbatim** 81:8
**versus** 15:25
**viability** 60:4,8
61:11 62:18,18
64:5,11 67:24
68:4,15 69:2
69:10,13,23
119:11
**view** 26:24 41:1
**vigilant** 39:9
**violate** 27:24
118:12,18
120:14
**virtually** 73:21
**virtue** 21:19
**voluntarily**
26:13
**vs** 1:7

**w**
**w** 123:19
132:21
**wait** 56:25 84:3
127:13
**waldor** 3:5
13:10 22:15
31:1 32:21
37:8 40:17
41:2 43:16,23
63:11 81:10
87:24 101:14
101:24 102:1
102:13,21
103:6 104:11
104:17 108:17
109:9 110:15
110:16 111:17
111:24 112:7
112:18,22,22
113:24 114:9
124:23 125:24
126:25 127:5
**waldor's** 26:14
27:14 56:2,23
**want** 3:15 7:5
8:20 9:12
13:17,17 14:3
14:9,17 16:18
17:23 18:1
19:14 20:7
21:21 23:12,15
23:19 24:1,3
28:8,14 33:8
35:9,11,15

36:19,21 39:9
41:15 49:16
51:3,14 55:8
55:16 56:15
57:24 62:11
64:2 65:16
67:9,12,14
68:9 69:8
70:17 74:14
75:1,19 77:25
78:6 80:6
81:21 82:18
86:5 87:6,7,15
91:22 93:7
94:15 96:15
97:18,23 98:15
98:19 99:19
100:7,23
103:24 105:20
108:9 111:4
112:2 117:12
117:18 118:8
124:24,25
125:20,24
127:24 128:6
128:10 129:2
131:12
**wanted** 3:4
34:11 38:3
63:11 104:1
105:14
**wants** 50:15
84:12 85:12
100:10 131:25

**way** 8:9 17:5
18:10 22:7,11
28:13 29:12
33:23 35:10
38:15 61:4,10
62:2 66:25
74:13 75:23
79:9 80:15
85:9 90:9 92:7
93:2 94:2
118:1 128:5
**wayne** 2:24
102:3,5 130:1
**ways** 122:10
133:21
**we've** 9:7 22:23
38:21,24 42:23
58:25 59:5,19
92:18,19
104:16 109:25
110:6,13
112:14 113:5
115:22 116:12
120:18 122:25
129:6,14
134:21
**webb** 2:4
**website** 89:10
91:15
**wednesday**
1:18 13:24
**week** 13:24
14:3,4 41:16
42:21 83:3
84:17 101:8

103:12
**weeks** 3:4
68:20,24
**weighing** 15:24
105:15
**welcomed**
124:2
**went** 16:12
40:22 48:25
104:11 105:10
112:21
**white** 111:14
112:13 113:19
113:24 114:13
114:13,17,21
115:8,12,17
117:4 118:16
119:4,17
120:17 121:8
121:14,17
124:19 125:15
128:10 134:15
134:22
**white's** 125:14
**wide** 80:8,25
91:19
**willing** 25:22
**wind** 45:15
**window** 104:24
**winds** 78:11
**withheld** 45:2
46:12 124:6
**witness** 136:7
**wohlforth** 2:20

**wolfson** 2:2 3:1
4:7,13 7:18 8:7
8:15,23 9:10
10:14 13:6,21
13:25 14:2,8
14:11,15,20
15:6,15,18
16:16,24 17:19
18:4,22 19:17
23:11,24 27:15
29:16,23 30:3
30:7,25 33:2,6
34:5,10 35:9
36:13 37:11,19
37:22 39:1,6
40:8 41:3,25
43:1 44:9
45:25 46:18
47:7 48:24
49:19 51:3
52:10,25 53:4
53:9 54:7,12
54:18,23 55:2
55:15 57:1
58:9,14 59:25
61:25 63:13,23
65:10 66:12
68:2 69:8 70:4
72:13 74:14,18
75:12 76:14
77:20 79:2,19
80:1 81:14
82:1 83:23
84:19 85:13,22
85:25 86:3,9

[wolfson - zoom]                                                    Page 42

86:14,18 88:13
88:18,21,25
89:4 91:4,12
91:22 92:4,17
92:23 93:6,10
94:15,19,24
95:2,24 96:23
97:2,9,14
98:17 99:19,22
99:24 100:19
101:4,6,11,23
102:10 103:20
105:5,25
106:10,13
107:11,18
108:7,13,21
109:17,24
110:3,8,20
111:7,11
112:15 113:4
113:18 115:5
117:16 118:5
119:16 120:3
120:16 121:10
122:7,18
123:16,20
124:22 125:20
126:13,20
127:12 128:2
128:14,17,22
129:14,24
130:14,20
131:1,4,18
132:8,16
133:18,23

134:5,20 135:1
135:7
**wondering**
74:19
**word**   22:12,13
23:3 35:6
36:20 132:20
**words**   37:5
45:11
**work**   35:13
39:25 40:3
44:22 47:16,18
48:8,20,20
50:4 51:2,2
52:7 61:23
81:23 102:20
105:14 116:1
118:21 125:10
132:12
**worked**   44:5
133:4
**working**   8:5
43:6 45:14
50:1 107:3
129:22 130:5
132:19,21
**works**   17:5
**world**   33:17
54:22 64:15
110:23 111:5
**worried**   109:18
**worse**   68:18
**write**   129:1
**writing**   129:7

**written**   32:23
**wrong**   44:19
83:5,6
**wrote**   129:21

**x**

**x**   80:8
**xio0115**   136:21
**xio1634**   136:21

**y**

**yeah**   14:20
55:15 62:20
65:10 66:12
76:14 85:7
87:10 91:12
94:19 112:16
113:18 119:16
127:22 129:11
**year**   24:22
27:13 57:8
63:17 94:1
95:12
**years**   10:5,12
13:3 39:22
92:2 109:20
**york**   2:5,5,13
2:13,16,16,20
2:20

**z**

**z**   123:19
**zoom**   2:10 3:3
41:18

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.