# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

March 20, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

> Re:  *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
>      **No. 2:22-cv-02632 (JKS) (CLW)**

Dear Judge Wolfson:

On behalf of Defendant Save On SP, LLC ("**SaveOn**"), we write to oppose Plaintiff Johnson & Johnson Health Care Systems Inc.'s (with its affiliates, "**J&J**") March 12, 2024 motion to compel supplemental Interrogatory responses. J&J's motion is meritless—it accuses SaveOn of not verifying Interrogatory answers that SaveOn demonstrably did verify, it demands answers to patently irrelevant questions, and it mischaracterizes documents and testimony in accusing SaveOn of incomplete answers. Your Honor should deny the motion.

## I.     SaveOn Verified Its Interrogatory Responses

J&J's motion to compel SaveOn to produce an additional verification of its Interrogatory responses is baseless. SaveOn investigated and responded to all of J&J's 20 Interrogatories,

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

providing verified responses. Consistent with Judge Waldor's November 7, 2023 Order, Dkt. 173 at 3, SaveOn then conducted a supplementary investigation into all of these Interrogatories. It determined that its responses to 16 Interrogatories did not require updating as the responses remained the same. SaveOn updated the rest, providing supplemental responses to Interrogatories 2, 10, 17, and 19 on February 1, 2024 and (after additional correspondence with J&J) providing supplemental responses to Interrogatories 4 and 16 on February 23, 2024. J&J Ex. 4 and J&J Ex. 15. Also on February 23, 2024, SaveOn submitted a sworn certification by SaveOn's President that:

> I certify that the foregoing answers made by me to these Interrogatories [4 and 16] are true. ***I further certify that all previously-submitted answers to Interrogatories, including where supplemented, are true.***

J&J Ex. 15 at 10 (emphasis added). On its face, this certification provided an updated verification of SaveOn's responses to all Interrogatories. J&J's assertion that SaveOn "has failed to verify all but two of its supplemental interrogatory responses," Mot. 2, is simply false.

## II.     SaveOn Provided Full Answers To J&J's Interrogatories

J&J's motion to compel additional Interrogatory responses is equally meritless. To remind of the context: SaveOn advises commercial health plans on plan design and administers a plan benefit on their behalf. Under that benefit, if plan members taking specified specialty drugs enroll in the drug makers' copay assistance programs and consent to the plans monitoring their pharmacy accounts, then the plans will cover any portion of the members' copay obligations not covered by copay assistance. The manufacturers alone decide how much copay assistance they provide to patients. Among other things, SaveOn communicates with its clients' plan members and helps them sign up for copay assistance programs, including J&J's CarePath program.

J&J's two claims against SaveOn—tortious interference with contract and violation of New York's General Business Law § 349[1]—focus on SaveOn's interactions with **patients**. In its tortious interference claim, J&J alleges that SaveOn induces patients to violate CarePath's terms and conditions. Dkt. 1 at 40. In its GBL claim, J&J alleges that SaveOn makes deceptive or false statements to patients that purportedly harm both the public and J&J. *Id.* at 40-41.

SaveOn has produced an extraordinary amount of material documenting its interactions and communications with patients, including call scripts, emails about patient complaints, mailings to patients and more. SaveOn has produced roughly 142,000 entries of Salesforce call or task notes; approximately 1,000 talk tracks; and more than 500 reviews of its own employees and their adherence to a talk tracks.

Despite receiving this mountain of discovery, J&J does not cite a single, specific instance of SaveOn deceiving or misleading a patient in its recently filed proposed amended complaint. SaveOn's documents rather consistently show that patients are happy to learn about the plan benefit that it administers. *See, e.g.*, SaveOn Ex. 1 at 5 ███████████████████████████████████████████████████████████████████████████████████████; SaveOn Ex. 2 (SOSP_0372789) at 1 ██████████████████████; SaveOn Ex. 3 (SOSP_0524666) ██████████████████████████████████████████████████████████

J&J's own internal analysis confirms that patients have no problem with SaveOn. *See, e.g.*, SaveOn

---

[1] J&J recently filed an amended complaint which did not materially change the claims against SaveOn. J&J merely added a claim of Conspiracy to Tortiously Interfere with a Contract. Dkt. 220.

Hon. Freda L. Wolfson                                                                 Page 4

Ex. 4 (internal J&J document showing survey results in which 0% of patients stated they had ex-

perienced negative effects of a copay accumulator or maximizer program). And feedback from

members of SaveOn-advised plans is overwhelmingly positive.[2]

Lacking evidence that SaveOn deceived the public, J&J focuses its motion instead on

SaveOn's purported deception of **J&J**. These topics are irrelevant to J&J's claims, which concern

only SaveOn's patient-facing conduct. While SaveOn agreed to answer Interrogatories about its

interactions with J&J to try to avoid a dispute, it reserved its relevance objections, and Your Honor

can dispense with most of J&J's motion on relevance grounds alone.

---

[2] *See* SaveOn Ex. 5

: SaveOn Ex.   (
); SaveOn Ex. 7

SaveOn Ex. 8 (

: SaveOn Ex. 9

: Ex. 10

(

Ex. 11 (

); Ex. 12

: Ex. 13

: Ex. 14 (

Ex. 15

Even were these topics relevant, J&J's assertions that some of SaveOn's answers are in-correct or incomplete—often based on J&J's mischaracterization of documents or testimony—are untrue. SaveOn answered the Interrogatories truthfully to the best of its knowledge, ███████████ ██████████████████████████████████████████████████████████████████████ and re-viewing numerous documents. When SaveOn discovered new information, it supplemented its responses, *see, e.g.,* SaveOn Ex. 16, which it has verified, *id.* at 10. If J&J does not like SaveOn's answers, it can ask about them in depositions.

On a few occasions, J&J also demands that SaveOn provide information that SaveOn has already produced in other forms. The law does not require such repetition. *See, e.g., Holley v. Port Auth. of N.Y.,* 2018 WL 11413338, at *5 (D.N.J. May 3, 2018) (finding compliance with the "oth-erwise been made known" clause of Rule 26 when the facts "were identified through [the party's] formal deposition testimony, during a line of questioning which appear[ed] to be directed at finding [those specific facts]" (citation omitted))*; Eli Lilly and Co. v. Actavis Elizabeth LLC*, 2010 WL 1849913, at *3 (D.N.J. May 7, 2010) ("A majority of courts, the leading treatises, and the Advisory Committee Note to Rule 26 agree that an individual's existence or knowledge can 'otherwise be made known,' and thus be sufficiently disclosed for Rule 26 purposes, through deposition testi-mony."); *Pa. State Lodge Fraternal Ord. of Police v. Twp. of Springfield*, 2023 WL 7547494, at *7 (E.D. Pa. Nov. 13, 2023) (disclosures need not be revised when information at issue was used during depositions); *Liggins-McCoy v. Democratic Caucus of Senate of Pa.*, 2022 WL 1446987, at *10 (E.D. Pa. May 5, 2022) (same); *In re Jacoby Airplane Crash*, 2007 WL 559801, at *8 (D.N.J. Feb. 14, 2007) (collecting cases).

Simply put, J&J has no basis to question SaveOn's investigation or the veracity of its an-swers, as an examination of J&J's arguments about each of the Interrogatories at issue shows.

### A.      Interrogatory No. 4

Interrogatory No. 4 asks SaveOn to "[d]escribe, in as much detail as possible, the process by which SaveOnSP determines the size of the 'inflated copay,' or increase to Plan Members' Copayment or Co-insurance, including any and all criteria used to inform how that Co-payment or Co-insurance is determined." J&J Ex. 15 at 6. SaveOn responded (not including its objections):



J&J Ex. 15 at 6-7.

J&J asserts that SaveOn omitted from this response any discussion of ▇▇▇▇▇▇▇▇ described in J&J's Exhibit 5. Mot. 8. In fact, as J&J's Exhibit 5 shows, ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇. J&J Ex. 5 at -232 (▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇. SaveOn objected to providing information about copays for drug makers other than J&J and said that it would not do so, J&J Ex. 15 at 6, and J&J does not explain why copays that

did not apply to J&J's drugs are relevant. Even if they were, SaveOn addressed ███████████

██████████████ in response to Interrogatory No. 16: "██████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ J&J Ex. 15 at 8-9.

J&J also complains that, in describing the ███████████████████████████████

███████████████████████, SaveOn "did not admit the ***intent*** of these tactics," citing J&J

Exhibits 5, 6, and 14.  Mot. 8 (original emphasis). But Interrogatory No. 4 did not ask about

SaveOn's intent; it asked about SaveOn's "process" for advising plans on copay and coinsurance

levels, which SaveOn described. J&J's assertions about SaveOn's intent (which SaveOn disputes)

are relevant only to Interrogatory No. 16, which SaveOn addresses below.

### B.    Interrogatory No. 15

Interrogatory No. 15 inquires "whether and under what circumstances You have advised

any Payors to eliminate or alter coverage for certain pharmaceuticals and to arrange for Plan Mem-

bers to obtain those pharmaceuticals from any source other than Accredo, including (without lim-

itation) independent nonprofit organizations, such as the Johnson & Johnson Patient Assistance

Foundation, Inc." J&J Ex. 10 at 6. SaveOn was compelled to respond "with respect to Janssen

drugs." Dkt. 102. It did so. SaveOn responded (not including its objections):







J&J Ex. 17 at 6-7.

