# Robinson+Cole

E. Evans Wohlforth, Jr.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

March 21, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Re:     *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
        *No. 2:22-cv-02632 (JKS) (CLW)*

Dear Judge Wolfson:

As Your Honor knows, on March 14, 2024, Johnson & Johnson Health Care Systems, Inc.'s (with its affiliates, "**J&J**") filed a motion for leave to file an Amended Complaint. Dkt. 219. Defendant Save On SP LLC ("**SaveOn**") writes to update Your Honor regarding the effect of J&J's proposed Amended Complaint on SaveOn's fully briefed February 20, 2024 motion for clarification and reconsideration, its February 7, 2024 motion to compel J&J to run CAP Terms for its refresh production, and its February 16, 2024 motion to compel J&J to use CAP Terms for several February 7 Court-ordered custodians. This is not intended to be a sur-reply but rather to address the effect of J&J's motion to amend on SaveOn's pending motions.

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

## I.     SaveOn's Motion for Clarification

In its original Complaint, in pleading its claim under NY GBL § 349, J&J alleged that SaveOn's conduct harmed the public by "jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive." Dkt. 1 ¶ 114. In the February 6 Order, Your Honor recognized that J&J's allegation of public harm "is tethered to the viability of the CarePath program vis-à-vis the availability of funds generally available to patients in need," Dkt. 192 at 22, and that "communications involving the viability of CarePath is a relevant topic that [SaveOn] may explore," *id.* at 19. In Section I.B of its February 20 motion, SaveOn asked Your Honor to clarify that J&J must produce documents relating to its financial viability even if they also relate to CarePath's budget or J&J's return on investment on the CarePath program.



In its proposed Amended Complaint, ███████████████████████████████ ██████████████████████████████████████████████████████████. *See* Dkt. 220 Ex. B ¶ 202 ███████████████████████████). ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████. *See* Compl. ¶ 114; Dkt No. 25 at 1; Dkt No. 79 at 17; Ex. 1 (Jan. 6, 2023 Letter from H. Sandick to M. Nelson) at 2, 5, 10; Ex. 2 (Jan. 24, 2024 Hr'g Tr.) at 68:4-69:5. On that basis, SaveOn withdraws its request for clarification in Section I.B, of its February 20 motion for clarification and reconsideration. (SaveOn reserves its rights to seek such information should J&J attempt to preserve any such argument.)

## II.    SaveOn's Motion for Reconsideration

### A.     Copay Assistance Maximums (Section II.A)

In its original Complaint, J&J alleged: "For most of these drugs [for which J&J offers CarePath], CarePath offers patients up to $20,000 in assistance towards their out-of-pocket costs

per calendar year." Compl. ¶ 47. It further alleged that SaveOn's conduct caused J&J to pay out

the maximum amount of CarePath funds "more often than it otherwise would," *id.* ¶ 99, which it

claimed as the basis of its damages, *id.* ¶¶ 110, 115. In Section II.A of its motion for reconsidera-

tion, SaveOn asked Your Honor to compel J&J to produce documents regarding (1) the reasons

that J&J set CarePath's annual maximums for the drugs at issue at the levels it did during the

relevant time period; and (2) the reasons that J&J apparently did not change those maximums until

2022 despite knowing that it was paying more due to accumulators, maximizers, and SaveOn.

       In its proposed Amended Complaint, 

. Dkt. 220 Ex. B ¶ 57 (

). 

. *See* Mot. 14

(quoting Ex. 18 (JJHCS_00164633) at -633)

).

       Without information from J&J, SaveOn does not know whether and how J&J has adjusted

the copay assistance maximums for the drugs at issue, even though those copay assistance levels

are a key component of J&J's alleged damages. Dkt. 220 Ex. B ¶¶ 186, 202. This is another reason

why the Court should grant SaveOn's motion for reconsideration in Section II.A of its February 7

motion and compel J&J to produce "documents going to why J&J set CarePath's annual maxi-

mums at the levels it did during the relevant time period and

. Mot. 14.

## B.    CarePath's Purpose (Section II.B)

       In Section II.B of its motion for reconsideration, SaveOn asked Your Honor to compel J&J

Hon. Freda L. Wolfson                                                                    Page 4

to produce discovery relating to CarePath's purpose on two bases: (1) J&J alleged that SaveOn's

conduct threatened CarePath's financial viability, hence SaveOn was entitled to show that any

harm to CarePath's viability does not harm the public, Mot. 16; and (2) J&J alleged that CarePath's

purpose was to help commercially insured patients afford their specialty drugs, *id.* at 15 (quoting

Compl. ¶¶ 2, 23, 47). In its proposed Amended Complaint, ███████████████████

███████████████████, *see* Dkt. 220 Ex. B ¶ 202; ███████████████

███████████████████████████████████████████

███████████████.

Also in its proposed Amended Complaint, however, ███████████████

███████████████████, Dkt. 220 Ex. B ¶¶ 2, 30, 57 ███████████

███████████████████)—and ███████████████

███████████, *id.* ¶ 2 (███████████████████); *id.*

¶ 128 (███████████████████████████████████

███████████████).

This underscores that Your Honor should grant the relief sought in Section II.B of

SaveOn's motion. SaveOn is entitled to the information necessary to effectively counter these al-

legations, which J&J has repeated throughout this litigation. *See, e.g.*, Dkt. 116 at 9:15-24, 20:14-

21 (J&J's counsel analogizing CarePath to a charity); *cf.* Mot. 17 (citing Ex. 10) (describing Care-

Path as an "investment" that drives J&J's profits). As long as J&J continues to make these allega-

tions or reserves the right to make them at trial, Your Honor should compel J&J to produce infor-

mation regarding CarePath's purpose.

**C.      Pricing (Section II.C)**

In its original Complaint, J&J alleged that (1) "JJHCS has consistently decreased the price

of the drugs targeted by the SaveOnSP Program," Compl. ¶ 80; and (2) SaveOn's conduct "mak[es]

4

other patient healthcare needs more expensive by not counting any of the [CarePath] funds spent on patients' medication towards their ACA maximum or deductible," *id.* ¶ 114. In the February 6 Order, Your Honor held that information regarding J&J's drug pricing was generally not relevant, in large part because "at the [January 24, 2024] hearing, [J&J's] counsel made an express representation on the record that [J&J] will not, at trial or on a summary judgment motion, rely on the pricing of Janssen drugs as a basis to prove its claims."

In Section II.C of its February 20 motion, SaveOn explained that it intended to counter J&J's allegation that SaveOn's conduct increases other healthcare costs (in part) by showing that J&J has increased those costs by raising drug prices. Mot. 18. If J&J reserves the right to oppose that showing, SaveOn argued, then J&J should produce any evidence relating to its drug pricing now. *Id.* at 19-20. In opposition, while saying it might move to exclude SaveOn's argument, it did not disclaim its right to oppose it if any such motion is denied. Opp. 18-20.



. Dkt. 220 Ex. B ¶ 129 (                    ).

This "transparency report" is actually quite opaque; it simply asserts that J&J reduced its prices, citing "Janssen internal financial accounting" that J&J has not produced. Ex. 3 at 2 & n.1.

Dkt. 220 Ex. B ¶ 129 (

███ Once again, its "transparency report" cites only "Janssen internal financial accounting" as support for these assertions, which it un-transparently does not provide. Ex. 3 at 6 & n.1.



███████████████. This is an additional reason that Your Honor should compel J&J to produce discovery "showing the connection between CarePath and its pricing of the 14 drugs at issue." Mot. 18.

## III.    SaveOn's Motions Regarding CAP Terms[1]

The Court recognized that SaveOn is entitled to discovery on J&J's mitigation measures of its damages. *See* Dkt. 171 at 93:21-23. As Your Honor and Judge Waldor recognized, a purpose of the CAP Program was to "take action to reduce [J&J's] losses," Dkt. 192 at 25, including by "identify[ing] patients who were enrolled in" maximizers, accumulators, and plans advised by SaveOn, *id.* at 25-26. Judge Waldor and Your Honor thus both held that SaveOn was entitled to discovery about the CAP program. *See* Dkt. 171 at 55:25-56:1 (opening the doors on CAP discovery); Ex. 2 (Jan. 24, 2024 Hr'g) at 108:21-109:6 (Your Honor indicating that documents related to the CAP Program are relevant).

In a November 2, 2023 Order, Judge Waldor thus compelled J&J to add the so-called CAP Custodians—William Shontz, Quinton Kinne, Daphne Longbothum, John Hoffman, L.D. Platt,

---

[1] The CAP Terms are: "CAPa" OR "CAPm" OR "adjustment program*".

and Alison Barklage, Dkt. 173 at 2—and in a February 6, 2024 Order, Your Honor compelled J&J

to add Karen Lade, Scott White, and Blasine Penkowski because they worked on the CAP Program

and related efforts to mitigate, Dkt. 192 at 26-29. On February 7, 2024, SaveOn filed a motion to

compel J&J to comply with the November 3 Order by running the CAP Terms for all its custodians

over the full refresh period of July 1, 2022 to November 7, 2023 (as J&J did for the period of April

1, 2016 to November 7, 2023). On February 16, 2024, SaveOn moved to compel J&J to comply

with the November 7 Order and the February 6 Order by running the CAP Terms over the custodial

files of the CAP Custodians and those of Lade, White, and Penkowski.



In its proposed Amended Complaint,

." Dkt. 220 Ex. B ¶ 177.

Id. ¶ 193.

This provides an additional reason that Your Honor should grant SaveOn's February 7 and

February 16 motions regarding the CAP Terms.

. Your Honor recognized that J&J used the CAP program in an effort to identify patients

enrolled in such plans, Dkt. 192 at 25, and                                                    , Dkt. 166

Ex. 1; Feb. 16, 2024 Mot. Ex. 9 (

). This makes robust discovery regarding the CAP Program even more essential.

. Exhibit 4 (JJHCS_00198255),

Hon. Freda L. Wolfson                                                        Page 8

for example, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████. Exhibit 5

(JJHCS_00195975) and Exhibit 6 (JJHCS_00196018) ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████. These documents

were identified by the CAP Terms but would not have been identified by the CAP Terms with a

SaveOn limiter. J&J should not be able to manipulate its terms to withhold such documents.

***

SaveOn appreciates Your Honor's attention to this matter.

Respectfully submitted,

*/s/ E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

Hon. Freda L. Wolfson                                                          Page 9

> Philippe Z. Selendy (admitted *pro hac vice*)
> Andrew R. Dunlap (admitted *pro hac vice*)
> Meredith Nelson (admitted *pro hac vice*)
> Elizabeth H. Snow (admitted *pro hac vice*)
> SELENDY GAY PLLC
> 1290 Avenue of the Americas
> New York, NY 10104
> (212) 390-9000
>
> pselendy@selendygay.com
> adunlap@selendygay.com
> mnelson@selendygay.com
> esnow@selendygay.com
>
> *Attorneys for Defendant Save On SP, LLC*

# Exhibit 1

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 6, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

<u>By Email</u>

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

Re:    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC***
       ***(Case No. 2:22-cv-02632-JMV-CLW)***

Dear Meredith:

We write in response to your December 21, 2022 letter concerning Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Responses and Objections to Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production.

As an initial matter, we note that the responses set out below are subject to ongoing factual investigation and document collection efforts. We reserve all rights to revise or amend these responses as necessary. Further, none of the responses set out below are intended to waive any of the general or specific objections or limitations provided in JJHCS's Responses and Objections to SaveOnSP's First Set of Requests for Production, or to suggest that responsive documents exist with respect to particular requests.

## I.    GENERAL ISSUES

### A.    Definition of "Janssen Drugs"

We objected to the term Janssen Drugs "to the extent it purports to include drugs that are not covered by CarePath." You ask us to clarify whether the drugs BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA are covered by CarePath. We write to confirm our understanding that patient assistance for these drugs is covered by CarePath.

### B.    Time Period

We objected to SaveOnSP's requests to the extent that they sought documents from before January 1, 2017. SaveOnSP seeks documents for many requests dating as far back

Meredith Nelson, Esq.
January 6, 2023
Page 2

as 2009.  We do not see the basis for extending the relevant time period beyond 2017, but would like to further understand your position as part of the meet-and-confer process.

For example, you assert that you are entitled to documents about the budgeting and development of CarePath from its inception, as well as the budgeting and development of any predecessor of the CarePath program, in order to "investigate JJHCS's assertions that SaveOnSP's services make CarePath financially unviable."  JJHCS's assessment that SaveOnSP's services "jeopardiz[e] the viability of patient assistance programs like CarePath by making them prohibitively expensive," Compl. ¶ 114, is one that you are free to probe in depositions and at trial, but it self-evidently turns on the added expenses caused by SaveOnSP, and all documents about the developing and budgeting of the program have no proportionate relationship to that general proposition.  Moreover, JJHCS has already agreed to search for and produce documents that will show that SaveOnSP is making CarePath prohibitively expensive, including, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath."  *See* R&Os to Requests 25, 27, 29.  Please explain why those documents, which include budget and harm-related materials, do not suffice.

Further, you claim that you need documents about CarePath's budget and cost for nearly a decade before SaveOnSP began operations, which we understand occurred in or about November 2017, when SaveOnSP executed its Master Program Agreement with Express Scripts Inc.  Please explain how CarePath's budget and development prior to 2017—a time when SaveOnSP did not exist—is relevant to investigating SaveOnSP's effect on CarePath's financial viability in the future.  Please also explain how the budgeting and development of any predecessors of the CarePath program, which only came into existence in 2015, has any bearing on the present dispute.

You also claim that you need documents from prior to 2017 in order to investigate whether "CarePath was designed solely to help patients, not to financially benefit JJHCS." Please direct us to where JJHCS has claimed that CarePath was designed "solely to help patients" and "not to financially benefit JJHCS."  Please also explain why documents prior to 2017 are needed to make such an assessment.

Finally, you claim that you are entitled to documents relating to CarePath's terms and conditions from before 2017 to "fully assess the meaning and materiality of the terms and conditions at issue in this case, as decisions about many of these terms likely predate 2017." Please explain what "decisions" prior to 2017 are relevant to this case, which concerns only whether SaveOnSP wrongfully induced patients to breach CarePath's actual terms and conditions during the time period when SaveOnSP was in operation.  Please also explain why SaveOnSP believes it needs additional documents apart from the final terms and conditions.  In any event, on this point, to the extent that SaveOnSP is willing to produce internal documents

Meredith Nelson, Esq.
January 6, 2023
Page 3

that it has thus far declined to produce, we are willing to discuss an appropriate compromise involving production from each side.

### C.    Documents in the Possession of JJHCS

You asked whether documents created or held by employees of entities other than JJHCS "within the J&J corporate family or involved in the administration of CarePath, including Janssen, CarePath Care Coordinators, JJHCS Hub Entities, Lash Group, and Trial Card" are in JJHCS's possession, custody, and control, and would accordingly be produced by JJHCS.

With respect to entities in the J&J corporate family, we plan to generally limit our production to documents in JJHCS's possession alone. The J&J corporate family consists of more than 140,000 employees who work at over 200 subsidiaries and affiliates across the world. Collecting and producing documents from all of these individuals and entities would be burdensome and disproportionate to the needs of this case. JJHCS is the sole corporate entity charged with administration of CarePath, and so it is incumbent on SaveOnSP to explain why the collection and production of documents outside of JJHCS is necessary and proportionate to the needs of this case. Please provide such an explanation to us, including an explanation of which of the J&J affiliates and subsidiaries you believe are likely to have relevant documents.

In addition, with respect to entities outside of the J&J corporate family, JJHCS objects to SaveOnSP's definition of "JJHCS Hub Entities" for a number of reasons, including to the extent it purports to include entities other than those responsible for administering CarePath during the relevant Time Period. Nevertheless, notwithstanding such objections, JJHCS will work with Trial Card, a third-party vendor with responsibility for the administration of CarePath during the relevant Time Period, to facilitate production of documents responsive to SaveOnSP's requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    Request Nos. 1-7, 35

SaveOnSP's Request Nos. 1-7 seek organizational charts, including charts for entities other than the JJHCS groups responsible for administration of CarePath. Request No. 35 seeks "documents sufficient to identify all JJHCS Hub Entities and CarePath Coordinators."

In response to Requests Nos. 1-7, JJHCS agreed to produce documents "sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath for the relevant Time Period." In response to Request No. 35, JJHCS agreed to produce "non-privileged documents in its possession sufficient to identify the entities responsible for administering CarePath during the relevant Time Period." We also note that while JJHCS will not produce organizational charts for Trial Card, we will work with Trial Card to facilitate production of such documents, to the extent they exist and can be located by a reasonable search.

Meredith Nelson, Esq.
January 6, 2023
Page 4

Please explain the basis for SaveOnSP's request that we collect and produce documents beyond this so that we can better understand your position.

We would also like to more fully understand the reasons you provided for why you need organizational charts beyond what JJHCS has agreed to produce. You claim that "SaveOnSP needs documents relating to CarePath's development, so that it can test JJHCS's assertion that CarePath was developed solely to benefit patients and not to benefit JJHCS financially." As requested in Section I.C, *supra*, please direct us to where JJHCS has claimed that CarePath was designed "solely to benefit patients" and "not to benefit JJHCS financially." Regardless, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to CarePath's finances, so it can test JJHCS's assertion that SaveOnSP's conduct financially harms CarePath and threatens its financial viability." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether SaveOnSP's wrongful conduct financially harms CarePath and threatens its financial viability. Again, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the marketing of CarePath, so it can explore whether JJHCS's marketing caused any of the purported patient confusion that JJHCS attributes to SaveOnSP." The patient confusion alleged in the Complaint is that created by SaveOnSP when pharmacies refuse to fill prescriptions at the point of sale unless those patients enroll with SaveOnSP. Compl. ¶ 88. Please explain your factual basis for claiming that such patient confusion could reasonably be attributed to JJHCS's marketing efforts. In particular, please direct us to specific instances of confusion identified in the complaint that could reasonably be attributed to specific CarePath's marketing efforts. Otherwise, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the sale, pricing, and marketing of Janssen Drugs so that it can evaluate the relationship between CarePath and JJHCS's financial performance, including how JJHCS sets prices for Janssen Drugs (thus increasing costs for health plans and patients)." Please explain how Janssen's drug sales, pricing, or marketing are related to the claims or defenses in this action, which concern SaveOnSP's misconduct in extracting funds from CarePath. Please also explain how Janssen's conduct is relevant in any way to this action. Again, this provides no basis for additional organizational charts. Further, even assuming that these points were relevant, SaveOnSP and its health plan partners already have access to extensive information concerning the pricing of Janssen Drugs, based on their own reimbursement records for those Drugs.

Meredith Nelson, Esq.
January 6, 2023
Page 5

       You claim that "SaveOnSP also needs documents relating to the drafting of JJHCS's terms and conditions, which JJHCS alleges that SaveOnSP induced patients into breaching." Please explain why the drafting of the terms and conditions with which patients must comply is relevant to this action which is based on whether SaveOnSP has engaged in wrongdoing when it strong-arms patients into breaching those terms and conditions. On this point again, however, to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce, we are willing to discuss a compromise.

**B.    Request No. 11**

       SaveOnSP's Request No. 11 seeks documents "regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." JJHCS offered to "meet and confer to determine if this Request can be appropriately narrowed." We do not currently see the basis for producing the materials you request, but are willing to continue to discuss the merits of this Request.

       You claim that documents pertaining to the "development, marketing, and management of [other copay assistance programs offered for Janssen Drugs,] as well as of CarePath itself, are relevant to refuting: JJHCS's assertions that SaveOnSP's services increase the cost and threaten the continued viability of 'patient assistance programs like CarePath by making them prohibitively expensive.'" Compl. ¶ 114.

       With respect to CarePath, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether its services increase the cost of CarePath and threatens its financial viability.

       With respect to the reference to "patient assistance programs like CarePath" in Compl. ¶ 114, that is a general reference to patient assistance programs across the industry, not other patient assistance programs for Janssen Drugs. As you know, SaveOnSP targets the patient assistance programs of other drug manufacturers as well. JJHCS reasonably infers that SaveOnSP's services harm those programs in ways similar to how they have harmed CarePath. We do not see how the "development, marketing and management" of those programs is relevant to that inference of harm, but invite you to explain.

       You also claim that such documents are relevant to "JJHCS's assertion that any increase in the cost of copay assistance programs amounts to a public harm." JJHCS claims that SaveOnSP causes public harm by "causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare

Meredith Nelson, Esq.
January 6, 2023
Page 6

needs more expensive by not counting any of the funds spent on patients' medication towards
their ACA maximum or deductible." Compl. ¶ 114. Please direct us to where JJHCS alleges
that "*any* increase in the cost of copay assistance amounts to a public harm." (emphasis added).
Please also explain how the "development, marketing and management" of such programs is
relevant to whether an increase in their costs amounts to a public harm.

You also claim that such documents are relevant to "JJHCS's assertion that
SaveOnSP induces patients to breach CarePath's terms and conditions and deceives patients by
failing to inform them of that alleged breach." Please explain how documents relating to the
"development, marketing and management" of CarePath, let alone other programs, is relevant to
whether SaveOnSP induces patients to breach CarePath's terms and conditions. Please also
identify the elements in the relevant claims or defenses to which such documents are material.

C.    Request Nos. 12 and 13

SaveOnSP's Request Nos. 12 and 13 seek documents regarding CarePath's terms
and conditions and the CarePath requirement that patients enrolled in CarePath make payments
toward Janssen Drugs. JJHCS agreed to produce documents "sufficient to show all final
versions of CarePath's terms and conditions for each Janssen Drug during the relevant Time
Period."

Seeking additional documents beyond what JJHCS has promised to produce, you
claim "JJHCS's understanding of the terms and conditions in its CarePath contracts and the
drafting of those terms and conditions is relevant to whether SaveOnSP induced patients to
breach them, a central point for JJHCS's tortious interference claims. Compl. ¶ 109." As noted
in Sections I.B and II.A, *supra*, whether there has been a breach is dependent on SaveOnSP's
conduct and the final terms themselves, not the back-story of the drafting of the terms and
conditions. Nonetheless, so that we can consider your demand more precisely, please identify
which terms you believe are relevant but also unclear or ambiguous on their face such that
consideration of extrinsic evidence, such as the drafting history of the terms and conditions, is
relevant to this action. Again, we are willing to discuss a compromise on this point to the extent
that SaveOnSP is willing to produce internal documents that it has thus far declined to produce.

D.    Request No. 14

SaveOnSP's Request No. 14 seeks documents relating to JJHCS's and other
entities' "understanding of commercial health plans' ability to designate specialty drugs as
Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its
regulations." You claim JJHCS refused to produce any documents in response.

You have misstated JJHCS's response. JJHCS did not refuse to produce any
documents in response to RFP No. 14. We agreed to search for and produce "all non-privileged
documents and communications in its possession regarding SaveOnSP's designation of specialty

Meredith Nelson, Esq.
January 6, 2023
Page 7

drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care
Act and its regulations during the relevant Time Period." *See* R&O to Request No. 14. Subject
to the objections laid out in JJHCS's Responses and Objections, JJHCS will produce such
documents. We hope this clarification resolves your concerns, but if there are additional
documents SaveOnSP believes it requires, please let us know.

     **E.**     **Request Nos. 20, 41, 43**

       SaveOnSP's Request Nos. 20, 41, and 43 seek documents concerning "Copay
Accumulator Services and Copay Maximizer Services." JJHCS in response agreed to produce
documents relating to SaveOnSP.

       You claim that documents relating to "Copay Accumulator Services" and "Copay
Maximizer Services" are relevant "because JJHCS has in its complaint blurred the lines between
SaveOnSP, accumulators, and maximizers. *See, e.g.*, Compl. ¶ 74. Thus, documents related to
JJHCS's understanding of accumulators and maximizers are also relevant to its understanding of
SaveOnSP's business and the impact of that business on JJHCS."

       First, please explain how JJHCS's understanding of accumulators and maximizers
in general is relevant to the claims or defense in this action. Please identify the elements of any
claims and defenses and explain the relevance of these requested documents to those elements.
Second, please explain why you need documents from JJHCS to refute an allegation that
SaveOnSP falls into the category of programs described in the article cited in Compl. ¶ 74.
Please explain why SaveOnSP needs documents from JJHCS in order to compare the contours of
its own program, as borne out by its own documents and other information within SaveOnSP's
control, against the descriptions in that article.

     **F.**     **Request No. 21**

       SaveOnSP's Request No. 21 concerns "any advocacy to or communications with
any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or
Copay Maximizer." Based on, *inter alia*, relevance and privilege, JJHCS declines to produce
documents in response to this Request.

       You claim that "JJHCS's lobbying campaign is, at a minimum, relevant to
showing that public confusion about SaveOnSP's services is the result of actions by JJHCS and
its allies, not SaveOnSP." As noted in Section II.A, *supra*, the Complaint alleges that SaveOnSP
confuses patients in part by creating rejections and delays at the point of sale. Compl. ¶ 88.
Please explain how such confusion could reasonably be attributed to any lobbying efforts by
JJHCS. In addition, please direct us to instances of confusion identified in the Complaint that
could reasonably be attributed to any lobbying efforts as opposed to the conduct of SaveOnSP
and its partners.

Meredith Nelson, Esq.
January 6, 2023
Page 8

You also claim that "such communications may also show JJHCS's understanding of whether SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits." Please explain how lobbying efforts are relevant to this question, as whether SaveOnSP violates the Affordable Care Act is a question of law.

Finally, please explain how requests for documents concerning JJHCS's lobbying of government officials are permissible given that JJHCS has a privilege against the production of documents that would unjustifiably burden its First Amendment right to political association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958).

**G.     Request No. 25**

SaveOnSP's Request No. 25 seeks "all Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 110, 115." JJHCS agreed to produce "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period, including the extent to which SaveOnSP has caused JJHCS to pay more in copay assistance that it otherwise would have."

You ask us to confirm whether "based on its response JJHCS is producing fully in response to this Request." Without waiving the objections and limitations in its response, JJHCS intends to search for and produce the documents and communications it identified in its response. We are happy to meet and confer should you have specific questions.

**H.     Request No. 26**

SaveOnSP's Request No 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum." In its Responses, JJHCS objected to this Request on the grounds that it was vague and ambiguous and declined to produce any documents in response to this Request.

You now clarify that this Request "seeks documents and communications that reflect any payments for Janssen Drugs made by JJHCS, Janssen, or any Hub Entity on behalf of patients, both in the ordinary course of providing copay assistance and in any instance where such entity covered a patient's copay for a Janssen Drug in excess of what it otherwise would have under CarePath's terms and conditions."

JJHCS has agreed to produce documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath. *See R&O to RFP No. 29.* Please let us know if that is sufficient or otherwise identify the claims or defenses for which SaveOnSP believes it needs documents beyond that. Please also let us know the rationale for seeking a broader production than what JJHCS has proposed.

Meredith Nelson, Esq.
January 6, 2023
Page 9

## I.     Request No. 28

SaveOnSP's Request No. 28 seek a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. through m.).  JJHCS does not believe that documents unrelated to SaveOnSP's misconduct, such as documents relating to the sales and marketing budgets for Janssen drugs, are relevant to this action, but nevertheless agreed to produce "Janssen Transparency Reports."  JJHCS also said it is willing to meet and confer regarding items i. through m.

You wrote that JJHCS's does not define the term "Janssen Transparency Reports" or clarify what responsive data is contained in those reports.  To clarify, those Reports summarize, *inter alia*, changes in Janssen drug prices, the amount of rebates paid for Janssen Drugs and total spend on CarePath patient assistance.  An example of such a report can be found here: *The 2021 Janssen U.S. Transparency Report*, JANSSEN PHARM., INC. (2022), https://transparencyreport.janssen.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000.

You claim further that the data "SaveOnSP seeks is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm."  JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath."  *See* R&Os to Requests 25, 27, 29.  We invite you to explain why it is necessary for SaveOnSP to also receive additional data, including, for the last thirteen years, (i) a listing of "all patients receiving a Janssen Drug," (ii) "the number of fills of the Janssen Drug each received by each such Patient," (iii) "the dosage of the Janssen Drug received by each such Patient for each fill," (iv) "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," as well as the other revenue and cost data.  In particular, please explain how a request for the names of each and every of the tens of millions of patients who have received Janssen therapies over the past thirteen years is a proportional request for information given the claims and defenses at issue in this action, to the extent that JJHCS even has the data that SaveOnSP seeks.  We are interested to understand your rationale for this Request and to hear your explanation for why it is proportionate to this action, particularly in light of the fact that, as explained above, SaveOnSP and its health partners already have substantial information about the pricing of Janssen Drugs based on their own claims and reimbursement data.

You claim further that "there are clear parallels between the data SaveOnSP seeks in RFP No. 28 and the data JJHCS seeks in its RFP Nos. 41 and 42" and "invite[] JJHCS to meet and confer."  We do not understand this comparison but are willing to meet and confer to discuss this Request further.

Meredith Nelson, Esq.
January 6, 2023
Page 10

**J.    Request No. 29**

SaveOnSP's Request No. 29 seeks documents relating to CarePath's finances. JJHCS in response agreed to produce documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath."

You claim that these documents are insufficient because the additional documents SaveOnSP seeks, "including information on JJHCS's return on investment for CarePath, is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." The documents JJHCS has agreed to produce, including the CarePath budget and actual costs, are sufficient to show the threat SaveOnSP poses to CarePath. We invite you to explain how further documents, including JJHCS's supposed "return on investment," are relevant or necessary, or how it is proportionate.

You also claim that additional data is necessary to dispute "JJHCS's claim that CarePath is designed to help patients and not simply J&J's bottom line." As noted in Section I.C and Section II.A, *supra*, please direct us to where JJHCS has claimed that CarePath was not "designed to help . . . J&J's bottom line."

**K.    Request No. 30**

SaveOnSP's Request No. 30 seeks "for each year for each Janssen Drug, all Documents and Communications regarding the basis for Janssen's decision to raise or lower the price of the Janssen Drug, including labor or manufacturing costs or the increase in efficacy of the Janssen Drug." JJHCS declined to produce any documents in response to this Request.

You claim that the documents requested are "relevant to JJHCS's allegations that SaveOnSP's conduct threatens the viability of copay assistance" and that it has "suffered monetary losses as a result of SaveOnSP's conduct." As noted above, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why it is necessary for SaveOnSP to obtain documents relating to "Janssen's decision to raise or lower the price of" to further probe those allegations.

You also claim that such documents are relevant to JJHCS's allegations that "copay assistance programs like CarePath are a public good" and "that the threatened viability of copay assistance programs is a public harm." Please explain how "Janssen's decision to raise or lower the price of" its drugs is at all relevant to whether copay assistance programs like CarePath

Meredith Nelson, Esq.
January 6, 2023
Page 11

are a public good.  Please also explain why it is relevant to the claims and defenses in this action whether CarePath and similar programs are a public good.

**L.      Request No. 32**

SaveOnSP's Request No. 32 seeks all documents and communications "regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient."  JJHCS declined to produce any documents in response to this Request.

You assert that the requested documents are "relevant to JJHCS's allegations that providing CarePath funds to individuals who do not qualify for CarePath threatens the viability of copay assistance, as well as the significance of the CarePath terms and conditions at issue to JJHCS.  If, for example, JJHCS offered CarePath funds to an individual whom it believed was on a plan that does not comply with the revised Stelara or Tremfya terms, *see* Compl. ¶¶ 102-03, such an offer would be relevant to JJHCS's allegation that providing copay assistance to patients enrolled in such plans threatens the viability of JJHCS's copay assistance."

Even if JJHCS continues to offer copay assistance to a patient who JJHCS believes is enrolled in a health plan that does not comply with the revised Stelara or Tremfya terms, please explain why this would be relevant to the claims at issue in this action.  For example, please explain how JJHCS's willingness to continue to provide copay assistance to a patient who does not comply with the Terms & Conditions would change the fact that SaveOnSP causes JJHCS to spend more in CarePath patient assistance than it otherwise would absent the SaveOnSP program.  That a plaintiff does not enforce a term in its contract is no defense to a claim of tortious interference.  Indeed, New Jersey law is clear that a claim of tortious interference may exist even where the underlying contract is *unenforceable*.  *See, e.g., Halebian N.J. v. Roppe Rubber Corp.*, 718 F. Supp. 348, 360 (D.N.J. 1989) ("That the underlying contract may be unenforceable is no defense to a claim of tortious interference."); *see also Mina L. Smith, Inc. v. Cyprus Indus. Minerals Co.*, 427 A.2d 1114 (N.J. App. Div. 1981) ("Unquestionably, one who unjustifiably interferes with the contract of another is guilty of a wrong.  That the contract may be unenforceable is no defense.").  We invite you to explain further why you believe such information is relevant to the claims or defenses at issue in this action.

**M.      Request No. 34**

SaveOnSP's Request No. 34 seeks documents and communications concerning JJHCS's consideration of SaveOnSP's services for its own employer-sponsored health plan. JJHCS declined to produce any such documents.

You claim that "whether JJHCS considered using such services for its own employees is relevant to JJHCS' claims that SaveOnSP harms patients by causing stress and

Meredith Nelson, Esq.
January 6, 2023
Page 12

confusion, increasing costs of other healthcare, and threatening the viability of copay assistance." As you are no doubt aware, Johnson & Johnson did not contract with SaveOnSP. Given this fact, please explain how Johnson & Johnson's employer-sponsored health plan bears on any of these issues, or more generally to the claims and defenses at issue in this action.

### N.      Request No. 36

SaveOnSP's Request No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS agreed to produce agreements in its possession between it and the entities responsible for administering CarePath for the period of January 1, 2017 to the present.

You wrote to confirm (1) whether this production would encompass "agreements which have in the past administered CarePath, not simply those which currently administer CarePath" and (2) whether JJHCS will produce documents responsive to Request No. 36 that relate to the fair market value of JJHCS's Hub Entities' or CarePath Care Coordinators' services."

We write to confirm that JJHCS intends to produce agreements for entities that have administered CarePath for the period of January 1, 2017 to the present, even if those entities no longer administer CarePath today. Our current understanding is that those agreements will include work orders that document the cost of the services provided. We do not understand any other relevant documents to be responsive to this Request. If you seek any other documents, please let us know and we will consider your request.

### O.      Request No. 37

SaveOnSP's Request No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." JJHCS declined to produce documents in response to this Request because this Request is irrelevant to the subject matter at issue in this litigation.

You assert that these documents are relevant to JJHCS allegations that SaveOnSP's conduct damages JJHCS, in part because they will "assist in demonstrating that SaveOnSP in fact causes more patients to use Janssen Drugs than would otherwise do so." We do not understand this purported rationale or its connection to this document request. Please explain how this might be the case. We do not understand SaveOnSP to make the decision to prescribe Janssen Drugs, and the "warm transfer" that is a necessary part of SaveOnSP's program will naturally deter some patients from using Janssen Drugs, as the patients are told that such medications are not covered by their health insurance unless additional steps are also taken. We invite you to describe any efforts that SaveOnSP has undertaken to alter individual

Meredith Nelson, Esq.
January 6, 2023
Page 13

prescribing decisions, including whether SaveOnSP collaborates with its health plan partners to require non-medical switching to drugs that SaveOnSP can designate as non-essential health benefits and for which manufacturer patient copay assistance exists.

**P.      Request No. 38**

SaveOnSP's Request No. 38 seeks all documents and communications "received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath." As noted in our initial Responses, JJHCS agreed to produce all documents responsive to this Request regarding SaveOnSP. *See* Response to Request Nos. 8, 38.

You wrote to confirm that JJHCS will produce documents responsive to this Request regarding CarePath generally. Please explain why a Request that seeks all documents "regarding CarePath" and would necessarily encompass all documents exchanged between JJHCS and any entity with whom JJHCS contracts or partners with to administer CarePath is not overbroad or why complying with it would not be unduly burdensome. Given the Federal Rules' emphasis on proportionality, please also explain how such burdensome discovery would be proportional to SaveOnSP's needs in this action. *See* Fed. R. Civ. P. 26(b)(1).

**Q.      Request No. 42**

SaveOnSP's Request No. 42 seeks all documents and communications "relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms 'copay accumulator' and 'copay maximizer.'" JJHCS responded that it would produce all non-privileged documents and communications in its possession for the period of January 1, 2017 to the present relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to SaveOnSP.

You wrote to inquire whether we would produce all documents and communications concerning those terms more generally. You assert that such documents are "relevant to whether JJHCS knowingly contributes to the alleged patient stress and confusion that it attempts to attribute to SaveOnSP by conflating SaveOnSP's conduct with that of 'maximizers' and 'accumulators,' including potentially harmful conduct commonly associated with 'copay accumulators' such as non-medical switching."

We do not understand your assertions. This action concerns SaveOnSP's scheme to extract patient copay assistance funds in violation of the CarePath terms and conditions. The patient harms, including patient "stress and confusion," flow from how SaveOnSP operates its profit-seeking scheme, not from any entity's abstract understanding of the meaning of the terms "copay accumulator" or "copay maximizer." In light of this, please explain how JJHCS's, a third-party vendor's, or partner's understanding of these terms generally would be relevant to the claims at issue in this action.

* * *

Meredith Nelson, Esq.
January 6, 2023
Page 14

We are available to meet and confer regarding the issues outlined above at your convenience. We look forward to your response.

Very truly yours,

Harry Sandick

# Exhibit 2

Page 1

```
 1          UNITED STATES DISTRICT COURT

 2          DISTRICT OF NEW JERSEY

 3          CIVIL ACTION NO. 22-2632

 4   JOHNSON & JOHNSON HEALTH CARE

 5   SYSTEMS, INC.,

 6        Plaintiff,                    TRANSCRIPT

 7        vs.                                OF

 8   SAVE ON SP, LLC,                   PROCEEDINGS

 9        Defendant.

10   - - - - - - - - - - - - - - - - -

11

12          TRANSCRIPT of the stenographic notes of

13   the proceedings in the above-entitled matter as

14   taken by and before RUTHANNE UNGERLEIDER, a

15   Certified Court Reporter and Notary Public of the

16   State of New Jersey, held at the office of

17   LOWENSTEIN SANDLER LLP, One Lowenstein Drive,

18   Roseland, New Jersey, on Wednesday, January 24,

19   2024, commencing at approximately 10:00 in the

20   forenoon.

21

22

23

24

25
```

Page 2

```
 1   B E F O R E:
 2   HONORABLE FREDA L. WOLFSON
 3   A P P E A R A N C E S:
 4   PATTERSON BELKNAP WEBB & TYLER LLP
     1133 Avenue of the Americas
 5   New York, New York  10036
          BY:  HARRY SANDICK, ESQ.
 6               JULIA LONG, ESQ.
                 GEORGE A. LoBIONDO, ESQ.
 7               SARA A. ARROW, ESQ.
     Attorneys for Plaintiff
 8
     SILLS CUMMIS & GROSS P.C.
 9   The Legal Center
     One Riverfront Plaza
10   Newark, New Jersey  07102
          BY:  JEFFREY J. GREENBAUM, ESQ. (VIA ZOOM)
11   Attorneys for Plaintiff
12   SILLS CUMMIS & GROSS P.C.
     101 Park Avenue, 28th Floor
13   New York, New York  10178
          BY:  KATHERINE M. LIEB, ESQ.
14   Attorneys for Plaintiff
15   SELENDY GAY ELSBERG PLLC
     1290 Avenue of the Americas
16   New York, New York  10104
          BY:  ANDREW R. DUNLAP, ESQ.
17               ELIZABETH SNOW, ESQ.
                 HANNAH MILES, ESQ.
18   Attorneys for Defendant
19   ROBINSON & COLE LLP
     666 Third Avenue 20th Floor
20   New York, New York  10017
          BY:  E. EVANS WOHLFORTH, JR., ESQ.
21   Attorneys for Defendant
22
23   ALSO PRESENT:
     SHERYN GEORGE, JJHCS In-House Counsel
24   WAYNE FANG, ESQ., Lowenstein Sandler
25
```

Page 3

1          JUDGE WOLFSON:  All right.

2          We're here today in connection with the

3     outstanding disputes, and when we had our Zoom

4     conference several weeks ago I indicated I wanted to

5     address whatever had been left open by Judge Waldor.

6     She's had many, many conferences in this case,

7     resolved many issues on the record, entered some

8     orders, and there were a couple of substantial issues

9     that have really been kicking around for a while

10    where she was looking for everyone to meet and confer

11    and see where you ended up.  And, primarily, they're

12    going to relate to discovery regarding the terms and

13    conditions, there was financial information, and now

14    there are other things to do with custodians, and I'm

15    going to try to get to everything.  But I want to

16    deal with this, in the first instance, with regard to

17    those pending discovery disputes, let me turn first

18    to the documents dealing with the CarePath terms and

19    conditions that have been talked about for quite a

20    while now and what should be discoverable with regard

21    to the drafting, understanding enforcement of the

22    terms and conditions.

23          We know that, in particular, what's

24    being looked at is that this program is supposed to

25    fall under the "Other Offer" category.  It's not the

Page 4

1    coupon.  No one is asserting that it falls within the
2    other language.  Right?  Everybody agrees?  Yes?  So
3    it's all about the other offer.
4              MR. GREENBAUM:  Your Honor, may I make
5    two short preliminary points for context to just kind
6    of set the table at least from our perspective?
7              JUDGE WOLFSON:  I don't think it's
8    necessary at this point.
9              Let me move forward.
10             And I will say this -- can I go off the
11   record one moment?
12             (Brief recess taken.)
13             JUDGE WOLFSON:  So let's break this down
14   into what's there.
15             There's no doubt -- or there's no
16   dispute that there certainly is relevance to evidence
17   regarding what this term means.  The question is, how
18   much discovery is to be given, and where does it go,
19   and what are our time tables for doing that, et
20   cetera?  And we're going to get to that.
21             The Plaintiff has said that it produced
22   thousands of pages of documents, approximately 1200,
23   in response to search terms that were used to find
24   documents relating to terms and conditions from
25   April 2016 to July 1, 2022 that had been an agreed

Page 5

1   upon discovery period, however, the Court at the last
2   hearing had directed the parties to continue to
3   update discovery through October 2023.
4           So now we're all dealing with updating,
5   updating.
6           Okay.
7           There were requests also for documents
8   that bear on -- if I can, for short, I know it's
9   JJHCS -- if I can say J&J for purposes of the
10  hearing.  We know it's a different entity, but just
11  for ease -- J&J's enforcement and understanding of
12  the relevant terms and conditions.  And Plaintiff
13  says also that J&J has investigated availability of
14  additional documents and based on that investigation
15  understands that the terms and conditions at issue
16  are standard, uncontroversial terms, used in most, if
17  not all, manufacturer co-pay support programs that
18  long predate the time period of 2016 to 2023.  And
19  J&J has offered to review additional documents to see
20  what else might fall within that relevant time frame.
21          J&J has indicated that documents that go
22  further back to 2009, which is what really I think
23  SaveOn has been talking about, argues that either
24  they're irrelevant and also enforcement of terms and
25  conditions relating to other terms besides "other

Page 6

1    offer."  I mean, I have all the arguments here.

2              So let's move into this.

3              Now, in this connection too we have

4    custodian issues, and you agreed to some

5    modifications.

6              I think what we have here is Defendant

7    asked Plaintiff to conduct a search for documents

8    relating to the drafting of the general T&C's to add

9    additional search terms used designed to identify

10   documents relating to drafting, understanding and

11   enforcement, and add two custodians that J&J

12   identified as responsible for drafting the new

13   Stelara and Tremfya T&C's and to extend a search for

14   documents relating to enforcement of the new Stelara

15   and Tremfya T&C's.

16             Plaintiff has indicated that it will

17   search eight more months of one custodian's documents

18   and add two limited search terms.

19             So let's talk about where we are.

20             With regard to the requests, it was

21   requested that Plaintiffs identify predecessor

22   programs from which CarePath's general T&C's were

23   drawn.  And I think there are also interrogatories on

24   that topic.  Right?

25             MR. DUNLAP:  Yes, are honor.

Page 7

1              MR. SANDICK:  I don't think that there

2     is an interrogatory that specifically tracks what

3     they asked for in our discovery letters.  And not to

4     get sidetracked, but one of the points of contention

5     is that if they want detailed historical information

6     about things within JJHCS, I think the discovery

7     device for that is an interrogatory.  If they

8     propound one, we'll answer it subject to objections.

9     But I don't think that they have propounded one that

10    would cover all of the issues that they have raised

11    and have tried to use discovery correspondence as a

12    mechanism essentially as a substitute for

13    interrogatories.  And they're not at their

14    interrogatory cap.  They could propound

15    interrogatories.

16              MR. DUNLAP:  Could I respond to that,

17    your Honor?

18              JUDGE WOLFSON:  Sure.

19              MR. DUNLAP:  Just briefly.

20              We served document requests asking for

21    documents relating to the drafting of the terms and

22    conditions.  We served interrogatories asking them to

23    identify individuals with responsibility for the

24    drafting of the terms and conditions.  It turns out

25    that this specific term and condition, which is the

Page 8

1    heart of part of the case, ██████████████

     ████████████████████████    We think our

3    existing interrogatory and document requests are

4    broad enough to cover whoever drafted it, whether

5    they were working at JJHCS or some other predecessor

6    program.  So we think it's covered.

7                    JUDGE WOLFSON:  Okay.

8                    We're going to talk about it today,

9    whether it was specifically asked in that way or not,

10   but I'm going to get to the bottom of this and be

11   done with it so that we have this resolved.

12                   Now, in that regard, you've asked for I

13   think January 1, 2009 to the present, right?

14                   MR. DUNLAP:  Yes.

15                   JUDGE WOLFSON:  Because it would include

16   predecessor programs.

17                   MR. DUNLAP:  Because that is our

18   understanding of when it began.  Obviously, if the

19   program began earlier, at some other time, then we

20   would want it to be tailored, our issue, but they

21   haven't given us information, so it's hard for us to

22   tailor our understanding of when the program started.

23                   JUDGE WOLFSON:  Okay.

24                   Why would you, Mr. Sandick, believe

25   that -- you know, we're looking for what the meaning

Page 9

1   of this is -- that if you had predecessor programs
2   that used the same term, why would that not be
3   relevant at a discovery stage?
4            MR. SANDICK:  So, a couple of things.
5            It's not so much that we're saying it
6   would be irrelevant.  What we're saying is, number
7   one, as we've explained to the Defendants before, we
8   do not have consistent record keeping within our
9   client's files.
10           JUDGE WOLFSON:  I'm going to get to
11  retention.
12           What I'm saying is, I want to take this
13  piece by piece.  Which is, if we start with
14  relevancy, now let's go to what the problems are with
15  producing it.
16           MR. SANDICK:  Sure.
17           I think the relevance issue is this:  As
18  to the meaning of "other offer" in the context of a
19  program like SaveOn, an accumulator or maximizer
20  program, those programs did not exist back in --
21  SaveOn was created in 2016.  So trying to figure out
22  prior to 2016 what the terms and conditions meant
23  with respect to a company like SaveOn I think is not
24  a productive project.
25           Also, for that matter, the current

1    CarePath system, which started in around 2016, also
2    did not exist prior to that.
3              To be short, J&J through JJHCS has tried
4    to help patients pay for co-pay support, help them
5    pay their deductibles on drugs for many years, but
6    the program was different.
7              So we're going to a time period when
8    SaveOn did not exist, when the CarePath program we're
9    talking about did not exist, and in a time period
10   where -- and I know your Honor said you'll get to
11   this -- but where the document record is not what it
12   is in more recent years because 2013 is a long time
13   ago.
14             JUDGE WOLFSON:  And I'll deal with that,
15   but I have to say I don't agree with your position
16   on -- that it would not be relevant simply because
17   programs like SaveOn didn't exist, whether
18   accumulator or maximizer programs, or CarePath didn't
19   come into being.
20             You know, you have indicated that these
21   are terms, that is the position you have taken, that,
22   you know, through maybe time, this is a term that is
23   used.  So in creating that, how broad a meaning you
24   thought that had, what it meant outside of the other
25   things you described, coupons, rebates, et cetera,

Page 11

1    that it could encompass, it may have nothing to do

2    with this, but that is okay.  So we need to answer

3    that question.

4              I do not agree with you.  I do agree

5    with SaveOn that I believe that going back in time is

6    relevant to the extent it was included in predecessor

7    programs.  It had to have a meaning.  If anyone even

8    discussed it.  Maybe they didn't.  And maybe that is

9    what will turn up.  But that is an answer in itself.

10             Now, talking about availability of

11   documents, because you have indicated that there are

12   preservation of retention issues, but I don't know

13   that you have provided anything that tells us what

14   those retention policies are or the issues as to why

15   they don't exist or how limited they are.

16             That has to be provided so that I could

17   determine, or your adversaries can determine, what

18   was done, and what the policy was, and whether it was

19   followed here.

20             That is always what we do when you have

21   a relevant document and a relevant time period and

22   there may be an issue.

23             So you're going to have to produce that

24   retention policy.

25             To the extent that you do find the

Page 12

1    documents regardless of that retention policy, I'm

2    ordering that they be produced.

3              Now, you've also indicated it's too

4    cumbersome, but you haven't done a search going back

5    because you haven't thought you had to produce them,

6    and the burden is on you to explain why it would be

7    burdensome.  And, frankly, if you're telling me you

8    may have nothing before 2013, it doesn't sound very

9    burdensome to me.  So I'm not buying that at the

10   moment without more.

11             For me, when I look at all of this,

12   rather this one seemed like an easy one, and I think

13   it's totally appropriate.

14             The crux of this case is going to be

15   what "other offer" means.  And in Judge Vazquez's

16   opinion in very short order in that last paragraph it

17   said this is going to need discovery and it could be

18   the subject of a summary judgment motion, but not a

19   dismissal motion, or maybe it goes to a trial, but he

20   noted that that was something that required

21   discovery.  And that term is going to be critical

22   here.

23             MR. SANDICK:  So, your Honor, we will

24   come back to you then with a submission on the

25   subject of burden and accessibility because I do

Page 13

1  believe those are substantial issues here.  That, you

2  know, very few companies would have sort of coherent

3  organized records going back 15 years or longer.  And

4  so I do think we have an issue that we need to bring

5  to your Honor's attention on this.

6            JUDGE WOLFSON:  Okay.

7            You're going to have to really convince

8  me because, first of all, I don't know what your

9  retention policy is, but on the burdenness, I know

10 that Judge Waldor kept putting burden to the side.

11 She said, a hundred million dollar case, it's a big

12 case, big companies, don't argue burden to me.

13           I'm not quite sure I always agree with

14 that because burden is something you are allowed to

15 assert.  I'm not preventing you from doing so, but I

16 think you have a high hurdle there.

17           So you want to move this along, I want

18 to also, so those answers you're going to have to get

19 to me pretty quickly.

20           MR. SANDICK:  We'll do that, your Honor.

21           JUDGE WOLFSON:  Okay, when?

22           MR. SANDICK:  I would like to talk to

23 people internally to figure out, but today is

24 Wednesday.  Next week?

25           JUDGE WOLFSON:  Sure.

Page 14

```
 1              MR. SANDICK:  Okay.
 2              JUDGE WOLFSON:  That would be fine.
 3              You want a week from today?
 4              The end of next week?
 5              MR. SANDICK:  Let me just confer for a
 6    moment.
 7              Next Friday.
 8              JUDGE WOLFSON:  Next Friday is fine.
 9              MR. DUNLAP:  I assume you would want us
10    to meet and confer about this.
11              JUDGE WOLFSON:  Yes.
12              MR. DUNLAP:  Part of our concern is that
13    they haven't been really forthcoming in explaining to
14    us what their preservation or retention issues are.
15              JUDGE WOLFSON:  Now you're going to get
16    it.
17              MR. DUNLAP:  I assume you want the
18    parties to meet and confer before they file the
19    motion.
20              JUDGE WOLFSON:  Yeah.
21              MR. SANDICK:  I mean, I'm happy to talk
22    to Andrew any time.  We're going to file something on
23    this.  And I do not agree that we have been not
24    forthcoming.  We explained that 2013 is the crucial
25    time period for our client when there were changes in
```

Page 15

1    the record keeping system and that before that time,

2    all though I can't say that there aren't documents

3    here and there sort of lying around, so to speak, the

4    digital equivalent of that, there is no consistent

5    effort to retain documents from that time period.

6                    JUDGE WOLFSON:  Look, they haven't

7    gotten that, and, you know, simply indicating that is

8    not enough.

9                    They said they would have an answer by

10   next Friday.  So what I'll direct is that information

11   be given to you, as to burden and retention, you can

12   meet and confer, and then tee it up for me.

13                   MR. SANDICK:  Would you like us to

14   submit it to your Honor in parallel next Friday?

15                   JUDGE WOLFSON:  I would love to see it.

16                   MR. SANDICK:  We will send it to you and

17   of course copy defense counsel by next Friday.

18                   JUDGE WOLFSON:  Okay.

19                   And then you can meet and confer and

20   we'll see if we have an issue.

21                   As I said, but from my perspective on

22   the burden aspect, it's going to have to be a pretty

23   darn heavy burden because I think this is highly

24   relevant information, and so on a weighing here as to

25   the relevance versus the burden on you, I think you

Page 16

1    know where I'm going to come out.

2                    All right.  Let's move onto the next

3    topic.

4                    These are, quote, the enforcement

5    documents.

6                    So let's talk about this issue.

7                    This is I think where it -- the issue is

8    whether it's enforcing all of the terms of that or

9    only the other offer, correct?  That's where we are.

10                    MR. DUNLAP:  I think that is part of it.

11    Part of it is also what search terms they employ.

12    Since this submission went in we met and conferred

13    with the other side and narrowed the search terms.

14    It cuts out about 20 percent of the documents that

15    were identified in my previous submission.

16                    JUDGE WOLFSON:  Okay.

17                    So tell me what is left on this issue

18    that you want to argue today.

19                    MR. DUNLAP:  Well, we believe that they

20    should run a broader search for documents relating to

21    the meaning and understanding and enforcement of the

22    general terms and conditions, the "other offer"

23    provision.

24                    JUDGE WOLFSON:  The "other offer"

25    provision is good.

Page 17

1              MR. DUNLAP:  Yes.

2              Well, we think there are other portions

3    of the general terms and conditions that are relevant

4    as well.

5              So the way this works is that a lot of

6    the -- they call this the SaveOn program, but a lot

7    of the things they're complaining about, the setting

8    of the co-pays, the not counting towards

9    out-of-pocket max, are actually plan terms.  Those

10   are part of what the commercial plan sets as terms

11   for their members.  And there are references within

12   the terms and conditions health plans.  And we

13   think -- part of our argument is that that indicates

14   whatever "other offer" means, it can't mean plan

15   terms.  So we think it can't be limited just to the

16   "other offer" provision.  That is point one.

17             Point two is, based on what we have seen

18   in the documents we don't --

19             JUDGE WOLFSON:  So let me think of

20   though what you're looking for in that regard.

21             You're not interested in coupons,

22   rebates, and the other things that are in there.

23             I want to make sure how we're limiting

24   this.

25             MR. DUNLAP:  Well, we are to the extent

1  that we want to understand, there is an affirmative

2  case did they actually believe SaveOn was a coupon or

3  other offer or a program.

4           JUDGE WOLFSON:  I think we are clear

5  that you said it's only other offer.

6           MR. SANDICK:  The other offer is the

7  only term that we're doing.

8           There is a long list of terms and

9  conditions that patients have to agree, most of them

10  have nothing to do in not even any conceivable way

11  with this case.

12           For example, you cannot by federal law

13  be on Medicare or Medicaid and be part of SaveOn.

14  That is prohibition.  Children are not eligible to

15  receive drugs through this program.  And there are a

16  number of other things.  None of them are within the

17  scope of what we are alleging to be the contract that

18  was tortiously interfered with.  That's why the focus

19  has been -- in Judge Vasquez's decision and in our

20  complaint -- on the "other offer" language that your

21  Honor has spotlighted.

22           JUDGE WOLFSON:  So we're limiting it to

23  the only contractual term that they think is "other

24  offer."

25           MR. DUNLAP:  Right.

Page 19

1          And I think we have a couple of issues

2     with that.

3          So, first, as you may have seen if

4     you've looked at the Motion to Dismiss briefing,

5     "other offer" appears in a string of other terms,

6     coupon, et cetera.  And under ejusdem generis, if I'm

7     pronouncing that doctrine correctly, you would

8     understand what "other offer" means by looking at

9     what the other terms in that clause mean.

10         So what they understand a coupon to

11    mean, what they understand another offer of financial

12    assistance to mean, is relevant to determining what

13    in context the "other offer" provision means.

14         So we do want to understand what they

15    think that means.

16         I would also make the point that --

17         JUDGE WOLFSON:  But we're on the

18    enforcement documents now, not on the actual

19    interpretation, terms, conditions.

20         MR. DUNLAP:  Well, but that period we're

21    talking about from 2016 through 2022 we're not just

22    looking for documents on enforcement, it also goes to

23    the meaning and their understanding of what the

24    "other offer" provision meant during that time

25    period.  And we submit to understand that you have to

Page 20

1    look not just at "other offer," but also at the other

2    terms that are in the clause where it appears other

3    provisions in the terms and conditions that relate to

4    health plans, there is a lot of contractual context

5    that we need in order to argue about what "other

6    offer" means.

7              But I do want to turn to enforcement

8    also.

9              So as Mr. Sandick said, there are other

10   eligibility requirements that are not at issue.  For

11   example, if you're on Medicare or Medicaid, or you're

12   not of a certain age, et cetera.

13             Part of our argument is that until they

14   decided to bring this lawsuit we don't think J&J

15   actually ever contemplated that the "other offer"

16   provision covered members on SaveOn plans.  They

17   never actually thought that being on a SaveOn plan

18   ran afoul of the "other offer" provision.

19             And part of the evidence of that will be

20   that they did enforce eligibility criteria.  That

21   they were able to enforce other parts of the terms

22   and conditions, on Medicare, Medicaid, on age

23   requirements, et cetera, but they never sought to

24   enforce their new position on SaveOn until they

25   brought this lawsuit.

Page 21

1     We think that information is highly
2 relevant circumstantial evidence to show their course
3 of performance was they didn't actually believe that
4 "other offer" applied to the SaveOn program.
5     And so we need to see what they were
6 doing in terms of enforcing the terms and conditions
7 generally not just on "other offer."
8     MR. SANDICK:  Your Honor, two things:
9 First of all, on the subject of enforcement, since
10 these letters were submitted I think in August we
11 have already agreed to produce what are either
12 directly through us or by asking our vendor, a
13 company called Trial Card, to produce what are known
14 as benefits investigations.  And those are the
15 enforcement documents.  We're in the process of
16 making those productions for the relevant time period
17 right now.
18     So the enforcement issue I think by
19 virtue of concessions made by HCS, by J&J, is already
20 being addressed.
21     I want to also though pause for a moment
22 on the subject of whether the other terms next to
23 "other offer" in that particular term and condition
24 are relevant.
25     I think it's important to say two

Page 22

1  things.  First of all, this particular language,

2  coupon, discount, prescription savings card, free

3  trial, those are primarily what is driving the hit

4  count for the search terms they have proposed.

5  Something like maybe two-thirds or three-quarters of

6  the documents that they are asking to be reviewed

7  relate not to "other offer," which, by the way, have

8  already been the subject of search terms.  That's

9  why, as your Honor pointed out, we have already

10  produced thousands of pages of documents.  But the

11  search terms that they are proposing go way beyond

12  that, into any time that someone uses the word

13  "coupon" and the word "Janssen," we would have to

14  produce those documents.

15          That is why Judge Waldor told -- well,

16  one of the reasons why she told them back in October

17  and in the order that they needed to narrow their

18  requests, not just the search terms, but the requests

19  themselves, that this is too broad, it goes beyond

20  the scope of what is actually necessary to resolve

21  this case.

22          And if we were focusing on things like

23  "other offer" language, again, we've already made a

24  lot of production on that.  And we had offered

25  before, as your Honor pointed out, to do some

Page 23

1    additional production on that subject.

2          It's when you blow it open into

3    everything -- every word that is used on the sheet of

4    terms and conditions that the burden in terms of

5    document review goes through the roof.  And as we

6    pointed out, probably for very little benefit.

7    Because these are standard industry terms that are

8    used in the co-pay program area and also used in all

9    sorts of other consumer areas.  The ABA said this is

10   a standard term in all consumer discount programs.

11         JUDGE WOLFSON:  So what I'm hearing is,

12   but what I want to understand too, is you are going

13   to produce documents with regard to this, quote,

14   benefits investigation.

15         What I want to get back to you here, Mr.

16   Dunlap, what you said a couple of moments ago is what

17   is important to you is to give definition to what

18   they're enforcing and what they're not enforcing, you

19   want to know, well, were you enforcing all of these

20   other programs that you have listed, whether they

21   were Medicare, Medicaid, and all the various coupons

22   and other things, right?

23         MR. DUNLAP:  The eligibility questions.

24         JUDGE WOLFSON:  The eligibility

25   questions.

Page 24

1          You want to know, were you diligently

2     and regularly enforcing.  You knew SaveOn was there

3     and you didn't do it.  And you want to make an

4     argument, so guess what, we're going to tell you, you

5     never thought of any of these exclusions.

6          I hear what you're saying.  The question

7     is, how many documents do we need?  If they're going

8     to give you what we would call the benefits

9     investigations, would that not turn up every time

10    that they questioned eligibility?

11         MR. DUNLAP:  We don't think so, your

12    Honor.

13         Let me talk about the benefits

14    investigations.

15         So what they said at the last conference

16    was that ███████████████████████████████

██ ████████████████████████████████

██ ████████████████████████████████

██ ██████████████████████████████████

██ ████████████  ████████████████████

██ ██████████████████████████████████

██ ██████████████████████████████

██ █████████████████████████████████████

██ █████████████████████████████████████

██ █████████████████

Page 25

1          They have so far declined to give us any

2     documents related to those investigations, just the

3     final reports themselves.

4          We got a production the other day.  We

5     had some issues with that.

6          What they're offering to give us is

7     very, very narrow.  They are not offering to give us

8     benefits investigations going to the full relevant

9     time period of this case from 2016 to present.  ████

      ███████████████████████████████████████████████

      ██████████████████████████████████  And they're

12    not offering to give us any documents, there are no

13    enforcement search terms, for example, that go to the

14    enforcement of eligibility criteria or the meaning of

15    things like coupon or discount or benefit card.

16          And I hear what opposing counsel is

17    saying about the search terms.

18          We have proposed search terms to them.

19    We have narrowed those search terms since we put in

20    our letter by about 20 percent.  We have not received

21    I believe a counteroffer from the other side about

22    which of our search terms they would be willing to

23    run.  Their response has generally been no.

24    Certainly inviting us to negotiate against ourselves.

25          We're always glad to talk about

Page 26

1    appropriate search terms here, but we don't have

2    anything on enforcement.  We're not convinced that

3    just the benefits investigations process will give us

4    what we need here.

5              I'm glad to address the other points he

6    made, but I think those are the main ones.

7              MR. SANDICK:  Your Honor, I think there

8    are a few things I would like to address and correct.

9              So, first of all, it's not true that we

10   aren't giving other documents relating to the subject

11   of enforcement of the terms and conditions against

12   accumulator and maximizer programs.  We are running

13   to some extent voluntarily and to some extent in

14   response to Judge Waldor's order the so-called CAP

15   terms.

16

Page 27

1            As we said in some of our papers, SaveOn

2    goes to great effort to prevent anyone from finding

3    out which patients are in the program. ████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████

     ██████████████████████████ they go to great length to

7    prevent us from figuring out who is in the program.

8                    ████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████████████████████████████████████████████████

     ████████ That's why we have been producing for that

13   category from 2022, the beginning of the year, now up

14   through the date of Judge Waldor's order.

15           JUDGE WOLFSON:  Well, let me go back a

16   moment.

17           We got two things going on.  Now we're

18   talking about dates, how far back we go, but the

19   other is the various enforcement efforts with regard

20   to eligibility, which they have been talking about.

21   And the position there is, SaveOn was in existence

22   prior to 2022.  The fact that you started to take

23   some steps in response to what you believe was a

24   problematic program and would violate your terms in

25   that time frame doesn't address their concern, which

Page 28

1    is, okay, we were around before, and you also came to

2    this conclusion in 2022, whatever, but we'd like to

3    see what generally did you do as enforcement efforts

4    with regard to other eligibility criteria.  Do you

5    police generally?  Do you let things go?

6                        I mean, these are some of the arguments.

7                        I know you have some defenses you also

8    want to raise on, you know, latches, mitigations,

9    whatever, steps that were not taking, but I think

10   that there needs to be some understanding of,

11   generally, what are your enforcement efforts that you

12   take with regard to eligibility criteria.

13                       Now, it has to be cabined in some way.

14   I don't want it to be so broad because there are lots

15   of things here and much of it may not be relevant.

16   So I think we have to understand, or they have to

17   understand, how do you go about enforcing, when do

18   you do so, and there is more information that is

19   needed.

20                       MR. SANDICK:  So, your Honor, a couple

21   of things:  First of all, the subject of benefits

22   investigations.  Benefits investigations are,

23   generally speaking, not relevant to this case because

24   they don't touch on the application of the "other

25   offer" term, they don't touch on how that's applied

Page 29

1    in the context of a so-called maximizer or

2    accumulator program like SaveOn.

3            So what that would lead to, your Honor,

4    if there were to be some expansion of benefits

5    investigations, would be, essentially, meaningless

6    documents about, "Oh, this person is on Medicare.  We

7    can't cover that."  Things having nothing at all to

8    do with the scope of this case.

9            The other thing is, the questions that

10   Mr. Dunlap is raising, if he serves an interrogatory

11   on us that asks those questions, we'd be obliged to

12   answer those questions in a way that would be binding

13   as an admission on JJHCS.

14           To, you know, beat it back and forth in

15   discovery letters doesn't lead to that outcome.

16           JUDGE WOLFSON:  What would that

17   discovery interrogatory look like?

18           MR. SANDICK:  Sure.

19           It would be an interrogatory asking for

20   a statement of what the company's policy was on the

21   issue of enforcement of the terms and conditions.

22           It could ask for --

23           JUDGE WOLFSON:  And then they're going

24   to ask for all the documents that support what that

25   policy is and explain that policy and discuss the

Page 30

```
 1    policy.
 2                MR. SANDICK:  And we produced those.
 3                JUDGE WOLFSON:  There will be a document
 4    request.
 5                MR. SANDICK:  As to "other offer," we
 6    produced those documents already.
 7                JUDGE WOLFSON:  I'm not so limiting it
 8    at this point.
 9                MR. SANDICK:  So, in any event, the
10    point I'm making is that, the subject of benefits
11    investigation is, unless it has something to do with
12    SaveOn, or maximizer, or accumulator programs, is
13    really just completely irrelevant to this case, and
14    it's going to lead to the production of documents
15    that talk about issues that have nothing to do with
16    the "other offer" term, nothing to do with SaveOn,
17    that just simply show that, you know, there are a
18    host of different eligibility requirements, and can
19    see this patient passing the test, this patient not
20    passing the test, but none of it relating to SaveOn,
21    none of it relating to maximizer or accumulator
22    programs, other than from the time period of 2022 to
23    the present, which we're already engaged in producing
24    documents for.
25                JUDGE WOLFSON:  I think that -- and I
```

Page 31

1    know that Judge Waldor would constantly say go meet

2    and confer, but I hate kicking the can down the road

3    and keep doing this, but I'm prepared to do it or

4    discuss it with you now, but I think you need to

5    narrow your request.  I believe we got to the crux of

6    it a moment ago, which is, I believe you're entitled

7    to documents that show what policies they had with

8    regard to enforcement of eligibility criteria beyond

9    "other offer."

10                 They need a comparison here to what were

11   your policies.

12                 Those documents I believe would be

13   relevant.

14                 It doesn't mean, therefore, and now we

15   eliminate the burden of going through every time you

16   actually took an individual's eligibility criteria

17   and looked at it.

18                 I think let's start with documents that

19   reflect what their policies were and anything that

20   reflects how they would go about enforcing it or

21   instructions given to enforce it, and it will also

22   identify, therefore, for you what areas that they

23   thought were important to enforce.

24                 That is of a more general nature.

25                 You said they could ask an interrogatory

Page 32

1   as to that.  The document request is going to follow,

2   so I'm saying go ahead with the document request

3   right now.  And it won't be involved with the

4   individual benefits investigations.

5              MR. SANDICK:  So what your Honor is

6   proposing is something limited, essentially, to

7   policy or discussion of policy.

8              My concern is that it really should be

9   tied to "other offer" because once it moves into

10  things like discount, or free trial, or coupon, the

11  burden escalates dramatically.

12             We're talking about the review of

13  perhaps a quarter of a million documents.  And we

14  told them this.

15             We haven't failed to engage them in meet

16  and confer.  I'm happy to relate the history of that,

17  your Honor, if you would like to hear it.  But we

18  have tried throughout to engage them in meet and

19  confer and for months the only position they took

20  was, these are our terms, you need to run them all.

21  Even for two months after Judge Waldor told them to

22  narrow their search terms, told them in court, told

23  them in a written order.  They did not even provide

24  us with narrow search terms, let alone narrowing the

25  request, which is what her order said, that they're

Page 33

1    going too far, they're taking extreme positions.

2                    JUDGE WOLFSON:  I read every single

3    transcript, not just the October one.

4                    MR. SANDICK:  Yes.

5                    It was in March too.

6                    JUDGE WOLFSON:  Okay.

7                    But you understand what I am saying is

8    relevant.  I appreciate we don't want every little

9    document every time they discuss a discount.

10                   When you're talking about policies and

11   discussions with regard to enforcing those policies,

12   no, I don't believe that we're talking about millions

13   of documents.

14                   So come up with better.  I'm not going

15   to create them for you, I mean, I have given general

16   categories about this.  You know, from my

17   perspective, the world has become search terms.  Not

18   how I grew up, or when I was a Magistrate judge, we

19   didn't have search terms.  Okay?  You made a document

20   request and everybody understood what it meant and go

21   find them, wherever they are.  Now everyone needs to

22   define custodians and search terms to make sure that

23   you have done it a certain way.

24                   I have given you what the subject matter

25   is.

Page 34

1          So you think you need search terms to do
2     it, talk about what they are.
3          MR. DUNLAP:  Your Honor, can I ask a
4     clarifying question?
5          JUDGE WOLFSON:  Yes, go ahead.
6          MR. DUNLAP:  So you said that policies
7     regarding enforcement would be relevant.  I've heard
8     my friend on the other side say he thinks enforcement
9     is only relevant as to "other offer."
10          JUDGE WOLFSON:  I already said no.
11          MR. DUNLAP:  I just wanted to clarify it
12     goes to other eligibility criteria as well.
13          Now, we still had -- within the request
14     for this 2016 to 2022 time period, part of our
15     request was also about their understanding and
16     meaning of things like coupon or discount or other
17     terms as well, which I don't believe your Honor
18     addressed in talking about the enforcement side of
19     the request.
20          So we would ask that whatever they do in
21     terms of running additional search terms, and we're
22     glad to continue meeting and conferring with them
23     about that, that there be an understanding that --
24     their understanding, their enforcement -- the meaning
25     of the other terms in that clause, coupon, discount

Page 35

1    and the others, is also relevant and something they

2    look for.

3              MR. SANDICK:  Your Honor, that's really

4    where the heart of the burden comes in.  If they're

5    asking for every time that someone at JJHCS talks

6    about the word discount in the context of Janssen,

7    you can just imagine the burden that that will

8    create.

9              JUDGE WOLFSON:  I don't want it that

10   broad, I agree.  So we have to figure out a way to

11   narrow that because, yes, we don't want to bring in

12   things that are not going to be relevant.

13             So you're going to go back and work as

14   to how to narrow this with the understanding of, I

15   appreciate your argument is, we want to see how they

16   define these terms or interpret them and then use

17   them.

18             They've already conceded, however, that

19   SaveOn doesn't fall within any of those terms, they

20   only fall within the "other offer."

21             So I understand -- what I'm trying to

22   figure out is what more that's relevant about

23   understanding how they interpreted coupon, rebate,

24   discount is important to your case?

25             MR. DUNLAP:  Sure.

Page 36

1          So, as you said, the "other offer"
2    provision is a big piece of this case.  It's a big
3    piece of the tortious interference claim.  What did
4    "other offer" mean?
5              They say it applies to SaveOn services.
6    We say it does not apply to SaveOn services.
7              So to the extent that the court finds
8    that term ambiguous, one of the standard tools of
9    construction that it may use is looking at the terms
10   that go along with it in that same clause.
11             And I'm sure you are familiar with that
12   doctrine.
13             JUDGE WOLFSON:  Absolutely.
14             MR. DUNLAP:  So in order to determine
15   whether or not other offer -- the scope of other
16   offer is like a coupon or discount savings card we
17   need to understand what they believe a coupon or
18   discount savings card meant.
19             So we don't want every time anyone at
20   Johnson & Johnson used the word "coupon."  What we
21   want to understand is, what did they believe, what
22   did they understand those terms within the context of
23   the general terms and conditions meant.
24             We believe that that is relevant.  And
25   if you can give us guidance that that is relevant,

Page 37

1    then we're glad to go back and continue meeting and

2    conferring with them on the search terms that are

3    designed to try and capture that.

4              MR. SANDICK:  Your Honor, Mr. Dunlap

5    said a moment ago words to the effect of, we're not

6    looking for every time that somebody mentioned

7    discount or coupon, but the search terms that they

8    proposed even after Judge Waldor ordered them to

9    narrow their request are exactly what Mr. Dunlap just

10   said --

11             JUDGE WOLFSON:  It's not going to

12   happen.

13             MR. SANDICK:  Okay.

14             Because I think what he is saying is,

15   I'd like guidance.  What I hear him saying is, he

16   would like you to say something that contradicts what

17   you said a moment ago.  And we'd ask you not to do

18   that.

19             JUDGE WOLFSON:  I got it.

20             MR. DUNLAP:  That is not what I said or

21   I asked for.

22             JUDGE WOLFSON:  We have what the

23   position is.  I appreciate your argument.

24             And this is also going again back to

25   interpreting what the terms and conditions mean.  And

Page 38

1    I do appreciate that one of the arguments is going to

2    be, if you look at this entire phrase, and the things

3    that they really wanted to exclude, it gives meaning

4    to "other offer."

5              I know that is your argument, and I

6    understand that, which is why I would permit the

7    discovery on what does that mean.

8              That is different than enforcement.

9              We have gone backwards now.  We are

10   going back to terms and conditions and what this

11   sentence means.  I was on enforcement for a moment.

12   We'll return to enforcement.  But, yes, I do.  But

13   we're not going to have search terms that you're

14   right that every time that phrase comes up it gets

15   produced.  It has to in some way be cabined to

16   capture what we are talking about, which is, what was

17   the understanding of those terms when they were

18   placed into these various agreements, plans,

19   whatever, and documents that reflect what that

20   understanding was and the intent of it.

21             MR. SANDICK:  And we've already produced

22   documents to the extent they exist, to the extent

23   that we have non-privileged documents, from the

24   period of 2016 to 2022.  We've already produced those

25   documents.

Page 39

```
 1            JUDGE WOLFSON:  And I guess you're going
 2    to have a privilege log.
 3            MR. SANDICK:  We do have a privilege
 4    log.  We're going to meet and confer on that subject.
 5    I'm sure that will go on too.
 6            JUDGE WOLFSON:  I would like to go back
 7    now to enforcement.
 8            It's of a similar nature, which is that
 9    the idea is, here, you want to know how vigilant were
10    they about enforcing these various terms that appear
11    here, or whatever the eligibility criteria are.
12            You don't need the underlying
13    investigations on all the other terms.  Right?  It's
14    really to figure out how they decided, one, if there
15    are documents that reflect, we are going to
16    aggressively pursue these terms.  You know, people
17    that get the coupons or whatever.  And do you
18    actually go about enforcing.  You know, because they
19    are going to make an argument you sat back on this
20    one.  Do you sit back on others too, is this kind of
21    what you do, or do you aggressively enforce that and
22    you didn't come about doing this for a few years.
23            These are, again, of a more general
24    nature than every individual one that they do.
25            So, go to work on figuring out -- I
```

Page 40

1    would do it in general categories like I did in the

2    old days, but you'll come up with search terms

3    instead that create all these issues for us -- work

4    on those search terms that capture what I just said.

5                 Okay?

6                 MR. DUNLAP:  Yes, your Honor.

7                 MR. SANDICK:  Okay.

8                 JUDGE WOLFSON:  Next.

9                 So then, I guess, part of this problem

10   has been we're still talking about the understanding

11   of what "other offer" means, how that overlaps with

12   the specific categories.  We're back to all these

13   search terms.  And I think you found 188,000

14   documents on using certain of the search terms they

15   gave you, and you say, hey, that is too burdensome.

16                 MR. SANDICK:  Yes.

17                 And after Judge Waldor asked them to

18   narrow their requests, they never narrowed their

19   requests, but they gave us somewhat narrower terms.

20                 From an apples to apples comparison, if

21   we look at the same time period and the same

22   custodians, they went from about 180,000 to about

23   150,000.

24                 The terms themselves are only slightly

25   narrowed.  The nature of the requests are not

Page 41

1    narrowed at all.  In our view, they have not complied

2    with what Judge Waldor asked them to do.

3              JUDGE WOLFSON:  I could sit here and we

4    could go through search terms and say, how can we

5    better do this, but the goal here is to come up with

6    the documents you need, and not more than you need,

7    which is going to be of no help for you either to

8    review.

9              So -- I hate to send you back to meet

10   and confer.

11             I've given you guidance on what

12   categories or subjects I think are relevant.  Based

13   on that, maybe you can do search terms that are honed

14   better to that.

15             But I want this meet and confer to

16   happen within the next week.  We're back and forth

17   too much.  And to the extent you can't agree, I'll do

18   a Zoom with you.  But we need to move this ahead.

19   Keeping in mind that I've defined for you areas that

20   I think are relevant.

21             Okay?

22             MR. DUNLAP:  We understand, your Honor,

23   yes.

24             Thank you.

25             JUDGE WOLFSON:  Okay, good.

Page 42

1          Now, I guess in January of 2022 there
2   were new terms and conditions for Stelara and Tremfya
3   medications that specifically excluded members of the
4   Defendant plans from CarePath.
5          I know SaveOn has argued that Plaintiff
6   didn't implement new terms and conditions for other
7   drugs.  Kind of a selective enforcement argument
8   maybe being made here.  And I guess you've asked for
9   documents reflecting the decision to revise those
10  terms and conditions for those two drugs, how it's
11  being enforced and implemented.
12         Okay.
13         I think the argument here is that there
14  have been -- the production is deficient, restrictive
15  search terms were used, and custodians, such as
16  Jennifer De Camara and Harman Grossman and Savaria
17  Harris were not added because they are attorneys, but
18  I don't think there has been a privilege log.
19         MR. SANDICK:  So a privilege log has
20  been sent.  They sent us a letter critiquing some of
21  it and we are going to this week, by the end of
22  Friday, send them back a response.  They identified
23  several hundred documents, we've reviewed every one,
24  and we have a response planned for them by Friday
25  close of business, so Friday the end of the day.

Page 43

1          JUDGE WOLFSON:  And then if there are

2     still documents upon which there is disagreement, I'm

3     going to do an in camera review of them.

4          MR. DUNLAP:  Yes, your Honor.

5          MR. SANDICK:  That is something we're

6     working through, and, of course, we'll bring it to

7     your Honor.

8          On the subject, your Honor, of the

9     Stelara and Tremfya terms and conditions, this is

10    really related to the CAP issue that was the subject

11    of movement at the October conference.  So we have

12    already produced documents that relate to this issue,

13    documents that show the changes in the Tremfya terms

14    and conditions, documents that show how the CAP

15    program operated, and that is going to be updated

16    right through, as Judge Waldor said, through

17    November 7.

18         So I think this issue is one that I

19    think has been kind of overtaken by events, so to

20    speak, since the letters in August.

21         MR. DUNLAP:  I agree to some extent.

22         Part of the original dispute was were

23    they going to search past July of 2022.  Judge Waldor

24    sort of took that out of everyone's hands by saying

25    go through November, and we understand they're going

Page 44

1   to be running all their search terms, so that should

2   capture a lot of it.  I think there are a few pieces

3   that still remain.  One is the issue of these two

4   custodians who are attorneys but there is evidence

5   they worked in a business role at some point.  So we

6   ask that they be added.

7              There are two additional points.

8              We had asked that they run --

9              JUDGE WOLFSON:  Well, I'm assuming, by

10  what I was just asking about, because we always know,

11  in-house attorneys in particular, we have to decide

12  are they acting in their role as an attorney or in a

13  business sense?

14             I am assuming this is part of the

15  privilege log.  You did go through their documents.

16             MR. DUNLAP:  No.

17             MR. SANDICK:  So, your Honor, we have

18  not added these people as custodians.

19             Mr. Dunlap is wrong.  They play no

20  business role.  They are lawyers.  They are not,

21  let's say, JD's doing business, or former lawyers

22  doing business.  They work in a legal capacity as

23  lawyers for JJHCS.  So their documents do come up

24  from time to time because they will be in

25  communication with the people who are custodians in

Page 45

1    this case, the business people, and when they are,

2    those documents will be withheld or redacted for

3    privilege as appropriate.

4              On very rare occasions they may be in

5    communications with both the business people and

6    people external to JJHCS, and in some of those cases

7    the documents are produced because, obviously, if a

8    lawyer is talking to a complete stranger, that might

9    not be privileged.

10             We have not added them as custodians.

11   In other words, we have not undertaken specifically

12   to review all of the lawyers' files.  And let me tell

13   you why.  It's because, given that they are attorneys

14   working as attorneys, if we are reviewing all of

15   their documents, all we are going to wind up doing is

16   creating a massive privilege log problem for us, and

17   in the end I suppose for them, because their files

18   are going to be, if not exclusively, overwhelmingly

19   privileged, because what they do when they talk to

20   people within the company is going to be conveying

21   legal advice or receiving requests for legal advice.

22             To the extent that they have

23   communications with business people and those are not

24   privileged, those would be produced.

25             JUDGE WOLFSON:  How do you search for

Page 46

1    those, though?  If you're saying you're not doing a

2    search for them as a custodian, how are you

3    determining which I falls in which category?

4              MR. SANDICK:  Sure.

5              Let's take an example.

6              You have a custodian at the company, an

7    employee named Heith Jeffcoat.  If he has e-mails

8    with Savaria Harris, who is the lawyer for JJHCS, we

9    may see those e-mails when we review Heith Jeffcoat's

10   files, and to the extent those documents are

11   privileged, they will be marked privilege, they will

12   be put on the log, they will either be withheld or

13   redacted, depending on the nature of the privilege

14   assertion.

15             What we're not doing is specifically

16   collecting all of Ms. Harris' e-mails and looking at

17   those separately.

18             JUDGE WOLFSON:  How about though -- we

19   use Ms. Harris as an example.  She's having

20   communications with Trial Card, she's having

21   communications with a third party outside that it

22   doesn't have a business person on it, so you're not

23   capturing it there, but if you're not doing a search

24   on her, you're not capturing Trial Card because

25   they're not part of the search.

Page 47

1      MR. SANDICK:  So Trial Card is producing

2  documents, actually, they're producing custodial

3  documents from the most important people at Trial

4  Card.  There has been a separate third-party subpoena

5  back and forth between Trial Card and SaveOn.  But

6  Trial Card is producing documents, number one.

7      JUDGE WOLFSON:  I only gave that as an

8  example.

9      Any third party on the outside that she

10  is having a communication with, if you're not doing a

11  search on her, you're not going to capture any of

12  those communications that would not be protected by

13  the privilege.

14      MR. SANDICK:  Well, what we have seen is

15  that her communications will inevitably have business

16  people on them.  She is not doing business work on

17  her own.  She is the legal advisor to JJHCS.  So to

18  the extent that JJHCS is doing business-related work,

19  that is going to be conducted by the business

20  personnel.  And if Ms. Harris is copied on an e-mail,

21  and the e-mail is not a request for legal advice, or

22  the rendering of legal advice, then there will be no

23  privilege assertion.  That is how they have gotten

24  some documents that Ms. Harris is on.  Because not

25  every communication that she is copied on is

Page 48

1    necessarily going to be privileged.

2              But the issue is this:  Should we have

3    to undertake separately the burden of reviewing

4    attorney e-mails, which is very unusual in this

5    context.  It's common when the attorney is not really

6    functioning as an attorney, when the attorney is

7    really -- they have a JD, but they're doing business

8    work.

9              That is not the case here.  These are

10   in-house lawyers for J&J.

11             So if we are required to review their

12   documents separate from reviewing the business

13   people's documents, what we're going to do, you know,

14   we'll have someone sitting at a computer, privilege,

15   privilege, privilege, and at the end they will get

16   thousands more entries.

17             The cost of that to us is significant.

18   The benefit to them will be negligible or

19   non-existent, because these are people engaged in

20   legal work.  They're not doing business work for the

21   company.  They're lawyers practicing as lawyers.

22             MR. DUNLAP:  Your Honor, may I respond

23   briefly to that?

24             JUDGE WOLFSON:  Yes.

25             MR. DUNLAP:  So since the letter went

Page 49

1   out we have seen documents indicating that a couple

2   of these folks did have communications with third

3   parties, not just Trial Card, but another J&J

4   consultant called Archbow.

5              Where I think your Honor is going, and

6   this might be something we can discuss, is something

7   where they don't have to review, in the first

8   instance at least, all the internal e-mails, which

9   really seems to be Mr. Sandick's concern, but start

10  with the production of their communications with

11  third parties outside of JJHCS limited by search

12  terms, specifically folks like Archbow or Trial Card

13  or the other consultants that we know were involved

14  in discussions like this.  That might be a place to

15  start.

16             I just want to note that we have dropped

17  our request for the one in-house lawyer who

18  apparently functioned in a litigation function.

19             JUDGE WOLFSON:  Mr. Grossman?

20             MR. DUNLAP:  Mr. Grossman, yes.

21             So we're only down to these other two.

22  So we would think that that might be a place to

23  start.

24             MR. SANDICK:  Your Honor, even on the

25  issue of external communications there is, of course,

Page 50

1   a privilege doctrine that when someone working

2   outside of the company is either serving,

3   essentially, as a functional employee of the company

4   because of the nature of the work that they're doing,

5   or is part of a discussion in anticipation of

6   litigation, those e-mails involving the lawyer will

7   also be protected.

8          So even the screen that Mr. Dunlap is

9   proposing is a very -- it's a very poor tool for

10  limiting the burden on us.

11         What they are getting is, to the extent

12  that Ms. Harris is on communications with external

13  parties, for instance, let's say -- going to

14  Mr. Jeffcoat again, to use him as an example, he

15  wants to enter into some kind of a contract to help

16  manage the CarePath program, he has back and forth

17  with his business counterpart at this other company,

18  at some point he will copy Ms. Harris on that e-mail,

19  and then there will be some external discussions.

20  But those aren't discussions that drop the business

21  people.  The business people are always involved.

22  Ms. Harris is just there maybe to look at a contract

23  or provide legal advice offline to Mr. Jeffcoat about

24  the nature of the business that is being proposed.

25         So we do object to the inclusion of

Page 51

1    lawyer custodians when we know that these are lawyers
2    doing legal work, not business work.
3                  JUDGE WOLFSON:  I want to go back to the
4    limitation that Mr. Dunlap raised, which is as to
5    third parties.
6                  Address that.
7                  I know you said they subpoenaed Trial
8    Card.
9                  That doesn't relieve you.
10                  As you know, more than one party could
11   have a document, and sometimes one of the parties
12   doesn't maintain the documents properly.  It doesn't
13   relieve your obligation to produce them as well.
14                  So I want to address communications with
15   third parties.
16                  And I know you said, well, there could
17   be an occasion where she is having a communication
18   with a third party, but we still believe privilege
19   applies.  And that's when you put it on a privilege
20   log though.  It doesn't mean you produce it, it ends
21   up on a privilege log.
22                  What is the problem with the third-party
23   communications?
24                  MR. SANDICK:  So third-party
25   communication issue, number one, they are going to

Page 52

1   have -- just saying based on our investigation for a

2   long time in this matter -- Ms. Harris'

3   communications with third parties when she has been

4   copied on an e-mail, or is the recipient of an

5   e-mail, they are going to be business people who are

6   already custodians in this case.  So we are doing

7   this work for no additional advantage.  We're going

8   to be reviewing documents that are already in the

9   files of the business people at JJHCS.

10                  JUDGE WOLFSON:  I hope.

11                  MR. SANDICK:  Well, or at least

12  overwhelmingly so.

13                  I can't sit here and say that there

14  might not be one document that falls outside of what

15  I'm describing, but, again, the question is, what is

16  reasonable and proportional in this context?

17                  They have 16 business unit custodians.

18  They are getting some more as a result of the Court's

19  order.  So they will be getting more production over

20  the next month.

21                  But the question is whether we should be

22  required to review all of the in-house lawyer e-mails

23  for the narrow purpose of seeing if maybe once in a

24  while she has done this.

25                  JUDGE WOLFSON:  I hope not all e-mails.

Page 53

```
 1                  What are the search terms you're using?
 2                  MR. DUNLAP:  Your Honor, may I respond
 3      to that?
 4                  JUDGE WOLFSON:  Yes.
 5                  MR. DUNLAP:  It's not all of their
 6      in-house lawyers.  It's not all of their e-mails.
 7      It's just the third-party communications at this
 8      point.
 9                  JUDGE WOLFSON:  Third-party
10      communications on what subject?
11                  MR. DUNLAP:  Well, we will limit it to
12      search terms.
13                  The reason we're interested in these
14      folks specifically is because the other side has
15      indicated they were involved in revising the Stelara
16      and Tremfya search terms.  So communications they had
17      about the meaning of those terms outside of JJHCS
18      would be very relevant to us.
19                  And Mr. Sandick said, well, you know, a
20      lot of times when they communicate outside, they have
21      copied existing custodians.
22                  Well, if they have, then those documents
23      will be de-dupped, they will be taken out, they have
24      already been identified for review if they hit on our
25      search terms.
```

Page 54

1           So we think at least in the first

2    instance they should gather the documents, we can

3    talk about tailored search terms for those

4    custodians, and then give us the numbers, and then

5    they can make a burden argument that is based on

6    actual numbers.

7                JUDGE WOLFSON:  All right, this is where

8    we're going on this.

9           It's only as to two attorneys, it's

10   Jennifer De Camara and Savaria Harris, correct?

11               MR. DUNLAP:  Yes.

12               JUDGE WOLFSON:  Okay.

13          As to them we're only looking at

14   communications to third parties on narrowly-defined

15   search terms, which I don't know what they are yet.

16               MR. DUNLAP:  We're glad to meet and

17   confer.

18               JUDGE WOLFSON:  You will.

19               MR. SANDICK:  And one other thing that

20   is important here, this is only terms and conditions

21   related discovery, that's what their request was, not

22   the whole world of SaveOn.

23               JUDGE WOLFSON:  Yes.

24               MR. SANDICK:  So communications with

25   third parties relating to terms and conditions is

Page 55

1   what your Honor is asking for?

2              JUDGE WOLFSON:  And I think this was

3   really within the Stelara and Tremfya area.

4              MR. SANDICK:  Right.

5              MR. DUNLAP:  Yes, that's why we were

6   interested in them.

7              I will say, if they mention SaveOn to a

8   third party, we do want to know about that.

9              MR. SANDICK:  What is the entitlement to

10  that?

11             MR. DUNLAP:  Because it goes to J&J's

12  awareness of SaveOn and their responses to SaveOn.

13             MR. SANDICK:  This has never been

14  briefed, your Honor.

15             JUDGE WOLFSON:  Yeah, I'm not addressing

16  that today.  If you want to address that with them,

17  you can address that with them.

18             MR. DUNLAP:  I think there are two other

19  issues that I think linger from the later time

20  period.  The custodians was one of the three.

21             So in our original request we had ask

22  that they run I think five search terms during this

23  later time period.  Four of those they had already

24  agreed to run for the earlier time period, but there

25  is one search term that we had asked them to run for

1   the 2022 time period forward that was not caught up

2   by Judge Waldor's order, and it's my understanding

3   that they're declining to run it, and it's one that

4   we think is very important, and it is a term that

5   asks for the term EI, which is benefits

6   investigations, which is what Mr. Sandick discussed

7   earlier, within the same document as Stelara and

8   Tremfya.

9              So you may have recalled him saying that

10  through Trial Card they are producing information or

11  copies of benefits investigations they conducted for

12  Stelara and Tremfya because at that point they

13  specifically started asking to look for whether

14  people were on SaveOn advised plans or not.

15             So we want documents relating to those

16  investigations, which is why we asked them to include

17  the search term.

18             I believe they're declining to run it

19  and we think that they should.

20             MR. SANDICK:  Your Honor, they are going

21  to be getting benefits investigations documents

22  relating to Stelara and Tremfya as a result of Judge

23  Waldor's order.  What they need beyond that I do not

24  perceive it or understand it, but maybe they should

25  wait to see what our production is.

Page 57

1          JUDGE WOLFSON:  See what their

2    production is, and if there is still an issue, I'll

3    resolve it.

4          MR. DUNLAP:  Glad to reserve that.

5          There is just one other issue that I

6    believe is still out there, which is within the

7    documents that they reviewed for this later period,

8    2022 through November of last year, we believe that

9    they should be looking for and producing documents

10   identified by the search terms that go to their

11   enforcement of the Stelara and Tremfya conditions.

12         I believe there was an indication in

13   some of their correspondence that they weren't going

14   to do that.  We don't think there is a basis for

15   that.  We think that if there is a document

16   identified by the search terms and it goes to

17   enforcement of these terms, we need to see it,

18   because we have seen some documents from that time

19   period indicating ████████████████████████████

     ████████████████████████████████████████████

     █████████████████████████████████████████████

     █████████████████████████████████████████████

     ████████████████████████████████

24         We just want to make sure that they're

25   producing documents relating to the enforcement of

Page 58

1   those terms.

2            MR. SANDICK:  The first time that I ever

3   heard this issue raised was right now.

4            I have in front of me the search

5   terms that they proposed on terms and conditions.  I

6   don't know what he's saying, how it connects to any

7   of this.  I'm just totally surprised by what he's

8   proposing.

9            JUDGE WOLFSON:  Then talk after we're

10  done.

11           MR. DUNLAP:  Sure.

12           We have met and conferred about this,

13  but we'll do it again.

14           JUDGE WOLFSON:  Okay.

15           Let's turn to the financial documents.

16  I think that's the next thing.

17           Now, what I understand is Plaintiff has

18  produced documents that bear on the following:  The

19  extent of the harm that SaveOn has caused J&J during

20  the relevant time period; and then a number of other

21  things.

22           What are those documents?  That is a

23  general description.  What does that mean?  What are

24  you producing to them?

25           MR. SANDICK:  So what we've produced to

Page 59

```
1    them is ████████████████████████████████████
     ██████████    ██████████████████████████████
     ████████████████████████    We have, of course,
4    agreed to update that through the present.
5              ████████████████████████████████████
     ███████████████████████████████████████
     ████████████████████████████████████
8              What they are asking for is -- going
9    back at one point at least to 2009 -- all documents
10   and communications about those budgets.  And they've
11   offered no rational for why they need all documents
12   and communications about the budget.
13             So this is one where we do object on the
14   basis of relevance.
15             What matters is what budget was set; how
16   much was paid.
17             ████████████████████████████████████
     ██████████████████████████████████████
     ███████████████████████████.  So we've already
20   produced substantial budget data.
21             What we haven't produced is all
22   communications ever about how much money was going to
23   be spent.  We don't think that is necessary for the
24   case.  It creates burden for no benefit.
25             JUDGE WOLFSON:  Okay.
```

Page 60

1          MR. DUNLAP:  So, they bring a GBL claim
2     against us alleging that we caused public harm.
3          One of the things that they allege that
4     we do is that we threaten the financial viability of
5     CarePath.
6          That is right in their complaint.
7          We don't think that SaveOn threatens the
8     financial viability of CarePath, number one.
9          And number two, we don't think that this
10    is a public harm, because CarePath is actually the
11    marketing program.  It is designed to encourage
12    patients to buy Johnson & Johnson's drugs instead to
13    competitors' drugs.
14         And there is case law saying that if
15    what you're really doing is impacting somebody's
16    business, that is not a harm recognizable under the
17    general business law, which is about protecting the
18    public.
19         We need documents showing who sets the
20    budget, why is it set, where do the funds come from.
21         JJHCS is a division of Johnson & Johnson
22    that as far as we know doesn't make any products or
23    offer any services outside of Johnson & Johnson.
24    It's an administrative entity that serves other J&J
25    entities.

Page 61

1          If, in fact, the budget for CarePath is

2     part of the marketing budget, if, in fact, it is not

3     part of some sort of public or charitable effort,

4     that goes a long way in showing that this was a

5     marketing program.

6          If, in fact, we can show that the

7     budget -- the factors that go into setting the budget

8     are not actually impacted by what SaveOn is doing and

9     they're going to keep funding this anyway, that could

10    go a long way in showing that we don't actually

11    threaten their financial viability.

12         What they have produced are a limited

13    number of documents showing amounts paid out under

14    the CarePath program and some budgeting documents,

15    but they're just numbers, they don't show us why the

16    budgets were set, we don't know who sets the budgets,

17    there is no documents indicating any of that.

18         We're not asking for every single

19    communication under the sun about this.  It's a

20    question of whether this is relevant.  And we think

21    it's squarely relevant.

22         And if we can establish that, then we're

23    glad to work on determining who the right custodians

24    are and the search terms and all of that.

25         JUDGE WOLFSON:  Let me first stop you.

Page 62

1          Judge Vazquez talked about public harm

2     in his opinion, and the way he analyzed it was -- he

3     said that "Plaintiffs plausibly allege at least two

4     deceptions as to consumers:  One, enlisting

5     pharmacies to reject Plaintiffs' claims for their

6     prescriptions at the point of sale; and two, failing

7     to inform patients that by enrolling in SaveOn SP can

8     breach the CarePath terms and conditions."

9          The things you're looking to do don't

10    answer those public harm questions.

11         So I want to get away from that for a

12    moment.

13         I think really the focus here is on the

14    harm to the Plaintiff itself and how the discovery

15    relates to that.

16         So let's focus on that.

17         I know that one of the arguments is the

18    viability, economic viability of the program.

19         Okay.

20         Yeah.  Documents that go to that are

21    important.

22         Could be communications go to it.

23         I think at this point what you've

24    done -- I don't know if you have produced any

25    communications.  You have given budgets.  You have

Page 63

1    given I think you know -- let's see -- data.

2              What have you given?

3              MR. SANDICK:  We have given them

4    documents about how co-pay assistance is determined.

5    We answered interrogatory on this subject.

6              They said we don't know who makes the

7    decisions.

8              Literally that exact question of who

9    makes the decisions was the subject of our

10   interrogatory response that we provided this summer

11   after Judge Waldor told us that she wanted us to

12   broaden our response on that.

13             JUDGE WOLFSON:  Okay.

14             MR. SANDICK:  Patient level data to show

15   every patient enrolled, dates of enrollment, the

16   amounts of assistance, the drugs they took, all of

17   this for a six-and-a-half year period.

18             You know, why would they need

19   communications within various parts of the J&J

20   company, not just JJHCS, but other components of the

21   company, why would they need that to figure out what

22   damages are?  There is no need for that.

23             JUDGE WOLFSON:  I will tell you, I think

24   that your requests in the financial area are over

25   broad.

Page 64

1          There may be areas that are pertinent,
2     and I want to define what they are.
3          I think to the extent that the harm
4     being alleged is a financial harm to the CarePath
5     program and, as you call it, the viability of the
6     program, there could be communications that could be
7     relevant.  It's not just what the budget is, but if
8     people are saying, you know, this is going to hurt
9     our bottom line, we're going to be okay, but it's
10    going to hurt our bottom line, that could go to your
11    viability argument.
12          There certainly could be communications.
13          So what I would like is a better or more
14    narrow request for what those communications are as
15    opposed to the entire world.
16          Frankly, the success of these drugs is
17    really not the issue for me or for this case.  These
18    are about programs.
19          I know you say this is really a
20    marketing tool, it's not to help the patient.
21          Maybe.
22          Maybe they're not such good guys.  I
23    don't know, that is not my determination today.  That
24    is not what this is about.
25          They created a program.  They are, you

Page 65

1    know, entitled to enforce the program how they'd

2    like.

3              And this is not a determination of, as I

4    said, are they benevolent here in doing something

5    great or not.  That is not the inquiry.  It's an

6    economic harm that is being alleged.

7              Right?

8              MR. DUNLAP:  Your Honor, may I respond

9    to that?

10             JUDGE WOLFSON:  Yeah.

11             MR. DUNLAP:  So I believe you said

12   that -- and you cited the Court's opinion in talking

13   about the harm and pointing to things like failing to

14   say that signing up for whatever it is allegedly

15   breaches the contract.

16             I just want to clarify the elements of

17   the GBL claim.

18             I believe when Judge Vazquez was talking

19   about those things he was talking about the

20   underlying acts.

21             The elements are, you have to have an

22   act that is consumer facing, public facing, that is

23   deceptive or missing.

24             That is one.

25             Two, that act has to cause some sort of

Page 66

1     harm to the public.

2              And then third, that act also has to

3     cause some sort of harm to the Plaintiff bringing the

4     suit.

5              So when he was talking about failing to

6     tell patients that they breached their contract, he

7     was talking about the deceptive act, one of the

8     alleged deceptive acts.  He wasn't talking about the

9     harm that they allege.

10             The harm that they allege, if you look

11    at the complaint --

12             JUDGE WOLFSON:  Yeah, but I'm looking at

13    his opinion right here.

14             You're right, he is talking about the

15    deception.

16             But turning to Defendant's argument.

17             "The Court first agrees with Plaintiff

18    that a plausible belief that Defendant deceived

19    participants already enrolled in CarePath.

20    Similarly, the Court disagrees with Defendant's

21    reading that the statute requires a threat to the

22    health or safety of the public at large.  While

23    Plaintiff must plausibly allege some harm to the

24    public at large, while a threat to the health or

25    safety of the public is certainly a way to meet this

Page 67

1  obligation, the statute is not related to health and
2  safety harms," and then it goes on to say what he
3  says.
4          Now, you may think that his opinion
5  didn't adequately address harm, but we have what he
6  did.  And, you know, it's not a lengthy opinion, and,
7  you know, but it is what is, and that is how he did
8  it.
9          But I want to get to, I think that -- I
10  believe that this financial information overall, your
11  request 28, 29, and I think 30, are over broad, and I
12  want to talk about what narrow requests could be
13  relevant to your claim.
14          MR. DUNLAP:  Your Honor, I don't want to
15  belabor this, but just in response to what you said,
16  which is, what the Court did was it disagreed with
17  our basis to dismiss the complaint in terms of
18  allegations of harm to the public.  So as I
19  understand it, he allowed J&J's allegations to go
20  through to discovery.
21          Those allegations of harm, paragraph 114
22  of their complaint, says SaveOn causes damage to the
23  public, including patients, through a series of
24  things, one of which is jeopardizing the viability of
25  patient assistance programs like CarePath by making

Page 68

1    them prohibitively expensive.

2              JUDGE WOLFSON:  But that is the point.

3              I am saying discovery about the

4    viability of the program is fine.  That is the

5    limitation.  And so that's what I'm focused on.  But

6    that's why I'm saying, things that you're saying

7    about, oh, but let's see how much money J&J makes on

8    Stelara, let's see how much money J&J makes overall,

9    is really not the issue.  I want to focus on the

10   program itself.

11             MR. SANDICK:  And, your Honor, just to

12   clarify the subject of the public harm that we're

13   alleging.

14             The public harm in this case is not even

15   exclusively or primarily this viability issue, what

16   it is, and as we have seen in discovery, is across

17   the country patients who come into contact with the

18   SaveOn program find their lives made much worse by

19   it.  ███████████████████████████████████

20   ███████████████████████████████████

21   ███████████████████████████████████████

22   ███████████████████████████████████████

23   ███████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████

Page 69

1          So the idea that somehow this will be a

2     case primarily about the viability of SaveOn, 349, as

3     I'm sure the Court knows, is a statute about consumer

4     harm, and consumer fraud, and the consumers have been

5     very badly harmed.

6          That evidence will be what this trial is

7     about.

8          JUDGE WOLFSON:  That is fine, but I want

9     to now get to the other aspect, which was what his

10    requests were about, which is the viability of

11    CarePath and what documents are necessary to talk

12    about that economic harm that challenged the

13    viability of CarePath.  And let's come up with

14    requests that are more narrowly tailored to that.

15         I don't think getting discovery on, you

16    know, gee, you're making -- you know, this is really

17    a marketing program, or, more broadly, J&J makes a

18    lot of money on these drugs.

19         Let's break it down.

20         So, with regard to CarePath

21    specifically, what do you think you're missing that

22    you need to give you the discovery you require to

23    show how this impacts the viability of CarePath.

24         MR. DUNLAP:  We need to understand how

25    Johnson & Johnson sets the CarePath levels, how it

Page 70

1    decides on the budget, where that is done, the

2    factors that go into it, and relevant communications

3    about that.

4              JUDGE WOLFSON:  Okay.

5              Frankly, I find that okay.

6              So that's where we are.

7              Let's move onto the next.

8              J&J's return on investment from

9    CarePath.

10             MR. DUNLAP:  I'm glad to speak about it.

11             Return on investment documents we think

12   goes to fundamental issues of injury and damages.

13             Fundamental issues of injury and

14   damages.

15             Their allegation is that somehow what we

16   do causes them to pay out more in CarePath, in these

17   co-pay assistance funds, and they say, we don't want

18   to be paying this much money, it costs us however

19   much it costs us, that is our injury, and those are

20   our damages.  We will figure that out.

21             Part of what SaveOn does on behalf of

22   its plan clients is it helps more people enroll in

23   CarePath and take more Janssen drugs.

24             So we believe that if you look at the

25   additional patients who have signed up for CarePath,

Page 71

1    the additional patients who have bought more Janssen

2    drugs as a result of what we are doing on behalf of

3    our clients, that Johnson & Johnson has made much

4    more money in terms of drug sales, new drug sales, it

5    otherwise would not have made than in the money that

6    it pays out.

7              Now, it has been well documented,

8    including congressional hearings, that a lot of drug

9    companies specifically monitor their return on

10   investment.

11             You can spend a little bit of money to

12   help patients take your drugs as opposed to a

13   competitors.  You can sell many more of these drugs

14   that the commercial health plans then basically pay

15   for.

16             That's why they do this, it's part of

17   the purpose of the program, not to benefit the

18   public, but to make this amazing investment, this

19   amazing return for themselves.

20             So that goes to whether it's a public

21   harm.

22             But it also goes to the question of

23   injury and damages.

24             If we are signing more people up and

25   they are paying more in CarePath assistance funds,

Page 72

```
 1    but they're making much more in drug sales, we think
 2    that offsets or eliminates their damages, and it
 3    might offset or eliminate their entire injury.
 4              These return on investment documents are
 5    absolutely critical to us.  We can talk about the
 6    scope of how we get them, the type of data they
 7    produce, the type of communication they produce, but
 8    the subject of return on investment is critical to
 9    our defenses on injury and damages, and it's relevant
10    to questions of public harm and GBL.
11              MR. SANDICK:  Judge, I would like to
12    respond.
13              JUDGE WOLFSON:  Sure.
14              MR. SANDICK:  This argument is
15    essentially that if CarePath, you know, and Johnson &
16    Johnson are still able to make money despite the
17    looting of the program that his client has engaged
18    in, then, you know, it's okay.  It's okay to steal
19    from someone, and to loot a program, so long as at
20    the end of the day they're still making money.
21              If this program was helping the
22    pharmaceutical manufacturers, as Mr. Dunlap suggests,
23    why have they gone through such extensive efforts to
24    hide their existence, to prevent us from knowing who
25    was in the program?
```

Page 73

1          If these were something that, you know,

2    advanced the profitability of the CarePath program,

3    or of pharmaceutical industry generally, why are they

4    hiding this from everyone?

5          This is a made for litigation argument

6    to obtain documents that have nothing to do with the

7    case in an effort to shift the case from a fairly

8    specific question, do their efforts lead CarePath to

9    pay more money than it would pay in the absence of

10   CarePath, into a huge question about how much money

11   is J&J making on its drugs, can it afford to absorb

12   some losses here because they're generally a

13   profitable company, things that are just totally

14   irrelevant.

15         Also, just for a moment on the burden

16   issue.

17         The question of how much money does a

18   drug company make on a particular drug is not a

19   simple question, you know, residing in a couple of

20   paper files in someone's office.  This is a massively

21   complicated question that goes to virtually every

22   corner of the entire J&J company to figure out, you

23   know, is a drug profitable relative to what?  To

24   other investments?  To other potential drugs?

25         It's an effort to place a huge burden on

Page 74

1    us for no benefit in the lawsuit.  It's totally

2    irrelevant to the lawsuit whether or not the whole

3    company of Johnson & Johnson makes more money or less

4    money.

5              The question is, are they inducing

6    people to breach the terms and conditions, the

7    patients, are they forcing them to do this in order

8    to get their medication, are they causing harm to

9    those patients, and does this lead to an increase in

10   the amount of co-pay support that we would pay absent

11   that?

12             They are reframing this to entities, by

13   the way, that are not part of this lawsuit.

14             JUDGE WOLFSON:  Well, that's why I want

15   to ask a question.

16             May I stop you there for a minute?

17             MR. SANDICK:  Sure.

18             JUDGE WOLFSON:  I find this curious, and

19   I have been wondering about this as I've looked at

20   this case since the beginning, the only Plaintiff in

21   this case is JJHCS, not J&J.  So the question is, you

22   have just defined, Mr. Sandick, that this is a very

23   narrow harm, narrow in the sense of to this one

24   subsidiary or affiliate that runs the CarePath

25   program.

Page 75

1                   You want to argument more broadly, it's
2       much more than that.  J&J is making a lot of money.
3                   So, first of all, who funds the CarePath
4       program?
5                   MR. SANDICK:  So -- I'm not actually
6       sure what the -- it's something within the Johnson &
7       Johnson family of companies, but I couldn't say
8       specifically.  I think there are specific drugs that
9       fund -- essentially that fund their own co-pay
10      support, it's not decided in one person's office
11      sitting alone.
12                  JUDGE WOLFSON:  Okay.
13                  So those decisions are made somewhere
14      else within corporate J&J perhaps, it's not limited
15      to this one entity who is the Plaintiff in the case,
16      but who may be the one administering it.
17                  I understand your arguments, Mr. Dunlap.
18      I'm not buying it at the moment.
19                  What I don't want to see happen too in
20      this case is that this becomes, essentially, J&J is a
21      big company that makes a lot of money.  Don't cry for
22      them.
23                  And I don't think, by the way, any juror
24      is going to believe that anyway, that you're doing
25      something that's greatly going to harm the overall

                                                              Page 76

1    J&J company.

2              So that's why I'm trying to figure out,

3    if you're narrowing harm as to the CarePath program

4    itself that exists within this one entity.

5              MR. SANDICK:  That is the case.

6              We are not, for example, this is not a

7    case about lost profits.  This is not a case about

8    the harm, more broadly, to Johnson & Johnson.  This

9    is a program that says, well, the program gets this

10   amount of money.  As a result of SaveOn, they need to

11   spend this amount of money.  And that delta is the

12   financial damage.  And then the patient harm is what

13   we talked about before.

14             JUDGE WOLFSON:  Yeah, that's what I'm

15   dealing with now on financials.

16             MR. DUNLAP:  So I have to reiterate how

17   strongly we believe this is relevant and how

18   important we think these documents are.  And, again,

19   we're glad to talk about exactly which documents they

20   would produce, what sort of data, et cetera.

21             But the name of the program, or it used

22   to be, it was not just CarePath, but Janssen

23   CarePath.  Janssen being the entity that actually

24   sells the drug.

25             They decided to arrange their business

```
 1   so that this entity develops and sells the drug,

 2   Janssen, and this entity administers the CarePath

 3   program, but the two are related.  Of course they

 4   analyze their return on investment.  There is, again,

 5   congressional testimony showing that a number of

 6   these drug companies do that.  And we haven't heard

 7   them say that they don't have return on investment

 8   related documents.  They figure out how much they're

 9   going to give to CarePath to give to patients.  They

10   figure out how much that helps them drive additional

11   sales over in the Janssen entity.

12               We don't think that they should be able

13   to say, well, nothing that happens over in Janssen in

14   terms of additional sales is relevant because they

15   decided to put the CarePath program under JJHCS.

16               We're not trying to stand up and say,

17   oh, J&J makes a huge amount of money generally.

18   We're not interested in baby powder sales or shampoo

19   sales or anything.

20               JUDGE WOLFSON:  I know that.

21               MR. DUNLAP:  But we do think that this

22   fundamentally goes to what the purpose of this

23   program is and what the financial consequences of it

24   are.

25               They want to stand up and tell a story
```

Page 78

1    that says, J&J provides this money to help patients

2    for their drugs and SaveOn comes in and loots and

3    steals and all the other pejorative terms Mr. Sandick

4    used.

5                We think that that is not true.

6                What we want to be able to stand up and

7    say, they don't offer this program to help patients.

8    They offer this program to help persuade people to

9    buy their drugs instead of their competitors.

10               And what SaveOn does on behalf of its

11   plans actually winds up with them making more money.

12   It's not, oh, they make lot of money, they can afford

13   this.  It's that the direct consequences of the

14   actions that they have put at issue causes them to

15   make more money.  That there is an offset through the

16   additional drug sales that we are able to drive by

17   signing more people up for CarePath that more than

18   offsets the additional CarePath funds that they're

19   spending.

20               This isn't some general argument, they

21   make a lot of money, they can afford it.  That is not

22   what it is.  It is directly tied to the allegations

23   in the complaint.

24               And I have to underscore -- you know,

25   we're glad to narrow, as I said, the search terms,

Page 79

```
 1    the types of requests that we go after here.
 2                   JUDGE WOLFSON:  Tell me what that
 3    narrowing would be.  Let me hear that.
 4                   And I do appreciate, but I'm assuming
 5    you are producing documents about CarePath being
 6    created and what it's intended to do and how it's
 7    being funded.
 8                   MR. SANDICK:  Absolutely.
 9                   And the reason, by the way, it's named
10    Janssen CarePath is not like some secret thing, it's
11    because patients know the company as Janssen.  So if
12    you take Darzalex, you know that is a Janssen drug.
13    Janssen CarePath helps you pay for it.
14                   That is the reason that at one time
15    Janssen was part of the name, it's not some broad
16    conspiracy theory.
17                   MR. DUNLAP:  We're not alleging a
18    conspiracy theory.
19                   JUDGE WOLFSON:  What is the narrow terms
20    you would say?
21                   MR. DUNLAP:  We need documents showing
22    Johnson & Johnson's analysis of its return on
23    investment for CarePath.  Not just the data about
24    what it's paid out.  We know thing going to produce
25    that because that's driving their damages.
```

Page 80

1              JUDGE WOLFSON:  Repeat that.

2              MR. DUNLAP:  We need Johnson & Johnson's

3    analysis of its return on investment for the CarePath

4    program, including how it helps patients adhere to

5    Janssen drugs once they enroll in CarePath, and we

6    want relevant communications on that topic as well.

7              MR. SANDICK:  Your Honor, what that

8    would require is, essentially, a company wide X-ray

9    of how much money the company makes on all of these

10   different drugs, how much it costs to make these

11   drugs, how much it costs to market these drugs.  All

12   of that information would be necessary.  A vast

13   project, totally irrelevant to the case.

14              And on the subject of adherence, by the

15   way, this is something that is very important for

16   your Honor to know, ██████████████████████████

17   ██████████████████████████████

18   ████████████████████████████████████

19   ██████████████████      We have documents.  We can

20   produce those to the Court if that is relevant, I

21   don't think it is necessary to reach this.  But the

22   notion that the adherence story somehow resides

23   within JJHCS, they've looked at it.  They know

24   already.  Their partner is Express Scripts.  They get

25   all sorts of tremendous industry wide data.  Express

Page 81

1    Scripts manages pharmaceutical benefits for more
2    Americans than any other company.  So if there is an
3    adherence story, they would know it.  And what
4    they've have figured out was it's nonsense.  There is
5    no adherence story.
6            And what he said is not a narrowing of
7    the request, when he said, "oh, this is my narrowed
8    request."  It is almost verbatim what they've asked
9    for in the requests, in the discovery correspondence,
10   before Judge Waldor.  It's not a narrowing at all in
11   any regard.
12           MR. DUNLAP:  Can I respond to those
13   points, your Honor?
14           JUDGE WOLFSON:  Go ahead.
15           MR. DUNLAP:  So, first, he's acting as
16   if we're asking him to create a return on investment
17   analysis from scratch and just go out into the
18   company and all the various corners of it and try to
19   figure this out.
20           No.
21           We want whatever analyses they have
22   already done on their return on investment for
23   CarePath.  There has to be existing work product on
24   this.  Whatever finance teams or product teams drive
25   it must have done something.

Page 82

1          JUDGE WOLFSON:  He's limiting it to

2     CarePath not on your drugs.

3          MR. SANDICK:  Well, in order to figure

4     out the question of whether CarePath is helpful you

5     have to look at all of these other issues relating to

6     the manufacturing, development, marketing, and sale

7     of the drugs, and I don't think -- I know Mr. Dunlap

8     keeps saying there is one piece of paper and it will

9     have all the answers -- I don't think that is true,

10    not based on anything I have seen.

11         MR. DUNLAP:  So the return on investment

12    documents would say, we put this much money into

13    CarePath, and then we make this much money in terms

14    of selling additional drugs to patients over in the

15    Janssen entity.

16         We're not asking him to, you know,

17    search every single corner for documents that are

18    irrelevant or -- we want whatever analysis they have

19    done.

20         They do CarePath for a reason.  There

21    must be some analysis of the benefit that CarePath

22    has on Janssen's product line.

23         MR. SANDICK:  The question of whether

24    CarePath operates for charitable purposes or for

25    business purposes is not really relevant to the case

Page 83

1  if they're taking money from it.

2          If you run a car dealership and someone

3  steals a car once a week from your lot, it doesn't

4  matter whether as an overall matter the dealership is

5  still making money, it's still wrong to take cars

6  from people's lots, and it's wrong to induce people

7  to breach their terms and conditions in order to make

8  more money.

9          So the idea that somehow it matters how

10 profitable CarePath is or whether it's prudent for

11 J&J to run it, it's just moving the case far, far

12 away afield from anything in the complaint, the

13 judge's order, into this other subject of, is this

14 segment of J&J's business, the drug segment, is it

15 profitable, and is this just some gold dust from the

16 machine that it's okay for SaveOn to take.

17         Whether CarePath has a huge return on

18 investment or has no return on investment, it still

19 has no bearing on whether they're allowed to do this.

20 It's irrelevant to the case.

21         MR. DUNLAP:  Your Honor, if I could just

22 respond quickly.

23         JUDGE WOLFSON:  Yes.

24         MR. DUNLAP:  It has a huge bearing on

25 whether we have actually damaged them because if the

Page 84

```
 1   action we take by signing someone up for CarePath,

 2   what they call the SaveOn program, resulted in a new

 3   patient signing up for CarePath, they're saying, wait

 4   a minute, we have paid more to that patient than we

 5   otherwise would have.  But if by signing them up we

 6   gave them more drug sales, we produced more drug

 7   sales for Janssen, which is a J&J entity, then that

 8   additional money eliminates whatever damage we say

 9   was caused -- they say was caused by the additional

10   expenditure of CarePath funds.

11              Now, of course it's fine for him to

12   argument differently at trial if he wants to, but we

13   need these documents to show that we're not actually

14   injuring them.

15              And the car dealership scenario he

16   provides makes no sense, frankly.  If you steal a car

17   a week from a car dealership, that might be illegal,

18   but it's not a GBL claim.

19              JUDGE WOLFSON:  Let me ask you this

20   question:  Mr. Sandick, is there any analysis --

21   their position is, guess what, we make more sales for

22   you.  More people sign up because of the SaveOn

23   program.  And that may not be accurate.  You may

24   dispute it.

25              Is there a document or do you have
```

Page 85

1    documents that show whether, indeed, as a result of

2    --

3                    MR. SANDICK:  If we do and it talks

4    about SaveOn, it would have already been produced.

5                    MR. DUNLAP:  Aw, if it talks about

6    SaveOn.  That is the critical point.

7                    MR. SANDICK:  Well, yeah, this is a case

8    about SaveOn.

9                    There is literally no way to search as a

10   practical matter without going to every corner of the

11   business to generate the information that Mr. Dunlap

12   wants to be generated for this case.

13                   JUDGE WOLFSON:  I didn't ask you to

14   generate it.  What I asked was, has anyone done an

15   analysis for documents that exist as to whether there

16   are more patients signing up for your drugs or

17   getting the drugs who are SaveOn customers?

18                   MR. SANDICK:  I have seen that analysis

19   in their files stating that it's not true.

20                   They have, along with their business

21   partner --

22                   JUDGE WOLFSON:  I asked if you have it?

23                   MR. SANDICK:  I haven't seen that

24   document.

25                   JUDGE WOLFSON:  Answer that question.

Page 86

```
 1                    MR. SANDICK:  I have not seen that
 2      document.
 3                    JUDGE WOLFSON:  I'm asking if there are.
 4                    Do a search for that.
 5                    I want to start in that instance.  I
 6      think that is a starting point.
 7                    MR. SANDICK:  What is the search, your
 8      Honor?
 9                    JUDGE WOLFSON:  Whether there are
10      documents that exist that have looked at whether
11      there are more patients taking your drugs as a result
12      of being in the SaveOn program.  That's the inquiry.
13                    MR. DUNLAP:  Your Honor, may I?
14                    JUDGE WOLFSON:  Yes.
15                    MR. DUNLAP:  I think it is necessary for
16      them to do that search, but we don't think it should
17      be limited to that.  And let me tell you why.
18                    JUDGE WOLFSON:  I'm going to start with
19      that.
20                    MR. DUNLAP:  Limiting it to the SaveOn
21      program we think has too narrow a net because if they
22      have documents that say, you know, for every
23      additional hundred people we sign up for taking
24      Stelara, we make this much money, that may not
25      mention SaveOn, but if we could find those documents,
```

Page 87

1   if we could find that analysis, and then we compare

2   that with our own separate analysis of how many new

3   patients we got to sign up, we can show additional

4   profits to them as well.

5           So the relevant documents may not

6   mention SaveOn.  I understand you want to start

7   narrow, but I just want to put a stake in the ground

8   that we don't think limiting return on investment

9   information to SaveOn is sufficient.

10          MR. SANDICK:  Yeah, I mean, if it

11  doesn't mention SaveOn, then I don't see what it has

12  to do with this issue.

13          I should also point out that going back

14  right to the start of the case we made some requests

15  to SaveOn, saying, we want to know about how your

16  program operates with other pharmaceutical companies,

17  because the public harm in the GBL 349 claim is not

18  limited to harm to patients taking our drugs, it

19  could be patients taking Pfizer's drugs, or some

20  other company's drugs, those could also be harmed

21  under 349.

22          They objected and said, anything beyond

23  Janssen and SaveOn, CarePath and SaveOn, we object

24  to.  And Judge Waldor heard argument and ruled in

25  their favor and said, absent some very specific

Page 88

1   showing, and a couple of times that showing has been

2   made, they don't have to tell you about their program

3   as it ties to other drug companies.  But now they are

4   making the mirrored request saying we have to do

5   something that has nothing to do with SaveOn.

6           MR. DUNLAP:  The mirrored request is

7   about Janssen drugs.  We're not asking them for all

8   kinds -- the draft drugs at issue in this case.

9   We're not asking for return on investment on a whole

10  bunch of drugs that aren't at issue.  What is their

11  return on investment for the drugs at issue, those 14

12  drugs.

13          JUDGE WOLFSON:  I need it to be honed in

14  on SaveOn at the moment, and I'm limiting it to that.

15  You're certainly free to come back to me depending on

16  what we get.  I know we're not done.

17          MR. DUNLAP:  Thank you, your Honor.

18          JUDGE WOLFSON:  All right.

19          But answer that, please.

20          MR. SANDICK:  Okay.

21          JUDGE WOLFSON:  Are those all the old

22  requests?

23          MR. DUNLAP:  Well, I think there was

24  also a pricing issue, a pricing data issue.

25          JUDGE WOLFSON:  The pricing of Janssen

Page 89

```
 1   drugs.
 2                MR. DUNLAP:  I could address that
 3   briefly.
 4                JUDGE WOLFSON:  Go ahead.
 5                MR. DUNLAP:  So they allege in their
 6   complaint that they have actually lowered the cost of
 7   Janssen drugs, and they cite for that something that
 8   they call a transparency report, which is a
 9   publicly-available document that they put up on a
10   website that says, we have lowered the cost of
11   Janssen drugs, but it provides no actual data.  And,
12   in fact, if you go and look at those reports, it
13   drops footnotes that says, we base this on internal
14   Janssen financials.  But they haven't produced the
15   backup for them.  And, in fact, we think that they
16   don't actually reduce drug prices, that they increase
17   drug prices.  Which is relevant to why these plans
18   are fighting back, because the prices that Johnson &
19   Johnson continues to raise, continues to put
20   financial pressure on the plans.
21                We also think that there is information
22   showing that one of the reasons they're able to keep
23   raising drug prices is because of the CarePath
24   program and the fact that they're able to get more
25   people through that program to stay on their drugs as
```

1    opposed to taking competitors' drugs.

2              We think that that is highly relevant to

3    their allegations here.

4              MR. SANDICK:  Your Honor, I think your

5    Honor may have said a few minutes ago that you didn't

6    think that the price of drugs was relevant in this

7    case, and it's not.

8              We produced the transparency reports as

9    a way of trying to give them something on an issue

10   that is actually irrelevant.

11             What they have asked for is, they say,

12   all internal data that supports the net price values.

13             Net price is, essentially, the price

14   that matters when we're talking about drug pricing.

15             And all internal data that supports it.

16             Again, this would require us to go well

17   outside of JJHCS to go through the entire company and

18   to try to explain what the pricing is, how it changes

19   over time.

20             First of all, they have a lot of this

21   information already through their business partners,

22   Express Scripts, and Accredo.  Accredo is a pharmacy.

23   The pharmacy collects payment on these drugs.  They

24   know, and their business partners know, what the drug

25   prices are.

Page 91

1          But the case is not about what we charge

2    for the medication, is that a fair price, should be

3    charge something more or something less.

4          JUDGE WOLFSON:  You're not going to

5    argue that your drug pricing was affected by their

6    program?

7          MR. SANDICK:  No.  The drug pricing --

8    we're not seeking lost profits.  Drug pricing is set

9    by reference to a million factors.  SaveOn is not one

10   of them.

11         MR. DUNLAP:  If I could respond on that.

12         JUDGE WOLFSON:  Yeah.

13         MR. DUNLAP:  They say they produced

14   these transparency reports.  Of course they're on the

15   website.  This wasn't really much of a production.

16   It was something that was already available.  And

17   they say the net price is what matters.  And they

18   also say, oh, we have to go outside of JJHCS.  We

19   have to do this wide range search.

20         They put these numbers into the

21   transparency reports.

22         JUDGE WOLFSON:  But I want to know what

23   is the relevance of it.

24         MR. DUNLAP:  It's relevant -- first,

25   it's relevant because we believe it will show that

Page 92

1   their allegation that they actually lowered real

2   prices over the course of these years, something

3   they're intending to tell the jury --

4               JUDGE WOLFSON:  Well, I hope not.  I

5   just asked that.  And I'm going to put that right out

6   there again to Mr. Sandick.

7               Are you in any way going to put to a

8   jury that you lowered prices and put that up to

9   suggest implicitly or explicitly it's because of

10  SaveOn.

11              MR. SANDICK:  This is not a lost profits

12  case.  This is about the CarePath program and whether

13  that funding has had to go up over time because of

14  their efforts.

15              I think that answers your Honor's

16  question.

17              JUDGE WOLFSON:  But you're not going to

18  argue, and by that funding, we've now lowered prices,

19  or we've raised prices, or anything else?

20              MR. SANDICK:  No.  The drug pricing is

21  not set by reference to SaveOn, it's set by reference

22  to a million other things, but not SaveOn.

23              JUDGE WOLFSON:  I'm going to put this

24  right out, Mr. Dunlap, we're on the record today:  If

25  there will be no argument in this case at a trial, or

Page 93

```
1    at a motion for summary judgment, or wherever it
2    might be, that CarePath in any way has impacted the
3    pricing of these drugs, it's a non-issue.
4              MR. DUNLAP:  Well, they're going to
5    stand up --
6              JUDGE WOLFSON:  I'm asking.
7              I want that representation.
8              MR. SANDICK:  Yes, that is not the
9    theory of our damages.
10             JUDGE WOLFSON:  I ask for a
11   representation that you will not make that argument.
12             MR. SANDICK:  Yes, we are not going to
13   argue that our drug prices were lowered due to what
14   SaveOn has done.
15             The only argument we will make about
16   damages is how the funding for the CarePath program
17   within JJHCS has changed as a result of their
18   conduct.
19             MR. DUNLAP:  Paragraph 80 of their
20   complaint they say, "SaveOn SP has inflated patients'
21   drug co-pay obligations even as JJHCS has
22   consistently decreased the price of the drugs
23   targeted by the SaveOn SP program," and it cites its
24   own transparency report, a quote that says, "Net
25   prices for Janssen medicines has declined for the
```

Page 94

1    fifth year in a row."

2              MR. SANDICK:  But that is not in any way

3    different from what I just said a moment ago, your

4    Honor.  What we say there is that they have taken a

5    bigger share of the CarePath program payments even

6    while we have reduced drug prices, but we are not

7    alleging that the drug price reduction was caused by,

8    was driven by, is related to SaveOn's program.  The

9    drug prices are set not by reference to what SaveOn

10   is doing, by reference to lots of other things, but

11   not that.

12             MR. DUNLAP:  The issue, your Honor, is

13   that we don't think that allegation is true.  We

14   think that, in fact, they have raised drug prices.

15             JUDGE WOLFSON:  Well, I want to know

16   what you're going to do with allegation number 80.

17             MR. SANDICK:  What am I going to do with

18   allegation number 80?

19             JUDGE WOLFSON:  Yeah.

20             MR. SANDICK:  What I'm going to do with

21   allegation number 80 is show that they are taking an

22   increased piece of the co-pay support program.

23             We are not intending --

24             JUDGE WOLFSON:  And that is not

25   impacting your pricing?

Page 95

1              MR. SANDICK:  No.

2              JUDGE WOLFSON:  Lowering your pricing or

3      raising your pricing?

4              MR. SANDICK:  No.

5              That line in there, which is far from

6      central to what our case is going to be about, what

7      that line in there is meant to say is that it is

8      commonly the case in sort of the market of public

9      discourse for insurance companies to say, oh, yes, we

10     know that your drug prices have gone up, but that is

11     not our fault, that is the drug company's fault that

12     raise their prices every year.

13             So we made this sort of rhetorical

14     aside.

15             We are not intending to show, will not

16     show, or not alleging that the cause of drug prices

17     moving up or down is because of SaveOn.

18             MR. DUNLAP:  Well, no, because they are

19     going to stand up and they're going to say, we have

20     been lowering our prices, and then they're going to

21     come in and say, while we have been lowering our

22     prices SaveOn has come in and taken a bunch of our

23     CarePath assistance programs --

24             JUDGE WOLFSON:  I think I heard you're

25     not going to say that.

Page 96

1        MR. DUNLAP:  Well, I thought he said he
2   wasn't limiting it to the damages or the cause of the
3   increase.
4        MR. SANDICK:  No, we are not going to
5   argue that our damages are in the form of lost
6   profits by having reduced prices due to SaveOn.  That
7   is not our theory of the case, our damages, or
8   anything else like that.
9        If they make arguments in their case
10  using SaveOn data about drug pricing, say, no, no,
11  no, actually, these guys are -- you know, they're
12  ganas, they're taking from everyone, then we will be
13  able to come back and say something.  But our case is
14  not about the drug prices being set by reference to
15  anything that SaveOn does.  I want to make that very
16  clear.
17       MR. DUNLAP:  He keeps trying to link it
18  to SaveOn.
19       Put SaveOn aside for a second.
20       He is going to stand up at trial, if it
21  gets there, and say, Johnson & Johnson has been
22  lowering its drug prices.
23       JUDGE WOLFSON:  Why would you say that?
24       MR. SANDICK:  I don't think that we're
25  going to say that.

Page 97

1          MR. DUNLAP:  It's in his complaint.

2          JUDGE WOLFSON:  I hear it's in the

3   complaint.  Just because it's in the complaint --

4   that's why I'm looking for representations today.

5          MR. SANDICK:  We're not planning to

6   prove a case about our drug prices.  The case that

7   we're going to prove on damages, just to spell it out

8   --

9          JUDGE WOLFSON:  You're not going to open

10  and say, and you're not going to close and say, we're

11  such good guys, we keep reducing the price, but they

12  stealing from us?

13         MR. SANDICK:  No.

14         JUDGE WOLFSON:  Do you agree you're not

15  going to do that?

16         MR. SANDICK:  I agree that we're not

17  going to do that.  That's not the theory of our case.

18         MR. DUNLAP:  I just want to make clear,

19  he is not going to make any representation that they

20  have been lowering drug prices?

21         MR. SANDICK:  We are not going to make

22  that representation.

23         I want to leave myself one out, your

24  Honor.  If they start making allegations about the

25  greedy drug companies that have raised prices, I

Page 98

1    think we're allowed to reply to that.  But that is

2    not something we're planning to present.  And, in any

3    event, they and their business partners have tons of

4    data about this.  ████████████████████████████

5    ████████████████████████████████████████████████

6    ████████████████████████████    ████████████

7    ████████████████████    ████████████████████████

8    ████████████████████████████    Why all the

9    lies and the deception?

10           MR. DUNLAP:  Well, I'm not getting into

11   all those false accusations.

12           Look, we had raised the drug pricing for

13   two reasons.  One is that they allege that they were

14   increasing these prices.  And if they are going to

15   make that allegation, we want to see the data on

16   which they are basing that.

17           JUDGE WOLFSON:  Okay.  I have just

18   gotten a commitment that they weren't.

19           MR. DUNLAP:  We also want to make the

20   point that it's our understanding that one of the

21   reasons Johnson & Johnson can, in fact, continue to

22   increase its drug prices is because it is able to get

23   patients to commit to taking its drugs through the

24   CarePath program.  That the CarePath program, one of

25   the consequences of it is, that it allows Johnson &

Page 99

1   Johnson to increase drug prices.  That they don't

2   exist separately, that, in fact, it's part of Johnson

3   & Johnson's strategy, that they've increased prices

4   for reasons having nothing to do with material costs

5   or efficacy or anything like that, but just because

6   they can.  And one of the reasons they can do that is

7   because they made the patients pricing sensitive to

8   this program and they keep buying more drugs.  And

9   the cost of that is borne by the employers.  And we

10  think that evidence goes to whether or not this is

11  actually a public harm or not or whether it's a

12  program designed to benefit J&J through increased

13  drug prices.  And we also think it could go to

14  damages and injury if we can show that by adding new

15  patients to the CarePath rolls, where they are able

16  to raise their prices more, not just make more sales,

17  but make more sales at a higher price.  That could

18  offset damages.

19              JUDGE WOLFSON:  Did you want to take a

20  break?

21              COURT REPORTER:  Yes, I would love to.

22              JUDGE WOLFSON:  Okay.

23              (Brief recess taken.)

24              JUDGE WOLFSON:  Mr. Dunlap, you got one

25  minute to summarize.  Before we took the break we

Page 100

1    kind of interrupted you.

2            MR. DUNLAP:  I think I just finished

3    making another pitch about why we thought drug

4    pricing was relevant even if they are not going to

5    affirmatively say that they have been decreasing

6    prices.

7            One other point I just want to make on

8    the financial stuff generally to the extent that your

9    Honor is going back and forth about whether or not

10   it's relevant or wants to put it off.

11           We have seen a number of documents that

12   have been produced since we submitted the letter and

13   since the conference occurred that we think

14   underscores that they do look at return on

15   investments.  And we're glad to make a supplemental

16   submission to you summarizing those documents, and

17   we're happy to do that promptly if that will help

18   you.

19           JUDGE WOLFSON:  Okay.

20           For today I'm not directing that

21   anything further be provided on the financial.  I

22   don't foreclose you if you got something else that

23   you want to submit to me that you think would be

24   convincing, but, first, would you please speak to the

25   other side and confer as to, based on that, why you

Page 101

1    think.

2              MR. DUNLAP:  This is on the drug

3    pricing?

4              JUDGE WOLFSON:  Yes.

5              MR. DUNLAP:  Okay.

6              JUDGE WOLFSON:  Okay, I think the next

7    thing now is with regard to this issue that's been

8    briefed the last week or so on custodians.

9              MR. DUNLAP:  And my associate Ms. Snow

10   is going to present argument on that.

11             JUDGE WOLFSON:  Okay.

12             All right.  So we got a couple of

13   disputes here.  This started with, I guess, 12

14   custodians, et cetera.  November 7 Judge Waldor

15   granted the motion as to six custodians.  And in that

16   regard the Plaintiff is now -- and I think you

17   reached some agreement on that, but the question is

18   the scope of the search terms.  Right now they have

19   been as to the CAP program, the Plaintiff has said,

20   right?

21             MS. SNOW:  Yes, just two narrow terms as

22   to the CAP program.

23             JUDGE WOLFSON:  And I think that you

24   have gone back and forth as to what did Judge Waldor

25   mean.

Page 102

1              Well, guess what?  As Judge Waldor had

2     put in her order, you know, I had the opportunity if

3     I would like to speak to her.  Actually, Wayne

4     communicated with her chambers and we got a response

5     that told us -- well, you know what, I'll let Wayne

6     put into the record because you communicated with

7     them about it.

8              MR. FANG:  The law clerk sent

9     correspondence back to my inquiry.

10             JUDGE WOLFSON:  Tim.

11             MR. FANG:  Tim.

12             And he summarized the dispute as he

13    understands it, and he spoke to Judge Waldor about

14    the differing interpretations, the parties'

15    interpretation of her order.  So, ultimately, what

16    she first said -- what he first said was, and

17    Defendant was right, that the judge did not

18    specifically order specifics regarding new custodian

19    searches, because the judge had asked the parties to

20    work up logistics, but upon reviewing and considering

21    the parties' dispute, Judge Waldor agrees -- and I'm

22    reading his e-mail -- that "Johnson & Johnson's

23    position is the only one that makes sense from a

24    proportionality standpoint.  We were only adding the

25    new custodians because of their association with the

Page 103

1   CAP program. ███████████████████████

2   ███████████████████████████████████████

3   ██████████████████████████████

4   ███████████. Similarly, we will limit the searches

5   of the new custodians' records to the CAP related

6   term that Judge Waldor specified since that is the

7   only reason these people are involved in the

8   discovery in the first place."

9          MS. SNOW: Your Honor, you know, I hear

10  what she is saying.

11  ████████████████████████████████████

12  ██████████████████████████████████

13  ████████████████████████████████████

14  ████████████████

15         I would ask that we be allowed discovery

16  on that earlier time period.

17         Additionally, I think we did raise new

18  evidence that demonstrates why the two narrow

19  searches --

20         JUDGE WOLFSON: I'm going to address

21  that in a moment. Okay?

22  ████████████████████████

23         MR. SANDICK: Let me pass it off to

24  Ms. Long. I have had enough. I don't want to say

25  anything else for the rest of the day.

Page 104

1              MS. LONG:  I just wanted to clarify, I

2    think as to the search terms at issue in the

3    November 7 order we did meet and confer where we were

4    considering the position that was offered by SaveOn

5    and a potential for compromise in the middle.

6    Ultimately we did not make that compromise.  But

7    prior to the October 30 conference we had agreed to

8    run a specific CAP search term which did not include

9    a SaveOn modifier for the 2016 to 2022 period.  We

10   did that to try to avoid the dispute that ultimately

11   went before Judge Waldor.  And what we took back from

12   the meet and confer was whether to consider running

13   that term over some period of these CAP custodians

14   earlier.

15             Ultimately we said back to Ms. Snow, and

16   we've had several meet and confers on this point,

17   that we did not consider that is what Judge Waldor

18   had ordered us to do so we declined to run the term.

19   ███████████████████████████████████████████

20   ███████████████████████████████████████████████████

21   ███████████████████████████████████████████████████

22   ████████████████████████████████████

23             It is always possible that there is some

24   correspondence just outside of that window, but

25   consistent with our meet and confer our position has

Page 105

1    been, as Mr. Fang just said, the order prescribed

2    only these search terms and only for that time

3    period, and that is why we cabined our searches

4    accordingly.

5              JUDGE WOLFSON:  She didn't say that,

6    though.  What she said is -- she didn't give a

7    specific order on it, but she said what makes sense

8    to her based on the discussion.

9              So it was not ruled upon.  So to the

10   extent you went back and forth, you're right, I think

11   you're interpreting what her meaning might be, but it

12   does say, the short answer is, "we did not order

13   specifics regarding the new custodian searches.  We

14   wanted the parties to work it out."  And then the

15   rest of the response was her kind of weighing in on

16   proportionality though.

17             So it's not necessarily a done deal.

18             So, let's talk about, is there

19   compromise in here?  That is really where we are.

20   And, one, I want to talk about dates.  I don't

21   understand this whole thing about before 2022.  There

22   is some earlier date involved or not.

23             MS. LONG:  ███████████████████████

24   ████████████

25             JUDGE WOLFSON:  ███████████████████████

Page 106

1    ████████████████████████████████

2         MS. LONG:  ████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████

5         MS. SNOW:  If I can speak on that.  Two

6    points on that.

7                ████████████████████████████████████

8    ██████████████████████████████████████

9    ████████████████████.

10        JUDGE WOLFSON:  ██████████████████

11   ██████████████████████████

12        MR. LoBIONDO:  We'll search for those.

13        JUDGE WOLFSON:  You're going to search

14   for those.

15        MR. LoBIONDO:  ██████████████████████

16   ██████████████████████████

17        MS. SNOW:  So I think my second point is

18   that, really, it's about the essence of the CAP

19   program, and ██████████████████████████████████

20   ████████████████████████████████

21   ████████████████████████████████████

22   ████████████  ██████████████████

23   ████████████████████████████████████

24   ████████████    And that is what we are -- that is what

25   we believe we're entitled to discovery on.

Page 107

1          And I think that for those custodians we
2    do need to go back further.  It is clear that, like,
3    for example, John Hoffman was working on the response
4    to accumulators and maximizers in 2020.
5          And I think there is another additional
6    point I have here, which is that the search terms
7    that they have agreed to run just on the CAP program
8    do not actually capture all of the documents that
9    would be involved in that response, which ultimately
10   turned into that program.
11         JUDGE WOLFSON:  Okay.
12         So you're saying there could be other
13   documents because perhaps even there wasn't a name of
14   a CAP program but the idea of what this program could
15   be was out there and maybe it's not being captured by
16   the search terms?
17         MS. SNOW:  Yes.
18         JUDGE WOLFSON:  What are the search
19   terms?
20         MS. SNOW:  So I believe they're
21   referring to the two additional search terms that
22   were requested in SaveOn's other motion regarding the
23   CAP program, and there is this additional term which
24   they agreed to starting -- they agreed to it in
25   September, which was also covering the CAP program

Page 108

1    specifically, but there are a number of other terms

2    that I'm happy to get into the specifics on but that

3    encompass mentions of SaveOn, mentions of ESI and of

4    accumulator because, of course, many of the documents

5    reveal that ███████████████████████████████████████

6    ████████████████████████████████████████.

7              JUDGE WOLFSON:  And you haven't reached

8    agreement on these?

9              MS. LONG:  I want to be clear that we're

10   limited as to the new CAP custodians.  We have run

11   these search terms for the original time period and

12   through the refresh as to 17 other custodians.

13             JUDGE WOLFSON:  Why wouldn't you run

14   them for these?

15             MS. LONG:  Because, respectfully, their

16   request was cabined -- was about the CAP program.

17   Judge Waldor opened the door about CAP.

18             We're happy to take the terms back to

19   mid-2021 or to another date, and we can investigate

20   what that date was.

21             JUDGE WOLFSON:  Well, the reason I asked

22   that is, if these were the people that were somehow

23   involved with the CAP program, they may have been

24   involved in the discussions at an earlier date as

25   well and may be relevant custodians.

Page 109

1          So I'm going to direct that it happen,

2     that you run them for these additional custodians as

3     well.

4          I can't believe they just suddenly

5     appeared just for CAP and didn't have involvement

6     before.

7          MR. LoBIONDO:  They were certainly

8     relevant, your Honor.

9          The argument we made before Judge Waldor

10    and she agreed with was, as I understand it, was, we

11    have custodians that are covering these issues.

12    These people would be cumulative of what we already

13    produced.  And she decided they were not cumulative

14    as to CAP, which is why she thought that they should

15    be added not with respect to proportionality, only as

16    to CAP.

17         JUDGE WOLFSON:  It's four more.  I'm not

18    worried about it.  I'm doing it.

19         MR. LoBIONDO:  It's six more for five

20    years.

21         MS. LONG:  Are we talking about number

22    of custodians or the search terms as to the CAP

23    custodians?

24         JUDGE WOLFSON:  Those custodians that

25    we've agreed to, but running the additional search

Page 110

1    terms on them.

2              MS. LONG:  Back to 2016?

3              JUDGE WOLFSON:  Right, what the

4    attorneys agreed to, correct.

5              MR. SANDICK:  So all of the search terms

6    that we've used in the case, that is your Honor's

7    ruling?

8              JUDGE WOLFSON:  I don't know of all the

9    search terms, it's whatever is related --

10             MR. SANDICK:  Because that is the core

11   issue.

12             MR. LoBIONDO:  This is part of the

13   issue, frankly, that we've been having, which is

14   that, we brief up an issue, they get a ruling they

15   don't like.  They say, no, Judge Waldor actually

16   meant something else.  Judge Waldor said, no, this is

17   what I meant.  And now we're re-litigating it for a

18   third time until they've finally gotten a ruling that

19   is going to give them everything they asked for.

20             JUDGE WOLFSON:  I don't know about

21   everything.  All I heard was the terms that would be

22   relevant to them would be referring to SaveOn,

23   referring to ESI.  It's not the world.

24             What I'm trying to capture with them,

25   the only reason is, that I'm saying it, is these are

Page 111

1   CAP people.  The likelihood is that they were

2   involved somehow before this in looking at these

3   issues, and to the extent they were, they should

4   produce documents.  But I want to limit it then to

5   this world, not every search term.

6               MR. LoBIONDO:  Okay.

7               JUDGE WOLFSON:  So come up with the

8   search terms that relate to this and confer on it.

9               MS. SNOW:  Your Honor, we're happy to

10  make a narrow proposal of search terms.

11              JUDGE WOLFSON:  Okay, let's do it.

12              New custodians that were brought up in a

13  letter.

14              I guess you brought up Scott White,

15  Blasine Penkowski, Karen Lade, and Juliette Deshaies.

16              I think Plaintiff is saying that Judge

17  Waldor rejected proposal of these additional

18  custodians, that they were part of that motion to

19  compel 12, and she ordered only half basically,

20  right?

21              Okay.

22              And now what you're claiming is that

23  there are new documents that were not part of the

24  motion before Judge Waldor that show that these

25  proposed custodians have more knowledge than you

Page 112

1    previously knew and presented to her and that you

2    want them to be added, right?

3                    MS. SNOW:  Yes, your Honor.

4                    There are actually five remaining

5    custodians that were left undecided, and we have

6    renewed our motion as to all five, however, in the

7    event you determine that Judge Waldor did resolve as

8    to -- you know, we don't think the order states

9    that -- it doesn't name those custodians at all.  At

10   the conference she didn't issue a ruling as to those

11   custodians, and so we don't think she's decided

12   those.  But we have also put forth significant new

13   evidence as to White, Penkowski, Lade and Deshaies,

14   as we've mentioned.

15                    JUDGE WOLFSON:  Ms. Long.

16                    MS. LONG:  Yeah.

17                    I think your Honor said our position

18   fairly succinctly.  We believe Judge Waldor already

19   decided this.  I think that is fairly clear from the

20   text of her order.  This issue was part of 27 single

21   spaces of briefing and 146 exhibits that went before

22   Judge Waldor, and ultimately Judge Waldor split the

23   issue.  As your Honor said, there were 12 custodians

24   that were at issue in the motion.  She ordered us to

25   provide six of seven.  We later conferred on which

Page 113

1    six those would be and agreed and resolved as to

2    those.  And I just don't think there is anything

3    ambiguous about the order and what was resolved.

4              JUDGE WOLFSON:  Do you think that --

5    their position is we've identified, now based on new

6    documents I'm assuming that you could not have

7    presented to her at the time because you didn't have

8    them, that based on new documents this is a new and

9    different argument to be made?

10             MS. LONG:  No.

11             If I could take the custodians in turn.

12             First, as to Ernie Knewitz, there are no

13   new documents.  There are no new documents in

14   SaveOn's opening brief.  There are no new documents

15   on the reply brief.

16             As to the remaining custodians that are

17   at issue --

18             JUDGE WOLFSON:  Yeah.

19             Let's start with White and Penkowski.

20             MS. LONG:  Sure.

21             They're the same types of documents that

22   were at issue, for example, calender invitations

23   concerning JALT, et cetera.  And as was before Judge

24   Waldor, the issue with Mr. Knewitz and Mr. White and

25   Ms. Penkowski are all that they serve on what's

Page 114

1   called the JALT.

2           We have a senior executive who was on

3   the JALT.  Her name is Katie Mazuk.  She has already

4   been designated as a custodian in this case on all

5   relevant issues on all agreed upon search terms.  And

6   so any discovery that would be relevant, anything

7   that the JALT considered, will be produced from Ms.

8   Mazuk's files.  That is something that was before

9   Judge Waldor.  That is consistent with the documents

10  that are still before your Honor.  Ms. Mazuk is the

11  senior most executive with responsibility for making

12  decisions about the CarePath program.

13          As to Mr. White.  Mr. White is one of

14  the highest ranking executives in the Johnson &

15  Johnson family of companies and he has no

16  responsibilities day to day for CarePath.

17          Mr. White came up first in a motion that

18  SaveOn brought in June about our interrogatory

19  responses, that was also at issue at the October

20  conference, where we have consistently provided

21  representation to the other side that Mr. White does

22  not have responsibility for -- does not have day to

23  day responsibility for the CarePath program.  He has

24  no unique documents because, again, he is on the

25  JALT, which is the main piece of evidence that SaveOn

Page 115

1    cites.  So is Ms. Mazuk.  And all of the documents

2    that SaveOn has cited Ms. Mazuk is either on or is a

3    custodian of.  The calendar invitations include

4    Ms. Mazuk.  And so the only --

5                 JUDGE WOLFSON:  So let me ask you this

6    question:  The documents that they now provided say

7    that -- you know, forget the day to day

8    responsibility -- that White may have been involved

9    in the high level discussions about CarePath,

10   SaveOn's role and how it was impacting Plaintiff's

11   program, litigation.

12                Why do you think that White would not

13   have relevant documents?

14                MS. LONG:  ███████████████████████████

15   ██████████████████████████████████████████████████

16   █████████████  ███████████████████████████  ██████

17   ███████████████████████████████████████████████████

18   ████████████████████  █████████████████████████████

19   ███████████████████████████████████████████████████

20   ████████████████████.

21                And that is consistent with all of the

22   documents that we've cited, including decks and

23   other -- the evidence that is at issue before your

24   Honor today.

25                The other evidence comes down to being a

Page 116

1    counterparty on certain work orders with Trial Card,

2    and, again, I don't see how that is relevant here.

3              And I think the last category of new

4    documents, which, you know, SaveOn points to as kind

5    of a smoking gun by a third party is an ███████

6    ████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ██████████████████████████████████████████████

9    ██████████████████████████████████████████et

10   ████████████████████████████████████████████

11   ██████████████████████████████████.

12             First, we've now found the calendar

13   invitation -- what we believe is the calendar

14   invitation for this meeting.  It does not include any

15   of those individuals. ████████████████████████████

16   ████████████████████████.  And, also, as

17   your Honor just ordered, ██████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████████████

20   ██████████████████████.  John Hoffman is one of

21   the CAP custodians that you just ordered additional

22   search terms be run over.

23             So there is not a gap in our production

24   here.

25             I don't see in the document what SaveOn

Page 117

1    is claiming, but even if it was true, those files

2    would be produced already.

3            And I think when we're looking at

4    someone as senior was Mr. White and Ms. Penkowski,

5    and the same would apply for Mr. Knewitz, there is a

6    particular concern about Apex custodians.  And I

7    recognize that the Apex doctrine comes up more so in

8    the context of depositions, but if we're talking

9    about cumulative files from very senior people, I

10   don't think that SaveOn has met that showing.

11   ████████████████████████████████████████

12   ████████████████████████████████████  ██

13   ██████████████████  ██████████████████████

14   ████████████████████  There is no additional

15   benefit to these other custodians.

16           JUDGE WOLFSON:  Ms. Snow.

17           MS. SNOW:  Yes.

18           So, first of all, I just want to address

19   the point that ███████████████████████████

20   ███████████████████████████.  That's because

21   that's who they actually have produced documents

22   from.  That doesn't mean that that's the only place

23   there are relevant documents.

24   ████████████████████████████████████████

25   ████████████████

Page 118

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████ You would -- I have a copy if you'd

4 like.

5              JUDGE WOLFSON:  I have it here too.

6              MS. SNOW:  ██████████████████████,

7 ████████████████████████████████████

8              And I also want to make a point about

9 this document.

10             This is the only -- █████████████████

11 ████████████████████████████████████

12 ████████████████████████████████████

13             There is not a single document produced

14 before January 2022 that suggests this idea.

15             So what this document shows us is that

16 ████████████████████████████████████

17 ████████████████████████████████████

18 ████████████████████████████████████

19             For that reason alone I think he's

20 highly likely to have relevant documents.

21             And just addressing the Trial Card work

22 order.

23             I think we brought up Trial Card a few

24 times today.

25 ████████████████████████████████████

Page 119

1  ████████████████████████████████████

2  ████████████████████████████████████

3  Those are very key aspects of how you actually run a

4  program like this.  █████████████████████████ a

5  ████████████████████████████████

6  ███████████ ███████████████████████████

7  ███████████████

8  ██████████████████████████████████

9  ██████████████████████████████

10 ███████████████

11             That goes to the viability we have been

12 discussing.  It goes to the harm, because they're

13 having to -- you know, J&J alleges that they're

14 having to up the amount that they're reimbursing

15 patients.

16             JUDGE WOLFSON:  Yeah, so let me ask you

17 this question:  So Scott White is apparently the

18 company group chairman of North America

19 Pharmaceuticals, right?  So one of the highest

20 ranking executives.

21             ███████████████████████████

22 ██████████████████████████

23 ██████████████████████████

24             MS. SNOW:  ████████████████

25 ████████████████████████████

Page 120

1   ████████████████████████████████████

2   ████████████    So we see in numerous documents --

3                   JUDGE WOLFSON:  At the what level?

4                   MS. SNOW:  ████████  ████████  ██████

5   ████████████████████████████████████

6   ███

7               You know, they make a point about us

8   going after so many executives.  ████████████████

9   ████████████████████    ████████████████

10  ████████████████████████████████

11  ████████████████████████████████

12  ████████████████████████████████.

13  ████████████████████████████████

14  ████████████████████████████████████

15  ███████████████.

16              JUDGE WOLFSON:  What is it precisely

17  you're looking for Mr. White to produce?

18              MS. SNOW:  Well, I think we've been

19  missing many documents to show who actually -- like

20  the decisions being made.

21              You know, ████████████████████████

22  ████████████████  and we're not disputing that.

23  ████████████████████████████████████

24  ████████████████████████████████

25  ████████████  ████████████████████████

Page 121



1 ███████████████ ███████████████

2 █████████████████████████████████

3 ████████████████████████████████

4 █████████████████████████████

5 ██████████

6     ███████████████████████

7 ██████████████████████████████

8 ███████████████

9     MS. LONG:  May I respond?

10     JUDGE WOLFSON:  Yes.

11     MS. LONG:  ███████████

12     Let's start with just a brief look at

13 Exhibit 2.

14     ███████████████████

15 █████████████████████████████

16 ████████████████

17     ████████████████████████

18 ███████████████ ████████████████

19 █████████████████████████████

20 ██████████████████████████████

21 ████████████ ███████████████.

22     What Ms. Snow was talking about,███████

23 █████████████████████████████

24 ██████████████████████████

25 ███████████████████. ██████████

Page 122

1 ████████████████████████████████████████

2 ████████████████████████ ██████████████ ,

3 ████████████████████████████ ██████████████

4 ████████████████████████████████

5 ██████████████████████████████████████████

6 ██████████████████ .

7          JUDGE WOLFSON:  But how was that meeting

8 captured?

9          MS. LONG:  Sure.

10          So there are a couple of ways that the

11 meeting was captured.  There are, first, these

12 calendar invites.  Usually attaching a presentation.

13 The presentation has content, sometimes relevant to

14 the CAP program, for example.

15          Ms. Mazuk was on the calendar

16 invitation, was on the e-mail where those decks were

17 communicated.

18          JUDGE WOLFSON:  But what happens at the

19 meeting, and where is that document?

20          MS. LONG:  So what happened at the

21 meeting I believe is that the presentation -- the

22 deck is presented and there is a discussion.  I am

23 not aware of any minutes, for example, that come out

24 of that meeting, but if there was subsequent e-mail

25 discussion, it would presumably be as we've seen in

Page 123

1   the documents amongst █████████████████████

2   ████████████████

3        █████████████████████████

4   ████████████████████████████,

5   ████████████████████████████ for

6   ████████████ -- this was at issue with

7   respect to our interrogatories -- different areas of

8   the company that have absolutely nothing to do with

9   the CarePath program.

10            And just, again, to emphasis, as to

11   Mr. Knewitz, we have also stated, for example, that

12   he has nothing to do with CarePath.  He occasionally

13   made statements regarding the lawsuit, and that is

14   the limitation.  We have represented that in

15   interrogatory responses.

16            JUDGE WOLFSON:  Which one are you

17   referring to?

18            MS. LONG:  Mr. Knewitz.  It's

19   K-N-E-W-I-T-Z.

20            JUDGE WOLFSON:  Okay.

21            MS. LONG:  And then as to the remaining

22   folks, again, those decisions would be captured -- to

23   the extent that there are documents, which I think if

24   █████████████████████████████████

25   ██████████████████████

```
                                                      Page 124

 1   ██████████████████████, but certainly SaveOn is

 2   welcomed, as I'm sure they will, to depose Ms. Mazuk

 3   to learn about those discussions, but I don't have

 4   any evidence, nor do they, that those discussions

 5   were otherwise memorialized in e-mails that have

 6   somehow been withheld from our productions.

 7              If there are relevant communications, if

 8   there are relevant documents, decks, minutes, those

 9   would have already been produced to opposing counsel.

10              MS. SNOW:  I just have a few quick

11   responses.

12              First of all, to the last point, we need

13   documents before we're taking depositions.  And the

14   standard that is at issue is, have we shown that

15   these individuals are likely to have relevant

16   documents.

17              Going to the point that Ms. Long was

18   making, while it's not in the new evidence, there are

19   ██████████████████████████████████████████████████

20   ██████████████████████████████████████████████████

21   ████████████████████████████████████████

22              JUDGE WOLFSON:  Did you present that to

23   Judge Waldor?

24              I don't want to go over ground that she

25   already decided.  So I don't want to do that.
```

Page 125

1          I'm only looking at if they're new

2    documents and you have a new argument to make,

3    because she obviously considered this already.

4          MS. SNOW:  Your Honor, if we could just

5    look at the old documents in the context of the new

6    documents.  There is evidence that shows that these

7    ██████████████████████████████████████████████

8    ████████

9             ██████████████████████████████████

10   █████████

11          I█████████████████████████████████

12   ████████████████████████████████████████

13   ██████████████████████████. ██████

14   ████████████████████████████████ █

15   ███████████████████████████████████████████

16   ██████████ ████████████████████████,

17   ██████████████████████████████████now,

18   ████████████████████████████████

19   ████████

20         JUDGE WOLFSON:  I don't know if you want

21   to take these one by one or as a group, I mean, you

22   dealt with them kind of as a group overall, but I

23   have a couple of concerns here.  I certainly don't

24   want to go over ground that Judge Waldor actually

25   dealt with unless, as I said, there was something new

Page 126

1    and there was a reason to do so and to revisit it.

2    Respectfully, I don't think it would be otherwise

3    appropriate.

4              Now, I don't know how well this was

5    addressed or simply if it was, like, get these, this

6    is all you're getting.  You know, you get six

7    custodians, I'm not giving you more, or whatever it

8    might be.

9              MS. SNOW:  So, actually, in the

10   transcript she said, I'm going to order some to

11   start, and then we'll deal with the Apex custodians

12   later, so I think today is that later.

13             JUDGE WOLFSON:  Did she leave that

14   opening?

15             They're seeming to shake their head no

16   on the other side of the table.

17             MS. LONG:  The transcript, your Honor,

18   is long.  In that context, we disagree with what was

19   set forth by Ms. Snow.

20             JUDGE WOLFSON:  Is it the October

21   transcript?

22             MS. LONG:  Yes, it is the October

23   transcript.  We agree on that.

24             But, your Honor, specifically Judge

25   Waldor said, "Well, I thought CAP -- the 12 new

Page 127

1    custodians included CAP custodians, I'm going to open

2    the doors on CAP," and then later, "I'm going to

3    permit additional custodians.  I know we're down to

4    six."  Referencing the six custodians that ultimately

5    Judge Waldor ordered.

6                I think that is also consistent with,

7    frankly, the natural reading of the order that

8    followed the conference.  Here the order read, "With

9    regard to SaveOn's requested relief as set forth in

10   docket entry number 165, custodians' motion, the

11   Court will require" --

12               JUDGE WOLFSON:  I'm looking at the

13   transcript, I'm reading, so if you could wait a

14   moment, please, I'm reading the portion of the

15   transcript.

16               Well, this is what she says, she said,

17   "I said start with four.  Mr. Mangi will talk to them

18   about it.  And then we can discuss the two that

19   you're trying to protect with the Apex doctrine,

20   which is, according to adversary, inapplicable to

21   documents."

22               Mr. Mangi, "Yeah."

23               The Court, "I assume ultimately you're

24   going to want to depose them."

25               MS. ARROW:  Your Honor, what page are

Page 128

1    you on?

2              JUDGE WOLFSON:  119, 120.

3              Well, it doesn't look like she

4    definitively closed the door, that is true.  So I

5    don't think I should look at it that way.  It clearly

6    was a start.  So I don't want to rely on that.

7              So let's talk about the merits of the

8    issue.

9              Now, what are the limited search terms

10   with regard to White and Penkowski that you want to

11   use?

12             MS. SNOW:  We're happy to provide a

13   proposal on that.

14             JUDGE WOLFSON:  Very limited.

15             MS. SNOW:  Very limited, yes, your

16   Honor.

17             JUDGE WOLFSON:  Very limited.

18             Confer with your adversary.

19             MS. SNOW:  And for the time period --

20   the full time period that they've used for every

21   other custodian?

22             JUDGE WOLFSON:  That's fine, but, as I

23   said, these are going to be limited search terms.  I

24   do understand they are high level executives and may

25   be duplicative of what others have, but I also know

Page 129

```
 1   people sometimes write e-mails and do things that
 2   don't include everybody else when they want to talk
 3   to someone else in the company, and it happens, so
 4   there could be other documents, but, please, limit
 5   it.
 6           Now we've got -- in fact, I mean,
 7   ███████████████████████████████████████████████
 8   ████████.  Very relevant.  I've got quotes from her in
 9   e-mails.  I understand others may have gotten them,
10   but that is an important person.
11           Yeah, do your search terms and I'm going
12   to allow it.
13           MS. SNOW:  Thank you, your Honor.
14           JUDGE WOLFSON:  Then we've got Lade,
15   L-A-D-E.
16           MS. SNOW:  Yes.
17           So just to start about the so-called
18   brand employees.
19           There's new evidence -- if you look at
20   Exhibit 6, it includes the e-mail, actually, that
21   █████████████████████   ██████████████████████
22   ████████████████  -- I can give you a copy of the
23   exhibit.
24           JUDGE WOLFSON:  I have them here, it's
25   just finding where 6 starts.
```

Page 130

1          Thank you, Wayne.

2          Okay, I got it.

3          MS. SNOW:  If you look at the -- I

4    believe the very bottom of that first page, it says,

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████

7    ██████████████████████████████████████████████████

8    ████████████████████████████████████

9          So Ms. Lade is a brand employee, and I

10   think -- you know, turning to just looking at the new

11   evidence, in May of 2017 -- if you look at Exhibit

12   11.

13         I'm happy to also give you a copy.

14         JUDGE WOLFSON:  Now, these documents

15   were produced to you because they came through other

16   custodians?

17         MS. SNOW:  Yes.

18         But if you look at Exhibit 11, there's

19   an e-mail -- I'll give you a minute.

20         JUDGE WOLFSON:  Okay, I'm up to 11.

21         Go ahead.

22         MS. SNOW:  So if you look at the second

23   page of that exhibit, there's an e-mail that Ms. Lade

24   sent and there is not a single current custodian on

25   that e-mail, and it's all about --

Page 131

```
 1                JUDGE WOLFSON:  So how did you get it?
 2                MS. SNOW:  Because later in the thread
 3     it was forwarded to a custodian.
 4                JUDGE WOLFSON:  Okay.
 5                I see you shaking your heads on this
 6     side, but that's happenstance, that it ended up being
 7     forwarded to someone.  She authored an e-mail, and if
 8     it's relevant -- and she's authoring a lot of
 9     documents.  I don't know why she would not be a
10     custodian to search if it's relevant material.
11                MS. LONG:  Your Honor, one, there is no
12     mention of SaveOn in this document; and two, I want
13     to be ███████████████████████████████████████████
14     ██████████████████████  ██████████████████████████████
15     ████████████████████████████████████████████████
16     ██████████████████████  ███████████████████████████
17     ██████████████████████████████████████████
18                JUDGE WOLFSON:  Yes, but you take the
19     position that they are.  Yes, you do.  So the fact
20     that they don't isn't really the issue because you
21     are going to be arguing they are.
22                Look, you know what, I have enough on
23     this.  This is someone who you should be getting
24     documents from.  I'm adding it.
25                You know, everybody wants to slice this
```

Page 132

1  so finely.  It's a huge case.  There is a lot of

2  discovery on both sides.  Let's just do it instead of

3  fighting over it.  It will take you less time to

4  produce and move on than to fight.

5           MS. SNOW:  And, your Honor, to be clear

6  on those, for the regular set of search terms and the

7  full regular time period?

8           JUDGE WOLFSON:  Regular time period, but

9  I don't know about all the search terms.  You have to

10 hone something that is appropriate for her, it cannot

11 be a universe.  I have to have some limitations.

12           So work on those search terms with your

13 adversary please.

14           Okay?

15           MS. SNOW:  And turning to Ms. Deshaies.

16           JUDGE WOLFSON:  Yes.

17           MS. SNOW:  So her primary -- or her

18 relevance in the new additional document is she was

19 working with a really important third party.  The

20 third party is named Archbow.  It's all one word,

21 A-R-C-H-B-O-W.  That third party was working on the

22 ████████████████████████████████████████

23 ██████████████  █████████████████████████████

24 ████████████████████████████████████

25 ██████████████████████████████████



Page 133

18    JUDGE WOLFSON:  Why is that critical?

19    MS. SNOW:  It's critical to our

20  mitigation defense.

21         They have these ways that they're trying

22  to use to limit their damages.

23    JUDGE WOLFSON:  Aren't there others

24  involved in this issue that are already custodians?

25    MS. SNOW:  There are others involved in

Page 134

1    the CAP program. ████████████████████████

2    ███████████████████    █████████████

3    ████████████████████████████████████████

4    ██████████████████████████████

5              JUDGE WOLFSON:  I never understood

6    Erleada to be the driving drug in this whole case.

7              I'm not buying this one.  I have to have

8    some limits.  So I'm not ordering that to be done.

9              Does that take care of all our new

10   custodians?

11             Go ahead.

12             MS. LONG:  I think Mr. Knewitz is still

13   at issue, your Honor.  That was the custodian without

14   any new evidence that we had discussed earlier.  I

15   believe you███████████████████████████████

16   ████████████████████████.

17             Mr. Knewitz is essentially a PR

18   professional.  ████████████████████

19   █████████████    ██████████████████

20             JUDGE WOLFSON:  I'm not adding him.

21             You have the ones we've added, Lade,

22   Penkowski and White, but you're going to confer on

23   search terms, please.

24             MS. SNOW:  Yes.

25             Thank you.

Page 135

1          JUDGE WOLFSON:  Anything else open?

2          MR. SANDICK:  No.

3          Thank you, your Honor.  We really

4     appreciate the evident time you spend reading all of

5     this paper and helping us resolve the issues.

6          Thank you very much.

7          JUDGE WOLFSON:  No problem.

8          MR. DUNLAP:  We greatly appreciate your

9     attention to this.

10          (Proceedings concluded at 1 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1              C E R T I F I C A T E

2

3          I, RUTHANNE UNGERLEIDER, a Certified Court

4    Reporter and Notary Public of the State of New

5    Jersey, certify that the foregoing is a true and

6    accurate transcript of the stenographic notes of the

7    deposition of said witness who was first duly sworn

8    by me, on the date and place hereinbefore set forth.

9          I FURTHER CERTIFY that I am neither

10   attorney, nor counsel for, nor related to or

11   employed by, any of the parties to the action in

12   which this deposition was taken, and further that I

13   am not a relative or employee of any attorney or

14   counsel in this case, nor am I financially

15   interested in this case.

16

17

18

19

20

          RUTHANNE UNGERLEIDER, C.C.R., C.R.R.

21        LICENSE NO. XIO1634, XIO0115

22

23

24

25

[& - accusations]                                                    Page 1

| & |
|---|
| **&** 1:4 2:4,8,12 2:19 36:20 60:12,21,23 69:25 71:3 72:15 74:3 75:6 76:8 79:22 80:2 89:18 96:21 98:21,25 99:3 102:22 103:12 114:14 |

| 0 |
|---|
| **07102** 2:10 |

| 1 |
|---|
| **1** 4:25 8:13 135:10 |
| **10017** 2:20 |
| **10036** 2:5 |
| **101** 2:12 |
| **10104** 2:16 |
| **10178** 2:13 |
| **10:00** 1:19 |
| **11** 130:12,18,20 |
| **1133** 2:4 |
| **114** 67:21 |
| **11883** 136:20 |
| **119** 128:2 |
| **12** 101:13 111:19 112:23 126:25 |
| **120** 128:2 |
| **1200** 4:22 |

**1290** 2:15
**14** 88:11
**146** 112:21
**15** 13:3
**150,000** 40:23
**16** 52:17
**165** 127:10
**17** 108:12
**180,000** 40:22
**188,000** 40:13

| 2 |
|---|
| **2** 119:5 121:13 |
| **20** 16:14 25:20 120:9 |
| **20,000** 121:3 |
| **200** 119:7 125:12,18 |
| **2009** 5:22 8:13 59:9 |
| **2013** 10:12 12:8 14:24 |
| **2016** 4:25 5:18 9:21,22 10:1 19:21 25:9 34:14 38:24 103:4 104:9 106:4,16 110:2 |
| **2017** 130:11 |
| **2020** 107:4 |
| **2021** 106:3,9,20 108:19 |
| **2022** 4:25 19:21 24:16,23 26:18 27:8,13 27:22 28:2 |

30:22 34:14 38:24 42:1 43:23 56:1 57:8 103:2,14 103:22 104:9 104:22 105:21 105:24 106:1 106:11,16 118:14
**2023** 5:3,18 24:24
**2024** 1:19
**20th** 2:19
**22-2632** 1:3
**24** 1:18
**27** 112:20
**28** 67:11
**28th** 2:12
**29** 67:11

| 3 |
|---|
| **30** 67:11 104:7 |
| **349** 69:2 87:17 87:21 |

| 6 |
|---|
| **6** 129:20,25 |
| **6,000** 121:3 |
| **666** 2:19 |

| 7 |
|---|
| **7** 24:24 43:17 101:14 104:3 |

| 8 |
|---|
| **80** 93:19 94:16 94:18,21 |

| a |
|---|
| **aba** 23:9 |
| **able** 20:21 72:16 77:12 78:6,16 89:22 89:24 96:13 98:22 99:15 132:25 |
| **above** 1:13 |
| **absence** 73:9 |
| **absent** 74:10 87:25 |
| **absolutely** 36:13 72:5 79:8 123:8 |
| **absorb** 73:11 |
| **accessibility** 12:25 |
| **accredo** 90:22 90:22 |
| **accumulator** 9:19 10:18 26:12 29:2 30:12,21 108:4 108:5 129:7 130:7 131:13 131:15 |
| **accumulators** 57:23 106:21 107:4 132:22 |
| **accurate** 84:23 136:6 |
| **accusations** 98:11 |

| | | | |
|---|---|---|---|
| **act** 65:22,25 66:2,7 | **adding** 99:14 102:24 131:24 134:20 | **adjustment** 26:16 106:23 130:7 131:14 131:16 | **age** 20:12,22 |
| **acting** 44:12 81:15 | | | **aggressively** 39:16,21 |
| **action** 1:3 84:1 136:11 | **additional** 5:14 5:19 6:9 23:1 34:21 44:7 | **administering** 75:16 | **ago** 3:4 10:13 23:16 31:6 37:5,17 90:5 94:3 |
| **actions** 78:14 | 52:7 70:25 71:1 77:10,14 | **administers** 77:2 118:25 | |
| **acts** 65:20 66:8 | 78:16,18 82:14 | **administrative** 60:24 68:24 | **agree** 10:15 11:4,4 13:13 14:23 18:9 35:10 41:17 43:21 97:14,16 126:23 |
| **actual** 19:18 54:6 59:3 89:11 120:1 121:20 | 84:8,9 86:23 87:3 107:5,21 107:23 109:2 109:25 111:17 | **admission** 29:13 | |
| | | **advanced** 73:2 | |
| | 116:21 117:14 127:3 132:18 | **advantage** 52:7 | **agreed** 4:25 6:4 21:11 55:24 59:4 104:7 107:7,24,24 109:10,25 110:4 113:1 114:5 |
| **actually** 17:9 18:2 20:15,17 21:3 22:20 31:16 39:18 47:2 60:10 61:8,10 75:5 76:23 78:11 83:25 84:13 89:6,16 90:10 92:1 96:11 99:11 102:3 103:13 107:8 110:15 112:4 117:21 118:25 119:3,5 120:19 125:24 126:9 129:20 | **additionally** 103:17 | **adversaries** 11:17 | |
| | **address** 3:5 26:5,8 27:25 51:6,14 55:16 55:17 67:5 89:2 103:20 117:18 | **adversary** 127:20 128:18 132:13 | |
| | | **advice** 45:21,21 47:21,22 50:23 | **agreement** 101:17 108:8 |
| | | **advised** 24:18 56:14 | **agreements** 38:18 |
| | **addressed** 21:20 34:18 126:5 | **advisor** 47:17 | **agrees** 4:2 66:17 102:21 |
| | | **affected** 91:5 | |
| | | **affiliate** 74:24 | **ahead** 32:2 34:5 41:18 81:14 89:4 130:21 134:11 |
| | **addressing** 55:15 118:21 | **affirmative** 18:1 | |
| | **adequately** 67:5 | **affirmatively** 100:5 | |
| **add** 6:8,11,18 | **adhere** 80:4 | **afford** 73:11 78:12,21 | **allegation** 70:15 92:1 94:13,16,18,21 98:15 |
| **added** 42:17 44:6,18 45:10 109:15 112:2 134:21 | **adherence** 80:14,18,22 81:3,5 98:5,6 | **afield** 83:12 | |
| | | **afoul** 20:18 | |

[allegations - asked]                                                    Page 3

| | | | |
|---|---|---|---|
| **allegations** 67:18,19,21 78:22 90:3 97:24 | 125:18 **amounts** 61:13 63:16 | **appears** 19:5 20:2 121:15,15 | **argued** 42:5 |
| **allege** 60:3 62:3 66:9,10,23 89:5 98:13 | **analyses** 81:21 **analysis** 79:22 80:3 81:17 | **apples** 40:20,20 **application** 28:24 **applied** 21:4 | **argues** 5:23 **arguing** 131:21 **argument** 17:13 20:13 |
| **alleged** 64:4 65:6 66:8 | 82:18,21 84:20 85:15,18 87:1 87:2 | 28:25 **applies** 36:5 51:19 | 24:4 35:15 37:23 38:5 39:19 42:7,13 |
| **allegedly** 65:14 116:19 | **analyze** 77:4 **analyzed** 62:2 | **apply** 36:6 117:5 | 54:5 64:11 66:16 72:14 73:5 75:1 |
| **alleges** 119:13 **alleging** 18:17 60:2 68:13 79:17 94:7 95:16 | **andrew** 2:16 14:22 **answer** 7:8 11:2,9 15:9 29:12 62:10 | **appreciate** 33:8 35:15 37:23 38:1 79:4 135:4,8 **appropriate** | 78:20 84:12 87:24 92:25 93:11,15 101:10 109:9 113:9 125:2 131:16 |
| **allow** 129:12 133:1 | 85:25 88:19 105:12 | 12:13 26:1 45:3 126:3 130:8 132:10 | **arguments** 6:1 28:6 38:1 |
| **allowed** 13:14 67:19 83:19 98:1 103:15 | **answered** 63:5 **answers** 13:18 82:9 92:15 | **approximately** 1:19 4:22 24:22 | 62:17 75:17 96:9 **arrange** 76:25 |
| **allows** 98:25 **amazing** 71:18 71:19 | **anticipation** 50:5 **anyone's** 123:25 | **april** 4:25 **archbow** 49:4 49:12 116:5,10 | **arrow** 2:7 127:25 **aside** 95:14 96:19 |
| **ambiguous** 36:8 113:3 | **anyway** 57:22 61:9 75:24 | 132:20 **area** 23:8 55:3 63:24 122:6 | **asked** 6:7 7:3 8:9,12 37:21 |
| **america** 119:18 **american** 123:6 **americans** 81:2 **americas** 2:4 2:15 120:5 | **apex** 117:6,7 126:11 127:19 **apologies** 116:8 **apparently** 49:18 119:17 | **areas** 23:9 31:22 41:19 64:1 123:7 **argue** 13:12 16:18 20:5 | 40:17 41:2 42:8 44:8 55:25 56:16 81:8 85:14,22 90:11 92:5 |
| **amount** 74:10 76:10,11 77:17 119:14,22 121:2,4,23 | **appear** 39:10 **appeared** 109:5 | 91:5 92:18 93:13 96:5 | 102:19 108:21 110:19 |

**asking** 7:20,22 21:12 22:6 29:19 35:5 44:10 55:1 56:13 59:8 61:18 81:16 82:16 86:3 88:7,9 93:6
**asks** 29:11 56:5
**aspect** 15:22 69:9
**aspects** 119:3 134:3
**assert** 13:15
**asserting** 4:1
**assertion** 46:14 47:23
**assistance** 19:12 59:1 63:4,16 67:25 70:17 71:25 95:23 121:2,4
**assistant** 121:16 125:14
**associate** 101:9
**association** 102:25
**assume** 14:9,17 125:11,15,16 127:23
**assuming** 44:9 44:14 79:4 113:6
**attaching** 122:12

**attention** 13:5 135:9
**attorney** 44:12 48:4,5,6,6 136:10,13
**attorneys** 2:7 2:11,14,18,21 42:17 44:4,11 45:13,14 54:9 110:4
**august** 21:10 43:20 103:4
**authored** 131:7
**authoring** 131:8
**authority** 121:18,20 125:12
**availability** 5:13 11:10
**available** 89:9 91:16 121:2
**avenue** 2:4,12 2:15,19
**avoid** 104:10
**aw** 85:5
**aware** 122:23
**awareness** 55:12

**b**

**b** 2:1 132:21
**baby** 77:18
**back** 5:22 9:20 11:5 12:4,24 13:3 22:16

23:15 27:15,18 29:14 35:13 37:1,24 38:10 39:6,19,20 40:12 41:9,16 42:22 47:5 50:16 51:3 59:9 87:13 88:15 89:18 96:13 100:9 101:24 102:9 104:11,15 105:10 106:15 107:2 108:18 110:2 125:9
**backup** 89:15
**backwards** 38:9
**badly** 69:5
**bag** 68:22
**base** 89:13
**based** 5:14 17:17 41:12 52:1 54:5 82:10 100:25 105:8 113:5,8
**basically** 71:14 111:19
**basing** 98:16
**basis** 57:14 59:14 67:17
**bear** 5:8 58:18
**bearing** 83:19 83:24

**beat** 29:14
**began** 8:18,19 24:16 27:12
**beginning** 24:23 27:13 74:20
**behalf** 70:21 71:2 78:10
**belabor** 67:15
**belief** 66:18
**believe** 8:24 11:5 13:1 16:19 18:2 21:3 25:21 27:23 31:5,6 31:12 33:12 34:17 36:17,21 36:24 51:18 56:18 57:6,8 57:12 65:11,18 67:10 70:24 75:24 76:17 91:25 103:11 106:25 107:20 109:4 112:18 116:13,18 122:21 130:4 134:15
**belknap** 2:4
**benefit** 23:6 25:15 48:18 59:24 71:17 74:1 82:21 99:12 117:15

[benefits - cap]                                                    Page 5

| | | | c |
|---|---|---|---|

**benefits** 21:14
23:14 24:8,13
24:17,21 25:8
26:3 28:21,22
29:4 30:10
32:4 56:5,11
56:21 81:1
98:6 104:20
**benevolent**
65:4
**best** 26:20
**better** 33:14
41:5,14 64:13
**beyond** 22:11
22:19 31:8
56:23 87:22
**big** 13:11,12
36:2,2 75:21
**bigger** 94:5
**binding** 29:12
119:6
**bit** 71:11
**blasine** 111:15
116:8
**blow** 23:2
**blowback**
133:12
**borne** 99:9
**bottom** 8:10
64:9,10 130:4
**bought** 71:1
**brand** 129:18
130:6,9
**breach** 62:8
74:6 83:7

**breached** 66:6
**breaches** 65:15
**break** 4:13
69:19 99:20,25
**brief** 4:12
99:23 110:14
113:14,15
121:12
**briefed** 55:14
101:8
**briefing** 19:4
112:21
**briefly** 7:19
48:23 89:3
**bring** 13:4
20:14 35:11
43:6 60:1
120:21
**bringing** 66:3
**broad** 8:4
10:23 22:19
28:14 35:10
63:25 67:11
79:15
**broaden** 63:12
**broader** 16:20
**broadly** 69:17
75:1 76:8
**brought** 20:25
111:12,14
114:18 118:23
**budget** 59:2,12
59:15,20 60:20
61:1,2,7,7 64:7
70:1

**budgeting**
61:14
**budgets** 59:3
59:10 61:16,16
62:25
**bunch** 88:10
95:22
**burden** 12:6,25
13:10,12,14
15:11,22,23,25
23:4 31:15
32:11 35:4,7
48:3 50:10
54:5 59:24
73:15,25
**burdenness**
13:9
**burdensome**
12:7,9 40:15
**business** 42:25
44:5,13,20,21
44:22 45:1,5
45:23 46:22
47:15,16,18,19
48:7,12,20
50:17,20,21,24
51:2 52:5,9,17
60:16,17 68:25
76:25 82:25
83:14 85:11,20
90:21,24 98:3
**buy** 60:12 78:9
**buying** 12:9
75:18 99:8
134:7

**c** 2:3 132:21
136:1,1
**c.c.r.** 136:20
**c.r.r.** 136:20
**cabined** 28:13
38:15 105:3
108:16
**calendar** 115:3
116:12,13
122:12,15
**calender**
113:22
**call** 17:6 24:8
64:5 84:2 89:8
**called** 21:13
26:14 29:1
49:4 114:1
129:17 133:7
**camara** 42:16
54:10
**camera** 43:3
**camouflage**
27:5
**cap** 7:14 26:14
26:16 43:10,14
101:19,22
103:1,5,13
104:8,13,19
106:9,18,19
107:7,14,23,25
108:10,16,17
108:23 109:5
109:14,16,22
111:1 116:21

120:24 121:23
122:14 126:25
127:1,2 132:22
133:7,10,12,14
133:16 134:1,2
**capacity** 44:22
**capture** 37:3
38:16 40:4
44:2 47:11
107:8 110:24
124:1
**captured**
107:15 122:8
122:11 123:22
**capturing**
46:23,24
**car** 83:2,3
84:15,16,17
**card** 21:13 22:2
25:15 36:16,18
46:20,24 47:1
47:4,5,6 49:3
49:12 51:8
56:10 116:1
118:21,23,25
119:6 125:19
**care** 1:4 134:9
**careful** 131:13
**carepath** 3:18
10:1,8,18 42:4
50:16 60:5,8
60:10 61:1,14
62:8 64:4
66:19 67:25
69:11,13,20,23

69:25 70:9,16
70:23,25 71:25
72:15 73:2,8
73:10 74:24
75:3 76:3,22
76:23 77:2,9
77:15 78:17,18
79:5,10,13,23
80:3,5 81:23
82:2,4,13,20,21
82:24 83:10,17
84:1,3,10
87:23 89:23
92:12 93:2,16
94:5 95:23
98:24,24 99:15
114:12,16,23
115:9,18,19
119:1,10 121:7
121:21 123:9
123:12 132:25
133:13 134:4
**carepath's** 6:22
118:12,18
120:14
**cars** 83:5
**case** 3:6 8:1
12:14 13:11,12
18:2,11 22:21
25:9 28:23
29:8 30:13
35:24 36:2
45:1 48:9 52:6
59:24 60:14
64:17 68:14

69:2 73:7,7
74:20,21 75:15
75:20 76:5,7,7
80:13 82:25
83:11,20 85:7
85:12 87:14
88:8 90:7 91:1
92:12,25 95:6
95:8 96:7,9,13
97:6,6,17
110:6 114:4
116:16 132:1
134:6 136:14
136:15
**cases** 45:6
**categories**
33:16 40:1,12
41:12
**category** 3:25
27:13 46:3
116:3
**caught** 56:1
**cause** 65:25
66:3 95:16
96:2
**caused** 58:19
60:2 84:9,9
94:7
**causes** 67:22
70:16 78:14
**causing** 74:8
**center** 2:9
**central** 95:6
**certain** 20:12
33:23 40:14

59:18 116:1
117:13 118:2
119:22
**certainly** 4:16
25:24 64:12
66:25 88:15
106:4,7 109:7
118:1 124:1
125:23
**certified** 1:15
136:3
**certify** 136:5,9
**cetera** 4:20
10:25 19:6
20:12,23 76:20
101:14 113:23
**chairman**
119:18
**challenged**
69:12
**chambers**
102:4
**change** 104:20
120:25 121:1,4
**changed** 93:17
**changes** 14:25
43:13 90:18
121:22,23
133:13
**charge** 91:1,3
**charitable** 61:3
82:24
**children** 18:14
**circumstantial**
21:2

[cite - concede]                                                    Page 7

| | | | |
|---|---|---|---|
| **cite** 89:7 | **closely** 130:7 | **communicated** | 123:8 129:3 |
| **cited** 65:12 | **coherent** 13:2 | 102:4,6 122:17 | **company's** |
| 115:2,22 | **cole** 2:19 | **communication** | 29:20 87:20 |
| **cites** 93:23 | **collecting** | 44:25 47:10,25 | 95:11 |
| 115:1 | 46:16 | 51:17,25 61:19 | **compare** 87:1 |
| **citing** 133:5 | **collects** 90:23 | 72:7 | **comparison** |
| **civil** 1:3 | **colon** 68:22 | **communicati...** | 31:10 40:20 |
| **claim** 36:3 60:1 | **colostomy** | 45:5,23 46:20 | **compel** 111:19 |
| 65:17 67:13 | 68:22 | 46:21 47:12,15 | **competitors** |
| 84:18 87:17 | **come** 10:19 | 49:2,10,25 | 60:13 71:13 |
| **claiming** | 12:24 16:1 | 50:12 51:14,23 | 78:9 90:1 |
| 111:22 117:1 | 33:14 39:22 | 52:3 53:7,10 | **complaining** |
| **claims** 62:5 | 40:2 41:5 | 53:16 54:14,24 | 17:7 |
| **clarify** 34:11 | 44:23 60:20 | 59:10,12,22 | **complaint** |
| 65:16 68:12 | 68:17 69:13 | 62:22,25 63:19 | 18:20 60:6 |
| 104:1 121:19 | 88:15 95:21,22 | 64:6,12,14 | 66:11 67:17,22 |
| **clarifying** 34:4 | 96:13 111:7 | 70:2 80:6 | 78:23 83:12 |
| **clause** 19:9 | 117:20 122:5 | 115:15 116:11 | 89:6 93:20 |
| 20:2 34:25 | 122:23 | 124:7 134:19 | 97:1,3,3 |
| 36:10 | **comes** 35:4 | **companies** 13:2 | **complete** 45:8 |
| **clear** 18:4 | 38:14 78:2 | 13:12 71:9 | **completely** |
| 96:16 97:18 | 115:25 117:7 | 75:7 77:6 | 30:13 |
| 107:2 108:9 | 133:3 | 87:16 88:3 | **complicated** |
| 112:19 132:5 | **commencing** | 95:9 97:25 | 73:21 |
| **clearly** 128:5 | 1:19 | 98:7,8 114:15 | **complied** 41:1 |
| **clerk** 102:8 | **commercial** | **company** 9:23 | **components** |
| **client** 14:25 | 17:10 71:14 | 21:13 45:20 | 63:20 |
| 72:17 | **commit** 98:23 | 46:6 48:21 | **comprised** |
| **client's** 9:9 | **commitment** | 50:2,3,17 | 130:5 |
| **clients** 70:22 | 98:18 | 63:20,21 73:13 | **compromise** |
| 71:3 | **common** 48:5 | 73:18,22 74:3 | 104:5,6 105:19 |
| **close** 42:25 | **commonly** 95:8 | 75:21 76:1 | **computer** |
| 97:10 | **communicate** | 79:11 80:8,9 | 48:14 |
| **closed** 128:4 | 53:20 | 81:2,18 90:17 | **concede** 121:17 |
| | | 119:18 121:7 | |

conceded 35:18
conceivable
18:10
conceptualize
123:3
concern 14:12
27:25 32:8
49:9 117:6
concerned
133:11
concerning
113:23
concerns
125:23
concessions
21:19
concluded 98:5
135:10
conclusion 28:2
condition 7:25
21:23
conditions 3:13
3:19,22 4:24
5:12,15,25
7:22,24 9:22
16:22 17:3,12
18:9 19:19
20:3,22 21:6
23:4 26:11,25
29:21 36:23
37:25 38:10
42:2,6,10 43:9
43:14 54:20,25
57:11 58:5
62:8 74:6 83:7

118:12,18
120:15 121:1
conduct 6:7
93:18
conducted
24:22 47:19
56:11
conducting
24:17
confer 3:10
14:5,10,18
15:12,19 31:2
32:16,19 39:4
41:10,15 54:17
100:25 103:11
104:3,12,25
111:8 128:18
134:22
conference 3:4
24:15 43:11
100:13 104:7
112:10 114:20
127:8
conferences 3:6
conferred
16:12 58:12
112:25
conferring
34:22 37:2
confers 104:16
congressional
71:8 77:5
connection 3:2
6:3

connects 58:6
consequences
77:23 78:13
98:25
consider
104:12,17
considered
106:21 114:7
125:3
considering
102:20 104:4
120:13
consistent 9:8
15:4 104:25
114:9 115:21
127:6
consistently
93:22 114:20
117:11 131:14
conspiracy
79:16,18
constantly 31:1
construction
36:9
consultant 49:4
consultants
49:13
consumer 23:9
23:10 65:22
69:3,4
consumers 62:4
69:4
contact 68:17
contemplated
20:15

content 122:13
contention 7:4
context 4:5
9:18 19:13
20:4 29:1 35:6
36:22 48:5
52:16 117:8
125:5 126:18
continue 5:2
34:22 37:1
98:21
continues
89:19,19
contract 18:17
50:15,22 65:15
66:6 125:13
contractual
18:23 20:4
contradicts
37:16
conveying
45:20
convince 13:7
convinced 26:2
convincing
100:24
copied 47:20,25
52:4 53:21
copies 56:11
copy 15:17
50:18 118:3
129:22 130:13
core 110:10
corner 73:22
82:17 85:10

[corners - damage]                                           Page 9

**corners** 81:18
**corporate**
  75:14
**correct** 16:9
  26:8 54:10
  110:4
**correctly** 19:7
**corresponden...**
  7:11 57:13
  81:9 102:9
  104:24
**cost** 48:17 89:6
  89:10 99:9
  106:22 133:1
**costs** 70:18,19
  80:10,11 99:4
**counsel** 2:23
  15:17 25:16
  103:12 121:19
  124:9 125:14
  136:10,14
**count** 22:4
**counter** 119:5
**counteroffer**
  25:21
**counterpart**
  50:17
**counterparty**
  116:1
**counting** 17:8
**country** 68:17
**couple** 3:8 9:4
  19:1 23:16
  28:20 49:1
  73:19 88:1

101:12 122:10
125:23
**coupon** 4:1
  18:2 19:6,10
  22:2,13 25:15
  32:10 34:16,25
  35:23 36:16,17
  36:20 37:7
**coupons** 10:25
  17:21 23:21
  39:17
**course** 15:17
  21:2 43:6
  49:25 59:3
  77:3 84:11
  91:14 92:2
  108:4
**court** 1:1,15
  5:1 32:22 36:7
  66:17,20 67:16
  69:3 80:20
  99:21 127:11
  127:23 136:3
**court's** 52:18
  65:12
**cover** 7:10 8:4
  29:7
**covered** 8:6
  20:16
**covering**
  107:25 109:11
**create** 33:15
  35:8 40:3
  68:25 81:16

**created** 9:21
  64:25 79:6
**creates** 59:24
**creating** 10:23
  45:16
**criteria** 20:20
  25:14 28:4,12
  31:8,16 34:12
  39:11
**critical** 12:21
  72:5,8 85:6
  133:18,19
**critiquing**
  42:20
**crucial** 14:24
  133:15
**crux** 12:14 31:5
**cry** 75:21
**cumbersome**
  12:4
**cummis** 2:8,12
**cumulative**
  109:12,13
  117:9
**curious** 74:18
**current** 9:25
  130:24
**custodial** 47:2
**custodian** 6:4
  46:2,6 102:18
  105:13 114:4
  115:3 116:16
  128:21 130:24
  131:3,10
  134:13

**custodian's**
  6:17
**custodians** 3:14
  6:11 33:22
  40:22 42:15
  44:4,18,25
  45:10 51:1
  52:6,17 53:21
  54:4 55:20
  61:23 101:8,14
  101:15 102:25
  103:3,5 104:13
  107:1 108:10
  108:12,25
  109:2,11,22,23
  109:24 111:12
  111:18,25
  112:5,9,11,23
  113:11,16
  116:21 117:6
  117:15 126:7
  126:11 127:1,1
  127:3,4,10
  130:16 133:24
  134:10
**customer** 130:6
**customers**
  85:17
**cutoff** 24:24
**cuts** 16:14

**d**

**d** 129:15 133:8
**damage** 67:22
  76:12 84:8

[damaged - develops]

Page 10

| | | | |
|---|---|---|---|
| **damaged** 83:25 | **dealing** 3:18 | **decreased** | **depositions** |
| **damages** 63:22 | 5:4 76:15 | 93:22 | 117:8 124:13 |
| 70:12,14,20 | **dealt** 125:22,25 | **decreasing** | **deprived** 68:19 |
| 71:23 72:2,9 | **deceived** 66:18 | 100:5 | 68:23 |
| 79:25 93:9,16 | **deception** | **deductibles** | **described** |
| 96:2,5,7 97:7 | 66:15 98:9 | 10:5 | 10:25 |
| 99:14,18 | **deceptions** 62:4 | **defendant** 1:9 | **describing** |
| 133:22 | **deceptive** 65:23 | 2:18,21 6:6 | 52:15 |
| **darn** 15:23 | 66:7,8 | 42:4 66:18 | **description** |
| **darzalex** 79:12 | **decide** 44:11 | 102:17 | 58:23 |
| **data** 59:2,20 | 133:9 | **defendant's** | **deshaies** |
| 63:1,14 72:6 | **decided** 20:14 | 66:16,20 | 111:15 112:13 |
| 76:20 79:23 | 39:14 57:20,21 | **defendants** 9:7 | 132:15 133:3 |
| 80:25 88:24 | 75:10 76:25 | **defense** 15:17 | **designated** |
| 89:11 90:12,15 | 77:15 109:13 | 133:20 | 114:4 |
| 96:10 98:4,15 | 112:11,19 | **defenses** 28:7 | **designed** 6:9 |
| **date** 24:24 27:9 | 124:25 | 72:9 | 37:3 60:11 |
| 27:14 105:22 | **decides** 70:1 | **deficient** 42:14 | 99:12 |
| 108:19,20,24 | **decision** 18:19 | **define** 33:22 | **despite** 72:16 |
| 118:6 136:8 | 42:9 119:21,25 | 35:16 64:2 | **detailed** 7:5 |
| **dates** 27:18 | 120:1 134:2 | **defined** 41:19 | **determination** |
| 63:15 105:20 | **decisions** 63:7 | 54:14 74:22 | 64:23 65:3 |
| **day** 25:4 42:25 | 63:9 75:13 | **definition** | 119:8 |
| 72:20 103:25 | 114:12 115:18 | 23:17 | **determine** |
| 114:16,16,22 | 120:12,20 | **definitively** | 11:17,17 24:18 |
| 114:23 115:7,7 | 121:6,20,25 | 128:4 | 36:14 112:7 |
| 120:21,22 | 123:22 | **delta** 76:11 | **determined** |
| **days** 40:2 | **deck** 122:22 | **demonstrates** | 63:4 |
| **de** 42:16 53:23 | **decks** 115:22 | 103:18 | **determining** |
| 54:10 | 122:2,16 124:8 | **depending** | 19:12 46:3 |
| **deal** 3:16 10:14 | **declined** 25:1 | 46:13 88:15 | 61:23 133:6 |
| 105:17 126:11 | 93:25 104:18 | **depose** 117:14 | **development** |
| **dealership** 83:2 | **declining** 56:3 | 124:2 127:24 | 82:6 |
| 83:4 84:15,17 | 56:18 | **deposition** | **develops** 77:1 |
| | | 136:7,12 | |

Case 2:22-cv-02632-CCC-CLW Document 365-06/18/24 09/06/249 of 263 PageID 226
Case 2:22-cv-02632-CCC-CLW Document 365 Filed 09/06/24 Page 249 of 263 PageID 22
PageID: 32868

[device - documents]                                                    Page 11

| | | | |
|---|---|---|---|
| **device** 7:7 | **discourse** 95:9 | **dismissal** 12:19 | 5:7,14,19,21 |
| **different** 5:10 | **discoverable** | **dispute** 4:16 | 6:7,10,14,17 |
| 10:6 30:18 | 3:20 | 43:22 84:24 | 7:21 11:11 |
| 38:8 80:10 | **discovery** 3:12 | 102:12,21 | 12:1 15:2,5 |
| 94:3 113:9 | 3:17 4:18 5:1,3 | 104:10 | 16:5,14,20 |
| 116:11 123:7 | 7:3,6,11 9:3 | **disputes** 3:3,17 | 17:18 19:18,22 |
| **differently** | 12:17,21 29:15 | 101:13 | 21:15 22:6,10 |
| 84:12 | 29:17 38:7 | **disputing** | 22:14 23:13 |
| **differing** | 54:21 62:14 | 120:22,23 | 24:7 25:2,12 |
| 102:14 | 67:20 68:3,16 | **district** 1:1,2 | 26:10 27:4 |
| **dig** 26:20 | 69:15,22 81:9 | **division** 60:21 | 29:6,24 30:6 |
| **digital** 15:4 | 103:8,15 | **docket** 127:10 | 30:14,24 31:7 |
| **diligently** 24:1 | 106:25 114:6 | **doctrine** 19:7 | 31:12,18 32:13 |
| **direct** 15:10 | 132:2 | 36:12 50:1 | 33:13 38:19,22 |
| 78:13 109:1 | **discuss** 29:25 | 117:7 127:19 | 38:23,25 39:15 |
| **directed** 5:2 | 31:4 33:9 49:6 | **document** 7:20 | 40:14 41:6 |
| **directing** | 127:18 | 8:3 10:11 | 42:9,23 43:2 |
| 100:20 | **discussed** 11:8 | 11:21 23:5 | 43:12,13,14 |
| **directly** 21:12 | 56:6 134:14 | 27:9 30:3 32:1 | 44:15,23 45:2 |
| 78:22 | **discussing** | 32:2 33:9,19 | 45:7,15 46:10 |
| **disagree** | 119:12 | 51:11 52:14 | 47:2,3,6,24 |
| 126:18 | **discussion** 32:7 | 56:7 57:15 | 48:12,13 49:1 |
| **disagreed** | 50:5 105:8 | 59:1,5 84:25 | 51:12 52:8 |
| 67:16 | 118:17 122:22 | 85:24 86:2 | 53:22 54:2 |
| **disagreement** | 122:25 123:24 | 89:9 116:6,20 | 56:15,21 57:7 |
| 43:2 | **discussions** | 116:25 118:9 | 57:9,18,25 |
| **disagrees** 66:20 | 33:11 49:14 | 118:13,15 | 58:15,18,22 |
| **disburses** 119:1 | 50:19,20 106:1 | 121:15,16 | 59:9,11,17 |
| **discount** 22:2 | 106:3,4,7 | 122:19 125:16 | 60:19 61:13,14 |
| 23:10 25:15 | 108:24 115:9 | 131:12,17 | 61:17 62:20 |
| 32:10 33:9 | 122:2 124:3,4 | 132:18 | 63:4 69:11 |
| 34:16,25 35:6 | 124:20,21 | **documented** | 70:11 72:4 |
| 35:24 36:16,18 | 125:7 | 71:7 | 73:6 76:18,19 |
| 37:7 | **dismiss** 19:4 | **documents** | 77:8 79:5,21 |
| | 67:17 | 3:18 4:22,24 | 80:16,19 82:12 |

[documents - e]                                                                                Page 12

82:17 84:13
85:1,15 86:10
86:22,25 87:5
100:11,16
107:8,13 108:4
111:4,23 113:6
113:8,13,13,14
113:21 114:9
114:24 115:1,6
115:13,22
116:4 117:19
117:21,23
118:20 120:2
120:11,19
123:1,23 124:8
124:13,16
125:2,5,6
127:21 129:4
130:14 131:9
131:24 133:11
**doing** 4:19
13:15 18:7
21:6 31:3
39:22 44:21,22
45:15 46:1,15
46:23 47:10,16
47:18 48:7,20
50:4 51:2 52:6
60:15 61:8
65:4 71:2
75:24 94:10
109:18
**dollar** 13:11
125:12

**door** 108:17
128:4
**doors** 127:2
**doubt** 4:15
**draft** 88:8
**drafted** 8:1,4
**drafting** 3:21
6:8,10,12 7:21
7:24
**dramatically**
32:11
**drawn** 6:23
**drive** 1:17
77:10 78:16
81:24
**driven** 94:8
**driving** 22:3
79:25 134:6
**drop** 50:20
**dropped** 49:16
**drops** 89:13
**drug** 71:4,4,8
72:1 73:18,18
73:23 76:24
77:1,6 78:16
79:12 83:14
84:6,6 88:3
89:16,17,23
90:14,24 91:5
91:7,8 92:20
93:13,21 94:6
94:7,9,14
95:10,11,16
96:10,14,22
97:6,20,25

98:7,8,12,22
99:1,13 100:3
101:2 133:7,17
134:6
**drugs** 10:5
18:15 24:19,25
25:11 42:7,10
60:12,13 63:16
64:16 68:24
69:18 70:23
71:2,12,13
73:11,24 75:8
78:2,9 80:5,10
80:11,11 82:2
82:7,14 85:16
85:17 86:11
87:18,19,20
88:7,8,10,11,12
89:1,7,11,25
90:1,6,23 93:3
93:22 98:23
99:8 121:5
123:6
**due** 93:13 96:6
**duly** 136:7
**dunlap** 2:16
6:25 7:16,19
8:14,17 14:9
14:12,17 16:10
16:19 17:1,25
18:25 19:20
23:16,23 24:11
29:10 34:3,6
34:11 35:25
36:14 37:4,9

37:20 40:6
41:22 43:4,21
44:16,19 48:22
48:25 49:20
50:8 51:4 53:2
53:5,11 54:11
54:16 55:5,11
55:18 57:4
58:11 60:1
65:8,11 67:14
69:24 70:10
72:22 75:17
76:16 77:21
79:17,21 80:2
81:12,15 82:7
82:11 83:21,24
85:5,11 86:13
86:15,20 88:6
88:17,23 89:2
89:5 91:11,13
91:24 92:24
93:4,19 94:12
95:18 96:1,17
97:1,18 98:10
98:19 99:24
100:2 101:2,5
101:9 135:8
**duplicative**
128:25
**dupped** 53:23
**dust** 83:15

**e**

**e** 2:1,1,3,3,20
46:7,9,16
47:20,21 48:4

[e - essence]

| | | | |
|---|---|---|---|
| 49:8 50:6,18 | 50:2 115:2 | **ends** 51:20 | **enrollment** |
| 52:4,5,22,25 | **ejusdem** 19:6 | **enforce** 20:20 | 63:15 |
| 53:6 102:22 | **elements** 65:16 | 20:21,24 31:21 | **enter** 50:15 |
| 122:16,24 | 65:21 | 31:23 39:21 | **entered** 3:7 |
| 123:19,25 | **eligibility** 20:10 | 57:21 65:1 | **entire** 38:2 |
| 124:5,19 129:1 | 20:20 23:23,24 | **enforced** 42:11 | 64:15 72:3 |
| 129:7,9,15,20 | 24:10 25:14 | **enforcement** | 73:22 90:17 |
| 130:19,23,25 | 27:20 28:4,12 | 3:21 5:11,24 | **entities** 60:25 |
| 131:7 132:23 | 30:18 31:8,16 | 6:11,14 16:4 | 74:12 |
| 133:8,8 136:1 | 34:12 39:11 | 16:21 19:18,22 | **entitled** 1:13 |
| 136:1 | **eligible** 18:14 | 20:7 21:9,15 | 31:6 65:1 |
| **earlier** 8:19 | **eliminate** 31:15 | 21:18 25:13,14 | 106:25 |
| 55:24 56:7 | 72:3 | 26:2,11 27:19 | **entitlement** |
| 103:14,16,22 | **eliminates** 72:2 | 28:3,11 29:21 | 55:9 |
| 104:14 105:22 | 84:8 | 31:8 34:7,8,18 | **entity** 5:10 |
| 108:24 134:14 | **elizabeth** 2:17 | 34:24 38:8,11 | 60:24 75:15 |
| **early** 26:18 | **elsberg** 2:15 | 38:12 39:7 | 76:4,23 77:1,2 |
| **ease** 5:11 | **emphasis** | 42:7 57:11,17 | 77:11 82:15 |
| **easy** 12:12 | 123:10 | 57:19,25 | 84:7 |
| **economic** 62:18 | **employ** 16:11 | **enforcing** 16:8 | **entries** 48:16 |
| 65:6 69:12 | **employed** | 21:6 23:18,18 | **entry** 127:10 |
| **effect** 37:5 | 136:11 | 23:19 24:2 | **equivalent** 15:4 |
| 104:22 105:23 | **employee** 46:7 | 28:17 31:20 | **erleada** 133:8 |
| 106:11 | 50:3 130:9 | 33:11 39:10,18 | 133:10 134:2,4 |
| **efficacy** 99:5 | 136:13 | **engage** 32:15 | 134:6 |
| **effort** 15:5 27:2 | **employees** | 32:18 | **ernie** 113:12 |
| 61:3 73:7,25 | 129:18 | **engaged** 30:23 | **escalates** 32:11 |
| **efforts** 27:19 | **employers** 99:9 | 48:19 72:17 | **esi** 108:3 |
| 28:3,11 72:23 | **encompass** | **enlisting** 62:4 | 110:23 |
| 73:8 92:14 | 11:1 108:3 | **enroll** 70:22 | **esi's** 108:5,6 |
| **ei** 56:5 | **encourage** | 80:5 | **esq** 2:5,6,6,7,10 |
| **eight** 6:17 | 26:23 60:11 | **enrolled** 63:15 | 2:13,16,17,17 |
| **either** 5:23 | **ended** 3:11 | 66:19 | 2:20,24 |
| 21:11 26:22 | 131:6 | **enrolling** 62:7 | **essence** 106:18 |
| 41:7 46:12 | | | 106:22 |

**essentially** 7:12
29:5 32:6 50:3
72:15 75:9,20
80:8 90:13
106:24 134:17
**establish** 61:22
**et** 4:19 10:25
19:6 20:12,23
76:20 101:14
113:23
**evans** 2:20
**event** 30:9 98:3
112:7
**events** 43:19
**everybody** 4:2
33:20 129:2
131:25
**everyone's**
43:24
**evidence** 4:16
20:19 21:2
44:4 69:6
99:10 103:18
112:13 114:25
115:23,25
124:4,18 125:6
129:19 130:11
134:14
**evident** 135:4
**exact** 63:8
**exactly** 37:9
76:19
**example** 18:12
20:11 25:13
46:5,19 47:8

50:14 76:6
107:3 113:22
122:14,23
123:11
**exclude** 38:3
121:1
**excluded** 42:3
**exclusions** 24:5
**exclusively**
45:18 68:15
**executive** 114:2
114:11 115:16
**executives** 27:4
114:14 119:20
120:8 122:4
128:24
**exhibit** 119:5
121:13 129:20
129:23 130:11
130:18,23
**exhibits** 112:21
**exist** 9:20 10:2
10:8,9,17
11:15 38:22
85:15 86:10
99:2
**existence** 27:21
72:24
**existent** 48:19
**existing** 8:3
53:21 81:23
**exists** 76:4
**expansion** 29:4
**expenditure**
84:10

**expensive** 68:1
**explain** 12:6
29:25 90:18
**explained** 9:7
14:24
**explaining**
14:13
**explicitly** 92:9
**express** 80:24
80:25 90:22
**extend** 6:13
**extensive** 72:23
**extent** 11:6,25
17:25 26:13,13
36:7 38:22,22
41:17 43:21
45:22 46:10
47:18 50:11
58:19 64:3
100:8 105:10
111:3 121:25
123:23
**external** 45:6
49:25 50:12,19
**extreme** 33:1

**f**

**f** 2:1 136:1
**facing** 65:22,22
**fact** 27:22 61:1
61:2,6 89:12
89:15,24 94:14
98:5,21 99:2
124:19 129:6
131:19 133:4

**factors** 61:7
70:2 91:9
**failed** 32:15
**failing** 62:6
65:13 66:5
**fair** 91:2
125:11
**fairly** 73:7
112:18,19
**fall** 3:25 5:20
35:19,20 106:3
**falls** 4:1 46:3
52:14
**false** 80:18
98:11
**familiar** 36:11
**family** 75:7
114:15
**fang** 2:24 102:8
102:11 105:1
**far** 25:1 27:18
33:1 60:22
83:11,11 95:5
**fault** 95:11,11
**favor** 87:25
**federal** 18:12
**fifth** 94:1
**fight** 132:4
**fighting** 89:18
132:3
**figure** 9:21
13:23 26:20
35:10,22 39:14
63:21 70:20
73:22 76:2

77:8,10 81:19 82:3
**figured** 81:4
**figuring** 27:7 39:25
**file** 14:18,22
**files** 9:9 45:12 45:17 46:10 52:9 73:20 85:19 114:8 115:20 117:1,9 117:13,20 122:3 123:25
**final** 24:21 25:3
**finally** 110:18
**finance** 81:24 130:6
**financial** 3:13 19:11 58:15 60:4,8 61:11 63:24 64:4 67:10 76:12 77:23 89:20 100:8,21
**financially** 136:14
**financials** 76:15 89:14
**find** 4:23 11:25 33:21 68:18 70:5 74:18 80:19 86:25 87:1
**finding** 27:2 129:25

**finds** 36:7
**fine** 14:2,8 68:4 69:8 84:11 128:22
**finely** 132:1
**finished** 100:2
**first** 3:16,17 13:8 19:3 21:9 22:1 26:9 28:21 49:7 54:1 58:2 61:25 66:17 75:3 81:15 90:20 91:24 100:24 102:16 102:16 103:8 113:12 114:17 116:12 117:18 118:11 122:11 124:12 130:4 136:7
**five** 55:22 109:19 112:4,6
**floor** 2:12,19
**focus** 18:18 62:13,16 68:9
**focused** 68:5
**focusing** 22:22
**folks** 49:2,12 53:14 116:9 123:5,22
**follow** 32:1
**followed** 11:19 127:8

**following** 58:18
**footnotes** 89:13
**forcing** 74:7
**forecasted** 59:3
**foreclose** 100:22
**foregoing** 136:5
**forenoon** 1:20
**forget** 115:7
**form** 96:5
**former** 44:21
**forth** 29:14 41:16 47:5 50:16 100:9 101:24 105:10 112:12 126:19 127:9 136:8
**forthcoming** 14:13,24
**forward** 4:9 56:1
**forwarded** 131:3,7
**found** 40:13 116:12
**four** 55:23 109:17 127:17
**frame** 5:20 27:25
**frankly** 12:7 64:16 70:5 84:16 110:13 127:7

**fraud** 69:4
**freda** 2:2
**free** 22:2 32:10 88:15
**friday** 14:7,8 15:10,14,17 42:22,24,25
**friend** 34:8
**front** 58:4
**full** 25:8 128:20 132:7
**function** 49:18
**functional** 50:3
**functioned** 49:18
**functioning** 48:6
**fund** 75:9,9
**fundamental** 70:12,13
**fundamentally** 77:22
**funded** 79:7
**funding** 61:9 92:13,18 93:16
**funds** 60:20 70:17 71:25 75:3 78:18 84:10 119:1
**further** 5:22 100:21 107:2 136:9,12

Case 2:22-cv-02632-CCC-CLW Document 365-06/15/24 Page 254 of 263 PageID: 26093
PageID: 32873

| g | | | |
|---|---|---|---|
| **ganas** 96:12 | 25:10,12 26:3 | 79:1 81:14,17 | 45:18,20 47:11 |
| **gap** 116:23 | 36:25 54:4 | 89:4,12 90:16 | 47:19 48:1,13 |
| **gather** 54:2 | 69:22 77:9,9 | 90:17 91:18 | 49:5 50:13 |
| **gay** 2:15 | 90:9 105:6 | 92:13 99:13 | 51:25 52:5,7 |
| **gbl** 60:1 65:17 | 110:19 129:22 | 107:2 124:24 | 54:8 56:20 |
| 72:10 84:18 | 130:13,19 | 125:24 130:21 | 57:13 59:8,22 |
| 87:17 | **given** 4:18 8:21 | 134:11 | 61:9 64:8,9,10 |
| **gee** 69:16 | 15:11 31:21 | **goal** 41:5 | 75:24,25 77:9 |
| **general** 6:8,22 | 33:15,24 41:11 | **goes** 12:19 | 79:24 85:10 |
| 16:22 17:3 | 45:13 62:25 | 19:22 22:19 | 86:18 87:13 |
| 31:24 33:15 | 63:1,2,3 | 23:5 27:2 | 91:4 92:5,7,17 |
| 36:23 39:23 | **gives** 38:3 | 34:12 55:11 | 92:23 93:4,12 |
| 40:1 58:23 | **giving** 26:10 | 57:16 61:4 | 94:16,17,20 |
| 60:17 78:20 | 125:15,17,18 | 67:2 70:12 | 95:6,19,19,20 |
| **generally** 21:7 | 126:7 | 71:20,22 73:21 | 95:25 96:4,20 |
| 25:23 28:3,5 | **glad** 25:25 26:5 | 77:22 99:10 | 96:25 97:7,9 |
| 28:11,23 73:3 | 34:22 37:1 | 119:11,12 | 97:10,15,17,19 |
| 73:12 77:17 | 54:16 57:4 | **going** 3:12,15 | 97:21 98:14 |
| 100:8 | 61:23 70:10 | 4:20 8:8,10 | 100:4,9 101:10 |
| **generate** 85:11 | 76:19 78:25 | 9:10 10:7 11:5 | 103:20 106:13 |
| 85:14 | 100:15 | 11:23 12:4,14 | 106:15 109:1 |
| **generated** | **go** 4:10,18 5:21 | 12:17,21 13:3 | 110:19 119:9 |
| 85:12 103:3 | 9:14 22:11 | 13:7,18 14:15 | 120:8,9,24,25 |
| **generating** | 25:13 27:6,15 | 14:22 15:22 | 121:1,3 124:17 |
| 118:17 | 27:18 28:5,17 | 16:1 23:12 | 126:10 127:1,2 |
| **generis** 19:6 | 31:1,20 32:2 | 24:4,7 25:8 | 127:24 128:23 |
| **george** 2:6,23 | 33:20 34:5 | 27:17 29:23 | 129:11 131:21 |
| **getting** 50:11 | 35:13 36:10 | 30:14 31:15 | 134:22 |
| 52:18,19 56:21 | 37:1 39:5,6,18 | 32:1 33:1,14 | **gold** 83:15 |
| 69:15 85:17 | 39:25 41:4 | 35:12,13 37:11 | **good** 16:25 |
| 98:10 126:6 | 43:25 44:15 | 37:24 38:1,10 | 41:25 64:22 |
| 131:23 | 51:3 57:10 | 38:13 39:1,4 | 97:11 98:7 |
| **give** 23:17 24:8 | 61:7,10 62:20 | 39:15,19 41:7 | **gotten** 15:7 |
| 24:21 25:1,6,7 | 62:22 64:10 | 42:21 43:3,15 | 47:23 98:18 |
| | 67:19 70:2 | 43:23,25 45:15 | 110:18 129:9 |

| | | | |
|---|---|---|---|
| **granted** 101:15 | **happen** 37:12 | **harry** 2:5 | **hereinbefore** |
| **granular** | 41:16 75:19 | **hate** 31:2 41:9 | 136:8 |
| 119:21 | 109:1 | **hcs** 21:19 | **hey** 40:15 |
| **great** 27:2,6,6 | **happened** | **head** 126:15 | **hide** 72:24 98:7 |
| 65:5 | 115:15 122:20 | **heads** 131:5 | **hiding** 73:4 |
| **greatly** 75:25 | **happens** 77:13 | **health** 1:4 | 98:8 |
| 135:8 | 122:18 129:3 | 17:12 20:4 | **high** 13:16 |
| **greedy** 97:25 | **happenstance** | 66:22,24 67:1 | 115:9 120:13 |
| **greenbaum** | 131:6 | 71:14 | 128:24 |
| 2:10 4:4 | **happy** 14:21 | **hear** 24:6 25:16 | **higher** 99:17 |
| **grew** 33:18 | 32:16 100:17 | 32:17 37:15 | **highest** 114:14 |
| **gross** 2:8,12 | 108:2,18 111:9 | 79:3 97:2 | 119:19 |
| **grossman** | 128:12 130:13 | 103:9 | **highly** 15:23 |
| 42:16 49:19,20 | **hard** 8:21 | **heard** 34:7 58:3 | 21:1 90:2 |
| **ground** 87:7 | **harm** 58:19 | 77:6 87:24 | 118:20 |
| 124:24 125:24 | 60:2,10,16 | 95:24 110:21 | **historical** 7:5 |
| **group** 119:18 | 62:1,10,14 | **hearing** 5:2,10 | **history** 32:16 |
| 125:21,22 | 64:3,4 65:6,13 | 23:11 | **hit** 22:3 53:24 |
| 129:22 130:5,6 | 66:1,3,9,10,23 | **hearings** 71:8 | **hoffman** 107:3 |
| **guess** 24:4 39:1 | 67:5,18,21 | **heart** 8:1 35:4 | 116:8,17,20 |
| 40:9 42:1,8 | 68:12,14 69:4 | **heavy** 15:23 | **hone** 132:10 |
| 84:21 101:13 | 69:12 71:21 | **heith** 46:7,9 | **honed** 41:13 |
| 102:1 111:14 | 72:10 74:8,23 | **held** 1:16 | 88:13 |
| **guidance** 36:25 | 75:25 76:3,8 | **help** 10:4,4 | **honor** 4:4 6:25 |
| 37:15 41:11 | 76:12 87:17,18 | 41:7 50:15 | 7:17 10:10 |
| **gun** 116:5 | 99:11 119:12 | 64:20 71:12 | 12:23 13:20 |
| **guys** 64:22 | **harman** 42:16 | 78:1,7,8 | 15:14 18:21 |
| 96:11 97:11 | **harmed** 69:5 | 100:17 | 21:8 22:9,25 |
| **h** | 87:20 | **helpful** 82:4 | 24:12 26:7 |
| | **harms** 67:2 | **helping** 72:21 | 28:20 29:3 |
| **h** 132:21 | **harris** 42:17 | 135:5 | 32:5,17 34:3 |
| **half** 63:17 | 46:8,16,19 | **helps** 70:22 | 34:17 35:3 |
| 111:19 | 47:20,24 50:12 | 77:10 79:13 | 37:4 40:6 |
| **hands** 43:24 | 50:18,22 52:2 | 80:4 | 41:22 43:4,7,8 |
| **hannah** 2:17 | 54:10 | | 44:17 48:22 |

[honor - instructions]                                    Page 18

49:5,24 53:2
55:1,14 56:20
65:8 67:14
68:11 80:7,16
81:13 83:21
86:8,13 88:17
90:4,5 94:4,12
97:24 100:9
103:9 109:8
111:9 112:3,17
112:23 114:10
115:24 116:17
119:24 125:4
126:17,24
127:25 128:16
129:13 131:11
132:5 134:13
135:3
**honor's** 13:5
92:15 110:6
**honorable** 2:2
**hope** 52:10,25
92:4
**host** 30:18
**house** 2:23
44:11 48:10
49:17 52:22
53:6
**huge** 73:10,25
77:17 83:17,24
132:1
**hundred** 13:11
42:23 86:23
**hurdle** 13:16

**hurt** 64:8,10

**i**

**idea** 39:9 69:1
83:9 107:14
118:11,14,17
**identified** 6:12
16:15 42:22
53:24 57:10,16
113:5
**identify** 6:9,21
7:23 31:22
**illegal** 84:17
**imagine** 35:7
**impacted** 61:8
93:2
**impacting**
60:15 94:25
115:10
**impacts** 69:23
**implement** 42:6
120:24 133:7
133:10,16
**implemented**
42:11
**implicitly** 92:9
**important**
21:25 23:17
27:8 31:23
35:24 47:3
54:20 56:4
62:21 76:18
80:15 129:10
132:19
**inapplicable**
127:20

**include** 8:15
56:16 104:8
115:3 116:14
129:2
**included** 11:6
127:1
**includes** 59:2
116:15 129:20
**including** 67:23
71:8 80:4
115:22 123:2
134:4
**inclusion** 50:25
**inconsistent**
26:25
**increase** 74:9
89:16 96:3
98:22 99:1
**increased**
94:22 99:3,12
**increasing**
98:14 125:18
**indicate** 80:17
**indicated** 3:4
5:21 6:16
10:20 11:11
12:3 53:15
**indicates** 17:13
**indicating** 15:7
49:1 57:19
61:17
**indication**
57:12
**individual** 32:4
39:24

**individual's**
31:16
**individuals**
7:23 116:15
118:3 120:12
123:1 124:15
125:7
**induce** 83:6
**inducing** 74:5
**industry** 23:7
73:3 80:25
**inevitably**
47:15
**inflated** 93:20
**inform** 62:7
**information**
3:13 7:5 8:21
15:10,24 21:1
28:18 56:10
67:10 80:12
85:11 87:9
89:21 90:21
**inherently**
122:5
**injuring** 84:14
**injury** 70:12,13
70:19 71:23
72:3,9 99:14
**inquiry** 65:5
86:12 102:9
**instance** 3:16
49:8 50:13
54:2 86:5
**instructions**
31:21

| | | | |
|---|---|---|---|
| **insurance**  95:9 | **interrupted** | 53:15 103:7 | 113:22,24 |
| **intended**  79:6 | 100:1 | 105:22 107:9 | 114:19 115:23 |
| **intending**  92:3 | **investigate** | 108:23,24 | 123:6 124:14 |
| 94:23 95:15 | 108:19 | 111:2 115:8 | 128:8 131:20 |
| **intent**  38:20 | **investigated** | 118:16 120:12 | 133:24 134:13 |
| **interested** | 5:13 | 133:24,25 | **issues**  3:7,8 6:4 |
| 17:21 53:13 | **investigation** | 134:1,3,18 | 7:10 11:12,14 |
| 55:6 77:18 | 5:14 23:14 | **involvement** | 13:1 14:14 |
| 136:15 | 30:11 52:1 | 109:5 | 19:1 25:5 |
| **interfered** | **investigations** | **involving**  50:6 | 30:15 40:3 |
| 18:18 | 21:14 24:9,14 | **irrelevant**  5:24 | 55:19 70:12,13 |
| **interference** | 24:17,21 25:2 | 9:6 30:13 | 82:5 98:5 |
| 36:3 | 25:8,10 26:3 | 73:14 74:2 | 109:11 111:3 |
| **internal**  27:4 | 28:22,22 29:5 | 80:13 82:18 | 114:5 135:5 |
| 49:8 89:13 | 32:4 39:13 | 83:20 90:10 | |
| 90:12,15 | 56:6,11,16,21 | **issue**  5:15 8:20 | **j** |
| **internally** | 104:20 | 9:17 11:22 | **j**  2:10 |
| 13:23 | **investment** | 13:4 15:20 | **j&j**  5:9,13,19 |
| **interpret**  35:16 | 70:8,11 71:10 | 16:6,7,17 | 5:21 6:11 8:1 |
| **interpretation** | 71:18 72:4,8 | 20:10 21:18 | 10:3 20:14 |
| 19:19 102:15 | 77:4,7 79:23 | 24:19 27:5 | 21:19 26:19 |
| **interpretations** | 80:3 81:16,22 | 29:21 43:10,12 | 48:10 49:3 |
| 102:14 | 82:11 83:18,18 | 43:18 44:3 | 58:19 60:24 |
| **interpreted** | 87:8 88:9,11 | 48:2 49:25 | 63:19 68:7,8 |
| 35:23 | **investments** | 51:25 57:2,5 | 69:17 73:11,22 |
| **interpreting** | 73:24 100:15 | 58:3 64:17 | 74:21 75:2,14 |
| 37:25 105:11 | **invitation** | 68:9,15 73:16 | 75:20 76:1 |
| **interrogatories** | 116:13,14 | 78:14 87:12 | 77:17 78:1 |
| 6:23 7:13,15 | 122:16 | 88:8,10,11,24 | 83:11 84:7 |
| 7:22 123:7 | **invitations** | 88:24 90:9 | 99:12 108:5 |
| **interrogatory** | 113:22 115:3 | 93:3 94:12 | 119:6,13 133:1 |
| 7:2,7,14 8:3 | **invites**  122:12 | 101:7 104:2,19 | 133:9 |
| 29:10,17,19 | **inviting**  25:24 | 110:11,13,14 | **j&j's**  5:11 |
| 31:25 63:5,10 | **involved**  32:3 | 112:10,20,23 | 55:11 67:19 |
| 114:18 123:15 | 49:13 50:21 | 112:24 113:17 | 70:8 83:14 |
| | | | 106:8,20 |

Case 2:22-cv-02632-CCC-CLW Document 365-06/15/24 Page 258 of 263 PageID: 26097
PageID: 32877
[j&j's - judge]                                               Page 20

125:13
jalt 113:23
  114:1,3,7,25
  117:19 120:2,4
  120:9 121:11
  122:1 123:2,4
  123:24 134:16
  134:19
janssen 22:13
  35:6 70:23
  71:1 76:22,23
  77:2,11,13
  79:10,11,12,13
  79:15 80:5
  82:15 84:7
  87:23 88:7,25
  89:7,11,14
  93:25 120:5
janssen's 82:22
january 1:18
  8:13 24:16
  42:1 104:22
  105:24 106:1
  106:11 118:14
jd 48:7
jd's 44:21
jeffcoat 46:7
  50:14,23
  116:15
jeffcoat's 46:9
jeffrey 2:10
jennifer 42:16
  54:10
jeopardizing
  67:24

jersey 1:2,16
  1:18 2:10
  136:5
jjhcs 2:23 5:9
  7:6 8:5 10:3
  27:10 29:13
  35:5 44:23
  45:6 46:8
  47:17,18 49:11
  52:9 53:17
  60:21 63:20
  74:21 77:15
  80:23 90:17
  91:18 93:17,21
john 107:3
  116:8,17,20
johnson 1:4,4
  36:20,20 60:12
  60:21,21,23,23
  69:25,25 71:3
  71:3 72:15,16
  74:3,3 75:6,7
  76:8,8 79:22
  80:2 89:18,19
  96:21,21 98:21
  98:21,25 99:1
  99:2 102:22
  103:12,12
  114:14,15
johnson's
  60:12 79:22
  80:2 99:3
  102:22
jr 2:20

judge 3:1,5 4:7
  4:13 7:18 8:7
  8:15,23 9:10
  10:14 12:15
  13:6,10,21,25
  14:2,8,11,15,20
  15:6,15,18
  16:16,24 17:19
  18:4,19,22
  19:17 22:15
  23:11,24 26:14
  27:14,15 29:16
  29:23 30:3,7
  30:25 31:1
  32:21 33:2,6
  33:18 34:5,10
  35:9 36:13
  37:8,11,19,22
  39:1,6 40:8,17
  41:2,3,25 43:1
  43:16,23 44:9
  45:25 46:18
  47:7 48:24
  49:19 51:3
  52:10,25 53:4
  53:9 54:7,12
  54:18,23 55:2
  55:15 56:2,22
  57:1 58:9,14
  59:25 61:25
  62:1 63:11,13
  63:23 65:10,18
  66:12 68:2
  69:8 70:4
  72:11,13 74:14

74:18 75:12
  76:14 77:20
  79:2,19 80:1
  81:10,14 82:1
  83:23 84:19
  85:13,22,25
  86:3,9,14,18
  87:24 88:13,18
  88:21,25 89:4
  91:4,12,22
  92:4,17,23
  93:6,10 94:15
  94:19,24 95:2
  95:24 96:23
  97:2,9,14
  98:17 99:19,22
  99:24 100:19
  101:4,6,11,14
  101:23,24
  102:1,10,13,17
  102:19,21
  103:6,20
  104:11,17
  105:5,25
  106:10,13
  107:11,18
  108:7,13,17,21
  109:9,17,24
  110:3,8,15,16
  110:20 111:7
  111:11,16,24
  112:7,15,18,22
  112:22 113:4
  113:18,23
  114:9 115:5

Veritext Legal Solutions
800-227-8440                                        973-410-4040

117:16 118:5
119:16 120:3
120:16 121:10
122:7,18
123:16,20
124:22,23
125:20,24
126:13,20,24
127:5,12 128:2
128:14,17,22
129:14,24
130:14,20
131:1,4,18
132:8,16
133:18,23
134:5,20 135:1
135:7
**judge's** 83:13
**judgment**
12:18 93:1
**julia** 2:6
**juliette** 111:15
**july** 4:25 43:23
**june** 114:18
**juror** 75:23
**jury** 92:3,8

**k**

**k** 123:19
**karen** 111:15
**katherine** 2:13
**katie** 114:3
116:7,19,20
**keep** 31:3 57:21
61:9 89:22
97:11 99:8

**keeping** 9:8
15:1 41:19
**keeps** 82:8
96:17
**kept** 13:10
**key** 119:3 130:5
**kicking** 3:9
31:2
**kind** 4:5 39:20
42:7 43:19
50:15 100:1
105:15 116:4
125:22
**kinds** 88:8
**knew** 24:2
112:1 125:17
**knewitz** 113:12
113:24 117:5
123:11,18
134:12,17
**know** 3:23 5:8
5:10 8:25
10:10,20,22
11:12 13:2,8,9
15:7 16:1
23:19 24:1
26:18 28:7,8
29:14 30:17
31:1 33:16
38:5 39:9,16
39:18 42:5
44:10 48:13
49:13 51:1,7
51:10,16 53:19
54:15 55:8

58:6 60:22
61:16 62:17,24
63:1,6,18 64:8
64:19,23 65:1
67:6,7 69:16
69:16 72:15,18
73:1,19,23
77:20 78:24
79:11,12,24
80:16,17,23
81:3 82:7,16
86:22 87:15
88:16 90:24,24
91:22 94:15
95:10 96:11
98:4 102:2,5
103:9 110:8,20
112:8 115:7
116:4 119:13
120:7,14,21
125:13,17,20
126:4,6 127:3
128:25 130:10
131:9,22,25
132:9
**knowing** 72:24
**knowledge**
111:25
**known** 21:13
**knows** 69:3

**l**

**l** 2:2 129:15
133:8
**lade** 111:15
112:13 129:14

130:9,23
134:21
**language** 4:2
18:20 22:1,23
**large** 66:22,24
**latches** 28:8
**law** 18:12
60:14,17 102:8
**lawsuit** 20:14
20:25 59:7
74:1,2,13
123:13
**lawyer** 45:8
46:8 49:17
50:6 51:1
52:22
**lawyers** 44:20
44:21,23 45:12
48:10,21,21
51:1 53:6
**lead** 29:3,15
30:14 73:8
74:9
**leadership**
120:5 123:4
**learn** 124:3
**leave** 26:24
97:23 126:13
**left** 3:5 16:17
68:22 112:5
**legal** 2:9 44:22
45:21,21 47:17
47:21,22 48:20
50:23 51:2

| | | | |
|---|---|---|---|
| length 27:6 | 128:23 | logistics 102:20 | 19:8,22 36:9 |
| lengthy 67:6 | limiting 17:23 | long 2:6 5:18 | 37:6 46:16 |
| letter 25:20 | 18:22 30:7 | 10:12 18:8 | 54:13 57:9 |
| 42:20 48:25 | 50:10 82:1 | 52:2 61:4,10 | 62:9 66:12 |
| 100:12 111:13 | 86:20 87:8 | 72:19 103:24 | 97:4 111:2 |
| letters 7:3 | 88:14 96:2 | 104:1 105:23 | 117:3 120:17 |
| 21:10 29:15 | limits 134:8 | 106:2 108:9,15 | 121:6 125:1 |
| 43:20 119:2 | line 59:2,2 64:9 | 109:21 110:2 | 127:12 130:10 |
| level 63:14 | 64:10 82:22 | 112:15,16 | looks 118:1 |
| 115:9 120:2,3 | 95:5,7 | 113:10,20 | loot 72:19 |
| 120:13 123:3 | linger 55:19 | 115:14 121:9 | looting 72:17 |
| 128:24 | link 96:17 | 121:11 122:9 | loots 78:2 |
| levels 69:25 | list 18:8 | 122:20 123:18 | losses 73:12 |
| license 136:21 | listed 23:20 | 123:21 124:17 | lost 76:7 91:8 |
| lieb 2:13 | literally 63:8 | 126:17,18,22 | 92:11 96:5 |
| lies 98:9 | 85:9 | 131:11 134:12 | lot 17:5,6 20:4 |
| light 26:18 | litigating | longer 13:3 | 22:24 44:2 |
| likelihood | 110:17 | look 12:11 15:6 | 53:20 69:18 |
| 111:1 | litigation 49:18 | 20:1 29:17 | 71:8 75:2,21 |
| likely 118:20 | 50:6 73:5 | 35:2 38:2 | 78:12,21 83:3 |
| 124:15 | 115:11 | 40:21 50:22 | 90:20 131:8 |
| limit 53:11 | little 23:6 33:8 | 56:13 66:10 | 132:1 |
| 103:4 111:4 | 71:11 | 70:24 82:5 | lots 28:14 83:6 |
| 129:4 133:22 | lives 68:18 | 89:12 98:12 | 94:10 |
| limitation 51:4 | llc 1:8 | 100:14 121:12 | love 15:15 |
| 68:5 123:14 | llp 1:17 2:4,19 | 125:5 128:3,5 | 99:21 |
| limitations | lobiondo 2:6 | 129:19 130:3 | lowenstein 1:17 |
| 132:11 | 106:12,15 | 130:11,18,22 | 1:17 2:24 |
| limited 6:18 | 109:7,19 | 131:22 | lowered 89:6 |
| 11:15 17:15 | 110:12 111:6 | looked 3:24 | 89:10 92:1,8 |
| 26:22 32:6 | log 39:2,4 | 19:4 31:17 | 92:18 93:13 |
| 49:11 61:12 | 42:18,19 44:15 | 74:19 80:18,23 | lowering 95:2 |
| 75:14 86:17 | 45:16 46:12 | 86:10 98:4 | 95:20,21 96:22 |
| 87:18 108:10 | 51:20,21 | looking 3:10 | 97:20 |
| 128:9,14,15,17 | | 8:25 17:20 | |

Case 2:22-cv-02632-CCC-CLW Document 365-06/15/24 Page 461 of 263 PageID: 36100
PageID: 32880

| | | | |
|---|---|---|---|
| **lying** 15:3 | 54:5 57:24 | **manufacturer** | **mazuk** 114:3 |
| **m** | 60:22 71:18 | 5:17 | 114:10 115:1,2 |
| **m** 2:13 | 72:16 73:18 | **manufacturers** | 115:4,16 |
| **machine** 83:16 | 78:12,15,21 | 72:22 | 116:20 117:12 |
| **made** 21:19 | 80:10 82:13 | **manufacturing** | 117:14,20 |
| 22:23 26:6 | 83:7 84:21 | 82:6 | 121:21,25 |
| 33:19 42:8 | 86:24 93:11,15 | **march** 33:5 | 122:1,5,15 |
| 68:18 71:3,5 | 96:9,15 97:18 | **mark** 116:8 | 123:2 124:2,20 |
| 73:5 75:13 | 97:19,21 98:15 | **marked** 46:11 | 125:7 |
| 87:14 88:2 | 98:19 99:16,17 | **market** 80:11 | **mazuk's** 114:8 |
| 95:13 99:7 | 100:7,15 103:2 | 95:8 | 115:20 |
| 109:9 113:9 | 104:6 111:10 | **marketing** | **mean** 6:1 14:21 |
| 115:19 120:20 | 118:8 120:7 | 60:11 61:2,5 | 17:14 19:9,11 |
| 121:7 123:13 | 125:2 133:13 | 64:20 69:17 | 19:12 28:6 |
| 134:15 | **makes** 63:6,9 | 82:6 134:4 | 31:14 33:15 |
| **magistrate** | 68:7,8 69:17 | **massive** 45:16 | 36:4 37:25 |
| 33:18 | 74:3 75:21 | **massively** | 38:7 51:20 |
| **mail** 47:20,21 | 77:17 80:9 | 73:20 | 58:23 87:10 |
| 50:18 52:4,5 | 84:16 102:23 | **material** 99:4 | 101:25 117:22 |
| 102:22 122:16 | 105:7 | 131:10 | 125:21 129:6 |
| 122:24 123:25 | **making** 21:16 | **matter** 1:13 | **meaning** 8:25 |
| 129:20 130:19 | 30:10 67:25 | 9:25 33:24 | 9:18 10:23 |
| 130:23,25 | 69:16 72:1,20 | 52:2 83:4,4 | 11:7 16:21 |
| 131:7 132:23 | 73:11 75:2 | 85:10 | 19:23 25:14 |
| **mails** 46:7,9,16 | 78:11 83:5 | **matters** 59:15 | 34:16,24 38:3 |
| 48:4 49:8 50:6 | 88:4 97:24 | 83:9 90:14 | 53:17 105:11 |
| 52:22,25 53:6 | 100:3 114:11 | 91:17 | **meaningless** |
| 124:5,19 129:1 | 119:22,25 | **max** 17:9 | 29:5 |
| 129:7,9 | 120:1,12 | **maximizer** 9:19 | **means** 4:17 |
| **main** 26:6 | 124:18 | 10:18 26:12 | 12:15 17:14 |
| 114:25 | **manage** 50:16 | 29:1 30:12,21 | 19:8,13,15 |
| **maintain** 51:12 | **manages** 81:1 | 108:6 | 20:6 38:11 |
| **make** 4:4 17:23 | **mangi** 127:17 | **maximizers** | 40:11 |
| 19:16 24:3 | 127:22 | 57:23 106:21 | **meant** 9:22 |
| 33:22 39:19 | | 107:4 132:23 | 10:24 19:24 |

33:20 36:18,23
95:7 110:16,17
**mechanism**
7:12
**medicaid** 18:13
20:11,22 23:21
**medicare** 18:13
20:11,22 23:21
29:6
**medication**
68:21 74:8
91:2
**medications**
42:3
**medicines**
93:25
**meet** 3:10
14:10,18 15:12
15:19 31:1
32:15,18 39:4
41:9,15 54:16
66:25 103:11
104:3,12,16,25
**meeting** 34:22
37:1 116:14,18
116:18 117:24
118:2 122:7,11
122:19,21,24
123:24
**members** 17:11
20:16 42:3
**memorialized**
124:5
**mention** 55:7
86:25 87:6,11

118:11 131:12
**mentioned** 37:6
112:14
**mentions** 108:3
108:3
**merits** 128:7
**met** 16:12
58:12 116:9
117:10
**mid** 108:19
**middle** 104:5
**miles** 2:17
**million** 13:11
32:13 91:9
92:22 119:7
125:12,18
**millions** 33:12
**mind** 41:19
**minute** 74:16
84:4 99:25
130:19
**minutes** 90:5
122:23 124:8
**mirrored** 88:4
88:6
**missing** 65:23
69:21 120:19
**mitigation**
133:20
**mitigations**
28:8
**modifications**
6:5
**modifier** 104:9

**moment** 4:11
12:10 14:6
21:21 27:16
31:6 37:5,17
38:11 62:12
73:15 75:18
88:14 94:3
103:21 127:14
**moments** 23:16
**money** 59:6,22
68:7,8 69:18
70:18 71:4,5
71:11 72:16,20
73:9,10,17
74:3,4 75:2,21
76:10,11 77:17
78:1,11,12,15
78:21 80:9
82:12,13 83:1
83:5,8 84:8
86:24 119:9,23
**monitor** 71:9
**monitoring**
130:7
**month** 52:20
**months** 6:17
32:19,21
**motion** 12:18
12:19 14:19
19:4 93:1
101:15 107:22
111:18,24
112:6,24
114:17 127:10
133:5

**move** 4:9 6:2
13:17 16:2
41:18 70:7
132:4
**movement**
43:11
**moves** 32:9
**moving** 83:11
95:17

**n**

**n** 2:3 123:19
**name** 76:21
79:15 106:20
107:13 112:9
114:3
**named** 46:7
79:9 132:20
**narrow** 22:17
25:7 31:5
32:22,24 35:11
35:14 37:9
40:18 52:23
64:14 67:12
74:23,23 78:25
79:19 86:21
87:7 101:21
103:18 111:10
**narrowed**
16:13 25:19
40:18,25 41:1
81:7
**narrower**
40:19
**narrowing**
32:24 76:3

[narrowing - offering]                                              Page 25

79:3 81:6,10
**narrowly** 54:14
69:14
**natural** 127:7
**nature** 31:24
39:8,24 40:25
46:13 50:4,24
**necessarily**
48:1 105:17
115:15 123:25
**necessary** 4:8
22:20 59:23
69:11 80:12,21
86:15
**need** 11:2 12:17
13:4 20:5 21:5
24:7 26:4 27:5
31:4,10 32:20
34:1 36:17
39:12 41:6,6
41:18 56:23
57:17 59:11
60:19 63:18,21
63:22 69:22,24
76:10 79:21
80:2 84:13
88:13 107:2
124:12
**needed** 22:17
28:19 68:21
**needs** 28:10
33:21
**negligible**
48:18

**negotiate** 25:24
**neither** 136:9
**net** 86:21 90:12
90:13 91:17
93:24
**never** 20:17,23
24:5 40:18
55:13 134:5
**new** 1:2,16,18
2:5,5,10,13,13
2:16,16,20,20
6:12,14 20:24
42:2,6 71:4
84:2 87:2
99:14 102:18
102:25 103:5
103:17 105:13
108:10 111:12
111:23 112:12
113:5,8,8,13,13
113:14 116:3
124:18 125:1,2
125:5,25
126:25 129:19
130:10 132:18
134:9,14 136:4
**newark** 2:10
**non** 38:23
48:19 93:3
**nonsense** 81:4
**north** 119:18
**notary** 1:15
136:4
**note** 49:16
118:7

**notebook** 116:7
117:25
**noted** 12:20
**notes** 1:12
118:2,7 136:6
**notion** 80:22
**november**
24:24 43:17,25
57:8 101:14
104:3
**number** 9:6
18:16 47:6
51:25 58:20
60:8,9 61:13
77:5 94:16,18
94:21 100:11
108:1 109:21
120:10 127:10
**numbers** 54:4,6
61:15 91:20
**numerous**
120:2

**o**

**o** 2:1 132:21
**object** 50:25
59:13 87:23
**objected** 87:22
**objections** 7:8
**obligation**
51:13 67:1
**obligations**
93:21
**obliged** 29:11
**obtain** 73:6

**obviously** 8:18
45:7 125:3
**occasion** 51:17
**occasionally**
123:12
**occasions** 45:4
**occurred**
100:13 116:19
**occurring**
120:1
**october** 5:3
22:16 33:3
43:11 104:7
114:19 126:20
126:22
**offer** 3:25 4:3
6:1 9:18 12:15
16:9,22,24
17:14,16 18:3
18:5,6,20,24
19:5,8,11,13,24
20:1,6,15,18
21:4,7,23 22:7
22:23 28:25
30:5,16 31:9
32:9 34:9
35:20 36:1,4
36:15,16 38:4
40:11 60:23
78:7,8
**offered** 5:19
22:24 59:11
104:4 121:24
**offering** 25:6,7
25:10,12

[office - part]                                                    Page 26

**office** 1:16
73:20 75:10
**offline** 50:23
**offset** 72:3
78:15 99:18
**offsets** 72:2
78:18
**oh** 29:6 68:7
77:17 78:12
81:7 91:18
95:9
**okay** 5:6 8:7,23
11:2 13:6,21
14:1 15:18
16:16 28:1
33:6,19 37:13
40:5,7 41:21
41:25 42:12
54:12 58:14
59:25 62:19
63:13 64:9
70:4,5 72:18
72:18 75:12
83:16 88:20
98:17 99:22
100:19 101:5,6
101:11 103:21
107:11 111:6
111:11,21
123:20 130:2
130:20 131:4
132:14
**old** 40:2 88:21
124:19 125:5

**once** 32:9 52:23
80:5 83:3
**oncology** 68:23
**ones** 26:6
134:21
**open** 3:5 23:2
97:9 127:1
135:1
**opened** 108:17
**opening** 113:14
126:14
**operated** 43:15
**operates** 82:24
87:16
**operation**
68:22
**opinion** 12:16
62:2 65:12
66:13 67:4,6
**opportunity**
102:2
**opposed** 64:15
71:12 90:1
119:22
**opposing** 25:16
121:19 124:9
**order** 12:16
20:5 22:17
26:14 27:14
32:23,25 36:14
52:19 56:2,23
74:7 82:3 83:7
83:13 102:2,15
102:18 104:3
105:1,7,12

112:8,20 113:3
118:22 125:10
125:15 126:10
127:7,8
**ordered** 37:8
104:18 111:19
112:24 116:17
116:21 127:5
**ordering** 12:2
134:8
**orders** 3:8
116:1
**organized** 13:3
**original** 43:22
55:21 108:11
118:16
**outcome** 29:15
**outside** 10:24
46:21 47:9
49:11 50:2
52:14 53:17,20
60:23 90:17
91:18 104:24
**outstanding**
3:3
**overall** 67:10
68:8 75:25
83:4 125:22
**overlaps** 40:11
**overtaken**
43:19
**overwhelmin...**
45:18 52:12
**own** 47:17 75:9
87:2 93:24

131:16

**p**

**p** 2:3,3
**p.c.** 2:8,12
**p.m.** 135:10
**page** 117:25
127:25 130:4
130:23
**pages** 4:22
22:10
**paid** 59:2,16
61:13 79:24
84:4 119:9
**paper** 73:20
82:8 116:6
135:5
**papers** 27:1
**paragraph**
12:16 67:21
93:19
**parallel** 15:14
**park** 2:12
**part** 8:1 14:12
16:10,11 17:10
17:13 18:13
20:13,19 34:14
40:9 43:22
44:14 46:25
50:5 61:2,3
70:21 71:16
74:13 79:15
99:2 110:12
111:18,23
112:20 119:8
132:23,23

[part - pharmacies]                                              Page 27

| | | | |
|---|---|---|---|
| 133:5,13 | **past** 43:23 | **payment** 90:23 | **period** 5:1,18 |
| **partially** | **patient** 30:19 | **payments** 94:5 | 10:7,9 11:21 |
| 119:25 | 30:19 63:14,15 | **pays** 17:8 71:6 | 14:25 15:5 |
| **participants** | 64:20 67:25 | **pejorative** 78:3 | 19:20,25 21:16 |
| 27:11 66:19 | 76:12 84:3,4 | **pending** 3:17 | 24:22 25:9 |
| 118:7 | 133:1,12 | **penkowski** | 30:22 34:14 |
| **participated** | **patients** 10:4 | 111:15 112:13 | 38:24 40:21 |
| 122:2 | 18:9 24:18 | 113:19,25 | 55:20,23,24 |
| **particular** 3:23 | 26:21,23 27:3 | 117:4 118:16 | 56:1 57:7,19 |
| 21:23 22:1 | 57:22 60:12 | 121:17 124:20 | 58:20 63:17 |
| 44:11 73:18 | 62:7 66:6 | 128:10 129:7 | 103:16 104:9 |
| 117:6 | 67:23 68:17,23 | 129:21 134:16 | 104:13 105:3 |
| **parties** 5:2 | 70:25 71:1,12 | 134:22 | 108:11 128:19 |
| 14:18 49:3,11 | 74:7,9 77:9 | **people** 13:23 | 128:20 132:7,8 |
| 50:13 51:5,11 | 78:1,7 79:11 | 39:16 44:18,25 | **permit** 38:6 |
| 51:15 52:3 | 80:4 82:14 | 45:1,5,6,20,23 | 127:3 |
| 54:14,25 | 85:16 86:11 | 47:3,16 48:19 | **person** 29:6 |
| 102:14,19,21 | 87:3,18,19 | 50:21,21 52:5 | 46:22 117:12 |
| 105:14 136:11 | 93:20 98:23 | 52:9 56:14 | 129:10 133:6 |
| **partner** 80:24 | 99:7,15 119:2 | 64:8 68:19 | **person's** 75:10 |
| 85:21 | 119:2,9,15 | 70:22 71:24 | **personnel** |
| **partners** 68:25 | 121:24 | 74:6 78:8,17 | 47:20 |
| 90:21,24 98:3 | **patterson** 2:4 | 83:6 84:22 | **perspective** 4:6 |
| **parts** 20:21 | **pause** 21:21 | 86:23 89:25 | 15:21 33:17 |
| 63:19 | **pay** 5:17 10:4,4 | 103:7 108:22 | **persuade** 78:8 |
| **party** 46:21 | 10:5 23:8 | 109:12 111:1 | **pertinent** 64:1 |
| 47:4,9 51:10 | 26:16,22 59:1 | 117:9 120:9 | **pfizer's** 87:19 |
| 51:18,22,24 | 59:6,19 63:4 | 129:1 | **pharmaceutical** |
| 53:7,9 55:8 | 70:16,17 71:14 | **people's** 48:13 | 72:22 73:3 |
| 116:5,10 119:5 | 73:9,9 74:10 | 83:6 | 81:1 87:16 |
| 132:19,20,21 | 74:10 75:9 | **perceive** 56:24 | **pharmaceutic...** |
| **pass** 103:23 | 79:13 93:21 | **percent** 16:14 | 119:19 |
| **passing** 30:19 | 94:22 121:2,4 | 25:20 | **pharmacies** |
| 30:20 | **paying** 57:21 | **performance** | 62:5 |
| | 70:18 71:25 | 21:3 | |

pharmacy
  90:22,23
phrase 38:2,14
piece 9:13,13
  36:2,3 82:8
  94:22 114:25
  116:6
pieces 44:2
pitch 100:3
place 49:14,22
  73:25 103:8
  117:22 136:8
placed 38:18
plaintiff 1:6 2:7
  2:11,14 4:21
  5:12 6:7,16
  42:5 58:17
  62:14 66:3,17
  66:23 74:20
  75:15 101:16
  101:19 111:16
plaintiff's
  115:10
plaintiffs 6:21
  62:3,5
plan 17:9,10,14
  20:17 70:22
planned 42:24
planning 97:5
  98:2
plans 17:12
  20:4,16 24:18
  38:18 42:4
  56:14 71:14
  78:11 89:17,20

plausible 66:18
plausibly 62:3
  66:23
play 44:19
plaza 2:9
please 88:19
  100:24 127:14
  129:4 132:13
  134:23
pllc 2:15
pocket 17:9
point 4:8 17:16
  17:17 19:16
  30:8,10 44:5
  50:18 53:8
  56:12 59:9
  62:6,23 68:2
  85:6 86:6
  87:13 98:20
  100:7 104:16
  106:17 107:6
  117:19 118:8
  120:7 124:12
  124:17 125:9
pointed 22:9,25
  23:6
pointing 65:13
points 4:5 7:4
  26:5 44:7
  81:13 106:6
  116:4
police 28:5
policies 11:14
  31:7,11,19
  33:10,11 34:6

policy 11:18,24
  12:1 13:9
  29:20,25,25
  30:1 32:7,7
poor 50:9
portion 127:14
portions 17:2
position 10:15
  10:21 20:24
  27:21 32:19
  37:23 84:21
  102:23 104:4
  104:25 112:17
  113:5 131:15
  131:19
positions 33:1
possible 104:23
potential 73:24
  104:5
powder 77:18
pr 134:17
practical 85:10
practicing
  48:21
precisely
  120:16
predate 5:18
predecessor
  6:21 8:2,5,16
  9:1 11:6
preliminary
  4:5
prepared 31:3
prescribed
  105:1

prescription
  22:2
prescriptions
  62:6
present 2:23
  8:13 24:23
  25:9 30:23
  59:4 98:2
  101:10 124:22
presentation
  122:12,13,21
  132:24
presentations
  122:3
presented
  112:1 113:7
  122:1,22
preservation
  11:12 14:14
pressure 89:20
presumably
  122:25
pretty 13:19
  15:22
prevent 27:2,7
  72:24
preventing
  13:15
previous 16:15
previously
  112:1
price 90:6,12
  90:13,13 91:2
  91:17 93:22
  94:7 97:11

[price - program]                                                Page 29

99:17
**prices** 89:16,17
  89:18,23 90:25
  92:2,8,18,19
  93:13,25 94:6
  94:9,14 95:10
  95:12,16,20,22
  96:6,14,22
  97:6,20,25
  98:14,22 99:1
  99:3,13,16
  100:6 133:1
**pricing** 88:24
  88:24,25 90:14
  90:18 91:5,7,8
  92:20 93:3
  94:25 95:2,3
  96:10 98:12
  99:7 100:4
  101:3
**primarily** 3:11
  22:3 68:15
  69:2
**primary**
  132:17
**prior** 9:22 10:2
  27:22 104:7
  133:5
**privilege** 39:2,3
  42:18,19 44:15
  45:3,16 46:11
  46:13 47:13,23
  48:14,15,15
  50:1 51:18,19
  51:21

**privileged**
  38:23 45:9,19
  45:24 46:11
  48:1
**probably** 23:6
  119:23
**problem** 40:9
  45:16 51:22
  135:7
**problematic**
  27:24
**problems** 9:14
**proceedings**
  1:8,13 135:10
**process** 21:15
  26:3
**produce** 11:23
  12:5 21:11,13
  22:14 23:13
  51:13,20 72:7
  72:7 76:20
  79:24 80:20
  111:4 120:17
  132:4
**produced** 4:21
  12:2 22:10
  30:2,6 38:15
  38:21,24 43:12
  45:7,24 58:18
  58:25 59:5,17
  59:20,21 61:12
  62:24 80:16
  84:6 85:4
  89:14 90:8
  91:13 100:12

109:13 114:7
  117:2,21
  118:13 124:9
  130:15
**producing** 9:15
  27:12 30:23
  47:1,2,6 56:10
  57:9,25 58:24
  79:5
**product** 81:23
  81:24 82:22
**production**
  22:24 23:1
  25:4 27:9
  30:14 42:14
  49:10 52:19
  56:25 57:2
  91:15 106:8
  116:23
**productions**
  21:16 124:6
**productive**
  9:24
**products** 60:22
**professional**
  134:18
**profitability**
  73:2
**profitable**
  73:13,23 83:10
  83:15
**profits** 76:7
  87:4 91:8
  92:11 96:6

**program** 3:24
  8:6,19,22 9:19
  9:20 10:6,8
  17:6 18:3,15
  21:4 23:8
  26:17,24 27:3
  27:7,24 29:2
  43:15 50:16
  59:7 60:11
  61:5,14 62:18
  64:5,6,25 65:1
  68:4,10,18
  69:17 71:17
  72:17,19,21,25
  73:2 74:25
  75:4 76:3,9,9
  76:21 77:3,15
  77:23 78:7,8
  80:4 84:2,23
  86:12,21 87:16
  88:2 89:24,25
  91:6 92:12
  93:16,23 94:5
  94:8,22 98:6
  98:24,24 99:8
  99:12 101:19
  101:22 103:1,1
  103:13 105:23
  106:9,10,16,19
  106:19,23
  107:7,10,14,14
  107:23,25
  108:6,6,16,23
  114:12,23
  115:11,18,19

119:1,4,10
120:25 121:8
121:21,23
122:14 123:9
129:8 131:14
131:16 132:22
133:7,10,12,14
133:16 134:1
**programs** 5:17
6:22 8:2,16 9:1
9:20 10:17,18
11:7 23:10,20
26:12,19,21
27:10,11 30:12
30:22 64:18
67:25 95:23
130:7
**prohibition**
18:14
**prohibitively**
68:1
**project** 9:24
80:13
**promising**
119:6
**promptly**
100:17
**pronouncing**
19:7
**properly** 51:12
**proportional**
52:16
**proportionality**
102:24 105:16
109:15

**proposal**
111:10,17
128:13
**proposed** 22:4
25:18 37:8
50:24 58:5
111:25
**proposing**
22:11 32:6
50:9 58:8
**propound** 7:8
7:14
**propounded**
7:9
**protect** 127:19
**protected**
47:12 50:7
**protecting**
60:17
**prove** 97:6,7
**provide** 32:23
50:23 112:25
128:12 130:8
**provided** 11:13
11:16 63:10
100:21 114:20
115:6 117:13
**provides** 78:1
84:16 89:11
**provision** 16:23
16:25 17:16
19:13,24 20:16
20:18 36:2
**provisions** 20:3

**prudent** 83:10
**public** 1:15
60:2,10,18
61:3 62:1,10
65:22 66:1,22
66:24,25 67:18
67:23 68:12,14
71:18,20 72:10
87:17 95:8
99:11 136:4
**publicly** 89:9
**purpose** 52:23
71:17 77:22
132:25
**purposes** 5:9
82:24,25
**pursue** 39:16
**put** 25:19 46:12
51:19 77:15
78:14 82:12
87:7 89:9,19
91:20 92:5,7,8
92:23 96:19
100:10 102:2,6
112:12 118:6
**putting** 13:10

**q**

**quarter** 32:13
**quarters** 22:5
**question** 4:17
11:3 24:6 34:4
52:15,21 61:20
63:8 71:22
73:8,10,17,19
73:21 74:5,15

74:21 82:4,23
84:20 85:25
92:16 101:17
115:6 116:8
119:17
**questioned**
24:10
**questions** 23:23
23:25 29:9,11
29:12 62:10
72:10 122:4
**quick** 124:10
**quickly** 13:19
83:22
**quite** 3:19
13:13
**quote** 16:4
23:13 93:24
**quotes** 129:8

**r**

**r** 2:1,3,16
132:21 133:8
136:1
**raise** 28:8
89:19 95:12
99:16 103:12
103:17 133:1
**raised** 7:10
51:4 58:3
92:19 94:14
97:25 98:12
**raising** 29:10
89:23 95:3
**ran** 20:18

**range** 91:19
**ranking** 114:14
　119:20
**rare** 45:4
**rather** 12:12
**rational** 59:11
**ray** 80:8
**reach** 80:21
**reached** 101:17
　108:7
**read** 33:2 127:8
**reading** 66:21
　102:22 127:7
　127:13,14
　135:4
**real** 92:1
**really** 3:9 5:22
　13:7 14:13
　26:20 30:13
　32:8 35:3 38:3
　39:14 43:10
　48:5,7 49:9
　55:3 60:15
　62:13 64:17,19
　68:9 69:16
　82:25 91:15
　105:19 106:18
　131:20 132:19
　135:3
**reason** 27:8
　53:13 79:9,14
　82:20 103:7
　108:21 110:25
　118:19 126:1

**reasonable**
　52:16
**reasons** 22:16
　89:22 98:13,21
　99:4,6
**rebate** 35:23
**rebates** 10:25
　17:22
**recalled** 56:9
**receive** 18:15
**received** 25:20
**receiving** 45:21
**recent** 10:12
**recess** 4:12
　99:23
**recipient** 52:4
**recognizable**
　60:16
**recognize**
　117:7
**record** 3:7 4:11
　9:8 10:11 15:1
　92:24 102:6
**records** 13:3
　103:3,5
**redacted** 45:2
　46:13
**reduce** 89:16
**reduced** 94:6
　96:6
**reducing** 97:11
**reduction** 94:7
**refer** 124:19
**reference** 91:9
　92:21,21 94:9

94:10 96:14
　116:19 131:13
**references**
　17:11
**referencing**
　127:4
**referring**
　107:21 110:22
　110:23 123:17
**refers** 108:5
**reflect** 31:19
　38:19 39:15
**reflecting** 42:9
**reflects** 31:20
**reframing**
　74:12
**refresh** 108:12
**regard** 3:16,20
　6:20 8:12
　17:20 23:13
　27:19 28:4,12
　31:8 33:11
　69:20 81:11
　101:7,16 127:9
　128:10
**regarding** 3:12
　4:17 34:7
　102:18 105:13
　107:22 123:13
**regardless** 12:1
**regular** 132:6,7
　132:8
**regularly** 24:2
**reimburse**
　119:6

**reimbursing**
　119:14
**reiterate** 76:16
**reject** 62:5
**rejected** 111:17
**relate** 3:12 20:3
　22:7 32:16
　43:12 111:8
**related** 25:2
　43:10 47:18
　54:21 67:1
　77:3,8 94:8
　103:5 110:9
　136:10
**relates** 62:15
　104:20
**relating** 4:24
　5:25 6:8,10,14
　7:21 16:20
　26:10 30:20,21
　54:25 56:15,22
　57:25 82:5
**relative** 73:23
　136:13
**relevance** 4:16
　9:17 15:25
　59:14 91:23
　132:18 133:3
**relevancy** 9:14
**relevant** 5:12
　5:20 9:3 10:16
　11:6,21,21
　15:24 17:3
　19:12 21:2,16
　21:24 25:8

| | | | |
|---|---|---|---|
| 28:15,23 31:13 | **report** 89:8 | **require** 69:22 | **responses** |
| 33:8 34:7,9 | 93:24 | 80:8 90:16 | 55:12 114:19 |
| 35:1,12,22 | **reporter** 1:15 | 127:11 | 123:15 124:11 |
| 36:24,25 41:12 | 99:21 136:4 | **required** 12:20 | **responsibilities** |
| 41:20 53:18 | **reports** 25:3 | 48:11 52:22 | 114:16 120:22 |
| 58:20 61:20,21 | 89:12 90:8 | **requirements** | **responsibility** |
| 64:7 67:13 | 91:14,21 | 20:10,23 30:18 | 7:23 114:11,22 |
| 70:2 72:9 | 115:17 | **requires** 66:21 | 114:23 115:8 |
| 76:17 77:14 | **representation** | **reserve** 57:4 | 115:17 122:6 |
| 80:6,20 82:25 | 93:7,11 97:19 | **resided** 121:25 | 123:5 |
| 87:5 89:17 | 97:22 114:21 | **resides** 80:22 | **responsible** |
| 90:2,6 91:24 | **representations** | **residing** 73:19 | 6:12 |
| 91:25 100:4,10 | 97:4 | **resolve** 22:20 | **rest** 103:25 |
| 108:25 109:8 | **represented** | 57:3 112:7 | 105:15 |
| 110:22 114:5,6 | 123:14 | 135:5 | **restrictive** |
| 115:13 116:2 | **request** 30:4 | **resolved** 3:7 | 42:14 |
| 117:23 118:20 | 31:5 32:1,2,25 | 8:11 113:1,3 | **result** 52:18 |
| 122:13 124:7,8 | 33:20 34:13,15 | **respect** 9:23 | 56:22 68:20 |
| 124:15 129:8 | 34:19 37:9 | 109:15 121:20 | 71:2 76:10 |
| 131:8,10,17 | 47:21 49:17 | 123:7 | 85:1 86:11 |
| 134:3 | 54:21 55:21 | **respectfully** | 93:17 |
| **relief** 127:9 | 64:14 67:11 | 108:15 126:2 | **resulted** 84:2 |
| **relieve** 51:9,13 | 81:7,8 88:4,6 | **respond** 7:16 | **retain** 15:5 |
| **rely** 128:6 | 108:16 | 48:22 53:2 | **retention** 9:11 |
| **remain** 44:3 | **requested** 6:21 | 65:8 72:12 | 11:12,14,24 |
| **remaining** | 107:22 127:9 | 81:12 83:22 | 12:1 13:9 |
| 112:4 113:16 | **requests** 5:7 | 91:11 121:9 | 14:14 15:11 |
| 123:21 | 6:20 7:20 8:3 | **response** 4:23 | **return** 38:12 |
| **rendering** | 22:18,18 40:18 | 25:23 26:14 | 70:8,11 71:9 |
| 47:22 | 40:19,25 45:21 | 27:23 42:22,24 | 71:19 72:4,8 |
| **renewed** 112:6 | 63:24 67:12 | 63:10,12 67:15 | 77:4,7 79:22 |
| **repeat** 80:1 | 69:10,14 79:1 | 102:4 105:15 | 80:3 81:16,22 |
| **reply** 98:1 | 81:9 87:14 | 106:20,23 | 82:11 83:17,18 |
| 113:15 | 88:22 | 107:3,9 132:22 | 87:8 88:9,11 |
| | | | 100:14 |

Case 2:22-cv-02632-CCW-CDW Document 365-06/15/24 09:06/24 of 263 Page ID #226110
Case 2:22-cv-02632-CCW Document 365 Filed 09/04/24 Page 271 of 263 PageID: 32890
PageID: 32890

**reveal** 108:5
**review** 5:19
  23:5 32:12
  41:8 43:3
  45:12 46:9
  48:11 49:7
  52:22 53:24
**reviewed** 22:6
  42:23 57:7
**reviewing**
  45:14 48:3,12
  52:8 102:20
**revise** 42:9
**revising** 53:15
**revisit** 126:1
**rhetorical**
  95:13
**right** 3:1 4:2
  6:24 8:13 16:2
  18:25 21:17
  23:22 32:3
  38:14 39:13
  43:16 54:7
  55:4 58:3 60:6
  61:23 65:7
  66:13,14 87:14
  88:18 92:5,24
  101:12,18,20
  102:17 105:10
  110:3 111:20
  112:2 119:19
**riverfront** 2:9
**road** 31:2
**robinson** 2:19

**role** 44:5,12,20
  115:10
**rolls** 99:15
**roof** 23:5
**root** 27:10
**roseland** 1:18
**row** 94:1
**ruled** 87:24
  105:9
**rules** 59:18
**ruling** 110:7,14
  110:18 112:10
  134:15
**run** 16:20
  25:23 32:20
  44:8 55:22,24
  55:25 56:3,18
  83:2,11 104:8
  104:18 107:7
  108:10,13
  109:2 116:22
  119:3
**running** 26:12
  34:21 44:1
  104:12 109:25
**runs** 74:24
**ruthanne** 1:14
  136:3,20

**s**

**s** 2:3
**safety** 66:22,25
  67:2
**sale** 62:6 82:6
**sales** 71:4,4
  72:1 77:11,14

  77:18,19 78:16
  84:6,7,21
  99:16,17
**sandick** 2:5 7:1
  8:24 9:4,16
  12:23 13:20,22
  14:1,5,21
  15:13,16 18:6
  20:9 21:8 26:7
  28:20 29:18
  30:2,5,9 32:5
  33:4 35:3 37:4
  37:13 38:21
  39:3 40:7,16
  42:19 43:5
  44:17 46:4
  47:1,14 49:24
  51:24 52:11
  53:19 54:19,24
  55:4,9,13 56:6
  56:20 58:2,25
  63:3,14 68:11
  72:11,14 74:17
  74:22 75:5
  76:5 78:3 79:8
  80:7 82:3,23
  84:20 85:3,7
  85:18,23 86:1
  86:7 87:10
  88:20 90:4
  91:7 92:6,11
  92:20 93:8,12
  94:2,17,20
  95:1,4 96:4,24
  97:5,13,16,21

  103:23 110:5
  110:10 135:2
**sandick's** 49:9
**sandler** 1:17
  2:24
**sara** 2:7
**sat** 39:19
**savaria** 42:16
  46:8 54:10
**save** 1:8
**saveon** 5:23
  9:19,21,23
  10:8,17 11:5
  17:6 18:2,13
  20:16,17,24
  21:4 24:2,18
  26:19,24 27:1
  27:4,11,21
  29:2 30:12,16
  30:20 35:19
  36:5,6 42:5
  47:5 54:22
  55:7,12,12
  56:14 58:19
  60:7 61:8 62:7
  67:22 68:18,25
  69:2 70:21
  76:10 78:2,10
  80:17 83:16
  84:2,22 85:4,6
  85:8,17 86:12
  86:20,25 87:6
  87:9,11,15,23
  87:23 88:5,14
  91:9 92:10,21

g 5

Case 2:22-cv-02632-CCC-CLW Document 365-06/19/24 Page 242 of 263 PageID: 26111
PageID: 32891

92:22 93:14,20
93:23 94:9
95:17,22 96:6
96:10,15,18,19
104:4,9 106:21
106:23 108:3,5
110:22 114:18
114:25 115:2
116:4,25
117:10 121:1
124:1 131:12
131:14,17
**saveon's** 94:8
107:22 113:14
115:10 118:11
118:17 120:14
127:9
**savings** 22:2
36:16,18
**saying** 9:5,6,12
24:6 25:17
32:2 33:7
37:14,15 43:24
46:1 52:1 56:9
58:6 60:14
64:8 68:3,6,6
82:8 84:3
87:15 88:4
103:10 107:12
110:25 111:16
**says** 5:13 67:3
67:22 76:9
78:1 89:10,13
93:24 116:7
127:16 129:21

130:4
**scenario** 84:15
**scg** 130:5
**scope** 18:17
22:20 29:8
36:15 72:6
101:18
**scott** 111:14
116:7 119:4,17
121:8,14
**scratch** 81:17
**screen** 50:8
**scripts** 80:24
81:1 90:22
**search** 4:23 6:7
6:9,13,17,18
12:4 16:11,13
16:20 22:4,8
22:11,18 25:13
25:17,18,19,22
26:1 32:22,24
33:17,19,22
34:1,21 37:2,7
38:13 40:2,4
40:13,14 41:4
41:13 42:15
43:23 44:1
45:25 46:2,23
46:25 47:11
49:11 53:1,12
53:16,25 54:3
54:15 55:22,25
56:17 57:10,16
58:4 61:24
78:25 82:17

85:9 86:4,7,16
91:19 101:18
103:2 104:2,8
105:2 106:12
106:13 107:6
107:16,18,21
108:11 109:22
109:25 110:5,9
111:5,8,10
114:5 116:22
128:9,23
129:11 131:10
132:6,9,12
134:23
**searches**
102:19 103:4
103:19 105:3
105:13
**second** 96:19
106:17 130:22
**secret** 79:10
**see** 3:11 5:19
15:15,20 21:5
28:3 30:19
35:15 46:9
56:25 57:1,17
63:1 68:7,8
75:19 87:11
98:15 116:2,25
119:4 120:2
131:5
**seeing** 52:23
**seeking** 91:8
120:10

**seemed** 12:12
**seeming** 126:15
**seems** 49:9
**seen** 17:17 19:3
47:14 49:1
57:18 68:16
82:10 85:18,23
86:1 100:11
106:8 122:25
**segment** 83:14
83:14
**selective** 42:7
**selendy** 2:15
**sell** 71:13
**selling** 82:14
**sells** 76:24 77:1
**send** 15:16 41:9
42:22
**sends** 119:2
**senior** 27:4
114:2,11
115:16 117:4,9
122:4
**sense** 44:13
74:23 84:16
102:23 103:2
105:7
**sensitive** 99:7
**sensitivity**
133:2
**sent** 42:20,20
102:8 130:24
**sentence** 38:11
**separate** 47:4
48:12 87:2

Veritext Legal Solutions
800-227-8440          973-410-4040

[separate - sorts]                                                    Page 35

124:21
**separately**
46:17 48:3
99:2
**september**
107:25
**series** 67:23
**serve** 113:25
**served** 7:20,22
**serves** 29:10
60:24
**services** 36:5,6
60:23 118:11
118:18 120:14
**serving** 50:2
**set** 4:6 59:15,18
60:20 61:16
91:8 92:21,21
94:9 96:14
126:19 127:9
132:6 136:8
**sets** 17:10
60:19 61:16
69:25
**setting** 17:7
61:7
**seven** 112:25
**several** 3:4
42:23 104:16
**shake** 126:15
**shaking** 131:5
**shampoo** 77:18
**share** 94:5
**sheet** 23:3

**sheryn** 2:23
**shift** 73:7
**short** 4:5 5:8
10:3 12:16
105:12
**show** 21:2
30:17 31:7
43:13,14 59:17
61:6,15 63:14
69:23 84:13
85:1 87:3
91:25 94:21
95:15,16 99:14
111:24 120:19
**showing** 59:1,5
60:19 61:4,10
61:13 77:5
79:21 88:1,1
89:22 117:10
**shown** 120:11
124:14
**shows** 118:15
125:6
**side** 13:10
16:13 25:21
34:8,18 53:14
100:25 114:21
126:16 131:6
**sides** 132:2
**sidetracked** 7:4
**sign** 84:22
86:23 87:3
119:23 120:24
**signatory**
121:18

**signature**
121:14 136:20
**signed** 70:25
121:16 125:16
**significant**
48:17 112:12
**signing** 65:14
71:24 78:17
84:1,3,5 85:16
125:12,13
**sills** 2:8,12
**similar** 39:8
**similarly** 66:20
103:4
**simple** 73:19
**simply** 10:16
15:7 30:17
126:5
**single** 33:2
61:18 82:17
112:20 116:6
118:10,13
130:24
**sit** 39:20 41:3
52:13
**sits** 120:5
**sitting** 48:14
75:11
**six** 63:17
101:15 109:19
112:25 113:1
126:6 127:4,4
**slice** 131:25
**slightly** 40:24

**small** 120:10,10
133:5
**smoking** 116:5
**snow** 2:17
101:9,21 103:9
104:15 106:5
106:17 107:17
107:20 111:9
112:3 117:16
117:17 118:6
119:24 120:4
120:18 121:22
124:10 125:4
126:9,19
128:12,15,19
129:13,16
130:3,17,22
131:2 132:5,15
132:17 133:19
133:25 134:24
**somebody** 37:6
**somebody's**
60:15
**someone's**
73:20
**somewhat**
40:19
**sorry** 120:4
**sort** 13:2 15:3
43:24 61:3
65:25 66:3
76:20 95:8,13
134:3
**sorts** 23:9
80:25

[sought - suggest]

| | | | |
|---|---|---|---|
| **sought** 20:23 | **sporadic** 57:20 | **statements** | **subject** 7:8 |
| **sound** 12:8 | **spotlighted** | 123:13 | 12:18,25 21:9 |
| **south** 123:6 | 18:21 | **states** 1:1 112:8 | 21:22 22:8 |
| **sp** 1:8 62:7 | **squarely** 61:21 | **stating** 85:19 | 23:1 26:10 |
| 93:20,23 | **stage** 9:3 | **statute** 66:21 | 28:21 30:10 |
| **spaces** 112:21 | **stake** 87:7 | 67:1 69:3 | 33:24 39:4 |
| **speak** 15:3 | **stand** 77:16,25 | **stay** 89:25 | 43:8,10 53:10 |
| 43:20 70:10 | 78:6 93:5 | **steal** 72:18 | 59:7 63:5,9 |
| 100:24 102:3 | 95:19 96:20 | 84:16 | 68:12 72:8 |
| 106:5 117:12 | **standard** 5:16 | **stealing** 97:12 | 80:14 83:13 |
| **speaking** 28:23 | 23:7,10 36:8 | **steals** 78:3 83:3 | **subjects** 41:12 |
| **specific** 7:25 | 124:14 | **stelara** 6:13,14 | **submission** |
| 40:12 73:8 | **standpoint** | 24:19 25:11 | 12:24 16:12,15 |
| 75:8 87:25 | 102:24 | 42:2 43:9 | 100:16 |
| 104:8 105:7 | **stands** 26:16 | 53:15 55:3 | **submit** 15:14 |
| **specifically** 7:2 | **start** 9:13 | 56:7,12,22 | 19:25 100:23 |
| 8:9 24:17 42:3 | 31:18 49:9,15 | 57:11 68:8,20 | **submitted** |
| 45:11 46:15 | 49:23 86:5,18 | 86:24 104:21 | 21:10 100:12 |
| 49:12 53:14 | 87:6,14 97:24 | 121:2,24 | **subpoena** 47:4 |
| 56:13 69:21 | 113:19 121:12 | **stenographic** | **subpoenaed** |
| 71:9 75:8 | 126:11 127:17 | 1:12 136:6 | 51:7 |
| 102:18 108:1 | 128:6 129:17 | **steps** 27:6,23 | **subsequent** |
| 126:24 134:1 | **started** 8:22 | 28:9 | 122:24 |
| **specifics** | 10:1 26:19 | **stop** 61:25 | **subsidiary** |
| 102:18 105:13 | 27:22 56:13 | 74:16 | 74:24 |
| 108:2 | 101:13 103:13 | **story** 77:25 | **substantial** 3:8 |
| **specified** 103:6 | 106:16 | 80:18,22 81:3 | 13:1 59:20 |
| **spell** 97:7 | **starting** 24:16 | 81:5 | **substitute** 7:12 |
| **spend** 71:11 | 86:6 107:24 | **stranger** 45:8 | **success** 64:16 |
| 76:11 135:4 | **starts** 129:25 | **strategic** 130:6 | **succinctly** |
| **spending** 78:19 | **state** 1:16 | **strategy** 99:3 | 112:18 |
| **spent** 59:6,23 | 136:4 | **string** 19:5 | **suddenly** 109:4 |
| **split** 112:22 | **stated** 123:11 | **strongly** 76:17 | **sufficient** 87:9 |
| **spoke** 102:13 | **statement** | **stuff** 100:8 | **suggest** 92:9 |
| | 29:20 | | 133:11 |

**suggests** 72:22 118:14
**suit** 66:4
**summarize** 99:25
**summarized** 102:12
**summarizing** 100:16
**summary** 12:18 93:1
**summer** 63:10
**sun** 61:19
**supplemental** 100:15
**support** 5:17 10:4 26:22 29:24 59:6,19 74:10 75:10 94:22
**supports** 90:12 90:15 116:9
**suppose** 45:17
**supposed** 3:24
**sure** 7:18 9:16 13:13,25 17:23 29:18 33:22 35:25 36:11 39:5 46:4 57:24 58:11 69:3 72:13 74:17 75:6 113:20 122:9 124:2

**surprised** 58:7
**sworn** 136:7
**system** 10:1 15:1
**systems** 1:5

**t**

**t** 123:19 136:1 136:1
**t&c's** 6:8,13,15 6:22
**table** 4:6 126:16
**tables** 4:19
**tailor** 8:22
**tailored** 8:20 54:3 69:14
**take** 9:12 27:6 27:22 28:12 46:5 70:23 71:12 79:12 83:5,16 84:1 99:19 106:10 108:18 113:11 118:2,7 125:21 131:18 132:3 134:9
**taken** 1:14 4:12 10:21 53:23 94:4 95:22 99:23 131:15 136:12
**talk** 6:19 8:8 13:22 14:21 16:6 24:13 25:25 30:15

34:2 45:19 54:3 58:9 67:12 69:11 72:5 76:19 105:18,20 127:17 128:7 129:2
**talked** 3:19 62:1 76:13
**talking** 5:23 10:9 11:10 19:21 27:18,20 32:12 33:10,12 34:18 38:16 40:10 45:8 65:12,18,19 66:5,7,8,14 90:14 109:21 117:8 121:22 123:4,5
**talks** 35:5 85:3 85:5
**targeted** 93:23
**team** 120:5 133:6,6
**teams** 81:24,24
**tee** 15:12
**tell** 16:17 24:4 45:12 63:23 66:6 77:25 79:2 86:17 88:2 92:3
**telling** 12:7
**tells** 11:13

**term** 4:17 7:25 9:2 10:22 12:21 18:7,23 21:23 23:10 28:25 30:16 36:8 55:25 56:4,5,17 103:6 104:8,13 104:18,19 107:23 111:5
**terminated** 26:23
**terms** 3:12,18 3:22 4:23,24 5:12,15,16,24 5:25 6:9,18 7:21,24 9:22 10:21 16:8,11 16:13,22 17:3 17:9,10,12,15 18:8 19:5,9,19 20:2,3,21 21:6 21:6,22 22:4,8 22:11,18 23:4 23:4,7 25:13 25:17,18,19,22 26:1,11,15,25 27:9,24 29:21 32:20,22,24 33:17,19,22 34:1,17,21,21 34:25 35:16,19 36:9,22,23 37:2,7,25 38:10,13,17

| | | | |
|---|---|---|---|
| 39:10,13,16 | 135:3,6 | 28:9,16 30:25 | 119:21,24 |
| 40:2,4,13,14,19 | **theory** 79:16,18 | 31:4,18 34:1 | 120:9,18 |
| 40:24 41:4,13 | 93:9 96:7 | 37:14 40:13 | 123:23 125:11 |
| 42:2,6,10,15 | 97:17 116:9 | 41:12,20 42:13 | 126:2,12 127:6 |
| 43:9,13 44:1 | **thicket** 68:24 | 42:18 43:18,19 | 128:5 130:10 |
| 49:12 53:1,12 | **thing** 29:9 | 44:2 49:5,22 | 131:14 133:10 |
| 53:16,17,25 | 54:19 58:16 | 54:1 55:2,18 | 134:12 |
| 54:3,15,20,25 | 79:10,24 101:7 | 55:19,22 56:4 | **thinks** 34:8 |
| 55:22 57:10,16 | 105:21 | 56:19 57:14,15 | **third** 2:19 |
| 57:17,20 58:1 | **things** 3:14 7:6 | 58:16 59:23 | 46:21 47:4,9 |
| 58:5,5 59:18 | 9:4 10:25 17:7 | 60:7,9 61:20 | 49:2,11 51:5 |
| 61:24 62:8 | 17:22 18:16 | 62:13,23 63:1 | 51:15,18,22,24 |
| 67:17 71:4 | 21:8 22:1,22 | 63:23 64:3 | 52:3 53:7,9 |
| 74:6 77:14 | 23:22 25:15 | 67:4,9,11 | 54:14,25 55:8 |
| 78:3,25 79:19 | 26:8 27:17 | 69:15,21 70:11 | 66:2 110:18 |
| 82:13 83:7 | 28:5,15,21 | 72:1 75:8,23 | 116:5,10 |
| 101:18,21 | 29:7 32:10 | 76:18 77:12,21 | 132:19,20,21 |
| 104:2,21 105:2 | 34:16 35:12 | 78:5 80:21 | **thirds** 22:5 |
| 107:6,16,19,21 | 38:2 58:21 | 82:7,9 86:6,15 | **thought** 10:24 |
| 108:1,11,18 | 60:3 62:9 | 86:16,21 87:8 | 12:5 20:17 |
| 109:22 110:1,5 | 65:13,19 67:24 | 88:23 89:15,21 | 24:5 31:23 |
| 110:9,21 111:8 | 68:6 73:13 | 90:2,4,6 92:15 | 96:1 100:3 |
| 111:10 114:5 | 92:22 94:10 | 94:13,14 95:24 | 103:13 109:14 |
| 116:22 118:12 | 129:1 | 96:24 98:1 | 126:25 |
| 118:18 120:14 | **think** 4:7 5:22 | 99:10,13 100:2 | **thousands** 4:22 |
| 120:25 128:9 | 6:6,23 7:1,6,9 | 100:13,23 | 22:10 48:16 |
| 128:23 129:11 | 8:2,6,13 9:17 | 101:1,6,16,23 | **thread** 131:2 |
| 132:6,9,12 | 9:23 12:12 | 103:17 104:2 | **threat** 66:21,24 |
| 134:23 | 13:4,16 15:23 | 105:10 106:17 | **threaten** 60:4 |
| **test** 30:19,20 | 15:25 16:7,10 | 107:1,5 111:16 | 61:11 |
| **testimony** 77:5 | 17:2,13,15,19 | 112:8,11,17,19 | **threatens** 60:7 |
| **text** 112:20 | 18:4,23 19:1 | 113:2,4 115:12 | **three** 22:5 |
| **thank** 41:24 | 19:15 20:14 | 115:14 116:3 | 55:20 133:6 |
| 88:17 129:13 | 21:1,10,18,25 | 117:3,10 | **tied** 32:9 78:22 |
| 130:1 134:25 | 24:11 26:6,7 | 118:19,23 | |

| | | | |
|---|---|---|---|
| **ties** 88:3 | **told** 22:15,16 | **tremfya** 6:13 | **turn** 3:17 11:9 |
| **tim** 102:10,11 | 32:14,21,22,22 | 6:15 24:19 | 20:7 24:9 |
| **time** 4:19 5:18 | 63:11 102:5 | 25:11 42:2 | 58:15 113:11 |
| 5:20 8:19 10:7 | 117:11 | 43:9,13 53:16 | **turned** 107:10 |
| 10:9,12,22 | **tons** 98:3 | 55:3 56:8,12 | **turning** 66:16 |
| 11:5,21 14:22 | **took** 31:16 | 56:22 57:11 | 117:24 130:10 |
| 14:25 15:1,5 | 32:19 43:24 | 68:20 104:21 | 132:15 |
| 19:24 21:16 | 63:16 99:25 | 121:3,24 | **turns** 7:24 |
| 22:12 24:9 | 104:11 105:23 | **trial** 12:19 | **two** 4:5 6:11,18 |
| 25:9 27:25 | 106:19 | 21:13 22:3 | 17:17 21:8,25 |
| 30:22 31:15 | **tool** 50:9 64:20 | 32:10 46:20,24 | 22:5 24:19,22 |
| 33:9 34:14 | **tools** 36:8 | 47:1,3,5,6 49:3 | 24:25 27:17 |
| 35:5 36:19 | **top** 116:7 118:6 | 49:12 51:7 | 32:21 42:10 |
| 37:6 38:14 | **topic** 6:24 16:3 | 56:10 69:6 | 44:3,7 49:21 |
| 40:21 44:24,24 | 80:6 | 84:12 92:25 | 54:9 55:18 |
| 52:2 55:19,23 | **tortious** 36:3 | 96:20 116:1 | 60:9 62:3,6 |
| 55:24 56:1 | **tortiously** | 118:21,23,25 | 65:25 77:3 |
| 57:18 58:2,20 | 18:18 | 119:6 125:19 | 98:13 101:21 |
| 79:14 90:19 | **totally** 12:13 | **tried** 7:11 10:3 | 103:18 106:5 |
| 92:13 103:16 | 58:7 73:13 | 32:18 | 107:21 127:18 |
| 105:2 108:11 | 74:1 80:13 | **true** 26:9 78:5 | 131:12 |
| 110:18 113:7 | **touch** 28:24,25 | 82:9 85:19 | **tyler** 2:4 |
| 128:19,20 | **towards** 17:8 | 94:13 117:1 | **type** 72:6,7 |
| 132:3,7,8 | **tracks** 7:2 | 128:4 132:25 | **types** 79:1 |
| 135:4 | **transcript** 1:6 | 136:5 | 113:21 |
| **times** 53:20 | 1:12 33:3 | **try** 3:15 26:20 | |
| 88:1 118:24 | 126:10,17,21 | 27:10 37:3 | **u** |
| **today** 3:2 8:8 | 126:23 127:13 | 81:18 90:18 | |
| 13:23 14:3 | 127:15 136:6 | 104:10 | **ultimately** |
| 16:18 55:16 | **transparency** | **trying** 9:21 | 102:15 104:6 |
| 64:23 92:24 | 89:8 90:8 | 35:21 76:2 | 104:10,15 |
| 97:4 100:20 | 91:14,21 93:24 | 77:16 90:9 | 106:19 107:9 |
| 115:24 118:24 | **tremendous** | 96:17 110:24 | 112:22 127:4 |
| 126:12 | 80:25 | 121:18 127:19 | 127:23 133:9 |
| | | 133:21 | **uncontrovers...** |
| | | | 5:16 |

| | | v | w |
|---|---|---|---|

**undecided**
  112:5
**under** 3:25
  19:6 60:16
  61:13,19 77:15
  87:21
**underlying**
  39:12 65:20
**underscore**
  78:24
**underscores**
  100:14
**understand**
  18:1 19:8,10
  19:11,14,25
  23:12 28:16,17
  33:7 35:21
  36:17,21,22
  38:6 41:22
  43:25 56:24
  58:17 67:19
  69:24 75:17
  87:6 105:21
  109:10 128:24
  129:9
**understanding**
  3:21 5:11 6:10
  8:18,22 16:21
  19:23 28:10
  34:15,23,24
  35:14,23 38:17
  38:20 40:10
  56:2 98:20
  104:21 132:24
  133:15

**understands**
  5:15 102:13
**understood**
  33:20 57:22
  134:5
**undertake** 48:3
**undertaken**
  45:11
**ungerleider**
  1:14 136:3,20
**unique** 114:24
**unit** 52:17
**united** 1:1
**universe**
  132:11
**unusual** 48:4
**update** 5:3 59:4
**updated** 43:15
**updates** 130:8
**updating** 5:4,5
**use** 7:11 35:16
  36:9 46:19
  50:14 128:11
  133:22
**used** 4:23 5:16
  6:9 9:2 10:23
  23:3,8,8 36:20
  42:15 76:21
  78:4 110:6
  128:20
**uses** 22:12
**using** 40:14
  53:1 96:10
**usually** 122:12

**v**

**values** 90:12
**various** 23:21
  27:19 38:18
  39:10 63:19
  81:18
**vasquez's**
  18:19
**vast** 80:12
**vazquez** 62:1
  65:18
**vazquez's**
  12:15
**vendor** 21:12
**verbatim** 81:8
**versus** 15:25
**viability** 60:4,8
  61:11 62:18,18
  64:5,11 67:24
  68:4,15 69:2
  69:10,13,23
  119:11
**view** 26:24 41:1
**vigilant** 39:9
**violate** 27:24
  118:12,18
  120:14
**virtually** 73:21
**virtue** 21:19
**voluntarily**
  26:13
**vs** 1:7

**w**

**w** 123:19
  132:21
**wait** 56:25 84:3
  127:13
**waldor** 3:5
  13:10 22:15
  31:1 32:21
  37:8 40:17
  41:2 43:16,23
  63:11 81:10
  87:24 101:14
  101:24 102:1
  102:13,21
  103:6 104:11
  104:17 108:17
  109:9 110:15
  110:16 111:17
  111:24 112:7
  112:18,22,22
  113:24 114:9
  124:23 125:24
  126:25 127:5
**waldor's** 26:14
  27:14 56:2,23
**want** 3:15 7:5
  8:20 9:12
  13:17,17 14:3
  14:9,17 16:18
  17:23 18:1
  19:14 20:7
  21:21 23:12,15
  23:19 24:1,3
  28:8,14 33:8
  35:9,11,15

36:19,21 39:9
41:15 49:16
51:3,14 55:8
55:16 56:15
57:24 62:11
64:2 65:16
67:9,12,14
68:9 69:8
70:17 74:14
75:1,19 77:25
78:6 80:6
81:21 82:18
86:5 87:6,7,15
91:22 93:7
94:15 96:15
97:18,23 98:15
98:19 99:19
100:7,23
103:24 105:20
108:9 111:4
112:2 117:12
117:18 118:8
124:24,25
125:20,24
127:24 128:6
128:10 129:2
131:12
**wanted** 3:4
34:11 38:3
63:11 104:1
105:14
**wants** 50:15
84:12 85:12
100:10 131:25

**way** 8:9 17:5
18:10 22:7,11
28:13 29:12
33:23 35:10
38:15 61:4,10
62:2 66:25
74:13 75:23
79:9 80:15
85:9 90:9 92:7
93:2 94:2
118:1 128:5
**wayne** 2:24
102:3,5 130:1
**ways** 122:10
133:21
**we've** 9:7 22:23
38:21,24 42:23
58:25 59:5,19
92:18,19
104:16 109:25
110:6,13
112:14 113:5
115:22 116:12
120:18 122:25
129:6,14
134:21
**webb** 2:4
**website** 89:10
91:15
**wednesday**
1:18 13:24
**week** 13:24
14:3,4 41:16
42:21 83:3
84:17 101:8

103:12
**weeks** 3:4
68:20,24
**weighing** 15:24
105:15
**welcomed**
124:2
**went** 16:12
40:22 48:25
104:11 105:10
112:21
**white** 111:14
112:13 113:19
113:24 114:13
114:13,17,21
115:8,12,17
117:4 118:16
119:4,17
120:17 121:8
121:14,17
124:19 125:15
128:10 134:15
134:22
**white's** 125:14
**wide** 80:8,25
91:19
**willing** 25:22
**wind** 45:15
**window** 104:24
**winds** 78:11
**withheld** 45:2
46:12 124:6
**witness** 136:7
**wohlforth** 2:20

**wolfson** 2:2 3:1
4:7,13 7:18 8:7
8:15,23 9:10
10:14 13:6,21
13:25 14:2,8
14:11,15,20
15:6,15,18
16:16,24 17:19
18:4,22 19:17
23:11,24 27:15
29:16,23 30:3
30:7,25 33:2,6
34:5,10 35:9
36:13 37:11,19
37:22 39:1,6
40:8 41:3,25
43:1 44:9
45:25 46:18
47:7 48:24
49:19 51:3
52:10,25 53:4
53:9 54:7,12
54:18,23 55:2
55:15 57:1
58:9,14 59:25
61:25 63:13,23
65:10 66:12
68:2 69:8 70:4
72:13 74:14,18
75:12 76:14
77:20 79:2,19
80:1 81:14
82:1 83:23
84:19 85:13,22
85:25 86:3,9

[wolfson - zoom]                                                                    Page 42

| | | |
|---|---|---|
| 86:14,18 88:13 | 134:5,20 135:1 | **written** 32:23 |
| 88:18,21,25 | 135:7 | **wrong** 44:19 |
| 89:4 91:4,12 | **wondering** | 83:5,6 |
| 91:22 92:4,17 | 74:19 | **wrote** 129:21 |
| 92:23 93:6,10 | **word** 22:12,13 | |
| 94:15,19,24 | 23:3 35:6 | **x** |
| 95:2,24 96:23 | 36:20 132:20 | **x** 80:8 |
| 97:2,9,14 | **words** 37:5 | **xio0115** 136:21 |
| 98:17 99:19,22 | 45:11 | **xio1634** 136:21 |
| 99:24 100:19 | **work** 35:13 | |
| 101:4,6,11,23 | 39:25 40:3 | **y** |
| 102:10 103:20 | 44:22 47:16,18 | **yeah** 14:20 |
| 105:5,25 | 48:8,20,20 | 55:15 62:20 |
| 106:10,13 | 50:4 51:2,2 | 65:10 66:12 |
| 107:11,18 | 52:7 61:23 | 76:14 85:7 |
| 108:7,13,21 | 81:23 102:20 | 87:10 91:12 |
| 109:17,24 | 105:14 116:1 | 94:19 112:16 |
| 110:3,8,20 | 118:21 125:10 | 113:18 119:16 |
| 111:7,11 | 132:12 | 127:22 129:11 |
| 112:15 113:4 | **worked** 44:5 | **year** 24:22 |
| 113:18 115:5 | 133:4 | 27:13 57:8 |
| 117:16 118:5 | **working** 8:5 | 63:17 94:1 |
| 119:16 120:3 | 43:6 45:14 | 95:12 |
| 120:16 121:10 | 50:1 107:3 | **years** 10:5,12 |
| 122:7,18 | 129:22 130:5 | 13:3 39:22 |
| 123:16,20 | 132:19,21 | 92:2 109:20 |
| 124:22 125:20 | **works** 17:5 | **york** 2:5,5,13 |
| 126:13,20 | **world** 33:17 | 2:13,16,16,20 |
| 127:12 128:2 | 54:22 64:15 | 2:20 |
| 128:14,17,22 | 110:23 111:5 | |
| 129:14,24 | **worried** 109:18 | **z** |
| 130:14,20 | **worse** 68:18 | **z** 123:19 |
| 131:1,4,18 | **write** 129:1 | **zoom** 2:10 3:3 |
| 132:8,16 | **writing** 129:7 | 41:18 |
| 133:18,23 | | |

Veritext Legal Solutions

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS

## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 3

# The 2022 Janssen U.S. Pricing Transparency Brief

Image Info: Microscopic Biology.

Janssen Pharmaceuticals, Inc.
© 2023 JP, Inc.

# $39 Billion Paid in Rebates, Discounts & Fees: Breaking It Down

In 2022, **we provided $39 billion in rebates, discounts and fees** to private payers and government programs, as well as providers, distributors and others.[1] Here is the breakdown:



**29%**
$11.2B
Commercial Payers and Pharmacy Benefit Managers

**16%**
$6.2B
340B Program

**13%**
$5.1B
Medicare

**11%**
$4.5B
Community Clinics

**5%**
$1.8B
Distributors

**4%**
$1.6B
Veterans Affairs/ Department of Defense

**2%**
$687M
Non-340B Hospitals

**10%**
$3.8B
Medicaid

**10%**
$4.2B
Other[*]

* Other: Includes Coupons/Co-Pay, programs such as Long-Term Care, ADAP (a program specific to HIV and AIDS) and other disease-specific sites of care/insurers.

Learn more at transparencyreport.janssen.com

Janssen Pharmaceuticals, Inc., © 2023 JP, Inc.

Case 2:22-cv-02632-CCC-CLW Document 519-5 Filed 06/29/34 Page 4 of 22 PageID: 25755
PageID: 32906
2022     U.S. TRANSPARENCY REPORT     02

# 2022 at a Glance

**Our net prices declined for the sixth year in a row in 2022.** Unfortunately, the reality for millions of patients is growing affordability and health equity gaps caused by underinsurance and inadequate insurance benefit design driven by middlemen, including pharmacy benefit managers.

### 1 Net Prices for Our Medicines Have Declined for the Sixth Year in a Row

**-3.5%** Average net price decline of Janssen medicines in 2022 (compared to the 9.1% rise in consumer prices over the year ended June 2022)[1,2]

### 2 Rebates and Discounts to Commercial Insurers, PBMs and Government Programs Have Grown

**$39B** Total amount Janssen paid in rebates, discounts and fees to commercial insurers, government programs and others in the healthcare system in 2022[1]

### 3 Insurance Benefit Design Shifts More Costs to Sicker Patients

**32%** Of covered U.S. workers face an annual deductible above $2,000[3]

**23%** Of Americans are considered underinsured[4]

### 4 Our Investments in R&D Continue to Grow

**$11.6B** Dedicated in 2022 to the discovery and development of new treatments and cures[1]

**110%** Janssen spent 110% more on R&D than on sales and marketing in 2022[1]



**3 Facts to Know**

**58%**

Of the **list prices of our medicines** went to commercial insurers and others in the healthcare system[1]

**$65.7B**

In total R&D spending since 2016[1]

More than

**1.16M**

patients were helped with support to afford their medicines through the **Janssen CarePath Program**[5]

# Introduction

When a prescription medicine becomes reality, it's the result of years of investments, research and the dedication of thousands of individuals across the U.S. healthcare innovation ecosystem that is bolstered by laws and policies supporting this ecosystem. When our ecosystem works as intended, patients and the entire healthcare system benefit from the discovery of next generation medicines that change the way we fight diseases. These discoveries do not happen overnight. They take decades, and the hope patients have today is created by a carefully cultivated innovation ecosystem.

At Janssen, we are proud of the innovative contributions that our dedicated employees have made to enable these medical breakthroughs that create hope for patients.

Since 2016, the first year we published the Transparency Report, Janssen has invested

## $65.7B

in research and development to push the boundaries to develop innovative therapies and treatments.[1]

These investments have led to significant breakthroughs, including the launch of our first cell therapy to treat multiple myeloma, a blood cancer, in 2022.[6] We are relentlessly pushing the frontier of innovation to bring greater personalization, earlier intervention and smarter, data-driven healthcare.

In addition to developing these transformative medicines that help millions of patients, we also negotiate and provide rebates, discounts and fees to many stakeholders in the healthcare system. These negotiations resulted in **our overall net prices in the U.S. decreasing by 3.5%,** our sixth year in a row of negative net prices.[1] Net prices are the amount we receive after providing rebates, discounts and/or fees to different parts of the healthcare system. In 2022, **we provided $39 billion in rebates, discounts and fees** to commercial insurers, pharmacy benefit managers (PBMs), hospitals, government payers and others in the healthcare system.[1] This means that nearly **58 cents of every dollar** of our gross sales went back into the healthcare system.[1]

**How Much in Gross Sales Was Returned to the Healthcare System in 2022[1]**



.58¢

$1.00



Pictured: Crypt Cells.

Notwithstanding our continued R&D investments and negotiations with payers to support patient access, we are deeply concerned about continuing trends and new policies that undermine patient access; further exacerbate gaps in affordability and health equity; and threaten the nation's leadership role in the global pharmaceutical innovation ecosystem. Our specific concerns include:



### Patients Are Not Directly Benefiting From Continuously Lower Net Prices and Growing Discounts

While the net prices that payers pay manufacturers for prescription drugs have grown at or below the consumer price index, too many patients continue to pay higher out-of-pocket costs.[7] This difference between the list price and net price has grown significantly, with one analysis putting the total at more than $200 billion in 2021 for the entire healthcare system.[8]



> **$200B** — The difference between list price and net price is now more than $200 billion.[8]

While commercial insurers pay lower net prices, patients do not always directly benefit from these lower prices and continue to pay higher out-of-pocket costs at the pharmacy counter.[7] Patients pay higher out-of-pocket costs because their cost-sharing amount is often based on the initial list price, not the negotiated lower net price the commercial insurer pays.



Pictured: Microscopic Image.



### Underinsurance Is Widening Gaps in Affordability, Health Equity and Access

There are a growing number of Americans who have health insurance but are still at financial risk, or underinsured, due to high deductibles, high out-of-pocket costs and some treatments not even being covered by their insurance plan. These inadequate benefit designs put the greatest burden on the sick, thereby raising concerns about affordability across the entire population and hampering the value of medical innovations.[9] Data show that commercial insurers' cost-shifting is a financial burden for households nationwide, affecting tens of millions of Americans every year who are unable to afford growing out-of-pocket costs.[10, 11]



### Enactment of the Inflation Reduction Act

The Inflation Reduction Act (IRA) threatens to harm the future development of innovative medicines, improvements in existing treatments and patients' access to these treatments. At a time when the nation is on the cusp of transformative innovation to tackle so many unmet healthcare needs, the IRA's drug pricing policies are the exact opposite of what patients need and deserve.

As one of the nation's leading healthcare companies, we have a responsibility to engage with stakeholders in constructive dialogue to address these gaps in affordability, access and health equity as well as protect our nation's leading role in the innovation ecosystem. Through the 2022 Janssen U.S. Transparency Report, we continue our legacy of contributing insights, data and real-world evidence to help inform and advance policy solutions to create a more sustainable, equitable and innovative healthcare system.

At Janssen, we know that patients are counting on us to develop and bring to market medicines that are safe, effective and accessible. We live this mission every day and are humbled by the patients who trust us to help them fight their diseases and live healthier lives.

# Prescription Drug Net Prices in the Healthcare System

Intense political focus on healthcare costs, particularly patients' prescription drug costs, continues. Yet, there is a need to better understand three key issues:

① how private market negotiation is driving prescription drug net prices lower;

② why patients' out-of-pocket costs continue to increase; and

③ how the Inflation Reduction Act (IRA) will alter the future of patient access to innovative medicines.

## Negotiations Lead to Lower Net Prices

The list price of a medicine is a starting point that is ultimately reduced to a net price, the amount a manufacturer receives after negotiating and providing rebates, discounts and/or fees to different parts of the healthcare system. These include negotiations with private insurance companies, PBMs and entities where medications are dispensed or administered (e.g., hospitals, clinics and private physician practices). In addition, there are mandatory or statutory price reductions provided through government programs. Government programs (e.g., Medicare, Medicaid, etc.) receive prices reduced by both private negotiations and statutory discounts. Vigorous private market negotiations throughout the system result in lower net prices for commercial payers and government programs.



Pictured: Tibia Talus.

## Janssen's Net Prices — Lower for the 6th Year in a Row

In the face of inflationary pressures, American families and businesses experienced the fastest growth in prices in nearly 40 years in 2022.[2] Yet, commercial insurers, pharmacy benefit managers (PBMs) and government payers paid lower net prices for Janssen's medicines for the sixth year in a row.[1] Net prices for our medicines declined by 3.5%, and nearly 20% when compounded over the past six years.[1]

## Change in List Price v. Net Price[1]



● List Price Change (Average)    ● Net Price Change (Compounded)

Industrywide, net prices for prescription drugs have grown at or below the consumer price index for the last five years.[7] This difference between the list price and net price has grown significantly over the past five years, with one analysis putting the total at more than $200 billion for the entire healthcare system.[8] While commercial insurers pay lower net prices, many patients do not directly benefit from these lower prices and continue to pay higher out-of-pocket costs.[7] Patients pay higher out-of-pocket costs because their cost-sharing amount, set by their insurance plan, is often based on the initial list price, not the negotiated lower net price the commercial insurer pays.

Case 2:22-cv-02632-CCC-CLW   Document 535-3   Filed 06/24/24   Page 8 of 22 PageID: 32910
Case 2:22-cv-02632-CCC-CLW   Document 535-3   Filed 06/29/04   Page 8 of 22 PageID: 25759
2022   U.S. TRANSPARENCY REPORT   06

## Rebates and Discounts Continue to Grow[1]

Rebates and discounts are one way we help support patients' access to medicines. In 2022, $39 billion of Janssen's gross sales (nearly 58 cents of every dollar) went back into the healthcare system through rebates, discounts and fees negotiated with or provided to commercial health insurers, PBMs, government healthcare programs and other intermediaries.[1] Since 2016, these rebates, discounts and fees have increased 256 percent, with the 340B Federal Drug Discount Program (340B Program) driving a significant part of this increase in rebates and discounts.[1] The chart to the right outlines where a majority of these rebates, discounts and fees went.



| | 2016 | | 2022 |
|---|---|---|---|
| VA/DOD | $0.7B 51%* | 2.3x | $1.6B 57%* |
| Medicaid | $1.4B 55%* | 2.7x | $3.8B 53%* |
| Medicare (Part D & Donut Hole) | $1.3B 30%* | 3.9x | $5.1B 48%* |
| 340B Program | $2.0B 59%* | 3.1x | $6.2B 62%* |
| Commercial Market | $1.7B 20%* | 6.6x | $11.2B 44%* |

● 2016   ● 2022   *As a Percentage of List Price

### Percent of Gross Sales Returned to the Healthcare System in 2022[1]



**58%**

Nearly 58 cents of every dollar in gross sales went back into the healthcare system.[1]

### Rebates, Discounts and Fees
(as $ and as % of Gross Sales)[1]



2022
2021
2020
2019
2018
2017

75%          25%

$14.9B
$20.7B
$24.5B
$29.4B
$33.9B
$39.0B

50%

Our rebates, discounts and fees (in $billions) as a percentage of gross sales have risen consistently, year-over-year.[1]

Case 2:22-cv-02632-JKS-CLW Document 819-5 Filed 06/18/24 Page 9 of 22 PageID: 25760
Case 2:22-cv-02632-JKS-CLW Document 819-5 Filed 06/18/24 Page 9 of 22 PageID: 32911
2022                                    U.S. TRANSPARENCY REPORT                                    07

## Growth in 340B Discounts Puts Pressure on the Program's Sustainability

The 340B Program's original, limited intent was to restore outpatient drug discounts to certain specified safety-net providers that directly purchased and dispensed drugs to their own patients, without having those discounts affect the Medicaid best price calculation.[12] However, the program has grown as large for-profit companies and healthcare systems leverage the program and discounts for maximum financial gain. Since 2016, Janssen's 340B Program discounts have grown from $2 billion to $6.2 billion in 2022.[1] The 340B Program now represents nearly one out of every five dollars of the total manufacturer rebates and discounts provided each year across the healthcare system.[13] However, independent research showed that hospitals' 340B participation did not result in an increase of total community benefit spending, and it was not associated with offering low-profit medical care services.[14]

Read more in our 340B Issue Brief.



### 340B Program Discounts[1]

2016
**$2B**

2022
**$6.2B**

Janssen's 340B Program discounts have grown from $2 billion to $6.2 billion from 2016 to 2022.[1]

## The Inflation Reduction Act Impact on Prices

On August 16, President Biden signed into law the Inflation Reduction Act of 2022 (IRA).[15] The bill includes Medicare drug pricing policies, among other healthcare related provisions. The major drug pricing provisions include inflation penalties for manufacturers in Medicare Part B & D if prices rise faster than inflation; government price setting in Medicare starting in 2026 for drugs that have been on the market for nine years and biologics that have been on the market for 13; and a Medicare Part D benefit redesign, effective in 2025, to cap patient out-of-pocket costs at $2,000.[16, 17]

Though the law is in its initial stages of implementation, it is clear that it could disincentivize R&D investments and undermine the generic and biosimilar prescription drug market. While much remains to be settled on the IRA's long-term impact on costs, the concerns are mounting that government-mandated prices could upend the entire healthcare innovation ecosystem. In undermining strong intellectual property incentives, the IRA can eventually result in the loss of choice for doctors and patients of new treatment options. Furthermore, while the law does include some patient out-of-pocket costs protections for seniors, there is growing concern that private health plans providing Medicare benefits (known as Medicare Advantage plans) could further erode the financial protections insurance is meant to provide by implementing greater utilization management programs and creating more hurdles to needed treatments for beneficiaries.



Pictured: Human umbilical cord cells.

# As Net Prices Decline, Who Benefits?

Even as net prices decreased, out-of-pocket costs for patients continued to increase due to:

1 underinsurance that puts more financial burden on patients;[4]

2 increased prevalence of high-deductible health plans;[18] and

3 the growth in patient assistance diversion programs.[19]

In short, while net prices for Janssen's medicines decreased, many patients continued to pay more out-of-pocket for those very same medicines.

### Underinsurance – A Growing Source of Financial Hardship for Millions of Americans

A near record number of Americans had some form of health insurance coverage in 2022.[4] Yet nearly 23% of Americans are considered underinsured.[4] This happens because commercial payers determine patient deductibles, co-insurance, co-pays and other cost sharing.[20] Even though patients have insurance coverage, the benefit design leaves them open to significant financial risk, effectively rendering healthcare unaffordable – the exact opposite of what insurance is supposed to do.[4] This issue is even worse for people with lower incomes and serious health problems, as they have even more financial exposure in times of need.[4]

Exposure to financial risk is even more problematic for people who take medication for one or more chronic illnesses. One out of four people with one or more chronic health problems identify high out-of-pocket costs for prescription drugs as a reason for skipping or not filling a prescription for their specific healthcare need.[4] Additionally, rising deductibles continue to be a major financial challenge for individuals and families – with nearly half of households with employer insurance unable to afford a typical deductible.[21] Similarly, commercially-insured patients with a deductible have seen their out-of-pocket costs for brand medicines increase 50% since 2014.[22] In fact, most patient spending on brand medicines is based on the undiscounted list price of a medicine rather than the net price negotiated by their health plans.[7]

One report projects that commercial insurers will escalate out-of-pocket expenses to a staggering $800 billion by 2026.[23] To put this in perspective, that burden would equate to an annual tax on every U.S. worker of $4,774.[24]

What do these higher costs mean for patients starting and staying on their medicines? In 2021, patients starting a new treatment abandoned 81 million prescriptions at pharmacies – and this trend of abandonment grows as out-of-pocket costs rise.[7] For patients with a chronic condition, these higher costs resulted in 5.3 billion lost patient days of therapy, particularly affecting the uninsured.[7]

### Beyond Cost-Sharing – Growing Use of Utilization Management Programs Means More Hurdles for Patients and Providers

In the 2021 U.S. Transparency Report, we highlighted how commercial insurers and PBMs implemented more restrictive utilization management programs.[25] Utilization management can be broadly defined as commercial insurers' use of administrative mechanisms (e.g., prior authorization) and financial mechanisms (e.g., patient cost sharing) to control or restrict patient access to healthcare.[25] One such example is the increasing use of exclusion lists, which are designed to block patients from accessing a medicine that their own doctor has prescribed. Since 2014, these exclusion lists have grown more than 961% to include more than 1,156 unique products.[26] Exclusion lists are also being leveraged with specialty drugs, which could disproportionately affect patients with very serious and specialized treatment needs.[26] Utilization programs also include expanded tiered lists with varying cost sharing, prior authorization, non-medical switching and step therapy.

Read more in our 2021 U.S. Transparency Report.

Case 2:22-cv-02632-CCC-CLW Document 355-3 Filed 06/18/24 Page 411 of 422 PageID: 25762

## Patient Assistance Should Be for Patients

Patient assistance programs have evolved to become an important source of access support for more patients who face greater financial burdens because of underinsurance.[30] As commercial insurers and PBMs shift more costs onto patients, these programs help patients meet their deductible and out-of-pocket maximums. Through our patient support program Janssen CarePath, Janssen provided more than 1.16 million patients with access support.[5]



# 1.16 Million

More than 1.16 million patients were provided with access support through Janssen CarePath.[4]

But patients face the growing threat of patient assistance diversion programs, which are implemented by commercial insurers and PBMs to divert patient assistance money away from patients to the financial benefit of non-patient third parties.[27] These programs have numerous, deceptive names (e.g., accumulators, maximizers, optimizers or Alternative Funding Programs), yet they all have the same purpose – to make it harder for patients to access and afford needed healthcare so program operators may financially benefit. The implementation of these programs in commercial insurance has grown significantly since 2018, with accumulators seeing a 39% growth and maximizers seeing a more than 580% growth.[28] As one industry expert and academic recently noted, these types of programs can "cause disruptions in people's access to their medications."[29]

### Growth of Patient Assistance Diversion Programs

**39%** Growth of accumulators since 2018[28]

**+ 580%** Growth of maximizers since 2018[28]

---

**Janssen Policy Position:**
**Health Equity & Patient Assistance Diversion**

New data shows that benefit plans imposing accumulators and maximizers place disproportionate burdens on historically marginalized populations and people of color. The research found non-white patients (African American, Asian, Hispanic and other) are



**31%** more likely to be affected by accumulators[30] and



**27%** more likely to be affected by maximizers.[30]



Pictured: HIV Particles.

Learn more at transparencyreport.janssen.com     Janssen Pharmaceuticals, Inc., © 2023 JP, Inc.

**What Are Patient Assistance Diversion Programs?**

As manufacturer patient assistance programs have grown in conjunction with higher out-of-pocket costs, commercial insurers, PBMs and third-party intermediaries are deploying various programs to divert these funds away from patients.

These patient assistance diversion programs take various forms including:



**Accumulators**

Do not allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of any patient assistance is reached. Then the patient's out-of-pocket costs begin counting toward their annual deductible and out-of-pocket maximum.[31]



**Non-essential Health Benefit Maximizers**

While similar to regular maximizers, this program classifies certain specialty medications as "non-essential," which takes away ACA patient protections related to maximum out-of-pocket limits.[32]



**Maximizers**

Do not allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizer programs take the maximum value of patient assistance for a year and apply that maximum throughout the plan year, either by distributing the maximum amount evenly or by taking larger amounts early in the year and tapering accordingly, without allowing any of those amounts to count toward a patient's annual deductible or cost-sharing limits under the plan.[31]



**Alternative Funding Programs**

Programs run by third-party vendors that push for the exclusion of specialty drugs from coverage by certain insurance plans. Upon exclusion for a specific medication, the patient becomes "uninsured" or underinsured and is then forced to apply for patient assistance for uninsured individuals through foundation-based patient assistance programs. If the patient is approved, then the third-party vendor claims a fee from the plan sponsor. These programs can cause disruption in coverage for patients.[33]



Pictured: Human pancreas.

Learn more at transparencyreport.janssen.com                                        Janssen Pharmaceuticals, Inc., © 2023 JP, Inc.

# Our Investments Are Helping Make Disease a Thing of the Past

Janssen is proud of our historical investments in helping develop the global healthcare innovation ecosystem aimed at making disease a thing of the past. A healthy innovation ecosystem depends upon many elements working together to support and sustain each other. In the healthcare innovation ecosystem, biopharmaceutical industry R&D spending accounts for 75.5% of all investments in U.S. medical and health research and development.[34] A recent report summarizing an expert symposium on the impact of our R&D ecosystem concludes that "Pharmaceutical innovations have resulted and will continue to result in immense benefits for society, which can be measured directly through increases in life expectancy itself (not to mention improvements in individuals' quality of life or ancillary societal benefits, such as fewer missed workdays, decreased use of disability insurance and increased economic productivity)."[35]

Such investments across the industry have contributed to our nation's significant progress in addressing previously untreatable diseases and creating dramatic improvements in patients' health. This robust approach is also a critical tool in our nation's efforts to end health inequities across the entire healthcare system.
For example:

- Pharmaceuticals accounted for 76% of the mortality reduction achieved for HIV/AIDS from 1990 to 2015, 60% for cerebrovascular disease, 60% for malignant breast neoplasms, 52% for ischemic heart disease and 27% for colon/rectal/anal cancers.[35]
- Over the past 40 years, the FDA has approved 599 medicines to treat rare diseases, which has brought hope for millions of patients living with a rare disease.[36]
- The biopharmaceutical industry has a robust pipeline of more than 800 new medicines, treatments and cures for diseases that disproportionately impact racial and ethnic communities.[37]

**Janssen's Continued R&D Investments**

In 2022, we spent 110% more on R&D than on sales and marketing.[1] Since 2016, our total investments in R&D have reached $65.7 billion, nearly double what we spent on marketing and sales in the same timeframe.[1] This growing investment enables our scientists and doctors to rigorously pursue new medicines from early discovery through clinical development with comprehensive efficacy and safety studies. We continue to push the frontier on the next generation of treatments and cures. Since 2016, we produced a total of eight new Janssen medicines approved by the FDA and an additional 52 approvals for expanded indications or new product formulations.[38, 39]

### The Next Generation of Cancer Care for Patients

Multiple myeloma is an incurable blood cancer that affects a type of white blood cell called plasma cells, which are found in the bone marrow.[40] Despite the development of additional treatment options in recent years, most people living with multiple myeloma face poor prognoses after experiencing disease progression following treatment with three major therapy classes, which include an immunomodulatory agent, a proteasome inhibitor and an anti-CD38 monoclonal antibody.[41] Building on Janssen's legacy and commitment to innovation in multiple myeloma, Janssen received FDA approval in February 2022 for its first CAR-T therapy: CARVYKTI®. This novel cell therapy works by harnessing the patient's own immune system, or T cells, to fight the disease. This type of personalized cancer therapy is just one example of how Janssen is working to get in front of cancer with a focus ultimately on eliminating the disease.

**Helping Build a More Equitable Healthcare System**

We also know a critical part of strengthening this ecosystem is to address inequities in the healthcare system, which is why we are investing in programs, people and research related to achieving health equity. Through *Our Race to Health Equity*, Johnson & Johnson is committed to addressing the systemic health inequities contributing to lower standards of care and outcomes for people in historically marginalized communities.[42] As part of this commitment, Janssen continues to identify innovative programs, community leaders and partners to make health inequity a thing of the past.

In 2022, we continued our investments to build a more equitable healthcare system by:

**(1) Helping to Address Peripheral Artery Disease in Black Communities:**

Save Legs. Change Lives.™ is a multi-year initiative that aims to create urgency and action to address the hidden threat of peripheral artery disease (PAD)-related amputation. The initial focus is on reaching Black Americans, who are more than twice as likely to be impacted by PAD. Janssen has joined forces with leading professional associations, including the American College of Cardiology, as well as healthcare systems and community advocacy organizations to advance equitable care for individuals and communities at an increased risk for cardiovascular disease. There are three pillars to the initiative: driving research, powerful partnerships and empowering individuals.[43]



Pictured: Gene Therapy DNA.

**(2) Empowering the Next Generation of a Diverse Healthcare Workforce:**

Building on its partnership with the National Medical Fellowships (NMF), Johnson & Johnson welcomed the newest 20 exceptional and diverse medical students from across the country to participate in the second cohort of the Alliance for Inclusion in Medicine (AIM) scholarship program. The three-year program helps students pursuing medical careers where their work is centered around prioritizing diversity and providing high-quality care to historically marginalized patient populations.[44] In 2023, Johnson & Johnson will expand its partnership and reach with NMF by welcoming its first cohort of diverse pharmacy students from the five accredited Historically Black Colleges and Universities (HBCU) Pharmacy Schools, which will be aligned to the same three-year programming that the diverse medical students experience. This effort will boost Johnson and Johnson's focus and commitment to building a "Diverse Healthcare Workforce." For more information, please visit www.nmfonline.org.

**(3) Expanding Diversity in Clinical Trials:**

Janssen is actively working on ways to improve diversity in clinical trials by changing clinical trial design, ensuring a more inclusive criteria approach for participants and training clinical trial site staff to engage and interact with different communities and people of color. Increasing diversity also involves addressing barriers to enrolling in clinical trials that groups that are historically excluded sometimes face. J&J is actively engaging in work with patient-focused organizations that focus on Black and Brown patients with digestive diseases. The goal of the partnership is to raise awareness about Inflammatory Bowel Diseases (IBD) clinical research, as well as increase education in underserved communities about IBD. Strategic partnership with organizations allows researchers to meet patients where they are in their communities to help them finally feel seen and heard.[45]

**Taken together, these actions are some of the many ways we continue our efforts to build an equitable healthcare system that works for every patient.**

# Supporting Access for Patients

## Janssen CarePath Directly Supports Patients

We continue to support patients through Janssen CarePath, a service that provides information about support resources for patients taking Janssen medications. Once a healthcare professional has decided a Janssen medication is right for their patient, the program can help that patient find the tools they may need to get started on a medication and stay on track, including sharing options to help manage out-of-pocket costs. In 2022, more than 1.16 million patients in the U.S. were helped through the Janssen CarePath program.[5]

## Johnson & Johnson Patient Assistance Foundation, Inc. (JJPAF)

We also support independent programs and foundations that help patients. In the U.S., Janssen and other Johnson & Johnson companies donate medicines and funding to the JJPAF, an independent, nonprofit organization. JJPAF gives eligible patients prescription medicines donated by Johnson & Johnson companies. In 2022, Janssen donated approximately $3.8 billion in products and financial support to JJPAF.[1] For more information, please visit JJPAF.org.

### How Patient Assistance Diversion Programs Are Taking Aid Away from Needy Patients

There are a growing number of companies operating programs called "Alternative Funding Programs" that are diverting patient assistance away from those patients who need aid the most.[46] These programs target patients who have complex or high-risk health needs that require specialty medicines to treat chronic and often fatal diseases, which often incur high cost-sharing because of insurance benefit design.[46] The programs limit or restrict coverage of certain specialty medicines, leaving patients functionally uninsured for a specific healthcare need. Then these program operators direct these "uninsured for the product" patients to seek assistance from charitable foundations (like the Johnson & Johnson Patient Assistance Foundation (JJPAF)) for free product.[47] Once the patients can access this free product, the program operators are financially rewarded for diverting the cost of these specialty medicines away from employers' health insurance plans. However, the charitable foundations intending to serve patients become overburdened in their ability to help patients in need when commercial insurance does not provide coverage that patients think they have through their existing plans.[46]



Pictured: Exacerbation.

# How We Build a Sustainable, Equitable and Innovative Healthcare System

**We have a responsibility as a leading healthcare company to advance patient-centric policy solutions and ideas that will reduce inequity and foster innovation.** We believe it is important to focus on ways to bring transparency into programs such as the 340B Federal Drug Discount Program and build more awareness of the benefit design changes that affect patients' access to needed treatments and medicines.

### Inflation Reduction Act – What It Could Mean for Innovation and the Future of Treating Unmet Healthcare Needs

While the IRA's healthcare provisions include important affordability improvements for seniors by capping out-of-pocket costs, the negative consequences to future innovation could be severe. Some experts have argued that the government negotiating, or "unilaterally setting prices," would lead to likely cuts in "...funding for development of new drugs, with a slowing of innovation."[48] Indeed, several leading biopharmaceutical companies and small biotech companies have already started shifting their R&D investment priorities, portfolios and budgets.[49] Some reports estimate that government-dictated prices like those included in the IRA "...could reduce overall annual cancer R&D spending by about $18.1 billion, or 31.8%."[50] In fact, this new law may undermine the industry's ability to develop new uses for existing therapies, reach new patient populations with unmet medical needs, including rare diseases, and advance product improvements that significantly increase adherence, tolerability and safety or reduce healthcare costs. The law will severely restrict the time available to research and gain regulatory approval to expand an existing medicine to treat additional patient conditions.

The policies included in the IRA will limit future discoveries of new treatments across the entire U.S. healthcare innovation ecosystem, which depends upon the efforts and ingenuity of small biotech companies, universities and academic institutions and large biopharmaceutical companies.

The United States, more than other nations, accounted for a significant share of FDA approvals since 2010, but the IRA could severely curtail the nation's leadership position in the global healthcare innovation ecosystem.[51] At a time when the nation is on the cusp of transformative innovation to tackle so many unmet healthcare needs, the drug pricing policies included in the IRA are the exact opposite of what patients need and deserve.

We are committed to working with policymakers, regulators and stakeholders across the healthcare system to identify and advance needed changes to the law that will prevent irreparable and lasting damage from this law to the innovation ecosystem. We have a responsibility to our patients, partners and the healthcare system to ensure we adapt to the mandates of the new law in the most effective manner possible while securing access to treatments for patients. We will highlight to regulators, government officials and policymakers the IRA's real impact – intended or otherwise – while there is still time to address these challenges before the law's full implementation.



Pictured: Hepatocellular Carcinoma Cells.

**As we continue to provide our insights, analysis and positions on these key policy issues, we are guided by our core principles:**

1. Patients should have affordable and timely access to the most appropriate, effective treatment options and sites of care now and in the future.

2. Treatment decisions belong in the hands of patients and their healthcare providers, not commercial payers with no accountability for patient outcomes due to misaligned incentives.

3. Clinically stable patients should not be switched from their treatments for non-medical reasons (unless deemed interchangeable by the FDA).

4. Appropriate clinical rigor and manufacturing quality standards should be applied in all instances to ensure patient safety.

**We believe by keeping these principles at the forefront of policy development, it is possible to create a sustainable healthcare system that:**

1. Maintains a fair and competitive marketplace.

2. Fosters an environment that supports future investment in transformational innovation.

3. Ensures responsible pricing and appropriate transparency system wide.

4. Determines value based on evidence that incorporates the benefits and risks for patients, the healthcare system and society.



Pictured: Neuronal Cells.

# Notes & Citations

**Notes on This Report.** All information in this report refers to the U.S. operations of the Janssen Pharmaceutical Companies of Johnson & Johnson, unless noted otherwise. Financial and nonfinancial information covers the period between January 4, 2022 and January 3, 2023, except where noted. The methodologies used for analyses in this report may be different from those used by other organizations. This report is not audited and is not intended to address all our required disclosures.

**Additional Resources.** In this report, we refer to locations where you can find more information about specific Janssen U.S. and Johnson & Johnson programs, disclosures, and patient resources. Financial performance information for our parent company and its subsidiaries, as well as its "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors," can be found in Johnson & Johnson Annual Reports at jnj.com/about-jnj/annual-reports. Information on corporate sustainability measures can be found on the Johnson & Johnson Health for Humanity Report at healthforhumanityreport.jnj.com.

1. Figure according to Janssen internal financial accounting.

2. Bureau of Labor Statistics, "Consumer prices up 9.1 percent over the year ended June 2022, largest increase in 40 years." TED: The Economics Daily. July 18, 2022. https://www.bls.gov/opub/ted/2022/consumer-prices-up-9-1-percent-over-the-year-ended-june-2022-largest-increase-in-40-years.htm. Accessed February 2023.

3. Kaiser Family Foundation. "2022 Employer Health Benefits Survey." October 27, 2022. https://www.kff.org/report-section/ehbs-2022-summary-of-findings.

4. Sara R. Collins, Lauren A. Haynes, and Relebohile Masitha, "The State of U.S. Health Insurance in 2022." Commonwealth Fund International Health Insurance Survey, The Commonwealth Fund, https://www.commonwealthfund.org/publications/issue-briefs/2022/sep/state-us-health-insurance-2022-biennial-survey. Accessed February 2022.

5. Data are an approximate number of patients supported by Janssen CarePath, provided by the program administrator.

6. U.S. Food and Drug Administration, "Approved Cellular and Gene Therapy Products." CARVYKTI, https://www.fda.gov/vaccines-blood-biologics/carvykti.

7. IQVIA Institute for Human Data Science, "The Use of Medicines in the U.S. 2022." April 2022. https://www.iqvia.com/-/media/iqvia/pdfs/institute-reports/the-use-of-medicines-in-the-us-2022/iqvia-institute-the-use-of-medicines-in-the-us-2022.pdf.

8. Adam Fein, "Warped Incentives Update: The Gross-to-Net Bubble Exceeded $200 Billion in 2021." Drug Channels. March 22, 2022. https://www.drugchannels.net/2022/03/warped-incentives-update-gross-to-net.html. Accessed March 1, 2023.

9. Darius Lakdawalla and Anup Malani, "The insurance value of medical innovation," Journal of Public Economics 145: 94-102. 2017. https://www.sciencedirect.com/science/article/pii/S0047272716301864.

10. West Health – Gallup, "Stress Prominent Among U.S. Adults Struggling to Pay for Care," December 5, 2022." https://news.gallup.com/opinion/gallup/390425/benchmarking-healthcare-affordability-perceived-value.aspx. Accessed February 2023.

11. The Commonwealth Fund Issue Briefs, "U.S. Health Insurance Coverage in 2020: A Looming Crisis in Affordability." August 19, 2020. https://www.commonwealthfund.org/publications/issue-briefs/2020/aug/looming-crisis-health-coverage-2020-biennial. Accessed February 2023.

12. Nicholas C. Fisher, "The 340B Program: A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of Uncertainty." Journal of Health Care Law and Policy 22 no. 1. 2019. https://digitalcommons.law.umaryland.edu/jhclp/vol22/iss1/4.

13. Adam Fein, "EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019." Drug Channels. June 16, 2021. https://www.drugchannels.net/2021/06/exclusive-340b-program-soared-to-38.html. Accessed March 1, 2023.

14. Sayeh Nikpay, Melinda Buntin and Rena Conti, "Relationship Between Initiation of 340B Participation and Hospital Safety-Net Engagement." Health Services Research S5(2): 157–169. April 2020. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7080377.

15. WhiteHouse.gov, "FACT SHEET: The Inflation Reduction Act Supports Workers and Families." The White House Briefing Room, August, 19, 2022. https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/19/fact-sheet-the-inflation-reduction-act-supports-workers-and-families.

16. Juliette Cubanski, Tricia Neumann and Meredith Freed, "Explaining the Prescription Drug Provisions in the Inflation Reduction Act." Kaiser Family Foundation. January 24, 2023. https://www.kff.org/medicare/issue-brief/explaining-the-prescription-drug-provisions-in-the-inflation-reduction-act.

17. Congressional Research Service, "Selected Health Provisions of the Inflation Reduction Act." September 1, 2022. https://crsreports.congress.gov/product/pdf/IF/IF12203. Accessed March 2023.

18. Gary Claxton, Anthony Damico, Emma Wager, Gregory Young and Heidi Whitmore, "Health Benefits In 2022: Premiums Remain Steady, Many Employers Report Limited Provider Networks For Behavioral Health." Health Affairs. October 27, 2022. https://www.healthaffairs.org/stoken/tollfree/2022_11_CLAXTON/full.

19. Dr. William Smith, Dr. Robert Popovian and Dr. Wayne Winegarden, "Out-of-Pocket Pirates: Pharmacy Benefit Managers (PBMs) and the Confiscation of Out-of-Pocket Assistance Programs." The Pioneer Institute. April 2023. https://pioneerinstitute.org/wp-content/uploads/PNR-519-Maxminimizers-WP-v01.pdf.

20. Gary Novack, "What Determines How Much Your Patient Pays for Their Medication in the United States?" American Journal of Ophthalmology. 2016;167:48-51. doi:10.1016/j.ajo.2016.04.010. https://pubmed.ncbi.nlm.nih.gov/27131775.

21. Gregory Young, Matthew Rae, Gary Claxton, Emma Wager and Krutika Amin, "How many people have enough money to afford private insurance cost sharing?" Peterson-KFF Health System Tracker. March 10, 2022. https://www.healthsystemtracker.org/brief/many-households-do-not-have-enough-money-to-pay-cost-sharing-in-typical-private-health-plans.

22. PhRMA, "Insurers and Middlemen Force Many of the Sickest Patients to Face High Out-of-Pocket Costs." https://phrma.org/resource-center/Insurance-Coverage/Insurance-Coverage-and-PBMs.

23. Kalorama Information, "Out-of-Pocket Healthcare Expenditures in the United States, 5th Edition." August 2, 2021. https://kaloramainformation.com/blog/u-s-out-of-pocket-healthcare-spending-swells-to-491-billion-up-10. Accessed February 2023.

24. Estimated $800B divided by 167.582M US workers in 2026, from U.S. Bureau of Labor Statistics 2018. https://www.bls.gov/opub/mlr/2017/article/projections-overview-and-highlights-2016-26.htm#:~:text=BLS%20projects%20that%20total%20employment,experienced%20from%202006%20to%202016. Accessed February 2022.

25. Scott Howell, Perry T. Yin and James C. Robinson, "Quantifying The Economic Burden Of Drug Utilization Management On Payers, Manufacturers, Physicians, And Patients." Health Affairs. August 2021. https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2021.00036.

26. Xcenda, "Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access." May 2022. https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_may_2022.pdf. Accessed February 2023.

27. Thomas J. Philipson and Troy Durie, "The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket Costs." University of Chicago, December 2021. https://cpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2021/12/2021_12_15-Copay-Assistance-Final-Draft-Clean.pdf. Accessed February 2023.

28. Adam Fein, "Copay Accumulator and Maximizer Update: Adoption Plateaus as Insurers Battle Patients Over Copay Support." Drug Channels. February 22, 2023. https://www.drugchannels.net/2023/02/copay-accumulator-and-maximizer-update.html.

29. Celine Castronuovo, "Patients Caught in Drug Industry, PBM Battle on Copay Assistance." Bloomberg Law. March 6, 2023. https://news.bloomberglaw.com/health-law-and-business/patients-caught-in-drug-industry-pbm-battle-on-copay-assistance

30. Janssen Health Equity Brief, "How Insurers Divert Co-Pay Support Meant for Patients." https://transparencyreport.janssen.com/_document/janssen-caps-infographic?id=00000184-cc93-d0e5-a59c-efd3c3980000.

31. American Society of Clinical Oncology, "Copay Accumulators and Copay Maximizers," Policy Brief. https://old-prod.asco.org/sites/new-www.asco.org/files/content-files/advocacy-and-policy/documents/2021-AccumulatorsPolicyBrief.pdf. Accessed March 2023.

32. Aimed Alliance, "Non-essential Health Benefits and Copay Maximizers," May 19, 2022. https://aimedalliance.org/non-essential-health-benefits-and-copay-maximizers

33. Optum.com, "Alternative funding: Real savings or problems?" https://www.optum.com/business/insights/pharmacy-care-services/page.hub.alternative-funding-savings-problems.html. Accessed March 2023.

34. Research!America, "U.S. Investments in Medical and Health Research and Development 2016-2020." January 2022. https://www.researchamerica.org/wp-content/uploads/2022/09/ResearchAmerica-Investment-Report.Final_.January-2022-1.pdf. Accessed December 6, 2022.

35. Stephen Ezell and Kelli Zhao, "The Economics of Biopharmaceutical Innovation: Symposium Report." Information Technology & Innovation Foundation. March 20, 2023. https://itif.org/publications/2023/03/20/economics-of-biopharmaceutical-innovation-symposium-report.

36. NORD, "ORPHAN DRUGS IN THE UNITED STATES: An Examination of Patents and Orphan Drug Exclusivity," March 25, 2021. https://rarediseases.org/wp-content/uploads/2022/10/NORD-Avalere-Report-2021_FNL-1.pdf.

37. PhRMA, "More Than 800 Medicines in Development for Diseases That Disproportionately Affect Racial and Ethnic Communities." Medicines in Development 2021 Report. https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/MID-Reports/MID-Health-Equity-2021-Report.pdf.

38. U.S. Food and Drug Administration, "New Drugs at FDA: CDER's New Molecular Entities and New Therapeutic Biological Products." https://www.fda.gov/drugs/development-approval-process-drugs/new-drugs-fda-cders-new-molecular-entities-and-new-therapeutic-biological-products

39. U.S. Food and Drug Administration, "Drugs@FDA: FDA Approved Drug Products." https://www.accessdata.fda.gov/scripts/cder/daf.

40. American Cancer Society. "What Is Multiple Myeloma?" http://www.cancer.org/cancer/multiplemyeloma/detailedguide/multiple-myeloma-what-is-multiple-myeloma

41. Jjawal H Gandhi, Robert F. Cornell, Arjun Lakshman., et al. "Outcomes of patients with multiple myeloma refractory to CD38-targeted monoclonal antibody therapy." Leukemia 33(9). http://www.ncbi.nlm.nih.gov/pubmed/30858549.

42. JNJ.com, "Our Race to Health Equity." https://www.jnj.com/our-race-to-health-equity

43. JNJ.com, "Screening Event Targets Hidden Threat of Amputation Related to Peripheral Artery Disease (PAD)." https://www.jnj.com/our-race-to-health-equity/screening-event-targets-hidden-threat-of-amputation-related-to-peripheral-artery-disease-pad.

44. JNJ.com, "Tackling Health Disparities Through Empowerment, Partnership and Scholarship." https://www.jnj.com/our-race-to-health-equity/tackling-health-disparities-through-empowerment-partnership-scholarship

45. JNJ.com, "What it Takes to Truly Diversify Clinical Trials." https://www.jnj.com/innovation/inside-johnson-and-johnsons-mission-to-improve-clinical-trial-diversity.

46. Adam Fein, "The Shady Business of Specialty Carve-Outs, a.k.a., Alternative Funding Programs." Drug Channels. August 2, 2022. https://www.drugchannels.net/2022/08/the-shady-business-of-specialty-carve.html.

47. Dawn Holcombe, "Patients in Financial Tug of War Under PBM Alternate Funding Programs." Oncology Practice Management. December 2021. https://oncpracticemanagement.com/issues/2021/december-2021-vol-11-no-12/2497-patients-in-financial-tug-of-war-under-pbm-alternate-funding-programs.

48. Paul Ginsburg and Steven Lieberman, "Government regulated or negotiated drug prices: Key design considerations." Brookings. August 30, 2021. https://www.brookings.edu/essay/government-regulated-or-negotiated-drug-prices-key-design-considerations.

49. Jamie Smyth, Financial Times, "Bristol Myers Squibb warns US price reforms will dent drug development." November 20, 2022. https://www.ft.com/content/a763ba0d-e48e-47e4-aba0-a71ee7e18d1f. Accessed December 9, 2022.

50. Tomas Philipson, Yier Ling and Ruiquan Chang, "Policy Brief: The Impact of Recent White House Proposals on Cancer Research." University of Chicago. June 2022. https://bpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2022/06/Cancer-Policy-Brief-June-27-no-tracking.pdf.

51. Daniel Gassull, Harry Bowen and Duane Schulthess, "Build Back Better: Total market impact of price controls in Medicare parts D and B." Vital Transformation. July 28, 2022. https://vitaltransformation.com/wp-content/uploads/2022/07/BBBA_VT_FINAL-28JULY.pdf.

Janssen Pharmaceuticals, Inc., © 2023 JP, Inc.

**EXHIBITS 4-6**

**CONFIDENTIAL – FILED UNDER SEAL**