## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAVE ON SP, LLC, <br><br> Defendant. | Civil Action No.: 22-2632 (JKS)(CLW) <br><br> **SPECIAL MASTER** <br> **REPORT AND RECOMMENDATION** |

**<u>Hon. Freda L. Wolfson (ret.), Special Master:[1]</u>**

In this contentious litigation, Plaintiff Johnson & Johnson Healthcare Systems ("Plaintiff" or "JJHCS") initially brought claims of tortious interference and New York unfair business practices against Defendant SaveOnSP, LLC ("Defendant" or "SaveOnSP"), alleging that Defendant devised a "scheme" to raid Plaintiff's payment assistance program for patients using certain of its specialty prescription medications. The parties have been actively engaged in written discovery, and Plaintiff currently moves to amend its Complaint to add non-parties, Accredo Health Group, Inc. ("Accredo") and Express Scripts, Inc. ("ESI" and together with Accredo, the "Intervenors")[2] as defendants under Fed. R. Civ. P. 21, and to add a civil conspiracy claim

---

[1]    I was appointed as the Special Master by the Court in an Order dated December 12, 2023. (ECF No. 184.)

[2]    On May 8, 2023, in my role as appointed Special Master, I granted ESI and Accredo's motion for permissive intervention to oppose Plaintiff's Motion to Amend. (ECF No. 224.)

against SaveOnSP pursuant to Fed. R. Civ. P. 15(a). In its simplest terms, the newly proposed claims allege that the Intervenors substantially assisted and implemented Defendant's scheme.

Defendant and the Intervenors oppose Plaintiff's Motion to Amend. The Court referred this Motion to me for a Report and Recommendation. For the reasons set forth herein, I recommend that the Court **GRANT** Plaintiff's Motion to Amend.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    The CarePath Program[3]

In this action, Plaintiff, a subsidiary of Johnson & Johnson, accuses Defendant of implementing a scheme to misappropriate funds from Plaintiff's payment assistance program, also known as the Janssen CarePath Program ("CarePath" or "the Program"). (*See* PAC ¶¶ 1-2, 7.) CarePath provides financial assistance to help patients afford out-of-pocket costs for forty-three medications manufactured by other Johnson & Johnson entities. (*Id*. ¶¶ 7, 46, 57.)[4] Recognizing the rapidly increasing costs that patients must pay out-of-pocket for those medications, CarePath helps to "defray" patients' copay costs. (*Id*. ¶ 6.) According to Plaintiff, many of the medications covered by CarePath do not have other treatment options, or generic substitutes available, such that the assistance provided to the affected patients through the Program is critical. (*Id*. ¶¶ 7, 44-45, 54.)

---

[3]    The purposes of this Opinion, I will recount facts asserted in the Proposed Amended Complaint ("PAC"), which was filed under seal along with Plaintiff's Motion.

[4]    These medications include complex biologic treatments for various cancers, pulmonary arterial hypertension, and autoimmune disorders. (*Id*. ¶ 7.)

CarePath offers patients financial assistance, in the form of a card or coupons, towards their out-of-pocket costs for the medications, as well as helps patients meet their deductible and Affordable Care Act's out-of-pocket maximums. (*Id.* ¶¶ 54, 57.) For some drugs, CarePath covers most out-of-pocket costs for the medication, with patients only needing to pay $5 or $10. (*Id.* ¶ 58.) To be eligible for the Program, patients must be enrolled in commercial or private health insurance. (*Id.*) Significantly, here, CarePath's terms and conditions provide, *inter alia*, that the Program may "not be used with any other coupon, discount, prescription savings card, free trial, or other offer." (*Id.*) Patients agree to meet these program requirements each time they utilize the financial assistance provided by CarePath. (*Id.*)

## II.    SaveOnSP's Alleged Scheme

Plaintiff alleges that Defendant operates a "scheme" that misappropriates tens of millions of dollars that JJHCS allocates towards CarePath's funding, that the scheme was implemented by ESI and Accredo, and that it "generated a financial windfall for all three companies." (*Id.* ¶ 1.) ESI is a pharmacy benefits manager ("PBM"),[5] and in that role, it manages prescription drug benefits on behalf of health insurance plans. (*Id.* ¶ 47.) Plaintiff alleges that while PBMs often serve as "middlemen" between an insurer and a patient, they aim to increase "insurers' and their own profits by determining which drugs a plan will cover and to what extent they will be covered." (*Id.*) As the "middlemen," PBMs have

---

[5]    According to Plaintiff, ESI, a subsidiary of Cigna, is the largest PBM in the United States, and "leverages its dominance in the marketplace to lend legitimacy" to SaveOnSP's scheme. (*Id.* ¶ 61.)

"presided over the rise of high cost-sharing insurance plans, which feature higher than usual deductibles, copays, and co-insurance. In essence, these plans pressure patients to limit their medical expenses by covering the full cost only after significant contribution by the patients." (*Id.* ¶ 49.) PBMs and payors, Plaintiff alleges, have created a "set of evolving schemes" that captures the benefit of patient copay assistance funds, such as CarePath. (*Id.* ¶ 60.)

Plaintiff avers that one such scheme has been devised by SaveOnSP and ESI. Working in tandem with insurance plans, the alleged scheme operates by 1) "circumventing statutory constraints on the level of copay costs that payors may require patients to pay for pharmaceuticals"; 2) "inflating patients' copay costs in order to increase the funds extracted from JJHCS's copay assistance program and thereby reduce the portion of the drug cost that the payors otherwise would have to pay to the pharmacy"; 3) using the inflated copay cost to "coerce" patients to join in SaveOnSP's program (the "SaveOnSP program"), which allegedly violates the terms and conditions of CarePath; and 4) using such a program to extract inflated amounts of copay assistance funds. (*Id.* ¶¶ 3, 63.)

To illustrate the "modus operandi" of the purported scheme, Plaintiff relies on an online video featuring a program presentation to a plan sponsor. (*Id.* ¶ 76.) The representative "admit[ted] that the SaveOnSP Program works by designating drugs covered under the health plan as non-essential health benefits." (*Id.* (citing SaveOnSP IPBC Video, 5:30).) The representative went to say that this change of designation "prevents any money paid toward the drug from applying to the ACA's annual limit,"

(*id.* ¶ 76), and "the moment [SaveOnSP] reclassif[ies] these as non-essential we get to operate outside of those [ACA] rules, which removes the limitations for how high we set the copay . . . ," (*id.* ¶ 78). "[I]n order for us to capitalize on this copay assistance funding, *we have to have that inflated copay upfront to bill to copay assistance.*" (*Id.* ¶ 79 (emphasis in the original).)

According to Plaintiff, the exclusive partnership between ESI and SaveOnSP is governed by a Master Program Agreement. (*Id.* ¶ 63.) Pursuant to the Agreement, ESI promotes SaveOnSP's program to ESI's clients and it "operationalizes" the program. (*Id.*) To do so, ESI provides services to the essential operation of the scheme, such as "operational set-up and support, member and claims support, program and benefit coordination, program invoicing and fee collections." (*Id.* ¶ 63.) As compensation, ESI allegedly charges health plans an administrative fee of the savings "extracted from CarePath via the artificially inflated SaveOnSP copay amount." (*Id.* (citing SaveOnSP IPBC Video at 37:38).)

Accredo, ESI's internal specialty pharmacy, administers the insurance claims process for patients filling prescriptions for drugs, including the J&J drugs at issue. (*Id.* ¶ 66.) According to Plaintiff, by design, most patients enrolled in the SaveOnSP program must use Accredo as the pharmacy to fill their prescriptions for SaveOnSP-eligible medications. (*Id.* ¶ 67.) Plaintiff lays out Accredo's role in this way:

> When a patient seeks to fill a prescription, Accredo will transfer those patients to SaveOnSP to make sure that the patients enroll both in SaveOnSP and the pharmaceutical company's copay assistance program. The SaveOnSP scheme depends on this so-called "warm transfer."

> Accredo's ability to access and offer medications is one critical factor in the determination of what drugs can be included in the SaveOnSP Program.

