# Sills Cummis & Gross
### A Professional Corporation

**The Legal Center**
**One Riverfront Plaza**
**Newark, New Jersey 07102-5400**
**Tel: 973-643-7000**
**Fax: 973-643-6500**

Jeffrey J. Greenbaum
Member
Direct Dial: (973) 643-5430
E-mail: jgreenbaum@sillscummis.com

101 Park Avenue
New York, NY 10112
Tel: 212-643-7000
Fax: 212-643-6500

**CONTAINS INFORMATION MARKED AS AEO/CONFIDENTIAL**
**UNDER THE DISCOVERY CONFIDENTIALITY ORDER**

August 12, 2024

<u>**Via Email and ECF**</u>

Honorable Freda L. Wolfson, U.S.D.J.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068

> **Re:** **Motion to Compel SaveOnSP to Produce Pre-April 2016 Documents**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*,
> <u>Case No. 2:22-cv-02632 (JKS) (CLW)</u>

Dear Judge Wolfson:

On behalf of JJHCS, we move to compel SaveOnSP to produce relevant documents from the files of four existing custodians for the eight-month period of August 1, 2015 to April 1, 2016.

The current "start date" of April 1, 2016 for SaveOnSP's productions was the subject of negotiation among the parties in 2023, and JJHCS accepted that date only after SaveOnSP repeatedly represented that it was unlikely to have relevant documents before then. That representation has proven false: it is now clear that SaveOnSP's founder, and at least three other custodians, were hard at work developing the scheme at least as early as August 2015. In fact, SaveOnSP recently disclosed that those four custodians possess about 3,200 unreviewed documents hitting on the parties' agreed-upon search terms from that eight-month period. SaveOnSP does not dispute that the documents are relevant, nor has it claimed that producing them would be unduly burdensome.

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 2

Yet SaveOnSP has refused to rectify its failures unless JJHCS agrees to producing additional documents from *all* of its own custodians for the same period. This tit-for-tat demand is groundless: there is no gap in JJHCS's production as there is in SaveOnSP's. Regardless, JJHCS is already producing various categories of documents going back to 2009, and there is no basis in the record for SaveOnSP to demand yet more from JJHCS.

The parties conferred regarding this dispute but were unable to reach agreement. Accordingly, we respectfully request that the Court compel SaveOnSP to expand its production of files from these four custodians for an additional eight months, back to August 1, 2015.

## STATEMENT OF FACTS

### A.     SaveOnSP Misleads JJHCS and the Court About When It Began Operations

There is a long history of misrepresentations by SaveOnSP regarding when it began operations, the effect of which has been to improperly shield important evidence regarding the origins of SaveOnSP's scheme from discovery.

JJHCS's initial requests for production asked SaveOnSP to produce documents starting from January 1, 2017, based on publicly available information indicating that SaveOnSP executed its Master Program Agreements with Express Scripts ("ESI") in November 2017. *See* Compl. ¶ 52. JJHCS repeatedly made clear to SaveOnSP that it chose that start date on the understanding that "SaveOnSP began operations … in or about November 2017, when SaveOnSP executed its Master Program Agreement with Express Scripts Inc." Ex. 1 (Jan. 6, 2023 Ltr. from H. Sandick to M. Nelson) at 2; *see also* Ex. 2 (Feb. 14, 2023 Ltr. from A. LoMonaco to M. Nelson) at 6. SaveOnSP—which, of course, is best situated to know when it in fact began operating—never suggested that JJHCS's understanding was inaccurate. To the contrary, SaveOnSP expressly stated to JJHCS that "SaveOnSP

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 3

did not exist until 2017." Ex. 3 (Jan. 20, 2023 Ltr. from M. Nelson to A. LoMonaco) at 5.  SaveOnSP

repeated that line to the Court, representing "that SaveOnSP began operations in 2017."  Dkt. No. 79

at 26.  These statements could not be more direct or explicit.

But as discovery continued, it became clear that, contrary to SaveOnSP's representations,

SaveOnSP's scheme was already well under way at least as early as September 2016.  For example,

one document indicated that, ████████████████████████████████████████████████████

████████████████████████████████.  *See* Ex 4 (SOSP_0000259) at -261.  In another, ████████████

████████████████████████████████████████████████████████."  Ex. 5 (SOSP_0013722)

at -723.  Yet another document stated that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████"  Ex. 6 (SOSP_0001032) at -033.

JJHCS brought this issue to SaveOnSP's attention and, highlighting the above documents,

requested that SaveOnSP "provide the date on which SaveOnSP began operations"—*i.e.*, when

SaveOnSP "conceived of its scheme, hired employees, drafted materials, marketed its scheme to

health plans, invested in call centers and related technology, and otherwise [got] ready to begin

meddling with patient access to therapy."  Ex. 7 (Mar. 27, 2023 Ltr. from G. LoBiondo to A. Dunlap);

Ex. 8 (Apr. 7, 2023 (10:22 am) email from G. LoBiondo to M. Nelson).  SaveOnSP eventually

claimed that "the earliest communications SaveOnSP had with its first client was in May 2016, that

it would have drafted any marketing materials shortly in advance of those communications, and that

it hired its first employees and set up its first call centers after that date."  *Id.* (Apr. 10, 2023 (3:00

pm) email from M. Nelson to G. LoBiondo).

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 4

SaveOnSP proposed to resolve the issue of its deficient production by "extend[ing] the general start date of its document production to April 2016"—a date that, SaveOnSP insisted, was "over a month before SaveOnSP's first contact with its first client." *Id.* Relying explicitly on SaveOnSP's representation that it "and its personnel are unlikely to have generated documents relevant to the issues in this lawsuit before April 2016," JJHCS accepted SaveOnSP's proposal. *Id.* (Apr. 10, 2023 (10:34 pm) email from G. LoBiondo to M. Nelson). JJHCS also made clear that it reserved the right to seek documents from before April 1, 2016, if it turned out that relevant documents from before that date existed. *Id.*

Shortly thereafter, in response to JJHCS's request for "all documents and communications concerning the origin of the relationship between SaveOnSP and ESI," SaveOnSP told JJHCS that it had investigated the origins of that relationship and that it had "had some limited communications with ESI before [April 1, 2016], starting in December 2015." Ex. 9 (May 26, 2023 Ltr. from G. LoBiondo to A. Dunlap) at 1; Ex. 10 (June 6, 2023 Ltr. from A. Dunlap to G. LoBiondo) at 1. SaveOnSP still did not suggest that it had any other relevant documents from before April 1, 2016.

**B.     The Evidence Again Belies SaveOnSP's Representations**

As it turned out, however, relevant documents from before that date do exist and apparently in significant quantities. Various documents produced by SaveOnSP and third parties reveal that, even before April 1, 2016, SaveOnSP was not just having "some limited communications with ESI"; rather, it was developing its program and its personnel were generating documents relevant to this lawsuit. Those documents include:

- Ex. 11 (SOSP_0622487), a document ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 5

- Ex. 12 (SOSP_0523594),



  *Id.* at slide 12.

- Ex. 13 (SOSP_0523623),

- Ex. 14 (SOSP_0523598), (emphasis supplied).

- Ex. 15 (SOSP_0523599),

- Ex. 16 (SOSP_0622489),

- Ex. 17 (Keenan_0030457), an email thread that includes an ***April 6, 2016*** email from Miller suggesting that, by then, SaveOnSP had been communicating with ESI and Prime Therapeutics (another PBM) for quite some time. For instance, Miller wrote that "we are close on the ESI portion of getting the program launched. … As you can imagine much has changed since we last spoke." *Id.* at -459. He further wrote that he had "been working with Dr Patel the CMO at Prime on a number of projects" and that "he has been trying to get his benefits manager to follow up for a couple of weeks." *Id.* And Miller boasted that he already had "a number of clients who I want to get in early and save the most vs. ESI house accounts" and that "[t]he lawyers have all (and I mean a lot of them) have determined how to operationalize at ESI and Accredo." *Id.*

SaveOnSP produced some of these documents because they were attached to post-April 2016 emails; as for others, it is not clear why they were produced. In any event, these documents

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 6

demonstrate that, contrary to SaveOnSP's prior representations to JJHCS, it had already been operating and generating relevant documents and communications before April 2016; indeed, it was seemingly doing so at least as early as August 2015.  JJHCS therefore requested that SaveOnSP update its custodial productions from the files of four SaveOnSP custodians—Jody Miller, Claudia Dunbar, Jill Stearns, and Jenna Ordonez—to include all responsive documents from August 1, 2015 to April 1, 2016.  *See* Ex. 18 (June 21, 2024 Ltr. from J. Chefitz to M. Nelson) at 2–3.  JJHCS requested those four custodians because they all appear in many of the documents described above and are thus the custodians most likely to have relevant evidence from before April 2016.  JJHCS still does not have clarity on when SaveOnSP actually commenced operations, but has chosen August 1, 2015 based on the substantive documents it has seen to date.  JJHCS relies on SaveOnSP to clarify if in fact it started even earlier.

      **C.**      **SaveOnSP Admits that It Possesses Relevant Pre-April 2016 Documents**

Faced with this clear documentary record, SaveOnSP now concedes that its operations began before April 2016.  It admits that it had, in fact, communicated with potential clients before "the spring of 2016" and that it possesses those communications; that, ███████████████████

████████████████████████████████████████████████████████████

██████████████████████"; that ███████████████████████████████████

██████████████████████████"; and that, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████.  Ex. 19 (July 18, 2024 Ltr. from M. Nelson to J. Chefitz) at 1–2.

And, after insisting that it had ***no*** documents from this eight-month period, SaveOnSP recently disclosed that it possesses 3,214 unreviewed documents hitting on the parties' agreed-upon search

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 7

terms, suggesting that the documents described above are just the tip of the iceberg. Ex. 20 (July 30, 2024 Ltr. from M. Nelson to J. Chefitz) at 1.

But instead of simply agreeing to produce these responsive documents, SaveOnSP has refused to do so unless JJHCS agrees to review and produce documents from *all* of its custodians from the August 1, 2015–April 1, 2016 time period hitting on a set of several search terms. *Id.* SaveOnSP also refuses to identify the communications it admitted to having "with a handful of potential clients from before the spring of 2016" unless JJHCS agrees to engage in the above further custodial discovery. *Id.*

## ARGUMENT

### I.      SaveOnSP Must Produce Its Relevant Documents from Before April 2016

JJHCS is "entitled to discovery on any acts that Defendant employed to effectuate or implement the [SaveOnSP] scheme," Apr. 10, 2024 Discovery Order at 8 n.4, as well as documents that "go to [SaveOnSP's] intent," Dkt. 131, June 27, 2023 Tr. at 30:3–12. *See generally* Compl. ¶ 2 (alleging that "with the deliberate intent to manipulate and thwart the purpose of JJHCS's program, SaveOnSP devised and implemented a scheme (the 'SaveOnSP Program') to inflate and misappropriate the funding JJHCS provides for patients"); Jan. 25, 2023 Op. & Order, Dkt. No. 68 at 15 (explaining that tortious interference with contract requires showing "intentional and malicious interference with that relationship").

There can be no serious dispute at this point that from at least ███████████████ ████████████████████████████████████████████████████████████ ██████████████████████████; and communicating and negotiating with Prime and ESI, SaveOnSP's eventual business partner in executing the SaveOnSP program. *See supra* at 4–5.

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 8

SaveOnSP has even admitted that, 

. *See supra* at 6. And SaveOnSP has

confirmed that the parties' agreed-upon search terms hit on ***3,214*** unreviewed documents from the

files of the four custodians JJHCS has requested for the August 1, 2015 to April 1, 2016 period. *Id.*

Those four custodians, in particular, are highly likely to have relevant documents. Jody Miler

is SaveOnSP's founder and President. *See generally* June 20, 2024 JJHCS Motion for In Camera

Review of SaveOnSP Text Messages at 2 (detailing Miller's role and direct involvement in every

aspect of the SaveOnSP scheme).

. *See* Ex. 15 (SOSP_0523599) at slides 3 & 44.

. *Id.* at slides 3 & 45. And

, including Exhibit 12 (SOSP_0523594). All four

of these custodians were

. *See, e.g.*, Ex. 16 (SOSP_0622489) (

).

SaveOnSP has articulated no basis to withhold any of those documents that are responsive

and non-privileged. And none exists. SaveOnSP does not and cannot object to reviewing these

documents on relevance grounds. And SaveOnSP does not raise any burden objection either. (Any

burden objection would be quite rich, given SaveOnSP's long insistence that it was unlikely to have

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 9

*any* responsive documents from before April 2016.)  The Court should order SaveOnSP to produce the responsive documents it possesses.

## II.    SaveOnSP Cannot Condition Its Production of Responsive Documents on JJHCS Engaging in Baseless Further Discovery

Instead of simply producing the responsive documents it possesses, SaveOnSP refuses to do so unless JJHCS agrees to further custodial discovery.  This is improper and not a valid basis on which to withhold responsive documents.  SaveOnSP's demand is particularly inappropriate given that SaveOnSP has long been misleading JJHCS about when SaveOnSP began operations and the extent and nature of its pre-April 2016 activities.  SaveOnSP and its leadership surely know when the company first began planning its program, developing marketing materials, and reaching out to potential clients and partners.  Indeed, key personnel that have been with SaveOnSP from the beginning, including founder and president Jody Miller, are still there.  Yet SaveOnSP repeatedly evaded JJHCS's attempts to learn when the company began its operations, repeatedly misrepresenting the relevant date to both JJHCS and the Court.  It should not now be permitted to use its own misrepresentations as a basis to demand more discovery from JJHCS.

SaveOnSP's tit-for-tat demand is not even reciprocal.  JJHCS is not seeking a general expansion of the discovery period to include all responsive documents from August 1, 2015; rather, its request here is highly targeted.  JJHCS seeks responsive documents from just four of SaveOnSP's custodians, and it has selected those four custodians because the documents show (and the hit counts provided by SaveOnSP confirm) that they are highly likely to have relevant documents from before April 2016.  By contrast, SaveOnSP demands pre-2016 documents from *all* of JJHCS's custodians, despite providing no basis for this demand and identifying no evidence that any of JJHCS's custodians even knew about SaveOnSP before April 2016.

Honorable Freda L. Wolfson, U.S.D.J.
August 12, 2024
Page 10

     SaveOnSP's refusal to produce its responsive pre-April 2016 documents is all the more egregious given that SaveOnSP has requested—and JJHCS is producing—documents going back to January 1, 2009 for several JJHCS custodians, notwithstanding the parties' general agreement to an April 1, 2016 discovery cutoff. Having already sought and received documents going back 15 years, SaveOnSP should not now be heard to complain about producing highly relevant documents from an additional eight-month period.

<p style="text-align:center">*    *    *</p>

     JJHCS therefore requests that Your Honor order SaveOnSP to produce, without condition, the responsive documents that SaveOnSP has identified from the August 1, 2015 to April 1, 2016 period. We appreciate Your Honor's consideration of this matter.

<p style="text-align:right">Respectfully submitted,</p>

<p style="text-align:right"><em>/s/ Jeffrey J. Greenbaum</em>      <br>Jeffrey J. Greenbaum</p>

cc: All counsel of record for SaveOnSP

# Exhibit 1

**Patterson Belknap Webb & Tyler** LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

January 6, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

By Email

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:  *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*
> *(Case No. 2:22-cv-02632-JMV-CLW)*

Dear Meredith:

We write in response to your December 21, 2022 letter concerning Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Responses and Objections to Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production.

As an initial matter, we note that the responses set out below are subject to ongoing factual investigation and document collection efforts. We reserve all rights to revise or amend these responses as necessary. Further, none of the responses set out below are intended to waive any of the general or specific objections or limitations provided in JJHCS's Responses and Objections to SaveOnSP's First Set of Requests for Production, or to suggest that responsive documents exist with respect to particular requests.

I.   **GENERAL ISSUES**

A.   **Definition of "Janssen Drugs"**

We objected to the term Janssen Drugs "to the extent it purports to include drugs that are not covered by CarePath." You ask us to clarify whether the drugs BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA are covered by CarePath. We write to confirm our understanding that patient assistance for these drugs is covered by CarePath.

B.   **Time Period**

We objected to SaveOnSP's requests to the extent that they sought documents from before January 1, 2017. SaveOnSP seeks documents for many requests dating as far back

Meredith Nelson, Esq.
January 6, 2023
Page 2

as 2009.  We do not see the basis for extending the relevant time period beyond 2017, but would like to further understand your position as part of the meet-and-confer process.

For example, you assert that you are entitled to documents about the budgeting and development of CarePath from its inception, as well as the budgeting and development of any predecessor of the CarePath program, in order to "investigate JJHCS's assertions that SaveOnSP's services make CarePath financially unviable."  JJHCS's assessment that SaveOnSP's services "jeopardiz[e] the viability of patient assistance programs like CarePath by making them prohibitively expensive," Compl. ¶ 114, is one that you are free to probe in depositions and at trial, but it self-evidently turns on the added expenses caused by SaveOnSP, and all documents about the developing and budgeting of the program have no proportionate relationship to that general proposition.  Moreover, JJHCS has already agreed to search for and produce documents that will show that SaveOnSP is making CarePath prohibitively expensive, including, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath."  *See* R&Os to Requests 25, 27, 29.  Please explain why those documents, which include budget and harm-related materials, do not suffice.

Further, you claim that you need documents about CarePath's budget and cost for nearly a decade before SaveOnSP began operations, which we understand occurred in or about November 2017, when SaveOnSP executed its Master Program Agreement with Express Scripts Inc.  Please explain how CarePath's budget and development prior to 2017—a time when SaveOnSP did not exist—is relevant to investigating SaveOnSP's effect on CarePath's financial viability in the future.  Please also explain how the budgeting and development of any predecessors of the CarePath program, which only came into existence in 2015, has any bearing on the present dispute.

You also claim that you need documents from prior to 2017 in order to investigate whether "CarePath was designed solely to help patients, not to financially benefit JJHCS."  Please direct us to where JJHCS has claimed that CarePath was designed "solely to help patients" and "not to financially benefit JJHCS."  Please also explain why documents prior to 2017 are needed to make such an assessment.

Finally, you claim that you are entitled to documents relating to CarePath's terms and conditions from before 2017 to "fully assess the meaning and materiality of the terms and conditions at issue in this case, as decisions about many of these terms likely predate 2017."  Please explain what "decisions" prior to 2017 are relevant to this case, which concerns only whether SaveOnSP wrongfully induced patients to breach CarePath's actual terms and conditions during the time period when SaveOnSP was in operation.  Please also explain why SaveOnSP believes it needs additional documents apart from the final terms and conditions.  In any event, on this point, to the extent that SaveOnSP is willing to produce internal documents

Meredith Nelson, Esq.
January 6, 2023
Page 3

that it has thus far declined to produce, we are willing to discuss an appropriate compromise involving production from each side.

### C.    Documents in the Possession of JJHCS

You asked whether documents created or held by employees of entities other than JJHCS "within the J&J corporate family or involved in the administration of CarePath, including Janssen, CarePath Care Coordinators, JJHCS Hub Entities, Lash Group, and Trial Card" are in JJHCS's possession, custody, and control, and would accordingly be produced by JJHCS.

With respect to entities in the J&J corporate family, we plan to generally limit our production to documents in JJHCS's possession alone.  The J&J corporate family consists of more than 140,000 employees who work at over 200 subsidiaries and affiliates across the world. Collecting and producing documents from all of these individuals and entities would be burdensome and disproportionate to the needs of this case.  JJHCS is the sole corporate entity charged with administration of CarePath, and so it is incumbent on SaveOnSP to explain why the collection and production of documents outside of JJHCS is necessary and proportionate to the needs of this case.  Please provide such an explanation to us, including an explanation of which of the J&J affiliates and subsidiaries you believe are likely to have relevant documents.

In addition, with respect to entities outside of the J&J corporate family, JJHCS objects to SaveOnSP's definition of "JJHCS Hub Entities" for a number of reasons, including to the extent it purports to include entities other than those responsible for administering CarePath during the relevant Time Period.  Nevertheless, notwithstanding such objections, JJHCS will work with Trial Card, a third-party vendor with responsibility for the administration of CarePath during the relevant Time Period, to facilitate production of documents responsive to SaveOnSP's requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    Request Nos. 1-7, 35

SaveOnSP's Request Nos. 1-7 seek organizational charts, including charts for entities other than the JJHCS groups responsible for administration of CarePath.  Request No. 35 seeks "documents sufficient to identify all JJHCS Hub Entities and CarePath Coordinators."

In response to Requests Nos. 1-7, JJHCS agreed to produce documents "sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath for the relevant Time Period."  In response to Request No. 35, JJHCS agreed to produce "non-privileged documents in its possession sufficient to identify the entities responsible for administering CarePath during the relevant Time Period."  We also note that while JJHCS will not produce organizational charts for Trial Card, we will work with Trial Card to facilitate production of such documents, to the extent they exist and can be located by a reasonable search.

Meredith Nelson, Esq.
January 6, 2023
Page 4

Please explain the basis for SaveOnSP's request that we collect and produce documents beyond this so that we can better understand your position.

We would also like to more fully understand the reasons you provided for why you need organizational charts beyond what JJHCS has agreed to produce. You claim that "SaveOnSP needs documents relating to CarePath's development, so that it can test JJHCS's assertion that CarePath was developed solely to benefit patients and not to benefit JJHCS financially." As requested in Section I.C, *supra*, please direct us to where JJHCS has claimed that CarePath was designed "solely to benefit patients" and "not to benefit JJHCS financially." Regardless, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to CarePath's finances, so it can test JJHCS's assertion that SaveOnSP's conduct financially harms CarePath and threatens its financial viability." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether SaveOnSP's wrongful conduct financially harms CarePath and threatens its financial viability. Again, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the marketing of CarePath, so it can explore whether JJHCS's marketing caused any of the purported patient confusion that JJHCS attributes to SaveOnSP." The patient confusion alleged in the Complaint is that created by SaveOnSP when pharmacies refuse to fill prescriptions at the point of sale unless those patients enroll with SaveOnSP. Compl. ¶ 88. Please explain your factual basis for claiming that such patient confusion could reasonably be attributed to JJHCS's marketing efforts. In particular, please direct us to specific instances of confusion identified in the complaint that could reasonably be attributed to specific CarePath's marketing efforts. Otherwise, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the sale, pricing, and marketing of Janssen Drugs so that it can evaluate the relationship between CarePath and JJHCS's financial performance, including how JJHCS sets prices for Janssen Drugs (thus increasing costs for health plans and patients)." Please explain how Janssen's drug sales, pricing, or marketing are related to the claims or defenses in this action, which concern SaveOnSP's misconduct in extracting funds from CarePath. Please also explain how Janssen's conduct is relevant in any way to this action. Again, this provides no basis for additional organizational charts. Further, even assuming that these points were relevant, SaveOnSP and its health plan partners already have access to extensive information concerning the pricing of Janssen Drugs, based on their own reimbursement records for those Drugs.

Meredith Nelson, Esq.
January 6, 2023
Page 5

You claim that "SaveOnSP also needs documents relating to the drafting of JJHCS's terms and conditions, which JJHCS alleges that SaveOnSP induced patients into breaching." Please explain why the drafting of the terms and conditions with which patients must comply is relevant to this action which is based on whether SaveOnSP has engaged in wrongdoing when it strong-arms patients into breaching those terms and conditions. On this point again, however, to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce, we are willing to discuss a compromise.

**B.      Request No. 11**

SaveOnSP's Request No. 11 seeks documents "regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." JJHCS offered to "meet and confer to determine if this Request can be appropriately narrowed." We do not currently see the basis for producing the materials you request, but are willing to continue to discuss the merits of this Request.

You claim that documents pertaining to the "development, marketing, and management of [other copay assistance programs offered for Janssen Drugs,] as well as of CarePath itself, are relevant to refuting: JJHCS's assertions that SaveOnSP's services increase the cost and threaten the continued viability of 'patient assistance programs like CarePath by making them prohibitively expensive.'" Compl. ¶ 114.

With respect to CarePath, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether its services increase the cost of CarePath and threatens its financial viability.

With respect to the reference to "patient assistance programs like CarePath" in Compl. ¶ 114, that is a general reference to patient assistance programs across the industry, not other patient assistance programs for Janssen Drugs. As you know, SaveOnSP targets the patient assistance programs of other drug manufacturers as well. JJHCS reasonably infers that SaveOnSP's services harm those programs in ways similar to how they have harmed CarePath. We do not see how the "development, marketing and management" of those programs is relevant to that inference of harm, but invite you to explain.

