# EXHIBIT B
# Part 1

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

October 25, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Re: *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
 *No. 2:22-cv-02632 (JKS) (CLW)*

Dear Judge Wolfson:

On behalf of Save On SP, LLC ("SaveOn"), we ask Your Honor to compel Plaintiff Johnson & Johnson Health Care Systems, Inc. ("JJHCS," and, with its affiliates, "J&J") to produce documents regarding its CAP program from its vendor TrialCard Inc. ("TrialCard") within two weeks.

## Background

As Your Honor knows, TrialCard administers CarePath for J&J, running it day-to-day at the "direction" of J&J, pursuant to a Master Servies Agreement ("MSA"). *See* Ex. 1 (2017 MSA);

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

Hon. Freda L. Wolfson                                                                                    Page 2

Ex. 2 (2024 MSA).[1] TrialCard screens patients to determine their eligibility for CarePath, communicates directly with patients on J&J's behalf, disburses the CarePath funds at issue in this litigation, and implements J&J's CAP program to identify patients on accumulators, maximizers, and SaveOn-advised plans. SaveOn's Apr. 19, 2024 Mot. to Compel at 3-4.

SaveOn has been seeking documents from TrialCard since this litigation began. In response to SaveOn's initial document requests to J&J, J&J said that it "[would] work with Trial Card … to facilitate production of documents responsive to SaveOnSP's requests," Ex. 3 at 3 (Jan. 6, 2023 Ltr.), then denied that it controlled TrialCard's documents, Ex. 4 at 3 (Feb. 7, 2023 Ltr.). SaveOn then served a subpoena on TrialCard, Ex. 5 (Feb. 17, 2023 SaveOn's First Subpoena of TrialCard), and TrialCard—through its then-counsel at Patterson Belknap, which also represents J&J in this action—said that it had no documents to produce because it had "already agreed" to produce various documents "through JJHCS." Ex. 6 at 6, 7, 8, 19 (Mar. 6, 2023 R&Os); Ex. 7 at 2 (June 7, 2023 Ltr.); Ex. 8 at 2 (Aug. 24, 2023 Ltr.).

TrialCard eventually produced some documents in response to SaveOn's subpoena but refused to produce emails or other custodial documents from after July 1, 2022. Ex. 9 at 11 (Dec. 1, 2023 SaveOn's Second Subpoena of TrialCard); *see* Ex. 10 at 7 (Dec. 15, 2023 TrialCard R&Os to SaveOn's Second Subpoena); Ex. 11 at 1-2 (Mar. 1, 2024 Ltr.). TrialCard also refused to submit that dispute to Your Honor, Ex. 12 (Jan. 12, 2024 Ltr.), insisting that it be heard by a court in North Carolina, despite having agreed to bring a prior discovery dispute to Judge Waldor, Ex. 13 (July 6, 2023 Ltr.).

---

[1] TrialCard is now known as Mercalis Inc. *See* Ex. 2 (2024 MSA).

In April 2024, SaveOn moved to compel J&J to produce documents in TrialCard's posses-

sion related to its work for J&J: (1) "refresh" documents from July 1, 2022 to November 7, 2023

from four TrialCard employees from whom TrialCard had produced documents from before

July 1, 2022 (the "Original TrialCard Custodians"); and (2) documents regarding J&J's CAP pro-

gram from both the Original TrialCard Custodians and additional TrialCard employees who

worked on that program (the "New TrialCard Custodians"). SaveOn's Apr. 19, 2024 Mot. to Com-

pel at 1. Your Honor granted the motion, finding that J&J has "legal control" over the requested

documents and that "the requested discovery is relevant as the documents at issue relate to the

creation and implementation of the CAP Program, and benefits investigations into whether patients

were on SaveOnSP programs." May 28, 2024 Order at 10. Your Honor ordered "the parties to

meet and confer on the scope of the TrialCard discovery by June 4, 2024." *Id.* at 10.

On May 24, 2024, SaveOn proposed search terms and additional custodians for J&J's pro-

duction of CAP-related documents. Ex. 14 (May 24, 2024 Ltr.). The parties met and conferred on

June 4, 2024, as ordered, but J&J had no substantive response to SaveOn's proposed terms. Ex. 15

(June 6, 2024 Ltr.). On June 17, 2024, J&J told SaveOn that Patterson no longer represented Trial-

Card and that TrialCard was "in the process of engaging [new] counsel." Ex. 16 at 1 (June 17,

2024 Ltr.). Throughout the summer and early fall, SaveOn pressed J&J to provide the accurate hit

counts needed to facilitate negotiation, but J&J did not do so. *See* Oct. 7, 2024 Ltr. at 2-4.

On October 7, 2024, SaveOn reported to Your Honor that J&J had made its "refresh" pro-

duction on August 29, 2024 but that "J&J had not produced any documents from the New Trial-

Card Custodians, has not told SaveOn that it has run the requested additional CAP-related searches

for the Original TrialCard Custodians or obtained the requested documents regarding the CAP

program from TrialCard, and has not provided accurate hit counts of the documents identified by
SaveOn's proposed search terms." *See* Oct. 7, 2024 Ltr at 2.

      J&J submitted a response on October 10, 2024. J&J did not contest that it had failed to
produce the requested CAP-related documents or provide the requested hit counts. Oct. 10, 2024
Ltr. J&J asserted that while Your Honor had "ruled that JJHCS has the legal right to request certain
documents from TrialCard," because J&J "does not have physical access to TrialCard's docu-
ments[,] … JJHCS can only *ask* TrialCard to provide it with documents relating to its work for
JJHCS, pursuant to the MSA." Oct. 10, 2024 Ltr. at 6 (original emphasis).[2] J&J concluded: "If
SaveOnSP is unsatisfied with the inefficiency of the process it has insisted upon—that is, only
seeking TrialCard documents indirectly through JJHCS pursuant to JJHCS's audit rights under the
MSA—SaveOnSP retains the option of seeking documents directly from TrialCard pursuant to its
pending Rule 45 subpoenas." *Id.*

      On October 18, 2024, SaveOn asked J&J to "provide the requested hit counts promptly;
commit to completing negotiations over the scope of production from TrialCard by November 1,
2024; and commit to producing the requested documents by December 1, 2024." Ex. 18 (Oct. 18,
2024 Ltr.). J&J refused, arguing that it "cannot commit to producing the requested documents" by
a date certain because "these are documents that JJHCS does not possess." Ex. 19 at 1 (Oct. 23,
2024 Ltr.). J&J said: "If SaveOnSP believes that the current process is inefficient … it only has

---

[2] *See also* Ex. 17 at Aug. 8, 2024 Email From J. Chefitz to H. Miles ("As we have repeatedly
explained, JJHCS has no physical control over TrialCard's files. … We have done what Judge
Wolfson directed, which is to make a request of TrialCard pursuant to the MSA."); *id.* at Aug. 6,
2024 Email from J. Chefitz to H. Miles ("We reiterate that TrialCard is an independent entity and
JJHCS does not physically control TrialCard's files.").

Hon. Freda L. Wolfson                                                                    Page 5

itself to blame. It was SaveOnSP's choice, not JJHCS's to seek TrialCard documents indirectly

from JJHCS via the MSA." *Id.* at 2.

      SaveOn now moves to compel.

**Argument**

      J&J does not appear to have accepted Your Honor's ruling that it legally controls Trial-

Card's documents regarding TrialCard's work for J&J. As Your Honor stated: "I don't want you

[J&J's attorneys at Patterson] to be misunderstanding. It's as counsel for J&J that you're confer-

ring, once I find control." May 23, 2024 Tr. at 49:6-8. Yet J&J asserts that it can only "ask" Trial-

Card for the documents because J&J does not possess physically possess them. Oct. 10, 2024 Ltr.

at 6.

      In fact, a party "cannot claim that it does not physically possess a document as a basis for

rejecting a request for production if that party has the legal right to obtain that document." *Zaloga*

*v. Borough of Moosic*, 2012 WL 1899665, at *2 (M.D. Pa. May 24, 2012); *see also* Handbk. Fed.

Civ. Disco. & Disclosure § 9:13 (4th Ed.) ("Possession by … a third party of the document …

required to be produced cannot be used as a means of avoiding compliance with a direction for its

production. The true test is control, not possession." (quotation omitted)).

      Courts in this District routinely hold that parties cannot refuse to produce evidence that

they legally control on the basis that they do not physically possess it. *See, e.g.*, *Indemnity Ins. Co.*

*of N.A. v. Electrolux Home Prods., Inc.*, 520 F. App'x 107, 111 (3d Cir. 2013) (affirming adverse

spoliation inference where plaintiff failed to produce evidence that it legally controlled but did not

physically possess); *First Sr. Fin. Grp. LLC v. Watchdog*, 2014 WL 1327584, at *6 (E.D. Pa.

Apr. 3, 2014) (imposing monetary sanctions on party whose documents were deleted from her

computer, even though she did not physically possess the computer at the time of destruction,

because she legally controlled it); *see also United States v. Approx. $7,400 in U.S. Currency*, 274

5

F.R.D. 646, 648 (E.D. Wis. 2011) ("To the extent that [a party] has not produced subject docu-

ments that are within her legal control, she must do so, even if she does not currently have physical

possession of them.").

Courts also routinely hold that it is not enough for a party with legal control of documents

simply to ask the entity that physically possesses them to turn them over and leave it at that—the

party must use all means at its disposal to secure and produce them. In *Haskin v. First American*

*Title Insurance Co.*, for example, the court rejected the defendant's argument that "it should not

be compelled to produce the requested [documents] because it cannot 'force' its agents to comply,"

because the defendant could "claim that the agent breached its contract if the agent does not pro-

duce the requested file." 2012 WL 5183908 at *4 (D.N.J. Oct. 18, 2012). In *In re Auction Houses*

*Antitrust Litigation*, similarly, the court rejected the defendant's argument that it complied with its

production obligations by asking a third-party for information that the third-party was contractu-

ally obligated to provide, holding that the defendant "certainly has not exhausted the means at its

disposal to procure a response from [the third party,]" such as threatening to cease payments to the

third party under their contract or considering its indemnification obligation as unenforceable in

light of the third-party's position. 196 F.R.D. 444, 445-46 (S.D.N.Y. 2000).

And in *Chevron Corp. v. Donzinger*, after a third party refused to turn over documents to

the defendants that the defendants legally controlled, the court rejected the defendants' argument

that they had fulfilled their obligations by asking the third-party for the documents. 296 F.R.D.

168, 217-19 (S.D.N.Y. 2013), *aff'd* 833 F.3d 74, 146-49 (2d Cir. 2016). The court held: "There

are myriad other ways defendants could have attempted to obtain the … documents" including

"threaten[ing] to sue or fire [the non-party] for his refusal to provide them with the documents so

they could comply with this Court's order, despite that his refusal constituted a breach of his re-tainer agreement." *Id.* at 217. But the defendants "failed to pursue any of the other options available to [them] to comply with the Court's order," including "attempt[ing] to enforce [their] contractual rights to access the documents," "initiat[ing] legal action against [the non-party]," "dischar[ing] or stop[ping] paying [the non-party] for their failure to provide [them] with the documents." *Id.* at 218. "Instead, [defendant] continued to fund their operation [and] supervise or assist in their work." *Id*. Because the defendants failed to take sufficient steps to produce the documents, the court con-cluded that it had discretion to infer that the evidence not produced "would have been unfavorable to them." *Id.* at 222-23.

J&J similarly has many means of obtaining the documents SaveOn has requested beyond simply asking TrialCard for them. J&J could sue to enforce the MSA's audit provision, Ex. 2 § 17 (2024 MSA), which Your Honor found establishes that J&J has control over TrialCard's relevant documents, May 23, 2024 Order at 9-10. J&J could also sue to enforce Section 6.9 of the MSA, which requires TrialCard to ███████████████████████████████████████████ ████████████████████████████████████████ Ex. 2 § 6.9, or sue to enforce Section 8.2, which requires TrialCard to ██████████████████████████████████████ ████████████████████████████████ *id.* at § 8.2, both of which TrialCard has violated by unreasonably delaying its production of documents. J&J could also cease payments to TrialCard for its services until it complies with its obligations under the MSA, or tell TrialCard ████████ ████████████████████████████, *id.* at § 8, ████████████ given TrialCard's refusal to cooperate. But J&J has done nothing but "ask" and then shrug its shoulders when TrialCard fails to cooperate.

J&J's assertion that its failure to produce documents that Your Honor compelled it to pro-duce five months ago is somehow *SaveOn's* doing is simply untrue. For a year and a half, Trial-Card, represented by Patterson, withheld documents that SaveOn had requested in third-party sub-poenas and refused to consent to have disputes over those subpoenas heard by Your Honor. *See* Apr.19, 2024 Mot. to Compel at 11. Yet now that Your Honor has ruled that J&J has legal control over TrialCard's documents regarding its work for J&J and compelled it to produce them, J&J says (without apparent irony) that the solution to its failure to produce the documents is for SaveOn to enforce its third-party subpoenas against TrialCard—the same subpoenas that TrialCard vehe-mently resisted when it was represented by J&J's counsel in this case. In fact, the solution is for J&J to comply with Your Honor's order.

J&J's stonewalling is especially inappropriate because, even as it withholds the requested TrialCard documents, J&J demands that Your Honor cut off SaveOn's ability to raise discovery disputes or to serve follow-up discovery requests, *see* Oct. 11, 2024 Tr. at 105:23-106:5, running out the clock on Your Honor's ability to compel J&J to comply with Your Honor's ruling. J&J asked Your Honor to order SaveOn to present all disputes within 60 days of the last hearing, or by December 15, 2024, *id.*, while at the same time refusing to commit to producing the TrialCard documents by December 1, 2024, Ex. 19 (Oct. 23, 2024 Ltr.). SaveOn needs time to receive the requested documents, review them, and serve any follow-up requests based on that production. The best way to move this case forward is for J&J to comply with Your Honor's order—quickly—not to cut off discovery while J&J withholds critical documents.

SaveOn asks Your Honor to order J&J to produce the requested CAP-related documents within two weeks of Your Honor's resolution of this motion. To ensure that J&J does so, it should

Hon. Freda L. Wolfson                                                                                        Page 9

complete negotiations with SaveOn about custodians and search terms for this production within

one week of the resolution of this motion.

SaveOn appreciates Your Honor's attention to this matter.

Respectfully submitted,

/s/ E. Evans Wohlforth, Jr.
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

**Exhibits 1-2**
**CONFIDENTIAL – FILED UNDER SEAL**

# Exhibit 3

## Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 6, 2023

Harry Sandick
(212) 336-2723
hsandick@pbwt.com

<u>By Email</u>

Meredith Nelson, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104
mnelson@selendygay.com

Re:     ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC***
***(Case No. 2:22-cv-02632-JMV-CLW)***

Dear Meredith:

We write in response to your December 21, 2022 letter concerning Johnson & Johnson Health Care Systems Inc.'s ("JJHCS") Responses and Objections to Save On SP, LLC's ("SaveOnSP") First Set of Requests for Production.

As an initial matter, we note that the responses set out below are subject to ongoing factual investigation and document collection efforts. We reserve all rights to revise or amend these responses as necessary. Further, none of the responses set out below are intended to waive any of the general or specific objections or limitations provided in JJHCS's Responses and Objections to SaveOnSP's First Set of Requests for Production, or to suggest that responsive documents exist with respect to particular requests.

## I.    GENERAL ISSUES

### A.    Definition of "Janssen Drugs"

We objected to the term Janssen Drugs "to the extent it purports to include drugs that are not covered by CarePath." You ask us to clarify whether the drugs BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA are covered by CarePath. We write to confirm our understanding that patient assistance for these drugs is covered by CarePath.

### B.    Time Period

We objected to SaveOnSP's requests to the extent that they sought documents from before January 1, 2017. SaveOnSP seeks documents for many requests dating as far back

Meredith Nelson, Esq.
January 6, 2023
Page 2

as 2009.  We do not see the basis for extending the relevant time period beyond 2017, but would like to further understand your position as part of the meet-and-confer process.

For example, you assert that you are entitled to documents about the budgeting and development of CarePath from its inception, as well as the budgeting and development of any predecessor of the CarePath program, in order to "investigate JJHCS's assertions that SaveOnSP's services make CarePath financially unviable."  JJHCS's assessment that SaveOnSP's services "jeopardiz[e] the viability of patient assistance programs like CarePath by making them prohibitively expensive," Compl. ¶ 114, is one that you are free to probe in depositions and at trial, but it self-evidently turns on the added expenses caused by SaveOnSP, and all documents about the developing and budgeting of the program have no proportionate relationship to that general proposition.  Moreover, JJHCS has already agreed to search for and produce documents that will show that SaveOnSP is making CarePath prohibitively expensive, including, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath."  *See* R&Os to Requests 25, 27, 29.  Please explain why those documents, which include budget and harm-related materials, do not suffice.

Further, you claim that you need documents about CarePath's budget and cost for nearly a decade before SaveOnSP began operations, which we understand occurred in or about November 2017, when SaveOnSP executed its Master Program Agreement with Express Scripts Inc.  Please explain how CarePath's budget and development prior to 2017—a time when SaveOnSP did not exist—is relevant to investigating SaveOnSP's effect on CarePath's financial viability in the future.  Please also explain how the budgeting and development of any predecessors of the CarePath program, which only came into existence in 2015, has any bearing on the present dispute.

You also claim that you need documents from prior to 2017 in order to investigate whether "CarePath was designed solely to help patients, not to financially benefit JJHCS."  Please direct us to where JJHCS has claimed that CarePath was designed "solely to help patients" and "not to financially benefit JJHCS."  Please also explain why documents prior to 2017 are needed to make such an assessment.

Finally, you claim that you are entitled to documents relating to CarePath's terms and conditions from before 2017 to "fully assess the meaning and materiality of the terms and conditions at issue in this case, as decisions about many of these terms likely predate 2017."  Please explain what "decisions" prior to 2017 are relevant to this case, which concerns only whether SaveOnSP wrongfully induced patients to breach CarePath's actual terms and conditions during the time period when SaveOnSP was in operation.  Please also explain why SaveOnSP believes it needs additional documents apart from the final terms and conditions.  In any event, on this point, to the extent that SaveOnSP is willing to produce internal documents

Meredith Nelson, Esq.
January 6, 2023
Page 3

that it has thus far declined to produce, we are willing to discuss an appropriate compromise involving production from each side.

### C.    Documents in the Possession of JJHCS

You asked whether documents created or held by employees of entities other than JJHCS "within the J&J corporate family or involved in the administration of CarePath, including Janssen, CarePath Care Coordinators, JJHCS Hub Entities, Lash Group, and Trial Card" are in JJHCS's possession, custody, and control, and would accordingly be produced by JJHCS.

With respect to entities in the J&J corporate family, we plan to generally limit our production to documents in JJHCS's possession alone. The J&J corporate family consists of more than 140,000 employees who work at over 200 subsidiaries and affiliates across the world. Collecting and producing documents from all of these individuals and entities would be burdensome and disproportionate to the needs of this case. JJHCS is the sole corporate entity charged with administration of CarePath, and so it is incumbent on SaveOnSP to explain why the collection and production of documents outside of JJHCS is necessary and proportionate to the needs of this case. Please provide such an explanation to us, including an explanation of which of the J&J affiliates and subsidiaries you believe are likely to have relevant documents.

In addition, with respect to entities outside of the J&J corporate family, JJHCS objects to SaveOnSP's definition of "JJHCS Hub Entities" for a number of reasons, including to the extent it purports to include entities other than those responsible for administering CarePath during the relevant Time Period. Nevertheless, notwithstanding such objections, JJHCS will work with Trial Card, a third-party vendor with responsibility for the administration of CarePath during the relevant Time Period, to facilitate production of documents responsive to SaveOnSP's requests.

## II.    ISSUES RELATED TO SPECIFIC REQUESTS

### A.    Request Nos. 1-7, 35

SaveOnSP's Request Nos. 1-7 seek organizational charts, including charts for entities other than the JJHCS groups responsible for administration of CarePath. Request No. 35 seeks "documents sufficient to identify all JJHCS Hub Entities and CarePath Coordinators."

In response to Requests Nos. 1-7, JJHCS agreed to produce documents "sufficient to show the organizational structure of the JJHCS groups responsible for the administration of CarePath for the relevant Time Period." In response to Request No. 35, JJHCS agreed to produce "non-privileged documents in its possession sufficient to identify the entities responsible for administering CarePath during the relevant Time Period." We also note that while JJHCS will not produce organizational charts for Trial Card, we will work with Trial Card to facilitate production of such documents, to the extent they exist and can be located by a reasonable search.

Meredith Nelson, Esq.
January 6, 2023
Page 4

Please explain the basis for SaveOnSP's request that we collect and produce documents beyond this so that we can better understand your position.

We would also like to more fully understand the reasons you provided for why you need organizational charts beyond what JJHCS has agreed to produce. You claim that "SaveOnSP needs documents relating to CarePath's development, so that it can test JJHCS's assertion that CarePath was developed solely to benefit patients and not to benefit JJHCS financially." As requested in Section I.C, *supra*, please direct us to where JJHCS has claimed that CarePath was designed "solely to benefit patients" and "not to benefit JJHCS financially." Regardless, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to CarePath's finances, so it can test JJHCS's assertion that SaveOnSP's conduct financially harms CarePath and threatens its financial viability." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether SaveOnSP's wrongful conduct financially harms CarePath and threatens its financial viability. Again, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the marketing of CarePath, so it can explore whether JJHCS's marketing caused any of the purported patient confusion that JJHCS attributes to SaveOnSP." The patient confusion alleged in the Complaint is that created by SaveOnSP when pharmacies refuse to fill prescriptions at the point of sale unless those patients enroll with SaveOnSP. Compl. ¶ 88. Please explain your factual basis for claiming that such patient confusion could reasonably be attributed to JJHCS's marketing efforts. In particular, please direct us to specific instances of confusion identified in the complaint that could reasonably be attributed to specific CarePath's marketing efforts. Otherwise, this provides no basis for additional organizational charts.

You claim that "SaveOnSP needs documents relating to the sale, pricing, and marketing of Janssen Drugs so that it can evaluate the relationship between CarePath and JJHCS's financial performance, including how JJHCS sets prices for Janssen Drugs (thus increasing costs for health plans and patients)." Please explain how Janssen's drug sales, pricing, or marketing are related to the claims or defenses in this action, which concern SaveOnSP's misconduct in extracting funds from CarePath. Please also explain how Janssen's conduct is relevant in any way to this action. Again, this provides no basis for additional organizational charts. Further, even assuming that these points were relevant, SaveOnSP and its health plan partners already have access to extensive information concerning the pricing of Janssen Drugs, based on their own reimbursement records for those Drugs.

Meredith Nelson, Esq.
January 6, 2023
Page 5

You claim that "SaveOnSP also needs documents relating to the drafting of JJHCS's terms and conditions, which JJHCS alleges that SaveOnSP induced patients into breaching." Please explain why the drafting of the terms and conditions with which patients must comply is relevant to this action which is based on whether SaveOnSP has engaged in wrongdoing when it strong-arms patients into breaching those terms and conditions. On this point again, however, to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce, we are willing to discuss a compromise.

**B.     Request No. 11**

SaveOnSP's Request No. 11 seeks documents "regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs." JJHCS offered to "meet and confer to determine if this Request can be appropriately narrowed." We do not currently see the basis for producing the materials you request, but are willing to continue to discuss the merits of this Request.

You claim that documents pertaining to the "development, marketing, and management of [other copay assistance programs offered for Janssen Drugs,] as well as of CarePath itself, are relevant to refuting: JJHCS's assertions that SaveOnSP's services increase the cost and threaten the continued viability of 'patient assistance programs like CarePath by making them prohibitively expensive.'" Compl. ¶ 114.

With respect to CarePath, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why SaveOnSP needs documents beyond this to analyze whether its services increase the cost of CarePath and threatens its financial viability.

With respect to the reference to "patient assistance programs like CarePath" in Compl. ¶ 114, that is a general reference to patient assistance programs across the industry, not other patient assistance programs for Janssen Drugs. As you know, SaveOnSP targets the patient assistance programs of other drug manufacturers as well. JJHCS reasonably infers that SaveOnSP's services harm those programs in ways similar to how they have harmed CarePath. We do not see how the "development, marketing and management" of those programs is relevant to that inference of harm, but invite you to explain.

You also claim that such documents are relevant to "JJHCS's assertion that any increase in the cost of copay assistance programs amounts to a public harm." JJHCS claims that SaveOnSP causes public harm by "causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare

Meredith Nelson, Esq.
January 6, 2023
Page 6

needs more expensive by not counting any of the funds spent on patients' medication towards their ACA maximum or deductible." Compl. ¶ 114. Please direct us to where JJHCS alleges that "*any* increase in the cost of copay assistance amounts to a public harm." (emphasis added). Please also explain how the "development, marketing and management" of such programs is relevant to whether an increase in their costs amounts to a public harm.

You also claim that such documents are relevant to "JJHCS's assertion that SaveOnSP induces patients to breach CarePath's terms and conditions and deceives patients by failing to inform them of that alleged breach." Please explain how documents relating to the "development, marketing and management" of CarePath, let alone other programs, is relevant to whether SaveOnSP induces patients to breach CarePath's terms and conditions. Please also identify the elements in the relevant claims or defenses to which such documents are material.

C.     **Request Nos. 12 and 13**

SaveOnSP's Request Nos. 12 and 13 seek documents regarding CarePath's terms and conditions and the CarePath requirement that patients enrolled in CarePath make payments toward Janssen Drugs. JJHCS agreed to produce documents "sufficient to show all final versions of CarePath's terms and conditions for each Janssen Drug during the relevant Time Period."

Seeking additional documents beyond what JJHCS has promised to produce, you claim "JJHCS's understanding of the terms and conditions in its CarePath contracts and the drafting of those terms and conditions is relevant to whether SaveOnSP induced patients to breach them, a central point for JJHCS's tortious interference claims. Compl. ¶ 109." As noted in Sections I.B and II.A, *supra*, whether there has been a breach is dependent on SaveOnSP's conduct and the final terms themselves, not the back-story of the drafting of the terms and conditions. Nonetheless, so that we can consider your demand more precisely, please identify which terms you believe are relevant but also unclear or ambiguous on their face such that consideration of extrinsic evidence, such as the drafting history of the terms and conditions, is relevant to this action. Again, we are willing to discuss a compromise on this point to the extent that SaveOnSP is willing to produce internal documents that it has thus far declined to produce.

D.     **Request No. 14**

SaveOnSP's Request No. 14 seeks documents relating to JJHCS's and other entities' "understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations." You claim JJHCS refused to produce any documents in response.

You have misstated JJHCS's response. JJHCS did not refuse to produce any documents in response to RFP No. 14. We agreed to search for and produce "all non-privileged documents and communications in its possession regarding SaveOnSP's designation of specialty

Meredith Nelson, Esq.
January 6, 2023
Page 7

drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations during the relevant Time Period." *See* R&O to Request No. 14. Subject to the objections laid out in JJHCS's Responses and Objections, JJHCS will produce such documents. We hope this clarification resolves your concerns, but if there are additional documents SaveOnSP believes it requires, please let us know.

### E.    Request Nos. 20, 41, 43

SaveOnSP's Request Nos. 20, 41, and 43 seek documents concerning "Copay Accumulator Services and Copay Maximizer Services." JJHCS in response agreed to produce documents relating to SaveOnSP.

You claim that documents relating to "Copay Accumulator Services" and "Copay Maximizer Services" are relevant "because JJHCS has in its complaint blurred the lines between SaveOnSP, accumulators, and maximizers. *See, e.g.*, Compl. ¶ 74. Thus, documents related to JJHCS's understanding of accumulators and maximizers are also relevant to its understanding of SaveOnSP's business and the impact of that business on JJHCS."

First, please explain how JJHCS's understanding of accumulators and maximizers in general is relevant to the claims or defense in this action. Please identify the elements of any claims and defenses and explain the relevance of these requested documents to those elements. Second, please explain why you need documents from JJHCS to refute an allegation that SaveOnSP falls into the category of programs described in the article cited in Compl. ¶ 74. Please explain why SaveOnSP needs documents from JJHCS in order to compare the contours of its own program, as borne out by its own documents and other information within SaveOnSP's control, against the descriptions in that article.

### F.    Request No. 21

SaveOnSP's Request No. 21 concerns "any advocacy to or communications with any governmental or regulatory body regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer." Based on, *inter alia*, relevance and privilege, JJHCS declines to produce documents in response to this Request.

You claim that "JJHCS's lobbying campaign is, at a minimum, relevant to showing that public confusion about SaveOnSP's services is the result of actions by JJHCS and its allies, not SaveOnSP." As noted in Section II.A, *supra*, the Complaint alleges that SaveOnSP confuses patients in part by creating rejections and delays at the point of sale. Compl. ¶ 88. Please explain how such confusion could reasonably be attributed to any lobbying efforts by JJHCS. In addition, please direct us to instances of confusion identified in the Complaint that could reasonably be attributed to any lobbying efforts as opposed to the conduct of SaveOnSP and its partners.

Meredith Nelson, Esq.
January 6, 2023
Page 8

You also claim that "such communications may also show JJHCS's understanding of whether SaveOnSP violates the Affordable Care Act by advising plans to designate certain drugs as Non-Essential Health Benefits."  Please explain how lobbying efforts are relevant to this question, as whether SaveOnSP violates the Affordable Care Act is a question of law.

Finally, please explain how requests for documents concerning JJHCS's lobbying of government officials are permissible given that JJHCS has a privilege against the production of documents that would unjustifiably burden its First Amendment right to political association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958).

### G.    Request No. 25

SaveOnSP's Request No. 25 seeks "all Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 110, 115."  JJHCS agreed to produce "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period, including the extent to which SaveOnSP has caused JJHCS to pay more in copay assistance that it otherwise would have."

You ask us to confirm whether "based on its response JJHCS is producing fully in response to this Request."  Without waiving the objections and limitations in its response, JJHCS intends to search for and produce the documents and communications it identified in its response.  We are happy to meet and confer should you have specific questions.

### H.    Request No. 26

SaveOnSP's Request No 26 seeks "documents and communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum."  In its Responses, JJHCS objected to this Request on the grounds that it was vague and ambiguous and declined to produce any documents in response to this Request.

You now clarify that this Request "seeks documents and communications that reflect any payments for Janssen Drugs made by JJHCS, Janssen, or any Hub Entity on behalf of patients, both in the ordinary course of providing copay assistance and in any instance where such entity covered a patient's copay for a Janssen Drug in excess of what it otherwise would have under CarePath's terms and conditions."

JJHCS has agreed to produce documents sufficient to show "how JJHCS determines the amounts of copay assistance funds that JJHCS offers to Patients enrolled in CarePath.  *See* R&O to RFP No. 29.  Please let us know if that is sufficient or otherwise identify the claims or defenses for which SaveOnSP believes it needs documents beyond that.  Please also let us know the rationale for seeking a broader production than what JJHCS has proposed.

Meredith Nelson, Esq.
January 6, 2023
Page 9

## I.        Request No. 28

     SaveOnSP's Request No. 28 seek a variety of categories of data relating to both Janssen Drugs (items a. through g.) and CarePath (items i. through m.). JJHCS does not believe that documents unrelated to SaveOnSP's misconduct, such as documents relating to the sales and marketing budgets for Janssen drugs, are relevant to this action, but nevertheless agreed to produce "Janssen Transparency Reports." JJHCS also said it is willing to meet and confer regarding items i. through m.

     You wrote that JJHCS's does not define the term "Janssen Transparency Reports" or clarify what responsive data is contained in those reports. To clarify, those Reports summarize, *inter alia*, changes in Janssen drug prices, the amount of rebates paid for Janssen Drugs and total spend on CarePath patient assistance. An example of such a report can be found here: *The 2021 Janssen U.S. Transparency Report*, JANSSEN PHARM., INC. (2022), https://transparencyreport.janssen.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000.

     You claim further that the data "SaveOnSP seeks is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. We invite you to explain why it is necessary for SaveOnSP to also receive additional data, including, for the last thirteen years, (i) a listing of "all patients receiving a Janssen Drug," (ii) "the number of fills of the Janssen Drug each received by each such Patient," (iii) "the dosage of the Janssen Drug received by each such Patient for each fill," (iv) "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," as well as the other revenue and cost data. In particular, please explain how a request for the names of each and every of the tens of millions of patients who have received Janssen therapies over the past thirteen years is a proportional request for information given the claims and defenses at issue in this action, to the extent that JJHCS even has the data that SaveOnSP seeks. We are interested to understand your rationale for this Request and to hear your explanation for why it is proportionate to this action, particularly in light of the fact that, as explained above, SaveOnSP and its health partners already have substantial information about the pricing of Janssen Drugs based on their own claims and reimbursement data.

     You claim further that "there are clear parallels between the data SaveOnSP seeks in RFP No. 28 and the data JJHCS seeks in its RFP Nos. 41 and 42" and "invite[] JJHCS to meet and confer." We do not understand this comparison but are willing to meet and confer to discuss this Request further.

Meredith Nelson, Esq.
January 6, 2023
Page 10

### J.    Request No. 29

SaveOnSP's Request No. 29 seeks documents relating to CarePath's finances. JJHCS in response agreed to produce documents sufficient to show "(1) how JJHCS determines the amount of copay assistance funds that JJHCS offers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance through CarePath, and (3) JJHCS's actual and projected annual costs for CarePath."

You claim that these documents are insufficient because the additional documents SaveOnSP seeks, "including information on JJHCS's return on investment for CarePath, is relevant to refuting JJHCS's claims that SaveOnSP threatens the viability of CarePath and causes it financial harm." The documents JJHCS has agreed to produce, including the CarePath budget and actual costs, are sufficient to show the threat SaveOnSP poses to CarePath. We invite you to explain how further documents, including JJHCS's supposed "return on investment," are relevant or necessary, or how it is proportionate.

You also claim that additional data is necessary to dispute "JJHCS's claim that CarePath is designed to help patients and not simply J&J's bottom line." As noted in Section I.C and Section II.A, *supra*, please direct us to where JJHCS has claimed that CarePath was not "designed to help . . . J&J's bottom line."

### K.    Request No. 30

SaveOnSP's Request No. 30 seeks "for each year for each Janssen Drug, all Documents and Communications regarding the basis for Janssen's decision to raise or lower the price of the Janssen Drug, including labor or manufacturing costs or the increase in efficacy of the Janssen Drug." JJHCS declined to produce any documents in response to this Request.

You claim that the documents requested are "relevant to JJHCS's allegations that SaveOnSP's conduct threatens the viability of copay assistance" and that it has "suffered monetary losses as a result of SaveOnSP's conduct." As noted above, JJHCS has agreed to search for and produce, *inter alia*, "all non-privileged documents and communications in its possession relating to the extent of the harm SaveOnSP has caused JJHCS during the relevant Time Period," "the data that formed the basis for the allegations in Complaint ¶¶ 92-100," "JJHCS's budget for copay assistance through CarePath," and "JJHCS's actual and projected annual costs for CarePath." *See* R&Os to Requests 25, 27, 29. Please explain why it is necessary for SaveOnSP to obtain documents relating to "Janssen's decision to raise or lower the price of" to further probe those allegations.

You also claim that such documents are relevant to JJHCS's allegations that "copay assistance programs like CarePath are a public good" and "that the threatened viability of copay assistance programs is a public harm." Please explain how "Janssen's decision to raise or lower the price of" its drugs is at all relevant to whether copay assistance programs like CarePath

Meredith Nelson, Esq.
January 6, 2023
Page 11

are a public good.  Please also explain why it is relevant to the claims and defenses in this action whether CarePath and similar programs are a public good.

### L.     Request No. 32

SaveOnSP's Request No. 32 seeks all documents and communications "regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient."  JJHCS declined to produce any documents in response to this Request.

You assert that the requested documents are "relevant to JJHCS's allegations that providing CarePath funds to individuals who do not qualify for CarePath threatens the viability of copay assistance, as well as the significance of the CarePath terms and conditions at issue to JJHCS.  If, for example, JJHCS offered CarePath funds to an individual whom it believed was on a plan that does not comply with the revised Stelara or Tremfya terms, *see* Compl. ¶¶ 102-03, such an offer would be relevant to JJHCS's allegation that providing copay assistance to patients enrolled in such plans threatens the viability of JJHCS's copay assistance."

Even if JJHCS continues to offer copay assistance to a patient who JJHCS believes is enrolled in a health plan that does not comply with the revised Stelara or Tremfya terms, please explain why this would be relevant to the claims at issue in this action.  For example, please explain how JJHCS's willingness to continue to provide copay assistance to a patient who does not comply with the Terms & Conditions would change the fact that SaveOnSP causes JJHCS to spend more in CarePath patient assistance than it otherwise would absent the SaveOnSP program.  That a plaintiff does not enforce a term in its contract is no defense to a claim of tortious interference.  Indeed, New Jersey law is clear that a claim of tortious interference may exist even where the underlying contract is *unenforceable*.  *See, e.g.*, *Halebian N.J. v. Roppe Rubber Corp.*, 718 F. Supp. 348, 360 (D.N.J. 1989) ("That the underlying contract may be unenforceable is no defense to a claim of tortious interference."); *see also Mina L. Smith, Inc. v. Cyprus Indus. Minerals Co.*, 427 A.2d 1114 (N.J. App. Div. 1981) ("Unquestionably, one who unjustifiably interferes with the contract of another is guilty of a wrong.  That the contract may be unenforceable is no defense.").  We invite you to explain further why you believe such information is relevant to the claims or defenses at issue in this action.

### M.     Request No. 34

SaveOnSP's Request No. 34 seeks documents and communications concerning JJHCS's consideration of SaveOnSP's services for its own employer-sponsored health plan. JJHCS declined to produce any such documents.

You claim that "whether JJHCS considered using such services for its own employees is relevant to JJHCS' claims that SaveOnSP harms patients by causing stress and

Meredith Nelson, Esq.
January 6, 2023
Page 12

confusion, increasing costs of other healthcare, and threatening the viability of copay assistance." As you are no doubt aware, Johnson & Johnson did not contract with SaveOnSP. Given this fact, please explain how Johnson & Johnson's employer-sponsored health plan bears on any of these issues, or more generally to the claims and defenses at issue in this action.

**N.    Request No. 36**

SaveOnSP's Request No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS agreed to produce agreements in its possession between it and the entities responsible for administering CarePath for the period of January 1, 2017 to the present.

You wrote to confirm (1) whether this production would encompass "agreements which have in the past administered CarePath, not simply those which currently administer CarePath" and (2) whether JJHCS will produce documents responsive to Request No. 36 that relate to the fair market value of JJHCS's Hub Entities' or CarePath Care Coordinators' services."

We write to confirm that JJHCS intends to produce agreements for entities that have administered CarePath for the period of January 1, 2017 to the present, even if those entities no longer administer CarePath today. Our current understanding is that those agreements will include work orders that document the cost of the services provided. We do not understand any other relevant documents to be responsive to this Request. If you seek any other documents, please let us know and we will consider your request.

**O.    Request No. 37**

SaveOnSP's Request No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." JJHCS declined to produce documents in response to this Request because this Request is irrelevant to the subject matter at issue in this litigation.

You assert that these documents are relevant to JJHCS allegations that SaveOnSP's conduct damages JJHCS, in part because they will "assist in demonstrating that SaveOnSP in fact causes more patients to use Janssen Drugs than would otherwise do so." We do not understand this purported rationale or its connection to this document request. Please explain how this might be the case. We do not understand SaveOnSP to make the decision to prescribe Janssen Drugs, and the "warm transfer" that is a necessary part of SaveOnSP's program will naturally deter some patients from using Janssen Drugs, as the patients are told that such medications are not covered by their health insurance unless additional steps are also taken. We invite you to describe any efforts that SaveOnSP has undertaken to alter individual

Meredith Nelson, Esq.
January 6, 2023
Page 13

prescribing decisions, including whether SaveOnSP collaborates with its health plan partners to require non-medical switching to drugs that SaveOnSP can designate as non-essential health benefits and for which manufacturer patient copay assistance exists.

> **P.    Request No. 38**

SaveOnSP's Request No. 38 seeks all documents and communications "received by JJHCS from any JJHCS Hub Entity or sent by JJHCS to any JJHCS Hub Entity regarding SaveOnSP or CarePath." As noted in our initial Responses, JJHCS agreed to produce all documents responsive to this Request regarding SaveOnSP. *See* Response to Request Nos. 8, 38.

You wrote to confirm that JJHCS will produce documents responsive to this Request regarding CarePath generally. Please explain why a Request that seeks all documents "regarding CarePath" and would necessarily encompass all documents exchanged between JJHCS and any entity with whom JJHCS contracts or partners with to administer CarePath is not overbroad or why complying with it would not be unduly burdensome. Given the Federal Rules' emphasis on proportionality, please also explain how such burdensome discovery would be proportional to SaveOnSP's needs in this action. *See* Fed. R. Civ. P. 26(b)(1).

> **Q.    Request No. 42**

SaveOnSP's Request No. 42 seeks all documents and communications "relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms 'copay accumulator' and 'copay maximizer.'" JJHCS responded that it would produce all non-privileged documents and communications in its possession for the period of January 1, 2017 to the present relating to JJHCS's understanding of whether the terms "copay accumulator" or "copay maximizer" apply to SaveOnSP.

You wrote to inquire whether we would produce all documents and communications concerning those terms more generally. You assert that such documents are "relevant to whether JJHCS knowingly contributes to the alleged patient stress and confusion that it attempts to attribute to SaveOnSP by conflating SaveOnSP's conduct with that of 'maximizers' and 'accumulators,' including potentially harmful conduct commonly associated with 'copay accumulators' such as non-medical switching."

We do not understand your assertions. This action concerns SaveOnSP's scheme to extract patient copay assistance funds in violation of the CarePath terms and conditions. The patient harms, including patient "stress and confusion," flow from how SaveOnSP operates its profit-seeking scheme, not from any entity's abstract understanding of the meaning of the terms "copay accumulator" or "copay maximizer." In light of this, please explain how JJHCS's, a third-party vendor's, or partner's understanding of these terms generally would be relevant to the claims at issue in this action.

* * *

Meredith Nelson, Esq.
January 6, 2023
Page 14

We are available to meet and confer regarding the issues outlined above at your convenience.  We look forward to your response.

Very truly yours,

Harry Sandick

# Exhibit 4

Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

selendy
gay
elsberg

Meredith Nelson
Associate
212 390 9069
mnelson@selendygay.com

February 7, 2023

**Via E-mail**

Anthony LoMonaco
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
alomonaco@pbwt.com

Re:  ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC*** **(Case No. 2:22-cv-02632-JMV-CLW)**

Dear Anthony,

We write to memorialize and follow up on our January 30, 2023 meet and
confer regarding Save On SP LLC's ("SaveOnSP") Requests for Production to John-
son & Johnson Health Care Systems, Inc. ("JJHCS"), as well as JJHCS's January
27, 2023 letters and JJHCS's Responses and Objections to SaveOnSP's First Set of
Interrogatories.

**I.    Global Issues**

**A.    Documents Related to the Development and Marketing of
CarePath and SaveOnSP's Financial Impact on JJHCS and
CarePath (RFP Nos. 11, 26, 28-30, and 36-37)**

We explained, as we have before, that SaveOnSP's RFP Nos. 11, 26, 28-39,
and 36-37 seek information relevant to SaveOnSP's defenses, including rebutting
JJHCS's allegations that CarePath is intended to help patients afford their medi-
cations, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the
continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114,
and that the threat to CarePath's viability constitutes a public harm for purposes
of JJHCS's GBL § 349 claim, *id.* SaveOnSP also seeks this information to discover
whether, because of SaveOnSP, Johnson & Johnson ("J&J") sold more drugs and
reaped more profits than it otherwise would have, which would be relevant to
JJHCS's claim of damages.

Anthony LoMonaco
February 7, 2023

These documents and communications are also relevant on three additional grounds.

*First*, JJHCS has asserted that it needs a wide range of documents and communications from SaveOnSP to assess the "wrongfulness" of SaveOnSP's conduct. In the context of a tortious interference claim, wrongfulness or malice "means that the harm was inflicted without justification or excuse." *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 564-65 (D.N.J. 2002) (citing *Printing Mart-Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). The standard is commercial in nature—asking whether the "loss of business is merely the incident of healthy competition." *Id.* at 565 (quoting *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001)). If JJHCS is permitted to seek broad discovery into the supposed wrongfulness of SaveOnSP's conduct, then SaveOnSP should also be permitted to seek discovery that will allow it to explain the broader context in which it operates, including the untenable position in which J&J and other pharmaceutical companies have placed health plans by raising specialty drug prices to extraordinary heights. *See id.*; *Hotaling & Co., LLC v. Berry Sols. Inc.*, 2022 WL 4550145, at *4 (D.N.J. Sept. 29, 2022) (noting that defendants may contest a tortious interference with contract claim by justifying their "motive[s] and purpose," in addition to "the means used" (quoting *Lamorte Burns & Co.*, 770 A.2d at 1171)).

*Second*, JJHCS has argued that SaveOnSP causes patient harm by making health care more expensive for patients. Compl. ¶ 114. SaveOnSP is entitled to discovery showing that JJHCS and J&J are the true drivers of increasing health care costs by driving up drug prices and, as a result, forcing health plans to offset those increased costs by raising patient deductibles and copays.

*Third*, JJHCS seeks injunctive relief in addition to damages. To obtain a permanent injunction, JJHCS must demonstrate "(1) it will suffer irreparable injury, (2) no remedy available at law could adequately remedy that injury, (3) the balance of hardships tips in its favor, and (4) an injunction would not disserve the public interest." *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). SaveOnSP is entitled to discovery that will enable it to refute each of those elements, including to support its theory that JJHCS uses CarePath as a marketing tool that distorts patient incentives and allows Janssen to raise the cost of its drugs year after year. This defense is relevant to both the balance of the equities and whether the public interest supports the permanent injunction JJHCS seeks.

JJHCS stated that it will not produce documents responsive to these Requests because it does not believe the information sought is relevant. We understand that the parties are at impasse on this issue and may present this dispute to the Court for resolution.

2

Anthony LoMonaco
February 7, 2023

### B.     JJHCS Hub Entities, Janssen, and Other J&J Entities

During our meet and confer, we further discussed your positions with re-
spect to SaveOnSP's requests for documents and communications possessed by the
JJHCS Hub Entities and all other J&J and Janssen entities. These issues also bear
on JJHCS's responses to SaveOnSP's Interrogatories.

### 1.     Documents Of JJHCS Hub Entities

SaveOnSP seeks documents and communications from any JJHCS Hub En-
tity that was or is involved in the development, administration, or marketing of
CarePath.

*First*, during our meet and confer, you told us for the first time that docu-
ments and communications held by Trial Card and Lash Group are not in JJHCS's
possession, custody, or control. SaveOnSP reserves its rights to contest that posi-
tion or to subpoena information directly from Trial Card and Lash Group.

*Second*, although JJHCS previously agreed to "facilitate" the production of
documents from Trial Card and Lash Group, in your January 27, 2023 letter and
during our meet and confer you stated that you now would not facilitate the pro-
duction of documents from Lash Group. You asserted that you "no longer believe
that Lash Group had a comparable role [to Trial Card] in the administration of
CarePath's co-pay assistance program." Jan. 27, 2023 Letter from A. LoMonaco to
M. Nelson at 3. We asked for further information regarding Lash Group's role in
CarePath. You said that while Lash Group may have been involved with CarePath
generally, it was not tasked with enrolling patients in CarePath or assisting patients
with their copay assistance cards, conduct for which you claimed Trial Card was
"the main entity that was responsible." Instead, you maintained, Lash Group pro-
vided other services in connection with CarePath, such as "determining coverage."

SaveOnSP lacks the information necessary to assess whether Lash Group
was in fact involved in the administration of CarePath. If, for example, confirming
that an individual's insurance covered the Janssen Drug they sought to fill was a
prerequisite to providing them with copay assistance, Lash Group's conduct as you
have described it would be part of the "administration" of CarePath. As we stated
during our meet and confer, we request that you provide further information on
Lash Group's involvement with CarePath, including details on the services you
claim Lash Group provided, the relationship between those services and the Care-
Path copay assistance program, and the time period during which Lash Group pro-
vided those services. Please also confirm promptly (1) whether you have completed
your investigation into Lash Group's involvement in CarePath; and (2) whether, as
a result of that investigation, you have changed your position on whether you will
facilitate the production of documents from Lash Group.

3

Anthony LoMonaco
February 7, 2023

*Third*, your letter also states that you are unaware of other entities that "have had a comparable role [to Trial Card] in administering CarePath." *Id.* As we explained during the meet and confer, this statement is not clear. Please tell us whether any entity other than Trial Card was *in any way* involved in enrolling patients in CarePath, assisting patients with their copay assistance cards, or providing any other administrative service which was also provided by Trial Card.

*Fourth*, JJHCS has also refused to produce documents and communications from any other JJHCS Hub Entity, to identify any Hub Entities involved in the development or marketing of CarePath (including stating whether Lash Group was involved in that development or marketing), or to identify any Hub Entities involved in the administration of CarePath prior to 2016.

You assert in your January 27, 2023 letter that "SaveOnSP has not explained how documents related to the development and marketing of CarePath are relevant to this litigation." *Id.* This is untrue. As we explained, such documents are directly relevant to several of SaveOnSP's defenses—including rebutting JJHCS's allegations that CarePath is intended to help patients afford their medications, *see, e.g.*, Compl. ¶ 44, that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," *id.* ¶ 114, and that the threat to CarePath's viability constitutes a public harm for purposes of JJHCS's GBL § 349 claim, *id*—and to contesting JJHCS's asserted damages. *See* Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2; *see also supra* Section I.A.

We therefore reiterate our request that you provide (1) the identities of Hub Entities involved in the development and marketing of CarePath from 2009 to present; and (2) the identities of Hub Entities involved in the administration of CarePath from 2009 to 2016.

*Finally*, you assert, without explanation, that entities that provided "limited, episodic services to JJHCS relating to CarePath are not relevant to the litigation." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 3. Please provide a basis for this representation, including the identity of these vendors and further information on the services provided by these vendors.

## 2. Documents Of J&J and Janssen Entities Other Than JJHCS

SaveOnSP also seeks documents and communications in the possession of Janssen and other J&J entities. As we have explained several times, these entities likely possess relevant documents and communications concerning the development, marketing, and administration of CarePath, as well as the development and marketing of Janssen Drugs. *See, e.g.*, Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2; *see also supra* Section I.A.

Anthony LoMonaco
February 7, 2023

JJHCS refuses to produce documents from any such entities or to provide a list of J&J and Janssen entities that may possess documents responsive to Save-OnSP's Requests for Production. JJHCS has not asserted that it lacks possession, custody, or control over these documents.

In our January 20, 2023 letter and during prior meet and confers, we explained why these entities likely possess relevant documents, including the likelihood that these entities possess documents related to the pricing of Janssen Drugs, the purpose of CarePath, and J&J's return on investment for CarePath. You did not substantively respond to this explanation in your January 27, 2023 letter or in our meet and confer session. Instead, your letter simply maintained that "[t]here is no need for JJHCS to provide any list of entities or for documents from other JJHCS affiliates to be produced" because "JJHCS is the entity that manages Care-Path and … is the only J&J entity that is a party to this action." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 4.

In our meet and confer, you said that JJHCS also objected to our request on both relevance and burden grounds. When we asked you to explain your burden objection, you provided no explanation other than asserting J&J and Janssen are "big companies" with many subsidiaries and employees. As we explained, Save-OnSP is not asking JJHCS to produce documents and communications from every J&J or Janssen entity, nor is it asking JJHCS to identify every J&J or Janssen entity, or every employee of those entities. Rather SaveOnSP seeks the identities of the specific J&J and Janssen entities that were involved in the development, marketing, or administration of CarePath or the development and marketing of Janssen Drugs and for JJHCS to produce relevant documents from those entities. Once you provide a list of those entities and identify relevant custodians and noncustodial sources, the parties can negotiate appropriate search parameters. You asserted (without explaining why) that it would be unduly burdensome for JJHCS to provide a list of such entities. You further asserted that J&J is a public company and that SaveOnSP should identify which entities it believes are relevant, despite our explanation that JJHCS is far better positioned to identify these entities.

Because JJHCS refuses to produce documents from entities other than JJHCS—including other J&J or Janssen entities—or to identify such entities involved with CarePath or Janssen Drugs, we understand the parties to be at impasse at this issue and may present this dispute to the Court.

### 3. Interrogatories Concerning Hub Entities, J&J, and Janssen

SaveOnSP's First Set of Interrogatories seek information on individuals employed by the Hub Entities, J&J, and Janssen. In response to Interrogatories 1, 5, and 6, JJHCS provided information on individuals from JJHCS and Trial Card. In

Anthony LoMonaco
February 7, 2023

response to Interrogatories 2-4 and 7, JJHCS provided information on only individuals from JJHCS.

Based on your similar objection to our RFPs, we understand that JJHCS is refusing to provide the names of responsive individuals who were not employed by JJHCS or Trial Card in response to these Interrogatories on the basis that it views other entities as irrelevant. Please tell us promptly if that understanding is incorrect. Otherwise, we understand the parties to be at impasse at this issue and may present this dispute to the Court.

### C.    Time Period

#### 1.    Documents and Information Back to January 1, 2009 (RFP Nos. 1-7, 11-13, 28-30, and 36-37; Interrogatory Nos. 1-4)

Several of SaveOnSP's document requests and interrogatories seek information dating back to January 1, 2009. As we explained in our prior letter, SaveOnSP selected January 1, 2009 as the starting date for RFP Nos. 1-7, 11-13, 28-30, and 36-37 and Interrogatories 1-4 based on its understanding of when most of the Janssen Drugs first went to market.

JJHCS previously refused to produce documents and communications from before January 1, 2017, the date that JJHCS selected for its own requests, on relevance, burden, and proportionality grounds. In your latest letter, you offered to produce documents and communications dating back to January 1, 2016 for several of SaveOnSP's Requests. We address those Requests in turn.

*RFP Nos. 12-13.* These requests seek documents and communications concerning the drafting and revision of CarePath's terms and conditions. SaveOnSP has requested such documents and communications dating back to January 1, 2009 to ensure that it receives complete information on the drafting, revision, and interpretation of the terms and conditions that JJHCS alleges SaveOnSP induces patients to breach. JJHCS's offer to provide responsive documents and communications dating back to January 1, 2016 is helpful, but is insufficient if JJHCS began to develop CarePath before that date. We ask that JJHCS produce documents regarding CarePath's terms and conditions back to January 1, 2009 or the earliest date on which it began to draft those terms and conditions.

*RFP Nos. 1-7, 11, 28-30, and 36-37.* RFP Nos. 1-7 seek organizational charts for JJHCS, Janssen, and the JJHCS Hub Entities, as well as specific groups within those entities. SaveOnSP has requested such documents and communications dating back to January 1, 2009 so that it can determine the full range of entities and persons whose conduct is relevant in this action. RFP Nos. 11, 28-30, and 36-37 seek documents and communications relating to the development, marketing,

6

Anthony LoMonaco
February 7, 2023

administration, and financials of CarePath, as well as the development, marketing, sale, and financials of Janssen Drugs. SaveOnSP has requested such documents and communications dating back to January 1, 2009 to ensure it receives sufficient information on the purpose and financial motivations behind CarePath, as well as the impact of SaveOnSP's services on JJHCS and CarePath. JJHCS's offer to provide responsive documents and communications dating back to January 1, 2016 is helpful, but is insufficient if JJHCS began to develop and sell Janssen Drugs and to develop and administer CarePath before that. We ask that that JJHCS produce organizational charts for JJHCS, Janssen, and the JJHCS Hub Entities, as well as specific groups within those entities starting on January 1, 2009 or the earliest dates on which it began developing CarePath and Janssen Drugs. We likewise ask that JJHCS produce the requested documents and communications relating to the development, marketing, administration, and financials of CarePath, as well as the development, marketing, sale, and financials of Janssen Drugs, starting on January 1, 2009 or the earliest dates on which it began developing CarePath and Janssen Drugs, respectively.

*Interrogatory Nos. 1-4.* SaveOnSP seeks information dating back to January 1, 2009 with respect to its Interrogatory Nos. 1-4. Those interrogatories concern the identities of individuals who were involved in several aspects of CarePath's development and administration, including communicating with patients and health plans; were responsible for marketing and communicating with the public about CarePath; or were involved in analyzing price, revenue, cost, or other financial data for Janssen Drugs, as well as financial data for CarePath. JJHCS limited its responses to Interrogatory Nos. 1-4 to January 1, 2017 through July 1, 2022. For the reasons explained above, SaveOnSP requires information on individuals involved in these subject matters dating back to January 1, 2009. Please amend your interrogatory responses to provide the requested information.

### 2. Documents Dating Back to January 1, 2015 (RFP Nos. 14, 41, and 42)

SaveOnSP's RFP Nos. 14, 41, and 42 seek documents and communications dating back to January 1, 2015. Those requests seek information on JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits ("EHBs") or Non-Essential Health Benefits ("NEHBs") under the Affordable Care Act ("ACA"), as well as their understanding of Copay Accumulator Services and Copay Maximizers Services. As we have explained, January 1, 2015 is the date on which we understand the relevant provisions of the ACA and related regulations concerning EHB requirements and out of pocket maximums came into effect.

In your latest letter, you reiterated your position that "extending the time period beyond January 1, 2017 is not appropriate for these requests." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 6. Based on your prior correspondence,

7

Anthony LoMonaco
February 7, 2023

we understand that JJHCS objects to producing documents dating back to 2015 in
response to these Requests on both relevance and burden grounds. JJHCS has not,
however, quantified this burden. We therefore understand that the parties are at
impasse on this issue and may present this dispute to the Court.

### D.    Documents and Information Related to Accumulators and Maximizers (RFP Nos. 20, 21, and 41-43; Interrogatory No. 7)

Both SaveOnSP and JJHCS seek documents and communications that re-
late to accumulators and maximizers. Several of these requests seek substantially
similar information. As we explained during our meet and confer, for example,
SaveOnSP's RFP No. 20 and JJHCS's RFP No. 45 both seek documents and com-
munications related to studies, reports, publications, and analyses on accumula-
tors and maximizers. Because of these similarities, SaveOnSP has offered to pro-
duce documents and communications relating to its understanding of maximizers
and accumulators if JJHCS is willing to do the same.

In your January 27, 2023 letter and during our meet and confer, however,
you refused to treat these requests reciprocally. You argued that while SaveOnSP's
intent and the wrongfulness of its conduct are at issue, JJHCS's intent—and, there-
fore, its understanding of whether accumulators and maximizers cause patient
harm—are not.

JJHCS's relevance arguments are misguided. As we explained, and as
demonstrated by the cases cited by the District Court in its recent opinion on Save-
OnSP's motion to dismiss, the only facet of SaveOnSP's "intent" that is relevant to
JJHCS's tortious interference claim is SaveOnSP's intent to induce breach of the
CarePath contracts. *See, e.g.*, *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp.
2d 552, 564 (D.N.J. 2002) (describing intent as "an intent to interfere with plain-
tiff's contract right or ... knowledge that his actions would interfere with the con-
tract right."). You have not explained how the documents sought by JJHCS's Re-
quests relate to SaveOnSP's intent to induce patients to (purportedly) breach their
contracts. For instance, whether SaveOnSP complies with state statutes concern-
ing accumulators and maximizers, JJHCS RFP No. 43, has no bearing on whether
SaveOnSP intends to induce a breach of CarePath's terms and conditions.

At best for JJHCS, documents regarding accumulators and maximizers
would relate to the wrongfulness of SaveOnSP's conduct in inducing purported
breaches, not to its intent. But, as noted above, that wrongfulness, or "malice,"
simply concerns whether the purported breach was induced "without justification
or excuse." *DiGiorgio*, 230 F. Supp. 2d at 564-65. Courts assess that inquiry with
reference to several factors, including: "(i) the nature of the actor's conduct; (ii) the
actor's motive; (iii) the interests of the party with which the actor's conduct inter-
feres; (iv) the interests sought to be advanced by the actor; (v) the social interests

8

Anthony LoMonaco
February 7, 2023

in protecting the freedom of action of the actor and the commercial interests of the other party; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties." *Id.* at 565 (citing *Restatement (Second) of Torts*, § 767 (1979)). In other words, the wrongfulness inquiry considers facts well beyond SaveOnSP's subjective understanding of whether its conduct was wrongful. If documents regarding accumulators and maximizers relate to whether SaveOnSP's conduct was objectively wrongful, those documents would be relevant whether held by SaveOnSP or JJHCS. SaveOnSP disputes that such documents are relevant to wrongfulness. But it is willing to produce such documents if JJHCS will do the same; alternatively, if JJHCS does not want to produce such documents, SaveOnSP would agree not to produce them either.

SaveOnSP remains open to reciprocal productions. You stated that you would consider our renewed request. Please confirm promptly whether JJHCS agrees to making reciprocal productions on this subject matter.

## II.    Issues Related to Specific Requests

### A.    RFP No. 11

SaveOnSP's RFP No. 11 seeks documents and communications regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs. In our January 20, 2023 letter, we asked you to confirm whether J&J or JJHCS operates or previously operated any copay assistance programs other than CarePath. We explained that documents related to those programs are relevant to understanding the purpose of CarePath. In your January 27, 2023 letter, you stated that you are not aware of any other copay assistance programs which J&J or JJHCS has operated since January 1, 2017. You also stated that any copay existence programs which pre-date January 1, 2017 are irrelevant to this litigation.

During our meet and confer, you confirmed that JJHCS is refusing to provide any information on any copay assistance programs J&J or JJHCS may have operated prior to 2017, including answering our question about whether any such programs existed. We understand that the parties are at impasse on this issue and may present this dispute to the Court.

### B.    RFP Nos. 12 and 13

SaveOnSP's RFP Nos. 12 and 13 seek documents and communications concerning various aspects of the CarePath terms and conditions. As we explained in our January 20, 2023 letter and during our meet and confer, SaveOnSP is entitled to gather parole evidence on the meaning of CarePath's terms and conditions because both of JJHCS's claims are based, at least in part, on allegations that SaveOn induced patients to breach those terms. *See* Opinion Denying SaveOnSP's Motion

9

Anthony LoMonaco
February 7, 2023

to Dismiss (ECF No. 68), at 16 (holding that SaveOnSP's argument concerning the meaning of the terms and conditions "are better suited for a motion for summary judgment"). The meaning of specific terms in CarePath's terms and conditions—including the terms "offer" and "health plan"—are thus of central importance in this case, and information on what JJHCS meant by those terms when it chose to include them in the CarePath terms and conditions is exclusively in the possession of JJHCS. SaveOnSP has agreed to produce documents reflecting its internal understanding of the CarePath terms and conditions. JJHCS has refused to do the same on the grounds that such documents are irrelevant.

JJHCS's attempt to condition its production of documents responsive to SaveOnSP's RFP Nos. 12 and 13 on SaveOnSP agreeing to produce all documents responsive to JJHCS's RFP No. 17 is inappropriate. JJHCS has not identified any term in SaveOnSP's contracts with health plan sponsors that is at issue in this case, and has identified no reason why it needs every draft as well as the full negotiation history of those contracts. During our meet and confer, you suggested that if a health plan raised concerns about SaveOnSP harming patients or J&J during the negotiation of its contract with SaveOnSP, those communications would be relevant to JJHCS's claims. But SaveOnSP has already agreed to produce documents concerning its marketing or promoting its services to health plans, JJHCS's RFP No. 16, all documents related to CarePath, JJHCS's RFP No. 23, and all documents and communications that SaveOnSP has received reflecting complaints, concerns, or inquiries about its services related to Janssen Drugs, JJHCS's RFP No. 33.

We understand that the parties are at impasse on this issue and may present this dispute to the Court.

## C.    RFP No. 14

SaveOnSP's RFP No. 14 seeks document and communications concerning JJHCS's or any Hub Entity's understanding of commercial health plans' ability to designate specialty drugs as Essential or Non-Essential Health Benefits under the Affordable Care Act and related regulations. In your January 27, 2023 letter, you proposed a compromise with respect to SaveOnSP's RFP No. 14 where both JJHCS and SaveOnSP would agree to produce non-privileged documents and communications regarding JJHCS's understanding of commercial health plans' ability to designate specialty drugs as EHBs or NEHBs under the ACA and its regulations for the time period of January 1, 2017 to June 1, 2022 to the extent such documents exist and can be located after a reasonable search. During our meet and confer, we stated that we were considering your proposal and would revert with our position.

Although we believe the parties can reach a reciprocal agreement on this RFP, JJHCS's insistence on limiting its production to the period beginning January 1, 2017 is inappropriate. As we explained above, *supra* Section I.C.2, January 1, 2015 is the date that the relevant provisions of the ACA and related regulations

10

Anthony LoMonaco
February 7, 2023

concerning EHB requirements and out of pocket maximums came into effect. Relevant documents concerning the parties' understanding of commercial health plans' ability to designate specialty drugs as EHB or NEHB under the ACA and its regulations thus likely date back to 2015.

Please let us know if JJHCS will agree that both parties will produce documents on this subject, with JJHCS's search going back to January 1, 2015. Please also confirm that SaveOnSP's agreement to this compromise would resolve any outstanding disputes with respect to JJHCS's RFP Nos. 18, 19, and 22.

### D.    RFP No. 21

SaveOnSP's RFP No. 21 seeks documents and communications concerning JJHCS's advocacy to or communications with governmental or regulatory bodies regarding SaveOnSP, accumulators, and maximizers. SaveOnSP is considering the points from your January 27, 2023 letter with respect to RFP No. 21 and will defer seeking documents responsive to this Request. SaveOnSP reserves the right to seek documents responsive to this Request at a future date.

### E.    RFP No. 25

SaveOnSP's RFP No. 25 seeks documents and communications regarding any alleged harm caused by SaveOnSP to JJHCS. In your January 27, 2023 letter, you confirmed that JJHCS will produce all documents responsive to SaveOnSP's RFP No. 25. We thus understand that there are no further disputes on this RFP.

### F.    RFP Nos. 26 and 32

SaveOnSP's RFP Nos. 26 and 32 seek documents and communications concerning the payment of Patient's costs, including payments in excess of the advertised cap on per-patient funds, by JJHCS, Janssen, or any Hub Entity. In your January 27, 2023 letter, you proposed a compromise on SaveOnSP's RFP Nos. 26 and 32 in which JJHCS would provide data regarding the actual amounts paid to patients in copay assistance, to the extent such data exists and can be located after a reasonable search. If that data reflects that JJHCS is in fact paying more than the budgeted amount of CarePath funds to certain patients, you stated that JJHCS will meet and confer further to determine if additional discovery is appropriate on those specific cases.

During our meet and confer, we asked you to confirm whether JJHCS intends to provide patient-level data as part of this proposal. We noted that without patient-level data, SaveOnSP would have no one of determining if any patients had received more funds than CarePath's terms and conditions would otherwise allow. You indicated that you were still confirming what data exists that JJHCS could produce. We also asked you to confirm whether JJHCS would commit to producing

11

Anthony LoMonaco
February 7, 2023

this data early in the discovery process so that SaveOnSP can analyze the data and
determine whether it needs additional discovery before the end of the fact discov-
ery period. Please provide us with your responses on both issues.

If JJHCS will provide patient-level data by Friday, March 3, 2023, Save-
OnSP would defer its request that JJHCS search for additional documents related
to the amount of CarePath funds paid to patients until after that production.

### G.    RFP Nos. 28 and 29

SaveOnSP's RFP Nos. 28 and 29 seek data regarding CarePath and Janssen
Drugs, including patient fills and dosages for Janssen Drugs, the manufacturing
and marketing of Janssen Drugs, copay assistance funds, the CarePath budget, and
JJHCS's return on investment for CarePath. JJHCS previously agreed to produce
Janssen transparency reports (RFP No. 28) and documents sufficient to show
"(1) how JJHCS determines the amount of copay assistance funds that JJHCS of-
fers Patients enrolled in CarePath, (2) JJHCS's budget for copay assistance
through Care-Path, and (3) JJHCS's actual and projected annual costs for Care-
Path" (RFP No. 29). In our January 20, 2023 letter, we noted the significant simi-
larities between certain categories of data covered by SaveOnSP's RFP No. 28 and
JJHCS's request for similar data regarding drug fills in its RFP No. 41, and re-
quested that JJHCS consider making reciprocal productions on this ground.

In your January 27, 2023 letter, you indicated that JJHCS is willing to en-
gage in reciprocal productions for certain portions of the data requested in Save-
OnSP's RFP No. 28. Specifically, you state that JJHCS "is willing to consider pro-
ducing" the data sought by items i. through m. of RFP No. 28, which seek CarePath
enrollment data, if SaveOnSP agrees to produce all categories of data requested by
JJHCS's RFP No. 41 and 42.

If JJHCS will produce the data items sought by i. through m. of RFP No. 28
from January 1, 2009 to July 1, 2022,[1] then SaveOnSP will expand its production
in response to RFP 41 to include, for each Janssen Drug for each year, data suffi-
cient to show: the total number of patients enrolled in SaveOnSP-advised plans
who received CarePath funds for the given drug; the total CarePath funds received
by those patients for the given drug; the pharmacies at which those patients filled
the given drug; and the average copay or coinsurance amount for the given drug
for patients enrolled in plans advised by SaveOnSP. Please let us know if JJHCS
agrees to this proposal.

---

[1] SaveOnSP remains open to alternative start dates as described above, *supra*
Section I.C.

12

JJHCS maintains that it will not produce any documents or information in response to items a. through g. of SaveOnSP's RFP No. 28 on relevance grounds. In your letter, you ask us to explain how JJHCS's return on investment for Care-Path and the relationship between CarePath and JJHCS's ability to increase drug prices "would permit SaveOnSP to cause patients to breach their contracts with JJHCS and repurpose CarePath's funds for SaveOnSP's profit or would excuse the damages that JJHCS alleges SaveOnSP has caused." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 11. You also ask us to "explain how SaveOnSP's theoretical impact on 'J&J more broadly' excuses those same damages." *Id*. As we have explained, several times, SaveOnSP seeks this information not to justify its alleged conduct but to show, among other things:

- That even after SaveOnSP began offering its services, JJHCS and J&J have continued to reap enormous profits because of their investment in copay assistance programs like CarePath, directly rebutting JJHCS's allegation that SaveOnSP harms patients and threatens the continued viability of CarePath by making it "prohibitively expensive," Compl. ¶ 114;

- That CarePath is not a public good but instead a means to sell more Janssen Drugs while raising the prices for those drugs year-after-year, such that any threat to its viability caused by SaveOnSP does not, as JJHCS's has alleged, *id*., constitute a public harm for purposes of JJHCS's GBL § 349 claim; and

- That SaveOnSP's services have helped more patients enroll in CarePath than would otherwise have enrolled, helped to increase patients' adherence to Janssen Drugs, and therefore caused J&J to sell more drugs and generate more profits than it otherwise would have, all of which are relevant to JJHCS's asserted damages stemming from those same services.

*See, e.g*., Jan. 20, 2023 Letter from M. Nelson to A. LoMonaco at 1-2, 9-10; *supra* Section I.A. We understand that the parties are at impasse on items a. through g. of SaveOnSP's RFP No. 28 and may present this dispute to the Court. Although your letter did not mention RFP No. 28.h, SaveOnSP understands that JJHCS is refusing to produce documents or information in response to that Request on the same grounds as RFP No. 28.a – g, and that the parties are therefore also at impasse on RFP No. 28.h.

Finally, in our last letter, we asked whether JJHCS is willing to produce additional data in response to RFP No. 29. In your letter, you do not agree to provide any information beyond what you have already agreed to provide and ask that we consider whether your offer in response to RFP No. 28 is sufficient. It is not. RFP Nos. 28 and 29 concern different categories of data. We have offered to produce additional data in response to your RFP No. 41 in exchange for your agreement to produce additional data in response to our RFP No. 28. Nothing about that offer

13

Anthony LoMonaco
February 7, 2023

obviates our request that you produce additional data in response to RFP No. 29. We remain willing, however, to explore producing additional categories of data or documents in response to your other requests to the extent that you are willing to do the same in response to RFP No. 29. Please let us know if JJHCS is willing to discuss a compromise along these lines.

### H.    RFP No. 34

SaveOnSP's RFP No. 34 seeks all documents and communications regarding JJHCS's or Janssen's negotiations or agreements regarding the potential use of SaveOnSP's services, or the services of any Copay Maximizer Service or Copay Accumulator Service, for JJHCS's Employee Health Plans, including JJHCS's abandonment of those negotiations or agreements. JJHCS has thus far refused to produce any documents in response, asserting that such documents are irrelevant.

These documents are relevant. As we explained, we understand that J&J or JJHCS conducted significant negotiations with SaveOnSP to use SaveOnSP's services for the health plan it provides for its own employees, and that those negotiations ultimately ceased at the insistence of another division within J&J or JJHCS. As with several of SaveOnSP's other requests, documents and communications reflecting J&J's or JJHCS's assessment of the benefits of employing SaveOnSP's services during these negotiations—irrespective of whether the parties ever executed a contracted—go to the credibility of JJHCS's assertions.

In your January 27, 2023 letter, you maintain that JJHCS will not produce documents in response to this request because "J&J never signed a contract with SaveOnSP" and "JJHCS itself was not involved in any such negotiations." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 12. But you do not address whether any other J&J entity was involved in such negotiations. To the extent that documents exist that show that any J&J entity was involved in negotiations to use SaveOnSP's services, those documents are relevant to JJHCS's claims in this litigation. JJHCS cannot claim that SaveOnSP's services harm patients while also holding back documents that show that its affiliates believed that SaveOnSP's services could help both its own employees and its own employer-sponsored plans.

We understand that the parties are at impasse on this issue and may present this dispute to the Court.

### I.    RFP Nos. 36 and 37

SaveOnSP's RFP No. 36 seeks documents "sufficient to show the economic terms of JJHCS's retention of or agreements with any JJHCS Hub Entity or Care Path Coordinator regarding Care Path, including any assessment of the fair market value of those services." JJHCS has agreed to produce agreements between JJHCS and the entities responsible for administering CarePath and work orders

14

Anthony LoMonaco
February 7, 2023

documenting the cost of those services. Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 12. We will defer our request for additional documents at this time but reserve all rights.

With respect to RFP No. 37, as noted above, JJHCS has taken the position that documents responsive to this Request are irrelevant. As detailed above, *supra* Section I.A, the parties are at impasse on this Request. We also disagree with JJHCS's suggestion that any dispute regarding this Request is mooted because you assert that "JJHCS does not keep statistics on whether patients sign up for Care-Path after being contacted by JJHCS or its vendors." Jan. 27, 2023 Letter from A. LoMonaco to M. Nelson at 13. SaveOnSP's RFP No. 37 seeks documents "sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs." RFP No. 37 is not limited to formal enrollment statistics, and the mere fact that JJHCS itself does not keep those statistics does not mean that JJHCS cannot produce documents, such as enrollment records, which would allow SaveOnSP to calculate the proportion of patients who enroll in CarePath after being contacted by JJHCS or its affiliates. Please confirm whether any such documents exist.

## III.    Drafting and Submission of Joint Letters

As we noted during the parties' meet and confer, we believe JJHCS and SaveOnSP should agree to a schedule for submitting any outstanding discovery disputes to the Court in advance of the February 28, 2023 conference. We propose this to avoid any miscommunications between the parties over what items are in dispute and to provide the parties' full positions to the Court a reasonable time in advance of the scheduled court conference. We propose the following schedule:

- Moving party provides its portion of any joint letter to the responding party by February 14, 2023.

- Responding party provides its portion of any joint letter to the moving party by February 21, 2023.

- Moving party provides any additional edits to the joint letter to the responding party by February 23, 2023.

- Parties finalize joint letter so that moving party may file joint letter by February 24, 2023.

So that the parties can plan accordingly, we ask that you tell us by no later than this **Thursday, February 9** whether this schedule is acceptable to you.

* * *

15

Anthony LoMonaco
February 7, 2023

      We remain hopeful that the parties can work through these issues to reach mutually agreeable resolutions. We look forward to your response and are available to meet and confer at your convenience.

Sincerely,

/s/ Meredith Nelson

Meredith Nelson
Associate

# Exhibit 5

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

District of New Jersey

| | |
|---|---|
| Johnson & Johnson Health Care Systems Inc. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  22-2632 (JMV) (CLW) |
| Save On SP, LLC | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
TrialCard Inc.
2250 Perimeter Park Dr., #300, Morrisville, NC 27560

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached requests for production.

| Place: Weno Process c/o Marcus Lawing<br>4711 Hope Valley Road, Ste. 4F-604<br>Durham, NC 27707 | Date and Time:<br><br>03/07/2023 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   02/17/2023

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/ E. Evans Wohlforth, Jr. |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   **Defendant**
Save On SP, LLC _____ , who issues or requests this subpoena, are:
E. Evans Wohlforth, Jr., Gibbons P.C., One Gateway Center, Newark, NY 07102-5310

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. **22-2632 (JMV) (CLW)**

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ **0.00** .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

| Print | Save As... | Add Attachment | | Reset |

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

David Elsberg
Andrew R. Dunlap
Meredith Nelson
SELENDY GAY ELSBERG, PLLC
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com

E. Evans Wohlforth, Jr.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
973-596-4500
ewohlforth@gibbonslaw.com

*Attorneys for Defendant Save On SP, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br> Plaintiff, <br><br> v. <br><br> SAVE ON SP, LLC, <br><br> Defendant. | Civil Action No. 22-2632 (JMV) (CLW) <br><br> **NOTICE OF SUBPOENA FOR THE PRODUCTION OF DOCUMENTS** |

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Civil Procedure 26, 34, and

45 Defendant Save On SP, LLC ("SaveOnSP") requests TrialCard Inc. ("TrialCard"), to produce

for inspection and copying the documents listed in these Requests, to the office of the undersigned

within 30 days of being served or at a time and place mutually agreed by the parties or ordered by the Court.

　　　　**PLEASE TAKE FURTHER NOTICE** that this demand for production of documents shall be deemed continuing in nature to require supplemental responses if Plaintiff or Plaintiff's counsel obtain or locate further or additional documents subsequent to the time Plaintiff's responses are served.

Dated: February 17, 2023

By: /s/ E. Evans Wohlforth, Jr.
E. Evans Wohlforth, Jr.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
973-596-4500
ewohlforth@gibbonslaw.com

David Elsberg
Andrew R. Dunlap
Meredith Nelson
SELENDY GAY ELSBERG, PLLC
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

2

## DEFINITIONS

1.      The singular form of a word includes the plural, and vice versa.

2.      Any tense of a verb includes all tenses.

3.      Any natural person includes that person's agents, assigns, attorneys, employees, representatives, and successors.

4.      Any entity other than a natural person includes (a) that entity's present and former agents, affiliates (foreign or domestic), assigns, attorneys, consultants, directors, divisions, employees, officers, parents, predecessors, representatives, servants, subsidiaries, and successors; (b) any person or entity, directly or indirectly, wholly or in part, associated with, controlled by, or owned by that entity; (c) and any other person or entity acting or purporting to act on behalf of (a) or (b).

5.      "Action" means this litigation styled as "*Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*" currently pending in the United States District Court for the District of New Jersey, No. 22-2632 (JMV) (CLW).

6.      "Affordable Care Act" means the Patient Protection and Affordable Care Act, Pub. L. 148, 124 Stat. 119.

7.      "All," "any," and "each" mean any and all.

8.      "And" and "or" are construed both conjunctively and disjunctively.

9.      "CarePath" means the Janssen copay assistance program marketed under the name CarePath that provides financial support services for patients using specialty drugs researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including Janssen (as defined herein).

10. "CarePath Care Coordinator" means any person or entity encompassed by that term as used on CarePath's "Contact Us" webpage,[1] as well as any person responsible for communicating with patients who contact CarePath via an advertised help number (*e.g.*, 877-CarePath).

11. "Communication" means the transmittal of information in the form of facts, ideas, inquiries, or otherwise.

12. "Complaint" means JJHCS's May 4, 2022 Complaint [ECF No. 1] or any subsequently amended Complaint in this Action.

13. "Copay Accumulator Service" means (a) any service provided by Pharmacy Benefit Managers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assistance from counting towards a patient's deductible and out-of-pocket maximum and under which members remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay accumulator."

14. "Copay Assistance" means any type of patient support that allows a drug manufacturer to pay all or some of a patient's prescription drug cost for that manufacturer's drug.

15. "Copay Maximizer Service" means (a) any service provided by Pharmacy Benefit Managers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assistance from counting towards a patient's deductible and out-of-pocket maximum and under which members do not remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay

---

[1] *See* Contact Us, https://www.janssencarepath.com/patient/contact-us (last visited October 25, 2022).

assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay maxi-mizer."

16.    "Document" means "document" and "electronically stored information" as defined in the Federal Rules of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

17.    "Essential Health Benefit" means, in the context of prescription drug benefits at issue in this case, (a) a prescription drug benefit that satisfies the requirement for a plan to provide essential prescription drug benefits under the Affordable Care Act or that is treated as such by a plan;[2] and (b) any definition JJHCS ascribes to the term "essential health benefit" as used in the Complaint.

18.    "Identify" means (a) with respect to persons, to give, to the extent known, the per-son's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment; (b) with respect to documents, either (i) to give, to the extent known, the (A) type of document; (B) general subject matter; (C) date of the docu-ment; and (D) author(s), addressee(s) and recipient(s); or (ii) to produce the documents, together with sufficient identifying information sufficient to satisfy Federal Rule of Civil Procedure 33(d).

19.    "Including" means including but not limited to.

20.    "Janssen" means Janssen Biotech, Inc., Janssen Pharmaceuticals, Inc., Janssen Products, LP, and Actelion Pharmaceuticals U.S., Inc., as well as any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons

---

[2] 45 C.F.R. §§ 156.122, 156.115.

or entities acting or purporting to act on behalf or under the control of Janssen Biotech, Inc.,
Janssen Pharmaceuticals, Inc., Janssen Products, LP, or Actelion Pharmaceuticals U.S., Inc.

21.    "Janssen Drug" means any Specialty Drug manufactured or sold by Janssen from
any time for which patients may receive copay assistance, including BALVERSA, DARZALEX,
DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT,
SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA, as well as any other
specialty drugs that JJHCS asserts are at issue in this Action.

22.    "JJHCS" means Johnson & Johnson Health Care Systems Inc. and any and all pre-
decessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or depart-
ments, agents, representatives, directors, officers, employees, committees, attorneys, accountants,
and all persons or entities acting or purporting to act on behalf or under the control of Johnson &
Johnson Health Care Systems Inc., including Centocor, Inc., Ortho Biotech Products LP, McNeil
Pharmaceutical, Ortho-McNeil Pharmaceutical, Inc., Ortho-McNeil-Janssen Pharmaceuticals,
Inc., Scios Inc., Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development,
LLC, Janssen Pharmaceuticals, Inc., Janssen Products, LP, Actelion Pharmaceuticals U.S., Inc.,
Janssen BioPharma LLC, and Janssen Research & Development LLC.

23.    "JJHCS Hub Entity" means any entity retained or utilized by JJHCS to administer,
in whole or in part, CarePath (including Lash Group and TrialCard), and any and all predecessors
and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments,
agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all
persons or entities acting or purporting to act on behalf of such an entity.

6

24.    "Lash Group" means The Lash Group, Inc. and any and all predecessors and suc-

cessors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, rep-

resentatives, directors, officers, employees, committees, attorneys, accountants, and all persons or

entities acting or purporting to act on behalf or under the control of The Lash Group, Inc.

25.    "Non-Essential Health Benefits" means, in the context of prescription drug benefits

at issue in this case, (a) any prescription drug benefit covered by a plan in excess of those necessary

for a plan to satisfy the requirements for providing essential prescription drug health benefits under

the Affordable Care Act[3] and designated by the plan as a non-essential health benefit; and (b) any

definition JJHCS ascribes to the term "non-essential health benefits" as used in the Complaint.

26.    "Patient" means a natural person prescribed or eligible to be prescribed any Janssen

Drug, whether or not they use CarePath or are a participant in a health plan advised by SaveOnSP.

27.    "Person" means a natural person or legal entity including any business or govern-

mental entity or association.

28.    "Regarding" means (directly or indirectly, partially or wholly) about, alluding to,

assessing, bearing upon, commenting upon, comprising, concerning, confirming, connected to,

considering, containing, contradicting, dealing with, discussing, embodying, evaluating, evidenc-

ing, identifying, in connection with, indicating, in respect of, involving, memorializing, mention-

ing, noting, pertaining to, probative of, proving, recording, referring to, reflecting, relating to, re-

porting on, reviewing, setting forth, showing, stating, suggesting, summarizing, supporting, touch-

ing upon a subject, or having been created, generated, or maintained in connection with or as a

result of that subject.

29.    "Request" means any of these Requests for Production.

---

[3] *See* 45 C.F.R. §§ 156.122, 156.115.

30.    "SaveOnSP" means Save On SP, LLC, and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Save On SP, LLC.

31.    "Specialty Drug" means any specialty pharmaceutical, medication, biologic, or other therapy treated as a pharmaceutical for purposes of health plan benefit coverage.

32.    "Stelara" means the Janssen Drug sold under that name.

33.    "Tremfya" means the Janssen Drug sold under that name.

34.    "TrialCard" means TrialCard Inc. and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of TrialCard Inc.

35.    "TrialCard's Employee Health Plans" means any health plan offered by TrialCard to its employees.

36.    "You" and "Your" means TrialCard.

## INSTRUCTIONS

1.    These Requests seek production of material in Your possession, custody, or control. Fed. R. Civ. P. 45(a)(1)(A)(iii).

2.    These Requests seek production of nonprivileged material. Fed. R. Civ. P. 26(b)(1).

3.    These Requests seek production of material that is proportional to the needs of this case. Fed. R. Civ. P. 26(b)(1).

4.    For each Request, either state that you will produce the requested material or state with specificity the grounds for objecting to the Request, including the reasons. Fed. R. Civ. P. 45(d)(2)(B).

5.    An objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. Fed. R. Civ. P. 45(d)(2)(B).

6.    If you object to all or part of a Request, state whether you are withholding any responsive material based on that objection.

7.    If you object to part of a Request, specify the part and state that you will produce documents responsive to the rest.

8.    If you withhold responsive information by claiming that the information is privileged or subject to protection as trial-preparation material, expressly make the claim and describe the nature of the information privileged or protected in a manner that, without revealing information itself privileged or protected, will enable SaveOnSP to assess the claim, Fed. R. Civ. P. 45(e)(2)(A), including by indicating whether any document exists regarding the information requested and stating, to the extent the privilege is being asserted in connection with a claim or defense governed by state law, the state privilege rule being invoked, Local Rule 34.1.

9.    If a document responsive to a Request was once in your possession, custody, or control and has since been lost or destroyed, provide (a) a detailed description of the document; (b) the name of the author; (c) the names of all persons to whom the document was sent; (d) the date on which the document was prepared or initially received; (e) the date on which the document was lost or destroyed; and (f) if the document was destroyed, the manner of its destruction, the reason for its destruction, the name of the person who requested or authorized its destruction, and the name of the person who destroyed it.

10.    Produce documents as they are kept in the usual course of business or in a form specified in this subpoena. Fed. R. Civ. P. 45(e)(1)(b). For each document, identify the file or

9

location from which it was taken and the name, affiliation, and position of the producing custodian or non-custodial source.

11.     Produce electronically stored information in the form and manner required by any agreed-upon or court-ordered protocols. In the absence of any such protocol at the time of production, consult SaveOnSP for further instruction.

12.     Produce each document in its entirety, without abbreviation or redaction, including all attachments or materials attached thereto.

13.     Produce all versions of each document that are not identical to the original document (including all drafts) whether due to handwritten notations, revisions, enclosures, attachments, underlining, highlighting, or otherwise.

14.     These Requests are deemed continuing. If after responding to any Request you learn that your response is in some material respect incomplete or incorrect, supplement or correct your response in a timely manner.

## TIME PERIOD

Unless otherwise specified, these Requests cover from and including January 1, 2017, through the present.

## REQUESTS

1.     From January 1, 2009 through the present, Documents sufficient to show the organizational structure of TrialCard.

2.     From January 1, 2009 through the present, Documents sufficient to show the organizational structure of any group or division within TrialCard involved in developing, managing, marketing, or administering CarePath and to identify their employees.

3.     All Documents and Communications with or regarding SaveOnSP, including those between You and JJHCS, You and any patients, and You and any other Hub Entity.

10

4.      From January 1, 2009 through the present, all Documents and Communications regarding the development, management, and marketing of CarePath or any other copay assistance program offered for Janssen Drugs, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 6-7, 36-49.

5.      From January 1, 2009 through the present, all Documents and Communications regarding CarePath's terms and conditions, including Documents and Communications regarding (a) JJHCS's allegations in Complaint ¶¶ 3, 8, 18-26, 102-103, 108; (b) all CarePath terms and conditions for each Janssen Drug; (c) revisions to any of the CarePath terms and conditions for any Janssen Drug; and (d) Your understanding of the term "offer" or "health plan" as used in CarePath's terms and conditions.

6.      From January 1, 2009 through the present, all Documents and Communications regarding CarePath's requirement that Patients enrolled in CarePath make any payments towards Janssen Drugs, including Documents and Communications regarding JJHCS's basis for setting the amounts of those payments and JJHCS's allegations in Complaint ¶¶ 48-49, 70, 89.

7.      From January 1, 2015 through the present, all Documents and Communications regarding Your understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its regulations, including Documents and Communications regarding JJHCS's allegations in Complaint ¶¶ 9-10, 43, 53-59, 71, 79.

8.      All Documents and Communications regarding SaveOnSP's communications with Patients regarding CarePath, including allegedly misleading or confusing communications and JJHCS's allegations in Complaint ¶¶ 60-67, 109, ¶¶ 13, 75-77, 85-88.

11

9.    All Documents and Communications regarding SaveOnSP's provision of services to qualified high deductible or health savings account plans, including JJHCS's allegations in Complaint ¶ 72.

10.    All Documents and Communications regarding JJHCS's payment of copay assistance funds to or on behalf of Patients enrolled in qualified high deductible or health savings account plans.

11.    All Documents and Communications regarding any alleged stress or confusion caused by SaveOnSP to any member of the public, including JJHCS's allegations in Complaint ¶ 114.

12.    All Documents and Communications regarding any alleged harm caused by SaveOnSP to any Patient by allegedly making their healthcare more expensive, including JJHCS's allegations in Complaint ¶ 114.

13.    All Documents and Communications regarding how SaveOnSP directly or indirectly affects or threatens the financial viability of CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

14.    All Documents and Communications regarding how SaveOnSP directly or indirectly affects or threatens the financial viability of any Copay Assistance Program other than CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

15.    All Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 110, 115.

16.    All Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum.

17.    All Documents and Communications regarding the "internal JJHCS data" discussed in Complaint ¶¶ 92-101, including the complete databases from which that data was drawn.

18.    From January 1, 2009 through the present, for each Janssen Drug for each year, Documents sufficient to show:

      a.    all Patients receiving the Janssen Drug;

      b.    the number of fills of the Janssen Drug received by each such Patient;

      c.    the dosage of the Janssen Drug received by each such Patient for each fill;

      d.    the projected number of Patients, average number of fills, and average dosage for the Janssen Drug;

      e.    the cost to manufacture the Janssen Drug;

      f.    the sales and marketing budget for the Janssen Drug;

      g.    the price of the Janssen Drug;

      h.    the revenue received by JJHCS from the Janssen Drug;

      i.    all Patients enrolled in the CarePath program for the Janssen Drug;

      j.    the dates on which each Patient was enrolled in CarePath;

      k.    the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath;

      l.    the Janssen Drugs for which each Patient enrolled in CarePath received copay assistance; and

    m.    all copay assistance payments that JJHCS made to or on behalf each Patient enrolled in CarePath.

19.    From January 1, 2009 through the present, for each Janssen Drug for each year, all Documents and Communications regarding:

    a.    JJHCS's determination of the amounts of copay assistance funds that JJHCS offered to Patients enrolled in CarePath, including the determination of the maximum program benefit per calendar year for the Janssen Drug;

    b.    JJHCS's budget for CarePath, including the sales and marketing budget;

    c.    JJHCS's actual and projected annual costs for CarePath;

    d.    JJHCS's use of or accounting for unused CarePath funds;

    e.    the impact of the Affordable Care Act on JJHCS's CarePath budget or funding, including the impact of laws and regulations regarding out-of-pocket maximums;

    f.    JJHCS's and Janssen's revenue and revenue projections from fills by Patients enrolled in CarePath;

    g.    the impact of CarePath on Janssen's sales of any Janssen Drug;

    h.    the impact of CarePath on JJHCS's or Janssen's gross to net calculations;

    i.    JJHCS's or Janssen's actual and projected return on investment for CarePath; and

    j.    any analysis of the adherence rates of Patients enrolled in CarePath to Janssen Drugs, including such Patients enrolled in plans advised by SaveOnSP.

14

20.     All Documents and Communications regarding JJHCS's attempts to limit or elim-
inate the amount of CarePath copay assistance funds available to Patients using Stelara or Tremfya
based on whether the Patients' plans allegedly reduce or eliminate Patients' out-of-pocket costs,
including Documents and Communications regarding JJHCS's attempts to limit or eliminate the
availability of CarePath copay assistance funds available to Patients enrolled in health plans ad-
vised by SaveOnSP.

21.     All Documents and Communications regarding any offer by JJHCS to provide to
any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath
Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance
funds available to a Patient.

22.     All Documents and Communications regarding JJHCS's attempts to identify health
plans advised by SaveOnSP or Patients enrolled in such plans.

23.     From any time, all Documents and Communications regarding TrialCard's negoti-
ations or agreements regarding the potential use of any Copay Maximizer Service or Copay Ac-
cumulator Service, for TrialCard's Employee Health Plans, including any abandonment of those
negotiations or agreements.

24.     Documents sufficient to identify all JJHCS Hub Entities and CarePath Care Coor-
dinators.

25.     From January 1, 2009 through the present, Documents sufficient to show the eco-
nomic terms of JJHCS's retention of or agreements with You, including any assessment of the fair
market value of those services.

26.     From January 1, 2009 through the present, documents sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs.

27.     From January 1, 2015 through the present, all Documents and Communications relating to Copay Accumulator Services and Copay Maximizer Services and their effect on JJHCS's return on investment for copay assistance dollars.

28.     From January 1, 2015 through the present, all Documents and Communications relating to Your understanding of the terms "copay accumulator" and "copay maximizer."

29.     All Documents and Communications concerning non-medical switching by participants of plans that implement SaveOnSP's services, a Copay Accumulator Service, or a Copay Maximizer Service.

30.     Your document retention policies.

31.     Complete data dictionaries for any data that You produce.

32.     From any time, all Documents and Communications regarding this Action provided to you by any person or entity other than SaveOnSP, including in response to subpoenas served in this Action.

# Exhibit 1

SILLS CUMMIS & GROSS P.C.
Jeffrey J. Greenbaum
Katherine M. Lieb
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick (*pro hac vice* forthcoming)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | : |
| | : Civil Action No. |
| Plaintiff, | : |
| | : Jury Trial Demanded |
| vs. | : |
| | : |
| SAVE ON SP, LLC, | : **COMPLAINT** |
| | : |
| Defendant. | : |

Plaintiff Johnson & Johnson Health Care Systems Inc. ("JJHCS"), having an address at 425 Hoes Lane, Piscataway, New Jersey 08854, for its Complaint against Defendant Save On SP, LLC, 611 Jamison Road, Elma, New York 14059 ("SaveOnSP"), alleges as follows:

## PRELIMINARY STATEMENT

1.      JJHCS brings this action to stop SaveOnSP's scheme to pilfer tens of millions of dollars from the financial support program that JJHCS provides for patients. The patient assistance that JJHCS provides is for *patients*—not for SaveOnSP or the health plans with

which it partners.  By targeting and exhausting those funds for the benefit of its (and its partners') bottom line, SaveOnSP is increasing the cost of, and will ultimately render it untenable to provide, the assistance that patients desperately require.  That will irreparably harm JJHCS and the patients it serves.

2.      As a subsidiary of Johnson & Johnson, JJHCS provides funds to help commercially insured patients afford the costs of valuable and life-saving therapies.  Those costs include the co-payments ("copays")[1] that insurance companies and private health plans ("payers") insist must be paid by patients to obtain their prescription drugs.  Study after study has shown that many patients cannot afford such copays, and will be forced to forgo vital treatments unless help is provided to meet those obligations.  JJHCS provides that support through its patient assistance program.  However, with the deliberate intent to manipulate and thwart the purpose of JJHCS's program, SaveOnSP devised and implemented a scheme (the "SaveOnSP Program") to inflate and misappropriate the funding JJHCS provides for patients by interfering with the contractual relationship between JJHCS and patients.

3.      SaveOnSP's scheme works by (i) circumventing statutory constraints on the level of copay costs that payers may require patients to pay for pharmaceuticals; (ii) inflating patients' copay costs in order to increase the funds extracted from JJHCS's patient assistance program and thereby reduce the portion of the drug cost that the payers otherwise would have to pay to the pharmacy; (iii) using this artificially inflated copay cost to coerce patients to enroll in a program run by SaveOnSP, in addition to, and in violation of the terms of, JJHCS's patient

---

[1]  In this Complaint, the term "copay" is generally meant to encompass both an out-of-pocket fixed amount paid by the patient at the point of sale, as well as "co-insurance," or an out-of-pocket percentage of the cost of the product or service paid by the patient at the point of sale.

assistance program; and (iv) leveraging its illicit SaveOnSP Program to surreptitiously extract inflated amounts of patient assistance.

4.      Through this artifice, SaveOnSP enriches the payers with which it partners by (a) reducing the amount they pay to pharmacists for each prescription in the SaveOnSP Program, and (b) increasing by a commensurate amount the costs to the JJHCS patient assistance program.  In return for this exploitation and interference with JJHCS's program, the payers reward SaveOnSP with a 25% commission on their "savings."

5.      As a result, the costs to JJHCS of providing patient support have exploded. SaveOnSP has caused JJHCS to pay at least $100 million more in copay assistance than it otherwise would have for a purpose JJHCS did not intend, depleting the support available for patients who cannot afford their rising copays.  SaveOnSP knows this, and nonetheless has maliciously pursued this scheme to cause harm to JJHCS and the patients it supports while lining its own pockets.

**Patient Out-of-Pocket Obligations & JJHCS's Patient Assistance**

6.      JJHCS does not and cannot control the price that a patient is asked to pay at a pharmacy when the patient goes to retrieve her or his medication.  Rather, a patient's copay cost is determined and imposed by private payers and their affiliated entities.  In recognition of the increasing costs that patients have faced at the pharmacy, since 2016, JJHCS has provided assistance to more than 2 million patients in order to help them defray their copay costs and more easily afford their life-saving and life-improving therapies.

7.      The patient assistance program at issue here, the Janssen CarePath Program ("CarePath"), provides a portfolio of support services for patients using medications researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including Janssen Biotech Inc., Janssen Pharmaceuticals, Inc, Janssen Products, LP, and Actelion

3

Pharmaceuticals U.S., Inc. (collectively, "Janssen"). These medications include complex biologic treatments for various cancers and serious immunological conditions. Without JJHCS's assistance, many patients would be unable to afford their medications, potentially leading them to discontinue treatment, reducing their quality of life, and sometimes shortening their lives.

### SaveOnSP's Actions Interfere with JJHCS's Patient Assistance

8.      SaveOnSP knows that JJHCS funds patient assistance programs like CarePath to ease the burden on patients.[2] Nevertheless, SaveOnSP has planned and executed a scheme to exploit, interfere with, and ultimately render it untenable for JJHCS to continue the CarePath program by inflating patients' copay obligations to coerce patients to enroll in SaveOnSP's own program—in violation of CarePath's terms and conditions.

9.      The SaveOnSP Program at the heart of SaveOnSP's scheme works by first changing the designation of Janssen's drugs—including live-saving cancer drugs and other critical medications—from "essential health benefits" to non-essential health benefits under the Affordable Care Act ("ACA"). Working in tandem with its payer partners, the SaveOnSP Program reclassifies the medications as non-essential *without regard to patients' actual medical needs and solely for SaveOnSP's own profit motives*. Indeed, in a recorded presentation available online, a SaveOnSP Program representative admits: "The moment we reclassify these as non-essential we get to operate outside of those rules, which removes the limitations for how high we set the copay, it removes the requirement to apply copay assistance dollars to the max out-of-pocket. And that's what allows us to be the *most lucrative* in terms of driving savings for SaveOn." *See* David Cook, *IPBC and SaveonSP Training-20210216 1901-1*, VIMEO, at 23:35 (Feb 17, 2021), https://vimeo.com/513414094 (hereinafter, *SaveOnSP IPBC Video*).

---

[2]  SaveOnSP is well-versed in JJHCS's program, as its founder is a former Johnson & Johnson employee, and its CEO is also a former Johnson & Johnson employee.

4

10.     Once the SaveOnSP Program re-categorizes a drug as a non-essential health benefit, it is no longer subject to the ACA's annual out-of-pocket maximum that limits how much patients with private insurance can be required to pay for their medical care each year. The out-of-pocket maximum rule is meant to prevent patients from being forced to choose between vital medication and other necessities of life, such as food, clothing and housing.  In direct contravention to this legislative intent, by reclassifying certain medications as non-essential health benefits, the SaveOnSP scheme allows the payer to continue to charge the patient inflated copay costs even where the patient has already satisfied their out-of-pocket maximum as indicated during the SaveOnSP Program presentation:



*Id.* at 24:00.  In addition, after removing a given drug from the purview of the ACA's out-of-pocket maximum, the SaveOnSP Program increases the patient's copay for the given drug to an artificially high amount—often thousands of dollars per dose.  As explained by the SaveOnSP Program representative, "[I]n order for us to capitalize on this copay assistance funding, *we have to have that inflated copay upfront to bill to copay assistance.*"  *Id.* at 49:26.

11.     Further, in deciding which drugs to include in its program, SaveOnSP targets drugs that "*have the most lucrative copay assistance programs*," programs like CarePath.  *Id.* at

5

13:31.[3]  Once it has included those drugs in the SaveOnSP Program and the drug's copay has been inflated, SaveOnSP then targets patients who take the drug, using the threat of an inflated copay to coerce them into enrolling in the SaveOnSP Program.  Specifically, SaveOnSP tells each patient that unless she enrolls in the SaveOnSP Program, she will have to pay the inflated copay herself—and, making matters worse, the SaveOnSP Program will not count the thousands she pays toward her deductible or out-of-pocket maximum.  SaveOnSP's offer is illustrated in marketing materials available online:



*Pay $0 for Select Specialty Medications*, CIGNA (Aug. 2021), https://hr.richmond.edu/benefits/insurance/medical-plans/pdf/SaveonSP.pdf (last visited Apr. 27, 2022).

---

[3] Similarly, in the same recorded presentation, the SaveOnSP Program representative admits that the program works only if they are able to extract patient assistance: "In order for us to leverage the savings, the member has to actively enroll in copay assistance. ***That's where the savings comes from***." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 49:27.

12.      SaveOnSP engages in a concerted effort to communicate this coercive offer to patients, including through phone calls and letters. This outreach campaign is illustrated by a SaveOnSP Program slide deck available online:



*Copay Assistance Program & Solutions*, EXPRESS SCRIPTS, at 9 (2019), https://pebp.state.nv.us/wp-content/uploads/2020/03/7.-Combined-for-website.pdf.

13.      SaveOnSP even goes so far as to enlist the help of the pharmacy to reject a patient's claim for their prescription medication at the point of sale—to tell the patient that insurance will not cover their prescription even though that medication is in fact covered—in order to get the patient on the phone with SaveOnSP so that a representative can pressure the patient to enroll in the SaveOnSP Program. This is highlighted in another SaveOnSP Program slide deck, which admits engineering a *"[p]oint of sale claim rejection"* to "facilitate warm transfer of member to SaveonSP":

7



*Human Resources Committee Meeting*, VILLAGE OF LINDENHURST ILLINOIS, at 69 (Mar. 11, 2021), https://www.lindenhurstil.org/egov/documents/1615238827_33717.pdf.

14.      Of course, a choice between paying nothing for badly needed medication, or paying thousands of dollars for that medication out of pocket, is—for most patients—no choice at all.  Indeed, many patients choose health plans precisely based on which plan purports to cover their necessary medications.  Unsurprisingly, therefore, once SaveOnSP's offer is communicated to the patients, most are coerced into accepting:  "[T]hat's often compelling enough for members to say, 'oh wait, I want my drugs for free.'"  *SaveOnSP IPBC Video*, *supra* ¶ 9, at 46:25.

15.      But while SaveOnSP is telling patients that their therapy will be "free" if they enroll in the SaveOnSP Program, what SaveOnSP is really doing is also enrolling them in

8

CarePath so that the cost of the artificially inflated copay is born by JJHCS and the entirety of the funds JJHCS makes available via patient assistance are drained. This is revealed when the SaveOnSP Program representative admits that patients may see an inflated copay on their "invoice paperwork," but "they will not be charged" that amount. *Id.* at 43:38; *see also, e.g.*, *Albuquerque Public Schools Summary of Benefits*, EXPRESS SCRIPTS, at 2 (2021), https://www.aps.edu/human-resources/benefits/documents/2021-summary-of-benefits/express-scripts-summary-of-benefits   (stating that the cost of drugs for patients enrolled in SaveOnSP "will be reimbursed by the manufacturer").

16.     Further, while SaveOnSP walks the patient through the process of enrolling in programs like CarePath, SaveOnSP does not tell patients that CarePath is already available to them without enrollment in the SaveOnSP Program, and already reduces patients' out-of-pocket costs to $10, $5, or even $0. In other words, the SaveOnSP Program exists not to benefit patients, but solely to wrongfully meet the payer's obligation to the patient using the cost support made available by JJHCS for SaveOnSP's own profit.

17.     The SaveOnSP Program does not change the amount the pharmacist receives for a prescription. It decreases the portion that the payer pays of that amount, and increases the portion that the patient pays with patient assistance dollars. The payers' "savings" is actually the increased amount that payers withhold from pharmacists because the payers foist the obligation onto patients, who will use CarePath dollars to pay it. SaveOnSP then calculates the payers' "savings"—actually, the value the payer has gained by virtue of displacing its payment obligation to JJHCS—and charges the payer a fee of 25%.

**SaveOnSP Disregards the Terms and Conditions of JJHCS's Program**

18.     SaveOnSP's scheme is expressly prohibited by the CarePath terms and conditions, which do not allow the program to be used in connection with any "other offer" like

9

the SaveOnSP Program. *See, e.g.*, DARZALEX® Savings Program (Sept. 2021), https://www.janssencarepath.com/sites/www.janssencarepath-v1.com/files/darzalex-faspro-yondelis-savings-program-overview.pdf.

19.     The SaveOnSP Program is such an "offer." The SaveOnSP representative expressly refers to the SaveOnSP Program in her presentation as the "SaveOn *offering*," *SaveOnSP IPBC Video*, *supra* ¶ 9, at 4:25; 27:31, and marketing materials state "That's why your plan *offers* a program called SaveOnSP, which can help lower your out-of-pocket costs to $0." *See Pay $0 for Select Specialty Medications*, *supra* ¶ 11 (emphasis added).

20.     SaveOnSP is well aware of this prohibition on other offers because it monitors drug manufacturers' patient assistance terms and conditions. *See SaveOnSP IPBC Video*, *supra* ¶ 9, at 31:59. Nevertheless, SaveOnSP continues to coerce patients into signing up for and using the SaveOnSP Program—thereby inducing those patients to breach the terms and conditions of their CarePath agreement with JJHCS.

21.     SaveOnSP's scheme harms patients in a number of ways, including by selecting drugs for coverage based upon a profit motive and not medical need; wrongfully engineering a denial of coverage at the point of sale to coerce patients to participate in the program; and not counting any of the funds spent on patients' medication towards their ACA maximum or deductible, thereby making their other healthcare needs more expensive.

22.     Further, by imposing on JJHCS inflated costs that are not tethered to actual patient need, SaveOnSP's scheme ultimately will make it cost prohibitive for JJHCS to offer patient assistance. This result is aligned with the interest of payers, which have used a variety of

tactics—widely condemned by patient advocacy groups[4]—to deprive patients of the benefits of patient assistance. As payers well know, eliminating patient assistance will result in patients seeking less medicine than they otherwise need and would obtain, which would in turn increase payers' profits.[5]

23.    SaveOnSP's scheme also harms JJHCS. SaveOnSP depletes the CarePath funds intended to help patients afford their Janssen medication, and causes JJHCS to pay out thousands of dollars more per patient in CarePath funds than it otherwise would pay, solely for SaveOnSP's and its partners' profit.

24.    SaveOnSP concedes this misappropriation and diversion. Marketing materials for the SaveOnSP Program tout the "savings" that it generates for payers. For example, one health plan projected $600,000 in annual "savings" from implementing the SaveOnSP Program. *See SaveOnSP for Specialty Medications*, VALLEY CENTER PAUMA UNIFIED SCHOOL DISTRICT, https://vcpusd.learning.powerschool.com/c/1720900/file/show/159819292; *see also Copay Assistance Program & Solutions*, *supra* ¶ 12, at 8 (projecting $1.9

---

[4] For instance, the "All Copays Count Coalition," made up of more than 60 groups representing patients with serious and chronic health conditions, has engaged in a concerted effort to stop payer use of "accumulators," programs that identify patient assistance funds and refuse to count them toward the patient's deductible or out-of-pocket maximum. *See New Insurance Policies Are Targeting Vulnerable Patients with High Copays*, NAT'L HEMOPHILIA FOUND., https://www.hemophilia.org/advocacy/federal-priorities/make-all-copays-count#ACCC (last visited Apr. 27, 2022). Accumulators and the harms they cause to patients are discussed in greater detail in Section III, *infra*.

[5] Certain payers have argued that copay assistance programs artificially increase payers' costs by "incentivizing patients to take brand-name drugs instead of cheaper bioequivalent generics" or even by incentivizing patients to take medications they do not require. *See, e.g.,* Tomas J. Philipson et al., *The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, UNIV. CHI. (Dec. 2021), at 18, https://cpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2021/12/2021_12_15-Copay-Assistance-Final-Draft-Clean.pdf (last visited Apr. 27, 2022). Beyond the absurdity of suggesting that copay assistance causes a patient suffering from cancer to take a cancer therapy they do not require, this argument overlooks that copay assistance is often used for specialty drugs without a generic substitute. *Id.*; *see infra* ¶ 34.

11

million in "savings" in 2020 for one health plan from implementing SaveOnSP); *Copay Assistance Strategy Reduces Financial Burdens for Plans and Patients*, EVERNORTH (Oct. 7, 2021), https://www.evernorth.com/articles/reduce-costs-for-health-care-plans-with-copay-program-assistance (advertising that "[i]n 2020, plans that participated in these copay assistance solutions [like the SaveOnSP Program] experienced a specialty [drug cost] trend of -7.2%, while nonparticipating plans experienced an 8.7% specialty [drug cost] trend."). But in fact, these "savings" are simply diverted CarePath funds that were intended to benefit patients, not payers.

25.     Patient assistance does not exist so that SaveOnSP can enrich payers further while taking a cut itself. Indeed, payers already negotiate enormous price concessions from manufacturers, including rebates that manufacturers pay when a patient fills a prescription. In 2021 alone, Janssen paid more than $8 billion in rebates, discounts, and fees to commercial insurers and pharmacy benefit managers. *See The 2021 Janssen U.S. Transparency Report*, at 6, https://2021jtr.prod.cmc.jnj-secondary.psdops.com/_document/the-2021-janssen-u-s-transparency-report?id=00000180-0108-dccf-a981-a52ec8300000 (last visited Apr. 27, 2022); *see also Form 10-K*, CIGNA CORP., at 37 (Feb. 24, 2022), https://investors.cigna.com/financials/sec-filings/default.aspx ("We maintain relationships with numerous pharmaceutical manufacturers, which provide us with, among other things: . . . discounts, in the form of rebates, for drug utilization."). SaveOnSP acknowledges that these payer rebates are a "completely different set of funds" from *patient* assistance—which, SaveOnSP further acknowledges, is made available pursuant to "an agreement between the member and the manufacturer." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 24:32-24:50. By tortiously interfering with that agreement between JJHCS and patients, SaveOnSP wrongfully enables payers to "double-dip" into both manufacturer rebates and copay assistance.

12

26.     SaveOnSP should not be permitted to profiteer on the backs of patients by exploiting JJHCS's patient assistance. SaveOnSP should therefore be enjoined from including Janssen drugs in the SaveOnSP Program, and should be ordered to compensate JJHCS for the funds it caused to be wrongfully extracted from CarePath.

## THE PARTIES

27.     Plaintiff JJHCS is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 425 Hoes Lane, Piscataway, New Jersey 08854. JJHCS is a subsidiary of Johnson & Johnson, and administers CarePath for the benefit of patients who are prescribed medications marketed by other Johnson & Johnson entities that are not fully paid for by private insurance.

28.     Defendant SaveOnSP is a limited liability company organized under the laws of the State of New York, with its principal place of business at 611 Jamison Road, Elma, New York 14059. SaveOnSP advertises and administers its program (the "SaveOnSP Program") in partnership with pharmacy benefits manager Express Scripts, Inc. ("Express Scripts") and specialty pharmacy Accredo Health Group, Inc. ("Accredo"). SaveOnSP has operations, including a call center, in Buffalo, New York. It also makes its client payers sign a joinder agreement governed by the laws of New York, and, on information and belief, accepts payments for its services in New York. Upon information and belief, none of the members of SaveOnSP are citizens of New Jersey.

## JURISDICTION AND VENUE

29.     This Court has personal jurisdiction over SaveOnSP because SaveOnSP has sufficient minimum contacts with New Jersey so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. SaveOnSP actively implements the SaveOnSP Program in New Jersey, including by offering the SaveOnSP

13

Program to New Jersey payers, and by inducing New Jersey patients to enroll in the SaveOnSP Program.

30.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim" occurred in this judicial district, including SaveOnSP's offering of the SaveOnSP Program to New Jersey payers, New Jersey patients' enrollment in the SaveOnSP Program, violation of CarePath's terms and conditions, and JJHCS's injury as a result of SaveOnSP's wrongful acts.

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy in the present action exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interests and costs, and complete diversity of citizenship between the parties exists because JJHCS is a citizen of New Jersey, while SaveOnSP's members are not.

## FACTUAL ALLEGATIONS

### I.   The Pharmaceuticals for which JJHCS Offers Support Have Improved and Saved the Lives of Countless Patients

32.     The pharmaceuticals for which JJHCS offers support are essential to patients' health and, in some cases, survival. These pharmaceuticals include treatments for various forms of cancer (for example, DARZALEX®, ERLEADA®), pulmonary arterial hypertension (for example, OPSUMIT®, TRACLEER®, UPTRAVI®), and various autoimmune disorders (for example, REMICADE®, STELARA®, TREMFYA®).

33.     A significant percentage of CarePath funds are provided for treatments known as "biologics," which are medications developed from living materials, usually cells, and which have complex molecular structures that are not easily definable. This complexity is in contrast to more conventional medications, which tend to be chemically synthesized and have

14

simpler molecular structures.  Because of this complexity, biologic therapies cannot be precisely copied, meaning that there are no "generic" versions of these molecules that can be substituted for branded products without a physician's prescription, as there are for simpler chemical compounds.[6]  *See also* Tomas J. Philipson et al., *The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, UNIV. CHI. (Dec. 2021), at 18,  https://cpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2021/12/2021_12_15-Copay-Assistance-Final-Draft-Clean.pdf (last visited Apr. 27, 2022) (noting that "copay cards are used primarily for brand drugs without a generic substitute").

34.        Biologics remain at the cutting edge of medical science, and they are often used to treat life-altering medical conditions for which no other treatments are available. Janssen's biologic treatments are essential to the health of patients in a variety of important therapeutic areas, including immunology, oncology, and pulmonary hypertension.  For example, STELARA® is an immunology biologic used to treat hundreds of thousands of patients in the United States for Crohn's disease, ulcerative colitis, and other chronic health conditions. TREMFYA® is an immunology biologic used to treat joint pain, stiffness, and swelling caused by psoriatic arthritis, as well as painful patches on the skin caused by moderate-to-severe plaque psoriasis.  DARZALEX® is an oncology biologic used to treat multiple myeloma, a form of cancer that targets plasma cells found in bone marrow.  For these and most of Janssen's other

---

[6]   There are "biosimilar" versions of certain biologics on the market.  *See* Biosimilar and Interchangeable Products, FDA, https://www.fda.gov/drugs/biosimilars/biosimilar-and-interchangeable-products (last visited Apr. 27, 2022) ("A biosimilar is a biological product that is highly similar to and has no clinically meaningful differences from an existing FDA-approved reference product.").  A biosimilar may also qualify for a designation by the FDA that it is "interchangeable" with the original branded product.  Currently, there are no FDA-approved interchangeable biosimilars for any Janssen product.

biologic therapies, there are currently no FDA-approved "biosimilar" versions of the same molecule on the market.

35.     Developing these biologics is an expensive and risky venture for Janssen and other pharmaceutical manufacturers.  In order to produce safe and effective biologic treatments, Janssen makes enormous investments in research and development.  Even so, only 1 in 5,000 drug candidates makes it from discovery to market, and even for successful drugs, the entire process takes approximately 10 to 12 years.  Further adding to the expense, biologics require rigorous quality control during the manufacturing process, as they are sensitive to even minute changes in raw materials and can be compromised by changes in temperature or microbial contamination.  Manufacturing biologics thus requires specialized manufacturing equipment and facilities.  Without manufacturers like Janssen who are willing to take on these risks and costs, innovative and life-saving biologic treatments would not be available to patients suffering from a range of diseases.

## II.     CarePath Offers Patients Thousands of Dollars in Financial Assistance to Help Defray Out-of-Pocket Costs that Limit Access to Medication

36.     Patients with private commercial health insurance, especially those with acute complex medical conditions, are increasingly subject to higher and higher cost-sharing obligations imposed by their insurers, making it harder for patients to access medications prescribed by their doctors.

37.     Health insurance plan sponsors do not typically determine these obligations alone.  Rather, they contract with entities known as "Pharmacy Benefits Managers" or "PBMs." PBMs are companies that manage prescription drug benefits on behalf of health insurance plans. They often serve as middlemen with an aim towards increasing insurers' and their own profits by

16

determining which drugs a plan will cover and to what extent they will be covered.  Express
Scripts, Inc. is a PBM.

38.     PBMs are also often part of even larger, vertically integrated organizations
that offer other services in the health insurance field.  For example, such organizations may offer
health insurance themselves or operate specialty pharmacies, i.e., pharmacies that dispense
complex pharmaceuticals like biologics that require special handling and care.  Express Scripts,
for example, is itself a subsidiary of the major insurance company Cigna.

39.     In their role as middlemen, PBMs have presided over the rise of high cost-
sharing insurance plans, which feature higher than usual deductibles, copays, and co-insurance.
In essence, these plans pressure patients to limit their medical expenses by covering the full cost
only after significant contributions by the patients.  For instance, when a patient's health plan has
a deductible, he or she must pay the entire price for the drug until the deductible threshold is met.
Only once the deductible is met will the payer help the patient pay for the drug, at which point
the patient may still pay either a fixed amount known as a copay, or a percentage of the drug's
price, known as co-insurance.

40.     Health plans with deductibles for prescription medications are becoming
more common.  Between 2012 and 2017, the share of employer-sponsored health plans requiring
patients to meet a deductible for prescription medications rose from 23% to 52%.  *See Faced
with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic
Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, PHRMA, at 3 (Jan. 29,
2021),    https://phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/D-F/Faced-
with-High-Cost-Sharing-for-Brand-Medicines.pdf.

17

41.     These high-cost sharing models have been found to discourage patients from filling their prescriptions and can lead to abandonment of treatment. *See, e.g.*, Katie Devane et al., *Patient Affordability Part Two: Implications for Patient Behavior & Therapy Consumption*, IQVIA (2018), https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two (finding that 52% of new patients with an out-of-pocket cost of $125 to $250 abandoned treatment, and 69% of new patients with an out-of-pocket cost of $250.01 abandoned treatment); Jalpa A. Doshi et al., *Association of Patient Out-of-Pocket Costs With Prescription Abandonment and Delay in Fills of Novel Oral Anticancer Agents*, JOURNAL OF CLINICAL ONCOLOGY (Dec. 20 2017), https://ascopubs.org/doi/abs/10.1200/JCO.2017.74.5091 (finding that abandonment of oral cancer treatment increased from 10% for patients with a $10 out-of-pocket cost or less to 31.7% for patients with a $100.01 to $500 out-of-pocket cost, 41% for patients with a $500.01 to $2,000 out-of-pocket cost, and 49.4% for patients with an out-of-pocket cost exceeding $2,000); Michael T. Eaddy, *How Patient Cost-Sharing Trends Affect Adherence and Outcomes*, PHARMACY & THERAPEUTICS (Jan. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3278192/ (conducting literature review of 160 articles from January 1974 to May 2008 and finding that "85% showed that an increasing patient share of medication costs was significantly associated with a decrease in adherence").

42.     Patient abandonment of prescribed medication is a serious, potentially fatal problem. It is associated with "poor therapeutic outcomes, progression of disease, and an estimated burden of billions per year in avoidable direct health care costs." Aurel O. Iuga & Maura J. McGuire, *Adherence and Healthcare Costs*, 7 RISK MGMT. HEALTHCARE POLICY 35 (Feb. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3934668/.

18

43.     In order to limit the negative effects of inflated out-of-pocket costs, the ACA places annual limits on the amount of out-of-pocket costs a payer can force a patient to pay for so-called "essential health benefits," which includes many prescription drugs. *See* 45 C.F.R. § 156.130(a). For example, the annual ACA out-of-pocket maximum for the 2022 plan year is $8,700 for an individual and $17,400 for a family. *See Out-of-Pocket Maximum/Limit*, HEALTHCARE.GOV, https://www.healthcare.gov/glossary/out-of-pocket-maximum-limit/ (last visited Apr. 27, 2022). Nevertheless, that threshold is high enough that many patients would still be unable to afford the costs of their medication without help.

44.     Thus, in the face of these ever-increasing cost-share obligations, financial assistance like that provided by JJHCS has become an important safety net helping patients pay for necessary medications. *See The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, *supra* ¶ 33, at 2 (explaining that "[m]anufacturer copay assistance is a tool to ensure drug affordability in response to higher list prices and shifts in benefit design that put more out-of-pocket burden on commercial patients" and that "[w]ithout copay assistance, . . . OOP spending would have increased 3.4 percent from 2015 to 2019, growing from $46.6 billion to $48.2 billion. However, due to the growing use of copay cards in response to growing OOP exposure, patients faced a lower OOP burden, so actual OOP spending paid by patients was lower and decreased 6.3 percent, from an estimated $38.6 billion to $36.2 billion"). Such financial assistance is offered in the form of programs providing patients with coupons or a card that they can then use when purchasing their prescription medications.

45.     Patients with chronic illnesses are increasingly reliant on patient assistance to afford their medications. For example, in 2019, 32% of patients filling brand-name oncology medicines used patient assistance, as did 45% of patients filling brand-name depression

19

medicines, 55% of patients filling brand-name HIV medicines, and 70% of patients filling brand-name multiple sclerosis medicines. *Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, *supra* ¶ 40, at 6. Without patient assistance, average patient out-of-pocket costs for brand medicines would have been 225% to 1,096% higher in 2019, depending on the illness category. *Id.* at 7; *see also The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket*, *supra* ¶ 33, at 2 (noting that "[c]opay cards are even more important to offset high-cost exposures for patients taking specialty drugs as 50 percent of patients taking a specialty brand drug use copay cards versus 33 percent of patients on traditional brand drugs. The savings from copay cards lead patients to have similar final OOP costs between specialty drugs and traditional drugs due to an average savings of $1,548 for specialty drugs and only $414 for traditional drugs"). On average, patient assistance helped patients taking brand HIV and oncology medicines with more than $1,600 in costs, and patients taking brand MS medicines with more than $2,200 in costs. *See Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, *supra* ¶ 40, at 7.

46.     These savings are critical to improving and saving the lives of patients who have private insurance without causing them to choose between treatment and other necessary expenditures, such as food, clothing and housing. Multiple studies have found that when manufacturers help patients pay their out-of-pocket costs, patients are more likely to obtain their medication and adhere to their treatment regimens. *See, e.g.*, Anna Hung et al., *Impact of Financial Medication Assistance on Medication Adherence: A Systematic Review*, 27 J. MGMT. CARE SPECIALTY PHARM. 924 (July 2021); *The Patient Impact of Manufacturing Copay*

*Assistance in an Era of Rising Out-of-Pocket*, *supra* ¶ 33, at 4 ("[A]ffordability offered by copay assistance has resulted in increased utilization of needed drugs. . . . Copay cards lower the out-of-pocket costs for patients leading them to increase their utilization by 4.8 to 16.7 percent."); Matthew Daubresse et al., *Effect of Prescription Drug Coupons on Statin Utilization and Expenditures: A Retrospective Cohort Study*, 37 PHARMACOTHERAPY 12 (Jan. 2017), https://accpjournals.onlinelibrary.wiley.com/doi/10.1002/phar.1802.

47.     CarePath helps patients afford out-of-pocket costs for 44 Janssen drugs.  For most of these drugs, CarePath offers patients up to $20,000 in assistance towards their out-of-pocket costs per calendar year.  This assistance is meant not only to help patients afford their out-of-pocket costs for medications, but also to help patients meet their deductible and ACA out-of-pocket maximums, thereby allowing patients to more easily afford their healthcare overall.

48.     To be eligible for CarePath, patients must meet certain criteria set forth in CarePath's terms and conditions.  Relevant here, patients using CarePath must be enrolled in commercial or private health insurance (not, for example, Medicare).  For some drugs, patients agree to pay $5 or $10 themselves at the point of sale.  Also, the terms state that CarePath "may not be used with any other coupon, discount, prescription savings card, free trial, or *other offer*." (emphasis added).  And patients agree that they "meet the program requirements every time [they] use the program."  *See, e.g.*, DARZALEX® Savings Program, *supra* ¶ 18.

49.     Patients may enroll in CarePath online using the MyJanssenCarePath.com website, by phone, or via mail or fax by filling out and sending an enrollment form.  Once enrolled, patients receive a card they can then use at the point of sale to cover the out-of-pocket costs for their prescription medication minus the $5 or $10 they agreed to pay themselves.

21

III.    **SaveOnSP Employs a Scheme to Drain Patient Assistance Program Funds for Its Own Benefit and the Benefit of Its Partners**

50.    Although programs like CarePath are meant to help patients, payers and PBMs have devised a set of evolving schemes designed to capture the benefit of patient assistance funds.[7] The scheme at issue in this lawsuit represents the latest in this line, and is administered by SaveOnSP.

51.    SaveOnSP's business model is to drain patient assistance from programs like CarePath by increasing patient out-of-pocket costs in a manner that serves no end other than to maximize profits for SaveOnSP and its partners.  SaveOnSP's compensation is based on a contingency fee; it is paid a percentage based on the amount of patient assistance it is able to extract from manufacturer programs like CarePath.  In partnership with PBM Express Scripts and specialty pharmacy Accredo, SaveOnSP markets and sells its program to payers, and then induces patients to enroll.

52.    The contours of the SaveOnSP Program, and the partnership between Express Scripts and SaveOnSP in particular, are governed by a non-public "Master Program

_____

[7]  For instance, for years and continuing today, various payers and PBMs have employed programs known as "accumulators."  These programs work by identifying and accepting manufacturer copay assistance, but refusing to count it toward the patient's deductible or out-of-pocket maximum.  Adam J. Fein, *Copay Maximizers Are Displacing Accumulators—But CMS Ignores How Payers Leverage Patient Support*, DRUG CHANNELS (May 19, 2020), https://www.drugchannels.net/2020/05/copay-maximizers-are-displacing.html.  Because none of the patient assistance counts towards the patient's deductible or out-of-pocket maximum, the scheme delays or prevents the patient from meeting those thresholds, and patient assistance that would normally be sufficient to last all year gets completely used up much earlier.  *Id.*  This leads to serious patient harm, as the patient will eventually go to fill a prescription and be shocked to learn that the patient assistance has run out and that the deductible and out-of-pocket maximum still have not been met—meaning he or she will have to pay the full list price or leave empty handed.  *Id.*  Patients often simply cannot afford to pay such costs without assistance, leading many patients to discontinue their treatment.  The harm caused by such programs has led 11 states to ban them.   Joseph Cantrell, *State Legislative Issues to Watch in 2022*, THE RHEUMATOLOGIST (Jan. 7, 2022), https://www.the-rheumatologist.org/article/state-legislative-issues-to-watch-in-2022/.

Agreement, effective November 13, 2017." *See* Res. 20-660, CITY OF JERSEY CITY, Exhibit B (Sept. 10, 2020), https://cityofjerseycity.civicweb.net/document/33785/Express%20Scripts%20-%20SaveOn%20Program.pdf. Further, SaveOnSP's public-facing website provides limited information about how its program functions. *See Frequently Asked Questions*, SAVEONSP, https://www.saveonsp.com/employers/ (last visited Apr. 27, 2022).

53.     Nevertheless, SaveOnSP's modus operandi is revealed in a video posted online showing a SaveOnSP Program presentation to an Illinois-based health insurance plan sponsor. *See SaveOnSP IPBC Video*, *supra* ¶ 9. In the presentation, the representative admits that the SaveOnSP Program works by designating drugs covered under the health plan as non-essential health benefits: "for a number of drugs, we can carve them out and create a different benefit design, where we designate these drugs as non-essential." *Id.* at 5:30.

54.     This designation prevents any money paid towards the drug from applying to the ACA's annual limit. *Id.* at 7:23 ("[W]e're not gonna allow [patient assistance] to hit [the patient's] max out-of-pocket."). This is because the ACA's annual limit applies only to "essential health benefits." *See* 45 C.F.R. § 155.20 (defining "cost sharing" so that the annual out-of-pocket maximum applies only to "any expenditure required by or on behalf of an enrollee with respect to ***essential health benefits***" (emphasis added)).

55.     As is clear from the presentation, there is no legitimate medical reason for applying the designation, as the drugs are plainly essential for the health and well-being of many patients. Rather, SaveOnSP uses the designation to extract as much money from patient assistance as possible: "***The moment we reclassify these as non-essential we get to operate outside of those rules, which removes the limitations for how high we set the copay***, it removes the requirement to apply copay assistance dollars to the max out-of-pocket. And that's what

allows us to be *the most lucrative* in terms of driving savings for SaveOn." *SaveOnSP IPBC Video, supra* ¶ 9, at 23:35.

56.     This "inflated" copay cost is essential to the SaveOnSP Program's mission of siphoning off patient assistance funds from programs like CarePath: "in order for us to capitalize on this copay assistance funding, *we have to have that inflated copay upfront to bill to copay assistance*." *Id.* at 19:01. For example, the representative explains, if the amount of assistance per fill is $6,600: "we would literally set the patient copay to $6,600, and you would save that amount on every fill." *Id.* at 6:11. To be clear, the "you" in this presentation is the payer—not the patient.

57.     SaveOnSP's method exploits what it perceives as a loophole in the ACA. To cover the required number of prescription drugs mandated by the ACA, a payer must identify as "essential" the greater of "(i) One drug in every United States Pharmacopeia (USP) category and class" or "(ii) The same number of prescription drugs in each category and class as the EHB-benchmark plan."[8] 45 C.F.R. § 156.122(a)(1); *see also* 42 U.S.C. § 18022(b)(1) (specifying that the Secretary of HHS shall "define the essential health benefits" including, *inter alia*, "prescription drugs").

---

[8] An "EHB-benchmark plan" is a "standardized set of essential health benefits that must be met by a" payer. 45 C.F.R. § 156.20. Each state typically selects the parameters for their own EHB-benchmark plan. 45 C.F.R. § 156.100.

58.     Because the regulation requires that payers provide "the same number" of prescription drugs in each category or class as the specified benchmark plans, SaveOnSP takes the view that payers may de-designate drugs covered beyond that number.  This view is reflected in a slide accompanying the recorded presentation:



*SaveOnSP IPBC Video*, *supra* ¶ 9, at 9:30.

59.     The Centers for Medicare & Medicaid Services ("CMS") has stated that if a payer "is covering drugs beyond the number of drugs covered by the [EHB] benchmark, all of these drugs are EHB" and cost sharing paid for drugs properly classed as EHB "must count toward the annual limitation on cost sharing." *See Patient Protection and Affordable Care Act*, 80 Fed. Reg. 10749, 10817 (Feb. 27, 2015) (codified at 45 C.F.R. pts. 144, 147, 153, 154, 155, 156 and 158).  SaveOnSP's Program defies this admonition.  Instead, SaveOnSP and its partners designate covered drugs—including life-saving oncology, pulmonary arterial hypertension, and

immunology drugs—as non-essential health benefits so that it can inflate patient copay obligations.

60.     Once the copay cost is inflated, SaveOnSP can coerce the patient into enrolling in its Program (and consequently in manufacturer programs) by telling them that they will either pay $0 per prescription if they enroll, or will have to pay the inflated copay cost— potentially in the thousands of dollars—themselves if they do not:  "Meaning if you don't participate in this program, your copay or your responsibility will be [for example] $1,000.  And because it's not part of your existing benefit design, that $1,000 is not applicable to your max out-of-pocket.  And that's often compelling enough for members to say, 'oh wait, I want my drugs for free.'"  *SaveOnSP IPBC Video*, *supra* ¶ 9, at 46:10.  Because most patients cannot afford such costs, they are essentially forced into acceding to SaveOnSP's offer.

61.     To communicate this coercive offer to patients, SaveOnSP first engages in outreach.  The representative explains that once the payer signs the contracts to use its program, "there is a standard member letter that we have that can be co-branded" that is sent to patients in the first 30 days, "and it's our goal to outreach to every one of these members before the program ever goes live."  *Id.* at 33:27; 34:04.  The representative explains further that "at 30 days out, if we're unsuccessful in reaching those members, we send a reminder letter and again, another phone call campaign with attempts to try and get contact with that member and get them enrolled."  *Id.* at 34:25.

62.     On average, however, only 55% to 65% of the payer's membership typically gets enrolled by the date that the program goes live.  *Id.* at 34:50.  At this point, SaveOnSP leverages its partnership with the specialty pharmacy Accredo to facilitate patient enrollment.  As the specialty pharmacy designated by the payers to administer the drug benefit plan, Accredo

26

steers the patients to SaveOnSP.  In the words of the SaveOnSP Program representative, "our Accredo advocates, once the claim is processed, will receive a prompt to alert them that this is a SaveOn drug, and they have some scripting that says, 'We have an opportunity for you to participate in a program which allows you to get your drug for free.  I need to connect you to SaveOn now.'  And at that point in time, they 'warm transfer'[9] the member to SaveOn."  *Id.* at 34:14.

63.     As illustrated in paragraph 13 above, adding to the pressure placed on patients, Accredo actually ***rejects*** the patient's claim for their prescription medication at the point of sale in order to transfer them to SaveOnSP, even though that medication is covered by the patient's insurance.  *Human Resources Committee Meeting*, *supra* ¶ 13, at 69.

64.     Once the patient agrees to enroll in its program, SaveOnSP helps the patient enroll in manufacturer patient assistance programs.  The representative explains that SaveOnSP "can help facilitate with the member on the phone" to guide them through online enrollment, or if enrollment is by phone, can advise patients "as how to respond to the questions that they're being asked as part of enrollment."  *SaveOnSP IPBC Video*, *supra* ¶ 9, at 16:08; 16:38.

65.     SaveOnSP inserts itself in this process even though it knows that the enrollment in its program violates the express terms and conditions of the CarePath agreement that prohibit the patient from combining CarePath with the SaveOnSP Program.  SaveOnSP recognizes that the CarePath relationship "is an agreement between the patient and copay assistance through the manufacturer," but nevertheless involves itself because "in order for us to leverage the savings, the member has to actively enroll in copay assistance.  ***That's where the***

---

[9]  A "warm transfer" is "a telecommunications mechanism in which the person answering the call facilitates transfer to a third party, announces the caller and issue and remains engaged as necessary to provide assistance."  *Warm Transfer Definition*, Law Insider, https://www. lawinsider.com/dictionary/warm-transfer (last visited Apr. 27, 2022).

*savings comes from.*" *Id.* at 49:20.  Once SaveOnSP assists the patient in enrolling in patient assistance, "it relays that to Accredo, so that it's housed in our system and then again, the claims from there on out just process at $0." *Id.* at 35:54

66.     The SaveOnSP Program then causes CarePath to be electronically billed for an inflated copay cost that is not connected to the patient's true out-of-pocket responsibility.  The amount charged to the CarePath card at the point of sale is communicated using an "OCC-8" code, which tells JJHCS that the patient owes a copay for the drug.  That code is supposed to communicate the patient's true out-of-pocket responsibility as set by their health plan.  Instead, SaveOnSP causes an inflated charge to be communicated to JJHCS for the express purpose of draining more patient assistant funds from the patient's CarePath card.

67.     This misrepresentation of an inflated copay is made to JJHCS even as it admits elsewhere that patients in the SaveOnSP Program do not have any copay obligation whatsoever. *See Pay $0 for Select Specialty Medications*, *supra* ¶ 11 ("If [a patient] participates in SaveOnSP, he won't pay anything ($0) out-of-pocket.").

68.     Finally, SaveOnSP charges the payer "25% of the savings that's achieved." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 37:38.  To facilitate this payment, payers sign "a 25% joinder agreement," which "allows Express Scripts to bill you for that fee on your administrative invoice.  So you'll see a simple line item for SaveOnSP." *Id.* at 40:50.  In other words, SaveOnSP is paid a percentage of the "savings" it has achieved for payers by meeting the payer's obligations to the patient with patient assistance funds—assistance that SaveOnSP obtains by inducing patients to violate the terms and conditions of CarePath.

69.     SaveOnSP also admits to engaging in careful tactics designed not for the patient's benefit but to optimize earnings.  For example, in deciding which drugs make it onto

28

SaveOnSP's drug list, the representative explains that SaveOnSP looks to which drugs "have the most lucrative copay assistance programs" and that SaveOnSP may "remove drugs from the programs" if "something comes to our attention where the funding goes away completely." *Id.* at 14:47. This further demonstrates that SaveOnSP is making business-driven decisions without any regard for what is best for the patients. Indeed, while SaveOnSP promises patients that they will receive their medication for $0, if the patient assistance is removed, it will eventually move the drug out of the SaveOnSP Program: "we would honor the copay assistance or the $0 SaveOn copay until they were able to effectively manage that patient out, manage that drug out." *Id.* at 14:58.

70.     In order to ensure that only the most lucrative drugs are on its list, SaveOnSP monitors manufacturers' assistance terms and conditions: "in the event that pharma decides to pull back funding for their programs *or decides to change the terms of the program*, it's seamless to the member. *SaveOn is actively watching* these claims process and sees when any of these changes occur." *Id.* at 31:50. And in response to such a change, SaveOnSP might switch one drug off their list in exchange for another one: "it might be a prompt to determine, 'Do we need to make a change in the drug list for this program? Because we are not saving as much as we initially anticipated, and there's another drug where we could.'" *Id.* at 32:09.

71.     Likewise, to minimize the necessary coverage and maximize profits, payers using the SaveOnSP Program are encouraged to pick the state EHB-benchmark plan that has the lowest number of requirements: "So again, the ACA defines the essential by again, leveraging a state benchmark. You do not have to leverage your own current state or the state in which most of your members reside. It's simply a guideline for how to administer that essential health benefit. So for example, many commercial plans pick Utah because it had the fewest number of

29

required drugs to cover, and therefore it was the most cost-effective. So all we're saying is that Utah is setting the list of drugs or the number of drugs by therapeutic category to be deemed essential." *Id.* at 22:40. In other words, instead of picking a state benchmark that reflects where a payer's patients live or where the drug coverage is most comprehensive, SaveOnSP encourages payers to choose a state benchmark with as few requirements as possible to maximize profits.

72. The SaveOnSP Program representative also admits that the SaveOnSP Program operates in a legal "gray area" as it relates to "qualified high deductible HSA [i.e., Health Savings Account] plan[s]." *Id.* at 25:55; 26:27. The representative acknowledges in her presentation that "copay assistance is not ACA compliant in an HSA plan." *Id.* at 26:43. But she explains that SaveOnSP gets away with knowingly breaking this rule because of a lack of oversight: "there's no requirement that patients provide documentation or confirm that they've met their deductibles before they get copay assistance," and "there's no governing body that's really monitoring the industry today," so "copay assistance happens in qualified HSA plans all the time." *Id.* at 26:50. It thus leaves it to plans to "determine whether or not it's appropriate to include their HSA plans in the SaveOn offering or not." *Id.* at 27:27.

73. Further, SaveOnSP deceives manufacturers by actively concealing its role and interference with patient assistance programs. SaveOnSP knows that such programs often have a requirement that a patient pay $5 or $10 of the cost of the prescription. But SaveOnSP intentionally circumvents this requirement by shifting that $5 or $10 obligation onto the payer—and actively conceals from JJCHS that it has done so by using the artifice of a "tertiary biller," which is "really SaveOn behind the scenes." *Id.* at 30:24.

74. While SaveOnSP engages in these wrongful courses of conduct to increase profits, it unfortunately comes at a great cost to patients. Patient assistance programs are meant

to help patients pay their actual and required out-of-pocket costs. By changing the amounts owed by patients based on only the availability of patient assistance, the programs disconnect patient assistance from actual cost to patients, causing patient assistance programs to be more expensive than originally intended, and converting what is meant to be patient assistance into a manufacturer subsidy for SaveOnSP and its partners. *See The Patient Impact of Manufacturing Copay Assistance in an Era of Rising Out-of-Pocket, supra* ¶ 33, at 17 (explaining that "accumulator adjustment and maximizer programs . . . counteract the uptake of manufacturer copay assistance shifting the cost burden back onto patients" and that "limiting [patients' use of copay assistance programs] without giving patients a new way to address their affordability issues will negatively impact patients"). By these actions, SaveOnSP wrongly increases the costs of patient assistance programs and, unless enjoined, will make it untenable for such programs to continue to be provided.

75. Moreover, SaveOnSP misleads patients about the nature of the SaveOnSP Program. SaveOnSP does not tell patients that by enrolling in the SaveOnSP Program, they are breaching their agreement with JJHCS. It does not tell patients that the SaveOnSP Program may cause as much as a year's worth of patient assistance to be drained in just a few prescription fills. And it does not tell patients that it charges a fee of at least 25% of the patient assistance funds pulled.

76. It also does not tell patients that patient assistance is available without the SaveOnSP Program. Indeed, in marketing materials, SaveOnSP misrepresents to patients that "Without SaveonSP," "[t]here is no copay assistance":

31

| Without SaveonSP | | | | |
| --- | --- | --- | --- | --- |
| The prescription copay is paid by you. There is no copay assistance. | | | | |
| **Drug Cost** | **Your Copay** | **Copay Assistance** | **Your Total Cost** | **Plan Cost** |
| $2,250 | $50 | $0 | $50 | $2,200 |

*SaveonSP: Copay Offset Program for Specialty Medication*, BLUECROSS BLUESHIELD OF WESTERN NEW YORK, https://www.bcbswny.com/content/dam/BCBSWNY/broker-group/public /pdf/group/computer-task-group/Saveon-Member-Flyer.pdf (last visited Apr. 27, 2022). This is false: manufacturers provide copay assistance independently of SaveOnSP, and did so for many years before SaveOnSP ever began interfering in these programs.

77. Further, the SaveOnSP Program puts patients who decide not to enroll in an even more precarious scenario: They will still have an inflated copay obligation, but the payer does not cover the cost, and the patient is told that he or she will have to pay the cost alone. *Id.*

78. Finally, in either case, no payments count towards the patient's deductible or out-of-pocket maximum, so the patient will still face higher costs for other healthcare services (such as doctor's visits or diagnostic testing). *Pay $0 for Select Specialty Medications*, *supra* ¶ 11. The marketing materials for the SaveOnSP Program referenced in paragraph 11 above make this clear, noting that in either scenario, payments made for the drug "won't count towards [the patient's] deductible or out-of-pocket maximum." *Id.*

79. The federal government has recognized that assistance from manufacturers is for patients, not payers, and has explained patients are harmed when payers "shift costs back to the patient prematurely by not applying the full value of the manufacturer-sponsored assistance to a patient's health plan deductible." *See* Medicaid Program, 85 Fed. Reg. 87,000, 87,049 (Dec. 31, 2020) (codified at 42 C.F.R pts. 433, 438, 447, and 456). Indeed, CMS has even issued a

rule intended to ensure that patient assistance benefits patients, not payers, 85 Fed. Reg. at 87,048–58, and has explained that the rule exists because "[h]ealth plans, with the help of third-party pharmacy benefits administrators, often reap the benefits of [patient assistance] by declining to allow [it] to offset patients' out-of-pocket costs," and as a result "plans are enriched through the reduction in the amount they have to cover for these drugs." *See Pharm. Research & Mfs. of Am. v. Becerra*, No. 21-CV-01395, Dkt. 32-1, at 1 (D.D.C. Feb. 3, 2022).

80.    Payers already can and do negotiate pricing discounts with manufacturers, including by securing rebates that manufacturers pay after patients fill prescriptions. *See The 2021 Janssen U.S. Transparency Report*, *supra* ¶ 25, at 6 (indicating that since 2016, "the rebates, discounts and fees we have provided to commercial insurers and PBMs have increased almost fivefold" and that Janssen provided $8.3 billion in rebates, discounts, and fees to commercial insurers and PBMs in 2021); *see also Form 10-K*, *supra* ¶ 25, at 37 (Cigna stating, "[w]e maintain relationships with numerous pharmaceutical manufacturers, which provide us with, among other things: . . . discounts, in the form of rebates, for drug utilization"). In fact, SaveOnSP has inflated patients' drug copay obligations even as JJHCS has consistently decreased the price of the drugs targeted by the SaveOnSP Program. *See The 2021 Janssen U.S. Transparency Report*, *supra* ¶ 25, at 2 (indicating that "net prices for Janssen medicines have declined for the fifth year in a row," including a net decline of -2.8% in 2021 (compared to the 2021 consumer inflation rate of 7%)).

81.    Patient assistance does not exist as additional funding for payers to absorb on top of those enormous price concessions. But various publicly available materials describing the SaveOnSP Program explicitly acknowledge that the program is designed for just that: to enrich payers.

82.     For example, in a presentation given to the New Jersey Health Insurance
Fund, a New Jersey-based insurance pool, the SaveOnSP Program is described as a "very
aggressive program" that sets copays to "maximize manufacturer assistance dollars" so that
"*plan sponsor spend* [is] reduced $2.50 - $4.50 [per member per month]."  Joseph M. DiBella,
*New Jersey Health Insurance Fund*, PERMA (Nov. 2019) at 19–20, https://slideplayer.com/
slide/17742625/ (emphasis added).

83.     Similarly, an agenda for the Burlington County Insurance Commission,
another New Jersey-based insurance pool, notes that the SaveOnSP Program is being
implemented "*so that the plan can maximize manufacturer assistance* dollars (coupons) while
reducing the member's copay to $0."  *Meeting and Reports*, BURLINGTON CNTY. INS. COMM'N
(Nov. 5, 2020), at 28, https://bcnj.co.burlington.nj.us/Upload/BCIC/Images/Agenda_11-5-20.pdf
(emphasis added).

84.     And in another agenda for Southern Skyland Regional, a New Jersey-based
insurance fund, there are notes that while "Members receive a $0 copay," the "*plan receives the
remaining discount*."  *Agenda & Reports*, Southern Skyland Regional (Oct. 5, 2021), at 8,
https://static1.squarespace.com/static/5b1c2db85ffd2031c58b5583/t/615db86e5abc5715e41a709
e/1633532015317/A_SSRHIF_October+5th+Agenda.pdf (emphasis added).

85.     SaveOnSP's own website emphasizes the same, explaining how "plan[s] see
savings generated" from its program.  *See Frequently Asked Questions*, SAVEONSP, https://
www.saveonsp.com/employers/ (last visited Apr. 27, 2022); *see also Copay Assistance Strategy
Reduces Financial Burdens for Plans and Patients*, *supra* ¶ 23 (highlighting that "[i]n 2020,
plans that participated in these copay assistance solutions [like the SaveOnSP Program]
experienced a specialty trend of -7.2%, while nonparticipating plans experienced an 8.7%

34

specialty trend."); *Form 10-K*, *supra* ¶ 25, at 7 (Cigna stating that it has a "partnership with SaveOnSP," an "aggressive solution" that "adapts" to changes in manufacturer programs to "protect plan design preferences and achieve lower trend" for health plans).

86.     And while these materials also tout reduced costs to patients, they mislead patients by obscuring the fact that patients can get the benefit of reduced costs by directly signing up for manufacturer assistance, without any involvement from SaveOnSP whatsoever.

87.     Further underscoring that the SaveOnSP Program is for the benefit of payers and not patients, SaveOnSP Program materials show that even when patients do hit their deductible or out-of-pocket maximum through other means, SaveOnSP will continue to extract patient assistance. *See Copay Assistance Program & Solutions*, *supra* ¶ 12, at 5 ("[T]he member continues to max out the copay assistance throughout the plan year regardless of whether they hit their DED/MOOP through other means.").

88.     Finally, the SaveOnSP Program also burdens patients with a complicated enrollment process that can create unnecessary confusion for individuals already under pressure from difficult medical circumstances. *See* Anndi McAfee, *SaveonSP's Copay Maximizer Failed Me: A Patient's Perspective*, Drug Channels (Nov. 13, 2020), https://www.drugchannels.net /2020/11/saveonsps-copay-maximizer-failed-me.html ("If SaveonSP had not used all of my money, I probably would have continued on in sweet blissful ignorance. But here I am again, expending precious time and energy to ensure that my drug gets into my body."). As noted in paragraph 13 above, one step in the SaveOnSP Program is to falsely tell a patient who is entitled to insurance coverage for a life-saving medication that their request for coverage was denied, as a ruse to push the person to apply for copay support just to drive greater profitability for SaveOnSP. *Human Resources Committee Meeting*, *supra* ¶ 12, at 69.

## IV.    JJHCS Is Harmed by SaveOnSP's Abusive Practices

89.      CarePath's terms and conditions typically require patients to pay $5 or $10 when using the Assistance Program, and they preclude patients from using the Assistance Program with "any other coupon, discount, prescription savings card, free trial, or other offer." *See, e.g.*, DARZALEX® Savings Program, *supra* ¶ 18.

90.      The SaveOnSP Program is clearly such an "offer." Indeed, the SaveOnSP representative refers to the SaveOnSP Program in her presentation as the "SaveOn *offering*." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 4:25; 27:31. And marketing materials similarly state, "That's why your plan *offers* a program called SaveOnSP, which can help lower your out-of-pocket costs to $0." *See Pay $0 for Select Specialty Medications*, *supra* ¶ 11 (emphasis added). Nevertheless, despite its knowledge of these terms, SaveOnSP implements its program to extract CarePath's funds.

91.      SaveOnSP's conduct is clear from its publicly available drug lists. For example, one such list includes 14 Janssen drugs: BALVERSA®, DARZALEX®, DARZALEX FASPRO®, ERLEADA®, IMBRUVICA®, OPSUMIT®, REMICADE®, RYBREVANT®, SIMPONI®, STELARA®, TRACLEER®, TREMFYA®, UPTRAVI®, and ZYTIGA®. *See 2022 SaveOnSP Drug List*, CHRISTIAN BROTHERS EBT, (Dec. 20, 2021), https://www.saveonsp. com/wp-content/uploads/2021/12/cbservices.pdf.

92.      Internal JJHCS data concerning CarePath use confirms that SaveOnSP is abusing CarePath. For instance, in 2021, the average amount of CarePath funds pulled per fill for STELARA® patients who were not enrolled in the SaveOnSP Program was $1,171, while the average amount of CarePath funds pulled per fill for STELARA® patients who were enrolled in the SaveOnSP Program was $4,301.

36

93.         The same pattern holds true for patients on TREMFYA®.  In 2021, the average amount of CarePath funds pulled per fill for TREMFYA® patients who were not enrolled in the SaveOnSP Program was $1,126, while the average amount of CarePath funds pulled per fill for TREMFYA® patients who were enrolled in the SaveOnSP Program was $3,717.

94.         The difference is even starker for other drugs.  For example, the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were not enrolled in the SaveOnSP Program was only $418, while the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were enrolled in the SaveOnSP Program was $5,000.

95.         These trends continue into this year.  For January through March of 2022, the average amount of CarePath funds pulled per fill for STELARA® patients who were not enrolled in the SaveOnSP Program was $2,057, while the average amount of CarePath funds pulled per fill for STELARA® patients who were enrolled in the SaveOnSP Program was $6,401.

96.         Likewise, for the same time period, the average amount of CarePath funds pulled per fill for TREMFYA® patients who were not enrolled in the SaveOnSP Program was $1,796, while the average amount of CarePath funds pulled per fill for TREMFYA® patients who were enrolled in the SaveOnSP Program was $3,745.

97.         And, for the same time period, the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were not enrolled in the SaveOnSP Program was only $1,242, while the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were enrolled in the SaveOnSP Program was $6,979.

98.     SaveOnSP harms JJHCS not only by causing inflated amounts of patient assistance to be charged per fill, but also by causing greater amounts of patient assistance to be charged earlier in the year. Many patients do not stay on therapy for an entire year. Thus, when SaveOnSP seizes a year's worth of copay assistance by repeatedly charging inflated copays, but the patient does not actually fill a year's worth of prescriptions, SaveOnSP reaps an additional windfall and charges JJHCS for more copay assistance than is actually warranted. In some instances, SaveOnSP has extracted an entire year's worth of patient assistance by the middle of the year.

99.     Indeed, SaveOnSP causes JJHCS to pay out the maximum amount of funds available per patient far more often than it otherwise would. For example, in 2021, only 3% of STELARA® patients who were not enrolled in the SaveOnSP Program exhausted the full CarePath benefit of $20,000, while *33%* of STELARA® patients who were enrolled in the SaveOnSP Program exhausted the full CarePath benefit of $20,000.

100.     Through the SaveOnSP Program, SaveOnSP knowingly and wrongfully harms JJHCS by causing it to pay CarePath funds solely for its own enrichment. JJHCS provides CarePath funds to help patients bridge the gap between what they must pay out-of-pocket to obtain their Janssen drugs and what they can afford. But the SaveOnSP Program interferes with this intended purpose by causing JJHCS to pay out exponentially more CarePath funds per patient only so that it may profit in violation of the CarePath terms and conditions.

101.     Further, there is no easy or foolproof way for JJHCS to simply reduce the amount of assistance it provides to all patients enrolled in SaveOnSP's Program. This is because SaveOnSP has taken steps to obscure when funds are being extracted from CarePath through its Program, including recently by varying the patient's out-of-pocket obligation per prescription

fill, such that the amounts extracted from the copay card by the pharmacy are not consistent and easily detectible. Further, JJHCS cannot reduce cost support preemptively to prevent SaveOnSP's activities without an unacceptable risk that individual patients may be misidentified and suffer from reduced cost support and consequently be unable to afford their therapy. The secretive nature of SaveOnSP's operations, therefore, renders any attempt to reduce copay assistance on a patient-by-patient basis unworkable as it risks harming the very patients CarePath was designed to support.

102.     For STELARA® and TREMFYA®, JJHCS released a new version of the terms and conditions that were publicly on the CarePath website in December 2021. *See* STELARA® Savings Program (Dec. 2021), https://www.janssencarepath.com/sites/www.janssencarepath-v1.com/files/stelara-savings-program-overview.pdf?v=39;        TREMFYA® Savings Program (Dec. 2021), https://www.janssencarepath.com/sites/www.janssencarepath-v1.com/files/tremfya-savings-program-overview.pdf?v=88.

103.     The new terms and conditions specify explicitly that to be eligible for CarePath, "you . . . must pay an out-of-pocket cost for your medication." *Id.* They also explicitly prohibit use of programs like SaveOnSP, stating "Patients who are members of health plans that claim to eliminate their out-of-pocket costs are not eligible for cost support." *Id.*

104.     To this date, however, SaveOnSP has not taken Janssen's drugs off its list, and continues to induce patients in the SaveOnSP Program to sign up for CarePath in violation of CarePath's terms and conditions.

105.     Thus, SaveOnSP continues to harm JJHCS, entitling it to relief. Moreover, damages for ongoing and future wrongdoing are inadequate because SaveOnSP takes concerted

39

measures to avoid detection.  Unless enjoined, it will continue to cause damages and irreparable

harm to JJHCS.

## COUNT I:
## TORTIOUS INTERFERENCE WITH CONTRACT

106.  JJHCS re-alleges paragraphs 1–105 as if fully set forth herein.

107.  JJHCS has a valid and enforceable contract with the patients who use

CarePath.

108.  The CarePath terms and conditions prohibit patients from being enrolled in

SaveOnSP while using CarePath.

109.  SaveOnSP knowingly and wrongfully induces patients to agree to CarePath's

terms and conditions, thereby intentionally causing those patients to breach their contract with

JJHCS every time they use CarePath funds while enrolled in the SaveOnSP Program.

110.  Through its wrongful inducement, SaveOnSP knowingly and proximately

causes JJHCS damage by making it pay more money from CarePath than it otherwise would

have for a purpose JJHCS did not intend.

111.  SaveOnSP has therefore tortiously interfered with JJHCS's agreement with

patients who use CarePath.

## COUNT II:
## DECEPTIVE TRADE PRACTICES
## IN VIOLATION OF N.Y. GEN. BUS. LAW § 349

112.  JJHCS re-alleges paragraphs 1–111 as if fully set forth herein.

113.  SaveOnSP has been and is engaging in willful deceptive acts and practices in

New York against JJHCS and the public in the conduct of its business through the following

consumer-oriented acts: engineering a false denial of coverage at the point of sale to coerce

patients into enrolling in the SaveOnSP Program; telling patients that there is "no copay

40

assistance with SaveOnSP" when manufacturers do in fact provide assistance independently of the SaveOnSP Program; failing to tell patients that by enrolling in the SaveOnSP Program, they are breaching their agreement with JJHCS; and failing to tell patients that they charge a fee of at least 25% of the patient assistance funds extracted from JJHCS.

114.    Through its willful deceptive acts and practices, SaveOnSP causes damage to the public, including patients, by causing undue stress and confusion through acts such as engineering false denials of coverage; jeopardizing the viability of patient assistance programs like CarePath by making them prohibitively expensive; and making other patient healthcare needs more expensive by not counting any of the funds spent on patients' medication towards their ACA maximum or deductible.

115.    Through its willful deceptive acts and practices, SaveOnSP also causes damage to JJHCS by making it pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend.

116.    SaveOnSP has therefore violated N.Y. Gen. Bus. Law § 349.

117.    SaveOnSP's violation of § 349 also warrants the recovery of attorneys' fees.

## DEMAND FOR JURY TRIAL

118.    JJHCS hereby respectfully requests a trial by jury for all claims and issues in its Complaint which are or may be entitled to a jury trial.

## PRAYER FOR RELIEF

**NOW, THEREFORE**, Plaintiff JJHCS respectfully requests that the Court:

A.    Award JJHCS damages in an amount to be ascertained at trial.

B.    Award to JJHCS pre-judgment and post-judgment interest.

C.    Issue an injunction preventing SaveOnSP from implementing the SaveOnSP Program as to Janssen drugs.

D.    Award JJHCS its reasonable attorneys' fees.

E.    Grant such other and further relief as the Court may deem appropriate.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:    s/ Jeffrey J. Greenbaum
       JEFFREY J. GREENBAUM
       KATHERINE M. LIEB


PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick (*pro hac vice* forthcoming)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

Dated:  May 4, 2022

42

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civ. Rule 11.2, I hereby certify to the best of my knowledge, information and belief that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:   s/ Jeffrey J. Greenbaum
      JEFFREY J. GREENBAUM
      KATHERINE M. LIEB


PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick (*pro hac vice* forthcoming)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

Dated: May 4, 2022

JS 44 (Rev. 04/21)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Johnson & Johnson Health Care Systems Inc. | Save On SP, LLC |

| (b) County of Residence of First Listed Plaintiff   Middlesex, NJ | County of Residence of First Listed Defendant   Erie County, NY |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Jeffrey J. Greenbaum, Katherine M. Lieb, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07305, 973-643-7000 | |

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury - Product Liability | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | | | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | 368 Asbestos Personal Injury Product Liability | | 835 Patent - Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | 840 Trademark | 460 Deportation |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle | 370 Other Fraud | 710 Fair Labor Standards Act | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced and Corrupt Organizations |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 720 Labor/Management Relations | **SOCIAL SECURITY** | 480 Consumer Credit (15 USC 1681 or 1692) |
| 190 Other Contract | 360 Other Personal Injury | [X] 380 Other Personal Property Damage | 740 Railway Labor Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 195 Contract Product Liability | 362 Personal Injury - Medical Malpractice | 385 Property Damage Product Liability | 751 Family and Medical Leave Act | 862 Black Lung (923) | 490 Cable/Sat TV |
| 196 Franchise | | | 790 Other Labor Litigation | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 791 Employee Retirement Income Security Act | 864 SSID Title XVI | 890 Other Statutory Actions |
| 210 Land Condemnation | 440 Other Civil Rights | **Habeas Corpus:** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 230 Rent Lease & Ejectment | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 240 Torts to Land | 443 Housing/ Accommodations | 530 General | | 871 IRS—Third Party 26 USC 7609 | 896 Arbitration |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment | 535 Death Penalty | **IMMIGRATION** | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other | **Other:** | 462 Naturalization Application | | 950 Constitutionality of State Statutes |
| | 448 Education | 540 Mandamus & Other | 465 Other Immigration Actions | | |
| | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause: Plaintiff seeks damages for tortious interference with contract and for deceptive trade practices in violation of N.Y. Gen. Bus. Law § 349

### VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ In excess of $100 million

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes  [ ] No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 5/4/2022 | s/ Jeffrey J. Greenbaum |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON                       :
HEALTH CARE SYSTEMS INC.,               :     Civil Action No. 22-2632 (JMV) (CW)
                                        :
                      Plaintiff,        :
            vs.                         :     **DISCOVERY CONFIDENTIALITY**
                                        :     **ORDER**
SAVE ON SP, LLC,                        :
                                        :
                      Defendant.        :


It appearing that discovery in the above-captioned action is likely to involve the disclosure of confidential information, it is ORDERED as follows:

1.  Any party to this litigation and any third-party who produces to any other person any "Discovery Material" (*i.e.*, information, documents, or things of any kind, including without limitation interrogatory answers, admissions, pleadings, responses to a subpoena, or testimony) in the course of discovery in this action) (a "Producing Party") shall have the right to designate as "Confidential" and subject to this Order any Discovery Material or portion thereof: (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales or other confidential business information, or (b) that contains private or confidential personal information, or (c) that contains information received in confidence from third parties, or (d) which the producing party otherwise believes in good faith to be entitled to protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure and Local Civil Rule 5.3, or the production of which would cause the Producing Party to violate his, her, or its privacy or confidentiality obligations to others.

    a.  Any Producing Party who produces or discloses any Confidential Discovery Material shall mark the same with the following or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Confidential").

    b.  Any Producing Party who produces Confidential Discovery Material in native format, shall include, at the end of the file name and prior to the file extension, the following or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER". Any person making any copy of the native file, if authorized under this Order, shall not rename the file.

2.  Any Producing Party shall have the right to designate as "Attorneys' Eyes Only" and subject to this Order any Discovery Material or any portion thereof that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the

Producing Party or the disclosure of which absent an Attorneys' Eyes Only designation could cause the Producing Party to violate its privacy or confidentiality obligations to others.

a.  Any Producing Party who produces or discloses any Attorneys' Eyes Only Discovery Material shall mark the same with the following or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER" (hereinafter "Attorneys' Eyes Only").

b.  Any Producing Party who produces Attorneys' Eyes Only Discovery Material in native format, shall include, at the end of the file name and prior to the file extension, the following or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY – SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER". Any person making any copy of the native file, if authorized under this Order, shall not rename the file.

3.  With respect to the production of any Discovery Material that identifies an individual or subscriber and relates to the past, present, or future care, services, or supplies relating to the physical or mental health or condition of such individual or subscriber, the provision of health care to such individual or subscriber, or the past, present, or future payment for the provision of health care to such individual or subscriber ("Confidential Health Information"), the Producing Party or its counsel shall mark the same with the following or similar legend: "CONFIDENTIAL HEALTH INFORMATION." If such Discovery Material is produced in native format, the native version shall include, at the end of the file name and prior to the file extension, the following or similar legend: "CONFIDENTIAL HEALTH INFORMATION." Any person making any copy of the native file, if authorized under this Order, shall not rename the file.

a.  Confidential Health Information specifically includes "protected health information" as such term is defined by the Standards for Privacy of Individually Identifiable Health Information, 45 CFR parts 160 and 164, promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). *See* 45 C.F.R. § 160.103 (defining "individually identifiable health information" and "protected health information"). Confidential Health Information also includes, but is not limited to, medical bills, claims forms, charge sheets, medical records, medical charts, test results, notes, dictation, invoices, itemized billing statements, remittance advice forms, explanations of benefits, checks, notices, and requests. Confidential Health Information also includes without limitation all notes, summaries, compilations, extracts, abstracts, or oral communications that contain, are based on, or are derived from, Confidential Health Information.

b.  Confidential Health Information does not include any Discovery Material that has all of the following identifiers of the individual or subscriber or of the relatives, employers, or household members of the individual or subscriber removed or redacted:

2

    i.    names;

    ii.    all geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent area codes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census, (i) the geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people, and (ii) the initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000;

    iii.    all elements of dates (except year) for dates directly related to an individual, including birth date, admission dates, discharge dates and date of death, and all ages over 89, and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

    iv.    telephone numbers;

    v.    fax numbers;

    vi.    electronic mail addresses;

    vii.    social security numbers;

    viii.    medical record numbers;

    ix.    health plan beneficiary numbers;

    x.    account numbers;

    xi.    certificate/license numbers;

    xii.    vehicle identifiers and serial numbers, including license plate numbers;

    xiii.    device identifiers and serial numbers;

    xiv.    web universal resource locators ("URLs");

    xv.    internet protocol ("IP") address numbers;

    xvi.    biometric identifiers, including finger and voice prints;

    xvii.    full face photographic images and any comparable images; and

    xviii.    any other unique identifying number, characteristic, or code except as permitted for a code utilized to re-identify de-identified data that complies with 45 C.F.R. § 164.514(c).

     c.     Notwithstanding the foregoing, the parties shall produce Discovery Material containing Confidential Health Information in response to discovery requests of another party in this litigation without redaction, designating such documents as set forth herein.

     d.     This Order is intended to provide protection sufficient to constitute a Qualified Protective Order under HIPAA and the regulations promulgated under its aegis. *See* 45 C.F.R. § 164.512(e)(1)(ii).

4.     All Designated Material, defined to include Confidential, Confidential Health Information, and Attorneys' Eyes Only materials, shall be used by any person to whom the Discovery Material is produced or disclosed (a "Receiving Party") solely for purposes of the prosecution or defense of this action, shall not be used by the Receiving Party for any business, commercial, competitive, personal or other purpose, including for purposes of initiating, prosecuting, or defending any other action, and shall not be disclosed by the Receiving Party to anyone other than those set forth herein, unless and until the restrictions herein are removed either by written agreement of counsel for the parties, or by Order of the Court. It is, however, understood that counsel for a Receiving Party may give advice and opinions to his or her client solely relating to the above-captioned action based on his or her evaluation of Designated Material, provided that such advice and opinions shall not reveal the content of such Designated Material except by prior written agreement of counsel for the parties, by Order of the Court, or as otherwise permitted by this Discovery Confidentiality Order.

5.     Discovery Material produced and marked Confidential and Confidential Health Information and the contents of such material may be disclosed only to the following individuals under the following conditions:

     a.     Outside litigation counsel retained by the parties for this action (herein defined as any attorney at the parties' outside law firms) and relevant in-house counsel for the parties;

     b.     Outside experts or consultants retained by outside counsel for purposes of this action, including their staff, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A.

     c.     Secretarial, paralegal, clerical, duplicating and data processing personnel of the foregoing;

     d.     The Court and court personnel;

     e.     Any deponent may be shown or examined on any information, document or thing designated under this Discovery Confidentiality Order if it appears that the witness authored or received a copy of it, was involved in the subject matter described therein or is employed by the party who produced the information, document or thing, or if the producing party consents to such disclosure;

4

f.    Vendors retained by or for the parties to assist in preparing for pretrial discovery, trial and/or hearings including, but not limited to, court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom or in depositions or mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials provided that the vendor has first signed a copy of Exhibit A;

g.    Any other person mutually agreed upon in writing among the Parties, but only if that person has signed a copy of Exhibit A; and

h.    The parties. In the case of parties that are corporations or other business entities, "party" shall mean executives who are required to participate in decisions with reference to this lawsuit.

6.    With respect to Discovery Material produced and designated Confidential Health Information:

a.    A Receiving Party or any other person who has access to Designated Material shall implement appropriate administrative, physical, and technical safeguards to prevent the use or disclosure of Confidential Health Information in any manner other than pursuant to the terms and conditions of this Order;

b.    A Receiving Party or any other person who has access to Designated Material shall limit the use or disclosure of Confidential Health Information to the minimum necessary to accomplish the intended purpose of such use or disclosure—but nothing in this sub-paragraph 6(b) shall prevent any use of Designated Material for purposes of this litigation in a manner consistent with the terms of this Order; and

c.    In the event that the Receiving Party or any person who has access to Designated Material becomes aware of or suspects that Discovery Material produced and marked Confidential Health Information or the contents of such material has been disclosed or used by the Receiving Party—or by any other party to which the Receiving Party disclosed said Discovery Material—in a manner other than those permitted under this Order, that person or the Receiving Party shall immediately notify the Producing Party. Such notification shall provide the Producing Party with information sufficient to identify the Confidential Health Information at issue and, to the extent possible, the nature of the unauthorized disclosure or use. For the purposes of this reporting requirement, no person is required to report inconsequential incidents that occur on a daily basis such as scans or 'pings' that are not allowed past that person's fire walls.

7.    Discovery Material produced and marked as Attorneys' Eyes Only may be disclosed only to the persons described in Paragraphs 5.a through 5.g above, except that with respect to in-house counsel, said Discovery Material may also be disclosed only up to four (4) in-house counsel with responsibilities for this matter, provided that before any such

Discovery Material is disclosed to in-house counsel, they have been disclosed to the opposing party and have signed a copy of Exhibit A. A party may substitute which in-house counsel may access Attorneys' Eyes Only materials pursuant to this Paragraph, provided that such substitution is disclosed to the opposing party prior to sharing any Attorneys' Eyes Only Discovery Material with the substituted counsel and the total number of in-house counsel does not exceed four. The parties may agree in writing that Discovery Material produced and marked as Attorneys' Eyes Only may be disclosed to additional in-house attorneys.

8.  Designated Material shall be used only by individuals permitted access to it under Paragraphs 5 and 7. Designated Material, copies thereof, and the information contained therein, shall not be disclosed in any manner to any other individual, until and unless (a) outside counsel for the party asserting confidentiality waives the claim of confidentiality, and, in the case of Discovery Materials marked "Confidential Health Information," there exists a valid authorization by the individual to whom it relates that complies with the requirements of 45 C.F.R. § 164.508(6); or (b) the Court orders such disclosure.

9.  With respect to any depositions that involve a disclosure of Designated Material, the designating party shall have until fourteen (14) days after receipt of the final deposition transcript to inform all other parties which portions of the transcript, by page and line number, are to be designated as Confidential, Confidential Health Information, or Attorneys' Eyes Only, which period may be extended by agreement of the parties. During these fourteen (14) days), all deposition transcripts shall be treated as if they had been designated as Attorneys' Eyes Only in their entirety.

10. If counsel for a Receiving Party objects to the designation of all or a portion of Discovery Material as Confidential, Confidential Health Information, or Attorneys' Eyes Only, the following procedure shall apply:

   a.  Counsel for the Receiving Party shall serve on the Producing Party a written objection to such designation, which shall describe with particularity by Bates number or deposition page and line number the documents or information in question and shall state the grounds for objection. Counsel for the Producing Party shall respond in writing to such objection within 14 days, and shall state with particularity the grounds for asserting that the Discovery Material is Confidential, Confidential Health Information, or Attorneys' Eyes Only. If no timely written response is made to the objection, the challenged designation will be deemed to be void. If the Producing Party makes a timely response to such objection asserting the propriety of the designation, counsel shall then confer in good faith in an effort to resolve the dispute. The challenged material shall be treated as it has been designated until the Producing Party agrees otherwise in writing or this Court issues an order rejecting the designation.

   b.  If a dispute as to a Confidential, Confidential Health Information, or Attorneys' Eyes Only designation of a document or item of information cannot be resolved by agreement, the party challenging the designation shall present the dispute to the Court initially by telephone or letter, in accordance with Local Civil Rule

37.1(a)(1), before filing a formal motion for an order regarding the challenged designation. The document or information that is the subject of the filing shall be treated as originally designated pending resolution of the dispute.

11. Any document designated Confidential, Confidential Health Information, or Attorneys' Eyes Only by a party or non-party and which document is filed with the Court shall be filed under seal in accordance with Local Civil Rule 5.3. Court filings that refer to Designated Material, but do not disclose the substance of that Designated Material, need not be filed under seal.  However, any Court filing that would disclose the substance of any Designated Material must be filed under seal or with redactions to the extent necessary to preserve confidentiality of that material in accordance with Local Civil Rule 5.3.

12. Each person who has access to Designated Material shall take reasonable precautions to prevent the unauthorized or inadvertent disclosure of such material.

13. To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Discovery Material that should have been marked as Designated Materials, regardless of whether the information, document or thing was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information, document or thing disclosed or as to any other material or information concerning the same or related subject matter.  Such inadvertent or unintentional disclosure may be rectified by notifying in writing counsel for all parties to whom the material was disclosed that the material should have been designated under this Discovery Confidentiality Order within a reasonable time after the Producing Party discovers that the material was not properly marked.  Such notice shall constitute a designation of the Discovery Material as Confidential, Attorneys Eyes Only, or Confidential Health Information under this Discovery Confidentiality Order.

14. When the inadvertent or mistaken disclosure of any Discovery Material protected by privilege or work-product immunity is discovered by the Producing Party and brought to the attention of the Receiving Party, the Receiving Party's treatment of such material shall be in accordance with Federal Rule of Civil Procedure 26(b)(5)(B). If a Producing Party asserts an inadvertently produced document is privileged in its entirety, the Producing Party shall produce a privilege log with respect to any such inadvertently disclosed information within five (5) business days of receiving confirmation from the Receiving Party that the inadvertently disclosed information has been returned or destroyed.  If a Producing Party asserts that only a portion of an inadvertently produced document is privileged, it must reproduce the document in redacted form within five (5) business days of receiving confirmation from the Receiving Party that the inadvertently disclosed information has been returned or destroyed.  The Receiving Party may request additional information regarding the redacted document to the extent necessary to evaluate whether to challenge the claim of privilege.  The Producing Party shall provide that information within five (5) business days of receiving such request.  Such inadvertent or mistaken disclosure of such information, document or thing shall not by itself constitute a waiver by the Producing Party of any claims of privilege or work-product immunity. However, nothing herein restricts the right of the Receiving Party to challenge

7

the Producing Party's claim of privilege if appropriate within a reasonable time after receiving notice of the inadvertent or mistaken disclosure. If such challenge involves moving the Court for an order compelling production, said motion shall be filed under seal, and neither the fact of the inadvertent production nor the content of any privileged portion of the Discovery Material at issue shall be asserted as a grounds or basis for entering such an order.

15.     If a non-party serves a Party in this action with a request, subpoena, or order ("demand") for disclosure of Designated Material of a Designating Party, the Party receiving the demand, if not prohibited under applicable law, shall promptly deliver a copy of the demand to the Designating Party's counsel, and shall notify the party who served the request that some or all of the materials sought by the request are subject to this Confidentiality Order. The Party receiving the demand shall not disclose any Designated Material prior to the date specified for disclosure, or prior to resolution of any dispute regarding production of such material in response to the request. In its sole discretion and at its own cost, the Designating Party may oppose or seek to limit the demand in any legal manner. The Party who received the demand shall not oppose or otherwise interfere with the Designating Party's actions.

16.     No information that is in the public domain or which is already known by the receiving party through proper means or which is or becomes available to a party from a source other than the party asserting confidentiality, rightfully in possession of such information on a non-confidential basis, shall be deemed or considered to be Confidential material under this Discovery Confidentiality Order.

17.     This Discovery Confidentiality Order shall not deprive any party of its right to object to discovery by any other party or on any otherwise permitted ground. This Discovery Confidentiality Order is being entered without prejudice to the right of any party to move the Court for modification or for relief from any of its terms.

18.     This Discovery Confidentiality Order shall survive the termination of this action and shall remain in full force and effect unless modified by an Order of this Court or by the written stipulation of the parties filed with the Court.

19.     Upon final conclusion of this litigation, within 30 days of the final disposition of the litigation, each party or other individual subject to the terms hereof shall promptly return to the origination source, or, upon permission of the producing party, destroy all originals and unmarked copies of documents and things containing Designated Material and to destroy, should such source so request, all copies of Designated Material that contain and/or constitute attorney work product as well as excerpts, summaries and digests revealing Designated Material; provided, however, that counsel may retain complete copies of all motions, filings, transcripts and pleadings including any exhibits attached thereto, and copies of attorney work product, including counsel's emails, for archival purposes, subject to the provisions of this Discovery Confidentiality Order. Any copies of transcripts and pleadings including exhibits attached thereto retained by counsel for archival purposes shall, to the extent that they that contain or reference Confidential Health Information, be maintained in accordance with the requirements of HIPAA and

45 C.F.R. § 164.504(e)(2)(ii)(J) imposed on Business Associates to preserve the privacy of those transcripts and pleadings. Counsel to all Receiving Parties must certify compliance with these requirements within 45 days of the final disposition of the litigation.

20. To the extent a party requests the return of Designated material from the Court after the final conclusion of the litigation, including the exhaustion of all appeals therefrom and all related proceedings, the party shall file a motion seeking such relief.

21. This Court shall retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

We consent to the form and entry of the within Order.

Dated: November 21, 2022

GIBBONS, PC.
One Gateway Center
Newark, New Jersey 07102-5310
973-596-4500

*/s/ E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr., Esq.

SELENDY GAY ELSBERG, PLLC
David Elsberg
Andrew R. Dunlap
Meredith Nelson
1290 Avenue of the Americas
New York, NY 10104
212-390-9000

*Attorneys for Defendant*
*Save On SP LLC*

Dated: November 21, 2022

SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
973-643-7000

*/s/ Jeffrey J. Greenbaum*
Jeffrey J. Greenbaum, Esq.

PATTERSON BELKNAP WEBB
& TYLER LLP
Adeel A. Mangi
George LoBiondo
Harry Sandick
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

**IT IS SO ORDERED**

Dated: November 22, 2022

s/ Cathy L. Waldor
Honorable Cathy L. Waldor, U.S.M.J.

9

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | Civil Action No. 22-2632 (JMV) (CLW) |
| Plaintiff, | **ENDORSEMENT OF** |
| vs. | **PROTECTIVE ORDER** |
| SAVE ON SP, LLC, | |
| Defendant. | |

## EXHIBIT A

I hereby attest that I understand that information or documents marked as Designated Material are provided to me subject to the Order dated _____, 2022 (the "Order"), in the above-captioned litigation ("Litigation"); that I have been given a copy of and have read the Order; and that I agree to be bound by its terms. I also understand that my signature below indicates my agreement to be bound by the Order and is a prerequisite to my review of any information or documents designated as Designated Material pursuant to the Order.

I further agree that I shall not use Designated Material for any purpose other than as authorized in the Order and that, except as explicitly authorized in the Order, I shall not disclose Designated Material, in any form whatsoever, to others.

I further agree to return or destroy Designated Material in my possession, custody, or control in the manner and time specified by the Order.

I further agree and attest to my understanding that my obligation to honor the confidentiality of such Designated Material will continue even after this Litigation concludes.

I further agree and attest to my understanding that, if I fail to abide by the terms of the Order, I may be subject to sanctions, including contempt of court, for such failure. I agree to be subject to the jurisdiction of the above-identified Court for the purposes of any proceedings relating to enforcement of the Order. I further agree to be bound by and to comply with the terms of the Order as soon as I sign this Agreement, regardless of whether the Order has been entered by the Court.

Date: _____

By: _____

# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JOHNSON & JOHNSON HEALTH CARE
SYSTEMS INC.,

          Plaintiff,

      v.

SAVE ON SP, LLC,

          Defendant.

Case No. 2:22-cv-02632-JMV-CLW

## STIPULATION AND ORDER
## GOVERNING THE EXCHANGE OF ELECTRONICALLY STORED INFORMATION

Upon agreement of the Parties for entry of an order establishing a protocol for the exchange and production of documents in hard-copy format ("Documents") and electronically stored information ("ESI"), as those terms are used in the Federal Rules of Civil Procedure, plaintiff Johnson & Johnson Health Care Systems Inc. ("Plaintiff") and Defendant Save On SP, LLC ("Defendant") (each a "Party" and, collectively, the "Parties") hereby stipulate ("ESI Stipulation") and the Court orders as follows:

## I.    GENERAL PROVISIONS

A.    The Parties and non-parties producing Documents and ESI (each a "Producing Party") shall prepare their Documents and ESI for production to the Parties receiving the production (each a "Receiving Party") in accordance with this ESI Stipulation.

B.    If a provision of this agreement conflicts with the terms of the stipulated Discovery Confidentiality Order (ECF No. 62) (the "Confidentiality Stipulation") entered in this action,[1] the Confidentiality Stipulation will control absent further order of the Court.

---

[1] Defined terms in the Confidentiality Stipulation not otherwise defined herein are incorporated.

C.    Proportionality

1.    Reasonable Discovery Limits. The proportionality standard set forth in Rule 26(b)(1) shall apply to discovery in this action. Consistent with that proportionality standard, the Parties agree to cooperate in identifying appropriate limits on discovery, including phased discovery and reasonable limits on search terms and the number of custodians, on discoverable data sources, on the relevant period, and on the permissible scope of requests for production, specifically including the permissible scope of requests for emails. Requests for production of ESI, including requests for emails, shall be reasonably targeted, clear, and as specific as possible.

D.    No Designation of Discovery Requests. Productions of Documents and ESI in the reasonably usable form set out in this protocol need not be organized and labeled to correspond to the categories in the requests.

II.    PRODUCTION OF HARD COPY DOCUMENTS

A.    TIFFs. Producing Parties shall produce Documents in the form of single-page, Group IV TIFFs at 300 dpi. They shall name each TIFF image as its corresponding Bates number. They shall maintain Original Document orientation (*i.e.,* portrait to portrait and landscape to landscape). They shall provide TIFF image files in a self-identified "Images" folder.

B.    OCR Text Files. Producing Parties shall provide Optical Character Recognition ("OCR") text files as a single text file for each Document, not one text file per page. They shall name each file with the beginning Bates number assigned to its corresponding Document, followed by .txt. They shall provide OCR text files in a self-identified "Text" directory. To the extent that a Document is redacted, they shall produce OCR text files for that Document that shall not contain text for redacted portions.

C. <u>Database Load Files/Cross-Reference Files</u>. Unless otherwise agreed by the Parties, Producing Parties shall provide Documents with Concordance-compatible image and data load files (*i.e.*, .OPT and DAT files) using standard Concordance delimiters. They shall provide Concordance-compatible image and data load files (*i.e.*, .OPT and DAT files) in a self-identified "Data" folder.

D. <u>Coding Fields</u>. Producing Parties shall produce Documents with at least the following searchable information in accompanying delimited data files: (1) BegBates, (2) EndBates, (3) BegAttach, (4) EndAttach, (5) Custodians, (6) OCRTextPath, (7) Confidentiality, and (8) Source. When a Producing Party determines in good faith judgment that it is practicable to accompany Documents with other metadata fields in Table I, the Producing Party shall produce those Documents with the practicable metadata fields. Producing Parties shall identify custodians using any of the following conventions, as appropriate: "Last Name, First Name"; "last name_first name"; "first name_last name"; or "FLast." Producing Parties shall use a uniform description of a particular custodian, and separate multiple custodians in the "Custodian" field by a semicolon. For Documents with no individual custodian (*e.g.*, centralized files, document management systems), Producing Parties shall (a) use the relevant entity name(s) in the "Custodian" field and (b) identify the source of the Documents in the "Source" field.

E. <u>Bates Numbering</u>. Producing Parties shall assign each TIFF image a Bates number that: (1) is unique across the entire production; (2) maintains a constant length across the entire production (*i.e.*, padded to the same number of characters); (3) contains no special characters or embedded spaces; and (4) is sequential within a given Document. If a Bates number or set of Bates numbers is skipped in a production, the Producing Party will so note in a cover letter or production log accompanying the production.

3

F.    <u>Parent-Child Relationships</u>. Producing Parties shall preserve parent-child relationships (*i.e.*, the association between an attachment and its parent Document), to the extent they exist in the manner in which the Documents are maintained in the ordinary course of business. For example, if a Producing Party produces a printout of an email with its attachments, it shall produce such attachments behind the email in the order in which they were attached.

G.    <u>Color</u>. Producing Parties need not, in the first instance, produce Documents containing color in color format. The Receiving Party may request production of such Documents in color format by (1) providing a list of the Bates numbers of the Document(s); and (2) explaining the need for production of the Documents in color format. Consent to produce in color shall not be unreasonably withheld.

H.    <u>Unitizing of Documents</u>. A Producing Party shall not, when scanning Documents: (1) merge distinct Documents into a single record; or (2) split single Documents into multiple records (*i.e.*, Documents should be logically unitized).

## III.    PRODUCTION OF ESI

A.    <u>Technology Assisted Review ("TAR")</u>.

1.    Any Producing Party that wishes to use TAR agrees to disclose that intent to the Receiving Party before the Producing Party employs any TAR and must meet-and-confer with the Receiving Party regarding an appropriate TAR protocol. The Producing Party will identify the universe of Documents or ESI to which it intends to apply TAR. The Producing Party may not use TAR to limit or cull Documents or ESI to be reviewed without the prior consent of the Receiving Party. If the parties are unable to reach agreement on an appropriate protocol, or if the Receiving Party withholds consent, any such disputes shall be resolved by the Court.

2.      The absence of a search term hit or retrieval by TAR methodology for a given ESI or Document does not automatically render it irrelevant. If any Producing Party identifies relevant ESI or Documents not hit upon by the search term filters noted above, it shall produce such non-privileged Documents and/or ESI, subject to the Producing Party's objections to discovery requests and rights under this ESI Protocol, the Local Rules, and this Court's individual rules.

3.      The fact that any electronic file has been identified in agreed-upon searches shall not prevent any Producing Party from withholding such file from production on the grounds that the file is not responsive or relevant, or that it is responsive or relevant but protected from disclosure by applicable privilege or immunity (in which case the Producing Party shall include it on a privilege log), or that the Protective Order entered in this Action allows the file to be withheld.

B.      Avoidance of Duplicate Production

1.      "Duplicate ESI" means files that are exact duplicates based on the files' MD5 hash, SHA-1 hash, email duplicate spare messages (as defined by Relativity), or SHA-256 hash values. The Producing Party need produce only a single copy of responsive Duplicate ESI. A Producing Party shall take reasonable steps to de-duplicate ESI globally (i.e., both within a particular custodian's files and across all custodians). Entire document families may constitute Duplicate ESI. De-duplication shall not break apart families. When the same Duplicate ESI exists in the files of multiple custodians, the additional custodians shall be listed in the "All Custodians" field identified in Table I to the extent such information is available.

2.      The Parties may confer regarding other deduplication methods, such as the use of Textual Near Deduplication. Except for the removal of extracted logos, no custom deduplication method will be implemented without the consent of the Receiving Party, and such consent shall not be unreasonably withheld.

3.      If the Producing Party collects and processes additional ESI which contains duplicates of ESI previously produced, that Party also shall provide an overlay file to allow the Receiving Party to update the "All Custodians" field. The overlay file shall include both all custodians listed in the "All Custodians" field in prior productions and any custodians identified in the newly processed ESI.

C.      Email Threading

1.      Email threads are email communications that contain lesser-included email communications that also may exist separately in the Party's electronic document collection. A most-inclusive email is one that contains unique content and all the lesser-included emails, including attachments, for that branch of the email thread. The Parties agree that removal of available lesser-included emails from potential production will reduce all Parties' costs of document review, production, and litigation-support hosting, and, when producing the most-inclusive email in a thread, the parties need not also produce lesser-included emails in the thread.

2.      Participants in lesser-included emails that otherwise would have been subject to review shall be listed in the most-inclusive email's "All Participants" field included in the data load file. With respect to an e-mail chain, the parties may produce the longest unique or most inclusive chain and the parties do not need to separately produce the lesser-included e-mails unless those lesser-included e-mails include unique attachments

6

not included in the longest chain or contain a BCC recipient not shown in the longest unique chain. If a lesser-included e-mail includes a unique attachment, or if the lesser-included email was modified in any way in a subsequent email, then the lesser-included e-mail must be separately produced with the attachment.

D.    <u>TIFFs</u>. Producing Parties shall produce ESI in the form of single-page, black and white, Group IV TIFFs at 300 dpi. They shall name each TIFF image as its corresponding Bates number. They shall maintain original document orientation (*i.e.*, portrait to portrait and landscape to landscape). They shall provide TIFF image files in a self-identified "Images" folder.

E.    <u>Parent-Child Relationships</u>. Producing Parties shall preserve parent-child relationships (*i.e.*, the association between an attachment and its parent file).

F.    <u>Metadata Fields and Processing</u>. Producing Parties shall produce each of the metadata and coding fields set forth in Table I that can be extracted from ESI for that ESI. They are not obligated to populate manually any of the fields in Table I if such fields cannot be extracted from the ESI, except for the following: (1) BegBates, (2) EndBates, (3) BegAttach, (4) EndAttach, (5) Custodians, (6) NativeLink, (7) Confidentiality, (8) Parent ID fields (which the Producing Party or its vendor may populate), and (9) Source. They shall identify custodians using any of the following conventions, as appropriate: "Last Name, First Name"; "last name_first name"; "first name_last name"; or "FLast." A Producing Party shall use a uniform description of a particular custodian and separate multiple custodians by a semicolon in the "Custodians" field. For documents with no individual custodian (*e.g.*, centralized files, document management systems), Producing Parties shall (a) use the relevant entity name(s) in the "Custodian" field and (b) identify the source of the documents in the "Source" field.

G.    Extracted Text Files. For all ESI (other than multimedia or graphic files), Producing Parties shall provide an extracted text file along with its corresponding TIFF image file(s) and metadata. They shall name each extracted text file such that it is identical to that of the first image page of its corresponding file, followed by .txt. They shall not use file names that contain special characters or embedded spaces and shall extract the text of native files directly from the native file. If a file contains redactions, however, the Producing Party may provide OCR of the redacted file in lieu of extracted text.

H.    Database Load Files/Cross-Reference Files.  Unless otherwise agreed to by the parties, Producing Parties shall include in each production (1) a metadata file (DAT file) using standard Concordance delimiters or carat pipe delimiters and (2) an image load file in Opticon format (.OPT file). They shall provide in a self-identified "Data" folder Concordance-compatible image and data load files (*i.e.*, .OPT and DAT files).

I.    Native Files. The following governs the production of native files.

1.    Producing Parties shall produce PowerPoint presentations, source code, large diagrams, Excel files and/or .csv files, word processing files with tracked changes, comments, or hidden text (*e.g.*, Word), desktop databases (*e.g.*, Access), and audio/video multimedia files in native format ("Native Files"), unless they have redactions.

2.    Producing Parties shall provide native files in a self-identified "Natives" directory. Producing Parties shall produce each native file with a corresponding single-page TIFF placeholder image, which shall state the ESI is being produced as a native file and provide the Confidentiality Designation, if any. Producing Parties shall name each native file with the beginning Bates number that is assigned to that specific record in the production.

8

3.      Producing Parties shall include a "NativeLink" entry for each native file in the .DAT load file indicating the relative file path to each native file on the production media. Producing Parties shall produce native files with extracted text and applicable metadata fields as set forth in Paragraphs III.E and III.F. Producing Parties may produce redacted files in either native format or as TIFF image files and OCR in lieu of a Native File, TIFF placeholder image and extracted text file. Producing Parties shall exclude any metadata fields for redacted files that would reveal privileged information.

4.      If produced as a TIFF, each Producing Party shall make reasonable efforts to ensure that its discovery vendor, prior to conversion to TIFF, reveals hidden data from redacted native files that are produced as TIFF image files and ensures that redacted native files will be formatted to be readable. (For example, column widths should be formatted so that numbers do not appear as "########").

J.      Structured Data. To the extent that responding to a discovery request requires production of ESI contained in a database, a Producing Party may query the database for discoverable information and generate and produce a report in a reasonably usable and exportable Excel or .csv format. The first line of each such file will, to the extent not unduly burdensome, show the column headers for each field of data included. The Parties shall meet and confer to finalize the appropriate data extraction and production format for specific information contained in a database.

K.      Audio and Video Files. Producing Parties shall produce audio and video files in a reasonably usable format as may be agreed upon by the Parties.

L.      Requests for Other Native Files. Other than as specifically set forth above, a Producing Party need not produce ESI in native format. The Receiving Party may request

production in native format of other documents by (1) providing a list of the Bates numbers of ESI it requests to be produced in native format; and (2) explaining the need for reviewing such ESI in native format. The Responding Party may object and any disputes will be resolved by the Court. If the Producing Party agrees to produce such a native file, the Producing Party shall produce in response to such request each native file with corresponding production number fields and a "NativeLink" entry in the DAT load file indicating the relative file path to each native file on the production media, all extracted text (other than for multimedia or graphic files), and applicable metadata fields set forth in Table I.

## Table I-ESI Metadata Fields

| FIELD NAME | DESCRIPTION |
|---|---|
| **Author** | Author of document, if identified in metadata |
| **Begin Bates** | Unique document identifier and the starting page of a document (*e.g.*, ABC00000001) |
| **Bates End** | The end number of a document (*e.g.*, ABC0000099) |
| **Bates Beg Attach** | The starting number of a group or family of documents (*e.g.*, ABC0000001) |
| **Bates End Attach** | The end number of a group or family of the document (*e.g.*, ABC0000099) |
| **Custodian** | The owner of a document |
| **All Custo-dians** | List of all custodians who had custody of the document; when global de-dupli-cation is used, these are custodians whose file has been de-duplicated; multiple custodians separated by semicolons |
| **All Partici-pants** | For emails only, lists all participants included in lesser-included emails that, without email threading, would have been subject to review |
| **Filename** | The original name of the file |
| **File Exten-sion** | File extension of document (*e.g.*, .msg, .docx, .xlsx, etc.) |
| **File Size** | The size of the file |

10

| FIELD NAME | DESCRIPTION |
|---|---|
| **Document Type** | Type of document (*e.g.*, email, e-document, attachment, hardcopy) |
| **Date Created** | Date document was created (*e.g.*, 01/01/2001) |
| **Time Created** | Time document was created (*e.g.*, 17:00) |
| **Date Last Modified** | Date the document was last modified (*e.g.*, 01/01/2001) |
| **Time Last Modified** | Time the document was last modified (*e.g.*, 17:00) |
| **Date Last Accessed** | Last access date of the document as extracted during processing from the file metadata |
| **Time Last Accessed** | Last access time of the document as extracted during processing from the file metadata |
| **Date Sent** | Date email was sent (*e.g.*, 01/01/2001) |
| **Time Sent** | Time email was sent (*e.g.*, 17:00) |
| **Date Received** | Date email was received (*e.g.*, 01/01/2001) |
| **Time Received** | Time email was sent (*e.g.*, 17:00) |
| **Email From** | Sender of email |
| **Email Subject** | Subject line of email |
| **Email To** | Recipient(s) of email |
| **Email BCC** | Blind-copied recipients of email |
| **Email CC** | Copied recipients of email |
| **MD5 Hash** | MD5 Hash Value of file |
| **Native Link** | Relative file path of native file |
| **File Path** | Original file path where file was kept (by the custodian) |
| **Pages** | Number of pages per document |

11

| FIELD NAME | DESCRIPTION |
|---|---|
| Confidenti-ality | Confidential, Confidential Health Information, or Attorneys' Eyes Only |
| Redactions | Yes/No |
| Source | Person, shared drive, or other source from whom files were collected |
| Prod Vol-ume | Volume in which the Document was produced (*e.g.*, VOL001) |

M.     Confidentiality Designations. If a Producing Party reduces native files or other ESI designated "Confidential," "Confidential Health Information," and/or "Attorneys' Eyes Only," as defined by the Confidentiality Stipulation, to Document form, it shall mark the Document with the appropriate designation. Producing Parties shall produce all ESI designated as "Confidential," "Confidential Health Information," and/or "Attorneys' Eyes Only" with the designation in the metadata field pursuant to Table I and in the ESI itself.

N.     Encryption of Production Media. To maximize the security of information in transit, any media on which documents or electronic files are produced may be encrypted by the Producing Party. In such cases, the Producing Party shall transmit the encryption key or password to the Receiving Party, under separate cover, contemporaneously with sending the encrypted media. The Receiving Parties in this matter are on notice that certain data produced may originate from custodians in the European Union and the Receiving Parties therefore agree to follow the strictest security standards in guarding access to such data.

O.     Time Zone. Producing Parties shall produce all ESI normalized to Eastern Standard Time (EST).

## IV. PROCESSING OF THIRD-PARTY DOCUMENTS

A.     A Party that issues a non-party subpoena ("Issuing Party") shall include a copy of this ESI Stipulation with the subpoena and request that the non-party produce Documents and ESI in accordance with the specifications set forth herein. If an Issuing Party issued a non-party subpoena prior to the execution of this ESI Stipulation, that Issuing Party shall promptly forward a copy of this ESI Stipulation to the non-party and request that the non-party produce Documents and ESI in accordance with the specifications set forth herein.

B.     The Issuing Party is responsible for producing to all other Parties any Documents and/or ESI obtained pursuant to a subpoena. If a non-party refuses to produce Documents and/or ESI in accordance with the specifications set forth here, the Issuing Party has no obligation to conform the non-party's production to such specifications.

C.     Nothing in this ESI Stipulation is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or non-parties to object to a subpoena.

## V. MISCELLANEOUS PROVISIONS

A.     This ESI Stipulation is intended solely to address the format of Document and ESI productions. Nothing in this ESI Stipulation is intended to affect the rights of any Party to object to any requests or demand for production. Nothing in this ESI Stipulation shall constitute, or operate as, a waiver of any rights of any Party to object to, or to avoid, discovery or disclosure, in whole or in part, under the laws of the United States, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of New Jersey, the Individual Practices of Magistrate Judge Cathy L. Waldor, the Individual Practices of Judge John Michael Vazquez, or any other applicable law, rule, or order.

B.     Nothing in this ESI Stipulation establishes any agreement as to either the temporal or subject matter scope of discovery or as to the relevance or admissibility of any Document or ESI. Nothing in this ESI Stipulation shall be interpreted to require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity. The Parties do not waive any objections as to the production, discoverability, admissibility, or confidentiality of Documents and ESI.

C.     The Parties shall make good faith efforts to comply with and resolve any differences concerning compliance with this ESI Stipulation. If a Producing Party, notwithstanding their good faith efforts, cannot comply with any material aspect of this ESI Stipulation or if compliance with such material aspect would be unreasonable, such Producing Party shall inform the Receiving Party in writing as to why compliance with the Stipulation is impossible or unreasonable as soon as reasonably practicable.

D.     Nothing herein is intended to, nor shall be construed to, diminish or otherwise affect any Party's discovery obligations.

E.     Any application to the Court under or regarding this ESI Stipulation shall be made pursuant to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of New Jersey, and the Individual Practices of Magistrate Judge Cathy L. Waldor.

14

Dated: Newark, New Jersey
November 21, 2022

By: */s/Jeffrey J. Greenbaum*
Jeffrey J. Greenbaum
Katherine M. Lieb
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

Adeel A. Mangi
Harry Sandick
George LoBiondo
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas New
York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff Johnson &
Johnson Health Care Systems Inc.*

By: */s/ E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
ewohlforth@gibbonslaw.com

David Elsberg
Andrew R. Dunlap
Meredith Nelson
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas New
York, NY 10104
Tel: 212-390-9000

*Attorneys for Defendant Save On SP,
LLC*

SO ORDERED this 22nd day of November, 2022

s/ Cathy L. Waldor
HON. CATHY L. WALDOR
United States Magistrate Judge

15

# Exhibit 6

Adeel A. Mangi, Esq.
Harry Sandick, Esq. (admitted *pro hac vice*)
George LoBiondo, Esq.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10035

*Attorneys for TrialCard Inc.*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | Civil Action No. 22-2632 (JMV) (CLW) |
| Plaintiff, | **NON-PARTY TRIALCARD, INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS** |
| v. | |
| SAVE ON SP, LLC, | |
| Defendant. | |

14168182

## GENERAL OBJECTIONS

TrialCard Incorporated ("TrialCard") incorporates each of the General Objections below into its specific objections to each Request, whether or not each such General Objection is expressly referred to in TrialCard objections to a specific Request.

TrialCard reserves the right to supplement, amend, modify, or correct its responses under Rule 26(e) should it discover additional information or grounds for objections at any time prior to the conclusion of this Action. The following responses and objections are based upon information known at this time.

1.      TrialCard is not a party to the above-captioned litigation pending in the District of New Jersey (the "Action") and objects to the Subpoena's imposition of significant burden on it because the vast majority of Requests in the Subpoena can be satisfied by obtaining documents directly from Johnson & Johnson Health Care Systems, Inc. ("JJHCS"), a party to the Action. TrialCard notes that the requests in the Subpoena are nearly identical to document requests made by SaveOnSP to JJHCS in the Action, and JJHCS has already agreed to facilitate a production of TrialCard documents in response to those requests in party discovery. TrialCard objects to producing any documents unless and until SaveOnSP can demonstrate that it has not been able to obtain these documents in party discovery.

2.      TrialCard objects to the Requests to the extent that they seek documents or information protected from disclosure by a privilege including, without limitation, the First Amendment privilege, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law. The inadvertent production by TrialCard of information, documents, materials, or things covered by any privilege or doctrine shall not constitute a waiver of any applicable privilege or doctrine, including but not limited to, objections on the

1

basis of competency, confidentiality, relevancy, materiality, work-product, privilege, and/or admissibility as evidence, as such objections may apply at trial or otherwise in this Action.

3.      TrialCard objects to the Requests to the extent that they seek documents or information that are not relevant to a claim or defense or to the subject matter of this litigation. Any response TrialCard makes to any Request shall not be deemed an admission that the response, information, document, or thing produced is relevant to a claim or defense or to the subject matter of this litigation, is reasonably calculated to lead to the discovery of admissible evidence, is material, or is admissible as evidence.

4.      TrialCard objects to the Requests to the extent that they impose obligations beyond or inconsistent with those imposed by the Federal Rules of Civil Procedure, the Local Rules of the Court, the Court's orders, the discovery schedule entered in this Action, or any other applicable rule, order, or source of law.

5.      TrialCard objects to the Requests to the extent that they seek the production of documents or things that are equally available to or already in SaveOnSP's possession, custody, or control.  To the extent that TrialCard agrees in these responses to produce certain documents, information, or things, these responses shall not be construed as conceding that the documents, information, or things exist and/or are in the possession, custody, or control of TrialCard. Instead, it means that TrialCard will perform a reasonable search for documents in its possession and produce such documents, information, or things to the extent any responsive documents, information, or things exist and are not otherwise protected from disclosure.

6.      TrialCard objects to the Requests to the extent that they seek information that is obtainable from sources other than TrialCard in a manner that is more convenient, less burdensome, or less expensive.

14168182

7.      TrialCard objects to the Requests to the extent that they seek production of documents, records, tangible things, or other materials to the extent that such disclosure would violate a confidentiality agreement, court order, or applicable law.

8.      TrialCard objects to the Requests to the extent that they are vague and/or ambiguous.

9.      TrialCard objects to the Requests to the extent that they require interpretation by it in providing a response.  TrialCard responds to the Requests as it interprets and understands each Request as set forth.  If SaveOnSP subsequently asserts an interpretation of any Request that differs from TrialCard's understanding of that Request, TrialCard reserves the right to modify or supplement its objections and responses.

10.      TrialCard objects to the Requests to the extent that they are duplicative of other document requests, interrogatories, and/or other discovery requests.

11.      TrialCard objects to the Requests to the extent that they are argumentative, lack foundation, or incorporate assertions that are disputed, erroneous, or irrelevant to the Action. TrialCard further objects to the Requests to the extent that they assume facts that do not exist or the occurrence of events that did not take place.

12.      TrialCard objects to the Requests to the extent that they seek documents and information relating to any business affairs other than those that are the subject of the Action.

13.      TrialCard objects to the Requests as overbroad and unduly burdensome to the extent they purport to require production of "all" or "any" documents where a subset of documents would be sufficient to provide the relevant information.

14.      TrialCard objects to the Requests to the extent that they seek the production of documents that are not in TrialCard's possession, custody, or control.

3

14168182

## OBJECTIONS TO DEFINITIONS

1.      TrialCard objects to the definition of the term "Janssen" as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it purports to include

"any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates,

divisions or departments, agents, representatives, directors, officers, employees, committees,

attorneys, accountants, and all persons or entities acting or purporting to act on behalf" of those

entities.

2.      TrialCard objects to the definition of the term "Janssen Drug" as irrelevant to

the extent it purports to include drugs that are not covered by CarePath.

3.      TrialCard objects to the definition of the term "JJHCS" as overbroad, unduly

burdensome, and not proportional to the needs of the case to extent it purports to include "any

and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, . . .

agents, [or] representatives" or purports to include entities and persons acting or purporting to

act on behalf of or under the control of entities other than Johnson & Johnson Healthcare

Systems, Inc., including Centocor, Inc., Ortho Biotech Products LP, McNeil Pharmaceutical,

Ortho-McNeil Pharmaceutical, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Scios Inc.,

Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development, LLC, Janssen

Pharmaceuticals, Inc., Janssen Products, LP, Actelion Pharmaceuticals U.S., Inc., Janssen

BioPharma LLC, and Janssen Research & Development LLC.

4.      TrialCard objects to the definition of the term "JJHCS Hub Entity" as vague

and as irrelevant to the extent it purports to include entities other than those responsible for

administering CarePath during the relevant Time Period.  TrialCard further objects to the

definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the

extent it includes "any and all predecessors and successors in interest, assignees, parents,

4

subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants and all persons or entities acting or purporting to act on behalf" of those entities.  TrialCard further objects to the extent the term is used to seek documents and communications concerning entities other than JJHCS.

5.      TrialCard objects to the definition of the term "Lash Group" as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants and all persons or entities acting or purporting to act on behalf or under the control of The Lash Group, Inc."

6.      TrialCard objects to the definition of the term "TrialCard" as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it includes "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants and all persons or entities acting or purporting to act on behalf or under the control of TrialCard Inc."  TrialCard further objects to the extent the term is used to seek documents and communications in the possession of entities other than TrialCard.

### OBJECTIONS TO INSTRUCTIONS

1.      TrialCard objects to the Instructions to the extent that they impose requirements on TrialCard beyond those required by the Federal Rules of Civil Procedure.

2.      TrialCard objects to Instruction No. 14 to the extent that SaveOnSP attempts to impose requirements on TrialCard beyond those required by the Federal Rules of Civil Procedure or ordered by the Court.  Rule 34, which contains a duty to supplement responses,

14168182

does not apply to requests for production directed to a non-party, and Rule 45 contains no duty

to supplement.

## OBJECTIONS TO THE TIME PERIOD FOR SPECIFIC REQUESTS

1.      TrialCard objects to SaveOnSP's Requests as overbroad, unduly burdensome,

and not relevant to the subject matter of this Action to the extent they call for documents from

before January 1, 2017 or after July 1, 2022.[1]

## SPECIFIC RESPONSES AND OBJECTIONS

### Request No. 1

From January 1, 2009 through the present, Documents sufficient to show the
organizational structure of TrialCard.

### Response to Request No. 1

In addition to the foregoing general objections, TrialCard, as a third party, objects

to this Request as irrelevant to any claim or defense in this Action to the extent it seeks

documents unrelated to the JJHCS groups responsible for the administration of CarePath.

TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional

to the needs of the case to the extent it seeks documents outside of the relevant Time Period.

TrialCard has already agreed to produce through JJHCS certain responsive

documents, subject to JJHCS's objections and to those presented here, from the relevant Time

Period.  TrialCard will not search for or produce documents in response to the Request.

### Request No. 2

From January 1, 2009 through the present, Documents sufficient to show the
organizational structure of any group or division within TrialCard involved in developing,
managing, marketing, or administering CarePath and to identify their employees.

---

[1] For convenience, TrialCard refers to the period of January 1, 2017 to July 1, 2022 as the "Time Period."

**Response to Request No. 2**

   In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request to the extent it seeks the production of documents and information that are available from parties to the Action.  TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents outside of the relevant Time Period.

   TrialCard has already agreed to produce through JJHCS certain responsive documents, subject to JJHCS's objections and to those presented here, from the relevant Time Period.  TrialCard will not search for or produce documents responsive to this Request.

**Request No. 3**

   All Documents and Communications with or regarding SaveOnSP, including those between You and JJHCS, You and any patients, and You and any other Hub Entity.

**Response to Request No. 3**

   In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard.  TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by any privilege including, without limitation, the attorney-client

14168182

privilege, the work-product doctrine, the joint defense privilege, the common interest privilege,

the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

TrialCard has already agreed to produce through JJHCS certain responsive documents,

subject to JJHCS's objections and to those presented here, from the relevant Time Period.

TrialCard will not further search for or produce documents or communications in response to this

Request.

## Request No. 4

From January 1, 2009 through the present, all Documents and Communications
regarding the development, management, and marketing of CarePath or any other copay
assistance program offered for Janssen Drugs, including Documents and Communications
regarding JJHCS's allegations in Complaint ¶¶ 6-7, 36-49.

## Response to Request No. 4

In addition to the foregoing general objections, TrialCard, as a third party, objects

to this Request as it seeks the production of documents and information relating to specific

allegations in the Complaint that are available from parties to the Action and, therefore, is unduly

burdensome on TrialCard.  TrialCard further objects to this Request insofar as it seeks the

production of documents and communications outside of TrialCard's possession, custody, and/or

control.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not

proportional to the needs of the case to the extent it seeks "all" documents and communications

regarding a broad subject matter.  TrialCard further objects to this Request as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it seeks documents and

communications outside of the relevant Time Period.  TrialCard further objects to this Request

on the ground that the phrase "any other copay assistance program offered for Janssen Drugs" is

vague and ambiguous.  TrialCard further objects to this Request as irrelevant to any claim or

defense in this Action to the extent it seeks documents unrelated to CarePath.

8

TrialCard will not search for or produce documents or communications responsive to this Request.

**Request No. 5**

From January 1, 2009 through the present, all Documents and Communications regarding CarePath's terms and conditions, including Documents and Communications regarding (a) JJHCS's allegations in Complaint ¶¶ 3, 8, 18-26, 102-103, 108; (b) all CarePath terms and conditions for each Janssen Drug; (c) revisions to any of the CarePath terms and conditions for any Janssen Drug; and (d) Your understanding of the term "offer" or "health plan" as used in CarePath's terms and conditions.

**Response to Request No. 5**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information beyond the final CarePath terms and conditions at issue. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period.

TrialCard will not search for or produce documents or communications responsive to this Request.

14168182

**Request No. 6**

From January 1, 2009 through the present, all Documents and Communications regarding CarePath's requirement that Patients enrolled in CarePath make any payments towards Janssen Drugs, including Documents and Communications regarding JJHCS's basis for setting the amounts of those payments and JJHCS's allegations in Complaint ¶¶ 48-49, 70, 89.

**Response to Request No. 6**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information beyond the final CarePath terms and conditions at issue. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period. TrialCard further objects to this Request to the extent it seeks documents and communications in the possession of entities other than TrialCard.

TrialCard will not search for or produce documents or communications responsive to this Request.

**Request No. 7**

From January 1, 2015 through the present, all Documents and Communications regarding Your understanding of commercial health plans' ability to designate specialty drugs as Essential Health Benefits or Non-Essential Health Benefits under the Affordable Care Act and its

14168182

regulations, including Documents and Communications regarding JJHCS's allegations in
Complaint ¶¶ 9-10, 43, 53-59, 71, 79.

**Response to Request No. 7**

   In addition to the foregoing general objections, TrialCard, as a third party, objects
to this Request as it seeks the production of documents and information relating to specific
allegations in the Complaint that are available from parties to the Action and, therefore, is unduly
burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the
production of documents and communications outside of TrialCard's possession, custody, and/or
control. TrialCard further objects to this Request to the extent it calls for views on a legal
question. TrialCard further objects to this Request as overbroad, unduly burdensome, and not
proportional to the needs of the case to the extent it seeks "all" documents and communications
regarding a broad subject matter. TrialCard further objects to this Request as overbroad, unduly
burdensome, and not proportional to the needs of the case to the extent it seeks documents and
communications outside of the relevant Time Period.

   TrialCard will not search for or produce documents or communications
responsive to this Request.

**Request No. 8**

   All Documents and Communications regarding SaveOnSP's communications
with Patients regarding CarePath, including allegedly misleading or confusing communications
and JJHCS's allegations in Complaint ¶¶ 60-67, 109, ¶¶ 13, 75-77, 85-88.

**Response to Request No. 8**

   In addition to the foregoing general objections, TrialCard, as a third party, objects
to this Request as it seeks the production of documents and information relating to specific
allegations in the Complaint that are available from parties to the Action and, therefore, is unduly
burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the

production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. TrialCard further objects to this Request to the extent it seeks "misleading or confusing communications," as those terms are vague and ambiguous.

TrialCard will not search for or produce documents or communications responsive to this Request.

### Request No. 9

All Documents and Communications regarding SaveOnSP's provision of services to qualified high deductible or health savings account plans, including JJHCS's allegations in Complaint ¶ 72.

### Response to Request No. 9

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. TrialCard further objects to this Request on the ground that the phrase "SaveOnSP's provision of services to qualified high deductible or health savings account plans" is vague and ambiguous.

TrialCard will not search for or produce documents or communications responsive to this Request.

**Request No. 10**

All Documents and Communications regarding JJHCS's payment of copay assistance funds to or on behalf of Patients enrolled in qualified high deductible or health savings account plans.

**Response to Request No. 10**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 11**

All Documents and Communications regarding any alleged stress or confusion caused by SaveOnSP to any member of the public, including JJHCS's allegations in Complaint ¶ 114.

**Response to Request No. 11**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications

14168182

regarding a broad subject matter.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 12**

All Documents and Communications regarding any alleged harm caused by SaveOnSP by allegedly making their healthcare more expensive, including JJHCS's allegations in Complaint ¶ 114.

**Response to Request No. 12**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 13**

All Documents and Communications regarding how SaveOnSP directly or indirectly affects or threatens the financial viability of CarePath, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

**Response to Request No. 13**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly

14

burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the

production of documents and communications outside of TrialCard's possession, custody, and/or

control. TrialCard further objects to this Request as overbroad, unduly burdensome, and not

proportional to the needs of the case to the extent it seeks "all" documents and communications

regarding a broad subject matter.

TrialCard will not search for or produce documents and communications

responsive to this Request.

**Request No. 14**

All Documents and Communications regarding how SaveOnSP directly or
indirectly affects or threatens the financial viability of any Copay Assistance Program other than
CarePath, including Documents and Communications regarding JJHCS's allegations in
Complaint ¶ 114.

**Response to Request No. 14**

In addition to the foregoing general objections, TrialCard, as a third party, objects

to this Request as it seeks the production of documents and information relating to specific

allegations in the Complaint that are available from parties to the Action and, therefore, is unduly

burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the

production of documents and communications outside of TrialCard's possession, custody, and/or

control. TrialCard further objects to this Request as irrelevant to any claim or defense in this

Action to the extent it seeks information about any Copay Assistance Program other than

CarePath. TrialCard further objects to this Request as overbroad, unduly burdensome, and not

proportional to the needs of the case to the extent it seeks "all" documents and communications

regarding a broad subject matter.

TrialCard will not search for or produce documents and communications

responsive to this Request.

15

14168182

**Request No. 15**

All Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 110, 115.

**Response to Request No. 15**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter. TrialCard further objects to this Request on the ground that the phrase "any alleged harm" is vague and ambiguous.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 16**

All Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's payment of any Patient's costs, including those that accumulate towards the Patient's deductible or out-of-pocket maximum.

**Response to Request No. 16**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this

16

14168182

Request on the ground that the phrase "payment of any Patient's costs including those that accumulate towards the Patient's deductible or out-of-pocket maximum" is vague and ambiguous.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 17**

All Documents and Communications regarding the "internal JJHCS data" discussed in Complaint ¶¶ 92-101, including the complete databases from which that data was drawn.

**Response to Request No. 17**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information relating to specific allegations in the Complaint that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard.  TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter and seeks "complete databases from which [ ] data was drawn."

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 18**

From January 1, 2009 through the present, for each Janssen Drug for each year, Documents sufficient to show:

14168182

a.    all Patients receiving the Janssen Drug;

b.    the number of fills of the Janssen Drug received by each such Patient;

c.    the dosage of the Janssen Drug received by each such Patient for each fill;

d.    the projected number of Patients, average number of fills, and average dosage for the Janssen Drug;

e.    the cost to manufacture the Janssen Drug;

f.    the sales and marketing budget for the Janssen Drug;

g.    the price of the Janssen Drug;

h.    the revenue received by JJHCS from the Janssen Drug;

i.    all Patients enrolled in the CarePath program for the Janssen Drug;

j.    the dates on which each Patient was enrolled in CarePath;

k.    the amounts of copay assistance funds that JJHCS offered to each Patient enrolled in CarePath;

l.    the Janssen Drugs for which each Patient enrolled in CarePath received copay assistance; and

m.    all copay assistance payments that JJHCS made to or on behalf each Patient enrolled in CarePath.

**Response to Request No. 18**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard.  TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks information unrelated to SaveOnSP's conduct at issue, including information relating to Patient fills, the cost of manufacturing Janssen Drugs, the sales and marketing budgets for Janssen Drugs, and pricing

14168182

and revenue generated by Janssen Drugs. TrialCard further objects to this Request on the ground

that the phrases "the projected number of Patients, average number of fills, and average dosage

for the Janssen Drug," "the cost to manufacture the Janssen Drug," and "the price of the Janssen

Drug" are vague and ambiguous. TrialCard further objects to this Request as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it seeks documents and

communications outside of the relevant Time Period.

TrialCard has already agreed to produce through JJHCS certain responsive

documents, subject to JJHCS's objections and to those presented here, from the relevant Time

Period. TrialCard will not further search for or produce documents or communications in

response to this Request.

**Request No. 19**

From January 1, 2009 through the present, for each Janssen Drug for each year,
all Documents and Communications regarding:

    a.      JJHCS's determination of the amounts of copay assistance funds that JJHCS
            offered to Patients enrolled in CarePath, including the determination of the
            maximum program benefit per calendar year for the Janssen Drug;

    b.      JJHCS's budget for CarePath, including the sales and marketing budget;

    c.      JJHCS's actual and projected annual costs for CarePath;

    d.      JJHCS's use of or accounting for unused CarePath funds;

    e.      the impact of the Affordable Care Act on JJHCS's CarePath budget or funding,
            including the impact of laws and regulations regarding out-of pocket maximums;

    f.      JJHCS's and Janssen's revenue and revenue projections from fills by Patients
            enrolled in CarePath;

    g.      the impact of CarePath on Janssen's sales of any Janssen Drug;

    h.      the impact of CarePath on JJHCS's or Janssen's gross to net calculations;

    i.      JJHCS's or Janssen's actual and projected return on investment for CarePath; and

14168182

j.     any analysis of the adherence rates of Patients enrolled in CarePath to Janssen
       Drugs, including such Patients enrolled in plans advised by SaveOnSP.

**Response to Request No. 19**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks information unrelated to SaveOnSP's conduct at issue, including information relating to the sales and marketing budget for CarePath, JJHCS's uses of or accounting for unused CarePath funds, the impact of the Affordable Care Act or other laws and regulations on CarePath's budget or funding, JJHCS's and Janssen's revenue and revenue projections from fills by patients enrolled in CarePath, the impact of CarePath on Janssen sales of any Janssen Drug, the impact of CarePath on JJHCS's or Janssen's gross to net calculations, JJHCS's or Janssen's actual or projected return on investment for CarePath, and the adherence rates of Patients enrolled in CarePath to Janssen Drugs. TrialCard further objects to this Request on the ground that the phrases "the projected number of Patients, average number of fills, and average dosage for the Janssen Drug," "JJHCS's or Janssen's gross to net calculations," and "JJHCS's or Janssen's actual and projected return on investment for CarePath" are vague and ambiguous. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a variety of broad subject matters. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and

communications outside of the relevant Time Period.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 20**

All Documents and Communications regarding JJHCS's attempts to limit or eliminate the amount of CarePath copay assistance funds available to Patients using Stelara or Tremfya based on whether the Patients' plans allegedly reduce or eliminate Patients' out-of-pocket costs, including Documents and Communications regarding JJHCS's attempts to limit or eliminate the availability of CarePath copay assistance funds available to Patients enrolled in health plans advised by SaveOnSP.

**Response to Request No. 20**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as irrelevant to any claim or defense in this Action to the extent it seeks information beyond the final CarePath terms and conditions at issue. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 21**

All Documents and Communications regarding any offer by JJHCS to provide to any Patient any CarePath funds greater than the amounts that JJHCS generally offers to CarePath Patients or to waive any limitation on or elimination of the amount of CarePath copay assistance funds available to a Patient.

21

**Response to Request No. 21**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information beyond the extent to which SaveOnSP has caused JJHCS to pay more in copay assistance than it otherwise would have. TrialCard further objects to this Request on the ground that the phrases "CarePath funds greater than the amounts that JJHCS generally offers CarePath Patients" and "to waive any limitation on or elimination of the amount of CarePath copay assistance funds available" are vague and ambiguous. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 22**

All Documents and Communications regarding JJHCS's attempts to identify health plans advised by SaveOnSP or Patients enrolled in such plans.

**Response to Request No. 22**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications

22

outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this

Request as irrelevant to any claim or defense in this Action to the extent it calls for information

unrelated to SaveOnSP's conduct at issue.  TrialCard further objects to this request as overbroad,

unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all"

documents and communications regarding a broad subject matter.

TrialCard will not search for or produce documents and communications

responsive to this Request.

**Request No. 23**

From any time, all Documents and Communications regarding TrialCard's
negotiations or agreements regarding the potential use of any Copay Maximizer Service or
Copay Accumulator Service, for TrialCard's Employee Health Plans, including any
abandonment of those negotiations or agreements.

**Response to Request No. 23**

In addition to the foregoing objections, TrialCard, as a third party, objects to this

Request as irrelevant to any claim or defense in this Action to the extent it seeks information

about "the potential use of any Copay Maximizer Service or Copay Accumulator Service,"

which is unrelated to SaveOnSP's conduct at issue.  TrialCard further objects to this Request as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks "all" documents and communications regarding a broad subject matter.  TrialCard further

objects to this Request insofar as it seeks the production of documents and communications

outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this

Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the

extent it seeks documents and communications outside of the relevant Time Period.  TrialCard

further objects to this Request to the extent it seeks information that is exempt from discovery

and protected from disclosure by a privilege including, without limitation, the attorney-client

privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court and relevant case law.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 24**

Documents sufficient to identify all JJHCS Hub Entities and CarePath Care Coordinators.

**Response to Request No. 24**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this request as irrelevant to any claim or defense in this Action to the extent it calls for information about "JJHCS Hub Entities" or "CarePath Care Coordinators" that are not implicated in this litigation. TrialCard further objects to this Request to the extent it uses the term "JJHCS Hub Entity" for the reasons stated in TrialCard's Objections to Definitions.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 25**

From January 1, 2009 through the present, Documents sufficient to show the economic terms of JJHCS's retention of or agreements with You, including any assessment of the fair market value of those services.

**Response to Request No. 25**

In addition to the foregoing general objections, TrialCard, as a third party, objects

24

14168182

to this Request as it seeks the production of documents and information that are available from

parties to the Action and, therefore, is unduly burdensome on TrialCard.  TrialCard further

objects to this Request insofar as it seeks the production of documents and communications

outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this

Request on the ground that "any assessment of the fair market value of those services" is

irrelevant.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not

proportional to the needs of the case to the extent it seeks documents and communications

outside of the relevant Time Period.  TrialCard further objects to this Request to the extent it

seeks information that is exempt from discovery and protected from disclosure by a privilege

including, without limitation, the attorney-client privilege, the work product doctrine, the joint

defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local

Rules of the Court, and relevant case law.

TrialCard will not search for or produce documents and communications

responsive to this Request.

## Request No. 26

From January 1, 2009 through the present, documents sufficient to show the percentage of Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen Drugs.

## Response to Request No. 26

In addition to the foregoing general objections, TrialCard, as a third party, objects

to this Request as it seeks the production of documents and information that are available from

parties to the Action and, therefore, is unduly burdensome on TrialCard.  TrialCard further

objects to this Request insofar as it seeks the production of documents and communications

outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this

Request as irrelevant to any claim or defense in this Action to the extent it calls for information

unrelated to SaveOnSP's misconduct, including information about JJHCS's advertising or

marketing of CarePath or Janssen Drugs. TrialCard further objects to this Request on the ground

that the phrase "Patients who enroll in CarePath after being contacted by JJHCS, Janssen, any

JJHCS Hub Entity, or any other third party authorized to advertise or market CarePath or Janssen

Drugs" is vague and ambiguous. TrialCard further objects to this Request as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it seeks documents and

communications outside of the relevant Time Period. TrialCard further objects to this Request to

the extent it uses the terms "JJHCS Hub Entity" for the reasons stated in TrialCard's Objections

to Definitions.

TrialCard will not search for or produce documents and communications

responsive to this Request.

**Request No. 27**

From January 1, 2015 through the present, all Documents and Communications
relating to Copay Accumulator Services and Copay Maximizer Services and their effect on
JJHCS's return on investment for copay assistance dollars.

**Response to Request No. 27**

In addition to the foregoing general objections, TrialCard, as a third party, objects

to this Request as it seeks the production of documents and information that are available from

parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further

objects to this Request insofar as it seeks the production of documents and communications

outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this

Request as irrelevant to any claim or defense in this Action to the extent it calls for information

about other "Copay Accumulator Services and Copay Maximizer Services" other than

SaveOnSP. TrialCard further objects to this Request on the ground that the phrase "JJHCS's

26

return on investment for copay assistance dollars" is vague and ambiguous.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period.

TrialCard will not search for or produce documents and communications responsive to this Request.

**Request No. 28**

From January 1, 2015 through the present, all Documents and Communications relating to Your understanding of the terms "copay accumulator" and "copay maximizer."

**Response to Request No. 28**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as irrelevant to any claim or defense in this Action to the extent it calls for information unrelated to SaveOnSP's conduct at issue.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  TrialCard further objects to this Request as unduly burdensome to the extent it seeks documents and communications outside of the relevant Time Period.  TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law.

TrialCard will not search for or produce documents and communications

27

responsive to this Request.

## Request No. 29

        All Documents and Communications concerning non-medical switching by participants of plans that implement SaveOnSP's services, a Copay Accumulator Service, or a Copay Maximizer Service.

## Response to Request No. 29

        In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome on TrialCard.  TrialCard further objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.

        TrialCard will not search for or produce documents or communications responsive to this Request.

## Request No. 30

        Your document retention policies.

## Response to Request No. 30

        In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as it seeks the production of documents and information that are not relevant to the Action.  TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege,

14168182

the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of the

Court, and relevant case law.

TrialCard will through JJHCS produce documents responsive to this Request for

the relevant Time Period.

## Request No. 31

Complete data dictionaries for any data that You produce.

## Response to Request No. 31

In addition to the foregoing general objections, TrialCard, as a third party, objects

to this Request as it seeks the production of documents and information that are not relevant to

the Action. TrialCard further objects to this Request on the ground that "data dictionaries for

any data that You produce" is vague and ambiguous. JJHCS further objects to this Request to

the extent that it purports to require the creation of any document or record in a format not kept

by TrialCard or seeks to impose production obligations that exceed those required by the Rules

of Federal Procedure, the Local Rules of the Court, this Court's or with any applicable

agreement among the parties.

TrialCard will not search for or produce documents responsive to this Request.

## Request No. 32

From any time, all Documents and Communications regarding this Action
provided to you by any person or entity other than SaveOnSP, including in response to
subpoenas served in this Action.

## Response to Request No. 32

In addition to the foregoing general objections, TrialCard, as a third party, objects

to this Request as it seeks the production of documents and information that are available from

parties to the Action and, therefore, is unduly burdensome on TrialCard. TrialCard further

29

14168182

objects to this Request insofar as it seeks the production of documents and communications outside of TrialCard's possession, custody, and/or control.  TrialCard further objects to this Request on the ground that the phrase "all Documents and Communications regarding this Action provided to you by any person or entity other than SaveOnSP" is vague and ambiguous. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" documents and communications regarding a broad subject matter.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks documents and communications outside of the relevant Time Period.  TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the Federal Rules of Civil Procedure, the Local Rules of Court, and relevant case law.

TrialCard will not search for or produce documents or communications responsive to this Request.

Dated: March 6, 2023

By:    /s/DRAFT_____

Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for TrialCard Inc.*

14168182

31

# Exhibit 7



www.pbwt.com

June 7, 2023

Katherine Brisson
(212) 336-2552

Emma Holland, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104

      **Re:**     *Johnson & Johnson Healthcare Systems, Inc. v. Save On SP, LLC*
                <u>**Case No. 2:22-cv-02632 (ES) (CLW)**</u>

Dear Emma:

        We write in response to your May 31, 2023 letter regarding the subpoena issued to TrialCard, Inc. ("TrialCard") and TrialCard's April 24, 2023 document production.

## I.     Requests for Which TrialCard Agreed to Produce Documents

        <u>RFP No. 3</u>:  TrialCard confirms that it has filtered its case and task notes by the Janssen drugs at issue in this litigation:  Balversa, Darzalex, Darzalex Faspro, Erleada, Imbruvica, Opsumit, Prezcobix, Remicade, Rybrevant, Simponi, Stelara, Symtuza, Tracleer, Tremfya, Uptravi, Ventavis, and Zytiga.[1]  The case and task notes that TrialCard anticipates producing will include patients who receive Janssen CarePath copay assistance for at least one Janssen drug at issue in this litigation, regardless of whether that is the only Janssen drug for which they receive copay assistance.  TrialCard anticipates producing over 19,000 call notes based on the application of the previously agreed-upon twelve search terms.

        Despite TrialCard's extensive efforts to identify and produce responsive documents, SaveOnSP now proposes that TrialCard supplement its already broad search parameters to include two additional terms: "out-of-pocket" and "OOP."  TrialCard declines to do so.  These terms are overinclusive, and their application would present a substantial burden, which is particularly pronounced for a third-party like TrialCard.  Nearly every call with TrialCard relating to the CarePath program likely involves some mention or reference to the terms "out-of-pocket" or "OOP."  Indeed, providing financial assistance to enable patients to meet their out-of-pocket obligations is a primary service that the CarePath program provides.  SaveOnSP is not

---

[1] As we have noted several times, *e.g.*, Ltr. from H. Sandick (for JJCHS) to A. Dunlap dated Apr. 11, 2023, Valchlor is not a Janssen drug.

Patterson Belknap Webb & Tyler LLP    1133 Avenue of the Americas, New York, NY 10036    T 212.336.2000    F 212.336.2222

Emma Holland, Esq.
June 7, 2023
Page 2

entitled to every call concerning out-of-pocket costs without some reasonable subject matter limitation, which is precisely what TrialCard's existing search terms already establish.

SaveOnSP also asks TrialCard to confirm that it "has investigated whether it possesses documents responses to RFP No. 3 beyond the above-described patient calls and the results of that investigation." TrialCard has conducted a reasonable investigation and has determined that it possesses no additional responsive materials beyond what it understands has been or will be produced through JJHCS.

## II. TrialCard's Investigation and Responses Regarding Other RFPs

RFP Nos. 5, 6, 8, 10–17, 20–22, 24–25, and 32: Following a reasonable investigation, we confirm that TrialCard does not have any documents responsive to these RFPs other than what it has already agreed to produce. If TrialCard becomes aware of any responsive documents in its possession that are not also in the possession of JJHCS, it will notify SaveOnSP.

RFP Nos. 7, 9, and 29: These requests each seek documents that improperly go beyond TrialCard's implementation of the Janssen CarePath program. In particular, RFP No. 7 seeks documents concerning TrialCard's "understanding" of commercial insurers' designation of specialty drugs; RFP No. 9 seeks TrialCard's documents concerning SaveOnSP's provision of services to qualified high deductible or health savings account plans; and RFP No. 29 seeks TrialCard's documents concerning the non-medical switching of patients who are subject to SaveOnSP's services or other accumulators or maximizers besides SaveOnSP. None of these requests have anything to do with TrialCard's provision of services to JJHCS. TrialCard's understanding of the health insurance market and its participants in the abstract is irrelevant to its actual implementation of the Janssen CarePath program and, thus, is immaterial to the claims at issue. Accordingly, TrialCard will limit its responses to these requests as previously described in its May 12 letter.

However, as also previously noted in our May 12 letter, TrialCard has published various written materials encompassing the subject of copay accumulator and maximizer programs generally, some of which may touch on the requests at issue. Without conceding the responsiveness or relevance of these documents, we note that they are publicly available at https://corp.trialcard.com/resources/.

RFP Nos. 13–15, 17, 20, and 22: As we explained in our May 12 letter, TrialCard's contributions to any analyses responsive to these requests would have been provided at the request of, or in consultation with, JJHCS. Accordingly, TrialCard would have furnished any such deliverables to JJHCS, which, in turn, would be captured by JJHCS's document productions (since SaveOnSP has served virtually identical requests on JJHCS).

TrialCard understands that, to date, JJHCS has produced more than 4,000 communications between JJHCS and TrialCard and related documents. This includes work orders for the Cost Adjustment Program ("CAP") referenced in your May 31 letter, *e.g.*,

Emma Holland, Esq.
June 7, 2023
Page 3

JJHCS_00001497, JJHCS_00037297; the CAP project requirements and business rules that JJHCS provided to TrialCard, *e.g.*, JJHCS_00077384, JJHCS_00077393; and over 1,000 documents and communications regarding the implementation of CAP. These materials are more than sufficient for SaveOnSP to understand the scope and nature of the work that TrialCard performed at JJHCS's direction.

SaveOnSP nevertheless seeks discovery into TrialCard's documents generated outside of its relationship with JJHCS or not furnished to JJHCS. Such documents are entirely irrelevant to the claims and defenses at issues, and as a third-party, TrialCard need not produce such materials. Accordingly, TrialCard will not produce documents in response to these requests.

RFP No. 26: Following a reasonable investigation, TrialCard does not possess any data, analyses, or other information about patient enrollment in CarePath responsive to this RFP.

## III.    TrialCard's April 24, 2023 Production

RFP Nos. 1–2: TrialCard will produce additional organizational charts in a forthcoming production.

RFP No. 3: TrialCard has produced all responsive patient letters to SaveOnSP in its April 24 production. It has no additional materials to produce in response to RFP No. 3.

RFP No. 18(i)–(m): TrialCard anticipates producing additional medical benefit claims data responsive to this request in a forthcoming production.

RFP No. 30: In its April 24 production, TrialCard produced its only Company-wide document retention policy, which was published in 2023. *See* TRIALCARD_00000125. It has no additional materials to produce in response to RFP No. 30.

Identification of Custodians: TrialCard has conducted a reasonable investigation to respond to SaveOnSP's document requests and has produced documents from a variety of non-custodial repositories. TrialCard will not further identify the specific non-custodial source for each document it has produced.

Very truly yours,

*/s/Katherine Brisson*
Katherine Brisson

# Exhibit 8



www.pbwt.com

August 24, 2023

Katherine Brisson
(212) 336-2552

**By Email**

Emma Holland, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the America
New York, NY 10104

Re:     **Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC
        (Case No. 2:22-cv-02632-ES-CLW)**

Dear Emma:

On behalf of TrialCard, we write further to our letter of August 3, 2023, and in response to your August 16, 2023 letter regarding the third party subpoena issued to TrialCard in the above-captioned action. We note that several of the issues you raise in your August 16 letter have been addressed at length in our prior correspondence, which we incorporate by reference as appropriate.

Request No. 3. As you know, we have already produced over 19,000 call notes based on the application of twelve existing search terms. This search methodology—which already includes the very broad term "Save*"—was designed to be quite expansive in yielding potentially responsive documents. We believe that the application of this methodology represents a good faith effort to identify documents responsive to Request No. 3. Nevertheless, in the interest of avoiding an unnecessary dispute, we are continuing to explore the feasibility of adding the "OOP" terms you have proposed and will revert when we have additional information.

Scope of Custodial Searches. TrialCard and SaveOnSP have met and conferred multiple times and exchanged extensive discovery correspondence addressing the scope of the searches it will conduct to satisfy its discovery obligations, and, as relevant here, why TrialCard believes custodial discovery is unnecessary as to certain Requests for Production. Custodial discovery is unlikely to yield non-duplicative information that JJHCS has not already produced. Nevertheless, we have agreed to perform custodial searches in an effort to resolve SaveOnSP's concerns about the sufficiency of TrialCard's productions and to avoid unnecessary recourse to motion practice.

Emma Holland, Esq.
August 24, 2023
Page 2

To address the questions you have raised concerning the specific RFPs you identify in your letter, we direct you to our May 12 letter, which describes at length the reasons why SaveOnSP's RFP Nos. 5–7, 10, 16, 17, 20–22, 24, 25, 27, 29, and 32 do not require additional collection and production of documents. By way of summary, we reiterate the following:

- Based on our reasonable investigation, TrialCard does not believe that it possesses documents responsive to RFP Nos. 5, 6, 10, 17, 20–22, 27, and 32 that are not also in the possession of JJHCS.

- TrialCard does not believe it has any documents responsive to RFP Nos. 7 and 29 that relate to TrialCard's implementation of the CarePath program.

- TrialCard has already produced call notes for patient calls using search criteria designed to capture relevant communications concerning SaveOnSP. After a reasonable investigation, TrialCard does not believe it has additional documents responsive to RFP No. 16.

- In response to RFP No. 24, TrialCard has produced organization charts for the portions of its business that oversee the administration of CarePath. Based on a reasonable investigation, TrialCard does not believe it has other documents responsive to RFP No. 24 that are not also in the possession of JJHCS.

- JJHCS has agreed to produce its agreements, work orders, and associated documents with TrialCard. These documents are responsive to RFP No. 25. TrialCard does not believe it has other documents responsive to RFP No. 25 that are not in the possession of JJHCS.

Documents Produced by JJHCS. TrialCard will not produce documents that it believes to be in the possession of JJHCS because such documents are duplicative of party discovery. As we already explained at length our August 3 letter, SaveOnSP's reliance on *Wyeth v. Abbott Laboratories*—which SaveOnSP first cited in its July 26 letter—squarely supports TrialCard's position that a third-party is not required to duplicate party productions. *See Wyeth v. Abbott Lab'ys*, 2011 WL 2429318, at *8 (D.N.J. June 13, 2011) ("To the extent Plaintiffs seek to compel Novartis to produce documents already produced by Abbott, Plaintiffs motions to enforce their subpoenas are denied as duplicative."). As counsel to both JJHCS and TrialCard, we state that both JJHCS and TrialCard are complying with their respective discovery obligations and conducting searches as agreed upon with SaveOnSP. Further, as we have previously explained, JJHCS has produced over 4,000 communications and related documents between JJHCS and TrialCard.

Additional Custodians and Custodial Search Terms. As you know, TrialCard has designated four custodians to address SaveOnSP's concerns and avoid an unnecessary dispute. Despite TrialCard's reasonable efforts to reach compromise, you persist in your unreasonable request for sixteen custodians. Once again, this is disproportionate given TrialCard's very narrow

Emma Holland, Esq.
August 24, 2023
Page 3

role in the events relevant to this litigation, and we will not add the twelve additional custodians you have requested.

You have also asked us to substantiate the burden of adding these additional custodians. TrialCard has run a hit report across its existing four custodians (Holly Weischedel, Sini Abraham, Paul Esterline, and Rick Fry) for the search terms proposed in Appendix A of SaveOnSP's July 26 letter. This report resulted in over 128,000 documents, inclusive of families. Given that tens of thousands of documents hit on these search terms for just these four custodians, it is self-evident that there will be a significant, undue burden associated with engaging in custodial discovery for all sixteen custodians you have requested. As such, we decline to designate the additional twelve TrialCard custodians you have proposed. We also suggest that you review the documents TrialCard produces from these four custodians in order to make an assessment about whether the additional proposed review is warranted.[1]

<u>Retention Policy.</u> TrialCard has produced all retention documents that it has been able to identify based on reasonable investigation for the applicable time frame.[2]

Very truly yours,

*/s/ Katherine Brisson*
Katherine Brisson

---

[1] In our letter of August 3, we stated that we would provide an evaluation of the search terms you proposed in Appendix A to your July 26 letter ("Appendix A"). TrialCard does not understand SaveOnSP to be disputing JJHCS's proposed Search Terms Nos. 2, 3, and 4 contained in Appendix A. Accordingly, we will run these mutually-agreed upon terms over the files of Weischedel, Abraham, Esterline, and Fry. TrialCard has run a hit report for SaveOnSP's proposed Search Term No. 1 (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "Save OnSP" OR Maximize* OR ("Express Scripts" OR ESI) OR Accredo OR CAP*), and has concluded that the term is overinclusive, yielding over 91,000 search hits, family inclusive, for just the existing four custodians. As such, we decline to add it to our existing custodial search methodology. We will, however, run TrialCard's Search Term No. 1 (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP).

[2] For this reason, we also decline to run SaveOnSP's proposed Search Term No. 5 in Appendix A. Nevertheless, in the interest of avoiding a dispute and to ensure that there are no other responsive documents from the four existing custodians, we will include the term "retention policy" as proposed in Search Terms Nos. 2, 3, and 4.

# Exhibit 9

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | | |
|---|---|---|
| Johnson & Johnson Health Care Systems Inc. | ) | |
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  22-2632 (JMV) (CLW) |
| Save On SP, LLC | ) | |
| _____ | ) | |
| *Defendant* | ) | |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS**
**OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To:                                      TrialCard Inc.
                    2250 Perimeter Park Dr., #300, Morrisville, NC 27560
                      *(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached requests for production.

| Place: Robinson & Cole LLP | Date and Time: |
|---|---|
| 666 Third Avenue, 20th Floor New York, NY 10017-4132 | 12/15/2023 5:00 pm |

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/01/2023

                    *CLERK OF COURT*
                                                    OR
                                                          /s/ E. Evans Wohlforth, Jr.
    _____          _____
    *Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Defendant
Save On SP, LLC                                    , who issues or requests this subpoena, are:

E. Evans Wohlforth, Jr., Gibbons P.C., One Gateway Center, Newark, NY 07102-5310

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   22-2632 (JMV) (CLW)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

David Elsberg
Andrew R. Dunlap
Meredith Nelson
Elizabeth H. Snow
SELENDY GAY ELSBERG, PLLC
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
deslberg@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

E. Evans Wohlforth, Jr.
ROBINSON & COLE LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
212-451-2954
ewohlforth@rc.com

*Attorneys for Defendant Save On SP, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br> Plaintiff, <br><br> v. <br><br> SAVE ON SP, LLC, <br><br> Defendant. | Civil Action No. 22-2632 (ES) (CLW) <br><br> **NOTICE OF SUBPOENA FOR THE PRODUCTION OF DOCUMENTS** |

 **PLEASE TAKE NOTICE** that pursuant to Federal Rules of Civil Procedure 26, 34, and 45 Defendant Save On SP, LLC ("SaveOnSP") requests TrialCard Inc. ("Trial-Card"), to produce for inspection and copying the documents listed in these Requests, to

the office of the undersigned on December 15, 2023 or at a time and place mutually agreed

by the parties or ordered by the Court.

      **PLEASE TAKE FURTHER NOTICE** that this demand for production of docu-

ments shall be deemed continuing in nature to require supplemental responses if Plaintiff

or Plaintiff's counsel obtain or locate further or additional documents subsequent to the

time Plaintiff's responses are served.


Dated:  December 1, 2023          By:  /s/_____
                        E. Evans Wohlforth, Jr.
                        ROBINSON & COLE LLP
                        666 Third Avenue, 20th floor
                        New York, NY 10017-4132
                        212-451-2954
                        ewohlforth@rc.com

                        David Elsberg
                        Andrew R. Dunlap
                        Meredith Nelson
                        SELENDY GAY ELSBERG, PLLC
                        1290 Avenue of the Americas
                        New York, NY 10104
                        212-390-9000
                        deslberg@selendygay.com
                        adunlap@selendygay.com
                        mnelson@selendygay.com

                        *Attorneys for Defendant Save On SP, LLC*

## DEFINITIONS

1.     The singular form of a word includes the plural, and vice versa.

2.     Any tense of a verb includes all tenses.

3.     Any natural person includes that person's agents, assigns, attorneys, employees, representatives, and successors.

4.     Any entity other than a natural person includes (a) that entity's present and former agents, affiliates (foreign or domestic), assigns, attorneys, consultants, directors, divisions, employees, officers, parents, predecessors, representatives, servants, subsidiaries, and successors; (b) any person or entity, directly or indirectly, wholly or in part, associated with, controlled by, or owned by that entity; (c) and any other person or entity acting or purporting to act on behalf of (a) or (b).

5.     "Action" means this litigation styled as "Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC" currently pending in the United States District Court for the District of New Jersey, No. 22-2632 (ES) (CLW).

6.     "Affordable Care Act" means the Patient Protection and Affordable Care Act, Pub. L. 148, 124 Stat. 119.

7.     "All," "any," and "each" mean any and all.

8.     "And" and "or" are construed both conjunctively and disjunctively.

9.     "Benefits Investigation" means any process by which TrialCard, or any entity acting on its behalf, receives information regarding the pharmacy benefits provided by a health plan, including information regarding prior authorization costs, Essential Health Benefits status, patient eligibility, and related information.

10.     "CarePath" means the Janssen copay assistance program marketed under the name CarePath that provides financial support services for patients using specialty

3

drugs researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including Janssen (as defined herein).

11.    "CarePath Care Coordinator" means any person or entity encompassed by that term as used on CarePath's "Contact Us" webpage,[1] as well as any person responsible for communicating with patients who contact CarePath via an advertised help number (*e.g.*, 877-CarePath).

12.    "Communication" means the transmittal of information in the form of facts, ideas, inquiries, or otherwise.

13.    "Complaint" means JJHCS's May 4, 2022 Complaint [ECF No. 1] or any subsequently amended Complaint in this Action.

14.    "Copay Accumulator Service" means (a) any service provided by Pharmacy Benefit Mangers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assistance from counting towards a patient's deductible and out-of-pocket maximum and under which members remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay accumulator."

15.    "Copay Assistance" means any type of patient support that allows a drug manufacturer to pay all or some of a patient's prescription drug cost for that manufacturer's drug.

---

[1] *See* Contact Us, https://www.janssencarepath.com/patient/contact-us (last visited November 20, 2023).

16.    "Copay Maximizer Service" means (a) any service provided by Pharmacy Benefit Managers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assistance from counting towards a patient's deductible and out-of-pocket maximum and under which members do not remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay maximizer."

17.    "Document" means "document" and "electronically stored information" as defined in the Federal Rules of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

18.    "Essential Health Benefit: means, in the context of prescription drug benefits at issue in this case, (a) a prescription drug benefit that satisfies the requirement for a plan to provide essential prescription drug benefits under the Affordable Care Act or that is treated as such by a plan;[2] and (b) any definition JJHCS ascribes to the term "essential health benefit" as used in the Complaint.

19.    "Identify" means (a) with respect to persons, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment; (b) with respect to documents, either (i) to give, to the extent known, the (A) type of document; (B) general subject matter; (C) date of the document; and (D) author(s), addressee(s) and recipient(s); or (ii) to produce the documents, together with sufficient identifying information sufficient to satisfy Federal Rule of Civil Procedure 33(d).

---

[2] 45 C.F.R. §§ 156.122, 156.115

20.    "Including" means including but not limited to.

21.    "Janssen" means Janssen Biotech, Inc., Janssen Pharmaceuticals, Inc., Janssen Products, LP, and Actelion Pharmaceuticals U.S., Inc., as well as any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Janssen Biotech, Inc., Janssen Pharmaceuticals, Inc., Janssen Products, LP, or Actelion Pharmaceuticals U.S., Inc.

22.    "Janssen Drug" means any Specialty Drug manufactured or sold by Janssen from any time for which patients may receive copay assistance, including BALVERSA, DARZELEX, DARZELEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, PREZCOBIX, REMICADE, RYBREVANT, SIMPONI, STELARA, SYMTUZA, TRACLEER, TREMFYA, UPTRAVI, VENTAVIS, ZYTIGA, as well as any other specialty drugs that JJHCS asserts are at issue in this Action.

23.    "JJHCS" means Johnson & Johnson Health Care Systems Inc. and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Johnson & Johnson Health Care Systems Inc., including Centocor, Inc., Ortho Biotech Products LP, McNeil Pharmaceutical, Ortho-McNeil Pharmaceutical, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Scios Inc., Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development, LLC, Janssen Pharmaceuticals, Inc., Janssen Products, LP, Actelion Pharmaceuticals U.S., Inc., Janssen BioPharma LLC, and Janssen Research & Development LLC.

6

24.    "JJHCS Hub Entity" means any entity retained or utilized by JJHCS to administer, in whole or in part, CarePath (including Lash Group and TrialCard), and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf of such an entity.

25.    "Lash Group" means The Lash Group, Inc. and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of The Lash Group, Inc.

26.    "Non-Essential Health Benefits" means, in the context of prescription drug benefits at issue in this case, (a) any prescription drug benefit covered by a plan in excess of those necessary for a plan to satisfy the requirements for providing essential prescription drug health benefits under the Affordable Care Act[3] and designated by the plan as a non-essential health benefit; and (b) any definition JJHCS ascribes to the term "non-essential health benefits" as used in the Complaint.

27.    "Patient" means a natural person prescribed or eligible to be prescribed any Janssen Drug, whether or not they use CarePath or are a participant in a health plan advised by SaveOnSP.

28.    "Person" means a natural person or legal entity including any business or governmental entity or association.

---

[3] *See* 45 C.F.R. §§ 156.122, 15.115

29.    "<u>Regarding</u>" means (directly or indirectly, partially or wholly) about, alluding to, assessing, bearing upon, commenting upon, comprising, concerning, confirming, connected to, considering, containing, contradicting, dealing with, discussing, embodying, evaluating, evidencing, identifying, in connection with, indicating, in respect of, involving, memorializing, mentioning, noting, pertaining to, probative of, proving, recording, referring to, reflecting, relating to, reporting on, reviewing, setting forth, showing, stating, suggesting, summarizing, supporting, touching upon a subject, or having been created, generated, or maintained in connection with or as a result of that subject.

30.    "<u>Request</u>" means any of these Requests for Production.

31.    "<u>SaveOnSP</u>" means Save On SP, LLC, and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Save On SP, LLC.

32.    "<u>Specialty Drug</u>" means any specialty pharmaceutical, medication, biologic, or other therapy treated as a pharmaceutical for purposes of health plan benefit coverage.

33.    "<u>Stelara</u>" means the Janssen Drugs sold under that name.

34.    "<u>Tremfya</u>" means the Janssen Drug sold under that name.

35.    "<u>TrialCard</u>" means TrialCard Inc. and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of TrialCard Inc.

36.    "TrialCard's Employee Health Plans" means any health plans offered by TrialCard to its employees.

37.    "You" and "Your" means TrialCard.

## INSTRUCTIONS

1.    These Requests seek production of material in Your possession, custody, or control. Fed. R. Civ. P. 45(a)(1)(A)(iii).

2.    These Requests seek production of nonprivileged material. Fed. R. Civ. P. 26(b)(1).

3.    These Requests seek production of material that is proportional to the needs of this case. Fed. R. Civ. P. 26(b)(1).

4.    For each Request, either state that you will produce the requested material or state with specificity the grounds for objecting to the Request, including the reasons. Fed. R. Civ. P. 45(d)(2)(B).

5.    An objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. Fed. R. Civ. P. 45(d)(2)(B).

6.    If you object to all or part of a Request, state whether you are withholding any responsive material based on that objection.

7.    If you object to part of a Request, specify the part and state that you will produce documents responsive to the rest.

8.    If you withhold responsive information by claiming that the information is privileged or subject to protection as trial-preparation material, expressly make the claim and describe the nature of the information privileged or protected in a manner that, without revealing information itself privileged or protected, will enable SaveOnSP to assess the claim, Fed. R. Civ. P. 45(e)(2)(A), including by indicating whether any document

9

exists regarding the information re- quested and stating, to the extent the privilege is be-
ing asserted in connection with a claim or defense governed by state law, the state privi-
lege rule being invoked, Local Rule 34.1.

9.      If a document responsive to a Request was once in your possession, custody,
or control and has since been lost or destroyed, provide (a) a detailed description of the
document; (b) the name of the author; (c) the names of all persons to whom the document
was sent; (d) the date on which the document was prepared or initially received; (e) the
date on which the document was lost or destroyed; and (f) if the document was destroyed,
the manner of its destruction, the reason for its destruction, the name of the person who
requested or authorized its destruction, and the name of the person who destroyed it.

10.      Produce documents as they are kept in the usual course of business or in a
form specified in this subpoena. Fed. R. Civ. P. 45(e)(1)(b). For each document, identify
the file or location from which it was taken and the name, affiliation, and position of the
producing custodian or non-custodial source.

11.      Produce electronically stored information in the form and manner required
by any agreed-upon or court-ordered protocols. In the absence of any such protocol at the
time of production, consult SaveOnSP for further instruction.

12.      Produce each document in its entirety, without abbreviation or redaction,
including all attachments or materials attached thereto.

13.      Produce all versions of each document that are not identical to the original
document (including all drafts) whether due to handwritten notations, revisions, enclo-
sures, attachments, underlining, highlighting, or otherwise.

14.    These Requests are deemed continuing. If after responding to any Request you learn that your response is in some material respect incomplete or incorrect, supplement or correct your response in a timely manner.

## TIME PERIOD

Unless otherwise specified, these Requests cover from and including April 1, 2016, through the present.

## REQUESTS

1.    Documents sufficient to show the identity of all drug makers for which TrialCard performs Benefits Investigations.

2.    Documents sufficient to show the identity of all drug makers for which TrialCard has performed investigations, including but not limited to Benefits Investigations, that identify or attempt to identify if patients are members of plans advised by Save-OnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service.

3.    Documents sufficient to show the methods by which TrialCard identifies or attempts to identify if patients are members of plans advised by SaveOnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service.

4.    All Documents and Communications between TrialCard and JJHCS regarding identification or attempts to identify patients who are members of plans advised by SaveOnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service, including without limitation proposals to perform such work.

5.    All Communications with patients receiving Stelara or Tremfya, including without limitation recordings of calls.

6.    Documents sufficient to show the methods by which TrialCard responded to Benefits Investigations that revealed or suggested that a patient was a member of a plan

advised by SaveOnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service, including without limitation regarding the criteria by which TrialCard determined to send the letter previously produced at TRIALCARD_00000074—77.

7.    All Communications between TrialCard and SaveOnSP, including without limitation recordings of calls.

8.    All Documents and Communications regarding the creation or attempted creation of a response to SaveOnSP, Copay Accumulator Services, and/or Copay Maximizer Services, including without limitation the creation or attempted creation of a █████

████████████████████████████████████████████████████████

██████████████████████████████████████████████, *see, e.g.*, TRIALCARD_00001815 ████████████████████████████████

████  ████████  ████  ████████  ████████████); TRIALCARD_00002256; TRIAL-CARD_00002725, as well as Documents and Communications regarding the sale or attempted sale of such a program to drug makers.

# Exhibit 10

Adeel A. Mangi, Esq.
Harry Sandick, Esq. (admitted *pro hac vice*)
George LoBiondo, Esq.
Sara A. Arrow, Esq.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

*Attorneys for TrialCard Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | Civil Action No. 22-2632 (ES) (CLW) |
| Plaintiff, | **NON-PARTY TRIALCARD INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS** |
| v. | |
| SAVE ON SP, LLC, | |
| Defendant. | |

## GENERAL OBJECTIONS

TrialCard Incorporated ("TrialCard") incorporates each of the General Objections below into its specific objections to each Request, whether or not each such General Objection is expressly referred to in TrialCard objections to a specific Request.

TrialCard reserves the right to supplement, amend, modify, or correct its responses under Rule 26(e) should it discover additional information or grounds for objections at any time prior to the conclusion of this Action. The following responses and objections are based upon information known at this time.

1.    TrialCard is not a party to the above-captioned litigation pending in the District of New Jersey (the "Action") and objects to the Subpoena's imposition of significant burden on it because the vast majority of Requests in the Subpoena can be satisfied by obtaining documents directly from Johnson & Johnson Health Care Systems, Inc. ("JJHCS"), a party to the Action. TrialCard notes that several of the requests in the Subpoena are nearly identical to document requests made by SaveOnSP to JJHCS in the Action. TrialCard objects to producing any documents unless and until SaveOnSP can demonstrate that it has not been able to obtain these documents in party discovery.

2.    TrialCard objects to the Requests to the extent that they seek documents or information protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the First Amendment privilege, the Federal Rules of Civil Procedure, the Local Rules of the Court, and relevant case law. The inadvertent production by TrialCard of information, documents, materials, or things covered by any privilege or doctrine shall not constitute a waiver of any applicable privilege or doctrine, including but not limited to, objections on the basis of

competency, confidentiality, relevancy, materiality, work-product, privilege, and/or admissibility as evidence, as such objections may apply at trial or otherwise in this Action.

3.      TrialCard objects to the Requests to the extent that they seek documents or information that are not relevant to a claim or defense or to the subject matter of this litigation. Any response TrialCard makes to any Request shall not be deemed an admission that the response, information, document, or thing produced is relevant to a claim or defense or to the subject matter of this litigation, is reasonably calculated to lead to the discovery of admissible evidence, is material, or is admissible as evidence.

4.      TrialCard objects to the Requests to the extent that they impose obligations beyond or inconsistent with those imposed by the Federal Rules of Civil Procedure, the Local Rules of the Court, the Court's orders, the discovery schedule entered in this Action, or any other applicable rule, order, or source of law.

5.      TrialCard objects to the Requests to the extent that they seek the production of documents or things that are equally available to or already in SaveOnSP's possession, custody, or control.  To the extent that TrialCard agrees in these responses to produce certain documents, information, or things, these responses shall not be construed as conceding that the documents, information, or things exist and/or are in the possession, custody, or control of TrialCard.  Instead, it means that TrialCard will perform a reasonable search for documents in its possession and produce such documents, information, or things to the extent any responsive documents, information, or things exist and are not otherwise protected from disclosure.

6.      TrialCard objects to the Requests to the extent that they seek information that is obtainable from sources other than TrialCard in a manner that is more convenient, less burdensome, or less expensive.

7.      TrialCard objects to the Requests to the extent that they seek production of documents, records, tangible things, or other materials to the extent that such disclosure would violate a confidentiality agreement, court order, or applicable law.

8.      TrialCard objects to the Requests to the extent that they are vague and/or ambiguous.

9.      TrialCard objects to the Requests to the extent that they require interpretation by it in providing a response.  TrialCard responds to the Requests as it interprets and understands each Request as set forth.  If SaveOnSP subsequently asserts an interpretation of any Request that differs from TrialCard's understanding of that Request, TrialCard reserves the right to modify or supplement its objections and responses.

10.     TrialCard objects to the Requests to the extent that they are duplicative of other document requests, interrogatories, and/or other discovery requests, including the requests contained within the subpoena served on TrialCard dated February 17, 2023 (the "February 2023 Subpoena").

11.     TrialCard objects to the Requests to the extent that they are argumentative, lack foundation, or incorporate assertions that are disputed, erroneous, or irrelevant to the Action. TrialCard further objects to the Requests to the extent that they assume facts that do not exist or the occurrence of events that did not take place.

12.     TrialCard objects to the Requests to the extent that they seek documents and information relating to any business affairs other than those that are the subject of the Action.

13.     TrialCard objects to the Requests as overbroad and unduly burdensome to the extent they purport to require production of "all" or "any" documents where a subset of documents would be sufficient to provide the relevant information.

4

14.     TrialCard objects to the Requests to the extent that they seek the production of documents that are not in TrialCard's possession, custody, or control.

## OBJECTIONS TO DEFINITIONS

1.     TrialCard objects to the definition of the term "Benefits Investigation" as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it purports to include "any means by which TrialCard, or any entity acting on its behalf, receives information regarding the pharmacy benefits provided by a health plan, including information regarding prior authorization costs, Essential Health Benefits status, patient eligibility, and related information" or purports to include entities and persons acting or purporting to act on behalf of or under the control of TrialCard.

2.     TrialCard objects to the definition of the term "Janssen" as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it purports to include "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf" of those entities.

3.     TrialCard objects to the definition of the term "JJHCS" as overbroad, unduly burdensome, and not proportional to the needs of the case to extent it purports to include "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, . . . agents, [or] representatives" or purports to include entities and persons acting or purporting to act on behalf of or under the control of entities other than Johnson & Johnson Healthcare Systems, Inc., including Centocor, Inc., Ortho Biotech Products LP, McNeil Pharmaceutical, Ortho-McNeil Pharmaceutical, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Scios Inc., Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development,

5

LLC, Janssen Pharmaceuticals, Inc., Janssen Products, LP, Actelion Pharmaceuticals U.S., Inc.,

Janssen BioPharma LLC, and Janssen Research & Development LLC.

4.      TrialCard objects to the definition of the term "JJHCS Hub Entity" as vague and

as irrelevant to the extent it purports to include entities other than those responsible for

administering CarePath during the Relevant Time Period.  TrialCard further objects to the

definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the

extent it includes "any and all predecessors and successors in interest, assignees, parents,

subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers,

employees, committees, attorneys, accountants and all persons or entities acting or purporting to

act on behalf" of those entities.  TrialCard further objects to the extent the term is used to seek

documents and communications concerning entities other than JJHCS.

5.      TrialCard objects to the definition of the term "Lash Group" as overbroad,

unduly burdensome, and not proportional to the needs of the case to the extent it includes "any

and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates,

divisions or departments, agents, representatives, directors, officers, employees, committees,

attorneys, accountants and all persons or entities acting or purporting to act on behalf or under

the control of The Lash Group, Inc."

6.      TrialCard objects to the definition of the term "TrialCard" as overbroad, unduly

burdensome, and not proportional to the needs of the case to the extent it includes "any and all

predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or

departments, agents, representatives, directors, officers, employees, committees, attorneys,

accountants and all persons or entities acting or purporting to act on behalf or under the control

of TrialCard Inc." TrialCard further objects to the extent the term is used to seek documents and communications in the possession of entities other than TrialCard.

## OBJECTIONS TO INSTRUCTIONS

1.      TrialCard objects to the Instructions to the extent that they impose requirements on TrialCard beyond those required by the Federal Rules of Civil Procedure.

2.      TrialCard objects to Instruction No. 14 to the extent that SaveOnSP attempts to impose requirements on TrialCard beyond those required by the Federal Rules of Civil Procedure or ordered by the Court. Rule 34, which contains a duty to supplement responses, does not apply to requests for production directed to a non-party, and Rule 45 contains no duty to supplement.

## OBJECTIONS TO THE TIME PERIOD FOR SPECIFIC REQUESTS

1.      TrialCard objects to SaveOnSP's Requests as overbroad, unduly burdensome, and not relevant to the subject matter of this Action to the extent they call for documents from before April 1, 2016 or after July 1, 2022. Except where expressly noted, TrialCard will only produce documents for the period April 1, 2016 to July 1, 2022 (the "Relevant Time Period").

## SPECIFIC RESPONSES AND OBJECTIONS

**Request No. 1**

Documents sufficient to show the identity of all drug makers for which TrialCard performed Benefits Investigations.

**Response to Request No. 1**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as overbroad and irrelevant to any claim or defense in this Action. TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by any privilege. TrialCard further objects to this Request to the extent it uses the terms "Benefits Investigations" and "TrialCard" for the reasons stated in TrialCard's

7

Objections to Definitions. TrialCard further objects to this Request on the grounds that the term "drug makers" is undefined. TrialCard further objects to this Request because it would require the disclosure of confidential business information, including information about other TrialCard clients, that has no relevance to this Action and is subject to confidentiality agreements between TrialCard and its other clients.

TrialCard will not search for or produce documents in response to this Request.

**Request No. 2**

Documents sufficient to show the identity of all drug makers for which TrialCard has performed investigations, including but not limited to Benefits Investigations, that identify or attempt to identify if patients are members of plans advised by SaveOnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service.

**Response to Request No. 2**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as overbroad and irrelevant to any claim or defense in this Action, insofar as it seeks documents related to efforts to identify or attempt to identify patients unaffiliated with SaveOnSP. TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by any privilege. TrialCard further objects to this Request to the extent it uses the terms "Benefits Investigations" and "TrialCard" for the reasons stated in TrialCard's Objections to Definitions. TrialCard further objects to this Request on grounds that the terms "investigations" and "drug makers" are undefined and/or vague and ambiguous. TrialCard further objects to this Request because it would require the disclosure of confidential business information, including information about other TrialCard clients, that has no relevance to this Action and is subject to confidentiality agreements between TrialCard and its other clients.

TrialCard will not search for or produce documents responsive to this Request.

**Request No. 3**

Documents sufficient to show the methods by which TrialCard identifies or attempts to identify if patients are members of plans advised by SaveOnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service.

**Response to Request No. 3**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant to any claim or defense in this Action, insofar as it seeks information about services that TrialCard provides to clients other than JJHCS and in relation to patients unaffiliated with SaveOnSP. TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by any privilege. TrialCard further objects to this Request to the extent it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome to TrialCard. TrialCard further objects to this Request to the extent it uses the term "TrialCard" for the reasons stated in TrialCard's Objections to Definitions.

Subject to the foregoing objections and without prejudice to those objections, to the extent that documents responsive to this Request are also arguably responsive to existing Requests for Production Numbers 20 and 22 in the February 2023 Subpoena, TrialCard has already agreed to produce certain documents subject to TrialCard's prior objections. Specifically, to the extent such documents have not already been produced by JJHCS, TrialCard has agreed to produce (1) non-privileged documents from certain agreed-upon TrialCard custodians that are responsive to Requests for Production Numbers 20 and 22 for the Relevant Time Period; and (2) Benefits

9

Investigations performed for JJHCS that sought to determine whether Stelara or Tremfya patients were in a SaveOnSP-advised plan, a maximizer plan, or an accumulator plan, to the extent such non-privileged documents exist for the period January 1, 2022 to November 7, 2023.  TrialCard will not otherwise search for or produce documents or communications responsive to this Request.

**Request No. 4**

All Documents and Communications between TrialCard and JJHCS regarding identification or attempts to identify patients who are members of plans advised by SaveOnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service, including without limitation proposals to perform such work.

**Response to Request No. 4**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant to any claim or defense in this Action, insofar as it seeks documents unrelated to SaveOnSP. TrialCard further objects to this Request to the extent it seeks the production of documents and communications that are available from parties to the Action and, therefore, is unduly burdensome to TrialCard.  TrialCard further objects to this Request to the extent it seeks "all" documents and communications regarding a broad subject matter.  TrialCard further objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by any privilege.  TrialCard further objects to this Request to the extent it uses the terms "TrialCard" and "JJHCS" for the reasons stated in TrialCard's Objections to Definitions.

Subject to the foregoing objections and without prejudice to those objections, to the extent that documents responsive to this Request are also arguably responsive to existing Requests for Production Numbers 20 and 22 in the February 2023 Subpoena, TrialCard has already agreed to

10

produce certain documents subject to TrialCard's prior objections.  Specifically, to the extent such documents have not already been produced by JJHCS, TrialCard has agreed to produce (1) certain non-privileged documents from certain agreed-upon TrialCard custodians that are responsive to Requests for Production Numbers 20 and 22 for the Relevant Time Period; and (2) Benefits Investigations performed for JJHCS that sought to determine whether Stelara or Tremfya patients were in a SaveOnSP-advised plan, a maximizer plan, or an accumulator plan, to the extent such non-privileged documents exist for the period January 1, 2022 to November 7, 2023.  TrialCard will not otherwise search for or produce documents responsive to this Request.

## Request No. 5

All Communications with patients receiving Stelara and Tremfya, including without limitation recordings of calls.

## Response to Request No. 5

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant to any claim or defense in this Action, insofar as it seeks communications unrelated to the CarePath program (and the "withMe" programs) and/or with patients unaffiliated with SaveOnSP.  TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" communications regarding a broad subject matter.  TrialCard further objects to this Request to the extent that it seeks the production of communications that are available from parties to the Action (specifically, SaveOnSP) and, therefore, is unduly burdensome to TrialCard.

Subject to the foregoing objections and without prejudice to those objections, to the extent that documents responsive to this Request are also arguably responsive to existing Request for

11

Production Number 3 in the February 2023 Subpoena, TrialCard has already agreed to produce certain documents subject to TrialCard's prior objections.  Specifically, to the extent such documents have not already been produced by JJHCS, TrialCard has agreed to produce (1) case and task notes reflecting communications between TrialCard and patients taking at least one Janssen Drug for the Relevant Time Period; and (2) for the period January 1, 2022 to November 7, 2023, certain documents sufficient to show written communications to patients receiving Stelara or Tremfya to the extent such communications concern whether those patients were in a SaveOnSP-advised plan, a maximizer plan, or an accumulator plan.  TrialCard will not otherwise search for or produce communications responsive to this Request.

**Request No. 6**

Documents sufficient to show the methods by which TrialCard responded to Benefits Investigations that revealed or suggested that a patient was a member of a plan advised by SaveOnSP, any Copay Accumulator Service, and/or any Copay Maximizer Service, including without limitation regarding the criteria by which TrialCard determined to send the letter previously produced at TRIALCARD_00000074–77.

**Response to Request No. 6**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant to any claim or defense in this Action, insofar as it seeks documents unrelated to SaveOnSP. TrialCard further objects to this Request to the extent it seeks the production of documents and information that are available from parties to the Action and, therefore, is unduly burdensome to TrialCard.  TrialCard further objects to this Request on the ground that the phrase "methods by which TrialCard responded to Benefits Investigations" is vague and ambiguous.  TrialCard further

12

objects to this Request to the extent it seeks information that is exempt from discovery and protected from disclosure by any privilege. TrialCard further objects to this Request to the extent it uses the terms "Benefits Investigations" and "TrialCard" for the reasons stated in TrialCard's Objections to Definitions.

Subject to the foregoing objections and without prejudice to those objections, to the extent that documents responsive to this Request are also arguably responsive to existing Requests for Production Numbers 20 and 22 in the February 2023 Subpoena, TrialCard has already agreed to produce certain documents subject to TrialCard's prior objections. Specifically, to the extent such documents have not already been produced by JJHCS, TrialCard has agreed to produce (1) certain non-privileged documents from certain agreed-upon TrialCard custodians that are responsive to Requests for Production Numbers 20 and 22 for the Relevant Time Period; and (2) for the period January 1, 2022 to November 7, 2023, certain documents sufficient to show written communications to patients receiving Stelara or Tremfya to the extent such communications concern whether those patients were in a SaveOnSP-advised plan, a maximizer plan, or an accumulator plan. TrialCard will not further search for or produce documents in response to this Request.

### Request No. 7

All Communications between TrialCard and SaveOnSP, including without limitation recordings of calls.

### Response to Request No. 7

In addition to the foregoing general objections, TrialCard, as a third party, objects to this Request as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant to any claim or defense in this Action, insofar as it seeks communications unrelated to any Janssen

Drug or to the CarePath (and the "withMe" programs). TrialCard further objects to the extent this Request seeks the production of documents and communications that are available from parties to the Action, in particular from SaveOnSP. TrialCard further objects to this Request to the extent it seeks documents and communications in the possession of entities other than TrialCard or outside of TrialCard's possession, custody, and/or control. TrialCard further objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all" communications regarding a broad subject matter. TrialCard further objects to this Request to the extent it uses the term "TrialCard" for the reasons stated in TrialCard's Objections to Definitions.

TrialCard further objects to this Request as unduly burdensome because it requires TrialCard to identify recordings of calls without the benefit of identifying information—specifically, all names and phone numbers used by SaveOnSP employees who communicated with TrialCard and its affiliates—that SaveOnSP has not provided. TrialCard further objects to this Request as duplicative of Request No. 5 to the extent communications between TrialCard and SaveOnSP included patients.

Subject to the foregoing objections, TrialCard will produce certain responsive call recordings as requested by JJHCS. TrialCard will not otherwise search for or produce documents or communications responsive to this Request.

**Request No. 8**

All Documents and Communications regarding the creation or attempted creation of a response to SaveOnSP, Copay Accumulator Services, and/or Copay Maximizer Services, including without limitation the creation or attempted creation of a ██████████████

████████████████████████████████████████████████████

██████████████████████████████, *see, e.g.,* TRIALCARD_00001815 ████

██████████████████████████████████████████████████████████);

TRIALCARD_00002256; TRIALCARD_00002725, as well as Documents and Communications

regarding the sale or attempted sale of such a program to drug makers.

**<u>Response to Request No. 8</u>**

In addition to the foregoing general objections, TrialCard, as a third party, objects to this

Request as overbroad, unduly burdensome, not proportional to the needs of the case, and irrelevant

to any claim or defense in this Action, insofar as it seeks information about services that TrialCard

provides to clients other than JJHCS and/or in relation to patients unaffiliated with SaveOnSP.

TrialCard further objects to this Request as it seeks the production of documents and information

that are available to parties to the Action and, therefore, is unduly burdensome to TrialCard.

TrialCard further objects to this Request to the extent it seeks information that is exempt from

discovery and protected from disclosure by any privilege.  TrialCard further objects to this Request

as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

seeks "all" documents and communications regarding a broad subject matter.

TrialCard will not search for or produce documents responsive to this Request.

Dated:  December 15, 2023

By:    */s/ Harry Sandick*

Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
Sara A. Arrow
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for TrialCard Inc.*

15

# Exhibit 11



www.pbwt.com

March 1, 2024

Sara Arrow
(212) 336-2031

**By Email**

Hannah Miles, Esq.
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:    **TrialCard's December 1, 2023 Subpoena**
*Johnson & Johnson Health Care Services, Inc. v. Save On SP, LLC,*
**Case No. 2:22-cv-02632 (JKS) (CLW)**

Dear Hannah:

On behalf of TrialCard, we write in response to SaveOnSP's February 16, 2024 letter regarding the December 1, 2023 Subpoena issued to TrialCard.

**I.    General Objections**

**Time Period.**  SaveOnSP continues to insist that TrialCard produce documents beyond July 1, 2022, the parties' agreed-upon cut-off date for discovery.  However, nothing in Judge Waldor's November 7, 2023 Order directs third parties, such as TrialCard, to update its discovery responses.  That Order only directs "both parties" to "supplement their discovery responses in accordance with the Federal Rules of Civil Procedure."  *See Johnson & Johnson Health Care Sys., Inc. v. Save On SP, LLC,* ECF No. 173.  This does not obligate TrialCard to update its discovery responses, as TrialCard is not a party to the underlying litigation.  It certainly does not provide any basis for TrialCard to produce documents ***beyond*** the cutoff date for party discovery (November 7, 2023), as SaveOnSP now insists.

SaveOnSP also states that "TrialCard has not raised any valid burden objection" to extending the time period beyond July 1, 2022.  That is not accurate.  In its Responses and Objections to the December 1, 2023 Subpoena, TrialCard did so, objecting to SaveOnSP's Requests as "overbroad, ***unduly burdensome***, and not relevant to the subject matter of this Action to the extent they call for documents from before April 1, 2016 or after July 1, 2022" (emphasis supplied).  Furthermore, TrialCard reiterated its burden objection during the January 12, 2024 meet and confer.  For the avoidance of doubt, TrialCard asserts relevance, breadth, and burden objections to SaveOnSP's demand that TrialCard produce documents beyond July 1, 2022.

Hannah Miles, Esq.
March 1, 2024
Page 2

SaveOnSP next suggests that TrialCard should be required to produce documents beyond July 1, 2022 because it "is central to the litigation." However, TrialCard is a third party, and is far more removed from the SaveOnSP scheme at issue than SaveOnSP's own business partners, ESI and Accredo—yet SaveOnSP apparently does not believe that ESI and Accredo should update their productions. *See* Jan. 11, 2024 Email from H. Miles to S. Arrow. TrialCard's role in administering the CarePath program, at the direction of JJCHS, does not impose on it unique obligations that are different than those applicable to other third parties.

Nevertheless, in the interest of compromise, TrialCard has agreed to produce, through November 7, 2023, thousands of benefits investigations ███████████████████████ ██████████████████████████████████████████████████████████. *See* TRIALCARD_00008931. In addition, TrialCard agrees to "refresh" certain CarePath claims data through November 7, 2023. We are currently investigating the full scope of this data "refresh" and will revert when we have additional information.

**General References to Accumulators and Maximizers.** SaveOnSP also seeks documents that relate generally to copay accumulators and maximizers without any reference to SaveOnSP. SaveOnSP has failed to justify its insistence that TrialCard must produce documents that do not mention SaveOnSP, and TrialCard declines to engage in an overbroad, unduly burdensome review of them.[1]

## II.    TrialCard's Ability to Identify Patients

**Request Nos. 1 and 2.** Requests Nos. 1 and 2 seek documents sufficient to show the identity of all drug makers for which TrialCard performed investigations, including benefits investigations, that identify or attempt to identify if a patient is on a health plan affiliated with a copay maximizer, accumulator, or SaveOnSP. SaveOnSP's reference to general investigations (beyond benefits investigations) is vague and ambiguous. In any event, TrialCard's purported actions with respect to clients other than JJHCS are irrelevant to the underlying litigation, which only concerns the administration of CarePath, and not copay assistance programs offered by other pharmaceutical manufacturers. SaveOnSP has failed to articulate the relevance of documents sought by this request, and has similarly failed to explain how TrialCard's work performed for

---

[1] As you know, Judge Waldor's November 7, 2023 Order imposed a limitation that documents related to JJHCS's CAP Program must also mention SaveOnSP. *See* Dkt. No. 173 at 2–3 ("Plaintiff shall run custodial document searches fashioning a search designed to capture documents wherein the terms 'CAP A', 'CAP M', or 'adjustment program,' (or reasonable variations of those terms) are found *in the same documents as the term 'SaveOn'* (or reasonable variations / abbreviations)." (emphasis supplied)). While this Order is only applicable to party discovery, it suggests that expanding third party discovery to documents that do not mention or refer to SaveOnSP is improper and disproportionate to the needs of the case.

Hannah Miles, Esq.
March 1, 2024
Page 3

clients other than SaveOnSP has any relevance whatsoever to JJHCS or CarePath.  TrialCard will
not search for or produce documents responsive to Requests 1 or 2.

            **Request No. 3.**  Request No. 3 seeks documents sufficient to show the methods by
which TrialCard identifies or attempts to identify if patients are members of health plans affiliated
with copay accumulators, maximizers, or SaveOnSP.  As you know, TrialCard produced thousands
of benefits investigations on January 12, 2024.  *See* TRIALCARD_00008931.  As we have
discussed, TrialCard is also in the process of identifying whether additional data fields exist for
these benefits investigations.

            SaveOnSP nevertheless asserts that the benefits investigations do not satisfy this
Request because "this request seeks 'method**s**,' plural."  Feb. 16, 2024 Ltr. from H. Miles to S.
Arrow at 3.  SaveOnSP identifies two documents wherein TrialCard employees discuss potential
methods for identifying patients on a copay accumulator, maximizer, or SaveOnSP and claims that
it "needs to know if those, or other methods, were ever used to identify or attempt to identify if
patients are members of plans advised by SaveOn, accumulators, or maximizers."  However, as
SaveOnSP acknowledges, the documents that SaveOnSP cites reflect ██████████████
████████████████████████████████████████████████  *See id.*;
TRIALCARD_00003417.  As we have explained, to the extent such ████████████████
████████████████, they are only relevant to the extent they were provided to JJHCS.  Accordingly,
such documents are more properly obtained through party discovery.

            Accordingly, we decline to review documents to identify general identification
"methods" of SaveOnSP patients that TrialCard may have considered.  To the extent SaveOnSP
seeks to propose a more narrowly tailored request concerning other methods of identification that
TrialCard may have developed with respect to CarePath, we remain open to considering such a
request.

            **Request No. 4.**  Request No. 4 seeks documents and communications between
TrialCard and JJHCS regarding the identification or attempted identification of patients who are
members of plans affiliated with copay accumulators, maximizers, or SaveOnSP.  As we have
explained repeatedly, documents and communications between TrialCard and JJHCS are more
appropriately sought through party discovery.  TrialCard makes no representations as to the
contents of JJHCS's productions, and further takes no position as to whether these documents
would be relevant.

     **III.**     **TrialCard's Responses to Patients Once Identified**

            **Request No. 6.**  Request No. 6 seeks documents sufficient to show the methods by
which TrialCard responded to benefits investigations that revealed or suggested that a patient was
a member of a health plan that was affiliated with a copay accumulator, maximizer, or SaveOnSP.
SaveOnSP asserts that TrialCard has not satisfied this Request.  This is incorrect.  TrialCard has
produced multiple letter templates that it has sent to patients in connection with the benefits
investigation process, including following identification of a patient as affiliated with a copay

Hannah Miles, Esq.
March 1, 2024
Page 4

accumulator, maximizer, or SaveOnSP.  TrialCard has further satisfied this Request by providing the CarePath IDs of the patient recipients of these letters and the dates on which those letters were sent.  *See* TRIALCARD_00008931 ("Tasks").  Because Request No. 6 seeks "documents sufficient to show," these documents satisfy this request.

          **Request No. 8.**  Request No. 8 seeks documents and communications regarding TrialCard's creation or attempted creation of a response to SaveOnSP and/or copay accumulators or maximizers.  This overbroad request seeks documents and communications that are irrelevant to any claim or defense in the underlying litigation.  SaveOnSP is not entitled to go on a fishing expedition of all efforts TrialCard contemplated or took with respect to copay maximizers, accumulators, or even SaveOnSP.  TrialCard is a vendor for JJHCS, and only the work that TrialCard work performed for JJHCS is relevant to this litigation.  Further, documents regarding what responses or solutions TrialCard purportedly offered to JJHCS, to the extent they exist, are more appropriately sought through party discovery.

          Further, SaveOnSP has not shown how any responses or solutions that TrialCard may have contemplated or developed for copay assistance programs other than CarePath have any applicability to CarePath.  Once again, we remain open to considering a request that concerns TrialCard's responses to SaveOnSP with respect to JJHCS and the CarePath Program, but absent such a request, we decline to produce documents in response to this Request.

## IV.    Communications Between TrialCard and SaveOnSP

          Request No. 7 seeks all communications between TrialCard and SaveOnSP.  To the extent these communications occurred, SaveOnSP can search its own records to locate them.  SaveOnSP has not explained why it needs a third party to search for and produce documents that should be within its own files.  Accordingly, TrialCard declines to undertake the undue burden of searching for and producing communications sought by Request No. 7.

*    *    *    *

          Finally, for avoidance of doubt, TrialCard does not agree that the parties are at impasse with respect to the December 1, 2023 Subpoena.  We reserve all rights and are available to meet and confer.

                    Very truly yours,

                    */s/ Sara A. Arrow*
                    Sara A. Arrow

# Exhibit 12



www.pbwt.com

January 12, 2024

Sara A. Arrow
(212) 336-2031

**<u>By Email</u>**

Elizabeth Snow, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104

   Re: ***Johnson & Johnson Healthcare Systems, Inc. v. Save On SP, LLC***
     <u>**Case No. 2:22-cv-02632 (JKS) (CLW)**</u>

Dear Elizabeth:

   On behalf of TrialCard, we write in response to your December 27, 2023 letter concerning the February 17, 2023 subpoena (the "Subpoena") served on TrialCard and our related email correspondence.

   Suffice it to say, we disagree with the statements in your December 27 letter, including for the reasons we have explained at length in discovery letters and during the conferral process.  *See, e.g.*, Dec. 6, 2022 Ltr. from S. Arrow to H. Miles; Dec. 22, 2023 Ltr. from S. Arrow to E. Snow.  As we have explained, SaveOnSP's request to the extend the scope of the Subpoena at least nine months beyond the service date is improper and contrary to the Federal Rules of Civil Procedure.

   In the interest of finality, we write to confirm that we are at impasse with respect to the applicable time period for the Subpoena.  TrialCard does not consent to submit this dispute to Judge Wolfson.

   TrialCard reserves all rights.

       Very truly yours,

       <u>*/s/ Sara A. Arrow*</u>
       Sara A. Arrow

Patterson Belknap Webb & Tyler LLP  1133 Avenue of the Americas, New York, NY 10036  T 212.336.2000  F 212.336.2222

14801960

# Exhibit 13



www.pbwt.com

July 6, 2023

Katherine Brisson
(212) 336-2552

Emma Holland, Esq.
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, NY 10104

**Re:** *Johnson & Johnson Healthcare Systems, Inc. v. Save On SP, LLC*
*Case No. 2:22-cv-02632 (ES) (CLW)*

Dear Emma:

On behalf of TrialCard, Inc. ("TrialCard"), we write in response to your July 5, 2023 letter concerning TrialCard's responses to Save On SP, LLC's (SaveOnSP) subpoena. As we previously stated, we have worked with our client to determine whether there is anything more to be done to satisfy the concerns you raised during our June 28, 2023 meet and confer. While we still do not think it necessary, in order to moot the concerns you have expressed and to avoid an unnecessary dispute, we will make a custodial production from TrialCard. We will update you further as that collection and review proceeds and will aim to make a prompt production. We believe this resolves our present dispute. However, if you insist on proceeding with a motion regarding the purported absence of a custodial production from TrialCard, we provide our consent to proceed before Magistrate Judge Waldor on that specific issue.

Very truly yours,

*/s/ Katherine Brisson*
Katherine Brisson

# Exhibit 14

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Hannah R. Miles
Associate
212.390.9055
hmiles@selendygay.com


May 24, 2024


**Via E-mail**

Sara A. Arrow
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
sarrow@pbwt.com

**Re:**   ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC*** **(Case No. 2:22-cv-02632-JKS-CLW)**

Dear Sara,

We write to you in your capacity as counsel for J&J.

As you know, at yesterday's discovery conference, Judge Wolfson held that
J&J controls TrialCard's documents regarding its work for J&J.

*First*, SaveOn requests that J&J produce custodial documents in TrialCard's
possession from the "refresh" period of July 1, 2022 to November 7, 2023 for the
four custodians and search terms on Appendix 1. As you know, TrialCard previ-
ously agreed to produce documents using those same search terms from those
same custodians from April 1, 2016 to July 1, 2022.

*Second*, SaveOn requests that J&J produce TrialCard's custodial and non-
custodial documents, from April 1, 2016 to November 3, 2023, regarding Trial-
Card's work for J&J in identifying patients on accumulators, maximizers, and
SaveOn-advised plans, including but not limited to the development, roll out, and
operation of the CAP Program. Please identify any non-custodial sources of such
documents at TrialCard and produce any responsive, non-privileged documents.
Please also identify and designate as custodians any individuals at TrialCard who
worked on these efforts during the discovery period. This should include, without
limitation, the seven individuals identified on Appendix 2. Please run the search
terms proposed on Appendix 2 over the documents of all custodians and produce
any responsive, non-privileged documents.

Sara A. Arrow
May 24, 2024

      *Finally*, SaveOn requests that J&J produce the approximately 1,500 call re-cordings in TrialCard's possession that SaveOn previously requested from Trial-Card. A list of those calls is enclosed. J&J's proposal—that SaveOn produce ap-proximately 28,000 call recordings in exchange for the approximately 1,500 call recordings that SaveOn seeks—is disproportionate. While we continue to evaluate J&J's request and are happy to consider an appropriately narrowed request, it is not appropriate for J&J to condition its production of the responsive call record-ings that SaveOn seeks on a reciprocal production from SaveOn that J&J waited a year to request.

      We request a response by May 31, 2024.

Sincerely,

/s/ Hannah Miles

Hannah R. Miles
Associate

Sara A. Arrow
May 24, 2024

## **<u>Appendix 1</u>**

- Custodians:

    o Holly Weischedel

    o Sini Abraham

    o Paul Esterline

    o Rick Fry

- Search Terms (*see* July 26, 2023 Ltr. from E. Holland to K. Brisson, at App. A; Aug. 24, 2023 Ltr. from K. Brisson to E. Holland, at 3 & n.1-2; Sept. 8, 2023 Ltr. from K. Brisson to E. Holland at n.1).

    o SaveOnSP OR SaveOn OR "Save On SP" OR Save On" OR SOSP

    o ("Johnson & Johnson" OR "Johnson and John-son" OR J&J OR JnJ OR JJHCS OR Janssen) AND (Save-OnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

    o (CarePath OR "Care Path") AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

    o (Accumulator OR Maximizer) AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

    o ("Johnson & Johnson" OR "Johnson and Johnson" OR J&J OR JnJ OR JJHCS OR Janssen) AND (CarePath w/5 "term* and condition*")

    o (Accumulator OR Maximizer OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP) w/10 (CarePath AND (Stelara OR Tremfya) AND (limit OR eliminat*))

    o ("Johnson & Johnson" OR "Johnson and Johnson" OR J&J OR JnJ OR JJHCS OR Janssen) AND (enroll w/5 CarePath) AND contact*

3

**Appendix 2**

- Proposed TrialCard custodians:

    o Jason Zemcik

    o Rick Ford

    o April Harrison

    o Tommy Gooch

    o Lynsi Newton

    o Amber Maldonado

    o Cosimo Cambi

- Proposed search terms:

    o Previously agreed to TrialCard search terms:

        ▪ SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP

        ▪ ("Johnson & Johnson" OR "Johnson and John-son" OR J&J OR JnJ OR JJHCS OR Janssen) AND (Save-OnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

        ▪ (CarePath OR "Care Path") AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

        ▪ (Accumulator OR Maximizer) AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

        ▪ ("Johnson & Johnson" OR "Johnson and Johnson" OR J&J OR JnJ OR JJHCS OR Janssen) AND (CarePath w/5 "term* and condition*")

        ▪ (Accumulator OR Maximizer OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP) w/10 (Care-Path AND (Stelara OR Tremfya) AND (limit OR elimi-nat*))

4

Sara A. Arrow
May 24, 2024

- ("Johnson & Johnson" OR "Johnson and Johnson" OR J&J OR JnJ OR JJHCS OR Janssen) AND (enroll w/5 CarePath) AND contact*

  o CAP search terms:

  - (CAPa OR CAPm OR "adjustment program") **AND** (Save-OnSP OR SaveOn OR "Save On SP" OR Save On" OR SOSP OR accumlat* OR maximiz*)

  - ("essential health benefit*" OR EHB* OR "non-essential health benefit" OR "nonessential health benefit*" OR NEHB*) **w/50** ("CAPa" OR CAPm" OR "adjustment pro-gram" OR accumulat* OR maximiz*)

  - "Save On" (*case sensitive*)

  - "save on" **w/50** (accumulat* OR maximiz* OR "essential health benefit*" OR EHB* OR "non-essential health ben-efit*" OR "nonessential health benefit*" OR NEHB* OR accredo OR ESI OR "express scripts")

  - "other offer" **w/5** (accumulat* OR maximiz*)

  - ("Express Scripts" OR ESI OR ExpressScripts) **w/50** ("accumulat* OR maximiz*)

  - (Accredo OR Acredo) **w/50** (accumulat* OR maximiz*)

  - (STELARA* OR TREMFYA* OR CarePath OR JCP OR "Savings Program") w/25 (6000 OR 6,000 OR limit OR eliminate)

# Exhibit 15

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Hannah R. Miles
Associate
212.390.9055
hmiles@selendygay.com

June 6, 2024

**<u>Via E-mail</u>**

Jacob Chefitz
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jchefitz@pbwt.com

**Re:    Johnson & Johnson Health Care Systems Inc. v. Save On SP,
        LLC (Case No. 2:22-cv-02632-JKS-CLW)**

Dear Jacob,

We write to memorialize the parties' discussion of J&J's production of documents in the possession of its vendor, TrialCard, during the parties' June 4, 2024 meet-and-confer, as directed by Judge Wolfson's May 28, 2024 Order. *See* May 28, 2024 Order at 10. We also write to follow up on our May 24, 2024 letter regarding production of TrialCard documents, to which J&J has not responded. You indicated that J&J would send a letter with a counterproposal regarding the scope of TrialCard discovery "expeditiously;" we await that letter.

*First*, you said we should expect a forthcoming production of "refresh" documents, *see* May 24, 2024 Ltr. from H. Miles to S. Arrow at Appendix 1. This forthcoming production is party discovery, but you did not confirm which entity—TrialCard or J&J—would make the production. Please let us know whether J&J will make this production (bearing JJHCS bates stamps) or TrialCard will make this production on behalf of J&J (bearing TRIALCARD bates stamps). Additionally, please provide us with a date when we can expect this production.

*Second*, you said that J&J has "passed on" to TrialCard SaveOn's request for additional discovery in the possession of TrialCard, *see* May 24, 2024 Ltr. at 1, Appendix 2, and that TrialCard is "considering" the request. To avoid doubt, consistent with Judge Wolfson's Order, SaveOn's request is to J&J, not TrialCard. *See* Order at 10 (directing "the parties" to meet and confer); *see also* May 23, 2024 Hr'g Tr. at 49:7-9 ("It's as counsel for J&J that you're conferring, once I find control,

Jacob Chefitz
June 6, 2024

about what they need or should be requesting."). Please provide us with a date by which J&J will respond to SaveOn's request.

*Third*, you asserted that because Judge Wolfson's May 28th Order compels J&J to produce documents related to the CAP program and benefits investigations, those are the only two relevant topics on which SaveOn may seek discovery from J&J of documents in TrialCard's possession. We disagree. While only those two categories of documents were at issue in the Order, Judge Wolfson compelled J&J to produce them because they "fall within the broad audit provision of the MSA," which gives J&J control over "documents and communications relating to the administration of CarePath." Order at 9-10. J&J must produce all relevant documents in TrialCard's possession over which it has legal control.

*Finally*, you said that J&J was willing to negotiate reciprocal productions of call recordings. We mentioned that SaveOn has requested approximately 1,500 call recordings from J&J, *see* May 23, 2024 Ltr., *see also* Mar. 27, 2024 Ltr. from H. Miles to S. Arrow. You said that J&J continues to request over 28,000 call recordings from SaveOn, with the possibility of adding more. *See* May 7, 2024 Ltr. from E. Shane to H. Miles. We explained that the differential in the call recordings sought by the parties—1,500 vs. 28,000—makes the requests, on their face, not equivalent. You stated J&J's position that those numbers are "proportional, given the position of the parties here." We asked you to clarify whether by "position of the parties," you meant that it is proportional for a defendant to produce twenty times more discovery than a plaintiff of the same record type. You agreed that it was proportional. We continue to disagree. SaveOn remains willing to negotiate reciprocal productions of call recordings that pose a reasonably equivalent burden upon each party.

We await your response to our May 24, 2024 letter and remain available to meet and confer.

Sincerely,

/s/ Hannah R. Miles

Hannah R. Miles
Associate

# Exhibit 16



www.pbwt.com

June 17, 2024

Jacob I. Chefitz
(212) 336-2474

**By Email**

Hannah R. Miles, Esq.
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:     ***Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC,***
       **2:22-cv-02632 (JKS) (CLW)**

Dear Hannah:

On behalf of JJHCS, we write in response to your May 24, 2024 letter regarding discovery from TrialCard, and also in response to your June 6, 2024 letter regarding the parties' June 4, 2024 meet-and-confer related to your May 24, 2024 letter.

As an initial matter, we wish to advise you that TrialCard has informed JJHCS that it intends to retain new counsel to represent it in connection with this matter. We understand that TrialCard is in the process of engaging such counsel and as soon as this engagement is finalized, you will be provided with contact information for TrialCard's new counsel.

## I.     The "Refresh" Production for TrialCard Custodians

As explained during our meet-and-confer, we have asked TrialCard to produce documents from its four previously agreed upon custodians for the "refresh" period of July 1, 2022 to November 7, 2023, and we expect TrialCard to provide those documents. As you know, however, TrialCard is an independent entity, and because JJHCS does not have physical control of TrialCard's files, JJHCS must ultimately rely on TrialCard's cooperation. Given that TrialCard has chosen to obtain new counsel and is in the process of retaining counsel, JJHCS is therefore not currently able to provide an expected production date. We understand that TrialCard is working to collect the "refresh" materials and we will provide a further update as soon as we can.

You also asked whether the "refresh" production will bear JJHCS or TRIALCARD bates stamps. While JJHCS reserves the right to either produce these documents itself (with the documents bearing the JJHCS bates stamps) or direct TrialCard to make the production (with the documents bearing the TRIALCARD bates stamp), JJHCS anticipates that these documents will be produced with the TRIALCARD bates stamp.

Hannah R. Miles, Esq.
June 17, 2024
Page 2

## II.     The Additional TrialCard Discovery Requested by SaveOn

SaveOnSP requests that JJHCS "produce TrialCard's custodial and noncustodial documents, from April 1, 2016 to November 3, 2023, regarding TrialCard's work for J&J in identifying patients on accumulators, maximizers, and SaveOnSP-advised plans, including but not limited to the development, roll out, and operation of the CAP Program."[1]  As an initial matter and as SaveOn well knows, TrialCard has already produced thousands of such documents, including thousands of records of benefits investigations that TrialCard performed at JJHCS's request to determine whether patients were in a SaveOnSP-advised plan, a maximizer plan, or an accumulator plan.  *See* Mar. 12, 2024 Ltr. from S. Arrow to H. Miles at 1.  It has also produced thousands of documents and communications that TrialCard has produced from its four agreed-upon TrialCard custodians.  So SaveOnSP has already received a substantial production from TrialCard on the requested subject.  And that is in addition to the many documents that JJHCS has produced reflecting communications between JJHCS and TrialCard, including communications relating to the CAP Program and benefits investigations.

Nonetheless, consistent with Judge Wolfson's order and reserving the right to maintain any burden objections, JJHCS will request additional documents from TrialCard, subject to JJHCS's and SaveOnSP's agreement on custodians and search terms.  We again reiterate that TrialCard is an independent entity over whose documents JJHCS does not have physical control, and that TrialCard is in the process of retaining new counsel.  To the extent that JJHCS and SaveOnSP can agree on the relevant scope of these discovery requests, JJHCS will, as required by Judge Wolfson's order, demand the relevant documents from TrialCard pursuant to the terms of JJHCS's and TrialCard's Master Services Agreement ("MSA"), a request that will be made to TrialCard's new counsel.

*Custodians*

In Appendix 2 of your May 24, 2024 letter, you propose seven additional TrialCard custodians.  TrialCard has long objected to adding those seven individuals as custodians.  *See, e.g.*, Mar. 8, 2024 Ltr. from S. Arrow to H. Miles; Feb. 16, 2024 Ltr. from K. Brisson to H. Miles; Dec. 22, 2023 Ltr. from S. Arrow to H. Miles.  JJHCS shares the objections that TrialCard has raised with respect to those custodians.  While we reserve all relevance and burden objections, in an effort to resolve these disputes and move discovery forward, JJHCS can agree to ask TrialCard to add Jason Zemcik, Tommy Gooch, Amber Maldonado, and Cosimo Cambi as custodians if SaveOnSP agrees to drop its request to add Rick Ford, April Harrison, and Lynsi Newton as custodians.  Based on our investigation to date, it appears that Ford, Harrison, and Newton had minimal involvement in identifying, for JJHCS, patients on a SaveOnSP-advised plan, a maximizer plan, or an accumulator plan, and in the development and rollout of the CAP Program.  To the extent

---

[1] With respect to the date cutoff, we assume you meant November 7, 2023, consistent with the date range for discovery more generally in this case.

Hannah R. Miles, Esq.
June 17, 2024
Page 3

that those individuals have relevant documents, those documents would already be in the files of the other JJHCS and TrialCard custodians.

*Search Terms*

For the additional custodians, SaveOnSP has proposed seven "[p]reviously agreed to TrialCard search terms" and eight "CAP search terms."

Of the seven "previously agreed to TrialCard search terms"—which, to be clear, were terms agreed to by TrialCard, not JJHCS—JJHCS is not willing to ask TrialCard to run the following two terms, which are untethered to JJHCS and thus sweep too broadly:

- SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP

- (Accumulator OR Maximizer) AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

As for the following five terms JJHCS is willing, subject to agreement on custodians, to ask TrialCard to run hit counts to assess the burden associated with them:

- ("Johnson & Johnson" OR "Johnson and John-son" OR J&J OR JnJ OR JJHCS OR Janssen) AND (Save-OnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

- (CarePath OR "Care Path") AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP OR "org* chart" OR "retention policy")

- ("Johnson & Johnson" OR "Johnson and Johnson" OR J&J OR JnJ OR JJHCS OR Janssen) AND (CarePath w/5 "term* and condition*")

- (Accumulator OR Maximizer OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save On" OR SOSP) w/10 (Care-Path AND (Stelara OR Tremfya) AND (limit OR eliminat*))

- ("Johnson & Johnson" OR "Johnson and Johnson" OR J&J OR JnJ OR JJHCS OR Janssen) AND (enroll w/5 CarePath) AND contact*

Of the eight "CAP search terms," JJHCS is willing, subject to agreement on custodians, to ask TrialCard to run hit counts to assess the burden associated with the following terms:

- (CAPa OR CAPm OR "adjustment program") AND (Save-OnSP OR SaveOn OR "Save On SP" OR Save On" OR SOSP OR accumlat* OR maximiz*)

Hannah R. Miles, Esq.
June 17, 2024
Page 4

- (STELARA* OR TREMFYA* OR CarePath OR JCP OR "Savings Program")
  w/25 (6000 OR 6,000 OR limit OR eliminate)

The remaining proposed "CAP search terms," however, are all unacceptably overbroad for the purposes of identifying relevant documents from TrialCard. Specifically, they are not tailored to identifying documents regarding (i) TrialCard's work for JJHCS in identifying patients on accumulators, maximizers, and SaveOnSP-advised plans, and (ii) the development, roll out, and operation of the CAP Program. Indeed, many of the terms would sweep in documents relating to TrialCard's work for its many other clients.

Such documents are not only irrelevant to this lawsuit but also go beyond the scope of the audit provision in the MSA as construed by Judge Wolfson. For instance, the proposed term ("essential health benefit*" OR EHB* OR "non-essential health benefit" OR "nonessential health benefit*" OR NEHB*) w/50 ("CAPa" OR CAPm" OR "adjustment program" OR accumulat* OR maximiz*) will hit on every document that discusses essential or nonessential health benefits in the context of any accumulator or maximizer program, regardless of its connection to TrialCard's work for JJHCS. Similarly, a term like (Accredo OR Acredo) w/50 (accumulat* OR maximiz*) is not only unlimited to JJHCS-specific work but also, given the loose w/50 connector, will include many irrelevant documents that simply mention Accredo's name. Documents that do not relate to TrialCard's work with JJHCS are outside the scope of the audit provision in the MSA, and JJHCS therefore does not accept search terms that deliberately seek such documents.

### III.    Call Recordings

Finally, in your May 24, 2024 letter, you requested that JJHCS "produce the approximately 1,500 call recordings in TrialCard's possession that SaveOn previously requested from TrialCard." As we have discussed, producing call recordings presents a burden to both sides, and we remain willing to negotiate an agreement on this issue. We have previously proposed two ways to alleviate SaveOn's burden concerns, *see* May 7, 2024 Letter from E. Shane to H. Miles, and while you have told us that SaveOnSP is "continuing to investigate the feasibility and the burden associated with [JJHCS's] request for call recordings," our proposal remains on the table.

In any event, we disagree that JJHCS's request for call recordings is "disproportionate" to SaveOnSP's. To be clear, our position is not based on the mere fact that JJHCS is the plaintiff and SaveOnSP is the defendant, as you suggest in your June 6, 2024 letter. Rather, as we have repeatedly explained, SaveOnSP seeks from TrialCard call recordings that appear to relate to individuals enrolled in CarePath who are also on a SaveOnSP program. *See* May 7, 2024 Letter from E. Shane to H. Miles; Apr. 23, 2024 Letter from E. Shane to H. Miles. If SaveOnSP is entitled to such recordings, then JJHCS is entitled to the recordings that SaveOnSP possesses involving the same subject—*i.e.* calls with individuals enrolled in CarePath relating to SaveOnSP. *See* Apr. 23, 2204 Ltr. from E. Shane to H. Miles (explaining that the recordings that JJHCS seeks are "the conceptual equivalent of what SaveOnSP now seeks from TrialCard"). That JJHCS's request is nominally larger simply reflects that SaveOnSP is the party that far more frequently communicated with individuals enrolled in CarePath about the SaveOnSP program.

Hannah R. Miles, Esq.
June 17, 2024
Page 5

We reserve all rights and are available to meet and confer.

Very truly yours,

*/s/Jacob I. Chefitz*

Jacob I. Chefitz

# Exhibit 17

| From: | Hannah Miles |
|---|---|
| To: | Chefitz, Jacob (x2474); Mangi, Adeel A. (x2563); Sandick, Harry (x2723); LoBiondo, George (x2008); Long, Julia (x2878); ~jgreenbaum@sillscummis.com; _cg J&J-SaveOn |
| Cc: | Philippe Selendy; Andrew Dunlap; Meredith Nelson; Elizabeth Snow; EWohlforth@rc.com |
| Subject: | RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians |
| Date: | Monday, August 19, 2024 11:38:41 AM |

Jacob,

On August 8th, J&J said that it would provide SaveOn with hit counts from TrialCard as soon as it received them, and indicated that would be last week. Please provide that hit count information promptly.

Please also advise when SaveOn can expect J&J's position on the substance of its request.

Best,
Hannah

**Hannah Miles**
Associate  [Email]
Selendy Gay PLLC  [Web]
Pronouns: she, her, hers
-----------------------------------------------
+1 212.390.9055 [O]
+1 347.731.1404  [M]

---

**From:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>
**Sent:** Friday, August 9, 2024 10:28 AM
**To:** Hannah Miles <hmiles@selendygay.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>; Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com <jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>; Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; EWohlforth@rc.com
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

Hannah,

As we noted in our earlier communications, we have and will continue to comply with Judge Wolfson's order with respect to TrialCard.  We will be in touch as soon as we hear back from TrialCard about our request made pursuant to the MSA and Judge Wolfson's order.

Regards,
Jacob

**From:** Hannah Miles <hmiles@selendygay.com>
**Sent:** Thursday, August 8, 2024 8:18 PM
**To:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>;
Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>;
Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com
<jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>;
Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>;
EWohlforth@rc.com
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

 **External: Think before you click.** 

Jacob,

Thank you for your email, and for informing us that TrialCard has collected documents from
the proposed custodians. Please let us know when we can expect a response from J&J on the
substance of our request.

To be clear, J&J is required to do more than "make a request of TrialCard" and wait for a
response. Judge Wolfson found that J&J has legal control over these documents; J&J has a
legal obligation to produce all relevant documents that it controls. Even if J&J "does not
physically control TrialCard's files," case law is clear that, if a party has legal control over
relevant documents in the physical possession of a third party, the party is required to
produce them.

Best,
Hannah

**Hannah Miles**
Associate  [Email]
Selendy Gay PLLC  [Web]
Pronouns: she, her, hers
---------------------------------------------
+1 212.390.9055 [O]
+1 347.731.1404  [M]

**From:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>
**Sent:** Thursday, August 8, 2024 1:38 PM
**To:** Hannah Miles <hmiles@selendygay.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>;
Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>;
Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com

<jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>;
Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>;
EWohlforth@rc.com
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

Hannah,

As we have repeatedly explained, JJHCS has no physical control over TrialCard's files. JJHCS can and
has requested that TrialCard, pursuant to TrialCard's MSA with JJHCS as construed by Judge Wolfson,
collect the documents from the additional custodians you have identified and provide hit counts for
the searches you requested. But JJHCS can only provide that information—and any updates with
respect to it—to the extent that TrialCard relays it.

Since our last email, TrialCard has informed JJHCS that there have been some delays in the
document collection process but that it completed document collection yesterday for the eight
additional custodians SaveOnSP has identified. TrialCard has further informed JJHCS that it plans on
responding to JJHCS's request next week. Once JJHCS receives that response, it can further
negotiate with SaveOnSP regarding the burden and proper scope of SaveOnSP's request of JJHCS for
TrialCard documents. *See* July 12, 2024 Ltr. from J. Chefitz to H. Miles.

SaveOnSP appears to complain about the speed of this process but that is the direct result of
SaveOnSP's insistence on proceeding through demands to JJHCS rather than using Rule 45
subpoenas to obtain TrialCard documents. We have done what Judge Wolfson directed, which is to
make a request of TrialCard pursuant to the MSA. We will continue to press these requests with
TrialCard as the Court ordered. At the same time, TrialCard is not just another JJHCS custodian; it is
an independent entity with separate counsel. TrialCard will need to determine for itself what the
MSA requires it to do in response to JJHCS's requests. All of this and any accompanying delay about
which you now complain was the foreseeable consequence of SaveOnSP's seeking to obtain
TrialCard's documents from JJHCS via the MSA's audit provision.

Regards,
Jacob

___

**From:** Hannah Miles <hmiles@selendygay.com>
**Sent:** Wednesday, August 7, 2024 10:49 AM
**To:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>;
Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>;
Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com
<jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>;
Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>;
EWohlforth@rc.com
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

▌**External: Think before you click.**

Jacob,

Thank you for confirming that J&J anticipates making the "refresh" production from TrialCard
by the end of August.

Regarding the additional custodians that SaveOn requested, we do not believe that saying—
ten weeks after Judge Wolfson held that J&J controls TrialCard's relevant documents—that
you will "provide an update when possible" is sufficient, especially given Judge Wolfson's
admonition at the last conference that "[s]ooner, rather than later, let's figure out if this is still
going to be issues that we need to bring to a head, just to move things along, and let me know."
July 15 Hearing Tr. at 135. If J&J does not provide a substantive response by the end of this
week, we intend to update to Judge Wolfson and seek a telephone conference to request her
guidance.

Best,

Hannah

**Hannah Miles**
Associate  [Email]
Selendy Gay PLLC  [Web]
Pronouns: she, her, hers
------------------------------------------------
+1 212.390.9055 [O]
+1 347.731.1404  [M]

---

**From:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>
**Sent:** Tuesday, August 6, 2024 8:35 PM
**To:** Hannah Miles <hmiles@selendygay.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>;
Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>;
Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com
<jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>;
Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>;
EWohlforth@rc.com
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

Dear Hannah,

First, with respect to the "refresh" production from the existing TrialCard custodians, we anticipate

making that production by the end of the month.

Second, as we have previously stated, JJHCS has requested that TrialCard collect the documents from the additional custodians you identified and provide hit counts for your requested search terms. That request is consistent with Judge Wolfson's ruling and, as the Court contemplated at the May 23, 2024 hearing, it has been made to TrialCard's separate counsel, who can provide independent advice on how to respond. *See* May 23, 2024 Hearing Tr. at 52–53. TrialCard is in receipt of JJHCS's request, and we will provide an update when possible. We reiterate that TrialCard is an independent entity and JJHCS does not physically control TrialCard's files. As we have said before, TrialCard, as an independent entity, "will have to decide what it believes it is required to do pursuant to the request that JJHCS makes." May 23, 2024 Hearing Tr. at 52.

Regards,
Jacob

**From:** Hannah Miles <hmiles@selendygay.com>
**Sent:** Monday, August 5, 2024 3:26 PM
**To:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>; Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com <jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>; Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; EWohlforth@rc.com
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

**External: Think before you click.**

Jacob,

As you know, Judge Wolfson found that J&J has possession, custody or control over TrialCard's documents related to its work for J&J 10 weeks ago, and ordered the parties to promptly meet and confer regarding the parameters of J&J's production of documents in the possession of TrialCard.

On July 9, 2024, J&J confirmed that a "refresh" production from the existing TrialCard custodians from July 1, 2022 to November 7, 2023 was "in progress" and promised to "provide an expected production date shortly." That was nearly a month ago. Please provide the expected production date.

On July 12, 2024, J&J stated that it had "asked TrialCard to collect the documents of the eight additional TrialCard custodians [SaveOn] identified" and had "asked TrialCard to provide hit

counts for the search terms that SaveOnSP has proposed." For the avoidance of doubt, pursuant to Judge Wolfson's May 28, 2024 Order, SaveOn is negotiating the terms of the production with you, as J&J's counsel. Please confirm that you have collected the documents of the requested custodians, and when you will provide the requested hit counts.

Best,
Hannah

**Hannah Miles**
Associate  [Email]
Selendy Gay PLLC  [Web]
Pronouns: she, her, hers
---------------------------------------------------
+1 212.390.9055 [O]
+1 347.731.1404 [M]

**From:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>
**Sent:** Friday, July 12, 2024 3:42 PM
**To:** Hannah Miles <hmiles@selendygay.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>; Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com <jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>; Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; EWohlforth@rc.com; Kevin Cryan <kcryan@selendygay.com>
**Subject:** RE: JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

Counsel,

Please see the attached correspondence.

Regards,
Jacob

**From:** Hannah Miles <hmiles@selendygay.com>
**Sent:** Friday, June 28, 2024 12:32 PM
**To:** Chefitz, Jacob (x2474) <jchefitz@pbwt.com>; Mangi, Adeel A. (x2563) <aamangi@pbwt.com>; Sandick, Harry (x2723) <hsandick@pbwt.com>; LoBiondo, George (x2008) <globiondo@pbwt.com>; Long, Julia (x2878) <jlong@pbwt.com>; ~jgreenbaum@sillscummis.com <jgreenbaum@sillscummis.com>; _cg J&J-SaveOn <JJSaveOn@pbwt.com>
**Cc:** Philippe Selendy <pselendy@selendygay.com>; Andrew Dunlap <adunlap@selendygay.com>; Meredith Nelson <mnelson@selendygay.com>; Elizabeth Snow <esnow@selendygay.com>; EWohlforth@rc.com; Kevin Cryan <kcryan@selendygay.com>
**Subject:** JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW) // TrialCard Custodians

**External: Think before you click.**

Counsel,

Please see the attached letter.

Best,
Hannah

**Hannah Miles**
Associate  [Email]
Selendy Gay PLLC  [Web]
Pronouns: she, her, hers
--------------------------------------------------------
+1 212.390.9055 [O]
+1 347.731.1404  [M]

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

---

---

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

---

# Exhibit 18

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Hannah R. Miles
Associate
212.390.9055
hmiles@selendygay.com

October 18, 2024

**Via E-mail**

Jacob I. Chefitz
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jchefitz@pbwt.com

Re:  ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC*** **(Case No. 2:22-cv-02632-JKS-CLW)**

Dear Jacob,

We write in connection with J&J's production of TrialCard documents that
SaveOn has requested.

On September 20, 2024, you stated that J&J had asked TrialCard to "ex-
pand its point of collection limitation to include the additional Janssen drug
names" that SaveOn requested, and to provide hit counts for SaveOn's proposed
search terms. *See also* Sept. 6, 2024 Letter. We have not received those hit counts.

As we explained in our October 7, 2024 letter to Judge Wolfson, J&J's delay
in producing these documents has hamstrung SaveOn's discovery efforts. Please
provide the requested hit counts promptly; commit to completing negotiations
over the scope of production from TrialCard by November 1, 2024; and commit to
producing the requested documents by December 1, 2024.

We request a response by October 23, 2024. If we do not receive a meaning-
ful response by that date, we will consider the parties to be at impasse.

Sincerely,

/s/ Hannah Miles

Hannah R. Miles
Associate

# Exhibit 19



www.pbwt.com

October 23, 2024

Jacob I. Chefitz
(212) 336-2474

**By Email**

Hannah R. Miles, Esq.
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:    ***Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC***,
        **2:22-cv-02632 (JKS) (CLW)**

Dear Hannah:

We write in response to SaveOnSP's October 18, 2024 letter (as corrected on October 22, 2024) regarding the additional TrialCard documents that SaveOnSP has requested from JJHCS.

As you know, JJHCS has requested that TrialCard, acting pursuant to the MSA as construed by Judge Wolfson, expand its point-of-collection limitations, run the search terms that SaveOnSP has requested, and provide the requested hit counts. JJHCS has repeatedly followed up with TrialCard regarding the status of that request, and TrialCard's counsel has informed JJHCS that it has been working to collect and process the documents for all twelve TrialCard custodians at issue. TrialCard has told JJHCS that it currently anticipates completing this process this week, and that, once that process is complete, it anticipates that it should be able to provide updated hit counts in short order. When JJHCS receives those hit counts, we will share them with SaveOnSP.

In its October 18, 2024 letter, SaveOnSP demands that JJHCS "commit to completing negotiations over the scope of production from TrialCard by November 1, 2024; and commit to producing the requested documents by December 1, 2024." This is an unreasonable demand. JJHCS cannot commit to completing negotiations on this issue within the next week and a half when it has yet to receive hit counts from TrialCard. And we again remind SaveOnSP, as we have repeatedly explained in several letters and emails, that JJHCS does not have physical control over TrialCard's documents such that JJHCS can run search terms and provide hit counts like JJHCS would for its own custodians. JJHCS likewise cannot commit to producing the requested documents by December 1, 2024, especially given that, again, these are documents that JJHCS does not possess.

We also note that JJHCS has objected that the prior hit counts provided by TrialCard (even after de-duping) would require the review of an unduly burdensome amount of documents and would impose an unwarranted expansion of discovery. *See* Sep. 6, 2024 Ltr. from J. Chefitz to H. Miles at 3. JJHCS has therefore repeatedly requested that SaveOnSP propose more narrowly tailored search terms for these TrialCard custodial documents. *See id.* SaveOnSP has

Hannah R. Miles, Esq.
October 23, 2024
Page 2

yet to do so—even though it demands that these negotiations be completed by November 1, 2024, and even though the updated hit counts that TrialCard will soon provide will certainly be no lower than the prior ones.

To be clear, and as stated in its October 10, 2024 letter to Judge Wolfson, JJHCS is working cooperatively with both SaveOnSP and TrialCard to provide SaveOnSP with discovery from TrialCard, subject to the usual constraints of burden and proportionality. But TrialCard is an independent entity, and the MSA does not authorize JJHCS to simply seize all of TrialCard's documents. If SaveOnSP believes that the current process is inefficient or that its discovery efforts have somehow been "hamstrung" (which we doubt), it only has itself to blame. It was SaveOnSP's choice, not JJHCS's, to seek TrialCard documents indirectly through JJHCS via the MSA, as opposed to just seeking them directly from TrialCard.

JJHCS reserves all rights, and we are available to meet and confer.

Very truly yours,

/s/ Jacob I. Chefitz
Jacob I. Chefitz