# EXHIBIT A

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

October 28, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Re:    ***Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC***
          ***No. 2:22-cv-02632 (JKS) (CLW)***

Dear Judge Wolfson:

Save On SP, LLC ("SaveOn") moves to compel Johnson & Johnson Health Care Systems, Inc. (with its affiliates, "J&J") to answer one portion of its response to SaveOn's Interrogatory No. 12 and to supplement another. *See* Ex. 1 at 11 (June 3, 2024 SaveOnSP's Fourth Set of Interrogatories).

## Background

As SaveOn explained this Spring, under the federal Best Price Rule, 42 C.F.R. § 447.505, J&J believed—for many years—that if it learned that any of its copay assistance payments for one of its drugs were going to entities other than patients, it would have to deduct the value of those

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

Hon. Freda L. Wolfson                                                    Page 2

payments from the "best price" that it charged federal health plans for that drug. J&J thus inten-

tionally avoided learning which patients taking its drugs were on so-called accumulators or maxi-

mizers. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████ Ex. 2 at -510 (JJHCS_00047500).

        Consistent with this strategy, ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████:

Ex. 3 at      -214 (JJHCS_00204199) (original emp████████████████████") . ████████████

████████

Ex. 3 at      -214 (JJHCS_0020████████████████ ████████████████████████

██████████████████████████████████████. *See, e.g., id.* (███████████████

████████████████████); Ex. 4 at -649-650 (JJHCS_00137635) (████████████

███████████████████).

        When SaveOn moved to compel J&J to produce documents regarding the Best Price Rule

and the Savings Program Checklists earlier this year, Your Honor agreed that the Best Price Rule

was relevant because it "*may* reveal Plaintiff's intent and motivation in identifying its patients who

Hon. Freda L. Wolfson                                                                    Page 3

are on SaveOnSp's programs." Dkt. 307 at 2 (original emphasis). Before ordering J&J to produce

documents, however, Your Honor directed SaveOn to serve interrogatories "to explore the purpose

of an internal checklist that may or may not relate to Plaintiff's obligations under the Best Price

Rule." Dkt. 307 at 2-3.

       SaveOn promptly served Interrogatory No. 12, which asked:

              Describe the purpose and meaning of the Savings Program Check-
              lists, including the meaning of the statements like those highlighted
              in Appendix 1; what steps, if any JJHCS took to ensure that these
              statements were accurate; when and why JJHCS created the Savings
              Program Checklists and, if applicable, stopped using them; and how
              the Savings Program Checklists relate to calculations or submissions
              of best price information pursuant to 42 C.F.R. § 447.505.

Ex. 1 at 11 (June 3, 2024 SaveOnSP's Fourth Set of Interrogatories). The "statements … high-

lighted in Appendix 1" were the Full Value Statement and the Compliance Statement. *Id.* at 29.

       In its response, J&J said nothing about the Full Value Statement. SaveOn asked J&J to

provide a response regarding the Full Value Statement, *see* Ex. 5 (Sep. 23, 2024 Ltr. from E. Snow

to J. Long), but J&J refused to do so. *See* Ex. 6 (Oct. 3, 2024 Ltr. from J. Long to E. Snow); Ex. 7

(Oct. 17, 2024 Ltr. from E. Snow to I. Eppler).

       Regarding the Compliance Statement, ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████." Ex. 8 at 7-8 (Sep. 3, 2024 Responses &

Objections to SaveOnSP's Fourth Set of Interrogatories). SaveOn asked J&J to explain what its

"compliance goals" were and if they included compliance with the Best Price Rule. Ex. 5 at 1 (Sep.

23, 2024 Ltr. from E. Snow to J. Long). J&J refused this too, stating that it "views its answer as

complete," Ex. 7 at 1 (Oct. 17, 2024 Ltr. from E. Snow to I. Eppler), and asserting that, ██████████

████████████████████████████████████████████████████████████████████████ then

                                              3

SaveOn should serve another interrogatory about the phrase's meaning or ask what it means in depositions. *Id*.

The parties having met and conferred, SaveOn now moves to compel.

## <u>Argument</u>

"Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). A party may not "ignore…specific inquiries in its interrogatories." *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc*., 707 F. Supp. 1429, 1439 (D. Del. 1989). Interrogatory responses must be "true, explicit, responsive, complete, and candid." *Hansel v. Shell Oil Corp.*, 169 F.R.D. 303, 305 (E.D. Pa. 1996); *see also Struthers Scientific & Intern. Corp. v. General Foods Corp.*, 51 F.R.D. 149, 153 (D. Del. 1970) (ordering Plaintiff to supplement interrogatory response that was "not sufficiently specific"). An "evasive" interrogatory response is treated as a failure to respond. Fed. R. Civ. P. 37(a)(4); *see Younes v. 7-Eleven, Inc.,* 312 F.R.D. 692, 705 & n.17 (D.N.J. 2015).

J&J violated Rule 33 by failing to address the Full Value Statement. In Interrogatory No. 12, SaveOn explicitly asked J&J to "describe the purpose and meaning" of statements that it had highlighted in the Savings Program Checklists, one of which was the Full Value Statement. J&J was thus bound to address that statement in its response, but it did not. Your Honor should compel J&J to answer this portion of Interrogatory No. 12. *See, e.g.*, *Barton v. RCI, LLC*, 2014 WL 1050417, at *6 (D.N.J. Mar. 17, 2014) (sanctioning Plaintiff for not responding to an interrogatory that it indicated it would answer substantively); *Pfizer Inc. v. Teva Pharms. USA, Inc*., 2006 WL 2938723, at *2-3 (D.N.J. Oct. 13, 2006) (sanctioning Defendant for its "materially incomplete" response that "ignored" Plaintiff's request to provide the conception date of specific

patents); *Willemijn Houdstermaatschaapij*, 707 F. Supp. at 1440-41 (ordering Defendant to pro-

vide information about at-issue product types "made, used, sold or leased," not just about those

"sold").

J&J also violated Rule 33 with its vague response that the Compliance Statement ensures

consistent operation with its "compliance goals." An interrogatory answer "should be complete in

itself," *Russell v. FirstBank Puerto Rico*, 2021 WL 7709714, at *1 (D.V.I. Dec. 10, 2021) (quoting

*Scaife v. Boenne*, 191 F.R.D. 590, 594 (N.D. Ind. 2000)), yet J&J does not explain what those

compliance goals are or whether they include compliance with the Best Price Rule—the very sub-

ject that Your Honor directed SaveOn to explore through this interrogatory. Your Honor should

compel J&J to supplement its response regarding the Compliance Statement to explain what its

"compliance goals" are and whether they include compliance with the Best Price Rule. *See, e.g.*,

*King v. Verizon N.J., Inc.*, 2023 WL 5817126, at *15-16 (D.N.J. Sept. 6, 2023) (ordering defendant

to supplement its insufficient interrogatory response to specify its "relationship" with a third party

beyond that it "handled" activities for an account); *Barton*, 2014 WL 1050417, at *3 (ordering

Plaintiff to supplement "evasive, indecipherable, and deficient" interrogatory responses); *Patton*

*v. Loadholt*, 2020 WL 5095858, at *4 (E.D. Cal. 2020) (ordering Defendant to supplement "vague

and incomplete" response where Plaintiff asked why they were not treated with a particular med-

ication and Defendant responded that "plaintiff did not receive the medication because he failed

to qualify for treatment"); *Struthers*, 51 F.R.D. at 153 (D. Del. 1970) (holding that plaintiff's in-

terrogatory response that "some … combination" of its machinery constituted the trade secret at

issue was "not sufficiently specific" and ordering plaintiff to state which "combination" of ma-

chinery constituted the trade secret).

Hon. Freda L. Wolfson                                                    Page 6

***

We appreciate Your Honor's attention to this matter.

Respectfully submitted,


/s/ *E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com


Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

# Exhibit 1

E. Evans Wohlforth, Jr.
ROBINSON COLE LLP
666 Third Avenue #20
New York, NY 10174
ewohlforth@rc.com
kkatchen@rc.com

Philippe Z. Selendy
Andrew R. Dunlap
Meredith Nelson
Elizabeth Snow
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | Civil Action No. 22-2632 (JKS) (CLW) |
| Plaintiff, | **DEFENDANT'S FOURTH SET OF INTERROGATORIES TO PLAINTIFF** |
| v. | |
| SAVE ON SP, LLC, | |
| Defendant. | |

To:     Jeffrey J. Greenbaum, Esq.
        SILLS CUMMIS & GROSS, P.C.
        One Riverfront Plaza
        Newark, NJ 07102
        973-643-7000

Adeel A. Mangi, Esq.
Harry Sandick, Esq.
George LoBiondo, Esq.
PATTERSON BELKNAP WEBB
& TYLER LLP
1133 Avenue of the Americas
New York, NY

*Attorneys for Plaintiff Johnson & Johnson*
*Health Care Systems Inc.*

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Civil Procedure 33 and Local Civil Rule 33.1, Defendant Save On SP, LLC ("SaveOnSP"), requests Plaintiff Johnson & Johnson Health Care Systems Inc. ("JJHCS"), answer these Interrogatories within 30 days of being served or at a time and place mutually agreed by the parties and ordered by the Court.

**PLEASE TAKE FURTHER NOTICE** that these Interrogatories are continuing in nature, and it is requested that JJHCS serve upon SaveOnSP's counsel, via supplemental answers, any information requested herein that is unavailable at the time answers hereto are submitted, but which becomes available to JJHCS or any attorney, agent, representative, or principal of JJHCS prior to the termination of this case.

Dated: June 3, 2024          By:        *E. Evans Wohlforth, Jr.*
                                    E. Evans Wohlforth, Jr.
                                    ROBINSON COLE LLP
                                    666 Third Avenue #20
                                    New York, NY 10174
                                    ewohlforth@rc.com
                                    kkatchen@rc.com

                                    Philippe Z. Selendy
                                    Andrew R. Dunlap
                                    Meredith Nelson
                                    Elizabeth Snow
                                    SELENDY GAY ELSBERG, PLLC
                                    1290 Avenue of the Americas

New York, NY 10104
212-390-9000
pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com


*Attorneys for Defendant Save On SP, LLC*

## **DEFINITIONS**

1.      The singular form of a word includes the plural, and vice versa.

2.      Any tense of a verb includes all tenses.

3.      Any natural person includes that person's agents, assigns, attorneys, employees, representatives, and successors.

4.      Any entity other than a natural person includes (a) that entity's present and former agents, affiliates (foreign or domestic), assigns, attorneys, consultants, directors, divisions, employees, officers, parents, predecessors, representatives, servants, subsidiaries, and successors; (b) any person or entity, directly or indirectly, wholly or in part, associated with, controlled by, or owned by that entity; (c) and any other person or entity acting or purporting to act on behalf of (a) or (b).

5.      "2016 Best Price Rule" means 42 C.F.R. § 447.505 which permits manufacturers to exclude funds paid by copay assistance programs, "to the extent the manufacturer ensures that the full value of the coupon is passed on to the consumer, and the pharmacy, agent, or other entity does not receive any price concession."

6.      "2023 Best Price Rule" means 85 Fed. Reg 87,000 which required that, starting on January 1, 2023, manufacturers must ensure that the full amount of copay assistance programs is passed on to the patient and that no other entity receives any price concession, in order to exclude any such benefits from the calculation of the drug's "Best Price." It was proposed by the Department of Health and Human Services on June 19, 2020, 85 Fed. Reg. 37,286, and permanently enjoined on May 17, 2022.

7.      "Accumulator" means a copay accumulator service, including (a) any service provided by Pharmacy Benefit Managers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assis-

4

tance from counting towards a patient's deductible and out-of-pocket maximum and under which members remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay accumulator."

8.    "Action" means this litigation styled as "*Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*" currently pending in the United States District Court for the District of New Jersey, No. 22-2632 (JMV) (CLW).

9.    "All," "any," and "each" mean any and all.

10.    "Amended Complaint" means the draft amendment to the May 4, 2022 Complaint (Dkt. No. 1) filed by JJHCS in this Action that JJHCS proposed on March 14, 2024 (Dkt. No. 219).

11.    "And" and "or" are construed both conjunctively and disjunctively.

12.    "Best Price" is the lowest price available form the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity in the United States in any pricing structure.

13.    "CAP Program" means JJHCS's Cost or Copay Adjustment Program, which was designed to identify members of Accumulators, Maximizers, and SaveOn-advised plans and to reduce CarePath payments to those members.

14.    "CarePath" means the Janssen copay assistance program marketed under the name CarePath that provides financial support services for patients using specialty drugs researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including Janssen (as defined herein).

15.    "Communication" means the transmittal of information in the form of facts, ideas, inquiries, or otherwise.

16.    "<u>Copay Assistance</u>" means any type of patient support that allows a drug manufacturer to pay all or some of a patient's prescription drug cost for that manufacturer's drug.

17.    "<u>Document</u>" means "document" and "electronically stored information" as defined in the Federal Rules of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

18.    "<u>Identify</u>" means (a) with respect to persons, to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment; (b) with respect to documents, either (i) to give, to the extent known, the (A) type of document; (B) general subject matter; (C) date of the document; and (D) author(s), addressee(s) and recipient(s); or (ii) to produce the documents, together with sufficient identifying information sufficient to satisfy Federal Rule of Civil Procedure 33(d).

19.    "<u>Including</u>" means including but not limited to.

20.    "<u>Janssen</u>" means Janssen Biotech, Inc., Janssen Pharmaceuticals, Inc., Janssen Products, LP, and Actelion Pharmaceuticals U.S., Inc., as well as any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Janssen Biotech, Inc., Janssen Pharmaceuticals, Inc., Janssen Products, LP, or Actelion Pharmaceuticals U.S., Inc.

21.    "<u>Janssen Drug</u>" means any Specialty Drug manufactured or sold by Janssen from any time for which patients may receive copay assistance, including BALVERSA, DARZALEX, DARZALEX FASPRO, ERLEADA, IMBRUVICA, OPSUMIT, REMICADE, RYBREVANT, SIMPONI, STELARA, TRACLEER, TREMFYA, UPTRAVI, and ZYTIGA, as well as any other specialty drugs that JJHCS asserts are at issue in this Action.

22.    "JJHCS" means Johnson & Johnson Health Care Systems Inc. and any and all pre-decessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or depart-ments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Johnson & Johnson Health Care Systems Inc., including without limitation Centocor, Inc., Ortho Biotech Products LP, McNeil Pharmaceutical, Ortho-McNeil Pharmaceutical, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Scios Inc., Janssen, Janssen Biotech, Inc., Janssen Oncology, Inc., Janssen Research & Development, LLC, Janssen Pharmaceuticals, Inc., Janssen Products, LP, Actelion Pharmaceuticals U.S., Inc., Janssen BioPharma LLC, and Janssen Research & Development LLC. "JJHCS" also includes TrialCard to the extent that any J&J entity has legal control over its docu-ments relating to its work for any J&J entity pursuant to a Master Services Agreement, per the Special Master's order of May 28, 2023; and any other entity to the extent that any J&J entity has legal control over its documents relating to its work for any J&J entity pursuant a contract contain-ing provisions similar to those in the Master Service Agreement discussing the May 28 order.

23.    "Maximizer" means copay maximizer service, including (a) any service provided by Pharmacy Benefit Managers or insurance companies, or any third party providing services to the same, to manage the cost of specialty drugs by preventing manufacturer copay assistance from counting towards a patient's deductible and out-of-pocket maximum and under which members do not remain responsible for all or most of their plans' copays, co-insurance requirements, and deductibles once copay assistance has been exhausted; and (b) any definition JJHCS ascribes to the term "copay maximizer."

24.    "Patient" means a natural person prescribed or eligible to be prescribed any Janssen Drug, whether or not they use CarePath or are a participant in a health plan advised by SaveOnSP.

25. "<u>Person</u>" means a natural person or legal entity including any business or governmental entity or association.

26. "<u>Regarding</u>" means (directly or indirectly, partially or wholly) about, alluding to, assessing, bearing upon, commenting upon, comprising, concerning, confirming, connected to, considering, containing, contradicting, dealing with, discussing, embodying, evaluating, evidencing, identifying, in connection with, indicating, in respect of, involving, memorializing, mentioning, noting, pertaining to, probative of, proving, recording, referring to, reflecting, relating to, reporting on, reviewing, setting forth, showing, stating, suggesting, summarizing, supporting, touching upon a subject, or having been created, generated, or maintained in connection with or as a result of that subject.

27. "<u>SaveOnSP</u>" means Save On SP, LLC, and any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of Save On SP, LLC.

28. "<u>Savings Program Checklist</u>" means checklists prepared by Janssen for its Copay Assistance programs which indicate that "[t]he full value of the assistance is passed onto the consumer," JJHCS_00204199 at 014.

## **INSTRUCTIONS**

1. These Interrogatories seek information available to you following a reasonable inquiry into the information sought.

2. These Interrogatories seek nonprivileged information. Fed. R. Civ. P. 26(b)(1).

3. Answer each Interrogatory separately and fully in writing under oath. Fed. R. Civ. P. 33(b)(3).

4.      If you object to all or part of an Interrogatory, state that objection with specificity. Fed. R. Civ. P. 33(b)(4). Any ground not stated in a timely objection will be waived unless excused by the Court for good cause. *Id.*

5.      If you object to part of an Interrogatory, specify the part and answer the rest.

6.      If you are unable to answer all or part of an Interrogatory, specify the part and answer the rest.

7.      If you find the meaning of any term in these Interrogatories unclear, assume a reasonable meaning, and respond to the Interrogatory according to the assumed meaning, stating your assumed meaning in your response.

8.      If the answer to an Interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a part your documents, and if the burden of deriving or ascertaining the answer will be substantially the same for either party, you may answer by (a) specifying the records that must be reviewed, in sufficient detail to enable SaveOnSP to locate and identify them as readily as you could; and (b) giving SaveOnSP a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries. Fed. R. Civ. P. 33(d).

9.      If you withhold responsive information by claiming that the information is privileged or subject to protection as trial-preparation material, expressly make the claim and describe the nature of the information privileged or protected in a manner that, without revealing information itself privileged or protected, will enable SaveOnSP to assess the claim. Fed. R. Civ. P. 26(b)(5)(A)(ii). When you claim any privilege, you shall indicate, as to the information requested, whether (a) any documents exist; or (b) any oral communications took place. If you assert a privilege in connection with a claim or defense governed by state law, you shall set forth the state privilege rule being invoked. Local Civ. Rule 33.1(c).

9

10.     If the person who verifies the answers to interrogatories does not have personal knowledge of the information contained in the answers, that person shall, for each answer not verified by personal knowledge, identify the person or persons from whom the information was obtained or, if the source of the information is documentary, provide a full description including the location thereof. Local Civ. Rule 33.1(b).

11.     If you become aware of a document concerning an Interrogatory that was once in your possession, custody, or control, and has since been lost or destroyed, provide (a) a detailed description of the document; (b) the name of the author; (c) the names of all persons to whom the document was sent; (d) the date on which the document was prepared or initially received; (e) the date on which the document was lost or destroyed; and (f) if the document was destroyed, the manner of its destruction, the reason for its destruction, the name of the person who requested or authorized its destruction, and the name of the person who destroyed it.

12.     Answers must be signed by the person providing them; objections mut be signed by an attorney. Fed. R. Civ. P. 33(b)(5).

13.     If after responding to any Interrogatory you learn that your response is in some material respect incomplete or incorrect, supplement or correct your response in a timely manner. Fed. R. Civ. P. 26(e)(1)(A).

## TIME PERIOD

These Interrogatories relate to the time period from and including June 19, 2020 through May 17, 2022.

## REQUESTS

11.     Describe all actions that JJHCS took or considered taking in response to or because of the promulgation of the 2023 Best Price Rule, including if applicable: creating the CAP Program or similar programs; attempting to identify patients on Accumulators, Maximizers, or SaveOnSP-

10

advised plans, including through benefits investigations; changing or enforcing CarePath's terms and conditions for any Janssen Drug (including developing or changing JJHCS's interpretation of such terms and conditions); changing the maximum amount of copay assistance offered through CarePath for any Janssen Drug; bringing litigation against any party (including SaveOnSP); and/or analyzing the impact or potential impact of the 2023 Best Price Rule on CarePath's viability or on JJHCS.

12.    Describe the purpose and meaning of the Savings Program Checklists, including the meaning of the statements like those highlighted in Appendix 1; what steps, if any JJHCS took to ensure that these statements were accurate; when and why JJHCS created the Savings Program Checklists and, if applicable, stopped using them; and how the Savings Program Checklists relate to calculations or submissions of best price information pursuant to 42 C.F.R. § 447.505.

13.    Identify all individuals with knowledge of or responsibility for any of the matters discussed in Interrogatories 12 and 13. For each such individual, please provide (a) their name; (b) their position(s), including whether or not they are currently employed by JJHCS; and (c) the matter(s) for which they had knowledge and/or responsibility.

## **CERTIFICATION**

I am the _____ of Plaintiff Johnson & Johnson Health Care

Systems Inc. ("Plaintiff"). I am authorized to submit this certification on behalf of Plaintiff. I cer-

tify that the foregoing responses made by me to these Interrogatories are true. I am aware that if

any of the foregoing answers are willfully false, I and Plaintiff are subject to punishment.

I certify that in responding to the foregoing Interrogatories, I furnished all information

available to Plaintiff, and to its agents, employees, and attorneys. As to those answers which are

not within my personal knowledge, I certify that I provided the name and address of every person

from whom such information was received or, where the source of such information is documen-

tary, a full description of the document including its location.

Dated: _____          By: _____

                                      Title: _____

# EXHIBIT 1, APPENDIX 1

## Confidential - Filed Under Seal

# EXHIBITS 2 - 4

## Confidential - Filed Under Seal

# Exhibit 5

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Elizabeth H. Snow
Associate
212.390.9330
esnow@selendygay.com

September 23, 2024

**Via E-mail**

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jlong@pbwt.com

**Re:** ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC*** **(Case No. 2:22-cv-02632-JKS-CLW)**

Dear Julia,

We write regarding J&J's R&Os to SaveOn's Fourth Set of Interrogatories.

*First*, in response to SaveOn's Interrogatory 12, ███████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████ ." Sept. 3, 2024
R&Os at 7-8. Please confirm that those "compliance goals" include compliance
with 42 C.F.R. § 447.505. *See* JJHCS_00232892 at 8.

*Second*, SaveOn's Interrogatory No. 12 asked J&J to "[d]escribe the purpose
and meaning of the Savings Program Checklists, including the meaning of the
statements like those highlighted." ████████████████████████
████████████████████████████ JJHCS_00204199 at -214
(████████████████████████████████████). J&J does not explain the meaning
of that statement. Please do so.

Following receipt of J&J's complete responses to SaveOn's Interrogatories,
SaveOn will respond to J&J's July 26, 2024 letter regarding J&J's production re-
garding the 2023 Best Price Rule, including the requested addition of Gina Kiris
and Lena Kane as custodians under a separate cover.

Julia Long
September 23, 2024

      We request a response by September 30, 2024. We reserve all rights and are available to meet and confer.

Best,

/s/ Elizabeth Snow

Elizabeth H. Snow
Associate

# Exhibit 6



www.pbwt.com

October 3, 2024

Julia Long
(212) 336-2878

**<u>By Email</u>**

Elizabeth Snow, Esq.
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

> Re:  **SaveOnSP's Fourth Set of Interrogatories**
> **_Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC_,**
> **Case No. 2:22-cv-02632 (JKS) (CLW)**

Dear Elizabeth:

We write in response to SaveOnSP's September 23, 2024 letter regarding its Fourth Set of Interrogatories.

First, your letter poses a substantive follow-up question regarding JJHCS's "compliance goals" based on Interrogatory No. 12. We have previously explained that "discovery letters to counsel are not a proper substitute for the discovery tools provided for in the Federal Rules." Aug. 19, 2024 Ltr. from J. Long to E. Snow at 3. SaveOnSP is, of course, welcome to pose any additional questions it has at depositions, or using an appropriate discovery device.

Second, your letter suggests that JJHCS's response to SaveOnSP's Interrogatory No. 12 is incomplete. We have reviewed JJHCS's response to SaveOnSP's Interrogatory No. 12 and have concluded that it is complete as served.

Very truly yours,

/s/ Julia Long
Julia Long

---

# Exhibit 7

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Elizabeth H. Snow
Associate
212 390 9330
esnow@selendygay.com

October 17, 2024

**<u>Via E-mail</u>**

Ian Eppler
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
ieppler@pbwt.com

**Re:    Johnson & Johnson Health Care Systems Inc. v. Save On SP,
        LLC (Case No. 2:22-cv-02632-JKS-CLW**

Dear Ian,

  We write to memorialize this morning's meet-and-confer regarding J&J's
response to SaveOn's Fourth Set of Interrogatories.

  ████████████████████████████████████████████████████████, *see,
e.g.*, JJHCS_00204199,██████████████████████████████ Sep. 3, 2024 Responses
& Objections to SaveOn's Fourth Set of Interrogatories at 7-8.

  During the parties' meet-and-confer, we asked J&J to clarify the meaning
of "compliance goals." You refused to answer. Instead, you requested that SaveOn
either serve another interrogatory to learn the meaning of "compliance goals" or
ask about the topic at depositions.

  We also asked if J&J understood what Interrogatory No. 12 was asking, in-
cluding that it requested that J&J explain the meaning of the highlighted portions
of the Appendix. You said J&J understood and views its answer as complete.

Ian Eppler
October 17, 2024

SaveOn disagrees, and the parties are at impasse.

Sincerely,

/s/ Elizabeth H. Snow

Elizabeth H. Snow
Associate

# Exhibit 8

Jeffrey J. Greenbaum, Esq.
Katherine M. Lieb, Esq.
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza Newark,
New Jersey 07102
973-643-7000

Adeel A. Mangi, Esq.
Harry Sandick, Esq. (admitted *pro hac vice*)
George LoBiondo, Esq.
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10035

*Attorneys for Plaintiff Johnson & Johnson Health Care
Systems Inc.*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br> Plaintiff, <br><br> v. <br><br> SAVE ON SP, LLC, <br><br> Defendant. | Civil Action No. 22-2632 (JKS) (CLW) <br><br> **PLAINTIFF JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.'S RESPONSES AND OBJECTIONS TO DEFENDANT SAVE ON SP, LLC'S REVISED FOURTH SET OF INTERROGATORIES** |

15221054

## GENERAL OBJECTIONS

Johnson and Johnson Health Care Systems, Inc. ("JJHCS") incorporates each of the General Objections below into its specific objections to each Interrogatory, whether or not each such General Objection is expressly referred to in JJHCS's objections to a specific Interrogatory. JJHCS's investigation of facts related to this Action is ongoing. It reserves the right to supplement, amend, modify, or correct its responses under Rule 26(e) should it discover additional information or grounds for objections at any time prior to the conclusion of this Action. The following responses and objections are based upon information known at this time.

1.      JJHCS objects to the Interrogatories to the extent that they seek material or information protected from disclosure by a privilege including, without limitation, the attorney-client privilege, the work-product doctrine, the joint defense privilege, the common interest privilege, the First Amendment privilege, or any privilege recognized by the Federal Rules of Civil Procedure, the Local Rules of the Court, and/or relevant case law.

2.      JJHCS objects to the Interrogatories to the extent that they seek information that is not relevant to a claim or defense or to the subject matter of this litigation. Any response JJHCS makes to any Interrogatory shall not be deemed an admission that the response, information, document, or thing produced is relevant to a claim or defense or to the subject matter of this litigation, is reasonably calculated to lead to the discovery of admissible evidence, is material, or is admissible as evidence.

3.      JJHCS objects to the Interrogatories to the extent that they are vague and/or ambiguous.

4.      JJHCS objects to the Interrogatories to the extent that they require interpretation or legal analysis by JJHCS in providing a response. JJHCS responds to the Interrogatories as it interprets and understands each Interrogatory as set forth. If SaveOnSP subsequently asserts an

1

interpretation of any Interrogatory that differs from JJHCS's understanding of that Interrogatory, JJHCS reserves the right to modify or supplement its objections and responses.

5.    JJHCS objects to the Interrogatories to the extent that they are duplicative of document requests, other interrogatories, and/or other discovery requests.

6.    JJHCS objects to the Interrogatories to the extent that they are argumentative, lack foundation, or incorporate assertions that are disputed, erroneous, or irrelevant to the Action. JJHCS further objects to the Interrogatories to the extent that they assume facts that do not exist or the occurrence of events that did not take place.

7.    JJHCS objects to the Interrogatories to the extent that they seek information relating to any business affairs other than those that are the subject of the Action.

8.    JJHCS objects to the Interrogatories to the extent that they seek information that is not in JJHCS's possession, custody, or control.

## OBJECTIONS TO DEFINITIONS

1.    JJHCS objects to the definition of the term "2016 Best Price Rule" to the extent that it reflects a legal conclusion regarding the requirements of 42 C.F.R. § 447.505.  JJHCS further objects to the definition as inconsistent with the text of 42 C.F.R. § 447.505 in 2016.  The version of 42 C.F.R § 447.505 adopted in 2016 did not require a "manufacturer [to] ensure[] that the full value of the coupon is passed on to the consumer."  *See Medicaid Program; Covered Outpatient Drugs*, 81 Fed. Reg. 5,170, 5,352 (Feb. 1, 2016).

2.    JJHCS objects to the definition of the term "2023 Best Price Rule" to the extent that it reflects a legal conclusion regarding the requirements of the since-enjoined regulation described in 85 Fed. Reg. 87,000.

2

15221054

3.     JJHCS objects to the term "CAP Program" to the extent that it offers a conclusion regarding the purpose of the CAP Program and JJHCS's intent in implementing the CAP Program.

4.     JJHCS objects to the definition of the term "Janssen" to the extent the term is used to seek information in the possession of entities other than JJHCS.  JJHCS further objects to the definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it purports to include "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants and all persons or entities acting or purporting to act on behalf" of those entities.

5.     JJHCS objects to the definition of the term "Janssen Drug" as irrelevant to the extent it purports to include drugs that are not covered by CarePath or otherwise implicated in SaveOnSP's scheme to misuse copay assistance funds.  JJHCS further objects to the definition as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it purports to include "any Specialty Drug manufactured or sold by Janssen from any time for which patients may receive copay assistance," even if the drug is not covered by CarePath or otherwise implicated in SaveOnSP's scheme to misuse copay assistance funds.

6.     JJHCS objects to the definition of the term "JJHCS" to the extent it purports to include attorneys, accountants, or others who may be outside of JJHCS's control.  JJHCS further objects to the definition as overbroad, unduly burdensome, and not proportional to the needs of the case to extent it purports to include "any and all predecessors and successors in interest, assignees, parents, subsidiaries, affiliates, . . . agents, [or] representatives" or purports to include

3

15221054

entities and persons acting or purporting to act on behalf of or under the control of entities other

than Johnson & Johnson Healthcare Systems, Inc.

7.    JJHCS objects to the term "Savings Program Checklist" as irrelevant to the extent

that it covers patient assistance programs not connected to CarePath or otherwise implicated in

SaveOnSP's scheme to misuse copay assistance funds.  JJHCS further objects to the definition as

overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it

purports to include "checklists prepared by Janssen for its Copay Assistance programs," other

than the copay assistance programs at issue in this litigation.

## TIME PERIOD

1.    Consistent with the Court's order and SaveOnSP's Interrogatories, JJHCS will

only provide information from June 19, 2020 through May 17, 2022 (the "Time Period").  May

28, 2024 Order, Dkt. No. 307, at 3 n.2.

## RESPONSES TO INTERROGATORIES

### Interrogatory No. 11

Describe all actions that JJHCS took or considered taking in response to or because of the
promulgation of the 2023 Best Price Rule, including if applicable: creating the CAP Program or
similar programs; attempting to identify patients on Accumulators, Maximizers, or SaveOnSP
advised plans, including through benefits investigations; changing or enforcing CarePath's terms
and conditions for any Janssen Drug (including developing or changing JJHCS's interpretation of
such terms and conditions); changing the maximum amount of copay assistance offered through
CarePath for any Janssen Drug; bringing litigation against any party (including SaveOnSP); and/or
analyzing the impact or potential impact of the 2023 Best Price Rule on CarePath's viability or on
JJHCS.

**Response:**

4



5

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████

JJHCS designates its response to this Interrogatory as "ATTORNEYS' EYES ONLY" under the Discovery Confidentiality Order, so-ordered November 22, 2022, Dkt. No. 62.

**Interrogatory No. 12**

Describe the purpose and meaning of the Savings Program Checklists, including the meaning of the statements like those highlighted in Appendix 1; what steps, if any JJHCS took to ensure that these statements were accurate; when and why JJHCS created the Savings Program Checklists and, if applicable, stopped using them; and how the Savings Program Checklists relate to calculations or submissions of best price information pursuant to 42 C.F.R. § 447.505.

**Response:**

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

6

15221054

███████████████████████████████████████████████████

███████████████████████████████████.

JJHCS designates its response to this Interrogatory as "ATTORNEYS' EYES ONLY"

under the Discovery Confidentiality Order, so-ordered November 22, 2022, Dkt. No. 62.

**Interrogatory No. 13**

Identify all individuals with knowledge of or responsibility for any of the matters discussed in Interrogatories 12 and 13. For each such individual, please provide (a) their name; (b) their position(s), including whether or not they are currently employed by JJHCS; and (c) the matter(s) for which they had knowledge and/or responsibility.

**Response:**

In ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[1] JJHCS understands this Interrogatory's reference to "Interrogatories 12 and 13" to be an error, and construes it as a reference to "Interrogatories 11 and 12."

15221054

9

JJHCS designates its response to this Interrogatory as "ATTORNEYS' EYES ONLY" under the Discovery Confidentiality Order, so-ordered November 22, 2022, Dkt No. 62.

Dated: September 3, 2024

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By:    /s/Jeffrey J. Greenbaum
       JEFFREY J. GREENBAUM
       KATHERINE M. LIEB


PATTERSON BELKNAP WEBB & TYLER LLP
Adeel A. Mangi
Harry Sandick (admitted *pro hac vice*)
George LoBiondo
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

10

## CERTIFICATION

1.      I am authorized by JJHCS to execute these Responses to Interrogatory Nos. 11 to 13 on its behalf.

2.      I have read the attached Responses to SaveOnSP's Interrogatory Nos. 11 to 13 dated September 3, 2024.

3.      The Responses are based upon my personal knowledge, upon information supplied to me by others, and upon JJHCS's documents, books, and records.

4.      To the extent that the Responses are based upon my personal knowledge, it is true to the best of my knowledge.  To the extent that the Responses are based upon information supplied to me by others and upon JJHCS's documents, books, and records, I believe the Responses to be true.

I certify that the foregoing is true and correct.


Dated: September 3, 2024

*Lena Kane*
_____
Lena Kane

15221054

# Sills Cummis & Gross
### A Professional Corporation

**The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102-5400
Tel: 973-643-7000
Fax: 973-643-6500**

Jeffrey J. Greenbaum
Member
Direct Dial: (973) 643-5430
E-mail: jgreenbaum@sillscummis.com

101 Park Avenue
New York, NY 10112
Tel: 212-643-7000
Fax: 212-643-6500

November 7, 2024

**By Email**

Hon. Freda L. Wolfson
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068

**CONTAINS INFORMATION MARKED AS AEO/CONFIDENTIAL
UNDER THE DISCOVERY CONFIDENTIALITY ORDER**

Re:    JJHCS's Opposition to SaveOnSP's October 28, 2024 Motion to Compel
       *Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*,
       Civil Action No. 22-2632 (JKS) (CLW)

Dear Judge Wolfson:

On behalf of JJHCS, we write in opposition to SaveOnSP's motion to compel JJHCS to supplement its response to SaveOnSP's Interrogatory No. 12. This is SaveOnSP's second motion regarding the irrelevant "Best Price" regulations that govern drug manufacturers' rebates to the Medicaid program.

SaveOnSP's motion should be denied because JJHCS's interrogatory response is complete as written and fully consistent with the strict guardrails in Your Honor's prior ruling. Following extensive briefing and argument earlier this year, Your Honor mostly rejected SaveOnSP's attempts to take expansive Best Price discovery. While SaveOnSP recounts its conspiracy theories that underpinned its original motion, SaveOnSP Br. at 1–2, it does not mention that those theories

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 2

were debunked in JJHCS's response and that Your Honor did not order the discovery it sought.

*See* Ex. 1 (May 2, 2024 Br.); Ex. 2 (May 28, 2024 Order).  Rather, Your Honor authorized inquiry

into one discrete and narrow question:  whether JJHCS "changed certain terms and conditions of

its CarePath program and the creation of the CAP Program in response to the promulgation of the

2023 Best Price Rule, which never went into effect."  Ex. 2 (May 28, 2024 Order) at 2.  To answer

that question, Your Honor permitted SaveOnSP to serve "no more than three" interrogatories "to

explore the purpose of an internal checklist" used by JJHCS.  *Id.* at 2–3.

Your Honor emphasized that JJHCS was under no obligation to write a dissertation for

SaveOnSP on every aspect of the checklist going back to the beginning of time.  Rather, the

interrogatories were to be "***targeted and narrow***."  *Id.* at 3 (emphasis supplied).  Moreover—and

particularly germane to this motion—Your Honor limited JJHCS's obligation to respond to the

short window of time following the promulgation of the 2023 Best Price Rule, since SaveOnSP's

entire theory of relevance was to speculate that JJHCS reacted to the promulgation by changing its

mind about SaveOnSP's scheme.  *See id.* at 3 n.2 ("The time period for the search should be limited

to the period from the date when the 2023 Best Price Rule was proposed by the government until

it was invalidated"); Ex. 3 (SaveOnSP May 9, 2024 Reply Brief) at 3 (SaveOnSP hypothesizing

that the 2023 Best Price Rule "flipped J&J's incentives" and "change[d]" JJHCS policy regarding

"SaveOn's conduct"); Ex. 4 (Tr. of May 23, 2024 Conf.) at 104:1–4 (the Court explaining the basis

for the "limited time period," i.e., SaveOnSP's belief that "actions were being taken in response to

this regulation").  SaveOnSP's moving papers carefully ignore all of this context.

As detailed later in this brief, SaveOnSP flouted Your Honor's order to serve three

"targeted and narrow" interrogatories—over the next six months, it served a number of compound

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 3

interrogatories totaling 16 questions regarding the Best Price Rule, plus demands for various new

custodians and wildly overbroad search terms.  But even if Your Honor were to ignore that

misconduct, and set aside all the evidence that this is yet another fishing expedition, there is still

no basis to grant relief here.  SaveOnSP's motion sets forth two complaints about JJHCS's

response to Interrogatory No. 12:  (1) that it "said nothing about the Full Value Statement"; and

(2) that its discussion of the Compliance Statement is "vague."  Neither complaint has merit.

    ***First***, JJHCS's response expressly addressed the "Full Value Statement," which is

SaveOnSP's nickname for Part III, Section 3 of the checklist. 

But more

importantly,

. *See* Ex. 5 (JJHCS_00225643) at -5656

.").  That fact categorically establishes that the Full Value Statement is irrelevant

and cannot support the speculation that animated SaveOnSP's original motion regarding the 2023

Best Price Rule.  There is nothing more JJHCS is required to say about the meaning of this

language between 2020 and 2022; SaveOnSP's real gripe seems to be that its conspiracy theory

has hit a dead end.

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 4

**Second**, there is nothing "vague" about JJHCS's explanation of the "Compliance

Statement," SaveOnSP's nickname for Part III, Section 8 of the checklist:



SaveOnSP Ex. 1 at 30.  SaveOnSP claims to be confused about whether JJHCS's compliance goals

"included compliance with the Best Price Rule."  SaveOn Br. at 3, 5.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████.  Nothing else is required under Your Honor's order.

    In sum, we are well past the point of "diminishing returns" on these interrogatories.  Ex. 6

(Tr. of Apr. 3, 2024 Conf.) at 126:2–6.  Your Honor long ago gave the parties clear guidance

regarding the wisdom of spending time and resources making motions about interrogatory

responses.  At that time, the dispute before Your Honor was far more material to this case than

Best Price—it was about SaveOnSP's false and admittedly incomplete responses to interrogatories

about its evasion and deception of manufacturers like JJHCS, misconduct that goes to the heart of

JJHCS's claims.  Yet Your Honor mostly denied JJHCS's motion seeking more comprehensive

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 5

responses from SaveOnSP, reasoning that "[i]n the end, it's what comes out at the deposition" that

matters, "where you also have an ability to follow up on answers." *Id.*

    Having secured that ruling from Your Honor, SaveOnSP should have thought better of

filing this motion. If SaveOnSP wishes to continue chasing the Best Price ghost, it is welcome to

ask further questions about the checklist in depositions, and JJHCS will evaluate their propriety.

But JJHCS's response to Interrogatory No. 12 is complete, whether or not SaveOnSP is pleased

with the information it received. Its motion should be denied.

## BACKGROUND

    The Best Price Rule is a federal regulatory scheme that requires drug manufacturers to

ensure that Medicaid receives the best price for prescription drugs available in the marketplace.

Under the Best Price Rule, a drug manufacturer must make quarterly reports to the government,

consisting of various pricing data calculated in accordance with federal regulations. 42 C.F.R.

§ 447.510(a). Drug manufacturers are permitted to omit copay assistance from the calculation of

Best Price, so long as they intend that all copay assistance go to patients. *Establishing Minimum*

*Standards in Medicaid State Drug Utilization Review*, 85 Fed. Reg 87000, 87048–049 (Dec. 31,

2020); *see also* PhRMA Br. at 25, *Pharm. Rsch. & Mfrs. of Am. v. Becerra,* No. 21-cv-1395

(D.D.C. Jan. 4, 2022), ECF No. 26-1.

    In 2020, the Department of Health and Human Services ("HHS") proposed an amendment

to the Best Price Rule that would have required manufacturers to include copay assistance

payments in the calculation of Best Price, unless "the manufacturer ensures the full value of the

assistance or benefit is passed on to the consumer or patient." *Revising Medicaid Drug Rebate*

*and Third Party Liability Requirements,* 85 Fed. Reg. 37286, 37299 (June 19, 2020). This

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 6

amendment was scheduled to take effect in 2023, and in this litigation, this amendment has been

referred to as the "2023 Best Price Rule." Manufacturers challenged the 2023 Best Price Rule in

federal court, and a court enjoined it in 2022. *Pharm. Rsch. & Mfrs. of Am. v. Becerra*, 2022 WL

1551924, at *5–6 (D.D.C. May 17, 2022). The earlier version of the Rule, in which a manufacturer

need not include copay assistance in calculating Best Price, remains in effect today.

The last time that SaveOnSP sought to compel discovery relating to the Best Price Rule, it

posited a theory that certain "Government Contract Compliance Checklists" produced by JJHCS

suggested that JJHCS "makes sworn certifications to HHS that all its copay assistance funds go to

patients." *See* Ex. 7 (Apr. 18, 2024 Mot. to Compel) at 3–5. This, in turn, led SaveOnSP to further

speculate that either JJHCS's certifications to the government or its "accusations that SaveOn

diverts CarePath funds" must be false. *Id.* In response, JJHCS laid out all the reasons why the

Best Price Rule is irrelevant to this litigation. Among other reasons, SaveOnSP had misunderstood

these documents—███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████." Ex. 1 (May 2, 2024 Opp.) at 11.

Your Honor denied SaveOnSP's motion to compel the production of documents related to

the Best Price Rule. Ex. 2 (May 28, 2024 Order) at 2. But Your Honor authorized SaveOnSP to

serve "no more than three" "targeted and narrow" interrogatories "to explore the purpose of an

internal checklist that may or may not relate to [JJHCS]'s obligations under the Best Price Rule."

*Id*. at 2–3. Your Honor further explained that any discovery related to the internal checklist should

be for a "limited time period" between the proposal of the 2023 Best Price Rule and the court order

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 7

that enjoined the 2023 Best Price Rule, since SaveOnSP's theory was "that actions were being
taken in response to this" amendment.  Ex. 4 (Tr. of May 23, 2024 Conf.) at 104:1–4.

As it is wont to do, SaveOnSP went far beyond the scope of what was authorized by Your
Honor's order.  It disregarded Your Honor's admonition to serve a maximum of three narrow
interrogatories concerning the internal checklist, and instead propounded broad, compound
interrogatories containing 16 questions addressing a wide range of issues related to JJHCS's Best
Price Rule compliance.  *See, e.g.*, SaveOnSP Ex. 1 at 10–11 (propounding a broad interrogatory
that demanded JJHCS "[d]escribe all actions that [it] took or considered taking in response to or
because of the promulgation of the 2023 Best Price Rule," followed by specific questions about
whether JJHCS undertook four potential responses).

This vexatious campaign continued, and expanded, all summer.  After JJHCS served its
Responses and Objections on July 3, SaveOnSP next demanded that JJHCS add two additional
custodians to cover (irrelevant) Best Price issues.[1]  *See* Ex. 8 (July 19, 2024 Ltr. from E. Snow to
J. Long re: Best Price) at 1.  SaveOnSP further proposed that JJHCS run ***twelve*** distinct search
terms over these custodians' documents.  *Id.* at 2–3.  Some of the search terms SaveOnSP
demanded were wildly overbroad and had nothing to do with even the Best Price Rule:  for
example, SaveOnSP demanded that JJHCS search these custodians' files for documents containing
the names of senior SaveOnSP executives.  *Id.* at 2.  Then, nearly a month after JJHCS first served
its interrogatory responses and weeks after making demands for additional custodians, SaveOnSP

---

[1] On the same day SaveOnSP demanded these custodians, SaveOnSP also requested that JJHCS
add 25 other new custodians.  *See* Ex. 9 (July 19, 2024 Ltr. from E. Snow to J. Long re: non-JJHCS
custodians); Ex. 10 (July 19, 2024 Ltr. from E. Snow to J. Long re: Janssen Scientific).

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 8

served a revised version of its Best Price interrogatories on August 2, 2024, starting the process over. JJHCS served Responses and Objections to the revised interrogatories on September 3, 2024, and it is this most recent version of JJHCS's responses that are at issue in this motion.

JJHCS provided comprehensive answers to SaveOnSP's revised Best Price Rule interrogatories, including Interrogatory No. 12, notwithstanding their overbreadth. *See* SaveOnSP Ex. 8 at 6–8. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 7–8. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* In other words, JJHCS provided a sworn interrogatory response confirming what it had said in its discovery briefing: SaveOnSP's theory regarding the internal checklists was based on its apparent misunderstanding of the checklists' purpose and the timing of their creation.

Almost three more weeks went by. Then, on September 23, SaveOnSP wrote a discovery letter to JJHCS—one of seven letters it wrote that week seeking more discovery—posing several follow-up questions regarding the contents of JJHCS's response to Interrogatory No. 12. *See* SaveOnSP Ex. 5. JJHCS invited SaveOnSP to ask its follow-up questions at depositions, as Your Honor previously instructed, rather than "fight[ing] over how complete" interrogatory responses are. Ex. 6 (Tr. of Apr. 3, 2024 Conf.) at 126:2–12; *see* SaveOnSP Ex. 6. SaveOnSP chose instead

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 9

to file this motion on October 28—one of three applications SaveOnSP brought to Your Honor

that day.

## ARGUMENT

Interrogatories are a discovery device designed "to obtain simple facts," and so the

sufficiency of an interrogatory response is assessed by whether the responding party has made "a

reasonable effort to respond." *IQVIA, Inc. v. Veeva Sys., Inc.*, 2018 WL 4537187, at *4 (D.N.J.

Sept. 14, 2018). JJHCS has exceeded that standard here.

Interrogatory No. 12 asked JJHCS to

> Describe the purpose and meaning of the Savings Program Checklists,
> including the meaning of the statements like those highlighted in [an appendix to
> the interrogatory]; what steps, if any JJHCS took to ensure that these statements
> were accurate; when and why JJHCS created the Savings Program Checklists and,
> if applicable, stopped using them; and how the Savings Program Checklists relate
> to calculations or submissions of best price information pursuant to 42 C.F.R.
> § 447.505.

SaveOnSP Ex. 1 at 11.

JJHCS's response provided a comprehensive response to SaveOnSP's interrogatory that

more than meets the "reasonable effort" standard. For ease of reference, JJHCS's response is

provided below (omitting the objections and confidentiality designation):



Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 10



SaveOnSP Ex. 8 at 7–8.

There is no deficiency in this response, and certainly not the two supposed deficiencies

advanced in SaveOnSP's motion.  ***First***, SaveOnSP argues that JJHCS's response says "nothing"

about what SaveOnSP calls the "Full Value Statement"—three sentences in the internal checklist

that address JJHCS's intent when structuring its patient assistance programs.  Not so.  ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████  *Id.*  In its

motion, SaveOnSP does not—and cannot—explain what else JJHCS should have said.  ████

████████████████████████████████████████

██████████████████████████████████████.  *Id.*

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████  SaveOnSP is not entitled to anything more under Your

Honor's prior ruling.

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 11

**Second**, SaveOnSP also takes issue with JJHCS's explanation of what SaveOnSP calls the "Compliance Statement"—three additional sentences found in Part III, Section 8 of the internal checklist. SaveOnSP does not dispute that JJHCS addressed this portion of the checklist explicitly in its response. SaveOnSP Ex. 8 at 7–8. But it claims that JJHCS must nonetheless do more, asking Your Honor to order JJHCS "to explain what its 'compliance goals' are and whether they include compliance with the Best Price Rule." SaveOnSP Br. at 5. There is no sound basis to issue such an order. JJHCS provided the information the interrogatory sought—████████████████ ████████████████████████████████████—and it is under no obligation to write a treatise about the purposes of corporate compliance programs. ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████e. But again, none of this has anything to do with the proposed 2023 Best Price Rule. "[I]nterpretation of [interrogatory] answer[s]" is not "hyper-technical." *Pherson v. Goodyear Tire & Rubber Co.*, 590 F.2d 756, 759 (9th Cir. 1978). Here, it is clear from JJHCS's interrogatory response that SaveOnSP's conspiracy theory tied to the proposed rule is baseless—and that ends the inquiry.

The cases cited by SaveOnSP do not help its position. Indeed, some of them do not address the sufficiency of interrogatory responses at all. *See, e.g.*, *Barton v. RCI, LLC*, 2014 WL 1050417, at *6 (D.N.J. Mar. 17, 2014) (sanctioning a party for serving interrogatory responses after the deadline and misleading the opposing party about the basis for the delay). SaveOnSP borrows another case from JJHCS's prior briefing regarding the sufficiency of **SaveOnSP's** interrogatory responses, but this case is also irrelevant to the current dispute. *See Pfizer Inc. v. Teva Pharms.*

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 12

*USA, Inc*., 2006 WL 2938723, at *2–3 (D.N.J. Oct. 13, 2006) (concerning whether a supplemental response was required based on intervening case developments).  Still others involve instances in which a party was ordered to supplement interrogatory responses that failed to address issues central to the plaintiff's cause of action.  *See, e.g.*, *Patton v. Loadholt*, 2020 WL 5095858, at *4 (E.D. Cal. Aug. 28, 2020) (ordering the defendant in a prisoner civil rights case involving inadequate medical treatment to supplement an interrogatory response that failed to explain why the plaintiff was not given a certain medication); *Hansel v. Shell Oil Corp.*, 169 F.R.D. 303, 305 (E.D. Pa. 1996) (ordering an antitrust plaintiff alleging discriminatory pricing to supplement interrogatory responses after the plaintiff failed to answer an interrogatory calling for the dates and names of buyers involved in the allegedly discriminatory sales); *Struthers Scientific & Intern. Corp. v. General Foods Corp.*, 51 F.R.D. 149, 153 (D. Del. 1970) (ordering a theft of trade secrets plaintiff to supplement an interrogatory response calling for the specific trade secrets involved). These cases do not address the situation presented here, in which JJHCS fully answered an interrogatory on a tangential issue that has nothing whatsoever to do with its claims.

The dispositive authority here comes not from SaveOnSP's inapposite caselaw, but from Your Honor's own prior rulings in this action.  When JJHCS sought more detailed—and honest—interrogatory responses from SaveOnSP, Your Honor denied JJHCS's motion.  Your Honor explained that there are "diminishing returns from interrogatories" and fighting "over how complete" the responses are, because "[i]n the end, it's what comes out at the deposition" that counts, "where you also have an ability to follow up on answers."  Ex. 6 (Tr. of Apr. 3, 2024 Conf.) at 126:2–6.  That principle dictates the outcome here.  JJHCS has answered the interrogatory it

Honorable Freda L. Wolfson, U.S.D.J.
November 7, 2024
Page 13

was presented, in a manner that was consistent with Your Honor's ruling authorizing that

interrogatory.  SaveOnSP cannot turn its interrogatory into an interview.

<b>CONCLUSION</b>

For the foregoing reasons, SaveOnSP's motion to compel should be denied.

Respectfully submitted,

s/ *Jeffrey J. Greenbaum*
JEFFREY J. GREENBAUM

cc:    Counsel of record

# Exhibit 1

# Sills Cummis & Gross
A Professional Corporation

**The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102-5400
Tel: 973-643-7000
Fax: 973-643-6500**

**Jeffrey J. Greenbaum**
Member
Direct Dial: (973) 643-5430
E-mail: jgreenbaum@sillscummis.com

101 Park Avenue
New York, NY 10112
Tel: 212-643-7000
Fax: 212-643-6500

May 2, 2024

**By Email**

Hon. Freda L. Wolfson
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068

**CONTAINS INFORMATION MARKED AS AEO/CONFIDENTIAL
UNDER THE DISCOVERY CONFIDENTIALITY ORDER**

Re:    **Opposition to SaveOnSP's April 18, 2024 Motion to Compel**
*Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*,
Civil Action No. 22-2632 (JKS) (CLW)

Dear Judge Wolfson:

On behalf of Johnson & Johnson Health Care Systems, Inc. ("JJHCS"), we write in opposition to Defendant Save On SP, LLC's ("SaveOnSP") April 18, 2024 letter motion to compel the production of documents purportedly relating to "Best Price."

SaveOnSP's motion consists of a grab-bag of disparate arguments. Some are hard to follow, and all are premised on tortured logic, if not outright errors of law. The gist, however, is simple: SaveOnSP argues that it should get documents about JJHCS's compliance with federal Best Price regulations, which govern Medicaid rebates, and in particular JJHCS's compliance with a proposed regulation that never went into effect. SaveOnSP's spurious relevance arguments are addressed below—but they are merely a smokescreen designed to conceal what SaveOnSP really

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 2

wants.  Best Price documents are by definition all about the details of drug pricing.  The documents

SaveOnSP seeks here include detailed and highly sensitive government reports about every price,

rebate, and discount on every formulation of every Janssen drug at issue, and internal documents

regarding the same.

SaveOnSP has long made clear that it wishes to make this case a trial on the propriety of

pharmaceutical pricing in America.  As the Court's prior rulings have recognized, however, this

case is not about Janssen drug pricing; it is about SaveOnSP's misappropriation of manufacturer-

provided patient assistance funds.  Accordingly, the Court repeatedly has denied SaveOnSP this

discovery.  *See, e.g.*, D.E. 192 at 24 ("[D]ocuments on pricing of Janssen drugs are [not] relevant

to Plaintiff's claims or Defendant's defenses"); D.E. 264 at 2,7 ("I was not convinced that the

documents related to year-to-year pricing of Janssen drugs are relevant . . . Nothing Defendant

now raises convinces me to reconsider on this issue").  This latest motion is just another attempt

to get at the same documents through a different pathway.

Even if the Court were to venture into the weeds of the Medicaid rebate regulatory scheme,

the motion should be denied.  SaveOnSP's primary argument is that JJHCS's Best Price reporting

to the government is non-compliant with regulations, and contradicts its claims in this lawsuit.  But

SaveOnSP has misunderstood the relevant regulations and JJHCS documents—there is no

contradiction.  Regardless, SaveOnSP is not a private Attorney General.  It is a self-described

"ghost company" whose personnel routinely lie to manufacturers about their names and affiliations

to further its scheme to misappropriate patient assistance funds.  The federal government, which

closely polices drug manufacturer compliance with Best Price, has never suggested that JJHCS's

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 3

position in this lawsuit, which has been pending for years and highly publicized, presents any

issues with JJHCS's Best Price submissions.  That is because it does not.

SaveOnSP next argues that all of JJHCS's attempts to enforce its terms and conditions

against SaveOnSP and mitigate its damages stemming from SaveOnSP's scheme are really an

elaborate ruse, somehow designed to engineer compliance with a Best Price regulation proposed

in 2020 and anticipated to go into effect in 2023, but which was enjoined and never went into

effect—as opposed to being motivated by SaveOnSP's conduct.  SaveOnSP contends that this

somehow proves that JJHCS actually is helped and not damaged by SaveOnSP.  This is a confusing

conspiracy theory for the ages.  But if JJHCS actually had any such documents relevant to this

outlandish theory, it would already be producing them:  it has agreed to produce documents about

SaveOnSP, about the entire history of the CarePath terms and conditions going back more than a

decade, and about its attempts at mitigating the harm done by SaveOnSP.  SaveOnSP is not entitled

to documents about Best Price regulations and submissions that have nothing to do with any

relevant issue, and nothing to do with SaveOnSP.

SaveOnSP's final contention is that documents about JJHCS's reaction to the 2023 Best

Price regulation when it was first proposed in 2020 will help further its laches defense by showing

what JJHCS knew about SaveOnSP in 2017.  This argument defies time itself.  How JJHCS reacted

to a 2020 proposed rule that was originally slated to go into effect in 2023 does not speak to what

it knew in 2017.  But regardless, it is also wrong as a legal matter, because SaveOnSP's laches

defense will fail in any event.  The claims at issue were timely filed under governing statutes of

limitations.  And, once again, SaveOnSP does not need these documents to know what JJHCS

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 4

knew about SaveOnSP and when it knew it, because JJHCS is already producing documents that
mention SaveOnSP from the files of more than twenty custodians.

There is one additional reason to deny this motion: SaveOnSP's position is not only
disingenuous, it is also hypocritical.  In pressing this motion, SaveOnSP now contends that
compliance with government regulations about Best Price is "highly relevant."  But SaveOnSP
itself categorically refused to produce documents regarding its *own* compliance with different laws
and regulations that actually *are* relevant (because they relate to the improper misappropriation of
patient assistance funds and whether SaveOnSP has been outlawed in certain states).  When JJHCS
sought documents "relating to how SaveOnSP operates in jurisdictions with statutes or regulations
that ban or limit accumulator adjustment programs," i.e., jurisdictions that ban programs like
SaveOnSP, SaveOnSP groused that JJHCS's request was "a blatant fishing expedition that seeks
completely irrelevant documents," because "**compliance with these statutes has nothing to do
with whether [SaveOnSP] induced patients to breach their contracts with JJHCS or whether
it deceives the public.**"  D.E. 66 at 7–8 (emphasis supplied); *see also* Mar. 17, 2023 Tr. at 20:8–
16 (SaveOnSP's counsel arguing that compliance with "some other statute" is just "**completely
tangential**." (emphasis supplied)).  Judge Waldor sided with SaveOnSP, commenting, "I don't see
the relevance at all.  And it's too much."  Mar. 17, 2023 Tr. at 23:1–3; *see also* D.E. 102, ¶ 3.
JJHCS accepted that ruling and has never moved to clarify, reconsider, or relitigate it.  The parties
thus proceeded with the understanding that discovery would not be expanded into general
regulatory compliance.  Having won the ruling on scope that it sought, and shielded far more
relevant documents about its own compliance from scrutiny, SaveOnSP cannot now—more than

4

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 5

a year later—put JJHCS's own compliance with an entirely irrelevant relevant regulatory scheme
at issue.

## DISCUSSION

The Court should deny SaveOnSP's motion for four reasons.  *First*, it is an improper
attempt to revisit discovery about the pricing of Janssen drugs.  *Second*, documents that relate
solely to the Best Price Rule—but not other issues subject to discovery like SaveOnSP or the CAP
program—are irrelevant.  *Third*, while SaveOnSP does its best to muddy the waters on the
document requests at issue, the bottom line is this:  to the extent that a document touches on Best
Price alongside other relevant topics, JJHCS has already agreed to produce it.  SaveOnSP is
entitled to nothing more.  *Fourth*, SaveOnSP is wrong when it claims it is entitled to these
documents to support a potential laches defense:  its argument misconstrues both the facts and the
legal framework that would govern such a defense.

## I.    SaveOnSP's Motion Is an Improper Attempt to Revisit Pricing-Related Discovery

The Best Price Rule is part of a regulatory scheme intended to ensure that Medicaid gets
the benefit of the lowest prices that drug manufacturers offer in the marketplace.  It does so by
requiring manufacturers to (i) disclose to the government certain pricing concessions that they
offer in the market, and (ii) provide rebates to Medicaid that result in Medicaid getting the net
"Best Price."  *See PhRMA v. Becerra*, 2022 WL 1551924, at *1 (D.D.C. May 17, 2022).  Discovery
about "Best Price" is therefore, by definition, discovery about the pricing of Janssen drugs.

For example, SaveOnSP's Request No. 79 seeks "[a]ll Best Price Quarterly Reports created
or submitted by JJHCS, Janssen, or their affiliates for each Janssen Drug."  SaveOnSP Ex. 13.

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 6

These Quarterly Reports to the government include, for each drug, the average manufacturer price[1] and the Best Price.[2]  42 C.F.R. § 447.510(a).  In simple terms, these reports contain within them the details on every relevant price, discount, and rebate that JJHCS or Janssen offers in the marketplace to a vast array of defined market participants.

　　As noted above, Your Honor previously concluded that "documents on pricing of Janssen drugs are [not] relevant to Plaintiff's claims or Defendant's defenses" because "the sales and profitability of Janssen drugs is not a justification for Defendant's tortious conduct."  D.E. 192 at 24.  Accordingly, Your Honor rejected three document requests seeking the prices of Janssen drugs.  *Id*.  Your Honor's rulings on this issue are in accord with two prior rulings from Judge Waldor.  *See, e.g.*, Oct. 30, 2023 Tr. at 52:16–20, 54:25–55:1; Mar. 17, 2023 Tr. at 34:1–10 (declining to compel compliance with an "awfully broad" request for pricing-related documents).  These rulings are dispositive here because SaveOnSP is seeking the very same pricing information.  This motion is nothing more than the proverbial old wine in new bottles.

　　SaveOnSP insists that it is innocent of any such intent to evade the Court's orders.  It says that it does not seek pricing data, but "only communications and documents that will allow it to test J&J's repeated accusations that SaveOn has been 'diverting' J&J's copay assistance funds." Mot. at 6.  Therefore, it argues "[t]his motion is not about how J&J sets prices; it is about whether

---

[1] Defined as "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to retail community pharmacies and retail community pharmacies that purchase drugs directly from the manufacturer."  42 C.F.R. § 447.504.

[2] Defined as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity in the United States in any pricing structure (including capitated payments) in the same quarter for which the [average manufacturer price] is computed."  42 C.F.R. § 447.505(a).

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 7

J&J actually believes that any of its copay assistance funds flow to SaveOn." *Id.* This is nonsensical. Request 79 on its face seeks pricing data. Moreover, there is no dispute that SaveOnSP engages in that diversion. SaveOnSP already admitted ten months ago that it helps itself and its partners to ***hundreds of millions of dollars per year*** of JJHCS's patient assistance funds. *See* D.E. 109 [Patient List Joint Letter] at 7 ("JJHCS's proposed action [to use discovery information to exclude patients in SaveOnSP from CarePath] would cost SaveOnSP tens of millions of dollars per year and would cost the employers who are SaveOnSP's clients over a hundred million dollars per year."). And so there is simply nothing to "test" here. SaveOnSP does not dispute that it makes money by taking copay patient assistance funds for the benefit of itself and its partners. The only question is whether this undisputed conduct is legal or constitutes either tortious interference with contract or a violation of New York General Business Law § 349.

All else aside, if JJHCS actually had documents stating that it thinks SaveOnSP is not diverting its patient assistance funds—the counterfactual scenario that SaveOnSP posits—then those documents will be produced, because JJHCS is producing documents relating to SaveOnSP from more than twenty custodians, as set forth below. Documents relating to pricing of Janssen drugs alone, however, are as irrelevant in the Best Price context as they were in any other.

## II. SaveOnSP's Argument to Compel the Production of Best Price Rule-Related Documents Depends on Errors of Law and Fact

SaveOnSP posits that it is entitled to take discovery on issues related to the Best Price Rule because JJHCS has made "contradictory representations" in this litigation and in regulatory filings made with the Department of Health and Human Services ("HHS"). Mot. at 5. Not even close. SaveOnSP's identification of alleged "contradictory representations" is rooted in

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 8

misunderstandings of the law and the facts.  In any event, the accuracy of JJHCS's regulatory

submissions is not an issue in this case, which turns solely on tortious conduct by SaveOnSP.

A.    *SaveOnSP Misconstrues the Best Price Regulatory Scheme*

SaveOnSP argues that JJHCS was required under the Best Price regulatory scheme to

include copay assistance dollars in its calculation of Best Price if it had any suggestion that some

of that money was being diverted "to a plan, PBM, accumulator, or maximizer."  Mot. at 7.

Accordingly, to avoid having a lower Best Price, and therefore higher Medicaid rebate obligations,

SaveOnSP posits that JJHCS "decided to be willfully blind to the effect of SaveOn or similar

companies on its copay assistance funds."  Mot. at 8.

SaveOnSP is flat wrong, as shown by the very regulatory history that it cites.  The relevant

facts are undisputed.  In 2020, HHS proposed an amendment to the Best Price Rule—what

SaveOnSP's motion refers to as the "2023 Best Price Rule"—that would for the first time have

included copay assistance payments in the calculation of Best Price, unless "the manufacturer

ensures the full value of the assistance or benefit is passed on to the consumer or patient."  *Revising*

*Medicaid Drug Rebate and Third Party Liability Requirements,* 85 Fed. Reg. 37286, 37298 (June

19, 2020).  This proposed amendment was a significant change from the existing regulatory

scheme, to which SaveOnSP refers as the "2016 Best Price Rule."  The proposed 2023 Best Price

Rule was controversial and was soon challenged in federal district court.

Two aspects of that litigation are pertinent here.  First, the court determined whether the

2023 Best Price Rule constituted a change from the requirements under the 2016 Best Price Rule.

From the time HHS proposed the 2023 Best Price Rule, there was debate regarding the preexisting

obligations of manufacturers under the 2016 Best Price Rule.  *See PhRMA*, 2022 WL 1551924, at

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 9

*4. HHS contended that under the 2016 Best Price Rule, manufacturers "ha[d] a duty to include in their best price calculations the effects of accumulator adjustment programs," and that the 2023 Best Price Rule merely clarified this existing requirement. *Id*.; *see also Establishing Minimum Standards in Medicaid State Drug Utilization Review*, 85 Fed. Reg 87000, 87052 (Dec. 31, 2020). Manufacturers had always understood their obligations under the 2016 Best Price Rule differently. Because manufacturers are "not aware of when [the use of accumulators or maximizers] by the health plans take[s] place," drug manufacturers understood the 2016 Best Price Rule did not require them to include copay assistance payments in the calculation of Best Price, so long as they intended that all copay assistance go to patients. *Establishing Minimum Standards in Medicaid State Drug Utilization Review*, 85 Fed. Reg 87000, 87048–049; *see also* PhRMA Br. (D.E. 26-1), *PhRMA v. Becerra*, No. 21-cv-1395 (D.D.C. Jan. 4, 2022), at 25 ("[HHS] itself thus has recognized that, when a manufacturer provides a rebate or benefit to a non-Best-Price-eligible purchaser, the manufacturer's intent is what matters"). The court sided with the manufacturers, explaining that the 2023 Best Price Rule "imposes new regulatory requirements on manufacturers" to "ensure that the full value of the [copay] assistance stays with the patient." *PhRMA*, 2022 WL 1551924, at *4 (quotation marks omitted).

Second, the court had to determine whether the 2023 Best Price Rule should be allowed to take effect. In the course of interposing various legal challenges, manufacturers pointed out that it made little sense to include copay assistance in the calculation of Best Price because it was money intended to help patients, not to reduce the prices at which drugs were being sold in the marketplace. *See* PhRMA Reply Br. (D.E. 34), *PhRMA v. Becerra*, No. 21-cv-1395 (D.D.C. Mar. 7, 2022), at 6–11 (explaining that "manufacturer assistance to patients . . . is not part of the

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 10

consideration for any sale transaction with a health plan for a manufacturer's drug," meaning that it is not part of the "price" under the ordinary meaning of the word "price"). Including copay assistance in Best Price calculations would create perverse incentives for manufacturers to stop helping patients. *Id*. at 22–23. And manufacturers pointed out that they had no ability to ensure that the full value of copay assistance was passed onto patients, because external actors could misappropriate such funds without the manufacturer's knowledge and without an opportunity for the manufacturer to intervene. *Id*. at 16–18.

Again, the court ruled in favor of the manufacturers. Before the "2023 Best Price Rule" ever went into effect, the court vacated and set aside the proposed amendment as inconsistent with the text of the operative statute. *See PhRMA*, 2022 WL 1551924, at *35 (noting that the Rule "would make the calculation of the best price turn on information often in the sole possession of commercial health insurers. Under the proposed rule, manufacturers would need to conduct transaction-by-transaction investigations into the operations of accumulator adjustment programs even though manufacturers have no control over (and sometimes no information concerning) those programs.").

And so, fatally for SaveOnSP's motion, the "2023 Best Price Rule" is not—and will never be—the law. The court's decision also confirmed that the law never required manufacturers to include copay assistance in Best Price so long as they intended for patient assistance funds to be used by patients—as JJHCS always did. With that, the premise of SaveOnSP's motion falls apart.

SaveOnSP also argues that it "cannot be [simultaneously] true" that "SaveOn[SP] was diverting CarePath funds from patients" and that JJHCS accurately "certif[ied] to HHS that all its copay assistance funds go to patients." Mot. at 5. This is a fallacy. SaveOnSP already has

10

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 11

admitted to diverting millions of dollars from JJHCS's copay assistance program.  And under the

operative Best Price framework, JJHCS was never required to include copay assistance dollars in

Best Price or make any such certification, because it always intended CarePath funds to be for its

patients.

### B.  *SaveOnSP Misreads the Documents It Cites*

SaveOnSP claims, based on citations to several documents, that JJHCS "appears to have

regularly certified to [HHS] that all its CarePath copay assistance funds go exclusively to patients"

while telling "the Court and Your Honor in this case that a portion of its copay assistance funds

flow to SaveOn."  Mot. at 3–4.  But each of the four JJHCS documents that SaveOnSP cites for

the proposition that JJHCS "appears to have regularly certified to [HHS] that all its CarePath copay

assistance funds go exclusively to patients" shows nothing of the kind.  ███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  They certainly do not certify to anyone

externally, let alone the government, that no bad actor like SaveOnSP is engaged in theft or

misappropriation.  Indeed, they all include this legend on each and every page:

Confidential and proprietary for internal use only.

*See* SaveOnSP Ex. 7; SaveOnSP Ex. 8; SaveOnSP Ex. 9; SaveOnSP Ex. 10.

Moreover, some of the "Program Checklists" cited by SaveOnSP do not involve CarePath

at all.  *See* SaveOnSP Ex. 9 at -5950, -5953 (describing ████████████████████████████

████████████████████████████████████████████.  SaveOnSP does not, and

11

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 12

cannot, explain how an internal JJHCS document connected to a program that is completely unrelated to CarePath, and functions differently from CarePath, has any probative value as evidence of the representations that JJHCS makes to the government regarding CarePath.[3]

The Best Price regulatory scheme is detailed and highly specific, yet SaveOnSP does not cite any regulation requiring any submission or certification that is somehow contradicted by any position JJHCS has taken in this lawsuit. Nor can it, because contrary to SaveOnSP's contention, the Best Price regulations do not require JJHCS to submit anything to the government in which it expressly states that "all its CarePath copay assistance funds go exclusively to patients." Mot. at 3. The regulation does not require JJHCS to make a certification regarding how CarePath functions; it simply requires JJHCS to calculate and submit certain pricing data to the government. 42 C.F.R § 447.510(a). Because the Best Price regulations did not and do not require JJHCS to do so, JJHCS never made the representations to the government SaveOnSP posits that JJHCS made, and when JJHCS submitted pricing data to the government, it calculated that pricing data in accordance with all regulatory requirements. These facts eviscerate the basis for SaveOnSP's motion.

---

[3] SaveOnSP also contends that JJHCS "█████████████████████████████████████████████████████████████████████████." Mot. at 3. Not true. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

SaveOnSP Ex. 6 at -7510. This is accurate: despite its best efforts, JJHCS has no definitive way of knowing which patients are affected by SaveOnSP, thanks to SaveOnSP's painstaking efforts to evade detection by JJHCS and other drug manufacturers. The risk that manufacturers could be penalized for evasive conduct by third parties is part of why a district court struck down the 2023 Best Price Rule. *PhRMA*, 2022 WL 1551924, at *5 (holding that "[f]easibility concerns support th[e] conclusion" that the 2023 Best Price Rule is invalid).

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 13

### III.    The Only Relevant Best Price-Related Documents Are Those Relating to the CAP Program, and JJHCS Already Has Agreed to Produce Them.

SaveOnSP has moved to compel the production of documents responsive to three document requests:  Request Nos. 8, 70, and 79.  Mot. at 2.  In its motion, SaveOnSP seeks to reinvent these document requests entirely in a series of bullet points at pages 6 to 7, with descriptions that bear no reasonable relationship to the actual underlying Requests.  But to the extent that SaveOnSP seeks relevant documents that do not relate exclusively to Janssen pricing or Best Price, and that instead also relate to relevant issues involving the CAP program or SaveOnSP, JJHCS is already running reasonable searches to identify and produce those documents.  It should not be required to do more.

#### A.    SaveOnSP's Motion to Compel on Request No. 79 Should be Denied

As set forth above, Request No. 79 sought JJHCS's Best Price submissions to the government.  Notably, nowhere in SaveOnSP's submission does it provide a single justification or reason for why it needs those detailed government pricing submissions sought through Request No. 79, and JJHCS has set forth above why they are irrelevant.  Accordingly, the motion to compel as to Request No. 79 should be denied.

#### B.    SaveOnSP's Motion to Compel on Request No. 70 Should be Denied

Request No. 70 seeks: "All Documents and Communications regarding manufacturer copay assistance program funds counting towards the calculation of a drug's Best Price, including the anticipated impact of the 2023 Best Price Rule on JJHCS, including without limitation the impact on CarePath."  *See* SaveOnSP Ex. 1 at 13.  SaveOnSP claims that the never-effective 2023 Best Price Rule may have influenced JJHCS's behavior regarding SaveOnSP, including by causing

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 14

JJHCS to "for the first time, c[o]me up with its current interpretation of CarePath's terms and conditions," "develop[] the CAP Program" and "file[] this lawsuit."  Mot. at 8–9.

This argument fails for two reasons.  *First*, the suggestion that a non-implemented regulatory proposal was somehow what drove JJHCS to pursue SaveOnSP—a company that admits damaging JJHCS to the tune of hundreds of millions of dollars—is a fanciful fishing expedition.  If SaveOnSP were correct, JJHCS would surely have halted the CAP Program and dismissed this lawsuit after the 2023 Best Price Rule was permanently blocked in May 2022.  But JJHCS did nothing of the kind.  Instead, it has continued with the expense and burden of maintaining the CAP Program, and this litigation, even though the 2023 Best Price Rule no longer exists.  It has done so for the obvious reason that it seeks to recover damages for SaveOnSP's misconduct, and to put an end to the harm that SaveOnSP's scheme visits on JJHCS and the patients it serves.[4]

SaveOnSP's related contention that JJHCS's interpretation of the CarePath terms and conditions is a "made-for-litigation" position is also belied by JJHCS's most recent productions

---

[4] SaveOnSP distorts the factual record to argue that JJHCS pursued the CAP Program and this litigation solely because of the 2023 Best Price Rule.  For example, SaveOnSP claims "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Mot. at 9.  But ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  SaveOnSP Ex. 23.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Another document it cites for this proposition does not mention the CarePath terms and conditions at all.  SaveOnSP Ex. 24.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  SaveOnSP Ex. 17 at 7, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 15

(cited nowhere in SaveOnSP's current motion).  Mot. at 11.  JJHCS's documents regarding the relevant terms and conditions going back to 2013—years before SaveOnSP or the 2023 Best Price regulation even existed—and demonstrate its longstanding view that patient assistance is for patients, not payors.  Ex. 1 at -4623 (JJHCS_00224591) ("███████████████████████
██████████████████████████).

Regardless, however, JJHCS already has agreed to produce non-privileged documents and communications related to CAP, as well as similar efforts that may predate the CAP Program, for the period April 1, 2016 to November 7, 2023.  *See* D.E. 192 at 26.  In other words, if a non-privileged document addresses ***both*** a Best Price-related issue ***and*** CAP or other JJHCS efforts to mitigate harm caused by SaveOnSP, JJHCS is producing it.  Indeed, SaveOnSP's citation of documents related to the Best Price Rule ***and*** CAP demonstrate that the current search and collection process works effectively to identify relevant documents.  But documents that relate ***only*** to the Best Price Rule are irrelevant, and JJHCS should not be ordered to produce them.

Nor is there a need for added search terms to capture CAP-related documents connected to the Best Price Rule.  The Court has already dealt with the parameters of that CAP-related discovery repeatedly.  As Your Honor knows, JJHCS now has many custodians, among them six "CAP"-specific custodians.  JJHCS is also already producing documents related to "why [J&J] decided to amend the [CarePath] terms in 2022."  Mot. at 10.  Indeed, after appearing before Your Honor on April 3, JJHCS reached compromise with SaveOnSP on several new terms meant to capture additional documents.  *See* Ex. 2 (Apr. 17, 2024 Ltr. from E. Wohlforth to Judge Wolfson).  And when SaveOnSP has proposed reasonable additional terms related to JJHCS's terms and conditions, JJHCS has agreed to run those as well.  *See* Ex. 3 (Apr. 23, 2024 Ltr. from J. Long to

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 16

E. Snow).  JJHCS also has agreed to run further mitigation-related searches to avoid motions practice.  *See* Ex. 4 (Apr. 26, 2024 Ltr. from I. Eppler to E. Snow).  In short, to the extent there is anything truly relevant in documents that also reference Best Price, other agreed-upon search terms or categories of discovery will capture those documents and SaveOnSP will have access to them.

### C.  *SaveOnSP's Motion to Compel on Request No. 8 Should be Denied*

JJHCS agreed long ago to produce documents from over twenty custodians regarding SaveOnSP in response to SaveOnSP's Request No. 8 (calling for "[a]ll Documents and Communications with or regarding SaveOnSP").  *See* Ex. 5 at 10 (JJHCS's R&Os to SaveOnSP's First Set of RFPs).  This Request has no connection to Best Price.  And again, relevant documents will not be withheld just because they happen to also include any content relating to Best Price.

### D.  *SaveOnSP's Recitation of Demands is Disconnected From the Requests Underlying its Motion and Should be Denied*

While citing only the three Requests addressed above, SaveOnSP sets forth an entirely different set of document requests in bullet points that purport to describe what it seeks to compel.  Mot. at 6–7.  The Court should reject those demands because they are not reasonably related to what the RFPs at issue ask for.  The actual text of the Requests is set forth and addressed above.  SaveOnSP cannot move to compel documents it never requested.

But even if the Court addresses the merits of SaveOnSP's demands, its wishlist either describes documents that it is already receiving, or documents that it is not entitled to.  For example, SaveOnSP argues, citing Request Nos. 8 and 70, that it seeks "documents sufficient to show" "the factual basis of all of J&J's statements to the Court in this litigation regarding SaveOn taking, seizing, pilfering, siphoning, diverting, and misappropriating copay assistance funds"; as well as "the factual basis of all of J&J's statements to the Court in this litigation regarding

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 17

SaveOn's services converting copay assistance funds into a manufacturer subsidy for SaveOn, Express Scripts, Accredo, and/or plans." Mot. at 6–7. That is not what Request Nos. 8 or 70 seek, and in any event, JJHCS is already producing from a long list of custodians the documents sought in Request No. 8, which calls for all documents regarding SaveOnSP.

Similarly, SaveOnSP demands documents showing JJHCS's communications with the government regarding "each patient that J&J or a vendor of J&J has identified as a member of a SaveOn-advised plan." *Id.* Again, that is not what these requests seek, and JJHCS would have no reason to make any such communications, because the Best Price regulations do not require it, but documents addressing SaveOnSP would nonetheless have been produced if they existed.

SaveOnSP's other demands are as misconceived as they are irrelevant to Request Nos. 8 and 70. SaveOnSP demands documents sufficient to show "the basis for J&J's assertions" to the government that "the full amount of J&J's copay assistance is passed to patients"—but as set forth above, there is no such requirement in the Best Price regulations. *Id.* SaveOnSP's demand for "documents sufficient to show J&J's evaluation" of whether SaveOnSP and similar companies "cause copayment assistance funds to be provided to any entities other than patients" is equally irrelevant because SaveOnSP admits that it does seize such funds. But regardless, any evaluation of SaveOnSP's role is nonetheless being produced already, because it is a document regarding SaveOnSP that is responsive to Request No. 8.

Finally, SaveOnSP demands "[a]ll communications or records of communications that discuss accumulators, maximizers, or SaveOn, with HHS, CMS, or other federal agencies, related to J&J's submission of Quarterly Best Price Reports." *Id.* Again, this is not what Request Nos. 8 or 70 address—it is an entirely new demand. But it is utterly irrelevant because Best Price reports

17

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 18

exclude and have always excluded copay assistance programs.  For the same reason, no additional

custodians relating to Best Price submissions are merited, much less custodians outside of the

named party (JJHCS) as demanded by SaveOnSP.  *Id.* at 7.

## IV.    Best Price Rule-Related Documents Are Irrelevant to SaveOnSP's Laches Defense

SaveOnSP is mistaken when it claims it is entitled to Best Price Rule documents to support

its laches defense.  Mot. at 10.  SaveOnSP's hypothesis is that JJHCS had all the materials

information that it needed to sue SaveOnSP in 2017 but decided not to act, entitling SaveOnSP to

invoke the defense of laches.  To be clear, JJHCS disputes that it had material information about

the SaveOnSP scheme in 2017.[5]  But even accepting that premise *arguendo*, there is still no reason

why JJHCS documents related to a regulatory change proposed in 2020 and litigated until 2022

would have any bearing on JJHCS's knowledge of, or decision-making regarding, SaveOnSP in

2017.

SaveOnSP is also wrong on the law.  The case cited by SaveOnSP on this point—the only

case cited in SaveOnSP's entire motion—does not support its argument.  *See* Mot. at 10 (citing

*New Reflections Plastic Surgery, LLC v. Reflections Ctr.*, 2018 WL 6716105 (D.N.J. Dec. 20,

2018)).  *New Reflections* arose in the context of federal Lanham Act claims with no statute of

---

[5] SaveOnSP's support for this proposition is a 2017 email from SaveOnSP's president, Jody Miller, to former JJHCS employee Michael Cassano in which Mr. Miller made several misrepresentations about the SaveOnSP scheme, e.g., falsely stating that the scheme was intended "[n]ot to drive savings to employers, but to maintain patient continuity on the drugs."  *See* Ex. 6 (SOSP_0026532).  SaveOnSP has never provided any evidence that Mr. Cassano shared even these false claims with anyone, much less that they provided the basis for a lawsuit.  And while SaveOnSP cites one of Your Honor's previous discovery rulings, Mot. at 10 (citing D.E. 192 at 14), Your Honor has made clear that you are not making merits findings.  *See* Apr. 3, 2024 Tr. at 148:1–149:3 ( "I would never do that and impose it on the judges that may have this case.").

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 19

limitations; in that specific circumstance, the doctrine of laches steps in to bar stale claims. *See* 2018 WL 6716105, at *6 (citing *Kaufhold v. Caifa*, 872 F. Supp. 2d 374, 379 (D.N.J. 2012)). Here, by contrast, there are statutes of limitations that apply to each of JJHCS's claims, and SaveOnSP does not dispute that JJHCS's claims were timely filed in accordance with them. That ends the inquiry, and with it, SaveOnSP's fishing expedition. *See, e.g.*, *Fox v. Millman*, 45 A.3d 332, 344 (N.J. 2012) ("To the extent that the trial and appellate courts understood . . . that an action at law otherwise governed by a statute of limitations can be barred by application of laches, they were in error"); *id* at 345 ("We see no reason to conclude that our regular, predictable, and uniform system of fixing timeliness through application of the statutes of limitations should be replaced with" the "chaotic and unpredictable patchwork" of laches). *See generally SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 335 (2017) ("Laches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill.").

## CONCLUSION

When SaveOnSP successfully resisted far more relevant discovery regarding its own compliance with directly relevant laws and regulations relating to copay assistance, it argued: "[A]t some point enough is enough. And this case needs to be about the actual claims that Johnson & Johnson brought." Mar. 17, 2023 Tr. at 20:23–25. That was more than a year ago. We agree with SaveOnSP on this much: the scope of discovery here needs to be about the merits of JJHCS's claims. SaveOnSP should not be rewarded for its transparent and endless attempts to burden JJHCS with irrelevant discovery demands—especially not on this motion, given the Court's unequivocal rejection of both pricing ***and*** regulatory compliance discovery.

For the foregoing reasons, Your Honor should deny SaveOnSP's April 18, 2024 motion.

Honorable Freda L. Wolfson, U.S.D.J.
May 2, 2024
Page 20

Respectfully submitted,

s/ *Jeffrey J. Greenbaum*
JEFFREY J. GREENBAUM

cc:     Counsel of record for SaveOnSP

# Exhibit 2



| | **Freda Wolfson** | One Lowenstein Drive |
|---|---|---|
| | Chief U.S. Dist. Judge (ret.) | Roseland, New Jersey 07068 |
| | Partner | |

**T:** **(862) 926-2708**
**F:** **(973) 597-2400**
**E:** **fwolfson@lowenstein.com**

<u>**LETTER ORDER**</u>

May 28, 2024

<u>*VIA ECF and Email*</u>
**TO ALL COUNSEL OF RECORD**

     **RE:**    *Johnson & Johnson Health Care Systems, Inc. v. SaveOnSP, LLC*
             <u>**Civ. Action No.: 22-2632(JKS)(CLW)**</u>

Counsel:

      On May 23, 2024, I conducted a hearing via Zoom on three discovery-related motions filed by both Plaintiff Johnson & Johnson Health Care Systems, Inc. ("Plaintiff" or "JJHCS") and Defendant SaveOnSp, LLC ("Defendant" or "SaveOnSP"): 1) Plaintiff's motion to compel Darcie Falsioni's third-party communications; 2) Defendant's motion to compel JJHCS to produce documents in the possession of TrialCard, Inc. ("TrialCard"); and 3) Defendant's motion to compel document concerning Best Price Rule. Because my rulings are memorialized on the record, I summarize them here; however, as discussed, I will provide a more fulsome explanation on the issue of TrialCard's documents.

      First, Plaintiff sought additional documents from Falsioni, Defendant's Corporate Counsel and Chief Compliance Officer and a designated custodian. These requested documents relate to communications that Falsioni had with third parties regarding the SaveOnSp program. Plaintiff argued that these documents are relevant because Falsioni negotiates contractual terms with Defendant's clients which could shed light on the alleged interference scheme. Plaintiff proposed the following search string:

1

*"service agreement" OR BAA OR "business associate agreement" OR joinder OR PHI OR contract OR amendment*

On the record, I found that the requested documents are relevant; however, I agree with Defendant's position that the search string is too expansive by using "OR" in connecting each seemingly broad independent term, such as "contract" or "amendment." I instructed the parties to meet and confer on the search string, with the suggestion that each term should be qualified by other terms such that the search would only generate relevant documents. The parties shall confer on the appropriate search terms by June 4, 2024. If any dispute arises, I can assist the parties in resolving their differences.

As to the Best Price Rule motion, Defendant sought documents regarding Plaintiff's "best price" certification to the federal government pursuant to Department of Health and Human Services' Best Price Rule. These documents are related to Defendant's Requests for Production Nos. 8, 70 and 79. Defendant insists that it is entitled to such documents for its mitigation defense; that is, to show that Plaintiff changed certain terms and conditions of its CarePath program and the creation of the CAP Program in response to the promulgation of the 2023 Best Price Rule, which never went into effect. While I agree with Defendant's position that these documents *may* reveal Plaintiff's intent and motivation in identifying its patients who are on SaveOnSp's programs, nonetheless before any production on the part of Plaintiff, Defendant must first serve interrogatories on Plaintiff—I suggest no more than three—to explore the purpose of an internal

checklist[1] that may or may not relate to Plaintiff's obligations under the Best Price Rule. Relatedly, Defendant may question Plaintiff regarding who was responsible for creating the internal checklist. I advised Defendant that these interrogatories must be targeted and narrow in scope.[2] Once the interrogatories are served and answered, the parties must meet and confer on appropriate search terms and whether any additional custodians may need to be included on this issue. Again, if any issues arise, the parties shall bring them to my attention.

Finally, I will further expand upon my decision granting Defendant's motion to compel JJHCS to produce TrialCard documents. In that motion, Defendant moved to compel Plaintiff to produce the following responsive documents in the possession of its vendor TrialCard, related to work performed by TrialCard for Plaintiff: (1) documents and communications related to TrialCard's administration of CarePath from the "refresh" time period of July 1, 2022 to November 7, 2023; and (2) documents and communications regarding TrialCard's efforts on behalf of Plaintiff to identify patients on accumulators, maximizers, and SaveOnSP-advised plans, including communications about benefits investigations.

---

[1] 

SaveOn Ex. 7 (JJHCS_00204199) at -421,

[2] The time period for the search should be limited to the period from the date when the 2023 Best Price Rule was proposed by the government until it was invalidated by the District Court in the District of Columbia.

As a third-party independent contractor, TrialCard administers the CarePath Program at the behest of Plaintiff. Indeed, TrialCard manages that program pursuant to a Master Services Agreement ("MSA") executed between the two parties. In that role, there is no dispute that TrialCard interfaces directly with patients, using materials that are approved by Plaintiff, to 1) screen patients to determine their eligibility for CarePath; and 2) disburse the CarePath funds. Additionally, TrialCard has been involved in identifying patients who are on SaveOnSp programs, and according to Defendant, TrialCard collaborated with Plaintiff in designing the CAP program.

According to Defendant, TrialCard has been withholding critical documents that relate to Defendant's defense, including mitigation of damages. Defendant maintains that while TrialCard produced a spreadsheet summary of the results of its benefits investigations for Plaintiff, TrialCard refuses, for example, to produce documents showing how it chooses which patients to investigate, how it conducts those investigations, how it determines if a patient is on an accumulator, maximizer, or plan advised by SaveOnSP, or any internal communications regarding any directions provided by Plaintiff. Defendant further maintains that although Plaintiff has produced some communications with TrialCard about patients identified through the CAP Program, documents show that TrialCard also held internal discussions related to the results of benefits investigations, which were not produced. In addition, Defendant argues that TrialCard is inappropriately withholding documents relating to methods that it used or considered using, in addition to benefits investigations, to attempt to identify members of SaveOnSP-advised plans.

Rather than filing a motion to compel TrialCard to produce those documents in North Carolina pursuant to Fed. R. Civ. P. 45, Defendant argues that these documents are within the "legal control" of Plaintiff such that Plaintiff may be compelled, here, to produce those documents.

The parties' primary dispute is whether Plaintiff has "legal control" over the documents Defendant seeks, as those documents are in the possession and custody of TrialCard. Defendant argues that the audit provisions in the MSA between Plaintiff and TrialCard are sufficient to establish control under Rule 34. On the other hand, Plaintiff insists that it does not have control over the requested documents because, in its view, the MSA provides only limited rights to audit certain documents for limited purposes. I disagree.

Federal Rule of Civil Procedure 34 allows "[a] party . . . [to] serve on any other party a request . . . to produce . . . in the responding party's possession, custody or control . . . any designated documents . . . ." Fed. R. Civ. P. 34(a). "In the absence of control by a litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce." *Gerling Int'l Ins. Co. v. C.I.R.*, 839 F.2d 131, 140 (3d Cir. 1988). "In the context of Fed. R. Civ. P. 34(a), so long as the party has the legal right or ability to obtain the documents from another source upon demand, that party is deemed to have control." *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d Cir. 2004). Importantly, a "practical ability to obtain the requested documents" from separate corporate entities is not enough to constitute control because an entity "could legally . . . refuse to turn over such documents." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107-

08 (9th Cir. 1999). Instead, "control" is defined as "the legal right to obtain documents upon demand." *United States v. International Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989). Federal courts construe "control" very broadly for Rule 34 purposes. *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991).

A contractual right to obtain documents in the possession of a third party can constitute control for Rule 34 purposes. *See, e.g., Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, 2016 U.S. Dist. LEXIS 20076, at *4 (D. Del. Feb. 12, 2016) (stock purchase agreement with third party provided requisite control); *Lofton v. Verizon Wireless (Vaw) LLC*, 2014 U.S. Dist. LEXIS 165140, at *1 (N.D. Cal. Nov. 25, 2014) (audit provisions in vendor contracts provided control over third party's documents); *Haskins v. First Am. Title Ins. Co.*, 2012 U.S. Dist. LEXIS 149947, 2012 WL 5183908, at *2 (D.N.J. Oct. 18, 2012) (contracts provided control over and access to third party agents' files).

Here, the relevant audit provisions of the MSA provide:





(MSA, § 17 (emphasis added).)

First, that the intent of § 17 may be on financial audits is of no moment. Indeed, the crux of the "control" analysis is whether the parties intended to provide Plaintiff

access to certain documents such that Plaintiff may audit or examine those documents. In other words, the focus is on whether Plaintiff has "the contractual right to obtain the documents requested." *Moretti v. Hertz Corp.*, No. 14-469, 2018 U.S. Dist. LEXIS 168609, at *8 (D. Del. Sep. 30, 2018). In that regard, Plaintiff's reliance on *Inline Connection Corp. v. AOL Time Warner, Inc.*, Nos. 02-272, 02-477, 2006 U.S. Dist. LEXIS 72724, at *11 (D. Del. Oct. 5, 2006) is misplaced. For one, in that case, unlike the broad provision in the MSA here, the contract in *Inline* required a non-party to provide information only "where feasible," which the court construed as merely providing the contracting party access to information. *Id.* Here, ███████████████████████████████████████ ████████████████████████████████████████ This language plainly is distinguishable from the provision in *Inline*.[3]

Indeed, during oral argument, Plaintiff conceded that the MSA's audit provision is quite broad. That provision states that TrialCard "████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

---

[3] During oral argument, Plaintiff argued that I should be guided by the decision in *Camden Iron*, and consider whether the documents sought are records which JJHCS may request and obtain in its normal course of business with TrialCard. But that case is distinguishable because it dealt with a parent and subsidiary relationship and the related companies' course of dealings, not control governed by a written agreement executed by two unrelated corporate entities.

██████████████" Courts that have examined similarly broad language have found control for the purposes of Rule 34. *See, e.g., Moretti*, 2018 U.S. Dist. LEXIS 168609, at *4-5 ("To allow representatives of International or Hertz, at any time during normal business hours, to inspect the premises, records, and vehicles of the Licensee used in operation as a Hertz System Licensee and to examine Licensee's records ascertaining and verifying the number of vehicles owned, leased, used or kept by the Licensee for use in Licensee's Vehicle Renting Business, the revenues therefrom and any - other information required by Hertz with respect to the Licensee's Vehicle Renting Business."); *Mercy*, 380 F.3d at 160 (where the subcontractor was "employed . . . to conduct the audit and receive documents," and thereby agreed to make available pertinent files "at all reasonable times, for review and obtaining any necessary information," the Third Circuit held that the "the documents were accessible to the [contracting party] and within its control"); *Haskins*, 2012 U.S. Dist. LEXIS 149947, at *2 (finding control from contract language that indicates that the third-party must "[m]aintain and carefully preserve all records . . . [and] [p]ermit [the defendant] to examine, audit and copy all financial information and records upon reasonable prior notice").

Turning to the documents sought by Defendant, these fall within the broad audit provision of the MSA. Defendant has requested production of documents and communications relating to the administration of CarePath, call recordings and other records reflecting communications between TrialCard's CarePath call center and patients, and documents and communications related to the implementation of the CAP program and TrialCard's benefits investigations. Presumably, these documents are being

"maintained by [TrialCard] in relation to [the MSA] and/or any applicable Work Orders" such that Plaintiff "shall at any time have the right to request [those] documents." (MSA, § 17.2.) They also fall under the term "other records" in the same provision. (*Id.*)("[ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Accordingly, I find that by virtue of the MSA, Plaintiff has legal control over the requested documents.

Having made that determination, I direct the parties to meet and confer on the scope of the TrialCard discovery by June 4, 2024. While I am not making any rulings on the appropriate scope or burden of the requested discovery in this context, I nevertheless make the following observations. At the outset, I reiterate that the requested discovery is relevant as the documents at issue relate to the creation and implementation of the CAP Program, and benefits investigations into whether patients were on SaveOnSP programs. Although Plaintiff argues that many of the TrialCard documents that Defendant seeks are cumulative of party discovery, I am not convinced, based on the simple fact that TrialCard, itself, has not performed a search of the requested documents to determine whether it possesses additional relevant documents. In short, regardless of whether the documents may be cumulative, to make that determination, TrialCard must first conduct a search at the request of JJHCS. Finally, at this juncture, I note that Plaintiff has not

presented any compelling reasons to avoid refreshing the production of the categories of

documents that TrialCard has already agreed to produce.


*/s/ Freda L. Wolfson*
Hon. Freda L. Wolfson (ret.)
Special Master

# Exhibit 3

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

May 9, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

  **Re:** *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
     **No. 2:22-cv-02632 (JKS) (CLW)**

Dear Judge Wolfson:

  On behalf of Defendant Save On SP, LLC ("**SaveOn**"), we write in reply to Plaintiff John-

son & Johnson Health Care Systems, Inc.'s (with its affiliates, "**J&J**") opposition to SaveOn's

motion to compel J&J to produce documents related to the 2016 Best Price Rule and the 2023 Best

Price Rule.[1]

---

[1] SaveOn uses the same definitions as in its opening brief. *See* Apr. 18, 2024 Mot. ("<u>Mot.</u>").

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

Hon. Freda L. Wolfson                                                                  Page 2

"It is well recognized that the federal rules allow broad and liberal discovery." *Pacciti v. Macy's*, 193 F. 3d 766, 777 (3d Cir. 1999). "[C]ourts have construed [Federal Rule of Civil Procedure 26] liberally, creating a broad range for discovery which would encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *AdvanSix Inc. v. Allianz Glob. Risks US Ins. Co.*, No. 221-CV-07962-MCA-CLW, 2023 WL 179963, at *2 (D.N.J. Jan. 13, 2023) (Waldor, J.). "It is beyond dispute that Rule 26 should be construed in favor of disclosure, as relevance is a broader inquiry at the discovery stage than at the trial stage." Dkt. 192 at 5-6. Once the party seeking discovery shows "that the information sought is relevant to the subject matter of the action and may lead to admissible evidence, the party resisting discovery bears the burden of supporting its objections with clear explanations." *Id.* at 6 (citations and quotations omitted).

SaveOn has firmly established why the discovery it seeks is relevant.

The 2016 Best Price Rule, in effect throughout the relevant period of this case, required drug manufacturers like J&J to certify to the federal government that it sells its drugs to the government at the best price that it sells them to anyone else. Under that rule, J&J did not have to deduct copay assistance funds from its prices to government insurers as long as all those funds went exclusively to patients. J&J required internal certifications that all these funds went to patients, which strongly indicates that J&J certified the same thing to the government, either explicitly by stating as much or implicitly by reporting prices that did not account for copay assistance payments. Such certifications that patients receive all copay assistance funds would be directly contrary to J&J's assertions in this case that some of those funds went to SaveOn and its health plan clients, disproving those allegations and undercutting J&J's credibility. SaveOn thus seeks

Hon. Freda L. Wolfson                                                                        Page 3

the Quarterly Reports that J&J submitted to the government regarding its best prices and docu-

ments relating to the bases of J&J's representations.

　　　The 2023 Best Price Rule, finalized at the end of 2020 and slated to go into effect in January

2023, would have required drug manufacturers like J&J to affirmatively "ensure" that no copay

assistance funds went to non-patients. This gave J&J a compelling financial incentive to investi-

gate if any such funds went to non-patients: if it did not ensure that this was so, it would have to

discount its prices to the government to account for those payments, costing it billions. This flipped

J&J's incentives from the 2016 Best Price Rule, under which J&J did not have to investigate where

the funds went but did have to account for any payments to non-patients if it learned about them.

Under this regime, J&J's incentive was to not investigate where the funds went; J&J's documents

show that it instituted a policy that it "was not allowed to know" if any funds went to so-called

accumulators or maximizers. Ex. 6 at -7510. This seemed to change with J&J's response to the

2023 Best Price Rule, which apparently included beginning to investigate if patients were on

SaveOn-advised plans and bringing this lawsuit. Documents about that response—along with doc-

uments relating to the 2016 Best Price Rule—could show that, before the 2023 Best Price Rule

was finalized, J&J affirmatively did not try to identify members of SaveOn-advised plans or to

enforce its terms and conditions against them, showing that J&J failed to mitigate its damages,

acquiesced to SaveOn's conduct, and did not believe that its terms applied to SaveOn's conduct.

SaveOn thus seeks documents concerning J&J's response to the 2023 Best Price Rule,

　　　In opposition, J&J provides no valid basis to withhold this discovery. Contrary to J&J's

repeated assertions, SaveOn does not seek pricing data—SaveOn would agree that J&J can redact

the dollar amounts of drug prices from its Quarterly Reports. It is also not true that SaveOn con-

cedes that it takes copay assistance funds from J&J—SaveOn strongly disputes that it takes any of

those funds. J&J asserts that SaveOn misreads the Best Price regulations, but even were this true (it is not) it would be irrelevant—SaveOn does not contest J&J's compliance with the regulations here; it seeks discovery of the facts of what J&J did in response to them. J&J asks Your Honor to ignore documents showing what it did by offering competing interpretations of those materials, but at best for J&J this simply raises a factual dispute about J&J's conduct, which SaveOn is entitled to explore through discovery. J&J also tries asserting that it is already producing all relevant documents, but in fact it continues to withhold the documents at issue and refuses to even identify relevant custodians.

The Special Master should grant SaveOn's motion.

## I.    SaveOn Does Not Seek Drug Prices

Contrary to J&J's repeated assertions, Opp. 2, 5, 6, 7, 19, SaveOn does not seek in this motion to discover the dollar amounts of J&J's drug prices. J&J asserts that SaveOn seeks this data by asking for J&J's Quarterly Reports, which J&J says contain "every relevant price, discount, and rebate" that it offers for the drugs at issue. Opp. 5-6; *see also id.* 6-7 (asserting RFP No. 79, seeking Quarterly Reports, "on its face seeks pricing data"). To assuage this concern, while reserving all rights, SaveOn would agree that J&J can **redact** the dollar amounts of its drug prices, discounts, and rebates from the versions of its Quarterly Reports that it produces in this case.[2]

J&J then asserts that Your Honor previously ruled that the information that SaveOn seeks is irrelevant. Opp. 6. Not so. In a prior motion, SaveOn sought "pricing data" to show the "true

---

[2] J&J asserts that all "Best Price documents are by definition all about the details of drug pricing." Opp. 2. In fact, J&J has produced documents regarding the Best Price Rule that do not contain pricing data. *See, e.g.*, Ex. 16 at 9 (JJHCS_00084277); Ex. 7 (JJHCS_00204199) at -4214 (April 7, 2022); Ex. 8 (JJHCS_00135354) at -5373 (December 15, 2021); Ex. 9 (JJHCS_00135950) at -5970 (March 31, 2022); Ex. 10 (JJHCS_00214452) at -4469 (Mar. 2, 2022).

Hon. Freda L. Wolfson                                                      Page 5

price[s]" and "net price[s]" of the drugs at issue, *see* Dkt. No. 150 at 7-8, which Your Honor denied

based on J&J's representation that it would not introduce evidence regarding its drug prices at trial.

Dkt. 192 at 24. Because SaveOn does not seek any pricing data in this motion, let alone "the very

same pricing information" that it previously sought, Opp. 6, that ruling has no bearing here.

As explained below, the reality is that SaveOn seeks documents regarding J&J's response

to the Best Price Rule because they are relevant to issues in the case. J&J cannot use the false

specter of producing pricing data to withhold this information.

## II.    J&J Must Produce Documents Regarding Its Compliance with HHS's 2016 Best Price Rule

The 2016 Best Price Rule permits a drug manufacturer to exclude copay assistance funds

from its best price calculations "to the extent that manufacturer ensures the program benefits are

provided entirely to the patient and the pharmacy, agent, or other entity does not receive any price

concession." 42 C.F.R. § 447.505(c)(10). J&J's internal checklists, in which it affirms that "[t]he

full value of the [copay] assistance is passed on to the customer," strongly indicate that J&J repre-

sented the same facts to the federal government in its required Quarterly Reports, either explicitly

or implicitly by reporting drug prices that reflect copay assistance funds going only to patients.[3]

Mot. 3-4. Such representations would contradict J&J's allegations in this case—repeated even in

its opposition, Opp. 2, 6-7—that SaveOn takes a portion of those funds.

SaveOn seeks discovery to explore this contradiction: (1) J&J's Best Price Quarterly Re-

ports for the drugs at issue and documents going to the basis of J&J's assertions to the government

---

[3] ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████ *See, e.g.*, Ex. 7 (JJHCS_00204199) at -4214 (April
7, 2022); Ex. 8 (JJHCS_00135354) at -5373 (December 15, 2021); Ex. 10 (JJHCS_00214452) at
-4469 (Mar. 2, 2022).

Hon. Freda L. Wolfson                                                                Page 6

that all its copay assistance funds go to patients; and (2) documents going to the basis of J&J's

allegations in this case that some of its copay assistance funds go to SaveOn. Mot. 6-7. Documents

showing that J&J knew that SaveOn does **not** receive any portion of its copay assistance funds

would show that J&J's accusations are not true and undermine its credibility. *Id.*[4] Documents con-

firming that none of J&J's copay assistance funds flow to SaveOn, but rather to members of health

plans, most of which are subject to ERISA, would show that J&J's claims as to those plans are

preempted by ERISA. *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 613 F.3d 179,

185 (D.C. Cir. 2010) (recognizing ERISA preemption for state law claims that affect "the availa-

bility of funds for benefit payments"). And documents showing that J&J intentionally did not in-

vestigate if any of its copay assistance funds went to non-patients, to avoid having to report such

facts to HHS, would show that J&J failed to mitigate its purported damages caused by payments

to patients on SaveOn-advised plans. Mot. 10. J&J should produce this relevant information.

      J&J's scattered arguments to the contrary are meritless.

      *First*, J&J asserts that there is no need to test its allegations about who gets its copay assis-

tance funds because SaveOn purportedly "does not dispute that it makes money by taking copay

assistance funds for the benefit of itself and its partners." Opp. 7. In fact, SaveOn strongly disputes

this accusation. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████. *E.g.*, Ex. 30 at -220 (SOSP_0000214)

---

[4] Such evidence could potentially lead the Court to estop J&J from asserting that SaveOn takes
any of its copay assistance funds. *See, e.g.*, *McBurrows v. Verizon*, 2019 WL 6908014, at *10
(D.N.J. Dec. 19, 2019) (holding plaintiff "judicially estopped" from "asserting his accommodation
claim" for disability discrimination because his submitted social security application represented
that he was "not able to work"); *see generally Morton Intern. Inc. v. General Acc. Ins. Co. of
America*, 629 A. 2d 831, 876 (N.J. 1993) (recognizing "estoppel doctrine in a regulatory context").

(███████████████████████████████). ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████. Saving money is not the same thing as "taking"

it. By alleging that SaveOn "helps itself and its partners to … JJHCS's patient assistance funds,"

Opp. 7, J&J put at issue the questions of whether those funds ever flow to SaveOn and whether

J&J knows that they do not. The discovery that SaveOn seeks is relevant to that disputed issue.

*Second*, J&J asserts that its Best Price representations under the 2016 Best Price Rule are

irrelevant because it "had always understood" that the rule did not require drug manufacturers to

report whether copay assistance funds were going to third parties "so long as they intended that all

copay assistance go to patients." Opp. 9. This was the litigation position of the collective repre-

senting pharmaceutical companies in challenging the 2023 Best Price Rule, but ████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████ Ex. 6 at -7510 (emphasis added).[5] ████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████ Ex. 7 (JJHCS_00204199) at -4213. ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

---

[5] ██████████████████████████████████████████████████████████████████████

████████████████████████. Opp. 12 n.3. ██████████████████████████████████████████████████████████████████ Ex. 6 at -7510 (JJHCS_00047500). ████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████.

Hon. Freda L. Wolfson                                                        Page 8

███████████████████████ At the very least, this is a disputed issue, and discovery is required

to determine how J&J interpreted the rule and what it reported.[6]

*Third*, J&J says that its intent-based reading of the 2016 Best Price Rule was validated in

*Pharmaceutical Research & Manufacturers of America v. Becerra* ("*PhRMA*"). Opp. 8-9; *see also*

*id.* 12 n.3. This is a distraction. The question in this discovery motion is not legal—which of two

competing interpretations of the 2016 Best Price Rule is correct—but factual—how did J&J inter-

pret the 2016 Best Price Rule in practice, and what did it report to HHS in response to that rule.

*PhRMA*'s ruling in May 2022 could not have retroactively changed those facts, and █████████

████████████████████████████████████████████████████████████████

*See* Ex. 6 (JJHCS_00047500) at -7510. SaveOn seeks these documents not to challenge J&J's

legal compliance with the 2016 Best Price Rule in this litigation but to discover the facts of what

J&J knew and what it represented about them.[7]

---

[6] Even if the Special Master were to agree with J&J's unsupported assertion that that 2016 Best Price Rule set an intent-based standard, and to further agree with J&J's counterfactual assertion that it always understood that this was the standard, Your Honor should still grant the motion. If J&J learned that any copay assistance funds went to non-patients, it would have had to stop those payments so it could act consistently with its intent. SaveOn is entitled to learn what J&J knew about where its payments went and what it represented to the government about them.

[7] Even if the legal conclusions of the *PhRMA* case were relevant (they are not), J&J fails to show that *PhRMA* sustained the intent-based interpretation of the 2016 Best Price Rule that it offers in its opposition. Plaintiffs in *PhRMA* challenged the 2023 Best Price Rule, not the 2016 rule. *PhRMA*, 2022 WL 1551924, at *5 (D.D.C. May 17, 2022). In ruling on standing, as J&J notes, Opp. 8-9, the court held that the 2023 Best Price Rule's requirement that drug manufacturers "en- sure" that copay assistance funds go only to patients was a change from the 2016 Best Price Rule. *Id.* at 4. The court did **not** say that the 2016 Best Price Rule excused drug manufacturers from reporting if they knew that some funds went to non-patients or allowed them to conceal such in- formation simply because they *intended* that all the funds go to patients. *See id.*

On the merits, the court enjoined the 2023 Best Price Rule, not because copay assistance funds are "intended to help patients" (as J&J asserts by citing the plaintiffs' own briefing, Opp. 9-10), but

Hon. Freda L. Wolfson                                                          Page 9

*Fourth*, J&J asks the Special Master to disregard its internal checklists requiring certifica-

tion that all copay assistance funds go to patients.[8] It asserts that these documents ███



Opp. 11, ██████████████████████████████████████████████████. Ex. 7

(JJHCS_00204199) at -4214 (████████████████████████████████████

██████████"). Once again, at best, J&J has established that the parties have competing factual

interpretations of these relevant documents, showing that SaveOn is entitled to discovery into

them. *See In re Gerber Probiotic Sales Practices Litig.*, 306 F.R.D. 527, 528 (D.N.J. 2015) (Wal-

dor, J.) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper

litigation." (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). J&J also asserts that it did not

_____

primarily because the court read the underlying statute as not requiring drug manufacturers to ac-
count for payments to patients at all, as it believed that they were not "eligible entities." *PhRMA*,
2022 WL 1551924, at *6. The court did ***not*** say that drug manufacturers' intent plays any role in
their reporting obligations. *See id.* Even if it applied to the 2016 Best Price Rule, moreover, that
non-binding ruling from one district court is not a dispositive interpretation of that rule; HHS's
position remains "in essence, that the best price calculation must take account of a price made
available *from* the manufacturer *to* the commercial health plan *through* an insured patient"—in-
cluding copay assistance funds. *Id.* at 5 (original emphases). And even were this a binding inter-
pretation of the 2016 Best Price Rule, that rule would still require J&J to report any payments that
it knew went to ESI—which is an "eligible entity"—and J&J alleges here that ESI received a
portion of those funds. Compl. ¶ 68. In any case, the Special Master should not indulge J&J's
demand to resolve these complex legal questions in ruling on this discovery motion; at a minimum,
there are disputed factual questions here that underscore the importance of the discovery that
SaveOn seeks.

[8] Ex. 7 (JJHCS_00204199) at -4214 (████████████████████████████████████
██████████████████ Ex. 8 (JJHCS_00135354) at -5373 (████████████
██████████████); Ex. 10 (JJHCS_00214452) at -4469 (██████████████████
██████████████████████). Opp. 11 (citing Ex. 9) but ████████████████
████████████████████████. *See, e.g.,*
Ex. 31 at -7538 (JJHCS_00137524) (██████████████████████████████
████████); Ex. 32 at -7559 (JJHCS_00137545) (██████████████████
██████████████.

submit these checklists to the government, Opp. 11, but this misses the point: ██████████



██████████████████████████████████████████ Ex. 7 (JJHCS_00204199)

at -4213,[9] ████████████████████████████████████████████████████████████

██████████████. Discovery is required to determine what J&J said to the government and its

bases for doing so.

*Fifth*, J&J claims that it did not make the representations to the government that SaveOn

posits that it made. Opp. 12. But J&J then says, carefully, that it did not submit anything to the

government that "expressly states" that all its copay assistance funds go to patients. *Id.* Even were

this true, J&J could have represented that fact to the government ***implicitly***. The 2016 Best Price

Rule required J&J to account for any payments going to non-patients in calculating the prices that

it submitted to HHS. If J&J calculated those prices as if all funds went to patients, then it implicitly

represented that no funds went to non-patients. This implicit representation would contradict its

allegations in this case that some of those funds went to SaveOn, ESI, and their health plan clients.

*Sixth*, J&J says that it is producing documents related to the CAP Program, Opp. 13-18,

but this production would not capture the requested documents regarding the 2016 Best Price Rule.

To start with, this production excludes the Quarterly Reports, which J&J admits that it withholds.

---

[9] *Compare* Ex. 7 (JJHCS_00204199) at -4214 (██████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████ *with* 42 C.F.R. § 447.505(c)(10) (2016 Best Price Rule, permitting manu-
facturers to exclude copay assistance funds from their best price calculations "to the extent that the
program benefits are provided entirely to the patient and the pharmacy, agent, or other entity does
not receive any price concession").

*Id.* at 17-18. Also—critically—J&J's production excludes custodians involved with J&J's Best Price reports, who are most likely to have documents about the bases for those submissions, and whom J&J refuses to identify.[10] The production also excludes documents from before the beginning of the CAP Program in early 2022, omitting years' worth of documents about J&J's representations to, and relevant communications with, the government and J&J's evaluations of SaveOn and similar entities. The search terms that J&J is using regarding CAP would not capture documents on Best Price in the five years before the CAP Program existed. J&J must identify the relevant custodians and must use reasonable search parameters to search their files for the documents at issue.[11]

*Finally*, J&J briefly asserts that SaveOn's document requests do not cover the documents that it seeks regarding the 2016 Best Price Rule. Opp. 17-18. In fact, they do. SaveOn's RFP No. 79 squarely asks for J&J's Quarterly Reports. Ex. 13 at 12 (SaveOn's Sixth Set of RFPs). SaveOn's RFP No. 70 seeks all documents and communications regarding copay assistance funds counting towards the calculation of best price, Ex. 15 at 11, which easily encompasses the narrower set of documents and communications that SaveOne seeks here about those calculations. Mot. 6-7. To the extent that any of these documents refer directly to SaveOn, or refer to it indirectly by using terms like "maximizer" or "accumulator," *see, e.g.*, Apr. 10, 2024 Order at 2, they are also covered

---

[10] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████. Ex. 31 at -541 (JJHCS_00137524); Ex. 32 at -562 (JJHCS_00137545).

[11] SaveOn proposes a single targeted search term to capture these documents: ("HHS" OR (Health /3 "Human Services") OR "CMS" OR ".gov") AND ("Best Price" OR "BP") AND (accumulat* OR maximiz* OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP). Mot. 7. Each document must on its face include a term regarding the relevant agencies; best price; and SaveOn, accumulators, or maximizers.

by SaveOn's RFP No. 8, which seeks all documents relating to SaveOn, Ex. 14 at 12 (SaveOn's First Set of RFPs). In addition to being wrong, J&J's technical arguments are pointless—even if SaveOn's current requests did not cover some portion of the documents at issue, Your Honor could confirm that they are relevant and SaveOn could seek them in a new request.

## III.    J&J Must Produce Documents Regarding Its Response to HHS's 2023 Best Price Rule

Where the 2016 Best Price Rule required drug manufacturers to report the state of their knowledge regarding whether any of their copay assistance funds were going to non-patients, 42 C.F.R. § 447.505(c)(10), the 2023 Best Price Rule stated that they would have to "ensure[]" that this was so, 85 Fed. Reg. 87049. That is, drug manufacturers could no longer claim that they were permitted to be willfully blind to where their copay assistance funds were going; they would have to affirmatively make sure, for example, that those funds did not go to patients on "accumulator adjustment programs." 85 Fed. Reg. 87050. Under the new rule, ██████████████████ ████████ ███████ ████ ████ █ ████████ ████████, *see, e.g.*, Ex. 6 at -510 (JJHCS_00047500) (████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████), potentially costing it billions. The 2023 Best Price Rule, announced on December 31, 2021, gave drug manufacturers until January 1, 2023, to implement this approach. 85 Fed. Reg. 87057. As J&J acknowledges, the 2023 Best Price rule was "significant" and "controversial." Opp. 8. ██████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████. Mot. 8-9 (citing Exs. 16-24).

SaveOn seeks limited additional discovery on this topic: It asks that J&J identify individ-
uals with knowledge of J&J's response to the proposed 2023 Best Price Rule and run a single
search term across their files.[12] Documents regarding J&J's response to the rule are relevant to
SaveOn's affirmative defenses of mitigation, laches, and acquiescence, Mot. 10—J&J's reaction
to the 2023 Best Price Rule, which would have no longer allowed drug manufacturers to be will-
fully blind of copay assistance funds flowing to non-patients, could show that J&J previously had
a compelling financial incentive not to investigate whether patients were on SaveOn-advised plans,
Ex. 16 (JJHCS_00084277) at -285 (                                ), and that it fol-
lowed that incentive, failing to mitigate its purported damages and acquiescing to SaveOn's con-
duct. The documents are also relevant to J&J's understanding of the "other offer" provision un-
derlying its tortious inference claim, which apparently changed along with its reaction to the 2023
Best Price Rule. Mot. 9.[13]

J&J's arguments resisting this discovery are meritless.

---

[12] ("copay" OR "co-pay" or fund* OR manufact*) /20 ("best price" or "BP") /20 (accumulat* OR
maximiz* OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR
SOSP).

[13] ███████████████████████████████████████████████████
███████████████████. Opp. 15 (citing J&J Ex. 1 (JJHCS_00224591)). This is not evidence
of what J&J knew about where the funds actually went. Nor is it evidence that J&J believed that
its "other offer" provision applied to SaveOn's services before the 2023 Best Price Rule came
along. Discovery is required on both topics. ████████████████████
████████████████████████ J&J Ex. 1 at -608, ████████████████
███████████████ *id.* at -613, contradicting J&J's allegations that "JJHCS funds copay assistance
programs like CarePath to ease the burden on patients" Amend. Compl. ¶ 8, and help them "defray
their copay costs and more easily afford their life-saving and life-improving therapies, *id.* ¶ 6.

*First*, J&J tries to dismiss the notion that "a never-effective 2023 Best Price Rule may have influenced [J&J's] behavior regarding [SaveOn]." Opp. 13-14. The rule's influence is straightforward. Because the 2016 Best Price Rule required drug manufacturers to report if copay assistance funds went to non-patients but did not require them to investigate whether that was the case, drug manufacturers had an incentive to remain willfully blind to where their funds went. Mot. 8; *see also* Ex. 6 (JJHCS_00047500) at -510. In the 2023 Best Price Rule, HHS eliminated this incentive. It stated that, starting in 2023, drug manufacturers would have an affirmative duty to investigate where their funds went—they would have to "ensure[]" that the full value of copay assistance went to patients. 85 Fed. Reg. 87049. For seventeen months, from when the 2023 Best Price Rule was promulgated on December 31, 2020 until it was enjoined on May 17, 2022, *see PhRMA*, 2022 WL 1551924 at *3, this was the law scheduled to take effect in 2023.[14] It is highly likely J&J reacted to this rule by preparing to implement it.

*Second*, J&J asserts that it is "fanciful" to suggest that its reaction to 2023 Best Price Rule motivated this lawsuit because the purported "damages" that SaveOn caused it were motive enough. Mot. 14. This is exactly SaveOn's point. J&J knew about SaveOn starting in at least 2017. Dkt. 192 at 14. If J&J believed that SaveOn was improperly increasing its copay assistance payments, then J&J had a financial incentive to sue SaveOn years before it did. But it did not. A highly plausible reason why it did not is that J&J had an even stronger financial incentive under the

---

[14] The 2023 Best Price Rule was not a "regulatory proposal." Opp. 14. It was a regulation that became the law on December 31, 2020. 85 Fed. Reg. 87000, 87048 through 87055, and 87102 through 87103. The regulation provided that this law would not become effective until 2023, *id.* at 87053, but the regulation itself was final, *id.* at 87057 ("[W]e are finalizing the proposed rule[.]"). The regulation was originally proposed on June 19, 2020, *id.* at 87000, went through the required notice-and-comment period, and was made final on December 31, 2020. *Id.* at 87057.

2016 Best Price Rule to not investigate whether its copay assistance payments were flowing to SaveOn (or to other non-patients).

Conversely, when it appeared that the 2023 Best Price Rule would eliminate this incentive and give J&J a new incentive to ensure that its copay assistance funds did not flow to so-called "accumulators," 85 Fed. Reg. 87000, 87054, it is highly plausible that J&J reacted in part by bringing this suit against SaveOn, which it internally referred to as an accumulator, Dkt. 166 at 3-4, to try and stop such payments. J&J has produced documents showing that this was likely the case. Mot. 8-9.[15]

*Third*, J&J argues that SaveOn cannot mount its laches affirmative defense because J&J purportedly brought its claims within the relevant statutes of limitations. Opp. 18-19. The Special Master need not reach this argument, as the requested documents are relevant to SaveOn's mitigation and acquiescence defenses. This merits argument is also inappropriate at the discovery stage: J&J could have moved to strike SaveOn's laches defense, *see Eagle View Techs., Inc. v. Xactware Sols., Inc.,* 325 F.R.D. 90, 95 (D.N.J. 2018), but did not, and SaveOn is entitled to discovery relevant to that defense. J&J also misstates the law: As the New Jersey Supreme Court case that J&J cites explains, "if a suit in equity raises claims as to which there is an applicable statute of limitations, there is nevertheless a role for the equitable doctrine of laches," *Fox v. Millman*, 210 N.J. 401, 419 (2012), and J&J here seeks the equitable remedy of an injunction, Compl. at 41 ¶ C; Am. Compl. 206 ¶ C.

---

[15] J&J also suggests that the 2023 Best Price Rule could not have been a motive in bringing this case because it continued the suit, and its CAP Program, after that rule was enjoined. Opp. 14. Of course, J&J could have decided to continue the suit and the program for other reasons, such as deciding that it would be more profitable to reduce its overall level of copay assistance spending. Discovery is required to determine what actually happened.

Hon. Freda L. Wolfson                                                                      Page 16

*Fourth*, J&J asserts that it is already producing documents related to the CAP Program, which it says should capture documents "address[ing] both a Best Price-related issue and CAP or other JJHCS efforts to mitigate harm." Opp. 15 (emphasis removed). The problem with this argument is ***custodians***. J&J asks Your Honor to assume that its current custodians are the only ones who would have information regarding J&J's reaction to the 2023 Best Price Rule, but ███████

████████████████████████████████████████████████████. *See, e.g.*, Ex. 24 (████████████

████████████████████████████████████████████████████); Ex. 26 (████████

████████████████████████████████████████████████████████████

████████████████████████████). J&J needs to identify the relevant custodians and apply SaveOn's proposed search term to their files.

*Finally*, J&J asserts that SaveOn's RFPs do not cover documents concerning the factual bases of its statements that SaveOn takes copay assistance funds, Opp. 16-17, but they do. RFP No. 8, for example, seeks all documents regarding SaveOn, which covers the documents at issue, and RFP No. 70 specifically asks for documents regarding "the anticipated impact of the 2023 Best Price Rule on JJHCS," Ex. 15 at 11-12 (Nov. 17, 2023 SaveOn's Fifth Set of RFPs). J&J asserts that it "agreed long ago," Opp. 16, to produce documents from twenty custodians in response to RFP No. 8, but SaveOn never agreed that J&J could limit its production to these custodians. To the contrary, when SaveOn has discovered that J&J withheld relevant documents— *e.g.*, failing to disclose its CAP Program, failing to disclose its Benefits Investigations, failing to disclose its predecessor programs in which it drafted the "other offer" provision—or that J&J has failed to designate relevant individuals as custodians—*e.g.*, Scott White, Blasine Penkowski, Karen Lade, Quinton Kinne, Daphne Longbothum, William Shontz, John Hoffman, L.D. Platt, Alison Barklage, —SaveOn has sought and received additional discovery. Dkt. 173 at 2-3 (CAP program),

Hon. Freda L. Wolfson                                                    Page 17

at 2 (Kinne, Longbothum, Shontz, Hoffman, Platt, and Barklage); 192 at 11-12 ("other offer"),

at 12-13 (benefits investigations), at 27-29 (White, Penkowski, and Lade). J&J should provide the

requested discovery here on its reaction to the 2023 Best Price Rule.

Respectfully submitted,

/s/ *E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com


Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

# Exhibit 4

```
                                              Page 1

1              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
2
     JOHNSON & JOHNSON HEALTH CARE
3    SYSTEMS, INC.,
                          Plaintiff,
4
              -against-                 C.A. No. 22-2632
5
     SAVE ON SP, LLC,
6                         Defendant.
     --------------------------------x
7                                 May 23, 2024
                                  11:17 a.m.
8
9                  ARGUMENTS ON MOTIONS
10
11
12   B e f o r e:
13              HON. FREDA WOLFSON (Ret.),
14                            Special Master
15
16        TRANSCRIPT of the stenographic notes of the
17   proceedings in the above-entitled matter as taken by
18   and before DAVID LEVY, a Certified Court Reporter and
19   Notary Public of the State of New Jersey, held
20   remotely over the Internet, Thursday, May 23, 2024,
21   commencing approximately 11:17 in the forenoon.
22
23
24
25
```

```
                                        Page 2

 1   A P P E A R A N C E S:

 2           (All appearances via Zoom telconference.)

 3     PATTERSON BELKNAP WEBB & TYLER LLP

 4     Attorneys for Plaintiff

 5           1133 Avenue of the Americas

 6           New York, New York 10036

 7     BY:   HARRY SANDICK, ESQ.

 8           JULIA LONG, ESQ.

 9           GEORGE A. LoBIONDO, ESQ.

10           SARA A. ARROW, ESQ.

11           KATHERINE BRISSON, ESQ.

12                 -and-

13     SILLS CUMMIS & GROSS P.C.

14           The Legal Center, One Riverfront Plaza

15           Newark, New Jersey 07102

16     BY:   JEFFREY J. GREENBAUM, ESQ.

17                 -and-

18     SILLS CUMMIS & GROSS P.C.

19           101 Park Avenue, 28th Floor

20           New York, New York 10178

21     BY:   KATHERINE A. LIEB, ESQ.

22

23

24

25
```

```
                                              Page 3

 1   A P P E A R A N C E S (Cont'd):

 2

 3      SELENDY GAY ELSBERG PLLC

 4      Attorneys for Defendant

 5            1290 Avenue of the Americas

 6            New York, New York 10104

 7      BY:   PHILIPPE SELENDY, ESQ.

 8            ANDREW R. DUNLAP, ESQ.

 9            ELIZABETH SNOW, ESQ.

10            MATTHEW NUSSBAUM, ESQ.

11            ADEEL MANGI, ESQ.

12                 -and-

13      ROBINSON & COLE LLP

14            666 Third Avenue, 20th Floor

15            New York, New York 10017

16      BY:   E. EVANS WOHLFORTH, JR., ESQ.

17

18

19   ALSO PRESENT:

20      JULIA KIECHEL, ESQ., Johnson & Johnson

21      WAYNE FANG, ESQ., Lowenstein Sandler

22

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2                    THE SPECIAL MASTER:  Looking at -- my

3      realtime is going to start appearing.  Let me have

4      the attorneys who intend on -- there are many

5      attorneys here.  I have no problem if everyone wants

6      to put their appearance on the record and get credit

7      for being here.  But then I would really like you to

8      indicate who will actually be speaking and arguing.

9                    Okay.  So let's start on the Plaintiff's

10     side first.  Who do I have?

11                   MR. GREENBAUM:  Jeffrey Greenbaum, Sills

12     Cummis & Gross.

13                   MR. MANGI:  Good morning, your Honor,

14     Adeel Mangi from Patterson Belknap Webb & Tyler,

15     representing JJHCS.

16                   THE SPECIAL MASTER:  Okay.  Anyone else

17     want to have credit for being on the Zoom, feel free.

18     Otherwise, those are my two main speakers.  I'm happy

19     to go with that.  I know there are a number of

20     people on, though.

21                   MR. LoBIONDO:  Your Honor, this

22     is George LoBiondo from Patterson Belknap, also on

23     behalf of the plaintiff.  I will be arguing the Best

24     Price motion.

25                   THE SPECIAL MASTER:  Okay.

```
                                                    Page 5
 1                    MR. LoBIONDO:  The motion that's on
 2      today.
 3                    THE SPECIAL MASTER:  Right.
 4                    MS. ARROW:  Good morning, your Honor,
 5      Sara Arrow from Patterson Belknap, on behalf of
 6      JJHCS.  I'll be arguing the Trial Card motions.
 7                    MS. BRISSON:  Good morning, your Honor,
 8      Katheryn Brisson from Patterson Belknap for JJHCS.
 9      I'll be arguing the Falsioni motion.
10                    THE SPECIAL MASTER:  All right.  Does
11      that cover everyone on the JJ side?  Okay.  Who do I
12      have then for SaveOn?
13                    MR. WOHLFORTH:  Good morning, your
14      Honor, this is Evans Wohlforth from the Robinson &
15      Cole firm.  With me today, my colleagues from Selendy
16      Gay are Andrew Dunlap, Philippe Selendy, Elizabeth
17      Snow, and Matthew Nussbaum.  Mr. Dunlap and Nussbaum
18      will be arguing today, all of the foregoing being
19      admitted pro hac vice.
20                    THE SPECIAL MASTER:  Okay.  Have they
21      been admitted, you said, or are they pending?
22                    MR. WOHLFORTH:  They are admitted.
23                    THE SPECIAL MASTER:  That's what I
24      thought.  Just for purposes of the record, I'm very
25      quickly going to indicate before we got on what I
```

Page 6

1   said with regard to filings.

2                    One, I've indicated, please, please,

3   resist filing anything with me unless there has been

4   adequate meet-and-confer on the issue and you can

5   represent that there's been adequate meet-and-confer.

6                    Second of all, with regard to briefing

7   schedule, when there is a letter motion filed before

8   me, I've indicated that the response or opposition

9   should be filed ten days later with a reply seven

10  days later.  Modifications to that schedule upon good

11  cause shall be made to me by e-mail request.

12                   Also, with regard to the filings on page

13  limitations would be, the initial filing, no more

14  than twenty pages, and in 12-point font Times Roman,

15  double spaced; opposition, same, no more than twenty

16  pages and reply ten.  Only exceptions are if there is

17  application made to me as to why additional pages are

18  necessary.  There will not be a limitation, however,

19  on exhibits attached to the extent that they are

20  referenced in the actual filings and need to be

21  attached.

22                   In that regard, too, there was a motion

23  filed by SaveOn on May 21, I believe, on compelling

24  Janssen Market Research documents, so I would say

25  that, although I didn't look yet at it, and how many

Page 7

1    pages it was, but that, I would say, is opposition in

2    ten days.  We're going to follow the rule unless

3    somebody tells me on the phone today, on the Zoom,

4    that you can't do that.  This is the only one that we

5    know at the moment.  I think that's just recently

6    filed.

7                     And let see, I think those are the

8    things that I covered before everyone got on.  The

9    order in which I'm going to take the three motions

10   that are before me today is, I will do the Falsioni

11   first; I will do Trial Card second; and I will do the

12   motion with regard to Best Price third.  All right?

13                     MR. GREENBAUM:  Your Honor, one other

14   issue we had raised in our letter, and that was

15   submitting new argument and new exhibits in reply

16   papers that we don't have a chance to address.  That

17   was also a part of the problem with the last

18   submission that we received, the length of reply of

19   the most recent motion.

20                     THE SPECIAL MASTER:  At this point, I

21   have what I have.  I've read everything that was

22   submitted with regard to the motions that were

23   pending.  I've given a way of going forward.  There

24   should not be additional replies or surreplies or

25   whatever you want to call it unless someone asked me,

Page 8

1   the same way as if you were in court and you wanted

2   to submit a surreply.  So that's going to be the rule

3   going forward.

4                With whatever is here, if you're saying

5   that there were things in the letter that referenced

6   the motions, I'm not really considering that letter

7   at this point, that May 21 letter.  If anyone wants

8   to note anything today that's some update that I have

9   to consider, I'll hear you today on the record.  I

10  don't consider that an actual filing that I'm dealing

11  with today.

12                So, let's begin with the Falsioni

13  third-party communications.  We know that

14  Ms. Falsioni -- and Darcy Falsioni is the corporate

15  counsel and chief compliance officer at SaveOn.  She

16  is a custodian.  SaveOn agreed that she will be a

17  custodian, and that they would be producing documents

18  that are similar to what I did with the J&J when I

19  dealt with in-house counsel, communications with

20  third parties, outsiders.

21                So where we are on this, however, is

22  that there is a search that JJHCS --

23                (Telephone interruption.)

24                THE SPECIAL MASTER:  Okay.  That, they

25  have requested additional search terms which are what

Page 9

1    are being objected to by SaveOn, and I received the

2    briefing on it.  I've read it all.  I'm happy to hear

3    if there's something that you would like to, at this

4    point, highlight.  And is there anything anyone wants

5    to add that's not in your papers you want

6    to highlight for me right now?  Who is arguing

7    Falsioni?  I'm sorry.

8              MS. BRISSON:  I am, your Honor,

9    Katherine Brisson.

10             MR. NUSSBAUM:  I'll be arguing for

11   SaveOn, your Honor.  That will be me, Mr. --

12             REPORTER:  I'm sorry, who is speaking?

13   The logo is lighting up but not the picture.

14             THE SPECIAL MASTER:  Oh, I see your

15   picture, Mr. Nussbaum.

16             MR. NUSSBAUM:  Oh, good.

17             THE SPECIAL MASTER:  Yes, that was a

18   problem I was also having when I was talking to

19   Mr. -- I saw the "Selendy Gay" and every time it

20   lights up when someone talks, I don't know why, but

21   okay.

22             So here we are on cue.  The terms that

23   you've asked for are, "service agreement," or "BAA"

24   or "Business Associate Agreement," or "joinder" or

25   "PHI" or "contract" or "amendment."  And that was the

```
                                          Page 10

 1    string that apparently yielded about 1,774 documents,

 2    right?  And you know, we have several arguments by

 3    SaveOn, as I'm aware, that include relevancy; also it

 4    would be duplication, and it would pick up many

 5    things based on those terms with "ors" as the

 6    connector that would go beyond.

 7                   So go ahead, Ms. Brisson, I'll hear from

 8    you briefly.

 9                   MS. BRISSON:  I think it's really

10    important to highlight that on its face, it has "ors"

11    and it -- so it is broad in practice -- it's --

12                   REPORTER:  I'm sorry but the audio is a

13    bit fuzzy.  Perhaps you can move closer to the

14    microphone?

15                   MS. BRISSON:  -- I'll put in my

16    headphone.

17                   THE SPECIAL MASTER:  Okay.

18                   MS. BRISSON:  Is this better?

19                   THE SPECIAL MASTER:  Yes.

20                   MS. BRISSON:  Is this a better mic?

21                   THE SPECIAL MASTER:  Yes.

22                   REPORTER:  Much better.

23                   MS. BRISSON:  Okay, great.

24                   THE SPECIAL MASTER:  Go ahead.

25                   MS. BRISSON:  Okay, sorry about that,
```

Page 11

1    your Honor.  So I think it's important to highlight

2    that this term only yields 1,774 documents for

3    review.  And so while this -- any argument that this

4    term is unduly burdensome really doesn't hold any

5    water.  We're really talking about a handful of

6    documents, and if SaveOn wanted us to consider a

7    different term that maybe had different limiters, we

8    could have done that during the meet-and-confer

9    process.

10           So going back to your previous point,

11   there could have been a negotiated term here that was

12   mutually agreeable.  However we're here today to talk

13   about less than two thousand documents; and in a case

14   of this size, we are seeking these highly relevant

15   communications with Darcy Falsioni, who is SaveOn's

16   go-to legal expert during contract negotiations with

17   third parties.

18           And so there really is no other

19   substitute for the conversations that we are seeking

20   for this term, and through this motion.  And there is

21   no replacement, including the final contracts are not

22   replacements to get her communications with external

23   parties about what these contract terms mean, how the

24   SaveOn program works, and we want to see how Falsioni

25   convinces its prospective clients to partner with the

```
                                              Page 12

 1   SaveOn program.

 2                  THE SPECIAL MASTER:  Okay.  So, I'm

 3   sorry, who is going to be arguing -- Mr. Nussbaum,

 4   correct?

 5                  MR. NUSSBAUM:  Yes, your Honor.  Can you

 6   hear me and see me all right?

 7                  THE SPECIAL MASTER:  Yes, and I see you.

 8   All right.  So look, I don't -- while there's some

 9   burden argument, I don't really think it was the key

10   argument as I saw it on your part.  You had several

11   arguments that you were making that you thought that

12   the terms were too broad, terms such as "contract"

13   and things of that nature, "Amendment," that could

14   pick up lots of things in the documents when they

15   don't have any qualifiers with them.  I think what I

16   just heard from Ms. Brisson now was, "Well, tell us."

17   Tell us, you know, how you think this could be,

18   better be structured to get what they think is

19   relevant.

20                  And by the way, I do think the things

21   they're looking for are relevant.  I don't think this

22   is a relevancy argument.  But is there some way to

23   make sure that we're getting really the relevant

24   documents as opposed to other extraneous things that

25   you have to look through because a term may be broad?
```

```
                                        Page 13

 1              And that's really where I'm focused,

 2      because I do think that, you know, seeking

 3      communications during the negotiation process could

 4      contain evidence that would show how a defendant

 5      induced clients to hire them, could lead to other

 6      admissible evidence.  There are many things that

 7      could be turned up here.  And so while I appreciate

 8      in the scheme of things 1,774 documents, it's

 9      certainly not as big a number; on the other hand, I

10      don't want to have unnecessarily more documents,

11      being reviewed than need to be.

12              So I think it could have been dealt

13      with, with perhaps a good meet-and-confer, but I'm

14      ready to resolve it right now.

15              MR. NUSSBAUM:  Well, your Honor, if I

16      may, very quickly, I'm glad your focus is on

17      overbreadth because that's where our focus is as

18      well, and I think what they are asking for has to be

19      viewed here in the context of what we're already

20      providing.

21              So just a little bit of background, J&J

22      asked that we add Ms. Falsioni as a custodian.  We

23      agreed to do so.  Even before adding her as a

24      custodian, we had already reviewed nearly 40,000

25      documents that she appeared on and produced about
```

Page 14

1      eight thousand of those.

2                    So back in early February, they asked

3      that we add her as a custodian, and they proposed

4      ten search strings.  SaveOn agreed to add her as a

5      custodian, and we agreed to run nine of the ten

6      search strings.  So all we're here to discuss today

7      is the tenth search string which was, as you noted,

8      has these "or" connectors, so it consists of seven

9      individual terms.

10                    And if you'll indulge me, I have a quick

11     demonstrative that I'd like to show, if my colleague

12     can pull it up on the screen.  Because of the way the

13     other nine terms were designed, also with "or"

14     connectors, we have 28 terms that we are already

15     running, and just seven terms that we are not

16     running.

17                    So on the left, you can see in blue the

18     terms that we're all running.  Those are also quite

19     broad, terms like "enrollment," "onboarding,"

20     "implement," terms that are designed to get at these

21     contracts, negotiations over these contracts, and the

22     types of conversations that J&J says they are looking

23     for.  That leaves us with these seven terms that we

24     feel are tailor-made to only capture irrelevant

25     documents, and I can explain why.

Page 15

1          So we divide these into two buckets.
2    First, the HIPPA bucket, and those are the terms
3    "PHI," "Protected Health Information," "Business
4    Associate Agreement," and its acronym, "BAA."
5              Now, these all get to confidential
6    health information, the type of information that's
7    protected by HIPPA.  In fact, this would be kind of
8    like running "HIPPA" as a search term.  It has
9    nothing to do with the claims or defenses in this
10   matter.  There's no allegation that SaveOn has
11   mishandled patient information or that that's part of
12   what the harm is here.
13             The BAAs are agreements that SaveOn
14   signs with its clients, that allows ESI to share PHI
15   with SaveOn, and that allows SaveOn to share PHI with
16   third parties.  So we feel very strongly that BAA and
17   PHI are not relevant at all.  So that takes us to the
18   second bucket, which I call the general contracting
19   bucket.
20             THE SPECIAL MASTER:  Well, let me stop
21   you there.  Let me hear Ms. Brisson respond to that
22   bucket.  We have them divided up, all right?  Let's
23   break these down.
24             So Ms. Brisson, he says, what would be
25   relevant about these which are really HIPPA issues?

```
                                                   Page 16

 1                 MS. BRISSON:  There are these terms come

 2      up during contract negotiations.  The BAA or the

 3      Business Associate Agreement is a contract or an

 4      agreement that prospective clients must sign to

 5      partner with the SaveOn program.  And it is one of

 6      multiple agreements that clients must sign to partner

 7      with the program, and so this is another way along

 8      with what my colleague is referring to, the second

 9      bucket of terms, this is just another term to ensure

10      that we are covering the full scope of contract

11      negotiations.

12                 Prospective clients are often very

13      concerned about their members' very sensitive health

14      information being shared and they want assurances

15      that PHI is being protected to be, you know, to the

16      fullest extent; and so they often have questions

17      about this.  And so what Ms. Falsioni says as

18      SaveOn's legal expert carries significant weight with

19      getting clients -- excuse me, getting prospective

20      clients comfortable with the SaveOn program to be

21      willing to partner with it.

22                 THE SPECIAL MASTER:  So, Mr. Nussbaum,

23      she thinks her point basically is, it's part of the

24      negotiation process and representations that are made

25      that would satisfy or convince someone as to why this
```

Page 17

```
 1   program is good and will protect them on the HIPPA
 2   side.
 3                 MR. NUSSBAUM:  So, your Honor, we've
 4   produced a number of these BAAs, not because they are
 5   in themselves relevant, but because they have been
 6   attached to various relevant documents.  I think
 7   we've produced hundreds if not thousands of these.
 8   And we have included some with the exhibits to our
 9   motion, included that, for example, I think Exhibit 8
10   is one of them, and you can take a look at this.
11                 It's a form agreement that talks about
12   obligations under HIPPA, information security, what
13   will happen in the event of a breach.  None of that
14   is relevant to this action and we haven't heard a
15   real relevance argument for why protected health
16   information should be drawn in here.  This is going
17   to draw a lot of irrelevant -- almost entirely
18   irrelevant documents.  HIPPA touches on almost every
19   part of our business.  So like I said, it's kind of
20   like running HIPPA as a term.
21                 THE SPECIAL MASTER:  Let me just
22   interrupt you, because I think what Ms. Brisson was
23   saying was, she's not so much concerned about what
24   your BAA looks like, because obviously you provided
25   copies of BAA.  She's looking at what documents you
```

Page 18

```
 1    have as to communications or representations that
 2    Ms. Falsioni may have made in pitching the program as
 3    to the protections under HIPPA.
 4              Ms. Brisson, am I misstating that, or is
 5    what you're position was?
 6              MS. BRISSON:  That is my position.  And
 7    also I would like to highlight, you'll notice HIPPA
 8    is not a term.  The term is PHI, and BAA, because
 9    those are the terms that are used in contract
10    negotiations, and it is the name of the agreement
11    itself, Business Associate Agreement.
12              MR. NUSSBAUM:  So, your Honor, I would
13    just note that we've talked about these BAAs and the
14    negotiations that may go into them; but there's no
15    connection to the two claims here that Johnson &
16    Johnson has brought.  So relevance is certainly a low
17    bar in discovery but it's not no bar.  And the claims
18    they have brought are for tortious interference with
19    contract, and the GBL 349 claim, which has to do with
20    deceptive business practices.
21              None of that has to do with patients'
22    health information.  It simply is not relevant, and
23    our concern is not that some of these documents it
24    pulls in are going to be irrelevant.  My concern is
25    all of the documents these terms pull in are going to
```

Page 19

1   be irrelevant because when you think about the types

2   of negotiations and contract discussions that

3   Ms. Brisson is interested in, those would include

4   these very broad 28 terms that we are already

5   running.  What PHI and BAA will pull in is lots and

6   lots of copies of the form agreement, which they

7   already have.

8                   THE SPECIAL MASTER:  Then I guess if

9   that's what it is, and it's simply duplicative, they

10  are not communications that are in addition, I'm --

11  fine.  Then what's -- this is not such a big problem.

12  I'm solving a problem.  I don't think it's a burden

13  issue.  If you're talking about relevancy, if there

14  are communications, I think, you know, they could be

15  arguably relevant.  So I'm not quite there with you.

16                  But okay, let's go to your second

17  grouping.

18                  MR. NUSSBAUM:  So I'll just quickly say

19  two more things about the first grouping, which is

20  that we do feel that when term after term comes back

21  with what's, you know, only 1,700 documents, there

22  needs to be a line somewhere.  And our client does

23  feel strongly that after having reviewed a million

24  documents, having produced 300,000 documents, which

25  means, you know, 700 irrelevant documents were

Page 20

1    reviewed, that there needs to be a line and, I think

2    if anything, some sort of connector with PHI, with

3    BAA, that could maybe draw in the type of information

4    that we're looking for would be -- would be more

5    designed to actually catch relevant documents.  And I

6    do just have to say, the idea that we refused to

7    negotiate on this is a little odd because we agreed

8    to run nine of the ten search strings.  So it's just,

9    do we have to run all ten.  But I will move on to the

10   general contracting budget.

11              THE SPECIAL MASTER:  Yes, and then I

12   will come pack to your argument on connectors,

13   because I will say, I think that that's where the

14   discussion should be added.  I think that they are

15   terms that are appropriate but with a connector which

16   doesn't exist now.  But we'll come back to it.

17              You want to address the last four?

18              MR. NUSSBAUM:  Yes, your Honor.

19              THE SPECIAL MASTER:  Yes.  You're right,

20   these are very broad terms that could appear

21   anywhere, I agree.  I can stop you here.  What I

22   really -- why don't you take me off the screen so I

23   can see everyone again?  Because I have those terms

24   in my own notes, so I know what they are.

25              What I really want to get down to, and I

Page 21

```
 1   hate that I have to do this, in this conference,

 2   because I would have liked this to have happened

 3   outside of here on your end, but I do think that I

 4   understand why they are terms that can lead to

 5   relevant evidence but they have to have connectors,

 6   particularly things like, words like "contract," or

 7   "joinder," or "amendment."  Simply saying, "Or," I

 8   don't know what it could draw in.  They have to have

 9   some connectors.

10             So, happy to do it with you now.  I

11   don't really want to but I will to put this to bed.

12   So let's come up with some suggestions as to how to

13   do this.

14             MS. BRISSON:  Your Honor, if I may, just

15   very briefly, we would have loved just like you said,

16   and back to your point from earlier, we would have

17   loved to engage in this discourse before having to

18   bring this motion.

19             But now we're here today, and we're

20   discussing just a handful of documents; so, happy to

21   engage in this, and I think that any sort of

22   connector should still be on the broader side

23   considering the fact that at base, that a term that

24   may on its face seem on the broader side, still only

25   captures less than two thousand documents.
```

Page 22

 1                    THE SPECIAL MASTER:  Ms. Brisson, I want

 2      to be clear now.  I appreciate less than two

 3      thousand, say we miss some, like not very much in

 4      this case.  Other cases, it might be a lot.  But

 5      that's not the answer.  The answer is, appropriately

 6      capture what is relevant.  And it's a universe that's

 7      less than, 1,774, I am sure.

 8                    So I would prefer that we not negotiate

 9      this at this moment with everybody on here.  I am

10      directing that there be some connectors and

11      agreement.  You go about it.  I am happy, if you

12      cannot reach agreement after this conference is over,

13      just to do a very short Zoom with you just to address

14      this at some later point.

15                    Doesn't have to be a motion, I don't

16      need more papers.  I can just get on the phone and do

17      it.  But I would prefer that you do it on your own

18      and --

19                    MR. NUSSBAUM:  Fine, your Honor, we're

20      happy to meet and confer and we will do that.

21                    THE SPECIAL MASTER:  Okay.  And I've

22      directed that it be done.  I directed that there be

23      connectors, so you know where I'm coming from.  Go

24      about it.  I assume I'm not going to hear from you

25      again, but if not, as I said, it will be a short

```
                                                   Page 23

 1    call.

 2                    MR. NUSSBAUM:  Thank you your Honor.

 3                    MS. BRISSON:  Thank you, your Honor.

 4                    THE SPECIAL MASTER:  No problem.  That's

 5    the Falsioni situation.  Now I'm going to move on the

 6    Trial Card.  So remind me again, who will be arguing

 7    first on the JJHCS side?

 8                    MS. ARROW:  Good morning, your Honor,

 9    Sara Arrow.

10                    THE SPECIAL MASTER:  Okay.

11                    MR. DUNLAP:  Your Honor, Andrew Dunlap

12    will be arguing for SaveOn on this issue.

13                    THE SPECIAL MASTER:  Okay, very good,

14    thank you.

15                    All right.  I'll just set the stage here

16    and, you know, as I understand it, you know, the

17    Trial Card issue was an issue that was addressed also

18    before my time, and there had been some agreement as

19    to some production that was being made.  Trial Card

20    obviously is a separate entity, a third party

21    independent contractor that administers CarePath for

22    plaintiff.  There is a Master Services Agreement that

23    controls their relationship.

24                    And there are, as I see it, two sets of,

25    really, issues here that are being discussed.  One
```

Page 24

1    is, documents and communications related to Trial

2    Card's administration of CarePath from that refresh

3    time period that was established for the parties,

4    which is July 1, 2022, to November 7, 2023.  And the

5    second is documents and communications regarding

6    Trial Card's efforts on behalf of JJHCS to identify

7    patients on accumulators, maximizers, etc., etc.,

8    including communications about benefits

9    investigations.

10               Now, the issues as they have been put

11   forth are, one, whether the plaintiff here has

12   control over those documents, and can, therefore, be

13   directed to produce them through Trial Card; and if

14   there is not such control, then whether they would

15   have to be pursuing this through subpoena in North

16   Carolina, wherever Trial Card is.

17               And then there's the issue that's been

18   raised by SaveOn, that if this issue is not resolved

19   by JJHCS -- is it okay for today's purposes, if we

20   just say J&J?  I know it's a separate entity, but it

21   will be easier, okay?  I'm seeing "yes" shaking heads

22   from those who represent the plaintiff, so I'll take

23   that as okay.

24               That there are certain ethical issues

25   that SaveOn has raised by the representation of

Page 25

1    Patterson Belknap of both J&J in this case, and Trial

2    Card.  And in the filings, SaveOn has reiterated,

3    "Well, we're not looking to disqualify Patterson

4    Belknap, but we feel there should be an ethical wall

5    that has been objected to by the plaintiff, but I

6    think we have to first, in the first instance resolve

7    whether there is control or not because to some

8    extent it's all mooted.

9              But I think there is one issue I want to

10   address about the joint representation.  And I know

11   and I'll put it in the record, it's in the papers,

12   but I want to be clear that also Patterson Belknap

13   has placed on the record that they have gotten

14   consent or waivers from both of their clients to

15   proceed in this way to the extent that there could be

16   perceived to be a conflict.  Okay.

17             Now, to go to the control issue, and a

18   good part of the briefing dealt with, you know,

19   practical ability versus legal control, and, you know

20   where the case law comes on this, and we're obviously

21   dealing with Rule 34 of the Federal Rules that allows

22   a party to serve on any other party a request to

23   produce, in the responding party's possession,

24   custody or control, any designated documents.  And

25   it's about a legal right or ability to obtain the

Page 26

1    documents from another source upon demand, then that

2    party is deemed to have control if they have that.

3                    What's been argued here for the most

4    part is, the contract, and whether there's a

5    contractual right to obtain documents in possession

6    of Trial Card based upon the MSA, the Master Services

7    Agreement that exists here, and the audit; and

8    specifically what we're looking at ████████████████

█    ████████████████████████████████

10                   I'm going to hear from the parties with

11   regard to this.  I've looked at the case law.  And as

12   I see it, too, and I'm happy to hear from you, the

13   plaintiff says that the intent ████████████ is

14   really looking at ████████████████, not a general

15   right to get documents or request documents to

16   examine them.  And SaveOn takes issue with that based

17   upon the broad language and how the case law comes

18   out.

19                   There is a rather limited universe of

20   cases that have addressed that you both have cited.

21   I've looked at both of them.  We've got the Third

22   Circuit case, we've got couple of District of New

23   Jersey cases, Delaware cases, etc.

24                   So let me first hear from actually J&J

25   on this issue, okay?  And may I ask, I guess before I

Page 27

```
 1  go forward, while I said I hadn't really taken a look
 2  at the letters, it seemed to me that there's been
 3  some more voluntary production --
 4              MS. ARROW:  Yes.
 5              THE SPECIAL MASTER:  -- by -- and is
 6  there a narrowing of what I'm looking at?  That I
 7  do --
 8              MS. ARROW:  Yes, your Honor, and if it's
 9  helpful -- so Trial Card was served with two
10  subpoenas in this case.  And it has been negotiating
11  those two subpoenas since February of 2023 when it
12  received those subpoenas.  And over the course of
13  over a year, Trial Card has complied with its
14  subpoena obligations.
15              And as we say in our papers, your Honor,
16  Trial Card has produced thousands of documents.  It's
17  produced documents from more custodians, it's
18  produced over 19,000 records from a centralized call
19  database, it's produced over 4,800 benefits
20  investigations, it's produced patient audit
21  templates; its produced, in particular, information
22  that would allow SaveOn to see exactly what action
23  was taken with respect to patients who are identified
24  as being on a maximizer, accumulator or affiliated
25  with SaveOn.  And it's produced enrollment and claims
```

Page 28

1   data.  That's in the vast majority of the categories

2   of documents, it has produced those documents.  It

3   has voluntarily updated its productions through the

4   date of party discovery, through November 7, 2023.

5               So as respects your specific question,

6   your Honor, those productions remain ongoing, and in

7   fact Trial Card anticipates making additional

8   productions through the end of this month.

9               So those productions remain ongoing.

10  There is also, your Honor, ongoing negotiation with

11  respect to the production of call report exhibits.

12  So obviously, there are significant burdens

13  associated with the production of call recordings,

14  but SaveOn has acknowledged that, JJHCS has

15  acknowledged that, Trial Card has acknowledged that.

16  And all three entities, the parties and Trial Card,

17  are trying to reach some reasonable limitation on

18  which call recordings might be produced in this case.

19              And to that end, your Honor, and -- I'd

20  like to talk about the control question in a moment,

21  but to that end, JJHCS and Trial Card have both

22  signaled their willingness to continue to meet and

23  confer in good faith to arrive at a reasonable

24  production of call recordings that are relevant --

25  that may be relevant to this case, to the extent they

```
                                         Page 29

 1    exist.

 2                  THE SPECIAL MASTER:  So let me ask this

 3    question:  It sounds like if you're telling me that

 4    they are producing during what we call the refresh

 5    period, okay?  Because initially, the objection was,

 6    they are not subject to a refresh period.  They had

 7    an original subpoena, and they are not a party that

 8    was ordered to do that, but you're telling me that

 9    they are now willingly producing on the refresh

10    period.

11                  MS. ARROW:  As to the vast majority of

12    the categories of documents, yes, Trial Card has

13    produced through the refresh period.  There is one

14    category of documents that it has not produced

15    through the refresh period; and in all candor, your

16    Honor, that is the custodial documents.

17                  And there are a number of reasons which

18    I'm happy to get into as to why we think Trial

19    Card should not be required to do so; and

20    specifically, in addition, why under the MSA we do

21    not believe that JJHCS has the control that is needed

22    to, you know, effectively compel Trial Card to

23    produce those custodial documents.  And the very

24    specific reason here is, these are not the types of

25    communications that JJHCS receives in the normal
```

Page 30

1   course of its business, in the normal course of its

2   dealings under the MSA here.

3              We do not normally, JJHCS does not

4   normally receive internal communications between

5   Trial Card employees.  It's a wholly internal

6   communication.  This is not the type of thing that we

7   regularly access, and it is not the type of category

8   of document that would -- for which there is control

9   under the MSA.  So we do not believe we have the

10  right to demand wholly internal communications

11  between Trial Card employees.  If there's some

12  question from SaveOn as to whether, you know,

13  additional production should be forthcoming from

14  custodians, that is a question, your Honor, that is

15  more appropriately addressed through the normal

16  process of a Rule 45 subpoena, because Trial Card is

17  a third party in this case.

18              So if there is, you know, a motion to

19  enforce the subpoena, that motion to enforce should

20  be brought in the jurisdiction in which Trial Card is

21  headquartered in North Carolina, where it receives

22  the protections against undue burdens associated with

23  its status as a third party.  But JJHCS, in the

24  normal course of its dealing with Trial Card, does

25  not receive wholly internal communications, and it

Page 31

```
1    does not receive -- it does not ask for or access
2    these types of communications.  And so what we see
3    here is really sort of an end run around Rule 45 in
4    an effort to get limitless discovery from a third
5    party.
6              THE SPECIAL MASTER:  Ms. Arrow, you keep
7    emphasizing "in the normal course of its dealings,
8    this is what, we don't ask for this, we don't get
9    it."  I think your emphasis is wrong.
10             I find that nowhere in the case law that
11   it talks about the control issue.  What the case law
12   looks at is, what is the language in the contractual
13   provision.  It does not have language like that.  It
14   has very broad language, and it indicates that you
15   can get and review, in the broadest possible way,
16   ██████████████████████████████████████████████
     ██████████████████████████████████████████████████
     ████████████████████████████████.  ████████████████
     ██  ██████████████████████████████████████
20             There is nothing about what do you get
21   in the normal course or what should you get in the
22   normal course.  So you have added a limitation of
23   language.  This does not appear in this agreement.
24   You drafted it, you and Trial Card, in the broadest
25   possible way, I'm sure, to give you the most
```

Page 32

1   flexibility in getting what you would want to see.

2   And it also says 

6                And it is very, very broad.  So I'm

7   going to, you know, frankly, your limitations do not

8   appear anywhere.  You're putting a gloss on that not

9   only do I not see in the agreement, nor have I seen

10  in the case law.

11               MS. ARROW:  Your Honor, if I may, what

12  we see in the case law, and I would point your

13  Honor's attention in particular to the Camden Iron

14  case where it says, "The proper inquiry here is

15  whether the documents sought are considered records

16  which match with the parties' actual requests and

17  obtains in its normal course of business."

18               And what we see in the case law is that

19  access, the ability to access documents, even when

20  it's enshrined in a contractual provision, does not

21  equate to control.  And this makes a great deal of

22  sense here, especially given the relationship between

23  Trial Card and JJHCS.  This is not a situation in

24  which there is a corporate affiliation.  This is not

25  a situation in which we, JJHCS, can log on to Trial

Page 33

1   Card's server or where we can raid its offices in

2   North Carolina.  The most we can do here is ask, is

3   make a request, but we cannot demand.  We do not have

4   the ability to compel Trial Card's employees to

5   respond to our requests; we do not have the ability

6   to go into its systems and get these documents, go

7   into its file cabinets and get these documents.  And

8   for good reason, because the communications that

9   happen between individual employees within Trial Card

10  are not, sort of, the types of documents that would

11  be related to -- that are maintained "in relation to

12  the agreement," and/or any applicable work orders.

13            The types of documents that are

14  maintained in relation to the agreement and/or any

15  applicable work orders are the types of documents

16  that are delivered to JJHCS by virtue of the

17  contractual relationship.  And they are the types of

18  documents, your Honor, that have been produced in

19  this case.  And where, for example, they are not

20  delivered to JJHCS, Trial Card has made voluntary

21  productions of them and has made those productions in

22  the course of complying with its subpoena

23  obligations.

24            But what SaveOn is asking here to do is

25  to go well beyond the subpoena obligations to

Page 34

1  effectively get any type of document that any Trial

2  Card employee may have ever written, any message that

3  may have been communicated between Trial Card

4  employees.  These are not the types of documents that

5  JJHCS --

6                    THE SPECIAL MASTER:  Ms. Arrow, let me

7  just interrupt you for a moment.

8                    Look, if it's the breadth of the

9  request, we can deal with that.  But the -- I still

10  disagree with the limitations you want to place on

11  it.

12                    But it may be -- we can talk about that.

13  And the Camden case dealt with related companies.

14  We're not talking about that.  We're not talking

15  about, are you a sub, and do you have control.  We're

16  talking about the contractual control now.  And I

17  have looked carefully at those cases that discuss

18  contractual control, and what the breadth of the

19  language is.  And it's whether the plaintiff has the

20  contractual right to obtain the documents requested.

21                    Now, whether that's in the Reddy case,

22  it's in the Third Circuit law as well as the District

23  of New Jersey cases that I guess Judge Schneider

24  wrote more than one about, and those -- those clearly

25  looked at what the wording is.  And your agreement is

Page 35

```
 1    as broad as the language that I saw in any of those
 2    cases which said the breadth of that language gives
 3    you the right to the control over these.
 4              My problem is, yes, the breadth, we can
 5    talk about whether what's being requested is
 6    appropriate.  But that's different.  I still want to
 7    stick with the control issue, and I don't think you
 8    can dispute that the contract language is very broad.
 9              MS. ARROW:  Your Honor, we don't dispute
10    that the contract language is very broad.  But what
11    we do want to make very clear is that, as part of
12    this motion practice, and this is partly a failing of
13    SaveOn to even try to meet and confer about this.
14              There was no conferral whatsoever, your
15    Honor, with JJHCS as to the documents sought.  What
16    they are making is very, very, very broad requests.
17    We don't even know what they are seeking.  And so
18    they are making these requests without any
19    delineation of what categories of documents are
20    sought, and what I think is clear through the conduct
21    of the negotiations that have elapsed thus far is
22    that Trial Card is very willing to engage and JJHCS
23    is very willing to engage and we know that Trial Card
24    is willing to produce these documents because Trial
25    Card has produced so many --
```

Page 36

```
 1                    THE SPECIAL MASTER:  Okay.  Well -- let
 2    me -- let me turn to Mr. Dunlap.  I have your point.
 3    I think you've stated it.  I have it.
 4                    Mr. Dunlap.  Okay.  So a willingness to
 5    produce, a willingness to confer, but more definition
 6    to what are the types of documents because I would
 7    agree that there may be certain internal
 8    communications between Trial Card employees regarding
 9    discreet issues that are not necessarily covered, you
10    know, under the MSA or that would be relevant here.
11    And I think what we need is some definition to be
12    clear of what it is that you're seeking so we don't
13    have an overbreadth argument.
14                    I'm prepared to rule on a control issue;
15    but what I'm hearing in the meantime is, they are
16    prepared to produce.  So, but what we have to define,
17    what is it that they are going to produce.  And by
18    the way, you're muted, Mr. Dunlap.
19                    MR. DUNLAP:  I think I'm available to
20    your conference room audio.  Can you hear me?
21                    THE SPECIAL MASTER:  Yes, that's why the
22    Selendy Gay keeps lighting up --
23                    MR. DUNLAP:  We're using a common mic
24    so --
25                    THE SPECIAL MASTER:  Now I understand.
```

Page 37

1    Go ahead.

2                    MR. DUNLAP:   -- providing any technical

3    issues, so thank you, your Honor.  I'd like to take

4    sort of your questions within the framework that you

5    set up at the beginning for the issues before you.

6                    I do think it's important for us to

7    establish that there is control of the documents

8    here.  I don't think I have to go any further than

9    the contract.  We agree with what you've said.  ████

10   ████████████████████████████████████████████████████

11   And it doesn't talk about any of the documents that

12   are provided in the normal course.  It's a very, very

13   broad provision.  So we think it's important to

14   establish that they have the legal right to control

15   these documents, that J&J has a legal right to

16   control Trial Card's documents regarding its work for

17   J&J.  From there, your second question is, well, what

18   exactly are we requesting, and are there concerns --

19                    THE SPECIAL MASTER:  Let me be clear

20   before you go on because there are the exclusions, so

21   that we don't get to unrelated things.  It says that

22   ████████████████████████████████████████████████

     ████████████████████████████████████████████

     ██████████████████████████████████████████████████████

     ██████████████████████████████████████████████████

Page 38

1     ████████████████████████ "

2              So I wanted to be clear that it did

3     decide what should be excluded.  And so there is an

4     exclusion there, but go ahead.

5              MR. DUNLAP:  And we agree, to be clear,

6     we're not seeking, at least we don't intend to be

7     seeking any of the documents that would fall under

8     that exclusion.  I mention it only because if they

9     wanted to exclude things like internal e-mails or

10    things that aren't provided in the regular course of

11    business, they could have done that.  And of course,

12    █████████████████, the idea is, you get access to

13    stuff you don't normally get so you can check what

14    the person is doing.

15             So once we establish that they have a

16    legal right to control, I'd like to turn to what

17    exactly it is we're requesting and, as you mentioned,

18    there are two buckets.  One is we're asking them to

19    refresh the production that Trial Card originally

20    made and do it through this refresh period of July of

21    2022 through November of 2023.

22             And they say they have produced a number

23    of these things but, as they just acknowledged, they

24    haven't refreshed their production from any of the

25    four, I believe it's four Trial Card custodians that

Page 39

```
 1   they had voluntarily added.  So we've already
 2   established, we think, through negotiations and
 3   discussions, that documents that are in those
 4   custodian files that relate to the matters at issue
 5   are relevant.  So we think we can go forward and
 6   require J&J to produce refreshed discovery from those
 7   four custodians right now.  I haven't heard an
 8   argument from the other side in their papers or here
 9   today that those materials aren't relevant.
10              THE SPECIAL MASTER:  Let me stop you
11   there, Mr. Dunlap.  I did hear Ms. Arrow say that,
12   right, they won't refresh as to the custodians.  Why
13   is that line being drawn?  If they were providing
14   from these custodians voluntarily before, without
15   enforcing a subpoena or going about it, why would
16   that not be voluntarily done now?
17              MR. DUNLAP:  I think that's a question
18   for Ms. Arrow --
19              THE SPECIAL MASTER:  That's for
20   Ms. Arrow.
21              MS. ARROW:  I mean, what is very clear
22   here, the productions from the four custodians, your
23   Honor, were made directly by Trial Card.  If SaveOn
24   believes that there is in gap in that production or
25   that production should be extended, the proper venue
```

Page 40

1    in which to bring that motion is through a motion to

2    enforce.  Trial Card has not consented to the

3    jurisdiction of this court.  But let me also

4    address --

5                THE SPECIAL MASTER:  Ms. Arrow, that

6    doesn't answer the question I asked.  There was not a

7    subpoena being enforced before.  There was an

8    agreement reached that they would do it.  Why is it

9    being objected to now that they will not produce

10   custodians?

11               MS. ARROW:  Yes, your Honor, and I think

12   what's critical to note, right, is, we have not

13   received from SaveOn search terms.  We have no sense

14   of, with the exception of one very broad search term,

15   we have no sense of the burdens involved, and -- but

16   what we do know is that JJHCS, for this entire period

17   through the date of party discovery through November

18   7, 2023, has searched the files of 25 custodians on

19   these topics.

20               And so we think as to relevance, if

21   there are relevant documents from Trial Card

22   custodians, those documents would be captured in the

23   communications between Trial Card, the vendor here,

24   and JJHCS.  And we are making room in this

25   production, JJHCS is making room in those productions

Page 41

1    of those documents related to the CAP program that

2    your Honor knows, because we've been before you on

3    that issue a few times at this point related to the

4    issue of mitigation, related to the issues of how to

5    put into place this benefits investigation program.

6                    THE SPECIAL MASTER:  Why would it be

7    limited only to communications between Trial Card and

8    JJHCS, since Trial Card is the one administering this

9    program and is doing this?  Why wouldn't it be that

10   it could recapture communications within Trial Card

11   that aren't necessarily communicated, that could be

12   relevant?  It would not capture that, based upon what

13   you're saying.

14                    MS. ARROW:  Your Honor, our position is

15   that to the extent there are relevant communications,

16   this work is done pursuant to a contract with JJHCS.

17   So to the extent there are relevant communications,

18   those are the types of communications that are

19   delivered back to the client.  They are contemplated

20   by the work orders in this case, and they are

21   presented in the form of deliverables to the client,

22   to JJHCS.

23                    And so through JJHCS's form productions

24   in this case, were capturing JJHCS' internal

25   communications and are capturing communications

Page 42

1    between JJHCS and its vendor.  Trial Card is a third
2    party.  They are not a party to this litigation, and
3    so you know, I think we have not heard a really
4    strong reason why, in addition to the voluminous
5    production that JJHCS is already making, Trial Card
6    as a third party should be subject to what could be
7    quite onerous burdens on it in producing additional
8    custodial documents.
9                 THE SPECIAL MASTER:  Well, that's not
10   clear to me.  We haven't even gotten to a burden
11   argument because you haven't reached, you haven't
12   told us how burdensome it is.  This is a little bit
13   of between a rock and a hard place too, because you
14   represent both Trial Card and JJHCS, and you're
15   making arguments on behalf of, in a way both of them,
16   even though Trial Card is not right on this motion,
17   it's only JJHCS that's on this motion.
18                 MS. ARROW:  Yes.
19                 THE SPECIAL MASTER:  And frankly, you
20   can't be making a burden argument on behalf of Trial
21   Card here, so that's a problem for you.
22                 So the question is, the burden on JJHCS,
23   if I find that there is control, and that you have
24   the right to get this, and you have to get it, all
25   right?  But it's not with regard to Trial Card.

```
                                                    Page 43
 1                 What you haven't answered now when I
 2     asked you is, when we talked about, "Well, I'm
 3     already producing documents with regard to JJHCS
 4     communications, or communications between Trial Card
 5     and JJHCS, because JJHCS is the party that's
 6     producing them."  But what I asked you, that I don't
 7     think you responded to, is communications within
 8     Trial Card that could be relevant to these inquiries
 9     that would not be produced by JJHCS without there
10     being discovery from Trial Card.
11                 Now, I keep saying -- whether I'm
12     leaving off an initial or not.  I'll go back to J&J,
13     make my life easier.  You know, it's -- the problem
14     here is, and I will, you know, I think you've already
15     gotten the idea, and I'm prepared to write on it for
16     you, but that based upon my review of the cases and
17     the MSA, I would find that there is control by J&J
18     over these Trial Card documents, ability to get them.
19                 Now, how far that goes, you've separated
20     out custodians versus just, I don't know what else it
21     would be, but that's how we find documents, because
22     you run them over custodians rather than through the
23     whole company, so there's really not much way to get
24     the around that.  I do agree that that would be
25     appropriate; however, everything is not open-ended.
```

Page 44

1    There would have to be clear definition of what it is

2    that's being sought, what the search terms are.  I

3    don't know -- and so with that, I'm still not getting

4    why we're not refreshing for the custodians as well.

5    I want to get to, basically, the practical result.

6                    At this point, the argument you're

7    making on behalf of J&J, not Trial Card, because your

8    position on Trial Card is, of course, they are not a

9    party here, they are not answering a subpoena here.

10   If there were a subpoena, we've got to go there.  But

11   they have -- J&J, at this point, is slicing and

12   dicing what you're willing to do and what you're

13   willing to cooperate on.

14                   Now, Mr. Dunlap, I would say for you, we

15   need some limitations.  And they are picking and

16   choosing, or you're picking and choosing for Trial

17   Card, I don't know which it is, what they are going

18   to respond to and produce.

19                   MR. DUNLAP:  May I respond to that, your

20   Honor?

21                   THE SPECIAL MASTER:  Yes.

22                   MR. DUNLAP:  So I think once we've

23   established the control issue, what we put forward in

24   the motion were two buckets of documents, the ones

25   you address at the top.  For the refresh production,

Page 45

1    they have already identified four custodians.  There

2    are already search terms that they've used for those

3    custodians.  We think we could find very clearly

4    what -- we defined what the time period is, it's a

5    refresh time period from July of '22 through November

6    7th of '23.  So they should know exactly what we're

7    asking them to do for that refresh period.  That's

8    clearly defined, and we haven't heard any objection

9    or quantification of how burdensome that would be.

10   So on that piece, I think we are pretty clearly

11   defining what it is we want in terms of custodians,

12   search terms, time period, etc.

13                On the second bucket, which is -- I'm

14   sorry.

15                THE SPECIAL MASTER:  And those were ones

16   that were already produced for the non-refresh

17   period.

18                MR. DUNLAP:  Correct, for the custodians

19   for the prior period ended on July 1, 2022, using the

20   same search terms for the same custodians.

21                THE SPECIAL MASTER:  So I'm trying to

22   figure out why, Ms. Arrow, other than saying, "Go to

23   North Carolina and enforce it," but if I find that

24   there is control, why you would not agree to that.

25                MS. ARROW:  Your Honor, that is the

Page 46

1    situation, that prior production was made by Trial

2    Card pursuant to its subpoena obligations.  So as to

3    providing an agreement as to that, that is an

4    agreement that has to be conferred upon and that has

5    to be reached by Trial Card.  And as your Honor aptly

6    noted, I'm here like partly as counsel for J&J.  So

7    they want to meet and confer with Trial Card about

8    the scope of a refresh production --

9                THE SPECIAL MASTER:  Ms. Arrow, they are

10   still going to talk to you because you represent

11   Trial Card, you're still talking to the same lawyer.

12   You can meet and confer, as I said, and divide it

13   however you like, but they are still talking to you.

14   So we're back to where we are.  Today you're

15   appearing for J&J.  You want them to have a separate

16   discussion with you in your capacity as Trial Card?

17   I mean, come on.  All right.  You know, look, I'm

18   also trying mightily to avoid discussing, you know,

19   this joint representation that you have.

20                But I, you know, I'll get to that at the

21   end very briefly.  But I really don't understand the

22   resistance.  And you do represent Trial Card.  And

23   while you're here for J&J today, you know what their

24   position is, and there has to be a reason that they

25   are not willing to voluntarily do the refresh period

Page 47

```
 1   for the custodians.  It's not a relevance argument,
 2   we know that.  I haven't even heard the burden
 3   argument because we don't know how many -- you want
 4   them to go to North Carolina, you control it.  I'm
 5   finding that you control it.  So it's not going to
 6   answer your question.
 7               All right, let's go to what the other
 8   area is, please?
 9               MR. DUNLAP:  If I could address the
10   second bucket, so that is about efforts that Trial
11   Card undertook on J&J's behalf to identify patients
12   on SaveOn plans, that includes the CAP program, which
13   has been the subject of prior briefing; it includes
14   the benefits investigations, which has been the
15   subject of prior briefing and, we are looking for
16   documents from Trial Card not limited to what they
17   sent on to J&J but internal documents that would show
18   how the programs were actually administered in
19   practice.  They are the ones who disburse the money,
20   there are the ones who conduct the investigation,
21   what did they do, how they do it, etc.
22               And on that we've really got sort of
23   hung up at the meet-and-confer stage because our view
24   is, once you establish control, there needs to be
25   discussion between the parties about who the
```

```
                                            Page 48

 1    appropriate custodians of Trial Card would be in

 2    addition to these four that we've already talked

 3    about, who might have relevant documents on those

 4    subjects.  And then --

 5                   THE SPECIAL MASTER:  Let me stop you,

 6    Mr. Dunlap, because if I find control, which I've

 7    already basically signaled I would do, then now is

 8    your time after this call to meet and confer.

 9                   MR. DUNLAP:  Correct.  I would just ask

10    for a little guidance that that should be the shape

11    of the meet-and-confer.  Once you establish control,

12    they should in the normal course tell us who these

13    individuals are who have knowledge of this and the

14    parties should meet about custodians.  Then we can do

15    the normal meet-and-confer where we propose search

16    terms, etc.  We've already identified in the course

17    of negotiating with them in their role as counsel for

18    Trial Card --

19                   THE SPECIAL MASTER:  Just remember,

20    though, the way this works under a control.  I want

21    to be clear.  Control means that J&J has the right to

22    request them from Trial Card, and then to produce

23    them to you.  You don't go directly to Trial Card and

24    get them.

25                   MR. DUNLAP:  We understand that.  What
```

Page 49

```
1    we're trying to establish is who's at the table and
2    in what capacity, and what are we talking about.  We
3    understand if your Honor is going to find control,
4    that we should now be negotiating with Patterson as
5    counsel for J&J --
6                    THE SPECIAL MASTER:  Correct.  I don't
7    want you to be misunderstanding.  It's as counsel for
8    J&J that you're conferring, once I find control,
9    about what they need or should be requesting.
10                   MR. DUNLAP:  Absolutely.  And that's
11   what we've been seeking in the motion.  I refer to
12   the prior negotiation simply to show that, as a
13   practical matter, there's already been some
14   discussion of who custodians might be.  And what we'd
15   like now is to sit down with them as counsel for J&J,
16   request control of Trial Card's documents and have
17   them tell us in that capacity who the relevant
18   custodians are.
19                   We've already -- we can suggest the
20   seven to them again, officially in their J&J
21   capacity, figure out who they are, we can talk about
22   search terms, they can collect the documents from the
23   search terms, and then we can have the normal
24   discussion about burden and proportionality and all
25   the rest of that.  But that's the discussion, that's
```

Page 50

1    the meet-and-confer that we think needs to happen if

2    you are now resolved that they have legal control of

3    the documents, J&J does.

4                    THE SPECIAL MASTER:  One of the problems

5    you're going to have, though, I'll say and I'll put

6    this out for J&J, once you have this meet-and-confer

7    and J&J goes to Trial Card and says, "We are

8    requesting under MSA these documents," the problem

9    for Patterson Belknap is going to be in representing

10   both parties.  What happens if Trial Card says, "I'm

11   thumbing my nose at you; you may think you're

12   entitled to the MSA but we don't agree," and now

13   you're in an adversarial role, when I have found that

14   you must be -- you have control to request them, but

15   they don't want to produce them.

16                    I don't want to go to that next stage,

17   but that's something that could happen, and I'm

18   highlighting that because that may create a problem

19   for this combined representation.

20                    MS. ARROW:  Your Honor, we appreciate

21   that concern.  We have thought through that concern.

22   We think quite honestly that that is one of the

23   reasons why JJHCS does not have the ability to do any

24   more than make a request here.  Because if Trial Card

25   returns and says to JJHCS, "No, JJHCS, we do not

Page 51

1    agree with your understanding of what the MSA

2    requires, we do not believe that you can enforce the

3    MSA to get these documents," then we are in a

4    position that we're -- we actually cannot go and

5    retrieve those documents.  There is no ability that

6    JJHCS has to go effectively to North Carolina and

7    compel those documents absent, for example, suing to

8    enforce the MSA.  And --

9                   THE SPECIAL MASTER:  But my point to you

10   is, and the problem that you would face yourself is

11   like you're arguing with yourself here.  Because to

12   the extent that you represent Trial Card as well,

13   it's as if you're talking to yourself.  J&J, you on

14   behalf of J&J goes to Trial Card and says, "Okay,

15   Special Master found we have control, and we are

16   under an MSA requesting these documents in connection

17   with the litigation we're in."  And by the way, the

18   agreement reflects that you can make these requests

19   as a result of litigation or other matters or

20   investigations.

21                   And then what you do, you put your Trial

22   Card hat on and say to yourself, "No."

23                   MS. ARROW:  Your Honor, this really, at

24   the end of the day, these are separate entities.

25   They are separate independent entities.  Trial

```
                                              Page 52
1    Card --
2                     THE SPECIAL MASTER:  But who is going to
3    advise Trial Card when you are representing Trial
4    Card in this matter?
5                     MS. ARROW:  So, your Honor, we do think
6    that is a premature question at this point.  If your
7    Honor were to rule that there is control and that
8    JJHCS must make the request that you are
9    contemplating, then of course JJHCS will comply with
10   your Honor's ruling.  What we cannot say is what
11   Trial Card will do.  There's nothing else.  Your
12   Honor, we have not been able to even share this
13   briefing with Trial Card because there are
14   confidentiality issues with sharing that briefing.
15                    So Trial Card, in its capacity as an
16   independent entity, will have to decide what it
17   believes it is required to do pursuant to the request
18   that JJHCS makes.  At that point, I do think -- we
19   certainly agree with your Honor that it is very
20   important to ensure that each of our clients is
21   getting appropriate independent counsel.
22                    THE SPECIAL MASTER:  Well, that is going
23   to be the issue, independent advice.  Because I don't
24   know how you'll advise them if the view is that they
25   shouldn't be doing it.  I mean, now look, I'm not
```

Page 53

1   going to get into that today, but I think that will

2   be a problem for you on how to address that and they

3   may need separate counsel at that point to respond to

4   it.   Okay, it's premature for me to address today.

5                But on that point, I am therefore going

6   to direct, I will issue something in writing about

7   the control issue.  I think it's a very important

8   issue.  I will cite the appropriate law and this

9   analysis that I have undertaken before I came here

10  today to reach that conclusion.

11               But it will require -- doesn't mean this

12  is open-ended -- it's going to require the

13  meet-and-confer as you normally would as to what

14  SaveOn and J&J agree would be the relevant documents

15  and searches that should be done so that J&J can make

16  the request of Trial Card, and that meet-and-confer

17  has not happened yet.  I'm going to direct that it

18  occur.  And so that's where we are.  And as I said, I

19  really have not gotten anything on burden at this

20  point, where I could even address it.

21               If there are duplicative documents, so

22  be it.  On the other things that already J&J are

23  producing, we'll know that.  And, but I do believe

24  that in that meet-and-confer, I would have a hard

25  time understanding why that refresh should not

                                                    Page 54

1    reoccur when they have already willingly produced

2    those documents for the earlier time periods.  But I

3    leave that, again, it would be a request that is

4    made, so I'll let that go forward.  I'm not going to

5    rule on what the scope of this is.

6                Just to address for a moment, though,

7    the request, it would be an ethical wall, frankly.

8    That doesn't have to be addressed at this time.  One,

9    to even get to an ethical wall, you have to show that

10   there's an actual conflict.  I do not believe I have

11   adequate briefing that would show that, so I do not

12   get to an issue of an ethical wall.  That's not

13   happening today.  And the only thing I would be very

14   careful of, though, because there was some mention in

15   the briefing, obviously, about these recordings or

16   calls that were made, that it appears that something

17   that was subject to the confidentiality order may

18   have been shared.

19                I know Ms. Arrow confirmed that they are

20   being very careful about honoring the confidentiality

21   restrictions.  I want to remind everyone of that.

22   There cannot be a blurring of the lines on what has

23   been produced between J&J and SaveOn that was subject

24   to a confidentiality order.  And obviously, counsel

25   cannot share that with Trial Card or discuss any of

Page 55

1  that.  And I will rely on the good-faith

2  representations of counsel that that is not

3  occurring.

4              So today, we can't make any finding on

5  conflict and no ethical wall, all right?

6              MS. ARROW:  I can just reiterate, we

7  take those obligations very seriously.  I personally

8  take those obligations very seriously, Patterson

9  Belknap takes those obligations very seriously, as do

10 both of our clients.

11             I just want to reiterate for purposes of

12 the record that there has been no violation and we

13 don't intend for there to be any violation in the

14 future.

15             THE SPECIAL MASTER:  Okay.  And as I

16 said, I do rely on the good-faith representations of

17 counsel and I accept that that's been made today.

18 All right?

19             Now, that was one of the most difficult,

20 today, of the legal questions, which was really the

21 only legal question we had.  Everything else pretty

22 much is a discovery dispute dealing with the facts.

23 And by the way, it was an interesting one, and I got

24 the read a number of cases that have dealt with this

25 in the past, probably, you know, both in my

Page 56

1    magistrate judge days and a district judge.  It was

2    good to do a refresher.

3                    All right, we'll move on to Best Price

4    document requests.  And now who will be arguing that?

5                    MR. LoBIONDO:  Your Honor, I will for

6    J&J, George LoBiondo from Patterson Belknap.

7                    THE SPECIAL MASTER:  Okay.

8                    MR. DUNLAP:  And it's me again, your

9    Honor, Andrew Dunlap for SaveOn.

10                   THE SPECIAL MASTER:  Okay, thank you.

11   Let me just briefly talk about two, you know, as some

12   of the briefing went on on this about the 2016 best

13   pricing rule, which is the one that's remained in

14   effect because the 2023 never came into being.

15                   So you know, as I understand it, and

16   even though I appreciate that J&J has made the

17   argument, it didn't -- it was declared, you know, not

18   to be effective.  There was a court decision, and so

19   it never took place.  So why are we really here?

20                   I think the position of SaveOn is,

21   "Well, until that court decision came about, people

22   were readying for this to possibly be the rule and so

23   therefore, we're reacting to it," and of course, they

24   are arguing that's why CAP came about, or whatever

25   other programs to deal with things.

```
                                              Page 57
1              So the -- and I appreciate that SaveOn
2    has said, "We don't want to know your pricing."  They
3    know my ruling on it.  I already said this, we're not
4    going to be going to how much money does J&J make off
5    of these drugs.  That's not really the issue, were
6    they doing great or not.  That's not what this is
7    about.
8              So let's get to what we have in the RFPs
9    that are actually in place.  First of all, the motion
10   to compel is with regard to the request number 8,
11   numbers 70 and 79.  I have to tell you number 8
12   doesn't seem to have anything to do with Best Price,
13   so I'm not sure why that's falling under this rubric.
14             MR. DUNLAP:  Isn't that --
15             THE SPECIAL MASTER:  It's the broadest
16   thing possible, "All documents, communications, with
17   or regarding SaveOn."  But it's so -- so, you know, I
18   don't see where this is specifically Best Price, but
19   okay.
20             MR. LoBIONDO:  And just to be clear,
21   your Honor, we are producing documents for, you know,
22   more than twenty custodians in response to that
23   request, so the people that actually have control and
24   actually have responsibility for the CarePath
25   program.  If it were true, this sort of conspiracy
```

```
                                                Page 58
 1    theory that, you know, we did a 180-degree in policy

 2    based on a rule that never went into effect, if that

 3    were true, SaveOn would already have proof of it,

 4    right?  We're producing documents from every business

 5    executive with direct responsibility for CarePath.

 6    We're searching those files for all documents

 7    mentioning SaveOn.

 8                    If, for example, Katie Mazuk, she's the

 9    senior person responsible for CarePath, if she

10    actually wrote an e-mail positing, as SaveOn's

11    briefing posits, "Oh, SaveOn has been great for us,

12    we love SaveOn; but because of these changes to the

13    Best Price rule, we need to do a 180," that would

14    have already been produced.

15                    Of course, that didn't happen.  Now, I

16    think their argument is going to be, maybe the

17    smoking gun is in the files of new custodians from

18    the J&J Government Compliance Group.  I just want to

19    address that at the outset.

20                    There is is no universe in which the

21    strategy for CarePath would not be in our CarePath

22    custodians' files that they already have.  Our

23    custodians are the people responsible for this

24    program and any notion that discussions of our terms,

25    or discussions of this lawsuit, would only be in the
```

Page 59

1    files of government compliance folks, it's just not

2    possible.  That's not their job.  So there's zero

3    need for a fishing expedition here into irrelevant

4    custodians from a completely different part of the

5    business.

6              I want to be very clear also what we

7    talk about when we're talking about Best Price;

8    because once you understand it, I think it will be

9    very clear why what they're seeking is categorically

10   irrelevant.

11             So the Best Price concept is, part of

12   the regulation, it relates exclusively to Medicaid,

13   which is not at all an issue in this case.  The idea

14   behind the rule is that Medicaid should get the "Best

15   Price for prescription drugs that are available in

16   the marketplace."  And the way it works is that J&J

17   and other drug manufacturers upload pricing data to a

18   portal maintained by CMS, which administers the

19   Medicaid program.  And the data J&J uploads includes

20   the best price in the market for each drug.

21             J&J uploads that data and then all it

22   does is check a box on the government website

23   confirming that the data is complete and accurate and

24   was prepared using the manufacturer's good-faith

25   reasonable efforts based upon existing CMS guidance.

Page 60

1    After that, there's a mechanism where J&J gives

2    rebates to the government.

3                    But none of this has the slightest bit

4    to do with this case.  This litigation involves no

5    Medicaid patients at all, zero.  This case is all

6    about commercial patients and that is, SaveOn's

7    scheme to misappropriate the assistance that J&J

8    makes available for patients with commercial

9    insurance.  As I said before, the folks that are in

10   charge of our co-pay assistance program, CarePath,

11   has nothing to do with Medicaid or government

12   compliance at all.  Those people are -- they are

13   already custodians in the case.  Everything that is

14   in their files that is relevant to SaveOn in any way,

15   we are already producing.

16                   I also very briefly want to touch on the

17   point you made between the 2016 rule and the 2020

18   rule because the parties agree that the 2020 rule

19   never went into effect.  But there's confusion and

20   perhaps a mistake in SaveOn's briefing about the 2016

21   rule, which is in effect, says.  SaveOn's briefing,

22   both their opening brief and their reply brief, say

23   that the 2016 rule requires J&J to ensure that all of

24   its co-pay assistance funding went exclusively to

25   patients.  That is just factually wrong.  The 2016

Page 61

1     rule does not require manufacturers to ensure.  That

2     "ensure" language didn't come in until the 2020

3     regulation, which never went into effect.  So the

4     entire --

5                    THE SPECIAL MASTER:  I don't think that

6     they say that.  I think what's hinted at there is,

7     what they are really saying is, maybe they said it,

8     but they said you wanted to turn a blind eye and

9     rather not know because, when you had to file your

10    reports, you could say, you know -- just not disclose

11    that that's the case.

12                    So I understand it may be playing with

13    the words, but it's more saying, we all know it

14    didn't require you to do something in particular,

15    which the next one would have.  That didn't come into

16    effect.  But I'm past that.  I don't need to argue

17    that.

18                    MR. LoBIONDO:  Okay.  I won't belabor

19    the point.  Then we just come back to, what if it is

20    true that we did this grand -- I think their Wording

21    is "180 change in policy."  If it were true, they

22    would already have that proof.  You know,

23    specifically, they said, "Okay, well, maybe there's a

24    connection between the Best Price rule and J&J's

25    decision to change the terms and conditions for two

Page 62

1    drugs in 2022."  Your Honor has already heard

2    arguments about that.  We're already producing

3    documents about our terms and conditions.  We're

4    specifically producing documents about why those

5    exact changes were made in 2022.

6               So if it were true that the terms were

7    changed for some reason related to Best Price, we're

8    already producing those documents.  Those documents

9    are not in the files of unrelated government

10   compliance people.

11              And I also just, to be very clear, if a

12   relevant document happens to have some discussion of

13   Best Price, we're not withholding it, we're producing

14   it.  If a document relates to both CAP and Best

15   Price, we're producing it.  We are not going through

16   and pulling out documents that say the words "Best

17   Price."

18              THE SPECIAL MASTER:  Let me ask you

19   this, Mr. LoBiondo, because we'll focus on this

20   point, which is really, I think, the one that they

21   make, which is the talking about the defenses of

22   mitigation and acquiescence.  As we know, I'll allow

23   them to explore why you amended your CarePath terms

24   in 2022, the CarePath program, the CAP program was

25   created, and their argument now was, "Well, the Best

Page 63

```
 1    Price rule that they thought would come into being,"
 2    could be another reason why you decided to make
 3    changes, why you decided to bring this lawsuit, etc.,
 4    etc.
 5                    But I take it what you're telling me is,
 6    if that were anywhere, and the words "Best Price"
 7    appear, they'd appear in those same documents.
 8    There's not -- are you telling me there are not going
 9    to be any separate documents that talk about where
10    that Best Price rule's -- we'd better be going after
11    SaveOn now, that it's already being captured in other
12    documents.  Is that what you're telling me?
13                    MR. LoBIONDO:  That's exactly right.
14    The decisionmakers that are talking about SaveOn, all
15    those documents are being produced.  The people
16    talking about the changes to the terms and
17    conditions, those documents are already being
18    produced.  There is nothing that could possibly be
19    relevant that isn't already getting produced.
20                    THE SPECIAL MASTER:  Okay.  I'm sorry,
21    is there anything else, Mr. LoBiondo, before I turn
22    to Mr. Dunlap?
23                    MR. LoBIONDO:  I'm happy to stop there,
24    unless your Honor has a question for me.
25                    THE SPECIAL MASTER:  No, I want to hear
```

Page 64

```
 1    how Mr. Dunlap is going to respond to what you've
 2    just said.
 3                   MR. DUNLAP:  Thank you, your Honor.
 4                   THE SPECIAL MASTER:  What do you believe
 5    is not showing up or would not show up in the
 6    searches that are already being done?
 7                   MR. DUNLAP:  I'd like to address that in
 8    the context of explaining why we think these
 9    documents are relevant.
10                   THE SPECIAL MASTER:  Okay.
11                   MR. DUNLAP:  If I may, and so just to be
12    clear, we're not, as you said, looking for pricing
13    data.  We're not trying to raise a complaint about
14    whether they complied or didn't comply with the Best
15    Price regulation.  What we are looking for are facts
16    about what J&J did or did not do in response to the
17    2016 or the proposed rule in 2023, because we think
18    they bear on the claims here.
19                   So what the Best Price rule says is that
20    drug manufacturers have to sell their drugs to the
21    Federal Government at the best price that they sell
22    to anybody else.  In doing so, they have to account
23    for any discounts or rebates or anything like that.
24                   What the 2016 rule says is you don't
25    have to count co-pay assistance as a discount as long
```

```
                                                    Page 65
 1    as all that money is going to the patients.
 2                 Now, we didn't argue that the 2016 rule
 3    requires them to ensure that.  To the contrary, the
 4    2016 rule says you don't have to ensure it but if you
 5    find out that any co-pay assistance fund is going to
 6    someone other than a patient, then you do have to
 7    count it in your Best Price.
 8                 So what that means as a practical matter
 9    is, if just for one patient we find that some co-pay
10    assistance is being taken by somebody else, they then
11    have to discount that amount from the price they
12    charge the federal government for every single
13    government person.  And so that could, because of the
14    volume at which they sell, that could be billions of
15    dollars a year, which creates a very strong financial
16    incentive for them not to investigate where their
17    co-pay assistance monies are going.  And we know that
18    J&J knew about SaveOn at least as early as 2017.  We
19    think in fact they knew about it in 2016.
20                 And so if J&J believed that sending
21    money to a patient on the SaveOn advised plan could
22    result in money going to someone other than the
23    patient, but they didn't want to know, so they said,
24    "We're not going to investigate who is on a SaveOn
25    plan," then they were willfully blind to where this
```

Page 66

1    money was going, and we think that that is strong

2    evidence that they failed to mitigate any purported

3    damages here.

4              And mitigation is a massive issue in

5    this case.  If they had a policy that they were not

6    able to know this, or they didn't want to know this,

7    that could dispense with the entire case potentially,

8    or certainly lop off many, many years' worth of

9    damages.

10             And this is not speculation.  We have

11   evidence, including Exhibit 6, which specifically

12   says, ███████████████████████████████████████████

     ██████████████████████████████████████  █████████

     ████████████████████████████████████████████

     ███████████████████  It's very strong evidence they actually

16   had that policy.  And so --

17             MR. LoBIONDO:  Can I address that -- I

18   apologize, please proceed.

19             THE SPECIAL MASTER:  Go ahead, just if

20   you know, and then Mr. LoBiondo can respond.

21             MR. DUNLAP:  Sure.  So if they have that

22   policy, and they are willfully blind, then we think

23   that's very, very relevant to mitigation.

24             Now, if -- we also know that they had

25   these internal checklists starting at around 2020,

Page 67

1    where they internally say, ███████████████

     ███████████████████████████████      It

3    doesn't talk about intent.  It says, ████████

     ███████████████████████

5            We need to know what was going on there.

6    Because if in fact they did some investigation where

7    they concluded internally that all the money was

8    going to patients even when they knew that some of

9    these patients were in SaveOn plans, that's highly

10   relevant.  Remember, they allege in this case that

11   some of this, the money, the CarePath funds they pay

12   out, goes to SaveOn.

13           And they use very incendiary language.

14   They talk about a stealing of the money, absconding

15   with the money, pilfering the money.  You've read and

16   heard all the accusations they made.  If they're

17   going to stand up in court and say, "SaveOn steals

18   co-pay assistance funds," we want to be able to stand

19   up and say, "That's not only not true, but you knew,

20   J&J, that that was not true because you internally

21   certified it wasn't true, and potentially, you also

22   told the federal government that it wasn't true."

23           THE SPECIAL MASTER:  Just a question.

24   Because when I read the various papers, it keeps

25   raising this question in my mind.

```
                                          Page 68

 1               I want -- each of you can walk me

 2     through, based on your view, of how this money

 3     actually flows, based on being in the SaveOn program.

 4               I thought, and I may be wrong about

 5     this, and I thought, "Okay, you go through this, you

 6     used up, you know, the deductibles, you do all this

 7     stuff and then at some point, whichever plan it is

 8     gives some commission or something to SaveOn."

 9               But the way I'm hearing it, though,

10     perhaps is the suggestion is that they are directly

11     getting money.  So my question is, could somebody

12     walk me through how this works once and for all?  I

13     read what Judge Vasquez wrote about his

14     understanding, they get 25 percent of whatever."  I

15     think he took that from the complaint, and making it

16     sound like, "Oop, that's a direct payment, goes right

17     to them."

18               But that wasn't exactly how I thought it

19     works.  So I'd like to hear from each of you and see

20     if you're going to explain it same way or not, to me,

21     how SaveOn actually gets money from this.  We know

22     they get money, but how it works.

23               MR. LoBIONDO:  I'm happy to address

24     that, your Honor, because I think it goes to our

25     allegation, right?  So we have alleged that SaveOn
```

Page 69

1    operates a scheme that inflates patients' co-pay

2    costs and they charge CarePath, our program, for many

3    extra thousands of dollars per patient to the tune of

4    over a hundred million dollars.  For every dollar in

5    co-pay assistance that SaveOn causes to be diverted,

6    the health plan keeps 75 percent and then SaveOn and

7    its business partners split up the rest.  And I don't

8    understand there to be a dispute about any of that.

9                    Actually, when SaveOn wrote a letter to

10    Judge Waldor last year, they more or less said that

11    we had understated our damages in the complaint.

12    They said that if we were allowed to exclude SaveOn

13    patients from CarePath, that would "cost SaveOn tens

14    of millions of dollars per year, and would cost the

15    employers who are SaveOn's clients over a hundred

16    million dollars per year."

17                    Now, I think the confusion perhaps is

18    that their reply brief says, "Oh, your Honor, we're

19    not taking over a hundred million of dollars per

20    year.  They are simply saving that much money by

21    causing it to be taken from us."  And to me that is

22    an entirely semantic game they are welcome to try

23    with the jury --

24                    THE SPECIAL MASTER:  Let me ask you

25    this:  Assuming that Mr. Dunlap is going to say,

Page 70

1    "Yeah, okay, that's how it works," how does that

2    implicate in any event the Best Price rule as direct

3    payments going to someone other than the patients?  I

4    don't understand.

5                    MR. LoBIONDO:  You don't understand it

6    because it doesn't make any sense, your Honor.

7    Our -- what we say to the government in Best Price

8    is, we give them the pricing in raw data.  There's

9    no, you know, long certification or anything.  We

10   gave them the data and we check a box on the

11   government website.

12                    So the idea that there is some -- that

13   we're making representations to the government about,

14   "SaveOn's not stealing our money," it's completely

15   absurd.  We would never make that representation to

16   the government because we can't make that

17   representation.  We don't know always and in what

18   circumstances SaveOn is behind scenes taking our

19   money.  In fact, that's the whole reason that the

20   District Court in D.C. threw out the 2020 rule,

21   because it recognized that this was information that

22   was not in manufacturers' control.  So --

23                    THE SPECIAL MASTER:  All right, so I --

24   and I don't have to go beyond this.  What I was

25   trying to say know is, and that's why frankly one of

Page 71

```
 1    the reasons I'm doing this motion last, because I've
 2    been trying to struggle with how this all worked
 3    because, in my mind, it is going all to the patient.
 4    I understand that the claim is at some point, because
 5    that there's -- it's additional funds and you're
 6    losing out because you're paying more, and because
 7    some portion is going to, obviously, the plan or the
 8    fund, and some portion for SaveOn.  But none of that
 9    CarePath money, as I understand it, is going to
10    anyone but the patient.
11                   MR. LoBIONDO:  This is how we've alleged
12    it works.
13                   THE SPECIAL MASTER:  Yes.
14                   MR. LoBIONDO:  A patient normally used
15    to have a $15 co-pay.  After they get coerced into
16    joining the SaveOn program, their co-pay is jacked up
17    to thousands of dollars.
18                   THE SPECIAL MASTER:  It becomes a
19    nonessential drug.
20                   MR. LoBIONDO:  Exactly, right.  So
21    SaveOn is getting the benefit of that money.  Whether
22    they are getting the same dollar bill, we've never
23    alleged that, and it's a complete distraction, your
24    Honor.  It's a distraction, I think, behind -- to get
25    at these irrelevant documents.
```

Page 72

```
 1                    THE SPECIAL MASTER:  Okay.  I just
 2      wanted to say, but when these are going, you know,
 3      it's not that CarePath, the CarePath money is being
 4      paid directly to SaveOn or someone else, it's going
 5      to -- okay, let's go to benefits --
 6                    MR. LoBIONDO:  Their pockets are lined
 7      on the back end.  They get a contingency, they get a
 8      cut.
 9                    THE SPECIAL MASTER:  Yes.  I get it.
10      Okay, so that's where I am.  So now, let me go back
11      to Best Price, fine.  So what relevance, if any, Best
12      Price can have.
13                    I heard what Mr. Dunlap described.  And
14      what he's really saying at this point is mitigation,
15      knowledge, and at some point, you thought that
16      somehow, this could be implicated by this new rule
17      based upon what they would have to do, and that was
18      behind all of a sudden bringing this lawsuit or
19      making the CAP program or whatever.
20                    But my real question, too, is,
21      Mr. Dunlap, what Mr. LoBiondo is representing is, you
22      are getting Best Price documents as well, to the
23      extent Best Price is referenced in these CAP
24      documents.  To the extent that is referenced in
25      whatever -- and I told them to produce what was
```

Page 73

1    behind CAP, as you know.  I allowed you to get those

2    documents as to why these changes were being made,

3    that it would be in there.

4              What do you think is not being produced

5    that a very limited search term could turn up that's

6    not being?

7              MR. DUNLAP:  Well, a few things, your

8    Honor.  In terms of what's not being produced, we

9    really think it's what's not being searched, that

10   there would be additional custodians who may have

11   access to this.  They may be in some of the multiple

12   groups between J&J.

13             And also, if you look at our motion,

14   we've requested specific categories of documents

15   going to what they said.  Most of our requests are

16   documents sufficient to show, for example, what they

17   told the government, the basis for their statements,

18   the basis for their allegations that we take money.

19   We do propose one search term for custodians.  If

20   they can tell us who the custodians are, we are glad

21   to negotiate that term based on hit counts.

22             So it's really a question of them not

23   looking in the right place.  We appreciate their

24   representation that we're getting everything but

25   we've seen before that that's not always the case.

Page 74

1    They told us, for example, that they were giving us
2    everything that was relevant on CAP, but we've had a
3    number of documents showing that new custodians had
4    to be added, which both Judge Waldor and your Honor
5    agreed with.  So what we're really asking them to
6    do is identify additional custodians or, if they're
7    not custodial sources that have things like copies of
8    the reports or copies of the checklists, produce from
9    there.  We're not asking for broad sweep.  We really
10   want to target in on what's most relevant.
11              Would I be able to address briefly --
12              THE SPECIAL MASTER:  Well, let's take a
13   look, though, at your RFPs.  Eight didn't request it,
14   70 requests documents, communication regarding
15   manufacturer co-pay assistance program funds counting
16   towards the calculation of a drug's Best Price,
17   including the anticipated impact of the 2023 Best
18   Price rule, and the impact on CarePath.  Okay.
19              MR. DUNLAP:  Yes.
20              THE SPECIAL MASTER:  And --
21              MR. DUNLAP:  Seventy-nine is for the
22   reports themselves.
23              THE SPECIAL MASTER:  And I don't know
24   what those reports will show you.  What's relevant
25   about the reports?

```
                                              Page 75

 1                MR. DUNLAP:  Okay.  And if I could

 2    answer that, I'd just like to put in context what

 3    opposing counsel said about how this works.  So we

 4    understand what they allege.  They allege there's

 5    some sort of independent program.  Again, that's not

 6    actually how it works.  SaveOn advises healthcare

 7    plans.  Those healthcare plans then are the ones who

 8    set co-pays, determine if drugs are essential or not

 9    essential, decides if payments will count towards

10    out-of-pocket maximums or not.

11                How they adjust the terms can then

12    result in the patients having higher co-pay

13    obligations and, when they make requests to J&J for

14    co-pay assistance, J&J then pays out more co-pay

15    assistance because all that money flows to the

16    patient, as we said, or technically to the pharmacy

17    on the patient's behalf.  None of those dollars go to

18    SaveOn.

19                As a result of that, the plans spend

20    less towards those drugs and therefore save money.

21    They then pay SaveOn a fee that is calculated in

22    reference to that.  But they never -- no co-pay

23    assistance ever flows to SaveOn, no percentage of

24    co-pay assistance ever flows to SaveOn.  And -- but

25    they are standing up and they are saying, "No, no,
```

Page 76

1    no.  SaveOn, you're taking our money, you're stealing

2    our money, you're absconding with our money,

3    pilfering our money," they've really exhausted the

4    source in terms of all the terms they use for how we

5    allegedly take all this.  And we want to show that

6    that's not true because, if you're going to stand up

7    in in front of a factfinder and say, "SaveOn is

8    stealing from this program or stealing from the

9    patients", we want to be able to show that that's not

10   correct.

11           And statements that they make either

12   internally through these checklists, where they say,

13   "No, no, this all goes to the patient," or

14   representations that they make to the government that

15   this was all calculated in compliance with the Best

16   Price rule, which means, "We're not aware of any of

17   this money going to anybody other than patients," we

18   think that's very relevant to shooting down those

19   allegations.

20           Plus, if in fact they had a policy ██

     ██████████████████████ where they were not allowed to

22   know -- they were not allowed to know -- if any of

23   the patients to whom they sent co-pay assistance were

24   on maximizers, or SaveOn, or accumulators, that's

25   huge because that's willful blindness.  It's failure

Page 77

```
 1   to mitigate.  It knocks out a huge number of damages.
 2   And we're not confident that any of those documents
 3   would have necessarily found their way over to JJHCS.
 4              If in fact there are decisionmakers
 5   about the Best Price rules, and J&J has yet to tell
 6   us who they are, they may very well have been the
 7   ones who said, "We're coming up with a policy where
 8   we, J&J, we don't want to know this."  And if that
 9   was a policy or practice or procedure, we definitely
10   need to know about it because it could knock out most
11   of the dollars at issue here.
12              I would like to address the '23 rule but
13   perhaps I should stop there to see if you have
14   questions about the 2016 rule first.
15              THE SPECIAL MASTER:  I think
16   Mr. LoBiondo is biting at the bit to respond to what
17   you just said.
18              MR. LoBIONDO:  Yeah, the idea that we
19   make certifications that SaveOn isn't diverting this
20   money, I just, again, shows that the entire premise
21   of this motion is wrong.  You know, I don't want to
22   belabor the point between the 2016 or the 2023 rule
23   because I think your Honor understands it.  But
24   what's happening is, there's this sort of muddying or
25   conflation of the two rules in part because their
```

Page 78

1    briefing, and I'm looking at it now, says, "The 2016
2    regulation requires the drug manufacturer to exclude
3    co-pay assistance program funds, or can exclude them
4    from the Best Price to the extent the manufacturer
5    ensures the program benefits are provided entirely to
6    the patient."
7                    That is not true.  That is not what the
8    regulation requires.  So there is no relevance to the
9    raw data that we give to the government.  We give
10    them the data, we check the box.
11                    I also want to address this notion that
12    J&J has been saying something different to the
13    government than what we've been saying in the
14    litigation through our allegations.  It's false.
15                    THE SPECIAL MASTER:  Can I ask you this?
16    The checkoff that you said, there's a box -- has that
17    been produced?
18                    MR. LoBIONDO:  That's from the
19    government website.  It's not one of our documents.
20                    THE SPECIAL MASTER:  All right, so they
21    have that.  They know what you answered.
22                    MR. LoBIONDO:  I don't know what they
23    have.  But I just want to be very clear.  To the
24    extent their briefing is saying, "You make all of
25    these representations," we don't.  We upload a file

Page 79

1   and we check the box.  But I do want to address your

2   Honor at this sort of "thesaurus" comment.  This is a

3   very public lawsuit.  We have very publicly alleged

4   that SaveOn is causing our co-pay assistance program

5   to be looted.  If those allegations were somehow

6   inconsistent with what Johnson & Johnson is telling

7   the Federal Government, you can be sure that the

8   government would have questions for us.  There is no

9   inconsistency.  And the notion that SaveOn, this

10  self-proclaimed ghost company which exists to profit

11  off patient assistance, the notion that SaveOn knows

12  more than about compliance with CMS regulation than

13  the federal government is a bit of a stretch.

14          The one other thing -- and I'm happy to

15  go through, you know, each one of the documents that

16  they say they need, you know.  They say they want our

17  Best Price submissions themselves.  I hope I've

18  addressed that.  The submissions are just data files.

19  They say, "Okay, redact the data.

20          If we redact the pricing from the best

21  pricing submissions, Judge, there's almost nothing

22  left, literally nothing left than the code for each

23  drug and the year that each line of pricing data

24  corresponds to.  They say they want documents

25  regarding their claims that SaveOn violated our terms

                                                  Page 80

1    and conditions and our decision to bring this

2    lawsuit.  I hope I've addressed that, too.  They are

3    getting all of that already.  Everybody involved in

4    the decision to bring this lawsuit, and involved in

5    the administration of CarePath at all, those people

6    are custodians.  We're searching for documents that

7    mention SaveOn, documents about our terms and

8    conditions, and finally they say --

9                THE SPECIAL MASTER:  May I ask a

10   question, Mr. LoBiondo?  Would those same custodians

11   be the ones that, if Best Price was part of the

12   decisionmaking matrix, they would be the ones who

13   would have said that?

14               MR. LoBIONDO:  Absolutely.  Because the

15   people with P&L responsibility for CarePath, yeah, if

16   there was going to be some huge hit to CarePath, the

17   people that we have as custodians are the

18   businesspeople responsible for CarePath.  Those

19   documents would already be in our production.

20               I think there was a reference to

21   Exhibit 6, which my friend on the other side says

22   showed that we had some kind of policy.  ██████████

     ██  ██████████████████████████████████████████████████

     ██  ███████████████████████████████████████████████ .

25   And here's the quote that they are relying on:

```
                                              Page 81
```

1  ████████████████████████████████

   ████████████████████████████████████

   ███████████████    ████████████████████

   ████████████████████████████  That's

5  the end of the quote.  And that's true, but it's not

6  because J&J had some policy of not knowing who is in

7  SaveOn.  It's because SaveOn and its business

8  partners won't tell us.

9            Our business has tried very hard to

10 figure out who is in SaveOn, including through a

11 motion made to Judge Waldor.  Now, SaveOn fights us

12 tooth and nail on that because they don't want the

13 money to stop flowing.  So they structure

14 transactions to evade detection, they lie to our

15 representatives, they play around with the amounts

16 that they take.  We've alleged all of this.  So

17 that's why -- by the way, obviously, we would never

18 and do never promise to the government that bad

19 actors aren't taking this money.  And when the 2020

20 rule threatened to force the manufacturers to make

21 that assurance, the D.C. court recognized that it

22 wasn't feasible and threw the rule out.

23            I'd like to make one other point, your

24 Honor, if I could, about the last category of

25 documents they say they want.  They want our reaction

Page 82

1    to the regulation.  As I hope I've made clear, if by

2    that they mean, you know, whether there were changes

3    to the terms and conditions, they are already getting

4    it.  But if they just want to go to a completely new

5    set of custodians from a different company and a

6    different group, Government Compliance, we think that

7    is way out of bounds.  We think they know it's out of

8    bounds.  And that's because more than a year ago we

9    served a request on them for documents relating to

10   their compliance with regulations.  Here's what they

11   said:  "It's a fishing expedition.  It's completely

12   tangential."  They said compliance with these

13   statutes has "nothing to do with whether SaveOn

14   induced patients to breach their contracts with JJHCS

15   or whether it deceived the public."  And they said,

16   I'm quoting, "Enough is enough.  This case needs to

17   be about the actual claims that Johnson & Johnson

18   brought."

19              Judge Waldor agreed with them.  We

20   accepted that.  We didn't seek clarification, we

21   didn't seek reconsideration, we didn't make three

22   more motions.  We just abided the Court's ruling and

23   moved on and we think it's the height of hypocrisy

24   for SaveOn to now say, "Well, we refuse to produce

25   documents about commercial insurance regulations, but

Page 83

1    now we want documents about a Medicaid regulation

2    from government compliance people that has literally

3    nothing to do with the commercial patients at issue

4    in this case."  We pointed this out in our brief, and

5    I really thought when --

6                    THE SPECIAL MASTER:  I read that.  I'm

7    not sure it's quite the same, but thank you.  I did

8    read that.

9                    MR. LoBIONDO:  I just want to point out,

10   they didn't say it's not the same in their reply

11   brief.  They didn't address it at all.  They could

12   have explained, if their positions were consistent,

13   why they were consistent.  They didn't say anything

14   about it.

15                   THE SPECIAL MASTER:  Let me just turn to

16   Mr. Dunlap as to anything else he might want to add

17   to this argument, and then I'll tell you where I

18   think we're going.

19                   MR. DUNLAP:  I think there are a number

20   of things I need to add because I haven't, I think,

21   even really gotten into the '23 rule.  But I want to

22   first just respond to a number of things opposing

23   counsel said.

24                   So, you know, the discovery we're

25   seeking here is really about J&J's conduct.  It's not

Page 84

1   about the regulation per se or whether their conduct

2   complies with the regulation.  It's about what they

3   actually did, specifically because we think things

4   they did in reaction to those rules are relevant to

5   showing that they failed to litigate or acquiesce to

6   our conduct or came up with a new interpretation of

7   the terms of conditions only for this litigation.

8            Again, they say, well, we're getting

9   everything relating to SaveOn but we're not getting

10  any insight into what is in these custodians' files,

11  because they wouldn't even tell us who the custodians

12  are who run search terms, those who are responsible

13  for reacting to the Best Price rules.

14           You know, I've heard my friend say,

15  "Well, if there is anything about a hit to CarePath,

16  that would be in JJHCS' files."  But the concern here

17  isn't about a financial hit to CarePath.  It's about

18  a financial hit to J&J as the entity selling drugs

19  that, if they find out that any of this co-pay

20  assistance money is going to a patient, then they

21  have to change the price that they're charging the

22  federal government.  And J&J as a drug seller would

23  lose a huge amount of money.  That's a big

24  financial --

25           THE ARBITRATOR:  I think I have to

Page 85

1    correct the record.  You said "is going."  If any of

2    the money is not going to a patient, you meant to

3    say.

4                    MR. LoBIONDO:  Is not going to a

5    patient, correct.

6                    THE SPECIAL MASTER:  Yes.

7                    MR. LoBIONDO:  I stumbled over that.  If

8    I could just -- if you would just indulge me, I'd

9    like to point to just a couple of exhibits.

10                   First, if we could open up -- do you

11   have access to our exhibits there from our motion?

12                   THE SPECIAL MASTER:  I do, but I don't

13   have them tabbed, so I tried to tab them myself.  You

14   know, I will say this to all of you, if you could do

15   this for me.

16                   I know you e-mail.  My request was, if

17   there are voluminous submissions, would you please

18   send them to me.  I had them printed for myself.  I

19   didn't have tabs for my exhibits.  I had to literally

20   go through and find one exhibit, and try and number

21   them myself.  So if you're going to be submitting

22   exhibits in the future, please send me a hard copy

23   that have tabs that are numbered that make it easier

24   for me to locate.

25                   But go ahead.  I did tab some of them

Page 86

1    myself, and I'll see if I can find them.

2                    MR. DUNLAP:  All right.  I'd like to

3    talk about Exhibits 6 and 7.

4                    THE SPECIAL MASTER:  Okay.  I know I

5    tabbed 6.  Okay.

6                    MR. DUNLAP:  ████████████████████

     ██████████████████████████████████████

     ████████████████████████████████      ██████

     ██████████████████████████████████████████

     ██████████████ .

11                   (A pause in the proceedings.)

12                   THE SPECIAL MASTER:  It will probably

13   easier if someone would screen-share with me, please.

14                   MR. DUNLAP:  We will try to figure that

15   out.

16                   (A pause in the proceedings.)

17                   MR. DUNLAP:  You see here, ████████████

     ██████████████████████████████████████

     ████████████████████      ████████████████

     ██████████████████████████████████████████

     ████████████████████      ██████████████████

     ████████████████████████████████████████

     ██████████████      ██████████████████████

     ██████████████████████████████████████████

     ██████████████      ████████████████████████

Page 87

1    ██████████████████████████████████████

     ██████████████████████████████████████

     █████████████████  ████████████████████

     ██████████████████████████████████████

     ███████████████████████████████████

     █████████

7              Now, opposing counsel tried to suggest

8    that somehow this is a reference to SaveOn or people

9    hiding their patients from J&J.  There's no

10   discussion of that at all.  ████████████████████

     ███████████████████████████████████████

     █████████████████████.  It's hard to say how

13   businesspeople at J&J would have any understanding of

14   what accumulators or maximizers would do in terms of

15   trying to hide patients.

16                    █████████████████████████

     █████████  ████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████

     █████████████

23              And that is clearly directed to co-pay

24   assistance, right?  Any amount of money paid to

25   directly to a payor on behalf of a patient impacts

Page 88

1   Best Price.  We think this is solid, dead-bang

2   evidence that there was a policy at J&J, at least for

3   some period of time, not to find out which patients

4   or payors have maximizers or accumulators.  The other

5   side may try to create some alternative reading of

6   the document but, for the discovery standard, we

7   certainly think that this more than plausibly

8   indicates that there was such a policy, and that's

9   directly relevant to mitigation because, if they

10  weren't trying to find out who was on these plans,

11  then they were failing to mitigate the damages that

12  they seek here.  So that's point one.

13              Point two, if you, or the -- your --

14  Mr. Fang is able to access Exhibit 7, and I'm not

15  sure if I should be waiting for that to go up on the

16  screen.

17              THE SPECIAL MASTER:  I think Wayne is

18  doing it first.  Go ahead.

19              MR. DUNLAP:  So I would ask to go to the

20  page ending in ███   Yes, there it is, okay.   ████

Page 89

1 ███████████████

2 ████████████████████████████████

███████████████████████████████

███████████████████████████████████

███████████████████████████████ ████

█████████████████████████████████████

██████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████ ██████████████

█████████████████████████████████████

█████████████████

13 ████████████████████████████

███████████████████████████████

██████████████████ ██████████████████████

███████████████████████████████████

████████████

18 ████████████████████████████████████

████████████████████████████████

█████████████████████████████████

█████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████.

25          That is directly contrary to the

Page 90

1    allegations made in the complaint and the accusations

2    that they have leveled at us, including in this

3    conference, that we take or pilfer or make off with

4    some portion of the funds.

5              We need to know what's behind this.  We

6    need to know what is their basis ███████████████

███████████████████████████████████████████

███████████  We also need to know, was that part of

9    what they took into account when they checked the box

10   or signed the form or did whatever they did in

11   submitting Best Price data to HHS?  Because it

12   certainly looks like they did, ████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████.

16             We need to know what was going on.  It's

17   not simply about getting the data forms or the

18   checked box.  We need to have the documents behind

19   this to understand what J&J knew, what actions it

20   took, what policies it had in terms of figuring out

21   where this money went and whether it did anything

22   about it.

23             These are critical documents, your

24   Honor, because if we can show that they had this

25   policy, that's mitigation.  If we can show that they

Page 91

```
 1   investigated and found none of the money went to
 2   anyone other than the patient, that is contrary to
 3   the allegations that they are making this case.  It's
 4   centrally relevant to what we are talking about here.
 5              THE SPECIAL MASTER:  But isn't it that
 6   they are not claiming that -- they are not claiming,
 7   I'm sorry, J&J, that you're stealing from the
 8   patient.  The claim is you're stealing from J&J.
 9              MR. DUNLAP:  Correct.  But this says ███

██ ████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

██ ██████████████████████████████████████████████████████

██ ████████████████████████████████████████████████████

██ ████████████████████████████████

15              Okay --
16              THE SPECIAL MASTER:  Because they are
17   claiming they are getting more from you than they
18   would have gotten if you didn't have this program.
19              MR. DUNLAP:  But again --
20              THE SPECIAL MASTER:  J&J would not pay
21   as much absent this program, is --
22              MR. DUNLAP:  -- the patients, but that's
23   a critical distinction.  They wouldn't pay as much to
24   the patients.  What they are saying, what they said,
25   and it sounds like what they want to tell the
```

Page 92

1    fact-finder is, we take money from patient, or we

2    take money from J&J.  What this shows is, that's not

3    true, all the --

4                    THE SPECIAL MASTER:  I lost the latter

5    part, taking money from J&J.  But let's go off the

6    screen again, please, so I can see.

7                    MR. DUNLAP:  This is not a semantic

8    point.  If they are going to stand up and say that we

9    take or abscond with this money, we have to be able

10   to show that they didn't actually believe that

11   because how the money actually flows is relevant

12   here.  It's relevant to causation, it's relevant to

13   ERISA preemption, and it's relevant to their

14   credibility because, if they don't think that we

15   actually take the money, then they shouldn't be able

16   to stand up and say that without us responding.

17                    Now, I'd like to just talk about a

18   couple of other things.  We don't think that the

19   Pharma case, the one that opposing counsel was

20   talking about, was relevant, because it's not really

21   about what the rule required or whether we complied

22   with it.  But I would just note that his

23   characterization of it is wrong.  They didn't say

24   that the rule simply says you have to state what your

25   intent is if you're a manufacturer.  What it said is

Page 93

1    that co-pay assistance doesn't qualify as a price

2    made available from a manufacturer to a

3    Best-Price-eligible purchaser; rather, a

4    manufacturer's financial assistance is available from

5    the manufacturer to the patient.  And a patient is

6    not a Best-Price-eligible purchaser.  That's the

7    Pharma opinion at page 5.

8                    So that actually supports what we're

9    saying, that the money goes from J&J to the patient.

10   We never take anything.  We get paid separately by

11   the plans.  And as for the 2023 rule, once that rule

12   is finalized, and it is -- the clock is ticking down

13   for it to be implemented, we see a change to J&J's

14   behavior.  They introduce CAP program, they

15   introduce these benefits investigations, they change

16   their terms and conditions for the Suda drugs, they

17   come up with this new interpretation of the terms and

18   conditions.

19                   And we think that that, all those

20   actions were probably in reaction to the anticipated

21   rule that was scheduled to take effect.  That

22   evidence is certainly consistent with them now trying

23   to figure out which patients are on those plans.

24                   On the other hand, we have evidence of

25   ████████████████████████████████████████████

Page 94

1   ████████████████████████████████████████

    ████████████████████████████████████████

    ██████████████████████████████████████████

    ████████████████████████████████████████

    ██████████████████████████████████████████████

    ████████.

7               So we really need to figure out what was

8   going on, because that's relevant to their

9   allegations, it's relevant to their interpretation of

10  the terms and conditions; and above all, it's

11  relevant for what did they do or not do as to

12  mitigation.

13              I just want to stress again, mitigation

14  could end this case or at least significantly reduce

15  it.  That's why we're pushing so hard for those

16  documents, and we're not seeking some massive fishing

17  expedition for every type of document under the sun.

18  Most of our requests are for documents sufficient to

19  show that we propose a single search term on the 2016

20  rule, and a single search term on the 2023 rule.

21              If they would identify the custodians

22  for us and give us head counts, we'd be glad to

23  negotiate that to make sure the burden isn't too

24  high.  But the relevance of these documents we don't

25  think can be disputed.

```
                                              Page 95

 1                    THE SPECIAL MASTER:  Okay.  Yes,
 2       Mr. LoBiondo, we're going to finish this.
 3                    MR. LoBIONDO:  Yes.  I don't want to
 4       belabor any points.  If I start to explain why any of
 5       that is wrong, and you tell me that you're not buying
 6       it already, I will move on.  But I actually think,
 7       you know, it's a good thing that opposing counsel
 8       brought up the Pharma case because there is a lot
 9       more in that decision than what counsel mentioned,
10       and it's not -- it's not dicta, it's not irrelevant
11       here.  It explains why the entire premise of this
12       motion makes no sense.
13                    Here is what the court said, I'm quoting
14       the decision:  "The accumulator adjustment rule of
15       2020 imposes new regulatory requirements on
16       manufacturers.  It has new language placing the
17       burden on manufacturers to ensure the patients
18       receive the full benefit of patient assistance
19       programs."
20                    So the stuff about checklists, this is
21       the rule that never went into effect.  The checklists
22       are a complete red herring.  They are internal
23       documents, they get used internally when employees
24       are dealing with terms and conditions.  They are
25       never submitted to the government, they are never
```

Page 96

1    quoted to the government, they have nothing to do

2    with Medicaid --

3                    THE SPECIAL MASTER:  Mr. LoBiondo, let

4    me ask you this, then:  Given also what you just

5    read, to the extent that, then, there was a concern

6    in the way that opinion is written would indicate

7    that it would have been directed at these kinds of

8    programs and accumulators, would not the argument be

9    from Mr. Dunlap; so, on concern that that rule was

10   going to take place, wouldn't that have resulted in

11   perhaps action on the part of J&J of how to deal with

12   this when that rule takes place?

13                   That's what he's looking for.  To --

14                   MR. LoBIONDO:  I understand but -- go

15   ahead.

16                   THE SPECIAL MASTER:  I was just going to

17   say, to me, the relevant time period really only

18   becomes from when that regulation was put out there

19   until the decision is entered, in that time period.

20   You know -- to see if there is some reaction based

21   upon that, which was probably, and if there were ever

22   to be, you know, something that would be searchable

23   on that, it's never going to be Best Price on its

24   own.  It would have to be Best Price with something

25   else.  That makes clear it's limiting action on your

Page 97

```
 1    part, which may be the CAP program or something else

 2    that you did.

 3              MR. LoBIONDO:  That's the reason why

 4    this is a complete dead end, your Honor, because we

 5    end were we began.  If there was a massive shift in

 6    policy because CarePath was all of a sudden going to

 7    bankrupt the company, that would already be in the

 8    files of the people they already have.  ████████████

      ███████████████████████████████████████████████

      ████████████████████████  ██████████████████████████

      ██████████████.  He says it shows a policy.  Of course,

12    it does not show a policy.  But if that person was

13    talking about a policy, that policy would be in that

14    custodian's files.  It would be in Keith Jeffcoat's

15    files; it would be in Katie Mazuk's files.  Any

16    policy relating to CarePath is not going to be found

17    in the Medicaid compliance group.  It's just, it's a

18    total non-sequitur.

19              THE SPECIAL MASTER:  So let me ask you

20    this, Mr. LoBiondo, and I don't think that Mr. Dunlap

21    has identified a custodian that he thinks would have

22    it.

23              Are you representing to me that the only

24    custodians that would have been talking about this or

25    responded to this possible Best Price rule that could
```

Page 98

1    come effect in 2023, by taking some sort of action

2    and stating a policy, are the custodians who are

3    already being served?

4                    MR. LoBIONDO:  As it relates to

5    CarePath, which is the only program at issue in this

6    case, absolutely.  I'm sure there were completely

7    irrelevant conversations happening about Best Price

8    in the Government Compliance Group, but anything that

9    deals with CarePath, whether it's profitability of

10   CarePath, to the extent that's a thing, or the idea

11   that CarePath would be causing a problem in other

12   areas of the business, which is what we just heard,

13   that's going to go through Katie Mazuk and her entire

14   group, who are all custodians and we're searching all

15   their files already.

16                    THE SPECIAL MASTER:  Yes, Mr. Dunlap?

17                    MR. DUNLAP:  If I could respond to a

18   couple of points here, we certainly agree that

19   anything from the time the '23 rule was proposed --

20   it was actually proposed, I believe, in mid 2020 --

21   forward, but certainly until the time it was struck

22   down would be relevant in terms of searching.

23                    We also think that the checklists, the

24   ones that I went through with you, those are relevant

25   whether they were submitted to the government or not.

Page 99

1    If J&J is internally certifying that all the money

2    goes to the patients, that is contrary to the

3    allegations they are making here.  And we should have

4    the right to explore why they said that, what they

5    did to figure it out, so we can show the

6    contradiction between the allegations here and their

7    internal --

8                    THE SPECIAL MASTER:  Mr. LoBiondo, that

9    checklist is already out there, at least one of them.

10                   MR. LoBIONDO:  The checklists have been

11   produced.  We're not making any certifications based

12   on the checklists.

13                   THE SPECIAL MASTER:  Okay.

14                   MR. LoBIONDO:  Hope I've explained what

15   we tell the government --

16                   THE SPECIAL MASTER:  So you have the

17   checklist, Mr. Dunlap.  You're disputing that?  He

18   says you've gotten them, obviously, because it was

19   just put up on the screen for me.

20                   MR. DUNLAP:  If I could respond to that,

21   so again, even if it's not submitted to the

22   government, he's representing or saying that they

23   never make such a representation to the government,

24   and it's in the documents to prove that's true.

25                   But even if it were true, it's still

Page 100

1    relevant that █████████████████████████

█    ████████████████████████████████████████

3                    THE SPECIAL MASTER:  -- so I don't

4    understand what you're looking for, he said that you

5    got the checklist.

6                    MR. DUNLAP:  We have the checklists but

7    we don't know how they were developed and what goes

8    into certifying.  So if you look at that,

9    Exhibit 7 --

10                   THE SPECIAL MASTER:  Well, ask in an

11   interrogatory, who prepares the checklists, and

12   respond to that.  That's not a document.  To me --

13   look, we can go round and round in having so many

14   requests.  I want to get to getting answers.  And if

15   your question is that you do have the checklist, and

16   you want to know who was responsible for creating

17   that checklist, and do they rely upon any policies or

18   directions in doing so, and then request those

19   documents.  That will be directed.

20                   So that's what I'm telling you to do.

21                   MR. DUNLAP:  Thank you, your Honor.

22                   MR. LoBIONDO:  If I could --

23                   MR. DUNLAP:  I'm sorry, could I just

24   make one point --

25                   THE SPECIAL MASTER:  Yes.

Page 101

1          MR. DUNLAP:  -- we have already

2     identified all the custodians.  You know, it's sort

3     of this "nothing to see here, nothing behind the

4     curtain" approach we've heard before.  I mean, just

5     again, on Exhibit 7, ████████████████████████

██████████████████████████████████████████

██████████████     ██████████████████████████

████████████████████████████████████████

██████████████████████████     And it's a bit

10    of shooting in the dark to say, "well, we should

11    identify those custodians."  We think now that we've

12    identified relevant materials like the checklists,

13    and relevant materials like these decs showing that

14    they had this internal policy -- we're suggesting

15    that they had this internal policy not to know --

16    once we've identified that, it's incumbent on them to

17    identify who are the people who have actual knowledge

18    of this, and then we can talk about searching their

19    files.  Otherwise, it's game of blind man's bluff

20    trying to figure out who the right custodians are.

21    It's inefficient, it takes a huge amount more time,

22    and it results in a sort of drip, drip, drip approach

23    to discovery.

24          I thinks it would be much better if they

25    just say, "All right, here are the people from

Page 102

1   whatever groups you want to identify who are

2   responsible for these checklists and for filling them

3   out, who are responsible for the certifications, who

4   are responsible for responding to the '23 Best Price

5   rule, not limited to JJHCS, but wherever they are,"

6   and then we'll talk about who we should add, and

7   search terms, and connectors and all the rest of that

8   stuff.  But it sort of hamstrings the discussion if

9   they won't tell us who the custodians are in the

10  first instance.

11              MR. LoBIONDO:  The thing that hamstrings

12  the discussion is that we are working from the

13  assumption that stuff is relevant that is

14  categorically irrelevant.  I think your Honor has

15  already ruled that if they want to ask in an

16  interrogatory who works on these checklists, we will

17  respond to the interrogatory.  But it is not a basis

18  to go to a completely different part of the company

19  and say, "You need to tell us everybody who's

20  relevant."  We don't think anybody is relevant.

21              THE SPECIAL MASTER:  Let me define this

22  for you.  It would be asking who is responsible for

23  creating the checklist, and are there -- and if there

24  is a policy with regard to how these checklists are

25  created, who is responsible for that, and then ask

Page 103

1    for the policies.  And let's be more directed about

2    this, as opposed to this blunderbuss, you know, way

3    of producing documents.

4              I would like things that are homed into

5    what the real inquiry is and I think those are

6    appropriate inquiries; and Mr. Dunlap, I suggest that

7    you go about doing it that way and then we'll get to

8    what we need to get done.

9              MR. DUNLAP:  Your Honor, if I could ask

10   for clarification on that, because you talked about

11   asking for people relating to the checklists and the

12   documents relating to the checklists, and they want a

13   separate request for that.  We're glad to do that,

14   but I thought --

15             THE SPECIAL MASTER:  And as to policies,

16   too.  And if there is any policy that directs how

17   these checklists are to be responded to with regard

18   to these particular questions, I don't know what else

19   is on there, but we're focusing only on these

20   questions that you identify.  Go ahead.

21             MR. DUNLAP:  -- but then I just wanted

22   to make sure that -- I think you also talked about

23   the time period when the 2023 rule had been proposed

24   and the time that it was either struck down or took

25   effect.

Page 104

1              THE SPECIAL MASTER:  I had a limited

2     time period because to the extent that the inquiry is

3     that you think that actions were being taken in

4     response to this regulation, that believes -- I think

5     that's the appropriate time period to search.

6              MR. DUNLAP:  Understood.  So I guess the

7     question is what additional searches we would have to

8     do within that time period, and I think that quickly

9     again leads us to the questions of --

10              THE SPECIAL MASTER:  Not yet.  Not --

11              MR. DUNLAP:  -- identifying people --

12              THE SPECIAL MASTER:  Not yet.  I asked

13     you to do another step first.  Before you get to that

14     of more searches, let's have these preliminary

15     questions so that we can direct it, and then your

16     discussion or your meet-and-confer will make a lot

17     more sense.  Something in fact, based on facts.

18              MR. DUNLAP:  I'm -- I have one

19     additional question for your Honor.

20              THE SPECIAL MASTER:  Go ahead.

21              MR. DUNLAP:  What I'm about to address

22     has come up multiple times, and I just feel we're

23     back on the same thing again, which is, it sounds

24     like, what I understand from the other side, that a

25     lot of the people who may be responsible for the

Page 105

1   checklist or for reaction to the Best Price

2   regulations may not be within JJHCS, and they have --

3   the other side has generally said they don't want to

4   produce from outside of JJHCS unless compelled to do

5   so, with one minor exception.

6           So if we're going to serve these

7   interrogatories, and they are going to say, "We're

8   not answering for anyone outside of JJHCS," I feel

9   we're going to be right back here --

10          THE SPECIAL MASTER:  Well, I would

11  expect that what I'm going to hear is, if they are

12  going to say, "We're not responsible for creating the

13  checklists, this is the entity that does it for us,"

14  or whatever it is, they are going to identify what

15  that is.  And if it's -- you know, and then you go to

16  the next step.  I don't know that there's someone

17  else who does it.  I would assume, and if you're

18  saying, is there another entity in the J&J family of

19  companies as opposed to J&J, we'll find out what that

20  is and then we'll take the next step.

21          MR. DUNLAP:  That's very helpful as long

22  as they are going to tell us what the entity of other

23  people are even if they're outside --

24          THE SPECIAL MASTER:  Right.  Yes.  I

25  agree with that.  That's going to be done.  Okay?

Page 106

1    What else?  Does that cover today until the next

2    time?  Okay.

3                  All right, look, I thank you for, I

4    guess, I thank you for all your submissions.  I do

5    read them, probably more than once, sadly.  But we

6    set some parameters at the beginning of this.  As I

7    said, please keep them in mind about page

8    limitations, about timing for responding to these

9    motions, about meeting and conferring, you know,

10   you're probably -- we can go off the record a second.

11   Thank you, David.

12                  (Discussion off the record.)

13                  THE SPECIAL MASTER:  Okay, thanks all

14   for being on today, and let's move forward.  Okay,

15   thanks very much.  Have a good holiday weekend.

16                  (Time noted:  1:22 p.m.)

17

18

19

20

21

22

23

24

25

Page 107

1              C E R T I F I C A T E.

2              I, DAVID LEVY, a Certified Court

3    Reporter and notary public of the State of New

4    Jersey, certify that the foregoing is a true and

5    accurate transcript of the stenographic notes of the

6    matter taken before me on May 23, 2024;

7              I FURTHER CERTIFY that I am neither

8    attorney, nor counsel for, nor related to or employed

9    by, any of the parties to the action in which this

10   deposition was taken, and further that I am not a

11   relative or employee of any attorney or counsel in

12   this place, nor am I financially interested in this

13   case.

14         IN WITNESS WHEREOF, I have hereunto set my

15   hand this 27th day of May 2024.

16

17

18         _David Levy_____

19

20         DAVID LEVY, CCR, RPR, CLR

21         LICENSE NO. 30X100234000

22

23

24

25

# EXHIBIT 5

**Confidential - Filed Under Seal**

# Exhibit 6

```
                                              Page 1

1                UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
2

    JOHNSON & JOHNSON HEALTH CARE
3   SYSTEMS, INC.,
                         Plaintiff,
4

           -against-               C.A. No. 22-2632
5

    SAVE ON SP, LLC,
6                    Defendant.
    --------------------------------x
7                              April 3, 2024
                               1:30 p.m.
8

9                    ARGUMENTS ON MOTIONS
10

11

12  B e f o r e:
13           HON. FREDA WOLFSON (Ret.),
14                        Special Master
15

16       TRANSCRIPT of the stenographic notes of the
17  proceedings in the above-entitled matter as taken by
18  and before DAVID LEVY, a Certified Court Reporter and
19  Notary Public of the State of New Jersey, held
20  remotely over the Internet, Wednesday, April 3, 2024,
21  commencing approximately 1:30 in the afternoon
22

23

24

25
```

Page 2

1 A P P E A R A N C E S :
2      (All appearances via Zoom telconference.)
3 PATTERSON BELKNAP WEBB & TYLER LLP
4 Attorneys for Plaintiff
5      1133 Avenue of the Americas
6      New York, New York 10036
7 BY:  HARRY SANDICK, ESQ.
8      JULIA LONG, ESQ.
9      GEORGE A. LoBIONDO, ESQ.
10      SARA A. ARROW, ESQ.
11      CASSANDRA DESKUS, ESQ.
12        -and-
13 SILLS CUMMIS & GROSS P.C.
14      The Legal Center, One Riverfront Plaza
15      Newark, New Jersey 07102
16 BY:  JEFFREY J. GREENBAUM, ESQ.
17        -and-
18 SILLS CUMMIS & GROSS P.C.
19      101 Park Avenue, 28th Floor
20      New York, New York 10178
21 BY:  KATHERINE A. LIEB, ESQ.
22
23
24
25

Page 3

1 A P P E A R A N C E S (Cont'd):
2
3 SELENDY GAY ELSBERG PLLC
4 Attorneys for Defendant
5      1290 Avenue of the Americas
6      New York, New York 10104
7 BY:  PHILIPPE SELENDY, ESQ.
8      ANDREW R. DUNLAP, ESQ.
9      ELIZABETH SNOW, ESQ.
10      HANNA MILES, ESQ.
11      MEREDITH NELSON, ESQ.
12      EMMA HOLLAND, ESQ.
13        -and-
14 ROBINSON & COLE LLP
15      666 Third Avenue, 20th Floor
16      New York, New York 10017
17 BY:  E. EVANS WOHLFORTH, JR., ESQ.
18
19
20 ALSO PRESENT:
21 JULIA KIECHEL, ESQ., Johnson & Johnson
22 WAYNE FANG, ESQ., Lowenstein Sandler
23
24
25

Page 4

1      THE SPECIAL MASTER:  If I could, we do
2 have a court reporter with us today, and I'm, while
3 we have many people on the Zoom hearing for the
4 various motions that I'll be hearing this afternoon,
5 I assume there's a select number that will actually
6 be arguing.  So if you could all be so kind as to
7 just on each side, starting with plaintiff, indicate
8 who might be arguing on the record today, so the
9 Court reporter and I can have that information.
10      MR. GREENBAUM:  Good afternoon, your
11 Honor, this is Jeffrey Greenbaum.  We have a division
12 of labor here on the different items.  Would you like
13 me to list who is going to be addressing which is
14 items, or just list the names of everyone who will be
15 addressing matters?
16      THE SPECIAL MASTER:  You can do for now,
17 and and then when they come on, we'll make sure we
18 know who it is, so just go ahead.
19      MR. GREENBAUM:  Okay, I will be
20 addressing one item, Sara Arrow from Patterson will
21 be addressing another.  Several, Julia Long will be
22 addressing some items, and George LoBiondo will be
23 addressing an item, and Harry Sandick will be
24 addressing an item, or more than one item.
25      THE SPECIAL MASTER:  Okay, I've got it.

Page 5

1 And on the Defendants' side?
2      MR. WOHLFORTH:  Can you, Judge Wolfson,
3 can you hear me okay?
4      THE SPECIAL MASTER:  I can.  Who's
5 speaking?  I don't think you have a picture on.
6      MR. WOHLFORTH:  I do, this is Evans
7 Wohlforth.  I'm sorry.  I should have identified
8 myself.
9      THE SPECIAL MASTER:  Let's see where you
10 are.  Maybe you're on the next screen.  Oh, I see
11 you, Evans, okay.  I've got it.
12      MR. WOHLFORTH:  Thank you.  This
13 is Evans Wohlforth for Defendant SaveOnSP from the
14 Robinson & Cole firm.  With me are my colleagues who
15 will be addressing the Court, Andrew Dunlap, Meredith
16 Nelson, Elizabeth Snow, Hannah Miles, and I believe
17 that Phillipe Selendy is joining us but is not
18 expected to speak.
19      THE SPECIAL MASTER:  Okay.
20      MR. WOHLFORTH:  The Selendy Gay firm
21 admitted pro hac vice in this matter.
22      THE SPECIAL MASTER:  Okay, thanks very
23 much.  All right.  So on the order of things, and I
24 confirmed yesterday and clarified, yes, we have a
25 number of motions on today.  The motion for

2 (Pages 2 - 5)

Page 6

1 reconsideration, I'll just be issuing a letter order
2 on that. I won't be taking argument.
3         I will start by, the first thing that
4 I'm going to hear is the claw-back motion, which is
5 also the first one filed. Then I'm going to be
6 hearing CAP 1 and CAP 2, where I call them CAP 1 and
7 CAP 2, and then Defendants' motion for relief
8 pursuant to the February 6th order. And then from
9 there, I'll decide how I want to go, will it be the
10 last three motions on the Plaintiff's motion to
11 compel with regard to 92, 102, 103, and the motion on
12 95 and 96, and then the motion for supplementary
13 interrogatory responses.
14         So let's start with the claw-back
15 motion. Who will be arguing that on each side?
16         MS. ARROW: Good afternoon, your Honor,
17 Sara Arrow for Johnson & Johnson Health Care Systems.
18         MS. MILES: And, your Honor, Hannah
19 Miles for SaveOn.
20         THE SPECIAL MASTER: Very good. And one
21 of the things that I want to say before we begin,
22 which was logged in the e-mail that I sent, and for
23 those of who you've appeared before me when I was on
24 the Court, they are familiar with how I do things
25 which is that I read the papers. I really don't want

Page 7

1 presentations from anyone, unless -- there's some
2 crazy thing came up, I don't know what this is on my
3 screen. Get back to me -- okay, we're good.
4         And instead what I'm going to do is, I
5 generally ask questions and then allow you to argue
6 as you wish based upon the things that I would like
7 to know.
8         So -- and I wanted to let you know that
9 in advance so you didn't come in with a prepared
10 statement thinking we'll be doing that today. And we
11 have so many on I want to move them along. So with
12 me, prior to the claw-back motion, which is the
13 motion to withdraw Exhibit 81 -- and if you don't
14 mind, I'll just say J&J's motion, even though we all
15 know it's Johnson & Johnson Health Care Systems, and
16 the Defendant will be SaveOn -- is the motion to have
17 Exhibit 81 be clawed back.
18         This was produced in a redacted form,
19 and at this time, and it is under seal. I know that
20 that is the case on the record, but the application
21 has now been made and a letter that was sent in, I
22 think it was early in December, asking that the
23 entire document be clawed back. SaveOn said that,
24 pursuant to what I said, pursuant to the protocol,
25 that they would destroy it. But we're here arguing

Page 8

1 on the motion that they have objected to doing so.
2 The arguments were largely focused on the defense
3 side against the claw-back on waiver grounds, but
4 also there was reference to whether we're receiving
5 a privileged document at all. I asked for an
6 in-camera submission. I got the unredacted version,
7 and let me just set forth also how this was used or
8 produced.
9         I'm not sure, it was initially produced
10 when, Ms. Arrow?
11         MS. ARROW: Sure, your Honor. It was
12 initially produced in redacted form in April 2023.
13         THE SPECIAL MASTER: Okay. And then at
14 some point, I guess in a Jeff Greenbaum letter that
15 was submitted, where SaveOn attached that exhibit,
16 and that was back in, I think that was October, and
17 J&J referred to the exhibit in a section of the
18 letter. I know there's been a rig back and forth of
19 who actually used or produced it. Yes, SaveOn
20 attached it but both parties addressed it in their
21 submissions and then on December 6, J&J sent the
22 request to destroy Exhibit 81.
23         Now, with regard to the issue of
24 privilege, now what I've gotten is -- and it was
25 not -- when this was produced in redacted form, now

Page 9

1 you've told me that that was back in April of 2023,
2 there had not been an objection on the privilege
3 designation, isn't that correct, Ms. Miles?
4         MS. MILES: It is correct, but part of
5 the reason was because we didn't actually get a
6 privilege log on this until February 2024.
7         THE SPECIAL MASTER: Okay. But you did
8 have a document produced to you in redacted form back
9 in April.
10         MS. MILES: Yes, but we didn't know the
11 basis on which it was being redacted.
12         THE SPECIAL MASTER: Okay. But you did
13 use it in a submission and attach it in October, so
14 you had it in that redacted form. And I guess no
15 question was raised at the time about what was being
16 redacted or -- that there may be any issue of
17 privilege, is that correct, back in October when you
18 attached it?
19         MS. MILES: Yes, that's correct. We had
20 been using the document as it had been produced.
21         THE SPECIAL MASTER: Okay. So I will
22 say that I'm, you know, this involved. It's been
23 represented on the redacted portion -- I have the
24 unredacted -- that this reflected ██████████
██████████████████████████████████████████,

3 (Pages 6 - 9)

Page 10

1 correct? And the e-mail chain at some point as it
2 went up, on what was produced but was not redacted is
3 ██████████████████████████████████████████
██████████████████████████.
5        And the argument that you've now
6 presented to me, or the position that you presented
7 which includes also in a supplemental letter that you
8 gave me that initially it was an attorney-client
9 privilege that you said was the basis of the
10 redaction; and then, subsequently said, work product.
11 Is that right, Ms. Arrow?
12        MS. ARROW: Yes, and just to be clear,
13 the initial portions in the e-mail exchange were very
14 obviously protected by the attorney-client privilege
15 ████████████████████████████████████████, as
16 ██████████████████████████████████████████
██████████████████████████████████████████
██████████.
19        The remaining portions of the document
20 include only business personnel, business personnel
21 who are performing analyses in anticipation of
22 litigation; but it was not clear to JJHCS, and we
23 only realized at a subsequent point in time that
24 those later portions of the e-mail in fact contained
25 work product. And that was not obvious based on the

Page 11

1 four corners of the document and only became evident
2 to us following reasonable investigation and
3 following the collection of additional contextual
4 information that allowed us to make that
5 determination.
6        THE SPECIAL MASTER: Okay. I accept
7 your position as to the original redaction, that it
8 appears to be not a business but an attorney-client
9 communication. I would not be saying that part of
10 the document has to be produced, so we will focus
11 solely on the rest of the e-mail chain.
12        I would not have said that the rest of
13 it was protected pursuant to attorney-client, based
14 on the face of that document, so I think your focus
15 really was a work product argument only as to the
16 unredacted portions.
17        Now, at this point, and I think work
18 product argument was raised in your last letter, the
19 supplemental letter that you submitted to me.
20        So, Ms. Miles, I'm going to turn to you.
21 You know that the unredacted portions look like this,
22 what you have, that's what you're looking to redact
23 at this point. And what they have represented is
24 going back now -- I want to confirm this though, with
25 you, Ms. Arrow -- we see the e-mail chain, but I

Page 12

1 think what you said, and I want to make sure that
2 this is accurate, is that based upon some further
3 investigation, you have confirmed that the
4 information being provided in this e-mail chain was
5 pursuant to counsel's request that began with the
6 initial e-mail and it was being done in anticipation
7 of the litigation for purposes of preparing the
8 complaint. Is that your position?
9        MS. ARROW: That is our position, your
10 Honor. And I just would add, specifically without
11 disclosing the specific contents of those
12 communications, the communications exchanged between
13 those business personnel were done in support of
14 certain damages calculations made for the purposes of
15 our complaint in this litigation.
16        THE SPECIAL MASTER: Okay. So I mean,
17 putting aside an e-mail that says, "A Friday invite
18 will becoming your way, giving you a heads up," which
19 has nothing to it other than the fact that they are
20 going to have a meeting, but that's not what we're
21 concerned about, whether you're -- how protected I'm
22 sure that particular e-mail was.
23        So Ms. Miles, I want to turn to you.
24 With the representations that they've made upon
25 probing with their inside people and their counsel

Page 13

1 that these follow-up e-mails were providing the
2 information that in-house counsel requested for
3 purposes of preparing a damages analysis for the
4 litigation.
5        What is your response as to why that
6 should be protected?
7        MS. MILES: Your Honor, just to be
8 clear, we do not have a copy of the partially
9 redacted version of this document anymore.
10        THE SPECIAL MASTER: Okay. Okay,
11 thanks.
12        MS. MILES: J&J --
13        THE SPECIAL MASTER: So you don't have
14 it in front of you to refer to anymore because you
15 destroyed it.
16        MS. MILES: We destroyed it pursuant to
17 the December 6th claw-back and then we --
18        THE SPECIAL MASTER: Okay.
19        MS. MILES: -- and we destroyed any
20 copies that we had in our docket file in January when
21 we realized --
22        THE SPECIAL MASTER: Okay.
23        MS. MILES: -- before December 6th.
24        THE SPECIAL MASTER: Okay. But you must
25 have some recollection because we've been arguing

4 (Pages 10 - 13)

Page 14

1 whether the privilege applies; but given the
2 representations made and the investigation that was
3 done and the representations, I don't know that you
4 can substantively argue it's not subject to a work
5 product privilege, but then you get your waiver
6 argument. I'm just asking, do you have anything that
7 you could argue against that assertion?
8        MS. MILES: So without arguing about the
9 content of the document, because I don't have it in
10 front of me, we will note that to the extent that
11 there is some privileged information on the document,
12 we can would ask that J&J be ordered to redact that
13 information and not withhold the e-mail chain in its
14 entirety, because there is factual information in the
15 e-mail chain such as the so-called envelope
16 information, `the "to," the "from," the "cc," that is
17 probably not privileged, even if there is some
18 underlying privileged information.
19        THE SPECIAL MASTER: Well, I think the
20 fact is, I would not agree with you. There are
21 certain things that would be considered facts, but
22 that you would be able to obtain as well. But those
23 are facts that they are getting in their way of
24 analyzing this in connection with the request that
25 was made. That's what we're concerned about. We're

Page 15

1 thinking of, what is the attorney looking at this and
2 asking for information.
3        I will tell you that based upon the
4 representations that have been made by counsel, and
5 the further inquiry that they made, I would find that
6 the e-mail chain would be protected by the work
7 product rule. So we then go to the waiver issue.
8 I'm sorry, does someone want to say something?
9        And we're talking about the portions of
10 course that were not redacted, with the e-mail chain
11 being protected. Now, with regard to the waiver, by
12 the way, I had to remind myself when the case was
13 being cited, the Ciba-Geigy vs. Sandoz case, actually
14 that was my opinion in 1996, that was one of the
15 factors when I was a magistrate judge, but let's just
16 look at those.
17        And the four factors that all of you
18 have identified as well, is, our -- whether
19 precautions were taken to prevent inadvertent
20 disclosure given the extent of the document
21 production, the quantity of inadvertent disclosure --
22 we're only talking at the moment about one -- the
23 extent of the disclosure and extent of any delay in
24 measures taken to rectify the disclosure and any
25 overriding interests of justice.

Page 16

1        I think the focus as I've read it here
2 has really been about the delay; is that fair,
3 Ms. Miles?
4        MS. MILES: Yes. The delay, but then
5 also what the parties did with the document during
6 the pending hearing --
7        THE SPECIAL MASTER: Right.
8        MS. MILES: -- so I'm happy to talk
9 about that if it would be helpful.
10        THE SPECIAL MASTER: Okay. All right.
11 So -- well, let me talk to you, Ms. Arrow, on -- you
12 are the disclosing party and you have the burden of
13 demonstrating that -- what was done here. And so
14 talk to me. You've heard the two things that
15 Ms. Miles was focusing on, what was done with the
16 document, and also the timing.
17        MS. ARROW: Thank you, your Honor. So
18 we -- we believe, your Honor, that we took
19 appropriate precautions to prevent the inadvertent
20 disclosure here; and in fact, that is reflected, we
21 believe, in the record of our having taken
22 painstaking efforts to identify the privileged
23 materials in the first instance, to continue our
24 investigation and ensure that we captured when we
25 discovered the work product protection issue as well,

Page 17

1 to issue a claw-back notice consistent with the
2 parties agreed-upon procedures in the confidentiality
3 order and protective order, and to -- to ensure that
4 this particular document which, as your Honor knows
5 is a single two-page document that was already
6 redacted for privilege, that has never been available
7 on a public docket, and that was included among 1,800
8 pages of exhibits to a filing that we took
9 appropriate precautions to alert counsel for the fact
10 that we understood that document contained work
11 product and that we expected counsel to delete all
12 copies of the document in its possession.
13        Upon receiving notice from counsel that
14 the document remained on a public docket, we took
15 nearly immediate actions within the business day. We
16 alerted Judge Waldor, we alerted your Honor as to the
17 fact that this document was on a public docket, and
18 we requested that it be withdrawn from that docket.
19        So we think that we have taken really
20 quite -- quite extensive efforts to ensure that both
21 our privilege and work product protected materials
22 are shielded from disclosure.
23        I would also just add, your Honor, that
24 you know, the document remains under permanent seal,
25 and if it was not obvious to us in the first instance

5 (Pages 14 - 17)

Page 18

1 because -- because these are discussions between
2 businesspeople, it was not obvious to us when we did
3 that very careful, close privilege review that it was
4 work product; but immediately upon learning of the
5 issue, we took very rapid steps to contain it.
6        THE SPECIAL MASTER:  Now, let me ask you
7 about that, Ms. Arrow.  You did an initial review
8 obviously because you redacted the document.  On its
9 face, I guess you determined attorney-client applied
10 on ████████████████ if that was redacted; and
11 looking at it, the question would become then why
12 didn't you at that point, as I looked at this e-mail
13 chain continuing -- which on its face didn't reflect
14 to me attorney-client, it could be work product --
15 why that investigation wasn't done at the time of
16 inquiry and what made that happen, considering that
17 in October -- and getting on the public docket or not
18 is really not the issue.  I know many things have
19 been sealed.  It was produced -- I know it was being
20 reflected in attachments.  They attached it.  You
21 referenced it as well in the letter.  And it wasn't
22 until about, I guess that was the end of October,
23 December 6, so, let's say, five, six weeks later that
24 you came back with this.
25        But the inquiry would be that, okay, if

Page 19

1 you didn't quite figure it out in April, and in
2 October, when it's being attached and you're looking
3 at it, shouldn't the inquiry have been then to
4 determine that it's work product and why they have
5 taken another month-and-a-half, you know, not an
6 excessive amount of time, but why then and not
7 sooner?  And that would be my question to you.
8        MS. ARROW:  Your Honor, to the extent
9 that the document is referenced in the October -- it
10 is not referenced as sort of a key component of our
11 argument.  It was not sort of the focus of our motion
12 practice at that time.  Following that motion
13 practice, we learned from discussions with our client
14 and from reasonable investigation that the material
15 contained in those later portions of the document
16 indeed referred to material that was prepared in
17 anticipation of the litigation.
18        But that was not obvious to us in
19 October.  It only became obvious to us in the early
20 period in December.  And we promptly issued the
21 claw-back.  And in fact, your Honor, we relied on the
22 representations that SaveOn had made that it had
23 destroyed all copies of the document in its
24 possession.  And once we learned in fact that that
25 was not the case, we promptly took steps to ensure

Page 20

1 that there was not further disclosure of the document
2 through the docket entry.
3        Now, I do want to say, your Honor, this
4 is a highly, highly different approach from the one
5 that SaveOn itself has taken very recently with
6 respect to its own disclosure of work product in the
7 context of its Exhibit 22, which we wrote to your
8 Honor about last week.
9        And there, just to provide just a moment
10 of background there, you know, we received a filing,
11 a submission from SaveOn and in reviewing the
12 exhibits to that submission, we, JJHCS, noticed that
13 a particular exhibit was curious.  And so instead of
14 accusing our adversary immediately of waiver, what we
15 did is, we sent an e-mail in a collegial fashion to
16 SaveOn, we had said, "Could you please explain to us
17 what this document is.  Doesn't look like what we
18 would expect it to be, could you explain to us what
19 it is?"  And promptly, SaveOn informed us that it was
20 work product.
21        We promptly confirmed to SaveOn that we
22 would delete it consistent with our obligations under
23 the discovery/confidentiality order.  And -- and
24 SaveOn came to your Honor and also asked that the
25 exhibit be withdrawn from the docket.  In both cases

Page 21

1 here, the Exhibit 81 case and the re Exhibit 22 case,
2 when the parties learned that there had been an
3 inadvertent disclosure of information, they acted
4 promptly.  They acted within a single business day of
5 learning that information to ensure that work product
6 protected information was not subject -- was not, you
7 know, allowed to be -- would be withdrawn.  And --
8        THE SPECIAL MASTER:  I have your
9 argument, Ms. Arrow.  Okay.
10        Ms. Miles, what, if anything, would you
11 like to add?  We can wrap this up.
12        MS. MILES:  Thank you, your Honor.  So
13 the first point I would like to make, the October
14 25th joint letter is not the first time the
15 parties used this document that we now call
16 Exhibit 81, but at the time was just a produced
17 document.
18        It was cited for, by both parties during
19 the summer of 2023, in at least three letters, two
20 letters SaveOn wrote and a letter that J&J wrote, and
21 it was cited for same reason it was cited in the
22 joint letter, which was to support SaveOn's request `
23 that J&J add these to the custodians list.  It was
24 also part of the record in front of Judge Waldor when
25 she ruled on the October 25th joint letter, on the

6 (Pages 18 - 21)

Page 22

1  motion within that letter.  And we think that those,
2  for those reasons, any claim of privilege that J&J
3  had had been waived by that point.  Just to speak
4  briefly about the Exhibit 22 issue, if your Honor
5  would like.  We think --
6          THE SPECIAL MASTER:  No, I have the
7  letters, and that's not really what's before me.  I
8  understand that J&J used a bit of, "This is how we do
9  things."  So we're not going to discuss 22 right now.
10         Okay.  I have your arguments.  I'm going
11 to be sending out a letter over to you on the issue
12 of waiver, which you will be getting very, very
13 shortly.  Okay.
14         MS. ARROW:  Thank you.
15         THE SPECIAL MASTER:  Let's turn to
16 CAP -- yes, Evans?
17         MR. WOHLFORTH:  I'm sorry, I want to
18 correct a mistake of mine.  Also appearing for our
19 side and for Mr. Levy's benefit, is going to be Emma
20 Holland.  Not sure which motion she's going to be up
21 for, but I just inadvertently left her out and my
22 mistake.
23         THE SPECIAL MASTER:  I'm sure she'll get
24 her name on the record when the argument occurs.  But
25 okay.

Page 23

1          All right, the next one I want to
2  address, what everybody has been referring to as the
3  CAP positions, and these are the defendant SaveOn's
4  motion, and we have as I call them, CAP 1 and CAP 2,
5  we'll start With.  And this is with regard to Judge
6  Waldor's November 7th order.  Particularly the
7  parties have focused on paragraphs 2 and 3.
8          Paragraph 2 addressed the custodial
9  document searches, asking the parties to run searches
10 with these CAP or adjustment program terms found in
11 the same document as SaveOn from January 1, 2022 to
12 the present.
13         And then paragraph 3 reflected the
14 argument and her ruling of an ongoing obligation to
15 supplement discovery responses in accordance with the
16 rules, and there we are.  And who is going to be
17 arguing this motion?
18         MS. SNOW:  Your Honor, Elizabeth Snow
19 for SaveOn, defendant SaveOn.
20         THE SPECIAL MASTER:  Okay.
21         MS. LONG:  And Julia Long for JJHCS.
22         THE SPECIAL MASTER:  Thank you so much.
23         So the position of SaveOn at this point
24 is that the use of the term "SaveOn" in the searches
25 makes this too narrow and that it should be really be

Page 24

1  subject to all that appears in paragraph 3 with
2  regard to the ongoing obligation to supplement.  And
3  the -- I have a -- several questions in this regard.
4          But I want to start by saying, with
5  regard to any of the issues that I will consider,
6  everyone does have to appreciate that the fact that I
7  have come into this case as a Special Master doesn't
8  create an opening to revisit or undo what
9  Judge Waldor may have done, and those were basically,
10 at this point, for discovery purposes, the law of the
11 case.
12         But we always, instead, what we look at
13 is, while discovery remains open, are there
14 circumstances that require a further analysis based
15 on what has happened since her ruling, but not to go
16 back as to what she wrote at the time that she did
17 it.  So I want to be clear about that.
18         And in that regard also, I think the
19 parties talk about whether there is an ambiguity in
20 the order.  You know, and I looked at the transcript
21 as well as the order, and I know that there are some
22 positions being taken as to when things were
23 addressed in the argument, and might she have come
24 out differently.  But we have an order, on November
25 7th, that still says what she actually said at the

Page 25

1  oral argument; and she clearly placed a limitation of
2  SaveOn with these CAP searches for the 2022, January
3  2022 to the present time.  There's no doubt she did.
4  You may think it doesn't make sense or you want to
5  disagree with it, but it's what she did.
6          Now, let me go from there, though.  What
7  she also said, because there were, I know that SaveOn
8  pressed the point, and said at some point that she
9  wanted to leave open whether this is sufficient,
10 etc., and Mr. Elsberg had said, "I hope it's going to
11 be sufficient," and the Court said, "Well, I don't
12 want to talk about what-ifs or tomorrow," and
13 Mr. Elsberg said, "Fine."  And there we are.
14         So I think to, her point was, we don't
15 want to talk about hypotheticals.  Clearly, however,
16 implicit in that is what's implicit in many rulings,
17 is, based on what I gleaned from her perspective,
18 based on where she is, she thought this was the
19 limitation.
20         The question then becomes, is, I think
21 that SaveOn is arguing at this point that documents
22 that have been produced since October 30th provide
23 ample grounds to revisit the decision based upon
24 those legal disclosures.  And in that regard, I would
25 certainly consider, are there things that have

7 (Pages 22 - 25)

Page 26

1  happened since the argument before Judge Waldor and
2  her decision that would give any reason to modify
3  what she did, and that should be my focus, not
4  whether she got it right in October or November.
5  We're not doing that. It's what the happened since
6  that would indicate that there's some reason for
7  doing that.
8          So Ms. Snow, I'm going to turn to you,
9  and you can tell me, I think you've pointed out
10 certain exhibits which J&J takes issue with. You
11 talk about Exhibits I think 4 through 11, and there
12 we are. But let me hear you now on that, and then
13 I'll hear from J&J.
14         MS. SNOW: Thank you, your Honor. So
15 just to start with one major event related to the CAP
16 terms since the October conference. SaveOn had not
17 received and J&J had not produced a single, we'll
18 call them CAP term document before the October 30th
19 conference. They agreed to the CAP term for the
20 pre-refresh period on November 29th, and then didn't
21 make their first production of those documents until
22 December 22nd, 2023. So with the benefit of seeing
23 those documents, what we now see when we lay out the
24 exact numbers in our papers, but we see a large
25 disparity between the number of relevant and

Page 27

1  responsive documents that hit on the broad CAP terms,
2  which is about ten thousand documents, versus when
3  using the SaveOn limiter, we only see about 1,700
4  documents. So obviously, we're excluding that other
5  8,300 approximately.
6          I also would note that the January 1 --
7  J&J has indicated and the documents have started to
8  reveal that the primary focus of the CAP program was
9  after January 1, 2022. And now, I guess, just as a
10 broader point, it obviously excludes a lot of
11 relevant documents, but I think it's helpful to
12 illustrate that by looking through some exhibits.
13 And if you look at Exhibit 7, I don't know if you
14 have those in front of you --
15         THE SPECIAL MASTER: I've got
16 every document. Go ahead.
17         MS. SNOW: I figured you did. So you we
18 see ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮ So it's -- CAPM is part of the
20 broad CAP term. And this document was not produced
21 until December 22nd, 2023. And we looked back
22 through the production; and this e-mail chain, full
23 chain was not produced until after the last
24 conference. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Page 28

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6          Turning then to Exhibit 10, again, this
7  is a -- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9          THE SPECIAL MASTER: Would you spell
10 that for the Court Reporter, please?
11         MS. SNOW: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮ again, there's not a single version of
13 it, there is -- in any production before December
14 22nd. It clearly, the only version of this document
15 came because of the addition of the CAP term without
16 the SaveOn limiter. And it's really important
17 because one of the -- as a reminder, and I know your
18 Honor is aware of this, but one of the primary
19 purposes of the CAP program is the identification of
20 patients on accumulators, maximizers, and SaveOn.
21 And it walks through various ways in which -- various
22 ways in which data could be used to identify
23 patients.
24         And just to be very clear, it was
25 produced -- these documents that I'm drawing your

Page 29

1  attention to, they were produced for the pre-refresh
2  period where J&J was using the full CAP term without
3  the SaveOn limiter, and the limited -- the CAP terms
4  limited by the SaveOn limiter would exclude these
5  types of relevant documents.
6          THE SPECIAL MASTER: I just have this
7  one question: Do these documents include the
8  accumulator or maximizer terms, even though not a
9  SaveOn term?
10         MS. SNOW: They do, your Honor.
11         THE SPECIAL MASTER: So my question
12 would be, and I'm going to turn to Ms. Long in a
13 moment, that I appreciate that some of these
14 documents are, you know, have relevancy, I also saw,
15 I guess -- I think nobody really focused on
16 Exhibit 6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮
18         So my question is, if Judge Waldor's
19 order was modified to say CAP with SaveOn or
20 "maximizer" or "accumulator," wouldn't that capture
21 all the same documents if the order was for all three
22 of those terms?
23         MS. SNOW: Your Honor, I do not have a
24 document that doesn't show that. But think that --
25 hold on one moment.

8 (Pages 26 - 29)

Page 30

1      THE SPECIAL MASTER:  I'm throwing that
2  out, because I understand what Judge Waldor was
3  trying to do, and she's made several comments about,
4  you know, we have need to have some reason here and,
5  you know, we don't want to have the world on every
6  request.
7      But I do appreciate that there can be
8  many documents that don't necessarily mention SaveOn
9  specifically but maximizer/accumulator, which is the
10 way even though I know SaveOn doesn't necessarily say
11 either one of those, but J&J pulls them within.  I
12 know J&J's position also is with some of these
13 things, and it may be with other searches as well,
14 that there are other programs.  But we're only
15 talking about SaveOn.  But the analyses are clearly
16 not referencing a particular other program.  But
17 these kinds of programs, which they include SaveOn
18 in, I don't think, Ms. Long, you would dispute that
19 J&J views SaveOn within one of those descriptions.
20     MS. LONG:  I don't dispute that, your
21 Honor.
22     THE SPECIAL MASTER:  Okay.
23     MS. LONG:  But if I could respond, I'm
24 happy to hold --
25     THE SPECIAL MASTER:  I'll come to you in

Page 31

1  a minute, I just want to finish with Ms. Snow, back
2  and forth, but okay.
3      I know, Ms. Snow, you said you haven't
4  looked through all of them, but you think probably
5  that would capture what you're talking about.
6      MS. SNOW:  Yes, your Honor.  Can I flag
7  just one additional term, and I know we'll talk about
8  it a little later in a different motion, but J&J also
9  uses the term NEHB maximizer, which it often shortens
10 to NEHB, so I would ask that we use all of the terms
11 that it uses for -- to also mean SaveOn, so
12 accumulator, maximizer, and NEHB.
13     THE SPECIAL MASTER:  Okay.  And we do
14 have that term later in other motions.  So I -- it's
15 going to be captured, so I'm not concerned about
16 that.  So I don't think that's what I'm talking
17 about.
18     I'm trying to also be very, really
19 pragmatic here about looking at what Judge Waldor
20 did, what she was trying to do and recognizing
21 when she said, "I can't deal with the four pieces at
22 the moment," and now that's why I've asked what's
23 been produced since.  And I think you've given me
24 some specifics, and I want to justify, I am going to
25 modify this.  It's going to be fairly limited to

Page 32

1  still capture the concerns Judge Waldor had.
2      Ms. Long, I'm going to hear from you.
3  We've heard my questions, you've hired what Ms. Snow
4  has said.  What would you like to say in that regard?
5      MS. LONG:  Your Honor, I agree with your
6  Honor that the Court's ruling is unambiguous on its
7  face but I just want to visit for one moment why
8  Judge Waldor caps the SaveOn limiter in place, and
9  then I will address the exhibits at issue.
10     From SaveOn's motion, you would think
11 that these are the only documents that we are
12 producing about the CAP program.  That simply isn't
13 the case.  And they aren't new, in fact, to this
14 dispute.  I know Ms. Snow mentioned a view of them,
15 but some of these documents, Exhibit 3 in particular,
16 we produced a version of Exhibit 3 in March of 2023,
17 over a year ago.
18     And the reason why I think Judge Waldor
19 imposed this limitation is because we have agreed to
20 produce, and this is from our October papers, scores
21 of non-custodial documents to give SaveOn what it
22 needs to mount this failure-to-mitigate defense.  We
23 have provided, Ms. Snow mentioned, identification of
24 patients as crucial to SaveOn's motion.  We've
25 already agreed separately to provide all documents

Page 33

1  sufficient to show final versions of reports that
2  JJHCS has internally related to identification of
3  SaveOn, and its maximizer patients.  We've agreed to
4  provide final versions of the reports from vendors.
5  We've provided scores of data related to co-pay
6  assistance that was actually paid out, documents and
7  communications related to the changes to our terms
8  and conditions that was also part of our efforts to
9  mitigate against senior interim maximizer programs,
10 documents sufficient to show, for example, why we
11 rebranded our program for co-pay assistance in 2023,
12 and those have since been extended by your Honor, as
13 you well know, in other motions that were live in
14 January.
15     So we have provided plenty of
16 information, not just data, not just noncustodial
17 documents, but through other custodial purchases,
18 we've agreed, for example, as to the top custodian,
19 to run a much broader term.  We've litigated that
20 issue, I think, twice and, Mr. Sandick will argue
21 later, we agreed to a broader first term.  We took
22 your Honor's advice not to argue, I think you said
23 "trivial things," and just get it done.
24     They asked us to run SaveOn, we will
25 give them any document that referenced SaveOn.  This

Page 34

1 is also about the CAP program, and your Honor
2 directed us to use these CAP-related search terms.
3 So we don't think that this is a line in the sand
4 that we're trying to draw, not to be trivial here.
5 We've now litigated this issue three times in at
6 least three separate motions. And I hear your Honor
7 that it's open to modification, and if your Honor so
8 orders that, we will take that at face value. But I
9 think, you know, I just want to say that this is not
10 the first time that we are before a court. And I do
11 think that Judge Waldor, I know you had said, she's
12 not dealing with it, but counsel for SaveOn, lead
13 counsel for SaveOn, agreed on the record in October
14 that this would be a sufficient term.
15        And so to constantly revisit this issue,
16 I hear Ms. Snow that there have been new productions
17 but individual documents do not, in my mind, move the
18 burden when this was the known outcome of what we
19 discussed in October.
20        And so I'm happy to go exhibit by
21 exhibit, but I do want to describe that for your
22 Honor's consideration.
23        THE SPECIAL MASTER: Ms. Long, how
24 burdensome is it to add those terms to SaveOn?
25        MS. LONG: The accumulator, maximizer?

Page 35

1        THE SPECIAL MASTER: I'm not doing, I'm
2 not looking at the NEHB. We're going to talk about
3 that later. But in this particular search with the
4 CAP.
5        MS. LONG: I don't have numbers in front
6 of me. I would speculate, your Honor, that it would
7 obviously yield more documents than the current term
8 but I think it would be -- it would not be unduly
9 burdensome for us to run. I think our approach is
10 more an argument based on what we've argued again
11 about this term over and over again, and time for the
12 parties to move on.
13        THE SPECIAL MASTER: I understand.
14 Okay. Ms. Snow, anything you want to respond to that
15 Ms. Long said?
16        MS. SNOW: Just to say, which I think
17 your Honor already is trying to get at, but that the
18 accumulator and maximizer terms, those are terms that
19 J&J is actively using to refer to SaveOn. So I
20 would, I guess, argue in favor of including them
21 along with the SaveOn limiter.
22        THE SPECIAL MASTER: I think those, you
23 know, those arguments were discussed with
24 Judge Waldor as possibilities, because you were
25 simply arguing that day, CAP by itself, which had

Page 36

1 been the earlier term, and I understand why
2 Judge Waldor wanted some limitation. I'm of the view
3 that it doesn't do violence to Judge Waldor's ruling
4 and is consistent with it if I permit actually to add
5 the SaveOn or whatever versions of accumulator,
6 adjustment, you know, you guys run these terms so
7 long, I don't know, I'm not going to use the words,
8 to add those to it, and that will be the end of CAP 1
9 with those additions.
10        And I appreciate, and I think, Ms. Long,
11 for your candor in saying that it's not a burdensome
12 argument, that was not what your Honor arguing. I do
13 appreciate that.
14        With regard to CAP 2, this was with
15 regard to -- really related to our first one but is
16 talking about the newly designated custodians and
17 what needs to be done on them, and you can tell me,
18 is there anything different about this than the first
19 argument?
20        MS. SNOW: Yes, your Honor, these
21 custodians were not the subject of Judge Waldor's
22 November 7th order. Your Honor and Judge Waldor
23 found these custodians to be relevant custodians
24 because of their involvement in the CAP program, and
25 in J&J's response to accumulators, maximizers and

Page 37

1 SaveOn. And the CAP terms are specifically designed
2 to capture documents regarding CAP. And so we ask
3 your Honor to compel the full CAP term over these
4 custodians, and I can go through each one, but each
5 one was found relevant by either your Honor or
6 Judge Waldor to the CAP program.
7        Also to touch on the order, there's no
8 question that the order -- there can really be no
9 question that the order applies prospectively. And
10 your Honor stated in the February 6th order that
11 Judge Waldor's November 7th order did not order
12 specific custodian search terms for those custodians.
13        So we just -- we don't think the CAP
14 term with SaveOn limiter and the portion of
15 Judge Waldor's order on that applies to these
16 custodians at all.
17        THE SPECIAL MASTER: So Ms. Snow, how
18 about my modified search?
19        MS. SNOW: Of course, if that is what
20 your Honor wishes to order, we will accept that.
21        THE SPECIAL MASTER: Okay. I mean,
22 there's no, at this point, if, you know, and
23 Ms. Long, I'll turn to you, but given what I just
24 did, I'm assuming that that's agreeable, if it's
25 SaveOn or maximizer or accumulator, for the new

10 (Pages 34 - 37)

Page 38

1 custodians as well, rather than --
2          MS. LONG:  I think that is generally
3 correct.  I would raise a few custodians, I know
4 Mr. Sandick will talk about the general search terms
5 later on in the hearing.  But Scott White and Blasine
6 Penkowski are custodians, and your Honor ordered --
7          THE SPECIAL MASTER:  I'm going to
8 discuss them later, so let's leave them out of this
9 for the moment.  We'll carve it out.
10          MS. LONG:  Okay.  They are at issue in
11 the CAP 2 motion, but I think subject to that
12 carve-out, I think if your Honor is ordering the
13 modification of the term in the CAP line, as we said
14 in our earlier papers, we have no objection --
15          MS. LONG:  Okay.  Because we
16 already have -- I have separate briefing really on
17 those two.  So I'd rather just discuss them and what
18 it looks like when I get to them.
19          Yes, Ms. Snow?
20          MS. SNOW:  Your Honor, I just want to
21 make sure that we're all in agreement on the temporal
22 scope of the CAP term.  And then it will be run for
23 the CAP custodians, and the ones at issue in the --
24 the other custodians at issue in CAP 2, which are
25 Karen Lade, Scott White, and Blasine Penkowski for

Page 39

1 the full April 1, 2016 through November 7th, 2023
2 period, like they are for the other custodians.
3          THE SPECIAL MASTER:  Right, but with the
4 modification that I've given, that's the one that
5 will apply to them.  Yeah.  I don't think there's an
6 argument about the time period, it was simply what
7 the terms would be.  I see Ms. Long shaking her head
8 yes, so I will take it for the record that that's
9 correct.
10          Okay.  So, fine.  Let me turn, then,
11 because it's isn't that belated, to the -- let me
12 just grab this other binder, sorry -- to the motion
13 with regard to the February 6th order, okay?
14          Now, we have, first issue we are going to
15 be with regard to the pre-2013 retention policy.  Who
16 is arguing for me on this one?
17          MR. SANDICK:  Mr. Sandick for the
18 plaintiff.
19          THE SPECIAL MASTER:  Okay, Mr. Sandick
20 for the Plaintiff.  And for the Defendant?
21          MR. DUNLAP:  On the terms and conditions
22 piece of this of this motion, Andrew Dunlap.  And
23 there are search terms also at issue, and Ms. Snow
24 and some other associates will be arguing those.
25          THE SPECIAL MASTER:  I guess we'll see

Page 40

1 who comes in.  Let me first deal, though, with this
2 retention policy issue which kind of has taken on a
3 little bit of a life of its own.
4          You know what I had ordered at the time
5 was, we talked about locating 32,013 documents with
6 regards to the terms and conditions of CarePath.  At
7 the time in the argument, Mr. Sandick, you had
8 indicated that producing documents pre-2013 would be
9 a problem because of retention policies, etc.  And
10 then, what's happened -- and I had said okay, well,
11 if we thought, you know, if you claim that there are
12 some issues, then produce the retention policy, so we
13 understand what should have been done and not done.
14          Now, and then what's happened is, two
15 things.  One, by the way, that argument was, you
16 know, repeated until, as recently as January 11th of
17 2024, that there would be a problem producing
18 documents from earlier dates because of retention
19 policies.
20          Now the position is that you have
21 located e-mails and hard drives and other things from
22 prior dates and that you're not aware of gaps.  And
23 so therefore, you don't have to produce a retention
24 policy.  Or if I tell you to produce one, then Sandoz
25 has to products its, too.  I'm not happy with the

Page 41

1 tit-for-tat.  We're going to put that one aside.  So
2 let's just focus on what, you know, at the moment,
3 your obligation.
4          You haven't identified what e-mails or
5 whose e-mails you have located from those earlier
6 times, or what hard drives have been located so we
7 can even determine, is that really capturing the
8 universe of what would be produced?
9          MR. SANDICK:  May I be heard, your
10 Honor?
11          THE SPECIAL MASTER:  Sure.
12          MR. SANDICK:  So there are two
13 custodians whom we have identified, two people who
14 were employed by the plaintiff in the co-pay support
15 area during this early time period, names are Chapman
16 and Wortman.  Because of litigation holds that were
17 in place for other cases, we have e-mails and hard
18 drives and other documents for these witnesses going
19 back to the time period of the request.
20          The reason why in the past I've always
21 cautioned about the ability to produce documents from
22 the earlier time period is because it's going to be
23 witness by witness; and for these two particular
24 people who we understand, based on our investigation,
25 to have been involved in the co-pay support programs

11 (Pages 38 - 41)

Page 42

1 during this relevant early time period, these are the
2 key people.
3         As the case goes forward, it's always
4 possible that other people will be identified as also
5 being relevant. But today, these are the only two,
6 based on our investigation, that we know about. And
7 so I read the court's order on page 10 to be what I
8 would describe as a conditional order.
9         If some or all documents were not
10 preserved prior to 2013, plaintiff must identify and
11 produce its retention policies. So there are two
12 conditions. First, if the documents weren't
13 preserved, and second, that the documents we're
14 talking about have to be relevant.
15         At this point, with respect to Chapman
16 and worth man, we do not know of any gaps in our
17 collection for these witnesses. As I said before, we
18 would not ordinarily have such early time period
19 documents, but fortuitously we do because they are
20 custodians, their documents have been retained in
21 other cases. So that's the only reason we didn't
22 produce the retention policies. If the Court orders
23 us to, you know, without condition to produce
24 retention policies, of course we'll abide by the
25 Court's orders. We -- that's our -- that's what we

Page 43

1 do.
2         But I read the court's order to be
3 conditional, and that's why we're here on the subject
4 of retention policies.
5         THE SPECIAL MASTER: I guess the
6 question I have, Mr. Sandick, is, what you're telling
7 me you're representing is, that these are the only
8 two custodians at the moment that you've identified
9 that would be involved in these searches.
10         But you're saying, well, but maybe
11 investigation might reveal others. So --
12         MR. SANDICK: And I can explain, your
13 Honor, I don't mean to jump in. When we review these
14 people's documents, and we're going to make a
15 production, actually, next week to Selendy and Gay
16 and their New Jersey counsel, we're going to make a
17 production of documents relating to terms and
18 conditions in the early time period. We used the
19 search term that we proposed. Those have been and
20 are being reviewed by our review team and we expect
21 that a production will be made of those documents by
22 next Friday, which I think is the 12th. So we are
23 going to produce those documents as we reviewed them,
24 and I'm sure as Defendants counsel reviews them. If
25 there are other people who, based on our review of

Page 44

1 documents, which is one way we learn things in the
2 case, need to be collected, we will go and see
3 whether we also, as a fortuitous matter, have
4 documents from the early time period for those
5 witnesses and, if we don't, then we go back to your
6 Honor's conditional order.
7         If some documents were -- some relevant
8 documents were not preserved, we'll have to disclose
9 that, we'll have to produce the retention policy.
10         So that's how we understood your Honor's
11 order, that it was not an absolute, "Produce your
12 retention policy." It was, "If you come across
13 witnesses and you say their documents are gone," then
14 you want us to produce the retention policy --
15         THE SPECIAL MASTER: It's more than --
16 well, you keep referring to documents. I think this
17 is really covering e-mails.
18         MR. SANDICK: Sure.
19         THE SPECIAL MASTER: But that's not
20 telling me about other documents that may exist that
21 may not be in the form of e-mails, and what have you
22 been able to determine with regard to, let's say, if
23 there were PowerPoints that were done that weren't in
24 the form of e-mails, that were programs, or things of
25 that nature, I know you said you do also have some

Page 45

1 hard data. I'm not sure what that is. My concern
2 is, Mr. Sandick, I'm not convinced that, other than
3 the e-mails, and I take your representation that you
4 believe that you have full files for these two
5 individuals that you believe are relevant custodians.
6         But I'm not sure how you can represent
7 to me that there are no other documents, whether --
8 resulting from these individuals, others, or
9 anywhere, that don't deal with the terms and
10 conditions pre-CarePath that would be relevant and
11 that were preserved. And perhaps without knowing
12 what that retention policy is, I don't know that they
13 would have been preserved, or how you can confirm.
14         MR. SANDICK: Sure. And I can offer a
15 couple of points in clarification. So first, what we
16 have are e-mails, but of course, we, as we said also
17 attachments to e-mails, and also what I would
18 describe as hard drive data. So people have
19 computers, either laptop or desktop computers, and we
20 have a hard drive collection for these witnesses from
21 the past. So it wouldn't only be e-mails, it would
22 also be, if a PowerPoint, to use your Honor's
23 example, was created and was saved on their hard
24 drive, my expectation is we have it.
25         If it was attached to an e-mail, as

12 (Pages 42 - 45)

Page 46

1 PowerPoints typically are when people are
2 collaborating on projects, I would expect that we
3 have it. That's based on the information known to us
4 today.
5        How do I know whether there are other
6 witnesses or custodians, so to speak, who might have
7 relevant documents on this issue? The answer is that
8 right now, we have been told that these two people
9 were the people who ran this co-pay support program
10 during the relevant time period. The two nonlawyers,
11 I should say.
12        We do not know of anyone else being
13 involved. But if we do, of course, as we have in the
14 past, and as defense counsel has in the past, you add
15 custodians, you can't expand the scope and, to the
16 extent that something can't be found because they
17 weren't collected many years ago, and they have been
18 destroyed or lost, we would at that point have the
19 obligation under your Honor's order of February 6th
20 to produce the retention policies.
21        So that's where we are now. We're only
22 a week away, or nine days away, or actually, making
23 an initial production in this matter. Our suggestion
24 is that at this point, there being no known witness
25 for whom we don't have documents from this time

Page 47

1 period, that we not be ordered to produce the
2 policies. But if your Honor wants to, in our view,
3 sort of modify the conditional order into just an
4 order, of course we'll comply with it and we'll
5 produce those documents in short order.
6        THE SPECIAL MASTER: Okay, Mr. Dunlap?
7 You're on mute, I think.
8        MR. DUNLAP: Am I --
9        THE SPECIAL MASTER: You're good. Go
10 ahead.
11        A.
12        MR. DUNLAP: I think we had a different
13 understanding of your Honor's order, and obviously
14 your Honor can clarify for us. What J&J seems to
15 think your Honor said was, they should identify who
16 they want to produce documents from on this topic.
17 Those are the relevant custodians, and as long as
18 they have preserved documents for who they deem the
19 relevant custodians are, then they are fine. They
20 don't have to do anything else.
21        We took you to be saying that what they
22 had to do was search for documents related to the
23 predecessor programs where these -- J&J admits these
24 terms and conditions were drafted and then identify
25 the people who might have relevant documents relating

Page 48

1 to the drafting, and then tell us whether any of
2 those files had been deleted.
3        Now, Mr. Sandick is very careful when he
4 speaks to you, he says that these two custodians that
5 they've named were the key people, I think in his
6 letter, he used the term "appropriate custodians,"
7 etc. but he doesn't represent to you that these were
8 the only people involved with the drafting of the
9 terms and conditions. And we don't know whether
10 those other people, who those other people were or
11 whether their documents were preserved.
12        And I will note that when we served an
13 interrogatory asking them to identify people who were
14 involved in the drafting of the terms and conditions,
15 they listed four people who were involved in drafting
16 or revising, there's a lot of terms and conditions
17 recently. But then they said individuals who had
18 responsibility for drafting, revising the CarePath
19 terms and conditions relating to the "other author"
20 provision did not include the two people they have
21 named here, Kimberly Wortman, or Kathi Chapman.
22 Rather two other people, Jennifer De Camera, and
23 Adrienne Minecci, as far as I understand, they have
24 not designated as custodians for this pre-2013 time
25 period. So we certainly at least have questions or

Page 49

1 therefore indications that there were other people
2 involved in drafting, revising the terms and
3 conditions during this earlier time period and we
4 think because they have not been able to come forward
5 and affirmatively tell you that they were able to
6 preserve all the custodial documents and all the
7 noncustodial documents relating to the drafting of
8 these predecessor programs, that this triggers their
9 obligation to produce the retention policies.
10        MR. SANDICK: Judge, I can answer that
11 now if you'd like.
12        THE SPECIAL MASTER: Yes, please.
13        MR. SANDICK: No one is trying to be
14 tricky or cagey. I disagree with what Mr. Dunlap is
15 saying. These are the only two people who are
16 nonlawyers at J&J who we know of having involvement
17 in terms and conditions under the co-pay support
18 program in the pre-2013 time period.
19        The reason they weren't listed in the
20 interrogatories is because, as Mr. Dunlap knows,
21 we've objected throughout the entire case, and
22 overruled by your Honor in February, to doing
23 anything from the pre-2013 time period as being, you
24 know, beyond the scope of what could reasonably be
25 expected in this case.

13 (Pages 46 - 49)

Page 50

1    So we were not, in our interrogatory
2 response, answering a question about pre-2013 people.
3 Jennifer De Camera, as your Honor knows, has been
4 added as a limited-purpose custodian on the issue of
5 Stelara and Tremfya terms and conditions, and the
6 other person, Adrienne Minecci, we've already offered
7 to produce documents. She was not there in the very
8 early years, along with Chapman and Wortman, but she
9 was there around 2013-2014, and I think we have
10 offered to produce those in the past. That offer
11 remains open.
12    But we are not trying to be cagey or
13 anything. And I don't understand also, Mr. Dunlap's
14 explanation of, like, how you do this is first you
15 look in the abstract for who was involved in the
16 program, but first you look at the program in the
17 abstract. The way you find documents is, you try to
18 find out who actually was involved in this issue, in
19 this relevant time period. That's what we did here,
20 these are the two nonlawyers who were involved, and,
21 you know, and based on that, we produced it.
22    I should just make one clarification.
23 Adrienne Minecci was not involved in terms and
24 conditions prior to 2015. I think I just said she
25 was for some period of time earlier than that. She

Page 51

1 was not involved pre-2015. I think our offer was
2 2015 and 2016 for Minecci, but Wortman and Chapman
3 are the only two people that I know of who are
4 nonlawyers who were involved in this process of terms
5 and conditions in the early years of co-pay support
6 at our client.
7    MR. DUNLAP: May I briefly respond, your
8 Honor?
9    THE SPECIAL MASTER: Yes, go ahead.
10    MR. DUNLAP: I think you heard
11 Mr. Sandick again being very careful, saying that
12 these two custodians were the only nonlawyers
13 involved, and certainly there's in implication that
14 there were lawyers involved. And I believe the last
15 time we were in front of you, we went through with
16 you on this and you made the point that just because
17 someone is an attorney doesn't mean that somehow
18 their documents are privileged from disclosure.
19    We're not reaching the point right now
20 of exactly what searches we might run of those, but
21 there certainly seem to have been lawyers involved in
22 addition to these two nonlawyers. And part of the
23 issue we have is that, you know, Mr. Sandick says,
24 "Well, these were the key people."
25    We don't know what that means. What we

Page 52

1 think he has to do is identify not in the abstract,
2 but based on an actual investigation, who was
3 involved, not just who ran the program, but who was
4 involved in drafting the terms and conditions, what
5 were the document sources, and tell us if any of that
6 stuff was deleted.
7    THE SPECIAL MASTER: Look, let me -- no
8 need to keep going on this -- look, I can't believe
9 that there were only two people involved. I think
10 you've said they were the key people. So I'm not
11 quite buying into and -- I know you said there's
12 further investigation that has to be done. I don't
13 know if these two people are still employed by your
14 company, but you would think, I think they are but
15 they've transitioned to other jobs, but -- but yes,
16 you said that.
17    MR. SANDICK: Sorry, yeah.
18    THE SPECIAL MASTER: But, you know,
19 certainly inquire of them, "Who else did you work
20 with," and being able to locate, "Did you have
21 records for those people?" So at the moment, I don't
22 think I have a full picture. And without that, I'll
23 direct you to re -- produce retention policy, but I
24 think you've got to go back to the drawing board and
25 figure out who else was there. But I'll accept what

Page 53

1 you have today.
2    MR. SANDICK: Okay, and your Honor, I
3 just want to say, we did ask those people who else
4 was involved, and essentially Chapman said Wortman,
5 and Wortman said Chapman. And there's one lawyer who
6 was also involved. These are small programs in terms
7 of the number of people who run them.
8    I think earlier in the case, Selendy Gay
9 pointed out that some very high percentage of our
10 document production came from like four our five
11 custodians. The reason for that is because this
12 program within JJHCS only has a few people who
13 actually worked on it. Throughout the whole case, we
14 only have ten or fifteen custodians. This is not an
15 operation that requires, you know, a lot more than
16 that.
17    So we definitely are committed to making
18 this production. We'll produce the retention
19 policies now that your Honor has ordered it, but I do
20 want for you know, dispel the notion that we have
21 not -- that we picked two names but that there are
22 actually 20 or 30 people involved. We really do
23 think these are the two people who were involved in
24 this process along with one lawyer.
25    THE SPECIAL MASTER: Okay, I guess you'd

14 (Pages 50 - 53)

Page 54

1 better be taking a look at who that lawyer is, and if
2 there's anything that would be relevant but that you
3 would claim privilege over, and see what's not
4 privileged, if there's anything among that. I don't
5 know. May all be. Yes, Mr. Dunlap? And then we're
6 going to move on.
7          MR. DUNLAP: Yes, I want to move on. I
8 just want to ask a clarifying question. Because you
9 asked them to go back to the drawing board and
10 determine who all was involved. I just want to make
11 clear that, if there were panel outside of the
12 JJHCS entity who were involved in other J&J entities
13 like Janssen, for example, that would be within what
14 they have to do. They can't limit their search just
15 to JJHCS. It's anyone within J&J who was involved in
16 drafting these terms and conditions.
17          MR. SANDICK: We don't agree with -- I
18 don't know that there is anyone in this category, but
19 we have throughout the case objected to the efforts
20 made by the defense in this case to expand discovery
21 from the plaintiff, JJHCS, to people all throughout
22 the Johnson & Johnson family of companies.
23          THE SPECIAL MASTER: I'm not expanding
24 it today. And that's something new that's being
25 raised and I'm not expanding it today, okay? If you

Page 55

1 could produce the policy, please, by April 17th, two
2 weeks. Within the next two weeks, all right?
3          MR. SANDICK: Thank you, your Honor.
4          THE SPECIAL MASTER: Okay. Next. Let's
5 see what we have. I guess we also have -- do we have
6 issues, you know, with regard to the volume of the
7 documents? I think its indicated that there are over
8 two hundred thousand documents. What are we talking
9 about?
10          MR. SANDICK: The documents, your Honor,
11 are the documents selected from Wortman and Chapman.
12 They are not described, so for speak, for
13 responsiveness or relevance to this case. But we
14 weren't really sure how we can provide such a --
15 given that we had not at the time agreed on search
16 terms.
17          We do have search terms that we've
18 proposed, in our letter. And those are the terms
19 that we used to make this initial production which is
20 coming next week.
21          THE SPECIAL MASTER: Okay. So what
22 we've got here is, I think there's a dispute as to
23 search terms. That's where we are, right?
24          MR. SANDICK: Yes. So your Honor, I
25 expressed concern at the January 24th conference that

Page 56

1 the proposed search terms that the defense had
2 offered would require us to review essentially every
3 document that had the word "discounts," or -- certain
4 other words really without limitation, and your
5 Honor, I don't want to read your mind, but sort of
6 recognizing our concern said, at one point, "It's not
7 going to happen."
8          At another point, your Honor said, "I
9 don't want it to be that broad, we have to figure out
10 a way to narrow that because yes, we don't want to
11 bring in things that are not going to be that
12 relevant." And so then when it came to search terms,
13 the defense proposed a search term that exactly what
14 your Honor says is not going to happen, a search them
15 that, any time the word "coupon" or "discount" or
16 "prescription savings card" or "free trial," any of
17 those kind of very standard terms are used with the
18 word "Janssen," we would have to review the document
19 for responsiveness.
20          You know, Janssen is the name of the
21 drug company. It's in signature blocks, it's in
22 e-mail addresses. Using the name of the company
23 as -- serves no limiting purpose. So it is
24 effectively the same as asking for every document
25 relating to coupon or discount or free trial to be

Page 57

1 reviewed, which is the thing that I was concerned
2 about at the conference and what your Honor, I
3 thought, gave helpful reassurance about.
4          So we made a counterproposal that's in
5 our letter, essentially saying, "Look, the list of
6 drugs that are at issue within 25 words, either
7 'terms and conditions,' or 'other offer,' or
8 'discount,' or 'coupon.'" This has a substantive
9 limit. It ties the review to documents that actually
10 mention the drugs at issue, and not the name of the
11 company, which is not really much of a limitation.
12          So those are the documents, those are
13 the terms we used for the upcoming production next
14 week. I think -- I don't have much more to say on
15 this other than we were surprised that they filed the
16 motion at all. We were in our view in the middle of
17 negotiations. Our last letter said we invite further
18 discussions, and it was met by just filing this
19 motion which I don't think is a productive way to
20 proceed, but I'm happy to answer questions the Court
21 may have about this.
22          THE SPECIAL MASTER: Who is arguing
23 this, Mr. Dunlap still? Okay.
24          I do think I'm going to start with
25 Mr. Dunlap, that your description, your terms were

15 (Pages 54 - 57)

Page 58

1 too broad. I question whether Plaintiffs are too
2 narrow, so I want to come up with what makes sense,
3 which I understand you're still negotiating.
4       But I would agree that -- but I do think
5 that yours are too broad, so let's talk. Were you
6 still negotiating?
7       MR. DUNLAP: No, your Honor.
8       THE SPECIAL MASTER: Okay.
9       MR. DUNLAP: This is Exhibit 3 to the
10 motion which is their letter to us. On page 2, they
11 say, "In light of SaveOn's pending motion for
12 reconsideration, it would not be productive for the
13 parties to meet and confer on search terms at this
14 time."
15       THE SPECIAL MASTER: Okay. Well let's
16 talk about this and see if we can reach resolution.
17       MR. DUNLAP: I don't want to get into
18 the back-and-forth under discovery unless your Honor
19 wants to. We think that the term we proposed doesn't
20 say any time it mentions "coupon." It doesn't
21 include Janssen. Mr. Sandick thinks that is not
22 enough of a limiter. Okay, but we think the right
23 way to go about this is for them to produce us hit
24 counts. They say they've gathered the documents from
25 these custodians. Give us hit counts both in the

Page 59

1 individual and aggregate, showing how many documents
2 our terms hit. If in fact it is the case that the
3 term "coupon," or "coupon" within a certain number of
4 words, and "Janssen" in the same document, in some
5 extraordinary documents, that that's where the spike
6 is, then we can have a meaningful discussion about
7 exactly how we're going to modify things.
8       The problem we have is that we proposed
9 a term, they said no. They didn't give us hit counts
10 justifying or explaining the burden or the volume of
11 documents that that search term would propose.
12       Instead they proposed their own term and
13 said, "You've got to" -- also without producing hit
14 counts -- and saying, You've got to trust us that
15 this is enough." But we're not supposed to negotiate
16 in a black box. If they are coming to you and they
17 are arguing that, "This will pick up a large number
18 of irrelevant documents, it's too burdensome," at
19 least as we understand the law in this district, they
20 have to quantify it.
21       And I think you're going to see on a lot
22 of these search term discussions, they don't come
23 back and quantify it. They simply say, "Unduly
24 burdensome, too broad," but they don't back it up.
25 So if we're going to have meaningful discussions, we

Page 60

1 think that J&J needs to start giving us hit counts
2 every time we make a proposal so we'll have a common
3 set of facts from which to negotiate.
4       MR. SANDICK: Your Honor, we're not
5 arguing hit counts here. I think that we're sort of
6 mirroring my friend Mr. Dunlap's comments that, you
7 know, we don't do hit counts enough, our focus is not
8 always on the hit counts. In most of these, our
9 focus is on the Court's orders and the logic of the
10 request, and the categories of documents. It's not
11 to get obsessed with the hit counts, but to really
12 focus on the categories of documents that should be
13 reviewed.
14       And so we are not saying, "Don't make us
15 do this, Judge, because there's, you know, ten
16 million documents and it's burdensome." Obviously,
17 if we made that type of argument, we would do hit
18 counts. What we're saying is that their terms are
19 too broad, given the Court's prior comments on these
20 issue.
21       The other thing I would say is, and I
22 think Mr. Dunlap was mistaken when he cited a letter
23 a moment ago that said, "Further discussion isn't
24 productive," that was a reference not to what I would
25 call the early period terms and conditions. That's

Page 61

1 what we're discussing now. That was a reference to
2 the general discovery request on terms and conditions
3 from the agreed-upon time period. The reason we set
4 it wasn't productive to discuss was because they
5 field a motion for reconsideration, and we didn't
6 think it was productive to negotiate the specific
7 issue that was, you know, being litigated in the
8 motion for reconsideration, but we never said we
9 don't want to talk about terms and conditions for the
10 early time period. We're happy to do that, you know,
11 immediately --
12       THE SPECIAL MASTER: Let me ask you a
13 question, Mr. Sandick. First of all, your proposal,
14 which, you know, is not written in stone, but yours,
15 which has only certain specified drugs, would they
16 not pick up predecessor terms that might be relevant
17 to find out what "other offer" means?
18       MR. SANDICK: The reason we proposed it
19 is, those are the drugs that are at issue in this
20 case.
21       THE SPECIAL MASTER: Right.
22       MR. SANDICK: And so that's why we
23 propose those drugs. Those would be relevant, I
24 would think, at any time period that Johnson &
25 Johnson through JJHCS provided co-pay support. I --

16 (Pages 58 - 61)

Page 62

1    THE SPECIAL MASTER:  Those are drugs
2 that have been around for quite some time.
3    MR. SANDICK:  Some of them absolutely.
4 Again, if the issue is, do we have the right list of
5 drugs, I'm happy to meet and confer offline with the
6 defense about that and get to the right list of
7 drugs.
8    THE SPECIAL MASTER:  Let's see, also,
9 would there be any benefit to adding a search term
10 that talks about savings program or rebate program?
11    MR. SANDICK:  We could consider that
12 because those are, I believe, they may be in the
13 terms and conditions themselves at certain points.  I
14 think that this could be done again so long as it's
15 joined with -- with, you know, the limitations that
16 we've proposed in terms of the names of the drugs.
17    So your Honor is proposing to add those,
18 would be at the back end of ours.  So, you know,
19 "other offer," or "coupon" or "discount" or
20 "prescription savings card" or "free trial" or
21 "rebate program" or "discount program," something
22 like that.  That's fine, your Honor.
23    THE SPECIAL MASTER:  The other thing
24 that I think has to be done, I would agree with the
25 Plaintiffs' position that is missing from Defendants'

Page 63

1 is, the back end of the Defendant's position is,
2 "Terms with a condition for," but it has everything
3 else, which would mean anywhere in the document.  I
4 would agree that there has to be a, within certain
5 word limitation of the "other offer," "coupon,"
6 "discount," etc., which is in Plaintiff's position.
7 So -- which is missing from the Defendants'.  Those
8 are the places that I would be saying would need some
9 limitations.  Some of that -- so mostly, I would say,
10 I suggest more along Plaintiff's line but with adding
11 savings-per-gram program or rebate program or
12 something else of that nature for the drug.
13    MR. SANDICK:  The one thing, your Honor,
14 I just want to go back and address the subject of the
15 term "rebate program" and I just have be to careful
16 will how we frame it.  As I'm sure the Court knows,
17 "Rebate," it may mean something in the co-pay support
18 context, but it also has a very different meaning in
19 other areas of the pharmaceutical business.  So
20 "rebate" is kind of the term of art for the payments
21 made by pharmaceutical companies to payers and to
22 PBMs as an agreement to, "Now we will pay rebates and
23 you will put our drug on your formulary."
24    So I don't want this be to swept up in
25 that, because that is totally not what co-pay support

Page 64

1 is about.  Those are different payments.  Those
2 payments are made for payors.  Unlike the co-pay
3 support where they are not meant for payors, they
4 are --
5    THE SPECIAL MASTER:  If you put that
6 one, though, at the beginning with the drugs and make
7 it an "and," does that help, if it's an "and" with
8 the other terms?
9    MR. SANDICK:  I would want to confer
10 briefly with my colleagues who are closer to the
11 management of the document production --
12    THE SPECIAL MASTER:  What I'm --
13    MR. SANDICK:  That word gives me a
14 little bit of caution for this technical reason, your
15 Honor.
16    THE SPECIAL MASTER:  -- I will stop it
17 there and to say, within the next week, confer along
18 the lines that I have said, which is that I don't
19 think we need Janssen in here, I think we have to
20 have something about savings programs, rebate
21 programs, whatever, where it falls within that, and
22 that on terms and conditions there has to be
23 something with the coupon, other offer, etc., that's
24 within a certain word, whether it's 25 or within 25
25 or whatever.

Page 65

1    Go back and draft.  We don't have to
2 spend our time doing it today.  If you can't come up
3 with it, okay, a quick call on the Zoom and figure it
4 out.  I don't need a formal motion on it.  Okay?
5 Yes?
6    MR. DUNLAP:  Ask or raise just a couple
7 of things.  I mean I do think it would be helpful if
8 trying to craft the right search terms here for them
9 to tell us the natures of the predecessor programs or
10 tell us what drugs were involved in the drafting of
11 this provision.  They still haven't told us that, but
12 that might help narrow it down so we don't have to
13 list every drug under the sun if we know it was
14 listed for two programs and not for others.
15    The other thing I would just mention is,
16 we really do think that when we make proposals, they
17 should be giving us hit counts.  I heard my friend on
18 the other day, I think, say they are not arguing
19 burden, which helpful.  But even if they are saying,
20 "Well, certain terms will pick up too many
21 documents," it would be very helpful to see those
22 numbers so we could know, for example, how much of a
23 limiter or how far to expand within limiters, within
24 ten, 25, 50, seeing the numbers and having them run
25 different permutations would be very, very helpful.

17 (Pages 62 - 65)

Page 66

1          THE SPECIAL MASTER: Although I don't
2 know that that would tell you whether 25 or 50 and
3 what's the appropriate limitation without seeing a
4 document. I appreciate hit counts are important to
5 proportionality and things of that nature, but I'm
6 also trying to deal with what I felt was too broad a
7 term that would pick up too many things here, you
8 know, when we have, you know, just Janssen in the
9 abstract.
10         So I'm getting rid of that. So I -- for
11 that, I don't need it, a hit term analysis. I'm not
12 disagreeing with you, but there are words
13 that were really talking about that. But please go
14 back to the drawing board on this one and do it
15 quickly, okay?
16         MR. DUNLAP: Can I ask if you have any
17 guidance on this, them identifying names of the
18 predecessor programs or the predecessor drugs?
19         THE SPECIAL MASTER: Mr. Sandick, can
20 you answer that question?
21         MR. SANDICK: Sure. I mean, I think
22 some of the these programs have been called CarePath
23 going back to 2009. I would need to confer with my
24 team for, essentially to confirm that there were no
25 other terms. But I'm happy to fold that into the

Page 67

1 meet-and-confer on this subject.
2          THE SPECIAL MASTER: Okay. Next item on
3 this motion is search terms for CAP-related
4 custodians. Who is going to be doing this?
5          MR. SANDICK: I'm going to be doing it
6 for JJHCS.
7          MR. DUNLAP: For SaveOn, we have a few
8 people arguing on different terms. I'm going to pass
9 it over to Ms. Snow --
10         THE SPECIAL MASTER: Okay.
11         MR. DUNLAP: -- our side's presentation.
12         THE SPECIAL MASTER: So let's start here
13 with, the first one is, who is going to be doing it?
14 I'm sorry.
15         MR. SANDICK: Here.
16         THE SPECIAL MASTER: Sand and --
17         MS. SNOW: I will, your Honor.
18         THE SPECIAL MASTER: Okay. So this is
19 now going to focus for a moment on NEHB and on health
20 benefits, and essential health benefits terms. And
21 there were certain search terms that were suggested.
22 Plaintiff had argued that they had nothing to do with
23 CAP, would fall outside the order, and a different
24 search term to run would have SaveOn within fifty of
25 certain terms. So let's talk about this one.

Page 68

1          MR. SANDICK: I'm sorry, go a head.
2          THE SPECIAL MASTER: Go ahead.
3          MR. SANDICK: So, your Honor I don't
4 know if this would be helpful at this point but I
5 prepared a demonstrative that tries to list out the
6 search terms, and I can share that on the screen if
7 that would be convenient for your Honor, and --
8          THE SPECIAL MASTER: Actually, we have
9 one, too. Oh, okay. Wayne, if you want to put up
10 Plaintiffs' and Defendants' searches on this.
11         MR. FANG: Do you want me to leave out
12 the third one --
13         MR. SANDICK: I have one that basically
14 leaves out the fact -- I think where I would like to
15 start is that we have already accepted I think eight
16 of the search terms that they have proposed in this
17 datapoint.
18         THE SPECIAL MASTER: Okay, why don't you
19 go ahead --
20         MR. SANDICK: And my colleague Cassi
21 Deskus is going to e-mail simultaneous to this a copy
22 to everyone so that they have it.
23         Okay, I thinks this is visible on the
24 screen now, does everyone see it?
25         THE SPECIAL MASTER: Yes.

Page 69

1          MR. SANDICK: Okay, this is our
2 interpretation. Defendants came to us with a number
3 of proposed search terms; and the ones that are in
4 blue, and we've done this for all of the search terms
5 in this part of the motion, are ones that we've
6 accepted.
7          So I just want to start with the basic
8 premise that we have tried to engage in compromise,
9 and the defense has too, I suppose, as much as
10 possible. And those issues, we've agreed to eight of
11 them. For one of them here, which is one that was
12 before your Honor earlier in the so called CAP 1 and
13 CAP 2 motion, we have said that we would run over the
14 SaveOn limiter, and that's obviously the subject of
15 your Honor's earlier ruling, so I won't revisit that.
16         So there are really only two of the
17 search terms that were proposed to us that we had a
18 concern about. And these are ones that -- argument
19 is that, you know, this is CAP discovery. And
20 quoting your Honor's comments at the conference, page
21 110 to 111 of the transcript, "These are CAP people.
22 I want to limit it, then, to this world, not every
23 search term."
24         And then in the order your Honor said,
25 "Plaintiff is directed to use CAP-related search

18 (Pages 66 - 69)

Page 70

1  terms, including terms that capture discussions by
2  the custodians prior to the creation of the CAP
3  program."
4         Judge Waldor -- and you said also in the
5  order -- "Judge Waldor nonetheless cautioned the
6  search terms for the additional custodians must be
7  limited." So we agreed to eight of these and the
8  ninth was the subject of another motion that's
9  already been discussed.
10        These two, I would submit they are
11  not -- they are not limited, and they are not tied to
12  CAP-related issues. These are general terms in the
13  industry. Any time that someone talks about an
14  essential health benefit or a non-essential health
15  benefit, any time that somebody makes a reference to
16  those terms in the context of the Affordable Care
17  Act, which is by the way the context in which those
18  terms make sense, those are Affordable Care Act, and
19  other related regulations to the Affordable Care Act
20  terms.
21        This is not something where, you know,
22  like the other terms that we agreed to, where in our
23  view the defense has honored the Court's instruction
24  that these be limited search terms and focused on
25  CAP-related issues. These are broader than that and

Page 71

1  that's why we opposed it. We've given them eight. I
2  suppose this ninth one will be the subject of your
3  Honor's ruling, so really nine of these they are
4  getting. But these two are just too broad and we
5  think they should have dropped them and they didn't,
6  and so that's why we're here to say, these are too
7  broad, these are not consistent with your Honor's
8  instructions.
9         THE SPECIAL MASTER: So first of all,
10  we're adding, as you know, on the CAP 1, consistent
11  with my prior holdings and -- right? So what we're
12  really looking at is, these were listed as "ors" by
13  the defendant, right, on the EHB and the NEHB, and
14  not an "and," and not "within a certain amount of
15  words," correct, of the other search terms?
16        MR. SANDICK: That's correct.
17        THE SPECIAL MASTER: So Mr. Sandick, let
18  me ask you this, because you know, their position has
19  been as I heard earlier in the argument, "Well,
20  sometimes you refer to SaveOn as an NEHB, and not as
21  an accumulator or maximizer." So they want to pick
22  that up.
23        If you had the other search terms that,
24  let's see -- either SaveOn or accumulator, maximizer,
25  all the things we've been talking about, and added

Page 72

1  "within a certain amount of words," the NEHB, would
2  that work?
3         MR. SANDICK: Does it have a SaveOn
4  limiter? Are we still requiring that it make a
5  reference to SaveOn or to CAP, or would it just be
6  any document that makes a reference to these other
7  terms? Because our concern is that, sure, SaveOn is
8  an NEHB maximizer, a nonessential health benefit
9  maximizer; but I would also say that so are other
10  entities in the industry.
11        And so our concern here is, this is
12  just, if we're talking about limited to CAP
13  discovery, this would pick up essentially any time
14  somebody mentions the existence of these NEHB
15  programs. That just strikes us as being not limited,
16  not limited --
17        THE SPECIAL MASTER: If you had the
18  other terms that you've all agreed to saying that all
19  of those other terms are in there, okay, which does
20  have SaveOn, right? Okay. If you had -- they have
21  the appropriate terms, you have for SaveOn, or
22  "accumulator," or "maximizer," "within fifty of,"
23  let's say 50 of either "essential health benefit" or
24  "NEB," would that work?
25        MR. SANDICK: So I think if I'm

Page 73

1  understanding your Honor, what your Honor is
2  proposing is somewhat similar to a term that we've
3  already agreed, which I just sort of highlighted.
4  It's the third term here, SaveOn within fifty of
5  "accumulator," "maximizer," or "essential health
6  benefit" or "nonessential health benefit." It's
7  similar to it except that it also has a SaveOn
8  limiter here. And to us that's the key issue.
9         So to just, if you were to just add
10  "maximizer" or "nonessential health benefit" terms,
11  if you were to just sort of -- to this term here, the
12  first of the rejected terms, the one that starts
13  with --
14        THE SPECIAL MASTER: Just to have it on
15  its own unconnected isn't going to work.
16        MR. SANDICK: Well, I think if it's
17  unconnected, there are lots of entities in the
18  industry that are nonessential health benefit
19  providers. And most of those documents are not going
20  to have anything to do with this case.
21        What I think we're being asked to do by
22  the defense is to review, you know, a very broad
23  category of documents that include many things that
24  have nothing to do with this. We're trying to narrow
25  it down and to focus on things that actually relate

19 (Pages 70 - 73)

Page 74

1  to SaveOn and how we dealt with what we perceived as
2  the threat to, you know, the threat to, you know, the
3  threat to patient care that SaveOn created.
4       So we tried to do that by using -- we've
5  also used Express Scripts, and Accredo. One of
6  the concerns raised by the defense in the past is
7  that somebody could have referred to this as the
8  Express Scripts accumulator because of the close
9  partnership between Express Scripts and SaveOn. So
10  we've taken that into account.
11      We also have a couple of more general
12  terms here, such as the one, "Other offer within five
13  of accumulator or maximizer." That's going to get
14  them things where people are talking about the
15  specific term that's at issue. So the broader terms
16  will capture discussion of classification of drugs as
17  essential or not essential, what I think is your
18  Honor's concern, but without going beyond the limits
19  that were discussed in our prior conference and the
20  Court's order.
21      THE SPECIAL MASTER: Are you arguing
22  this, Mr. Dunlap? I don't know who's on the other
23  side.
24      MS. SNOW: Elizabeth Snow for --
25      THE SPECIAL MASTER: Oh, I'm sorry,

Page 75

1  Ms. Snow, go ahead.
2      MS. SNOW: I have a few factual
3  corrections to make for what Mr. Sandick just said.
4  First of all, there are loads, in the industry,
5  so-called NEHB maximizers. J&J uses that term to
6  refer to two, maybe three primary companies, SaveOn
7  being one of them. And to be clear, mitigation
8  efforts relevant to those, to other NEHB maximizers
9  or, so-called, using J&J's term, so-called NEHB
10  maximizers, would be relevant to our mitigation
11  defense.
12      Additionally, by asking for the SaveOn
13  modifier, which they keep -- is certainly a pattern
14  today, what they are basically saying is, it needs to
15  say "SaveOn," or refer to SaveOn twice in the same
16  document in a different way. So you know, if you
17  look at Exhibit 9 to this motion, I'll give your
18  Honor a second.
19      THE ARBITRATOR: Okay, I have Exhibit 9.
20
21
22
23
24
25

Page 76

1      THE SPECIAL MASTER: Okay.
2      MS. SNOW: --
3
4                                         o
5  it's really the shorthand that they are using to
6  refer to SaveOn. And we believe this is fully within
7  your Honor's order because if they are using it to
8  refer to SaveOn, and J&J is -- does not always use
9  SaveOn's brand name in its documents, your Honor
10  recognized that it uses the term "accumulators," or
11  "maximizers" to refer to SaveOn. And this is part
12  and parcel of the same thing. It's just using a
13  slightly different term, this NEHB term, or sometimes
14  it uses a "variable EHB" to refer to SaveOn.
15      And so therefore, the CAP program, which
16  is about J&J's response to SaveOn and similar
17  programs, is using that term as a shorthand for
18  SaveOn.
19      THE SPECIAL MASTER: Mr. Sandick? Do
20  you want to respond?
21      MR. SANDICK: Yes, a couple of
22  responses. So first, on the subject of -- well,
23  broadly speaking, I mean, I think we're losing a
24  little bit of the connection to -- this is supposed
25  to be CAP-related discovery.

Page 77

1      THE SPECIAL MASTER: Right.
2      MR. SANDICK: And the references to
3  essential health benefits and nonessential health
4  benefits, those are about, I would say, it's kind of
5  like the business model of SaveOn. That's how
6  they -- just to step back and provide some context,
7  the way that they operate is, they take a particular
8  drug and they say, "Let's make this a nonessential
9  health benefit under the Affordable Care Act
10  regulations because, if we do that, we're not subject
11  to the limitations on what you can ask patients to
12  pay as co-pay or coinsurance."
13      So what -- this search term is really
14  like the entire business of SaveOn. It's not
15  actually limited in any way like the other ones are
16  to CAP discovery. To this, you know, I don't -- I'm
17  not sure that it is mitigation, but the so-called
18  mitigation defense that we're hearing. So I think, I
19  would really like the Court, if it's willing to,
20  respectfully, to kind of ground the ruling to the
21  focus on CAP.
22      And these two terms, they don't mention
23  CAP, they don't have any connection to CAP's related
24  efforts. The only other thing I would say is the
25  suggestion that I've just heard from the defense a

20 (Pages 74 - 77)

Page 78

1 few minutes ago, they said mitigation efforts
2 relating to other NEHBs should be produced. I mean,
3 first of all, I dont think that's before your Honor
4 today. But I was just going to ask, they take the
5 exact opposite position when it comes to discovery
6 about their efforts to thwart mitigation, their
7 evasion efforts. They say, if it relates to other
8 pharmaceutical manufacturers, we shouldn't get that.
9 Obviously, that has to be a two-way street but it's
10 not really before your Honor today.
11          I mention it just because this is -- I
12 think the approach that we're seeing here is, your
13 Honor, you know, gave them an arm, and they now want
14 a leg. Your Honor gave them CAP discovery, now they
15 are looking for kind of broader discovery about any
16 time people talked about the business, we have to
17 review those documents. And not just the business of
18 SaveOn, but the business of their competitors. And
19 maybe I shouldn't have said there are many in this
20 space, but there are other maximizer and accumulator
21 programs. There are a number of them that are not --
22          THE SPECIAL MASTER: Well --
23          MR. SANDICK: -- and these will generate
24 false hits and unnecessary work and has nothing to do
25 with CAP.

Page 79

1          THE SPECIAL MASTER: Let me turn to
2 Ms. Snow. Ms. Snow, Mr. Sandick is sitting on the
3 argument that these searches will not hit on CAP, and
4 the point of this is the CAP custodians. How do you
5 want to respond to that?
6          MS. SNOW: So, your Honor, at the last
7 conference, and I think based on -- based on your
8 statements at the last conference, you agreed that
9 references to -- and search terms to capture
10 references to SaveOn accumulators and maximizers also
11 were relevant to the CAP program, even if they didn't
12 use the term "CAP" because they were part of J&J's
13 response to companies like accumulators, maximizers,
14 any -- what they -- what they, J&J, call NEHBs and
15 SaveOn.
16          That is the purpose of the CAP program.
17 When it, J&J, uses the term "NEHB," and it may be
18 using it at times to refer to both SaveOn and
19 Prudent RX, as we saw in the documents, it is
20 CAP-related because it is responding to those NEHBs.
21          THE SPECIAL MASTER: Let me ask you this
22 question: Are there any other searches, that --
23 Mr. Sandick, put on your display for a moment so I
24 can see the things. Okay.
25          MR. SANDICK: There's one more, your

Page 80

1 Honor, I'm sorry, I'm trying to squeeze it in here,
2 the one at the very bottom that your Honor has
3 modified a few minutes ago.
4          THE SPECIAL MASTER: But why wouldn't,
5 then -- I appreciate Ms. Snow's argument about, you
6 know, it doesn't have to mention CAP each time
7 because it's not going to. With e-mails, as you
8 pointed out, may not mention CAP specifically.
9          But if the concern is that we're
10 capturing and not duplicating, you know, how,
11 perhaps, an entity like SaveOn is referred to by J&J,
12 whether sometimes they are called SaveOn, they might
13 be called a maximizer, an accumulator, one NEHB,
14 wouldn't just "ors" among them in some of your other
15 searches that add that, it doesn't have to be SaveOn
16 "and," but it can be SaveOn "or" NEHB, can't we
17 capture in some way that way?
18          MR. SANDICK: Well if we do SaveOn or
19 NEHB, the practical effect in how it's run would be
20 any document that mentions NEHB.
21          THE SPECIAL MASTER: Okay.
22          MR. SANDICK: Adding th same word
23 doesn't actually place any real limitation on the
24 NEHB, and I would point out that we have agreed to
25 NEHB in the third of the search terms that they have

Page 81

1 proposed, the one that starts, SaveOn, within fifty
2 accumulate exclamation -- sorry, asterisk, then that
3 term, if SaveOn within fifty of nonessential health
4 benefit or essential health benefit or even Accredo
5 or Express Scripts, to take into account possibility
6 of other types of discussions.
7          Those will be produced. Just as we move
8 further away from CAP discovery, we have many terms
9 here that will allow us to see if there are
10 CAP-related documents; for instance, that mention
11 SaveOn, or that mention Express Scripts within fifty
12 of accumulator, or Accredo within fifty, or even
13 Other Offer within accumulator.
14          So they are not tying all these terms to
15 SaveOn. Many of these, the fourth, fifth, sixth,
16 don't have any SaveOn connection. So we're not
17 insisting on that as a categorical matter. We're
18 just saying that these two at the bottom, they just
19 don't tie to CAP at all. They just go much more
20 broadly than that. And of course, we wouldn't --
21          THE SPECIAL MASTER: I would agree that
22 those search terms alone, not in any way modified by
23 anything else, are too broad. So I'm trying to think
24 about how they get combined with a way that makes
25 sense.

21 (Pages 78 - 81)

Page 82

1          MS. SNOW:  Your Honor, may I make a
2  suggestion of another place that we could perhaps
3  start?  I think at a minimum, part of the issue that
4  we have identified is, we're using the term, we're
5  requiring the term "SaveOn" with this NEHB or EHB
6  term.  And I think what -- one thing we're missing is
7  those terms with the CAP term that your Honor just,
8  you know, as an additional modifier to the CAP term
9  that your Honor just ordered, as well as, you know,
10  those documents with "accumulator" or a reference to
11  a "maximizer," you know, I hear your Honor --
12          THE SPECIAL MASTER:  I'd like you to
13  look at this, both you and Mr. Sandick.
14          Mr. Sandick, I am agreeing with you that
15  EHB, non-EHB or whatever, by themselves are just too
16  broad.  So what we need to do is take a look at where
17  that can be brought in.  I know you said -- bring
18  your thing down again, please.
19          MR. SANDICK:  Sure, I'm sorry.  And I do
20  have a proposal, your Honor --
21          THE SPECIAL MASTER:  What's your
22  proposal?
23          MR. SANDICK:  -- and these are tough to
24  do spoken, so I'm not insisting that the Court and
25  the defense agree to it right here.  But just to

Page 83

1  promote discussion, essential health benefit, or EHB,
2  or nonessential health benefit, or non-EHB, so those
3  terms in parentheses, and within 25, meaning within
4  25 words of CAPA or CAPM or adjustment program, which
5  are the, you know, so it's basically taking these
6  here and linking them to SaveOn.  It's linking them
7  to some of these other terms like, having trouble
8  here with my highlighting but --
9          THE SPECIAL MASTER:  So what you want to
10  do is take exactly this one, this last one that says
11  "Accepted," and instead of SaveOn words, put the
12  other NES stuff and ES stuff in there, right?
13          MR. SANDICK:  That's right.  So that it
14  captures some of the ideas that the defense is
15  talking about and that your Honor has concerns about.
16          THE SPECIAL MASTER:  Yes.
17          MR. SANDICK:  But without the broader
18  ones that I highlighted in red that we did not agree
19  to run.
20          MS. SNOW:  May I just --
21          THE SPECIAL MASTER:  What?
22          MS. SNOW:  -- make a couple of points?
23  First, in addition to CAPA, CAPM or adjustment
24  program as the now modifier, I would also ask for the
25  accumulator --

Page 84

1          THE SPECIAL MASTER:  He understands that
2  has to be changed --
3          MS. SNOW:  Okay.
4          THE SPECIAL MASTER:  -- that I made.
5          MS. SNOW:  Within 25 seems quite tight,
6  given, in particular, I think the way that we've
7  dealt with search terms that are on the screen right
8  now.  We would prefer an "and" at a minimum,
9  within fifty.
10          THE SPECIAL MASTER:  Mr. Sandick?
11          MR. SANDICK:  I would consider that.
12          THE SPECIAL MASTER:  Okay.  Can we agree
13  or you want to consider?  What are --
14          MR. SANDICK:  I would like to talk to a
15  colleague but I think, your Honor, we're now at a
16  point where basically the only question is how the
17  tightness of the connection, should it be 25 or 50,
18  and I'm happy to go back to the defense tomorrow or
19  Friday with an answer on that.
20          THE SPECIAL MASTER:  Great.
21          MR. SANDICK:  I'd like to --
22          MS. SNOW:  Your Honor, could we ask that
23  if they do, that they provide us hit counts, that
24  this -- if they want to continue within the --
25  "within 25," and don't agree to the "within 50," or

Page 85

1  an "and," that that provide hit count?
2          THE SPECIAL MASTER:  That one I
3  understand.  So Mr. Sandick, if you don't like the
4  fifty, because you think it's too broad, you have to
5  give a hit count, I guess.  I think that's right.  So
6  that we make sure that we have a word count that
7  makes sense.
8          Please, though, get back to me about
9  what you agree on because it I want to put it in an
10  order.
11          MR. SANDICK:  Yes, your Honor.  Thank
12  you.
13          THE SPECIAL MASTER:  Thank you.  I think
14  we can now move on the Scott White and Blasine
15  Penkowski, and the Trial Card statements of work,
16  etc.  They have been added as CAP custodians, and
17  they have disputes on the search terms related to
18  work orders between plaintiff and whether Trial Card
19  should be included, how this is all going to work
20  over.  And again what I have is, I think, plaintiff
21  agreeing to certain words, I see you're putting up
22  what you've agreed to again, and let's see where we
23  are.  Okay?
24          MR. SANDICK:  So for Scott White, I
25  think we've agreed to all of them.  This one here

22 (Pages 82 - 85)

Page 86

1 that's in italics was the subject of your Honor's --
2         THE SPECIAL MASTER:  Right.
3         MR. SANDICK:  -- discussion.  We should
4 come back to that, perhaps.  But the one that we
5 declined to run was the statement of work issue.  And
6 then I have over here on the next page, for
7 Ms. Penkowski, we agreed to run many of the terms
8 that they wanted, and again the statement of work,
9 and there are some other issues for Ms. Penkowski.
10        But staying on the Statement of Work
11 issue -- you know, the Court called for -- and this
12 is from page 128 of the transcript, "Very limited
13 discovery," and -- you know, engaging in colloquy
14 with defense counsel, your Honor stated, "Very
15 limited," and the counsel for SaveOn agreed, "Very
16 limited, yes, your Honor."  And what I would say is,
17 the ones that we've accepted, you know, I think we'll
18 give them quite a bit of information on the issue
19 that they are looking for.
20        What we've declined to agree to is what
21 I'll call the statement of work term.  This is a
22 request for all documents that mention in any way
23 statements of work with Trial Cards.  The Trial Card
24 is the vendor that helps to --
25        THE SPECIAL MASTER:  Um-hum --

Page 87

1         MR. SANDICK:  -- administer the care
2 program.  We offered to produce the final contracts
3 and final statements of work.  Those can be produced
4 for noncustodial sources, but what I would say is
5 this is just a sweeping request that I don't think
6 they have demonstrated the need for and it's not
7 consistent with your Honor's description of the
8 discovery here as being limited.
9         The final contract and statement of work
10 will show what Trial Card gave and didn't do.  So if
11 Trial Card for instance did not have a term in their
12 agreement relating specifically to the identification
13 of maximizer programs, then you know, they will be
14 able to see whether they -- whether J&J put that into
15 a contract or not.  They will get that from the
16 noncustodial documents, from the final contracts and
17 statements of work.
18        And again, if we're going to have very
19 limited discovery from high level executives, just
20 quoting from your Honor's statement, people who may
21 have, you know, there may be very limited discovery
22 from, this doesn't seem to be consistent with that.
23 We've agreed on virtually everything else.  This is
24 the one piece of it that we haven't agreed to.
25        There's also still, I think, the

Page 88

1 question about revisiting the CAP 2 motion in the
2 context of White and Penkowski.  I just want to set
3 that aside.  But on the Statement of Work issue, it's
4 just not consistent with the idea of it being a very
5 limited search.
6         MS. MILES:  Your Honor, if I may
7 respond --
8         THE SPECIAL MASTER:  Yes, go ahead.
9         MS. MILES:  We understood, your Honor,
10 when your Honor ordered us to have limited discovery
11 with these individuals, we understood that to be
12 limited in terms of tailoring search terms for the
13 reasons why you found that these custodians were
14 relevant.  So the cases that, you know, we have seen
15 about apex custodians, so-called, first of all have
16 to do with the physician, not document production.
17        But even when they are applicable, the
18 idea is that just because you're a CEO, doesn't mean
19 you're involved in the day-to-day running of every
20 single part of the business.  But your Honor did find
21 that White and Penkowski were relevant because, in
22 part, because they were overseeing Trial Card, J&J's
23 vendor that runs the CarePath program.  So they were
24 responsible for approving the work orders, the
25 statements of work that would allocate funds for

Page 89

1 Trial Card to disburse to the CarePath patients.  And
2 we showed you examples of that during the last
3 conference, and you talked about them in your order;
4 ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████.  That was Exhibit 2 to our December 28th
7 letter.
8         These individuals you found were
9 relevant based on their oversight of Trial Card, so
10 we created a search term that was designed to get at
11 that very topic.  So we think that this is narrowly
12 tailored.
13        (A pause in the proceedings.)
14        MR. SANDICK:  You want me to take the
15 document down, your Honor, I can take it down and --
16        MS. MILES:  Okay, now it's down.  I
17 wanted to direct your attention to the fact that this
18 includes, this proposed search term includes three
19 "ands," which means that it has to, for it to pick up
20 a document, has to have four separate components in
21 that document.  So we think that that further limits
22 it.  It has to be Trial Card and a statement of work,
23 or contract, and CarePath, or Savings Program, or
24 With Me, and one of the drugs in issue in litigation;
25 so this is providing a lot of limitations.  I think

23 (Pages 86 - 89)

Page 90

1 J&J's counsel is not recognizing that when they are
2 saying this is going to pick up everything under the
3 sun.
4         THE SPECIAL MASTER:  And I'm going to
5 pick this up, Mr. Sandick.  I don't think that you're
6 arguing that Trial Card is irrelevant, but that it's
7 just simply, the request is too broad.  I'm not sure
8 if you're arguing --
9         MR. SANDICK:  That is exactly the
10 argument.  Trial Card, they are already a third-party
11 witness in this case.  They have produced documents,
12 they will produce more documents.  What we're saying
13 here is that they should get the final statements of
14 work and final contracts with Trial Card.  The
15 defense should know what Trial Card was engaged to
16 do, what the contracts covered, and by implication,
17 what the contract covered because, if there's
18 something that's not in the contract, then it wasn't
19 something that my client hired Trial Card to do.
20 They can make whatever arguments flow from that.
21         The only question is whether in the
22 context of extremely limited discovery from Apex,
23 custodians like White and Penkowski, whether they
24 should also get all of the communications that stand
25 behind the statements of work.  We think that's not

Page 91

1 consistent with the spirit of your Honor's very
2 limited ruling.
3         THE SPECIAL MASTER:  Well, let me ask
4 you, Ms. Miles, you think that by adding all these
5 "ands" you've done it.  I understand what Mr. Sandick
6 is saying, this is like, yes, you should see what
7 Trial Card is doing but you don't need every
8 conference that ever happened, particularly if things
9 didn't end up going that way.
10         So how do you respond to that?
11         MS. MILES:  So, your Honor, we need the
12 draft and the communications about these work orders
13 because we need to know not only what steps J&J
14 actually took, or J&J instructed Trial Card to take,
15 but why they did it, and what steps it contemplated
16 but did not take, because that is key to our failure
17 to mitigate defense that requires us to identify
18 reasonable steps that J&J could have taken but chose
19 not to in order to mitigate their damages.
20         THE SPECIAL MASTER:  Okay.  Mr. Sandick,
21 on this one I'm going to ask you to use the search
22 and tell me how many hits there are and we'll see if
23 it comes up too broad or not.
24         MR. SANDICK:  I understand, your Honor,
25 and I will go back with my team and do that.  There's

Page 92

1 one other issue that a colleague has reminded me of
2 which is that when we talked about the CAP 1 and
3 CAP 2 motions, your Honor, we left open, I believe,
4 the subject of whether your Honor's ruling would also
5 apply in the context of White and Penkowski.
6         That issue has been raised kind of in
7 multiple places across the motions.  And what I would
8 say is that again, consistent with the idea of very
9 limited discovery for these two particular witnesses,
10 we would ask your Honor not to expand your prior --
11 your Honor's prior ruling from earlier today to cover
12 white and Penkowski, but allow those to stand on the
13 terms of Judge Waldor's earlier ruling, which I think
14 your Honor has indicated was clear.
15         And Ms. Long, I don't know -- I'm sorry,
16 I don't mean to tag team to Defendants on this, but
17 Ms Long, I see, has just emerged perhaps to correct
18 or clear something I've said.
19         THE SPECIAL MASTER:  Okay.  Go ahead.
20         MS. LONG:  I have nothing more than what
21 Mr. Sandick said, but I would add that I think
22 earlier your Honor said and agreed that the
23 application of CAP 2 on the Apex custodians and --
24         THE SPECIAL MASTER:  Right --
25         MS. LONG:  -- as we have said, and I

Page 93

1 think Mr. Sandick said just now, we understood the
2 Court to order very limited discovery and we think in
3 this context, Judge Waldor's prior ruling on
4 maintaining the SaveOn modifiers should exist for
5 these narrow, again, senior executives of the
6 company.
7         MS. SNOW:  Your Honor, may I respond?
8 Elizabeth Snow for the defense.
9         THE SPECIAL MASTER:  Yes.
10         MS. SNOW:  So first of all, the offer
11 for use Judge Waldor's term with the SaveOn limiter
12 for the -- Ms. Penkowski and Mr. White is, it's no
13 offer at all.  They are already using the SaveOn
14 term.  And just taking a step back, one of the
15 reasons that you ordered the addition of Mr. White
16 and Ms. Penkowski, and I can start with Mr. White,
17 is, in recognition that he was, and I'm looking at
18 page 28 of your order, was involved in high level
19 discussions about the CarePath program, SaveOnSP's
20 role and how that was impacting Plaintiff's program
21 and litigation against SaveOnSP.
22         If you look in the prior paragraph, you
23 observe that documents reflect that White convened a
24 meeting of J&J's patient engagement and customer
25 solutions team to conduct a business review of the

24 (Pages 90 - 93)

Page 94

1 CAP program.
2        So it is our view on Mr. White, and I
3 will get to Ms. Penkowski in a second, Mr. White did
4 work on the CAP program, and we need documents
5 consistent with the order that your Honor issued on,
6 we'll call them CAP 1, and we need those full terms
7 as opposed to using just the term "SaveOn" on its
8 face.  And just to turn to Ms. Penkowski, there's a
9 document that we'll get to in a moment, but --
10       THE SPECIAL MASTER:  I'm ready to go on
11 this.  I think that it's limited enough to simply
12 say, the ruling that I gave earlier today but for
13 Mr. White, you want to talk about Ms. Penkowski
14 separately, it will be limited to the CAP, with -- it
15 has to have "and SaveOn or accumulator or maximizer."
16 So let's move on.
17       MS. SNOW:  Your Honor, can I just
18 clarify one point on that?  Does that apply to
19 Ms. Penkowski?
20       THE SPECIAL MASTER:  Well, I haven't
21 heard anything separate about her so I would say yes
22 unless somebody has an argument.
23       MR. SANDICK:  I would say as to
24 Ms. Penkowski, the issue with regard to the work
25 order, because I don't think it's any different, and

Page 95

1 I meant my arguments to apply to both, so I don't
2 think I need to reargue that position.
3        There is another issue for
4 Ms. Penkowski, and with the Court's permission I'd
5 like to share that document again to reflect where I
6 think we are in terms of the meet-and-confer process
7 and what we've already agreed to do.
8        THE SPECIAL MASTER:  Okay, go ahead.  So
9 for both of these, we're going to apply the new
10 limiter that I gave earlier.  Now we're up to
11 Ms. Penkowski.  Go ahead.
12       MR. SANDICK:  So as with Mr. White,
13 we've agreed to six of these terms.  There is another
14 one that was just covered by the discussion that we
15 had together with respect to Mr. White.  I think it's
16 the same issue with respect to Ms. Penkowski.  This
17 is the statement of work term.  We're already
18 resolved that here today.  So really, there are a
19 couple of ones that we did not agree to and that have
20 not been moved on by the defense.
21       So it really limits us back to this
22 particular term that relates to something that
23 Ms. Penkowski leaves, it's called the Strategic
24 Customer Group, the SCG, and it discusses a number of
25 different issues.  One of them does relate to

Page 96

1 maximizers and accumulators.  And the concern that we
2 have here, and I think -- not I think, I'm certain at
3 some point in the meet-and-confer the defense
4 recognized that this was not like a crazy concern for
5 us to have.  But if we use the term of SCG, or
6 Strategic Customer Group, what will happen is, every
7 time that somebody uses that term in their signature
8 block, or even just makes a stray reference to it,
9 the document will be picked up and have to be
10 reviewed.
11       Again, this is someone for whom
12 discovery was meant to be very limited, and by using
13 a term that hits on a signature block, you're going
14 to necessarily have you know, lots and lots of
15 irrelevant things.  We're not making a burden
16 argument.  We're just saying if we're trying to do
17 very limited discovery for Ms. Penkowski, which is
18 what the Court could said last time, then it really
19 should be narrowed, and we've proposed a narrow term
20 that is meant to capture the important documents that
21 the defense wants to get here, but without making us
22 review every document that uses Strategic Customer
23 Group or SCG, such as in a signature block.
24       And this is, with the exception of what
25 we've already resolved, this was the only other term

Page 97

1 that is in dispute over Ms. Penkowski.  We accepted
2 nearly all of their terms.  They never came back with
3 a counteroffer on this.
4        We really think that our proposed offer
5 is more fair and reasonable, at least as an initial
6 matter.  They can always come back as we've seen and
7 ask for more.  But at least as an initial matter, to
8 allow us to run the narrower term and product
9 responsive documents that we identify using that
10 term.
11       MS. SNOW:  May I respond, your Honor?
12       THE SPECIAL MASTER:  Yes.
13       MR. SANDICK:  I'll take this down, I
14 didn't mean to prevent counsel from being seen.  I'm
15 still learning Zoom.
16       THE SPECIAL MASTER:  But the odd thing,
17 is, Mr. Sandick, when you do the display, you show up
18 in the corner.  But because probably you're the one
19 showing it, you're showing up in the corner, but when
20 your adversary shows up, it's not there.
21       MR. SANDICK:  I want for assure your
22 Honor, that that is totally unintentional, and also
23 thank my teammates who showed me how to do sharing
24 documents on Zoom at all, but I certainly don't mean
25 to suppress the images of defense counsel who I

25 (Pages 94 - 97)

Page 98

1 respect and have worked with on other matters, and
2 no --
3        MR. GREENBAUM:  I want to point out that
4 SCG are initials of my law firm.
5        THE SPECIAL MASTER:  Thank you, Jeff.
6 All right, Ms. Snow, you've heard what Mr. Sandick
7 says.  I don't know if you've responded to his recent
8 suggestion here which I think looks like brand or
9 finance SCG or strategic -- customer within 25 of
10 working group or guidance or respond or response, and
11 accumulator/maximizer.
12        MS. SNOW:  Yes, I do want to correct the
13 record on one point.  We sent multiple letters, we
14 engaged in a meet-and-confer process.  This search
15 term that they are now proposing, they didn't make
16 any proposal to us until it was in the letter to your
17 Honor.
18        So our term was the only term, our
19 proposal was the only term part that was part of the
20 meet-and-confer process.  And we crafted that term to
21 target a very specific subject.  So if you have
22 Exhibit 17 in front of you --
23        THE SPECIAL MASTER:  I have your -- I
24 have yours in front of me.  This -- I can turn to it,
25 but I have it in my own writing here, so --

Page 99

1        MS. SNOW:  ███████████████████████
███████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████
9        So we targeted our search term to go
10 directly at -- at that -- the work of that group
11 which we think, at a minimum, it's a precursor to the
12 CAP program, and it shows J&J's response to SaveOn.
13        So J&J, I mean, I just heard Mr. Sandick
14 say that he has no burden objection.  We, I guess,
15 are a little bit surprised on that, because you know,
16 I mean, perhaps not because he just -- J&J refused to
17 provide hit counts --
18        THE SPECIAL MASTER:  I'm going to
19 interrupt you for a moment.  Assume like this has not
20 been really back-and-forth on the latest suggestion.
21 Meet and confer on this so you can get back to me.
22        MR. SANDICK:  I'm happy to do that, your
23 Honor.
24        MS. SNOW:  Your Honor, can I ask on that
25 point as well that they provide hit counts for both

Page 100

1 our proposed search term and their proposed search
2 term in advance of any meet-and-confer so that we can
3 be meeting and conferring in a concrete manner?
4        THE SPECIAL MASTER:  Mr. Sandick, can
5 you do that?
6        MR. SANDICK:  Yes, we're happy to --
7        THE SPECIAL MASTER:  All right.  Let's
8 turn to Harris and De Camera, right?
9        MR. SANDICK:  Yes, your Honor, this is
10 another area in which I feel they are greatly
11 expanding upon what your Honor ordered last time.
12 Your Honor's comments at the transcript, page 54, 55,
13 said, you know, "These are limited to documents
14 within the Stelara/Tremfya area," 'cause these are
15 two attorneys.  So it's a third-party communication
16 about this particular subject.
17        In the Court order there's a heading
18 called "New Stelara and Tremfya."  And I'm happy,
19 David, also after the call to give you any spellings
20 or anything like that, to be helpful.
21        THE SPECIAL MASTER:  You know, and I
22 have your arguments, and you're right about what I
23 ordered.  It doesn't mean somewhere down the line
24 similar to Judge Waldor, when I said, you know,
25 things can happen, and we can change, you know,

Page 101

1 wherever we are, we might expand.
2        I would agree that at this point, you're
3 limiting it to the other offer search streams on the
4 two custodians with regard to the Stelara and
5 Tremfya, so I don't want to hear argument on this.
6        You can always come back to me if
7 there's a reason for expanding it and there's some
8 basis for it.  But that's it.  Let's move on to
9 something else.
10        How is my court reporter?  You need a
11 break or are you good?
12        REPORTER:  I'm okay.
13        THE SPECIAL MASTER:  Plaintiff's motion
14 to compel Defendant to produce documents responsive
15 to your request 99, 102 and 103.  This is the one --
16 I'm sorry?
17        MS. NELSON:  Your Honor -- I'm sorry, I
18 was just about to identify myself --
19        THE SPECIAL MASTER:  Ms. Nelson, oh, you
20 are going to be doing motion?
21        MS. NELSON:  Yes, for the defense.
22        THE SPECIAL MASTER:  I'm sorry, for --
23        MS. NELSON:  For SaveOn.
24        THE SPECIAL MASTER:  Okay, Ms. Nelson,
25 and I see Ms. Arrow saying we're on for this one.

26 (Pages 98 - 101)

Page 102

1 Okay, very good.  Now, all right, so 99 is -- this is
2 all, again, about some of the search terms.  This is
3 asking for documents or communications regarding any
4 actual contemplated changes to SaveOn's program or
5 offerings to become effective January 1, 2024, that
6 affect patients enrolled in a high-deductible plan;
7 102 calls for documents or communications concerning
8 any changes to SaveOn's policies or programs,
9 offerings with the intent or effect of increasing
10 SaveOn's affiliated patients' co-pay or
11 out-of-pocket; and 103, documents or communications
12 related to SaveOn claims that patients' final costs
13 would be as low as zero dollars, including all
14 documents or communications regarding the change in
15 SaveOn materials representing the patients final
16 costs being reduced.
17        Now, I believe defense argues how many
18 documents, it's already produced, that a review of an
19 additional five thousand pages would be cumulative,
20 duplicative, or irrelevant.  And I think that is
21 largely the argument -- it's a burden argument and
22 proportionality, is that correct?
23        MS. NELSON:  Your Honor, I think there
24 were some documents that would be swept up by J&J's
25 request that we do think are irrelevant, but it plays

Page 103

1 into the burden of proportionality.
2        THE SPECIAL MASTER:  Okay.  I don't
3 think that I need much.  I will tell you that at this
4 point, I didn't really find that SaveOn's opposition
5 met its burden of showing the cumulative nature
6 necessarily of the proposed search terms.  And I
7 could go through these, I mean, I'm going to be
8 issuing some sort of, you know, a sort of speaking
9 order on it.
10        But on this one, I'm not going to rule
11 in favor of the objection.  I don't think the 5,600
12 documents is unduly burdensome.  And while I do
13 appreciate defendant has produced a lot of documents
14 in this case, I absolutely -- but I do find that the
15 requests are relevant and the fact that there may be
16 some duplication, I'm not satisfied that it will
17 really be that duplicative.  It's not going to rule
18 the day.  So both will work on this one.
19        MS. ARROW:  Thank you, your Honor.  We
20 don't need further argument on this.
21        THE SPECIAL MASTER:  So you're declining
22 the chance to argue.
23        MS. ARROW:  That's rare.  Thank you,
24 your Honor.
25        THE SPECIAL MASTER:  I'm going to move

Page 104

1 on to J&J's request 95 and 96, and this deals with
2 the, first of all, the confidentiality obligations
3 and communications about those.
4        MS. NELSON:  Your Honor, I can say you
5 did not deprive me of the opportunity to argue,
6 'cause I will be handling this one.
7        THE SPECIAL MASTER:  Are you going to
8 argue this one, too, Ms. Nelson?  Okay.
9        MR. GREENBAUM:  Your Honor, I'm going to
10 argue it for JJHCS.
11        THE SPECIAL MASTER:  Mr. Greenbaum.
12 Okay.
13        Now, I know the large focus in both of
14 these rises out of, and I'll spell his name, I don't
15 know how you pronounce it, M-i-g-h-e-l-l-s is it
16 "Miguels"?
17        MR. GREENBAUM:  "Myles," apparently.
18        THE SPECIAL MASTER:  Mighells, who is
19 now a former employee, and is, I guess, puts some
20 things on social media.  He's been deposed at this
21 point, right?
22        MS. NELSON:  Not my understanding.
23        THE SPECIAL MASTER:  Not yet.  I'm sure
24 he will be at some point.  But here we are.  So, I'll
25 hear what you have to say about this.  I mean, but

Page 105

1 make it quick.  Because I've read what you've got.
2        MR. GREENBAUM:  Your Honor, should I
3 start?
4        THE SPECIAL MASTER:  You can.  It's your
5 motion.  Look, they are relying on confidentiality
6 clause, then there's an updated policy that was
7 really what they call kind of dealing with
8 Sarbanes-Oxley or data privacy clause, and by the
9 way, Mr. Mighells was born by then, by the time that
10 was the updated policy.  But we all know that
11 confidentiality agreements, particularly when they
12 are talking about, you know, the business, etc., are
13 typical.  You may not like the clauses that they, how
14 they've written them here, that's one thing.  But
15 you've indicated that you've narrowed your request
16 and you want to compel the production of the
17 following documents and communications:
18        Communications regarding the reasons,
19 goals or notifications for the policies or other
20 confidentiality obligations, communications relating
21 to any contemplated or actual effort to discipline,
22 fire or sue any person it has suspected of violating
23 his or her supposed confidentiality obligation, and
24 communications regarding or with any employee who has
25 refused or failed in a timely manner to sign the

27 (Pages 102 - 105)

Page 106

1  confidentiality policies or other confidentiality
2  obligations.  Right, Mr. Greenbaum, that's how you've
3  said, these are your requests, right?
4           MR. GREENBAUM:  Yes.
5           THE SPECIAL MASTER:  Okay.  What you're
6  saying at this point is, if they have answered these,
7  but you do not think -- and even though I know that
8  on the defense side, you're still arguing a relevancy
9  objection, but they have responded and it's typical
10 of, notwithstanding my objection, here you are.
11 Right?  Okay?
12          But Mr. Greenbaum, I'm having a problem
13 about what more you're really looking for in this --
14 in this regard.  Defense has produced documents, they
15 have indicated how they relate to how they have
16 instructed employees.  Tell me what else you think is
17 out there.  And they have said they are not aware of
18 enforcing this against anyone else.
19          MR. GREENBAUM:  Judge, let me -- let me
20 start by saying, I don't see any requests that could
21 be more relevant than these.  They are very limited,
22 it's probably limited to information that the top
23 executives know.  This is about their efforts to
24 muzzle whistleblowers from speaking out about the
25 SaveOn misconduct and covering up their wrongful

Page 107

1  scheme.  Look, they have admitted in answers to
2  interrogatory 18 that they have used these policies
3  to prevent communications regarding their misconduct.
4  They have admitted that.  And then we followed up
5  with these requests.  The timing here is very
6  suspect.  The cases --
7           THE SPECIAL MASTER:  Let me also ask you
8  this, Mr. Greenbaum.  Isn't it true that they have
9  also claimed that Mr. Mighells transferred documents
10 to himself before leaving the company, confidential
11 documents, that they claim that he misappropriated --
12 I mean, Mr. Mighells is a case unto himself.  I know
13 you're going beyond.
14          MR. GREENBAUM:  I am, because look what
15 happened.  Look at the timing here, which is very
16 suspect.  In May of 2023, what did they do?  They
17 amend this confidentiality policy, which we know was
18 done by May 23rd, because that's the date the CEO
19 signed it.  And they have produced that document.
20 Within three days, they hired a lawyer, and sent the
21 threatening letter to Mr. Mighells.
22          I want to know what was the
23 communication that led them to, A, amend the
24 confidentiality -- they say it's for Sarbanes-Oxley.
25 I don't think so.  And I think the documents will

Page 108

1  show it was not for that.  They obviously did it
2  because they learned something happened, and they
3  realized maybe the truth is getting out, that the
4  truth is getting posted on social media.  And
5  therefore, we have to stop it.
6           I want to see those e-mails.  I want to
7  see those communications as to why they made this
8  change all of a sudden in May of 2023.
9           Second, I want to know who they policed,
10 if anyone, of people refusing to sign this new
11 confidentiality policy.  We've e-mails they have put
12 in the record that show people were upset about what
13 SaveOn was doing, and about all the people that were
14 suffering because of their policies.  They didn't
15 want their people going public with that.  So that's
16 very limited.
17          So we want information about their
18 change in policy, how that came about, what are the
19 communications -- it's probably among the top three
20 or four executives.  It's not a lot of documents.
21 And how did it come about that you decided to write
22 this letter to Mighells?  What did they learn and
23 when?  That's not confidential.  And third, efforts
24 to enforce it.
25          It's three very narrow categories of

Page 109

1  documents, and a lot of it's been admitted and they
2  say they don't know about any other people.  They
3  said point-blank, "We refuse to search.  We refuse to
4  ask our clients about this."
5           So there's nothing that could be more
6  relevant about, it goes right to intent, which we
7  have to prove in this case.  And we think these
8  documents are very discreet and very relevant, and
9  we're probably not talking about more than twenty
10 documents in the whole case.
11          THE SPECIAL MASTER:  Ms. Nelson?
12          MS. NELSON:  Yes, can you hear me okay?
13          THE SPECIAL MASTER:  I can.
14          MS. NELSON:  Okay.  I appreciate.
15 There's some audio issues on our end which is why I
16 have now put on in glamorous headset.
17          So I think there's a number of issues
18 with this motion.  And the reality is, J&J is
19 fantasizing about documents that might exist.  It has
20 no proof that they do exist.  And we have
21 investigated, right?  They stand on the fact that we
22 were not willing to do some of the investigation that
23 they asked us to do.  But to say that we have done no
24 investigation is simply not true.
25          So in its position, J&J says for

28 (Pages 106 - 109)

Page 110

1 instance, it gives some categories of documents that
2 it wishes, you know, it would want to be produced if
3 they existed, things like if a SaveOnSP
4 executive sent an e-mail stating that, "We're
5 implementing these so called confidentiality policies
6 with the real goal of preventing J&J from learning
7 the truth from our employees."
8           We ran ten different permutations of J&J
9 over all our custodians' documents, including every
10 single one of the top executives. If that document
11 existed, we would with have found it, we would have
12 produced it.
13          We also did an investigation when J&J
14 served its interrogatories on us, asking us for any
15 instances in which they might have taken actions that
16 might make it harder for employees to talk to J&J.
17 If we had been out threatening employees, saying, "If
18 you talk to J&J, you're going to be in violation of
19 your confidentiality policy and we're going to fire
20 you," we would have had to disclose that in response
21 to the Rog.
22          We did an investigation, and there's no
23 reason to believe that ever happened. The only
24 reason, the only thing that J&J has to stand on to
25 suggest this idea that we ever abused our

Page 111

1 confidentiality policies, is what happened with
2 Mr. Mighells. And frankly, your Honor, at the time
3 that we sent the letter to Mr. Mighells, and at the
4 time that SaveOn changed its confidentiality policies
5 in 2023, we had no reason to know that Mr. Mighells
6 was talking to J&J. That wasn't revealed to us until
7 later.
8           We found out later that summer when J&J
9 told us that it was serving a subpoena on
10 Mr. Mighells, and then we became aware that he had
11 been talking to J&J. But when we sent the letter to
12 Mr. Mighells, it had nothing to do with J&J. It had
13 everything to do with the fact that he had taken
14 documents from SaveOn.
15          We learned that through a forensic
16 review, and he was out posting on the Internet that
17 he was willing to talk about SaveOn to anyone. So he
18 was effectively threatening to disclose his
19 confidential information to anyone who wanted it. We
20 are concerned, right? And all we did was send him
21 two letters.
22          The idea that this has been some sort of
23 intimidation or threatening campaign against
24 Mr. Mighells, it's just not true. He clearly
25 breached, and we sent him two letters. We've done an

Page 112

1 investigation. I understand that there was some
2 confusion about whether we had done an investigation
3 into how many times SaveOn has enforced, but we have
4 done one now and we're happy to make any
5 representations that Mr. Greenbaum would like --
6           THE SPECIAL MASTER: But --
7           MS. NELSON: -- we have. Only one, is
8 the answer.
9           THE ARBITRATOR: Okay. So Ms. Nelson, I
10 appreciate your response, I think that Mr. Greenbaum
11 was suggesting that you had not made these
12 investigations when this was being briefed, and you
13 are doing so now. So I would suggest that you
14 supplement your response by indicating you made an
15 investigation, and there was no one else. You have a
16 response now, right? And frankly, I don't see what
17 else needs to be produced.
18          MR. GREENBAUM: Your Honor, I still
19 don't know -- I don't think this change in the policy
20 just happened by itself. It happened in May, right,
21 three days before the letter went out to
22 Mr. Mighells. I would like to see the e-mails as to
23 how that came about. It didn't come about in a
24 vacuum. What was the purpose, what was the intent of
25 changing the policy and how did it come about that

Page 113

1 they wrote the letter to Mighells? There was nothing
2 that I saw that he posted on the Internet that
3 revealed anything confidential. He said, "I want to
4 go public with the abuses." That's trying to muzzle
5 a whistleblower, and --
6           MS. NELSON: Can I please respond to
7 that?
8           THE SPECIAL MASTER: Yes, Ms. Nelson.
9 Were you done, Mr. Greenbaum?
10          MR. GREENBAUM: I was not.
11          THE SPECIAL MASTER: Go ahead.
12          MR. GREENBAUM: I think those are very
13 discreet things. We want to know how this policy
14 came to be changed. There are e-mails, I am sure,
15 regarding that. They have not been produced, they
16 have not been searched for, and if they have, if they
17 have nothing, it just kind of happened by itself
18 because a lawyer told them Sarbanes-Oxley, then
19 that's an explanation.
20          I don't think that's the truth. I don't
21 think they can sustain that. How did it come about
22 that the letter went to Mighells? They have not
23 produced that and I'm sure there's e-mails or some
24 communications on those subjects. And then again,
25 did they follow up with anyone who refused to sign?

29 (Pages 110 - 113)

Page 114

1 If they didn't, fine. But I'd like to see what
2 searches were done to see if they followed up with
3 that and who did that. These are all very limited
4 things and they are very, very relevant.
5          THE SPECIAL MASTER: Go ahead,
6 Ms. Nelson. I'm going to let you respond, but I have
7 a couple of questions. Go ahead.
8          MS. NELSON: Of course. I think the
9 problem here is that frankly Mr. Greenbaum is
10 changing J&J's requests on the fly because the very
11 limited categories of documents he's asking for
12 aren't what they asked for in the motion, right?
13          In the motion they say they want every
14 document about SaveOn's reasons for having a
15 confidentiality policy. That's not limited to 2023,
16 it's not time-limited. It covers the entire period.
17 These are concerns we've raised. In the motion, he
18 says, you know, they say they want -- let's see I
19 think there are three --
20          THE SPECIAL MASTER: Yes, I read them
21 into the record at the outset.
22          MS. NELSON: Yes.
23          THE SPECIAL MASTER: Yes. The first is
24 the communication regarding reasons for modifications
25 to the policies or other confidentiality obligations.

Page 115

1          MS. NELSON: Right. So he's still
2 talking about -- I'm sorry, can you hear me clearly?
3 I'm reverberating in our own room, but I'm hoping not
4 for you.
5          THE SPECIAL MASTER: No, it's fine.
6          MS. NELSON: Here he's talking about
7 just 2023. He says he just wants this is one month
8 in 2023. But that's not what this request is. If
9 they had come to us and said, "We just want the docs
10 about Mighells, we just want docs one month in 2023,"
11 maybe we'd be in a different position.
12          But again, none of this stuff is
13 relevant, right? It doesn't matter why SaveOn change
14 its confidentiality policy or sent a letter to
15 Mr. Mighells if we didn't have any reason to know
16 that Mr. Mighells was trying to talk to J&J. He took
17 documents, we strengthened our confidentiality
18 policy, we sent him a letter. The fact that that may
19 have prevented him from talking to J&J, maybe that
20 happened --
21          THE SPECIAL MASTER: How did you learn
22 that he took documents?
23          MS. NELSON: Two ways. Initially we did
24 an internal forensic review, and actually the way
25 that he took documents was fairly transparent. I

Page 116

1 sent them to his personal Gmail and his wife actually
2 was still working at the company after he left and
3 our understanding is that she also sent him
4 documents. But we were able to determine that from
5 internal sources. It was then confirmed for us when
6 J&J subpoenaed him and he produced, in response to
7 their subpoena, hundreds of internal documents that
8 he would only have gotten if he took them from the
9 company.
10          MR. GREENBAUM: Your Honor, the
11 complaint seems to be that we're asking for fewer
12 documents. I don't understand that.
13          THE SPECIAL MASTER: Well, I think first
14 of all, I think the position is, the breadth of your
15 requests initially were the bases for their
16 objection. You're wanting to now ask for limited
17 documents. What I'm hearing from Ms. Nelson is, "If
18 that was the request, I might have had a different
19 response." But let's stay with where we are now so I
20 can put this to bed, okay? All right.
21          So, Ms. Nelson, let's talk about what it
22 is that you have or can produce that are also
23 consistent with certain representations today. I ask
24 you to put them in writing as you, you know, as a
25 further response, okay? And I think, one, you're

Page 117

1 confirming you haven't used the policy at this point
2 against anyone else that you're aware of, right?
3          MS. NELSON: Yes.
4          THE SPECIAL MASTER: And frankly, you
5 know, I think the only thing we should be looking at
6 is the 2023. Why you had a policy originally, every
7 company has a confidentiality policy.
8          MR. GREENBAUM: We're not disputing
9 that. We're focusing on 2023.
10          THE SPECIAL MASTER: But that's not the
11 way it was written. It was both policies, okay?
12 Plaintiff asked for both. So Ms. Nelson, if we focus
13 on 2023, what can you provide that indicates, you
14 know, I just want to know, was that policy written to
15 target Mr. Mighells and SaveOn or what else? As you
16 said, Sarbanes-Oxley, I don't know what -- what can
17 you answer?
18          And the last is, well, you've already
19 told us. By the way, I don't agree with this idea
20 about communications regarding, or with any employee
21 who refused or failed to sign a confidentiality
22 policy. What is the relevance of that? I'm not
23 buying it.
24          MR. GREENBAUM: Well, if there was
25 pushback by saying, "You know, I feel strongly about

30 (Pages 114 - 117)

Page 118

1 this and I don't want to sign it," their efforts to
2 keep people from talking to the public I think is
3 relevant. If they haven't done that, then that's
4 fine. But I think we're entitled to know that,
5 especially about what did they do over this time
6 period. They say -- they still haven't told us how
7 they learned that Mr. Mighells --
8          THE SPECIAL MASTER: But you don't have
9 any time constraints in your question. Any
10 communications with your employee -- number 96
11 reads --
12          MR. GREENBAUM: I'm talking about
13 directly after May --
14          THE SPECIAL MASTER: But that's not how
15 it's written. That's not how it's written. It asks
16 any -- it would be capturing any period of time and
17 would be either policy.
18          MR. GREENBAUM: Well, we're happy to
19 limit it to the 2023 change in policy and thereafter.
20 Because they say it's not relevant. It is relevant.
21 If in fact their effort was to stop people from going
22 public about abuses, about what this harm is doing to
23 people in the public, that's what we're trying to
24 prove. And if they are trying to muzzle people who
25 are trying to make those statements, we're entitled

Page 119

1 to know that. We're not generically objecting to a
2 confidentiality policy, but the way it was used in
3 this case. And they still haven't told us why or how
4 they came to know that Mr. Mighells --
5          THE SPECIAL MASTER: But, you know, now
6 we're talking about who didn't sign on. You've
7 already said they haven't enforced it against anyone.
8 What did you want to ask now, if an employee refused
9 to sign the updated policy, what did you do with
10 them, that's your question?
11          MR. GREENBAUM: Yes.
12          THE SPECIAL MASTER: That goes far
13 afield, too. It's not limited. You know, you have
14 employees say, "Ah, you know, I don't want to sign
15 the confidentiality policy." That happens in the
16 employment area. And it would encompass many more
17 things than you're entitled to, as to what their
18 employment practices are.
19          And if you -- if you think there's
20 something narrow that you'd like to request because
21 it will get to the issue of, was there communication
22 that says, "This person doesn't want to sign it
23 because they want to go around talking about us"? I
24 mean, I can't imagine that that's what exists, but
25 okay.

Page 120

1          MR. GREENBAUM: When there was a lot of
2 publicity, and I'm dating myself and maybe others,
3 about the plumbers at the federal level trying to
4 plug leaks. I think any efforts to do that in this
5 context in this time frame would be very relevant to
6 what SaveOn was trying to accomplish. If there's
7 nothing there, there's nothing there. But it's very
8 discreet, it's very limited --
9          THE SPECIAL MASTER: Well, it's not
10 written discreet and limited. It's not. And I'm
11 denying it as it is. If you want to send out a
12 different request that's discreet and limited, then
13 Ms. Nelson, you'll respond to it.
14          MS. NELSON: Thank you, your Honor.
15          THE SPECIAL MASTER: But I would ask you
16 to please supplement consistent with
17 the representations you've made today, and the
18 investigations you've made.
19          MR. GREENBAUM: Your Honor, are we
20 entitled to the e-mails and documents relevant to why
21 they changed this policy in May of 2023, and the
22 efforts to -- and how they came about to write to
23 Mr. Mighells?
24          THE SPECIAL MASTER: You wanted to say
25 something, Mr. Wohlforth? I can't hear you. We

Page 121

1 can't hear you, or I can't hear you.
2          MR. WOHLFORTH: My audio? How about
3 now, can you hear me now?
4          THE SPECIAL MASTER: Yes.
5          MR. WOHLFORTH: Okay, thank you. I
6 think your Honor's ruled. I only jump in here,
7 because, I'm sorry, Mr. Greenbaum, but we frequently
8 see this as, after the Court rules --
9          MR. GREENBAUM: The Court did not rule
10 on this aspect.
11          MR. WOHLFORTH: I think the Court ruled
12 and what frequently happens is that the record gets
13 chowdered up with post-ruling arguments and requests,
14 frankly to me, spurious requests for clarification.
15 And I think that we should let the record speak as it
16 is. I simply --
17          THE SPECIAL MASTER: Well, I think what
18 I've already said is, one, you didn't have limited
19 requests in that way. I'm not ordering anything
20 further. And if you want to send out something
21 that's very limited and directed, Ms. Nelson will
22 respond to it.
23          MR. WOHLFORTH: Thank you, your Honor.
24          THE SPECIAL MASTER: Okay, thank you. I
25 think we have one more. Okay, now, this relates to

31 (Pages 118 - 121)

Page 122

1 J&J's motion to compel defendants to provide
2 supplemental responses to Plaintiff's
3 interrogatories, specifically 4, 15 through 17, and
4 19 through 20.
5          Okay.  Who ask going to be arguing this?
6          MR. LoBIONDO:  For Plaintiff, I am, your
7 Honor, George LoBiondo from Patterson Belknap.
8          THE SPECIAL MASTER:  Okay.
9          MR. DUNLAP:  For SaveOn it's me again,
10 your Honor, Andrew Dunlap.
11          THE SPECIAL MASTER:  I'm sorry, I
12 couldn't hear you,.
13          MR. DUNLAP:  Andrew Dunlap for SaveOn.
14          THE ARBITRATOR:  We're getting quiet.  I
15 hope it's not that your tired.
16          MR. DUNLAP:  I think the audio issues
17 Ms. Nelson was referring to --
18          THE SPECIAL MASTER:  Okay.
19          MR. DUNLAP:  -- resolved.
20          THE SPECIAL MASTER:  Okay.  Now, on
21 these interrogatories, I can go through each one
22 separately, but I will say what comes across in all
23 of these is that defendant has answered the
24 interrogatories and plaintiff believes, based upon
25 other information that's come out in discovery,

Page 123

1 whether in a deposition or elsewhere, that they may
2 not be either fully accurate responses or something
3 more needs to be done.
4          Now, I will say that my overall
5 impression in reading this is, I think you're using
6 supplementation, plaintiff, in the way it was not
7 intended.  But let's go through it.
8          Interrogatory number 4, which asks
9 SaveOn about the process by which SaveOn determined
10 the size of the "inflated co-pay" or increased plan
11 members' co-payment or co-insurance, including
12 criteria used to inform how that co-payment or
13 co-insurance was determined.
14          They then provide this response, which
15 I'm not going to read into the record, which is
16 fairly lengthy here.  And then the issues here are --
17 first of all, let me just point out, Defendants make
18 an argument throughout that the interrogatories are
19 irrelevant, and I believe they are relevant, so we're
20 going to get past that.  I really am talking about
21 what is the obligation at this point.
22          And, for instance, in number 4,
23 plaintiff says that it has documents showing that
24 defendant omitted any discussion of a variable co-pay
25 in its response to interrogatory 4.  Defendant

Page 124

1 responds by explaining that the purported omitted
2 variable co-pay was proposed for two drugs the
3 plaintiff does not make.  But it has answered that in
4 interrogatory 16, and I know what they are referring
5 to here, I think are these AbbVie drugs or whatever.
6 And then number 16 references for two non-Janssen
7 drugs that they, SaveOn advised health plans to use
8 variable co-pays, and just set forth what it is.
9          And then also, explains that this -- the
10 30 percent/20 percent which comes out on coinsurance,
11 and plaintiff says, "But defendant didn't admit the
12 intent of these tactics."
13          Question number 4 didn't ask about
14 intent.
15          MR. LoBIONDO:  Your Honor, I can address
16 that.  I think if we're asking you the criteria by
17 which you made a decision, and you say, "Oh, well, we
18 did this, and we did that," but you leave a big hole
19 in the middle of the response, which is why you made
20 the changes, and your documents show why you made the
21 changes, it was so that manufacturers like J&J could
22 not identify you or to make identification of
23 patients or --
24          THE SPECIAL MASTER:  Mr. LoBiondo, the
25 way it's written is, you asked for, you said, the

Page 125

1 criteria that was used to inform how the co-pay or
2 coinsurance is determined.
3          MR. LoBIONDO:  Right, so --
4          THE SPECIAL MASTER:  So it's --
5          MR. LoBIONDO:  -- Well, can I address
6 that, your Honor?
7          THE SPECIAL MASTER:  Go ahead.
8          MR. LoBIONDO:  So yes, they had a
9 process originally that was not designed to evade
10 detection, right?  And then they changed their
11 process, and we asked them to describe in as much
12 detail as possible the process "by which you
13 determined the size of the inflated co-pay, and any
14 and all criteria used to inform how that co-payment
15 or coinsurance is determined."
16          So, you know, we think it's a bit of a
17 semantic game for them to say, "Well, we're going to
18 give you some details on this, but we're not going to
19 tell you basically the whole point of the changes.
20          And our point is, you know --
21          THE SPECIAL MASTER:  You know, I will
22 tell you this, and I'm going to put this on the
23 record for all of you.
24          I used to say this as a judge, and we in
25 fact addressed this at our Lawyers' Advisory

32 (Pages 122 - 125)

Page 126

1  Committee meeting.  In fact, Mr. Greenbaum was there.
2        There are diminishing returns from
3  interrogatories at some point.  You want to fight
4  over how complete they are.  In the end, it's what
5  comes out at the deposition where you also have an
6  ability to follow up on answers.  And I think that a
7  lot of time is spent and wasted on this.  You have an
8  answer here.  And by the way, and if you think that
9  answers that they have given in some of these
10 interrogatories are inconsistent with things that
11 they have produced, go home with it.  Strike back at
12 them in your deposition.
13       MR. LoBIONDO:  Can I briefly address
14 that, your Honor?
15       THE SPECIAL MASTER:  Yes.
16       MR. LoBIONDO:  Two points:  So after the
17 last deposition that we took of one of their
18 employees who admitted routinely lying to J&J when
19 she called, she pretended to be calling from doctors'
20 offices, and she wasn't.  She pretended to be calling
21 and be a pharmacist.  She wasn't.  She was using
22 various lies to try to get information out of us so
23 that they could steal our money more easily.
24       After that deposition, we went back to
25 them and said, "We don't think these interrogatory

Page 127

1  responses are accurate."  And they did not say,
2  about -- well, in some instances they said, "Go pound
3  sand."  But they also agreed to update their
4  investigation and their response.  I will read for
5  you from Exhibit 21, which is what they said, which
6  was after this deposition.
7        "SaveOn is investigating the full extent
8  to which she" -- that's the deponent -- "or other
9  SaveOn employees made these types of statements,
10 including whether they were authorized to do so.  We
11 will supplement our responses to interrogatories 17,
12 19 and 20 to reflect the results of that
13 investigation."  And they just didn't.
14       You can look this their responses to see
15 whether they have identified who authorized all of
16 this deceptive conduct because it wasn't a low-level
17 employee.  She said it was a higher-level employee
18 although she couldn't remember exactly who.  It's
19 just not in their response.
20       So I understand, you know, starting from
21 scratch, your Honor's position that, you know, at a
22 certain point you're going to have to get past the
23 interrogatories.  You're going to have to depose
24 people.  One problem is, they admitted that they are
25 going to have to go back and do this work, and they

Page 128

1  just refused to do it.  And the second point is, we
2  don't know what we don't know.  We've seen the tip of
3  the iceberg, right?  We've seen some instances in
4  which their Rog responses are not accurate, but we,
5  you know, we're just basically going through their
6  documents and it's frankly not our job to investigate
7  their interrogatory responses.
8        They have obligations under Rule 26 to
9  make sure that they are accurate.  They don't get to
10 just ask one low-level person who then says, "I can't
11 remember doing it."  Once they are on notice that it
12 actually happened, they have to certify interrogatory
13 responses they are accurate as to the entire
14 organization.  And that's what they said they did,
15 but they didn't.
16       THE SPECIAL MASTER:  Well, they are
17 verified at this point.  You removed that from the
18 motion.
19       MR. LoBIONDO:  They are verified, but
20 the -- I'm sorry to interrupt, the verification says
21 they were answered using all information available to
22 SaveOn.  That's just not true, because we've pointed
23 out instances in their own documents which are
24 disproving how they have answered these
25 interrogatories.

Page 129

1        Or they say, "Oh, this employee can only
2  remember doing it one time."  We showed them five
3  more times that the employee did it.  That is now an
4  inaccurate interrogatory response, and sure it's one
5  thing for them to just parrot back to us, "Okay, you
6  caught us this time."
7        But we don't have perfect information.
8  We can't go interview their employees.  They are the
9  only ones that can do that.  So I don't think it's
10 fair for them to have agreed to do their
11 supplementation and then when they don't do it, say,
12 "Oh, but we actually don't think this stuff is
13 relevant."  You agreed to do it.
14       THE SPECIAL MASTER:  Well, let me ask
15 you.  So the ones, Mr. Dunlap, that you said you
16 would agree to supplement, what happened?
17       MR. DUNLAP:  It was investigated --
18       THE SPECIAL MASTER:  Can you speak up,
19 please?
20       MR. DUNLAP:  Sure.  Can you hear me now?
21 I'm not sure about the room mics here.
22       THE SPECIAL MASTER:  Yes.
23       MR. DUNLAP:  We have investigated our
24 response to all of their interrogatories after
25 Judge Wolfson ordered the refresh in late October,

33 (Pages 126 - 129)

Page 130

1 early November --
2          THE SPECIAL MASTER: Judge Waldor.
3          MR. DUNLAP: -- Judge Waldor ordered the
4 refresh, we went back and we conducted a supplemental
5 investigation into all of the interrogatories where
6 we thought updated information was necessary. We
7 provided that, including following the deposition of
8 this one employee, and we have verified all those
9 responses, as J&J now concedes.
10         And we think that you are right, that
11 this is really not a matter for further interrogatory
12 supplementation, it's a matter for depositions. They
13 don't like the answers that we've given, and they
14 cite various documents and testimony and claim that
15 all we've said is inaccurate. I won't respond to
16 everything that they put in their papers but, just
17 for an example, you heard the other side say that
18 this deponent admitted that she was directed by
19 higher-ups to lie to J&J.
20         In fact, and we put this in our motion,
21 page 16. She was asked:
22         "Question: Did somebody tell you not
23 to give your real name?
24         "Answer: No one told me that."
25         We don't think that what the other side

Page 131

1 is saying is in any way accurate. Again, he says,
2 "Oh, we showed her instances that she spoke to J&J
3 more than once." Well, we say in our interrogatory
4 response, she spoke to them occasionally, but it's
5 still the case, even after hearing those calls, that
6 she only remembers doing it one time.
7          We think what we've said is fully
8 accurate. If they don't like what they we've said,
9 they can explore this in deposition. And if any of
10 their claims get to trial they can make an argument
11 to the fact-finder. But I'm glad to go Rog by Rog,
12 although we seem to have moved off of doing that, and
13 explain why think what we've done is sufficient.
14         But the bottom line here is, we've
15 answered these, we've answered truthfully, we've
16 produced documents. If we become aware of something
17 that we think makes our disclosures to
18 interrogatories and to documents somehow incomplete
19 or inaccurate, we will update as we are required to
20 do. But the other side's characterization and, we
21 think, mischaracterization of the evidence doesn't
22 mean that what we've done is inadequate or
23 inaccurate.
24         THE SPECIAL MASTER: This is the
25 problem -- go ahead, Mr. LoBiondo --

Page 132

1          MR. LoBIONDO: Two brief responses to
2 that. We deposed the witness over a course of one
3 day. In some instances, she said she couldn't recall
4 who told her to do XYZ. In other instances, she
5 said, "I think upper management did." In still other
6 instances she said, "Nobody told me to do that."
7          So what can we do with that testimony?
8 Well, we think it's the entity's job to actually
9 giver correct interrogatory responses, right? They
10 have to investigate not just with this one employee,
11 but also with the C-Suite. If there are people
12 authorizing these statements, or not authorizing
13 these statements, they have to say that in their
14 interrogatory responses. And I didn't hear anything
15 in my friend's response about their commitment to
16 investigate who authorized the false statements.
17         MR. DUNLAP: Your Honor, can I just
18 respond to that? We have -- they have said that
19 nobody instructed these employees to not use their
20 full names or to provide false information.
21         MR. LoBIONDO: I'm sorry, where are you
22 looking?
23         MR. DUNLAP: Where you asked -- hold on.
24 Interrogatory 20, you -- your Honor, I'm sorry to
25 respond directly to opposing --

Page 133

1          THE SPECIAL MASTER: No, that's fine,
2 because I'm looking at 20 as you're speaking. Go
3 ahead.
4          MR. LoBIONDO: Yes, that one asks to,
5 "Describe the circumstances under which You,"
6 capitalized, defined as SaveOn, "Have instructed your
7 representatives or employees to lie to, mislead or
8 deceive pharmaceutical manufacturers, including with
9 regard to affiliation with SaveOn." And we answered,
10 "SaveOn is not aware of any instances in which it
11 instructed as representatives or employees to lie,
12 mislead or deceive a pharmaceutical manufacturer."
13         I mean, we've given the answer. We say
14 there are instances where we don't affirmatively
15 disclose information about the company, which we
16 don't consider deception, but I'm not sure what else
17 they want. We've answered --
18         MR. DUNLAP: I'm happy to tell you what
19 we want, or I'm happy to tell the judge what we want.
20 You're saying "we're not aware of any instances" is
21 exactly the problem. That's not the same thing as
22 saying, "We've gone around, we've checked with
23 everybody and nobody authorized this, shows a rogue
24 agent." If you say "I'm not aware of any instances,"
25 that bespeaks that the investigation was not

34 (Pages 130 - 133)

Page 134

1 complete, because it's frankly SaveOn's job to know
2 whether this conduct was authorized or not. That's
3 one.
4         Two, I know we have a disagreement about
5 whether lying by omission is deceptive, but the
6 reality is, we brought this up with SaveOn months
7 ago. We pointed them to the dictionary definitions
8 of "deception" and they wrote back and said, "We will
9 supplement our answers."
10        So this is sort of recycled arguments
11 that they made and then backed off from, and now,
12 either because they didn't do the work or because
13 they didn't like what they learned, they are bringing
14 them back.
15        But we're past this, because we had this
16 discussion months ago and they agreed to supplement
17 and investigate deception by omission. We pointed
18 out --
19        THE SPECIAL MASTER: I'm going to make
20 this one easy for number 20. I mean, frankly, we
21 don't need to go around this longer than it is. You
22 have answered, I think it's their use of the words
23 "not aware" which indicates, Ms. LoBiondo is
24 suggesting that does not tell them that you have
25 adequately investigated the issue.

Page 135

1         So Mr. Dunlap, my -- what I'm going to
2 you suggest you do is that when you say you're not
3 aware, I think you have to verify or confirm that you
4 have done a proper investigation to determine that
5 there -- this does not occur. Maybe that's what you
6 meant by what you said, but let's clarify the
7 language because I think by saying "not aware," it
8 leaves open questions, all right?
9         MR. DUNLAP: We're glad to make that
10 clarification. I'll just --
11        THE SPECIAL MASTER: Thank you.
12        MR. DUNLAP: -- say we did conduct an
13 investigation, we talked to executives, we talked to
14 middle management, lower-level employees. We think
15 that's bound up in the verification. What we're
16 saying is, having conducted that reasonable
17 investigation, I think we conducted like -- something
18 like a total of 32 interviews, we are not aware of
19 anything.
20        THE SPECIAL MASTER: I'm okay with that.
21 I don't think that's said in the interrogatory. So
22 if you would supplement it in that way so it's made
23 clear you have done this internal investigation, you
24 know, and yes, it is not disclosed that this
25 occurred.

Page 136

1         MR. LoBIONDO: The other thing, your
2 Honor, I think is helpful is that you've dispensed
3 with the relevance objection --
4         THE SPECIAL MASTER: I have --
5         MR. LoBIONDO: -- and then reasserted.
6 So there's -- I think the record hopefully is clear
7 now that there's not going to be any silent
8 withholding of information based on a relevance
9 objection.
10        THE SPECIAL MASTER: No, I've done away
11 with relevance, Mr. Dunlap. You understand where we
12 are with regard to these questions?
13        MR. DUNLAP: Yes, but I understood that
14 your ruling on Rog 20, at least, wasn't actually
15 based on relevance. You were just ordering us to be
16 clear about what we're saying. I --
17        THE SPECIAL MASTER: Well, I made a
18 comment early on about the interrogatories generally,
19 that I do -- I know you took a very cabined view of
20 what's relevant here, because you interpret the cause
21 of action as relating to, you know, the patients or,
22 you know, the clients.
23        It's not so narrow, and I've said -- so
24 what I'm going to say is, the interrogatories
25 themselves because, even though they are directed at

Page 137

1 J&J, are relevant. So all I want to get to, is there
2 anything else that needs to be done? Just address
3 for me, how can you go through to look at any of
4 these, anything else? 19 dealt with the employee
5 we've been talking about, who was Ayesha Zulquarnaia,
6 Z-u-l-q-a-r-n-a-i-a, right? That's who we've been
7 talking about.
8         And she talked about this and then we've
9 been going back and forth about whether she seemed to
10 have, in her deposition, vacillated as to whether
11 someone told her or didn't tell her, or how this came
12 about, how to respond.
13        You answered about mock enrollments, you
14 say "none recalled," including a mock enrollment for
15 Janssen drugs, what goes about -- I'm not sure
16 there's anything else to add to 19.
17        MR. LoBIONDO: Your Honor, part of the
18 problem is, we don't know, either. That's why I
19 asked the question about relevance. I don't want to
20 take up any more of your time than we need to. I
21 just want confirm that as they are updating these
22 responses, they are not going to be only telling half
23 the story based on a view of relevance that's not
24 borne out. I think we're now settled on relevance as
25 to JJHCS, and also they previously agreed to answer

35 (Pages 134 - 137)

Page 138

1 some of these interrogatories as to non-JJHCS
2 manufacturers, and that's Exhibit 19. So as long
3 as -- as long as the scope of what the response is
4 going to be is clear, you know, it's totally up to
5 you whether we go through them one by one but I just
6 want to make sure that everybody is on the same page
7 about what it is they have to do. If the answer is
8 the same because in fact they didn't withhold any
9 information based on relevance, that's one thing, but
10 I'm not sure that it is, so I'd like the record to be
11 clear on that.
12        THE SPECIAL MASTER: Well, Mr. Dunlap,
13 so I'm telling you that -- and you did answer that.
14 So I think it's one of these where we don't think
15 it's relevant, but notwithstanding, here we are.
16        So all I'm going to say is, looking
17 through these, you know, I think it's more of J&J
18 taking the position that, based on deps or other
19 things that they have seen produced, they don't think
20 that what you're saying is necessarily accurate.
21 That's not a supplementation, by the way. If at some
22 point, Mr. Dunlap, you believe you've given an
23 inaccurate statement, you have an obligation to
24 correct it. But the fact that J&J tells you it's
25 inaccurate is not the way it works. It's your

Page 139

1 determination that it's inaccurate.
2        And Mr. LoBiondo, you'll use their
3 answers wherever you will, if in the end you want to
4 show that they are. You can ask for requests for
5 admissions, and of course if you have documents that
6 demonstrate something, feel free.
7        I will, as I said, on 20 because of the
8 language you used, being there, I do want you to
9 confirm that you have done that. You've answered
10 affirmatively in other questions, like for instance
11 in number 15, you say, "SaveOn does not advise plan
12 participants to attempt to obtain or assist" -- I
13 mean, these are answerable in an affirmative fashion.
14        You say that some SaveOn clients asked
15 you help them develop this co-pay assistance benefit
16 related to drug manufacturers patient assistance
17 programs, as, you talk about advantage -- I mean,
18 you've given answers.
19        Now, J&J may think, "We don't think that
20 that's complete. We don't think it's accurate."
21 That's your view. --
22        MR. LoBIONDO: I want to be clear, your
23 Honor, I'm not asking them to parrot back what we
24 have already found. Right? Our concern was they
25 make a broad statement that they have never done

Page 140

1 this. We showed them a document that says, "It looks
2 like you have done this." And then they just shut
3 down completely.
4        So again, it goes to the strength of the
5 investigation. Because it's not really our job to be
6 making sure that these interrogatories responses are
7 all buttoned up.
8        THE SPECIAL MASTER: Okay. So yes,
9 Mr. Dunlap, you wanted to add something else, go
10 ahead.
11        MR. DUNLAP: Well, there are two things
12 I'd like to say. One thing is, to be clear, where we
13 agreed to answer interrogatories, some we only
14 answered as per J&J drugs, some for others. But
15 wherever we agreed to answer an interrogatory, we
16 didn't withhold information on the basis of
17 relevance, and we didn't hold back documents where we
18 had agreed to produce on the basis of relevance, and
19 we made that clear to J&J multiple times. We've
20 conducted investigations. Our answers are what they
21 are.
22        I to want to say because I did hear your
23 Honor say that you concluded that these
24 interrogatories were relevant and that we were sort
25 of done. I don't want to get into an extended

Page 141

1 discussion of that here but if your Honor was
2 planning to write something in the order or make a
3 more general ruling that communications, for example,
4 between SaveOn and J&J just relating to finding out
5 the terms and conditions are somehow relevant to the
6 elements of the claims, I would like a chance to be
7 heard on that.
8        Now, if you think it's relevant, or
9 perhaps at a later time, because we do think very
10 strongly under the standards that it has to be
11 related to consumer-facing conduct for GBL or it has
12 to actually go to something that shows that the
13 tortious interference was without justification.
14 Again, I don't want to tie this up into a larger
15 discussion of relevance, but that is something we
16 feel strongly about. So if you're going to have an
17 argument about it or write about it, we would like an
18 opportunity to present.
19        MR. LoBIONDO: And I would just say to
20 that, how could it possibly be true that if they are
21 calling us up and lying to us for purposes of
22 stealing our money, that that would not be relevant
23 or at least discoverable on that "without
24 justification" element that counsel just described?
25        THE SPECIAL MASTER: You can discuss the

36 (Pages 138 - 141)

Page 142

1  relevance before we get off, because I will be
2  issuing some letter orders on each of these motions.
3  So that everyone knows what -- so go ahead.
4        MR. DUNLAP:  Just a reminder, they bring
5  two claims against us.  One is a GBL claim, one is
6  a tortious interference claim.  Now, SaveOn's intent
7  is not an element of the GBL claim.  The elements of
8  GBL claim are that we had to engage in a deceptive
9  act directed at consumers, that acts were misleading
10  in a material way, and that J&J was injured as a
11  result of those same deceptive acts.
12        And what they are trying to say is, "Oh,
13  well, if you evaded detection or employees called up
14  and used fake names when handing J&J better terms and
15  conditions," that that's somehow relevant to the
16  deception element of GBL claim.  But it's not.  New
17  York law is very clear that the only deceptive acts
18  that are cognizable under a GBL claim are ones that
19  are consumer-oriented.  And we'd ask you to look at
20  the Stutman case, S-t-u-t-m-a-n, 95 NY.2nd 24.
21  That's very clear.  It has to be consumer-oriented
22  conduct.
23        And so SaveOn doing things regarding J&J
24  using fake names when they call J&J up about stuff,
25  trying to do things so that J&J can't detect which

Page 143

1  patients are on SaveOn plans, that's not
2  consumer-oriented conduct.  It's simply not consumer
3  oriented --
4        THE SPECIAL MASTER:  Go ahead.  Let
5  me -- I'll let you finish, Mr. Dunlap and then I'll
6  ask you a question.
7        MR. DUNLAP:  -- I was just going to say,
8  they have to charge the same conduct that hurts the
9  public that hurts them.  And what they tried to do in
10  multiple arguments is to say, "Well, we've alleged
11  that you used, you say false things to the public
12  over here purportedly arranging false denials or
13  saying misleading things about co-pay assistance, and
14  over here, separately, you've done things that we
15  don't like that have hurt us, and all that is
16  cognizable."  But it's not.
17        They have to show that what we did to
18  the public that was false or deceptive actually
19  injured them.  And there's no allegation here that
20  anything that we said to J&J when we were trying to
21  call up confirming terms and conditions for example,
22  hurt the public at all or they don't explain how it
23  hurt them.  So we just don't see how it's relevant at
24  all to their GBL claims.  And I'm glad to address
25  tortious interference, but maybe I'll stop there.

Page 144

1        THE SPECIAL MASTER:  Okay.  I'd hear
2  from Mr. LoBiondo.
3        MR. LoBIONDO:  Sure, so here is the
4  argument:  "Yes, we are calling up and pretending to
5  be from patients' doctors' offices so that we can
6  help ourselves to hundreds of millions of dollars of
7  your money, but that's irrelevant and it's not
8  discoverable."
9        I hope that just me saying that out loud
10  exposes sort of how extreme it is.  But just to be
11  clear, we think the lies that they tell in the
12  process of misappropriating our money are indeed
13  relevant and discoverable, and Judge Waldor already
14  agreed with us on this.
15        Now, we have our tortious interference
16  claim.  As Mr. Dunlap mentioned, that requires a
17  showing that there was wrongful or unjustified
18  conduct.  A jury could certainly conclude that
19  SaveOn's egregious lies and deceptions are wrongful
20  or unjustified here.  There is also a similar element
21  under the GBL claim.  We've cited a lot of this in
22  the past.  Judge Waldor has ruled on it in the past.
23  We've said plaintiff has to show under New York law
24  for the GBL claim that the defendant is engaging in
25  an act or practice that is deceptive or misleading in

Page 145

1  a material way and that the plaintiff has been
2  injured by reason thereof.
3        Separately, the idea that we have not
4  pled anything about how SaveOn's deception of J&J --
5  that we haven't pled anything about SaveOn deceiving
6  J&J is just false.  If you look at paragraph 73 of
7  our complaint, it describes how SaveOn actively
8  concealed its presence from J&J.  So these
9  interrogatories, which I think was originally what we
10  were talking about, was getting to more deceptive
11  acts.
12        But it is in the complaint.  It's also
13  in paragraph 115 of the complaint where we say,
14  "Through its willful deceptive acts and practices,
15  SaveOn also causes damage to JJHCS by making it pay
16  more money from CarePath than it otherwise would have
17  for a purpose JJHCS did not intend."  That's one
18  thing.
19        THE SPECIAL MASTER:  Okay.
20        MR. LoBIONDO:  I'm not finished.  So
21  again, this all seemed completely beside the point of
22  this motion on these interrogatories, but if we're
23  just now talking about what the elements of these
24  claims are, fair enough.  It's also relevant to their
25  defenses.  Every time they make an argument to your

37 (Pages 142 - 145)

Page 146

1 Honor, and they did it today again, it always comes
2 back to their theory that J&J failed to mitigate its
3 damages, right? That's their mantra.
4         Well, evidence that they deceived us is
5 squarely relevant to this defense. They are blaming
6 us for not cutting off SaveOn patients when the
7 reality is, we don't know who the SaveOn patients are
8 because of all these evasive tactics they employ.
9 And we've given your Honor examples of this, like
10 Exhibit 30 in this motion, in which they told the
11 patient who had been excluded from co-pay assistance
12 to "call the manufacturer back and inform them that
13 you spoke to your benefits administrator and you
14 confirm that you are not enrolled in SaveOnSP."
15         That's a lie and it's obviously relevant
16 to whether or not we mitigated our damages. If we're
17 taking steps to identify their employees or their
18 patients and then they are making that impossible for
19 us, how can they say it's not discoverable on their
20 failure-to-mitigate defense?
21         THE SPECIAL MASTER: Okay, Mr. Dunlap,
22 you wanted to respond?
23         MR. DUNLAP: I thought we were just
24 talking about GBL in the first instance, so that's
25 where I'll start. We heard opposing counsel say they

Page 147

1 have alleged deceptive or misleading conduct that
2 hurt J&J. What you didn't hear him say was that the
3 conduct was consumer-facing, that SaveOn calling J&J
4 is consumer-oriented conduct as the GBL requires. If
5 they think --
6         THE SPECIAL MASTER: Well, what about
7 this, though? I'm not worried about so much what
8 Mr. LoBiondo said. But even though, yes, the focus
9 is on the consumer, such approved claims, so
10 plaintiff has to show that you deceived patients in
11 some material way; and as part of that being, aren't
12 they entitled to discover any acts that you employed
13 to effectuate or implement the scheme?
14         And discovery is broad. This isn't
15 what's going to be admissible ultimately at trial,
16 but in figuring out the scheme, they are entitled to
17 that solely on the tortious interference. There,
18 we're talking about alleged misrepresentations and
19 that bears on the issue of whether they employed
20 wrongful means to induce patients to breach the terms
21 of the CarePath program.
22         So under the broad principles, they are
23 entitled to this discovery. Mr. Dunlap, you know, I
24 have the briefing, but if there's anything else you'd
25 like to add before we're done, feel free.

Page 148

1         MR. DUNLAP: I would like to add
2 something, because I'm very glad you said that
3 towards the end. What I was concerned about was that
4 your Honor making a general finding that the sort of
5 material at issue in these interrogatories is somehow
6 relevant to their claims or defenses that they are
7 defenses that they could then use, for example, in
8 motions in limine or down the line when we actually,
9 if we get to trial, to talk about whether this is
10 relevant to the causes of action.
11         THE SPECIAL MASTER: Well, I don't know
12 where it's going to go to trial, and I don't know
13 what's going to be relevant at trial. My rulings are
14 based upon discovery principles which are broad.
15         MR. DUNLAP: With that clarification, if
16 what you're saying is you think it's likely to lead
17 to discoverable evidence so it fits within the
18 discovery standard, then I don't have a concern --
19         THE ARBITRATOR: Okay.
20         MR. DUNLAP: -- that you might be going
21 forward or that the other side may cite to this down
22 the line and say, "Ha ha, this is absolutely relevant
23 to your claims on the merits." As long as that's off
24 the table, then I don't think we have to --
25         THE SPECIAL MASTER: It's not what's on

Page 149

1 the table. I would never do that and impose it on
2 the judges that may have this case. I'll just rely
3 it for discovery purposes, okay? Okay.
4         I think that covers everything. We'll
5 issue some -- you people have some work to do on some
6 of the terms we've discussed. I'd like that done by
7 next week. Report back so we can perhaps incorporate
8 whatever you -- oh now, locations are coming on.
9 Very, very good.
10         Okay, look, I appreciate everyone's
11 cooperation on staying on for over three hours today.
12 I -- you know, off record for a second.
13         (Discussion off the record.)
14         MR. GREENBAUM: I have one other order,
15 matter, your Honor under the scheduling order, the
16 time for completing fact depositions is April 25th.
17 The parties have agreed that we're going to extend it
18 at least four months and will be submitting a
19 stipulation. I'm hoping there's agreement on that,
20 so I just wanted to alert you on that.
21         THE SPECIAL MASTER: That's fine. The
22 other thing I wanted to mention is, right now,
23 nothing has been filed on the docket on any of these
24 motions. We need to have a record of them. I don't
25 know how much of this has to be under seal. So my

38 (Pages 146 - 149)

Page 150

1  suggestion is, you have to take a look through, but
2  we do need things on the docket.  They are motions,
3  there are going to be orders that come out on them,
4  so figure it out and a process for how we can get
5  these things on the docket.  And even if,
6  preliminarily, virtually everything is under seal,
7  and then we figure out what remains on and what
8  doesn't, that's fine, too.  But we'll have to get
9  everything on, okay?  So we've got nothing on right
10  now.  So that's fine.
11          I think -- and I will deal with the
12  sealing motion that you would file in connection with
13  these, so I know what's happening.  Anything else
14  before we go?  Nope, okay.  All right.  Thanks
15  everybody, I, you know, I really would have liked to
16  be in person, you know.  I'm away this week, so --
17  and I wanted to get this done, I didn't want to wait.
18  We're having such problems finding everybody on a
19  date that worked.  I think this worked okay, doing
20  this virtually.  So thanks all for doing that.  Have
21  a good week until the next thing.  All right?
22          ALL:  Thank you, your Honor.
23          (Time noted:  4:39 p.m.)
24
25

Page 151

1      C E R T I F I C A T E.
2          I, DAVID LEVY, a Certified Court
3  Reporter and notary public of the State of New
4  Jersey, certify that the foregoing is a true and
5  accurate transcript of the stenographic notes of the
6  matter taken before me on April 3, 2024;
7      I FURTHER CERTIFY that I am neither
8  attorney, nor counsel for, nor related to or employed
9  by, any of the parties to the action in which this
10  deposition was taken, and further that I am not a
11  relative or employee of any attorney or counsel in
12  this place, nor am I financially interested in this
13  case.
14      IN WITNESS WHEREOF, I have hereunto set my
15  hand this 4th day of April 2024.
16
17
18
19      _David Levy_
20      DAVID LEVY, CCR, RPR, CLR
21      LICENSE NO. 30X100234000
22
23
24
25

39 (Pages 150 - 151)

# Exhibit 7

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

April 18, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Re:    *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
       *No. 2:22-cv-02632 (JKS) (CLW)*

Dear Judge Wolfson:

Defendant Save On SP LLC ("**SaveOn**") moves to compel Johnson & Johnson Health Care Systems, Inc. (with its affiliates, "**J&J**") to produce documents regarding J&J's "best price" certifications to the federal government and related allegations to the Court. In these certifications, J&J affirms that all its copay assistance funds go to patients—contradicting its allegations in this case that SaveOn misappropriates a portion of those funds. SaveOn also moves to compel J&J to produce documents regarding its reaction to an updated best price regulation that triggered J&J's sudden interest in determining which patients are on SaveOn-advised plans (five years after J&J became aware of SaveOn's services), its claims that SaveOn violated its terms and conditions at issue (never made during the first five years of SaveOn's operations), and its decision to bring this

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

Hon. Freda L. Wolfson                                                      Page 2

lawsuit. These documents are responsive to SaveOn's Requests for Production Nos. 8, 70, and 79.

J&J does not make, much less substantiate, any burden objection to these requests,[1] *see* Ex. 2 (Apr. 9, 2024 Ltr.), and it refuses to identify custodians or provide hit counts of the unique documents identified by SaveOn's proposed search terms. *Id.* J&J's only objection—made repeatedly during the parties' negotiations—is that the requested documents are irrelevant. *See* Ex. 3 (Feb. 22, 2024 Ltr.) ("[I]ssues related to the Best Price Rule are completely irrelevant to this action."); Ex. 4 (Feb. 28, 2024 Ltr.) ("JJHCS has repeatedly explained its position that Best Price-related documents are irrelevant for a variety of reasons, and it reiterates those objections here."); Ex. 2 (Apr. 9, 2024 Ltr.) ("The Best Price Rule Is Irrelevant to the Claims and Defenses at Issue."); *see also* Ex. 5 (Apr. 18, 2024 Email Chain) (J&J refusing to withdraw its relevance objection). Because the documents are in fact highly relevant, the parties are at an impasse.

## I.    J&J Must Produce Documents Regarding Its Compliance with HHS's 2016 Best Price Rule

By federal statute, a drug manufacturer—like J&J—must offer state Medicaid programs the "best price" for its drugs that it offers any other purchaser (with a few minor exceptions). 42 U.S.C. § 1396r-8. "Best price" for a drug means "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity in the United States in any pricing structure (including capitated payments) in the same quarter for which the AMP is computed." 42 C.F.R. § 447.505; *see also* 42 U.S.C. § 1396r-8(c)(1)(C). A drug manufacturer's best price must reflect all discounts,

---

[1] J&J originally objected to RFP No. 70 on the basis of burden "to the extent it seeks 'all documents and communications' regarding a broad subject matter." Ex. 1 at 13-14 (Dec. 18, 2023 J&J's R&Os to SaveOn' Fifth Set of RFPs). J&J has not articulated a burden objection in response to SaveOn's narrowing of the Requests at issue.

rebates, and other pricing adjustments "either directly or indirectly to the best price-eligible enti-ties." 42 C.F.R. § 447.505. In other words, the greater the discount or rebate, the lower the maxi-mum price that manufacturers may charge to federal government entities for their drugs. Manu-facturers must report their best price to the Department of Health and Human Services ("**HHS**") quarterly. 42 U.S.C. § 1396r-8(b)(3)(A); 42 C.F.R. § 447.510(a).

In 2016, HHS promulgated a regulation—still in effect—that a drug manufacturer may exclude copay assistance program funds from its best price calculation "to the extent that the man-ufacturer ensures the program benefits are provided entirely to the patient and the pharmacy, agent, or other entity does not receive any price concession." 42 C.F.R. § 447.505(c)(10) (the "2016 Best Price Rule"). If any portion of copay assistance is not applied to a patient's cost-sharing obliga-tions, however, "the assistance becomes a price concession to the health plan … and thus should be counted in best price." 85 Fed. Reg. 87050 (Dec. 31, 2020). ████████████████

████████████████████████████████████████████████████████

████████. *See* Ex. 6 (JJHCS_00047500) at -7510.

J&J appears to have regularly certified to HHS that all its CarePath copay assistance funds go exclusively to patients. For example, ████████████████████████████



Ex. 7 (JJHCS_00204199) at -421 (second emphasis added) (April 7, 2022); *see also, e.g.*, Ex. 8 (JJHCS_00135354) at -537 (December 15, 2021); Ex. 9 (JJHCS_00135950) at -5970 (March 31, 2022); Ex. 10 (JJHCS_00214452) at -4469 (Mar. 2, 2022). ████████████████

████████████████████████████████████████████████████████



Ex. 7 (JJHCS_00204199) at -421. "

*Id.* This strongly indicates that

.

At the same time, however, J&J has told the Court and Your Honor in this case that a portion of its copay assistance funds flow to SaveOn. It alleges that SaveOn converts copay assistance to patients into a "manufacturer subsidy for [SaveOn, ESI, and Accredo]," Dkt. 219 Ex. A ¶ 128; *see also* Compl. ¶ 74, and that the savings that SaveOn generates for its commercial health plan clients are "simply diverted CarePath funds." Compl. ¶ 24.[2] In this case, J&J has regularly accused SaveOn of "seizing," "extract[ing]," "pilfering," "siphoning," "diverting," "misappropriating," "looting," and "stealing" J&J's copay assistance funds.[3] That is, J&J accuses SaveOn of

---

[2] *See also* Compl. ¶ 51 (accusing SaveOn of draining patient assistance programs); Dkt. 219 Ex. A ¶¶ 1 ("JJHCS brings this action to stop a scheme to pilfer tens of millions of dollars from the financial support that JJHCS provides for patients."), *id.* ¶ 3 ("The SaveOnSP scheme works by … leveraging the illicit SaveOnSP Program to surreptitiously extract inflated amounts of patient copay assistance, often exhausting the maximum amount of allotted copay assistance."), *id.* ¶ 127 (stating that SaveOn misappropriates copay assistance).

[3] *See* Dkt. 65, at 2 ("seiz[ing]"); Dkt. 66 at 2 (same); Dkt. 79 at 3 ("siphoning" and "pilfering"); Dkt. 109 at 1, 2, 4, 5 ("misappropriating"); Dkt. 110 at 1 ("diverting"); Dkt. 111 ("misappropriating"); Dkt. 133 at 6 (same); Dkt. 150 at 20 (same); Dkt. 165 at 15 (same); Apr. 3, 2024 Hr'g Tr. at 141:19-24 (Mr. LoBiondo: accusing SaveOn of "stealing our money:); *see also id.* at 126:16-23 (same); 144:3-14 (Mr. LoBiondo: "[SaveOn helps itself] to hundreds of millions of dollars of [J&J's] money."); Feb. 28, 2023 Hr'g at 4:10-15 (Mr. Sandick: "SaveOn's misappropriation of the CarePath co-pay support."); June 6, 2023 Hr'g at 41:14-17 (Mr. Mangi: "And we can cut off payments to an entity that we know is taking money that is not intended to."); June 27, 2023 Hr'g Tr. at 7:24-8:6 (Mr. Greenbaum: "[D]iversion of patient assistance funds is the foundation of

Hon. Freda L. Wolfson                                                                          Page 5

taking copay assistance funds directly from J&J. Jan. 24, 2024 Hr'g at 83:2-8 (comparing
SaveOn's services to "someone steal[ing] a car").

Both cannot be true. If SaveOn were diverting CarePath funds from patients as J&J asserts,
then any certification that J&J makes to HHS that all those funds go to patients would have to be
false. If J&J's apparent certifications to HHS that all its copay assistance funds go to patients were
true, on the other hand, then J&J's accusations that SaveOn diverts CarePath funds from those
patients would necessarily be false.

J&J appears to be aware of the connection between its "best price" certifications and its
CarePath expenditures: ███████████████████████████████████████████
███████████████████████████████████████████. *See, e.g.*, Ex.
7 (JJHCS_00204199) at -419, -421 ███████████████████████████████
███████████████████████████████████████████████████████████
███████████████████. ████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
2022, Ex. 11 at Tab "SaveOn ID" (JJHCS_00139021); Ex. 12 (JJHCS_00002774), ████████
███████████████████████████████ SaveOn is entitled to discover the basis
for J&J's apparently contradictory representations to HHS and to this Court.

In correspondence, J&J asserted that SaveOn's requests are "just another way of asking for

---

SaveOn's business model."); *id.* 14:3-5 (Mr. Greenbaum: "We're trying to show that they are try-
ing to circumvent the changes at manufacturers are making to defeat their efforts to take our
money."); Jan 24, 2024 Hr'g Tr. at 72:14-20 (Mr. Sandick: accusing SaveOn of arguing that "[i]t's
okay to steal from someone, and to loot a program, so long as at the end of the day they're still
making money").

the same pricing data that the Court's February 6 Order squarely rejected." Ex. 2 at 4 (Apr. 9, 2024

Ltr.). Not so. SaveOn does not seek here the pricing data underlying J&J's transparency reports

that J&J put at issue in its Complaint, Compl. ¶¶ 25, 80, or the pricing data necessary to counter

any representation that J&J might make at trial about its purported pricing reductions, at issue in

SaveOn's February 20 Motion for Reconsideration, *see* Feb. 20, 2024 Mot. for Clarification &

Reconsideration at 18-20. SaveOn seeks here only communications and documents that will allow

it to test J&J's repeated accusations that SaveOn has been "diverting" J&J's copay assistance

funds. This motion is not about how J&J sets prices; it is about whether J&J actually believes that

any of its copay assistance funds flow to SaveOn. Evidence that J&J regularly certified that copay

assistance funds go entirely to patients, *see* 42 C.F.R. §§ 447.510(a)(2), (e), would contradict this

assertion and severely undermine J&J's credibility.

SaveOn thus asks Your Honor to compel J&J to produce the following categories of doc-

uments for the full discovery period (April 1, 2016 through November 7, 2023):

- All Best Price Quarterly Reports for all Janssen drugs at issue in this litigation
  (RFP 79), *see* Ex. 13 (SaveOn's Sixth Set of RFPs);

- Documents sufficient to show the factual basis of all of J&J's statements to the
  Court in this litigation regarding SaveOn taking, seizing, pilfering, siphoning, di-
  verting, and misappropriating copay assistance funds (RFPs 8, 70), *see* Ex. 14
  (SaveOn's First Set of RFPs); Ex. 15 (SaveOn's Fifth Set of RFPs);[4]

- Documents sufficient to show the factual basis of all of J&J's statements to the
  Court in this litigation regarding SaveOn's services converting copay assistance

---

[4] SaveOn's RFP No. 8 seeks: "All Documents and Communications with or regarding SaveOnSP,"
Ex. 14 at 12 (Nov. 11, 2022 SaveOn's First Set of RFPs). SaveOn's RFP No. 70 seeks: "All Doc-
uments and Communications regarding manufacturer copay assistance program funds counting
towards the calculation of a drug's Best Price, including the anticipated impact of the 2023 Best
Price Rule on JJHCS, including without limitation the impact on CarePath." Ex. 15 at 11-12
(SaveOn's Fifth Set of RFPs). SaveOn's RFP No. 79 seeks: "All Best Price Quarterly Reports
created or submitted by JJHCS, Janssen, or their affiliates for each Janssen Drug." Ex. 13 at 12
(Dec. 28, 2023 SaveOn's Sixth Set of RFPs).

Hon. Freda L. Wolfson                                                          Page 7

funds into a manufacturer subsidy for SaveOn, Express Scripts, Accredo, and/or plans, *see* Compl. ¶¶ 23-24, 74, (RFPs 8, 70), *see* Ex. 14 (SaveOn's First Set of RFPs); Ex. 15 (SaveOn's Fifth Set of RFPs);

- Documents sufficient to show what J&J has told HHS, CMS, or other executive agencies regarding each patient that J&J or a vendor of J&J has identified as a member of a SaveOn-advised plan (RFPs 8, 70), *see* Ex. 14 (SaveOn's First Set of RFPs); Ex. 15 (SaveOn's Fifth Set of RFPs);

- Documents sufficient to show the basis for J&J's assertions to HHS, CMS, and other executive agencies that the full amount of J&J's copay assistance is passed to patients (RFP 70), *see* Ex. 15 (SaveOn's Fifth Set of RFPs);

- Documents sufficient to show J&J's evaluation of whether the services provided by SaveOn, accumulators, or maximizers cause copay assistance funds to be provided to any entities other than patients (RFPs 8, 70), *see* Ex. 14 (SaveOn's First Set of RFPs); Ex. 15 (SaveOn's Fifth Set of RFPs); and

- All communications or records of communications that discuss accumulators, maximizers, or SaveOn, with HHS, CMS, or other federal agencies, related to J&J's submission of Quarterly Best Price Reports (RFPs 8, 70), *see* Ex. 14 (SaveOn's First Set of RFPs); Ex. 15 (SaveOn's Fifth Set of RFPs).

For the last category of documents, SaveOn asks Your Honor to compel J&J to identify individuals with documents relevant to this topic as custodians (not limited to individuals within JJHCS), including, but not limited, the individuals who certify compliance with the 2016 Best Price Rule to HHS, and run the following search term across their custodial documents for the full discovery period of April 1, 2016 to November 7, 2023:

- ("HHS" OR (Health /3 "Human Services") OR "CMS" OR ".gov") AND ("Best Price" OR "BP") AND (accumulat* OR maximiz* OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP)

## II.    J&J Must Produce Documents Regarding Its Response to HHS's 2023 Best Price Rule

Under the 2016 Best Price Rule, so long as a drug manufacturer did not know that its copay assistance funds were going to a plan, PBM, accumulator, or maximizer, it could avoid accounting for those funds as a discount in its "best price" calculations and so charge a higher price to gov-

7

Hon. Freda L. Wolfson                                                    Page 8

ernment entities. This regime gave J&J a financial incentive not to learn whether its copay assistance funds were going to any entities other than patients—if J&J learned that any funds were going to other entities, it would have to lower the "best price" it charged federal insurers for its drugs. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████. *See* Ex. 6 (JJHCS_00047500) at -7510 ███████

███████████████████████████████████████████████████████████

███████████████████████████████████

On December 31, 2020, however, HHS finalized a "accumulator adjustment rule" (the "2023 Best Price Rule"), which required manufacturers to "ensure the benefit [of their assistance programs] go exclusively to the consumer" before the manufacturers exclude the discount from their best price calculations. CMS Final Rule 85 Fed. Reg. 87,000 (Dec. 31, 2020). This required drug manufacturers to take affirmative steps to ensure that none of their copay assistance funds flow to entities other than patients; manufacturers would now face a penalty unless they took all steps to know whether the funds went to entities other than patients. █████████████████

███████████████████████████████████████████████████████████

█████████████████████████████ Ex. 16 (JJHCS_00084277) at -4292.[5]

In 2022, after the 2023 Best Price Rule was issued, ████████████████████████

██████████████████████, Ex. 16 at 9 (JJHCS_00084277) at -285, ███████████████

---

[5] While a court would ultimately strike it down in May 2022 before it took effect, *Pharm. Rsch. & Mfrs. of Am. v. Becerra*, No. 21-CV-1395 (CJN), 2022 WL 1551924, at *5-6 (D.D.C. May 17, 2022), the 2023 Best Price Rule was a final HHS rule embodied in federal regulations for well over a year starting in early 2021. From January 2021 until May 2022, J&J thus had every reason to believe that the 2023 Best Price Rule would be effective starting in January 2023.

Hon. Freda L. Wolfson                                                                    Page 9

███████.[6] It stated: "██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████." Ex. 17 at 4 (JJHCS_00033653)

(emphasis added).[7] ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████. *See* Ex. 23 (ARCHBOW_000443) ████████

██████████████████████████████████████████████████████████████████████

██████); Ex. 24 JJHCS_00141442 (███████████████████████████████████████

████████████████████). J&J also changed CarePath's terms and conditions for Stelara

and Tremfya ███████████████████ Ex. 17 at 7 (JJHCS_00033653).[8]

_____

[6] █████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

[7] *See also* Ex. 18 at 1 (JJHCS_00084196) ██████████████████████████████
██████████); Ex. 19 at 3 (JJHCS_00010110) ██████████████████████████████
███████████████████████████████████████████████████████████████████████
█████████████████████████); Ex. 20 at 4 (JJHCS_00003023) (███████████████
███████████████████████████████████); Ex. 21 at 2 (JJHCS_00001595) (T████
████ ██ ████ ████████ ██ █ ████████ ██████████████); Ex. 22 (TRIAL-
CARD_00003689) (article titled ██████████████████████████████████████").

[8] *See* Ex. 17 at 7 (JJHCS_00033653) (████████████████████████████████
███████████████████████); Ex. 25 (JJHCS_00001209) ████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████);

Hon. Freda L. Wolfson                                                      Page 10

J&J's reaction to the 2023 Best Price Rule is relevant in multiple ways. As Your Honor observed, "[SaveOn] is entitled to explore why [J&J] decided to amend the terms in 2022, when it knew of the SaveOnSp Program since 2017, which decision could potentially support Defendant's defenses of mitigation, laches and acquiescence." Dkt. 192 at 14; *see also New Reflections Plastic Surgery, LLC v. Reflections Ctr. for Skin & Body, PC*, Civil Action No. 16-8523 (FLW) (TJB), 2018 WL 6716105, at *6 (D.N.J. Dec. 20, 2018) ("[A]ggrieved parties must … bring their claim … when they learned or should have learned, through the exercise of due diligence, that they have a cause of action."). J&J knew of SaveOn since at least 2017, Dkt. 192 at 14, ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████. *Cf.* Ex. 6 (JJHCS_00047500) at -7510.[9] ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████d. *See id.* (███████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Your Honor also reaffirmed that J&J's understanding of the terms and conditions at issue in this case is highly relevant. *See* Dkt. 192 at 7 ("[T]he Court held that arguments regarding the meaning of the terms and conditions should be decided at summary judgment with the benefit of extrinsic evidence."). J&J's response to the 2023 Best Price Rule will likely also show that J&J

---

Ex. 26 (JJHCS_00026369) at -370 (noting that ██████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████).

[9] ████████████████████████████████████████████████████████████████
██████████████████████████████████████ *See* Ex. 27
(JJHCS_00197563); Ex. 28 (JJHCS_00197574).

Hon. Freda L. Wolfson                                                      Page 11

developed its current, made-for-litigation interpretation of the T&Cs solely to bring this lawsuit,

shut down SaveOn, and avoid the effect of the 2023 Best Price Rule—not because J&J truly be-

lieved that SaveOn's activities violated T&Cs or that SaveOn caused any real damage to J&J.

In correspondence, J&J asserted that its productions regarding the CAP Program will cover

documents on this topic. *See* Ex. 2 at 3 (Apr. 9, 2024 Ltr.). But J&J has neither identified the

custodians who were responsible for responding to the 2023 Best Price Rule, nor is J&J running a

search term which would capture the relevant documents related to that rule. That is plainly insuf-

ficient. As discussed *supra*, J&J must produce documents to explain ███████████████

████████████████████████████████████████████. *Com-*

*pare* Ex. 29 (JJHCS_00195975) (████████████████████████████████

████████████████████████████████████████████████████

████████) *with* Ex. 23 (ARCHBOW_000443).

SaveOn asks Your Honor to compel J&J to produce documents and communications re-

flecting J&J's response to the 2023 Best Price Rule, including without limitation its creation of the

CAP Program and its interpretations of or modifications to its terms and conditions. J&J should

identify individuals with documents relevant to this topic as custodians (not limited to individuals

within JJHCS) and run the following term run across their custodial documents from December 1,

2020 to November 7, 2023:

- ("copay" OR "co-pay" or fund* OR manufact*) /20 ("best price" or "BP") /20 (accu-mulat* OR maximiz* OR SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP)

SaveOn appreciates Your Honor's attention to this matter.

Respectfully submitted,

*/s/ E. Evans Wohlforth, Jr.*
E. Evans Wohlforth, Jr.

11

Hon. Freda L. Wolfson                                                      Page 12

Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*

# Exhibit 8

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Elizabeth H. Snow
Associate
212.390.9330
esnow@selendygay.com

July 19, 2024

**Via E-mail**

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jlong@pbwt.com

**Re:**   ***Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC*** **(Case No. 2:22-cv-02632-JKS-CLW)**

Dear Julia,

We write regarding J&J's July 3, 2024 responses and objections to SaveOn's
Fourth Set of Interrogatories (the "R&Os") and to request additional custodians
regarding the Best Price Rule. *See* May 28, 2024 Letter Order at 3 (directing the
parties to meet and confer after the interrogatories were served and answered).

In light of J&J's responses, SaveOn requests the addition of Lena Kane and
Gina Kiris as custodians. Both did work relevant to J&J's response to the 2023 Best
Price Rule, which is relevant to J&J's intent for instituting the CAP Program. *See*
May 28, 2024 Order at 2. Their work is relevant to (1) the meaning of CarePath's
T&Cs—they edited the eligibility requirements for CarePath, and (2) mitigation—
they worked on strategy for and implementing the CAP Program.

**Lena Kane**.

. JJHCS_00150781; *see also* JJHCS_00156938 (

). JJHCS_00198121 (

); JJHCS_00083755 (                              ); JJHCS_00117387 (

Julia Long
July 19, 2024

██████████████████████████████████████); *see also* JJHCS_00083830 (████████
███████████████████████; JJHCS_00205896 (████████████████████████████████
███████████); JJHCS_00197915 (████████████████████████████████████████
██████████; JJHCS_00133545 (████████████████████████████████████
████████); JJHCS_00001239 (████████████████████████████████
██████████████████████████████████); JJHCS_00011216 (████████████
██████████████████████); JJHCS_00084174 (████████████████████████████
███████████████████████████████████; JJHCS_00041211
(████████████████████████████████████████████).

**Gina Kiris**. In ████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████. ██████████████████████
████████████████████████████████████████. *See* JJHCS_00122171; JJHCS_00150779;
JJHCS_00156938. ████████████████████████████████████
███████████████████████. JJHCS_00150779; *see also*
JJHCS_00257203 (████████████████████████████████████); JJHCS_00156591 (
████████████████████████████████████████████████
██████████████).

SaveOn requests that J&J run the following search terms over Kane and
Kiris's documents from June 19, 2020 through May 17, 2022:

- "Save On" (case sensitive)

- "save on" w/50 (accumulat* OR maximiz* OR "essential health benefit*"
  OR EHB* OR "non-essential health benefit*" OR "nonessential health
  benefit*" OR NEHB* OR ac-credo OR ESI OR "express scripts")

- SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On
  OR SOSP OR "Jody Miller" OR "Ron Krawczyk"

- ("Express Scripts" OR ESI OR ExpressScripts) w/50 (accumulat* OR
  maximiz*)

- (Accredo OR Acredo) w/50 (accumulat* OR maximiz*)

- (CAPa OR CAPm OR "adjustment program" OR "diversion program")
  AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR
  Save-On OR SOSP OR accumulat* OR maximiz*)

- ("copay" OR "co-pay" or fund* OR manufact*) w/20 ("best price" or
  "BP") w/20 (accumulat* OR maximiz* OR SaveOnSP OR SaveOn OR
  "Save OnSP" OR "Save OnSP" OR Save-On OR SOSP)

Julia Long
July 19, 2024

- ("best price" OR "BP" OR "CMS" OR "Final Rule") AND (accumulat* OR maximiz* OR "adjustment program" OR "diversion program")

- (CAP w/3 (2023 OR 23))

- (Compliance w/5 Checklist*) AND "CAP" (case sensitive)

- (Checklist* AND (Balversa OR Darzalex OR Erleada OR Imbruvica OR Opsumit OR Prezcobix OR Remicade OR Rybrevant OR Simponi OR Stelara OR Symtuza OR Tracleer OR Uptravi OR Ventavis OR Zytiga OR Ponvory OR Edurant OR Intelence)) AND ((assistance OR benefit) w/30 ("other third party" OR "PBM"))

- (Checklist* AND (Balversa OR Darzalex OR Erleada OR Imbruvica OR Opsumit OR Prezcobix OR Remicade OR Rybrevant OR Simponi OR Stelara OR Symtuza OR Tracleer OR Uptravi OR Ventavis OR Zytiga OR Ponvory OR Edurant OR Intelence)) AND ((exclud* OR includ*) w/30 ("AMP" OR "Best Price Calculation"))

Please confirm that J&J will add Kane and Kiris as custodians and run the above terms. If not, please explain the basis on which you refuse. If J&J asserts a burden objection, please provide hit counts for SaveOn's proposed terms.

We request a response by July 26, 2024. We reserve all rights and are available to meet and confer.

Best,

/s/ Elizabeth Snow

Elizabeth H. Snow
Associate

3

# Exhibit 9

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Elizabeth H. Snow
Associate
212 390 9330
esnow@selendygay.com

July 19, 2024

**<u>Via E-mail</u>**

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
jlong@pbwt.com

**Re:    Johnson & Johnson Health Care Systems Inc. v. Save On SP,
LLC (Case No. 2:22-cv-02632-JKS-CLW)**

Dear Julia,

Pursuant to Judge Wolfson's July 16, 2024 Order, SaveOn writes to request
that J&J add the following custodians:

**<u>Sylvia Shubert</u>**.



Shubert's work on the
CAP program is relevant to J&J's mitigation efforts.

Julia Long
July 19, 2024



**Jennifer    Goldsack**.



2

Julia Long
July 19, 2024



**<u>Mark Wiley</u>**.

**<u>Michelle Barnard</u>**.

**<u>Mitchell Akright</u>**.

Julia Long
July 19, 2024



**Cherilyn Nichols**.



**Katie Hanculak**.



Julia Long
July 19, 2024



**<u>Kevin Kleemeier</u>**.



**<u>Matthew Saggese</u>**.



5

Julia Long
July 19, 2024

**Pinal Shah**.



**Claudia Adomah**.

**Sabrina Ade**.

Julia Long
July 19, 2024



**<u>Barbara McCabe</u>**.



**<u>Casey Sasse</u>**.



Julia Long
July 19, 2024

**<u>Elizabeth Kreul-Starr</u>**.



**<u>Camille Dorsey</u>**.

**<u>Kassandra Cruz</u>**.

Julia Long
July 19, 2024



**Bryan Weinlein**.



**Cecelia Trybus**.



Julia Long
July 19, 2024



**Jane Frechette**.



**Brian Taft**.



Julia Long
July 19, 2024



**<u>Thao Mazrullo</u>**.

     Please let us know if J&J will agree to add these individuals as custodians.

     We request a response by July 26, 2024. We reserve all rights and are available to meet and confer.

Sincerely,

/s/ Elizabeth H. Snow

Elizabeth H. Snow
Associate

# Exhibit 10

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Elizabeth Snow
Associate
212.390.9330
esnow@selendygay.com

July 19, 2024

**Via E-mail**

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

**Re:** *JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW)*

Dear Julia,

     We write pursuant to Judge Wolfson's order regarding Janssen Scientific Affairs ("Scientific").

     *First*, we ask that J&J add Scientific employees Mike Ingham, Kay Sadik, and Bridget Doherty as custodians. Ingham and Sadik were involved in soliciting studies from vendors and developing J&J's analysis of copay accumulator and maximizer programs.[1] ███████████████████████████████

----

[1] *See, e.g.*, JJHCS_00132939 (███████████████████████████

███████████████ "); JJHCS_00132936 (███████████

█████████████ ); JJHCS_00132277 (███████

████ ); JJHCS_00132323 (████████

████ ); JJHCS_00132682 (█████

███ █ ██ ███ ██ █ ██ "); JJHCS_00132736 (███

██████████████ ); JJHCS_00132931 (██████████████ ); JJHCS_00132682 (██ JJHCS_00132736 (█████

██████ )

Julia Long
July 19, 2024

*See, e.g.,*

JJHCS_00132266 at 6, 9, 11 (⬛⬛⬛).

JJHCS_00167771.[2]

We propose the following search terms for their documents for the full discovery time period of April 1, 2016 to November 7, 2023:

- SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP

- (accumulat* OR maximiz* OR "essential health benefit*" OR EHB* OR "non-essential health benefit" OR "nonessential health benefit" OR NEHB* OR "Affordable Care Act" OR ACA OR Obamacare) w/25 (report* OR article* OR post* OR "white paper" OR WP OR analy* OR sponsor* OR partner* OR (talk* w/3 point*) OR propos* OR study OR studie*)

- (accumulator* OR maximizer* OR copay OR co-pay OR CAP) w/25 (impact* OR effect* OR patient* OR equity)

- (IQVIA OR Excenda OR "Analysis Group" OR Xcenda OR "The Eagle Force") w/25 (accumulator* OR maximizer* OR copay OR co-pay OR CAP)

- (CAPa OR CAPm OR "adjustment program") AND (accumulat* OR maximiz*)

*Second*, we ask that J&J produce from non-custodial sources documents associated with the following requests, also from the full discovery time period:

- Request No. 3: Documents Sufficient to show Janssen Scientific Affairs' organizational structure, including organizational charts.

- Request No. 8: All documents and Communications with or regarding SaveOnSP.

---

[2] *See also* JJHCS_00132340 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛");
JJHCS_00132379 (⬛⬛⬛
JJHCS_00132917 (⬛⬛⬛⬛).

Julia Long
July 19, 2024

- **Request No. 20:** All Documents and Communications regarding any publicly distributed material (including, for example, articles, op-eds, white papers, and online postings) regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer Services, including Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect involvement with such material and JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect funding of the authors, publishers, or distributors of such material.

- **Request No. 22:** All Documents and Communications regarding any alleged harm caused by SaveOnSP to any Patient by allegedly making their healthcare more expensive, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

- **Request No. 25:** All Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 110, 115.

- **Request No. 42:** All Documents and Communications relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms "copay accumulator" and "copay maximizer."

- **Request No. 49:** All Documents and Communications regarding efforts by JJHCS, Janssen, a JJHCS Hub Entity, or other entity working on any of their behalves to (a) identify (through non-litigation means) individuals enrolled in CarePath as members of SaveOnSP-advised plans; or (b) to enforce CarePath's terms and conditions against those individuals, including without limitation by reducing the amount of copay assistance funds provided to those individuals or by disenrolling those individuals from CarePath.

*Finally*, if Scientific employees other than Ingham, Sadick, and Doherty worked on these topics, please identify them.

We ask that you respond by July 26, 2024. We reserve all rights, and are available to meet and confer.

Sincerely,

/s/ Elizabeth H. Snow

Elizabeth H. Snow
Associate

# Robinson+Cole

E. EVANS WOHLFORTH, JR.

666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com
Direct (212) 451-2954

Admitted in New York
and New Jersey

November 14, 2024

**VIA E-Mail**

Hon. Freda L. Wolfson, U.S.D.J. (ret.)
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068

Re:     *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*
        **No. 2:22-cv-02632 (JKS) (CLW)**

Dear Judge Wolfson:

On behalf of Save On SP, LLC ("SaveOn"), we write in reply to Johnson & Johnson Health

Care Systems, Inc.'s ("JJHCS," and, with its affiliates, "J&J") opposition to SaveOn's motion to

compel J&J to update its answer to Interrogatory No. 12 to (1) clarify its response to the Compli-

ance Statement; and (2) address the Full Value Statement.[1]

**The Compliance Statement**. In its response to Interrogatory No. 12, ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

_____

[1] Unless otherwise noted, defined terms have the meanings defined in SaveOn's opening motion.

Boston | Hartford | New York | Washington, DC | Providence | Miami | Stamford | Wilmington | Philadelphia | Los Angeles | Albany | rc.com

Robinson & Cole LLP

Hon. Freda L. Wolfson                                                                    Page 2

Ex. 8 at 7-8. J&J does not dispute that, when SaveOn asked what this meant, J&J refused to clarify

and asserted that SaveOn should serve another interrogatory to find out. Mot. at 3-4 (citing Ex. 7

at 1). In its Opposition, J&J now says, for the first time, that its response "state[s] 'unequivocally'

that ████████████████████████████████████████████████████████████

████████████████████████████████ Opp. at 4. Your Honor should compel J&J to update

its sworn Interrogatory response to include this admission.

**Full Value Statement**. The Full Value Statement, a part of J&J's internal Savings Program

Checklists, states:



Ex. 3 at -214 (original emphasis). In response to Interrogatory No. 12, which asks about the mean-

ing and purpose of those checklists, J&J stated in relevant part:





Ex. 8 at 7-8.

J&J's response does not fully address the purpose of the Full Value Statement. ██████



████████████████████. Opp. at 4; Your Honor should compel J&J to update its sworn

Interrogatory response to include this admission.

J&J's response also does not address at all the meaning of the Full Value Statement—████

████████████████████████████████████████████████████████████████

█████████████████████████████████. This is critically

important. J&J continues to assert that SaveOn takes CarePath funds, *see* Dkt. 418 at 4, n. 3 (Apr.

18, 2024 Mot.) (compiling quotes); *see also, e.g.*, Dkt. 378 at 6 (Sept. 10, 2024 Opp.) ("SaveOnSP

. . . tortiously pilfered [money] from CarePath"), and that SaveOn's theft of these funds violates

the May-Not-Use Provision, because J&J has "long intended that its patient assistance programs

'not provide any value to any other entity other than the patient,'" Dkt. 377 at 5 (Sept. 10, 2024

Opp.). Because the statements in the checklists appear to directly contradict J&J's claims that pa-

tients on SaveOn-advised plans breach that provision, SaveOn is entitled to understand what J&J

meant when it made these statements and how it intends to explain this apparent contradiction.

Your Honor recognized the importance of this topic by allowing SaveOn to serve interrogatories

about the checklists. *See* May 23, 2024 Hr'g Tr. at 99:20-100:19.

J&J asserts that its response addresses the purpose of Full Value Statement "to the extent required by Your Honor's order," but J&J does so by mischaracterizing that order as limiting any response to "the proposed [2023] amendment to the Best Price Rule," Opp. at 10. J&J confuses Your Honor's reasoning with the scope of Your Honor's order. Your Honor reasoned that "documents regarding [J&J's] 'best price' certification to the federal government" are relevant because they may reveal that J&J changed some of its terms and conditions and created its CAP Program "in response to the proposed 2023 Best Price Rule." Dkt. 307 at 2 (May 28, 2024 Order). But Your Honor did not limit the order to the proposed 2023 amendment—Your Honor held that SaveOn could serve interrogatories "to explore the purpose of an internal checklist that may or may not relate to [J&J's] obligations under the Best Price Rule." *Id*. at 2-3. This makes sense: One needs to understand J&J's certifications before and after the 2023 Best Price Rule, and the meaning it attached to those certifications, to understand how J&J may have changed its behavior in reaction to that Rule. J&J is not allowed to assert that ███████████████████████████████ ████████████████████████████; it must say what the Full Value Statement means.

J&J tries to relitigate the relevance of the Best Price Rule, calling the likelihood that it changed its T&Cs and instituted its CAP Program in part in reaction to the 2023 Best Price Rule a "debunked," Opp. at 1-2, and "tangential," *id*. at 12, "conspiracy theory," *id*. at 11. In fact, Your Honor held that the Best Price Rule is relevant, *see* Dkt. 307 at 2 (May 28, 2024 Order) ("I agree with Defendant's position that these documents may reveal Plaintiff's intent and motivation in identifying its patients who are on SaveOnSp's programs" (emphasis removed)) and asked SaveOn to stage discovery by first serving interrogatories, *id*. at 2-3, which it did. J&J did not appeal this decision, or ask Your Honor to reconsider it, and may not relitigate it now.

J&J next asserts that Your Honor ruled "dispositive[ly]" in a prior order that parties never need to supplement their interrogatory responses, Opp. at 12-13, but in truth Your Honor simply denied J&J's motion to compel SaveOn to change an Interrogatory answer with which J&J disagreed, *see* Dkt. 305 at 7-8 (Apr. 10, 2024 Order). This motion, by contrast, concerns J&J's failure to answer portions of Interrogatory No. 12 in the first place—including the meaning of the Full Value Statement. Such a refusal has not arisen in this case before, and ample caselaw supports compelling J&J to answer those portions of SaveOn's interrogatories that it did not address. Mot. at 4-5.

J&J's tries to distinguish SaveOn's case law, Opp. at 11-12, but it does not dispute that a party cannot ignore portions of an interrogatory without a basis to object. Mot. at 4 (citing *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc*., 707 F. Supp. 1429, 1439 (D. Del. 1989)). J&J asserts that *Barton v. RCI, LLC* did not address the sufficiency of interrogatory responses, Opp. at 11, but, in reality, that case found multiple responses "evasive, indecipherable, and deficient," 2014 WL 1050417 at *4, *6 (D.N.J. Mar. 17, 2014), and compelled plaintiff to provide substantive answers, *id.* at *6. J&J says that *Pfizer Inc. v. Teva Pharms. USA, Inc.* is "irrelevant," Opp. at 11-12, but in fact the court found that plaintiff's interrogatory response had been "materially incomplete" without justification until late in the case, 2006 WL 2938723 at *2-3 (D.N.J. Oct. 13, 2006), just as J&J's is now. J&J acknowledges that SaveOn's other cited cases required parties to supplement incomplete interrogatory answers, Opp. at 12, but dismisses them on the sole basis that it "fully answered" Interrogatory No. 12, *id.*, which, as shown, it did not.

J&J finally tries arguing that SaveOn's interrogatories are "compound," in service of arguing that they are too numerous, Opp. at 2-3, but they are not—SaveOn served only three interrogatories regarding the Best Price Rule. Ex. 1 at 10-11. Interrogatories may have sub-parts, whether

Hon. Freda L. Wolfson                                                                Page 6

"explicit or implicit," so long as they are all within one "discrete separate subject." *Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*, 2017 WL 2371834 at *3 (D.N.J. Feb. 10, 2017), *report and recommendation adopted*, 2017 WL 2367051 (D.N.J. May 31, 2017) (quoting *Erfindergemeinschaft Uropep GbR v. Eli Lilly & Co.*, 315 F.R.D. 191, 195 (E.D. Tex. 2016)). The single subject of Interrogatory No. 12 is "the purpose and meaning of the Savings Program Check-lists" and the Full Value Statement is self-evidently within that subject. *See* Ex. 1 at 11.[2]

At bottom, J&J has not provided full answers to the Interrogatory No. 12, which Your Honor directed SaveOn to serve, on a topic that Your Honor held was relevant. Your Honor should compel J&J to provide those answers.

SaveOn appreciates Your Honor's attention to this matter.

Respectfully submitted,

/s/ E. Evans Wohlforth, Jr.
E. Evans Wohlforth, Jr.
Robinson & Cole LLP
666 Third Avenue, 20th floor
New York, NY 10017-4132
Main (212) 451-2900
Fax (212) 451-2999
ewohlforth@rc.com

---

[2] J&J also complains about search parameters that SaveOn proposed for a production of documents about the Best Price Rule, Opp. at 7-8, but they are not at issue in this motion.

Hon. Freda L. Wolfson                                                        Page 7

Philippe Z. Selendy (admitted *pro hac vice*)
Andrew R. Dunlap (admitted *pro hac vice*)
Meredith Nelson (admitted *pro hac vice*)
Elizabeth H. Snow (admitted *pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

pselendy@selendygay.com
adunlap@selendygay.com
mnelson@selendygay.com
esnow@selendygay.com

*Attorneys for Defendant Save On SP, LLC*