# EXHIBIT B

# Sills Cummis & Gross

A Professional Corporation

The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102-5400
Tel: 973-643-7000
Fax: 973-643-6500

Jeffrey J. Greenbaum
Member
Direct Dial: (973) 643-5430
E-mail: jgreenbaum@sillscummis.com

101 Park Avenue
New York, NY 10112
Tel: 212-643-7000
Fax: 212-643-6500

**CONTAINS INFORMATION MARKED AS AEO/CONFIDENTIAL UNDER THE DISCOVERY CONFIDENTIALITY ORDER**

January 17, 2025

**By Email**

Hon. Freda L. Wolfson, U.S.D.J.
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068

Re:     **JJHCS's Opposition to SaveOnSP's Jan. 3, 2025 Motion to Compel**
        ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC, et al.,***
        **Civil Action No. 22-2632 (JKS) (CLW)**

Dear Judge Wolfson:

On behalf of Johnson & Johnson Health Care Systems, Inc. ("JJHCS"), we write to oppose SaveOnSP's January 3, 2025 motion to compel searches in the custodial files of Michael Ingham. This is one of seven motions SaveOnSP has brought in recent weeks, which collectively seek to force JJHCS to review over 100,000 additional documents. SaveOnSP's demands as to Ingham alone account for about 16,000 of those.

SaveOnSP has not come close to justifying this significant burden. *First*, Ingham's primary function related to policy—he was never involved with CarePath, and never did any work relating to SaveOnSP specifically. He merely contributed to research and scholarship on racial and income disparities in copay adjustment programs. JJHCS already has produced hundreds of documents concerning this scholarship, and also already designated Ingham's supervisor as a

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 2

custodian to capture any remaining relevant documents. JJHCS was even willing to add Ingham as a custodian to avoid yet another dispute, if SaveOnSP were to propose search strings for a narrow time period targeted at a legitimate need for unique documents from him. SaveOnSP Ex. 1 at 2. Your Honor has made clear repeatedly that the Court expects the parties to take that approach. And JJHCS repeatedly tried, by asking what specific topics and time periods SaveOnSP remained interested and what gaps it had identified in JJHCS's productions, and providing further breakdowns of search hits to assist SaveOnSP in narrowing its request. *See* JJHCS Ex. 1 (Nov. 21, 2024 Ltr. from J. Long to E. Snow); SaveOnSP Ex. 3. But SaveOnSP had no interest in making a targeted request. It refused to provide an appropriately tailored proposal and instead moved to motion practice. JJHCS Ex. 2 (Dec. 6, 2024 Ltr. from H. Miles to J. Long). The exhibits to SaveOnSP's motion vindicate JJHCS's position: there is no gap in JJHCS's production that would justify additional expansive discovery from Ingham given his marginal role. Based on SaveOnSP's moving papers, it is now clear that there is no basis to add Ingham as a custodian.

*Second*, SaveOnSP has not given any reason to rummage through seven years' worth of Ingham's files. Ingham worked on the scholarship at issue here during a period of about two years from August 2021 to October 2023. And SaveOnSP already has extensive coverage of this period.

*Third*, SaveOnSP's proposed search strings are overbroad, because they are the expansive slate of search strings that JJHCS agreed to run on dozens of other custodians, some of whom have far more relevance to this case than Ingham. There is no reason to use these same broad search strings as to Ingham's files, particularly after JJHCS undertook a separate investigation and produced documents related to his work from a separate, non-custodial source. *See* JJHCS Ex. 3 (Nov. 1, 2024 Ltr. from J. Long to E. Snow). Nothing more is required here.

2

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 3

# ARGUMENT

## I.    Discovery from Ingham Would be Cumulative of JJHCS's Existing Productions

Ingham did not oversee or have any responsibility for CarePath. Nor did he work at JJHCS. He served as the ███████████████████████████████████████

██████████████████████████████████████████████████████████████████

████. *See* SaveOnSP Ex. 2; JJHCS Ex. 4 (JJHCS_00132266). His ostensible relevance here is limited to two related studies: "Assessment of racial and ethnic inequities in copay card utilization and enrollment in copay adjustment programs"[1] and "Assessing the Relationship Between Copay Adjustment Program Exposure and Household Income Levels in a Cohort of Patients with Schizophrenia." *See* JJHCS Ex. 5 (JJHCS_00139002); SaveOnSP Ex. 16; SaveOnSP Ex. 26.

These studies do not mention SaveOnSP and it is entirely unclear what relevance SaveOnSP contends they have to this case. Regardless, JJHCS already has produced a mountain of documents about them—far more than what SaveOnSP needs to defend the claims at issue in this case. Last year, JJHCS added Ingham's colleague and supervisor, Silas Martin, as a custodian. And JJHCS has produced hundreds of records maintained by Ingham and Martin in two network folders: nearly every routine update on the studies at issue; version-upon-version of manuscripts, abstracts, and presentations for submission to conferences and journals for publication; and the underlying research. *See* SaveOnSP Ex. 9 (manuscript dated April 2022); SaveOnSP Ex. 39

---

[1] Although the team employed different titles for the project throughout its course, these are all referring to the same project. *Compare* SaveOnSP Ex. 9 ████████████████████████████ ████████████████████████████████████████████████████████████████████ "); SaveOnSP Exs. 32, 39 ████████████████████████ SaveOnSP Ex. 23 ████████████ ████████████████████████████████████████████████████████

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 4

(abstract dated May 2022), SaveOnSP Ex. 32 (finalized version of abstract); SaveOnSP Ex. 23 (email attaching project poster and summary of project); SaveOnSP Ex. 26 (poster presentation for follow-up project).

The entire point of producing shared files from a centralized source, as JJHCS has done, is to obviate the need for cumbersome, time-consuming, and expensive email searches. SaveOnSP already has all of these materials, and also already has additional custodial files from Silas Martin. It has not shown that adding another custodian is necessary or proportional, and its motion can be denied on this basis alone.

## II.    SaveOnSP Cannot Justify Its Requested Time Period

Even if custodial searches of Ingham's files were necessary here—and they are not—SaveOnSP's proposals are enormously overbroad. SaveOnSP demands searches for a seven-year period, from April 1, 2016 to November 7, 2023. *See* JJHCS Ex. 6 (July 19, 2024 Ltr. from E. Snow to J. Long) at 2. But nowhere in its brief does SaveOnSP attempt to justify this span of time. This is important: because Ingham did not begin conducting even the research SaveOnSP has identified until the summer of 2021, any search hits on his documents before then are likely to be false hits. SaveOnSP's own exhibits support, at most, a two-year time period from August 2021 to October 2023. *See, e.g.*, SaveOnSP Ex. 15 at -685 (███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████) SaveOnSP Ex. 17

(███████████████ on webinar co-hosted with IQVIA regarding the studies in June 2023).[2]

_____

[2] SaveOnSP cites a handful of communications from before this window, but those are not relevant to this case. Instead, they relate to separate workstreams that were conducted in the context of irrelevant issues like the impact of the proposed 2023 Best Price Rule. *See* SaveOnSP Ex. 36

4

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 5

### III.    SaveOnSP's Proposal Is Overbroad and Unduly Burdensome

Even during this two-year period when Ingham worked on the two studies at issue, he did

so alongside existing custodians, 

. *See* SaveOnSP Ex. 29 (

Nonetheless, SaveOnSP demands that JJHCS conduct broad searches related to three topics:

documents that expressly mention SaveOnSP; documents related to JJHCS's "CAP Program"; and

assorted research and vendors regarding accumulators and maximizers. None of these searches

are reasonable, proportionate, or narrowly tailored to Ingham's work.

### A.  Search String Related to SaveOnSP

SaveOnSP demands that JJHCS run the search string, SaveOnSP OR SaveOn OR "Save

On SP" OR "Save OnSP" OR Save-On OR SOSP, across Ingham's files. But as SaveOnSP admits,

JJHCS is already running "the same term proposed here, or a slightly broader version, over the

---



(                                                                                        ); SaveOnSP Ex. 28 (                                                                                        );
SaveOnSP Ex. 13 (                                                                                        ) As JJHCS has explained, and Your Honor has
recognized, the proposed 2023 Best Price Rule and work related to its possible implementation are
irrelevant to the issues in this case. *See* May 28, 2024 Order at 2–3 (limiting discovery to three
interrogatories "to explore the purpose of an internal checklist that may or may not relate to
Plaintiff's obligations under the Best Price Rule"); Dec. 30, 2024 Order at 7 (reaffirming discovery
is limited to "whether Plaintiff modified or created its checklist as a result of the proposed rule").
Research that explored the potential impact of the proposed rule on patient outcomes certainly
does not fit within the very narrow discovery Your Honor permitted.

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 6

files of ***all its 29 other custodians***." Mot. at 2 (emphasis added). There is no principled reason to make Ingham the 30th.

In arguing otherwise, SaveOnSP posits that Ingham "knew of and regularly discussed SaveOn," *see* Mot. at 3, but this supposition is completely unfounded. Even the exhibits it relies on to make this argument reveal others (not Ingham) mentioning SaveOnSP, and even then, they did so only in passing. *See* SaveOnSP Ex. 7 (██████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████); SaveOnSP Ex. 9 (██████████████████ ██████████████████████████████

Therefore, there is no basis to run this search string, which generates many false hits, over an additional custodian's files.

### B. Search String Related to JJHCS's CAP Program

SaveOnSP proposes to run a second search string, (CAPa OR CAPm OR "adjustment program") AND (accumulat* OR maximiz*), to "capture documents about J&J's CAP program." Mot. at 3. Again, SaveOnSP admits that a broader version of this string is being run over "***all other custodians*** with a link to the CAP program"—i.e., 27 existing custodians. *See* Mot. at 3 (emphasis added).

Ingham need not be the 28th. As a threshold matter, Ingham had no responsibility for copay assistance at all, let alone the CAP program. Rather, as SaveOnSP's own Exhibit 10 suggests, CAP falls within the "Patient Engagement & Customer Solutions" team, which is already thoroughly covered by over 20 existing custodians, such as Jasmeet Singh, Lauren Pennington, Spilios Asimakopoulos, Debbie Kenworthy, Katie Mazuk, and Heith Jeffcoat. *See, e.g.,*

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 7

SaveOnSP Ex. 10 (████████████████████████████████████████████

████████████████        SaveOnSP  Ex.  7  (████████████████████████████

████████████████████████████████████████████████).

