SILLS CUMMIS & GROSS P.C.
Jeffrey J. Greenbaum
Katherine M. Lieb
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

LINKLATERS LLP
Adeel A. Mangi
George LoBiondo
Patrick Ashby (admitted *pro hac vice*)
Sara A. Arrow
Julia Long (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
(212) 903-9000

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., | : | |
| | : | Civil Action No. 22-2632 (CCC) (CLW) |
| Plaintiff, | | |
| vs. | : | Jury Trial Demanded |
| SAVE ON SP, LLC, EXPRESS SCRIPTS, INC., and ACCREDO HEALTH GROUP, INC. | : | **THIRD AMENDED COMPLAINT** |
| | : | |
| Defendants. | : | |

Plaintiff Johnson & Johnson Health Care Systems Inc. ("JJHCS"), having an address at 425 Hoes Lane, Piscataway, New Jersey 08854, for its Supplemented Second Amended Complaint against Defendant SaveOnSP, LLC, 611 Jamison Road, Elma, New York 14059 ("SaveOnSP"), Express Scripts Inc. ("Express Scripts"), One Express Way, St. Louis, Missouri, and Accredo Health Group, Inc. ("Accredo"), 1640 Century Center Parkway, Suite 101, Memphis, Tennessee, alleges as follows:

## PRELIMINARY STATEMENT

1. JJHCS brings this action to stop a scheme to pilfer tens of millions of dollars from the financial support that JJHCS provides for patients. This scheme was devised by SaveOnSP, was implemented with Express Scripts and Accredo, and generated a financial windfall for all three companies. But the patient assistance that JJHCS provides is for *patients*—not for SaveOnSP, Express Scripts, Accredo, or the health plans with which they partner. By targeting and exhausting those patient support funds for the benefit of their bottom line, Defendants are increasing the cost of the assistance that patients need. That will irreparably harm JJHCS and the patients it serves.

2. As a subsidiary of Johnson & Johnson, JJHCS provides funds to help commercially insured patients afford the costs of valuable and life-saving therapies. Those costs include the co-payments ("copays")[1] that insurance companies and private health plans ("payers") insist must be paid by patients to obtain their prescription drugs. Study after study has shown that many patients cannot afford such copays, and will be forced to forgo vital treatments unless help is provided to meet those obligations. JJHCS provides that support through its copay assistance program. However, with the deliberate intent to manipulate and thwart the purpose of JJHCS's program, SaveOnSP devised a scheme aimed at taking funds meant to help patients. Since 2016, Express Scripts and Accredo have worked with SaveOnSP in furtherance of that scheme to inflate and misappropriate the funding JJHCS provides for patients by interfering with the contractual

[1] In this Supplemented Second Amended Complaint, the term "copay" is generally meant to encompass both an out-of-pocket fixed amount paid by the patient at the point of sale, as well as "co-insurance," or an out-of-pocket percentage of the cost of the product or service paid by the patient at the point of sale.

relationship between JJHCS and patients. The Defendants have implemented this scheme through a methodical strategy premised on deceit and lies directed at both patients and JJHCS.

3. The SaveOnSP scheme works by (i) circumventing statutory constraints on the level of copay costs that payers may require patients to pay for pharmaceuticals; (ii) inflating patients' copay costs in order to increase the funds extracted from JJHCS's copay assistance program and thereby reduce the portion of the drug cost that the payers otherwise would have to pay to the pharmacy; (iii) using this artificially inflated copay cost to coerce patients to enroll in a program run by SaveOnSP (the "SaveOnSP Program"), in addition to, and in violation of the terms of, JJHCS's copay assistance program; and (iv) leveraging the illicit SaveOnSP Program to surreptitiously extract inflated amounts of patient copay assistance, often exhausting the maximum amount of allotted copay assistance. To facilitate this scheme and cover up its tracks, SaveOnSP regularly employs tactics such as training its employees to lie about and conceal their SaveOnSP affiliations, varying the dollar sums that SaveOnSP imposes as inflated payment obligations, and working to prevent pharmaceutical manufacturers from uncovering which patients are in the SaveOnSP Program.

4. Through this artifice, the SaveOnSP scheme enriches both SaveOnSP and Express Scripts, as well as their specialty pharmacy Accredo and the payers with whom Defendants partner, by (a) reducing the amount that health plans (as opposed to JJHCS) pay to pharmacies for each prescription in the SaveOnSP Program, and (b) increasing by a commensurate amount the costs to the JJHCS copay assistance program. In return for this exploitation and interference with JJHCS's program, the payers reward SaveOnSP with a 25% commission on their "savings." *See Save On Specialty Drug Costs*, CIGNA, http://meuhp.com/media/20100/saveonsp%20broker%20client%20flyer.pdf (last visited Mar. 12, 2024). These "savings" are the profits from the

SaveOnSP scheme, and are split by SaveOnSP and Express Scripts, with Accredo reaping the benefits of being the exclusive pharmacy for most patients in the SaveOnSP Program.

5. As a result of the SaveOnSP scheme, the costs to JJHCS of providing patient support have exploded. The SaveOnSP scheme has caused JJHCS to pay at least $100 million more in copay assistance than it otherwise would have for a purpose JJHCS did not intend, depleting the support available for patients who cannot afford their rising copays. And this $100 million in damages increases every single day that the scheme continues. SaveOnSP, Express Scripts, and Accredo know this, and nonetheless they have maliciously pursued this scheme to cause harm to JJHCS and the patients it supports while lining their own pockets.

**<u>Patient Out-of-Pocket Obligations & JJHCS's Patient Assistance</u>**

6. Defendants' scheme is premised on exploiting certain structural aspects of the market for drugs. JJHCS does not and cannot control the price that a patient is asked to pay at a pharmacy when the patient goes to retrieve her or his medication. Rather, a patient's copay cost is determined and imposed by private payers and their affiliated entities. In recognition of the increasing costs that patients have faced at the pharmacy, since 2016, JJHCS has provided assistance to more than 2 million patients in order to help them defray their copay costs and more easily afford their life-saving and life-improving therapies.

7. The copay assistance program at issue here, the Janssen CarePath Program ("CarePath"),[2] provides a portfolio of support services for patients using medications researched, developed, and marketed by the pharmaceutical companies of Johnson & Johnson, including

[2] JJHCS has begun rebranding certain copay assistance programs from "CarePath" to "withMe," (e.g., "Stelara withMe"). For ease of reference, this Supplemented Second Amended Complaint continues to refer to all such copay assistance programs as "CarePath."

Janssen Biotech Inc., Janssen Pharmaceuticals, Inc, Janssen Products, LP, and Actelion Pharmaceuticals U.S., Inc. (collectively, "Janssen"). These medications include complex biologic treatments for various cancers and serious immunological conditions. Without JJHCS's assistance, many patients would be unable to afford their medications, potentially leading them to discontinue treatment, reducing their quality of life, and sometimes shortening their lives.

**Defendants' Actions Interfere with JJHCS's Patient Assistance**

8. SaveOnSP, Express Scripts, and Accredo know that JJHCS funds copay assistance programs like CarePath to ease the burden on patients.[3] Nevertheless, they have planned and executed a scheme to exploit and interfere with the CarePath program by inflating patients' copay obligations to coerce patients to enroll in the SaveOnSP Program in violation of CarePath's terms and conditions. SaveOnSP and Express Scripts work together pursuant to a contractual relationship and in close coordination to market the SaveOnSP Program to Express Scripts' payer clients and to communicate with those clients about the Program. SaveOnSP and Express Scripts then team up with Accredo—Express Scripts' exclusive specialty pharmacy—to facilitate patient enrollment in the SaveOnSP Program and to cause CarePath to be billed for inflated copay costs. As explained in this Supplemented Second Amended Complaint, SaveOnSP, Express Scripts, and Accredo work in partnership to carry out the SaveOnSP scheme, with each playing a critical role in organizing and maintaining the scheme.

9. The SaveOnSP Program works by first changing the designation of Janssen's drugs—including life-saving cancer drugs and other critical medications—from "essential health benefits" to non-essential health benefits under the Affordable Care Act ("ACA"). Working in

[3] SaveOnSP is well-versed in JJHCS's program—its founder and its former CEO are both former Johnson & Johnson employees.

tandem with its payer partners—the vast majority of whom are Express Scripts' clients—the SaveOnSP Program reclassifies the medications as non-essential ***without regard to patients' actual medical needs and solely for the profit of SaveOnSP, Express Scripts, and Accredo***. Indeed, in a recorded presentation available online, a SaveOnSP Program representative admits: "The moment we reclassify these as non-essential we get to operate outside of those rules, which removes the limitations for how high we set the copay, it removes the requirement to apply copay assistance dollars to the max out-of-pocket. And that's what allows us to be the ***most lucrative*** in terms of driving savings for SaveOn." *See* David Cook, *IPBC and SaveonSP Training-20210216 1901-1*, VIMEO, at 23:35 (Feb. 17, 2021), https://vimeo.com/513414094 (hereinafter, *SaveOnSP IPBC Video*).[4]

10. Once the SaveOnSP Program re-categorizes a drug as a non-essential health benefit, it is purportedly no longer subject to the ACA's annual out-of-pocket maximum that limits how much patients with private insurance can be required to pay for their medical care each year. The out-of-pocket maximum rule is meant to prevent patients from being forced to choose between vital medication and other necessities of life, such as food, clothing, and housing. In direct contravention to the intent behind the ACA and its applicable regulations, by reclassifying certain medications as non-essential health benefits, the SaveOnSP scheme allows the payer to continue to charge the patient inflated copay costs even where the patient has already satisfied their out-of-pocket maximum as indicated during the SaveOnSP Program presentation:

[4] This presentation and many other marketing materials reflect the collaborative efforts of SaveOnSP and Express Scripts, and they are frequently co-branded to bear the trade name and logos of both companies, as reflected in the graphic shown in paragraph 10.




*Id.* at 24:00. After removing a given drug from the purview of the ACA's out-of-pocket maximum, the SaveOnSP Program increases the patient's copay for the given drug to an artificially high amount—often thousands of dollars per dose. As explained by the SaveOnSP Program representative, "[I]n order for us to capitalize on this copay assistance funding, ***we have to have that inflated copay upfront to bill to copay assistance.***" *Id.* at 49:26.

11. Because SaveOnSP and Express Scripts rely on circumventing the ACA provisions designed to protect patients, programs such as the SaveOnSP Program have drawn increased regulatory scrutiny in recent years. Indeed, the Centers for Medicare & Medicaid Services has instructed that if a payer chooses to provide coverage for additional drugs beyond those required to be covered under the applicable provisions of the ACA, those medications are considered essential health benefits and must be counted toward the annual limitations on a patient's cost sharing obligations. *See Patient Protection and Affordable Care Act*, 80 Fed. Reg. 10749, 10817 (Feb. 27, 2015) (codified at 45 C.F.R. pts. 144, 147, 153, 154, 155, 156 and 158); *Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2025*, 88 Fed. Reg. 82510 (Nov. 24, 2023). The SaveOnSP Program defies this regulatory guidance by

relying on the reclassification of life-saving drugs as non-essential health benefits. This has the effect of inflating patients' cost-sharing obligations far beyond the maximum amounts imposed by the ACA.

12. Further, in deciding which drugs to include in its program, SaveOnSP and Express Scripts target drugs that "***have the most lucrative copay assistance programs***," programs like CarePath. *SaveOnSP IPBC Video*, *supra* ¶ 9, at 13:31.[5] Once they have included those drugs in the SaveOnSP Program and the drug's copay has been inflated, SaveOnSP and Express Scripts then target patients who take the drug, using the threat of an inflated copay and other "strong arm[]" tactics to coerce them into enrolling in the SaveOnSP Program. Specifically, SaveOnSP tells each patient that unless she enrolls in the SaveOnSP Program, she will have to pay the inflated copay herself—and, making matters worse, the SaveOnSP Program will not count the thousands of dollars she pays toward her deductible or out-of-pocket maximum. SaveOnSP's offer is illustrated in marketing materials available online:




[5] Similarly, in the same recorded presentation, the SaveOnSP Program representative admits that the program works only if they are able to extract patient copay assistance: "In order for us to leverage the savings, the member has to actively enroll in copay assistance. ***That's where the savings comes from***." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 49:27.

*Pay $0 for Select Specialty Medications*, CIGNA (Aug. 2021), https://hr.richmond.edu/benefits/insurance/medical-plans/pdf/SaveonSP.pdf (last visited Mar. 13, 2024).

13. SaveOnSP and Express Scripts engage in a concerted effort to communicate this coercive offer to patients, including through phone calls and letters. This outreach campaign is illustrated by a SaveOnSP Program slide deck prepared and co-branded by SaveOnSP and Express Scripts. This slide deck was available online:




*Copay Assistance Program & Solutions*, EXPRESS SCRIPTS, at 9 (2019), formerly at https://pebp.state.nv.us/ wp-content/uploads/2020/03/7.-Combined-for-website.pdf.

14. SaveOnSP even goes so far as to enlist the help of the pharmacy (typically Accredo) to reject a patient's claim for their prescription medication at the point of sale—to tell the patient that insurance will not cover their prescription even though that medication is in fact covered—in order to get the patient on the phone with SaveOnSP so that a representative can pressure the

patient to enroll in the SaveOnSP Program. This is highlighted in another SaveOnSP Program slide deck, which admits engineering a ***"[p]oint of sale claim rejection"*** to "facilitate warm transfer of member to SaveonSP":




*Human Resources Committee Meeting*, VILLAGE OF LINDENHURST ILLINOIS, at 69 (Mar. 11, 2021), formerly at https://www.lindenhurstil.org/egov/documents/1615238827_33717.pdf. Once SaveOnSP successfully lures the patient into the SaveOnSP Program, it then coordinates with Accredo to collect necessary billing information and adjudicate the pharmacy claim.

15. This red tape has caused patients to describe dealing with the SaveOnSP Program and Accredo as an "absolute nightmare" and a "horrendous experience," requiring them to "jump through hoops" to obtain their necessary medications. As Defendants know, delayed medication, interrupted medical treatment, and adverse health consequences are commonplace among patients

enrolled in SaveOnSP. The SaveOnSP Program's enrollment processes have caused interruptions in patient treatment lasting days or weeks, leading one pharmacist to express concerns that the SaveOnSP Program would cause even the most vulnerable of patients—like "babies under 2" suffering from "[i]nfantile [s]pasm" disorders—to face serious obstacles in obtaining medical treatment. Although Defendants have known for years that the enrollment process for the SaveOnSP Program causes widespread problems for patients, they have refused to modify this process to lessen the hardship on patients.

16. Of course, a choice between paying nothing for badly needed medication, or paying thousands of dollars for that medication out of pocket, is—for most patients—no choice at all. To the contrary, the President of SaveOnSP has himself recognized that this purported "patient[']s choice" is just a euphemism for the "penalty" a patient faces in choosing not to enroll in SaveOnSP. And when selling the program to prospective clients, senior SaveOnSP executives describe the program as having "required participation." Indeed, many patients choose health plans precisely based on which plan purports to cover their necessary medications. Unsurprisingly, therefore, once SaveOnSP's offer is communicated to the patients, most are coerced into accepting: "[T]hat's often compelling enough for members to say, 'oh wait, I want my drugs for free.'" *SaveOnSP IPBC Video*, *supra* ¶ 9, at 46:25. This false sense of choice between enrolling in the SaveOnSP Program or paying thousands of dollars per month for medication leaves patients feeling "pressured to sign up" due to SaveOnSP's "'strong arm[]'" enrollment tactics.

17. But while SaveOnSP is telling patients that their therapy will be "free" if they enroll in the SaveOnSP Program, what SaveOnSP is really doing is enrolling them in CarePath so that the cost of the artificially inflated copay is borne by JJHCS, and the entirety of the funds JJHCS makes available via patient copay assistance are drained. As one SaveOnSP Program

representative admitted, patients may see an inflated copay on their "invoice paperwork," but "they will not be charged" that amount. *SaveOnSP IPBC Video*, *supra* ¶ 9, at 43:38; *see also, e.g.*, *Albuquerque Public Schools Summary of Benefits*, EXPRESS SCRIPTS, at 2 (2021), https://www.aps.edu/human-resources/benefits/documents/2021-summary-of-benefits/express-scripts-summary-of-benefits (stating that the cost of drugs for patients enrolled in SaveOnSP "will be reimbursed by the manufacturer").

18. Further, while SaveOnSP guides the patient through the process of enrolling in programs like CarePath, SaveOnSP does not tell patients that CarePath is already available to them without enrollment in the SaveOnSP Program, and already reduces patients' out-of-pocket costs to $10, $5, or even $0. In other words, the SaveOnSP Program exists not to benefit patients, but solely to wrongfully meet the payer's obligation to the patient using the cost support made available by JJHCS exclusively for patients for Defendants' own profit. As one Express Scripts representative put it, "the name [SaveOnSP] alone is probably misleading since the member isn't really saving anything[.]"

19. The SaveOnSP Program does not change the amount the pharmacy receives for a prescription. It decreases the portion that the payer pays of that amount, and increases the portion that the patient pays with copay assistance dollars, with the deliberate goal of "deplet[ing] all that the manufacturer has to offer." The payers' "savings" is actually the increased amount that payers withhold from pharmacies because the payers foist the obligation onto patients, who will use CarePath dollars to pay it. SaveOnSP then calculates the payers' "savings"—actually, the value the payer has gained by virtue of displacing its payment obligation to JJHCS—and charges the payer a fee of 25%. Express Scripts and SaveOnSP share in these ill-gotten gains, with Express Scripts and SaveOnSP each retaining a portion of the SaveOnSP fee charged to health plans.

Accredo likewise benefits financially from the scheme by collecting fees associated with SaveOnSP transactions, as it is the exclusive specialty pharmacy for the SaveOnSP Program in most instances.

20. Patients continue to experience significant hardships after they enroll in the SaveOnSP Program. Some patients spend hours on the phone in advance of each medication refill to ensure that they will receive their medication on time and that they will not be left with a bill for the copay cost. Many patients are automatically charged the inflated SaveOnSP copay or are left with large account balances that prevent them from filling other medications that are not subject to the SaveOnSP Program—despite SaveOnSP's assurances that neither would occur. Once patients are wrongfully charged, it is very difficult for them to get reimbursed or have the balance removed from their account. As one patient explained, the SaveOnSP scheme has "made it so much more difficult to get anything done, and we have to fight to get our bills paid."

21. Account balances, erroneous charges, shipment errors, and prior authorization delays can cause significant interruptions to patients' required medical treatment. This is particularly acute for patients with complex, chronic conditions, many of whom rely on specialty medications to control their diseases. A patient with Crohn's Disease, who was pregnant with her second child and who had "never missed a dose" of her medication before SaveOnSP partnered with her health plan, did, in fact, miss a dose of her medication due to the enrollment roadblocks erected by SaveOnSP and Accredo. This "put her, her pregnancy, and [her] new baby's health in critical jeopardy." According to the patient's husband, the experience "brought a tremendous amount of angst and anxiety to her, the baby, and our family."

22. This patient's experience is not an isolated incident. Many patients suffer similar angst, anxiety, and worry over how the SaveOnSP Program's interference with their prescribed

course of treatment will impact their health and the progression of their medical condition. Unless the SaveOnSP Program is stopped, patients will continue to suffer.

**<u>SaveOnSP Disregards the Terms and Conditions of JJHCS's Program</u>**

23. SaveOnSP's scheme is expressly prohibited by the CarePath terms and conditions, which do not allow the program to be used in connection with "any other coupon, discount, prescription savings card, free trial, or other offer" like the SaveOnSP Program. *See, e.g.*, DARZALEX® Savings Program (Nov. 2023), https://www.janssencarepath.com/sites/www.janssencarepath-v1.com/files/darzalex-faspro-talvey-tecvayli-savings-program-overview.pdf.

24. The SaveOnSP Program is such an "offer." The SaveOnSP Program representative expressly refers to the SaveOnSP Program in her presentation as the "SaveOn ***offering***," *SaveOnSP IPBC Video*, *supra* ¶ 9, at 4:25; 27:31, and marketing materials state "That's why your plan ***offers*** a program called SaveOnSP, which can help lower your out-of-pocket costs to $0." *See Pay $0 for Select Specialty Medications*, *supra* ¶ 12 (emphasis added). SaveOnSP's marketing materials also refer to the SaveOnSP Program as providing a "point of sale ***discount***."

25. SaveOnSP, Express Scripts, and Accredo are well aware of this prohibition on other offers because SaveOnSP systematically monitors drug manufacturers' patient copay assistance terms and conditions, including the CarePath program. *See SaveOnSP IPBC Video*, *supra* ¶ 9, at 31:59. In fact, SaveOnSP directs its agents to surreptitiously collect information regarding the requirements of drug manufacturers' copay assistance programs and encourages those representatives to lie about their own identities and their connection with SaveOnSP, falsely saying that they are calling from the *patient's* doctor's office or pharmacy. SaveOnSP further instructs its employees to "**NEVER** disclose any information" about SaveOnSP when speaking with drug

manufacturers. SaveOnSP even refers to itself as a "Ghost Company" because it designs its operations to evade detection by manufacturers whose terms and conditions prohibit patients from enrolling in the SaveOnSP Program. Nevertheless, SaveOnSP continues to coerce patients into signing up for and using the SaveOnSP Program—thereby inducing those patients to breach the terms and conditions of their CarePath agreement with JJHCS.

26. SaveOnSP is well-versed in the terms and conditions of CarePath. SaveOnSP's Special Projects Coordinator extensively researches the terms and conditions of the CarePath Program and other manufacturers' copay assistance programs. As part of this research, she calls CarePath from anonymized phone numbers, uses fake names and fake credentials, and falsely represents to CarePath agents that she works for entities other than SaveOnSP. At other times, she has falsified her own medical history to enroll herself into the CarePath Program. Using these tactics, SaveOnSP learns more about CarePath's terms and conditions without being detected. The Special Projects Coordinator maintains the information she surreptitiously obtains in spreadsheets that are shared with SaveOnSP's upper management, and the other employees routinely consult this data to assist with patient enrollment into CarePath.

27. SaveOnSP knows that if pharmaceutical manufacturer copay support programs like CarePath are able to identify the misappropriation in real time, the manufacturers will try to stop the bleeding. Leveraging the information learned through the Special Project Coordinator's research, SaveOnSP has developed sophisticated and constantly evolving strategies to avoid manufacturer detection. Upon information and belief, these tactics target every aspect of the pharmacy benefit claims adjudication process. For example, as part of a concerted strategy to "make identification of SaveOn members more difficult," SaveOnSP has varied patients' payment obligations to "[b]etter camouflage copays from manufacturers." This strategy of varying the

copayment amounts across thousands of transactions enables SaveOnSP to cover its tracks and perpetuate its scheme of siphoning copay assistance funds into its own and its partners' pockets.

28. In the face of efforts to curb its improper conduct, SaveOnSP has even gone one step further, prioritizing its own bottom line over the medical needs of patients enrolled in its program. For example, when a drug manufacturer indicated in 2020 that it would reduce the amount of funding available to SaveOnSP affiliated patients, SaveOnSP drafted a letter to patients suggesting that they "switch their medications," and directed such patients to "other pharmaceutical companies . . . to meet [their] therapeutic needs." A draft letter to doctors similarly directed them to alternative treatment options for their patients. These communications are part of a developed strategy of ignoring patients' clinical needs and encouraging them to switch from medically necessary treatments to alternative medicines for which SaveOnSP believes it can extract more lucrative profits.

29. The SaveOnSP scheme harms patients in a number of ways, including by selecting drugs for coverage based upon a profit motive and not medical need; wrongfully engineering a denial of coverage at the point of sale to coerce patients to participate in the program; and not counting any of the funds spent on patients' medication towards their ACA maximum or deductible, thereby making their other healthcare needs more expensive.

30. The SaveOnSP scheme also harms JJHCS. SaveOnSP uses CarePath funds intended to help patients afford their Janssen medications, and causes JJHCS to pay out thousands of dollars more per patient in CarePath funds than it otherwise would pay, solely for Defendants' profit, thereby burdening the provision of copay support. This result advances the interests of

payers, which have used a variety of tactics—widely condemned by patient advocacy groups[6]—to deprive patients of the benefits of assistance.[7]

31. SaveOnSP concedes that it has engaged in misappropriation and diversion of co-pay support. Marketing materials for the SaveOnSP Program tout the "savings" that it generates for payers. For example, one health plan projected $600,000 in annual "savings" from implementing the SaveOnSP Program.[8] But in fact, these "savings" are simply diverted CarePath

---

[6] For instance, the "All Copays Count Coalition," made up of more than 60 groups representing patients with serious and chronic health conditions, has engaged in a concerted effort to stop payer use of programs that reclassify drugs as non-essential health benefits to circumvent the ACA's limitations on patient's cost-sharing obligations, inflate copays to drain the maximum amount of manufacturer copay assistance available, and refuse to count copay assistance funds toward the patient's deductible or out-of-pocket maximum. *See New Insurance Policies Are Targeting Vulnerable Patients with High Copays*, NAT'L HEMOPHILIA FOUND., https://www.hemophilia.org/advocacy/federal-priorities/make-all-copays-count#ACCC (last visited Mar. 12, 2024); *Copay Maximizers*, HEMOPHILIA FED. OF AM., https://www.hemophiliafed.org/resource/copay-maximizers/ (last visited Mar. 12, 2024). These types of programs, referred to as "copay maximizer" and "copay accumulator" programs and the harms they cause to patients are discussed in greater detail in Section IV, *infra*.

[7] Certain payers have argued that copay assistance programs artificially increase payers' costs by "incentivizing patients to take brand-name drugs instead of cheaper bioequivalent generics" or even by incentivizing patients to take medications they do not require. *See, e.g.*, Tomas J. Philipson & Troy Durie, *The Patient Impact of Manufacturer Copay Assistance in an Era of Rising Out-of-Pocket Costs*, UNIV. CHI. (Dec. 2021), at 18, https://cpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/d/3128/files/2021/12/2021_12_15-Copay-Assistance-Final-Draft-Clean.pdf (last visited Mar. 12, 2024). Beyond the absurdity of suggesting that copay assistance causes a patient suffering from cancer to take a cancer therapy they do not require, this argument overlooks that copay assistance is often used for specialty drugs without a generic substitute. *Id.*; *see infra* ¶ 43.

