Lowenstein Sandler

**Freda L. Wolfson**
Chief U.S. Dist. Judge (ret.)
Partner

One Lowenstein Drive
Roseland, New Jersey 07068

T: (862) 926-2708
F: (973) 597-2400
E: fwolfson@lowenstein.com

**SPECIAL MASTER LETTER ORDER**

**FILED UNDER SEAL**

July 24, 2026

***Via ECF and Email***
**TO ALL COUNSEL OF RECORD**

**RE: *Johnson & Johnson Health Care Systems, Inc. v. SaveOnSP, LLC, et al.*,**
**Civ. Action No.: 22-2632(CCC)(CF)**

Counsel:

On July 9, 2026, I heard oral argument on the motion to change expert report sequencing following the close of fact discovery, filed jointly by Accredo Health Group, Inc. ("Accredo"), Express Scripts, Inc. ("ESI"), and SaveOnSP, Inc. ("SaveOnSP or SaveOn"). Plaintiff Johnson & Johnson Health Care Systems, Inc. ("JJHCS" or "Plaintiff") also filed an informal motion, via email, requesting that I direct ESI and Accredo to provide sufficient responses to Plaintiff's revenue-related interrogatories concerning the SaveOnSP program. During oral argument, I rendered decisions on the record with respect to these motions. I now issue this Letter Order to memorialize my rulings, and where appropriate, to provide additional reasoning in support of those determinations.

## I. Defendants' Motion to Change Expert Report Sequencing

The parties dispute the sequence for exchanging expert reports following the close of fact discovery. Defendants seek to depart from the three-round expert schedule previously contemplated in the case and instead request a four-stage sequence under which JJCHS would first serve all affirmative expert reports on issues for which it bears the burden of proof, followed by Defendants' responsive reports and affirmative reports on their affirmative defenses, then JJHCS's replies and responses, and finally Defendants' reply reports. JJHCS opposes any modification to the existing framework, arguing that the current three-round schedule has governed the case since its inception, adequately protects both parties' interests, and should simply be assigned new dates.

More specifically, Defendants posit that Rule 26 affords the Court broad discretion to determine both the timing and sequence of expert disclosures and contend that a revised schedule is necessary because of the interaction between JJHCS's damages case and Defendants' affirmative defense of failure to mitigate. Defendants maintain that although mitigation is an affirmative defense on which they bear the burden of proof, it necessarily responds to JJHCS's payment-by-payment damages claims. They assert that JJHCS must first identify the specific payments for which it seeks damages before Defendants can meaningfully evaluate which payments allegedly could have been avoided and prepare patient-specific mitigation opinions. According to Defendants, simultaneous opening reports would force them either to (1) submit incomplete mitigation opinions without patient-level

analysis, (2) present affirmative mitigation opinions in what would ordinarily be a responsive report, thereby forfeiting a reply report on an issue for which they bear the burden of proof, or (3) speculate regarding JJHCS's damages theories before those theories are disclosed. They contend that none of these alternatives is fair or consistent with the purpose of expert discovery.

JJHCS opposes any change to the existing expert disclosure framework and argues that I should simply establish new deadlines using the same three-round sequence that has governed the case since 2022. Under that framework, all parties simultaneously exchange opening reports on issues for which they bear the burden of proof, followed by responsive reports and then reply reports. JJHCS notes that the parties jointly proposed this structure on multiple occasions and that it was repeatedly adopted in prior scheduling orders.