J&J asserts that its Exhibits 8 and 18 show that ██████████████████████

██████ Mot. 9. They do not. J&J Exhibit 8 is PowerPoint presentation, one slide of which states,

in a footnote: ████████████████████████████████████

████████████████ J&J Ex. 8 at 3. ████████████████████

████████████████████████ J&J Exhibit 18 is a PowerPoint

presentation regarding ████████████████████████████

████████████████████████. J&J Ex. 18. Even were ████ oth-

erwise relevant (they are not), SaveOn's answer would not change, as ████████████

█████████████████████████████████████████████

████████████████████

**C.      Interrogatory No. 16**

Interrogatory No. 16 asks SaveOn to "[d]escribe, in as much detail as possible, all measures

that You have utilized to prevent any Pharmaceutical Manufacturer or manufacturers from being

able to identify patients that are enrolled in the SaveOnSP Program, or to make it more difficult

for them to do so." J&J Ex. 15 at 7. While SaveOn agreed to respond to avoid a dispute, it reserved

its relevance objection as to drug makers other than J&J, J&J Ex. 15 at 8, and even such efforts

regarding J&J are at best marginally relevant, as J&J's claims concern SaveOn's communications

with patients, not what SaveOn concealed or revealed to drug manufacturers.

Even if Interrogatory No. 16 sought relevant information, moreover, SaveOn provided it.

SaveOn responded (not including its objections):



J&J Ex. 15 at 8-9.

J&J asserts that its Exhibits 5 and 20 "flatly contradict" SaveOn's answer. Mot. 11; *see also* Mot. 7-8 (discussing J&J's Exhibits 5 and 6 regarding Interrogatory No. 4). In reality, J&J's Exhibits 5 and 20 discuss ███████████████████████████████████████ ██████ J&J Ex. 5 ████████ at -232 (dis█████████████████████████ J&J Ex. 20 at 15 (discussing ███████████████████████████████████████ ██████████████████████ are not relevant to J&J's claims. Even were ███████████████ ██████████████████ relevant, moreover, SaveOn produced ██████████████████ SaveOn is not obligated to repeat that information in its Interrogatory responses. *See, e.g.*, *Branch v. Temple Univ.*, 2023 WL 3993016, at *5 (3d Cir. June 14, 2023).

J&J also asserts (in addressing Interrogatory No. 4) that J&J Exhibits 6 and 14 show that avoiding manufacturer detection was one of SaveOn's "critical criterion" ████████████████ ██████████████████, which is entirely distinct from ██████████ Mot. 8. In fact, the cited portions of both documents are ████████████████. J&J Ex. 6 (████████ ██████████; J&J Ex. 14 at -1312 (████████████████████). ████████████████ ██████████████████████████ As SaveOn stated in its response, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████—a fact borne out repeatedly in SaveOn's documents. *See, e.g.*, SaveOn Ex. 17 ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████; SaveOn Ex. 18 (discussing ██████████████████████████████████; SaveOn Ex. 19 ("████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████). SaveOn need not change its response to falsely assert otherwise.

J&J further asserts that SaveOn's response that ████████████████████████ is "vague" because it does not ████████████████████████████████████ Mot. 11-12. But SaveOn has produced documents showing ██████████████████ ██████████████—including J&J's Exhibit 14. *See, e.g.*, J&J Ex. 14 At -312 (██████████ ███████████████████████████████████████████████████████

██████. SaveOn is not required to further update its Interrogatories to provide details that it has already provided. *See, e.g.*, *Branch v. Temple Univ.*, 2023 WL 3993016, at *5 (3d Cir. June 14, 2023) (finding the "otherwise been made known" clause applied when the party faulting the opposing side for failure to update their disclosures was the party that identified the after-acquired evidence); 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1 (3d ed. 2023) (the "otherwise been made known" exception to Rule 26(e)(1)(A) "recognize[s] that there is no need as a matter of form to submit a supplemental disclosure to include information already revealed by a witness in a deposition or otherwise through formal discovery.").

### D.    Interrogatory Nos. 17 & 19

Interrogatory Nos. 17 asks for "all measures" that Save used to prevent its employees from being identified by drug makers; Interrogatory No. 19 asks for "all instances where and all circumstances under which" SaveOn employees "lied to, misled or deceived Pharmaceutical Manufacturers." While SaveOn agreed to respond to these Interrogatories to try to avoid a dispute, it reserved its objection that communications with drug makers other than J&J are irrelevant, J&J Ex. 4 at 9, 11, and even its communications with J&J are at most tangentially relevant, as this case is about SaveOn's interactions with patients, not with J&J.

Even if Interrogatory Nos. 17 and 19 sought relevant information, moreover, SaveOn provided it. SaveOn responded to Interrogatory No. 17 (not including its objections):



Hon. Freda L. Wolfson                                                                                  Page 12



J&J Ex. 4 at 9-10. SaveOn responded to Interrogatory No. 19 (not including its objections):





J&J Ex. 4 at 11-12.

J&J's complaints about these responses focus on Ayesha Zulqarnain, a Special Project Co-ordinator for SaveOn, whom J&J deposed on November 10, 2023. As SaveOn stated in its response,  J&J Ex. 3 at 115, 120, 143, 179, 279. J&J asserts that these discussions are relevant to SaveOn's purported "systematic strategy of deception targeted at manufacturers like JJHCS." Mot. 4. This is untrue— J&J Ex. 3 at 151:18-20—and even if it were true, J&J's claims have nothing to do with SaveOn's purported deception of drug makers—they deal with SaveOn's statements to patients, and *Id.* at 297:14-16 (.") *id.* at 297:21-24 (" ).

Nevertheless, J&J decided to ambush Zulqarnain at her deposition. solely

within J&J's possession, responsive to SaveOn's document requests, that J&J withheld until the

deposition. J&J refused to explain when it had identified ⬛⬛⬛⬛ or why it had withheld

them, SaveOn Ex. 20, and later said that it might do the same thing to other witnesses, SaveOn Ex.

21 at 2. Despite J&J's misconduct,[3] ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛

 J&J now asserts that SaveOn's statement that ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ is inaccurate and contradicts its statement that ⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Mot. 12-13. Not so. SaveOn accurately stated that ⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ J&J Ex. 3 at 98:18-21 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛), and

afterwards, *id.* 201:15-20 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛.

 J&J next questions SaveOn's statement that ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, pointing to its Exhibit 22, which d⬛⬛

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Mot. 13-14. SaveOn's



---

[3] A party may not withhold "discovery until a moment when its impact would be most acute." *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 106 (D.N.J. 2006) (granting motion to strike evidence submitted with a motion for summary judgment that the moving party had intentionally withheld during discovery). "Indeed, '[i]t is fundamental to our litigation system that parties rely on each other's good faith and professional responsibilities to comply with the Rules of Civil Procedure.'" *Reilly v. Home Depot U.S.A., Inc.*, 2023 WL 3043885, at *7 (D.N.J. Apr. 20, 2023); *see also Younes v. 7-Eleven, Inc*., 312 F.R.D. 692, 709 (D.N.J. 2015) ("'the discovery provisions of the Federal Rules are meant to function without the need for constant judicial intervention, and ... [the] Rules rely on the honesty and good faith of counsel in dealing with adversaries"); *see also* New York Rule of Professional Conduct 3.4(a)(1) (a lawyer shall not "suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce").

statement was accurate: ███████████████████████████████████████████████ its

Exhibit 22 identifies ██████████████████████████████████████

     J&J also asserts that SaveOn's responses to Interrogatory Nos. 17 and 19 are "materially

incomplete" because SaveOn purportedly did not disclose ████████████████████████

██████████████████████████████ Mot. 14. In fact, SaveOn has disclosed ███

█████████████████████████████████████████████████████████

█████████████████ J&J also complains that SaveOn does not state who authorized ████

█████████████████████████████████████████████████████████

█████████████ly Interrogatory No. 20 does, which SaveOn addresses below.

     Finally, J&J asserts SaveOn's answers are deficient because J&J's Exhibit 24 indicates that

██████████████████████████████████████████████████████ Mot. 14.

In fact, ██████████████████████████████████████ J&J Ex. 24 at -345.

As J&J has alleged—including in its proposed amended complaint, Dkt. 220 at 2—SaveOn is

business partners with ESI and Accredo, with whom it works to ensure that plan members receive

specialty medications, Dkt. 1 at 22. ████████████████████████████████████

██████████████████ *E.g.*, J&J Ex. 3 at 108:17-24 ████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████. It is hard to

see how such conduct is even arguably misleading or deceptive.

    **E.    Interrogatory No. 20**

     Interrogatory No. 20 asks SaveOn to "[d]escribe, in as much detail as possible, each in-

stance where and all circumstances under which You have instructed Your representatives or em-

ployees to lie to, mislead, or deceive Pharmaceutical Manufacturers including with regard to their

affiliation with SaveOnSP." SaveOn responded (not including its objections):



J&J Ex. 25 at 8 (Nov. 3, 2023 supplemental rog responses).

J&J asserts that Zulqarnain's testimony "cast[s] serious doubt on the veracity of [SaveOn's] response." Mot. 15. It does not. J&J asserts that Zulqarnain testified that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ *Id.* at 15-16 (citing J&J Ex. 3 at 32:23-33:10; 72:7-73:25; 121:23-25; 153:3–23), but in none of that cited testimony did Zulqarnain say that ▮▮▮▮▮▮▮▮▮▮▮▮ J&J also says that SaveOn does not say "who authorized ▮▮▮▮▮▮▮▮ Mot. 16, but SaveOn clearly stated that ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ J&J Ex. 3 at 119:16-18 (▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) (emphasis added); *see also id.* at 80:22-24. (▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮) (emphasis added).

J&J also cites J&J Exhibits 1 and 2, which state that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, and say that "[i]t defies credibility that senior SaveOnSP leadership did not approve these official company policies." Mot. 16. But not ▮▮▮ ▮▮▮▮▮▮ is not lying, misleading, or deceiving, as much as J&J might wish it otherwise. To the extent that J&J suggests that SaveOn instructs its employees to make

affirmatively false statements to drug makers, SaveOn has stated that this is not true and J&J has also produced information showing that, when asked for their affiliations, its employees regularly disclose that they are calling from SaveOn. *See, e.g.* SaveOn Ex. 22 (spreadsheet produced by TrialCard showing SaveOn employees regularly identified themselves as such when speaking with TrialCard about CarePath). If J&J is interested in which specific policies SaveOn's executives approved, it may ask them in depositions.

<div align="center">***</div>

Your Honor should deny J&J's motion.

Respectfully submitted,

/s/ *E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

# EXHIBIT 1

# SEALED IN ITS ENTIRETY

**EXHIBIT 2**

**SEALED IN ITS ENTIRETY**

**EXHIBIT 3**

**SEALED IN ITS ENTIRETY**

# Exhibit 4

# File Provided Natively

ATTORNEYS' EYES ONLY

JJHCS_00142279





Copay Accumulator Competitive Assessment: Strategic Recommendations and Roadmap

*Prepared for Janssen*

**Avalere Health** | An Inovalon Company
October 2021

# Today's Agenda

**1** | **Task Overview and Executive Summary**

**2** | **Patient Survey Findings**

**3** | **Copay Program Solutions Assessment**

**4** | **Next Steps**

Avalere | 2

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Project Objectives

Janssen is interested in understanding how copay assistance program design (both from a manufacturer and copay vendor standpoint) can help mitigate potential Best Price and AMP calculation risks due to the Medicaid VBP rule finalized in December 2020

## Avalere's Project Tasks include:

| 1 | Strategic Alignment and Competitive Assessment: |
|---|---|
| **1a** | *Strategic Alignment and Project Kickoff* |
| **1b** | *Competitor Program and Copay Vendor Benchmarking and Assessment* |
| **1c** | *Primary Research* |
| **1d** | *Patient Survey* |
| **2** | Strategic Recommendations and Roadmap** |

AMP: Average Manufacturer Price; VBP: Value-Based Purchasing
 **Janssen should consult with internal/external legal counsel on regulatory implications of potential solutions addressed



3

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Avalere Developed Strategies and Solutions for Janssen to Consider Implementing for Copay Assistance

CASE 2:22-cv-02632-CCC-CLW Document 255-21 Filed 09/30/24 Page 26 of 91 PageID: 28668

| Task 1D: Patient Adherence and Copay Assistance Type Survey | Task 2: Strategic Recommendations Development and Roadmap |
|---|---|
| • Avalere developed a survey of 22 questions and deployed it to 130 patients that met specific screening criteria <br><br> • The goal of the survey was to identify patient experience with current copay support, willingness to move to non-traditional or new copay assistance approaches, and sensitivity to additional OOP and/or administrative burden in deciding whether to abandon therapy | • Avalere synthesized findings of Task 1 and provided guidance on the service offerings/tactics that Janssen can take in the immediate term (i.e., 2022) as well as mid- and long-term strategies that Janssen may consider as steps to mitigate BP/AMP calculation risks in 2023 in light of the Medicaid VBP final rule <br><br> • Avalere has developed a roadmap of recommended activities and engagement for Janssen generally and the Patient Support Services team specifically across key areas such as program design and internal/external analytics |

OOP: Out-of-Pocket; BP: Best Price; AMP: Average Manufacturer Price; VBP: Value-Based Purchasing

Avalere | 4

Copyright ©2021. Avalere Health LLC. All Rights Reserved.





Executive Summary

# Janssen Can Consider Several Incremental and Significant Solutions to Address Growing CAP Risks

Case 2:23-cv-02384-RGK-MAA Document 100-3 Filed 07/10/24 Page 28 of 91 Page ID #:9798
PageID: 28670

| | | |
|---|---|---|
| **Update Existing Solutions** | **1. Revising Eligibility Criteria** | Revise patient copay support eligibility to reduce the potential exposure to patients on a CAP program |
| | **2. Variable Max Support for CAP Patients** | Implement a maximum copay assistance amount for patients identified as being in a copay adjustment program |
| | **3. Enhanced Patient OOP Rebate** | Utilize financial technology platform to expedite direct member reimbursement to patients that pay OOP in lieu of using copay card |
| **Enhanced Solutions** | **4. CAP Patient Roll-off and Navigator Support** | Upon identifying CAP patients, wind down copay support and triage to navigator to address potential access issues (e.g., appeals, bridge program) and identify alternative financing options if necessary |
| | **5. Enhanced Two-Card Copay Solution** | Implement debit cards for patients who are in CAPs and drive patients to specific specialty pharmacies |
| **Disruptive Solutions** | **6. Mandated Hub/SP Copay Support Enrollment** | Mandate patients enroll in a HUB and a defined specialty pharmacy to ensure program has clear view into patient liability and CAP risk |
| | **7. Digital Banking Platform** | Utilize financial technology platform to pre-load patient's debit card or fund patient's account in real-time with copay support dollars |
| | **8. Eliminate Copay Support** | Eliminate the use of copay assistance programs and rely on alternative funding and affordability assistance options |

CAP: Copay Adjustment Program; SP: Specialty Pharmacy; OOP: Out-of-Pocket

Avalere | 6

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Avalere Assessed Potential Copay Solutions Across Several Key Parameters to Meet 2022 and 2023 Needs

Case 1:25-cv-00093-JMB-PJG ECF No. 64-1, PageID.1066 Filed 06/30/25 Page 29 of 91 PageID.5488
PageID: 28671

|  | Market Readiness Today | Timeline for Implementation | Addresses Accumulators | Addresses Maximizers | Addresses BP/AMP Risk |
|---|---|---|---|---|---|
| 1. Revising Eligibility Criteria | ● | Immediate | Unlikely | Unlikely | ◔ |
| 2. Variable Max Support for CAP Patients | ● | Immediate | Moderately | Significantly | ◔ |
| 3. Enhanced Patient OOP Rebate | ● | Immediate | Significantly | Significantly | ● |
| 4. CAP Patient Roll-off and Navigator Support | ◔ | 2022+ | Moderately | Moderately | ◐ |
| 5. Enhanced "Two Card" Copay Solution | ◔ | 2022+ | Significantly | Significantly | ◕ |
| 6. Mandated Hub/SP Copay Support Enrollment | ◔ | Immediate | Moderately | Moderately | ◐ |
| 7. Digital Banking Platform | ◔ | 2022+ | Significantly | Significantly | ● |
| 8. Eliminate Copay Support | ● | 2023 | Significantly | Significantly | ● |

 Low Risk  Medium  High  In Market / Fully Addresses

CAP: Copay Adjustment Program; SP: Specialty Pharmacy; OOP: Out-of-Pocket

 Avalere | 7

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Market Readiness and Degree of BP/AMP Impact Are Key Factors For Janssen Determining Opportune Strategies

Case 2:22-md-03034-TGB ECF No. 100-10, PageID.4843 Filed 10/03/24 Page 30 of 91 PageID: 28672



| | |
|---|---|
| 1 | Revising Eligibility Criteria |
| 2 | Variable Max Support for CAP Patients |
| 3 | Enhanced Patient OOP Rebate |
| 4 | CAP Patient Roll-off and Navigator Support |
| 5 | Enhanced "Two Card" Copay Solution |
| 6 | Mandated Hub/SP Copay Support Enrollment |
| 7 | Digital Banking Platform |
| 8 | Eliminate Copay Support |

**Year of Implementation /**

- Immediate
- 2022
- 2023

## Takeaways /

- Few feasible solutions exist that would completely remove BP/AMP risk due to CAP program exposure
- Aside from discontinuation of copay program entirely, enhanced patient OOP rebate, two card" solution, and digital banking platforms have the most effective potential tool to curb risk

BP: Best Price; AMP: Average Manufacturer Price; SP: Specialty Pharmacy; OOP: Out-of-Pocket

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

Avalere | 8



 Patient Survey Findings

# Avalere Worked Closely with the Janssen Project Team to Develop and Deploy the Patient Survey Questionnaire

Case 2:22-cv-02632-CCC-CLW Document 314-24 Filed 12-02-22 PageID: 15491
PageID: 28674

| Survey Development | Candidate Screening and Recruitment | Response and Insight Synthesis |
|---|---|---|
| • Avalere drafted the survey document to include 22 multiple choice questions and 4 screener questions<br><br>• Survey questions touched upon key topics, such as:<br>   o Patient characteristics;<br>   o Experience with copay support programs;<br>   o Financial drivers of decision-making; and<br>   o Willingness to utilize alternative approaches | • Avalere deployed the survey into the field, utilizing the screening questions to collect responses from 130 qualified commercially-insured individuals with experience utilizing manufacturer copay support<br><br>• Patients must be currently prescribed therapy in immunology, oncology, PAH, or infectious diseases | • Avalere collected responses into an Excel spreadsheet to view responses across segments and summarized these findings in the following slides<br><br>• Avalere also pulled insights from these survey findings into the copay strategies identified as potential solutions to address copay adjustment program risks |

PAH: Pulmonary Arterial Hypertension

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Avalere Developed Screener Questions Designed to Identify The Most Appropriate Candidates

See Page www.researchgate.net/publication/349613884_Screener Page1492
PageID: 28675