(*Id.*) Plaintiff alleges that should a patient seemingly refuse to enroll in the SaveOnSP program, "Accredo actually **rejects** the patient's claim for their prescription medication at the point of sale in order to transfer them to SaveOnSP, even though that medication is covered by the patient's insurance." (*Id.* ¶ 88.) In this regard, Plaintiff claims that "[t]he point-of-sale rejection at Accredo prevents any patient, whether they want to enroll in SaveOnSP or not, from filling their SaveOnSP-eligible prescription until they make contact with SaveOnSP to accept or decline enrollment." (*Id.*) Through this arrangement, Accredo receives new and continuous sources of patient transactions from the SaveOnSP program. (*Id.* ¶ 68.)

Plaintiff alleges that SaveOnSP, ESI and Accredo work in tandem and seamlessly to carry out the scheme. (*See id.* ¶¶ 69-74.) For example, Plaintiff alleges that the executives of the companies are in regular contact to discuss operational issues and communication strategies, (*id.* ¶ 69); employees of these companies regularly share marketplace intelligence, "including changes to the terms and conditions of manufacturers' copay assistance programs and potential changes to the SaveOnSP program design," (*id.*); employees move between three companies effectuating the scheme, (*id.* ¶ 70); the companies collaborate their marketing, messaging and sales efforts such that they all use, reference and agree to the same presentations to patients, (*id.* ¶¶ 71, 73); they work together to develop announcements for health plans to send to patients regarding changes to SaveOnSP program, (*id.* ¶ 74); and the companies collectively draft

responses regarding regulatory compliance, (*id.* ¶ 83). Plaintiff maintains that the companies' tactics are designed not for the patient's benefit, but rather, to pad their earnings. (*Id.* ¶ 94.)

In its original Complaint, Plaintiff asserted two claims against SaveOnSP: 1) tortious interference with contract; and 2) deceptive trade practices under the New York General Business Law ("GBL") § 349. Based on the foregoing factual allegations, Plaintiff seeks leave to add ESI and Accredo as defendants and assert the following claims against the Intervenors: 1) tortious interference with contract; (Count I); or in the alternative, 2) a claim for aiding and abetting tortious interference with contract (Count III). As against all three entities, Plaintiff asserts a claim for conspiracy to tortiously interfere with contract (Count II).

## III.    Procedural History

In May 2022, Plaintiff filed suit against Defendant. In January 2023, the Court denied Defendant's motion to dismiss, finding that Plaintiff had sufficiently alleged its tortious interference and deceptive business practices claims. During the pendency of that motion, the Court permitted discovery to proceed, and it has been ongoing since late 2022. In addition, the Court entered a Pre-Trial Scheduling Order [ECF No. 177], under which motions for leave to amend the pleadings must be filed no later than March 14, 2024.

In January 2023, Plaintiff issued third-party subpoenas to both Intervenors. ESI and Accredo, separately, sought to quash the subpoenas in their respective home districts, *i.e.*, the Eastern District of Missouri and the Western District of Tennessee.

Motion practice ensued in those districts. These courts compelled the Intervenors to produce certain documents to Plaintiff.[6]

On March 13, 2024—one day prior to the deadline to amend—Plaintiff filed the instant Motion for leave to amend the complaint. The allegations that Plaintiff has added in its PAC are significant—well over 80 additional paragraphs and more substantive descriptions of SaveOnSP's alleged scheme, along with the detailed participation of the Intervenors in the alleged scheme. Thereafter, Accredo and ESI moved to intervene in this action to oppose the Motion to Amend. Following extensive briefing and opposition by Plaintiff, I granted the Intervenors' motion; the Intervenors then filed their opposition to the instant Motion to Amend. Defendant separately filed its own opposition to the Motion.[7]

I held an in-person oral argument on July 15, 2024, wherein counsel for all parties participated. Having considered the written submissions of the parties and arguments of counsel, I issue this written opinion memorializing the reasons for recommending that the Motion to Amend be granted.

---

[6]    According to the Intervenors, because document production became so burdensome, in March 2024, Accredo, on behalf of ESI and itself, sent a letter to Plaintiff seeking fees pursuant to Fed. R. Civ. P. 45(d)(2)(B)(ii).

[7]    Defendant also asks permission to file a sur-reply [ECF No. 267] that addresses the element of special damages as it relates to Plaintiff's civil conspiracy claim. While Plaintiff opposes Defendant's application, in its letter brief [ECF No. 269], Plaintiff also responds substantively to Defendant's arguments raised in the proposed sur-reply. Because I find that the issue of special damages is critical to the civil conspiracy claim, I will exercise my discretion and consider both submissions on this Motion.

## DISCUSSION

### I.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 15,[8] once the time to amend as of right has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Courts are to "freely give leave when justice so requires." *Id.* As such, Rule 15 encourages and provides for a liberal policy for amending pleadings. *Gordon v. Dailey*, No. 14-7495, 2017 U.S. Dist. LEXIS 47281, at *2 (D.N.J. Mar. 30, 2017). In *Foman v. Davis*, the Supreme court articulated such a policy underlying Rule 15(a), as follows:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or undeclared reasons—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

371 U.S. 178, 182 (1962).

Based on the Supreme Court's pronouncement in *Foman*, the Third Circuit has advised that "[t]here are three instances when a court typically may exercise its discretion to deny a Rule 15(a) motion for leave to amend: when '(1) the moving party has

---

[8]    While Plaintiff is seeking to amend its claims against Defendant under Rule 15(a), it also seeks to add two defendants in the PAC, which implicates Fed. R. Civ. P. 21; however, "[i]n evaluating the propriety of an amended pleading pursuant to [Rule 21], the Court applies the same liberal standard applicable to motions arising under [Rule 15(a)]." *Acad. Hill, Inc. v. City of Lambertville*, No. 19-426, 2020 U.S. Dist. LEXIS 118036, at *12 (D.N.J. July 6, 2020) (citations and quotations omitted).

demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party.'" *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 249 (3d Cir. 2016). "Generally, there is a presumption in allowing the moving party to amend its pleadings." *Donovan v. W.R. Berkley Corp.*, 566 F. Supp. 3d 224, 229 (D.N.J. 2021). The decision to grant leave to amend rests within the sound discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 330 (1970).

I will address each of these factors, below.

## II.    Undue Delay, Dilatory Motive and Bad Faith

Undue delay focuses on whether the party seeking leave has inexplicably failed to take advantage of previous opportunities to amend, resulting in unfair burdens to the court and the opposing party. *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2005). "The mere passage of time does not require that a motion to amend a complaint be denied on grounds of delay." *Cureton v. Nat'l Collegiate Ath. Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001). In other words, delay becomes undue "when it places an unwarranted burden on the court or when the plaintiff has had previous opportunities to amend." *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008) (citing *Cureton*, 252 F.3d at 273). In making this determination, the court "focus[es] on the movant's reasons for not amending sooner," *Cureton*, 252 F.3d at 273, and balances "these reasons against the burden of delay on the District Court." *Bjorgung*, 550 F.3d at 266 (citing *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 520 (3d Cir. 1988)); *Le v. City of Wilmington*, No. 08-615, 2010 U.S. Dist. LEXIS 69038, at *6 (D. Del. July 12, 2010) ("In evaluating whether a party's delay is

undue, the Court must focus on the movant's reasons for not amending its pleading earlier."). In that regard, the Third Circuit places an importance on a movant articulating a "colorable excuse" for the delay. *See Arthur*, 434 F.3d at 205 n.11 (citing *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir. 1984) (internal quotation marks omitted)).

Both Defendant and the Intervenors vehemently oppose Plaintiff's proposed amendment on the basis of undue delay. They argue that Plaintiff has been aware of ESI's and Accredo's alleged roles with respect to SaveOnSP's product/program since at least 2017, when ESI shared with JJHCS information concerning SaveOnSP products. While Plaintiff has added more substantive allegations against the Intervenors in the PAC, the Intervenors point out that Plaintiff also had alleged their involvement in the SaveOnSP program in the original Complaint. The Intervenors stress that since most of the facts alleged in the PAC were known to Plaintiff years before it filed its motion, Plaintiff's delay is inexplicable and dooms its Motion. In response, Plaintiff maintains that while it understood that ESI assisted Defendant in marketing and administering the SaveOnSP program, it did not appreciate the full extent of the roles played by both Intervenors until Plaintiff began to review documents in discovery. Based on the parties' arguments, my first inquiry focuses on whether Plaintiff could have sufficiently alleged claims against the Intervenors at the time it filed its original Complaint in May 2022.