You also claim that such documents are relevant to "JJHCS's assertion that any increase in the cost of copay assistance programs amounts to a public harm." JJHCS claims that SaveOnSP causes public harm by "causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare

Meredith Nelson, Esq.
January 6, 2023
Page 6

needs more expensive by not counting any of the funds spent on patients' medication towards their ACA maximum or deductible." Compl. ¶ 114. Please direct us to where JJHCS alleges that "*any* increase in the cost of copay assistance amounts to a public harm." (emphasis added). Please also explain how the "development, marketing and management" of such programs is relevant to whether an increase in their costs amounts to a public harm.

You also claim that such documents are relevant to "JJHCS's assertion that SaveOnSP induces patients to breach CarePath's terms and conditions and deceives patients by failing to inform them of that alleged breach." Please explain how documents relating to the "development, marketing and management" of CarePath, let alone other programs, is relevant to whether SaveOnSP induces patients to breach CarePath's terms and conditions. Please also identify the elements in the relevant claims or defenses to which such documents are material.

### C. Request Nos. 12 and 13

SaveOnSP's Request Nos. 12 and 13 seek documents regarding CarePath's terms and conditions and the CarePath requirement that patients enrolled in CarePath make payments toward Janssen Drugs. JJHCS agreed to produce documents "sufficient to show all final versions of CarePath's terms and conditions for each Janssen Drug during the relevant Time Period."

Seeking additional documents beyond what JJHCS has promised to produce, you claim "JJHCS's understanding of the terms and conditions in its CarePath contracts and the drafting of those terms and conditions is relevant to whether SaveOnSP induced patients to breach them, a central point for JJHCS's tortious interference claims. Compl. ¶ 109." As noted in Sections I.B and II.A, *supra*, whether there has been a breach is dependent on SaveOnSP's conduct and the final terms themselves, not the back-story of the drafting of the terms and conditions. Nonetheless, so that we can consider your demand more precisely, please identify which terms you believe are relevant but also unclear or ambiguous on their face such that consideration of extrinsic evidence, such as the drafting history of the terms and conditions, is relevant to this action. Again, we are willing to discuss a compromise on this point to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce.

### D. Request No. 14

SaveOnSP's Request No. 14 seeks documents relating to JJHCS's and other entities' "understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations." You claim JJHCS refused to produce any documents in response.

You have misstated JJHCS's response. JJHCS did not refuse to produce any documents in response to RFP No. 14. We agreed to search for and produce "all non-privileged documents and communications in its possession regarding SaveOnSP's designation of specialty

Meredith Nelson, Esq.
January 6, 2023
Page 7

drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care
Act and its regulations during the relevant Time Period." *See* R&O to Request No. 14. Subject
to the objections laid out in JJHCS's Responses and Objections, JJHCS will produce such
documents. We hope this clarification resolves your concerns, but if there are additional
documents SaveOnSP believes it requires, please let us know.

    **E.**    **Request Nos. 20, 41, 43**

        SaveOnSP's Request Nos. 20, 41, and 43 seek documents concerning "Copay
Accumulator Services and Copay Maximizer Services." JJHCS in response agreed to produce
documents relating to SaveOnSP.

        You claim that documents relating to "Copay Accumulator Services" and "Copay
Maximizer Services" are relevant "because JJHCS has in its complaint blurred the lines between
SaveOnSP, accumulators, and maximizers. *See, e.g.*, Compl. ¶ 74. Thus, documents related to
JJHCS's understanding of accumulators and maximizers are also relevant to its understanding of
SaveOnSP's business and the impact of that business on JJHCS."

        First, please explain how JJHCS's understanding of accumulators and maximizers
in general is relevant to the claims or defense in this action. Please identify the elements of any
claims and defenses and explain the relevance of these requested documents to those elements.
Second, please explain why you need documents from JJHCS to refute an allegation that
SaveOnSP falls into the category of programs described in the article cited in Compl. ¶ 74.
Please explain why SaveOnSP needs documents from JJHCS in order to compare the contours of
its own program, as borne out by its own documents and other information within SaveOnSP's
control, against the descriptions in that article.

    **F.**    **Request No. 21**

        SaveOnSP's Request No. 21 concerns "any advocacy to or communications with
any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or
Copay Maximizer." Based on, *inter alia*, relevance and privilege, JJHCS declines to produce
documents in response to this Request.

        You claim that "JJHCS's lobbying campaign is, at a minimum, relevant to
showing that public confusion about SaveOnSP's services is the result of actions by JJHCS and
its allies, not SaveOnSP." As noted in Section II.A, *supra*, the Complaint alleges that SaveOnSP
confuses patients in part by creating rejections and delays at the point of sale. Compl. ¶ 88.
Please explain how such confusion could reasonably be attributed to any lobbying efforts by
JJHCS. In addition, please direct us to instances of confusion identified in the Complaint that
could reasonably be attributed to any lobbying efforts as opposed to the conduct of SaveOnSP
and its partners.

Meredith Nelson, Esq.
January 6, 2023
Page 8

You also claim that "such communications may also show JJHCS's understanding of whether SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits." Please explain how lobbying efforts are relevant to this question, as whether SaveOnSP violates the Affordable Care Act is a question of law.

Finally, please explain how requests for documents concerning JJHCS's lobbying of government officials are permissible given that JJHCS has a privilege against the production of documents that would unjustifiably burden its First Amendment right to political association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958).

**G.     Request No. 25**

SaveOnSP's Request No. 25 seeks "all Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 110, 115." JJHCS agreed to produce "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period, including the extent to which SaveOnSP has caused JJHCS to pay more in copay assistance that it otherwise would have."

You ask us to confirm whether "based on its response JJHCS is producing fully in response to this Request." Without waiving the objections and limitations in its response, JJHCS intends to search for and produce the documents and communications it identified in its response. We are happy to meet and confer should you have specific questions.

**H.     Request No. 26**

SaveOnSP's Request No 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum." In its Responses, JJHCS objected to this Request on the grounds that it was vague and ambiguous and declined to produce any documents in response to this Request.

You now clarify that this Request "seeks documents and communications that reflect any payments for Janssen Drugs made by JJHCS, Janssen, or any Hub Entity on behalf of patients, both in the ordinary course of providing copay assistance and in any instance where such entity covered a patient's copay for a Janssen Drug in excess of what it otherwise would have under CarePath's terms and conditions."

JJHCS has agreed to produce documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath. *See R&O to RFP No. 29.* Please let us know if that is sufficient or otherwise identify the claims or defenses for which SaveOnSP believes it needs documents beyond that. Please also let us know the rationale for seeking a broader production than what JJHCS has proposed.

Meredith Nelson, Esq.
January 6, 2023
Page 9

## I.     Request No. 28

SaveOnSP's Request No. 28 seek a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. through m.). JJHCS does not believe that documents unrelated to SaveOnSP's misconduct, such as documents relating to the sales and marketing budgets for Janssen drugs, are relevant to this action, but nevertheless agreed to produce "Janssen Transparency Reports." JJHCS also said it is willing to meet and confer regarding items i. through m.

You wrote that JJHCS's does not define the term "Janssen Transparency Reports" or clarify what responsive data is contained in those reports. To clarify, those Reports summarize, *inter alia*, changes in Janssen drug prices, the amount of rebates paid for Janssen Drugs and total spend on CarePath patient assistance. An example of such a report can be found here: *The 2021 Janssen U.S. Transparency Report*, JANSSEN PHARM., INC. (2022), https://transparencyreport.janssen.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000.

You claim further that the data "SaveOnSP seeks is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. We invite you to explain why it is necessary for SaveOnSP to also receive additional data, including, for the last thirteen years, (i) a listing of "all patients receiving a Janssen Drug," (ii) "the number of fills of the Janssen Drug each received by each such Patient," (iii) "the dosage of the Janssen Drug received by each such Patient for each fill," (iv) "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," as well as the other revenue and cost data. In particular, please explain how a request for the names of each and every of the tens of millions of patients who have received Janssen therapies over the past thirteen years is a proportional request for information given the claims and defenses at issue in this action, to the extent that JJHCS even has the data that SaveOnSP seeks. We are interested to understand your rationale for this Request and to hear your explanation for why it is proportionate to this action, particularly in light of the fact that, as explained above, SaveOnSP and its health partners already have substantial information about the pricing of Janssen Drugs based on their own claims and reimbursement data.

You claim further that "there are clear parallels between the data SaveOnSP seeks in RFP No. 28 and the data JJHCS seeks in its RFP Nos. 41 and 42" and "invite[] JJHCS to meet and confer." We do not understand this comparison but are willing to meet and confer to discuss this Request further.

Meredith Nelson, Esq.
January 6, 2023
Page 10

J.      **Request No. 29**

SaveOnSP's Request No. 29 seeks documents relating to CarePath's finances. JJHCS in response agreed to produce documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath."

You claim that these documents are insufficient because the additional documents SaveOnSP seeks, "including information on JJHCS's return on investment for CarePath, is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." The documents JJHCS has agreed to produce, including the CarePath budget and actual costs, are sufficient to show the threat SaveOnSP poses to CarePath. We invite you to explain how further documents, including JJHCS's supposed "return on investment," are relevant or necessary, or how it is proportionate.

You also claim that additional data is necessary to dispute "JJHCS's claim that CarePath is designed to help patients and not simply J&J's bottom line." As noted in Section I.C and Section II.A, *supra*, please direct us to where JJHCS has claimed that CarePath was not "designed to help . . . J&J's bottom line."

K.      **Request No. 30**

SaveOnSP's Request No. 30 seeks "for each year for each Janssen Drug, all Documents and Communications regarding the basis for Janssen's decision to raise or lower the price of the Janssen Drug, including labor or manufacturing costs or the increase in efficacy of the Janssen Drug." JJHCS declined to produce any documents in response to this Request.

You claim that the documents requested are "relevant to JJHCS's allegations that SaveOnSP's conduct threatens the viability of copay assistance" and that it has "suffered monetary losses as a result of SaveOnSP's conduct." As noted above, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why it is necessary for SaveOnSP to obtain documents relating to "Janssen's decision to raise or lower the price of" to further probe those allegations.

You also claim that such documents are relevant to JJHCS's allegations that "copay assistance programs like CarePath are a public good" and "that the threatened viability of copay assistance programs is a public harm." Please explain how "Janssen's decision to raise or lower the price of" its drugs is at all relevant to whether copay assistance programs like CarePath

Meredith Nelson, Esq.
January 6, 2023
Page 11

are a public good.  Please also explain why it is relevant to the claims and defenses in this action whether CarePath and similar programs are a public good.

    **L.**    **Request No. 32**

    SaveOnSP's Request No. 32 seeks all documents and communications "regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient."  JJHCS declined to produce any documents in response to this Request.

    You assert that the requested documents are "relevant to JJHCS's allegations that providing CarePath funds to individuals who do not qualify for CarePath threatens the viability of copay assistance, as well as the significance of the CarePath terms and conditions at issue to JJHCS.  If, for example, JJHCS offered CarePath funds to an individual whom it believed was on a plan that does not comply with the revised Stelara or Tremfya terms, *see* Compl. ¶¶ 102-03, such an offer would be relevant to JJHCS's allegation that providing copay assistance to patients enrolled in such plans threatens the viability of JJHCS's copay assistance."

    Even if JJHCS continues to offer copay assistance to a patient who JJHCS believes is enrolled in a health plan that does not comply with the revised Stelara or Tremfya terms, please explain why this would be relevant to the claims at issue in this action.  For example, please explain how JJHCS's willingness to continue to provide copay assistance to a patient who does not comply with the Terms & Conditions would change the fact that SaveOnSP causes JJHCS to spend more in CarePath patient assistance than it otherwise would absent the SaveOnSP program.  That a plaintiff does not enforce a term in its contract is no defense to a claim of tortious interference.  Indeed, New Jersey law is clear that a claim of tortious interference may exist even where the underlying contract is *unenforceable*.  *See, e.g.*, *Halebian N.J. v. Roppe Rubber Corp.*, 718 F. Supp. 348, 360 (D.N.J. 1989) ("That the underlying contract may be unenforceable is no defense to a claim of tortious interference."); *see also Mina L. Smith, Inc. v. Cyprus Indus. Minerals Co.*, 427 A.2d 1114 (N.J. App. Div. 1981) ("Unquestionably, one who unjustifiably interferes with the contract of another is guilty of a wrong.  That the contract may be unenforceable is no defense.").  We invite you to explain further why you believe such information is relevant to the claims or defenses at issue in this action.

    **M.**    **Request No. 34**

    SaveOnSP's Request No. 34 seeks documents and communications concerning JJHCS's consideration of SaveOnSP's services for its own employer-sponsored health plan.  JJHCS declined to produce any such documents.

    You claim that "whether JJHCS considered using such services for its own employees is relevant to JJHCS' claims that SaveOnSP harms patients by causing stress and

Meredith Nelson, Esq.
January 6, 2023
Page 12

confusion, increasing costs of other healthcare, and threatening the viability of copay assistance." As you are no doubt aware, Johnson & Johnson did not contract with SaveOnSP. Given this fact, please explain how Johnson & Johnson's employer-sponsored health plan bears on any of these issues, or more generally to the claims and defenses at issue in this action.

**N.    Request No. 36**

SaveOnSP's Request No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS agreed to produce agreements in its possession between it and the entities responsible for administering CarePath for the period of January 1, 2017 to the present.

You wrote to confirm (1) whether this production would encompass "agreements which have in the past administered CarePath, not simply those which currently administer CarePath" and (2) whether JJHCS will produce documents responsive to Request No. 36 that relate to the fair market value of JJHCS's Hub Entities' or CarePath Care Coordinators' services."

We write to confirm that JJHCS intends to produce agreements for entities that have administered CarePath for the period of January 1, 2017 to the present, even if those entities no longer administer CarePath today. Our current understanding is that those agreements will include work orders that document the cost of the services provided. We do not understand any other relevant documents to be responsive to this Request. If you seek any other documents, please let us know and we will consider your request.

**O.    Request No. 37**

SaveOnSP's Request No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." JJHCS declined to produce documents in response to this Request because this Request is irrelevant to the subject matter at issue in this litigation.

You assert that these documents are relevant to JJHCS allegations that SaveOnSP's conduct damages JJHCS, in part because they will "assist in demonstrating that SaveOnSP in fact causes more patients to use Janssen Drugs than would otherwise do so." We do not understand this purported rationale or its connection to this document request. Please explain how this might be the case. We do not understand SaveOnSP to make the decision to prescribe Janssen Drugs, and the "warm transfer" that is a necessary part of SaveOnSP's program will naturally deter some patients from using Janssen Drugs, as the patients are told that such medications are not covered by their health insurance unless additional steps are also taken. We invite you to describe any efforts that SaveOnSP has undertaken to alter individual

Meredith Nelson, Esq.
January 6, 2023
Page 13

prescribing decisions, including whether SaveOnSP collaborates with its health plan partners to require non-medical switching to drugs that SaveOnSP can designate as non-essential health benefits and for which manufacturer patient copay assistance exists.

**P.      Request No. 38**

SaveOnSP's Request No. 38 seeks all documents and communications "received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath." As noted in our initial Responses, JJHCS agreed to produce all documents responsive to this Request regarding SaveOnSP. *See* Response to Request Nos. 8, 38.

You wrote to confirm that JJHCS will produce documents responsive to this Request regarding CarePath generally. Please explain why a Request that seeks all documents "regarding CarePath" and would necessarily encompass all documents exchanged between JJHCS and any entity with whom JJHCS contracts or partners with to administer CarePath is not overbroad or why complying with it would not be unduly burdensome. Given the Federal Rules' emphasis on proportionality, please also explain how such burdensome discovery would be proportional to SaveOnSP's needs in this action. *See* Fed. R. Civ. P. 26(b)(1).

**Q.      Request No. 42**

SaveOnSP's Request No. 42 seeks all documents and communications "relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms 'copay accumulator' and 'copay maximizer.'" JJHCS responded that it would produce all non-privileged documents and communications in its possession for the period of January 1, 2017 to the present relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to SaveOnSP.

You wrote to inquire whether we would produce all documents and communications concerning those terms more generally. You assert that such documents are "relevant to whether JJHCS knowingly contributes to the alleged patient stress and confusion that it attempts to attribute to SaveOnSP by conflating SaveOnSP's conduct with that of 'maximizers' and 'accumulators,' including potentially harmful conduct commonly associated with 'copay accumulators' such as non-medical switching."

We do not understand your assertions. This action concerns SaveOnSP's scheme to extract patient copay assistance funds in violation of the CarePath terms and conditions. The patient harms, including patient "stress and confusion," flow from how SaveOnSP operates its profit-seeking scheme, not from any entity's abstract understanding of the meaning of the terms "copay accumulator" or "copay maximizer." In light of this, please explain how JJHCS's, a third-party vendor's, or partner's understanding of these terms generally would be relevant to the claims at issue in this action.

\*  \*  \*

Meredith Nelson, Esq.
January 6, 2023
Page 14

       We are available to meet and confer regarding the issues outlined above at your convenience.  We look forward to your response.

Very truly yours,

Harry Sandick

# Exhibit 2

**Patterson Belknap Webb & Tyler** LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

February 14, 2023

Anthony C. LoMonaco
Associate
(212) 336-2642
alomonaco@pbwt.com

**VIA EMAIL**

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

> Re:   **SaveOnSP's Requests For Production**
> *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,*
> No. 22 Civ. 2632 (JMV) (CLW)

Dear Meredith:

We write in response to your letter dated February 7, 2023 regarding Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production and First Set of Interrogatories. Below, we identify potential areas of compromise, as well as areas where we agree that the parties are at an impasse.

**I.     GLOBAL ISSUES**

**A.     Documents Related to the Development and Marketing of CarePath and SaveOnSP's Financial Impact on JJHCS and CarePath (RFP Nos. 11, 26, 28-30, 36-37)**

As we explained in our January 6 and 27 letters and during our meet and confers, SaveOnSP's requests for documents related to the development and marketing of CarePath seek documents that are not relevant and the requests are not proportional to the needs of this litigation. Nevertheless, we have offered to produce certain responsive documents in our February 9, 2023 letter. We are willing to discuss this subject further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

Further, with respect to SaveOnSP's financial impact on JJHCS and CarePath, JJHCS has already agreed to produce, *inter alia*:

- "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period,"

Meredith Nelson, Esq.
February 14, 2023
Page 2

- "the data that formed the basis for the allegations in Complaint ¶¶ 92-100,"

- "JJHCS's budget for copay assistance through CarePath," and

- "JJHCS's actual and projected annual costs for CarePath."

*See* R&Os to SaveOnSP's RFP Nos. 25, 27, 29.

As we explained in our January 6 and 27 letters and during our meet and confers, we do not agree that these documents are insufficient for the needs of the case, but we are willing to discuss this further as well.

**B.      JJHCS Hub Entities, Janssen, and Other J&J Entities**

**1.      Documents of JJHCS Hub Entities**

In your letter, you raise several issues relating to "documents of JJHCS Hub Entities."  We address each in turn.

*First*, you asked us to clarify the role of Lash Group.  Our current understanding remains that Lash Group did not have a comparable role to Trial Card in the administration of CarePath's copay assistance program.  As we have said before, Trial Card is the entity that did the work of administering CarePath's copay assistance program and we have already agreed to facilitate a document production from Trial Card.  All that said, we are continuing to investigate and will follow up with more details about Lash Group's role in a separate letter as soon as possible.

*Second*, you asked us to state "whether any entity other than Trial Card was in any way involved in enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card."  You also asked us to provide "(1) the identities of Hub Entities involved in the development and marketing of CarePath from 2009 to present; and (2) the identities of Hub Entities involved in the administration of CarePath from 2009 to 2016."  Finally, you asked us to provide the identities of any entities that provide "limited, episodic services to JJHCS relating to CarePath," and further information on the services provided by these vendors.

For the reasons set forth in our previous letters and at our meet and confers, documents and information from before 2017 and documents and information relating to the development and marketing of CarePath are not relevant to this action.  Therefore, JJHCS will not identify all the entities—of which there are many—who have played any role in the operation of CarePath.  Nevertheless, in an effort accommodate SaveOnSP's request for additional information, JJHCS identifies the following examples of entities that have provided certain services related to CarePath:

Meredith Nelson, Esq.
February 14, 2023
Page 3

- ***EagleForce***.  A vendor that works with TrialCard to ensure that a patient who is enrolling in copay assistance is not insured by a government payor, such as Medicaid.  The EagleForce check is performed electronically and EagleForce rarely communicates with patients directly.

- ***IBM***.  A vendor that developed and maintains the IT infrastructure for the CarePath website and certain data sharing platforms between TrialCard and JJHCS.

- ***TJ Paul***.  A vendor that provides marketing and design support, such as input on fonts and logos for the CarePath website.

- Numerous other agencies have been engaged to design content for CarePath marketing, promotional, and educational materials (all of which then go through JJHCS's internal review before issuance).

JJHCS does not represent that the list above is exhaustive.  The JJHCS teams that support CarePath are able to engage vendors as needed, subject to certain internal review and procurement processes, and it is possible that other vendors have performed services related to the development and marketing of CarePath.  However, other than EagleForce, which has a limited, discrete role in CarePath, JJHCS is unaware of other entities involved in "enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card."

## 2.    Documents of J&J and Janssen Entities other than JJHCS

As we explained in our January 6 and 27 letters and during our meet and confers, while JJHCS is prepared to make arrangements with its corporate affiliates to produce documents from other Johnson & Johnson or Janssen entities if required, SaveOnSP has not yet provided a compelling reason to do so.  We have explained to you before that Johnson & Johnson is composed of more than 200 affiliates with over 100,000 employees.  SaveOnSP's insistence that JJHCS is required to conduct an investigation throughout the entire Johnson & Johnson organization for documents that are possibly responsive to SaveOnSP's requests when it has already determined that JJHCS is the entity that manages the CarePath program is evidently driven by a motivation to impose burden and cost on JJHCS without any legitimate rationale.

We are willing to discuss this issue further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

Meredith Nelson, Esq.
February 14, 2023
Page 4

### 3. Interrogatories Concerning Hub Entities, J&J, and Janssen

JJHCS has complied with your Interrogatories and submitted verified responses that identify the relevant individuals at JJHCS and Trial Card. We are happy to discuss this issue further, if it would be helpful.

## C. Time Period

### 1. Documents and Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

SaveOnSP continues to seek documents from January 1, 2009 onward for various requests. As we explained in our January 6 and 27 letters and during our meet and confers, a starting date of 2009 is vastly overbroad for the needs of this case and is unacceptable to JJHCS. As we have told you repeatedly in our many meet and confer sessions, the January 1, 2009 date is disconnected from any facts or events that are pertinent to this lawsuit. It is almost a decade before SaveOnSP was created. It is eight years before the allegations in the Complaint. Never once has SaveOnSP identified any possible rationale for its selection of this specific date. Nor could it, as it was selected by SaveOnSP for a single self-evident purpose: to impose unnecessary expense and burden on JJHCS.

JJHCS is prepared to produce documents from January 1, 2016, for certain categories of documents, in an effort to compromise. We remain willing to discuss this issue further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

### 2. Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, 42)

For certain documents relating to health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as JJHCS's understanding of Copay Accumulator Services and Copay Maximizer Services, SaveOnSP continues to seek a date range starting January 1, 2015 on the theory that "January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect." As we stated in our January 27 letter, a starting date of 2015 is also overbroad date range for the needs of this case. We confirm that the basis for this objection is both relevance and burden, but we nevertheless remain willing to discuss this further in the hope that continued dialogue will persuade SaveOnSP to reconsider its position.

## D. Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20, 21, 41-43; Interrogatory No. 7)

As we explained in our Responses and Objections, JJHCS will produce documents and communications from January 1, 2017 through July 1, 2022 relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to

Meredith Nelson, Esq.
February 14, 2023
Page 5

SaveOnSP.  JJHCS R&O to RFP No. 42.  Additionally, in our February 9, 2023 letter, we noted that, with respect to SaveOnSP's RFP No. 20, JJHCS is willing to produce studies, reports, and publications that JJHCS has funded or supported regarding accumulator and maximizer programs generally, as well as internal communications about such documents, provided that SaveOnSP is willing to make a reciprocal production of documents in response to JJHCS's RFP No. 45.[1]

Please confirm that SaveOnSP accepts this compromise with respect to these requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    RFP No. 11

We write to confirm that JJHCS has not operated any copay assistance programs other than CarePath since CarePath was created in its current form in June 2016.  JJHCS will not produce documents concerning any copay assistance program that predated CarePath.  As discussed earlier, SaveOnSP has failed to identify any legitimate basis for this request.  We agree that the parties are at an impasse on this issue and may present this dispute to the Court.