      SaveOnSP claims that Ingham was "deeply involved" with JJHCS's CAP program, *see*

Mot. at 3, but it blatantly misconstrues the three exhibits it cites.  Those exhibits discuss a ***different***

"CAP" acronym that is used to refer to "copay adjustment programs"—i.e., accumulators and

maximizers—***not*** JJHCS's own "CAP" initiative developed in response to those programs.  *See*

SaveOnSP  Ex.  10  (████████████████████████████████████████████

████████████████████████████████████████        SaveOnSP Ex. 11

(████████████████████████████████████████████

████████████████████████████████████████████

SaveOnSP Ex. 12 (████████████████████████████).  In other

words, Ingham's research concerned the impact of accumulators and maximizers on different

racial and minority groups—it had nothing to do with JJHCS's internal CAP program that was the

subject of the Court's prior rulings.  *See, e.g.*, SaveOnSP Ex. 10 (████████████████

████████████████████████████; SaveOnSP Ex. 12 (████████████

████████████████████████); SaveOnSP Ex. 16 (████████

████████████████████████████████████████████

████████████████; SaveOnSP Ex. 34 (████████████████ "The truth about copay

adjustment programs" ████████████████████); SaveOnSP Ex. 33 (████████

████████████████████████.  And so there is no reason to run a search about

JJHCS's CAP program over the files of a non-JJHCS employee who did not work on that program.

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 8

### C. Search Strings Related to Research Regarding Accumulators and Maximizers

SaveOnSP demands three search strings "to capture documents about research regarding accumulators and maximizers conducted by J&J and J&J's vendors." Mot. at 4.[3] Combined, these three strings would require JJHCS to review over 15,000 documents. Not only are these search strings burdensome and overbroad, but they capture material that has been more than sufficiently covered by JJHCS's custodial and non-custodial productions. As illustrated by SaveOnSP's own exhibits, JJHCS's production includes ███████████████████████, *see* SaveOnSP Exs. 10–12, 14–17, 19–24, 29–30, 37, along with ██████████████████████████ ███████████████████, *see* SaveOnSP Exs. 9, 23, 26, 32, 39, related to the 2023 studies. These materials come from others' custodial files, non-custodial sources from Janssen Scientific Affairs (such as Ingham and Martin's network folders), and material "prepared by IQVIA that relate[s] to SaveOnSP specifically or to JJHCS's response to accumulators or maximizers." JJHCS Ex. 7 (Nov. 8, 2024 Ltr. from F. Famakinwa to E. Snow).

#### 1. SaveOnSP's "Vendor" String

SaveOnSP's first string—(accumulator* OR maximizer* OR CAP) w/10 (IQVIA OR "Analysis Group" OR Xcenda)—hits on over 11,000 documents (with families). *See* Mot. at 4. As a threshold matter, SaveOnSP's vendor search string is overbroad because it is likely to pull

---

[3] These search strings are:

- (accumulator* OR maximizer* OR CAP) w/10 (IQVIA OR "Analysis Group" OR Xcenda);
- (accumulat* OR maximizer*) w/10 (report* OR article* OR post* OR "white paper" OR WP OR analy* OR sponsor* OR partner*); and
- (accumulator* OR maximizer* OR CAP) w/15 ((impact* OR effect*) w/10 (patient* OR equity)).

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 9

material that is not relevant to the issues in this case, namely work related to the proposed 2023

Best Price Rule (also referred to as the "CMS Accumulator Rule"). *See, e.g.*, SaveOnSP Ex. 27

( █████████████████████████████████████████████████████████████

████████████████████████████████████ SaveOnSP Ex. 13

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ This work is not relevant and SaveOnSP cannot

use it as an end-run around Your Honor's rejection of custodial Best Price discovery.

There are also vendor-specific problems with SaveOnSP's proposal. For one, SaveOnSP

fails to sufficiently tie Ingham to any relevant work by Xcenda or the Analysis Group. SaveOnSP

relies on just one email to support its claim that Ingham "solicited studies from . . . Xcenda," but

Ingham is not even included on the email. Mot. at 4–5 (citing SaveOnSP Ex. 25).[4] Similarly, as

to the Analysis Group, none of SaveOnSP's three exhibits show Ingham soliciting or contracting

on studies related to accumulators or maximizers pertaining to relevant issues in this case. *See,*

*e.g.*, SaveOnSP Exs. 28, 36 (█████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████). And again, any relevant communications would have been captured from

Martin's custodial file, over which a similar search has been run. *See, e.g.*, SaveOnSP Ex. 28

---

[4] Indeed, the only relevant individual on this chain is Martin—and JJHCS long ago ran a similar
search that includes "Xcenda" over Martin's files. *See* Mot. at 6 n.10.

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 10

(███████████████████████████); SaveOnSP Ex. 36 (█████████████

████████████████████).

As to IQVIA, SaveOnSP acknowledges that JJHCS has already run a similar IQVIA-related string over Martin's files—as well as a second IQVIA string over 10 other custodians. As Ingham's supervisor, ████████████████████████████████████

████████████. *See* SaveOnSP Ex. 12 (████████████████████████████████);

SaveOnSP Ex. 20 (████████████████████████████); JJHCS Ex. 8

(JJHCS_00132796 & JJHCS_00132799) (████████████████████████

████████████████████); JJHCS Ex. 9 (JJHCS_00200381) (████████████

████████████████████); JJHCS Ex. 10 (JJHCS_00224061 &

JJHCS_00224062) (████████████████████████████

████████████). And, as detailed above, JJHCS produced hundreds of files from various non-custodial sources that includes all "'final studies, reports, or analysis' prepared by IQVIA that relate to SaveOnSP specifically or to JJHCS's response to accumulators or maximizers, including the CAP program." JJHCS Ex. 7 (Nov. 8, 2024 Ltr. from F. Famakinwa to E. Snow) at 1. It is unclear what more SaveOnSP wishes to glean from Ingham's file on this topic.

## 2. SaveOnSP's "Report" Search String

SaveOnSP's second overbroad search string—(accumulat* OR maximizer*) w/10 (report* OR article* OR post* OR "white paper" OR WP OR analy* OR sponsor* OR partner*)—hits on more than 13,000 documents (with families). *See* Mot. at 7. These include any discussion including the words accumulators or maximizers plus one of eight generic words—and so captures irrelevant material. *See, e.g.*, SaveOnSP Ex. 36 (Best Price); SaveOnSP Ex. 38 (same).

Honorable Freda L. Wolfson, U.S.D.J.
January 17, 2025
Page 11

### 3.    SaveOnSP's "Patient Impact" Search String

SaveOnSP's final search string—(accumulator* OR maximizer* OR CAP) w/15 ((impact*
OR effect*) w/10 (patient* OR equity))—is overbroad in structure and would force JJHCS to
review over 8,000 documents.  *See* Mot. at 7.  Once again, this string is likely to bring in work that
exclusively relates to the Best Price Rule or other irrelevant material.  *See, e.g.*, SaveOnSP Exs.
27, 31 (██████████████████████████████████████████████████████████

██████████████████████    And even if this string did incidentally identify relevant material, it is
still cumulative—JJHCS ran a similar search over Martin's files and produced files from Ingham's
folders on a shared drive.  *See, e.g.*, JJHCS Ex. 11 (JJHCS_00169527) (████████████████

█████████████████████████); SaveOnSP Ex. 21 (████████████████████

█████████████████████████); SaveOnSP Ex. 29 (████████████████████

████████████████████████████████████████████████████████████

██████████████████████████).  SaveOnSP has not identified
any gap in JJHCS's productions to date, and so cannot justify the additional burden of running this
search string across Ingham or any other additional custodians.

*        *        *

For the foregoing reasons, Your Honor should deny SaveOnSP's January 3, 2025 motion.

Respectfully submitted,

s/ *Jeffrey J. Greenbaum*
JEFFREY J. GREENBAUM

cc:    Counsel of record

11

# Exhibit 1



www.pbwt.com

November 21, 2024

Julia Long
(212) 336-2878

**<u>VIA EMAIL</u>**

Elizabeth H. Snow, Esq.
Selendy Gay, PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:     **Search Terms for Agreed-Upon "Non-JJHCS" Custodians**
        *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC,*
        <u>2:23-cv-02632 (JKS) (CLW)</u>

Dear Elizabeth:

        We write in response to SaveOnSP's November 4, 2024 letter regarding SaveOnSP's proposed search terms for Michael Ingham, Sylvia Shubert, Jennifer Goldsack, Michelle Barnard, Cherilyn Nichols, and Pinal Shah and further to our letter of November 1, 2024 regarding the same.

        Thank you for agreeing to narrow some of the search terms for these custodians. However, even your narrowed proposal continues to yield over 56,000 additional search hits (family inclusive). JJHCS has provided a de-duplicated hit report, a total number of documents at issue per custodian, and search hits (with and without families) in **Exhibit A**. As with our prior letters, these numbers reflect only additional documents for JJHCS to review.

        JJHCS is willing to work in good faith with SaveOnSP to resolve the applicable search protocol for these custodians. SaveOnSP's current proposal, however, is unworkable both in volume and because SaveOnSP's expansive demands are untethered to any purported gap in JJHCS's productions to date. As just one example, SaveOnSP demands that JJHCS search five custodians' files—Shubert, Goldsack, Barnard, Nichols, and Shah—for the names "Jody Miller" and "Ron Krawczyk" without articulating any basis for this demand. And, in any event, documents with or regarding SaveOnSP would be captured by variations of the word "SaveOn" that appear in the same term:

- SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR "Jody Miller" OR "Ron Krawczyk"

        In addition, three of SaveOnSP's proposed search terms as to Michael Ingham (listed below) related to a single workstream responsive to Request No. 20 alone elicit over 16,000 documents (family inclusive). This is unduly burdensome, both because this topic has already

Patterson Belknap Webb & Tyler LLP    1133 Avenue of the Americas, New York, NY 10036    T 212.336.2000    F 212.336.2222

15390600

Elizabeth H. Snow, Esq.
November 21, 2024
Page 2

been explored through Silas Martin's custodial documents, and because such documents are at most tangentially related to the claims and defenses at issue.

- (IQVIA OR "Analysis Group" OR Xcenda) w/15 (accumulator* OR maximizer* OR CAP)

- (accumulat* OR maximizer* OR "nonessential health benefit" OR NEHB*) w/15 (report* OR article* OR post* OR "white paper" OR WP OR analy* OR sponsor* OR partner*)

- (accumulator* OR maximizer* OR CAP) w/15 (impact* OR effect*) w/15 (patient* OR equity)

As listed in Exhibit A, several of SaveOnSP's remaining terms are equally overbroad, including those with overbroad proximity limiters[1] and others with no such limiters at all.[2]  As such, JJHCS maintains the objections in its November 1, 2024 letter and asks SaveOnSP to propose a more reasonable set of terms.