[8] *See SaveOnSP for Specialty Medications*, Valley Center Pauma Unified School District, https://core-docs.s3.amazonaws.com/documents/asset/uploaded_file/2756/VCPUSD/2332193/Saveonsp.pdf, at 1 (projecting $600,000 in savings in 2020 for one health plan from implementing SaveOnSP); *Copay Assistance Strategy Reduces Financial Burdens for Plans and Patients*, EVERNORTH (Oct. 7, 2021), https://www.evernorth.com/articles/reduce-costs-for-health-care-plans-with-copay-program-assistance (advertising that "[i]n 2020, plans that participated in these copay assistance solutions [like the SaveOnSP Program] experienced a specialty [drug cost] trend of -7.2%, while nonparticipating plans experienced an 8.7% specialty [drug cost] trend.").

funds that were intended to benefit patients, not payers. SaveOnSP generates these "savings" for payers by reclassifying medications as non-essential health benefits, circumventing the ACA's limitations on patient's cost-sharing obligations, and inflating patients' copayments to drain the maximum funding available through manufacturers' copay assistance programs.

32. In addition to draining greater amounts of copay assistance funds at a quicker rate, SaveOnSP does not credit copay assistance funds toward a patient's deducible or out of pocket maximums. Before SaveOnSP's involvement, patients had been able to apply copay assistance funds to satisfy their plan's cost-sharing requirements. SaveOnSP eliminates this application. Therefore, patients are likely to pay more over time as a result of the SaveOnSP Program because they will be responsible for paying other healthcare-related expenses, or for their medications once copay assistance funds are exhausted, until they meet their overall cost-sharing obligations under the terms of their healthcare plan. This harm to patients has not only been condemned by patient advocacy organizations, but also been the subject of recent litigation and regulatory debate.[9]

33. Patient assistance does not exist so that Defendants can enrich payers further while taking a cut themselves. Indeed, payers already negotiate enormous price concessions from

[9] For example, patient advocacy groups challenged a 2021 rule promulgated by the United States Department of Health and Human Services, *see* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2021; Notice Requirement for Non-Federal Governmental Plans, 85 Fed. Reg. 29164, 29230–35, 29261 (May 14, 2020) (codified at 45 C.F.R. § 156.130(h)), that permitted payers to decline to count certain types of manufacturer copay assistance toward patients' cost-sharing obligations under the ACA. *See HIV & Hepatitis Policy Institute v. United States Dep't of Health & Human Servs.*, No. 22-CV-2604 (D.D.C.). The District Court granted plaintiffs' motion for summary judgment and vacated the 2021 rule. *See* 2023 WL 6388932 (D.D.C. Sept. 29, 2023). Patient advocacy groups have praised the ruling as a victory for patients, as the reinstated 2020 rule requires payers to count some copay assistance dollars received from manufacturers toward patients' cost-sharing obligations. *See, e.g.*, *Patient and Provider Groups Applaud HHS Decision to Drop Appeal of Court Ruling*, ARTHRITIS FOUNDATION, https://www.arthritis.org/news/press-releases-and-statements/coalition-applauds-decision-to-count-copays (last visited Mar. 12, 2024).

manufacturers, including rebates that manufacturers pay when a patient fills a prescription. In 2022 alone, Janssen paid more than $11 billion in rebates, discounts, and fees to commercial insurers and pharmacy benefit managers. *See The 2022 Janssen U.S. Transparency Report*, at 6, https://transparencyreport.janssen.com/_document/2022-janssen-transparency-report-pdf?id=00000188-267e-d95e-abca-7e7e58750000 at 36 (May 25, 2023); *see also Form 10-K*, CIGNA CORP., at 33 (Feb. 29, 2024), https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001739940/000173994024000005/ci-20231231.htm ("We maintain relationships with numerous pharmaceutical manufacturers, which provide us with, among other things: . . . discounts, in the form of rebates, for drug utilization."). Defendants acknowledge that these payer rebates are a "completely different set of funds" from *patient* assistance—which, SaveOnSP further acknowledges, is made available pursuant to "an agreement between the member and the manufacturer." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 24:32–24:50. By tortiously interfering with that agreement between JJHCS and patients, SaveOnSP, Express Scripts, and Accredo wrongfully enable payers to "double-dip" into both manufacturer rebates and copay assistance.

34. Defendants should not be permitted to profiteer on the backs of patients by exploiting JJHCS's copay assistance. Defendants should therefore be enjoined from including Janssen drugs in the SaveOnSP Program, and should be ordered to compensate JJHCS for the funds it caused to be wrongfully extracted from CarePath.

## THE PARTIES

35. Plaintiff JJHCS is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 425 Hoes Lane, Piscataway, New Jersey 08854. JJHCS is a subsidiary of Johnson & Johnson, and administers CarePath for the benefit of patients

who are prescribed medications marketed by other Johnson & Johnson entities that are not fully paid for by private insurance.

36. Defendant SaveOnSP is a limited liability company organized under the laws of the State of New York, with its principal place of business at 611 Jamison Road, Elma, New York 14059. SaveOnSP has operations, including a call center, in Buffalo, New York. It also makes its client payers sign a joinder agreement governed by the laws of New York, and, on information and belief, accepts payments for its services in New York. None of the members of SaveOnSP are citizens of New Jersey.

37. Defendant Express Scripts, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One Express Way, St. Louis, Missouri 63121. Express Scripts is the largest pharmacy benefit manager ("PBM") in the nation, reaping over $100 billion in annual revenue. Express Scripts is a subsidiary of Evernorth Health, Inc., which is a wholly owned subsidiary of The Cigna Group ("Cigna").

38. Defendant Accredo Health Group, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1640 Century Center Parkway, Suite 101, Memphis, Tennessee 38134. Like Express Scripts, Accredo is a subsidiary of Evernorth Health, Inc., which is a wholly owned subsidiary of Cigna, and it functions as Express Scripts' exclusive specialty pharmacy.

## JURISDICTION AND VENUE

39. This Court has personal jurisdiction over SaveOnSP, Express Scripts, and Accredo because each defendant has sufficient minimum contacts with New Jersey so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. SaveOnSP actively implements the SaveOnSP Program in New Jersey, with

the assistance of Express Scripts and Accredo, including by offering the SaveOnSP Program to New Jersey payers, and by inducing New Jersey patients to enroll in the SaveOnSP Program. Express Scripts provides its services as a pharmacy benefit manager to health plans and payers located in New Jersey.[10] Accredo fills pharmacy prescriptions for patients who live and work in New Jersey. Both Express Scripts and Accredo are registered to do business in New Jersey as foreign corporations.

40. Venue is proper pursuant to 28 U.S.C. § 1391(b) because "a substantial part of the events or omissions giving rise to the claim" occurred in this judicial district, including the offering of the SaveOnSP Program to New Jersey payers, New Jersey patients' enrollment in the SaveOnSP Program, violation of CarePath's terms and conditions, and JJHCS's injury as a result of SaveOnSP's wrongful acts.

41. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy in the present action exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interests and costs, and complete diversity of citizenship between the parties exists because JJHCS is a citizen of New Jersey, while SaveOnSP's members Express Scripts and Accredo are not.

[10] *See* Members Health Plan NJ Prescription Benefit Plan Summary, Express Scripts https://www.savoyassociates.com/CMSPages/GetFile.aspx?guid=625D8769-8612-4B4D-ADAB-D94E04719047 (last visited Mar. 13, 2024) for a description of the services Express Scripts offers in New Jersey to members of the Affiliated Physicians & Employers Health Plan.

## FACTUAL ALLEGATIONS

### I. The Pharmaceuticals for which JJHCS Offers Support Have Improved and Saved the Lives of Countless Patients

42. The pharmaceuticals for which JJHCS offers support are essential to patients' health and, in some cases, survival. These pharmaceuticals include treatments for various forms of cancer (for example, DARZALEX®, ERLEADA®), pulmonary arterial hypertension (for example, OPSUMIT®, TRACLEER®, UPTRAVI®), and various autoimmune disorders (for example, REMICADE®, STELARA®, TREMFYA®).

43. A significant percentage of CarePath funds are provided for treatments known as "biologics," which are medications developed from living materials, usually cells, and which have complex molecular structures that are not easily definable. This complexity is in contrast to more conventional medications, which tend to be chemically synthesized and have simpler molecular structures. Because of this complexity, biologic therapies cannot be precisely copied, meaning that there are no "generic" versions of these molecules that can be substituted for branded products without a physician's prescription, as there are for simpler chemical compounds. *See* Philipson & Durie, *supra* ¶ 30 n.7, at 18 (noting that "copay cards are used primarily for brand drugs without a generic substitute").

44. Biologics remain at the cutting edge of medical science, and they are often used to treat life-altering medical conditions for which no other treatments are available. Janssen's biologic treatments are essential to the health of patients in a variety of important therapeutic areas, including immunology, oncology, and pulmonary hypertension. For example, STELARA® is an immunology biologic used to treat hundreds of thousands of patients in the United States for Crohn's disease, ulcerative colitis, and other chronic health conditions. TREMFYA® is an immunology biologic used to treat joint pain, stiffness, and swelling caused by psoriatic arthritis,

as well as painful patches on the skin caused by moderate-to-severe plaque psoriasis. DARZALEX® is an oncology biologic used to treat multiple myeloma, a form of cancer that targets plasma cells found in bone marrow. For these and most of Janssen's other biologic therapies, there are currently no FDA-approved "biosimilar" versions of the same molecule on the market.

45. Developing these biologics is an expensive and risky venture for Janssen and other pharmaceutical manufacturers. In order to produce safe and effective biologic treatments, Janssen makes enormous investments in research and development. Even so, only 1 in 5,000 drug candidates makes it from discovery to market, and even for successful drugs, the entire process takes approximately 10 to 12 years. Further adding to the expense, biologics require rigorous quality control during the manufacturing process, as they are sensitive to even minute changes in raw materials and can be compromised by changes in temperature or microbial contamination. Manufacturing biologics thus requires specialized manufacturing equipment and facilities. Without manufacturers like Janssen who are willing to take on these risks and costs, innovative and life-saving biologic treatments would not be available to patients suffering from a range of diseases.

## II. CarePath Offers Patients Thousands of Dollars in Financial Assistance to Help Defray Out-of-Pocket Costs that Limit Access to Medication

46. Patients with private commercial health insurance, especially those with acute complex medical conditions, are increasingly subject to higher and higher cost-sharing obligations imposed by their insurers, making it harder for patients to access medications prescribed by their doctors.

47. Health insurance plan sponsors do not typically determine these obligations alone. Rather, they contract with entities known as "Pharmacy Benefits Managers" or "PBMs." PBMs

are companies that manage prescription drug benefits on behalf of health insurance plans. They often serve as middlemen with an aim towards increasing insurers' and their own profits by determining which drugs a plan will cover and to what extent they will be covered. Defendant Express Scripts is a PBM. Most of the payers who have contracts with SaveOnSP are clients of Express Scripts.

48. PBMs are also often part of even larger, vertically integrated organizations that offer other services in the health insurance field. For example, such organizations may offer health insurance themselves, or operate specialty pharmacies like Accredo, i.e., pharmacies that dispense complex pharmaceuticals like biologics that require special handling and care. Express Scripts is itself an indirect subsidiary of the major insurance company Cigna.

49. In their role as middlemen, PBMs have presided over the rise of high cost-sharing insurance plans, which feature higher than usual deductibles, copays, and co-insurance. In essence, these plans pressure patients to limit their medical expenses by covering the full cost only after significant contributions by the patients. For instance, when a patient's health plan has a deductible, he or she must pay the entire price for the drug until the deductible threshold is met. Only once the deductible is met will the payer help the patient pay for the drug, at which point the patient may still pay either a fixed amount known as a copay, or a percentage of the drug's price, known as co-insurance.

50. Health plans with deductibles for prescription medications are becoming more common. Between 2012 and 2017, the share of employer-sponsored health plans requiring patients to meet a deductible for prescription medications rose from 23% to 52%. *See Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, PHRMA, at 3 (Jan. 29, 2021), https://

phrma.org/-/media/Project/PhRMA/PhRMA-Org/PhRMA-Org/PDF/D-F/Faced-with-High-Cost-Sharing-for-Brand-Medicines.pdf.

51. These high-cost sharing models discourage patients from filling their prescriptions and can lead to abandonment of treatment. *See, e.g.*, Katie Devane et al., *Patient Affordability Part Two: Implications for Patient Behavior & Therapy Consumption*, IQVIA (2018), https://www.iqvia.com/locations/united-states/library/case-studies/patient-affordability-part-two (finding that 52% of new patients with an out-of-pocket cost of $125 to $250 abandoned treatment, and 69% of new patients with an out-of-pocket cost of $250.01 abandoned treatment); Jalpa A. Doshi et al., *Association of Patient Out-of-Pocket Costs With Prescription Abandonment and Delay in Fills of Novel Oral Anticancer Agents*, JOURNAL OF CLINICAL ONCOLOGY (Dec. 20, 2017), https://ascopubs.org/doi/abs/10.1200/JCO.2017.74.5091 (finding that abandonment of oral cancer treatment increased from 10% for patients with a $10 out-of-pocket cost or less to 31.7% for patients with a $100.01 to $500 out-of-pocket cost, 41% for patients with a $500.01 to $2,000 out-of-pocket cost, and 49.4% for patients with an out-of-pocket cost exceeding $2,000); Michael T. Eaddy, *How Patient Cost-Sharing Trends Affect Adherence and Outcomes*, PHARMACY & THERAPEUTICS (Jan. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3278192/ (conducting literature review of 160 articles from January 1974 to May 2008 and finding that "85% showed that an increasing patient share of medication costs was significantly associated with a decrease in adherence"); Bruce W. Sherman, et al., *Impact of a Co-pay Accumulator Adjustment Program on Specialty Drug Adherence*, AMERICAN JOURNAL OF MANAGED CARE (July 2019), https://ajmc.s3.amazonaws.com/_media/_pdf/AJMC_07_2019_Sherman%20final.pdf (assessing impact of copay accumulator programs on medication adherence and finding that "HSA patients

on autoimmune drugs" had higher risks of discontinuation of their medications, suggesting that copay accumulator programs "have the potential to negatively affect specialty drug use").

52. Patient abandonment of prescribed medication is a serious, potentially fatal problem. It is associated with "poor therapeutic outcomes, progression of disease, and an estimated burden of billions per year in avoidable direct health care costs." Aurel O. Iuga & Maura J. McGuire, *Adherence and Healthcare Costs*, 7 RISK MGMT. HEALTHCARE POLICY 35 (Feb. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3934668/.

53. In order to limit the negative effects of inflated out-of-pocket costs, the ACA places annual limits on the amount of out-of-pocket costs a payer can force a patient to pay for so-called "essential health benefits," which includes many prescription drugs. *See* 45 C.F.R. § 156.130(a). For example, the annual ACA out-of-pocket maximum for the 2024 plan year is $9,450 for an individual and $18,900 for a family. *See Out-of-Pocket Maximum/Limit*, HEALTHCARE.GOV, https://www.healthcare.gov/glossary/out-of-pocket-maximum-limit/ (last visited Mar. 12, 2024). Nevertheless, that threshold is high enough that many patients would still be unable to afford the costs of their medication without help.

54. Thus, in the face of these ever-increasing cost-share obligations, financial assistance like that provided by JJHCS has become an important safety net helping patients pay for necessary medications. *See* Philipson & Durie, *supra* ¶ 30 n.7, at 2 (explaining that "[m]anufacturer copay assistance is a tool to ensure drug affordability in response to higher list prices and shifts in benefit design that put more out-of-pocket burden on commercial patients" and that "[w]ithout copay assistance, . . . OOP spending would have increased 3.4 percent from 2015 to 2019, growing from $46.6 billion to $48.2 billion. However, due to the growing use of copay cards in response to growing OOP exposure, patients faced a lower OOP burden, so actual OOP

spending paid by patients was lower and decreased 6.3 percent, from an estimated $38.6 billion to $36.2 billion"). Such financial assistance is offered in the form of programs providing patients with coupons or a card that they can then use when purchasing their prescription medications.

55. Patients with chronic illnesses are increasingly reliant on copay assistance to afford their medications. For example, in 2019, 32% of patients filling brand-name oncology medicines used copay assistance, as did 45% of patients filling brand-name depression medicines, 55% of patients filling brand-name HIV medicines, and 70% of patients filling brand-name multiple sclerosis medicines. *Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, *supra* ¶ 50, at 6. Without patient copay assistance, average patient out-of-pocket costs for brand medicines would have been 225% to 1,096% higher in 2019, depending on the illness category. *Id.* at 7; *see also* Philipson & Durie, *supra* ¶ 30 n.7, at 2 (noting that "[c]opay cards are even more important to offset high-cost exposures for patients taking specialty drugs as 50 percent of patients taking a specialty brand drug use copay cards versus 33 percent of patients on traditional brand drugs. . . . The savings from copay cards lead patients to have similar final OOP costs between specialty drugs and traditional drugs due to an average savings of $1,548 for specialty drugs and only $414 for traditional drugs"). On average, copay assistance helped patients taking brand HIV and oncology medicines with more than $1,600 in costs, and patients taking brand MS medicines with more than $2,200 in costs. *See Faced with High Cost Sharing for Brand Medicines, Commercially Insured Patients with Chronic Conditions Increasingly Use Manufacturer Cost-Sharing Assistance*, *supra* ¶ 50, at 7.

56. These savings are critical to improving and saving the lives of patients who have private insurance without causing them to choose between treatment and other necessary

expenditures, such as food, clothing and housing. Multiple studies have found that when manufacturers help patients pay their out-of-pocket costs, patients are more likely to obtain their medication and adhere to their treatment regimens. *See, e.g.*, Anna Hung et al., *Impact of Financial Medication Assistance on Medication Adherence: A Systematic Review*, 27 J. MGMT. CARE SPECIALTY PHARM. 924 (July 2021); Philipson & Durie, *supra* ¶ 30 n.7, at 4 ("[A]ffordability offered by copay assistance has resulted in increased utilization of needed drugs. . . . Copay cards lower the out-of-pocket costs for patients leading them to increase their utilization by 4.8 to 16.7 percent."); Matthew Daubresse et al., *Effect of Prescription Drug Coupons on Statin Utilization and Expenditures: A Retrospective Cohort Study*, 37 PHARMACOTHERAPY 12 (Jan. 2017), https://accpjournals.onlinelibrary.wiley.com/doi/10.1002/phar.1802.

57. CarePath helps patients afford out-of-pocket costs for 43 Janssen drugs. This assistance is meant not only to help patients afford their out-of-pocket costs for medications, but also to help patients meet their deductible and ACA out-of-pocket maximums, thereby allowing patients to more easily afford their healthcare overall.

58. To be eligible for CarePath, patients must meet certain criteria set forth in CarePath's terms and conditions. Relevant here, patients using CarePath must be enrolled in commercial or private health insurance (not, for example, Medicare). For some drugs, patients agree to pay $5 or $10 themselves at the point of sale. Also, the terms state that CarePath "may not be used with any other coupon, discount, prescription savings card, free trial, or other offer." And patients agree that they "meet the program requirements every time [they] use the program." *See, e.g.*, DARZALEX® Savings Program, *supra* ¶ 23.

59. Patients may enroll in CarePath online using the MyJanssenCarePath.com website, by phone, or via mail or fax by filling out and sending an enrollment form. Once enrolled, patients

can use these co-pay assistance funds to cover the out-of-pocket costs for their prescription medication minus the $5 or $10 they agreed to pay themselves.

## III. SaveOnSP, Express Scripts, and Accredo Work Together to Carry Out the SaveOnSP Scheme

60. Although programs like CarePath are meant to help patients, payers and PBMs have devised a set of evolving schemes designed to capture the benefit of patient copay assistance funds.[11] The scheme at issue in this lawsuit represents the latest in this line. When carrying out the strategic objectives needed to make the SaveOnSP Program function, SaveOnSP, Express Scripts, and Accredo operate as one team.

**SaveOnSP and Express Scripts Partnership**

61. SaveOnSP has marketed a program[12] that is "only available through ESI[,]" also referred to as Express Scripts. Express Scripts, a subsidiary of insurance industry giant Cigna, is

[11] For instance, for years and continuing today, various payers and PBMs have employed programs known as "accumulators." These programs work by identifying and accepting manufacturer copay assistance, but refusing to count it toward the patient's deductible or out-of-pocket maximum. Adam J. Fein, *Copay Maximizers Are Displacing Accumulators—But CMS Ignores How Payers Leverage Patient Support*, DRUG CHANNELS (May 19, 2020), https://www.drugchannels.net/2020/05/copay-maximizers-are-displacing.html. Because none of the patient copay assistance counts toward the patient's deductible or out-of-pocket maximum, the scheme delays or prevents the patient from meeting those thresholds, and copay assistance that would normally be sufficient to last all year gets completely used up much earlier. *Id.* This leads to serious patient harm, as the patient will eventually go to fill a prescription and receive what industry experts have called a "co-pay surprise." The patient is shocked to learn that the copay assistance has run out and that the deductible and out-of-pocket maximum still have not been met—meaning he or she will have to pay the full list price or leave empty handed. *Id.* Patients often simply cannot afford to pay such costs without assistance, leading many patients to discontinue their treatment. The harm caused by such programs has led 20 states to ban them. Joseph Cantrell, *2024 State Legislative Preview*, THE RHEUMATOLOGIST (Feb. 6, 2024), https://www.the-rheumatologist.org/article/2024-state-legislative-preview/.

[12] Although SaveOnSP has claimed in this litigation that it does not operate a "Program" through which patients can enroll, public materials describing its services and internal documents are replete with references to Defendants' offering as a "Program." *See, e.g.*, Copay Maximizers vs. Accumulator Adjustments: Navigating Key Differences for an Optimized Solution, FIERCE

the largest pharmacy benefits manager in the United States, reaping over $100 billion in annual revenue and serving health plans covering more than 100 million lives. *See About,* EXPRESS SCRIPTS, https://www.expressscripts.com/corporate/about (last accessed Mar. 11, 2024). Express Scripts leverages its dominance in the marketplace to lend legitimacy to the SaveOnSP Program and drives a continuous stream of business to SaveOnSP.

62. Although SaveOnSP is a separate business entity from Cigna and is not in the Cigna corporate family, prior to this lawsuit, Cigna referred to SaveOnSP as a "brand" of Cigna, in its securities filings, which bespeaks the close connection between SaveOnSP, on the one hand, and Cigna affiliates Express Scripts and Accredo on the other hand. *Form 10-K*, CIGNA CORP., at 5 (Feb. 24, 2022), https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001739940/000173994022000007/ci-20211231.htm. This was deleted from Cigna's future SEC filings. The close connection between SaveOnSP and Cigna affiliates Express Scripts and Accredo is not a tightly guarded secret. Counsel for SaveOnSP acknowledged in open court that Express Scripts is "our business partner" who is "right in there with us" and it "make[s] money off what we do." Transcript of Hearing at 55:5–6, 55:15–16 (Apr. 13, 2023) (remarks of counsel for SaveOnSP from Selendy Gay PLLC). The generation of profits through the SaveOnSP scheme is of notable value to Cigna, whose CEO not only has "knowledge about the [SaveOnSP] program," but also "its success, the value it brings to the organization" and its "growth/investment."

PHARMA (Oct. 2021), https://www.saveonsp.com/wp-content/uploads/2022/01/SaveOnSP-FPh-white-paper-07.pdf (describing SaveOnSP's offering as a "copay maximizer program"). When communicating with patients, SaveOnSP employees struggle to refrain from calling SaveOnSP a "program." Indeed, the Master Program Agreement between SaveOnSP and ESI—which uses the word program in its name—itself refers to SaveOnSP's offering as the "SaveOn Program." *See infra* ¶ 63.

63. The contours of the SaveOnSP Program, and the exclusive partnership between Express Scripts and SaveOnSP in particular, are governed by a Master Program Agreement (the "Agreement"). "The SaveOnSP program was developed in concert with ESI." Since its inception in 2016, SaveOnSP has relied on Express Scripts to promote the Program to Express Scripts' clients, who comprise the vast majority of SaveOnSP's payer partners, and to operationalize the SaveOnSP Program. Pursuant to the Agreement, Express Scripts provides an array of services essential to the operation of the SaveOnSP scheme, "including operational set-up and support, member and claims support, program and benefit coordination, program invoicing and fee collections." Express Scripts charges participating health plans an administrative fee equal to 25% of the "savings" extracted from CarePath via the artificially inflated SaveOnSP copay amount. *See SaveOnSP IPBC Video*, *supra* ¶ 9, at 37:38. Express Scripts splits this fee with SaveOnSP, enabling both companies to profit from the scheme. While the precise profit-sharing has varied over time, in recent years SaveOnSP has received a bounty equal to a significant percentage of the "savings," with the balance retained by Express Scripts.

64. When a health plan or employer decides to implement the SaveOnSP Program, they must execute a joinder to the Agreement between SaveOnSP and Express Scripts. Among other things, the health plan client also submits an authorization for Express Scripts to disclose protected health information gathered through the administration of the SaveOnSP Program to SaveOnSP.

65. Once a health plan client submits the requisite agreements to implement the SaveOnSP Program, the client, SaveOnSP, and Express Scripts collaborate on outreach strategies to inform the plan's members about the Program and facilitate enrollment. Letters sent to members about the SaveOnSP Program sometimes feature both the Express Scripts and SaveOnSP logos.

**Accredo's Role In Carrying Out The SaveOnSP Scheme**

66. Accredo focuses on dispensing complex and sensitive specialty medications, including many of the Janssen drugs at issue here. *See Find a Medication*, ACCREDO, https://www.accredo.com/medications (last accessed Mar. 11, 2024). It also handles the insurance claims process for patients filling prescriptions for specialty drugs, drawing upon CarePath and other manufacturer assistance programs to do so. An Accredo presentation about its "Service Journey" describes how "SaveOnSP has partnered with Accredo as our Copay Maximizer vendor," a reference to the important role Accredo plays in Defendants' scheme to inflate patients' copayment amounts to drain manufacturers' available copay assistance funds.