Furthermore, JJHCS argues that Defendants have failed to demonstrate good cause to modify the existing structure. It contends that Defendants seek not merely new dates but a fundamental alteration of the parties' disclosure obligations, including creation of a fourth round of expert reports. JJHCS maintains that Defendants' reliance on mitigation does not justify such a change because the mitigation defenses pleaded by Defendants principally concern JJHCS's alleged company-wide policies rather than individualized payment determinations. JJHCS further argues that Defendants already possess the patient-level information—such as Benefits Investigations and Patient Segmentation Decisions—that they identify as necessary to prepare their mitigation opinions, and therefore do not need to review

JJHCS's damages report before preparing their own affirmative expert opinions. JJHCS also argues that the existing schedule already permits Defendants to respond to JJHCS's damages analysis through responsive expert reports, and that Defendants are effectively seeking an additional opportunity to address damages by creating a fourth round of expert reports that would allow them the last word on issues for which JJHCS bears the burden of proof.

Fed. R. Civ. P. 26(a)(2)(D) governs the timing of expert disclosures. It provides:

> A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:
>
> > (i) at least 90 days before the date set for trial or for the case to be ready for trial; or
> > (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

There is no general rule on whether mitigation of damages properly falls within the scope of initial or rebuttal report.[1] *Compare, e.g., Rodriguez v. Walt Disney Parks & Resorts U.S., Inc.*, No. 17-01314, 2018 U.S. Dist. LEXIS 123707, at *7 (C.D.

[1] A rebuttal report should be stricken if it contains new opinions or information which is contradictory to that set forth in first expert's first report. *See Stein v. Foamex Int'l, Inc.*, No. 00-2356, 2001 U.S. Dist. LEXIS 12211, at *14 (E.D. Pa. Aug. 15, 2001). However, a rebuttal report is permissible "if it contains merely 'an elaboration of and [is] consistent with an opinion/issue previously addressed' in the expert report." *Pritchard v. Dow Agro Scis.*, 263 F.R.D. 277, 285 (W.D. Pa. 2009) (quoting *Emcore Corp. v. Optium Corp.*, Civ. A. No. 06-1202, 2008 U.S. Dist. LEXIS 59794, at *11 (W.D. Pa. Aug. 5, 2008) (citing *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006))); *Fulton Fin. Advisors v. Natcity Invs.*, No. 09-4855, 2016 U.S. Dist. LEXIS 134212, at *5 (E.D. Pa. Sep. 28, 2016).

Cal. July 2, 2018) (finding mitigation testimony exceeded the scope of rebuttal when the initial expert did not mention mitigation and defendant carried the burden of proof on the affirmative defense) *with Humphreys v. Regents of Univ. of California*, No. 04-03808, 2006 U.S. Dist. LEXIS 47822, at *18 (N.D. Cal. July 6, 2006) (holding mitigation testimony was proper rebuttal because it exposed "a potential flaw" in the affirmative expert's method of calculating damages); *Hellman-Blumberg v. Univ. of Pac.*, No. 12-00286, 2013 U.S. Dist. LEXIS 94979, at *10 (E.D. Cal. July 8, 2013) (finding mitigation testimony was appropriate rebuttal to an initial report addressing future expected earnings). Having surveyed relevant cases, determining the timing of the reports depends on the content of the mitigation report; that is, whether the report discusses issues that transcend a party's initial report or it introduces new concepts and evidence that goes well beyond rebuttal.

As a threshold matter, I find that Rule 16(b)(4)'s good-cause requirement does not govern the present dispute. Rule 16 applies to modifications of an operative scheduling order. Here, however, the expert discovery deadlines contained in the prior scheduling order expired without ever becoming operative, as I repeatedly recognized that new deadlines would need to be established following resolution of the parties' extensive and ongoing written discovery disputes. Throughout discovery, I intentionally refrained from fixing replacement expert deadlines because the timing of expert discovery necessarily depended upon the completion of document production, resolution of privilege disputes, and the substantial completion of fact discovery. Those issues remain extant. Accordingly, I am not modifying an existing operative

schedule, but rather establishing a new one in light of the current posture of the litigation.