**Objectives /** Screener questions designed to ensure only appropriate patients were included based on copay card use for relevant treatments and therapeutic areas

| | |
|---|---|
| **Prescribed Therapy** | • All 130 respondents indicated that they are currently prescribed an immunology (e.g., rheumatoid arthritis, psoriasis), oncology (e.g., cancer), pulmonary arterial hypertension (PAH), or infectious disease (e.g., anti-retroviral) therapy |
| **Therapeutic Area** | • 85% of patients were prescribed immunology drugs<br>• 14% were prescribed oncology drugs<br>• 10% were prescribed PAH drugs<br>• 11% were prescribed infectious disease drugs |
| **Insurance and Copay Assistance** | • All 130 patients were covered under commercial (e.g., employer-sponsored, private) health insurance<br>• All 130 patients were currently using a manufacturer copay coupon or card for their prescribed therapy |
| **Types of Therapies** | • Out of the 130 patient responses<br>    • 5 patients indicated they were on Cimzia<br>    • 8 patients indicated they were on Cosentyx<br>    • 6 patients indicated they were on Enbrel<br>    • 19 patients indicated they were on Humira<br>    • 7 patients indicated they were on Otezla<br>    • 7 patents indicated they were on Skyrizi<br>    • 8 patients indicated they were on Stelara<br>    • 11 patients indicated they were on Taltz |

Avalere | 11

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Most Patients Surveyed Have Been on Therapy for Over a Year and Would Face Significant OOP Without Support

Case 1:25-cv-02631-JMC Document 1-22 Filed 08/14/25 Page 34 of 91 PageID: 28676

| | |
|---|---|
| **Years on Current Therapy** | • **38% of patients have been on their current therapy/therapies for between 1-3 years**<br>• 30% of patients have been on their current therapy/therapies for less than 12 months<br>• 32% of patients have been on their current therapy/therapies for over 3 years |
| **Household Income** | • **The majority of patient's (42%) household incomes were between $51,000 and $91,000**<br>• 32% of patient's incomes were between $21,000 and $50,000 while 21% were above $91,000<br>• 5% of patient's incomes were below $20,000 |
| **Out-Of-Pocket Costs** | • **55% of patients indicated that their out-of-pocket would be over $200 a month without manufacturer patient assistance**<br>• With copay assistance, 33% of patients indicated that they paid $0 for their therapy; 36% indicated that they paid below $10; and 20% indicated they paid between $10-$25 a month |

OOP: Out-of-Pocket

Avalere | 12

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Patients Typically Used Copay Support for Over a Year and Were Introduced to Program Through Varied Sources

Electronically signed by Unknown Author at 5:14:10 PM ET on Page 35 of 91 Page ID: 25489
PageID: 28677



Additional considerations for copay program enrollment include:
- 43% of patients enrolled in *directly over the internet*; 28% enrolled via phone; 15% of patients indicated their provider enrolled them; and 11% indicated their pharmacist enrolled them
- Over half of patients (56%) indicated that *enrolling in copay assistance was very easy*
- Only 7% of patients indicated that enrolling in copay assistance was difficult

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

Avalere | 13

# Habits of Patients Using Copay Assistance Indicate That Cost Was Not A Driving Factor For Adherence

Case 2:22-cv-02696-KSM Document 1 Filed 07/11/22 Page 36 of 91 PageID: 28678

| Therapy Cost | Switching Medications |
|---|---|



*Have you ever stopped therapy because of product cost?*



*Have you considered stopping a therapy because of cost?*

**75%**

■ No ▢ Yes



*Have you ever considered switching medications due to cost?*

**71%**

■ No ▢ Yes



**Patients demonstrated that costs of their products played only a small part in considering stopping or switching therapies; however, 85% of patients indicated that the discounts offered by copay assistance were a key factor to continuing therapy**

Avalere | 14

Copyright ⓒ2021. Avalere Health LLC. All Rights Reserved.

# Over Two-Thirds of Patients Were Unaware Of Any Experiences On a Copay Accumulator or Maximizer

Case 1:22-cv-02549-LKG Document 23-8 Filed 09/09/22 Page 37 of 91 PageID: 25496
PageID: 28679

*To your knowledge, have you ever experienced the effects of a copay accumulator or maximizer program (e.g., you were unable to meet your deductible in a timely manner while using manufacturer copay assistance)?*



 **33% of patients accessed medication without copay assistance by paying for the therapy out-of-pocket and another 33% indicated that they received manufacturer free drug support (e.g., PAP)**

PAP: Patient Assistance Program

Avalere | 15

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Patients Were Largely Willing To Switch Forms Of Copay Assistance To Offset OOP Liability

Page ID: 28680



**Types of Assistance**

*What type of copay assistance form are you currently using?*

Copay card / coupon: 84%
Debit card: 9%
Voucher: 5%
Other (please explain): 2%



**Willingness to Switch**

*How willing would you be to switch to another form of copay assistance?*

Very Willing: 25%
Somewhat willing: 40%
Somewhat unwilling: 13%
Very Unwilling: 3%
Unsure: 18%



**65% of patients indicated that they would be somewhat or very willing to switch to another form of copay assistance indicating that patients are willing to make changes to continue receiving help**

OOP: Out-of-Pocket

Avalere | 16
Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Patient Responses Were Mixed On Using Other Modes or Approaches for Providing Copay Assistance

## Willingness to Pay OOP

*Would you be willing to pay upfront out-of-pocket for your copay assistance and be reimbursed by the manufacturer?*

## Interest in Two Card Support

*Would you be willing to use a form of copay assistance that offers a copay card/coupon, with the option to move to a secondary form of financial support such as a debit card or voucher?*

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Payment Trends and Indicated Willingness To Use For Copays

Case 1:21-cv-02406-JLR-DCF Document 849-11 Filed 09/23 Page 40 of 91 Page ID-91
PageID: 28682

| Mobile Payment Use | Willingness to Use | Bank Linkage |
|---|---|---|
| *Do you use any mobile payment services such as PayPal, Venmo, or Zelle?* | *Would you be willing to use these mobile payment services as a part of copay assistance?* | *How willing would you be to enroll in copay support if it required you use a specific pharmacy and/or provide banking information to allow for financial assistance to be sent to your checking/savings account?* |



**88%**

■ Yes ☐ No



**81%**

■ Yes ☐ No



**Patients demonstrated a clear affinity for mobile banking and its ease of use**



Copyright ©2021. Avalere Health LLC. All Rights Reserved.

Avalere | 18





# Copay Program Solutions Assessment

**\*\*Janssen should consult with internal/external legal counsel on regulatory implications of potential solutions addressed**

# Revising Patient Eligibility Criteria Can Quickly Reduce CAP Exposure for Near-Term Risks

**Revise Eligibility Criteria**

**Solution Overview /** Janssen could seek to revise eligibility criteria for participation in copay assistance for patients. This could be implemented through changes to patient income requirements / considerations, revised assistance amounts, and/or stricter language in any copay assistance terms and conditions for patients that may be in plans with known accumulators or maximizers.

## Adoption Considerations /

### Address 2023 BP/AMP Risk

 Revising eligibility criteria would limit the total BP/AMP impact, but would not satisfy or circumvent requirements under VBP rule to ensure copay assistance is passed to patient

### Standalone Solution
**No** – this is an immediate term tactic that would need to be implemented with other solutions to fully address BP/AMP risk

### Market Availability: Available Now

 Janssen is able to implement this solution with their current copay card vendor and internal teams immediately

## Solution Opportunities

- Revising eligibility criteria will reduce the number of patients in known adjustment programs from participating in copay assistance
- Would likely reduce Janssen GtN spending on copay assistance
- Janssen can tailor terms and conditions of eligibility criteria for individual products

## Solution Risks

- Will do little to address BP/AMP risk for Medicaid VBP
- There may be increased hub enrollment and/or BV error with changing terms and conditions for individual products

## Solution Impact on Patient / Provider Experience

- *53% of surveyed patients* stated they were not aware of the max copay support that would be provided by their assistance program over a year
- Some patients may fall off product or not fill their first script if revised eligibility criteria block their access to Janssen copay assistance

 Low  Medium  High  In Market

 | 20

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

BP: Best Price; AMP: Average Manufacturer Price; GtN: Gross-to-Net; CAP: Copay Adjustment Program; BV: Benefits Verification

# Adjusting Eligibility Criteria May Limit Certain Patients Requiring Assistance From Enrolling

**Revise Eligibility Criteria**

**Solution Process Flow /**



1. Patient is prescribed medication and made aware of copay support program
2. Patient begins enrollment process, including BV, PA assistance for copay support program
3. Only patients who qualify for the program under new eligibility criteria receive copay support
4. Patient fills their prescription at pharmacy
5. Patient uses copay card or is responsible for full OOP cost if they do not qualify for copay assistance program

Janssen can adjust eligibility criteria for varying products to reduce risk of patient assistance being funneled into a CAP

**Key Operational Considerations /**

- Some patients will not be able to access product based on revised eligibility criteria; Janssen could realize reduction in adherence rates and more patients may begin using third-party foundations
- Making revisions to the terms and conditions and broader eligibility criteria for a brand/portfolio can be done quickly, but should involve modeling to identify expected potential reduction in access/adherence due to stricter eligibility criteria

BV: Benefits Verification; PA: Prior Authorization; CAP: Copay Adjustment Program; OOP: Out-of-Pocket; BP: Best Price; AMP: Average Manufacturer Price

 | 21

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Some Manufacturers Have Instituted a Variable Max Assistance Benefit for Patients

**Solution Overview /** Janssen could update its program design and terms and conditions to create a variable maximum level of copay assistance for patients, providing a reduced amount to patients identified as being enrolled in plans utilizing a CAP, specifically copay maximizer programs.