On the issue of prior knowledge, the Intervenors highlight communications in 2017, that ESI had with certain representatives of Johnson & Johnson's employee benefits department, not JJHCS. According to ESI, it made detailed presentations to those representatives about SaveOnSP and provided information in that regard. Admittedly,

the information, which includes presentation slides, provided a fairly detailed overview of SaveOnSP's "Copay Offset Program." (*See* Declaration of Mark Berman ("Berman Decl."), Ex. C.)[9] Despite these communications, however, the Intervenors' argument is not convincing for two reasons. The most damning response is that any prior knowledge—in 2107—held by some members of an unrelated subsidiary of J&J regarding SaveOnSP's program or offers, cannot be imputed to JJHCS, a separate, independent subsidiary of J&J, vis-à-vis this litigation. Indeed, the Intervenors fail to provide any basis for imputation, such as, whether the two companies, albeit related by a common parent, shared any employees with the requisite knowledge involved in this litigation. In other words, it is unreasonable to impose such a duty of inquiry on JJHCS when it filed its Complaint in 2022; the suggestion that JJHCS must investigate the knowledge of employees in all of the various subsidiaries of J&J prior to filing suit in order to ascertain all possible causes of action is simply not contemplated by the Rules.

Second, knowledge aside, the documents and information upon which the Intervenors rely do not shed light on ESI and Accredo's level of involvement in the

---

[9]     Plaintiff argues that consideration of the documents introduced by the Intervenors is improper on a motion to amend. I do not agree. While it is well-settled that when assessing futility on a Rule 15(a) motion, courts cannot go outside of the four corners of the complaint and the documents that the complaint references, *see Brezinski v. Widener U.*, 582 F. Supp. 3d 257, 263-64 (E.D. Pa. 2022) (holding that district court could not consider factual material outside the complaint, exhibits attached thereto, and matters of public record), *see also S.E. Pennsylvania Transportation Auth. v. Orrstown Fin. Services, Inc.*, 335 F.R.D. 54, 61 (M.D. Pa. 2020), aff'd, 12 F.4th 337 (3d Cir. 2021) ("In assessing 'futility,' a district court applies the same standard of legal sufficiency that applies under Federal Rule of Civil Procedure 12(b)(6)."), there is no such requirement for determining undue delay, particularly since that assessment is fact dependent, and Plaintiff has not cited to any contrary authority.

alleged scheme to the extent set forth in the PAC. While the Intervenors point to other publicly available information, which will be discussed *infra*, past communications about SaveOnSP's program and offers would not have placed JJHCS on notice of the alleged wrongful conduct on the part of *the Intervenors* in the purported SaveOnSP scheme. Indeed, none of the 2017 information provides sufficient facts regarding the elements of tortious interference (e.g., malice) or civil conspiracy (e.g., meeting of the minds to commit a wrong) that Plaintiff must plead to sustain its proposed claims against the Intervenors.

Next, Defendant and the Intervenors contend that the "SaveOnSP IPBC Video" (the "Video") relied upon in the PAC was also cited by Plaintiff in its original Complaint, and as such, Plaintiff had sufficient knowledge of the Intervenors' alleged roles at least by the time JJHCS initiated this suit. The video in question is a co-branded SaveOnSP and ESI February 2021 presentation for a health plan client. The Video,[10] as alleged in the PAC, explains SaveOnSP's program and how it works, including how certain medications are re-designated as non-essential under the ACA. Indeed, in the Video, a representative of ESI provided an extensive overview of the program, along with ESI's involvement, as well as Accredo's participation in "warm transfers."[11] (*See* Berman Decl., Ex. H.)

---

[10]    Because the PAC references the Video, I may consider the content of it on this motion. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[11]    Moreover, the Intervenors point to a blog, authored by Dr. Adam Fein, that Plaintiff cited both in the original Complaint and PAC. The blog examined ESI's 2019 Drug Trend Report and it questions the SaveOnSP program based on the report. (*See*

Having reviewed these various exhibits and the extensive proposed allegations against the Intervenors, there is no doubt that Plaintiff was aware that ESI and Accredo were, and continue to be, involved in marketing the SaveOnSP products to ESI's payor clients and communicating with those clients about the program, and that the Intervenors each had a role in patient outreach and enrollment. In fact, based on all the available information, public or otherwise, alleged by Plaintiff in its original Complaint, Plaintiff certainly had the requisite knowledge that the Intervenors partnered with Defendant in the operation of the SaveOnSP program. But, merely alleging facts about the Intervenors' business roles in relation to the program's operation differs from possessing the necessary facts to establish the elements of the claims asserted against the Intervenors.

As the Court outlined in its previous Opinion denying Defendant's motion to dismiss (the "Dismissal Opinion"), to adequately allege tortious interference, "a plaintiff must set forth (1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *Johnson & Johnson Health Care Sys. v. Save on SP, LLC*, No. 22-2632, 2023 U.S. Dist. LEXIS 12619, at *21-22 (D.N.J.

---

Berman Decl., Ex I.) While the blog highlights the serious concerns that the author had with the SaveOnSP program, it does not, however, place Plaintiff on notice of any wrongful conduct on the part of ESI or Accredo sufficient to assert a civil conspiracy or tortious interference claim. Additionally, the Intervenors contend that, as cited by Plaintiff in its original Complaint, the public information the Intervenors released about their partnership with SaveOnSP and their use of the SaveOnSP products to reduce the impact of drug costs on payors, placed Plaintiff on notice. (Berman Decl., Ex. K.) Again, I disagree that the public information disclosed sufficient details such that Plaintiff could have relied upon it to adequately allege the elements of the claims against the Intervenors, as further discussed *infra*.

Jan. 25, 2023) (citations and quotations omitted). As for civil conspiracy, in New Jersey, a plaintiff must allege: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages."[12] *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003) (citations omitted).

Each element of the claims must be sufficiently averred to satisfy the *Twombly/Iqbal* standard. Comparing the 2022 Complaint and the PAC, I find the following facts, *inter alia*, alleged for the first time in the PAC, critical in forming the legal causes of action against the Intervenors:

*"Agreement"*

- The contours of the SaveOnSP Program, and the exclusive partnership between Express Scripts and SaveOnSP in particular, are governed by a Master Program Agreement (the "Agreement"). "The SaveOnSP program was developed in concert with ESI." Pursuant to the Agreement, Express Scripts provides an array of services essential to the operation of the SaveOnSP scheme, "including operational set-up and support, member and claims support, program and benefit coordination, program invoicing and fee collections." (PAC ¶ 63.)

- When a health plan or employer decides to implement the SaveOnSP Program, they must execute a joinder to the Agreement between SaveOnSP and Express Scripts. (*Id.* ¶ 64.)

- Once a health plan client submits the requisite agreements to implement the SaveOnSP Program, the client, SaveOnSP, and Express Scripts collaborate on outreach strategies to inform the plan's members about the Program and facilitate enrollment. Letters sent to members about the SaveOnSP Program sometimes feature both the Express Scripts and SaveOnSP logos. (*Id.* ¶ 65.)

---

[12]   I will discuss the issue of special damages, *infra*.

-  Most patients enrolled in the SaveOnSP Program are required to use Accredo as the specialty pharmacy to fill their prescriptions for SaveOnSP-eligible medications. (*Id.* ¶ 67.)

- Accredo's ability to access and offer medications is one critical factor in the determination of what drugs can be included in the SaveOnSP Program. (*Id.* ¶ 67.)

*"Concerted Action"*

- Executives from Express Scripts, Accredo, and SaveOnSP hold regular calls to discuss operational issues and communication strategies. Defendants' employees also regularly share marketplace intelligence, including changes to the terms and conditions of manufacturers' copay assistance programs and potential changes to the SaveOnSP Program design (*Id.* ¶ 69.)

- When necessary to advance the objectives of the SaveOnSP scheme, employees have moved seamlessly between the three companies while continuing their work to effectuate the SaveOnSP scheme. (*Id.* ¶ 70.)

- Marketing efforts are closely coordinated. Employees from SaveOnSP and Express Scripts collaborate to develop joint marketing materials and outreach communications to plans and patients. (*Id.* ¶ 71.)