### B.    RFP Nos. 12 and 13

As we explained in our January 27, 2023 letter, JJHCS would be willing to produce internal communications relating to the drafting of CarePath's terms and conditions if SaveOnSP would be willing to produce internal communications responsive to JJHCS's RFP No. 17.  In our February 9, 2023 letter, we offered to further narrow the categories of internal communications responsive to JJHCS's RFP No. 17 that JJHCS would accept.  If SaveOnSP agrees to produce documents responsive to JJHCS's RFP No. 17 as laid out in our February 9, 2023 letter, then JJHCS would be willing to produce internal communications relating to the drafting of CarePath's terms and conditions.

Please let us know if SaveOnSP accepts the compromise with respect to these requests.

### C.    RFP No. 14

We write to confirm that JJHCS is willing to produce documents responsive to this request regarding JJHCS's understanding of commercial health plans' ability to designate specialty drugs as essential health benefits ("EHB") or non-essential health benefits ("NEHB")

---

[1] As noted in our February 9, 2023 letter, however, JJHCS is not willing to withdraw its RFP No. 43, which seeks documents relating to how SaveOnSP operates in jurisdictions with statutes or regulations that ban or limit accumulator adjustment programs.

Meredith Nelson, Esq.
February 14, 2023
Page 6

under the Affordable Care Act and its regulations for the time period of January 1, 2017 to July 1, 2022. JJHCS will not search for documents that predate this time period, as such a search would be unduly burdensome and irrelevant to the needs of this action, given that SaveOnSP did not begin operations until 2017. We believe that the parties are at an impasse on this issue with respect to documents before January 1, 2017 and may present this dispute to the Court.

### D. RFP No. 21

We write to memorialize the fact that SaveOnSP is deferring its request for documents responsive to this RFP at this time.

### E. RFP No. 25

JJHCS confirms that there are no further disputes on this RFP. JJHCS will produce all non-privileged documents responsive to this request.

### F. RFP Nos. 26 and 32

In your letter, you raise two issues relating to SaveOnSP's RFP Nos. 26 and 32, seeking "documents and communications concerning the payment of Patient's costs, including payments in excess of the advertised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity." We address each in turn.

*First*, you asked that we confirm whether JJHCS intends to provide patient-level data regarding the actual amounts paid to patients in copay assistance. To clarify, in our January 27, 2023 letter, we proposed a compromise on SaveOnSP's RFP Nos. 26 and 32 in which JJHCS is willing to produce the data requested in items i. through m. for RFP No. 28, which includes data regarding the actual amounts paid to patients in copay assistance, if SaveOnSP would in turn agree to produce the information sought in JJHCS's RFP Nos. 41 and 42. We reiterated this proposal in our February 9, 2023 letter and reiterate it in Section II.G, *infra*. If SaveOnSP agrees, JJHCS will provide patient-level data regarding the actual amounts paid to patients in copay assistance from January 1, 2016 to July 1, 2022, to the extent such data exists and can be located after a reasonable search.

*Second*, you asked JJHCS to confirm—without offering any rationale—that it will provide patient-level data by Friday, March 3, 2023. JJHCS agrees to produce this data early in the discovery process but does not consent to SaveOnSP's attempt to impose an arbitrary and unilateral deadline on production.

Please confirm whether you agree to the compromise outlined above.

Meredith Nelson, Esq.
February 14, 2023
Page 7

### G.    RFP Nos. 28 and 29

In your letter, you asked whether JJHCS consents to the following proposal: if JJHCS will produce the data items sought by i. through m. of RFP No. 28 from January 1, 2009 to July 1, 2022, SaveOnSP will produce data sufficient to show, for each Janssen Drug, the total number of patients enrolled in SaveOnSP-advised plans who received CarePath funds for the given drug; the total CarePath funds received by those patients for the given drug; the pharmacies at which those patients filled the given drug; and the average copay or coinsurance amount for the given drug for patients enrolled in plans advised by SaveOnSP.

As explained more fully in Section I.C, *supra*, and in other sections of this letter, much of the information sought from these requests is irrelevant to the claims and defenses in this case.  Further, the additional categories of information offered by SaveOnSP are insufficient because they do not include non-Janssen drugs and they only include aggregate, rather than patient-specific data.  Accordingly, as outlined in our February 9, 2023 letter, JJHCS renews its compromise proposal: if SaveOnSP is willing to produce the information sought in RFP Nos. 41 and 42, JJHCS will produce any available data responsive to parts (i) through (m) of SaveOnSP's RFP No. 28 for the period of January 1, 2016 through July 1, 2022.

Please let us know if you accept JJHCS's proposed compromise above.

### H.    RFP No. 34

We write to confirm that J&J never signed a contract with SaveOnSP, nor was JJHCS involved in any such negotiations.  Therefore, JJHCS will not produce any documents responsive to RFP No. 34, as these documents are irrelevant to the claims and defenses in this action.

Accordingly, JJHCS agrees that the parties are at an impasse on this issue and may present this dispute to the Court.

### I.    RFP Nos. 36 and 37

We write to memorialize the fact that SaveOnSP is deferring its request for documents responsive to RFP No. 36 at this time.

With respect to RFP No. 37, in its letter dated January 27, 2023, JJHCS clarified that because, after further investigation, it determined that it does not keep statistics on whether patients sign up for CarePath after being contacted by JJHCS or its vendors, we have no documents to produce, rendering this request moot.  In your letter, you dispute that RFP No. 37 has been mooted, claiming that "RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates."

Meredith Nelson, Esq.
February 14, 2023
Page 8

        These documents are irrelevant to the claims and defenses in this litigation. However, to the extent SaveOnSP seeks enrollment data for CarePath, as indicated above and in our January 27, 2023 letter, JJHCS is willing to produce such data in response to parts (i) through (m) of RFP No. 28, if SaveOnSP is willing to produce the categories of data requested in JJHCS's RFP Nos. 41 and 42.

        Please let us know whether SaveOnSP accepts this proposal.

<div align="center">* * *</div>

        We are available to meet and confer regarding the issues outlined above at your convenience.  We look forward to your response.

        Very truly yours,

        */s/Anthony C. LoMonaco*
        Anthony C. LoMonaco

# Exhibit 3



Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

January 20, 2023

**Via E-mail**

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

Re:     ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
        LLC*** **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

     We write to memorialize and follow up on our January 13, 2023 meet and confer regarding Save On SP LLC's ("SaveOnSP") Requests for Production to Johnson & Johnson Health Care Systems, Inc. ("JJHCS").

## I.     Global Issues

### A.     Documents Related to the Development and Marketing of CarePath and SaveOnSP's Financial Impact on JJHCS and CarePath (RFPs 11, 26, 28-30, 36, and 37)

     Several of SaveOnSP's requests, including RFPs 11, 26, 28-30, 36, and 37, seek information on the development and marketing of CarePath, as well as the finances of any entity with a stake in CarePath, including documents reflecting the financial impact of SaveOnSP's services and the plan terms set by its clients on JJHCS. You have objected to producing such information, telling us that you do not view it as relevant.

     This material is highly relevant. As we explained to you in our meet and confer, JJHCS's Complaint alleges that CarePath is intended to help patients afford their medications, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114, and that the threat to CarePath's viability constitutes a public harm for purposes of JJHCS's GBL § 349 claim, *id.* In response, SaveOnSP intends to show that

Anthony LoMonaco
January 20, 2023

CarePath is not a public good, but primarily a marketing tool that JJHCS and its affiliates use to sell more Janssen Drugs and to hike the price of those drugs year after year. SaveOnSP also intends to show that Johnson & Johnson's ("J&J's") return on investment from CarePath is substantial, and that even if JJHCS's costs for CarePath have gone up, CarePath is still profitable for J&J—not "prohibitively expensive," as JJHCS claims. SaveOnSP further intends to show that it has helped more patients enroll in CarePath than would otherwise have enrolled; that patients' adherence to Janssen Drugs has increased because of the benefit terms implemented by SaveOnSP's plan partners (which ensure that plan members always receive their drugs for free); and that, as a result of SaveOnSP's activities, J&J has sold more drugs and reaped more profits than it otherwise would have.

SaveOnSP's RFP Nos. 11, 26, 28-30, 32, 36, and 37 seek information relevant to these topics. RFP No. 11 seeks documents and communications regarding "the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." These documents relate to SaveOnSP's defense that CarePath is a marketing tool, developed to increase J&J's bottom line. RFP Nos. 26 and 32 seeks documents concerning the actual amount of CarePath funds paid to patients, including instances where patients received more than the budgeted amount of CarePath funds. These documents are relevant to disputing JJHCS's claims that its increased CarePath expenditures threaten the viability of CarePath by making it prohibitively expensive, as well as to the extent of JJHCS's alleged damages. RFP Nos. 28 and 29 seek data that is relevant to understanding JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, the financial impact of SaveOnSP on J&J more broadly, and JJHCS's damages. RFP No. 30 seeks documents and communications "regarding the basis for Janssen's decision to raise or lower the prices of Janssen Drugs," which relate to SaveOnSP's defenses that CarePath is primarily a marketing tool that enables J&J to continue to raise drug prices year after year and that J&J profits from SaveOnSP increasing enrollment in CarePath, because it is able to sell more of its incredibly expensive drugs. And RFP Nos. 36 and 37 seek documents relevant to SaveOnSP's defense that, because SaveOnSP is more successful than JJHCS at getting patients to sign up for CarePath, SaveOnSP helps J&J by generating additional revenue, which is also relevant to the extent of JJHCS's damages. *See infra* Section II.I.

During our meet and confer, you stated that SaveOnSP is not entitled to the information it seeks because this case is only about the allegation that JJHCS is paying more in copay assistance than it would if SaveOnSP did not exist. But that is not what JJHCS pled, and, regardless, JJHCS cannot provide only discovery that it believes supports its theory of the case. SaveOnSP is entitled to information that will allow it to disprove JJHCS's allegations and to prove its defenses.

Please confirm promptly that JJHCS will produce documents in response to these requests.

**B.    Documents in the Possession of JJHCS Hub Entities, Janssen, and other J&J entities**

Several of SaveOnSP's requests seek documents and communications likely possessed by Janssen, JJHCS Hub Entities, or entities within the broader J&J corporate family. In its January 6 letter, JJHCS stated that it would produce only those documents directly within JJHCS's "possession." During our meet and confer, we discussed your positions with respect to the JJHCS Hub Entities and all other J&J and Janssen entities, as detailed below.

**1.    JJHCS Hub Entities**

With respect to the JJHCS Hub Entities, we reiterated that SaveOnSP seeks documents and communications from any J&J entity, including any JJHCS Hub Entity, that was or is involved in the development, administration, or marketing of CarePath. As we explained, any JJHCS Hub Entity's documents or communications concerning SaveOnSP or the development, administration, or marketing of CarePath are relevant to this action. SaveOnSP maintains that JJHCS must produce all such responsive documents and communications to the extent they are within JJHCS's possession, custody, or control.

We understand that JJHCS is working with Trial Card to facilitate its production of documents, as you confirmed for us in your January 6 letter and during our meet and confer. You also stated during our meet and confer that JJHCS is similarly working with Lash Group to facilitate its production of documents. You confirmed that you were working with TrialCard and Lash Group to produce organizational charts responsive to our requests, and that JJHCS will produce organizational charts for other JJHCS entities administering CarePath, to the extent that any such entities exist. Although you took the position that Trial Card and Lash Group are the two primary JJHCS Hub Entities involved with CarePath, you were unable to confirm whether any other JJHCS Hub Entities are or have been involved with CarePath. We asked that you investigate whether there were any other relevant JJHCS Hub Entities that may have documents or communications responsive to SaveOnSP's requests. We also asked you to take a formal position as to whether documents possessed by any JJHCS Hub Entity are within JJHCS's possession, custody, or control.

Please confirm promptly (1) whether there previously were or currently are other JJHCS Hub Entities involved in the development, administration, and marketing of CarePath and (2) if so, that JJHCS will produce documents from those entities responsive to SaveOnSP's requests. Please also tell us whether the JJHCS Hub Entities' documents and communications are within JJHCS's possession, custody, and control.

**2.    J&J and Janssen**

During our meet and confer, we also reiterated that SaveOnSP seeks documents and communications likely in the possession of J&J and Janssen, including

organizational charts and other information which SaveOnSP may use to determine which entities and individuals possess responsive documents. You explained that your objection to producing documents from these entities was based on relevance and that you were not asserting that documents held by these entities were outside of JJHCS's possession, custody, and control.

As we explained, Janssen and J&J likely possess documents that are highly relevant to JJHCS's claims and SaveOnSP's defenses, including documents related to the pricing of Janssen Drugs, the purpose of CarePath, and J&J's return on investment for CarePath.

You stated that you would take our position back to your client. Please confirm promptly that JJHCS will produce documents and communications held by Janssen or other relevant J&J entities. We also request that you provide us with a list of all J&J entities involved in the development, marketing, or administration of CarePath.

## C.    Time Period

SaveOnSP's RFP Nos. 1-7, 11-13, 28-30, and 36-37 seek documents and communications dating back to January 1, 2009. RFP Nos. 14, 41, and 42 seek documents and communications dating back to January 1, 2015. JJHCS has thus far refused to produce documents and communications from before January 1, 2017, the date that JJHCS selected for its own requests, on relevance, burden, and proportionality grounds.

As we explained during our meet and confer, SaveOnSP selected January 1, 2009 as the starting date for RFP Nos. 1-7, 11-13, 28-30, and 36-37 based on its understanding of when most of the Janssen Drugs first went to market. SaveOnSP attempted to apply this date range only to those requests where historical documents and communications are necessary to provide SaveOnSP with the full set of relevant materials. For instance, SaveOnSP requires extrinsic evidence concerning the drafting of CarePath's terms and conditions so that it can make arguments about the meaning of the contracts that SaveOnSP allegedly induced patients to breach. RFP Nos. 12 and 13. SaveOnSP also requires documents pre-dating 2017 so that it can probe why CarePath was created, J&J's historical return on investment for CarePath, and how SaveOnSP has impacted JJHCS and CarePath. *See supra* Section I.A (discussing RFP Nos. 11, 28-30, 36, and 37). As we pointed out during our meet and confer, JJHCS has said that it intends to rely on historical information to assess its damages and the impact that SaveOnSP has on JJHCS and CarePath. *See, e.g.*, Dkt. No. 65 at 13 ("JJHCS may also study how patient co-pays increased or changed after a patient joined the SaveOnSP Program."). SaveOnSP is entitled to that same type of information. Finally, in order to understand how the above information implicates the various entities whose conduct is relevant in this action and to identify potential sources of additional information, SaveOnSP requires documents dating back to January 1, 2009 for its requests seeking

documents sufficient to show the organizational structure of JJHCS, Janssen and other entities described in RFP Nos. 1-7.

SaveOnSP selected January 1, 2015 as the starting date for RFP Nos. 14, 41, and 42, because SaveOnSP understands that the relevant provisions of the Affordable Care Act ("ACA") and related regulations concerning EHB requirements and out of pocket maximums, *see, e.g.*, 45 C.F.R. §§ 156.122, 156.115, came into effect around January 1, 2015. SaveOnSP seeks information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits, under the ACA, since 2015 to track whether JJHCS has always considered SaveOnSP's designation activities legally suspect, as alleged in the complaint. RFP No. 14. Similarly, relevant documents and communications regarding Copay Accumulator Services and Copay Maximizer Services, JJHCS and Hub Entities' understanding of the meaning of those terms, and such services' effect on JJHCS's return on investment for copay assistance will likely have been created soon after January 1, 2015, when JJHCS became aware of the relevant provisions.

During our meet and confer, you stated that you do not believe it is appropriate for JJHCS to produce documents pre-dating 2017 because SaveOnSP did not exist until 2017 and that the burden of producing such documents would therefore be disproportional. But the mere fact that SaveOnSP did not exist until 2017 does not relieve JJHCS of its obligation to produce relevant documents, including those that pre-date SaveOnSP's existence. If JJHCS wishes to make proposals to narrow the time frame for specific requests based on its investigation, SaveOnSP is happy to meet and confer regarding those proposals.

Please confirm promptly whether JJHCS is standing on its refusal to produce any documents pre-dating January 1, 2017. If not, please tell us which documents pre-dating January 1, 2017 JJHCS will produce.

### D. Requests Related to Accumulators and Maximizers (RFP Nos. 20, 21, and 41-43)

During our meet and confer, the parties discussed several of SaveOnSP's requests that seek documents related to copay maximizers and accumulators (*e.g.*, RFP Nos. 20, 21, and 41-43). We explained that this information appeared to be relevant to JJHCS allegations regarding accumulators in its complaint, Compl. ¶¶ 22 n.4, 50 n.7, 74, and JJHCS's insistence that it has alleged SaveOnSP "operates like an 'accumulator,'" Jan. 5 Joint Letter (Dkt. 66), at 7.

You replied that, in the letter, JJHCS claimed that SaveOnSP has a characteristic of accumulators because it does not count copays towards patients' deductibles or out-of-pocket maximums. You conceded, however, that JJHCS has not alleged that SaveOnSP is itself a copay accumulator or maximizer. In response, we suggested that both parties might drop their requests concerning accumulators

and maximizers. You stated that you would take this proposed compromise back to your client.

Please let us know promptly whether JJHCS will agree to dropping all discovery requests to the extent they concern copay accumulators and maximizers.

## II. Issues Related to Specific Requests

### A. RFP No. 11

SaveOnSP's RFP No. 11 seeks documents and communications regarding "the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." In addition to explaining the relevance arguments detailed above, *supra* Section I.A, during our meet and confer, we asked for clarification as to whether J&J or JJHCS operates or previously operated any other copay assistance programs besides CarePath. You explained that paragraph 146 of the Complaint, which refers to SaveOnSP's harm to "copay assistance programs like CarePath," does not imply that JJHCS has other copay assistance programs, but simply asserts that SaveOnSP is likely affecting other manufacturers' copay assistance programs similarly to how it affects CarePath. We explained that if J&J or JJHCS does have other copay assistance programs, then documents relating to those programs are relevant to the extent they shed light on the purpose of copay assistance. You could not confirm whether J&J or JJHCS has any copay assistance programs other than CarePath and stated that you would get back to us on this point.

Please confirm promptly whether J&J or JJHCS operates or previously operated any copay assistance programs other than CarePath.

### B. RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek, respectively, documents and communications regarding CarePath's terms and conditions and the CarePath requirement that patients enrolled in CarePath make payments toward Janssen Drugs. JJHCS has agreed to produce only final versions of CarePath's terms and conditions, asserting that all other requested documents are irrelevant.

During our meet and confer, we explained that we are entitled to gather parole evidence on the meaning of CarePath's terms and conditions because both of JJHCS's claims are based, at least in part, on allegations that SaveOn induced patients to breach those terms. SaveOnSP seeks this information so that it can prove that JJHCS's interpretation of its contract is incorrect and that patients have not breached the relevant terms and conditions. You stated that SaveOnSP is not entitled to this information because the contract is unambiguous. But, as we explained, whether the contract is ambiguous or not is a merits argument, not a basis to refusing producing documents. SaveOnSP is entitled to extrinsic evidence on the meaning of the relevant terms and conditions unless and until the Court determines that those terms and conditions are unambiguous. *See Nestle Foods Corp.*

*v. Aetna Cas. & Sur. Co.*, No. CIV. 89-1701 (CSF), 1990 WL 191922, at *5 (D.N.J. Nov. 13, 1990) ("[W]hen the question of ambiguity in the contract has not yet been resolved, the drafting history is relevant and discoverable under the federal rules."). We specifically identified the terms "offer" and "health plan" as examples of terms for which we dispute JJHCS's alleged interpretation.

You asked us to consider whether if JJHCS would agree to produce documents responsive to these requests, SaveOnSP would agree in exchange to produce internal documents responsive to JJHCS's RFP No. 17 ("Any agreements, including drafts, between SaveOnSP or Express Scripts on the one hand, and health insurance plan sponsors, on the other, regarding the SaveOnSP Program, and any communications relating thereto."). As we explained, we do not view that offer as reciprocal, because—unlike the CarePath terms and conditions—the terms of Save-OnSP's contracts with health plans are not at issue in this case. Moreover, Save-OnSP has already agreed to produce internal communications regarding Save-OnSP's understanding of the meaning of CarePath's terms and conditions—we simply ask that JJHCS agree to produce the same.

You stated that you would take this request and our explanation of relevance back to your client. Please confirm promptly that JJHCS will produce documents responsive to RFP Nos. 12 and 13.

## C.    RFP No. 14

SaveOnSP's RFP No. 14 seeks information regarding JJHCS's and its related entities' understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") and Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act. JJHCS has thus far agreed to produce only non-privileged documents and communications regarding SaveOnSP's designation of specialty drugs as Essential Health Benefits or Non-Essential Health Benefits.

During our meet and confer, we requested that JJHCS agree to produce a broader range of documents concerning any aspect of JJHCS's understanding of the designation of EHBs and NEHBs. You suggested that JJHCS may be willing to produce such documents if SaveOnSP would agree to produce internal communications regarding this topic. Though SaveOnSP maintains that such communications are not relevant, we agreed to discuss the exchange further with our clients and you agreed to do the same.

While reserving all rights, SaveOnSP would be open to producing internal documents that reflect its understanding of whether SaveOnSP's advice to health plans complies with the ACA if JJHCS would agree to produce (as discussed) documents concerning any aspect of JJHCS's understanding of the designation of EHBs and NEHBs, and not merely SaveOn's own advice regarding or understanding of the designation of EHBs and NEHBs.

Please confirm promptly whether JJHCS will produce the broader set of documents SaveOnSP seeks in response to RFP No. 14, and, if so, on what conditions.

### D.    RFP No. 21

SaveOnSP's RFP No. 21 seeks information regarding JJHCS's advocacy to or communications with any governmental or regulatory body regarding Save-OnSP, Copay Accumulator Services, or Copay Maximizer Services. JJHCS has thus far refused to produce any responsive documents on the grounds that it has a First Amendment right to withhold them and that such communications are irrelevant.

During our meet and confer, the parties agreed to forego discussing this request insofar as it relates to copay accumulators and maximizers in light of the parties' potential agreement noted above. *See supra* Section I.D. As it relates to communications and advocacy regarding SaveOnSP, we explained that such documents are relevant to JJHCS's GBL claim, as JJHCS's public advocacy efforts may include misinformation that causes the alleged patient stress and confusion that JJHCS attributes to SaveOnSP. We maintained that we are entitled to discover such documents notwithstanding your assertion that this case concerns only the specific types of stress and confusion that JJHCS alleged in its complaint.

We note that JJHCS has requested similar information from SaveOnSP. In its RFP No. 33, JJHCS requests documents and communications SaveOnSP has received reflecting complaints, concerns, or inquiries about its services, including from governmental agencies. Both parties are currently seeking communications between parties and government entities. We are open to discussing a reciprocal agreement on this material.

You agreed to take our position back to your clients. Please confirm promptly whether JJHCS will produce any documents in response to RFP No. 21.

### E.    RFP No. 25

SaveOnSP's RFP No. 25 seeks all documents and communications regarding any alleged harm caused by SaveOnSP to JJHCS, including JJHCS's allegations in Complaint ¶¶ 110, 115. JJHCS has thus far agreed to produce documents and communications relating to "the extent of the harm SaveOn has caused."

During the meet and confer, we sought further clarification on whether JJHCS's use of the phrase "extent of the harm" in its response, as compared to the phrase "any alleged harm," as used in the request, is intended to exclude any documents responsive to SaveOnSP's request. You noted that you had not previously picked up on that distinction, but that you recognized the difference and would confirm what JJHCS intends to produce.

Anthony LoMonaco
January 20, 2023

Please confirm promptly that JJHCS will produce all documents regarding any alleged harm caused by SaveOnSP to JJHCS, without withholding any documents based on JJHCS's use of the phrase "extent of the harm."

**F.      RFP Nos. 26 & 32**

SaveOnSP's RFP No. 26 seeks documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum. SaveOnSP's RFP No. 32 seeks documents and Communications regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient.

With respect to RFP No. 26, JJHCS has taken the position that its agreement to produce documents sufficient to show how JJHCS determines the amount of copay assistance funds it offers to CarePath enrollees is sufficient to satisfy this request. JJHCS has refused to produce any documents responsive to RFP No. 32.

As we explained during our meet and confer, these requests seek documents reflecting payments made to CarePath enrollees via JJHCS, Janssen, JJHCS Hub Entities, or any other entity that pays CarePath funds to patients, as well as communications concerning those payments. In short, SaveOnSP seeks documents concerning the actual amount of CarePath funds paid to patients, including instances where patients received more than the budgeted amount of CarePath funds. We explained that in this latter situation, such documents are particularly relevant to both refuting JJHCS's allegations regarding viability as well as for contesting any damages amount put forward by JJHCS, as such overpayments would not be caused by SaveOnSP.

You agreed to take these requests and our explanation of relevance back to your client. Please confirm promptly whether JJHCS will produce documents in response to RFP Nos. 26 and 32.