We remain available to meet and confer.

Very truly yours,

*/s/ Julia Long*
Julia Long

---

[1] For example, SaveOnSP requests the following term, which includes a "w/50" proximity limiter, be run over Barnard and Nichols's files:  Tiger Team" w/50 (accumulat* OR maximiz* OR copay OR co-pay OR CAP OR CAPa OR CAPm OR "adjustment program").

[2] For example, SaveOnSP requests JJHCS run ("CAP 2023" OR "CAP 23" OR "CAP '23") AND (accumulat* OR maximiz*) over Goldsack, Barnard, Nichols, and Shah's custodial files.

**Exhibit A:  Hit Counts**

| | |
|---|---|
| **Total Search Hits (Deduplicated)** | 20,036 |
| **Total Search Hits + Families (Deduplicated)** | 56,751 |

Custodians:  Michael Ingham, Sylvia Shubert, Jennifer Goldsack, Michelle Barnard, Cherilyn Nichols, and Pinal Shah

Date Range:  April 1, 2016 to November 7, 2023, unless otherwise noted

| Custodian | Total Additional Search Hits | Total Additional Search Hits + Families |
|---|---|---|
| Michael Ingham | 10,631 | 18,918 |
| Sylvia Shubert | 1,222 | 4,221 |
| Jennifer Goldsack | 1,017 | 6,362 |
| Michelle Barnard | 1,661 | 8,395 |
| Cherilyn Nichols | 1,969 | 12,598 |
| Pinal Shah | 3,758 | 6,866 |

1

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| (IQVIA OR "Analysis Group" OR Xcenda) w/15 (accumulator* OR maximizer* OR CAP) | Ingham | 8,830 | 12,174 |
| (accumulat* OR maximizer* OR "nonessential health benefit"OR NEHB*) w/15 (report* OR article* OR post* OR "white paper" OR WP OR analy* OR sponsor* OR partner*) | Ingham | 7,842 | 16,246 |
| (RIS OR RISRx) w/50 (accumulator* OR maximizer* OR CAPm OR CAPa OR "adjustment program")<br><br>Time period:  January 1, 2022 to November 7, 2023 | Nichols; Shah | 1,817 | 3,460 |
| SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR "Jody Miller" OR "Ron Krawczyk" | Shubert; Goldsack; Barnard; Nichols; Shah | 1,703 | 10,942 |
| (STELARA* OR TREMFYA* OR CarePath OR JCP OR "Savings Program") w/25 (6000 OR 6,000 OR limit OR eliminate)<br><br>Time period:  January 1, 2021 to November 7, 2023 | Barnard; Nichols; Shah | 1,367 | 7,427 |
| (accumulator* OR maximizer* OR CAP) w/15 (impact* OR effect*) w/15 (patient* OR equity) | Ingham | 1,348 | 9,382 |
| IQVIA w/15 (accumulat* OR maximiz* OR CAP OR CAPa OR CAPm OR "adjustment program") | Shubert; Goldsack; Barnard; Nichols | 1,276 | 7,473 |
| TrialCard w/25 (accumulator* OR maximizer* OR CAPm OR CAPa OR | Shubert; Goldsack; | 1,044 | 3,830 |

2

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| "adjustment program" OR EHB OR NEHB) | Barnard; Nichols; Shah | | |
| (RIS OR RISRx) w/50 identif*<br><br>Time period: January 1, 2022 to November 7, 2023 | Nichols; Shah | 993 | 2,906 |
| (Janssen OR Jannsen OR Jansen OR CarePath OR "Care Path" OR CP OR JCP OR "Savings Program") AND ((term* w/3 condition) OR T&C OR TNC OR "other offer") AND (maximiz* OR accumulat*) | Shah | 843 | 2,748 |
| ("Express Scripts" OR ESI OR ExpressScripts) w/50 (accumulat* OR maximiz*) | Shubert; Goldsack; Barnard; Nichols; Shah | 777 | 7,502 |
| (CAPa OR CAPm OR "adjustment program") AND (accumulat* OR maximiz*) | Ingham | 770 | 3,400 |
| "This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer" | Shah | 709 | 1,443 |
| (revis* OR rewrit* OR chang* OR maximizer* OR accumulator*) AND ((term* OR condition*) w/50 (Stelara OR Tremfya) w/50 (CarePath OR "Care Path" OR CP OR JCP OR WithMe))<br><br>Time period: January 1, 2021 to November 7, 2023 | Barnard; Nichols; Shah | 624 | 3,307 |
| (CAPa OR CAPm OR "adjustment program") AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulat* OR maximiz*) | Shubert; Goldsack; Barnard; Nichols | 579 | 3,496 |

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| Avalere w/50 (accumulator* OR maximizer* OR mitigat* OR NEHB OR (variable w/5 EHB) OR CAPa OR CAPm OR "adjustment program") | Shubert; Goldsack; Barnard; Nichols | 408 | 3,224 |
| (MR OR (market w/3 (research OR insight OR survey OR intellig*))) w/25 (accumulat* OR maximiz* OR CAP OR CAPa OR CAPm OR "adjustment program") | Nichols | 354 | 1,180 |
| ("CAP 2023" OR "CAP 23" OR "CAP '23") AND (accumulat* OR maximiz*) | Goldsack; Barnard; Nichols; Shah | 337 | 1,687 |
| "Tiger Team" w/50 (accumulat* OR maximiz* OR copay OR co-pay OR CAP OR CAPa OR CAPm OR "adjustment program") | Barnard; Nichols | 335 | 672 |
| ((violat* OR bar* OR prohibit* OR breach* OR preclude* OR allow* OR permit*) w/25 (accumulat* OR maximiz*)) w/40 ("other offer*" OR coupon* OR discount* OR "savings card*" OR "free trial*") | Shubert; Goldsack; Barnard; Nichols; Shah | 331 | 2,325 |
| ((max* w/15 benefit*) w/50 (chang* OR increas* OR decreas*)) w/50 ($20,000 OR $20K OR 20k) | Nichols; Shah | 306 | 1,744 |
| ((additional OR more OR number* OR quantit* OR greater OR impact OR effect OR frequency) w/3 (patient* OR sales OR fill* OR lives)) w/20 (SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulator* OR maximizer*) | Nichols | 219 | 2,147 |

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP | Ingham | 208 | 965 |
| (Accredo OR Acredo) w/50 (accumulat* OR maximiz*) | Shubert; Goldsack; Barnard; Nichols; Shah | 194 | 989 |
| (Fein OR Pembroke OR Adam OR "Drug Channels") AND afein@drugchannels.net AND (SaveOnSP OR accumulat* OR maximiz*) | Shubert; Barnard; Nichols | 140 | 163 |
| ("Drug Channel*" OR ZS OR SunDial OR "Sun Dial") w/50 (accumulat* OR maximiz* OR CAP OR CAPa OR CAPm OR "adjustment program" OR diversion) | Nichols | 138 | 356 |
| Deloitte w/50 (accumulator* OR maximizer* OR mitigat* OR NEHB OR (variable w/5 EHB) OR CAPa OR CAPm OR "adjustment program") | Goldsack | 99 | 430 |
| (essential OR nonessential OR non-essential OR "non essential") w/50 ("Affordable Care Act" OR ACA OR Obamacare) | Shubert | 94 | 362 |
| "save on" w/50 (accumulat* OR maximiz* OR "essential health benefit*" OR EHB* OR "non-essential health benefit*" OR "nonessential health benefit*" OR NEHB* OR accredo ORI ESI OR "express scripts") | Shubert; Goldsack; Barnard; Nichols; Shah | 81 | 376 |
| adher* w/20 (SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulator* OR maximizer*) | Nichols | 74 | 502 |
| "Save On" | Shubert; Goldsack; | 42 | 197 |

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
|  | Barnard; Nichols; Shah |  |  |
| (CAPa OR CAPm OR "adjustment program") AND "Save On" | Shubert; Goldsack; Barnard; Nichols | 22 | 47 |
| Archbow w/50 (accumulator* OR maximizer* OR mitigat* OR NEHB OR (variable w/5 EHB) OR CAPa OR CAPm OR "adjustment program") | Shubert; Nichols; Shah | 5 | 6 |
| (((coupon* OR discount* OR "prescription savings card*" OR "free trial*") w/30 (Janssen OR Jannsen OR Jansen OR CarePath OR "Care Path" OR CP OR JCP OR "Savings Program")) w/100 (accumulat* OR maximiz*)) w/100 (enforc* OR eligib* OR ineligib*) | Shah | 4 | 8 |
| "other offer" w/5 (accumulat* OR maximiz* OR "health plan*" OR insur*) | Shubert; Goldsack; Barnard; Nichols; Shah | 0 | 0 |
| Archbow w/50 "other offer" | Shubert; Nichols; Shah | 0 | 0 |
| Avalere w/50 "other offer" | Shubert; Goldsack; Barnard; Nichols | 0 | 0 |

# **Exhibit 2**

Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
212.390.9000

Selendy|Gay

Hannah R. Miles
Associate
212.390.9055
hmiles@selendygay.com

December 6, 2024

<u>Via E-mail</u>

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
@pbwt.com

**Re:**    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC*** **(Case No.
2:22-cv-02632-JKS-CLW)**

Dear Julia,

SaveOn writes in partial response to J&J's December 3, 2024 letter regarding Mike
Ingham. On August 13, 2024, J&J agreed to add Ingham as a custodian. Aug. 13, 2024 Ltr.
from I. Eppler to E. Snow. Yet after nearly four months of negotiations over search terms,
J&J has not agreed to run any of the search terms that SaveOn proposed.

J&J objects to SaveOn's proposed search terms for Ingham on the basis of burden
and because it claims SaveOn has "neither identified a gap, nor tailored search terms to fill
it." Dec. 3, 2024 Ltr. from J. Long to E. Snow. J&J also claims that because Ingham worked
closely with existing custodian Silas Martin on the subjects at issue, SaveOn's requested
Ingham documents are not relevant. As SaveOn has previously explained, *see* Nov. 26,
2024 Ltr. from E. Snow to J. Long, the number of unique documents returned by SaveOn's
proposed search terms indicate that Ingham conducted relevant work that was not picked
up by Martin's custodial production.