67. Most patients enrolled in the SaveOnSP Program are required to use Accredo as the specialty pharmacy to fill their prescriptions for SaveOnSP-eligible medications. When a patient seeks to fill a prescription, Accredo will transfer those patients to SaveOnSP to make sure that the patients enroll both in SaveOnSP and the pharmaceutical company's copay assistance program. The SaveOnSP scheme depends on this so-called "warm transfer."[13] Accredo's ability to access and offer medications is one critical factor in the determination of what drugs can be included in the SaveOnSP Program.

68. Even though Accredo is not a participant in the fee-splitting arrangement between SaveOnSP and its parent Express Scripts, it directly benefits financially from the SaveOnSP scheme because it receives new and continuous sources of transactions from the SaveOnSP Program. Moreover, even though the total monetary amount Accredo receives for a prescription

[13] A "warm transfer" is "a telecommunications mechanism in which the person answering the call facilitates transfer to a third party, announces the caller and issue and remains engaged as necessary to provide assistance." *Warm Transfer Definition*, LAW INSIDER, https://www.lawinsider.com/dictionary/warm-transfer (last visited Mar. 11, 2024).

does not change through the SaveOnSP scheme, a greater percentage of that amount will reflect CarePath funds, as opposed to funds otherwise collected from the patient or their plan. Therefore, Accredo will collect more copay assistance dollars from CarePath than it would absent its participation in the scheme for each prescription that it fills affiliated with the SaveOnSP Program.

**SaveOnSP, Express Scripts, and Accredo Coordinate the Management and Marketing of the SaveOnSP Scheme**

69. Since the SaveOnSP scheme requires close coordination between SaveOnSP, Express Scripts, and Accredo, it is unsurprising that executives of the three companies are in regular communication. Executives from Express Scripts, Accredo, and SaveOnSP hold regular calls to discuss operational issues and communication strategies. At those meetings, projects related to the management and marketing of the SaveOnSP Program are assigned to employees of each of the three companies. Express Scripts and Accredo employ SaveOnSP "product owners" who are responsible for managing the companies' relationship with SaveOnSP. Defendants' employees also regularly share marketplace intelligence, including changes to the terms and conditions of manufacturers' copay assistance programs and potential changes to the SaveOnSP Program design. For example, a Senior Express Scripts Project Manager stated that while Express Scripts and SaveOnSP ordinarily would lack "visibility" into when program terms change, "our partners at Accredo" can discover this information through "proactive research." Accredo employees report back these developments to SaveOnSP and Express Scripts, which can then make "updates" to the SaveOnSP Program to help evade detection by manufacturers. In one instance, an Express Scripts employee shared intelligence with his contact at SaveOnSP that two manufacturers, including JJHCS, were "taking additional steps" to prevent the misappropriation of their program funds, and as a result, Express Scripts was "working to baseline" the

manufacturers' processes and "to better understand [the] impact of this latest move" on the SaveOnSP Program.

70. When necessary to advance the objectives of the SaveOnSP scheme, employees have moved seamlessly between the three companies while continuing their work to effectuate the SaveOnSP scheme. At times, it can be difficult to determine whether an individual works for Express Scripts or Accredo, as many employees for each company are cross-designated as Express Scripts and Accredo employees and utilize email addresses for both entities at the same time. For example, Accredo's Vice President of Product Development worked extensively with SaveOnSP on crafting its communications strategy and program structure over the course of several years. She later transitioned to a cross-designated role in which she appeared to work primarily for Express Scripts, without leaving Accredo. In that dual capacity, she worked closely with SaveOnSP's senior executive team to use Express Scripts funds to address cash flow problems at SaveOnSP. Another executive who worked at Express Scripts during the start-up phase of the SaveOnSP Program, and who was critical to the design of SaveOnSP's communications strategy, was later engaged by SaveOnSP to work as a consultant to "refram[e] SaveOnSP messaging." This shifting of personnel from one of the three defendants to another further demonstrates that the three defendants work jointly as a team to advance the SaveOnSP scheme.

71. Marketing efforts are closely coordinated. Employees from SaveOnSP and Express Scripts collaborate to develop joint marketing materials and outreach communications to plans and patients. As one SaveOnSP representative remarked, the close partnership between SaveOnSP and Express Scripts means that it would be "[b]est to have us all using, referencing, and agreeing to the same presentations."

72. To market the SaveOnSP Program and provide information to potential clients, SaveOnSP representatives reach out to Express Scripts employees for their guidance and approval on marketing materials describing the SaveOnSP Program. Express Scripts employees provide feedback and ensure that the marketing materials are "aligned with brand standards" and consistent with other SaveOnSP Program resources. For example, in response to a request for information about the SaveOnSP Program, SaveOnSP representatives developed a slide that was subsequently edited by Express Scripts and incorporated the Express Scripts logo.

73. SaveOnSP and Express Scripts employees discuss and analyze potential strategies to utilize in marketing, messaging, and sales efforts. For example, an employee from Express Scripts sent an email communication to SaveOnSP representatives noting that an analysis of "adherence data," which they "were hoping to include . . . into our external marketing campaign," led to "negligible" results and would therefore be omitted. In another example, Express Scripts and SaveOnSP employees discussed "reframing SaveOnSP messaging" including how to "get away from the concept that members must 'enroll,' as that is causing some manufacturers to deny copay assistance." In response, they collaborated on how to alter the content of the "Accredo Messaging" "being pushed" to patients when they receive a point-of-service denial that includes a statement "that the member must enroll in SaveOnSP."

74. Defendants also work together to develop announcements for health plans to send to patients regarding changes to the SaveOnSP Program. For example, SaveOnSP employees drafted a client letter outlining "drug list changes" taking place on July 1, 2018, which was sent to Express Scripts and Accredo for review and approval. In response, an employee from Accredo responded with edits and noted that Defendants "may need to course correct" on their "message/strategy" based on "patients [being] denied copay assistance entirely due to having an

'accumulator' program in place." Defendants also work together to draft Sales and Account Communications, known as SAMCOMMs, that are distributed by Express Scripts to health plans participating in the SaveOnSP Program. In one instance, Express Scripts, Accredo, and SaveOnSP exchanged many drafts of a SAMCOMM that covered "Copay Assistance Changes Impacting SaveOnSP design," with employees from all three entities providing substantive comments on the draft communications and weighing in on messaging strategies.

## IV. The SaveOnSP Program Drains Copay Assistance Program Funds for the Benefit of SaveOnSP, Express Scripts, and Accredo

75. SaveOnSP's business model is to drain copay assistance from programs like CarePath by increasing patient out-of-pocket costs in a manner that serves no end other than to maximize profits for SaveOnSP and its partners, Express Scripts and Accredo. SaveOnSP's compensation is based on a contingency fee; it is paid a percentage based on the amount of copay assistance it is able to extract from manufacturer programs like CarePath. In partnership with Express Scripts and Accredo, SaveOnSP markets and sells its program to payers, and then induces patients to enroll.

### <u>The Means and Methods of the SaveOnSP Scheme</u>

76. The modus operandi of the SaveOnSP scheme is revealed in a video posted online showing a SaveOnSP Program presentation to an Illinois-based health insurance plan sponsor. *See SaveOnSP IPBC Video*, *supra* ¶ 9. In the presentation, the SaveOnSP representative admits that the SaveOnSP Program works by designating drugs covered under the health plan as non-essential health benefits: "for a number of drugs, we can carve them out and create a different benefit design, where we designate these drugs as non-essential." *Id.* at 5:30.

77. This designation prevents any money paid toward the drug from applying to the ACA's annual limit. *Id.* at 7:23 ("[W]e're just not gonna allow [copay assistance] to hit [the

patient's] max out-of-pocket."). This is because the ACA's annual limit applies only to "essential health benefits." *See* 45 C.F.R. § 155.20 (defining "cost sharing" so that the annual out-of-pocket maximum applies only to "any expenditure required by or on behalf of an enrollee with respect to ***essential health benefits***" (emphasis added)).

78. As is clear from the presentation, there is no legitimate medical reason for applying the designation, as the drugs are plainly essential for the health and well-being of many patients. Rather, SaveOnSP uses the designation to extract as much money from copay assistance as possible: "***The moment we reclassify these as non-essential we get to operate outside of those rules, which removes the limitations for how high we set the copay***, it removes the requirement to apply copay assistance dollars to the max out-of-pocket. And that's what allows us to be ***the most lucrative*** in terms of driving savings for SaveOn." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 23:35.

79. This "inflated" copay cost is essential to the SaveOnSP Program's mission of siphoning off patient copay assistance funds from programs like CarePath: "in order for us to capitalize on this copay assistance funding, ***we have to have that inflated copay upfront to bill to copay assistance***." *Id.* at 19:01. For example, the representative explains, if the amount of assistance per fill is $6,600: "we would literally set the patient copay to $6,600, and you would save that amount on every fill." *Id.* at 6:11. To be clear, the "you" in this presentation is the health plan—not the patient.

80. The SaveOnSP scheme exploits a perceived a loophole in the ACA. To cover the required number of prescription drugs mandated by the ACA, a payer must identify as "essential" the greater of "(i) One drug in every United States Pharmacopeia (USP) category and class" or "(ii) The same number of prescription drugs in each category and class as the EHB-benchmark

plan."[14] 45 C.F.R. § 156.122(a)(1); *see also* 42 U.S.C. § 18022(b)(1) (specifying that the Secretary of Health and Human Services shall "define the essential health benefits" including, *inter alia*, "[p]rescription drugs").

81. Because the regulation requires that payers provide "the same number" of prescription drugs in each category or class as the specified benchmark plans, SaveOnSP takes the view that payers may de-designate drugs covered beyond that number. This view is reflected in a slide accompanying the recorded presentation:




*SaveOnSP IPBC Video*, *supra* ¶ 9, at 9:30.

82. SaveOnSP and Express Scripts representatives have collaborated to develop guidance documents related to the SaveOnSP Program and compliance under the ACA. For

[14] An "EHB-benchmark plan" is a "standardized set of essential health benefits that must be met by a" payer. 45 C.F.R. § 156.20. Each state typically selects the parameters for their own EHB-benchmark plan. 45 C.F.R. § 156.100.

example, SaveOnSP employees referred to "an INTERNAL to ESI document" to "find answer[s] to a lot of questions on the program." The document, "FAQ: Copay Assistance Solutions," is described as the "primary resource for information about the Express Scripts Copay Assistance Solutions," including the SaveOnSP Program. The FAQ document explains that "[i]mplementation of the SaveOnSP program requires identifying certain drugs as non-essential health benefits," the drug list reflecting the medications included in the program "varies based on the benchmark state and client formulary," and that "SaveOnSP feels that their program is in accordance with all rules and regulations within healthcare." It also provides regulatory guidance on what types of plans Express Scripts and SaveOnSP believe are eligible to implement the SaveOnSP Program pursuant to existing regulations. This FAQ was made available to Express Scripts account representatives who worked to "sell" the SaveOnSP Program to existing Express Scripts clients.

83. SaveOnSP and Express Scripts employees work together to draft responses when clients express skepticism about the SaveOnSP Program's compliance with the ACA. For instance, one client stated that the "practice of reclassifying certain high cost specialty drugs as non-essential health benefits . . . in order to fully utilize manufacturer financial assistance concerns us. Drugs carved out of the EHB are not afforded the protections of the ACA." An Express Scripts employee requested that a SaveOnSP representative draft an appropriate response to address these concerns. When she provided an explanation that "the [non-essential health benefits] are not subject to the annual and lifetime cost sharing requirements under the ACA," the Express Scripts representative responded, "Thanks perfect."

84. The Centers for Medicare & Medicaid Services ("CMS") has stated that if a payer "is covering drugs beyond the number of drugs covered by the [EHB] benchmark, all of these

drugs are EHB" and cost sharing paid for drugs properly classed as EHB "must count towards the annual limitation on cost sharing." *See* Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10749, 10817 (Feb. 27, 2015) (codified at 45 C.F.R. pts. 144, 147, 153, 154, 155, 156 and 158). To eliminate any ambiguity, CMS has proposed amending 45 C.F.R. § 156.22 as part of the 2025 Notice of Benefit and Payment Parameters Proposed Rule, to "explicitly state that drugs [covered] in excess of the benchmark are considered EHB" and would therefore be required to count toward the annual limitation on cost sharing. *See* Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2025, 88 Fed. Reg. 82510 (Nov. 24, 2023) (to be codified at 45 C.F.R. pts. 435 and 600). SaveOnSP's scheme defies these admonitions. Instead, Defendants designate covered drugs—including life-saving oncology, pulmonary arterial hypertension, and immunology drugs—as non-essential health benefits so that they can inflate patient copay obligations.

85. Once the copay cost is inflated, SaveOnSP can coerce the patient to enroll in its Program (and consequently in manufacturer co-pay support programs) by telling them that they will either pay $0 per prescription if they enroll, or will have to pay the inflated copay cost—potentially in the thousands of dollars—themselves if they do not: "Meaning if you don't participate in this program, your copay or your responsibility will be [for example] $1,000. And because it's not part of your existing benefit design, that $1,000 is not applicable to your max out-of-pocket. And that's often compelling enough for members to say, 'oh wait, . . . I want my drugs for free.'" *SaveOnSP IPBC Video*, *supra* ¶ 9, at 46:10. Because most patients cannot afford such costs, they are essentially forced into acceding to SaveOnSP's offer.

86. To communicate this coercive offer to patients, SaveOnSP first engages in outreach. The representative explains that once the payer signs the contracts to use its program,

"there is a standard member letter that we have that can be co-branded" that is sent to patients in the first 30 days, and "it's our goal to outreach to every one of these members before the program ever goes live." *Id.* at 33:27; 34:04. The representative explains further that "at 30 days out, if we're unsuccessful in reaching those members, we send a reminder letter and again, another phone call campaign with attempts to try and get contact with that member and get them enrolled." *Id.* at 34:25.

87. On average, however, only 55% to 65% of the payer's membership typically gets enrolled by the date that the program goes live. *Id.* at 34:50. At this point, SaveOnSP leverages its partnership with Accredo to facilitate patient enrollment. As the specialty pharmacy designated by the payers to administer the drug benefit plan, Accredo steers the patients to SaveOnSP. In the words of the SaveOnSP Program representative (who is an Express Scripts employee), "our Accredo advocates, once the claim is processed, will receive a prompt to alert them that this is a SaveOn drug, and they have some scripting that says, 'We have an opportunity for you to participate in a program which allows you to get your drug for free. I need to connect you to SaveOn now.' And at that point in time, they 'warm transfer' the member to SaveOn." *Id.* at 35:14.

88. As illustrated in paragraph 14 above, adding to the pressure placed on patients, Accredo actually ***rejects*** the patient's claim for their prescription medication at the point of sale in order to transfer them to SaveOnSP, even though that medication is covered by the patient's insurance. *Human Resources Committee Meeting*, *supra* ¶ 14, at 69. The point-of-sale rejection at Accredo prevents any patient, whether they want to enroll in SaveOnSP or not, from filling their SaveOnSP-eligible prescription until they make contact with SaveOnSP to accept or decline enrollment. The rejection has nothing to do with the validity of a patient's prescription and

everything to do with holding critical medication hostage until a SaveOnSP representative has the chance to "strong arm[]" the patient into enrolling in the Program. The success of the SaveOnSP Program hinges on the "warm transfer" from Accredo to facilitate enrollment.

89. Once the patient agrees to enroll in the SaveOnSP Program, SaveOnSP then makes sure that the patient enrolls in the manufacturer copay assistance program applicable to the prescribed medication. The representative explains that "SaveOnSP can help facilitate with the member on the phone" to guide them through online enrollment, or if enrollment is by phone, can advise patients "as how to respond to the questions that they're being asked as part of enrollment." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 16:08; 16:38. For example, when a patient reports that "[t]he manufacturer told me I need to disenroll in your program to be covered by their copay assistance," SaveOnSP instructs its employees to respond with the following script: "SaveOnSP is not a program, we are a service to help support you in obtaining the financial support needed for your medication. ***You can advise them that you are not enrolled in a program. . . . You can let the manufacturer know that you are not enrolled***." As noted above, SaveOnSP has repeatedly referred to itself internally and in communications and even in its agreement with Express Scripts as offering a program. Moreover, SaveOnSP is now directing patients to lie to manufacturer programs like CarePath, i.e., directing them to falsely tell the relevant manufacturer that they are "not enrolled" in the SaveOnSP Program if asked.

90. SaveOnSP inserts itself in this process of CarePath registration even though it knows that the enrollment in its program violates the express terms and conditions of the CarePath agreement that prohibit the patient from combining CarePath with the SaveOnSP Program. SaveOnSP recognizes that the CarePath relationship "is an agreement between the patient and copay assistance through the manufacturer," but nevertheless involves itself because "in order for

us to leverage the savings, the member has to actively enroll in copay assistance. ***That's where the savings comes from.***" *SaveOnSP IPBC Video*, *supra* ¶ 9, at 49:20. Once SaveOnSP assists the patient in enrolling in copay assistance, "it relays that to Accredo, so that it's housed in our system and then again, the claims from there on out just process at $0." *Id.* at 35:54. As discussed *infra* at ¶¶ 94–101, 116–21, SaveOnSP and Express Scripts expend considerable effort and often use deception to learn the terms and conditions applicable to each copay assistance program.

91. To carry out the SaveOnSP Program, Accredo electronically bills CarePath for an inflated copay cost that is not connected to the patient's true out-of-pocket responsibility. The amount charged to the CarePath card at the point of sale is communicated using an "OCC-8" code, which tells JJHCS that the patient owes a copay for the drug. That code is supposed to communicate the patient's true out-of-pocket responsibility as set by their health plan. Instead, SaveOnSP causes an inflated charge to be communicated to JJHCS for the express purpose of draining more patient assistant funds from the patient's CarePath card.

92. This misrepresentation of an inflated copay is made to JJHCS even as it tells patients elsewhere while in the SaveOnSP Program they do not have any copay obligation whatsoever. *See Pay $0 for Select Specialty Medications*, *supra* ¶ 12 ("If [a patient] participates in SaveOnSP, he won't pay anything ($0) out-of-pocket.").

93. Finally, SaveOnSP charges the payer "25% of the savings that's achieved." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 37:38. To facilitate this payment, payers sign "a 25% joinder agreement," which "allows Express Scripts to bill you for that fee on your administrative invoice. So you'll see a simple line item for SaveOnSP." *Id.* at 40:50. In other words, SaveOnSP is paid a percentage of the "savings" it has achieved for payers by meeting the payer's obligations to the patient with copay assistance funds—assistance that SaveOnSP obtains by inducing patients to

violate the terms and conditions of CarePath. Express Scripts retains a significant portion of the SaveOnSP fee charged to health plans and remits the remainder to SaveOnSP.

**Defendants Developed the SaveOnSP Program to Increase Their Profits Without Regard For Patient Impact**

94. Defendants admit to engaging in tactics designed not for the patient's benefit but to optimize their own earnings. For example, in deciding which drugs make it onto SaveOnSP's drug list, the program representative explains that SaveOnSP looks to which drugs "have the most lucrative copay assistance programs" and that SaveOnSP may "remove drugs from the programs" if "something comes to our attention where the funding goes away completely." *Id.* at 14:47.

95. SaveOnSP openly communicates this strategy to clients who question why there are not more drugs on the SaveOnSP list, informing them that "not only do we take EHB count into consideration, but we also have to take the manufacturer program itself (monthly/annual limits, etc.), the enrollment criteria . . . , etc." This further demonstrates that Defendants are making business-driven decisions without any regard for what is best for the patients. Indeed, while SaveOnSP promises patients that they will receive their medication for $0, if the copay assistance is removed, it will eventually move the drug out of the SaveOnSP Program: "we would honor the copay assistance or the $0 SaveOn copay until they were able to effectively manage that patient out, manage that drug out." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 14:58.

96. In order to ensure that only the most lucrative drugs are on its list, SaveOnSP monitors manufacturers' assistance terms and conditions: "in the event that pharma decides to pull back funding for their programs ***or decides to change the terms of the program***, it's seamless to the member. ***SaveOn is actively watching*** these claims process and sees when any of these changes occur." *Id.* at 31:50. And in response to such a change, SaveOnSP might switch one drug off its list in exchange for another one: "it might be a prompt to determine, 'Do we need to make

a change in the drug list for this program? Because we are not saving as much as we initially anticipated, and there's another drug where we could.'" *Id.* at 32:09.

97. Indeed, upon information and belief, SaveOnSP and Express Scripts work with plans who contract for the SaveOnSP Program to explore or engage in a process known as non-medical switching. Non-medical switching is a cost-savings strategy whereby patients stable on their medicines are forced "to switch from their current, effective medications to drugs that may not be as effective, for reasons unrelated to health." *See What Is Non-Medical Switching*, NAT'L INFUSION CTR. ASS'N, https://infusioncenter.org/non-medical-switching/ (last accessed Mar. 12, 2024).

98. A SaveOnSP representative described this strategy of "mov[ing] members to alt medications in the therapy class" as a "more aggressive counter-strategy threat" to be deployed when a manufacturer threatens Defendants' profits by limiting copay assistance available to SaveOnSP-affiliated patients. This strategy has been incorporated into talking points sent to clients.

99. In at least one instance, SaveOnSP has also taken steps to operationalize non-medical switching in the face of manufacturer efforts to thwart the SaveOnSP Program's misappropriation of copay assistance funds. For example, when a drug manufacturer indicated in 2020 that it would reduce the amount of funding available to SaveOnSP affiliated patients, SaveOnSP drafted communications to patients and their providers suggesting that they might "switch their medications" and directing them to "other pharmaceutical companies . . . to meet [their] therapeutic needs."

100. Likewise, to minimize the necessary coverage and maximize profits, payers using the SaveOnSP Program are encouraged to pick the state EHB-benchmark plan that has the lowest

number of requirements: "So again, the ACA defines the essential by again, leveraging a state benchmark. You do not have to leverage your own current state or the state in which most of your members reside. It's simply a guideline for how to administer that essential health benefit. So for example, many commercial plans pick Utah because it had the fewest number of required drugs to cover, and therefore it was the most cost-effective. So all we're saying is that Utah is setting the list of drugs or the number of drugs by therapeutic category to be deemed essential." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 22:40. In other words, instead of picking a state benchmark that reflects where a payer's patients live or where the drug coverage is most comprehensive, Defendants encourage payers to choose a state benchmark with as few requirements as possible to maximize profits.

101. The SaveOnSP Program representative also admits that the SaveOnSP Program operates in a legal "gray area" as it relates to "qualified high deductible HSA [i.e., Health Savings Account] plan[s]." *Id.* at 25:55; 26:27. The representative acknowledges in her presentation that "copay assistance is not ACA compliant in an HSA plan." *Id.* at 26:43. But she explains that SaveOnSP gets away with knowingly breaking this rule because of a lack of oversight: "there's no requirement that patients provide documentation or confirm that they've met their deductibles before they get copay assistance," and "there's no governing body that's really monitoring . . . the industry today," so "copay assistance happens in qualified HSA plans all the time." *Id.* at 26:50. Defendants thus leave it to plans to "determine whether or not it's appropriate to include their HSA plans in the SaveOn offering or not." *Id.* at 27:27.

**<u>The SaveOnSP Program Relies On Systematic Deception of Patients</u>**

102. SaveOnSP misleads patients about the nature of the SaveOnSP Program in a variety of different ways. Patients are misled about whether participation in the Program is voluntary and

the potential consequences of a patient's enrollment. SaveOnSP does not tell patients that by enrolling in the SaveOnSP Program, they are breaching their agreement with JJHCS. It does not tell patients that the SaveOnSP Program may cause as much as a year's worth of copay assistance to be drained in just a few prescription fills. And it does not tell patients that it charges a fee of at least 25% of the copay assistance funds taken from the manufacturer, or that it shares those funds with Express Scripts and the patient's health plan, conferring a benefit in many instances on the patient's employer who promised to pay for the patient's health insurance costs as a term of his or her employment. The President of SaveOnSP even admitted that the SaveOnSP Program "is an extremely confusing offering for all parties to fully understand[.]"

103. SaveOnSP affirmatively conceals from patients that its program is a copay maximizer, i.e., one that sets patients' cost-sharing obligations based on the maximum dollar amount available through manufacturers' copay assistance programs. This is not a matter of debate: the SaveOnSP Program "works by setting the member's copay to drive full use of the available manufacturer assistance dollars." Indeed, SaveOnSP describes itself on its own website as a "copay maximizer program." *See Copay Maximizers Vs. Accumulator Adjustments: Navigating Key Differences for an Optimized Solution*, *supra* ¶ 61 n.12.[15] Yet SaveOnSP conceals this fact from patients, instructing its employees to "NEVER be using the words 'copay maximizer program' when talking to a member/pharm." The impossibility of this approach was best expressed by a SaveOnSP employee who asked how he should "define a copay maximizer" to sales representatives "without sounding like that's what we are." This tactic ensures patients are

[15] SaveOnSP's founder acknowledges that its program is a maximizer, admitting that SaveOnSP "is a maximizer in the vernacular of the industry."

kept in the dark about the fact that the SaveOnSP Program operates to divert the benefits of copay assistance funds from patients to Defendants.

104. Moreover, although patients may choose not to participate in the SaveOnSP Program, in reality this "choice" is illusory. After a plan contracts with SaveOnSP and Express Scripts, SaveOnSP's inflated copayments apply to all plan members, regardless of whether they choose to enroll in the Program. In other words, even members who decline enrollment in the SaveOnSP Program are still subject to the inflated copay obligation. The difference is that SaveOnSP will not "monitor" their account to "ensure a $0 cost." A SaveOnSP representative described this paradox as follows: "the plan change is mandatory, . . . whether a member agrees to participate to ensure a $0 cost is the voluntary piece."