In any event, even assuming Rule 16(b)(4) applies, I find that Defendants have demonstrated good cause. The basis for Defendants' requested modification did not arise from mere reconsideration of an earlier agreed-upon schedule, but from developments during discovery concerning the nature of Plaintiff's damages case and Defendants' mitigation defense. Defendants represent that the evidence necessary to formulate their mitigation opinions—including the patient-level information underlying Plaintiff's damages claims—has been obtained through discovery and informs their position that meaningful mitigation opinions cannot be fully developed until Plaintiff's affirmative damages opinions are disclosed. I am satisfied that Defendants' request is based on information learned during discovery rather than undue delay or tactical maneuvering. I therefore conclude that, even if Rule 16's good cause standard governs, Defendants have satisfied that standard.

As a Special Discovery Master, I have broad discretion to determine the timing and sequence of expert disclosures. The dispute here ultimately turns on the nature of Defendants' anticipated mitigation expert testimony. Defendants characterize the mitigation report as necessarily responsive to JJHCS's damages case, arguing that meaningful mitigation opinions cannot be formulated until JJHCS identifies the specific payment-by-payment damages it seeks. JJHCS, by contrast, contends that Defendants' mitigation theories are based primarily on company-wide policies and practices, and therefore, constitute affirmative expert testimony that should be

disclosed in Defendants' initial expert reports, regardless of JJHCS's damages calculations.

At this juncture, it is unclear which characterization is more accurate. Thus, it is difficult to assess whether Defendants' mitigation opinions will merely rebut JJHCS's damages calculations or whether they will instead advance affirmative opinions regarding JJHCS's alleged company-wide conduct and mitigation policies that go beyond responding to JJHCS's expert analyses. Indeed, it is also plausible that Defendants' mitigation report will contain both types of opinions—that is, affirmative opinions concerning JJHCS's overall mitigation efforts together with rebuttal opinions addressing JJHCS's payment-specific damages calculations.

Given this uncertainty, I recognize Defendants' concern that meaningful patient-by-patient mitigation opinions cannot be formulated until JJHCS first discloses its affirmative damages analyses. Accordingly, while I will maintain the existing three-round expert disclosure framework, I will permit Defendants, solely with respect to their affirmative defense of mitigation, to serve their affirmative mitigation opinions—including any patient-by-patient mitigation analyses—in their responsive expert report after service of JJHCS's initial expert report. Defendants shall not be required to disclose those mitigation opinions in the first round of expert reports.

In addition, if JJHCS's reply expert report raises new mitigation-related opinions or analyses that could not reasonably have been anticipated in Defendants' responsive report, Defendants may, if necessary, serve a limited supplemental reply

mitigation expert report. Any such report shall be confined solely to responding to new mitigation-related opinions or analyses first advanced in JJHCS's reply report and shall not permit Defendants to assert new affirmative opinions that could have been included in their earlier expert disclosures. This approach preserves the existing three-round scheduling framework, yet affords Defendants a fair opportunity to respond to JJHCS's affirmative damages case, and avoids unnecessarily expanding expert discovery. As I explained during the hearing, this limited accommodation applies only to Defendants' affirmative defense of mitigation, which was the only affirmative defense fully briefed and argued before me. Accordingly, any expert opinions concerning Defendants' other affirmative defenses—for which they have the burden of proof—shall be disclosed in Defendants' initial affirmative expert report(s) in the first round of expert disclosures.[2]

For the foregoing reasons, I will maintain the parties' existing three-stage expert disclosure sequence, subject only to the limited mitigation-related supplementation described above, if warranted. I will permit approximately thirty (30) days between each round of expert disclosures. Upon completion of the final round of expert reports, the parties shall have sixty (60) days to complete all expert depositions. The chart below reflects this sequencing. I find that this schedule appropriately balances the parties' need for adequate time to prepare expert opinions with the Court's interest in moving this litigation.

[2] To the extent there are other affirmative defenses of which Defendants are seeking a different sequencing, like their mitigation defense discussed herein, they must separately move for that relief.