## Adoption Considerations /

### Address 2023 BP/AMP Risk

 Instituting a reduced maximum for maximizer patients puts a ceiling on the BP hit but does not ensure that all assistance is being passed to the patient

### Standalone Solution
**No** – While this will limit potential negative impact to a brand's BP/AMP calculation, it does not remove these risks entirely

### Market Availability: Available Now

 Janssen could implement this solution immediately with current vendors

## Solution Opportunities

- Janssen to perform a risk analysis per brand to identify where patients enter and exhaust copay assistance amounts

- For programs where Janssen has already implemented a variable maximum for all patients, they could seek to add a maximizer specific term

- Janssen GtN impact may decrease with less patient assistance amounts being used in maximizers

## Solution Risks

- Not a long-term (e.g., 2023) solution, as solution does not fully mitigate BP/AMP considerations

- Requires a program algorithm that can accurately identify patients who may be enrolled in plans or benefit designs using a CAP

- May require manual review and/or navigator support if revised max amount results in patient no longer being able to afford therapy

## Solution Impact on Patient / Provider Experience

- Only *15% of surveyed patients stated* that they had ever exhausted their copay assistance program dollars over the course of a year

- If revised/lowered maximum support means certain patients exhaust available funds (particularly in accumulator programs), this could lead to patients falling off therapy due to lack of affordability

 Low  Medium  High  In Market

Avalere | 22

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

BP: Best Price; AMP: Average Manufacturer Price; GtN: Gross-to-Net; CAP: Copay Adjustment Program;

**Variable Support for CAP Patients**

# Setting a Variable Over Max Allows Janssen To Mitigate Some Risk of Copay Pass-Through

**Solution Process Flow /**



**1** Patient is prescribed medication and enrolls in copay support via hub/SP

**2** Patient begins enrollment process for copay support program

**3** After enrollment, patient is flagged as being in a CAP (e.g., maximizer)

**4** Patient fills their prescription at pharmacy and receives EOB for cost-sharing liability

**5** Patient pays cost-sharing amount using copay card until benefits are exhausted by max amount

**6** Patients filling subsequent prescriptions may incur full insurer-mandated cost sharing amount or seek third-party assistance

When enrolling in copay assistance, patient agrees to updated terms & conditions regarding maximum amount for patients in CAP

Depending on CAP response, patient may not see disruption (particularly in maximizers) or may eventually exhaust funds and face affordability challenges

**Key Operational Considerations /**

- This solution would require the development and implementation of a monitoring/flagging system for identifying and reviewing potential patients that are in plans/benefit designs that are accumulating or maximizing Janssen copay assistance

- Hub/vendor would need to routinely check which patients are in CAP program in order to ensure the correct patients are being captured – this process may require manual reviews if it will lead to the program deciding to wind down or limit copay assistance

BP: Best Price; AMP: Average Manufacturer Price; GtN: Gross to Net; CAP: Copay Adjustment Program; EOB: Explanation of Benefits

 | 23

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

Case 2:25-cv-02152-RMG Document 1-15 Filed 04/18/25 Page 46 of 91 PageID: 28688

# Janssen Can Emphasize the Long-Standing Option of Direct Member Reimbursement

**Enhance Patient OOP Rebate**

**Solution Overview /** Janssen could initiate a rebate system where a patient pays copay directly OOP and submits receipt to the manufacturer. The copay program/vendor and patient would then utilize a financial technology platform to initiate an instantaneous rebate to reimburse patient for dollars that would have otherwise been provided via a copay card.

## Adoption Considerations /

### Address 2023 BP/AMP Risk?


Would ensure that rebated funds have been allocated exclusively toward the patient

### Standalone Solution?
**No** – Would likely require implementation of additional affordability solutions as this would not be scalable across all patients (e.g., patients unable to finance treatment at the point of sale)

### Market Availability: Available Now


Direct member reimbursement via rebate scenario is an active vendor strategy that can be implemented now

## Solution Opportunities

- Basic version of solution has been long-offered in PSP space
- Removes assistance pass through necessity and allows Janssen to ensure that dollars were spent on therapy, removing BP/AMP risk
- Multiple platform/sophistication options across patient demographics (Venmo, PayPal, expedited mailed check)

## Solution Risks

- Solution is likely not scalable across all patients and brands
- Not all patients will be able to front payment for medication at point of sale, excluding them from use of solution

## Solution Impact on Patient / Provider Experience

- While 42% of surveyed patients stated they would be willing to pay upfront and be reimbursed later by copay program, *47% of surveyed patients said they were not willing to do this*
- Patient must be able to front cost of treatment and may be required to establish accounts with manufacturer financial partner (e.g., Venmo, PayPal)

 Low   Medium  High   In Market

OOP: Out-of-Pocket; BP: Best Price; AMP: Average Manufacturer Price; PSP: Patient Support Program

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

Avalere | 24

# Enhanced Patient OOP Rebate

## Using a Mobile Technology Platform Would Allow Full Pass Through of Copay Funds

**Solution Process Flow /**



**Key Operational Considerations /**

- Janssen would need to develop technology infrastructure that connects third party payment system (Venmo/ PayPal) with patient receipt; Janssen would need to develop heightened encryption parameters to support this process from intake to dispersal of funds

- Hub/copay program would need to be operationalized to support mobile banking receipts and payouts and increased technical support

- May require front-end algorithm to identify appropriate candidates or else triage patients to alternative funding

OOP: Out-of-Pocket; EOB: Explanation of Benefits

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

https://www.researchgate.net/publication/330601846_... 06/ Electronic copy available at: ... PageID: 28690

# To Combat Maximizers, Janssen Could Roll-Off Identified CAP Patients to the Hub/Navigators

**Solution Overview /** When patients are identified as being enrolled in plans utilizing CAPs, Janssen could roll patients off traditional manufacturer copay assistance and pass these individuals to the hub, where patient navigators would work to secure other available assistance methods (e.g., foundation or grant opportunities).

## Adoption Considerations /

### Address 2023 BP/AMP Risk

 Moving identified CAP patients off traditional patient assistance will reduce total BP/AMP risk, but (given this is action after the patient is identified) copay dollars will be pulled into CAP and thus affect BP/AMP calculation

### Standalone Solution

**No** – While a potential standalone solution for maximizers in near-term, this tactic does not entirely remove BP/AMP risks in 2023

### Market Availability: 2022/2023

 Janssen could implement this with vendors in near-term; however, Janssen would need to scale certain staffing and capabilities to be able to implement this solution

## Solution Opportunities

- Solution would limit exposure to maximizer upon identification, as patients should still be able to access drug with minimal OOP
- Would build off foundational patient identification algorithm, allow for triage to alternative funding sources
- Allows patients that may otherwise abandon therapy without assistance in finding other forms of support and staying on therapy

## Solution Risks

- May be difficult for Janssen vendors to identify all patients in CAPs without weekly analyses, creating risk of BP/AMP hit if copay assistance continues to flow to patients in CAPs
- May create access issues if plan with CAP refuses coverage or access to Janssen therapy
- Third-party or foundation support may not be viable options due to inconsistent availability of funding

## Solution Impact on Patient / Provider Experience

- *90% of surveyed patients* stated it would be helpful to have a navigator to help address potential affordability and access opportunities
- While a navigator may help address potential issues, rolling a patient off standard copay assistance may add unnecessary complexities and/or disruptions to the care journey and jeopardize adherence or time to start

 Low  Medium  High  In Market

Avalere | 26

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

CAP: Copay Adjustment Program; BP: Best Price; AMP: Average Manufacturer Price; GtN: Gross to Net; CMS: Centers for Medicare & Medicaid Services

Case 2:22-cv-02632-CCC-CLW Document 425-5 Filed 10/30/24 Page 49 of 91 PageID: 25508
PageID: 28691

# Moving Identified Patients Off of Copay Assistance Will Mitigate Near-Term CAP Risk

**CAP Patient Roll-off and Navigator Support**

## Solution Process Flow /



## Key Operational Considerations /

- Approach would require hub/vendor to have existing identification algorithm; Janssen would then need to build a patient navigator team and decision-trees to support payer engagement (e.g., potential appeals support) and triage to alternative funding sources as necessary (e.g., bridge, third-party copay assistance, cash card)

- Janssen may need to develop more sophisticated tracking of availability of third-party assistance funds

CAP: Copay Adjustment Program; BV: Benefits Verification; PA: Prior Authorization

Avalere | 27

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Janssen Could Build Off Forthcoming "Two Card" Approach with Enhanced Hub/SP Intake

**Enhanced "Two Card" Copay Solution**

**Solution Overview /** Building off the expanded use of the "two card" solution in early 2022, Janssen could build out enhanced services through hub and SP network using FMV/U&C payment for enrolling patients into copay program through these points of entry. This would allow great insights into patient benefit design/CAP risk and support appropriate copay support option.