- To market the SaveOnSP Program and provide information to potential clients, SaveOnSP representatives reach out to Express Scripts employees for their guidance and approval on marketing materials describing the SaveOnSP Program. Express Scripts employees provide feedback and ensure that the marketing materials are "aligned with brand standards" and consistent with other SaveOnSP Program resources. (*Id.* ¶ 72.) SaveOnSP and Express Scripts employees discuss and analyze potential strategies to utilize in marketing, messaging, and sales efforts. (*Id.* ¶ 73.)

- SaveOnSP and Express Scripts representatives have collaborated to develop guidance documents related to the SaveOnSP Program and compliance under the ACA. (*Id.* ¶ 82.) SaveOnSP and Express Scripts employees work together to draft responses when clients express

16

skepticism about the SaveOnSP Program's compliance with the ACA. (*Id.* ¶ 83.)

- To carry out the SaveOnSP Program, Accredo electronically bills CarePath for an inflated copay cost that is not connected to the patient's true out-of-pocket responsibility. (*Id.* ¶ 91.)

- In addition, SaveOnSP and Express Scripts altered the SaveOnSP Program structure in order to evade detection by changing the methodology for setting patients' inflated copayment obligations. (*Id.* ¶ 123.)

- SaveOnSP and Express Scripts implemented the coinsurance model in or around January 2022 specifically in response to "Pharma identification of SaveOnSP copays" with the hope that it would "better camouflage copays from manufacturers" so as to avoid any reduction in plan savings and Defendants' profits. (*Id.* ¶ 124.)

*"Tortious Interference"*

- The point-of-sale rejection at Accredo prevents any patient, whether they want to enroll in SaveOnSP or not, from filling their SaveOnSP-eligible prescription until they make contact with SaveOnSP to accept or decline enrollment. The rejection has nothing to do with the validity of a patient's prescription and everything to do with holding critical medication hostage until a SaveOnSP representative has the chance to "strong arm[]" the patient into enrolling in the Program. The success of the SaveOnSP Program hinges on the "warm transfer" from Accredo to facilitate enrollment. (*Id.* ¶ 88.)

- SaveOnSP and Express Scripts expend considerable effort and often use deception to learn the terms and conditions applicable to each copay assistance program. (*Id.* ¶ 90.)

- Defendants admit to engaging in careful tactics designed not for the patient's benefit but to optimize their own earnings. (*Id.* ¶ 94.)

- Defendants are making business-driven decisions without any regard for what is best for the patients. (*Id.* ¶ 95.)

- Indeed, upon information and belief, SaveOnSP and Express Scripts work with plans who contract for the SaveOnSP Program to explore or engage in

a process known as non-medical switching. Non-medical switching is a cost-savings strategy whereby patients stable on their medicines are forced "to switch from their current, effective medications to drugs that may not be as effective, for reasons unrelated to health." (*Id.* ¶ 97.)

- Express Scripts and SaveOnSP's outreach strategies are designed to coerce patients into participating in the SaveOnSP Program by emphasizing the huge penalty that may result from failure to enroll. (*Id.* ¶ 105.) As part of their coercive outreach strategy, SaveOnSP and Express Scripts do not tell patients that copay assistance is available without the SaveOnSP Program that may lessen their financial responsibility for their copay amounts. (*Id.* ¶ 108.)

- SaveOnSP and Express Scripts mislead patients about the consequences of their potential enrollment in the SaveOnSP Program. (*Id.* ¶ 112.) SaveOnSP and Express Scripts also deceive patients about how their enrollment in the SaveOnSP Program will preclude their eligibility to participate in CarePath. (*Id.* ¶ 113.) Furthermore, SaveOnSP and Express Scripts collaborate to ensure they control the information available to patients about the SaveOnSP Program. (*Id.* ¶ 114.)

As pointed out by the Intervenors, in the original Complaint, Plaintiff used ESI's documents and other publicly available information, such as the Video, to set forth various aspects of the SaveOnSP program, and importantly, Plaintiff used the information to explain ESI's and Accredo's roles in the operation of the program. And, it is clear that Plaintiff was aware of the Intervenors' business relationship with SaveOnSP. But, nowhere in the Video or in the 2022 Complaint, including the documents it referenced, can I glean that Plaintiff had the type of information (outlined in bullets above) sufficient to sustain its *claims* against the Intervenors at the time it initiated this suit. Thus, I find that Plaintiff did not sit on facts or evidence that it already had in its possession regarding the Intervenors' alleged conduct at the time Plaintiff filed its 2022 Complaint. That does not, however, end my inquiry; I next determine when, during

18

discovery, Plaintiff had sufficient information to amend its Complaint, and relatedly, whether Plaintiff unduly delayed in moving to amend.

The Intervenors argue that in January 2023, Plaintiff, in its applications to enforce the third-party subpoenas in the District Courts of Tennessee and Missouri, posited that ESI and Accredo play a critical role in the alleged SaveOnSP scheme, and that they are necessary parts of that scheme. Moreover, Defendant argues that while Plaintiff supports the allegations in the PAC with documents produced in discovery, the vast majority of them were produced nearly a year ago. In other words, Defendant and the Intervenors maintain that Plaintiff waited too long to amend its Complaint when it had all the necessary information sometime in 2023.

The record is not fully clear when Plaintiff obtained the necessary information during discovery to seek leave to amend. As the Special Master, I presided over numerous discovery disputes since I was appointed in December 2023. The discovery process has been contentious, including the third-party subpoena proceedings conducted in other districts. In that regard, there is some inherent delay in Plaintiff receiving adequate discovery in order to piece together its proposed allegations. That said, Plaintiff has had in its possession thousands of documents produced by Defendant, as well as the Intervenors, yet it waited until the day before the Scheduling Order's deadline to amend to file its motion. On timing, it is reasonable to question whether Plaintiff could have sought to amend sooner.

During oral argument, I pointedly questioned timing with Plaintiff's counsel. Counsel responded that Plaintiff acted prudently by waiting to develop necessary facts,

particularly since the Intervenors represented to the district courts presiding over the subpoena litigations that they played no role in the alleged scheme; in that regard, Plaintiff submits that it needed strong evidentiary support to fend off the Intervenors' eventual legal arguments. While I agree that that proposed new allegations, claims, and parties should be well supported, Plaintiff has an obligation under Rule 15 to avoid any unnecessary delays. Under the totality of the circumstances, here, I do find that Plaintiff's motion could have been filed earlier, and that despite various discovery disputes, Plaintiff was in a position to adequately plead its proposed allegations in the PAC sufficient to withstand a challenge from the Intervenors and Defendant. However, the delay is not so significant to be considered undue, as Plaintiff filed the motion before the amendment deadline, albeit just one day prior thereto. More importantly, as discussed *infra*, the delay did not cause any prejudice.

While Plaintiff potentially delayed in seeking amendments, I do not find that the delay was borne out of bad faith or dilatory tactics. The Intervenors argue that the fact that Plaintiff inexplicably delayed in filing its motion to amend, despite possessing the necessary information at the time the original Complaint was filed, evinces that Plaintiff harbored bad faith. As I discussed above, because I find that Plaintiff did not have adequate information in 2022 to assert claims against the Intervenors, I reject the Intervenors' bad faith argument in this regard. I stress again that knowledge of the Intervenors' involvement in the SaveOnSp program is not the same as unearthing potential wrongdoing that could support a legal cause of action against them.

The Intervenors also raise another basis for bad faith: to avoid fee-shifting costs. On March 8, 2024, in response to Plaintiff demanding additional discovery from then non-party Intervenors, the Intervenors sough fee-shifting pursuant to Rule 45(d), and one week later, Plaintiff moved to add the Intervenors as defendants in this litigation. Without any evidentiary basis, the Intervenors speculate that this maneuver appears to be an attempt by Plaintiff to avoid responsibility for those potential costs. Apart from the fact that this position is based on pure guesswork, the costs of bringing this motion to amend could be comparable to the costs resulting from fee-shifting. While I am not making a finding as to which fees would be greater, in my view, it is more likely that Plaintiff brought this motion before the deadline to amend expired, which timing coincidentally coincided with Intervenors' request for fees.[13] In any event, I reject the Intervenors' assertion of bad faith because of its speculative nature.