**G.      RFP Nos. 28 & 29**

SaveOnSP's RFP Nos. 28 and 29 seek data regarding several topics, including patient fills and dosages for Janssen Drugs, the manufacturing and marketing of Janssen Drugs, copay assistance funds, the CarePath budget, and JJHCS's return on investment for CarePath. JJHCS has thus far agreed to produce Janssen transparency reports (RFP No. 28) and documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath" (RFP No. 29).

As discussed above, *see supra* Section I.A., we explained that the data Save-OnSP seeks in RFP Nos. 28 and 29 is relevant to understanding JJHCS's return on investment for CarePath, how CarePath enables JJHCS to increase the costs of Janssen Drugs, and the financial impact of SaveOnSP on J&J more broadly. With respect to RFP No. 28, we clarified that the transparency reports JJHCS has agreed to produce are insufficient, as they are public documents with very little responsive information. We also pointed out the significant similarities between certain categories of data covered by SaveOnSP's RFP No. 28 and JJHCS's request for similar data regarding drug fills in its RFP No. 41. We asked that JJHCS consider whether, in light of those similarities, there is potential for reciprocity.

We are open to discussing more robust data production from both Save-OnSP and JJHCS, subject to an agreement that satisfactorily limits the commercial harm to SaveOnSP by limiting JJHCS's ability to contact SaveOnSP-enrolled patients and SaveOnSP clients. *See* January 20, 2021 Letter from A. Dunlap to H. Sandick.

You agreed to take both requests back to your client for further discussion. Please confirm promptly whether JJHCS will produce additional documents, beyond what it has already agreed to produce, in response to RFP Nos. 28 and 29.

## H.     Request No. 34

SaveOnSP's RFP No. 34 seeks all documents and communications regarding JJHCS's or Janssen's negotiations or agreements regarding the potential use of SaveOnSP's services, or the services of any Copay Maximizer Service or Copay Accumulator Service, for JJHCS's Employee Health Plans, including JJHCS's abandonment of those negotiations or agreements. JJHCS has thus far refused to produce any documents in response, asserting that such documents are irrelevant.

During our meet and confer, we explained that these documents and communications are relevant to the credibility of JJHCS's allegations. We explained that SaveOnSP understands that J&J or JJHCS conducted significant negotiations with SaveOnSP to use SaveOnSP's services for the health plan it provides for its own employees. Before the parties could sign a contract, however, another division within J&J or JJHCS insisted that the negotiations cease. We explained that if J&J or JJHCS was in fact considering using SaveOnSP's services for its employee health plan, that would call into question JJHCS's assertions that SaveOnSP harms patients. You responded that these documents and communications are nonetheless irrelevant because no contract was ever signed between J&J and SaveOnSP. But, as we explained, J&J or JJHCS likely would have analyzed the benefits of employing SaveOnSP's services during these negotiations. Documents and communications reflecting that analysis are relevant to assessing the credibility of JJHCS's allegations.

You stated that you would take this request and our explanation back to your client. Please confirm promptly that JJHCS will produce documents responsive to RFP No. 34.

## I.      Request Nos. 36 & 37

SaveOnSP's RFP No. 36 seeks documents sufficient to show the economic terms of JJHCS's retention of, or agreements with, any JJHCS Hub Entities or CarePath Care Coordinator regarding CarePath, including any assessment of the fair market value of those services. SaveOnSP's RFP No. 37 seeks documents sufficient to show the percentage of patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third-party authorized to advertise or market CarePath or Janssen Drugs. In response to RFP No. 36, JJHCS has agreed to produce agreements between JJHCS and the entities responsible for administering CarePath, for the period of January 1, 2017 to the present, even if those entities no longer administer CarePath today. JJHCS has represented that those agreements will include work orders that document the cost of the services provided. JJHCS has thus far refused to produce documents responsive to RFP No. 37, asserting that they are irrelevant.

During our meet and confer, we explained that SaveOnSP believes it is more successful at getting patients to sign up for CarePath than JJHCS is through its own outreach, and that SaveOnSP thus generates additional revenue for JJHCS both in the form of profits from additional drug fills and by saving JJHCS from the expense of conducting outreach to these patients. We explained that demonstrating SaveOnSP's net benefit to JJHCS is relevant to refuting JJHCS's alleged injury and the alleged threatened viability of CarePath. RFPs Nos. 36 and 37 seek information relevant to that defense, including information regarding the value of the CarePath outreach services for which JJHCS contracts and information about the number of patients that JJHCS is able to enroll in CarePath through it and its partners' outreach. Regarding RFP No. 36, we acknowledged that the contracts between JJHCS and the entities responsible for administering CarePath which JJHCS has already agreed to produce may provide information regarding the value of those entities' outreach services to JJHCS, but that SaveOnSP also seeks any other documents reflecting the value of those services, including internal documents that may have been generated by JJHCS in the process of negotiating its contracts.

You stated that you would take these requests and our explanations back to your client. Please confirm promptly whether JJHCS will produce a broader range of documents responsive to RFP No. 36, and whether it will produce any documents responsive to RFP No. 37.

## J.      Request No. 38

SaveOnSP's RFP No. 38 seeks documents and communications received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity

Anthony LoMonaco
January 20, 2023

regarding SaveOnSP or CarePath. JJHCS has agreed to produce all documents responsive to this Request regarding SaveOnSP. SaveOnSP accepts JJHCS's offer and will not seek further documents responsive to this request relating solely to CarePath at this time, although SaveOnSP reserves all rights.

* * *

We remain hopeful that the parties can work through these issues to reach a mutually agreeable resolution. We look forward to your response and are available to meet and confer.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

# Exhibit 4

| | |
|---|---|
| **From:** | Jody Miller [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2BFE0F6F48F74064838E71E39C109AF9-JMILLER] |
| **Sent:** | 2/21/2017 7:50:53 PM |
| **To:** | Jill Stearns [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5a707bb212634316b7f72618f5eb4e41-jstearns.sa] |
| **Subject:** | RE: Saveon questions 2/13 at 4pmET |

Jill
See below answers in red
Please send when you review.  Notice I left an question for you

Jody L. Miller
President
SaveonSP
611 Jamison Rd, Suite 201
Elma, NY 14059
716-440-0192
Jmiller@saveonsp.com

**From:** Nanick, Andrew T. (BLM) [mailto:andrew_nanick@express-scripts.com]
**Sent:** Tuesday, February 21, 2017 12:15 PM
**To:** Jill Stearns <jstearns@saveonsp.com>; Jody Miller <jmiller@saveonsp.com>; Geiger, Daniel (EHQ) <DGeiger@express-scripts.com>
**Cc:** Schneider, Timothy A. (EHQ) <TASchneider@express-scripts.com>
**Subject:** RE: Saveon questions 2/13 at 4pmET

Thank you

**From:** Jill Stearns [mailto:jstearns@saveonsp.com]
**Sent:** Tuesday, February 21, 2017 12:14 PM
**To:** Nanick, Andrew T. (BLM); Jody Miller; Curch, Daniel J (WKC)
**Cc:** Schneider, Timothy A. (EHQ)
**Subject:** [EXTERNAL] RE: Saveon questions 2/13 at 4pmET

We are working on this and will get back to you with responses soon.  Thanks.

**From:** Nanick, Andrew T. (BLM) [mailto:andrew_nanick@express-scripts.com]
**Sent:** Tuesday, February 21, 2017 9:03 AM
**To:** Jody Miller <jmiller@saveonsp.com>; Curch, Daniel J (WKC) <daniel_curch@express-scripts.com>; Jill Stearns <jstearns@saveonsp.com>
**Cc:** Schneider, Timothy A. (EHQ) <TASchneider@express-scripts.com>
**Subject:** FW: Saveon questions 2/13 at 4pmET

Hi Jody,Jill and Dan,

Can you please provide answers to the questions below from the Willis Towers Watson leadership team on the SaveonSP program? If you can type in the answer next to each question it would be helpful.

The large communication to the Willis Towers Watson pharmacy practice on SaveonSP is pending these last answers.

Thanks,

Andrew Nanick, R.Ph. | Sr. Clinical Account Executive | Express Scripts, Inc.

Attorneys Eyes Only

phone 404.545.0757 | andrew_nanick@express-scripts.com

🌳 *Save a tree. Don't print this email unless it's absolutely necessary.*

---

**From:** Rivera, Carmelina (Phoenix)
**Sent:** Monday, February 20, 2017 3:22 PM
**To:** Sell, Chantell (Philadelphia) <chantell.sell@willistowerswatson.com>; Asch, Katie (Chicago) <katie.asch@willistowerswatson.com>; Shubin, Alan (Charlotte) <alan.shubin@willistowerswatson.com>; Brodin, Kaliroi (New York) <kaliroi.brodin@willistowerswatson.com>; Morana, Sal (Atlanta) <sal.morana@willistowerswatson.com>; Herout, Rhonda (Chicago) <rhonda.herout@willistowerswatson.com>
**Cc:** Rosier, Nadina (New York) <nadina.rosier@willistowerswatson.com>; Perry, Connie (Milwaukee) <connie.perry@willistowerswatson.com>; Michael, Eric (Minneapolis) <eric.michael@willistowerswatson.com>; Rivera, Carmelina (Phoenix) <JCarmelina.Rivera@willistowerswatson.com>
**Subject:** RE: Saveon questions 2/13 at 4pmET

Thanks for the notes Chantell – apologize I could not attend the session.

Seems intriguing – and hard to believe the potential $$ that are available! Couple of specific questions that come to mind (maybe they were addressed, but not sure I see that detail below):

- How "easy" is to change the originally selected state benchmark? Are there implications from the actuarial/rate setting side (i.e., it creates additional work or changes to their models or processes)? Changing the state benchmark is relatively easy, as you simply document that you are using a certain state. If you choose a state that has less requirements, but keep your current plan it has no negative effect. I am speaking only about the pharmacy requirements. The medical requirements may be different and would need to be reviewed, however our findings have led us to believe the same holds true. Our counsel has felt it is best to elect at the plan year, and not mid-year, though she admits there is no prohibition against it. I want to be clear here that each customer must get guidance from their own counsel, because this is a legal matter more than operational.
- Contract is directly with SaveOn –which I think will create some client issues/concerns.
  - Each contract will need to go through legal, IT, security review. Is SaveOn prepared for the legal discussions that are likely going to ensue with most of our clients? YES we do it every day,
- A little confused on "savings" is calculated. (pdf deck does not show an actual calculation). Of course, we also do not typically align to shared savings model. Any discussion on that point? Our savings are calculated by taking the copay assistance for that fill, minus the previous copay paid by patient for a fill ( we agree and set this amount in our contract with customer) We then take 25% of that number as our fee. This way we are being paid only on true savings, and it is very understandable and auditable. This is not the typical percentage of savings of some future hopeful savings. This is actual savings from the program. The Customer enjoys their savings at time of fill and we get paid around 45 days later.
  - The LOL in the contract refers to fees the prior 12 months (which would equate to the shared savings) --- another red flag for contracting I believe. Jill help me here, as I don't understand the question
- I am a little unclear on the "max PA edit"….more importantly, I get concerned when ESI is making changes in their system! we all have experienced how a simple edit in the ESI system has actually resulted with unintended other consequences. The max edit is an administrative PA in place after all clinical approvals to help us manage the patient experience. It is a critical tool for the program.
- Finally, we should attempt to maximize all available pharma manuf dollars for our clients….but I always think about whether this is contributing to the high price points set by manufacturers. PBMs are always noting how much they 'extract' out of the system – but are programs like this continuing to inflate pricing (while keeping in the constraints of Medicaid best price)?.....a conversation for another day for sure! I am always glad to have a dialogue about this program and our insights into pharma pricing. I have not heard of a single manufacturer implying that their copay programs are causing them to change pricing. Here are my thoughts as to why. First, it would be a dangerous comment, because Pharma invented these programs. The government does not like them as evidenced by the restrictions on government payers. Secondly, these programs were built to assist patients on biologics because even in the early days the co share for patients were so high that retention was a major issue for pharma.(the first program was started well over ten years ago) These drugs are in competitive classes and all of the manufacturers attempt to maintain a similar level of support, both in pricing and in support dollars. Finally, the way I look at this, is to look at drug pricing for drugs that do not have a copay program. What is the rate of inflation in those drugs? The answer you will find is about the same. This leads me to believe that there is no correlation between copay assistance being offered and drug pricing. Bottom line in my mind is, Pharma can, and does take price when they want, and as long as patients are getting drug they will continue. Of course this is just an informed opinion and I certainly respect those that can offer a different view point. I have been asked this

**Attorneys Eyes Only**                                                                                                  SOSP_0000260

question many times, and having worked to develop these programs for pharma (I still do), I feel I understand their motives pretty well.

I hope this sheds some light on my thinking, but please feel free if you want to have the discussion on this topic I would welcome the dialogue.


Thanks all
Jody



Thanks, Carmelina

---

**From:** Sell, Chantell (Philadelphia)
**Sent:** Tuesday, February 14, 2017 12:02 PM
**To:** Asch, Katie (Chicago) <katie.asch@willistowerswatson.com>; Shubin, Alan (Charlotte) <alan.shubin@willistowerswatson.com>; Brodin, Kaliroi (New York) <kaliroi.brodin@willistowerswatson.com>; Morana, Sal (Atlanta) <sal.morana@willistowerswatson.com>; Herout, Rhonda (Chicago) <rhonda.herout@willistowerswatson.com>; Rivera, Carmelina (Phoenix) <JCarmelina.Rivera@willistowerswatson.com>
**Cc:** Rosier, Nadina (New York) <nadina.rosier@willistowerswatson.com>; Perry, Connie (Milwaukee) <connie.perry@willistowerswatson.com>; Michael, Eric (Minneapolis) <eric.michael@willistowerswatson.com>
**Subject:** FW: Saveon questions 2/13 at 4pmET

Hi everyone, please see the notes from yesterday's call (reviewed by Saveon and ESI). Though it's hard to believe ESI is not receiving anything for promoting this vendor, this offering (could) potentially be an option for those who have maximized their Specialty management. I would appreciate others thoughts/opinions on this vendor before I communicate to the RxPx.

- Saveon maximizes pharma funded specialty coupon programs by working with clients to redefine their essential health benefits (EHB)
- ACA plans must pick a state benchmark, not necessarily where the employer resides
  - Most employers (~70%) pick Utah as their state benchmark, as it's the most restrictive
  - By assigning the least utilized drugs to the essential benefit, the other more utilized ones become non-essential and are not subject to the max OOP requirements
- Estimated savings ranges from $2.50 - $4.00 PMPM (across all membership, verified by Saveon)
- Saveon does not think the pharma funding will stop anytime soon (2017-2018) due to the increased utilization/PR it brings to them, unless the federal laws change
- Rebates are not affected, as formulary status does not change with this program.  (NOTE: Non-specialty drugs can also be included in EHB – Saveon gave example of methotrexate)
- Saveon is working exclusively with Express Scripts and notes there are smaller players who are working with smaller PBMs
- The contract is between Saveon and the client with Saveon provides invoices every 4 weeks to the clients.  Saveon will provide more detailed reporting for audit purposes
- Saveon retains 25% of the savings (after copays, etc) in a shared savings model with the client
- Express Scripts gets the client to move to Accredo exclusive with no refills (also "maximum PA edit" must be turned off).  For this program ESI uses a cost exceeds ingredient max PA to drive new fills to SaveonSP. In the past they have set that limit to $100 to prevent any drugs slipping through and drive members to SaveonSP to get enrolled in the program.  This would be only set on the drugs captured in the Saveon SP program.
- The program is available for clients ≥15k lives and ESI will do modeling
- Some clients consider this a minor SPD change and Saveon will communicate 60 days prior, while others consider this a major SPD change, so they defer to implement on the plan year (usually 1/1).  This is determined by the client's counsel. If major then 60 day prior notice required. If minor then a post notice suffices.
- 50-60% of patients are making an inbound call prior to go-live (3 way call w/ manufacturer/Saveon/patient)
- Saveon provides concierge-level customer service, noting they can solve problems faster than Accredo
- Disruption is minimal (i.e.56k plan with < 500 members impacted)
- Saveon has implemented this for 5 clients (>100k lives) as of September 2016, with public sector interest growing (Note: one plan implemented off plan-year, however plan year implementation is not required)
- **Follow-ups**: Saveon to provide the list of 64 drugs (targeted for Utah benchmark plans) in 13 classes

Attorneys Eyes Only

**From:** Sell, Chantell (Philadelphia)
**Sent:** Tuesday, February 14, 2017 8:32 AM
**To:** Asch, Katie (Chicago) <katie.asch@willistowerswatson.com>; Shubin, Alan (Charlotte)
<alan.shubin@willistowerswatson.com>; Brodin, Kaliroi (New York) <kaliroi.brodin@willistowerswatson.com>; Morana,
Sal (Atlanta) <sal.morana@willistowerswatson.com>
**Subject:** FW: Saveon questions 2/13 at 4pmET

Thanks for joining the call w/ Saveon yesterday.  Please see my notes and let me know if I missed anything or you have
comments before I forward to the larger group:

- Saveon maximizes pharma funded programs by working with clients to redefine their essential benefits
- ACA plans must pick a state benchmark, not necessarily where the employer resides
- Most employers (~70%) pick Utah as their state benchmark, as it's the most restrictive
- By assigning the least utilized drugs to the essential benefit, the other more utilized ones become non-essential and are not subject to the max OOP requirements
- Estimated savings ranges from $250-$400 PMPM
- Saveon does not think the pharma funding will stop anytime soon (2017-2018) due to the increased utilization/PR it brings to them, unless the federal laws change
- Rebates are not affected, as formulary status does not change with this program.  (NOTE: Non-specialty drugs can also be included in EHB – Saveon gave example of methotrexate)
- Saveon is working exclusively with Express Scripts and notes there are smaller players who are working with smaller PBMs
- The contract is between Saveon and the client with Saveon provides invoices every 4 weeks to the clients.  Saveon will provide more detailed reporting for audit
- Saveon retains 25% of the savings (after copays, etc) in a shared savings model with the client
- Express Scripts gets the client to move to Accredo exclusive with no refills (also "maximum PA edit" must be turned off)
- The program is available for clients ≥15k lives and ESI will do modeling
- Some clients consider this a minot SPD change and Saveon will communicate 60 days prior, while others consider this a major SPD change
- 50-60% of patients are making an inbound call prior to go-live (3 way call w/ manufacturer/Saveon/patient
- Saveon provides concierge-level customer service, noting they can solve problems faster than Accredo
- Disruption is minimal (i.e.56k plan with < 500 members impacted)
- Saveon has implemented this for 5 clients (>100k lives) as of 2016, with public sector interest growing (Note: one plan implemented off plan-year)
- Follow-ups: Saveon to provide the list of 64 drugs in13 classes

Thanks again,
Chantell

**From:** Sell, Chantell (Philadelphia)
**Sent:** Monday, January 30, 2017 10:09 AM
**To:** Rosier, Nadina (New York) <nadina.rosier@willistowerswatson.com>; Shubin, Alan (Charlotte)
<alan.shubin@willistowerswatson.com>; Herout, Rhonda (Chicago) <rhonda.herout@willistowerswatson.com>; Perry,
Connie (Milwaukee) <connie.perry@willistowerswatson.com>; Asch, Katie (Chicago)
<katie.asch@willistowerswatson.com>; Brodin, Kaliroi (New York) <kaliroi.brodin@willistowerswatson.com>; Rehrer,
Christa (New York) <Christa.Rehrer@willistowerswatson.com>; Morana, Sal (Atlanta)
<sal.morana@willistowerswatson.com>
**Cc:** Michael, Eric (Minneapolis) <eric.michael@willistowerswatson.com>; Rivera, Carmelina (Phoenix)
<JCarmelina.Rivera@willistowerswatson.com>
**Subject:** FW: Saveon questions 2/13 at 4pmET

Hi everyone, thanks for your interest in participating in a conversation with ESI and SaveonSP.  Nadina and I solicited
them with some preliminary questions, which have been (mostly) answered below.  If you have any additional questions,
please let me know.  Otherwise, we can discuss directly with Saveon on 2/13.

Attorneys Eyes Only

SOSP_0000262

Regards,
Chantell

---

**From:** Nanick, Andrew T. (BLM) [mailto:andrew_nanick@express-scripts.com]
**Sent:** Friday, January 27, 2017 5:08 PM
**To:** Sell, Chantell (Philadelphia) <chantell.sell@willistowerswatson.com>; Rehrer, Christa (New York) <Christa.Rehrer@willistowerswatson.com>
**Cc:** Express Scripts - Rob Vitolo <rob_vitolo@express-scripts.com>; Campbell, CaraLee (EHQ) <CCampbell@express-scripts.com>
**Subject:** Saveon questions 2/13 at 4pmET

Hi Chantell and Christa,

See below for responses to the initial set of questions. Attached are the reference documents requested. Please let me know if additional questions arise prior to the 13th.

Thanks,

Andrew Nanick, R.Ph. | Sr. Clinical Account Executive | Express Scripts, Inc.
phone 404.545.0757 | andrew_nanick@express-scripts.com

🌲 *Save a tree. Don't print this email unless it's absolutely necessary.*

---

**From:** Sell, Chantell (Philadelphia) [mailto:chantell.sell@willistowerswatson.com]
**Sent:** Wednesday, January 25, 2017 12:44 PM
**To:** Nanick, Andrew T. (BLM)
**Subject:** [EXTERNAL] Saveon questions 2/13 at 4pmET

Hi Andy, I had a discussion with Nadina regarding Saveon. We drafted some questions which we're hoping will could be addressed prior or during the 2/13 call at 4pmET.

- What is Saveon's non-essential drug definition and is it different from ESI's current definition? If the definition is misinterpreted, who is being held legally responsible from a benefits management perspective? Please see attached Client FAQ. There is information on the above question and more. The Plan is the fiduciary and that does not change.
- Since ESI currently manages clients essential/non-essential benefits, how will this change with the Saveon relationship? ESI does not currently manages a client's essential/non-essential benefit. The client chose the benefit structure when they chose a "benchmark" state when they qualified the plan under the ACA. The essential list must be met by any employer plan that wants to validate that it was in fact a "qualified" plan under the ACA.
- Please explain the shared savings model, as this business model doesn't make sense to WTW. How does Saveon calculate savings and what reporting is available to clients to demonstrate this? Is the program auditable?
  We have attached a sample invoice and there is a little bit of information in the attached Client FAQ. Prior to the start of the program and documented in the contract, the current average copay for the drugs included in the Saveon program is established. The new, higher copays are implemented at the start of the program. Every two weeks, retrospectively, SaveonSP will pull from the ESI CDL the claims included in the program and then calculate the net savings comparing the new copay to the documented, prior copay. That administrative fee is calculated off of that net savings. A detail list of claims will accompany the invoice. The client receives the full savings up front and, retrospectively, pays SaveonSP. The savings is directly related to the claims processed during the reporting timeperiod.
- How did the ESI/Saveon partnership come about? Does ESI have any partial ownership or similar business relationship with Saveon? What is ESI's relationship with Saveon and moving forward? SaveonSP approached ESI with this partnership as they had a client wanting to implement the program. ESI only holds an Exclusive agreement with SaveonSP in response to the competitive nature of the market.
- Please provide a sample client contract prior to the call. Is ESI in any way party to this contract? Sample contract is attached and ESI is not a party in this contract. Exhibit B outlines the shared savings terms.

---

Attorneys Eyes Only

Thanks in advance,
Chantell

**Chantell Sell Reagan, Pharm.D.**
Pharmacist Consultant, Rx Group Benefits

**Willis Towers Watson**
1500 Market Street | Philadelphia, PA 19102
Phone: 203.585.9444
Email: chantell.sell@willistowerswatson.com
willistowerswatson.com
Follow Willis Towers Watson on social media

*Notice of Confidentiality*
This email contains confidential material prepared for the intended addressees only and it may contain intellectual property of Towers Watson, its affiliates or a third party. This material may not be suitable for, and we accept no responsibility for, use in any context or for any purpose other than for the intended context and purpose. If you are not the intended recipient or if we did not authorize your receipt of this material, any use, distribution or copying of this material is strictly prohibited and may be unlawful. If you have received this communication in error, please return it to the original sender with the subject heading "Received in error," then delete any copies.

This e-mail has come to you from Towers Watson Delaware Inc.
*Notice of Confidentiality*
This email contains confidential material prepared for the intended addressees only and it may contain intellectual property of Towers Watson, its affiliates or a third party. This material may not be suitable for, and we accept no responsibility for, use in any context or for any purpose other than for the intended context and purpose. If you are not the intended recipient or if we did not authorize your receipt of this material, any use, distribution or copying of this material is strictly prohibited and may be unlawful. If you have received this communication in error, please return it to the original sender with the subject heading "Received in error," then delete any copies.