SaveOn has also identified a gap in J&J's production. SaveOn asked for Ingham to
be added as a custodian because he, on behalf of Janssen Scientific Affairs ("JSA"), was
involved in soliciting and overseeing studies from vendors such as IQVIA, Analysis Group,
and Xcenda regarding accumulators, maximizers, and SaveOn, including J&J's responses
to each. *See* July 19, 2024 Ltr. (citing documents); *see also* Apr. 22, 2024 Mot. at 6
("Janssen Scientific Affairs, LLC subsequently executed multiple work orders with the J&J
vendor IQVIA to learn more about copay maximizers and accumulators."). Judge Wolfson
recognized this gap during the July 14, 2024 hearing, where she commented that "[t]here

Julia Long
December 6, 2024

were a lot of things involving Janssen Scientific Affairs also looking to the effects of co-pay accumulators and maximizers," including individuals "emailing IQVIA, which was one of the vendors." July 14, 2024 Tr. at 210:10-16. Judge Wolfson also mentioned Ingham by name in connection with relevant articles and reports that he authored or contributed to regarding accumulators and maximizers. *Id.* at 213:1-6 (commenting on "an email from Mike Ingham … who is an employee of Scientific Affairs reaching out to a USA Today article discussing accumulators and maximizers impact to patients and how co-pay assistance program[s] drive up drug prices"); *id.* at 213:7-12 (commenting on "Ingham drafting an editorial in response to another article about CAP programs aiming to argue that accumulators and maximizers are not helping with patient affordability and instead risk access issues, poor outcomes, and additional cost to patients").

Judge Wolfson ordered J&J to "identify some custodians … from this one entity [JSA] because I do believe they have relevant information." *Id.* at 213:17-21. SaveOn proposed three potential custodians from JSA, and J&J agreed to add only Ingham. The search terms that SaveOn has proposed are targeted at the relevant issues discussed in SaveOn's April 22 motion and recognized by Judge Wolfson during the July 14 hearing. Indeed, the search terms that return the most results are directly targeted to find documents regarding (1) Ingham's work with vendors regarding accumulators, maximizers, and CAP—"(IQVIA OR "Analysis Group" OR Xcenda) w/10 (accumulator* OR maximizer* OR CAP)—and (2) Ingham's work drafting reports, articles, and white papers regarding accumulators, maximizers—(accumulat* OR maximizer* OR "nonessential health benefit" OR NEHB*) w/10 (report* OR article* OR post* OR "white paper" OR WP OR analy* OR sponsor* OR partner*).

In the interest of compromise, SaveOn has attempted to narrow search terms for Ingham's custodial files. In response, J&J stated that, despite the reduced hit counts, it still will not run SaveOn's requested terms over Ingham's files. J&J has not provided a counterproposal. *See* Dec. 3, 2024 Ltr. from J. Long to E. Snow. If J&J is prepared to offer a counterproposal, please do so by December 13, 2024. Otherwise, SaveOn stands by its proposed terms and will consider the parties to be at impasse.

We reserve all rights and are available to meet and confer.

Sincerely,

/s/ Hannah Miles

Hannah R. Miles
Associate

2

# **Exhibit 3**





www.pbwt.com

November 1, 2024

Julia Long
(212) 336-2878

**VIA EMAIL**

Elizabeth H. Snow, Esq.
Selendy Gay, PLLC
1290 Avenue of the Americas
New York, NY 10104

>    Re:     **Search Terms for Agreed-Upon "Non-JJHCS" Custodians**
>             *Johnson & Johnson Health Care Systems, Inc. v. Save On SP, LLC*,
>             **2:23-cv-02632 (JKS) (CLW)**

Dear Elizabeth:

   We write in response to SaveOnSP's September 26, 2024 and October 1, 2024 letters, and further to JJHCS's September 23, 2024 letter regarding SaveOnSP's proposed search terms for Michael Ingham, Sylvia Shubert, Jennifer Goldsack, Michelle Barnard, Cherilyn Nichols, and Pinal Shah, as well as SaveOnSP's requests for certain non-custodial collections related to Janssen Scientific Affairs.

> **I.     Search Terms**

   JJHCS maintains its objections to SaveOnSP's overbroad search term proposal as to these custodians. As you know, in our September 23, 2024 letter, we outlined our objections to SaveOnSP's previous proposal—which would have required JJHCS to review of over 90,000 additional documents (family inclusive) and asked SaveOnSP to narrow its requests.[1] With the exception of three terms limited to Michael Ingham's files, SaveOnSP disregarded this request. Instead, in your October 1, 2024 letter, you failed to provide any meaningful narrowing to your previous proposal and attached seven appendices (including fifteen pages of search terms). Further, you requested that JJHCS provide search hits broken out by custodian and by term (despite JJHCS including such information in its September 23, 2024 letter). To be clear, JJHCS has provided a de-duplicated hit report, a total number of documents at issue per custodian, and search hits (with and without families) in **Exhibit A**. But JJHCS will not run six unique search protocols,

---

[1] In our September 23, 2024 letter, we noted that certain custodial files from Jennifer Goldsack, Cherilyn Nichols, and Pinal Shah were not yet available for searching. Those files have since processed and are reflected in the search hits (with and without families) reflected in Exhibit A.

Patterson Belknap Webb & Tyler LLP     1133 Avenue of the Americas, New York, NY 10036     T 212.336.2000     F 212.336.2222

15299170

Elizabeth H. Snow, Esq.
November 1, 2024
Page 2

which alone is burdensome and disproportionate, particularly when SaveOnSP refuses to meaningfully narrow its proposal.

In addition, SaveOnSP's October 1, 2024 letter includes three terms that were narrowed as to date range or proximity connectors in Judge Wolfson's October 21, 2024 Order, and further clarified in her October 28, 2024 Order. JJHCS has provided hit counts as to the narrowed versions of these three terms (listed below). Even with this narrowing, however, SaveOnSP's proposal would require the review of over 73,000 additional documents (family inclusive).

- (RIS OR RISRx) w/50 (accumulator* OR maximizer* OR CAPm OR CAPa OR "adjustment program"). Time period: January 1, 2022 to November 7, 2023.[2]

- TrialCard w/25 (accumulator OR maximizer OR CAPm OR CAPa OR "adjustment program" OR EHB OR NEHB)

- ((violat* OR bar* OR prohibit* OR breach* OR preclude* OR allow* OR permit*) w/25 (accumulat* OR maximiz*)) w/40 ("other offer*" OR coupon* OR discount* OR "savings card*" OR "free trial*")

Based on the provided hit counts, JJHCS will not run SaveOnSP's proposed terms.

**II.      Non-Custodial Collections Related to Janssen Scientific Affairs**

As stated in our September 23, 2024, letter, JJHCS is willing to make a non-custodial production from Janssen Scientific Affairs responsive to Request Nos. 3, 8, and 20 to the extent such documents exist and can be identified through a reasonable search. We anticipate producing any additional non-privileged, responsive documents in the next month.

As to the remaining requests in your September 26, 2024 letter (Request Nos. 22, 25, and 42), based on a reasonable investigation, JJHCS has not identified additional non-custodial sources with documents responsive to these requests.

We remain available to meet and confer.

Very truly yours,

*/s/ Julia Long*
Julia Long

---

[2] For the same reasons, JJHCS objects to the time period for the following term: (RIS OR RISRx) w/50 identif*.

**Exhibit A:  Hit Counts**

| | |
|---|---|
| **Total Search Hits (Deduplicated)** | 28,148 |
| **Total Search Hits + Families (Deduplicated)** | 73,617 |

Custodians:  Michael Ingham, Sylvia Shubert, Jennifer Goldsack, Michelle Barnard, Cherilyn Nichols, and Pinal Shah

Date Range:  April 1, 2016 to November 7, 2023, unless otherwise noted

| Custodian | Total Additional Search Hits | Total Additional Search Hits + Families |
|---|---|---|
| Michael Ingham | 14,682 | 30,212 |
| Sylvia Shubert | 1,457 | 4,540 |
| Jennifer Goldsack | 1,080 | 6,579 |
| Michelle Barnard | 2,261 | 8,774 |
| Cherilyn Nichols | 4,405 | 16,794 |
| Pinal Shah | 4,530 | 7,375 |

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| (accumulator* OR maximizer* OR CAP) w/25 (impact* OR effect*) w/25 (patient* OR equity) | Ingham | 1,836 | 10,981 |

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| (accumulat* OR maximiz* OR "essential health benefit*" OR EHB* OR "non-essential health benefit" OR "nonessential health benefit" OR NEHB* OR "Affordable Care Act" OR ACA OR Obamacare) w/25 (report* OR article* OR post* OR "white paper" OR WP OR analy* OR sponsor* OR partner*) | Ingham | 11,645 | 27,376 |
| (IQVIA OR "Analysis Group" OR Xcenda) w/15 (accumulator* OR maximizer* OR copay OR co-pay OR CAP) | Ingham | 9,903 | 13,367 |
| (CAPa OR CAPm OR "adjustment program") AND (accumulat* OR maximiz*) | Ingham | 770 | 3,400 |
| SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" Save-On OR SOSP | Ingham | 208 | 965 |
| IQVIA w/15 (accumulat* OR maximiz* OR copay OR co-pay OR CAP OR CAPa OR CAPm OR "adjustment program") | Shubert; Goldsack; Barnard; Nichols | 3,977 | 11,283 |
| (RIS OR RISRx) w/50 (accumulator* OR maximizer* OR CAPm OR CAPa OR "adjustment program")[1] | Nichols; Shah | 1,817 | 3,460 |
| SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR "Jody Miller" OR "Ron Krawczyk" | Shubert; Goldsack; Barnard; Nichols; Shah | 1,703 | 10,942 |

---

[1] SaveOnSP requested a broader time period for this term in its October 1, 2024 letter. JJHCS has provided a hit count for January 1, 2022 to November 7, 2023. *See* Oct. 21, 2024 Order at 3-4.

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| "CAP 2023" OR "CAP 23" OR "CAP '23" | Goldsack; Barnard; Nichols; Shah | 1,637 | 2,877 |
| (STELARA* OR TREMFYA* OR CarePath OR JCP OR "Savings Program") w/25 (6000 OR 6,000 OR limit OR eliminate) | Barnard; Nichols; Shah | 1,367 | 7,427 |
| TrialCard w/25 (accumulator OR maximizer OR CAPm OR CAPa OR "adjustment program" OR EHB OR NEHB)[2] | Shubert; Goldsack; Barnard; Nichols; Shah | 995 | 3,782 |
| (RIS OR RISRx) w/50 identif* | Nichols; Shah | 993 | 2,906 |
| (Janssen OR Jannsen OR Jansen OR CarePath OR "Care Path" OR CP OR JCP OR "Savings Program") AND ((term* w/3 condition) OR T&C OR TNC OR "other offer") AND (maximiz* OR accumulat*) | Shah | 843 | 2,748 |
| ("Express Scripts" OR ESI OR ExpressScripts) w/50 (accumulat* OR maximiz*) | Shubert; Goldsack; Barnard; Nichols; Shah | 777 | 7,502 |
| (MR OR market w/3 (research OR insight OR survey OR intellig*)) w/50 (accumulat* OR maximiz* OR copay OR co-pay OR CAP OR CAPa OR CAPm OR "adjustment program" OR diversion OR divert) | Nichols | 712 | 4,110 |

[2] SaveOnSP requested a broader version of this term— TrialCard w/40 (accumulator* OR maximizer* OR CAPm OR CAPa OR "adjustment program")—in its October 1, 2024 letter. JJHCS has provided a hit count for the terms as narrowed by Judge Wolfson's October 28, 2024 Order.