105. Express Scripts and SaveOnSP's outreach strategies are designed to coerce patients into participating in the SaveOnSP Program by emphasizing the huge penalty that may result from failure to enroll: being financially responsible for the inflated copay amount. SaveOnSP and Express Scripts collaborate on patient outreach materials to "make it read like there is not [an] option but to participate in the program[.]" Indeed, the President of SaveOnSP stated to a plan representative that the "penalty" of any "choice" not to participate in the SaveOnSP Program is to pay the inflated copay "set to the max available" of a manufacturer's copay assistance funds. If a patient chooses not to enroll, "[t]he penalty is they pay the copay however we don't call it a penalty. ***We call it patients choice***."

106. Even if a patient manages to overcome the informational barriers that Defendants have erected and decides not to enroll in the SaveOnSP Program, she will still be subject to the increased SaveOnSP copay. Patients who choose not to enroll in SaveOnSP can still enroll in CarePath, but they run the risk of exhausting the available copay assistance funds early in the year

due to the grossly inflated copay. If they do exhaust their CarePath funds early, patients are responsible for copays for their medications that are thousands of dollars per fill and any payments made towards these copays will not count towards their annual deductible or out-of-pocket maximum.

107. Given the potentially devastating financial consequences of failing to participate in the SaveOnSP Program, enrollment is hardly a choice at all. As one patient remarked, "It's frustrating that this change which is supposed to be beneficial to me is ***promoted as a choice***, ***but it is only a choice between acceptance or tens of thousands of dollars a year to properly treat a medical condition that is beyond my control***."

108. As part of their coercive outreach strategy, SaveOnSP and Express Scripts do not tell patients that copay assistance is available without the SaveOnSP Program that may lessen their financial responsibility for their copay amounts. Indeed, in marketing materials, SaveOnSP misrepresents to patients that "Without SaveonSP," "[t]here is no copay assistance."

**Without SaveonSP**
The prescription copay is paid by you. There is no copay assistance.

| Drug Cost | Your Copay | Copay Assistance | Your Total Cost | Plan Cost |
|---|---|---|---|---|
| $2,250 | $50 | $0 | $50 | $2,200 |

*SaveonSP: Copay Offset Program for Specialty Medication*, HIGHMARK, formerly at https://www.bcbswny.com/content/dam/BCBSWNY/broker-group/public/pdf/group/computer-task-group/Saveon-Member-Flyer.pdf (last visited Jan. 31, 2024). This is false: manufacturers provide copay assistance independently of SaveOnSP, and did so for many years before SaveOnSP ever began interfering in these programs.

109. SaveOnSP and Express Scripts also fail to inform patients affiliated with certain plans that they can override the SaveOnSP Program—and the inflated copay—altogether and remain with their existing plan design. For these plans, members who opt-out of the SaveOnSP Program are not subject to the inflated copay obligation. Rather, the Express Scripts team "can enter the override at [the plan's] direction," remove the SaveOnSP inflated copay, and reinstate whatever copay amount the patient was paying prior to the plan introducing the SaveOnSP Program. Essentially, for these patients, it will be as if the SaveOnSP Program's inflated copay does not exist.

110. SaveOnSP and Express Scripts adopt evasive strategies in order to conceal this option available to patients associated with certain clients. In fact, one plan that adopted the opt-out model remarked that SaveOnSP's draft letter to patients seemed "very smoke and mirrors" because it failed to clearly indicate that a member had the ability to opt-out of the SaveOnSP Program and remain with their existing copay obligation. SaveOnSP refused to make this option clear to patients in the outreach letter.

111. Not only do Defendants hide this option from patients, but they also leave their own health care plan clients in the dark about how copay overrides can be implemented, unless they affirmatively ask about this option. Accredo, SaveOnSP, and Express Scripts all discussed this option and concluded that "[t]his is NEVER to be used proactively" but rather could "be discussed if [the plan] see[s] the potential member noise as a barrier to implementation." "Member noise" is the euphemism used by Defendants for patients complaining about how they have been misled and otherwise harmed by the SaveOnSP Program.

112. SaveOnSP and Express Scripts mislead patients about the consequences of their potential enrollment in the SaveOnSP Program. In some instances, for plans that do not want the

inflated copay to be discussed during patient outreach calls, SaveOnSP and Express Scripts omit ***any*** discussion of the increased copay amounts that will apply. For these plans, SaveOnSP advises its sales representatives to stick to an "easy to sign up message" and "not mention the increased copay during enrollment." This tactic deprives patients of information about the hallmark of the SaveOnSP scheme—the drastically increased copayment amount—and denies them the ability to make an informed choice about whether to participate.

113. SaveOnSP and Express Scripts also deceive patients about how their enrollment in the SaveOnSP Program will preclude their eligibility to participate in CarePath. Although SaveOnSP is aware of the CarePath terms and conditions, which prohibit CarePath's use in connection with any "other offer" like the SaveOnSP Program, SaveOnSP representatives advise patients that they can participate in both programs simultaneously. SaveOnSP representatives even advise patients enrolled in SaveOnSP to tell manufacturers the falsehood that they "are not enrolled in a program."

114. Furthermore, SaveOnSP and Express Scripts collaborate to ensure they control the information available to patients about the SaveOnSP Program. They have agreed upon a practice in which they avoid referring members back to their plan's benefit coordinator or human resources department. This is because the plan coordinator or human resources department might ask hard questions about the SaveOnSP Program that the Defendants would rather not be asked, or even recommend that the plan not participate in the SaveOnSP Program. Instead, SaveOnSP employees are directed to refer patients with questions to Express Scripts, which is financially motivated to do none of these things.

**<u>The SaveOnSP Program Also Involves Deception of Drug Manufacturers' Copay Support Programs, Including JJHCS</u>**

115. SaveOnSP actively conceals its identity from manufacturers' copay assistance programs, including CarePath. SaveOnSP knows that participation in its Program violates CarePath's Terms and Conditions. Thus, SaveOnSP takes significant measures to avoid detection. For example, SaveOnSP maintains strict guidelines to ensure that its Patient Services Representatives ("PSRs") do not identify themselves as employees of SaveOnSP and, likewise, that SaveOnSP-affiliated patients cannot be identified as being enrolled in SaveOnSP. SaveOnSP thus instructs PSRs to "**NEVER** disclose any information regarding SaveOnSP" to manufacturers and to tell manufacturers that they are calling "on behalf of" the patients' employer or health plan, instead of SaveOnSP. Under this company policy, PSRs mislead CarePath into thinking they are employed by entities other than SaveOnSP. SaveOnSP management routinely trains PSRs on these guidelines, and they are evaluated on their compliance with them. PSRs who fall short receive additional "coaching" on how to conform to the company's policy on evasion.

116. To facilitate this policy of deception, SaveOnSP has a dedicated "Special Projects Coordinator" whose primary "special project" is to research and catalogue the terms and conditions of various copay assistance programs. She routinely calls copay assistance programs, including CarePath, to learn more about the programs' terms and conditions. Mindful that patients who enroll in the SaveOnSP Program are ineligible for manufacturer copay assistance, the Special Projects Coordinator employs deceitful strategies to keep her affiliation with SaveOnSP undetected. For example, she repeatedly has called CarePath, including in October 2021 and April 2022, and utilized deceptive tactics including calling from personal and anonymized phone numbers and utilizing fake names and false affiliations during those calls. In other communications with CarePath, she has claimed to be calling from Express Scripts, Accredo, and

various doctors' offices—anyone but SaveOnSP. She has misrepresented her professional credentials, claiming to be a pharmacist even though she was not. All of these exhaustive efforts to disguise her identity were in service of acquiring information about CarePath's terms and conditions and its administration so that SaveOnSP could efficiently—and without detection—enroll SaveOnSP patients into CarePath even though those patients were rendered ineligible due to their participation in SaveOnSP.

117. SaveOnSP's upper management, including its President and Managing Partner, closely supervised the Special Projects Coordinator's work, asking her to collect detailed information about copay assistance programs. She compiled her research into spreadsheets complete with links to each programs' website, abbreviated terms and conditions, eligibility requirements, and the amount of assistance offered per year. She regularly shared her spreadsheets with SaveOnSP's upper management and billing department, to keep them apprised of her work. SaveOnSP used this ill-gotten research to make decisions about what medications to keep, add, or remove from SaveOnSP's drug list.

118. In addition, the Special Projects Coordinator investigated changes to copay assistance programs' terms and conditions and methods of copay fund distribution. With respect to JJHCS, she called CarePath to obtain additional information about JJHCS's efforts to mitigate SaveOnSP's scheme, including efforts to identify patients who participate in programs like SaveOnSP's, what vendor issues CarePath copay cards, and whether patients on Medicare are eligible to enroll in CarePath. Upon learning of potential changes to the eligibility requirements for the CarePath program, the Special Projects Coordinator sought permission from SaveOnSP's President and Managing Partner to call JJHCS to "verify" the supposed changes. After covertly obtaining this type of information, the Special Projects Coordinator disseminated it to her

colleagues so that they could enhance their methods of gaining information while avoiding detection.

119. In another instance, the Special Projects Coordinator encouraged a PSR to ignore a CarePath agent's instruction that the PSR could not remain on the line during an enrollment call with a patient. Instead of instructing the PSR to abide by this rule, the Special Projects Coordinator told the PSR to "do a conference call with the member on the line and act like you are dropping off the line but put yourself on mute."

120. In addition to calling manufacturers, the Special Projects Coordinator engaged in "mock" enrollments in copay assistance programs, including CarePath. The Special Projects Coordinator falsified her own personal medical history to enroll in at least five copay assistance programs so that she could obtain information about the programs' enrollment processes and terms and conditions for the benefit of SaveOnSP. As applied to JJHCS, the Special Projects Coordinator conducted a mock enrollment into CarePath for the Janssen Drug PREZCOBIX®, an HIV medication, even though she was never prescribed this medication and had no legitimate reason to enroll in CarePath.

121. The Special Projects Coordinator was not the only SaveOnSP employee who used deceptive tactics when calling manufacturers' copay assistance programs. At least two other employees "did not use their real names when speaking with Pharmaceutical Manufacturers about their copay assistance programs" and at least three other employees "conducted mock enrollments" including "false names and medical histories."

122. Further, SaveOnSP deceives manufacturers by actively concealing its role and interference with copay assistance programs. SaveOnSP knows that such programs often have a requirement that a patient pay $5 or $10 of the cost of the prescription. But SaveOnSP intentionally

circumvents this requirement by shifting that $5 or $10 obligation onto the payer—and actively conceals from JJHCS that it has done so by using the artifice of a "tertiary biller," which is "really SaveOn behind the scenes." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 30:24.

123. In addition, SaveOnSP and Express Scripts altered the SaveOnSP Program structure in order to evade detection by changing the methodology for setting patients' inflated copayment obligations. Historically, SaveOnSP and Express Scripts instituted a "flat dollar, set copay submitted to the manufacturer . . . on a monthly basis." This "set" copayment amount was determined by dividing the available copay assistance funds for a particular medication by twelve months. However, because "this consistent, flat dollar copay" permitted manufacturers "to more easily identify SaveOnSP members[,]" SaveOnSP and Express Scripts redesigned the SaveOnSP Program's payment obligation structure to adopt, in some instances, a "variable" copayment model in which patients' copayments "change[d] on a monthly basis." In other instances, SaveOnSP and Express Scripts implemented a percentage model in which patients' copayment obligations were based on different percentages of the amounts pharmacies pay for the drug at issue. SaveOnSP and Express Scripts referred to the latter modified copayment structure as the "coinsurance" model.

124. SaveOnSP and Express Scripts implemented the coinsurance model in or around January 2022 specifically in response to "Pharma identification of SaveOnSP copays" with the hope that it would "better camouflage copays from manufacturers" so as to avoid any reduction in plan savings and Defendants' profits. In other words, SaveOnSP and Express Scripts adopted the coinsurance model to disguise their conduct from pharmaceutical manufacturers: as they noted, with these changes "Pharma would have a harder time identifying the copays with co-insurance."

125. The shift to the "coinsurance" model also ensured that SaveOnSP and Express Scripts could maximize the amount of money they could extract from manufacturers by aligning patients' copayment obligations "with true filling patterns" or "real-world patient behaviors." Specifically, SaveOnSP and Express Scripts recognized that many patients failed to refill their medications as prescribed over a twelve-month period, resulting in "money being left with the manufacturer." Thus, through the coinsurance model, SaveOnSP and Express Scripts set the copayment amounts ***even higher*** than those under the original "flat dollar" plan design to ensure that they could take full advantage of available copay assistance funds for patients who only filled their prescriptions a few times early in the calendar year. In response to an inquiry from a plan, one SaveOnSP representative put it bluntly: "We are increasing a few copays to ensure we do deplete all that the manufacturer has to offer."

126. In mid-2022, SaveOnSP also changed the terminology it used with patients and health plan clients in an attempt to cover its tracks and ensure drug manufacturers would not catch on to the fact that the SaveOnSP Program violated copay assistance programs' terms and conditions. For example, SaveOnSP issued guidance that clients should no longer refer to SaveOnSP as a "program" because "[s]ome manufacturers have requirements that their program cannot be combined with *any other program*, or the member will be blocked from assistance." At the same time, SaveOnSP contemplated removing its guarantee of "$0 member cost" for medications from patient communications. When asked for the rationale for this change by a client, a SaveOnSP Account Director agreed that SaveOnSP did "not want to tell members that they are getting $0 because [SaveOnSP] is afraid they will blow SaveOnSP's cover with the manufacturer[.]"

127. Defendants' ongoing adjustment of the SaveOnSP Program, done for the express purpose of evading detection, undermines any attempt by JJHCS to stop the misappropriation of the assistance it makes available for patients. JJHCS cannot reduce copay assistance on a patient-by-patient basis without taking the risk that some patients might be erroneously identified as having been enrolled in the SaveOnSP Program. Such patients could be harmed by the unwarranted deprivation of copay support. In other words, JJHCS cannot unilaterally stop the flow of funds to SaveOnSP without potential unintended and negative consequences for the very patients CarePath was designed to support.

## **<u>The SaveOnSP Scheme Causes Grave Harm to Patients</u>**

### *Defendants Drain Resources Allocated to Help Patients Afford Life-Saving Medications*

128. Copay assistance programs are meant to help patients pay their actual and required out-of-pocket costs. But by changing the amounts owed by patients based on only the availability of patient copay assistance, the SaveOnSP Program disconnects patient copay assistance from actual cost to patients, causing copay assistance to be more expensive than originally intended, and converting what is meant to be copay assistance for patients into a manufacturer subsidy for Defendants. *See* Philipson & Durie, *supra* ¶ 30 n.7, at 17 (explaining that "accumulator adjustment and maximizer programs . . . counteract the uptake of manufacturer copay assistance shifting the cost burden back onto patients" and that "limiting [patients' use of copay assistance programs] without giving patients a new way to address their affordability issues will negatively impact patients"). By these actions, Defendants wrongly increase the costs of assistance and, unless enjoined, will continue to take funds to which they are not entitled.

129. Payers already can and do negotiate pricing discounts with manufacturers, including by securing rebates that manufacturers pay after patients fill prescriptions. *See The 2022*

*Janssen U.S. Transparency Report*, *supra* ¶ 33, at 6 indicating that since 2016, "rebates, discounts and fees have increased 256 percent" and that "[i]n 2022, $39 billion of Janssen's gross sales (nearly 58 cents of every dollar) went back into the healthcare system through rebates, discounts and fees negotiated with or provided to commercial health insurers, PBMs, government healthcare programs and other intermediaries"); *see also 2024 Cigna Form 10-K*, *supra* ¶ 33, at 36 (Cigna stating, "[w]e maintain relationships with numerous pharmaceutical manufacturers, which provide us with, among other things: . . . discounts, in the form of rebates, for drug utilization"). In fact, SaveOnSP has inflated patients' drug copay obligations even as JJHCS has consistently decreased the price of the drugs targeted by the SaveOnSP Program. *See The 2022 Janssen U.S. Transparency Report*, *supra* ¶ 33, at 5 (indicating that "net prices for Janssen medicines have declined for the sixth year in a row," including a net decline of -3.5% in 2022 (compared to the 2022 consumer inflation rate of 9.1%)).

130. Patient copay assistance does not exist as additional funding for payers to absorb on top of those enormous price concessions. But various publicly available materials describing the SaveOnSP Program explicitly acknowledge that the program is designed for just that: to enrich payers.

131. For example, in a presentation given to the New Jersey Health Insurance Fund, a New Jersey-based insurance pool, the SaveOnSP Program is described as a "very aggressive program" that sets copays to "maximize manufacturer assistance dollars" so that "***plan sponsor spend*** [is] reduced $2.50 - $4.50 [per member per month]." Joseph M. DiBella, *New Jersey Health Insurance Fund*, PERMA (Nov. 2019) at 19–20, https://slideplayer.com/slide/17742625/ (emphasis added).

132. Similarly, an agenda for the Burlington County Insurance Commission, another New Jersey-based insurance pool, notes that the SaveOnSP Program is being implemented "***so that the plan can maximize manufacturer assistance*** dollars (coupons) while reducing the member's copay to $0." *Meeting and Reports*, BURLINGTON CNTY. INS. COMM'N (Nov. 5, 2020), at 28, https://bcnj.co.burlington.nj.us/Upload/BCIC/Images/Agenda_11-5-20.pdf (emphasis added).

133. And in another agenda for Southern Skyland Regional, a New Jersey-based insurance fund, there are notes that while "Members receive a $0 copay," the "***plan receives the remaining discount***." *Agenda & Reports*, Southern Skyland Regional (Oct. 5, 2021), at 8, https://southernskylandshif.com/wp-content/uploads/2023/12/A_SSRHIF_October-5th-Agenda.pdf (emphasis added).

134. SaveOnSP's own website emphasizes the same, explaining how "plan[s] see savings generated" from its program. *See Frequently Asked Questions*, SAVEONSP, https://www.saveonsp.com/employers/ (last visited Mar. 12, 2024); *see also Copay Assistance Strategy Reduces Financial Burdens for Plans and Patients*, *supra* ¶ 31 n.8 (highlighting that "[i]n 2020, plans that participated in these copay assistance solutions [like the SaveOnSP Program] experienced a specialty trend of -7.2%, while nonparticipating plans experienced an 8.7% specialty trend."). Likewise, Cigna—the indirect parent to both Express Scripts and Accredo—states in its securities filings that it has a "partnership with SaveOnSP," an "aggressive solution" that "adapts" to changes in manufacturer programs to "protect plan design preferences and achieve lower trend" for health plans. See *Managing Specialty*, EXPRESS SCRIPTS, https://www.express-scripts.com/corporate/solutions/managing-specialty-drugs#accredo.

135. And while these materials also tout reduced costs to patients, they mislead patients by obscuring the fact that patients can get the benefit of reduced costs by directly signing up for manufacturer assistance, without any involvement from SaveOnSP whatsoever.

136. Further underscoring that the SaveOnSP Program is for the benefit of payers and not patients, SaveOnSP Program materials show that even when patients do hit their deductible or out-of-pocket maximum through other means, SaveOnSP will continue to extract patient copay assistance. *See Frequently Asked Questions*, SAVEONSP, https://www.saveonsp.com/employers/ (last visited Mar. 12, 2024) (explaining that copay assistance funds will not "accumulate to the plan participant's out-of-pocket or deductible").

137. Whether or not a patient enrolls in the SaveOnSP Program, any payments they make toward their medications will not count towards the patient's deductible or out-of-pocket maximum, so the patient will still face higher costs for other healthcare services (such as doctor's visits or diagnostic testing). *Pay $0 for Select Specialty Medications*, *supra* ¶ 12. The marketing materials for the SaveOnSP Program referenced in paragraph 12 above make this clear, noting that in either scenario, payments made for the drug "won't count towards [the patient's] deductible or out-of-pocket maximum." *Id.*

*The SaveOnSP Scheme Is a Nightmare for Patients that Interferes with Their Access to Medications*

138. The SaveOnSP Program also burdens patients with a complicated enrollment process that can create unnecessary confusion for individuals already under pressure from difficult medical circumstances. *See* Anndi McAfee, *SaveonSP's Copay Maximizer Failed Me: A Patient's Perspective*, DRUG CHANNELS (Nov. 13, 2020), https://www.drugchannels.net /2020/11/saveonsps-copay-maximizer-failed-me.html ("If SaveonSP had not used all of my money, I probably would have continued on in sweet blissful ignorance. But here I am again,

expending precious time and energy to ensure that my drug gets into my body."). As noted in paragraph 14 above, one step in the SaveOnSP scheme is for Accredo to falsely tell a patient who is entitled to insurance coverage for a life-saving medication that their request for coverage was denied, as a ruse to push the person to apply for copay support just to drive greater profitability for Defendants. *Human Resources Committee Meeting*, *supra* ¶ 14, at 69. Further underscoring the pressure created by the warm transfer process, patients have been told that "if they do not sign up [for SaveOnSP], they will not get their medications." One prospective SaveOnSP client recognized that the terminology "warm transfer" was a blatant euphemism for a roadblock preventing patients from accessing their medications, noting that it seems Accredo's "internal claim rejection" amounted to the "member's claim being rejected and having to go without their medication." Although Defendants acknowledge that the point-of-sale denial and "warm transfer" to SaveOnSP imposes frequent hardship on patients, Defendants continue to rely on these features as a central part of the SaveOnSP enrollment process.

139. Many patients experience problems related to the warm transfer and enrollment process. For example, one insurer complained that SaveOnSP and Accredo provide "[i]ncorrect information" to patients, patients experience "[d]elayed [s]hipments," "[m]ember experience is not simple," and "[m]embers [are] being told they 'have to enroll,'" even though the health plan "advised [SaveOnSP enrollment] needed to be voluntary and members would need to be routed to us if they wanted to opt out[.]"

140. These issues are not unique to one member or one SaveOnSP client; rather, they are emblematic of the warm transfer process Defendants have used since the inception of the SaveOnSP Program. For example, a patient who had taken the same self-injectable specialty medication for years without issue faced significant hardship once her health plan partnered with

SaveOnSP, and the enrollment process took so long that she was without her medication for over two weeks. Another patient had to spend "3–4 hours **every month** getting bounced from group to group" to get his medication shipped because SaveOnSP had to take action to remove a "flag" on his account every time he tried to fill his medication. Instead of rectifying the issue so the patient would not need to go through the "monthly nightmare" of spending hours on the phone to fill his medication, SaveOnSP wiped its hands clean of the problem, saying "[i]t looks like there is nothing additional we need to do on our end." Yet another patient explained that because it took over a week to even sign up for SaveOnSP, it jeopardized the timely shipment of his medication, which was "troubling" because he "spent a lot of time in the hospital from Crohn's Disease and ha[d] finally reached remission with the current treatment."

141. The warm transfer process even impacts patients who are not eligible for the SaveOnSP Program or who choose to opt out. One pharmacist was so concerned about the delays associated with this process for non-eligible patients that he informed SaveOnSP that the "delays are causing an interruption in treatment" and "[a]ny delays to treatment can have significant impact. We have seen several patients experience interruptions in therapy because their order delayed for days or weeks." For example, when the husband of a newly diagnosed cancer patient pleaded with a Senior Account Manager at Express Scripts for help scheduling his wife's medication for shipment, he emphasized that "fighting" the SaveOnSP Program to obtain timely access to his wife's medication added to the "stress and emotional turmoil" he and his wife were going through. He explained that dealing with the delays in treatment Defendants caused was "an overload to put it lightly[,]" as his wife's prescriptions were "literally the difference between life and death[.]" Accredo continues to warm transfer patients to SaveOnSP even when they have opted out, causing confusion and delayed shipment of medication.

142. Once a patient manages to enroll in SaveOnSP, they are met with a series of broken promises about how the Program works. Patients are told that "SaveonSP will be in place to monitor the billing portion of your account" to ensure that they will have a "$0 financial responsibility" for eligible medications. Despite these promises, patients are blindsided by outstanding account balances amounting to hundreds or thousands of dollars for their SaveOnSP-eligible medications. Even worse, some patients have their personal bank accounts or credit cards wrongfully charged for the inflated copay amount. Defendants automatically withdraw these outstanding balances from patients' personal bank accounts or charge their credit cards without authorization. After Express Scripts automatically charged one patient $1,800 for a patient's medication, she considered "therapy alternatives to avoid having a med that runs through Saveon and also threaten[ed] going off her meds to avoid the stress of it all." In another example, one patient left a voicemail with SaveOnSP requesting that a supervisor call her back because she felt as though the SaveOnSP Program "falsely misled" her. After receiving her Stelara medication, the patient was billed thousands of dollars with the balance automatically billed to her credit card.

143. These erroneous balances and automatic charges are caused by SaveOnSP, Express Scripts, and Accredo. Express Scripts has acknowledged that autopay "is a flaw of our shared systems." Instead of fixing this "flaw," Defendants place all of the responsibility on patients, explaining that this type of error would not occur if the patient were to "remove autopay" from their Express Scripts account.

144. As a result of the outstanding balances erroneously charged to their accounts, patients cannot fill any prescription through Accredo—even if it is not a medication on the SaveOnSP drug list—until the account balance is settled. In other words, Accredo holds patients'

medications hostage until SaveOnSP, Accredo, and Express Scripts investigate and remove the balance from their account.

145. Patients often have to spend hours on the phone across multiple days before Defendants remove the improper balance from a patient's account or issue a refund to a patient who was wrongfully charged for their medication. Because this takes a significant amount of time and effort to resolve, billing problems can delay shipment of the next dose of a patient's medication or discourage patients from filling their medications altogether. For example, one patient who had recently been diagnosed with breast cancer stopped taking her medication "because [A]ccredo told her she has a balance and won't ship [her medication]." After another patient was billed $600 for their SaveOnSP-eligible medication, they stopped filling their prescription for months because they were "so afraid of having to pay the full amount of the drug."

146. Patients describe dealing with the SaveOnSP Program and Accredo as an "absolute nightmare." SaveOnSP, Express Scripts, and Accredo regularly receive reports from clients that patients spend hours on the phone trying to schedule timely shipment of their medication, often without success. One SaveOnSP client characterized members' experiences with the Program as needing to "jump through hoops in order to utilize any copay assistance[.]"