**Court's Expert Disclosure Schedule**

| Event | Deadline |
|---|---|
| Initial Expert Reports | March 1, 2027 |
| Responsive Expert Reports | April 1, 2027 |
| Reply Expert Reports | May 1, 2027 |
| Limited Mitigation Supplemental Reply Report (if necessary) | June 1, 2027 |
| Depositions of All Experts | August 1, 2027 |

## II. Substantial Completion of Document Production

The parties agree that a substantial completion deadline should be established but disagree as to whether the record permits a date to be set at this time. JJHCS requests that I set a July 24, 2026 deadline for substantial completion of document production and proceed to establish the remaining discovery schedule. JJHCS contends that any additional productions resulting from pending privilege rulings or in camera review would not undermine a substantial completion deadline because such supplemental productions would be limited in scope.

Defendants, by contrast, argue that a substantial completion deadline should not be set until all pending discovery issues are resolved and JJHCS completes all required productions. Defendants maintain that setting a deadline now risks requiring depositions and further discovery before document production is materially complete. Below are four issues that Defendants argue must be resolved before discovery can be deemed substantially complete.

1. **RIS Rx Documents**. Defendants contend that JJHCS has not completed its court-ordered production from RIS Rx because internal RIS Rx materials remain outstanding, such as emails, Teams messages, spreadsheets, or presentations, and questions remain regarding the custodians and search methodology used to collect the documents. Defendants maintain that JJHCS should complete the production and certify that the proper collection methodology was employed before substantial completion is declared. JJHCS responds that it continues to supplement its RIS Rx production and expects to complete any remaining production on its proposed timetable, *i.e.*, July 24, 2026, arguing that this issue should not delay the overall discovery schedule. During the hearing, Plaintiff represented on the record that any and all RIS Rx documents will be produced before July 24, 2026. I am satisfied with this representation.

2. **Case-and-Task Notes**. Defendants contend that JJHCS has not fully complied with the prior discovery order concerning Case-and-Task Notes because it intends to search only for the term "SavOn," rather than additional reasonable variations that Defendants believe are necessary to identify all responsive entries. JJHCS maintains that it is complying with my prior order and disputes that additional search terms are required. I explained during the hearing that it was my intention to direct Plaintiff to search all variation of SaveOnSP misspellings identified by Defendants. As such, I direct that search to be performed and this issue will not impact the substantial completion deadline.

3. **CAPm Exceptions**. Defendants assert that JJHCS has not fully answered the interrogatory concerning CAPm exceptions because it seeks to limit its response to patients enrolled in SaveOn-advised plans, notwithstanding my prior ruling directing a broader response concerning CAPm patients. JJHCS responds that requiring a patient-by-patient investigation of all identified CAPm patients is unduly burdensome and proposes limiting its response to approximately 150 SaveOnSP patients. Having considered the parties' arguments, I concluded that my prior ruling was not intended to be limited to SaveOnSP patients. Nevertheless, because the record was insufficient to assess the actual burden associated with responding on a patient-by-patient basis, I adopted an interim compromise. Specifically, I directed JJHCS to supplement its interrogatory response as to all identified SaveOnSP patients (approximately 150) and an additional 100 non-SaveOnSP patients selected by Defendants. I further directed that, after completing those responses, the parties could return to me, if necessary, to address whether any additional supplementation was warranted in light of the burden demonstrated by that initial production. Again, this issue will not impact setting a substantial completion date.

4. **Quality Control Review**. Defendants argue that JJHCS's repeated production of previously withheld responsive documents during its quality-control review raises questions regarding the adequacy of its responsiveness review and the reliability of its document production. Specifically, Defendants contend that responsive documents should have been produced years earlier, seek an explanation for why the quality-control reviews occurred late in discovery, and request additional

information concerning the procedures employed, the reviewers involved, and the basis for JJHCS's confidence that all responsive documents have now been produced. Defendants also argue that these concerns should be resolved before JJHCS's production of documents is deemed substantially complete. JJHCS responds that its later productions resulted from customary quality-control measures undertaken near the close of fact discovery, as well as evolving responsiveness determinations following subsequent rulings. JJHCS further represents that it has completed its quality-control review, is confident that its responsiveness determinations are accurate, and will continue to supplement its productions as required by Rule 26(e) should additional responsive documents be identified.