## Adoption Considerations /

### Address 2023 BP/AMP Risk

 Would address most BP/AMP risk due to Janssen following patient use of copay assistance through to fill

### Standalone Solution
**Yes** – an enhanced "two card" solution with intake and review through hub/SP could be used in immediate and long term for both accumulator and maximizer risks

### Market Availability: 2022

 2-card solutions are in the market now, but a defined specialty pharmacy route has not yet been piloted

## Solution Opportunities

- Approach would build off an existing solution, expanding its effectiveness against CAP risk
- Establishing hub/SP framework would fit into new product launch or revisions to existing brand channel strategy
- Approach would be easily amenable to revisions based on potential regulatory clarification in 2022

## Solution Risks

- Moving patients through defined gates/check points for copay support access could create administrative barriers
- Potential risk regarding patient steering through specific SPs for patient access
- Likely not effective/scalable for in broadly-used retail brands
- Program still faces potential BP/AMP risk with initial draw-down from first card

## Solution Impact on Patient / Provider Experience

- *84% of surveyed patients* stated they would be willing to utilize a second form of assistance to ensure they can access affordability support
- If enhanced "two card" approach requires additional administrative burden or delay to support for patient, this could drive fall-off from product

 Low  Medium  High  In Market

SP: Specialty Pharmacy; FMV: Fair Market Value; U&C: Usual & Customary; CAP: Copay Adjustment Program; BP: Best Price; AMP: Average Manufacturer Price; GtN: Gross-to-Net

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

 | 28

Copyright 2021 Avalere Health LLC. All Rights Reserved.
PageID: 28693

# Using Enhanced "Two Card" Solution Will Use Hub/SPs to Drive CAP Risk Avoidance

**Enhanced "Two Card" Copay Solution**

## Solution Process Flow /



**1** Patient is prescribed medication and enrolls in copay support

**2** Patient enrolls in copay support program, seeks first fill and pays reduced cost sharing amount using copay card

**3** Patient identified as being in a potential CAP is directed to hub and/or triaged to specified SP for enhanced support

**4** Hub/SP issues patient a debit card or second copay offering to be used if at risk for CAP pull-down from copay program

**5** Hub directs patient to SP and details use of "two card" solution including time and place of use

**6** Patient fills subsequent fills at SP

When patient is identified in a CAP through risk analyses or vendor identification, patient is directed to Hub to begin "two card" enrollment process

Hub will subsequently issue patients a debit card to fulfill copay assistance obligation without hitting BP/AMP

Hub drives patient to use of manufacturer-determined SP, giving line of site into use of card

## Key Operational Considerations /

- Debit or second card will not get counted towards BP unless PBM can identify debit card dollars as manufacturer-funded dollars and make revision to OOP calculation with the plan year

- Driving patients to a singular SP would likely require further hub integration into copay assistance

BP: Best Price; AMP: Average Manufacturer Price; GtN: Gross-to-Net; CAP: Copay Adjustment Program; SP: Specialty Pharmacy

Avalere | 29

**Mandated Hub/SP Copay Support Enrollment**

# Requiring Program Enrollment Through Hub/SP Will Enable Janssen To Limit CAP Exposure

**Solution Overview /** Janssen could revise parameters and enrollment processes for copay support to require intake through the hub or a select set of SPs providing enhanced services; this controlled entry-point for copay support access would allow greater ability to gauge CAP risk at or before first fill and triage patient to appropriate support.

## Adoption Considerations /

### Address 2023 BP/AMP Risk

 Driving enrollment through hub and specific SPs will allow for better patient identification and remedy of CAP patients, but will not address or prevent risks to BP/AMP calculation on its own

### Standalone Solution
**No** – this approach would require (and also enhance) other copay solutions such as patient navigator or financial technology platform-enabled support

### Market Availability: Available Now

 Mandating hub or SP enrollment is available in the marketplace from vendors now

## Solution Opportunities

- Mandating hub/SP enrollment would give manufacturers an increased line of sight into patient benefit design and CAP risk
- Approach could serve as the foundation of (and amplify the impact of) additional copay solutions
- Enrollment requirements could be applied to and scaled across specialty and retail brands alike

## Solution Risks

- Moving patients through defined gates/check points for copay support access could create administrative barriers
- Potential risk regarding patient steering through specific SPs for patient access
- Approach may disrupt in-market programs or patients already accessing copay assistance

## Solution Impact on Patient / Provider Experience

- *75% of surveyed patients* said they would be very or somewhat willing to use a specific pharmacy if it meant access to copay assistance support
- Patients would likely not realize a change to their use of assistance making this a solution that could be implemented fairly easily

 Low  Medium  High  In Market

 | 30

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

SP: Specialty Pharmacy; CAP: Copay Adjustment Program; BP: Best Price; AMP: Average Manufacturer Price

# Patients Would Be Required to Enroll in Hub Prior to Receiving Copay Support

**Mandated Hub/SP Copay Support Enrollment**

## Solution Process Flow /



**1** Patient is prescribed medication and enrolls in copay support via hub/SP

**2** Patient begins enrollment process for copay support program

**3** Hub/SP runs eBV/IV to understand patient CAP risks and moves patient appropriate affordability solution

**4** Patient fills their prescription at either preferred SP that immediately applies affordability support or the patient uses selected mode of copay support at other pharmacy

**5** Patient pays cost-sharing requirement using the designated mode of support, with mitigated CAP exposure

Enrollment in hub or prescriptions being sent to a specific pharmacy allows Janssen to track the claim and the patient and have visibility into how the funds are being used

Janssen can track patient cost sharing and ensure the full value of discount is passed to the patient

## Key Operational Considerations /

- Janssen would need to heavily invest in hub intake and algorithm/triage approach or contract with third-party vendor to establish this framework to support scaled approach
- Patients could only use SPs that Janssen has a data sharing agreement with and business rules/SLAs to support hub visibility – solution may be limited by ability to establish enhanced services in SP contracts

SP: Specialty Pharmacy; eBV: Electronic Benefits Verification; IV: Insurance Verification; CAP: Copay Adjustment Program; SLA: Service Level Agreement



| 31

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

Case 2:22-cv-02632-JWH-RGK-KK Document 100-8 Filed 03/20/23 Page 55 of 91 Page ID #:5513
PageID: 28696

**Digital Bank Platform Solution**

# Mobile Financing Solutions Would Bypass CAP Through Direct Funding at Point of Purchase

**Solution Overview /** Utilize financial technology platform (e.g., Zelle, PayPal) to pre-load patient's debit card or fund patient's account in real-time with specific dollar amount to serve as copay support dollars; this approach ensures patient fully realizes benefit of copay assistance and payer/PBM cannot apply CAP to patient's payment.

## Adoption Considerations /

### Address 2023 BP/AMP Risk

 Using digital platform/interface for providing funding would ensure patient directly and fully realizes benefit of manufacturer copay support

### Standalone Solution
**Yes** – Digital bank platform and mobile reimbursement could be implemented as standalone solution in advance of 2023 Medicaid VBP rule effect date

### Market Availability: 2022/2023

 While vendors are in discussion with mobile banking platforms and Fintech companies, no manufacturer or copay vendor has piloted this solution at scale

## Solution Opportunities

- Bypasses payer/PBM means of identifying third-party support and meets CMS' requirement that the patient directly benefit from the copay assistance

- Would allow copay card funds to be directly deposited by outside funding source for patient use increasing accuracy of assistance funding

- Could potentially stipulate time and pharmacy location for mobile use

## Solution Risks

- Currently not an actionable item offered by copay card vendors

- Manufacturers would not be able to ensure that copay assistance is being used for the intended therapy / misappropriation of funds

- Patient may be beholden to benefit design that requires return of funds, may face pressure to withhold information

- May not be scalable across certain brans and/or patients

## Solution Impact on Patient / Provider Experience

- Patients must be amenable to changing funding mechanisms and enrolling in a financial technology platform with banking information; this could be more difficult for older or less technologically-literate adults

- *81% of patients* indicated that they would be willing to use a digital banking platform as part of copay assistance

 Low   Medium   High   In Market

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

CAP: Copay Adjustment Program; PBM: Pharmacy Benefit Manager; BP: Best Price; AMP: Average Manufacturer Price; VBP: Value-Based Purchasing; CMS: Centers for Medicare & Medicaid Services

Case 2:22-cv-02632-CCC-CLW Document 431-6 Filed 10/07/24 Page 55 of 91 PageID: 41514
PageID: 28697

# Patients Would Need to Enroll in Banking Platform Prior to First Fill

**Digital Banking Platform Solution**

## Solution Process Flow /



**① Patient is prescribed medication and enrolls in copay support**

**② Patient enrollment process (e.g., eBV, PA) is initiated by manufacturer. Insurer/PBM claim is pinged**

Insurer/PBM claim is pinged to provide coverage details but not acted upon by manufacturer or vendor

**③ Patient is asked to enroll in digital banking platform and provide information to manufacturer hub or SP supporting the enrollment and copay support process**

**④ At point of sale (first or subsequent fill), manufacturer funds patient's account through digital banking platform**

Janssen would provide funds to a digital banking platform to be dispersed to patients

**⑤ Patient fills their first prescription at the pharmacy utilizing their own debit/credit card, submits verification of prescription fill to confirm appropriate use of funds**

**⑥ Hub pings patient monthly to initiate subsequent fills and prefill debit card with cost sharing amount**

The hub would provide monthly fill reminders and deposits to patients' digital banking accounts

## Key Operational Considerations /

- Patients would need to enroll digital banking platform to preload bank account before or at point of service
- Increased hub technical support may be needed to ensure communication through digital banking platform and patient
- Janssen would need to have a system to quickly verify patient's claim and immediately reimburse for copay amount

eBV: Electronic Benefits Investigation; PA: Prior Authorization; PBM: Pharmacy Benefit Manager

Avalere | 33

Copyright ©2021. Avalere Health LLC. All Rights Reserved

# Eliminating Copay Assistance Will Ensure No Risk to BP/AMP But Will Reduce Adherence

Case 2:23-cv-00629-JLR Document 44 Filed 03/04/24 Page 56 of 91
Case 2:23-cv-00629-JLR Document 45-5 Filed 03/04/24 Page 56 of 91
PageID: 28698

**Solution Overview /** Janssen could eliminate the use of copay assistance in the commercial market (e.g., employer-sponsored insurance, exchanges) in order to negate any risk of triggering BP/AMP once the Medicaid VBP Rule goes into effect in 2023.