One final note on dilatory tactics. The Intervenors contend that Plaintiff made a "tactical decision" not to name them in its original Complaint. But, what is missing from the Intervenors' explanation is why Plaintiff made such a purported tactical decision. While I have found that Plaintiff could have filed its Motion to Amend earlier, I have seen no evidence that Plaintiff gained any tactical advantage by filing its Motion on the eve before the deadline to do so expired. Coupled with the fact that I do not find that either

---

[13]    During the hearing, counsel represented that the fee-shifting motion was denied.

Defendant or the Intervenors will suffer any prejudice, *see infra*, the Intervenors' lone assertion of "tactics" does not suffice.[14]

## III.    Prejudice

Delay alone does not justify denying a motion to amend. *See Cureton,* 252 F.3d at 273. Rather, it is only where delay becomes prejudicial, which places "an unfair burden on the opposing party" that denial of a motion to amend is appropriate. *Adams v,* 739 F.2d at 868. Accordingly, in deciding whether to grant leave to amend, "'prejudice to the non-moving party is the touchstone for the denial of the amendment.'" *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (quoting *Cornell & Co., Inc. v. Occupational Health and Safety Review Comm'n*, 573 F.2d 820, 823 (3d Cir. 1978)).

To establish prejudice, the non-moving party must make a showing that allowing the amended pleading would (1) require the non-moving party to expend significant additional resources to conduct discovery and prepare for trial, (2) significantly delay the resolution of the dispute, or (3) prevent a party from bringing a timely action in another jurisdiction. *Long v. Wilson,* 393 F.3d 390, 400 (3d Cir. 2004).

---

[14]    On the issue of dilatory tactics, SaveOnSP criticizes Plaintiff for engaging in gamesmanship during discovery, which consists of purported retaliatory actions that have imposed additional burdens and costs on Defendant. SaveOnSP argues that the Plaintiff's Motion is another tactic to delay both discovery and the litigation overall. I do not find this argument convincing. Since overseeing discovery beginning in December 2023, it has been challenging for either party to resolve its differences without resorting to motion practice. Both parties have been vigorously advocating for their positions. I have no basis to find that Plaintiff's decision to file its Motion is intended to gain a tactical advantage. Furthermore, Plaintiff has repeatedly argued that it seeks to move this litigation forward because of the asserted losses it is suffering from the SaveOnSP program while the case proceeds without resolution.

Here, Defendant argues that permitting Plaintiff to amend will unduly prejudice SaveOnSP, because it would unnecessarily extend discovery, which has been extended numerous times, and that Plaintiff will seek yet more discovery from Defendant. There is no doubt that if ESI and Accredo are added as defendants and the conspiracy claim is asserted against Defendant, discovery would be extended, and that Plaintiff would seek relevant discovery related to the new claims. But, "[t]he fact that some additional discovery may result from [a party's] amendment is not enough to establish the sort of prejudice necessary to deny [that party's] motion." *Venuto v. Atlantis Motor Grp., LLC*, No. 17-3363, 2020 U.S. Dist. LEXIS 37043, at *14 (D.N.J. Mar. 2, 2020) (quoting *Evonik Degussa GMBH v. Materia Inc.*, No. 09-636, 2011 U.S. Dist. LEXIS 156390, at *26 (D. Del. Dec. 13, 2011)); *see High 5 Games, LLC v. Marks*, No. 13-7161, 2017 U.S. Dist. LEXIS 9302, at *9-10 (D.N.J. Jan. 24, 2017) (finding that while an amendment would require "some additional paper discovery, that does not amount to undue prejudice warranting denial of leave to amend); *Evonik*, 2011 U.S. Dist. LEXIS 156390, at *26 (permitting amendment under Rule 15 despite the resulting need to conduct further depositions); *Williams v. City of York, Pennsylvania*, No. 15-0493, 2016 U.S. Dist. LEXIS 60127, at *17 (M.D. Pa. May 6, 2016) (permitting amendment under Rule 15 despite potential requirement for further depositions, stating that "[i]nasmuch as the amendment would result in prejudice . . . it can be cured by extending the discovery deadlines").

Indeed, although the case has been pending for more than two years, the parties are still in the midst of written discovery. Only very few depositions have been taken, and expert discovery and substantive motion practice have not commenced, let alone be

near completion. The parties continue to assess blame on each other for obstructionist discovery conduct, and there is still much to be accomplished, particularly since they continue to file discovery motions. In that regard, while the deadline for fact discovery may be nearing, based on all the pending disputes, the deadline may be extended once again even absent the amendments. While the amendments may require Defendant to expend some additional resources to defend this case, it is by no means certain; Defendant has not convinced me that the resources it would need to allocate would tip the scale, especially when the proposed amendments arise from the same set of facts and involve similar alleged wrongful conduct already at issue and currently being probed. Considering the history and the current stage of this case, I find that any additional discovery resulting from the amendments would not be the cause of a significant delay in the resolution of this matter.

The Intervenors contend that they have already invested a significant amount of money and time in their responses to Plaintiff's subpoenas, and being hailed into this lawsuit will likely result in discovery beginning anew. On that basis, the Intervenors submit that any amendment will prohibit a timely resolution of this action. I do not agree.

First and foremost, the cases cited by the Intervenors address prejudice to the defendant already involved in the case. In fact, Rule 15's prejudice prong evaluates the hardship caused by an amendment from the perspective of a named party. Because the Intervenors have not been defending this matter since the original Complaint was filed two years ago, the prejudice factors largely do not apply to them. But, even considering the resources that they have spent litigating the subpoenas, which is not a factor under

Rule 15, the Intervenors would still have allocated similar resources to participate in discovery as named defendants. More importantly, contrary to the Intervenors' position that discovery will begin anew, the documents produced due to the subpoenas do not need to be duplicated, which will streamline the discovery process and not significantly delay the resolution of this matter. And, any concerns that Intervenors have as to the timing of the discovery, as discussed, the discovery deadline may be extended to accommodate the parties in light of the new claims.

Accordingly, after evaluating the factors, I find that neither Defendant nor the Intervenors will suffer prejudice.

**IV.    Futility**

The futility of amendment is one of the factors that may be considered by the Court in denying a motion to amend. *Foman*, 371 U.S. at 182; *Fed. Deposit Ins. Corp. v. Bathgate*, 27 F.3d 850, 874 (3d Cir. 1994); *Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1203 (3d Cir. 1989). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). In assessing futility, a district court must apply the same standard of legal sufficiency that applies under Fed. R. Civ. P. 12(b)(6). *Id.* (citation omitted).

Under Rule 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, "[a]lthough the Federal Rules of Civil Procedure

do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149-50 n.3 (1984) (quotation and citation omitted). Following the *Twombly/Iqbal* standard, the Third Circuit applies a two-part analysis in reviewing a pleading under Rule 12(b)(6). First, a district court must accept all of the pleading's well-pleaded facts as true, but may disregard any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Second, a district court must determine whether the facts alleged in the pleading are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.*

### A.    Conspiracy

Defendant argues that leave to amend the conspiracy claim is futile[15] because Plaintiff fails to plead special damages, a necessary element of the claim. In response, Plaintiff argues that the New Jersey Supreme Court has held that special damages are not required under civil conspiracy, and even if they are required, Plaintiff has adequately alleged special damages. The threshold inquiry, then, is whether special damages is an element of the conspiracy claim.

---

[15]    Defendant only has standing to argue that the conspiracy claim against it is futile. It does not have standing to raise a futility argument with respect to the proposed claims against the Intervenors. *See Chesler v. City of Jersey City*, No. 15-1825, 2019 U.S. Dist. LEXIS 204989, at *11 (D.N.J. Nov. 26, 2019) ("Defendants may not raise a futility argument as to proposed claims against new parties").

It appears that the issue is not settled in New Jersey. When applicable state law is unclear—as it is here—a federal court sitting in diversity must predict how the state's highest court would rule. *Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr., P.A.*, 101 F.4th 272, 276 (3d Cir. 2024) ("[w]hen federal courts answer questions of state law, they rule as they predict the state supreme court would"); *Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 92 (3d Cir. 1996). In forming a prediction, the federal court must "consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and other reliable data tending convincingly to show the highest court would decide the issue at hand." *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980), *cert. denied*, 449 U.S. 976, 101 (1980); *see In re Makowka*, 754 F.3d 143, 148-52 (3d Cir. 2014).