This e-mail has come to you from Towers Watson Delaware Inc.

Attorneys Eyes Only

# Exhibit 5

| | |
|---|---|
| **From:** | Claudia Dunbar [cdunbar@saveonsp.com] |
| **Sent:** | 3/7/2018 6:22:33 AM |
| **To:** | Jody Miller [jmiller@saveonsp.com] |
| **Subject:** | Fwd: Cost Savings for NYC PICA Program |

Your thoughts on this please.
I have had 3 client invoicing review for 1/1 go lives that had no member disruption
Very positive feedback

Sent from my iPhone

Begin forwarded message:

**From:** Jill Stearns <jstearns@saveonsp.com>
**Date:** March 6, 2018 at 11:40:36 PM EST
**To:** Ron Krawczyk <rkrawczyk@saveonsp.com>, Jody Miller <jmiller@saveonsp.com>, Claudia Dunbar
<cdunbar@saveonsp.com>
**Subject: FW: Cost Savings for NYC PICA Program**

Do you want me to give PICA the list of our legacy clients and a contact?  Please see below.  I think that request is a bit
much, but let me know.

---

**From:** Capstick, Amber H. (STL) [mailto:ACapstick@express-scripts.com]
**Sent:** Tuesday, March 06, 2018 2:56 PM
**To:** Jill Stearns <jstearns@saveonsp.com>
**Cc:** Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** FW: Cost Savings for NYC PICA Program
**Importance:** High

Jill:  Can you send me the 7 clients that have had SaveOn in place for a year and the main contact's phone?

*Amber Capstick*
*Director, Specialty Solutions*

**From:** Depcik, Kelly M. (EHQ)
**Sent:** Tuesday, March 6, 2018 2:49 PM
**To:** Capstick, Amber H. (STL) <ACapstick@express-scripts.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

I am dealing with 4 raging fires.  Can you please put it all together in an email that I can forward to Georgette including
the names of the clients and their contact information so they can call them for references?

Thank you,
Kelly

Kelly Depcik
Senior Account Executive
Office:  973-539-4214

Attorneys Eyes Only

**From:** Capstick, Amber H. (STL)
**Sent:** Tuesday, March 06, 2018 3:33 PM
**To:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

No quotes yet, but I would use this...

Express Script's first client started with SaveOnSP on 9/1/2016. Throughout 2017, we had 6 additional clients implement the solution. Each of these clients has had nothing but great things to say about the program.

To date, we have 45 clients enrolled which equates to approximately 900,000 lives. We have several very large clients in the pipeline scheduled to implement sometime this year.

SaveOnSP uses the highest touch model in the industry. They will do whatever it takes to make sure a patient pays $0 for their medication. Of all of the lives in the program, less than .3% declined working with SaveOnSP to enroll in copay assistance and that was because they were already enrolled. They didn't need help getting signed up.


*Amber Capstick*
*Director, Specialty Solutions*

**From:** Capstick, Amber H. (STL)
**Sent:** Tuesday, March 6, 2018 1:26 PM
**To:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

Hoping to get some additional info on what happens if a patient declines and potentially some positive patient or client quotes. I followed up with her again. She is actively working on it. I am hoping she can add a bit more color on the statement below.


Express Script's first client started with SaveOnSP on 9/1/2016. Throughout 2017, we had 6 additional clients implement the solution. Each of these clients has had nothing but great things to say about the program.

To date, we have 45 clients enrolled which equates to approximately 900,000 lives. We have several very large clients in the pipeline scheduled to implement sometime this year.


*Amber Capstick*
*Director, Specialty Solutions*

**From:** Depcik, Kelly M. (EHQ)
**Sent:** Tuesday, March 6, 2018 1:07 PM
**To:** Capstick, Amber H. (STL) <ACapstick@express-scripts.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

What are you asking Jill to respond to exactly? Is there something different or in addition to what you've both noted below that you're expecting her to share? I have to get back to Georgette asap and then the PICA Committee.

Attorneys Eyes Only

SOSP_0013723

Thank you both!
Kelly

Kelly Depcik
Senior Account Executive
Office:  973-539-4214

---

**From:** Depcik, Kelly M. (EHQ)
**Sent:** Tuesday, March 06, 2018 11:52 AM
**To:** Capstick, Amber H. (STL) <ACapstick@express-scripts.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

Ok.  Please draft the entire response for me to send to PICA.  We need this early this afternoon.  Georgette wants me to run the response  by her first...I'll let you know her feedback.

Thank you,
Kelly

Kelly Depcik
Senior Account Executive
Office:  973-539-4214

---

**From:** Capstick, Amber H. (STL)
**Sent:** Tuesday, March 06, 2018 10:47 AM
**To:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

Hi Kelly:  She will have something to me this afternoon.

*Amber Capstick*
*Director, Specialty Solutions*

---

**From:** Depcik, Kelly M. (EHQ)
**Sent:** Tuesday, March 6, 2018 8:37 AM
**To:** Capstick, Amber H. (STL) <ACapstick@express-scripts.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

Good morning,

Amber, can we expect Jill's response soon?  I really need to respond to the PICA committee asap.

To summarize:
Program was first offered when? Was it 1/1/17?
To date, we have 45 clients comprising approximately 900K lives who are enrolled in Saveon.  Of those 900k lives, 800k went live 1/1/18 which collectively come close to the size of PICA.
We have 7 clients who have had Savon in place for 1 year and every one of them is happy to be a reference.
Meghan, you mentioned another large client the same size of PICA that was likely going to implement Saveon on 7/1/18.  Is that still happening?
Didn't the State of New Mexico implement Saveon?

SOSP_0013724

Thank you,
Kelly

Kelly Depcik
Senior Account Executive
Office:  973-539-4214

---

**From:** Capstick, Amber H. (STL)
**Sent:** Monday, March 05, 2018 6:49 PM
**To:** Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>; Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

On another note, I am waiting on a response from Jill to help address Claire's comment.  The good news is that the 7 clients that have had SaveOn in place for a year are all referenceable.

*Amber Capstick*
*Director, Specialty Solutions*

---

**From:** Pasicznyk, Meghan E. (EHQ)
**Sent:** Monday, March 5, 2018 5:45 PM
**To:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>; Capstick, Amber H. (STL) <ACapstick@express-scripts.com>
**Subject:** RE: Cost Savings for NYC PICA Program

We're at 45 clients and 900k lives, roughly. We had 800k lives go live on 1/1/18, which is pretty close to PICA's size (even though it was across lots of clients).

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>
**Date:** Monday, Mar 05, 2018, 5:36 PM
**To:** Capstick, Amber H. (STL) <ACapstick@express-scripts.com>, Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Subject:** FW: Cost Savings for NYC PICA Program

Hi ladies,

Just an fyi, Georgette sent me a text and asked me if we have any other large clients close to the size of PICA enrolled or who are planning on enrolling soon.   Can we tell her the number of clients and/or the number of lives enrolled in the program or both?  I don't think they want to be one of the first clients or one of the first larger clients to enroll and so they're looking for some facts/figures we can share around enrollment to give them confidence.

We need to send this to the PICA Committee no later than tomorrow.

Thank you both!
Kelly

Kelly Depcik
Senior Account Executive
Office:  973-539-4214

---

Attorneys Eyes Only

**From:** Depcik, Kelly M. (EHQ)
**Sent:** Monday, March 05, 2018 1:08 PM
**To:** Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>; Capstick, Amber H. (STL) <ACapstick@express-scripts.com>
**Subject:** FW: Cost Savings for NYC PICA Program
**Importance:** High

Please see below.  Can you please help me and draft a great response asap?

Thank you!
Kelly

Kelly Depcik
Senior Account Executive
Office:  973-539-4214

---

**From:** Claire Levitt (OLR) [mailto:clevitt@olr.nyc.gov]
**Sent:** Monday, March 05, 2018 1:06 PM
**To:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>; Willie Chang (Wchang@DC37.net) <Wchang@DC37.net>; Georgette Gestely (OLR) <ggestely@olr.nyc.gov>; Arthur Pepper <arthurpepperhbc@gmail.com>
**Cc:** Patel, Shardul S. (STL) <SSPatel@express-scripts.com>; Love, Charles (FKN) <CHARLES_LOVE@express-scripts.com>; Coughlin, William P. (STL) <bill_coughlin@express-scripts.com>
**Subject:** [EXTERNAL] RE: Cost Savings for NYC PICA Program

Thanks for the update Kelly.

Can you provide an update on other clients who have implemented this program and what their member experience has been.

Claire

_____
Claire Levitt
Deputy Commissioner
Mayor's Office of Labor Relations
40 Rector Street
New York, New York 10006
(212) 306-7706
clevitt@olr.nyc.gov

---

**From:** Depcik, Kelly M. (EHQ) [mailto:KMDepcik@express-scripts.com]
**Sent:** Monday, January 08, 2018 5:58 PM
**To:** Claire Levitt (OLR) <clevitt@olr.nyc.gov>; Willie Chang (Wchang@DC37.net) <Wchang@DC37.net>; Georgette Gestely (OLR) <ggestely@olr.nyc.gov>; Arthur Pepper <arthurpepperhbc@gmail.com>
**Cc:** Patel, Shardul S. (STL) <SSPatel@express-scripts.com>; Love, Charles (FKN) <CHARLES_LOVE@express-scripts.com>; Coughlin, William P. (STL) <bill_coughlin@express-scripts.com>
**Subject:** FW: Cost Savings for NYC PICA Program

Good evening,

SOSP_0013726

I spoke with Artie briefly today regarding various copay options and as you can see from the attached copay modeling, we've provided numerous scenarios to review.  I mentioned that if copays and/or the member deductible increase, that's even more reason to implement the SaveonSP Copay Savings program.  Not only would members save a lot of money but PICA is estimated to save almost **$23M annually**.  I've attached the slide deck of our presentation at the last PICA meeting for your reference.

Artie and I discussed SaveonSP and I shared the attached analysis that we were asked to complete that shows what the estimated Plan cost would be if PICA loses grandfathering status and has to open up coverage for ACA preventative meds as a result of implementing the SaveonSP program.  The analysis is based on Express Scripts Book of Business numbers and is not PICA specific since we don't have all of the unions non-specialty claims data.  This analysis does not take into account that many PICA members are already obtaining ACA preventative meds for a $0 copay through their medical carrier so estimated PICA Plan Cost may be overstated.  PICA SaveonSP Program Savings far outweighs the estimated cost of covering ACA preventive medications.

Assuming PICA loses grandfathering status, as we discussed, because most PICA members are already obtaining ACA Preventative Meds through their medical carrier for a $0 copay, PICA would want to confirm with outside benefits counsel if PICA would even be required to open coverage for ACA Preventative Meds.  Please advise as to where this stands and if there are any additional questions around the SaveonSP program.  Please note we would need at least 120 days minimum to implement.

Thank you,
Kelly

Kelly Depcik
Senior Account Executive
Office:  973-539-4214

**From:** Claire Levitt (OLR) [mailto:clevitt@olr.nyc.gov]
**Sent:** Friday, January 05, 2018 4:59 PM
**To:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>
**Cc:** Arthur Pepper - UFT Welfare Fund (ArthurPepperHBC@gmail.com) <ArthurPepperHBC@gmail.com>; Willie Chang (Wchang@DC37.net) <Wchang@DC37.net>
**Subject:** [EXTERNAL] RE: Cost Savings for NYC PICA Program

Thank you. Have a great weekend.

_____

Claire Levitt
Deputy Commissioner
Mayor's Office of Labor Relations
40 Rector Street
New York, New York 10006
(212) 306-7706
clevitt@olr.nyc.gov

**From:** Depcik, Kelly M. (EHQ) [mailto:KMDepcik@express-scripts.com]
**Sent:** Friday, January 05, 2018 4:56 PM
**To:** Claire Levitt (OLR) <clevitt@olr.nyc.gov>
**Cc:** Arthur Pepper - UFT Welfare Fund (ArthurPepperHBC@gmail.com) <ArthurPepperHBC@gmail.com>; Willie Chang (Wchang@DC37.net) <Wchang@DC37.net>
**Subject:** RE: Cost Savings for NYC PICA Program

Attorneys Eyes Only

Hi Claire,

Happy new year!  The team would be happy to prepare a menu of ideas and options for consideration.  We'll work to get the information to you prior to the Jan. 17th Tech Committee mtg. and we look forward to discussing with the full PICA Committee after that.

Thank you,
Kelly

Kelly Depcik
Senior Account Executive
Office: 973-539-4214

---

**From:** Claire Levitt (OLR) [mailto:clevitt@olr.nyc.gov]
**Sent:** Friday, January 05, 2018 4:53 PM
**To:** Depcik, Kelly M. (EHQ) <KMDepcik@express-scripts.com>
**Cc:** Arthur Pepper - UFT Welfare Fund (ArthurPepperHBC@gmail.com) <ArthurPepperHBC@gmail.com>; Willie Chang (Wchang@DC37.net) <Wchang@DC37.net>
**Subject:** [EXTERNAL] Cost Savings for NYC PICA Program

Kelly:

Happy New Year. Hope you are well and staying warm.

Artie suggested that I reach out to you to ask ESI to present some cost savings concepts for the new round of bargaining that we are currently engaged in for the period beginning July 1, 2018.

We've mentioned increasing the deductible and the copays as well as the idea of moving from copays to cost sharing, at least on the non-preferred brand prescriptions. We'd like to get a menu of options from you to consider. Please feel free to present a range of options, even those that the group hadn't been willing to consider in the past. We want to get a sense of what others are doing in the specialty drug area. If you can provide some preliminary information before our Technical Committee meeting on January 17, that would be very helpful. After that, we can set up another PICA Committee meeting to get into more depth. Thanks.

Claire

_____
Claire Levitt
Deputy Commissioner
Mayor's Office of Labor Relations
40 Rector Street
New York, New York 10006
(212) 306-7706
clevitt@olr.nyc.gov

Attorneys Eyes Only

# Exhibit 6

| | |
|---|---|
| **From:** | Pasicznyk, Meghan E. (EHQ) [MEPasicznyk@accredo.com] |
| **Sent:** | 7/19/2017 8:39:45 PM |
| **To:** | Jody Miller [jmiller@saveonsp.com]; Schneider, Timothy A. (EHQ) [TASchneider@express-scripts.com]; Slen, Benjamin (EHQ) [Ben.Slen@AccredoHealth.com] |
| **CC:** | Jill Stearns [jstearns@saveonsp.com] |
| **Subject:** | RE: Triumph |

Yes – if a competitor-type program required services outside of what we customarily provide to PBM clients, we would absolutely charge.  I think you're right that larger clients may be looking to negotiate on the fees and agree that we need to get aligned before the ask is made.  Let's plan to discuss when we meet next week.


Meghan


Meghan Pasicznyk, PharmD, MBA
Director – Specialty Market Development
Accredo  |  One Express Way  |  St. Louis, MO 63121
t 407.852.4929  |  m 407.680.7991  |  MEPasicznyk@accredo.com

Upcoming OOO
Business Travel: July 19, July 31 – August 2, August 7-9

---

**From:** Jody Miller [mailto:jmiller@saveonsp.com]
**Sent:** Wednesday, July 19, 2017 10:38 AM
**To:** Pasicznyk, Meghan E. (EHQ); Schneider, Timothy A. (EHQ); Slen, Benjamin (EHQ)
**Cc:** Jill Stearns
**Subject:** [EXTERNAL] RE: Triumph


Team
As we have discussed prior, if a client is asking for you to do things that would be within the scope of your ESI servicing contract you really cannot do anything to bloc that request.  However if the client needs special services, are you prepared to push back or put a fee on the service such that the difference between SOSP and the competitor becomes closer, thus improving the comparison?
Id like to better understand your thoughts on this

Additionally, I would like to discuss pricing discipline as we go forward.  I am anticipating that some of the biggest customers i.e. PICA may be looking for discounts.
Lets align around the talking points as to why we are priced where we are.



Thanks all
Jody

Jody L. Miller
President
SaveonSP
611 Jamison Rd, Suite 201
Elma, NY 14059
716-440-0192
Jmiller@saveonsp.com

---

**From:** Pasicznyk, Meghan E. (EHQ) [mailto:MEPasicznyk@accredo.com]
**Sent:** Tuesday, July 18, 2017 1:39 PM
**To:** Hentschell, Rachel A. (EHQ) <RAHentschell@express-scripts.com>; Schneider, Timothy A. (EHQ)

Attorneys Eyes Only

<TASchneider@express-scripts.com>; Jody Miller <jmiller@saveonsp.com>; Jill Stearns <jstearns@saveonsp.com>
**Subject:** RE: Triumph

What does it take for a PBM (us) to implement the program for them?  Is it just setting up the copays?  We may not even know that yet.

Is this client Exclusive Accredo?  If so, we need to think through the experience at Accredo, too.

I think our biggest opportunity is to poke holes in the program and the member experience.  If they're just looking for the PBM to set up the copays as they're requesting, we can't really push back on it.

Meghan

Meghan Pasicznyk, PharmD, MBA
Director – Specialty Market Development
Accredo  |  One Express Way  |  St. Louis, MO 63121
t 407.852.4929  |  m 407.680.7991  |  MEPasicznyk@accredo.com

Upcoming OOO
Business Travel: July 19, July 31 – August 2, August 7-9

---

**From:** Hentschell, Rachel A. (EHQ)
**Sent:** Tuesday, July 18, 2017 1:31 PM
**To:** Schneider, Timothy A. (EHQ); Jody Miller; Pasicznyk, Meghan E. (EHQ); Jill Stearns
**Subject:** RE: Triumph

Thank you all for the prompt feedback and talking points. I agree. The concern with Triumph particularly is that they have agreed to take the Rx Savings solution OVER our offering. The account team is meeting today to talk through. I don't suppose there's anything that we know about supporting this program and/or our ability to refuse this in lieu of our offering? Too hard of a stance?

Rachel Hentschell, RPh
Director, Clinical Account Management – Specialty Solutions
Express Scripts  |  One Express Way  |  St. Louis, MO 63121
t 314.810.3056  |  m 314.749.4421  |  rahentschell@express-scripts.com

---

**From:** Schneider, Timothy A. (EHQ)
**Sent:** Tuesday, July 18, 2017 12:24 PM
**To:** Jody Miller; Pasicznyk, Meghan E. (EHQ); Hentschell, Rachel A. (EHQ); Jill Stearns
**Subject:** RE: Triumph

This is also pilot program for them. I don't think they have an established clients running the program. I we have been running the program at ESI for almost a year now, and are well ahead of the curve.  SOSP has been running the program much longer outside of ESI.

---

**From:** Jody Miller [mailto:jmiller@saveonsp.com]
**Sent:** Tuesday, July 18, 2017 1:19 PM
**To:** Pasicznyk, Meghan E. (EHQ); Hentschell, Rachel A. (EHQ); Jill Stearns
**Cc:** Schneider, Timothy A. (EHQ)
**Subject:** [EXTERNAL] RE: Triumph

You were all ahead of me.  Great work and thanks for sharing.
We will be following as well.
Jody

Jody L. Miller
President

Attorneys Eyes Only

SaveonSP
611 Jamison Rd, Suite 201
Elma, NY 14059
716-440-0192
Jmiller@saveonsp.com

---

**From:** Pasicznyk, Meghan E. (EHQ) [mailto:MEPasicznyk@accredo.com]
**Sent:** Tuesday, July 18, 2017 1:16 PM
**To:** Jody Miller <jmiller@saveonsp.com>; Hentschell, Rachel A. (EHQ) <RAHentschell@express-scripts.com>; Jill Stearns <jstearns@saveonsp.com>
**Cc:** Schneider, Timothy A. (EHQ) <TASchneider@express-scripts.com>
**Subject:** RE: Triumph

I've also attached an email chain of some communication Ben, Tim and I had a while back on Rx Savings Solutions. Here are the high points:

- Savings are lower than SOSP, as copay assistance is accumulating and copays can only be inflated to the point of the OOPM
- Members are only notified via email that copay assistance is available; high member abrasion
o SOSP sends letters and makes outreaches; Accredo will warm transfer patients new to service

Meghan Pasicznyk, PharmD, MBA
Director – Specialty Market Development
Accredo | One Express Way | St. Louis, MO 63121
t 407.852.4929 | m 407.680.7991 | MEPasicznyk@accredo.com

Upcoming OOO
Business Travel: July 19, July 31 – August 2, August 7-9

---

**From:** Jody Miller [mailto:jmiller@saveonsp.com]
**Sent:** Tuesday, July 18, 2017 1:11 PM
**To:** Hentschell, Rachel A. (EHQ); Jill Stearns; Pasicznyk, Meghan E. (EHQ)
**Cc:** Schneider, Timothy A. (EHQ)
**Subject:** [EXTERNAL] RE: Triumph

Ask the client on what basis do the patients copays not accumulate to the OOP Max meaning savings stop at $7150. (do the savings add up?)
Ask the client to have legal review basis for exclusion and determine if they are comfortable taking the risk.
Ask the employer how the patients will be enrolled when they are new to therapy (hint pbm would need to put in a step edit, and we know what that takes)
Ask if it is such a good idea why are they only doing 5 drugs. We are way beyond pilot.
I could go on but hopefully this is enough to seed the doubt.

Jill you are better at phrasing things, any thoughts?

Jody


Jody L. Miller
President
SaveonSP
611 Jamison Rd, Suite 201
Elma, NY 14059
716-440-0192
Jmiller@saveonsp.com

Attorneys Eyes Only

**From:** Hentschell, Rachel A. (EHQ) [mailto:RAHentschell@accredo.com]
**Sent:** Tuesday, July 18, 2017 12:44 PM
**To:** Jody Miller <jmiller@saveonsp.com>; Jill Stearns <jstearns@saveonsp.com>; Pasicznyk, Meghan E. (EHQ) <MEPasicznyk@express-scripts.com>
**Cc:** Schneider, Timothy A. (EHQ) <TASchneider@express-scripts.com>
**Subject:** FW: Triumph

SOSP team – I wanted to make you aware of some competition we are hearing about more frequently. Rx Savings solutions is out there promoting their version of copay assistance savings programs. I am not clear on all the details, but sounds very similar. What's not clear is how they are managing the rules setup for the benefit as well as how they're managing the member experience/disruption. My sell against message has and continues to be the ability to manage the full patient experience at ESI/Accredo, but wanted to make sure you were aware. Any insight on your end or other ways to prevent these guys from stepping in?

Rachel Hentschell, RPh
Director, Clinical Account Management – Specialty Solutions
Express Scripts | One Express Way | St. Louis, MO 63121
t 314.810.3056 | m 314.749.4421 | rahentschell@express-scripts.com

**From:** Riganti, Marc H. (EHQ)
**Sent:** Tuesday, July 18, 2017 9:39 AM
**To:** Hentschell, Rachel A. (EHQ)
**Cc:** Geiger, Daniel (EHQ)
**Subject:** FW: Triumph

Hi Rachel – let me know if you have a few minutes to speak with me about SaveOn since it looks like Dan is out on PTO. I have a client, Triumph Carrier 6909, who was presented SaveOn – they liked it and we were moving forward however the client just moved to new consultants and the new consultants want to put in place their own SaveOn type program. The attached document, especially page 8, outlines their program. I am meeting with the consultants this afternoon and hope you have a few minutes before then so we can speak – thanks…Marc

Marc Riganti
Express Scripts
Senior Account Executive
Office – 314-996-0930
Cell – 314-807-2178
mriganti@express-scripts.com

Attorneys Eyes Only

# **Exhibit 7**



<div align="right">

**www.pbwt.com**
</div>

March 27, 2023

<div align="right">

George LoBiondo
(212) 336-2008
</div>

**VIA EMAIL**

Andrew Dunlap, Esq.
Selendy Gay Elsberg, PLLC
1290 Avenue of the Americas
New York, NY 10104

> **Re:** **Relevant Time Period for SaveOnSP's Document Production**
> *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*,
> No. 22 Civ. 2632 (ES) (CLW)

Dear Andrew:

.              We write to request that SaveOnSP (1) confirm when it began operations, and (2) expand its document production to include responsive documents from that time period.

As you know, JJHCS initially requested that SaveOnSP produce documents from January 1, 2017 to the present. This requested time period was premised on JJHCS's understanding, based upon publicly available information, that the SaveOnSP Program began in 2017. *See, e.g.*, Compl. ¶ 52 (referencing Nov. 13, 2017 Master Services Agreement between Express Scripts and SaveOnSP). Moreover, SaveOnSP recently represented to the Court that it "began operations in 2017." ECF No. 79 at 26.