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| "This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer" | Shah | 709 | 1,443 |
| (revis* OR rewrit* OR chang* OR maximizer* OR accumulator*) AND ((term* OR condition*) w/50 (Stelara OR Tremfya) w/50 (CarePath OR "Care Path" OR CP OR JCP OR WithMe)) | Barnard; Nichols; Shah | 624 | 3,307 |
| (CAPa OR CAPm OR "adjustment program") AND (SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulat* OR maximiz*) | Shubert; Goldsack; Barnard; Nichols | 579 | 3,496 |
| ((max* w/15 benefit*) w/50 (chang* OR increas* OR decreas*)) AND ($20,000 OR $20K OR 20k) | Nichols; Shah | 461 | 3,308 |
| Avalere w/50 (accumulator* OR maximizer* OR mitigat* OR NEHB OR (variable w/5 EHB) OR CAPa OR CAPm OR "adjustment program") | Shubert; Goldsack; Barnard; Nichols | 408 | 3,224 |
| "Tiger Team" w/50 (accumulat* OR maximiz* OR copay OR co-pay OR CAP OR CAPa OR CAPm OR "adjustment program") | Barnard; Nichols | 335 | 672 |
| ((violat* OR bar* OR prohibit* OR breach* OR preclude* OR allow* OR permit*) w/25 (accumulat* OR maximiz*)) w/40 ("other offer*" OR coupon* OR discount* OR "savings card*" OR "free trial*")[3] | Shubert; Goldsack; Barnard; Nichols; Shah | 331 | 2,325 |

---

[3] SaveOnSP requested a broader version of this term— ((violat* OR bar* OR prohibit* OR breach* OR preclude* OR al-low* OR permit*) w/50 (accumulat* OR maximiz*)) w/50 ("other offer*"

4

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| ("Drug Channel*" OR ZS OR SunDial OR "Sun Dial") w/50 (accumulat* OR maximiz* OR copay OR co-pay OR CAP OR CAPa OR CAPm OR "adjustment program" OR diversion OR divert) | Nichols | 266 | 845 |
| ((additional OR more OR number* OR quantit* OR greater OR impact OR effect OR frequency) w/3 (patient* OR sales OR fill* OR lives)) w/20 (SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulator* OR maximizer*) | Nichols | 219 | 2,147 |
| (Accredo OR Acredo) w/50 (accumulat* OR maximiz*) | Shubert; Goldsack; Barnard; Nichols; Shah | 194 | 989 |
| ((coupon* OR discount* OR "prescription savings card*" OR "free trial*") w/30 (Janssen OR Jannsen OR Jansen OR CarePath OR "Care Path" OR CP OR JCP OR "Savings Program")) AND (accumulat* OR maximiz*) AND (enforc* OR eligib* OR ineligib*) | Shah | 178 | 1,131 |
| (Fein OR Pembroke OR Adam OR "Drug Channels") AND afein@drugchannels.net AND (SaveOnSP OR accumulat* OR maximiz*) | Shubert; Barnard; Nichols | 140 | 163 |
| Deloitte w/50 (accumulator* OR maximizer* OR mitigat* OR NEHB OR | Goldsack | 99 | 430 |

---

OR coupon* OR discount* OR "savings card*" OR "free trial*")—in its October 1, 2024 letter. JJHCS has provided a hit count for the terms as narrowed by Judge Wolfson's October 21, 2024 Order.

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| (variable w/5 EHB) OR CAPa OR CAPm OR "adjustment program") | | | |
| (essential OR nonessential OR non-essential OR "non essential") w/50 ("Affordable Care Act" OR ACA OR Obamacare) | Shubert | 94 | 362 |
| "save on" w/50 (accumulat* OR maximiz* OR "essential health benefit*" OR EHB* OR "non-essential health benefit*" OR "nonessential health benefit*" OR NEHB* OR accredo OR ESI OR "express scripts") | Shubert; Goldsack; Barnard; Nichols; Shah | 81 | 376 |
| adher* w/20 (SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP OR accumulator* OR maximizer*) | Nichols | 74 | 502 |
| "Save On" | Shubert; Goldsack; Barnard; Nichols; Shah | 42 | 197 |
| (CAPa OR CAPm OR "adjustment program") AND "Save On" | Shubert; Goldsack; Barnard; Nichols | 22 | 47 |
| Archbow w/50 (accumulator* OR maximizer* OR mitigat* OR NEHB OR (variable w/5 EHB) OR CAPa OR CAPm OR "adjustment program") | Shubert; Nichols; Shah | 5 | 6 |
| "other offer" w/5 (accumulat* OR maximiz* OR "health plan*" OR insur*) | Shubert; Goldsack; Barnard; Nichols; Shah | 0 | 0 |

6

| Search Term Proposed by SaveOnSP | Custodian(s) at Issue | Additional Documents Hitting on Term | Additional Documents Hitting on Term + Families |
|---|---|---|---|
| Archbow w/50 "other offer" | Shubert; Nichols; Shah | 0 | 0 |
| Avalere w/50 "other offer" | Shubert; Goldsack; Barnard; Nichols | 0 | 0 |

7

# EXHIBIT 4

# CONFIDENTIAL FILED UNDER SEAL

# Exhibit 5

# Assessment of racial and ethnic inequities in copay card utilization and enrollment in copay adjustment programs

Mike Ingham, MSc; Kay Sadik, PharmD, PhD; Xiaohui Zhao, PhD; Ji Song, PhD; A. Mark Fendrick, MD

## Plain language summary

This data analysis shows that copay card use does not differ by the race and ethnicity of patients; however, the potential for a patient to be included in a copay adjustment program (CAP) is much higher among non-White patients vs White patients. Non-White patients may therefore be more impacted by this loss of copay assistance, resulting in unexpected clinical and economic concerns.

## Implications for managed care pharmacy

This study evaluated copay card utilization and CAP exposure among commercially insured patients younger than 65 years. The greater exposure of non-White patients to the potential extra financial burden from CAP exposure is an unintended consequence of these programs. Assuming that managed care organizations do not want to worsen existing health care disparities, this evidence suggests that organizations and payers should reconsider or rescind their use.

## Author affiliations

Janssen Scientific Affairs, LLC, Titusville, NJ (Ingham, Sadik, Song); Real-World Evidence, IQVIA, Cambridge, MA (Zhao); Center for Value-Based Insurance Design, University of Michigan, Ann Arbor (Fendrick).

AUTHOR CORRESPONDENCE:
Mike Ingham, 1.267.221.0524;
mingham2@its.jnj.com

*J Manag Care Spec Pharm.*
2023;29(9):1-9

Copyright©2023, Academy of Managed Care Pharmacy. All rights reserved.

## ABSTRACT

**BACKGROUND:** Increases in consumer cost sharing lead to decreases in the use of both high- and low-value care. Copay assistance was designed to reduce out-of-pocket (OOP) cost burden. Commercial insurers have recently instituted copay adjustment programs (CAPs), which exclude copay assistance from deductibles and OOP cost maximums, thereby effectively increasing the financial burden on patients. The utilization of these programs by specific demographic populations is unknown.

**OBJECTIVE:** To assess utilization of copay assistance and CAP exposure in a commercially insured patient population and examine potential differences in the use of each of these programs by non-White and by White patients.

**METHODS:** A retrospective, cross-sectional study using IQVIA Longitudinal Access and Adjudication Data, linked to Experian Marketing Solutions, LLC consumer data, identified unique patients who were younger than 65 years, covered by commercial insurance, had at least 1 pharmacy claim for treatment within prespecified therapeutic areas, and had full financial data visibility on paid claims (ie, nonmissing data on costs associated with the pharmacy claim and the secondary payer) between January 1, 2019, and September 30, 2021. Analyses of copay card use or CAP exposure (defined as the likelihood to be included in the accumulator or maximizer program) between non-White and White patient populations were adjusted for age, gender, household income, patient state of residence, pharmacy benefit manager, state-level CAP policy, and overall drug cost.

**RESULTS:** In total, 4,073,599 unique patients (5.6% of the total database population) were included in the copay card analysis. In adjusted analyses, there were no significant differences in copay card utilization between non-White patients and White patients (odds ratio [OR] = 0.995, 95% CI = 0.99-1.00; $P$=0.0964). However, among copay card users, non-White patients were significantly more likely to be exposed to CAPs, as either maximizers (OR = 1.27, 95% CI = 1.22-1.33; $P$<0.0001) or accumulators (OR = 1.31, 95% CI = 1.26-1.36; $P$<0.0001), compared with White patients.

**CONCLUSIONS:** In an adjusted analysis of this selected sample of a commercially insured population, there was no difference in the use of copay cards between non-White and White patients. CAP exposure, however, was significantly higher among non-White

CONFIDENTIAL

JJHCS_00139002

patients. This increased exposure suggests a disproportionate effect due to this reduction in copay assistance benefits, which has the potential to exacerbate racial and ethnic disparities in access to medications.