147. Even if patients proactively alert Defendants that they have an upcoming prescription that must be filled, their efforts often fail to result in timely delivery of their medication. The life-saving specialty medications involved in the SaveOnSP Program commonly require strict dosing schedules. Delayed or skipped doses can have devastating consequences for patients who take these medications to treat or manage complex and chronic conditions. This dosing irregularity not only leads to negative physical health outcomes for patients, but it also significantly increases the mental and emotional toll of managing serious medical conditions.

148. It is not uncommon for patients to feel frustrated, upset, and exhausted with the SaveOnSP Program. To avoid creating records that reflect this harm, SaveOnSP has trained its employees not to mention a patient's frustration or agitation in their written notes memorializing the call. This instruction exemplifies SaveOnSP's awareness that the SaveOnSP Program harms patients and reveals the steps it is willing to take to cover up the detrimental consequences of Defendants' scheme.

*Defendants Restrict Access to Care For Patients Suffering From Life-Threatening Illnesses*

149. Defendants also harm some of the most vulnerable patients—those suffering from diseases like cancer requiring frequent infusions of intravenous medication by a medical professional—by prohibiting them from receiving their infusions from their trusted local healthcare providers. One SaveOnSP patient, who suffered from a "very aggressive cancer," was unable to receive treatment from his oncologists at a major university hospital after his health plan implemented SaveOnSP and the Express Scripts medical channel management program, forcing this patient to "white bag" his drugs from Accredo and change his site of care to an infusion center unaffiliated with his oncologist. These risks are known to the Defendants' key executives: an Express Scripts executive ***acknowledged*** that the coincident operation of Express Scripts' "medical channel management" and the SaveOnSP Program can cause patients to "experience[] some pain."

**Defendants Continue to Explore New Opportunities to Drain Resources From JJHCS to Increase Their Profits at the Expense of Patients**

150. Defendants are aware that regulatory efforts may be underway to eliminate their perceived loophole in the ACA, which they exploit to designate life-saving drugs as nonessential health benefits so that they can inflate patient copay obligations. They also recognize that they face growing competition in the market. And companies like JJHCS have moved to limit copay

assistance they make available, expressly because of abusive programs like SaveOnSP. In view of all of these emerging challenges, Defendants have explored alternative business opportunities that would allow them to continue to exploit manufacturer resources designed to assist patients in affording life-saving medications.

*Defendants Seek to Exploit Patient Assistance Programs Through a New Program Design that Relies on Alternative Funding Solutions*

151. Defendants have developed a "new product line" targeting patient assistance programs that provide free drugs to patients. Although the terms vary depending on the manufacturer, patient assistance programs are typically designed to provide free medication to patients who demonstrate financial need and who are insufficiently insured.

152. In order to take advantage of these programs meant to help those with demonstrated financial need and who lack sufficient health insurance to cover the costs of their medications, Defendants have implemented what is commonly known as an "alternative funding program." Such programs work with health plans to increase the coinsurance associated with specialty drugs from 30% to 100%, effectively removing coverage for those medications. This is done for no reason other than the fact that members are taking those drugs and the health insurer no longer wishes to pay for them or hold up its end of the insurance bargain. Having deprived their members of the benefit of their health insurance with respect to their specialty drugs, entities that offer alternative funding programs then present those members to manufacturer patient assistance programs intended for the benefit of under-insured patients with demonstrated financial need.

153. Per SaveOnSP, its clients' denial of insurance coverage for that drug purportedly now renders patients potentially eligible for patient assistance programs (and the associated free drugs those programs provide). If they are able to enroll, the plan is able to "sidestep[] the high cost of the drugs" and shift the costs onto the manufacturer, whose assistance program covers most

of the costs. *See* Alliance for Patient Access, *The High Costs of Alternative Funding Programs* (June 2023), https://allianceforpatientaccess.org/wp-content/uploads/2023/06/AfPA_High-Costs-of-Alternative-Funding-Programs_June-2023.pdf.

154. Likely in recognition that these types of programs deplete resources meant to assist under-insured patients, the President of SaveOnSP originally stated that the SaveOnSP Program has "nothing to do with PAP[,]" "we are adamant to never engage on pap[,]" and "Esi in is alignment." However, in response to market competition and legislative developments, he apparently changed his mind and encouraged his employees to exploit patient assistance programs to preserve SaveOnSP's profits. He, together with another SaveOnSP executive, served as the executive sponsor of the project focused on developing an alternative funding business line so as to keep up with "SOSP competitors" who "have developed solutions to increase client pharmacy spend savings."

155. The President of SaveOnSP has made clear that he views alternative funding programs as a key business imperative. For example, in the context of discussing potential legislation that would eliminate the statutory loophole that Defendants exploit to perpetuate the SaveOnSP Program, he remarked, "All the more reason to evolve to free drug[.]" In another instance, when notified that a pharmaceutical manufacturer decreased available copay assistance for a patient affiliated with SaveOnSP, the President instructed his employees "to try to get free drug[s]" and to "go after free drug[s]" so SaveOnSP could then "ask for 25%" of any savings generated for the plan by allocating the cost of the prescription from the plan to the manufacturer's free drug program.

156. SaveOnSP has experimented with different product designs to achieve the goal of maximizing savings through the institution of an alternative funding program. For instance,

Express Scripts and SaveOnSP have contemplated a scheme in which the standard SaveOnSP program system would apply to drugs associated with the highest rebates from manufacturers. Other drugs would be effectively excluded from plan coverage by changing the coinsurance associated with these medications to 100%, forcing plan members to resort to patient assistance programs to access their medications. This "hybrid program"—also referred to as an alternative funding program with a SaveOnSP "wrap"—would enable SaveOnSP and Express Scripts to take advantage of free drug offerings from available through patient assistance programs by denying plan coverage to patients for their medications.

157. In or around October 2022, Defendants implemented at least one version of this business design targeting patient assistance programs. Referred to as "SaveOnSP Advantage," Express Scripts and SaveOnSP coordinated with plans to set plan participants' coinsurance to 100% for specialty medications with available patient assistance programs, thereby effectively removing insurance coverage for patients' specialty medications and purportedly rendering them eligible to receive medications from manufacturers free of cost. This generates increased savings for the plan, and for Express Scripts and SaveOnSP, by diverting the cost of the drug from the plan to the manufacturer. SaveOnSP and Express Scripts developed an information sheet on this evolved business model, noting that "Express Scripts can prevent claims from being processed prior to alternate funding exploration by leveraging existing and custom SaveOnSP edits." This approach would "leverage[] both drug manufacturer copay assistance and patient assistance programs (PAP) to secure vital medications at no cost to the member while helping plan sponsors optimize savings."

158. As if depriving patients of the benefit of their health insurance were not sufficiently egregious, through the SaveOnSP Advantage program, Defendants actually exhaust ***two*** different

sources of support made available to patients by the manufacturer—the manufacturer copay assistance funds ***and*** free medication available through the patient assistance program. SaveOnSP recognizes that the "process for a member to qualify for and be approved by the manufacturer [patient assistance program] can be lengthy, sometimes taking as long as 8 weeks (about 2 months)." While the patient's application is pending, Defendants arrange for a "bridge fill" by "enroll[ing the patient] in the SaveOnSP Standard service." "Once the member is approved for PAP, [SaveOnSP] . . . [then] switch[es] them to the SaveOnSP Advantage service." In other words, through the "SaveOnSP Advantage" scheme, Defendants first drain the available manufacturer copay assistance by enrolling the patient in SaveOnSP's "standard service" during the pendency of their patient assistance program application; then, after exhausting this funding, Defendants target yet ***another*** source of manufacturer assistance—free medications made available to underinsured patients with a demonstrated financial need.

159. To make this project succeed, SaveOnSP employees researched patient assistance programs implemented by manufacturers whose drugs are included on SaveOnSP's drug lists, monitored eligibility criteria, and assessed enrollment procedures in order to direct patients to available patient assistance programs. Again, the objective is for SaveOnSP and its partners to capture funds meant for patients, not for payers, just as the SaveOnSP Program seeks to accomplish this goal.

*Defendants Market the SaveOnSP Program to Fully Insured Plans and Other PBMs*

160. As another means of seeking profit, Defendants have expanded their business model to work with different types of plans. SaveOnSP and Express Scripts have historically worked with self-funded plans based on their understanding that "self-funded plans are not required to offer Essential Health Benefits." In recognition of the need to remain competitive in

the marketplace, SaveOnSP and Express Scripts broadened their model to work with "fully insured plans" and to seek the necessary regulatory approvals to permit the application of the SaveOnSP Program to those types of plans.

161. As part of their scheme to extract ever-increasing sums of money from CarePath and other copay assistance programs, SaveOnSP and Express Scripts have even revisited the exclusivity arrangement that defined their early business relationship. In 2020, SaveOnSP and Express Scripts entered into an agreement with Prime Therapeutics ("Prime"), a different PBM serving over 30 million patients enrolled in Blue Cross Blue Shield health plans. *See Our History*, PRIME THERAPEUTICS (last accessed March 11, 2024), https://www.primetherapeutics.com/about/our-history. That agreement allowed health plans affiliated with Prime to partner with SaveOnSP. The agreement requires Prime health plans that choose to partner with SaveOnSP to make Accredo their exclusive specialty pharmacy. This arrangement with Prime allows Defendants to wrongfully profit from copay assistance funds available to the massive patient population enrolled in Prime health plans. And it exposes the 30 million patients in health plans affiliated with Prime to all the harms and risks associated with the SaveOnSP Program.

162. Under the agreement between Prime, Express Scripts, and SaveOnSP, Express Scripts helps itself to a substantial percentage of the program fees paid by each Prime-affiliated health plan that contracts with SaveOnSP. Even senior executives at SaveOnSP expressed concerns about this arrangement, questioning the basis for payments to Express Scripts under the Prime agreement given Express Scripts' limited role in providing the SaveOnSP Program to Prime patients. The lure of accessing the copay assistance funds available to Prime's 30 million patients evidently overcame those qualms.

## V. JJHCS Is Harmed by Defendants' Abusive Practices

163. CarePath's terms and conditions typically require patients to pay $5 or $10 when using the Assistance Program, and they preclude patients from using the Assistance Program with "any other coupon, discount, prescription savings card, free trial, or other offer." *See, e.g.*, DARZALEX® Savings Program, *supra* ¶ 23.

164. The SaveOnSP Program is clearly such an "offer." Indeed, the SaveOnSP representative refers to the SaveOnSP Program in her presentation as the "SaveOn ***offering***." *SaveOnSP IPBC Video*, *supra* ¶ 9, at 4:25; 27:31. And marketing materials similarly state, "That's why your plan ***offers*** a program called SaveOnSP, which can help lower your out-of-pocket costs to $0." *See Pay $0 for Select Specialty Medications*, *supra* ¶ 12 (emphasis added). In similar contravention of CarePath's terms and conditions, other marketing materials refer to the SaveOnSP Program as providing a "point of sale ***discount***." Nevertheless, despite its knowledge of these terms, Defendants implement the SaveOnSP Program to extract CarePath's funds.

165. SaveOnSP's conduct is clear from its publicly available drug lists. For example, one such list includes 14 Janssen drugs: BALVERSA®, ERLEADA®, IMBRUVICA®, OPSUMIT®, PREZCOBIX®, REMICADE®, RYBREVANT®, SIMPONI®, STELARA®, SYMTUZA®, TRACLEER®, TREMFYA®, UPTRAVI®, and ZYTIGA®. *See 2024 SaveOnSP Drug List*, CHRISTIAN BROTHERS EBT, https://saveonsp.com/wp-content/uploads/2023/12/cbservices.pdf. Internal JJHCS data concerning CarePath use confirms that SaveOnSP is abusing CarePath. For instance, in 2021, the average amount of CarePath funds pulled per fill for STELARA® patients who were not enrolled in the SaveOnSP Program was $1,171, while the average amount of CarePath funds pulled per fill for STELARA® patients who were enrolled in the SaveOnSP Program was $4,301.

166. The same pattern holds true for patients on TREMFYA®. In 2021, the average amount of CarePath funds pulled per fill for TREMFYA® patients who were not enrolled in the SaveOnSP Program was $1,126, while the average amount of CarePath funds pulled per fill for TREMFYA® patients who were enrolled in the SaveOnSP Program was $3,717.

167. The difference is even starker for other drugs. For example, the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were not enrolled in the SaveOnSP Program was only $418, while the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were enrolled in the SaveOnSP Program was $5,000.

168. For January through March of 2022, the average amount of CarePath funds pulled per fill for STELARA® patients who were not enrolled in the SaveOnSP Program was $2,057, while the average amount of CarePath funds pulled per fill for STELARA® patients who were enrolled in the SaveOnSP Program was $6,401.

169. Likewise, for the same time period, the average amount of CarePath funds pulled per fill for TREMFYA® patients who were not enrolled in the SaveOnSP Program was $1,796, while the average amount of CarePath funds pulled per fill for TREMFYA® patients who were enrolled in the SaveOnSP Program was $3,745.

170. And, for the same time period, the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were not enrolled in the SaveOnSP Program was only $1,242, while the average amount of CarePath funds pulled per fill for UPTRAVI® patients who were enrolled in the SaveOnSP Program was $6,979.

171. The SaveOnSP Program harms JJHCS not only by causing inflated amounts of copay assistance to be charged per fill, but also by causing greater amounts of copay assistance to be charged earlier in the year. Many patients do not stay on therapy for an entire year. Thus, when

Defendants seize a year's worth of copay assistance by repeatedly charging inflated copays, but the patient does not actually fill a year's worth of prescriptions, they reap an additional windfall and charge JJHCS for more copay assistance than is actually warranted. In some instances, SaveOnSP has extracted an entire year's worth of copay assistance by the middle of the year.

172. Indeed, SaveOnSP causes JJHCS to pay out the maximum amount of funds available per patient far more often than it otherwise would. For example, in 2021, only 3% of STELARA® patients who were not enrolled in the SaveOnSP Program exhausted the full CarePath benefit of $20,000, while ***33%*** of STELARA® patients who were enrolled in the SaveOnSP Program exhausted the full CarePath benefit of $20,000.

173. Through the SaveOnSP Program, Defendants knowingly and wrongfully harm JJHCS by causing it to pay CarePath funds solely for its own enrichment. JJHCS provides CarePath funds to help patients bridge the gap between what they must pay out-of-pocket to obtain their Janssen drugs and what they can afford. But the SaveOnSP Program interferes with this intended purpose by causing JJHCS to pay out exponentially more CarePath funds per patient only so that it may profit in violation of the CarePath terms and conditions.

174. Further, there is no easy or foolproof way for JJHCS to simply reduce the amount of assistance it provides to all patients enrolled in the SaveOnSP Program. This is because Defendants have taken steps to obscure when funds are being extracted from CarePath through its Program, including varying the patient's out-of-pocket obligation per prescription fill, such that the amounts extracted from the copay card by the pharmacy are not consistent and easily detectible.

175. SaveOnSP and Express Scripts admitted as much in a co-branded presentation from March 2021 in which they reveal their intent to "[p]roactively adjust [the] copay structure of [the SaveOnSP] program to make identification of SaveOn members more difficult[.]" Three months

later, Defendants justified the decision to "move from flat copays to 30% coinsurance" as a way to "[b]etter camouflage copays from manufacturers" because "[c]opay assistance maximization by coinsurance [is] less easily identifiable by manufacturers[.]"

176. When Defendants discovered an "uptick in copay assistance rejects for Stelara" in the spring of 2022, they believed it was due to JJHCS "continuing to update their terms and conditions for copay assistance programs with the goal of limiting funds when they identify a patient has a 'maximizer program' . . . as part of their plan design." Working in concert, Defendants reduced the coinsurance for Stelara from 30% to 20% "[i]n an attempt to thwart the new program logic[.]"

177. Reducing cost support preemptively to prevent Defendants' activities creates an unacceptable risk that individual patients may be misidentified and suffer from reduced cost support and consequently be unable to afford their therapy. The secretive nature of Defendants' operations, therefore, renders any attempt to reduce copay assistance on a patient-by-patient basis unworkable as it risks harming the very patients CarePath was designed to support. JJHCS has expended significant resources to develop methods that assist in the identification and tracing of Defendants' misappropriation of CarePath funds, preserve the integrity of CarePath, and ensure that CarePath funds are utilized for their authorized purpose.

178. For STELARA® and TREMFYA®, JJHCS worked to develop and release a new version of the terms and conditions that were publicly on the CarePath website in December 2021. *See* STELARA® Savings Program (Dec. 2021) & TREMFYA® Savings Program (Dec. 2021), both of which are attached hereto as Ex. A. The terms and conditions specify explicitly that to be eligible for CarePath, "you . . . must pay an out-of-pocket cost for your medication." *Id.*

179. Beginning in April 2024, JJHCS developed and released additional CarePath terms that further confirm what has always been the case: CarePath cannot be used in conjunction with SaveOnSP's program or services. While previous iterations of the terms prohibited the SaveOnSP Program by reference to its characteristics (*e.g.*, it is an "other offer," pursuant to which patients do not "pay an out-of-pocket cost" for their medication), the 2024 iteration of the CarePath terms also prohibits SaveOnSP by name.

180. The 2024 iteration of the CarePath terms and conditions for STELARA®, TREMFYA®, SIMPONI®, SIMPONI ARIA®, OPSUMIT®, TRACLEER®, UPTRAVI®, REMICADE®, RYBREVANT®, AKEEGA®, BALVERSA®, DARZALEX®, DARZALEX FASPRO®, and ERLEADA® states that:

- "If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, [CarePath]."
- "If your health plan removes [the affected drug] from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in [CarePath]."
- "Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for [CarePath]. If your health plan removes [the affected drug] from its partnership with SaveOnSP, you may be eligible for [CarePath]."

*See* Ex. B (CarePath terms and conditions for STELARA®, TREMFYA®, SIMPONI®, SIMPONI ARIA®, OPSUMIT®, TRACLEER®, UPTRAVI®, REMICADE®, RYBREVANT®, AKEEGA®, BALVERSA®, DARZALEX®, DARZALEX FASPRO®, and ERLEADA® as in effect on October 7, 2024). JJHCS also added language that "[CarePath] is designed solely for the benefit of the patient." *Id.* For five of these drugs—AKEEGA®, BALVERSA®, DARZALEX®, DARZALEX FASPRO®, and ERLEADA®—these additional terms were publicly released on

October 4, 2024. In January 2025, JJHCS added the above terms to the copay assistance programs for INTELENCE®, PREZCOBIX®, SYMTUZA®, and ZYTIGA®. *See* Ex. C (CarePath terms and conditions for INTELENCE®, PREZCOBIX®, SYMTUZA®, and ZYTIGA® effective January 2025).

181. SaveOnSP claims that it has instructed patients on certain drugs to now call JJHCS and tell it that their plan has a benefit administered by SaveOnSP. Upon information and belief, SaveOnSP has done so in an attempt to foist responsibility for its misconduct onto patients, while anticipating that few patients will take any action in response. But SaveOnSP has not taken Janssen's drugs off its list, and thus continues to pilfer funds from CarePath's copay assistance programs in violation of CarePath's terms and conditions despite knowing that those terms and conditions now expressly prohibit CarePath patients from being enrolled in SaveOnSP by name. JJHCS has no reason to believe SaveOnSP will stop misappropriating JJHCS's copay assistance, including through tortious interference with CarePath's terms and conditions (both the current iteration and any future updates).

182. Thus, the SaveOnSP scheme continues to harm JJHCS, entitling it to relief. Moreover, damages for ongoing and future wrongdoing are inadequate because SaveOnSP, Express Scripts, and Accredo take concerted measures to avoid detection. Unless the SaveOnSP Program is enjoined, it will continue to cause damages and irreparable harm to JJHCS.

## COUNT I:
## TORTIOUS INTERFERENCE WITH CONTRACT
## (as to all Defendants)

183. JJHCS re-alleges paragraphs 1–182 as if fully set forth herein.

184. JJHCS has a valid and enforceable contract with the patients who use CarePath.

185. The CarePath terms and conditions prohibit patients from being enrolled in SaveOnSP while using CarePath.

186. SaveOnSP, Express Scripts, and Accredo knowingly and wrongfully induces patients to agree to CarePath's terms and conditions, thereby intentionally causing those patients to breach their contract with JJHCS every time they use CarePath funds while enrolled in the SaveOnSP Program.

187. Through this wrongful inducement, SaveOnSP, Express Scripts, and Accredo knowingly and proximately cause JJHCS damage by making it pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend.

188. SaveOnSP, Express Scripts, and Accredo have therefore tortiously interfered with JJHCS's agreement with patients who use CarePath.

## COUNT II:
## TORTIOUS INTERFERENCE WITH CONTRACT
## (as to all Defendants)

189. JJHCS re-alleges paragraphs 1–188 as if fully set forth herein.

190. JJHCS has a valid and enforceable contract with the patients who use CarePath.

191. The post-2023 iteration of the CarePath terms and conditions prohibit patients from being enrolled in SaveOnSP while using CarePath.

192. SaveOnSP, Express Scripts, and Accredo knowingly and wrongfully induces patients to agree to CarePath's terms and conditions, thereby intentionally causing those patients to breach their contract with JJHCS every time they use CarePath funds while enrolled in the SaveOnSP Program.

193. Through this wrongful inducement, SaveOnSP, Express Scripts, and Accredo knowingly and proximately cause JJHCS damage by making it pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend.

194. SaveOnSP, Express Scripts, and Accredo have therefore tortiously interfered with JJHCS's agreement with patients who use CarePath.

## COUNT III: CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACT (as to all Defendants)

195. JJHCS re-alleges paragraphs 1–194 as if fully set forth herein.

196. As described herein, Defendants SaveOnSP, Express Scripts, and Accredo have agreed to wrongfully extract inflated amounts of patient copay assistance funds from CarePath by tortiously interfering with the contractual relationship between JJHCS and patients.

197. Defendants SaveOnSP, Express Scripts, and Accredo acted and continue to act in concert to knowingly and wrongfully induce patients to breach the CarePath terms and conditions.

198. Defendants SaveOnSP, Express Scripts, and Accredo have each taken and continue to take overt acts in furtherance of the conspiracy. As alleged herein, Defendants cooperate to design the SaveOnSP Program to evade manufacturer detection, to promote the SaveOnSP scheme, to facilitate the enrollment of patients in the SaveOnSP Program and in the CarePath Program, and to misappropriate CarePath funds. By intentionally inducing patients to breach their contract with JJHCS each time they receive CarePath funds, Defendants repeatedly commit tortious acts in furtherance of the conspiracy.

199. These overt acts have damaged and continue to damage JJHCS by causing it to pay more money from CarePath that it otherwise would have paid and for a purpose it did not intend—the enrichment of Defendants and their client health plans.

200. As a result of Defendants' conspiracy to commit tortious interference with contract, JJHCS has suffered harm, including special damages such as the expenditure of resources to identify patients in the SaveOnSP Program and thereby preserve the integrity of CarePath and to ensure that CarePath funds are utilized for their authorized purpose pursuant to the CarePath terms and conditions.

## COUNT IV: AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACT (as to Express Scripts and Accredo, in the alternative)

201. JJHCS re-alleges paragraphs 1–200 as if fully set forth herein.

202. As described herein, Defendant SaveOnSP knowingly and wrongfully induces patients to breach their contract with JJHCS every time the patients use CarePath funds while enrolled in the SaveOnSP Program.

203. Defendants Express Scripts and Accredo were and are aware of the SaveOnSP scheme, including SaveOnSP's tortious interference with CarePath terms and conditions, and have taken steps to advance the SaveOnSP scheme. As alleged herein, employees from Express Scripts and Accredo were and are in regular contact with employees from SaveOnSP to discuss the design, implementation and marketing of the SaveOnSP scheme, including the enrollment of patients in the SaveOnSP Program. Express Scripts and Accredo have knowingly profited from their aiding and abetting of the scheme.

204. Defendant Express Scripts has actively encouraged and substantially assisted SaveOnSP's tortious interference, including by providing a variety of services essential to the operation of the SaveOnSP scheme, promoting SaveOnSP to health insurance plans that use Express Scripts' services, and by entering a contract entitling it to receive a portion of SaveOnSP's ill-gotten gains from the SaveOnSP scheme.

205. Defendant Accredo has actively encouraged and substantially assisted the SaveOnSP scheme, including by serving as the exclusive specialty pharmacy for patients enrolled in the SaveOnSP Program in most instances, coordinating with SaveOnSP to establish the list of drugs subject to the SaveOnSP Program, transferring patients to SaveOnSP when they contact Accredo to fill prescriptions, and by receiving increased business as a result of its role in the SaveOnSP scheme.

206. Defendants Express Scripts and Accredo have therefore committed the tort of aiding and abetting SaveOnSP's tortious interference with contract, inflicting damage upon JJHCS.

## COUNT V: DECEPTIVE TRADE PRACTICES IN VIOLATION OF N.Y. GEN. BUS. LAW § 349 (as to SaveOnSP)

207. JJHCS re-alleges paragraphs 1–206 as if fully set forth herein.

208. SaveOnSP has been and is engaging in willful deceptive acts and practices in New York against JJHCS and the public in the conduct of its business through the following consumer-oriented acts: engineering a false denial of coverage at the point of sale to coerce patients into enrolling in the SaveOnSP Program; telling patients that there is "no copay assistance with SaveOnSP" when manufacturers do in fact provide assistance independently of the SaveOnSP Program; failing to tell patients that by enrolling in the SaveOnSP Program, they are breaching their agreement with JJHCS; and failing to tell patients that they charge a fee of at least 25% of the patient copay assistance funds extracted from JJHCS.

209. Through its willful deceptive acts and practices, SaveOnSP causes damage to the public, including patients, by causing undue stress and confusion through acts such as engineering false denials of coverage and making other patient healthcare needs more expensive by not

counting any of the funds spent on patients' medication towards their ACA maximum or deductible.