During the hearing, I determined that these issues would not delay the substantial completion deadline. However, to address Defendants' concerns, I directed JJHCS to provide additional information describing its quality-control process, including: (1) whether outside litigation counsel and internal counsel performed the delayed quality-control review; (2) the manner in which the quality-control review was conducted, including how documents were selected for review; (3) why JJHCS is confident that the review identified all responsive documents; (4) the number of documents produced as a result of the quality-control review; and (5) any other basic information sufficient to explain the process employed. I further directed

JJHCS to provide this information to Defendants by July 17 2026,[3] after which the parties could raise any remaining dispute with me, if necessary.

Having resolved the four outstanding issues raised by Defendants, I find it appropriate to set a substantial completion date for written discovery of **August 14, 2026**. The deadline for the completion of fact discovery shall be **February 1, 2027**.

## III. Revenue Interrogatories

This discovery dispute concerns whether Defendants have complied with the Court's March 12, 2026 Order directing responses to Plaintiff's revenue interrogatories concerning the SaveOnSP program. The parties disagree over the scope of that Order and whether Defendants' supplemental interrogatory responses satisfy their discovery obligations. In the March 12, 2026 Letter Order, I concluded that revenue information was relevant only to the extent it illuminated the overall scope of the SaveOnSP program and Defendants' financial incentive, but rejected Plaintiff's request for a comprehensive, drug-by-drug accounting of revenue, particularly as to non-Janssen products. I found that aggregated or summary revenue information would appropriately balance relevance and proportionality and noted that Defendants had agreed to answer a targeted interrogatory identifying the topline revenue for all drugs included in the SaveOnSP program. In that regard, I directed Defendants to answer the revenue interrogatories by providing a means to derive the

[3] Since this Letter Order is being issued after the deadline set during the hearing, I note that Plaintiff has provided Defendants with the information I directed concerning its quality-control review process, and I have not received any further objections from Defendants.

yearly topline revenue for the SaveOnSP program as a whole, while rejecting a drug-by-drug revenue breakdown, and further holding that Rule 33(d) did not permit Defendants simply to refer Plaintiff to voluminous financial data without meaningful guidance.

**1. Topline Revenue Figures**

Plaintiff contends that Defendants have not complied with the Letter Order because they have not provided the yearly topline revenue figures for the SaveOnSP program. Plaintiff argues that, although Defendants identified numerous spreadsheets and datasets, they have not supplied a direct interrogatory response identifying the requested revenue, nor have they confirmed the accuracy of Plaintiff's calculations derived from the produced data. Plaintiff further asserts that the data production contains ambiguities, including negative values, duplicative information, and undefined fields, making it impossible to determine with certainty whether Plaintiff's calculations accurately reflect Defendants' revenue. Plaintiff therefore requests that Defendants either provide narrative yearly revenue figures or verify the calculations Plaintiff derived from the data.

Defendants respond that the Letter Order required only that they provide instructions identifying how yearly topline revenue could be derived from their business records, not that they calculate, verify, or certify Plaintiff's calculations. Defendants contend that they complied with the Order by identifying the relevant datasets, specifying the applicable fields, and providing a methodology for calculating yearly revenue. According to Defendants, neither Rule 33(d) nor the Letter Order

requires them to validate Plaintiff's work product or provide narrative interrogatory responses after furnishing sufficient instructions to derive the requested information.