## Adoption Considerations /

### Address 2023 BP/AMP Risk

 Eliminating copay assistance will fully address BP/AMP risk in advance of VBP rule implementation in 2023

### Standalone Solution
**Yes** – This can be implemented as a standalone solution to address BP/AMP risks, but would require a broad set of coordinated solutions to address newly-created affordability

### Market Availability: 2023

 Eliminating copay assistance is available as a market option today

## Solution Opportunities

- By eliminating copay assistance, Janssen will eliminate risk to triggering BP/AMP in 2023
- Janssen could seek to enhance other forms of copay assistance outside of their internal patient support programs (e.g., increasing charitable giving, third-party foundation grant support, cash card solutions)

## Solution Risks

- Eliminating copay assistance creates immediate risks to adherence and affordability for patients relying on support
- Commercial scripts/revenues lost would likely outweigh Medicaid GTN savings gained

## Solution Impact on Patient / Provider Experience

- **38% of surveyed patients** reported that they had stopped therapy previously because of product cost
- While dependent on brand and therapeutic area, patient adherence could reduce drastically if commercial patients cannot be linked to alternative solutions to address potential affordability needs

 Low  Medium  High  In Market

BP: Best Price; AMP: Average Manufacturer Price; VBP: Value-Based Purchasing; GTN: Gross-to-Net

Avalere | 34

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

# Eliminating Copay Assistance Would Reduce Any Janssen Risk of Tipping BP/AMP

Case 2:22-cv-02632-CCC-CLW Document 483-9 Filed 05/16/24 Page 58 of 103 PageID: 28699

## Solution Process Flow /



**1** Patient is prescribed medication and engages hub or SP to identify potential affordability support for product

**2** Hub or SP utilizes patient navigator to identify affordability solutions, including foundation, cash card, or PAP

**3** Based on patient's profile and availability of alternative support, navigator triages patient to the appropriate support option

**4** Patient fills their prescription at pharmacy

**5** Patient uses foundation or third-party support to help cover cost of product

As manufacturer funded copay assistance would no longer exist, patients would be funneled through the hub to seek other forms of financial assistance to afford therapy

## Key Operational Considerations /

- Current contracts with copay and patient services vendors would need to be reviewed to ensure they are wound-down appropriately ahead of move to a "post-copay support" world

- Hubs would need to transition from in-house or vendor copay assistance options to outside copay assistance options – this would include hiring (or contracting for) new navigator staff and creating algorithms/decision-trees for appropriate patient triage

BP: Best Price; AMP: Average Manufacturer Price; SP: Specialty Pharmacy

Copyright ©2021. Avalere Health LLC. All Rights Reserved.





Next Steps

# Janssen Can Implement A Series of Immediate Copay Safeguards Followed By Long-Term Strategy Shifts

Case 2:23-cv-02918-MSG Document 63-3 Filed 01/17/24 Page 59 of 91
PageID: 28701

**Janssen can immediately implement solutions that may mitigate CAP exposure. However, larger changes to copay assistance should be further developed and deployed in 2022 to mitigate BP/AMP risk prior to 2023 Medicaid VBP final rule implementation.**

Avalere recommends a series of solutions, including:

**Immediate-Term:**
- Implement a variable max support limit for CAP patients
- Increase digital direct member reimbursements (rebates)

**2022+**
- Implement enhanced two-card solution
- Pilot digital banking platform

| Mandated Hub/SP Copay Support Enrollment | | |
|---|---|---|
| Enhanced Patient OOP Rebate | CAP Patient Roll-off and Navigator Support | |
| Variable Max Support for CAP Patients | Enhanced Two-Card Copay Solution | |
| Revising Eligibility Criteria | Digital Banking Platform | Eliminate Copay Support |
| **Immediate** | **2022** | **2023** |

37

Avalere

Copyright ©2021. Avalere Health LLC. All Rights Reserved.

**EXHIBIT 5**

**SEALED IN ITS ENTIRETY**

**EXHIBIT 6**

**SEALED IN ITS ENTIRETY**

**EXHIBIT 7**

**SEALED IN ITS ENTIRETY**

**EXHIBIT 8**

**SEALED IN ITS ENTIRETY**

# EXHIBIT 9

# SEALED IN ITS ENTIRETY

# EXHIBIT 10

# SEALED IN ITS ENTIRETY

# EXHIBIT 11

# SEALED IN ITS ENTIRETY

# EXHIBIT 12

# SEALED IN ITS ENTIRETY

# EXHIBIT 13

# SEALED IN ITS ENTIRETY

# EXHIBIT 14

# SEALED IN ITS ENTIRETY

# EXHIBIT 15

# SEALED IN ITS ENTIRETY

# Exhibit 16

E. Evans Wohlforth, Jr., Esq.
**ROBINSON & COLE LLP**
666 Third Avenue, 20th Floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

David Elsberg (*admitted pro hac vice*)
Andrew R. Dunlap (*admitted pro hac vice*)
Meredith Nelson (*admitted pro hac vice*)
Elizabeth Snow (*admitted pro hac vice*)
**SELENDY GAY ELSBERG, PLLC**
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON<br>HEALTH CARE SYSTEMS INC.,<br><br>        Plaintiff,<br><br>     v.<br><br>SAVE ON SP, LLC,<br><br>        Defendant. | Civ. A. No. 22-2632 (JMV) (CLW)<br><br>**DEFENDANT'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES** |

To:    Jeffrey J. Greenbaum, Esq.
       SILLS CUMMIS & GROSS, P.C.
       One Riverfront Plaza
       Newark, New Jersey 07102
       973-643-7000

Adeel A. Mangi, Esq.
Harry Sandick, Esq.
George LoBiondo, Esq.
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, New York

*Attorneys for Plaintiff Johnson & Johnson*
*Health Care Systems Inc.*

Pursuant to Federal Rules of Civil Procedure 26 and 33, and Local Civil Rule 33.1, Defendant Save On SP, LLC ("SaveOnSP"), by and through its undersigned counsel, hereby supplements its Responses and Objections to Plaintiff Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Interrogatory Nos. 19 and 20, contained in SaveOnSP's Responses and Objections to JJHCS's Third Set of Interrogatories, dated September 18, 2023. These responses should be deemed to supplement and amend SaveOnSP's disclosures under Rule 26(a) of the Federal Rules of Civil Procedure. If SaveOnSP learns that in some material respect its responses are incomplete or incorrect, SaveOnSP will supplement or correct them if the additional or corrective information has not otherwise been made known to JJHCS during the discovery process or in writing. Fed. R. Civ. P. 26(e)(1)(A). SaveOnSP's responses to these Interrogatories are based on information available to it at the time it made them. SaveOnSP reserves the right to modify or supplement its responses.

## <u>GENERAL OBJECTIONS</u>

1. JJHCS does not limit any of its Interrogatories to nonprivileged material. SaveOnSP objects to each Interrogatory to the extent that it seeks disclosure of information which is subject to the attorney-client privilege, the work product doctrine, the common-interest privilege, or any other applicable privileges, immunities, or doctrines.

2.      JJHCS does not limit any of its Interrogatories to information within SaveOnSP's possession, custody, or control. SaveOnSP objects to each Interrogatory to the extent that it seeks disclosure of information that is not within SaveOnSP's possession, custody, or control that Save-OnSP can locate after a reasonable inquiry.

### OBJECTIONS TO DEFINITIONS

3.      SaveOnSP objects to the term "or other substance" in the definition of "Pharmaceutical Manufacturer" as vague and ambiguous. SaveOnSP will interpret the term "Pharmaceutical Manufacturer" to mean any entity that develops, produces, manufactures, creates, licenses, or distributes any pharmaceutical, drug, or medicine used in the treatment, cure, prevention or diagnosis of any illness, disease, disorder, or other condition.

4.      SaveOnSP objects to the definition of "SaveOnSP" as including attorneys and accountants who may be outside of SaveOnSP's possession, custody, and control. SaveOnSP interprets the term "SaveOnSP" to mean Save On SP, LLC, and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, and all persons or entities acting or purporting to act on behalf or under the control of Save On SP, LLC.

5.      SaveOnSP objects to the definition of "SaveOnSP Program," as described in Complaint ¶¶ 9-17, because it mischaracterizes SaveOnSP's services. SaveOnSP will not use this definition.

6.      SaveOnSP objects to the definition of "You" and "Your" to the same extent that it objects to the definition of "SaveOnSP."

## OBJECTIONS TO INSTRUCTIONS

7.    SaveOnSP objects to Instruction No. 16 in Plaintiff's Third Set of Interrogatories to the extent that JJHCS attempts to impose requirements on SaveOnSP beyond those required by the Federal Rules of Civil Procedure, agreed to by the parties, or ordered by the Court.

8.    SaveOnSP objects to Instruction No. 17 to the extent it purports to require Save-OnSP to answer Plaintiff's Interrogatories based on knowledge obtained from all available sources. SaveOnSP will answer Plaintiff's Interrogatories based on information in its possession, custody, and control available to it following a reasonable inquiry.

9.    SaveOnSP objects to Instruction No. 18 to the extent that JJHCS attempts to impose requirements on SaveOnSP beyond those required by the Federal Rules of Civil Procedure, agreed to by the parties, or ordered by the Court.

10.    SaveOnSP objects to Instruction No. 19 because it attempts to require SaveOnSP to provide information that is irrelevant to the claims and defenses in this action. SaveOnSP will provide information on its interactions with JJHCS and on its general business practices applicable to multiple Pharmaceutical Manufacturers that include such practices applicable to JJHCS.