On the issue of special damages, the Third Circuit, relying on *Naylor v. Harkins*, 27 N.J. Super. 594 (Ch. Div. 1953), *modified on other grounds*, 32 N.J. Super. 559 (1954), predicted that under New Jersey law, to properly plead the tort of civil conspiracy, a plaintiff must allege the following elements: "(1) a combination of two or more persons; (2) real agreement or confederation with common design; (3) existence of unlawful purpose, or of lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth*, 331 F.3d at 414.

Two years later in *Banco Popular N. Am. v. Gandi*, the New Jersey Supreme Court explained that a civil conspiracy is "two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and

an overt act." 184 N.J. 161, 177 (2005). Indeed, because damages were not at issue, the State Supreme Court was silent on whether a plaintiff must allege special damages. *See id.* Plaintiff relies on that silence to support its contention that special damages are not required under New Jersey law. Plaintiff overstates the decision.

*Banco Popular* dealt with a conspiracy to violate the Uniform Fraudulent Transfer Act. *See id.* The narrow issue before the Supreme Court was whether a plaintiff may bring a cause of action against an attorney for encouraging his client to transfer assets to avoid a creditor. *See id.* at 177-78. The Court found that a creditor may bring a conspiracy claim against anyone who assists him in transferring assets to avoid a creditor, even if that person is the lawyer in the transaction. *Id.* at 178.

While Plaintiff is technically correct that *Banco Popular* never mentions special damages, the lack of discussion of an issue not before the Court is not an explicit endorsement or holding. Rather, the more sensible reading of the decision is that the Court did not have the occasion to decide whether special damages should be an element of the claim, because its analysis was focused on the disputed issues in the case.[16]

---

[16]    In addition to *Banco Popular*, Plaintiff cites to *Laquidara v. Westwood Reg'l Sch. Dist.*, 2023 N.J. Super. Unpub. LEXIS 1808, at *23-24 (N.J. App. Div. Oct. 19, 2023) (relying on the elements of civil conspiracy set forth in Banco Popular); *Main St. at Woolwich, LLC v. Ammons Supermarket, Inc.*, 451 N.J. Super. 135, 152 (App. Div. 2017). But these cases, other than citing to *Banco Popular*, do not specifically discuss whether special damages is a necessary element of a civil conspiracy claim, and damages, like *Banco Popular*, were not at issue there. Like the state cases, Plaintiff cites federal cases that also do not discuss special damages. *See K.J. v. J.P.D.*, 659 F. Supp. 3d 471, 482 (D.N.J. 2023); *Mu Sigma, Inc. v. Affine, Inc.*, 2014 U.S. Dist. LEXIS 38234, at *16 (D.N.J. Mar. 24, 2014). Indeed, I authored *Mu Sigma*, and in that decision, I cited to *Banco Popular* without considering whether special damages is a required element of civil conspiracy. It was not necessary to the analysis. I dismissed the claim on the basis that an agent of a corporation cannot conspire

The New Jersey Chancery Court's decision in *Naylor,* requiring special damages, remains good law and is still cited for this proposition more than seventy years after it was decided.[17] The New Jersey Supreme Court has *never* abrogated *Naylor* by holding that special damages are not required in civil conspiracy cases, nor has the Third Circuit in applying New Jersey law.[18] Indeed, *Banco Popular* did not address *Naylor,* much less overturn it. Furthermore, more recently, the Third Circuit reaffirmed its prediction that the New Jersey Supreme Court would require special damages in civil conspiracies— fifteen years after *Banco Popular*— in *Gross-Quatrone v. Mizdol*, 811 Fed. Appx. 95, 100 (3d Cir. 2020). Accordingly, following the Third Circuit, I find that special damages is a required element in New Jersey civil conspiracy claims.

Next, Defendant argues that Plaintiff does not sufficiently plead special damages. I disagree. General damages are those elements of an injury that are the proximate and foreseeable consequence of defendant's conduct,[19] while special damages are the

---

with the corporation to form an agreement. *Mu Sigma*, 2014 U.S. Dist. LEXIS 38234 at *18. As such, none of these cases add to the analysis on the issue.

[17]    *See, e.g.*, *Cagno v. Ivery*, No. 19-20384, 2023 U.S. Dist. LEXIS 170114, *16-17 (D.N.J. Sept. 25, 2023); *Mehnert v. U.S. Bank Nat'l Ass'n as Tr.*, No. 17-4985, 2019 U.S. Dist. LEXIS 34471, at *16 (D.N.J. Mar. 4, 2019); *Galicki v. New Jersey*, No. 14-169, 2016 U.S. Dist. LEXIS 126076, at *57-58 (D.N.J. Sept. 15, 2016); *Tiburon Lockers, Inc. v. Fletcher*, No. 15-6970, 2016 U.S. Dist. LEXIS 113560, at *14-15 (D.N.J. Aug. 24, 2016); *Bd. of Ed. of City of Asbury Park v. Hoek*, 66 N.J. Super. 231, 241 (App. Div. 1961), *overturned on other grounds*, 38 N.J. 213, 238-40 (1962)

[18]    Defendant also cites numerous New Jersey federal district court decisions that require special damages in state civil conspiracy claims. *See* Def. Surreply 4-5.

[19]    According to Plaintiff, its general damages are the payments of at least $100 million or more in copay assistance that it paid for a purpose it did not intend nor contemplate. *Id.* ¶ 5.

"unusual" type of damage that stems from defendant's misconduct. *Delzotti v. Morris*, No. 14-7223, 2015 U.S. Dist. LEXIS 120286, at * 22-23 (D.N.J. Sept. 10, 2015) ("*Special*, as contradistinguished from *general* damage, is that which is the natural, but not the necessary, consequence of the act complained of.") (quoting *Roberts v. Graham*, 73 U.S. 578, 580 (1867)); *see also Neal v. Honeywell, Inc.*, 191 F.3d 827, 832 (7th Cir. 1999) ("The usual consequences of a wrong are 'general' damages, and unusual consequences are 'special.'").

Special damages flowing from a civil conspiracy must be pled with specificity. *See* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated."); *see AMTRAK v. Arch Specialty Ins. Co.*, 124 F. Supp. 3d 264, 281 (S.D.N.Y. 2015) ("The primary purpose of Rule 9(g) is one of notice, both to inform defending parties as to the nature of the damages claimed in order to avoid surprise; and to inform the court of the substance of the complaint.").

In its PAC, Plaintiff pleads that it suffered special damages in the form of "the expenditure of resources to identify patients in the SaveOnSP Program and thereby preserve the integrity of CarePath and to ensure that CarePath funds are utilized for their authorized purpose pursuant to the CarePath terms and condition." (PAC, ¶ 193.) Defendant argues that expenditures to identify patients in the SaveOn Program are not special damages because: (1) they are the result of Plaintiff's own actions, and (2) they are not pled with specificity. I address each argument in turn.

Defendant first argues that Plaintiff's expenditures to identify individuals in the SaveOn Program are not special damages because special damages must result from

30

conduct other than Plaintiff's own actions. *See id*. To support its argument, Defendant relies on *Synygy, Inc. v. ZS Assocs., Inc.*, 110 F. Supp. 3d 602, 618 (E.D. Pa. 2015). Such reliance is misplaced.

In *Synygy*, the district court in the Eastern District of Pennsylvania found that expenses incurred to mitigate damages stemming from an allegedly defamatory press release are not special damages in defamation per quod claims. *Id*. The plaintiff in *Synygy* claimed special damages for the value of the time and expenses of its personnel who responded to a defamatory press release. *See id*. The court found these mitigation-related expenses were not special damages for two reasons. First, they were too illusory; the court noted that while plaintiff "suspected" clients declined to work with plaintiff based on the content in the press release, nowhere did plaintiff allege direct evidence to support the allegation. *Id*. Next, the court criticized that plaintiff's special damages were caused by the plaintiff itself. *Id*. (expressing that if special damages were permitted "any time" a corporation sent an email related to an allegedly defamatory publication, any corporation could potentially claim special damages).