Based on documents recently produced by SaveOnSP, however, we now understand that ███████████████████████████████. *See, e.g.*, SOSP_0000259 at -261 ("███████████████████████████████████████████"); SOSP_0013722 at -723 ("███████████████████████████████████████."); SOSP_0001032 at -033 (noting on ████████████████████████████████████████████████████ ██████." (emphasis supplied)).

In light of this new information, on or before March 31, 2023, please provide the date on which SaveOnSP began operations, and please confirm that SaveOnSP will produce responsive documents going back to that date.

<div align="center">

Very truly yours,

*/s/ George LoBiondo*
George LoBiondo
</div>

# **Exhibit 8**

**Long, Julia (x2878)**

| | |
|---|---|
| **From:** | LoBiondo, George (x2008) |
| **Sent:** | Monday, April 10, 2023 10:35 PM |
| **To:** | Meredith Nelson; Carotenuto, George (x2547) |
| **Cc:** | Andrew Dunlap; Elizabeth Snow; Dominic Budetti; Sandick, Harry (x2723); Mangi, Adeel A. (x2563); Haigney Long, Julia (x2878); Shane, Beth (x2659); Brisson, Katherine (x2552); Hashmi, Kabir (x2701); Jeffrey Greenbaum; Katherine Lieb |
| **Subject:** | RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories |

Hi Meredith,

Thanks very much for this additional information. We understand you to now be representing that SaveOnSP and its personnel are unlikely to have generated documents relevant to the issues in this lawsuit before April 2016. Accordingly, we will accept SaveOnSP's latest offer to extend its start date to April 1, 2016. Of course, if it turns out that earlier relevant documents do exist, we reserve the right to seek them.

Regarding JJHCS's own production, we do not agree with your characterization of JJHCS's position regarding the "appropriate period for discovery for both parties." We also note that you have failed to identify any principled basis for your demand that JJHCS produce documents going back to 2016 (and we are not aware of any). You have also declined to identify, as requested, any authority for the proposition that parties must produce documents from precisely the same date ranges (and we are, again, not aware of any). Nevertheless, we would like to avoid burdening Judge Waldor with another discovery dispute. So we will agree to produce documents going back to April 1, 2016, solely in the interest of compromise, and without conceding the propriety of your tit-for-tat demand.

Thanks again,
George

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Monday, April 10, 2023 3:00 PM
**To:** LoBiondo, George (x2008) <globiondo@pbwt.com>; Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

*Caution: External Email!*

George,

We have attempted to answer your question, multiple times. Your accusations of evasion and false statements to the court are untrue, and unhelpful to trying to resolve this issue.

JJHCS served discovery requests asking for documents beginning January 1, 2017. JJHCS's decision to ask for documents starting in 2017 was not based on any representation by SaveOnSP. JJHCS did not ask SaveOnSP any questions about its pre-2017 activities until two weeks ago, even though we produced ████████████████████████████ to you last November.

We understood that when the parties previously referred to SaveOnSP's "operations," they meant when the copay assistance benefits which SaveOnSP administers went live on an ongoing basis. That was in January 2017. As some of the documents you cited indicate, ███████████████████████████████████████████████████; as we told you, we believe the earliest that SaveOnSP would have spoken to any patients ███████████████████████ would have been July 2016.

You now say that JJHCS believes that "beginning operations" includes activities before it began providing services on an ongoing basis, such as hiring employees, drafting materials, marketing services, and setting up call centers. We understand based on additional investigation that the earliest communications SaveOnSP had with its first client was in May 2016, that it would have drafted any marketing materials shortly in advance of those communications, and that it hired its first employees and set up its first call centers after that date.

SaveOnSP is willing to extend the general start date of its document production to April 2016, over a month before SaveOnSP's first contact with its first client, if JJHCS will do the same. JJHCS has consistently taken the position that the appropriate period for discovery for both parties is when SaveOnSP was "operating," which you now have clarified includes activities like hiring employees and marketing its services. Please let us know whether you will agree to begin your productions in April 2016.

Regards,

Meredith

**Meredith Nelson**
Associate  [Email]
Selendy Gay Elsberg PLLC  [Web]
Pronouns: she, her, hers
_____
+1 212.390.9069  [O]
+1 918.200.3148  [M]

---

**From:** LoBiondo, George (x2008) <globiondo@pbwt.com>
**Sent:** Friday, April 7, 2023 10:22 AM
**To:** Meredith Nelson <mnelson@selendygay.com>; Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

Hi Meredith,

With respect, we do not believe that "When did SaveOnSP begin operations?" is a confusing or difficult question.  Indeed, SaveOnSP itself (falsely) told Judge Waldor that it "began operations in 2017," belying your present claim of confusion around this concept.  And the letter we provided to you yesterday should have resolved any lingering doubt.  As it stated, we want SaveOnSP to produce documents covering the entire early period during which it "conceived of its scheme, hired employees, drafted materials, marketed its scheme to health plans, invested in call centers and related technology, and otherwise [got] ready to begin meddling with patient access to therapy."  If your position is that SaveOnSP started operations right after it formed the corporate entity in March 2015 then just say so.  If your position is that SaveOnSP formed a corporate shell in 2015 but did not actually begin operations until 2016, then just say that.  But please do not evade the question.

SaveOnSP should agree to produce documents going back to when its activities began, whether that was at the same time as the entity was formed, or before that, or after that.  We cannot know with specificity when that was, which is why

we have repeatedly asked you. For its part, JJHCS will not be producing documents going back to 2015 because you have not provided any principled reason that it should do so, and because we believe JJHCS was completely unaware of SaveOnSP's existence until years later. It is self-evident that SaveOnSP will have relevant documents from a period prior to JJHCS because SaveOnSP is the defendant that was engaged in the conduct at issue before JJHCS ever became aware of it. As such, there is no reason for the periods on each side to be mirrored. With that said, if your position is that SaveOnSP began operations at a later date, we will consider whether that changes our position after we know what the date is.

We think further back-and-forth along these lines is unlikely to be productive. So we ask, one final time, whether SaveOnSP will correct its previous misstatement on this issue and agree to produce the requested documents without resort to judicial intervention. Otherwise you can tell Judge Waldor why you are now unable to answer the simple question of when SaveOnSP began operations, despite previously telling her it was in 2017.

Thanks again,
George

---

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Thursday, April 6, 2023 7:52 PM
**To:** LoBiondo, George (x2008) <globiondo@pbwt.com>; Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

*Caution: External Email!*

George,

The most productive way to bring this issue to resolution is to finish meeting and conferring before proposing joint letters on an issue that the parties are still discussing.

Your statement that we have refused to answer when SaveOnSP began operations remains false. As we told you, SaveOnSP began operating—that is, providing services to its first clients—in 2016. The earliest that SaveOnSP would have communicated with any plan members in providing those services was July 1, 2016. In your proposed joint letter, you indicated that you intended "began operations" to mean activities before providing services (apparently including hiring employees or speaking to potential clients), which we understood to mean asking when SaveOnSP was formed. We then told you that SaveOnSP was formed in March 2015. You now say that you did not intend "began operations" to mean formation. We cannot keep guessing at your intended meaning. Please tell us what you mean by "began operations" (if not providing services to clients or formation) and we will consider your request.

We repeat our request that you tell us if JJHCS will agree to move the start date of its document production to the same date that SaveOnSP agrees to move its own start date. There is no reason that you cannot answer that question now.

Regards,

Meredith

**Meredith Nelson**
Associate  [Email]

Selendy Gay Elsberg PLLC  [Web]
Pronouns: she, her, hers

---

+1 212.390.9069  [O]
+1 918.200.3148  [M]

---

**From:** LoBiondo, George (x2008) <globiondo@pbwt.com>
**Sent:** Thursday, April 6, 2023 6:20 PM
**To:** Meredith Nelson <mnelson@selendygay.com>; Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** Re: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

Hi Meredith,

Thanks very much for your prompt response.  We of course disagree with the accusations and characterizations in your email but would like to stay focused on bringing this issue to resolution.

As you note, we have now repeatedly asked when SaveOnSP began operations.  You have refused to squarely answer that question and have instead offered various dates that you say correspond to SaveOnSP doing various things.  But we did not ask when SaveOnSP formed its LLC, just as we did not ask for the date that SaveOnSP's clients went "live."  If you are representing that SaveOnSP actually began operations in 2015, then we request that SaveOnSP collect and produce documents going back to January 1 of that year.  If on the other hand SaveOnSP personnel did not actually begin conceiving of and developing the program (as that term is used in the Complaint as well as the SaveOnSP documents we referred you to in our May 27 letter) until some later date, please let us know what that date is.

Without this information we have repeatedly requested, we cannot say whether JJHCS would agree to an identical expansion of its own production parameters.  As a general matter, though, we do not understand the basis for your suggestion that the parties must produce documents from exactly the same time period, without regard to relevance and their knowledge of the issues in dispute, and we do not believe that to be correct under the law.  If you have authority that supports your position we would be pleased to consider it.  Either way, we do not think that SaveOnSP's tit-for-tat request should be used as a pretext to artificially delay impasse on the core issue.

Thanks again,
George

---

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Thursday, April 6, 2023 3:48 PM
**To:** LoBiondo, George (x2008); Carotenuto, George (x2547)
**Cc:** Andrew Dunlap; Elizabeth Snow; Dominic Budetti; Sandick, Harry (x2723); Mangi, Adeel A. (x2563); Haigney Long, Julia (x2878); Shane, Beth (x2659); Brisson, Katherine (x2552); Hashmi, Kabir (x2701); Jeffrey Greenbaum; Katherine Lieb
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

*Caution: External Email!*

George,

Thanks for your email.

JJHCS's ongoing practice of proposing joint letters before the parties have finished meeting and conferring is inappropriate. We are glad to engage in a joint letter process once the parties have met and conferred and agreed that they are at impasse on an issue.

Your proposed joint letter contains a series of false or misleading statements. We will not try to address all of them here, but rather focus on the main points.

You falsely accuse us of refusing to identify when SaveOnSP "began operations." In fact, we did just that in our March 31, 2023 letter, identifying the earliest point at which SaveOnSP would have begun contacting health plan members in advance of a few clients implementing copay assistance benefits. Your colleague, George Carotenuto, contacted me directly after our meet and confer on Monday to ask for additional information on the activities in which SaveOnSP was engaged prior to July 2017. I told him that we would revert with that information. Instead of simply waiting for SaveOnSP to answer your additional questions, you now propose a letter to the Court accusing us of refusing to provide the information you asked for. From your proposed joint letter, it seems that the question you intended to ask is when SaveOnSP began developing its services, hiring employees, etc. before it began operations—something you never raised in your correspondence or during our meet-and-confer session. The answer to your new question is that SaveOnSP was formed in March 2015. This information is publicly available on the New York Secretary of State's website and has been available to JJHCS throughout the entirety of this lawsuit.

You also falsely accuse us of refusing to move back the starting date of our document production. In fact, in our March 31 letter, we offered to extend our document production back to the earliest point at which SaveOnSP would have contacted plan members—July 1, 2016—if JJHCS would agree to do the same. You have repeatedly asserted that the relevant period for discovery in this case is the period in which SaveOnSP was operating. *See, e.g.*, Jan. 6, 2023 Letter from H. Sandick to M. Nelson at 2 (stating that this case "concerns only whether SaveOnSP wrongfully induced patients to breach CarePath's actual terms and conditions during the time period when SaveOnSP was in operation"). If you now claim that SaveOnSP should produce documents from before 2017 because you believe that SaveOnSP had relevant operations during that period, then that expanded period for discovery should apply across the board. You have never told us whether JJHCS will move back the date of its own production.

So that the parties can continue to meet and confer, please promptly tell us (1) the date on which you are asking SaveOnSP to begin its document production; (2) whether JJHCS will move the starting date of its own document production to that same date; and (3) if JJHCS will not do so, the reasons why.

Regards,

Meredith

**Meredith Nelson**
Associate  [Email]

Selendy Gay Elsberg PLLC  [Web]

Pronouns: she, her, hers
---------------------------------------------------

+1 212.390.9069  [O]
+1 918.200.3148  [M]

---

**From:** LoBiondo, George (x2008) <globiondo@pbwt.com>
**Sent:** Wednesday, April 5, 2023 6:26 PM
**To:** Meredith Nelson <mnelson@selendygay.com>; Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>; Hashmi, Kabir (x2701) <khashmi@pbwt.com>; Jeffrey Greenbaum <JGREENBAUM@sillscummis.com>; Katherine Lieb <klieb@sillscummis.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

Meredith,

Thanks for your email.  We have prepared the attached letter concerning the time period issue that you discussed with George C. during the last meet and confer.  We hope that SaveOnSP will agree to extend its document production back to when it actually began operations, in which case JJHCS will not need to seek Judge Waldor's intervention.  But if SaveOnSP is declining to concede on this issue, then please add SaveOnSP's section to the attached letter so that it can be considered and resolved by Judge Waldor at the upcoming conference.  Also, please let us know whether SaveOnSP believes the letter and/or its exhibits should be filed under seal.

We do think that, out of courtesy to Judge Waldor, the parties should endeavor to submit these disputes to the Court on Monday.  This will give her sufficient time to review them before the conference.  So we request that you provide SaveOnSP's responses by Friday afternoon.

Thanks again,

George

**From:** Meredith Nelson <mnelson@selendygay.com>
**Sent:** Wednesday, April 5, 2023 5:52 PM
**To:** Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti <dbudetti@selendygay.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>; Haigney Long, Julia (x2878) <jhaigneylong@pbwt.com>; Shane, Beth (x2659) <eshane@pbwt.com>; Brisson, Katherine (x2552) <kbrisson@pbwt.com>
**Subject:** RE: JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

_**Caution: External Email!**_

George,

As you know, this week is Passover and Easter, and several members of our team are out of the office. We will provide our response to your letter by Friday if feasible, or early next week otherwise, but in time that you can file in advance of next week's conference.

Regards,

Meredith

**Meredith Nelson**
Associate  [Email]

Selendy Gay Elsberg PLLC  [Web]

Pronouns: she, her, hers
_____

+1 212.390.9069  [O]
+1 918.200.3148  [M]

**From:** Carotenuto, George (x2547) <gcarotenuto@pbwt.com>
**Sent:** Tuesday, April 4, 2023 12:28 PM
**To:** Meredith Nelson <mnelson@selendygay.com>
**Cc:** Andrew Dunlap <adunlap@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; Dominic Budetti

<[dbudetti@selendygay.com](mailto:dbudetti@selendygay.com)>; Sandick, Harry (x2723) <[hsandick@pbwt.com](mailto:hsandick@pbwt.com)>; Mangi, Adeel A. (x2563)
<[aamangi@pbwt.com](mailto:aamangi@pbwt.com)>; LoBiondo, George (x2008) <[globiondo@pbwt.com](mailto:globiondo@pbwt.com)>; Haigney Long, Julia (x2878)
<[jhaigneylong@pbwt.com](mailto:jhaigneylong@pbwt.com)>; Shane, Beth (x2659) <[eshane@pbwt.com](mailto:eshane@pbwt.com)>; Brisson, Katherine (x2552)
<[kbrisson@pbwt.com](mailto:kbrisson@pbwt.com)>
**Subject:** JJHCS v. SaveOnSP // Joint Letter re: JJHCS Interrogatories

Meredith,

Attached please find JJHCS's half of a joint letter to Judge Waldor regarding SaveOnSP's responses to Interrogatory Nos. 14 and 15. Assuming that the arguments we have set forth do not change SaveOnSP's position on responding to these interrogatories, please provide SaveOnSP's half of the letter by 5pm on Thursday, April 6. We will provide you with any further edits by noon on Friday, April 7 so that this letter can be filed with the Court by the end of the day on Friday, in advance of the April 13 conference. Please also let us know if you believe that this letter or any exhibits thereto must be filed under seal.

Separately, we write to confirm that SaveOnSP will respond to Interrogatory No. 13 by producing documents that show what advice SaveOnSP has provided to all payors, through to the present, "regarding whether payors can continue to include Janssen Drugs in the SaveOnSP Program after any changes to the CarePath terms and conditions." Please confirm that this understanding is correct and that SaveOnSP does not intend to withhold any documents responsive to this request. JJHCS reserves all rights to raise issues regarding SaveOnSP's response to Interrogatory No. 13 following a review of documents that SaveOnSP produces.

As we discussed on yesterday's call, JJHCS seeks a response to Interrogatory Nos. 13-15 through the present. While a standard date range cutoff may be appropriate for many requests in this matter, there are certain categories of information that JJHCS requires through the present in order to prove liability and damages. We are continuing to review SaveOnSP's responses to JJHCS's first set of interrogatories and will advise you if we seek information through the present for any other request.

Best,

George

**George Carotenuto**

He | Him | His

Associate

**Patterson Belknap Webb & Tyler LLP**

1133 Avenue of the Americas | New York, NY 10036

T: 212.336.2547

gcarotenuto@pbwt.com | www.pbwt.com

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise

immediately if you or your employer do not consent to receiving email messages of this kind.

# Exhibit 9

**Patterson Belknap**

May 26, 2023

George LoBiondo
(212) 336-2008

Andrew Dunlap, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:     *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
        No. : cv   ES   L

Dear Andrew:

We write to memoriali e our May 23 meet and confer concerning SaveOnSP's esponses and Ob ections to JJHCS's Fourth Set of  equests for Production, and further to those esponses and Ob ections.

**I        S's Re uests for Production  os             and**

*JJHCS's RFP No. 60*:     FP No. 60 requests all documents and communications concerning the origin of the relationship between SaveOnSP and ESI.  SaveOnSP's response indicated that SaveOnSP would limit its production to responsive documents "from April 1, 2016 to July 1, 2022."  During the meet and confer, we explained that this limitation would not capture documents regarding the origin of SaveOnSP's relationship with ESI, if that relationship began before April 1, 2016.  You agreed to investigate this issue and, if appropriate, to consider expanding the applicable date range.  By June 1, 2023, please let us know the results of your investigation and how SaveOnSP proposes to proceed.

In addition, although you have agreed to produce documents and communications responsive to JJHCS's  FP No. 60 (sub ect to the issues discussed above), you have not proposed search terms to capture documents responsive to this request.  Therefore, JJHCS requests that SaveOnSP search all documents hitting on the term "  express-scripts.com" for the month the ESI relationship began (as determined by your investigation noted in the previous paragraph) through August 31, 2016, the month when the first agreement between SaveOnSP and ESI was executed.

Please confirm by June 1 that you will run this search.

*JJHCS's RFP No. 63*:  During the meet and confer, JJHCS and SaveOnSP agreed that, in the first instance, SaveOnSP will produce final versions of Annual  eviews, without waiver of JJHCS's right to request additional documents regarding Annual  eviews at a later date.

*JJHCS's RFP No. 68*:  JJHCS's   FP No. 68 seeks "documents sufficient to show all reasons for SaveOnSP's decision to remain  closed' to business or customers in or around January 2023."  In its  esponses and Ob ections, SaveOnSP explained that it is "unable to respond or ob ect to this  equest, as it is not aware of any decision by SaveOnSP  to remain  closed' to new business or customers in or around January 2023.'"  During the meet and confer, JJHCS asked

Andrew Dunlap, Esq.
May 26, 2023
Page 2

SaveOnSP to clarify its response to FP 68. SaveOnSP stated that it is "not aware" of any such decision to remain "closed," nor was SaveOnSP ever closed to new business or customers in or around January 2023. Please inform us if your understanding changes.

_JJHCS's RFP Nos. 69–70_: SaveOnSP has agreed to produce documents responsive to JJHCS FP No. 69, which requests " a ll communications with Premera Blue Cross related to matters set forth in the January 12, 2023 article _SaveOnSP Program Impacted by Drug Manufacturer Changes_." SaveOnSP has also agreed to produce documents responsive to JJHCS's FP No. 70, which requests " a ll documents and communications related to the January 12, 2023 article _SaveOnSP Program Impacted by Drug Manufacturer Changes_." JJHCS requests that SaveOnSP run the following search string to capture documents responsive to those requests:

"SaveOnSP Program Impacted" O (Premera W/15 (article O alert O news ))
O ("close " W/15 ("business O "customer "))

Please confirm by June 1 that you will run this search string.

_JJHCS's RFP No. 71_: During the meet and confer, you represented that SaveOnSP has no knowledge of the ESI Program titled "Co-Pay Assurance Plan," nor does SaveOnSP have any communications in which this Program is discussed. Please inform us if your understanding changes.

**II        S's Re uests for Production os     and**

SaveOnSP refuses to produce documents responsive to JJHCS's FP Nos. 61 and 62, which request SaveOnSP's business plans and corporate governance documents, respectively. We have met and conferred in good faith in an attempt to reach a mutual compromise before seeking the Court's intervention, but such meet and confer was unsuccessful. The parties are now at impasse.

Attached with this letter, please see JJHCS's portion of a draft oint letter addressing JJHCS's FP Nos. 61 and 62, which we intend to raise at the June 6 conference. Please respond by June 1 with SaveOnSP's positions on these issues.

Very truly yours,

_/s/ George LoBiondo_
George LoBiondo

# Exhibit 10



Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Andrew R. Dunlap
Partner
212.390.9005
adunlap@selendygay.com

June 6, 2023

**Via E-mail**

George LoBiondo
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
globiondo@pbwt.com

Re:   *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*
      **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear George,

    We write in response to your May 26, 2023 letter regarding the parties' May 23, 2023 meet and confer about SaveOnSP's Responses and Objections to JJHCS's Fourth Set of Requests for Production.

    *First*, regarding JJHCS's RFP No. 60, you ask if SaveOnSP's relationship with ESI began before April 1, 2016. Our investigation shows that SaveOnSP had some limited communications with ESI before then, starting in December 2015. We will produce those communications. You also ask us to add the search term "@express-scripts.com" for the time period from when the ESI relationship began through August 31, 2016. We will add that term for the period December 2015 though August 31, 2016.

    *Second*, regarding JJHCS's RFP No. 63, we have agreed to identify and compile final copies of Annual Reviews that are in SaveOnSP's possession, custody, and control.

    *Third*, regarding JJHCS's RFP No. 68, we are not aware of any decision by Save-OnSP's decision to remain closed to business or customers in or around January 2023.

    *Fourth*, regarding JJHCS's RFP Nos. 69 and 70, you ask us to add the following search terms: "SaveOnSP Program Impacted" OR (Premera W/15 (article OR alert* OR news*)) OR ("close*" W/15 ("business OR "customer*")). We will.

We reserve all rights and are available to meet and confer.

Best,

/s/ *Andrew R. Dunlap*

Andrew R. Dunlap
Partner

# Exhibit 11



# Save on SP

## Specialty Pharmacy Savings Program

### Implementation Information
### (Document Amendments)

The Save on SP Specialty Pharmacy Savings Program (Program) is intended to assist employers and plan participants by reducing the cost of specialty pharmacy drugs. Our unique Program utilizes benefit design and manufacturer assistance to achieve these goals.

The Program is intended to be fully compliant with the Affordable Care Act (ACA) and the Employee Retirement Income Security Act (ERISA).

**What action must be taken under my group health plan to implement the Program?**

The employer must clearly identify in all plan documentation including, but not limited to, the Plan Document, Summary Plan Description (SPD) and Summary of Benefits and Coverage (SBC) which specialty pharmacy drugs will not count towards a plan participant's out-of-pocket-maximum. The plan must also have a procedure in place should a plan participant claim the specialty drug is the only medically appropriate drug and, therefore, should count towards the out-of-pocket maximum.[1] You must also require your pharmacy benefit manager (PBM) to administer the plan in accordance with the Program requirements.

Plan Document and Summary Plan Description (SPD)

ERISA plans are required to maintain a written plan document and provide such document to participants upon request. An SPD is a summary of the plan document and must be distributed to participants within 90 days of enrollment. When the plan is amended, the plan administrator must prepare and distribute an "amendment" to the SPD called a summary of material modifications (SMM). The SMM must be distributed within 210 days following the end of the plan year in which the change became effective. If the change is considered a material reduction in benefits (which this likely would be), the SMM must be provided within 60 days following the effective date of the change. Although not required for non-ERISA plans, the Plan Document and SPD are recommended.

To the extent the Plan Document contains detailed information regarding benefit coverages, the plan should be amended to reflect the exclusion of the specialty pharmacy drugs included in the Program from the out-of-pocket maximums. If the Plan Document incorporates other benefit summaries or documents by reference (such as benefit grids, benefit booklets or coverage summaries), the plan administrator should make sure such documents are amended to reflect the change.

---

[1] While a requirement under the ACA, it is unlikely this will be a common challenge under the Program as the plan participant's higher copay and out-of-pocket expense for the drug is being paid by the manufacturer.