Over the past 5 years, patients have faced approximately 25% higher cost sharing for prescription medication, mostly driven by changes in plan design.[1-4] Increased consumer cost sharing has been shown to negatively affect evidence-based medication utilization and worsen health disparities.[1,5] In an attempt to mitigate the negative clinical impact of out-of-pocket (OOP) costs on medication use, patient assistance programs—usually offered as copay cards—support patients in offsetting cost-sharing components of prescription medication within their health benefits plan.[4,6-8] Notably, programs that reduce OOP costs for patients improve medication adherence, facilitate access to preventive care services, and could reduce racial and/or ethnic health disparities.[9-11]

In recent years, payers (ie, pharmacy benefit managers [PBMs] and insurers) have introduced copay adjustment programs (CAPs) that block the funds provided by copay assistance from applying toward patients' deductibles and OOP cost maximums.[12-14] Two primary forms of CAPs, known as copay accumulators and maximizers, have an impact on patients' costs in different ways.[13,14] In accumulator programs, the payments made with copay cards do not count against the patients' deductibles or the OOP cost maximums. Therefore, these programs may increase the patients' total cost-sharing burden and potentially lead to unexpected, substantial midyear expenses.[6,15,16] In maximizer programs, the total annual benefit is allowed to increase up to the maximum amount that a manufacturer is willing to reimburse patients for their copay expense.[13] This amount is distributed across a patient's benefit year to equalize the use of these available funds. These maximizer programs still do not count toward a patient's deductible or OOP cost maximum within a given year and can delay a patient's ability to reach this benefit threshold, leaving the patient exposed to further costs related to other medications or illnesses. Both accumulator and maximizer programs are associated with a negative impact on treatment adherence and persistence of patients.[10,11]

Given the potential positive effects of copay assistance and the possible negative effects of CAPs on patient behavior, medication adherence, and health care disparities, it is important to better understand how often these programs are used and how their use varies across patient demographics. Accordingly, this study aims (1) to quantify

the use of copay cards and assess their utilization across race and ethnicity groups, and similarly, (2) to measure CAP exposure among copay card users and CAP exposure by race and ethnicity within the commercially insured patient population, across 7 major therapeutic areas in which copay assistance and corresponding CAPs are commonly in place (cardiovascular and metabolic diseases, immunology, infectious diseases, multiple sclerosis, oncology, pulmonary arterial hypertension, and schizophrenia). These therapeutic areas were selected because of their relatively high disease burden as well as their expected claim volume to allow copay card and CAP exposure analyses based on retail/specialty pharmacy and commercial mix and variations in wholesale acquisition cost price within the therapeutic area. According to an August 2020 report on medication spending in the United States,[17] the therapeutic areas included here are within the top 10 therapeutic classes for nondiscounted spending.

## Methods

### DATA SOURCES AND STUDY DESIGN

This retrospective, cross-sectional study used data on paid claims from the IQVIA Longitudinal Access and Adjudication Data (LAAD) 1:1 matched to Experian Marketing Solutions, LLC consumer data between January 1, 2019, and September 30, 2021 (study period). The IQVIA LAAD is a comprehensive patient longitudinal dataset that captures claims with information on adjudicated dispensed prescriptions sourced from retail, mail, long-term care, and specialty pharmacies. The Experian Marketing Solutions, LLC, consumer data are a multisourced, compiled repository containing known as well as derived and probabilistic information, among adults (aged ≥18 years) and are referred to as consumer marketing attributes data.

### PATIENT SELECTION

An adapted version of the CONSORT (Consolidated Standards of Reporting Trials) flowchart, used solely to help visualize the patient selection process for this study, is shown in Figure 1. A checklist for STROBE (STrengthening the Reporting of OBservational studies in Epidemiology) is included in Supplementary Table 1 available in online article. Patients included in this study were originally sourced from the IQVIA LAAD and were required to be part of a commercial insurance plan with at least 1 pharmacy claim (hence excluding medical buy and bill claims) that included reliable payer information to have a record of an active claim in all 3 years from January 1, 2019, to September 30, 2021, as a proxy of continuous enrollment and were assigned to a therapeutic area based on receiving treatment within

CONFIDENTIAL

JJHCS_00139003

## FIGURE 1 | Flowchart of Patient Selection



CAP = copay adjustment program; LAAD = Longitudinal Access and Adjudication Data; PBM = pharmacy benefit manager; Rx = pharmacy.

prespecified therapeutic areas of interest (ie, cardiovascular and metabolic diseases, immunology, infectious diseases, multiple sclerosis, oncology, pulmonary arterial hypertension, and schizophrenia) according to the National Drug Codes (Supplementary Table 2). These patients were matched to patients with linkable consumer marketing attributes data. Linking was performed based on a patented and proprietary encryption algorithm by using unique patient identification numbers that were created from patient-level information, including first name, last name, date of birth, gender, and 5-digit zip code.[18,19] This deterministic matching algorithm is Health Insurance Portability

CONFIDENTIAL

JJHCS_00139004

**4  Inequities in copay adjustment programs**

| TABLE 1 | Patient CAP Classification | | |
|---|---|---|---|
| **Patient CAP classification[a,b]** | **Description** | | |
| Maximizers | • Patients with ≥3 prescriptions at the same high initial patient cost exposure for a product within a therapeutic area | | |
| Accumulators[c] | • Patients with ≥3 prescriptions with a high patient cost exposure that are >50% of a treatment's WAC price | | |
| | • Patients with high annual cumulative patient cost exposures (eg, >$10,000 in a given year) across ≥3 prescriptions of the same treatment | | |
| | • Patients with unsuccessful mitigation by the manufacturer, shown as ≥2 prescriptions with equal and high copay card buydown amounts with minimal decreases in patient cost exposures over time | | |
| | • Patients who have ≥3 prescriptions with high patient cost exposure that are decreasing by copay card program PALA amounts | | |
| Neither | • Patients not meeting above criteria | | |

[a]All patients were first identified as commercial copay card users with activity every year from January 1, 2019, to September 30, 2021, with valid payer information of PALA amounts; all categories were mutually exclusive.
[b]Race and ethnicity was categorized as non-White (African American, Central and Southwest Asian, Far Eastern Polynesian, Hispanic, Native American, Southeast Asian, and other) and White.
[c]Patients meeting the first criterion and any other criteria were classified as accumulators.
CAP=copay adjustment program; PALA=pay-as-little-as; WAC=wholesale acquisition cost.

and Accountability Act (HIPAA)–compliant and achieves a balance between false positive (~2%) and false-negative (~3%) rates. Patients matched to Experian data skewed as slightly older vs those unmatched, as Experian data are limited to adult patients only.

To assess the risk of patient selection bias, sensitivity analysis focused on areas with the largest attrition losses (ie, when matching to consumer marketing attributes data and when requiring full financial data), in which before and after attrition loss comparisons assessed differential losses by race and ethnicity (and other demographics) that might impact either of the primary comparison cohorts (White vs non-White patients). No systematic underrepresentation was uncovered.

This resulting population was used to generate the 2 analytic populations. (1) Population for copay card analysis: Patients with null or missing data values for age, gender, race and ethnicity, household income, state of residence, PBM, state-level CAP policy, and overall drug cost data (ie, with full financial data visibility and nonmissing primary payment amount), or nonrepresentative age data (ie, excluding those aged ≥65 years or in Medicare/Medicaid plans) were excluded (detailed definitions in Supplementary Table 3). The resulting populations were further categorized into copay card users and non–copay card users. (2) Population for CAP analysis: Among copay card users only, patients with insufficient or incomplete cost data, and null or missing data values for age, gender, race and ethnicity, household income, state of residence, PBM, state-level CAP policy, and overall drug cost data, or nonrepresentative age data, were excluded. The resulting population constituted patients with

sufficient data for CAP analysis (CAP-exposed patients vs nonexposed patients). Within this CAP analysis population, patients were categorized into 3 mutually exclusive cohorts in the following order: maximizers, accumulators, or neither.

Product-specific, therapeutic area–specific, and general flagging were conducted according to IQVIA primary and secondary payer identification expertise and corresponding cost data to determine whether the patient ever used a copay card or was exposed to a CAP in a therapeutic area of interest during the study period.

### IDENTIFICATION OF PATIENTS USING COPAY CARDS
The National Drug Code numbers recorded in the IQVIA LAAD database identified patients with branded, generic, and biosimilar drug use. Patients were required to have at least 1 claim for each of the 3 years to be flagged as copay card users. Both general and product-specific flagging were used to identify copay card usage. General flagging was based on known copay card vendors (eg, OPUS, Mckesson) flagged and observed in the data. Product-specific flagging was based on a pay-as-little-as amount and buydown amount that aligned with the design parameters of the product-specific copay support design.

### IDENTIFICATION OF PATIENTS EXPOSED TO ACCUMULATOR AND MAXIMIZER PROGRAMS
Table 1 summarizes the 3 classified CAP analysis cohorts following the prespecified rules below. Patients were required to have at least 3 claims per year to be flagged as CAP-exposed patients. General flagging for CAP prevalence was based on annual patient cost exposure amounts over the

CONFIDENTIAL

JJHCS_00139005

course of a given year. Therapeutic area–specific flagging for CAP prevalence was based on patient cost exposures, patient cost exposures relative to overall treatment cost, and copay card buydown amounts over a given year.

The accumulator cohort included (1) patients who were exposed to consistently high OOP costs per claim and (2) patients with annual cumulative OOP costs greater than $10,000 as a reasonable OOP maximum depending on prespecified therapeutic areas (Table 1).

The IQVIA data enable identification of the cost that a patient is asked to pay based on their insurance coverage (primary exposure) as well as any copay card support that the patient is using to offset their costs. Inclusion of patients who repeatedly face greater than 50% of their treatment's wholesale acquisition cost price ensures they are patients who are not on common commercial coinsurance benefit designs, as average common coinsurance rates for formulary tiers that include the products in this study range from 25% to 37%.[20]

In addition, the high annual cumulative cost exposure threshold is set to more than $10,000 to ensure the accumulated cost exposure exceeds the OOP maximum limits that have been set by the Affordable Care Act.[21] In 2019, the Affordable Care Act OOP maximum limit was $7,900 for self-only coverage. A 2022 Kaiser Family Foundation report on employer health benefits lists the maximum for various types of high-deductible health plans at less than $6,000.[20] Hence, this criterion is set to ensure that patients who are in traditional high-deductible health plans (with no accumulator) are not being classified as exposed to accumulators.

The maximizer cohort included patients facing costs consistent with known relevant program annual limits divided by 8 to 12 fills.

Patients who fit into both accumulator and maximizer categories were included in the maximizer cohort. Patients who were not categorized into either CAP program formed the neither cohort (non-CAP cohort).

## OUTCOME AND COVARIATES

Patient demographic characteristics (ie, age, gender, and state of residence), PBM, and overall drug cost were reported based on data from the IQVIA LAAD database. Patient household income and race and ethnicity were reported based on the matched consumer marketing attributes data. Overall drug cost was calculated based on total drug costs for a given year across all LAAD medication claims from January 1, 2019, to December 31, 2021. Primary analysis assessed the prevalence differences by race and ethnicity for copay assistance use vs non-copay assistance use and for CAP exposure vs non-CAP exposure cohorts. Per the primary objectives, patients in each cohort were

categorized as non-White based on racial and ethnic minority groups vs White. Non-White included patients identified as African American, Central and Southwest Asian, Far Eastern Polynesian, Hispanic, Native American, Southeast Asian, and other. Covariates included age, gender, household income, state of residence, whether that state had an existing legislative ban on CAP programs, drug cost exposure in the previous year, and PBM.