210. Through its willful deceptive acts and practices, SaveOnSP also causes damage to JJHCS by making it pay more money from CarePath than it otherwise would have for a purpose JJHCS did not intend.

211. SaveOnSP has therefore violated N.Y. Gen. Bus. Law § 349.

212. SaveOnSP's violation of § 349 also warrants the recovery of attorneys' fees.

## DEMAND FOR JURY TRIAL

213. JJHCS hereby respectfully requests a trial by jury for all claims and issues in its Supplemented Second Amended Complaint which are or may be entitled to a jury trial.

## PRAYER FOR RELIEF

**NOW, THEREFORE**, Plaintiff JJHCS respectfully requests that the Court:

A. Award JJHCS damages in an amount to be ascertained at trial.

B. Award to JJHCS pre-judgment and post-judgment interest.

C. Issue an injunction preventing all Defendants from implementing the SaveOnSP Program as to Janssen drugs.

D. Award JJHCS punitive damages.

E. Award JJHCS its reasonable attorneys' fees.

F. Grant such other and further relief as the Court may deem appropriate.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By: s/ *Jeffrey J. Greenbaum*
JEFFREY J. GREENBAUM
KATHERINE M. LIEB

LINKLATERS LLP
Adeel A. Mangi
George LoBiondo
Patrick Ashby (admitted *pro hac vice*)
Sara A. Arrow
Julia Long (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
(212) 903-9000
adeel.mangi@linklaters.com
george.lobiondo@linklaters.com
patrick.ashby@linklaters.com
sara.arrow@linklaters.com
julia.long@linklaters.com

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

Dated: June 22, 2026

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**

Pursuant to Local Civ. Rule 11.2, I hereby certify to the best of my knowledge, information and belief that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

By: s/ *Jeffrey J. Greenbaum*
JEFFREY J. GREENBAUM
KATHERINE M. LIEB

LINKLATERS LLP
Adeel A. Mangi
George LoBiondo
Patrick Ashby (admitted *pro hac vice*)
Sara A. Arrow
Julia Long (admitted *pro hac vice*)
1290 Avenue of the Americas
New York, New York 10104
(212) 903-9000
adeel.mangi@linklaters.com
george.lobiondo@linklaters.com
patrick.ashby@linklaters.com
sara.arrow@linklaters.com
julia.long@linklaters.com

*Attorneys for Plaintiff*
*Johnson & Johnson Health Care Systems Inc.*

Dated: June 22, 2026

# EXHIBIT A

Janssen CarePath

Stelara® (ustekinumab)

# Savings Program

## for eligible commercially insured patients

## Pay $5 per dose

Maximum program benefit per calendar year shall apply.
Terms expire at the end of each calendar year and may change.
See program requirements below.




**Get savings on your out-of-pocket medication costs for STELARA®. Depending on your health insurance plan, savings may apply toward deductible, co-pay, and co-insurance.**

**Program does not cover costs to give you your treatment.**

# 1 Enroll in the Savings Program

### 3 ways to enroll

**By creating an online account** and enrolling at **MyJanssenCarePath.com**

**By phone**
877-CarePath
(877-227-3728)

**By fax or mail**
Complete **Patient Enrollment Form**†

†You will activate your card upon receipt of enrollment confirmation by mail.

## Am I eligible?

**You may be eligible for the Janssen CarePath Savings Program if you are age 6 or older and currently use commercial or private health insurance for STELARA®, and must pay an out-of-pocket cost for your medication. There is no income requirement.**

**Janssen CarePath Savings Program for STELARA® is based on medication costs only and does not include costs to give you your treatment.**

## Other requirements

- **This program is only for people age 6 or older using commercial or private health insurance for their Janssen medication. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Patients who are members of health plans (often termed "maximizer" plans) that claim to **reduce** their patients' out-of-pocket costs will have a reduced maximum program benefit of $6,000 per calendar year. Out-of-pocket costs may be co-pay, co-insurance, or deductible. If you have enrolled in one of these plans, please inform Janssen CarePath at 877-CarePath (877-227-3728).
- Patients who are members of health plans that claim to **eliminate** their out-of-pocket costs are not eligible for cost support. If you have enrolled in one of these plans, please inform Janssen CarePath at 877-CarePath (877-227-3728).
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program. By getting a Savings Program benefit, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you activate your card, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of STELARA®, and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use STELARA®, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.
- If you use medical/primary insurance to pay for your medication, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 877-CarePath (877-227-3728).

Janssen Biotech, Inc., is not liable for unintended or unauthorized use of the STELARA® Mastercard®, if it is lost or stolen. The Janssen CarePath Savings Program for STELARA® Prepaid Mastercard is issued by MetaBank®, N.A., Member FDIC, pursuant to license by Mastercard International Incorporated. Mastercard is a registered trademark, and the circles design is a trademark of Mastercard International Incorporated. Janssen CarePath Savings Program is not a MetaBank or Mastercard product or service, nor is the optional offer endorsed by them.

**Please read the full Prescribing Information and Medication Guide for STELARA®, and discuss any questions you have with your doctor.**

# ② How to use your Savings Program benefits

## How your card can be used depends on the insurance you use to pay for your medication:

### If you use your **pharmacy/prescription insurance** to pay for your medication from a pharmacy:

- You may use your card (provide your Member ID #, Rx BIN #, and Group #) to receive instant savings off the cost of your medication
- The pharmacy will collect your co-pay

### If you use your **medical/primary insurance** to pay for your medication through your doctor, treatment provider, or pharmacy:

- You may use your card to receive a rebate, **OR**
- You may assign your benefits directly to your treatment provider. Please discuss this option with your provider

**How it works:**

- Your provider or pharmacy may or may not collect your co-pay, based on your insurance coverage
- You receive your treatment with STELARA® (ustekinumab)
  - Your provider or pharmacy submits your claim to your healthcare insurance provider
- You and your provider receive an EOB statement from your insurance
  - You are responsible for submitting the EOB to Janssen CarePath Savings Program, or you can request your provider to submit the EOB on your behalf (see *How to submit a rebate request* below)
- Janssen CarePath Savings Program reviews your EOB, and issues rebate to your card, to you by check, or to your provider if you have assigned your benefits to your provider

**Remember to bring your card to your treatment appointment. Your card is not a credit card. There is no charge for your card.**

**If for any reason your provider or pharmacy cannot process your card, please call us at 877-CarePath (877-227-3728). You may be able to submit a Rebate Form to receive a check. Proof of medication payment required.**

**With a Janssen CarePath online account, you can manage your Savings Program benefits**

- Review your available benefits
- Submit Savings Program requests
- View benefit payment transactions
- Receive timely alerts and program updates

**Get started now...**

**Need help?** Visit **JanssenCarePath.com/Stelara**
Call **877-CarePath** (877-227-3728)
Monday–Friday, 8:00 AM–8:00 PM ET

## How to submit a rebate request

If you have created an online Janssen CarePath Patient Account, you may submit online in your account. If you would like to receive a rebate check payable to you by mail, you must complete a **Rebate Request Form** and provide proof of medication payment.

**At your request, your provider may submit rebate requests to the Savings Program on your behalf via the Provider Portal or by fax or mail.**

**Online:** **MyJanssenCarePath.com**

**Fax:** 844-250-7193

**Mail:**
Janssen CarePath Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

**Please read the full Prescribing Information and Medication Guide for STELARA®, and discuss any questions you have with your doctor.**

© Janssen Biotech, Inc. 2021 12/21 cp-54244v7

janssen

Janssen CarePath

Tremfya® (guselkumab)

# Savings Program

## for eligible commercially insured patients

## Pay $5 per injection

Maximum program benefit per calendar year shall apply.
Terms expire at the end of each calendar year and may change.
See program requirements on next page.




**Get instant savings on your out-of-pocket costs for your Janssen medication. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

Enroll and get a card

### Mobile Enrollment Available

**Text "SAVINGS" to 56011**
(message and data rates may apply*)

**Express Enrollment**
**MyJanssenCarePath.com/Express**

Check eligibility, enroll, and receive an electronic Savings Program card that can be saved to your digital wallet on your iPhone or Android device.

You can use your Savings Program card when filling your prescription at a specialty or retail pharmacy. If for any reason your pharmacy cannot process your card, please submit a Rebate Form to receive a check.

**You can also create a personalized Janssen CarePath Account at MyJanssenCarePath.com where you can:**

- Enroll in the Janssen CarePath Savings Program
- View and manage your Savings Program benefits
- Learn about your insurance coverage
- Sign up for treatment support

If you enroll in the Savings Program via Mobile or Express Enrollment, you will not be able to view and manage your Savings Program benefits until you create an account at MyJanssenCarePath.com.

Care Team members, such as Providers and Pharmacists, can enroll patients in the Savings Program at **JanssenCarePathPortal.com/Express**

*See Terms and Privacy Policy.

**Please read the full Prescribing Information and Medication Guide for TREMFYA®, and discuss any questions you have with your doctor.**

Janssen CarePath

Tremfya® (guselkumab)

# Savings Program

## Am I eligible?

**You may be eligible for the Janssen CarePath Savings Program if you are age 18 or older and use commercial or private health insurance for TREMFYA® and must pay an out-of-pocket cost for your medication.**

**There is no income requirement.**

## Other requirements

- **This program is only for people age 18 or older using commercial or private health insurance for their Janssen medication. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the card.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Patients who are members of health plans (often termed "maximizer" plans) that claim to **reduce** their patients' out-of-pocket costs will have a reduced maximum program benefit of $6,000 per calendar year. Out-of-pocket costs may be co-pay, co-insurance, or deductible. If you have enrolled in one of these plans, please inform Janssen CarePath at 877-CarePath (877-227-3728).
- Patients who are members of health plans that claim to **eliminate** their out-of-pocket costs are not eligible for cost support. If you have enrolled in one of these plans, please inform Janssen CarePath at 877-CarePath (877-227-3728).
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program. By using the Savings Program card, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of TREMFYA®, and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use TREMFYA®, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 877-CarePath (877-227-3728).

## Get started at **MyJanssenCarePath.com/Express**

**Need help?** Call **877-CarePath** (877-227-3728)
Monday–Friday, 8:00 AM–8:00 PM ET
Visit **JanssenCarePath.com/Tremfya**

**Please read the full Prescribing Information and Medication Guide for TREMFYA®, and discuss any questions you have with your doctor.**

© Janssen Biotech, Inc. 2021 12/21 cp-05009v9

Janssen

# EXHIBIT B

Stelara withMe

Stelara® (ustekinumab)

# Savings Program

for eligible commercially insured patients

## Pay $5 per dose

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply.

**Program does not cover costs to give you your treatment.**

See program requirements on the following pages.

**Get savings on your out-of-pocket medicine costs for STELARA®. Depending on your health insurance plan, savings may apply toward deductible, co-pay, and co-insurance.**




## 1. Enroll in the Savings Program

**2 ways to enroll**

**By creating an online account** and enrolling at MyJanssenCarePath.com

**By phone** 844-4withMe (844-494-8463)

## 2. How to use the Savings Program

**How the Savings Program can be used depends on the insurance you use to pay for your medicine:**

If you use your **pharmacy/prescription insurance** to pay for your medicine from a pharmacy:

You may provide your Group #, BIN #, and Member ID # to receive instant savings off the cost of your medicine. The pharmacy will collect your co-pay.

If you use your **medical/primary insurance** to pay for your medicine through your doctor or treatment provider:

1. **Receive your treatment:** After receiving treatment with STELARA®, your provider will submit a claim to your insurance company. Depending on your insurance coverage, a co-pay may or may not be collected at the time of treatment
2. **Explanation of Benefits (EOB):** You and your provider will receive an EOB statement from your health insurance company
3. **Submit your EOB:** You are responsible for submitting the EOB to the STELARA withMe Savings Program, or you can ask your provider to submit it on your behalf. You can submit your EOB online at MyJanssenCarePath.com
4. **Get your rebate:** The STELARA withMe Savings Program reviews your EOB and issues a rebate based on your selected payment preference at the time of enrollment: to your provider if you have assigned your benefits to them, to a Virtual Payment Card, or to you by check if you have paid in full with another form of payment

**NOTE:** You will get a Virtual Payment Card upon approval of your initial rebate request, if selected as your payment preference. Your Virtual Payment Card can be used only for STELARA® medicine costs. **Your card is not a credit card. There is no charge for your card.**

**Please read the full Prescribing Information and Medication Guide for STELARA® and discuss any questions you have with your doctor.**

## With an online account, you can manage your Savings Program benefits

- View your Savings Program information, including BIN #, Group #, and Member ID #
- Submit your EOB
- Review, track, and manage your Savings Program transactions and benefits
- Sign up to receive timely updates and information about STELARA®

**If for any reason your provider or pharmacy cannot process your requests, please call us at 844-4withMe (844-494-8463). You may be able to submit a Rebate Form to receive a check. Proof of medicine payment required.**

## How to submit a rebate request

You can submit your EOB online, by fax, or by mail. If you would like to receive a rebate check payable to you by mail, you must complete a **Rebate Form** and provide proof of medicine payment.

**Online:**
MyJanssenCarePath.com

**Fax:**
844-250-7193

**Mail:**
STELARA withMe Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

**At your request, your provider can also submit rebate requests to the Savings Program.** Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

---

# Savings Program Requirements

## Am I eligible?

You may be eligible for the STELARA withMe Savings Program if you are age 6 or older, use commercial or private health insurance for your prescribed STELARA®, and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as “accumulators” or “maximizers.” These programs divert patient assistance funds away from patients.

- Accumulators don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient’s annual deductible or out-of-pocket maximum.
- The STELARA withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the STELARA withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have “non-essential health benefit maximizers” that conflict with the program requirements of the STELARA withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as STELARA® as “non-essential.” This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The STELARA withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the STELARA withMe Savings Program.
- Please let STELARA withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 844-4withMe (844-494-8463) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in STELARA withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes STELARA® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the STELARA withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

**Please read the full Prescribing Information and Medication Guide for STELARA® and discuss any questions you have with your doctor.**

# Savings Program Requirements (cont'd)

## Other Requirements

- **This program is only for people age 6 or older using commercial or private health insurance who must pay an out-of-pocket cost for their Johnson & Johnson medicine. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the STELARA withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for STELARA®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the STELARA withMe Savings Program. If your health plan removes STELARA® from its partnership with SaveOnSP, you may be eligible for the STELARA withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medicine insurance and treatment. This information is needed for Janssen Biotech, Inc., and our service providers to enroll you in the STELARA withMe Savings Program. We may also use the information you give us to learn more about the people who use STELARA®, and to improve the information we give them. Johnson & Johnson Health Care Systems Inc. will not share your information with anyone else except where legally allowed.
- If you use medical/primary insurance to pay for your medicine, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in STELARA withMe at any time by calling 844-4withMe (844-494-8463).

## Get started now...

**Need help?**

Call **844-4withMe** (844-494-8463)
Monday–Friday, 8:00 AM–8:00 PM ET
Visit **JanssenCarePath.com/Stelara**

The support and resources provided by STELARA withMe are not intended to provide medical advice, replace a treatment plan you receive from your doctor or nurse, or serve as a reason for you to start or stay on treatment.

**Please read the full Prescribing Information and Medication Guide for STELARA® and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 07/24 cp-54244v11

Johnson&Johnson

Tremfya withMe

Tremfya® (guselkumab)

# TREMFYA withMe Savings Program

for eligible patients using commercial insurance

## Pay as little as $0 per dose

**Program provides:**

- **Medicine Cost Support** (for all eligible patients prescribed TREMFYA®)
- **Treatment Administration Cost Support** (only for eligible patients prescribed a TREMFYA® infusion)
  - Program may cover your out-of-pocket costs for TREMFYA® administration and eligible laboratory tests




Maximum program benefit per calendar year shall apply. Offer subject to change or end without notice. Participate without sharing your income information. See program requirements on the following pages.

**Get savings on your out-of-pocket costs for TREMFYA®. Savings may apply toward co-pay, co-insurance, or deductible.**

## 1. Get started

**Express Enrollment Available**

MyJanssenCarePath.com/express

Once enrolled, receive an electronic Savings Program card that can be saved to your digital wallet on your mobile device

## 2. How to use the Savings Program

**How the Savings Program can be used depends on the insurance you use to pay for your treatment:**

### If you use your **pharmacy/prescription insurance** to pay for your medicine from a pharmacy:

You may provide your Pharmacy Claims Information (Group #, BIN #, and Member ID #) to the pharmacy to receive instant savings off the cost of your medicine.

### If you use your **medical/primary insurance** to pay for your medicine (and your treatment administration costs if you're prescribed an infusion) through your doctor or treatment provider:

1. **Receive Your Treatment:** After receiving treatment with TREMFYA®, your provider will submit a claim to your insurance company. Depending on your insurance coverage, a co-pay may or may not be collected at the time of treatment. If you are required to pay a co-pay, keep proof of payment and submit with your rebate request
2. **Explanation of Benefits (EOB):** You and your provider will receive an EOB statement from your health insurance company
3. **Submit Your EOB (and proof of payment, if applicable):** You are responsible for submitting the required document(s) to the TREMFYA withMe Savings Program, or you can ask your provider to submit it on your behalf. You can submit your document(s) online at MyJanssenCarePath.com
4. **Get Your Rebate:** The TREMFYA withMe Savings Program reviews your EOB (and proof of payment, if applicable) and issues a rebate to you in one of the following ways, depending on the required documents submitted: to a Virtual Payment Card that you will get upon approval of your initial rebate request or to you by check if you have paid in full with a personal form of payment. Rebate may also be issued to your provider if you have assigned your benefits to them and your provider submits the required documents

**NOTE:** Your Virtual Payment Card can be used only for TREMFYA® treatment costs. **Your card is not a credit card. There is no charge for your card.**

**Please read the full Prescribing Information and Medication Guide for TREMFYA® and discuss any questions you have with your doctor.**

Tremfya withMe

Tremfya® (guselkumab)

## With an online account, you can manage your Savings Program benefits

- View your Savings Program information for pharmacy claims (BIN #, Group #, Member ID #) and medical claims
- Submit your EOB and proof of payment, if applicable
- Review, track, and manage your Savings Program payments and available savings
- Sign up to receive timely updates and information about TREMFYA®

**If for any reason your provider or pharmacy cannot process your requests, please call us at 833-WITHME1 (833-948-4631). You may be able to submit a Rebate Form to receive a check. Proof of payment required.**

## How to submit a rebate request

You can submit your EOB online or by fax. If you would like to receive a rebate check payable to you by mail, you must complete a Rebate Form and provide proof of payment.

**Online Account:** MyJanssenCarePath.com

**Online:** MyJanssenCarePath.com/Submit-Rebate

**Fax:** 833-512-0495

**At your request, your provider can also submit rebate requests to the Savings Program.**
Confirm with your provider whether you or your provider will submit rebate requests to the program.

# Savings Program Requirements

The TREMFYA withMe Savings Program provides two separate offerings for eligible patients: Medicine Cost Support (for all eligible patients prescribed TREMFYA®) and Treatment Administration Cost Support (only for eligible patients prescribed TREMFYA® infusion).

- **Medicine Cost Support** can help eligible patients **pay $0 per dose**. Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply.
- **Treatment Administration Cost Support** can help eligible patients save on out-of-pocket costs for:
  - Intravenous infusion of the medicine
  - Tuberculosis test (Quantiferon Gold or TB-SPOT)
  - Liver enzyme and bilirubin lab monitoring costs associated with the infusion

There is a $2,000 maximum benefit per calendar year for Treatment Administration Cost Support. The patient or healthcare provider is required to submit an Explanation of Benefits (EOB) following each infusion and/or laboratory test to the TREMFYA withMe Savings Program. Terms expire at the end of each calendar year. Offer subject to change or end without notice, including in specific states. Not valid for residents of MA, MI, MN, or RI.

## Medicine Cost Support

### Am I eligible for Medicine Cost Support?

You may be eligible for the Medicine Cost Support through TREMFYA withMe Savings Program if you are age 18 or older, use commercial or private health insurance for your prescribed TREMFYA®, and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as “accumulators” or “maximizers.” These programs divert patient assistance funds away from patients.

- Accumulators don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient’s annual deductible or out-of-pocket maximum.
- The TREMFYA withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the TREMFYA withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have “non-essential health benefit maximizers” that conflict with the program requirements of the TREMFYA withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as TREMFYA® as “non-essential.” This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.

(continued next page)

Tremfya withMe

Tremfya® (guselkumab)

# Medicine Cost Support (cont'd)

## Am I eligible for Medicine Cost Support? (cont'd)

- The TREMFYA withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the TREMFYA withMe Savings Program.
- Please let TREMFYA withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 833-WITHME1 (833-948-4631) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in TREMFYA withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes TREMFYA® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the TREMFYA withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

## Other requirements

- **This program is only for people age 18 or older using commercial or private health insurance who must pay an out-of-pocket cost for their prescribed TREMFYA®. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the TREMFYA withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for TREMFYA®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the TREMFYA withMe Savings Program. If your health plan removes TREMFYA® from its partnership with SaveOnSP, you may be eligible for the TREMFYA withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and/or other information, including information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the TREMFYA withMe Savings Program. The use of your information will be governed by our **Privacy Policy**.
- If you use medical/primary insurance to pay for your medicine, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request. Rebate requests must be submitted within 365 days of the date of service.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in TREMFYA withMe at any time by calling 833-WITHME1 (833-948-4631).

(continued next page)

Tremfya withMe

Tremfya® (guselkumab)

# Treatment Administration Cost Support

## Am I eligible for Treatment Administration Cost Support?

If you have been prescribed TREMFYA® infusion, you may be eligible for Treatment Administration Cost Support through the TREMFYA withMe Savings Program if you are age 18 or older, use commercial or private health insurance for TREMFYA®, and must pay an out-of-pocket cost for your TREMFYA® administration and eligible laboratory tests. Participate without sharing your income information.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

## Other requirements

- **This program is only for people age 18 or older using commercial or private health insurance who must pay an out-of-pocket cost for their TREMFYA® treatment. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states. Treatment Administration Cost Support is not valid for residents of MA, MI, MN, or RI.
- To use this Treatment Administration Cost Support, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and/or other information, including information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the TREMFYA withMe Savings Program. The use of your information will be governed by our Privacy Policy.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories, excluding states noted above. Void where prohibited, taxed, or limited by law.

You may end your participation in TREMFYA withMe at any time by calling 833-WITHME1 (833-948-4631).

Get started at **MyJanssenCarePath.com/express**

**Need help?**

Call **833-WITHME1** (833-948-4631)
Monday–Friday, 8:00 AM–11:00 PM ET
Visit JanssenCarePath.com/Tremfya

The support and resources provided by TREMFYA withMe are not intended to provide medical advice, replace a treatment plan you receive from your doctor or nurse, or serve as a reason for you to start or stay on treatment.

**Please read the full Prescribing Information and Medication Guide for TREMFYA® and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 09/24 cp-05009v16

Johnson&Johnson

Janssen CarePath

Simponi® golimumab

# Savings Program

## for eligible commercially insured patients

## Pay $5 per injection

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply. See program requirements on next page.




**Get instant savings on your out-of-pocket costs for your Janssen medication. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

Enroll and get a card

### Mobile Enrollment Available

**Text "SAVINGS" to 93327**
(message and data rates may apply*)

**Express Enrollment**
**MyJanssenCarePath.com/express**

Check eligibility, enroll, and receive an electronic Savings Program card that can be saved to your digital wallet on your iPhone or Android device.

You can use your Savings Program card when filling your prescription at a specialty or retail pharmacy. If for any reason your pharmacy cannot process your card, please submit a **Rebate Form** to receive a check.

**You can also create a personalized Janssen CarePath Account at MyJanssenCarePath.com where you can:**

- Enroll in the Janssen CarePath Savings Program
- View and manage your Savings Program benefits
- Learn about your insurance coverage
- Sign up for treatment support

If you enroll in the Savings Program via Mobile or Express Enrollment, you will not be able to view and manage your Savings Program benefits until you create an account at **MyJanssenCarePath.com**.

Care Team members, such as Providers and Pharmacists, can enroll patients in the Savings Program at **JanssenCarePathPortal.com/express**

*See Terms and Privacy Policy.

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guide for SIMPONI® and discuss any questions you have with your doctor.**

Janssen CarePath

Simponi® golimumab

# Savings Program

## Am I eligible?

You may be eligible for the Janssen CarePath Savings Program if you are age 18 or older, use commercial or private health insurance for SIMPONI®, and must pay an out-of-pocket cost for your medication. There is no income requirement.

Some health plans have programs or benefit designs known as “accumulators” or “maximizers.” These programs divert patient assistance funds away from patients.

- Accumulators don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient’s annual deductible or out-of-pocket maximum.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. Thus, Janssen reserves the right to reduce the Janssen CarePath Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have “non-essential health benefit maximizers” that conflict with the program requirements of the Janssen CarePath Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as SIMPONI® as “non-essential.” This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the Janssen CarePath Savings Program.
- Please let Janssen CarePath know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 877-CarePath (877-227-3728) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in Janssen CarePath, Janssen will monitor your utilization.
- Janssen reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes SIMPONI® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the Janssen CarePath Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guide for SIMPONI® and discuss any questions you have with your doctor.**

Janssen CarePath

Simponi® golimumab

# Savings Program (cont'd)

## Other requirements

- **This program is only for people age 18 or older using commercial or private health insurance who must pay an out-of-pocket cost for their Janssen medication. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of Janssen and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the Janssen CarePath Savings Program, because this program is only for people who must pay an out-of-pocket cost for SIMPONI®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the Janssen CarePath Savings Program. If your health plan removes SIMPONI® from its partnership with SaveOnSP, you may be eligible for the Janssen CarePath Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of SIMPONI®, and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use SIMPONI®, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 877-CarePath (877-227-3728).