Following the completion of briefing, Plaintiff sent another email to me advising that testimony obtained during the deposition of former Accredo Senior Clinical Account Executive, Scott Stapleton, further supports Plaintiff's position that Defendants routinely track and report revenue associated with the SaveOnSP program such that it would not be a burden to provide topline revenue numbers. Specifically, Plaintiff points to testimony that SaveOnSP-related revenue was considered as one component of Mr. Stapleton's performance metrics and testimony concerning internal marketing materials reporting "CPA revenue," which Plaintiff contends demonstrates that Defendants maintain and update revenue information associated with copay assistance programs. Defendants respond that the deposition testimony does not alter the issues presented by the pending motion. According to Defendants, Mr. Stapleton did not testify that ESI or Accredo maintains the yearly SaveOnSP topline revenue sought by the interrogatories, did not identify whether the referenced revenue pertained to ESI and Accredo, and explained that the "CPA revenue" figures reflected total copay assistance processed by Accredo rather than SaveOnSP-specific revenue. Defendants therefore insist that Mr. Stapleton's testimony does not establish that responsive revenue information has been withheld.

The parties' dispute is not whether Defendants provided supplemental interrogatory responses or whether they identified datasets from which revenue information could be derived. Rather, the dispute concerns whether those responses

satisfy the March 12, 2026 Letter Order. In that Order, I rejected Plaintiff's request for a comprehensive drug-by-drug accounting of revenue and instead adopted a "middle-ground approach." I found that aggregated or summary revenue information was sufficient to demonstrate the overall scale of the SaveOnSP program and Defendants' financial incentive while avoiding unnecessarily granular disclosures. Consistent with that approach, Defendants were directed, and they agreed, to answer the interrogatories by providing instructions enabling Plaintiff to derive the yearly topline revenue for the SaveOnSP program, rather than requiring a drug-by-drug analysis.

Indeed, Plaintiff does not dispute that Defendants supplied a methodology. Rather, Plaintiff argues that the methodology has proven deficient in practice. According to Plaintiff, after following Defendants' instructions, it encountered issues including negative values, apparent duplicative data, and other ambiguities that prevented it from determining whether its calculations accurately reflected Defendants' yearly topline revenue. Plaintiff further contends that Defendants declined to provide additional clarification regarding those issues, leaving Plaintiff unable to determine with confidence whether it had correctly derived the information sought by the interrogatories.

The dispositive question is not whether Defendants provided some methodology, but whether the methodology they provided was sufficiently complete to accomplish the purpose of my directives. If Plaintiff followed Defendants' prescribed methodology and nevertheless encountered material ambiguities that

prevented it from reliably deriving the yearly topline revenue—and if those ambiguities could only be resolved by Defendants because of their superior knowledge of their own financial systems—then the objectives underlying my prior Order have not been fully realized. Conversely, if the remaining disputes concern only Plaintiff's own calculations or analytical choices, the Letter Order does not require Defendants to verify Plaintiff's work or independently calculate the requested figures.

Moreover, the Stapleton deposition testimony is relevant to the extent it demonstrates that Defendants internally measured revenue generated by the SaveOnSP program for at least some business purposes. Mr. Stapleton testified that when clients implemented the SaveOnSP solution, the program generated "additional revenue to the organization," that such revenue was measured, and that the resulting revenue metric was one component of the margin metric used in evaluating his performance and bonus compensation. That testimony supports Plaintiff's contention that Defendants, in some degree, tracked SaveOnSP-related revenue in the ordinary course of business and supports Plaintiff's contention that Defendants maintained internal revenue metrics associated with the SaveOnSP program and raises a legitimate question whether those metrics differ from the annual topline revenue sought by the interrogatories.