Dated:  November 6, 2023

By:  /s/ E. Evans Wohlforth, Jr.
E. Evans Wohlforth, Jr.
**ROBINSON & COLE LLP**
666 Third Avenue, 20th Floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

David Elsberg
Andrew R. Dunlap
Meredith Nelson
Elizabeth Snow

SELENDY GAY ELSBERG, PLLC
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP,*
*LLC*

## SUPPLEMENTAL RESPONSES TO PLAINTIFF'S INTERROGATORY
## NOS. 16, 17, AND 18

**INTERROGATORY NO. 16:**

Describe, in as much detail as possible, all measures that You have utilized to prevent any Pharmaceutical Manufacturer or manufacturers from being able to identify patients that are enrolled in the SaveOnSP Program, or to make it more difficult for them to do so.

**RESPONSE:**

██████████████████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

SaveOnSP designates its response to this Interrogatory as Attorneys' Eyes Only under the Discovery Confidentiality Order, so-ordered November 22, 2022, ECF No. 62.

**INTERROGATORY NO. 17:**

Describe, in as much detail as possible, all measures that You have utilized to prevent any Pharmaceutical Manufacturer or manufacturers from being able to identify Your employees or representatives as being affiliated with SaveOnSP, or to make it more difficult for them to do so.

**RESPONSE:**

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

SaveOnSP designates its response to this Interrogatory as Attorneys' Eyes Only under the

Discovery Confidentiality Order, so-ordered November 22, 2022, ECF No. 62.

**INTERROGATORY NO. 18:**

Describe, in as much detail as possible, all measures that You have utilized to prevent Your current or former employees from communicating with JJHCS or others with regard to SaveOnSP's conduct at issue in this lawsuit, or to make it more difficult for them to do so.

**RESPONSE:**

SaveOnSP designates its response to this Interrogatory as Confidential under the Discovery Confidentiality Order, so-ordered November 22, 2022, ECF No. 62.

## CERTIFICATION OF SAVE ON SP, LLC

I, Jody Miller, am the President of Save On SP, LLC ("SaveOnSP"). I am authorized to submit this certification on behalf of SaveOnSP. I certify that the foregoing answers made by me to these Interrogatories are true. I am aware that if any of the foregoing answers are willfully false, SaveOnSP and I are subject to punishment. I certify that in responding to the foregoing Interrogatories, I have furnished all information available to SaveOnSP, its agents, employees and attorneys. As to those answers which are not within my personal knowledge, I certify that I have provided the name and address of every person from whom such information was received or, where the source of such information is documentary, a full description of the document including its location.

Save On SP, LLC

By: _____

Jody Miller
President

Date: November 6, 2023

# EXHIBIT 17

# SEALED IN ITS ENTIRETY

# EXHIBIT 18

# SEALED IN ITS ENTIRETY

**EXHIBIT 19**

**SEALED IN ITS ENTIRETY**

# Exhibit 20



February 9, 2024

Julia Long
(212) 336-2878

**VIA EMAIL**

Elizabeth H. Snow, Esq.
Selendy Gay Elsberg, PLLC
1290 Avenue of the Americas
New York, NY 10104

> Re: *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*,
> 2:23-cv-02632 (JKS) (CLW)

Dear Elizabeth:

We write in response to SaveOnSP's February 7, 2024 letter regarding SaveOnSP's Request No. 76.

SaveOnSP continues to misstate JJHCS's position as to Request No. 76, which requests all call recordings between SaveOnSP, or any employee of SaveOnSP, and JJHCS or any Hub Entity. We have now corrected SaveOnSP's misunderstanding in two meet and confers and in a separate, written letter concerning SaveOnSP's Fifth Set of RFPs. *See* Feb. 8, 2024 Ltr. from I. Eppler to E. Snow at 6. For the avoidance of doubt, JJHCS will do so again here: JJHCS objects to Request No. 76 as unduly burdensome because "it requires JJHCS to identify recordings of calls without the benefit of identifying information—specifically, all names (including the ███████ ████████████████████████████ and phone numbers used by SaveOnSP employees who called JJHCS and its affiliates—that SaveOnSP has not provided." JJHCS's Dec. 18, 2023 Responses and Objections to SaveOnSP's Fifth Set of Requests for Production at 18-19.

JJHCS reiterated this same position at both the January 29, 2024 and February 8, 2024 meet and confers, as well as in its latest response concerning JJHCS's Responses and Objections to SaveOnSP's Fifth Set of Requests for Production. *See* Feb. 8, 2024 Ltr. from I. Eppler to E. Snow at 6. JJHCS cannot be clearer in its position: given the ████████ ████████████████████████████████ we are not able to identify and produce the requested call recordings. SaveOnSP must first provide the ████████████████████████████████████

SaveOnSP's recent supplemental interrogatory responses underscore the need for the information that JJHCS has requested. As SaveOnSP admits in its responses, ████████████

Elizabeth H. Snow, Esq.
February 9, 2024
Page 2

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████ SaveOnSP's Feb. 1, 2024
Supplemental Interrogatory Responses at 9-10; *see also id.* at 11-12.  If SaveOnSP personnel are
████████████████████████████████, then JJHCS cannot feasibly identify these call
recordings—let alone evaluate the burden in producing such recordings—without additional
information from SaveOnSP, including the ████████████████████████████████████
████████

        SaveOnSP also fundamentally misstates JJHCS's position, claiming that JJHCS
stated that "J&J might again rely on additional unproduced documents or recordings at future
depositions."  Feb. 7, 2024 Ltr. from E. Snow to J. Long at 2.  We said no such thing.  At our
January 29, 2024 meet and confer, and again at our February 8, 2024 meet and confer, we repeated
more than once that we were making no representation whatsoever as to the use of call recordings
at future depositions.  Instead, as detailed above, we stated that absent additional identifying
information from SaveOnSP, JJHCS could not identify call recordings responsive to SaveOnSP's
Request No. 76 or evaluate the burden in making such a production.[1]  SaveOnSP mischaracterizes
JJHCS's position and any accusation of the suppression of evidence is baseless.


                            Very truly yours,


                            */s/ Julia Long*
                            Julia Long

---

[1] Even while SaveOnSP insists on this production, it continues to refuse to produce its call
recordings, claiming that this request is too burdensome to undertake.  *See* Mar. 29, 2023 Ltr. from
A. Dunlap to H. Sandick at 4.

# Exhibit 21



www.pbwt.com

March 18, 2024

Julia Long
(212) 336-2878

**<u>By Email</u>**

Elizabeth Snow, Esq.
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

<div align="center">

Re:     **SaveOnSP's Request for Production No. 76**
        ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,***
        <u>Case No. 2:22-cv-02632 (JKS) (CLW)</u>

</div>

Dear Elizabeth:

We write in response to your February 26, 2024 letter regarding SaveOnSP's RFP No. 76, which seeks all recordings of calls between SaveOnSP or any employee of SaveOnSP and JJHCS or any Hub Entity.

SaveOnSP continues to misstate JJHCS's position. As we repeatedly have made clear, JJHCS objects to RFP No. 76 as unduly burdensome because "it requires JJHCS to identify recordings of calls without the benefit of identifying information—specifically, all names (including the ███████████████████████████████████████ and phone numbers used by SaveOnSP employees who called JJHCS and its affiliates—that SaveOnSP has not provided." JJHCS's Dec. 18, 2023 Responses and Objections to SaveOnSP's Fifth Set of Requests for Production at 18–19; *see also* Feb. 8, 2024 Ltr. from I. Eppler to E. Snow at 6; Feb. 9, 2024 Ltr. from J. Long to E. Snow at 1. In our February 9 letter, we again clarified that "given the ████████████████████████████████████ we are not able to identify and produce the requested call recordings." Feb. 9, 2024 Ltr. from J. Long to E. Snow at 1.

JJHCS has explained its need for identifying information in its December 18, 2023 Responses and Objections, three discovery letters, and two meet and confers. In fact, JJHCS even served two document requests on SaveOnSP that seek, among other things, identifying information JJHCS can use to evaluate the burden associated with making a production responsive to SaveOnSP's RFP No. 76. *See* JJHCS's RFP Nos. 114, 115.

You ask us to confirm whether we have reasonably identified any additional calls that involve SaveOnSP employees or officers. For the avoidance of doubt, we repeat our prior

Elizabeth Snow, Esq.
March 18, 2024
Page 2

correspondence: in light of ███████████████████████████████████████
███████████████████████████████ JJHCS cannot feasibly identify whether additional
call recordings with SaveOnSP employees or officers exist, nor can JJHCS reasonably identify all
such call recordings.

       Finally, you ask us to confirm that if JJHCS "identifies or learns that it can
reasonably identify such calls in the future, it will promptly produce such recordings, including
within a reasonable amount of time in advance of any depositions in which [JJHCS] intends to use
such recordings." Once again, JJHCS makes no representation as to the use of call recordings at
future depositions that have yet to be noticed or scheduled. *See* Feb. 9, 2024 Ltr. from J. Long to
E. Snow at 2 ("At our January 29, 2024 meet and confer, and again at our February 8, 2024 meet
and confer, we repeated more than once that we were making no representation whatsoever as to
the use of call recordings at future depositions."). If SaveOnSP provides the requested
information, JJHCS can evaluate the burden of producing call recordings responsive to Request
No. 76. The ball remains in SaveOnSP's court.

       Very truly yours,

       */s/ Julia Long*
       Julia Long

**EXHIBIT 22**

**SEALED IN ITS ENTIRETY**