Here, the special damages alleged by Plaintiff are not analogous to those asserted in *Synygy*. *Synygy* dealt with Pennsylvania defamation law. Pennsylvania law requires a showing of special harm resulting to the plaintiff from defendant's defamatory publication. *Wilson v. Slatalla,* 970 F. Supp. 405, 415 (E.D. Pa. 1997). The term "special harm" is defined as "actual damages which are economic or pecuniary losses." *Pennoyer v. Marriott Hotel Servs., Inc.*, 324 F.Supp.2d 614, 618 (E.D. Pa. 2004). The *Synygy* court, quoting the Restatement (Second) Torts § 575 cmt. b, explained that the special harm in a

defamation context, "'must result from the conduct of a *person other than the defamer or the one defamed* and must be legally caused by the defamation.'" *Synygy*, 110 F. Supp. 3d at 618 (emphasis in the original). Relying on that statement, Defendant submits that to sufficiently plead special damages, here, Plaintiff must plead a harm caused by a third-party. I do not agree, because the score of New Jersey federal cases discussing special damages in the context of civil conspiracy do not impose such a requirement. *See infra*. Indeed, I do not find that specialized harm that flows from defamation is analogous to damages that are the natural consequences of a conspiracy. *See Delzotti*, 2015 U.S. Dist. LEXIS 120286, at *22 ("*Special*, as contradistinguished from *general* damage, is that which is the natural, but not the necessary, consequence of the act complained of.") (emphases in the original) (citations and quotations omitted).

The principles espoused in *Synygy* also do not apply, because Plaintiff is not alleging remedial expenses as special damages. Plaintiff's identification of patients improperly using the CarePath program is different than costs incurred by employees to rectify the aftermath of a defamatory press release. In the instant matter, putting aside the fact that *Synygy* did not deal with a conspiracy claim, Plaintiff alleges expenditures paid to identify patients who were on the SaveOnSP program in order to assess the impact of the program on its CarePath program, including funding, and in an attempt to cease the alleged misappropriation of those funds.

Plaintiff's expenditures to identify which of its patients were using the SaveOn Program are more akin to the types of special damages, such as lost profits and loss of time, courts routinely deem sufficient. *See Galicki*, 2016 U.S. Dist. LEXIS 126076, at *63

(finding that special damages in the form of loss of gas, loss of time, lost wages, and economic losses stemming from plaintiff's misrepresentations are special damages); *Svigals v. Lourdes Imaging Assocs., P.A.*, No. 18-1736, 2018 U.S. Dist. LEXIS 200251, at *26 (D.N.J. Nov. 27, 2018) (same); *Iron Bar, LLC v. Dougherty*, No. 19-9170, 2021 U.S. Dist. LEXIS 20416, at *27 (D.N.J. Feb. 3, 2021) (finding that "additional expended resources" in combatting the licensing restrictions, obtaining financing, and the diminished value of the LLCs suffice to meet the special damages requirement); *Unimed Int'l, Inc. v. Fox News Network, LLC*, No. 20-17335, 2021 U.S. Dist. LEXIS 66470, at *12 (D.N.J. Apr. 6, 2021) ("Plaintiff's special damages allegations are also sufficiently specified" as the plaintiff has alleged that it suffered reputational harm and loss of profits and advertising opportunities.); *Huyler's v. Ritz-Carlton Rest. & Hotel Co.*, 6 F.2d 404, 406 (D. Del. 1925) ("Both [special and general] damages must be the natural and proximate consequence of the breach complained of, but general damages are such as inevitably follow, while special damages are such as may or may not follow the breach.").

During discovery, the parties heavily disputed the production of documents related to Plaintiff's Cost Adjustment Program ("CAP"). This program was created by Plaintiff in order to locate patients on Defendant's program, which was necessary, according to Plaintiff, in order to not only "block" the alleged misappropriation of the CarePath funds by Defendant's conduct, but to also assess the impact of the SaveOnSP program on Plaintiff's own program. These expenditures are not the necessary consequence of Defendant's alleged wrongdoing; rather, they constitute additional resources that Plaintiff incurred as a result of the alleged wrongdoing by Defendant. In

33

other words, while the increased CarePath payments are alleged as general damages, Plaintiff's expenses incurred in assessing and purportedly combating the SaveOnSP program, are the "unusual" but "natural" consequence from the imposition of the program, and thus, qualify as special damages.

Furthermore, Plaintiff's special damages allegation is sufficient under Rule 9(g) at this stage of the proceeding. Courts typically find that if the allegation of special damages sufficiently places the defendant on notice of the "additional expended resources" attributable to the conspiracy, it suffices for Rule 9(g) pleading purposes. *See Iron Bar*, 2021 U.S. Dist. LEXIS 20416, at *27; *John Wiley & Sons, Inc. v. Rivadeneyra*, 179 F. Supp. 3d 407, 412 (D.N.J. 2016) (finding allegations of "lost profits" sufficient to plead special damages from a civil conspiracy under Rule 9(g)); *Svigals*, 2018 U.S. Dist. LEXIS 200251, at *26 (finding "civil conspiracy special damages, including without limitation interruptions of income and lost income" sufficient under Rule 9(g)). Contrary to Defendant's position, I find that the allegation that Plaintiff incurred expenses to identify patients on the SaveOnSP program, sufficiently places Defendant on notice of the extra financial outlay by Plaintiff caused by the alleged conspiracy, and therefore, Plaintiff has adequately alleged special damages under Rule 9(g).

Accordingly, Plaintiff's civil conspiracy claim is not futile.

## B.    Statute of Limitations

As to futility, the Intervenors argue that all three of Plaintiff's claims are barred by the six-year statute of limitations. Plaintiff responds that because it asserts actionable conduct that occurred within the limitations period, its claims are not barred.

34

Plaintiff brings three claims against the Intervenors: tortious interference with contract (Count I); conspiracy to tortiously interfere with contract (Count II); and aiding and abetting tortious interference with contract (Count III). Under New Jersey law,[20] the statute of limitations for these claims is six years. *See HP Holding LLC v. Red Roof Inns, Inc.*, No. 23-20907, 2024 U.S. Dist. LEXIS 94203, at * 14 (D.N.J. May 28, 2024) ("Under New Jersey law, the statute of limitations for tortious interference is six years.") (citing N.J.S.A 2A:14-1)); *Daruwala v. Merchant*, No. L–162–11, 2015 N.J. Super. Unpub. LEXIS 2581, at *29 (App. Div. Nov. 9, 2015) (conspiracy claims rise and fall with underlying tort); *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Comms Int'l, Inc.*, 387 N.J. Super. 469, 482 (App. Div. 2006) (aiding and abetting claims are tied to underlying tort). Accordingly, if Plaintiff's tortious interference claims accrued before the statute of limitations period began to run, *i.e.*, March 14, 2018 (six years before Plaintiff moved to amend its original Complaint), those claims are time-barred. *See Arab African Int'l Bank v. Epstein*, 10 F.3d 168, 175 (3d Cir. 1993) (affirming denial of motion to amend because untimeliness rendered it futile).

To begin, I consider the Intervenors' statute of limitations arguments under a motion to dismiss standard. *Hull v. Global Digit. Sols., Inc.*, No. 16–5153, 2017 U.S. Dist. LEXIS 208191, at *23-24 (D.N.J. Dec. 19, 2017) (explaining that courts assess the statute of

---

[20]    At this stage of the proceeding, I am not deciding, and the parties have not argued, whether New York or New Jersey law applies to Plaintiff's common law claims. Rather, the Intervenors argue that Plaintiff's "claims are untimely even under New Jersey's longer [statute of limitations] period." (Intervenor Br. at 30, n.6.) Accordingly, I will consider Plaintiff's claims under applicable New Jersey law, just as the Court did in its Dismissal Opinion.

limitations defense under a dismissal standard on a motion to amend, and that courts are reluctant to dismiss a complaint as untimely before discovery given the fact intensive nature of such a defense). Therefore, my timeliness inquiry focuses on whether the time bar is "apparent on the face of the complaint" and no possibility of tolling exists. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation omitted).

*i    When the Statute of Limitations Began to Run*

To determine whether Plaintiff's claims against the Intervenors are time-barred, I decide, first, when the statute of limitations began to run, or put differently, when did Plaintiff's claims accrue. The Intervenors argue that Plaintiff's claims accrued in 2016 or 2017 at the latest, and as such, the statute of limitation had long expired when Plaintiff sought to amend in March 2024.