SOSP_0622487



The SMM, like the SPD, is meant to be written in an easy to understand format and provide participants with a clear understanding of the benefits, as well as a participant's rights and responsibilities under the plan. Therefore, the plan administrator may want to include information in the SMM regarding the impact this change will have on participants and the following language can be used to achieve this result:

- the plan is implementing a specialty pharmacy co-pay assistance program;
- certain specialty pharmacy drugs are considered non-essential health benefits under the plan and the cost of such drugs will not be applied toward satisfying the participant's out-of-pocket maximums (the SMM should list such drugs or direct participants to where the list can be accessed - like with the plan document, if the SPD incorporates other documents by reference, such other documents should be amended to reflect the terms of the Program and distributed to participants); and
- although the cost of the Program drugs will not be applied towards satisfying a participant's out-of-pocket maximums, the cost of the Program drugs will be reimbursed by the manufacturer at no cost to the participant.

Summary of Benefits and Coverage (SBC)

Plan administrators of self-funded plans are required to prepare and distribute the plan's SBC to eligible individuals and participants at open enrollment, initial enrollment, special enrollment and upon request. Notice of a material modification in any of the terms of the plan that would affect the content of the SBC must be provided, or a revised SBC distributed that reflects the change, at least sixty (60) days prior to the effective date of the change.

The SBC contains a field entitled "What is not included in the out–of–pocket limit?" Since the Program will now include specialty pharmacy drugs that will be considered non-essential health benefits and not subject to the out-of-pocket limits, this change will be considered a material modification and require notice of the change.

The following is an example of language that can be included within the SBC:

| Important Questions | Answers | Why this Matters: |
|---|---|---|
| **What is not included in the <u>out–of–pocket limit</u>?** | Certain specialty pharmacy drugs are considered non-essential health benefits and fall outside the out-of-pocket limits. | The cost of these drugs (though reimbursed by the manufacturer at no cost to you) will not be applied towards satisfying your out-of-pocket maximums. |

**This information is provided for assistance with the plan's compliance obligations under applicable laws, including, but not limited to, the ACA, ERISA and the Internal Revenue Code. Save on SP does not provide legal advice. Plan administrators should consult with the plan's legal counsel and advisors prior to implementing the Program and undertaking any amendments to plan documentation.**

4810-7422-9031.1

SOSP_0622488

# Exhibit 12

Document Produced in Native Format

Attorneys Eyes Only

SOSP_0523594

# Copay Offset Program

Saving Employers money while protecting Employee benefits



1

# Program Objectives and Mission

To offset specialty medication plan costs by maximizing the use of publicly available copay assistance funds provided by manufacturers

To foster better patient adherence through elimination of the financial barrier to adherence

Our mission is to help patients and plan sponsors offset the increasingly high cost of specialty drugs in hopes of maintaining benefits into the future



2

Case 2:22-cv-02632-CKS-CLW Document 437-5 Filed 10/09/24 Page 94 of 167 Page ID: 40764

## Why the program works

There is competition in each category included in this program.

Manufacturers want to pull in new and maintain existing patients

These support programs continue to grow with more products and dollars being added to copay assistance programs

## Savings Opportunity

Approximately $8,000 per patient per year on these products



3

# Savings Illustration

# (Humira ex.)

## Current Benefit Design

**Patient Responsibility**

25/prescription
x 12    300

**Employer Responsibility**

3164 per prescription
37,970 annual

## New Benefit Design With Save On SP

**Patient Responsibility**

750.00/ prescription    12
9000

▽

Save on SP Enrolls patient in Manufacturer Support program Results in
0 patient responsibility

▽

Save on SP pays any remaining balance as a tertiary payer
(Typical   5- 25)

**Employer Responsibility**

2439/ prescription
29,270 annual

▽

Employer is paying 750 less / prescription

▽

Employer Saves 8700/ Humira patient per year if started at month one of plan year
(  9000- 300 previous copay)

▽

Save on SP bills Employer for a percentage of savings at month end

**Base Assumptions:**
**$38,270 annual drug cost**
25 copay for tier 2 drugs
AWP-17   price for Humira
Proprietary and Confidential



4

# Cost Comparison Humira



**Current Plan Design**

$300.00

$37,970.00

■ Patient Responsibility ■ Employer Responsibility

$25 per fill
*Manufacturer Assistance Available

**Plan Using SaveonSP**

$8,700.00

$60.00

$29,270.00

■ SaveonSP ■ Drug Manufacturer ■ Employer Responsibility

$25 per fill
Manufacturer Assistance via SOSP
Employer saving $37,970-$29,270=$8,700

Approximately .005% of covered lives will be on program drugs



5

## Specialty Categories Included in Program

Hepatitis C (Hep C)

Multiple Sclerosis (MS)

Oncology

Plaque Psoriasis (PsO)/ Psoriatric Arthritis (PSA)/ Inflammatory Bowel Disease (IBD)

Rheumatoid Arthritis (RA)

Myelodysplastic Syndromes (MSD)/ Sickle cell (SC)

These drugs represent well **over 50%** of the specialty spend on the pharmacy benefit



New drugs are constantly evaluated to ensure this list grows as new drugs enter market



6

## High level overview of program

Identify specialty products to be included in program

Review SPD language and how this change affects benchmark plan under ACA

Identify patients on these products

Notify and educate patient on program

Move these products to a separate copay tier and increase copay amount

Add Administrative Prior Authorization to these products

Save on SP works with patient and pharmacy to adjudicate claim using copay assistance funding



7

# Employer Opportunities

Employers with all levels of cost sharing levels can benefit

No patient is disadvantaged by this program

No reduction in benefit

Small percentage of employees taking Specialty Drugs, <1%



8

# Program Details
## Existing Patients





9



# Program Details
## New Patients

Patient receives script for listed drug → Pharmacy adjudicates claim and sees that there is an administrative PA

→ Pharmacy calls service center and indicates the patient name and drug → Service center educates the pharmacy on the process and contacts patient

→ Service center educates patient and enrolls them in the copay program → Service center contacts pharmacy with secondary billing information

→ Patient is contacted by pharmacy for shipment information

saveonsp

# Service Center
## Billing Requirements

Save on SP Service Center requires access to prescription data through employer or PBM in order to reconcile savings

Savings are calculated based on enrollment information

A percentage of savings is paid to service center as program fees

If employer does not save money then there is no cost to the employer



## Our Team

Our team is made up of experienced specialty pharmacy and call center experts

The leadership team has built many custom service offerings for employers, major insurers, grocery chains and university health systems

Team has a deep understanding of the PBM and Specialty Industry and Consulting across all drug delivery channels

Our call center technology is secure and has the latest cloud technology allowing for rapid deployment of additional personnel as needed

Company is based in Buffalo, New York and utilizes trained Pharmacy Techs as support center personnel



# Exhibit 13

| | |
|---|---|
| **From**: | jillstearns521@yahoo.com [jillstearns521@yahoo.com] |
| **Sent**: | 4/20/2016 4:04:43 PM |
| **To**: | Claudia Dunbar [cdunbar@4frontcg.com] |
| **Subject**: | Fw: Draft of Product Flow |
| **Attachments**: | Implementation Details 03022016.docx |

Sent from Windows Mail

**From:** Jill Stearns
**Sent:** Wednesday, March 2, 2016 4:07 PM
**To:** Jody Miller

Let me know what you think?

Sent from Windows Mail

Attorneys Eyes Only



## Save on SP

## Specialty Pharmacy Savings Program

### Implementation Information

The Save on SP Specialty Pharmacy Savings Program (Program) is intended to assist employers and plan participants by reducing the cost of specialty pharmacy drugs.  Our unique Program utilizes benefit design and manufacturer assistance to achieve these goals.  The Program is intended to be fully compliant with the Affordable Care Act (ACA) and the Employee Retirement Income Security Act (ERISA).

**Proposed flow of program:**

- **SaveonSP** to train ESI AM, including how to run Value Prop
  - If answer to #6 above is NO, then **ESI AM** to run Value Prop
- **ESI AM** to present program (with communications) and value prop to Client
- **ESI Client and SP** establish contract
- **Client** to inform ESI AM which State they use as their benchmark
- **Client** to inform ESI AM which products will be included
- **ESI AM** to submit pre-established form to ESI SP
- **ESI SP to work with SP** to determine if products selection works with Benchmark State formulary
  - **SaveonSP** to review and approve moving products to "non-essential" benefits
- **ESI SP** to prioritize client implementation with SaveonSP (volume management)
- **ESI SP** to submit implementation request to SaveonSP
- **SaveonSP** confirm installation date
- **ESI AM** to work with Client to modify SPD language
- **TBD** to send introductory letter to patient
- **ESI SP** to provide SP with patient enrollment file
- **ESI SP** to code system with PA's, copay changes and OOP
- **SaveonSP** to contact pre-existing patients to educate, enroll member in manufacturer program
- **SaveonSP** contacts ESI to approve and ESI to enter PA prior to implementation date
- Once program is live, **SaveonSP** to take calls from pharmacies where members have not been previously enrolled.
- **SaveonSP** to work with member and pharmacy and put needed PA in system
- **SaveonSP** to contact pharmacy once adjudication is ready
- **ESI SP** to provide monthly claims file to SaveonSP including all clients enrolled in program and pertinent claims
- **SaveonSP** to analyze against patient enrollment
- **SaveonSP** to bill Client directly
- **SaveonSP** pay ESI

1 | P a g e

Proprietary and Confidential                 8/4/2023



**What actions to be taken by SaveonSP and ESI Specialty prior to roll out of the Program?**

1. Contract and BAA execution between ESI and SaveonSP
2. Establish contract documents between ESI client and SaveonSP
   - Establish communications flow, contract template and process between SaveonSP and ESI Client.
   - Contract terms: annual? Renewability? How do you define "savings"?
   - For public sector clients, what are the implications of a direct contract between SP and client?
3. Establish variables to account set up
   - Prior Authorization on products included in program (to be after any clinical PA already in place)
   - Code new copayments that do NOT apply to member OOP
4. Determine communication channels: Client, ESI AM, ESI SP, SoSP, ESI CS, SoSP CS
5. Finalize Account Management training materials
6. Can SoSP run value prop on clients prior to AM Training?
7. Build form to be submitted to ESI SP when client is interested
8. Establish how ESI wants to identify patients being enrolled in program
   - Claims to SaveonSP with SaveonSP pulling members
   - ESI to identify members and then supply file to SaveonSP
9. Determine who will send notification to patient
10. Establish billing and reporting process between ESI SP and SaveonSP: frequency? Claims cycle, monthly, etc? Information to be included in file
11. Establish billing and reporting process between SaveonSP and ESI Client: payment terms
12. What are the savings based off of? Difference between specialty copay and increased copay?
13. Establish payment reporting from SaveonSP to ESI
14. Train ESI CS on how to answer member calls around this program

**Variables on form submitted by ESI AM to ESI SP:**

- **Client name and identifier number**
- **Current formulary**
- **State which the client uses as a benchmark**
- **Products to be included in program**
- **Current specialty copayment**
- **Identify who will send notification to members**
- **Target implementation date**

Proprietary and Confidential          8/4/2023

Attorneys Eyes Only                                                    SOSP_0523625



**AM Training to include:**

- Description of program
- SPD language
- Patient letter
- Value prop formula
- Enrollment form information

Proprietary and Confidential            8/4/2023

Attorneys Eyes Only                                                    SOSP_0523626

# Exhibit 14

**From**: Claudia Dunbar [cdunbar@4frontcg.com]
**Sent**: 4/5/2016 1:24:14 PM
**To**: Gary Meyn [gmeyn@saveonsp.com]
**Subject**: Documents
**Attachments**: SOSP Deck to ESI 2016 V3 4.1.16.pptx; Drug Manufacturer Program SummaryESI.xlsx; Super Valu Savings estimate 3.9.2016.xlsx; Estimator.Headcount.Revenue.xlsx

Claudia Dunbar, CPA
Partner
4Front Consulting Group, Inc.
One Seneca Tower
Suite 2820A
Buffalo, NY  14203
Cell 716-994-1451
CDunbar@4Frontcg.com



Attorneys Eyes Only

SOSP_0523598

# Exhibit 15

Document Produced in Native Format

Attorneys Eyes Only

SOSP_0523599

# SaveonSP

SAVEONSP GO LIVE READINESS

MARCH 2016

saveonsp

# Agenda

o Introductions

o Experience

o Timeline Overview

o Human Resource Systems, Planning, and Recruitment

o Quality Assurance & Compliance Program

o AssistRx—HUB software system

o Implementation and Transition Plan (first 90 days)

o Operations

o IT Infrastructure
  ◦ Hardware
  ◦ Security
  ◦ Disaster Recovery, redundancy
  ◦ LAN
  ◦ Phone System

o Site preparation and tour of new space

# Executive Team



○ SaveonSP

- ◦ Jody Miller, President
- ◦ Claudia Dunbar, CFO
- ◦ Jill Stearns, VP Account Management
- ◦ Gary Meyn, Executive Director of Operations
- ◦ Susan Henderson, RPh Pharmacist and Compliance Officer

# Experience

saveonsp

○ Extensive experience in healthcare operations across numerous types of operations

○ Call Center experience
  ◦ Specialty Pharmacy operations
  ◦ Loan and Debt Collection
  ◦ Physician Practice Billing and Collections, Office Operations

○ Pharmacy—Hospital, Retail, and Specialty

○ Experience from multiple points of view in the market—Health Care Provider, Pharma, HUB, Payer, Specialty Pharmacy, & Retail

# Human Resources



# Organizational Chart

Jody Miller

Presiden

See bio slides in back of presentation



# Human Resource Systems

○ Human Resources Handbook is complete

○ Benefits are established through Independent Health

○ Retention Plan
  ◦ Collections and Sales call centers see 15-20% quarterly turn over
  ◦ We expect to see less because of type of call center
  ◦ Replacement personnel take 5-6 weeks to identify and bring on new personnel
  ◦ Continual recruitment and onboarding is extremely expensive
  ◦ Retention is important for program continuity
  ◦ Every effort is made to attract and retain competent employees

○ Ongoing personnel development opportunities include Pharmacy
  Technician certification program
  ◦ 20 hour program, 4 practices tests, 1 final exam
  ◦ Paid for by SaveonSP



# HR Planning and Recruitment

- ○ Closure of a local pharmacy chain has resulted in numerous Pharmacy Technicians available in the market

- ○ Currently have 53 candidates ready for hire if needed immediately

- ○ Looking to start program with 3 full time call center representatives

- ○ Depending on number of lives serviced will look to hire more qualified candidates as positions become available.

# Call Center Operations

EMPLOYEE STAFFING AND TRAINING

# Headcount Projections







# Staffing Plan for Operations

- Majority of calls are outbound. Dependent on the number of lives the headcount will be adjusted accordingly.
- For November renewal phase we will have an extra headcount of 10+ patient access representatives to deal with the overlap depending on the number of lives.
- The Training phase for new hires will be two weeks.





# Training Plan

○ Core training programs necessary for compliance will be accessed through PRS Pharmacy Services

○ This includes

 *Your Partner* for Pharmacy Success

- ◦ HIPAA
- ◦ Fraud, Waste, and Abuse Training
- ◦ OSHA
- ◦ QA Track

○ System tracks employee status of required trainings and renewals



# Operations Training

- Week 1
  - Orientation
  - HIPAA, FWA, OSHA
  - Product Training
  - AE & Product Complaint Training
  - Pharmacy Benefit Primmer
    - Benefits
    - Copay
    - Prior Authorization
  - Customer Service Standards
  - Process Overview
  - Job Aid, Script, & Work Instruction Overview
  - Script Review
  - Work Instruction Review

- Week 2
  - Phone Training
  - Mock Calls
  - QA and Compliance Program
  - More Sample Patients
  - Putting it all together



# Call Center Management

- The Avaya Phone System produces numerous reports for us to manage our workforce and monitor phone activity
  - Activity dashboard—Avaya has a flexible dashboard for monitoring
  - In real time we can monitor number of representatives on the phone, number of active and inactive representatives, lines available, abandonment rate, average speed to answer, and call length

- Our Service Level metrics:
  - Average Speed to Answer (ASA): <30 seconds
  - Abandonment Rate: <4%

- All calls will be recorded



# Customer Service Approach

o Customer Service is not done in one course—it is an attitude

o We hire for ATTITUDE and train for SKILLS

o Over the course of the year, we will bring Dale Carnegie trainers onsite for:
  ◦ Telephone Skills: Inbound and Outbound
  ◦ Attitudes for Service
  ◦ Customer Follow Through



# Quality Assurance & Compliance Program



# Immediate Escalations

- In the event a customer (patient or prescriber) asks for a supervisor or has a service concern, the process in place is to immediately escalate to a Program Supervisor or Manager

- Any HIPAA complaint is directed to the Compliance Officer or Program Manager immediately

- Complaints about representatives my be handled by Program Supervisor or Program Manager
  - Complaints will be tracked, investigated, and integrated into the Quality Assurance program
  - Investigation will be completed in 24 hours
  - Retraining provided when necessary
  - Disciplinary policy will apply when appropriate



# Quality Assurance Program Components

- Continual evaluation of Job Aids, Work Instructions, and Call Scripts
  - Active process focused on Continual Quality Improvement
  - Retrain as appropriate

- Monthly evaluation of representatives skills

- Performance improvement initiatives for representatives not meeting expectations
  - Representatives must meet or exceed expectations on 90% of evaluations
  - Those not meeting will be coached and then an additional evaluation cycle will occur

- Issues Resolutions Coordinator role collects information for the root cause analysis in quality improvement cycle
  - May be responsible for immediate retraining when need is identified through investigation of escalated issue

- Supervisor, Manager, and Compliance Officer all play a role in coaching representatives based on assessments and identified problems



# QA Program--Evaluations

○ On a monthly basis, each representative will be evaluated (prospectively or retrospectively) on no less than 5 calls for:

　◦ **Connection:** Uses appropriate greetings, transfers, and closings

　◦ **Communication:** Uses proper word choices, seeks to understand caller, clarifies questions, allows caller to speak without interruption, proper documentation

　◦ **Accuracy of Procedures:** Did the representative do the right steps, accesses resources in Knowledge Management system where appropriate, document appropriately, and relay correct information

　◦ **Resolution:** Proper case resolution is documented and reflects adequate attempts at resolving case

　◦ **Soft Skills/Finesse:** Tone, empathy, rate of speech, volume, courteousness

○ Evaluation Auto Fails—HIPAA, Documentation, Greetings & Salutations

○ Retrospective review: QA analyst will review recorded calls and provide report and coaching later.

○ Prospective review: QA analyst will listen to live calls and provide immediate feedback for representative to incorporate into next call

# Sample Grids—QA plan



| Weighting | Achieved | Value | Quality Moch-Up Form | Decision | Comments |
|---|---|---|---|---|---|
| Name:>>> | | | | | |
| 5.00% | 5.00% | | Connections | | Connections Comments |
| 1.25% | 1.25% | 1.25% | 1. Open – Uses proper greeting and introduction | Yes | |
| 1.25% | 1.25% | 1.25% | 2. Close – Uses appropriate closing | Yes | |
| 1.25% | 1.25% | 1.25% | 3. Hold – Uses proper hold technique | Yes | |
| 1.25% | 1.25% | 1.25% | 4. Transfer – Uses appropriate transfer technique | Yes | |
| 10.00% | 10.00% | | Communication – what they said | | Communication Comments |
| 1.43% | 1.43% | 1.43% | 1. Word choice - understood by caller | Yes | |
| 1.43% | 1.43% | 1.43% | 2. Avoids unexplained silences | Yes | |
| 1.43% | 1.43% | 1.43% | 3. Asks questions to clarify | Yes | |
| 1.43% | 1.43% | 1.43% | 4. Resolves other issues revealed during the interaction or "reads between the lines" | Yes | |
| 1.43% | 1.43% | 1.43% | 5. Educates/sells when appropriate | Yes | |
| 1.43% | 1.43% | 1.43% | 6. Uses caller's name | Yes | |
| 1.43% | 1.43% | 1.43% | 7. Clearly explains details throughout the calls | Yes | |
| 50.00% | 50.00% | | Accuracy/Procedures | | Accuracy/Procedures Comments |
| 13.00% | 13.00% | 13.00% | 1.    Follows Work instructions/Program Procedures | Yes | |
| 2.00% | 2.00% | 2.00% | 2.    Offers survey when appropriate | Yes | |
| 5.00% | 5.00% | 5.00% | 3.    Uses available tools, systems, & resources | Yes | |
| 5.00% | 5.00% | 5.00% | 4.    Complete and accurate information given to the caller | Yes | |
| 5.00% | 5.00% | 5.00% | 5.    Documents Accurate notes in the systems | Yes | |
| 20.00% | 20.00% | 20.00% | 6.    Compliance- HIPPA/Verification | Yes | |
| 15.00% | 15.00% | | Resolution | | Resolution Comments |
| 5.00% | 5.00% | 5.00% | 1. Reflects back what was done or summarizes the call | Yes | |
| 3.00% | 3.00% | 3.00% | 2. Follows through sharing next steps | Yes | |
| 7.00% | 7.00% | 7.00% | 3.  Resolves the issue | Yes | |
| 20.00% | 20.00% | | Finesse or soft skills | | Soft Skills Comments |
| 2.00% | 2.00% | 2.00% | Confidence – Displays assurance and freedom from doubt or hesitation | Yes | |
| 2.00% | 2.00% | 2.00% | Allows caller to speak uninterrupted – Does not break in with questions or remarks while the caller is speaking | Yes | |
| 2.00% | 2.00% | 2.00% | Empathy – Sounds sincere about helping the caller, puts self in "caller's shoes" | Yes | |
| 2.00% | 2.00% | 2.00% | Conversational – Engages in a comfortable exchange of appropriate  information | Yes | |
| 2.00% | 2.00% | 2.00% | Professional – portrays a positive image in language used and program and company support | Yes | |
| 2.00% | 2.00% | 2.00% | Rate of speech & volume of voice – Does not have to repeat information because the caller did not "hear" due to agent speaking too rapidly, too slowly, or not loud enough | Yes | |
| 2.00% | 2.00% | 2.00% | Listens to the caller – actively listens, and understands, doesn't anticipate or make assumptions, remembers important facts, 100% present with the caller | Yes | |
| 2.00% | 2.00% | 2.00% | Courteous – uses courtesy words like please, thank you, etc | Yes | |
| 2.00% | 2.00% | 2.00% | Tone of Voice – varies tone to add warmth & expression in voice | Yes | |
| 2.00% | 2.00% | 2.00% | Call flow (call control) – Guides the call; stays on track | Yes | |

| | Possible | Earned | % |
|---|---|---|---|
| Connections | 5.00% | 5.00% | |
| Communication | 10.00% | 10.00% | |
| Accurracy/Procedures | 50.00% | 50.00% | |
| Resolution | 15.00% | 15.00% | |
| Finesse Or Soft Skills | 20.00% | 20.00% | |
| | | | |
| Final Score | 100.00% | 100.00% | 100.00% |



# Compliance Officer Duties

| Go Live | Next Product & Program Growth |
|---|---|
| Corporate Compliance<br>• Policies & Procedures<br>• HIPAA<br>• Fraud, Waste, and Abuse<br>• Ethics<br>• Education | Corporate Compliance<br>• Policies & Procedures<br>• HIPAA<br>• Fraud, Waste, and Abuse<br>• Ethics<br>• Education |
| Contract and Service Compliance<br>• Representative Evaluations<br>• Oversee Remediation Plans | Contract and Service Compliance<br>• Oversees QA Analyst administration of Representative Evaluations<br>• Oversee Remediation Plans |
| Pharmacy Compliance | Pharmacy Compliance |
| Establish operations with URAC Call Center Accreditation in mind | Achieve URAC Call Center Accreditation |

# AssistRx

# Implementation & Transition Plans

Case 2:22-cv-02632-JKS-CLW   Document 849-5   Filed 09/14/24   Page 136 of 177 PageID: 30766

# Implementation

○ Kick Off meeting to approve processes, set expectations

○ Weekly Project Management meeting with ESI

○ Internal Bi Weekly Project Management meetings (Mondays and Thursdays)

○ Implementation Risks:
  ◦ Approval of program assets by company Regulatory Committees
  ◦ Phone and Fax transfer redirection to different lines

○ Mitigation
  ◦ Communication of deadlines and timing expectations
  ◦ Firm understanding of what needs review with Regulatory Committee vs. Legal review
    ◦ Scripts and Fax cover sheets vs. Portal Views
  ◦ Testing of communication lines during weekend

saveonsp

# Transition Plan—First 90 Days

o Project management does not stop at launch

o Communication is important

o Initially a daily call, then weekly to discuss volume and address other questions
  ◦ Fax Volume
  ◦ Phone Volume
  ◦ Staffing Update
  ◦ Escalations
  ◦ IT Update
  ◦ Program Data
  ◦ Questions/Concerns

# Operations

# Service Level Agreements



# Assumptions

saveonsp

1.  Inbound conversation with patient pharmacy to gather all pertinent information. (5 minutes)

2.  Outbound to fully enroll patient into saving programs (20 minutes)
    - Savings Program Enrollment process
    - Welcome call to patient
    - Intake / Enrollment (including Missing Information handling)
    - Enrollment in instant savings programs

3. Outbound call placed to PBM to lift the PA step edit  (5 minutes)

4. Outbound call placed to Pharmacy to provide secondary information along with the tertiary information (5-10 minutes)

Each new referral per patient will take a estimated 40 minutes to complete enrollment process



# SaveonSP Program Operations

Process — High Level Flow Chart of Operations

Job Aids — Quick Reference Guides and Knowledge Management System for Representatives

Phone Scripts — Guidelines for Conversations with Patients

Work Instructions — Details of How to Do each step

Detailed Requirements Document — Comprehensive Document including all Processes, Scripts, Use of Status and Sub Status, etc.

saveonsp

# Sample Job Aid



# Financial Analysis

# Information Technology & Phone System

# MVP Network Consulting

- MVP is a managed IT service provider located in Buffalo, NY.
- We focus on the healthcare market.
- We manage 500+ healthcare facilities.
- We deliver the best SLA in the industry.
- Proactive approach to IT maintenance and security.
- Perform regular security audits.

| Gold SLA - Response Goals | | | | |
|---|---|---|---|---|
| Priority | Response | Resolution Plan | Resolution | Based On |
| Priority Gold – Emergency Down | 1 hrs. | 4 hrs. | 8 hrs. | Office Hours |
| Priority Gold – High | 1 hrs. | 4 hrs. | 16 hrs. | Office Hours |
| Priority Gold – Standard | 8 hrs. | 24 hrs. | 48 hrs. | Office Hours |
| Priority Gold - Portal / Auto | 1/2 hr. | 24 hrs. | 48 hrs. | Office Hours |





# IT Executive Summary

◦ Create a Highly Available and secure network.
  ◦ Eliminate any single point of failure on the network.
  ◦ Comply and surpass all HIPAA and PCI regulations.
◦ Built the network to support 96 users to start.
◦ Perform regular network and system audits.
◦ Generator backup for the site and data center.
◦ 24 x 7 Network maintenance and monitoring.
◦ 24 x 7 security monitoring and remediation.
◦ Implement a leading Disaster recovery and business continuity plan.
◦ Dual internet connections for redundancy and burstable to gigabit as needed.
◦ Implement a robust phone system with redundancy and call center functionality.