## STATISTICAL ANALYSES

All categorical variables were summarized with frequencies and percentages. All continuous variables were summarized with measures of central tendency (mean, median, SD, interquartile range, minimum, and maximum). Multivariable logistic regression and multinomial logistic regression were conducted to examine the association of race and ethnicity with copay card utilization and CAP exposure, respectively, adjusting for age, gender, household income, patient state of residence, PBM, state-level CAP policy, and overall annual drug cost. All analyses were conducted assuming a 2-tailed test of significance and an α level set a priori at 0.05 by using R Release 4.0.3 (R Foundation for Statistical Computing, Vienna).

## ETHICS STATEMENT

In this study, the dataset was constructed according to HIPAA-compliant processes. An IQVIA-patented, proprietary encryption algorithm created a unique patient identification number based on actual patient information (first name, last name, date of birth, gender, and zip code). This encryption tool was deployed across IQVIA's data suppliers (ie, LAAD and Experian in this study) to deidentify patient data at the source. The data subsequently underwent a deterministic matching algorithm process, which used actual patient information, to be assigned a unique and persistent IQVIA patient identification number, which was used to match patients between LAAD and Experian Marketing Solutions, LLC, consumer data. This matching algorithm achieved a balance between false-positive (~2%) and false-negative (~3%) rates. Ethics approval was not required because the study was conducted using HIPAA-compliant, deidentified data.

# Results

## STUDY POPULATION

Of the 72,548,472 unique patients in the LAAD database, 7,211,361 were eligible for copay card utilization or CAP exposure analyses (Figure 1). The population for copay card analysis included 4,073,599 patients whose data contributed to the multivariable logistic regression model (Figure 1).

CONFIDENTIAL    JJHCS_00139006

**6** Inequities in copay adjustment programs



**FIGURE 2** | OR of the Likelihood of Copay Card Utilization for Non-White Patients vs White Patients (Adjusted)

Patient count

| All (N) | 4,073,599 |
|---|---|
| Non-White (n) | 805,211 |
| White (n) | 3,268,388 |

[a]P = 0.0964 for non-white patients vs White.
Dashed line represents OR = 1.
OR = odds ratio.



**FIGURE 3** | OR of the Likelihood of CAP Exposure for Non-White Patients vs White Patients (Adjusted)

Patient count

| All (N) | 172,374 |
|---|---|
| Non-White (n) | 28,706 |
| White (n) | 143,668 |

[a]P < 0.0001 for non-White Patients vs White.
Dashed line represents OR = 1.
CAP = copay adjustment program; OR = odds ratio.

The population for CAP analysis included 172,374 patients who met inclusion criteria (0.24% of the initial total LAAD database); these patients' data contributed to the multinomial logistic regression model.

### COPAY CARD UTILIZATION BY RACE AND ETHNICITY

Of 4,073,599 patients in the copay card analysis, 1,257,931 patients (30.9%) were classified as copay card users. The demographic distribution of the primary comparison cohorts (White vs non-White patients) for copay card users and non-copay card users, overall and across each therapeutic area studied, is included in Supplementary Table 4. Among non-White patients (n = 805,211), 232,552 (28.9%) were copay card users. Among White patients (n = 3,268,388), 1,025,379 (31.4%) were copay card users. In adjusted analyses, there was no significant difference in use vs nonuse of copay cards between non-White patients and White patients (odds ratio [OR] = 0.995, 95% CI = 0.99-1.00; P = 0.0964) (Figure 2) when adjusting for covariates.

### CAP EXPOSURE BY RACE AND ETHNICITY

Of 172,374 patients in the CAP analysis, 15,654 (9.1%) patients were exposed to CAPs; 7,298 (4.2%) were classified as maximizers, 8,356 (4.8%) as accumulators, and 156,720 (90.9%) as "neither" (Figure 1). Among non-White patients (n = 28,706), 3,124 (10.9%) were exposed to CAPs. Among White patients (n = 143,668), 12,530 (8.7%) were exposed to CAPs. Non-White patients (n = 28,706; 16.7%) were significantly more likely to be exposed to CAPs as either maximizers (OR = 1.27, 95% CI = 1.22-1.33; P < 0.0001) or accumulators (OR = 1.31, 95% CI = 1.26-1.36; P < 0.0001) (Figure 3) compared with White patients (n = 143,668; 83.3%). Results were adjusted for the same covariates as with the copay prevalence comparisons.

## Discussion

This adjusted analysis examined the copay card utilization and CAP exposures and differences between non-White

CONFIDENTIAL

JJHCS_00139007

patients and White patients across a range of therapeutic areas for which copay cards and CAPs are commonly implemented. To our knowledge, this is the first study evaluating copay card utilization and CAP exposure by patient demographics, particularly for historically marginalized populations, while accounting for other patient characteristics. Our results showed that there was no significant difference in copay card utilization between non-White patients and White patients. However, compared with White patients, non-White patients were significantly more likely to be exposed to CAPs as either maximizers or accumulators.

A recent online MarketWatch article succinctly highlights the potential plan issues related to CAP exposure.[22] The article suggests that the CAP plan provisions are opaque to patients and difficult for them to avoid, even in situations in which there are no less expensive therapeutic alternatives to a prescribed medication, leaving patients unknowingly exposed to high levels of cost sharing and burden. Our current research suggests this exposure may be borne disproportionally by historically marginalized populations. As for consequences, a study by Sherman et al[6] suggests that CAP implementation leads to significant reductions in autoimmune specialty-drug adherence and persistence. Related to the potential to increased patient cost sharing, Chandra et al, in a National Bureau of Economic Research working paper,[23] demonstrated that whereas random increases in OOP costs of as little as $10.41 per drug caused a 22.6% drop in total drug consumption, it also caused a 32.7% increase in monthly mortality, which was traced to cutbacks in life-saving medications. Furthermore, in a retrospective analysis, Lewey et al[24] demonstrated that reducing copayments for statins improved adherence rates, particularly among communities with higher proportions of Black residents (6%; $P < 0.0001$).

Combining these potential implications of cost burden as a result of CAP application and differential CAP exposure, as found in this study, risks further exacerbation of the effects of health plan designs and cost sharing on historically marginalized racial and ethnic groups.[25]

## LIMITATIONS

This study has a number of important limitations. First, matching patients across 2 different databases may have excluded some patients of interest. In these analyses, this would have biased the results only in the event that the methodologic approach differentially excluded non-White populations. Second, although a proxy for continuous enrollment was used in the study, specific enrollment data cannot be definitively ascertained in the study database, which is often the case with claims-based datasets. Third, given the

sample used, the study results may not be generalizable (1) beyond the prespecified therapeutic areas included in the current analysis, (2) at the level of each individual therapeutic area, (3) beyond those younger than 65 years (as data on patients aged 65 years or older were unreliable/incomplete, and, hence, these patients were excluded from the study), or (4) beyond the commercially insured population based on the selected product sample used. Fourth, the study results may be affected by confounding factors (eg, disease severity, comorbidities, and work-type specifics) that were not explicitly captured in the study, although the prior year's drug cost served as a surrogate for severity/comorbidities. Commercially insured patients were assumed to be employed; however, employer-level data were not available for this study. Fifth, the primary research question sought to compare CAP exposure and is, by necessity, only applicable within the subset of the population that uses a copay card. Last, classifying patients per therapeutic area using National Drug Code numbers vs diagnosis codes may lead to some misclassification, similar to that associated with compiled vs self-reported consumer marketing attributes data. CAP flagging also requires visibility into a minimum number of claims and full cost data, which had an effect on sample size. Although we have used all available financial information, including known details of product-specific copay assistance programs, to assign CAP exposure, and because PBMs and payers do not explicitly identify maximizers and accumulators within the IQVIA LAAD dataset, there remains risk of some CAP misclassification. Some of these limitations could potentially underrepresent CAP prevalence, although we found no clear indication that there is systematic underrepresentation in one population of interest vs the other (eg, non-White vs White) that may impact the primary research question.

## Conclusions

This real-world, retrospective, adjusted analysis provided first-of-its-kind evidence that copay card use is not associated with race and ethnicity disparities and that CAP exposure is significantly higher among non-White patients. Non-White patients may therefore be disproportionately impacted by a net financial loss of copay assistance, resulting in unintended clinical and economic consequences. There is currently a national call to action to implement policies to reduce racial and ethnic health disparities. Thus, the CAP exposure risks identified here, including the lack of differential use of copay assistance by race and ethnicity and negative equity effects from CAP exposure, should warrant their reconsideration.

CONFIDENTIAL

JJHCS_00139008

## DISCLOSURES

This study was sponsored by Janssen Scientific Affairs, LLC. Mr Ingham, Dr Sadik, and Dr Song are employees of Janssen Scientific Affairs, LLC. Dr Zhao is an employee of IQVIA. Dr Fendrick is a consultant for AbbVie, Amgen, Bayer, CareFirst BlueCross BlueShield, Centivo, Community Oncology Association, Covered California, EmblemHealth, Exact Sciences, Freedman Health, GRAIL, Harvard University, Health & Wellness Innovations, Health at Scale Technologies, HealthCorum, Hygeia, MedsIncontext, MedZed, Merck, Mercer, Montana Health Cooperative, Pair Team, Penguin Pay, Phathom Pharmaceuticals, Proton Intelligence, Risalto Health, Risk International, Sempre Health, Silver Fern Health, State of Minnesota, Teladoc Health, US Department of Defense, Virginia Center for Health Innovation, Wellth, Wildflower Health, Yale New Haven Health System, and Zansors; received research funds from Agency for Healthcare Research and Quality (AHRQ), Boehringer-Ingelheim, Gary and Mary West Health Policy Center, Arnold Ventures, National Pharmaceutical Council, Patient-Centered Outcomes Research Institute (PCORI), Pharmaceutical Research and Manufacturers of America (PhRMA), Robert Wood Johnson (RWJ) Foundation, State of Michigan/The Centers for Medicare & Medicaid Services (CMS); and has an outside position at the American Journal of Managed Care (AJMC; co-editor), Medicare Evidence Development & Coverage Advisory Committee (MEDCAC) member, VBID Health (partner).

## ACKNOWLEDGMENTS

This study was sponsored by Janssen Scientific Affairs, LLC. The authors thank Patrick Mayne, a previous employee of IQVIA, for analysis support. Medical writing support was provided by Panita Maturavongsadit, PhD, of Lumanity Communications Inc., and was funded by Janssen Scientific Affairs, LLC.

## REFERENCES

1. Goldman DP, Joyce GF, Zheng Y. Prescription drug cost sharing: Associations with medication and medical utilization and spending and health. JAMA. 2007;298(1):61-9. doi:10.1001/jama.298.1.61

2. Shrank WH, Fox SA, Kirk A, et al. The effect of pharmacy benefit design on patient-physician communication about costs. J Gen Intern Med. 2006;21(4):334-9. doi:10.1111/j.1525-1497.2006.00402.x

3. Kaiser Family Foundation. Employer health benefits: 2020 summary of findings. Accessed October 24, 2022. https://files.kff.org/attachment/Summary-of-Findings-Employer-Health-Benefits-2020.pdf

4. Wedell K. Is prescription copay assistance contributing to rising drug prices? Why buyers should beware. USA Today. Accessed November 16, 2022. https://www.usatoday.com/story/money/2022/11/01/prescription-copay-assistance-role-rising-drug-prices/10555488002/

5. Chernew M, Gibson TB, Yu-Isenberg K, Sokol MC, Rosen AB, Fendrick AM. Effects of increased patient cost sharing on socioeconomic disparities in health care. J Gen Intern Med. 2008;23(8):1131-6. doi:10.1007/s11606-008-0614-0

6. Sherman BW, Epstein AJ, Meissner B, Mittal M. Impact of a co-pay accumulator adjustment program on specialty drug adherence. Am J Manag Care. 2019;25(7):335-40.

7. Howard DH. Drug companies' patient-assistance programs--helping patients or profits? N Engl J Med. 2014;371(2):97-9. doi:10.1056/NEJMp1401658

8. Dafny LS, Ody CJ, Schmitt MA. Undermining value-based purchasing - lessons from the pharmaceutical industry. N Engl J Med. 2016;375(21):2013-5. doi:10.1056/NEJMp1607378

9. Agarwal R, Gupta A, Fendrick AM. Value-based insurance design improves medication adherence without an increase in total health care spending. Health Aff (Millwood). 2018;37(7):1057-64. doi:10.1377/hlthaff.2017.1633

10. Norris HC, Richardson HM, Benoit MC, Shrosbree B, Smith JE, Fendrick AM. Utilization impact of cost-sharing elimination for preventive care services: A rapid review. Med Care Res Rev. 2022;79(2):175-97. doi:10.1177/10775587211027372

11. Choudhry NK, Bykov K, Shrank WH, et al. Eliminating medication copayments reduces disparities in cardiovascular care. Health Aff (Millwood). 2014;33(5):863-70. doi:10.1377/hlthaff.2013.0654

12. Walsh BS, Kesselheim AS. CAAP rule and prescription drug prices. Am J Manag Care. 2021;27(8):312-4. doi:10.37765/ajmc.2021.88613

13. American Society of Clinical Oncology. Policy brief: Copay accumulators and copay maximizers. Accessed October 14, 2022. https://www.asco.org/sites/new-www.asco.org/files/content-files/advocacy-and-policy/documents/2021-AccumulatorsPolicyBrief.pdf

14. American Society of Clinical Oncology. Position statement: Copay accumulators and copay maximizers. Accessed October 14, 2022. https://www.asco.org/sites/new-www.asco.org/files/content-files/advocacy-and-policy/documents/2021-CopayAccumulatorsStatement.pdf

15. Migliara G. Accumulator adjustment programs lead to surprise out-of-pocket costs and nonadherence, analysis finds. PhRMA Foundation. Accessed October 18, 2022. https://catalyst.phrma.org/accumulator-adjustment-programs-lead-to-surprise-out-of-pocket-costs-and-nonadherence-analysis-finds

16. Ford C. Copay accumulators and the impact on patients. Xcenda. Accessed October 18, 2022. https://www.xcenda.com/insights/copay-accumulators-and-the-impact-on-patients

17. IQVIA. Medicine spending and affordability in the U.S.: Understanding patients' costs for medicines. Updated August 4, 2020. Accessed May 30, 2023. https://www.iqvia.com/insights/the-iqvia-institute/reports/medicine-spending-and-affordability-in-the-us

18. Ober NS, Grubmuller J, Farrell M, et al. System and method for generating de-identified health care data. US Patent 6,732,113/7,376,677. United States Patent and Trademark Office. January 4, 2011.

19. Zubeldia K, Romney GW. Anonymously linking a plurality of data records. US Patent 6,397,224. United States Patent and Trademark Office. May 28, 2002.

CONFIDENTIAL

JJHCS_00139009

20. Kaiser Family Foundation. 2022 Employer health benefits survey. Updated October 27, 2022. Accessed May 30, 2023. https://www.kff.org/health-costs/report/2022-employer-health-benefits-survey/

21. US Centers for Medicare & Medicaid Services. Out-of-pocket maximum/limit. Accessed May 30, 2023. https://www.healthcare.gov/glossary/out-of-pocket-maximum-limit/

22. Laise E. War over drug-cost assistance traps sickest patients in the middle. MarketWatch. Accessed January 6, 2023. https://www.marketwatch.com/story/war-over-drug-cost-assistance-traps-sick-est-patients-in-the-middle-11664818784

23. Chandra A, Flack E, Obermeyer Z. The health costs of cost-sharing. National Bureau of Economic Research. Accessed January 6, 2023. https://www.nber.org/papers/w28439

24. Lewey J, Shrank WH, Avorn J, Liu J, Choudhry NK. Medication adherence and healthcare disparities: Impact of statin co-payment reduction. *Am J Manag Care.* 2015;21(10):696-704.

25. Straw T. Trapped by the Firewall: Policy changes are needed to improve health coverage for low-income workers. Center on Budget and Policy Priorities. Updated December 3, 2019. Accessed December 3, 2019. https://www.cbpp.org/research/health/trapped-by-the-firewall-policy-changes-are-needed-to-improve-health-coverage-for

CONFIDENTIAL

JJHCS_00139010

# Exhibit 6

Selendy Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212.390.9000

Selendy|Gay

Elizabeth Snow
Associate
212.390.9330
esnow@selendygay.com

July 19, 2024

**Via E-mail**

Julia Long
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

Re:    *JJHCS v. SaveOnSP (Case No. 2:22-cv-02632-JKS-CLW)*

Dear Julia,

We write pursuant to Judge Wolfson's order regarding Janssen Scientific Affairs ("Scientific").

*First*, we ask that J&J add Scientific employees Mike Ingham, Kay Sadik, and Bridget Doherty as custodians. ████████████████████████████████████
███████████████ Doherty was involved in █████████████████████

---

[1] *See, e.g.,* ████████████████████████████████

Julia Long
July 19, 2024



We propose the following search terms for their documents for the full discovery time period of April 1, 2016 to November 7, 2023:

- SaveOnSP OR SaveOn OR "Save On SP" OR "Save OnSP" OR Save-On OR SOSP



- (CAPa OR CAPm OR "adjustment program") AND (accumulat* OR maximiz*)

*Second*, we ask that J&J produce from non-custodial sources documents associated with the following requests, also from the full discovery time period:

- Request No. 3: Documents Sufficient to show Janssen Scientific Affairs' organizational structure, including organizational charts.

- Request No. 8: All documents and Communications with or regarding SaveOnSP.

---

[2] *See also* 

Julia Long
July 19, 2024

- Request No. 20: All Documents and Communications regarding any publicly distributed material (including, for example, articles, op-eds, white papers, and online postings) regarding SaveOnSP, Copay Accumulator Services, or Copay Maximizer Services, including Documents and Communications regarding JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect involvement with such material and JJHCS's, Janssen's, or any JJHCS Hub Entity's direct or indirect funding of the authors, publishers, or distributors of such material.

- Request No. 22: All Documents and Communications regarding any alleged harm caused by SaveOnSP to any Patient by allegedly making their healthcare more expensive, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 114.

- Request No. 25: All Documents and Communications regarding any alleged harm caused by SaveOnSP to JJHCS, including Documents and Communications regarding JJHCS's allegations in Complaint ¶ 110, 115.

- Request No. 42: All Documents and Communications relating to JJHCS's or any JJHCS Hub Entity's understanding of the terms "copay accumulator" and "copay maximizer."

- Request No. 49: All Documents and Communications regarding efforts by JJHCS, Janssen, a JJHCS Hub Entity, or other entity working on any of their behalves to (a) identify (through non-litigation means) individuals enrolled in CarePath as members of SaveOnSP-advised plans; or (b) to enforce CarePath's terms and conditions against those individuals, including without limitation by reducing the amount of copay assistance funds provided to those individuals or by disenrolling those individuals from CarePath.

*Finally*, if Scientific employees other than Ingham, Sadick, and Doherty worked on these topics, please identify them.

We ask that you respond by July 26, 2024. We reserve all rights, and are available to meet and confer.

Sincerely,

/s/ Elizabeth H. Snow

Elizabeth H. Snow
Associate

3

# Exhibit 7



www.pbwt.com

November 8, 2024

Folasade K. Famakinwa
(212) 336-2202

**By Email**
Elizabeth Snow, Esq.
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104

Re:    ***Johnson & Johnson Health Care Systems Inc. v. Save On SP, LLC,
Case No. 2:22-cv-02632 (JKS) (CLW)***

Dear Elizabeth:

We write in response to SaveOnSP's October 17, 2024 letter regarding JJHCS's productions related to IQVIA and SaveOnSP's October 25, 2024 letter seeking consent to share with IQVIA a document produced by JJHCS.

First, we continue to disagree with your characterization of JJHCS's prior offer to conduct a noncustodial search for "'final studies, reports, or analysis' prepared by IQVIA that relate to SaveOnSP specifically or to JJHCS's response to accumulators or maximizers, including the CAP program," for the reasons stated in our October 4, 2024 letter. However, in the interest of compromise and to avoid a dispute, we agree to undertake such a search. We anticipate producing any additional non-privileged, responsive documents (to the extent they exist) in the next month.

Second, we do not consent to SaveOnSP sharing JJHCS_00279371 with IQVIA because the document is irrelevant. Based on a reasonable investigation, we understand that the ███████████████. As you know, the Special Master has held that "[w]hat matters for purposes of liability and damages are not the changes that Plaintiff contemplated implementing, but actual changes that occurred." *E.g.*, Feb. 6, 2024 Order at 19. Accordingly, there is no basis for SaveOnSP to share JJHCS_00279371.

Very truly yours,

*/s/Folasade K. Famakinwa*
Folasade K. Famakinwa

# EXHIBITS 8-11

## CONFIDENTIAL FILED UNDER SEAL