Get started at **MyJanssenCarePath.com/express**

**Need help?**

Visit **JanssenCarePath.com/Simponi**

Call **877-CarePath** (877-227-3728)
Monday–Friday, 8:00 AM–8:00 PM ET

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guide for SIMPONI® and discuss any questions you have with your doctor.**

© Janssen Biotech, Inc. 2024 05/24 cp-53954v12

Janssen PHARMACEUTICAL COMPANIES OF Johnson & Johnson

Janssen CarePath

Simponi ARIA golimumab for infusion

# Savings Program

for eligible commercially insured patients

## Pay $5 per infusion

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply. See program requirements on pages 2 and 3.




**Get savings on your out-of-pocket medication costs for SIMPONI ARIA®. Depending on your health insurance plan, savings may apply toward deductible, co-pay, and co-insurance.**

**Program does not cover costs to give you your infusions.**

For treatment administration cost support, we offer Janssen CarePath Treatment Administration Rebate Program. Learn more at **JanssenCarePath.com/SimponiAria-TARP**

## 1 Enroll in the Savings Program

### 3 ways to enroll

**By creating an online account** and enrolling at **MyJanssenCarePath.com**

**By phone**
877-CarePath
(877-227-3728)

**By fax or mail**
Complete **Patient Enrollment Form***

*You will activate your card upon receipt of enrollment confirmation by mail.

## 2 How to use your Savings Program benefits

### How your card can be used depends on the insurance you use to pay for your medication:

If you use your **medical/primary insurance** to pay for your medication through your doctor, treatment provider, or pharmacy:

- You may use your card to receive a rebate, **OR**
- You may assign your benefits directly to your treatment provider. Please discuss this option with your provider

**How it works:**

- Your provider or pharmacy may or may not collect your co-pay, based on your insurance coverage
- You receive your treatment with SIMPONI ARIA®
  - Your provider or pharmacy submits your claim to your healthcare insurance provider
- You and your provider receive an Explanation of Benefits (EOB) statement from your insurance
  - You are responsible for submitting the EOB to Janssen CarePath Savings Program, or you can request your provider to submit the EOB on your behalf (see *How to submit a rebate request* below)
- Janssen CarePath Savings Program reviews your EOB, and issues rebate to your card, to you by check, or to your provider if you have assigned your benefits to your provider

If you use your **pharmacy/prescription insurance** to pay for your medication from a pharmacy:

- You may use your card (provide your Member ID #, Rx BIN #, and Group #) to receive instant savings off the cost of your medication
- The pharmacy will collect your co-pay

**Remember to bring your card to your treatment appointment. Your card is not a credit card. There is no charge for your card. If for any reason your provider or pharmacy cannot process your card, please call us at 877-CarePath (877-227-3728). You may be able to submit a Rebate Form to receive a check. Proof of medication payment required.**

Janssen Biotech, Inc., is not liable for unintended or unauthorized use of the SIMPONI ARIA® Mastercard® if it is lost or stolen. The Janssen CarePath Savings Program for SIMPONI ARIA® Prepaid Mastercard is issued by Pathward®, N.A., Member FDIC, pursuant to license by Mastercard International Incorporated. Mastercard and the circles design are registered trademarks of Mastercard International Incorporated. Janssen CarePath Savings Program is not a Pathward or Mastercard product or service, nor is the optional offer endorsed by them.

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guide for SIMPONI ARIA® and discuss any questions you have with your doctor.**

**With a Janssen CarePath online account, you can manage your Savings Program benefits**

- Review your available benefits
- Submit Savings Program requests
- View benefit payment transactions
- Receive timely alerts and Program updates

**Get started now...**

**Need help?** Visit **JanssenCarePath.com/SimponiAria**
Call **877-CarePath** (877-227-3728)
Monday–Friday, 8:00 AM–8:00 PM ET

## How to submit a rebate request

If you have created an online Janssen CarePath Patient Account, you may submit online in your account. If you would like to receive a rebate check payable to you by mail, you must complete a **Rebate Request Form** and provide proof of medication payment.

**At your request, your provider may submit rebate requests to the Savings Program on your behalf via the Provider Portal or by fax or mail.**

**Online:** **MyJanssenCarePath.com**

**Fax:** 855-820-3224

**Mail:**
Janssen CarePath Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the Program—you or your provider at your request.

# Savings Program Requirements

## Am I eligible?

You may be eligible for the Janssen CarePath Savings Program if you are age 2 or older, use commercial or private health insurance for your prescribed SIMPONI ARIA® (golimumab), and must pay an out-of-pocket cost for your medication. There is no income requirement.

Some health plans have programs or benefit designs known as "accumulators" or "maximizers." These programs divert patient assistance funds away from patients.

- Accumulators don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient's annual deductible or out-of-pocket maximum.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. Thus, Janssen reserves the right to reduce the Janssen CarePath Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have "non-essential health benefit maximizers" that conflict with the program requirements of the Janssen CarePath Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as SIMPONI ARIA® as "non-essential." This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the Janssen CarePath Savings Program.
- Please let Janssen CarePath know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 877-CarePath (877-227-3728) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in Janssen CarePath, Janssen will monitor your utilization.
- Janssen reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes SIMPONI ARIA® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the Janssen CarePath Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guide for SIMPONI ARIA® and discuss any questions you have with your doctor.**

# Savings Program Requirements (cont'd)

## Other requirements

- **This program is only for people age 2 or older using commercial or private health insurance who must pay an out-of-pocket cost for their Janssen medication. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of Janssen and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the Janssen CarePath Savings Program, because this program is only for people who must pay an out-of-pocket cost for SIMPONI ARIA®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the Janssen CarePath Savings Program. If your health plan removes SIMPONI ARIA® from its partnership with SaveOnSP, you may be eligible for the Janssen CarePath Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of SIMPONI ARIA®, and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use SIMPONI ARIA®, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.
- If you use medical/primary insurance to pay for your medication, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 877-CarePath (877-227-3728).

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guide for SIMPONI ARIA® and discuss any questions you have with your doctor.**

janssen PHARMACEUTICAL COMPANIES OF Johnson & Johnson

© Janssen Biotech, Inc. 2024 06/24 cp-53614v10

Janssen CarePath

# Savings Program

## for eligible commercially insured patients

## Pay $5 per prescription fill

Maximum program benefit per calendar year shall apply across all oral PAH therapies in the program. Not valid for patients using Medicare, Medicaid, or other government-funded programs to pay for their medications. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply. Offer not valid for TRACLEER® in CA or MA, or for MA residents (62.5 mg and 125 mg only). Participate without sharing your income information. See program requirements on next page.




**Get savings on your out-of-pocket medication costs for OPSUMIT®, OPSYNVI®, TRACLEER®, or UPTRAVI®. Depending on the health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

Call a Janssen CarePath Care Coordinator at **866-228-3546** or visit **JanssenCarePath.com** for more information about affordability programs that may be available.

**Please see the full Prescribing Information for OPSUMIT® and OPSYNVI® and Medication Guides for OPSUMIT® and OPSYNVI®, including an Important Warning about Serious Birth Defects. Please read the full Prescribing Information, including Boxed Warning about liver injury and birth defects, for TRACLEER® and Medication Guide for TRACLEER®. Please read full Prescribing Information for UPTRAVI® and Patient Product Information for UPTRAVI®.**

Janssen CarePath

Opsumit macitentan tablets 10 mg | Opsynvi macitentan/tadalafil 10 mg/40 mg tablets | Tracleer BOSENTAN 62.5 mg/125 mg Tablets 32 mg Tablets for Oral Suspension | Uptravi selexipag tablets | 200-1600 mcg

# Savings Program

## Am I eligible?

**You may be eligible for the Janssen CarePath Oral PAH Savings Program if you:**

- Are age 18 or older (age 3 or older for TRACLEER® [bosentan] 32 mg), use commercial or private health insurance for OPSUMIT® (macitentan), OPSYNVI® (macitentan and tadalafil), UPTRAVI® (selexipag), or TRACLEER®, and must pay an out-of-pocket cost for your medication
- (Female patients only) Are enrolled in the Macitentan-Containing Products REMS Program for OPSUMIT® or OPSYNVI®. Learn more at **MacitentanREMS.com**
- Are enrolled in the Bosentan REMS Program for TRACLEER®. Learn more at **BosentanREMSProgram.com**

Some health plans have programs or benefit designs known as "accumulators" or "maximizers." These programs divert patient assistance funds away from patients.

- Accumulators don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient's annual deductible or out-of-pocket maximum.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. Thus, Janssen reserves the right to reduce the Janssen CarePath Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have "non-essential health benefit maximizers" that conflict with the program requirements of the Janssen CarePath Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as OPSUMIT®, OPSYNVI®, UPTRAVI®, or TRACLEER® as "non-essential." This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the Janssen CarePath Savings Program.
- Please let Janssen CarePath know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 866-228-3546 to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in Janssen CarePath, Janssen will monitor your utilization.
- Janssen reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes OPSUMIT®, OPSYNVI®, UPTRAVI®, or TRACLEER® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the Janssen CarePath Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

**Please see the full Prescribing Information for OPSUMIT® and OPSYNVI® and Medication Guides for OPSUMIT® and OPSYNVI®, including an Important Warning about Serious Birth Defects. Please read the full Prescribing Information, including Boxed Warning about liver injury and birth defects, for TRACLEER® and Medication Guide for TRACLEER®. Please read full Prescribing Information for UPTRAVI® and Patient Product Information for UPTRAVI®.**

Janssen CarePath

Opsumit macitentan tablets 10 mg | Opsynvi macitentan/tadalafil 10 mg/40 mg tablets | Tracleer BOSENTAN 62.5 mg/125 mg Tablets 32 mg Tablets for Oral Suspension | Uptravi selexipag tablets 200-1600 mcg

# Savings Program (cont'd)

## Other requirements

- **This program is only for people age 18 or older (age 3 or older for TRACLEER® 32 mg) using commercial or private health insurance who must pay an out-of-pocket cost for their Janssen medication. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states. Offer not valid for TRACLEER® in CA or MA or for MA residents (for 62.5 mg and 125 mg only).
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of Janssen and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the Janssen CarePath Savings Program, because this program is only for people who must pay an out-of-pocket cost for OPSUMIT®, OPSYNVI®, UPTRAVI®, or TRACLEER®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the Janssen CarePath Savings Program. If your health plan removes OPSUMIT®, OPSYNVI®, UPTRAVI®, or TRACLEER® from its partnership with SaveOnSP, you may be eligible for the Janssen CarePath Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Actelion Pharmaceuticals US, Inc., and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use OPSUMIT®, OPSYNVI®, UPTRAVI®, or TRACLEER®, and to improve the information we give them. Actelion Pharmaceuticals US, Inc. will not share your information with anyone else except where legally allowed.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and the Commonwealth of Puerto Rico, excluding states noted above. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 866-228-3546.

**Need help?** Call **866-228-3546**
Monday–Friday, 8:00 AM–8:00 PM ET
Multilingual phone support available

**Please see the full Prescribing Information for OPSUMIT® and OPSYNVI® and Medication Guides for OPSUMIT® and OPSYNVI®, including an Important Warning about Serious Birth Defects. Please read the full Prescribing Information, including Boxed Warning about liver injury and birth defects, for TRACLEER® and Medication Guide for TRACLEER®. Please read full Prescribing Information for UPTRAVI® and Patient Product Information for UPTRAVI®.**

© Actelion Pharmaceuticals US, Inc. 2024 06/24 cp-184256v5

Janssen PHARMACEUTICAL COMPANIES OF Johnson & Johnson

Janssen CarePath

Remicade® INFLIXIMAB | Infliximab

# Savings Program

## for eligible commercially insured patients

## Pay $5 per infusion

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply. See program requirements on pages 2 and 3.




**Get savings on your out-of-pocket medication costs for REMICADE® or Infliximab. Depending on your health insurance plan, savings may apply toward deductible, co-pay, and co-insurance.**

**Program does not cover costs to give you your infusion.**

## 1 Enroll in the Savings Program

### 3 ways to enroll

**By creating an online account** and enrolling at MyJanssenCarePath.com

**By phone**
877-CarePath
(877-227-3728)

**By fax or mail**
Complete Patient Enrollment Form*
*You will activate your card upon receipt of enrollment confirmation by mail.

## 2 How to use your Savings Program benefits

### How your card can be used depends on the insurance you use to pay for your medication:

If you use your **medical/primary insurance** to pay for your medication through your doctor, treatment provider, or pharmacy:

- You may use your card to receive a rebate, **OR**
- You may assign your benefits directly to your treatment provider. Please discuss this option with your provider

**How it works:**

- Your provider or pharmacy may or may not collect your co-pay, based on your insurance coverage
- You receive your treatment with REMICADE® or Infliximab
  - Your provider or pharmacy submits your claim to your healthcare insurance provider
- You and your provider receive an EOB statement from your insurance
  - You are responsible for submitting the EOB to Janssen CarePath Savings Program, or you can request your provider to submit the EOB on your behalf (see *How to submit a rebate request* below)
- Janssen CarePath Savings Program reviews your EOB, and issues rebate to your card, to you by check, or to your provider if you have assigned your benefits to your provider

If you use your **pharmacy/prescription insurance** to pay for your medication from a pharmacy:

- You may use your card (provide your Member ID #, Rx BIN #, and Group #) to receive instant savings off the cost of your medication
- The pharmacy will collect your co-pay

**Remember to bring your card to your treatment appointment. Your card is not a credit card. There is no charge for your card.**

**If for any reason your provider or pharmacy cannot process your card, please call us at 877-CarePath (877-227-3728). You may be able to submit a Rebate Form to receive a check. Proof of medication payment required.**

Janssen Biotech, Inc., is not liable for unintended or unauthorized use of the REMICADE® and Infliximab Mastercard® if it is lost or stolen. The Janssen CarePath Savings Program for REMICADE® and Infliximab Prepaid Mastercard is issued by Pathward®, N.A., Member FDIC, pursuant to license by Mastercard International Incorporated. Mastercard and the circles design are registered trademarks of Mastercard International Incorporated. Janssen CarePath Savings Program is not a Pathward or Mastercard product or service, nor is the optional offer endorsed by them.

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guides for REMICADE® and Infliximab, and discuss any questions you have with your doctor.**

**With a Janssen CarePath online account, you can manage your Savings Program benefits**

- Review your available benefits
- Submit Savings Program requests
- View benefit payment transactions
- Receive timely alerts and program updates

**Get started now...**

**Need help?** Visit **JanssenCarePath.com**
Call **877-CarePath** (877-227-3728)
Monday–Friday, 8:00 AM–8:00 PM ET

## How to submit a rebate request

If you have created an online Janssen CarePath Patient Account, you may submit online in your account. If you would like to receive a rebate check payable to you by mail, you must complete a **Rebate Request Form** and provide proof of medication payment.

**At your request, your provider may submit rebate requests to the Savings Program on your behalf via the Provider Portal or by fax or mail.**

**Online:** MyJanssenCarePath.com

**Fax:** 877-234-3048

**Mail:**
Janssen CarePath Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

# Savings Program Requirements

## Am I eligible?

You may be eligible for the Janssen CarePath Savings Program if you are age 6 or older, use commercial or private health insurance for your prescribed REMICADE® (infliximab) or Infliximab, and must pay an out-of-pocket cost for your medication. There is no income requirement.

Some health plans have programs or benefit designs known as "accumulators" or "maximizers." These programs divert patient assistance funds away from patients.

- Accumulators don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient's annual deductible or out-of-pocket maximum.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. Thus, Janssen reserves the right to reduce the Janssen CarePath Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have "non-essential health benefit maximizers" that conflict with the program requirements of the Janssen CarePath Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as REMICADE® or Infliximab as "non-essential." This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The Janssen CarePath Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the Janssen CarePath Savings Program.
- Please let Janssen CarePath know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 877-CarePath (877-227-3728) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in Janssen CarePath, Janssen will monitor your utilization.
- Janssen reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes REMICADE® or Infliximab from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the Janssen CarePath Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guides for REMICADE® and Infliximab, and discuss any questions you have with your doctor.**

# Savings Program Requirements (cont'd)

## Other requirements

- **This program is only for people age 6 or older using commercial or private health insurance who must pay an out-of-pocket cost for their Janssen medication. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of Janssen and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the Janssen CarePath Savings Program, because this program is only for people who must pay an out-of-pocket cost for REMICADE® or Infliximab.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the Janssen CarePath Savings Program. If your health plan removes REMICADE® or Infliximab from its partnership with SaveOnSP, you may be eligible for the Janssen CarePath Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Janssen Biotech, Inc., the maker of REMICADE® and Infliximab, and our service providers to enroll you in the Janssen CarePath Savings Program. We may also use the information you give us to learn more about the people who use REMICADE® or Infliximab, and to improve the information we give them. Janssen Biotech, Inc., will not share your information with anyone else except where legally allowed.
- If you use medical/primary insurance to pay for your medication, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in Janssen CarePath at any time by calling 877-CarePath (877-227-3728).

**Please read the full Prescribing Information, including Boxed Warning, and Medication Guides for REMICADE® and Infliximab, and discuss any questions you have with your doctor.**

© Janssen Biotech, Inc. 2024 06/24 cp-54222v8

J&J withMe

RYBREVANT® (amivantamab-vmjw) Injection for IV Use | 350 mg/7 mL (50 mg/mL)

# Savings Program

**for eligible commercially insured patients**

## Pay $0 for each infusion

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply.

Program does not cover costs to give you your infusion. See program requirements on the following pages.




**Get savings on your out-of-pocket medicine costs for RYBREVANT®. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

**Enroll by phone | 833-JNJ-wMe1** (833-565-9631) **OR** **Enroll online | Account.JNJwithMe.com/express**

# How to use your Savings Program benefits

1. **Receive Your Treatment:** After receiving treatment with RYBREVANT®, your provider or pharmacy will submit a claim to your insurance company. Depending on your insurance coverage, a co-pay may or may not be collected at the time of treatment.
2. **Explanation of Benefits (EOB):** You and your provider will receive an EOB statement from your insurance company.
3. **Submit Your EOB:** You are responsible for submitting the EOB to the J&J withMe Savings Program, or you can ask your provider to submit it on your behalf. For details, see *How to submit a rebate request* below.
4. **Get Your Rebate:** The J&J withMe Savings Program reviews your EOB and issues a rebate to your card, to you by check if you have paid in full with another form of payment, or to your provider, if you have assigned your benefits to them.

Your J&J withMe Savings Program Virtual Payment Card can be used only for RYBREVANT® medicine costs. **Your card is not a credit card. There is no charge for your card.**

### How to submit a rebate request

You can submit your EOB online at **Account.JNJwithMe.com/submitrebate**, by fax, or by mail. At your request, your provider can also submit rebate requests to the Savings Program.

**Online:**
**Account.JNJwithMe.com/submitrebate**

**Fax:**
833-512-0489

**Mail:**
J&J withMe Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

Please read the full **Prescribing Information and Patient Information** for RYBREVANT® and discuss any questions you have with your doctor.

## Savings Program Requirements

### Am I eligible?

You may be eligible for the J&J withMe Savings Program if you are age 18 or older, use commercial or private health insurance for your prescribed RYBREVANT® (amivantamab-vmjw), and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as “accumulators” or “maximizers.” These programs divert patient assistance funds away from patients.

- Accumulators don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient’s annual deductible or out-of-pocket maximum.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the J&J withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have “non-essential health benefit maximizers” that conflict with the program requirements of the J&J withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as RYBREVANT® as “non-essential.” This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the J&J withMe Savings Program.
- Please let J&J withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 833-JNJ-wMe1 (833-565-9631) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in J&J withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes RYBREVANT® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the J&J withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

(continued)

**Please read the full Prescribing Information and Patient Information for RYBREVANT® and discuss any questions you have with your doctor.**

## Savings Program Requirements (cont'd)

### Other requirements

- **This program is only for people age 18 or older using commercial or private health insurance who must pay an out-of-pocket cost for their Johnson & Johnson medicine. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the J&J withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for RYBREVANT® (amivantamab-vmjw).
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the J&J withMe Savings Program. If your health plan removes RYBREVANT® from its partnership with SaveOnSP, you may be eligible for the J&J withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medication insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the J&J withMe Savings Program. We may also use the information you give us to learn more about the people who use RYBREVANT®, and to improve the information we give them. Johnson & Johnson Health Care Systems Inc. will not share your information with anyone else except where legally allowed.
- If you use medical/primary insurance to pay for your medication, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in J&J withMe at any time by calling 833-JNJ-wMe1 (833-565-9631).

**Need help?**

Call **833-JNJ-wMe1** (833-565-9631)
Monday–Friday, 8:00 AM–8:00 PM ET
Multilingual phone support available

**Please read the full Prescribing Information and Patient Information for RYBREVANT® and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 08/24 cp-201094v5

J&J withMe

RYBREVANT® (amivantamab-vmjw) Injection for IV Use | 350 mg/7 mL (50 mg/mL)

LAZCLUZE™ (lazertinib) Tablets | 240 mg/80 mg

# Savings Program for eligible commercially insured patients

## Pay $0 for each RYBREVANT® infusion and LAZCLUZE™ prescription fill when RYBREVANT® is used in combination with LAZCLUZE™

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply. Program does not cover costs to give you your infusion. See program requirements on the following pages.

**Get savings on your out-of-pocket medicine costs for RYBREVANT® and LAZCLUZE™. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

**Enroll by phone** | 833-JNJ-wMe1 (833-565-9631) OR **Enroll online** | Account.JNJwithMe.com/express

## Once enrolled, you will have 2 J&J withMe Savings Program cards







### RYBREVANT® Savings Program Virtual Payment Card

Get your Virtual Payment Card for your RYBREVANT® medicine by visiting **JNJwithMeCard.com** or by calling 833-JNJ-wMe1 (833-565-9631), Monday through Friday, 8:00 AM to 8:00 PM ET. Share your Virtual Payment Card with your provider.

### LAZCLUZE™ Savings Program Card

Use your J&J withMe Savings Program Card at the pharmacy to receive instant savings off your medicine costs for LAZCLUZE™.

Please read the full Prescribing Information for RYBREVANT® and LAZCLUZE™ and discuss any questions you have with your doctor.

J&J withMe

RYBREVANT® (amivantamab-vmjw) Injection for IV Use | 350 mg/7 mL (50 mg/mL)

LAZCLUZE™ (lazertinib) Tablets | 240 mg/80 mg

# How to use your Savings Program benefits

## How it works for RYBREVANT®




1. **Receive Your Treatment:** After receiving treatment with RYBREVANT®, your provider or pharmacy will submit a claim to your insurance company. Depending on your insurance coverage, a co-pay may or may not be collected at the time of treatment.
2. **Explanation of Benefits (EOB):** You and your provider will receive an EOB statement from your insurance company.
3. **Submit Your EOB:** You are responsible for submitting the EOB to the J&J withMe Savings Program, or you can ask your provider to submit it on your behalf. For details, see *How to submit a rebate request* below.
4. **Get Your Rebate:** The J&J withMe Savings Program reviews your EOB and issues a rebate to your card, to you by check if you paid in full with another form of payment, or to your provider if you have assigned your benefits to them.

Your J&J withMe Savings Program Virtual Payment Card can only be used for RYBREVANT® medicine costs. **Your card is not a credit card. There is no charge for your card.**

## How to submit a rebate request

You can submit your EOB online at **Account.JNJwithMe.com/submitrebate**, by fax, or by mail. At your request, your provider can also submit rebate requests to the Savings Program.

**Online:**
Account.JNJwithMe.com/submitrebate

**Fax:**
833-512-0489

**Mail:**
J&J withMe Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

---

## How it works for LAZCLUZE™




**Provide Savings Program Card information to Pharmacy:** Your pharmacy will call you to collect payment information for your LAZCLUZE™ prescription. During that call, inform them that you have a Savings Program Card and be ready to share the BIN, Group, and Member ID numbers shown on the card.

**Receive Instant Savings:** Your pharmacy will apply your Savings Program benefit directly against your medicine cost.

If for any reason your pharmacy cannot process your card, please submit a rebate request at **Account.JNJwithMe.com/submitrebate** to receive a check. Or, you can submit a **Rebate Form** by mail.

**Online:**
Account.JNJwithMe.com/submitrebate

**Mail:**
J&J withMe Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Please read the full Prescribing Information for **RYBREVANT®** and **LAZCLUZE™** and discuss any questions you have with your doctor.

J&J withMe

RYBREVANT® (amivantamab-vmjw) Injection for IV Use | 350 mg/7 mL (50 mg/mL)

LAZCLUZE™ (lazertinib) Tablets | 240 mg/80 mg

## Savings Program Requirements

### Am I eligible?

You may be eligible for the J&J withMe Savings Program if you are age 18 or older, use commercial or private health insurance for RYBREVANT® and LAZCLUZE™, and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as “accumulators” or “maximizers.” These programs divert patient assistance funds away from patients.

- Accumulators don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient’s annual deductible or out-of-pocket maximum.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the J&J withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have “non-essential health benefit maximizers” that conflict with the program requirements of the J&J withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as RYBREVANT® or LAZCLUZE™ as “non-essential.” This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the J&J withMe Savings Program.
- Please let J&J withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 833-JNJ-wMe1 (833-565-9631) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in J&J withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes RYBREVANT® or LAZCLUZE™ from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the J&J withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

(continued)

**Please read the full Prescribing Information for RYBREVANT® and LAZCLUZE™ and discuss any questions you have with your doctor.**

J&J withMe

RYBREVANT® (amivantamab-vmjw) Injection for IV Use | 350 mg/7 mL (50 mg/mL)

LAZCLUZE™ (lazertinib) Tablets | 240 mg/80 mg

## Savings Program Requirements (cont'd)

### Other requirements

- **This program is only for people age 18 or older using commercial or private health insurance who must pay an out-of-pocket cost for their prescribed RYBREVANT® or LAZCLUZE™. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the J&J withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for RYBREVANT® or LAZCLUZE™.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the J&J withMe Savings Program. If your health plan removes RYBREVANT® or LAZCLUZE™ from its partnership with SaveOnSP, you may be eligible for the J&J withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc., and our service providers to enroll you in the J&J withMe Savings Program. We may also use the information you give us to learn more about the people who use RYBREVANT® or LAZCLUZE™, and to improve the information we give them. Johnson & Johnson Health Care Systems Inc., will not share your information with anyone else except where legally allowed.
- If you use medical/primary insurance to pay for your RYBREVANT® medicine, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in J&J withMe at any time by calling 833-JNJ-wMe1 (833-565-9631).

**Need help?** Call **833-JNJ-wMe1** (833-565-9631)
Monday–Friday, 8:00 AM–8:00 PM ET
Multilingual phone support available

**Please read the full Prescribing Information for RYBREVANT® and LAZCLUZE™ and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 08/24 cp-447152v1

Johnson&Johnson

J&J withMe

Balversa® (erdafitinib) 3, 4, 5 mg tablets

# Savings Program for eligible commercially insured patients

# Pay $5 per fill

J&J withMe

Balversa® (erdafitinib) 3, 4, 5 mg tablets

**Savings Program Card**

**BIN:** 610020 **GROUP:** 99994010

**ID:**

Please read the full Prescribing Information and Patient Information for BALVERSA®, and discuss any questions you have with your doctor.

PROGRAM REQUIREMENTS APPLY.

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply.

See program requirements on the following pages.

**Get savings on your out-of-pocket medicine costs for BALVERSA®. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

## Enroll and get a card

**Patients can check eligibility and enroll at Account.JNJwithMe.com/express**

**Care Team members, such as Providers and Pharmacists, can enroll patients in the Savings Program at Portal.JNJwithMe.com**

**For additional information and resources to help you start and stay on therapy as prescribed by your doctor, visit Balversa.com**

The support and resources provided by J&J withMe are not intended to provide medical advice, replace a treatment plan you receive from your doctor or nurse, or serve as a reason for you to start or stay on treatment.

Please read the full Prescribing Information and Patient Information for BALVERSA®, and discuss any questions you have with your doctor.

J&J
withMe

Balversa®
(erdafitinib)
3, 4, 5 mg tablets

## Savings Program Requirements

### Am I eligible?

You may be eligible for the J&J withMe Savings Program if you use commercial or private health insurance for your prescribed BALVERSA®, and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as “accumulators” or “maximizers.” These programs divert patient assistance funds away from patients.

- Accumulators don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient’s annual deductible or out-of-pocket maximum.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the J&J withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have “non-essential health benefit maximizers” that conflict with the program requirements of the J&J withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as BALVERSA® as “non-essential.” This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the J&J withMe Savings Program.
- Please let J&J withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 866-378-1910 to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in J&J withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes BALVERSA® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the J&J withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

(continued)

**Please read the full Prescribing Information and Patient Information for BALVERSA®, and discuss any questions you have with your doctor.**

J&J
withMe

Balversa®
(erdafitinib)
3, 4, 5 mg tablets

## Savings Program Requirements (cont'd)

### Other requirements

- **This program is only for people using commercial or private health insurance who must pay an out-of-pocket cost for their prescribed BALVERSA®. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the J&J withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for BALVERSA®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the J&J withMe Savings Program. If your health plan removes BALVERSA® from its partnership with SaveOnSP, you may be eligible for the J&J withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and/or other information, including information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the J&J withMe Savings Program. The use of your information will be governed by our **Privacy Policy**.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in J&J withMe at any time by calling 866-378-1910.

**Please read the full Prescribing Information and Patient Information for BALVERSA®, and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 09/24 cp-69169v5

Johnson&Johnson

J&J withMe

DARZALEX® (daratumumab) injection for intravenous infusion 100 mg/5 mL, 400 mg/20 mL | DARZALEX *Faspro*® (daratumumab and hyaluronidase-fihj) Injection for subcutaneous use | 1,800mg/30,000units | TALVEY® (talquetamab-tgvs) | TECVAYLI® (teclistamab-cqyv)

# Savings Program

**for eligible commercially insured patients**

## Pay $5 per dose

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply.

Program does not cover costs to give you your treatment. See program requirements on the following pages.




**Get savings on your out-of-pocket medicine costs for your J&J medicine. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

**Enroll by phone | 833-JNJ-wMe1 (833-565-9631)** OR **Enroll online | Account.JNJwithMe.com**

# How to use your Savings Program benefits

1. **Receive Your Treatment:** After receiving treatment with DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, or TECVAYLI®, your provider or pharmacy will submit a claim to your insurance company. Depending on your insurance coverage, a co-pay may or may not be collected at the time of treatment.
2. **Explanation of Benefits (EOB):** You and your provider will receive an EOB statement from your insurance company.
3. **Submit Your EOB:** You are responsible for submitting the EOB to the J&J withMe Savings Program, or you can ask your provider to submit it on your behalf. For details, see *How to submit a rebate request* below.
4. **Get Your Rebate:** The J&J withMe Savings Program reviews your EOB and issues a rebate to your card, to you by check if you have paid in full with another form of payment, or to your provider, if you have assigned your benefits to them.

Your J&J withMe Savings Program Virtual Payment Card can only be used for DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, and TECVAYLI® medicine costs. **Your card is not a credit card. There is no charge for your card.**

## How to submit a rebate request

You can submit your EOB online at **Account.JNJwithMe.com/submitrebate**, by fax, or by mail. At your request, your provider can also submit rebate requests to the Savings Program.

**Online:**
**Account.JNJwithMe.com/submitrebate**

**Fax:**
833-512-0489

**Mail:**
J&J withMe Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Confirm with your provider who will submit rebate requests to the program—you or your provider at your request.

**Please read the full Prescribing Information for DARZALEX® and DARZALEX *FASPRO*® and discuss any questions you have with your doctor. Please read full Prescribing Information, including Boxed Warning, and Medication Guides for TALVEY® and TECVAYLI® and discuss any questions you have with your doctor.**

J&J withMe

DARZALEX® (daratumumab) injection for intravenous infusion 100 mg/5 mL, 400 mg/20 mL | DARZALEX Faspro® (daratumumab and hyaluronidase-fihj) Injection for subcutaneous use | 1,800mg/30,000units | TALVEY® (talquetamab-tgvs) | TECVAYLI® (teclistamab-cqyv)

## With a J&J withMe online account, you can manage your Savings Program benefits

- Review your available benefits
- Submit Savings Program requests
- View benefit payment transactions
- Receive timely alerts and program updates

## Get started now...

Visit **Account.JNJwithMe.com**

**Need help?**
Call **833-JNJ-wMe1** (833-565-9631)
Monday–Friday, 8:00 AM–8:00 PM ET

If you only want to check your eligibility and enroll in the J&J withMe Savings Program, visit **Account.JNJwithMe.com/oncology** or call 833-JNJ-wMe1 (833-565-9631).

## Savings Program Requirements

### Am I eligible?

You may be eligible for the J&J withMe Savings Program if you meet the minimum age requirements in product labeling – age 18 or older for TALVEY® and TECVAYLI®, use commercial or private health insurance for your prescribed DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, or TECVAYLI®, and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as “accumulators” or “maximizers.” These programs divert patient assistance funds away from patients.

- Accumulators don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don’t allow patient assistance to count toward the patient’s deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient’s annual deductible or out-of-pocket maximum.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the J&J withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have “non-essential health benefit maximizers” that conflict with the program requirements of the J&J withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, or TECVAYLI® as “non-essential.” This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the J&J withMe Savings Program.
- Please let J&J withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 833-JNJ-wMe1 (833-565-9631) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in J&J withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, or TECVAYLI® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the J&J withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

(continued)

**Please read the full Prescribing Information for DARZALEX® and DARZALEX *FASPRO*® and discuss any questions you have with your doctor. Please read full Prescribing Information, including Boxed Warning, and Medication Guides for TALVEY® and TECVAYLI® and discuss any questions you have with your doctor.**

J&J withMe

DARZALEX® (daratumumab) injection for intravenous infusion 100 mg/5 mL, 400 mg/20 mL | DARZALEX *Faspro*® (daratumumab and hyaluronidase-fihj) Injection for subcutaneous use | 1,800mg/30,000units | TALVEY® (talquetamab-tgvs) | TECVAYLI® (teclistamab-cqyv)

## Savings Program Requirements (cont'd)

### Other requirements

- **This program is only for people who meet the minimum age requirements (see previous page) using commercial or private health insurance who must pay an out-of-pocket cost for their prescribed DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, or TECVAYLI®. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the J&J withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, or TECVAYLI®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the J&J withMe Savings Program. If your health plan removes DARZALEX®, DARZALEX *FASPRO*®, TALVEY®, or TECVAYLI® from its partnership with SaveOnSP, you may be eligible for the J&J withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and/or other information, including information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the J&J withMe Savings Program. The use of your information will be governed by our **Privacy Policy**.
- If you use medical/primary insurance to pay for your medicine, you need to submit a rebate request with an Explanation of Benefits (EOB) to get payment from the Savings Program. With your permission, your provider may submit the rebate request and EOB for you. Please make sure you and your provider know who will submit the rebate request.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in J&J withMe at any time by calling 833-JNJ-wMe1 (833-565-9631).

**Need help?** Call **833-JNJ-wMe1** (833-565-9631)
Monday–Friday, 8:00 AM–8:00 PM ET
Multilingual phone support available

**Please read the full Prescribing Information for DARZALEX® and DARZALEX *FASPRO*® and discuss any questions you have with your doctor. Please read full Prescribing Information, including Boxed Warning, and Medication Guides for TALVEY® and TECVAYLI® and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 09/24 cp-465040v1

Johnson&Johnson

J&J withMe

Akeega® (niraparib/abiraterone acetate) 100mg/500mg tablets • 50mg/500mg tablets

Erleada® (apalutamide) 60 mg tablets 240 mg tablet

# Savings Program

**for eligible commercially insured patients**

## Pay $0 per month

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply.

See program requirements on the following pages.




**Get savings on your out-of-pocket medicine costs for AKEEGA® and ERLEADA®. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

## Enroll and get a card

**By phone** | 833-JNJ-wMe1 (833-565-9631) **OR** **Express Enrollment** | Account.JNJwithMe.com/express

**Provide Savings Program Card information to Pharmacy:** Your pharmacy will call you to collect payment information for your prescription. During that call, inform them that you have a Savings Card and be ready to share the BIN, Group, and Member ID numbers shown on the card.

**Receive Instant Savings:** Your pharmacy will apply your Savings Program benefit directly against your medicine cost.

If for any reason your pharmacy cannot process your card, please submit a rebate request at **Account.JNJwithMe.com/submitrebate** to receive a check. Or, you can submit a **Rebate Form** by mail.

**Online:**
Account.JNJwithMe.com/submitrebate

**Mail:**
J&J withMe Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

**You can also create a personalized J&J withMe Account at Account.JNJwithMe.com* where you can:**

- Enroll in the J&J withMe Savings Program
- Learn about your insurance coverage
- View and manage your Savings Program benefits
- Sign up for treatment support

If you enroll in the Savings Program via Express Enrollment, you will not be able to view and manage your Savings Program benefits until you create an account at **Account.JNJwithMe.com**.*

*J&J withMe Account not available for AKEEGA®.

The support and resources provided by J&J withMe are not intended to provide medical advice, replace a treatment plan you receive from your doctor or nurse, or serve as a reason for you to start or stay on treatment.

**Please read the full Prescribing Information for AKEEGA® and ERLEADA® and discuss any questions you have with your doctor.**

J&J withMe

Akeega® (niraparib/abiraterone acetate) 100mg/500mg tablets • 50mg/500mg tablets

Erleada® (apalutamide) 60 mg tablets 240 mg tablet

## Savings Program Requirements

### Am I eligible?

You may be eligible for the J&J withMe Savings Program if you use commercial or private health insurance for your prescribed AKEEGA® or ERLEADA®, and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as "accumulators" or "maximizers." These programs divert patient assistance funds away from patients.

- Accumulators don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient's annual deductible or out-of-pocket maximum.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the J&J withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have "non-essential health benefit maximizers" that conflict with the program requirements of the J&J withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as AKEEGA® or ERLEADA® as "non-essential." This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the J&J withMe Savings Program.
- Please let J&J withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 833-JNJ-wMe1 (833-565-9631) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in J&J withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes AKEEGA® or ERLEADA® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the J&J withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

(continued)

**Please read the full Prescribing Information for AKEEGA® and ERLEADA® and discuss any questions you have with your doctor.**

J&J withMe

Akeega® (niraparib/abiraterone acetate) 100mg/500mg tablets • 50mg/500mg tablets

Erleada® (apalutamide) 60 mg tablets 240 mg tablet

## Savings Program Requirements (cont'd)

### Other requirements

- **This program is only for people using commercial or private health insurance who must pay an out-of-pocket cost for their prescribed AKEEGA® or ERLEADA®. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the J&J withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for AKEEGA® or ERLEADA®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the J&J withMe Savings Program. If your health plan removes AKEEGA® or ERLEADA® from its partnership with SaveOnSP, you may be eligible for the J&J withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and/or other information, including information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the J&J withMe Savings Program. The use of your information will be governed by our **Privacy Policy**.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in J&J withMe at any time by calling 833-JNJ-wMe1 (833-565-9631).

**Need help?** Call **833-JNJ-wMe1** (833-565-9631)
Monday–Friday, 8:00 AM–8:00 PM ET
Multilingual phone support available

**Please read the full Prescribing Information for AKEEGA® and ERLEADA® and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 09/24 cp-465041v1

# EXHIBIT C

J&J withMe

PREZISTA® (darunavir) tablets
PREZCOBIX® (darunavir 800 mg/cobicistat 150 mg) tablets
Symtuza® darunavir/cobicistat/emtricitabine/tenofovir alafenamide tablets 800mg/150mg/200mg/10mg
EDURANT® (rilpivirine) tablets
INTELENCE® (etravirine) tablets

# Savings Program

**for eligible commercially insured patients**

## Pay $0 per fill

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply. For PREZISTA®, offer not valid for residents of CA or MA or for prescriptions filled in CA or MA. See program requirements on the following pages.




**Get instant savings on your out-of-pocket costs for your medicine from Johnson & Johnson. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

## Enroll and get a card

**Text "SAVINGS" to 89633**
(message and data rates may apply*)

**OR**

**Express Enrollment**
**Account.JNJwithMe.com**

Check eligibility, enroll, and receive an electronic Savings Program card that can be saved to your digital wallet on your iPhone or Android device.

You can use your Savings Program card when filling your prescription at a retail or mail-order pharmacy. If for any reason your pharmacy cannot process your card, please submit a Rebate Form to receive a check.

**You can also create a personalized J&J withMe Account at Account.JNJwithMe.com where you can:**

- Enroll in the J&J withMe Savings Program
- View and manage your Savings Program benefits
- Learn about your insurance coverage
- Sign up for treatment support

If you enroll in the Savings Program via Mobile or Express Enrollment, you will not be able to view and manage your Savings Program benefits until you create an account at **Account.JNJwithMe.com**.

Care Team members, such as Providers and Pharmacists, can enroll patients in the Savings Program at **Portal.JNJwithMe.com**.

*See **Terms** and **Privacy Policy**.

The support and resources provided by J&J withMe are not intended to provide medical advice, replace a treatment plan you receive from your doctor or nurse, or serve as a reason for you to start or stay on treatment.

**Please see full Prescribing Information, including Boxed Warning and Patient Information for SYMTUZA®, and discuss any questions you have with your doctor.**

**Please read full Prescribing Information for PREZISTA®, PREZCOBIX®, EDURANT®, and INTELENCE®, and discuss any questions you have with your doctor.**

J&J withMe

# J&J withMe Savings Program Requirements

## Am I eligible?

You may be eligible for the J&J withMe Savings Program if you meet the minimum age requirements in product labeling (PREZCOBIX® (darunavir 800 mg/cobicistat 150 mg), SYMTUZA® (darunavir/cobicistat/emtricitabine/tenofovir alafenamide), and EDURANT® (rilpivirine) 12 years, PREZISTA® (darunavir) 3 years, INTELENCE® (etravirine) 2 years), use commercial or private health insurance for your prescribed SYMTUZA®, PREZISTA®, PREZCOBIX®, EDURANT®, or INTELENCE®, and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as "accumulators" or "maximizers." These programs divert patient assistance funds away from patients.

- Accumulators don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient's annual deductible or out-of-pocket maximum.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the J&J withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have "non-essential health benefit maximizers" that conflict with the program requirements of the J&J withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as SYMTUZA®, PREZISTA®, PREZCOBIX®, EDURANT®, or INTELENCE® as "non-essential." This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the J&J withMe Savings Program.
- Please let J&J withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 866-836-0114 to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in J&J withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes SYMTUZA®, PREZISTA®, PREZCOBIX®, EDURANT®, or INTELENCE® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the J&J withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

*(continued on next page)*

**Please see full Prescribing Information, including Boxed Warning and Patient Information for SYMTUZA®, and discuss any questions you have with your doctor.**

**Please read full Prescribing Information for PREZISTA®, PREZCOBIX®, EDURANT®, and INTELENCE®, and discuss any questions you have with your doctor.**

J&J withMe

PREZISTA (darunavir) tablets
PREZCOBIX (darunavir 800 mg/ cobicistat 150 mg) tablets
Symtuza darunavir/cobicistat/emtricitabine/ tenofovir alafenamide tablets 800mg/150mg/200mg/10mg
EDURANT (rilpivirine) tablets
INTELENCE (etravirine) tablets

## J&J withMe Savings Program Requirements (cont'd)

### Other requirements

- **This program is only for people who meet the minimum age requirements (see above) using commercial or private health insurance who must pay an out-of-pocket cost for their prescribed SYMTUZA® (darunavir/cobicistat/emtricitabine/ tenofovir alafenamide), PREZISTA® (darunavir), PREZCOBIX® (darunavir 800 mg/cobicistat 150 mg), EDURANT® (rilpivirine), or INTELENCE® (etravirine). This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states. For PREZISTA®, offer not valid for residents of CA or MA or for prescriptions filled in CA or MA.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the J&J withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for SYMTUZA®, PREZISTA®, PREZCOBIX®, EDURANT®, or INTELENCE®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the J&J withMe Savings Program. If your health plan removes SYMTUZA®, PREZISTA®, PREZCOBIX®, EDURANT®, or INTELENCE® from its partnership with SaveOnSP, you may be eligible for the J&J withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and/or other information, including information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the J&J withMe Savings Program. The use of your information will be governed by our **Privacy Policy**.
- If your pharmacy can't process your Savings Program card, you may still be able to receive a rebate by submitting a rebate request. Rebate requests must be submitted within 365 days of the date of service.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories, excluding states noted above. Void where prohibited, taxed, or limited by law.

You may end your participation in J&J withMe at any time by calling 866-836-0114.

**Need help?** Call **866-836-0114**
Monday–Friday, 8:00 AM–8:00 PM ET
Multilingual phone support available

**Please see full Prescribing Information, including Boxed Warning and Patient Information for SYMTUZA®, and discuss any questions you have with your doctor.**

**Please read full Prescribing Information for PREZISTA®, PREZCOBIX®, EDURANT®, and INTELENCE®, and discuss any questions you have with your doctor.**

© Johnson & Johnson and its affiliates 2025 01/25 cp-08424v12

Johnson&Johnson

J&J withMe

Zytiga® abiraterone acetate




# Savings Program

**for eligible commercially insured patients**

## Pay $10 per month

Maximum program benefit per calendar year shall apply. Terms expire at the end of each calendar year. Offer subject to change or end without notice. Restrictions, including monthly maximums, may apply. Offer not valid for residents of CA or MA or for prescriptions filled in CA or MA. See program requirements on the following pages.

**Get instant savings on your out-of-pocket costs for ZYTIGA®. Depending on your health insurance plan, savings may apply toward co-pay, co-insurance, or deductible.**

## Enroll and get a card

**By phone**
855-ZYTIGA-1 (855-998-4421)

**OR**

**Express Enrollment**
**Account.JNJwithMe.com**

You can use your Savings Program card when filling your prescription at a pharmacy. If for any reason your pharmacy cannot process your card, please submit a rebate request at **Account.JNJwithMe.com/submitrebate** to receive a check. Or, you can submit a **Rebate Form** by mail.

**Online:**
Account.JNJwithMe.com/submitrebate

**Mail:**
J&J withMe Savings Program
2250 Perimeter Park Drive, Suite 300
Morrisville, NC 27560

Care Team members, such as Providers and Pharmacists, can enroll patients in the Savings Program at **Portal.JNJwithMe.com**.

The support and resources provided by J&J withMe are not intended to provide medical advice, replace a treatment plan you receive from your doctor or nurse, or serve as a reason for you to start or stay on treatment.

**Please read the full Prescribing Information and Patient Information for ZYTIGA® and discuss any questions you have with your doctor.**

J&J withMe

Zytiga® abiraterone acetate

## J&J withMe Savings Program Requirements

### Am I eligible?

You may be eligible for the J&J withMe Savings Program if you use commercial or private health insurance for your prescribed ZYTIGA® and must pay an out-of-pocket cost for your medicine. Participate without sharing your income information.

Some health plans have programs or benefit designs known as "accumulators" or "maximizers." These programs divert patient assistance funds away from patients.

- Accumulators don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum until the maximum value of the patient assistance is reached.
- Maximizers also don't allow patient assistance to count toward the patient's deductible and out-of-pocket maximum. Maximizers apply the full value of the patient assistance over the year. This could be either the same amount each month or a larger amount early in the year that tapers off, without allowing any of those funds to count toward the patient's annual deductible or out-of-pocket maximum.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. Thus, Johnson & Johnson reserves the right to reduce the J&J withMe Savings Program maximum benefit for patients in an accumulator or maximizer program or benefit design, except where prohibited by law.

In addition, some health plans have "non-essential health benefit maximizers" that conflict with the program requirements of the J&J withMe Savings Program.

- These programs or benefit designs, like the services offered by SaveOnSP, classify certain specialty medicines such as ZYTIGA® as "non-essential." This takes away protections for patients provided by the Affordable Care Act (ACA) related to maximum out-of-pocket limits.
- The J&J withMe Savings Program is designed solely for the benefit of the patient. If your insurance company or health plan partners with SaveOnSP, then except where prohibited by law, you will not be eligible for, and you agree not to use, the J&J withMe Savings Program.
- Please let J&J withMe know if your insurance company or health plan has one of these programs or benefit designs, including SaveOnSP, by calling 855-ZYTIGA-1 (855-998-4421) to discuss your options. Since you may not know you are subject to one of these programs or benefit designs when you enroll in J&J withMe, J&J will monitor your utilization.
- J&J reserves the right to discontinue cost support if you no longer meet eligibility requirements.
- If your health plan removes ZYTIGA® from its partnership with SaveOnSP or other non-essential health benefit maximizer, you may be eligible to be reinstated in the J&J withMe Savings Program.

By utilizing this Savings Program, you accept and agree to abide by these program requirements. Any individual or entity who enrolls or assists in the enrollment of a patient in the Savings Program represents that the patient meets the eligibility criteria and other requirements described.

*(continued on next page)*

**Please read the full Prescribing Information and Patient Information for ZYTIGA® and discuss any questions you have with your doctor.**

J&J withMe

Zytiga® abiraterone acetate

## J&J withMe Savings Program Requirements (cont'd)

### Other requirements

- **This program is only for people using commercial or private health insurance who must pay an out-of-pocket cost for their prescribed ZYTIGA®. This includes plans from the Health Insurance Marketplace.** This program is not for people who use any state or federal government-funded healthcare program. Examples of these programs are Medicare, Medicaid, TRICARE, Department of Defense, and Veterans Administration.
- By enrolling in this program, you agree that this program is intended solely for the benefit of you, the patient. You may not seek payment for the value received from this program from any health plan, patient assistance foundation, flexible spending account, or healthcare savings account.
- You must meet the program requirements every time you use the Savings Program.
- Program terms will expire at the end of each calendar year. The program may change or end without notice, including in specific states.
- Program participants are subject to an annual maximum benefit. Program benefits are set at the discretion of J&J and may change without notice.
- Patients who are subject to programs, health plans, or benefits that claim to **reduce** their patients' out-of-pocket co-pay, co-insurance, or deductible obligations for certain prescription drugs based upon the availability of, or patient's enrollment in, manufacturer-sponsored co-pay assistance for such drugs will be subject to a reduced annual maximum program benefit per calendar year (not applicable to patients in Maine).
- Patients who are subject to programs, health plans, or benefits that claim to **eliminate** their out-of-pocket costs are not eligible for the J&J withMe Savings Program, because this program is only for people who must pay an out-of-pocket cost for ZYTIGA®.
- Notwithstanding any other term of this program, patients who are members of health plans that partner with SaveOnSP, or who are subject to services administered by SaveOnSP, are not eligible for the J&J withMe Savings Program. If your health plan removes ZYTIGA® from its partnership with SaveOnSP, you may be eligible for the J&J withMe Savings Program.
- To use this program, you must follow any health plan requirements, including telling your health plan how much co-payment support you get from this program, if required. By using the Savings Program, you confirm that you have read, understood, and agree to the program requirements on this page, and you are giving permission for information related to your Savings Program transactions to be shared with your healthcare provider(s). These transactions include rebates and any funds placed on the card or balance remaining on the card.
- Before you enroll in the program, you will be asked to provide personal information that may include your name, address, phone number, email address, and/or other information, including information related to your prescription medicine insurance and treatment. This information is needed for Johnson & Johnson Health Care Systems Inc. and our service providers to enroll you in the J&J withMe Savings Program. The use of your information will be governed by our **Privacy Policy**.
- If your pharmacy can't process your Savings Program card, you may still be able to receive a rebate by submitting a rebate request. Rebate requests must be submitted within 365 days of the date of service.
- This program offer may not be used with any other coupon, discount, prescription savings card, free trial, or other offer. Offer good only in the United States and its territories. Void where prohibited, taxed, or limited by law.

You may end your participation in J&J withMe at any time by calling 855-ZYTIGA-1 (855-998-4421).

**Need help?**

Visit **JNJwithMe.com**

Call **855-ZYTIGA-1** (855-998-4421)

Monday–Friday, 8:00 AM–8:00 PM ET

**Please read the full Prescribing Information and Patient Information for ZYTIGA® and discuss any questions you have with your doctor.**

© Johnson & Johnson Health Care Systems Inc. 2024 10/24 cp-53381v10

Johnson&Johnson