During oral argument, it became apparent that the parties had reached an impasse on whether the methodology contemplated by my prior Letter Order resolved the revenue discovery request. Plaintiff represented that, despite following Defendants' instructions, it remained unable to determine with confidence whether

its calculations accurately reflected Defendants' yearly topline revenue. Defendants, in turn, maintained that they would not verify Plaintiff's calculations and instead asserted that, if required to provide yearly topline revenue themselves, they would perform their own calculations from the same underlying data. As I observed during the hearing, this placed the parties on an endless cycle in which Plaintiff would calculate a figure, Defendants would dispute it, and Defendants would ultimately undertake their own calculation in any event. Under those circumstances, requiring Plaintiff to continue attempting to derive the information no longer served the purpose of my prior Order.

In light of the parties' continued disagreement and the practical difficulties discussed during the hearing, I concluded that further disputes regarding Plaintiff's calculations would not meaningfully advance discovery. Accordingly, I directed Defendants to provide direct answers to the interrogatories identifying the yearly topline revenue for the SaveOnSP program. Defendants may include any appropriate qualifications or caveats concerning the calculations, including that experts may ultimately disagree with the methodology employed, but they shall provide their own revenue figures rather than requiring Plaintiff to continue deriving those figures from the underlying data. I further directed that Defendants provide those figures through the end of calendar year 2024. Any subsequent supplementation or refresh shall occur in accordance with the parties' agreed-upon refresh schedule applicable to other discovery, which, as represented during the hearing, coincides with the substantial completion deadline.

### 2. Scope of Accredo's Revenue Response

Plaintiff contends that Accredo's response remains incomplete because it is limited to transactions involving Johnson & Johnson products rather than revenue associated with the SaveOnSP program as a whole, which includes products manufactured by other companies. Plaintiff argues that the March 12, 2026 Letter Order adopted a program-wide approach by directing Defendants to provide topline revenue for all drugs included in the SaveOnSP program while rejecting only Plaintiff's request for a drug-by-drug breakdown. Plaintiff therefore maintains that Accredo must provide aggregated revenue for the entire SaveOnSP program rather than limiting its response to a subset of products.

Defendants respond that Accredo has fully complied with the Letter Order. They maintain that Accredo does not generate separate SaveOnSP revenue beyond the pharmacy payments it ordinarily receives for dispensing prescriptions and that its supplemental response exceeded what the Order required by identifying data from which Plaintiff could calculate payments associated with SaveOnSP patients receiving Johnson & Johnson products. Defendants further contend that requiring Accredo to compile revenue information across all manufacturers would impose a substantial burden because Accredo does not maintain program-wide SaveOnSP revenue in the ordinary course of business. According to Defendants, calculating such revenue would require collecting and analyzing tens to hundreds of millions of additional transaction records at considerable expense and would exceed the proportional limits recognized in the March 12, 2026 Letter Order.

During the hearing, Defendants renewed their contention that Accredo's response could properly be limited to Johnson & Johnson products because compiling program-wide revenue would be unduly burdensome. I rejected that position, explaining that my prior Letter Order imposed no such limitation and instead required discovery directed to topline revenue for the SaveOnSP program as a whole. My March 12, 2026 Letter Order expressly rejected a drug-by-drug approach in favor of aggregated, program-wide revenue information and noted that Defendants had agreed to identify topline revenue for all drugs included in the SaveOnSP program. Nothing in that Order distinguishes between ESI and Accredo or authorizes Accredo to satisfy its obligations by limiting its response to a single manufacturer's products.

Accredo's present position largely reprises the relevance, proportionality, and burden arguments advanced during the original motion practice. Those arguments were fully considered when I adopted the middle-ground approach reflected in the March 12, 2026 Letter Order and do not justify narrowing the scope of the discovery previously ordered. Moreover, limiting Accredo's response to Johnson & Johnson products would undermine the very purpose of that Order, which sought aggregated, program-wide revenue information to illuminate the overall financial significance of the SaveOnSP program, rather than revenue attributable to any individual manufacturer. Accordingly, Accredo shall supplement its interrogatory response by providing aggregated revenue information for the SaveOnSP program consistent with the March 12, 2026 Letter Order.

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson (ret.)
Special Master