Generally, the statute of limitations for a cause of action is triggered from "the moment of the wrong." *Lopez v. Swyer*, 62 N.J. 267, 274 (1973). In claims of tortious interference, the limitations period begins to run when "a plaintiff can assert and maintain an action," which occurs when plaintiff suffers an injury due to defendant's conduct. *CGB Occupational Therapy, Inc. v. RHA Health Services Inc.*, 357 F.3d 375, 384 (3d Cir. 2004). Similarly, the statute of limitations for conspiracy and aiding and abetting claims begins to run when a defendant commits "an overt act causing damages." *Wells v. Rockefeller*, 728 F.2d 209, 217 (3d Cir. 1984). Indeed, some courts have looked to when the last overt act occurs to start the clock. *See, e.g., Lloyd v. Ocean Twp. Couns.*, 857 Fed. Appx. 61, 64 (3d Cir. 2021) (finding that the statute of limitations on plaintiff's conspiracy claim under Section 1985 began to run from the last overt act causing damage).

On the issue of knowledge, the Intervenors argue that Plaintiff has known about the Intervenors' involvement in the SaveOnSP Program since 2016. *See, e.g.,* PAC ¶ 2 (alleging Intervenors have been "taking funds meant to help patients" by targeting JJHCS's CarePath program "[s]ince 2016"). In that connection, the Intervenors argue that because Plaintiff alleges it suffered damages beginning in 2016, Plaintiff's claims are time barred. *See* Intervenor Br. at 31 (relying on Plaintiff's briefing and statements filed in the subpoena litigations to posit that JJHCS had sufficient knowledge such that the statute of limitations clock started to run before 2018).

Plaintiff responds in two ways. First, it contends that under New Jersey's discovery rule, its claims did not accrue until it discovered that it may have a basis for an actionable claim. Second, Plaintiff argues that even if the discovery rule does not apply, it has alleged that the Intervenors interfered with every contract that Plaintiff has executed with every patient enrolled in the SaveOnSP program, with each request for copay supporting a new breach of contract. In that regard, Plaintiff reasons that since it alleges that the Intervenors have been interfering with its patients' contracts since 2016, each act of interference starts the clock anew. *See* PAC ¶ 185 ("[Defendant and the Intervenors] knowingly and wrongfully induce[] patients . . . to breach their contract with JJHCS *every time* they use CarePath funds while enrolled in the SaveOnSP Program.") (emphasis added). I address Plaintiff's latter argument, first, because it is dispositive.

Plaintiff argues that it does not accuse the Intervenors of a *single* episode of tortious interference. Rather, Plaintiff explains that it has alleged illegal interference with every contract that Plaintiff has entered into with every patient enrolled in the SaveOnSp

program, and as such, each interference is a separate tort that triggers a new six-year limitations period. I agree.

The New Jersey Supreme Court has advised that in the context of tort actions, "each injury allegedly constitutes a new tort, because each injury contains all of the elements of a tort, without any need to refer to prior actions to establish liability." *Russo Farms v. Vineland Bd. of Educ.*, 144 N.J. 84, 105 (1996); *see Kolczycki v. City of E. Orange*, 317 N.J. Super. 505, 519–20 (App. Div. 1999). The Court explained:

> Battery, for example, is established by "proof of an unauthorized invasion of the plaintiff's person, even if harmless . . . . Any non-consensual touching is a battery." If an individual assaults another person on a continuing basis extending over several years, each new assault is a battery, because the attack itself includes every element of a new tort. If the first attack is barred by the statute of limitations, more recent claims may not be barred because each asserts a new tort.

*Russo Farms*, 144 N.J. at 105-06 (citations omitted).

Accordingly, if Plaintiff, here, pleads sufficient facts such that its tortious interference claims against the Intervenors, during the statute of limitations period, can stand on their own, Plaintiff may defeat the Intervenor's statute of limitations argument at this stage of the proceeding.

To reiterate, for tortious interference with a contract, a plaintiff must allege "(1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (1989)).

In its Dismissal Opinion, the Court already found that Plaintiff sufficiently pled the existence of a valid contractual relationship between Plaintiff and CarePath patients, and that Defendant interferes with Plaintiff's contractual relationship with those patients who use CarePath funds while enrolled in the SaveOnSP Program. *See Johnson & Johnson Health Care Sys.*, 2023 U.S. Dist. LEXIS 12619, at \*23 (finding that "Plaintiff . . . sufficiently pleads an existing contractual relationship and that Defendant interfered in this relationship"). In its PAC, Plaintiff alleges that Defendant and the Intervenors "to this date . . . continue to induce patients in the SaveOn Program to sign up for CarePath in violation of CarePath's terms and conditions." PAC ¶ 180; *see also* PAC ¶¶ 5, 25, 185, 190–92 (alleging that defendant and the Intervenors "intentionally induce patients to breach their contract with JJHCS *each* time they receive CarePath funding" and that the SaveOnSP scheme "continues to harm JJHCS . . . and unless the SaveOn program is enjoined it will continue to cause damages and irreplaceable harm to JJHCS") (emphasis added). Given that Plaintiff has alleged that the SaveOnSP program has been violating CarePath's terms and conditions since 2016 to the present, and because Plaintiff alleges that each inappropriate use of CarePath funding is a separate breach, I find that Plaintiff's PAC sufficiently alleges distinct instances of interference with CarePath patients that occurred after March 2018, without the need to refer to prior actions to assert liability on the part of the Intervenors. The same is true of Plaintiff's allegations of aiding and abetting, *see* PAC ¶¶ 194-199 (alleging present allegations of aiding and abetting such that Defendant and the Intervenors "are in regular contact . . . to discuss . . . the SaveOn Scheme") and civil conspiracy, PAC ¶¶ 188-193 (alleging that Defendant, ESI and

Accredo "continue to act in concert to knowingly and wrongfully induce patients to breach CarePath terms and conditions"). Accordingly, I find that Plaintiff's interference and conspiracy claims against the Intervenors that accrued within six years of the filing of the PAC are not time barred.[21]

## CONCLUSION

For the foregoing reasons, I recommend that Plaintiff's Motion to Amend be **GRANTED**. It bears repeating that Rule 15(a) requires that leave to amend the pleadings should be freely granted, *see Adams*, 739 F.2d at 867-68, because a liberal amendment regime aids the policy of "favoring resolution of cases on their merits." *Mullin v. Balicki*, 875 F.3d 140, 149 (3d Cir. 2017). While Plaintiff could have sought to amend earlier, it nevertheless filed its motion prior to the amendment deadline set by the Court in its Scheduling Order. More importantly, the delay was not so significant as to defeat the liberal amendment regime in this Circuit, particularly since neither Defendant nor the Intervenors would suffer any prejudice. Because written discovery is still ongoing, with very few depositions having been taken, this case has not progressed to the stage where it would place Defendant or the Intervenors at a disadvantage. Indeed, any timing issues

---

[21]    In its PAC, Plaintiff also alleges conduct on the part of the Intervenors that falls outside of the statute of limitations period. However, notably, in Plaintiff's response to the Intervenors' statute of limitations argument, Plaintiff represents that it does not intend to pursue those claims. *See* Pl. Reply Br. 11-13. Rather, Plaintiff seeks to pursue those "claims that have accrued within six years of the filing of the PAC." *Id.* 13. As such, because of my findings on the statute of limitation issue, I need not discuss or resolve the parties' arguments on the discovery rule, continuing violation and relation back doctrines or equitable tolling. However, should Plaintiff change course and seek to include those time-barred claims, it would necessitate further review.

may be addressed by adjusting the appropriate deadlines. Moreover, none of the futility issues raised are meritorious; rather, guided by the Court's decision in its Dismissal Opinion, I find that Plaintiff adequately alleges its tortious interference theories against the Intervenors, and that Plaintiff timely brought its claims. Accordingly, it is recommended that Plaintiff's Motion be granted.[22]

The parties have 21 days to object to my Report and Recommendation.

DATED: September 5, 2024                                    /s/ Freda L. Wolfson
                                                           Hon. Freda L. Wolfson (ret.)
                                                           Special Master

---

[22]    I will resolve Plaintiff's motion to unseal in a separate order.