# Current Network Layout & Design





# Disaster Recovery and Business Continuity plan

○ The solution is based on an appliance onsite that will do the following:

- ◦ *Image and backup all systems* every 10mins.
- ◦ **Verify backup** with automated screenshots for each image-based backup.
- ◦ Data and backups **stored in both local device AND secure cloud** will mitigate downtime, as business can run off the local device or the cloud.
- ◦ *Instant virtualization:* incremental backups can be instantly virtualized rather than the entire backup chain.
- ◦ AES 256 and SSL Key-based encryption
- ◦ Offsite backups stored in SSAE 16 data centers.



# IT security

saveonsp



# Phone System phase 1



- ○ Utilizing Ring Central Polycom VVX-310 phone series for startup phone system operations.

- ○ All calls will be recorded.

- ○ System capability to listen to calls and do retraining.

- ○ Compliance Officer will be charged will maintenance of files until phase 2.

- ○ Detailed call reporting and statistics of metrics met



# Phone System phase 2

- Utilizing AVAYA IP Office 500 VoIP phone system.

- The system setup on a separate voice VLAN for better QoS.

- Utilizing Chronicall – true cradle to grave reporting with call center functionality.

- All calls will be recorded.

- Multiple phone line carriers
  - PRI – digital lines for phone calls.
  - Copper line for backup.

- **In the event of a DR, remote users will be able to use softphones from any remote locations to receive and make call to continue working.**

- Customized detailed reporting

- Wallboard setup in the call center.



# Physical Space



# Call Center Location

- ○ Currently have two available spaces with options to lease

- ○ Both locations would allow for expansion if necessary over the next year

- ○ Both locations are call center ready with structures already in place for all necessary IT and Network needs

# Appendix

VENDOR INFORMATION

# Jody Miller



**saveonsp**

Partner
716-440-0192
jmiller@saveonsp.com

With more than 25 years of experience in the medical field, Jody's background is varied and diverse. His career in health care began while serving as a Captain in the U.S. Army Medical Service Corps, where he was the Commanding Officer of the Medical Company at Martin Army Community Hospital in Fort Benning, Georgia. Since then, his continued experience in health care has included owning numerous successful health care service businesses, working in various roles at Johnson and Johnson, and most recently as a co-founder and partner in Reliance Rx, an $100m specialty pharmacy.

Jody has worked with nearly all aspects of the medical community – from providers' practices and hospitals, Payers of all types, to the biopharmaceutical industry. His years of experience in the medical field have provided him with an acquired knowledge in, physician practice management, pharmacy development and operations, and pharmaceutical trade and distribution expertise.

After selling Reliance Rx to his PBM partner, Jody has launched 4Front Consulting Group to, accelerate the success of companies, using his established relationships within the Healthcare Marketplace.  His current engagements include building new Specialty Pharmacy solutions for Grocery Chains, Health Systems and Independent businesses.  Additionally, he consults on a number of new biopharmaceutical product launches in the area of payer and provider strategy.

Jody is a frequent speaker at National Trade conferences on Payer and Provider topics pertaining to the distribution, and payment strategies for bio Pharmaceutical products.

Jody holds an undergraduate degree in Health Care Administration from Texas State University and a Master's of Business Administration from Canisius College.

saveonsp

# Claudia Dunbar



## Chief Financial Officer
## 716-994-1451
## cdunbar@saveonsp.com

Claudia Dunbar CPA, MBA started her career at Bristol Myers Squibb in Financial Planning & Analysis at a $250 million business unit. She progressed during her 12 years to Director of Operations Accounting. This included budget development, projections, financial reporting & analysis and establishing internal controls for the fair & accurate reporting of all inventory receipts, manufacturing & distribution of inventory.  After a hiatus to raise her 3 children she returned to work doing tax research and preparation at a CPA Firm for one year.  Claudia then joined Reliance Rx in a financial capacity establishing all business unit accounting policies, procedures, and internal controls and reporting for the startup Specialty Pharmacy. She progressed to Director Operations & Finance where she oversaw all finance and intake pharmacy operations. Claudia was responsible for the annual budget preparation and presentation to IHA Board of Directors, all financial preparation & analysis for monthly presentation to the IHA Operating Committee and all contract & service metrics for the Operations team to demonstrate value and service to the patient, provider and payor.  These metrics as well as an emphasis on cross functional teamwork and staff sharing and accountability fostered ideas for continuous process improvement and the highest level of care to the patient and all customers.

Most recently Claudia has joined 4Front Consulting Group, Inc. working with companies to meet their operational and financial goals in building and growing their Specialty Pharmacy.

Claudia holds an undergraduate degree in Accounting from Canisius College and a Master's of Business Administration from the State University of New York at Buffalo.

Claudia is a CPA licensed in NYS.



# Jill Stearns



VP Account Manager
512-799-3880
jstearns@saveonsp.com

# Gary Meyn



Executive Director of Operations
210-912-0120
gmeyn@saveonsp.com

saveonsp

# Susan Henderson, RPh



Compliance Officer, Pharmacist
716-254-1193
email

Susan Henderson is a New York and New Jersey State registered pharmacist working professionally since 1981 in retail, PBM, and hospital environments.

Most recently, her 22+ years in retail pharmacies have afforded her a strong knowledge of pharmacy claims processing, law and regulatory compliance as well as clinical, management and collaborative skills.

Susan received a B.S. in Pharmacy from the University of the Sciences in Philadelphia and Master in Business Administration from University of Baltimore Graduate School.

She is a certified Pharmacist Immunizer and holds a Medication Therapy Management Certificate as well.

She values her passion for customer service as her greatest gift.

# Exhibit 16

# Agenda

**Date**: March 29, 2016
**Time**: 11:00am
Meeting Period: 35 Minutes
**Attendees**: Jody Miller, Claudia Dunbar, Jenna Elliott, Rachel Miller, Gary Meyn, Jill Stearns, Ted Butler

1. Introductions
2. Status of Contract

Site Visit preparations

1. Presentation of capabilities and team members
2. April 14th  9-11 am
3. Dinner on the 13th is up in air.
4.

Supervalu focus

1. Resend contract with tertiary Payment agreement
2. State Benchmark analysis (Waiting on ESI formulary lists)
3. List creation
4. Letters to employees
5. SPD language change

Open Items

1. Tertiary Bin provider.   ESI or PDMI?
2. List of Pilot employers
3. Data reporting needs

Notes:

- Send Linda employee letter without drug list
- Reach out to Darcie for legal wording/advice on how we'll notify them of updates for FDA approved drugs. Quarterly?
- Get electrician in here for wiring on new cubes
- Continue to review/revise PowerPoint presentation

Attorneys Eyes Only

SOSP_0622489

# Exhibit 17

| | |
|---|---|
| **From:** | Jeffrey Hall |
| **Sent:** | Thursday, April 7, 2016 8:33 AM |
| **To:** | Howard Mazzafro; Lisa Krajewski |
| **Cc:** | Robert Dillon; LaShai Payne |
| **Subject:** | RE: Jody and SaveOn Prime Hospitals |
| | |
| **Importance:** | High |

Hey Howard

Just an FYI...Jody is a guy

I need Jody in Torrance to go over his program again in detail since we are no longer in the prospecting evaluation mode...but he has sold the program to one of our Key major clients.  Which means...we need a thorough and complete understanding of the impact to our pharmacy program for PRIME, we need to be able to consult PRIME as well other clients since Jody's comments below says that he went through via MedAssets (a competitor to us), he also says that he is close to a deal with ESI.  All of us should be dialed in here.

We left off with Jody looking at his math, his presentation.

I need the team to vet out SaveOn, that would be LaShai and Robert for when Prime is using this program, Robert in pricing out the claims that impacts PRIME's cost, you and Lisa to understand how the program works.

This will be more than a phone call as there are many items at play here.  We need to move quickly since PRIME is purchasing and we do not know what is going on.

We need a full deep dive of this in our program.

Thanks

Jeff


-----Original Message-----
From: Howard Mazzafro
Sent: Thursday, April 07, 2016 8:01 AM
To: Jeffrey Hall; Lisa Krajewski
Cc: Robert Dillon; LaShai Payne
Subject: RE: Jody and SaveOn Prime Hospitals

Jeff,

You asked me to contact Jody, so she and I could meet to have her provide me with an update on this issue.  She and I have a call scheduled for next Wed at 9:00 PST.  Would you prefer to forgo that briefing and use that time to get everyone on the call with Jody to hash out all these issues?

Thanks.

Howard

Keenan_0030457

-----Original Message-----
From: Jeffrey Hall
Sent: Thursday, April 07, 2016 7:34 AM
To: Lisa Krajewski
Cc: Howard Mazzafro; Robert Dillon; LaShai Payne
Subject: FW: Jody and SaveOn Prime Hospitals
Importance: High

Hello Lisa,

I added you to this project and would like you to work with Howard to get this meeting set up, we need at all of us again.

To the team: Depending on where Jim takes this with Tammy, operations and pricing need to come to play. Looks like we have another fire added to the list to vet this out for PRIME and either endorse the program, stay neutral, ...or other...by pointing out the facts. I have concerns with a program that increases utilization of $100k cost drugs. If SaveOn has corrected this, then great.

Jeff

-----Original Message-----
From: Jeffrey Hall
Sent: Thursday, April 07, 2016 7:31 AM
To: Jim Kreig
Cc: LaShai Payne; Robert Dillon; Howard Mazzafro; Jim Tinyo; Lisa Krajewski
Subject: RE: Jody and SaveOn Prime Hospitals

Hey Jim,

I do not have much more to add to what I provided below, and I know you are looking for a response to Tammy. We need time to get the team assembled to meet with Jody and see what they have done differently to the program.

Originally I had reservations with the program as it allows SaveOn to earn an Admin Fee on large cost Specialty drugs, that from a clinical position, we are more in line to looking to alternatives to these high cost claims with lower cost equal or better therapy. The copay program takes dollars from the manufacturers (who are already overcharging for their drugs) to give a rebate at the front end to cover the patient deductible. What I also had concerns with was the increased financial cost to our clients.

These three items: a vendor making a fee on our clients utilization - increased utilization of high cost drugs - clinical intervention? We needed to fully understand the program before commenting on it or endorsing it. We just are not there.

If you can get to Tammy to say that we previously have met with SaveOn, pointed out some observations and concerns with their program and that they were going to get back to us with revisions, then as schedules are what they are, looks like they were in front of PRIME before getting back to us, that we will be meeting with them. I would recommend that we fully vet out the cost of this program for PRIME with their claims data, the impact for future utilization.

At this point, we could not endorse their program or give them any financial perspectives of the true impact.

I am on the East Coast until the 13th at a conference and meetings that for me is nonstop here in Boston through Sunday, then I head to Pennsylvania and Maryland finishing up back to LA.

Let me know if you still need to visit and sometimes that you are available, otherwise I would recommend asking Tammy to wait on the installation of this program as we were in the middle of reviewing it.

Thanks

Jeff

-----Original Message-----
From: Jim Kreig
Sent: Wednesday, April 06, 2016 7:44 PM
To: Jeffrey Hall
Cc: LaShai Payne; Robert Dillon; Howard Mazzafro; Jim Tinyo; Jim Kreig
Subject: Re: Jody and SaveOn Prime Hospitals

Jeff - please call me to discuss. Thx

Sent from my iPhone

> On Apr 6, 2016, at 7:27 PM, Jeffrey Hall <jhall@Keenan.com> wrote:
>
> Jim,
>
> FYI...
>
> -----Original Message-----
> From: Jody Miller [mailto:jmiller@saveonsp.com]
> Sent: Wednesday, April 06, 2016 7:20 PM
> To: Jeffrey Hall; Ted Butler
> Cc: Howard Mazzafro; Robert Dillon; LaShai Payne; Claudia Dunbar; Jill Stearns
> Subject: RE: Jody and SaveOn Prime Hospitals
>
> Jeff and Howard
>
> Good to hear from you.
>
> So we are close on the ESI portion of getting the program launched.   Senior leadership will be in my office next Thursday to button up the details.
>
> As you can imagine much has changed since we last spoke. Involving ESI was a great strategy, however it necessitated that the deal structure be substantially changed.
>
> I have been working with Dr Patel the CMO at Prime on a number of projects.   I am fairly confident I mentioned this relationship the last time we all got together. I had dinner the night before with Dr Patel and he indicated you were the Vendor for most of his lives.   So how I got to him is that  I am the exclusive Specialty consultant for MedAssets the GPO that Prime Health uses.   (Now Vizent, a Novation company)   In any event he has been trying to get his benefits manager to follow up for a couple of weeks. I spoke with Tammy Valle on Monday or Tuesday.   After explaining the program, I told her to check with you.   Obviously she did.
>
> So the number of lives (I  have been told) are around 28K so the savings before fees are approx. 1.4 million. We still take a 25% of savings fee.   I have the ability to determine who I want to prioritize in the launch of the program. I have a number of clients who I want to get in early and save the most vs ESI house accounts.
>
> I promised Dr Patel I would put him in first or second.

Keenan_0030459

>
> The program is exactly as it was operationally. The lawyers have all (and I mean a lot of them) have determined how to operationalize at ESI and Accredo   BTW we are only launching with Accredo mandatory lives.
>
> At this point I can bring your team back up to speed. I will be talking to Howard next Wednesday.
>
> Let me know if you have any questions
>
> Thanks for contacting me.
>
> Jody
>
>
> Jody L. Miller
> Founder
> Save On SP
>
> One Seneca Tower
> Suite 2820 A
> Buffalo, NY 14203
>
> Cell : 716-440-0192
> www.saveonsp.com
>
>
>
>
>
>
>
>
>
> -----Original Message-----
> From: Jeffrey Hall [mailto:jhall@Keenan.com]
> Sent: Tuesday, April 5, 2016 6:13 PM
> To: Ted Butler <TButler@Premierconsultingassoc.com>; Jody Miller <jmiller@4frontcg.com>
> Cc: Howard Mazzafro <hmazzafro@keenan.com>; Robert Dillon <rdillon@Keenan.com>; LaShai Payne <lpayne@Keenan.com>
> Subject: Jody and SaveOn Prime Hospitals
>
>
> Hello Ted and Jody
>
> Ted, I have your email on the MPA, just upside on time will get to you this week
>
> On another side note, would like to know the details on the above interaction with our client Prime with SaveOn
>
> As business partners and or potential business partners, we do like to know about prospecting of them ahead of time. Did we miss an advance email Jody?  Very possible as it has been crazy.
>
> Since we vet out vendors proposals just like Premier would, we are being asked to vet SaveOn.  This we need to do now.

Keenan_0030460

>
> We havent met in some time And we were at a place where some items had to be worked out.  Where did we end up?
>
> Weve added a new VP Business Development, Howard Mazzafro.  Jody i would like you two to visit and then lets get the group together.
>
> Please Jody, if you would please provide details on you PRIME involvement?  Conversations? Analysis if any?
>
> Thanks
>
> Jeffrey Hall
> SVP Keenan Pharmacy
>
> Sent from my iPhone
> CONFIDENTIALITY NOTICE: This communication and its attachments may contain non-public, confidential, or legally privileged information including HIPAA-protected PHI. The interception, use or disclosure of such information is prohibited. If you are not the intended recipient, or have received this information in error, please notify the sender immediately by reply email and delete all copies of this message and attachments without reading, saving, or further distributing them.

Keenan_0030461

# Exhibit 18



www.pbwt.com

June 21, 2024

Jacob I. Chefitz
(212) 336-2474

**By Email**

Meredith Nelson, Esq.
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:    *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*,
      **2:22-cv-02632 (JKS) (CLW)**

Dear Meredith:

We write regarding the start date for SaveOnSP's productions.

As you know, JJHCS previously agreed to accept April 1, 2016 as the start date for SaveOnSP's productions based on SaveOnSP's representation that "SaveOnSP and its personnel are unlikely to have generated documents relevant to the issues in this lawsuit before April 2016." *See* Apr. 10, 2023 (10:35 pm) email from G. LoBiondo to M. Nelson. In particular, you represented that based on your investigation, "the earliest communications SaveOnSP had with its first client was in May 2016, that it would have drafted any marketing materials shortly in advance of those communications, and that it hired its first employees and set up its first call centers after that date." *See* Apr. 10, 2023 (3:00 pm) email from M. Nelson to G. LoBiondo.

We have reviewed SaveOnSP's productions, and we have identified several documents that appear to call into question those representations. Specifically, SaveOnSP's productions contain documents generated by SaveOnSP and its personnel before April 1, 2016 that are relevant to the issues in this lawsuit, including ███████████████████████ ████████████████████████████████. For instance:

- **SOSP_0622487**. This document is ████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████

- **SOSP_0523594**. This ████████████████████████████████████ ████████████████████████████████████. *Compare, e.g.,*

Meredith Nelson, Esq.
June 21, 2024
Page 2

SOSP_0523594, slide 5 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"), *with* SOSP_0622756 (▮
▮▮▮▮▮▮▮▮▮▮▮▮), slide 43.  Slide 12 of SOSP_0523594

.

- **SOSP_0523623**.  This 
."

- **SOSP_0523598**.  This 
" (emphasis supplied).
.  *See* SOSP_0523602.  This file,
which concerns ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, calls into question your
representation that "the earliest communications SaveOnSP had with its first client
was in May 2016."

- **SOSP_0523599**.   This 

- **SOSP_0622489**.  This document is 
."

In sum, it appears that, contrary to SaveOnSP's prior representations, SaveOnSP
was already operating and generating relevant documents and communications before April 2016;
indeed, it appears that SaveOnSP and its personnel were doing so as early as August 2015.

JJHCS therefore requests that SaveOnSP update its custodial productions from the
files of Jody Miller, Jill Stearns, Claudia Dunbar, and Jenna Ordonez, as well as SaveOnSP's

Meredith Nelson, Esq.
June 21, 2024
Page 3

noncustodial production, to include all responsive documents from August 1, 2015 to April 1,
2016.  Please confirm that SaveOnSP will make this production and that it will include documents
collected from those custodians' personal email addresses.  Please also confirm whether any other
custodians have relevant documents from August 1, 2015 to April 1, 2016; if such other custodians
exist, please confirm that SaveOnSP will produce their documents from that time period as well.

   Finally, please explain who Rachel Miller and Ted Butler are, and their roles with
respect to SaveOnSP.

   We request a response by June 28, 2024.  We reserve all rights and are available
to meet and confer.


       Very truly yours,

       */s/Jacob I. Chefitz*

       Jacob I. Chefitz

# Exhibit 19

Selendy|Gay

July 18, 2024

**Via E-mail**

Jacob I. Chefitz
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jchefitz@pbwt.com

**Re:**   ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
         LLC* (Case No. 2:22-cv-02632-JKS-CLW)**

Dear Jacob,

        We write in response to your June 21, 2024 letter regarding the start date
for SaveOn's productions.

        *First,* as you note, based on an investigation, we told you that our under-
standing was that SaveOn's communications with potential clients began in the
spring of 2016. Upon further investigation, SaveOn has identified limited commu-
nications with a handful of potential clients before then, ██████████████████
██ SOSP_0523598. SaveOn does not agree, however, that these communications
or the other documents that J&J cites support an extension of the discovery period:



              **SOSP_0622487, SOSP_0523623**: These documents, ███████████
              ████████████████████████████████████████████████████████
              ██████████████████████.

              **SOSP_0523594**: This ████████████████████████████████████
              ████████████████████████████████████████████████████. It

───────────────────

[1] While the file name of the document ███████████████████████████████████
████████████████████████

Jacob I. Chefitz
July 18, 2024



" Jun. 21, 2024 Ltr. at 1.                          you also cite in
your letter (SOSP_0523599) reflects
                                           .

**SOSP_0523599**: This
                                           .

**SOSP_0622489**: The only statement made in this
                                           ." Based on our
investigation,
                                           . SaveOn has al-
ready produced responsive documents connected to          . *See,*
*e.g.,* SOSP_0622534, SOSP_0622492, SOSP_0622499.

*Second,* you ask who Rachel Miller and Ted Butler are.

We reserve all rights and are available to meet and confer.

Regards,

/s/ Meredith Nelson

Meredith Nelson
Associate

# Exhibit 20

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Meredith Nelson
Associate
212.390.9069
mnelson@selendygay.com

July 30, 2024

**Via E-mail**

Jacob Chefitz
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

Re:  *Johnson & Johnson Health Care Systems Inc. v. Save On SP,
     LLC* (Case No. 2:22-cv-02632-JKS-CLW)

Dear Jacob,

    We write regarding your July 19, 2023 and July 23, 2023 letters requesting
that SaveOn produce documents of Jody Miller, Jill Stearns, Claudia Dunbar, and
Jenna Ordonez from August 1, 2015 to April 1, 2016.

    *First*, running the parties' full set of agreed-upon search terms over these
four custodians' documents in this new time period results in 3,568 hits, 5,740 in-
clusive of families, and would require SaveOn to review 3,214 additional docu-
ments. SaveOn will agree to review these additional documents if J&J will review
and produce documents from its custodians from the same time period of August
1, 2015 to April 1, 2016 that hit on search terms related to J&J's awareness of
SaveOn:

- SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On
  OR SOSP OR "Jody Miller" OR "Ron Krawczyk"

- "save on" w/50 (accumulat* OR maximiz* OR "essential health benefit*"
  OR EHB* OR "non-essential health benefit*" OR "nonessential health
  benefit*" OR NEHB* OR accredo OR ESI OR "express scripts")

- "Save On" (*case sensitive*)

- "other offer" w/5 (accumulat* OR maximiz* OR "health plan*" OR in-
  sur*)

Jacob Chefitz
July 30, 2024

- ("Express Scripts" OR ESI OR ExpressScripts) w/50 (accumulat* OR maximiz*)

- (Accredo OR Acredo) w/50 (accumulat* OR maximiz*)

If J&J is not willing to agree to this compromise, please provide us with the hit counts showing the number of additional documents J&J would need to review from these proposed search terms.

*Second*, you ask us to identify the limited communications with a handful of potential clients from before the spring of 2016 to which we referred in our July 18, 2024 letter. SaveOn is willing to review and produce these documents as part of the compromise proposal discussed above.

*Finally*, you ask us to explain again Rachel Miller and Ted Butler's roles with respect to SaveOn. We provide that information in our July 18, 2024 letter.

We are available to meet and confer. We reserve all rights.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate